# EXHIBIT A1

-----BEGIN PRIVACY-ENHANCED MESSAGE-----
Proc-Type: 2001,MIC-CLEAR
Originator-Name: webmaster@www.sec.gov
Originator-Key-Asymmetric:
MFgwCgYEVQgBAQICAf8DSgAwRwJAW2sNKK9AVtBzYZmr6aGjlWyK3XmZv3dTINen
TWSM7vrzLADbmYQaionwg5sDW3P6oaM5D3tdezXMm7z1T+B+twIDAQAB
MIC-Info: RSA-MD5,RSA,
FgEndj9MZqxRzEplMIWC7LX2Y0RWyrH2C9av9xx4PmDlgduHOBKGm7zPrS5Z+uE5
E0xFXfHcNrbi6QyPgu+b+Q==

<SEC-DOCUMENT>0000897101-05-001462.txt : 20050628
<SEC-HEADER>0000897101-05-001462.hdr.sgml : 20050628
<ACCEPTANCE-DATETIME>20050628163522

ACCESSION NUMBER: 0000897101-05-001462
CONFORMED SUBMISSION TYPE: 10-K/A
PUBLIC DOCUMENT COUNT: 7
CONFORMED PERIOD OF REPORT: 20041231
FILED AS OF DATE: 20050628
DATE AS OF CHANGE: 20050628

FILER:

COMPANY DATA:
COMPANY CONFORMED NAME: INTRICON CORP
CENTRAL INDEX KEY: 0000088790
STANDARD INDUSTRIAL CLASSIFICATION: ELECTRONIC COMPONENTS & ACCE
IRS NUMBER: 231069060
STATE OF INCORPORATION: PA
FISCAL YEAR END: 1231

FILING VALUES:
FORM TYPE: 10-K/A
SEC ACT: 1934 Act
SEC FILE NUMBER: 001-05005
FILM NUMBER: 05921241

BUSINESS ADDRESS:
STREET 1: 1260 RED FOX ROAD
CITY: ARDEN HILLS
STATE: MN
ZIP: 55112
BUSINESS PHONE: 6516369770

MAIL ADDRESS:
STREET 1: 1260 RED FOX ROAD
CITY: ARDEN HILLS
STATE: MN
ZIP: 55112

FORMER COMPANY:
FORMER CONFORMED NAME: SELAS CORP OF AMERICA
DATE OF NAME CHANGE: 19920703

</SEC-HEADER>
<DOCUMENT>
<TYPE>10-K/A
<SEQUENCE>1
<FILENAME>int052815_10ka.txt
<TEXT>

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION

Washington, D.C. 20549

FORM 10-K/A

[X] ANNUAL REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the fiscal year ended December 31, 2004

or

[ ] TRANSITION REPORT PURSUANT TO SECTION 13 or 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934

For the transition period from ____________ to ____________.

Commission File Number 1-5005

INTRICON CORPORATION

(Exact name of registrant as specified in its charter)

| Pennsylvania | 23-1069060 |
|---|---|
| (State or other jurisdiction of Incorporation or organization) | (I.R.S. Employer Identification No.) |
| 1260 Red Fox Road<br>Arden Hills, Minnesota | 55112 |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code (651) 636-9770

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Name of each exchange on which registered |
|---|---|
| Common Shares, $1 par value per share | American Stock Exchange |

Securities registered pursuant to Section 12(g) of the Act: None

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes [X] No [ ]

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. [ ]

Indicate by check mark whether the registrant is an accelerated filer (as defined in Exchange Act Rule 12b-2 of the Act) Yes [ ] No [X]

The aggregate market value of the voting common shares held by non-affiliates of the registrant on June 30, 2004 was $7,080,846. Common shares held by each officer and director and by each person who owns 10% or more of the outstanding common shares have been excluded in that such persons may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

The number of outstanding shares of the registrant's common shares on March 18, 2005 was 5,129,214.

<PAGE>

DOCUMENTS INCORPORATED BY REFERENCE

Portions of the Company's amended 2004 annual report to shareholders are incorporated by reference into Part II of this report. Portions of the Company's definitive proxy statement for the 2005 annual meeting of shareholders are incorporated by reference into Part III of this report; provided, however, that the Compensation Committee Report, The Audit committee Report, the graph showing the performance of the Company's stock and any other information in such Proxy Statement that is not required to be included in this Annual Report on Form 10-K, shall not be deemed to be incorporated herein or filed for the purposes of the Securities Act of 1933 or the Securities Exchange Act of 1934. Except for the parts of such documents that have been specifically incorporated herein by reference, such documents shall not be deemed "filed" for the purposes of this report.

<PAGE>

EXPLANATORY NOTE

We are filing this Amendment No. 1 to our Annual Report on Form 10-K for the fiscal year ended December 31, 2004 as filed with the Securities and Exchange Commission (SEC) on April 1, 2005 to reflect the restatement of the Company's financial statements, as discussed in Note 2 to Consolidated Financial Statements, and other information related to such restated financial statements. Except for information contained or incorporated by reference in Items 1, 6, 7, 8, 9A, and 15 or described herein, no other information included in the original Annual Report on Form 10-K is amended by this Form 10-K/A. We are also updating the table of contents, the signature page and certifications contained in exhibits 31.1, 31.2, 32.1 and 32.2.

Items not being amended are presented for the convenience of the reader only. This report continues to be presented as of the date of the original Annual Report on Form 10-K and the Company has not updated the disclosure in this report to a later date. Therefore, this amendment should be read together with other documents that the Company has filed with the Securities and Exchange Commission subsequent to the filing of the original Annual Report on Form 10-K. Information in such reports and documents updates and supersedes certain information contained in this amendment.

<PAGE>

Table of Contents

| | | Page No. |
|---|---|---|
| PART I | | |
| Item 1. | Business | 5 |
| Item 2. | Properties | 16 |
| Item 3. | Legal Proceedings | 16 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 17 |
| Item 4A. | Executive Officers of the Registrant | 17 |
| PART II | | |
| Item 5. | Market for Registrant's Common Equity Related Stockholder Matters and Issuer Purchases of Equity Securities | 18 |
| Item 6. | Selected Financial Data | 18 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 18 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 18 |
| Item 8. | Financial Statements and Supplementary Data | 19 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 19 |
| Item 9A. | Controls and Procedures | 19 |
| Item 9B. | Other Information | 20 |
| PART III | | |
| Item 10. | Directors and Executive Officers of the Registrant | 21 |
| Item 11. | Executive Compensation | 22 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Shareholder Matters | 22 |
| Item 13. | Certain Relationships and Related Transactions | 22 |
| Item 14. | Principal Accounting Fees and Services | 22 |
| PART IV | | |
| Item 15. | Exhibits, Financial Statement Schedules | 23 |
| SIGNATURES | | 28 |

<PAGE>

PART I

ITEM 1. Business

IntriCon Corporation, formerly Selas Corporation of America (together with its subsidiaries referred herein as the "Company")is an international firm with operations and sales that engages in the design, development, engineering and manufacturing of micro-miniature components, systems and molded plastic parts

primarily for the hearing instrument, electronics, telecommunications, computer and medical equipment industries. The Company, headquartered in Arden Hills, Minnesota has facilities in Minnesota, California, Singapore, and Germany, and operates directly or through subsidiaries. Within discontinued operations, the Company has facilities in Pennsylvania, Japan and Germany. The Company is a Pennsylvania corporation that was founded in 1930.

Currently, the Company has one operating segment, its precision miniature medical and electronics products segment. In the past the Company had operated three segments, precision miniature medical and electronics products segment, heat technology segment, and tire holders, lifts and related products segment. Since 2001, the Company began focusing on its precision miniature medical and electronics products segment and developing plans to exit the businesses that comprised the heat technology segment, and tire holders, lifts and related products segment. The Company exited the tire holders, lifts and related products business in 2003 and the heat technology segment in the first quarter of 2005. For fiscal year 2004, the Company classified its heat technology segment as discontinued operations.

RECENT DEVELOPMENTS

Sale of Burners and Components Business - In the first quarter of 2005, the Company sold the remainder of its Heat Technology segment. The total purchase price was approximately $3.6 million, subject to adjustment, of which approximately $2.7 million was paid in cash and $900,000 was paid in the form of a subordinated promissory note. This segment consisted of the operating assets and liabilities of Selas Corporation of America (Dresher, Pennsylvania), Nippon Selas (Tokyo, Japan) and Selas Waermetechnik GmbH (Ratingen, Germany). This business was classified as a discontinued operation in 2004. For more detailed information, see note 2 to the Consolidated Financial Statements included herein.

With the completed sale of the burner and components business, the Company has successfully completed the shift from its traditional business segments to the emerging prospects in its precision miniature medical and electronic products business. To reflect the Company's redefined focus, it has changed it name to IntriCon Corporation.

MAJOR EVENTS IN 2004

Sale of Dresher Property - On June 23, 2004, the Company completed the sale of its property in Dresher, PA, to BT Limekiln LP, a Pennsylvania limited partnership, for approximately $3.6 million in cash, net of expenses. A gain of $3.1 million was recognized on the sale. The property was the headquarters for the Company's discontinued Heat Technology business and was previously classified as an asset held for sale on the Company's consolidated balance sheet. In connection with the sale, the Company leased back the property for a term of nine months at a base rental of $20,000 per month, plus expenses. Proceeds of the sale were used to reduce the Company's outstanding bank debt.

Reduction of Overhead - In 2004, the Company experienced weakness in the hearing health markets. The weakness was due to competitive pricing pressures, customer inventory management programs resulting in more just-in-time inventory, and unfavorable legislation in the German market reducing the reimbursement amount for the purchase of hearing aids. These factors resulted

<PAGE>

in both reduced sales and lower product margins. In an effort to return to operating profitability, the Company took steps during 2004 to reduce its overhead. These steps included the elimination of several management and other support positions, resulting in an annualized savings of over $3 million.

Reacquisition of Selas Waermetechnik - In the third quarter of 2004, the Company reacquired Selas Waermetechnik GmbH, which was previously part of Selas SAS. Selas SAS filed insolvency in July of 2003. Since that time, Selas Waermetechnik GmbH was under the control of a French court administrator. The Company owned the rights to the Selas name and the technology for the European market. This enabled the Company to reacquire the subsidiary for the minimal amount of $10,500 and record an extraordinary gain within discontinued operations of approximately $684,000 on the acquisition. The Company sold this subsidiary during the first quarter of 2005, as part of its Burners and Components business; therefore it has classified the subsidiary as a discontinued operation. See note 3 of the consolidated financial statements for further information regarding this issue.

MAJOR EVENTS IN 2003

SALE OF DEUER MANUFACTURING - In July 2003, the Company completed the planned sale of its Tire Holders, Lifts and Related Products segment. This segment consisted of one wholly owned subsidiary, Deuer Manufacturing Inc. (Deuer), which operated on a stand-alone basis. In 2003, prior to its sale, Deuer generated approximately $8.5 million of revenue and $8,000 in net income. The net purchase price of $6.6 million was determined by negotiations between the parties. The Company recognized a gain of approximately $1.5 million, net of tax, on the transaction. Proceeds from the transaction were used primarily to reduce the Company's outstanding bank debt. The Company classified the subsidiary as a discontinued operation beginning in December 2002. For more detailed information, see note 2 to the Consolidated Financial Statements included herein.

INSOLVENCY OF FRENCH SUBSIDIARY - Selas SAS, the Company's French subsidiary, filed insolvency in France in July 2003 after four consecutive quarters of substantial losses. Under French law, Selas SAS is now under the control of a French insolvency court administrator. Because Selas SAS and its subsidiaries are no longer under the control of the Company, its results of operations are excluded from the Company's continuing operations and the Company's historical financial information has been restated to reflect these subsidiaries as discontinued operations. For more detailed information, see note 2 to the Consolidated Financial Statements included herein.

FORWARD-LOOKING STATEMENTS

Certain statements included or incorporated by reference in this Annual Report on Form 10-K or the Company's other public filings and releases, which are not historical facts, are forward-looking statements (as such term is defined in the Securities Exchange Act of 1934, and the regulations thereunder), which are intended to be covered by the safe harbors created thereby. These statements may include, but are not limited to:

- statements in "Business," "Legal Proceedings" and "Risk Factors", such as the Company's ability to focus on the precision miniature medical and electronics products business, the ability to compete, the adequacy of insurance coverage, and potential increase in demand for the Company's products; and
- statements in "Management's Discussion and Analysis of Financial Condition and Results of Operations" statements in "Notes to the Consolidated Financial Statements," which are incorporated by reference into this Annual

Report on Form 10-K from the 2004 Annual Report to Shareholders, such as the potential impact of new digital products to gain market share, recovery of the telecommunications market, potential growth in the Company's medical profits, future gross profit margins, future cost

<PAGE>

savings, net operating loss carryforwards, the impact of future cash flows, the ability to maintain financial covenants, the ability to meet working capital requirements, future level of funding of employee benefit plans, the ability to negotiate extension on purchases, the impact of foreign currencies and litigation.

