IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-422 (GMS) |
| | ) | |
| SONIC INNOVATIONS, INC., et. al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## PLAINTIFF ENERGY TRANSPORTATION GROUP INC.'S OPENING *MARKMAN* BRIEF IN SUPPORT OF ITS PROPOSED CLAIM CONSTRUCTION

Edmond D. Johnson (DE Bar #2257)
Thomas H. Kovach (DE Bar #3964)
Pepper Hamilton LLP
1313 Market Street, Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Fax: (302) 421-8390

Attorneys for Energy
Transportation Group, Inc.

OF COUNSEL:

Brian M. Buroker
Robert L. Kinder, Jr.
HUNTON & WILLIAMS LLP
1900 K Street, N.W.; Suite 1200
Washington, DC 20006-1109
Telephone: (202) 955-1500
Facsimile: (202) 778-2201

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone: (804) 788-8788
Facsimile: (804) 343-4630

Dated: May 16, 2007

#8567012 v1

## TABLE OF CONTENTS

Page

I.    STATEMENT OF FACTS ................................................................. 1

II.   SUMMARY OF ARGUMENT ........................................................ 3

III.  GENERAL CLAIM CONSTRUCTION PRINCIPLES ........................................ 3

      A.   The Federal Circuit Has Reaffirmed The Paramount Importance Of
           Intrinsic Evidence ........................................................ 3

      B.   Limitations May Not Be Read From The Specification Into The
           Claims .................................................................... 4

      C.   Interpretation of Means-Plus-Function Claims ............................. 4

      D.   Modifying Language That Merely States A Claim Result Does Not
           Limit The Function Of A Means-Plus-Function Recitation .................... 5

IV.   THE PROPER CONSTRUCTION OF THE '850 PATENT ................................... 6

      A.   "Programmable Delay Line Filter" Means "A Filter Employing One
           Or More Delays And Coefficients, The Value(s) Of At Least One
           Delay Or Coefficient Can Be Programmed" - Claims 1, 9, 10 and 19 ........ 6

      B.   "Programmed" Means "Provided With One Or More Values So As
           To Produce A Response" - Claims 1, 9, 10, 17, 18 and 19. ................ 8

      C.   "Programmable Filter" And "Filter Therein Programmed" Mean "A
           Filter Having Coefficients Where The Values Of The Coefficients
           May Be Programmed" - Claims 13, 14, 15, 16 and 17 ...................... 10

      D.   "Determining" And "As A Function Of Frequency" Should Be Given
           Their Ordinary and Customary Meaning - Claims 13 and 14. ............... 10

      E.   Claims 13 And 14 Do Not Require A Specific Order of Steps ............... 11

      F.   "Inserting Between The Input And Output Of Said Transmission
           Channel An Electrical Feedback Path Having A Filter" Means
           "Making an Electric Feedback Path Effective Between The Input
           And Output Of The Transmission Channel" - Claim 13. .................... 12

      G.   "Inserting Between The Input And Output Of Said Transmission
           Channel A Programmable Filter" Means "Making a Programmable
           Filter Effective Between The Input And Output Of The Transmission
           Channel" - Claim 14. ................................................... 13

      H.   "Feedback Path" Should Be Given Its Ordinary and Customary
           Meaning - Claims 1, 13, 18 and 19 ...................................... 13

      I.   "Forward Path" Should Be Given Its Ordinary And Customary
           Meaning - Claims 9 and 15 .............................................. 15

J.     "Responsive Characteristic Effective To Compensate For Impaired Hearing Of The Wearer Of The Aid" Should Be Given Its Ordinary and Customary Meaning - Claim 18.........................................................15

V.    THE PROPER CONSTRUCTION OF THE '850 PATENT MEANS-PLUS-FUNCTION CLAIMS ....................................................................................16

    A.     "Programmable Signal Limiter Means" - Claim 1 ......................................16

    B.     "Memory Means," "Means ... For Providing An Output," and "Means For Converting Analog Signals…" - Claims 2 and 3 ................................21

    C.     "Means Controllable To Impart Different Response Characteristics To Said Hearing Aid" - Claim 5 .................................................................21

    D.     "Controlling Means . . . For Automatically Controlling Said Controllable Means" - Claim 5 .....................................................................23

    E.     "Speech Detector Means For Determining When Speech Signals Are in Said Transmission Channel" - Claim 6 ....................................................24

    F.     "A Plurality Of Bandpass Filter Means For Determining The Noise Frequency Spectrum In Said Transmission Channel" - Claim 6...............25

    G.     "A Plurality of Comparator Means . . . For Indicating Whether The Speech Level In Each Said Bandpass Filter Exceeds The Noise Level Therein And For Actuating Said Controlling Means To Impart To The Hearing Aid A Response Characteristic" - Claim 6...........................26

    H.     "Means For Adjusting The Amplitude And Phase Characteristics Of Each Of Said Microphone Channels" - Claim 17.......................................27

    I.     "Means For Summing The Outputs Of Said Microphone Channels" .......27

    J.     None of the Terms are Indefinite.................................................................28

VI.    THE PROPER CONSTRUCTION OF THE '749 PATENT ................................28

    A.     "Host Controller" Means "A Processor For Controlling Operations Of A Device" ...........................................................................................28

    B.     "Output Signal" Should Be Given Its Plain And Ordinary Meaning - Claim 6 .....................................................................................................30

VII.   THE PROPER CONSTRUCTION OF THE '749 PATENT MEANS-PLUS-FUNCTION CLAIMS ....................................................................................30

    A.     "Means For Receiving Signals From The Hearing Aid And Measuring Phase And Amplitude" - Claim 1 ............................................30

    B.     "Means For Receiving Signals From The Hearing Aid Indicative Of The Summation Of Acoustic Feedback And Acoustic Feedback Cancellation Signals" - Claim 1 ...............................................................32

    C.     "Means Controlled By The Computer For Adjusting The Phase And Amplitude Necessary To Eliminate Acoustic Feedback And Produce A Null Summation" - Claim 1 .................................................................34

ii

D. "Means Controlled By The Computer For Transmitting Phase Shift And Amplitude Data To Program The Hearing Aid To Eliminate Acoustic Feedback" - Claim 2 ................................................................... 35

E. "Computer Controlled Means For Adjusting The Phase Shift And Amplitude To Produce An Acoustic Feedback Cancellation Signal" - Claim 4 ..................................................................................................... 36

F. "Computer Controlled Means For Supplying A Logic Signal To The Hearing Aid For Programming And A logic Signal To The Hearing Aid To Restore It For Use By The Patient" - Claim 5 .............................. 37

G. "Adjustable Phase Shift And Amplitude Means Controlled By The Computer For Adjusting The Phase Shift And Amplitude Necessary To Eliminate Acoustic Feedback And Transmitting An Acoustical Feedback Cancellation Signal To The Hearing Aid" - Claim 6 ................ 38

VIII. CONCLUSION ................................................................................... 40

# TABLE OF AUTHORITIES

**Cases:**

*Altiris, Inc. v. Symantec Corp.*
318 F.3d 1363 (Fed. Cir. 2003) ............................................................5, 12

*Applied Medical Resources Corp. v. United States Surgical Corp.*
448 F.3d 1324 (Fed. Cir. 2000) .........................................................4, 5, 18

*Asyst Techs., Inc. v. Empak, Inc.*
268 F.3d 1364 (Fed. Cir. 2001) .............................................................3, 19

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Industrial, Inc.*
145 F.3d 1303 (Fed. Cir. 1998) ..................................................................5

*Freeman v. Gerber Products Co.*
357 F.Supp.2d 1290 (D. Kan. 2005) ...........................................................20

*Interactive Gift Express, Inc. v. CompuServe, Inc.,*
256 F.3d 1323 (Fed. Cir. 2001) ..................................................................11

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.,*
324 F.3d 1308 (Fed. Cir. 2003) ...................................................................5

*Micro Chemical, Inc. v. Great Plains Chemical Co.,*
194 F.3d 1250 (Fed. Cir. 1999) ......................................................4, 5, 30, 31

*Omega Engineering Inc. v. Raytek Corp.,*
334 F.3d 1314 (Fed. Cir. 2003) .............................................................5, 19

*Phillips v. AWH Corp.*
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................................................3, 4

*U.S. Surgical Corp. v. Ethicon, Inc.*
103 F.3d 1554 (Fed. Cir. 1997) .............................................................6, 9

*Vitronics Corp. v. Conceptronics Inc.*
90 F.3d 1576 (Fed. Cir. 1996) ....................................................................3

## FEDERAL STATUTES

35 U.S.C. § 112 ...................................................................................18, 30

## I.    STATEMENT OF FACTS

United States Patent Nos. 4,731,850 ("the '850 Patent") and 4,879,749 ("the '749 Patent") (collectively, "the ETG Patents")[1] generally relate to programmable digital hearing aids.  While the claims of these patents are varied, the claims generally relate to hearing aid systems that are programmable so as to have optimum electro-acoustic characteristics for the patient and acoustic environment in which they are used.  '850 Patent, Abstract.  "More specifically, [the disclosure describes and claims] relate to hearing aids of this character that are capable of automatically adjusting to optimum parameter values as operating conditions such as speech level, room reverberation and background noise change, and also for reducing acoustic feedback." Id. at 1:8-13.

The '850 Patent claims recite several different inventions related to the signal processing capabilities of a programmable hearing aid.  The '749 Patent, sharing the same disclosure, contains claims relating to a host controller device that outputs data "for a programmable filter of a hearing aid." '749 Patent, Abstract.

While the '749 Patent contains several different claims directed to the host controller, the '850 Patent claims several distinct embodiments for digital signal processing within hearing aids.  The first embodiment, to which claims 1 - 3 and 10 are primarily directed, pertains to a hearing aid having a programmable delay line filter and programmable signal limiter means interposed between the input and output of the transmission channel in a feedback path.  The filter is programmed to impart at least one response characteristic effective to compensate for the impaired hearing of the wearer.  Further, the programmable delay line filter is programmed with coefficients designed to

---

[1] Copies of the '850 and '749 Patents are provided in the Joint Appendix ("JA") at JA 0001-0013, and JA 0014-0025, respectively, and copies of the patents' prosecution histories are provided at JA 0026-0130, and JA 0131-0235, respectively.  The '850 Patent and the '749 Patent share a common disclosure, the '749 Patent being a divisional of the '850 Patent.  For simplicity, references to the specification, e.g., "1:6-20", are in "column:line number" format.

compensate for the specific frequency response of the wearer's natural hearing. *See, e.g.,* '850 Patent, 11:32-57.

