IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | C.A. No. 05-422 (GMS) |
| SONIC INNOVATIONS, INC., et al., | ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
    Attorneys for Defendants GN Resound A/S
    and GN Hearing Care Corporation

WOLF, BLOCK, SCHORR AND
    SOLIS-COHEN LLP
Barry M. Klayman (#3676)
Wilmington Trust Center, Suite 1001
1100 North Market Street
Wilmington, DE 19801
(302) 777-0313
    Attorneys for Defendants Resistance
    Technology, Inc.

MORRIS JAMES LLP
Mary B. Matterer (#2696)
Amy A. Quinlan (#3021)
500 Delaware Ave., Suite 1500
Wilmington, DE 19801
(302) 888-6960
    Attorneys for Defendant
    Starkey Laboratories, Inc.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 N. Market St., 18th Floor
Wilmington, DE 19801
(302) 658-9200
    Attorneys for Defendants Widex AS and
    Widex Hearing Aid Co.

May 16, 2007

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Thomas C. Grimm (#1098)
Leslie A. Polizoti (#4299)
1201 N. Market Street
Wilmington, DE 19801
(302) 658-9200
    Attorneys for Defendants Phonak AG,
    Phonak Inc., Phonak LLC, Unitron Hearing
    Ltd. and Unitron Hearing, Inc.

POTTER ANDERSON & CORROON, LLP
Richard L. Horwitz (#2246)
David Ellis Moore (#3983)
1313 N. Market St., 6th Floor
Wilmington, DE 19801
(302) 984-6027
    Attorneys for Defendant
    Sonic Innovations Inc.

CONNOLLY BOVE LODGE & HUTZ LLP
N. Richard Powers (#494)
James D. Heisman (#2746)
1007 North Orange Street
Wilmington, DE 19801
(302) 658-9141
    Attorneys for Defendants William Demant
    Holding A/S, WDH, Inc., Oticon A/S,
    Oticon Inc., Bernafon AG, and Bernafon,
    LLC

# TABLE OF CONTENTS

I.      INTRODUCTION AND SUMMARY OF ARGUMENTS                                    1

II.     BACKGROUND OF THE TECHNOLOGY                                             2

        A.      Host Controller                                                  3

        B.      Acoustic Feedback Cancellation                                   4

        C.      Level of Speech                                                  5

        D.      Compensation for Impaired Hearing                               5

III.    THE PATENTS-IN-SUIT                                                      5

        A.      General Operation                                                5

        B.      Host Controller 20                                              6

        C.      Hearing Aid of FIGS. 2 and 4                                    8

        D.      Two Microphone Configuration                                     9

        E.      Prosecution History                                             9

                1.      The '850 Patent                                          9

                2.      The '749 Patent                                          9

IV.     SUMMARY OF CLAIM CONSTRUCTION LAW                                        9

        A.      The Law of Claim Construction                                    9

        B.      Claims Must Be Construed To Conform To The Scope of The
                Patent Disclosure                                               10

        C.      Means Plus Function Claim Interpretation                        12

V.      CLAIM CONSTRUCTION OF THE '850 PATENT                                   13

        A.      Claims Related to Feedback Cancellation                         14

                1.      Feedback Cancellation in a Feedback Path                14

                        a.      Claim 19                                        14

                                i.      delay line filter                      14

i

|  |  |  | ii. | programmable delay line filter | 16 |
|  |  |  | iii. | feedback path | 18 |
|  |  |  | iv. | programmable filter being programmed to effect substantial reduction of acoustic feedback from said microphone | 20 |
|  | b. | Claim 10 |  |  | 27 |
|  |  |  | i. | said programmable delay line filter is programmed so as to effect substantial reduction of acoustic feedback from said receiver to said microphone | 27 |
|  | c. | Claim 13 |  |  | 27 |
|  |  |  | i. | determining the effect on the amplitude and phase of a signal in said transmission channel as a function of frequency of acoustic feedback between said transducer and microphone | 27 |
|  |  |  | ii. | inserting ... a filter therein programmed | 29 |
|  |  |  | iii. | a filter therein programmed to equalize and reduce the effect of said feedback acoustic feedback both in amplitude and phase on a signal in the transmission channel | 30 |
|  | d. | Claim 14 |  |  | 31 |
| 2. | Feedback Cancellation in a Forward Path |  |  |  | 31 |
|  | a. | Claim 9 |  |  | 31 |
|  |  |  | i. | forward path | 31 |
| B. | Claims Related to Hearing Impairment/Noise |  |  |  | 32 |
| 1. | Claim 1 |  |  |  | 32 |
|  | a. | programmable signal limiter means |  |  | 32 |
|  | b. | said filter being programmed to impart to the hearing aid at least one response characteristic effective to compensate for impaired hearing of the wearer of the aid |  |  | 35 |
| 2. | Claim 5 |  |  |  | 36 |

a.      means controllable to impart different response
        characteristics to said hearing aid                                    36

b.      controlling means responsive to the level of speech signals
        in said transmission channel in excess of the level of noise
        signals in said channel for automatically controlling said
        controllable means to impart a selected one of said
        different response characteristics to said hearing aid                 38

3.    Claim 6                                                                   40

        a.    speech detector means                                            40

        b.    plurality of bandpass filter means                               41

        c.    plurality of comparator means                                    42

4.    Claim 17                                                                  43

        a.    means for adjusting the amplitude and phase
              characteristics of each of said microphone channels              43

        b.    means for summing the outputs of said microphone

              channels                                                         44

        c.    said filter being programmed to impart to the hearing
              aid at least one response characteristic effective to
              compensate for impaired hearing of the wearer of the
              aid and to reduce the effects of both noise and
              reverberation                                                    45

5.    Claim 18                                                                 45

        a.    signal-level dependent amplifier" and "said amplifier
              being programmed to impart to the hearing aid at least
              one response characteristic effective to compensate for
              impaired hearing of the wearer of the aid                        45

VI.    CLAIM CONSTRUCTION OF THE '749 PATENT                                    46

    A.    Claim 1                                                              46

        1.    host controller                                                  46

        2.    means for receiving signals from the hearing aid and
              measuring phase and amplitude                                    49

iii

3.      means for receiving signals from the hearing aid indicative
of the summation of acoustic feedback and acoustic feedback
cancellation signals                                                               51

4.      means controlled by the computer for adjusting the phase and
amplitude necessary to eliminate acoustic feedback and produce
a null summation                                                                   52

B.    Claim 2                                                                        53

1.      means controlled by the computer for transmitting phase shift
and amplitude data to program the hearing aid to eliminate
acoustic feedback                                                                  53

C.    Claim 4                                                                        54

1.      computer controlled means for adjusting the phase shift and
amplitude to produce an acoustic feedback cancellation signal      54

D.    Claim 5                                                                        55

1.      computer controlled means for supplying a logic signal to the
hearing aid for programming and a logic signal to the hearing
aid to restore it for use by the patient                                   55

E.    Claim 6                                                                        56

1.      output signal                                                              56

2.      adjustable phase shift and amplitude means controlled by the
computer for adjusting the phase shift and amplitude necessary
to eliminate acoustic feedback and transmitting an acoustical
feedback cancellation signal to the hearing aid                        57

# TABLE OF AUTHORITIES

**Cases**

*ASM Am., Inc. v. Genus, Inc.*, 401 F.3d 1340 (Fed. Cir. 2005) ......................................25

*B. Braun Med. Inc. v. Abbot Labs.*, 124 F.3d 1419 (Fed. Cir. 1997)..............................12

*Curtiss-Wright Flow Control Corp., v. Velan, Inc.*, 438 F.3d 1374 (Fed. Cir. 2006) .................28

