### d.     Claim 14

Claim 14 is a method claim that is similar to claim 13.  Claim 14 has a determining step that must be construed consistent with the determining step of claim 13.  Similarly, claim 14 has an inserting step that, as discussed in connection with claim 13, must be performed after the determining step.  Finally, claim 14 requires a "programmable filter programmed to equalize and reduce the effect of said acoustic feedback both in amplitude and phase on a signal in the transmission channel," which must be construed consistent with the construction of that phrase in claim 13.  Although claims 13 and 14 are different in other respects, there is no claim construction issue raised by those differences.

### 2.     Feedback Cancellation in a Forward Path

### a.     Claim 9

Claim 9 is an alternative embodiment of the disclosed system for feedback cancellation. Like claim 19, claim 9 requires a "programmable delay line filter" that is "programmed to effect substantial reduction of acoustic feedback from said receiver to said microphone." These claim elements should be construed in the manner set forth above for claim 19.  Claim 9 differs from claim 19 in that the "programmable delay line filter" is now "interposed in a forward path."

### i.     forward path

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| forward path | a path in which a signal travels in a direction from the microphone to the receiver | this phrase does not need to be construed and should be afforded its plain and ordinary meaning because it takes an otherwise understandable term and makes it more complicated for a jury; otherwise, the proper definition would be:  A path in which a signal travels from an input toward an output of a transmission channel. |

The term "forward path" is used in claim 9 and should be construed to avoid jury confusion.  While ETG asserts that "forward path" is an understandable term, it is used in a

specific context in the '850 patent and therefore requires construction.  Indeed, ETG has proffered its own construction.

The claim defines the transmission channel with respect to the microphone and receiver, and puts the "forward path" between those elements.  Defendants' proposed construction maintains this relationship.  ETG's proposed construction, while similar in some respects to Defendants' proposed construction, may result in jury confusion since it lacks reference to either the microphone or receiver.

### B.     Claims Related to Hearing Impairment/Noise

Claims 1, 5, 6, 17 and 18 are directed to the correction of a wearer's particular hearing impairment.

### 1.     Claim 1

Claim 1 contains several elements that have been construed in the sections above.  For example, claim 1 has a "programmable delay line filter" and a "feedback path."  These elements should be construed consistent with claim 19.

### a.     programmable signal limiter means

| Disputed Term | Defendants' Construction[13] | ETG's Construction |
|---|---|---|
| programmable signal limiter means | Function – to programmably limit the [amplitude of the] signal [from exceeding a certain level by using externally calculated coefficients]<br><br>Structure – programmable limiter 67, RAM 77 and attendant signal lines; and equivalent structures | Function – limiting or reducing the signal in some manner<br><br>Structure – one corresponding structure is an amplitude limiter or a device that controls the maximum allowable signal to pass to the wearer's ear; another structure is a programmable compression amplifier; equivalents of these structures also fall within the claim scope |

Claim 1 includes a "programmable signal limiter means" that is subject to 35 U.S.C. § 112, ¶ 6.  The parties disagree as to both (1) the function and (2) the corresponding structure.

---

[13] In our proposed constructions of means-plus-function elements, Defendants have inserted brackets around the terms/phrases that are not recited in the claim language, but are necessary to properly interpret the claimed function.

Defendants' proposed function is "to programmably limit the [amplitude of the] signal [from exceeding a certain level by using externally calculated coefficients]," which is consistent with the claim language "programmable limiter means." Defendants propose to insert the term "[amplitude of the]" to make explicit that the aspect of the signal that is limited is the amplitude. Indeed, the '850 patent describes the limiter means as an "*amplitude* limiter," and describes measuring loudness discomfort levels in order to program the *limiter* so that sound amplified by the hearing aid never exceeds the patient's loudness discomfort "*level.*" Abstract; 7: 21-30. Similarly, during prosecution of the '850 patent, the Applicant amended the claim to include the "programmable signal limiter means" and argued that "[a] limiter's characteristic is to *constrain its output* from increasing, or at least increasing only very slowly, whenever its output signal reaches a critical *level.*" ('850 File history, June 29, 1987 Amendment at p. 2, 7 (JA-0100, 05).

The phrase "[from exceeding a certain level by using externally calculated coefficients]" is required because it clarifies how the limiter is made "programmable." In connection with claim 19, Defendants explained how the term "programmable" must be used in the context of the claimed filters. That same explanation is applicable to the "programmable limiter." For example, the patent refers to a "programmable read only memory (EEPROM) which supplies coefficients to programmable filter and amplitude limiting means." (2:46-50). Similarly, the patent states that, "[o]n power-up, the filter coefficients and limit parameters are transferred from the EEPROM 84 to the RAM 77." (5:31-36).

ETG's proposed construction of the "programmable signal limiter means" function ignores the claim language as well as the intrinsic evidence. ETG omits any reference to the "programmable" aspect of the function, which is explicitly recited in the claim. This is improper. *Lockheed Martin*, 324 F.3d at 1319 ("neither may the function be improperly

broadened by ignoring the clear limitations contained in the claim language"). Rather, ETG's

proposed function is "limiting or reducing the signal in some manner." There is no intrinsic

support for ETG's proposed addition of the phrase "reducing the signal in some manner."

Adding a different function not supported by the claim language is improper. *JVW Enters. V.*

*Interact Accessories, Inc.*, 424 F.3d 1324, 1331 (Fed. Cir. 2005) ("[A] court may not construe a

means-plus-function limitation by adopting a function different from that explicitly recited in the

claim.").

    The parties also disagree on the corresponding structure. Defendants' proposed

corresponding structure for this means element is found in the intrinsic record:

> The measurements of loudness discomfort level are used to program the limiter 67
> so that sounds amplified by the hearing aid never exceed the patient's loudness
> discomfort level. (7:23-26).

> On power-up, the filter coefficients and limit parameters are transferred from the
> EEPROM 84 to the RAM 77 … (5:35-37).

    Finally, as FIGS. 2 and 4 illustrate, signal lines are necessary to allow the programmable

limiter means to perform its function.

    ETG's proposed structure of the "programmable limiter means" is "an amplitude limiter

or a device that controls the maximum allowable signal to pass to the wearer's ear; another

structure is a programmable compression amplifier." A claim drafted pursuant to 35 U.S.C. §

112, ¶ 6 cannot be construed to include ***any*** structure that performs the recited function, it

requires a specific disclosed structure. ETG's attempt to broaden the claim to a generic "device"

that performs the claimed function violates this well-established principle. Therefore, ETG's

broad and generic construction should be rejected. Moreover, ETG's proposed construction,

when referencing an "amplitude limiter" or a "device" fails to identify any structure

corresponding to the "programmable" aspect of the element.

