IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-422-GMS |
| | ) | |
| SONIC INNOVATIONS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' RESPONSE TO ETG'S OPENING *MARKMAN* BRIEF

Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON, LLP
1313 North Market Street
Hercules Plaza, 6th Floor
Wilmington, DE  19801
*Attorneys for Sonic Innovations, Inc.*

James D. Heisman
CONNOLLY, BOVE, LODGE & HUTZ LLP
1007 North Orange Street
Wilmington, DE  19801
*Attorneys for William Demant Holding,*
*Oticon A/S, Oticon, Inc., Bernafon AG,*
*WDH, Inc. and Bernafon, LLC*

Jack B. Blumenfeld
Maryellen Noreika
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE  19801
*Attorneys for GN Resound A/S*
*and GN Resound Corp.*

Barry M. Klayman
WOLF, BLOCK, SCHORR & SOLIS-COHEN LLP
Wilmington Trust Center
1100 North Market Street, Suite 1001
Wilmington, DE  19801
*Attorneys for Resistance Technology, Inc.*

Thomas C. Grimm
Leslie A. Polizoti
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE  19801
*Attorneys for Phonak Inc., Phonak AG,*
*Phonak LLC, Unitron Hearing Ltd.,*
*and Unitron Hearing, Inc.*

Donald E. Reid
Jason A. Cincilla
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 North Market Street
Wilmington, DE  19801
*Attorneys for Widex A/S and Widex*
*Hearing Aid Co.*

Richard K. Herrmann
Mary Matterer
Amy Arnott Quinlan
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
*Attorneys for Starkey Laboratories, Inc.*

## TABLE OF CONTENTS

I.     INTRODUCTION ........................................................................................... 1

II.    OVERVIEW ................................................................................................. 1

III.   STRUCTURAL AND METHOD CLAIM LIMITATIONS IN THE '850 PATENT ....... 3

     A.     Defendants Properly Construe "Programmable Delay Line Filter" ...................... 3

           1.     ETG Tries To Broaden "Delay Line Filter" To Encompass Any Filter ................................................................................................. 3

           2.     A Delay Line Filter Sums Together Delayed Samples That Have Been Multiplied By A Weighting Coefficient ........................................... 4

           3.     A Delay Line Filter Is Not A Recursive Filter ............................................ 4

           4.     Incorporating The Word "Programmable" Further Limits "Programmable Delay Line Filter" ................................................................ 5

     B.     The Claims Require Filters In Different Locations ................................................ 7

           1.     The Forward Path Is Properly Defined With Respect To The Microphone And The Receiver .................................................................. 7

           2.     A Feedback Path Must Have An Output That Is Returned To The Input, Not Merely Toward The Input .......................................................... 8

     C.     The Claims Require Filters "Programmed" For Different Purposes ...................... 9

           1.     ETG Fails To Apply "Programmed" In the Context Of The Claims And The Specification .................................................................................. 9

           2.     The Programmable Delay Line Filter In Claim 1 Must Be Programmed To Correct For The Wearer's Hearing Loss ....................... 10

           3.     Claim 17 Addresses Hearing Loss and Reduction of Noise and Reverberation Effects ............................................................................. 12

           4.     Claims 9, 10, And 19 Address Cancellation Of Acoustic Feedback ........ 12

     D.     "Programmed" Means The Device Has Received Fixed Sets of Coefficients That Provide The Desired Output Of The Filter ............................. 13

           1.     ETG's Construction Of "Programmed" Is Untenable ............................... 13

           2.     ETG's Constructions Of "Filter Therein Programmed" And "Filter Programmed" Should Also Be Rejected .................................................. 15

i

E.    The Steps Of The Method Claims ('850 Patent, Claims 13 And 14) ................... 16

    1.    "Determining" Means "Measuring" .................................................. 16

    2.    "As A Function Of Frequency" Means "At A Known Frequency" ......... 16

    3.    ETG's Construction Of "Inserting" Is Untenable .................................... 17

IV.    THE HOST CONTROLLER OF THE '749 PATENT ............................................ 18

A.    The Hearing Aid And The Host Controller Are Two Separate Devices ............. 18

B.    ETG's "Integral" Argument Is Misguided............................................................ 18

C.    ETG Wrongly Attempts To Rewrite "Host Controller" As A Generic
    "Processor" ........................................................................................................... 19

V.    MEANS-PLUS-FUNCTION CLAIM CONSTRUCTIONS ........................................... 20

A.    ETG'S Arguments Are Legally Incorrect ............................................................. 20

    1.    ETG Cannot Rewrite The Recited Function .............................................. 20

    2.    ETG Cannot Broaden The Corresponding Structure For Means-
      Plus-Function Claim Elements To General Categories Of
      Structures ................................................................................................... 20

B.    ETG's Constructions Should Be Rejected ............................................................ 22

    1.    ETG Cannot Use "Processing Elements" As Corresponding
      Structure .................................................................................................... 22

    2.    Controlling Means ('850 Patent, Claim 5)................................................ 23

    3.    Controllable Means ('850 Patent, Claim 5) .............................................. 27

    4.    Band Pass Filter Means ('850 Patent, Claim 6)........................................ 28

    5.    Plurality Of Comparator Means ('850 Patent, Claim 6) ........................... 29

    6.    Speech Detector Means ('850 Patent, Claim 6)........................................ 30

    7.    Programmable Signal Limiter Means ('850 Patent, Claim 1) .................. 31

    8.    Means For Adjusting The Amplitude And Phase Characteristics
      ('850 Patent, Claim 17)............................................................................. 33

    9.    Means For Summing ('850 Patent, Claim 17) .......................................... 34

    10.    The Means-Plus-Function Limitations Of The '749 Patent....................... 35

VI.    INDEFINITENESS.................................................................................................... 38

VII.    CONCLUSION......................................................................................................... 38

# TABLE OF AUTHORITIES

## Cases

*Asyst Techs., Inc. v. Empak, Inc.,*
   268 F.3d 1364 (Fed. Cir. 2001) ............................................................. 31

*B. Braun Med., Inc. v. Abbott Labs.,*
   124 F.3d 1419 (Fed. Cir. 1997) ............................................................. 35

*Ballard Med. Prods. v. Allegiance Healthcare Corp.,*
   268 F.3d 1352 (Fed. Cir. 2001) ............................................................. 22

*Boss Control, Inc. v. Bombardier Inc.,*
   410 F.3d 1372 (Fed. Cir. 2005) ............................................................. 13

*Combined Sys., Inc. v. Defense Tech. Corp. of Am.,*
   350 F.3d 1207 (Fed. Cir. 2003) ............................................................. 17

*E-Pass Techs., Inc. v. 3Com Corp.,*
   473 F.3d 1213 (Fed. Cir. 2007) ............................................................. 17

*Fantasy Sports Props., Inc. v. Sportsline.com, Inc.,*
   287 F.3d 1108 (Fed. Cir. 2002) ............................................................. 24

*Fonar Corp. v. Gen. Elec. Co.,*
   107 F.3d 1543 (Fed. Cir. 1997) ......................................................... 22, 28

*Freeman v. Gerber Prods. Co.,*
   357 F. Supp. 2d 1290 (D. Kan. 2005) ...................................................... 31

*Fuji Photo Film Co. v. Int'l Trade Comm'n,*
   386 F.3d 1095 (Fed. Cir. 2004) .............................................................. 1

*Genzyme Corp. v. Atrium Med. Corp.,*
   315 F. Supp. 2d 552 (D. Del. 2004) .................................................... 21, 22

*Ishida Co. v. Taylor,*
   221 F.3d 1310 (Fed. Cir. 2000) ......................................................... 27, 28

*K-2 Corp. v. Salomon S.A.,*
   191 F.3d 1356 (Fed. Cir. 1999) .............................................................. 2

*Laitram Corp. v. Rexnord, Inc.,*
   939 F.2d 1533 (Fed. Cir. 1991) ........................................................ 20, 21

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  No. 1:04-CV-607, 2006 WL 335846, at *6 (S.D. Ohio Feb. 14, 2006) .................................... 2

*Lockheed Martin Corp. v. Space Sys./Loral, Inc.*,
  324 F.3d 1308 (Fed. Cir. 2003) ...................................................................... 20, 24

*Markman v. Westview Instruments, Inc.*,
  517 U.S. 370 (1996).................................................................................. 2

*Med. Instrumentation & Diagnostics Corp. v. Elekta AB*,
  344 F.3d 1205 (Fed. Cir. 2003) ...................................................................... 20, 21

*Old Town Canoe Co. v. Confluence Holdings Corp.*,
  448 F.3d 1309 (Fed. Cir. 2006) .......................................................................... 13

*On Demand Mach. Corp. v. Ingram Indus., Inc.*,
  442 F.3d 1331 (Fed. Cir. 2006) ........................................................................... 2

*Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*,
  183 F.3d 1347 (Fed. Cir. 1999) ...................................................................... 21, 22

*Sulzer Textil A.G. v. Picanol N.V.*,
  358 F.3d 1356 (Fed. Cir. 2004) ...................................................................... 2, 3

*Telcordia Techs., Inc. v. Alcatel*,
  Nos. 04-874; 04-875; 04-876, at 3-5, 7-8 (D. Del. June 22, 2006)......................................... 31

*Tex. Digital Sys., Inc. v. Telegenix, Inc.*,
  308 F.3d 1193 (Fed. Cir. 2002) .......................................................................... 30

*Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n*,
  988 F.2d 1165 (Fed. Cir. 1993) ...................................................................... 3, 6

*U.S. Surgical Corp. v. Ethicon, Inc.*,
  103 F.3d 1554 (Fed. Cir. 1997) ........................................................................... 2

*Unique Concepts, Inc. v. Brown*,
  939 F.2d 1558 (Fed. Cir. 1991) ........................................................................... 4

*Va. Panel Corp. v. MAC Panel Co.*,
  133 F.3d 860 (Fed. Cir. 1997)............................................................................ 2

## Statutes

35 U.S.C. § 112, ¶ 6...............................................................................20, 21, 28, 31

## I.    INTRODUCTION

Defendants jointly submit this brief in reply to Plaintiff, Energy Transportation Group Inc.'s ("ETG's") Opening *Markman* Brief.  To assist the Court in understanding the technology at issue in this case, attached as Exhibit 1 is a short multimedia demonstrative exhibit that provides an overview of how the ear works, a history of hearing aids, and an introduction to filters and feedback.  A chart listing all the disputed claim terms, the claims in which they appear, and the parties' proposed claim constructions is attached as Exhibit 2.

