IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-422 (GMS) |
| | ) | |
| SONIC INNOVATIONS, INC., et al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

PLAINTIFF ENERGY TRANSPORTATION GROUP INC.'S RESPONSE BRIEF IN
SUPPORT OF ITS PROPOSED CLAIM CONSTRUCTION

Edmond D. Johnson (No. 2257)

PEPPER HAMILTON
Hercules Plaza Suite 5100
1313 Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6539
Facsimile: (302) 658-6395

Attorneys for Energy Transportation Group, Inc.

OF COUNSEL:

Marty Steinberg
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460

Brian M. Buroker
Robert L. Kinder, Jr.
HUNTON & WILLIAMS LLP
1900 K Street, N.W.; Suite 1200
Washington, DC 20006-1109
Telephone: (202) 955-1500
Facsimile: (202) 778-2201

Dated June 6, 2007

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone:  (804) 788-8788
Facsimile:  (804) 343-4630

## TABLE OF CONTENTS

Page

I.   INTRODUCTION ..................................................................................................1

    A.   Background..................................................................................................2

    B.   The Patents In Suit......................................................................................4

    C.   Defendants' Improper Miniaturization Theory ...........................................6

II.  INNOVATIONS INVOLVING FEEDBACK REDUCTION ...........................9

    A.   Reduction of Acoustic Feedback by Using a Programmable Filter -
        Claims 9, 10, and 19 of the '850 Patent.................................................12

        1.   "Programmable Delay Line Filter" Means "A Filter Employing One or
            More Delays and Coefficients, The Value(s) Of At Least One Delay Or
            Coefficient Can Be Programmed".........................................................13

            a.   Recursive Filtering Is Within the Scope of the Claimed Filter .....13

            b.   The "Programmable Delay Line Filter" Is One Claim Term, Not
            Two ........................................................................................15

            c.   The Claims Do Not Require Externally Calculated And Fixed
            Coefficients.............................................................................15

        2.   "Programmed" Means "Provided With One or More Values So As To
            Produce A Response" ..........................................................................17

        3.   "Feedback Path" and "Forward Path" Should Be Given Their Ordinary
            and Customary Meaning.......................................................................18

        4.   "Substantial Reduction" And "Equalize and Reduce" Are Definite Terms
            in the Hearing Aid Art .........................................................................19

    B.   "Host Controller" Means "A Processor For Controlling Operations Of A Device"
        - Claims 1-6 of the '749 Patent..............................................................21

        1.   The Host Controller is Wearable..........................................................23

        2.   The Host Controller is Interfaced With the Hearing Aid ......................25

    C.   Methods of Reducing Feedback - Claims 13-16 of the '850 Patent.....................27

1.     "Determining" Should Be Afforded Its Plain and Ordinary Meaning ......27

2.     "As a Function of Frequency" Should Be Afforded Its Plain and Ordinary Meaning ..................................................................................28

3.     "Inserting Between the Input and Output of Said Transmission Channel an Electrical Feedback Path Having a Filter" (Claim 13) and "Inserting Between The Input And Output of Said Transmission Channel a Programmable Filter" (Claim 14) ............................................................30

4.     "Filter Therein Programmed" ..................................................................30

5.     The Steps Need Not Be Performed In Order - Claims 13 and 14 of the '850 Patent ..................................................................................33

III.     INNOVATIONS BASED UPON SPEECH TO NOISE DETERMINATIONS - CLAIMS 5 AND 6 OF THE '850 PATENT ..................................................36

A.     "Means Controllable To Impart Different Response Characteristics To Said Hearing Aid" - Claim 5 of the '850 Patent ..............................................36

B.     "Controlling Means Responsive To The Level Of Speech Signals In Said Transmission Channel In Excess Of The Level Of Noise Signals In Said Channel For Automatically Controlling Said Controllable Means" - Claim 5 of the '850 Patent ..................................................................................39

C.     "Speech Detector Means For Determining When Speech Signals Are in Said Transmission Channel" - Claim 6 of the '850 Patent ..............................42

D.     "A Plurality Of Bandpass Filter Means For Determining The Noise Frequency Spectrum In Said Transmission Channel" - Claim 6 of the '850 Patent ...............42

E.     "A Plurality of Comparator Means . . . For Indicating Whether The Speech Level In Each Said Bandpass Filter Exceeds The Noise Level Therein And For Actuating Said Controlling Means To Impart To The Hearing Aid A Response Characteristic" - Claim 6 of the '850 Patent ..............................................43

IV.     DIGITAL HEARING INNOVATIONS FOR IMPROVED HEARING ...........................44

A.     Programmable Filter to Impart A Response Characteristic - Claims 1-3 of the '850 Patent ..................................................................................44

1.     "Programmable Signal Limiter Means" - Claim 1 of the '850 Patent .......44

2.     "Memory Means," "Means . . . For Providing An Output," and "Means For Converting Analog Signals . . ." - Claims 2 and 3 of the '850 Patent ..................................................................................46

ii

B.   Dual Microphone Channels with a Programmable Filter - Claim 17 of the '850 Patent ..................................................................................................48

1.   "Means For Adjusting The Amplitude And Phase Characteristics Of Each Of Said Microphone Channels"........................................................48

2.   "Means For Summing The Outputs Of Said Microphone Channels" .......49

C.   Use of a Signal-Level Dependent Amplifier to Impart a Response Characteristic - Claim 18 of the '850 Patent .........................................................49

1.   "Responsive Characteristic Effective To Compensate For Impaired Hearing Of The Wearer Of The Aid" Should Be Given Its Ordinary and Customary Meaning ................................................................................49

D.   Additional Host Controller Functionality - Claims 1-6 of the '749 Patent ...........50

1.   Defendants' Identification of Function is Improper ...................................50

2.   Defendants' Identification of Structure is Improper..................................55

V.   CONCLUSION .................................................................................................58

# TABLE OF AUTHORITIES

**CASES**                                                                          **Page**

*Advanced Cardiovascular Systems v. Scimed Life Systems,*
    96 F. Supp.2d 1006 (N.D. Cal 2000) ................................................................. 20

*Altiris, Inc. v. Symantec Corp.,*
    318 F.3d 1363 (Fed. Cir. 2003) ....................................................................... 33

*Asyst Tech., Inc. v. Empak, Inc.,*
    268 F.3d 1364 (Fed. Cir. 2001) ....................................................................... 57

*Bendix Corp. v. United States,*
    600 F.2d 1364 (Ct. Cl. 1979) ........................................................................... 7

*E-Pass Technologies, Inc. v. 3Com Corporation,*
    343 F.2d 1364 (Fed. Cir. 2003) .................................................................. 6, 12

*Ecolab, Inc. v. Envirochem, Inc.,*
    264 F.3d 1358 (Fed. Cir. 2001) ....................................................................... 20

*Eaton Corp. v. Rockwell International Corp.,*
    323 F.3d 1332 (Fed. Cir. 2003) ....................................................................... 35

*Exxon Research & Eng. 'g Co. v. United States*
    265 F.3d 1371 (Fed. Cir. 2001) ....................................................................... 20

*General Electric Co. v. Nintendo Co., Ltd.,*
    179 F.3d 1350 (Fed. Cir. 1999) ....................................................................... 58

*IMS Technology, Inc. v. Haas Automation, Inc.,*
    206 F.3d 1422 (Fed. Cir. 2000) ....................................................................... 37

*Interactive Gift Exp., Inc. v. Compuserve Inc.,*
    256 F.3d 1323 (Fed. Cir. 2001) ....................................................................... 36

*JVW Enterprises, Inc. v. Interact Accessories, Inc.,*
    424 F.3d 1324 (Fed. Cir. 2005) ....................................................................... 38

*Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.,*
    301 F. Supp. 2d 970 (S.D. Iowa 2004), *modified order on claim construction,* 319 F.
    Supp.2d 939 (S.D. Iowa 2004) ....................................................................... 26

*Leighton Techs. LLC v. Oberthur Card System, S.A.,*
    358 F. Supp. 2d 361 (S.D.N.Y 2005) ............................................................... 33

*Lockheed Martin Corp. v. Space Systems/Loral, Inc.,*
    324 F.3d 1308 (Fed. Cir. 2003) ...................................................................................40

*Loral Fairchild Corp. v. Sony Elects. Corps.,*
    181 F.3d 1313 (Fed. Cir. 1999) ...................................................................................36

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995) ................................................................................22, 48,

*Micro Chemical, Inc. v. Great Plains Chemical Co.,*
    194 F.3d 1250 (Fed. Cir. 1999) .............................................................................40, 55

*NTP, Inc. v. Research in Motion, Ltd.,*
    418 F.3d 1282 (Fed. Cir. 2005) ...................................................................................27

*Omega Engineering, Inc. v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003) .............................................................37-39, 41, 46, 50, 57

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) .........................................................................15, 22, 38

*U.S. Surgical Corp. v. Ethicon, Inc.,*
    103 F.3d 1554 (Fed. Cir. 1997) ...................................................................................28

*Wenger Manufacturing, Inc. v. Coating Machinery System, Inc.,*
    239 F.3d 1225 (Fed. Cir. 2001) ...................................................................................51

*York Products v. Central Tractor Farm & Family Ctr.,*
    99 F.3d 1568 (Fed. Cir. 1996) ...................................................................................20

## FEDERAL STATUTES

35 U.S.C. §112 .......................................................................................................37, 57

## I.    INTRODUCTION

The two patents at issue in this case, United States Patent Nos. 4,731,850 (the "'850 Patent") and 4,879,749 (the "'749 Patent") are truly pioneering patents. The claimed inventions, which concern innovative processing capabilities for digital hearing aids, were developed by Dr. Harry Levitt and a team of inventors from Audimax, a former subsidiary of Plaintiff Energy Transportation Group, Inc. The technology of Defendants' hearing aids and related products are encompassed by the claims of these patents, and Defendants know it. Which makes it understandable that Defendants would consistently attempt to limit the scope of the asserted claims of these patents in an attempt to escape infringement. Unfortunately for Defendants, however, the Federal Circuit simply does not permit the kind of claim rewriting and narrowing they propose. Claims are not limited to the specific exemplary embodiments set forth in the specification. Claims are not interpreted using extrinsic evidence that contravenes the intrinsic record where the intrinsic record so clearly indicates the meaning of the claim terms at issue. Claims are not construed in light of prototypes. But these flawed theories permeate Defendants' proposed constructions.

In contrast, ETG interprets the terms of the claims at issue in light of the intrinsic record, by using the claims themselves and the specification for the proper context. ETG respects and proposes the plain, ordinary meaning of terms where it is obvious it was the drafter's intention. And as to means-plus-function claim elements, ETG identifies corresponding structure that is **necessary** to perform the claimed function — no more, no less.

ETG's proposed claim constructions should therefore be adopted and Defendants' improperly narrowed construction rejected. Defendants should not be permitted to circumscribe the scope of the pioneering inventions described and claimed in the '850 and '749 Patents.

## A.     Background

Dr. Harry Levitt and the Audimax team of inventors are undisputably pioneers in digital hearing aids with significant innovative processing capabilities. "Hearing aids **partially** overcome the deficits associated with a hearing loss."[1] The basic technology of all active (powered) hearing aid devices is essentially similar. Differences arise in the specific sound signal processing techniques. Most modern hearing aids sold today can be described as a circuit that includes a signal transmission path beginning with a microphone and terminating with a speaker (receiver) with some intervening amplification and/or filtering circuitry. An illustrative example is shown below.[2] It is the innovative intervening circuitry that make the patents at issue unique.



**Figure 1.9** The typical location of components in an ITC and a BTE hearing aid.

At the time of invention of the claimed technology, the digital hearing aid era was in its infancy. As described by Dillon in his text on hearing aids:

As just mentioned, digital electronics first met hearing aids when the digital circuits acted as the controls for an otherwise conventional [analog] hearing aid. The real revolution came when the sound waveform itself was converted to a series of

---

[1]Harvey Dillon, *Hearing Aids* 1 (2001). (JA-0319)
[2]Dillon, p.11. (JA-0322)

> numbers and manipulated using digital circuits.
> . . .
> [I]t was not until the 1980s that power consumption and size were decreased
> sufficiently to make a wearable hearing aid.
>
> Because the first digital aid was a body aid and did essentially the same things to
> sound as ear-level analog hearing aids, it was not a commercial success and quickly
> ceased to be available. Finally, in 1996, fully digital BTE, ITE and ITC hearing aids
> became commercially available. . . . Some excellent reviews of the development
> (and future!) of digital hearing aids have been written by Levitt (1987, 1997).

Dillon, p.16-17 (citations omitted). (JA-0325-0326)

Recognizing the potential impact that digital signal processing could have on the

development of advanced hearing aids, Audimax, ETG's predecessor, brought together a team of

top industry professionals. In 1984, Dr. C. Y. Chen, who chaired Audimax, engaged Dr. Harry

Levitt, a world leader in audiology research, to try to solve a major problem in the hearing

industry — an effective all-digital hearing aid system. Teamed with a top engineer, Richard

Dugot, and a circuit designer, Kenneth Kopper, this effort resulted in the development of the

proprietary programmable digital hearing aid technology at issue in this infringement action. As

a result, many recognize Dr. Levitt as the father of the modern digital hearing aid.[3]

By May of 1985, the Levitt team had developed a complete design and a "bread-board"

---

[3] Dr. Levitt has long been regarded by the entire hearing aid industry as "a renowned pioneer in the
creation of devices and systems to help people with hearing loss. He created a model for the world's first
digital hearing aid and has developed advanced methods for filtering out background noise in audio
perception technology." (JA-0331-0333) (Press Release for 1999 Mayor's Award (NYC) for Excellence
in Science and Technology presented by Rudolph Giuliani). Similarly, another prestigious body
recognized that Dr. Levitt's "pioneering work in digital signal processing resulted in the development of
the **first digital hearing aid** reported in his 1982 paper *An array-processor computer hearing aid*." (JA-
0344-0345) (2006 James Jerger Career Award for Research in Audiology presented by The American
Academy of Audiology) (emphasis added). Dr. Levitt's awards, recognitions and contributions are far
too numerous to begin to capture, but the irony should not be missed that prior to the filing of this lawsuit
the entire hearing aid industry, including the Defendants to this action, recognized Dr. Levitt's
innovations as pioneering in the development of an all digital programmable hearing aid.

prototype.[4]  Given the state of chip and circuit development at the time, a bread-board prototype was used to test the operability of the patented technology instead of building a device that would fit on the ear or behind the ear.  Nevertheless, the patent claims cover the concept of what the structure is doing and how it interacts within a programmable digital framework, regardless of the size or physical location of the structure.  The claims focus on what happens inside the intervening process "box" and not the size of the box.

