IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) | Civil Action No. 05-422 (GMS) |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | REDACTED |
| | ) | NON-CONFIDENTIAL |
| SONIC INNOVATIONS, INC., *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

APPENDIX TO DEFENDANT RESISTANCE TECHNOLOGY, INC.'S
MEMORANDUM IN SUPPORT OF ITS RENEWED MOTION TO DISMISS FOR
LACK OF PERSONAL JURISDICTION PURSUANT TO RULE 12(b)(2)

REDACTED

NON-CONFIDENTIAL

Barry M. Klayman, Esquire (#3676)
WOLF, BLOCK, SCHORR and SOLIS-
COHEN LLP
Wilmington Trust Center
1100 North Market Street, Suite 1001
Wilmington, DE 19801
Tel: (302) 777-0313

Jefffrey D. Shewchuk, Esquire
Shewchuk IP Services, LLC
533 77th Street West
Eagan, MN 55121
Tel: (651) 331-9558

*Attorneys for Defendant, Resistance
Technology, Inc.*

Dated:  June 8, 2007

## TABLE OF CONTENTS

Excerpts from deposition testimony of Mark Gorder (May 7, 2007) ..................................................A1

Excerpts from deposition testimony of Philip N. Seamon (April 27, 2007)......................................A32

Affidavit of Mark S. Gorder in support of Resistance Technology, Inc.'s Motion to Dismiss for
Lack of Personal Jurisdiction Pursuant to Rule 12(b)(6) [D.I. 57-1]................................................A51

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 1

1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE
2
3    ------------------------------------------------------

4    Energy Transportation Group, Inc.,

                      Plaintiff,
5
6         vs.                        C.A. No. 05-422 GMS

7    Sonic Innovations, Inc., Phonak
     Holding Ag, Phonak Inc., Unitron
     Hearing, Inc., William Demant
8    Holding A/S, Oticon A/S, Oticon Inc.,
     GN Resound A/S, GN Resound
9    Corporation, Starkey Laboratories,
     Inc., Gennum Corporation, Resistance
10   Technology, Inc., Bernafon Ag,
     WDH, Inc., and Bernafon, LLC,
11
                      Defendants.
12
13   ------------------------------------------------------

14

15

16

17                   DEPOSITION OF

18                   MARK GORDER

19

20              Taken May 7, 2007

21          Commencing at 12:55 p.m.

22

23

24

25   JOB NO. 206615

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 2

1          Deposition of MARK GORDER, taken on the 7th
day of May, 2007 commencing at 12:55 p.m. at Esquire
2    Deposition Services, 701 Fourth Avenue South, Suite
500, Minneapolis, Minnesota, before Sheila D. Ford,
3    RPR, CRR and Notary Public of and for the State of
Minnesota.
4
              * * * * * * * * * *
5
                    APPEARANCES
6
On Behalf of the Plaintiff:
7        Harry Laxton, Jr., Esquire
         Hunton & Williams, LLP
8        Riverfront Plaza
         East Tower
9        951 East Byrd Street
         Richmond, Virginia 23219
10       804-788-8200
         hlaxton@hunton.com
11
On Behalf of the Defendant RTI:
12
         Jeffrey D. Shewchuk, Esquire
13       Shewchuk IP Services, LLP
         533 77th Street West
14       Eagan, Minnesota 55121
         651-331-9558
15       jdshewchuk@comcast.net
16
    (Via Telephonic)
17  On Behalf of the Defendant Starkey Laboratories:
18
         Anthony J. Tacconi, Esquire
19       Bowman & Brooke, LLP
         Riverfront Plaza West Tower
20       901 East Byrd Street
         Suite 1500
21       Richmond, Virginia 23219
         804-649-8200
22       anthony.tacconi@ric.bowmanandbrooke.com
23
24
25

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 4

1                    P R O C E E D I N G S

2                        MARK GORDER,

3              after having been first duly sworn,

4                testifies under oath as follows:

5                         EXAMINATION

6    BY MR. LAXTON:

7         Q.    Would you state your name, please?

8         A.    Mark Gorder.

9         Q.    Mr. Gorder, my name is Harry Laxton, Jr.,

10   and I represent the Plaintiff Energy Transportation

11   Group, Incorporated, a party that is adverse to

12   Resistance Technology, Incorporated.  Do you

13   understand that, sir?

14        A.    Yes.

15        Q.    How are you affiliated with Resistance

16   Technology, Incorporated?

17        A.    I was a founder of Resistance Technology

18   back in 1977 -- a co-founder.

19        Q.    Since 1977 have you been affiliated with

20   Resistance Technology, Incorporated in some regard?

21        A.    Yes, I have.

22        Q.    Can we have an agreement that if I use the

23   term RTI, you'll understand it to mean that I'm

24   referring to Resistance Technology, Incorporated?

25        A.    Yes.

A3

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 7

1    statement.

2        Q.    Okay.    How many facilities did RTI have in

3    the period 2002 through 2005?

4        A.    We had -- when you -- when you ask the

5    question about facilities, do you mean physical

6    facilities or subsidiaries?

7        Q.    I mean physical facilities.

8        A.    We had two plants in Minnesota; one in

9    Vadnais Heights and one in Arden Hills.    We have one

10   facility in Singapore, which is a wholly-owned

11   subsidiary of RTI, and we have a sales and service

12   center in Munich, Germany.

13       Q.    The Vadnais Heights -- how do you spell

14   Vadnais?

15       A.    V-a-d-n-a-i-s and Heights as you would.

16       Q.    During the period 2002 through 2005 how

17   many facilities did IntriCon have itself; not it's

18   subsidiaries, but IntriCon, if any?

19       A.    IntriCon only has subsidiaries.    It has no

20   facilities of its own.    It's basically a holding

21   company.

22       Q.    Can you explain to the ladies and gentlemen

23   of the jury what a holding company is in the regards

24   that you use it?

25       A.    One that would own multiple businesses.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 11

1      Q.    Are there records that would reflect when

2  these meetings were held from 2002 to 2005?

3      A.    Yes.

4      Q.    From your recollection do you recall when

5  these were occurring during those periods of time?

6      A.    I can give you an approximate.  On an

7  annual basis there's one meeting that would take

8  place in late January, early February, to finalize

9  the prior year's numbers, annual results.

10          Then there's a quarterly meeting that takes

11  place at the end of April, which also coincides with

12  our annual shareholders meeting.

13          And then there's one that takes place in

14  July, which would, again, review the quarterly

15  results for the prior quarter.

16          And there's one in October -- late October

17  for the quarterly results.

18          Then a December meeting for the budget.

19          And then you're back to the cycle again in

20  January, late January, early February.  Those are

21  the kind of planned five meetings per year.

22      Q.    And from 2002 to 2005 when you and the

23  other board members of IntriCon were meeting, at

24  what facility or facilities were you meeting?

25      A.    It would vary.  Sometimes in Philadelphia.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 12

1    Sometimes in Florida.  Sometimes in Arden Hills.

2        Q.   And which physical facility were you

3    meeting at in Arden Hills?  Was it an RTI facility

4    or a different subsidiary or both?

