IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ENERGY TRANSPORTATION GROUP, INC. | )<br>)<br>) C.A. NO. 05-422 (GMS) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| Sonic Innovations, Inc, *et al.*, | ) **PUBLIC VERSION**<br>)<br>) |
| Defendants. | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT WILLIAM DEMANT HOLDING A/S'S
<u>RENEWED MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION</u>**

OF COUNSEL:

Brian M. Buroker
Robert L. Kinder, Jr.
HUNTON & WILLIAMS LLP
1900 K Street, N.W., Suite 1200
Washington, DC 20006-1109
Telephone: (202) 955-1500
Facsimile: (202) 778-2201

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone: (804) 788-8788
Facsimile: (804) 343-4630

Marty Steinberg
HUNTON & WILLIAMS LLP
1111 Brickell Avenue
Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460

Edmond D. Johnson (No. 2257)
Thomas H. Kovach (No. 3964)
PEPPER HAMILTON
Hercules Plaza Suite 5100
1313 Market Street
Wilmington, DE 19899-1709

Attorneys for Energy Transportation Group, Inc.

Date: September 4, 2007
**Public Version: September 13, 2007**

**TABLE OF CONTENTS**

|      |      |      |     | Page |
|------|------|------|-----|------|
| I.   | PRELIMINARY STATEMENT | | | 1 |
| II.  | ARGUMENT | | | 2 |
|      | A. | Motion to Dismiss Standard | | 2 |
|      | B. | ETG Establishes a *Prima Facie* Case of Personal Jurisdiction | | 2 |
|      |    | 1. | WDH A/S's Actions Satisfy the Delaware Long-Arm Statute | 2 |
|      |    |    | a. Stream of commerce satisfies the Delaware Long Arm Statute | 2 |
|      |    |    | b. Inducing infringement meets the stream of commerce test | 2 |
|      |    |    | c. WDH A/S had pre-suit knowledge of the patents-in-suit | 3 |
|      |    |    | d. WDH A/S induced infringement by its subsidiaries through concerted and orchestrated sales efforts directed throughout the United States, including Delaware | 7 |
|      |    | 2. | WDH A/S's Actions Satisfy the Due Process Clause | 15 |
| III. | CONCLUSION | | | 16 |

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Adams v. Monroe County Dept. of Social Services,*
   21 F.Supp.2d 235 (W. D. N.Y. 1998)..................................................................................3

*Employers Ins. of Wausau v. Banco De Seguros Del Estado,*
   199 F.3d 937 (7th Cir. 1999), *cert. denied,* 530 U.S. 1215, 120 S.Ct. 2218, 147 L.Ed.2d
   251 (2000) ............................................................................................................................4

*In re Color Tile Inc.,*
   475 F.3d 508 (3rd Cir. 2007)................................................................................................4

*In re Kentucky Wagon Mfg. Co.,*
   71 F.2d 802 (6th Cir. 1934), *cert. denied,* 293 U.S. 612, 55 S.Ct. 142, 79 L.Ed. 701
   (1934) ...................................................................................................................................6

*In re Powell,*
   121 F.Supp. 33 (D. Del. 1954), *aff'd,* 216 F.2d 752 (3rd Cir. 1954)....................................5

*Joint Stock Soc'y v. Heublein, Inc.,*
   936 F. Supp. 177 (D. Del. 1996) .........................................................................................2

*Malek v. Martin Corp.,*
   859 F.Supp. 458 (D. Kan. 1994)..........................................................................................3

*Martin Marietta Corp. v. Gould, Inc.,*
   70 F.3d 768 (4th Cir. 1995) .................................................................................................4

*Maxwell v. Land Developers, Inc.,*
   485 S.W.2d 869 (Tenn. Ct. App. 1972)................................................................................5

*Northern Nat'l Gas Co. v. Superior Court,*
   134 Cal.Rptr. 850 (Cal. App. 1976) ....................................................................................6

*Oakley, Inc. v. Jofa AB,*
   287 F. Supp.2d 1111 (C.D. Cal. 2003)....................................................................2, 15, 16

*Philips,*
   2004 WL 503602 at *3 .......................................................................................................15

*Sonoco Products Co. v. Inteplast Corp.,*
   867 F. Supp. 352 (D. S.C. 1994) ...................................................................................3, 16

