REDACTED B365 - B366



## Stock Exchange Announcement No 2006-01      1 February 2006
Oticon launches new, advanced design product
targeted at the "baby boomer" generation

William Demant Holding announces today that the Group's Oticon business is launching a new high-end hearing aid designed to meet the wishes of the fast-growing group of 50 to 65-year-olds – both in terms of functionalities and design. So far, the so-called "baby boomer" generation has been reluctant to use hearing aids.

The new instrument, Oticon Delta, belongs to a new generation of communication solutions in the RITE (Receiver-In-The-Ear) category. Oticon Delta consists of two units connected by an ultra-thin, almost invisible copper wire. This copper wire connects a newly developed speaker placed inside the ear canal with a small, triangular, digital amplifier placed discreetly behind the ear. By moving the electronic parts behind the ear, we have made room for a completely open solution, without compromising the cosmetic and audiological advantages of in-the-ear hearing aids. For example, the potential of the speaker is exploited to the full through its position close to the eardrum. At the same time, the sturdiness and functionality of behind-the-ear hearing aids are maintained.

Oticon Delta contains all the features that characterise the best and most sophisticated products on the market. In the product tests conducted and based on feedback from focus groups consisting of end-users, the impression of Oticon Delta has been very positive. The new Oticon product targets in particular persons with the frequently occurring mild and high-frequency hearing loss. This group accounts for approx. 20-30% of the total market for hearing aids, but accounts for up to half of all first-time users. This target group appreciates state-of-the-art technology and demands elegant design and discretion.

Oticon Delta is expected to be released for sale in March 2006, but already now we are in dialogue with a multitude of dispensers world-wide. At the time of the American hearing aid convention, American Academy of Audiology (AAA), from 5 to 8 April 2006, Oticon Delta will be fully available on all major markets.

*"With Oticon Delta, the end-users are offered all available, advanced features together with the most attractive, cosmetic solution on the market. We consider Oticon Delta the most whole-hearted attempt in the business to overcome the younger generations' reservations about the use of hearing aids,"* says Niels Jacobsen, President & CEO of William Demant Holding.

After the fourth quarter of 2005, the Group maintains its outlook for 2005 in accordance with the most recently expressed expectations. For 2005, the Group thus expects revenues of approx. DKK 4.7 billion and an operating profit (EBIT) of approx. DKK 1.1 billion.



William Demant Holding A/S
Kongebakken 9
DK-2765 Smørum
Denmark

Phone +45 3917 7100   william@demant.dk   CVR 71186911
Fax   +45 3927 8900   www.demant.com

Page 1 of 2



INTERIM REPORT 2001

1 January - 30 June

William Demant Holding A/S

amounting to DKK 138 million to the distributable reserves. The transfer was made on expiry of the statutory notice on 18 July.

The first half-year saw a buyback of own shares totalling 45,150 at an average price of 269. At 30 June the company held 558,762 of its own shares (0.7% of the share capital).

## BUSINESS AREAS

### Hearing aids

The hearing aid market developed in two speeds in the first half of 2001:

- On the North American market sales in terms of units stagnated according to official statistics. The William Demant Group experienced a positive trend in sales in this market. In the first half-year a number of collaboration agreements were concluded in the US between manufacturers and chains of hearing care professionals, in accordance with which manufacturers increasingly provide finance for these chains.

- On the other markets - particularly in Europe - the hearing aid market developed favourably.

Group sales of hearing aids developed positively in the first half of 2001. In terms of units sales rose by 14%, which is satisfactory just three or four months before the introduction of Oticon's third-generation digital product family.

In the past six months the Group's existing hearing aid families have been supplemented with Power and Super Power aids, which specifically target the 10% of users with the most powerful hearing losses. These new hearing aids have reinforced our position in this market segment. DigiFocus II Super Power was introduced on the market in July with good fitting results.

In October Oticon will start its sale of a new high-end product, which has been developed over the past three years. The product is expected to set a new standard for products competing in the high-end segment.

In the first half-year Bernafon's revenue increased and contributed positively to net profits. At the German hearing aid congress in October Bernafon will also present new products, scheduled for marketing by the end of the year.

The hearing aid companies thus have a good foundation for continued growth in 2002.

### AHAA

Effective as of today the William Demant Group has made an agreement with the shareholders of American Hearing Aid Associates, Inc. (AHAA) for the acquisition of 49% of its shares at a total amount of USD 50 million. The amount will be paid with an up-front amount of USD 36 million with the remaining USD 14 million being paid within a four-year period when sales and profits reach the targeted figures.

The acquisition will be financed through a USD loan. On acquisition consolidated group goodwill amounted to DKK 430 million which will be written off via equity in the second half-year of 2001.

