IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., Plaintiff, v. SONIC INNOVATIONS, INC., et al, Defendants. | ) | C.A. No. 05-422 (GMS) **CONFIDENTIAL EXHIBITS ARE FILED SEPARATELY UNDER SEAL** |

**LETTER TO THE HONORABLE GREGORY M. SLEET FROM MARY B. GRAHAM <u>REGARDING CERTAIN PRIVILEGE AND WORK PRODUCT DISPUTES</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200

*Attorneys for William Demant Holding A/S, WDH Inc., Oticon A/S, Oticon, Inc., Bernafon AG, and Bernafon LLC*

OF COUNSEL:

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER
901 New York Ave., N.W.
Washington, DC 20001-4413
202.408.4000

Dated: September 25, 2007

1245052

Dear Chief Judge Sleet:

As permitted by the Court in the Sept. 18 teleconference, this letter on behalf of Defendants addresses certain privilege and work product disputes (proposed order Ex. A).

1. ETG's Implied Waiver by Reliance on Communications with Counsel.

The date of invention of the asserted claims of ETG's patents is an important issue because it may determine whether publications supporting Defendants' invalidity defense have the status at trial of "prior art." ETG alleges a date of invention of "early 1984" for each asserted claim. (Ex. B at 13.) ETG bases that date - for each claim - on an alleged conception in "early 1984" and diligence thereafter in "constructively reduc[ing] the invention to practice with the filing of the patent application on June 26, 1986." (Ex B at 13.) *See Marhurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1578 (Fed. Cir. 1996) ("Where a party is first to conceive but second to reduce to practice, [to have priority] that party must demonstrate reasonable diligence toward reduction to practice"). ETG's claim of diligence relies on work on the patent application from early 1985 to June 26, 1986 by counsel for Audimax, ETG's predecessor. (Ex. B at 21; Ex. C.)

ETG must show that Audimax's counsel was actively working on the patent application. *Allied Signal v. Allegheny Ludlum*, 29 U.S.P.Q. 2d 1039, 1993 WL 315339, at *9 (D. Conn. 1993) (To show diligence, a party must demonstrate that "its inventors were actively working on the inventions at issue."). That work must have directly related to the inventions of each claim at issue. *Smith v. Crivello*, 215 U.S.P.Q. 446, 452, 1982 WL 52060 (Bd. Pt. Int. 1982) ("[T]o satisfy the 'reasonable diligence' requirement of 35 U.S.C. § 102(g), the work must ordinarily be directly related to a reduction to practice of *the invention of the counts in issue*."); *see also Bell Tel. Labs v. Hughes Aircraft*, 564 F.2d 654, 656 (3d Cir. 1977) ("[W]ork quite unconnected with the reduction of an invention to practice cannot be considered [for reasonable diligence]"). ETG must "account for the entire period" from conception to reduction to practice, and must explain any periods of inactivity with a reasonable excuse. *Brown v. Barbacid*, 436 F.3d 1376, 1380 (Fed. Cir. 2006) ("The basic inquiry is whether, on all the evidence, there was reasonably continuing activity to reduce the invention to practice."); *Monsanto Co. v. Mycogen Plant Sci.*, 261 F.3d 1356, 1369 (Fed. Cir. 2001).

To support diligence, ETG will offer testimony equivalent to its privilege log entries that certain communications and meetings with counsel took place.[1] (Ex. B at 18.) Those entries run from February 28, 1985 to June 26, 1986, and include entries such as from May 14, 1985, "draft specification prepared by outside counsel reflecting counsel's legal advice." (Ex. C.)

