# EXHIBIT 1

1307566_1.DOC

## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC. | § § § | Civil Action No. 05-CV-422-GMS |
| Plaintiff, | § § | PUBLIC VERSION |
| v. | § § | |
| SONIC INNOVATIONS, INC., et al. | § § | |
| Defendants. | § | |

## AMENDED ANSWER OF DEFENDANTS OTICON A/S, OTICON INC., BERNAFON AG, WDH, INC., AND BERNAFON, LLC, COUNTERCLAIMS OF OTICON INC. AND BERNAFON, LLC, AND DEMAND FOR JURY TRIAL

Defendants Oticon A/S, Oticon Inc., Bernafon AG, WDH, Inc. and Bernafon, LLC

(collectively the "Oticon Defendants") for their Amended Answer to the Second Amended

Complaint and Jury Demand of Plaintiff Energy Transportation Group, Inc. ("ETG"), served on

the Oticon Defendants on February 16, 2006, hereby state as follows:

### SECOND AMENDED COMPLAINT AND JURY DEMAND

1.     The Oticon Defendants admit that a Second Amended Complaint and Jury

Demand was served on February 16, 2006 naming SONIC INNOVATIONS, INC., PHONAK

AG, PHONAK INC., PHONAK LLC, UNITRON HEARING, INC., UNITRON HEARING

LTD., WILLIAM DEMANT HOLDING A/S, OTICON A/S, OTICON INC., WIDEX A/S,

WIDEX HEARING AID CO. INC, GN RESOUND A/S, GN RESOUND CORPORATION,

STARKEY LABORATORIES, INC., GENNUM CORPORATION, RESISTANCE

TECHNOLOGY INC., BERNAFON AG, WDH, INC., AND BERNAFON, LLC as defendants

#1055043v4

PUBLIC VERSION

to this action (collectively referred to as "Defendants") and demanding a jury trial. The Oticon
Defendants otherwise deny the allegations of Paragraph 1.

## NATURE OF THE ACTION

2.    The Oticon Defendants admit that this is an action for patent infringement arising
under the patent laws of the United States, 35 U.S.C. §§ 271, *et seq*. charging Defendants with
infringing one or more claims of United States Patent No. 4,731,850 (the "'850 Patent") entitled
"Programmable Digital Hearing Aid System" and one or more claims of United States Patent
No. 4,879,749 (the "'749 Patent") entitled "Host Controller for Programmable Digital Hearing
Aid System." The Oticon Defendants admit that a copy of the '850 Patent was attached as
Exhibit A and a copy of the '749 Patent was attached as Exhibit B to the Second Amended
Complaint and Jury Demand. The Oticon Defendants expressly deny any inference that the '850
or '749 Patents are valid, enforceable, and/or infringed by any of the Oticon Defendants. The
Oticon Defendants expressly deny that William Demant Holding A/S or WDH, Inc.
manufacture, use, sale, offer for sale in the United States or elsewhere in the world, and/or
import any product into the United States. The Oticon Defendants admit that hearing aids are
manufactured outside the United States by Oticon A/S and certain of these hearing aids are sold
in the United States by Oticon Inc. and certain of these hearing aids are sold in the United States
by Bernafon, LLC. The Oticon Defendants, as to SONIC INNOVATIONS, INC., PHONAK
AG, PHONAK INC., PHONAK LLC, UNITRON HEARING, INC, UNITRON HEARING
LTD., WIDEX A/S, WIDEX HEARING AID CO. INC, GN RESOUND A/S, GN RESOUND
CORPORATION, STARKEY LABORATORIES, INC., GENNUM CORPORATION, and
RESISTANCE TECHNOLOGY INC., collectively referred to as the "Other Defendants," are
without knowledge or information sufficient to form a belief as to the truth of the remaining

2                                                                        #1055043v4

PUBLIC VERSION

allegations of Paragraph 2 and, therefore, deny the remaining allegations of Paragraph 2. In all
other respects, the Oticon Defendants expressly deny the allegations of Paragraph 2.

    3.    The Oticon Defendants are without knowledge or information of the activities of
the Other Defendants sufficient to form a belief as to the truth of the allegations of Paragraph 3
as they pertain to the Other Defendants and, therefore, deny the allegations of Paragraph 3 as
they pertain to the Other Defendants. The Oticon Defendants admit that Oticon A/S
manufactures hearing aids outside the United States and imports some of those hearing aids into
the United States. The Oticon Defendants admit that Oticon Inc. and Bernafon, LLC offer for
sale and sell hearing aids in the United States. In all other respects, the Oticon Defendants
expressly deny the allegations of Paragraph 3.

    4.    The Oticon Defendants expressly deny the allegations of Paragraph 4.

    5.    The Oticon Defendants expressly deny the allegations of Paragraph 5.

## The Parties

    6.    The Oticon Defendants are without knowledge or information sufficient to form a
belief as to the truth of the allegations of Paragraph 6 and, therefore, deny the allegations of
Paragraph 6.

    7.    The Oticon Defendants admit that, on its face, the '850 Patent has an issue date of
March 15, 1988, is entitled "Programmable Digital Hearing Aid System," lists Harry Levitt,
Richard S. Dugot, and Kenneth W. Kopper as inventors, and lists Audimax, Inc. as assignee.
The Oticon Defendants admit that, on its face, the '749 Patent has an issue date of November 7,
1989, is entitled "Host Controller For Programmable Digital Hearing Aid System," lists Harry
Levitt, Richard S. Dugot, and Kenneth W. Kopper as inventors, and lists Audimax, Inc. as
assignee. The Oticon Defendants are without knowledge or information sufficient to form a

    #1055043v4

PUBLIC VERSION

belief as to the truth of the allegation that Audimax Corporation and Audimax, Inc. are the predecessors to plaintiff Energy Transportation Group, Inc. ("ETG") or that ETG is the current owner of the '850 and/or '749 Patents and, therefore, denies this allegation of Paragraph 7. In all other respects, the Oticon Defendants deny the allegations of Paragraph 7.

8.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 8 and, therefore, deny the allegations of Paragraph 8.

9.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 9 and, therefore, deny the allegations of Paragraph 9.

10.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 10 and, therefore, deny the allegations of Paragraph 10.

11.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 11 and, therefore, deny the allegations of Paragraph 11.

12.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 12 and, therefore, deny the allegations of Paragraph 12.

13.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 13 and, therefore, deny the allegations of Paragraph 13.

#1055043v4

PUBLIC VERSION

14.    The Oticon Defendants admit that William Demant Holding A/S is an
Aktieselskab, a Danish public company. William Demant Holding A/S presently maintains a
place of business at Kongebakken 9, 2765 Smorum, Denmark. In all other respects, the Oticon
Defendants expressly deny the allegations of Paragraph 14.

15.    The Oticon Defendants admit that Oticon A/S is an Aktieselskab, a Danish public
company. Oticon A/S presently maintains a place of business at Kongebakken 9, 2765 Smorum,
Denmark. In all other respects, the Oticon Defendants expressly deny the allegations of
Paragraph 15.

16.    The Oticon Defendants admit that Oticon Inc. maintains a place of business at 29
Schoolhouse Road, P.O. Box 6724, Somerset, New Jersey. In all other respects, the Oticon
Defendants expressly deny the allegations of Paragraph 16.

17.    The Oticon Defendants are without knowledge or information sufficient to form a
belief as to the truth of the allegations of Paragraph 17 and, therefore, deny the allegations of
Paragraph 17.

18.    The Oticon Defendants are without knowledge or information sufficient to form a
belief as to the truth of the allegations of Paragraph 18 and, therefore, deny the allegations of
Paragraph 18.

19.    The Oticon Defendants are without knowledge or information sufficient to form a
belief as to the truth of the allegations of Paragraph 19 and, therefore, deny the allegations of
Paragraph 19.

20.    The Oticon Defendants are without knowledge or information sufficient to form a
belief as to the truth of the allegations of Paragraph 20 and, therefore, deny the allegations of
Paragraph 20.

5                    #1055043v4

PUBLIC VERSION

21.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 21 and, therefore, deny the allegations of Paragraph 21.

22.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 22 and, therefore, deny the allegations of Paragraph 22.

23.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 23 and, therefore, deny the allegations of Paragraph 23.

24.    The Oticon Defendants admit that Bernafon AG is an Aktiengesellschaft, a Swiss public company, and maintains a place of business at Morgenstrasse 131, 3018 Berne, Switzerland. In all other respects, the Oticon Defendants expressly deny the allegations of Paragraph 24.

25.    The Oticon Defendants admit that WDH, Inc. is a corporation organized under the laws of Minnesota, and maintains a current place of business at 200 Cottontail Lane, Bldg. B, Somerset, NJ 08873. WDH, Inc. was formerly known as Bernafon Inc. and Bernafon-Maico Inc. Bernafon Inc. and Bernafon-Maico Inc. had maintained a place of business at 9675 West 76th Street, Eden Prairie, MN 55344. In all other respects, the Oticon Defendants expressly deny the allegations of Paragraph 25.

26.    The Oticon Defendants admit that Bernafon, LLC is a limited liability corporation organized under the laws of New Jersey, and maintains a place of business at 200 Cottontail Lane, Bldg. B, Somerset, NJ 08873.

6                                    #1055043v4

PUBLIC VERSION

## JURISDICTION AND VENUE

27.     The Oticon Defendants admit that this Court has jurisdiction over the subject matter of this patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a). The Oticon Defendants do not contest this Court's personal jurisdiction over the Oticon Defendants for purposes of this action. The Oticon Defendants are without knowledge or information of the activities of the Other Defendants sufficient to form a belief as to the truth of the allegations of Paragraph 27 as they pertain to the Other Defendants and, therefore, deny the allegations of Paragraph 27 as they pertain to the Other Defendants. In all other respects, including the alleged personal jurisdiction of this Court over William Demant Holding, A/S, the Oticon Defendants expressly deny the allegations of Paragraph 27.

28.     The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegation of Paragraph 28 that ETG is a Delaware corporation, and therefore denies that allegation. The Oticon Defendants do not contest the venue of this action. In all other respects, the Oticon Defendants expressly deny the allegations of Paragraph 28.

## COUNT I: INFRINGEMENT OF U.S. PATENT NO. 4,731,850

29.     The Oticon Defendants incorporate by reference their responses above to Paragraphs 1-28 as if fully set forth herein.

30.     The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the implicit allegation that claims of the '850 Patent cover any of the products or activities of the Other Defendants and therefore deny that allegation. The Oticon Defendants admit that Oticon A/S manufactures hearing aids outside the United States and imports certain of these hearing aids into the United States. The Oticon Defendants admit that

7                                                          #1055043v4

PUBLIC VERSION

Oticon Inc. and Bernafon, LLC sell and offer for sale certain hearing aids in the United States. In all other respects, the Oticon Defendants deny the allegations of Paragraph 30.

31.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegation that claims of the '850 Patent cover any of the products or activities of the Other Defendants and therefore deny that allegation. In all other respects, the Oticon Defendants deny the allegations of Paragraph 31.

32.    The Oticon Defendants deny the allegations of Paragraph 32.

### COUNT II:  WILLFUL INFRINGEMENT OF U.S. PATENT NO. 4,731,850

33.    The Oticon Defendants incorporate by reference their responses above to Paragraphs 1-32 as if fully set forth herein.

34.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegation implicit in Paragraph 34 that the Other Defendants had prior notice of the '850 Patent and therefore deny that allegation. In all other respects, the Oticon Defendants deny the allegations of Paragraph 34.

### COUNT III:  INFRINGEMENT OF U.S. PATENT NO. 4,879,749

35.    The Oticon Defendants incorporate by reference their responses above to Paragraphs 1-34 as if fully set forth herein.

36.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the implicit allegation that claims of the '749 Patent cover any of the products or activities of the Other Defendants and therefore deny that allegation. The Oticon Defendants admit that Oticon A/S manufactures hearing aids outside the United States and imports certain of these hearing aids into the United States. The Oticon Defendants admit that

8                              #1055043v4

PUBLIC VERSION

Oticon Inc. and Bernafon, LLC offer for sale and sell certain hearing aids in the United States.
In all other respects, the Oticon Defendants deny the allegations of Paragraph 36.

37.     The Oticon Defendants are without knowledge or information sufficient to form a
belief as to the truth of the allegation that claims of the '749 Patent cover any of the products or
activities of the Other Defendants and therefore deny that allegation. In all other respects, the
Oticon Defendants deny the allegations of Paragraph 37.

38.     The Oticon Defendants deny the allegations of Paragraph 38.

**COUNT IV:  WILLFUL INFRINGEMENT OF U.S. PATENT NO. 4,731,749**

39.     The Oticon Defendants incorporate by reference their responses above to
Paragraphs 1-38 as if fully set forth herein.

40.     The Oticon Defendants are without knowledge or information sufficient to form a
belief as to the truth of the allegation implicit in Paragraph 40 that the Other Defendants had
prior notice of the '749 Patent and therefore deny that allegation. In all other respects, the
Oticon Defendants deny the allegations of Paragraph 40.

**FIRST AFFIRMATIVE DEFENSE—NONINFRINGEMENT**

41.     The Oticon Defendants do not and have not infringed, directly or indirectly, any
valid and enforceable claim of the '850 Patent or the '749 Patent (collectively, "the ETG
Patents").

**SECOND AFFIRMATIVE DEFENSE—INVALIDITY**

42.     Claims of the ETG Patents are invalid for failure to meet one or more of the
conditions for patentability under 35 U.S.C. §§ 101, 102, 103, and 112.

**THIRD AFFIRMATIVE DEFENSE—SALES TO THE FEDERAL GOVERNMENT**

43.     ETG is barred under 28 U.S.C. § 1498(a) from pursuing an action in this Court
against any products used or manufactured by or for the United States.

9                                    #1055043v4

PUBLIC VERSION

## FOURTH AFFIRMATIVE DEFENSE—LACHES, WAIVER AND/OR ESTOPPEL

44.    ETG's claims are barred by the equitable doctrine of laches, waiver and/or estoppel.

## FIFTH AFFIRMATIVE DEFENSE – UNENFORCEABILITY

45.    During the prosecution of the patent applications that resulted in the '850 and '749 Patents, lead inventor Dr. Harry Levitt, in violation of his duty of candor, withheld from the patent examiners of the United States Patent and Trademark Office ("USPTO") handling these applications, information that was material to the patentability of the claims in these applications. On information and belief, Dr. Levitt withheld that information with intent to deceive. As a consequence, at least the '850 Patent should be found to be unenforceable.

46.    Dr. Levitt signed an initial "Combined Declarations and Power of Attorney" ("Levitt Declaration") declaring to the USPTO that he understood the claims in the application as filed and that he, Mr. Dugot and a third-named inventor, were the original and true inventors of the inventions defined by those claims. Dr. Levitt knew, however, contrary to this declaration, that the three were not and could not possibly have been the inventors of at least application claims 1, 2, 8-11, 15, 16, 19, 20, and 22 and issued claims 5, 9, 13, 14, 16, and 19 of the '850 Patent.

47.    As explained in more detail below, Dr. Levitt, at the time the '850 Patent application was being prepared, knew of material prior art that rendered those claims invalid, or at the very least, was material to their patentability, and he knew that this prior art was not disclosed in the application because he was responsible for supplying the prior art background in the application.

10                                    #1055043v4

PUBLIC VERSION

48.   Dr. Levitt consulted for Audimax, ETG's predecessor, beginning in 1984.
REDACTED

REDACTED                          During that time, Dr. Levitt was actively

following what others, including Nunley, Egolf, and Graupe, were doing and had written in the

field, as a well-known member of review and editorial panels and as professor of audiology at

City College of New York ("CUNY").

49.   Dr. Levitt appreciated the significance that knowledge of this work and writings

by others work would have, if disclosed to the USPTO, in undermining the patent rights he was

claiming. Yet he did not disclose that information when framing the claimed invention in the

context of what he represented to the USPTO was the prior art. Dr. Levitt was the one to select

the prior art to be disclosed to the USPTO and his failure to fully and fairly disclose the prior art

information known to him was knowingly done with the intent to deceive.

**The "Nunley Article" which Levitt withheld, alone and in combination with the
"1982 Egolf Article" which he also withheld, was material and non-cumulative Prior
Art to Application Claims 1, 2, and 15 and to issued claim 9 of the '850 Patent**

50.   Application claim 1 that Dr. Levitt and his co inventors approved and filed in

their patent application recited very generally a hearing aid with a "programmable delay line

filter" programmed to help the user hear better (emphasis added):

> *Application Claim 1.* A hearing aid comprising at least one input
> microphone, an output receiver, and a signal transmission channel
> interposed between said microphone and said receiver in which the
> improvement comprises *a programmable delay line filter interposed
> between the input and output of said transmission channel, said filter
> being programmed to impart to the hearing aid at least one response
> characteristic effective to compensate for the impaired hearing* of the
> wearer of the aid.

