# EXHIBIT 4

PUBLIC VERSION

Formatted: Centered

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ENERGY TRANSPORTATION GROUP, )
INC. )
       )
    Plaintiff, )
       )    C.A. NO. 05-422 (GMS)
    v. )
       )
SONIC INNOVATIONS, INC., ET AL. )
       )
    Defendants )

### DEFENDANT WIDEX A/S'S
### AMENDED ANSWER, DEFENSES AND COUNTERCLAIMS

Deleted: answers

Defendant Widex A/S, by and through its attorneys, amends the answer to the

Second Amended Complaint as follows:

1.    Widex A/S admits that plaintiff has made a complaint against Widex A/S

and has demanded a jury trial. Widex A/S is without knowledge or information sufficient

to admit or deny the remaining allegations of Paragraph 1, and therefore denies the same.

### NATURE OF THE ACTION

2.    Widex A/S admits that this is an action for patent infringement arising

under the patent laws of the United States and that copies of the '850 and '749 patents

were attached to the Amended Complaint. Widex A/S denies that it has infringed any

claims of the '850 and '749 patents, that plaintiff is entitled to enjoin Widex A/S, and that

plaintiff is entitled to any damages from Widex A/S. Widex A/S is without knowledge or

information sufficient to admit or deny the remaining allegations of Paragraph 2, and

therefore denies the same.

1

PUBLIC VERSION

Formatted: Centered

3.    Widex A/S denies the allegations of Paragraph 3 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 3, and therefore denies the same.

4.    Widex A/S denies the allegations of Paragraph 4 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 4, and therefore denies the same.

5.    Widex A/S denies the allegations of Paragraph 5 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 5, and therefore denies the same.

## THE PARTIES

6.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 6, and therefore denies the same.

7.    Widex A/S admits that the '850 Patent issued on March 15, 1988 and that the '749 patent issued on November 7, 1989, each showing Harry Levitt, Richard S. Dugot and Kenneth W. Kopper as named inventors. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 7, and therefore denies the same.

8.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 8, and therefore denies the same.

9.    Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 9, and therefore denies the same.

PUBLIC VERSION

Formatted: Centered

10.   Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 10, and therefore denies the same.

11.   Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 11, and therefore denies the same.

12.   Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 12, and therefore denies the same.

13.   Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 13, and therefore denies the same.

14.   Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 14, and therefore denies the same.

15.   Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 15, and therefore denies the same.

16.   Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 16, and therefore denies the same.

17.   Widex A/S admits the allegations of Paragraph 17.

18.   Widex A/S admits the allegations of Paragraph 18.

19.   Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 19, and therefore denies the same.

20.   Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 20, and therefore denies the same.

21.   Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 21, and therefore denies the same.

PUBLIC VERSION

Formatted: Centered

22.　Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 22, and therefore denies the same.

23.　Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 23, and therefore denies the same.

24.　Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 24, and therefore denies the same.

25.　Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 25, and therefore denies the same.

26.　Widex A/S is without knowledge or information sufficient to admit or deny the allegations of Paragraph 26, and therefore denies the same.

## JURISDICTION AND VENUE

27.　Widex A/S admits that this court has subject matter jurisdiction and personal jurisdiction over Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 27, and therefore denies the same.

28.　Widex A/S admits that venue is proper in this district for Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 28, and therefore denies the same.

## COUNT I
### (Patent Infringement of United States Patent No. 4,731,850)

29.　Widex A/S incorporates by reference its answer to Paragraphs 1-28 above.

4

PUBLIC VERSION

Formatted: Centered

30.    Widex A/S denies the allegations of Paragraph 30 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 30, and therefore denies the same.

31.    Widex A/S denies the allegations of Paragraph 31 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 31, and therefore denies the same.

32.    Widex A/S denies the allegations of Paragraph 32 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the reminaing allegations of Paragraph 32, and therefore denies the same.

## COUNT II
### (Willful Patent Infringement of United States Patent No. 4,731,850)

33.    Widex A/S incorporates by reference its answer to Paragraphs 1-32 above.

34.    Widex A/S denies the allegations of Paragraph 34 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 34, and therefore denies the same.

## COUNT III
### (Patent Infringement of United States Patent No. 4,879,749)

35.    Widex A/S incorporates by reference its answer to Paragraphs 1-34 above.

36.    Widex A/S denies the allegations of Paragraph 36 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 36, and therefore denies the same.

5

PUBLIC VERSION

Formatted: Centered

37.    Widex A/S denies the allegations of Paragraph 37 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 37, and therefore denies the same.

38.    Widex A/S denies the allegations of Paragraph 38 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 38, and therefore denies the same.

## COUNT IV
### (Willful Patent Infringement of United States Patent No. 4,879,749)

39.    Widex A/S incorporates by reference its answer to Paragraphs 1-38 above.

· 40.    Widex A/S denies the allegations of Paragraph 40 with respect to Widex A/S. Widex A/S is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 40, and therefore denies the same.

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
#### (Invalidity of the '850 Patent)

41.    The claims of the '850 patent are invalid on one or more grounds specified in 35 U.S.C. §§ 101, 102, 103 and 112.

6

PUBLIC VERSION

Formatted: Centered

### SECOND AFFIRMATIVE DEFENSE
(Invalidity of the '749 Patent)

42. The claims of the '749 patent are invalid on one or more grounds specified

in 35 U.S.C. §§ 101, 102, 103 and 112.

### THIRD AFFIRMATIVE DEFENSE
(Non-infringement of the '850 Patent)

43. Widex A/S has not, and is not, infringing any of the claims of the '850

patent.

### FOURTH AFFIRMATIVE DEFENSE
(Non-infringement of the '749 Patent)

44. Widex A/S has not, and is not, infringing any of the claims of the '749

patent.

### FIFTH AFFIRMATIVE DEFENSE
(Laches)

45. ETG's claims are barred by the defense of laches.

### SIXTH AFFIRMATIVE DEFENSE
(Unenforceability)

46. During the prosecution of the patent application that resulted in the '850

Patent, lead inventor Dr. Harry Levitt, in violation of his duty of candor, withheld from

7

PUBLIC VERSION

Formatted: Centered

the patent examiners of the United States Patent and Trademark Office ("USPTO")
handling these applications, information that was material to the patentability of the
claims in these applications.   On information and belief, Dr. Levitt withheld that
information with intent to deceive.  As a consequence, at least the '850 Patent should be
found to be unenforceable.

     47.    Dr. Levitt signed an initial "Combined Declarations and Power of
Attorney" ("Levitt Declaration") declaring to the USPTO that he understood the claims in
the application as filed and that he and two other named inventor, were the original and
true inventors of the inventions defined by those claims.  Dr. Levitt knew, however,
contrary to this declaration, that the three were not and could not possibly have been the
inventors of at least application claims 1, 2, 8-11, 15, 16, 19, 20, and 22 and issued claims
5, 9, 13, 14, 16, and 19 of the '850 Patent.

     48.    As explained in more detail below, Dr. Levitt, at the time the '850 Patent
application was being prepared, knew of material prior art that rendered those claims
invalid, or at the very least, was material to their patentability, and he knew that this prior
art was not disclosed in the application because he was responsible for supplying the
prior art background in the application.

     49.    Dr. Levitt consulted for Audimax, ETG's predecessor, beginning in 1984.
REDACTED

REDACTED           During that time, Dr.
Levitt was actively following what others, including Nunley, Egolf, and Graupe, were
doing and had written in the field, as a well-known member of review and editorial
panels and as professor of audiology at City College of New York ("CUNY").

8

PUBLIC VERSION

Formatted: Centered

50.    Dr. Levitt appreciated the significance that knowledge of this work and writings by others work would have, if disclosed to the USPTO, in undermining the patent rights he was claiming. Yet he did not disclose that information when framing the claimed invention in the context of what he represented to the USPTO was the prior art. Dr. Levitt was the one to select the prior art to be disclosed to the USPTO and his failure to fully and fairly disclose the prior art information known to him was knowingly done with the intent to deceive.

**The "Nunley Article" which Levitt withheld, alone and in combination with the "1982 Egolf Article" which he also withheld, was material and non-cumulative Prior Art to at least Application Claims 1, 2, and 15 and to issued claim 9 of the '850 Patent**

51.    Application claim 1 that Dr. Levitt and his co inventors approved and filed in their patent application recited very generally a hearing aid with a "programmable delay line filter" programmed to help the user hear better (emphasis added):

> *Application Claim 1.* A hearing aid comprising at least one input microphone, an output receiver, and a signal transmission channel interposed between said microphone and said receiver in which the improvement comprises *a programmable delay line filter interposed between the input and output of said transmission channel, said filter being programmed to impart to the hearing aid at least one response characteristic effective to compensate for the impaired hearing* of the wearer of the aid.

52.    Dr. Levitt's understanding of his claim to a "programmable delay line filter" when approving and filing his patent application cannot be disputed. Plaintiff has asserted, and this Court has agreed, that one of ordinary skill at the time the '850 patent application was filed, including Dr. Levitt, would have understood that "programmable delay line filter" meant "a filter that operates on time-delayed samples of an input by

9

PUBLIC VERSION

Formatted: Centered

multiplying each sample by a corresponding weighting coefficient and summing the weighted samples." Markman Order of August 17, 2007.

53.     This claimed idea of a programmable delay line filter in a digital hearing aid, however, did not originate with Dr. Levitt and his co-inventors. Dr. Levitt is alleged to be "the Father of the digital hearing aid," not based on his 1984-86 work with Audimax, but based on his prior work at CUNY,     REDACTED
REDACTED

54.     The pre-1984 CUNY work, however, was of large scale, the size of a wheel barrow. The '850 Patent was Dr. Levitt's so-called improved version—a wearable digital hearing aid. Dr. Levitt, in making this claim to the USPTO, failed to inform the Patent Office examiners about an article by James Nunley in the October 1983 Hearing Journal, entitled "A Wearable Digital Hearing Aid (the "Nunley Article," Exhibits 108 and 109). The Nunley Article disclosed a "programmable digital processor" (Figure 2 of the Nunley Article) and reported that concept (emphasis added):

> This digital signal representation [in the Nunley hearing aid] is operated on by *adding and subtracting weighted versions of past and present inputs to emphasize or de-emphasize various aspects of the signal. By adjusting these weighting factors, the action of the hearing aid may be "personalized"* for its recipient.

