# EXHIBIT 6

PUBLIC VERSION

Formatted: Centered

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

ENERGY TRANSPORTATION GROUP, )
INC.                         )
                             )
        Plaintiff,         )
                             )    C.A. NO. 05-422 (GMS)
        v.                 )
                             )
SONIC INNOVATIONS, INC., ET AL. )
                             )
        Defendants          )

### DEFENDANT WIDEX HEARING AID CO. INC.'S
### AMENDED ANSWER, DEFENSES AND COUNTERCLAIMS

Defendant Widex Hearing Aid Co. ("Widex Hearing Aid"), by and through its

attorneys, answers the Second Amended Complaint as follows:

    1.    Widex Hearing Aid admits that plaintiff has made a complaint against

Widex Hearing Aid and has demanded a jury trial. Widex Hearing Aid is without

knowledge or information sufficient to admit or deny the remaining allegations of

Paragraph 1, and therefore denies the same.

### NATURE OF THE ACTION

    2.    Widex Hearing Aid admits that this is an action for patent infringement

arising under the patent laws of the United States and that copies of the '850 and '749

patents were attached to the Amended Complaint. Widex Hearing Aid denies that it has

infringed any claims of the '850 and '749 patents, that plaintiff is entitled to enjoin

Widex Hearing Aid, and that plaintiff is entitled to any damages from Widex Hearing

PUBLIC VERSION

Formatted: Centered

Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny
the remaining allegations of Paragraph 2, and therefore denies the same.

3.    Widex Hearing Aid denies the allegations of Paragraph 3 with respect to
Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient
to admit or deny the remaining allegations of Paragraph 3, and therefore denies the same.

4.    Widex Hearing Aid denies the allegations of Paragraph 4 with respect to
Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient
to admit or deny the remaining allegations of Paragraph 4, and therefore denies the same.

5.    Widex Hearing Aid denies that it has disregarded plaintiff's property
rights, that it is using plaintiff's patented technology, and that it is committing acts of
infringement. Widex Hearing Aid is without knowledge or information sufficient to
admit or deny the remaining allegations of Paragraph 5, and therefore denies the same.

## THE PARTIES

6.    Widex Hearing Aid is without knowledge or information sufficient to
admit or deny the allegations of Paragraph 6, and therefore denies the same.

7.    Widex Hearing Aid admits that the '850 Patent issued on March 15, 1988
and that the '749 patent issued on November 7, 1989, each showing Harry Levitt,
Richard S. Dugot and Kenneth W. Kopper as named inventors. Widex Hearing Aid is
without knowledge or information sufficient to admit or deny the remaining allegations
of Paragraph 7, and therefore denies the same.

8.    Widex Hearing Aid is without knowledge or information sufficient to
admit or deny the allegations of Paragraph 8, and therefore denies the same.

2

PUBLIC VERSION

Formatted: Centered

9.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 9, and therefore denies the same.

10.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 10, and therefore denies the same.

11.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 11, and therefore denies the same.

12.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 12, and therefore denies the same.

13.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 13, and therefore denies the same.

14.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 14, and therefore denies the same.

15.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 15, and therefore denies the same.

16.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 16, and therefore denies the same.

17.     Widex Hearing Aid admits the allegations of Paragraph 17.

18.     Widex Hearing Aid admits the allegations of Paragraph 18.

19.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 19, and therefore denies the same.

20.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 20, and therefore denies the same.

3

PUBLIC VERSION

Formatted: Centered

21.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 21, and therefore denies the same.

22.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 22, and therefore denies the same.

23.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 23, and therefore denies the same.

24.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 24, and therefore denies the same.

25.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 25, and therefore denies the same.

26.     Widex Hearing Aid is without knowledge or information sufficient to admit or deny the allegations of Paragraph 26, and therefore denies the same.

## JURISDICTION AND VENUE

27.     Widex Hearing Aid admits that this court has subject matter jurisdiction and personal jurisdiction over Widex Hearing Aid.  Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 27, and therefore denies the same.

28.     Widex Hearing Aid admits that venue is proper in this district for Widex Hearing Aid.  Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 28, and therefore denies the same.

4

PUBLIC VERSION

Formatted: Centered

### COUNT I
(Patent Infringement of United States Patent No. 4,731,850)

29.    Widex Hearing Aid incorporates by reference its answer to Paragraphs 1-28 above.

30.    Widex Hearing Aid denies the allegations of Paragraph 30 with respect to Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 30, and therefore denies the same.

31.    Widex Hearing Aid denies the allegations of Paragraph 31 with respect to Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 31, and therefore denies the same.

32.    Widex Hearing Aid denies the allegations of Paragraph 32 with respect to Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 32, and therefore denies the same.

### COUNT II
(Willful Patent Infringement of United States Patent No. 4,731,850)

33.    Widex Hearing Aid incorporates by reference its answer to Paragraphs 1-32 above.

34.    Widex Hearing Aid denies the allegations of Paragraph 34 with respect to Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 34, and therefore denies the same.

### COUNT III
(Patent Infringement of United States Patent No. 4,879,749)

PUBLIC VERSION

Formatted: Centered

35.    Widex Hearing Aid incorporates by reference its answer to Paragraphs 1-34 above.

36.    Widex Hearing Aid denies the allegations of Paragraph 36 with respect to Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 36, and therefore denies the same.

37.    Widex Hearing Aid denies the allegations of Paragraph 37 with respect to Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 37, and therefore denies the same.

38.    Widex Hearing Aid denies the allegations of Paragraph 38 with respect to Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 38, and therefore denies the same.

## COUNT IV
### (Willful Patent Infringement of United States Patent No. 4,879,749)

39.    Widex Hearing Aid incorporates by reference its answer to Paragraphs 1-38 above.

40.    Widex Hearing Aid denies the allegations of Paragraph 40 with respect to Widex Hearing Aid. Widex Hearing Aid is without knowledge or information sufficient to admit or deny the remaining allegations of Paragraph 40, and therefore denies the same.

6

PUBLIC VERSION

Formatted: Centered

## AFFIRMATIVE DEFENSES

### FIRST AFFIRMATIVE DEFENSE
#### (Invalidity of the '850 Patent)

41.    The claims of the '850 patent are invalid on one or more grounds specified

in 35 U.S.C. §§ 101, 102, 103 and 112.

### SECOND AFFIRMATIVE DEFENSE
#### (Invalidity of the '749 Patent)

42.    The claims of the '749 patent are invalid on one or more grounds specified

in 35 U.S.C. §§ 101, 102, 103 and 112.

### THIRD AFFIRMATIVE DEFENSE
#### (Non-infringement of the '850 Patent)

43.    Widex Hearing Aid has not, and is not, infringing any of the claims of the

'850 patent.

### FOURTH AFFIRMATIVE DEFENSE
#### (Non-infringement of the '749 Patent)

44.    Widex Hearing Aid has not, and is not, infringing any of the claims of the

'749 patent.

7

PUBLIC VERSION

Formatted: Centered

## FIFTH AFFIRMATIVE DEFENSE
### (Laches)

45.    ETG's claims are barred by the defense of laches.

Formatted: Font: Not Bold

## SIXTH AFFIRMATIVE DEFENSE
### (Unenforceability)

46.    During the prosecution of the patent applications that resulted in the '850 Patent, lead inventor Dr. Harry Levitt, in violation of his duty of candor, withheld from the patent examiners of the United States Patent and Trademark Office ("USPTO") handling these applications, information that was material to the patentability of the claims in these applications. On information and belief, Dr. Levitt withheld that information with intent to deceive. As a consequence, at least the '850 Patent should be found to be unenforceable.

47.    Dr. Levitt signed an initial "Combined Declarations and Power of Attorney" ("Levitt Declaration") declaring to the USPTO that he understood the claims in the application as filed and that he, and two other named inventors, were the original and true inventors of the inventions defined by those claims. Dr. Levitt knew, however, contrary to this declaration, that the three were not and could not possibly have been the inventors of at least application claims 1, 2, 8-11, 15, 16, 19, 20, and 22 and issued claims 5, 9, 13, 14, 16, and 19 of the '850 Patent.

48.    As explained in more detail below, Dr. Levitt, at the time the '850 Patent application was being prepared, knew of material prior art that rendered those claims invalid, or at the very least, was material to their patentability, and he knew that this prior

8

PUBLIC VERSION

Formatted: Centered

art was not disclosed in the application because he was responsible for supplying the

prior art background in the application.

49.   Dr. Levitt consulted for Audimax, ETG's predecessor, beginning in 1984.
REDACTED

REDACTED                    During that time, Dr.

Levitt was actively following what others, including Nunley, Egolf, and Graupe, were

doing and had written in the field, as a well-known member of review and editorial

panels and as professor of audiology at City College of New York ("CUNY").

50.   Dr. Levitt appreciated the significance that knowledge of this work and

writings by others work would have, if disclosed to the USPTO, in undermining the

patent rights he was claiming.  Yet he did not disclose that information when framing the

claimed invention in the context of what he represented to the USPTO was the prior art.

Dr. Levitt was the one to select the prior art to be disclosed to the USPTO and his failure

to fully and fairly disclose the prior art information known to him was knowingly done

with the intent to deceive.

**The "Nunley Article" which Levitt withheld, alone and in combination with the "1982 Egolf Article" which he also withheld, was material and non-cumulative Prior Art to Application to at least Claims 1, 2, and 15 and to issued claim 9 of the '850 Patent**

51.   Application claim 1 that Dr. Levitt and his co inventors approved and filed

in their patent application recited very generally a hearing aid with a "programmable

delay line filter" programmed to help the user hear better (emphasis added):

> *Application Claim 1.* A hearing aid comprising at least one input
> microphone, an output receiver, and a signal transmission channel
> interposed between said microphone and said receiver in which the
> improvement comprises *a programmable delay line filter
> interposed between the input and output of said transmission*

9

PUBLIC VERSION

Formatted: Centered

> *channel, said filter being programmed to impart to the hearing aid*
> *at least one response characteristic effective to compensate for the*
> *impaired hearing* of the wearer of the aid.

52.    Dr. Levitt's understanding of his claim to a "programmable delay line

filter" when approving and filing his patent application cannot be disputed.  Plaintiff has

asserted, and this Court has agreed, that one of ordinary skill at the time the '850 patent

application was filed, including Dr. Levitt, would have understood that "programmable

delay line filter" meant "a filter that operates on time-delayed samples of an input by

multiplying each sample by a corresponding weighting coefficient and summing the

weighted samples." Markman Order of August 17, 2007.

53.                              REDACTED

                              REDACTED

54.    The pre-1984 CUNY work, however, was of large scale, the size of a

wheel barrow.  The '850 Patent was Dr. Levitt's so-called improved version---a wearable

digital hearing aid.  Dr. Levitt, in making this claim to the USPTO, failed to inform the

Patent Office examiners about an article by James Nunley in the October 1983 Hearing

Journal, entitled "A Wearable Digital Hearing Aid (the "Nunley Article," Exhibits 108

and 109).  The Nunley Article disclosed a "programmable digital processor" (Figure 2 of

the Nunley Article) and reported that concept (emphasis added):

10

PUBLIC VERSION

Formatted: Centered

> This digital signal representation [in the Nunley hearing aid] is operated on by *adding and subtracting weighted versions of past and present inputs to emphasize or de-emphasize various aspects of the signal. By adjusting these weighting factors, the action of the hearing aid may be "personalized"* for its recipient.

