EXHIBIT 27

AO 88 (Rev. 1/94) Subpoena in a Civil Case

## Issued by the
## UNITED STATES DISTRICT COURT

| NORTHERN | DISTRICT OF | CALIFORNIA |
|---|---|---|

ENERGY TRANSPORTATION GROUP, INC., Plaintiff

V.

SONIC INNOVATION, INC. et. al, Defendant

### SUBPOENA IN A CIVIL CASE

CASE NUMBER: C.A. No. 05-422 (GMS)
UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

TO: Harry Levitt
    REDACTED

☐ YOU ARE COMMANDED to appear in the United States District Court at the place, date, and time specified below to testify in the above case.

| PLACE OF TESTIMONY | COURTROOM |
|---|---|
| | DATE AND TIME |

☐ YOU ARE COMMANDED to appear at the place, date, and time specified below to testify at the taking of a deposition in the above case.

| PLACE OF DEPOSITION | DATE AND TIME |
|---|---|

☒ YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the place, date, and time specified below (list documents or objects):
SEE ATTACHED SCHEDULE A

| PLACE | DATE AND TIME |
|---|---|
| SUGHRUE MION, PLLC, 401 Castro Street, Suite 220, Mountain View, California 94041, (650) 625-8100 | August 3, 2007, at 9:30 AM |

☐ YOU ARE COMMANDED to permit inspection of the following premises at the date and time specified below.

| PREMISES | DATE AND TIME |
|---|---|

Any organization not a party to this suit that is subpoenaed for the taking of a deposition shall designate one or more officers, directors, or managing agents, or other persons who consent to testify on its behalf, and may set forth, for each person ____ich the person will testify. Federal Rules of Civil Procedure, 30(b)(6).

REDACTED

| AND TITLE (INDICATE IF ATTORNEY FOR PLAINTIFF OR DEFENDANT) torney for Defendants Widex A/S and Widex Hearing Aid Co. Inc. | DATE 7/20/07 |
|---|---|

ISSUING OFFICER'S NAME, ADDRESS AND PHONE NUMBER
Carl J. Pelleghini, Esq., SUGHRUE MION, PLLC, 2100 Pennsylvania Ave, N.W., Suite 800, Washington, D.C. 20037, (202) 293-7060

(See Rule 45, Federal Rules of Civil Procedure, Parts C & D on Reverse)

If action is pending in district other than district of Issuance, state district under case number.

AO 88 (rev. 1/94) Subpoena in a Civil Case

## PROOF OF SERVICE

| | DATE | | PLACE |
|---|---|---|---|
| SERVED | | | |

| SERVED ON (PRINT NAME) | MANNER OF SERVICE |
|---|---|
| | |

| SERVED BY (PRINT NAME) | TITLE |
|---|---|
| | |

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Proof of Service is true and correct.

Executed on _____
DATE

SIGNATURE OF SERVER

ADDRESS OF SERVER

Rule 45, Federal Rules of Civil Procedure, Parts C & D:

(c) PROTECTION OF PERSONS
(1) A party or an attorney responsible for the issuance and service of a subpoena shall take reasonable steps to avoid imposing undue burden or expense on a person subject to that subpoena. The court on behalf of which the subpoena was issued shall enforce this duty and impose upon the party or attorney in breach of this duty an appropriate sanction which may include, but is not limited to, lost earnings and reasonable attorney's fee.
(2) (A) A person commanded to produce and permit inspection and copying of designated books, papers, documents or tangible things, or inspection of premises need not appear in person at the place of production or inspection unless commanded to appear for deposition, hearing or trial.
(B) Subject to paragraph (d) (2) of this rule, a person commanded to produce and permit inspection and copying may, within 14 days after service of subpoena or before the time specified for compliance if such time is less than 14 days after service, serve upon the party or attorney designated in the subpoena written objection to inspection or copying of any or all of the designated materials or of the premises. If objection is made, the party serving the subpoena shall not be entitled to inspect and copy materials or inspect the premises except pursuant to an order of the court by which the subpoena was issued. If objection has been made, the party serving the subpoena may, upon notice to the person commanded to produce, move at any time for an order to compel the production. Such an order to compel production shall protect any person who is not a party or an officer of a party from significant expense resulting from the inspection and copying commanded.
(3) (A) On timely motion, the court by which the subpoena was issued shall quash or modify the subpoena if it
(i) fails to allow reasonable time for compliance;
(ii) requires a person who is not a party or an officer of a party to travel to a place more than 100 miles from the place where that person resides, is employed or regularly transact business in

person, except that, subject to the provisions of clause (c) (3) (B) (iii) of this rule, such a person may in order to attend trial be commanded to travel from any such place within the state in which the trial is held, or
(iii) requires disclosure of privileged or other protected matter and no exception or waiver applies, or
(iv) subjects a person to undue burden.
(B) If a subpoena
(i) requires disclosure of a trade secret or other confidential research, development, or commercial information, or
(ii) requires disclosure of an unretained expert's opinion or information not describing specific events or occurrences in dispute and resulting from the expert's study made not at the request of any party, or
(iii) requires a person who is not a party or an officer of a party to incur substantial expense to travel more than 100 miles to attend trial, the court may, to protect a person subject to or affected by the subpoena, quash or modify the subpoena, or, if the party in whose behalf the subpoena is issued shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship and assures that the person to whom the subpoena is addressed will be reasonably compensated, the court may order appearance or production only upon specified conditions.
(d) DUTIES IN RESPONDING TO SUBPOENA.
(1) A person responding to a subpoena to produce documents shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the demand.
(2) when information subject to a subpoena is withheld on a claim that it is privileged or subject to protection as trial preparation materials, the claim shall be made expressly and shall be supported by a description of the nature of the documents, communications, or things not produced that is sufficient to enable the demanding party to contest the claim.

ETG v. SONIC INNOVATION, INC., ET AL.
CASE NO. C.A. No. 05-422 (GMS), DISTRICT OF DELAWARE
SUBPOENA TO HARRY LEVITT

## SCHEDULE A

YOU ARE COMMANDED to produce and permit inspection and copying of the following documents or objects at the time and place specified in the subpoena to which this Schedule A is attached.

## DEFINITIONS

The following definitions apply to the document requests set forth below:

1.    "CUNY" refers to The City University of New York, including The Graduate School and University Center of The City University of New York, The Graduate School of The City University of New York, and Research Foundation of The City University of New York, or any successors thereof.

2.    "VA" refers to the United States Department of Veterans Affairs and the United States Department of Veterans Administration.

3.    "AT&T" refers to American Telephone & Telegraph Company, American Telephone & Telegraph Corporation, AT&T Corporation, American Telephone & Telegraph, Inc., Bell Laboratories, Bell Labs, AT&T Bell Laboratories, Bell Telephone Laboratories, and any affiliated entities.

## DOCUMENT REQUESTS

1.    All documents dated or generated between January 1, 1980, and November 7, 1989, concerning research on hearing aids and/or hearing impairment conducted, supervised or reviewed by you.

A-1

ETG v. SONIC INNOVATION, INC., ET AL.
CASE NO. C.A. No. 05-422 (GMS), DISTRICT OF DELAWARE
SUBPOENA TO HARRY LEVITT

2.     All documents dated or generated between January 1, 1980, and November 7,

1989, concerning hearing aids and/or hearing impairment, including without limitation

documents prepared pursuant to your relationship with CUNY.

3.     All documents dated or generated between January 1, 1980, and November 7,

1989, concerning hearing aids and/or hearing impairment and authored or presented by or for the

VA, and/or persons affiliated with the VA.

4.     All documents generated during the period of your employment or association

with CUNY concerning consulting performed by you or persons directed by you, concerning

hearing aids and/or hearing impairment with any third party.

5.     All documents concerning any consulting performed by you or persons directed

by you with any of the parties to this action or any predecessor in interest to any of those parties.

6.     All documents dated or generated between January 1, 1980, and November 7,

1989, concerning any consulting performed by you or persons directed by you with AT&T or

any successor to AT&T.

7.     All documents dated or generated between January 1, 1980, and November 7,

1989, concerning hearing aids and/or hearing impairment and authored or presented by or for

Nicolet Instrument Corporation ("Nicolet") and/or persons affiliated with Nicolet.

8.     All documents dated or generated between January 1, 1980, and November 7,

1989, concerning any consulting performed by you or persons directed by you with Nicolet

Instrument Corporation or any successor thereof.

A-2

9.    All documents dated or generated between January 1, 1980, and November 7, 1989, concerning hearing aids and/or hearing impairment and authored or presented by or for "Project Phoenix," and/or persons affiliated with "Project Phoenix, " including without limitation, any consulting performed by you, or persons under your direction, with "Project Phoenix," and/or persons affiliated with "Project Phoenix."

10.    All documents dated or generated between January 1, 1980, and November 7, 1989, concerning hearing aids and/or hearing impairment and authored or presented by or for Central Institute for the Deaf ("CID") and/or persons affiliated with CID, including without limitation, any consulting performed by you, or persons under your direction, with CID and/or persons affiliated with CID.

11.    All documents dated or generated between January 1, 1980, and November 7, 1989, concerning hearing aids and/or hearing impairment and authored or presented by or for the University of Wyoming and/or persons affiliated with the University of Wyoming, including without limitation, any consulting performed by you, or persons under your direction, with the University of Wyoming and/or persons affiliated with the University of Wyoming.

12.    All documents dated or generated between January 1, 1980, and November 7, 1989, concerning hearing aids and/or hearing impairment and authored or presented by or for Brigham Young University (BYU") and/or persons affiliated with BYU, including without limitation, any consulting performed by you, or persons under your direction, with BYU and/or persons affiliated with the BYU.

# EXHIBIT 28

## FULLY REDACTED

EXHIBIT 29

$179-1$



DEPOSITION
EXHIBIT
$112$
Levitt

# United States Patent [19]

## Graupe et al.

[11]    **4,025,721**

[45]    **May 24, 1977**

[54]    **METHOD OF AND MEANS FOR ADAPTIVELY FILTERING NEAR-STATIONARY NOISE FROM SPEECH**

[75]    Inventors: **Daniel Graupe,** Fort Collins, Colo.; **G. Donald Causey,** Chevy Chase, Md.

[73]    Assignee: **Biocommunications Research Corporation,** Chevy Chase, Md.

[22]    Filed:    **May 4, 1976**

[21]    Appl. No.: **683,234**

[52]    U.S. Cl. ........................... 179/1 P; 179/107 FD
[51]    Int. Cl.² ......................................... H04R 27/00
[58]    Field of Search .............. 179/1 P, 1 D, 1 SA, 179/107 R, 107 FD

[56]    **References Cited**

UNITED STATES PATENTS

| 3,126,449 | 3/1964 | Shirman | 179/1 P |
| 3,784,749 | 1/1974 | Shigeyama et al. | 179/1 P |
| 3,803,357 | 4/1974 | Sacks | 179/1 P |
| 3,889,059 | 6/1975 | Thompson | 179/1 P |

| 3,894,195 | 7/1975 | Kryter | 179/107 FD |

*Primary Examiner*—William C. Cooper
*Assistant Examiner*—E. S. Kemeny
*Attorney, Agent, or Firm*—Donald M. Sandler

[57]    **ABSTRACT**

By identifying and analyzing the properties of the parameters of an input signal that contains speech in the presence of simultaneously occuring near-stationary noise, pauses between speech intervals as well as the termination of such noise can be recognized. When a pause interval containing noise is recognized, the parameters identified during such interval are used to set the parameters of an adaptive filter through which the input signal is passed during subsequent intervals of speech and until the noise terminates. During the time the input signal passes through the filter, the near-stationary noise is filtered out. In response to recognition of the termination of noise, the input signal is caused to by-pass the filter which is then prepared to accept the parameters of noise occuring in a subsequent pause.

**28 Claims, 6 Drawing Figures**



MMS:
Doc
Jont:

noise

This is the patent on the ^ filter described in the Stein et al proper sent to you by Harvey Levitt. I heard about it from David Preve, chief engineer of Starkey.

Fred W.
10/4/84

**D1**

*FIG. 1.*



*FIG. 2.*



*FIG. 3.*



**D2**



FIG. 4A.

**D3**



*FIG. 4B.*

*FIG. 5.*

4,025,721

1

## METHOD OF AND MEANS FOR ADAPTIVELY FILTERING NEAR-STATIONARY NOISE FROM SPEECH

### CROSS-REFERENCES TO RELATED PRIOR ART

The followng references, helpful to an understanding of the present invention, are hereby incorporated by reference:

1. D. Graupe, "Identification of Systems", Krieger Publishing Company, Huntington, N.Y., 1976;
2. E. Parzen, IEEE Trans. on Auto Control, December, 1974;
3. Sage and Melsa, "Estimation Theory with Applications to Communications and Control", McGraw Hill, 1971;
4. N. Levenson and N. Wiener, "Extrapolation, Interpolation and Smoothing of Stationary Time Series," MIT Press, 1964;
5. Y. Z. Tsypkin, "Foundations of the Theory of Learning Systems", Academic Press, N.Y., 1973;
6. M. Schwarz and L. Shaw, "Signal Processing", McGraw Hill, N.Y., 1975; and
7. D. E. Johnson and J. L. Hilburn, "Rapid Practical Design of Active Filters", John Wiley & Sons, N.Y., 1975.

### BACKGROUND OF THE INVENTION

This invention relates to a method of and means for filtering environmental noise from speech, and more particularly noise that is near-stationary and of relatively long duration.

Environmental noise is often tolerated by persons with unimpaired hearing with no more discomfort than annoyance at the existence of such noise and the loss of ability to understand speech in the presence of such noise. For persons with impaired hearing fitted with a hearing aid having a fixed frequency spectrum, environmental noise is often disturbing, often interferes with their ability to understand speech, and is sometimes physically painful.

Environmental noise can be classified as follows:

1. relatively short duration noise such as clicking of shoes during walking, or dishes during stacking;

2. relatively long duration noises having near stationary spectral characteristics such as the noise associated with passing cars, trains and airplanes, or running fans or machinery; and

3. relatively long duration noises that lack stationary spectral characteristics such as a background conversation, etc.

The last mentioned class of noise may mask speech preventing its being understood by a hearing aid user and is disturbing for this reason. However, this type of noise does not assault the user's ear as do clicking noises and near-stationary noises of relatively long duration.

A relatively satisfactory solution to the problem of clicking noises is obtained by incorporating automatic gain control (AGC) into the circuitry of the hearing aid. Such circuitry responds to a sudden, high volume click, by automatically reducing the volume for the duration of the click thus suppressing the input to the user's ear. This eliminates not only the sound of the click, but any intelligence occuring simultaneously with the click. No loss of intelligibility of speech occurs, however, because of the short duration of the gain

2

reduction and the ability of the ear to fill in a relatively short information gap.

So far as is known, however, no practical solution exists to the problem encountered with hearing aids due to near-stationary noise of relatively long duration. For the purpose of this description, the term "near-stationary, relatively long duration noise", hereinafter referred to as noise of the type described, refers to noise having particular time and spectral characteristics, namely noise of a duration exceeding about three seconds and whose frequency spectrum does not vary with time or varies with only within a narrow range. As indicated above, vehicular and machinery noises are examples of noise of the type described. The minimum duration of noise of the type described is thus considerably longer than intervals of normal speech occuring between speech pauses.

It is therefore an object of the present invention to provide a novel method of, and means for, filtering noise of the type described from speech, whereby hearing aids or other devices can be adapted to operate properly under changing environmental noise situations.

### SUMMARY OF THE INVENTION

Noise of the type described is filtered from speech by providing a system that identifies and analyzes the properties of an input signal that contains speech in the presence of such noise. Pauses between speech intervals as well as the termination of the noise can be recognized. When a pause interval containing noise is recognized, the parameters identified during such interval are used to set the parameters of an adaptive filter through which the input signal is passed during subsequent intervals of speech and until the noise terminates. During the time the input signal passes through the filter, the near-stationary noise is filtered out. In response to recognition of the termination of noise, the input signal is caused to by-pass the filter which is then prepared to accept the parameters of noise occuring during a subsequent pause.

The system of the present invention has two components: a recognition subsystem, and an adaptive filer subsystem. The recognition subsystem performs a parameter identification algorithm that identifies the parameters of the input signal. Such identification is carried out at intervals of time much smaller than the smallest interval of speech or pause between speech intervals likely to occur in normal speech patterns. At regular intervals, the identified parameters are examined to determine whether they meet criteria for being considered stationary, or near-stationary. If the criteria are met, the recognition subsystem is effective to determine whether the noise is occuring in the absence of speech, i.e., during a pause, the identified parameters are furnished to the adaptive filter whose characteristic is thereby adapted to the noise, and the input signal is switched to the filter input.

The adaptive filter subsystem not only serves to filter out the noise in the input signal during the subsequent speech interval, but serves to determine whether the noise has terminated during a speech interval, i.e., before a pause occurs. If termination during a speech interval occurs, the input signal is caused to by-pass the filter, and its operation is stopped until a future pause containing noise of the type described is detected.

The parameters identified by the recognition subsystem may be stored at times other than during pauses

4,025,721

3

containing noise and used by the adaptive filter at other times.

An adaptive filter according to the present invention must be computationally powerful and fast, and can be built from well known digital components. While many applications of the present invention are not size, weight, or cost constrained, the application of the present invention to hearing aids requires the use of microcomputer techniques. An adaptive filter so constructed can be coupled electrically to a conventional ear-borne hearing aid, or a hearing aid of the type disclosed in co-pending application Ser. No. 650,513, filed Feb. 23, 1976. Alternatively, the adaptive filter of the present invention can be carried by the user in his pocket and linked to a hearing aid via wire or radio.

The adaptive filter of the present invention also has general application to other types of voice communication systems operating in the presence of high-level environmental noise that is essentially near-stationary. Examples of such systems are the engine-room to bridge voice communication link aboard a ship, and intercrew voice communication links aboard helicopters or tanks.

BRIEF DESCRIPTION OF THE DRAWINGS

Embodiments of the present invention are illustrated by way of example in the accompanying drawings wherein:

FIG. 1 is a block diagram showing an adaptive hearing aid according to the present invention being utilized with a voice communication system in the form of a conventional hearing aid;

FIG. 2 is a time-sequence diagram showing a typical relationship between the occurrence of noise of the type described and a speech pattern;;

FIG. 3 is a block diagram showing the functional relationship between the major components of an adaptive hearing aid according to the present invention;

FIGS. 4A and 4B are portions of a detailed block diagram of one embodiment of the adaptive filter of the present invention; and

FIG. 5 is a composite showing how the partial block diagram of FIGS. 4A and 4B fit together to form a composite block diagram.

DETAILED DESCRIPTION OF THE DRAWINGS

Referring now to FIG. 1, reference numeral 10 designates an adaptive filter according to the present invention, such filter receiving an input signal comprising environmental noise, including noise of the type described, and speech which are additively combined in transducer 11 which may be a microphone; for example. The input signal is applied to filter 10, which operates as described below, to filter noise of the type described from the input signal and apply a filtered signal to a communication system having an amplifier and a speaker, such system being shown as hearing aid 13. The hearing aid may be a conventional one well known in the art, or a hearing aid such as that disclosed in copending application Ser. No. 660,513 filed Feb. 23, 1976. The output of the hearing aid is applied to the ear of a user who is thus able to understand the intelligence in the speech portion of the input signal substantially unaffected by the presence therein of noise of the type described.

Filter 10 can be incorporated physically into hearing aid 13. Alternatively, filter 10 can be carried by the

4

person wearing the hearing aid, and linked to the hearing aid via a wire or radio.

The relationship between noise of the type described and speech is illustrated in FIG. 2. Speech is characterized by a series of separate speech intervals containing a single sound, word or group of sounds or words spoken by an individual. Between such intervals, there are pauses that do not contain intelligence and which may or may not contain noise of the type described depending on factors independent of the intelligence in speech intervals preceeding or succeeding a pause.

