# EXHIBIT B

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

1 (Pages 1 to 4)

**Page 1**

1    IN THE UNITED STATES DISTRICT COURT
2       FOR THE DISTRICT OF DELAWARE
3
4    ------------------------------x
5    ENERGY TRANSPORTATION GROUP,  :
6    INC.,                         :
7          Plaintiff,     :
8       vs.           : C.A. No. 05-422 (GMS)
9    SONIC INNOVATIONS, INC.,     :
10   et al.,                      :
11         Defendants.   :
12   ------------------------------x
13
14    Videotaped Deposition of Sigfrid D. Soli, Ph.D.
15              Washington, D.C.
16         Wednesday, November 14, 2007
17              9:10 a.m.
18
19
20   Job No.:  1-115478
21   Pages 1 through 339
22   Reported by:  Cappy Hallock, RPR-CRR

**Page 2**

1
2       Videotaped deposition of SIGFRID D. SOLI,
3    Ph.D., held at:
4
5         HUNTON & WILLIAMS LLP
6         900 K Street N.W., Suite 1200
7         Washington, D.C. 20006
8
9         Pursuant to Notice, before Cappy
10   Hallock, Registered Professional Reporter, Certified
11   Realtime Reporter, and Notary Public in and for the
12   District of Columbia.
13
14
15
16
17
18
19
20
21
22

**Page 3**

1           A P P E A R A N C E S
2
3    ON BEHALF OF THE PLAINTIFF:
4       MARTY STEINBERG, ESQUIRE
5       HUNTON & WILLIAMS LLP
6       1111 Brickell Avenue, Suite 2500
7       Miami, Florida 33131
8       305-810-2500
9
10
11   ON BEHALF OF DEFENDANT WIDEX:
12      J. WARREN LYTLE, JR., ESQUIRE
13      BRIAN K. SHELTON, ESQUIRE
14      SUGHRUE MION, PLLC
15      2100 Pennsylvania Avenue, N.W.
16      Washington, D.C. 20037-3213
17      202-293-7060
18
19
20   Also Present:
21      Tanya Wood, Hunton & Williams Paralegal
22      Video Specialist:  Terry Michael King

**Page 4**

1              I N D E X
2      Deposition of Sigfrid D. Soli, Ph.D.
3            November 14, 2007
4
5    EXAMINATION BY                    PAGE
6      Mr. Steinberg            9
7      Mr. Lytle              328
8      Mr. Steinberg            332
9
10            -o0o-
11
12
13          E X H I B I T S
14
15   Number   Description              Page
16   1    Expert report            28
17   2    U.S. Patent No. 5,402,496       47
18   3    U.S. Patent No. 6,563,931 B1     51
19   4    U.S. Patent No. 6,134,329       53
20   5    U.S. Patent No. 6,876,751 B1     56
21   6    U.S. Patent Publication Application   64
22   No. 2005/0163331 A1

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

2 (Pages 5 to 8)

5

INDEX: (Continued)

| Number | Description | Page |
|---|---|---|
| 7 | Article: An Objective Procedure for Evaluation of Adaptive Antifeedback Algorithms in Hearing Aids | 66 |
| 8 | Article: Band-limited Feedback Cancellation with a Modified Filtered-X LMS Algorithm for Hearing Aids | 72 |
| 9 | Article: A Novel Approach of Adaptive Feedback Cancellation for Hearing Aids | 76 |
| 10 | Article: Robust Microphone Array Processor Incorporation Headshadow Effects | 80 |
| 11 | U.S. Patent No. 4,731,850 | 86 |
| 12 | U.S. Patent No. 4,879,749 | 87 |
| 13 | Levitt resume' | 91 |
| 14 | subpoena | 104 |
| 15 | Markman order | 111 |
| 16 | ReSound materials | 137 |
| 17 | Report: Acoustic Feedback Suppression in Hearing Aids | 142 |

7

INDEX: (Continued)

| Number | Description | Page |
|---|---|---|
| 33 | U.S. Patent No. 4,783,818 | 275 |
| 34 | Feedback Phase Inverter | 286 |
| 35 | The Vanderbilt Hearing Aid Report | 313 |
| 36 | U.S. Patent No. 4,658,426 | 317 |
| 37 | Article: A Wearable Digital Hearing Aid | 327 |

6

INDEX: (Continued)

| Number | Description | Page |
|---|---|---|
| 18 | Oticon Syncro memo | 153 |
| 19 | Widex document: FBC Description by Kaulberg | 157 |
| 20 | Pluvinage declaration | 180 |
| 21 | 12-4-84 Bell Lab memo | 181 |
| 22 | 10-9-07 Egolf deposition | 194 |
| 23 | 3-29-85 letter, Egolf to Larson | 196 |
| 24 | 8-31-87 letter, Egolf to Larson | 199 |
| 25 | Report: Acoustic Feedback Suppression In Hearing Aids, Larson and Egolf | 212 |
| 26 | HearTech advertisement | 230 |
| 27 | Article: The Hearing Aid Feedback Path: Mathematical Simulations and Experimental Verification | 241 |
| 28 | Hanscom, Woods and Paul affidavits | 249 |
| 29 | Catalog printout: Weaver thesis | 250 |
| 30 | Widex supplemental responses | 255 |
| 31 | ASA Program of the 109th Meeting | 258 |
| 32 | 1985 Best thesis | 273 |

8

P R O C E E D I N G S
-  -  -  -  -  -

THE VIDEO OPERATOR:  Please stand by.
Here begins Videotape Number 1 in the deposition of Sigfrid Soli, Ph.D. in the matter of the Energy Transportation Group, Incorporated versus Sonic Innovation, Incorporated, et al. for the District Court for the District of Delaware, Case Number C.A. 05-422 (GMS).

Today's date is November 14th, 2007. The time on the video monitor is 9:10 a.m.

The video operator today is Terry Michael King of L.A.D. Reporting.  This video deposition is taking place at Hunton and Williams, 1900 K Street, Northwest, Washington, D.C.

Counsel, please identify yourself and state who you represent.

MR. STEINBERG:  Marty Steinberg for the plaintiff ETG.

MR. LYTLE:  J. Lytle from Sughrue Mion representing Widex.

MR. SHELTON:  Brian Shelton also of

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

3 (Pages 9 to 12)

9

1  Sughrue Mion representing Widex.
2       THE VIDEO OPERATOR:  The court reporter
3  today is Cappy Hallock of L.A.D. Reporting.
4       Will you please swear in the witness.
5  WHEREUPON,
6       SIGFRID D. SOLI, Ph.D.,
7       A Witness called for examination, having
8  been first duly sworn, was examined and testified
9  as follows:
10      THE VIDEO OPERATOR:  Please begin.
11      EXAMINATION
12 BY MR. STEINBERG:
13   Q.   Dr. Soli, would you please begin by
14 stating your name and spell it for the record?
15   A.   My first name is Sigfrid, S-i-g-f-r-i-d,
16 last name Soli, S-o-l-i.
17   Q.   Dr. Soli, do you prefer to be addressed
18 as Dr. Soli?
19   A.   That's fine.  Thank you.
20   Q.   Dr. Soli, have you ever given a
21 deposition before?
22   A.   Yes, I have.

10

1    Q.   And how many times?
2    A.   I think I have given, let me think, I
3  think I have given three different depositions.
4    Q.   Okay.  In what years were they, do you
5  recall?
6    A.   I don't recall the exact years.  It was
7  several years ago.  Not recently.
8    Q.   I think your report states that you
9  haven't testified in the last four years or so?
10   A.   In court.
11   Q.   Oh, you have given depositions within
12 that time period?
13   A.   Yes.
14   Q.   Do you recall what different matters you
15 have given depositions in?
16   A.   Yes, I do.
17   Q.   And what are they?
18   A.   They've generally related to cases
19 involving whether law enforcement officers have a
20 hearing impairment that may affect their functional
21 hearing ability and thus their ability to do their
22 job.

11

1    Q.   Do any of those cases involve a hearing
2  aid device of any kind?
3    A.   Yes.  I believe one of them did.
4    Q.   And have you ever given any testimony
5  before on a hearing aid?
6    A.   No, I have not.
7    Q.   And in those cases, were you testifying
8  as an expert?
9    A.   Yes, I was testifying as an expert.
10   Q.   And what was your field of expertise in
11 those cases?
12   A.   Functional hearing assessment.
13   Q.   And just for layman jurors who will hear
14 this, what does that mean?
15   A.   It means that over the years we have
16 developed tests and procedures that can be used to
17 characterize a person's ability to hear and
18 function, especially in difficult listening
19 environments, and that's an important consideration
20 for people who have jobs where hearing is critical
21 to the safe and effective performance of their
22 jobs.

12

1    Q.   So essentially a study of how people
2  hear?
3    A.   Well, it's more than that.  It measures
4  their ability to hear and communicate in
5  challenging listening environments.
6    Q.   Okay, and have you ever had any court
7  designate you as an expert?
8    A.   I'm not sure I understand what you mean.
9    Q.   Well, has a judge approved your
10 testimony --
11   A.   As an expert?
12   Q.   -- as an expert in any court?
13   A.   Yes.
14   Q.   And which court was that?
15   A.   There is a court in Boston involving a
16 case of the kind I just described for a Boston
17 police officer.
18   Q.   Okay.
19   A.   And --
20   Q.   I'm sorry, go ahead.
21   A.   And a case in Indianapolis involving a
22 man who wanted to be a firefighter.

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

4 (Pages 13 to 16)

---

13

1    Q.    And in the Boston case, what expertise
2  were you permitted to testify about?
3    A.    Again, it was related to his functional
4  hearing ability.
5    Q.    And in the Indianapolis the same thing?
6    A.    Yes.
7    Q.    Okay.
8        I assume you understand there is a court
9  reporter here taking down your testimony.  There is
10  a videographer at the end of the table and you are
11  testifying under oath, correct?
12    A.    I do.
13    Q.    Is there anything that would impair your
14  ability to testify today?
15    A.    Not that I know of.
16    Q.    Okay.
17        Let's start with your educational
18  background, and if you wouldn't mind telling us
19  where you went to college?
20    A.    I have a bachelor's degree from Saint
21  Olaf College in Minnesota.
22    Q.    And did you have a specialty?

---

14

1    A.    I majored in math and physics.
2    Q.    And then after that?
3    A.    I have a second bachelor's from the
4  University of Minnesota with a major in
5  experimental psychology.
6    Q.    Experimental psychology did you say?
7    A.    Correct.
8    Q.    Okay.
9    A.    And then a Ph.D. from the University of
10  Minnesota in experimental psychology as well.
11    Q.    Do you hold any other degrees?
12    A.    No, that's it.
13    Q.    And do you have any special
14  certifications or special expertise outside of
15  those subject matters?
16    A.    Well, I have worked in the area of
17  medical device development, hearing aid development
18  for almost twenty years now, so whatever expertise
19  that represents.
20    Q.    Okay.  Other than your work expertise,
21  which we will get to in a moment, do you have any
22  other degrees or certifications or any other

---

15

1  recognition for any other field of endeavor other
2  than those you have discussed so far?
3    A.    No.  That's it.
4    Q.    Do you have any sort of engineering
5  training?
6    A.    I have had engineering course work, but
7  I don't have formal degree in that field.
8    Q.    When you say engineering course work,
9  would that be a rudimentary course in engineering?
10    A.    Yes.
11    Q.    You have no engineering degree of any
12  sort?
13    A.    No, I do not.
14    Q.    And have you taken any engineering
15  courses or seminars after you left college?
16    A.    Yes, I have.
17    Q.    And which courses or seminars have you
18  taken in engineering?
19    A.    Well, I have attended many, many
20  sessions and professional meetings relating to
21  engineering topics.  I have also sat in on courses
22  at the university generally in the area of digital

---

16

1  signal processing, adaptive filtering, especially
2  as it applies to medical device applications.
3    Q.    When you say you attended many sessions
4  related to engineering can you name them?
5    A.    There is too many to name.  It's over a
6  period of twenty years.  The professional meetings
7  of the Acoustical Society of America and other
8  meetings of that type.
9    Q.    So are you talking about a meeting where
10  certain aspects of engineering would be discussed?
11    A.    Yes, sir.
12    Q.    Did you get any degree or certification
13  from any of those meetings or sessions?
14    A.    No, I did not.
15    Q.    And if you would, just after you
16  finished college would you give us sort of a bird's
17  eye view of your employment?
18    A.    Well, I received a bachelor's degree in
19  '68, I believe it was, and then I was in the Air
20  Force for four years in a technical position.  Then
21  I went to the University of Minnesota, was there
22  for several years, got my second masters and my

---

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

5 (Pages 17 to 20)

**17**

1 Ph.D. Then I was a member of the faculty at
2 University of Maryland College Park for I think
3 five or six years. I took a leave of absence
4 because I was interested in working on new medical
5 devices, especially cochlear implants.
6           I went to 3M Company which is the place
7 in the United States where that work was being done
8 at that time. I received my promotion and tenure
9 from the University of Maryland but respectfully
10 declined to accept it and stayed at 3M. I was
11 there for about six years working on medical device
12 development. That was in the '80s. The first part
13 of that time was cochlear implant. The second part
14 of that time was hearing aids, hearing aid signal
15 processing.
16           Then I went to the House Ear Institute
17 in Los Angeles in '89 where I founded the
18 laboratory that does hearing aid research as well
19 as a variety of other research, and I have been
20 there ever since.
21     Q.   You said you were at the University of
22 Maryland for five or six years?

**18**

1     A.   Yes.
2     Q.   Were you tenured?
3     A.   Yes. I received my promotion to
4 associate professor and tenure while I was on my
5 leave, and like I said I did not accept it. I
6 resigned my position and stayed in industry.
7     Q.   Your report and resume' said you were
8 not tenured. Is there a mistake?
9     A.   There is a mistake, yes.
10     Q.   So you were in fact tenured at the
11 University of Maryland?
12     A.   I was given a letter -- I received a
13 letter from John Toll, the president of the
14 university, congratulating me on my promotion and
15 tenure while I was on leave, and I did not -- I did
16 not accept the offer so I guess technically you
17 could say even though I was offered the tenure I
18 did not take it.
19     Q.   So you have never held a tenured
20 position; is that correct?
21     A.   That's correct. I declined the tenure
22 offer because I chose to do other things.