Forward-looking statements also include, without limitation, statements as to the Company's expected future results of operations and growth, the Company's business strategy, the expected benefits of reduction in employee headcount, the expected increases in operating efficiencies, anticipated trends in the hearing health market related to the Company's precision miniature medical and electronic products business, estimates of goodwill impairments and amortization expense of other intangible assets, the effects of changes in accounting pronouncements, the effects of litigation and the amount of insurance coverage, and statements as to trends or the Company's or management's beliefs, expectations and opinions. Forward-looking statements are subject to risks and uncertainties and may be affected by various factors that may cause actual results to differ materially from those in the forward-looking statements. In addition to the factors discussed in this Annual Report on Form 10-K, certain risks, uncertainties and other factors can cause actual results and developments to be materially different from those expressed or implied by such forward-looking statements, including, without limitation, the following:

- the ability to implement the Company's business strategy;
- risks arising in connection with the insolvency of Selas SAS and potential liabilities and actions arising in connection therewith;
- the volume and timing of orders received by the Company;
- changes in estimated future cash flows;
- foreign currency movements in markets the Company services;
- changes in the global economy and financial markets;
- changes in the mix of products sold;
- acceptance of the Company's products;
- competitive pricing pressures;
- pending and potential future litigation;
- availability of electronic components for the Company's products;
- ability to create and market products in a timely manner;
- ability to pay debt when it comes due; and
- risks associated with terrorist attacks, war and threats of attacks and wars.

The Company does not undertake to update any forward-looking statement that may be made from time to time by or on behalf of the Company.

RISK FACTORS

You should carefully consider the risks described below. If any of the risks actually occur, the Company's business, financial condition or results of future operations could be materially adversely affected. This Annual Report on Form 10-K contains forward-looking statements that involve risk and uncertainties. Our actual results could differ materially from those anticipated in the forward-looking statements as a result of many factors, including the risks

faced by the Company described below and elsewhere in this Annual Report on Form 10-K.

THE COMPANY HAS EXPERIENCED AND EXPECTS TO CONTINUE TO EXPERIENCE FLUCTUATIONS IN ITS RESULTS OF OPERATIONS, WHICH COULD ADVERSELY AFFECT THE COMPANY.

Factors that affect the Company's results of operations include, but are not limited to, the volume and timing of orders received, changes in the global economy and financial markets, changes in the mix of products sold, market acceptance of the Company's and its customer's products, competitive pricing pressures, global currency valuations, the availability of electronic components that the Company purchases from suppliers, the Company's ability to meet increasing demand, the Company's ability to introduce new products on

<PAGE>

a timely basis, the timing of new product announcements and introductions by the Company or its competitors, changing customer requirements, delays in new product qualifications, and the timing and extent of research and development expenses. These factors have caused and may continue to cause the Company to experience material fluctuations in operating results on a quarterly and/or annual basis. These fluctuations could materially adversely affect the Company's business, financial condition and results of operations, which in turn, could adversely affect the price of the Company's common stock.

IF THE COMPANY'S PRECISION MINIATURE MEDICAL AND ELECTRONIC PRODUCTS BUSINESS IS UNABLE TO CONTINUE TO DEVELOP NEW PRODUCTS THAT ARE INEXPENSIVE TO MANUFACTURE, THE COMPANY'S RESULTS OF OPERATIONS COULD BE ADVERSELY AFFECTED.

The Company may not be able to continue to achieve its historical profit margins in its precision miniature medical and electronic products business due to advancements in technology. The ability to continue its profit margins is dependent upon the Company's ability to stay competitive by developing products that are technologically advanced and inexpensive to manufacture.

The precision miniature medical and electronic products business has also been affected by unfavorable conditions in the hearing instrument market and the impact of the Asian economic situation. The Company is unable to predict with any certainty when and if these conditions will improve.

THE COMPANY OPERATES IN SINGAPORE AND GERMANY, VARIOUS FACTORS RELATING TO ITS INTERNATIONAL OPERATIONS COULD AFFECT ITS RESULTS OF OPERATIONS.

In 2004, the Company operated in Singapore, Germany, and Japan. Approximately 12 percent of the Company's revenues were derived from these countries in 2004. The Company currently operates in Singapore and Germany. Political or economic instability in these countries could have an adverse impact on the Company's results of operations due to diminished revenues in these countries. The Company's future revenues, costs of operations and profit results could be affected by a number of factors related to the Company's international operations, including changes in foreign currency exchange rates, changes in economic conditions from country to country, changes in a country's political condition, trade protection measures, licensing and other legal requirements and local tax issues. Unanticipated currency fluctuations in the Euro and Singapore Dollar could lead to lower reported consolidated revenues due to the translation of these currencies into U.S. dollars when the Company consolidates its revenues.

THE COMPANY OPERATES IN A HIGHLY COMPETITIVE BUSINESS AND IF THE COMPANY IS UNABLE TO BE COMPETITIVE, ITS FINANCIAL CONDITION COULD BE ADVERSELY AFFECTED.

Several of the Company's competitors have been able to offer more standardized and less technologically advanced hearing products at lower prices. Price competition has had an adverse effect on the Company's sales and margins. There can be no assurance that the Company will be able to maintain or enhance its technical capabilities or compete successfully with its existing and future competitors.

THE COMPANY MAY EXPERIENCE DIFFICULTY IN PAYING ITS DEBT WHEN IT COMES DUE, WHICH COULD LIMIT ITS ABILITY TO OBTAIN FINANCING.

The Company's ability to pay the principal and interest on its indebtedness as it comes due will depend upon its current and future performance. The Company's performance is affected by general economic conditions and by financial, competitive, political, business and other factors. Many of these factors are beyond the Company's control. The Company believes that the amended credit facility combined with funds expected to be generated from

<PAGE>

operations, the available borrowing capacity through its revolving credit loan facilities, curtailment of the dividend payment and control of capital spending will be sufficient to meet its anticipated cash requirements for operating needs through April 1, 2006. If, however, the Company is unable to renew these facilities in the future, or does not generate sufficient cash or complete such financings on a timely basis, it may be required to seek additional financing or sell equity on terms which may not be as favorable as it could have otherwise obtained. No assurance can be given that any refinancing, additional borrowing or sale of equity will be possible when needed or that the Company will be able to negotiate acceptable terms. In addition, the Company's access to capital is affected by prevailing conditions in the financial and equity capital markets, as well as its own financial condition.

THE COMPANY'S SUCCESS DEPENDS ON ITS SENIOR MANAGEMENT TEAM AND IF THE COMPANY IS NOT ABLE TO RETAIN THEM, IT COULD HAVE A MATERIALLY ADVERSE EFFECT ON THE COMPANY.

The Company is highly dependent upon the continued services and experience of its senior management team, including Mark S. Gorder, the Company's President, Chief Executive Officer and a director. Mr. Gorder is also the President of the Company's Precision Miniature Medical and Electronics Products segment. The Company depends on the services of Mr. Gorder and the other members of its senior management team to, among other things, continue the development and implementation of the Company's business strategies and maintain and develop its client relationships.

THE COMPANY IS SUBJECT TO NUMEROUS ASBESTOS-RELATED LAWSUITS, WHICH COULD ADVERSELY AFFECT THE COMPANY'S FINANCIAL POSITION, RESULTS OF OPERATIONS OR LIQUIDITY.

The Company is a defendant along with a number of other parties in approximately 123 lawsuits as of December 31, 2004, (approximately 101 lawsuits as of December 31, 2003) alleging that plaintiffs have or may have contracted asbestos-related diseases as a result of exposure to asbestos products or equipment containing asbestos sold by one or more named defendants. Due to the noninformative nature

of the complaints, the Company does not know whether any of the complaints state valid claims against the Company. Certain carriers have informed the Company that the primary policies for the period August 1, 1970-1973, have been exhausted and that the carriers will no longer provide a defense under those policies. The Company has requested that the carriers substantiate this situation. The Company believes it has additional policies available for other years which have been ignored by the carriers. As settlement payments are applied to all years a litigant was deemed to have been exposed to asbestos, the Company believes when settlement payments are applied to these additional policies, the Company will have availability under the years deemed exhausted. If the Company's insurance policies do not cover the costs and any awards for the asbestos-related lawsuits, the Company will have to use its cash or obtain additional financing to pay the asbestos-related obligations and settlement costs. There is no assurance that the Company will have the cash or be able to obtain additional financings on favorable terms, or at all to pay asbestos related obligations or settlements should they occur. The ultimate outcome of any legal matter cannot be predicted with certainty. In light of the significant uncertainty associated with asbestos lawsuits, there is no guarantee that these lawsuits will not materially adversely affect the Company's financial position, results of operations or liquidity.

THE MARKET PRICE OF THE COMPANY'S COMMON STOCK HAS BEEN AND IS LIKELY TO CONTINUE TO BE VOLATILE, WHICH MAY MAKE IT DIFFICULT FOR SHAREHOLDERS TO RESELL COMMON STOCK WHEN THEY WANT TO AND AT PRICES THEY FIND ATTRACTIVE.

<PAGE>

The market price of the Company's common stock has been and is likely to be highly volatile, and there has been limited trading volume in the common stock. The common stock market price could be subject to wide fluctuations in response to a variety of factors, including the following:

- announcements of fluctuations in the Company's or its competitors' operating results;
- the timing and announcement of sales or acquisitions of assets by the Company or its competitors;
- changes in estimates or recommendations by securities analysts;
- adverse or unfavorable publicity about the Company's services or the Company;
- the commencement of material litigation, or an unfavorable verdict, against the Company;
- terrorist attacks, war and threats of attacks and war;
- additions or departures of key personnel; and
- sales of common stock.

In addition, the stock market in recent years has experienced significant price and volume fluctuations. Such volatility and decline has affected many companies irrespective of, or disproportionately to, the operating performance of these companies. These broad fluctuations and limited trading volume may materially adversely affect the market price of the common stock, and the ability to sell said common stock.

Most of the Company's outstanding shares are available for resale in the public market without restriction. The sale of a large number of these shares could adversely affect the share price and could impair the Company's ability to raise capital through the sale of equity securities or make acquisitions for common stock.

MERGER AND ACQUISITION ACTIVITY IN THE COMPANY'S HEARING HEALTH MARKET HAS RESULTED IN A SMALLER CUSTOMER BASE. RELIANCE ON FEWER CUSTOMERS MAY HAVE AN ADVERSE EFFECT ON THE COMPANY.

Several of the Company's customers in the hearing health market, have undergone mergers or acquisitions, resulting in a smaller customer base with larger customers. If the Company is unable to maintain satisfactory relationships with the reduced customer base, it may adversely affect the company's operating profits and revenue.

UNFAVORABLE LEGISLATION IN THE HEARING HEALTH MARKET MAY DECREASE THE DEMAND FOR THE COMPANY'S PRODUCTS, AND MAY NEGATIVELY IMPACT THE FINANCIAL CONDITION OF THE COMPANY.

In some of the Company's foreign markets government subsidies cover a portion of the cost of hearing aids. A change in legislation that would reduce or eliminate these subsidies could decrease the demand for the Company's hearing health products. This could result in an adverse effect on the Company's operating results. The Company is unable to predict the likelihood of any such legislation.

TERRORIST ATTACKS, WAR AND THREATS OF ATTACKS AND WAR MAY NEGATIVELY IMPACT THE COMPANY'S RESULTS OF OPERATIONS, REVENUE AND COMMON STOCK MARKET PRICE.

Terrorist attacks, war and threats of attacks and war may negatively impact the Company's results of operations, revenue and share price. Recent terrorist attacks in the United States, as well as future events occurring in response or in connection to them, including, without limitation, future terrorist attacks against United States targets and threats of war or actual conflicts involving the United States or its allies, may impact the Company's operations, including affecting its ability to operate its subsidiary's abroad. More generally, any of these events could cause consumer confidence and spending to decrease or result in increased volatility in the economy.

<PAGE>

They could also result in the deepening of the economic recession in the United States. Any of these occurrences could have a material adverse effect on the Company's operating results, revenue, and may result in the volatility of the market price for the Company's common stock.

"ANTI-TAKEOVER" PROVISIONS MAY MAKE IT MORE DIFFICULT FOR A THIRD PARTY TO ACQUIRE CONTROL OF THE COMPANY, EVEN IF THE CHANGE IN CONTROL WOULD BE BENEFICIAL TO SHAREHOLDERS.

The Company is a Pennsylvania corporation. Anti-takeover provisions in Pennsylvania law and the Company's charter and bylaws could make it more difficult for a third party to acquire control of the Company. These provisions could adversely affect the market price of the common stock and could reduce the amount that shareholders might receive if the Company is sold. For example, the Company's charter provides that the board of directors may issue preferred stock without shareholder approval. In addition, the Company's bylaws provide for a classified board, with each board member serving a staggered three-year term. Directors may be removed only with the approval of the holders of at least two-thirds of all of the shares outstanding and entitled to vote.