The second embodiment of the '850 Patent, to which claims 5 and 6 are primarily directed, focuses on the automatic control of the hearing aid to account for the levels of speech in excess of the level of noise in various frequency channels. *See, e.g., id.* at 5:60-6:54. Based on these levels, a response characteristic is imparted to the hearing aid to improve the signal and sound quality for the wearer. A third embodiment of the '850 Patent, to which claims 13 - 16 are directed, pertains to a novel method of reducing acoustic feedback in a hearing aid. *See, e.g., id.* at 9:12-46. Claims 13 - 16 address one of the most important problems of hearing aid use - the unconformable feedback or whistling effect. This occurs generally by determining the profile of acoustic feedback in terms of phase and amplitude and then filtering to equalize the feedback signal in both amplitude and phase.

A fourth embodiment pertains to a hearing aid using two or more microphones along with a programmable filter to compensate for the impaired hearing of the wearer. *See, e.g., id.* at Fig. 5; 11:16-31. Several other embodiments are directed to other novel characteristics of the invention. *See, e.g., id.* at 2:31-3:26. Thus, numerous embodiments are disclosed and claimed in the '850 Patent. These different embodiments are directed to various hearing aid designs that utilize a programmable filter or amplifier to correct for a wearer's hearing impairment. This is accomplished by, for example, reducing acoustic feedback between the speaker and microphone or by dynamically adjusting the hearing aid parameters based upon differing speech to noise levels. Such features were novel at the time the ETG patents were filed in the mid-1980's.

The Parties previously submitted their proposed constructions to the Court in their Joint Claim Construction Statement Table ("JCCS") (attached as Plaintiff's Appendix, at Exhibit "A") on May 9, 2007. ETG submits this memorandum in support of its Proposed Claim Construction.

2

## II.    SUMMARY OF ARGUMENT

ETG's constructions attempt to provide the jury with assistance by elaborating on the ordinary and customary meaning to one of ordinary skill in view of the ETG Patents' disclosure. In contrast, Defendants' proposed constructions are blatant attempts to rewrite the claims using words divorced from the specification, file history or ordinary meaning. As explained in detail in the following discussions, ETG relies upon the following legal propositions in support of its proposed claim constructions:

1. The Court first looks at the words of the claims to define the scope of the patented invention. *Vitronics Corp. v. Conceptronics Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

2. The words of a claim are generally given their ordinary and customary meaning, that is, the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312-13 (Fed. Cir. 2005) (*en banc*).

3. The claims must be read in view of the specification, of which they are a part. *Phillips*, 415 F.3d at 1315.

4. Although the specification may describe very specific embodiments of the invention, the claims are not confined to those embodiments. *Phillips*, 415 F.3d at 1323.

5. Extrinsic evidence may be useful to shed light on the relevant art, but it is less significant than the intrinsic record in determining the legally operative meaning of claim language. *Phillips*, 415 F.3d at 1317.

## III.    GENERAL CLAIM CONSTRUCTION PRINCIPLES

### A.    The Federal Circuit Has Reaffirmed The Paramount Importance Of Intrinsic Evidence

The Federal Circuit recently revisited the applicable principles of claim construction in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) (*en banc*). *Phillips* confirmed that the most probative evidence of the meaning of a patent claim term is found primarily in the intrinsic record, *i.e.*, the claims themselves, the specification, and to a lesser extent, the prosecution history. *See id.* at 1312-17. Extrinsic evidence, such as dictionaries and treatises, may still be considered, but are generally disfavored as a means of interpreting claim terms. *See id.* at 1317-19. Furthermore,

*Phillips* reaffirmed previous holdings admonishing against any claim construction that attempts to limit the scope of the claims by the number of embodiments described in the specification. *See id.* at 1323-24.

"[T]the words of a claim are generally given their ordinary and customary meaning," *i.e.*, "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Phillips*, 415 F.3d at 1312-13 (citations omitted). A person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the other claims and the specification. *Phillips,* 415 F.3d at 1313.

In this instance, one of ordinary skill in the art would have a bachelor's degree or equivalent, or an equivalent in experience, in electrical engineering or computer engineering. This person, in 1986, would also have experience with digital hearing aids and the design of digital hearing aids, and would have general experience with circuit design and audiology.

### B.    Limitations May Not Be Read From The Specification Into The Claims

While emphasizing the importance of the specification in claim construction, *Phillips* warned against the "danger of reading limitations from the specification into the claim." *Phillips*, 415 F.3d 1323. Indeed, the Federal Circuit has repeatedly cautioned courts not to use the specification to construe the claims in a manner inconsistent with their plain language.

### C.    Interpretation of Means-Plus-Function Claims

Means-plus-function recitations are interpreted by identifying first the claimed function and second the corresponding structure in the written description for performing that function. *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). In identifying the function, "[a] court errs when it improperly imports unclaimed functions into a means-plus-function claim limitation. First, this can occur during claim construction by defining a claimed function to

4

require more than is actually claimed." *See, e.g., Applied Med. Res. Corp. v. United States Surgical Corp.*, 448 F.3d 1324, 1334 (Fed. Cir. 2006).

Next, the court "ascertains the corresponding structure in the written description **that is necessary to perform that function**." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1375 (Fed. Cir. 2003) (citing *Micro Chem.*, 194 F.3d at 1258) (emphasis added); *Accord Omega Eng'g. Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003) ("[t]he structure must be necessary to perform the claimed function."). Structural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations. *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1308-09 (Fed. Cir. 1998). Section 112, paragraph 6, does not "permit incorporation of structure from the written description beyond that necessary to perform the claimed function." *Micro Chem.*, 194 F.3d at 1257-58.

### D.     Modifying Language That Merely States A Claim Result Does Not Limit The Function Of A Means-Plus-Function Recitation

The "function" of a means-plus-function claim limitation is signaled by the preposition "for." *See Micro Chem.*, 194, F.3d at 1258 (identifying the "function" of a means-plus-function claim limitation as being signaled by the preposition "for"); *see also Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003) (stating that "[t]he function is properly identified as the language after the 'means for' clause . . . ."). Thus, language following the preposition "for" is likely to be associated with the function. Not all language following the preposition "for," however, is attributable to the function.

A clause within a claim that merely states a result is not part of the "function." *Lockheed Martin*, 324 F.3d at 1319 (stating that a clause which merely recites the result of a claim limitation is exclusive of the function of a means-plus-function claim limitation). Thus, modifying language describing a proposed result is not part of the scope of the claim and cannot limit the function of a means-plus-function limitation.

5

## IV.    THE PROPER CONSTRUCTION OF THE '850 PATENT

As explained below, many of the recitations in dispute are simple, straightforward, and used in accordance with their ordinary and customary meaning. These recitations are written in common terms that will be readily understood by the jury with no clarification by the Court. "The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court. Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy." *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997). As a result, ETG has asked this Court to provide an interpretation only for terms that it believes may be helpful to explain to the jury the meanings of terms specific to the art of digital signal processing within programmable hearing aids.

In contrast, Defendants seek improper, results-oriented constructions for the disputed limitations. Primarily, Defendants ask the Court to disregard the ordinary and customary meaning of the words of the claims in favor of interpretations that strictly limit the invention to cover only mirror images of the disclosed exemplary embodiments (Figures) of the invention. Defendants' approach is contrary to law, an invitation to reversible error, and should be rejected.

### A.    "Programmable Delay Line Filter" Means "A Filter Employing One Or More Delays And Coefficients, The Value(s) Of At Least One Delay Or Coefficient Can Be Programmed" - Claims 1, 9, 10 and 19.

ETG's construction of "programmable delay line filter" will assist a jury in understanding this relatively technical term that is certainly not one used in everyday conversation. As the term suggests, a programmable delay line filter involves a delay line filter that is programmable. A delay line filter employs delays that are multiplied by weighting coefficients. *See, e.g.*, '850 Patent, Abstract; 2:55-62. The programmable nature of the filter is determined by the values of the delays

6

and the coefficients. *See, e.g., id.* at 5:18-30. ETG's proposed construction clarifies the concept of a programmable delay line filter in straight-forward terms so that a jury would readily understand this claim recitation, consistent with the specification and the manner in which it is used in the claims.

In contrast, Defendants attempt to create two claim limitations out of one by offering a two-part construction[2] that not only fails to properly describe the claim language in accordance with the specification but will also confuse a jury. More specifically, Defendants offer a construction for "delay line filter[3]" and a separate construction for "programmable delay line filter." When combined, Defendants' construction for "programmable delay line filter" is wrong because it imports unnecessary details (attempting to limit the filter to a non-recursive filter) and because it introduces unsupported technical concepts (attempting to require external calculated weighting coefficients).

First, Defendants' construction improperly requires that the programmable delay line filter be "non-recursive." The specification does not support this characterization. In addition, Defendants fail to identify any support that programmable delay line filters must be non-recursive. Rather, the specification states just the opposite, namely that a programmable filter may implement recursive filtering. *See, e.g., id.* at 2:67-3:2 ("Another form of filter uses a small number of delays in which the delayed output is multiplied by a coefficient and added to the filter input so as to achieve additional delays, a technique known as recursive filtering.") Thus, Defendants' proposed construction contradicts the specification. Moreover, a jury will not understand what is meant by

---

[2] Defendants' proposed constructions: A "delay line filter" is a non-recursive filter that operates on time-delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighted samples to provide an output having desired electro-acoustic characteristics. A "programmable delay line filter" is a delay line filter that uses externally calculated weighting coefficients. JCCS, p.2.

[3] Construing the term "delay line filter" is "makework" for the Court. That term is never used in the claims without the modifier "programmable."

7

"non-recursive," as this term is not used in the specification. Accordingly, Defendants'
construction offers no guidance and will only serve to confuse the jury.