*Default Proof Credit Card Sys., Inc. v. Home Depot, Inc.*, 412 F.3d 1291 (Fed. Cir. 2005) ..12, 50

*Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370
    (Fed. Cir. 2004)...........................................................................................13

*Gentex Corp. v. Donnelly Corp.*, 69 F.3d 527 (Fed. Cir. 1995) .....................................25

*Hakim v. Cannon Avent Gp., PLC.*, 479 F.3d 1313 (Fed. Cir. 2007) ............................39

*Honeywell Int'l v. ITT Indus.*, Inc., 452 F.3d 1312 (Fed. Cir. 2006) ...............................11, 23, 46

*Johnston v. IVAC Corp.*, 885 F.2d 1574 (Fed. Cir. 1989) ........................................37, 40

*Jonsson v. The Stanley Works*, 903 F.2d 812 (Fed. Cir. 1990)......................................25

*JVW Enters. V. Interact Accessories, Inc.*, 424 F.3d 1324 (Fed. Cir. 2005) ................................34

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308 (Fed. Cir. 2003)
    .................................................................12, 33, 38, 42, 49, 51, 52, 53, 57

*Loral Fairchild Corp. v. Sony Elects. Corp.*, 181 F.3d 1313 (Fed Cir. 1999).............................29

*Mantech Envt'l Corp. v. Hudson Envt'l Servs., Inc.*, 152 F.3d 1368 (Fed. Cir. 1998).................30

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) ..........................................9

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205 (Fed. Cir. 2003)....35, 37

*Nomos Corp. v. Brainlab USA, Inc.*, 357 F.3d 1364 (Fed. Cir. 2004)..........................................13

*Nystrom v. TREX Co.*, 424 F.3d 1136 (Fed. Cir. 2005) .....................................................11, 23, 47

*On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331 (Fed. Cir. 2006) .....10, 22, 23, 46

*Pause Tech. LLC v. TiVo Inc.*, 419 F.3d 1326 (Fed. Cir. 2005) ....................................................20

*Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005) ................................10, 17, 22, 23, 24, 47

*Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193 (Fed. Cir. 2002) ............................12, 40

*Toro Co. v. White Consolidated Indus.*, 199 F.3d 1295 (Fed. Cir. 1999) ....................11, 17, 23, 47

*Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044 (Fed Cir. 1988) .........................................26

*Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996) .........................................17

*Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377 (Fed. Cir. 1999) .....................11, 23, 47

**Statutes**

35 U.S.C. § 112, ¶ 1 ............................................................................................................10

35 U.S.C. § 112, ¶ 6 .............2, 12, 32, 34, 35, 36, 37, 38, 40, 41, 43, 44, 50, 52, 53, 54, 55, 56, 58

## I.    INTRODUCTION AND SUMMARY OF ARGUMENTS

Pursuant to the Court's February 20, 2007 Scheduling Order, Defendants submit their Opening Claim Construction Brief.[1]

The two patents at issue in this case, U.S. Patent Nos. 4,879,749 ("the '749 patent," JA-0014-25) and 4,731,850 ("the '850 patent," JA-0001-13), have a common technical disclosure that was filed on June 26, 1986 by Harry Levitt, Richard Dugot and Kenneth Kopper. Both patents have expired and the patent owner has never commercialized either patent. The '749 patent describes a standalone "host controller" that is temporarily connected to a hearing aid when the hearing aid is being fitted by an audiologist for a particular patient. During this fitting process, the "host controller" provides the parameters, i.e., filter "coefficients," necessary for normal, everyday operation of the hearing aid. The '850 patent is directed to the hearing aid itself and is described in terms of discrete analog and digital components. Because power consumption and size constraints were the overriding concerns in the design of a practical hearing aid, the inventors chose to perform the power-intensive calculations that define the operating coefficients of the hearing aid through the use of the "host controller" during the fitting process.

Defendants' proposed claim constructions follow the Federal Circuit's *en banc* admonition that claims must be construed in the context of the patent's written description. In contrast, ETG's proposed claim constructions take terms out of the context of the patents-in-suit and present generalized definitions that construe claim terms far broader than what the patentees are entitled to based on the patents' disclosures.

---

[1] "Defendants" collectively refers to: GN Resound A/S, GN Hearing Care Corp., Phonak AG, Phonak Inc., Phonak, LLC, Unitron Hearing, Ltd., Unitron Hearing, Inc., Resistance Technology, Inc., Sonic Innovations, Inc., Starkey Laboratories, Inc., Oticon A/S, Oticon Inc., Bernafon AG, Bernafon, LLC, WDH, Inc., William Demant Holding A/S, Widex A/S and Widex Hearing Aid Co., Inc.

The difference between the parties' positions is exemplified in their proposed constructions of "means-plus-function" elements.  Although the parties agree that all of the asserted claims that contain elements using "means" expressions should be construed pursuant to 35 U.S.C. § 112, ¶ 6, they disagree about the identification of the corresponding structure. Defendants' proposed constructions follow the Federal Circuit precedent, and identify the corresponding structure found in the patent specification that is linked to the claimed functions. ETG on the other hand has proffered generalized structures that cannot be linked in the specification to the claimed functions.  For example, in its proposed constructions, ETG repeatedly identifies "processors" and "processing elements" as structure corresponding to "means" elements.  Such generalized structures are not linked to the patent disclosures and cannot be squared with the quid pro quo that comes when a patentee chooses to use the means plus function claim format.

## II.    BACKGROUND OF THE TECHNOLOGY

Early hearing aids simply amplified sound.  They had a microphone to pick-up sound, an amplifier to magnify the sound, and a speaker or "receiver" to allow the user to hear the amplified sound.[2]  These early devices did not, however, address the fact that hearing impaired persons often have a different amount of hearing loss at different frequencies.[3]  For example, a person may have no problem hearing sounds at low frequencies, like a bass drum, but may have poor hearing at higher frequencies where critical speech information is found.  If all of the sound

---

[2] Hearing aid speakers are often called "receivers."

[3] The "frequency" of a signal is the number of times a signal alternates or cycles in one second.  The 120 volt signal used in the home has a "frequency" of 60 cycles per second.  That is much too low a frequency to be heard.  Sound signals that can be heard have a "frequency" of between about 800 cycles per second and 15,000 cycles per second.  Speech signals tend to fall in the range 1000 to 5000 cycles per second.

is amplified equally, amplification of high frequency sounds so that they can be heard will result in the low frequency sounds being too loud.

In early efforts to overcome this problem, some hearing aids used "bandpass filters" in the "forward path" of the hearing aid.[4] These bandpass filters split the signal into different frequency bands. After separate amplitude adjustment of each band, the signals in the different frequency bands were recombined and delivered to the receiver. When the signals were recombined, there was some risk of signal distortion.

Rather than processing each band separately, the patents-in-suit describe using a single delay line filter in the forward path of the hearing aid between the microphone and the receiver. (Levitt Dep. at 273:1-9; 440:22-442:4 (JA-0503; 08)). In a delay line filter, successive time delayed samples of an input signal are each multiplied by a respective weighting coefficient and the weighted samples are summed to provide the filter output. According to named inventor Dr. Harry Levitt, if such a filter were properly "programmed," it would effectively adjust the amplitude of the signal differently at different frequencies as it passed through the single filter. This was intended to allow compensation for frequency-dependant hearing impairments, yet avoid the potential for interference caused by recombining the outputs of plural bandpass filters. (Levitt Dep. at 432:18-433:2; 440:22-442:4 (JA-0507-08)).