Another ETG proposed structure is a "programmable compression amplifier." The adoption of this proposed structure would be legal error since neither the '850 patent specification nor the patent's file history links a programmable compression amplifier to the function of limiting the signal level. The only description of a programmable compression amplifier in the '850 patent is for adjusting the *frequency response* of the hearing aid. (11:32-38).

Since neither the '850 patent specification nor file history links a programmable compression amplifier to the function of limiting the signal, this amplifier is not a "corresponding structure" of the programmable signal limiter means under 35 U.S.C. § 112, ¶ 6. *Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211-12 (Fed. Cir. 2003) (error to include software as corresponding structure where specification did not link software to the recited function).

> **b.    said filter being programmed to impart to the hearing aid at least one response characteristic effective to compensate for impaired hearing of the wearer of the aid**

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| said filter being programmed to impart to the hearing aid at least one response characteristic effective to compensate for impaired hearing of the wearer of the aid | the entire phrase means the filter has received at least one set of weighting coefficients that, in normal operating mode, are fixed to create a response characteristic that corrects for the particular hearing impairment of a wearer of the aid<br><br>**programmed** cannot be fairly construed outside the context of the remainder of the entire claim element | this phrase does not need to be construed and should be afforded its plain and ordinary meaning because it takes an otherwise understandable phrase and makes it more complicated for a jury<br><br>**programmed** means provided with one or more values so as to produce a response |

Claim 1 requires a "programmable delay line filter" in a feedback path that is "programmed to impart to the hearing aid at least one response characteristic effective to compensate for impaired hearing of the wearer of the aid."

As discussed with respect to claim 19, the '850 patent discloses only one way that results in a programmed filter: providing fixed sets of weighting coefficients that correspond to

measurements of the patient's residual hearing, where the measurements are made during fitting. (6:54-7:20). From those measurements, response characteristics for the hearing aid are calculated that correspond to one of four frequency-gain curves particular to the individual patient. (7:21-59), and are graphically depicted in FIG. 3 of the '850 patent. A "set of coefficients is derived for each" curve during the fitting process and, that when the hearing aid is placed in its normal operating mode are stored in RAM 77. (7:60-66). Accordingly, the programmed filter of claim 1 has received "at least one set" of fixed weighting coefficients. Each of these sets creates a response characteristic that corrects for the particular hearing impairment of a wearer of the aid. (7:21-23).

ETG's infringement contentions assert that feedback cancellation "compensate[s] for the impaired hearing of the wearer." Therefore, ETG must believe that the plain meaning of this phrase is broad enough to encompass feedback cancellation. ETG is incorrect. Acoustic feedback is a product of the hearing aid and not a characteristic of the patient's hearing impairment. (Dugot Dep. at 62:22-63:15 (JA-0512)).

### 2. Claim 5

#### a. means controllable to impart different response characteristics to said hearing aid

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| means controllable to impart different response characteristics to said hearing aid | Structure – programmable filter 64 (structures 63a, 70-75, 77, 78, 78a, 79, and 80) programmed to impart different response characteristics; or 5 bit counter, timing logic, and structures 63a, 77, 80, and 145-151; and equivalent structures | Structure – programmable filter(s) that can be programmed with different coefficients to impart different response characteristics to audio signals present in the transmission channel of the hearing aid, and structural equivalents thereof |

Claim 5 (and claim 6 through dependency) includes a "means controllable to impart different response characteristics to said hearing aid." The parties agree that the functional language of this 35 U.S.C. § 112, ¶ 6 element does not require clarification.

The corresponding structure proposed by Defendants is that structure which the '850 specification clearly links to the function of this element. The specification discloses two versions of structures that impart different response characteristics to said hearing aid. The digital version is programmable filter 64 shown in FIG. 2, with the necessary components of this filter described at col. (5:9-30). An analog version is shown in FIG. 4 with the necessary components of this filter described at col. 10:44-11:3.

ETG's proposed structure of the "means controllable ..." is "programmable filter(s) that can be programmed with different coefficients to impart different response characteristics to audio signals present in the transmission channel of the hearing aid." A claim drafted pursuant to 35 U.S.C. § 112, ¶ 6 cannot be construed to include *any* structure that performs the recited function, it requires a specific disclosed structure. ETG has not identified specific "programmable filters" disclosed in the patent that are linked in the specification to the claimed function. ETG's attempt to broaden the claim generic "programmable filter(s)" that perform the claimed function violates this well-established principle. *Med. Instrumentation, supra, Johnston v. IVAC Corp.*, 885 F.2d 1574, 1580 (Fed. Cir. 1989). Therefore, ETG's broad and generic construction should be rejected.

**b.    controlling means responsive to the level of speech signals in said transmission channel in excess of the level of noise signals in said channel for automatically controlling said controllable means to impart a selected one of said different response characteristics to said hearing aid**

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| controlling means responsive to the level of speech signals in said transmission channel in excess of the level of noise signals in said channel for automatically controlling said controllable means to impart a selected one of said different response characteristics to said hearing aid | Function – responding to [a determination that] the level of speech signals in the transmission channel [is] in excess of the level of noise signals in the channel for automatically controlling the controllable means to impart a selected one of the different response characteristics to the hearing aid<br><br>Structure – speech detector 96, band pass filters 97-100, sample and hold circuits 105-108, rectifiers 109-112, comparators 113-116, latch 118, switch 95, and switch 88; and equivalent structures | Function – selecting the appropriate response characteristic based on the current environment<br>Structure – processing elements(s); and structural equivalents thereof |

Claim 5 (and claim 6 through dependency) also includes a "controlling means responsive to the level of speech signals in said transmission channel in excess of the level of noise signals in said channel for automatically controlling said controllable means to impart a selected one of said different response characteristics to said hearing aid" that is subject to 35 U.S.C. § 112, ¶ 6.

The parties disagree about whether the claimed function should include the entirety of the functional language included in the claim element. Consistent with *Lockheed Martin Corp.*, 324 F.3d at 1319, Defendants' proposed construction recites all of the element's functional language. ETG improperly crops and incorporates only portions of the recited functional language of the element.

The terms "[a determination that]" and "[is]" are required to clarify the claimed function, particularly in the context of the patent's written description and prosecution history. According to the intrinsic record, this means responds to speech that is in excess of noise by making a binary determination, i.e., it either determines whether or not speech is in excess of noise. The controlling means does not measure the relative amounts of speech and noise.

> So long as there is one output from the speech detector 96 indicating the presence of speech in the input, the instantaneous outputs of each of the band pass filters 97-100 are compared with previous values held in the sample and hold circuits 105-108, causing the comparators 113-116, respectfully, to generate a binary coefficient (0,1) indicating whether or not the speech level in the associated band pass filter exceeds the noise level.  (6:23-31).