## II.    OVERVIEW

Numerous digital and analog hearing aid devices were already disclosed before the '850 and '749 patent applications were filed with the United States Patent and Trademark Office.[1] Consequently, Audimax—the original assignee of the patents-in-suit—chose to focus its claims on aspects of the hearing aid system it was attempting to develop.  The Audimax hearing aid employed a specific type of filter and a specific way of controlling the hearing aid by using a host controller to provide fixed coefficients during the fitting process.  Twenty years later, ETG cannot rewrite the claims to broaden their scope or to take back the concessions Audimax made to obtain its patents.

The Court of Appeals for the Federal Circuit has repeatedly stated that, "as between the patentee who had a clear opportunity to negotiate broader claims but did not do so, and the public at large, it is the patentee who must bear the cost of its failure to seek protection." *Fuji Photo Film Co. v. Int'l Trade Comm'n*, 386 F.3d 1095, 1100 (Fed. Cir. 2004).  The "scope and

---

[1]  The intrinsic evidence includes several such references.  *See, e.g.*, (JA 0629-59) (Engebretson patent disclosing multi-band techniques for compensating for the varying degrees of hearing loss at different frequencies); (JA 0551-574) (Borth patent disclosing a manner in which the hearing aid's operation would change depending on the current sound environment); (JA 0660-65) (Admiraal patent disclosing an acoustic feedback canceller in a hearing aid).

outer boundary of claims is set by the patentee's description of his invention." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1338 (Fed. Cir. 2006). ETG should not be allowed to expand the scope of the claims to what it now wishes Audimax had invented and claimed. *See K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1364 (Fed. Cir. 1999) ("Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee.").

ETG attempts to justify its overreaching claim constructions by asserting that they are "simple, straightforward, and . . . written in common terms that will be readily understood by the jury." (ETG Br. 6.) ETG's proposed interpretations, however, are so "dumbed down," they would prevent the jury from performing its role in determining infringement. *See Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366 (Fed. Cir. 2004) (jury instructions on claim construction are written to allow the jury to be "able to 'intelligently determine the questions presented'").

Finally, ETG even attempts to eviscerate the *Markman* process by arguing that the Court should construe only those terms that ETG "believes may be helpful to explain to the jury." (ETG Br. 6.) ETG cannot reserve disputed claim construction issues for argument before the jury. *See Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996) (holding that claim interpretation is an issue for the judge, not the jury). Moreover, by asking the Court not to construe disputed terms in asserted claims, ETG invites the Court to commit legal error. *See Va. Panel Corp. v. MAC Panel Co.*, 133 F.3d 860, 865 (Fed. Cir. 1997) (holding that the district court erred by failing to construe disputed terms).[2]

---

[2] *See Liebel-Flarsheim Co. v. Medrad, Inc.*, No. 1:04-CV-607, 2006 WL 335846, at *6 (S.D. Ohio Feb. 14, 2006) ("[A] patentee cannot avoid defining its own claim terms by asserting that its claims have a plain meaning . . . . [S]uch a position would improperly make the patent holder the arbiter of whether its claims are 'clear and unambiguous.'") (citations omitted). Further, ETG's reliance upon *U.S. Surgical Corp. v. Ethicon, Inc.,* 103 F.3d 1554, 1568 (Fed. Cir. 1997), is misplaced. *U.S. Surgical* holds that no claim construction is needed for *undisputed* claim

2

### III.    STRUCTURAL AND METHOD CLAIM LIMITATIONS IN THE '850 PATENT

#### A.  Defendants Properly Construe "Programmable Delay Line Filter"

In contrast to claim 17, which requires a "programmable filter," claims 1, 9, and 19 of the '850 patent were drafted to require a "programmable delay line filter."  A delay line filter is a particular type of filter that the inventors believed could be used to reduce power consumption. (2:62-66; Dugot Dep. 62:1-21, 84:19-85:9 (JA 0512-13).)[3]  These claims impose additional requirements beyond what is required for a "programmable filter."

ETG concedes that a "programmable delay line filter involves a delay line filter that is programmable."  (ETG Br. 6.)  As ETG's admission demonstrates, the analysis of "programmable delay line filter" must first begin with the meaning of "delay line filter."

#### 1.  ETG Tries To Broaden "Delay Line Filter" To Encompass Any Filter

ETG proposes that "delay line filter" should mean any "filter employing one or more delays or coefficients."  (ETG Br. 7.)  ETG's proposal fails to distinguish a delay line filter from other types of filters and serves to read an express limitation out of the claims.

ETG's construction would convert "programmable delay line filter" into merely "programmable filter."  All digital filters use delays and coefficients.  Yet, not all digital filters are delay line filters.[4]  ETG's construction improperly renders "delay line" superfluous and thus should be rejected.  *See Tex. Instruments Inc. v. U.S. Int'l Trade Comm'n*, 988 F.2d 1165, 1171 (Fed. Cir. 1993) (holding that the patentee cannot read express limitations out of the claims);

terms; it has no bearing on the court's responsibility to resolve disputed claim terms.  *Id.*; *see also Sulzer*, 358 F.3d at 1366-67.

[3] Except where otherwise indicated, all citations to the specification reference column and line numbers from the '850 patent.

[4] As shown at JA 0549, Fig. 18-14, a delay line filter implementation is schematically shown to have*, inter alia*, a line of delays.  By simply contending that a filter uses one or more delays, ETG does not even attempt to address this aspect of the delay line filter structure.

3

*Unique Concepts, Inc. v. Brown*, 939 F.2d 1558, 1563 (Fed. Cir. 1991) (cautioning against interpretations that render express claim limitations meaningless).

### 2. A Delay Line Filter Sums Together Delayed Samples That Have Been Multiplied By A Weighting Coefficient

ETG admits that a delay line filter is "a relatively technical term that is certainly not one used in everyday conversation." (ETG Br. 6.) Accordingly, both sides turn to the specification to construe these terms. ETG and the Defendants agree that column 2, lines 55-62, of the '850 patent defines the operation of a delay line filter. (ETG Br. 6; Defs. Br. 14.) Defendants' proposed construction correctly follows the specification—a delay line filter operates on time-delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighting coefficient and summing the weighted samples to provide an output. (*See* 2:55-62.)[5]

ETG does not contest this portion of the Defendants' "delay line filter" construction. (ETG Br. 6-8.) Indeed, ETG supports Defendants' construction by conceding that a delay line filter "employs delays that are multiplied by weighting coefficients." (ETG Br. 6.)

### 3. A Delay Line Filter Is Not A Recursive Filter

Defendants' proposal further includes the requirement that a delay line filter is non-recursive. The patent specifically distinguishes delay line filters from recursive filters. (2:55-3:2.) The proper construction of a "delay line filter" should reflect the patent's distinction. ETG's proposed construction, however, ignores the fact that a "programmable filter" and "programmable *delay line* filter" mean different things.

---

[5] A demonstration of the operation of a delay line filter is shown in Exhibit 1 in section 4(e).

As discussed above, the specification states that a *programmable filter* can take two forms. The first is the delay line filter (either digital or analog). (2:55-66.) The second is a recursive filter. (2:67-3:2.) The specification distinguishes a delay line filter from a recursive filter. ETG's statement "a programmable filter may implement recursive filtering" fails to even address the issue. (ETG Br. 7 (citing 2:67-3:2).) ETG addresses programmable filter, not programmable *delay line* filter. ETG fails to contest that the specification distinguishes the use of a delay line filter from recursive filtering.

ETG contends that the jury would not understand what "non-recursive" means because "this term is not used in the specification." (ETG Br. 8.) This argument is specious—the patent uses the term "recursive" to define the second type of filter. (3:2.) Moreover, the patent itself explains that a recursive filter is a filter in which the output is added back into the input. (2:68-3:2.) Consequently, the jury would certainly understand that a non-recursive filter is a filter that does not add its output back into its input.

### 4. Incorporating The Word "Programmable" Further Limits "Programmable Delay Line Filter"

ETG admits that a "programmable delay line filter" is not just any delay line filter by stating "a programmable delay line filter involves a delay line filter that is programmable." (ETG Br. 6.) Yet, ETG's proposed construction attempts to eliminate "programmable" from "programmable delay line filter."[6]

---

[6] ETG contends that the jury would be confused by a construction that addresses programmable delay line filter in two parts—first addressing "delay line filter" and then what it means to be a "*programmable* delay filter." (ETG Br. 7.) But ETG's own construction requires two parts. Regardless, if the Court prefers a construction with only one part, Defendants' proposed constructions of "delay line filter" and "programmable delay line filter" can easily be grouped together under the single heading "programmable delay line filter."

ETG's definition of "programmable delay line filter" is "a filter employing one or more delays and coefficients, [where] the value(s) of at least one delay or coefficient can be programmed." (Joint Claim Construction Statement ("JCCS") at 2; Ex. 2 at 1.) ETG's definition of "programmed" is "provided with one or more values so as to provide a response." (JCCS at 3; Ex. 2 at 2.) Taken together, ETG's multi-part construction amounts to a filter employing and provided with one or more delays and coefficients to provide a response. This fails to differentiate a "programmable delay line filter" from a "delay line filter." ETG's proposed constructions should be rejected because they render "programmable" meaningless and, in effect, amount to no construction at all.[7] *See Tex. Instruments,* 988 F.2d at 1171. Indeed, all filters use "one or more values." Therefore, "programmable" must mean something more.