Defendants emphasize quotes from deposition testimony of the inventors that relates to "prototype" systems to point out the obvious - circuits and power sources were bigger in the 1980s than they are today.  Defendants do this in an improper attempt to use size to limit the scope of the claimed inventions.  However, that limitation does not exist.

**B.    The Patents In Suit**

The concepts developed by Audimax for novel digital hearing aid processing became the subject of a patent application entitled "Programmable Digital Hearing Aid System," filed on June 26, 1986.  This application matured into the '850 Patent on March 15, 1988.  Other claims directed toward a "Host Controller For Programmable Digital Hearing Aid System" were separated into a divisional patent application that issued as the '749 Patent on November 7, 1989.

The currently asserted claims of the '850 Patent (claims 1, 5, 6, 9, 10, 13-19) and '749 Patent (claims 1-6) are directed to various aspects of a programmable adaptive digital hearing aid, the features and functions of which may be categorized as:  (1) Innovations Involving Feedback Reduction; (2) Innovations Based Upon Speech and Noise Determinations; and (3) Digital Hearing Innovations for Improved Hearing.  While the claims each have a unique set of limitations and scope, the inventions of the patents in suit may generally be broken down within

---

[4] "Bread-board" is a type of test equipment that allows chips to be "plugged in" and moved around easily without soldering.

theses 3 categories into the following "invention" concepts:

(1) Innovations Involving Feedback Reduction:

- Reduction of Acoustic Feedback by Using a Programmable Filter (Claims 9, 10 and 19 of the '850 Patent)

- Host Controller For Providing Feeback Coefficients (Claims 1-6 of the '749 Patent)

- Methods of Reducing Feedback (Claims 13-16 of the '850 Patent)

(2) Innovations Based Upon Speech and Noise Determinations

- Hearing Improvement Based Upon Speech to Noise Determinations (Claims 5-6 of the '850 Patent)

(3) Digital Hearing Innovations for Improved Hearing

- Use of a Programmable Filter to Impart a Response Characteristic to Effect Automatic Adjustment of the Optimum Parameter Values Such as the Speech Level, Room Echo and Type of Background Noise Changes (Claims 1, 2 and 3 of the '850 Patent)

- Dual Microphone Channels With a Programmable Filter Where the Amplitude and Phase Characteristics of Each Microphone Channel are Adjusted to Achieve Optimum Results (Claim 17 of the '850 Patent)

- Use of a Signal-Level Dependent Amplifier to Impart a Response Characteristic to Effect Automatic Adjustment of the Optimum Parameter Values Such as the Speech Level, Room Echo and Type of Background Noise Changes (Claim 18 of the '850 Patent)

The patent claims do **not** address and have no limitation based on: (i) the size of the hearing aid, (ii) the size of the battery needed to operate the hearing aid and/or host controller, (iii) the size of the chips, (iv) the location of the host controller, nor (v) the size of the host controller that serves to program the hearing aid.

The '749 Patent is directed to a host controller for a programmable digital hearing aid. The host controller developed by the inventors serves as a catalyst in the programming of the hearing aid to achieve optimum hearing results and reduction of acoustic feedback. As described in the specification, "the hearing aid is interfaced with the host controller" for "hearing parameter selection and programming." '749 Patent, 8:25-29. The only physical requirement

5

between the hearing aid and the host controller is that the two devices must be "interfaced" in some manner. One such example is through an electric cable connection, however, the dimensions of that connection are not described. *See id.*, 6:59-60 ("The hearing aid is connected to the host controller by an electrical cable (not shown), thereby placing it directly under the control of the host controller."). Accordingly, there is no limitation described within the specification as to the size and physical location of the host controller. In fact, Dr. Levitt anticipated that as power sources became more efficient and chips became smaller - all of these functions could be placed in a wearable hearing aid. Levitt Dep. Tr. at 118:3-14. (" . . . bear in mind that with modern technology that host controller, given that nice name, could really fit in with the electronics of the regular hearing aid.") (JA-0367)

### C.    Defendants' Improper Miniaturization Theory

Now, in an apparent attempt to avoid giving any recognition to the team of Audimax inventors, and to avoid the obvious monetary burden of their willful infringement, Defendants are left trying to narrow the scope of the patent claims based upon a "miniaturization" theory. The foundational premise of this theory is flawed. Factually, the claims themselves do not cover size or spatial relationships. Instead, the claims of these pioneering patents cover digital signal processing techniques never before executed in digital hearing aids. The fact that the entire industry was unable to solve the "power consumption" or miniaturization problems associated with the claimed processing techniques until the late 1990s is further testament to the revolutionary and pioneering nature of the claimed inventions. Legally, any attempt to define the claims in a way to create an exclusion for devices that may happen to be smaller or miniaturized due to technological advances or increased sophistication would be improper. *See E-Pass Technologies, Inc. v. 3Com Corporation*, 343 F.2d 1364, 1369 (Fed. Cir. 2003) (reversing a claim interpretation that imposed size limitations to the term "card" based on a "description of

the early technology" in the patent application); *Bendix Corp. v. United States*, 600 F.2d 1364, 1382 (Ct. Cl. 1979) ("The mere fact that the accused controls may be more sophisticated in sensing variations in mass air flow by sensing compressor discharge pressure (pressure of the air flowing 'to the burner') as a controlling reference signal does not allow the accused controls to escape the web of infringement.").

Defendants seek to exclude any products that have benefited from "miniaturization" due to advances in the chip and battery industry and to limit claim scope to the exact pictures of some of the Patent Figures, while ignoring others. Defendants' end-game is obvious based on their questioning of witnesses thus far. Defendants wish to characterize the inventions as requiring an external programming device that cannot fit into a hearing aid and a hearing aid that relies on fixed adjustments previously programmed into the hearing aid by the external program. Defendants thus hope to avoid the claims by relying on advances in miniaturization of computer chips and power source technology made by others and simply adapted by Defendants - allowing for smaller parts to be placed in the hearing aid itself. Thus, Defendants rely on technology and advancements they had nothing to do with to attempt to narrow the scope of the various patent claims. But miniaturization of circuitry and advance in power sources have nothing whatsoever to do with the patented concepts. These advances apply to every product from computers to cellular phones that have shrunk since the 1980s - but this is not a valid reason for narrowing the scope of the claims of these patents. Defendants' approach focuses the Court on a slew of extrinsic evidence discussing pre-filing "prototype" bread-boards and host controllers developed by the Audimax team in an effort to test and then later attempt to commercialize the technology of the patents in suit. In contrast, focus on the claims and the teachings of patent specifications points to a much clearer picture of the tremendous pioneering nature of the Audimax team's

work. While today's modern hearing aids may be smaller than the examples Audimax was able to build in 1985, they employ the fundamental innovations encompassed by the claims when interpreted in light of the specification.

In an attempt to find support for limiting the claimed inventions, Defendants ironically rely upon several articles and patents by Dr. James Kates. Defendants, however, fail to mention that Dr. Kates is a Senior Research Engineer for Defendant GN ReSound. (JA-0368) Further, based upon Dr. Kates' own works, he used Dr. Levitt's inventions from the patents in suit as a springboard for the further development of digital hearing aids, including advanced systems for feedback cancellation. In June 2001, for example, Dr. Levitt was honored in a Special Session at the 141st Meeting of the Acoustical Society of America. As part of the tribute to the life long work and contributions in hearing aid improvements of Dr. Levitt, several prominent persons in the industry submitted papers that, *inter alia*, gave recognition to Dr. Levitt for his work. One such paper, **submitted by Dr. Kates**, dealt with Dr. Levitt's pioneering contributions to feedback cancellation in hearing aids. The paper, entitled "Feedback Cancellation in Hearing Aids," began with the following abstract:

> Harry Levitt was an early advocate of digital signal processing for hearing aids. His interest included not only algorithms for compression and speech enhancement, but also more practical issues such as obtaining the desired hearing aid versus frequency response at the ear drum. Acoustic feedback is one problem that can limit the maximum gain possible in a hearing aid. Feedback cancellation, in which the acoustic feedback signal is estimated and subtracted from the microphone input, allows for greater hearing-aid signal amplification, and feedback cancellation was included in the work that Harry supported in his research group.

J. Acoust. Soc. Am. 109, 2355 (2001), (Abstract). (JA-0337)

Dr. Kates, along with Defendants, recognize that Dr. Levitt was the first to invent feedback cancellation by estimating "the acoustic feedback signal" and then "subtract[ing it] from the microphone input" in a digital hearing aid. *Id.* Thus, not only have Defendants been

8

aware for years of the contributions that Dr. Levitt has made, including the patents in suit,[5] but the entire hearing aid industry has also used Dr. Levitt's work in feedback cancellation **as a blueprint** for the development of their commercial products.

## II.    INNOVATIONS INVOLVING FEEDBACK REDUCTION

As recognized by the Defendants, feedback in hearing aids has been one of the greatest obstacles to commercial implementation.  Sometimes referred to as "feedback oscillation," or "whistling," feedback has long been recognized as a primary reason many patients are unable to tolerate using a hearing aid.  "The term feedback literally means that some of the output of the hearing aid manages to get back to the input of the aid (i.e., it is fed back to the input)."  Dillon, at 107 (JA-0328).  After some fraction of the output "get[s] back to the input, it is amplified along with every other signal arriving at the input."  *Id*.  This results in a vicious growing cycle that results in an unbearable "whistling" or similar spike of sound.  This is graphically demonstrated by Dillon:



Forward path (gain)

Feedback path (attenuation)

**Figure 4.17** The feedback mechanism in hearing aids.

*Id.* at 108 (JA-0329).  Along with the painful "whistling" effect, disgruntled hearing aid users complain about distorted sound and problems with speech understanding because of feedback.

Recognizing feedback elimination as one of the critical problems for hearing aid users,

---

[5] For example, over 75 other United States Patents cite or include reference to the patents in suit. JA0349-55.  Many of these patents are owned by Defendants in this action.

9

Audimax, through its pioneering team led by Dr. Levitt, began the task of integrating new digital filtering capabilities into a hearing aid system in order to achieve a state "in which acoustic feedback is substantially reduced." '850 Patent, 2:18-22. The traditional methods of reducing feedback involved controlling "the output limits by peak clipping or compression limiting." Dillon, at 108 (JA-0329). In essence, this method involved chopping the amplitude of a signal at a certain frequency where feedback occurred in order to prevent the loud whistling. As described in the '850 Patent, "[m]ethods of acoustic feedback control that are typically used include a tighter acoustic seal between the earmold and the walls of the ear canal so as to reduce acoustic leakage, placing the microphone at some distance from the hearing aid receiver, e.g. on the opposite ear, or simply reducing the gain of the hearing aid. None of these methods provides a satisfactory solution for high-gain hearing aids." '850 Patent, 1:43-50.

Traditional methods of feedback reduction through "peak clipping or compression limiting" produced, for example, great distortions of sound and loss of clarity at particular frequency ranges. The Audimax team, thus, approached the problem in a unique way. Specifically, through then state-of-art digital filtering techniques, the Audimax team conceived of a method to identify the feedback path signal in terms of phase and amplitude, and then use that information to determine a replica or estimation of the electrical signal of the feedback. Then, the "electrical feedback path in the hearing aid is matched in both amplitude and phase to the acoustic feedback path and the two feedback signals are subtracted so as to cancel each other." '850 Patent, 3:3-11. At the time of the invention, no such technique had been perfected in such a manner in a digital hearing aid system. Ironically, nearly every advanced digital hearing aid system built in the past five years now incorporates this novel method developed by Dr. Levitt and his team of inventors at Audimax.

10

Claims 9, 10, 13-16, and 19 of the '850 Patent, and claims 1-6 of the '749 Patent, are directed to various novel implementations of this pioneering form of feedback cancellation. For instance, in some embodiments (e.g., Claims 10, 13, 16, and 19), the novel feedback reduction is implemented through the use of a digital programmable filter in a feedback path. While most claims are directed to apparatus or structure, Claims 13-16 distinctively claim a "method of reducing acoustic feedback." While various differences exist in the particular claims, as discussed below, the feedback reduction claims maintain several common characteristics:

(1) Within each claim relating to feedback there is no requirement that filter coefficients be "pre-programmed" or "fixed."

(2) Similarly, there is no claim limitation that requires that the coefficients (which are not in themselves claimed) must be "externally calculated." Where, and when, the filter coefficients are derived is simply not within the scope of the claims.

(3) The use of "recursive filtering" is specifically pointed out in the "Summary of the Invention" as a filtering technique within the scope of the claimed invention.

(4) The claims do not require a physical proximity or spatial relationship with a host controller device. In fact, the claims of the '850 Patent do not claim a host controller, or the technique of how filter coefficients are derived.

Defendants assert, incorrectly, that the scope of the claims of the patents-in-suit must be limited to the size and shape of a product capable of being built in the mid-1980s. Defendants go to great lengths to rely upon deposition testimony given on prototype embodiments that Audimax built to test and confirm the operability of the inventions at issue. Within the claimed inventions, Defendants also seek to impose nonexistent size and spatial limitations into the claims primarily because Defendants' commercial products have become smaller and more compact than systems of the mid-1980s. Defendants' position is erroneous and contrary to law.