5             MR. SHEWCHUK:  I'm going to go ahead

6    and object at this point as going beyond the

7    Schedule A topics, but you can go ahead and answer.

8        A.   Well, prior to 2004, a majority of the

9    board meetings took place at the company's, at that

10   time, headquarters in Dresher Pennsylvania.  And

11   then when we sold off the last remnant of that

12   business, at which the Dresher facility resided,

13   then we started to rotate the meetings between

14   Minneapolis, Philadelphia and the other place.  So

15   if you go back and check the records, there would be

16   a number of different venues for the meetings

17   depending on what year it was between 2000 and 2005.

18       Q.   I'm going to hand you Exhibit No. 1, and I

19   think it may help if you need to look at it.  I'm

20   going to ask you about some of those topics.

21            Referring to topic No. 2:  "The

22   identification and description of all personal

23   property, real property, offices, facilities,

24   equipment, employee, representative, director,

25   officer and agent of Defendant that entered into

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 13

```
 1   and/or was maintained and/or owned in Delaware."

 2   And I won't continue with it, but do you see that

 3   topic?

 4       A.   Yes.

 5       Q.   Because that's what I'm going to ask you

 6   about is, from 2002 to 2005 did RTI own or maintain

 7   in Delaware any personal or real property?

 8       A.   Not to my knowledge, no.

 9       Q.   And if they did, you would expect that you

10   would be aware of that?

11       A.   Yeah.

12       Q.   During that period of time, 2002 to 2005,

13   did RTI have any offices, facility or equipment that

14   was owned or maintained in Delaware?

15       A.   No.

16       Q.   During the years 2002 to 2005 did RTI have

17   any employees, representatives, directors, officers

18   or agents in Delaware?

19       A.   No.

20       Q.   Has RTI ever paid to any Delaware

21   government or entity any monetary amounts for taxes

22   or tariffs or for any other reason?

23       A.   No, not that I'm aware of or can recall.

24       Q.   Let me ask you about RTI's document

25   production.  There's a list of 2005 vendors, and
```

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 14

1   included on that list was the Delaware Secretary of

2   State.  Are you familiar with that document?

3       A.   I was wondering if could you show it to me.

4       Q.   Sure.  This is the two pages of the --

5   several pages.  This first page, which is

6   RTI 00086, shows a heading here of vendors and a

7   year, and then on the next page, which is

8   RTI 000089, it has listed Delaware Secretary of

9   State 2005.  Are you familiar with that document?

10      A.   I think -- I don't know if I've seen this

11  one, no, this particular one.

12      Q.   Do you know why RTI would possess a

13  document reflecting Delaware Secretary of State as a

14  vendor?

15      A.   No.  The only thing I can think of is RTI

16  Electronics, which is a subsidiary of IntriCon, is

17  incorporated in Delaware.

18      Q.   Does --

19      A.   Why it shows up on our list I couldn't tell

20  you.

21      Q.   Okay.  Am I correct in assuming that RTI

22  Electronics and RTI, that they maintain separate

23  records?

24      A.   Yes.

25      Q.   Is that also true with IntriCon and RTI,

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 15

1    that they maintain separate records?

2        A.    Uh-huh.

3        Q.    Is that a yes?

4        A.    Yes.

5        Q.    We all say uh-huh in normal conversation,

6    but it makes for a more clear record.

7        A.    Understood.

8        Q.    I'm not getting on --

9        A.    Understood.

10       Q.    The products that RTI manufacturers from

11   the period of 2002 to 2005 -- strike that.

12             During the period 2002 to 2005 for the

13   products that RTI manufactured that were designed to

14   be used in hearing aid products, did they contain

15   any type of identifying marks?

16       A.    Only date codes and lot codes, but you

17   would not be able to tell that there was an RTI

18   product on it.  In other words, they're marked only

19   for quality purposes if the customer is going to

20   return them.

21       Q.    The two codes, are they combined into one

22   number or are they two separate sets of numbers?

23       A.    I think they might be combined into one

24   number.

25       Q.    Is there anything -- is it strictly a

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 16

1    numerical sequence or is there anything else in that

2    code?

3        A.    Well, there would be a lot identifier, but

4    then also a date identifier.

5        Q.    What is a lot identifier?

6        A.    Well, there could have been multiple lots

7    of a product built in a particular time period, so

8    you have to identify the lot as well as the date.

9        Q.    How do you identify a lot?

10       A.    It's probably a number.

11       Q.    So the letters l-o-t wouldn't be on it?

12       A.    No, I don't think so.

13       Q.    You're just saying in the numerical

14   sequence, some of those numbers would represent the

15   lot numbers?

16       A.    Yes.

17       Q.    Some of those numbers would represent the

18   date and some of those numbers would represent the

19   product itself?

20       A.    Yes, that's correct.

21       Q.    Has RTI had any brand names registered in

22   Delaware during the years 2002 to 2005?

23       A.    Not to my knowledge, no.

24       Q.    From the years 2002 to 2005 did RTI have

25   any telephone listings in Delaware?

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 18

1    on what year it was.

2        Q.    Would any of the topic matters set forth on

3    Exhibit No. 1, would there be anybody at RTI that

4    you believe would be more knowledgeable regarding

5    any of those topics?

6        A.    No, not more knowledgeable, no.

7                    (Exhibit 2 marked.)

8    BY MR. LAXTON:

9        Q.    I'm handing you a document that's been

10   labeled Exhibit No. 2, and it has Bates stamps

11   RTI 000113 through 115.  If you could look at that,

12   please.

13                    MR. SHEWCHUK:  I'm going to remark

14   for the record that this is a document which was

15   produced as Confidential Attorneys' Eyes Only and

16   request that we go on the confidential portion of

17   this transcript.

18   BY MR. LAXTON:

19       Q.    Have you seen that document before?

20       A.    Yes, Mr. Shewchuk reviewed it with me last

21   week.

22       Q.    And that document has a title "East Coast

23   Initial Targets," correct?

24       A.    Yes.

25       Q.    And on page RTI 000114 there is a DOBI

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 19

1    Medical International, Delaware, is that correct?

2        A.    Uh-huh.

3        Q.    Is that a yes?

4        A.    Yes, it is.

5        Q.    Are you familiar with that entity?

6        A.    No, I'm not.

7        Q.    Do you know, are you familiar with this

8    document other than having reviewed it in the last

9    week?

10       A.    Having reviewed it I recall what its origin

11   was, yes.

12       Q.    What's its origin?

13       A.    We had a -- hired a sales manager for a

14   medical business and we gave him the task of coming

15   up with a plan to expand our medical business.  And

16   he came up with a list of target accounts, but it

17   was never executed.  We terminated him when we had

18   to cut back on our staff back in 2004.

19       Q.    So were these targets for you to make sales

20   to?

21       A.    They were targets to be contacted for

22   potential sales, but to my knowledge they were never

23   contacted.