*Stockwell v. U.S.,*
   80 U.S. 531 (1871) ...............................................................................................................4

*Tegal Corp. v. Tokyo Electron Co., Ltd.,*
   248 F.3d 1376 (Fed. Cir. 2001) ...........................................................................................8

*Thorn EMI North America, Inc. v. Micron Technology, Inc.*,
  821 F. Supp. 272 (D. Del. 1993) ...........................................................................................2
*Wheeler v. Sage*,
  68 U.S. 518 (1863) ...............................................................................................................4

I.   **PRELIMINARY STATEMENT**

Energy Transportation Group ("ETG") sued William Demant Holding A/S (WDH A/S") for inducing infringement of patents related to programmable hearing aids. WDH A/S wholly owns co-defendants Oticon A/S, Oticon, Inc., Bernafon AG, and Bernafon, LLC, ███████ ███████ and further owns 49% of American Hearing Aid Associates, Inc. ("AHAA")[1] and 47% of AVADA, an American hearing aid distribution network.[2] Oticon A/S designs and manufactures infringing products,[3] Bernafon AG designs infringing products,[4] Oticon, Inc. and Bernafon LLC sell infringing products in the United States,[5] AHAA is an American hearing health care network which directs customers to providers who dispense the infringing products,[6] and AVADA distributes hearing aids in the U.S., including the infringing products.[7]

The facts demonstrate a *prima facie* case of personal jurisdiction. WDH A/S has actively induced its subsidiaries toward certain activities, including sales of the infringing products in the United States, including Delaware. WDH A/S cannot credibly claim it had no inkling that some of its hearing aids would make their way into Delaware via well-established distribution channels (that it owned and controlled).

---

[1] First Declaration of Niels Jacobsen ("1st Jacobsen Decl.") (Exhibit 1) (original attached to D.I. 88 as Exhibit 1), ¶¶ 7, 8.

[2] Declaration of Brian M. Buroker ("Buroker Decl."), (Exhibit 2), (original attached to D.I. 89 as Exhibit A), ¶ 3 and Exhibit A1 thereto.

[3] D.I. 88, at p. 2, ¶¶ 2, 3.

[4] *Id.*

[5] *Id.*

[6] Buroker Decl., ¶ 4, 5 and Exhibits A2 and A3 thereto (Exhibit 2).

[7] Buroker Decl., ¶ 3 and Exhibit A1 thereto (at ¶¶ 1-4), (Exhibit 2).

## II.   ARGUMENT

### A.   Motion to Dismiss Standard

Regarding Defendant's motion to dismiss; (1) Plaintiff need only establish a prima facie case with the record viewed in the light most favorable to Plaintiff, (2) Plaintiff's proffered evidence must be accepted as true, (3) all disputed facts must be resolved in Plaintiff's favor; and (4) all reasonable inferences must be drawn in Plaintiff's favor. *Joint Stock Soc'y v. Heublein, Inc.*, 936 F. Supp. 177, 192-3 (D. Del. 1996)

### B.   ETG Establishes a *Prima Facie* Case of Personal Jurisdiction

#### 1.   WDH A/S's Actions Satisfy the Delaware Long-Arm Statute

##### a.   Stream of commerce satisfies the Delaware Long Arm Statute

When a defendant purposefully avails itself of a stream of a commerce that delivers products into Delaware, the exercise of personal jurisdiction is proper under the Delaware long-arm statute. *E.g., Thorn EMI North America, Inc. v. Micron Technology, Inc.*, 821 F. Supp. 272, 275 (D. Del. 1993). Personal jurisdiction is not determined by whether the company labels itself a "holding" company, but rather by the company's activities. WDH A/S encouraged its subsidiaries to use streams of commerce owned, funded and controlled by WDH A/S and directed toward the U.S. and Delaware.

##### b.   Inducing infringement meets the stream of commerce test

A party can place its goods into the stream of commerce by inducing others to make direct sales. *See Thorn EMI*, 821 F. Supp. at 275. In *Oakley, Inc. v. Jofa AB*, 287 F. Supp.2d 1111 (C.D. Cal. 2003), the parent holding company was subject to personal jurisdiction by inducing its subsidiaries to infringe. *Id.* at 1116-7 (noting that "the fact situation is . . . compelling here . . . given the peculiar relationship between The Hockey Company and the other Defendants, which

are its subsidiaries"). *See also Sonoco Products Co. v. Inteplast Corp.*, 867 F. Supp. 352 (D. S.C. 1994).