AHAA is a multi-brand wholesale distributor of hearing aids and business services on the North American market. AHAA provides services to independent hearing care professionals who are not members of one of the hearing aid chains. One of the advantages of independent hearing care professionals is the systematised and thoroughly tested business principles which AHAA offers its associates. The principles include management and business systems, marketing programmes, referral programmes, training programmes and course modules. Further information on the AHAA service programmes is available on *www.ahaanet.com*.

In 2000 AHAA generated a revenue of USD 36 million. AHAA is experiencing heavy growth both as regards revenues and profits. AHAA will be consolidated pro rata with a 49% interest, and for 2001 we expect it to contribute revenues to the tune of DKK 50-60 million, although its contribution to profits in 2001 is expected to be modest. In 2002 we expect AHAA to contribute positively to the trends in consolidated revenue and profits. The valuation of AHAA is based on an EBITDA multiple of 9 which is the target for payment of the remaining USD 14 million.

AHAA will remain an independent organisation under current management offering hearing aids from several manufacturers including the William Demant Group. Today sales of William Demant products to AHAA members are moderate, but over the next few years they are expected to account for an increasing share of AHAA sales.

In the Board's opinion the William Demant Group will benefit from AHAA's business concept also on other markets than in the US.

### Diagnostic Instruments

Diagnostic Instruments showed satisfactory growth in 2001. This area has developed favourably - both in terms of revenue and profit.

We expect the positive trend to continue throughout the year. To strengthen the development we have from the German company, SensoMotoric Instruments GmbH, acquired the rights to a number of products for analysis and measurement of the function of the vestibular system. The vestibular system, which is part of the

5

# INTERIM REPORT 2000



1 January - 30 June

William Demant Holding A/S

EXHIBIT 50
B370
DEM012339

The effective tax rate is 24%, which is expected to be the tax rate for the whole year.

Net profits for the first half amounted to DKK 202 million providing a return on equity of 121% p.a.

In the first half-year, cash flow from operating activities (CFFO) amounted to DKK 198 million, or a 170% improvement on the same period last year.

In the first half of 2000, 51,325 shares were bought back at an average price of DKK 225 per share. At 30 June 2000, the portfolio of own shares was 723,025 of DKK 1 - or close on 1% of the share capital.

As part of an employee share scheme, Group employees were given an option to buy a total of 375,000 shares from the portfolio of own shares at a favourable price. The scheme will be implemented in the autumn.

At the company's annual general meeting, a share split was carried out in a ratio of 1:5. All share-related ratios have been correspondingly adjusted.

## BUSINESS AREAS

### Hearing aids
In the first half-year, the William Demant Group's sale of hearing aids outmatched the market development in terms of units which means that the Group has acquired market shares.

The introduction of new product series in the autumn of 1999 and new products in the spring of 2000 has contributed significantly to the substantial improvement in revenue.

Oticon's high-end DigiFocus II series was introduced a year ago. After a relatively brief introduction period in the autumn of last year, the new digital product series has contributed materially to Group earnings.

The sale of the two Oticon product series - Ergo and Swift - which were developed with major focus on lower unit production costs - have sold very successfully to the middle and low-end segments which still account for about 80% of total unit sales on the market.

Bernafon has continued the favourable trend in profits and contributed satisfactorily to interim net profits.

### Diagnostic instruments
Diagnostic instruments showed considerable growth in the first half-year, and the business area was expanded through the acquisition of the Danish audiometer business, Interacoustics, on 17 January.

Sales have more than doubled compared with 1999, and the successful trend is expected to continue in the second half of 2000 (excluding acquisitions growth was 57% in the first half-year).

### Personal communication
Phonic Ear (wireless communication equipment) was not quite able to realise the budgeted sales target in the first half-year due to delay in the introduction of a new product, Sprite. A somewhat higher rate of growth is expected for the second half.

DanaCom (headsets for professional users), 50% of which was acquired by the Group a year ago, has matched the expectations announced when the company was acquired.

On acquisition in 1999, the William Demant Group was given an option - based on a fixed calculation model - to acquire the remaining 2 x 25% in 2000 and 2001, respectively.

With effect from 1 September 2000, the Group has acquired another 25% of the shares bringing the stake up to 75%.

### Prospects for the 2000 financial year
The growth achieved by the William Demant Group during the first half of 2000 is expected to continue throughout this year.

Based on today's rates of exchange, the Directors expect the Group as a whole to generate revenues to the tune of DKK 2.9 billion in 2000.

In the second half, growth is mainly expected to come from the product introductions that created growth in the first half as well as new product introductions in the second half-year.