Although ETG intends to offer "privilege-log-equivalent" testimony, ETG is withholding the underlying communications as privileged. ETG's position, as stated in meet and confer sessions, is that, by relying simply on testimony at the level of the privilege log, it has not

---

1 The attorneys will apparently testify, for example, that on the date of each privileged document, they sent a draft patent application to the client, they sent draft claims, they had a meeting with the client on a particular date to discuss the application, etc.

waived privilege any more than a party waives privilege in providing a log. The flaw in ETG's logic is that, when providing a privilege log, a party is not waiving privilege because it has not relied on the log for evidentiary purposes. By contrast, ETG *is* relying on its log (through equivalent testimony) and in doing so is making representations, explicit and implicit, about the content of the communications. The representations include that (1) events occurred (e.g., communications with counsel about the patent application for the patents in suit and not some other application), (2) the communications and work by counsel were directed to *all* inventions of the asserted claims of the patents in suit, and (3) the character and quality of the work amounted to diligence. ETG's reliance on the contents of the communications in this way results in a classic issue waiver. *Rhone-Poulenc Rorer, Inc. v. Home Indem. Co.*, 32 F.3d 851 (3d Cir. 1994); *Sanofi-Synthelabo v. Apotex, Inc.*, 299 F. Supp. 2d 303, 308-09 (S.D.N.Y. 2004).

Here, there are several alleged inventions, including certain acoustic feedback cancellation, noise blocking, and reverberation reduction. ETG's testimony would create the impression that the draft patent applications covered *all* these inventions. But if ETG were allowed to withhold the underlying documents, defendants will be foreclosed from probing ETG's created impression in any meaningful way. We will not be able to explore the contents of the draft applications and communications, whether they relate to the filed application,[2] or whether they cover the full scope of the inventions. This is particularly important because ETG supports, for example, its invention date for certain feedback cancellation with two documents of highly questionable dates although other documents strongly suggest that the inventors did not conceive of feedback cancellation of that type until later, after inventor Levitt had seen the work of Egolf and others. ETG should not be allowed to rely on "trust-me" testimony, not subject to meaningful cross examination, that the draft applications addressed the claimed method of feedback cancellation, particularly when the date Levitt first conceived of the idea is very much in question. Defendants should have "an opportunity to uncover the foundation for [ETG's] assertions in order to contradict them." *Friction Div. Prods. v. E.I. DuPont de Nemours & Co.*, 117 F.R.D. 535, 538 (D. Del. 1987); *Synalloy Corp. v. Gray*, 142 F.R.D. 266, 269 (D. Del. 1992) ("privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications.").

An instructive case is *Software AG v. BEA Sys., Inc.*, C.A. 03-739-GMS, slip op. at 1 (D. Del. Apr. 8, 2005) (Ex. J), in which this Court declined, based on the "obvious prejudice to plaintiff," to allow the defendant to rely on the bare fact of its communications with patent counsel to show good faith to rebut willful infringement. *Id.* This Court observed that involvement of the attorney by itself was not relevant to intent, so the "true value" of the evidence could only be "to give the jury a subtle 'wink wink' in the hope that the jury will draw the improper inference that the patent attorney's involvement demonstrates [Defendant's] lack of

2 ETG's privilege log indicates that other patent applications were also being prepared simultaneously. (*e.g.*, May 14, 1985) (Ex. D.)

[bad] intent." *Id.* at 4. ETG is looking for a not-so-subtle inference that counsel's work involved the full scope of the claimed inventions.

ETG relies on a (nonprecedential and unpublished) Board decision in an interference action. *Ginter v. Benson*, 81 U.S.P.Q. 2d 1342, 2005 WL 3694320 (B.P.A.I. 2005)[3]. Ginter, the junior party, attempted to prove diligence, and thus priority, with his own testimony and the testimony and billing records of his patent attorney. *Id.* at *1-4. He refused, however, to produce the ten draft patent applications on grounds of attorney-client privilege. *Id.* The senior party, Benson, moved to compel production of the documents.