51.   Dr. Levitt's understanding of his claim to a "programmable delay line filter"

when approving and filing his patent application cannot be disputed. Plaintiff has asserted, and

11                                   #1055043v4

PUBLIC VERSION

this Court has agreed, that one of ordinary skill at the time the '850 patent application was filed, including Dr. Levitt, would have understood that "programmable delay line filter" meant "a filter that operates on time-delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighted samples." Markman Order of August 17, 2007.

52.     This claimed idea of a programmable delay line filter in a digital hearing aid, however, did not originate with Dr. Levitt and his co-inventors. Dr. Levitt is alleged to be "the Father of the digital hearing aid," not based on his 1984-86 work with Audimax, but based on his prior work at CUNY,                    REDACTED

REDACTED

REDACTED

53.     The pre-1984 CUNY work, however, was of large scale, the size of a wheel barrow. The '850 Patent was Dr. Levitt's so-called improved version—a wearable digital hearing aid. Dr. Levitt, in making this claim to the USPTO, failed to inform the Patent Office examiners about an article by James Nunley in the October 1983 Hearing Journal, entitled "A Wearable Digital Hearing Aid (the "Nunley Article," Exhibits 108 and 109). The Nunley Article disclosed a "programmable digital processor" (Figure 2 of the Nunley Article) and reported that concept (emphasis added):

> This digital signal representation [in the Nunley hearing aid] is operated on by *adding and subtracting weighted versions of past and present inputs to emphasize or de-emphasize various aspects of the signal. By adjusting these weighting factors, the action of the hearing aid may be "personalized"* for its recipient.

12                                    #1055043v4

PUBLIC VERSION

REDACTED

54.

REDACTED

REDACTED

55.    In not telling the USPTO of the Nunley work on a wearing digital hearing aid
with the very programmable delay line filter Dr. Levitt claimed as his own, Dr. Levitt intended to
obtain patent rights to the subject matter of application claim 1, whereas that subject matter is
unpatentable in view of the withheld Nunley Article and the Nunley hearing aid.  At the very
least, the Nunley Article and hearing aid is prior art that would have been of interest to a
reasonable examiner, and its intentional withholding by Dr. Levitt was an act that justifies
rendering at least the resulting '850 patent unenforceable as a matter of equity.

56.    Rights to other dependent claims were also sought by Dr. Levitt when he knew
that the Nunley prior art that he was not disclosing rendered those claims invalid or, at the least,
made the patentability of those claims questionable.  Not only did the Nunley Article disclose the
general feature of a programmable delay line filter as claimed in application claim 1, but it
further disclosed specific details Dr. Levitt claimed in dependent claims 2 and 15, which
depended from application claim 1.  Specifically, claim 2, which depended from claim 1 of the
filed application, required that the programmable delay line filter be placed in the "forward path"
of the hearing aid (emphasis added):

> Application Claim 2.  A hearing aid as described in claim 1 in
> which said programmable delay line filter is *interposed in a
> forward path* through said transmission channel.

13                                              #1055043v4

PUBLIC VERSION

Yet, Figure 2 of the Nunley Article shows the Nunley "programmable digital processor" (i.e. its programmable delay line filter) located in the forward path of the Nunley hearing aid, exactly as is required by application claim 2.

57.    Dr. Levitt's failure to call the Nunley work, including Figure 2 of the Nunley Article with its programmable delay line filter in the forward path, to the attention of the USPTO was intentional so that he and is named "co-inventors" could claim as their own the subject matter of application claim 2. In fact, the subject matter of claim 2 describes Nunley's work and is unpatentable in view of the withheld Nunley Article and Nunley hearing aid. At the very least, the Nunley Article and hearing aid is prior art that would have been of interest to a reasonable examiner, and its intentional withholding by Dr. Levitt was an act that justifies rendering the resulting '850 patent and its related '749 patent unenforceable as a matter of equity.

58.    Similarly, application claim 15, which depended from application claim 2, required that the filter be programmed to effect the "reduction of acoustic feedback" (emphasis added):

> Application Claim 15. A hearing aid as described in claim 2 in which said programmable filter is programmed *to effect substantial reduction of acoustic feedback* from said receiver to said microphone.

Acoustic feedback occurs when sound travels from the output of the receiver back to the microphone over what is sometimes referred to the "acoustic feedback path." Under certain conditions, acoustic feedback can build to the point of causing an annoying whistle at the output of the microphone. Yet, the Nunley Article expressly anticipates using its "programmable digital processor" (programmable delay line filter) to eliminate acoustic feedback (emphasis added):

> The advantages of a digital hearing aid become more apparent with the understanding of what the *microprocessor can potentially perform*:

14                                          #1055043v4

PUBLIC VERSION

> 1. Imagine a hearing aid *free from feedback*. The digital hearing
> aid of the future will have this freedom.

59.     While the Nunley Article did not explicitly explain how to eliminate acoustic

feedback in a digital hearing aid,                    REDACTED

REDACTED

REDACTED                          Specifically, a 1982 seminal review article by Dr.

Egolf, entitled "Review of the Acoustic Feedback Literature from a Control Systems Point of

View," discloses a method of reducing the effect of acoustic feedback (*id.*).

60.     The particular method of the 1982 Egolf Article introduces a phase shift in the

forward path of the hearing aid to establish a more beneficial operating condition (the "Phase

Shifting" method). It would have been obvious to one of ordinary skill in the art to use the

Nunley "programmable digital processor" to implement the phase shift of the 1982 Egolf Article

and thereby achieve a digital hearing aid with improved acoustic feedback reduction as predicted

by Nunley.                          REDACTED

REDACTED

61.                                 REDACTED

REDACTED

REDACTED

15                                    #1055043v4

PUBLIC VERSION

REDACTED                                                                    REDACTE
                    Other documents also confirm that consideration.             D
                              REDACTED


REDACTED


In the filed application, in spite of knowing that the Phase Shifting method was first suggested by

the 1982 Egolf Article, Dr. Levitt proceeded to claim this idea as his own in his application claim

15 and his patented claim 9.

        62.     Dr. Levitt's failure to cite to the USPTO the 1982 Egolf Article with its disclosure

of the Phase Shifting method of reducing acoustic feedback was not an innocent oversight

                                       REDACTED


REDACTED                                              In other words, Dr. Levitt

was responsible for deciding what prior art should be disclosed and how the invention should be

framed for the examiner within the context of the prior art. But he decided to frame his claimed

invention within the context of methods for reducing acoustic feedback that were plainly less

relevant and effective than the Phase Shifting method of Egolf of which he was well aware.

        63.     Dr. Levitt cannot claim that he forgot about the Egolf work when applying for his

patent application. That Dr. Levitt fully appreciated the significance of the Egolf Phase Shifting
                                       REDACTED
method is evidenced

PUBLIC VERSION

REDACTED

REDACTED

REDACTED

64.

REDACTED

REDACTED

REDACTED

REDACTED

65.

REDACTED

REDACTED

there is not a scintilla of

evidence that he or his co inventors involved in the Audimax project had considered a filter in

the feedback path as of this date. Moreover, this is the first reported test after the first prototype

was built and

REDACTED

REDACTED

#1055043v4

PUBLIC VERSION

REDACTED

REDACTED

66.     Dr. Levitt's attempt now to revise history to diminish the role of the Phase Shifting in his own work highlights the fact his failure to cite the 1982 Egolf Article was intentional. By not disclosing the 1982 Egolf Article he could claim as his own the subject matter of application claim 15 (that became issued claim 9), whereas the subject matter of those claims is unpatentable in view of the withheld 1982 Egolf Article either alone or in combination with the Nunley Article. At the very least, the Nunley Article and the Egolf 1982 Articles are prior art that would have been of interest to a reasonable examiner, and their intentional withholding by Dr. Levitt was an act that justifies rendering the resulting '850 patent unenforceable as a matter of equity.

**The Withheld "Nunley Article," alone or in combination with the 1985 Egolf Abstract and the 1984 VA Report, were material and non-cumulative Prior Art to Application Claims 19, 20, and 22 and to issued claims 13, 14, 16, and 19 of the '850 Patent**

67.     Application claims 19 and 20, and issued claims 13, 14, and 19 relate to the reduction of the effect of acoustic feedback with the filter being used in the feedback path.

68.     In particular, application claim 19, which issued as patent claim 13, requires:

> . . . *inserting between the input and output of said transmission channel an electrical feedback path having a filter* therein programmed to equalize and reduce the effect of said acoustic feedback both in amplitude and phase on a signal in said transmission channel

Application claim 22, which issued as patent claim 16, requires:

#1055043v4

PUBLIC VERSION

> A method of *reducing feedback* in a hearing aid as described in
> claim 14 in which said *programmable filter is inserted in an
> electrical feedback loop* for said transmission channel.

Application claim 20, which issued as patent claim 14, requires:

> . . . *inserting between the input and output of said transmission
> channel a programmable filter programmed to equalize and
> reduce the effect of said acoustic feedback* both in amplitude and
> phase on a signal in said transmission channel

Issued claim 19, which was added by Amendment of July 6, 1987, requires:

> . . . a *programmable delay line filter interposed in a feedback path*
> between the input and output of said transmission channel, said
> programmable filter being programmed *to effect substantial
> reduction of acoustic feedback* from said receiver to said
> microphone

69.     In terms of implementation of those claims, the '850 patent teaches that an

electrical feedback path should be introduced that mimics in effect the characteristics of the

acoustic feedback path:

> Feedback cancellation is achieved in the hearing aid by first
> measuring the acoustic feed back in situ and then creating an
> electronic feedback path with identical amplitude and phase
> characteristics. The outputs of the two feedback paths are then
> subtracted, thereby canceling any feedback signals that might
> occur. ('850 Patent, 9:12-17).

70.     This method of reducing the effect of acoustic feedback is herein called the

"Mimic and Subtract" method because the electrical feedback path in effect "mimics" the

acoustic feedback path and the resultant signal is "subtracted" from the signal with the effect of

the acoustic feedback to reduce that effect. That Dr. Levitt intended to claim the Mimic and

Subtract method as his own (along with the Phase Shifting Method) can again be seen as early as

REDACTED                         The second of the three

techniques to be claimed is the Mimic and Subtract method:

#1055043v4

PUBLIC VERSION

> [A] second, electrical feedback path is now introduced. This
> feedback path contains a second programmable filter which is
> programmed to provide feedback equal and opposite to that
> provided by the acoustic feedback path.

71.    The "Mimic and Subtract" method described in the '850 patent, although

purportedly originating with Dr. Levitt and his co-inventors, had in fact already been published,

as Dr. Levitt well new. In an abstract in the Spring 1985 Supplement of the Journal of the

Acoustic Society of America, Dr. Egolf already reported use of the Mimic and Subtract method

("1985 Egolf Abstract," Levitt Exhibit 115):

> **VV5. Electronic cancellation of acoustic feedback to increase
> hearing-aid stability. . . .**
>
> The acoustic feedback which causes a hearing aid to become
> unstable at high gains is effectively reduced by the addition of
> negative electrical feedback. . . .

The 1985 Egolf Abstract was a summary of a talk Dr. Egolf and Mr. Weaver were to give on

April 12, 1985. The 1985 Egolf Abstract is material prior art because it reports that an

"estimator" forms the electrical feedback path. Combined with the Nunley Article, it was

obvious that this "estimator" could take the form of a programmable delay line filter.

72.                              REDACTED

REDACTED        This claim is not credible.        REDACTED

REDACTED

REDACTED

REDACTED    The 1985 Egolf Abstract surely was of interest to him because it reported on

work solving the very problem he was addressing, cancellation of acoustic feedback.

73.    Most telling, however, is contemporaneous written evidence found in Dr. Levitt's

possession. In particular, in 1985, Dr. Egolf and Mr. Weaver prepared a typed version of their

20                              #1055043v4

PUBLIC VERSION

abstract with contact information not included in the public version, which they sent to the

Journal prior to the April 1985 presentation for purposes of allowing the Acoustic Society to

contact them with notice of acceptance or rejection of the proposed presentation. This copy was

private and never distributed to the public. (Weaver, 25Aug07, 70:11-73:2) REDACTED

REDACTED

74.    Interestingly, REDACTED

REDACTED

the earliest documentary evidence

produced by plaintiff or Dr. Levitt of any appreciation by Dr. Levitt that acoustic feedback might

be a problem in his Audimax work is dated a month thereafter, May 15, 1985 (Dugot Exhibit

44); REDACTED

REDACTED

75.    REDACTED

REDACTED

there was found in Dr. Levitt's garage a copy of the Veterans

Administration Rehabilitation R&D Progress Reports 1984 that includes another reference to the

Egolf and Weaver work (the "1984 VA Report") and that again reports the use of the Mimic and

Subtract method using an electrical feedback path to cancel the effect of acoustic feedback:

> In the other system, called the active feedback cancellation (AFC)
> system, the microprocessor uses computed values of GH to create
> an estimator. The estimator causes the input informational signal
> (e.g., that containing information such as speech and not PRN) to
> react destructively with signals returning via the vent outlet,
> thereby cancelling the effect of the feedback path.

76.    The 1984 VA Report was widely distributed in the fall of 1985, as evidenced by

the "Distribution/Circulation Policy" reported on page iii of the document itself and the

recollection of Dr. Larson ( Larson, 30Aug07, 193:10-194:22). Submissions for this Report

#1055043v4

PUBLIC VERSION

were to be made to the VA Journal of Rehabilitation Research and Development, the very

journal for which Dr. Levitt was a member of the Editorial Board at this very same time period.

*See* Lev. Exhibit 101.                     REDACTED

REDACTED                It is simply not credible that Dr. Levitt did not know of

this publication.

77.    And again,                  REDACTED

which was distributed in the fall of 1985, the earliest documentary evidence produced by

plaintiff or Dr. Levitt of any appreciation by Dr. Levitt that the acoustic feedback path might be

mimicked using a test signal as referenced in that Report is dated late fall 1985 (ETG0020286,

dated "11/12/85").                 REDACTED

REDACTED

work to the USPTO simply highlights the fact this failure to disclose was indeed intentional.

78.    Dr. Levitt's failure to call the Nunley Article to the attention of the USPTO, either

alone or in combination with Dr. Levitt's failure to call the 1985 Egolf Abstract and the 1984 VA

Report to the attention of the USPTO, was with the intent to wrongly claim as his own the

subject matter of application claims 19 and 20, and issued claims 13, 14, and 19, whereas that

subject matter is unpatentable in view of the withheld Nunley Article alone or in combination

with the undisclosed 1985 Egolf Abstract and 1984 VA Report. At the very least, the Nunley

Article is prior art, alone or in combination with the undisclosed 1985 Egolf Abstract and 1984

---

[1] In addition, Defendants have been permitted additional discovery to establish the distribution
and location of the 1984 VA Report in the fall of 1985 and fully expect to establish
additional admissible evidence to this effect.

#1055043v4

PUBLIC VERSION

VA Report, and would have been of interest to a reasonable examiner. Its intentional

withholding by Dr. Levitt was an act that justifies rendering at least the resulting '850 patent

unenforceable as a matter of equity.

79.    Moreover, there is a direct relationship between the claims of the '749 patent and

the withheld 1984 VA Report given that these claims are all directed, at least in part, to apparatus

that uses a test signal of the type report in the undisclosed 1984 VA Report.

**The Intentionally Withheld "Zeta Noise Blocker" Information, Described Below,
was Material and non-cumulative at Least to Application Claims 8-11 and to issued
claim 5 of the '850 Patent**

80.    Application claim 8 was directed toward the generic idea of changing the

characteristics of the hearing aid as the characteristic of the sound being heard changes.

Specifically, application claim 8 claimed:

> A hearing aid comprising at least one input microphone, as an
> output receiver, and a transmission channel interposed between
> said microphone and receiver, *means controllable* to impart
> different response characteristics to said hearing aid, and *means*
> responsive to a characteristic of the signal in said transmission
> channel *for* automatically *controlling* said controllable means to
> impart a selected one of said different response characteristics to
> said hearing aid. [emphasis added].

81.    This claim requires two element: one that is controlled (the "means controllable")

and one that does the controlling (the "means...for...controlling").

82.    The Parties agree that the "means controllable" is a programmable filter, although

they disagree on the degree of structural detail required. In any event,      REDACTED

REDACTED

REDACTED

       asserted that the "means controllable" element, as it appears in issued claim 5,

covers any form of electronic device that can impart different response characteristics. Dr. Levitt

(and his co-inventor Mr. Dugot) knew that the "Zeta Noise Blocker" was covered by a claim of

#1055043v4

this scope, yet he failed to disclose this fact to the USPTO. The failure by Dr. Levitt to disclose

the "Zeta Noise Blocker," is inequitable and justifies a finding of unenforceability for at least the

'850 patent.