55.     REDACTED

REDACTED

PUBLIC VERSION

Formatted: Centered

REDACTED

56.    In not telling the USPTO of the Nunley work on a wearing digital hearing aid with the very programmable delay line filter Dr. Levitt claimed as his own, Dr. Levitt intended to obtain patent rights to the subject matter of application claim 1, whereas that subject matter is unpatentable in view of the withheld Nunley Article and the Nunley hearing aid. At the very least, the Nunley Article and the Nunley hearing aid is prior art that would have been of interest to a reasonable examiner, and its intentional withholding by Dr. Levitt was an act that justifies rendering at least the resulting '850 patent unenforceable as a matter of equity.

57.    Rights to other dependent claims were also sought by Dr. Levitt when he knew that the Nunley prior art that he was not disclosing rendered those claims invalid or, at the least, made the patentability of those claims questionable. Not only did the Nunley Article disclose the general feature of a programmable delay line filter as claimed in application claim 1, but it further disclosed specific details Dr. Levitt claimed in dependent claims 2 and 15, which depended from application claim 1. Specifically, claim 2, which depended from claim 1 of the filed application, required that the programmable delay line filter be placed in the "forward path" of the hearing aid (emphasis added):

> Application Claim 2. A hearing aid as described in claim 1 in which said programmable delay line filter is *interposed in a forward path* through said transmission channel.

11

PUBLIC VERSION

Formatted: Centered

Yet, Figure 2 of the Nunley Article shows the Nunley "programmable digital processor"
(i.e. its programmable delay line filter) located in the forward path of the Nunley hearing
aid, exactly as is required by application claim 2.

58.    Dr. Levitt's failure to call the Nunley work, including Figure 2 of the
Nunley Article with its programmable delay line filter in the forward path, to the
attention of the USPTO was intentional so that he and is named "co-inventors" could
claim as their own the subject matter of application claim 2. In fact, the subject matter of
claim 2 describes Nunley's work and is unpatentable in view of the withheld Nunley
Article and the Nunley hearing aid. At the very least, the Nunley Article and Nunley
hearing aid is prior art that would have been of interest to a reasonable examiner, and its
intentional withholding by Dr. Levitt was an act that justifies rendering at least the
resulting '850 patent unenforceable as a matter of equity.

59.    Similarly, application claim 15, which depended from application claim 2,
required that the filter be programmed to effect the "reduction of acoustic feedback"
(emphasis added):

> Application Claim 15. A hearing aid as described in claim
> 2 in which said programmable filter is programmed *to
> effect substantial reduction of acoustic feedback* from said
> receiver to said microphone.

Acoustic feedback occurs when sound travels from the output of the receiver back to the
microphone over what is sometimes referred to the "acoustic feedback path." Under
certain conditions, acoustic feedback can build to the point of causing an annoying
whistle at the output of the microphone. Yet, the Nunley Article expressly anticipates
using its "programmable digital processor" (programmable delay line filter) to eliminate
acoustic feedback (emphasis added):

12

PUBLIC VERSION

Formatted: Centered

The advantages of a digital hearing aid become more apparent with the understanding of what the microprocessor can potentially perform:

1. Imagine a hearing aid *free from feedback*. The digital hearing aid of the future will have this freedom.

60.    While the Nunley Article did not explicitly explain how to eliminate acoustic feedback in a digital hearing aid, REDACTED

REDACTED

REDACTED                    Specifically, a 1982 seminal review article by Dr. Egolf, entitled "Review of the Acoustic Feedback Literature from a Control Systems Point of View," discloses a method of reducing the effect of acoustic feedback (*id.*).

61.    The particular method of the 1982 Egolf Article introduces a phase shift in the forward path of the hearing aid to establish a more beneficial operating condition (the "Phase Shifting" method). It would have been obvious to one of ordinary skill in the art to use the Nunley "programmable digital processor" to implement the phase shift of the 1982 Egolf Article and thereby achieve a digital hearing aid with improved acoustic feedback reduction as predicted by Nunley. REDACTED

REDACTED

62.                    REDACTED

REDACTED

13

PUBLIC VERSION

REDACTED

REDACTED

REDACTED

Other documents also confirm that consideration.

REDACTED

REDACTED

In the filed application, in spite of knowing that the Phase Shifting method was first suggested by the 1982 Egolf Article, Dr. Levitt proceeded to claim this idea as his own in his application claim 15 and his patented claim 9.

63.    Dr. Levitt's failure to cite to the USPTO the 1982 Egolf Article with its disclosure of the Phase Shifting method of reducing acoustic feedback was not an innocent oversight.

REDACTED

REDACTED

REDACTED    In other words, Dr. Levitt was

responsible for deciding what prior art should be disclosed and how the invention should

14

PUBLIC VERSION    ·······[ Formatted: Centered ]

be framed for the examiner within the context of the prior art. But he decided to frame his claimed invention within the context of methods for reducing acoustic feedback that were plainly less relevant and effective than the Phase Shifting method of Egolf of which he was well aware.

64.    Dr. Levitt cannot claim that he forgot about the Egolf work when applying for his patent application. That Dr. Levitt fully appreciated the significance of the Egolf Phase Shifting method is evidenced                    REDACTED

                    REDACTED

    REDACTED

                    REDACTED

        REDACTED

                    REDACTED

    65.

                    REDACTED

    REDACTED    In additional to filing a claim that covers that "ineffective"

method,                    REDACTED

                    REDACTED

                    REDACTED

PUBLIC VERSION

Formatted: Centered

REDACTED

REDACTED

66.

REDACTED

there is not a

scintilla of evidence that he or his co inventors involved in the Audimax project had

considered a filter in the feedback path as of this date. Moreover, this is the first reported

test after the first prototype was built and

REDACTED

REDACTED

REDACTED

REDACTED

67.     Dr. Levitt's attempt now to revise history to diminish the role of the Phase

Shifting in his own work highlights the fact his failure to cite the 1982 Egolf Article was

intentional.  By not disclosing the 1982 Egolf Article he could claim as his own the

subject matter of application claim 15 (that became issued claim 9), whereas the subject

matter of those claims is unpatentable in view of the withheld 1982 Egolf Article either

alone or in combination with the Nunley Article.  At the very least, the Nunley Article

and the Egolf 1982 Articles are prior art that would have been of interest to a reasonable

examiner, and their intentional withholding by Dr. Levitt was an act that justifies

rendering the resulting '850 patent unenforceable as a matter of equity.

PUBLIC VERSION

Formatted: Centered

**The Withheld "Nunley Article," alone or in combination with the 1985 Egolf Abstract and the 1984 VA Report, were material and non-cumulative Prior Art to at least Application Claims 19, 20, and 22 and to issued claims 13, 14, 16, and 19 of the '850 Patent**

68.    Application claims 19 and 20, and issued claims 13, 14, and 19 relate to the reduction of the effect of acoustic feedback with the filter being used in the feedback path.

69.    In particular, application claim 19, which issued as patent claim 13, requires:

> ... *inserting between the input and output of said transmission channel an electrical feedback path having a filter* therein programmed to equalize and reduce the effect of said acoustic feedback both in amplitude and phase on a signal in said transmission channel

Application claim 22, which issued as patent claim 16, requires:

> A method of *reducing feedback* in a hearing aid as described in claim 14 in which said *programmable filter is inserted in an electrical feedback loop* for said transmission channel.

Application claim 20, which issued as patent claim 14, requires:

> ... *inserting between the input and output of said transmission channel a programmable filter programmed to equalize and reduce the effect of said acoustic feedback* both in amplitude and phase on a signal in said transmission channel

Issued claim 19, which was added by Amendment of July 6, 1987, requires:

> ... a *programmable delay line filter interposed in a feedback path* between the input and output of said transmission channel, said programmable filter being programmed *to effect substantial reduction of acoustic feedback* from said receiver to said microphone

17

PUBLIC VERSION

Formatted: Centered

70.    In terms of implementation of those claims, the '850 patent teaches that an

electrical feedback path should be introduced that mimics in effect the characteristics of

the acoustic feedback path:

> Feedback cancellation is achieved in the hearing aid by first measuring the acoustic feed back in situ and then creating an electronic feedback path with identical amplitude and phase characteristics. The outputs of the two feedback paths are then subtracted, thereby canceling any feedback signals that might occur. ('850 Patent, 9:12-17).

71.    This method of reducing the effect of acoustic feedback is herein called

the "Mimic and Subtract" method because the electrical feedback path in effect "mimics"

the acoustic feedback path and the resultant signal is "subtracted" from the signal with

the effect of the acoustic feedback to reduce that effect. That Dr. Levitt intended to claim

the Mimic and Subtract method as his own (along with the Phase Shifting Method) can

again be seen                              REDACTED

REDACTED    The second of the three techniques to be claimed is the Mimic and Subtract

method:

> [A] second, electrical feedback path is now introduced. This feedback path contains a second programmable filter which is programmed to provide feedback equal and opposite to that provided by the acoustic feedback path.

72.    The "Mimic and Subtract" method described in the '850 patent, although

purportedly originating with Dr. Levitt and his co-inventors, had in fact already been

published, as Dr. Levitt well new. In an abstract in the Spring 1985 Supplement of the

Journal of the Acoustic Society of America, Dr. Levitt already reported use of the Mimic

and Subtract method ("1985 Egolf Abstract," Levitt Exhibit 115):

> VV5. Electronic cancellation of acoustic feedback to increase hearing-aid stability. . . .

18

PUBLIC VERSION                    Formatted: Centered

The acoustic feedback which causes a hearing aid to become unstable at high gains is effectively reduced by the addition of negative electrical feedback. . . .

The 1985 Egolf Abstract was a summary of a talk Dr. Egolf and Mr. Weaver were to give on April 12, 1985. The 1985 Egolf Abstract is material prior art because it reports that an "estimator" forms the electrical feedback path. Combined with the Nunley Article, it was obvious that this "estimator" could take the form of a programmable delay line filter.