55.                    REDACTED

                       REDACTED

56.     In not telling the USPTO of the Nunley work on a wearing digital hearing aid with the very programmable delay line filter Dr. Levitt claimed as his own, Dr. Levitt intended to obtain patent rights to the subject matter of application claim 1, whereas that subject matter is unpatentable in view of the withheld Nunley Article and the Nunley hearing aid. At the very least, the Nunley Article and the Nunley hearing aid is prior art that would have been of interest to a reasonable examiner, and its intentional withholding by Dr. Levitt was an act that justifies rendering the resulting '850 patent and its related '749 patent unenforceable as a matter of equity.

57.     Rights to other dependent claims were also sought by Dr. Levitt when he knew that the Nunley prior art that he was not disclosing rendered those claims invalid or, at the least, made the patentability of those claims questionable. Not only did the Nunley Article disclose the general feature of a programmable delay line filter as claimed in application claim 1, but it further disclosed specific details Dr. Levitt claimed in dependent claims 2 and 15, which depended from application claim 1. Specifically,

11

PUBLIC VERSION

Formatted: Centered

claim 2, which depended from claim 1 of the filed application, required that the programmable delay line filter be placed in the "forward path" of the hearing aid (emphasis added):

> Application Claim 2. A hearing aid as described in claim 1 in which said programmable delay line filter is *interposed in a forward path* through said transmission channel.

Yet, Figure 2 of the Nunley Article shows the Nunley "programmable digital processor" (i.e. its programmable delay line filter) located in the forward path of the Nunley hearing aid, exactly as is required by application claim 2.

58.    Dr. Levitt's failure to call the Nunley work, including Figure 2 of the Nunley Article with its programmable delay line filter in the forward path, to the attention of the USPTO was intentional so that he and is named "co-inventors" could claim as their own the subject matter of application claim 2. In fact, the subject matter of claim 2 describes Nunley's work and is unpatentable in view of the withheld Nunley Article and the Nunley hearing aid. At the very least, the Nunley Article and Nunley hearing aid is prior art that would have been of interest to a reasonable examiner, and its intentional withholding by Dr. Levitt was an act that justifies rendering at least the resulting '850 patent unenforceable as a matter of equity.

59.    Similarly, application claim 15, which depended from application claim 2, required that the filter be programmed to effect the "reduction of acoustic feedback" (emphasis added):

> Application Claim 15. A hearing aid as described in claim 2 in which said programmable filter is programmed *to effect substantial reduction of acoustic feedback* from said receiver to said microphone.

12

PUBLIC VERSION

Formatted: Centered

Acoustic feedback occurs when sound travels from the output of the receiver back to the

microphone over what is sometimes referred to the "acoustic feedback path." Under

certain conditions, acoustic feedback can build to the point of causing an annoying

whistle at the output of the microphone. Yet, the Nunley Article expressly anticipates

using its "programmable digital processor" (programmable delay line filter) to eliminate

acoustic feedback (emphasis added):

> The advantages of a digital hearing aid become more
> apparent with the understanding of what the
> *microprocessor can potentially perform:*
>
> 1. Imagine a hearing aid *free from feedback.* The digital
> hearing aid of the future will have this freedom.

60.                              REDACTED

REDACTED

seminal review article by Dr. Egolf, entitled "Review of the Acoustic Feedback Literature

from a Control Systems Point of View," discloses a method of reducing the effect of

acoustic feedback *(id.).*

61.     The particular method of the 1982 Egolf Article introduces a phase shift in

the forward path of the hearing aid to establish a more beneficial operating condition (the

"Phase Shifting" method). It would have been obvious to one of ordinary skill in the art

to use the Nunley "programmable digital processor" to implement the phase shift of the

1982 Egolf Article and thereby achieve a digital hearing aid with improved acoustic

feedback reduction as predicted by Nunley.             REDACTED

13

PUBLIC VERSION

Formatted: Centered

REDACTED

62.                              REDACTED
                                 REDACTED




REDACTED

REDACTED




REDACTED

In the filed application, in spite of knowing that the Phase Shifting method was first suggested by the 1982 Egolf Article, Dr. Levitt proceeded to claim this idea as his own in his application claim 15 and his patented claim 9.

63.     Dr. Levitt's failure to cite to the USPTO the 1982 Egolf Article with its disclosure of the Phase Shifting method of reducing acoustic feedback was not an innocent oversight.                    REDACTED
                                 REDACTED

14

PUBLIC VERSION

Formatted: Centered

REDACTED

REDACTED    In other words, Dr. Levitt was

responsible for deciding what prior art should be disclosed and how the invention should

be framed for the examiner within the context of the prior art. But he decided to frame

his claimed invention within the context of methods for reducing acoustic feedback that

were plainly less relevant and effective than the Phase Shifting method of Egolf of which

he was well aware.

64.    Dr. Levitt cannot claim that he forgot about the Egolf work when applying

for his patent application. That Dr. Levitt fully appreciated the significance of the Egolf

Phase Shifting method is evidenced by his citation of it in that time frame when it was

beneficial for him to do so. In particular, Dr. Levitt.    REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

65.

REDACTED

15

PUBLIC VERSION

Formatted: Centered

effective is not credible. In additional to filing a claim that covers that "ineffective"

REDACTED

REDACTED

REDACTED

66.          REDACTED

REDACTED              there is not a

scintilla of evidence that he or his co inventors involved in the Audimax project had

considered a filter in the feedback path as of this date. Moreover, this is the first reported

test after the first prototype was built and          REDACTED

REDACTED

REDACTED

REDACTED

67.    Dr. Levitt's attempt now to revise history to diminish the role of the Phase

Shifting in his own work highlights the fact his failure to cite the 1982 Egolf Article was

intentional. By not disclosing the 1982 Egolf Article he could claim as his own the

subject matter of application claim 15 (that became issued claim 9), whereas the subject

16

PUBLIC VERSION

Formatted: Centered

matter of those claims is unpatentable in view of the withheld 1982 Egolf Article either

alone or in combination with the Nunley Article. At the very least, the Nunley Article

and the Egolf 1982 Articles are prior art that would have been of interest to a reasonable

examiner, and their intentional withholding by Dr. Levitt was an act that justifies

rendering at least the resulting '850 patent unenforceable as a matter of equity.

**The Withheld "Nunley Article," alone or in combination with the 1985 Egolf Abstract and the 1984 VA Report, were material and non-cumulative Prior Art to at least Application Claims 19, 20, and 22 and to issued claims 13, 14, 16, and 19 of the '850 Patent**

68.    Application claims 19 and 20, and issued claims 13, 14, and 19 relate to

the reduction of the effect of acoustic feedback with the filter being used in the feedback

path.

69.    In particular, application claim 19, which issued as patent claim 13,

requires:

> *... inserting between the input and output of said transmission channel an electrical feedback path having a filter therein programmed to equalize and reduce the effect of said acoustic feedback both in amplitude and phase on a signal in said transmission channel*

Application claim 22, which issued as patent claim 16, requires:

> A method of *reducing feedback* in a hearing aid as described in claim 14 in which said *programmable filter is inserted in an electrical feedback loop* for said transmission channel.

Application claim 20, which issued as patent claim 14, requires:

> *... inserting between the input and output of said transmission channel a programmable filter programmed to equalize and reduce the effect of said acoustic feedback both in amplitude and phase on a signal in said transmission channel*

17

PUBLIC VERSION

Formatted: Centered

Issued claim 19, which was added by Amendment of July 6, 1987, requires:

> ... a *programmable delay line filter interposed in a feedback path* between the input and output of said transmission channel, said programmable filter being programmed *to effect substantial reduction of acoustic feedback* from said receiver to said microphone

70.    In terms of implementation of those claims, the '850 patent teaches that an

electrical feedback path should be introduced that mimics in effect the characteristics of

the acoustic feedback path:

> Feedback cancellation is achieved in the hearing aid by first measuring the acoustic feed back in situ and then creating an electronic feedback path with identical amplitude and phase characteristics. The outputs of the two feedback paths are then subtracted, thereby canceling any feedback signals that might occur. ('850 Patent, 9:12-17).

71.    This method of reducing the effect of acoustic feedback is herein called

the "Mimic and Subtract" method because the electrical feedback path in effect "mimics"

the acoustic feedback path and the resultant signal is "subtracted" from the signal with

the effect of the acoustic feedback to reduce that effect. That Dr. Levitt intended to claim

the Mimic and Subtract method as his own    REDACTED

REDACTED

REDACTE The second of the three techniques to be claimed is the Mimic and Subtract

method:

> [A] second, electrical feedback path is now introduced. This feedback path contains a second programmable filter which is programmed to provide feedback equal and opposite to that provided by the acoustic feedback path.

72.    The "Mimic and Subtract" method described in the '850 patent, although

purportedly originating with Dr. Levitt and his co-inventors, had in fact already been

18

PUBLIC VERSION

Formatted: Centered

published, as Dr. Levitt well new. In an abstract in the Spring 1985 Supplement of the

Journal of the Acoustic Society of America, Dr. Egolf already reported use of the Mimic

and Subtract method ("1985 Egolf Abstract," Levitt Exhibit 115):

> **VV5. Electronic cancellation of acoustic feedback to
> increase hearing-aid stability. . . .**
>
> The acoustic feedback which causes a hearing aid to
> become unstable at high gains is effectively reduced by the
> addition of negative electrical feedback. . . .

The 1985 Egolf Abstract was a summary of a talk Dr. Egolf and Mr. Weaver were to give

on April 12, 1985. The 1985 Egolf Abstract is material prior art because it reports that an

"estimator" forms the electrical feedback path. Combined with the Nunley Article, it was

obvious that this "estimator" could take the form of a programmable delay line filter.

73.                                  REDACTED

REDACTED


REDACTED

REDACTED              The 1985 Egolf Abstract surely was of

interest to him because it reported on work solving the very problem he was addressing,

cancellation of acoustic feedback.

74.    Most telling, however, is contemporaneous written evidence found in Dr.

Levitt's possession. In particular, in 1985, Dr. Egolf and Mr. Weaver prepared a typed

version of their abstract with contact information not included in the public version,

which they sent to the Journal prior to the April 1985 presentation for purposes of

allowing the Acoustic Society to contact them with notice of acceptance or rejection of

the proposed presentation. This copy was private and never distributed to the public.

19

PUBLIC VERSION

Formatted: Centered

(Weaver, 25 Aug 07, 70:11-73:2)  But this private, typed version of the  1985 Egolf

Abstract was found in Dr. Levitt's garage.  (Levitt, 23 Aug 07, 109:14-110:20).

   75.                 REDACTED

             REDACTED                   the  earliest

documentary evidence produced by plaintiff or Dr. Levitt of any appreciation by Dr.

Levitt that acoustic feedback might be a problem in his Audimax work is dated a month

thereafter, May 15, 1985 (Dugot Exhibit 44);          REDACTED

               REDACTED

   76.                REDACTED

  REDACTED         was found in Dr. Levitt's garage a copy of the

Veterans Administration Rehabilitation R&D Progress Reports 1984 that includes

another reference to the Egolf and Weaver work (the "1984 VA Report") and that again

reports the use of the Mimic and Subtract method using an electrical feedback path to

cancel the effect of acoustic feedback:

> In the other system, called the active feedback cancellation
> (AFC) system, the microprocessor uses computed values of
> GH to create an estimator.  The estimator causes the input
> informational signal (e.g., that containing information such
> as speech and not PRN) to react destructively with signals
> returning via the vent outlet, thereby cancelling the effect
> of the feedback path.

   77.    The 1984 VA Report was widely distributed in the fall of 1985, as

evidenced by the "Distribution/Circulation Policy" reported on page iii of the document

itself and the recollection of Dr. Larson ( Larson, 30 Aug 07,  193:10-195:22).