Filter 10, as shown in FIG. 3, has two main components: recognition subsystem 15, and adaptive filter system 16. Subsystem 15 comprises parameter identifier 17 for identifying the parameters of the input signal, and discriminator 18 for examining the identified parameters to determine whether they meet predetermined criteria for being stationary. Parameter identification is preferably made using a time series identification such as an auto-regressive model identification, or an auto-regressive moving average model identification following the teachings in reference [1]. Alternatively, parameter identification can be by way of spectral identification based on transforming the times series identification model into the frequency domain using Fourier transformation processes. When the time series identification is an auto-regressive model identification, the transformation into the frequency domain can be carried out using Parzen's method as disclosed in reference [2].

Under the influence of clock input 19, parameter identification takes place periodically at successive identification intervals that are much shorter than the smallest interval of speech or pause between speech intervals likely to be encountered in normal speech patterns. Identification experiments show that the auto-regressive model parameters of speech usually vary at intervals of about 0.05. seconds. For this reason, the preferred sampling period is approximately 0.1 seconds, but other periods can be used. For this reason, the clock rate is indicated as being adjustable. The sampling intervals are subintervals of the speech and pause intervals as indicated in FIG. 2.

Discriminator 18 examines changes in the identified parameters over a number of identification intervals selected by input 20 to the discriminator in order to determine whether the identified parameters are stationary. During a speech interval, the identified parameters will change significantly over a number of identification intervals independently of whether or not noise of any type including noise of the type described is present; and the identified parameters are not considered to be stationary. During a pause containing only noise of the type described, the parameters will not change at all over a number of identification intervals, or the change will be small. Changes within predetermined limits over a predetermined number of identification intervals establish the criteria that determines whether the parameters are stationary, and hence whether a pause contains noise of the type described.

During a pause without noise, the parameters will be zero and the output 21 of discriminator 18 passing through OR-gate 22 will operate on control means 23 connecting terminal C to terminal A and allowing the input signal to bypass subsystem 16 and appear at the output of gate 24. This connection is maintained until a pause containing noise of the type described is detected by discriminator 18. When this occurs the parameters

4,025,721

5

6

identified by identifier 17 will be characteristic of the noise and discriminator 18 will produce output 25 which, first of all, operates on control means 23 to connect terminal C to terminal B switching the input signal into subsystem 16. Output 25 also operates on transfer circuit 26 to effect the transfer of the identified parameters characteristic of the noise to the adjustable parameter section of filter means 27 of subsystem 16. Filter means 27 is thus adjusted so as to attenuate sharply those frequencies constituting the noise without substantially affecting other frequencies in the input signal.

Filter means 27 is preferably a minimum variance time domain filter of the type disclosed in reference [3]. For example, the filter can be an augmented Kalman filter of colored noise as described in reference [3], or it may be a realizable Wiener filter as described in references [4] and [5]. Alternatively the filter can be an adjustable notch filter such as described in references [6] and [7]. A realizable Wiener filter as discussed in Sec. 8.6 of reference [5], wherein the autocorrelation function of the noise can be computed from the autoregressive model parameters of the noise using the relationship between these terms as set forth in reference [1], may be used with a modification that the error cost is directly minimized to yield faster filtering than is achieved using the original learning algorithm of Sec. 8.6 of reference [5].

During the next speech interval following the detected noise-containing-pause, subsystem 16 is effective to substantially filter out the noise in the input signal while allowing the speech signal (less the noise frequencies) to pass substantially unaffected through gate 24. This situation remains in effect, with the noise parameters in the parameter section of the filter means 27 being up-dated as each pause occurs, until the noise terminates. As described in detail below, subsystem 16 not only serves to filter noise in the input system during speeches following detection of a pause containing noise, but also serves to determine whether the noise has terminated during a speech interval.

When noise cessation circuit 28 recognizes the termination of noise during a speech interval, output 29 is effective to operate on control means 23, through OR-gate 22, disconnecting terminal C from terminal B and connecting it to terminal A which allows the input signal to pass directly to the output of gate 24. Thus, the noise free signal bypasses filter means 27 during the balance of the speech interval within which the noise terminated. This arrangement eliminates distortion that the filter would have introduced after the noise terminates.

Output 29 is also effective to terminate the operation of filter means 27, and to clear its adjustable parameter section. The filter means is thus in condition for receiving a new set of parameters if the next pause contains noise of the type described.

Referring now to FIGS. 4A and 4B, where terminal a1 is connected to terminal a2, etc., a speech signal $s_k$ is additively combined with a noise signal of the type described designated $n_k$ to provide an input signal $y_k = n_k + s_k$. The input signal is applied to recognition subsystem 15A that includes a linear delay device 30 having a plurality of taps 31 at which the input signal $y_k$ appears delayed in time by the interval B. Considering the time delay B to be a delay operator,

$$B y_k = y_{k-1},$$

$$B^2 y_k = B y_{k-1}, \text{ etc.}$$

The delayed input signals are applied to circuit 32 which computes the variance of the signal, and to circuit 33 which continuously identifies the parameters associated with characteristics of the input signal. Circuit 32 samples the analog inputs thereto, and computes the variance (i.e., the sum of the squares of the amplitude of the input signal at each instant of sampling, hereinafter referred to as the sampled variance), and applies it to threshold detector 34. If the variance does not exceed the limit of threshold detector 34 then the input signal at that instant must represent a pause without noise of the type described. An output from line 35 of detector 34 thus serves to open gate 36 which allows the input signal $y_k$ to pass into OR-gate 37 whose output is applied to a hearing aid, for example. In this case, the input signal is applied directy to the hearing aid bypassing the other components of the adaptive filter.

An output on line 38 of detector 34, which occurs when the variance exceeds the threshold of detector 34, occurs when the input signal at that instant represents either a pause containing noise of the type described or speech (with or without noise). An output on line 38 is applied to gate 39 as well as to AND-gates 40, 41 of the adaptive filter subsystem 16A. Gate 39 directs the input signal $y_k$ into an augmented Kalman filter 42. Instead of this type of filter, block 42 may contain an adjustable notch filter, or a Wiener filter based on Sec. 8.6 of reference [5] described above. The latter two filters require only the noise parameters ($an$) for their setting. Hence, block 46 and gates 45 and 47 are not required in such cases.

The output of filter 42 is applied to OR-gate 37. The input to this filter is thus the input signal containing noise of the type described or speech which may or may not contain noise of the type described.

Parameter identifier 33 receives the tapped signals $y_k$, $y_{k-1}$, etc. and produces a plurality of outputs, one corresponding to each parameter $\alpha_x(B)$. Circuit 43 tests these parameters for being stationary. If the parameter-set is stationary (i.e., does not change over several indentification interludes), or if the parameter-set varies within predetermined limits over a fixed interval of time, the input signal $y_k$ cannot contain speech. The input signal must, therefore, be a pause containing noise of the type described if the variance exceeds the threshold of detector 34. Thus, if AND-gate 40 has an output, the input signal $y_k$ must be a pause containing noise of the type described. The output of gate 40 causes the noise parameters calculated by identifier 33 to be stored in buffer 43 in preparation for their use in the Kalman filter 42.

On the other hand, if AND-gate 41 has an output, that is, if $\alpha_x(B)$ parameters are nonstationary, and if at the same time sample variance of $y_k$ exceeds the threshold of the detector 34, then $y_k$ exceeds the threshold of the detector 34, then $y_k$ represents speech and gate 45 is opened to apply the noise parameters $\alpha_n$ characteristic of the noise of the type described occuring within the previous pause interval, to computer circuit 46 which computes the speech parameters $\alpha_s$ from the noise parameters $\alpha_n$ stored in buffer 44 and the input parameters $\alpha_y$ currently identified by identifier 33. The latter parameters are applied to a computer 46 through gate 47 by reason of the same output of circuit 43 which is applied to gate 41. It should be noted that the

D7

7

4,025,721

8

$\alpha_x$ parameters are not required as inputs to block 42 when the latter is a Wiener filter design following Sec. 8.6 of reference [5], or an adjustable notch filter.

Since the filter 42 is furnished with the noise parameters obtained during a pause containing noise of the type described, and since the rest of the parameters of this filter (if an augmented Kalman filter is used in block 42) are obtained from a speech interval following a noise containing pause and are continuously updated during the speech interval, the output of filter 42 will contain the estimate $\hat{s}_k$ of the speech signal $s_k$. Such an estimate of the speech signal will be available at the output of OR-gate 37. It should be noted that if block 42 contains an augmented Kalman filter, then both the noise parameters $\alpha_x$ obtained during the last pause containing noise, and the currently identified input parameters $\alpha_y$ are required to set the Kalman filter. The setting for this filter is in accordance with Section 12.8 of reference [1], taking note of the augmented form of such filter. Hence, the setting of the augmented Kalman filter requires the parameters $\alpha_z$ and the parameters $\alpha_x$ ($\alpha_z$ being computed from $\alpha_y$ and $\alpha_x$) for its setting. To set the Wiener filter based on Sec. 8.6 of reference [5], or to set a notch filter, only $\alpha_x$ is required.

If the noise of the type described lasts throughout the speech interval, the above-described state of affairs continues until a pause occurs containing noise of the type described.

If filter 42 is being supplied with the input signal by reason of the state of gate 39, and the noise terminates during a pause, gate 39 is closed because the output on line 48 disappears, and the input signal is applied to OR-gate 37 by way of gate 36 by reason of the initiation of an output on line 35. This state of affairs again continues until a pause occurs containing noise of the type described. Such noise may be characterized by similar or other parameters.

If the noise terminates during a speech interval, the operation of filter 42 is terminated in response to a change in the state error covariance P matrix of the Kalman filter (see section 8.1 of refrence [3]), and to a sudden drop in the sample covariance of the input signal. Circuit 50 (which is absent if block 42 is not based on an augmented Kalman filter) computes the P matrix, which is an estimate of the covariance of the difference between the speech signal $s_k$ and the best estimate of the speech signal $\hat{s}_k$ when the latter contains noise. Detector circuit 51 has an output when the threshold set in detector 41 is exceeded. Additionally, circuit 52 computes the change in the sample variance of the output of circuit 32, and threshold detector 53 determines when the change in variance drops suddenly. The coincidence of these events provides an output to gate 54 which serves to clear buffer 44 and to terminate the filtering action of filter 42. At the same time, gate 55 is opened to allow the input signal to pass to OR-gate 37 and bypass filter 42.

Alternatively, the termination of noise of the type described during a speech interval can be detected if the sample variance of the input $y_k$ suddenly drops when the filter output does not simultaneously drop.

The latter arrangement is alternative to that shown in FIGS. 4A and 4B, and is used with an augmented discrete Wiener filter or a notch filter is used at 42 in place of the augmented Kalman filter. If a notch filter is used, it will employ one or more notches or prespecified depth. In such case, the notch, or notches, would

be adjusted so as to occur in the frequency range within which the noise of the type described has been identified as being mainly concentrated via either a time series identification model transformed to a frequency model, or via direct frequency spectrum analysis of the noise signal based on Fourier transforms thereof. The spectral estimate can be directly related to the autoregressive model, if time-domain identification is employed by using spectral (minimum entropy) estimates as given in reference [2]. Regardless of which method is used, to obtain the model for the noise or the notch range for the notch filter, both the model and the notch range can be varied with time as long as the changes in the noise are gradual, or change slowly with time.

It is believed that the advantages and improved results furnished by the method and apparatus of the present invention are apparent from the foregoing description of the several embodiments of the invention. Various changes and modification may be made without departing from the spirit and scope of the invention as sought to be defined in the claims that follow.

What is claimed is:

1. A method for adaptively filtering noise of the type described from speech comprising the steps of:

a. periodically identifying the parameters representing the characteristics of an input signal comprising said noise and speech;

b. detecting the occurrence of pauses containing said noise between speech intervals;

c. adjusting the parameters of a filter to those identified in response to detection of a pause containing said noise; and

d. passing the input signal through the filter following the detected noise containing pause only until cessation of said noise is detected.

2. A method according to claim 1 including the steps of:

a. detecting the occurrence of pauses without said noise between speech intervals; and

b. causing the input signal to bypass during this speech interval following the detected pause without noise.

3. A method according to claim 1 including the step of causing the input signal to bypass the filter in response to termination of said noise within a pause between speech intervals.

4. A method according to claim 3 including the step of causing the input signal to bypass the filter in response to termination of said noise during a speech interval.

5. A method according to claim 1 wherein the parameter identification is a time-series identification.

6. A method according to claim 5 wherein the parameter identification is an auto-regressive model identification.

7. A method according to claim 5 wherein the parameter identification is an auto-regressive moving average model identification.

8. A method according to claim 1 wherein the parameter identification is spectral identification and the frequency domain obtained by taking a transform of the input signal.

9. A method according to claim 1 wherein the parameter identification is obtained by spectral identification of a time-series model based on taking its Fourier transform.

10. A method according to claim 1 wherein the parameter identification is obtained by spectral identifi-

9                                4,025,721                                10

cation of a time-series model based on transforming the model to a frequency domain model.

**11.** A method according to claim 1 wherein the parameter identification uses an auto-regressive model transformed into a frequency domain model.

**12.** An adaptive filter for filtering noise of the type described from speech comprising:

a. discriminator means for periodically identifying the parameter representing the characteristics of an input signal comprising said noise and speech, and for detecting pauses containing said noise between speech intervals;

b. filter means having adjustable parameters;

c. control means responsive to detection of the pause containing noise for adjusting the parameters of the filter means to the identified parameters and for passing the input signal through the filter means following the detected noise-containing pause only until cessation of said noise.

**13.** An adaptive filter according to claim **12** wherein the discriminator means detects pauses without noise and said control means is responsive to detection of a pause without noise for causing the input signal to bypass the filter means.

**14.** An adaptive filter according to claim **12** including means responsive to termination of noise during a pause for causing the input signal to bypass the filter, and for preparing the filter means to accept a new set of parameters.

**15.** An adaptive filter according to claim **12** wherein the discriminator means for computing the sampled variance of the input signal, and the adaptive filter includes means responsive to a sudden drop in the sampled variance for causing the input signal to by-pass the filter means.

**16.** An adaptive filter according to claim **12** wherein the filter means is in the form of an augmented Kalman filter, namely a colored measurement noise Kalman filter where certain noise vector elements augment the state vector.

**17.** An adaptive filter according to claim **12** wherein the filter means is in the form of an adjustable notch filter, namely a notch filter wherein the frequency location of the notch is adjustable.

**18.** An adaptive filter according to claim **12** wherein the filter means is in the form of a Wiener filter.

**19.** An adaptive filter according to claim **12** wherein the filter is a linear least square filter.

**20.** An adaptive filter according to claim **12** wherein the filter means is in the form of an augmented Kalman filter for colored measurement noise.

**21.** An adaptive filter according to claim **12** wherein the filter means is in the form of an augmented Kalman filter and the adaptive filter includes means for computing the state error covariance matrix P of the Kalman filter, and means responsive to a threshold increase in the value of the P matrix for causing the input signal to by-pass the filter means.

**22.** An adaptive filter according to claim **12** wherein the filter means is in the form of an augmented Kalman filter, and the adaptive filter includes means for computing the covariance matrix P of the Kalman filter, means for computing the sampled variance of the input signal, and means responsive to a sudden drop in the sampled variance simultaneously with a threshold increase in the value of the P matrix for causing the input signal to by-pass the filter means.

**23.** An adaptive filter according to claim **15** including means for monitoring the filter output and responsive to maintain one of the output when the sampled variance decreases suddenly for causing the input signal to by-pass the filter means.

**24.** A voice communication system including the adaptive filter of claim **12** in combination with an amplifier driven speaker whose input is derived from the output of the filter means during occurrence of noise of the type described.

**25.** A hearing aid system comprising an adaptive filter according to claim **12** in combination with a hearing aid whose input is the output of said filter means.

**26.** A hearing aid system according to claim **24** wherein the adaptive filter is physically incorporated into the hearing aid.

**27.** A hearing aid system according to claim **24** wherein the adaptive filter is physically separate from the hearing aid but is linked thereto by a wire.

**28.** A hearing aid system according to claim **24** wherein the adaptive filter is physically separate from the hearing aid but is linked thereto by a radio link.

* * * * *

50

55

60

65

0196/0202/84/0504-0199$02.00/0
EAR AND HEARING
Copyright © 1984 by The Williams & Wilkins Co.

Vol. 5, No. 4
Printed in U.S.A.

# Listener-Assessed Intelligibility of a Hearing Aid Self-Adaptive Noise Filter

Laszlo K. Stein, and Deborah Dempsey-Hart

Siegel Institute [L. K. S., D. D.-H.], Michael Reese Hospital, and Department of Surgery (Otolaryngology) [L. K. S.], University of Chicago, Chicago, Illinois

## ABSTRACT

A principal complaint of hearing aid users is the inability to understand speech in the presence of competing background noise. Efforts at reducing the adverse effects of external noise on amplification systems have centered on manually adjusted or low frequency activated high-pass filtering; however, there has been recent interest in the potential of self-adaptive noise reduction systems. In this study we investigate the performance of normals and three groups of sensorineural loss subjects under five noise conditions with a self-adaptive noise filter incorporated in a conventional hearing aid. Significant improvement in monosyllabic word scores with the self-adaptive noise filter were recorded by 30 to 65% of the hearing-impaired subjects under four of the five noise conditions.

The ability of a hearing-impaired individual to understand speech in the presence of competing noise is often severely reduced. Unlike the normal hearing person, the hearing-impaired listener may not be able to attend selectively to one of several sounds or to one speaker among many because of a combination of reduced frequency selectivity, poorer temporal resolution, and difficulty in localization.[5] Use of a hearing aid may increase the problem when both speech and the interfering background noise are amplified without improvement in the speech-to-noise ratio. Not only would speech intelligibility be affected but the amplified competing noise could produce irritation and discomfort, thereby further limiting the hearing-impaired listeners' functional use of a hearing aid.

Attempts at reducing the adverse effects of external noise with communication systems, including hearing aids, have centered principally on the use of manually engaged fixed configuration high-pass filters or noise suppression circuits activated by low frequencies to engage preset high-pass filters. Modification of frequency response through tailored high-pass filtering can reduce predominantly low-frequency noise and improve the signal-to-noise ratio but only in a specified and preselected way. Fixed configuration filtering can also affect the quality of speech in no-noise situations, a factor that many hearing aid users may find objectionable. Recently, there has been growing interest in the potential advantages of adaptive noise reduction systems.[1]

Essentially, self-adaptive noise reduction filters, whether analog or digital, sample an incoming signal, identify the spectra of the noise present, and automatically set filter parameters that approximate the inverse of the noise spectrum present at any instant. Theoretically, a self-adaptive noise reduction filter system should improve both the intelligibility and the quality of speech because the full frequency range is passed when noise is not present and the characteristics of the filter change selectively and automatically with changes in the spectra of the noise.

The purpose of this study was to investigate the effects on speech intelligibility under several noise conditions of the Graupe-Causey Self-Adaptive Noise Filter (GCAF) incorporated in a conventional hearing aid.

## METHOD

### Graupe-Causey Self-Adaptive Noise Filter

The GCAF (U.S. Patent 4025721, 1977) operates on the principle that the characteristic temporal variations in the power spectra of an input signal (speech alone, speech plus noise, or noise alone) can be compared, identified, and programmed into memory to automatically and adaptively adjust a tunable discrete frequency filter to minimize the effects of noise on speech throughout the spectrum.

The first stage of the filter examines the input signal by comparing variations in the power spectra of different frequency regions over a series of time windows. This stage utilizes a predetermined threshold to identify the fast temporal variations as speech phonemes and the slow variations as noise. Babble noise, because of the averaging effects of room acoustics and of speech mixing, also has a slower rate-of-change in power spectra than speech alone. Once the spectral characteristics of the input signal have been identified, a discrete frequency filter (essentially a least squares-type) is automatically tuned to selectively reduce the spectrum of noise relative to the spectrum of speech. The filter differs from conventional least-squares-type filters in that it can automatically adapt and adjust itself to a continually changing noise environment. Furthermore, the GCAF is programmed in nonlinear manner to take into account the greater importance of high-frequency phonemes versus low-frequency phonemes for speech intelligibility.