**19**

1     Q.   And the tenured offer was in what field?
2     A.   In experimental psychology, the
3 Department of Psychology.
4     Q.   Not in engineering?
5     A.   Correct.
6     Q.   Nothing to do with hearing devices?
7     A.   That's correct.
8     Q.   Okay.
9           And when you worked for 3M you said you
10 worked, at least at the beginning, on cochlear
11 implants, and for the jury would you explain what
12 that is?
13     A.   A cochlear implant is a medical device
14 with a small array of electrodes that is implanted
15 by a surgeon in the inner ear of a deaf person, and
16 when those electrodes are stimulated the hearing
17 nerve responds as if to sound and the deaf person
18 is enabled to hear.
19     Q.   When you were at 3M did you perform any
20 engineering work?
21     A.   I directed a laboratory that did
22 engineering work on the development of cochlear

**20**

1 implant processors, procedures for testing and
2 evaluating the function of those processors with
3 patients, things of that sort.
4     Q.   Did you yourself perform any engineering
5 work at 3M?
6     A.   Can you explain to me what you mean by
7 engineering work?
8     Q.   Well, do you know what engineering work
9 means?
10     A.   I have an idea, but I'm not sure it is
11 the same as your idea.
12           I wrote software that did signal
13 processing for cochlear implants. I worked side by
14 side on a regular basis with engineers who were
15 developing hardware to implement that software, who
16 were developing electrodes, the various aspects of
17 the implantable medical device.
18     Q.   Did you design any electrical circuits?
19     A.   No, I did not.
20     Q.   Do you have any training with filter
21 design?
22     A.   I know how to use filter design

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

6 (Pages 21 to 24)

21

1  software, and I had done that.
2      Q.  Do you know how to design a filter, an
3  electrical filter?
4      A.  I know how to use the software which
5  designs the filter which I think is how most people
6  do it nowadays.
7      Q.  Do you have any filter design training?
8      A.  No, I haven't been trained in the
9  formulas that are used to design filters.
10     Q.  And if one were to actually manufacture,
11  make the patents that we are talking about in this
12  case, wouldn't you expect that person to have some
13  level of training in filter design?
14     A.  I'm not sure I understand the question.
15  Could you rephrase it again, please?
16     Q.  Sure.  If someone were to make,
17  manufacture, the filters -- excuse me, the hearing
18  aid devices described in the patents in this case,
19  wouldn't you expect that they would have filter
20  design training?
21     A.  Well, the manufacturer might not.
22  Somebody might.

22

1      Q.  To make them?
2      A.  To build them you would need to have the
3  ability to design a circuit that would perform the
4  filtering, that is correct.
5      Q.  So you would need an electrical
6  engineering background, correct?
7      A.  That would be one of the --
8      Q.  And you would need someone who had been
9  trained in filter design, correct?
10     A.  Yes.  That's one of the several skills
11  that are needed.
12     Q.  In terms of individually, have you ever
13  been sued or sued anybody?
14     A.  I was involved in a traffic accident
15  quite a few years ago in Los Angeles where one of
16  the people who was in the accident sued for an
17  insurance payment.  My insurance company
18  represented me in that case, so I participated in
19  that.
20     Q.  Were you ever deposed in that case?
21     A.  I don't recall.  I testified.
22     Q.  You testified at trial or --

23

1      A.  Yes.  Yes, I did.
2      Q.  And what was the outcome of that case,
3  do you recall?
4      A.  I don't recall how it was settled.
5      Q.  Okay.  Any other case you have been
6  involved in personally?
7      A.  Not that I can recall, no.
8      Q.  Have you been involved in a case as
9  either an employee, officer, director or consultant
10  to any entity?
11     A.  Years and years ago the House Ear
12  Institute was sued by somebody when I was working
13  there, but I was not involved in that.
14     Q.  So you weren't deposed or --
15     A.  No.  No, I was not.
16     Q.  Have you ever had any criminal
17  investigation or been arrested or been convicted of
18  anything?
19     A.  No, I have not.
20     Q.  Are you currently employed?
21     A.  Yes, I am.
22     Q.  And who are you employed by?

24

1      A.  I am employed by the House Ear Institute
2  in Los Angeles.
3      Q.  What is that?
4      A.  It's a nonprofit research institute.
5      Q.  And what is your position with the House
6  Ear Institute?
7      A.  I have two positions there.  I am the
8  head of our laboratory that does research on device
9  development and evaluation, and I am also vice
10  president and a member of the executive management
11  team.  My responsibilities are for our patents,
12  licenses, intellectual property, commercial
13  contracts, things of that sort.
14     Q.  Does the House Ear Institute employ
15  electrical engineers?
16     A.  Yes, I believe they do.
17     Q.  Do they employ individuals who have
18  training with filters?
19     A.  Yes, they do.
20     Q.  And how long have you been employed
21  there?
22     A.  Since 1989.

**25**

1    Q.    And do you have an ownership interest in
2    this entity?
3        A.    No, I do not.
4        Q.    Do you have an ownership interest in any
5    entity?
6        A.    Just my real estate where I live.
7        Q.    Okay.
8            What is the ownership structure of the
9    hearing ear institute?
10       A.    House Ear Institute.
11       Q.    House Ear Institute.  I'm having a time
12   with that.
13       A.    Well, it's a private nonprofit research
14   institute so maybe -- I don't really understand how
15   it is owned.
16       Q.    Well, let's put it this way.  How does
17   it receive its funding?
18       A.    It receives its funding from donors who
19   received treatment in the House Ear Clinic, which
20   is a separate organization.  It receives its
21   fundings from contracts and grants from the U.S.
22   government and foundations, from commercial

**26**

1    contracts with companies in the field, in my field.
2        Q.    Does it receive any financial support in
3    any way from any entity in the hearing aid
4    industry?
5        A.    I'm not certain of that.  I believe that
6    one of the hearing aid companies may have supported
7    a traineeship for an audiologist in our children's
8    clinic at one time.
9        Q.    You said commercial contracts with
10   companies in the field.  What does that mean?
11       A.    Well, in the field related to the
12   treatment of hearing loss, cochlear implants,
13   medical devices, diagnostic instruments, surgical
14   tools and techniques, hearing aids, things of that
15   sort.
16       Q.    Does the House Ear Institute have any
17   contracts with any hearing aid companies?
18       A.    At present?
19       Q.    At any time.
20       A.    In the past years ago we have.
21       Q.    What kind of contracts?
22       A.    We had a contract with Starkey

**27**

1    Laboratories to develop hearing aid technology,
2    algorithms for them.
3        Q.    Was that a commercial contract?
4        A.    Well, it was a research co-development
5    agreement with a license option in it.
6        Q.    Do you know how much money Starkey paid
7    the House Ear Institute?
8        A.    I don't know the exact amount, no.
9        Q.    Can you tell us a roundabout figure?
10       A.    It was over a period of several years
11   the contract lasted.  I think it may be 2,
12   $300,000.
13       Q.    Any other hearing aid industry, any
14   other entities, any other financial association --
15       A.    Not that I'm aware of.
16       Q.    -- with the House Ear Institute?
17       A.    Not that I'm aware of.
18       Q.    When you say you receive grants, who do
19   you receive grants from?
20       A.    Usually it is the National Institutes of
21   Health, although there are private granting
22   institutions as well like the Deafness Hearing

**28**

1    Foundation.
2            MR. STEINBERG:  Let's get this marked,
3    Soli 1.
4            (Soli Deposition Exhibit Number 1 was
5    marked for identification.)
6            THE WITNESS:  Is that for me?
7            MR. STEINBERG:  It is.
8            THE WITNESS:  Thank you.
9    BY MR. STEINBERG:
10       Q.    I will hand you what has been marked as
11   Soli Exhibit 1 which purports to be the Expert
12   Report of Sigfrid Soli, Ph.D., Regarding Invalidity
13   of the ETG Patents.  Can you identify that as your
14   report?
15       A.    It does appear to be my report, yes.
16       Q.    On Page 4 of your report you state that
17   you had certain algorithms that were patented and
18   licensed to Starkey Labs; is that correct?
19       A.    Yes, that is correct.
20       Q.    And what does that mean?  What does that
21   refer to?
22       A.    It refers to, if you look at the

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

8 (Pages 29 to 32)

29

1  previous sentence there, an algorithm that is
2  designed to compensate for hearing loss and also to
3  preserve characteristics of sound that the binaural
4  system uses, the two ears together which are
5  important for hearing and noise.
6      Q.   And did you yourself patent some
7  algorithms in that field?
8      A.   I'm one of the inventors on the patents,
9  yes.
10     Q.   And who were the other inventors on that
11 patent or patents?
12     A.   I don't remember all the names.
13     Q.   What was the breakdown of the patentees'
14 jobs, so to speak, on that particular patent?  Who
15 did what?
16     MR. LYTLE:  Objection.
17     Q.   You can answer.
18     A.   Well, my role was basically I conceived
19 of the idea.
20     Q.   Um-hmm.
21     A.   I worked with the -- there was one or
22 two engineers who with me devised methods of

30

1  designing the filters that were used in the hearing
2  aid for the purposes I described a few minutes ago,
3  and there were other engineers who worked with us
4  to build a wearable prototype device that was field
5  tested with these algorithms.  I don't think they
6  were listed as inventors.  The inventors were
7  myself and the people who worked on the method of
8  designing the filters.
9      Q.   Okay, the actual design of the filters
10 was performed by engineers?
11     A.   Yes, under my direction.
12     Q.   Okay.
13         Now, did you have some sort of contract
14 or license with Starkey?
15     A.   Well, we, as I said, we developed these
16 and then entered into a license agreement with
17 Starkey for them to commercialize them.
18     Q.   Is that a license agreement that is
19 different than the House Ear Institute or the same?
20     A.   I'm not sure what you mean.
21     Q.   You mentioned some license agreement
22 that the House Ear Institute had with Starkey.

31

1      A.   That's the same one.
2      Q.   That's the same one.
3      A.   Yes.
4      Q.   And that's the 2 to $300,000 in payments
5  over the years you mentioned?
6      A.   They paid us during the time we were
7  doing the work with them for the cost of that
8  effort.  And there was also associated with a
9  license, a royalty stream.
10     Q.   Did you or the House Ear Institute --
11 well, strike that.
12         You were the patentee with a few other
13 fellows?
14     A.   That's correct.
15     Q.   Did you ever assign that patent to any
16 entity?
17     A.   No.  It's still held by the House Ear
18 Institute.
19     Q.   So you assigned it to the House Ear
20 Institute?
21     A.   Yes, it is held in title by the House
22 Ear Institute.

32

1      Q.   Did the House Ear Institute license that
2  patent to some third party like Starkey?
3      A.   Yes, sir.  That's what happened.
4      Q.   Did you negotiate that license?
5      A.   I was one of the people who did.
6      Q.   And what were the terms of that license?
7      A.   I don't remember the details.  There was
8  a royalty rate and a term of the license.  It was
9  exclusive.  It was over a period of, I don't know,
10 three years, five years.  I honestly don't
11 remember.
12     Q.   So it was a running royalty.  The
13 royalty was paid over time?
14     A.   Yes, sir.
15     Q.   Do you know --
16     A.   Based on sales.
17     Q.   Based on sales?
18     A.   Yes, sir.
19     Q.   And do you know the percentage of the
20 royalty rate?
21     A.   I don't remember.  Three, 4, 5 percent,
22 somewhere in there.

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

9 (Pages 33 to 36)

33

1    Q.  Do you have any documents that would
2  identify the rate?
3    A.  I could go find the contract, I guess,
4  the license agreement.
5    Q.  Also on Page 4 you indicate that there
6  was a certain algorithm that has been licensed to
7  Dynamic Hearing of Melbourne, Australia.
8    A.  Yes, sir.
9    Q.  What is Dynamic Hearing?
10    A.  Dynamic Hearing is a small startup
11  company in Australia that has some algorithms of
12  their own that perform other functions in hearing
13  aids, and they license that algorithm in
14  combination with our feedback cancellation
15  algorithm to various hearing aid manufacturers for
16  use in their products.
17    Q.  Now, is this a different algorithm than
18  the algorithm you prepared for Starkey?
19    A.  Yes, sir.
20    Q.  And this was -- was this also assigned
21  to the House Ear Institute?
22    A.  Yes, sir.

34

1    Q.  And did the House Ear Institute license
2  that to Dynamic Hearing?
3    A.  That's correct.
4    Q.  And do you know the terms of that
5  license?
6    A.  Generally --
7      MR. LYTLE:  Objection.  Vague.
8    Q.  You can answer.
9    A.  Generally, it's an equity deal where the
10  House Ear Institute was granted a certain number of
11  shares in the company in exchange for the license
12  of the algorithm.
13    Q.  The House Ear Institute was granted
14  shares in Dynamic Hearing?
15    A.  Yes, sir.
16    Q.  Do you know how many shares or what
17  percentage?
18    A.  I think it was 100,000 shares and I
19  think the percentage is 3 percent, 5 percent,
20  something like that.
21    Q.  Do you have documents that describe the
22  terms?