IF WE FAIL TO MAINTAIN AN EFFECTIVE SYSTEM OF INTERNAL CONTROLS, WE MAY NOT BE

ABLE TO ACCURATELY REPORT OUR FINANCIAL RESULTS OR PREVENT FRAUD. AS A RESULT, CURRENT AND POTENTIAL SHAREHOLDERS AND CUSTOMERS COULD LOSE CONFIDENCE IN OUR FINANCIAL REPORTING, WHICH COULD HARM OUR BUSINESS, THE TRADING PRICE OF OUR STOCK AND OUR ABILITY TO RETAIN OUR CURRENT CUSTOMERS OR OBTAIN NEW CUSTOMERS.

Beginning in fiscal 2004, we began a process to document and evaluate our internal controls over financial reporting in order to satisfy the requirements of Section 404 of the Sarbanes-Oxley Act, which requires annual management assessments of the effectiveness of our internal controls over financial reporting and a report by our independent auditors addressing these assessments. In this regard, management has been dedicating internal resources, has engaged outside consultants and has adopted a detailed work plan to (i) assess and document the adequacy of internal controls over financial reporting, (ii) take steps to improve control processes, where appropriate, (iii) validate through testing that controls are functioning as documented and (iv) implement a continuous reporting and improvement process for internal control over financial reporting At this time, we are not aware, and our outside auditors have not advised us, of any "material weaknesses" or "significant deficiencies" in our internal controls, as defined in the relevant literature. If we fail to identify and correct any issues in the design or operating effectiveness of internal controls over financial reporting or fail to prevent fraud, current and potential shareholders and customers could lose confidence in our financial reporting, which could harm our business, the trading price of our stock and our ability to retain our current customers and obtain new customers.

<PAGE>

PRECISION MINIATURE MEDICAL AND ELECTRONIC PRODUCTS

The precision miniature medical and electronics products business represents the continuing operations of the Company. All other businesses are now included in discontinued operations.

Resistance Technology, Inc. ("RTI"),and RTI Tech PTE LTD ("RTI Tech") both wholly-owned subsidiaries of the Company, manufacture microminiature components, systems and molded plastic parts for hearing instrument, medical equipment, electronics, professional audio, telecommunications and computer industry manufacturers. RTI Electronics, Inc. ("RTIE"), a wholly owned subsidiary of the company, has expanded RTI's microminiature components business through the manufacture of thermistors and film capacitors.

Products and Industries Serviced. RTI is a leading manufacturer and supplier of microminiature electromechanical components to hearing instrument manufacturers. These components consist of volume controls, microphones, trimmer potentiometers and switches. RTI also manufactures hybrid amplifiers and integrated circuit components ("hybrid amplifiers"), along with faceplates for in-the-ear and in-the-canal hearing instruments. Components are offered in a variety of sizes, colors and capacities in order to accommodate a hearing manufacturer's individualized specifications. Sales to hearing instrument manufacturers represented approximately 52% of 2004 annual net sales for the Company's precision miniature medical and electronic products business.

Hearing instruments, which fit behind or in a person's ear to amplify and process sound for a hearing impaired person, generally are composed of four basic parts and several supplemental components for control or fitting purposes. The four basic parts are microphones, amplifier circuits, miniature receivers/speakers and batteries. RTI's hybrid amplifiers are a type of

amplifier circuit. Supplemental components include volume controls, trimmer potentiometers, which shape sound frequencies to respond to the particular nature of a person's hearing loss, and switches used to turn the instrument on and off and to go from telephone to normal speech modes. Faceplates and an ear shell molded to fit the user's ear often serve as a housing for hearing instruments. RTI manufactures its components on a short lead-time basis in order to supply "just-in-time" delivery to its customers and, consequently, order backlog amounts are not meaningful.

Using DSP technology, RTI is building a new generation of affordable, high-quality hearing aids and similar amplifier devices. Compared to most products currently on the market, DSP devices have better clarity, attractive pricing points and an improved ability to filter out background noise. Low to moderately-priced DSP hearing aids, like newly introduced line of ClariD Digital ONE(TM) DSP hearing-aid amplifiers, represent the fastest-growing segment in the hearing-aid market.

In the medical market, the Company is focused on sales of microelectronics, micromechanical assemblies and high-precision plastic molded components to medical device manufacturers. Targeted customers include medical product manufacturers of portable and lightweight battery powered devices, large AC-powered units often found in clinics and hospitals, as well as a variety of sensors designed to connect a patient to an electronic device.

The medical industry is faced with pressures to reduce the costs of healthcare. RTI offers medical manufacturers the capabilities to design, develop and manufacture components for medical devices that are easier to use, measure with greater accuracy and provide more functions while reducing the costs to manufacture these devices. Examples of RTI products used by medical device manufacturers include components found in intravenous fluid administration pumps that introduce drugs into the bloodstream. RTI manufacturers and supplies bubble sensors and flow restrictors that monitor and control the flow of fluid in an intravenous infusion system.

<PAGE>

RTI also manufactures a family of safety needle products for an OEM customer that utilizes RTI's insert and straight molding capabilities. These products are assembled using full automation including built-in quality checks within the production lines. Other examples include sensors used to detect pathologies in specific organs of the body and monitoring devices to detect cardiac and respiratory functions. The early and accurate detection of pathologies allows for increased likelihood for successful treatment of chronic diseases and cancers. Accurate monitoring of multiple functions of the body, such as heart rate and breathing, aids in generating more accurate diagnosis and treatments for patients.

RTI entered the high-quality audio communication device market in 2001, and now has a line of miniature, professional audio headset products used by performers and support staff in the music and stage performance markets. For customers focusing on homeland security needs, the line includes several communication devices that are more portable and perform well in noisy or hazardous environments. These products are also well suited for applications in the fire, law enforcement, safety, aviation and military markets.

RTIE manufactures and sells thermistors and thermistor assemblies, which are solid state devices that produce precise changes in electrical resistance as a function of any change in absolute body temperature. RTIE's Surge-GardTM product

line, an inrush electric current limiting device used primarily in computer power supplies, represented approximately 28 percent of RTIE's sales in 2004. The balance of sales represents various industrial, commercial and military sales for thermistor and thermistor assemblies to domestic and international markets.

RTI's and RTIE's principal raw materials are plastics, polymers, metals, various metal oxide powders and silver paste, for which there are multiple sources of supply.

Marketing and Competition. RTI sells its hearing instrument components directly to domestic hearing instrument manufacturers through an internal sales force. Sales of microphone products and of molded plastic parts to industries other than hearing instrument manufacturers are made mainly through an internal sales force. In recent years, five companies have accounted for a substantial portion of the sales in the United States hearing instrument industry. In 2004 no one customer accounted for more than 10 percent of the Company's consolidated net sales, during 2004 the top five customers accounted for approximately $12 million or 34 percent of the Company's consolidated net sales. See note 5 to the consolidated financial statements for a discussion of net sales and long-lived assets by geographic area.

Internationally, sales representatives employed by Resistance Technology, GmbH ("RT, GmbH"), a German company 90% of whose capital stock is owned by RTI, solicits sales from European hearing instrument manufacturers on behalf of RTI.

RTI believes that it is the largest supplier worldwide of micro-miniature electromechanical components to hearing instrument manufacturers and that its full product line and automated manufacturing process allow it to compete effectively with the two other manufacturers within this market.

In the market of hybrid amplifiers and molded plastic faceplates, RTI's primary competition is from the hearing instrument manufacturers themselves. The hearing instrument manufacturers produce a substantial portion of their internal needs for these components.

RTI markets its high performance microphone products to the radio communication and professional audio industries and has several larger competitors who have greater financial resources. RTI holds a small market

<PAGE>

share in the global market for microphone capsules and other related products.

RTIE sells its thermistors and film capacitors through a combination of independent sales representatives and internal sales force.

RTIE has many competitors, both domestic and foreign, that sell various thermistor and film capacitors and some of these competitors are larger and have greater financial resources. In addition, RTIE holds a relatively small market share in the world-market of thermistor and film capacitor products.

Operations. The precision miniature medical and electronic products business has a total of 372 employees. RTI currently employs 178 people, of whom 16 are executive and administrative personnel, eight sales, and 154 engineering and operations personnel at RTI's two facilities near Minneapolis, Minnesota. At RT, GmbH, the Company employs three sales personnel located in Munich, Germany. In Singapore, RTI Tech PTE Ltd. employs 116 people, of whom four are administrative

personnel, four sales, and 108 engineering and operations personnel. At its facilities in Anaheim, California, RTIE employs 75 employees, of which four are administrative, four are sales, and 67 are engineering and operations personnel.

As a supplier of parts for consumer and medical products, RTI is subject to claims for personal injuries allegedly caused by its products. The Company maintains what it believes to be adequate insurance coverage.

Research and Development. RTI and RTIE conduct research and development activities primarily to improve its existing products and technology. Their research and development expenditures were $1,616,000, $2,111,000 and $1,186,000 in 2004, 2003 and 2002, respectively. See note 1 to the consolidated financial statements for information regarding customer funded research and development projects.

RTI owns a number of United States patents which cover a number of product designs and processes. The Company believes that, although these patents collectively add some value to the Company, no one patent or group of patents is of material importance to its business as a whole.

DISCONTINUED OPERATIONS - HEAT TECHNOLOGY

The Company specialized in the controlled application of heat to achieve precise process and temperature control. The Company's principal heat technology equipment and systems were smaller standard-engineered systems, burners and combustion control equipment. The Company sold this business in the first quarter of 2005 and has accounted for it as discontinued operations in the accompanying financial statements.

Standard Engineered Systems. The Company engineered and fabricated a variety of small heat treating furnaces and heat processing equipment. This standard equipment and small-furnace business was conducted principally by its then wholly-owned subsidiaries, Nippon Selas (Tokyo, Japan) and Selas Waermetechnik (Ratingen, Germany).

Burners and Combustion Control Equipment. At its Dresher, Pennsylvania facility and through its subsidiaries in Japan, Nippon Selas (Tokyo) and Germany, Selas Waermetechnik, (Ratingen) the Company designed, manufactured and sold an array of original equipment and replacement gas-fired industrial burners for many applications.

The Company was a producer of burners used in fluid processing furnaces serving the petrochemical industry. The Company also produced burners suitable for creating a high temperature furnace environment desirable in steel and glass heat treating furnaces. The Company's burners accommodated a

wide variety of fuel types, environmental constraints and customer production requirements.

The Company furnished many industries with gas combustion control equipment sold both as component parts and as systems that were engineered to meet a particular customer's needs. This equipment was provided with the Company's original custom-engineered and standard heat treating equipment, as replacement or additional components for existing furnaces being refurbished or upgraded, and as original components for heat treating equipment manufactured by others.

Marketing and Competition. The Company marketed its standard-engineered systems products on a global basis through its sales and marketing personnel located in Dresher, Pennsylvania, and also sold these products through licensees and agents located in various parts of the world.

Operations. The heat technology segment had a total of 48 employees. At its Dresher facility, the Company had 32 employees; 6 were executive and administrative personnel, 10 were sales and engineering personnel and 16 were personnel engaged in manufacturing. The hourly personnel were represented by a union, and the current union contract expires in May 2005. The Company considered its relations with its employees to be satisfactory. Selas Waermetechnik had 6 employees; 1 was an administrative personnel, 3 were sales and engineering personnel and 2 were personnel engaged in manufacturing.

In April 2001, the Company sold a minority interest of Nippon Selas to three directors of Nippon Selas. This minority interest was reacquired by the Company in the first quarter of 2005 in contemplation of the sale of this business, which was completed in the first quarter of 2005. Its Tokyo facility employed 10 people; 3 administrative and 7 sales and engineering.

Research and Development. The Company conducted limited research and development activities at its Dresher facility to support its heat processing services and products. Research and development expenditures for heat processing aggregated $18,000, $16,000 and $66,000 in 2004, 2003 and 2002, respectively.

AVAILABLE INFORMATION

The Company files or furnishes annual report on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, proxy statements and other information with the SEC. You may read and copy any reports, statements and other information that the Company files with the SEC at the SEC's Public Reference Room at 450 Fifth Street, N.W., Washington, D.C., 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The Company's filings are also available on the SEC's Internet site as part of the EDGAR database (http://www.sec.gov).

The Company maintains an internet web site at www.IntriCon.com. The Company maintains a link to the SEC's website by which you may review its annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, and amendments to those reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act.

The information on the website listed above, is not and should not be considered part of this annual report on Form 10-K and is not incorporated by reference in this document. This website is and is only intended to be an inactive textual reference.

In addition, we will provide, at no cost (other than for exhibits), paper or electronic copies of our reports and other filings made with the SEC. Requests should be directed to:

<PAGE>

Corporate Secretary
IntriCon Corporation
1260 Red Fox Road
Arden Hills, MN 5112

ITEM 2.  Properties

Continuing Operations

RTI leases a 47,000 sq. ft. manufacturing facility in Arden Hills, Minnesota, which also serves as the Company's headquarters, from a partnership consisting of two former officers of RTI and Mark S. Gorder who serves as an officer of the Company and RTI and on the Company's Board of Directors. At this facility, RTI manufactures all of its products other than plastic component parts. The lease expires in October 2011.