Second, Defendants improperly require the programmable delay line filter to use externally
calculated weighting coefficients. The claims do not recite the source of the coefficients and there
is no language even in the specification detailing that the weighting coefficients must be externally
calculated. Further, a jury would need clarification as to what would qualify as "externally
calculated." For example, external to one component may be internal to another (*e.g.*, coefficients
may be externally calculated with respect to one component but internally calculated with respect to
the digital processor or overall hearing aid). Defendants confound the meaning of this term by
including unnecessary technical requirements that are simply not part of the claim language.

### B. "Programmed" Means "Provided With One Or More Values So As To Produce A Response" - Claims 1, 9, 10, 17, 18 and 19.

ETG proposes this construction because it is the only one that is consistent with the manner
in which the recitation is used in the patent claims. ETG's proposed construction is consistent with
what a jury would expect the term "programmed" to mean. For example, a digital video recorder
can be programmed to record a television show. One would provide values, *e.g.*, selection of the
show, for producing a response, *e.g.,* the recording of the television show. That interpretation is
supported by the specification, which describes that selected optimum parameter values are
programmed into a memory which supplies coefficients to a programmable filter and amplitude
limiter in the hearing aid. *See, e.g.*, '850 Patent, Abstract. The specification also describes the
programmable filter as being adapted to be programmed in a manner to produce a response, *e.g.*,
optimum hearing aid characteristics. *See, e.g.*, *id.* at 4:66-5:4.

The phrases in claims 1, 9, 10, 17, 18 and 19 following the term "programmed" are
understandable terms that need not be construed and should be afforded their plain and ordinary
meaning. Otherwise, the understandable phrases would only be made more complicated for a jury.

8

*See U.S. Surgical Corp.*, 103 F.3d at 1568 (Markman was meant "to clarify and when necessary to explain what the patentee covered by the claims").

Defendants offer a construction of the term "programmed" in relation to the recitation "said filter being programmed ....[4]" In this context, Defendants argue for "weighting coefficients that, in normal operating mode, are **fixed** to create **a response characteristic**." *See* JCCS at 3 (emphasis added). The "filter" referred to in this limitation is the programmable delay line filter. The term "programmable" used to describe the filter precludes the overly narrow construction that would require the programmable filter to be fixed and therefore no longer programmable. While a filter may be programmed to be fixed, the term "programmed" itself does not require that the filter be fixed. *See, e.g.*, '850 Patent, 6:67-68 ("**re-programming** the hearing aid to minimize acoustic feedback").

In addition, the term "fixed" would mislead the jury to believe that the filter is programmed to create a single response characteristic. This misguidance is further attributed to Defendants' use of "a response characteristic" in the singular, which diminishes the claim language itself. Claims 1, 17 and 18 recite "at least one response characteristic" which necessarily encompasses more than one response characteristic. Thus, Defendants seek to rewrite this limitation by restricting "at least one response characteristic" to a single "response characteristic."

As for claims 9, 10 and 19[5], Defendants make the additional argument that "programmed to effect reduction of acoustic feedback from said receiver to said microphone" requires the weighting coefficients that, in normal operation, are fixed **to impart cancellation of acoustic feedback**

---

[4] Defendants' proposed construction: "said filter being programmed to impart ..." means that the filter has received at least one set of weighting coefficients that, in normal operating mode, are fixed to create a response characteristic that corrects for the particular hearing impairment of a wearer of the aid. JCCS, p.3.

[5] Defendants' proposed construction: "programmed to effect ..." means that the filter has received weighting coefficients that, in normal operating mode, are fixed to impart cancellation of acoustic feedback between the receiver and the microphone. JCCS, p.7.

9

**between the receiver and the microphone.** Claims 9, 10 and 19 recite "substantial reduction of acoustic feedback" - not "cancellation." The patentee knew how to recite cancellation when that was intended (see claims 13 and 14); in this claim, the phrase substantial reduction was selected instead. As is readily apparent, acoustic feedback can be reduced substantially (thereby meeting the claim language) but not cancelled (as Defendants require the term to be construed). To add the term "cancellation" here would cause more confusion for a jury than clarification. In addition, Defendants' proposed construction contradicts the claim language itself and should be rejected.

    **C.**    **"Programmable Filter" And "Filter Therein Programmed" Mean "A Filter Having Coefficients Where The Values Of The Coefficients May Be Programmed" - Claims 13, 14, 15, 16 and 17.**

As the claim language suggests, a "programmable filter" or a "filter therein programmed" simply refers to a filter that is programmable. The proposed construction is supported by the specification and is consistent with the manner in which the recitation is used in the patent claims. *See* sect. IV. B., *supra*. For example, a filter can be programmed through the values of the coefficients. *See, e.g.*, '850 Patent, Abstract; 5:1-4; 4:66-5:4.

Defendants' construction[6] requires that the coefficients are fixed, which is improper and misleading for at least the reasons stated above. *See* sect. IV. B., *supra*.

    **D.**    **"Determining" And "As A Function Of Frequency" Should Be Given Their Ordinary and Customary Meaning - Claims 13 and 14.**

These terms do not need to be construed and should be afforded their plain and ordinary meaning. Defendants' proposed constructions[7] take an otherwise understandable phrase and make

---

[6] Defendants' proposed construction: "Programmable filter programmed" and "filter therein programmed" mean that the filter has received coefficients that, during normal operation, are fixed to impart an "equalization" and reduction of the effect of acoustic feedback both in amplitude and phase on a signal in said transmission channel. JCCS, pp. 9, 11.

[7] Defendants' proposed constructions: "Determining" means measuring and "as a function of frequency" means at a known frequency. JCCS, p.8.

10

it more complicated. A jury would readily understand what is meant by the term "determining." Thus, there is no need to narrow the term "determining" to mean "measuring," which unnecessarily imports the additional step of taking specific measurements. The specification and the manner in which the term is used in the claims does not require specific measurements. In other words, Defendants' construction requires an additional unclaimed step.

Further, Defendants seek to narrow the phrase "as a function of frequency" to mean at a known frequency. There is no support in the specification that would require measuring at a known frequency. One of ordinary skill in the art would appreciate that the phrase "a function of frequency" as referring to a range of frequencies. For example, the specification discusses signal manipulation over bands of frequency ranges. *See, e.g.*, '850 Patent, 5:60-6:1. Thus, the term "function of frequency" indicates that the effect on the amplitude and phase of a signal may be determined over a range of frequencies. The specification supports this construction. *See, e.g., id.* at 9:12-55. Moreover, the determining step is made as a function of frequency, and not a function of **a** frequency. Defendants' construction should be rejected as being contrary to the claim language and unsupported by the specification. Without support or explanation, Defendants contend that the remainder of the recitation is indefinite. Rather than speculate as to Defendants' reasoning, ETG will address this contention in its Response Brief.

### E. Claims 13 And 14 Do Not Require A Specific Order of Steps

"Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *See, e.g., Interactive Gift Express, Inc. v. CompuServe, Inc.*, 256 F.3d 1323, 1342-1343 (Fed. Cir. 2001). Here, contrary to Defendants' urging, the language of claims 13 and 14 do not require a specific order. In fact, both the determining step and the inserting step refer to "a signal." Neither recitation bears a temporal relation to the other, either logically or grammatically. Thus, there is no antecedent relationship between "a signal" or any other claim term that might

11

require a certain sequence. Defendants fail to give any reason why the elements in claims 13 and 14 must be performed in the order recited.

Moreover, the specification does not require a sequential relationship between the "determining" and "inserting" steps. The specification does not indicate that the "determining" step must occur before the "inserting" step. The specification lacks "any statement that this order is important, any disclaimer of any other order of steps, or any prosecution history indicating a surrender of any other order of steps." *Altiris*, 318 F.3d at 1371 (that the written description only discussed a single preferred embodiment in which the "setting" step occurred after the "testing" step and before the "booting normally" step was of no consequence.) ETG requests that the Court reject Defendants' proposal to instruct the jury that the order of the steps in claims 13 and 14 are important, instead inform the jury that the steps may be performed in any order.

### F.     "Inserting Between The Input And Output Of Said Transmission Channel An Electrical Feedback Path Having A Filter" Means "Making an Electric Feedback Path Effective Between The Input And Output Of The Transmission Channel" - Claim 13.

The act of "inserting" does not require a physical insertion of an electrical feedback path and/or filter. In other words, as used in this claim, the word "inserting" is referring to an effect, not a literal, manual act. As is clear from the specification, the filter is already "connected" physically in the transmission path. The act of "inserting" introduces and makes the filter take effect. *See, e.g.*, '850 patent, Fig. 2. In contrast, a physical insertion would involve a manual restructuring of an electrical circuit to include an electrical path. This is certainly not what the inventors intended nor would one skilled in the art misunderstand the same. Therefore, to offer guidance to the jury and to avoid any such misunderstanding, ETG proposes a construction that clarifies that this term involves making an electrical feedback path with a filter effective between the input and output of the transmission channel. The specification supports ETG's construction. For example, filter 64 is made effective with appropriate changes in the coefficients of the filter. *See, e.g., id.* at 9:41-55.

12

Further, as shown in Figure 2, making an electrical path effective may involve programming the circuit to activate various switch mechanisms, as illustrated in one exemplary embodiment, by components 82, 83, 88, 90, 93, 94 and 95.

In contrast, Defendants' construction[8] offers no guidance. Defendants add "after the determining step" and specify that the filter is "therein programmed." Beyond these two modifications (the first is incorrect as described above), Defendants fail to offer any instructions that would be remotely helpful to a jury.

      **G.**    **"Inserting Between The Input And Output Of Said Transmission Channel A Programmable Filter" Means "Making a Programmable Filter Effective Between The Input And Output Of The Transmission Channel" - Claim 14.**

As discussed above, ETG believes a clarification of the term "inserting" would be helpful to the jury. *See* sect. IV.F., *supra*.

      **H.**    **"Feedback Path" Should Be Given Its Ordinary and Customary Meaning - Claims 1, 13, 18 and 19.[9]**

Feedback path has a plain and ordinary meaning that would be readily grasped by the jury. The term "feedback" refers to a signal that travels towards an input. A jury would be familiar with feedback which means what it says - something is feeding backwards, in this case a signal, towards the input. In addition, the IEEE Standard Dictionary of Electrical and Electronics Terms, p.251 (1978) - which defines the term feedback to mean "returning of a fraction of the output to the input" - supports ETG's construction. [JA 0243]. A "path" refers to a route or a track on which the signal

---

[8] Defendants' proposed construction: "Inserting ..." means inserting, after the determining step, an electrical feedback path between the input and output of said transmission channel, the electrical feedback path having a filter therein programmed. JCCS, p.9.