## A.    Host Controller

During fitting of the hearing aid to a particular user, a significant amount of calculation was required to determine the weighting coefficients needed by the filter during normal operation to compensate for hearing impairment and to also cancel acoustic feedback. The patents-in-suit discuss the use of a separate "host controller" to perform the necessary

---

[4] The "forward path" is the path the signal travels from the microphone, through the amplifier to the receiver.

measurements and calculations during the fitting process.  By minimizing the functionality of the

hearing aid, its size was kept small and its power consumption low.  (Dugot Dep. at 62:1-21;

84:19-85:9 (JA-0512-13)).  The host controller was plugged into the wall, so its power

consumption was not a problem. (Dugot Dep. at 84:7-10, 85:10-19 (JA-0513).  Because the filter

was "programmable," the amplitude of a signal passing though the filter at a given frequency

could be dictated by these externally calculated weighting coefficients.  After fitting, these pre-

calculated coefficients were loaded into a memory in the hearing aid for use by the filter after the

host controller and hearing aid were separated.  (Levitt Dep. at 113:2-4; 286:10-20; 364:6-12

(JA-0502; JA-0505-06); Dugot Dep. at 61:9-62:8 (JA-0511-12)).  Claims 1-6 of the '749 patent

are directed to specific features of the "host controller."  Claims 13 and 14 of the '850 patent

relate to methods that include at least one step performed by the "host controller."

### B.    *Acoustic Feedback Cancellation*

"Acoustic feedback" is the annoying whistle that can occur in any audio system if the

speaker/receiver gets too close to the microphone.  This "acoustic feedback" occurs in hearing

aids due to leakage of the amplified acoustic signal from the receiver back to the microphone.

As described in a 1982 article titled, "Review of the Acoustic Feedback Literature from a

Control Systems Point of View" by Dr. David Egolf (JA-0520-29), then a professor at the

University of Wyoming, the problem of "acoustic feedback" in hearing aids could be addressed

by properly controlling the "phase"[5] of the signals in the hearing aid.

A programmable delay line filter not only allows amplitude to be altered at different

frequencies, it allows the "phase" of the signal passing through the filter to be altered.  (Levitt

---

[5] The "phase" of a signal is the timing of a particular part of a signal's cycle to that same part of some
reference signal cycle.  This timing is usually measured in "degrees," with a complete cycle having
360 degrees.

Dep. at 27:18-22; 274:2-6 (JA-0501; JA-0504)).  Thus, acoustic feedback could be addressed by introducing a proper phase shift.  Claims 10, 13 and 19 of the '850 patent are directed to the cancellation of acoustic feedback when the filter is in a "feedback path."  Claims 9 and 15 of the '850 patent are directed to the cancellation of acoustic feedback when the filter is inserted in the forward path.  Claim 14 is also directed to feedback cancellation, but is silent as to where the filter is to be located.

### C.    Level of Speech

The patents-in-suit also describe using a speech detector in a hearing aid to allow the selection among specific sets of pre-calculated weighting coefficients to allow the hearing aid to react differently when the determination is made that the level of speech signals is in excess of the level of noise signals.  Claims 5 and 6 of the '850 patent are directed to this feature.

### D.    Compensation for Impaired Hearing

The remaining asserted claims of the '850 patent (claims 1, 17, and 18) and previously mentioned claim 6 are directed to having the hearing aid "compensate for impaired hearing of the wearer of the aid."  Claim 1 puts a "programmable delay line filter" and "programmable signal limiter means" in the "feedback path" to accomplish this result, claim 6 requires speech level detection, claim 17 requires the use of two microphones, and claim 18 requires a "signal-level dependent amplifier."

## III.    THE PATENTS-IN-SUIT

### A.    General Operation

FIG. 1 discloses a host controller 20 that is used to "program" the hearing aid shown in FIG. 2.[6]  The hearing aid of FIG. 2, in normal operation mode, receives sound at a microphone

---

[6] As noted above, the '749 and '850 patents have a common disclosure.  In the following sections, reference will be made to the figures, columns and lines of the '850 patent.

57 that converts the sound to an electrical signal, increases the level of that electrical signal in an amplifier 68, and reconverts the electrical signal from amplifier 68 to a sound signal at a receiver 69. This combination of microphone 57, amplifier 68, and receiver 69 is in the "forward path" of the hearing aid.

When placed in the ear of a wearer, some sound from receiver 69 that is intended for the ear drum can find its way back to microphone 57, either around the edges of the hearing aid or through a "vent hole" that hearing aids use to equalized pressure on both sides of the aid. This returning sound at microphone 57 is called "acoustic feedback." If that returned sound is loud enough and of the proper phase with respect to the original sound, a loud "whistle" results at receiver 69.

The *acoustic* feedback signal that enters microphone 57 is the same signal that has left receiver 69, with each frequency component of that receiver signal being altered in phase and amplitude by the acoustic feedback path. In FIG. 2, with switches 83 and 138 in the feedback position as shown, an *electrical* feedback path is created from the input of receiver 69, though digital delay line filter 64, and through the lower input of summing amplifier 60 where it is combined with the output from microphone 57. If filter 64 imparts exactly those same phase and amplitude alterations on the *electrical* signal as the acoustic feedback path imparts to the *acoustic* feedback signal, the resultant electrical signal from filter 64 will, according to the specification, cancel the acoustic feedback signal that microphone 57 is receiving.

### B.    *Host Controller 20*

Host controller 20 of FIG. 1 is required to program filter 64 to achieve this result. During fitting, host controller 20 is connected to the hearing aid. Switches 37 and 120 of host controller 20 disconnect hearing aid microphone 57 from amplifier 68. Host controller 20 inserts a test signal into amplifier 68 via switch 120, and then via elements 62, 63, 66 and 67, to generate

6

sound of a particular frequency in receiver 69. The phase and amplitude of this sound is altered as a result of the acoustic feedback path and returned to microphone 57. At this point, the sound out of microphone 57 is the acoustic feedback signal caused by the test signal under the acoustic feedback conditions that exist at the time of fitting, and this microphone output signal is provided to the upper input of summing amplifier 60.

The electrical signal at the receiver 69 as a result of the host controller test signal is also presented as signal $V_\varnothing OUT$ to the host controller 20 via terminals 142 and 31. In host controller 20, the amplitude and phase of signal $V_\varnothing OUT$ are altered by programmable gain amplifier 32 and digital phase shifter 30, and the altered signal is returned to the hearing aid where it is summed in summing amplifier 60 with the output of microphone 57. When the output of summing amplifier 60 is null, i.e., zero, the phase and amplitude alterations introduced into the *electrical* input signal of receiver 69 mirror the phase and amplitude alterations introduced into the *acoustic* output of receiver 69 by the then existent acoustic feedback path.

The settings of the programmable gain amplifier 32 and the digital control phase shifter 30, when this "null" is achieved, are measurements of the phase and amplitude alterations that the acoustic feedback path of the hearing aid imposes on the receiver sound resulting from the test signal. According to the patent, these phase and amplitude measurements are used to calculate weighting coefficients for filter 64. When the fitting process has been complete and these predetermined weighting coefficients have been loaded into filter 64, they allow filter 64 to impart on the electrical input to receiver 69 exactly the same phase and amplitude alterations imparted by programmable amplifier 32 and digital control phase shifter 30 of the host controller to achieve that "null" summation.

Accordingly, at the conclusion of the fitting process, the host controller loads the predetermined coefficients into an EEPROM 84. The host controller is then disconnected from the hearing aid, the EEPROM 84 is connected in its place, and, when the hearing aid is turned on, the pre-calculated weighting coefficients are loaded from EEPROM 84 into RAM 77 of filter 64. From then on, the EEPROM is inactive to conserve power. In normal operation mode, the filter 64, with these fixed weighting coefficients determining its operating characteristics, provides an electrical feedback signal to the input of amplifier 68 that supposedly cancels acoustic feedback, at least at the frequency of the test signal that was used in the fitting process, and provided that the conditions that defined the acoustic feedback path do not change.