The specification discloses no other way to perform this function.

The file history reinforces Defendants' proposed clarification.  As originally filed, the claim required "means responsive to a characteristic of a signal."  That claim was rejected as anticipated by a number of references including U.S. Patent No. 4,628,529 (Borth) (JA-0552-75). To overcome this rejection, the applicant amended the claim to instead require the "controlling means responsive to the level of speech signals in said transmission channel in excess of the level of noise signals in said channel."  ETG's proposed construction improperly seeks to recapture the claim scope that the applicants voluntarily surrendered.  *Hakim v. Cannon Avent Gp., PLC.*, 479 F.3d 1313, 1317 (Fed. Cir. 2007) ("an applicant cannot recapture claim scope that was surrendered or disclaimed").

Defendants' proposed clarification is presented to confirm that the claim function excludes a measurement of signal to noise ratio that was found in the Borth prior art reference. Borth's noise reduction technology does not, however, "generate a binary coefficient indicating whether or not [i.e., make a determination that] the speech level … exceeds the noise level," as required by the issued claim 5.

The corresponding structure proposed by Defendants is that structure which the '850 specification clearly links to the function of this element:

> So long as there is a one output from the speech detector 96 indicating the presence of speech in the input, the instantaneous outputs of each of the band pass filters 97-100 are compared with previous values held in the sample and hold circuits 105-108, causing the comparators 113-116, respectively, to generate a ***binary coefficient (0,1) indicating whether or not the speech level in the associated band pass filter exceeds the noise level.***  (6:23-31).

\*\*\*

The outputs of the comparators 113-116, inclusive, and of the input level detector 117 are fed to latching means 118, which provides a six bit output that is adapted to be transmitted through the switches 95 and 88 to the RAM 77.  (6:35-39).

ETG's proposed structure of the "controlling means" is "processing element(s)."  A claim drafted pursuant to 35 U.S.C. § 112, ¶ 6 cannot be construed to include *any* structure that performs the recited function, it requires a specific disclosed structure.  *Johnston,* 885 F.2d at 1580 (Fed. Cir. 1989).   ETG's attempt to broaden the claim to generic "processing element(s)" that perform the claimed function violates this well-established principle.  *Texas Digital Sys.,* 308 F.3d at 1213 (error to construe means-plus-function limitation to cover "a broad array of possible structures not mentioned anywhere in the specification.").  Therefore, ETG's broad and generic construction should be rejected.

### 3.    Claim 6

#### a.    speech detector means

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| speech detector means for determining when speech signals are in said transmission channel | Structure – speech detector 96; and equivalent structures | Structure – a speech detector(s), and structural equivalents thereof |

Claim 6 requires a "speech detector means" to be construed under 35 U.S.C. § 112, ¶ 6. The parties agree on the function of the means.  However, the parties dispute the structure corresponding to the claimed function disclosed in the specification.

As Defendants have proposed, the only structure in the specification that corresponds to the speech detector means is speech detector 96, which is described to be "conventional" as of the 1986 filing date of the patent.  (6:1-4).  ETG's proposal of a "generic" speech detector does not meet the requirements of 35 U.S.C. § 112, ¶ 6.

**b.    plurality of bandpass filter means**

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| plurality of bandpass filter means for determining the noise frequency spectrum in said transmission channel | Structure – bandpass filters 97-100 and rectifiers 109-112 and S/H 105-108; and equivalent structures | Structure – bandpass filters and processing elements, and structural equivalents thereof. |

Claim 6 requires a "plurality of bandpass filter means." The parties agree on the function of the means. However, the parties dispute the structure corresponding to the claimed function disclosed in the specification.

As the law requires, the corresponding structure proposed by Defendants is that structure which the '850 specification may link to the function of this element:

> Typical bandwidths for the filters 97, 98, 99 and 100 might be 100-750 Hz, 750-1500 Kz, 1500-3000 Hz, and 3000 to the upper frequency limit, respectively.
>
> ***
>
> The outputs of the band pass filters 97, 98, 99 and 100 are rectified in the rectifiers 109, 110, 111 and 112, respectively and fed to the sample and hold circuits 105-108, respectively, the outputs of which are fed to the comparators 113, 114, 115 and 116, respectively. (5:67-6:1, 6:14-19).

ETG's proposed structure of the "plurality of bandpass filter means" is "bandpass filters and processing elements." By requiring "processing elements," ETG acknowledges that bandpass filters alone are not sufficient to perform the function. As discussed above in connection with claim 5 (supra at pp. 36-37), a claim drafted pursuant to 35 U.S.C. § 112, ¶ 6 cannot be construed to include *any* structure that performs the recited function, it requires a specific disclosed structure. ETG's improper attempt to broaden the claim to generic "bandpass filters and processing elements" that perform the claimed function violates this well-established principle.

### c.    plurality of comparator means

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| Plurality of comparator means each responsive to said speech detector and to respective bandpass filter means for indicating whether the speech level in each said bandpass filter exceeds the noise level therein and for actuating said controlling means to impart to the hearing aid a response characteristic effective to compensate for impaired hearing of the wearer of the aid at the noise levels obtaining in said channel | Function – to respond to the speech detector and respective bandpass filter means for indicating whether the speech level in each bandpass filter exceeds the noise level therein and for actuating the controlling means to impart to the hearing aid a response characteristic effective to compensate for impaired hearing of the wearer of the aid at the noise levels obtaining in the channel<br><br>Structure – comparators 113-116; and equivalent structures | Function – indicating whether the speech level in each band pass filter exceeds the noise level and for actuating said controlling means to impart to the hearing aid a response characteristic.<br>Structure – are various processing elements, and structural equivalents thereof |

Claim 6 also includes a "plurality of comparator means each responsive to said speech detector and to respective bandpass filter means for indicating whether the speech level in each said bandpass filter exceeds the noise level therein and for actuating said controlling means to impart to the hearing aid a response characteristic effective to compensate for impaired hearing of the wearer of the aid at the noise levels obtaining in said channel."

The parties disagree about whether claimed function should include the entirety of the functional language included in the claim element.  Consistent with *Lockheed Martin Corp.*, 324 F.3d at 1319, Defendants' proposed construction, recites all of the element's functional language. ETG improperly crops and incorporates only portions of the recited functional language of the element.

The corresponding structure proposed by Defendants is that structure which the '850 specification clearly links to the function of this element:

> So long as there is a one output from the speech detector 96 indicating the presence of speech in the input, the instantaneous outputs of each of the band pass filters 97-100 are compared with previous values held in the sample and hold circuits 105-108, causing the comparators 113-116, respectively, to generate a binary coefficient (0,1) indicating whether or not the speech level in the associated band pass filter exceeds the noise level.  (6:23-31).