Defendants' proposed claim construction, on the other hand, imparts meaning that is consistent with the intrinsic evidence. The specification makes it clear that the *programmable* nature of the delay line filter serves the purpose of customizing the filter "for the patient and [the] acoustic environment in which it is used." (2:30-33.) The programming is "determined from the measurements made." (2:33-40.) Those measurements that are used during the fitting process result in particular values that are sent from a host controller to the hearing aid. (2:30-40.) What makes the filter *programmable* is the fact that it can receive externally generated values to customize the hearing aid for the wearer. Indeed, even in ETG's digital video recorder

---

[7] ETG's construction should also be rejected because it is not supported by the intrinsic evidence. ETG seeks to encompass filters in which the amount of the delay can be changed. (ETG Br. 6-7.) Contrary to ETG's citation, column 5, lines 18-30, of the '850 patent makes no mention of using delay to change the characteristics of the filter. Instead, it states that "[t]he characteristics of the programmable filter 64 are determined by coefficients stored in a random access memory (RAM) 77." (5:18-30.) These coefficients are used to weight the samples, not to vary the delay between the samples. There is no discussion of varying the amount of delay. (*Id.*)

analogy, the "programmed" values are provided by an external source—the person programming the machine.

Defendants' proposal requiring weighting coefficients that are externally calculated and provided by the host controller to the hearing aid is the only construction consistent with the only teaching of "programmable" in the patent specification. (Defs. Br. 16-17.) The specification describes a single way to provide a "programmable" filter with the weighting coefficients required for its operation. Those coefficients are supplied by the host controller, which is external to the hearing aid.[8] (Defs. Br. 6-8, 16-17.) Given the uniform teachings of the specification, the use of the term "externally calculated" will not be confusing to the jury.

**B. The Claims Require Filters In Different Locations**

      **1. The Forward Path Is Properly Defined With Respect To The Microphone And The Receiver**

The dispute between the parties centers on whether the terms "microphone" and "receiver" should be incorporated in the construction of "forward path." ETG proposes that forward path should be "a path in which a signal travels from an input *toward* an output of a transmission channel." (JCCS at 7; Ex. 2 at 1.) Defendants propose "a path in which a signal travels in a direction from the microphone to the receiver." (*Id.*)

Defendants' construction properly addresses the context in which the term "forward path" is used in the claims. Claims 9 and 15 define the forward path as being between the input and output of the transmission channel. (13:7-8; 14:33-34.) This transmission channel is defined to be interposed between at least one microphone and an output receiver. (13:4-5; 14:20-21.)

---

[8] ETG is wrong when it asserts in its opening brief that "there is no language even in the specification that the weighting coefficients must be externally calculated." (ETG Br. 8.) The patent's entire discussion of the fitting process demonstrates that weighting coefficients are calculated external to the hearing aid, i.e., using the host controller.

ETG does not attempt to substantively refute any aspect of Defendants' construction. Instead, ETG again simply contends that the Defendants' construction would "confuse the jury." (ETG Br. 8.)  Defendants' proposal is clearer than ETG's deliberately vague proposal. Defendants provide a frame of reference for the jury that is already required by the claims; the claims define the inputs and outputs with respect to the microphone and receiver.  (13:3-9.)

## 2.  A Feedback Path Must Have An Output That Is Returned To The Input, Not Merely Toward The Input

ETG contends that a "feedback path" is any path that moves toward an input.  ETG's proposed construction disregards the entire concept of feedback and is contradicted by the intrinsic and extrinsic evidence.[9]  The feedback path must guide an output signal back *to* the input, not merely *toward* it.

The '850 patent explains that a common problem with hearing aids is acoustic feedback, which occurs because a portion of the amplified signal leaks back to the hearing aid microphone. (1:33-41.)  Feedback occurs because the amplified signal is fed back into the hearing aid.

The intrinsic evidence cited by ETG supports Defendants, not ETG.  (ETG Br. 14; 9:41-46.)  The specification notes that a filter will be in a feedback path if positioned between terminals 142 and 143.  Following the paths drawn in Fig. 2, one end of the feedback path is connected to the point immediately before the speaker (the output of the circuit), and the other is connected to the summer 60, which combines the feedback signal with the input signal from the microphone 57.   Fig. 2 with the feedback path highlighted is shown at JA 0666.

Similarly, the specification discusses placing the programmable delay line filter 64 in the feedback path.  (9:54-55.)   Here as well, the feedback path is shown to conclude at summer 60.

---

[9] A demonstration of a feedback path is shown in Exhibit 1 at section 4(c).

(Fig. 2; JA 0628). The intrinsic evidence consistently shows the feedback paths having a feedback signal that is returned to the input, not merely toward it.

Further, both ETG's and Defendants' dictionary definitions require that an output signal returns *to* the input, not merely *toward* the input. (*Id.*; Defs. Br. 18; JA 0243; JA 0577.) As shown below and confirmed by the testimony of inventor Richard Dugot, the feedback path begins at the output and ends at the adder, where it is combined with the input.



ETG wrongly asserts that the claims do not recite feedback path "in relation to the microphone." (ETG Br. 14.) Like the claims reciting "forward path," claims 1, 18, and 19 define the feedback path as being in the transmission channel. In all three claims, the transmission channel is, in turn, defined to be "interposed between said microphone and said receiver." Thus, the claims do define "feedback path" in relation to the microphone.

### C. The Claims Require Filters "Programmed" For Different Purposes

#### 1. ETG Fails To Apply "Programmed" In the Context Of The Claims And The Specification

Having addressed the requirements of a programmable delay line filter and the forward and feedback path limitations that govern where the filter must be located, Defendants now turn to how claims 1, 9, 10, 17, and 19 of the '850 patent further require the programmable delay line filter to be "programmed" to perform a particular action.

The Audimax hearing aid that is the subject of the '850 patent tried to: (1) compensate for hearing loss; (2) address acoustic feedback, which would result when the gain (i.e.,

amplification) in the hearing aid was large; and (3) change its parameter values selected from coefficients based on speech and noise levels. (11:46-57.) It did so using coefficients that are fixed—"programmed"—during a separate fitting process using a stand-alone host controller (the subject of the '749 patent). Precalculating the hearing aid's coefficients using the host controller allows for a small hearing aid that consumes a minimum amount of power. Once the host controller is disconnected from the hearing aid, these coefficients cannot be changed unless the host controller is reconnected. The '850 patent, therefore, does not include hearing aids that use coefficients that are recalculated during normal operation to correct for transient conditions.

These three goals are addressed separately in the claims of the '850 patent: Claims 1, 6, and 17 address hearing loss. Claims 5 and 6 address the changing of the operation based on a particular speech and noise determination. Claims 9, 10, 13, 14-16, and 19 address acoustic feedback.

With respect to claims 1, 9, 10, 17, and 19, each of these claims recite a programmable delay line filter (programmable filter in claim 17) that is "programmed" to perform actions related to one of these three goals. ETG, however, refuses to provide constructions for what these actions entail, asserting that the jury would already understand these terms. In so doing, ETG wants to eliminate the distinction between the above stated goals, arguing that they are all the same (e.g., ETG Br. 2). Defendants' proposed constructions would properly preclude ETG from attempting to avoid the teachings of the patent and the arguments Audimax made before the Patent Office to procure these claims.

### 2. The Programmable Delay Line Filter In Claim 1 Must Be Programmed To Correct For The Wearer's Hearing Loss

Claim 1 of the '850 patent requires that the programmable delay line filter is "programmed to impart to the hearing aid at least one response characteristic effective to

10

compensate for impaired hearing of the wearer of the aid."[10]  Defendants construe "response

characteristic effective to compensate for impaired hearing of the wearer of the aid" to mean a

response characteristic that corrects for the particular hearing impairment of a wearer of the aid.

ETG fails to identify any substantive dispute.  (ETG Br. 15-16.)  The jury will understand

Defendants' construction, and the construction does not restrict the scope of claim 1 to a single

response characteristic, as ETG contends, but rather "*at least one* response characteristic."

Moreover, it appears that ETG may try to support its allegations of infringement by

arguing to the jury that a filter that is programmed for feedback cancellation somehow reads on a

claim that calls for programming to compensate for hearing loss.  (ETG Br. 16.)  Such an

interpretation is contrary to the prosecution history and the language of the claims.

Claim 1 was drafted to require the filter to address hearing loss compensation.

Accordingly, when claim 1 was examined, the Examiner applied prior art relating to hearing loss

compensation.  (JA 0105.)  When Audimax responded to the Examiner's rejection of the claim,

Audimax affirmatively stated that claim 1 would provide the same benefits as the "multi-band

compression" method of compensating for hearing loss in the cited Engebretson patent.  (JA

0105-06.)  Audimax made no mention of acoustic feedback.

Claim differentiation further demonstrates that claim 1 addresses hearing loss, and not

acoustic feedback.  Claim 1 requires that the filter "compensate for impaired hearing of the

wearer."  Claim 10, which is dependent on claim 1, adds a second requirement for that filter—it

must also be "programmed so as to effect substantial reduction of acoustic feedback."  Claims 1

and 10 do not both address acoustic feedback.  Claim 1 addresses hearing loss.  Claim 10

---

[10] Claim 18 imposes the same requirement, but for a signal-level dependent amplifier—not a
filter.  Defendants contend that "signal-level dependent amplifier" is indefinite.  ETG has neither
contested Defendants' contentions nor offered any claim construction of its own.

11

addresses hearing loss and acoustic feedback. The claims themselves evidence the differences between the two.