Courts, including the Federal Circuit, have uniformly held that a mere change in size is insufficient to avoid infringement of a valid patent. Even if that miniaturization is the result of a technological advance, the miniaturization by itself is insufficient to save a product from infringement. For example, the Federal Circuit has reasoned that any attempt to define the

11

claims in a way to create an exclusion for devices that may happen to be smaller or miniaturized due to technological advances or increased sophistication would be improper. *See* E-Pass Tech. Inc., 343 F.2d at 1369. The court further determined that "[a]s a matter of law, subsequent improvements do not in themselves preclude a finding of infringement." *Id.*, at 1568. This is especially true here, where the advancements in miniaturization and power sources were not even the creation of Defendants, but the hard work of other persons or entities in the computer chip and battery industries.

In the instant action, Defendants base their theories of the case on this flawed legal premise, namely, that the physical size and positioning of the claimed structures is determinative. This is not the case. The scope of the claims of the patents in suit are not bound to a physical size or specific location. For instance, improvements in technology, including chip miniaturization, have now permitted a host controller to be small enough to fit inside a hearing aid. These natural, expected improvements are not sufficient to avoid infringement, especially considering that the scope of the claims are not bound to size limitations.

### A.    Reduction of Acoustic Feedback by Using a Programmable Filter - Claims 9, 10, and 19 of the '850 Patent

Claims 9, 10, and 19 are each apparatus claims relating to an embodiment of the invention that effects "substantial reduction of acoustic feedback." Each claim utilizes a "programmable delay line filter" to carry out the reduction of acoustic feedback. According to the exact language of the specification, the claimed system may incorporate either FIR filtering or "a technique known as recursive filtering," and select coefficients may be determined to impart "automatic adjustment" of the hearing aid "at any time" to achieve optimum responses.

1.    **"Programmable Delay Line Filter" Means "A Filter Employing One or More Delays and Coefficients, The Value(s) Of At Least One Delay Or Coefficient Can Be Programmed"**

| ETG's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| A filter employing one or more delays and coefficients, the value(s) of at least one delay or coefficient can be programmed. | A "delay line filter" is a non-recursive filter that operates on time-delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighted samples to provide an output having desired electro-acoustic characteristics.<br><br>A "programmable delay line filter" is a delay line filter that uses externally calculated weighting coefficients. |
| Why Defendants' Proposed Constructions are Improper | |
| <ul><li>Recursive filtering is within the scope of the claimed filter.</li><li>"Programmable delay line filter" only needs one construction, not two separate constructions.</li><li>The claims do not require externally calculated and fixed coefficients.</li></ul> | |

Along with Claim 19, the term "programmable delay line filter" is also found in Claims 1, 9, and 10. Although each claim encompasses a slightly different scope, a single interpretation of this technical claim recitation would assist the jury in its ultimate decision making.

### a. Recursive Filtering Is Within the Scope of the Claimed Filter

Defendants argue that the invention does not contemplate the use of recursive filters mainly because some of their hearing aid models utilize recursive filters. However, the specification contemplates that different filters, including a "recursive" filter, are within the meaning of "programmable delay line filter." First, and remarkably within the "Summary Of The Invention" portion of the specification, the '850 Patent describes, "[i]n one form, the programmable filter may be a digital equivalent of a tapped delay line in which each delayed sample is multiplied by a weighting coefficient." '850 Patent, 2:55-57. Just following this description, and still within the "**Summary Of The Invention**" section, the patentee further explains that, "[a]nother form of filter uses a small number of delays in which the delayed output is multiplied by a coefficient and added to the filter input so as to achieve additional delays, **a**

13

**technique known as recursive filtering**." '850 Patent, 2:67-3:2.  Clearly, the patentee contemplated recursive filters within the meaning of "programmable delay line filters."  Using recursive or FIR filters were clearly contemplated by the patent - the key was the ability to digitally program the filters to reduce or cancel feedback.

Defendants' argument that the patentee was "distinguishing" recursive filters from the filter types actually within the scope of the claims is disingenuous at best.  The "Summary Of The Invention" indicates recursive filtering is encompassed.  Every patent drafter knows that the "Summary of the Invention" section provides an overview of the invention and not what is outside the scope of the invention.  As the MPEP explicitly explains regarding the "Brief Summary of Invention:"

> A brief summary of the invention **indicating its nature and substance**, which may include a statement of the object of the invention, should precede the detailed description.  **Such summary should**, when set forth, **be commensurate with the invention as claimed and <u>any object recited should be that of the invention as claimed</u>**.

MPEP § 608.01(d) (citing 37 C.F.R. § 1.73) (emphases added).  Clearly, the description of a "recursive" filter within the "Summary Of The Invention" section of the '850 Patent means that such a filter is "commensurate with the invention as claimed."  *Id.*

Because the specification fails to support Defendants' self-serving construction, they resort to extrinsic evidence, including a diagram of a purported filter found in a secondary source.  Interestingly, Defendants offer "three necessary features" without providing any support except for this self-serving diagram of an unknown filter.  As described above, the specification fully discloses and explains how different filter embodiments would work within the scope of the claimed invention, including a recursive filter.

14

### b. The "Programmable Delay Line Filter" Is One Claim Term, Not Two

Defendants divide the single claim limitation "programmable delay line filter" into two separate claim terms, which is improper as a matter of law. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005) ("the court's focus remains on understanding how a person of ordinary skill in the art would understand the **claim terms**" (emphasis added)).  The phrase "delay line filter" is only used in the claims with the term "programmable."  Therefore, the phrase "delay line filter" is not a claim term and should not be construed.

### c. The Claims Do Not Require Externally Calculated And Fixed Coefficients

In an attempt to limit the claims to exclude clearly disclosed embodiments, Defendants claim that the coefficients must be both (i) externally calculated, and (ii) fixed.  Each of these limitations is improper and unduly restricting of the scope of the invention.  Contrary to Defendants' contentions, several embodiments of the invention contemplate "automatic adjustment" of the hearing aid "at any time" to achieve optimum response through re-determined coefficients.  '850 Patent, 5:60-62.  Further, the argument that the coefficients are static during normal operation simply does not comport with the numerous teachings of the specification that contemplate continual and "automatic adjustment" of the hearing aid parameters to achieve optimum characteristics, for example:

> (i) Automatic adjustment of the hearing aid to take into account environmental conditions such as changes in the speech level and type of background noise obtaining at any time is effected by environmental control means" '850 Patent, 5:60-62 (emphases added).

> (ii) **Automatic adjustment** of the frequency response of the hearing aid as a function of speech level may also be effected by placing the programmable filter in a feedback loop in series with a programmable compression amplifier. Since the degree of **feedback** depends on signal level, the overall frequency response also depends on signal level. *Id.*, 11:32-37 (emphases added).

15

(iii) Moreover, **by virtue of the novel means employed for effecting automatic adjustment of the programmable filter to optimum parameter values** as the speech level, room reverberation and type of background noise change **and for reducing acoustic feedback**, a superior hearing aid system of optimum characteristics can be prescribed for hearing deficient patients. *Id.*, 11:51-57 (emphases added).

The scope of the invention contemplates that the hearing aids claimed therein are capable of "automatic adjustment" "at any time" in order to achieve optimum results. Defendants' theory that the coefficients must be "fixed" fails because it is not reconcilable with the teachings of the specification and the plain meaning of the claims. Merely because size and power source had not yet "caught up to" this advance in technology is no reason to narrow the scope of the patent.

Such "automatic adjustment" as described in the specification necessitates that the programmed coefficients be modifiable in some instances. Another embodiment, for example, even contemplates a re-determination of an optimum set of coefficients to reprogram the filter. '850 Patent, 7:1-3 ("testing of possible alternative setting of the hearing aid to determine the optimal hearing aid settings [coefficients] for the subject"). Moreover, nothing in the patent requires the coefficients to be fixed. Defendants are correct that ETG's interpretation would cover adaptive filters, because, as thoroughly explained in the specification, the scope of the invention encompasses filters capable of automatic adjustment. Adaptive filters are therefore clearly contemplated. Dr. Levitt indicated that he intended and considered the patent to cover adaptive filters of all types. (JA-0361-0363) Levitt Dep. Tr. 29:4-31:18 ("Q. Which filter is described in your patent? A. I believe the claim did not specify the type of filter, whether it was infinite impulse or finite impulse response, but we used the finite impulse response filter because we could actually build it relatively quickly.").

Likewise, nothing in the specification limits these coefficients to being "externally" calculated within the scope of the claims. The claims do not even recite the term "coefficients,"

so Defendants are left attempting to improperly read that term, as well as an "external" requirement into the claims. Merely because miniaturization may now allow coefficient collections within the filter in contrast to the size of devices capable of performing those calculations from the 1980s, the Court should not impose limitations on **where** the coefficients are calculated. In fact, the claims of the '850 Patent do not depend on where coefficients are derived — only that programmable filters operate within the circuit as claimed.

> 2.    "Programmed" Means "Provided With One or More Values So As To Produce A Response"

| ETG's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Provided with one or more values so as to produce a response. | The defendants do not believe that the term "programmed" can be fairly construed outside the context of the remainder of the entire claim element.<br><br>Claim 1: The phrase "said filter being programmed to impart to the hearing aid at least one response characteristic effective to compensate for impaired hearing of the wearer of the aid" means that the filter has received at least one set of weighting coefficients that, in normal operating mode, are fixed to create a response characteristic that corrects for the particular hearing impairment of a wearer of the aid.<br><br>Claim 9: The phrase "programmed to effect reduction of acoustic feedback from said receiver to said microphone" means that the filter has received weighting coefficients that, in normal operating mode, are fixed to impart cancellation of acoustic feedback between the receiver and the microphone.<br><br>Claim 14: The phrase "programmable filter programmed" means that the filter has received coefficients that, during normal operating mode, are fixed to impart an "equalization" and reduction of the effect of acoustic feedback both in amplitude and phase on a signal in said transmission channel. |
| Why Defendants' Proposed Constructions are Improper | |
| • A jury will understand the term "programmed." <br> • The claims do not require externally calculated and fixed coefficients. | |

While the term "programmed" is straightforward and requires no construction, Defendants insist on imposing a construction on the term. thus, the term "programmed" is best construed as "provided with one or more values so as to produce a response." Each time this

term is used, the claim language is straightforward and should be afforded its plain meaning. For instance, Claim 19 recites "programmed to effect substantial reduction of acoustic feedback." A jury would fully appreciate the scope of this language without guidance from this Court, and Defendants' proffered limitations are simply an attempt to redraft the patent in a manner that avoids obvious infringement.

Again, Defendants' interpretation seeks to impart a "fixed" coefficient requirement that is contrary to the teachings of the specification. However, Defendants' attempt to limit the invention to fixed coefficients is ancillary to their overarching attack that the lack of miniaturization somehow neutralizes the patent. Case law and common sense dictate otherwise. Defendants also attempt to rewrite the express claim language — "effect substantial reduction of acoustic feedback" as "to impart cancellation of acoustic feedback." As explained below, the patentee carefully selected the claim language to indicate that those claims achieved "substantial reduction." Other claims, such as those in the '749 Patent, indicate that the patentee knew how to state "feedback cancellation" when the technique being used was being specified. Defendants' goal here is clear. If the Court accepts their proposed limitations, they will then claim that the coefficients in their hearing aids do not "cancel" feedback even if they may "effect substantial reduction." But, Defendants cannot escape the clear language and intent of the patent.

### 3.    "Feedback Path" and "Forward Path" Should Be Given Their Ordinary and Customary Meaning

| ETG's Proposed Construction for Feedback Path | Defendants' Proposed Construction for Feedback Path |
|---|---|
| A path in which a signal travels toward an input of a transmission channel. | A path in which a signal from a forward path travels in a direction toward the microphone and is combined into an earlier point in the forward path. |
| ETG's Proposed Construction for | Defendants' Proposed Construction for Forward |

| Forward Path | Path |
|---|---|
| A path in which a signal travels from an input toward an output of a transmission channel. | A path in which a signal travels in a direction from the microphone to the receiver. |
| Why Defendants' Proposed Constructions are Improper | |
| • A jury will understand the terms "feedback path" and "forward path."<br>• The claims recite "feedback path" and "forward path" with respect to "input" and "output," not a microphone and a receiver. | |

Each of these terms would be fully understandable to a finder of fact and construction

would serve no legitimate purpose. The plain meaning of the terms should be adopted. Even the

parties' definitions are similar except for a few unduly limiting terms proposed by Defendants.

First, the "feedback" and "forward" paths are claimed with respect to an "input and output of

said transmission channel" and not in terms of a microphone and receiver as Defendants contend.

Next, Defendants seek to make the path lead into a single "point," which is unduly limiting

because nothing in the specification prevents the feedback path from combining into multiple

points.

### 4. "Substantial Reduction" And "Equalize and Reduce" Are Definite Terms in the Hearing Aid Art

Defendants contend that the claim language "substantial reduction" in Claims 1, 9, 10

and 19 and "equalize and reduce" in Claims 13 and 14 are indefinite. One of ordinary skill in the

art would understand the scope of this claim language when read in view of the specification and

intended purpose of the feedback reduction claims. Specifically, and contrary to Defendants'

assertions, the claim terms are not indefinite because the inventors chose to establish a claim

scope in terms of describing the result achieved. Thus, the specification notes that "substantial

reduction" occurs when whistling does not occur during normal use. '850 Patent, 3:3-11.

The specification supports the understanding that one of skill in the art would have of

"equalize and reduce" and "substantial reduction" in terms of feedback. As stated in the

Summary of the Invention, "[t]he invention also provides means for **reducing** acoustical

19

feedback. In one embodiment, an electrical feedback path in the hearing aid is matched in both amplitude and phase to the acoustic feedback path and the two feedback signals **are subtracted so as to cancel each other**." '850 Patent, 3:3-8 (emphasis added). This is explained where a goal of "the invention is to provide new and improved hearing aid apparatus of the above character in which **acoustic feedback is substantially reduced**." *Id.*, 2:18-21 (emphasis added). One of ordinary skill in the art would fully comprehend that "subtracted so as to cancel" is the equivalent of "equalize and reduce" within the meaning of Claims 13-16. If two signals, matched in both amplitude and in phase, are "subtracted" they would be understood as "equalized."