24       Q.    Do you know how -- what was the name of the

25   sales manager?

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 20

1      A.    Yachimowicz.  And don't ask me to spell it.

2    Y-a-c-h-i-m-o-w-i-c-z, to the best I can recall.

3      Q.    Do you know how he came up with this list?

4      A.    I do not.

5      Q.    Are you familiar with this other entity on

6    here, Rafael Medical Technologies of Dover,

7    Delaware?

8      A.    No, I'm not.

9            MR. LAXTON:  I offer that for

10   attachment to the deposition.

11   BY MR. LAXTON:

12     Q.    During the period 2002 to 2005 did RTI have

13   a method of providing advice to U.S. customers?

14     A.    Advice regarding?

15     Q.    Regarding anything.  Regarding problems

16   with the product, regarding returns, regarding

17   acquiring products?

18     A.    It wasn't -- it wasn't geared to U.S.; it

19   was geared to our global customer base, of which the

20   U.S. is part of.

21     Q.    And what was that method?

22     A.    We have a direct sales force that calls on

23   all our customers on a global basis.

24     Q.    How do you call upon a global basis?  What

25   does that mean?

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 21

1    A.    They visit the customers.

2    Q.    Okay.

3    A.    And of course they also can discuss by

4  phone, but the primary method is visiting face to

5  face because it's a very technical sale.

6    Q.    To your knowledge has RTI ever been

7  contacted by a hearing aid wearer with a problem

8  about the product?

9    A.    Not to my knowledge.

10    Q.    Now, on RTI's website there's a statement

11  that RTI has worldwide customers, is that correct?

12    A.    Uh-huh.

13    Q.    Is that a yes?

14    A.    Yes, it is, sir.

15    Q.    Do you know who determined that statement

16  would be contained on the website?

17    A.    I'm not sure.  We have a gentleman that

18  updates our website.  It was -- which one?  Is it

19  the IntriCon website you're referring to or the RTI

20  website?

21    Q.    I'm referring to the RTI website.

22    A.    I believe that would be Chris Conger or

23  Mike Geraci -- but I'm guessing -- that put that

24  together.  We don't spend a lot of time on our

25  website.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 33

1    would call into that main line, unless they knew an

2    extension number to ask for.

3        Q.    Okay.

4        A.    Or to dial into.

5        Q.    The calls to Delaware to these numbers that

6    I just ran through the list, do you know who made

7    those calls?

8        A.    No, I do not.

9        Q.    Do you know the purpose of any of those

10   calls?

11       A.    No, I do not.

12       Q.    Are you familiar with Frank Toczylowski?

13       A.    Yes.

14       Q.    Who is he?

15       A.    He was the former chief financial officer

16   of Selas Corporation, also known as IntriCon.

17       Q.    How do you spell his last name?

18       A.    Oh, you would ask me that.

19       Q.    If you don't know --

20       A.    It's pronounced Toczylowski.  I could

21   certainly provide that spelling, but I don't -- I

22   wouldn't even want to venture a guess.  It's hard to

23   pronounce.

24       Q.    Is he still with Selas?

25       A.    No.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 34

1    Q.    Is he still with IntriCon?

2    A.    He left in 2004, I believe.

3    Q.    Okay.

4    A.    Possibly 2003.

5    Q.    And for the benefit of the jury, CFO is

6    short for chief financial officer?

7    A.    That's correct.

8    Q.    And Jerry Broecker, do you know him?

9    A.    Jerry Broecker was the vice president of

10   administration for IntriCon or Selas.  And he's also

11   left.

12   Q.    Is it B-u-r --

13   A.    It's B-r-o-e-c-k-e-r.

14   Q.    Are you familiar with Bob Gallagher?

15   A.    Yes.

16   Q.    And who is that?

17   A.    Bob was the former chief financial officer

18   of Selas, also known as IntriCon.

19   Q.    Is he with IntriCon?

20   A.    He's not.  He's departed.

21   Q.    How about Bill Kullback, are you familiar

22   with him?

23   A.    Yes.  Bill Kullback was also a chief

24   financial officer of IntriCon, and he's also gone.

25   Q.    During approximately what years were each

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 35

1    of these three CFOs actual CFOs of IntriCon?

2        A.    Mr. Toczylowski was CFO, I believe, from

3    approximately 2002, and then Bob Gallagher was 2003

4    to 2004.  And Mr. Kullback was CFO from mid 2004 to

5    mid 2005, I believe.  Let's see.  Did I get that

6    right?  Let me just think here.  I'm sorry.

7    Mr. Gallagher was from 2003 to 2005.  And

8    Mr. Kullback back was from 2005 -- mid 2005 to mid

9    2006.  And we now have a different CFO who is

10   currently employed.

11       Q.    Is Kullback spelled -- how is that spelled?

12       A.    K-u-l-l-b-a-c-k.

13       Q.    Are you familiar with the relationship

14   between RTI and Philip Seamon before he became a

15   director of IntriCon?

16       A.    He has no relationship with RTI.  He was

17   employed by the board of directors as a financial

18   consultant to help us through our restructuring.

19       Q.    When you say the board of directors, which

20   board of directors are you referring to?

21       A.    The board of directors of IntriCon.

22       Q.    And you said he was hired to do what?

23       A.    He was hired as a financial consultant to

24   assist Selas, also known as IntriCon, with its

25   restructuring.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 36

1    Q.    And was there a written employment

2  agreement?

3    A.    I don't believe it was an employment

4  agreement.  He was acting as a consultant for

5  PricewaterhouseCoopers, which later was restructured

6  into I believe called FTI Consulting located in

7  Philadelphia.  And the -- we utilized Mr. Seamon as

8  -- under agreement with those entities, I believe.

9    Q.    Did Mr. Seamon generate any written product

10 while he was working doing this work that you just

11 referred to?

12   A.    He did financial analysis to assist us with

13 our banking relationships.  So there were -- he

14 assisted us with financial analysis of our

15 operations.

16   Q.    And which entity would have those records?

17   A.    We would have them in our -- IntriCon would

18 have them.

19   Q.    Did you have any involvement with

20 Mr. Seamon while he was doing this financial

21 consulting work?

22   A.    Not -- I wasn't directly supervising his

23 activities; the chief financial officer was doing

24 that.  But I certainly had discussions with him when

25 we would meet with the banks.  That was

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 37

1    predominantly done in Philadelphia.

2        Q.    When you say predominantly, that indicates

3    to me that there may have been other locations?

4        A.    He would have attended numerous board

5    meetings to report to the directors on his

6    activities.

7        Q.    And where would those board meetings have

8    been that he attended?

9        A.    The same locations that we previously

10   discussed.

11       Q.    Do you believe -- how many of those did he

12   attend?  Did he attend every one while he was

13   working or not every one?

14       A.    Not every one.  It would have been

15   sporadic.

16       Q.    So have you ever verbally spoken with Mr.

17   -- strike that.

18            Did you ever verbally speak with Mr. Seamon

19   when he was working as a financial consultant?