### c. WDH A/S had pre-suit knowledge of the patents-in-suit

WDH A/S fails to offer credible evidence that WDH A/S lacked knowledge of the patents-in-suit. Paragraphs 8 and 9 of the Second Declaration of Niels Jacobsen merely asserts that Niels Jacobsen, *himself*, lacked knowledge, and that "*to the best of [his] information and belief,*" WDH A/S did not have such knowledge. This statement lacks evidentiary weight because it is based on belief, rather than personal knowledge, (*e.g.*, Malek v. Martin Corp., 859 F.Supp. 458, 460 (D. Kan. 1994)), does not show the basis of any personal knowledge (*Id.*), and is conclusory. The letters from WDH A/S's attorneys are also without evidentiary weight for lack of personal knowledge and do not reflect any basis of personal knowledge. *See Adams v. Monroe County Dept. of Social Services*, 21 F.Supp.2d 235, 238 (W. D. N.Y. 1998).

The credible evidence establishes a prima facie case of knowledge of the patents by WDH A/S:



---

[8] ████████ WDH A/S's response to Jurisdictional Request No. 3 (Exhibit 8).

████████

[10] Declaration of Harry L. Laxton, Jr. (Exhibit 9), ¶3; ████

3

▪ The patents ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ included several that cite the Levitt '850 patent.[13]

Accordingly, WDH A/S obtained pre-suit notice of the Levitt '850 patent.

Moreover, WDH A/S had notice of the patents because HIMPP (WDH A/S's agent) had notice of the patents. The knowledge of a partner or partnership is imputed to all partners. *Stockwell v. U.S.*, 80 U.S. 531, 545-6 (1871). Such imputed notice is actual, not constructive, notice. *See Id.* at 545-6 ("[T]he knowledge of the agent is in law attributed to his principal, as well as that of the partner to all the members of the firm[.]"); *Wheeler v. Sage*, 68 U.S. 518, 528 (1863) ("Each partner is the agent of his copartners in all transactions relating to partnership business[.]"); *Employers Ins. of Wausau v. Banco De Seguros Del Estado*, 199 F.3d 937 (7th Cir. 1999), *cert. denied*, 530 U.S. 1215, 120 S.Ct. 2218, 147 L.Ed.2d 251 (2000) ("[T]he 'common-law principle of partnership law [is] that notice to one general partner constitutes notice to all partners.' [Citation omitted]. That common-law principle depends on the characterization of a partnership as a web of interlocking agency relationships, in which each principal is imputed actual knowledge from the knowledge of any of his agents."); *In re Color Tile Inc.*, 475 F.3d 508, 512-3 (3rd Cir. 2007) (stating that, under agency principles, imputed notice is actual, not constructive, notice); *Martin Marietta Corp. v. Gould, Inc.*, 70 F.3d 768, 773 (4th Cir. 1995)

---

4

(stating that knowledge imputed, under agency principles, is considered actual, not constructive, knowledge.); *In re Powell*, 121 F.Supp. 33, 36 (D. Del. 1954), *aff'd*, 216 F.2d 752 (3rd Cir. 1954), ("Having been so closely aligned with business matters, the partners' wives may well be chargeable with actual or constructive knowledge[.]"). Indeed, ███████████

███████████████████████

███████████████████████████████████████████

Thus, WDH A/S had notice of the patents because its agent, HIMPP, had notice.

Finally, WDH A/S had notice of the patents through its closely related subsidiaries. Notice may be imputed between such entities. *E.g.*, *In re Powell*, 121 F.Supp. 33, 36 (D. Del. 1954), *aff'd*, 216 F.2d 752 (3rd Cir. 1954), ("Having been so closely aligned with business matters, the partners' wives may well be chargeable with actual or constructive knowledge[.]"); *Maxwell v. Land Developers, Inc.*, 485 S.W.2d 869, 874 (Tenn. Ct. App. 1972) ("[T]he corporate entity Land Developers, Inc. cannot deny the actual notice possessed by its grantor Tipton Investments, Inc. because of the common officer, stockholder and board member, M. A. Tipton. To hold otherwise would be to set the stage for considerable chicanery by the mere dropping of a corporate veil so as to isolate the corporate entity from the knowledge possessed by its corporate