In the light of the results for the first six months of 2000, the Directors are now upgrading their forecast for earnings before interest and tax (EBIT) to about DKK 560 - 590 million and the increase in earnings per share (EPS) to about 60% compared with 1999.

| Development in Shareholders' Equity (DKK million) | 1st half 2000 | 1st half 1999 |
|---|---:|---:|
| Shareholders' equity 1 January | 499.4 | 504.1 |
| Exchange rate adjustments | 11.0 | -3.2 |
| Write-down of goodwill | -371.3 | -3.0 |
| Write-down of own shares | -11.6 | -123.1 |
| Retained earnings | 202.0 | 111.2 |
| Shareholders' equity 30 June | 329.5 | 486.0 |

INTERIM REPORT 1999 — WILLIAM DEMANT HOLDING A/S

For the first half of 1999 the cash flow from operating activities (CFFO) amounted to DKK 74 million, or a rise of 57% on the same period last year.

DEVELOPMENT IN GROUP EQUITY

| DKKm | 1st half 1999 | 1st half 1998 |
|---|---|---|
| Shareholders' equity 1 Jan. | 504.1 | 524.3 |
| Exchange rate adjustments | -3.2 | -4.6 |
| Write-down of goodwill | -3.0 | -18.2 |
| Write-down of own shares | -123.1 | - |
| Retained earnings | 111.2 | 90.4 |
| Shareholders' equity 30 Jun. | 486.0 | 591.9 |

In the first half of 1999 the Company bought back 260,831 shares at an average price of DKK 472 per share. In compliance with our accounting policies the total cost hereof was written off direct via shareholders' equity by an amount of DKK 123 million.

At the annual general meeting in May it was decided to cancel the entire portfolio of the Company's own shares, i.e. the share capital was written down by DKK 3.1 million to DKK 74.4 million.

At 30 June 1999 we held 81.983 of our own shares, or 0.6% of the share capital.

BUSINESS AREAS

Hearing instruments

The sale of hearing aids continued the positive trends in the first half of 1999.

In connection with the US audiology conference in April, Oticon introduced its new product series – DigiFocus II. This series includes Oticon's first fully digital CIC instrument. The commercial sale began in July, consequently any profits from this sale are not included in the profit for the first half of 1999.

Sales of DigiFocus II in July and August were off to a good start and will contribute to growth in both net revenue and profits in the second half-year.

Bernafon continued the favourable trends in profits and contributed satisfactorily to interim profits. At the end of 1999 Bernafon will introduce a new generation of digital aids.

Diagnostic instruments

Diagnostic instruments developed satisfactorily in the first half of 1999. The improvement in sales resulted in a matching increase in profits from primary operations.

In April Maico acquired a minor audiometer activity from American Electromedics. The implementation of these new products by Maico will have a positive impact on the result for the second half of 1999. In connection with the acquisition, a goodwill amount of DKK 3 million was written off via shareholders' equity.

Personal communication

Phonic Ear, which is the largest business in this area, continued its progress in the first half-year although its new products will not be launched until the second half-year.

Expectations for 1999

We expect continued growth in revenue, profits and earnings per share.

The growth in revenue in the second half of 1999 will originate from the introduction of many new products - particularly in Oticon. Organic growth for the Group as a whole is estimated to be around 10% for all 1999.

Compared with 1998, the profit margin for 1999 is expected to increase, partly as a result of an expected rise in the gross profit ratio and partly because the percentage of fixed costs of total net revenues is expected to fall.

For the full year earnings per share (EPS) is expected to go up by minimum 20%.


EXHIBIT 57

Page 4 of 7

To the Copenhagen Stock Exchange

**William Demant Holding**

Announcement no. 2002-06
3 pages in total

William Demant Holding A/S
Strandvejen 58
2900 Hellerup
Danmark

Contact person:
Niels Jacobsen, President & CEO

Tlf.: 39 17 71 00
Fax: 39 27 89 00

CVR-nr. 71186911
william@demant.dk

Hellerup, 7 May 2002
NJA

### Quarterly information – first quarter 2002

**Summary**

- In the first quarter of 2002, the William Demant Group has fully met the expectations expressed in the *Annual Report 2001*.
- Group sales of hearing aids have risen more steeply than sales in the underlying market. Concurrently, the average sales prices have increased, which is mainly due to a positive development in the sales of Oticon's new high end hearing aid family named Adapto.
- Personal Communication's development in sales as well as hearing aid sales directly to the end-users through Hidden Hearing have not met expectations.
- We estimate that the Group's hearing aid business has won market shares in all major markets, including the American market.
- William Demant Holding A/S maintains its expectations for the year with an expected operating profit (EBIT) of DKK 800-840 million.