Although the the motion was moot given the panel's previous ruling that Ginter had not made out a *prima facie* case of diligence, *Ginter*, 2005 WL 3694320 at *6, and final judgment was entered against Ginter that same day (Ex. E), the Board in *dictum* said that Benson had failed to prove waiver because he had failed to show that Ginter relied on the *substance* of the draft applications or that the testimony of the patent attorney touched on the *content* of the drafts. *Id.* at *8. By contrast, ETG is attempting, notwithstanding its protestations to the contrary, to rely on the substance of the communications, including the contents of the draft applications. Reliance on that substance waives attorney-client privilege. *See Software AG.*

2. <u>ETG's Improper Withholding Of The EKMS Documents.</u>

ETG hired a third-party consulting firm known as EKMS, apparently in 2002, to assess the value of the patents in suit. ETG has withheld production of any documents EKMS prepared and correspondence between EKMS and ETG, including a 2002 report EKMS prepared for ETG. Defendants conducted three depositions of ETG witnesses, each of whom confirmed that EKMS was engaged to look into licensing opportunities for the patents in suit, not to render or assist with legal advice in anticipation of litigation. Nevertheless, ETG has withheld production of these documents on the flawed legal and factual premise that the Baker Botts law firm directed the activities of EMKS, and, therefore, all EKMS documents may be withheld (Ex. F). In depositions, however, Kimball Chen (owner of ETG), Michael Pitonyak (former president of Audimax, the original owner of the patents-in-suit), and Alex Evans (current president of ETG) confirmed that Baker Botts did not direct EKMS's activities and, of greater importance, that the EKMS work had no relation to legal advice or anticipation of litigation.

To support its work product claims, ETG bears the burden of demonstrating that the materials were prepared in the course of preparation for possible litigation. *Kopacz v. Del. River and Bay Authority*, 2005 WL 2086747, at *1 (D. Del. Aug. 29, 2005). "Materials

---

3 This decision was on a renewed motion to compel by senior party Benson. *Id.* at *1. The Board previously held, ruling on the first motion, that Ginter had failed to establish diligence on the evidence presented. *Ginter v. Benson*, 74 U.S.P.Q. 2d 1930, 2004 WL 2342558 at *5 (B.P.A.I. 2004). Because other priority issues remained, the interference action was bifurcated and a merits panel entered final judgment against Ginter on December 28, 2005.

assembled in the ordinary course of business . . . or for other non litigation purposes are not under the qualified immunity provided by [Fed. R. Civ. P. 26]." *Id.* Documents relating to strategies or approaches to licensing patents are commercial matters, not legal issues or advice. *Tulip Computers Int'l. v. Dell Computer Corp.*, 2002 WL 31556497, at *1 (D. Del. Nov. 18, 2002) (Mag. J. Thynge). Such documents are not entitled to work product immunity. *Id.* at *2.

ETG first identified the EKMS report and related EKMS documents on July 30, 2007, in a privilege log of over 700 entries. The next day, Defendants inquired about EKMS during the deposition of Chen (owner of ETG). Chen testified that EKMS was hired to help determine the value of the patents in suit. (Ex. G at 106-07.) In particular, "EKMS was engaged to ascertain whether there was any licensing potential for those patents." (*Id.* at 107.) Chen had no recollection of any attorney involvement, other than review by a corporate lawyer of the contract with EKMS, or of any legal matters contained in the EKMS report. (*Id.* at 113-14, 123-24.) Yet, when Defendants inquired about EKMS's conclusions, ETG's counsel instructed Chen not to answer. (*Id.* at 144-45); *see also* (*Id.* at 108-110) (limiting scope of witness's testimony).

After Mr. Chen's deposition, ETG maintained its work product claim but said that the EKMS engagement was under the direction of Baker Botts. In meet and confer discussions, counsel for ETG asserted that Michael Pitonyak, the former president of Audimax (ETG's predecessor) would factually substantiate this allegation.

On August 27, 2007, Defendants deposed Mr. Pitonyak. Contrary to ETG's contentions, Mr. Pitonyak was unable to recall any attorney involvement. (Ex. H at 44-47; 60-61.) Pitonyak also confirmed that EKMS was hired to determine if "the patent may have value" and "to identify potential licensing partners." (*Id.* at 41, 77.)