83.    Application claim 9, which depends from application claim 8, requires that the

hearing aid react to the loudness of the sound being heard:

> Application Claim 9. A hearing aid as described in claim 8 in
> which said controlling means is responsive to the signal level on
> said transmission channel.

84.    The undisclosed Zeta Noise Blocker had this feature as well, which Dr. Levitt

(and Mr. Dugot) knew.

85.    Application claim 10 requires the hearing aid react to noise in the sound being

heard:

> Application Claim 10. A hearing aid as described in claim 8 in
> which said controlling means is responsive to noise in said
> transmission channel.

86.    The undisclosed Zeta Noise Blocker again had this feature, which Dr. Levitt (and

Mr. Dugot) knew.

87.    Application claim 11 requires the hearing aid react to the level of speech being in

excess of the level of noise[2]:

> Application Claim 11. A hearing aid as described in claim 6 in
> which said controlling means is responsive to the level of speech
> signals in said transmission channel in excess of the level of noise
> signals in said channel.

88.    Once again. the undisclosed Zeta Noise Blocker had this feature, which Dr. Levitt

(and Mr. Dugot) knew.

---

[2]    Defendants continue to assert that this phrase "speech signals . . . in excess of the level of
noise signals" is indefinite.

    #1055043v4

PUBLIC VERSION

89.    Issued Claim 5 of the '850 Patent is application claim 11 written in dependant form and, thus, is directed to automatically controlling the response characteristic of a hearing aid in response to detection of a level of speech in excess of a level of noise in the transmission channel of the hearing aid, and to reduce the noise, thereby allowing the speech to be better heard. Claim 5 reads as follows:

> A hearing aid comprising at least one input microphone, an output receiver, and a transmission channel interposed between said microphone and receiver, means controllable to impart different response characteristics to said hearing aid, and controlling means responsive to the level of speech signals in said transmission channel in excess of the level of noise signals in said channel for automatically controlling said controllable means to impart a selected one of said different response characteristics to said hearing aid.

90.    The "Zeta Noise Blocker," which employs the same subject matter of all these claims, as asserted by ETG, is described in an article by Laszlo K. Stein et al., entitled "Listener-Assessed Intelligibility of a Hearing Aid Self-Adaptive Noise Filter," published in *Ear and Hearing*, Vol. 5, No. 4, 1984 (ETG002591-596) (the "Stein Article"), as well as various U.S. patents to Dr. Daniel Graupe, and was incorporated into a commercial chip called the "Zeta Noise Blocker" by Intellitech Corp. ("Intellitech"), all prior to the alleged invention by Dr. Levitt and his co inventors . Dr. Levitt was aware of all of this during the pendency of the '850 patent application, yet he never brought this information to the attention of the USPTO, even though he had the key role in bringing the prior art to the attention of the patent office.

91.    The Stein Article describes a study conducted into improvements in speech intelligibility using a hearing aid with the Zeta Noise Blocker. The Stein Article describes that the hearing aid used a "Graupe-Causey Self-Adaptive Noise Filter," cites a Graupe '721 Patent as describing the filter, and goes on to describe the filter as differentiating between speech and

#1055043v4

noise, and automatically adapting and adjusting itself to a continually changing noise environment. (ETG002591.)

92.     The Graupe '721 Patent, U.S. Patent No. 4,025,721 issued in 1977 and, like the Stein Article, is prior art under 35 U.S.C. § 102(b).    The Graupe '721 Patent stores a representation of the transmission channel signal at times when no speech is determined to be present, and in response to a subsequent detection of speech, compares the speech-plus-noise signal to the stored noise-only signal and uses the results of the comparison to adjust the response characteristics of the hearing aid, all as is done in the '850 Patent. The '721 Graupe Patent, which is referenced in the Stein Article, teaches each and every limitation of claim 5 of the '850 Patent.

93.                              REDACTED

                              REDACTED

REDACTED            Stein Article documented the effectiveness of the Zeta Noise Blocker.

                              REDACTED

94.                                                                    He was also a member of the Acoustic Society of America, whose members received the publication in which the Stein Article appeared.            REDACTED

                              REDACTED

95.     The Stein Article describes the Zeta Noise Blocker.            REDACTED
                              REDACTED

96.     Dr. Levitt participated in the decision to purchase and test the Zeta Noise Blocker chip, and was fully aware of the Stein Article, the cited Graupe '721 Patent, and the Zeta Noise Blocker chip all prior to any conception of his alleged own Levitt noise blocker invention.

26                              #1055043v4

PUBLIC VERSION

REDACTED

97.    The similarity between the claimed Levitt noise limiter invention of claim 5 and

the Intellitech Zeta Noise Blocker is not mere coincidence.    REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

27                              #1055043v4

PUBLIC VERSION

REDACTED

98.                               REDACTED

REDACTED

REDACTED

99.     Nevertheless, before there was any written evidence of any new Levitt noise blocker design, on October 25, 1985, Dr. Levitt and his team met personally with Dr. Graupe, the inventor of the Zeta Noise Blocker chip, to discuss the operation of the Zeta Noise Blocker chip. (ETG007464-466.)[3]   Dr. Graupe explained to Dr. Levitt how the Zeta Noise Blocker chip worked. By January 17, 1986, the Levitt team was still using the Intellitech Zeta Noise Blocker, with an option to switch it in or out of the Levitt control circuit. (ETG002573.)  Even as of this late date, there is no evidence of any new Levitt noise blocker design.

**Dr. Levitt and Mr. Dugot Utilized the Zeta Noise Blocker**

100.     In his deposition, Mr. Dugot admitted knowing about the Intellitech Zeta Noise Blocker. (Dugot, 24Apr07,. 30:7-13.)

101.                               REDACTED

REDACTED

---

[3]   Once again, Dr. Levitt tried to diminish the effect of this meeting by       REDACTED
                               REDACTED

#1055043v4

PUBLIC VERSION

REDACTED

102.    Dr. Levitt, rather than disclose the Zeta Noise Blocker to the USPTO in the '850

patent application, instead disclosed the Fig. 2 circuit, which the inventors adapted as their own.[4]

REDACTED

REDACTED

REDACTED

**Dr. Levitt Omitted Disclosure of the Zeta Noise Blocker and Stein Article with Intent to Deceive the USPTO**

103.    In spite of the undisputed fact that Dr. Levitt knew about the prior art Intellitech

Zeta Noise Blocker, when he explained the prior art in the patent application so that the

Examiner could make a fair judgment whether what was shown in Figure 2 was novel and

patentable over the prior art, he failed to make any mention of the Stein Article, Intellitech or the

Intellitech Zeta Noise Blocker. Instead, he described the prior art as though the Intellitech Zeta

Noise Blocker never existed. For example, in the "Background of the Invention" section, he

opine that the prior art only uses "filtering techniques in which the frequency regions containing

high noise levels are eliminated." ('850 Patent, 1:55-56.) He further stated that no prior art

"affords a satisfactory solution for the problem of . . . changes in the optimum frequency-gain

---

[4] As will be shown at trial, this bogus substitution for the Zeta Noise Block did not and can not work as a noise reduction circuit.

#1055043v4

PUBLIC VERSION

characteristic resulting in variations in the level of the speech signal reaching the hearing aid."

(*Id.* at 2:4-9.)

104.    In contrast to Dr. Levitt's representations in the patent application, the Stein

Article (known to Dr. Levitt, and Mr. Dugot) states:

> When both speech and noise are present in the same frequency range, the filter theoretically can only pass both speech and noise or reject both. In actuality, the filter alternates between passing and rejecting both speech and noise depending on the relative importance of the speech phoneme at that frequency range.

(ETG0002592.) The Stein Article also discloses:

> Essentially, self-adapting noise reduction filters, whether analog or digital, sample an incoming signal, identify the spectra of noise present, and automatically set filter parameters that approximate the inverse of the noise spectrum at any instant. Theoretically, a self adaptive filter system should improve both the intelligibility and quality of speech because the full frequency range is passed when noise is not present and the characteristics of the filter change selectively and automatically with changes in the spectrum of the noise.

(ETG0002591.) This is exactly what Levitt claims to be his invention:

> Each of the sixty-four possible combinations of the 6 bit binary words identifies a different frequency response for the programmable filter, and a corresponding set of coefficients stored in the RAM 77 is selected, thereby automatically adjusting the hearing aid to the optimum set of parameter values as the speech level and type of background noise change.

('850 Patent, 6:46-54.)

105.    In view of the foregoing, it is apparent that the Examiner was deprived of a fair

examination of claim 5 of the '850 Patent because he was deliberately never told about the Zeta

Noise Blocker, the Stein Article, or the Graupe '721 Patent. This prior art is more relevant to

claim 5 than any prior art that the Examiner had before him during the examination process and,

thus, material and noncumulative. Dr. Levitt withheld—with intent to deceive—the Stein Article

30                              #1055043v4

PUBLIC VERSION

and any mention of the Zeta Noise Blocker from the Examiner. Thus, the '850 Patent is unenforceable as a result of inequitable conduct. Similarly, the '749 Patent issued from a divisional application from the application that ultimately became the '850 Patent and, thus, is likewise unenforceable due to inequitable conduct.

## COUNTERCLAIMS

Oticon Inc. and Bernafon LLC assert the following Counterclaims in response to Counts I-IV of ETG's Second Amended Complaint and Jury Demand:

### THE PARTIES

1.      Oticon Inc. is a corporation organized under the laws of the State of California with a place of business at 29 Schoolhouse Road, P.O. Box 6724, Somerset, New Jersey.

2.      Bernafon, LLC is a limited liability corporation organized under the laws of New Jersey, and maintains a place of business at 200 Cottontail Lane, Bldg. B, Somerset, NJ 08873

3.      ETG states that it is a corporation organized and existing under the laws of Delaware and having its principal place of business at 654 Madison Avenue, Suite 1705, New York, NY 10021.

### JURISDICTION AND VENUE

4.      This is a counterclaim seeking declaratory relief of noninfringement and invalidity of the ETG Patents pursuant to 28 U.S.C. §§ 2201 and 2202. This Court has jurisdiction over the counterclaim pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.      There is an actual controversy between ETG and the Counterclaim Plaintiffs Oticon Inc. and Bernafon LLC regarding the validity and infringement of the ETG Patents

#1055043v4

PUBLIC VERSION

because ETG, in its Second Amended Complaint and Jury Demand, sued Oticon Inc. and Bernafon LLC for infringement of the ETG patents.

6. Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1400(b), as ETG alleges that it resides in this district.

### COUNT I: DECLARATORY JUDGMENT OF NONINFRINGEMENT

7. Oticon Inc. and Bernafon LLC incorporate by reference the allegations contained in Paragraphs 1 through 6 of the Counterclaim as if fully set forth herein.

8. Oticon Inc. and Bernafon LLC do not and have not infringed, directly or indirectly, any valid and enforceable claim of the ETG Patents.

### COUNT II: DECLARATORY JUDGMENT OF INVALIDITY

9. Oticon Inc. and Bernafon LLC incorporate by reference the allegations contained in Paragraphs 1 through 6 of the Counterclaim as if fully set forth herein.

10. Claims of the ETG Patents are invalid for failure to meet one or more of the conditions for patentability under 35 U.S.C. §§ 101, 102, 103, and 112.

### COUNT III: DECLARATORY JUDGMENT OF UNENFORCEABILITY

11. Oticon Inc. and Bernafon, LLC incorporate by reference the allegations contained in Paragraphs 1 through 10 of the Counterclaim, as if fully set forth herein.

12. Claims of the ETG Patents are unenforceable due to inequitable conduct. Oticon Inc. and Bernafon, LLC incorporate by reference the allegations in Paragraphs 45 through 105 of their Fifth Affirmative Defense: Unenforceability, above, as if fully set forth herein.

#1055043v4

PUBLIC VERSION

## **PRAYER FOR RELIEF**

WHEREFORE, the Oticon Defendants pray for a final judgment against ETG and respectfully request that this Court enter an Order providing:

A. That ETG's Second Amended Complaint and Jury Demand, including Counts I through VI, be dismissed with prejudice;

B. That each and every claim of the ETG Patents are invalid;

C. That the Oticon Defendants have not infringed, directly or indirectly, any valid and enforceable claim of the ETG Patents;

D. That the Oticon Defendants be granted their attorney's fees and costs, pursuant to, inter alia, 35 U.S.C. § 285;

E. That Oticon Inc. and Bernafon LLC be granted the relief requested in their Counterclaims, including an order holding the ETG Patents noninfringed, invalid, and unenforceable; and

F. That the Oticon Defendants be granted such other and further relief as the equity of the case may require and this Court may deem just and proper, together with the costs and disbursements incurred in this action.

## **DEMAND FOR JURY TRIAL**

Pursuant to Fed. R. Civ. P. 38(b), the Oticon Defendants demand a trial by jury of all issues so triable.

#1055043v4

PUBLIC VERSION

November 6, 2007

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Mary B. Graham*

Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200

*Attorneys for William Demant Holding A/S,*
*WDH, Inc., Oticon A/S, Oticon Inc.,*
*Bernafon AG, and Bernafon, LLC*

OF COUNSEL:

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, DC 20001-4413
202.408.4000

34                                                            #1055043v4

# EXHIBIT 2

J479237 1.DOC

Formatted: Font: 8 pt

## PUBLIC VERSION

### IN THE UNITED STATES DISTRICT COURT FOR
### THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC. | § § § § | Civil Action No. 05-CV-422-GMS |
| Plaintiff, | § | |
| v. | § § § | CONFIDENTIAL ATTORNEYS' EYES ONLY INFORMATION; FILED UNDER SEAL |
| SONIC INNOVATIONS, INC., et al. | § § | JURY TRIAL DEMANDED |
| Defendants. | § | |

Deleted: ¶

Formatted: Centered

**AMENDED ANSWER OF DEFENDANTS OTICON A/S, OTICON INC., BERNAFON AG, WDH, INC., AND BERNAFON, LLC, COUNTERCLAIMS OF OTICON INC. AND BERNAFON, LLC, AND DEMAND FOR JURY TRIAL**

Deleted: AND

Defendants Oticon A/S, Oticon Inc., Bernafon AG, WDH, Inc. and Bernafon, LLC (collectively the "Oticon Defendants") for their Amended Answer to the Second Amended Complaint and Jury Demand of Plaintiff Energy Transportation Group, Inc. ("ETG"), served on the Oticon Defendants on February 16, 2006, hereby state as follows:

Deleted: Reply

### SECOND AMENDED COMPLAINT AND JURY DEMAND

1.     The Oticon Defendants admit that a Second Amended Complaint and Jury Demand was served on February 16, 2006 naming SONIC INNOVATIONS, INC., PHONAK AG, PHONAK INC., PHONAK LLC, UNITRON HEARING, INC., UNITRON HEARING LTD., WILLIAM DEMANT HOLDING A/S, OTICON A/S, OTICON INC., WIDEX A/S, WIDEX HEARING AID CO. INC, GN RESOUND A/S, GN RESOUND CORPORATION, STARKEY LABORATORIES, INC., GENNUM CORPORATION, RESISTANCE TECHNOLOGY INC., BERNAFON AG, WDH, INC., AND BERNAFON, LLC as defendants

#1055043v4

PUBLIC VERSION

Formatted: Centered

to this action (collectively referred to as "Defendants") and demanding a jury trial. The Oticon
Defendants otherwise deny the allegations of Paragraph 1.

## NATURE OF THE ACTION

2.      The Oticon Defendants admit that this is an action for patent infringement arising
under the patent laws of the United States, 35 U.S.C. §§ 271, *et seq*. charging Defendants with
infringing one or more claims of United States Patent No. 4,731,850 (the "'850 Patent") entitled
"Programmable Digital Hearing Aid System" and one or more claims of United States Patent
No. 4,879,749 (the "'749 Patent") entitled "Host Controller for Programmable Digital Hearing
Aid System." The Oticon Defendants admit that a copy of the '850 Patent was attached as
Exhibit A and a copy of the '749 Patent was attached as Exhibit B to the Second Amended
Complaint and Jury Demand. The Oticon Defendants expressly deny any inference that the '850
or '749 Patents are valid, enforceable, and/or infringed by any of the Oticon Defendants. The
Oticon Defendants expressly deny that William Demant Holding A/S or WDH, Inc.
manufacture, use, sale, offer for sale in the United States or elsewhere in the world, and/or
import any product into the United States. The Oticon Defendants admit that hearing aids are
manufactured outside the United States by Oticon A/S and certain of these hearing aids are sold
in the United States by Oticon Inc. and certain of these hearing aids are sold in the United States
by Bernafon, LLC. The Oticon Defendants, as to SONIC INNOVATIONS, INC., PHONAK
AG, PHONAK INC., PHONAK LLC, UNITRON HEARING, INC, UNITRON HEARING
LTD., WIDEX A/S, WIDEX HEARING AID CO. INC, GN RESOUND A/S, GN RESOUND
CORPORATION, STARKEY LABORATORIES, INC., GENNUM CORPORATION, and
RESISTANCE TECHNOLOGY INC., collectively referred to as the "Other Defendants," are
without knowledge or information sufficient to form a belief as to the truth of the remaining

2                                    #1055043v4

PUBLIC VERSION

Formatted: Centered

allegations of Paragraph 2 and, therefore, deny the remaining allegations of Paragraph 2. In all

other respects, the Oticon Defendants expressly deny the allegations of Paragraph 2.