73.                    REDACTED

REDACTED        This claim is not credible.    REDACTED

REDACTED

REDACTED        The 1985 Egolf Abstract surely was of interest to him because it reported on work solving the very problem he was addressing, cancellation of acoustic feedback.

74.    Most telling, however, is contemporaneous written evidence found in Dr. Levitt's possession. In particular, in 1985, Dr. Egolf and Mr. Weaver prepared a typed version of their abstract with contact information not included in the public version, which they sent to the Journal prior to the April 1985 presentation for purposes of allowing the Acoustic Society to contact them with notice of acceptance or rejection of the proposed presentation. This copy was private and never distributed to the public. (Weaver, 25 Aug 07, 70:11-73:2)    REDACTED

REDACTED

REDACTED

75.    Interestingly,

REDACTED                    the earliest

19

PUBLIC VERSION

Formatted: Centered

documentary evidence produced by plaintiff or Dr. Levitt of any appreciation by Dr.

Levitt that acoustic feedback might be a problem in his Audimax work is dated a month

thereafter, May 15, 1985 (Dugot Exhibit 44);          REDACTED

                    REDACTED

                            REDACTED

     76.

     REDACTED
                         there was found in Dr. Levitt's garage a copy of the

Veterans Administration Rehabilitation R&D Progress Reports 1984 that includes

another reference to the Egolf and Weaver work (the "1984 VA Report") and that again

reports the use of the Mimic and Subtract method using an electrical feedback path to

cancel the effect of acoustic feedback:

> In the other system, called the active feedback cancellation
> (AFC) system, the microprocessor uses computed values of
> GH to create an estimator. The estimator causes the input
> informational signal (e.g., that containing information such
> as speech and not PRN) to react destructively with signals
> returning via the vent outlet, thereby cancelling the effect
> of the feedback path.

     77.     The 1984 VA Report was widely distributed in the fall of 1985, as

evidenced by the "Distribution/Circulation Policy" reported on page iii of the document

itself and the recollection of Dr. Larson (Larson, 30 Aug 07, 193:10-195:22).

Submissions for this Report were to be made to the VA Journal of Rehabilitation

Research and Development, the very journal for which Dr. Levitt was a member of the

Editorial Board at this very same time period. *See* Lev. Exhibit 101.          REDACTED

PUBLIC VERSION

Formatted: Centered

REDACTED

REDACTED is simply not credible that Dr. Levitt did not know of this publication.

78.  And again,                               REDACTED

REDACTED which was distributed in the fall of 1985, the earliest documentary evidence

produced by plaintiff or Dr. Levitt of any appreciation by Dr. Levitt that the acoustic

feedback path might be mimicked using a test signal as referenced in that Report is dated

late fall 1985 (ETG0020286, dated "11/12/85").        REDACTED

REDACTED

REDACTED

attempt to cover-up his failure to disclose the Egolf work to the USPTO simply highlights

the fact this failure to disclose was indeed intentional.

79.  Dr. Levitt's failure to call the Nunley Article to the attention of the

USPTO, either alone or in combination with Dr. Levitt's failure to call the 1985 Egolf

Abstract and the 1984 VA Report to the attention of the USPTO, was with the intent to

wrongly claim as his own the subject matter of application claims 19 and 20, and issued

claims 13, 14, and 19, whereas that subject matter is unpatentable in view of the withheld

Nunley Article alone or in combination with the undisclosed 1985 Egolf Abstract and

1984 VA Report.  At the very least, the Nunley Article is prior art, alone or in

combination with the undisclosed 1985 Egolf Abstract and 1984 VA Report, and would

---

[1] In addition, Defendants have been permitted additional discovery to establish the distribution and location of the 1984 VA Report in the fall of 1985 and fully expect to establish additional admissible evidence to this effect.

PUBLIC VERSION

Formatted: Centered

have been of interest to a reasonable examiner. Its intentional withholding by Dr. Levitt

was an act that justifies rendering at least the resulting '850 patent unenforceable as a

matter of equity.

80.     Moreover, there is a direct relationship between the claims of the '749

patent and the withheld 1984 VA Report given that these claims are all directed, at least

in part, to apparatus that uses a test signal of the type reported in the undisclosed 1984

VA Report.

**The Intentionally Withheld "Zeta Noise Blocker" Information, Described Below, Was Material And Non-Cumulative To At Least Application Claims 8-11 And To Issued Claim 5 Of The '850 Patent**

81.     Application claim 8 was directed toward the generic idea of changing the

characteristics of the hearing aid as the characteristic of the sound being heard changes.

Specifically, application claim 8 claimed:

> A hearing aid comprising at least one input microphone, as
> an output receiver, and a transmission channel interposed
> between said microphone and receiver, *means controllable*
> to impart different response characteristics to said hearing
> aid, and *means* responsive to a characteristic of the signal
> in said transmission channel *for* automatically *controlling*
> said controllable means to impart a selected one of said
> different response characteristics to said hearing aid.
> [emphasis added].

82.     This claim requires two element: one that is controlled (the "means

controllable") and one that does the controlling (the "means...for...controlling").

83.     The Parties agree that the "means controllable" is a programmable filter,

REDACTED

although they disagree on the degree of structural detail required.

REDACTED

REDACTED                              las asserted that the "means controllable" element, as

22

Formatted: Centered

it appears in issued claim 5, covers any form of electronic device that can impart different

response characteristics. Dr. Levitt knew that the "Zeta Noise Blocker" was covered by a

claim of this scope, yet he failed to disclose this fact to the USPTO. The failure by Dr.

Levitt to disclose the "Zeta Noise Blocker," is inequitable and justifies a finding of

unenforceability for at least the '850 patent.

84.     Application claim 9, which depends from application claim 8, requires that

the hearing aid react to the loudness of the sound being heard:

> Application Claim 9. A hearing aid as described in claim 8
> in which said controlling means is responsive to the signal
> level on said transmission channel.

85.     The undisclosed Zeta Noise Blocker had this feature as well, which Dr.

Levittknew.

86.     Application claim 10 requires the hearing aid react to noise in the sound

being heard:

> Application Claim 10. A hearing aid as described in claim
> 8 in which said controlling means is responsive to noise in
> said transmission channel.

87.     The undisclosed Zeta Noise Blocker again had this feature, which Dr.

Levitt knew.

88.     Application claim 11 requires the hearing aid react to the level of speech

being in excess of the level of noise[2]:

> Application Claim 11. A hearing aid as described in claim
> 6 in which said controlling means is responsive to the level

---

[2] Defendants continue to assert this phase "speech signals . . . in excess of the level of
noise signals" is indefinite.

23

PUBLIC VERSION

········ Formatted: Centered

of speech signals in said transmission channel in excess of
the level of noise signals in said channel.

89.    Once again, the undisclosed Zeta Noise Blocker had this feature, which

Dr. Levitt knew.

90.    Issued Claim 5 of the '850 Patent is application claim 11 written in

dependant form and, thus, is directed to automatically controlling the response

characteristic of a hearing aid in response to detection of a level of speech in excess of a

level of noise in the transmission channel of the hearing aid, and to reduce the noise,

thereby allowing the speech to be better heard. Claim 5 reads as follows:

> A hearing aid comprising at least one input microphone, an
> output receiver, and a transmission channel interposed
> between said microphone and receiver, means controllable
> to impart different response characteristics to said hearing
> aid, and controlling means responsive to the level of speech
> signals in said transmission channel in excess of the level
> of noise signals in said channel for automatically
> controlling said controllable means to impart a selected
> one of said different response characteristics to said
> hearing aid.

91.    The "Zeta Noise Blocker," which employs the same subject matter of all

these claims, as asserted by ETG, is described in an article by Laszlo K. Stein et al.,

entitled "Listener-Assessed Intelligibility of a Hearing Aid Self-Adaptive Noise Filter,"

published in *Ear and Hearing*, Vol. 5, No. 4, 1984 (ETG002591-596) (the "Stein

Article"), as well as various U.S. patents to Dr. Daniel Graupe, and was incorporated into

a commercial chip called the "Zeta Noise Blocker" by Intellitech Corp. ("Intellitech"), all

prior to the alleged invention by Dr. Levitt and his co inventors. Dr. Levitt was aware of

all of this during the pendency of the '850 patent application, yet he never brought this

24

PUBLIC VERSION

Formatted: Centered

information to the attention of the USPTO, even though he had the key role in bringing the prior art to the attention of the patent office.

92.     The Stein Article describes a study conducted into improvements in speech intelligibility using a hearing aid with the Zeta Noise Blocker. The Stein Article describes that the hearing aid used a "Graupe-Causey Self-Adaptive Noise Filter," cites a Graupe '721 Patent as describing the filter, and goes on to describe the filter as differentiating between speech and noise, and automatically adapting and adjusting itself to a continually changing noise environment. (ETG002591.)

93.     The Graupe '721 Patent, U.S. Patent No. 4,025,721 issued in 1977 and, like the Stein Article, is prior art under 35 U.S.C. § 102(b). The Graupe '721 Patent stores a representation of the transmission channel signal at times when no speech is determined to be present, and in response to a subsequent detection of speech, compares the speech-plus-noise signal to the stored noise-only signal and uses the results of the comparison to adjust the response characteristics of the hearing aid, all as is done in the '850 Patent. The '721 Graupe Patent, which is referenced in the Stein Article, teaches each and every limitation of claim 5 of the '850 Patent.

94.                    REDACTED
                       REDACTED

REDACTED
                              the Stein Article documented the effectiveness of

the Zeta Noise Blocker.

95.                    REDACTED

REDACTED He was also a member of the Acoustic Society of America, whose members
                                                        REDACTED
received the publication in which the Stein Article appeared.