Submissions for this Report were to be made to the VA Journal of Rehabilitation

Research and Development, the very journal for which Dr. Levitt was a member of the

20

PUBLIC VERSION                    Formatted: Centered

Editorial Board at this very same time period. *See* Lev. Exhibit 101.   REDACTED

REDACTED

78.                    REDACTED

REDACTED which was distributed in the fall of 1985, the earliest documentary evidence

produced by plaintiff or Dr. Levitt of any appreciation by Dr. Levitt that the acoustic

feedback path might be mimicked using a test signal as referenced in that Report is dated

late fall 1985 (ETG0020286, dated "11/12/85").   REDACTED

REDACTED

REDACTED                    Dr. Levitt's

attempt to cover-up his failure to disclose the Egolf work to the USPTO simply highlights

the fact this failure to disclose was indeed intentional.

79.    Dr. Levitt's failure to call the Nunley Article to the attention of the

USPTO, either alone or in combination with Dr. Levitt's failure to call the 1985 Egolf

Abstract and the 1984 VA Report to the attention of the USPTO, was with the intent to

wrongly claim as his own subject matter of application claims 19 and 20, and issued

claims 13, 14, and 19, whereas that subject matter is unpatentable in view of the withheld

Nunley Article alone or in combination with the undisclosed 1985 Egolf Abstract and

1984 VA Report.   At the very least, the Nunley Article is prior art, alone or in

---

[1] In addition, Defendants have been permitted additional discovery to establish the distribution and location of the 1984 VA Report in the fall of 1985 and fully expect to establish additional admissible evidence to this effect.

PUBLIC VERSION

Formatted: Centered

combination with the undisclosed 1985 Egolf Abstract and 1984 VA Report, and would have been of interest to a reasonable examiner. Its intentional withholding by Dr. Levitt was an act that justifies rendering the resulting '850 patent and its related '749 patent unenforceable as a matter of equity.

80.     Moreover, there is a direct relationship between the claims of the '749 patent and the withheld 1984 VA Report given that these claims are all directed, at least in part, to apparatus that uses a test signal of the type reported in the undisclosed 1984 VA Report.

**The Intentionally Withheld "Zeta Noise Blocker" Information, Described Below, was Material and non-cumulative to at Least Application Claims 8-11 and to issued claim 5 of the '850 Patent**

81.     Application claim 8 was directed toward the generic idea of changing the characteristics of the hearing aid as the characteristic of the sound being heard changes. Specifically, application claim 8 claimed:

> A hearing aid comprising at least one input microphone, as an output receiver, and a transmission channel interposed between said microphone and receiver, *means controllable* to impart different response characteristics to said hearing aid, and *means* responsive to a characteristic of the signal in said transmission channel *for* automatically *controlling* said controllable means to impart a selected one of said different response characteristics to said hearing aid. [emphasis added].

82.     This claim requires two element: one that is controlled (the "means controllable") and one that does the controlling (the "means…for…controlling").

83.     The Parties agree that the "means controllable" is a programmable filter, although they disagree on the degree of structural detail required. In any event REDACTED

REDACTED

22

PUBLIC VERSION

Formatted: Centered

REDACTED          asserted that the "means controllable" element, as
it appears in issued claim 5, covers any form of electronic device that can impart different
response characteristics. Dr. Levitt knew that the "Zeta Noise Blocker" was covered by a
claim of this scope, yet he failed to disclose this fact to the USPTO. The failure by Dr.
Levitt to disclose the "Zeta Noise Blocker," is inequitable and justifies a finding of
unenforceability for at least the '850 patent.

84.    Application claim 9, which depends from application claim 8, requires that
the hearing aid react to the loudness of the sound being heard:

> Application Claim 9. A hearing aid as described in claim 8
> in which said controlling means is responsive to the signal
> level on said transmission channel.

85.    The undisclosed Zeta Noise Blocker had this feature as well, which Dr.
Levitt knew.

86.    Application claim 10 requires the hearing aid react to noise in the sound
being heard:

> Application Claim 10. A hearing aid as described in claim
> 8 in which said controlling means is responsive to noise in
> said transmission channel.

87.    The undisclosed Zeta Noise Blocker again had this feature, which Dr.
Levitt knew.

88.    Application claim 11 requires the hearing aid react to the level of speech
being in excess of the level of noise[2]:

---

[2] Defendants continue to assert this phase "speech signals . . . in excess of the level of
noise signals" is indefinite.

23

PUBLIC VERSION

Formatted: Centered

> Application Claim 11.  A hearing aid as described in claim 6 in which said controlling means is responsive to the level of speech signals in said transmission channel in excess of the level of noise signals in said channel.

89.    Once again, the undisclosed Zeta Noise Blocker had this feature, which Dr. Levitt (and Mr. Dugot) knew.

90.    Issued Claim 5 of the '850 Patent is application claim 11 written in dependant form and, thus, is directed to automatically controlling the response characteristic of a hearing aid in response to detection of a level of speech in excess of a level of noise in the transmission channel of the hearing aid, and to reduce the noise, thereby allowing the speech to be better heard.  Claim 5 reads as follows:

> A hearing aid comprising at least one input microphone, an output receiver, and a transmission channel interposed between said microphone and receiver, means controllable to impart different response characteristics to said hearing aid, and controlling means responsive to the level of speech signals in said transmission channel in excess of the level of noise signals in said channel for automatically controlling said controllable means to impart a selected one of said different response characteristics to said hearing aid.

91.    The "Zeta Noise Blocker," which employs the same subject matter of all these claims, as asserted by ETG, is described in an article by Laszlo K. Stein et al., entitled "Listener-Assessed Intelligibility of a Hearing Aid Self-Adaptive Noise Filter," published in *Ear and Hearing*, Vol. 5, No. 4, 1984 (ETG002591-596) (the "Stein Article"), as well as various U.S. patents to Dr. Daniel Graupe, and was incorporated into a commercial chip called the "Zeta Noise Blocker" by Intellitech Corp. ("Intellitech"), all prior to the alleged invention by Dr. Levitt and his co-inventors. Dr. Levitt was aware of all of this during the pendency of the '850 patent application, yet he never brought this

24

PUBLIC VERSION

Formatted: Centered

information to the attention of the USPTO, even though he had the key role in bringing the prior art to the attention of the patent office.

92.     The Stein Article describes a study conducted into improvements in speech intelligibility using a hearing aid with the Zeta Noise Blocker. The Stein Article describes that the hearing aid used a "Graupe-Causey Self-Adaptive Noise Filter," cites a Graupe '721 Patent as describing the filter, and goes on to describe the filter as differentiating between speech and noise, and automatically adapting and adjusting itself to a continually changing noise environment. (ETG002591.)

93.     The Graupe '721 Patent, U.S. Patent No. 4,025,721 issued in 1977 and, like the Stein Article, is prior art under 35 U.S.C. § 102(b). The Graupe '721 Patent stores a representation of the transmission channel signal at times when no speech is determined to be present, and in response to a subsequent detection of speech, compares the speech-plus-noise signal to the stored noise-only signal and uses the results of the comparison to adjust the response characteristics of the hearing aid, all as is done in the '850 Patent. The '721 Graupe Patent, which is referenced in the Stein Article, teaches each and every limitation of claim 5 of the '850 Patent.

94.                                     REDACTED

                                        REDACTED

                        REDACTED                           effectiveness of

the Zeta Noise Blocker.

95.                               REDACTED

REDACTED  He was also a member of the Acoustic Society of America, whose members received the publication in which the Stein Article appeared.     REDACTED

25

PUBLIC VERSION

Formatted: Centered

REDACTED

96.                    REDACTED

REDACTED

97.     Dr. Levitt participated in the decision to purchase and test the Zeta Noise

Blocker chip, and was fully aware of the Stein Article, the cited Graupe '721 Patent, and

the Zeta Noise Blocker chip all prior to any conception of his alleged own Levitt noise

blocker invention.                    REDACTED

REDACTED

98.     The similarity between the claimed Levitt noise limiter invention of claim

                                        REDACTED

5 and the Intellitech Zeta Noise Blocker is not mere coincidence.

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

26

PUBLIC VERSION

Formatted: Centered

REDACTED

REDACTED

REDACTED

REDACTED

REDACTED

99.        REDACTED

REDACTED

100.    Nevertheless, before there was any written evidence of any new Levitt

noise blocker design, on October 25, 1985, Dr. Levitt and his team met personally with

27

PUBLIC VERSION

Formatted: Centered

Dr. Graupe, the inventor of the Zeta Noise Blocker chip, to discuss the operation of the Zeta Noise Blocker chip. (ETG007464-466.)[3] Dr. Graupe explained to Dr. Levitt how the Zeta Noise Blocker chip worked. By January 17, 1986, the Levitt team was still using the Intellitech Zeta Noise Blocker, with an option to switch it in or out of the Levitt control circuit. (ETG002573.) Even as of this late date, there is no evidence of any new Levitt noise blocker design.

**Dr. Levitt Utilized the Zeta Noise Blocker**

    101.
                    REDACTED

REDACTED


    102.   Dr. Levitt, rather than disclose the Zeta Noise Blocker to the USPTO in the '850 patent application, instead disclosed the Fig. 2 circuit, which the inventors adapted as their own.[4]
                      REDACTED

REDACTED

---

[3] Once again, Dr. Levitt tried to diminish the effect of this meeting   REDACTED
REDACTED

[4] As will be shown at trial, this bogus substitution for the Zeta Noise Block did not and can not work as a noise reduction circuit.

28

PUBLIC VERSION

REDACTED

Formatted: Centered

REDACTED

**Dr. Levitt Omitted Disclosure of the Zeta Noise Blocker and Stein Article with Intent to Deceive the USPTO**

103.    In spite of the undisputed fact that Dr. Levitt knew about the prior art Intellitech Zeta Noise Blocker, when he explained the prior art in the patent application so that the Examiner could make a fair judgment whether what was shown in Figure 2 was novel and patentable over the prior art, he failed to make any mention of the Stein Article, Intellitech or the Intellitech Zeta Noise Blocker. Instead, he described the prior art as though the Intellitech Zeta Noise Blocker never existed. For example, in the "Background of the Invention" section, he opine that the prior art only uses "filtering techniques in which the frequency regions containing high noise levels are eliminated." ('850 Patent, 1:55-56.) He further stated that no prior art "affords a satisfactory solution for the problem of . . . changes in the optimum frequency-gain characteristic resulting in variations in the level of the speech signal reaching the hearing aid." (*Id.* at 2:4-9.)

104.    In contrast to Dr. Levitt's representations in the patent application, the Stein Article (known to Dr. Levitt) states:

> When both speech and noise are present in the same frequency range, the filter theoretically can only pass both speech and noise or reject both. In actuality, the filter alternates between passing and rejecting both speech and noise depending on the relative importance of the speech phoneme at that frequency range.

29

PUBLIC VERSION

Formatted: Centered

(ETG0002592.) The Stein Article also discloses:

> Essentially, self-adapting noise reduction filters, whether analog or digital, sample an incoming signal, identify the spectra of noise present, and automatically set filter parameters that approximate the inverse of the noise spectrum at any instant. Theoretically, a self adaptive filter system should improve both the intelligibility and quality of speech because the full frequency range is passed when noise is not present and the characteristics of the filter change selectively and automatically with changes in the spectrum of the noise.