199

LEV00085345

200    Stein and Dempesy-Hart

The GCAF is transparent if no noise exists and modifies the spectrum only when noise is detected above a preselected threshold. It allows any part of the speech spectrum to pass unaffected, including low-frequency phonemes, in those frequency regions where noise does not exist. If, however, noise does exist somewhere in the spectrum and within the filter's resolution, the spectrum is modified accordingly. This modification will not eliminate all noise. When both speech and noise are present in the same frequency range, the filter theoretically can only pass both speech and noise or reject both. In actuality, the filter alternates between passing and rejecting both speech and noise depending on the relative importance of the speech phoneme at that frequency range. Thus, the filter automatically and continuously computes and readjusts its filter parameters. Figure 1 is a simplified block diagram of the GCAF.

Maximum delay between onset of a new noise and final filter tuning is 500 msec, with the average delay being 300 msec. If the change in noise spectra is minimal or gradual, the tuning delay of the filter can be as short as 100 msec. These delays in tuning may affect the quality of filtering but not the temporal flow of speech which is heard with no delay. Threshold of the GCAF varies with spectra of the noise (approximately 53 dB SPL for white noise to 63 dB SPL for a 1700- to 2400-Hz band, pass noise).

The GCAF is presently being manufactured in a single C-MOS chip approximately $3.9 \times 5.5$ mm in size. This chip is a special purpose computer that is mainly digital but with some analog elements and analog/digital conversion on board. It will consume less than 250 microwatts at 1.4 volts DC and will function down to 1.0 volts DC. The chip will thus have electrical and physical characteristics such that it can be included in conventional hearing aids (ear-level and possibly in-the-ear) and operate with conventional hearing aid batteries without seriously adding to drain on the battery. Interconnection will be between the hearing aid preamplifier and the power-amplifier-speaker stage.

For this study, a prototype bench model of the GCAF was utilized, the electrical and performance equivalent of the C-MOS chip described. Available to us were a postauricular mild-to-moderate gain aid and a higher gain body aid. Extensive pilot studies with both indicated that the technical and methodological variables associated with the prototype GCAF-hearing aid configuration were, for the purposes of this initial study, more easily controlled with a body-type aid. The GCAF prototype was hard-wired between the preamplifier and power-amplifier-speaker stage of a Rexton 25 PP body aid with variable output, gain, and tone controls.

Subjects A total of 19 subjects were tested. The normal hearing group consisted of 5 subjects (15 dB HL re: ANSI 1969 at octave frequencies 0.25 to 4 kHz) with a mean age of 20.0, range 17 to 24 years. Fourteen subjects (15 ears) with sensorineural hearing loss comprised the following three groups: SN group 1: 5 subjects with sensorineural hearing loss of mild to moderate degree (0.25 to 4 kHz octave thresholds falling between 15 and 55 dB HL); SN group 2: 5 subjects with sensorineural impairment of moderate to severe degree (0.25 to 4 kHz octave thresholds falling between 55 and 80 dB HL); and SN group 3: 5 subjects with sloping high-frequency sensorineural loss (15 dB difference between three or more octave thresholds from 0.25 to 4 kHz). Audiograms, speech discrimination scores, and ages for each subject in the sensorineural loss groups are shown in Figure 2. One ear of each subject was tested with the exception of subject SB whose right ear was tested for SN group 1 and left ear for SN group 2. All hearing-impaired subjects were experienced hearing aid users.

Test Materials and Equipment Magnetic tape recordings of monosyllabic words (Northwestern University Auditory Test No. 6) transcribed to cassette tape were utilized with all subjects. The 200 monosyllabic words consisted of four randomizations of four 50-word lists.

Five noise conditions were utilized: (1) 600 to 800 band-pass filtered noise, (2) 1700 to 2400 band-pass filtered noise, (3) cafeteria noise, (4) six-speaker babble (3 male and 3 female voices), and (5) white noise. The band-pass noises (48 dB per octave slope), cafeteria noise, and the six-speaker babble were recorded on cassette tape (Biocommunications Research Corporation). A Grason-Stadler 1701 two-channel audiometer was the source of the white noise.

Selection of two band-pass noises, cafeteria, and six-speaker babble as competing noise conditions allowed measures of the response of the GCAF to quasi-steady noises with spectra similar to predominantly low-frequency and mid-frequency noise and to speech. White noise was included in deference to its continued use as a clinical test of hearing aid performance.

All speech materials and competing noises, except the white noise, were routed from two cassette tape decks (Sony TC-K35) to a two-channel audiometer (Grason-Stadler 1701) and booster amplifier. The speech signal was delivered from one of the



SELF-ADAPTIVE NOISE FILTER

Figure 1. Simplified block diagram of self-adaptive filter.

**D11**

LEV00085346



Figure 2. Audiograms, speech discrimination scores, and ages for each subject in the sensorineural loss groups.

cassette tape decks to the primary loudspeaker situated 74 cm from the floor at 0° incidence to the subject seated in an acoustically and electrically shielded double-wall sound room (IAC 1204A). The correlated competing noises were delivered from the second cassette tape deck to two loudspeakers situated 60 cm from the floor at 90° and 270° incidence to the subject. The Rexton 25 PP body aid, wired to the GCAF was placed upright on a small table with the top mounted microphone 1.94 and 2.1 meters from the primary and secondary speakers. At regular intervals, the speaker system was acoustically calibrated using "speech noise" as the calibration source at the center of the position occupied by the aid.

The receiver of the aid (SM-W, wide receiver) was connected to snap ring earmolds custom made for each subject. For purposes of this study we kept the earmold type constant, although most of the hearing-impaired subjects used or were candidates for alternative earmold configurations. Controls of the aid (tone = "N", PC = −24, GC = −36) were kept constant for all subjects and conditions. Bioacoustic and electroacoustic checks of the aid were made at the start of each test session.

## PROCEDURE

Aided sound field speech discrimination measures were obtained in a no-noise situation and in the presence of five background noises. Each subject aided was presented one speech discrimination list in quiet and two lists for each background noise condition. Thus, 11 scores were obtained in a randomized manner for each subject: one aided in quiet and one in the filter bypassed and filter-on mode with five types of noises: (1) 600 to 800 Hz band-passed filtered, (2) 1700 to 2400 Hz band-passed filtered, (3) cafeteria, (4) babble, and (5) white noise.

The level of the primary speech signal was held constant throughout the entire test procedure at 68 dB SPL, the approximate midpoint in the critical range of average conversational speech.[2] Due to the variability of hearing sensitivity across subjects (normal hearing to severe sensorineural hearing loss), a standard SN ratio could not be used because a SN ratio that degrades a severely hearing-impaired individual's speech discrimination score to 50% would not appreciably affect the speech discrimination score of a normal hearing or mild hearing loss subject. Therefore, a transformed up-down adaptive procedure was utilized prior to each noise condition to estimate the SN ratios which would degrade an individual subject's speech dis-

crimination score to a 30 to 50% range.[2,3] The transformed up-down procedure involved maintaining the primary signal at 68 dB SPL while adjusting the intensity of the background noise in 2.5 dB steps. Six reversals were made and the means of the midpoints of the last four reversals were used to estimate the SN ratio for a 30 to 50% performance in the filter bypassed mode.

The volume control of the hearing aid was initially adjusted by the subject to a most comfortable listening level (MCL) for speech in quiet in the filter bypassed mode, then either held constant or adjusted by the subject for MCL for speech to the noise present in the filter bypassed and filter-on mode, depending on which procedure yielded higher speech discrimination scores during preliminary trials. It was reasoned that a hearing aid user will arbitrarily elect to either adjust or not adjust the volume control of an aid in the presence of background noise.

All testing was conducted during two, 2-hr test sessions. Subjects were given a minimum of two 5-min breaks every 20 min and a 10-min break on the hour to minimize effects due to fatigue, with additional rest periods if needed. Subjects wrote their responses. Subjects' nontest ear was acoustically dampened by an E-A-R plug and circumaural earphone to produce a monaural listening condition and prevent auditory input from the nonaided ear.

## RESULTS

Individual performance data for 20 ears (19 subjects) under the five noise conditions are presented in Table 1. Raffin and Thornton's[4] computer-generated tables delineating confidence levels for speech discrimination scores in an open set test were employed to determine statistical significance at the 0.05 level of confidence for the difference between individual scores. Subjects whose filter bypassed (D) or filter-on (F) mode scores were significant at the 0.05 level of confidence are identified in Table 1.

Examination of Table 1 reveals that the GCAF had the most marked effect on speech discrimination ability under the 600 to 800 Hz band-pass and cafeteria noise conditions. Speech discrimination scores recorded by 14 (70%) and 15 (75%) of the total 20 subjects exceeded the critical difference limits for the 600 to 800 Hz band-pass and cafeteria noise conditions, respectively. Eight of 20 scores

LEV00085347

Table 1. Aided monosyllabic word scores for normal hearing and hearing-impaired subjects obtained in the filter bypassed (D) and filter-on mode (F) with five types of background noise. Also shown are aided no-noise scores

| Subject | Quiet | 600–800 Hz | | 1700–2400 Hz | | Cafeteria | | Babble | | White noise | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | D | F | D | F | D | F | D | F | D | F |
| Normals | | | | | | | | | | | |
| MP | 98 | 38 | 86* | 36 | 60* | 44 | 68* | 48 | 52 | 34 | 54* |
| SS | 92 | 48 | 78* | 42 | 74* | 44 | 76* | 36 | 54* | 46 | 62 |
| PP | 98 | 50 | 74* | 34 | 36 | 44 | 74* | 36 | 78* | 44 | 32 |
| FG | 100 | 50 | 82* | 46 | 60 | 30 | 62* | 32 | 42 | 36 | 24 |
| JG | 100 | 38 | 48 | 42 | 62* | 30 | 62* | 38 | 54 | 36 | 48 |
| Mean | 97.6 | 44.2 | 73.6* | 40 | 58.4 | 38.4 | 68.4* | 36.8 | 56.0* | 39.2 | 44.0 |
| SN group 1 | | | | | | | | | | | |
| MN | 86 | 46 | 58 | 34 | 62* | 38 | 62* | 32 | 36 | 38 | 58* |
| TR | 96 | 32 | 78* | 44 | 52 | 30 | 76* | 38 | 80* | 36 | 52 |
| CO | 94 | 32 | 94* | 28 | 74* | 46 | 50 | 28 | 42 | 46 | 60 |
| LT | 98 | 34 | 84* | 48 | 66 | 42 | 74* | 48 | 82* | 38 | 44 |
| SB | 98 | 38 | 84* | 36* | 16 | 32 | 84* | 46 | 78* | 42 | 48 |
| Mean | 94.4 | 36.4 | 80.4* | 38 | 54 | 37.6 | 69.2* | 38.4 | 63.6* | 40 | 52.4 |
| SN group 2 | | | | | | | | | | | |
| SB | 90 | 44 | 86* | 44 | 50 | 46 | 80* | 44 | 62 | 40 | 36 |
| HC | 56 | 18 | 40* | 26 | 54* | 28 | 64* | 34 | 36 | 32 | 42 |
| IG | 92 | 48 | 80* | 50 | 64 | 30 | 56* | 34 | 54* | 46 | 68* |
| MM | 66 | 30 | 56* | 42* | 18 | 34 | 70* | 40 | 34 | 30 | 24 |
| HK | 82 | 48 | 58 | 38 | 56 | 42 | 78* | 36 | 44 | 48* | 24 |
| Mean | 77.6 | 37.6 | 64 | 40 | 48 | 36 | 69.6 | 37.6 | 46 | 39.2 | 38.4 |
| SN group 3 | | | | | | | | | | | |
| CS | 62 | 38 | 62* | 30 | 48 | 38 | 52 | 42 | 46 | 36 | 50 |
| CP | 74 | 32 | 56* | 42 | 44 | 44 | 64* | 46 | 58 | 40 | 56 |
| BB | 92 | 44 | 62 | 44 | 72* | 54 | 48 | 46 | 66* | 26 | 50* |
| MJ | 86 | 46 | 56 | 46 | 48 | 48 | 46 | 38 | 40 | 38 | 40 |
| RS | 60 | 44 | 38 | 38 | 58* | 30 | 24 | 40 | 56 | 90 | 42 |
| Mean | 74.8 | 40.8 | 53.2 | 40.8 | 54 | 42.8 | 46.8 | 42.4 | 52.8 | 34 | 48 |

* Significant at the 0.05 level of confidence.

(40%) with the GCAF were statistically higher for the 1700 to 2400 band-pass condition and in two instances (10%) statistically lower. For babble and white noise, 7 of 20 (35%) and 4 of 20 (20%) scores, respectively, were statistically higher with the GCAF. One of 20 (5%) scores with the GCAF was statistically lower for white noise. Table 2 summarizes these results.

Figure 3 graphically displays the performance differences recorded by the normal (A) and three SN groups (B, C, D) with the filter-on and filter bypassed for the five competing noise conditions. The monosyllabic word scores (% correct) for the filter bypassed mode are plotted along the horizontal axis in Figure 3 and the monosyllabic word scores (% correct) for the filter-on mode along the vertical. Each data point represents the score obtained under the filter-on mode for the respective noise condition. The curved lines denote the 95% confidence level for critical differences according to the tables of Raffin and Thornton.[4] Scores falling outside these boundaries have a high statistical probability of a true difference. The closer to the diagonal line a data point falls, the closer the scores were under the filter bypassed and filter-on modes (no difference).

From Figure 3, it is apparent that more normals and SN group 1 and 2 subjects recorded significantly higher speech discrimination scores with the GCAF than did SN

Table 2. Percent of all subjects whose monosyllabic word scores exceeded the 95% level of confidence for performance differences under the filter-on mode for the five competing noise conditions

| Noise Type | Percent of Subjects |
|---|---|
| 600–800 Hz | 70 |
| 1700–2400 Hz | 40 (10%)* |
| Cafeteria | 75 |
| Babble | 35 |
| White noise | 20 (5%)* |

* Percent recording statistically lower speech discrimination under the filter-on mode.

group 3 (the high-frequency loss group). Sixty percent of the normals, 56% of SN group 1, and 48% of SN group 2 obtained speech discrimination scores that exceeded the 95% level of confidence. In comparison, 7 of 25 scores (28%) for SN group 3 exceeded the 95% confidence level. In only three instances were filter-on scores significantly poorer than in the filter bypassed mode. If data for the white noise condition are excluded, these percentages for the three sensorineural loss groups rise to 65% for SN group 1, 55% for SN group 2, and 30% for SN group 3.

Table 3 compares the performance of each subject group with each of the five competing noise conditions. Overall, these percentage figures indicate that 80 to 100% of the



Figure 3. Performance differences with filter bypassed and filter-on under five competing noise conditions for normals (A), SN group 1 (B), SN group 2 (C), and SN group 2 (D). Monosyllabic word recognition score (% correct) in filter bypassed mode shown on horizontal axis; filter-on mode on vertical axis. Curved lines indicate 95% confidence level.

Table 3. Percent of subjects in each group whose monosyllabic word scores exceeded the 95% level of confidence for performance differences under the filter-on mode for each of the five competing noise conditions

| Subjects | Noise Types | | | | |
| --- | --- | --- | --- | --- | --- |
| | 600–800 Hz | 1700–2400 Hz | Cafe-teria | Babble | White noise |
| Normals | 80 | 60 | 100 | 40 | 20 |
| SN group 1 | 80 | 40 (20%)* | 80 | 60 | 20 |
| SN group 2 | 80 | 20 (20%)* | 100 | 20 | 20 (20%)* |
| SN group 3 | 40 | 40 | 20 | 20 | 20 |

* Percent recording statistically lower speech discrimination under the filter-on-mode.

normals and subjects in SN groups 1 and 2 recorded statistically higher speech discrimination scores in the filter-on mode for the 600 to 800 Hz band-pass and cafeteria competing noise conditions. Performance of SN group 3 subjects across the five noise conditions ranged from 20 to 40%.

## DISCUSSION

In recent years, methodology to evaluate possible differences in hearing aid performance has undergone critical reappraisal.[6,7] This is particularly true for speech discrimination testing where both the reliability and validity of the method have been questioned. The work of Thornton and Raffin[8] and Raffin and Thornton[4] addressing the issue of test-retest reliability provides both clinicians and researchers tabled confidence limit values on which to predict true differences between two speech test scores. Using their tables, the outcome of speech test scores can be accepted with high statistical certainty. Similarly, Studebaker[7] has indicated that speech discrimination testing can be made almost as reliable as anyone would want provided adequate data are collected.

The question of the validity of clinic or laboratory measures, such as speech discrimination scores, must of course be eventually weighed against some criterion measure of successful or satisfactory hearing aid use by the wearer in his or her real world situation. Unfortunately, the lack of generally acceptable validation means that for the foreseeable future, first approximations of hearing aid performance differences, at least in the laboratory situation, must rely on some form of direct or indirect measure of which aid provides best speech intelligibility. This, of course, assumes there is a direct relationship between the aid that enables the wearer to better understand speech and his or her ultimate success and satisfaction with that aid.

In this study, we utilized monosyllabic word lists to evaluate differences in listener performance in noise with GCAF. Statistical treatment relied principally on the confidence level tables of Raffin and Thornton.[4] Significant

LEV00085349

improvement in speech discrimination scores with the GCAF were obtained by 70% of all subjects in the presence of 600 to 800 Hz noise, 40% in 1700 to 2400 Hz noise, 75% in cafeteria noise, 35% in six-speaker babble, and 20% on white noise.

The principal effects of the GCAF were with low-frequency noise (600 to 800 Hz) and cafeteria noise and to a lesser extent midfrequency noise (1700 to 2400 Hz) and babble. The effects of the GCAF with white noise were minimal. The design of the GCAF predicted some of these performance differences found among the competing noises utilized in this study. Recall that the GCAF is biased toward rejecting predominantly low-frequency noise and passing higher frequency phonemic information when both occur at the same instant in time. The apparent ability of the GCAF to adaptively and automatically filter some of the interfering low-frequency components of cafeteria and babble noise is encouraging in terms of its potential for improving speech intelligibility in every day listening situations. Added to this is the fact that, although fixed configuration filtering can improve speech-to-noise ratios when the spectra of the noise is in the lower frequencies, the GCAF has the advantage of passing low-frequency phonemic information in the no-noise situation.

Inclusion of white noise in this study as a noise condition was done in deference to its continued use as a clinical test of hearing aid performance. White noise exists basically in the clinic or laboratory because it is easily generated as a repeatable reference. It is seldom, if ever, encountered in the real world. The GCAF was designed to adaptively filter noises in the environment as they occur at any instant in time. The steady state broadband spectral characteristic of white noise (flat over the whole frequency range of the hearing aid) does not allow the adaptive filter to adjust to any specific parameter in time, only to a long-term average.

Normal hearing, mild sensorineural loss (SN group 1), and moderate to severe sensorineural loss (SN group 2) subjects demonstrated greater gains in speech discrimination in noise with the GCAF than the sloping high-frequency loss (SN group 3) subjects. Possible explanations for poorer performance of SN group 3 include interactions between the frequency characteristics of the Rexton 25 PP aid, the sloping nature of the subjects' loss, and the frequency filtering traits of the GCAF. While the frequency gain characteristics of the Rexton 25 PP body aid (flat electroacoustic response with the SM-W earphone in the frequency range 0.5 to 2 kHz) were probably better suited for the two sensorineural loss groups with generally flat audiometric profiles, it may not have been for the sloping high-frequency loss subjects in SN group 3. This was recognized when the study was planned but for technical reasons we were able to utilize the prototype GCAF with only one hearing aid. We also felt varying the frequency response parameters of the aid or the acoustic characteristics of the earmold for an individual subject would have introduced variables beyond the scope of this initial study. Because the GCAF is programmed to weigh and selectively filter low-frequency phonemic information and pass high-frequency phonemes when noise is present, the low-frequency phonemic cues SN group 3 subjects were forced to rely on were the very ones the GCAF filtered. This combination of minimal high-frequency emphasis and filtering of low-frequency phonemic cues may have rendered the Rexton 25 PP aid inappropriate for testing the effects of the GCAF with high-frequency hearing loss subjects.