35

1    A.  Yes, sir, I do.  I could produce those.
2    Q.  And you say that Dynamic Hearing in turn
3  licensed this technology to hearing aid
4  manufacturers?
5    A.  Yes, sir.
6    Q.  Do you know what hearing aid
7  manufacturers?
8    A.  I'm not one hundred percent certain.  I
9  know of one for sure, but there are others that I
10  guess are in negotiation and I'm not aware of the
11  outcome of that.
12    Q.  What hearing aid manufacturer are you
13  aware of?
14    A.  The one that I know of is in Germany.
15  It is called Interton, I-n-t-e-r-t-o-n.
16    Q.  You say there are others that are
17  bargaining for this technology?
18    A.  I believe so.
19    Q.  Are you involved in the terms of those
20  licenses?
21    A.  Not at all.
22    Q.  Do you know what the license terms were

36

1  for the Interton?
2    A.  No, I do not.
3    Q.  Have you personally ever had any --
4  strike that.
5      Have you or any company that you have
6  been associated with ever had any relationship to
7  any company in the hearing aid industry?
8    A.  I'm not sure --
9      MR. LYTLE:  Objection, vague.
10    A.  Could you rephrase that in a different
11  way so I can understand it more clearly?
12    Q.  Sure.
13      Have you had any relationship to any
14  company in the hearing aid industry?
15      MR. LYTLE:  Same objection.
16    A.  Only through these contracts that I have
17  just described.
18    Q.  None other?
19      MR. LYTLE:  Same objection.
20    A.  The reason I'm hesitating is I have done
21  some consulting work, but I don't believe I have
22  ever consulted for anybody in the hearing aid

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

10 (Pages 37 to 40)

37

1  industry.
2     Q.   So you don't think you have consulted
3  for anyone in the hearing aid industry other than
4  what you have mentioned so far?
5     A.   Not that I can remember at the moment.
6     Q.   How about any company you have been
7  associated with?  Has any company you have been
8  associated with had any relationship to any company
9  in the hearing aid industry other than what you
10  have mentioned so far?
11     MR. LYTLE:  Objection, vague.
12     A.   The only company I have been associated
13  with was 3M, and they were definitely in the
14  business of the hearing aid industry, but I did
15  mention that before.
16     Q.   Do you recall when you were first
17  contacted to be an expert in this case?
18     A.   Vaguely.  I don't remember all the
19  details.
20     Q.   When would that have been?
21     A.   I guess it was last year sometime.
22     Q.   Okay.  And do you know what entity

38

1  retained you, which hearing aid manufacturer or
2  which hearing aid manufacturer's counsel retained
3  you as an expert?
4     A.   That was Widex.  It is Widex.
5     Q.   And you are being paid for your
6  services?
7     A.   Yes.
8     Q.   And how much are you being paid?
9     A.   I'm being paid $300 an hour for expert
10  services.
11     Q.   And are you being paid for expenses
12  also?
13     A.   Yes, sir.
14     Q.   And how much have you been paid to date?
15     A.   To date?  I would have to estimate.
16  Probably $50,000 would be my guess, maybe $55,000.
17     Q.   And do you expect to be paid more in the
18  future?
19     A.   Well, I expect to be paid for whatever
20  future time I spend.
21     Q.   Are you making plans to attend the trial
22  in this case?

39

1     A.   I've been told that they would like me
2  to attend the trial, yes, sir.
3     Q.   And of course you will be paid for your
4  time and attendance and preparation?
5     A.   I believe so.
6     Q.   Have you signed any affidavit or
7  declaration in this matter?
8     A.   No, I don't think so, except my report
9  and the supplement to my report.
10     Q.   Now, prior to your deposition today have
11  you reviewed any documents or transcripts or
12  listened to any recordings?
13     A.   I haven't listened to any recordings.  I
14  have reviewed my report and some of the references
15  that are mentioned in my report.
16     Q.   Have you read any deposition
17  transcripts?
18     A.   I've looked at, not carefully but
19  casually, I have looked at Levitt's deposition,
20  parts of Weaver's deposition.
21     Q.   Parts of?
22     A.   Weaver, Kim Weaver.

40

1     Q.   Okay.
2     A.   And those are the main ones I have
3  looked at.
4     Q.   Have you looked at Dr. Egolf's
5  deposition?
6     A.   No, I have not seen that.
7     Q.   Have you asked for it?
8     A.   No, I have not.
9     Q.   Are there any documents that you are
10  relying on that haven't been produced that you are
11  aware of?
12     A.   No, there are not.
13     Q.   Did you prepare with your attorneys for
14  your testimony today?
15     A.   Yes, I did.
16     Q.   About how long did you prepare?
17     A.   Over the last couple days.
18     Q.   About how many hours per day?
19     A.   Oh, I would say eight or nine, maybe
20  ten.  I mean part of the time was with them.  Part
21  of that time was on my own.  Probably about eight
22  hours a day with them.

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

11 (Pages 41 to 44)

---

**41**

1    Q.    For two or three days?
2    **A.    Two days.**
3    Q.    And apart from your conversations with
4    your attorneys, have you spoken to anyone else
5    about this case or this deposition?
6    **A.    My wife.**
7    Q.    I won't get into those conversations.
8    **A.    No.  Good.**
9    Q.    Anyone other than that?
10   **A.    Well, I said hello to Bob Morley**
11   **yesterday because he is a friend of mine.**
12   Q.    Did you have any substantive
13   communication?
14   **A.    No, I did not.**
15   Q.    How about with Mr. Anderson?
16   **A.    I don't know who he is.**
17   Q.    Mr. Putnam?
18   **A.    Don't know him.**
19   Q.    Dr. Egolf?
20   **A.    I know who he is but I have not spoken**
21   **to him.**
22   Q.    Dr. Larson?

---

**42**

1    **A.    I know who he is but I have not spoken**
2    **to him.**
3    Q.    Mr. Weaver?
4    **A.    No.**
5    Q.    Mr. Best?
6    **A.    No.**
7    Q.    Mr. Graupe?
8    **A.    No.**
9    Q.    Have you spoken with any officer or
10   employee of any current or former defendant in this
11   case, any of the hearing aid manufacturers?
12   **A.    No, I haven't.**
13   Q.    Now, you are named as an inventor on how
14   many patents would you say?
15   **A.    I think it is six, but to be honest I'm**
16   **not one hundred percent certain because sometimes**
17   **there are continuations, divisionals and things of**
18   **that sort.**
19   Q.    And do any of your patents relate to
20   feedback cancellation?
21   **A.    Yes, they do.**
22   Q.    Do any relate to noise suppression?

---

**43**

1    **A.    No.**
2    Q.    Do any relate to dual microphones?
3    **A.    No, they do not.**
4    Q.    Have you ever asserted your patents
5    against anyone for patent infringement?
6    **A.    No one.  I have not done that.**
7    Q.    And other than the licenses you have
8    discussed already, have you licensed any or all of
9    your patents to anyone else other than what you
10   have discussed so far?
11   **A.    Yes.**
12   Q.    And who would -- strike that.  What
13   patents would be involved and who did you license
14   them to?
15       MR. LYTLE:  Objection, compound.
16   Q.    You can answer.
17   **A.    We have a patent on a pressure**
18   **equalizing ear plug that has been licensed to a**
19   **company called Cirrus Technology.**
20   Q.    How do you spell that?
21   **A.    C-i-r-r-u-s like the clouds.**
22   Q.    And did you participate in that license?

---

**44**

1    **A.    I'm not sure I understand what you mean.**
2    Q.    Did you participate in negotiating the
3    license?
4    **A.    I was one of the people who did, yes.**
5    Q.    Do you know the terms of that license?
6    **A.    There is a royalty on per unit sales of**
7    **several percent over the life of the patent, I**
8    **believe.**
9    Q.    Do you know what the percentage is?
10   **A.    I think it is maybe 5 or 6 percent,**
11   **somewhere in that ballpark.**
12   Q.    And it is over the life of the patent
13   did you say?
14   **A.    Yes, sir.**
15   Q.    And when was that entered into, do you
16   know?
17   **A.    That was a long time ago, probably eight**
18   **or nine years ago, maybe.**
19   Q.    And was that patent likewise assigned to
20   the House Ear Institute?
21   **A.    Yes, sir.**
22   Q.    So they get the royalties?

---

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

12 (Pages 45 to 48)

45

1    A.   Yes, sir.
2    Q.   Okay.  What other patent has been
3  licensed?
4    A.   Let me think.  I think that's the only
5  one.  I mean, I would have to look at the list to
6  refresh my memory but I believe that's the only
7  one.
8    Q.   Did you personally perform any research
9  concerning any prior art for any of your patents?
10    A.   I don't understand your question.
11    Q.   Did you personally perform any research
12  to determine if there was any prior art that would
13  have affected any of your patents?
14    A.   No.  We didn't do that.
15    Q.   Did anyone do that for you?
16    A.   Not that I'm aware of.  Well, I guess if
17  I understand your question correctly, are you
18  asking if someone did a review of the prior art in
19  preparing the patent?
20    Q.   Yes.
21    A.   Yes.  Our patent attorney did that.
22    Q.   Did you participate in that at all?

46

1    A.   I'm sure that he showed me a draft of
2  his patent application materials and I would have
3  discussed that with him.
4    Q.   But you yourself didn't perform that
5  search?
6    A.   No, I did not.
7    Q.   Okay.
8      Now, are any of your patents assigned to
9  HIMPP?  H-I-M-P-P is the acronym.
10    A.   I'm not certain of that because there is
11  a patent, one of my patents -- a couple of my
12  patents are held by 3M and I don't know what they
13  have done with those patents.  They have moved
14  along through some course so I'm not certain.
15    Q.   Do you know what HIMPP is?
16    A.   I think I do.  Well, I know it's an
17  organization of the hearing aid industry.  That's
18  all.
19    Q.   What is your understanding of HIMPP?
20    A.   I think I have just told you what it is.
21  I really don't know much about it.
22    Q.   Do you understand they hold patents for

47

1  hearing aid manufacturers?
2    A.   I have been told that is one of the
3  things they do, yes.
4    Q.   Do you know if any of your patents are
5  held by HIMPP?
6    A.   Like I said, I don't know.  The ones
7  that are held in title by the House Ear Institute
8  are not, I'm certain of that.  The ones that are
9  held in title by 3M, I don't know.
10    Q.   Did you or any entity you were
11  associated with ever sell any patents to ReSound
12  Corporation?
13      MR. LYTLE:  Objection.
14    A.   No, not that I'm aware of.
15      MR. STEINBERG:  Let's mark that as
16  Number 2.
17      (Soli Deposition Exhibit Number 2 was
18  marked for identification.)
19  BY MR. STEINBERG:
20    Q.   Let me hand you Exhibit Number 2 which
21  purports to be a U.S. Patent, the last four (sic)
22  numbers are '496, where you appear to be one of the

48

1  inventors.  Do you see that?
2    A.   Yes, I do.
3    Q.   And it lists a couple of other
4  inventors, Kevin Buckley?
5    A.   Yes.
6    Q.   Who is Kevin Buckley?
7    A.   Kevin is a, at that time was a faculty
8  member at the University of Minnesota.
9    Q.   And what is his expertise?
10    A.   He's an engineer, signal processing
11  engineer.
12    Q.   Signal processing?
13    A.   I believe so.
14    Q.   And it lists Gregory is it Widdin,
15  W-i-d-i-n?
16    A.   Widin.
17    Q.   What is his expertise?
18    A.   His training is in the same field as
19  mine, experimental psychology.
20    Q.   And you see that it lists U.S. patents
21  as under References Cited?
22    A.   Yes, I see that.

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

13 (Pages 49 to 52)

49

1    Q.   Okay.  And that is what I was referring
2  to.  You didn't do any of that research, right?
3    A.   No.  This was all done after I left 3M.
4    Q.   Okay.  Did you help prepare this patent
5  in any way?
6    A.   No, I did not.
7    Q.   So you did not write the description?
8    A.   No I did not.
9    Q.   Anything like that?
10   A.   No.  I think Bill Bauer probably did.
11   Q.   I'm sorry?
12   A.   I think Bill Bauer probably did.
13   Q.   Do you know why neither of the patents
14  in this case are listed under the patent documents
15  cited?
16   A.   I'm sorry?
17   Q.   Do you know why neither the '850 or the
18  '749 patents in this case are listed under the
19  patent documents cited?
20       MR. LYTLE:  Objection.
21   A.   I have no idea.
22   Q.   Does this purport to be a --

50

1        (Interruption by reporter.)
2        (Discussion off the record.)
3  BY MR. STEINBERG:
4    Q.   Back to Exhibit 2.  Does this purport to
5  be a feedback cancellation, a patent dealing with
6  feedback cancellation or some other technology?
7        MR. LYTLE:  Objection.
8    A.   Let me take a look.  I'm not that
9  familiar with this patent, but looking at the
10  structure that is shown on the face page it appears
11  to have an adaptive filter that creates a
12  cancellation signal that may be used for cancelling
13  feedback.
14   Q.   And do you agree that's what the patents
15  in this case do?
16       MR. LYTLE:  Objection.
17   A.   No, I don't.
18   Q.   You don't agree that they are feedback
19  cancellation patents?
20   A.   Well, one of the patents is about a host
21  controller.
22   Q.   I understand that.  There are two

51

1  patents though, right?
2    A.   Yes, sir.
3    Q.   Is the '850 patent a feedback
4  cancellation patent?
5        MR. LYTLE:  Objection.
6    A.   I believe there are claims that relate
7  to feedback cancellation in that patent.
8    Q.   And you would agree that you are to
9  assume the validity of those patents, correct, for
10  your testimony?  You are to assume they are valid?
11       MR. LYTLE:  Objection.
12   A.   I'm not sure I understand what you mean
13  by that.
14   Q.   Okay.
15       MR. STEINBERG:  Let's get this marked as
16  the next exhibit.
17       (Soli Deposition Exhibit Number 3 was
18  marked for identification.)
19       THE WITNESS:  Thank you.
20  BY MR. STEINBERG:
21   Q.   I'm handing you what has been marked as
22  Exhibit 3, which is a United States patent the last

52

1  numbers are '931B1.  Do you see that?
2    A.   I see that.
3    Q.   You are listed as an inventor?
4    A.   Yes, sir.
5    Q.   Who is Ralph Fravel also mentioned,
6  F-r-a-v-e-l?
7    A.   Ralph was an engineer at 3M at the time
8  I was there.
9    Q.   And was his expertise as an engineer?
10   A.   I'm not certain.  He's probably an
11  electrical engineer but I'm not certain.
12   Q.   Okay.  Do you see the assignee mentioned
13  as K/S HIMPP, H-I-M-P-P.
14   A.   I do see that.
15   Q.   Were you aware of that?
16   A.   No, I was not.  I have not seen this
17  patent until this moment.
18   Q.   And again, you had nothing with do with
19  reviewing or researching the prior art of this
20  patent?
21   A.   No, I did not.
22       MR. STEINBERG:  Okay let's go to

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

14 (Pages 53 to 56)

53

1  Number 4.
2      (Soli Deposition Exhibit Number 4 was
3  marked for identification.)
4  BY MR. STEINBERG:
5      Q.   Let me hand you Exhibit 4 which purports
6  to be a United States patent with the last three
7  numbers '329. The date of the patent is October
8  17, 2000. You are listed as an inventor, correct?
9      **A.   That's correct.**
10     Q.   And also listed as an inventor is Shawn
11 is it Gao, G-a-o?
12     **A.   Yes.**
13     Q.   And who is Shawn Gao?
14     **A.   Shawn is an engineer who worked for me**
15 **at the House Ear Institute.**
16     Q.   And do you know what his specialty was?
17     **A.   Electrical engineering.**
18     Q.   And you see the assignee there is the
19 House Ear Institute, correct?
20     **A.   Correct.**
21     Q.   And I take it you did not do any of the
22 prior art work under the References Cited?