In addition, RTI owns, subject to a mortgage from a third party lender, a 34,000 sq. ft. building in Vadnais Heights, Minnesota at which RTI produces plastic component parts. See notes 16 and 17 to the Company's consolidated financial statements, which are incorporated by reference into "Item 8. Financial Statements and Supplementary Data" from the 2004 annual report to shareholders.

RTIE leases a building in Anaheim, California, which contains its manufacturing facilities and offices and consists of a total of 50,000 square feet. The lease expires in September 2008.

RTI Technologies PTE LTD leases a 6,000 square foot building in Singapore which houses its production facilities and administrative offices. This lease expires in June 2007.

Discontinued Operations

In June 2004, the Company sold its manufacturing facility, on a 17 acres site in Dresher, Pennsylvania at which it produced standard-engineered systems, burners and combustion control equipment. The Company leased this facility back until it sold the Burners and Components Business in March 2005. The 136,000 square foot Dresher facility had substantially more space than was needed for the Company's operations. See note 8 to the Company's consolidated financial statements, which are incorporated by reference into "Item 8. Financial Statements and Supplementary Data" from the 2004 annual report to shareholders. Additionally, Nippon Selas leased office space in Tokyo, Japan for its sales and administrative facilities pursuant to a month-to-month lease. Selas Waermetechnik, Germany leased facilities in Ratingen, Germany which were used for sales, administrative and engineering activities and assembly of small furnaces and furnace components.

ITEM 3.  Legal Proceedings

The Company is a defendant along with a number of other parties in approximately 123 lawsuits as of December 31, 2004, (approximately 101 lawsuits as of December 31, 2003) alleging that plaintiffs have or may have contracted asbestos-related diseases as a result of exposure to asbestos products or equipment containing asbestos sold by one or more named defendants. Due to the noninformative nature of the complaints, the Company does not know whether any of the complaints state valid claims against the Company. Certain carriers have informed the Company that the primary policies for the period August 1, 1970-1973, have been exhausted and that the carriers will no longer provide a defense under those policies. The Company has requested that the carriers substantiate this situation. The Company believes it has additional policies available for other years which have been ignored

by the carriers. As settlement payments are applied to all years a litigant was deemed to have been exposed to asbestos, the Company believes when settlement payments are applied to these additional policies, the Company will have availability under the years deemed exhausted. The Company does not believe that the asserted exhaustion of the primary insurance coverage for this period will have a material adverse effect on its financial condition, liquidity, or results of operations. Management believes that the number of insurance carriers involved in the defense of the suits and the significant number of policy years and policy limits, to which these insurance carriers are insuring the Company, make the ultimate disposition of these lawsuits not material to the Company's consolidated financial position or results of operations.

The Company is also involved in other lawsuits arising in the normal course of business. While it is not possible to predict with certainty the outcome of these matters, management is of the opinion that the disposition of these lawsuits and claims will not materially affect the Company's consolidated financial position, liquidity, or results of operations.

ITEM 4. Submission of Matters to a Vote of Security Holders

None

ITEM 4A. Executive Officers of the Registrant

The names, ages and offices (as of March 18, 2005) of the Company's executive officers were as follows:

| Name | Age | Position |
|---|---|---|
| Mark S. Gorder | 58 | President, Chief Executive Officer and Director of the Company; President of Resistance Technology, Inc. |
| Robert F. Gallagher | 49 | Chief Financial Officer, Treasurer and Secretary of the Company |

Mr. Gorder joined the Company in October 1993 when Resistance Technology, Inc. ("RTI") was acquired by the Company. Prior to the acquisition, Mr. Gorder was President and one of the founders of RTI, which began operations in 1977. Mr. Gorder was promoted to Vice President of the Company and elected to the Board of Directors in April 1996. In December 2000, he was elected President and Chief Operating Officer and in April 2001, Mr. Gorder assumed the role of Chief Executive Officer.

Mr. Gallagher has served as the Company's Chief Financial Officer from August 2002 until April 1, 2005. From October 2000 until June 2002, he was Chief Financial Officer for Visionics Corporation (which merged with Identix Corporation in June 2002). From October 1989 until June 2000 he was employed by TSI Incorporated (which was acquired and taken private in June 2000), most recently as Chief Financial Officer. Both Visionics Corporation and TSI Incorporated were publicly-held manufacturing companies. Mr. Gallagher has left the Company to pursue other opportunities.

<PAGE>

PART II

ITEM 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities

The Company's common shares are listed on the American Stock Exchange under the ticker symbol "SLS". The Company expects that its common shares will begin trading under the symbol "IIN" on or after April 4, 2005.

The high and low sale prices during each quarterly period during the past two years were as follows:

MARKET AND DIVIDEND INFORMATION

| | 2004 | | 2003 | |
|---|---|---|---|---|
| | Market Price Range | | Market Price Range | |
| Quarter | High | Low | High | Low |
| First.......... | $3.60 | $2.82 | $1.89 | $1.29 |
| Second......... | 3.24 | 2.36 | 1.62 | 1.15 |
| Third.......... | 2.99 | 1.40 | 1.95 | 1.40 |
| Fourth......... | 2.40 | 1.70 | 3.85 | 1.58 |

At March 25, 2005 the Company had 378 shareholders of record of common shares.

The Company ceased paying quarterly cash dividends in the fourth quarter of 2001 and has no intention of paying cash dividends in the foreseeable future. The payment of any future cash dividends is subject to the discretion of the Board of Directors and is dependent on a number of factors, including the Company's capital requirements, financial condition, financial covenants and cash availability. Terms of the Company's banking agreements prohibit the payment of cash dividends without prior bank approval.

See "ITEM 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters -- Equity Compensation Plans" for disclosure regarding our equity compensation plans.

ITEM 6. Selected Financial Data

Certain selected financial data is incorporated by reference from "Five-Year Summary of Operations" and "Other Financial Highlights" as contained in the Company's 2004 annual report to shareholders, which is filed as an exhibit to this Form 10-K.

ITEM 7. Management's Discussion and Analysis of Financial Condition and Results of Operations

Management's Discussion and Analysis of Financial Condition and Results of Operations is incorporated by reference from the Company's 2004 annual report to

shareholders, which is filed as an exhibit to this Form 10-K.

ITEM 7A. Quantitative and Qualitative Disclosures About Market Risk

Quantitative and qualitative disclosure about market risk is incorporated by reference from the Company's 2004 annual report to shareholders, which is filed as an exhibit to this Form 10-K.

<PAGE>

ITEM 8. Financial Statements and Supplementary Data

The Company's Consolidated Financial Statements, the "Notes to the Consolidated Financial Statements", and the "Report of Independent Auditors" are incorporated by reference from the Company's 2004 annual report to shareholders, which is filed as an exhibit to this Form 10-K.

ITEM 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure

None

Item 9A. Controls and Procedures

The Company's management, with the participation of its chief executive officer and chief financial officer, conducted an evaluation of the effectiveness of the Company's disclosure controls and procedures, as defined in Exchange Act Rule 13a-15(e), as of December 31, 2004. Based on the evaluation reported on April 1,2005 in the original filing of the Company's annual report on Form 10-K for the year ended December 31, 2004, the Company's chief executive officer and chief financial officer concluded that the Company's disclosure controls and procedures were effective as of the end of the period covered by this report.

On May 31, 2005, subsequent to the original evaluation, the Company concluded, after discussions among the Audit Committee of the Board of Directors of the Company and management, that it would restate financial results for the years 2000 through 2004 in order to correct the accounting for certain research and development expenditures that were erroneously capitalized on the balance sheet instead of being recorded as charges on the statement of operations. As the result of this error, the Company's chief executive officer and chief financial officer re-evaluated the Company's disclosure controls and procedures and concluded that control deficiencies existed with respect to our historical financial reporting related to capitalization of research and development expenditures and accordingly, have concluded that the Company's disclosure controls and procedures were not effective as of the end of the period covered by this report. We have subsequently corrected our methodology for accounting for our research and development expenses and implemented policies and procedures to ensure that the expense is properly reported in our financial statements.

There were no changes in our internal controls over financial reporting during the quarter ended December 31, 2004 that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

<PAGE>

Item 9B. Other Information

ASSET PURCHASE AGREEMENT
On March 31, 2005, the Company entered into an asset purchase agreement with Selas Heat Technology Company LLC, a Delaware limited liability company, pursuant to which the Company sold the remaining assets and certain liabilities of its heat technology business including its subsidiaries Nippon Selas Co. Ltd., a Japanese company and Selas Waernetechnik GmbH, a German company. The Company also sold the rights to the name "Selas Corporation of America". The total purchase price was approximately $3.6 million, subject to adjustment, of which approximately $2.7 million was paid in cash and $900,000 was paid in the form of a subordinated promissory note. The asset purchase agreement included representations, warranties, covenants and indemnifications typical for transactions of this type.

AMENDMENT TO ARTICLES OF INCORPORATION
On April 1, 2005, the Company amended its articles of incorporation to change its name effective immediately from Selas Corporation of America to IntriCon Corporation. Additionally, the Company's common shares are now listed on the American Stock Exchange under the ticker symbol "IIN".

CREDIT FACILITIES
In March 2005, the Company entered into amended agreements for its domestic revolver and long-term debt. The new facility provides the Company with a revolving credit limit of $4.5 million which was reduced to $4.0 million upon the sale of burners and components business in the first quarter of 2005. The agreement also stipulates that a portion of the proceeds from the sale of the Burners and Components business be used to payoff the approximately $1.5 million outstanding principal balance on the term loan. These facilities expire on April 1, 2006. See note 8 to the consolidated financial statements for additional information regarding this agreement.

DEPARTURE OF CHIEF FINANCIAL OFFICER
Robert F. Gallagher will no longer serve as the Company's chief financial officer, treasurer and secretary effective April 1, 2005. Mr. Gallagher is pursuing other opportunities.

EMPLOYMENT AGREEMENT FOR CHIEF EXECUTIVE OFFICER

On March 30, 2005, the Corporation entered into an employment agreement with Mr. Gorder, dated as of December 4, 2004, whereby Mr. Gorder agreed to serve as the Corporation's Chief Executive Officer and President. The employment agreement will expire on April 30, 2006, unless further extended by Mr. Gorder and the Corporation. Mr. Gorder's base salary will be established from time to time by the Board of Directors of the or the Compensation Committee of the Board of

Directors of the Corporation. In no event will Mr. Gorder's base salary be less than $275,000. For 2005, the Compensation Committee has set Mr. Gorder's base salary at $275,000. Mr. Gorder is entitled to receive performance bonuses in accordance with the policies and plans of the Corporation in place from time to time with respect to the payment of bonuses to executive officers. Mr. Gorder is also entitled to participate in the Corporation's employee benefit plans and benefit programs, including medical benefit programs, stock options under the Corporation's 2001 Stock Option Plan or any additional plans or programs, as may from time to time be provided by the Corporation for its executive officers. Additionally, the Corporation maintains disability insurance for his benefit. Under the employment agreement, the Corporation is required to reimburse Mr. Gorder for his country club membership fees and provide him with an automobile for use in connection with the performance of his duties under the employment agreement and reimburse him for all expenses reasonably incurred by him for the maintenance and operation, including fuel, of the automobile. The Corporation reimbursed Mr. Gorder $2,500 for the cost of consulting with counsel in connection with the negotiation of the employment agreement.

<PAGE>

Upon termination of Mr. Gorder's employment due to a disability, Mr. Gorder is entitled to continue to receive medical benefits coverage for him and his wife (if any) in accordance with the Corporation's policies in effect from time to time through the remainder of the then-current term of the employment agreement, and is entitled to benefits under the disability policy to the extent provided therein. In the event of Mr. Gorder's death during the term of the employment agreement, his wife (if any) is entitled to continue to receive medical benefits coverage in accordance with the Corporation's policies in effect from time to time through the remainder of the then-current term of the employment agreement.

The Corporation may terminate Mr. Gorder's employment for Cause (as defined in the employment agreement). If Mr. Gorder's employment is terminated by the Corporation prior to the end of the term for any reason other than Cause (as defined in the employment agreement) or the death or disability: (i) the Corporation must either (A) continue to pay Mr. Gorder his base salary or any performance bonus accrued (based on not less than the previous year's bonus and prorated to the end of the term) during the remainder of the then-current term of the employment agreement, or (B) if Mr. Gorder requests in writing, pay him in a lump sum upon such termination the present value of the payments that would have been made under clause (A), using a discount rate of 6 percent per year. Additionally, Mr. Gorder will be entitled to continue to receive medical benefits coverage in accordance with the Corporation's policies in effect from time to time through the remainder of the then-current term of the employment agreement. To be entitled to any payments Mr. Gorder must execute and deliver to the Corporation an agreement releasing the Corporation from all claims, undertaking to maintain confidentiality of the agreement and indemnify the Corporation if Mr. Gorder breaches such agreement. If Mr. Gorder's employment is terminated by the Corporation during the term of the employment agreement for any reason other than for Cause (as defined in the employment agreement) or if he terminates his employment during the term of the employment agreement under circumstances that would constitute an Involuntary Termination (as defined in the Change-of-Control Agreement), then any stock options granted to him which have not been exercised prior to his termination will accelerate and be exercisable in full.