[9] The Scheduling Order states that on or before May 1, 2007, "the parties shall exchange claim terms proposed to be construed and proposed constructions." At the meet and confer on May 1, 2007, Defendants indicated that the terms "feedback path" and "forward path" should be afforded their plain and ordinary meaning and offered no proposed constructions to the contrary. Contravening the Scheduling Order, Defendants offer an untimely construction that seeks to improperly restrict these simple concepts.

travels. The specification also supports this description. *See, e.g.*, '850 Patent, 9:41-46; Fig. 2. If the Court determines that the jury would benefit from clarifying this recitation, in keeping with the ordinary and customary meaning, ETG urges that the proper interpretation of this recitation is "a path in which a signal travels towards an input of a transmission channel."

In contrast, Defendants seek to limit the term "feedback path" in terms of specific directionality and pinpoint positions.[10] Defendants' construction, which recites a signal that "travels in a direction toward the microphone," would only force a jury to look for specific directionality with respect to a microphone, which is not required by the claims. In other words, the construction proposed by Defendants would likely confuse the jury into believing that the feedback path must point in a direction toward a microphone. Based on the shape of the hearing aid as well as drafting preferences in schematic illustrations, the feedback path may not always be illustrated as being in a direction toward the physical microphone. In addition, the claims recite a feedback path in relation to "the input and output of said transmission channel" and not in relation to the microphone. Requiring a directionality requirement with respect to the physical microphone unnecessarily imports additional structural requirements to the claims and will only serve to confuse the jury.

Moreover, Defendants' construction calls for the feedback path to be combined at an earlier "point" in the forward path, which is another confusing and unnecessary restriction for the jury to consider. The feedback path may include intervening components and may not always make a direct connection into an earlier "point" in the forward path. Defendants' construction only confuses an otherwise simple and understandable concept.

---

[10] Defendants' proposed construction: A "feedback path" is a path in which a signal from a forward path travels in a direction toward the microphone and is combined into an earlier point in the forward path. JCCS, p.2.

I.    **"Forward Path" Should Be Given Its Ordinary And Customary Meaning - Claims 9 and 15.**

This limitation has a plain and ordinary meaning that would be readily grasped by the jury. The term "forward path" refers to a signal that travels from an input towards an output. In addition, the specification supports this description. *See, e.g.*, '850 Patent, 9:46-55; Fig. 2. If the Court determines that the jury would benefit from clarifying this limitation, in keeping with the ordinary and customary meaning, ETG believes that the proper interpretation of this recitation should be "a path in which a signal travels from an input towards an output of a transmission channel." This construction is consistent with the ordinary meaning of the recitation, and the manner in which the recitation is used in the patent claims.

Defendants offer a construction[11] in relation to the physical microphone and receiver. The claims recite a forward path in relation to "the input and output of said transmission" and not in terms of the microphone and receiver. As discussed above, requiring a directionality requirement with respect to the physical microphone and receiver unnecessarily imports additional structural requirements to the claims and will only serve to confuse the jury. Defendants' attempt to improperly import a directionality limitation with respect to the microphone and receiver into the claims should be rejected.

J.    **"Responsive Characteristic Effective To Compensate For Impaired Hearing Of The Wearer Of The Aid" Should Be Given Its Ordinary and Customary Meaning - Claim 18**

This phrase does not need to be construed and should be afforded its plain and ordinary meaning. Defendants' construction[12] takes an otherwise understandable phrase and makes it more

---

[11] Defendants' proposed construction: A "forward path" is a path in which a signal travels in a direction from the microphone to the receiver. JCCS, p.7.

[12] Defendants' proposed construction: "Response characteristic …" means a response characteristic that corrects for the particular hearing impairment of a wearer of the aid. JCCS, p.13.

15

complicated for a jury. For example, Defendants attempt to change the phrase "at least one response characteristic" to "a single responsive characteristic" - a clear and blatant attempt to improperly rewrite the claim. In addition, Defendants' construction attempts to morph the claim language "compensate for impaired hearing of the wearer of the aid" to mean "corrects for the particular hearing impairment of a wearer of the aid." Defendants' construction confuses an otherwise understandable phrase. The specification discusses hearing aids having "suitable characteristics to compensate for the hearing deficiencies of a patient." *See, e.g.*, '850 Patent, 1:5-8. In addition, the hearing aid may be programmed to have selected characteristics to "compensate for hearing deficiencies." *See, e.g., id.* at 2:34-40. However, there is nothing in the specification or in the manner in which the phrase is used in the claim that would require **correcting for the particular hearing impairment**. As each wearer may have a different hearing impairment, it would be impossible to explain to a jury how to identify "the particular hearing impairment of a wearer of the aid." Defendants' construction is unhelpful to a jury and would require additional clarification.

## V.    THE PROPER CONSTRUCTION OF THE '850 PATENT MEANS-PLUS-FUNCTION CLAIMS

### A.    "Programmable Signal Limiter Means" - Claim 1

#### 1. The Proper Function Is "limiting or reducing the signal in some manner"

One of ordinary skill in the art would understand that a "programmable signal limiter means" performs the function of: "limiting or reducing the signal in some manner." As discussed in the "Background of the Invention," sometimes it is necessary in a hearing aid "to protect patients from uncomfortably or dangerously loud signals." One way to accomplish this at the time of the invention was "to limit the maximum acoustic power output of the hearing aid in some way." '850 Patent, 1:25-32. Similarly, the specification discloses that "[t]he measurements of loudness discomfort level are used to program the limiter 67 so that sounds amplified by the hearing aid

16

never exceed the patient's loudness discomfort level." *Id.* at 7:23-26. Based upon the plain

meaning of the claims, the relevant function is "limiting or reducing the signal in some manner."

> **2. The Proper Structure Is "a programmable amplitude limiter or a device that controls the maximum allowable signal to pass to the wearer's ear" or "a programmable compression amplifier"**

The corresponding structure for performing this function is identified within several

embodiments within the specification. For example, the programmable limiters pictured in Figures

2 and 4 as component 67 are two structures that performs the corresponding function. As described

in the specification, "The output of the programmable filter 64 is fed from the movable contact 65

of the volume control 66, through a **programmable limiter** 67, and an amplifier 68 to the hearing

aid receiver 69." *Id.* at 5:4-8 (emphasis added).

Another structure contemplated within the scope of the claim to perform the function recited

is a "programmable compression amplifier." *Id.* at 11:32-38. The specification describes how the

programmable filter and programmable compression amplifier may effect "[a]utomatic adjustment

of the frequency response of the hearing aid as a function of speech level" by placing these two

components "in a feedback loop." *Id.* This disclosure is nearly identical to the language of claim 1,

and one of ordinary skill in the art would understand that a "programmable compression amplifier"

is commensurate with a programmable signal limiter. Accordingly, the corresponding structure that

performs the properly construed function is: "a programmable amplitude limiter or a device that

controls the maximum allowable signal to pass to the wearer's ear" or "a programmable

compression amplifier."

The prosecution history of the '850 Patent supports both ETG's proposed function and the

corresponding structure. In a Response to an Office Action, the Applicant noted:

> A limiter's characteristic is to constrain its output from increasing, or at least
> increasing only very slowly, whenever its input signal reaches a critical level. A
> limiter thus reduces the gain of the system as a function of signal level when the
> limiter is in the forward path. However, when a limiter is placed in a feedback path,

the **gain of the system** should increase, rather than decrease, when the input signal to the limiter reaches a critical level. . . . However, according to one application of the invention, a limiter and frequency filter are used to keep the overall gain of the hearing aid low when only noise is present and then to increase gain when the input level is increased by the addition of speech.

Response to Office Action, Jun. 29, 1987, p.7 [JA 0105]. Thus, while the function of the claimed

limiter means is properly construed so as to limit or reduce the signal through the limiter in some

manner, when such a limiter means "is placed in a feedback path [as claim 1 recites] the gain of the

system should increase, presuming other conditions are met." One of skill in the art at the time of

filing the '850 Patent would have understood the "programmable compression amplifier" to be

corresponding structure for accomplishing signal limiting in the feedback path. *See, e.g.*, '850

Patent, 11:32-38.

### 3. Defendants' Construction Requires Unnecessary Function and Structure[13]

Defendants begin a pattern of interjecting functional requirements that are not contemplated

within the meaning of the claims. Essentially, Defendants seek to import unclaimed functions into

the construction that will improperly require a significant amount of extraneous structure. This

ignores basic principles of claim construction pursuant to 35 U.S.C. § 112, ¶ 6. *Applied Med.*, 448

F.3d at 1334 ("A court errs when it improperly imports unclaimed functions into a means-plus-

function claim limitation."). Nowhere does the claim language or the specification require the

structure to "programmably limit" the signal. This makes no sense. "Programmably" is not even a

proper word in the English language, nor is it a term understood to one of skill in the art - ETG

could not find one technical dictionary with the word "programmably." The functional construction

"to programmably limit" would cause more confusion for a jury than clarification and such an

---

[13] Defendants propose the following function: "to programmably limit the [amplitude of the] signal [from exceeding a certain level by using externally calculated coefficients]." JCCS, p.2. Likewise, the Defendants propose the following structure: "programmable limiter 67, RAM 77, and attendant signal lines; and equivalent structures." (underlining added). *Id.*

improper and grammatically incorrect recitation should be avoided. The fact that the structure of the "programmable signal limiter means" is capable of being programmed has nothing to do with the ultimate function, which is simply limiting or reducing the signal in some manner.

Similarly, Defendants seek to import more unclaimed functions by stating that the signal may **only** be limited "by using externally calculated coefficients." How the coefficients arrived in the structure or where they arrived from is simply not part of the claimed function of "limiting or reducing the signal." As mentioned prior, the specification does not indicate that weighing coefficients must be externally calculated. Defendants' attempt to import the unclaimed function of "using externally calculated coefficients" is simply improper.