### C.     *Hearing Aid of FIGS. 2 and 4*

In FIG. 2, the hearing aid uses a "digital delay line filter" 64, and in FIG. 4, the hearing aid uses an analog delay line filter. Otherwise, the two are identical and reference below will be made only to FIG. 2.

As noted above, the forward path of the FIG. 2 hearing aid includes microphone 57, amplifier 68, and receiver 69. Switches 83 and 138 allow programmable delay line filter 64 to be placed either in the forward or feedback path. According to the inventors, filter 64 is used to cancel acoustic feedback in either configuration. (3:3-11; 9:11-55).

The hearing aid of FIG. 2 can also respond differently to the input signal as speech level and type of background noise change. (6:46-54). Sixty-four different sets of predetermined weighting coefficients for filter 64 are loaded into EEPROM 84 by host controller 20. This allows filter 64 to operate differently on the input signal depending on which set of coefficients is selected. That selection depends on, *inter alia*, whether the level of speech detected by speech detector 96 exceeds the level of noise in various frequency bands. The values of the coefficients are fixed once they are loaded into the EEPROM 84.

8

### D.    Two Microphone Configuration

FIG. 5 and the related text disclose the use of two microphones. Without any detailed explanation, amplifiers 157 and 158 are said to have programmable gain and phase characteristics that will reduce the effect of both noise and room reverberation. (11:16-38).

### E.    Prosecution History

#### 1.    The '850 Patent

The '850 patent, which issued on March 15, 1988, is based on U.S. Patent Application No. 06/879,214 (the '214 application). The '214 application was filed on June 26, 1986 with twenty-three original application claims. The '214 application was allowed after a June 29, 1987 Amendment in response to a March 31, 1987 Office Action.

#### 2.    The '749 Patent

The '749 patent issued on November 7, 1989 and is based on U.S. Patent Application No. 07/155,374 (the '374 application). The '374 application was filed on February 12, 1988 as a divisional application of the '214 application. A Preliminary Amendment was filed with the '374 application to cancel the original twenty-three claims from the '214 application and add new application claims 24-32, all of which were directed to a "host controller" for programming a hearing aid. The '374 application was allowed after a March 23, 1989 Amendment in response to an October 17, 1988 Office Action.

## IV.    SUMMARY OF CLAIM CONSTRUCTION LAW

### A.    The Law of Claim Construction

Claim construction is a matter of law. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 978 (Fed. Cir. 1995). In construing patent claims, the Court must view the patent claims from the viewpoint of a person of ordinary skill in the field of the invention and "determine how such a person would understand the claim in the context of the particular technology and the

description in the specification, with due reference to the prosecution history." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1337 (Fed. Cir. 2006).

> **B.    *Claims Must Be Construed To Conform To The Scope of The Patent Disclosure***

In *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir 2005), the *en banc* Federal Circuit reaffirmed that the specification is usually "dispositive" in understanding the scope and defining the limits of disputed terms. As the *en banc* court noted, the primacy of intrinsic evidence is mandated by the patent statute itself. The "written description" provision of 35 U.S.C. § 112, ¶ 1 requires that what is claimed be related to what has been disclosed. This is because inventors must "provide a full and exact description of the claimed invention" and the patent claims "must conform to the invention as set forth in the remainder of the specification." *Phillips*, 415 F.3d at 1316-17 (internal quotes and citations omitted).

In short, the "scope and outer boundary of claims is set by the patentee's description of his invention." *On Demand Mach. Corp.*, 442 F.3d at 1338 (citing *Phillips*, 415 F.3d 1313-14). "The claims **cannot be of broader scope** than the invention that is set forth in the specification." *Id.* at 1340 (emphasis added).

Federal Circuit cases after *Phillips* have consistently limited the construction of a disputed term in light of the specification. In *On Demand Mach.*, 442 F.3d at 1339-40, the Federal Circuit found that the plaintiff was not entitled to a broad construction of the term "customer" that was divorced from the specification. The Federal Circuit explained that:

> [W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, *it is not necessary to disavow explicitly a different scope*.
>
> ***
>
> Although we agree with the district court that the Ross invention does not concern itself with whether the "customer" reads the book or obtains it for resale, the focus of the Ross patent is immediate single-copy printing and binding initiated

by the customer and conducted at the customer's site. ***The district court's definition of "customer" cannot eliminate these constraints*** ….

*Id.* (emphasis added); *see also Honeywell Int'l v. ITT Indus.*, Inc., 452 F.3d 1312, 1318 (Fed. Cir. 2006) ("the written description uses language that leads us to the conclusion that a fuel filter is the only 'fuel injection component' that the claims cover, and that a fuel filter was not merely discussed as a preferred embodiment"); *Nystrom v. TREX Co.*, 424 F.3d 1136, 1138 (Fed. Cir. 2005) ("Nystrom II") (because the patentee "consistently used the term 'board' to refer to wood cut from a log," the proper construction of that term was limited to "wood cut from a log," and other building materials were beyond the scope of the disclosure).

The rule applied in *On Demand*, *Honeywell* and *Nystrom* is consistent with Federal Circuit cases from even before *Phillips*. For example, in *Toro Co. v. White Consol. Indus.*, 199 F.3d 1295 (Fed. Cir. 1999), the Federal Circuit affirmed the district court's finding that the phrase "cover including" meant a permanent attachment. The Federal Circuit reviewed the patent specification and found that:

> The specification shows only a structure whereby the restriction ring is "part of" the cover, in permanent attachment. ***This is not simply the preferred embodiment; it is the only embodiment***.

*Toro*, 199 F.3d at 1301 (emphasis added). The Federal Circuit further explained:

> This is not a case of limiting the claims to a "preferred embodiment" of an invention that has been more broadly disclosed …. ***No such broader invention is here described***.

*Id.* (emphasis added); *see also Wang Labs., Inc. v. America Online, Inc.*, 197 F.3d 1377, 1382-83 (Fed. Cir. 1999) (limiting the construction of the term "frame" to character-based, and excluding graphically-based, protocols where "[t]he only system that is described and enabled in the '669 specification and drawings uses a character-based protocol").

### C.   *Means Plus Function Claim Interpretation*

Many of the limitations of the asserted claims of the patents-in-suit are expressed using "means plus function" language.  Under 35 U.S.C. § 112, ¶ 6, a patentee may claim a certain function without reciting a specific structure – instead relying on the patent specification for that structure.

Thus, in construing means plus function claims, the Court must first identify the claimed function.  *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1318-19 (Fed. Cir. 2003).  Once that function is identified, the Court must "next construe the meaning of the words used to describe the claimed function, using ordinary principles of claim construction."  *Id.* at 1319.

The Court must then identify the corresponding structure – if any – that is disclosed in the specification and that is necessary to perform that function.  *Id.*  A disclosed structure is "corresponding" only if "the specification or the prosecution history ***clearly links or associates that structure to the function recited in the claims***."  *Default Proof Credit Card Sys., Inc. v. Home Depot, Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005) (emphasis added); *see also B. Braun Med. Inc. v. Abbot Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997).

The identification of the structure must include all of the structure that is linked to the recited function.  For example, in *Texas Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1207-08 (Fed. Cir. 2002), the Federal Circuit found that the District Court's construction of the "color control means" was improper.  The district court found that the corresponding structure was "the structure that performs as disclosed in the specification of the display decoder and decoder driver."  *Id.* at 1208.  The Federal Circuit, however, included more specific structures, finding that the "corresponding structure includes the memory 76, the counters 71e and 71f, the flip-flop 73, and associated connection circuitry illustrated in Figures 5 and 9" *Id.* at 1209.