ETG's proposed structure of the "plurality of comparator means" is "various processing elements." As discussed above (supra at pp. 36-37), a claim drafted pursuant to 35 U.S.C. § 112, ¶ 6 cannot be construed to include *any* structure that performs the recited function, it requires a specific disclosed structure. ETG again improperly attempts to broaden the claim to generic "various processing elements" that perform the claimed function. Therefore, ETG's broad and generic construction should be rejected.

### 4.    Claim 17

#### a.    means for adjusting the amplitude and phase characteristics of each of said microphone channels

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| means for adjusting the amplitude and phase characteristics of each of said microphone channels | Structure – amplifiers 157 and 158 that, in an undefined manner, provide amplitude and phase adjustment in response to "gain and phase control" information; and equivalent structures | Structure – amplifiers and processing elements, and structural equivalents thereof |

Claim 17 requires "means for adjusting the amplitude and phase characteristics of each of said microphone channels." The parties agree on the function of the means. However, the parties dispute the structure corresponding to the claimed function disclosed in the specification.

As the law requires, the corresponding structure proposed by Defendants is that structure which the '850 specification links to the function of this element:

> This will reduce the effects of both noise and room reverberation. A typical configuration is shown in FIG. 5 as comprising the microphones 155 and 156 supplying inputs to amplifiers 157 and 158, the gain and phase characteristics of each of which is programmable from the RAM 77 in the hearing aid. The outputs of the programmable gain amplifiers 157 and 158 are summed in a summing amplifier 159, the output of which would be supplied to the programmable AGC device 58. (11:22-31; FIG 5).

ETG's proposed structure of the "means for adjusting" is "amplifiers and processing elements." As discussed above (supra at pp. 36-37), a claim drafted pursuant to 35 U.S.C. § 112, ¶ 6 cannot be construed to include *any* structure that performs the recited function, it requires a

specific disclosed structure.  The specification discloses amplifiers other than amplifiers 157 and 158.  However, the patent fails to disclose that these other amplifiers receive gain and phase control information to adjust both gain and phase, or operate on signals in the microphone channels.  ETG's broad and generic construction should be rejected.

### b.     means for summing the outputs of said microphone channels

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| means for summing the outputs of said microphone channels | Structure – summing amplifier 159; and equivalent structures | Function – summing circuits, and structural equivalents thereof |

Claim 17 requires "means for summing the outputs of said microphone channels."  The parties agree on the function of the means.  However, the parties dispute the structure corresponding to the claimed function disclosed in the specification.

As the law requires, the corresponding structure proposed by Defendants is that structure which the '850 specification links to the function of this element:

> The outputs of the programmable gain amplifiers 157 and 158 are summed in a summing amplifier 159, the output of which would be supplied to the programmable AGC device 58.  (11:27-31; FIG 5).

ETG's proposed structure of the "means for summing" is "summing circuits."  As discussed above (supra at pp. 36-37), a claim drafted pursuant to 35 U.S.C. § 112, ¶ 6 cannot be construed to include *any* structure that performs the recited function, it requires a specific disclosed structure.  ETG's attempt to broaden the claim to generic "summing circuits" that perform the claimed function violates this well-established principle.  Therefore, ETG's broad and generic construction should be rejected.

> **c.     said filter being programmed to impart to the hearing aid at least one response characteristic effective to compensate for impaired hearing of the wearer of the aid and to reduce the effects of both noise and reverberation**

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| said filter being programmed to impart to the hearing aid at least one response characteristic effective to compensate for impaired hearing of the wearer of the aid and to reduce the effects of both noise and reverberation | the entire phrase means: the filter has received at least one set of coefficients that, in normal operating mode, are fixed to create a characteristic to correct for the particular hearing impairment of a wearer of the aid and reduces the effects of both noise and reverberation | programmed means: provided with one or more values so as to produce a response |

The first portion of this phrase ("programmed to impart to the hearing aid at least one response characteristic effective to compensate for impaired hearing of the wearer of the aid") should be construed consistently with claim 1. Claim 17, however, differs from claim 1 because it adds the additional limitation that the imparted response characteristic must also "reduce the effects of both noise and reverberation." Thus, claim 17 requires a programmed filter that creates a response characteristic for correcting the particular hearing impairment of the wearer of the hearing aid, as well as reducing the effects of noise and reverberation.

> 5.     Claim 18

Claim 18 contains several elements that have been construed in the sections above. For example, claim 18 has the phrases "feedback path" and "response characteristic effective to compensate for impaired hearing of the wearer of the aid." These elements should be construed consistent with claim 1.

> **a.     signal-level dependent amplifier" and "said amplifier being programmed to impart to the hearing aid at least one response characteristic effective to compensate for impaired hearing of the wearer of the aid**

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| signal-level dependent amplifier | This phrase is indefinite | |
| said amplifier being programmed to impart to | **"said [signal level dependent] amplifier being programmed" is indefinite** | **"response characteristic effective to compensate for impaired hearing of** |

| the hearing aid at least one response characteristic effective to compensate for impaired hearing of the wearer of the aid | **"response characteristic effective to compensate for impaired hearing of the wearer of the aid"** means a response characteristic that corrects for the particular hearing impairment of a wearer of the aid | **the wearer of the aid"** does not need construed and should be afforded its plain and ordinary meaning because it takes an otherwise understandable phrase and makes it more complicated for a jury |

Neither Defendants nor ETG proffer a construction of the phrases "signal-level dependent amplifier" and "said [signal level dependent] amplifier being programmed," which Defendants assert are indefinite.

Defendants assert that the phrase "response characteristic effective to compensate for impaired hearing of the wearer of the aid" should be construed as set forth above for claim 1.

## VI.    CLAIM CONSTRUCTION OF THE '749 PATENT

### A.    *Claim 1*

#### 1.    host controller

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| host controller | a device for prescribing a wearable programmable hearing aid interposed between a computer and the hearing aid | a processor for controlling operations of a device |

The parties' dispute concerning this phrase is whether the host controller needs to be interpreted in the context of the '749 patent, as a device for prescribing a wearable programmable hearing aid as Defendants propose, or as a "processor for controlling operations" that are undefined, as ETG proposes.  Independent claim 1 of '749 patent requires a "host controller for producing data from a computer for a programmable hearing aid to cancel acoustic feedback."[14]  Defendants' proposed construction of "host controller" is appropriate because it conforms to the only process and structure disclosed in the '749 patent for the "host controller." *See On Demand Mach.*, 442 F.3d at 1339-40; *Honeywell Int'l*, 452 F.3d at 1318; *Nystrom II*, 424

---

[14] Independent claim 6 also requires a "host controller."  In that claim, the "host controller" is provided "for programming a filter interposed in a transmission channel of a hearing aid between a microphone and a receiver from a computer associated with the host controller."