### 3. Claim 17 Addresses Hearing Loss and Reduction of Noise and Reverberation Effects

Claim 17 of the '850 patent imposes the same requirements as claim 1 and additionally requires the filter be programmed to "reduce the effects of both noise and reverberation." Thus, claim 17 also demonstrates that the various response characteristics cannot be conflated into one—as ETG would have it. ETG does not contest Defendants' interpretation of these additional requirements or provide its own construction.[11]

### 4. Claims 9, 10, And 19 Address Cancellation Of Acoustic Feedback

Claims 9, 10, and 19 of the '850 patent require the programmable delay line filter to be programmed "to effect substantial reduction of acoustic feedback from said receiver to said microphone." Defendants construe "to effect substantial reduction of acoustic feedback" to mean to impart cancellation of acoustic feedback.[12]

ETG fails to provide a construction of its own. ETG nonetheless insinuates that reduction of acoustic feedback can be achieved in a myriad of ways, and would undoubtedly argue this to the jury. (ETG Br. 10.) The intrinsic evidence, however, precludes such an interpretation.

---

[11] The Joint Claim Construction Chart included a typographical error for this limitation. The proposed construction should read, "a response characteristic that corrects for" instead of "a characteristic to correct" to be consistent with Claim 1 which includes the same limitation. This error is corrected in Exhibit 2, item nos. 7 and 10.

[12] This disputed clause also uses the term "substantial." As discussed in Defendants' Opening Brief, the use of the term "substantial" in this clause is indefinite. (Defs. Br. 25-26.) Inventor Dugot testified that "I don't know what they meant by substantial, that is the lawyer's language." (JA 0516, Dugot Dep. 203:21-205:10.) In its opening brief, ETG failed to provide a construction for "substantial." In fact, it failed to address this issue in any way.

In the "Background of the Invention," the specification criticizes existing methods of feedback control, including "simply reducing the gain of the hearing aid," as failing to provide "a satisfactory solution." (1:33-50.) The background section further criticizes numerous other methods for failing to provide a satisfactory solution to the problems of acoustic feedback. (1:64-2:9.) The intrinsic evidence criticizes prior art methods and discusses only cancellation (the addition of an electrical signal that is ideally equal but opposite in phase with the acoustic feedback signal). ETG should not be allowed to argue at trial that its claims encompass the very prior art from which the patents distinguish themselves. *See Boss Control, Inc. v. Bombardier Inc.*, 410 F.3d 1372, 1377 (Fed. Cir. 2005) (distinguishing the claimed invention from the prior art provides strong evidence of a disavowal of claim scope).

### D. "Programmed" Means The Device Has Received Fixed Sets of Coefficients That Provide The Desired Output Of The Filter

#### 1. ETG's Construction Of "Programmed" Is Untenable

ETG seeks to interpret "programmed" as "provided with one or more values so as to produce a response." (ETG Br. 8.) To work as a filter having coefficients, every coefficient must be "provided with one or more values so as to produce a response." Therefore, ETG's proposal is so vague, it fails to provide any meaning at all, and it is not supported by the intrinsic record.

Defendants' construction, on the other hand, is fully supported and consistent with the intrinsic evidence. As the Federal Circuit has repeatedly admonished, disputed claim terms must be construed in the context of the specification. *Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1316 (Fed. Cir. 2006). Defendants' constructions and supporting evidence are set forth in Defendants' Opening Brief in the method of programming and the purpose for which a filter is "programmed." (Defs. Br. 20-27 ("substantial reduction" of

acoustic feedback); Defs. Br. 31 ("equalize and reduce" acoustic feedback); Defs. Br. 35, 45

("compensate for impaired hearing").)

ETG criticizes Defendants' proposed constructions on the various "programmed" terms

only by rewriting them.  First, ETG interprets the Defendants' proposed construction to "require

the programmable filter to be fixed and therefore no longer programmable."[13]  (ETG Br. 9.)

ETG is wrong.  According to Defendants' proposed construction, when the filter has been

"programmed," it "has received . . . weighting coefficients that, in normal operating mode, are

fixed [i.e. do not change] to impart" specified results.  That filter is still "programmable,"

because different "externally calculated weighting coefficients" can be supplied to the filter in a

subsequent fitting process, i.e., the filter can be "reprogrammed" through a re-connection to the

host controller.  This is exactly what the specification explains.  (5:31-39, 10:16-21; *see* Defs. Br.

21-23.)

ETG then rewrites Defendants' proposed construction to require that the

"programmed . . . filter" "of claims 1 and 17 create a single response characteristic."[14]  (ETG Br.

9.)  Again, ETG is wrong.  Under Defendants' construction, there can be multiple "response

characteristics" if there are multiple sets of weighting coefficients that were "programmed"

during fitting.  In fact, Defendants' proposed construction states that the programmed filter has

received "***at least one set of weighting coefficients that***, in normal operating mode, are fixed to

**create a response characteristic**."  Thus, a particular one of these sets may be selected

---

[13] *See*, *e.g.*, claim 1, "said filter being programmed" means that the "filter has received at least one set of weighting coefficients that, in normal operating mode, are fixed to create a response characteristic."

[14] Claim 18 does not recite a programmed "filter" but rather a programmed "signal-level dependent amplifier."  (*See* Defs. Br. 45-46.)

depending on the speech/noise conditions.  That is exactly as the patent specification teaches.
(Defs. Br. 35-36, 45.)

In addition to rewriting Defendants' proposed construction, ETG rewrites its own patent
claims.  For example, ETG asserts that claims 13 and 14 demonstrate that the patentees "knew
how to recite cancellation when that was intended."  But claims 13 and 14 **do not** say
"cancellation."  Rather, they require that acoustic feedback be "equalize[d] and reduce[d]."  It is
ETG—not the Defendants—who is trying to rewrite the claims.  ETG's claim differentiation
argument fails.

### 2.  ETG's Constructions Of "Filter Therein Programmed" And "Filter Programmed" Should Also Be Rejected

With respect to the '850 patent, claim 13 requires a "filter therein programmed."  Claims
14-16 require a "filter programmed."  Claim 17 requires a "programmable filter . . . being
programmed."  ETG's construction for these terms is no different than its construction set forth
above with respect to the "programmable delay line filter."  ETG's construction of
"programmed" and "programmable" terms should not be adopted for all the reasons set forth
above with respect to Defendants' construction of "programmable delay line filter" and
"programmable filter . . . being programmed."[15]

Moreover, ETG's proposed definition is also infirm because it states that a "filter therein
programmed" is one "where the values of the coefficients **may be** programmed."  (ETG Br. 10)
(emphasis added).  ETG's use of a permissive verb is inconsistent with the plain language of

---

[15] The only programming of any filter—delay line or otherwise—disclosed in the '850 patent is
performed using a host controller during a fitting process where coefficients are calculated
external to the hearing aid.  Those coefficients are then sent by the host controller to the filter
where in normal operating mode they are fixed to impart a particular response.

claim 13 itself, which requires that the filter must be "programmed to equalize and reduce the effect of said acoustic feedback . . . ."

### E.  The Steps Of The Method Claims ('850 Patent, Claims 13 And 14)

#### 1.  "Determining" Means "Measuring"

The term "determining" should be construed to mean "measuring," as this is the only construction supported by the intrinsic record.  ETG baldly asserts that "[a] jury would readily understand what is meant by the term 'determining.'"  What a "jury would readily understand" a claim term to mean is not the proper inquiry.  It is for the Court to construe disputed claim terms from the point of view of a person of ordinary skill in the art in light of the patent specification.

Moreover, although claims 13 and 14 refer to "determining" the effect of acoustic feedback, the specification does not use the term "determining" in connection with the effect of acoustic feedback "on amplitude and phase of a signal in said transmission channel."  The specification describes only "measurement" of acoustic feedback in the written description.  "Determining" is used only in other unrelated contexts.  (*See* Defs. Br. 27-28.)  "Measuring" is the appropriate construction.

#### 2.  "As A Function Of Frequency" Means "At A Known Frequency"

The phrase "as a function of frequency" means "at a known frequency."  As described in Defendants' Opening Brief (28-29), the effect on the amplitude and phase of a signal is measured only during the fitting process using a test signal.  That test signal has a known frequency. (Defs. Br. 28-29.)  ETG disagrees, relying on unrelated portions of the specification at 5:60-6:1 and 9:12-55.  The first citation that discloses "four band pass filters," however, has nothing to do with acoustic feedback, which is discussed in the second citation.  In describing the measurement of acoustic feedback, the patent refers only to "[a]n electrical test signal."  (9:19-20.) Defendants' proposed construction should be adopted.

16

### 3.  ETG's Construction Of "Inserting" Is Untenable

The second step in claims 13 and 14 begins with the word "inserting."  ETG argues, "The act of inserting does not require physical insertion of an electrical feedback path and/or filter.  In other words, as used in this claim, the word 'inserting' is referring to an effect, not a literal, manual act."  (ETG Br. 12.)  ETG's proposal for "inserting" does not require insertion at all, but rather is so broad as to cover metaphysical "effects."  The specification requires an insertion step—and not an effect:

> From the settings obtained with the phase shifter 30 and amplifier 32 at cancellation (at the "null"), the host controller calculates a set of coefficients for a ***programmable filter to be inserted in the electrical feedback path between terminals 142 and 143*** so as to cancel the acoustic feedback.

(9:41-46) (emphasis added).

Moreover, both Defendants' and ETG's constructions require completing the determining step before the inserting step.  This is because, even under ETG's construction, the effect of acoustic feedback must be determined before it can be equalized and reduced.

ETG also mischaracterizes the applicable law.  Method steps must be construed to require order where the completion of one step is essential to the performance of another step.  *See E-Pass Techs., Inc. v. 3Com Corp.*, 473 F.3d 1213, 1222 (Fed. Cir. 2007) ("Substantively, because the language of most of the steps of its method claim refer to the completed results of the prior step, E-Pass must show that all of those steps were performed in order."); *Combined Sys., Inc. v. Defense Tech. Corp. of Am.*, 350 F.3d 1207, 1211-12 (Fed. Cir. 2003).  Because the filter to be inserted is "programmed," the determining step of the prior limitation is essential and must be performed in the order of the claim.

17

## IV.    THE HOST CONTROLLER OF THE '749 PATENT

### A.  The Hearing Aid And The Host Controller Are Two Separate Devices

The claims in the '749 patent address a "host controller."  The host controller serves as a temporary interface between an external computer and the hearing aid for programming the hearing aid during the fitting process.  (3:63-4:47; 8:27-9:9; Fig. 1.)  As described and claimed in the '749 patent, the host controller is separate and distinct from the hearing aid.