Likewise, the claim language "substantial[6] reduction of acoustic feedback" of Claims 9, 10, and 19 is fully supported and understandable to one of ordinary skill in the art based upon the combined teachings of the specification, including the "substantially reduced" descriptions found in the specification. As the Federal Circuit has recognized, "[T]he term 'substantially' is a descriptive term commonly used in patent claims to avoid a strict numerical boundary to the specified parameter." *Ecolab, Inc. v. Envirochem., Inc.*, 264 F.3d 1358, 1367 (Fed. Cir. 2001). Further, "[t]he mere use of a term like 'substantially' to modify a term in a claim does not render a claim indefinite." *Advanced Cardiovascular Sys. v. Scimed Life Sys.*, 96 F. Supp.2d 1006, 1020 (N.D. Cal. 2000). To determine whether one skilled in the art would understand the claim term containing "substantial," a court should examine the purpose of the invention, which in this instance is to eliminate the unwanted and highly unpleasant whistling sound. '850 Patent, 1:36-53. *See, e.g., Exxon Res. & Eng'g Co. v. United States*, 265 F.3d 1371, 1377-81 (Fed. Cir.

---

[6]The plain meaning of the term "substantial" should apply based upon the teachings of the specification to one of ordinary skill in the art. *See also, York Prods. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1572-73 (Fed. Cir. 1996) ("The ordinary meaning of 'substantially' is 'considerable in extent.") (quoting American Heritage Dictionary Second College Edition 1213 (2d ed. 1982)).

2001). Accordingly, the intended purpose and scope of the claim term "substantial reduction of acoustic feedback," would be fully understood by one of skill in the art as a large degree of feedback reduction, and the Defendants' contention that the term is indefinite should be dismissed.

B.    "Host Controller" Means "A Processor For Controlling Operations Of A Device" - Claims 1-6 of the '749 Patent

The claims of the '850 Patent are directed to a programmable hearing aid while the claims of the '749 Patent cover a host controller. Consistent with Defendants' miniaturization theory as discussed above, Defendants improperly limit the programmable filters of the '850 Patent claims to externally calculated coefficients. Defendants further advance this theory of externally calculated coefficients by requiring the coefficients to be calculated by a separate and interposed host controller. The host controller - which is only claimed by the '749 Patent - does not have claim limitations directed to the physical positioning of the claimed elements, nor do the claims require that the host controller be separate from the hearing aid. The specification of the patents in suit indicate that the hearing aid is interfaced with the host controller. In fact, the specification does not preclude the hearing aid and the host controller from being part of the same device, nor does the specification preclude the host controller from being miniaturized into the hearing aid itself.

| ETG's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| A processor for controlling operations of a device. | A device for prescribing a wearable programmable hearing aid interposed between a computer and the hearing aid. |
| Why Defendants' Proposed Constructions are Improper | |
| • The specification states that the hearing aid is interfaced with the host controller and does not limit the host controller to a separate detached device.<br>• Mr. Dugot's testimony was directed to prototypical embodiments and cannot be used to limit the scope of the claims. | |

Defendants' proposed construction of the term "host controller" found in claims 1

through 6 of the '749 Patent is yet another example of Defendants' attempt to narrow the scope

of the claims by improperly importing limitations from the specification. As the Federal Circuit

has repeatedly recognized, however, the scope of a patent's claims are not to be limited by the

language of the specification. In *Phillips v. AWH Corp.*, the Federal Circuit recently stated:

> In particular, we have expressly rejected the contention that if a patent describes only
> a single embodiment, the claims of the patent must be construed as being limited to
> that embodiment. . . . because persons of ordinary skill in the art rarely would
> confine their definitions of terms to the exact representations depicted in the
> embodiments.

415 F.3d at 1323 (citations omitted) (emphasis added). Any attempt by Defendants to limit

claims 1-6 to an embodiment of the specification, and thus capitalize on the normal reduction in

size of electronic components, over time, must fail. Obviously, as with all other programmable

electronic devices, advances in chip miniaturization and energy sources created opportunities to

include the programming capability in the commercial device itself rather than externally. But a

mere change in size by technological advancement does not spare the accused devices from

infringement.

Whereas claims define the scope of the invention, the specification is merely illustrative

and does not limit the rights of the patentee:

> It is a "bedrock principle" of patent law that "the claims of a patent define the
> invention to which the patentee is entitled the right to exclude. . . ." The written
> description part of the specification itself does not delimit the right to exclude. That
> is the function and purpose of claims.

*Id.* at 1313 (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)).

Here, too, if the "host controller" were limited to operate precisely as the specification describes,

there would be no need for Claims 1-6 to set forth elements that fully define the invention.

ETG contends that a "host controller" as used in '749 Patent claims 1-6, is "a processor

for controlling operations of a device." This construction is supported by ample intrinsic

evidence—mainly the specification—which describes a "host controller" generally as a processing device which produces data necessary to control the operations of a hearing aid. *See, e.g.*, '749 Patent, Abstract. Accordingly, the proper construction of "host controller" is "a processor for controlling operations of a device."

Defendants attempt to narrow construction of the term "host controller" to "a device for prescribing a **wearable** programmable hearing aid **interposed between** a computer and the hearing aid" (emphasis added). This construction improperly imports two limitations: "wearable" and "interposed between" from the specification into the claims. Once again, Defendants attempt to take advantage of the normal reduction in size over time as a limitation on the scope of the invention.

### 1.    The Host Controller is Wearable

First, Defendants attempt to limit the "host controller" to "a device for prescribing a **wearable** programmable hearing aid." To support this limitation, Defendants argue that the host controller's only role is in the fitting process for canceling acoustic feedback, and it cannot be connected to a hearing aid while the hearing aid is in "normal operating mode." Defendants' Op. Brief at 49.

Nowhere in the '749 Patent specification does the language preclude the host controller from being connected to the hearing aid while the hearing aid is in "normal operating mode." Defendants' only cite to the specification of the '749 Patent at 10:37-43 as purported support for this assertion. However, that language does not address the issue:

> [After the data stored in the EEPROM is transferred to the RAM] [t]he hearing aid is now in its normal operating mode and speech detected by the microphone 57 is amplified in the programmable automatic gain control circuit 58 and transmitted through the amplifier 60, the filter 63 and the low pass filter 63a into the programmable and the low pass filter into the programmable filter circuitry.

'749 Patent, 10:37-45. Again, **nowhere** in this discussion does it even suggest that the host

controller must be external to the hearing aid.  *See* Levitt Dep. Tr. 118:4-14. (JA-0367)

What the specification **does** say, though, is that "[f]or hearing parameter selection and programming, the hearing aid is **interfaced** with the host controller as described above, and the EEPROM . . . is plugged into a programming slot in the host controller." *See, e.g., id.* at 8:25-8:67 (emphasis added).  The term "interface" is defined by Chambers Science and Technology Dictionary, p.471 (1988) (JA-0312), to mean "hardware and associated software needed to enable one device to communicate with another."  Therefore, the specification contemplates the host controller's role as a processor that communicates with the hearing aid.  In fact, certain embodiments of the invention disclose the "host controller" as being integral with the hearing aid.  *See, e.g., id.* at 6:57-63 ("[t]he hearing aid is . . . directly under the control of the host controller.").

Further, in the description of the preferred embodiment, the specification contemplates that the host controller can be **either** a separate external unit that programs the hearing aid, or a unit internal to the hearing aid itself:

> A hearing aid system according to the invention comprises generally a wearable, programmable read only memory (EEPROM), and a host controller providing electrical signals and test sounds as necessary for measuring the residual hearing of a subject, establishing optimal hearing aid parameters for the subject (including the phase relationship between input and output) and generating control signals as necessary to program the EEPROM module to perform the desired operations in the hearing aid.

'749 Patent, 3:51-62.  Thus, the specification teaches that the host controller is used to control operation of the hearing aid in accordance with parameters specific to the particular subject who is to wear the hearing aid.  The host controller does this by, among other things, calculating certain coefficients and other data which are stored on the EEPROM.  *See, e.g., id.* at 3:64-4:63; 5:34-38.  Notably, the specification does **not** teach, even in its lengthy discussion of a host controller, that the host controller must be an external device that cannot be connected to the

24

hearing aid while it is in its "normal operating mode." *See, e.g., id.* at 3:64-4:63; 6:57-10:17.  In fact, the specification teaches the opposite—that the host controller need not be external to the hearing aid and can be connected to the hearing aid while it is in its "normal operating mode." *See, e.g., id.* at 3:51-62.

### 2.   The Host Controller is Interfaced With the Hearing Aid

Next, Defendants attempt to limit the "host controller" by requiring it to be "**interposed between** a computer and the hearing aid."  To support this limitation, Defendants argue that (1) their construction tracks the language of claim 1; (2) the patent only contemplates incorporating FIGS. 2, 4, and 5 into the hearing aid; and (3) one of the inventors, Mr. Dugot, testified that the host controller was separate from the hearing aid.

First, the language of claim 1 does not support Defendants' construction because the claim language simply describes the **flow of data from** the host controller **for** the hearing aid. Claim 1 begins with a recitation of the host controller's intended purpose, explaining that "[a] host controller [is used] for producing data **from** a computer **for** a programmable hearing aid." *See, e.g., id.* at 12:12-14.  Contrary to Defendants' argument, there is no limitation or constraint in the claims on how the data (the parameters, coefficients, etc.) gets to the hearing aid from the host controller.  In other words, "**from**" does not require a spatial relationship between the host controller and a computer; instead it simply describes that there is flow of data for the hearing aid which comes from the host controller. *See, e.g., id.* at 7:63-68.

Moreover, the prosecution history does not support Defendants' argument.  In response to an Office Action dated March 17, 1989, the patentee explained that the amended claims "relate to a host controller for producing the data necessary to cancel acoustic feedback in a hearing aid," omitting the phrase "from a computer."  Response to Official Action, March 17, 1989, p.28 (JA-0208).  This explanation of the amended claims by the patentee suggests that the phrase

"from a computer" was not intended to impose a spatial limitation on the host controller. Instead, the statement conveys that data is simply being transferred from one device to the other.

Second, while the specification contemplates that "[t]he components shown in FIGS. 2, 4, and 5 **may be** incorporated in the hearing aid," this is only an exemplary embodiment of the invention, which does not mean that FIG. 1, the host controller, could **never be** incorporated into the hearing aid. *See, e.g.,* '749 Patent, 11:39-41 (emphasis added). Moreover, the inventors stated in the specification that the disclosed embodiments "are intended to be only illustrative, and modifications in form and detail are possible within the scope of the following claims." *See, e.g., id.* at 12:1-4.

Third, Mr. Dugot's testimony does not support the spatial limitation proposed by Defendants. Mr. Dugot testified only about **prototypical** embodiments and not about the scope of the claimed invention: "[w]e made twelve prototypes which we tested in Lexington School for the Deaf." (Dugot Dep. at 28:9-11 (JA-0315)). And, in response to the question, "So, the prototypes that you referred to, the twelve prototypes for Lexington, were they ever sold?," Mr. Dugot stated, "We didn't sell them. We gave it to them. . . . You know, in the process of developing a product you have to establish that the product is working." (Dugot Dep. at 28:14-21 (JA-0315)). Defendants, however, fail to acknowledge that Mr. Dugot's testimony pertained to prototypical embodiments—not the embodiments described in the claims. The claimed invention should not be limited to specific features of prototypes. *Kemin Foods, L.C. v. Pigmentos Vegetales del Centro S.A. de C.V.*, 301 F. Supp.2d 970, 981 (S.D. Iowa 2004), *modified order on claim construction*, 319 F. Supp.2d 939 (S.D. Iowa 2004) ("it is improper for a court to consider the patentee's commercial embodiment of the patent in determining claim meaning."); *Sport Squeeze Inc. v. Pro-Innovative Concepts Inc.*, No. 97-CV-115 TW (JFS), 1999

U.S. Dist. LEXIS 16681, at *3 n.1 (S.D. Cal. April 1, 1999) ("the construction of the claims in a patent does not depend on how . . . patents [are] commercially implemented."). Thus, Mr. Dugot's testimony regarding attempted commercial embodiments does not support requiring the host controller to be physically positioned between a computer and a hearing aid.

Defendants' arguments, once again, merely go to the size and location of parts in the invention and not to the uniqueness of the inventions themselves.

## C.   Methods of Reducing Feedback - Claims 13-16 of the '850 Patent

Claims 13-16 of the '850 Patent differ from all other asserted claims in that each claim covers a "method for reducing acoustic feedback." Method claims vary from traditional apparatus claims because "[u]nder section 271(a), the concept of 'use' of a patented method or process is fundamentally different from the use of a patented system or device." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1317 (Fed. Cir. 2005) (citations omitted). The primary issue with method claims is whether the recited steps are utilized in an accused method. The default is that the steps of a method claim need not be performed in the order written in the claim itself. Claims 13-16 were never rejected, objected to, or amended during prosecution of the '850 Patent. Each of Claims 13 and 14 recite two steps in the overall method: (i) a determining step, and (ii) an inserting step.

### 1.   "Determining" Should Be Afforded Its Plain and Ordinary Meaning

| ETG's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | "Determining" means measuring |
| Why Defendants' Proposed Constructions are Improper | |

- The term "determining" is not a technical term and will be understandable to a jury.
- Defendants fail to offer any explanation why this term needs to be construed.
- Defendants' proposed construction adds unclaimed limitations, *i.e.*, taking specific measurements, into the claims.

The term "determining" is not used as technical term of art that a lay jury would be unable to comprehend. Accordingly, this Court should decline to construe the claim. *See U.S.*

*Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)

> "The Markman decisions do not hold that the trial judge must repeat or restate every claim term to comply with the ruling that claim construction is for the court. Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."

Further, Defendants offer no explanation of why this term needs to be construed at all to provide clarification to the jury. Clearly, the attempt is meant to narrow an otherwise understandable term in order to cause confusion and misdirection.