20       A.    Yes, I did.

21       Q.    And was that at these board of director

22   meetings?

23       A.    Board of director meetings or in

24   Philadelphia.

25       Q.    To your knowledge, did anyone with IntriCon

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 38

1   or RTI travel to Mr. Seamon's residence?

2       A.   Not to my knowledge.

3       Q.   Did Mr. -- and if I'm mispronouncing these

4   names, I apologize, but did Mr. Toczylowski,

5   Broecker, Gallagher, or Kullback, ever state to you,

6   inform you that they had called Mr. Seamon at his

7   residence in Delaware?

8       A.   Not specifically.  We would always return

9   Mr. Seamon's calls at his request.

10      Q.   Okay.  What do you mean at his request?

11      A.   Well, he would work from many locations,

12  but he -- primarily his office was in Philadelphia,

13  but he would call us from his cell phone, and I'm

14  sure he would call us occasionally from his

15  residence.  Not me directly.  But, you know, he

16  was -- 24-7 he was working.

17      Q.   Am I understanding correctly that he would

18  call you on his cell phone and ask you to call him

19  back?

20      A.   I'm sure that took place.  I can't imagine

21  that it didn't.

22      Q.   I was just wondering why you said you would

23  return his calls.  It leads me to believe he was

24  initiating calls -- or could it have been either,

25  you initiated calls or he initiated calls?

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 39

1      A.    Yeah.   And he would tell us the best way to

2  reach him and we would call him where we could best

3  reach him.

4      Q.    So was it your understanding in 2002 to

5  2005 that at least some of the calls that you were

6  making, you or anyone associated with IntriCon or

7  RTI was making -- strike that.

8            Was it your understanding that the phone

9  calls being made at the phone numbers reflected in

10  the RTI records produced, that those phone calls, at

11  least some of which, were being made to Mr. Seamon's

12  residence?

13      A.    I don't know that.

14                MR. SHEWCHUK:   Objection.

15  BY MR. LAXTON:

16      Q.    Did you make any of those calls?

17      A.    No.

18      Q.    How do you know that he was working 24-7?

19  Strike that.

20            Why do you say he was working 24-7?

21      A.    Very busy person.   Hard to get a hold of.

22      Q.    Did anyone at IntriCon or RTI ever indicate

23  that they believed he was working so much that he

24  was working at home often?

25      A.    No, I don't think anybody ever -- I don't

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 40

1    recall anybody ever telling me that, no.

2        Q.   Are you aware now that Mr. Seamon's

3    residence is in Delaware?

4        A.   Yes.

5        Q.   So do you believe that at the -- from the

6    RTI assigned numbers, that some calls were made to

7    Mr. Seamon's Delaware residence?

8        A.   I don't know that.  I didn't review that

9    record in detail.

10        Q.   Approximately when did you first become

11    aware that Mr. Seamon resided in Delaware?

12        A.   Probably two, three years ago.

13        Q.   And how did you become aware of that?

14        A.   I believe one of the directors told me

15    that.

16        Q.   Do you remember why he was telling you

17    that?

18        A.   No, I don't.

19        Q.   Are you familiar with Corporation Service

20    Company of Wilmington, Delaware?

21        A.   Yes.  They have some --

22             THE WITNESS:  I'm sorry, Jeff?

23             MR. SHEWCHUK:  Go ahead.

24        A.   They are a -- they have some affiliation

25    with our subsidiary -- with IntriCon's subsidiary

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 41

1   RTI Electronics.  And I forget the correct term, but

2   they have some registering or reporting

3   responsibilities as part of our corporation of RTI

4   Electronics in Delaware.

5   BY MR. LAXTON:

6       Q.    So CSC Corporation has performed some

7   services on behalf of RTI Electronics, is that

8   correct?

9       A.    Yes.

10      Q.    And do you know approximately how long

11  they've been doing that?

12      A.    I do not.  I could guess, but I don't know

13  exactly for how long.

14      Q.    Other than what you've already told me, do

15  you have any further detail that you can provide me

16  as to what services CSC Corporation was providing?

17      A.    No.

18      Q.    Do you know why CSC is listed as a vendor

19  in the RTI records that have been produced to us?

20      A.    No, I do not.

21      Q.    Am I correct in understanding that RTI does

22  not --

23            Where are the facilities of RTI

24  Electronics?

25      A.    Anaheim, California.

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 44

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# REDACTED

CONFIDENTIAL
ATTORNEYS EYES ONLY

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 46

1

2

3

4

5

6

7

8

9

10

11

12  REDACTED

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL
ATTORNEYS EYES ONLY

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 47

1     Q.    Do you know that telephone number?

2     A.    I don't know it offhand, but I could

3  provide it if asked.

4     Q.    What states are the DuPont supplies coming

5  out of?

6     A.    I don't know that in detail, but I could

7  get it for you.

8     Q.    You don't know what states it comes out of,

9  but you know it doesn't come out of Delaware?

10    A.    Not by route, no.

11    Q.    Okay.  But am I correct in understanding

12 you're saying that you don't know which states it

13 comes out of, but you do know that the supplies are

14 not coming out of Delaware?

15    A.    Yes.

16    Q.    Okay.

17    A.    I verified that as part of my discussions

18 with Mr. Shewchuk.

19    Q.    Okay.  And how did you verify that?

20    A.    I asked the appropriate people.

21    Q.    And who was the appropriate people?

22    A.    Mr. Paul Colling and Ms. Faith Grekhoff.

23 And they do the procurement.

24    Q.    And how do you spell their names?

25    A.    Colling is C-o-l-l-i-n-g, and Grekhoff is

Page 54

1    knowledge of that, that's correct.

2        Q.    Are you familiar with Starkey Laboratories'

3    Mount Laurel, New Jersey facility?

4        A.    No, I'm not.

5        Q.    Have you ever viewed Starkey Laboratories'

6    website?

7        A.    I have not, no.

8        Q.    Have you ever heard anybody with RTI

9    discuss Starkey Laboratories' website?

10       A.    I have not.

11       Q.    Are you aware that that website directs

12   persons to locations in Delaware in which hearing

13   aids may be obtained?

14       A.    I'm not, no.

15       Q.    Where in the United States do you believe

16   that your component parts are being -- ultimately

17   ending up in the hands of hearing aid wearers?

18       A.    Well, we don't know because we sell -- for

19   example, I'll give you an example.  Volume controls.

20   We sell Starkey volume controls.  We don't know

21   where they put those volume controls.  They'll buy

22   10, 20,000 volume controls, all the same part

23   numbers, and we don't know which hearing aid models

24   those are going into.  They don't tell us that.