███████████████████████████████████████
███████████████████████████████
███████████████████████████████
███████████████████

grantor (Tipton Investments, Inc.) whose president is also the one-third owner, vicepresident [sic] and board member of the grantee corporation."); *In re Kentucky Wagon Mfg. Co.*, 71 F.2d 802, 804 (6th Cir. 1934), *cert. denied*, 293 U.S. 612, 55 S.Ct. 142, 79 L.Ed. 701 (1934) ("Banco purchased the claim of the Bank on July 3, 1930. Banco and the Bank had the same president and an interlocking directorate, and Banco was chargeable with knowledge of the nature of the claim it acquired."); *Northern Nat'l Gas Co. v. Superior Court*, 134 Cal.Rptr. 850 (Cal. App. 1976).

In *Northern Nat'l Gas Co.*, the same individual was president of the parent and subsidiary. As a result, the subsidiary's knowledge was imputed to the parent company. The court explained that [t]he trial court had a right to conclude that Propane Gas [parent company] as stockholder of Geni-Chlor [subsidiary] elected Larson president of Geni-Chlor so that Larson as president of Propane Gas would be fully aware of what its wholly owned subsidiary was doing." *Id.* at 856.

Niels Jacobsen, WDH A/S president and CEO, also is CEO of Oticon, Inc. and Oticon A/S, and director of Oticon, Inc. and Bernafon AG.[17] Four of WDH A/S's directors also are Oticon A/S directors.[18] As in *Northern Nat'l Gas Co.*, a reasonable inference could be drawn (and thus, must be drawn in this proceeding) that WDH A/S placed its officers and directors in prominent positions with its subsidiaries so that WDH A/S would be fully aware of what its closely related subsidiaries were doing. Similarly, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

---

[17] 1st Jacobsen Decl., ¶¶ 1, 22 (Exhibit 1).
[18] *Id.*, ¶ 24.

6

███████████████████████████████████████

WDH A/S and it subsidiaries are much closer related than the entities in the above cited cases. WDH A/S and its subsidiaries "collaborate in *many areas*" and "*to a wide extent* also share resources and technologies."[20] ████████████████████████████

████████████████████████████████ Thus, the subsidiaries' notice of the patents constitutes notice to WDH A/S.

The subsidiaries received notice when:

- The Levitt '749 Patent was cited in the 1999 International Search Report for Oticon A/S's PCT Application WO 99/65275;[22]

- The Levitt '850 Patent was cited on Oticon A/S's U.S. Pat. No. 5,033,090, which was patented on July 16, 1991;[23] and

- The Levitt '850 Patent was cited against Oticon, Inc.'s U.S. Pat. App. No. 07/322,387 on October 11, 1989.[24]

Accordingly, WDH A/S had pre-suit knowledge of the patents-in-suit.

        **d.**    **WDH A/S induced infringement by its subsidiaries through concerted and orchestrated sales efforts directed throughout the United States, including Delaware**

Inducing infringement "is as broad as the range of actions by which one in fact causes, or

---

[20] Buroker Decl., ¶ 6 and Exhibit A4 thereto, (Exhibit 2) (emphasis added).

████████████████████████████

[22] (Exhibit 33).

[23] DEM518919 (Exhibit 34).

[24] (Exhibit 35).

7

urges, or encourages, or aids another to infringe a patent." *Tegal Corp. v. Tokyo Electron Co., Ltd.*, 248 F.3d 1376, 1378-9 (Fed. Cir. 2001).

WDH A/S does not simply invest in multiple companies involving diverse industries and passively allow those subsidiaries to direct their own activities and product distribution. WDH A/S purchased companies that primarily operate in a singular industry (the hearing aid industry), which are complementary businesses (i.e., function together in a complementary manner), and which, under its direction, operate with related purpose, strategy, and activities. WDH A/S urged, encouraged, and aided its subsidiaries in the sale within the U.S. and importation into the U.S., including Delaware, of the infringing products. For example, WDH A/S's 2004 annual report states:

> William Demant Holding A/S and the Oticon foundation have furthermore made an agreement that the Company seeks to identify active investment opportunities, and <u>following any such investment the Company will be in charge of the **control** and **development** of the particular investments.</u> In each case, a **management** agreement will be made on commercial terms. [emphasis added][25]

Moreover, Niels Jacobsen's statement that "William Demant Holding A/S does not control the *day to day activities* [emphasis added] of its subsidiaries, including Oticon A/S, Oticon, Inc., Bernafon AG, and Bernafon LLC" implicitly admits that WDH A/S ***controls*** activities of its subsidiaries - just not on a daily basis.[26] Drawing all reasonable inferences in Plaintiff's favor, it is reasonable to infer that WDH A/S controls activities of its subsidiaries on a non-daily basis.