**Market conditions and business development**

*Hearing aids*
Hearing aid sales have been better than expected, and especially the sales of Oticon's new high end hearing aid family, Adapto, have been higher than expected, just as we are seeing satisfactory sales of the other hearing aid families. The shift towards an increased share of high end instruments has had a positive influence on Group gross margin.

Based on available statistics and information from the market, it is the Company's estimate that both in the USA and in Europe the hearing aid market has seen a comparatively flat unit growth in the first quarter. We also estimate that if measured by value the North American market has grown faster than if measured by units sold due to increased digital instruments sales. In addition, the management estimates that the Group has increased its market share in the first quarter.



Page 1 of 3

If we look at the North American market, a number of recently published financial statements show that major retail chains are still having trouble making their respective business models profitable. The advantages of common purchasing, marketing and administration cannot however cover the resources used on such chains' central common costs and on the payment of interest on major establishment investments. At the same time, we are seeing a considerable difference between these chains and minor chains that are still driven by the founders and are still making a profit.

The Group's joint venture, Avada, has seen a positive development in the first quarter of 2002 with rising revenues and an increasing number of clinics. Throughout 2001, Avada has worked on bringing together the independent dispensers into a common network. For the remaining part of 2002, Avada is expected to continue its growth both in terms of revenues and the number of clinics.

The American Hearing Aid Association (AHAA), of which the Group acquired 49% in August 2001, has chosen a business model that supports the independent hearing aid dispenser. Thus, AHAA supplies business support in the form of education and training in business operations as well as help in the planning and carrying out of local marketing campaigns etc. AHAA is showing continued growth and a comfortable recruitment rate of new associated partners. AHAA's business model is that each associated dispenser is free to choose the hearing aid supplier that he or she prefers, for which reason AHAA will continue as a multi-brand supplier. As expected, Group gross margin has been diluted by the consolidation of AHAA in the quarterly financial statement.

At the American congress in April, Bernafon made a successful introduction of its new high end instrument called Symbio. As was the case with the introduction of Oticon's Adapto, Symbio will be ready for sale in the major markets shortly after the introduction. Bernafon is responsible for a somewhat smaller share of Group revenues and earnings than Oticon, which is why on Group level the effect of the introduction of Symbio will be correspondingly smaller than was the effect of Adapto's introduction.

*Personal Communication*
In the first quarter, the business unit of Personal Communication did not meet expectations. To a certain extent, Danacom's sales derive from the investment level in for instance telecommunication companies and major undertakings with call centres and the like, whereas Phonic Ear's sales are mainly influenced by the demand from American schools. Thus, this business unit has felt the general recession.

*Diagnostic Instruments*
Diagnostic Instruments has seen a satisfactory – but slightly smaller – growth than expected. The integration of the product lines from Tremetrics, a business that was acquired at the end of 2001, has taken place according to schedule, and Tremetrics's business activities have now been transferred to Maico in Minneapolis.

The rebuilding of Interacoustics's production facilities for diagnostic equipment was finished in April. The purpose of this rebuilding is to ensure even higher capacity and efficiency in the years to come.

**Other matters**

Since 1 January 2002, the Company has bought back 225,200 own shares at a total price of DKK 47 million, so that the holding of own shares is now 853,262.

**Expectations for 2002**

The development during the first quarter of 2002 has fully met management expectations, and based on this the Company maintains the expectations expressed in the *Annual Report 2001*. Thus, the Company expects an operating profit of DKK 800-840 realised with a profit margin of approx. 20%.

The Group expects to publish the interim report for the first half-year of 2002 on 20 August 2002.

*Sincerely yours*
William Demant Holding A/S


Niels Jacobsen

**Westlaw.**

Not Reported in F.Supp.2d
2004 WL 503602 (D.Del.)
(Cite as: 2004 WL 503602 (D.Del.))

Page 1

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
D. Delaware.
PHILIPS ELECTRONICS NORTH AMERICA
CORPORATION and U.S. Philips Corporation,
Plaintiffs,
v.
CONTEC CORPORATION, Compo Micro Tech,
Inc., Seoby Electronics Co., Ltd., Remote
Solution Co., Ltd., F/K/A Hango Electronics Co.,
Ltd., Hango Remote Solution,
Inc., Defendants.
No. Civ.A. 02-123-KAJ.

March 11, 2004.
Richard L. Horwitz, Potter Anderson & Corroon, LLP, Wilmington, DE, for Plaintiffs.