On September 19, Defendants deposed Alex Evans, ETG's current president. He testified that EKMS was "hired to see whether any fruitful licensing discussions could be started." (Ex. I at 26.) Evans explained that the EKMS report led ETG to conclude that the hearing aid industry would not be interested in licensing the patents in suit. (*Id.* at 79-80.) When Defendants questioned the basis for that conclusion, counsel reiterated ETG's claim of work product and instructed Evans not to disclose the contents of the report. (*Id.*)

ETG's sole basis for its work product claims is that Baker Botts directed the activities of non-lawyers at EKMS. The issue is not whether work product immunity may extend to work conducted by non-lawyers at the direction of lawyers. Rather, ETG's work product claims are improper because: (1) ETG cannot substantiate its claim that Baker Botts directed the EKMS activities; and (2) even if attorneys were involved, licensing activities are discoverable business matters that do not constitute legal advice or work done in anticipation of litigation.

First, ETG's contention that Baker Botts directed the activities of EKMS is wholly unsupported. The testimony of ETG's own witnesses contradicts its contention. Both Chen and Evans testified that Baker Botts was engaged to evaluate the patents in suit *after* Audimax received the EKMS report. (Ex. G at 131-32; Ex. I at 26.) Chen also testified that he

hired EKMS based on the recommendation of a consulting firm, not a law firm. (Ex. G at 103-07.) Further, Pitonyak had no recollection of any attorney involvement or any instructions by attorneys to meet with EKMS. (Ex. H at 44-47, 60-61.) Defendants even mentioned Baker Botts by name to Mr. Pitonyak, but he had no recollection concerning the firm's involvement. (Ex. H at 60-61.) In short, the testimony of three ETG witnesses - including Mr. Pitonyak, whom ETG's counsel said would substantiate ETG's claims - refutes ETG's claim that the EKMS documents were created "at the direction of counsel."[4]

Second, even if Baker Botts had directed the work of EKMS, this fact would not support ETG's work product assertion. Even if directed to or copied to counsel, documents relating to licensing strategies involve "commercial matters relating to the [patents in suit], not legal issues or legal advice (the seeking or providing of such advice)." *Tulip Computers,* 2002 WL 31556497, at *1 (Mag. J. Thynge). Chen and Evans characterized the EKMS work as a "commercial matter" and "commercial activity," respectively. (Ex. G, at 125; Ex. H at 75-76.) As such, neither work product immunity nor privilege applies to the EKMS documents.

Additionally, ETG should not be allowed to use privilege and attorney work product claims as both a sword and a shield. Evans stated in his deposition that the 2002 EKMS report led him to the conclusion that the hearing aid industry would not agree to license the patents in suit (Ex. I at 79-80), which ETG now contends supports its charge of willful infringement. Yet, ETG maintains that the underlying report itself is not discoverable. ETG cannot selectively rely on EKMS where it is convenient, and then preclude defendants from discovering what is in the documents themselves. *Tracinda Corp. v. DaimlerChrysler AG*, 362 F. Supp. 2d 487, 513 (D. Del. 2005) ("[A] party should not be permitted to use the privilege to shield information which it has deliberately chosen to use offensively.").

Defendants ask the Court to order that ETG produce the documents identified in Exhibit F and further reassess whether any other documents it withheld on the basis of work product immunity should be produced consistent with the Court's order.

Respectfully,

*/s/ Mary B. Graham*

Mary B. Graham (#2256)

MBG/dam
cc: Clerk of the Court (via hand delivery)
All Counsel of Record (via efiling and email)
1236896

4 Further, a review of four separate privilege logs (the 150-page ETG log; the 50+-page Baker Botts log; the Michael Pitonyak log; and the EKMS (now known as UTEK) log) have failed to identify any evidence of instructions from the Baker Botts law firm to EKMS.