3.     The Oticon Defendants are without knowledge or information of the activities of

the Other Defendants sufficient to form a belief as to the truth of the allegations of Paragraph 3

as they pertain to the Other Defendants and, therefore, deny the allegations of Paragraph 3 as

they pertain to the Other Defendants. The Oticon Defendants admit that Oticon A/S

manufactures hearing aids outside the United States and imports some of those hearing aids into

the United States. The Oticon Defendants admit that Oticon Inc. and Bernafon, LLC offer for

sale and sell hearing aids in the United States. In all other respects, the Oticon Defendants

expressly deny the allegations of Paragraph 3.

4.     The Oticon Defendants expressly deny the allegations of Paragraph 4.

5.     The Oticon Defendants expressly deny the allegations of Paragraph 5.

### The Parties

6.     The Oticon Defendants are without knowledge or information sufficient to form a

belief as to the truth of the allegations of Paragraph 6 and, therefore, deny the allegations of

Paragraph 6.

7.     The Oticon Defendants admit that, on its face, the '850 Patent has an issue date of

March 15, 1988, is entitled "Programmable Digital Hearing Aid System," lists Harry Levitt,

Richard S. Dugot, and Kenneth W. Kopper as inventors, and lists Audimax, Inc. as assignee.

The Oticon Defendants admit that, on its face, the '749 Patent has an issue date of November 7,

1989, is entitled "Host Controller For Programmable Digital Hearing Aid System," lists Harry

Levitt, Richard S. Dugot, and Kenneth W. Kopper as inventors, and lists Audimax, Inc. as

assignee. The Oticon Defendants are without knowledge or information sufficient to form a

#1055043v4

PUBLIC VERSION

Formatted: Centered

belief as to the truth of the allegation that Audimax Corporation and Audimax, Inc. are the predecessors to plaintiff Energy Transportation Group, Inc. ("ETG") or that ETG is the current owner of the '850 and/or '749 Patents and, therefore, denies this allegation of Paragraph 7. In all other respects, the Oticon Defendants deny the allegations of Paragraph 7.

8.      The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 8 and, therefore, deny the allegations of Paragraph 8.

9.      The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 9 and, therefore, deny the allegations of Paragraph 9.

10.     The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 10 and, therefore, deny the allegations of Paragraph 10.

11.     The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 11 and, therefore, deny the allegations of Paragraph 11.

12.     The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 12 and, therefore, deny the allegations of Paragraph 12.

13.     The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 13 and, therefore, deny the allegations of Paragraph 13.

#1055043v4

PUBLIC VERSION

◄ - ¦ Formatted: Centered

14.    The Oticon Defendants admit that William Demant Holding A/S is an Aktieselskab, a Danish public company. William Demant Holding A/S presently maintains a place of business at Kongebakken 9, 2765 Smorum, Denmark. In all other respects, the Oticon Defendants expressly deny the allegations of Paragraph 14.

15.    The Oticon Defendants admit that Oticon A/S is an Aktieselskab, a Danish public company. Oticon A/S presently maintains a place of business at Kongebakken 9, 2765 Smorum, Denmark. In all other respects, the Oticon Defendants expressly deny the allegations of Paragraph 15.

16.    The Oticon Defendants admit that Oticon Inc. maintains a place of business at 29 Schoolhouse Road, P.O. Box 6724, Somerset, New Jersey. In all other respects, the Oticon Defendants expressly deny the allegations of Paragraph 16.

17.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 17 and, therefore, deny the allegations of Paragraph 17.

18.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 18 and, therefore, deny the allegations of Paragraph 18.

19.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 19 and, therefore, deny the allegations of Paragraph 19.

20.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 20 and, therefore, deny the allegations of Paragraph 20.

#1055043v4

PUBLIC VERSION

Formatted: Centered

21.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 21 and, therefore, deny the allegations of Paragraph 21.

22.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 22 and, therefore, deny the allegations of Paragraph 22.

23.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 23 and, therefore, deny the allegations of Paragraph 23.

24.    The Oticon Defendants admit that Bernafon AG is an Aktiengesellschaft, a Swiss public company, and maintains a place of business at Morgenstrasse 131, 3018 Berne, Switzerland. In all other respects, the Oticon Defendants expressly deny the allegations of Paragraph 24.

25.    The Oticon Defendants admit that WDH, Inc. is a corporation organized under the laws of Minnesota, and maintains a current place of business at 200 Cottontail Lane, Bldg. B, Somerset, NJ 08873. WDH, Inc. was formerly known as Bernafon Inc. and Bernafon-Maico Inc. Bernafon Inc. and Bernafon-Maico Inc. had maintained a place of business at 9675 West 76th Street, Eden Prairie, MN 55344. In all other respects, the Oticon Defendants expressly deny the allegations of Paragraph 25.

26.    The Oticon Defendants admit that Bernafon, LLC is a limited liability corporation organized under the laws of New Jersey, and maintains a place of business at 200 Cottontail Lane, Bldg. B, Somerset, NJ 08873.

#1055043v4

PUBLIC VERSION

Formatted: Centered

## JURISDICTION AND VENUE

27.    The Oticon Defendants admit that this Court has jurisdiction over the subject matter of this patent infringement action pursuant to 28 U.S.C. §§ 1331 and 1338(a). The Oticon Defendants do not contest this Court's personal jurisdiction over the Oticon Defendants for purposes of this action. The Oticon Defendants are without knowledge or information of the activities of the Other Defendants sufficient to form a belief as to the truth of the allegations of Paragraph 27 as they pertain to the Other Defendants and, therefore, deny the allegations of Paragraph 27 as they pertain to the Other Defendants. In all other respects, including the alleged personal jurisdiction of this Court over William Demant Holding, A/S, the Oticon Defendants expressly deny the allegations of Paragraph 27.

28.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegation of Paragraph 28 that ETG is a Delaware corporation, and therefore denies that allegation. The Oticon Defendants do not contest the venue of this action. In all other respects, the Oticon Defendants expressly deny the allegations of Paragraph 28.

## COUNT I:  INFRINGEMENT OF U.S. PATENT NO. 4,731,850

29.    The Oticon Defendants incorporate by reference their responses above to Paragraphs 1-28 as if fully set forth herein.

30.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the implicit allegation that claims of the '850 Patent cover any of the products or activities of the Other Defendants and therefore deny that allegation. The Oticon Defendants admit that Oticon A/S manufactures hearing aids outside the United States and imports certain of these hearing aids into the United States. The Oticon Defendants admit that

7                                    #1055043v4

PUBLIC VERSION

Formatted: Centered

Oticon Inc. and Bernafon, LLC sell and offer for sale certain hearing aids in the United States. In all other respects, the Oticon Defendants deny the allegations of Paragraph 30.

31.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegation that claims of the '850 Patent cover any of the products or activities of the Other Defendants and therefore deny that allegation. In all other respects, the Oticon Defendants deny the allegations of Paragraph 31.

32.    The Oticon Defendants deny the allegations of Paragraph 32.

**COUNT II:  WILLFUL INFRINGEMENT OF U.S. PATENT NO. 4,731,850**

33.    The Oticon Defendants incorporate by reference their responses above to Paragraphs 1-32 as if fully set forth herein.

34.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegation implicit in Paragraph 34 that the Other Defendants had prior notice of the '850 Patent and therefore deny that allegation. In all other respects, the Oticon Defendants deny the allegations of Paragraph 34.

**COUNT III:  INFRINGEMENT OF U.S. PATENT NO. 4,879,749**

35.    The Oticon Defendants incorporate by reference their responses above to Paragraphs 1-34 as if fully set forth herein.

36.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the implicit allegation that claims of the '749 Patent cover any of the products or activities of the Other Defendants and therefore deny that allegation. The Oticon Defendants admit that Oticon A/S manufactures hearing aids outside the United States and imports certain of these hearing aids into the United States. The Oticon Defendants admit that

#1055043v4

PUBLIC VERSION

Formatted: Centered

Oticon Inc. and Bernafon, LLC offer for sale and sell certain hearing aids in the United States. In all other respects, the Oticon Defendants deny the allegations of Paragraph 36.

37.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegation that claims of the '749 Patent cover any of the products or activities of the Other Defendants and therefore deny that allegation. In all other respects, the Oticon Defendants deny the allegations of Paragraph 37.

38.    The Oticon Defendants deny the allegations of Paragraph 38.

### COUNT IV:  WILLFUL INFRINGEMENT OF U.S. PATENT NO. 4,731,749

39.    The Oticon Defendants incorporate by reference their responses above to Paragraphs 1-38 as if fully set forth herein.

40.    The Oticon Defendants are without knowledge or information sufficient to form a belief as to the truth of the allegation implicit in Paragraph 40 that the Other Defendants had prior notice of the '749 Patent and therefore deny that allegation. In all other respects, the Oticon Defendants deny the allegations of Paragraph 40.

### FIRST AFFIRMATIVE DEFENSE—NONINFRINGEMENT

41.    The Oticon Defendants do not and have not infringed, directly or indirectly, any valid and enforceable claim of the '850 Patent or the '749 Patent (collectively, "the ETG Patents").

### SECOND AFFIRMATIVE DEFENSE—INVALIDITY

42.    Claims of the ETG Patents are invalid for failure to meet one or more of the conditions for patentability under 35 U.S.C. §§ 101, 102, 103, and 112.

### THIRD AFFIRMATIVE DEFENSE—SALES TO THE FEDERAL GOVERNMENT

43.    ETG is barred under 28 U.S.C. § 1498(a) from pursuing an action in this Court against any products used or manufactured by or for the United States.

#1055043v4

PUBLIC VERSION

Formatted: Centered

### FOURTH AFFIRMATIVE DEFENSE—LACHES, WAIVER AND/OR ESTOPPEL

44.    ETG's claims are barred by the equitable doctrine of laches, waiver and/or estoppel.

### FIFTH AFFIRMATIVE DEFENSE – UNENFORCEABILITY

45.    During the prosecution of the patent applications that resulted in the '850 and '749 Patents, lead inventor Dr. Harry Levitt, in violation of his duty of candor, withheld from the patent examiners of the United States Patent and Trademark Office ("USPTO") handling these applications, information that was material to the patentability of the claims in these applications. On information and belief, Dr. Levitt withheld that information with intent to deceive. As a consequence, at least the '850 Patent should be found to be unenforceable.

46.    Dr. Levitt signed an initial "Combined Declarations and Power of Attorney" ("Levitt Declaration") declaring to the USPTO that he understood the claims in the application as filed and that he, Mr. Dugot and a third-named inventor, were the original and true inventors of the inventions defined by those claims. Dr. Levitt knew, however, contrary to this declaration, that the three were not and could not possibly have been the inventors of at least application claims 1, 2, 8-11, 15, 16, 19, 20, and 22 and issued claims 5, 9, 13, 14, 16, and 19 of the '850 Patent.

47.    As explained in more detail below, Dr. Levitt, at the time the '850 Patent application was being prepared, knew of material prior art that rendered those claims invalid, or at the very least, was material to their patentability, and he knew that this prior art was not disclosed in the application because he was responsible for supplying the prior art background in the application.

PUBLIC VERSION

+ ·  ·    Formatted: Centered

48.    Dr. Levitt consulted for Audimax, ETG's predecessor, beginning in 1984.
REDACTED

REDACTED                  During that time, Dr. Levitt was actively

following what others, including Nunley, Egolf, and Graupe, were doing and had written in the

field, as a well-known member of review and editorial panels and as professor of audiology at

City College of New York ("CUNY").

49.    Dr. Levitt appreciated the significance that knowledge of this work and writings

by others work would have, if disclosed to the USPTO, in undermining the patent rights he was

claiming. Yet he did not disclose that information when framing the claimed invention in the

context of what he represented to the USPTO was the prior art. Dr. Levitt was the one to select

the prior art to be disclosed to the USPTO and his failure to fully and fairly disclose the prior art

information known to him was knowingly done with the intent to deceive.

**The "Nunley Article" which Levitt withheld, alone and in combination with the
"1982 Egolf Article" which he also withheld, was material and non-cumulative Prior
Art to Application Claims 1, 2, and 15 and to issued claim 9 of the '850 Patent**

50.    Application claim 1 that Dr. Levitt and his co-inventors approved and filed in

their patent application recited very generally a hearing aid with a "programmable delay line

filter" programmed to help the user hear better (emphasis added):

> *Application Claim 1.* A hearing aid comprising at least one input
> microphone, an output receiver, and a signal transmission channel
> interposed between said microphone and said receiver in which the
> improvement comprises *a programmable delay line filter interposed
> between the input and output of said transmission channel, said filter
> being programmed to impart to the hearing aid at least one response
> characteristic effective to compensate for the impaired hearing* of the
> wearer of the aid.

51.    Dr. Levitt's understanding of his claim to a "programmable delay line filter"

when approving and filing his patent application cannot be disputed. Plaintiff has asserted, and

11                    #1055043v4

PUBLIC VERSION

this Court has agreed, that one of ordinary skill at the time the '850 patent application was filed, including Dr. Levitt, would have understood that "programmable delay line filter" meant "a filter that operates on time-delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighted samples." Markman Order of August 17, 2007.

52.    This claimed idea of a programmable delay line filter in a digital hearing aid, however, did not originate with Dr. Levitt and his co-inventors. Dr. Levitt is alleged to be "the Father of the digital hearing aid," not based on his 1984-86 work with Audimax, but based on his prior work at CUNY.

REDACTED

REDACTED

53.    The pre-1984 CUNY work, however, was of large scale, the size of a wheel barrow. The '850 Patent was Dr. Levitt's so-called improved version---a wearable digital hearing aid. Dr. Levitt, in making this claim to the USPTO, failed to inform the Patent Office examiners about an article by James Nunley in the October 1983 Hearing Journal, entitled "A Wearable Digital Hearing Aid (the "Nunley Article," Exhibits 108 and 109). The Nunley Article disclosed a "programmable digital processor" (Figure 2 of the Nunley Article) and reported that concept (emphasis added):

> This digital signal representation [in the Nunley hearing aid] is operated on by *adding and subtracting weighted versions of past and present inputs to emphasize or de-emphasize various aspects of the signal. By adjusting these weighting factors, the action of the hearing aid may be "personalized"* for its recipient.

12                            #1055043v4

PUBLIC VERSION

Formatted: Centered

54.        REDACTED

REDACTED

55.    In not telling the USPTO of the Nunley work on a wearing digital hearing aid with the very programmable delay line filter Dr. Levitt claimed as his own, Dr. Levitt intended to obtain patent rights to the subject matter of application claim 1, whereas that subject matter is unpatentable in view of the withheld Nunley Article and the Nunley hearing aid. At the very least, the Nunley Article and hearing aid is prior art that would have been of interest to a reasonable examiner, and its intentional withholding by Dr. Levitt was an act that justifies rendering at least the resulting '850 patent unenforceable as a matter of equity.

56.    Rights to other dependent claims were also sought by Dr. Levitt when he knew that the Nunley prior art that he was not disclosing rendered those claims invalid or, at the least, made the patentability of those claims questionable. Not only did the Nunley Article disclose the general feature of a programmable delay line filter as claimed in application claim 1, but it further disclosed specific details Dr. Levitt claimed in dependent claims 2 and 15, which depended from application claim 1. Specifically, claim 2, which depended from claim 1 of the filed application, required that the programmable delay line filter be placed in the "forward path" of the hearing aid (emphasis added):

> Application Claim 2.  A hearing aid as described in claim 1 in which said programmable delay line filter is *interposed in a forward path* through said transmission channel.

13                                #1055043v4

PUBLIC VERSION

◄ - - Formatted: Centered

Yet, Figure 2 of the Nunley Article shows the Nunley "programmable digital processor" (i.e. its programmable delay line filter) located in the forward path of the Nunley hearing aid, exactly as is required by application claim 2.

57.    Dr. Levitt's failure to call the Nunley work, including Figure 2 of the Nunley Article with its programmable delay line filter in the forward path, to the attention of the USPTO was intentional so that he and is named "co-inventors" could claim as their own the subject matter of application claim 2. In fact, the subject matter of claim 2 describes Nunley's work and is unpatentable in view of the withheld Nunley Article and Nunley hearing aid. At the very least, the Nunley Article and hearing aid is prior art that would have been of interest to a reasonable examiner, and its intentional withholding by Dr. Levitt was an act that justifies rendering the resulting '850 patent and its related '749 patent unenforceable as a matter of equity.