25

PUBLIC VERSION

Formatted: Centered

REDACTED

96. The Stein Article describes the Zeta Noise Blocker.    REDACTED

REDACTED

97. Dr. Levitt participated in the decision to purchase and test the Zeta Noise Blocker chip, and was fully aware of the Stein Article, the cited Graupe '721 Patent, and the Zeta Noise Blocker chip all prior to any conception of his alleged own Levitt noise blocker invention.    REDACTED

REDACTED

98. The similarity between the claimed Levitt noise limiter invention of claim 5 and the Intellitech Zeta Noise Blocker is not mere coincidence    REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

26

PUBLIC VERSION                              Formatted: Centered

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

99.                    REDACTED
REDACTED

100.    Nevertheless, before there was any written evidence of any new Levitt
noise blocker design, on October 25, 1985, Dr. Levitt and his team met personally with

27

PUBLIC VERSION

Formatted: Centered

Dr. Graupe, the inventor of the Zeta Noise Blocker chip, to discuss the operation of the

Zeta Noise Blocker chip. (ETG007464-466.)[3]  Dr. Graupe explained to Dr. Levitt how

the Zeta Noise Blocker chip worked.  By January 17, 1986, the Levitt team was still

using the Intellitech Zeta Noise Blocker, with an option to switch it in or out of the Levitt

control circuit.  (ETG002573.)  Even as of this late date, there is no evidence of any new

Levitt noise blocker design.

**Dr. Levitt Utilized the Zeta Noise Blocker**

     101.                 REDACTED

                    REDACTED

     102.     Dr. Levitt, rather than disclose the Zeta Noise Blocker to the USPTO in

the '850 patent application, instead disclosed the Fig. 2 circuit, which the inventors

adapted as their own.[4]                 REDACTED

REDACTED

'

---

[3] Once again, Dr. Levitt tried to diminish the effect of this meeting by     REDACTED
REDACTED

[4] As will be shown at trial, this bogus substitution for the Zeta Noise Block did not and
can not work as a noise reduction circuit.

PUBLIC VERSION

Formatted: Centered

REDACTED

REDACTED

**Dr. Levitt Omitted Disclosure of the Zeta Noise Blocker and Stein Article with Intent to Deceive the USPTO**

103.    In spite of the undisputed fact that Dr. Levitt knew about the prior art Intellitech Zeta Noise Blocker, when he explained the prior art in the patent application so that the Examiner could make a fair judgment whether what was shown in Figure 2 was novel and patentable over the prior art, he failed to make any mention of the Stein Article, Intellitech or the Intellitech Zeta Noise Blocker. Instead, he described the prior art as though the Intellitech Zeta Noise Blocker never existed. For example, in the "Background of the Invention" section, he opine that the prior art only uses "filtering techniques in which the frequency regions containing high noise levels are eliminated." ('850 Patent, 1:55-56.) He further stated that no prior art "affords a satisfactory solution for the problem of . . . changes in the optimum frequency-gain characteristic resulting in variations in the level of the speech signal reaching the hearing aid." (*Id.* at 2:4-9.)

104.    In contrast to Dr. Levitt's representations in the patent application, the Stein Article (known to Dr. Levitt) states:

> When both speech and noise are present in the same frequency range, the filter theoretically can only pass both speech and noise or reject both. In actuality, the filter alternates between passing and rejecting both speech and noise depending on the relative importance of the speech phoneme at that frequency range.

29

PUBLIC VERSION

Formatted: Centered

(ETG0002592.) The Stein Article also discloses:

> Essentially, self-adapting noise reduction filters, whether analog or digital, sample an incoming signal, identify the spectra of noise present, and automatically set filter parameters that approximate the inverse of the noise spectrum at any instant. Theoretically, a self adaptive filter system should improve both the intelligibility and quality of speech because the full frequency range is passed when noise is not present and the characteristics of the filter change selectively and automatically with changes in the spectrum of the noise.

(ETG0002591.) This is exactly what Levitt claims to be his invention:

> Each of the sixty-four possible combinations of the 6 bit binary words identifies a different frequency response for the programmable filter, and a corresponding set of coefficients stored in the RAM 77 is selected, thereby automatically adjusting the hearing aid to the optimum set of parameter values as the speech level and type of background noise change.

('850 Patent, 6:46-54.)

105. In view of the foregoing, it is apparent that the Examiner was deprived of a fair examination of claim 5 of the '850 Patent because he was deliberately never told about the Zeta Noise Blocker, the Stein Article, or the Graupe '721 Patent. This prior art is more relevant to claim 5 than any prior art that the Examiner had before him during the examination process and, thus, material and noncumulative. Dr. Levitt withheld—with an intent to deceive—the Stein Article and any mention of the Zeta Noise Blocker from the Examiner. Thus, the '850 Patent is unenforceable as a result of inequitable conduct. Similarly, the '749 Patent issued from a divisional application from the application that ultimately became the '850 Patent and, thus, is likewise unenforceable due to inequitable conduct.

30

PUBLIC VERSION

Formatted: Centered

## COUNTERCLAIMS

Deleted: 43

106.    Defendant/Counterplaintiff Widex A/S is a Danish corporation having a

Deleted: Co, Inc.

place of business at Ny Vestergaardsvej 25, 3500 Vaerloese, Denmark.

### FIRST COUNTERCLAIM
(Declaratory Judgment of Non-Infringement – '850)

Deleted: 44

107.    Jurisdiction of this Counterclaim arises under the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions

relating to patents, 28 U.S.C. § 1338(a). There is a justiciable controversy between

Plaintiff and Defendant/Counterplaintiff concerning Defendant's/Counterplaintiff's

liability for infringement of the '850 patent as evidenced by the Complaint and Amended

Complaint filed in this suit.

Deleted: 45

108.    Venue and personal jurisdiction are proper in this District.

Deleted: 46

109.    Defendant/Counterplaintiff reallege and incorporate by reference the

Deleted: 43.

allegations set forth in Paragraph 106.

Deleted: 47

110.    Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. §2201, for

declaratory judgment that they do not infringe the '850 patent.

### SECOND COUNTERCLAIM
(Declaratory Judgment of Non-Infringement – '749)

Deleted: 48

111.    Jurisdiction of this Counterclaim arises under the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions

31

PUBLIC VERSION

Formatted: Centered

relating to patents, 28 U.S.C. § 1338(a).  There is a justiciable controversy between

Plaintiff and Defendant/Counterplaintiff concerning Defendant's/Counterplaintiff's

liability for infringement of the '749 patent as evidenced by the Complaint and Amended

Complaint filed in this suit.

Deleted: 49

112.  Venue and personal jurisdiction are proper in this District.

Deleted: 50

113.  Defendant/Counterplaintiff reallege and incorporate by reference the

Deleted: Paragraph 43.

allegations set forth in Paragraphs 106 through 110.

Deleted: 51

114.  Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. §2201, for

declaratory judgment that they do not infringe the '749 patent.

## THIRD COUNTERCLAIM
### (Declaratory Judgment of Invalidity - '850)

Deleted: 52

Formatted: Line spacing: Double

115.  Jurisdiction of this Counterclaim arises under the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions

relating to patents, 28 U.S.C. § 1338(a).  There is a justiciable controversy between

Plaintiff and Defendant/Counterplaintiff concerning the validity, enforceability and scope

of the '850 patent as evidenced by the Complaint and Amended Complaint filed in this

suit.

Deleted: 53

116.  Venue and personal jurisdiction are proper in this District.

Deleted: 54

117.  Defendant/Counterplaintiff reallege and incorporate by reference the

Deleted: Paragraph 43.

allegations set forth in Paragraphs 106 through 114.

32

PUBLIC VERSION

118.    Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. § 2201, for

declaratory judgment that the '850 patent is invalid under sections 101, 102, 103, 112,

115 and 116 of the Patent Act.

## FOURTH COUNTERCLAIM
### (Declaratory Judgment of Invalidity - '749)

119.    Jurisdiction of this Counterclaim arises under the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions

relating to patents, 28 U.S.C. § 1338(a).  There is a justiciable controversy between

Plaintiff and Defendant/Counterplaintiff concerning the validity, enforceability and scope

of the '749 patent as evidenced by the Complaint and Amended Complaint filed in this

suit.

120.    Venue and personal jurisdiction are proper in this District.

121.    Defendant/Counterplaintiff reallege and incorporate by reference the

allegations set forth in Paragraphs 106 through 118.

122.    Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. § 2201, for

declaratory judgment that the '749 patent is invalid under sections 101, 102, 103, 112,

115 and 116 of the Patent Act.

## FIFTH COUNTERCLAIM
### (Declaratory Judgment of Unenforceability - '850)

123.    Widex A/S incorporates by reference the allegations contained in

Paragraphs 106 through 122 of the Counterclaim, as if fully set forth herein.

33

Formatted: Centered

Deleted: 55

Deleted: 56

Formatted: Line spacing: Double

Deleted: 57

Deleted: 58

Deleted: 43.

Deleted: 59

PUBLIC VERSION

Formatted: Centered

124.   Claims of at least the '850 patent are enforceable due to inequitable conduct. Widex A/S incorporates by reference the allegations in Paragraphs 46 through 105 of their Sixth Affirmative Defense: Unenforceability of their Amended Answer to the Second Amended Complaint and Jury Demand of Plaintiff Energy Transportation Group, Inc., as if fully set forth herein.

Formatted: English (U.S.)
Formatted: Line spacing: 1.5 lines

## PRAYER FOR RELIEF

WHEREFORE, Defendant Widex A/S prays that this Court:

a)   Enter judgment that U.S. Patent No. 4,731,850 is invalid, void and unenforceable;

b)   Enter judgment that U.S. Patent No. 4,879,749 is invalid, void and unenforceable;

c)   Enter judgment that defendant has not infringed any claim of U.S. Patent No. 4,731,850;

d)   Enter judgment that defendant has not infringed any claim of U.S. Patent No. 4,879,749;

e)   Awarding defendant the costs of defending its suit and bringing its counterclaims, including reasonable attorneys' fees, as provided by law;

f)   Determine that plaintiff's conduct is such as to render this case exceptional within the meaning of 35 U.S.C. § 285; and

f)   Enter judgment for defendant for such other relief as this Court may deem just or proper.