(ETG0002591.) This is exactly what Levitt claims to be his invention:

> Each of the sixty-four possible combinations of the 6 bit binary words identifies a different frequency response for the programmable filter, and a corresponding set of coefficients stored in the RAM 77 is selected, thereby automatically adjusting the hearing aid to the optimum set of parameter values as the speech level and type of background noise change.

('850 Patent, 6:46-54.)

105.    In view of the foregoing, it is apparent that the Examiner was deprived of a fair examination of claim 5 of the '850 Patent because he was deliberately never told about the Zeta Noise Blocker, the Stein Article, or the Graupe '721 Patent. This prior art is more relevant to claim 5 than any prior art that the Examiner had before him during the examination process and, thus, material and noncumulative. Dr. Levitt withheld—with an intent to deceive—the Stein Article and any mention of the Zeta Noise Blocker from the Examiner. Thus, at least the '850 Patent is unenforceable as a result of inequitable conduct.

PUBLIC VERSION

Formatted: Centered

## COUNTERCLAIMS

Deleted: 46

106.    Defendant/Counterplaintiff Widex Hearing Aid Co. Inc. is a New York

corporation having a place of business at 3553 24th Street, Long Island City, NY 11006.

### FIRST COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement – '850)

Deleted: 47

107.    Jurisdiction of this Counterclaim arises under the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions

relating to patents, 28 U.S.C. § 1338(a). There is a justiciable controversy between

Plaintiff and Defendant/Counterplaintiff concerning Defendant's/Counterplaintiff's

liability for infringement of the '850 patent as evidenced by the Complaint and Amended

Complaint filed in this suit.

Deleted: 48

108.    Venue and personal jurisdiction are proper in this District.

Deleted: 49

109.    Defendant/Counterplaintiff reallege and incorporate by reference the

Deleted: 46

allegations set forth in Paragraph 106.

Deleted: 50

110.    Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. §2201, for

declaratory judgment that they do not infringe the '850 patent.

### SECOND COUNTERCLAIM
### (Declaratory Judgment of Non-Infringement – '749)

Deleted: 51

111.    Jurisdiction of this Counterclaim arises under the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions

relating to patents, 28 U.S.C. § 1338(a). There is a justiciable controversy between

31

PUBLIC VERSION                                    Formatted: Centered

Plaintiff and Defendant/Counterplaintiff concerning Defendant's/Counterplaintiff's

liability for infringement of the '749 patent as evidenced by the Complaint and Amended

Complaint filed in this suit.

Deleted: 52

   112.    Venue and personal jurisdiction are proper in this District.

Deleted: 53

   113.    Defendant/Counterplaintiff reallege and incorporate by reference the

Deleted: Paragraph 46.

allegations set forth in Paragraphs 106 through 110.

Deleted: 54

   114.    Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. §2201, for

declaratory judgment that they do not infringe the '749 patent.


## THIRD COUNTERCLAIM
### (Declaratory Judgment of Invalidity - '850)

Deleted: 55

   115.    Jurisdiction of this Counterclaim arises under the Declaratory Judgment

Formatted: Line spacing: Double

Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions

relating to patents, 28 U.S.C. § 1338(a). There is a justiciable controversy between

Plaintiff and Defendant/Counterplaintiff concerning the validity, enforceability and scope

of the '850 patent as evidenced by the Complaint and Amended Complaint filed in this

suit.

Deleted: 56

   116.    Venue and personal jurisdiction are proper in this District.

Deleted: 57

   117.    Defendant/Counterplaintiff reallege and incorporate by reference the

Deleted: Paragraph 46.

allegations set forth in Paragraphs 106 through 114.

PUBLIC VERSION

118.   Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. § 2201, for

declaratory judgment that the '850 patent is invalid under sections 101, 102, 103, 112,

115 and 116 of the Patent Act.

### FOURTH COUNTERCLAIM
#### (Declaratory Judgment of Invalidity - '749)

119.   Jurisdiction of this Counterclaim arises under the Declaratory Judgment

Act, 28 U.S.C. §§ 2201 and 2202, and the laws of the United States concerning actions

relating to patents, 28 U.S.C. § 1338(a).  There is a justiciable controversy between

Plaintiff and Defendant/Counterplaintiff concerning the validity, enforceability and scope

of the '749 patent as evidenced by the Complaint and Amended Complaint filed in this

suit.

120.   Venue and personal jurisdiction are proper in this District.

121.   Defendant/Counterplaintiff reallege and incorporate by reference the

allegations set forth in Paragraphs 106 through 118.

122.   Defendant/Counterplaintiff prays, pursuant to 28 U.S.C. § 2201, for

declaratory judgment that the '749 patent is invalid under sections 101, 102, 103, 112,

115 and 116 of the Patent Act.

### FIFTH COUNTERCLAIM
#### (Declaratory Judgment of Unenforceability - '850)

123.   Widex Hearing Aid incorporates by reference the allegations contained in

Paragraphs 106 through 122 of the Counterclaim, as if fully set forth herein.

33

Formatted: Centered

Deleted: 58

Deleted: 59

Formatted: Line spacing:  Double

Deleted: 60

Deleted: 61

Deleted: 46.

Deleted: 62

PUBLIC VERSION

Formatted: Centered

124.  Claims of the '850 patent are enforceable due to inequitable conduct.
Widex Hearing Aid Co., Inc., incorporates by reference the allegations in Paragraphs 46
through 105 of their Sixth Affirmative Defense: Unenforceability of their Amended
Answer to the Second Amended Complaint and Jury Demand of Plaintiff Energy
Transportation Group, Inc., as if fully set forth herein.

## PRAYER FOR RELIEF

WHEREFORE, Defendant Widex Hearing Aid prays that this Court:

a)    Enter judgment that U.S. Patent No. 4,731,850 is invalid, void and
unenforceable;

b)    Enter judgment that U.S. Patent No. 4,879,749 is invalid, void and
unenforceable;

c)    Enter judgment that defendant has not infringed any claim of U.S. Patent
No. 4,731,850;

d)    Enter judgment that defendant has not infringed any claim of U.S. Patent
No. 4,879,749;

e)    Awarding defendant the costs of defending its suit and bringing its
counterclaims, including reasonable attorneys' fees, as provided by law;

f)    Determine that plaintiff's conduct is such as to render this case
exceptional within the meaning of 35 U.S.C. § 285; and

f)    Enter judgment for defendant for such other relief as this Court may deem
just or proper.

34

PUBLIC VERSION

Formatted: Centered

JURY DEMAND: Defendant requests a trial by jury on all issues so triable.

MORRIS, NICHOLS, ARSHT & TUNNELL

OF COUNSEL:

SUGHRUE MION PLLC
William H. Mandir (*pro hac vice*)
David J. Cushing (*pro hac vice*)
Carl J. Pellegrini (*pro hac vice*)
2100 Pennsylvania Avenue, NW
Washington, DC 20037
(202) 293-7600

Donald E. Reid (#1058)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19801
(302) 575-7219
Attorneys for Defendant
Widex Hearing Aid Co. Inc.

November   , 2007

Deleted: February 27, 2006

35

# EXHIBIT 7

## FULLY REDACTED

EXHIBIT 8

## ENGINEERING & DESIGN

*Dear Dr. Levit*
*please find the article*
*I mentioned to you.*
*Hope you will*
*find it useful.*
*Regard*
*By*


DEPOSITION
EXHIBIT
*108*
*Levitt*

# A Wearable Digital Hearing Aid

### By JAMES NUNLEY, WAYNE STAAB, JOHN STEADMAN, PERRY WECHSLER, & BONNIE SPENCER

The world is turning more and more to the use of computers. Many articles have been written on how computers will influence our lives. In the major trade magazines devoted to hearing health care, a few articles are beginning to appear on the uses of computers for the testing of the hearing handicap, for office management, and now, for applications to the hearing aid itself.

This article reports on the first digital hearing aid ever developed as a wearable unit (Figure 1) — a device that Audiotone plans to market in the future. This innovative computer-based system will change the future of hearing aid technology and should be considered the most significant advancement to date in the history of amplification devices for the hearing-impaired.

The essence of the computers used

in the hearing aid is *digital signal processing* (DSP). A *central processing unit* (CPU) manipulates digitized data to obtain desired programmed results. Almost any information can be manipulated in the computer by means of software programs. It is these software programs that are the interface between the hearing aid wearer and the computer. Software programs instruct the

CPU on how to process the input data. For example, computers are used in this way to control the temperature in buildings, to control automobile ignitions, and for many other purposes. In all of these applications, the raw information is fed into a computer. The computer then performs its role: Signal processing. This signal processing involves the following steps:

James Nunley *and* Wayne Staab, PhD, *are, respectively, Vice President/Engineering and Vice President/Marketing at Audiotone, Division of Lear Siegler, Inc.* John Steadman *is Professor of Electrical Engineering and* Perry Wechsler *is Project Director and Researcher — both at the University of Wyoming.* Bonnie Spencer *is Project Coordinator at Audiotone.* David Egolf *is Assistant Professor of Electrical Engineering at the University of Wyoming, and* Robert Brechbiel *is Engineering Technician at Audiotone. Correspondence to Dr. Staab, 2422 West Holly, Phoenix, AZ 85009.*



**Figure 1.** Prototype of first digital hearing aid ever developed as a wearable unit: (A) power supply, (B) microphone, (C) A/D Converter, (D) CPU, (E) D/A Converter, (F) Receiver.



**Figure 2.** A basic digital signal processing (DSP) system as used in the hearing aid described.

1. Analog-to-digital conversion (A/D): The conversion of an analog input (e.g., temperature) to digital-input information.

2. Manipulation of this digital signal by the central processing unit. In the case of building temperature, the data manipulation may indicate that the building is too hot. This digital signal is then converted back to analog (D/A), and the analog signal may then change the setting of the thermostat.

For a number of years, Audiotone has been interested in the possibility of applying digital signal-processing to hearing aids. In April of 1981, Audiotone, in conjunction with a noted research consulting firm — Integrated Circuit Engineering Corporation — undertook a study to determine the then-current state of digital development and what the future might hold. This in-depth survey indicated that circuitry could be available for body-worn digital hearing aids in 5 to 10 years.

As a result of this information, Audiotone made a serious commitment to begin development of this type of digital signal-processing circuitry. In June of 1982, Audiotone entered into a joint research project with the University of Wyoming, Department of Electrical Engineering to develop the first body-worn digital hearing aid. In February 1983, the first prototype breadboard digital hearing aid was demonstrated ahead of schedule.

Not only was it a success to demonstrate that a digital hearing aid could be built; even more remarkable were three additional breakthroughs: The ability of the digital aid to (1) adapt to changing signals using a microprocessor (adaptive filtering), (2) provide noise suppression, and (3) perform these functions in real time.

## DIGITAL SIGNAL-PROCESSING

The digital hearing aid as described here is a wearable computer that uses digital signal-processing of analog signals to replace the need for conventional analog components (transistors, resistors, capacitors, and diodes). This is accomplished by implementing in software the functions that usually require hardware devices (i.e., filters, limiters, oscillators, modulators, and demodulators).

Digital signal-processing, in the most general sense, means the creation, changing, and/or detection of signals using digital implementation. In hearing aid applications, signal-processing implies the real-time processing of a digitized analog signal to change that signal in some way. (Data processing, on the other hand, implies the manipulation of data, which may or may not represent an occurring action, and in general, does not modify any real-time communication signal).