## CONCLUSIONS

Given the fact that a true performance difference of 10% in monosyllabic word scores may reflect differences as great as 20 to 25% in sentence intelligibility,[7] the practical implications for those hearing-impaired subjects in this study who were able to achieve statistically significant improvement in monosyllabic scores may be considerable. As a first approximation under laboratory conditions, the GCAF provided significant improvement in monosyllabic word scores for 65% of the hearing-impaired subjects in SN group 1, 55% in SN group 2, and 30% in SN group 3 under the four noise conditions of 600 to 800 Hz band pass, 1700 to 2400 band pass, cafeteria, and babble. In contrast, only 4% of the SN group 1 subjects, 8% of the SN group 2 subjects, and none of the SN group 3 subjects recorded significantly poorer speech discrimination scores with the GCAF. The number of hearing aid users who could potentially benefit from the GCAF appear sufficient to warrant further laboratory study, and ideally, validation through extended field trials. Availability of the GCAF in a C-MOS chip incorporated into several different model ear level or possibly in-the-ear aids should make such additional evaluations possible.

### References

1. Cole, W. A. 1983. Prospects for the application of high technology to hearing aids. Hear. Instrum. 34, 6-12.
2. Dirks, D. D., D. E. Morgan, and J. R. Dubno. 1982. A procedure for quantifying the effects of noise on speech recognition. J. Speech Hear. Disord. 47, 114-123.
3. Levitt, H. 1971. Transformed up-down methods in psychoacoustics. J. Acoust. Soc. Am. 49, 113-122.
4. Raffin, M. J., and A. R. Thornton. 1980. Confidence levels for differences between speech discrimination scores: A research note. J. Speech Hear. Disord. 23, 5-18.
5. Scharf, B., and M. Florentine. 1983. Psychoacoustics of elementary sounds, pp. 3-15. in G. Studebaker, and F. Bess, eds. The Vanderbilt Hearing-Aid Report. Monographs in Contemporary Audiology, Upper Darby, NY.
6. Schwartz, D. 1983. Hearing aid selection methods: An Enigma. pp. 180-187. in G. Studebaker, and F. Bess, eds. The Vanderbilt Hearing-Aid Report. Monographs in Contemporary Audiology, Upper Darby, NY.
7. Studebaker, G. 1983. Hearing aid selection: An overview. pp. 147-155. in G. Studebaker, and F. Bess, eds. The Vanderbilt Hearing-Aid Report. Monographs in Contemporary Audiology, Upper Darby, NY.
8. Thornton, A. R., and M. J. Raffin. 1978. Speech discrimination scores modeled as a binomial variable. J. Speech Hear. Res. 21, 507-518.

Address reprint requests to Laszlo K. Stein, Ph.D., Siegel Institute, Michael Reese Hospital and Medical Center, Lake Shore Drive at 31st St., Chicago, IL 60616.

Received December 5, 1983; accepted March 29, 1984.

LEV00085350

# EXHIBIT 30

## FULLY REDACTED

# EXHIBIT 31

**Page 1**

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            IN AND FOR THE DISTRICT OF DELAWARE

 3                         -  -  -

 4

 5    ENERGY TRANSPORTATION GROUP        :   Civil Action
      INC.,                             :
 6                                      :
                 Plaintiff,             :
 7                                      :
           v.                           :
 8                                      :
      SONIC INNOVATIONS, INC.,          :
 9    PHONAK HOLDING AG,                :
      PHONAK INC.,                      :
10    UNITRON HEARING, INC.,            :
      WILLIAM DEMANT HOLDING A/S,       :
11    OTICON A/S,                       :
      OTICON INC.,                      :
12    WIDEX A/S,                        :
      WIDEX HEARING AID CO. INC.,       :
13    GN RESOUND A/S,                   :
      GN RESOUND CORPORATION,           :
14    STARKEY LABORATORIES, INC.,       :
      GENNUM CORPORATION,               :
15    RESISTANCE TECHNOLOGY INC.,       :
      BERNAFON AG,                      :
16    WOU, INC., and                    :
      BERNAFON, LLC,                    :
17                                      :
                 Defendants.            :  No. 05-422 (GMS)
18                         -  -  -

19

20              Wilmington, Delaware
              Tuesday, September 18, 2007
21                   9:30 a.m.
              Telephone Conference
22                       -  -  -

23    BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

24

25
```

**Page 2**

APPEARANCES:

EDMOND D. JOHNSON, ESQ., and
THOMAS HENRY KOVACH, ESQ.
Pepper Hamilton LLP
        -and-
BRIAN M. BUROKER, ESQ.,
MARTIN STEINBERG, ESQ.,
MAYA M. ECKSTEIN, ESQ., and
RAFAEL RIBEIRO, ESQ.
Hunton & Williams
(Washington, D.C.)

        Counsel for Plaintiff

MARY B. GRAHAM, ESQ.
Morris, Nichols, Arsht & Tunnell
        -and-
JOHN M. ROMARY, ESQ., and
C. GREGORY GRAMENOPOULOS, ESQ.
Finnegan, Henderson, Farabow, Garrett & Dunner
(Washington, D.C.)

        Counsel for Defendant
        Oticon

RICHARD L. HORWITZ, ESQ.
Potter Anderson & Corroon LLP
        -and-
DONALD DEGNAN, ESQ., and
BRYAN K. HANKS, ESQ.
Holland & Hart
(Salt Lake City, Utah)

        Counsel for Defendant Sonic

MARYELLEN NOREIKA, ESQ.
Morris, Nichols, Arsht & Tunnell
        -and-
ERIC R. HUBBARD, ESQ., and
DAVID CHUN, ESQ.
Ropes & Gray
(New York, New York)

        Counsel for Defendant GN ReSound

**Page 3**

APPEARANCES CONTINUED:

THOMAS C. GRIMM, ESQ.
Morris Nichols Arsht & Tunnell
        -and-
DAVID H. BLUESTONE, ESQ., and
CHARLES M. McMAHON, ESQ.
Brinks Hofer Gilson & Leone
(Chicago, Illinois)

        Counsel for Defendant Phonak

DONALD E. REID, ESQ.
Morris, Nichols, Arsht & Tunnell
        -and-
CARL J. PELLEGRINI, ESQ.
Sughrue Mion
(New York, New York)

        Counsel for Defendant Widex

AMY A. QUINLAN, ESQ.
Morris James Hitchens & Williams
        -and-
RICHARD G. MORGAN, ESQ., and
STEVEN L. REITENOUR, ESQ.
Bowman and Brooke
(Minneapolis, Minnesota)

        Counsel for Defendant
        Starkey Labs

BARRY M. KLAYMAN, ESQ.
Wolf Block Schorr and Solis-Cohen
        -and-
JEFFREY D. SHEWCHUK, ESQ.
Shewchuk IP Services

        Counsel for Defendant
        Resistance Technology

**Page 4**

```
09:43:10   1          THE COURT:  Good morning.

09:43:19   2              UNIDENTIFIED SPEAKER:  Good morning, Your Honor.

09:43:19   3          THE COURT:  Apologize for the delay.  Let's

09:43:19   4   start with introductions for plaintiff, plaintiff's counsel.

09:43:28   5          MR. STEINBERG:  Marty Steinberg from Hunton &

09:43:30   6   Williams, Your Honor.

09:43:31   7          THE COURT:  Good morning.

09:43:32   8          MR. BUROKER:  Brian Buroker, Maya Eckstein, and

09:43:36   9   Rafael Ribeiro from Hunton & Williams on the line.

09:43:39  10          MR. JOHNSON:  Ted Johnson and Tom Kovach at

09:43:42  11   Pepper Hamilton.

09:43:43  12          Mary Graham had provided the Court with the list

09:43:46  13   of the attendees for the Court, Your Honor.

09:43:49  14          THE COURT:  I want you to identify yourselves

09:43:52  15   for the record.  I have that list.  We can start with Mary

09:43:55  16   Graham.

09:43:56  17          MS. GRAHAM:  Yes, Your Honor.  This is Mary

09:43:58  18   Graham.  With me are John Romary and Greg Gramenopoulos of

09:44:03  19   Finnegan Henderson.

09:44:04  20          THE COURT:  Ms. Noreika.

09:44:06  21          MS. NOREIKA:  Good morning, Your Honor.

09:44:06  22   Maryellen Noreika.  With me are Eric Hubbard and David Chun

09:44:10  23   from Ropes & Gray.

09:44:13  24          THE COURT:  Mr. Grimm, who are you with?  Hello?