54

1      **A.   I did not.**
2      Q.   You see under the References Cited it
3  lists the '749 patent of Dr. Levitt?
4      **A.   I see that.**
5      Q.   Were you aware of that?
6      **A.   Not until this moment.**
7      Q.   This patent purports to be a method of
8  measuring and preventing unstable feedback in
9  hearing aids, correct?
10     **A.   Yes, sir.**
11     Q.   Do you know why the '749 patent is
12 listed but the '850 patent is not?
13     **A.   I do not.**
14     Q.   Do you agree they go hand-in-hand, so to
15 speak?
16     MR. LYTLE:  Objection.
17     **A.   Well, the specification is the same on**
18 **them. Yes. They do go together. They are**
19 **intended to be used together as I understand it.**
20     Q.   In fact, the '749 is essentially the
21 processor for the '850, right?
22     MR. LYTLE:  Object.

55

1      **A.   I don't agree with that.**
2      Q.   You don't agree with that?
3      **A.   No, I don't.**
4      Q.   It's a host controller for the '850,
5  correct?
6      **A.   Yes, it is.**
7      Q.   And what do you think a host controller
8  is?
9      **A.   Well, I would view a host controller as**
10 **a separate device that is used to program or**
11 **control some other device.**
12     Q.   So a processor?
13     **A.   I'm sorry?**
14     Q.   It would be a processor? A computer?
15     **A.   It could be a computer.**
16     Q.   Okay.
17         Would you agree that if this is a method
18 of measuring and preventing unstable feedback in
19 hearing aids, the '850 patent should have been
20 listed?
21     MR. LYTLE:  Objection.
22     **A.   It's impossible for me to say that.  I**

56

1  don't know.
2      Q.   Okay.
3          (Soli Deposition Exhibit Number 5 was
4  marked for identification.)
5  BY MR. STEINBERG:
6      Q.   Let me hand you Exhibit Number 5 which
7  purports to be a U.S. Patent with the last number
8  '751B1. Do you see that?
9      **A.   I do.**
10     Q.   The date of the patent is April 5th,
11 2005. You are listed as one of the inventors,
12 correct?
13     **A.   That's correct.**
14     Q.   And the other inventor is again a Shawn
15 Gao, the electrical engineer, right?
16     **A.   Yes, sir.**
17     Q.   And who is, I'm going to get this wrong,
18 Hsiang-Feg Chi, spelled H-s-i-a-n-g dash F-e-g last
19 name C-h-i?
20     **A.   That's why we call him Fred.**
21     Q.   I would, too.
22     **A.   Yes.  Fred Chi was a graduate student at**

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

15 (Pages 57 to 60)

57

1   UCLA who worked in my laboratory with Shawn Gao and
2   myself on the development of this algorithm.
3       Q.   What was his expertise?
4       A.   Signal processing. Digital signal.
5       Q.   Engineering?
6       A.   Yes, he was.
7       Q.   And I take it you did not do any of the
8   prior art work here?
9       A.   No, I did not. I did not. That was
10  done by our patent counsel.
11      Q.   This is entitled Band-Limited Adaptive
12  Feedback Canceller for Hearing Aids. Do you see
13  that?
14      A.   Yes, I see that.
15      Q.   Do you know why the Levitt patents are
16  not listed?
17      A.   I do not know.
18      Q.   Under the publications listed, it lists
19  James Kates, an article entitled Feedback
20  Cancellation In Hearing Aids. Do you see that?
21      A.   I see that.
22      Q.   Do you know Mr. Kates or Dr. Kates?

58

1       A.   I know him professionally, as a member
2   of my field.
3       Q.   Do you know who he worked for and
4   trained under?
5       A.   I don't know where he was trained. I
6   know that he has worked a number of different
7   places.
8       Q.   Do you know he worked for Dr. Levitt?
9       A.   At one time I believe he did.
10      Q.   Are you aware that his hearing aid
11  patents reference Dr. Levitt's patents and say they
12  are an extension of those patents?
13      A.   No, I'm not aware of that.
14      Q.   Okay.
15           Do you know whether this was what one
16  would refer to as a notch filter or do you know
17  anything about the technical aspects of this
18  patent?
19           MR. LYTLE: Objection.
20      A.   Yes. I know quite a bit about the
21  technical aspects of it. No, it is not a notch
22  filter.

59

1       Q.   How did this limit the bandwidth of the
2   feedback cancelling signal?
3           MR. LYTLE: Objection, foundation.
4       Q.   Do you know?
5       A.   Yes, I do.
6       Q.   Can you explain it to us?
7       A.   Yes, I can.
8           Look at the figure on the face page.
9       Q.   Yes, sir.
10      A.   There are two elements inside the dashed
11  line box that is called feedback canceller. One
12  says BPF1 over in the right-hand corner. The other
13  says BPF2 on the left-hand side. Those are band
14  path filters and their function is to limit the
15  bandwidth of the signal that is operated on by the
16  band canceller.
17      Q.   When you say limit the bandwidth can you
18  explain to the jury what that means?
19      A.   Yes. The bandwidth refers to the range
20  of frequencies of the signal that are being
21  processed. So normally the bandwidth of sound
22  being processed by a hearing aid might be some very

60

1   low frequency, maybe 100 or 200 Hertz, up to some
2   high frequency, maybe 5,000 or 6,000 Hertz. That
3   would be the bandwidth of the hearing aid.
4           When we limit the bandwidth we filter
5   those wideband signals to some narrower bandwidths
6   and those narrower bandwidths signals are what are
7   then processed by the feedback canceller.
8       Q.   And how does the feedback canceller
9   work? Do you know?
10      A.   Yes, I do.
11           The feedback canceller uses an adaptive
12  filter like that disclosed, and used by a number of
13  different people in the past, to create a
14  cancellation signal that is used to subtract from
15  the input of the hearing aid, and in so doing
16  cancel or eliminate the feedback component of that
17  input.
18      Q.   Does it measure the phase and amplitude
19  of the feedback signal?
20      A.   No, it does not.
21      Q.   It doesn't?
22      A.   No, it does not.

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

16 (Pages 61 to 64)

61

1    Q.    When you say it subtracts, what does it
2    subtract from?
3        MR. LYTLE:  Objection.
4        **A.    It subtracts -- the output of the**
5    **feedback canceller is a signal that is subtracted**
6    **from the signal that comes in from the microphone.**
7    Q.    Does it measure or determine that
8    feedback signal and then create essentially an
9    equal but opposite signal and subtract it?
10       **A.    It doesn't measure the feedback signal,**
11   **it creates through adaptive filtering the signal**
12   **that can be subtracted for cancellation purposes.**
13   Q.    How does it make that signal?
14       **A.    How does the adaptive filter make that**
15   **signal?**
16   Q.    Yes.
17       **A.    It makes that signal by using an**
18   **adaptive filtering algorithm called the LMS**
19   **algorithm, least means squares, described by Widrow**
20   **back in the '50s, maybe back in the '70s, I'm not**
21   **sure how far back that goes, and that algorithm**
22   **uses the -- the result of the subtraction process**

62

1    **is an input, together with another input, and what**
2    **it tries to do is minimize the power or the**
3    **magnitude of the signal after cancellation.**
4    Q.    Is that the same as creating a
5    pseudonoise feedback signal?
6        **A.    No, it is not.**
7    Q.    What is created by this Widrow method?
8        **A.    What is created?**
9    Q.    Um-hmm.
10       MR. LYTLE:  Objection.
11       **A.    Well, it creates -- the adaptive filter**
12   **creates an output signal that is used for**
13   **cancellation purposes.**
14   Q.    Okay, and is that output signal then
15   matched by an equal but opposite signal and
16   subtracted?
17       MR. LYTLE:  Objection.
18       **A.    No.  The output signal from the adaptive**
19   **filter is what is used to subtract from the input.**
20   Q.    So once you subtract those signals they
21   essentially nullify each other?
22       **A.    No.  No.**

63

1    Q.    Cancel each other?
2        **A.    No.**
3        MR. LYTLE:  Objection.
4        **A.    Would you like me to keep going?**
5    Q.    Sure.
6        **A.    The feedback canceller, the adaptive**
7    **filter in the feedback canceller adjusts its**
8    **response to match as closely as possible the**
9    **response of the acoustic feedback path shown down**
10   **below at the bottom there.  And so it's a parallel**
11   **electronic feedback path that is included inside**
12   **the hearing aid processor, so to speak, and the**
13   **signal that is processed through that feedback**
14   **canceller, if the canceller is working properly, is**
15   **very similar to the feedback component that is**
16   **reaching the microphone.  And if you subtract the**
17   **output of that feedback canceller from the**
18   **microphone input, you should cancel or eliminate**
19   **the feedback component that was present in the**
20   **microphone input.**
21   Q.    Now, in the patents we have been going
22   over, all these exhibits, in addition to not

64

1    reviewing the patent references, you also didn't
2    review the publications that were listed in any of
3    these, correct?
4        MR. LYTLE:  Objection.
5        **A.    I believe that those patent -- those**
6    **publication references were put together by Shawn**
7    **Gao.  They were part of his and Fred Chi's work.**
8    **As I said, Fred was working on his Ph.D. thesis so**
9    **he went through a lot of background literature that**
10   **I did not see.**
11   Q.    But you personally did not do it?
12       **A.    No, I did not.**
13   Q.    Okay.
14       (Soli Deposition Exhibit Number 6 was
15   marked for identification.)
16   BY MR. STEINBERG:
17   Q.    I hand you what has been marked as
18   Exhibit 6, which purports to be a patent
19   application publication.  The number is 0163331-A1
20   dated July 28th, 2005.  It lists you as the
21   inventor along with Mr. Gao and Mr. Chi, correct?
22       **A.    Correct.**

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

17 (Pages 65 to 68)

65

1    Q.   And I take it they had the same
2  responsibilities on this patent application as you
3  have described previously?
4    A.   Yes, that's correct.  These are closely
5  related patents as you can see.
6    Q.   I was just going to ask you that.  I
7  assume this is related to the '751B1, correct?
8    A.   Yes.  Very closely related.
9    Q.   And do you know why this additional
10  document was filed?
11    A.   I knew you were going to ask me that.
12       I don't remember the details, honestly,
13  but the issue was that there was some limitations
14  imposed on the claims by the examiner at the time,
15  and it was a recommendation of our patent counsel
16  to address those limitations by separating this and
17  making a separate filing here as a CIP.  I think
18  it's a CIP.  Maybe I'm not right -- yes, it is a
19  continuation.
20       MR. STEINBERG:  We have been going about
21  an hour.  You want to take a five-minute break?
22       THE WITNESS:  Sure.

66

1       THE VIDEO OPERATOR:  Going off the
2  record.  The time is now 10:05 a.m.
3       (Recess taken -- 10:05 a.m.)
4       (After recess -- 10:14 a.m.)
5       THE VIDEO OPERATOR:  Please stand by.
6       We are now back on the record.  The time
7  is 10:14 a.m.
8       MR. STEINBERG:  Please mark this as the
9  next exhibit.
10       (Soli Deposition Exhibit Number 7 was
11  marked for identification.)
12  BY MR. STEINBERG:
13    Q.   Dr. Soli, we are handing you Exhibit 7
14  which purports to be an article entitled An
15  Objective Procedure for Evaluation of Adaptive
16  Antifeedback Algorithms In Hearing Aids.  Do you
17  see that?
18    A.   Yes, I do.
19    Q.   And were you one of the authors to this
20  article?
21    A.   Yes, I am.
22    Q.   And who is Daniel Freed?

67

1    A.   Daniel Freed is a software engineer who
2  works in my laboratory for me.
3    Q.   And you agree that in this article you
4  state in the introduction that feedback is a
5  long-standing problem in hearing aids.
6    A.   Yes.  That's the first sentence.
7    Q.   And you would agree that feedback is a
8  significant issue in hearing aids, correct?
9    A.   It can be, yes.
10    Q.   Now, at the bottom of the second column,
11  oh about five or six lines up there is some -- I
12  will read the sentence and you can probably follow
13  me.  It says, "Static antifeedback algorithms
14  assume a fixed open loop transfer function, whereas
15  adaptive antifeedback algorithms attempt to track
16  changes in the open loop transfer function over
17  time.  Adaptive antifeedback algorithms may be
18  grouped into two categories.  Cancellers model the
19  feedback path with an adaptive filter to produce an
20  estimate of the feedback signal which is then
21  subtracted from the hearing aid input."
22       Do you see that?