If Mr. Gorder becomes entitled to any payment by the terms of the Change-of-Control Agreement, he is not entitled to any additional payment under the employment agreement (other than accrued and unpaid bonus, salary and

benefits) unless otherwise provided for in the employment agreement.

PART III

Item 10. Directors and Executive Officers of the Registrant

The information called for by Item 10, except for the information concerning executive officers included in Item 4A hereof, is incorporated by reference from the Company's definitive proxy statement relating to its 2005 annual meeting of shareholders. The information concerning executive officers contained in Item 4A hereof is incorporated by reference into this Item 10.

Code of Ethics

The Company has adopted a code of ethics that applies to its directors, officers and employees, including its chief executive officer, chief financial officer, controller and persons performing similar functions. Copies of the Company's code of ethics are available without charge upon written request directed to Cari Sather, Director Human Resources, IntriCon Corporation, 1260 Red Fox Road, Arden Hills, MN 55112.

21

<PAGE>

Item 11. Executive Compensation

The information called for by Item 11 is incorporated by reference from the Company's definitive proxy statement relating to its 2005 annual meeting of shareholders.

Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholders Matters

The information called for by Item 12 is incorporated by reference from the Company's definitive proxy statement relating to its 2005 annual meeting of shareholders.

Equity Compensation Plans

The following table details information regarding the Company's existing equity compensation plans as of December 31, 2004:

<TABLE>
<CAPTION>

| Plan Category | (a) Number of securities to be issued upon exercise of outstanding options, warrants and rights | (b) Weighted-avera exercise price outstanding opt warrants and ri |
|---|---|---|
| <S> | <C> | <C> |
| Equity compensation plans approved by security holders.................... | 453,400 | $5. |
| Equity compensation plans not | | |

| | | |
|---|---|---|
| approved by security holders (1)....... | 207,500 | $3. |
| | ------- | |
| Total.................................. | 660,900 | $4. |

</TABLE>

(1) Represents shares issuable under the Non-Employee Directors Stock Option Plan, pursuant to which directors who are not employees of the Corporation or any of its subsidiaries receive an automatic one-time grant of an option to acquire 5,000 common shares upon their initial election or appointment to the Board of Directors. The Plan also permits discretionary grants. The exercise price of the option is the fair market value of the stock on the date of grant. Options become exercisable in equal one-third annual installments beginning one year from the date of grant, except that the vesting schedule for discretionary grants is determined by the Compensation Committee.

Item 13. Certain Relationships and Related Transactions

The information called for by Item 13 is incorporated by reference from the Company's definitive proxy statement relating to its 2005 annual meeting of shareholders.

Item 14. Principal Accountant Fees and Service

The information called for by Item 14 is incorporated by reference from the Company's definitive proxy statement relating to its 2005 Annual Meeting of shareholders.

<PAGE>

PART IV

ITEM 15. Exhibits, Financial Statement Schedules

(a) The following documents are filed as a part of this report:

1. Financial Statements - The Company's consolidated financial statements, as described below, are incorporated by reference as contained in the Company's 2004 annual report to shareholders, which is filed as an exhibit to this Form 10-K.

   Consolidated Statements of Operations for the years ended December 31, 2004, 2003 and 2002.

   Consolidated Balance Sheets at December 31, 2004 and 2003.

   Consolidated Statements of Cash Flows for the years ended December 31, 2004, 2003 and 2002.

   Consolidated Statements of Shareholders' Equity and Comprehensive Loss for the years ended December 31, 2004, 2003 and 2002.

   Notes to Consolidated Financial Statements.

   Report of Independent Registered Public Accounting Firm.

2. Financial Statement Schedules

The Board of Directors and Shareholders
IntriCon Corporation:

Under date of March 18, 2005, except as to notes 3, 4, 8 and 18, which are as of March 31, 2005 and note 2 which is as of June 24, 2005, we reported on the consolidated balance sheets of IntriCon Corporation (formerly Selas Corporation of America) and subsidiaries as of December 31, 2004 and 2003, and the related consolidated statements of operations, stockholders' equity and comprehensive income (loss), and cash flows for each of the years in the three-year period ended December 31, 2004, as contained in the 2004 annual report to shareholders. These consolidated financial statements and our report thereon are incorporated by reference in the annual report on Form 10-K for the year 2004. In connection with our audits of the aforementioned consolidated financial statements, we also audited the related financial statement schedule. This financial statement schedule is the responsibility of the Company's management. Our responsibility is to express an opinion on this financial statement schedule based on our audits.

In our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

As discussed in note 2 to the consolidated financial statements, the Company has restated its consolidated financial statements as of December 31, 2004 and 2003 and for each of the years in the three-year period ended December 31, 2004.

As discussed in note 1 to the consolidated financial statements, the Company adopted Statement of Financial Accounting Standards No. 142 "Goodwill and Other Intangible Assets" on January 1, 2002.

/s/ KPMG LLP

Minneapolis, Minnesota
March 18, 2005, except as to notes 3, 4, 8 and 18 which are as of March 31, 2005 and note 2 which is as of June 24, 2005

<PAGE>

Schedule II - Valuation and Qualifying Accounts

INTRICON CORPORATION AND SUBSIDIARY COMPANIES

VALUATION AND QUALIFYING ACCOUNTS
DECEMBER 31, 2003, 2002 AND 2001

<TABLE>
<CAPTION>

| Description | Balance at beginning of Year | "Addition" charged to costs and expense | "Other" (a) additions (deductions) |
|---|---|---|---|

| <S> | <C> | <C> | <C> |
|---|---|---|---|
| YEAR ENDED DECEMBER 31,2004 | | | |
| Allowance for doubtful accounts | $ 253,840 | $ 88,427 | $ 19 |
| Deferred tax asset valuation allowance | $7,211,013 | $1,455,615 | -- |
| YEAR ENDED DECEMBER 31,2003 | | | |
| Allowance for doubtful accounts | $ 414,509 | $ 191,771 | $ 59 |
| Deferred tax asset valuation allowance | $ 743,859 | $6,467,154 | -- |
| YEAR ENDED DECEMBER 31,2002 | | | |
| Allowance for doubtful accounts | $ 90,653 | $ 338,949 | $ 143 |
| Deferred tax asset valuation allowance | $ -- | $ 743,859 | -- |

</TABLE>

a) Represents the difference between translation rates of foreign currency at beginning and end of year and the average rate during the year.
b) Uncollectible accounts written off.
c) Continuing operations net operating loss utilized to offset tax impact of operating income from discontinued operations.

All other schedules are omitted because they are not applicable, or because the required information is included in the consolidated financial statements or notes thereto.

3. Exhibits

2.1(1) Asset and Share Purchase Agreement dated as of October 11, 2002 among the Company, Selas S.A.S, Andritz A.G. and Andritz Acquisition S.A.S. Schedules and attachments are listed under section 1.2 of the agreement and will be provided to the Commission upon request.

2.2(2) Stock purchase Agreement dated July 21, 2003 between the Company and Ventra Ohio Corp, and VTA USA, INC. Schedules and attachments are listed beginning on page 38 of the agreement and will be provided to the Commission upon request.

<PAGE>

2.3(7) Agreement of Sales between the Company and BET Investments, Inc. dated December 31, 2002, as amended. Incorporated by reference from the Company's current report on Form 8-K filed with the commission

on June 29, 2004.

3.1(1) The Company's Articles of Incorporation as amended May 18, 1984 and April 25, 1991.

3.2(1) The Company's By-Laws as amended March 15, 2004.

4.1(1) Amended, Restated and Consolidated Loan Agreement dated March 18, 2004 among the Company, certain of its subsidiaries, and Wachovia Bank.

4.2(1) Amended, Restated and Consolidated Guaranty dated March 18, 2004 among the Company, certain of its subsidiaries, and Wachovia Bank.

4.3(1) Amended, Restated and Consolidated Term Loan Note dated March 18, 2004 among the Company, certain of its subsidiaries, and Wachovia Bank.

4.4(1) Amended and Restated Revolving Credit Note dated March 18, 2004 among the Company, certain of its subsidiaries, and Wachovia Bank.

4.5* Fifth Amendment to Mortgage, Security Agreement and Fixture Financing Statement dated March 30, 2005 among Resistance Technology, Inc., a subsidiary of the Company, and Wachovia Bank.

4.6* Amendment to Amended, Restated and Consolidated Loan Agreement dated March 30, 2005 among the Company, certain of its subsidiaries, and Wachovia Bank.

4.7* Second Amended, Restated and Consolidated Term Loan Note dated March 30, 2005 among the Company, certain of its subsidiaries, and Wachovia Bank.

4.8* Second Amended and Restated Revolving Credit Note dated March 30, 2005 among the Company, certain of its subsidiaries, and Wachovia Bank.

+ 10.1(2) Amended and Restated 1994 Stock Option Plan.

+ 10.2(3) Form of Stock Option Agreements granted under the Amended and Restated 1994 Stock Option Plan.

+ 10.3(9) 2001 Stock Option Plan.

+ 10.4(3) Supplemental Retirement Plan (amended and restated effective January 1, 1995).

10.5(5) Amended and Restated Office/Warehouse Lease, between Resistance Technology, Inc. and Arden Partners I. L.L.P. (of which Mark S. Gorder is one of the principal owners) dated November 1, 1996.

<PAGE>

+ 10.6(4) Amended and Restated Non-Employee Directors' Stock Option Plan.

+ 10.7(6) Retirement Agreement, Consulting Agreement and General Release, dated August 30, 2000, between the Company and Stephen F. Ryan.

10.8(4) Separation Agreement dated November 30, 2001 between the Company and Robert W. Ross.

10.9(10) Settlement agreement dated September 12, 2003 between the Company and Andritz AG, Andritz Acquisition S.A.A.

+ 10.10(7) Termination agreement following change of control or asset sale between the Company and Mark S. Gorder dated December 14, 2004

+ 10.11(7) Termination agreement following change of control or asset sale between the Company and Robert F. Gallagher dated December 14, 2004

+ 10.12(7) Separation Agreement between the Company and Gerald H. Broecker dated December 14, 2004

+ 10.13* Summary sheet for director fees.

+ 10.14* Summary sheet for chief executive officer compensation.

+ 10.15* Employment agreement between the Company and Mark S. Gorder dated as of December 4, 2004

13. "Five-Year Summary of Operations" as contained in the Company's amended 2004 annual report to shareholders; "Other Financial Highlights" as contained in the Company's amended 2004 annual report to shareholders; "Management's Discussion and Analysis of Financial Condition and Results of Operations" as contained in the Company's amended 2004 annual report to shareholders; and the Company's consolidated financial statements, including the "Notes to Consolidated Financial Statements" and the "Report of Independent Auditors" as contained in the Company's amended 2004 annual report to shareholders.

21.* List of significant subsidiaries of the Company.

23. Consent of Independent Registered Public Accounting Firm.

31.1 Certification of principal executive officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

31.2 Certification of principal financial officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

32.1 Certification of principal executive officer pursuant to U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

<PAGE>

32.2 Certification of principal financial officer pursuant to U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

99.1* Press Release dated April 1, 2005 announcing earnings

99.2* Press Release dated April 1, 2005 announcing sale of heat technology assets and new company name

---

+ Denotes management contract, compensatory plan or arrangement.

* Denotes previously filed exhibit on Form 10-K for the year ended December 31, 2004.

(1) Incorporated by reference from the Company's annual report on Form 10-K for the year ended December 31, 2003.

(2) Incorporated by reference from the Company's annual report on Form 10-K for the year ended December 31, 1997.

(3) Incorporated by reference from the Company's annual report on Form 10-K for the year ended December 31, 1995.

(4) Incorporated by reference from the Company's annual report on Form 10-K for the year ended December 31, 2001.

(5) Incorporated by reference from the Company's annual report on Form 10-K for the year ended December 31, 1996.

(6) Incorporated by reference from the Company's quarterly report on Form 10-Q for the quarter ended September 30, 2000.

(7) Incorporated by reference from the Company's current report on Form 8-K filed with the Commission on December 20, 2004.

(8) Incorporated by reference from the Company's current report on Form 8-K filed with the Commission on June 29, 2004.

(9) Incorporated by reference from the Company's annual report on Form 10-K for the year ended December 31, 2000.

(10) Incorporated by reference from the Company's quarterly report on Form 10-Q for the quarter ended September 30, 2003.