Along with extraneous functions, Defendants improperly attempt to impose unnecessary structure into the definition - structure that is not necessary for performing the function of "limiting or reducing the signal in some manner." Defendants' argument that "RAM 77, and attendant signal lines" are necessary structure for limiting a signal is simply unsupportable. The memory has nothing to do with the ultimate function being performed. The memory may send coefficients to the signal limiter means, but the memory does not itself limit or reduce the signal. As the Federal Circuit has repeatedly held, "[t]he structure **must be necessary to perform the claimed function**." *Omega Eng'g.*, 334 F.3d at 1321 (emphasis added). Here, the "RAM 77" (a Random Access Memory) has nothing to do with "limiting or reducing the signal in some manner." Where, as here, an element provides data that is used to achieve the function, the element is not corresponding structure to the function performed. *See, e.g., Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1371 (Fed. Cir. 2001) (rejecting identification of a communication line as part of a "means for transferring" because it did "not actually perform any of [the recited] functions."). Defendants' attempt to require unnecessary structural limitations (memory and signal lines) should be rejected.

### 4. Defining the Structure in Terms of "Figure numbers" Is Improper

19

Along with adding improper recitations to the functions of the claims, Defendants similarly attempt to improperly limit the scope of the claims by defining the claims in terms of various Figure numbers from the specification. For instance, Defendants believe that the proper structure for "programmable signal limiter means" is "programmable limiter 67, RAM 77, and attendant signal lines…." The purpose of claim construction is for a court to construe claim terms as a matter of law for use by a jury in deciding the factual issue of infringement. The properly construed claims are compared to the accused products through jury instructions adopting a court's Markman Order. For this Court to add Figure numbers to any Claim Construction Order for delivery to a jury makes little sense. Instead of stand-alone instructions to the jury, the Court would tie the jury to the corresponding Figures of the patents in suit and confuse the jury by making them find "RAM 77" in an accused product. The "77" is simply not part of a proper construction of the structure of a means-plus-function claim. Such is the case with every means-plus-function claim where Defendants attempt to impart a definition inextricably tied to Figure numbers from the patents in suit.

A reference to a drawing in a claim construction requires a jury reading the interpretation to refer to the drawing. Claims should be construed to stand on their own and not require further interpretation.[14] During prosecution, claims are generally required to be self-contained. When constructing claims for a jury, reference to figures should be used only if it is not possible or feasible to appropriately define the invention within the confines of the claim itself. Clearly it is possible in the present case to define the invention through a written description within the confines of the claim. In fact, even in a case where the only support for corresponding structure was found

---

[14] *See, e.g.*, MPEP 2173.05(s) ("Where possible, claims are to be complete in themselves. Incorporation by reference to a specific figure or table 'is permitted only in exceptional circumstances where there is no practical way to define the invention in words and where it is more concise to incorporate by reference than duplicating a drawing or table into the claim.'").

#8567012 v1

solely in the figures, a court construed the claims without including references to the figures.

*Freeman v. Gerber Prods. Co.*, 357 F. Supp. 2d 1290, 1307 (D. Kan. Feb 17, 2005) ("[T]he court

will not commit the cardinal sin of claim interpretation and import these limitations from the

specification and drawings into the claim…").

    **B.**    **"Memory Means," "Means ... For Providing An Output," and "Means For Converting Analog Signals…" - Claims 2 and 3**

       Defendants refuse to offer any proposed construction for Claims 2 and 3.  Accordingly, ETG

asks the Court to adopt its proposed constructions as outlined in the JCCS.

    **C.**    **"Means Controllable To Impart Different Response Characteristics To Said Hearing Aid" - Claim 5**

       The parties agree upon the function of this means-plus-function claim as: "imparting

different response characteristics to the hearing aid." JCCS, Table of Agreed Upon Terms.[15]

       The proper corresponding structure that performs this function are: "programmable filter(s)"

that are capable of being programmed with different coefficients to impart different response

characteristics to audio signals present in the transmission channel of the hearing aid, and structural

equivalents thereof.  Claims 5 and 6 of the '850 Patent relate to improving hearing aid performance

by automatically imparting, through a programmable filter, a select response characteristic that is

based in part on the level of speech signals in a transmission channel in excess of the level of noise

signals. *See* '850 Patent, Claims 5 & 6.  The "means controllable" is simply the programmable

filter or filters.  As explained in the specification, "[i]n normal operation, amplifier 60 supplies the

signal through the conductors 61 and 62 and a filter 63 to a **programmable filter** 64 which is

adapted to be programmed in the manner described below to produce optimum hearing aid

---

[15] The Defendants request that the Court require the following corresponding structures to perform the function: "programmable filter 64 (structures 63a, 70-75, 77, 78, 78a, 79, and 80) programmed to impart different response characteristics; or 5 bit counter, timing logic, and structures 63a, 77, 80, and 145-151; and equivalent structures." JCCS, p.4.

characteristics for the patient based on the measurements made of the patient's residual hearing. *Id.*
at 4:66-5:4 (emphasis added).   Similarly, after the level of speech in excess of noise is used to
determine a response profile, "[e]ach of the sixty-four possible combinations of the 6 bit binary
words identifies a different frequency response for the **programmable filter**, and a corresponding
set of coefficients stored in the RAM 77 is selected, thereby **automatically adjusting the hearing
aid** to the optimum set of parameter values as the speech level and type of background noise
change." *Id.* at 6:46-54 (emphases added).

    Defendants agree that a "programmable filter" represents the corresponding structure, but as
discussed above (*see* sect. V. A. 4, *supra*), improperly attempt to limit the scope by tying the
construction to Figure numbers, specifically element "64."  Defendants also attempt to pack into the
"programmable filter" additional components that do not perform the "imparting" function.
Specifically, they attempt to identify numerous subcomponents of a programmable filter and in so
doing, improperly limit the scope of the claim.  While the "structures" may represent certain
subcomponents of a "programmable filter" in a preferred embodiment, it is the "programmable
filter" that performs the agreed upon function of "imparting different response characteristics to the
hearing aid" and not the individual subcomponents found in one Figure.

    The specification also specifically states that the "structures" referenced by Defendants may
vary within the claimed filters:

> The several embodiments described above and depicted in the drawings are intended
> to be only illustrative, and modifications in form and detail are possible within the
> scope of the following claims.  For example, more than four bandwidth filters and
> different frequency bands might be employed.  Also, the number of taps on the
> digital filter may be greater than 32 as in the specific embodiment described above
> and the A/D converter may, of course have more than 12 bit resolution.

'850 Patent, 11:58-67.  Adopting Defendants' proposed snapshot of the preferred embodiment
would, *inter alia*, limit the A/D converter to element "70" of Figure 2 (a 12 bit converter) as well as
limiting the other "structures" to the preferred embodiment as pictured, which is contrary to the

22

teachings of the specification. The corresponding structure must be the structure that actually

performs the function and not some obscure reference to Figure numbers or reliance upon trivial

subcomponents that do not perform the ultimate function claimed.

**D.**    **"Controlling Means . . . For Automatically Controlling Said Controllable Means" - Claim 5**

While there is some agreement on the function,[16] Defendants ask this Court to include the

additional descriptive phrase "responsive to the level of speech signals in said transmission channel

in excess of the level of noise signals in said channel" as part of the function. That is clearly

incorrect. The "responsive" part of the recitation is not part of the function of the claim language.

The function begins after the word "for" - the traditional beginning of the functional definition in

means-plus-function claims. *See* Sect. III. D, *supra.* The "responsive to" clause is simply a

modifier of the structure that merely states a result. *See id.* Similarly, the clause "to impart a

selected one of said different response characteristics to said hearing aid" is another example of a

"to" clause that merely describes a result. *See id.* Defendants improperly seek to make all the

language of the recitation part of the function without regard to the action that is actually taking

place. The function of this recitation is defined in terms of the language "for automatically

controlling said controllable means" which more understandably requires "selecting the appropriate

response characteristic based upon the current environment." The specification fully supports this

functional definition. For example,

> Environmental noise control is effected according to the invention by providing
> means for sensing the relative speech/noise content in the signals from the hearing

---

[16] Defendants request the following function: "responding to [a determination that] the level of speech signals in the transmission channel [is] in excess of the level of noise signals in the channel for automatically controlling the controllable means to impart a selected one of the different response characteristics to the hearing aid." JCCS, p. 5. To perform this function, Defendants demand the following structures: "speech detector 96, band pass filters 97-100, sample and hold circuits 105-108, rectifiers 109-112, comparators 113-116, latch 118, switch 95, and switch 88; and equivalent structures." *Id.*

aid microphone and **generating binary words** that are supplied to the programmable filter **for selecting from a memory a set of delay line tap coefficients that are effective to impart to the filter the appropriate frequency response** for the specific environmental noise condition then being detected.

'850 Patent, 3:12-20 (emphasis added). The "means ... for automatically controlling said controllable means [programmable filter]" simply translates to selecting, from the memory, the appropriate coefficient that imparts to the filter the correct frequency response.

The proper corresponding structure for the defined function is "processing element(s), and structural equivalents thereof." The "processing elements" that serve to "select the appropriate response characteristic" from memory are defined in the specification as processing elements linked to the programmable filter. *See, e.g., id.* at 6:39-54. Specifically, the "controllable means" are described as various environmental control processing elements.

Defendants err in their proposed construction by adding unnecessary functional recitations. They compound that error by adding significant amounts of structural elements that are not necessary to perform the properly construed function. For example, "rectifiers," a "latch," and switches are not necessary elements to perform the ultimate function, and any construction including these subcomponents is incorrect. Once again, Defendants attempt to define the structure in terms of Figure numbers, which is improper.

### E.    "Speech Detector Means For Determining When Speech Signals Are in Said Transmission Channel" - Claim 6

The parties agree[17] that the function here is "determining when speech signals are in the transmission channel." *See* JCCS, Table of Agreed Upon Terms. The main point of disagreement here is again, Defendants' improper attempt to impart an element number from a Figure into the

---

[17] The parties almost agree on structure, but the Defendants demand that this Court's definition incorporate a Figure number "96" such that their definition for structure is: "speech detector 96; and equivalent structures." JCCS, p.5.

24

construction. As fully explained above, tacking a "96" from a preferred embodiment Figure onto

the definition of "speech detector" serves no purpose except to confuse the jury. *See* sect. V. A. 4,

*supra*. The proper construction should be "a speech detector(s), and structural equivalents thereof."