The identification of the structure must include all of the structure minimally necessary to perform the recited function, *if* that structure has been linked to the function, and all structure explicitly described as being used to perform the function, even if it is possible to perform the function with out that explicitly described structure. *Frank's Casing Crew & Rental Tools, Inc. v. Weatherford Int'l, Inc.*, 389 F.3d 1370, 1377 (Fed. Cir. 2004) (where specification described means as having a lift plate, lift plate was part of the corresponding structure even though function could be done without the lift plate); *Nomos Corp. v. Brainlab USA, Inc.*, 357 F.3d 1364, 1368 (Fed. Cir. 2004) (structure to mount a probe to a table was part of the corresponding structure for a "means for generating an image," rather than just the probe, since the specification described the "means for generating" as "*including* a means for mounting the ultrasound probe").

## V.     CLAIM CONSTRUCTION OF THE '850 PATENT

The asserted claims[2] of the '850 patent are directed to a variety of hearing aid features.  In addition, those claims are presented in a variety of formats, including claims directed to structure, methods and means-plus-function.  To most efficiently present Defendants' proposed constructions, the claims containing disputed terms are organized by subject matter.  Defendants begin with claims directed to acoustic feedback cancellation because one of the inventors has testified that those claims are "most important."  (Levitt Dep. at 17:8-11 JA-0500)).  Claims 19, 10 and 13 are directed to cancellation of acoustic feedback using a filter in the feedback path and claim 14 is silent as to filter location.  Claim 9 is directed to cancellation of acoustic feedback

---

[2] ETG has improperly proffered claim constructions for claims 2 and 3.  ETG did not assert those claims against any Defendant in ETG's December 12, 2006 Identification of Products and Claims, or in its March 2, 2007 Preliminary Infringement Contentions.  Therefore, it would be a waste of the resources of both the Court and Defendants to construe claims 2 and 3 of the '850 patent.

using a filter in the forward path. Claims 1, 5, 6, 17 and 18 are directed to the correction of a

wearer's particular hearing impairment.

### A.    *Claims Related to Feedback Cancellation*

#### 1.    Feedback Cancellation in a Feedback Path

##### a.    Claim 19

###### i.    delay line filter

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| delay line filter | a non-recursive filter that operates on time-delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighted samples to provide an output having desired electro-acoustic characteristics | Presumably, "a filter employing one or more delays and coefficients" (*See* programmable delay line filter below) |

Claim 19 requires a "programmable delay line filter." Because this phrase has two

components, Defendants first offer a construction for "delay line filter," and then offer a

construction for "programmable delay line filter." ETG offers a single construction for the entire

phrase.

As defined in the intrinsic evidence, including the patent specification, a delay line filter

operates by *multiplying* time-delayed samples of an input signal by a weighting coefficient.

(2:55-62; 5:9-30; 10:55-11:3). These weighted samples are then *added together* to provide a

filter output. (*Id.*) The filter output provides desired "electroacoustic characteristics." (2:55-66).

The patent distinguishes delay line filters from recursive filters.[8]

> In one form, the programmable filter may be a digital equivalent of a
> tapped *delay line* in which each *delayed sample is multiplied by a weighting
> coefficient. The sum of the weighted samples generates the desired
> electroacoustic characteristics.* Alternatively, the programmable filter may be a
> tapped analog delay line in which *the sum of the weighted outputs of the taps
> generates the desired characteristics.* (2:55-62).

---

[8] A recursive filter is one that returns one or more of its outputs to the input. Handbook of Sound
Engineers, p. 627-28 (JA-0549-50).

14

\*\*\*

*Another form of filter* uses a small number of delays in which the delayed output is multiplied by a coefficient and added to the filter input so as to achieve additional delays, a technique known as *recursive* filtering. (2:67-3:2).

The extrinsic evidence reaffirms the patent's teaching that a delay line filter is non-recursive. (Handbook for Sound Engineers, 1st Ed. 1987 at 627-28 (JA-0549-50)). The extrinsic evidence also confirms that a delay line filter operates by multiplying time-delayed samples of an input signal by a weighting coefficient and then adding the weighted samples together to provide the output. *Id.* The diagram below illustrates the operation of a delay line filter.



(Handbook for Sound Engineers at 627 (JA-0549))

In this diagram, the time-delayed input samples ($X_n$) pass through a line of delays ($T_n$). (*Id.* at 627-28 (JA-0549-50)). Each of these time-delayed samples is "tapped" and then multiplied by its corresponding weighting coefficient ($a_n$). (2:55-66; Handbook for Sound Engineers at 627-28 (JA-0549-50). The summer ($\sum$) sums the weighted samples to provide an output.

ETG apparently contends that a "delay line filter" is "a filter employing one or more delays and coefficients." This definition is overbroad. Many types of discrete audio filters employ one or more delays and coefficients, but not all such filters are *delay line* filters. ETG's proposed construction overlooks three necessary features of a delay line feature, all of which are

confirmed in the patent's specification and the extrinsic evidence: (1) time-delayed samples are *multiplied* by weighting coefficients; (2) the weighted samples are then *added together* to form an output; and (3) the filter is *non-recursive*.

ii.    programmable delay line filter

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| programmable delay line filter | a delay line filter that uses externally calculated weighting coefficients | a filter employing one or more delays and coefficients, the value(s) of at least one delay or coefficient can be programmed |

Claim 19 does not merely recite a delay line filter, it recites a "*programmable* delay line filter." The "programmable delay line filters" of the patent all require that *externally* calculated weighting coefficients are used by the filter. (4:35-41). The coefficients are loaded in an EEPROM 84 that is plugged into the host controller. (8:23-27). The EEPROM 84 is then physically transferred to the hearing aid where the weighting coefficients are loaded into the RAM 77 of the delay line filter.[9] (10:16-20; 5:31-34).

The narrow scope of the written description of the '850 patent restricts the claims to filters that use weighting coefficients that are externally calculated. Under the controlling authorities, where the written description discloses a single method or system for a

_____

[9] At least two issued U.S. patents also confirm that the '850 patent is directed only to externally calculated weighting coefficients. For example, U.S. Patent 5,083,312 (JA-0578-91, discussed the '850 patent, stating that:

U.S. Pat. No. 4,731,850 (Levitt) discloses a hearing aid with an electronically erasable programmable read-only memory (EEPROM) which can be connected to an *outside-the-ear controller*, through which *the EEPROM is loaded with operating coefficients*. When the hearing aid is in use, it is disconnected from the controller, and *the EEPROM provides the previously loaded coefficients to a random access memory (RAM)* through a series parallel converter (1:30-45 (JA-0583)) (emphasis added).

*See also* U.S. Patent 5,303,306, (JA-0592-606) Col. 2, ll. 63-68 (The '850 patent "is directed to a hearing aid which *stores various filter coefficients* in the EEPROM on board the hearing aid. These settings are *loaded into the EEPROM with a computer by an Audiologist*") (JA-0600) (emphasis added).

"programmable delay line filter," the scope of the claims must be limited to that disclosure. *Phillips*, 415 F.3d at 1314-17; *see also Toro Co. v. White Consolidated Indus.*, 199 F.3d 1295 (Fed. Cir. 1999).

The Federal Circuit's reasoning applies equally to the '850 patent. There is no disclosure or embodiment in the '850 patent other than a filter using externally calculated weighting coefficients. Moreover, there is nothing to indicate that the externally calculated coefficient embodiment is merely a preferred embodiment. It is the only embodiment. Even where the '850 patent says that other embodiments are possible, those alternatives merely comment on changing the number of filters, the frequency bands, or the number of taps (11:58-66). There is not even a suggestion of using anything other than externally calculated coefficients. Accordingly, ETG's broad proposed construction should be rejected.