F.3d at 1138; *Phillips*, 415 F.3d at 1316-17; *Toro*, 199 F.3d at 1301; *Wang Labs*, 197 F.3d at 1382-83.

Defendants' proposed construction refers to "prescribing a wearable programmable hearing aid" to clarify that it is the host controller's only role disclosed in the '749 patent specification. According to the '749 patent, the prescriptive procedure or "fitting process" is the way the hearing aid filter receives the fixed coefficients that control the hearing aid's normal operation. *See e.g.*, 4:6-41; 6:55-61; 9:18-46. The patent discloses two fitting processes:

(1)    **Impaired Hearing of The Wearer.** Based on measurements of the patient's residual hearing, parameters for the hearing aid that are directed to compensating for the impaired hearing of the wearer are calculated. These parameters correspond to one of four frequency-gain curves particular to the individual patient (7:31-59), and are graphically depicted in Fig. 3. During the fitting process, a "set of coefficients is derived for each" curve (7:60-66), and a fixed number of sets of coefficients for use in a filter in the hearing aid are selected using the computer (8:62-9:11). These precalculated coefficients are stored in an EEPROM, which is plugged into the host controller during the fitting process. (7:60-66); and

(2)    **Acoustic Feedback.** The '749 patent also provides that the fitting process is used in the calculation of coefficients to cancel acoustic feedback. (9:41-46). A test signal of a controlled frequency is supplied from the host controller to the hearing aid, and the resulting acoustic feedback is measured in situ. (9:14-31). From this measurement, a computer adjusts the host controller circuitry to calculate a set of fixed "optimum coefficients" that also are stored in the EEPROM. (10: 16-21).

Only the fitting process for canceling acoustic feedback is the subject of claim 1.

The '749 patent specification makes clear that the hearing aid is not and can never be in "normal operating mode" while connected to the host controller. (10:37-43). After the fitting process, the EEPROM is plugged into the hearing aid so that its data, including the pre-determined fixed coefficients, can be transferred to the hearing aid filter's RAM memory for use during the hearing aids' normal operating mode. (10:16-37).

Defendants' proposed construction also requires that the host controller is "interposed between a computer and the hearing aid." This tracks the language of the claim (e.g., claim 1: "A *host controller* for producing data *from* a computer *for* a programmable hearing aid"). In addition, the '749 patent specification confirms that the host controller is separate from the hearing aid and computer. Although the '749 patent contemplates incorporating the structures of FIGS. 2, 4 and 5 into the hearing aid, the patent excludes the host controller shown in FIG. 1 from the hearing aid:

> The components *shown in FIGS. 2, 4 and 5* may be incorporated in the hearing aid or part may be contained in a pocket size case to be carried in the clothing of the person wearing the hearing aid. In the latter case, the components contained in the case may be coupled to the components in the hearing aid by a conventional FM transmission link, for example. (11:39-45).
>
> ***
>
> *Fig. 1* illustrates schematically a *host controller* for use in, prescribing a wearable, programmable hearing aid according to the invention. (3:34-36) (emphasis added).

The extrinsic evidence also confirms Defendants' construction. Mr. Dugot testified that "[o]f course" the host controller was a device separate from the hearing aid (Dugot Dep. at 62:1-12 (JA-0512)), and that it had its own power supply (Dugot Dep. at 85:2-19 (JA-0513)). Mr. Dugot explained:

> No, [the host controller] cannot be in the hearing aid. It is a big box. It has generators, it generates noise, various noises, it generated speech signals. It was like a test instrument, like an audiometer. A big instrument. (Dugot Dep. at 85:5-9 (JA-0513)).

After the hearing aid was "set," Mr. Dugot explained, "we unplug the hearing aid and the hearing aid [is] on its own." *Id.*

ETG's proposed definition of a "processor" is overbroad and unsupported by the patent disclosure. Both the '749 patent specification and claim 1 itself require the construction Defendants' propose. ETG's suggested generic "processor for controlling operations" language is inconsistent with the '749 patent specification, which makes clear that the host controller's only role is in the fitting process. It is disconnected from the hearing aid during "normal operating mode."

**2.    means for receiving signals from the hearing aid and measuring phase and amplitude**

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| means for receiving signals from the hearing aid and measuring phase and amplitude | <u>Function</u> – receiving [first] signals [at the host controller] from the hearing aid and measuring phase and amplitude [of those signals during programming of the hearing aid]<br><br><u>Structure</u> – digital phase shifter 30; programmable gain amplifier 32; latches 33, 42, 43, and 45; terminals 31, 34 and 121; switches 37 and 120; and related control and signal lines; and equivalent structures | <u>Function</u> – receiving signals from the hearing aid and measuring phase and amplitude.<br><br><u>Structure</u> – circuits and processing elements, and structural equivalents thereof. |

Claim 1 (and claim 3 through dependency) includes a "means for receiving signals from the hearing aid and measuring phase and amplitude." Defendants and ETG agree that the function of this "means" is found in the claim language, and requires both the receiving of signals from the hearing aid and the measuring of phase and amplitude. Defendants contend, however, that this language is unclear and therefore should be construed in the context of the specification to avoid jury confusion. *Lockheed Martin Corp.*, 324 F.3d at 1319.

Defendants propose to insert "[first]" because there are two separate "means for receiving" in claim 1. The phrase "[at the host controller]" is proposed to clarify where the signal "from the hearing aid" is received. Finally, the phrase "[of those signals during

programming of the hearing aid]" is added to make explicit that this function is performed during the fitting process.

As the law requires, *Default Proof*, 412 F.3d at 1298, the corresponding structure proposed by Defendants is that structure which the '749 specification clearly links to the function of this element:

> The host controller 20 also includes a phase measurement circuit comprising a digital phase shifter 30 which is adapted to receive the output voltage of the hearing aid through a connector 31 and a programmable gain amplifier 32, the gain of which is controllable by the computer 24 through the latch 33. (4:6-11).

FIG. 1 and the '749 specification show that terminals 34 and 121, through operation of switches 120 and 37 that are under control of latch 45, are connected together in normal operation. However, they are separated by operation of latch 45 during the fitting process. This permits terminal 121 to send the $V_{TEST\ IN}$ signal to the hearing aid, which is returned as the claimed "received [first] signal." (3:63-4:41; 9:18-36). Latches 42 and 43 are necessary to allow the digital phase shifter to communicate with the computer, and switches 120 and 37 are necessary to place the host controller in the acoustic feedback fitting mode.