ETG seeks to completely rewrite the disclosure and '749 patent claims by asserting that the "host controller" is part of the hearing aid.  (ETG Br. 29.)  ETG ignores the plain language of claim 1 of the '749 patent, which defines the host controller as an interface between a computer and a hearing aid—it is not a part of the hearing aid itself.  The claims define a host controller as a device "for producing data *from a computer for a programmable hearing aid*."  ('749 patent at 12:12-23) (emphasis added).  Moreover, the claim requires means for "receiving signals *from the hearing aid*."  (*Id.* at 12:16) (emphasis added).

The specification confirms that the host controller and hearing aid are separate devices. The host controller is shown and described only in Fig. 1, the description of which notes that the host controller is "for use in []prescribing a wearable, programmable hearing aid."  ('850 patent at 3:37-39.)  The prescribing was performed by an audiologist at his or her office.  The specification makes it abundantly clear that the host controller is not part of the hearing aid by specifically omitting the host controller components in Fig. 1 from its list of items that "may be incorporated in the hearing aid" or in a separate case carried with the wearer of the hearing aid. (11:39-55.)

### B.  ETG's "Integral" Argument Is Misguided

ETG challenges Defendants' proposal that the host controller is "interposed between a computer and the hearing aid."  (ETG Br. 29.)  ETG claims that "[n]othing in the specification

requires that the 'host controller' be physically 'placed between' the hearing aid and a computer." (*Id.*) But *every* embodiment contained in the specification has the host controller interposed between a computer and the hearing aid. (3:63-4:47; 8:27-9:9; Fig. 1.)

ETG argues that certain embodiments "contemplate that the 'host controller' be integral with the hearing aid." (ETG Br. 29.) In doing so, ETG misquotes the specification. In particular, ETG omits the following italicized language: "The hearing aid is ***connected to the host controller by an electrical cable (not shown), thereby placing it*** directly under the control of the host controller." (6:57-60) (emphasis added). The presence of an electrical cable demonstrates that a host controller is "interposed between a computer and the hearing aid." It is not part of the hearing aid itself.

Further, it is contrary to the teachings of the patents to place the host controller inside the hearing aid. The patent instructs that the host controller is used to program the hearing aid during fitting. (3:34-36; 6:55-60.) The host controller is attached only during this programming process. (6:55-61.)

### C. ETG Wrongly Attempts To Rewrite "Host Controller" As A Generic "Processor"

ETG argues "[a]s depicted in Figure 1, the host controller is essentially a ***processor*** comprised of numerous ***processing elements*** and circuits." (ETG Br. 29) (emphases added). The terms "processor" and "processing elements" do not appear anywhere in the '749 or '850 patents. None of the specification passages ETG cites support its proposed constructions.

To the contrary, the description and figures of the specification consistently support Defendants' proposed construction that a host controller is "a device for prescribing a wearable programmable hearing aid interposed between a computer and the hearing aid":

> In prescribing hearing aids with the use of the host controller, the
> subject is seated in a quiet room with the hearing aid inserted in his

> ear.  The hearing aid is connected to the host controller by an
> electrical cable (not shown), thereby placing it directly under the
> control of the host controller.  The prescriptive procedure usually
> consists of five stages: . . . .

(6:55-61.)

## V.    MEANS-PLUS-FUNCTION CLAIM CONSTRUCTIONS

### A.  ETG'S Arguments Are Legally Incorrect

Section 112, paragraph 6 of the patent statute allows the patentee to claim an element by

reciting a function instead of directly stating structure.  35 U.S.C. § 112, ¶ 6.  "However, '[t]he

price that must be paid for use of that convenience is limitation of the claim to the means

specified in the written description and equivalents thereof.'"  *Med. Instrumentation &

Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003).  A means-plus-function

claim limitation "does not cover *every means* for performing the specified function."  *Laitram

Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1536 (Fed. Cir. 1991).

#### 1.    ETG Cannot Rewrite The Recited Function

For many means-plus-function elements of the '850 and '749 patents, ETG improperly

seeks to omit portions of the recited claim functions.  "The function of a means-plus-function

claim must be construed to include the limitations contained in the claim language."  *Lockheed

Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003).  The function

cannot be "improperly broadened by ignoring the clear limitations contained in the claim

language."  *Id.*

#### 2.    ETG Cannot Broaden The Corresponding Structure For Means-Plus-Function Claim Elements To General Categories Of Structures

ETG improperly attempts to present general categories of structure instead of the

corresponding structure actually disclosed in the specification.  This tactic has been rejected by

the Federal Circuit and this Court.

Section 112, paragraph 6 of the patent statute precludes a patentee from "claim[ing] in functional terms unbounded by any reference to structure in the specification." *Med. Instrumentation*, 344 F.3d at 1211; *see also Laitram*, 939 F.3d at 1536 ("Section 112(6) rules out the possibility that any and every means which performs the function specified in the claim *literally* satisfies that limitation."); *Genzyme Corp. v. Atrium Med. Corp.*, 315 F. Supp. 2d 552, 577 (D. Del. 2004) ("[T]he corresponding structure of a means-plus-function element cannot be circularly described to include all means for doing the claimed function.").

The corresponding structure of § 112, ¶ 6 claim elements are limited to the structure in the specification that is clearly linked or associated with the claimed function. *Med. Instrumentation*, 344 F.3d at 1211. A patentee also cannot broaden the corresponding structure by replacing the particular structure with generalized structure. *See Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1357 (Fed. Cir. 1999) (rejecting patentee's attempt to identify the corresponding structure as a generic squeezebag because "the specification does not describe a generic squeezebag but rather only a *double-entry* squeezebag"). As this Court has explained, a patentee cannot "incorporate a broader interpretation of the patent claims based on language either eluded to tangentially, or not related within the specification to the disclosed structures. Such a request is contrary to the intent of § 112, ¶ 6." *Genzyme*, 315 F. Supp. 2d at 577 (rejecting an attempt to construe "closing means" to encompass any generic closing member where "the only specific structural examples of such [a] means in the specification are the spherical ball and a hinged door").

A patentee is not entitled to corresponding structure that is not specifically linked in the specification to the claimed function. *See Med. Instrumentation*, 344 F.3d at 1211 (holding that the district court's claim construction erroneously identified software as additional corresponding

structure because there was "nothing in the specification or prosecution history that clearly links or associates software with the [claimed] function"); *Fonar Corp. v. Gen. Elec. Co.*, 107 F.3d 1543, 1551 (Fed. Cir. 1997) (holding that the corresponding structure was limited to gradient wave form, notwithstanding the statement in the specification that other wave forms may be used because the specification "fail[ed] to specifically identify those wave forms").

### B. ETG's Constructions Should Be Rejected

#### 1. ETG Cannot Use "Processing Elements" As Corresponding Structure

For nine of the fifteen means-plus-function limitations at issue, ETG contends that the corresponding structure is or includes the generic and undisclosed phrase "processing elements." ('850 Patent, claims 5, 6, 17; '749 Patent, claims 1, 4, 6.)  Neither the patents nor the file histories disclose "processing elements."

Genericized corresponding structure improperly circumvents the statutory requirements of § 112, ¶ 6.  *See Smiths*, 183 F.3d at 1357; *Genzyme*, 315 F. Supp. 2d at 577.  Even if the patent specification had hypothetically mentioned that "processing elements" could be used in addition to the specific corresponding structure disclosed in the specification (and it does not), ETG still would not be able to recite "processing elements" alone as the corresponding structure.  *See Fonar*, 107 F.3d at 1551.

For example, in *Ballard Medical Products v. Allegiance Healthcare Corp*., the Federal Circuit rejected a patentee's argument that its valve means could encompass any structure that performed a function of minimizing cross contamination:

> As for Ballard's contention that the '344 and '296 patents apply to any valve structure that minimizes the cross-contamination between the interior of the catheter and the outside environment, *that functional characterization of the scope of the claims is inconsistent with the statutory provision that limits means-plus-function claims to the disclosed structure and equivalents, rather than covering any structure that performs the recited function*.

268 F.3d 1352, 1361 (Fed. Cir. 2001) (emphasis added).  The Court should similarly reject

ETG's attempts here to circumvent § 112, ¶ 6.

### 2. Controlling Means ('850 Patent, Claim 5)

#### a. The Function of the Controlling Means

Claim 5 of the '850 patent requires a "controlling means responsive to the level of speech

signals in said transmission channel in excess of the level of noise signals in said channel for

automatically controlling said controllable means to impart a selected one of said different

response characteristics to said hearing aid."  ETG wrongly attempts to completely remove the

"responsive to" limitation from claim 5.

The "responsive to the level of speech signals [that is] in excess of the level of noise

signals" limitation must be included in any construction of function of the "controlling means."

Claim 5 was amended to specifically include this clause during prosecution to overcome the

Examiner's rejection of the claim because it was anticipated by multiple prior art references.

During prosecution, the Examiner rejected claim 5 (claim 8 in the application) as

unpatentable over various prior art patents, including the '529 patent to Borth.  (JA 0087.)  In

response to the rejection, the applicants then amended the claim as follows:

> A hearing aid comprising . . . **controlling** means responsive to **the level of speech signals** ~~a characteristic of the signal~~ in said transmission channel **in excess of the level of noise signals in said channel** for automatically controlling said controllable means to impart a selected one of said different response characteristics to said hearing aid.

(JA 0100.)  The amended version of the claim issued as claim 5 of the '850 patent.

ETG cannot ignore this limitation as "simply a modifier of the structure that merely states

a result" or argue that such "modifying language describing a proposed result is not part of the

scope of the claim."  (ETG Br. 5, 23.)  By amending the claim to overcome prior art, Audimax

limited the functional scope of the controlling means.