The plain and ordinary meaning of "determining" a jury would understand. For example, Webster's Third New International Dictionary 616 (1993) (JA-0308), offers over fifteen definitions for "determine" and "determining" and not one definition contains the word "measuring" - Defendants' proposed definition. Instead, the terms "decide" and "discover" are listed as synonyms. Defendants' attempt to narrow the claim scope and depart from the plain meaning of the term should therefore be denied.

### 2. "As a Function of Frequency" Should Be Afforded Its Plain and Ordinary Meaning

| ETG's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Plain and Ordinary Meaning | "As a function of frequency" means at a known frequency. |
| Why Defendants' Proposed Constructions are Improper | |
| <ul><li>Feedback response varies over a range of frequencies.</li><li>Determining the effect on amplitude and phase cannot be limited to a single frequency because phase shift information cannot be obtained from a single frequency.</li><li>The specification describes how multiple frequency responses are used.</li></ul> | |

The claim language, "as a function of frequency," is simply not the same or even remotely similar to Defendants' proposed construction of "at a **known** frequency." The two meanings are entirely different. If the inventors had meant to limit the claim scope to determining only "at a known frequency" they certainly could have done so. The correct

interpretation, which is simply the plain meaning of the phrase, must encompass the capability to determine the response over a varying range of frequencies, as provided by the claim language and the specification. The "determining" step requires: "determining the effect on the amplitude and phase of a signal in said transmission channel as a function of frequency of acoustic feedback." One of ordinary skill in the art would understand, after examining the specification, that the feedback response will vary over a range of frequencies. Therefore, one would want the ability to determine the effect on amplitude and phase at various frequencies. Thus, the claim language "as a function of frequency" means that "determining the effect on the amplitude and phase of a signal" cannot be limited to a single frequency because the proper phase shift information is not available at a single frequency.

For instance, the specification describes how multiple frequency responses are used to determine the appropriate coefficients to eliminate feedback:

> If desired, the additional programmable filter in the feedback path of the hearing aid can be eliminated by calculating the effective gain of both the forward and feedback paths and modifying the programmable filter 64 so as to include this additional gain. **This implementation necessarily requires an adjustment to both the amplitude and phase characteristics of the filter 64.** Alternatively, filter 64 can be placed in the feedback path with appropriate changes in the coefficients.

> The setting of the hearing aid is then checked using a paired comparison technique **to determine if optimum frequency response characteristics for the patient have been obtained**. This involves the provision in the host controller of one or more additional programmable filters adjusted **to have frequency responses** that differ systematically from that prescribed using the above procedure.

'850 Patent, 9:47-63 (emphases added). To determine "frequency response characteristics" and "frequency responses," the amplitude and phase characteristics of the filter are modified until an optimum result is achieved. The specification therefore supports giving "as a function of frequency" its plain and ordinary meaning, and not limiting the phrase to a single frequency as Defendants propose.

29

Even portions of the specification relied upon by Defendants support adopting the plain

meaning. As the specification describes, "a signal generator" generates a range of frequency

signals, "the frequency of which is controllable by a digital-to-analog (D/A) converter." *Id.*,

3:65-67. Based upon the teachings of the specification where determining the optimum

parameters for phase and amplitude response is in terms of a range of frequency responses, it is

undeniable that the patentee intended the claimed "determining" step to occur over a range of

frequencies; or just as the plain language of the claim states, "as a function of frequency."

> **3.    "Inserting Between the Input and Output of Said Transmission
> Channel an Electrical Feedback Path Having a Filter" (Claim 13) and
> "Inserting Between The Input And Output of Said Transmission
> Channel a Programmable Filter" (Claim 14)**

| ETG's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Making an electric feedback path with a filter effective between the input and output of the transmission channel. | Inserting, after the determining step, an electric feedback path between the input and output of said transmission channel, the electrical feedback path having a filter therein programmed. |
| Why Defendants' Proposed Constructions are Improper | |
| <ul><li>As explained in section 5 below, the method steps may be performed in any order.</li><li>Defendants seek to confuse the jury by requiring a physical insertion of a filter into a feedback path, when in fact the filter is already located in the path.</li></ul> | |

Clarification of the "inserting" step will assist a jury in understanding the meaning of this

particular claim language. Foremost, "inserting" is relative to the context of the claim language

that requires the insertion of a filter into an electrical feedback path. The filter itself, which

would be already physically inserted within a circuit, is then programmed and put into operation.

Accordingly, the proper meaning of this claim language is: making the filter effective between

the input and output of the transmission channel. As fully explained below, the "inserting" step

is not required to follow the "determining" step in all situations.

> **4.    "Filter Therein Programmed"**

| ETG's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| A filter having coefficients | The filter has received coefficients that, during normal |

30

| where the values of the coefficients may be programmed. | operation, are fixed to impart an "equalization" and reduction of the effect of acoustic feedback both in amplitude and phase on a signal in said transmission channel. |
|---|---|
| Why Defendants' Proposed Constructions are Improper | |
| • Defendants' attempt to limit the coefficients as fixed is improper because the specification discusses re-determining an optimum set of coefficients to reprogram the filter as needed.<br>• The coefficients cannot be static because the specification contemplates continual and automatic adjustments of the hearing aid parameters.<br>• Arguments based on miniaturization cannot be used to narrow the scope of the claims. | |

The proper meaning of this claim terminology is "a filter having coefficients where the values of the coefficient may be programmed." The specification supports this interpretation by describing how "[t]he selected optimum parameter values are preferably programmed into an electronically erasable, programmable read only memory (EEPROM) which supplies coefficients to programmable filter and amplitude limiting means in the hearing aid . . . ." '850 Patent, 2:46-50. Therefore, after the device determines the proper filtering coefficients to eliminate feedback, those coefficients are programmed into the EEPROM memory of the hearing aid to be available to select from to cancel feedback. ETG offers a simple, straightforward construction consistent with the meaning of the claims and the scope of the specification.

Defendants, however, seek to limit the scope of the claim by insisting that the programming can only take place **externally** and that the coefficient in the filter must always be **fixed**. They attempt this narrowing of the scope based upon a "normal operation" mode versus some other, undefined operating condition. Further, nothing in the specification limits claim scope to always require that the programming takes place externally, or that the programmed filter coefficients be permanently fixed while in operation. Defendants once again argue that advances in miniaturization and energy sources are limitations to the scope of the patent. In contrast, and as explained above, the specification even contemplates that during a fifth prescriptive stage, the system will re-determine an optimum set of coefficients to reprogram the

31

filter as needed. *See* '850 Patent, 7:1-3 ("testing of possible alternative setting of the hearing aid to determine the optimal hearing aid settings [coefficients] for the subject").

Accordingly, Defendants' definition that requires the coefficients to be permanently "fixed" during a so called "normal operation" - nowhere described in the specification - cannot stand. The specification simply does not limit when the programming may or may not occur for the programmable filter. According to Dr. Levitt, as circuits get smaller and power sources get more efficient, the coefficient could be re-determined in the hearing aid itself. (JA-0364-0366) Levitt Dep. Tr. 99:2-101:20 ("Q. And did it derive a set of coefficients for canceling feedback? A. It derived the coefficients using the adaptive null method. Q. Okay. And that adaptive null method would be used in commercial application during the fitting stage, correct? A. It doesn't say. It could be used during the fitter procedure definitely, yes, but it could also be used while you're wearing it.")).

As discussed above, the argument that the coefficients must be "fixed" during normal operation simply does not comport with the numerous teachings of the specification that contemplate continual and "automatic adjustment" of the hearing aid parameters to achieve optimum characteristics. *See* '850 Patent, 5:60-62; 11:32-37; 11:51-57. Thus, the scope of the invention contemplates that the "filter therein program" is capable of "automatic adjustment" "at any time" in order to achieve optimum results. Defendants' theory that the coefficients must be "fixed" fails because it is not reconcilable with the teachings of the specification and the plain meaning of the claims.

Notably, the "filter" of Claim 13 ("having a filter therein programmed") and the "programmable filter" of Claim 14 ("a programmable filter being programmed to equalize and reduce") are not claimed as "delay line" filters as in Claims 1, 9, 10, and 19. Accordingly,

Defendants' arguments regarding "delay line" filters are simply not applicable to Claims 13-16. Thus, all filter types described in the specification are within the scope of Claims 13-16, as Defendants apparently recognize.

**5.     The Steps Need Not Be Performed In Order - Claims 13 and 14 of the '850 Patent**

The "determining" and "inserting" steps of Claims 13 and 14 may be performed in any order. The Federal Circuit recently crafted a two-part test, both prongs of which involve only intrinsic evidence, to determine whether the steps included in a process claim must be performed in the recited order:

> First, we look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written . . . If not, we next look to the rest of the specification to determine whether it 'directly or implicitly requires such a narrow construction.'"

*Leighton Techs. LLC v. Oberthur Card Sys., S.A.*, 358 F. Supp. 2d 361, 366 (S.D.N.Y 2005) (quoting *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369-70 (Fed. Cir. 2003) (internal citations omitted)). Examining the claim language and the specification in this instance reveals no justification for requiring a specific order of execution of the method steps. In fact, just the opposite is true.

In Claims 13 and 14 of the '850 Patent, the inventors contemplated implementing the method steps in any order. The patent provides for a usual prescriptive hearing aid fitting procedure. '850 Patent, 6:60-7:3. Although the patent is not limited to this implementation, the specification proves that the inventors contemplated execution of the steps of Claims 13 and 14 in any order. The first clause in both claims is a step of "determining" feedback through a pre-existing programmed filter. Obviously, this requires "inserting," or making the filter effective, prior to the determination, an inversion of the order of clauses in the claim. The insertion of "an electric feedback path having a filter therein programmed to equalize and reduce" the feedback

33

(the second clause) may therefore be read as a condition required for the execution of the "determining" step in certain instances.

The specification clearly provides a scenario when the "determining" step may in fact occur after the "inserting" step, which makes the programmable filter effective. For instance, the specification illustrates how the inventors contemplated additional measurements after the insertion of the filter, an inversion of the clause order. '850 Patent, 6:55-7:3. For example, the specification describes a typical scenario for fitting and programming of the hearing aid:

| Specification, 6:55-7:3<br>These are five stages: | Relationship to Claim 13 and 14 Language |
|---|---|
| "(1) Measurement of subject's residual hearing" | Initial calibrations based upon the patients hearing profile. |
| "(2) Derivation of an appropriate set of electroacoustic characteristics [coefficients] of the hearing aid from such measurements,<br><br>and programming the hearing aid accordingly" | The "derivation" occurring in this stage is not yet the "determining" step, which is derived as a function of feedback. *See* Claims 13 and 14. These coefficients are derived from the subject's residual hearing.<br><br>The programming in this stage, however, is akin to the "inserting" a filter, indicating that the "inserting" step of Claim 13 and 14 could occur prior to the "determining" step. |
| "(3) Measuring acoustic feedback in the hearing aid" | This step corresponds to "Determining the effect on the amplitude and phase of a signal in said transmission channel." The "determining" step may occur after initial calibration, with no requirement of physical proximity of the host controller to the hearing aid. From this "determining" step, coefficients are derived for programming the filter. |
| "(4) Re-programming the hearing aid to minimize acoustic feedback" | This step corresponds to "Inserting between the input and output of said transmission channel a programmable filter therein programmed . . . ." The "inserting" step is properly interpreted as "making an electric feedback path with a filter effective . . . ." The coefficients measured from stage (3) above are used to program the filter to equalize and reduce acoustic feedback. |

34

| "(5) Paired comparison testing of possible alternative setting of the hearing aid to determine the optimal hearing aid settings [coefficients] for the subject" | Clarification that after the "inserting" step, the coefficients used to program the filters may be determined yet again and later re-inserted to the filter in order to find the optimal hearing aid settings. This additional phase description shows that the patent contemplates implementing the steps in Claims 13 and 14 in any order - i.e., the "determining" step may occur after the "inserting" step. |
|---|---|

Since the specification itself illustrates the clauses in Claims 13 and 14 being executed in either order, this Court must allow for the application of the clauses in either order.

Defendants' position is that the phrase "said acoustic feedback" in the "inserting" step requires a specific order because the phrase is a reference to the "acoustic feedback" in the "determining" step. This is simply incorrect because the preamble of Claims 13 and 14 provides the antecedent basis for "acoustic feedback" that is referenced in the "inserting" step, and the preamble of each claim states that "reducing acoustic feedback" is the objective of the claim. Accordingly, the use of the term "acoustic feedback" in both clauses merely refers back to that objective from the preamble of the claim. To illustrate, Claim 13 recites:

> (Preamble): A method of reducing acoustic feedback . . .
>
> (i) Determining the effect ... of acoustic feedback . . .
>
> (ii) Inserting between the input and output . . . of said acoustic feedback. .

The "determining" step, therefore, does not have to precede the "inserting" step because an antecedent basis for the "acoustic feedback" exists in the preamble. *See Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) ("When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention."). Further, as described above, the specification provides for a situation where the weighting coefficients are re-determined **after** the filter is initially programmed.

There is no reason to construe a method claim in the order written, unless the claim itself

requires such a construction. Such is not the case here. The Federal Circuit has held that a patent limits itself to the written order only by explicitly stating so, or by implying in the language of the claim, the specification, and the prosecution history that the sequence must be in order. Even the cases relied upon by Defendants state the same. "[N]ot every process is limited to the performance of its steps in the written order." *Loral Fairchild Corp. v. Sony Elects. Corps.*, 181 F.3d 1313, 1322 (Fed. Cir. 1999). The Federal Circuit has reiterated this standard, stating "there is no reason the claim needs to be construed to require that the steps be performed in the order written." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1343 (Fed. Cir. 2001). The fact that the specification provides a situation where coefficients are "determined" then "inserted" and then later "determined" again to achieve optimal hearing aid settings dismisses Defendants' improper attempt at narrowing the claim scope.

## III. INNOVATIONS BASED UPON SPEECH TO NOISE DETERMINATIONS - CLAIMS 5 AND 6 OF THE '850 PATENT

As explained, the hearing aid of Claims 5 and 6 imparts selected "response characteristics" based upon "the level of speech signals in said transmission channel in excess of the level of noise signals," to improve a patients hearing in noisy environments. This invention achieves this goal through the use of a first component that detects the condition of an input signal in terms of speech to noise. Then, a second component chooses an appropriate response characteristic based upon the first determination.