25   They're just buying these volume controls in bulk

CONFIDENTIAL
ATTORNEYS' EYES ONLY



Page 55

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# REDACTED

CONFIDENTIAL
ATTORNEYS EYES ONLY

CONFIDENTIAL
ATTORNEYS' EYES ONLY



Page 56

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

REDACTED

CONFIDENTIAL
ATTORNEYS EYES ONLY

CONFIDENTIAL
ATTORNEYS' EYES ONLY

Page 57

1

2

3

4

5

6

7

8

9

10

11

12

13          REDACTED

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL
ATTORNEYS EYES ONLY

A30

1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

\-    \-    \-

ENERGY TRANSPORTATION    : CIVIL ACTION
GROUP, INC.,            :
         Plaintiff   :
                 :
       V.           :
                 :
SONIC INNOVATIONS, INC.,:
et al.,                :
       Defendants : NO. 05-422(GMS)

COPY

\-    \-    \-

April 27, 2007

\-    \-    \-

Oral deposition of PHILIP N.
SEAMON, held in the offices of Esquire
Deposition Services, Suite 1210, 1600
J.F.K. Boulevard, Philadelphia,
Pennsylvania 19103, commencing at 11:10
a.m., on the above date, before Denise D.
Bach, a Federally Approved Registered
Professional Reporter and a Certified
Shorthand Reporter.

\-    \-    \-

ESQUIRE DEPOSITION SERVICES
Four Penn Center, Suite 1210
1600 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103
(215) 988-9191

2

1    A P P E A R A N C E S :

2

3         HUNTON & WILLIAMS, LLP
         BY: HARRY LAXTON, JR., ESQUIRE
4         Riverfront Plaza
         East Tower
5         951 East Byrd Street
         Richmond, Virginia 23219
6         (804) 788-8200
         hlaxton@hunton.com
7         Representing Energy Transportation
         Group, Inc.

8

9

         SHEWCHUK IP SERVICES
10        BY: JEFFREY D. SHEWCHUK, ESQUIRE
         533 77th Street West
11        Eagan, Minnesota 55121
         (651) 331-9558
12        jdshewchuk@comcast.net
         Representing Resistance
13        Technology, Inc.

14

15        BOWMAN & BROOKE
         BY: ANTHONY J. TACCONI, ESQUIRE
16        901 East Byrd Street
         Suite 1500
17        Richmond, Virginia 23219
         (804) 819-1148
18        atacconi@bowmanandbrooke.com
         Representing Starkey Laboratories
19        (Appearing via telephone)

20

21

22

23

24

A33

PHILIP N. SEAMON

```
1                    -   -   -

2              PHILIP  N.  SEAMON, having

3         been  first  duly  sworn,  was

4         examined  and  testified  as  follows:

5                    -   -   -

6              EXAMINATION

7                    -   -   -

8    BY MR. LAXTON:

9         Q.     Good  morning,  Mr.  Seamon.

10   My  name  is  Harry  Laxton  and  I  am  one  of

11   the  attorneys  representing  the  plaintiff

12   in  this  present  lawsuit,  ETC,  Energy

13   Transportation  Company.

14              Do  you  understand  that?

15        A.     Yes,  I  do.

16        Q.     Can  you  state  your  name  for

17   the  record,  please?

18        A.     Philip  Seamon.

19        Q.     And  how  are  you  currently

20   employed?

21        A.     I  am  currently

22   self-employed.  I  have  my  own  business,

23   consulting  business.

24        Q.     Are  you  currently  employed
```

PHILIP N. SEAMON

1   in any regards by IntriCon?

2          A.      Am I currently employed by

3   them?

4          Q.      Yes.

5          A.      No.

6          Q.      Are they a client of yours?

7          A.      No.    Currently they are not

8   a client.

9          Q.      Are you a director of

10  IntriCon at the moment?

11         A.      I am.

12         Q.      Do you act in any other

13  capacity for IntriCon, as an officer or

14  otherwise?

15         A.      No, I do not.

16         Q.      Have you ever been deposed

17  before?

18         A.      Yes.

19         Q.      Approximately how many

20  occasions?

21         A.      Just a couple.

22         Q.      Can we have an agreement

23  that if I ask you a question that you

24  don't understand, that you won't answer

PHILIP N. SEAMON

1    the question, but rather you'll tell me

2    you don't understand the question?

3            A.        Certainly.

4            Q.        What college degrees do you

5    hold, if any?

6            A.        I have a BA and an MBA.

7            Q.        Can you tell me for whom you

8    were employed from the period 2002

9    through 2005?

10           A.        2002 through 2005, for a

11   period in 2002, I was employed as a

12   partner at PriceWaterhouseCoopers.  And

13   for the period starting September of 2002

14   through 2000 -- middle of 2000 -- I'm

15   trying to think of the time frame -- 2005

16   would have been FTI Consulting, Inc.

17           Q.        Were you ever employed by a

18   company called CSC?

19           A.        No.

20           Q.        Did you ever work with CSC?

21           A.        Did I ever work for CSC?

22           Q.        Did you ever work with them?

23           A.        CSC?

24           Q.        Do you know which company

PHILIP N. SEAMON

1    I'm referring to by CSC?

2          A.    No, I do not.

3          Q.    Okay.  Have you heard of CSC

4    Trust Company of Delaware?

5          A.    No, I have not.

6          Q.    Have you heard of

7    Corporation Service Company?

8          A.    No, I have not.

9          Q.    Do you have any ownership

10   interest in IntriCon or Resistance

11   Technology, Incorporated?

12                MR. SHEWCHUK:  I'm just

13           going to caution the witness to

14           the extent that that gets into

15           confidential information, we may

16           want to go on the confidential

17           record.  I don't know.

18                THE WITNESS:  I have -- I

19           have options that were granted to

20           me upon becoming a director.  So I

21           have options that have not been

22           exercised.

23   BY MR. LAXTON:

24          Q.    And do those pertain to --

PHILIP N. SEAMON

1    know of anything other than the

2    fact that, you know, I'm in

3    Delaware, but I don't know of any

4    action with regard to anybody

5    else.

6  BY MR. LAXTON:

7    Q.    Okay.

8    A.    So I don't know whether

9  that's what you're trying to get to.

10    Q.    What do you mean by "I'm in

11  Delaware"?

12    A.    I live in Delaware.

13    Q.    Do you work in Delaware?

14    A.    Do I -- no.

15    Q.    So you never perform any

16  work functions in Delaware?

17    A.    What period of time are we

18  talking about?

19    Q.    2002 through 2005.

20    A.    I have an office -- during

21  that period of time, I had an office at

22  PriceWaterhouseCoopers and FTI in

23  Philadelphia.  That's where -- that's

24  where my work was.

PHILIP N. SEAMON

1    was -- Selas Heat Technology.  S-E-L-A-S,

2    Heat, H-E-A-T, Tech, Technology.

3           Q.      During what period of time

4    did you perform those services?

5           A.      That would have been first

6    or second quarter of 2002 to, roughly

7    speaking, second quarter of 2005.

8           Q.      Did you perform any

9    consulting for Resistance Technology,

10   Incorporated?

11          A.      I was specifically engaged

12   by Selas Heat Technology, which became

13   IntriCon.  And basically was working for

14   the holding company relative to financial

15   issues that the company was having.

16          Q.      When you say the holding

17   company, you're referring to IntriCon?