Similarly, on its website, WDH A/S discusses "The William Demant Holding Group"

---

[25] WDH A/S 2004 annual report, DEM012166, DEM012209 (Exhibit 31).
[26] 1st Jacobsen Decl., ¶ 21 (Exhibit 1).

and illustrates the Group's shared functions with the following image:[27]



The shared purpose of the Group is further reflected by WDH A/S's Mission Statement, which states, in part: "The core business of the Group is hearing aids."[28] That nearly singular, shared focus is reflected by the fact that 89% of the Group's net revenue is generated by hearing aids (with related fields of diagnostics instruments and personal communication comprising 11%).[29] As WDH A/S boasts, "Group undertakings <u>collaborate in *many areas*</u> and <u>*to a wide extent* also share resources and technologies</u>."[30]

WDH A/S's influence on the Group is pervasive: Group members share an intranet,[31] Information Technology infrastructure,[32] administrative resources,[33] financial activities and

---

[27] Buroker Decl., ¶ 6 and Exhibit A4 thereto (Exhibit 2); *see also* WDH A/S annual reports (Exhibits 26-32).

[28] DEM011965 (Exhibit 26); *see also* DEM012011 (Exhibit 27), DEM012044 (Exhibit 28), DEM012082 (Exhibit 29), DEIM012124 (Exhibit 30).

[29] Buroker Decl., ¶ 9 and Exhibit A7, at p. 5, thereto (Exhibit 2); *accord* DEM011970 (Exhibit 26), DEM012018 (Exhibit 27), DEM012055 (Exhibit 28), DEM012093 (Exhibit 29).

[30] Buroker Decl., ¶ 6 and Exhibit A4 thereto (Exhibit 2) (emphasis added).

[31] DEM012056 (Exhibit 28), DEM12294 (Exhibit 36), DEM012094 (Exhibit 29).

[32] DEM011990 (Exhibit 26), DEM012013 (Exhibit 27), DEM12047 (Exhibit 28), DEM012216-7 (Exhibit 32).

[33] *Id.* DEM012047 (Exhibit 28), DEM012833 (Exhibit 37).

systems,[34] the use of the same standard computer software,[35] quality control/management systems,[36] service and technical support activities,[37] insurance,[38] employee incentive stock option program,[39] purchasing activities,[40] logistics activities,[41] research and development,[42] manufacturing/production facilities and activities,[43] corporate facilities,[44] and design facilities.[45]

Further, the evidence clearly indicates that WDH A/S provides *financial support* for Group activities.[46] Certainly, the financial support of an activity encourages and aids that activity.

---

[34] DEM011990 (Exhibit 26), DEM12047(Exhibit 28), DEM012216-7 (Exhibit 32), DEM012057 (Exhibit 28), DEM012056 (Exhibit 28).

[35] DEM012056 (Exhibit 28).

[36] DEM011990 (Exhibit 26), DEM12047 (Exhibit 28), DEM12216-7 (Exhibit 32), DEM012057 (Exhibit 28).

[37] *Id.*

[38] DEM12289 (Exhibit 36), DEM12320 (Exhibit 36).

[39] DEM012023 (Exhibit 27), DEM012483 (Exhibit 38), DEM012598 (Exhibit 39) (allowing Group employees [as opposed to only its own employees] opportunities to purchase WDH A/S stock at favorable prices).

[40] DEM12047 (Exhibit 28), DEM12216-7 (Exhibit 32), DEM012057 (Exhibit 28).

[41] *Id.*

[42] DEM12327 (Exhibit 36), DEM12278 (Exhibit 36).

[43] DEM011990 (Exhibit 26), DEM12047 (Exhibit 28), DEM12216-7 (Exhibit 32), DEM012057 (Exhibit 28), DEM12327 (Exhibit 36).