Patricia Smink Rogowski, Connolly, Bove, Lodge & Hutz, Jack B. Blumenfeld, Morris, Nichols, Arsht & Tunnell, Kathleen Jennings-Hostetter, Oberly & Jennings, Andre G. Bouchard, Bouchard, Margules & Friedlander, David L. Finger, David L. Finger, Esq., Wilmington, DE, for Defendants.

*MEMORANDUM ORDER*

JORDAN, J.

I. INTRODUCTION

*1 This is a patent infringement case. Jurisdiction is proper under 28 U.S.C. § 1338. Presently before me is a Motion to Dismiss for Lack of Personal Jurisdiction (the "Motion") filed by defendant Remote Solution Co., Ltd. ("Remote Solution") pursuant to Federal Rule of Civil Procedure 12(b)(2). (Docket Item ["D.I."] 105.) For the following reasons, Remote Solution's Motion will be denied.

II. BACKGROUND

Plaintiffs Philips Electronics North America Corporation and U.S. Philips Corporation (collectively, "Philips"), both Delaware corporations, filed an action on February 12, 2002, alleging that Contec Corporation ("Contec"), also a Delaware corporation, was infringing U.S. Patent Nos. 4,703,359 [FN1] (the " '359 patent") and 5,872,562 [FN2] (the " '562 patent"), both owned by Philips. [FN3] The technology disclosed in the '359 and '562 patents is directed to remote control units ("RCUs") for controlling home appliances from different manufacturers and categories. *See* '359 patent, col 1, lns. 15-17; '562 patent, col 1, lns. 13-16 (attached to D.I. 1 as Exs. A and B). On September 17, 2002, Philips filed an amended complaint joining Remote Solution and others as additional defendants in this action. (D.I.41, 42.) Remote Solution is a Korean corporation with its principal place of business in Kimcheon City, Kyongbuk, Korea. (D.I. 41, Ex. A at ¶ 6.) Philips alleges that Remote Solution "manufactures and designs RCUs that infringe the patents in suit under a manufacturing and purchase agreement with Contec, and is subject to personal jurisdiction in [the District of Delaware]." (*Id.* at ¶ 12.) One of the types of RCUs accused of infringement in this case is Remote Solution's model RT U49C. (*Id.*)

> FN1. The '359 patent, entitled "Universal Remote Control Unit With Model Identification Capability," names as inventors Robin B. Rumbolt, William R. McIntyre, and Larry E. Goodson. The '359 patent issued on October 27, 1987 and was assigned to Philips on May 25, 1993. (D.I. 42, Ex. A at ¶ 16.)

> FN2. The '562 patent, entitled "Universal Remote Control Transmitter With Simplified Device Identification," names as inventors Donald P. McConnell and William R. McIntyre. The '562 patent issued on February 16, 1999 and was assigned to Philips on the same day. (D.I. 42, Ex. A at ¶ 17.)

> FN3. Defendants Contec Corporation and Seoby Electronics Co. are no longer involved in this case, having submitted to a Consent Judgment on August 28, 2003. (D.I.258.)

Remote Solution filed its Motion on January 24, 2003, arguing that this court cannot properly exercise personal jurisdiction over it under Delaware's long-

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.


EXHIBIT 53

Not Reported in F.Supp.2d
2004 WL 503602 (D.Del.)
(Cite as: 2004 WL 503602 (D.Del.))

Page 2

arm statute, 10 Del. C. § 3104, or consistent with the requirements of the Due Process Clause. (D.I. 106 at 4, 9.) In support of its Motion, Remote Solution submitted the Declaration of its Director, Suk-Kyu Park. (*Id.*, Ex. A.) In his declaration, Mr. Park stated that Remote Solution does not have any offices, facilities, subsidiaries or employees in Delaware; is not registered to do business in Delaware; has not contracted to supply services or things in Delaware; has no sales force in Delaware; has derived no revenues from sales in Delaware; does not own any property, assets or bank accounts in Delaware or maintain any offices in Delaware. (*Id.* ¶ 4, 7-10.) According to Mr. Park, Contec is Remote Solution's only customer for the accused RT U49C RCU. (*Id.* ¶ 5.) Mr. Park further stated that Remote Solution maintains a website to provide information about its products, but Remote Solution does not accept orders through its website. (*Id.* ¶ 12.)

After Remote Solution filed its Motion, the parties conducted jurisdictional and substantive discovery until September 15, 2003. (D.I. 286 at 2.) The following facts are taken from Philips' opposition to Remote Solution's Motion. (D.I.286.) Since Philips' factual allegations are not directly controverted, they are taken as true for purposes of determining jurisdiction in this court. *See Beverly Hills Fan Co. V. Royal Sovereign Corp.,* 21 F.3d 1558, 1563 (Fed.Cir.1994).