58.    Similarly, application claim 15, which depended from application claim 2, required that the filter be programmed to effect the "reduction of acoustic feedback" (emphasis added):

> Application Claim 15. A hearing aid as described in claim 2 in which said programmable filter is programmed *to effect substantial reduction of acoustic feedback* from said receiver to said microphone.

Acoustic feedback occurs when sound travels from the output of the receiver back to the microphone over what is sometimes referred to the "acoustic feedback path." Under certain conditions, acoustic feedback can build to the point of causing an annoying whistle at the output of the microphone. Yet, the Nunley Article expressly anticipates using its "programmable digital processor" (programmable delay line filter) to eliminate acoustic feedback (emphasis added):

> The advantages of a digital hearing aid become more apparent with the understanding of what the *microprocessor can potentially perform*:

14                                          #1055043v4

PUBLIC VERSION

Formatted: Centered

1. Imagine a hearing aid *free from feedback.* The digital hearing aid of the future will have this freedom.

59.    While the Nunley Article did not explicitly explain how to eliminate acoustic

REDACTED

feedback in a digital hearing aid,

REDACTED

REDACTED    Specifically, a 1982 seminal review article by Dr.

Egolf, entitled "Review of the Acoustic Feedback Literature from a Control Systems Point of

View," discloses a method of reducing the effect of acoustic feedback *(id.).*

60.    The particular method of the 1982 Egolf Article introduces a phase shift in the

forward path of the hearing aid to establish a more beneficial operating condition (the "Phase

Shifting" method).  It would have been obvious to one of ordinary skill in the art to use the

Nunley "programmable digital processor" to implement the phase shift of the 1982 Egolf Article

and thereby achieve a digital hearing aid with improved acoustic feedback reduction as predicted

REDACTED

by Nunley.

REDACTED

61. ____    REDACTED

REDACTED

REDACTED

#1055043v4

PUBLIC VERSION

Formatted: Centered

REDACTED          Other documents also confirm that consideration.

REDACTED

REDACTED

In the filed application, in spite of knowing that the Phase Shifting method was first suggested by the 1982 Egolf Article, Dr. Levitt proceeded to claim this idea as his own in his application claim 15 and his patented claim 9.

62.     Dr. Levitt's failure to cite to the USPTO the 1982 Egolf Article with its disclosure of the Phase Shifting method of reducing acoustic feedback was not an innocent oversight.

REDACTED

REDACTED          In other words, Dr. Levitt was responsible for deciding what prior art should be disclosed and how the invention should be framed for the examiner within the context of the prior art. But he decided to frame his claimed invention within the context of methods for reducing acoustic feedback that were plainly less relevant and effective than the Phase Shifting method of Egolf of which he was well aware.

63.     Dr. Levitt cannot claim that he forgot about the Egolf work when applying for his patent application. That Dr. Levitt fully appreciated the significance of the Egolf Phase Shifting method is evidenced          REDACTED

16                          #1055043v4

PUBLIC VERSION

REDACTED

Formatted: Centered

REDACTED

REDACTED

64.                          REDACTED

REDACTED

additional to filing a claim that covers that "ineffective" method    REDACTED

REDACTED

REDACTED

REDACTED

65.                      REDACTED

REDACTED

here is not a scintilla of

evidence that he or his co-inventors involved in the Audimax project had considered a filter in

the feedback path as of this date.  Moreover, this is the first reported test after the first prototype

was built and                    REDACTED

REDACTED

17                    #1055043v4

PUBLIC VERSION

REDACTED

Formatted: Centered

REDACTED

66.    Dr. Levitt's attempt now to revise history to diminish the role of the Phase

Shifting in his own work highlights the fact his failure to cite the 1982 Egolf Article was

intentional.  By not disclosing the 1982 Egolf Article he could claim as his own the subject

matter of application claim 15 (that became issued claim 9), whereas the subject matter of those

claims is unpatentable in view of the withheld 1982 Egolf Article either alone or in combination

with the Nunley Article.  At the very least, the Nunley Article and the Egolf 1982 Articles are

prior art that would have been of interest to a reasonable examiner, and their intentional

withholding by Dr. Levitt was an act that justifies rendering the resulting '850 patent

unenforceable as a matter of equity.

**The Withheld "Nunley Article," alone or in combination with the 1985 Egolf
Abstract and the 1984 VA Report, were material and non-cumulative Prior Art to
Application Claims 19, 20, and 22 and to issued claims 13, 14, 16, and 19 of the '850
Patent**

67.    Application claims 19 and 20, and issued claims 13, 14, and 19 relate to the

reduction of the effect of acoustic feedback with the filter being used in the feedback path.

68.    In particular, application claim 19, which issued as patent claim 13, requires:

> . . . *inserting between the input and output of said transmission
> channel an electrical feedback path having a filter* therein
> programmed to equalize and reduce the effect of said acoustic
> feedback both in amplitude and phase on a signal in said
> transmission channel

Application claim 22, which issued as patent claim 16, requires:

18                                    #1055043v4

PUBLIC VERSION

Formatted: Centered

> A method of *reducing feedback* in a hearing aid as described in claim 14 in which said *programmable filter is inserted in an electrical feedback loop* for said transmission channel.

Application claim 20, which issued as patent claim 14, requires:

> *... inserting between the input and output of said transmission channel a programmable filter programmed to equalize and reduce the effect of said acoustic feedback* both in amplitude and phase on a signal in said transmission channel

Issued claim 19, which was added by Amendment of July 6, 1987, requires:

> *... a programmable delay line filter interposed in a feedback path* between the input and output of said transmission channel, said programmable filter being programmed *to effect substantial reduction of acoustic feedback* from said receiver to said microphone

69.    In terms of implementation of those claims, the '850 patent teaches that an electrical feedback path should be introduced that mimics in effect the characteristics of the acoustic feedback path:

> Feedback cancellation is achieved in the hearing aid by first measuring the acoustic feed back in situ and then creating an electronic feedback path with identical amplitude and phase characteristics. The outputs of the two feedback paths are then subtracted, thereby canceling any feedback signals that might occur. ('850 Patent, 9:12-17).

70.    This method of reducing the effect of acoustic feedback is herein called the "Mimic and Subtract" method because the electrical feedback path in effect "mimics" the acoustic feedback path and the resultant signal is "subtracted" from the signal with the effect of the acoustic feedback to reduce that effect. That Dr. Levitt intended to claim the Mimic and Subtract method as his own (along with the Phase Shifting Method) can again be seen as early as

REDACTED

The second of the three techniques to be claimed is the Mimic and Subtract method:

PUBLIC VERSION

Formatted: Centered

> [A] second, electrical feedback path is now introduced. This feedback path contains a second programmable filter which is programmed to provide feedback equal and opposite to that provided by the acoustic feedback path.

71.   The "Mimic and Subtract" method described in the '850 patent, although purportedly originating with Dr. Levitt and his co-inventors, had in fact already been published, as Dr. Levitt well new. In an abstract in the Spring 1985 Supplement of the Journal of the Acoustic Society of America, Dr. Egolf already reported use of the Mimic and Subtract method ("1985 Egolf Abstract," Levitt Exhibit 115):

> YY5. Electronic cancellation of acoustic feedback to increase hearing-aid stability. . . .

> The acoustic feedback which causes a hearing aid to become unstable at high gains is effectively reduced by the addition of negative electrical feedback. . . .

The 1985 Egolf Abstract was a summary of a talk Dr. Egolf and Mr. Weaver were to give on April 12, 1985. The 1985 Egolf Abstract is material prior art because it reports that an "estimator" forms the electrical feedback path. Combined with the Nunley Article, it was obvious that this "estimator" could take the form of a programmable delay line filter.

72.   REDACTED

REDACTED

REDACTED   1985 Egolf Abstract surely was of interest to him because it reported on work solving the very problem he was addressing, cancellation of acoustic feedback.

73.   Most telling, however, is contemporaneous written evidence found in Dr. Levitt's possession. In particular, in 1985, Dr. Egolf and Mr. Weaver prepared a typed version of their

20                    #1055043v4

PUBLIC VERSION

Formatted: Centered

abstract with contact information not included in the public version, which they sent to the

Journal prior to the April 1985 presentation for purposes of allowing the Acoustic Society to

contact them with notice of acceptance or rejection of the proposed presentation. This copy was

private and never distributed to the public. (Weaver, 25Aug07, 70:11-73:2)  REDACTED

REDACTED

REDACTED

REDACTED

74.   Interestingly

REDACTED

the earliest documentary evidence

produced by plaintiff or Dr. Levitt of any appreciation by Dr. Levitt that acoustic feedback might

be a problem in his Audimax work is dated a month thereafter, May 15, 1985 (Dugot Exhibit

44);  REDACTED

REDACTED

75.   REDACTED

REDACTED

here was found in Dr. Levitt's garage a copy of the Veterans

Administration Rehabilitation R&D Progress Reports 1984 that includes another reference to the

Egolf and Weaver work (the "1984 VA Report") and that again reports the use of the Mimic and

Subtract method using an electrical feedback path to cancel the effect of acoustic feedback:

> In the other system, called the active feedback cancellation (AFC)
> system, the microprocessor uses computed values of GH to create
> an estimator. The estimator causes the input informational signal
> (e.g., that containing information such as speech and not PRN) to
> react destructively with signals returning via the vent outlet,
> thereby cancelling the effect of the feedback path.

76.   The 1984 VA Report was widely distributed in the fall of 1985, as evidenced by

the "Distribution/Circulation Policy" reported on page iii of the document itself and the

recollection of Dr. Larson ( Larson, 30Aug07, 193:10-194:22). Submissions for this Report

21                                    #1055043v4

PUBLIC VERSION

Formatted: Centered

were to be made to the VA Journal of Rehabilitation Research and Development, the very

journal for which Dr. Levitt was a member of the Editorial Board at this very same time period.

*See* Lev. Exhibit 101.                                    REDACTED

       REDACTED                    is simply not credible that Dr. Levitt did not know of

this publication.

       77.    And again,                        REDACTED

which was distributed in the fall of 1985, the earliest documentary evidence produced by

plaintiff or Dr. Levitt of any appreciation by Dr. Levitt that the acoustic feedback path might be

mimicked using a test signal as referenced in that Report is dated late fall 1985 (ETG0020286,

dated "11/12/85").                              REDACTED

                                REDACTED

       REDACTED                Dr. Levitt's attempt to cover-up his failure to disclose the Egolf

work to the USPTO simply highlights the fact this failure to disclose was indeed intentional.

       78.    Dr. Levitt's failure to call the Nunley Article to the attention of the USPTO, either

alone or in combination with Dr. Levitt's failure to call the 1985 Egolf Abstract and the 1984 VA

Report to the attention of the USPTO, was with the intent to wrongly claim as his own the

subject matter of application claims 19 and 20, and issued claims 13, 14, and 19, whereas that

subject matter is unpatentable in view of the withheld Nunley Article alone or in combination

with the undisclosed 1985 Egolf Abstract and 1984 VA Report. At the very least, the Nunley

Article is prior art, alone or in combination with the undisclosed 1985 Egolf Abstract and 1984

---

[1]  In addition, Defendants have been permitted additional discovery to establish the distribution
     and location of the 1984 VA Report in the fall of 1985 and fully expect to establish
     additional admissible evidence to this effect.

#1055043v4

PUBLIC VERSION

Formatted: Centered

VA Report, and would have been of interest to a reasonable examiner.  Its intentional

withholding by Dr. Levitt was an act that justifies rendering at least the resulting '850 patent

unenforceable as a matter of equity.

79.    Moreover, there is a direct relationship between the claims of the '749 patent and

the withheld 1984 VA Report given that these claims are all directed, at least in part, to apparatus

that uses a test signal of the type report in the undisclosed 1984 VA Report.

**The Intentionally Withheld "Zeta Noise Blocker" Information, Described Below,
was Material and non-cumulative at Least to Application Claims 8-11 and to issued
claim 5 of the '850 Patent**

80.    Application claim 8 was directed toward the generic idea of changing the

characteristics of the hearing aid as the characteristic of the sound being heard changes.

Specifically, application claim 8 claimed:

> A hearing aid comprising at least one input microphone, as an
> output receiver, and a transmission channel interposed between
> said microphone and receiver, *means controllable* to impart
> different response characteristics to said hearing aid, and *means*
> responsive to a characteristic of the signal in said transmission
> channel *for* automatically *controlling* said controllable means to
> impart a selected one of said different response characteristics to
> said hearing aid. [emphasis added].

81.    This claim requires two element: one that is controlled (the "means controllable")

and one that does the controlling (the "means…for…controlling").

82.    The Parties agree that the "means controllable" is a programmable filter, although

they disagree on the degree of structural detail required.          REDACTED

REDACTED

REDACTED                   that the "means controllable" element, as it appears in issued claim 5,

covers any form of electronic device that can impart different response characteristics.  Dr. Levitt

(and his co-inventor Mr. Dugot) knew that the "Zeta Noise Blocker" was covered by a claim of

PUBLIC VERSION

←---- Formatted: Centered

this scope, yet he failed to disclose this fact to the USPTO. The failure by Dr. Levitt to disclose

the "Zeta Noise Blocker," is inequitable and justifies a finding of unenforceability for at least the

'850 patent.

83.    Application claim 9, which depends from application claim 8, requires that the

hearing aid react to the loudness of the sound being heard:

> Application Claim 9. A hearing aid as described in claim 8 in
> which said controlling means is responsive to the signal level on
> said transmission channel.

84.    The undisclosed Zeta Noise Blocker had this feature as well, which Dr. Levitt

(and Mr. Dugot) knew.

85.    Application claim 10 requires the hearing aid react to noise in the sound being

heard:

> Application Claim 10. A hearing aid as described in claim 8 in
> which said controlling means is responsive to noise in said
> transmission channel.

86.    The undisclosed Zeta Noise Blocker again had this feature, which Dr. Levitt (and

Mr. Dugot) knew.

87.    Application claim 11 requires the hearing aid react to the level of speech being in

excess of the level of noise[2]:

> Application Claim 11. A hearing aid as described in claim 6 in
> which said controlling means is responsive to the level of speech
> signals in said transmission channel in excess of the level of noise
> signals in said channel.

88.    Once again, the undisclosed Zeta Noise Blocker had this feature, which Dr. Levitt

(and Mr. Dugot) knew.

---

[2]    Defendants continue to assert that this phrase "speech signals . . . in excess of the level of
noise signals" is indefinite.

#1055043v4

PUBLIC VERSION

Formatted: Centered

89.    Issued Claim 5 of the '850 Patent is application claim 11 written in dependant form and, thus, is directed to automatically controlling the response characteristic of a hearing aid in response to detection of a level of speech in excess of a level of noise in the transmission channel of the hearing aid, and to reduce the noise, thereby allowing the speech to be better heard.  Claim 5 reads as follows:

> A hearing aid comprising at least one input microphone, an output receiver, and a transmission channel interposed between said microphone and receiver, means controllable to impart different response characteristics to said hearing aid, and controlling means responsive to the level of speech signals in said transmission channel in excess of the level of noise signals in said channel for automatically controlling said controllable means to impart a selected one of said different response characteristics to said hearing aid.

90.    The "Zeta Noise Blocker," which employs the same subject matter of all these claims, as asserted by ETG, is described in an article by Laszlo K. Stein et al., entitled "Listener-Assessed Intelligibility of a Hearing Aid Self-Adaptive Noise Filter," published in *Ear and Hearing*, Vol. 5, No. 4, 1984 (ETG002591-596) (the "Stein Article"), as well as various U.S. patents to Dr. Daniel Graupe, and was incorporated into a commercial chip called the "Zeta Noise Blocker" by Intellitech Corp. ("Intellitech"), all prior to the alleged invention by Dr. Levitt and his co-inventors .  Dr. Levitt was aware of all of this during the pendency of the '850 patent application, yet he never brought this information to the attention of the USPTO, even though he had the key role in bringing the prior art to the attention of the patent office.

91.    The Stein Article describes a study conducted into improvements in speech intelligibility using a hearing aid with the Zeta Noise Blocker.  The Stein Article describes that the hearing aid used a "Graupe-Causey Self-Adaptive Noise Filter," cites a Graupe '721 Patent as describing the filter, and goes on to describe the filter as differentiating between speech and

25                                        #1055043v4

PUBLIC VERSION

Formatted: Centered

noise, and automatically adapting and adjusting itself to a continually changing noise environment. (ETG002591.)