PUBLIC VERSION                    Formatted: Centered

JURY DEMAND: Defendant requests a trial by jury on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL    Formatted Table

| | |
|---|---|
| | Donald E. Reid (#1058) |
| | 1201 N. Market Street |
| OF COUNSEL: | P.O. Box 1347 |
| | Wilmington, DE 19801 |
| SUGHRUE MION PLLC | (302) 575-7219 |
| William H. Mandir (*pro hac vice*) | Attorneys for Defendant |
| David J. Cushing (*pro hac vice*) | Widex A/S |
| Carl J. Pellegrini (*pro hac vice*) | |
| 2100 Pennsylvania Avenue, NW | |
| Washington, DC 20037 | |
| (202) 293-7600 | |

November ___, 2007                    Deleted: September 12, 2005

35

# EXHIBIT 5

PUBLIC VERSION

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

ENERGY TRANSPORTATION GROUP, )
INC.                         )
                             )
    Plaintiff,            )
                             )       C.A. NO. 05-422 (GMS)
    v.                    )
                             )
SONIC INNOVATIONS, INC., ET AL. )
                             )
    Defendants            )

### DEFENDANT WIDEX HEARING AID CO. INC.'S
### AMENDED ANSWER, DEFENSES AND COUNTERCLAIMS

Defendant Widex Hearing Aid Co. ("Widex Hearing Aid"), by and through its

attorneys, answers the Second Amended Complaint as follows:

1.    Widex Hearing Aid admits that plaintiff has made a complaint against

Widex Hearing Aid and has demanded a jury trial. Widex Hearing Aid is without

knowledge or information sufficient to admit or deny the remaining allegations of

Paragraph 1, and therefore denies the same.

### NATURE OF THE ACTION

2.    Widex Hearing Aid admits that this is an action for patent infringement

arising under the patent laws of the United States and that copies of the '850 and '749

patents were attached to the Amended Complaint. Widex Hearing Aid denies that it has

infringed any claims of the '850 and '749 patents, that plaintiff is entitled to enjoin

Widex Hearing Aid, and that plaintiff is entitled to any damages from Widex Hearing

1

PUBLIC VERSION

Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 2, and therefore denies the same.

3.    Widex Hearing Aid denies the allegations of Paragraph 3 with respect to Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 3, and therefore denies the same.

4.    Widex Hearing Aid denies the allegations of Paragraph 4 with respect to Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 4, and therefore denies the same.

5.    Widex Hearing Aid denies that it has disregarded plaintiff's property rights, that it is using plaintiff's patented technology, and that it is committing acts of infringement. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 5, and therefore denies the same.

## THE PARTIES

6.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 6, and therefore denies the same.

7.    Widex Hearing Aid admits that the '850 Patent issued on March 15, 1988 and that the '749 patent issued on November 7, 1989, each showing Harry Levitt, Richard S. Dugot and Kenneth W. Kopper as named inventors. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 7, and therefore denies the same.

8.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 8, and therefore denies the same.

2

PUBLIC VERSION

9.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 9, and therefore denies the same.

10.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 10, and therefore denies the same.

11.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 11, and therefore denies the same.

12.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 12, and therefore denies the same.

13.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 13, and therefore denies the same.

14.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 14, and therefore denies the same.

15.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 15, and therefore denies the same.

16.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 16, and therefore denies the same.

17.    Widex Hearing Aid admits the allegations of Paragraph 17.

18.    Widex Hearing Aid admits the allegations of Paragraph 18.

19.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 19, and therefore denies the same.

20.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 20, and therefore denies the same.

3

PUBLIC VERSION

21.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 21, and therefore denies the same.

22.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 22, and therefore denies the same.

23.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 23, and therefore denies the same.

24.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 24, and therefore denies the same.

25.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 25, and therefore denies the same.

26.    Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 26, and therefore denies the same.

## JURISDICTION AND VENUE

27.    Widex Hearing Aid admits that this court has subject matter jurisdiction and personal jurisdiction over Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 27, and therefore denies the same.

28.    Widex Hearing Aid admits that venue is proper in this district for Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 28, and therefore denies the same.

PUBLIC VERSION

### COUNT I
### (Patent Infringement of United States Patent No. 4,731,850)

29.    Widex Hearing Aid incorporates by reference its answer to Paragraphs 1-28 above.

30.    Widex Hearing Aid denies the allegations of Paragraph 30 with respect to Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 30, and therefore denies the same.

31.    Widex Hearing Aid denies the allegations of Paragraph 31 with respect to Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 31, and therefore denies the same.

32.    Widex Hearing Aid denies the allegations of Paragraph 32 with respect to Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 32, and therefore denies the same.

### COUNT II
### (Willful Patent Infringement of United States Patent No. 4,731,850)

33.    Widex Hearing Aid incorporates by reference its answer to Paragraphs 1-32 above.

34.    Widex Hearing Aid denies the allegations of Paragraph 34 with respect to Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 34, and therefore denies the same.

### COUNT III
### (Patent Infringement of United States Patent No. 4,879,749)

5

PUBLIC VERSION

35.     Widex Hearing Aid incorporates by reference its answer to Paragraphs 1-
34 above.

36.     Widex Hearing Aid denies the allegations of Paragraph 36 with respect to
Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient
to admit or deny the remaining allegations of Paragraph 36, and therefore denies the same.

37.     Widex Hearing Aid denies the allegations of Paragraph 37 with respect to
Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient
to admit or deny the remaining allegations of Paragraph 37, and therefore denies the same.

38.     Widex Hearing Aid denies the allegations of Paragraph 38 with respect to
Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient
to admit or deny the remaining allegations of Paragraph 38, and therefore denies the same.

## COUNT IV
### (Willful Patent Infringement of United States Patent No. 4,879,749)

39.     Widex Hearing Aid incorporates by reference its answer to Paragraphs 1-
38 above.

40.     Widex Hearing Aid denies the allegations of Paragraph 40 with respect to
Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient
to admit or deny the remaining allegations of Paragraph 40, and therefore denies the same.

6

PUBLIC VERSION

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
### (Invalidity of the '850 Patent)

41.    The claims of the '850 patent are invalid on one or more grounds specified

in 35 U.S.C. §§ 101, 102, 103 and 112.

### SECOND AFFIRMATIVE DEFENSE
### (Invalidity of the '749 Patent)

42.    The claims of the '749 patent are invalid on one or more grounds specified

in 35 U.S.C. §§ 101, 102, 103 and 112.

.

### THIRD AFFIRMATIVE DEFENSE
### (Non-infringement of the '850 Patent)

43.    Widex Hearing Aid has not, and is not, infringing any of the claims of the

'850 patent.

### FOURTH AFFIRMATIVE DEFENSE
### (Non-infringement of the '749 Patent)

44.    Widex Hearing Aid has not, and is not, infringing any of the claims of the

'749 patent.

7

PUBLIC VERSION

## FIFTH AFFIRMATIVE DEFENSE
### (Laches)

45.    ETG's claims are barred by the defense of laches.

## SIXTH AFFIRMATIVE DEFENSE
### (Unenforceability)

46.    During the prosecution of the patent applications that resulted in the '850 Patent, lead inventor Dr. Harry Levitt, in violation of his duty of candor, withheld from the patent examiners of the United States Patent and Trademark Office ("USPTO") handling these applications, information that was material to the patentability of the claims in these applications. On information and belief, Dr. Levitt withheld that information with intent to deceive. As a consequence, at least the '850 Patent should be found to be unenforceable.

47.    Dr. Levitt signed an initial "Combined Declarations and Power of Attorney" ("Levitt Declaration") declaring to the USPTO that he understood the claims in the application as filed and that he, and two other named inventors, were the original and true inventors of the inventions defined by those claims. Dr. Levitt knew, however, contrary to this declaration, that the three were not and could not possibly have been the inventors of at least application claims 1, 2, 8-11, 15, 16, 19, 20, and 22 and issued claims 5, 9, 13, 14, 16, and 19 of the '850 Patent.

48.    As explained in more detail below, Dr. Levitt, at the time the '850 Patent application was being prepared, knew of material prior art that rendered those claims invalid, or at the very least, was material to their patentability, and he knew that this prior

8

PUBLIC VERSION

art was not disclosed in the application because he was responsible for supplying the prior art background in the application.

49.    Dr. Levitt consulted for Audimax, ETG's predecessor, beginning in 1984.
REDACTED

REDACTED                              During that time, Dr.

Levitt was actively following what others, including Nunley, Egolf, and Graupe, were doing and had written in the field, as a well-known member of review and editorial panels and as professor of audiology at City College of New York ("CUNY").

50.    Dr. Levitt appreciated the significance that knowledge of this work and writings by others work would have, if disclosed to the USPTO, in undermining the patent rights he was claiming. Yet he did not disclose that information when framing the claimed invention in the context of what he represented to the USPTO was the prior art. Dr. Levitt was the one to select the prior art to be disclosed to the USPTO and his failure to fully and fairly disclose the prior art information known to him was knowingly done with the intent to deceive.

**The "Nunley Article" which Levitt withheld, alone and in combination with the "1982 Egolf Article" which he also withheld, was material and non-cumulative Prior Art to Application to at least Claims 1, 2, and 15 and to issued claim 9 of the '850 Patent**

51.    Application claim 1 that Dr. Levitt and his co inventors approved and filed in their patent application recited very generally a hearing aid with a "programmable delay line filter" programmed to help the user hear better (emphasis added):

> *Application Claim 1.* A hearing aid comprising at least one input microphone, an output receiver, and a signal transmission channel interposed between said microphone and said receiver in which the improvement comprises *a programmable delay line filter interposed between the input and output of said transmission*

9

PUBLIC VERSION

> *channel, said filter being programmed to impart to the hearing aid*
> *at least one response characteristic effective to compensate for the*
> *impaired hearing* of the wearer of the aid.

52.    Dr. Levitt's understanding of his claim to a "programmable delay line filter" when approving and filing his patent application cannot be disputed. Plaintiff has asserted, and this Court has agreed, that one of ordinary skill at the time the '850 patent application was filed, including Dr. Levitt, would have understood that "programmable delay line filter" meant "a filter that operates on time-delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighted samples." Markman Order of August 17, 2007.