The general nature of the digital hearing aid can best be described by separately examining its two major functions. The analog section is primarily responsible for conditioning the incoming analog acoustic signal for proper digital processing, and for smoothing the output of the digital section for accurate reproduction of intelligible speech signals. When implementing a digital filter, it is necessary to "band-limit" the incoming signal to prevent a phenomenon known as



*Engineering team that developed the first wearable digital hearing aid. From left to right, Jim Nunley, Perry Wechsler, Dr. Egolf, Bonnie Spencer and Dr. Steadman. Not pictured, Bob Brechbiel.*

**SPENT BATTERIES WANTED!**
Call Toll Free: 800-833-3505
(In N.Y. Call (518) 489-7363)
Silver Oxide and Mercury Type
Highest prices, immediate payment
**We Pay for Mercury Cells Too**
MERCURY REFINING CO., INC.
Railroad Ave., Albany, NY 12205
Our 28th Year of Service to the Hearing Aid Industry

Circle 107 on Reader Service Card

*aliasing.* This is accomplished in the present system using an active, low-pass filter, which rejects incoming signals that are above those necessary for good fidelity and intelligibility. Failure to implement this section properly can result in severe distortion of the audio signal.

The conditioned analog signal is converted to a digital signal using an *analog-to-digital converter (ADC).* This digital representation is operated on by adding and subtracting weighted versions of past and present inputs and outputs to emphasize or de-emphasize various aspects of the signal. By adjusting these weighting factors, the action of the hearing aid may be "personalized" for its recipient.

The computed digital output is then converted back to an analog signal using a *digital-to-analog converter (DAC).* In order to achieve real-time operation, the entire process of analog-to-digital conversion, digital processing, and digital-to-analog conversion must be accomplished before the next sample of the input is taken. In the present version of the hearing aid, all of these functions are contained within a single digital signal-processing chip. This not only reduces space requirements, but tends

to lessen total system power requirements as well.

A basic digital signal-processing (DSP) system as used in the hearing aid described is depicted in Figure 2. The process is as follows:

1. The hearing-aid microphone picks up airborne speech signals.
2. These analog speech signals are digitized in real time by the analog-to-digital converter (ADC).
3. The central processing unit (which is a very small computer, or *microprocessor*) mathematically manipulates these digitized data according to programmed instructions. For example, the central processing unit may be programmed to change the frequency pattern — i.e., to increase the high frequencies and reduce the low frequencies of the incoming signal. This would be a relatively simple operation. On the other hand, the ability to adapt to changing environments and to suppress noise is much more difficult (Audiotone is moving to apply for patents or copyrights on the software involved to perform these latter functions).
4. The resulting output sequence is changed to analog form through the digital-to-analog converter (DAC).

5. This analog-output signal is used to drive the hearing-aid receiver (speaker) with the modified signal as determined by the central processing unit.

Digital signal-processing in a wearable hearing aid had not been accomplished prior to this time because a very high-speed microprocessor allowing audio-bandwidth digital filtering in real time had not been available. In fact, most currently available microprocessors that are *fast* enough for this task require so many other devices (e.g., memory, I/O, A/D, D/A, and so forth) that the complete system is too large and requires too much current for a body-worn aid. Even though the software algorithms of digital signal-processing have been available for 20 years or more, the processing of data took hours, or even days. This processing required the use of recorded signals, thus prohibiting the real-time processing required for a wearable hearing aid.

### DIGITAL VS. OTHER SIGNAL PROCESSING
The differences between this new, digital signal-processing (DSP) and other forms of electronic signal-processing

*Continued on page 34*



# SOME OF YOU HAVE A PROBLEM. These days
people expect audiologists and hearing specialists to have equipment to test aids. And some of you don't have it.

**Solve your problem with the FONIX FP20 and the F20, the affordable hearing aid analyzers.**

Sometimes it isn't cost effective to buy a top-of-the line tester. Or perhaps you have limited office space. Or perhaps you need portability. Thats why Frye Electronics builds the FP20 and the F20.

Call **800-547-8209** for a demonstration.

**FRYE ELECTRONICS, INC.®**

Circle 192 on Reader Service Card

that have been used in hearing aids for years should be well understood.

*Electronic signal-processing* in this application can be described as an attempt to improve the ability of the hearing aid to maximize the clarity or intelligibility of speech, especially by improving the signal-to-noise (S/N) ratio. A variety of techniques have been applied, including the use of mechanical insert filters, active and passive filters, venting, binaural fittings, directionality, and a variety of AGC (automatic-gain-control) circuits. In addition, other attempts have been made to improve hearing-aid performance (as judged by the listener) by precise, individualized adjustment of compression ratios, frequency bandwidth, output-limiting levels, and functional frequency-gain levels.

While these contemporary approaches to signal processing will dominate hearing-aid design in the next few years, digital signal-processing, with a microprocessor as the heart of the system, will far surpass anything available today. Aside from the digital hearing aid discussed here, *no* contemporary manufacturer uses microprocessor technology in its hearing aids.

## THE MICROPROCESSOR

The microprocessor (computer or central processing unit) and its programming is the heart of the digital hearing aid. The advantages of a digital hearing aid become more apparent with the understanding of what the microprocessor can potentially perform:

1. Imagine a hearing aid free from feedback. The digital hearing aid of the future will have this freedom.
2. Imagine a hearing aid capable of being programmed and reprogrammed by the hearing aid dispenser to meet specified user requirements (i.e., a true prescription). In other words, a change in software changes the hearing aid characteristics. The hearing aid does what you tell it to do — without changing components or altering the earmold acoustics.
3. Imagine a hearing aid that can be programmed to reduce or eliminate the major user complaint about hearing aids: That noise is louder than the signal they want to hear. This is accomplished through adaptive filtering (the microprocessor decides what it will do with a signal on the basis of the incoming signal).
4. Imagine a hearing aid that will provide for more precise and variable filter ranges and responses, for frequency-shifting, and for compression options not available in current hearing aids.
5. Imagine a hearing aid whose characteristics are repeatable and stable, free from parameter-drift.
6. Imagine a hearing aid that eliminates switches and moving parts — always a source of breakdowns.



7. Imagine a hearing aid not stuck with amplifying and producing only what is presented to the input. "Garbage in — garbage out" does not have to be the rule.

We believe that the magnitude of this inventive breakthrough can be best depicted by the chart in Figure 3. Note the steepness of the curve (indicating magnitude of the event) as various breakthroughs or new components have arisen.

## CONCLUSION

The possibilities for providing an improved signal to the hearing-impaired person through digital signal-processing are numerous. Not only will there be a direct bearing on hearing-aid function, but the technology developed here for the digital hearing aid will open up new horizons in diagnostic equipment for assessing a hearing impairment, determining a prescription, and then programming the hearing aid with this equipment.

As never before, with the digital signal-processing technology developed here, the future holds new hope for the hearing-impaired and new challenges for the hearing-aid industry.

Grateful acknowledgment is made to the Electronic Instrumentation Division of Lear Siegler, Incorporated, and specifically to Gordon Eckley and to William Draeger.



Figure 3. Estimated significance of the introduction of the digital hearing aid.



EXHIBIT 9



DEPOSITION
EXHIBIT
105
Levitt

# The Vanderbilt Hearing-Aid Report

## State of the Art–Research Needs

EDITED BY
**Gerald A. Studebaker and Fred H. Bess**

MONOGRAPHS IN CONTEMPORARY AUDIOLOGY

EGOLF 00631

Copyright © 1982 Monographs in Contemporary Audiology
6796 Market Street
Upper Darby, Pennsylvania 19082
All rights reserved
Printed in the United States of America

EGOLF 00632

# Preface

This monograph reports the proceedings of "A Working Conference on Amplification for the Hearing Impaired: Research Needs" held at the Bill Wilkerson Hearing and Speech Center of Vanderbilt University in Nashville, Tennessee on June 7 through 10, 1981.

The impetus for the meeting was the belief that progress on how best to design and apply amplification systems for the hearing impaired has been impeded by insufficient communication between researchers working on matters related to different aspects of the problem. For this reason the Steering Committee brought together researchers with a variety of interests including the psychoacoustics of hearing impairment, the acoustics of hearing aid performance, innovative hearing aid designs, hearing aid fitting techniques, post-fitting care and so on. The audience attended the "Working Conference" by invitation. They were chosen on the basis of their current active involvement in research related to speech perception by the hearing impaired or hearing aid performance, measurement and selection or on the basis of evidence of thoughtful application of that research.

Each speaker discussed his or her area of research as it related to determining the amplification needs of the hearing impaired and/or of providing for those needs. Following most of the major presentations, a Discussant presented further comments in the same area. With only one exception these comments were prepared as formal papers and are printed in this volume. In some cases the printed version was considerably expanded.

Following the formal papers a panel discussion involving a great deal of audience participation was conducted concerning the research needs in different areas. Finally, all conference participants were asked to identify, in writing, what they felt were the most important research needs in each of several areas. The results of this poll were collated, analyzed and reported to the group by Dr. Fred Bess. His report is found on page 217 of these proceedings.

The conference was an outstanding success in several different regards. A great deal of invaluable cross-communication occurred between persons of differing backgrounds and orientations both within and between the formal meetings. The papers that were presented were truly outstanding contributions in many cases as the reader will learn by study of this volume. Finally, the goal of obtaining informed opinions on research priorities and needs from a broad cross-section of researchers and practitioners was realized.

It is hoped that this volume will convey to the reader as much as possible of the stimulating interaction and cross-pollination that was a major feature of this conference. It is also hoped that it will promote and suggest future research endeavors that are at once basic, relevant and of high technical quality. Finally, it is hoped that it will suggest what may be possible through cooperative research efforts.

We are grateful to the Veterans Administration's Rehabilitation Engineering Research and Development Service for sponsoring the conference. We are also grateful to the publishers of the Monographs and especially to E.R. "Cy" Libby for making this report possible.

THE EDITORS

EGOLF 00633

# Review of the Acoustic Feedback Literature from a Control Systems Point of View

David P. Egolf, Ph.D.
*Dept. of Electrical Engineering*
*University of Wyoming*
*Laramie, Wyoming*

ABSTRACT An *in situ* hearing aid is modeled as an assemblage of transfer function blocks. The block model is identified as a "control system," a term borrowed from the field of control systems engineering. Nyquist's stability criterion is derived and applied to several control system examples to establish the conditions under which acoustic feedback may occur in a hearing aid. Characteristic features of "howl" associated with acoustic feedback are identified. Published methods for suppressing feedback in public address (PA) systems are examined and critically reviewed for their applicability to hearing aids. Future research efforts necessary to achieve the desired goal of feedback elimination in hearing aids are recommended.

KEY WORDS: Acoustic Feedback, Hearing Aid, Howl Back

## INTRODUCTION

Acoustic feedback, as it occurs in public address (PA) systems, has been discussed extensively in the literature. Its causes and various remedies appear in numerous articles [1-22]. On the other hand, acoustic feedback in hearing aids is not so well understood and has received scant coverage in the literature.

deBoer [23] discussed the possible physical mechanisms by which acoustic feedback may occur in a hearing aid. Grover and Martin [24] showed that the amount of attenuation in the feedback path through the earmold was related to the maximum stable gain of a hearing aid. Johanssen [25, 26] described several earmold vent and leak conditions which influence acoustic feedback. His laboratory data was supported partially by a theoretical treatise on sound transmission in and radiation from the vent/leak. Lybarger [27] developed guidelines for avoiding feedback based on experiments establishing a relationship between vent size and maximum stable gain. Remedies allowing additional stable

gain in hearing aids, such as the feedback suppression devices designed for PA systems, have not appeared in the literature.