09:44:18  25   Thomas Grimm?
```

9

09:50:00 **1** chambers and then decided to go forward with the deposition

09:50:03 **2** for just the one day.

09:50:05 **3** Now, the reason, the primary reason that ETG

⌐ **4** gives for refusing to give us an additional day of

09:50:14 **5** deposition, which would be a second day in his personal

09:50:17 **6** capacity, is the fact that we took the two days of him in

09:50:20 **7** February when they designated him. And they rely on the

09:50:23 **8** scheduling order, which says that defendants may depose each

09:50:28 **9** of the three inventors for 21 hours, and the defendants may

09:50:33 **10** depose ETG for 56 hours of deposition.

09:50:36 **11** They take the position now that by virtue of

09:50:40 **12** their having designated him, we were, in effect, taking his

09:50:44 **13** deposition, so that counted as two days. Now, that was not

09:50:47 **14** our understanding when we went forward. Indeed, I had a

09:50:50 **15** conversation with Mr. Buroker, and Steve Reitenour on behalf

09:50:56 **16** of Starkey was also present. And we both recall this issue

09:51:00 **17** coming up in February, when there was a discussion of the

09:51:02 **18** fact that they were designating Mr. Levitt. And we

09:51:05 **19** understood him to say that taking his deposition would not

09:51:10 **20** count as taking him in his personal capacity.

09:51:12 **21** Now, perhaps there was a misunderstanding, I

09:51:15 **22** don't know. But certainly we were not told, and ETG has

09:51:19 **23** never suggested that they told us, that it would count

09:51:22 **24** against us. We just understood them to say that it wouldn't

⌐ ···26 **25** count.

10

09:51:27 **1** But in any case, we certainly were never told

09:51:30 **2** that there were all these documents waiting to be produced.

09:51:33 **3** The scheduling order does provide that even

09:51:37 **4** with respect to these limits, even if they did apply, that

09:51:40 **5** they are not final. It specifically characterizes them as

09:51:43 **6** initial limits, subject to further consideration if there is

09:51:46 **7** a need. Clearly, there is a need. It is not possible for

09:51:51 **8** defendants to have done any kind of a reasonable job of

09:51:53 **9** deposing Mr. Levitt on actually 90,000 pages of documents in

09:52:00 **10** only one day.

03:52:03 **11** For that reason, we would ask that we be

09:52:08 **12** permitted to take him for another day.

09:52:10 **13** THE COURT: Okay. Who is going to respond on

09:52:12 **14** the plaintiff's behalf?

09:52:14 **15** MR. BUROKER: Yes, Your Honor. Brian Buroker

09:52:16 **16** for plaintiff.

09:52:17 **17** We think it is actually a pretty simple issue.

09:52:19 **18** And most of the facts that Ms. Graham has presented are not

09:52:22 **19** quite the way we view thin gs, obviously.

09:52:26 **20** The scheduling order, when we negotiated it, we

⌐ **21** particularly wanted to protect these third-party inventors.

09:52:31 **22** Dr. Levitt, although we represent him, is not being

09:52:34 **23** compensated for his time. And he is 70 years old. This is,

09:52:40 **24** you know, quite an imposition for him. He has been deposed

09:52:43 **25** for 21 hours, for three full days.

11

09:52:49 **1** The reason the documents are produced in the way

09:52:51 **2** Ms. Graham characterizes is largely because there have been

09:52:54 **3** three subpoenas issued in this case. The first subpoena

09:52:57 **4** called for certain documents. Two additional subpoenas

09:53:00 **5** called for additional documents. So we had to keep going

09:53:03 **6** back to Dr. Levitt, asking him does he have any more

09:53:08 **7** documents. We produced documents only when requested by

09:53:10 **8** defendants.

09:53:11 **9** And we don't believe that any of the new

09:53:14 **10** documents that they are saying caused them to need

09:53:16 **11** additional time actually do cause them to need additional

09:53:20 **12** time. They had the opportunity on August 23rd, on his last

09:53:24 **13** day of deposition, to ask him questions about every document

09:53:28 **14** that has been produced in this case. The last group of

09:53:32 **15** documents were made available for inspection at his home.

09:53:35 **16** We opened up his home so that they could look through every

09:53:39 **17** document in his sort of what is a converted garage to see if

09:53:44 **18** there was anything else they needed. They had access to

09:53:47 **19** those before the depositions and they had a chance to ask

09:53:50 **20** him questions about it.

09:53:51 **21** So we just don't think there is any additional

09:53:53 **22** reason to offer any additional time.

09:54:03 **23** THE COURT: Ms. Graha m.

09:54:03 **24** MS. GRAHAM: If I might respond to that.

09:54:05 **25** With respect to that subpoena, absolutely, I am

12

09:54:03 **1** looking at the very first subpoena, on February 1st, it

09:54:07 **2** called for all documents relating to the making and

09:54:11 **3** conception of the invention. There is another request that

09:54:14 **4** says, all documents referring or relating to prior art

09:54:20 **5** concerning the patents in suit. If the 60,000 pages of

09:54:20 **6** documents they produced in March and April weren't

09:54:22 **7** responsive to the first subpoena, then why were they

09:54:25 **8** producing them? Because there wasn't another issue until

09:54:28 **9** July.

09:54:29 **10** MR. BUROKER: It's not true --

09:54:32 **11** THE COURT: Hold on, counsel.

09:54:33 **12** Go ahead, Ms. Graham.

09:54:37 **13** MS. GRAHAM: With respect to the documents, we

09:54:39 **14** thought we have had them. That was our understanding, when

09:54:41 **15** we went forward with the deposition in February on the

09:54:46 **16** conception and reduction to practice of the invention, that

09:54:48 **17** we had all the documents. No one told us otherwise.

09:54:51 **18** And Mr. Levitt said at his deposition that his

09:54:54 **19** counsel, which is ETG's counsel, had been at his house and

09:54:57 **20** had helped him get documents.

09:55:00 **21** THE COURT: So do you want to refute that, Mr.

09:55:02 **22** Buroker?

09:55:03 **23** MR. BUROKER: Yes, Your Honor, I do. We told

09:55:06 **24** the defendants -- they wanted the early deposition on

09:55:09 **25** conception and reduction to practice. To say that it's a

17

10:00:29  1    necessarily make that assumption.

10:00:31  2         Mr. Buroker, what do you know about this?

10:00:33  3         MR. BUROKER: I believe he is back at the end of

10:00:??  4    next week. But the following week, Your Honor, Mr.

10:00:40  5    Steinberg and I were planning to be with Judge Thynge in the

10:00:43  6    mediation in this case all week.

10:00:45  7         THE COURT: That takes place starting the 19th,

10:00:48  8    is that?

10:00:48  9         MR. BUROKER: No, sir. The 24th.

10:00:50 10         THE COURT: Okay.

10:01:00 11         MS. GRAHAM: Let's do it the following week. By

10:01:00 12    then we will also have the files from his computer that are

10:01:03 13    currently being produced.

10:01:07 14         MR. BUROKER: Can we just agree to do it at the

10:01:10 15    time it is convenient to the parties?

10:01:11 16         THE COURT: I am not so willing to let you do

10:01:16 17    that. I would like you to discuss that right now. I don't

10:01:19 18    need to -- just pretend I am not here. Go ahead and talk.

10:01:25 19         MR. STEINBERG: Your Honor, could we agree to do

10:01:2? 20    it within two or three weeks of the mediation, rather than

10:01:31 21    the week after, where we will all have been away from our

10:01:34 22    offices and homes far, you know, seven or eight days?

10:01:37 23         THE COURT: Ms. Graham.

10:01:41 24         MR. BUROKER: There is also a deposition already

10:01:?? 25    scheduled for the week after the mediation that's going to

18

10:01:45  1    tie up a number of the defendants and probably plaintiff.

10:01:49  2         MS. GRAHAM: Why don't we plan on either doing

10:01:51  3    it the week of October 8th or 15th to suit the convenience

10:01:56  4    of the witness and counsel.

10:01:55  5         THE COURT: Counsel, is that acceptable on the

10:02:00  6    other side?

10:02:02  7         MR. BUROKER: As long as Dr. Levitt is back,

10:02:04  8    which I believe he will be.

10:02:05  9         THE COURT: Okay.

10:02:10 10         MR. BUROKER: Unfortunately, I didn't get his

10:02:12 11    full calendar.

10:02:18 12         THE COURT: I understand. I just expect counsel

10:02:18 13    to be able to pick up a phone and talk about this.

10:02:19 14         UNIDENTIFIED SPEAKER: Your Honor, if we could

10:02:20 15    add the week of the 22nd to that, I would appreciate that.

10:02:23 16         THE COURT: Any problem with that, Ms. Graham?

10:02:26 17         MS. GRAHAM: No. That is fine.

10:02:27 18         MR. STEINBERG: Judge, the only other thing

10:02:30 19    is -- and I know there will be disagreement about what I am

10:02:32 20    going to say -- but Dr. Levitt was asked questions

10:02:?? 21    repeatedly, over and over again, about the same subject

10:02:39 22    matter. We would expect that this day of deposition would

10:02:44 23    not be a repeat of the questions he has already been asked.

10:02:47 24         THE COURT: You know, counsel has seven hours.

10:02:49 25    I would expect them to use the time wisely, a point that I

19

10:02:56  1    hope is taken.

10:02:56  2         MS. GRAHAM: Yes, thank you, Your Honor.

10:02:59  3         I could respond to that point.

10:03:02  4         THE COURT: I said what I said, Ms. Graham, so

10:03:04  5    that you wouldn't.

10:03:08  6         MS. GRAHAM: Thank you. I understand.

10:03:10  7         THE COURT: That's great. Let's go on to No. 2.

10:03:13  8         MS. GRAHAM: Okay. The second issue relates to

10:03:18  9    two third-party subpoenas. We found in Dr. Levitt's garage

10:03:24 10    shortly before his deposition on August 23rd a very

10:03:29 11    important piece of prior art. It is a VA report with a date

10:03:32 12    on it of 1984. And this is something the defendants

10:03:34 13    absolutely want to rely on.

10:03:47 14         We were not aware of it before his deposition,

10:03:47 15    and it was -- excuse me, before getting his documents,

10:03:46 16    shortly before his deposition, when we were allowed to go to

10:03:52 17    his garage ourselves and inspect his documents.

10:03:59 18         So we now want to get the date of the VA report

10:04:06 19    authenticated, get the report authenticated, and show that

10:04:09 20    it was publicly available. And there are two witnesses, two

10:04:15 21    third-party witnesses that we want to depose for that

10:04:18 22    purpose. One is the National Library of Medicine, where one

10:04:22 23    copy was located. I believe copies exist elsewhere, but one

10:04:28 24    copy is there. We also want to depose the journal who

10:04:35 25    published it.

20

10:04:30  1         As I said, both of these depositions are for the

10:04:38  2    purpose of authentication and showing that it was at this

10:04:44  3    date publicly available.

10:04:48  4         The plaintiffs complain that we noticed these

10:04:49  5    late. It is true, we noticed them on the last day of

10:04:52  6    deposition. But it was because we hadn't -- we didn't even

10:04:55  7    get this VA report until very late in August.

10:04:59  8         Now, aside from that, the fact is, and we have

10:05:03  9    checked this out, both of these witnesses are within the

10:05:06 10    hundred-mile limit. So we could subpoena them for trial.

10:05:10 11    But we submit that that does not make sense as an

10:05:13 12    alternative, because it will leave us up in the air the issues

10:05:19 13    that I mentioned, the status of this as prior art. And I

10:05:21 14    understand that even plaintiff would like certainty on the

10:05:26 15    evidentiary status of this document.

10:05:29 16         So from that standpoint, this is a very

10:05:41 17    important issue. We ought to just nail it down. It is not

10:05:41 18    like it is going to take a long time to take these people's

10:05:41 19    depositions.

10:05:41 20         Second of all, these are third parties. I would

10:05:42 21    submit it's not fair to them to drag them up to Delaware to

10:05:46 22    be in a trial when we can satisfactorily get their

10:05:50 23    deposition testimony. Indeed, it's the sort of testimony

10:05:54 24    that is taken sometimes under the rubric of a trial

10:05:59 25    deposition. We proposed to plaintiff that we could take

21

1  their deposition that way. We could call it a trial
2  deposition if they wanted. But they oppose our taking the
3  deposition on the grounds that they are too late.
4         THE COURT: Okay.
5         MR. BUROKER: Your Honor, addressing this issue,
6  Ms. Graham is correct, we received the deposition notices on
7  August 31st, which was close of discovery. They were set to
8  take place on September 12, which is two weeks after the
9  close of discovery, which is in our view outside of the
10  discovery rules.
11        The reason why they want to take this deposition
12  is that it's alleged prior art, and the reason is there is
13  an abstract in the large volume. In the volume there is an
14  abstract by this fellow named Dr. Egolf and Vernon Larson.
15  These are two gentlemen that the defendants have been
16  working with since February. They have hired them as
17  consultants, been working with them to find prior art. And
18  for them to say that they didn't know about it until just
19  before the close of discovery, we think, is sort of a
20  problem with their own due diligence in finding it.
21        The fact that Dr. Levitt happened to have a copy
22  that he had obtained just a few weeks before his deposition
23  in August because it had become prior art, an issue of what
24  Dr. Larson and Dr. Egolf were working on, Dr. Levitt went
25  and found this document in the VA report, in order to today,

22

1  then he was deposed on it. They had an opportunity to ask
2  Dr. Levitt questions about it.
3         So they had this document on August 20th. They
4  waited until August 31st to even notice the subpoenas to
5  occur two weeks after the close of discovery. We just think
6  it's too late, particularly considering that the authors of
7  the articles they want to authenticate are their own
8  consultants.
9         We don't think there is a good cause to modify
10  the scheduling order.
11        THE COURT: Do you want to respond to those two
12  points, Ms. Graham?
13        MS. GRAHAM: Yes, Your Honor.
14        While it is true that defendants have been
15  working with Drs. Egolf and Larson, who were involved in the
16  work, the fact is they don't apparently have a copy of this.
17  They didn't tell us about it, and they apparently didn't
18  remember it. And so we did not know about it.
19  Interestingly, apparently, Dr. Levitt does have a good
20  memory and did remember it, because what we are being told
21  is it wasn't in his garage until a few weeks ago and he
22  remembered it on his own, thinking about these issues, I
23  guess, and called up and got it.
24        So the fact is, we didn't know about it.
25        Second of all, with respect to timing, while it

23

1  is true that we saw it, whoever did the inspection found it,
2  I believe, on August 20th in his garage, we were able to ask
3  him about it on August 23rd. The evidence to show public
4  availability and date is going to need to come from others.
5  And it wasn't until we tracked down and realized where we
6  would need to get that evidence, which took some time, to
7  find who is the current publisher of the journal is not the
8  same name as the person was before.
9         We also needed to track down libraries. And we
10  did that very quickly. And we did it in a week following
11  the deposition. But it took that week to find the people
12  that we would want to subpoena. And we did it as soon as we
13  were able.
14        THE COURT: All right. I am going to find that
15  counsel has acted with reasonable diligence.
16        Again, the logistics of this are what?
17        MS. GRAHAM: We need to talk to the third
18  parties to find a date. We had just selected September
19  12th. So we will need to talk with them to find a date and
20  work with plaintiff's counsel. I would think now, with the
21  ruling, that this shouldn't be a problem. They are not
22  going to be difficult depositions, I don't believe. We
23  would try to get them scheduled as soon as we could. If
24  Your Honor would like, I could submit a status letter.
25        THE COURT: No. I have got enough to read.

24

1         MS. GRAHAM: Okay.
2         THE COURT: Mr. Buroker, are you going to be
3  able to work with your opponent on this?
4         MR. BUROKER: Sure. We actually had indicated
5  that we didn't think that they should proceed; if they were
6  to proceed, we would probably like to issue documents as
7  well, because they are going to try to show that these
8  documents were distributed. We would like evidence, to the
9  extent it exists, that they weren't distributed. We will
10  work with the defendants' counsel in getting the dates and
11  documents requested from the two parties.
12        THE COURT: Okay.
13        All right, then. I want to skip to the
14  plaintiff's issues. We will come back to privilege and work
15  product. Starting with the Demant Group. Who will start
16  with the first issue, failure to provides 1498 supporting
17  documents?
18        MR. BUROKER: Your Honor, I will deal with that
19  one.
20        As you know, there is a statute, 1498, that
21  precludes —
22        THE COURT: That is a reference to a statute? I
23  am sorry.
24        MR. BUROKER: Not well--phrased on our part.
25        It has to deal with sales to the government.

EXHIBIT 32

| From: | REDACTED |
| --- | --- |
| Sent: | Friday, October 19, 2007 7:01 PM |
| To: | REDACTED |
| Subject: | Proposed amended answer |

Ted and Brian,
Will ETG agree that the Oticon defendants may file the attached amended answer to assert a defense and counterclaim of unenforceability of the patent in suit? Widex also asks for ETG's agreement to file that defense and counterclaim. Please note that the pleading has been designated as confidential pursuant to the protective order.
Mary



101907 Amended
Answer.pdf (96 ...

1

# EXHIBIT 33

## FULLY REDACTED

# EXHIBIT 34

## FULLY REDACTED

EXHIBIT 35

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ENERGY TRANSPORTATION GROUP, INC.,    )
                                      )
            Plaintiff,                )
                                      )
    v.                                )        C.A. No. 05-422 (GMS)
                                      )
SONIC INNOVATIONS, INC., et al.,      )
                                      )
            Defendants.               )
                                      )

**EXPERT REPORT OF SIGFRID SOLI, Ph.D.**
**REGARDING INVALIDITY OF THE ETG PATENTS**

## TABLE OF CONTENTS

I.     BACKGROUND AND QUALIFICATIONS ............................................................. 2
II.    MATERIALS CONSIDERED ............................................................................ 6
III.   SUMMARY OF ISSUES COVERED ................................................................. 6
IV.    TECHNOLOGY BACKGROUND ..................................................................... 6
V.     INVALIDITY ................................................................................................ 13
       A.  Legal Standards ................................................................................... 13
           1.   Claim Construction ..................................................................... 13
           2.   Anticipation ................................................................................. 13
           3.   Obviousness ................................................................................. 13
       B.  Level of Ordinary Skill in the Art ........................................................ 15
VI.    DISCUSSION OF THE ETG PATENTS ........................................................... 15
       A.  The Host Controller ............................................................................ 18
       B.  Programmable Delay Line Filter ......................................................... 21
       C.  Programming the Hearing Aid ............................................................ 24
       D.  Adjustment of the Hearing Aid ........................................................... 25
       E.  Feedback Cancellation ........................................................................ 30
       F.  Multiple Microphone System .............................................................. 35
VII.   FILE HISTORY OF THE '850 PATENT ........................................................... 37
VIII.  THE SCOPE AND CONTENT OF THE PRIOR ART ........................................ 39
       A.  Prior Art Directed to Differentiating Desired Signals from Undesired Signals ............... 39
           1.   US Patent No. 4,025,721 to Graupe et al ..................................... 39
           2.   Stein et al., "Listener-assessed intelligibility of a hearing aid self-adaptive noise filter,"
                Ear and Hearing, Vol. 5, No. 4, 1984, pp. 199-204 ...................... 43
           3.   US Patent No. 4,185,168 to Graupe et al ..................................... 44
           4.   US Patent No. 4,791,672 to Nunley et al ...................................... 45
           5.   US Patent No. 4,628,529 to Borth et al ........................................ 47
           6.   AT&T Multi-Band Compression Hearing Aid (from 12/4/84 Waldhauer "Prototype
                Architecture" Memo) ................................................................... 49
       B.  Prior Art Directed to the Suppression of Acoustic Feedback .......................... 49
           1.   US Patent No. 4,232,192 to Beex .................................................. 49
           2.   Larson and Egolf-VA Rehabilitation R&D Progress Report 1984 .............. 51
           3.   US Patent No. 4,188,667 to Graupe et al ...................................... 51
           4.   US Patent No. 4,038,536 to Feintuch ........................................... 55
       C.  Prior Art Directed to the Cancellation of Acoustic Feedback .......................... 56
           1.   The Hearing Journal June 1986 - HearTech Electronic Anti-Feedback Circuit ........... 56
           2.   US Patent No. 4,658,426 to Chabries et al .................................... 57
           3.   South et al., "Adaptive Filter to Improve Loudspeaker Telephone," Electronic Letters,
                Vol. 15, No. 21, 1979, pp. 673-674 ............................................... 59
           4.   Weaver, "An Adaptive Open-Loop Estimator for the Reduction of Acoustic
                Feedback," Masters Thesis, University of Wyoming, 1984 ................ 61
           5.   Automatic Feedback Cancellation (AFC-1) Circuit Described in Weaver Thesis ....... 64
           6.   Weaver et al., "Electronic Cancellation of Acoustic Feedback to Increase Hearing Aid
                Stability," abstract of presentation at the 109th Meeting of the Acoustical Society of

defined feedback path as "a path in which the signal travels from the output to the input." Finally, I understand that ETG is interpreting "programmable delay line filter" so as to include adaptive delay line filters. I disagree for the reasons previously stated.

159.    In my opinion, claim 1, as applied by ETG, is rendered obvious by Best, Weaver, Graupe '818 or South in combination with Egolf (Vanderbilt article). In addition, it is my opinion that claim 1 is rendered obvious by the HearTech Circuit in combination with the Nunley et al. article and the Egolf (Vanderbilt article). The article describing the HearTech Circuit was only very recently uncovered and it is not clear at this point whether the Electronic Anti-Feedback Circuit described in that article is a digital hearing aid. However, digital hearing aids were known at the time of the ETG patents. For example, the Nunley et al. article describes a wearable digital hearing aid with a programmable digital processor. In particular, Nunley et al. article describes a programmable delay line filter for operating on a digital input signal. In my opinion it would have been obvious to one of ordinary skill in the art to employ a programmable delay line filter of Nunley et al., in the HearTech Circuit, if in fact, the HearTech Circuit did not already include such a filter. The HearTech Circuit and the Nunley et al. article are both directed to a hearing aid, and the use of the Nunley programmable digital line filter to provide the cancellation signal in the HearTech Circuit would have been an obvious and predictable implementation. None of this prior art was considered by the Examiner in allowing the '850 patent. As described above and as applied by ETG, the Best thesis and work, the collective Weaver work, as well as the South article all describe a programmable delay line filter located in the feedback path for canceling acoustic feedback. The Egolf Vanderbilt article describes a correlation detector on page 101. As shown in Figure 10, the correlation detector D monitors the onset of acoustic feedback and computes a correlation coefficient $C_c$ between each successive

86

pair of samples. If the coefficient were high, then the system would take corrective action in the form of automatic gain control (AGC) of the amplifier, whereby the closed loop response GH [abs value] would be reduced. In my opinion, it would have been obvious to one of ordinary skill in the art to modify the HearTech Circuit (in combination with Nunley et al. article), Best, Weaver, Graupe '818, or South to include the system shown in Figure 10 of Egolf Vanderbilt Article. The HearTech Circuit, Best, Weaver, Graupe '818, and South references all deal with solving the problem of acoustic feedback by cancelling its effect. However, one of ordinary skill in the art would understand that they could supplement the cancellation techniques by preventing the onset of acoustic feedback by reduction of the gain in the forward path, as described by Egolf, since that is also a technique for solving the acoustic feedback problem. One of ordinary skill in the art would understand that where the canceling techniques alone was completely effective in canceling acoustic feedback and would therefore would have been motivated to include some other mechanism to deal with the onset of acoustic feedback in that situation. The combination of the filters in the HearTech Circuit, Best, Weaver, Graupe '818 or South with the system shown in Figure 10 of Egolf Vanderbilt article provides no more than the predictable result of solving the acoustic feedback problem and, therefore, in my opinion is obvious.[1]