68

1    A.   Yes, I do.
2    Q.   The patents in this case, the '850 and
3  the '749, would fall into that category, correct?
4       MR. LYTLE:  Objection.
5    A.   In which category?
6    Q.   Cancellers.
7    A.   Yes, but they are -- that's a
8  subcategory under adaptive algorithms, and my
9  understanding is the '850 or '749 use a fixed or
10  static characterization of the feedback path.
11    Q.   Where did you get that understanding
12  from?
13    A.   By reading the patents.
14    Q.   Do the patents say anywhere that they
15  are fixed?
16    A.   I don't believe the patents say one way
17  or the other.
18    Q.   Do they ever use the word fixed in any
19  way?
20    A.   I don't recall.
21    Q.   Okay.  Other than that, that caveat, the
22  '850 and '749 patents fall into this category of

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

18 (Pages 69 to 72)

69

1  cancellers, correct?
2          MR. LYTLE:  Same objection.
3      **A.   Yes. Well, those patents claim several**
4  **things.  They claim cancellers and they also claim**
5  **I guess what I would call a notch filter.**
6      Q.   Okay, but in terms of the cancellation
7  process they would fall into this category you have
8  identified, correct?
9          MR. LYTLE:  Objection.
10     **A.   I would class them as a static**
11 **antifeedback algorithm.**
12     Q.   You are saying the word static because
13 of this issue with fixed, correct?
14     **A.   Yes, sir.**
15     Q.   Absent that caveat, they fall into the
16 category of cancellers, correct?
17     **A.   Yes, sir.**
18     Q.   If you look at the top of the next page,
19 the first full paragraph starting with the second
20 sentence says, "The process of subtracting the
21 filter hearing aid output from the hearing aid
22 input creates an internal feedback path.  If the

70

1  filter is a sufficiently accurate model of the
2  external feedback path, the internal and external
3  feedback paths will cancel each other, virtually
4  eliminating all feedback."
5          Do you see that?
6      **A.   Yes, I do.**
7      Q.   And the patents in this case would fall
8  into that category, correct?
9          MR. LYTLE:  Objection.
10     **A.   Yes, I believe that's a correct**
11 **characterization of how a canceller would operate.**
12     Q.   If you turn over to the third page,
13 which is in the top left marked 384?
14     **A.   I see that.**
15     Q.   Okay.  You have certain models from
16 various manufacturers, and then you have a column
17 that says Algorithm Type.
18     **A.   I see that, yes.**
19     Q.   And in that Algorithm Type it has a
20 designation that says Canceller and then it says
21 either initializeed or not initializeed, right?
22     **A.   That's correct.**

71

1      Q.   A canceller means the same kind of
2  cancellation we have just been talking about that
3  you described?
4          MR. LYTLE:  Objection.
5      Q.   Is that correct?
6      **A.   Yes, it does.**
7      Q.   And initialized or not initialized means
8  only that they had that function and it was either
9  turned on or turned off?
10         MR. LYTLE:  Objection.
11     **A.   I don't understand the question.**
12     Q.   What does initialized or not initialized
13 mean in your chart, in your article?
14     **A.   Okay.**
15     **That's discussed in here somewhere.  Let**
16 **me see if I can find it for you.**
17     Q.   Okay.
18     **A.   If you look at 383 down at the bottom**
19 **where it says Methods, the third sentence, "Three**
20 **of the seven cancellers are initialized whereas**
21 **none of the detectors is initialized."**
22     **Let's see where he explains what that**

72

1  **means.  This was written by Dan Freed, by the way.**
2      **Well, I can explain it.  I don't see**
3  **where it is in here but I can explain it if you**
4  **would like.**
5      Q.   Okay.
6      **A.   Initialized means that when the hearing**
7  **aid is first fit or programmed for the user, there**
8  **is some process internal to the hearing aid that**
9  **puts it in an initial state for enabling it to do**
10 **feedback cancellation.  Some hearing aids do that,**
11 **others do not.**
12     Q.   Are you familiar with the concept that
13 most of the hearing aid platforms we are talking
14 about that have feedback cancellation features are
15 also used on low end hearing aids that don't
16 initialize that feature?
17         MR. LYTLE:  Objection.
18     **A.   I'm not familiar with that, no.**
19     Q.   Okay.
20         (Soli Deposition Exhibit Number 8 was
21 marked for identification.)
22 BY MR. STEINBERG:

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

19 (Pages 73 to 76)

73

1    Q.   Let me hand you Exhibit 8 which purports
2  to be an article entitled Band-limited Feedback
3  Cancellation with a Modified Filter-X LMS Algorithm
4  for Hearing Aids. And you are listed as one of the
5  authors, correct?
6    **A.   Yes, I am.**
7    Q.   And then you have Mr. Chi and Mr. Gao
8  who we have talked about, right?
9    **A.   Yes.**
10    Q.   And then we have a fellow --
11    **A.   It's a woman.**
12    Q.   It's a woman?
13    **A.   Yes.**
14    Q.   Okay, it's not a fellow.
15    -- named Abeer, A-b-e-e-r, Alwan,
16  A-l-w-a-n. And what is Ms. Alwan's expertise?
17    **A.   She is a professor, a Ph.D. in**
18  **electrical engineering and signal processing at**
19  **UCLA, and she is the thesis advisor for Mr. Chi.**
20    Q.   And this article appears to have been
21  written in 2002?
22    **A.   It was published in 2003.**

74

1    Q.   Okay.
2    **A.   It says. Copyright is marked 2002, but**
3  **publication date on the top says 2003.**
4    Q.   And in this article you talk about most
5  feedback cancellation methods using a wideband
6  approach and you are arguing for a more narrowband
7  approach, correct?
8    **A.   Can you show me where that is?**
9    Q.   On the top of Page 2.
10    **A.   Yes, that's correct.**
11    Q.   Okay, and then you describe a couple of
12  those patented devices that use the wideband
13  approach, and among them in the second paragraph on
14  Page 2 are the -- you see the Graupe patent in
15  1988?
16    **A.   Is that the reference to a patent? I**
17  **would have to check.**
18    MR. LYTLE: Objection.
19    **A.   The Graupe '88 reference is to -- yes,**
20  **it is the '818 patent.**
21    Q.   Okay. And you see your description of
22  it there. It says, "For example, probe noises

75

1  insert broadband noises into hearing aids to
2  provide strong excitation -- excitation,
3  e-x-c-i-t-a-t-i-o-n -- signals for adaptive
4  filtering," and then after that you list among
5  others the Graupe patent; is that correct?
6    **A.   That's correct.**
7    Q.   And then it says, "The injection of
8  probe noises must be carefully controlled,
9  otherwise the output sound will be contaminated by
10  the added noise," right?
11    **A.   That's right.**
12    Q.   What that means for a layman sort of
13  like me is that this methodology inserts these
14  noises every so often, like every 30 or 60 seconds,
15  and it interrupts the hearing aid essentially,
16  correct?
17    MR. LYTLE: Objection.
18    **A.   I'm not certain exactly how each of**
19  **these particular cited references perform that**
20  **function, but in general the injection of a probe**
21  **noise as I understand it would temporarily or**
22  **momentarily interrupt the hearing aid function,**

76

1  **might sound like "ch", something like that.**
2    Q.   And the '850 and '749 patents don't
3  operate in that fashion, correct? They don't have
4  a probe noise that interrupts the hearing aid, do
5  they?
6    **A.   My understanding of the '850 and the**
7  **'749 patents are they use tones at different**
8  **frequencies that when they used to identify the**
9  **feedback path they interrupt the hearing aid as**
10  **well.**
11    Q.   Okay. When we get to those patents I
12  will ask you to show me where that is.
13    **A.   Sure.**
14    Q.   Okay?
15    (Soli Deposition Exhibit Number 9 was
16  marked for identification.)
17  BY MR. STEINBERG:
18    Q.   Handing you what has been marked as
19  Exhibit 9 which is an article entitled A Novel
20  Approach of Adaptive Feedback Cancellation for
21  Hearing Aids, you are one of the authors; is that
22  correct?

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

20 (Pages 77 to 80)

77

1     A.   That's correct.
2     Q.   And the other authors are Mr. Chi and
3   Mr. Gao, correct?
4     A.   Correct.
5     Q.   And this is another article about this
6   band-limited approach that you have, right?
7     A.   That's correct.
8     Q.   Under Problems In Wideband Adaptive
9   Feedback Cancellation in Paragraph 3 on Page 1, at
10   the end of the first paragraph you say, "Therefore,
11   the feedback canceller will introduce distortion in
12   the frequency bands where most of the external
13   input signal energy is located."
14        Right?
15     A.   Yes.  That's a little bit out of
16   context, however.
17        MR. LYTLE:  Objection.
18     Q.   I'm sorry, go ahead.  You can continue
19   your answer.
20     A.   I was just going to say, the "therefore"
21   refers to the situation described in a couple
22   sentences in advance of that citation that you gave

78

1   me.
2     Q.   You mean, "using the mean-square
3   estimation criteria, corelated interference
4   introduces a basis" --
5     A.   A bias.
6     Q.   -- "a bias in the feedback path
7   estimation that is being performed by the adaptive
8   filter."  Is that what you are referring to?
9     A.   That is what I am referring to, yes.
10     Q.   It then it goes on to say, For a speech
11   signal input most of the energy is concentrated in
12   the low frequency region.  As a result, there is
13   significant low frequency distortion in the output
14   signal when wideband adaptive filters are used for
15   feedback cancellation.  The sound quality and
16   intelligibility, the output speech are
17   compromised."
18        Is that correct?
19     A.   That is what Mr. Chi wrote.
20     Q.   Do you agree with that?
21     A.   I think maybe he has overstated it a
22   little bit, but the principle is correct that he

79

1   states.
2     Q.   And that refers to the Graupe patent
3   that we just looked at, right?
4     A.   I don't think he refers to the Graupe
5   patent here.  Maybe he does.  No, I don't think so.
6     Q.   Well --
7     A.   I'm sorry, there is a reference to the
8   Graupe patent.  I don't know if it is in this
9   context, however.
10     Q.   Isn't that what your prior article just
11   identified with respect to the Graupe patent?
12        MR. LYTLE:  Objection.
13     Q.   The noise interruption?
14     A.   No.  This is different.
15     Q.   This is a different kind of --
16     A.   This is a different issue, yes.
17     Q.   Okay.
18     A.   It is a different issue.
19     Q.   And would that affect the Graupe patent,
20   or do you know?
21     A.   This different issue?  I really don't
22   know.

80

1     Q.   Okay.
2     A.   Yes, that's a good question.
3     Q.   Now, if you look back in the reference
4   section, you see there is obviously a citation to
5   Dr. Graupe and his patent, right?
6     A.   I do see that.
7     Q.   And then you see Mr. Kates, right?
8     A.   Right.  Number 3.
9     Q.   Right.  But there is no reference to any
10   of Dr. Levitt's articles, correct?
11     A.   There does not appear to be.
12     Q.   Do you know why?
13     A.   No, I do not.
14        (Soli Deposition Exhibit Number 10 was
15   marked for identification.)
16   BY MR. STEINBERG:
17     Q.   I will hand you Exhibit Number 10 which
18   is an article entitled Robust Microphone Array
19   Processor Incorporating Headshadow Effects, and you
20   are one of the authors?
21     A.   I see that.
22     Q.   And Mr. Buckley who we described, right?

81

1    **A.    Yes.**
2    Q.    Who is Mr. Hoffman or Ms. Hoffman?
3    **A.    Michael Hoffman --**
4    Q.    Okay.
5    **A.    -- was a graduate student of Professor**
6    **Buckley at that time.**
7    Q.    Was he in electrical engineering?
8    **A.    I believe so, yes.**
9    Q.    And how about Mr. or Ms. Link?
10   **A.    Mr. I believe he was a graduate student**
11   **of Buckley's as well. I'm not certain about that.**
12   Q.    And what is a headworn microphone array?
13   What is that?
14   **A.    It's hard for me to answer these**
15   **questions because this is an article that I was**
16   **last author on many years ago. I guess I would**
17   **need to read the article to give you a good answer**
18   **on that. I would be happy to do that if you like.**
19   **Would you like me to do that?**
20   Q.    No. Let me read a section of it and ask
21   you if it refreshes your recollection. I'm looking
22   at the bottom of the second column on the first

82

1    page. It says, "For the problem of a headworn
2    microphone array the effects of acoustic headshadow
3    greatly alter the individual element beam
4    patterns."
5         Are you aware of issues of testing
6    hearing aid devices that aren't worn directly in
7    the ear or behind the ear such as eyeglass or on
8    the, around the head, so to speak?
9         MR. LYTLE: Objection.
10   **A.    I'm aware that people do that, but I do**
11   **not, have not done that.**
12   Q.    Are you aware of problems where the
13   eyeglass hearing aids and other external hearing
14   aids not in the ear or behind the ear do not
15   translate to success when in the ear or behind the
16   ear in hearing aids?
17   **A.    Yes. As a scientist I understand why**
18   **that problem exists.**
19   Q.    And does that deal with something called
20   the, I'm not going to pronounce it correctly, the
21   pina?
22   **A.    The pina.**

83

1    Q.    What is the pina?
2    **A.    The pina is your external ear, what you**
3    **can see of the person's ear.**
4    Q.    And those external systems, the
5    eyeglasses and other systems don't take that into
6    consideration, correct?
7    **A.    That's one of the things they don't take**
8    **into consideration.**
9    Q.    What other things don't they don't take
10   into consideration?
11   **A.    Well, as the term headshadow is used**
12   **here, what that means here is that sound, let's say**
13   **you put a microphone right here and there is a**
14   **sound on the other side --**
15   Q.    Just for the record you are pointing to
16   a place on your eyeglass near your temple?
17   **A.    Yes, or any place along here. Let's**
18   **just say up here toward the front. You put a sound**
19   **over on the other side. The head shadows the sound**
20   **that reaches the microphone so all of the sound**
21   **does not get to the microphone. Some of it bounces**
22   **off, just like your head shadows light my hand**

84

1    **shadows the light on the table.**
2    Q.    So it can't emulate the in the ear or
3    behind the ear experience, correct?
4    **A.    That's correct. Headshadow effects are**
5    **quite important in dealing with microphone arrays.**
6    Q.    Do you know Dr. Harry Levitt?
7    **A.    Yes, I do.**
8    Q.    Have you met Dr. Levitt?
9    **A.    Yes, I have.**
10   Q.    How many times have you met Dr. Levitt?
11   **A.    Over the last, let me see, oh, twenty**
12   **years or so maybe seven, eight, nine, ten times. I**
13   **don't know.**
14   Q.    And in what circumstances have you met
15   Dr. Levitt?
16   **A.    At conferences, professional meetings.**
17   Q.    Is he a member of any organization you
18   belong to?
19   **A.    I'm not certain of his membership,**
20   **although I recall somewhere that he is a member of**
21   **the Acoustical Society of which I am a member.**
22   Q.    At any of those meetings has he spoken?