<PAGE>

SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

INTRICON CORPORATION
(Registrant)

By: /s/ William J. Kullback
-----------------------------
William J. Kullback
Chief Financial Officer,
Treasurer and Secretary

/s/ Mark S. Gorder
-----------------------------
Mark S. Gorder
President and Chief Executive
Officer (principal executive
officer)

Dated: June 27, 2005

<PAGE>

EXHIBIT INDEX

EXHIBITS:

13. "Summary of Operations" as contained in the Company's amended 2004 annual report to shareholders; "Other Financial Highlights" as contained in the Company's amended 2004 annual report to shareholders; "Management's Discussion and Analysis of Financial Condition and Results of Operations" as contained in the Company's amended 2004 annual report to shareholders; and the Company's consolidated financial statements, including the "Notes to Consolidated Financial Statements" and the "Report of Independent Auditors" as contained in the Company's amended 2004 annual report to shareholders.

23. Consent of Independent Registered Public Accounting Firm.

31.1 Certification of principal executive officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

31.2 Certification of principal financial officer pursuant to Section 302 of the Sarbanes-Oxley Act of 2002.

32.1 Certification of principal executive officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002.

32.2 Certification of principal financial officer pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002.

</TEXT>

</DOCUMENT>
<DOCUMENT>
<TYPE>EX-13
<SEQUENCE>2
<FILENAME>int052815_ex13.txt
<TEXT>

EXHIBIT 13

[Intricon Logo]

2004 ANNUAL REPORT

<PAGE>

INTRICON, FORMERLY SELAS CORPORATION OF AMERICA

Headquartered in Arden Hills, Minnesota, IntriCon Corporation is an international firm that designs, develops, engineers and manufactures micro-miniature medical and electronic products. The Company supplies micro-miniaturized components, systems and molded plastic parts, primarily to the hearing instrument manufacturing industry, as well as the computer, electronics, telecommunications and medical equipment industries. In addition to its Arden Hills headquarters, the Company has facilities in Minnesota, California, Singapore, and Germany. Within discontinued operations, the Company had facilities in Pennsylvania, Japan and Germany. See note 5 to the consolidated financial statements for a discussion of net sales and long-lived assets by geographic area for 2004, 2003, and 2002.

Currently, the Company has one operating segment, its precision miniature medical and electronics products segment. In the past the Company had operated three segments, precision miniature medical and electronics products segment, heat technology segment, and tire holders, lifts and related products segment. In 2001, the Company began focusing on its precision miniature medical and electronics products segment and developing plans to exit the businesses that comprised the heat technology segment, and tire holders, lifts and related products segment. The Company exited the tire holders, lifts and related products business in 2003 and exited the heat technology segment in the first quarter of 2005. For fiscal year 2004, the Company classified its heat technology segment as discontinued operations.

The Company manufactures microminiature components, systems and molded plastic parts for hearing instrument, medical equipment, electronics, telecommunications and computer industry manufacturers. These components consist of volume controls, microphones, trimmer potentiometers and switches. The Company also manufactures hybrid amplifiers and integrated circuit components ("hybrid amplifiers"), along with faceplates for in-the-ear and in-the-canal hearing

instruments. Components are offered in a variety of sizes, colors and capacities in order to accommodate a hearing manufacturer's individualized specifications. Sales to hearing instrument manufacturers represented approximately 52 percent of 2004 annual net sales for the Company's precision miniature medical and electronic products business.

In the medical market, the Company is focused on sales of microelectronics, micromechanical assemblies and high-precision plastic molded components to medical device manufacturers. Targeted customers include medical product manufacturers of portable and lightweight battery powered devices, large AC-powered units often found in clinics and hospitals, as well as a variety of sensors designed to connect a patient to an electronic device.

The medical industry is faced with pressures to reduce the costs of healthcare. The Company offers medical manufacturers the capabilities to design, develop and manufacture components for medical devices that are easier to use, measure with greater accuracy and provide more functions while reducing the costs to manufacture these devices. Examples of the Company's products used by medical device manufacturers include components found in intravenous fluid administration pumps that introduce drugs into the bloodstream. The Company manufacturers and supplies bubble sensors and flow restrictors that monitor and control the flow of fluid in an intravenous infusion system.

The Company also manufactures a family of safety needle products for an OEM customer that utilizes the Company's insert and straight molding capabilities. These products are assembled using full automation including built-in quality checks within the production lines. Other examples include sensors used to detect pathologies in specific organs of the body and monitoring devices to detect cardiac and respiratory functions. The early and accurate detection of pathologies allows for increased likelihood for successful treatment of chronic diseases and cancers. Accurate monitoring of multiple functions of the body, such as heart rate and breathing, aids in generating more accurate diagnosis and treatments for patients.

The Company has also expanded its microminiature components business through the manufacture of thermistors and film capacitors. The Company manufactures and sells thermistors and thermistor assemblies, which are solid state devices that produce precise changes in electrical resistance as a function of any change in absolute body temperature. The Company's Surge-Gard TM product line, an inrush electric current limiting device used primarily in computer power supplies, represented approximately 5 percent of the Company's sales in 2004. The balance of sales represents various industrial, commercial and military sales for thermistor and thermistor assemblies to domestic and international markets.

<PAGE>

In 2004 and 2002 no one customer accounted for more than 10 percent of the Company's consolidated net sales. During 2004 the top five customers accounted for approximately $12 million or 34 percent of the Company's consolidated net sales. In 2003, Sonic Innovations, one of the Company's hearing-health customers accounted for $4.5 million or 12.4 percent of the Company's consolidated net sales.

In 2004, the Company's foreign operations were conducted in Singapore, Germany, and Japan. Approximately 12 percent of the Company's revenues were derived from these countries in 2004. Currently the Company operates in Singapore and Germany, political or economic instability in these countries could have an adverse impact on the Company's results of operations due to diminished revenues

in these countries. The Company's future revenues, costs of operations and profit results could be affected by a number of factors related to the Company's international operations, including changes in foreign currency exchange rates, changes in economic conditions from country to country, changes in a country's political condition, trade protection measures, licensing and other legal requirements and local tax issues. Unanticipated currency fluctuations in the Euro and Singapore Dollar could lead to lower reported consolidated revenues due to the translation of these currencies into U.S. dollars when the Company consolidates its revenues.


RECENT DEVELOPMENTS

SALE OF BURNERS AND COMPONENTS BUSINESS - In the first quarter of 2005, the Company sold the remainder of its Heat Technology segment. The total purchase price was approximately $3.6 million, subject to adjustment, of which approximately $2.7 million was paid in cash and $900,000 was paid in the form of a subordinated promissory note. This segment consisted of the operating assets and liabilities of Selas Corporation of America (Dresher, Pennsylvania), Nippon Selas (Tokyo, Japan) and Selas Waermetechnik GmbH (Ratingen, Germany). This business was classified as a discontinued operation in 2004. For more detailed information, see note 3 to the Consolidated Financial Statements included herein.

MAJOR EVENTS IN 2004

SALE OF DRESHER PROPERTY - On June 23, 2004, the Company completed the sale of its property in Dresher, PA, to BT Limekiln LP, a Pennsylvania limited partnership, for approximately $3.6 million in cash, net of expenses. A gain of $3.1 million was recognized on the sale. The property was the headquarters for the Company's discontinued Heat Technology business and was previously classified as an asset held for sale on the Company's consolidated balance sheet. In connection with the sale, the Company leased back the property for a term of nine months at a base rental of $20,000 per month, plus expenses. Proceeds of the sale were used to reduce the Company's outstanding bank debt.

REDUCTION OF OVERHEAD - In 2004, the Company experienced weakness in the hearing health markets. The weakness was due to competitive pricing pressures, customer inventory management programs resulting in more just-in-time inventory, and unfavorable legislation in the German market reducing the reimbursement amount for the purchase of hearing aids. These factors resulted in both reduced sales and lower product margins. In an effort to return to operating profitability, the Company took steps in 2004 to reduce its overhead. These steps included the elimination of several management and other support positions, resulting in an annualized savings of over $3 million.

REACQUISITION OF SELAS WAERMETECHNIK - In the third quarter of 2004, the Company reacquired Selas Waermetechnik GmbH, which was previously part of Selas SAS. Selas SAS filed insolvency in July of 2003. Since that time, Selas Waermetechnik GmbH was under the control of a French court administrator. The Company owned the rights to the Selas name and the technology for the European market. This enabled the Company to reacquire the subsidiary for the minimal amount of $10,500 and record an extraordinary gain within discontinued operations of approximately $684,000 on the acquisition. The Company sold this subsidiary during the first quarter of 2005, as part of its Burners and Components business; therefore it has classified the subsidiary as a discontinued operation.

MAJOR EVENTS IN 2003

SALE OF DEUER MANUFACTURING - In July 2003, the Company completed the planned sale of its Tire Holders, Lifts and Related Products segment. This segment consisted of one wholly owned subsidiary, Deuer Manufacturing Inc. (Deuer), which operated on a stand-alone basis. In 2003, prior to its sale, Deuer generated approximately $8.5 million of revenue and $8,000 in net income. The net purchase price of $6.6 million was determined by negotiations between the parties. The Company recognized a gain of approximately $1.5 million, net of tax,

<PAGE>

on the transaction. Proceeds from the transaction were used primarily to reduce the Company's outstanding bank debt. The Company classified the subsidiary as a discontinued operation beginning in December 2002. For more detailed information, see note 3 to the Consolidated Financial Statements included herein.

INSOLVENCY OF FRENCH SUBSIDIARY - Selas SAS, the Company's then French subsidiary, filed insolvency in France in July 2003 after four consecutive quarters of substantial losses. Under French law, Selas SAS is now under the control of a French insolvency court administrator. Because Selas SAS and its subsidiaries are no longer under the control of The Company, its results of operations are excluded from the Company's continuing operations and the Company's historical financial information has been restated to reflect these subsidiaries as discontinued operations. For more detailed information, see note 3 to the Consolidated Financial Statements included herein.

MARKET AND DIVIDEND INFORMATION

| | 2004 | | 2003 | |
|---|---|---|---|---|
| | Market Price Range | | Market Price Range | |
| Quarter | High | Low | High | Low |
| First.......... | $3.60 | $2.82 | $1.89 | $1.29 |
| Second......... | 3.24 | 2.36 | 1.62 | 1.15 |
| Third.......... | 2.99 | 1.40 | 1.95 | 1.40 |
| Fourth......... | 2.40 | 1.70 | 3.85 | 1.58 |

At March 25, 2005, the Company had 378 shareholders of record.

There were no cash dividends declared in 2004 or 2003. The payment of any future cash dividends is subject to the discretion of the Board of Directors and is dependent on a number of factors, including the Company's capital requirements, financial condition, financial covenants and cash availability. The Company ceased paying quarterly cash dividends in the fourth quarter of 2001 and has no intention of paying cash dividends in the foreseeable future. Terms of the Company's banking agreements prohibit the payment of cash dividends without prior bank approval.

THE COMMON STOCK OF THE COMPANY IS LISTED ON THE AMERICAN STOCK EXCHANGE UNDER THE SYMBOL "SLS". THE COMPANY EXPECTS THAT ITS COMMON SHARES WILL BEGIN TRADING UNDER THE SYMBOL "IIN" ON OR AFTER APRIL 4, 2005.

<PAGE>

FINANCIAL HIGHLIGHTS

| YEARS ENDED DECEMBER 31, | 2004 (a) (RESTATED) | 2003(a,b) (restated) |
|---|---|---|
| Sales, net | $ 35,183,000 | $ 36,202,000 |
| Loss from continuing operations, net of income taxes | (1,905,000) | (4,032,000) |
| Income (loss) from discontinued operations, net of income taxes | 1,369,000 | (1,013,000) |
| Extraordinary gain from discontinued operations | 684,000 | -- |
| Net income (loss) | $ 148,000 | $ (5,045,000) |
| Basic earnings (loss) per share: | | |
| Continuing operations | $ (.37) | $ (.78) |
| Discontinued operations | .27 | (.20) |
| Extraordinary gain discontinued operations | .13 | -- |
| Net income (loss) | $ .03 | $ (.98) |
| Diluted income (loss) per share: | | |
| Continuing operations | $ (.37) | $ (.78) |
| Discontinued operations | .27 | (.20) |
| Extraordinary gain discontinued operations | .13 | -- |
| Net income (loss) | $ .03 | $ (.98) |
| Working capital | $ 2,183,000 | $ 245,000 |
| Total assets | $ 30,939,000 | $ 34,729,000 |
| Total shareholders' equity | $ 12,128,000 | $ 11,807,000 |

(a) See note 2 to the Company's consolidated financial statement included herein for information pertaining to the restatement of earnings.

(b) For 2003, the Company reclassified its remaining Heat Technology business which consisted of the burners and components portion of the business as discontinued operations. The Company sold this portion of the business in the first quarter of 2005. For 2004 and 2003, the Heat Technology business had revenues of $9.7 and $18.4 million, respectively, with net income of $2.1 million for 2004 and a net loss of $2.5 million for 2003. The Tire Holders, Lifts and Related Products business that was sold in July 2003 is also included in discontinued operations. For 2003, this segment had revenue of $8.5 million, and net income of $8,000.