F.    **"A Plurality Of Bandpass Filter Means For Determining The Noise Frequency Spectrum In Said Transmission Channel" - Claim 6**

The parties agree[18] that the function here is: "determining the noise frequency spectrum in

said transmission channel." *See* JCCS. Defendants properly recognize that the corresponding

structure are "bandpass filters," but Defendants seek to add on extraneous structures that are not

necessary to perform the function. As the specification clearly delineates, the "frequency-gain

characteristics are derived by first determining the incoming signal level . . . selecting an

appropriate frequency-gain characteristic and then reducing the gain in those frequency regions

where the background noise level exceeds the speech level. **This is determined by comparing the**

**output levels of the bandpass filters** 97, 98, 99, and 100 when speech is present to the

corresponding levels measured when noise only is present." '850 Patent, 8:7-16 (emphasis added).

Accordingly, it is the bandpass filters themselves that perform the pinpointed function of

"determining the noise frequency spectrum."

Defendants attempt to correlate the additional structure of "rectifiers" and sample and hold

(S/H) units as necessary to perform the claimed function. While these elements may receive the

output of the "bandpass filters," it is the bandpass filters themselves that actually determine the

noise frequency spectrum - the recited function. *See, e.g., id.* at 6:14-22 ("The outputs of the band

pass filters 97, 98, 99 and 100 are rectified in the rectifiers 109, 110, 111 and 112, respectively and

fed to the sample and hold circuits 105-108, respectively . . . .").

---

[18]  The Defendants propose the following corresponding structures: "bandpass filters 97-100 and
rectifiers 109-112 and S/H 105-108; and equivalent structures." JCCS, p.5.

G.    **"A Plurality of Comparator Means . . . For Indicating Whether The Speech Level In Each Said Bandpass Filter Exceeds The Noise Level Therein And For Actuating Said Controlling Means To Impart To The Hearing Aid A Response Characteristic" - Claim 6**

The function of this means-plus-function recitation is "indicating whether the speech level in each band pass filter exceeds the noise level and for actuating said controlling means to impart to the hearing aid a response characteristic." The Defendants offered functional definition[19] again seeks to impart a number of clauses, *e.g.* the "each responsive..." clause and the "to compensate for impaired hearing..." clause, that only state the ultimate claim result but fail to recite a claimed function. *See* sect. III. D, *supra*.

The corresponding structures are various processing elements that perform the indicated function. As explained in the specification:

> So long as there is a one output from the speech detector 96 indicating the presence of speech in the input, the instantaneous outputs of each of the band pass filters 97-100 are compared with previous values held in the sample and hold circuits 105-108, causing the comparators 113-116, respectively, to generate a binary coefficient (0,1) **indicating whether or not the speech level in the associated band pass filter exceeds the noise level**.

'850 Patent, 6:23-34. Accordingly, the comparators, which are processing elements, serve to indicate whether the speech level exceeds the noise level. *See* JCCS, p. 6.

---

[19]   The Defendants essentially seek to require the entire claim, including extraneous modifying clauses, as the function. Their proposed function is:

> to respond to the speech detector and respective bandpass filter means for indicating whether the speech level in each bandpass filter exceeds the noise level therein and for actuating the controlling means to impart to the hearing aid a response characteristic effective to compensate for impaired hearing of the wearer of the aid at the noise levels obtaining in the channel.

JCCS, p.6. The Defendants proposed corresponding structure is: "comparators 113-116; and equivalent structures." *Id.*

26

H.    "Means For Adjusting The Amplitude And Phase Characteristics Of Each Of Said Microphone Channels" - Claim 17

The parties agree[20] that the function here is "adjusting the amplitude and phase characteristics of each of the input microphone channels." *See* JCCS.

The parties also agree that "amplifiers" satisfy the corresponding structure. Defendants' attempt, however, to interject element numbers from the Figures should again be rejected. The specification defines how amplitude and phase characteristics are adjusted for each input channel. As explained, "A typical configuration is shown in FIG. 5 as comprising the microphones 155 and 156 supplying inputs to **amplifiers 157 and 158, the gain and phase characteristics of each of which is programmable from the RAM 77 in the hearing aid**. The outputs of the programmable gain amplifiers 157 and 158 are summed in a summing amplifier 159, the output of which would be supplied to the programmable AGC device 58." '850 Patent, 11:23-31. Based upon the "gain [amplitude] and phase characteristics" programmed from a random access memory, the "amplifiers" adjust the signal characteristics to compensate for the impaired hearing of the wearer and to reduce the effects of noise and reverberation. After examining the specification, one of ordinary skill in the art at the time of filing would understand that the programmed inputs from memory allow the "amplifiers" to achieve the recited function.

I.    "Means For Summing The Outputs Of Said Microphone Channels"

The parties agree upon that the function here is "summing the outputs of the input microphone channels." *See* JCCS.

ETG agrees generally that in one embodiment a "summing amplifier" would satisfy the claimed function. Other embodiments, however, dictate that the Court's interpretation of the

---

[20] The Defendants offered corresponding structure is: "amplifiers 157 and 158 that, in an undefined manner, provide amplitude and phase adjustment in response to "gain and phase control" information; and equivalent structures." JCCS, p.12.

27

structure should be somewhat broader than just the "summing amplifier." For instance, "Referring

now to FIG. 2, a wearable hearing aid according to the invention comprises a microphone 57, **the**

**output of which is fed through a programmable automatic gain control (AGC) circuit 58 and**

**a switch 59 to one terminal of summing amplifier 60**. In normal operation, amplifier 60 supplies

the signal through the conductors 61 and 62 and a filter 63 to a programmable filter 64...." '850

Patent, 4:62-68. Nothing in the specification prevents the circuit (AGC) alone or in connection with

"summing amplifier 60" from performing the function of "summing the outputs of the input

microphone channels," as described in the specification.

Accordingly, the proper interpretation should encompass all embodiments. Such an interpretation

should be: "summing circuits and structural equivalents thereof." This interpretation captures the

ability of the summing amplifiers alone or combined with the AGC to perform the recited function.

### J.     None of the Terms are Indefinite

Defendants do not explain how any of the terms are indefinite. Rather than speculate as to

Defendants' reasoning, ETG will address any such contentions in its Response Brief.

## VI.     THE PROPER CONSTRUCTION OF THE '749 PATENT

### A.     "Host Controller" Means "A Processor For Controlling Operations Of A Device"

The term "host controller" should be construed in accordance with the teachings of the '749

Patent.[21] As described in the specification of the '749 Patent, a "host controller" is generally a

processing device for producing the data provided to control the operations of a hearing aid or

computer that programs a hearing aid. *See, e.g.*, '749 Patent, Abstract ("A host controller for

producing data from a computer for a programmable filter of a hearing aid . . . ."). As explained in

---

[21] Contrarily, the Defendants propose the following overly narrow definition for "host controller:" "a device for prescribing a wearable programmable hearing aid interposed between a computer and the hearing aid." JCCS, p.15.

the specification, "[t]he hearing aid is connected to the host controller by an electrical cable . . .
thereby placing it **directly under the control of the host controller**." *See, e.g., id.* at 6:57-63
(emphasis added). As depicted in Figure 1, the host controller is essentially a processor comprised
of numerous processing elements and circuits. *See, e.g., id.* at 3:65-4:62. Accordingly, the proper
construction of "host controller" is "a processor for controlling operations of a device."

In an attempt to completely rewrite the '749 Patent claims, Defendants first seek to limit the
hearing aid claimed within the '749 Patent to a "wearable programmable hearing aid." This
characterization is inaccurate. The specification teaches many embodiments of hearing aids, and in
one such embodiment, "the components shown in FIGS. 2 ['one form of programmable hearing
aid'], 4, and 5 may be incorporated in the hearing aid or part may be contained in a pocket size case
to be carried in the clothing of the person wearing the hearing aid." *See, e.g.,* '749 Patent, 3:36-50;
11:41-47. Accordingly, the term "wearable" is an improper limitation.

Next, Defendants attempt to interject an unsupported spatial limitation by requiring that the
"host controller" be "interposed between a computer and the hearing aid." The term "interposed"
typically means "to place or put between."[22] Nothing in the specification requires that the "host
controller" be physically "placed between" the hearing aid and a computer. In fact, certain
embodiments of the invention contemplate that the "host controller" be integral with the hearing
aid. *See, e.g., id.* at 6:57-63 ("[t]he hearing aid is . . . directly under the control of the host
controller.").

---

[22] Webster's New World Dictionary, p 706 (3d ed. 1988) (JA 0239).

#8567012 v1

B.      "Output Signal" Should Be Given Its Plain And Ordinary Meaning -Claim 6

The term "output signal" does not need to be construed.  Defendants seek to confuse the jury by rewriting an otherwise understandable concept.[23]  The term should be afforded it plain and ordinary meaning as should be easily understood.

## VII.   THE PROPER CONSTRUCTION OF THE '749 PATENT MEANS-PLUS-FUNCTION CLAIMS

A.      "Means For Receiving Signals From The Hearing Aid And Measuring Phase And Amplitude" - Claim 1

The parties do not agree on the function and structure of this means-plus-function claim. ETG respectfully requests that the Court construe this means-plus-function language in a simple and straightforward manner.  Defendants' proposed construction of this means-plus-function language includes extraneous text that only serves to narrow and confuse a proper interpretation.  Section 112, paragraph 6 does not permit limitation of a means-plus-function claim by adopting a function different from that explicitly recited in the claim.  *Micro Chem.*, 194 F.3d at 1257-58.

ETG's proposed construction of the functional language - "receiving signals from the hearing aid and measuring phase and amplitude" - tracks the language of the claim and creates a straightforward interpretation of the recitation.  ETG's construction finds broad support in the specification.  For example, a "phase **measurement circuit** . . . is adapted **to receive** the output voltage of the hearing aid through a connector. . . ."  *See, e.g.*, '749 Patent, 4:8-13 (emphases added).  The output voltage may consist of phase and amplitude information in a digital hearing aid.

---

[23] Defendants argue for the following definition of "output signal:" "an output of the hearing aid transmission channel."  JCCS, p.19.