Moreover, ETG's construction seeks to encompass programmable delay line filters with "one or more delays and coefficients [that] … can be programmed." As to the delays, nowhere in the '850 patent specification is there any disclosure of delay line filters with *any* time delays that can be changed. Oscillator 76 dictates the delay in the FIG. 2 and 4 configurations and there is no teaching that this oscillator, or any other device that effects delay, can be programmed. Therefore, ETG's construction should not be adopted also because it excludes all of the fixed time delay embodiments, which are the only embodiments disclosed. *See Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996) (The court held that construing a claim to exclude a preferred embodiment "is rarely, if ever, correct and would require highly persuasive evidentiary support.").

### iii.    feedback path

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| feedback path | a path in which a signal from a forward path travels in a direction toward the microphone and is combined into an earlier point in the forward path | this phrase does not need to be construed and should be afforded its plain and ordinary meaning because it takes an otherwise understandable term and makes it more complicated for a jury; otherwise, the proper definition would be: a path in which a signal travels toward an input of a transmission channel |

The term "feedback path" is used in claim 19. Defendants' proposed construction is consistent with the specification and the well-understood meaning of this phrase. ETG's proposed construction merely identifies a direction of travel; it deliberately omits the requirement that the output "feeds back" into the input.

Feedback is a signal from an output that is added back to the input. (McGraw Hill Dictionary of Scientific Terms, 6th Ed. 2003 at p. 783 (JA-0577)). For example, if a person with a microphone stands in front of loudspeaker that is amplifying his voice, the output of the speaker may feed back into the microphone, creating a loud, irritating, squeal. On a physically smaller scale, this same feedback can occur in a hearing aid. (1:36-41; *see also* Dugot Dep. at 42:6-11 (JA-0510)).

The "feedback path" is the path that the feedback signal takes in returning to the input. In the context of a microphone / loudspeaker arrangement, the "forward path" is a path in which a signal travels in a direction from the microphone to the receiver.[10] The feedback path is a path in which a signal from the forward path travels in a direction toward the microphone and is combined into an earlier point in the forward path. A feedback path can be acoustic, as described above in the case of the microphone and loudspeaker. A feedback path also can be

---

[10] See Defendants' proposed construction for claim 9, *infra* at pp. 31-32.

electrical.  In an electrical feedback path, an electrical signal is fed back into an earlier point in the forward path.  The diagrams below represent a filter in a forward path and in a feedback path.



Inventor and ETG Rule 30(b)(6) designee Richard Dugot confirmed that the above diagrams accurately show a filter in a "forward path" and a filter in a "feedback path," respectively.  (Dugot Dep. at 153:22–155:14 (JA-0514-15); Dugot Dep. Exs. 66, 67, 68 (JA-0517-19)).  These definitions are further confirmed by scientific dictionaries.  (Handbook for Sound Engineers at pp. 496-97 (JA-0545-46); the McGraw Hill Dictionary of Scientific Terms, at p. 783 (JA-0577)).

The terms "feedback path" and "forward path" are used in the claims of the '850 patent and the common specification of the patents-in-suit to identify the location of certain elements.  *See, e.g.,* Abstract, lines 19-21; 3:4-11; 9:44-55; claims 1, 13, 18 and 19 (feedback path); and claims 9 and 15 (forward path).  These terms are critical to the appropriate determination of the scope of the claims.  Indeed, claim 1 was allowed only after applicants amended the claim to place both the "programmable delay line filter" and "programmable signal limiter means" in a feedback path.  ('850 file history, June 29, 1987 Amendment at 2, 7, 8 (JA-0100, 105, 106)).

The intrinsic evidence fully supports Defendants' proposed construction.  FIG. 2 of the '850 patent shows a "feedback path," as defined by switches 82 and 138.  When these switches are in the feedback path position [FBK], filter 64 is connected to the transmission channel at the output of amplifier 68 and is combined back into the transmission channel at the output of microphone 57 by summing amplifier 60.  In contrast, when switches 82 and 138 are in the

forward path position [FWD], they connect the filter between microphone 57 and amplifier 68.

Exhibit A illustrates the feedback and forward path modes of operation.  (JA-0627-28)

ETG's proposed construction should not be adopted because it is incomplete and will

result in jury confusion.  ETG's "feedback path" is disembodied from the forward path.  It has no

beginning and no end.  In every usage in the patent, the "feedback path" provides for a signal

from the forward path to be combined back into an earlier point in the forward path.

> iv.     **programmable filter being programmed to effect substantial reduction of acoustic feedback from said microphone**

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| programmable filter being programmed to effect substantial reduction of acoustic feedback from said microphone | the entire phrase means: the filter has received weighting coefficients that in normal operating mode are fixed to impart cancellation of acoustic feedback between the receiver and the microphone | "programmed" means: provided with one or more values so as to produce a response |

Because the purpose for which the programmable delay line filter is "programmed" is an

important limitation in the individual claims, the term "programmed" should not, as ETG

contends, be construed in a vacuum, independent of the context of the rest of the claim element

in which it is contained.[11]  *Pause Tech. LLC v. TiVo Inc.*, 419 F.3d 1326, 1331 (Fed. Cir. 2005)

("proper claim construction demands interpretation of the entire claim in context, not a single

element in isolation").  Claim 19 requires a "programmable delay line filter interposed in a

feedback path" that is "programmed to effect substantial reduction of acoustic feedback from

said receiver to said microphone."

---

[11] The '850 patent includes claims directed to "programmed" filters for addressing two separate concerns:  (1) to cancel acoustic feedback (claims 9, 10, 13, 14, 19); and (2) to compensate for the impaired hearing of the wearer of the hearing aid (claims 1, 10, 17).

**The Programmed Filter Coefficients Are Fixed**

The only references in the '850 patent regarding the way that a hearing aid filter is made to provide a particular result is by being loaded with weighting coefficients that were "predetermined" during the fitting process. (11:13-15). After being loaded in the filter's RAM, the coefficients cannot be changed during normal hearing aid operation. They are fixed.

For example, during the fitting process, a "set of coefficients is derived for each" curve, and the precalculated coefficients are transferred from an EEPROM to the filter's RAM for normal operation of the hearing aid. (7:60-66).

Similarly, the specification states that to cancel acoustic feedback during the fitting process, a test signal is supplied from the host controller to the hearing aid, and the resulting acoustic feedback is measured in situ. (9:11-12). An electrical feedback path with phase and amplitude characteristics that are identical to but opposite of the acoustic feedback is created to cancel the acoustic feedback during fitting. Once the acoustic feedback is cancelled during fitting, the computer-controlled host controller "calculates a set of coefficients for a programmable filter" that cancels feedback during normal hearing aid operation. (9:41-46).

As the specification for the '850 patent also explains:

> The coefficients stored in the RAM 77 when the hearing aid is in operation are provided essentially by the EEPROM 84 *previously programmed* by the host controller 20 (FIG. 1) as described in greater detail hereinafter. *On power-up, the filter coefficients and limit parameters are transferred from the EEPROM 84 to the RAM 77.* (5:31-35)(emphasis added).

The coefficients that are stored in the EEPROM and the RAM are fixed and calculated during fitting. The specification provides no means by which they can be changed during normal operation of the hearing aid. (5:31-39; 10:16-21).

The '850 patent suggests that such processor-heavy (and thus, power-heavy) calculations during normal operation are to be avoided. The '850 patent recognizes that power consumption

is a key concern for the disclosed hearing aid system. Consistent with that concern, the '850

patent explains one reason why the filter coefficients are fixed in the RAM:

> In normal operation, the EEPROM 84, with the optimum coefficients determined
> as described above stored therein, is plugged into the hearing aid, and when
> power is turned on the coefficients are transferred from the EEPROM 84 into the
> RAM 77. From then on **the EEPROM is inactive in order to save power**.
> (10:16-21)(emphasis added).