ETG's proposed structure of the "means for receiving signals…" is "circuits and processing elements." As discussed above in connection with claim 5 of the '850 patent (supra at pp. 36-37), a claim drafted pursuant to 35 U.S.C. § 112, ¶ 6 cannot be construed to include *any* structure that performs the recited function, it requires a specific disclosed structure. ETG's broad and generic construction should be rejected.

**3.        means for receiving signals from the hearing aid indicative of the summation of acoustic feedback and acoustic feedback cancellation signals**

| Disputed Term | Defendants' Construction | ETG's Construction |
| --- | --- | --- |
| means for receiving signals from the hearing aid indicative of the summation of acoustic feedback and acoustic feedback cancellation signals | Function – receiving [second] signals [at the host controller] from the hearing aid indicative of the summation of acoustic feedback and acoustic feedback cancellation signals Structure – terminals 34 and 121, switches 37 and 120, latch 45, programmable amplifier 38, rectifier 39, A/D converter 40, and related control and signal lines; and equivalent structures | Function – receiving signals from the hearing aid indicative of the summation of the acoustic feedback and acoustic feedback cancellation signals. Structure – processing elements that receive a combined signal of acoustic feedback and a feedback cancellation signal, and structural equivalents thereof. |

Claim 1 includes "means for receiving signals from the hearing aid indicative of the summation of acoustic feedback and acoustic feedback cancellation signals." Defendants and ETG agree that the function of this "means" is found in the claim language. Defendants contend, however, that this language is unclear and therefore should be construed in the context of the specification to avoid jury confusion. *Lockheed Martin Corp.*, 324 F.3d at 1319.

Consistent with the previous claim element, Defendants propose to insert the term "[second]" to distinguish this means signal from the "[first] signals." The phrase "[at the host controller]" also clarifies where the signal "from the hearing aid" is received. (4:6-9).

Defendants' proposed corresponding structure for this means element is found in the specification. The '749 patent states:

> The summed acoustic and electrical feedback voltages from the hearing aid are supplied from the terminal 34 through the engaged movable and fixed contacts 35 and 36 of a switch 37, a programmable gain amplifier 38, a rectifier 39 and an analog to digital (A/D) converter 40 to the computer 24. (4:17-27).

FIG. 1 and the '749 specification show that terminals 34 and 121, through operation of switches 120 and 37 that are under control of latch 45, are connected together in normal operation. However, they are separated by operation of latch 45 during the fitting process. This permits

terminal 34 to receive "[second] signals." (9:36-9:46). Thus, switches 120 and 37 are necessary to place the host controller in the acoustic feedback fitting mode.

ETG's proposed structure of the "means for receiving signals ..." is "processing elements that receive a combined signal of acoustic feedback and a feedback cancellation signal" As discussed above (supra at pp. 36-37), a claim drafted pursuant to 35 U.S.C. § 112, ¶ 6 cannot be construed to include *any* structure that performs the recited function, it requires a specific disclosed structure. ETG's attempt to broaden the claim to generic "processing elements" that perform the claimed function violates this well-established principle. Therefore, ETG's broad and generic construction should be rejected.

### 4. means controlled by the computer for adjusting the phase and amplitude necessary to eliminate acoustic feedback and produce a null summation

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| means controlled by the computer for adjusting the phase and amplitude necessary to eliminate acoustic feedback and produce a null summation | Function – adjusting [at the host controller and controlled by the computer] the phase and amplitude [of a signal from the hearing aid] necessary to eliminate acoustic feedback and produce a null summation<br><br>Structure – latches 33, 42, and 43, digital phase shifter 30 and programmable gain amplifier 32; and equivalent structures | Function – adjusting the phase and amplitude necessary to eliminate acoustic feedback.<br>Structure – amplifiers and processing elements, and structural equivalents thereof. |

Claim 1 includes "means controlled by the computer for adjusting the phase and amplitude necessary to eliminate acoustic feedback and produce a null summation." Defendants and ETG agree that the function of this "means" is found in the claim language. Defendants contend, however, that this language is unclear and therefore should be construed in the context of the specification to avoid jury confusion. *Lockheed Martin Corp.*, 324 F.3d at 1319.

The phrase "[at the host controller and controlled by the computer]" clarifies where the act of adjusting occurs and the phrase "[of a signal from the hearing aid]" clarifies the source of the signal whose phase and amplitude is adjusted. (4:17-23).

Defendants' proposed corresponding structure for this means element is found in the specification. The '749 patent states:

> The programmable phase shifter 30 and programmable amplifier 32 are then adjusted by the computer 24 so as to minimize the sum of the acoustic and electrical feedback signals of the output of summing amplifier 60. (9:36-40).

Latches 33, 42 and 43 are necessary structure for allowing the digital phase shifter 30 and programmable gain amplifier 32 to be controlled by the computer 24. (4:6-11; 4:31-34; FIG. 1).

ETG's proposed structure of the "means for adjusting ..." is "amplifiers and processing elements." As discussed above (supra at pp. 36-37), a claim drafted pursuant to 35 U.S.C. § 112, ¶ 6 cannot be construed to include *any* structure that performs the recited function, it requires a specific disclosed structure. ETG's broad and generic construction should be rejected.

### B.    Claim 2

#### 1.    means controlled by the computer for transmitting phase shift and amplitude data to program the hearing aid to eliminate acoustic feedback

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| means controlled by the computer for transmitting phase shift and amplitude data to program the hearing aid to eliminate acoustic feedback | Function – transmitting phase shift and amplitude data [from the host controller to the computer] to program the hearing aid to eliminate acoustic feedback<br><br>Structure – programmable gain amplifier 32, latches 33, 42, and 43, and digital phase shifter 30; and equivalent structures | Function – transmitting phase shift and amplitude data to program the hearing aid.<br>Structure – combined circuitry, and structural equivalents thereof. |

Claim 2 includes "means controlled by the computer for transmitting phase shift and amplitude data to program the hearing aid to eliminate acoustic feedback." The Defendants and ETG agree that the function of this "means" is found in the claim language. Defendants contend, however, that this language is unclear and therefore should be construed in the context of the specification to avoid jury confusion. *Lockheed Martin Corp.*, 324 F.3d at 1319.

The phrase "[from the host controller to the computer]" clarifies that the phase and amplitude information is provided to the computer and not to the hearing aid. (4:23-30).

Defendants' proposed corresponding structure for this means element is found in the specification. The '749 patent states:

> In effecting the adjustment, the gain of the amplifier 32 and the phase shifter 30 are adjusted until a null output from the A/D converter 40 is read by the computer 24, indicating cancellation of the electrical and acoustic signals. The settings of the phase shifter 30 and the amplifier are then used to program an EEPROM in the hearing aid so as to cancel acoustic feedback. The programmable gain amplifier 38 is controlled by the computer 24 through a latch 41, and the digital phase shifter 30 is also controlled by the computer 24 through the latches 42 and 43. (4:23-34).