23

Further, the intrinsic record mandates that the "responsive to" limitation requires a **determination** of whether the speech is in excess of noise.  In amending the claim, Audimax replaced responsive to "a characteristic of the signal" with "a level of speech signals [that is] in excess of the level of noise signals."  In doing so, Audimax sought to overcome the Borth '529 reference, which taught noise reduction technology that uses a signal-to-noise ratio to select gain parameters for a filter.  (JA 0563, 1:50-65.)  Audimax amended the claims to address how its system "generate[d] a binary coefficient (0,1) indicating whether or not the speech level . . . exceeds the noise level."  (6:23-31.)

In addition to arguing that the "responsive to" clause does not limit the scope of the controlling means, ETG also argues that the "to impart" clause is not part of the function of the controlling means.  But both clauses set forth required elements of the stated function—the "responsive to" clause sets forth the function of determining that the level of speech in the channel is in excess of the level of noise, and the "to impart" clause sets forth the function of selecting from memory a set of delay line tap coefficients.  *See Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1113-16 (Fed. Cir. 2002) (clause reciting "wherein said players in said first and second groups receive bonus points" recited required functional element, i.e., the ability to receive "bonus points").

In contrast, Defendants' proposed construction follows the principle that "[t]he function of a means-plus-function claim must be construed to include the limitations contained in the claim language."  *Lockheed Martin Corp.*, 324 F.3d at 1319.  Defendants' construction largely mirrors the recited claim language.

### b. Defendants Properly Construe The Structure Of The Controlling Means

ETG's proposed structure for the "controlling means" of claim 5 has no relationship to the claim or the specification. ETG argues that "the proper corresponding structure for the defined function is "processing element(s), and structural equivalents thereof." (ETG Br. 24.) "Processing elements" is not found anywhere in the '850 patent, and provides no more structure than "means." Indeed, "processing" is a functional term; "elements" is no more informative than "means."

The structure corresponding to the controlling means includes speech detector 96, band pass filters 97-100, differentially prebiased comparators 101-104, sample and hold circuits 105-108, rectifiers 109-112, comparators 113-116, latch 118, switch 95, and switch 88. ETG argues that the "rectifiers, a latch, and switches are not necessary elements." (ETG Br. 24.) ETG's arguments are premised on an incorrect function, ignore the teachings of the specification, and reflect a lack of technical understanding.

The following section of Fig. 2 shows the structure of the controlling means highlighted in green.



As illustrated in Fig. 2, the structure necessary to "respond to a determination that the level of speech signals in the transmission channel is in excess of the level of noise signals" includes comparators 113-116.

According to the specification, "comparators 113-116 . . . generate a binary coefficient (0,1) indicating whether or not the speech level in the associated band pass filter exceeds the noise level."  (6:28-31.)  Comparators 113-116 determine whether or not the level of speech exceeds the level of noise by comparing the outputs of band pass filters 97-100 with the outputs of sample and hold circuits 105-108.  (8:12-19; Fig. 2.)  Comparators 113-116 compare only the outputs of band pass filters 97-100 and sample and hold circuits 105-108 "[s]o long as there is a one output from the speech detector 96 indicating the presence of speech in the input."  (6:23-31.)  In other words, "[i]f the signal reaching the hearing aid consists of speech plus noise, as determined by the speech detector 96," comparators 113-116 determine whether the level of speech exceeds the level of noise by "comparing the output levels of the band-pass filters 97, 98, 99, and 100 when speech is present to the corresponding levels . . . stored in the sample and hold units 105, 106, 107 and 108."  (8:4-17.)

Fig. 2 shows that rectifiers 109-112 are necessary to prepare the signals from band pass filters 97-100 for use in comparators 113-116.[16]  Fig. 2 also shows that latch 118 and switches 88 and 95 are necessary to transmit the outputs of comparators 113-116 to the controllable means.

_____

[16] Rectifiers 109-112 are necessary to the function of the controlling means.  As shown in Fig. 2, the sub-band signals from band pass filters 97-100 are rectified by rectifiers 109-112 before being sent to comparators 113-116.  The outputs of band pass filters 97-100 are sinusoidal signals, and therefore they cycle between positive and negative values.  A comparison of the levels of two sine waves may provide an erroneous result.  Rectifiers 109-112 create a signal envelope, which represents a magnitude of a sine wave with positive values.  Rectifiers 109-112 are essential for determining whether a speech signal is in excess of a noise signal because they create the signal envelopes that allow comparators 113-116 to function properly.

In other words, the controlling means "automatically control[s] said controllable means" by sending the controllable means "6 bit binary words [that] identif[y] a different frequency response for the programmable filter." (6:47-50.) This 6-bit binary word is sent to the means controllable from latch 118 through switches 88 and 95.

The specification teaches, and one of ordinary skill in the art would recognize, that rectifiers 109-112, latch 118, and switch 88, along with the other structure identified by the Defendants, are necessary for performing the recited function. Defendants' proposed construction should be adopted.

### 3.   Controllable Means ('850 Patent, Claim 5)

The parties agree to the function of the controllable means as "imparting different response characteristics to the hearing aid." The dispute lies in the corresponding structure.

Defendants correctly identify the structure that is disclosed in the specification. The specification discloses two sets of structures that impart different response characteristics to the hearing aid. The digital version is a programmable delay line filter implementation as shown in Fig. 2 and with the structural components described at 5:9-30. The second, analog version of this filter is shown in Fig. 4 with the structural components of this filter described at 10:44-11:3. Defendants' proposed construction identifies specific structural components expressly disclosed and linked to the recited function.

ETG improperly seeks to broaden the corresponding structure with an interpretation that not only covers the two embodiments, it expands the disclosed structure to any programmable filter. It is not proper to "formulate a single claim interpretation to cover multiple embodiments." *Ishida Co. v. Taylor*, 221 F.3d 1310, 1316 (Fed. Cir. 2000). In *Ishida*, the Federal Circuit found that the "district court properly identified 'the corresponding structure[s]'

for each embodiment as required by § 112 ¶ 6 by repeating in words the structures that the patentee had himself already defined in words and pictures." *Id.*

For support, ETG notes that the specification states, "The several embodiments described above and depicted in the drawings are intended to be only illustrative, and modification in form and detail are possible within the scope of the following claims." General statements in the specification do not justify broadening the scope of structure of a means-plus-function claim. *See Fonar*, 107 F.3d at 1551.

### 4.  Band Pass Filter Means ('850 Patent, Claim 6)

The parties also agree to the function of the band pass filter means. The function of this limitation is "determining the noise frequency spectrum in said transmission channel." The corresponding structure is in dispute.

The structure required to perform the function of "determining the noise frequency spectrum" includes band pass filters 97-100, rectifiers 109-112, and sample and hold circuits 105-108. Band pass filters themselves cannot "determine a noise frequency spectrum." Band pass filters 97-100 simply divide an incoming signal into frequency bands, which "might be 100-750 Hz, 750-1500 Hz, 1500-3000 Hz, and 3000 to the upper frequency limit." (5:67-6:1.) In order to determine a *noise* frequency spectrum, "the instantaneous outputs of each of the band pass filters 97-100" are sent through rectifiers 109-112 and then "compared with previous values held in the sample and hold circuits 105-108, . . . to generate a binary coefficient (0,1) indicating whether or not the speech level in the associated band pass filter exceeds the noise level." (6:25-31.)

ETG's position with respect to band pass filters contradicts itself. ETG's brief notes that the specification discloses that "frequency-gain characteristics are . . . **determined by comparing the output levels of the band-pass filters** 97, 98, 99, and 100 when speech is

28

present to the corresponding levels measured when noise only is present.  '850 patent 8:7-16."

(ETG Br. 25) (emphasis added by ETG).  Thus, the specification teaches that the noise frequency

spectrum is determined by comparing the output levels of band pass filters 97, 98, 99, and 100

with corresponding levels from sample and hold circuits 105-108.  ETG uses this teaching of the

specification to draw the illogical conclusion that "it is the band pass filters themselves that

perform the pinpointed function of determining the noise frequency spectrum."  (ETG Br. 25.)

Band pass filters 97-100 are part of performing the function, but the specification clearly teaches

and shows that sample and hold circuits 105-108 and rectifiers 109-112 are also required to

perform the recited function.

### 5.  Plurality Of Comparator Means ('850 Patent, Claim 6)

#### a.  Defendants' Proposed Function Should Be Adopted

The function of the comparator means, in its entirety, is "respon[ding] to said speech

detector and to respective bandpass filter means for indicating whether the speech level in each

said bandpass filter exceeds the noise level therein and for actuating said controlling means to

impart to the hearing aid a response characteristic effective to compensate for impaired hearing

of the wearer of the aid at the noise levels obtaining in said channel."  Defendants' construction

properly follows the recited language of the claim.

ETG wrongly accuses the Defendants of "impart[ing] a number of clauses, *e.g.*, the 'each

responsive…' clause and the 'to compensate for impaired hearing…' clause, that only state the

ultimate claim result but fail to recite a claimed function."  (ETG Br. 26.)  On the contrary, the

"each responsive" clause sets out a required element of the stated function—the ability to

respond to the speech detector means and the band pass filter means.  The "to compensate for

impaired hearing" clause also sets out a required element of the claimed function—the ability to

compensate for impaired hearing at noise levels obtained in the channel.

ETG's construction cannot be adopted because it seeks to eliminate express limitations from the claim. ETG converts a 63-word recitation into a 15-word generalization. This is principally accomplished by eliminating the portion of the claim that requires the comparator means to be responsive to the speech detector and the respective band pass filter means. As discussed above in conjunction with the "controlling means" limitation of claim 5, such "responsive to" claim elements are parts of the recited function, not merely statements of a result.

### b. Defendants' Proposed Corresponding Structure Is Correct

The structure that corresponds to the plurality of comparators means includes comparators 113-116 because comparators 113-116 perform the recited function. The specification teaches that "comparators 113-116 . . . generate a binary coefficient (0,1) indicating whether or not the speech level in the associated band pass filter exceeds the noise level." (6:28-31.)