### A. "Means Controllable To Impart Different Response Characteristics To Said Hearing Aid" - Claim 5 of the '850 Patent

| ETG's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Structure – programmable filter(s) that can be programmed with different coefficients to impart different response characteristics to audio signals present in the transmission channel of the hearing aid, and structural equivalents thereof. | Structure – programmable filter 64 (structures 63a, 70-75, 77, 78, 78a, 79, and 80) programmed to impart different response characteristics; or 5 bit counter, timing logic, and structures 63a, 77, 80, and 145-151; and equivalent structures |

| Why Defendants' Proposed Constructions are Improper |
| --- |
| • Defendants identify programmable filter 64 (63a, 70-75, 77, 78, 78a, 79 and 80) or 5 bit counter, timing logic, and structures 63a, 77, 80, and 145-151 that are not necessary or linked to the function.<br>• Defendants' use of Figure numbers 64, 63a, 70-75, 77, 78, 78a, 79, 80, 63a, 77, 80, 145-151 is unduly restrictive and confusing to a jury. |

The parties agree that the function of this means-plus-function element is "imparting different response characteristic to the hearing aid." The parties' positions diverge on what structure corresponds to the claimed function in this element. Defendants' construction is wrong because it imports structural limitations that are simply not necessary to perform the recited function.

Construction of "means-plus-function" claim elements to which 35 U.S.C. §112, ¶ 6 applies requires a multi-step construction process. It includes (1) first determining if the element is a means-plus-function element, (2) if it is, identifying the claimed function of that element, and (3) determining the structure or acts disclosed in the specification which directly correspond to the claimed function. *IMS Technology, Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1430 (Fed. Cir. 2000).

Identification of the function recited in the claim requires "staying true to the claim language and the limitations expressly recited by the claims." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1322 (Fed. Cir. 2003). The corresponding structure in the specification that performs the claimed function is "corresponding" "***only if the specification or the prosecution history clearly links or associates that structure to the function recited in the claim***," *i.e.*, it must be "necessary to perform the claimed function." *Id.* at 1321 (citations omitted) (emphasis added).

Defendants attempt to both incorrectly state ETG's position and advance a position which inappropriately limits the means-plus-function element to an overly specific and overly inclusive

description. Defendants assert that ETG attempts to include "**any** structure that performs the recited function." *See* Defendants' Opening Brief, p. 37. Defendants overstate and misconstrue ETG's position. Defendants again try to limit the scope of the invention to the literal embodiment in the specification. ETG instead advances a reasonable construction that is neither "broad and generic" nor onerously restrictive, as Defendants propose. By limiting the construction to "programmable filter 64 (structures 63a, 70-75, 77, 78, 78a, 79, and 80) programmed to impart different response characteristics; or 5 bit counter, timing logic, and structures 63a, 77, 80, and 145-151," Defendants improperly propose to limit the construction to an overly specific and overly inclusive description.

Indeed, Defendants' proposed construction is also improper for including structural elements not necessary to perform the function of the element.

> "We do not import limitations into claims from examples or embodiments appearing only in a patent's written description, even when a specification describes very specific embodiments of the invention or even describes only a single embodiment, unless the specification makes it clear that "the patentee . . . intends for the claims and the embodiments in the specification to be strictly coextensive."

*JVW Enterprises, Inc. v. Interact Accessories, Inc.*, 424 F.3d 1324, 1335 (Fed. Cir. 2005) (quoting *Phillips*, 415 F.3d at 1323). The '850 Patent does not make such a limiting claim.

The '850 Patent states that the "embodiments described . . . are intended to be only illustrative, and modifications in form and detail are possible. . . ." '850 Patent, 11:58-60. In other words, the patent proposes means controllable to "impart different response characteristics." It does not limit the description of the means to a programmable filter placed as a drawing or diagram as an example of one embodiment. Defendants propose to disregard this language and construe this means-plus-function element in a way that limits the claim to an overly inclusive circuit diagram illustrated by the Figures.

38

Finally, Defendants fail to provide any justification that their proposed structural construction is "necessary to perform the claimed function." *Omega Eng'g*, 334 F.3d at 1322. Indeed, Defendants' proposed structures each contain at least twelve structural elements. A means-plus-function element with the agreed-upon function of "imparting different response characteristic to the hearing aid" does not require twelve structural elements, and Defendants fail to explain how each of the twelve structural elements is necessary to the claimed function.

**B.    "Controlling Means Responsive To The Level Of Speech Signals In Said Transmission Channel In Excess Of The Level Of Noise Signals In Said Channel For Automatically Controlling Said Controllable Means" - Claim 5 of the '850 Patent**

| ETG's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Function – selecting the appropriate response characteristic based on the current environment. | Function – responding to [a determination that] the level of speech signals in the transmission channel [is] in excess of the level of noise signals in the channel for automatically controlling the controllable means to impart a selected one of the different response characteristics to the hearing aid |
| Structure – processing element(s), and structural equivalents thereof. | Structure – speech detector 96, band pass filters 97-100, sample and hold circuits 105-108, rectifiers 109-112, comparators 113-116, latch 118, switch 95, and switch 88; and equivalent structures |
| Why Defendants' Proposed Constructions are Improper | |
| <ul><li>Defendants' function is overly restrictive because the function should not incorporate the modifier "responsive to the level of speech signals in said transmission channel in excess of the level of noise signals in said channel."</li><li>Defendants' identify speech detector 96, band pass filters 97-100, sample and hold circuits 105-108, rectifiers 109-112, comparators 113-116, latch 118, switch 96 and switch 88 that are not necessary or linked to the function.</li><li>Defendants' use of Figure numbers 96, 97-100, 105-108, 109-112, 113-116, 118, 95 and 88 is unduly restrictive and confusing to a jury.</li></ul> | |

ETG and Defendants disagree on the claimed function and the structure corresponding to that claimed function. Defendants' construction is flawed in two respects: First, it improperly imports additional language into the claimed function. Then, Defendants attempt to link to that improper function structure which does not correspond, i.e., is not directly linked to the performance of the claimed function. *See Omega Eng'g*, 334 F.3d at 1322.

As to the function, Defendants' proposed construction improperly incorporates the additional descriptive phrase "responsive to the level of speech signals in said transmission channel in excess of the level of noise signals in said channel." As this phrase *modifies* the means-plus-function element, it is ancillary to the means-plus-function element and not a part of the element itself. The function of a means-plus function term is typically determined by looking for the language "means for." *Lockheed Martin Corp. v. Space Systems/Loral, Inc.*, 324 F.3d 1308, 1319 (Fed. Cir. 2003). In other words, the claim element will recite a means and then it will state "for" performing a function directly linked to that means. *Micro Chem, Inc. v. Great Plains Chem. Co.,* 194 F.3d 1250, 1258 (Fed. Cir. 1999). Here, the means is a "controlling means" whose function is "*for* automatically controlling said controllable means." (emphasis added). The phrase "responsive to the level of speech signals in said transmission channel in excess of the level of noise signals in said channel" which Defendants seek to import into the function, merely describes a *result* of an action of the means. Defendants' addition is not a correct construction. Defendants are trying to read a *result* as a part of the function itself. The proper construction should be limited to the functional language and should not include results of the function.

In addition to improperly including result language in the means-plus-function element, Defendants seek to impose artificially-created, limiting terms under the guise of "clarity." The terms "[a determination that]" and "[is]" only seek to impose limitations into the element that do not exist. The additional unclaimed terms require a specific determination at a specific time, neither of which are properly included within the plain language of this element.

Further, Defendants' construction is not proper, and their assertion that "[t]he specification discloses no other way to perform this function" is not accurate. The specification

40

discloses assigning, for example, frequency gain characteristics, shown in Fig. 3 and 7:33-61 of

the '850 Patent. These characteristics are used to compensate for noise based on different

environmental factors.

> "[i]f the signal reaching the hearing aid consists of speech plus noise, as determined
> by the speech detector 96, then alternative frequency-gain characteristics are used.
> These frequency-gain characteristics are derived by first determining the incoming
> signal level, as described above, selecting an appropriate frequency-gain
> characteristic and then reducing the gain in those frequency regions where the
> background noise level exceeds the speech level. This is determined by comparing
> the output levels of the band-pass filters 97, 98, 99 and 100 when speech is present to
> the corresponding levels measured when noise only is present."

'850 Patent, 8:6-18.

Defendants' assertion that ETG improperly attempts to recapture claim scope by

proposing a construction for this element which was amended during prosecution is unfounded.

ETG's proposed construction for this element - "selecting the appropriate response characteristic

based on the current environment" - is consistent with the claim scope. ETG is not trying to read

the phrase "responsive to the level of speech signals in said transmission channel in excess of the

level of noise signals in said channel" out of the claim entirely; ETG's position is simply that the

phrase is not properly construed as a part of the means-plus-function element.

Defendants' identification of the structure of this element is improper as unduly narrow.

Defendants assert that ETG attempts to include "any structure that performs the recited

function." *See* Defendants' Opening Brief, p.40 (emphasis removed). As shown in greater detail

in section III. A. above, Defendants again overstate and misconstrue ETG's position. By

limiting the construction to "speech detector 96, band pass filters 97-100, sample and hold

circuits 105-108, rectifiers 109-112, comparators 113-116, latch 118, switch 95, and switch 88,"

Defendants improperly propose to narrow the construction to an overly specific and overly

inclusive description. *See Omega Eng'g.*, 334 F.3d at 1321. Not all of these structures are

41

required to perform the recited function. A patent claim is not limited in scope by reciting the parts identified in a diagram of an exemplary illustration, the structure must be **necessary** to perform the properly construed function.

### C.    "Speech Detector Means For Determining When Speech Signals Are in Said Transmission Channel" - Claim 6 of the '850 Patent

| ETG's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Structure – a speech detector(s), and structural equivalents thereof. | Structure – speech detector 96; and equivalent structures |
| Why Defendants' Proposed Constructions are Improper | |
| • Defendants' use of Figure number 96 is unduly restrictive and confusing to a jury. | |

ETG objects to the inclusion of a Figure number into the construction of the claim, which only serves to confuse a jury. The improper reference to the '850 Patent figures serves only to require the jury to continually refer to the figures.

### D.    "A Plurality Of Bandpass Filter Means For Determining The Noise Frequency Spectrum In Said Transmission Channel" - Claim 6 of the '850 Patent

| ETG's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Structure – bandpass filters and processing elements, and structural equivalents thereof. | Structure – bandpass filters 97-100 and rectifiers 109-112 and S/H 105-108; and equivalent structures |
| Why Defendants' Proposed Constructions are Improper | |
| • Defendants' identify structure that is not necessary or linked to the function | |
| • Defendants' use of Figure numbers is unduly restrictive and confusing to a jury. | |

ETG and Defendants agree on the function of this means-plus-function element. Defendants attempt to unduly limit the structure to elements unnecessary to perform the recited function and also to a specific number of those elements. For example, Defendants include "rectifiers 109-112 and S/H 105-108," but do not explain how these structural elements are necessary to perform the function or why four of each is specifically required. The specification is clear that "modifications in form and detail are possible," and importantly, "more than four bandwidth filters and different frequency bands might be employed." '850 Patent, 11:58-63.

42

Defendants assert that ETG attempts to include "any structure that performs the recited function." *See* Defendants' Opening Brief, p. 41 (emphasis removed). As shown in greater detail in section III. A. above, Defendants again overstate and misconstrue ETG's position. By limiting the construction to "bandpass filters 97-100 and rectifiers 109-112 and S/H 105-108," Defendants improperly seek to limit the scope of the claims by reciting the parts identified in a diagram of an exemplary illustration and unnecessary to the claimed function.

E.    **"A Plurality of Comparator Means . . . For Indicating Whether The Speech Level In Each Said Bandpass Filter Exceeds The Noise Level Therein And For Actuating Said Controlling Means To Impart To The Hearing Aid A Response Characteristic" - Claim 6 of the '850 Patent**

| ETG's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Function – indicating whether the speech level in each band pass filter exceeds the noise level and for actuating said controlling means to impart to the hearing aid a response characteristic. | Function – to respond to the speech detector and respective bandpass filter means for indicating whether the speech level in each bandpass filter exceeds the noise level therein and for actuating the controlling means to impart to the hearing aid a response characteristic effective to compensate for impaired hearing of the wearer of the aid at the noise levels obtaining in the channel. |
| Structure – are various processing elements, and structural equivalents thereof. | Structure – comparators 113-116; and equivalent structures |
| Why Defendants' Proposed Constructions are Improper | |
| • Defendants improperly incorporate a modifying phrase into the function of the element. <br> • Defendants' use of Figure numbers 113-116 is unduly restrictive and confusing to a jury. | |

ETG and Defendants do not agree on the function or the structure of this means-plus-function element. Defendants' proposed construction improperly inserts the additional descriptive phrases "each responsive to said speech detector" and "to compensate for impaired hearing . . ." These phrases should be construed as phrases modifying the means-plus-function element, rather than internal to the function itself. Instead, Defendants would disregard the clear modifying language of the phrases and construe them to be additional requirements of the function. This construction unduly limits the function.

43

ETG and Defendants generally agree that comparators may be processing elements of the structure of this means-plus-function element, however Defendants' inclusion of Figure numbers into the construction of the claim would only serve to confuse a jury.