18          A.      IntriCon.  Selas was the

19   predecessor to IntriCon.

20          Q.      And what services were you

21   doing for IntriCon?

22          A.      Going back to 2002, the

23   nature of the engagement was provide

24   financial advisory services to the

16

PHILIP N. SEAMON

1   company.

2        Q.      What type of financial

3   advice were you providing?

4        A.      Generally, at that time, was

5   restructuring advice relative to its

6   finances as well as interfacing and

7   giving advice to the financial officers

8   as to dealing with its banking

9   relationships.

10       Q.      During the year 2002, what

11  was your work routine as far as how many

12  hours you were in the office?  Like did

13  you go in eight to five?  Was it nine to

14  eight?  What was your routine?

15       A.      As a consultant?  During

16  2002?  It would depend on the client.  I

17  had more than one client.  So I would

18  generally be either working in the office

19  or working on site at a client's.

20       Q.      Did you have any typical

21  hours that you'd work?

22       A.      Typical hours?  On a weekly

23  basis, 60, 70, 80, 100 hours, depending

24  on the intensity of the engagement, the

PHILIP N. SEAMON

1    would have generally been the same, but,

2    I mean, I can't be specific as to what

3    happened in 2003, 2004, 2005. I mean,

4    that -- you know, I'd have to go back and

5    look at my client list and who I worked

6    with during those periods.

7         Q.    But as you sit here today,

8    from your independent recollection, it

9    seems like your work routine was similar

10   during those periods of time?

11        A.    I would say so, generally.

12   I mean, either I'm working in the office

13   or working outside, given the nature of

14   my business, I'm working in the office

15   or, generally, most likely at a client

16   site.

17        Q.    Have you ever received

18   telephone calls from RTI?

19        A.    Are we lumping RTI and Selas

20   together? Are you asking --

21        Q.    I'm asking about RTI.

22        A.    To the extent that RTI was a

23   part of the Selas organization, you know,

24   I don't know whether, you know, I'm

1  supposed to be thinking in terms of who

2  was with, you know, Selas and who may

3  have been, you know, with RTI.  I was

4  generally dealing with the global entity,

5  the corporate entity here, and dealing

6  with issues associated with the total

7  debt of the organization.  All right?

8           So I don't know whether or

9  not certain people that may have been

10 calling me, whether or not they were

11 specifically an RTI employee or an

12 officer of the holding company.

13      Q.    Okay.  Who do you recall

14 that you spoke to during the period 2002

15 to 2005 that you believe either was

16 associated with either Selas or IntriCon,

17 it later became, or RTI?

18      A.    It would be the various

19 people that were in a financial capacity.

20 I mean, are you looking for names?

21      Q.    Yes, please.

22      A.    It would be -- there was a

23 fellow by the name of Frank Tosloski,

24 Jerry Broker.  There was a financial --

PHILIP N. SEAMON

1   both of whom were in a financial

2   capacity.  Bob Gallagher.  And perhaps

3   Bill Kullback.  All financial types.

4         Q.    As you sit here today, do

5   you remember any conversations that you

6   have had with RTI, IntriCon or the Selas

7   entity that you've described during the

8   period 2002 to 2005 that would pertain to

9   something other than a financial

10  capacity?

11        A.    No.

12        Q.    Prior to you becoming a

13  consultant in 2002, did you have any

14  conversations with RTI?

15              MR. SHEWCHUK:  Objection.

16              THE WITNESS:  Prior to 2002,

17        did I have --

18  BY MR. LAXTON:

19        Q.    Let me interrupt you,

20  because that's not my question.  I'm

21  sorry, let me try to make it more clear.

22              You described 2002, but you

23  prefaced it by saying "as a consultant."

24  And I understand that sometime during

PHILIP N. SEAMON

1    practice and basically the lead person on

2    the engagement that was between Selas and

3    PriceWaterhouseCoopers initially that was

4    succeeded by an ongoing consulting

5    engagement with FTI.  We just continued

6    on with that engagement.

7            Q.    What is your --

8            A.    So --

9            Q.    I'm sorry.

10           A.    Go ahead.

11           Q.    Did you have more to add?

12           A.    No.

13           Q.    If at any time you think

14   I've cut you off, let me know, because I

15   want to give you an opportunity to -- I

16   don't want to cut you off.

17               Is that fair?

18           A.    That's fair.

19           Q.    All right.  Frank

20   Tosloski --

21           A.    Tosloski.  I couldn't spell

22   it for you.

23           Q.    What is your understanding

24   of his position with his employer?

PHILIP N. SEAMON

1      A.    I don't -- I don't know that
2  he's any longer employed.
3      Q.    During 2002 to 2005, do you
4  know what his position was?
5      A.    He was located out in
6  Dresher at Selas Heat Technology and he
7  was a financial -- the financial guy out
8  there.
9      Q.    And what was the position
10 during 2002/2005, as you understood it,
11 of Jerry Broker?
12     A.    Jerry Broker was a
13 financial -- was a financial type that
14 had -- and also, I believe, had computer
15 skills, computer science skills.  So he
16 had a combination of a skill set at the
17 company.
18     Q.    Do you know the titles of
19 either of these two individuals during
20 that period of time?
21     A.    I do not.
22     Q.    When you say a financial
23 guy, did you get the impression that they
24 were pretty far up in the hierarchy in

PHILIP N. SEAMON

1   the company?  Because financial could

2   mean an accountant.

3                MR. SHEWCHUK:  Objection.

4                THE WITNESS:  With Tosloski,

5           who was there for a period, I got

6           the impression he was, perhaps,

7           the local accounting guy for this

8           operation in Dresher.  Broker was

9           in Minnesota and he was a, I

10          think, a multi-disciplined

11          individual that had technology

12          skills and, basically, to some

13          degree, to some lesser degree,

14          financial skills.  He wasn't the

15          CFO.  He basically, however, did

16          some modeling, financial modeling

17          that I worked with him on.

18  BY MR. LAXTON:

19          Q.    And what is your

20  understanding of the title or position of

21  Bob Gallagher during 2002/2005?

22          A.     Bob Gallagher, I believe,

23  held the title of chief financial

24  officer.

PHILIP N. SEAMON

1        Q.      What is your understanding

2  of which corporate entity he was the CFO

3  of?

4        A.      The overall financial

5  entity, which would have been either

6  Selas or IntriCon at that period.

7        Q.      And what is your

8  understanding of the title or position of

9  Bill Kullback during 2002/2005?

10       A.      He was the successor to

11 Mr. Gallagher.

12       Q.      And, just generally, what

13 was the advice, if any, that you gave to

14 these gentlemen that would have pertained

15 to RTI, if any?

16       A.      What was the advice?  Are

17 you talking about sort of over the period

18 or --

19       Q.      Yes.  Did you -- let me give

20 you an example.  Did you suggest that

21 certain subsidiaries needed to be

22 created, certain subsidiaries needed to

23 be sold off, entities needed to be

24 purchased?