[44] DEM012740 (Exhibit 40), DEM012753-4 (Exhibit 41).

[45] DEM012740 (Exhibit 40).

WDH A/S's direction provided to its subsidiaries extends to production/manufacturing. The Group's descriptive image depicted on the preceding page of this brief is displayed on WDH A/S's website and annual reports and notes that the Group "share[s] functions" of "Operational activities" and "Distribution activities:"[47]

As WDH A/S has stated:

> The Group entities collaborate closely on ... **marketing and sale[s],** where the use of resources on the individual markets is **co-ordinated and monitored by Management in Denmark**. The Group entities are therefore highly integrated. Consequently, **Management considers the overall business as one cash-generating unit**.[48]

Indeed, WDH A/S's website proclaims that, "[i]n 2000, the William Demant Holding Group acquired four major companies that have *strengthened the distribution of hearing aids manufactured by both Oticon and Bernafon[;]*"[49] including *WDH A/S's* acquisition of AVADA,[50] which WDH A/S boasted strengthened distribution in North America.[51] At that time,

---

[46] DEM012008 (Exhibit 26) (noting, among Group members' functions, that WDH A/S's function was "finance"); DEM012095 (Exhibit 29) (WDH A/S established credit facilities for funding of continued expansion and acquisitions); DEM012264 (Exhibit 32) (WDH A/S acted as credit guarantor - in the amount of DKK 490 million [approximately $89 million USD] for its Danish subsidiaries); DEM012208 (Exhibit 31) (WDH A/S acted as guarantor for Oticon A/S [designer and manufacturer of infringing products; *see* n. 3] for a credit amount of DKK 479 million [approximately $145 million USD]); DEM012323 (Exhibit 36) (WDH A/S acted as guarantor of a subsidiary's rent of $11.2 million DKK [approximately $2 million USD] and provided other guarantees for subsidiaries); DEM012033 (Exhibit 27) (interest income from subsidiaries to WDH A/S), DEM012110 (Exhibit 28), DEM012200 (Exhibit 31); *see also* n.56-69 and discussion related thereto.

[47] Buroker Decl., ¶ 6 and Exhibit A4 thereto (Exhibit 2); DEM012013 (Exhibit 27), DEM012047 (Exhibit 28), DEM012084 (Exhibit 29), DEM012126 (Exhibit 30), and DEM012170 (Exhibit 31).

[48] DEM12313 (Exhibit 36) (emphasis added).

[49] Buroker Decl., ¶ 8 and Exhibit A6 thereto (Exhibit 2) (emphasis added).

[50] Buroker Decl., ¶ 9 and Exhibit A7 thereto, at p.10 wherein it is stated, "AVADA and AHAA acquired in Nov 2000 and Aug 2001, respectively." (Exhibit 2).

[51] Buroker Decl., ¶ 3 and Exhibit A1, at ¶¶ 1, 8, thereto (Exhibit 2).

AVADA had about 163 clinics.[52] **WDH A/S** acquired 47% ownership of the joint venture.[53] The agreement required that the clinics "mainly sell OEM[54]-products from the William Demant companies[,]"[55] and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ WDH A/S noted that[57] "the cooperation with the AVADA Group will strengthen the position of ***William Demant Holding A/S*** on the ***North American market***, and the newly established joint venture is expected to be a good basis for future growth." (emphasis added). By this transaction alone, WDH A/S urged, encouraged, and aided the sale and offer to sell of the infringing products in the U.S.

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ a "US wholesale distributor" of hearing aids.[59] At that time, over 1,300 practitioners, representing over 1,800 sites, were affiliated with AHAA.[60] WDH A/S proclaimed that the purchase was made "[t]o improve distribution on the North American market[.]"[61] At the time of the purchase, WDH A/S noted that "the sale of William Demant products to AHAA's members is moderate, but sales are

---

[52] *Id.* at ¶ 2; DEM012628-9 (Exhibit 42).
[53] *Id.* at ¶ 4; ▮▮▮▮▮▮▮▮▮▮
[54] Original Equipment Manufacturer.
[55] Buroker Decl., ¶ 3 and Exhibit A1, at ¶ 3, thereto.
[56] Id. (Exhibit 2) at ¶ 12 and Exhibit A10 thereto (emphasis added); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[57] *Id.* at ¶ 8.
[58] Buroker Decl., ¶ 13 and Exhibit A11, p. 4, n. 5, thereto (Exhibit 2); Jacob Decl. ¶ 8 (Exhibit 1); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
[59] Buroker Decl., ¶ 13 and Exhibit A11, p. 2, thereto (Exhibit 2).
[60] Buroker Decl., ¶ 14 and Exhibit A12 thereto (Exhibit 2).
[61] Buroker Decl., ¶ 13 and Exhibit A11, p. 2, thereto (Exhibit 2).