*2 In 1997, Remote Solution decided to expand its RCU sales by entering the United States consumer market. (*Id.* at 5 (citing deposition testimony of Suk-Kyu Park at D.I. 287, Ex. 14).) To that end, Remote Solution hired David Ahn, a native Korean living in California, as its exclusive sales agent in the United States. (*Id.*) Mr. Ahn established Hango Electronics, Inc., d/b/a Remote Solution ("HEI") in California, for the sole purpose of soliciting customers in the United States on behalf of Remote Solution. (*Id.* (citing deposition testimony of David Ahn at D.I. 287, Ex. 3).) HEI is an independent corporation of which Mr. Ahn is the sole owner and employee. (*Id.*)

In 1999, HEI entered into a Manufacturing and Purchase Agreement with Contec, L.P., a New York limited partnership, wherein Contec L.P. retained HEI to design and manufacture RCUs and sell them to Contec L.P. [FN4] (D.I. 287, Ex. 15 at 1.) HEI also agreed to "defend any suit or proceeding brought against Contec L.P. to the extent that such suit or proceeding is based on a claim that the [RCUs] constitute an infringement of any valid United States ... patent...." (*Id.* at 3.) In 2000, with Mr. Ahn's consent, HEI changed its name to Remote Solution, the name under which Mr. Ahn conducts business in California. (*Id.* at 6.)

> FN4. The relationship between Contec L.P. and Contec Corporation was fleshed out at oral argument. At some point in time, Contec L.P., a New York entity, merged with Contec LLC, another New York entity, which then merged with Contec Corporation, a Delaware entity. (D.I. 338 at 67:16-25.)

According to Mr. Ahn, Remote Solution's business plan was to sell as many RCUs as possible. (*Id.*) As a result of his extensive efforts to market the RCUs, Mr. Ahn acquired Contec, TiVo, Inc., Harman Kardon, Inc. and Hy-Tek Manufacturing Co., Inc. as customers for Remote Solution. (*Id.*) Remote Solution does not design its own remote controls, rather, it manufactures them according to its customers' specifications. (*Id.* at 7.) Contec is a Delaware corporation with its principal place of business in New York, and its primary business is to sell refurbished cable set top boxes and RCUs to major cable companies in the United States. (*Id.* at 10.) Contec's customers include Comcast, which provides cable television services to residents of Delaware. (*Id.*) Generally, Remote Solution knows who Contec's customers are because Remote Solution marks the RCUs with those customer's logos. (*Id.*; D.I. 287, Ex. 10.) Remote Solution knew that Comcast was one of Contec's customers, as it sent drawings of the Comcast logo to Contec via email on April 24, 2002. (D.I.287, Ex. 36.)

In 2000, Remote Solution established a subsidiary in the United States, Hango Remote Solution, Inc. ("Hango"). (D.I. 286 at 8.) Remote Solution was a 70% shareholder in Hango and Mr. Ahn owned the remaining 30%. (*Id.*) About half of Hango's revenue came from sales of Remote Solution's RCUs, Hango's primary business was marketing an MP3 player called Personal Jukebox. (*Id.* at 8-9.) Ultimately, however, Hango's business failed, and the company folded in December 2002. (*Id.* at 9.) Thereafter, Remote Solution began litigating this case on Hango's behalf as well as its own, filing an answer to the complaint and a motion to amend the answer to include a crossclaim against Contec for indemnification in the event Hango is found liable for patent infringement. (*Id.* at 9; *see also* D.I. 287, Ex. 2 at 8.)

*3 Remote Solution has sold at least 1,969,849 of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 503602 (D.Del.)
(Cite as: 2004 WL 503602 (D.Del.))

Page 3

the accused RCUs in the United States since November 22, 2000. (D.I. 286 at 2 (citing Expert Report of Kerry Ruoff at D.I. 287, Ex. 1).) Based on the records obtained from TiVo, one of Remote Solution's customers, Philips discovered that at least 2,000 infringing RCUs manufactured by Remote Solution for TiVo have been sold or used in Delaware since March 31, 1999. (D.I. 286 at 3, 13.) According to TiVo's records, 1,738 residents of Delaware subscribed to TiVo's service between March 31, 1999 and May 28, 2003. (*Id.* (citing Declaration of Matthew P. Zinn at D.I. 287, Ex. 39 ¶ 12).) Because TiVo sells its digital video recorders ("DVRs") bundled with the RCUs manufactured by Remote Solution, it is likely that more than 1,500 Remote Solution RCUs are being used for TiVo recorders in Delaware today. (*Id.* (citing D.I. 287, Ex. 39 ¶¶ 6, 17).) Furthermore, since January 1, 2000, more than 1,000 DVRs bundled with RCUs manufactured by Remote Solution were sold in Delaware at two retailers, specifically, 654 were sold at BestBuy and 406 were sold at Circuit City. (*Id.* (citing Declaration of Scott Jacobi at D.I. 287, Ex. 40 ¶ 7; Declaration of Mark Smucker at D.I. 287, Ex. 41 ¶ 9).)