92.    The Graupe '721 Patent, U.S. Patent No. 4,025,721 issued in 1977 and, like the Stein Article, is prior art under 35 U.S.C. § 102(b).    The Graupe '721 Patent stores a representation of the transmission channel signal at times when no speech is determined to be present, and in response to a subsequent detection of speech, compares the speech-plus-noise signal to the stored noise-only signal and uses the results of the comparison to adjust the response characteristics of the hearing aid, all as is done in the '850 Patent.    The '721 Graupe Patent, which is referenced in the Stein Article, teaches each and every limitation of claim 5 of the '850 Patent.

93.    REDACTED
       REDACTED

REDACTED    Stein Article documented the effectiveness of the Zeta Noise Blocker.

94.    REDACTED    He was also a member of the Acoustic Society of America, whose members received the publication in which the Stein Article appeared.    REDACTED
       REDACTED

95.    The Stein Article describes the Zeta Noise Blocker.    REDACTED
       REDACTED

96.    Dr. Levitt participated in the decision to purchase and test the Zeta Noise Blocker chip, and was fully aware of the Stein Article, the cited Graupe '721 Patent, and the Zeta Noise Blocker chip all prior to any conception of his alleged own Levitt noise blocker invention.

26                                        #1055043v1

PUBLIC VERSION

REDACTED

Formatted: Centered

97.    The similarity between the claimed Levitt noise limiter invention of claim 5 and

the Intellitech Zeta Noise Blocker is not mere coincidence.        REDACTED

REDACTED

REDACTED

Formatted: Bullets and Numbering

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

PUBLIC VERSION

REDACTED

Formatted: Centered

REDACTED

98.

REDACTED

99.    Nevertheless, before there was any written evidence of any new Levitt noise blocker design, on October 25, 1985, Dr. Levitt and his team met personally with Dr. Graupe, the inventor of the Zeta Noise Blocker chip, to discuss the operation of the Zeta Noise Blocker chip. (ETG007464-466.)[3]  Dr. Graupe explained to Dr. Levitt how the Zeta Noise Blocker chip worked. By January 17, 1986, the Levitt team was still using the Intellitech Zeta Noise Blocker, with an option to switch it in or out of the Levitt control circuit. (ETG002573.) Even as of this late date, there is no evidence of any new Levitt noise blocker design.

**Dr. Levitt and Mr. Dugot Utilized the Zeta Noise Blocker**

100.    In his deposition, Mr. Dugot admitted knowing about the Intellitech Zeta Noise Blocker. (Dugot, 24Apr07, 30:7-13.)

101.

REDACTED
REDACTED

---

[3]    Once again, Dr. Levitt tried to diminish the effect of this meeting    REDACTED
REDACTED

#1055043v4

PUBLIC VERSION

REDACTED

Formatted: Centered

102.    Dr. Levitt, rather than disclose the Zeta Noise Blocker to the USPTO in the '850

patent application, instead disclosed the Fig. 2 circuit, which the inventors adapted as their own.[4]

REDACTED

REDACTED

REDACTED

**Dr. Levitt Omitted Disclosure of the Zeta Noise Blocker and Stein Article with Intent to Deceive the USPTO**

103.    In spite of the undisputed fact that Dr. Levitt knew about the prior art Intellitech

Zeta Noise Blocker, when he explained the prior art in the patent application so that the

Examiner could make a fair judgment whether what was shown in Figure 2 was novel and

patentable over the prior art, he failed to make any mention of the Stein Article, Intellitech or the

Intellitech Zeta Noise Blocker.  Instead, he described the prior art as though the Intellitech Zeta

Noise Blocker never existed.  For example, in the "Background of the Invention" section, he

opine that the prior art only uses "filtering techniques in which the frequency regions containing

high noise levels are eliminated."  ('850 Patent, 1:55-56.)  He further stated that no prior art

"affords a satisfactory solution for the problem of . . . changes in the optimum frequency-gain

---

[4] As will be shown at trial, this bogus substitution for the Zeta Noise Block did not and can not work as a noise reduction circuit.

#1055043v4

PUBLIC VERSION

Formatted: Centered

characteristic resulting in variations in the level of the speech signal reaching the hearing aid."

(*Id*, at 2:4-9.)

104.    In contrast to Dr. Levitt's representations in the patent application, the Stein

Article (known to Dr. Levitt, and Mr. Dugot) states:

> When both speech and noise are present in the same frequency
> range, the filter theoretically can only pass both speech and noise
> or reject both. In actuality, the filter alternates between passing and
> rejecting both speech and noise depending on the relative
> importance of the speech phoneme at that frequency range.

(ETG0002592.) The Stein Article also discloses:

> Essentially, self-adapting noise reduction filters, whether analog or
> digital, sample an incoming signal, identify the spectra of noise
> present, and automatically set filter parameters that approximate
> the inverse of the noise spectrum at any instant. Theoretically, a
> self adaptive filter system should improve both the intelligibility
> and quality of speech because the full frequency range is passed
> when noise is not present and the characteristics of the filter
> change selectively and automatically with changes in the spectrum
> of the noise.

(ETG0002591.)  This is exactly what Levitt claims to be his invention:

> Each of the sixty-four possible combinations of the 6 bit binary
> words identifies a different frequency response for the
> programmable filter, and a corresponding set of coefficients stored
> in the RAM 77 is selected, thereby automatically adjusting the
> hearing aid to the optimum set of parameter values as the speech
> level and type of background noise change.

('850 Patent, 6:46-54.)

105.    In view of the foregoing, it is apparent that the Examiner was deprived of a fair

examination of claim 5 of the '850 Patent because he was deliberately never told about the Zeta

Noise Blocker, the Stein Article, or the Graupe '721 Patent. This prior art is more relevant to

claim 5 than any prior art that the Examiner had before him during the examination process and,

thus, material and noncumulative. Dr. Levitt withheld—with intent to deceive—the Stein Article

PUBLIC VERSION

Formatted: Centered

and any mention of the Zeta Noise Blocker from the Examiner. Thus, the '850 Patent is unenforceable as a result of inequitable conduct. Similarly, the '749 Patent issued from a divisional application from the application that ultimately became the '850 Patent and, thus, is likewise unenforceable due to inequitable conduct.

## COUNTERCLAIMS

Oticon Inc. and Bernafon LLC assert the following Counterclaims in response to Counts I-IV of ETG's Second Amended Complaint and Jury Demand:

## THE PARTIES

1.      Oticon Inc. is a corporation organized under the laws of the State of California with a place of business at 29 Schoolhouse Road, P.O. Box 6724, Somerset, New Jersey.

2.      Bernafon, LLC is a limited liability corporation organized under the laws of New Jersey, and maintains a place of business at 200 Cottontail Lane, Bldg. B, Somerset, NJ 08873

3.      ETG states that it is a corporation organized and existing under the laws of Delaware and having its principal place of business at 654 Madison Avenue, Suite 1705, New York, NY 10021.

## JURISDICTION AND VENUE

4.      This is a counterclaim seeking declaratory relief of noninfringement and invalidity of the ETG Patents pursuant to 28 U.S.C. §§ 2201 and 2202. This Court has jurisdiction over the counterclaim pursuant to 28 U.S.C. §§ 1331 and 1338(a).

5.      There is an actual controversy between ETG and the Counterclaim Plaintiffs Oticon Inc. and Bernafon LLC regarding the validity and infringement of the ETG Patents

31                    #1055043v4

PUBLIC VERSION

Formatted: Centered

because ETG, in its Second Amended Complaint and Jury Demand, sued Oticon Inc. and

Bernafon LLC for infringement of the ETG patents.

6.       Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1400(b), as ETG

alleges that it resides in this district.

### COUNT I: DECLARATORY JUDGMENT OF NONINFRINGEMENT

7.       Oticon Inc. and Bernafon LLC incorporate by reference the allegations contained

in Paragraphs 1 through 6 of the Counterclaim as if fully set forth herein.

8.       Oticon Inc. and Bernafon LLC do not and have not infringed, directly or

indirectly, any valid and enforceable claim of the ETG Patents.

### COUNT II: DECLARATORY JUDGMENT OF INVALIDITY

9.       Oticon Inc. and Bernafon LLC incorporate by reference the allegations contained

in Paragraphs 1 through 6 of the Counterclaim as if fully set forth herein.

10.      Claims of the ETG Patents are invalid for failure to meet one or more of the

conditions for patentability under 35 U.S.C. §§ 101, 102, 103, and 112.

### COUNT III: DECLARATORY JUDGMENT OF UNENFORCEABILITY

Formatted: Indent: Left: 0", First line: 0.5", Tabs: Not at 1.75"

Formatted: Bullets and Numbering

11.      Oticon Inc. and Bernafon LLC incorporate by reference the allegations

contained in Paragraphs 1 through 10 of the Counterclaim, as if fully set forth herein.

12.      Claims of the ETG Patents are unenforceable due to inequitable conduct. Oticon

Inc. and Bernafon, LLC incorporate by reference the allegations in Paragraphs 45 through 105 of

their Fifth Affirmative Defense: Unenforceability, above, as if fully set forth herein.

32                                    #1055043v4

PUBLIC VERSION

◄ - - - ⎯ **Formatted:** Centered

## PRAYER FOR RELIEF

WHEREFORE, the Oticon Defendants pray for a final judgment against ETG and

respectfully request that this Court enter an Order providing:

    A.    That ETG's Second Amended Complaint and Jury Demand, including Counts I

through VI, be dismissed with prejudice;

    B.    That each and every claim of the ETG Patents are invalid;

    C.    That the Oticon Defendants have not infringed, directly or indirectly, any valid

and enforceable claim of the ETG Patents;

    D.    That the Oticon Defendants be granted their attorney's fees and costs, pursuant to,

inter alia, 35 U.S.C. § 285;

    E.    That Oticon Inc. and Bernafon LLC be granted the relief requested in their

Counterclaims, including an order holding the ETG Patents noninfringed, invalid, and

unenforceable; and

    F.    That the Oticon Defendants be granted such other and further relief as the equity

of the case may require and this Court may deem just and proper, together with the costs and

disbursements incurred in this action.

## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38(b), the Oticon Defendants demand a trial by jury of all

issues so triable.

           #1055043v4

PUBLIC VERSION



Formatted: Centered

November 6, 2007

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200

*Attorneys for William Demant Holding A/S,*
*WDH, Inc., Oticon A/S, Oticon Inc.,*
*Bernafon AG, and Bernafon, LLC*

OF COUNSEL:

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, DC 20001-4413
202.408.4000

Deleted: ¶

Deleted: Dated: February 27, 2006¶
¶
¶
¶
¶
¶
¶
¶
¶
¶
¶
¶
¶
¶
¶
OF COUNSEL:¶
John M. Romary¶
C. Gregory Gramenopoulos¶
FINNEGAN, HENDERSON,
FARABOW,¶
 GARRETT & DUNNER, L.L.P.¶
901 New York Avenue, N.W.¶
Washington, D.C. 20001-4413¶
Phone: (202) 408-4000¶
Fax: (202) 408-4400¶
¶
¶

[1]

34

Page 34: [1] Deleted                    ROMARYJ                    11/6/2007 12:12:00 PM

Dated: February 27, 2006

Respectfully submitted,

_____

N. Richard Powers (#493)
CONNELLY, BOVE, LODGE, & HUTZ L.L.P.
1007 North Orange Street
Suite 878
Wilmington, DE 19801
Phone: (302) 658-9141
Fax: (302) 658-5614

**ATTORNEYS FOR DEFENDANTS,**
OTICON A/S
OTICON INC.
WDH, INC.
BERNAFON AG
BERNAFON, LLC

**OF COUNSEL:**
John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, L.L.P.
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
Phone: (202) 408-4000
Fax: (202) 408-4400

# EXHIBIT 3

PUBLIC VERSION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ENERGY TRANSPORTATION GROUP,  )
INC.                          )
                              )
            Plaintiff,        )
                              )          C.A. NO. 05-422 (GMS)
      v.                      )
                              )
SONIC INNOVATIONS, INC., ET AL.   )
                              )
            Defendants        )

## DEFENDANT WIDEX A/S'S
## AMENDED ANSWER, DEFENSES AND COUNTERCLAIMS

Defendant Widex A/S, by and through its attorneys, amends the answer to the

Second Amended Complaint as follows:

1.    Widex A/S admits that plaintiff has made a complaint against Widex A/S

and has demanded a jury trial. Widex A/S is without knowledge or information sufficient

to admit or deny the remaining allegations of Paragraph 1, and therefore denies the same.

## NATURE OF THE ACTION

2.    Widex A/S admits that this is an action for patent infringement arising

under the patent laws of the United States and that copies of the '850 and '749 patents

were attached to the Amended Complaint. Widex A/S denies that it has infringed any

claims of the '850 and '749 patents, that plaintiff is entitled to enjoin Widex A/S, and that

plaintiff is entitled to any damages from Widex A/S. Widex A/S is without knowledge or

information sufficient to admit or deny the remaining allegations of Paragraph 2, and

therefore denies the same.

1

PUBLIC VERSION

## INFORMATION

3.    Widex A/S denies the allegations of Paragraph 3 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 3, and therefore denies the same.

4.    Widex A/S denies the allegations of Paragraph 4 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 4, and therefore denies the same.

5.    Widex A/S denies the allegations of Paragraph 5 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 5, and therefore denies the same.

## THE PARTIES

6.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 6, and therefore denies the same.

7.    Widex A/S admits that the '850 Patent issued on March 15, 1988 and that the '749 patent issued on November 7, 1989, each showing Harry Levitt, Richard S. Dugot and Kenneth W. Kopper as named inventors. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 7, and therefore denies the same.

8.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 8, and therefore denies the same.

9.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 9, and therefore denies the same.

2

PUBLIC VERSION

## INFORMATION

10.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 10, and therefore denies the same.

11.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 11, and therefore denies the same.

12.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 12, and therefore denies the same.

13.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 13, and therefore denies the same.

14.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 14, and therefore denies the same.

15.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 15, and therefore denies the same.

16.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 16, and therefore denies the same.

17.    Widex A/S admits the allegations of Paragraph 17.

18.    Widex A/S admits the allegations of Paragraph 18.

19.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 19, and therefore denies the same.

20.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 20, and therefore denies the same.

21.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 21, and therefore denies the same.

3

PUBLIC VERSION

## INFORMATION

22.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 22, and therefore denies the same.

23.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 23, and therefore denies the same.

24.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 24, and therefore denies the same.

25.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 25, and therefore denies the same.

26.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 26, and therefore denies the same.

## JURISDICTION AND VENUE

27.    Widex A/S admits that this court has subject matter jurisdiction and personal jurisdiction over Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 27, and therefore denies the same.

28.    Widex A/S admits that venue is proper in this district for Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 28, and therefore denies the same.

## COUNT I
### (Patent Infringement of United States Patent No. 4,731,850)

29.    Widex A/S incorporates by reference its answer to Paragraphs 1-28 above.

4

PUBLIC VERSION

## INFORMATION

30.    Widex A/S denies the allegations of Paragraph 30 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 30, and therefore denies the same.

31.    Widex A/S denies the allegations of Paragraph 31 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 31, and therefore denies the same.

32.    Widex A/S denies the allegations of Paragraph 32 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the reminaing allegations of Paragraph 32, and therefore denies the same.

## COUNT II
### (Willful Patent Infringement of United States Patent No. 4,731,850)

33.    Widex A/S incorporates by reference its answer to Paragraphs 1-32 above.

34.    Widex A/S denies the allegations of Paragraph 34 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 34, and therefore denies the same.

## COUNT III
### (Patent Infringement of United States Patent No. 4,879,749)

35.    Widex A/S incorporates by reference its answer to Paragraphs 1-34 above.

36.    Widex A/S denies the allegations of Paragraph 36 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 36, and therefore denies the same.

PUBLIC VERSION

**INFORMATION**

37.    Widex A/S denies the allegations of Paragraph 37 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 37, and therefore denies the same.

38.    Widex A/S denies the allegations of Paragraph 38 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 38, and therefore denies the same.

**COUNT IV**
**(Willful Patent Infringement of United States Patent No. 4,879,749)**

39.    Widex A/S incorporates by reference its answer to Paragraphs 1-38 above.

40.    Widex A/S denies the allegations of Paragraph 40 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 40, and therefore denies the same.

**AFFIRMATIVE DEFENSES**

**FIRST AFFIRMATIVE DEFENSE**
**(Invalidity of the '850 Patent)**

41.    The claims of the '850 patent are invalid on one or more grounds specified in 35 U.S.C. §§ 101, 102, 103 and 112.

6

PUBLIC VERSION

## SECOND AFFIRMATIVE DEFENSE
### (Invalidity of the '749 Patent)

42.     The claims of the '749 patent are invalid on one or more grounds specified

in 35 U.S.C. §§ 101, 102, 103 and 112.

## THIRD AFFIRMATIVE DEFENSE
### (Non-infringement of the '850 Patent)

43.     Widex A/S has not, and is not, infringing any of the claims of the '850

patent.