53.    This claimed idea of a programmable delay line filter in a digital hearing aid, however, did not originate with Dr. Levitt and his co-inventors. Dr. Levitt is alleged to be "the Father of the digital hearing aid," not based on his 1984-86 work with Audimax, but based on his prior work at CUNY,              REDACTED

REDACTED

54.    The pre-1984 CUNY work, however, was of large scale, the size of a wheel barrow. The '850 Patent was Dr. Levitt's so-called improved version---a wearable digital hearing aid. Dr. Levitt, in making this claim to the USPTO, failed to inform the Patent Office examiners about an article by James Nunley in the October 1983 Hearing Journal, entitled "A Wearable Digital Hearing Aid (the "Nunley Article," Exhibits 108 and 109). The Nunley Article disclosed a "programmable digital processor" (Figure 2 of the Nunley Article) and reported that concept (emphasis added):

10

PUBLIC VERSION

This digital signal representation [in the Nunley hearing aid] is operated on by *adding and subtracting weighted versions of past and present inputs to emphasize or de-emphasize various aspects of the signal. By adjusting these weighting factors, the action of the hearing aid may be "personalized"* for its recipient.

55.                                    REDACTED

REDACTED

56.     In not telling the USPTO of the Nunley work on a wearing digital hearing aid with the very programmable delay line filter Dr. Levitt claimed as his own, Dr. Levitt intended to obtain patent rights to the subject matter of application claim 1, whereas that subject matter is unpatentable in view of the withheld Nunley Article and the Nunley hearing aid. At the very least, the Nunley Article and the Nunley hearing aid is prior art that would have been of interest to a reasonable examiner, and its intentional withholding by Dr. Levitt was an act that justifies rendering the resulting '850 patent and its related '749 patent unenforceable as a matter of equity.

57.     Rights to other dependent claims were also sought by Dr. Levitt when he knew that the Nunley prior art that he was not disclosing rendered those claims invalid or, at the least, made the patentability of those claims questionable. Not only did the Nunley Article disclose the general feature of a programmable delay line filter as claimed in application claim 1, but it further disclosed specific details Dr. Levitt claimed in dependent claims 2 and 15, which depended from application claim 1. Specifically,

11

PUBLIC VERSION

claim 2, which depended from claim 1 of the filed application, required that the
programmable delay line filter be placed in the "forward path" of the hearing aid
(emphasis added):

> Application Claim 2. A hearing aid as described in claim 1
> in which said programmable delay line filter is *interposed
> in a forward path* through said transmission channel.

Yet, Figure 2 of the Nunley Article shows the Nunley "programmable digital processor"
(i.e. its programmable delay line filter) located in the forward path of the Nunley hearing
aid, exactly as is required by application claim 2.

58.    Dr. Levitt's failure to call the Nunley work, including Figure 2 of the
Nunley Article with its programmable delay line filter in the forward path, to the
attention of the USPTO was intentional so that he and is named "co-inventors" could
claim as their own the subject matter of application claim 2. In fact, the subject matter of
claim 2 describes Nunley's work and is unpatentable in view of the withheld Nunley
Article and the Nunley hearing aid. At the very least, the Nunley Article and Nunley
hearing aid is prior art that would have been of interest to a reasonable examiner, and its
intentional withholding by Dr. Levitt was an act that justifies rendering at least the
resulting '850 patent unenforceable as a matter of equity.

59.    Similarly, application claim 15, which depended from application claim 2,
required that the filter be programmed to effect the "reduction of acoustic feedback"
(emphasis added):

> Application Claim 15. A hearing aid as described in claim
> 2 in which said programmable filter is programmed *to
> effect substantial reduction of acoustic feedback* from said
> receiver to said microphone.

12

PUBLIC VERSION

Acoustic feedback occurs when sound travels from the output of the receiver back to the microphone over what is sometimes referred to the "acoustic feedback path." Under certain conditions, acoustic feedback can build to the point of causing an annoying whistle at the output of the microphone. Yet, the Nunley Article expressly anticipates using its "programmable digital processor" (programmable delay line filter) to eliminate acoustic feedback (emphasis added):

> The advantages of a digital hearing aid become more apparent with the understanding of what the *microprocessor can potentially perform*:
>
> 1. Imagine a hearing aid *free from feedback*. The digital hearing aid of the future will have this freedom.

60.        REDACTED

REDACTED

REDACTED                      Specifically, a 1982

seminal review article by Dr. Egolf, entitled "Review of the Acoustic Feedback Literature from a Control Systems Point of View," discloses a method of reducing the effect of acoustic feedback (*id.*).

61.    The particular method of the 1982 Egolf Article introduces a phase shift in the forward path of the hearing aid to establish a more beneficial operating condition (the "Phase Shifting" method). It would have been obvious to one of ordinary skill in the art to use the Nunley "programmable digital processor" to implement the phase shift of the 1982 Egolf Article and thereby achieve a digital hearing aid with improved acoustic feedback reduction as predicted by Nunley.        REDACTED

13

PUBLIC VERSION

REDACTED

62.                           REDACTED

REDACTED

REDACTED

REDACTED          Other documents also confirm that consideration.   REDACTED

REDACTED

REDACTED

In the filed application, in spite of knowing that the Phase Shifting method was first suggested by the 1982 Egolf Article, Dr. Levitt proceeded to claim this idea as his own in his application claim 15 and his patented claim 9.

63.     Dr. Levitt's failure to cite to the USPTO the 1982 Egolf Article with its disclosure of the Phase Shifting method of reducing acoustic feedback was not an innocent oversight.                     REDACTED

REDACTED

14

PUBLIC VERSION

REDACTED

REDACTED          In other words, Dr. Levitt was

responsible for deciding what prior art should be disclosed and how the invention should

be framed for the examiner within the context of the prior art. But he decided to frame

his claimed invention within the context of methods for reducing acoustic feedback that

were plainly less relevant and effective than the Phase Shifting method of Egolf of which

he was well aware.

64.    Dr. Levitt cannot claim that he forgot about the Egolf work when applying

for his patent application. That Dr. Levitt fully appreciated the significance of the Egolf

Phase Shifting method is evidenced by his citation of it in that time frame when it was

beneficial for him to do so. In particular,          REDACTED

REDACTED

REDACTED

REDACTED

65.                  REDACTED

REDACTED

15

PUBLIC VERSION

REDACTED

REDACTED

REDACTED

66.                              REDACTED

REDACTED

there is not a

scintilla of evidence that he or his co inventors involved in the Audimax project had

considered a filter in the feedback path as of this date. Moreover, this is the first reported

test after the first prototype was built and          REDACTED

REDACTED

REDACTED

REDACTED

67.      Dr. Levitt's attempt now to revise history to diminish the role of the Phase

Shifting in his own work highlights the fact his failure to cite the 1982 Egolf Article was

intentional. By not disclosing the 1982 Egolf Article he could claim as his own the

subject matter of application claim 15 (that became issued claim 9), whereas the subject

16

PUBLIC VERSION

matter of those claims is unpatentable in view of the withheld 1982 Egolf Article either alone or in combination with the Nunley Article. At the very least, the Nunley Article and the Egolf 1982 Articles are prior art that would have been of interest to a reasonable examiner, and their intentional withholding by Dr. Levitt was an act that justifies rendering at least the resulting '850 patent unenforceable as a matter of equity.

**The Withheld "Nunley Article," alone or in combination with the 1985 Egolf Abstract and the 1984 VA Report, were material and non-cumulative Prior Art to at least Application Claims 19, 20, and 22 and to issued claims 13, 14, 16, and 19 of the '850 Patent**

68.    Application claims 19 and 20, and issued claims 13, 14, and 19 relate to the reduction of the effect of acoustic feedback with the filter being used in the feedback path.

69.    In particular, application claim 19, which issued as patent claim 13, requires:

> . . . *inserting between the input and output of said transmission channel an electrical feedback path having a filter* therein programmed to equalize and reduce the effect of said acoustic feedback both in amplitude and phase on a signal in said transmission channel

Application claim 22, which issued as patent claim 16, requires:

> A method of *reducing feedback* in a hearing aid as described in claim 14 in which said *programmable filter is inserted in an electrical feedback loop* for said transmission channel.

Application claim 20, which issued as patent claim 14, requires:

> . . . *inserting between the input and output of said transmission channel a programmable filter programmed to equalize and reduce the effect of said acoustic feedback* both in amplitude and phase on a signal in said transmission channel

17

PUBLIC VERSION

Issued claim 19, which was added by Amendment of July 6, 1987, requires:

> . . . a *programmable delay line filter interposed in a feedback path* between the input and output of said transmission channel, said programmable filter being programmed *to effect substantial reduction of acoustic feedback* from said receiver to said microphone

70.    In terms of implementation of those claims, the '850 patent teaches that an electrical feedback path should be introduced that mimics in effect the characteristics of the acoustic feedback path:

> Feedback cancellation is achieved in the hearing aid by first measuring the acoustic feed back in situ and then creating an electronic feedback path with identical amplitude and phase characteristics. The outputs of the two feedback paths are then subtracted, thereby canceling any feedback signals that might occur. ('850 Patent, 9:12-17).

71.    This method of reducing the effect of acoustic feedback is herein called the "Mimic and Subtract" method because the electrical feedback path in effect "mimics" the acoustic feedback path and the resultant signal is "subtracted" from the signal with the effect of the acoustic feedback to reduce that effect. That Dr. Levitt intended to claim the Mimic and Subtract method as his own (along with the Phase Shifting Method) REDACTED
REDACTED

REDACTED The second of the three techniques to be claimed is the Mimic and Subtract method:

> [A] second, electrical feedback path is now introduced. This feedback path contains a second programmable filter which is programmed to provide feedback equal and opposite to that provided by the acoustic feedback path.