It is the purpose of this paper to (1) develop an understanding of the hearing aid acoustic feedback phenomenon, (2) review the literature with emphasis on the published remedies for feedback in PA systems, and (3) discuss research needs with regards to feedback in hearing aids. Since the feedback problem is best explained in terms of control systems terminology, the approach taken herein will be that commonly used in the field of control systems engineering.

## I. FEEDBACK IN HEARING AIDS

### A. Control Systems Description

The acoustic feedback phenomenon is best explained by referring to the *in-situ* hearing aid in Fig. 1(a). As shown in Fig. 1(a), sound waves of pressure $P^*$ at some distant point in space are incident upon the head and ear. These waves are transformed to sound pressure $P_I$ by the time they reach the pinna. Transformation $T_1$, known in control systems terminology as a "transfer function" or "frequency response function," is dependent upon parameters of the transmission path such as the acoustical properties of the room and wave interaction with the body, head, and pinna. The microphone, having a transfer function denoted by M, converts sound pressure signal $P_I$ to an electrical signal which undergoes amplification in A and then drives receiver R. The receiver output pressure $P_R$ is transformed to pressure $P_T$ at the tympanic membrane via an assortment of

---

*Throughout this paper, upper case letters represent complex quantities which are functions of frequency f while lower case letters represent quantities which are functions of time t.

EGOLF 00634

waveguides having transfer functions $T_2$ and $T_3$. The terms $T_2$ and $T_3$ are dependent, for example, upon tube properties such as length and diameter and upon eardrum impedance.

Sound is also lost through the vent, having a transfer function $T_4$, so that sound pressure $P_o$ at the vent inlet becomes $P_V$ at the vent outlet. Sound pressure $P_V$ undergoes further transformation to $P_F$ via transfer function $T_5$. Finally, after a few milli- or microseconds of travel, $P_F$ combines with $P_i$ (either constructively or destructively, depending on their relative phases) at the location labeled "summation" in Fig. 1(a). The summation process occurs naturally when two sound pressure waves occur together at the same point in space.

Fig. 1(b) is a "block diagram" incorporating all of the pertinent information given in Fig. 1(a). In Fig. 1(b) the blocks represent the transfer functions described above while the arrows are signals (i.e., sound pressure or electrical signals). The relationship between blocks and arrows can best be described by the statement "output signal equals transfer function times input signal." For example, application of this relationship to the left-hand block of Fig. 1(b) yields

$$\dot{P}_i = (T_1) P_c$$

The summation process is denoted by a circle enclosing the Greek letter sigma and is called the "summer." Its output signal is a simple algebraic sum of the input signals, paying particular attention to the respective sign of each, or $P_i + P_F$.

Next, suppose that we combine the blocks from M to $T_2$ into a single block labeled G. This can be accomplished by multiplication of blocks, or

$$G = M \times A \times R \times T_2.$$



Figure 1   Typical behind-the-ear hearing aid: (a) illustration of signal flow (b) block diagram of the system.



Figure 2   System block diagram resulting from block multiplication.

where G is yet another transfer function and is called the "plant" or "system" by control systems engineers. Likewise, $T_4$ and $T_5$ can be combined by multiplication to yield

$$H = T_4 \times T_5,$$

where H is also a transfer function known as the "feedback element." The results of this block multiplication are illustrated in Fig. 2, where that portion of the figure enclosed by the dashed line is called a "control system." The path beginning at $P_o$, passing through H and ending in $P_F$ at the summer is called the "feedback path" or "feedback loop."

In order to analyze the acoustic feedback problem and develop remedies, the investigator must be able to describe, either theoretically or experimentally, all of the transfer function blocks in the diagram of Fig. 1(b). This amounts to assembling information gathered by several earlier investigators from different fields of science. A partial list of information needed to describe each block is given in Table 1 along with pertinent references.

| Transfer Function | Parameters Necessary to Describe Transfer Function | References |
|---|---|---|
| $T_1$ | Room acoustics. Wave interaction with body, head, and ear. | Schroeder [28]. Kuhn [29]. Shaw [30]. |
| M | Acousto-electric response, directivity. Location. | Manufacturer? Franks [31]. Kuhn [32]. |
| A | Gain and phase response. | Manufacturer? |
| R | Electroacoustic response. | Egolf and Leonard [33]. |
| $T_2, T_3, T_4$ | Tube transmission line characteristics. | Egolf, et al. [34]. Egolf [35]. |
| $T_5$ | Vent radiation. Room acoustics. Wave interaction with the body, head, and ear. | Morse and Ingard [36]. Johansen [25]. Schroeder [28]. Kuhn [29]. Shaw [30]. |

Table 1   Information needed to describe transfer functions shown in Fig. 1(b).

95

EGOLF 00635

## B. Nyquist's Stability Criterion

Consider only the control system shown in Fig. 3 and suppose that all of its transfer function blocks are fully described (the result of some future research investigation). We can then begin to analyze the system by applying several control system theories. One of these, a well-known theory known as Nyquist's Stability Criterion, was developed by H. Nyquist [37] whose name it bears.



**Figure 3**   *Control system model.*

Nyquist's Stability Criterion can be explained by referring to Fig. 3. Upon initial application of the continuous input signal $P_i$ to the control system, there will not yet (not until some time later) be any feedback signal $P_F$. Thus

$$P_F = 0 \tag{1}$$

and the summer output will be

$$P_S = P_i + 0 \tag{2}$$

so the initial output signal will be

$$P_o = (G)P_S. \tag{3}$$

Combining Eqs. (2) and (3), we get

$$P_o = (G)P_i. \tag{4}$$

After a very short period of time $P_o$ will be transmitted back through H and will arrive at the summer as $P_F'$ where

$$P_F' = (H)P_o \tag{5}$$

and the prime has been added to $P_F$ to denote the first passage of a signal through H (i.e., the first "looping" of a signal around the control system). Substituting Eq. (4) into Eq. (5) yields:

$$P_F' = (GH)P_i. \tag{6}$$

Next, the summer creates the signal

$$P_S' = P_i + P_F' \tag{7}$$

Substitution of Eq. (6) into Eq. (7) produces

$$P_S' = P_i + (GH)P_i. \tag{8}$$

$P_S'$ then passes through G so we must substitute Eq. (8) into Eq. (3), being careful to add the prime ('), or

$$P_o' = (G)P_i + (G^2H)P_i. \tag{9}$$

The new output signal $P_o'$ will then pass through H and arrive at the summer as

$$P_F'' = (GH)P_i + (GH)^2P_i. \tag{10}$$

where the double prime (") denotes the second passage of a signal through H. The summer then produces

$$P_S'' = P_i + (GH)P_i + (G^2H^2)P_i. \tag{11}$$

Thus, after a second looping of the control system, the output becomes

$$P_o'' = (G)P_i + (G^2H)P_i + (G^3H^2)P_i. \tag{12}$$

This process can be repeated for 3,4, etc. passages around the loop until, after n loopings, we get

$$P_o = G[1 + (GH) + (GH)^2 + ... + (GH)^n]P_i. \tag{13}$$

where GH is called the "open-loop transfer function," a complex quantity with magnitude $|GH|$ and phase $\angle GH$ or

$$GH = |GH| \, e^{j\angle GH} \tag{14}$$

If we wait for a long period of time after applying $P_i$ to measure $P_o$, the number of passages around the feedback loop will be quite large, or $n \to \infty$. If $|GH| < 1$, reference to a mathematics handbook will show that the power series of Eq. (13) reduces to

$$P_o = \left(\frac{G}{1-GH}\right)P_i. \tag{15}$$

On the other hand, if $|GH| \geq 1$ and $\angle GH = m(360°)$ for $m = 0,1,2...$ then, from Eq. (13) it follows that

$$P_o \to \infty. \tag{16}$$

Notice that in Eq. (15) an input $P_i$ is required to get an output $P_o$. Conversely, if the input $P_i = 0$ in Eq. (15) then the output $P_o = 0$. Thus, "no input—no output" for a system where $|GH| < 1$. This type of system, where $P_o < \infty$, is called a "stable" system.

Notice also that the output $P_o$ given by Eq. (16) does not require an input $P_i$. It is only needed initially for a short period of time to get the "looping" started. Recall that the howl in a PA system continues to build up (i.e., $P_o \to \infty$) long after the talker ceases to speak into the

EGOLF 00636

microphone (i.e., $P_i = 0$). To kill the howl, a person must severely reduce the amplifier gain (i.e., reduce $|A|$ and thus, $|G|$) to stop the looping phenomenon. This type of system, where $P_o \to \infty$, is called an "unstable" system.

The above discussion may be stated more concisely in the manner spelled out by Nyquist [37]. System instability (i.e., acoustic feedback) will occur at any frequency where

$$|GH| \geq 1.0 \tag{17}$$

and

$$\underline{/GH} = m(360°) \text{ for } m = 0,1,2... \tag{18}$$

Consequently, to eliminate acoustic feedback in a hearing aid, one or both of the above conditions must be avoided.

### C. Applying the Stability Criterion

In the following, graphical illustrations are presented to help develop an understanding of the ramifications of applying the Nyquist Criterion.

For example, suppose that the control system illustrated in Fig. 4 has transfer functions G and H such that, at some frequency $f = f_i$, their values are

$$G = 1.0e^{j0°} \tag{19}$$

and

$$H = 0.5e^{j360°} \tag{20}$$

so that

$$GH = 0.5e^{j360°} \tag{21}$$

This system is stable at $f_i$ because at that frequency, it does not adhere to the condition described by Eq. (17).



Figure 4. *Control system model of a stable system with $GH = 0.5e^{j360°}$*

Next, suppose that the input $P_i$ is a continuous pure tone of magnitude c and frequency $f_i$, or

$$p_i(t) = c \sin 2\pi f_i t. \tag{22}$$

which has the $P_i$ spectrum shown in Fig. 4, and given by

$$P_i = ce^{j0°}. \tag{23}$$

Substitution of Eqs. (21) and (23) into Eq. (6) yields the feedback signal on the first pass around the loop

$$P_F = \frac{c}{2}e^{j0°} \tag{24}$$

which is plotted in Fig. 4. The output spectrum, computed by Eq. (15), is

$$P_o = 2ce^{j0°}, \tag{25}$$

which is also plotted in Fig. 4 and has a time-domain representation given by

$$p_o(t) = 2c \sin 2\pi f_i t. \tag{26}$$

Notice that the output is also a pure tone of the same frequency $f_i$, but with twice the magnitude. By virtue of the output signal $P_o$ being $< \infty$, we could say that this system is stable, a conclusion reached earlier. We could also say that the output is "intelligible" by noting that its spectrum shape is similar to that of the input. Since $P_o > P_i$, the system is also said to be of the "regenerative"-type. This results from the in-phase constructive interference of $P_F$ with $P_i$. Notice that $P_o$ is greater than $P_i$ despite the fact that the plant gain $|G|$ is unity, meaning no amplification by the plant. Thus, the output spectrum may be altered significantly by the presence of a feedback path through the earmold even though it may be an inherently stable system not susceptible to howl.

Let us now investigate another system having transfer function values at $f = f_i$ given by

$$G = 1.0e^{j0°} \tag{27}$$

and

$$H = 1.0e^{j180°} \tag{28}$$

so that

$$GH = 1.0e^{j180°}. \tag{29}$$

This system is also stable at $f_i$ because, at that frequency, $\underline{/GH}$ is not a whole-number multiple of 360°.