### 2.    Claims 5 and 6

160.    In my opinion, claims 5 and 6 are invalid as being obvious based on Graupe '721 in view of Borth '529. The Graupe '721 patent was not considered by the Examiner in allowing claims 5 and 6. The description of the noise filter of Graupe '721 is further reflected in the Stein Article. The Court has construed many of the limitations of claims 5 and 6 as means plus function limitations. Graupe '721 and Borth together perform the identical function that the Court has construed, and the combination of these references provides the corresponding

---

[1] A chart describing my prior art analysis for each of the asserted claims is attached as Exhibit C

183.    As set forth in the attached chart, it is my opinion that claim 2 is anticipated by Weaver and Graupe '818.

### 3.    Claim 3

184.    As set forth in the attached chart, it is my opinion that claim 3 is anticipated by Weaver, Best, and Graupe '818.

### 4.    Claim 4

185.    As set forth in the attached chart, it is my opinion that claim 4 is anticipated by Weaver, Best, and Graupe '818.

### 5.    Claim 5

186.    As set forth in the attached claim chart, Graupe '818 anticipates claim 5.

### 6.    Claim 6

187.    As set forth in the attached claim chart, claim 6 is anticipated by Weaver, Graupe '818 and the hearing aid described in the Best thesis.

## X.    MATERIALITY OF REFERENCES THE EXAMINER DID NOT CONSIDER

188.    I have been asked to consider whether the following documents would have been material to the examination of the claims in either of the ETG patents: the 1984 VA Rehabilitation R&D Progress Report; the Egolf, "Review of the Acoustic Feedback Literature from a Control Systems Point of View", 1982 (Vanderbilt Article); and April '85 Weaver JASA abstract; Stein at al., "Listener-Assessed Intelligibility of a Hearing Aid Self-Adaptive Noise Filter", Ear and Hearing, Vol. 5, No. 4, 1984, pp.194-204 (the "Stein article"). I understand to be material to a patent claim, the prior art reference must be more relevant than any of the prior art that the Examiner had before him or her during examination. That is, the prior art reference must .

99

not be merely cumulative to the prior art of record that the Examiner considered in allowing the patent.

### A.    1984 VA Rehabilitation R&D Progress Report, the April 1985 Weaver abstract, the 1982 Egolf Vanderbilt article and the Nunley et al. article

189.    In reviewing the prior art of record, I note that none of the prior art the Examiner considered describes canceling acoustic feedback. In fact, the Examiner, in the Examiner's Action date mailed March 31, 1987, indicated that claim 15 defined allowable subject matter, but rejected claims 1 and 2, upon which claim 15 was dependent. Claim 15 simply recited that the programmable filter recited in claims 1 and 2 was programmed to effect substantial reduction of acoustic feedback. Therefore, the only feature the Examiner believed that made claim 15 allowable was the feature of substantially reducing acoustic feedback. Accordingly, any prior art that described substantially reduced acoustic feedback would certainly have been material to the Patent Office's examination because none of the art even mentions this feature. The following references all describe substantially reducing acoustic feedback, and therefore were material to the examination of the '850 patent: the 1984 VA Rehabilitation R&D Progress Report, the April 1985 Weaver abstract, the 1982 Egolf Vanderbilt article and the Nunley et al. article. Therefore, it is my opinion that VA Progress Report, the Weaver abstract, the Egolf Vanderbilt articles and the Nunley et al. article are all material to those claims of the ETG patents that recite reducing or canceling acoustic feedback.

### B.    Zeta Noise Blocker, as described in Graupe '721 and the Stein Article

190.    As described above, claim 5 was originally rejected as anticipated over several references, including Borth '529. Claim 5 was subsequently allowed after the inventors amended the claim to include the limitation of "the level of speech in excess of the level of

100

noise." As also discussed above, Graupe '721 and the Stein article describe the feature that was added to claim 5 to make it allowable. Therefore, it is my opinion that the Examiner would have certainly considered Graupe '721 and the Stein article material to claims 5 and 6 because this prior art discloses the very feature considered to be patentable.

## XI.    CONCLUSION

191.    It is my opinion that the asserted '850 and '749 patent claims, are invalid for the reasons I have stated above regarding anticipation and obviousness, among others.

192.    It is also my opinion that the 1984 VA Rehabilitation R&D Progress Report; the Egolf, "Review of the Acoustic Feedback Literature from a Control Systems Point of View"(Vanderbilt Article); and April '85 Weaver JASA abstract; and Stein at al., "Listener-Assessed Intelligibility of a Hearing Aid Self-Adaptive Noise Filter", Ear and Hearing, Vol. 5, No. 4, 1984, pp.194-204 (the "Stein article") are material to the examination of the '850 and '749 patent claims for the reasons I have described above.

EXHIBIT 36

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ENERGY TRANSPORTATION GROUP, INC., )
)
     Plaintiff, )
)
v. )    C.A. No. 05-422 (GMS)
)
SONIC INNOVATIONS, INC., et al, )
)
     Defendants. )
)
)

## EXPERT REPORT OF NORMAN MATZEN
## RELATING TO PATENT VALIDITY

This report is submitted pursuant to Rule 26(a)(2) of the Federal Rules of Civil Procedure

and is in opposition to the Reports of Sigfrid Soli, Ph.D. and Robert E. Morley, Jr., D. Sc. on

certain issues relating to the validity of U.S. Patent No. 4,731,850 ("the '850 Patent") and U.S.

Patent No. 4,879,749 ("the '749 Patent") (collectively, "the patents-in-suit").

## I.    INTRODUCTION

1.    My name is Norman Matzen. I am a professional consulting engineer. My

                REDACTED         I have been

involved in the engineering industry for about 40 years. I am over eighteen years of age and I

would otherwise be competent to testify as to the matters set forth herein if I am called to do so

at trial.

2.    I have been retained by counsel for Energy Transportation Group, Inc. ("ETG") as

a technical expert witness with respect to the proceedings currently before the Court in the

above-captioned matter.        REDACTED       that I

devote to providing the expert analysis and testimony requested of me in this case. ETG has also

reimbursed me for travel and other expenses that I have incurred that are related to providing this technical analysis. My compensation is in on way dependent on the outcome of this matter.

3. For purposes of this Report, I have been asked to provide an expert technical analysis as to whether the claims of U.S. Patent No. 4,731,850 ("the '850 Patent") and U.S. Patent No. 4,879,749 ("the '749 Patent") that ETG contends are infringed by each of the Defendants, as properly construed by the Court, are invalid under 35 U.S.C. §§ 102 or 103 in view of the alleged prior art cited by the Defendants in Dr. Soli's and Dr. Morley's Expert Reports.

4. In summary, it is my opinion that the Defendants have failed to present clear and convincing evidence that any of the claims of the '850 Patent or the '749 Patent are invalid under any proper analysis conducted pursuant to patent law principles.

5. My detailed response to the positions taken in Dr. Soli's and Dr. Morley's Expert Reports is set forth below.

6. I currently hold the opinions set forth in this Report. As my study of the case continues, I may acquire additional information and/or attain supplemental insights that result in added observations. I reserve the right to supplement this Report and to rely on additional documents and testimony that come to my attention between now and the time of trial. For example, the additional documents relevant to my analysis that Defendants continue to produce and any deposition testimony of various witnesses relevant to purported prior art systems that has not yet been taken may necessitate supplementation of this Report. Nevertheless, the evidence adduced to-date provides support for the opinions expressed herein. Any additional discovery outstanding from Defendants, however, may serve to further develop and buttress these opinions.

- 2 -

## II.    MATERIALS REVIEWED

7.    In performing the analysis that is the subject of this Report, I have reviewed the

'850 Patent and its prosecution history and the '749 Patent and its prosecution history. In

addition, I have reviewed the following depositions transcripts, pleadings and documents

produced during discovery in this case, discovery responses and materials obtained through my

own research:

A.    The Stipulated Protective Order entered by the Court in this action;

B.    Order Construing the Terms of U.S. Patent Nos. 4,731,850 and 4,879,749;

C.    U.S. Patent No. 4,731,850, file history and cited references;

D.    U.S. Patent No. 4,879,749, file history and cited references;

E.    Deposition Transcripts and Exhibits for Harry Levitt;

F.    Deposition Transcript and Exhibits for Kenneth Kopper;

G.    Deposition Transcript and Exhibits for Richard Dugot;

H.    Deposition Transcript and Exhibits for Kim Weaver;

I.    Deposition Transcript and Exhibits for Leland Best;

J.    Deposition Transcript and Exhibits for Daniel Graupe;

K.    Deposition Transcript and Exhibits for Vernon Larson;

L.    Deposition Transcript and Exhibits for David Egolf;

M.    Deposition Transcript and Exhibits for Martha Hanscom, Janet Woods and Margaret Paul;

N.    The Initial Infringement Expert Report of Kip Brown (and Exhibits);

O.    The Initial Invalidity Expert Report of Dr. Sigfrid Soli (and Exhibits);

P.    The Initial Invalidity Expert Report of Mr. Robert E. Morley, Jr., D. Sc. (and Exhibits);

Q.    The Expert Report of Kip Brown Relating to Patent Validity (and Exhibits); and

- 3 -

R.    All exhibits to this Report.

## III.    BACKGROUND, EDUCATION AND EXPERIENCE

8.    In terms of my background and experiences that qualify me as an expert in this case, I earned a BSEE degree from Santa Clara University 1970. I have graduate level training in Audiology at California State University in San Jose, California during 1995 to 1997. I am a licensed hearing aid dispenser in California.

9.    I have over 40 years of experience in the design, development and analysis of integrated circuits. I worked as a design engineer since 1967. I instructed a two hour course on digital signal processors for hearing aids at the 2000 and 2001 annual convention for American Academy of Audiologists. I am co-inventor on two patents - both are related to hearing aids.

10.    I co-founded a successful start-up company in Scotland called Integrated Power Semiconductors, Ltd., in 1984 that specialized in the design and fabrication of Bipolar standard and custom power control integrated circuits. I have also served as a Graduate Extension Instructor for the University of California at Berkeley Extension teaching integrated circuit design. I also have served as an instructor at Cogswell Polytechnic College, teaching courses in analog circuit design.

11.    I have served as a consultant in the following cases: California O2 Micro v. MPS, and Server Technology Inc. vs. American Power Conversion Corp. These cases involved analog, microprocessor, power control, drivers and mixed-signal device design, development and production. I have provided both deposition and trial testimony for California O2 Micro v. MPS. I have not otherwise testified at trial or by deposition within the preceding four years.

12.    Additional information regarding my education and technical experience is included in my *curriculum vitae*, a copy of which is attached as Appendix A. I have no publications during the last 10 years.

- 4 -

Moreover, Dr. Soli makes no effort to identify the corresponding structure in the Weaver Thesis or the AFC-1 circuit, namely "latches 33, 42, 43, programmable gain amplifier 32, digital phase shifter 30," and all equivalents thereof, as required by the Court's claim construction. Therefore, as the structure or equivalents thereof is not supported by the Weaver Thesis or the AFC-1 circuit, Dr. Soli's invalidity position fails.

94.     As for claim 2 of the '749 Patent, for at least the reasons stated above in connection with claim 1, the Weaver Thesis and the AFC-1 circuit fail to disclose the recited combination of claim recitations. Moreover, Dr. Soli makes no effort to identify the corresponding structure in the Weaver Thesis or the AFC-1 circuit, namely "programmable gain amplifier 32, latches 33, 42, 43, digital phase shifter 30," and all equivalents thereof, as required by the Court's claim construction. Therefore, as the structure or equivalents thereof is not supported by the Weaver Thesis or the AFC-1 circuit, Dr. Soli's invalidity position fails.

95.     As for claim 3 of the '749 Patent, for at least the reasons stated above in connection with claim 1, the Weaver Thesis and the AFC-1 circuit fail to disclose the recited combination of claim recitations. In addition, the system of the Weaver Thesis fails to support any sound generator for generating test signals and further fails to disclose a circuit for receiving the test signals back from the hearing aid to provide reference phase and amplitude signals.

96.     As for claim 4 of the '749 Patent, for at least the reasons stated above in connection with claim 3, the Weaver Thesis and the AFC-1 circuit fail to disclose the recited combination of claim recitations. Moreover, Dr. Soli makes no effort to identify the corresponding structure in the Weaver Thesis or the AFC-1 circuit, namely "programmable gain amplifier 32, latches 33, 42, 43, terminal 144," and all equivalents thereof, as required by the

Court's claim construction. Therefore, as the structure or equivalents thereof is not supported by the Weaver Thesis or the AFC-1 circuit, Dr. Soli's invalidity position fails.

97.     As for claim 5 of the '749 Patent, for at least the reasons stated above in connection with claim 2, the Weaver Thesis and the AFC-1 circuit fail to disclose the recited combination of claim recitations. In addition, the Weaver Thesis fails to disclose means for supplying a logic signal to the hearing aid for programming and a logic signal to the hearing aid to restore it for use by the patient. Moreover, Dr. Soli makes no effort to identify the corresponding structure in the Weaver Thesis or the AFC-1 circuit, namely "latches 44, 45, lines 125, 128, tri-state buffer 46," and all equivalents thereof, as required by the Court's claim construction. Therefore, as the structure or equivalents thereof is not supported by the Weaver Thesis or the AFC-1 circuit, Dr. Soli's invalidity position fails.

98.     As for claim 6 of the '749 Patent, the Weaver Thesis and AFC-1 circuit fail to disclose a host controller for programming a filter comprising the claimed signal generator and claimed phase and amplitude measuring circuit. As shown in Figure 6.1, the system of the Weaver Thesis fails to measure phase and amplitude of the output signal from the transmission channel. Moreover, Dr. Soli makes no effort to identify the corresponding structure in the Weaver Thesis or the AFC-1 circuit, namely "digital phase shifter 30, programmable gain amplifier 32, latches 33, 42, 43, connectors/terminals 31, 144," and all equivalents thereof, as required by the Court's claim construction. Therefore, as the structure or equivalents thereof is not supported by the Weaver Thesis or the AFC-1 circuit, Dr. Soli's invalidity position fails.

## 3.     Journal of Acoustical Society of America Abstract ("JASA Abstract") - Egolf and Weaver

99.     Dr. Soli also discusses an abstract published in the Journal of Acoustical Society of America (JASA) in the Spring 1985 edition. The abstract is a single paragraph summary -

- 38 -

with no diagrams or illustrations – entitled "Electronic cancellation of acoustic feedback to increase hearing aid stability" by Mr. Weaver and Dr. Egolf. This brief summary does not refer to the Weaver Thesis. The alleged reference cannot be relied on to support the Weaver Thesis. I note that Dr. Soli refers to the JASA Abstract as the "Weaver Abstract" – however, as Dr. Egolf and Mr. Weaver both participated in this abstract, I believe that Dr. Soli's characterization is incorrect and misleading.

100.    Dr. Soli asserts that the JASA Abstract discloses a 6-pole high pass filter and further asserts that "two filters are used in the cancellation feedback path to create a feedback cancellation signal." *See* Soli Report at ¶121. There is nothing in this brief paragraph discussion that supports either the 6-pole high pass filter or the two filters characterized by Dr. Soli.

101.    Further, this single paragraph summary is not an enabling disclosure and fails to disclose any of the claimed inventions of the '850 Patent or the '749 Patent. Mr. Weaver acknowledges that the abstract does not describe any type of filter and fails to provide any technical details. *See* K. Weaver Tr. at 139:15-18 ("there's no technical details given. I mean, it's an abstract."). In addition, Dr. Larson, who worked at the VA Medical Center at the time, indicated that the abstract did not provide sufficient detail. *See* V. Larson Tr. at 169:3-6 ("There's not enough information given for me to say the means by which cancellation is effective in the abstract."). When asked about this abstract, REDACTED
REDACTED

REDACTED
In addition, Dr. Egolf
further supports my opinion that the description is insufficient. *See* D. Egolf Tr. at 125:6-12 ("Q: Could someone who's familiar with hearing aids from this description alone build this device? A: I have no idea.").

- 39 -

102.    I understand that, in order for a patent to be invalid for anticipation, a single prior
art reference must be enabling, meaning that it must contain a description of the claimed
invention with sufficient clarity and detail to establish that the invention existed in the prior art
and that its existence was recognized by persons of ordinary skill in the field of the invention.
Therefore, it is my opinion that the JASA Abstract is not enabling and accordingly fails to
qualify as valid prior art.

103.    This brief abstract fails to provide any discussion or any details concerning a
programmable delay line filter in a feedback path or forward path, determining phase and
amplitude of a signal, inserting a programmable filter or a filter therein programmed, or a host
controller, as recited by the claims of the patents-in-suit. Mr. Weaver further acknowledges that
neither a "programmable delay line filter" or even a "delay line filter" is disclosed in the
Abstract. *See* K. Weaver Tr. at 139:6-14. Dr. Soli concludes that the JASA Abstract is
considerably more relevant than any of the considered prior art. *See* Soli Report at ¶122. I am
unclear as to how he can come to this conclusion considering the lack of technical details of this
brief paragraph.

104.    Dr. Soli has not applied the JASA abstract to any of the claims under any
anticipation theory. As such, the single paragraph abstract alone does not invalidate any claim of
the patents-in-suit. I understand that Dr. Soli applies the JASA Abstract in combination with the
HearTech Electronic Anti-Feedback Circuit ("HearTech Advertisement"). For the reasons
discussed below in Section VIII. C., Dr. Soli's obviousness contention fails.

### 4.    Journal of Acoustical Society of America Presentation ("JASA Presentation") - Egolf and Weaver

105.    Dr. Soli also discusses an alleged presentation by Dr. Egolf and Mr. Weaver
entitled "Electronic Cancellation of Acoustic Feedback to Increase Hearing Aid Stability," given

- 40 -

### 5. Rehabilitation R&D Progress Reports 1984 ("R&D Progress Report") Does Not Invalidate Any Claim

111.    Dr. Soli contends that the R&D Progress Report anticipates claims 9, 14 and 15 and obviates claims 9, 13, 14, 16 and 19 of the '850 Patent. I disagree. In my opinion, the R&D Progress Report does not anticipate these patent claims and further fails to render these patent claims obvious because it fails to satisfy each and every recitation of any of the claims and there is no motivation to modify the R&D Progress Report to meet each and every recitation of any of the claims. I will discuss Dr. Soli's obviousness allegations below.

#### a.    The R&D Progress Report is Not Valid Prior Art

112.    The R&D Progress Report is not an enabling disclosure. I note that the abstract/excerpt from the R&D Progress Report relied upon by the Defendants provides even less detail than the JASA Abstract and is deficient for at least the same reasons. The abstract/excerpt provides no technical details and fails to provide sufficient information to enable one skilled in the art at the time of the invention to make and use the invention. Even combined with either Beex '192 or the South article (another non-enabling reference), the R&D Progress Report fails to provide sufficient detail to one skilled in the art how to make and use the invention without undue experimentation.

113.    I understand that, in order for a patent to be invalid for anticipation, a single prior art reference must contain a description of the claimed invention with sufficient clarity and detail to establish that the invention existed in the prior art and that its existence was recognized by persons of ordinary skill in the field of the invention. Therefore, it is my opinion that the R&D Progress Report is not enabling and accordingly fails to qualify as valid prior art.

114.    I understand that for a reference to be considered a "publication" it must have been available to the public in a manner such that one interested in the subject matter would have

been able to find the alleged reference. My understanding is that individual progress reports
were not indexed by author, title, keyword or subject matter prior to June 1986. Accordingly,
individual progress reports were not searchable by author, title, keyword or subject matter. I am
informed that if someone familiar with hearing aids or acoustic feedback issues had come to a
library prior to June 1986 and had asked about certain topics related to hearing aids, that person
would not have been successful in finding any progress reports.

     **b.**    **The R&D Progress Report Fails to Anticipate the Claimed Inventions**

    115.    Assuming *arguendo* that the R&D Progress Report relied upon by Dr. Soli is
valid prior art, which it is clearly not, I will respond to his other contentions with respect to the
purported disclosure in the R&D Progress Report.

    116.    The R&D Progress Report briefly summarizes two systems - the first one is the
time delay/notch filter (TDNF). The second one - is the active feedback cancellation (AFC)
system. The R&D Progress Report devotes a mere two sentences to the TDNF system,
reproduced below:

> "In one system, called the time delay/notch filter (TDNF) system, the
> microprocessor uses computed values of GH to automatically place high-Q notch
> filters at those frequencies where feedback is most likely to occur."

    117.    From this brief discussion, Dr. Soli infers a complete functioning system. These
two brief sentences fail to provide any details concerning a feedback reduction system.

    118.    As for the AFC system, the R&D Progress Report fails to provide sufficient
details to enable one skilled in the art to make and use the system without undo experimentation.
The excerpt that discuss the AFC system in its entirety is reproduced as follows:

> "In the other system, called the active feedback cancellation (AFC) system, the microprocessor uses computer values of GH to create an estimator. The estimator causes the input information signal (e.g., that containing information such as speech and not PRN) to react destructively with signals returning via the vent outlet, thereby cancelling the effect of the feedback path."

119.    This brief discussion simply refers to an "estimator" without providing any technical details. In my opinion, the estimator as described by the R&D Progress Report fails to qualify as a programmable delay line filter, or even a programmable filter under the Court's construction. Moreover, there is no support in the R&D Progress Report that the estimator operates on time delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighted coefficients. Further, there is no support in the R&D Progress Report that the estimator uses weighting coefficients where the value of the weighting coefficients can be programmed or even any use of coefficients at all.

120.    Dr. Soli alleges that the time delay/notch filter of R&D Progress Report anticipates claims 9, 14 and 15 and the estimator of the R&D Progress Report combined with the South article renders claim 14 obvious. I will address Dr. Soli's obviousness arguments concerning the R&D Progress Report with the South Article below in Section VIII. D.

121.    As for claim 9 of the '850 Patent, Dr. Soli relies on the time delay/notch filter as described in the R&D Progress Report. *See* Soli Report at ¶161. The Report devotes a mere two sentences to the filter. The Report briefly notes that GH is used to automatically place high-Q notch filters at those frequencies where feedback is most likely to occur. However, there is no discussion concerning any determination of the effect on amplitude and phase of a signal in a transmission channel as a function of frequency of acoustic feedback. The Report mentions placing notch filters at certain frequencies but makes no determination on amplitude and phase of a signal as a function of acoustic feedback.

- 45 -

122. Dr. Soli bases his conclusion on the blanket assertion that a time delay/notch filter suggests that it is realized as a programmable delay line filter. *See* Exhibit C of Soli Report at 140. In his "anticipation" analysis, I note that Dr. Soli relies on USPN 4,232,192 ("Beex '192"). *Id.* I am informed that under anticipation multiple references cannot be used. For this reason alone, Dr. Soli's basis for anticipation is flawed. Furthermore, based on Dr. Soli's reliance on Beex '192, it is evident that the R&D Progress Report itself is deficient in addressing each and every claim recitation. Regardless, it is my opinion, that the combination of the time delay notch filter of the R&D Progress Report and Beex '192 fails to address each and every claim recitation. It is also my opinion that there is no motivation to redesign and substantially modify the time delay/notch filter of the R&D Progress Report to incorporate any filter of Beex.

123. As discussed in detail below in Section VII. F., Beex '192 discloses that the coefficients implemented in the filter circuit were first determined using a computer program. Based on this determination, the filter circuit was hardwired using a configuration of resistors that would approximate the predetermined values of the coefficients. Accordingly, Beex '192 fails to disclose a *programmable* delay line filter in which the value of at least one weighting coefficient can be programmed in accordance with the Court's construction. Therefore, the R&D Progress Report - either alone or in combination with Beex '192 - fails to address each and every recitation of claim 9 of the '850 Patent.

124. As for claim 14 of the '850 Patent, Dr. Soli relies on the time delay/notch filter as described in the R&D Progress Report. The Report briefly notes that GH is used to automatically place high-Q notch filters at those frequencies where feedback is most likely to occur. However, there is no discussion concerning any determination the effect on amplitude and phase of a signal in a transmission channel as a function of frequency of acoustic feedback.