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

85
1    A.   Has he spoken?
2    Q.   Yes.
3    A.   Yes, he has.
4    Q.   And what topics did he speak on, do you
5  recall?
6    A.   The last time I heard him speak was at a
7  meeting of an organization called the AG Bell
8  Association here in Washington, and he spoke about
9  general issues related to meeting the needs of
10  people with hearing impairment and deaf people.  I
11  have never heard him speak about acoustic feedback
12  and what is his work that relates to that, however.
13    Q.   What is AG Bell Association or --
14    A.   It's a nonprofit advocacy group in
15  Washington that I believe tries to interface with
16  people on the Hill for purposes of earmarking
17  legislation, things of that sort.
18    Q.   For hearing impaired people?
19    A.   Yes, sir.
20    Q.   Okay, and what other seminars or other
21  meetings have you heard Dr. Levitt speak at?
22    A.   I'm trying to remember.  It has been a

86
1  very long time since I heard him speak.  Most
2  occasions I have met him or seen him he has not
3  been a speaker, so I don't remember.
4    Q.   When you met him did you talk to him?
5    A.   Yes.
6    Q.   Did you talk to him about any hearing
7  aid issues?
8    A.   Not usually, no.
9    Q.   Just social?
10    A.   Mostly social chatter.
11    Q.   Okay.
12    (Soli Deposition Exhibit Number 11 was
13  marked for identification.)
14  BY MR. STEINBERG:
15    Q.   Handing you Exhibit 11, which purports
16  to be the '850 patent at issue in this case, do you
17  recognize that?
18    A.   Yes, I do.
19    Q.   And is that the '850 patent which you
20  have reviewed in this matter?
21    A.   It appears to be.
22    Q.   Okay.  When did you first read this

87
1  patent?
2    A.   I may have seen it back in the '80s when
3  I was working at 3M.  I don't recall.  I certainly
4  saw it last year when I started working on this
5  case.
6    Q.   Other than 3M, when did you first become
7  aware of this patent?
8    A.   It would have been when I was asked to
9  serve on this case.
10    (Soli Deposition Exhibit Number 12 was
11  marked for identification.)
12  BY MR. STEINBERG:
13    Q.   Let me hand you Exhibit 12 which
14  purports to be the '749 patent at issue in this
15  case.  Is that the '749 patent that you have
16  reviewed?
17    A.   Yes, it is.
18    Q.   Okay.  When did you first become aware
19  of the '749 patent?
20    A.   Again, I may have seen it back in the
21  '80s at 3M, but I don't recall for certain.  So the
22  first time I am certain would have been last year

88
1  when I started working on this case.
2    Q.   This is the same patent that is cited in
3  one of your patents, though, correct?
4    A.   I believe it is, yes, sir.
5    Q.   So either you or one of your engineering
6  colleagues would have known about it at the time
7  you filed that patent, right?
8    A.   Not necessarily.
9    Q.   Well, to be cited someone would have
10  known about it, right?
11    A.   Well, I suspect what happened is the
12  patent counsel who prepared the patent application
13  did a prior art search and he made that list.
14    Q.   If he made that list, did either you or
15  your colleagues read the patent before it was
16  filed?
17    A.   I don't recall that I did.
18    Q.   Okay.  Aren't you aware that the
19  patentee has to read and affirm under oath that
20  everything in the patent is true and accurate?
21    MR. LYTLE:  Objection.
22    A.   Everything in the patent that is being

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

23 (Pages 89 to 92)

89

1    filed is my understanding, yes, I'm aware of that.
2        Q.    Wouldn't that include the first page
3    where it lists the prior patents, the prior art?
4            MR. LYTLE:  Objection.
5        A.    I don't know the answer.
6        Q.    Did you ever read the patent that lists
7    the '749 patent, and I will get it out in a moment,
8    it is the '329 patent, Exhibit 4, which was filed
9    September 5th, 1997 and apparently granted October
10   17th, 2000.  Do you see the Levitt patent listed
11   there?
12       A.    I do.
13       Q.    Did you ever read this patent?
14       A.    I may --
15           MR. LYTLE:  Objection.  Which patent are
16   you referring to?
17           MR. STEINBERG:  To Exhibit 4, just what
18   I referred him to.
19           MR. LYTLE:  Not the Levitt patent?
20           MR. STEINBERG:  No, Exhibit 4 which is
21   what he is looking at.
22           MR. LYTLE:  Okay.

90

1        A.    I may have looked over these, this
2    patent list briefly, but I don't recall the
3    details.  I recognize some of them.
4        Q.    So you don't recall that the Levitt
5    patent was listed as a reference cited?
6        A.    Only when you drew it to my attention
7    now.
8        Q.    How long have you known of Dr. Levitt?
9        A.    I would say I probably first knew of
10   some of his work on, related to areas, other areas
11   of interest of mine, probably 20, 25 years ago.
12       Q.    Are you aware that Dr. Levitt is a
13   prominent expert in the field of hearing devices?
14       A.    Yes, I am.
15       Q.    Have you ever seen his resume'?
16       A.    I may have seen a copy of it some time
17   ago, yes.
18       Q.    And does Dr. Levitt have a
19   representation for misrepresenting facts?
20       A.    Not that I'm aware of.
21       Q.    Does he have a reputation for honesty
22   and integrity?

91

1        A.    I believe he does, yes.
2        Q.    Does he have a good reputation in the
3    field of hearing devices?
4        A.    Absolutely he does.
5        Q.    And is he known as an expert in digital
6    devices?
7            MR. LYTLE:  Objection.
8        A.    I think he has some expertise in that
9    area, yes.
10           (Soli Deposition Exhibit Number 13 was
11   marked for identification.)
12   BY MR. STEINBERG:
13       Q.    I want to hand you Exhibit 13 which
14   purports to be the resume' of Harry Levitt.  Have
15   you seen that before?
16       A.    I have seen a resume'.  I don't know if
17   this is one.
18       Q.    Okay.  On the first page it lists a
19   number of the honors that Dr. Levitt has received
20   through the years.  Have you reviewed those honors?
21       A.    No, I have not.
22       Q.    Would you mind just scanning them, or

92

1    reading them to whatever degree you feel necessary?
2        A.    I have had a chance to look them over.
3        Q.    And do you contest that Dr. Levitt
4    received any of those honors?
5        A.    No, I do not.
6        Q.    Did you belong to any of the
7    organizations that gave him those honors?
8        A.    I belong to the Acoustical Society of
9    America.  I think that's the only entity that I
10   belong to.
11       Q.    Are the other entities that provided him
12   the honors reputable entities as far as you know?
13       A.    As far as I know, yes.
14       Q.    Are you aware that certain of the
15   defendants in this case have hired Dr. Levitt from
16   time to time as an expert in the field of hearing
17   aid devices?
18       A.    No, I am not.
19       Q.    When Dr. Levitt was a speaker who
20   selected him to be a speaker, do you know?
21           MR. LYTLE:  Objection.
22       Q.    That you have attended?

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

24 (Pages 93 to 96)

93

1      A.  I don't know who selected him for the AG
2  Bell presentation.
3      Q.  Is the AG Bell Association a recognized
4  association in your field?
5      A.  Yes, it is.
6      Q.  Have you ever spoke for any of these
7  organizations?
8      A.  Yes, I have.
9      Q.  Which ones?
10     A.  I spoke at the AG Bell meeting.  I have
11  spoken at the Acoustical Society of America many,
12  many times.  I have spoken at the American Academy
13  of Audiology.  I think those are the main ones.
14     Q.  Have you ever spoken on acoustic
15  feedback for any of these entities?
16     A.  Yes, I have.
17     Q.  For which ones?
18     A.  I believe I gave a course on -- I'm not
19  one hundred percent certain.  I might have spoken
20  at the American Academy of Audiology.  I know I
21  have spoken at the Acoustical Society of America.
22     Q.  Did you participate in any of these

94

1  honors to Dr. Levitt in any way?
2      A.  Not that I'm aware of, no.
3      Q.  And you are aware that Dr. Levitt has a
4  Ph.D. in electrical engineering, correct?
5      A.  I see that on his resume', yes.
6      Q.  Did you know that before?
7      A.  I wasn't aware of that field before.
8      Q.  Were you aware that he received the Life
9  Achievement Award of the American Auditory Society?
10     A.  No, I was not.  I just saw that now.
11     Q.  Is that a very significant award in your
12  field?
13     A.  I believe it is, yes.
14     Q.  Have you received that award?
15     A.  No, I've not.
16     Q.  Were you aware that he received the
17  James Jerger Career Award for Research in Audiology
18  from the American Academy of Audiology?
19     A.  No, I was not.
20     Q.  Is that a significant award?
21     A.  Yes, it is.
22     Q.  Have you received that award?

95

1      A.  No, I have not.
2      Q.  Do you believe the awards Dr. Levitt
3  received were justified by his work?
4      A.  Yes, I do.
5      Q.  And do the bodies that give those awards
6  generally do their homework to determine if the
7  recipient is worthy of the award?
8          MR. LYTLE:  Objection.
9      A.  I don't have any direct evidence but I
10  suspect they do, yes.
11     Q.  Is it important for a scientist to
12  publish his studies and projects?
13     A.  Yes, it is.
14     Q.  Okay, and if you are associated with a
15  university it is important to publish to get tenure
16  and other benefits, those kinds of things?
17     A.  Yes, that is correct.
18     Q.  And it is important for scientific
19  articles to be peer reviewed?
20     A.  Absolutely.
21     Q.  What does peer review mean?
22     A.  Well, peer review is a process whereby

96

1  other members of your profession are asked to read
2  and comment and criticize a manuscript that you
3  have written for publication, and as an author when
4  you submit to the review, peer review process, you
5  are expected to respond to all those comments and
6  criticisms in revising your manuscript.
7      Q.  Starting on Page 3 of Dr. Levitt's
8  resume', and it goes on for many, many, many pages,
9  it lists a number of publications of Dr. Levitt.
10  Have you read many of his publications?
11     A.  I have read a few of them, yes.
12     Q.  How many would you say you have read
13  through the years?
14     A.  I would say maybe six, seven, eight,
15  somewhere in there.
16     Q.  Do you know what subject matters you
17  have read his publications about?
18     A.  I'm mostly interested in adaptive
19  testing in audiology which he has published on over
20  the years.
21     Q.  Do you recall when you first started
22  reading publications prepared by Dr. Levitt?

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

25 (Pages 97 to 100)

97

1    **A.    I don't recall exactly, no.**
2    Q.    Do you remember when you last read a
3    publication by Dr. Levitt?
4    **A.    I don't recall exactly.**
5    Q.    Are you aware that many of his
6    publications deal with digital hearing aids?
7    **A.    Yes, I am.**
8    Q.    Are you aware that a number of his
9    publications deal with feedback?
10    **A.    Could you rephrase that question for me,**
11    **please?**
12    Q.    Sure.  Are you aware that many of his
13    publications deal with the issue of feedback?
14    **A.    Well, yes.  I suspect they do.  When you**
15    **are talking about digital hearing aids you have to**
16    **talk about feedback.**
17    Q.    Do you recall reading any publications
18    of Dr. Levitt that dealt with feedback or feedback
19    cancellation or suppression?
20    **A.    Only the patent materials.**
21    Q.    Have you ever read a publication that
22    mentions the patents that are at issue in this

98

1    case?
2    **A.    I don't recall that I did, no.**
3    Q.    Prior to you being hired by the
4    defendants in this case, have you ever challenged
5    any patent that Dr. Levitt held?
6    **A.    No, I have not.**
7    Q.    Prior to being hired by the defendants
8    in this case, have you ever challenged the '850 or
9    '749 patents?
10    **A.    No, I have not.**
11    Q.    Okay.
12    Now, you are aware that these patents
13    are about twenty years old, right?
14    **A.    Yes, I am.**
15    Q.    Prior to being hired as an expert in
16    this case by the defendants, have you ever
17    challenged Dr. Levitt as the inventor of this
18    technology?
19    **A.    Which technology are you referring to?**
20    Q.    The technology in the '850 and '749
21    patents.
22    **A.    No, I have not.**

99

1    Q.    Are you challenging him here in your
2    testimony as the inventor of that technology?
3    **A.    No, I am not.**
4    Q.    Did you ever -- strike that.
5    The publications where Dr. Levitt has
6    published in, I'm sure you have looked at a few of
7    them, are for many of the organizations that you
8    belong to, right?
9    **A.    That's correct.**
10    Q.    Have you ever written those
11    organizations and challenged any of Dr. Levitt's
12    articles in any way?
13    **A.    No, I have not.**
14    Q.    Have you ever claimed that Dr. Levitt
15    was wrong or misrepresented his facts or his
16    scientific achievements?
17    **A.    No, I have not.**
18    Q.    Have you ever made any claim prior to
19    being hired by the defendants in this case that
20    there was some sort of prior art that would have
21    affected Dr. Levitt's patents?
22    **A.    No, I have not.**