<PAGE>

[For purposes of this amendment, the Chief Executive Officer's letter has been deleted.]

<PAGE>

<TABLE>
<CAPTION>
FIVE-YEAR SUMMARY OF OPERATIONS*
(IN THOUSANDS, EXCEPT FOR PER SHARE AND SHARE DATA)

| Years ended December 31, | 2004(a) (RESTATED) | 2003(a,b) (restated) | ( |
|---|---|---|---|
| <S> | <C> | <C> | <C> |
| Sales, net | $ 35,183 | $ 36,202 | $ |
| Cost of sales | 27,121 | 27,638 | |
| Operating expenses | 11,535 | 11,457 | |
| Interest expense | 465 | 533 | |
| Interest income | (2) | (8) | |
| Gain on sale of asset | 3,110 | -- | |
| Other (income) expense, net | (61) | 130 | |
| | ----------- | ----------- | --- |

| | | | |
|---|---|---|---|
| Income (loss) from continuing operations before income taxes, discontinued operations and change in accounting principle.......... | (765) | (3,548) | |
| Income tax expense (benefit)..................... | 1,140 | 484 | |
| | ----------- | ----------- | --- |
| Income (loss) from continuing operations before discontinued operations and change in accounting principle....................... | (1,905) | (4,032) | |
| Income (loss) from discontinued operations, net of income taxes (note 3).... | 1,369 | (1,013) | |
| Extraordinary gain from discontinued operation.. | 684 | -- | |
| | ----------- | ----------- | --- |
| Cumulative effect of change in accounting principle....................... | -- | -- | |
| | ----------- | ----------- | --- |
| Net income (loss)............................... | $ 148 | $ (5,045) | $ |
| | =========== | =========== | === |
| Basic earnings (loss) per share: | | | |
| Continuing operations....................... | $ (.37) | $ (.78) | $ |
| Discontinued operations..................... | .27 | (.20) | |
| Extraordinary gain discontinued operations............................ | .13 | -- | |
| Accounting principle change................. | -- | -- | |
| | ----------- | ----------- | --- |
| Net income (loss)........................... | $ .03 | $ (.98) | $ |
| | =========== | =========== | === |
| Diluted earnings (loss) per share: | | | |
| Continuing operations....................... | $ (.37) | $ (.78) | $ |
| Discontinued operations..................... | .27 | (.20) | |
| Extraordinary gain discontinued operations.. | .13 | -- | |
| Accounting principle change................. | -- | -- | |
| | ----------- | ----------- | --- |
| Net income (loss)........................... | $ .03 | $ (.98) | $ |
| | =========== | =========== | === |
| Weighted average number of Shares outstanding during year: | | | |
| Basic............................................. | 5,129,214 | 5,124,433 | 5 |
| | =========== | =========== | === |
| Diluted........................................... | 5,131,841 | 5,124,433 | 5 |
| | =========== | =========== | === |

</TABLE>

<PAGE>

<TABLE>
<CAPTION>
OTHER FINANCIAL HIGHLIGHTS*
(IN THOUSANDS, EXCEPT FOR PER SHARE DATA)

| YEARS ENDED DECEMBER 31, | 2004(a) (RESTATED) | 2003(a,b) (restated) | 2002(a) (restated) | 2001(a (restate |
|---|---|---|---|---|
| <S> | <C> | <C> | <C> | <C> |

| | | | | |
|---|---|---|---|---|
| Working capital | $ 2,183 | $ 245 | $ 4,711 | $ 16,57 |
| Total assets | $ 30,939 | $ 34,729 | $ 63,936 | $ 86,51 |
| Long-term debt | $ -- | $ -- | $ 2,415 | $ 2,56 |
| Shareholders' equity: | | | | |
| Capital stock and additional paid-in capital | $ 17,670 | $ 17,670 | $ 17,648 | $ 17,64 |
| Retained earnings (accumulated deficit) | (3,680) | (3,828) | 1,216 | 23,00 |
| Accumulated other comprehensive loss | (597) | (770) | (1,525) | (1,00 |
| Treasury stock | (1,265) | (1,265) | (1,265) | (1,26 |
| Total shareholders' equity | $ 12,128 | $ 11,807 | $ 16,074 | $ 38,37 |
| Depreciation and amortization | $ 2,289 | $ 2,387 | $ 2,452 | $ 3,35 |
| Dividends per share | $ -- | $ -- | $ -- | $ .1 |

</TABLE>

* See note 14 to the Company's consolidated financial statements included herein for quarterly results of operations.

(a) See note 2 to the Company's consolidated financial statements included herein for information pertaining to the restatement of earnings.

(b) The Company has reclassified two of its business segments as discontinued operations. This includes the entire Heat Technology business, including the large custom-engineered furnace portion of this segment, which was sold in 2002, and the burners and components portion of the segment which the Company sold in the first quarter of 2005. The Company's Tire Holders, Lifts and Related Products business that was sold in July of 2003 is also included in discontinued operations. Accordingly, the historical financial information has been reclassified. See note 3 to the Consolidated Financial Statements.

<PAGE>

MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

The Company has not amended and does not intend to amend its previously filed Form 10K for the fiscal year ended December 31,2003 or its previously filed Annual Reports on Form10-k or Quarterly Reports on Form 10-Q for the periods affected by the Restatement that ended prior to December 31,2004. For this reason the consolidated financial statements, auditors' reports and related financial information for the affected periods contained in such reports should no longer be relied upon. However, we have restated the financial information for 2000 and 2001 presented in "Other Financial Highlights" of this report.

We have restated our consolidated financial statements for the years 2000 through 2004 (the "Restatement"). The determination to restate these financial statements was made after errors were discovered in May, 2005. In addition, certain disclosures in other notes to our consolidated financial statements have been restated to reflect the Restatement adjustments. In the Restatement, we have:

- o Corrected the accounting for certain research and development expenditures that were erroneously capitalized to the balance sheet by recording charges to the statement of operations.
- o Reversed amortization expense related to the erroneously capitalized research and development expenditures.
- o Adjusted income tax reserves as a result of the changes to pre-tax income relating to the correction of accounting for certain research and development expenditures noted above.

The Restatement narrative below includes only the 2002, 2003, and 2004 audited amounts as well as the impact of prior period Restatement amounts on beginning retained earnings at January 1, 2002.

The Restatement reduced our earnings before income taxes for 2002 and 2003 by $314,000 and $97,000, respectively. For 2004, the Restatement increased our earnings before income taxes by $49,000.

The 2002 Restatement was comprised of a $24,000 reduction in cost of sales to reverse amortization expense and a $338,000 charge to research and development expense to reverse capitalized research and development costs. The 2003 Restatement was comprised of a $347,000 reduction in cost of sales to reverse amortization expense, a $37,000 charge to general and administrative expense to reverse capitalized engineering support costs, and a $408,000 charge to research and development expense to reverse capitalized research and development costs. The 2004 Restatement was comprised of a $193,000 reduction in cost of sales to reverse amortization expense, a $15,000 charge to general and administrative expense to reverse capitalized engineering support costs, and a $129,000 charge to research and development expense to reverse capitalized research and development costs.

The Restatement decreased beginning retained earnings for the year ended December 31, 2002 presented on our consolidated statements of stockholders' equity from $23,297,000 as previously reported to $23,004,000 as restated. This $293,000 decrease, net of tax of $127,000 represented the cumulative impact of restating 2000 and 2001 for the accounting errors described above.

The Restatement had no impact on historical cash balances or total cash flows from operating, investing or financing activities for the years ended December 31, 2004 and 2003. The only impact on the consolidated statements of cash flows was to reclassify certain amounts within the cash flow statement categories.

The primary impact of the above adjustments on the December 31, 2004 and December 31, 2003 consolidated balance sheet was a reduction to property, plant and equipment. Further information regarding the impact of these adjustments is provided in Note 2.

OVERVIEW

The Company has embarked on a strategy to focus on its Precision Miniature Medical and Electronics Products markets for future growth. Consistent with this strategy, the following actions were taken in 2004:

BURNERS AND COMPONENTS BUSINESS - In the fourth quarter of 2003, the Company initiated its plan to sell the remainder of its Heat Technology segment. This segment consists of the operating assets of Selas Corporation of America (Dresher, Pennsylvania) and Nippon Selas (Tokyo, Japan). The Company sold the segment during the first quarter of 2005 and has classified the segment as a discontinued operation and, accordingly, has reclassified the historical financial data. For more detailed information, see note 3 to the Consolidated Financial Statements included herein.

PROPERTY IN DRESHER, PENNSYLVANIA. - On June 23, 2004, the Company completed the sale of its property in Dresher, PA, to BT Limekiln LP, a Pennsylvania limited partnership, for approximately $3.6 million in cash, net of expenses. A gain of $3.1 million was recognized on the sale. The property was the headquarters for the Company's discontinued Heat Technology business and was previously classified as an asset held for sale on the Company's consolidated balance sheet. In connection with the sale, the Company leased back the property for a term of nine months at a base rental of $20,000 per month, plus expenses. Proceeds of the sale were used to reduce the Company's outstanding bank debt.

REDUCTION OF OVERHEAD - In 2004, the Company experienced weakness in the hearing health markets. The weakness was due to competitive pricing pressures, customer inventory management programs resulting in more just-in-time inventory, as well as unfavorable legislation in the German market reducing the reimbursement amount for the purchase of hearing aids. These factors resulted in both reduced sales and lower product margins. In an effort to return to operating profitability, the Company took steps in 2004 to reduce its overhead. These steps included the elimination of several management and other support positions, resulting in an annualized savings of over $3 million.

FORWARD-LOOKING AND CAUTIONARY STATEMENTS

Certain statements included in this Annual Report to Shareholders or documents the Company files with the Securities and Exchange Commission, which are not historical facts, are forward-looking statements (as such term is defined in the Securities Exchange Act of 1934, and the regulations thereunder), which are intended to be covered by the safe harbors created thereby. These statements may include, but are not limited to:

o statements in the letter to shareholders, such as the Company's position and focus on the Company's core product lines, ability to compete, the potential for growth for the hearing health market, growth in the military and aviation markets, disposition of assets and the renaming of the Company;
o statements in "Management's Discussion and Analysis of Financial Condition and Results of Operations" such as new digital products to gain market share, recovery of the telecommunications market, potential growth in the Company's medical profits, future gross profit margins, future cost savings, net operating loss carryforwards, the impact of future cash flows, the ability to maintain financial covenants, the ability to meet working capital requirements, future level of funding of employee benefit plans, the ability to negotiate extension on purchases, the impact of foreign currencies and litigation;
o statements in "Notes to the Company's Consolidated Financial Statements;" and
o statements in the Company's annual report on Form 10-K for the year ended December 31, 2004, in "Business", Legal Proceedings" and "Risk Factors",

such as the Company's ability to focus on the precision miniature medical and electronics products business segment and exit the heat technology segment, the ability to compete, the adequacy of insurance coverage, and potential increase in demand for the Company's products.

Forward-looking statements include, without limitation, statements as to the Company's:

o expected future results of operations and growth;
o ability to meet working capital requirements;
o business strategy; o expected benefits from staff reductions;
o expected increases in operating efficiencies;
o anticipated trends in the hearing-health market related to the Company's Precision Miniature Medical and Electronic Products segment; and
o estimates of goodwill impairments and amortization expense of other intangible assets.

<PAGE>

In addition, forward-looking statements also include the effects of changes in accounting pronouncements, the effects of litigation and the amount of insurance coverage, and statements as to trends or the Company's or management's beliefs, expectations and opinions. Forward-looking statements are subject to risks and uncertainties and may be affected by various factors that may cause actual results to differ materially from those in the forward-looking statements. In addition to the factors discussed in this Annual Report to Shareholders, certain risks, uncertainties and other factors can cause actual results and developments to be materially different from those expressed or implied by such forward-looking statements, including, without limitation, the following:

o the ability to implement the Company's business strategy;
o risks arising in connection with the insolvency of The Company SAS, and potential liabilities and actions arising in connection therewith;
o the volume and timing of orders received by the Company;
o changes in estimated future cash flows;
o foreign currency movements in markets the Company services;
o changes in the global economy and financial markets;
o changes in the mix of products sold;
o acceptance of the Company's products;
o competitive pricing pressures;
o pending and potential future litigation;
o availability of electronic components for the Company's products;
o ability to create and market products in a timely manner;
o ability to pay debt when it comes due;
o ability to sell businesses marked for sale; and
o risks associated with terrorist attacks, war and threats of attacks and wars.

For a description of these and other risks see "Risk Factors" in the Company's annual report on Form 10-K for the year ended December 31, 2004 or in other filings the Company makes from time to time with the Securities and Exchange Commission. The Company does not undertake to update any forward-looking statement that may be made from time to time by or on behalf of the Company.