Defendants' proposed functional definition[24] includes tentative, bracketed language that adds no clarity to the interpretation. In fact, the extraneous language only serves to confuse the meaning of the element, interject new and inappropriate limitations into the claims, and offers no additional useful information. If the bracketed language Defendants improperly seek to include were allowed, the functional recitation of claim 1 would become a clumsy and incomprehensible interpretation, not at all resembling the plain meaning of the claim language. For example, Defendants' inclusion of the word "[first]" is needlessly confusing and unduly narrowing on the means-plus-function language and the claim as a whole. The use of the terms "[first]" and "[second]" incorrectly implies that the signals themselves must be differentiated, which finds no support in the specification. The use of the term "[at the host controller]" is similarly confusing, and also improperly imparts a limitation into the claim. Finally, the use of the term "[of those signals during programming of the hearing aid]" improperly limits the scope of the function. The claim language only recites "means for receiving signals from the hearing aid and measuring phase and amplitude." It does not, either explicitly or implicitly, include a recitation that the receiving of signals may only happen during "programming of the hearing aid." Defendants seek to impose a temporal limitation on the element which is not supported in the claim or in the specification.

As noted above, the statute does not permit incorporation of structure from the written description beyond that necessary to perform the claimed function. *Micro Chem.*, 194 F.3d at 1258. A person of ordinary skill in the art would understand, for example, that the means-plus-function language recited in claim 1 of the '749 Patent would include the exemplary corresponding structure

---

[24] Defendants proposed function is: "receiving [first] signals [at the host controller] from the hearing aid and measuring phase and amplitude [of those signals during programming of the hearing aid]." JCCS, p.15. Also, the argued structure is: "digital phase shifter 30; programmable gain amplifier 32; latches 33, 42, 43, and 45; terminals 31, 34 and 121; switches 37 and 120; and related control and signal lines; and equivalent structures." *Id.*

31

as: "circuits and processing elements and structural equivalents thereof." No additional structure is necessary to perform the function, and that structure is disclosed in the specification. *See, e.g.*, '749 Patent, 4:8-13. Defendants' construction of this element includes a large amount of unnecessary structure. For example, Defendants' proposed construction includes numerous subcomponents, such as "latches 33, 42, 43, and 45." Latches are not required to "receiv[e] signals from the hearing aid and measur[e] phase and amplitude. . . ." Defendants' position that exactly four latches are required improperly limits the means-plus-function language to an overly specific description of the structure of Figure 1, which is incorrect as a matter of law. Similar arguments may be made for Defendants' recitation of "terminals 31, 34, and 121" and "switches 37 and 120" – that they create a level of detail not required by the statute and are therefore improperly narrowing. In essence, Defendants are attempting to limit the structure to an overly specific description of the elements from a preferred embodiment. Such a level of detail and complexity is not required under the statute. Indeed, under Defendants' approach, the patents in suit could never arguably cover any system other than that disclosed in the '749 Patent Figure 1 circuit, which is undoubtedly the intent. The use of Figure numbers in the structure construction is also improper as needlessly confusing to the jury. *See* sect. V. A. 4., *supra*.

**B.** **"Means For Receiving Signals From The Hearing Aid Indicative Of The Summation Of Acoustic Feedback And Acoustic Feedback Cancellation Signals" - Claim 1**

The parties do not agree on the function and structure of this means-plus-function claim. ETG's proposed construction of this means-plus-function language - "receiving signals from the hearing aid indicative of the summation of the acoustic feedback and acoustic feedback cancellation signals" - tracks with the language of the claim. *See, e.g.*, '749 Patent, 4:20-26. Defendants' inclusion of the bracketed terms "[second]" and "[at the host controller]" is needlessly confusing

and unduly narrowing on the means-plus-function language and the claim as a whole.  *See* sect. VII.

A., *supra*.

A person of ordinary skill in the art would understand that the function of "receiving signals

from the hearing aid and measuring phase and amplitude" is performed by "processing elements

that receive a combined signal of acoustic feedback and a feedback cancellation signal."  Additional

structure is not necessary to perform the function, and that structure is disclosed in the specification.

*See, e.g.*, '749 Patent, 4:20-26.  Defendants' construction of this element[25] includes a large number

of unnecessary structure elements.  For example, Defendants' proposed construction includes

"terminals 34 and 121."  Terminals are not required to "receiv[e] signals from the hearing aid

indicative of the summation of acoustic feedback and acoustic feedback cancellation signals. . . ."

Defendants' position that exactly two terminals are required improperly limits the means-plus-

function language to a preferred embodiment from the patent.  The specification does not

specifically require two, and; contrarily notes variations of such elements are contemplated.  *See,*

*e.g.*, '749 Patent, 12:1-10 ("modifications in form and detail are possible.")  Similar arguments may

be made for Defendants' recitation of "switches 37 and 120" and "latch 45" – that they create a

level of detail not required by the statute and are therefore improperly narrowing.  In essence,

Defendants are improperly attempting to limit the structure to one overly specific description from

the specification.  Such a level of detail and complexity is not required under the statute.[26]  Indeed,

---

[25] Defendants demand that the function be interpreted as:  "receiving [second] signals [at the host controller] from the hearing aid indicative of the summation of acoustic feedback and acoustic feedback cancellation signals."  JCCS, p.15.  The corresponding structures sought are:  "terminals 34 and 121, switches 37 and 120, latch 45, programmable amplifier 38, rectifier 39, A/D converter 40, and related control and signal lines; and equivalent structures."  *Id.*

[26] In other words, if the specification described a nail and said that the nail may be a flathead nail, then in identifying the corresponding structure for a "means for providing a hook for a painting," the court should identify "a nail."  The fact that the nail in the specification may be a flathead is unimportant to achieving the function of "providing a hook for a painting."  Here, the description Defendants propose for the

under Defendants' approach, the patents in suit could never arguably cover any system other than

that disclosed in the '749 patent Figure 1 circuit, which is undoubtedly the intent.  The use of Figure

numbers in the structure construction is also improper as needlessly confusing to the jury.  *See* sect.

V. A. 4., *supra*.

      C.      **"Means Controlled By The Computer For Adjusting The Phase And Amplitude Necessary To Eliminate Acoustic Feedback And Produce A Null Summation" - Claim 1**

      The parties do not agree on the function and structure of this means-plus-function claim.

The phrases "controlled by the computer" and "produce a null summation" are not part of the

properly constructed function, and are more properly construed as separate claim recitations that

modify the means-plus-function language.  Therefore, Defendants' importation[27] of these modifying

phrases into the constructed function is improper.  *See* sect. III. D., *supra*.

      ETG's proposed construction - "adjusting the phase and amplitude necessary to eliminate

acoustic feedback" - follows from the language of the element itself.  *See, e.g.*, '749 Patent, 4:26-

30.  Defendants' use of the bracketed term "[at the host controller and controlled by the computer]"

is needlessly confusing and unduly narrowing on the means-plus-function language and the claim as

a whole.  *See* sect. VII. A., *supra*.  There is no support in the specification for the proposition that

the phase and amplitude must be adjusted "at the host controller."  Similarly, the use of the term

"[of a signal from the hearing aid]"only serves to add unsupported additional functional language so

that the host controller may only adjust the phase and amplitude conveyed from the hearing aid.

---

structure in the '749 Patent specification includes descriptors that are similarly unimportant to achieve the recited function.

    [27] Defendants offered function is:  "adjusting [at the host controller and controlled by the computer] the phase and amplitude [of a signal from the hearing aid] necessary to eliminate acoustic feedback and produce a null summation."  JCCS, p.16.  Defendants requested corresponding structures are:  "latches 33, 42, and 43, digital phase shifter 30 and programmable gain amplifier 32; and equivalent structures."

Such a limitation, however, does not explicitly appear in claim 1 or in the specification. Reading this limitation into the claim function is therefore improper.

A person of ordinary skill in the art would understand, for example, that the function of "adjusting the phase and amplitude necessary to eliminate acoustic feedback" is performed by "amplifiers and processing elements, and structural equivalents thereof." ETG's structure is all that is necessary to accomplish the function; Defendants' proposed construction is improper as unduly narrow. *See, e.g.*, '749 Patent, 4:26-30. Defendants' construction of this element includes unnecessary structure elements. For example, Defendants' proposed construction includes "latches 33, 42, and 43." Latches are not required to "adjust[] the phase and amplitude necessary to eliminate acoustic feedback. . . ." Further, Defendants seek to advance a position that exactly three latches are required to implement the function. This is overly narrow and the proposed construction is incorrect as a matter of law, as attempting to narrow the structure to the point of excluding all circuits other than as disclosed in Figure 1 of the '749 patent. The use of Figure numbers in the structure construction is also improper as needlessly confusing to the jury. *See* sect. V. A. 4., *supra*.

### D.    "Means Controlled By The Computer For Transmitting Phase Shift And Amplitude Data To Program The Hearing Aid To Eliminate Acoustic Feedback" - Claim 2

The parties do not agree on the function and structure of this means-plus-function claim. The phrase "produce a null summation" is not part of the properly constructed function, and is more properly construed as a separate claim recitation that modifies the means-plus-function language. Therefore, Defendants' importation of this modifying phrase into the constructed function is improper. *See* sect. III. D., *supra*.

ETG's proposed construction of the means-plus-function language - "transmitting phase shift and amplitude data to program the hearing aid" - tracks with the language of the claim. *See, e.g.*, '749 Patent, 4:30-33. Defendants' use of the bracketed term "[from the host controller to the

computer]" is improper.[28] *See* sect. VII. A., *supra*. The specification does not require that the phase shift and amplitude data may only be transmitted from the host controller to the computer.

A person of ordinary skill in the art would understand, for example, that the function of "transmitting phase shift and amplitude data to program the hearing aid" is performed by "combined circuitry, and structural equivalents thereof." No additional structure is necessary to perform the function, and that structure is disclosed in the specification. *See, e.g.*, '749 Patent, 4:38-44. Defendants again intend to improperly narrow the structure of the means-plus-function language in an attempt to unduly limit the scope of the language. For example, Defendants' proposed construction includes "latches 33, 42, and 43." Latches are not required to "transmit[] phase shift and amplitude data to program the hearing aid. . . ." Defendants' position that exactly three latches are required improperly limits the means-plus-function language to the exact structure of Figure 1, which is incorrect as a matter of law. In essence, Defendants improperly attempt to limit the structure to the **exact picture** of Figure 1 of the '749 patent. The use of Figure numbers in the structure construction is also improper as needlessly confusing to the jury. *See* sect. V. A. 4., *supra*.