The '850 patent also recognizes that the use of a digital filter in and of itself is a power concern,

and suggests that an analog implementation is a suitable alternative:

> An important advantage of the latter type of filter is that the power consumption is
> low and quasi-digital techniques can be used …. (2:62-66).

Consistent with the expressed concern, the '850 patent discloses filters that are

programmed with fixed filter weighting coefficients. Indeed, the specification refers to

"predetermined coefficients … to produce a resultant characteristic. (11:13-15). For feedback

cancellation, the '850 patent teaches that only one set of coefficients need be provided to the

filter to cancel acoustic feedback. Indeed, the '850 patent does not recognize or acknowledge

that the acoustic feedback characteristics may change with the environment or activities of the

wearer. According to the '850 patent, a single set of precalculated coefficients that are fixed

during normal operation are all that is needed to cancel acoustic feedback.

The narrow scope of the written description of the '850 patent, combined with the

patent's expressed concerns over power use, results in filters that are programmed with

weighting coefficients precalculated during the fitting process and fixed during normal operation.

In such cases, the construction of the claims must conform to the patent specification. *Phillips*,

415 F.3d at 1316-17; *On Demand Mach. Corp.*, 442 F.3d at 1340. Indeed, there is nothing in the

intrinsic record to indicate that the disclosed filter programmed with fixed weighting coefficients

was merely a preferred embodiment of the claimed invention. It is the only embodiment. And,

even where the '850 patent says that other embodiments are possible, there is no suggestion of

using anything other than externally calculated fixed coefficients.[12]  *On Demand Mach.*, 442

F.3d at 1339-40; *Honeywell Int'l*, 452 F.3d at 1318; *Nystrom II*, 424 F.3d at 1138; *Phillips*, 415

F.3d at 1316-17; *Toro*, 199 F.3d at 1301; *Wang Labs*, 197 F.3d at 1382-83.

### ETG's Proposed Construction Is Overbroad

ETG proposes that the term "programmed" should be construed to mean "provided with

one or more values so as to produce a response" – without regard to whether a filter uses values

obtained during fitting or during normal operation.  ETG's proposed construction goes well

beyond the scope of the '850 patent's written description and is apparently posited to allow ETG

to argue that its claimed programmed filter covers adaptive filters.

The use of hearing aid filters that operate using coefficients that are adaptive – i.e., filters

that operate using values that are calculated from determinations of the environment made during

the course of everyday hearing aid use by the wearer – are not found anywhere in the

specification.  Because ETG's proposed construction goes well beyond what is disclosed in the

'850 patent, that construction is overbroad and should be rejected.  *Phillips*, 415 F.3d at 1316-17;

*On Demand Mach. Corp.*, 442 F.3d at 1340 ("claims **cannot be of broader scope** than the

invention that is set forth in the specification") (emphasis added).

### The Extrinsic Evidence Confirms Defendants' Proposed Construction

The extrinsic record confirms that the '850 patent disclosure is directed only to a filter

whose operations are controlled by externally calculated fixed weighting coefficients.  In

---

[12] The '850 does recognize that some "automatic adjustment" may be necessary to compensate for the impaired hearing of the wearer in response to changing speech/noise conditions.  But even in this context, the hearing aid makes those automatic adjustments using the fixed weighting coefficients that were previously calculated during fitting (3:12-20).  The patent teaches that a logic circuit may be used to select between the finite number of sets of weighting coefficients for the filter that are stored in the RAM (6:44-54).

*Phillips*, the Federal Circuit reaffirmed that the Court may consider extrinsic evidence when that evidence is considered in the context of the intrinsic record, and where that evidence is not inconsistent with the intrinsic record. *Phillips*, 412 F.3d at 1324.

In 1997, Dr. James M. Kates discussed the '850 patent in a patent application that issued as U.S. Patent 6,072,884 ("the '884 patent" (JA-0607-26)). As part of his review of the prior art, Dr. Kates explained that the '850 patent used "a *fixed approximation* to the feedback path *instead of an adaptive filter.*" ('884 patent; 2:61-62 (JA-0618)) (emphasis added). In other words, the '850 patent taught that programming was performed by "setting the feedback cancellation filter response when the hearing aid was fitted to the user." ('884 patent, 2:64-66 (JA-0618)).

The '884 patent is significant because Dr. Kates was a colleague of Dr. Levitt at the Center for Research in Speech and Hearing Sciences at the City University of New York (CUNY). In 1991, while Dr. Kates was at CUNY with Dr. Levitt, Dr. Kates published an article titled "The Problem of Feedback in Hearing Aids" (JA-0530-42) in which he reviewed both then existing technology for reducing acoustic feedback, including the '850 patent, and new approaches. His interpretation of the '850 patent disclosure was the same and did not change over time. In the article, Dr. Kates noted that the '850 patent:

> used a *time-invariant cancellation filter* set when fitting the hearing aid. The *fixed filter*, however, cannot adjust to changes in the acoustic environment (LEV4197 (JA-0538)) (emphasis added).

Dr. Kates contrasted the '850 patent from "adaptive systems" that detect changes in acoustic feedback during real-time. *Id.*

Dr. Kates observed in his article that changes in acoustic feedback occur in varying situations, including, e.g., when using a telephone, or when the hearing aid shifts in the ear during eating or talking. *Id.* The '850 patent does not acknowledge any of these potential

changes in acoustic feedback behavior after the fitting process and thus does not acknowledge
any need for an adaptive solution for acoustic feedback cancellation.  These patents and
publications confirm that the '850 patent written description and claims are limited to filters
programmed with weighting coefficients that during normal operation are fixed to create a
particular response.

Similarly, Mr. Dugot, one of the named inventors for the patents-in-suit, confirmed that
power consumption was the overriding concern at the time of the work that led to the '850
patent.  Mr. Dugot testified (as a Rule 30(b)(6) witness for ETG) that the "whole problem of
implementing this hearing aid was the power consumption problem" and that the goal was to
"find a delay line [filter] which would be functional at a much less consumption of power."
(Dugot Dep. at 22 (JA-0509)).  Accordingly, as Mr. Dugot confirmed, the '850 patent discloses
the use of programmed filters with fixed weighting coefficients cannot be recalculated during
operation.  (Dugot Dep. at 61-62 (JA-0511-12)).  *Jonsson v. The Stanley Works*, 903 F.2d 812,
821 (Fed. Cir. 1990) (district court's reliance on inventor's deposition testimony that was
contrary to patent holder's litigation-induced interpretation was proper); accord *ASM Am., Inc. v.
Genus, Inc.*, 401 F.3d 1340, 1347 (Fed. Cir. 2005) (relying on extrinsic evidence consisting of
inventor's and exclusive licensee's statements on the scope of the patent in affirming district
court's construction of claim limitations); *Gentex Corp. v. Donnelly Corp.*, 69 F.3d 527, 530
(Fed. Cir. 1995) (Inventor's testimony that he did not intend for solid films to be included within
his patent used to interpret claim by limiting its scope to liquid film and not include solid film).

### The Programmed Filter "Cancels" Acoustic Feedback

This claim element requires that the programmed filter effect "substantial reduction of
acoustic feedback."  Neither the claim nor the patent specification describes what measure of

reduction is "substantial." *Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 837 F.2d 1044 (Fed Cir. 1988) ("We note that the height and position limitation in the claim are modified by the terms 'substantially' and 'approximately.' These terms must be interpreted in light of the specification and prosecution history to determine the literal coverage of the claims with respect to height and position.").

The only disclosures in the '850 patent relating to acoustic feedback provide that acoustic feedback is "cancelled" by subtracting the signal from the electrical feedback path from the acoustic feedback path during the fitting process. (3:3-11; 4:27-30; 9:11-17; 9:41-46). The '850 patent also describes this cancellation as the production of a "null" summation during the fitting process, and calculating corresponding filter coefficients. (4:23-26; 9:42). The '850 patent does not provide for any fraction, percentage or other measure of reduction for acoustic feedback that is considered "substantial."