Latches 33, 42 and 43 are necessary structure for allowing the digital phase shifter 30 and programmable gain amplifier 32 to be controlled by the computer 24. (4:6-11; 4:31-34; Fig. 1).

ETG's proposed structure of the "means for transmitting ..." is "combined circuitry." As discussed above (supra at pp. 36-37), a claim drafted pursuant to 35 U.S.C. § 112, ¶ 6 cannot be construed to include *any* structure that performs the recited function, it requires a specific disclosed structure. ETG's broad and generic construction should be rejected.

### C.   *Claim 4*

#### 1.   computer controlled means for adjusting the phase shift and amplitude to produce an acoustic feedback cancellation signal

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| computer controlled means for adjusting the phase shift and amplitude to produce an acoustic feedback cancellation signal | Structure – programmable gain amplifier 32, digital phase shifter 30, latches 33, 42, and 43, and terminal 144 (VFBK) adapted for connection to a hearing aid summing amplifier; and equivalent structures | Structure – amplifiers and processing elements, and structural equivalents thereof. |

Claim 4 includes "computer controlled means for adjusting the phase shift and amplitude to produce an acoustic feedback cancellation signal." Defendants and ETG agree that the function of this "means" is found in the claim language. Defendants' proposed corresponding structure for this means element is found in the specification. The '749 patent states:

> In adjusting a hearing aid for reduced feedback as described below, the input voltage developed by the hearing aid microphone in response to acoustic feedback

alone when a test signal is supplied to the hearing aid is summed with an electrical feedback voltage supplied to the terminal 144 [$V_{FBK}$] by the phase shifter 30. (4:12-17; FIG. 1).

Latches 33, 42 and 43 are necessary structure for allowing the digital phase shifter 30 and programmable gain amplifier 32 to generate the acoustic feedback cancellation signal $V_{FBK}$. (4:6-11; 4:31-34; 9:36-40; Fig. 1; '749 File history, March 23, 1989 Amendment at p. 3 (JA-0210)).

ETG's proposed structure of the "means for adjusting ..." is "amplifiers and processing elements." As discussed above (supra at pp. 36-37), a claim drafted pursuant to 35 U.S.C. § 112, ¶ 6 cannot be construed to include *any* structure that performs the recited function, it requires a specific disclosed structure. ETG's broad and generic construction should be rejected.

### D.    Claim 5

#### 1.    computer controlled means for supplying a logic signal to the hearing aid for programming and a logic signal to the hearing aid to restore it for use by the patient

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| computer controlled means for supplying a logic signal to the hearing aid for programming and a logic signal to the hearing aid to restore it for use by the patient | Structure – latches 44 and 45 and lines 125 and 128, and tri-state buffer 46; and equivalent structures | Structure – circuitry for logic signal transmission, and structural equivalents thereof |

Claim 5 includes "computer controlled means for supplying a logic signal to the hearing aid for programming and a logic signal to the hearing aid to restore it for use by the patient." Defendants and ETG agree that the function of this "means" is found in the claim language. Defendants' proposed corresponding structure for this means element is found in the specification. The '749 patent states:

> Additional components of the host controller 20 are programming logic comprising the latches 44 and 45 and a conventional tri-state buffer 46 which are activated in response to the computer 24 to provide the necessary signals to program the EEPROM and control the hearing aid during testing and programming, as described in greater detail below. (4:12-17; FIG. 1).

Lines 125 and 128 are necessary structure to connect latches 44 and 45 to the hearing aid.  (FIG. 1).

ETG's proposed structure of the "means for supplying…" is "circuitry for logic signal transmission."  As discussed above (supra at pp. 36-37), a claim drafted pursuant to 35 U.S.C. § 112, ¶ 6 cannot be construed to include *any* structure that performs the recited function, it requires a specific disclosed structure.  ETG's broad and generic construction should be rejected.

### E.    *Claim 6*

#### 1.    output signal

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| output signal | an output of the hearing aid transmission channel | **"output signal"** does not need construed and should be afforded its plain and ordinary meaning because it takes an otherwise understandable phrase and makes it more complicated for a jury |

Defendants propose to construe the phrase "output signal" in the claim language "a circuit for returning an output signal from the transmission channel" to avoid any possible jury confusion.  The next phrase of claim 6 requires "a phase and amplitude measuring circuit for measuring phase and amplitude of the output signal."  The only "output signal" from the hearing aid for measuring phase and amplitude is $V_{\varnothing}OUT$ on terminal 31 of the host controller in FIG. 1.  Terminal 31 is supplied by $V_{\varnothing}OUT$ on terminal 142 of the hearing aid.  $V_{\varnothing}OUT$ on terminal 142 is a signal from the output of the hearing aid "transmission channel."

**2.      adjustable phase shift and amplitude means controlled by the computer for adjusting the phase shift and amplitude necessary to eliminate acoustic feedback and transmitting an acoustical feedback cancellation signal to the hearing aid**

| Disputed Term | Defendants' Construction | ETG's Construction |
|---|---|---|
| adjustable phase shift and amplitude means controlled by the computer for adjusting the phase shift and amplitude necessary to eliminate acoustic feedback and transmitting an acoustical feedback cancellation signal to the hearing aid | Function – adjusting [at the host controller] the phase shift and amplitude [of a signal from the hearing aid] necessary to eliminate acoustic feedback and transmitting an acoustical feedback cancellation signal to the hearing aid<br><br>Structure – digital phase shifter 30 and programmable gain amplifier 32; latches 33, 42, and 43; and connectors 31 and 144; and equivalent structure | Function – adjusting the phase shift and amplitude necessary to eliminate acoustic feedback and transmitting an acoustical feedback cancellation signal to the hearing aid<br>Structure – amplifiers and processing elements, and structural equivalents thereof |

Claim 6 includes "adjustable phase shift and amplitude means controlled by the computer for adjusting the phase shift and amplitude necessary to eliminate acoustic feedback and transmitting an acoustical feedback cancellation signal to the hearing aid."  Defendants and ETG agree that the function of this "means" is found in the claim language.  Defendants contend, however, that this language is unclear and therefore should be construed in the context of the specification to avoid jury confusion.  *Lockheed Martin Corp.*, 324 F.3d at 1319.

The phrase "[at the host controller]" clarifies where the act of adjusting occurs and the phrase "[of a signal from the hearing aid]" clarifies the source of the signal whose phase and amplitude is adjusted.  (4:17-23).