Again, ETG fails to identify specific structure in the patent specification. Instead, ETG relies on the vague phrase "various processing elements." (ETG Br. 26.) As noted above, this groundless argument has been rejected by the Federal Circuit.

### 6. Speech Detector Means ('850 Patent, Claim 6)

The parties agree that the function of this limitation is "determining when speech signals are in said transmission channel." Defendant's construction properly identifies the structure corresponding to the speech detector means as speech detector 96.

ETG is simply wrong in arguing that the inclusion of reference numbers is improper. (ETG Br. 24-25.) Indeed, this Court and the Federal Circuit repeatedly have used reference numbers to clarify the corresponding disclosed structure. *See, e.g., Tex. Digital Sys., Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1209 (Fed. Cir. 2002) (holding that "the corresponding structure

includes memory 76, the counters 71e and 71f, the flip-flop 73, and associated connection circuitry illustrated in Figures 5 and 9"); *Asyst Techs., Inc. v. Empak, Inc.,* 268 F.3d 1364, 1372-73 (Fed. Cir. 2001) (identifying corresponding structure by reference numerals, including "local process controller 20," "communication means 50," and "communication line 51"); and *Telcordia Techs., Inc. v. Alcatel*, Nos. 04-874; 04-875; 04-876, at 3-5, 7-8 (D. Del. June 22, 2006) (order construing patent terms) ("The corresponding structure is 'the controller 118, 147, 148,' and all equivalents thereof.").

Moreover, ETG's analysis of *Freeman v. Gerber Products Co.*, 357 F. Supp. 2d 1290 (D. Kan. 2005), is both inaccurate and incomplete. (ETG Br. 21.) ETG's parenthetical quotation is taken out of context. In fact, the limitations that the *Freeman* court refused to import into the claim did not relate to structure in a means-plus-function analysis, and were not mere figure numbers, but specific unclaimed structural features. *See Freeman*, 357 F. Supp. 2d at 1307.

ETG again tries to hide behind disingenuous jury confusion arguments. (ETG Br. 25.) It is ETG who wishes to confuse the jury by trying to omit reference numeral "96." Identifying the speech detector means as speech detector 96 serves the purpose of meeting the requirements of 35 U.S.C. § 112, ¶ 6 by identifying the corresponding structure in the specification—a purpose that ETG's proposed construction fails to accomplish.

### 7. Programmable Signal Limiter Means ('850 Patent, Claim 1)

In an ironic twist, ETG cites *too much* structure for the programmable signal limiter means of claim 1 of the '850 patent. ETG correctly identifies the programmable limiter 67 as corresponding structure that is linked to the function of this limitation. (ETG Br. 17.) ETG proposes additional structure, however, that is completely unrelated to the claimed function, namely, a "programmable compression amplifier." (ETG Br. 17-18.) Neither the '850 patent specification nor the prosecution history links a programmable compression amplifier to the

31

recited function.  ETG is trying to shoehorn this unlinked structure into the construction of the

programmable signal limiter means so that ETG can later capture completely unrelated accused

structure within this limitation during the infringement phase of this case.

To accomplish this result, ETG's proposed construction for the "programmable signal

limiter means" improperly adds the alternative function of "reducing" that finds no support in the

claim language.  Claim 1 recites the function of "limiting" the signal, not "reducing" it.  The

concepts are different.  Limiting a signal prevents the signal's amplitude *from exceeding* some

maximum level.[17]  The '850 patent employs this limiting function "so that sounds amplified by

the hearing aid *never exceed* the patient's loudness discomfort *level*."  (7:21-30) (emphases

added).  On the other hand, reducing a signal requires subtraction such that the signal *is lowered*.

Preventing a signal from increasing any further is not the same as actively lowering that signal.

The only structure disclosed in the patent that is described as performing the "limiting"

function is the amplitude limiter 67.  Therefore, as a matter of law, the only structure clearly

linked to the "limiting" function is the amplitude limiter 67.  ETG adds a "reducing" function so

it can argue that the corresponding structure also includes a programmable compression

amplifier.  (ETG Br. 17.)

The specification mentions a programmable compression amplifier only once, and that

reference concerns the unrelated function of adjusting the hearing aid frequency response at

different speech levels.  (11:32-38.)  The specification passage ETG cites has nothing to do with

limiting the signal.  (*Id.*)  Moreover, none of the figures show a programmable compression

amplifier.

---

[17] A demonstration of a feedback path is shown in Exhibit 1 at section 4(b).

The prosecution history also does not support ETG's misguided attempt to capture a programmable compression amplifier within the meaning of programmable signal limiter means. The portion of the prosecution history that ETG cites explicitly describes a "limiter" (e.g., programmable limiter 67). (ETG Br. 17-18.) It does not mention a programmable compression amplifier. (*Id.*)

ETG's reliance on the understanding of one of ordinary skill in the art is equally unpersuasive. (ETG Br. 18.) Other than the unrelated specification passage discussed above, ETG cites no evidence whatsoever to support its view of what one of ordinary skill in the art would understand. (*Id.*) ETG's attempt to include a programmable compression amplifier within the programmable signal limiter means is improper and should be rejected.

### 8.  Means For Adjusting The Amplitude And Phase Characteristics ('850 Patent, Claim 17)

With respect to claim 17 of the '850 patent, the parties agree that the function of the "means for adjusting" limitation is "adjusting the amplitude and phase characteristics of each of [the input] microphone channels." The parties dispute, however, the structure corresponding to the claimed function. Defendants identify the corresponding structure as amplifiers 157 and 158, and RAM 77, and ETG argues for a generic structure of "amplifiers and processing elements."

Amplifiers 157 and 158 are structures that correspond to the recited function because "the gain and phase characteristics of each . . . is programmable." (11:24-27.) ETG notes that RAM 77 is also required to allow amplifiers 157 and 158 to perform the required function:

> The specification defines how amplitude and phase characteristics are adjusted for each input channel. . . . As explained, 'A typical configuration is shown in FIG. 5 as comprising the microphones 155 and 156 supplying inputs to **amplifiers 157 and 158, the gain and phase characteristics of each of which is programmable from the RAM 77 in the hearing aid**'. . . . After examining the specification, one of ordinary skill in the art at the time of filing would understand that the programmed inputs from memory

33

> [RAM 77] allow the 'amplifiers' [157 and 158] to achieve the
> recited function.

(ETG Br. 27).  Defendants concede that RAM 77, along with amplifiers 157 and 158, are

required to perform the recited function and thus modify Defendants' proposed construction to

include RAM 77 as corresponding structure.

Amplifiers 157 and 158 should be identified with their reference characters rather than

the broad, generic characterizations proposed by ETG.  ETG argues that Defendants' reference

to the specific structure set out in the figures should be rejected.  But ETG does not suggest any

alternative construction that clearly identifies corresponding structure in the specification.

ETG's generic identification of "amplifiers" is ambiguous and would lead to confusion because

the specification identifies at least five amplifiers other than amplifiers 158 and 159 (amplifiers

32, 38, 60, 119, and 157), none of which are disclosed as being capable of adjusting both

amplitude and phase.  Thus, the general term "amplifiers" covers structures that do not

correspond to the recited function.

RAM 77 should also be identified using its reference character.  ETG appears to use the

phrase "processing elements" to cover RAM 77.  But the phrase "processing elements" does not

appear in the specification and therefore cannot be a corresponding structure from the

specification.

### 9.    Means For Summing ('850 Patent, Claim 17)

With respect to the "means for summing" limitation of claim 17, the parties agree that the

function is "summing the outputs of said microphone channels."  The parties, however, dispute

the structure corresponding to the claimed function.  Defendants identify the corresponding

structure as summing amplifier 159, and ETG argues for a generic structure of "summing

circuits."

While ETG agrees that "in one embodiment a 'summing amplifier' would satisfy the claim function," it goes on to argue for a broader description of structure beyond summing amplifier 159. ETG argues that:

> Other embodiments, however, dictate that the Court's interpretation of the structure should be somewhat broader than just the summing amplifier . . . . Nothing in the specification prevents the circuit (AGC) alone or in connection with "summing amplifier 60" from performing the function of "summing the outputs of the input microphone channels," as described in the specification. Accordingly, the proper interpretation should be: "summing circuits and structural equivalents thereof."

(ETG Br. 27-28.) ETG's argument has no basis in the law. The test for corresponding structure is not whether the "specification prevents [the structure] from performing the function." The test is whether the specification "clearly links or associates that structure to the function recited in the claim." *B. Braun Med., Inc. v. Abbott Labs.,* 124 F.3d 1419, 1424 (Fed. Cir. 1997). Although the specification does not prevent summing amplifier 60 from performing the recited function, the specification does not link the summing amplifier to the function. Thus, summing amplifier 60 is not structure that corresponds to the recited function.

ETG's generic identification of "summing circuits" is ambiguous and would lead to confusion because the only two summing circuits identified by the specification (summing circuits 78a and 149) are not disclosed as being capable of performing the recited function. Indeed, each of summing circuits 78a and 149 include only a single input and do not appear to be capable of summing the outputs of multiple microphone channels. (5:23-27; 10:67-11:3; Figs. 2, 4.)

### 10. The Means-Plus-Function Limitations Of The '749 Patent

#### a. ETG Omits Important Functional Language

For two of the '749 patent means-plus-function limitations, ETG improperly omits crucial functional language from the claims. In claim 1, ETG eliminates the phrase "produce a

null summation" from the function of the limitation, "means controlled by the computer for adjusting the phase and amplitude necessary to eliminate acoustic feedback and ***produce a null summation***." ('749 Patent at 12:18-21; ETG Br. 34.)

In claim 2, ETG omits the phrase "eliminate acoustic feedback" from the limitation "means controlled by the computer for transmitting phase shift and amplitude data to program the hearing aid ***to eliminate acoustic feedback***."[18] ('749 Patent at 12:23-25; ETG Br. 35.)