## IV.    DIGITAL HEARING INNOVATIONS FOR IMPROVED HEARING

### A.    Programmable Filter to Impart A Response Characteristic - Claims 1-3 of the '850 Patent

#### 1.    "Programmable Signal Limiter Means" - Claim 1 of the '850 Patent

| ETG's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Function – limiting or reducing the signal in some manner. | Function –to programmably limit the [amplitude of the] signal [from exceeding a certain level by using externally calculated coefficients] |
| Structure – One corresponding structure is an amplitude limiter.[7] Another structure is a programmable compression amplifier. Equivalents of these structures also fall within the claim scope. | Structure – programmable limiter 67, RAM 77, and attendant signal lines; and equivalent structures |
| Why Defendants' Proposed Constructions are Improper | |
| <ul><li>Defendants import unclaimed structural limitations - "[**amplitude of the**] signal [**from exceeding a certain level by using externally calculated coefficients**]" - into the function.</li><li>Defendants identify RAM 77 and attendant signal lines that are not linked to the function.</li><li>Defendants' use of Figure numbers 67, 77 is unduly restrictive and confusing to a jury.</li></ul> | |

ETG and Defendants do not agree on the function or structure of this means-plus-function element. Defendants' proposed function introduces limitations that are not found in a plain reading of the means-plus-function element itself. For example, Defendants seek to introduce the additional unclaimed limitations "[amplitude of the]" and "[from exceeding a certain level by using externally calculated coefficients]." Defendants draw attention to the improper additional limitations specifically by bracketing them.

Defendants propose to include the "[amplitude of the]" limitation to make explicit that

---

[7] ETG withdraws the "a device that controls the maximum allowable signal to pass to the wearer's ear."

the aspect of the signal that is limited is the amplitude. However, neither the element nor the claim read as a whole supports such an assertion, making absolutely no reference solely to amplitude. Defendants are clearly attempting to import limitations in an attempt to improperly narrow the scope of this means-plus-function element. Similarly, Defendants seek to import other unnecessary limitations into this element in an effort to make it unduly narrow. For example, the word "programmably" - not even a proper word - creates an unnecessary restriction on the function. Additionally, the phrase "by using externally calculated coefficients" is clearly an unnecessary part of the function of this element, and is only included in an attempt to restrict the scope of the element. *See* ETG's Opening Brief, pp. 18-19 (D.I. 250). Once again, Defendants hope to take advantage of miniaturization and power sound efficiency, not available at the time of the invention, to limit the scope of the invention. The patented concepts, as all patented devices, would have gotten smaller over time, and where the coefficients are derived is simply not part of the scope of the claims.

The prosecution history of the '850 Patent supports both ETG's proposed function and the corresponding structure. The specification supports ETG's contention that the proper function of this means-plus-function element is "limiting or reducing the signal in some manner." *See* ETG's Opening Brief, pp. 17-18 (D.I. 250). Likewise, the testimony of Dr. Harry Levitt, an inventor and world-renown hearing aid authority supports ETG's proposed construction:

> Q. Can you explain how you would use a limiter in the feedback path to accomplish this solution of limiting the gain to the hearing aid user?
>
> A. . . . A device of that type in the feedback path might have the opposite effect in which case the limiter would act as an expander. The bottom line is whatever you do with a system that controls the dynamic range[, i]t has to operate in a way such that the total effect of all of the components of the **amplifier** gives you the dynamic – the reduction in dynamic range that you want. You can accomplish that in a clever way by playing around with the feedback path.

45

Q. When you say "in a clever way," can you expand on that?

A. [ ] choose the limiter's characteristics, maybe perhaps to expand the signal, such that when it's in the feedback path the output of the complex feed forward and feedback give you the constraints on the dynamic range that you want.

Q. If the limiter is in the feedback path, isn't it too late from the time that a signal comes into the microphone to try to limit it for purposes of making sure that the user doesn't get this really loud input?

A. We're not talking of waveform clipping. **We're talking of limiting or controlling the signal.**

. . .

Q. What's an expander? It seems the opposite of a limiter to me.

A. Well, **a limiter is a form of compression, and compression can either reduce dynamic range or expands dynamic range.**

Levitt Dep. Tr. 75:14-79:5, Feb. 27, 2007 (emphasis added) (JA-0249-0253). One skilled in the art at the time of filing the '850 Patent would have understood the "programmable compression amplifier" to be corresponding structure for accomplishing signal limiting in the feedback path. *See, e.g.,* '850 Patent, 11:32-38. Moreover, the specification also supports ETG's construction of the structure of this element. *See* ETG's Opening Brief pp. 17-18.

Defendants seek to impose elements that are unnecessary for performing the claimed function. *See id.* at 18-21. More specifically, "RAM 77" and "attendant signal lines" are not capable of performing the function of "limiting or reducing the signal" or even the function proposed by Defendants. "The structure must be necessary to perform the claimed function." *Omega Eng'g.,* 334, F.3d at 1321. Indeed, Defendants fail to provide any explanation how these structural components relate in any manner to the recited function. Accordingly, the Court should adopt ETG's construction of the function and structure of this element.

2.    **"Memory Means," "Means . . . For Providing An Output," and "Means For Converting Analog Signals . . ." - Claims 2 and 3 of the '850 Patent**

| Claim 2 | ETG's Proposed Constructions |
|---|---|
| memory means for storing filter- | Function - storing filter-response related coefficients |

46

| response related coefficients therein | therein.<br>Structure - memory devices or components, and structural equivalents thereof. |
|---|---|
| means jointly responsive to said delay line taps and to coefficients stored in said memory means for providing an output having at least one response characteristic effective to compensate for impaired hearing of the wearer of the aid. | Function - providing an output having at least one response characteristics.<br>Structure - transmission channels leading to the output along with combined circuitry, and structural equivalents thereof. |
| Claim 3 | |
| means for converting analog signals in said channel to digital signals | Function - converting analog signals in said channel to digital signals.<br>Structure - analog to digital converters, and structural equivalents thereof. |
| Why Defendants' Failure to Construe These Claims is Improper | |
| • Defendants agreed that ETG's infringement charts were preliminary and subject to further modification, which includes assertion of other claims.<br>• Defendants produced many technical documents **after** the due date of ETG's Preliminary Infringement Contentions.<br>• ETG seeks to preserve the right to assert claims 2 and 3 later by construing these means-plus-function elements now. | |

Defendants assert that ETG has "improperly proffered claim constructions for claims 2 and 3." This is not accurate, and this assertion should fail for several reasons. Defendants' assertion is simply a move to improperly limit ETG's ability to amend its infringement contentions, although Defendants have argued specifically against making their invalidity positions non-modifiable. Defendants therefore seek to lock in ETG's positions while retaining the freedom to modify their own invalidity arguments.

Indeed, the language of Defendants' Opening Brief contradicts their own position on this issue. Defendants' Opening Brief says that "ETG did not assert [claims 2 and 3] against any Defendant in ETG's . . . March 2, 2007 **Preliminary** Infringement Contentions." *See* Defendants' Opening Brief, p.13, fn. 7 (emphasis added). Defendants agreed to accept **preliminary** infringement contentions, which may be later modified, in return for the ability to

modify Defendants' invalidity contentions.[8] Moreover, Defendants had also not provided all

technical documentation before March 2, 2007 when Preliminary Infringement Contentions were

due, and not all FRCP 30(b)(6) depositions have been taken by ETG. Defendants fail to offer a

construction, instead relying on an argument which does not reflect their earlier position of

modifiability.

Should claims 2 and 3 not be construed during the *Markman* hearing, and later asserted

against Defendants, Defendants' clear argument will be that the claims were not construed

during the *Markman* phase of the case. ETG therefore respectfully requests that the Court

construe claims 2 and 3, to preserve ETG's right to assert the claims at a later time.

**B.    Dual Microphone Channels with a Programmable Filter - Claim 17 of the '850 Patent**

**1.    "Means For Adjusting The Amplitude And Phase Characteristics Of Each Of Said Microphone Channels"**

| ETG's Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Structure – amplifiers and processing elements, and structural equivalents thereof. | Structure – amplifiers 157 and 158 that, in an undefined manner, provide amplitude and phase adjustment in response to "gain and phase control" information; and equivalent structures |
| Why Defendants' Proposed Constructions are Improper | |
| • Defendants identify amplifiers 157 and 158 that are not linked to the function. <br> • Defendants' use of Figure numbers 157, 158 is unduly restrictive and confusing to a jury. | |

ETG and Defendants agree on the function of this means-plus-function element.

Defendants' assertion as to the structure of this element is improper as unduly narrow.

Defendants assert that ETG attempts to include "any structure that performs the recited

function." *See* Defendants' Opening Brief, p. 43 (emphasis removed). As shown in greater

detail in section III. A. above, Defendants again overstate and misconstrue ETG's position. By

---

[8] The Scheduling Order indicates that plaintiff shall serve a **preliminary** Plaintiff's Claim Chart and each defendant shall serve a **preliminary** Defendant's Claim Chart. *See* Section 5. b. iii.

limiting the construction to "amplifiers 157 and 158," Defendants improperly propose to limit

the construction to an overly inclusive illustration of the Figures.

### 2.    "Means For Summing The Outputs Of Said Microphone Channels"

| ETG's Proposed Construction | Defendant's Proposed Construction |
|---|---|
| Structure – summing circuits, and structural equivalents thereof. | Structure – summing amplifier 159; and equivalent structures |
| Why Defendants' Proposed Constructions are Improper | |
| • Defendants' use of Figure number 159 is unduly restrictive and confusing to a jury. | |

ETG and Defendants agree on the function of this means-plus-function element.

Defendants attempt to both incorrectly state ETG's position and advance a position which

inappropriately limits the means-plus-function element to an overly specific and overly inclusive

description.  Defendants assert that ETG attempts to include "any structure that performs the

recited function."  *See* Defendants' Opening Brief, p. 44 (emphasis removed).  As shown in

greater detail in section III. A. above, Defendants again overstate and misconstrue ETG's

position.  By limiting the construction to "amplifier 159," Defendants improperly propose to

limit the construction to an overly inclusive illustration of the Figures.

### C.    Use of a Signal-Level Dependent Amplifier to Impart a Response Characteristic - Claim 18 of the '850 Patent

#### 1.    "Responsive Characteristic Effective To Compensate For Impaired Hearing Of The Wearer Of The Aid" Should Be Given Its Ordinary and Customary Meaning

Defendants improperly seek to construe this element to "a single responsive

characteristic" in a clear attempt to introduce an unduly narrow limitation into claim 18.

Defendants assert that this element should be construed in the same manner as the identical

element in claim 1.  Defendants' construction of this element in claim 18, and therefore in claim

1, is not proper.  Defendants improperly propose to limit the construction of this element

contrary to its own plain meaning.  For example, Defendants' construction includes "**a response**

characteristic. . . ." *See* Defendants' Opening Brief, p. 46 (D.I. 252) (emphasis added). This is clearly incorrect, as the plain language of the claim element itself recites "at least one response characteristic." Defendants also seek to inject an additional limitation - "particular" - into the construction of this element. In so doing, they have simply reworded the element into a new form which is substantially narrower than the plain meaning of the element in Claim 18, as well as within Claim 1.

Defendants strain to use deposition testimony in an attempt to show that feedback reduction is not a responsive characteristic. Defendants do not offer evidence that feedback reduction is not a responsive characteristic, but only that "feedback is a product of the hearing aid." Defendants fail, however, to recognize that feedback reduction does indeed compensate for impaired hearing by allowing the hearing aid to send a louder signal to the wearer without an uncomfortable whistling. The element should be given an ordinary and plain meaning. Any attempt to limit the scope of the element to a single responsive characteristic is not correct.

Defendants have failed to provide justification as to how "signal level dependent amplifier" could be indefinite, offering instead only a vague accusation with no support or evidence. Defendants' have the burden of presenting evidence as to why the term is indefinite.

**D.     Additional Host Controller Functionality - Claims 1-6 of the '749 Patent**

As detailed in ETG's opening brief, ETG's proposed constructions for the means-plus-function terms of the '749 Patent are proper. Contrary to Defendants' assertion that ETG attempts to include any structure, ETG properly identifies the claimed function and corresponding structure necessary to perform the claimed function, as detailed below. Defendants advance a construction that is overly restrictive and contrary to the specification.

**1.     Defendants' Identification of Function is Improper**

Defendants' proposed claim constructions serve no other purpose than to improperly

narrow the terms with confusing brackets that will only distract the jury. In means-plus-function

analysis, the first step is to identify the **claimed** function recited by the claims themselves.

*Omega Eng.,* 334 F.3d at 1322 ("The construction of a means-plus-function limitation follows a

two-step approach. First, we must identify the claimed function, … staying true to the claim

language and the limitations expressly recited by the claims.").

Defendants' identification of the function is severely flawed on several fronts. Rather

than identifying the **claimed** function, Defendants seek to rewrite the functional language by

inserting unclaimed limitations, such as "[at the host controller]." *See Wenger Mfg., Inc. v.*

*Coating Machinery Sys., Inc.,* 239 F.3d 1225, 1233 (Fed. Cir. 2001) ("Under § 112, ¶ 6, a court

may not import functional limitations that are not recited in the claim, or structural limitations

from the written description that are unnecessary to perform the claimed function.").