PHILIP N. SEAMON

1              So, I mean, that was the

2    main focus of the engagement during that

3    period, working with these various

4    individuals.

5          Q.    Approximately how many

6    telephone calls do you believe that you

7    received during 2002 to 2005 from any of

8    these individuals while you were inside

9    the state of Delaware?

10         A.    Approximately how many phone

11   calls?

12         Q.    Yes, sir.

13         A.    I don't know.

14         Q.    When these gentlemen would

15   call you, were you ever aware of where

16   they were calling you from?

17         A.    Was I ever aware?  Not

18   necessarily.  I mean, I'd get a call, you

19   know, I might presume where they were.

20   Do I specifically know where they were at

21   the time?

22         Q.    Is that a no?

23         A.    Was I ever aware where they

24   were?

PHILIP N. SEAMON

28

1          Q.     Yes.

2          A.     I presume that, you know, I

3     got calls from their offices in

4     Minneapolis or -- by and large.  I mean,

5     I might have gotten calls from their cell

6     phones, on their cell phones from them.

7          Q.     And do you believe you may

8     have gotten calls from cell phones

9     because you could tell by the reception

10    or possibly also because they mentioned

11    that they were on their cell phone?

12         A.     I don't recall.

13         Q.     When you were working 100

14    hours a week, am I correct in assuming

15    that a lot of that work was done from

16    home?

17         A.     Not necessarily, no.  I said

18    to you, you know -- you asked me about my

19    work habits.  As a consultant, as a

20    partner at PriceWaterhouse, and a senior

21    managing director here, you didn't work a

22    9-to-5 job, you worked, you know, all

23    hours of the day and night.

24         Q.     Right.

# UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| ENERGY TRANSPORTION GROUP, INC., | ) | Civil Action No. 05-422 (GMS) |
|  | ) |  |
| Plaintiff, | ) |  |
|  | ) |  |
| v. | ) |  |
|  | ) |  |
| SONIC INNOVATIONS, INC., et al., | ) |  |
|  | ) |  |
| Defendants. | ) |  |

## AFFIDAVIT OF MARK S. GORDER IN SUPPORT OF RESISTANCE TECHNOLOGY, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION PURSUANT TO RULE 12(b)(2).

Barry M. Klayman, Esq. (#3676)
WOLF, BLOCK, SCHORR and SOLIS-
COHEN LLP
Wilmington Trust Center
1100 North Market Street
Suite 1001
Wilmington, DE 19801
(302) 777-0313

Attorneys for Defendant, Resistance
Technology, Inc.

Of Counsel:
Jeffrey D. Shewchuk, Esq.
Shewchuk IP Services, LLC
533 77th Street West
Eagan, MN 55121
(651) 331-9558

A51

## AFFIDAVIT OF MARK S. GORDER IN SUPPORT OF RESISTANCE TECHNOLOGY, INC.'S MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION PURSUANT TO RULE 12(b)(2).

I, Mark S. Gorder, being duly sworn, state as follows:

1. I currently am the President and Chief Executive Officer of Defendant Resistance Technology Inc. I was one of the founders of RTI, which began operations in 1977.

2. RTI engages in the design, development, engineering and manufacturing of micro-miniature components, systems and molded plastic parts primarily for the hearing instrument, electronics, telecommunications, computer and medical equipment industries. The current annual revenue of RTI is between twenty and forty million dollars.

3. RTI is registered as a Minnesota corporation and is headquartered in Arden Hills, Minnesota, just outside of Minneapolis, which is the location from which I usually office. I am one of the owners of a partnership which owns the 47,000 sq. ft. building in which RTI is headquartered, and the partnership leases the facility to RTI. RTI owns a second facility, a 34,000 sq. ft. manufacturing facility in Vadnais Heights, Minnesota, also just outside of Minneapolis. RTI has no facilities outside the state of Minnesota; (those of RTI's subsidiaries are discussed below). RTI neither owns nor leases any real property in Delaware, and has no office in Delaware. To the best of my knowledge, RTI has never had any tangible personal property or real property in Delaware.

4. RTI currently employs about 178 people from its Minnesota facilities, of whom 16 are executive and administrative personnel, eight are in sales, and 154 are engineering and operations personnel. RTI has no employees outside the state of Minnesota; (those of RTI's subsidiaries are discussed below). RTI has no employees in

Affidavit of Mark S. Gorder
Page 3 of 6

Delaware. To the best of my knowledge, RTI has never had any employees working from the state of Delaware. To the best of my knowledge, RTI has never held any meetings within Delaware. All or substantially all of RTI's business records are located in Minnesota.

5. RTI is not registered with the Secretary of State to do business in Delaware. RTI has not paid taxes or franchise fees in Delaware. To the best of my knowledge, RTI has never been licensed or registered to do business in Delaware.

6. RTI currently has no local telephone listing nor bank accounts in Delaware. To the best of my knowledge, RTI has never had any local telephone listing nor bank accounts in Delaware.

7. To the best of my knowledge, RTI has never commenced any legal action or proceeding in the State of Delaware and has never been named as defendant in any action in Delaware, except in the current litigation.

8. RTI has never sold a programmable hearing aid component or product into Delaware. I have conducted a review of RTI's sales for the last three years, over which time RTI made no sales (programmable hearing aid or otherwise) in Delaware and derived no revenue from Delaware. I do not recall RTI ever making a sale of any kind into Delaware. To the best of my knowledge, RTI has never contracted to supply services or things in Delaware, and RTI does not regularly solicit business in Delaware.

9. To the best of my knowledge, RTI has never contracted to act as a surety for a contract or other such obligation located, executed, or to be performed within Delaware at the time the contract was made.

10. RTI maintains a website at www.rti-corp.com. RTI's website, though viewable from within Delaware, is entirely passive and does not permit purchases from

A3

RTI nor any other interaction with any Delaware residents who might seek to purchase RTI product or conduct business with RTI. No goods or services can be purchased through RTI's website, and none of RTI's products are delivered electronically.

11. RTI wholly owns two operating subsidiaries, RTI Tech PTE LTD ("RTI Tech") and Resistance Technology GmbH ("RT GmbH"). RTI Tech and RT GmbH both provide similar products to RTI. To the best of my knowledge, neither of RTI's subsidiaries have ever done business in Delaware.

12. RTI Tech operates out of Singapore and employs 116 people, of whom four are administrative personnel, four are in sales, and 108 are engineering and operations personnel. All of the personnel of RTI Tech are located in Singapore; RTI Tech has no employees in Delaware. RTI Tech has never had any employees working from the state of Delaware, and has never held any meetings within Delaware. RTI Tech is not currently or previously registered with the Secretary of State to do business in Delaware, does not regularly solicit business in Delaware, and has not paid taxes or franchise fees in Delaware. RTI Tech does not have currently or previously any local telephone listing nor bank accounts in Delaware. RTI Tech has never commenced any legal action or proceeding in the State of Delaware and has never been named as defendant in any action in Delaware. To the best of my knowledge, RTI Tech has never sold a product into Delaware, has never contracted to supply services or things in Delaware,.