12

expected to increase in the years to come."[62] The agreement provided that AHAA would receive an additional $14 million if sales targets for William Demant Group hearing aids were reached![63]

Niels Jacobsen's statement that WDH A/S "has no involvement in the *day-to-day* [emphasis added] management of AHAA[,]" raises the reasonable inference that WDH A/S is involved in the management of AHAA - just not on a daily basis.[64] To further ensure that AHAA would follow its urging, encouragement, and aid, WDH A/S placed its CEO and president, Niels Jacobson,[65] as AHAA's sole director,[66] just as it had done with several subsidiaries.[67] WDH A/S explained that its position on growth included "strong focus on developing distribution power through ... strategic acquisitions" and that it's "[m]ost important acquisitions" for "[e]xpansion of distribution" included "AVADA" and "AHAA."[68] WDH A/S's substantial efforts to increase sales in the U.S. were successful.[69]

It is disingenuous for WDH A/S to purchase extensive U.S. networks of hearing aid distributors, contractually require the sale in the U.S. of Oticon and Bernafon products, ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ boast that its efforts will increase its U.S. sales (which it did) – and now claim that it has not encouraged Oticon/Bernafon

---

[62] *Id.*

[63] *Id.*; DEM012057 (Exhibit 28).

[64] 1st Jacobsen Decl., ¶ 8 (Exhibit 1). As noted previously herein, Neils Jacobsen has similarly declared that WDH A/S has no involvement in the day to day management of its subsidiaries.

[65] 1st Jacobsen Decl., ¶ 1 (Exhibit 1).

[66] Buroker Decl., ¶ 21 and Exhibit A19 thereto (Exhibit 2). Plaintiff also requests that the Court take judicial notice of such fact since the fact is capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned (Lexis and the Connecticut Secretary of State).

[67] 1st Jacobsen Decl., ¶¶ 22, 23 (Exhibit 1).

[68] Buroker Decl., ¶ 15 and Exhibit A13, p. 18, thereto (Exhibit 2).

[69] Buroker Decl., ¶ 16, 11, 10, 9 and Exhibits A14, p. 4; A9, p. 7; A8, p. 7; and A7, p. 6, thereto (Exhibit 2).

13

sales in the U.S.

Further, this intentional expansion of sales in the U.S. foreseeably resulted in sales in Delaware. As noted previously, two expansive U.S. networks of distributors were purchased – with the intent ▮▮▮▮▮ for expansion. AHAA's website directs citizens to three Delaware providers,[70] one of which advertises that he distributes Oticon hearing aids[71] and another of which (Bayside Health Association) is represented by Oticon A/S to be an Oticon hearing aid distributor[72] and to which Oticon A/S also directs customers.[73] WDH A/S's encouragement of AHAA and its subsidiaries to distribute the infringing products foreseeably resulted in sales in Delaware.

That U.S. sales expansion would include sales in Delaware was even more foreseeable because Oticon, Inc.'s production facilities[74] and Bernafon, Inc.'s facilities[75] are in Somerset, New Jersey -- less than 100 miles from the Delaware city in which this Court presides.[76]

---

[70] Buroker Decl., ¶ 17 and Exhibit A15 thereto (Exhibit 2).

[71] Buroker Decl., ¶ 18 and Exhibit A16 thereto (Exhibit 2).

[72] Buroker Decl., ¶¶ 19, 20 and Exhibits A17, A18 thereto (Exhibit 2).

[73] *Id.*

[74] 1st Jacobsen Decl., ¶ 17 (Exhibit 1); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also Bernafon, Inc. Announces Plans to Relocate Company to New Jersey*, Audiology Online, March 11, 2003 (http://www.audiologyonline.com/news/displaynews.asp?news_id=809 at ¶ 4 [noting that Oticon, Inc.'s production facilities are located in Somerset, New Jersey); http://www.oticon.com/eprise/main/oticon/us_en/sec_aboutus/abouttoticon/jobsatoticon/cnt03_seniorclinicalaudiologist (Oticon Inc.'s address is set forth therein).