III. DISCUSSION

When a non-resident defendant's motion to dismiss challenges personal jurisdiction, the plaintiff has the burden to show the basis for the court's jurisdiction over that defendant. *Intel Corp. v. Broadcom Corp.*, 167 F.Supp.2d 692, 699 (D.Del.2001) (citing *Wright v. American Home Products*, 768 A.2d 518, 526 (Del.Super.2000)). To satisfy this burden, Philips must make a *prima facie* showing that this court may exercise personal jurisdiction over Remote Solution. *Id.* After discovery has begun, the plaintiff must sustain this burden by "establishing jurisdictional facts through sworn affidavits or other competent evidence." *Id.* (citing *Time Share Vacation Club v. Atlantic Resorts, Ltd.*, 735 F.2d 61, 66 n. 9 (3d Cir.1984)).

Determining whether Remote Solution is subject to personal jurisdiction requires a two-part analysis. *Id.* at 700; *see also Siemens Aktiengesellschaft v. LG Semicon Co., Ltd.*, 69 F.Supp.2d 622, 624 (D.Del.1999). First, I must determine whether the language of Delaware's long-arm statute, 10 Del. C. § 3104(c), reaches Remote Solution. *Broadcom*, 167 F.Supp. at 700. Second, if I find that Remote Solution's conduct gives rise to personal jurisdiction under the long-arm statute, I must then determine whether subjecting Remote Solution to jurisdiction in Delaware would comport with the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Id.* (citing *Intel Corp. v. Silicon Storage Tech, Inc.*, 20 F.Supp.2d 690, 694 (D.Del.1998)).

A. Jurisdiction over Remote Solution is Proper Under § 3104(c)(1) of Delaware's Long-Arm Statute

Philips contends that Remote Solution is subject to jurisdiction under sections 3104(c)(1) and (c)(4) of the Delaware long-arm statute (D.I. 286 at 17, 20), which provide:

*4 (c) As to a cause of action brought by any person arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident, or a personal representative, who in person or through an agent:
* * *
(1) Transacts business or performs any character of work or service in the State;
* * *
(4) Causes tortious injury in the State or outside of the State by an act or omission outside of the State if the person regularly does or solicits business, engages in any other persistent course of conduct in the State or derives substantial revenue from services, or things used or consumed in the State....

10 Del. C. §§ 3104(c)(1) & (c)(4). Delaware state courts have interpreted the "transacting business" provision of § 3104(c)(1) as a specific jurisdiction provision that requires a nexus between the cause of action and the conduct used as a basis for jurisdiction. *See LaNuova D & B S.p.A. v. Bowe Co.*, 513 A.2d 764, 768 (Del.1986). The Federal Circuit has held that, where a defendant has "purposefully shipped the accused [product] into [the forum state] through an established distribution channel ... [n]o more is usually required to establish specific jurisdiction." *Beverly Hills Fan*, 21 F.3d at 1564. Moreover, in order to meet the requirements of § 3104(c)(1), Remote Solution's actions must be directed at residents of Delaware and the protection of Delaware laws. *See Thorn EMI N. Am., Inc. v. Micron Tech., Inc.*, 821 F.Supp. 272, 274 (D.Del.1993) (citing *Sears, Roebuck & Co. v. Sears*, 744 F.Supp. 1289, 1292 (D.Del.1990)).

Philips argues that Remote Solution has shipped the accused RCUs into an established distribution channel as part of a general business plan that results in sales of the accused products in Delaware. (D.I. 286 at 18.) In response, Remote Solution argues that it merely had a general plan to serve the national market and that its activities were not directed

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
2004 WL 503602 (D.Del.)  
**(Cite as: 2004 WL 503602 (D.Del.))**

Page 4

specifically toward Delaware. (D.I. 309 at 2, 4.)