## FOURTH AFFIRMATIVE DEFENSE
### (Non-infringement of the '749 Patent)

44.     Widex A/S has not, and is not, infringing any of the claims of the '749

patent.

## FIFTH AFFIRMATIVE DEFENSE
### (Laches)

45.     ETG's claims are barred by the defense of laches.

## SIXTH AFFIRMATIVE DEFENSE
### (Unenforceability)

46.     During the prosecution of the patent application that resulted in the '850

Patent, lead inventor Dr. Harry Levitt, in violation of his duty of candor, withheld from

7

PUBLIC VERSION

the patent examiners of the United States Patent and Trademark Office ("USPTO") handling these applications, information that was material to the patentability of the claims in these applications.   On information and belief, Dr. Levitt withheld that information with intent to deceive. As a consequence, at least the '850 Patent should be found to be unenforceable.

47.    Dr. Levitt signed an initial "Combined Declarations and Power of Attorney" ("Levitt Declaration") declaring to the USPTO that he understood the claims in the application as filed and that he and two other named inventor, were the original and true inventors of the inventions defined by those claims.  Dr. Levitt knew, however, contrary to this declaration, that the three were not and could not possibly have been the inventors of at least application claims 1, 2, 8-11, 15, 16, 19, 20, and 22 and issued claims 5, 9, 13, 14, 16, and 19 of the '850 Patent.

48.    As explained in more detail below, Dr. Levitt, at the time the '850 Patent application was being prepared, knew of material prior art that rendered those claims invalid, or at the very least, was material to their patentability, and he knew that this prior art was not disclosed in the application because he was responsible for supplying the prior art background in the application.

49.    Dr. Levitt consulted for Audimax, ETG's predecessor, beginning in 1984.
REDACTED

REDACTED

During that time, Dr. Levitt was actively following what others, including Nunley, Egolf, and Graupe, were doing and had written in the field, as a well-known member of review and editorial panels and as professor of audiology at City College of New York ("CUNY").

8

PUBLIC VERSION

50.     Dr. Levitt appreciated the significance that knowledge of this work and

writings by others work would have, if disclosed to the USPTO, in undermining the

patent rights he was claiming. Yet he did not disclose that information when framing the

claimed invention in the context of what he represented to the USPTO was the prior art.

Dr. Levitt was the one to select the prior art to be disclosed to the USPTO and his failure

to fully and fairly disclose the prior art information known to him was knowingly done

with the intent to deceive.

**The "Nunley Article" which Levitt withheld, alone and in combination with the
"1982 Egolf Article" which he also withheld, was material and non-cumulative Prior
Art to at least Application Claims 1, 2, and 15 and to issued claim 9 of the '850
Patent**

51.     Application claim 1 that Dr. Levitt and his co inventors approved and filed

in their patent application recited very generally a hearing aid with a "programmable

delay line filter" programmed to help the user hear better (emphasis added):

> *Application Claim 1.* A hearing aid comprising at least one input
> microphone, an output receiver, and a signal transmission channel
> interposed between said microphone and said receiver in which the
> improvement comprises *a programmable delay line filter
> interposed between the input and output of said transmission
> channel, said filter being programmed to impart to the hearing aid
> at least one response characteristic effective to compensate for the
> impaired hearing* of the wearer of the aid.

52.     Dr. Levitt's understanding of his claim to a "programmable delay line

filter" when approving and filing his patent application cannot be disputed. Plaintiff has

asserted, and this Court has agreed, that one of ordinary skill at the time the '850 patent

application was filed, including Dr. Levitt, would have understood that "programmable

delay line filter" meant "a filter that operates on time-delayed samples of an input by

9

PUBLIC VERSION

multiplying each sample by a corresponding weighting coefficient and summing the weighted samples." Markman Order of August 17, 2007.

53.    This claimed idea of a programmable delay line filter in a digital hearing aid, however, did not originate with Dr. Levitt and his co-inventors. Dr. Levitt is alleged to be "the Father of the digital hearing aid," not based on his 1984-86 work with Audimax, but based on his prior work at CUNY,                    REDACTED

REDACTED

54.    The pre-1984 CUNY work, however, was of large scale, the size of a wheel barrow. The '850 Patent was Dr. Levitt's so-called improved version—a wearable digital hearing aid. Dr. Levitt, in making this claim to the USPTO, failed to inform the Patent Office examiners about an article by James Nunley in the October 1983 Hearing Journal, entitled "A Wearable Digital Hearing Aid (the "Nunley Article," Exhibits 108 and 109). The Nunley Article disclosed a "programmable digital processor" (Figure 2 of the Nunley Article) and reported that concept (emphasis added):

> This digital signal representation [in the Nunley hearing aid] is operated on by *adding and subtracting weighted versions of past and present inputs to emphasize or de-emphasize various aspects of the signal. By adjusting these weighting factors, the action of the hearing aid may be "personalized"* for its recipient.

55.                    REDACTED

REDACTED

10

PUBLIC VERSION

REDACTED

56.    In not telling the USPTO of the Nunley work on a wearing digital hearing aid with the very programmable delay line filter Dr. Levitt claimed as his own, Dr. Levitt intended to obtain patent rights to the subject matter of application claim 1, whereas that subject matter is unpatentable in view of the withheld Nunley Article and the Nunley hearing aid.  At the very least, the Nunley Article and the Nunley hearing aid is prior art that would have been of interest to a reasonable examiner, and its intentional withholding by Dr. Levitt was an act that justifies rendering at least the resulting '850 patent unenforceable as a matter of equity.

57.    Rights to other dependent claims were also sought by Dr. Levitt when he knew that the Nunley prior art that he was not disclosing rendered those claims invalid or, at the least, made the patentability of those claims questionable.  Not only did the Nunley Article disclose the general feature of a programmable delay line filter as claimed in application claim 1, but it further disclosed specific details Dr. Levitt claimed in dependent claims 2 and 15, which depended from application claim 1.  Specifically, claim 2, which depended from claim 1 of the filed application, required that the programmable delay line filter be placed in the "forward path" of the hearing aid (emphasis added):

> Application Claim 2.  A hearing aid as described in claim 1 in which said programmable delay line filter is *interposed in a forward path* through said transmission channel.

11

PUBLIC VERSION

Yet, Figure 2 of the Nunley Article shows the Nunley "programmable digital processor" (i.e. its programmable delay line filter) located in the forward path of the Nunley hearing aid, exactly as is required by application claim 2.

58.    Dr. Levitt's failure to call the Nunley work, including Figure 2 of the Nunley Article with its programmable delay line filter in the forward path, to the attention of the USPTO was intentional so that he and is named "co-inventors" could claim as their own the subject matter of application claim 2. In fact, the subject matter of claim 2 describes Nunley's work and is unpatentable in view of the withheld Nunley Article and the Nunley hearing aid. At the very least, the Nunley Article and Nunley hearing aid is prior art that would have been of interest to a reasonable examiner, and its intentional withholding by Dr. Levitt was an act that justifies rendering at least the resulting '850 patent unenforceable as a matter of equity.

59.    Similarly, application claim 15, which depended from application claim 2, required that the filter be programmed to effect the "reduction of acoustic feedback" (emphasis added):

> Application Claim 15. A hearing aid as described in claim 2 in which said programmable filter is programmed *to effect substantial reduction of acoustic feedback* from said receiver to said microphone.

Acoustic feedback occurs when sound travels from the output of the receiver back to the microphone over what is sometimes referred to the "acoustic feedback path." Under certain conditions, acoustic feedback can build to the point of causing an annoying whistle at the output of the microphone. Yet, the Nunley Article expressly anticipates using its "programmable digital processor" (programmable delay line filter) to eliminate acoustic feedback (emphasis added):

PUBLIC VERSION

> The advantages of a digital hearing aid become more apparent with the understanding of what the *microprocessor can potentially perform*:
>
> 1. Imagine a hearing aid *free from feedback*. The digital hearing aid of the future will have this freedom.

60.    While the Nunley Article did not explicitly explain how to eliminate acoustic feedback in a digital hearing aid,      REDACTED

REDACTED

REDACTED                            Specifically, a 1982

seminal review article by Dr. Egolf, entitled "Review of the Acoustic Feedback Literature from a Control Systems Point of View," discloses a method of reducing the effect of acoustic feedback (*id.*).

61.    The particular method of the 1982 Egolf Article introduces a phase shift in the forward path of the hearing aid to establish a more beneficial operating condition (the "Phase Shifting" method). It would have been obvious to one of ordinary skill in the art to use the Nunley "programmable digital processor" to implement the phase shift of the 1982 Egolf Article and thereby achieve a digital hearing aid with improved acoustic feedback reduction as predicted by Nunley.      REDACTED

REDACTED

62.                            REDACTED

REDACTED

13

PUBLIC VERSION

REDACTED


REDACTED


REDACTED


REDACTED


In the filed application, in spite of knowing that the Phase Shifting method was first suggested by the 1982 Egolf Article, Dr. Levitt proceeded to claim this idea as his own in his application claim 15 and his patented claim 9.

63.     Dr. Levitt's failure to cite to the USPTO the 1982 Egolf Article with its disclosure of the Phase Shifting method of reducing acoustic feedback was not an
                                                              REDACTED
innocent oversight.
                              REDACTED


REDACTED
                                        In other words, Dr. Levitt was

responsible for deciding what prior art should be disclosed and how the invention should

14

PUBLIC VERSION

be framed for the examiner within the context of the prior art. But he decided to frame his claimed invention within the context of methods for reducing acoustic feedback that were plainly less relevant and effective than the Phase Shifting method of Egolf of which he was well aware.

64.    Dr. Levitt cannot claim that he forgot about the Egolf work when applying for his patent application. That Dr. Levitt fully appreciated the significance of the Egolf Phase Shifting method is evidenced                                REDACTED

REDACTED

REDACTED

REDACTED

65.    Rather,                          REDACTED

REDACTED

REDACTED                    In additional to filing a claim that covers that "ineffective"

method,                                REDACTED

REDACTED

REDACTED

15

PUBLIC VERSION

REDACTED

REDACTED

66.

REDACTED

there is not a

scintilla of evidence that he or his co inventors involved in the Audimax project had

considered a filter in the feedback path as of this date. Moreover, this is the first reported

test after the first prototype was built and                  REDACTED

REDACTED

REDACTED

REDACTED

67.    Dr. Levitt's attempt now to revise history to diminish the role of the Phase

Shifting in his own work highlights the fact his failure to cite the 1982 Egolf Article was

intentional. By not disclosing the 1982 Egolf Article he could claim as his own the

subject matter of application claim 15 (that became issued claim 9), whereas the subject

matter of those claims is unpatentable in view of the withheld 1982 Egolf Article either

alone or in combination with the Nunley Article. At the very least, the Nunley Article

and the Egolf 1982 Articles are prior art that would have been of interest to a reasonable

examiner, and their intentional withholding by Dr. Levitt was an act that justifies

rendering the resulting '850 patent unenforceable as a matter of equity.

16

PUBLIC VERSION

**The Withheld "Nunley Article," alone or in combination with the 1985 Egolf Abstract and the 1984 VA Report, were material and non-cumulative Prior Art to at least Application Claims 19, 20, and 22 and to issued claims 13, 14, 16, and 19 of the '850 Patent**

68.    Application claims 19 and 20, and issued claims 13, 14, and 19 relate to

the reduction of the effect of acoustic feedback with the filter being used in the feedback

path.

69.    In particular, application claim 19, which issued as patent claim 13,

requires:

> ... *inserting between the input and output of said transmission channel an electrical feedback path having a filter* therein programmed to equalize and reduce the effect of said acoustic feedback both in amplitude and phase on a signal in said transmission channel

Application claim 22, which issued as patent claim 16, requires:

> A method of *reducing feedback* in a hearing aid as described in claim 14 in which said *programmable filter is inserted in an electrical feedback loop* for said transmission channel.

Application claim 20, which issued as patent claim 14, requires:

> ... *inserting between the input and output of said transmission channel a programmable filter programmed to equalize and reduce the effect of said acoustic feedback* both in amplitude and phase on a signal in said transmission channel

Issued claim 19, which was added by Amendment of July 6, 1987, requires:

> ... a *programmable delay line filter interposed in a feedback path* between the input and output of said transmission channel, said programmable filter being programmed *to effect substantial reduction of acoustic feedback* from said receiver to said microphone

17

PUBLIC VERSION

70.    In terms of implementation of those claims, the '850 patent teaches that an

electrical feedback path should be introduced that mimics in effect the characteristics of

the acoustic feedback path:

> Feedback cancellation is achieved in the hearing aid by first
> measuring the acoustic feed back in situ and then creating
> an electronic feedback path with identical amplitude and
> phase characteristics. The outputs of the two feedback
> paths are then subtracted, thereby canceling any feedback
> signals that might occur. ('850 Patent, 9:12-17).

71.    This method of reducing the effect of acoustic feedback is herein called

the "Mimic and Subtract" method because the electrical feedback path in effect "mimics"

the acoustic feedback path and the resultant signal is "subtracted" from the signal with

the effect of the acoustic feedback to reduce that effect. That Dr. Levitt intended to claim

the Mimic and Subtract method as his own (along with the Phase Shifting Method) can
REDACTED

REDACTED    The second of the three techniques to be claimed is the Mimic and Subtract

method:

> [A] second, electrical feedback path is now introduced.
> This feedback path contains a second programmable filter
> which is programmed to provide feedback equal and
> opposite to that provided by the acoustic feedback path.

72.    The "Mimic and Subtract" method described in the '850 patent, although

purportedly originating with Dr. Levitt and his co-inventors, had in fact already been

published, as Dr. Levitt well new. In an abstract in the Spring 1985 Supplement of the

Journal of the Acoustic Society of America, Dr. Egolf already reported use of the Mimic

and Subtract method ("1985 Egolf Abstract," Levitt Exhibit 115):

> **VV5. Electronic cancellation of acoustic feedback to
> increase hearing-aid stability. . . .**

18

PUBLIC VERSION

> The acoustic feedback which causes a hearing aid to
> become unstable at high gains is effectively reduced by the
> addition of negative electrical feedback. . . .

The 1985 Egolf Abstract was a summary of a talk Dr. Egolf and Mr. Weaver were to give

on April 12, 1985. The 1985 Egolf Abstract is material prior art because it reports that an

"estimator" forms the electrical feedback path. Combined with the Nunley Article, it was

obvious that this "estimator" could take the form of a programmable delay line filter.

REDACTED

73.

REDACTED                This claim is not credible.        REDACTED

REDACTED

REDACTED

REDACTED                        The 1985 Egolf Abstract surely was of

interest to him because it reported on work solving the very problem he was addressing,

cancellation of acoustic feedback.

74.    Most telling, however, is contemporaneous written evidence found in Dr.

Levitt's possession. In particular, in 1985, Dr. Egolf and Mr. Weaver prepared a typed

version of their abstract with contact information not included in the public version,

which they sent to the Journal prior to the April 1985 presentation for purposes of

allowing the Acoustic Society to contact them with notice of acceptance or rejection of

the proposed presentation. This copy was private and never distributed to the public.

(Weaver, 25 Aug 07, 70:11-73:2)              REDACTED

REDACTED

75.    Interestingly, in spite of his denial as to any knowledge of the Egolf and

Weaver work reflected in the abstract for the April 12, 1985 talk, the earliest

19

PUBLIC VERSION

documentary evidence produced by plaintiff or Dr. Levitt of any appreciation by Dr. Levitt that acoustic feedback might be a problem in his Audimax work is dated a month
                                                            REDACTED
thereafter, May 15, 1985 (Dugot Exhibit 44);
                        REDACTED

76.                             REDACTED

REDACTED                there was found in Dr. Levitt's garage a copy of the Veterans Administration Rehabilitation R&D Progress Reports 1984 that includes another reference to the Egolf and Weaver work (the "1984 VA Report") and that again reports the use of the Mimic and Subtract method using an electrical feedback path to cancel the effect of acoustic feedback:

> In the other system, called the active feedback cancellation (AFC) system, the microprocessor uses computed values of GH to create an estimator. The estimator causes the input informational signal (e.g., that containing information such as speech and not PRN) to react destructively with signals returning via the vent outlet, thereby cancelling the effect of the feedback path.

77.    The 1984 VA Report was widely distributed in the fall of 1985, as evidenced by the "Distribution/Circulation Policy" reported on page iii of the document itself and the recollection of Dr. Larson (Larson, 30 Aug 07, 193:10-195:22). Submissions for this Report were to be made to the VA Journal of Rehabilitation Research and Development, the very journal for which Dr. Levitt was a member of the
                                                            REDACTED
Editorial Board at this very same time period. *See* Lev. Exhibit 101.

20

PUBLIC VERSION

REDACTED

REDACTED
It is simply not credible that Dr. Levitt did not know of this publication.