72.    The "Mimic and Subtract" method described in the '850 patent, although purportedly originating with Dr. Levitt and his co-inventors, had in fact already been

PUBLIC VERSION

published, as Dr. Levitt well new. In an abstract in the Spring 1985 Supplement of the

Journal of the Acoustic Society of America, Dr. Egolf already reported use of the Mimic

and Subtract method ("1985 Egolf Abstract," Levitt Exhibit 115):

> **VV5. Electronic cancellation of acoustic feedback to
> increase hearing-aid stability. . . .**
>
> The acoustic feedback which causes a hearing aid to
> become unstable at **high gains** is effectively reduced by the
> addition of negative electrical feedback. . . .

The 1985 Egolf Abstract was a summary of a talk Dr. Egolf and Mr. Weaver were to give

on April 12, 1985. The 1985 Egolf Abstract is material prior art because it reports that an

"estimator" forms the electrical feedback path. Combined with the Nunley Article, it was

obvious that this "estimator" could take the form of a programmable delay line filter.

73.                                     REDACTED

                                 REDACTED

                 REDACTED                    The 1985 Egolf Abstract surely was of

interest to him because it reported on work solving the very problem he was addressing,

cancellation of acoustic feedback.

74.    Most telling, however, is contemporaneous written evidence found in Dr.

Levitt's possession. In particular, in 1985, Dr. Egolf and Mr. Weaver prepared a typed

version of their abstract with contact information not included in the public version,

which they sent to the Journal prior to the April 1985 presentation for purposes of

allowing the Acoustic Society to contact them with notice of acceptance or rejection of

the proposed presentation. This copy was private and never distributed to the public.

19

PUBLIC VERSION

(Weaver, 25 Aug 07, 70:11-73:2)  But this private, typed version of the  1985 Egolf Abstract was found in Dr. Levitt's garage.       REDACTED

75.                              REDACTED

REDACTED                                    the earliest

documentary evidence produced by plaintiff or Dr. Levitt of any appreciation by Dr. Levitt that acoustic feedback might be a problem in his Audimax work is dated a month thereafter, May 15, 1985 (Dugot Exhibit 44);       REDACTED
REDACTED

76.                              REDACTED

REDACTED          there was found in Dr. Levitt's garage a copy of the Veterans Administration Rehabilitation R&D Progress Reports 1984 that includes another reference to the Egolf and Weaver work (the "1984 VA Report") and that again reports the use of the Mimic and Subtract method using an electrical feedback path to cancel the effect of acoustic feedback:

> In the other system, called the active feedback cancellation
> (AFC) system, the microprocessor uses computed values of
> GH to create an estimator. The estimator causes the input
> informational signal (e.g., that containing information such
> as speech and not PRN) to react destructively with signals
> returning via the vent outlet, thereby cancelling the effect
> of the feedback path.

77.    The 1984 VA Report was widely distributed in the fall of 1985, as evidenced by the "Distribution/Circulation Policy" reported on page iii of the document itself and the recollection of Dr. Larson ( Larson, 30 Aug 07, 193:10-195:22). Submissions for this Report were to be made to the VA Journal of Rehabilitation Research and Development, the very journal for which Dr. Levitt was a member of the

20

PUBLIC VERSION

Editorial Board at this very same time period. *See* Lev. Exhibit 101.    REDACTED

REDACTED

REDACTED

It is simply not credible that Dr. Levitt did not know of this publication.

78.                                     REDACTED

REDACTED

which was distributed in the fall of 1985, the earliest documentary evidence

produced by plaintiff or Dr. Levitt of any appreciation by Dr. Levitt that the acoustic

feedback path might be mimicked using a test signal as referenced in that Report is dated

late fall 1985 (ETG0020286, dated "11/12/85").              REDACTED

REDACTED

attempt to cover-up his failure to disclose the Egolf work to the USPTO simply highlights

the fact this failure to disclose was indeed intentional.

79.      Dr. Levitt's failure to call the Nunley Article to the attention of the

USPTO, either alone or in combination with Dr. Levitt's failure to call the 1985 Egolf

Abstract and the 1984 VA Report to the attention of the USPTO, was with the intent to

wrongly claim as his own the subject matter of application claims 19 and 20, and issued

claims 13, 14, and 19, whereas that subject matter is unpatentable in view of the withheld

Nunley Article alone or in combination with the undisclosed 1985 Egolf Abstract and

1984 VA Report. At the very least, the Nunley Article is prior art, alone or in

---

[1] In addition, Defendants have been permitted additional discovery to establish the distribution and location of the 1984 VA Report in the fall of 1985 and fully expect to establish additional admissible evidence to this effect.

21

PUBLIC VERSION

combination with the undisclosed 1985 Egolf Abstract and 1984 VA Report, and would have been of interest to a reasonable examiner. Its intentional withholding by Dr. Levitt was an act that justifies rendering the resulting '850 patent and its related '749 patent unenforceable as a matter of equity.

80.    Moreover, there is a direct relationship between the claims of the '749 patent and the withheld 1984 VA Report given that these claims are all directed, at least in part, to apparatus that uses a test signal of the type reported in the undisclosed 1984 VA Report.

**The Intentionally Withheld "Zeta Noise Blocker" Information, Described Below, was Material and non-cumulative to at Least Application Claims 8-11 and to issued claim 5 of the '850 Patent**

81.    Application claim 8 was directed toward the generic idea of changing the characteristics of the hearing aid as the characteristic of the sound being heard changes. Specifically, application claim 8 claimed:

> A hearing aid comprising at least one input microphone, as an output receiver, and a transmission channel interposed between said microphone and receiver, *means controllable* to impart different response characteristics to said hearing aid, and *means* responsive to a characteristic of the signal in said transmission channel *for* automatically *controlling* said controllable means to impart a selected one of said different response characteristics to said hearing aid. [emphasis added].

82.    This claim requires two element: one that is controlled (the "means controllable") and one that does the controlling (the "means...for...controlling").

83.    The Parties agree that the "means controllable" is a programmable filter, although they disagree on the degree of structural detail required. In any event, REDACTED

REDACTED

22

PUBLIC VERSION

REDACTED                    asserted that the "means controllable" element, as

it appears in issued claim 5, covers any form of electronic device that can impart different

response characteristics. Dr. Levitt knew that the "Zeta Noise Blocker" was covered by a

claim of this scope, yet he failed to disclose this fact to the USPTO. The failure by Dr.

Levitt to disclose the "Zeta Noise Blocker," is inequitable and justifies a finding of

unenforceability for at least the '850 patent.

84.     Application claim 9, which depends from application claim 8, requires that

the hearing aid react to the loudness of the sound being heard:

> Application Claim 9. A hearing aid as described in claim 8
> in which said controlling means is responsive to the signal
> level on said transmission channel.

85.     The undisclosed Zeta Noise Blocker had this feature as well, which Dr.

Levitt knew.

86.     Application claim 10 requires the hearing aid react to noise in the sound

being heard:

> Application Claim 10. A hearing aid as described in claim
> 8 in which said controlling means is responsive to noise in
> said transmission channel.

87.     The undisclosed Zeta Noise Blocker again had this feature, which Dr.

Levitt knew.

88.     Application claim 11 requires the hearing aid react to the level of speech

being in excess of the level of noise[2]:

---

[2] Defendants continue to assert this phase "speech signals . . . in excess of the level of
noise signals" is indefinite.

PUBLIC VERSION

> Application Claim 11. A hearing aid as described in claim
> 6 in which said controlling means is responsive to the level .
> of speech signals in said transmission channel in excess of
> the level of noise signals in said channel.

89.     Once again. the undisclosed Zeta Noise Blocker had this feature, which

Dr. Levitt (and Mr. Dugot) knew.

90.     Issued Claim 5 of the '850 Patent is application claim 11 written in

dependant form and, thus, is directed to automatically controlling the response

characteristic of a hearing aid in response to detection of a level of speech in excess of a

level of noise in the transmission channel of the hearing aid, and to reduce the noise,

thereby allowing the speech to be better heard. Claim 5 reads as follows:

> A hearing aid comprising at least one input microphone, an
> output receiver, and a transmission channel interposed
> between said microphone and receiver, means controllable
> to impart different response characteristics to said hearing
> aid, and controlling means responsive to the level of speech
> signals in said transmission channel in excess of the level
> of noise signals in said channel for automatically
> controlling said controllable means to impart a selected
> one of said different response characteristics to said
> hearing aid.

91.     The "Zeta Noise Blocker," which employs the same subject matter of all

these claims, as asserted by ETG, is described in an article by Laszlo K. Stein et al.,

entitled "Listener-Assessed Intelligibility of a Hearing Aid Self-Adaptive Noise Filter,"

published in *Ear and Hearing*, Vol. 5, No. 4, 1984 (ETG002591-596) (the "Stein

Article"), as well as various U.S. patents to Dr. Daniel Graupe, and was incorporated into

a commercial chip called the "Zeta Noise Blocker" by Intellitech Corp. ("Intellitech"), all

prior to the alleged invention by Dr. Levitt and his co inventors. Dr. Levitt was aware of

all of this during the pendency of the '850 patent application, yet he never brought this

24

PUBLIC VERSION

information to the attention of the USPTO, even though he had the key role in bringing the prior art to the attention of the patent office.

92.    The Stein Article describes a study conducted into improvements in speech intelligibility using a hearing aid with the Zeta Noise Blocker. The Stein Article describes that the hearing aid used a "Graupe-Causey Self-Adaptive Noise Filter," cites a Graupe '721 Patent as describing the filter, and goes on to describe the filter as differentiating between speech and noise, and automatically adapting and adjusting itself to a continually changing noise environment. (ETG002591.)

93.    The Graupe '721 Patent, U.S. Patent No. 4,025,721 issued in 1977 and, like the Stein Article, is prior art under 35 U.S.C. § 102(b). The Graupe '721 Patent stores a representation of the transmission channel signal at times when no speech is determined to be present, and in response to a subsequent detection of speech, compares the speech-plus-noise signal to the stored noise-only signal and uses the results of the comparison to adjust the response characteristics of the hearing aid, all as is done in the '850 Patent. The '721 Graupe Patent, which is referenced in the Stein Article, teaches each and every limitation of claim 5 of the '850 Patent.