Also suppose that the input is the same as that given by Eq. (23). Substituting Eqs. (23) and (29) into Eq. (6) yields

$$P_F = -ce^{j0°}. \tag{30}$$

which is shown in Fig. 5. Again using Eq. (15) to compute the output, we get

97

EGOLF 00637

$$P_o = \frac{c}{2} e^{j0^\circ}. \tag{31}$$

which is also shown in Fig. 5. Thus, the time-domain representation of the output signal is given by

$$p_o(t) = \frac{c}{2} \sin 2\pi f_1 t. \tag{32}$$



Figure 5  *Control system model of a stable system with* $GH = 1.0 e^{j360^\circ}$

As before, examination of the output $P_o$ plot shown in Fig. 5 ($P_o < \infty$) reveals the system is stable at $f_1$. The output is also intelligible when compared to the input. The out-of-phase destructive interference of $P_F$ with $P_I$ causes $P_o < P_I$. Consequently, this is called a "degenerative" type system. Again notice that the presence of a feedback path alters the shape of the output spectrum: the output amplitude is reduced even though the plant gain $|G| = 1.0$. As before, this occurs in a system that is inherently stable and not susceptible to howl.

Finally, consider the system given in Fig. 6 with transfer functions at $f = f_1$ given by

$$G = 1.0 e^{j0^\circ} \tag{33}$$

and

$$H = 1.0 e^{j360^\circ} \tag{34}$$

so that

$$GH = 1.0 e^{j360^\circ} \tag{35}$$

Thus, the system is inherently unstable at $f_1$ because it satisfies both Eqs. (17) and (18). Given the same input as in Eq. (23), $P_F$ may be computed by combining this with Eqs. (6) and (35) to get

$$P_F = ce^{j0^\circ} \tag{36}$$

which is plotted in Fig. 6. The output spectrum must be computed by Eq. (13), as it does not meet the $|GH| < 1.0$ criterion for applying Eq. (15). The result of applying Eq. (13) is

$$P_o = |1 + 1e^{j360^\circ} + 1e^{j720^\circ} + 1e^{j1080^\circ} + \ldots|c$$
$$\approx |1 + 1 + 1 + \ldots|c$$

98

or

$$P_o \to \infty,$$

which is illustrative of an unstable system that tends to produce acoustic feedback or howl. Since $P_o \to \infty$, we could also say that the output is "unintelligible" because it would saturate any real-life circuit, including the human hearing mechanism.



Figure 6  *Control system model of an unstable system with* $GH = 1.0 e^{j360^\circ}$

## II. FEEDBACK IN PA SYSTEMS: METHODS OF SUPPRESSION

Several investigators have published methods for suppressing acoustic feedback in PA systems. The following is a review of some of these methods.

### A. User's Method

In order to eliminate feedback in a PA system or in a hearing aid, the user can make $|GH| < 1$ by simply turning down the volume control. This amounts to reducing the amplifier gain $|A|$ which causes a reduction in $|G|$.

### B. Gain-Reduction Method

A technique devised by Boner and Boner [7] for feedback suppression involves the insertion of a notch filter ($N_F$) into the PA system circuit ahead of the amplifier, as in the upper part of Fig. 7. As demonstrated in the lower



Figure 7  *Stabilizing a PA system unstable at* $f_1$ *by the gain-reduction method.*

EGOLF 00638

part of Fig. 7, the center frequency of the notch filter $f_i$ is set to coincide with a peak(s) in the $|GH|$ spectrum that exceeds a value of 1.0. In this manner, the value of $|GH|$ is reduced below 1.0 at $f_i$ and the system is stable at all frequencies. This allows the amplifier gain and thus $|GH|$ to be increased by an amount equal to the "additional stable gain," shown at the bottom right of Fig. 7, until acoustic feedback again occurs. The authors [7] report cases where this method has provided between 7 and 18 dB of additional stable gain in PA systems.

The gain reduction method requires actual measurement of the $|GH|$ spectrum in order to locate the peak(s) of interest. Since H is dependent upon the local acoustical environment, the $|GH|$ spectrum shape is unique to one speaker-microphone arrangement in one particular room or hall. Application of the scheme to hearing aids would probably be thwarted by the wide range of acoustical environments to which an *in-situ* hearing aid may be exposed. In other words, the shape of the $|GH|$ spectrum and its peaks would be continually changing, making it difficult to locate the notch filters without some scheme employing automation.

### C. Frequency-Shifting Method

In a method pioneered by Schroeder [2], a + 5Hz frequency shifting network is inserted into the circuit ahead of the amplifier. The network causes the output $P_o$ to be 5Hz higher than $P_i$.

The frequency shifting method may be demonstrated by assuming that the system transfer functions have the values

$$G = 1.0e^{j0°} \qquad (37)$$

and

$$H = 0.8e^{j360°} \qquad (38)$$

so that

$$GH = 0.8e^{j360°} \qquad (39)$$



**Figure 8** *Improving stability of a PA system unstable at $f_i$ by the frequency-shifting method.*

except at $f = f_i$, where GH is the same as that given by Eq. (35). This is illustrated by the $|GH|$ spectrum in Fig. 8. Therefore, the system is stable at all frequencies except at $f = f_i$, where it is unstable and susceptible to howl.

Now, insert a + 5Hz frequency shifting network into G such that, with each passage through G, $P_i$ is increased by 5Hz. As a result, Eq. (6) should be altered as follows:

$$P_F = (GH)P_i(f + 5). \qquad (40)$$

Equation (13) will likewise reflect this change, or

$$P_o = (G)P_i(f + 5) + (G^2H)P_i(f + 10) \\ + (G^3H^2)P_i (f + 15) + ... \qquad (41)$$

If a continuous pure tone input $P_i$ at frequency $f_i$ given by Eq. (23) is introduced; the feedback signal on the first pass around the loop may be computed by Eqs. (23), (39), and (40), resulting in

$$P_F = 0.8ce^{j0°}. \qquad (42)$$

which is sketched at the lower left of Fig. 8. A comparison of this with the $P_F$ plot of Fig. 6, shows that it has been shifted to the right by 5Hz, causing a reduction in height by 0.8. Notice also that the $P_F$ peak does not add directly to the $P_i$ peak (which would create a taller peak) because they are 5Hz apart.

The output spectrum, computed by Eqs. (23), (37), (38) and (41), is

$$P_o = 0.8 P_i(f_i + 5) + 0.64 P_i(f_i + 10) \\ + 0.512 P_i(f_i + 15) + ... \qquad (43)$$

which is also sketched in Fig. 8 and has a time-domain signal of the form

$$p_o(t) = 0.8c \sin [2\pi(f_i + 5)t] \\ + 0.64 \sin [2\pi(f_i + 10)t] \\ + 0.512 \sin [2\pi(f_i + 15)t] + ... \qquad (44)$$

Notice, by comparison with the $P_o$ plot in Fig. 6, that in this case $P_o < \infty$. Consequently, the frequency shifting network has a stabilizing influence on this inherently unstable system.

By comparison with the $P_i$ plot in Fig. 8, the shape of the $P_o$ plot suggests that the intelligibility of the output is in question. In fact, according to Schroeder [6], subjective effects called "audible beating" and "audible ringing" limit the additional stable gain to about 6dB even though 10–12 dB are theoretically available. Application of this method to hearing aids would require further subjective testing of the effect of frequency shifting on speech intelligibility.

99

EGOLF 00639

### D. Phase Shifting Method

Two investigators [8, 20] have suggested eliminating feedback by inserting a broad-band phase shifting network into G. This has the effect of changing an inherently unstable system so that it comes into compliance with the phase angle portion of Nyquist's stability criterion (i.e., Eq. (18)).

For example, suppose that the system were inherently unstable, having system transfer function values at some frequency $f = f_1$ given by Eqs. (33), (34), and (35). Next, suppose that a $+90°$ phase-shifting network is inerted into G so that Eqs. (33) and (35) become

$$G = 1.0e^{j90°} \tag{45}$$

and

$$GH = 1.0e^{j450°}. \tag{46}$$

Assuming a continuous input of the form given by Eq. (23), $P_F$ may be computed by Eqs. (6), (23), and (46), producing

$$P_F = ce^{j90°}. \tag{47}$$

Combining Eqs. (15), (23), and (46) produces the output spectrum

$$P_o = \frac{c}{\sqrt{2}} e^{j135°} \tag{48}$$

or the time-domain signal

$$p_o(t) = \frac{c}{\sqrt{2}} \sin(2\pi f_1 t + 135°). \tag{49}$$

Plots of $|P_F|$ and $|P_o|$ are given in Fig. 9.



**Figure 9** *Using the phase-shifting method to stabilize a PA system unstable at $f_1$.*

Inspection of the $|P_o|$ plot in Fig. 9 verifies the above statement that inclusion of the phase-shifting network stabilizes an otherwise unstable system. Notice also that the output is intelligible when compared with the input.

100

Successful utilization of this scheme in a hearing aid would probably be prevented by the extreme variability of H. For example, suppose that the hearing aid user happened to encounter an acoustical environment (i.e., combined effects of pinna, head, body, and room) such that at some frequency $f = f_1$

$$H = 1.0e^{j270°}. \tag{50}$$

Therefore, combining this with Eq. (45) yields

$$GH = 1.0e^{j360°} \tag{51}$$

which is descriptive of an unstable system that would howl at frequency $f_1$.

### E. Frequency Modulation Method

Nishinomiya [16] reports a scheme whereby the frequency $f_O$ of the output is "warbled" or modulated sinusoidally about the frequency $f_1$ of the input according to

$$f_O = f_1 + \Delta f \sin 2\pi f_w t, \tag{52}$$

where $f_w$ is the warbling frequency and $\Delta f$ is the frequency deviation, both in Hertz.

As a means of demonstrating this technique, it is instructive to point out its similarities with the frequency shifting method illustrated in Fig. 8. Because of the warbling and finite time required for looping, it is unlikely that the $P_F$ peak, on any pass around the loop, will be located at the same frequency $f_1$ as the $P_i$ peak. Thus, summation of the two signals by the summer, creating a still larger peak, is unlikely to occur. Within the constraints of his study, the author [16] showed that the optimum conditions for achieving maximum additional stable gain are when $f_w = 5\text{Hz}$ and $\Delta f = 10\text{Hz}$. He obtained a maximum of 7dB additional stable gain in one case under these conditions. The author also showed that, to prevent listener annoyance, only the frequency range where feedback is likely to occur should be warbled. Frequencies outside that range, especially those below 500Hz, should be passed untouched through the system. He stated that warbling was "hardly perceptible" when the circuit was operated under these limitations.

Because of the importance of speech perception to a hearing aid user, this method would have to be supported by extensive subjective test data before being adapted for use in a hearing aid.

### F. Feedback Detection Methods

Patronis [22] has suggested two methods whereby the onset of acoustic feedback is detected and action is then taken to suppress it. The difference between the two methods lies with their means for detecting feedback.

### 1. Correlation Detector

The correlation detector mentioned by Patronis [22] is based on the premise that there is little, if any, correlation (i.e., similarity) between two samples of a speech signal, given that the sampling interval is longer than a single syllable. On the other hand, correlation between the same two samples would be strong if the system were experiencing acoustic feedback. This is due to the existence of a persistant tone or tones (i.e., an oscillation which coincides in frequency with each peak in the GH spectrum where $|GH| > 1$, such as the peak at $f_1$ in the BEFORE illustration of Fig. 7) which is one characteristic of the howl of acoustic feedback.