- 46 -

The Report mentions placing notch filters at certain frequencies but makes no determination on amplitude and phase of a signal as a function of acoustic feedback. Moreover, Dr. Egolf testified that the R&D Progress Report makes no mention of phase and amplitude. *See* D. Egolf Tr. at 249:15-250:10.

125.    Dr. Soli bases his conclusion on the blanket assertion that a time delay/notch filter suggests that it is realized as a programmable delay line filter. *See* Exhibit C of Soli Report at 159. In his "anticipation" analysis, I note that Dr. Soli relies on the Beex disclosure. *Id.* I am informed that under anticipation multiple references cannot be used. For this reason alone, Dr. Soli's basis for anticipation is flawed. Furthermore, based on Dr. Soli's reliance on the Beex disclosure, it is evident that the R&D Progress Report itself is deficient in address each and every claim recitation. Regardless, it is my opinion, that the combination of the time delay notch filter of the R&D Progress Report and the Beex disclosure fails to address each and every claim recitation. It is also my opinion that there is no motivation to redesign and substantially modify the time delay/notch filter of the R&D Progress Report to incorporate any filter of Beex.

126.    As discussed in detail below in Section VII. G., Beex '192 discloses that the coefficients implemented in the filter circuit were first determined using a computer program. Based on this determination, the filter circuit was hardwired using a configuration of resistors that would approximate the predetermined values of the coefficients. Accordingly, Beex '192 fails to disclose a *programmable* filter in which the value of at least one weighting coefficient can be programmed in accordance with the Court's construction. Therefore, the R&D Progress Report - either alone or in combination with Beex '192 - fails to address each and every recitation of claim 14 of the '850 Patent.

127.   As for claim 15 of the '850 Patent, for at least the reasons stated above in connection with claim 14, the R&D Progress Report - either alone or in combination with Beex' 192 - fails to disclose the recited combination of claim recitations.

### 6.   Collective Weaver Work

128.   Dr. Soli refers to the collective Weaver work as being anticipatory without clearly explaining what he means by the "collective Weaver work." By definition, the "collective Weaver work" refers to multiple references. Insofar as Dr. Soli is relying on a combination of references associated with Mr. Weaver's work at the University of Wyoming, his analysis is improper and contrary to law because anticipation cannot be addressed with multiple references.

129.   As I understand the patent laws, for alleged invalidity based upon a theory of an anticipating printed publication, the allegedly anticipatory document must be a single printed publication that teaches each and every element of a claimed invention within the four corners of such single publication. Therefore, Dr. Soli's theory fails on this basis alone since he relies upon a collection of Weaver's work, rather than a single publication. Moreover, there is no evidence to corroborate that this collection of Weaver's work was provided as a unitary package of documentation. In fact, the references - JASA abstract, JASA presentation, VA R&D Report - are distinct and separate from each other. In my opinion, each document is deficient as an invalidating reference, and, furthermore, none of the references make up for the deficiencies of the other.

### B.   Egolf - Vanderbilt Hearing aid Report Does Not Invalidate Any Claim

130.   I understand that Dr. Soli contends that the Egolf Vanderbilt Report anticipates claims 9 and 18 and obviates claim 1 of the '850 Patent. I disagree with his opinion. In my opinion, the R&D Progress Report does not anticipate these patent claims and further fails to

render these patent claims obvious because it fails to satisfy each and every recitation of any of the claims and there is no motivation to modify the R&D Progress Report to meet each and every recitation of any of the claims. I will address Dr. Soli's obviousness allegation with respect to claim 1 below.

131.    The Egolf Vanderbilt Report is not an enabling disclosure. I understand that, in order for a patent to be invalid for anticipation, a single prior art reference must contain a description of the claimed invention with sufficient clarity and detail to establish that the invention existed in the prior art and that its existence was recognized by persons of ordinary skill in the field of the invention. The short excerpts from the Egolf Vanderbilt Report relied upon by Dr. Soli provides minimal technical details and fails to provide sufficient information to enable one skilled in the art at the time of the invention to make and use the invention without undo experimentation. Moreover, the Egolf Vanderbilt Report concludes against any application to a hearing aid or any other device. Therefore, it is my opinion that the Egolf Vanderbilt Report is not enabling and accordingly fails to qualify as valid prior art.

132.    As for claim 9 of the '850 Patent, Dr. Soli alleges that the Egolf Vanderbilt Report anticipates this claim. More specifically, Dr. Soli relies on the discussion of the gain reduction method on pages 98-99 of the Egolf Vanderbilt Report. Figure 7 illustrates a notch filter in a forward path. The center frequency of the notch filter is set to coincide with a peak(s) in the |GH| spectrum. In my opinion, the notch filter discussed in this article does not meet the Court's construction of the term "programmable delay line filter." More specifically, the notch filter as described by the Egolf Vanderbilt Report does not operate on time delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighted samples. In addition, there is nothing from the Egolf Vanderbilt Report that indicates

- 49 -

that the notch filter uses weighting coefficients where the value of at least one weighting coefficient can be programmed.

133.    There is insufficient detail in this brief discussion of the Gain Reduction Method. I understand that, in order for a patent to be invalid for anticipation, a single prior art reference must contain a description of the claimed invention with sufficient clarity and detail to establish that the invention existed in the prior art and that its existence was recognized by persons of ordinary skill in the field of the invention. Therefore, it is my opinion that the brief discussion of the gain reduction method is not enabling and accordingly fails to qualify as valid prior art.

134.    Dr. Soli simply concludes that the notch filter *could be implemented* using a programmable delay line filter. *See* Exhibit C at 138. However, Dr. Soli points to nothing in the Egolf Vanderbilt Report that supports this conclusion. In my opinion, one skilled in the art at the time of the invention would not have realized that the notch filter as described by the Egolf Vanderbilt Report could be implemented as a programmable delay line filter.

135.    Claim 9 further requires a "hearing aid." The Egolf Vanderbilt Report teaches against any application of the gain reduction method to a hearing aid. Specifically, Egolf indicates that "[a]pplication of the scheme to hearing aids would probably be thwarted by the wide range of acoustical environments to which an in-situ hearing aid may be exposed. In other words, the shape of the |GH| spectrum and its peaks would be continually changing, making it difficult to locate the notch filters without some scheme employing automation." *See* Egolf Vanderbilt Report at 99. Therefore, the gain reduction method as disclosed by the Egolf Vanderbilt Report is not applied to a hearing aid.

136.    In addition, Dr. Soli relies on the Egolf Vanderbilt Report's discussion of the phase shifting method on page 100. Figure 9 illustrates the phase-shifting method to a PA

- 50 -

system. The Egolf Vanderbilt Report discusses inserting a broad-band phase shifting network into G. This has the effect of changing an inherently unstable system so that it comes into compliance with the phase angle portion of Nyquist's stability criterion. In my opinion, block G as discussed in this article does not meet the Court's construction of the term "programmable delay line filter." More specifically, block G of the Egolf Vanderbilt Report does not operate on time delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighted samples. In addition, there is nothing from the Egolf Vanderbilt Report that indicates that block G uses weighting coefficients where the value of at least one weighting coefficient can be programmed.

137.    I further note that there is insufficient detail in this brief discussion of the phase-shifting method. I understand that, in order for a patent to be invalid for anticipation, a single prior art reference must contain a description of the claimed invention with sufficient clarity and detail to establish that the invention existed in the prior art and that its existence was recognized by persons of ordinary skill in the field of the invention. Therefore, it is my opinion that the brief discussion of the phase shifting method is not enabling and accordingly fails to qualify as valid prior art.

138.    Dr. Soli simply concludes that the all-pass phase shifting filter *can also be implemented* by a programmable delay line filter. *See* Exhibit C at 138. However, Dr. Soli points to nothing in the Egolf Vanderbilt Report that supports this conclusion. In my opinion, one skilled in the art at the time of the invention would not have realized that the all-pass phase shifting filter as described by the Egolf Vanderbilt Report could be implemented as a programmable delay line filter.

139.    Claim 9 further requires a "hearing aid." The Egolf Vanderbilt Report specifically teaches against any application of the Phase Shifting Method to a hearing aid. Specifically, Egolf indicates that "[s]uccessful utilization of this scheme in a hearing aid would probably be prevented by the extreme variability of H." *See* Egolf Vanderbilt Report at 100. Therefore, the phase shifting method as disclosed by the Egolf Vanderbilt Report is not applied to a hearing aid.

140.    Dr. Soli opines that by changing the phase response of the forward path, potentially unstable feedback frequencies are moved to other frequencies, where instability may not occur. *See* Soli Report at ¶162. This statement contradicts the Egolf Vanderbilt Report which specifically notes that, due to the extreme variability of H, instability will occur even at other frequencies.

141.    I note that Dr. Soli has failed to address the claim recitation of "said programmable filter being programmed to effect substantial reduction of acoustic feedback from said receiver to said microphone" in relation to the Egolf Vanderbilt Report. *See* Exhibit C at 140. Accordingly, it can only be inferred that the gain reduction method and the phase shifting method both fail to meet this claim recitation. In my opinion, the Egolf Vanderbilt Report fails to disclose this claim recitation. Moreover, I note that Dr. Soli fails to identify any teaching or motivation to address this deficiency. Furthermore, there is no motivation to apply any other teaching to make up for this deficiency.

142.    As for claim 18 of the '850 Patent, Dr. Soli alleges that the Egolf Vanderbilt Report anticipates this claim. More specifically, Dr. Soli relies on the correction detector D and the automatic gain control (AGC) to meet the claim recitation of "a signal-level dependent amplifier." I disagree. The correlation detector is based on the premise that there is little, if any,

- 52 -

correlation between two samples of a speech signal and that correlation between the same two samples would be strong if the system were experiencing acoustic feedback. The correlation detector D periodically samples the output of the amplifier and computes a correlation coefficient. If the coefficient were low, no action would be taken but if it were high, the system would automatically take action. The system of Figure 10 does not disclose a signal level dependent amplifier because the system is responsive to a correlation coefficient, not a signal level.

143.    The Egolf Vanderbilt Report notes that the correlation detector discussed in Figure 10 would be expensive to employ in practice. *See* Egolf Vanderbilt Report at 101. Consequently, further development of the correlation detector was abandoned. It is my opinion that the correlation detector disclosed in the Egolf Vanderbilt Report was not and could not be developed in a working embodiment.

144.    I also note that Dr. Soli has failed to address the claim recitation of "said amplifier being programmed to impart to the hearing aid at least one response characteristic effective to compensate for impaired hearing of the wearer of the aid" in relation to the Egolf Vanderbilt Report. *See* Exhibit C at 128 and 168. Accordingly, it can only be inferred that the correlation detector of the Egolf Vanderbilt Report fails to meet this claim recitation. In my opinion, the Egolf Vanderbilt Report fails to disclose this claim recitation. Moreover, I note that Dr. Soli fails to identify any teaching or motivation to address this clear deficiency. Furthermore, there is no motivation to apply any other teaching to make up for this deficiency.

C.    **The Best Thesis Does Not Invalidate Any Claim**

145.    I understand that Dr. Soli contends that the Best Thesis anticipates claims 1, 10, 13, 14, 16, 18 and 19 of the '850 Patent and claims 1-6 of the '749 Patent. I disagree. In my

- 53 -

opinion, the Best Thesis does not anticipate these patent claims because it fails to satisfy each and every element of any of the claims.

### 1.    The Best Thesis is Not Valid Prior Art

146.    As an initial matter, Dr. Soli's opinions are apparently based upon an allegedly anticipatory printed publication and an alleged prior invention. In my opinion, each of his analyses is flawed. First, with respect to his opinions concerning an allegedly anticipatory printed publication, Dr. Soli ignores the fact that the Best Thesis was not cataloged, indexed and shelved prior to the filing date of the patents-in-suit. Accordingly, the Best Thesis is not a valid printed publication and cannot qualify as prior art under this rationale. Rather, without any analysis or discussion, Dr. Soli merely states that he has been *informed* that the hearing aid described in the Best Thesis qualifies as prior art with respect to the ETG patents. *See* Soli Report at ¶ 127.

147.    Second, with respect to his opinions concerning an alleged prior invention, Dr. Soli fails to rely upon any record evidence suggesting that any particular system was conceived and diligently reduced to practice prior to the June 1986 filing date of the application resulting in the patents-in-suit.

### a.    ETG's Prior Conception and Reduction to Practice

148.    Moreover, the Best Thesis is not valid prior art under any section of 35 U.S.C. § 102 because the patents-in-suit were conceived prior to May 1985, the date relied upon by Dr. Soli, and then later diligently reduced to practice. I understand that Mr. Brown's Expert Report on Validity establishes a prior conception date and diligent reduction to practice to the filing of the patent application of the patents-in-suit. While I maintain that the Best Thesis was not "published" until after the filing date of the patents-in-suit, if Dr. Soli is relying on the Best

- 54 -

claims. In my opinion, none of the possible combinations render any of claims obvious for at least the reasons set forth below.

## A.    The Egolf Vanderbilt Report Does Not Invalidate Claim 1

255.    I understand that Dr. Soli contends that the Egolf Vanderbilt Report renders claim 1 of the '850 Patent obvious. I disagree with his opinion. In my opinion, the Egolf Vanderbilt Report does not render claim 1 of the '850 Patent obvious because there is no motivation to combine the Egolf Vanderbilt Report with any of Best, Weaver, Graupe '818 or the South Article to meet each and every recitation of any of the claims. Specifically, Dr. Soli alleges that Best, Weaver, Graupe '818 or the South Article in combination with the Egolf Vanderbilt Report renders claim 1 of the '850 Patent obvious. In addition, Dr. Soli alleges that the HearTech Advertisement in combination with the Nunley article and the Egolf Vanderbilt Report renders claim 1 obvious - which is addressed below in Section VIII. F. For these assertions, Dr. Soli relies on a correlation detector on page 101 and Figure 10.

256.    Dr. Soli alleges that the Best, Weaver, Graupe '818 or the South Article in combination with the Egolf Vanderbilt Report renders this claim obvious. I disagree. Dr. Soli attempts to combine references that are structurally different from each other with absolutely no motivation to combine these disparate systems other than for the purpose of attempting to invalidate the claims of the '850 Patent. More specifically, the Best Thesis and the Weaver Thesis does not disclose a filter in a feedback path of a transmission channel but rather in a loop at an input of the transmission channel. In addition, the structure of Graupe '818 involves an identification mode that excludes the amplifier of the hearing aid. The system of Graupe '818 switches from the identification mode to a correction mode. The South Article does not disclose

- 91 -

a hearing aid and fails to describe the claimed filter in a feedback path, as discussed in detail below.

257.    Dr. Soli relies on the correlation detector as described by the Egolf Vanderbilt Report on page 101, Figure 10 to modify each of the systems of Best, Weaver, Graupe '818 and the South article. *See* Soli Report at ¶159. More specifically, Dr. Soli relies on the correction detector D and the automatic gain control (AGC) to meet the claim recitation of a "programmable signal limiter means." I disagree. The correlation detector is based on the premise that there is little, if any, correlation between two samples of a speech signal and that correlation between the same two samples would be strong if the system were experiencing acoustic feedback. The correlation detector D periodically samples the output of the amplifier and computes a correlation coefficient. If the coefficient were low, no action would be taken but if it were high, the system would automatically take action. The system of Figure 10 does not indicate that the automatic gain control is programmable.

258.    Dr. Soli's statement of motivation is as follows: "One of ordinary skill in the art would understand that where the canceling techniques alone was completely effective in canceling acoustic feedback and would therefore would have been motivated to include some other mechanism to deal with the onset of acoustic feedback in that situation." *See* Soli Report at ¶159. This conclusory statement is confusing, at best. If Dr. Soli's opinion is that the canceling techniques alone were completely effective, there would be no need to modify the existing systems.

259.    Further, Dr. Soli opines that the combination provides "no more than the predictable result of solving the acoustic feedback problem." *Id.* I disagree with his statement that the proposed combinations of the disparate structures would have been predictable. In fact,

- 92 -

the Egolf Vanderbilt Report notes that the correlation detector discussed in Figure 10 would be expensive to employ in practice. *See* Egolf Vanderbilt Report at 101. Consequently, further development of the correlation detector was abandoned. *Id.* Accordingly, it is my opinion that the Egolf Vanderbilt Report teaches away from any implementation of the correlation detector to a hearing aid. It is my opinion that the correlation detector disclosed in the Egolf Vanderbilt Report was not and could not be implemented in a working embodiment.

260.    Finally, even if the references could be combined, in my opinion, the resulting combinations would nevertheless fail to address each and every claim recitation, as required. More specifically, each of the systems of Weaver, Best, Graupe '818 and the South article are deficient for the additional reasons discussed herein.

## B.    R&D Progress Report Does Not Invalidate Any Claim

261.    I understand that Dr. Soli contends that the R&D Progress Report obviates claims 9, 13, 14, 15, 16 and 19 of the '850 Patent. I disagree with his opinion. In my opinion, the R&D Progress Report does not render these patent claims obvious because it fails to satisfy each and every recitation of any of the claims and there is no motivation to modify the R&D Progress Report to meet each and every recitation of any of the claims.

262.    Specifically, Dr. Soli attempts to combine the alleged teaching of the R&D Progress Report to make up for the admitted deficiencies of Beex '192 for claims 9 and 14 and the South article for claims 13, 14, 15, 16 and 19. For at least the reasons discussed below, I disagree with Dr. Soli. I will address the proposed combinations with respect to the South article below in Section VIII. D.

263.    As discussed above, it is my opinion that the R&D Progress Report is not an enabling disclosure and accordingly fails to qualify as valid prior art.

- 93 -

264.    As discussed above, it is my opinion that the R&D Progress Report does not qualify as a "publication" and accordingly fails to qualify as valid prior art.

265.    Assuming *arguendo* that the R&D Progress Report relied upon by Dr. Soli is valid prior art, which it is clearly not, I respond to his other contentions with respect to the purported disclosure in the R&D Progress Report. Specifically, the R&D Progress Report fails to invalidate the claims of the patents-in-suit because it fails to obviate the admitted deficiencies of Beex '192 or the South Article. Dr. Soli admits that the R&D Progress Report by itself fails to invalidate the claims of the patents-in-suit.

266.    The R&D Progress Report briefly summarizes two systems - the first one is the time delay/notch filter (TDNF). The second one - is the active feedback cancellation (AFC) system. The R&D Progress Report devotes a mere two sentences to the TDNF system, reproduced below:

"In one system, called the time delay/notch filter (TDNF) system, the microprocessor uses computed values of GH to automatically place high-Q notch filters at those frequencies where feedback is most likely to occur."

267.    From this brief discussion, Dr. Soli infers a complete functioning system. These two brief sentences fail to provide any details concerning a feedback reduction system.

268.    As for the AFC system, the R&D Progress Report fails to provide sufficient details to enable one skilled in the art to make and use the system without undue experimentation. The excerpt that discusses the AFC system in its entirety is reproduced as follows:

"In the other system, called the active feedback cancellation (AFC) system, the microprocessor uses computer values of GH to create an estimator. The estimator causes the input information signal (e.g., that containing information such as speech and not PRN) to react destructively with signals returning via the vent outlet, thereby cancelling the effect of the feedback path."

- 94 -

269.    This brief discussion simply refers to an "estimator" without providing any technical details. In my opinion, the estimator as described by the R&D Progress Report fails to qualify as a programmable delay line filter, or even a programmable filter under the Court's construction. Moreover, there is no support in the R&D Progress Report for the opinion that the estimator operates on time delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighted coefficients. Further, there is no support in the R&D Progress Report for the opinion that the estimator uses weighting coefficients where the value of the weighting coefficients can be programmed or even use of any coefficients at all.

270.    As for claim 9 of the '850 Patent, Dr. Soli relies on a combination of the R&D Progress Report and Beex '192. More specifically I understand that Dr. Soli contends that the combination obviates the claim recitation "said programmable filter being programmed to effect substantial reduction of acoustic feedback from said receiver to said microphone" of claim 9 of the '850 Patent. I disagree with his opinion. In my opinion, this combination does not render claim 9 obvious because it fails to satisfy each and every recitation of claim 9 and there is no motivation to modify Beex '192 to meet each and every recitation of claim 9.

271.    Dr. Soli asserts that it would have been obvious for one of ordinary skill in the art to implement the notch filter of the R&D Progress Report as a programmable delay line filter as allegedly disclosed in Beex '192. Contrary to Dr. Soli's assertion, however, Beex '192 does not disclose a programmable delay line filter. As previously discussed, the Court has construed the term "programmable delay line filter" to mean "a filter that operates on time-delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighted samples" where "the value of at least one weighting coefficient can be programmed."

- 95 -

Beex '192 does not disclose a programmable delay line filter because the notch filter disclosed

therein is not programmable in accordance with the Court's construction. The coefficients

implemented in the notch filter are not programmable, but rather fixed. Therefore, it would not

have been obvious to one of ordinary skill in the art to implement a notch filter as a

programmable delay line filter as allegedly disclosed in Beex '192 because Beex '192 fails to

even disclose a programmable delay line filter. Even if the R&D Progress Report and Beex '192

could be combined as suggested by Dr. Soli, the resulting combination would nevertheless fail to

show each and every claim recitation of the claim 9.

272.    As for claim 14 of the '850 Patent, Dr. Soli relies on a combination of the R&D

Progress Report and Beex '192. I disagree with this opinion. As discussed above, R&D

Progress Report refers to an "estimator" without providing any technical details. In addition,

there is no discussion that refers to determining the effect on the amplitude and phase of a signal

as a function of acoustic feedback. As discussed above, Beex '192 also fails to disclose a

programmable filter as construed by the Court. Moreover, there is no motivation to completely

alter and redesign the system of R&D Progress Report with an estimator to include the notch

filter in a forward path as shown by Beex '192. The two references disclose structurally

divergent systems that one skilled in the art would not be motivated to combine. Regardless,

even if they could be combined, the resulting combination would nevertheless fail to address

each and every claim recitation.

## C.    The Combination of HearTech Advertisement and the JASA Abstract Fails to Invalidate Claim 19

273.    I understand that Dr. Soli contends that the HearTech Advertisement and the

JASA Abstract obviate claim 19 of the '850 Patent. I disagree with his opinion. In my opinion,