100

1    Q.    Are you claiming that any prior art
2    would have affected or prevented Dr. Levitt from
3    getting either of these patents today?
4    **A.    Well, what I have said in my expert**
5    **report is I believe there is prior art that makes**
6    **claims in those patents obvious.**
7    Q.    And is that your only expert opinion
8    about that prior art?
9    **A.    No.**
10    Q.    What else are you opining on with
11    respect to that prior art?
12    MR. LYTLE:  Objection.
13    **A.    Well, I have offered many detailed**
14    **opinions in there.  It might be easiest to address**
15    **specific issues if you would like to raise them.**
16    Q.    So you're saying that prior art to
17    Dr. Levitt's patent would have made his work
18    obvious, right?
19    **A.    That is my opinion, yes.**
20    Q.    And have you ever in the twenty years
21    that these patents have been in existence, have you
22    ever made that claim before you were hired by the

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

26 (Pages 101 to 104)

101

1  defendants?
2      **A.  No, I have not.**
3      Q.   Okay, and are you claiming that prior
4  art in some way would have or should have affected
5  Dr. Levitt's ability to obtain the patents in the
6  first place?
7          MR. LYTLE:  Objection.
8      **A.   What I'm claiming, what I'm stating in**
9  **my expert report, is that in some cases the**
10  **interpretation of the claims that has been made by,**
11  **and the claim construction that has been made by**
12  **ETG, as I understand it, is so broad as to make**
13  **prior art -- so broad as to raise questions about**
14  **prior art that might render some of those claims**
15  **obvious.**
16      Q.   Well, the claim construction was decided
17  by the court, right?
18      **A.   There is the court's claim construction,**
19  **and as I understand it there is also the**
20  **interpretation of those claims as alleged in the**
21  **invalidity -- I'm sorry, as alleged by ETG.**
22      Q.   Well, let's stick with the court's claim

102

1  construction.  If you are looking only at the
2  court's claim construction order, are you
3  contending that any of this prior art would have
4  affected that claim construction?
5          MR. LYTLE:  Objection.
6      **A.   If you look very close -- as I look very**
7  **closely at the court's claim construction and look**
8  **at the specific structures that are enumerated in**
9  **the claim construction as the means of implementing**
10  **the various functions that are described, if you**
11  **limit yourself just to those structures then I**
12  **think many of the issues about the prior art may go**
13  **away.**
14      Q.   What does that mean, may go away?
15      **A.   I think if the claims are interpreted**
16  **strictly in terms of the structures that are**
17  **described in this patents, that the issues about**
18  **obviousness from prior art are not -- are not as**
19  **significant.**
20      Q.   So if you are looking strictly at the
21  wording in the patents and how it is described, the
22  prior art you have seen wouldn't affect them,

103

1  correct?
2          MR. LYTLE:  Objection.  Are you --
3      **A.   I'm not --**
4          MR. LYTLE:  Are you talking about
5  specific claims?
6          MR. STEINBERG:  He understands what I'm
7  talking about.
8      **A.   Well, it would be helpful to me if I**
9  **could understand more clearly by you pointing me to**
10  **specific issues.**
11      Q.   Well, you just made a statement that the
12  prior art issues would go away, if I'm
13  characterizing your testimony correctly, if you
14  looked strictly at the wording of the patents
15  themselves; is that correct?
16      **A.   When I look at the structures that are**
17  **enumerated in the claim construction, and I look to**
18  **find those structures in prior art, I don't see**
19  **those specific structures.**
20      Q.   Okay.
21          Have you ever written or spoken to the
22  patent office to tell them that they made a

104

1  horrible mistake in granting these patents?
2      **A.   No, I have not.**
3      Q.   Have you ever written to any of the
4  sponsors of any of the awards and tell them that
5  they should strip Dr. Levitt of his awards?
6      **A.   Of course not.**
7          (Soli Deposition Exhibit Number 14 was
8  marked for identification.)
9  BY MR. STEINBERG:
10      Q.   Let me hand you Exhibit 14 which
11  purports to be a subpoena by ETG to yourself,
12  Dr. Soli, correct?
13      **A.   Correct.**
14      Q.   Have you seen this before?
15      **A.   I saw an electronic version of it.**
16      Q.   Okay, and if you turn to Schedule A --
17      **A.   Yes.**
18      Q.   -- there is a list of requested
19  documents, 1 through 12?
20      **A.   Yes.**
21      Q.   Have you seen that list before?
22      **A.   Yes, I have.**

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

27 (Pages 105 to 108)

105

1    Q.   And are you aware that ETG had requested
2  these documents from you?
3      **A.   Yes, I am.**
4    Q.   Did you conduct a search to locate these
5  documents?
6      **A.   I did.**
7    Q.   And how did you conduct that search?
8      **A.   I went through my paper records, which**
9  **are quite limited in this case, or in this**
10 **situation, and then I went through all my**
11 **electronic files on my computer.**
12   Q.   Did you go through your historic files,
13 whatever historic files you have?
14     **A.   I went through -- yes, I went through**
15 **the ones that are relevant to acoustic feedback.**
16   Q.   And did you find any of the records that
17 were requested?
18     **A.   Well, the only thing I found is what has**
19 **already been produced.**
20   Q.   Produced by who?
21     **A.   I assume by the Widex attorneys, the**
22 **materials that I listed in my expert report.**

106

1    Q.   So there is nothing that you are relying
2  on that you have not produced in this case?
3      **A.   That's correct.**
4      MR. STEINBERG:  Want to take a
5  five-minute break?
6      MR. LYTLE:  Sure.
7      (Discussion off the record.)
8      THE VIDEO OPERATOR:  This marks the end
9  of Tape Number 1 in the deposition of Sigfrid
10 Soli, Ph.D.  We are going off the record, the time
11 is 10:59 a.m.
12     (Recess taken -- 10:59 a.m.)
13     (After recess -- 11:07 a.m.)
14     THE VIDEO OPERATOR:  Please stand by.
15 We are now back on the record.  Here
16 marks the beginning of Tape Number 2 in the
17 deposition of Sigfrid Soli, Ph.D.  The time is now
18 11:08 a.m.
19 BY MR. STEINBERG:
20   Q.   Dr. Soli, you submitted an expert
21 report, Exhibit Number 1 in this case; is that
22 correct?

107

1      **A.   That's correct.**
2    Q.   Did you prepare that report solely on
3  your own?
4      **A.   All the ideas in there are mine.  I**
5  **wrote it.  I had some guidance on the choice of**
6  **words from the attorneys, especially on the legal**
7  **matters that are listed.**
8    Q.   So who would you list as assisting you
9  in preparing this report?
10     **A.   These two gentlemen.**
11   Q.   The two attorneys sitting here today?
12     **A.   Right.**
13   Q.   Okay.  Anyone else?
14     **A.   Possibly Bill Mandir as well who is**
15 **another attorney at Sughrue.**
16   Q.   Can you spell his last name, or do you
17 know him?
18     **A.   M-a-n-d-i-r, I believe.**
19     THE WITNESS:  Is that right?
20     MR. LYTLE:  That's right.
21   Q.   Anyone else?
22     **A.   No.**

108

1    Q.   You had no other assistance besides the
2  attorneys?
3      **A.   That is correct.**
4    Q.   Did you draft it yourself?
5      **A.   Yes, I did.**
6    Q.   Did you write it?
7      **A.   Yes, I did.**
8    Q.   As you sit here today are you aware of
9  any errors or inaccuracies in your report?
10     **A.   I'm sure there are some typos in there,**
11 **but we tried to scrub it as best we can.**
12   Q.   Is there any opinion in there that you
13 no longer believe to be true?
14     **A.   No, there is not.**
15   Q.   Are there any opinions that you intend
16 to offer that are not in your report?
17     **A.   No, I will not do that.**
18   Q.   Your report deals to some degree with
19 prior art, right?
20     **A.   That's correct.**
21   Q.   Okay.  And do you know what the
22 definition of prior art is?

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

28 (Pages 109 to 112)

---

**109**

1    A.    I believe I do.
2    Q.    And what is it?
3    A.    Prior art is disclosures of information
4  that may enable someone to make this invention, or
5  make this invention obvious, or anticipate this
6  invention.
7    Q.    Prior to your retention in this case
8  have you ever offered an opinion on prior art?
9    A.    No, I have not.
10    Q.    Prior to your retention in this case,
11  have you ever searched for prior art personally?
12    A.    In a very limited way for some of the
13  patents that I am named on.
14    Q.    I thought you testified earlier that you
15  didn't do those searches, that they were done by
16  the patent attorneys.
17    A.    The patent attorneys did those searches
18  but I have also researched literature, other
19  things, other sources of information in the course
20  of doing the work that led up to the patent.
21    Q.    I understand that, but prior art is
22  something different than that, isn't it?

---

**110**

1         MR. LYTLE:   Objection.
2    A.    Right.  I stand corrected on that.
3    Q.    Have you done any searches for prior art
4  personally yourself prior to being retained in this
5  case?
6    A.    No, I have not.
7    Q.    And did someone instruct you -- strike
8  that.
9         Did you personally do the searches for
10  prior art in this case?
11    A.    No, I did not.
12    Q.    You yourself?
13    A.    No, I did not.
14    Q.    Who did?
15    A.    I believe someone at Sughrue Mion did.
16    Q.    So someone essentially handed you what
17  they thought was prior art?
18    A.    That's correct.
19    Q.    And then you read that?
20    A.    That's correct.
21    Q.    And you did no searches yourself?
22    A.    That's correct.

---

**111**

1    Q.    So essentially not one hour of the
2  $50,000 worth of hours that you billed would be
3  associated with searching for prior art, right?
4    A.    No.  I --
5    Q.    Is that correct?
6    A.    Well, there was something that I thought
7  might be prior art that was easier for me to find
8  through my librarian so I asked my librarian to
9  find that for me.
10    Q.    Is it included in the prior art?
11    A.    It turned out to be immaterial.
12    Q.    Other than that?
13    A.    That was it.
14    Q.    You had no time associated with
15  searching for prior art?
16    A.    That's correct.
17         (Soli Deposition Exhibit Number 15 was
18  marked for identification.)
19  BY MR. STEINBERG:
20    Q.    I'm handing you Exhibit 15, which is
21  what we commonly refer to as the Markman order in
22  this case.  It is entitled Order Construing the

---

**112**

1  Terms of U.S. Patents, and we have been referring
2  to them as '850 and '749, correct?
3    A.    Correct.
4    Q.    Have you had an opportunity to review
5  the court's claim construction order?
6    A.    Yes, I have.
7    Q.    Have you personally applied the claim
8  construction order in your analysis?
9    A.    Yes, I have.
10    Q.    And do you agree with the court's claim
11  construction order?
12    A.    Generally, as I understand it, although
13  I believe there is an error in it.  There may be
14  more than one error.
15    Q.    Okay.  Now, did you understand the
16  court's claim construction of the term programmed
17  does not require that coefficients be externally
18  generated?
19    A.    Can you repeat that, please?
20    Q.    Yes.  Do you understand that the court's
21  claim construction of the term programmed does not
22  require that the coefficients be externally

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

29 (Pages 113 to 116)

---

**113**

1 generated?

2    MR. LYTLE: Objection.

3    **A. My understanding of the term programmed,**

4 **as given in Item 4, is that they are provided, the**

5 **coefficients or the values are provided in some way**

6 **which means they can be externally provided.**

7    Q. Does it limit them to being externally

8 generated or provided?

9    **A. No, it does not.**

10    Q. Okay. The court's claim construction of

11 the term host controller, does that indicate that

12 the host controller must be external to the hearing

13 aid?

14    **A. Let me find that.**

15    **I'm sorry. I've found it. Now, would**

16 **you repeat the question?**

17    Q. Sure. The court's claim construction on

18 host controller, does that indicate that the host

19 controller must be external to or separate from the

20 hearing aid?

21    **A. All it states is that it is a processor**

22 **for controlling operations of the device.**

---

**114**

1    Q. So it's not limited in that fashion, is

2 it?

3    MR. LYTLE: Objection.

4    **A. No, it is not.**

5    Q. Does the court's claim construction of a

6 programmable delay line filter make a distinction

7 between a recursive and nonrecursive filter?

8    **A. No, it does not.**

9    Q. Do you agree that a United States -- if

10 the United States issues a patent it is presumed

11 valid?

12    **A. That's correct.**

13    Q. And do you agree that for someone to

14 challenge the validity of a patent the person must

15 prove that by clear and convincing evidence?

16    **A. Yes, I do believe that.**

17    Q. Do you believe that to establish

18 invalidity each and every claim recitation must be

19 shown in the prior art?

20    **A. That's my understanding.**

21    Q. And do you agree that to invalidate a

22 patent on anticipation you have to show that a

---

**115**

1 single prior art reference shows each and every

2 claim recitation?

3    **A. Yes, that is correct.**

4    Q. Do you know what the -- when you refer

5 to prior art do you know whether there is any

6 requirement that that prior art has to be published

7 or available to the public in any way?

8    **A. I'm not an expert on that matter.**

9    Q. So -- well, let me just ask you the

10 questions. Do you know if in qualifying for prior

11 art a printed publication had to have been

12 accessible by the public before the filing dates of

13 the patents?

14    **A. I don't know for certain, no.**

15    Q. Do you know that accessibility means

16 that if someone was interested in the subject

17 matter they could have found it by exercising

18 reasonable diligence to locate it?

19    **A. I don't know that.**

20    Q. Okay. Do you know that, for instance,

21 if we are talking about a thesis or something like

22 that, to qualify as a printed publication it would

---

**116**

1 have to be sufficiently accessible to the public by

2 subject matter?

3    **A. I don't know that.**

4    Q. Do you know if there is any requirement

5 that prior art has to be indexed or cataloged in a

6 meaningful way by subject matter so that by

7 reasonable diligence you could locate it?