<PAGE>

RESULTS OF OPERATIONS

2004 COMPARED WITH 2003

CONSOLIDATED NET SALES

Consolidated net sales for 2004 and 2003 were as follows (in thousands):

| | 2004 | 2003 | Change Dollars | Change Percent |
|---|---|---|---|---|
| Consolidated net sales.... | $35,183 | $36,202 | $(1,019) | (2.8)% |

The Company's sales continued to be impacted by weakness in its primary hearing-health market. Competitive pricing issues, customer inventory reduction efforts as well as unfavorable legislation in the German market, which reduced the reimbursement amount to the end user for the purchase of hearing aids, contributed to a 15 percent decrease in sales to the hearing-health market in 2004.

The Company also saw a decline of 15 percent in sales to the medical equipment market in 2004. Sales to this market are extremely reliant on orders from two customers, and are volatile depending on sales levels, inventory levels and acceptance of these customer's end products. Medical products comprised $4.2 million, about 12 percent of the Company's 2004 consolidated net sales, compared to $4.9 million or 13 percent in 2003.

The weakness in the hearing-health and medical equipment markets was partially offset by increases in sales to the Company's remaining markets. Sales of the Company's thermistor and capacitor products, into the telecommunication markets, represented 20 percent of the Company's sales in 2004 increasing 17 percent year-over-year as the overall world telecommunications market continued to strengthen. Sales to the professional audio market represented 16 percent of the Company's 2004 sales increasing 44 percent; 2004 sales to this market included a $1.1 million order of helmets for the Singapore military.

Looking forward to 2005, the Company believes its new digital products will help it gain market share in the hearing health market, as the product performance has been rated exceptional. The telecommunications market seems to be recovering and the Company expects sales to its medical equipment market to rebound.

GROSS PROFIT

Gross profit, both in dollars and as a percent of sales, for 2004 and 2003, were as follows (in thousands):

| | 2004 (restated) | | 2003 (restated) | | Change (restated) | |
|---|---|---|---|---|---|---|
| | Dollars | Percent | Dollars | Percent | Dollars | Percent |
| Gross profit.... | $8,061 | 22.9% | $8,564 | 23.7% | $(503) | (.8)% |

2004 gross margins decreased due to the lower overall sales volume, this included a decrease in sales to the medical equipment products market, which generally provides higher gross profit margins. The hearing-health product mix continued shifting away from higher gross profit margins of mechanical components to digital products, which typically have lower gross profit margins for the Company. These factors were partially offset by lower inventory reserves in 2004 when compared to 2003, along with an increase in sales of electronic products, which generally have higher gross profit margins. Inventory write-downs were $770,000 and $1.1 million in 2004 and 2003, respectively and are the result of more specialized inventory, changes in product mix, and shorter product life cycles particularly in the hearing health market. The Company believes its gross profit margins in 2005 will be in the 23 to 26 percent range due to cost saving measures which have been implemented, including staffing reductions, additional automation, shifting certain production to its

<PAGE>

Singapore facility and changes in product mix including an anticipated rebound of its medical product sales.

SELLING, GENERAL AND ADMINISTRATIVE EXPENSES

Selling, general and administrative expenses (SG&A) for the years ended December 31, 2004 and 2003 were (in thousands):

<TABLE>
<CAPTION>

| | 2004 (restated) | | 2003 (restated) | | Chang (restat | |
|---|---|---|---|---|---|---|
| | Dollars | Percent of Sales | Dollars | Percent of Sales | Dollars | Y I |
| <S> | <C> | <C> | <C> | <C> | <C> | |
| Selling...................... | $3,934 | 11.2% | $3,649 | 10.1% | $ 285 | |
| Research and development.... | $1,616 | 4.6% | $2,170 | 6.0% | $(554) | |
| Asset impairment............ | $ 488 | 1.4% | $ 379 | 1.0% | $ 109 | |
| General and administrative. | $5,497 | 15.6% | $5,259 | 14.5% | $ 238 | |

</TABLE>

The higher SG&A expenses in 2004 were mainly attributable to an increase in selling and administrative expense, partially offset by a decline in development cost. The $285,000 increase in selling expense was mainly due to the hiring of a sales and marketing manager for our medical products market and the associated fees paid to a third party recruiter. Research and development decreased as a result of an increase in customer funded development projects, as the Company partners with its customers to bring new hearing health products to market. The $238,000 increase in administrative expenses was mainly attributable to accruals of severance cost in 2004, as the Company reduced its staff, to compensate for the decline in sales.

IMPAIRMENT OF LONG-TERM ASSETS

In 2004, the Company recorded an impairment from abandonment of long-term assets of $488,000 based on analysis of future cash flows; in 2003, an impairment from

abandonment of long-term assets of $379,000 was recorded. The 2004 abandonment was mainly associated with technology having to do with the development of a specific microphone for use in both the professional audio and hearing health markets; management determined that due to external technological advances the technology was no longer viable. The 2003 abandonment was due to previously capitalized technology costs primarily related to microphone and headset products for the professional audio-device market. These technology costs were no longer considered to have future value.

NET INTEREST EXPENSE

Net interest expense for 2004 was $465,000 a decline of $68,000 from $533,000 in 2003. This was principally due to a reduction in the overall bank debt, offset by an increase in interest rates. Total bank debt was $5.2 million at December 31, 2004 compared to $8.2 million December 31, 2003.

OTHER

In 2004, other income was $61,000 compared to other expense of $130,000 in 2003. The difference principally stemmed from an exchange loss of $94,000 on Euro denominated bank debt in 2003. There was no similar loss in 2004.

INCOME TAXES

Income taxes were as follows (in thousands):

| | 2004 (restated) | 2003 (restated) |
|---|---|---|
| Income tax expense (benefit)................... | $ 1,140 | $ 485 |
| Percentage of pre-tax loss..................... | (149.0%) | (13.6%) |

<PAGE>

The effective tax rate of (149.0%) percent compared to the U.S. Federal statutory rate of 34 percent in 2004 was primarily due to three reasons:

- -- The Company established an $890,000 valuation reserve against previously established tax assets as their realizability was uncertain due to the operating losses the Company has generated for the last three years;
- -- The estimated 2003 Federal income tax refund was reduced by approximately $45,000 in alternative minimum tax; and
- -- The Company generated taxable profits in its foreign operations and recognized income tax expense of approximately $196,000 related to those operations.

The Company estimates it has approximately $16.3 million of net operating loss (NOL) carryforwards available to offset future federal income taxes.

DISCONTINUED OPERATIONS

The Company recorded a net profit (loss) from discontinued operations as follows (in thousands):

| | 2004 | 2003 |
|---|---|---|

| | | |
|---|---|---|
| Net income (loss) from Heat Technology Business.... | $ 1,369 | $(2,512) |
| Net income from Tire Holders, Lifts and related products segment...................... | -- | 1,499 |
| Extraordinary gain from discontinued operations.... | 684 | -- |
| Net income (loss) from discontinued operations..... | $ 2,053 | $(1,013) |

HEAT TECHNOLOGY SEGMENT

The 2004 net income was a result of the operating profits from its remaining burners and components business, and an extraordinary gain from the reacquisition of Selas Warmetechnik (see note 3 and note 4 in the consolidated financial statements). The 2003 net loss from the Heat Technology business was primarily the result of the insolvency filed in France by the Company's wholly owned French subsidiary. This consisted of the European heat technology operation remaining after the 2002 sale of the large custom-engineered furnace business. The European loss in 2003 was partially offset by $110,000 of net income from the remaining the Company's burner and component business with locations in Dresher, Pennsylvania, and Tokyo, Japan. In the first quarter of 2005, the Company sold its remaining burner and component business for approximately $3 million.

TIRE HOLDER, LIFTS AND RELATED PRODUCTS SEGMENT

The 2003 net income from the Tire Holder, Lifts and Related Products segment was the combination of net income of $8,000 from Deuer Manufacturing, Inc. prior to its sale In July 2003 and the approximately $1.5 million gain recognized from the sale.

2003 COMPARED WITH 2002

CONSOLIDATED NET SALES

Consolidated net sales for 2003 and 2002 were as follows (in thousands):

| | | | Change | |
|---|---|---|---|---|
| | 2003 | 2002 | Dollars | Percent |
| Consolidated net sales.... | $36,202 | $34,975 | $1,227 | 3.5% |

<PAGE>

The Company's sales in 2003 were impacted by weakness in its primary hearing-health market. Competitive pricing issues and a continued decline in sales of component products contributed to a 5 percent decrease in sales to the hearing-health market. Other contributing factors included a fourth-quarter reduction in orders from two major customers, as they sought to lower their inventory levels. The weakness in the hearing-health market was offset by gains in other markets. Sales of the Company's Thermistor and Capacitor products into the telecommunication markets increased 10 percent year-over-year as the overall world telecommunications market strengthened.

The Company continued to expand its customer base in the medical equipment market; the Company's sales to this market saw a 40 percent year-over-year growth. Medical products comprised about 13 percent of the Company's 2003 sales, compared to 10 percent in 2002.

GROSS PROFIT

Gross profit, both in dollars and as a percent of sales, for 2003 and 2002, were as follows (in thousands):

| | 2003 (restated) | | 2002 (restated) | | Change (restated) | |
|---|---|---|---|---|---|---|
| | Dollars | Percent | Dollars | Percent | Dollars | Percent |
| Gross profit...... | $8,564 | 23.7% | $8,164 | 23.3% | $400 | .4% |

Although year over year sales increased by $1.2 million, gross profit remained relatively flat as a percentage of sales in 2003, due primarily to an increase in inventory reserves in 2003. The increase in inventory reserves of approximately $1.1 million was the result of more specialized inventory, changes in product mix, and shorter product life cycles. The hearing-health product mix continued shifting away from higher gross profit margins of mechanical components to digital products, which typically have lower gross profit margins for the Company. These factors were partially offset by an increase in sales of electronic products as well as medical products, which generally have higher gross profit margins.

SELLING, GENERAL AND ADMINISTRATIVE EXPENSES

Selling, general and administrative expenses (SG&A) for the years ended December 31, 2003 and 2002 were (in thousands):

<TABLE>
<CAPTION>

| | 2003 (restated) | | 2002 (restated) | | Change (restate | |
|---|---|---|---|---|---|---|
| | Dollars | Percent of Sales | Dollars | Percent of Sales | Dollars | Ye In |
| <S> | <C> | <C> | <C> | <C> | <C> | |
| Selling.................... | $3,649 | 10.1% | $3,667 | 10.5% | $ (18) | |
| Research and development.. | $2,170 | 5.8% | $1,187 | 3.4% | $ 983 | |
| Asset impairment........... | $ 379 | 1.0% | -- | -- | $ 379 | |
| General and administrative | $5,259 | 14.7% | $5,630 | 16.1% | $(371) | |

</TABLE>

The higher SG&A expenses in 2003 were mainly attributable to the significant increase in research and development cost, partially offset by a decline in general and administrative expenses. Research and development increased as a result of the Company's efforts to develop new products for its growing sales to the medical equipment market, as well as new digital products for the hearing-health market. The $371,000 decline in administrative expenses was mainly attributable to accruals of severance cost in 2002, along with reduced legal and consulting fees in 2003.

IMPAIRMENT OF LONG-TERM ASSETS

In 2003, the Company recorded an impairment from abandonment of long-term assets of $379,000 based on analysis of future cash flows; no abandonment was recorded in 2002. The abandonment was due to previously capitalized technology costs primarily related to microphone and headset products for the professional audio-device market. These technology costs were no longer considered to have future value.

<PAGE>

NET INTEREST EXPENSE

Net interest expense declined by $161,000 from $525,000 in 2003 compared to $686,000 in 2002. This was principally due to a reduction in the overall bank debt. Total bank debt was $8.2 million and $14.3 million at December 31, 2003 and 2002, respectively.

OTHER

In 2003, other expense was $130,000 compared to other income of $31,000 in 2002. The difference stemmed from an exchange loss of $94,000 on Euro denominated bank debt in 2003. There was no similar loss in 2002.

INCOME TAXES

Income taxes were as follows (in thousands):

| | 2003 (restated) | 2002 (restated) |
|---|---|---|
| Income tax expense (benefit)...... | $ 485 | $ (1,160) |
| Percentage of pre-tax loss......... | (13.7%) | (39.0%) |

The effective tax rate of (13.7) percent compared to the U.S. Federal statutory rate of 34 percent in 2003 was primarily due to two reasons:

- The Company established a $1.8 million valuation reserve against previously established tax assets as their realizability was uncertain due to the operating losses the Company has generated for the last three years.
- The Company generated net operating losses (NOL) for Federal tax purposes, but only recognized them to the extent of the $714,000 current refund available. The Company estimated it had $16.6 million of carry forward available to offset future federal income taxes, as of December 31, 2003.

DISCONTINUED OPERATIONS

The Company recorded a net loss from discontinued operations as follows (in thousands):

| | 2003 | 2002 |
|---|---|---|
| Net loss from Heat Technology Business.............................. | $ (2,512) | $(11,637) |
| Net income from Tire Holders, Lifts and related products segment.............. | 1,499 | 1,093 |