### E.    "Computer Controlled Means For Adjusting The Phase Shift And Amplitude To Produce An Acoustic Feedback Cancellation Signal" -Claim 4

The parties agree upon the function of this means-plus-function claim as: "adjusting the phase shift and amplitude to produce an acoustic feedback cancellation signal." JCCS, Table of Agreed Upon Terms. The parties disagree on the structure of this means-plus-function claim.

---

[28] Defendants requested function is: "transmitting phase shift and amplitude data [from the host controller to the computer] to program the hearing aid to eliminate acoustic feedback." JCCS, p.16. The corresponding structure sought by the Defendants is: "programmable gain amplifier 32, latches 33, 42, and 43, and digital phase shifter 30; and equivalent structures." *Id.*

A person of ordinary skill in the art would understand, for example, that the function of this language is performed by "amplifiers and processing elements, and structural equivalents thereof." No additional structure is necessary to perform the function, and that structure is disclosed in the specification. *See, e.g.,* '749 Patent, 4:26-30. Defendants' construction of this element includes unnecessary structure elements. For example, Defendants' proposed construction[29] includes "latches 33, 42, and 43." Latches are not required to "adjust[] the phase shift and amplitude to produce an acoustic feedback cancellation signal." Defendants' position that exactly three latches are required improperly limits the means-plus-function language to the exact structure of Figure 1, which is incorrect as a matter of law. The use of Figure numbers in the structure construction is also improper as needlessly confusing to the jury. *See* sect. V. A. 4., *supra.* Also, a "digital phase shifter" and "VFBK" are unnecessary structure.

### F.    "Computer Controlled Means For Supplying A Logic Signal To The Hearing Aid For Programming And A logic Signal To The Hearing Aid To Restore It For Use By The Patient" - Claim 5

The parties agree upon the function of this means-plus-function claim as: "supplying a logic signal to the hearing aid for programming and a logic signal to the hearing aid to restore it for use by the patient." JCCS, Table of Agreed Upon Terms. The parties disagree on the structure of this means-plus-function claim.

A person of ordinary skill in the art would understand, for example, that function of this language is performed by "circuitry for logic signal transmission, and structural equivalents thereof." No additional structure is necessary to perform the function, and that structure is disclosed in the specification. *See, e.g.,* '749 Patent, 4:38-44. Defendants' construction of this element

---

[29] Defendants corresponding structures are: "programmable gain amplifier 32, digital phase shifter 30, latches 33, 42, and 43, and terminal 144 (VFBK) adapted for connection to a hearing aid summing amplifier; and equivalent structures." JCCS, p. 17. The term "VFBK" is found nowhere in the patents-in-suit.

includes unnecessary structure elements. For example, Defendants' proposed construction[30] includes "latches 44 and 45." Latches are not required to "supply[] a logic signal to the hearing aid for programming and a logic signal to the hearing aid to restore it for use by the patient." Defendants' position that exactly two latches are required improperly limits the means-plus-function language to the exact structure of Figure 1, which is incorrect as a matter of law. A similar improper limitation argument may be made against Defendants' assertion that the means-plus-function language contains "lines 125 and 128." The use of Figure numbers in the structure construction is also improper as needlessly confusing to the jury. *See* sect. V. A. 4., *supra*.

G.   **"Adjustable Phase Shift And Amplitude Means Controlled By The Computer For Adjusting The Phase Shift And Amplitude Necessary To Eliminate Acoustic Feedback And Transmitting An Acoustical Feedback Cancellation Signal To The Hearing Aid" - Claim 6**

The parties do not agree on the function and structure of this means-plus-function claim. ETG's proposed construction of the means-plus-function language - "adjusting the phase shift and amplitude necessary to eliminate acoustic feedback and transmitting an acoustical feedback cancellation signals to the hearing aid" - tracks with the language of the claim. The use of the bracketed term "[at the host controller]" is grammatically confusing and improper. *See* sect. VII. A., *supra*. There is no support in the specification for the proposition that the phase shift and amplitude data may only be adjusted at the host controller. Similarly, the term "[of a signal from the hearing aid]" also serves only to confuse the plain meaning of the claim.

A person of ordinary skill in the art would understand, for example, that the means-plus-function language recited in claim 6 of the '749 Patent, would include the exemplary corresponding structure as: amplifiers and processing elements, and structural equivalents thereof. No additional

---

[30] Defendants offered corresponding structures are: "latches 44 and 45 and lines 125 and 128, and tri-state buffer 46; and equivalent structures." JCCS, p.18.

38

structure is necessary to perform the function, and that structure is disclosed in the specification. *See, e.g.*, '749 Patent, 4:26-30. Defendants' construction[31] includes a number of unnecessary structure elements. For example, Defendants' proposed construction includes "latches 33, 42, and 43." Latches are not required to "adjust[] the phase shift and amplitude necessary to eliminate acoustic feedback and transmit[] an acoustical feedback cancellation signal to the hearing aid." Defendants' position that exactly three latches are required improperly limits the means-plus-function language to the exact structure of Figure 1, which is incorrect as a matter of law. A similar improper limitation argument may be made against Defendants' assertion that the means-plus-function language contains "connectors 31 and 144." The use of Figure numbers in the structure construction is also improper as needlessly confusing to the jury. *See* sect. V. A. 4., *supra*.

---

[31] Defendants argue for the following function: "adjusting [at the host controller] the phase shift and amplitude [of a signal from the hearing aid] necessary to eliminate acoustic feedback and transmitting an acoustical feedback cancellation signal to the hearing aid." JCCS, p.19. Defendants propose the following corresponding structures: "digital phase shifter 30 and programmable gain amplifier 32; latches 33, 42, and 43; and connectors 31 and 144; and equivalent structure." *Id.*

#8567012 v1

## VIII.  CONCLUSION

ETG respectfully requests this Court adopt in its entirety the claim constructions ETG has

proffered in the Joint Claim Construction Statement.  Further, the Court should reject Defendant's

strained constructions which improperly seek to import limitations from the patent specifications

into the claims and further ignore the tenants of proper construction of means-plus-function claim

limitations.  Defendant's claim constructions are the product of a results-oriented approach which

find no basis in the law, and are intended solely for the purpose of escaping the consequences of

their obvious infringement.

Dated:   May 16, 2007

Edmond D. Johnson (DE Bar #2257)
Thomas H. Kovach (DE Bar #3964)
PEPPER HAMILTON LLP
1313 Market Street, Suite 5100
P.O. Box 1709
Wilmington, DE 19899-1709
Telephone: (302) 777-6500
Fax: (302) 421-8390

Attorneys for Energy
Transportation Group, Inc.

OF COUNSEL:

Brian M. Buroker
Robert L. Kinder, Jr.
HUNTON & WILLIAMS LLP
1900 K Street, N.W.; Suite 1200
Washington, DC 20006-1109
Telephone:  (202) 955-1500
Facsimile:  (202) 778-2201

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone:  (804) 788-8788
Facsimile:  (804) 343-4630

40

## CERTIFICATE OF SERVICE

I do hereby certify that on the 16th day of May, 2007, I caused a true copy of Plaintiff's Opening *Markman Brief* in Support of its Proposed Claim Construction to be served via electronic mail:

James D. Heisman (#2746)
CONNOLLY BOVE LODGE & HUTZ LLP
N. Richards Powers (#494)
1007 North Orange Street
Wilmington, DE 19899

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW, GARRETT
& DUNNER
901 New York Ave., N.W.
Washington, DC 20001-4413

*Attorneys for William Demant Holding A/S,
WDH Inc., Oticon A/S, Oticon, Inc., Bernafon
AG, and Bernafon LLC*

Jack B. Blumenfeld (#1014)
Maryellen E. Noreika (#3208)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

Kenneth B. Herman
William J. McCabe
ROPES & GRAY LLP
1251 Avenue of the Americas
New York, NY 10020

*Attorneys for GN ReSound A/S and
GN Hearing Care Corporation*

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19899

William H. Mandir
David J. Cushing
Carl J. Pellegrini
SUGHRUE MION PLC
2100 Pennsylvania Ave., N.W.
Washington, DC 20037

*Attorneys for Widex Hearing Aid Co. Inc., and
Widex A/S*

Thomas C. Grimm (#1098)
Leslie A. Polizoti (#4299)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19899

James R. Sobieraj
Meredith Martin Addy
David H. Bluestone
Jeffrey A. Marx
BRINKS HOFER GILSON & LIONE
NBC Tower
455 Cityfront Plaza Dr.; Suite 3600
Chicago, IL 60611

*Attorneys for Phonak Inc., Phonak LLC,
Unitron Hearing Inc., and Unitron Hearing
Ltd.*

Barry M. Klayman (#3676)
WOLF, BLOCK, SCHORR AND SOLIS-COHEN LLP
Wilmington Trust Center
1100 North Market St., Suite 1001
Wilmington, DE 19801

Jeffrey D. Shewchuk
SHEWCHUK IP SERVICES, LLP
533 77th Street West
Eagan, MN  55121

*Attorneys for Resistance Technology Inc.*

Richard K. Herrmann (#405)
Mary B.Matterer (#2696)
Amy Quinlan (#3021)
MORRIS, JAMES, HITCHENS & WILLIAMS
222 Delaware Avenue, 10th Floor
Wilmington, DE  19899

Richard Morgan
Steven Reitenour
BOWMAN AND BROOKE LLP
150 S. Fifth St., Suite 2600
Minneapolis, MN  55402

*Attorneys for Starkey Laboratories, Inc.*

Richard L. Horwitz (#2246)
David E. Moore (#3983)
POTTER ANDERSON & CORROON
1313 N. Market St.
Hercules Plaza, 6th Floor
Wilmington, DE

Brett L. Foster
L. Grant Foster
HOLLAND & HART
60 East South Temple; Suite 2000
Salt Lake City, UT  84111

*Attorneys for Sonic Innovations, Inc.*

/s/ Thomas H. Kovach
Thomas H. Kovach (DE Bar #3964)