What is more, ETG does not even offer a proposed construction and instead chose to avoid this ambiguity by urging the Court to construe the term "programmed" without regard to context.

Thus, the limitation "substantially" is indefinite in the context of the '850 patent. To the extent that the term "substantial" can be construed at all, the claimed filter that is programmed to "substantially reduce" acoustic feedback must be programmed to "cancel" acoustic feedback. This entire claim element should be construed to mean that the filter has received weighting coefficients that in normal operating mode are fixed to impart cancellation of acoustic feedback between the receiver and the microphone.

### b.    Claim 10

#### i.    said programmable delay line filter is programmed so as to effect substantial reduction of acoustic feedback from said receiver to said microphone

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| said programmable delay line filter is programmed so as to effect substantial reduction of acoustic feedback from said receiver to said microphone | the entire phrase means: the filter has received weighting coefficients that in normal operating mode are fixed to impart cancellation of acoustic feedback between the receiver and the microphone | "programmed" means: provided with one or more values so as to produce a response |

Claim 10 is dependent on claim 1, which requires a "programmable delay-line filter" in a feedback path. This phrase should be construed consistently with claim 19.

### c.    Claim 13

Like claim 19, claim 13 is directed to acoustic feedback. Rather than claiming an apparatus, claim 13 recites a "method of reducing acoustic feedback." Claim 13 also requires a "feedback path," which should be construed as set forth above for claim 19.

#### i.    determining the effect on the amplitude and phase of a signal in said transmission channel as a function of frequency of acoustic feedback between said transducer and microphone

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| determining the effect on the amplitude and phase of a signal in said transmission channel as a function of frequency of acoustic feedback between said transducer and microphone | "determining" means measuring and "as a function of frequency" means at a known frequency; the remainder of this recitation is indefinite | "determining" and "as a function of frequency" do not need [to be] construed and should be afforded the plain and ordinary meanings because the proposed construction takes an otherwise understandable phrase and makes it more complicated for a jury |

**determining**

Claim 13 recites in the first step the term "determining." This term should be construed as "measuring," as this is the only construction supported by the intrinsic record. The specification of the '850 patent consistently and uniformly discloses that acoustic feedback must be "measured" during the fitting process in order to define the appropriate weighting coefficients

necessary to cancel acoustic feedback during normal hearing aid operation. Although
"determining" is used throughout the specification in other contexts, the term "measuring" is the
only term used in connection with the effect of acoustic feedback "on amplitude and phase of a
signal in said transmission channel:"

> The host controller 20 also includes a phase ***measurement*** circuit … (4:6-7).

> The prescriptive procedure usually consists of five stages:
> … (3) ***measuring*** acoustic feedback in the hearing aid; (6:60-66).

> Feedback cancellation is achieved in the hearing aid by first ***measuring*** the
> acoustic feed back in situ … (9:12-15)

> Acoustic feedback is ***measured*** with the hearing aid in the ear as it would
> normally be worn. (9:18-19).

> For the purpose of this ***measurement***, the feedback loop is broken between 140
> and 122. (9:30-31).

Therefore, the intrinsic evidence mandates that the term "determining" be construed to
mean "measuring." Claims should be construed consistent with the uniform description of the
invention. *Curtiss-Wright Flow Control Corp., v. Velan, Inc.*, 438 F.3d 1374, 1379 (Fed. Cir.
2006). (construing "adjustable" to require de-heading during operation because the "patent
consistently, and without exception, describes adjustment that occurs during the operation of the
de-header system").

### as a function of frequency

Claim 13 also requires that the measurement of the effect of acoustic feedback be
performed "as a function of frequency" of that acoustic feedback. The written description of the
'850 patent is devoid of any structure or method for directly measuring the frequency of acoustic
feedback. The only reference in the patent to the use of "frequency" in connection with the
fitting process for feedback cancellation is the use of a test signal, which is generated by signal
generator 21, "the frequency of which is controllable … by the computer 24." (3:63-67; 4:12-18;

9:19-25).  The patent also teaches that a "portion" of this test signal will leak through the ear

mold and reach microphone 57.  (9:19-25).  This is the acoustic feedback signal, which is at the

same frequency as the test signal.  Therefore, to the extent that the "as a function of frequency"

phrase of claim 13 has any meaning, it must be "at a known frequency" of the test signal.

ii.    inserting ... a filter therein programmed

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| inserting ... a filter therein programmed | "inserting ... a filter therein programmed" means inserting, after the determining step, an electrical feedback path between the input and output of said transmission channel, the electrical feedback path having a filter therein programmed | The steps of "determining" and "inserting" do not have to be performed in the recited order<br><br>"inserting ... a filter" means making an electric feedback path with a filter effective between the input and output of the transmission channel |

There are two disputes between the parties with respect to the inserting step.  First,

Defendants propose that the inserting step must be construed to follow the determining step.

ETG disagrees.  Second, Defendants assert that a feedback path having a filter therein

programmed to equalize and reduce the effect of said acoustic feedback must be inserted

between "the input and output of said transmission channel."  In contrast, ETG proposes an

incomprehensible construction that finds no support in the intrinsic record.

Claim 13 requires "determining the effect ... of acoustic feedback," and "inserting a filter

therein programmed ... to equalize and reduce the effect of *said* acoustic feedback."  The plain

language of the claim thus dictates that the determining step must precede the inserting step.

Moreover, as explained above with respect to claim 19, the filter is "programmed" during the

fitting process with weighting coefficients that can only be calculated *after* there has been a

measurement of the acoustic feedback effect.  Accordingly, the act of measuring, i.e., the

"determining" step of claim 13 occurs before the step of inserting.  *See Loral Fairchild Corp. v.*

*Sony Elects. Corp.*, 181 F.3d 1313, 1321 (Fed Cir. 1999) (holding that the claim language itself

indicated the steps had to be performed in recited order when second step required an alignment

that was formed in the first step); *see also Mantech Envt'l Corp. v. Hudson Envt'l Servs., Inc.,*

152 F.3d 1368, 1376 (Fed. Cir. 1998) (method claim construed so as to require the steps be

performed in the recited order because each subsequent step referenced something logically

indicating the prior step had been performed).

### iii.    a filter therein programmed to equalize and reduce the effect of said feedback acoustic feedback both in amplitude and phase on a signal in the transmission channel

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| a filter therein programmed to equalize and reduce the effect of said feedback acoustic feedback both in amplitude and phase on a signal in the transmission channel | the entire phrase means: the filter has received coefficients that, during normal operation, are fixed to impart an "**equalization**" and reduction of the effect of acoustic feedback both in amplitude and phase on a signal in said transmission channel<br><br>the term **equalize** is indefinite | "filter therein programmed" means a filter having coefficients where the values of the coefficients may be programmed |

Claim 13 also requires the step of inserting in an electrical feedback path a filter

programmed "to equalize and reduce the effect of said feedback acoustic feedback both in

amplitude and phase on a signal in the transmission channel."  This claim element is similar to

claim 19, which requires a "filter being programmed."

Claim 13 differs from claim 19 in that it requires that the filter both "equalize" and

"reduce" the effect of acoustic feedback rather than "substantially reduce" acoustic feedback.  In

the context of the written description of the patent, "equalize and reduce" is not defined and the

term is indefinite.  As discussed with respect to claim 19, the '850 patent only discloses the

"cancellation" of acoustic feedback or the production of a "null" summation to cancel acoustic

feedback.  Plaintiffs have also not proffered any proposed construction for this phrase.

Accordingly, Defendants' proposed construction includes both "equalization" and "reduction"

consistent with requirements of the claim language.