Defendants' proposed corresponding structure for this means element is found in the specification.  The '749 patent states:

> The programmable phase shifter 30 and programmable amplifier 32 are then adjusted by the computer 24 so as to minimize the sum of the acoustic and electrical feedback signals of the output of summing amplifier 60.  (9:36-40).
>
> ***
>
> In adjusting a hearing aid for reduced feedback as described below, the input voltage developed by the hearing aid microphone in response to acoustic feedback alone when a test signal is supplied to the hearing aid is summed with an electrical feedback voltage supplied to the terminal 144 [$V_{FBK}$] by the phase

shifter 30 as an acoustical feedback cancellation voltage. ('749, 4:14-20[15]; FIG. 1).

Latches 33, 42 and 43 are necessary structure for allowing the digital phase shifter 30 and programmable gain amplifier 32 to generate the acoustic feedback cancellation signal $V_{FBK}$. (4:6-11; 4:31-34; 9:36-40; Fig. 1; File history, March 23, 1989 Amendment at p. 3 (JA-0210)).

ETG's proposed structure of the "means for adjusting…" is "amplifiers and processing elements." As discussed above (supra at pp. 36-37), a claim drafted pursuant to 35 U.S.C. § 112, ¶ 6 cannot be construed to include *any* structure that performs the recited function, it requires a specific disclosed structure. ETG's broad and generic construction should be rejected.

---

[15] The phrase "as an acoustical feedback cancellation voltage" was added to the '749 patent specification during prosecution to clarify that $V_{FBK}$ is this voltage.

| | |
|---|---|
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br><br><br>_____/s/ Maryellen Noreika_____<br>Jack B. Blumenfeld (#1014)<br>Maryellen Noreika (#3208)<br>1201 N. Market Street<br>Wilmington, DE 19801<br>(302) 658-9200<br>  Attorneys for Defendants GN Resound A/S<br>  and GN Hearing Care Corporation<br><br>OF COUNSEL:<br><br>ROPES & GRAY LLP<br>Kenneth B. Herman<br>William J. McCabe<br>Jeffrey D. Mullen<br>1211 Avenue of the Americas<br>New York, NY 10036-8704<br>(212) 596-9020 | MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br><br><br>_____/s/ Leslie A. Polizoti_____<br>Thomas C. Grimm (#1098)<br>Leslie A. Polizoti (#4299)<br>1201 N. Market Street<br>Wilmington, DE 19801<br>(302) 658-9200<br>  Attorneys for Defendants Phonak AG,<br>  Phonak Inc., Phonak LLC, Unitron Hearing<br>  Ltd. and Unitron Hearing, Inc.<br><br>OF COUNSEL:<br><br>BRINKS HOFER GILSON & LIONE<br>James R. Sobieraj<br>David H. Bluestone<br>NBC Tower, Suite 3600<br>455 North Cityfront Plaza Drive<br>Chicago, IL 60611-5599<br>(312) 321-4200 |
| WOLF, BLOCK, SCHORR AND<br>  SOLIS-COHEN LLP<br><br><br>_____/s/ Barry M. Klayman_____<br>Barry M. Klayman (#3676)<br>Wilmington Trust Center, Suite 1001<br>1100 North Market Street<br>Wilmington, DE 19801<br>(302) 777-0313<br>  Attorneys for Defendants Resistance<br>  Technology, Inc.<br><br>OF COUNSEL:<br><br>SHEWCHUK IP SERVICES, LLP<br>Jeffrey D. Shewchuk<br>533 77th Street West<br>Eagan, MN 55121<br>(direct) 651-331-9558 | POTTER ANDERSON & CORROON, LLP<br><br><br>_____/s/ David E. Moore_____<br>Richard L. Horwitz (#2246)<br>David Ellis Moore (#3983)<br>1313 N. Market St., 6th Floor<br>Wilmington, DE 19801<br>(302) 984-6027<br>  Attorneys for Defendant<br>  Sonic Innovations Inc.<br><br>OF COUNSEL:<br><br>HOLLAND AND HART LLP<br>Brett L. Foster<br>L. Grant Foster<br>Donald Degnan<br>Bryan K. Hanks<br>60 E. South Temple Suite 2000<br>Salt Lake City, UT 84111-1031<br>(801) 595-7836 |

| | |
|---|---|
| MORRIS JAMES LLP<br><br>_____/s/ Amy A. Quinlan_____<br>Mary B. Matterer (#2696)<br>Amy A. Quinlan (#3021)<br>500 Delaware Ave., Suite 1500<br>Wilmington, DE  19801<br>(302) 888-6960<br>  Attorneys for Defendant<br>  Starkey Laboratories, Inc.<br><br>OF COUNSEL:<br><br>BOWMAN AND BROOKE LLP<br>Steven L. Reitenour<br>Richard G. Morgan<br>150 South Fifth Street<br>Suite 3000<br>Minneapolis, MN  55402<br>(612) 339-8682 | CONNOLLY BOVE LODGE & HUTZ LLP<br><br>_____/s/ James D. Heisman_____<br>N. Richard Powers (#494)<br>James D. Heisman (#2746)<br>1007 North Orange Street<br>Wilmington, DE  19801<br>(302) 658-9141<br>  Attorneys for Defendants William Demant<br>  Holding A/S, WDH, Inc., Oticon A/S,<br>  Oticon Inc., Bernafon AG, and Bernafon,<br>  LLC<br><br>OF COUNSEL:<br><br>FINNEGAN, HENDERSON, FARABOW,<br>GARRETT & DUNNER<br>John M. Romary<br>C. Gregory Gramenopoulos<br>901 New York Avenue, NW<br>Washington, DC  20001-4413<br>(202) 408-4000 |
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br><br>_____/s/ Jason A. Cincilla_____<br>Donald E. Reid (#1058)<br>Jason A. Cincilla (#4232)<br>1201 N. Market St., 18th Floor<br>Wilmington, DE  19801<br>(302) 658-9200<br>  Attorneys for Defendants Widex AS and<br>  Widex Hearing Aid Co.<br><br>OF COUNSEL:<br><br>SUGHRUE MION PLC<br>William H. Mandir<br>David J. Cushing<br>Carl J. Pellegrini<br>2100 Pennsylvania Ave., N.W.<br>Washington, DC  20037<br>(202) 293-7060 | |

May 16, 2007

829843.1

## CERTIFICATE OF SERVICE

I, Jason A. Cincilla, hereby certify that on the 16th day of May, 2007, a copy of

**Defendants' Opening Claim Construction Brief** was electronically filed with the Clerk of the

Court using CM/ECF which will send electronic notification of such filing to all counsel of record.

Additionally, a copy was served as indicated below:

### BY HAND DELIVERY:

Edmond D. Johnson, Esquire
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE 19801


_____ */s/ Jason A. Cincilla*_____
Jason A. Cincilla (#4232)