ETG's attempt to read these two phrases out of the claims is improper and should be rejected. Defendants' proposed constructions and supporting evidence for the functions of the individual means elements for the '749 patent claims are set forth in their opening brief. (Defs. Br. 49-56.)

### b. The Specification Passages ETG Cites Support Defendants' Proposed Structure

For each of the '749 patent means-plus-function limitations, ETG cites a portion of the patent specification to support its proposed structure. (ETG Br. 32-39.) None of these passages describe the generalized "circuits," "processing elements," "circuitry," or "combined circuitry" that ETG suggests as the corresponding structure for these means-plus-function limitations.[19]

To the contrary, every passage ETG cites supports Defendants' proposed structure. For example, ETG cites column 4, lines 8-13, of the specification to support its proposed structure for the "means for receiving signals from the hearing aid and measuring phase and amplitude,"

---

[18] ETG argues that the phrase "produce a null summation" is not part of the claimed function for this limitation. (ETG Br. 35.) Defendants agree and have never asserted that this phrase is part of this claimed function.

[19] In alleged support of its proposed means-plus function interpretations, ETG makes repeated and conclusory reference to what "one of ordinary skill in the art would understand." (ETG Br. 32-39.) Yet ETG offers no ***evidence*** whatsoever to support its version of what one of ordinary skill would understand. These contentions are nothing more than attorney argument.

as recited in claim 1.  (ETG Br. 32.)  This section of the specification actually tracks Defendants'

proposed structure:

> "*[A] digital phase shifter 30*" is "adapted to receive the output voltage of the hearing aid
> through a connector 31 and a *programmable gain amplifier 32*, the gain of which is
> controllable by the computer 24 through the *latch 33*."

('749 Patent at 4:8-13) (emphases added).

In another example, ETG cites column 4, lines 20-26, to support its proposed structure

for the "means for receiving signals from the hearing aid indicative of the summation of acoustic

feedback and acoustic feedback cancellation signals," as recited in claim 1.  (ETG Br. 33.)

Again, this passage from the specification describes the corresponding structure Defendants have

proposed:

> [T]he summed acoustic and electrical *feedback* voltages from the hearing aid "are
> supplied from the *terminal 34* through . . . a *switch 37*, a *programmable gain amplifier
> 38*, a *rectifier 39* and an *analog to digital (A/D) converter 40* to the computer 24."

('749 Patent at 4:20-26) (emphases added).

This pattern of describing Defendants' proposed structure is found in every specification

passage ETG cites for the means-plus-function limitations of the '749 patent.  (ETG Br. 35

(citing '749 Patent at 4:26-30), 36 (citing '749 Patent at 4:38-44), 37 (citing '749 Patent at 4:26-

30 and 4:38-44), 39 (citing '749 Patent at 4:26-30).)

ETG contends that much of the corresponding structure Defendants propose is not

required to perform the claimed functions (ETG Br. 32-39), but this is incorrect.  Fig. 1 and the

'749 specification specifically disclose Defendants' proposed structure for the purpose of

performing the claimed functions.  Defendants' proposed constructions of these means-plus-

function limitations include only the structure necessary to perform the function as described in

the '749 patent.

Fundamentally, ETG's proposed constructions are an attempt to rewrite the claims so that the "host controller" does not have to be separate from the hearing aid. As discussed in Defendants' Opening Brief, this is clear from ETG's proposed constructions of such limitations as "means for receiving signals," "means controllable by a computer," and "computer controlled means." ETG's proposed constructions are inconsistent with the plain meaning of the '749 patent specification and the language of the claims themselves.

## VI.   INDEFINITENESS

During the meet and confer discussions with ETG, Defendants informed ETG that they believe that "substantial" in claims 9, 10, and 19, the first step in the method claims and "equalize" in claims 13 and 14, and "signal-dependent amplifier" of claim 18 are indefinite. ETG has never provided a claim construction for these terms. Instead, ETG takes the implausible position that these terms do not need to be construed.

ETG's inability to provide claim constructions demonstrates that these terms, and thus claims 9, 10, 13, 14, 18, and 19, are indefinite. ETG long since had an opportunity to present constructions, but deliberately failed to do so. Defendants respectfully request that the Court find these claims invalid at this time.

## VII.   CONCLUSION

ETG's proposed claim constructions ignore the binding concessions made to the Patent Office, ignore the requirements of the patent statute and the claim construction rules established by the Federal Circuit, and would not help the jurors understand the issues they must deal with. This Court must not permit ETG to blatantly disregard these claim construction requirements. Accordingly, Defendants respectfully ask this Court to reject ETG's proposed claim constructions in their entirety and to adopt the claim constructions proposed by Defendants.

| | |
|---|---|
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br><br>*/s/ Jack B. Blumenfeld*<br>_____<br>Jack B. Blumenfeld (#1014)<br>Maryellen Noreika (#3208)<br>1201 North Market Street<br>Wilmington, DE 19801<br>(302) 658-9200<br> *Attorneys for Defendants GN Resound A/S*<br>  *and GN Hearing Care Corporation*<br><br>OF COUNSEL:<br><br>ROPES & GRAY LLP<br>Kenneth B. Herman<br>Eric R. Hubbard<br>William J. McCabe<br>1211 Avenue of the Americas<br>New York, NY 10036-8704<br>(212) 596-9020 | MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br><br>*/s/ Thomas C. Grimm*<br>_____<br>Thomas C. Grimm (#1098)<br>Leslie A. Polizoti (#4299)<br>1201 North Market Street<br>Wilmington, DE 19801<br>(302) 658-9200<br> *Attorneys for Defendants Phonak AG,*<br>  *Phonak Inc., Phonak LLC, Unitron Hearing*<br>  *Ltd. and Unitron Hearing, Inc.*<br><br>OF COUNSEL:<br><br>BRINKS HOFER GILSON & LIONE<br>James R. Sobieraj<br>Meredith Martin Addy<br>Charles M. McMahon<br>David H. Bluestone<br>Jeffrey A. Marx<br>NBC Tower, Suite 3600<br>455 North Cityfront Plaza Drive<br>Chicago, IL 60611-5599<br>(312) 321-4200 |
| WOLF, BLOCK, SCHORR AND<br>  SOLIS-COHEN LLP<br><br>*/s/ Barry M. Klayman*<br>_____<br>Barry M. Klayman (#3676)<br>Wilmington Trust Center<br>1100 North Market Street, Suite 1001<br>Wilmington, DE 19801<br>(302) 777-0313<br> *Attorneys for Defendants Resistance*<br>  *Technology, Inc.*<br><br>OF COUNSEL:<br><br>SHEWCHUK IP SERVICES, LLP<br>Jeffrey D. Shewchuk<br>533 77th Street West<br>Eagan MN 55121<br>(651) 785-6007 | POTTER ANDERSON & CORROON, LLP<br><br>*/s/ Richard L. Horwitz*<br>_____<br>Richard L. Horwitz (#2246)<br>David Ellis Moore (#3983)<br>1313 N. Market Street<br>Hercules Plaza, 6th Floor<br>Wilmington, DE 19801<br>(302) 984-6027<br> *Attorneys for Defendant*<br>  *Sonic Innovations Inc.*<br><br>OF COUNSEL:<br><br>HOLLAND AND HART LLP<br>Brett L. Foster<br>L. Grant Foster<br>Bryan K. Hanks<br>60 E. South Temple Suite 2000<br>Salt Lake City, UT 84111-1031<br>(801) 595-7836 |

| | |
|---|---|
| MORRIS JAMES LLP | CONNOLLY BOVE LODGE & HUTZ LLP |
| */s/ Mary B. Matterer* | */s/ James D. Heisman* |
| _____ | _____ |
| Mary B. Matterer (#2696)<br>Amy A. Quinlan (#3021)<br>500 Delaware Avenue, Suite 1500<br>Wilmington, DE  19801<br>(302) 888-6960<br>  *Attorneys for Defendant*<br>  *Starkey Laboratories, Inc.* | James D. Heisman (#2746)<br>1007 North Orange Street<br>Wilmington, DE  19801<br>(302) 658-9141<br>  *Attorneys for Defendants William Demant*<br>  *Holding A/S, WDH, Inc., Oticon A/S,*<br>  *Oticon Inc., Bernafon AG, and Bernafon,*<br>  *LLC* |
| OF COUNSEL: | OF COUNSEL: |
| BOWMAN AND BROOKE LLP<br>Steven L. Reitenour<br>Richard G. Morgan<br>150 South Fifth Street<br>Suite 3000<br>Minneapolis, MN  55402<br>(612) 339-8682 | FINNEGAN, HENDERSON, FARABOW,<br>GARRETT & DUNNER LLP<br>John M. Romary<br>C. Gregory Gramenopoulos<br>901 New York Avenue, NW<br>Washington, DC  20001-4413<br>(202) 408-4000 |
| MORRIS, NICHOLS, ARSHT & TUNNELL LLP | |
| */s/ Donald E. Reid* | |
| _____ | |
| Donald E. Reid (#1058)<br>Jason A. Cincilla (#4232)<br>1201 North Market Street<br>Wilmington, DE  19801<br>(302) 658-9200<br>  *Attorneys for Defendants Widex AS and*<br>  *Widex Hearing Aid Co.* | |
| OF COUNSEL: | |
| SUGHRUE MION PLC<br>William H. Mandir<br>David J. Cushing<br>Carl J. Pellegrini<br>2100 Pennsylvania Ave., N.W.<br>Washington, DC  20037<br>(202) 293-7060 | |

June 6, 2007

## CERTIFICATE OF SERVICE

I, Thomas C. Grimm, hereby certify that on the 6th day of June, 2007, a copy of

**Defendants' Response to ETG's Opening Markman Brief** was electronically filed with the Clerk

of the Court using CM/ECF, which will send electronic notification of such filing to all counsel of

record.  Additionally, a copy was also served as indicated below:

### BY HAND DELIVERY:

Edmond D. Johnson, Esquire
Pepper Hamilton LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE  19801


*/s/ Thomas C. Grimm*
_____
Thomas C. Grimm (#1098)