As made evident below, ETG's constructions of the means-plus-function terms of the

'749 Patent follow the claim language while Defendants' constructions seek to import extraneous

unsupported bracketed limitations (highlighted in bold).[9]

| Claim 1 | ETG's Construction | Defendants' Construction |
| --- | --- | --- |
| means for receiving signals from the hearing aid and measuring phase and amplitude | Function - receiving signals from the hearing aid and measuring phase and amplitude | Function - receiving [**first**] signals [**at the host controller**] from the hearing aid and measuring phase and amplitude [**of those signals during programming of the hearing aid**] |
| means for receiving signals from the hearing aid indicative of the summation of acoustic feedback and acoustic feedback cancellation signals | Function - receiving signals from the hearing aid indicative of the summation of acoustic feedback and acoustic feedback cancellation signals | Function - receiving [**second**] signals [**at the host controller**] from the hearing aid indicative of the summation of acoustic feedback and acoustic feedback cancellation signals |

---

[9]    ETG and Defendants agree on the function for claims 4 and 5. However, the structure is in dispute.

| | | |
|---|---|---|
| means controlled by the computer for adjusting the phase and amplitude necessary to eliminate acoustic feedback and produce a null summation. | Function - adjusting the phase and amplitude necessary to eliminate acoustic feedback | Function - adjusting [**at the host controller and controlled by the computer**] the phase and amplitude [**of a signal from the hearing aid**] necessary to eliminate acoustic feedback and produce a null summation |
| **Claim 2** | | |
| means controlled by the computer for transmitting phase shift and amplitude data to program the hearing aid to eliminate acoustic feedback | Function - transmitting phase shift and amplitude data to program the hearing aid | Function - transmitting phase shift and amplitude data [**from the host controller to the computer**] to program the hearing aid to eliminate acoustic feedback |
| **Claim 3** | | |
| means for receiving signals from the hearing aid includes a circuit for receiving the test signals back from the hearing aid to provide reference phase and amplitude signals | See above "means for receiving signals from the hearing aid and measuring phase and amplitude" | See above "means for receiving signals from the hearing aid and measuring phase and amplitude" |
| **Claim 6** | | |
| adjustable phase shift and amplitude means controlled by the computer for adjusting the phase shift and amplitude necessary to eliminate acoustic feedback and transmitting an acoustical feedback cancellation signal to the hearing aid | Function - adjusting the phase shift and amplitude necessary to eliminate acoustic feedback and transmitting an acoustical feedback cancellation signal to the hearing aid | Function - adjusting [**at the host controller**] the phase shift and amplitude [**of a signal from the hearing aid**] necessary to eliminate acoustic feedback and transmitting an acoustical feedback cancellation signal to the hearing aid |

Defendants' use of bracketed language is curious at best. A jury will likely question whether the bracketed terms should be considered at all or why they are even proposed. In fact, the bracketed language will raise more questions and doubt from the jury. Defendants' suggested limitations are merely yet another awkward attempt to confine the patent concepts merely because miniaturization on technological advancements have permitted the functions identified in the patent to be performed in smaller and smaller spaces.

Defendants argue that the terms "[first]" and "[second]" are necessary because there are

two separate "means for receiving" in Claim 1. This reasoning is baseless. A jury would appreciate that claim 1 recites two different means, namely (1) means for receiving signals from the hearing aid and measuring phase and amplitude and (2) means for receiving signals from the hearing aid indicative of the summation of acoustic feedback and acoustic feedback cancellation signals. Accordingly, there is no logical reason to insert "[first]" and "[second]" to an already understandable concept. Moreover, the terms "first" and "second" modify the term "signals," and not the "means for receiving." Thus, Defendants' proposal does not even address the alleged source of confusion. Moreover, Defendants seek to restrict the signals as two separate signals by using the phrases "[first] signals" and "[second] signals." However, this modification contradicts the claim term "signals" which may encompass the same signals and/or different signals. During prosecution, the inventors carefully chose these terms to describe their inventions. Defendants should not be allowed to redraft the claims now in hopes of avoiding infringement.

Defendants seek to import a spatial relationship between a host controller and a hearing aid that does not exist in the claims. As the claims do not expressly recite a physical separation, the host controller and hearing aid may be separate or integrated, so long as they are "interfaced." *See* '749 Patent, 8:25-29. There is no language in the specification that precludes this proper claim scope. Defendants' arguments about the required separation of the host controller are merely an attempt to claim that miniaturization should limit, rather than empower the patent concept.

Defendants propose inserting the phrase "[at the host controller]" to allegedly clarify where the signal is received. Defendants offer no basis for this modification. Accordingly, this phrase provides no clarification but rather incorporates unnecessary structural limitations into the functional language. The inclusion of [at the host controller] in relation to the adjusting function

of claim 6 is also improper. Adjusting the phase shift and amplitude necessary to eliminate acoustic feedback may occur within the signal path of the hearing aid. *See, e.g.,* '749 Patent, 4:14-33; 9:49-57 ("This implementation necessarily requires an adjustment to both the amplitude and phase characteristics of the filter 64."). Accordingly, Defendants' construction is improper because it precludes an embodiment of the invention.

In Claim 1, the phrase "[of those signals during programming of the hearing aid]" unduly narrows the scope of the claims by importing a temporal relationship that does not exist nor is required by the claims or specification. The specification does not limit the function of receiving signals to a specific time, i.e., "during programming." In Claim 2, the phrase "[from the host controller to the computer]" contradicts the scope of the claim by adding a narrowing structural limitation that is unsupported by the specification. There is nothing in the specification that indicates that the amplitude information is **only** provided to the computer and not the hearing aid. The excerpt (4:23-30) relied upon by Defendants fails to support this view. Indeed, Defendants' bracketed language appears nowhere in the claims and unnecessarily limits the function actually recited in the claims. Again, functions that are performed in different locations merely because technology or lack of miniaturization did not allow for the functions to be performed in smaller spaces at the time of the invention do not limit the scope of the invention.

As for "means controlled by the computer for adjusting the phase and amplitude necessary to eliminate acoustic feedback and produce a null summation," Defendants seek to add limiting language to specify (1) where the act of adjusting occurs and (2) the source of the signal whose phase and amplitude is adjusted. *See* Defendants' Opening Br. at 52. However, these modifications have nothing to do with the recited function. Instead, Defendants' distracting bracketed language only serves to unduly narrow the scope of the claims by importing additional

limiting language into the function. In doing so, Defendants attempt to find an improper basis for identifying unnecessary and irrelevant structure. Thus, the only purpose for adding the distracting bracketed language is to correlate unnecessary and irrelevant structure in Defendants' means-plus-function analysis. Accordingly, Defendants' proposed constructions are improper and should be rejected.

The erroneously narrow functions advocated by Defendants lead to erroneous exclusion of alternative embodiments. *Micro Chem.*, 194 F.3d at 1258 (For the term "weighing means," the recited function is simply "weighing," and not the "sequential and cumulative weighing" illustrated in the patent's preferred embodiment. "Because it had adopted an unnecessarily narrow function, the district court . . . erroneously overlooked alternative embodiments of the invention."). By relying on an improper identification of the "function," Defendants have identified unnecessary structure that fails to even relate to the recited function.

### 2.    Defendants' Identification of Structure is Improper

Defendants rely on unnecessary components for each function. Many of the components relied upon by Defendants for a corresponding function overlap with other corresponding structure which further supports Defendants' theme of jury confusion. More specifically, Defendants identify the same latches, terminals, phase shifter and programmable amplifier from the specific circuit of Figure 1 for many of the functions attributed to claims 1-6 of the '749 Patent. According to Defendants, latches 33, 42, 43 as well as phase shifter 30 and programmable gain amplifier 32 all correspond to the functions for each of claims 1-4 and 6. How these common components are necessary structure to perform each separate function of the means-plus-function terms recited in claims 1-4 and 6 is beyond reason.

| Claim 1 | ETG's Structure | Defendants' Structure |
|---|---|---|
| means for receiving signals | circuits and processing | digital phase shifter 30; |

| from the hearing aid and measuring phase and amplitude | elements, and structural equivalents thereof. | programmable gain amplifier 32; latches 33, 42, 43 and 45; terminals 31, 34 and 121; switches 37 and 120; and related control and signal lines; and equivalent structures. |
| --- | --- | --- |
| means for receiving signals from the hearing aid indicative of the summation of acoustic feedback and acoustic feedback cancellation signals | processing elements that receive a combined signal of acoustic feedback and a feedback cancellation signal, and structural equivalents thereof. | terminals 34 and 121, switches 37 and 120, latch 45, programmable amplifier 38, rectifier 39, A/D converter 40, and related control and signal lines; and equivalent structures. |
| means controlled by the computer for adjusting the phase and amplitude necessary to eliminate acoustic feedback and produce a null summation. | amplifiers and processing elements, and structural equivalents thereof. | latches 33, 42 and 43, digital phase shifter 30 and programmable gain amplifier 32; and equivalent structures. |
| **Claim 2** | | |
| means controlled by the computer for transmitting phase shift and amplitude data to program the hearing aid to eliminate acoustic feedback | combined circuitry, and structural equivalents thereof. | programmable gain amplifier 32, latches 33, 42 and 43, and digital phase shifter 30; and equivalent structures. |
| **Claim 3** | | |
| means for receiving signals from the hearing aid includes a circuit for receiving the test signals back from the hearing aid to provide reference phase and amplitude signals | circuits and processing elements, and structural equivalents thereof. | digital phase shifter 30; programmable gain amplifier 32; latches 33, 42, 43 and 45; terminals 31, 34 and 121; switches 37 and 120; and related control and signal lines; and equivalent structures. |
| **Claim 4** | | |
| computer controlled means for adjusting the phase shift and amplitude to produce an acoustic feedback cancellation signal | amplifiers and processing elements, and structural equivalents thereof. | programmable gain amplifier 32, digital phase shifter 30, latches 33, 42 and 43, and terminal 144 (VFBK) adapted for connection to a hearing aid summing amplifier; and equivalent structures. |
| **Claim 5** | | |
| computer controlled means for supplying a logic signal to the hearing aid for programming and a logic | circuitry for logic signal transmission, and structural equivalents thereof. | latches 44 and 45 and lines 125 and 128, and tri-state buffer 46; and equivalent structures. |

| signal to the hearing aid to restore it for use by the patient | | |
|---|---|---|
| Claim 6 | | |
| adjustable phase shift and amplitude means controlled by the computer for adjusting the phase shift and amplitude necessary to eliminate acoustic feedback and transmitting an acoustical feedback cancellation signal to the hearing aid | amplifiers and processing elements, and structural equivalents thereof. | digital phase shifter 30 and programmable gain amplifier 32; latches 33, 42 and 43; and connectors 31 and 144; and equivalent structures. |

In addition, many of the components relied upon by Defendants are unnecessary for performing the corresponding function. As the Federal Circuit has repeatedly held, "[t]he structure must be necessary to perform the claimed function." *Omega Eng'g.*, 334 F.3d at 1321. More specifically, Defendants rely on latches 33, 42, 43 and 45; terminals 31, 34 and 121; switches 37 and 120 and related control and signal lines. None of these components relate in any manner to the function "receiving signals from the hearing aid and measuring phase and amplitude." In a similar manner, Defendants improperly rely on specific latches, specific terminals, specific switches, specific connectors and control and signal lines illustrated in Figure 1 of the '749 Patent for the remaining means-plus-function terms recited in claims 1-6. The identified components are not necessary to perform the claimed function. *Asyst Tech., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001) ("Structural features that do not actually perform the recited function do not constitute corresponding structure and thus do not serve as claim limitations."). Moreover, Figure 1 of the '749 Patent is one exemplary embodiment. Thus, the claims cannot be tied to this specific circuit when the specification clearly indicates that "several embodiments described above and depicted in the drawings are intended to be only illustrative ...." '749 Patent, 12:1-4.

In addition, Defendants have no basis for relying on the specific programmable amplifier 38, rectifier 39, A/D converter 40 for addressing the function of "receiving signals from the hearing aid ..." None of these components relate to the recited function.

Rather than identifying corresponding structure necessary to the claimed function, Defendants are attempting to improperly associate each function recited in claims 1-6 with the specific circuit illustrated in Figure 1 of the '749 Patent. *See General Electric Co. v. Nintendo Co., Ltd.*, 179 F.3d 1350, 1361 (Fed. Cir. 1999) (The claim recited a "gating means" for coupling a signal. The corresponding "means" in the specification was an "AND" gate and not the "very specific circuit" set forth in the specification.). Moreover, Defendants' use of exact Figure numbers further advocates an improper correlation to the specific circuit of Figure 1 of the '749 Patent which illustrates structure that is unnecessary to the claimed function.

## V.    CONCLUSION

ETG respectfully requests that this Court adopt the claim constructions ETG has proposed in the Joint Claim Construction Statement (D.I. 247) and in its Opening and Answering briefing herein. Defendants' proposed constructions should be rejected. They improperly attempt to limit the asserted claims by importing limitations from the specifications into the claims in violation of Federal Circuit case law. Defendants' constructions are designed to litigate their way around pioneering patents that cover their technology, by relying on a red herring. The inventors invented this pioneering technology many years before the industry caught up with a way to make it commercially available. Defendants rely on technology and advancements concerning miniaturization of computer chips and power source technology - allowing for smaller parts to be placed in the hearing aid itself. But miniaturization of circuitry and advance in power sources have nothing whatsoever to do with the inventions of the patent claims. Defendants' attempt to insinuate otherwise, and to improperly narrow the scope of the

claims on that basis, should be rejected.

Dated: June 6, 2007

Edmond D. Johnson (No. 2257)
PEPPER HAMILTON
Hercules Plaza Suite 5100
1313 Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6539
Facsimile: (302) 658-6395

Attorneys for Energy Transportation Group, Inc.

OF COUNSEL:

Marty Steinberg
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, FL 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460

Brian M. Buroker
Robert L. Kinder, Jr.
HUNTON & WILLIAMS LLP
1900 K Street, N.W.; Suite 1200
Washington, DC 20006-1109
Telephone: (202) 955-1500
Facsimile: (202) 778-2201

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone: (804) 788-8788
Facsimile: (804) 343-4630

## CERTIFICATE OF SERVICE

The undersigned counsel certifies that, on June 6, 2007, he electronically filed PLAINTIFF ENERGY TRANSPORTATION GROUP INC.'S RESPONSE BRIEF IN SUPPORT OF ITS PROPOSED CLAIM CONSTRUCTION with the Clerk of the Court using CM/ECF, which will send automatic notification of the filing to the following:

Richard W. Horwitz, Esquire
Potter Anderson & Corroon LLP
1313 N. Market St., 6th Fl.
Wilmington, DE 19801

N. Richard Powers, Esquire
Connolly Bove Lodge & Hutz LLP
1007 North Orange Steet
P.O. Box 2207
Wilmington, DE 19899

Richard K. Herrmann, Esquire
Morris James Hitchens & Williams
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801

Barry M. Klayman, Esquire
Wolf, Block, Schorr and Solis-Cohen LLP
Wilmington Trust Center
1100 North Market Street, Suite 1001
Wilmington, DE 19801

Maryellen Noereika, Esquire
Donald E. Reid, Esquire
Thomas C. Grimm
Leslie A. Polizoti
Morris Nichols Arsht & Tunnell
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19801

Edmond D. Johnson (#2257)

600980v1