13. RT GmbH operates out of Friesing (near Munich), Germany, having only three sales personnel located there. All of the personnel of RT GmbH are located in Germany; RT GmbH has no employees in Delaware. RT GmbH has never had any employees working from the state of Delaware, and has never held any meetings within Delaware. RT GmbH is not currently or previously registered with the Secretary of State

Affidavit of Mark S. Gorder
Page 5 of 6

to do business in Delaware, does not regularly solicit business in Delaware, and has not paid taxes or franchise fees in Delaware. RT GmbH does not have currently or previously any local telephone listing nor bank accounts in Delaware. RT GmbH has never commenced any legal action or proceeding in the State of Delaware and has never been named as defendant in any action in Delaware. To the best of my knowledge, RT GmbH has never sold a product into Delaware, and has never contracted to supply services or things in Delaware.

14. RTI is one of two operating wholly owned subsidiaries of IntriCon Corporation, formerly Selas Corporation of America, ("IntriCon/Selas"), which purchased RTI in October, 1993. I currently serve as President and Chief Executive Officer for IntriCon/Selas, having begun such positions in 2001.

15. IntriCon/Selas is a Pennsylvania corporation, now headquartered at Arden Hills, Minnesota, which is publicly traded on the American Stock Exchange. With its two operating wholly owned subsidiaries, the total annual revenue of IntriCon/Selas is currently less than forty million dollars.

16. The currently operating wholly owned subsidiary of IntriCon/Selas other than RTI is RTI Electronics, Inc. ("RTIE"). RTIE is a California corporation operating out of Anaheim, California, which manufactures thermistors and film capacitors. RTIE employs about 75 employees, of which four are administrative, four are sales, and 67 are engineering and operations personnel, all located in California.

17. To the best of my knowledge, neither IntriCon/Selas nor RTI's operating sister company (RTIE) have ever done business in Delaware. Neither IntriCon/Selas nor RTIE file tax documents in Delaware. Neither IntriCon/Selas nor RTIE are registered to do business in Delaware.

Affidavit of Mark S. Gorder
Page 6 of 6

18.   Former business segments of IntriCon/Selas had facilities in Pennsylvania, France, Germany and Japan, and included a heat technology segment, and a tire holders, lifts and related products segment, but these former business segments were exited and discontinued prior to the filing of this lawsuit.  To the best of my knowledge, none of the former business segments of IntriCon/Selas involved the state of Delaware in any way.

19.   To the best of my recollection, I had never heard of Energy Transportation Group, Inc. prior to the filing of this lawsuit.  Prior to receiving the Complaint in this matter, I had no awareness of the patents that Energy Transportation Group, Inc. is alleging are infringed.   To the best of my knowledge, RTI has never conducted any business with Energy Transportation Group, Inc.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: _Aug 17, 2005_

Mark S. Gorder

STATE OF MINNESOTA    )
                                          )   ss.
COUNTY OF RAMSEY    )

Subscribed and Sworn to before me this August _17_, 2005

Notary Public



KATHLEEN A HANNING
Notary Public Minnesota
My Commission
Expires 1/31/2007

A6

<u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this date, he caused true and correct copies of

the Redacted Appendix to Defendant Resistance Technology, Inc.'s Memorandum in Support of

its Renewed Motion to Dismiss for Lack of Personal Jurisdiction Pursuant to Rule 12(b)(2) to be

served on the following counsel of record by e-mail to their respective addresses as follows:

| | |
|---|---|
| REPRESENTING ENERGY<br>TRANSPORTATION GROUP, INC. | Edmond D. Johnson<br>PEPPER HAMILTON LLP<br>johnsone@pepperlaw.com |
| | Thomas H. Kovach<br>PEPPER HAMILTON LLP<br>kovacht@pepperlaw.com |
| | Brian M. Buroker<br>HUNTON & WILLIAMS LLP<br>bburoker@hunton.com |
| REPRESENTING GN RESOUND A/S<br>AND GN HEARING CARE<br>CORPORATION | Jack B. Blumenfeld<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>jblumenfeld@mnat.com |
| | Maryellen E. Noreika<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>mnoreika@mnat.com |
| | Kenneth B. Herman<br>ROPES & GRAY LLP<br>kenneth.herman@ropesgray.com |
| | William J. McCabe<br>ROPES & GRAY LLP<br>william.mccabe@ropesgray.com |
| | Jeffrey D. Mullen<br>ROPES & GRAY LLP<br>jeffrey.mullen@ropesgray.com |
| REPRESENTING PHONAK AG,<br>PHONAK INC., PHONAK, LLC,<br>UNITRON HEARING, INC. | Thomas C. Grimm<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>tgrimm@mnat.com |
| | James R. Sobieraj<br>BRINKS HOFER GILSON & LIONE |

jsobieraj@usebrinks.com

David H. Bluestone
BRINKS HOFER GILSON & LIONE
dbluestone@usebrinks.com

REPRESENTING SONIC
INNOVATIONS, INC.

Richard L. Horwitz
David E. Moore
POTTER ANDERSON & CORROON LLP
sonicnet@potteranderson.com

Brett L. Foster
HOLLAND AND HART LLP
bfoster@hollandhart.com

L. Grant Foster
HOLLAND AND HART LLP
gfoster@hollandhart.com

Donald Degnan
HOLLAND AND HART LLP
ddegnan@hollandhart.com

Bryan K. Hanks
HOLLAND AND HART LLP
bkhanks@hollandhart.com

REPRESENTING STARKEY
LABORATORIES, INC.

Mary B. Matterer
MORRIS, JAMES, HITCHENS & WILLIAMS
mmatterer@morrisjames.com

Amy A. Quinlan
MORRIS, JAMES, HITCHENS & WILLIAMS
aquinlan@morrisjames.com

Steven L. Reitenour
BOWMAN AND BROOKE LLP
steve.reitenour@bowmanandbrooke.com

Richard G. Morgan
BOWMAN AND BROOKE LLP
richard.morgan@bowmanandbrooke.com

REPRESENTING WILLIAM DEMANT
HOLDING A/S, WDH, INC., OTICON
A/S, OTICON INC., BERNAFON AG,
AND BERNAFON, LLC

James D. Heisman
CONNOLLY BOVE LODGE & HUTZ LLP
jhjeisman@cblh.com

N. Richards Powers
CONNOLLY BOVE LODGE & HUTZ LLP
rpowers@cblh.com

John M. Romary
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
john.romary@finnegan.com

C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
c.gregory.gramenopoulos@finnegan.com

REPRESENTING WIDEX A/S

Donald E. Reid
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
dreid@mnat.com

William H. Mandir
SUGHRUE MION PLC
wmandir@sughrue.com

David J. Cushing
SUGHRUE MION PLC
dcushing@sughrue.com

Carl J. Pellegrini
SUGHRUE MION PLC
cpellegrini@sughrue.com

Barry M. Klayman

Dated:  June 8, 2007