[75] DEM12378 (Exhibit 46); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *see also* Annual Report 2003, William Demant Holding A/S Investor Presentation March/April 2004 http://www.williamdemant.com/eprise/main/Demant/com/SEC_Investor/2004_03_InvestorPresentation.pdf at page 14; *Bernafon, Inc. Announces Plans to Relocate Company to New Jersey*, Audiology Online, March 11, 2003 (http://www.audiologyonline.com/news/displaynews.asp?news_id=809).

[76] http://www.mapquest.com/directions/main.adp?go=1&do=nw&rmm=1&2si=gaz&un=m&2gi=0&cl=EN&ct=NA&2n=New+Castle&2da=-1.000000&2rc=A5XAX&rsres=1&1ex=1&1y=US&1a=&1ac=%252bm4INP2XVZN64IuWdEUxnixy6jFjfblk6Ucal12fBpxNwOMDA0viOwLRgwWwge

In light of the close proximity to Delaware of Oticon, Inc.'s and Bernafon, Inc.'s facilities and Oticon A/S's and AHAA's direction of customers to Delaware distributors, WDH A/S's substantial efforts and investments toward expanded U.S. distribution was likely to lead to the sales of the infringing products[77] in Delaware, particularly since the Group is the second-largest manufacturer of hearing aids in the world,[78] 10% of the population in economically developed countries suffer from hearing loss,[79] and Delaware has a population of 853,000.[80] WDH A/S should have reasonably anticipated being subject to personal jurisdiction in Delaware.

### 2.  WDH A/S's Actions Satisfy the Due Process Clause

The stream of commerce doctrine support the exercise of personal jurisdiction consistent with Due Process. *See, e.g., Philips Electronics North America Corp. v. Contec Corp.*, 2004 WL 503602 at *3 (D. Del. 2004).[81] By establishing and availing itself of a distribution network directed to Delaware, WDH A/S has purposefully availed itself of Delaware's state law and reasonably could have anticipated being haled into Delaware courts. *See Id.* at *5 and generally. It would not be unduly burdensome for WDH A/S to defend this action in Delaware, particularly since much of the relevant testimony and document production has and/or will be presented by WDH A/S's subsidiaries that are already parties to the lawsuit. *See Oakley,* 287 F. Supp.2d at 1114. Moreover, a "holding" company cannot avoid the jurisdictional consequences of its

---

1M&2ahXX=&2y=US&2a=&2c=Wilmington&2s=DE&2z=

[77] WDH A/S was aware of the products its subsidiaries were distributing. *E.g.,* Exhibits 48-52 and generally all exhibits cited herein.

[78] DEM012090 (Exhibit 29).

[79] Buroker Decl., ¶ 15 and Exhibit A13, p. 18, thereto (Exhibit 2).

[80] http://quickfacts.census.gov/qfd/states/10000.html

[81] (Exhibit 53).

activities directed toward a State simply because the company holds ownership interest in the directly infringing company or the chains of distribution. *Oakley*, 287 F. Supp.2d at 1114; *Sonoco Products*, 867 F. Supp. at 355 (D. S.C. 1994).

### III. CONCLUSION

A *prima facie* case has been made. WDH A/S treated it and its subsidiaries as "one [highly integrated] cash-generating unit" with the primary goal of selling hearing aids and assisted with the development of a stream that, in part, directed products into Delaware.

Date: September 4, 2007

						Edmond D. Johnson (# 2257)
						Thomas H. Kovach (# 3964)
						PEPPER HAMILTON LLP
						Hercules Plaza Suite 5100
						1313 Market Street
						Wilmington, DE 19899-1709
						Telephone: (302) 777-6500

						*Attorneys for Energy Transportation Group, Inc.*

OF COUNSEL:
Brian M. Buroker
Robert L. Kinder, Jr.
HUNTON & WILLIAMS LLP
1900 K Street, N.W.; Suite 1200
Washington, DC 20006-1109
Telephone: (202) 955-1500

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone: (804) 788-8788

Marty Steinberg
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Ste. 2500
Miami, FL 33131
Telephone: (305) 810-2500

16

#8845824 v1