I find that Philips has presented competent evidence that an established distribution channel exists through which accused RCUs manufactured by Remote Solution are shipped to, distributed, and sold in Delaware. First, the evidence shows that Remote Solution and Contec have enjoyed a close business relationship since at least as early as 1999, when, in a manufacturing and purchase agreement governed by New York law, Remote Solution agreed to defend one of Contec's predecessors against any claims of patent infringement. Furthermore, Remote Solution is seeking indemnification from Contec for Hango, Remote Solution's defunct subsidiary, in the event Hango is found liable for patent infringement in this case. Philips has also presented competent evidence that Remote Solution knew that Comcast, a major provider of cable television services in the State of Delaware, was one of Contec's customers for the accused RCU. Given all of these facts, and in light of Remote Solution's ongoing business relationship with Contec, it was reasonably foreseeable that the accused RCUs would make their way into the Delaware market through Contec's customers. Documents obtained from Remote Solution show that Contec was selling the accused RCUs to Comcast, such that Remote Solution knew or should have known that the accused RCUs were being sold or distributed in Delaware. See Thorn EMI, 821 F.Supp. at 275-76.

*5 Finally, Philips has competent evidence that the accused RCUs are present in Delaware in large numbers, and were present in Delaware prior to its filing suit, as a result of Remote Solution manufacturing the accused RCUs for TiVo. Because Philips has presented competent evidence of an established distribution channel that caused the accused RCUs to be sold and distributed in Delaware, and that the accused RCUs are actually present in Delaware, I find that jurisdiction over Remote Solution is proper under § 3104(c)(1), and I need not address the issue of whether jurisdiction over Remote Solution is proper under § 3104(c)(4). [FN5]

> FN5. Remote Solutions relies upon Commissariat A L'Energie Atomique v. Chi Mei Optoelectronics Corp., 293 F.Supp.2d 423, reconsideration denied, 293 F.Supp.2d 430 (D.Del.2003) (granting defendant's motion to dismiss for lack of personal jurisdiction in patent infringement case) in support of its motion to dismiss. There are key factual distinctions between this case and Commissariat. First, unlike the plaintiff in Commissariat, Philips requested and conducted jurisdictional discovery which uncovered evidence of actual sales and the presence of the accused device in Delaware prior and subsequent to the date the complaint was filed, evidence that was lacking in Commissariat. Second, that Remote Solution (1) agreed to defend a predecessor of Contec from patent infringement and (2) is seeking indemnification from Contec should Hango be found liable for patent infringement is evidence of Remote Solution's close business relationship with Contec, and its knowledge of the established distribution channel through which its products were being sent into Delaware. Thus, the quantum of evidence upon which to rest personal jurisdiction in this case is significantly greater than in Commissariat.

**B. Exercising Jurisdiction over Remote Solution in Delaware Comports With the Requirements of the Due Process Clause**

Due process requires that sufficient minimum contacts exist between the defendant and the forum state to satisfy "traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In considering whether jurisdiction may extend to a defendant, courts should primarily consider whether the defendant has purposely availed itself of the forum state's law, Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985), and whether the defendant reasonably could have anticipated being haled into the courts of the forum state, World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 291-92, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). Courts should also consider the burden imposed on the defendant by having to litigate in a foreign forum, as well as the interests of the plaintiff and the forum state. Asahi Metal Industry Co. v. Superior Court of California, 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987).

In this case, the accused RCUs arrived in Delaware through Remote Solution's purposeful shipment of them through an established distribution channel. See Beverly Hills Fan, 21 F.3d at 1565. Philips has "stated all of the necessary ingredients for an exercise of jurisdiction consonant with the requirements of due process," namely, that Remote Solution placed the accused products in the stream of commerce, that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
2004 WL 503602 (D.Del.)
(Cite as: 2004 WL 503602 (D.Del.))

Page 5

it knew the likely destination of the products, and that its conduct and connections with Delaware were such that they should reasonably have anticipated being brought into court here. *Id.* at 1566.

Finally, litigating this case in Delaware would not place such a burden on Remote Solution as to offend traditional notions of fair play and substantial justice, especially since Remote Solution has executed an agreement to defend Contec L.P. against all claims of patent infringement, which proves that Remote Solution was well aware of and prepared for the possibility of litigation where Contec did business, including Delaware. Nor has Remote Solution shown that it does not have the resources to fairly litigate this case in Delaware. *See Thorn EMI,* 821 F.Supp. at 276. Moreover, "Delaware has an abiding interest in protecting the property rights of its residents[,]" *id.,* including corporate citizens such as Philips. Thus, exercising jurisdiction over Remote Solution in this case comports with the requirements of the Due Process Clause.

IV. CONCLUSION

*6 For these reasons, it is hereby ORDERED that Remote Solution's Motion to Dismiss for Lack of Personal Jurisdiction (D.I.105) is DENIED.

2004 WL 503602 (D.Del.)

**Motions, Pleadings and Filings (Back to top)**

• 1:02cv00123 (Docket) (Feb. 12, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.