78.    And again,                           REDACTED

REDAC
TED    which was distributed in the fall of 1985, the earliest documentary evidence

produced by plaintiff or Dr. Levitt of any appreciation by Dr. Levitt that the acoustic

feedback path might be mimicked using a test signal as referenced in that Report is dated

late fall 1985 (ETG0020286, dated "11/12/85").         REDACTED

REDACTED


REDACTED                           Dr. Levitt's

attempt to cover-up his failure to disclose the Egolf work to the USPTO simply highlights

the fact this failure to disclose was indeed intentional.

79.    Dr. Levitt's failure to call the Nunley Article to the attention of the

USPTO, either alone or in combination with Dr. Levitt's failure to call the 1985 Egolf

Abstract and the 1984 VA Report to the attention of the USPTO, was with the intent to

wrongly claim as his own the subject matter of application claims 19 and 20, and issued

claims 13, 14, and 19, whereas that subject matter is unpatentable in view of the withheld

Nunley Article alone or in combination with the undisclosed 1985 Egolf Abstract and

1984 VA Report.    At the very least, the Nunley Article is prior art, alone or in

combination with the undisclosed 1985 Egolf Abstract and 1984 VA Report, and would

---

[1] In addition, Defendants have been permitted additional discovery to establish the
distribution and location of the 1984 VA Report in the fall of 1985 and fully expect to
establish additional admissible evidence to this effect.

21

PUBLIC VERSION

have been of interest to a reasonable examiner. Its intentional withholding by Dr. Levitt

was an act that justifies rendering at least the resulting '850 patent unenforceable as a

matter of equity.

80.    Moreover, there is a direct relationship between the claims of the '749

patent and the withheld 1984 VA Report given that these claims are all directed, at least

in part, to apparatus that uses a test signal of the type reported in the undisclosed 1984

VA Report.

**The Intentionally Withheld "Zeta Noise Blocker" Information, Described Below, Was Material And Non-Cumulative To At Least Application Claims 8-11 And To Issued Claim 5 Of The '850 Patent**

81.    Application claim 8 was directed toward the generic idea of changing the

characteristics of the hearing aid as the characteristic of the sound being heard changes.

Specifically, application claim 8 claimed:

> A hearing aid comprising at least one input microphone, as
> an output receiver, and a transmission channel interposed
> between said microphone and receiver, *means controllable*
> to impart different response characteristics to said hearing
> aid, and *means* responsive to a characteristic of the signal
> in said transmission channel *for* automatically *controlling*
> said controllable means to impart a selected one of said
> different response characteristics to said hearing aid.
> [emphasis added].

82.    This claim requires two element: one that is controlled (the "means

controllable") and one that does the controlling (the "means...for...controlling").

83.    The Parties agree that the "means controllable" is a programmable filter,

although they disagree on the degree of structural detail required.    REDACTED

REDACTED

REDACTED                 asserted that the "means controllable" element, as

22

PUBLIC VERSION

it appears in issued claim 5, covers any form of electronic device that can impart different response characteristics. Dr. Levitt knew that the "Zeta Noise Blocker" was covered by a claim of this scope, yet he failed to disclose this fact to the USPTO. The failure by Dr. Levitt to disclose the "Zeta Noise Blocker," is inequitable and justifies a finding of unenforceability for at least the '850 patent.

 84. Application claim 9, which depends from application claim 8, requires that the hearing aid react to the loudness of the sound being heard:

> Application Claim 9. A hearing aid as described in claim 8 in which said controlling means is responsive to the signal level on said transmission channel.

 85. The undisclosed Zeta Noise Blocker had this feature as well, which Dr. Levittknew.

 86. Application claim 10 requires the hearing aid react to noise in the sound being heard:

> Application Claim 10. A hearing aid as described in claim 8 in which said controlling means is responsive to noise in said transmission channel.

 87. The undisclosed Zeta Noise Blocker again had this feature, which Dr. Levitt knew.

 88. Application claim 11 requires the hearing aid react to the level of speech being in excess of the level of noise[2]:

> Application Claim 11. A hearing aid as described in claim 6 in which said controlling means is responsive to the level

---

[2] Defendants continue to assert this phase "speech signals . . . in excess of the level of noise signals" is indefinite.

23

PUBLIC VERSION

> of speech signals in said transmission channel in excess of
> the level of noise signals in said channel.

89.     Once again. the undisclosed Zeta Noise Blocker had this feature, which

Dr. Levitt knew.

90.     Issued Claim 5 of the '850 Patent is application claim 11 written in

dependant form and, thus, is directed to automatically controlling the response

characteristic of a hearing aid in response to detection of a level of speech in excess of a

level of noise in the transmission channel of the hearing aid, and to reduce the noise,

thereby allowing the speech to be better heard.  Claim 5 reads as follows:

> A hearing aid comprising at least one input microphone, an
> output receiver, and a transmission channel interposed
> between said microphone and receiver, means controllable
> to impart different response characteristics to said hearing
> aid, and controlling means responsive to the level of speech
> signals in said transmission channel in excess of the level
> of noise signals in said channel for automatically
> controlling said controllable means to impart a selected
> one of said different response characteristics to said
> hearing aid.

91.     The "Zeta Noise Blocker," which employs the same subject matter of all

these claims, as asserted by ETG, is described in an article by Laszlo K. Stein et al.,

entitled "Listener-Assessed Intelligibility of a Hearing Aid Self-Adaptive Noise Filter,"

published in *Ear and Hearing*, Vol. 5, No. 4, 1984 (ETG002591-596) (the "Stein

Article"), as well as various U.S. patents to Dr. Daniel Graupe, and was incorporated into

a commercial chip called the "Zeta Noise Blocker" by Intellitech Corp. ("Intellitech"), all

prior to the alleged invention by Dr. Levitt and his co inventors.  Dr. Levitt was aware of

all of this during the pendency of the '850 patent application, yet he never brought this

24

PUBLIC VERSION

information to the attention of the USPTO, even though he had the key role in bringing the prior art to the attention of the patent office.

92.     The Stein Article describes a study conducted into improvements in speech intelligibility using a hearing aid with the Zeta Noise Blocker. The Stein Article describes that the hearing aid used a "Graupe-Causey Self-Adaptive Noise Filter," cites a Graupe '721 Patent as describing the filter, and goes on to describe the filter as differentiating between speech and noise, and automatically adapting and adjusting itself to a continually changing noise environment. (ETG002591.)

93.     The Graupe '721 Patent, U.S. Patent No. 4,025,721 issued in 1977 and, like the Stein Article, is prior art under 35 U.S.C. § 102(b). The Graupe '721 Patent stores a representation of the transmission channel signal at times when no speech is determined to be present, and in response to a subsequent detection of speech, compares the speech-plus-noise signal to the stored noise-only signal and uses the results of the comparison to adjust the response characteristics of the hearing aid, all as is done in the '850 Patent. The '721 Graupe Patent, which is referenced in the Stein Article, teaches each and every limitation of claim 5 of the '850 Patent.

94.                                REDACTED
                                   REDACTED

        REDACTED               Stein Article documented the effectiveness of

the Zeta Noise Blocker.

        95.                        REDACTED

REDACTED He was also a member of the Acoustic Society of America, whose members received the publication in which the Stein Article appeared.                    REDACTED

25

PUBLIC VERSION

REDACTED

96.    The Stein Article describes the Zeta Noise Blocker.    REDACTED

REDACTED

97.    Dr. Levitt participated in the decision to purchase and test the Zeta Noise Blocker chip, and was fully aware of the Stein Article, the cited Graupe '721 Patent, and the Zeta Noise Blocker chip all prior to any conception of his alleged own Levitt noise blocker invention.    REDACTED

REDACTED

98.    The similarity between the claimed Levitt noise limiter invention of claim 5 and the Intellitech Zeta Noise Blocker is not mere coincidence.    REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

26

PUBLIC VERSION

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

99.                                 REDACTED

REDACTED

100.    Nevertheless, before there was any written evidence of any new Levitt

noise blocker design, on October 25, 1985, Dr. Levitt and his team met personally with

27

PUBLIC VERSION

Dr. Graupe, the inventor of the Zeta Noise Blocker chip, to discuss the operation of the Zeta Noise Blocker chip. (ETG007464-466.)[3] Dr. Graupe explained to Dr. Levitt how the Zeta Noise Blocker chip worked. By January 17, 1986, the Levitt team was still using the Intellitech Zeta Noise Blocker, with an option to switch it in or out of the Levitt control circuit. (ETG002573.) Even as of this late date, there is no evidence of any new Levitt noise blocker design.

**Dr. Levitt Utilized the Zeta Noise Blocker**

101.                                    REDACTED

REDACTED

102.    Dr. Levitt, rather than disclose the Zeta Noise Blocker to the USPTO in the '850 patent application, instead disclosed the Fig. 2 circuit, which the inventors adapted as their own.[4]                        REDACTED

REDACTED

---

[3] Once again, Dr. Levitt tried to diminish the effect of this meeting by    REDACTED
REDACTED

[4] As will be shown at trial, this bogus substitution for the Zeta Noise Block did not and can not work as a noise reduction circuit.

28

PUBLIC VERSION

REDACTED

REDACTED

## Dr. Levitt Omitted Disclosure of the Zeta Noise Blocker and Stein Article with Intent to Deceive the USPTO

103.    In spite of the undisputed fact that Dr. Levitt knew about the prior art Intellitech Zeta Noise Blocker, when he explained the prior art in the patent application so that the Examiner could make a fair judgment whether what was shown in Figure 2 was novel and patentable over the prior art, he failed to make any mention of the Stein Article, Intellitech or the Intellitech Zeta Noise Blocker. Instead, he described the prior art as though the Intellitech Zeta Noise Blocker never existed.  For example, in the "Background of the Invention" section, he opine that the prior art only uses "filtering techniques in which the frequency regions containing high noise levels are eliminated." ('850 Patent, 1:55-56.)  He further stated that no prior art "affords a satisfactory solution for the problem of . . . changes in the optimum frequency-gain characteristic resulting in variations in the level of the speech signal reaching the hearing aid." (*Id.* at 2:4-9.)

104.    In contrast to Dr. Levitt's representations in the patent application, the Stein Article (known to Dr. Levitt) states:

> When both speech and noise are present in the same frequency range, the filter theoretically can only pass both speech and noise or reject both. In actuality, the filter alternates between passing and rejecting both speech and noise depending on the relative importance of the speech phoneme at that frequency range.

PUBLIC VERSION

(ETG0002592.)  The Stein Article also discloses:

> Essentially, self-adapting noise reduction filters, whether
> analog or digital, sample an incoming signal, identify the
> spectra of noise present, and automatically set filter
> parameters that approximate the inverse of the noise
> spectrum at any instant. Theoretically, a self adaptive filter
> system should improve both the intelligibility and quality
> of speech because the full frequency range is passed when
> noise is not present and the characteristics of the filter
> change selectively and automatically with changes in the
> spectrum of the noise.

(ETG0002591.)  This is exactly what Levitt claims to be his invention:

> Each of the sixty-four possible combinations of the 6 bit
> binary words identifies a different frequency response for
> the programmable filter, and a corresponding set of
> coefficients stored in the RAM 77 is selected, thereby
> automatically adjusting the hearing aid to the optimum set
> of parameter values as the speech level and type of
> background noise change.

('850 Patent, 6:46-54.)

     105.  In view of the foregoing, it is apparent that the Examiner was deprived of

a fair examination of claim 5 of the '850 Patent because he was deliberately never told

about the Zeta Noise Blocker, the Stein Article, or the Graupe '721 Patent. This prior art

is more relevant to claim 5 than any prior art that the Examiner had before him during

the examination process and, thus, material and noncumulative. Dr. Levitt withheld—

with an intent to deceive—the Stein Article and any mention of the Zeta Noise Blocker

from the Examiner. Thus, the '850 Patent is unenforceable as a result of inequitable

conduct.  Similarly, the '749 Patent issued from a divisional application from the

application that ultimately became the '850 Patent and, thus, is likewise unenforceable

due to inequitable conduct.

PUBLIC VERSION

## COUNTERCLAIMS

106.    Defendant/Counterplaintiff Widex A/S is a Danish corporation having a place of business at Ny Vestergaardsvej 25, 3500 Vaerloese, Denmark.

### FIRST COUNTERCLAIM
#### (Declaratory Judgment of Non-Infringement - '850)

107.    Jurisdiction of this Counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions relating to patents, 28 U.S.C. § 1338(a). There is a justiciable controversy between Plaintiff and Defendant/Counterplaintiff concerning Defendant's/Counterplaintiff's liability for infringement of the '850 patent as evidenced by the Complaint and Amended Complaint filed in this suit.

108.    Venue and personal jurisdiction are proper in this District.

109.    Defendant/Counterplaintiff reallege and incorporate by reference the allegations set forth in Paragraph 106.

110.    Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. §2201, for declaratory judgment that they do not infringe the '850 patent.

### SECOND COUNTERCLAIM
#### (Declaratory Judgment of Non-Infringement - '749)

111.    Jurisdiction of this Counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions

31

PUBLIC VERSION

relating to patents, 28 U.S.C. § 1338(a). There is a justiciable controversy between

Plaintiff and Defendant/Counterplaintiff concerning Defendant's/Counterplaintiff's

liability for infringement of the '749 patent as evidenced by the Complaint and Amended

Complaint filed in this suit.

     112.   Venue and personal jurisdiction are proper in this District.

     113.   Defendant/Counterplaintiff reallege and incorporate by reference the

allegations set forth in Paragraphs 106 through 110.

     114.   Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. §2201, for

declaratory judgment that they do not infringe the '749 patent.

### THIRD COUNTERCLAIM
### (Declaratory Judgment of Invalidity - '850)

     115.   Jurisdiction of this Counterclaim arises under the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions

relating to patents, 28 U.S.C. § 1338(a). There is a justiciable controversy between

Plaintiff and Defendant/Counterplaintiff concerning the validity, enforceability and scope

of the '850 patent as evidenced by the Complaint and Amended Complaint filed in this

suit.

     116.   Venue and personal jurisdiction are proper in this District.

     117.   Defendant/Counterplaintiff reallege and incorporate by reference the

allegations set forth in Paragraphs 106 through 114.

PUBLIC VERSION

118.    Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. § 2201, for declaratory judgment that the '850 patent is invalid under sections 101, 102, 103, 112, 115 and 116 of the Patent Act.

## FOURTH COUNTERCLAIM
### (Declaratory Judgment of Invalidity - '749)

119.    Jurisdiction of this Counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions relating to patents, 28 U.S.C. § 1338(a). There is a justiciable controversy between Plaintiff and Defendant/Counterplaintiff concerning the validity, enforceability and scope of the '749 patent as evidenced by the Complaint and Amended Complaint filed in this suit.

120.    Venue and personal jurisdiction are proper in this District.

121.    Defendant/Counterplaintiff reallege and incorporate by reference the allegations set forth in Paragraphs 106 through 118.

122.    Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. § 2201, for declaratory judgment that the '749 patent is invalid under sections 101, 102, 103, 112, 115 and 116 of the Patent Act.

## FIFTH COUNTERCLAIM
### (Declaratory Judgment of Unenforceability - '850)

123.    Widex A/S incorporates by reference the allegations contained in Paragraphs 106 through 122 of the Counterclaim, as if fully set forth herein.

33

PUBLIC VERSION

· 124.    Claims of at least the '850 patent are enforceable due to inequitable conduct. Widex A/S incorporates by reference the allegations in Paragraphs 46 through 105 of their Sixth Affirmative Defense: Unenforceability of their Amended Answer to the Second Amended Complaint and Jury Demand of Plaintiff Energy Transportation Group, Inc., as if fully set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Widex A/S prays that this Court:

a)    Enter judgment that U.S. Patent No. 4,731,850 is invalid, void and unenforceable;

b)    Enter judgment that U.S. Patent No. 4,879,749 is invalid, void and unenforceable;

.c)    Enter judgment that defendant has not infringed any claim of U.S. Patent No. 4,731,850;

d)    Enter judgment that defendant has not infringed any claim of U.S. Patent No. 4,879,749;

e)    Awarding defendant the costs of defending its suit and bringing its counterclaims, including reasonable attorneys' fees, as provided by law;

f)    Determine that plaintiff's conduct is such as to render this case exceptional within the meaning of 35 U.S.C. § 285; and

f)    Enter judgment for defendant for such other relief as this Court may deem just or proper.

34

PUBLIC VERSION

JURY DEMAND: Defendant requests a trial by jury on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Donald E. Reid*

Donald E. Reid (#1058)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19801
(302) 575-7219
Attorneys for Defendant
Widex A/S

OF COUNSEL:

SUGHRUE MION PLLC
William H. Mandir (*pro hac vice*)
David J. Cushing (*pro hac vice*)
Carl J. Pellegrini (*pro hac vice*)
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 293-7600

November 6, 2007

35