94.                          REDACTED

REDACTED

REDACTED                    documented the effectiveness of

the Zeta Noise Blocker.

95.                          REDACTED

REDACTED   He was also a member of the Acoustic Society of America, whose members received the publication in which the Stein Article appeared.        REDACTED

25

PUBLIC VERSION

REDACTED

96.    The Stein Article describes the Zeta Noise Blocker.    REDACTED

REDACTED

REDACTED

97.    Dr. Levitt participated in the decision to purchase and test the Zeta Noise
Blocker chip, and was fully aware of the Stein Article, the cited Graupe '721 Patent, and
the Zeta Noise Blocker chip all prior to any conception of his alleged own Levitt noise
blocker invention.    REDACTED

REDACTED

98.    The similarity between the claimed Levitt noise limiter invention of claim
REDACTED
5 and the Intellitech Zeta Noise Blocker is not mere coincidence.

REDACTED

REDACTED

REDACTED

REDACTED

26

PUBLIC VERSION

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

99.                                    REDACTED

REDACTED

100.    Nevertheless, before there was any written evidence of any new Levitt noise blocker design, on October 25, 1985, Dr. Levitt and his team met personally with

27

PUBLIC VERSION

Dr. Graupe, the inventor of the Zeta Noise Blocker chip, to discuss the operation of the Zeta Noise Blocker chip. (ETG007464-466.)[3] Dr. Graupe explained to Dr. Levitt how the Zeta Noise Blocker chip worked. By January 17, 1986, the Levitt team was still using the Intellitech Zeta Noise Blocker, with an option to switch it in or out of the Levitt control circuit. (ETG002573.) Even as of this late date, there is no evidence of any new Levitt noise blocker design.

**Dr. Levitt Utilized the Zeta Noise Blocker**

101.                            REDACTED

                               REDACTED

102.  Dr. Levitt, rather than disclose the Zeta Noise Blocker to the USPTO in the '850 patent application, instead disclosed the Fig. 2 circuit, which the inventors adapted as their own.[4]                REDACTED

REDACTED

---

[3] Once again, Dr. Levitt tried to diminish the effect of this meeting by    REDACTED
REDACTED

[4] As will be shown at trial, this bogus substitution for the Zeta Noise Block did not and can not work as a noise reduction circuit.

28

PUBLIC VERSION

REDACTED


REDACTED

## Dr. Levitt Omitted Disclosure of the Zeta Noise Blocker and Stein Article with Intent to Deceive the USPTO

103.    In spite of the undisputed fact that Dr. Levitt knew about the prior art Intellitech Zeta Noise Blocker, when he explained the prior art in the patent application so that the Examiner could make a fair judgment whether what was shown in Figure 2 was novel and patentable over the prior art, he failed to make any mention of the Stein Article, Intellitech or the Intellitech Zeta Noise Blocker. Instead, he described the prior art as though the Intellitech Zeta Noise Blocker never existed. For example, in the "Background of the Invention" section, he opine that the prior art only uses "filtering techniques in which the frequency regions containing high noise levels are eliminated." ('850 Patent, 1:55-56.) He further stated that no prior art "affords a satisfactory solution for the problem of . . . changes in the optimum frequency-gain characteristic resulting in variations in the level of the speech signal reaching the hearing aid." (*Id.* at 2:4-9.)

104.    In contrast to Dr. Levitt's representations in the patent application, the Stein Article (known to Dr. Levitt) states:

> When both speech and noise are present in the same frequency range, the filter theoretically can only pass both speech and noise or reject both. In actuality, the filter alternates between passing and rejecting both speech and noise depending on the relative importance of the speech phoneme at that frequency range.

29

PUBLIC VERSION

(ETG0002592.) The Stein Article also discloses:

> Essentially, self-adapting noise reduction filters, whether
> analog or digital, sample an incoming signal, identify the
> spectra of noise present, and automatically set filter
> parameters that approximate the inverse of the noise
> spectrum at any instant. Theoretically, a self adaptive filter
> system should improve both the intelligibility and quality
> of speech because the full frequency range is passed when
> noise is not present and the characteristics of the filter
> change selectively and automatically with changes in the
> spectrum of the noise.

(ETG0002591.) This is exactly what Levitt claims to be his invention:

> Each of the sixty-four possible combinations of the 6 bit
> binary words identifies a different frequency response for
> the programmable filter, and a corresponding set of
> coefficients stored in the RAM 77 is selected, thereby
> automatically adjusting the hearing aid to the optimum set
> of parameter values as the speech level and type of
> background noise change.

('850 Patent, 6:46-54.)

105.    In view of the foregoing, it is apparent that the Examiner was deprived of

a fair examination of claim 5 of the '850 Patent because he was deliberately never told

about the Zeta Noise Blocker, the Stein Article, or the Graupe '721 Patent. This prior art

is more relevant to claim 5 than any prior art that the Examiner had before him during

the examination process and, thus, material and noncumulative. Dr. Levitt withheld—

with an intent to deceive—the Stein Article and any mention of the Zeta Noise Blocker

from the Examiner.  Thus, at least the '850 Patent is unenforceable as a result of

inequitable conduct.

30

PUBLIC VERSION

## COUNTERCLAIMS

106.    Defendant/Counterplaintiff Widex Hearing Aid Co. Inc. is a New York corporation having a place of business at 3553 24th Street, Long Island City, NY 11006.

### FIRST COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement – '850)

107.    Jurisdiction of this Counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions relating to patents, 28 U.S.C. § 1338(a).  There is a justiciable controversy between Plaintiff and Defendant/Counterplaintiff concerning Defendant's/Counterplaintiff's liability for infringement of the '850 patent as evidenced by the Complaint and Amended Complaint filed in this suit.

108.    Venue and personal jurisdiction are proper in this District.

109.    Defendant/Counterplaintiff reallege and incorporate by reference the allegations set forth in Paragraph 106.

110.    Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. §2201, for declaratory judgment that they do not infringe the '850 patent.

### SECOND COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement – '749)

111.    Jurisdiction of this Counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions relating to patents, 28 U.S.C. § 1338(a).  There is a justiciable controversy between

31

PUBLIC VERSION

Plaintiff and Defendant/Counterplaintiff concerning Defendant's/Counterplaintiff's liability for infringement of the '749 patent as evidenced by the Complaint and Amended Complaint filed in this suit.

112.   Venue and personal jurisdiction are proper in this District.

113.   Defendant/Counterplaintiff reallege and incorporate by reference the allegations set forth in Paragraphs 106 through 110.

114.   Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. §2201, for declaratory judgment that they do not infringe the '749 patent.

## THIRD COUNTERCLAIM
### (Declaratory Judgment of Invalidity - '850)

115.   Jurisdiction of this Counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions relating to patents, 28 U.S.C. § 1338(a). There is a justiciable controversy between Plaintiff and Defendant/Counterplaintiff concerning the validity, enforceability and scope of the '850 patent as evidenced by the Complaint and Amended Complaint filed in this suit.

116.   Venue and personal jurisdiction are proper in this District.

117.   Defendant/Counterplaintiff reallege and incorporate by reference the allegations set forth in Paragraphs 106 through 114.

32

PUBLIC VERSION

118.   Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. § 2201, for declaratory judgment that the '850 patent is invalid under sections 101, 102, 103, 112, 115 and 116 of the Patent Act.

## FOURTH COUNTERCLAIM
### (Declaratory Judgment of Invalidity - '749)

119.   Jurisdiction of this Counterclaim arises under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions relating to patents, 28 U.S.C. § 1338(a).  There is a justiciable controversy between Plaintiff and Defendant/Counterplaintiff concerning the validity, enforceability and scope of the '749 patent as evidenced by the Complaint and Amended Complaint filed in this suit.

120.   Venue and personal jurisdiction are proper in this District.

121.   Defendant/Counterplaintiff reallege and incorporate by reference the allegations set forth in Paragraphs 106 through 118.

122.   Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. § 2201, for declaratory judgment that the '749 patent is invalid under sections 101, 102, 103, 112, 115 and 116 of the Patent Act.

## FIFTH COUNTERCLAIM
### (Declaratory Judgment of Unenforceability - '850)

123.   Widex Hearing Aid incorporates by reference the allegations contained in Paragraphs 106 through 122 of the Counterclaim, as if fully set forth herein.

PUBLIC VERSION

124.   Claims of the '850 patent are enforceable due to inequitable conduct:
Widex Hearing Aid Co., Inc., incorporates by reference the allegations in Paragraphs 46
through 105 of their Sixth Affirmative Defense: Unenforceability of their Amended
Answer to the Second Amended Complaint and Jury Demand of Plaintiff Energy
Transportation Group, Inc., as if fully set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Widex Hearing Aid prays that this Court:

a)   Enter judgment that U.S. Patent No. 4,731,850 is invalid, void and
unenforceable;

b)   Enter judgment that U.S. Patent No. 4,879,749 is invalid, void and
unenforceable;

c)   Enter judgment that defendant has not infringed any claim of U.S. Patent
No. 4,731,850;

d)   Enter judgment that defendant has not infringed any claim of U.S. Patent
No. 4,879,749;

e)   Awarding defendant the costs of defending its suit and bringing its
counterclaims, including reasonable attorneys' fees, as provided by law;

f)   Determine that plaintiff's conduct is such as to render this case
exceptional within the meaning of 35 U.S.C. § 285; and

f)   Enter judgment for defendant for such other relief as this Court may deem
just or proper.

34

PUBLIC VERSION

.

JURY DEMAND: Defendant requests a trial by jury on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL

*/s/ Donald E. Reid*

_____

Donald E. Reid (#1058)
1201 N. Market Street
P.O. Box 1347
OF COUNSEL:                          Wilmington, DE 19801
                                     (302) 575-7219
SUGHRUE MION PLLC                     Attorneys for Defendant
William H. Mandir (*pro hac vice*)   Widex Hearing Aid Co. Inc.
David J. Cushing (*pro hac vice*)
Carl J. Pellegrini (*pro hac vice*)
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 293-7600

November 6, 2007

35