The correlation detector, labeled D in Fig. 10, would periodically sample the output $E_p$ of the amplifier and would then compute a correlation coefficient $C_c$ between each successive pair of samples. If the coefficient were low, no action would be taken, but if it were high then the system would automatically take corrective action. This might come in the form of automatic gain control (AGC) of the amplifier, whereby $|GH|$ would be reduced each time the detector output (i.e., the correlation coefficient) reached some threshold value.



Figure 10   Using a correlation detector D to monitor the onset of acoustic feedback in a PA system and then reduce amplifier gain with an AGC circuit.

According to Patronis [22], the correlation detector ". . . though viable, would be expensive to employ in practice . . ." and consequently he ceased further development of this concept.

### 2. Phase-Lock-Loop Detector

A second method of feedback detection mentioned by Patronis [22] employs an electronic device known as a PLL circuit. A comprehensive discussion of PLL circuits is beyond the scope of this publication and the interested reader should consult the Patronis paper for more detail. Suffice it to say herein, that the PLL circuit produces no output voltage for input signals of short duration such as speech signals. When a persistent signal of long duration, such as the howl of acoustic feedback, is present the PLL produces a voltage. This voltage is then used to drive an AGC circuit which reduces the amplifier gain, thereby reducing $|GH|$. When the persistent signal is no longer present the AGC circuit allows the amplifier gain to rise to its original value, restoring the intended output volume.

## III. RESEARCH NEEDS

A review of the literature shows that research of the acoustic feedback phenomenon in hearing aids appears to be incomplete. Likewise, there are few, if any, efforts being made to develop feedback suppression devices for hearing aids or to adapt existing devices designed for PA systems. In order to correct this situation, it is suggested herein that a number of topics need further research. Results of that research could be incorporated into an envisioned physical/mathematical model of an entire in-situ hearing aid. In prior publications [35, 38], Egolf has stressed the need for a major research effort to develop such a model: a comprehensive computer-based model of the hearing aid system supported by experimental data. The model would then be used to simulate various conditions, including those causing or inhibiting acoustic feedback.

### A. Microphone and Amplifier Models

Accurate mathematical models of the hearing aid microphone and amplifier are not available in the literature. Microphone manufacturers generally supply microphone sensitivity data (i.e., essentially a magnitude $|M|$ versus frequency f plot), but not phase data for their microphones. Research in this area should concentrate on the development of microphone and amplifier models that will predict magnitude and phase of the output signal, given a known input signal. Engolf [39] has suggested a technique for producing these models by applying the "two-load" method reported by Egolf and Leonard [33].

### B. Effects of the Feedback Path on Frequency Response

Recall that the existence of the feedback path, even in an inherently stable system, can alter the shape of the frequency response of the in-situ hearing aid. This is supported by Figs. 5 through 8 of the chapter on "Acoustic Feedback Control" by Samuel Lybarger in this Proceedings.

Current mathematical models, such as that reported by Egolf et al. [34], treat the vent as a path by which sound energy is lost and not as part of a feedback path to the microphone. Consequently it is necessary to investigate, mathematically and experimentally, the role of the feedback path in shaping the frequency response. The envisioned result would be a model to predict, a-priori, spectrum shapes at the eardrum. This should yield better information on which to base decisions about venting.

### C. Effects of "Feedforward" on Frequency Response

Sound energy is admitted (i.e., "feedforward") as well as lost through vents and leaks, as earlier investigations of the "open" earmold have shown. Consequently, there must be constructive and destructive interference of sound entering via the vent with that entering by way of the receiver which will alter the shape of the hearing aid

101

EGOLF 00641

frequency response. This phenomenon has not been accounted for in earlier research including the model of Egolf, et al. [34]. Models such as this should be expanded to include feedforward in order to yield better, *a-priori*, information.

### D. Cause/Control of Acoustic Feedback

The roles played by the microphone, receiver, earmold, vent, etc. in producing feedback are not well understood. What physical variables affect feedback and which ones could be used to control it? Research in this area should include a thorough mathematical analysis because there are far too many variables (e.g., bore size, vent size, receiver type, microphone location, etc.) to develop an understanding based solely on experiment. For example, a model incorporating the transfer functions listed in Table 1 could be assembled and used to investigate the effect of various hearing aid parameters on stability (and thus feedback) of the system.

### E. Adapting PA System Feedback-Suppression Methods

Several feedback suppression devices designed for PA systems were reported in the preceding discussion. Would these devices also suppress feedback in hearing aids? Any attempt to adapt such a device to a hearing aid should be preceded by a thorough control-systems analysis of the aid in question. In addition, extensive subjective testing will have to be performed to assure that the device preserves speech intelligibility (i.e., if preservation of intelligibility is desired).

### IV. SUMMARY AND CONCLUSION

In the foregoing material, the problem of acoustic feedback in hearing aids and its relationship to system stability was discussed. It was also demonstrated that stability is dependent on a number of system transfer functions which are characteristic of the. *in-situ* hearing aid and the acoustical environment in which it is located. Several of these transfer functions have been defined by earlier investigators who successfully applied complicated theories of electroacoustic transduction, waveguide damping, acoustical shadow/diffraction, etc. Thus, developing a thorough understanding of the feedback problem will not be an easy task and solving it will be even more difficult: probably requiring additional skills from the fields of control systems and signal processing.

### REFERENCES

1. Nimura, T., Kido, K. Effect of sound reinforcement system in a room on the reverberation time and clearness (abstract). J. Acoust. Soc. Am. 28, 1956: 792.

2. Schroeder, M.R. Improvement of acoustic feedback stability in public address systems. Proc. Third Int. Cong. Acoust. V2, 1961: 771–775.

3. Schroeder, M.R. Improvement of feedback stability of public address systems by frequency shifting. J. Audio Eng. Soc., 10(2), 1962:108–109.

4. Prestigiacomo, A.J., MacLean, D.J. Frequency shifter for improving acoustic feedback stability. J. Audio Eng. Soc. 10(2), 1962: 110–113.

5. Burkhard, M.D. Simplified frequency shifter for improving acoustic feedback. J. Audio Eng. Soc. 11(3), 1963: 234–237.

6. Schroeder, M.R. Improvement of acoustic-feedback stability by frequency shifting. J. Acoust. Soc. Am. 36(9), 1964: 1718–1724.

7. Boner, C.P., Boner, C.R. Minimizing feedback in sound systems and room-ring modes with passive networks. J. Acoust. Soc. Am. 37, 1965: 131–135.

8. Waterhouse, R.V. Theory of howlback in reverberant rooms. J. Acoust. Soc. Am. 37, 1965: 921–923.

9. Boner, C.P., Boner, C.R. A procedure for controlling room-ring modes and feedback modes in sound systems with narrow-band filters. J. Audio Eng. Soc. 13(4), 1965: 297–300.

10. Furduev, V.V. Limiting amplification of sound in closed rooms. Soviet Physics-Acoustics 11(3), Jan.–Mar. 1966: 323–327.

11. Antman, H.S. Extension of the theory of howlback in reverberant rooms. J. Acoust. Soc. Am. 39, 1966: 399.

12. Boner, C.P., Boner, C.R. Behavior of sound system response immediately below feedback. J. Audio Eng. Soc. 14, 1966: 200.

13. Curtis, G.J. An analysis of the regenerative reverberation effects of acoustic feedback in rooms. Acustica 20(3), 1968: 119–133.

14. Indlin, Yu.A. Regeneration reverberation associated with sound amplification. Soviet Physics-Acoustics 14, Oct.–Dec. 1968: 179.

15. Furduev, V.V. Stability of stereophonic sound amplification systems. Soviet Physics-Acoustics 13(4), April–June 1968: 516–520.

16. Nishinomiya, G. Improvement of acoustic feedback stability of public address system by warbling. Proc. Sixth Int. Cong. Acoust. V3, 1968: 93–96.

17. Boner, C.R. Boner, C.R. Problems of sound reinforcement in large halls. J. Audio Eng. Soc. 19, 1971: 138–140.

18. Crowhurst, N.H. Electronics for public address. Audio 54(8), August 1970: 36, 38, 42, 61.

19. Conner, W.K. Experimental investigation of sound-system-room feedback. J. Audio Eng. Soc. 21(1), 1973: 27–32.

20. Jones, M.H. Frequency shifter for "howl" suppression. Wireless World 79, July 1973: 317–322.

21. Heinz, H.K. Feedback elimination simplified (abstract). J. Audio Eng. Soc. 1977: 496.

22. Patronis, E.T. Electronic detection of acoustic feedback and automatic sound system gain control. J. Audio Eng. Soc. 26(5), 1978: 323–326.

23. deBoer, B. Avoiding feedback in hearing aids. Zts. Hörgeräte Akustik, Heft 4, 1963: 122–140.

24. Grover, B.C., Martin, M.C. On the practical gain limit for postaural hearing aids. Brit. J. Audiol. 8, 1974: 121–124.

25. Johansen, A.P. An evaluation of the acoustic feedback damping for behind-the-ear hearing aids, report 75.1. Research Laboratory for Technical Audiology, Odense, Denmark, 1975.

26. Johansen, A.P. Magnitude of the acoustical feedback as a function of leakage in earmolds. Scandanavian Audiology. Supp. 5, 1975: 271–279.

EGOLF 00642

27. Lybarger, S.F. Sound leakage from vented earmolds. Scandanavian Audiology Supp. 5, 1975: 261–270.

28. Schroeder, M.R. Frequency-correlation functions of frequency responses in rooms. J. Acoust. Soc. Am. 34(12), 1962: 1819–1823.

29. Kuhn, G.F. The pressure transformation from a diffuse sound field to the external ear and to the body and headsurface. J. Acoust. Soc. Am. 65, 1979: 991–1000.

30. Shaw, E.A.G. The acoustics of the external ear. In: Studebaker, G.A., Hochberg, I., eds. Acoustical factors affecting hearing aid performance. Baltimore: University Park Press, 1980: 109–125.

31. Franks, J.R. Microphone directionality effects on hearing aid frequency response. In: Larson, V.D., Egolf, D.P., Kirlin, R.L., Stile, S.W., eds. Auditory and hearing prosthetics research. New York: Grune and Stratton, 1979: 133–146.

32. Kuhn, G.F. Some effects of microphone location, signal bandwidth, and incident wave field on the hearing and input signal. In: Studebaker, G.A., Hochberg, I., eds. Acoustical factors affecting hearing aid performance. Baltimore: University Park Press, 1980: 55–80.

33. Egolf, D.P., Leonard, R.G. Experimental scheme for analyzing the dynamic behavior of electroacoustic transducers. J. Acoust. Soc. Am. 62(4), 1977: 1013–1023.

34. Egolf, D.P., Tree, D.R., Feth, L.L. Mathematical predictions of electroacoustic frequency response of in-situ hearing aids. J. Acoust. Soc. Am. 63(1), 1978: 264–271.

35. Egolf, D.P. Techniques for modeling the hearing aid receiver and associated tubing. In: Studebaker, G.A., Hochberg, I., eds. Acoustical factors affecting hearing aid performance. Baltimore: University Park Press, 1980: 297–319.

36. Morse, P.M., Ingard, K.U. Theoretical acoustics. New York: McGraw-Hill, 1968: 381–388.

37. Nyquist, H. Regeneration theory. Bell Sys. Tech. J. 11, 1932: 126–147.

38. Egolf, D.P. Computer predictions of hearing aid sound-spectra. Hearing Aid Journal, March 1978: 6, 46–48.

39. Egolf, D.P. A mathematical scheme for predicting the electroacoustic frequency response of hearing aid receiver—earmold—ear systems (unpublished Ph.D. dissertation). West Lafayette, IN: Purdue University, August 1976: 153–161.

103

EGOLF 00643