the combination of the HearTech Advertisement and the JASA Abstract does not render claim 19

316.     The Soli Report correctly concedes that the Feintuch Patent does not explicitly describe a hearing aid. The Soli Report incorrectly asserts, however, that the Feintuch Patent describes an acoustic feedback problem; the Feintuch Patent contains no mention, or even a suggestion, of an acoustic feedback problem. The Feintuch Patent also does not describe a programmable filter being programmed to effect substantial reduction of acoustic feedback from a receiver to a microphone, nor does it even mention or suggest acoustic feedback or the reduction of acoustic feedback. The focus of the Feintuch Patent is on a filter intended to eliminate noise introduced into a signal during transmission of the signal. The Soli Report notes that the Feintuch Patent references the applications identified in Widrow, et al., "Adaptive Noise Cancelling: Principles and Applications, " in Proc. IEEE, Vol. 63, Dec. 1975. That reference also does not mention hearing aids, acoustic feedback or the reduction of acoustic feedback. Instead, like the Feintuch Patent, that reference focuses on cancelling noise in a signal. The applications identified include, canceling interference in electrocardiography, canceling noise in speech signals from the cockpit of an aircraft, canceling antenna sidelobe interference and canceling tape hum or turntable rumble from the playback of recorded speech or music. Accordingly, I disagree that it would have been obvious to a person of ordinary skill in the art at the time of the ETG Patents to apply the Feintuch Patent to hearing aids. Furthermore, even if it would have been obvious to apply the Feintuch Patent to hearing aids, I disagree that it would have been obvious to do so for the purpose of reducing acoustic feedback, as opposed to for the purpose of eliminating noise generated in the transmission channel between the microphone and the output receiver.

- 113 -

## F.    The Nunley et al. Article[3] Does Not Invalidate Any Claim

317.    Dr. Soli contends that the Nunley et al. article ("Nunley Article") obviates claims 1, 13, 14, 15, 16 and 19 of the '850 Patent. I disagree. In my opinion, the Nunley Article does not render these patent claims obvious because it fails to satisfy each and every recitation of any of the claims and there is no motivation to modify the Nunley Article to meet each and every recitation of any of the claims.

318.    As an initial matter I note that Dr. Soli has not relied upon the Nunley Article as an anticipatory reference to any of the claims. As such, Dr. Soli acknowledges the shortcomings of the reference. Specifically, Dr. Soli attempts to combine the alleged teaching of the Nunley Article to make up for the admitted deficiencies of the HearTech Advertisement for claims 1, 13, 14, 15, 16 and 19 and the Weaver Thesis for claim 19. In addition, Dr. Soli alleges that the HearTech Advertisement in combination with the Nunley Article and the Egolf Vanderbilt Report renders claim 1 obvious. For at least the reasons discussed below, I disagree with Dr. Soli.

319.    Specifically, the Nunley Article fails to invalidate the claims of the '850 Patent because it fails to obviate the admitted deficiencies of the HearTech Advertisement. Dr. Soli admits that the Nunley Article by itself fails to invalidate claims of the '850 Patent.

320.    As for claim 1 of the '850 Patent, the Soli Report opines that claim 1 is rendered obvious by the HearTech Advertisement in combination with the Nunley Article. Dr. Soli notes that the HearTech Advertisement was only recently uncovered, and it is not even clear if the

---

[3] It should be noted that Dr. Soli's Report lists US Patent No. 4,791,672 ("'672 Patent") to Nunley et al. as alleged prior art, but fails to apply this reference to any of the asserted claims. The '672 Patent focuses on an apparatus and method for noise suppression, as opposed to, feedback cancellation.

hearing aid disclosed is a digital hearing aid. *See* Soli Report at ¶159. I note that the HearTech Advertisement provides no details of the Feedback Network B shown in the figure. There is simply insufficient information to provide any meaningful understanding of what is involved in Feedback Network B.

321.    The alleged publication date on the HearTech Advertisement is June 1986. As Dr. Soli has provided no actual dissemination date, I am informed that Dr. Soli cannot rely on a date earlier than the last day of the month. It is my understanding that the burden is on Defendants to show a publication date before June 26, 1986. In my opinion, this burden has not been satisfied. Regardless, I am informed that a conception date prior to at least June 1, 1986 and diligent reduction to practice to the filing of the patent application on June 26, 1986 has been established. Therefore, the HearTech Advertisement is not valid prior art.

322.    Even if the references could be combined, as argued by Dr. Soli, the resulting combination would nevertheless fail to address each and every claim recitation. The Soli Report opines that claim 1 is rendered obvious by the HearTech Advertisement in combination with the Nunley Article. In support of this opinion, the Soli Report first argues that the HearTech Advertisement "includes an input microphone, an output receiver, and a signal transmission channel between the input microphone and the output receiver." *See* Exhibit C of Soli Report at 126. The Soli Report then goes on to argue that one of ordinary skill in the art would have been motivated to "implement the Feedback Network B as a programmable delay line filter in view of Nunley et al. article." Id. I disagree.

323.    Dr. Soli's Report fails to provide a sufficient motivation to combine the HearTech Advertisement with the Nunley Article. The HearTech Advertisement merely shows a high-level feedback network. However, this advertisement provides absolutely no technical details

- 115 -

concerning the feedback network. For this major deficiency, Dr. Soli alleges that it would have been obvious to restructure the circuit advertised by HearTech based on the alleged teachings of the Nunley Article. I note, however, that the Nunley Article, at most, is directed to a method and system for the suppression of noise. Accordingly, one of ordinary skill in the art would not have been motivated to redesign the feedback network of HearTech Advertisement based on the alleged noise suppression teaching of the Nunley Article because the scope of both references are clearly distinguishable.

324.   Further, the Nunley Article fails to disclose a programmable delay line filter. The Nunley Article primarily discusses the miniaturization of hearing aids to allow for mobility and portable use. At most, the Nunley Article discloses a programmable digital processor. Indeed, the Nunley Article even admits that the disclosure does not address feedback cancellation. *See e.g.*, ETG0002652. Thus, the Nunley Article fails to disclose or suggest a programmable delay line filter being used for feedback cancellation.

325.   The Court has construed the term "programmable delay line filter" to mean "a filter that operates on time-delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighted samples" where "the value of at least one weighting coefficient can be programmed." The only language from the Nunley Article on which Dr. Soli bases his misguided assertion that the Nunley Article obviates a programmable delay line filter recites the following[4]:

---

[4] It should be noted that this language is almost identical to a portion of the disclosure of the '672 Patent which is directed to an apparatus and method for noise suppression, as opposed to, feedback cancellation. *See*, e.g., '672 Patent, col. 9, ll. 54-60.

- 116 -

> "This digital representation is operated on by adding and subtracting weighted
> versions of past and present inputs and outputs to emphasize or de-emphasize
> various aspects of the signal. By adjusting these weighting factors, the action of
> the hearing aid may be 'personalized' for its recipient." *See*, e.g., ETG00002651

326.    This vague disclosure, however, fails to sufficiently enable a person of ordinary

skill in the art to make and use the invention without undue experimentation. In particular, as

construed by the Court, a programmable delay line filter operates on time-delayed samples of an

input by multiplying each sample by a corresponding weighting coefficient and ***summing the***

***weighted sample***s where ***the value of at least one weighting coefficient can be programmed***.

The Nunley Article is severely deficient in its disclosure of which, if any, of the inputs or outputs

are being added or subtracted. The Nunley Article also fails to sufficiently disclose a

programmable delay line filter with one or more programmable coefficients.

327.    Furthermore, as previously discussed, Dr. Soli's assertions rely on the Nunley

Article disclosure, which is admittedly out of the scope of feedback cancellation. *See* e.g.,

ETG0002652. Accordingly, the Nunley Article, at most, contemplates the possibility of

addressing feedback cancellation in the future.

328.    For at least these reasons, the Nunley Article fails to disclose a programmable

delay line filter in accordance with the Court's construction.

329.    In addition, Dr. Soli alleges that the HearTech Advertisement in combination with

the Nunley Article and the Egolf Vanderbilt Report renders claim 1 obvious. *See* Soli Report at

¶159. As Dr. Soli is relying on a third reference to meet the combination of claim recitations

recited in claim 1 of the '850 Patent, I note that he admits the deficiencies of the HearTech

Advertisement and Nunley Article combination in meeting at least the programmable signal

limiter means recitation.

330.    As discussed above, the combination of the HearTech Advertisement and the
Nunley Article fails to obviate the combination of the claim recitations. Furthermore, as
discussed above, the Egolf Vanderbilt Report also fails to address the programmable signal
limiter means and further teaches against the application to hearing aids. Accordingly, Dr. Soli's
obviousness contention fails. Even if the references could be combined, I note the resulting
combination would nevertheless fail to meet each and every claim recitation of claim 1.

331.    As for claim 13 of the '850 Patent, the Soli Report opines that the HearTech
Advertisement in view of the Nunley Article renders claim 13 of the '850 Patent obvious
because the Nunley Article would teach one of ordinary skill in the art to place the alleged filter
in the Nunley Article in the Feedback Network B of the HearTech Advertisement. I disagree.
No motivation exists to combine the Nunley Article with the Heartech Advertisement as
discussed above. Furthermore, the Nunley Article fails to disclose a filter therein programmed.
The Court has construed the term "a filter therein programmed" to mean "a filter having
coefficients where the values of the coefficients are programmed." As previously discussed with
regard to claim 1, the language of the Nunley Article does not sufficiently disclose a filter with
one or more programmable coefficients in accordance with the Court's construction.
Accordingly, the Nunley Article fails to disclose "inserting between the input and output of said
transmission channel an electrical feedback path having a filter therein programmed to equalize
and reduce the effect of said acoustic feedback both in amplitude and phase on a signal in said
transmission channel."

332.    As for claim 14 of the '850 Patent, the Soli Report opines that the HearTech
Advertisement in view of the Nunley Article renders claim 14 of the '850 Patent obvious
because the Nunley Article would teach one of ordinary skill in the art to place the alleged

- 118 -

programmable filter in the Nunley Article in the Feedback Network B of the HearTech Advertisement. I disagree. No motivation exists to combine the Nunley Article with the HearTech Advertisement as discussed above. Furthermore, the Nunley Article fails to disclose a programmable filter. The Court has construed the term "programmable filter" to mean "a filter having coefficients where the values of the coefficients can be programmed." As previously discussed with regard to claim 1, the language of the Nunley Article does not sufficiently disclose a filter with one or more programmable coefficients in accordance with the Court's construction. Accordingly, the Nunley Article fails to disclose "inserting between the input and output of said transmission channel a programmable filter programmed to equalize and reduce the effect of said acoustic feedback both in amplitude and phase on a signal in said transmission channel."

333.    As for claim 15 of the '850 Patent, for at least the reasons stated above in connection with claim 14, the Nunley Article fails to disclose the recited combination of claim recitations.

334.    As for claim 16 of the '850 Patent, for at least the reasons stated above in connection with claim 14, the Nunley Article fails to disclose the recited combination of claim recitations.

335.    As for claim 19 of the '850 Patent, the Soli Report opines that the HearTech Advertisement in view of the Nunley Article renders claim 19 of the '850 Patent obvious because the Nunley Article would teach one of ordinary skill in the art to place the alleged programmable delay line filter in the Nunley Article in the Feedback Network B of the HearTech Advertisement. I disagree. No motivation exists to combine the Nunley Article with the HearTech Advertisement as discussed above. Furthermore, the Nunley Article fails to disclose a

- 119 -

programmable delay line filter, as discussed above in connection with claim 1. In addition, the

Nunley Article fails to disclose "a programmable delay line filter interposed in a feedback path

between the input and output of said transmission channel, said programmable filter being

programmed to effect substantial reduction of acoustic feedback from said receiver to said

microphone."

336.    In addition, the Nunley Article is not an enabling disclosure. Even combined with

the Weaver Thesis - as suggested by Dr. Soli - the Nunley Article fails to provide sufficient

detail to one skilled in the art how to make and use the invention without undue experimentation.

Nevertheless, in my opinion, the combination of the Weaver Thesis and Nunley Article fails to

obviate the combination of claim recitations. As discussed above, the Weaver Thesis is directed

to an echo estimator in a loop at an input of the transmission channel. In addition, the echo

estimator is not a programmable delay line filter according to the Court's claim construction.

Recognizing this major deficiency, Dr. Soli relies on the alleged teachings of the Nunley Article

to address these missing features. I note, however, that the Nunley Article, at most, is directed to

a method and system for the suppression of noise. Accordingly, one of ordinary skill in the art

would not have been motivated to redesign the echo estimator system of the Weaver Thesis

based on the alleged noise suppression teaching of the Nunley Article because the scope of both

references are clearly distinguishable.

## G.    The Combination of the Graupe '721 Patent and Borth '529 Patent Does Not Invalidate Claims 5 and 6 of the '850 Patent

337.    Dr. Soli opines that claims 5 and 6 of the '850 Patent are invalid as being obvious

in view of the combination of Graupe '721 and Borth '529. As explained below, I disagree with

Dr. Soli's opinion that claims 5 and 6 of the '850 Patent are obvious in view of the alleged prior

art. I further disagree with certain of Dr. Soli's characterizations of certain documents.

- 120 -

**1.    The Borth '529 Reference is Not Valid Prior Art**

338.    Borth '529 was filed on July 1, 1985 and issued on December 9, 1986. Borth '529 is not prior art under 35 U.S.C. § 103 because the filing date of July 1, 1985 is after the date of invention of the '850 Patent. I understand that Mr. Brown's Expert Report on Validity establishes a prior conception date and diligent reduction to practice to the filing of the patent application of the patents-in-suit.

**2.    There is No Motivation To Combine The References**

339.    It is my opinion that Dr. Soli has failed to properly establish a motivation to combine Graupe '721 and Borth '529 to render claims 5 and 6 obvious, and, in fact, no such motivation exists.

340.    U.S. Patent 4,025,721 to Graupe *et al.* ("Graupe '721") is directed towards a method of and means for adaptively filtering near-stationary noise from speech. Generally, Graupe '721 discloses a system including a recognition subsystem for identifying parameters of an input signal as being non-stationary or near-stationary and an adaptive filter subsystem for filtering near-stationary noise from the input signal.

341.    U.S. Patent 4,628,529 to Borth *et al.* ("Borth '529") is directed to a noise suppression system. As illustrated in Figure 5 of Borth '529 (inserted on the next page), an input signal is provided to a channel divider 210 containing a bank of bandpass filters, which separate the input signal into a plurality of pre-processed signals representative of selected frequency channels.

342.    Laszlo K. Stein and Deborah Dempsey-Hart's article Listener-Assessed Intelligibility of a Hearing Aid Self-Adaptive Noise Filter, Ear and Hearing, Vol. 5, No. 4, 1984, pp. 199-204 ("Stein Article") is a research publication investigating the performance of a hearing

- 121 -

aid having a self-adaptive noise filter incorporated therein. Specifically, the self-adaptive noise filter used in the investigation appears to be the Graupe-Causey Self Adaptive Noise Filter ("GCAF") described in Graupe '721. The Stein Article discloses the method, subjects, test materials and equipment, procedure, results, discussion, and conclusions of using the GCAF in a conventional hearing aid. In discussing the method, the Stein Article recites how the GCAF is used as well as the specifications of the filter.

343.    It is my opinion that Dr. Soli improperly attempts to patch together the elements of claims 5 and 6 of the '850 Patent using Graupe '721 and Borth '529 which, on their face, do not indicate that they should be combined in the manner he suggests.

344.    Dr. Soli asserts on pages 132-133 of Exhibit C that "Borth '529 specifically points out undesirable features for noise suppression systems, like those used in Graupe '721. See, Borth '429 at 4:46-53.

345.    Column 4, lines 46-53 of 'Graupe '721 recites that: "One drawback of the Fourier Transform approach of FIG. 1 is that it is a digital signal processing technique requiring considerable computational power to implement the noise suppression system in the frequency domain. Another disadvantage of the FFT approach is that the output signal is delayed by the time required to accumulate the samples for the FFT calculation."

346.    It is my opinion that the underlying premise that Dr. Soli relies on for motivation to combine the teachings of Borth '529 and Graupe '721 is improper. Graupe '721 is directed to a time-domain system that does not convert the signals into the frequency domain. The problem cited in column 4, lines 46-53 of Graupe '721 is that a system that converts input signals in the time domain into input signals in the frequency domain using the Fast Fourier Transform (FFT) 115 requires a large amount of power. Since Graupe '721 does not convert the input signals

## X.    NONE OF THE REFERENCES ARE MATERIAL TO PATENTABILITY

421.    Dr. Soli contends that certain references are material to the patentability of certain claims of the patents-in-suit. *See* Soli Report at Section X, ¶¶ 188-190. Dr. Soli opines that the following references are material to claims of the patents-in-suit that recite reducing or cancelling acoustic feedback: the 1984 VA Rehabilitation R&D Progress Report, the April 1985 JASA Abstract, the 1982 Egolf Vanderbilt article and the Nunley Article. Dr. Soli further opines that the Examiner would have considered Graupe '721 and the Stein article material to claims 5 and 6 of the '850 Patent. I understand that the Patent and Trademark Office considered a good amount of prior art references, as indicated on the face of the patents-in-suit. However, in my opinion, Dr. Soli fails to establish that the references he identifies now are any more material than the ones that were before the Patent and Trademark Office.

422.    I understand that the issue of materiality of references arises when an inequitable conduct defense has been raised to an allegation of infringement. I have been informed that no such defense has been raised in this action. Nevertheless, I have been asked to address Dr. Soli's opinions concerning materiality. I disagree with those opinions. As previously discussed in detail, substantial differences exist between the references identified as material by Dr. Soli and the claims of the patents-in-suit.

423.    I understand that, to have the Court engage in the balancing tests necessary to determine whether inequitable conduct exists, the party asserting inequitable conduct must prove a prima facie case of materiality and intent by clear and convincing evidence. I also understand that, although courts have used several standards for materiality, the standard articulated as whether a reasonable examiner would have considered the prior art important in deciding whether to allow the application has been accepted as a reasonable starting point. Finally, I understand that the PTO's Rule 56 has been deemed essentially the same as the "reasonable

- 155 -

examiner" standard. I have applied these understandings in assessing the materiality of the cited references.

424.    Dr Soli appears to conclude that the R&D Progress Report, the April 1985 JASA abstract, the 1982 Egolf Vanderbilt article and the Nunley Article are each material to the patents-in-suit because the references describe reducing acoustic feedback. This common theme does not necessarily make the references material to any claim of the patents-in-suit, however. As previously discussed in detail, none of these references, either alone or in combination with other references, is an enabling disclosure. Furthermore, Dr. Soli does not assert that any of the references, other than the Egolf Vanderbilt article, anticipates a claim of the patents-in-suit. As previously noted, I disagree that the Egolf Vanderbilt article anticipates any claim of the patents-in-suit and that any of these four references, either alone or in combination with other references, renders any claim of the patents-in-suit obvious. Applying the standards detailed in PTO Rule 56, the references identified as material by Dr. Soli fail, either individually or in combination with any other information, to establish a prima facie case of unpatentability of any claim of the patents-in-suit for all of the reasons previously discussed in this report. Moreover, none of the references either refutes or is inconsistent with any position that the inventors took in opposing an argument of unpatentability or asserting an argument of patentability. Accordingly, in my opinion, a reasonable examiner would not have considered these references important in deciding whether to allow any claim of the applications for the patents-in-suit.

425.    Similarly, Dr. Soli appears to conclude that the Graupe '721 and Stein Article references are material to claims 5 and 6 of the '850 Patent because those references discuss the level of speech in excess of the level of noise. Certainly, mere discussion of a concept as broad as the level of speech in excess of the level of noise, without a more substantive connection to

- 156 -

the patent claim, cannot be sufficient to render a reference material. As previously discussed, these references have no such substantive connection to claims 5 and 6 of the '850 Patent. Dr. Soli concedes that the references do not contain every element of either claim by not asserting that either reference anticipates either claim. Rather, he asserts that Graupe '721 in combination with Borth '529 renders claims 5 and 6 obvious. The intent of citing the Stein Article is not made clear, though it appears to be used to bolster the description of the noise filter in the Graupe '721 reference. As previously discussed in more detail, I disagree that Graupe '721 in combination with Borth '529 renders claims 5 and 6 obvious. Applying the standards detailed in PTO Rule 56, any discussion of the level of speech in excess of the level of noise in the cited references is merely cumulative of the discussion of the signal-to-noise-ratio (SNR) in the two Borth patents (U.S. Patent Numbers 4,628,529 and 4,630,305) cited as references in the '850 Patent. Moreover, Graupe '721 and the Stein Article fail, either individually or in combination with any other information, to establish a prima facie case of unpatentability of either claim 5 or 6 of the '850 Patent for all of the reasons previously discussed in this report. Finally, neither reference either refutes or is inconsistent with any position that the inventors took in opposing an argument of unpatentability or asserting an argument of patentability relative to either claim 5 or 6 of the '850 Patent. Accordingly, in my opinion, a reasonable examiner would not have considered the Graupe '721 and Stein Article references important in deciding whether to allow any claim of the applications for the patents-in-suit.

426.    Therefore, I disagree that the references identified by Dr. Soli are material to the patentability of any claim of the patents-in-suit.

## XI.    CONCLUSION

427.    I currently hold the opinions expressed in this Report. As my study of the case continues, I may acquire additional information and/or attain supplemental insights that result in

added observations. I reserve the right to supplement this Expert Report and to rely on
additional documents and testimony that come to my attention between now and the time of trial.
I also reserve the right to rely on all other Expert Reports submitted in this litigation.

428.    During my testimony at trial, I expect to rely upon exhibits prepared to depict and
explain the information contained in this Report or as rebuttal to testimony by the Defendants'
witnesses. Any such exhibits will be prepared and identified in advance of trial.

Respectfully submitted,

Dated: October 19, 2007

Norman Matzen

## CERTIFICATE OF SERVICE

I do hereby certify that on this 19th day of October, 2007, a copy of the foregoing
**EXPERT REPORT OF NORMAN MATZEN RELATING TO PATENT
VALIDITY** to be served via electronic service and by United States mail service upon the
following counsel of record:

Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
MORRIS, NICHOLS, ARSHT &TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW, GARRETT
& DUNNER
901 New York Ave., N.W.
Washington, DC  20001-4413

*Attorneys for William Demant Holding A/S,
WDH Inc., Oticon A/S, Oticon, Inc., Bernafon
AG, and Bernafon LLC*

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
MORRIS, NICHOLS, ARSHT &TUNNELL LLP
1201 N. Market Street
Wilmington, DE  19899

William H. Mandir
David J. Cushing
Carl J. Pellegrini
Brian K. Shelton
SUGHRUE MION PLC
2100 Pennsylvania Ave., N.W., Ste. 800
Washington, DC  20037

*Attorneys for Widex A/S, Widex Hearing Aid
Co., Inc.*

# EXHIBIT 37

## FULLY REDACTED