8    **A. I don't know that.**

9    Q. Do you know that if it can only be

10 located by being directed to it by someone who

11 already knows of its existence, it can't qualify as

12 a prior art?

13    **A. I'm not aware of that, no.**

14    Q. Did you take any of that into

15 consideration in your review of prior art?

16    **A. No, I did not.**

17    Q. So for the record, when you refer to a

18 document or a publication as prior art you didn't

19 determine whether or not it was accessible to the

20 public prior to the filing of this patent?

21    **A. No, I did not make that determination.**

22    Q. Do you know if anyone did?

---

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

30 (Pages 117 to 120)

117

1      A.   I do not know.
2      Q.   Do you know what the term invalidity
3  analysis means?
4           MR. LYTLE:  Objection.
5      A.   I'm not sure I know the legal definition
6  of the term.
7      Q.   Are you aware that you would have to do
8  a claim by claim analysis to demonstrate that the
9  prior art specifically covers in its entirety a
10 specific claim?
11     A.   Yes.
12          MR. LYTLE:  Objection.
13     A.   I am aware of that.
14     Q.   Okay.
15          So looking at your report, let's turn to
16 Page 44 --
17     A.   44?
18     Q.   Yes.
19     A.   Okay, I have that.
20     Q.   -- Page 44 you discuss the Graupe patent
21 '168, correct?
22     A.   Correct.

118

1      Q.   It is accurate, isn't it, that your
2  report provides no invalidity analysis based on
3  that patent, correct?
4      A.   That is correct.
5      Q.   And then we turn to Page 45, we turn to
6  the Nunley patent '672, right?
7      A.   Correct.
8      Q.   And it is also true your report provides
9  no invalidity patent based on that patent, right?
10     A.   That's correct.
11     Q.   And then we turn to Page 74, that's the
12 Gabr, if I'm pronouncing that right, G-a-b-r patent
13 number '124, correct?
14     A.   Correct.
15     Q.   And it is true that your report provides
16 no invalidity analysis based on that Gabr patent,
17 right?
18     A.   That's correct.
19     Q.   And Page 77 you provide a discussion of
20 the Mansgold, M-a-n-s-g-o-l-d, patent '481, right?
21     A.   Yes.
22     Q.   And it is true that your report provides

119

1  no invalidity analysis of the Mansgold patent,
2  correct?
3      A.   That's right.
4      Q.   And at Page 78 you discuss Engebretson,
5  E-n-g-e-b-r-e-t-s-o-n, patent '082, right?
6      A.   Correct.
7      Q.   And it is true your report provides no
8  invalidity analysis of that patent, right?
9      A.   That's correct.
10     Q.   Now, let's go back to 64 for a second.
11 64 is where you discuss the AFC-1, 2, 3 circuits.
12 I guess I'm calling them circuits correctly,
13 correct?
14     A.   I mention them, yes.
15     Q.   Isn't it true that your report provides
16 no invalidity analysis based on those AFC circuits,
17 right?
18          MR. LYTLE:  Objection.
19     A.   No, that's not correct.  I don't believe
20 that.
21     Q.   Where is it that you perform a claim
22 by claim analysis of the AFC circuits?

120

1      A.   Well, I would have to find it, but the
2  Weaver work as I describe it at various places of
3  the report I think refers to those circuits, and
4  when I do the claim by claim analysis I refer to
5  the Weaver work, so I think it would be done in
6  that way.
7      Q.   Do you ever take the circuits themselves
8  and perform a claim by claim analysis on the
9  circuits?
10          MR. LYTLE:  Objection.
11     A.   Well, the Weaver thesis in the AFC-1
12 circuit, as I understand it, are very similar in
13 terms of the circuit, and I have done an analysis
14 of the contents of the thesis.
15     Q.   Other than the analysis of the thesis
16 have you done any invalidity analysis of the
17 specific circuits themselves?
18     A.   The AFC circuits?
19     Q.   Yes.
20     A.   No, I have not.
21     Q.   Okay, so let's turn to Page 66.  You
22 discuss the Weaver presentation of April 12th,

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

31 (Pages 121 to 124)

121

1  1985, right?
2      A.   Correct.
3      Q.   And your report provides no invalidity
4  analysis based on the Weaver presentation, right?
5          MR. LYTLE:  Objection.
6      A.   Again I refer to the Weaver work in my
7  invalidity analysis which would include the Weaver
8  presentation.
9      Q.   You refer to the Weaver work in your
10  supplemental report?
11         MR. LYTLE:  Objection.
12     A.   The supplemental report I believe
13  attempts to clarify and define it more fully.
14     Q.   Let's stick with this presentation in
15  and of itself.
16     A.   Okay.
17     Q.   Have you done any invalidity analysis of
18  the Weaver presentation based on Page 66 of your
19  report?
20     A.   I would have to look specifically
21  through there.  Again, I believe the invalidity
22  analysis was done on the Weaver work, and it

122

1  mentions different pieces of that work.  I don't
2  remember exactly the words I use, though.
3      Q.   Let me ask my question again.  Sticking
4  strictly with the Weaver presentation only, nothing
5  else, just that, have you done an invalidity
6  analysis on the Weaver presentation?
7      A.   Only as part of the Weaver work.
8      Q.   So I take it your answer is no, you
9  haven't done it separately?
10     A.   No, just as part of the Weaver work.
11         MR. LYTLE:  Objection.
12     Q.   On Page 82, Paragraph 149, you discuss
13  an article by Christiansen Chabries -- Chabries,
14  C-h-a-b-r-i-e-s -- and Lynn entitled Noise
15  Reduction in Speech Using Adaptive Filtering,
16  right?
17     A.   I see that, yes.
18     Q.   And your report provides no invalidity
19  analysis based on that article, correct?
20         MR. LYTLE:  Objection.
21     A.   Correct.
22     Q.   And on Page 82 in the same paragraph you

123

1  discuss another article by Christiansen Chabries
2  and Anderson entitled Noise Reduction in Speech and
3  so forth, and isn't it true that your report
4  provides no invalidity analysis of that article?
5          MR. LYTLE:  Objection.
6      A.   That's correct.
7      Q.   Now, there are a number of articles that
8  have been provided to us in various interrogatories
9  as potential prior art that are not in your report,
10  and I just wanted to make sure that you're not
11  relying on them in any way.  So I'm going to
12  identify them and ask you whether or not you ever
13  made any prior art analysis of these articles.
14  Okay?
15     A.   Okay.  Go ahead.
16     Q.   The first one is a December 7th, 1984
17  presentation purportedly made to the VA Medical
18  Center.
19     A.   I have been made aware of that by
20  Weaver's deposition, and I have also been informed
21  by the attorneys that the, that presentation is
22  also discussed by Egolf and Larson in their

124

1  depositions, although I have not seen those
2  depositions.
3      Q.   Well, my question is, it's not listed in
4  your report, right?
5      A.   That's correct.
6      Q.   And so you're making no invalidity
7  analysis based on that presentation, right?
8          MR. LYTLE:  Objection.
9          If it is clear which document he is
10  talking about, answer the question.
11     A.   I'm not aware of what the document is.
12     Q.   It's a December 7th, 1984 presentation
13  purportedly made at the VA Medical Center.
14     A.   Okay.  I am aware of Weaver's deposition
15  discussing that, and I do rely on that.
16     Q.   Is there any invalidity analysis of that
17  presentation in your report?
18     A.   I do not believe there is.
19     Q.   Now, Kim Weaver's thesis defense, are
20  you claiming that as prior art?
21     A.   No, I'm not.
22     Q.   Okay.  A presentation made by Dr. Egolf

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

32 (Pages 125 to 128)

125

1  at the Jackson Hole Conference, are you claiming
2  that is prior art?
3      A.  No --
4          MR. LYTLE:  Objection.  If you have
5  copies of any of these, counsel, that may help
6  refresh his recollection.
7          MR. STEINBERG:  He is answering
8  questions.
9      A.  I'm sorry.  Please ask the question
10  again.
11      Q.  Did you consider any quarterly progress
12  reports from Dr. Egolf to Vernon Larson at the VA
13  as prior art?
14      A.  I have not seen those.
15      Q.  So I take it you have no invalidity
16  analysis as to them, correct?
17          MR. LYTLE:  Objection.
18      A.  That's correct.
19      Q.  Did you consider any final report
20  submitted from Dr. Egolf to Vernon Larson at the
21  VA?
22      A.  No, I did not.

127

1      Q.  And where did you report it?
2      A.  I reported it at the meetings of the
3  Acoustical Society of America, and at the Hearing
4  Aid Research Conference.
5      Q.  And so these would have been oral
6  presentations?
7      A.  Yes, sir.
8      Q.  Nothing in writing?
9      A.  That's correct.
10      Q.  Okay.
11          Had you considered this a feedback
12  cancellation mechanism?
13      A.  No, that is not what I describe here.
14      Q.  That particular patent, did you license
15  it to Starkey?
16      A.  That's correct.
17      Q.  Is that the one we have talked about
18  before?
19      A.  Yes, sir.
20      Q.  And you then talked about -- strike
21  that.
22          Other than your testimony in the police

126

1      Q.  Now, if you turn to Paragraph 5 on
2  Page 4 of your report --
3      A.  I have it.
4      Q.  -- somewhere in the middle you say that
5  "We designed, built, and tested a realtime portable
6  digital hearing aid prototype that used tapped
7  delay line digital filters designed to have a
8  specific magnitude and phase response that
9  compensated for the subject's hearing loss while
10  preserving the magnitude and phase auditory cues
11  for binaural hearing."
12          Do you see that?
13      A.  Yes, I do.
14      Q.  When did you do that?
15      A.  That was in the, probably the late '90s.
16      Q.  Okay.
17      A.  I don't remember the exact dates.
18      Q.  And where did you do that?
19      A.  I did that at the House Ear Institute.
20      Q.  And was that published work?
21      A.  I reported the results at professional
22  meetings, but there is no publication on that.

128

1  officer cases that you identified earlier today,
2  you have not testified either in deposition or
3  trial as an expert on any other topic, right?
4      A.  No, that's it.
5      Q.  Have you ever rendered a report on any
6  other topic as an expert other than those cases?
7      A.  No, I have not.
8      Q.  I'm sorry?
9      A.  No, I have not.
10      Q.  Have you ever previously opined on prior
11  art?
12      A.  No, I have not.
13      Q.  Have you ever previously opined on
14  obviousness?
15      A.  No, I have not.
16      Q.  Okay.  What are your qualifications for
17  opining on prior art?
18          MR. LYTLE:  Objection.
19      A.  Well, I have worked in the field on
20  digital hearing aid design and algorithms on and
21  off for the last twenty years, so I believe I am
22  qualified to read and interpret work that may

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

33 (Pages 129 to 132)

129

1 qualify as prior art.
2     Q.   That's the extent of your
3 qualifications?
4     A.   No. That is my main qualification.
5     Q.   What other qualifications do you have?
6     A.   Well, I have training and experience in
7 developing and testing algorithms. I have gone
8 through the process with others of patenting them,
9 so that's also part of my experience.
10     Q.   Have you ever done a patent search?
11     A.   I have not.
12     Q.   Have you ever been a patent examiner?
13     A.   No. Of course not.
14         I'm sorry, could I go back a moment?
15     Q.   Sure.
16     A.   If you mean by a patent search you go on
17 Google and type in an inventor's name or something
18 like that I have done that before.
19     Q.   Okay. That's not exactly what I was
20 referring to.
21     A.   I just wanted to be clear.
22     Q.   Now, prior to the mid-'80s, as you say

130

1 in your report, hearing aids generally used the
2 lower power analog circuits, right?
3     A.   That's correct.
4     Q.   And they had, as you recognized,
5 substantial limitations.
6     A.   That's correct.
7     Q.   And when digitalization became a
8 possibility, they required significantly more
9 power, would you say?
10     A.   Initially that was true, yes, I would
11 say.
12     Q.   Okay.
13         In the mid-1980s were power sources
14 small enough to fit in the ear?
15     A.   Do you mean by that a complete hearing
16 aid unit by itself?
17     Q.   Either in the ear or behind the ear.
18     A.   There was at least one under development
19 at that time that worked behind the ear, as I
20 recall.
21     Q.   Was it a digital hearing aid?
22     A.   Yes, it was.

131

1     Q.   And what was that?
2     A.   I think that was the Nicolet, Phoenix,
3 Project Phoenix.
4     Q.   Did that have feedback cancellation?
5     A.   I don't recall. I don't recall but I
6 think the answer is no.
7     Q.   Would you say that the size of batteries
8 has gotten smaller since the mid-80s?
9     A.   Yes, that's true.
10     Q.   Would you say the size of chips has
11 gotten smaller since the mid-80s?
12     A.   Yes, that's true.
13     Q.   Would you know who is responsible for
14 the size of batteries getting smaller, that is what
15 companies, entities, inventors?
16     A.   No, I don't.
17     Q.   Do you know if any of the hearing aid
18 companies are responsible for that?
19     A.   No, I don't.
20     Q.   With respect to the size of chips, do
21 you know who is responsible for the size of chips
22 getting smaller through the years?

132

1     A.   I suspect there are many.
2     Q.   Like Intel, maybe?
3     A.   Intel is one example. There are a lot
4 of power chip manufacturers that specialize in
5 things of that sort.
6     Q.   Did any of the hearing aid manufacturers
7 have anything to do with the reduced size of chips
8 through the years?
9     A.   I can't really say one way or the other.
10     Q.   Now, if you look at Page 11 of your
11 report, and, you know, pardon me, I'm not an
12 expert, but it seems to me you are mentioning three
13 different methods to address feedback: One is a
14 notch filter, the second appears to be some sort of
15 phase shifter, and the third appears to be a
16 cancellation feedback path that measures magnitude
17 and phase response.
18         Am I characterizing that correctly?
19     A.   I think that's pretty close.
20     Q.   And the '850 and '749 patent method fit
21 in the third method, right?
22     A.   Well, there is a, I believe there is a