133

1  claim or claims in '850 that relate to perhaps the
2  first and second methods as well.
3      Q.   Okay, but the feedback mechanism would
4  clearly fit in the third category, right?
5      A.   I believe that's correct.
6      Q.   And phase shifting is not cancellation
7  as you have described it, right?
8      A.   No, it is not.
9      Q.   Now, at the bottom of Page 11 you say
10  essentially that you believe these patents are
11  fixed, right?
12      A.   I'm sorry?
13          MR. LYTLE:  Objection.
14      Q.   You believe --
15      A.   The patents are fixed?
16      Q.   Excuse me, the method of fixing the
17  coefficients is fixed and not adaptive.
18          MR. LYTLE:  Objection.
19      A.   I'm sorry, I don't really understand
20  your question.
21      Q.   In your testimony prior, earlier today,
22  you said that one of your criticisms of the '850

134

1  and the '749 patent were they were fixed and not
2  adaptive.  Am I mischaracterizing your testimony?
3      A.   No, I think that's more or less what I
4  said.
5      Q.   Okay.  So let's get out Exhibit 11,
6  which is the '850 patent.
7      A.   Okay, I have it.
8      Q.   I don't know if you know how to read
9  patents, I just learned myself, but apparently
10  there are these columns that are numbered, 5, 6 at
11  the top.
12      A.   Yes.
13      Q.   Do you see those?
14      A.   I do.
15      Q.   I will be referring to the column
16  number, if you don't mind.  If you will look in
17  Column Number 5 --
18      A.   Okay.  I have Column 5.
19      Q.   -- and then you see the lines in the
20  middle?
21      A.   Um-hmm.
22      Q.   They go from 5 to 65.

135

1      A.   I see those.
2      Q.   If you look at 60, it says, "Automatic
3  adjustment of the hearing aid to take into account
4  environmental conditions such as changes in the
5  speech level and type of background noise obtaining
6  at any time is effected by environmental control
7  means compromising a speech detector, four band
8  pass filters, and a level detector including four
9  differently prebiased comparators."
10          Do you see that?
11      A.   Yes, I do.
12          MR. LYTLE:  Objection to the form.
13      Q.   The automatic adjustment of the hearing
14  aid, isn't that adaptive?  Doesn't it say that?
15          MR. LYTLE:  Objection.
16      A.   My understanding of that is it provides,
17  it is providing a description of the adaptive
18  aspect of the hearing aid that changes its
19  frequency response in different sound environments.
20  But it's not -- it's not adaptive as it relates to
21  canceling acoustic feedback.
22      Q.   But you would agree that the automatic

136

1  adjustment that is referred to there is adaptive?
2          MR. LYTLE:  Objection.
3      A.   Yes, that is adaptive.
4      Q.   Okay.  Let's turn to Column 11.  And
5  then we go to Lines 30 to 37 where it says,
6  "Automatic adjustment of the frequency response of
7  the hearing aid as a function of speech level may
8  also be effected by placing the programmable filter
9  in a feedback loop in series with a programmable
10  compression amplifier."
11          Do you see that?
12      A.   I see that.
13      Q.   So that's adaptive also, correct?
14          MR. LYTLE:  Objection.
15      A.   It could be adaptive.  It's difficult to
16  say from just that one sentence.
17      Q.   You just said that the automatic
18  adjustment meant that it was adaptive, right?
19          MR. LYTLE:  Objection.
20      A.   Let me go back and look at the 5 again.
21          Yes, that could be an adaptive
22  mechanism.

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

35 (Pages 137 to 140)

**137**

1    Q.   Okay.  Then let's go to Column 11, 57
2   through -- excuse me, 51 through 57, where it says,
3   "Moreover, by virtue of the novel means employed
4   for effecting automatic adjustment of the
5   programmable filter to optimum parameter values as
6   the speech level, room reverberation and type of
7   background noise change and for reducing acoustic
8   feedback, a superior hearing aid system of optimum
9   characteristics can be prescribed for hearing
10  deficient patients."
11          Right.  So that's also adaptive,
12  correct?
13          MR. LYTLE:  Objection.
14      A.   Yes, it could be.
15      Q.   Okay.
16          (Soli Deposition Exhibit Number 16 was
17  marked for identification.)
18  BY MR. STEINBERG:
19      Q.   Handing you Exhibit 16 which purports to
20  be ReSound materials, do you see that?
21      A.   I see it.
22      Q.   Have you ever seen that before?

**138**

1      A.   No, I have not.
2      Q.   You see in the middle of the page they
3   have a term that says Adaptive Digital Feedback
4   Suppression?
5      A.   I do see that.
6      Q.   Okay, and it is described as follows:
7   "Bullet 1, eleviates feedback problems without
8   sacrificing gain."
9          Do you see that?
10      A.   I see that.
11      Q.   Bullet 2, "In situ measurement to store
12  the individual feedback path in the memory of the
13  hearing instrument.  The stored data allows for
14  cancellation of feedback using an out-of-phase
15  signal."
16          Do you see that?
17      A.   I do.
18      Q.   Isn't that what the '850 patent does?
19          MR. LYTLE:  Objection.
20      A.   It's impossible to tell from this type
21  of marketing materials.  I would need to see a
22  detailed description of the algorithm and structure

**139**

1   just like what is shown in the '850 patent to
2   answer that question.
3      Q.   Do you believe that's an accurate
4   description of the term adaptive digital feedback
5   suppression?
6          MR. LYTLE:  Objection.
7      A.   No.  I would prefer to see a technical
8   description of how it is done, and that's not what
9   is given here.
10      Q.   But this is put out by a hearing aid
11  manufacturer, right?
12          MR. LYTLE:  Objection.
13      A.   That is true, but I still would like to
14  see a technical description.
15      Q.   Have you ever looked at the testimony of
16  Nicolai Bisgaard of ReSound?
17      A.   No, I have not.
18      Q.   Have you ever been advised that upon
19  being shown Exhibit 16 he testified that is our
20  definition of an adaptive feedback system?
21      A.   No, I'm not aware of that.
22      Q.   Page 12 of your report you refer at the

**140**

1   top of the page to what you call an LMS adaptive
2   filter by Widrow?
3      A.   Correct.
4      Q.   Do you know when that was developed?
5      A.   I'm not exactly certain.  There are
6   references back in the '70s and perhaps even before
7   that.
8      Q.   Do you know if it was ever patented?
9      A.   I do not know.
10      Q.   Do you know if it was ever used in a
11  hearing aid?
12      A.   The Widrow LMS?
13          I'm not certain.
14      Q.   Do you know if it was ever used in a
15  hearing --
16      A.   Excuse me.  We use a Widrow LMS adaptive
17  filter, a modified version of it in our feedback
18  canceller which I believe is used in some hearing
19  aids.
20      Q.   And you began using it after your
21  patent in 2000?
22      A.   We were using it even before the patent

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

36 (Pages 141 to 144)

141

1    issued.
2        Q.    Are you aware of it being used in any
3    commercial hearing aid prior to that?
4        A.    I don't know for certain, no.  It's
5    possible but I don't know for certain.
6        Q.    Now, on Page 30 of your report -- I'm
7    sorry, I meant Paragraph 30.
8        A.    Paragraph Number 30.
9        Q.    Paragraph 30, I apologize, Page 15.
10       A.    Okay.
11       Q.    You describe the issue as quote, "I
12   understand that obviousness may be established by
13   noting that there existed at the time of the
14   invention a known problem for which there was an
15   obvious solution encompassed by the patent's
16   claim," right?
17       A.    Correct.
18       Q.    The '850 patent was filed June 26th,
19   1986 and granted May 15th, 1988, correct?
20       A.    I believe so.
21       Q.    Okay.  Now, feedback cancellation as you
22   have testified was a very attractive feature to

142

1    hearing aid manufacturers, right?
2        MR. LYTLE:  Objection.
3        A.    I think what I said was it was an
4    important problem for any type of hearing aid.
5        Q.    And you agree that hearing aid
6    manufacturers list feedback cancellation as a key
7    feature on their products?
8        A.    I have seen this from ReSound.  I don't
9    know about others.
10       Q.    Well, you do work in the hearing aid
11   field all the time.  Don't you know that feedback
12   cancellation is a significant feature for a hearing
13   aid?
14       A.    I know that feedback cancellation is
15   important in hearing aids.  I don't know what
16   specific manufacturers say or don't say about it.
17       MR. STEINBERG:  Let's mark this as the
18   next exhibit, whatever that is.
19       THE REPORTER:  17.
20       (Soli Deposition Exhibit Number 17 was
21   marked for identification.)
22       MR. STEINBERG:  What exhibit number was

143

1    this?
2        THE REPORTER:  17.
3    BY MR. STEINBERG:
4        Q.    I'm handing you Exhibit Number 17 which
5    purports to be a report to the VA entitled Acoustic
6    Feedback Suppression in Hearing Aids.  Have you
7    ever seen this before?
8        A.    No, I have not.
9        Q.    Okay.  Now, if you turn, there is some
10   Bates stamp numbers -- if you know what they are at
11   this point in time in your career.
12       A.    I do.
13       Q.    -- in the bottom right-hand corner.  It
14   would be 7757.  It's about two-thirds of the way
15   through.
16       A.    7757.  Is that a letter?
17       Q.    Yes, it is.  It is a letter dated
18   October 4th, 1982.
19       A.    I see it.
20       Q.    Right.  It is a letter to Dr. Larson
21   from Starkey, and it says, "Acoustic feedback is
22   currently regarded generally as one of the two

144

1    major problems that are detracting from the
2    effectiveness of hearing aid fittings."
3        Do you see that?
4        A.    I see that.
5        Q.    Okay.  We think -- at the bottom it
6    says, "Vern, I think it is very significant that
7    you are interested in addressing one of the most
8    debilitating problems plaguing today's generation
9    of hearing aids."
10       And then in the middle it says, "Were
11   someone to solve this problem with a practical
12   means of implementation within the scope of size
13   and cost restrictions in the hearing health
14   industry, I believe the industry would jump at the
15   opportunity to market hearing aids including this
16   feature."
17       Do you agree with that?
18       A.    I think in 1982 I would definitely agree
19   with that.
20       Q.    But you know from your own research that
21   it wasn't until about 1999 that hearing aids,
22   digital hearing aids with feedback cancellation

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

37 (Pages 145 to 148)

145

1  were offered to the public, right?
2       MR. LYTLE: Objection.
3    **A. I don't know when they were first**
4  **offered.**
5    Q.  You don't?
6    **A. No, I don't.**
7    Q.  Well, assuming it was wasn't until about
8  1999 -- let's assume that for the purpose of -- you
9  are an expert, you can assume a hypothetical.
10  Okay?
11    **A. I will try.**
12    Q.  Assuming they weren't offered until
13  approximately 1999, if this was so obvious why did
14  it take the industry ten or fifteen years to
15  produce one to the market?
16    **A. If what was so obvious? I'm sorry.**
17    Q.  The feedback cancellation mechanism in
18  the '850 patent.
19       MR. LYTLE: Objection.
20    **A. There are many factors, and I think he**
21  **mentions one of them in here or a couple of them in**
22  **here. Let's see if I can find it. He said**

146

1  **something about the --**
2    Q.  Size and cost?
3    **A. -- yes, size and cost, thank you. Size.**
4    Q.  Right.
5    **A. The size issue was a big problem. It's**
6  **a practical limitation of building a small hearing**
7  **aid that goes in the ear that can run on a hearing**
8  **aid battery. I think people knew how to cancel**
9  **acoustic feedback, you know, quite well for a long**
10  **time. The limitation was not the knowledge of**
11  **feedback cancellation. It was in the practical**
12  **implementation in the hearing aid circuit.**
13    Q.  Now, on Page 15 under the Level of
14  Ordinary Skill In the Art you say that --
15    **A. Are you back on my report?**
16    Q.  I'm back on your report. I'm sorry. I
17  apologize.
18    **A. Let's me get that. Page 15.**
19    Q.  Right.
20       You say, "In my opinion a person of
21  ordinary skill in the art of ETG patents would have
22  been an individual with at least training at the

147

1  master's degree level with a specialty in acoustic
2  related engineering."
3       Do you see that?
4    **A. I see that.**
5    Q.  Okay. Now, that's obviously not you.
6    **A. That's obviously not me.**
7    Q.  And when you were involved in patents
8  and technical articles, you had individuals who had
9  that level of expertise assisting you, correct?
10    **A. That's correct.**
11    Q.  Okay.
12    **A. Including when I was working in the '80s**
13  **at 3M on this.**
14    Q.  Right, but you -- you know, as you
15  stated before you have no master's in engineering
16  and no master degree level with a specialty in
17  acoustic related engineering, right?
18    **A. That's correct.**
19    Q.  But you say, "In the alternative, that
20  person would have training in hearing and speech
21  science, auditory physiology, sensory psychology,
22  and at least three years of practical experience

148

1  with hearing aid device development including the
2  design, development, and behavioral evaluation of
3  prototype hearing aids," right?
4    **A. That's what I said.**
5    Q.  And that is your qualifications?
6    **A. Yes, that's correct.**
7    Q.  Are you aware of anyone else ever
8  equating those qualifications to someone with a
9  master's level degree with a specialty in acoustic
10  related engineering?
11       MR. LYTLE: Objection.
12    **A. I don't think I made an equation there.**
13  **I said as an alternative.**
14    Q.  So you are saying a Ph.D. in psychology
15  who has worked in the hearing aid field is an
16  alternative to a master's degree level with a
17  specialty in acoustic related engineering?
18       MR. LYTLE: Objection.
19    Q.  Is that correct?
20    **A. Well, what I'm saying and what I intend**
21  **to mean by these statements here, is that hearing**
22  **aid research and development is a**

149

1  multidisciplinary, multifaceted undertaking and it
2  takes all of these skills. There are Ph.D.s like
3  myself with training like mine who work in the
4  field. There are engineers. There are
5  audiologists. There are a variety of different
6  people who work in this field.
7      Q.   But as you've pointed out to us on a
8  number of occasions with respect to the patents and
9  the technical articles, you would not venture into
10  the electrical engineering side of this yourself,
11  would you?
12          MR. LYTLE: Objection.
13      Q.   Is that correct?
14      A.   I would form a research team that
15  included an electrical engineer as I have done in
16  the past.
17      Q.   But you wouldn't do it yourself,
18  correct?
19      A.   No. That's not my expertise.
20      Q.   On Page 16 at the very top in
21  Paragraph 33 almost toward the end it says, "In one
22  embodiment," and here you are talking about the

150

1  '850 patent, right? At the top of page --
2      A.   I'm not sure which patent it is. Both
3  of them are referred to at the beginning.
4      Q.   Let's say both.
5      A.   All right.
6      Q.   You say, "In one embodiment, from time
7  to time, the stored coefficient set is purported to
8  change to another one of the sets of stored
9  coefficients to achieve a different hearing aid
10  response characteristic."
11          Do you see that?
12      A.   I see that.
13      Q.   That's adaptive, right?
14          MR. LYTLE: Objection.
15      A.   Well, no. Not what is said there.
16  Those words don't necessarily mean adaptive. They
17  just mean the response set could be changed from
18  time to time. It could be changed by pushing a
19  button, for example.
20      Q.   So that means they are not fixed
21  permanently, right? They can be changed?
22      A.   That's correct.

151

1      Q.   Okay. Isn't that adaptive?
2      A.   No, that does not mean adaptive in my
3  mind.
4      Q.   And then in Paragraph 34 on Page 16 you
5  say, "The hearing aid described in the '850 patent
6  also contains a means that purportedly senses when
7  to select a different set of filter coefficients
8  based on an evaluation of speech and noise
9  characteristics present in the microphone input
10  signal."
11          Do you see that?
12      A.   I see that.
13      Q.   Isn't that adaptive?
14          MR. LYTLE: Objection.
15      A.   I would say that the sensing of speech
16  and noise characteristics to change the response of
17  the hearing aid is, makes it responsive to the
18  environment. Yes. I guess it adapts its response
19  to the sound environment.
20      Q.   So that's adaptive, right?
21          MR. LYTLE: Objection.
22      A.   It adapts its response to the sound

152

1  environment.
2      Q.   So that means adaptive, correct?
3          MR. LYTLE: Objection.
4      A.   It performs an adaptive function.
5      Q.   Now, in Paragraph 35 you describe the
6  ETG patents and I will just read what you wrote
7  about them and ask you if that's your description
8  of the patents.
9          You say, "The ETG patents describe
10  measuring the magnitude and phase characteristics
11  of the acoustic feedback path in order to provide a
12  parallel cancellation feedback path in the hearing
13  aid circuit with the same magnitude and phase
14  characteristics. The same signals that are sent to
15  the receiver are also passed through the
16  cancellation feedback path and subtracted from the
17  microphone input signal, and in so doing the
18  acoustic feedback component of the microphone input
19  signal is purportedly canceled."
20          Do you see that?
21      A.   I see that.
22      Q.   And that is your description of the

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

39 (Pages 153 to 156)

153

1  patents after reading them, right?
2      A.  That's correct.  That's my description
3  of the '850 patent.
4          (Soli Deposition Exhibit Number 18 was
5  marked for identification.)
6  BY MR. STEINBERG:
7      Q.  I'm handing you --
8      MR. STEINBERG:  What number is that?
9      THE REPORTER:  18.
10     Q.  -- Exhibit Number 18 which purports to
11 be an Oticon Syncro memo starting with DEM002099.
12 And I will refer you to DEM002124.
13     A.  Okay, I think I have it.  The one that
14 says Sound Quality on the top?
15     Q.  Right.
16         Now, you see the description of dynamic
17 feedback cancellation where it says, "Dynamic
18 feedback cancellation is a two-stage feedback
19 cancellation system designed to eliminate feedback
20 before it develops into uncomfortable whistling.
21 Unlike traditional feedback management, which
22 reduces gain to eliminate feedback, the DFC in

154

1  Syncro uses phase cancellation.  Phase cancellation
2  is the only way to eliminate feedback while
3  maintaining audibility of the signal.  As soon as
4  feedback is detected, the feedback detection
5  initiates the DFC system to remove the unwanted
6  whistling through a digital phase cancellation."
7          Do you see that?
8      A.  I see that.
9      Q.  Isn't that a description of what the
10 '850 patent does?
11     MR. LYTLE:  Objection.
12     A.  I can't tell by reading this.  Again I
13 would like to see a technical description at the
14 same level as the '850 to make a good answer to
15 that question.
16     Q.  All right.  You see the pictures over to
17 the right where it says Feedback Identified, Phase
18 Cancellation, Feedback Removed?
19     A.  I see those three sketches, yes.
20     Q.  You see it developing an equal but
21 opposite signal in the second picture or graph
22 there?

155

1      A.  On my copy it's hard to see anything in
2  that gray area, but is there something below that
3  peak?
4      Q.  Yes, there is.
5      A.  Okay.
6      Q.  Can you see the gray below the peak?
7      A.  Yes.  I see something there.  Yes, I do.
8      Q.  Okay, and it says, "Example of how phase
9  cancellation can remove the feedback while leaving
10 the important signal untouched," right?
11     A.  I see that, yes.
12     Q.  Isn't that what the '850 patent purports
13 to do?
14     MR. LYTLE:  Objection.
15     A.  I can't tell from this.  Again, I need a
16 technical description.  This I think has been
17 written as marketing materials for the consumer.
18 It's hard to evaluate it at a technical level.
19     Q.  Well, the ETG patents determine the
20 magnitude and phase characteristics of the feedback
21 path, don't they?
22     A.  They do describe a method of measuring

156

1  magnitude and phase.
2      Q.  And then based on that determination, an
3  electrical feedback path is created that estimates
4  those characteristics and subtracts them out,
5  mirrors it, the opposite but equal, correct?
6      MR. LYTLE:  Objection.
7      A.  Let me take a look at exactly what they
8  are doing.
9          Well, the '850 patent, for example,
10 talks about equalizing and reducing effective
11 feedback.  I'm not certain if that's the same as
12 cancellation of feedback.
13     Q.  Well, you yourself describe it as
14 subtracting the signal, right?
15     A.  That's correct.
16     Q.  Okay.  So that means it creates an equal
17 but opposite signal and subtracts it, right?
18     MR. LYTLE:  Objection.
19     A.  Well, you had asked me what the patent
20 says, and I was trying to refer to the language
21 used in the patent which talks about equalizing and
22 reducing.

157

1    Q.   Right, but when you describe that, you
2  describe that as subtracting the signal which means
3  you have an equal but opposite signal and you
4  subtract it.
5        MR. LYTLE:  Objection.
6    A.   Can you give me --
7    Q.   Top of Page 17.
8    A.   17?  I say it is purportedly canceled by
9  subtraction, yes, that is correct.
10       (Soli Deposition Exhibit Number 19 was
11  marked for identification.)
12  BY MR. STEINBERG:
13   Q.   I'm handing you Exhibit --
14       MR. STEINBERG:  What is it?
15       THE REPORTER:  19.
16   Q.   -- Exhibit 19 which is a Widex document
17  entitled FBC Description, author Thomas Kalburg,
18  K-a-l-b-u-r-g, of Widex APS; do you see that?
19   A.   I see that.
20   Q.   Describes the feedback cancelling system
21  in the Senso Diva, D-i-v-a.  Have you ever seen
22  this document before?

158

1    A.   No, I have not.
2    Q.   If you look at the first page, the third
3  paragraph starting "The other part" --
4    A.   I see that.
5    Q.   It says, "The other part of the feedback
6  cancellation system," and then there is parens,
7  "consists of a single adaptive filter that attempts
8  to increase the feedback margin over the whole
9  frequency area.  In order to increase this margin,
10  the output of this filter must be subtracted from
11  the input signal."
12       Do you see that?
13   A.   I see that.
14   Q.   Isn't that what the '850 patent does?
15       MR. LYTLE:  Objection.
16   A.   I can't tell from such a sketchy
17  description here.
18   Q.   Now, are the -- is the '850 patent
19  initialize the startup as you described before,
20  that process?
21       MR. LYTLE:  Objection.
22   A.   I'm not certain.  I don't recall that

159

1  being discussed in the patent.
2    Q.   Do you recall that the coefficients are
3  sent from an EEPROM to a ram for use by the filter?
4    A.   That is correct, I do recall that.
5    Q.   Would you describe that as initializing?
6    A.   Not necessarily, no.
7    Q.   Okay.  How do you describe that?
8    A.   Well, it may be that all the
9  coefficients and everything just have to be loaded
10  into the hearing aid when you power it up.  That
11  may not be the same kind of initialization that
12  takes place for the purpose of feedback
13  cancellation.  For example, it might just load all
14  the coefficient sets for the filters that are
15  selected based on the level of speech in relation
16  to noise, so I can't tell from that.
17   Q.   Okay.  Now, if you look again on
18  Exhibit 1, Page 17, Paragraph 35, the very last
19  sentence reads, "The ETG patents purport that the
20  filter can cancel feedback by placing the filter in
21  either the cancellation feedback path or in the
22  forward path of the hearing aid between the

160

1  microphone input and the receiver output."
2        Do you see that?
3    A.   I see that.
4    Q.   And that is your description after you
5  read the patents, correct?
6    A.   That's correct.
7    Q.   So one embodiment is placing the filter
8  in the feedback path, correct?
9    A.   That's correct.
10   Q.   And then if you look in Paragraph 37 on
11  the same page when you are talking about the, I
12  believe you are talking about the host controller
13  at that point --
14   A.   Yes, I believe so.
15   Q.   Okay, you say that the host controller
16  transfers the coefficients to the ram, the memory
17  of the hearing aid, right?
18   A.   Where is that?
19   Q.   It's right at the bottom, the very
20  bottom.
21   A.   "During the configuration of the hearing
22  aid for the user," that sentence?

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

41 (Pages 161 to 164)

161

1    Q.   Yes.
2    **A.   Yes, that's -- so what is the question?**
3    Q.   Do modern day hearing aids use EEPROMs
4    in ram to your knowledge?
5    **A.   I don't know what they use.  They have**
6    **to use some kind of memory.**
7    Q.   You're not sure exactly what it is?
8    **A.   No, I'm not.**
9    Q.   Okay.  On Page 18, Paragraph 38 --
10    **A.   Yes, I see it.**
11    Q.   Okay, the third sentence says, "The
12    methods for automatic adjustment of the hearing aid
13    based on microphone output signal are presented
14    next, followed by methods for feedback
15    cancellation, and finally the multiple microphone
16    system as described."
17    **A.   Yes.**
18    Q.   Right.
19         And that automatic adjustment is another
20    way of saying adaptive, correct?
21    **A.   Yes, that's correct.  That's the**
22    **adaptive aspect that responds to the level of**

162

1    **speech in relation to noise.**
2    Q.   Now, Page 18, Paragraph 39, you describe
3    the host controller as a processor.
4    **A.   Correct.**
5    Q.   Is that correct?
6         And is that processor used to then
7    program the hearing aid?
8    **A.   I think the programming of the hearing**
9    **aid is actually done by various, the EEPROM socket**
10    **and clock control signals and things of that sort.**
11    Q.   The --
12    **A.   I'm sorry.**
13    Q.   Go ahead.  I'm sorry.
14    **A.   The processor performs a number of**
15    **general functions other than just programming a**
16    **hearing aid.**
17    Q.   Do current hearing aids because of the
18    size of chips now have processors inside of them?
19    **A.   I'm not certain.**
20    Q.   You don't know from your own knowledge?
21    **A.   No.  Depends on what is meant by a**
22    **processor.**

163

1    Q.   Well, you've used the word yourself.
2    You say the host controller is a processor for
3    controlling the operations of a device.  Do you
4    understand what that means?
5    **A.   Well, that's the -- yes, I understand**
6    **what that means.  That's the claim construction**
7    **language that was provided.**
8    Q.   Are there any processors currently
9    inside hearing aids, in modern hearing aids?
10    **A.   I believe so.  Most modern digital**
11    **hearing aids have some type of a digital processor**
12    **inside of them.**
13    Q.   And is it because in the years since the
14    mid-'80s the chip size has reduced to the point
15    that you can do that?
16         MR. LYTLE:  Objection.
17    **A.   I suspect that's one of the reasons but**
18    **it's not the only reason.**
19    Q.   Do you know of any other reasons?
20    **A.   Well, I think other reasons might be**
21    **that new algorithms, new knowledge, new experience**
22    **with these devices has enabled -- has enabled**

164

1    **various features and functions to be embedded in**
2    **the hearing aid.**
3    Q.   What does the term null, n-u-l-l, mean?
4    **A.   Can you give me the context for its use?**
5    Q.   I'm trying to find it on Page 19.  Oh,
6    yes.  I see it, the very last sentence.  "The
7    magnitude and phase of output 144 at this minimum
8    or null point purportedly provide information," so
9    forth and so on.
10    **A.   What is the question again?**
11    Q.   What does the term null mean?  Do you
12    know what the term null means in terms of feedback
13    cancellation?
14    **A.   Well, the term null here is used in**
15    **relation to a measurement, not a feedback**
16    **cancellation.**
17    Q.   Okay.  Does null mean zero?
18    **A.   Not necessarily.**
19    Q.   Does it mean as close to zero as you can
20    come?
21    **A.   Yes.  It means a minimum or null, like I**
22    **said.**

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

42 (Pages 165 to 168)

---

**165**

1    Q.   On Page 20 in Paragraph 45 you say that
2    once the programming is completed the EEPROM,
3    E-E-P-R-O-M, is removed from the host controller
4    and put in the hearing aid, right?
5    **A.   I'm just citing the language from the**
6    **patent in that regard.**
7    Q.   Is there any language in the '749 or
8    '850 patents that would prohibit the controller,
9    the processor, from being resident in the hearing
10   aid once technology became small enough to do that?
11   **A.   I don't know of any language that would**
12   **prohibit that.**
13   Q.   Okay.  Now starting on Page 15 through I
14   think, correct me if I am wrong, from Page 15 to
15   Page 36 you describe the '850 and '749 patents.
16   **A.   There is a little bit that spills over**
17   **to the top of 37.**
18   Q.   So by my count that's 21 pages to
19   describe those patents or thereabouts?
20   **A.   Okay.**
21   Q.   What prior art describes each and every
22   element of these patent claims that took you 21

---

**166**

1    pages to describe?
2    **A.   Could you ask that again, please?**
3    Q.   Sure.  What prior art describes each and
4    every claim of these patent claims that it took you
5    21 pages to describe?
6    MR. LYTLE: Objection to the form.
7    **A.   Well, the prior art that I have listed**
8    **in the remainder of the report, in my opinion, is**
9    **what is relevant, and that goes on for many pages**
10   **as well.**
11   Q.   But each one of them are only a page or
12   two, right?
13   MR. LYTLE: Objection.
14   Q.   Each one of your descriptions of prior
15   art.
16   **A.   I don't recall.  They vary.**
17   Q.   Okay.  Well, we will get to that.
18   MR. STEINBERG:  It looks like we are
19   bringing in lunch.  Do you want to take a break
20   now?
21   MR. LYTLE: Sure.
22   THE VIDEO OPERATOR: We are going off

---

**167**

1    the record.  The time is now 12:13 p.m.
2    (Recess taken -- 12:13 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

---

**168**

1    AFTERNOON SESSION
2    (1:03 p.m.)
3    THE VIDEO OPERATOR:  Please stand by.
4    We are now back on the record.  The time
5    is 1:03 p.m.
6    BY MR. STEINBERG:
7    Q.   Dr. Soli, during the break did you talk
8    to anyone about this case?
9    **A.   No.  Just about the form of the**
10   **deposition.**
11   Q.   The what?
12   **A.   Just about the style and the form.**
13   Q.   Meaning what?
14   **A.   They told me to talk slower, take more**
15   **time.**
16   Q.   Okay.  Did you discuss the substance of
17   your testimony?
18   **A.   No, we did not.**
19   Q.   Okay.
20   If you look at Page 30 of your
21   Exhibit 1, your report, in Paragraph 59 you
22   describe the '850 patent, correct?

---

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

43 (Pages 169 to 172)

169

1    A.    Yes. I began the description there,
2  yes.
3    Q.    I'm going to read it into the record.
4  It says, "The process of feedback cancellation, as
5  described in the '850 patent, is achieved by first
6  measuring the acoustic feedback in situ with the
7  hearing aid in the user's ear. These measurements
8  are used to program a programmable delay line
9  filter with purportedly the same magnitude and
10 phase response as the acoustic feedback path. This
11 filter is placed in a cancellation feedback path
12 and its output is subtracted from the electrical
13 output of the microphone signal that contains
14 acoustic feedback components as well as other
15 input.
16      "If the magnitude and phase responses of
17 the acoustic feedback path and the cancellation
18 feedback path are matched, the result of the
19 subtraction is cancellation of the feedback
20 component from the microphone input. Note that
21 this process does not reduce the acoustic feedback.
22 This feedback is still present in the microphone

170

1  input. Instead, this process removes by
2  cancellation the acoustic feedback component of the
3  microphone input."
4      Is that correct?
5    A.    That's correct.
6    Q.    And that description you got from
7  reading the patent, right?
8    A.    Yes. I got it from reading the patent
9  and my knowledge of acoustic feedback cancellation.
10   Q.    Okay. And the filter you described as
11 being placed in the cancellation feedback path,
12 correct?
13   A.    Yes, that's where it is placed.
14   Q.    If you turn to Page 38, in Paragraph 71
15 I believe through 74 you are discussing the
16 Engebretson, if I'm pronouncing his name right,
17 patent and you're saying that the applicant argued
18 to the patent office that this patent was different
19 from Engebretson patent and the patent office
20 allowed the claim.
21   A.    I'm not sure where you see that.
22   Q.    The beginning of 71 it says, "The patent

171

1  applicant argued that Claim 1 as amended should be
2  patentable over the prior art cited by the
3  examiner," and then you go on to discuss that prior
4  art as Engebretson, if I'm reading this correctly.
5    A.    Let me see.
6        MR. LYTLE:  Is there a question pending?
7        MR. STEINBERG:  I described to him what
8  he wanted me to describe to him.
9    A.    Okay. What is your question of me?
10   Q.    The question is, those paragraphs deal
11 with the applicant arguing to the patent office
12 that the patent was different from the Engebretson
13 patent and the patent office allowing the claim?
14   A.    Right. I think Paragraph 72.
15   Q.    Is that the purpose of these paragraphs?
16   A.    The purpose of these paragraphs is just
17 to summarize the relevant information from the file
18 history.
19   Q.    Are you claiming that the patent
20 examiner erred in any way?
21   A.    No, I'm not claiming that.
22   Q.    Okay.

172

1        Now, if you turn to Page 40,
2  Paragraph 76, it says, "I am informed that U.S.
3  Patent Number," and we will use the last three
4  numbers, the '721 to Graupe, the '721 patent,
5  "qualifies as prior art with respect to the ETG
6  patents."
7        Do you see that?
8    A.    Yes. I do.
9    Q.    Okay, who informed you of that?
10   A.    The Widex attorneys did.
11   Q.    So the Widex attorneys informed you that
12 the Graupe patent '721 qualifies as prior art; is
13 that correct?
14   A.    Yes. That's what I said.
15   Q.    And you are relying on that?
16   A.    Well, I have read the patent myself and
17 formed my own opinion about it, but they drew it to
18 my attention.
19   Q.    But this says that you were informed
20 that the '721 patent qualifies as prior art. Is
21 that what they informed you?
22   A.    Yes. They informed me that it qualifies

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

44 (Pages 173 to 176)

173

1  as prior art.
2      Q.   And you are relying on that, correct?
3      A.   In this case I agree that it qualifies
4  as prior art.
5      Q.   Right.
6      A.   That there --
7      Q.   And you are relying on what they told
8  you, right?
9      A.   In this case.
10     Q.   And that opinion came from the
11 defendant's attorneys, right?
12     A.   Correct.
13     Q.   You're not a patent attorney?
14     A.   No, I am not.
15     Q.   Okay.  Now, if you look at your
16 description of the Graupe patent on Pages 39
17 through 43, that's the '721 patent, is there
18 anything in those pages that discusses the feedback
19 cancellation method that you yourself described in
20 the '749 and '850 patents?
21     A.   No.
22          MR. LYTLE:  Objection.

174

1      Q.   You can answer.
2      A.   No, there is nothing in those paragraphs
3  that relates to feedback cancellation.
4      Q.   Now, on Page 43 you discuss the Stein
5  article entitled Listener-Assessed Intelligibility
6  of a Hearing Aid Self-Adaptive Noise Filter in Ear
7  and Hearing, correct?
8      A.   Correct.
9      Q.   Okay, and you say again I am informed
10 that this article is prior art.  Who informed you?
11     A.   The Widex patent attorneys.
12     Q.   Now, the Stein article does not describe
13 the feedback cancellation method you yourself have
14 described in your report of the '850 and '749
15 patents, does it?
16     A.   No, it does not.
17     Q.   It just discusses the Graupe filter that
18 we have already discussed, right?
19          MR. LYTLE:  Objection.
20     A.   It discusses the Graupe causing
21 self-adaptive noise filter.
22     Q.   The '721 we were just talking about,

175

1  right?
2      A.   I understand from what they said that
3  that self-adaptive noise filter comprises an
4  implementation of the '721.
5      Q.   Okay, but again it doesn't describe the
6  cancellation method described in the '850 and the
7  '749 patents, right?
8      A.   No, not to my knowledge.
9      Q.   And then on Page 44, you discuss the
10 Graupe '168 patent, do you see that?
11     A.   I see that.
12     Q.   And it says again, "I am informed that
13 the '168 patent qualifies as prior art with respect
14 to the ETG patents."
15          Who informed you of that?
16     A.   The Widex attorneys.
17     Q.   The '168 patent is just a continuation
18 of the '721, right?
19     A.   I believe that is correct.
20     Q.   So it doesn't describe the cancellation
21 of the '850 and the '749 patents, right?
22     A.   I do not believe so.

176

1      Q.   Okay.
2          And then if you turn to Page 45 you
3  discuss the Nunley patent '672, right?
4      A.   Right.
5      Q.   And you say again, "I am informed that
6  the '672 patent qualifies as prior art with respect
7  to the ETG patents," correct?
8      A.   That is correct.
9      Q.   Who informed you?
10     A.   The Widex attorneys informed me.
11     Q.   And you describe the Nunley patent on
12 Pages 45 and 46, right?
13     A.   Yes, that is correct.
14     Q.   And nothing in that description covers
15 the feedback cancellation method covered in the
16 '850 or '749 patents, correct?
17     A.   Not that I can see, no.
18     Q.   And then if you go to Page 47 you talk
19 about the Barth, the '529 patent?
20     A.   Yes.
21     Q.   Is that correct?
22     A.   That's correct.

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

45 (Pages 177 to 180)

177

1    Q.   And you say again, "I am informed that
2  the U.S. Patent, '529 patent qualifies as prior art
3  with respect to the ETG patents," right?
4    A.   That is correct.
5    Q.   Who informed you?
6    A.   The Widex attorneys.
7    Q.   Okay.  Now, you agree, don't you, that
8  the patent officer actually reviewed the Barth
9  patent, the '529 patent?
10       MR. LYTLE:  Objection.
11   Q.   Is that correct?
12   A.   Well, it was cited in the prior art by
13  the examiner, that is correct.
14   Q.   And you say that the '850 patent was
15  amended as a result of that and the patent officer
16  then allowed the '850 patent as being patentable?
17   A.   That is my understanding, yes.
18   Q.   Okay.  So that was -- that
19  quote-unquote, if it is or isn't prior art was
20  specifically reviewed by the patent officer, right?
21   A.   Yes, sir.
22   Q.   Are you opining that the patent office

178

1  was wrong?
2       MR. LYTLE:  Objection.
3    A.   No.  I think Barth is relevant in my
4  opinion in light of other prior art that the patent
5  officer did not consider.
6    Q.   The description of the Barth patent on
7  47 and 48 of your report does not describe the
8  feedback cancellation system in the '850 and '749
9  patents, does it?
10   A.   No, it does not.
11   Q.   Now, on Page 49 you say that you
12  understand that AT&T Bell Labs developed a
13  programmable hearing aid, right?
14   A.   Yes, I believe they were planning to do
15  that.
16   Q.   What is the basis for your
17  understanding?
18   A.   I have seen this prototype architecture
19  memo that I refer to there.
20   Q.   Do you have any other basis other than
21  that?
22   A.   No, I don't.

179

1    Q.   Now, you don't say in your report that
2  you had been informed that this is prior art or
3  this is prior art, right?
4    A.   I'm sorry?
5    Q.   You don't say in your report that you
6  had been informed or that this is prior art, do
7  you?
8    A.   That's correct.
9    Q.   Okay.  So you're not basing your opinion
10  on prior art on this AT&T Bell Labs memo or
11  document you saw, correct?
12       MR. LYTLE:  Objection.
13   A.   Well, I believe in the claim tables I do
14  cite it as prior art in relation to one of the
15  claims or more, one or more of the claims.
16   Q.   But in the body of your report you don't
17  say that.
18   A.   I guess I did not say that, no.
19   Q.   Did any manufacturers purchase this
20  technology from AT&T?
21   A.   I don't know.
22   Q.   Do you have an understanding of what

180

1  AT&T Bell Labs did?
2    A.   My understanding is limited to what I
3  have seen in this memo.
4    Q.   Okay.  Did AT&T Bell Labs develop any
5  feedback cancellation system as you've admitted the
6  '850 and '749 patents describe?
7       MR. LYTLE:  Objection.
8    A.   I'm not aware that they developed them
9  for hearing aids but they might have developed them
10  for other applications, telephony.
11   Q.   Have you seen any feedback cancellation
12  system in the AT&T Bell Labs work that you
13  reviewed?
14   A.   No, I have not.
15       (Soli Deposition Exhibit Number 20 was
16  marked for identification.)
17  BY MR. STEINBERG:
18   Q.   Handing you Exhibit 20 which purports to
19  be a declaration of Vincent Pluvinage, Ph.D. in
20  support of a motion to refer the question of
21  infringement to a special master, have you ever
22  seen this report before?

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

46 (Pages 181 to 184)

181

1     **A.   No, I have not.**
2     Q.   Do you know who Vincent Pluvinage is, or
3 was?
4     **A.   I have seen him at professional meetings**
5 **years ago.**
6     Q.   Were you aware that he was the president
7 of the international operations for ReSound?
8     **A.   No, I was not.**
9     Q.   Did anyone advise you that he filed an
10 affidavit dealing with the AT&T technology?
11     **A.   No.**
12     Q.   So you have never had an opportunity to
13 review this before?
14     **A.   I have never seen this before.**
15     Q.   Okay.
16     (Soli Deposition Exhibit Number 21 was
17 marked for identification.)
18 BY MR. STEINBERG:
19     Q.   Handing you Exhibit 21, which purports
20 to be an AT&T Bell Lab memo on the second page
21 entitled Draft Project NV58 Prototype Architecture
22 December 4th, 1984.

182

1     Do you see that?
2     **A.   I see that.**
3     Q.   Is that the document that you reviewed
4 with respect to your analysis here in your report?
5     **A.   It looks like it, yes.**
6     Q.   Okay.  You see on the first page it
7 says, "AT&T Bell Labs - Proprietary (restricted)
8 solely for authorized persons having a need to know
9 pursuant to G.E.I. 2.2."
10     Do you see that?
11     **A.   Yes.  I do.**
12     Q.   And then that's printed on all the pages
13 of this report, right?
14     MR. LYTLE:  Objection.
15     **A.   It's not printed on all of the pages.**
16     Q.   Okay.  It's printed on the body of the
17 report, the verbiage, not the charts.
18     **A.   That appears to be the case, yes.**
19     Q.   Now, how can this be prior art if it was
20 proprietary and confidential?
21     MR. LYTLE:  Objection, foundation.
22     **A.   I was -- I understand from what I have**

183

1 **been told that this report was provided to**
2 **Dr. Levitt at some point.**
3     Q.   And who told you that?
4     **A.   Widex attorneys told me that.**
5     Q.   Do you have any independent knowledge of
6 that?
7     **A.   No, I don't.**
8     Q.   Okay.
9     And do you have any independent basis to
10 understand that this was accessible to the public
11 at any point in time?
12     **A.   I don't know.**
13     Q.   Is there a description in Exhibit 21 of
14 the feedback cancellation mechanisms in patents
15 '850 and '749?
16     MR. LYTLE:  Objection, vague.
17     **A.   I don't see anything in here.**
18     Q.   Next we go to Page 49 of Exhibit 1,
19 that's your report, and you talk about the Beex
20 B-e-e-x patent, the '192 patent.  Do you see that?
21     **A.   I see that.**
22     Q.   It says, "I am informed that the Beex

184

1 '192 patent qualifies as prior art with respect to
2 the ETG patents."
3     Who informed you of that?
4     **A.   The Widex attorneys.**
5     Q.   And then on Page 50 you described the
6 '192 patent, correct?
7     **A.   Correct.**
8     Q.   And that does not describe the method of
9 feedback cancellation that you have described for
10 the '850 and '749 patents, does it?
11     **A.   It describes -- it describes a method of**
12 **feedback cancellation using a notch filter in the**
13 **forward path of the hearing aid, which is one of**
14 **the methods for dealing with feedback that is**
15 **discussed in the '850 patent as I understand it.**
16     Q.   If we go back to Page 11 of your report,
17 you describe notch filter as a separate method to
18 address feedback, separate and apart from
19 cancellation, don't you?
20     MR. LYTLE:  Objection.
21     **A.   I describe three different methods, yes.**
22 **That's one of them.**

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

47 (Pages 185 to 188)

185

1    Q.    But that's separate and apart from
2  cancellation; is that correct?
3    **A.    That's correct.**
4    Q.    And this so-called notch filter system
5  in the Beex patent, that is not the cancellation
6  method that you have described two or three times
7  in your report of the '850 and '749 patents in
8  terms of determining the amplitude and phase and
9  then having an equal but opposite signal that
10  cancels it?
11    **A.    No.**
12        MR. LYTLE:  Objection.
13    Q.    Is that correct?
14    **A.    The Beex method uses a filter in the**
15  **forward path.  It does not use a cancellation**
16  **filter.**
17    Q.    Nor does it measure amplitude or phase,
18  does it?
19    **A.    The notch filter does not measure**
20  **amplitude or phase, nor does the feedback**
21  **cancellation filter.**
22    Q.    Should we read your description of what

186

1  the '850 filter does again?
2    **A.    Sure.**
3    Q.    If you would turn to Page 30 --
4    **A.    Page which?  I'm sorry.**
5    Q.    Page 30.  Isn't that what you said?  It
6  measures the magnitude and phase and then creates
7  essentially an equal but opposite signal that is
8  subtracted?
9        MR. LYTLE:  Objection.
10    **A.    The feedback cancellation filter does**
11  **not do that.**
12    Q.    Well, what does that?
13    **A.    The host controller and the operator.**
14    Q.    You're saying all of those functions are
15  in the host controller; is that your testimony?
16        MR. LYTLE:  Objection.
17    **A.    Which functions?  I'm sorry.**
18    Q.    The functions you just described.
19    **A.    Would you repeat them for me so I am**
20  **sure I understand what you mean?**
21    Q.    When I directed you to Paragraph 59 on
22  Page 30 you said that those functions are done in

187

1  the host controller, right?
2        MR. LYTLE:  Objection.
3    Q.    Is that what you just said?
4    **A.    I think we are talking about two**
5  **different things.  One is a filter that cancels**
6  **feedback.  The other is a method of measuring**
7  **amplitude and phase.**
8    Q.    Well, measuring amplitude and phase in
9  creating an equal but opposite signal to cancel it
10  is what I described to you in my question.
11    **A.    The measurement process is separate from**
12  **the filtering and canceling process, and the**
13  **feedback cancellation filter only does the**
14  **cancellation part.  The measurement is not done**
15  **using a feedback cancellation filter, as I**
16  **understand it.**
17    Q.    Well, when I asked you to read this
18  Paragraph 59 --
19    **A.    Okay.**
20    Q.    -- I thought your answer was that's all
21  done in the host controller.  Is that your answer
22  or is that not your answer?

188

1    **A.    No, that's not my answer.**
2    Q.    Because it says on its face that you are
3  describing the '850 patent, right?
4    **A.    That's correct.**
5    Q.    And the '850 patent is not the host
6  controller, is it?
7    **A.    That's correct.**
8        MR. LYTLE:  Objection.
9    Q.    So again when I point out the Beex
10  patent, the '192, the Beex '192 does not describe a
11  cancellation method that is similar or identical to
12  the feedback cancellation method in the '850
13  patent, does it?
14    **A.    That's correct.**
15    Q.    Okay.
16        Now, on Page 51 of your report you
17  mention the Larson Egolf VA Rehabilitation R&D
18  Progress Report of 1984.  Do you see that?
19    **A.    Yes, I do see that.**
20    Q.    Now, you don't say there that you are
21  informed that this is prior art.
22    **A.    That's correct.  Although I believe in**

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

48 (Pages 189 to 192)

189

1    my -- in the tables that I produce later on I
2    identify it as such.
3        Q.    Okay. When is the very first time you
4    saw that report?
5        A.    I don't remember exactly when it was.
6        Q.    How did you get it?
7        A.    It was given to me by the Widex
8    attorneys.
9        Q.    By Widex attorneys?
10       A.    Yes, sir.
11       Q.    Now, do you know if this report has been
12   published anywhere?
13       A.    Well, from the appearance of the report
14   section I saw, it appears to be copies of pages
15   from a publication of some kind.
16       Q.    Do you know from your own personal
17   knowledge that it was published?
18       A.    My only knowledge is what I have seen on
19   that piece of paper. It appears to me it was a
20   copy of a publication of some kind.
21       Q.    Have you ever attempted to obtain that
22   publication in any public library?

190

1        A.    From time to time I have received copies
2    of the Rehab R&D research reports from time to time
3    over the years that are sent to me without being
4    solicited. I don't recall whether I received this
5    one. That was a long time ago.
6        Q.    Okay. Can you answer my question? Have
7    you attempted to obtain that document from a public
8    library?
9        A.    No, I have not.
10       Q.    Okay. Do you know if this is some sort
11   of -- if this is related to the Egolf R&D quarterly
12   progress reports to the VA that he sent to them
13   through the years?
14       A.    Excuse me, by "this" you mean the
15   report, the R&D Progress Report?
16       Q.    Yes.
17       A.    I don't know, because I haven't seen the
18   quarterly reports.
19       Q.    If Dr. Egolf testified that it was the
20   same project would you believe him?
21       A.    Yes, I would.
22       Q.    Do you know that Dr. Egolf referred to

191

1    his VA reports as unpublished in many articles and
2    publications?
3        A.    I'm not aware of that.
4        Q.    Has anyone shown you Dr. Egolf's
5    publications where he refers to his VA reports as
6    being unpublished?
7        A.    I don't recall seeing those, no.
8        Q.    You said you never read Dr. Egolf's
9    deposition testimony; is that correct?
10       A.    That is correct.
11       Q.    Do you know if the progress report of
12   1984 you are referring to there are Pages 163 and
13   164 of that larger report that you looked at?
14       MR. LYTLE: Objection.
15       A.    All I've seen is the section that
16   summarizes the Larson and Egolf results, which I
17   think was two or three pages.
18       Q.    Okay.
19       A.    I haven't seen the entire report.
20       Q.    Let me read to you -- you would agree --
21   strike that.
22            You would agree that Dr. Egolf's

192

1    understanding of his own reports are far superior
2    to yours, wouldn't you?
3        MR. LYTLE: Objection.
4        A.    I would hope they are.
5        MR. LYTLE: So would we.
6        Q.    Let me read to you his testimony at
7    Pages 253 on about this particular progress report.
8            "Question: That's entitled Acoustic
9    Feedback Suppression In Hearing Aids, an article
10   written by Vernon Larson and David Egolf, Ph.D. so
11   you were an author of this document.
12           "Answer: Presumably yes."
13           And when we discuss a little bit about
14   when he first saw this article. That goes on until
15   Page 254. And 255. Then he is asked on 256:
16           "Question: You never cited this report
17   in any of your other works or publications, did
18   you?
19           "Answer: I did not, no.
20           "Question: And it doesn't have any
21   diagrams or drawings or sketches, correct?
22           "Answer: No diagrams, drawings or

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

49 (Pages 193 to 196)

193

1  sketches."
2        And then on 257:
3        "Question: Does this article refer to
4  phase and amplitude anywhere?
5        "Answer: There are no words in here
6  that say phase and amplitude.
7        "Question: Does it refer to measuring
8  phase and amplitude in creating an equal and
9  opposite signal of any kind?
10        "Answer: It doesn't say so.
11        "Question: Does this report mention or
12  use the term a programmable delay line filter?
13        "Answer: I don't believe it does, no.
14        "Question: Does this report refer to an
15  AFC system?
16        "Answer: No, it does not.
17        "Question: Do you know if this report
18  was prepared relating to any of the AFC systems
19  that we have discussed?
20        "Answer: Yes, it was.
21        "Question: Which one?
22        "Answer: AFC-2.

194

1        "Question: Have you seen it in any
2  publication?
3        "Answer: No, I have not."
4        Did you understand his testimony before
5  today, before I read it to you?
6        **A.   No. That's the first I've heard it.**
7        Q.   Does that change your opinion in any
8  way?
9        **A.   Which aspect of my opinion are you**
10  **referring to?**
11        Q.   Well, we are talking about the R&D
12  Progress Report of 1984.
13        MR. LYTLE: Objection, and I would also
14  note for the record the witness does not have in
15  front of him a deposition transcript.
16        MR. STEINBERG: Be glad to give it to
17  him if he wants it. He has never asked for it but
18  if he wants it I would be glad to hand it to him.
19        THE WITNESS: Could I see it, please?
20        MR. STEINBERG: Sure.
21        Let's mark that as the next exhibit.
22        (Soli Deposition Exhibit Number 22 was

195

1  marked for identification.)
2  BY MR. STEINBERG:
3        Q.   Handing you Exhibit 22, which is the
4  deposition of David Egolf --
5        **A.   Can you refer me to those pages again,**
6  **please?**
7        Q.   Sure. 256 to -- let me see where I
8  ended -- 259.
9        Have you read it?
10        **A.   I have skimmed it over, yes.**
11        Q.   Okay. And has it changed your opinion
12  as to whether it is prior art?
13        **A.   No, it does not.**
14        Q.   Why not?
15        **A.   Because I think somebody skilled in the**
16  **art at that time would understand what was written**
17  **in that report in light of the, or using the kinds**
18  **of language that I use to describe it in Paragraphs**
19  **90 and 91.**
20        Q.   So you're saying you could have taken
21  this progress report in 1984, the couple of
22  paragraphs, and actually built the feedback

196

1  cancellation system yourself; is that correct?
2        MR. LYTLE: Do you have a copy of the
3  progress report that he could look at?
4        THE WITNESS: Yes. I would like to see
5  that, please.
6        MR. STEINBERG: I think it is attached
7  to this.
8        We will have to do it later. We will
9  get it when we take a break.
10        MR. LYTLE: Okay.
11        THE WITNESS: So you want to come back
12  to that?
13        MR. STEINBERG: We will come back to
14  that when we show you that report.
15        THE WITNESS: Thank you.
16  BY MR. STEINBERG:
17        Q.   Were you aware that Dr. Egolf insisted
18  that his VA reports be kept confidential?
19        **A.   No, I was not aware of that.**
20        **(Soli Deposition Exhibit Number 23 was**
21  **marked for identification.)**
22  **BY MR. STEINBERG:**

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

50 (Pages 197 to 200)

197

1    Q.   I'm handing you Exhibit 23, which is a
2  March 29th, 1985 letter to Vernon Larson from David
3  P. Egolf, and it deals with his quarterly progress
4  reports for the fifth and sixth quarters of the VA
5  project.  Do you see that?
6    A.   Yes, I see that.
7    Q.   Do you see, the third full paragraph it
8  says, "Vern, there are other reasons for keeping
9  this material confidential, for at least a short
10  period of time.  First, I have not yet had time to
11  send this material off for publication and I would
12  hate to be scooped by someone at another university
13  who sent for copies of these reports.
14        "Second, you and I seem to have the edge
15  in the grantsmanship game with the VA.  If this
16  material is distributed to other researchers who we
17  must compete with for grants, we lose that edge."
18        Were you aware that he was asking for
19  confidentiality?
20    A.   No, I was not.
21    Q.   And were you aware that he says that he
22  separated his reports for the following reasons:

198

1  "First, I think the circuit described in part 5
2  report Appendix B is patentable and therefore this
3  appendix should be considered confidential until
4  such time as the patent procedure is begun."
5        Were you aware of that?
6    A.   No, I was not.
7    Q.   Do you know, are you aware that this
8  document, Exhibit 23, refers to the AFC circuits?
9    A.   I can't tell from reading this.
10    Q.   If Dr. Egolf testified that it did,
11  would you believe him?
12    A.   Yes, I would.
13    Q.   So if it is confidential it's not
14  available to the public, correct?
15        MR. LYTLE:  Objection.
16    A.   I gather that those reports would not be
17  available to the public.  I think this was before
18  FOI.
19    Q.   You what?
20    A.   I said I think this is probably before
21  FOI.
22    Q.   That's probably a good guess.

199

1        (Soli Deposition Exhibit Number 24 was
2  marked for identification.)
3  BY MR. STEINBERG:
4    Q.   I'm now handing you Exhibit 24, which is
5  an August 31, 1987 letter to Vernon Larson by David
6  Egolf.  Do you see that?
7    A.   I see that.
8    Q.   And this letter again is pursuant to his
9  contract with the University of Wyoming -- the VA
10  contract with the University of Wyoming entitled
11  Acoustic Feedback Suppression In Hearing Aids.  Do
12  you see that?
13    A.   Yes.  I do.
14    Q.   Are you familiar enough with Dr. Egolf's
15  work to understand that all of these VA reports
16  were performed pursuant to that contract with the
17  VA?
18    A.   I don't know that.
19    Q.   And then attached to it is a document
20  that is entitled Confidential, right?
21    A.   I see that.
22    Q.   Do you know who filled that out?

200

1    A.   No, I do not.
2    Q.   If Dr. Egolf said that he filled it out
3  would you believe him?
4    A.   I would believe him.
5    Q.   And this is called a Report of Invention
6  or Copyright Work Formal Disclosure, right?
7    A.   I see that.
8    Q.   And the date of the disclosure is August
9  31st, 1987, right?
10    A.   I see that.
11    Q.   And you see that the inventor, at least
12  one of them, is David Egolf, right?
13    A.   I see that.
14    Q.   And Kim Weaver?
15    A.   I see that.
16    Q.   And if you look under what the title of
17  the invention is, it says Automatic Feedback
18  Control Circuit, right?
19    A.   Correct.
20    Q.   So is it your understanding that's the
21  AFC circuits that you discussed in your report?
22    A.   I can't tell until I study this, but --

201

1    Q.   If you look down under Item 2, where it
2  says "dates important to disclosure" --
3    A.   Yes, I see that.
4    Q.   And if you look down at E, "Publication
5  of pertinent information constituting public
6  disclosure," what does it say?
7    A.   It says "none."
8    Q.   And do you understand that to mean there
9  had been no disclosure to that date?
10   A.   That's what it appears to be saying.
11   Q.   Now, when you look at the next page does
12 that refresh your recollection that that is a
13 description of the AFC circuits that are mentioned
14 in your report?
15       MR. LYTLE:  Objection.  It is vague as
16 to which AFC circuits you are mentioning in your
17 question.
18   A.   Okay.  Could you repeat your question
19 again, please?
20   Q.   Sure.  Doesn't that description describe
21 the AFC circuits that you have described in your
22 report?

202

1        MR. LYTLE:  Same objection.  Which AFC
2  circuits?
3    A.   This is a rather brief verbal
4  description without any diagrams or enough detail
5  to really verify for certain that it is the same
6  but it bears a family resemblance.  I would say
7  that.
8    Q.   And if Dr. Egolf testified that this
9  description applied to AFC-1, 2 and 3, would you
10 believe him?
11   A.   I would believe him.
12   Q.   So if there was no disclosure up through
13 August 31, 1987, it wouldn't be available to the
14 public, correct?
15       MR. LYTLE:  Objection.
16   A.   If there was no disclosure that would be
17 the case.
18   Q.   Now, you devote two paragraphs to this
19 progress report in your -- on Page 51 of Exhibit 1,
20 your report, right?
21   A.   I think I discuss it actually in two
22 different places.

203

1    Q.   Okay.
2    A.   Let me see if I can find that for you.
3    Q.   Sure.
4    A.   I also discuss it on Page 68 at the end
5  of a section, several pages, related to Weaver's
6  work.
7    Q.   Well, there you have sort of mixed it in
8  with other work, right?
9    A.   Well, it's part of one continuous effort
10 that according to this letter dates back to 1984.
11   Q.   And do you agree that that continuous
12 effort was the contract with the VA that Dr. Egolf
13 and Mr. Weaver and others submitted periodic
14 reports to the VA about?
15   A.   It may have been.  It appears that way,
16 but I don't know for certain.
17   Q.   And do you agree that effort dealt with
18 AFC circuits 1 through 3?
19   A.   The continuous effort from 1984; is that
20 what you mean?
21   Q.   Yes.  Your understanding.
22   A.   My understanding is that there was an

204

1  ongoing effort that began -- they labeled these
2  AFC-1, 2, 3 designations to distinguish different
3  versions of it as it evolved.
4    Q.   You don't rely on any version subsequent
5  to AFC-3, do you?
6    A.   I don't know of any.
7    Q.   So no one told you that there were a
8  number of subsequent versions, I take it?
9    A.   That's true.  I don't know -- the only
10 versions I have seen are 1 and 2, or reference to
11 is 1 and 2.
12   Q.   And in neither of your descriptions that
13 you have directed me to in your report do you
14 discuss the feedback cancellation method that you
15 have described for the '850 and '749 patents,
16 right?
17   A.   No.  I don't think that's correct.  The
18 second discussion, Pages 60, whatever, refers to
19 feedback cancellation explicitly.
20   Q.   Does it discuss measuring or determining
21 the amplitude and phase of a feedback signal and
22 creating an equal but opposite signal when

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

52 (Pages 205 to 208)

205

1  canceling it?
2      A.  Yes, it does.
3      Q.  Where does it say that?
4      A.  Let me -- well, the discussion starts at
5  Page 115, 62 --
6      Q.  When you say 115 are you referring to a
7  paragraph?
8      A.  Paragraph Number 115.
9      Q.  Okay.
10     A.  He creates a cancellation feedback path.
11 He measures using a variety of techniques the delay
12 or phase response in that path, and then adjusts an
13 amplifier to match the amplitude response, and in
14 so doing creates an electronic feedback path.
15     Q.  Where do you see that?
16     A.  Well --
17     Q.  Where do you see those words that you
18 just said?
19     A.  Those weren't exactly the words.  I
20 wasn't quoting.  I was paraphrasing.
21     Q.  That's what I asked you.  Where is it in
22 this report that describes the same method that is

206

1  used in the '850 and '749 patent?
2      A.  It starts on 115, as I said --
3      Q.  And does that say anything about
4  measuring the amplitude and phase?
5      A.  Let me find that.
6          The discussion about the amplitude and
7  phase begins I think in Paragraph 116, about the
8  third or fourth line.  Why don't we start at the
9  beginning?
10         "The Weaver thesis describes on Pages 15
11 and 16 the requirement that the magnitude in phase
12 response of the cancellation feedback path match
13 that of the acoustic feedback path as closely as
14 possible for effective feedback cancellation of the
15 acoustic feedback component in the electrical
16 output of the microphone."
17     Q.  There you --
18     A.  I'm just getting started.
19     Q.  Okay.
20     A.  Next sentence, "Relying on the fact that
21 the phase response of the acoustic feedback path
22 can be derived from the measurement of the delay

207

1  around the open loop system, he developed a method
2  for measuring this delay using a phase lock loop
3  circuit in Chapter 4.  He opened the closed loop
4  system by introducing a pseudonoise to the input of
5  the amplifier, then measuring this pseudonoise
6  signal present in the electrical output of the
7  microphone.  He used no methods to auto correlate
8  and cross correlate between the input signal and
9  the noise signal at the output of the microphone.
10 A circuit was designed to process these
11 correlations to derive the delay of the open loop
12 system."  And that circuit is shown in Appendix F
13 of this thesis.
14         "The circuit also updated the delay
15 measurement from time to time and estimated the
16 magnitude response of the acoustic feedback path.
17 This method provides an estimate of the phase
18 response of the open loop acoustic feedback path
19 including the amplifier, the loud speaker, the
20 acoustic length from the speaker to the microphone,
21 and the microphone if one assumes that the path has
22 a linear response, that is the delay is the same at

208

1  all frequencies."
2      Q.  Are you finished?
3      A.  I could go on but I think that describes
4  what I intended to convey about Weaver's methods.
5      Q.  Now, when you read that description that
6  all came from the Weaver thesis, right?
7      A.  It is based on my interpretation of it.
8  Those are my words, not his.
9      Q.  So you're not contending that those
10 words are in his thesis?  That is your
11 interpretation?
12     A.  No, it is my description of it.
13     Q.  But it all comes from the Weaver thesis?
14     A.  That's correct.
15     Q.  That's a master's thesis?
16     A.  That's correct.
17     Q.  Do you know if that was ever published?
18     A.  I do not know.
19     Q.  Do you know what circuit that describes,
20 what AF circuit his master's thesis describes?
21     A.  That's the first one he worked on so I
22 gather it was AFC-1.

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

53 (Pages 209 to 212)

209

1    Q.   Do you know that AFC-1 was abandoned?
2         MR. LYTLE:  Objection.
3    A.   I know that AFC-1 gave way to AFC-2.  I
4    would not use the term abandon to describe that
5    process.
6    Q.   What happens to AFC-1?
7    A.   The same thing that always happens when
8    you are developing circuits.  You work on a
9    breadboard -- you make it work on a breadboard.
10   You put it on a smaller circuit, and then the
11   breadboard isn't used any more.
12   Q.   Do you know if AFC-1 was ever used to
13   cancel feedback for a human being?
14   A.   I'm not aware.
15   Q.   Okay.  Do you know that AFC-1 did not
16   work very well and had to be abandoned?
17        MR. LYTLE:  Objection.
18   A.   I don't agree with that
19   characterization, no.
20   Q.   If Dr. Egolf testified to that would you
21   believe him?
22   A.   Well, I guess the way I would interpret

210

1    that -- if he testified to that I would agree with
2    him, but I would like to see the whole testimony in
3    that regard.
4         My understanding, having read the
5    thesis -- and having read many theses, by the
6    way -- is you always point out the weaknesses of
7    what you have done and, you know, point to the
8    future for additional work that is required.  So
9    this, I view this as a first prototype that
10   demonstrated the feasibility of the concept of
11   using electrical feedback path, and I believe it
12   was successful in that regard.
13   Q.   If you are going to issue a report about
14   Dr. Egolf's reports to the VA including -- his
15   graduate student was Mr. Weaver, right?
16   A.   I believe so.
17   Q.   A graduate student?
18   A.   One of his students.
19   Q.   And Mr. Weaver was working on this
20   project with him; is that right?
21   A.   As I understand it, yes.
22   Q.   If you were going to write a report

211

1    about Mr. Egolf's project, wouldn't you want to
2    read his deposition and understand what he said
3    about it?
4    A.   I read what was presented to me and I
5    believe the Weaver thesis describes in very
6    complete and thorough detail the work on that first
7    circuit.
8    Q.   Why wouldn't you want to read his
9    deposition and understand what Dr. Egolf said about
10   his own work?
11   A.   I never said I did not want to read it.
12   Q.   You just didn't --
13   A.   It was never offered to me.
14        MR. STEINBERG:  Let's take a break.
15        THE VIDEO OPERATOR:  This marks the end
16   of Tape Number 2 in the deposition of Sigfrid Soli,
17   Ph.D.  We are going off the record.  The time is
18   now 1:55 p.m.
19        (Recess taken -- 1:55 p.m.)
20        (After recess -- 2:01 p.m.)
21        THE VIDEO OPERATOR:  Please stand by.
22        We are back on the record.  Here marks

212

1    the beginning of Tape Number 3 in the deposition of
2    Sigfrid Soli, Ph.D.  The time is now 2:02 p.m.
3         (Soli Deposition Exhibit Number 25 was
4    marked for identification.)
5    BY MR. STEINBERG:
6    Q.   Let me hand you Exhibit 25 which
7    purports to be the report that you were referring
8    to, and then I believe it takes out of there the
9    Pages 163 and 164 entitled Acoustic Feedback
10   Suppression In Hearing Aids, report by Larson and
11   Egolf.  Is that what you were referring to on
12   Page 51 of your report?
13   A.   Yes.  I didn't see the cover page, but
14   the two pages that have the report by Larson and
15   Egolf are the same.
16   Q.   Okay.  And what language are you
17   referring to in here that is identical to the
18   feedback cancellation system in the '850 and '749
19   patents?
20   A.   I don't believe I said it was identical.
21   I said I think it described enough information so
22   that someone skilled in the art at the time would

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

54 (Pages 213 to 216)

213

1   understand how to do this, so to speak.
2       Q.   Okay, and what information is that?
3       A.   Well, if you look on 164 on the left
4   column, the second full paragraph, it begins, "The
5   investigators have also designed and built two
6   different microprocessor-based adaptive feedback
7   systems."
8           So that tells me something there
9   already.  It is digital, it's adaptive, and it is
10  intended to deal with acoustic feedback.  And there
11  is earlier discussion about acoustic feedback in
12  the report as well.
13          And then it says, "In both systems,
14  low-level pseudorandom noise is injected into the
15  circuit just ahead of the amplifier.  That portion
16  that returns to the microphone via the feedback
17  path is monitored," and it goes on to describe how
18  that is done.  This is the measuring part that we
19  have talked about before.
20          And then let's jump down to the
21  paragraph that begins, "In the other system"
22  because the balance of the discussion in that

214

1   previous paragraph talks about the notch filter
2   method, which I don't think is what you are
3   concerned about in the moment.
4           So "in the other system called the
5   active feedback cancellation or AFC system, the
6   microprocessor uses computed values of GH to create
7   an estimator."
8           Now, GH is described up here as the,
9   what is called the open loop transfer function of
10  the feedback path.  That is a term that is used in
11  signal processing to summarize and present the
12  magnitude and phase characteristics of the feedback
13  path.
14      Q.   Where do you see it says that?
15      A.   I believe that's well-known.  It doesn't
16  say that in so many words there, but I think
17  someone who would read this and understand this
18  would know that.
19          Okay, so the -- it creates an estimator.
20  That's the filter that is put in the feedback path
21  so that the signals processed through that
22  estimator can be used to cancel, or react

215

1   destructively is the words they use here of the
2   signals returning via the vent outlet which is the
3   feedback input.
4           So that's my interpretation of this
5   report, and I think what it tells me is that they
6   have shown, they have described, they have created
7   a method using the electrical feedback path for
8   canceling acoustic feedback in a hearing aid, and
9   they have demonstrated its effectiveness and they
10  even report some results, 6 to 8 decibels of
11  additional gain.
12      Q.   So you are saying the seven lines in the
13  next-to-last paragraph to you describe the feedback
14  cancellation method in the '850 and '749 patents?
15          MR. LYTLE:  Objection.
16      Q.   Is that correct?
17      A.   I'm not saying just that.  But what I
18  would say is, and the reason I discuss the Weaver
19  work in my report is I see an evolution of this
20  work that culminates in this report.  So there is
21  another report given to the Acoustical Society of
22  America earlier this same year, '85, that gives

216

1   more detail.
2       Q.   Well, this is '84.  How could it
3   culminate with an '85 report?
4       A.   Are you sure about that, sir?
5       Q.   That's how you describe it.
6       A.   It says '84, but -- you are right, it
7   does say '84, but my understanding of the report --
8   maybe I am mixed up in my years.
9       Q.   Well, if it's '84 it couldn't culminate
10  in anything, could it?  It would be the beginning
11  of the project, not the end; is that correct?  Is
12  that correct?
13      A.   I'm not sure I would agree with that
14  characterization.  No.  I'm looking for the
15  copyright data on here.  It doesn't appear.
16      Q.   Well, you described it as the Larson and
17  Egolf VA Rehabilitation R&D Progress Report of
18  1984.  That's on the cover page.
19      A.   That's what is printed on the cover,
20  yes.
21      Q.   Do you have any reason to disagree with
22  that?

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

55 (Pages 217 to 220)

217

1    A.    I guess not.
2    Q.    So wouldn't that be at the beginning of
3    the project, not the end?
4    A.    Well, it is at a -- I don't know that
5    it's at the beginning of the project because I
6    think the, if I recall correctly, this work began
7    in May sometime of 1984?
8    Q.    It's at the early stages, would you
9    agree?
10    A.    I don't know how long the project went
11    so it's hard for me to answer that question.
12    Q.    And in that one paragraph, the second
13    paragraph from the end of Page 164 of Exhibit 25 it
14    doesn't say it measures the amplitude and phase and
15    creates an equal but opposite signal and cancels
16    it, does it?
17    A.    What it says, it computes the values of
18    GH which is the transfer function which gives you
19    the magnitude and phase.
20    Q.    Would you answer my question?  Does it
21    say what I just said?
22    A.    In those words?

218

1    Q.    Yes.
2    A.    No, it doesn't use those same words.
3    Q.    And do you know what react destructively
4    means?
5    A.    Yes, I do understand that.
6    Q.    What does it mean?
7    A.    React destructively to me would mean it
8    would cancel out or eliminate it by destroying it,
9    so to speak.
10    Q.    And do you know which of the AFC
11    circuits it is supplied to?
12    A.    I'm not certain.  It doesn't say in
13    here.
14    Q.    If it was 1984 wouldn't it be AFC-1 or 2
15    at the most?
16    A.    Possibly.  I suspect that it is 1 or 2.
17    Q.    You didn't go past 3 in any event, did
18    you?
19    A.    I have never seen anything about 3.
20    Q.    Now, in your report you describe this as
21    using the computed value of GH to automatically
22    place a notch filter in the forward path.  Right?

219

1        MR. LYTLE:  Objection.
2    A.    Excuse me, but that's -- that is the
3    first microprocessor-based system.  Remember, I
4    discussed in my report in two different places this
5    VA report.
6    Q.    Right.
7    A.    The first one has to do with the notch
8    filter and the second has to do with the adaptive
9    noise cancellation or feedback cancellation filter.
10    Q.    So on Page 51 it only deals with the
11    notch filter, right?
12    A.    Let me find that.
13    Q.    Sure.
14    A.    Yes, that's true.  A good way to keep
15    this separate, this is in Section B of my report
16    which is prior art directed to the suppression of
17    acoustic feedback, and then there is a Section C
18    which is directed to the cancellation of acoustic
19    feedback.
20    Q.    Let's go to the other section, the other
21    pages that you describe this particular one
22    paragraph.

220

1    A.    Okay.  That is on Page 68,
2    Paragraph 125.
3    Q.    You essentially say only those things
4    that are said in this one paragraph in Exhibit 25,
5    right?
6    A.    I'm sorry?
7    Q.    You essentially are repeating this
8    single paragraph of seven lines on Page 164 of
9    Exhibit 25.
10    A.    It is -- let me just see here.  There
11    are three or two paragraphs in that section
12    describing the VA progress report.  But in
13    introducing it, yes, I summarize what I just read
14    to you or what we just discussed a moment ago.
15    Q.    Well, the first paragraph only deals
16    with the progress report.  The other paragraphs
17    deal with the so-called Weaver work, right?
18    A.    Let's see.  Yes, you're right.
19    Q.    Okay.  We will get to that in a minute.
20    In fact, when you look at Page 51,
21    Paragraph 91, the only patent that you mention in
22    this report that a person of ordinary skill in the

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

56 (Pages 221 to 224)

221

1  field could use to anticipate a similar method
2  would be the Beex patent, right?
3      MR. LYTLE:  Objection.
4      A.   I would have to look at the table but I
5  believe the BEEX and the Graupe '667 are both
6  possible prior art.
7          Would you like me to do that now?
8      Q.   I was just asking you on Page 51, the
9  only patent that you mention understood by one of
10  ordinary skill in the art at the time by referring
11  to this R&D report of 1984 is the Beex patent,
12  right?
13     A.   I'm a little bit confused.  This section
14  has, is related to suppression of acoustic
15  feedback.  The first topic under there is the Beex
16  patent.  The second one is the 1984 report.  The
17  third one is the Graupe patent, and there may be
18  more.
19     Q.   So you're saying that Paragraph 91 has
20  no relationship to the R&D progress report of 1984?
21     A.   No, I'm not saying that.
22     Q.   Because it is in that section, right, if

222

1  I'm reading this correctly?
2      A.   Let me read it myself, please.
3      Q.   Okay.
4      A.   Okay.  I see the paragraph now.  Could
5  you paraphrase your question to me, please?
6      Q.   Is Paragraph 91 related to the Beex
7  patent intended to be related to the progress
8  report of 1984?
9      A.   Yes.
10     Q.   Okay.
11     A.   That is correct.
12     Q.   And you're saying that it would be
13  understood by one of ordinary skill in the art at
14  the time that this notch filter that you describe
15  above in the progress report would be implemented
16  in patents such as the Beex patent, right?
17     A.   Has been implemented in patents such as
18  the Beex patent, yes.
19     Q.   And the Beex patent is just another
20  notch filter, right?
21         MR. LYTLE:  Objection.
22     A.   Well, just a little more than that.  The

223

1  Beex patent describes the theoretical background
2  that allows you to determine the transfer function
3  of the feedback path and from that determine which
4  frequencies you would like to use for your notch
5  filter, and it describes a method of implementing
6  that filter using time -- tap delay line filter
7  structure.
8      Q.   You just testified a few minutes ago
9  that the Beex filter was a notch filter on Page 50
10  when we went through it.
11     A.   That's correct.
12     Q.   And it doesn't analyze phase and
13  amplitude?
14     A.   No, it does not.  The filter does not
15  but the Beex patent describes how to obtain the
16  information you need to make that filter and make
17  it function properly.
18     Q.   Does it deal with magnitude and phase at
19  all?
20     A.   Yes, it does.
21     Q.   Does it deal with both?
22     A.   Yes, it does.

224

1      Q.   Then why on Page 50 do you have a
2  sentence that reads, "The '192 patent emphasizes
3  that the notch filter should modify only the
4  magnitude response of the hearing aid and not its
5  phase response."
6      A.   Again, I think we are talking about two
7  different things.  One is the filter itself, which
8  is what I think you just referred to, and I would
9  agree that filter response should not modify the
10  phase response.  And the other is the measurement
11  or information that is required, both magnitude and
12  phase, about the feedback path that allows you to
13  decide what frequency to use for the notch, so it
14  is two different things.
15     Q.   And you just testified a few moments ago
16  that when you read your entire description of the
17  Beex patent it does not say that it measures the
18  amplitude and phase anywhere --
19         MR. LYTLE:  Objection.
20     Q.   -- is that correct?
21     A.   The summary that I describe of Beex does
22  not describe explicitly everything that is in the

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

57 (Pages 225 to 228)

225

1  patent.
2     Q.   But that summary doesn't say anything
3  about measuring amplitude or phase, does it?
4     A.   No, not in so many words.
5     Q.   Well, not in any words, right?
6     A.   Not in any words.
7     Q.   On Page 51 you then turn to the Graupe
8  patent, '667; is that correct?
9     A.   Yes, sir.
10    Q.   And then you describe it, you know, from
11 Page 52 through 54; is that correct?
12    A.   Correct.
13    Q.   And you again say, "I am informed that
14 patent '667 of Graupe qualifies as prior art to the
15 ETG patents." Who informed you of that?
16    A.   The Widex attorneys.
17    Q.   Now, in the description that you give
18 the Graupe patent on those two and a half pages, do
19 you describe the feedback cancellation method that
20 is inherent in the '850 or '749 patents at all?
21    A.   Not the cancellation method, no.
22    Q.   You describe another notch filter called

226

1  a deep notch, right?
2     A.   I don't remember those words, but that's
3  a good description.
4     Q.   Then on Page 55 you refer to the
5  Feintuch -- am I pronouncing that right?
6     A.   I think so.
7     Q.   F-e-i-n-t-u-c-h patent which is the '536
8  patent, right?
9     A.   Correct.
10    Q.   Now, you don't say here that I was
11 informed that the Feintuch patent was prior art,
12 right?
13    A.   That's true.
14    Q.   So are you using this as a prior art?
15    A.   Yes, in my claim table.
16    Q.   But you didn't write it in?
17    A.   I neglected to say that.
18    Q.   And who drew your attention to the
19 Feintuch patent?
20    A.   The Widex attorneys.
21    Q.   Now, you described the Feintuch patent
22 in one paragraph on Page 55, right?

227

1     A.   Correct.
2     Q.   So it doesn't have all the elements of
3  the claims in the ETG patents, correct?
4     A.   No, it doesn't, because it is relevant
5  only to the -- as a piece of prior art directed to
6  suppression of feedback, not cancellation of
7  feedback.
8     Q.   Okay. And you nowhere describe the
9  feedback cancellation method that you have
10 described in the ETG patents, right?
11    A.   Not in this section of the report, no.
12    Q.   You essentially conclude by saying the
13 Feintuch patent says that this can be used as the
14 Widrow method of canceling, right?
15    A.   That's correct.
16    Q.   But nowhere in your report do you list
17 the Widrow method as prior art to ETG's feedback
18 cancellation system, do you?
19    A.   No, I don't, because Widrow uses an
20 adaptive element as filter and I don't believe
21 that's embodied in the '850 patent, as I understand
22 it.

228

1     Q.   You then discuss the Hearing Journal of
2  1986 on Page 56, HearTech's electronic antifeedback
3  circuit?
4     A.   Yes, sir.
5     Q.   And you say, "It is my understanding
6  that the hearing aid including HearTech's
7  electronic antifeedback circuit described in the
8  Hearing Journal qualifies as prior art."
9          What did you get that understanding
10 from?
11    A.   I was informed of that from the Widex
12 attorneys.
13    Q.   Have you seen that document?
14    A.   Yes, I have.
15    Q.   It's just an advertisement, isn't it?
16    A.   It is.
17    Q.   It is not a technical description, is
18 it?
19    A.   No, it is not. It does have a block
20 diagram, which is more than some of the other
21 advertisements do.
22    Q.   But it is just an advertisement, right?

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

58 (Pages 229 to 232)

229

1    A.    It is an advertisement, yes.
2    Q.    And it doesn't have a description of the
3  feedback cancellation method in the '850 or '749
4  patents, does it?
5    A.    What it does, it shows --
6    Q.    Can you answer my question first and
7  then you can explain?
8    A.    No, it does not.
9    Q.    Okay.
10    A.    It shows the use of a filter or network
11  in the feedback path for the cancellation of
12  acoustic feedback, and it talks about the -- we
13  were talking about destructive interaction. Now
14  this time they talk about the degenerative nature
15  of the signal that is fed back, so ...
16    Q.    Well, according to you, the article
17  says, the advertisement says the degenerative
18  nature in which the sample signal is fed back to
19  the basic amplifier serves to stabilize hearing
20  performance; is that right?
21    A.    That's correct.
22    Q.    Is there any definition for what that

230

1  means?
2    A.    That is the words that were used. Those
3  are the words that were used.
4    Q.    And you don't know what that means, do
5  you?
6    A.    Well, I would interpret that to mean
7  that if the feedback serves to stabilize the
8  hearing performance then it is -- it is canceling
9  or adjusting for the occurrence of feedback with
10  that electrical feedback loop in the circuit.
11    Q.    But certainly your interpretation is
12  nowhere at all in that advertisement, is it?
13    A.    I didn't see it.
14    Q.    Okay.
15        MR. STEINBERG: Let's mark this as the
16  next exhibit.
17        (Soli Deposition Exhibit Number 26 was
18  marked for identification.)
19  BY MR. STEINBERG:
20    Q.    I'm handing you Exhibit 26 which
21  purports to be the HearTech advertisement we have
22  been talking about?

231

1    A.    Correct.
2    Q.    Is that the advertisement we just
3  discussed?
4    A.    That's the one I saw.
5    Q.    And that does not have a description of
6  the '749 or '850 patents' cancellation method, does
7  it?
8    A.    It just describes what they call an
9  antifeedback circuit and shows a block diagram of
10  it.
11    Q.    But it doesn't describe the mechanism in
12  the '850 or '749 patents, does it?
13    A.    No, it does not.
14    Q.    Now, let's go to Chabries --
15    A.    Chabries.
16    Q.    Chabries -- sorry about that -- the '426
17  patent, that's on Page 27 of your report.
18    A.    Um-hmm.
19    Q.    You again say, "I am informed that the
20  Chabries '426 patent qualifies as prior art to the
21  ETG patents," right?
22    A.    That's correct.

232

1    Q.    Who informed you of that?
2    A.    The Widex attorneys.
3    Q.    And then you devote about two and a half
4  pages to describe that method, right?
5    A.    It appears that way, yes.
6    Q.    And nowhere in that two and a half pages
7  do you describe the feedback cancellation method of
8  the ETG patents, do you?
9        MR. LYTLE: Objection.
10    A.    I describe the feedback cancellation
11  used, disclosed by Chabries instead.
12    Q.    Right. That's my point. It doesn't
13  identify the feedback cancellation method used in
14  the '850 or '749 patents, does it?
15    A.    No, it does not exactly.
16    Q.    In fact, it is discussed as a reduction
17  system, not a cancellation system, right?
18    A.    I'm not sure that that is -- no. This
19  is under the cancellation section. Because if you
20  look at Figure 2 on Page 58, he has an adaptive
21  filter that interjects a cancellation signal at 80
22  into the circuit.

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

59 (Pages 233 to 236)

233

1    Q.   In Paragraph 106 you say, "In the
2   Chabries filter the weights of the weighted means
3   are internally readjusted to effect substantial
4   reduction of the acoustic feedback, minimizes the
5   feedback suppressed speech signal," right?
6    A.   That's what it says, yes.
7    Q.   That's not cancellation, is it?
8    A.   No.  I would -- cancellation reduces
9   feedback, and I intended it to indicate that the
10  output of this adaptive filter creates a
11  cancellation signal, and in so doing it, as he
12  said, this feedback squeal is filtered at its very
13  inception so it never really develops.
14   Q.   But this doesn't say cancellation.  In
15  fact, it says, "Future applications for binaural
16  hearing with linear phase filtering and for
17  feedback cancellation will be discussed," right?
18   A.   That's a separate reference.
19   Q.   That's a separate reference?
20   A.   That's an abstract.
21   Q.   Does that refer to Chabries as well?
22   A.   It's an abstract that was prepared by

234

1   Chabries and some of his colleagues reporting on
2   this work.
3    Q.   But it is the same work that we are
4   talking about, right?
5    A.   I believe so.  I'm not one hundred
6   percent certain but I believe so.
7    Q.   But when he is talking about his own
8   work he says that feedback cancellation will be
9   discussed, meaning that it hasn't yet, correct?
10   A.   When you submit an abstract for
11  consideration at a professional meeting like this,
12  what is referred to as the ASHA presentation, the
13  verb tense you use in the abstract is usually
14  future tense because you describe what you will say
15  when you go to the meeting.
16   Q.   You say that you understand Dr. Chabries
17  created an audio demo.  How do you understand that?
18   A.   I was told that.
19   Q.   Have you ever heard or seen that demo or
20  that tape?
21   A.   No, I have not.
22   Q.   Do you know if it exists?

235

1    A.   At present?
2    Q.   Yes.
3    A.   I don't know.
4    Q.   On Page 59 you talk about the South
5   article, Adaptive Filter to Improve Loudspeaker
6   Telephone Electronic -- excuse me, from the volume
7   Electronic Letters; is that correct?
8    A.   That's correct.
9    Q.   Okay.  And again you say, "I am informed
10  that the South article qualifies as prior art."
11  Right?
12   A.   That's correct.
13   Q.   Who informed you?
14   A.   The Widex attorneys.
15   Q.   That article deals with a loudspeaker
16  telephone, right?
17   A.   That's correct.
18   Q.   It doesn't deal with a hearing aid?
19   A.   That's correct.
20   Q.   Are you aware that Dr. Egolf analyzed PA
21  systems and loudspeakers and other kinds of
22  speaking mechanisms that may create feedback and

236

1   concluded that one, those methods hadn't been tried
2   on hearing aids, and two, they wouldn't work?
3    A.   If you are referring to his 1982 paper,
4   I am aware of that paper, although I didn't draw
5   the same conclusion from it.
6    Q.   So if Dr. Egolf testified that his work
7   through the years, starting with his 1982 article
8   and going on through his VA reports, concluded that
9   the feedback suppression systems on external
10  objects, like PAs and loudspeakers and hearing aids
11  on glasses, would not apply to in the ear or behind
12  the ear hearing aids.  Would you agree with that?
13   A.   No.
14       Could I see a copy of the '82 Vanderbilt
15  report because I didn't draw that conclusion from
16  the report.
17   Q.   I didn't ask you only about that report,
18  I asked you about his body of work.
19   A.   Well, his body of work included the
20  supervision of the work done by Leland Best, and
21  when I read his thesis he referred to three
22  different pieces of research on telephony and

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

60 (Pages 237 to 240)

237

1  loudspeaker systems. So I guess even though if it
2  is true that the work on PA systems never found its
3  way directly into application, it is still fruitful
4  to look to that research as you are developing
5  algorithms for hearing aids. That is my
6  understanding of what Egolf said in that 1982
7  report, and it is also my understanding of what
8  Best did under Egolf's supervision in his thesis.
9      Q. Are you aware of any work dealing with
10  an external amplification system being successfully
11  used in a hearing aid ever?
12     A. Yes. This South article describes a
13  successful external canceller that has the same
14  structure as a feedback canceller does in a hearing
15  aid.
16     Q. Listen to my question. That talks about
17  a loudspeaker telephone, doesn't it?
18     A. Yes, it does.
19     Q. It doesn't talk about a hearing aid.
20     A. Maybe you better repeat your question.
21  I misunderstood.
22     Q. Are you aware of any feedback system

238

1  used on some external amplification system, a
2  loudspeaker telephone, PA system, anything like
3  that, being successfully used on an in the ear or
4  behind the ear hearing aid ever?
5      A. It depends on what you mean by system.
6  If you mean the exact circuit board or elements
7  that somebody like South used, no. But if you take
8  that circuit and shrink it down and put it onto a
9  smaller chip like we talked about before, that LMS
10  adaptive structure that South disclosed is used at
11  least in the hearing aids that embody the feedback
12  cancellation algorithm that we have developed and
13  licensed.
14        So the short answer to your question is
15  yes.
16     Q. Was the South method used in any hearing
17  aid that you are aware of?
18     A. The South method uses LMS adaptive
19  feedback cancellation. The -- that's the method
20  that Best used. That's the method that is used in
21  the feedback cancellation patents that have my name
22  on them. And it may be used in others that I'm not

239

1  aware of.
2      Q. So your testimony is that you know of a
3  hearing aid product that uses the South method; is
4  that correct?
5      A. Well --
6          MR. LYTLE: Objection.
7      A. I would characterize that method as an
8  LMS adaptive filter, and that's how South
9  characterizes it, too. I would go on to say that
10  LMS adaptive filters for feedback cancellation I
11  know are used in hearing aids.
12     Q. Well, LMS is a pretty broad description,
13  isn't it?
14     A. No. I don't believe so. It is a
15  well-defined structure. The equations for it can
16  be written very easily and there is only a few of
17  them.
18     Q. Now, are you aware of any hearing aid
19  manufacturer that claims they are using the method
20  described by South in this article?
21     A. No. I'm not aware of manufacturers'
22  claims. Such manufacturers' claims I should say.

240

1      Q. And when you are talking about a method
2  that deals with a loudspeaker telephone you are not
3  taking into effect the pina and the head and the
4  shadowing that you talked about before, are you?
5          MR. LYTLE: Objection.
6      A. No, you don't need to because those are
7  relevant to the discussion before about multiple
8  microphones but not directly relevant to the
9  acoustic feedback problem.
10     Q. They are not relevant to the acoustic
11  feedback?
12     A. Shadow is not, no.
13     Q. If Dr. Egolf who studied this for years
14  said that it is directly relevant to acoustic
15  feedback, would you agree with him?
16     A. I would like to see what he says about
17  that. I might not.
18     Q. Okay.
19          THE WITNESS: Here is Doug Egolf's
20  deposition. Is that what you need?
21          MR. STEINBERG: No.
22          THE WITNESS: Sorry.

241

1    MR. LYTLE: Do you need anything to
2 drink?
3    THE WITNESS: I'm okay. Thank you.
4    (Soli Deposition Exhibit Number 27 was
5 marked for identification.)
6 BY MR. STEINBERG:
7    Q.   Handing you Exhibit 27, which is an
8 article that is entitled The Hearing Aid Feedback
9 Path: Mathematical Simulations and Experimental
10 Verification by Dr. Egolf, Kim Weaver and others,
11 have you seen that before?
12    A.   Years ago.
13    Q.   Okay. If you look at the
14 next-to-the-last page, which is Page 1586, I
15 believe, or DEM517939?
16    A.   I see it.
17    Q.   It has a conclusion section. Do you see
18 that?
19    A.   I do.
20    Q.   And it says, "Before concluding this
21 paper, the authors wish to caution the reader about
22 two important issues. First, the mathematical

242

1 models presented herein were developed to
2 application to eyeglass type hearing aids where the
3 microphone is normally located in the arm of the
4 eyeglass at some distance from the pina. In this
5 case the effect of neglecting the pina is minimal.
6 The authors made no attempt to apply these models
7 to behind the ear or in the ear hearing aids where
8 the microphone is usually located behind, above or
9 actually within the pina. It is expected that in
10 such cases either the -- either of the present
11 models would yield very poor results due to the
12 dominant near field scattering effects of the
13 irregular folds and convolutions of the pina."
14    Do you see that?
15    A.   I do.
16    Q.   Do you agree with that?
17    A.   It is hard to say because I have to
18 study the present model, but I understand the
19 general idea that he is stating.
20    Q.   Similar to what you said before, right?
21    A.   Well, when I was talking before, I
22 wasn't talking about hearing aids with microphones

243

1 on eyeglasses. I was talking about hearing aids in
2 the ear, and headshadow effects are not -- I stand
3 by what I said. They are not important for
4 feedback in those situations.
5    Q.   Let's go back to this. Do you agree
6 with what Dr. Egolf's and Kim Weaver's conclusion
7 is here?
8    A.   This first conclusion?
9    Q.   Yes.
10    A.   It makes sense to me.
11    Q.   These are the same two fellows you are
12 relying on some of their articles, right?
13    A.   Yes, right.
14    Q.   So he is saying if it is not in the ear
15 and it is not behind the ear but it is even as
16 close as an eyeglass, then it would yield very poor
17 results, right?
18    A.   What is "it" in this case?
19    Q.   Well, the eyeglass hearing aid that he
20 describes.
21    A.   No. No. I think what he is describing
22 here is a simulation of the blocks in a model

244

1 comprising the path that sound travels from the
2 entrance of the hearing aid microphone to the
3 output of the hearing aid microphone, and also the
4 feedback path. It is a model.
5    If you look at Figure 1 on Page 1579 I
6 think he shows you a picture of that, and my
7 understanding is what he has done is he has
8 measured each one of these little blocks, the
9 transfer functions of each one of those little
10 blocks, and put them together in a model. That was
11 his first approach to feedback, in understanding
12 feedback was to model it.
13    What I understand him to say at the end
14 of this article is the model, when you have the
15 microphone on the eyeglass, is not the same as the
16 model when you have a microphone in the ear canal
17 or at the position of the BTE microphone. But that
18 doesn't mean the hearing aid won't work.
19    Q.   So you contend that his conclusion is
20 not that the eyeglass hearing aid feedback
21 suppression method won't work behind the ear or in
22 the ear; is that what your testimony is?

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

62 (Pages 245 to 248)

245

1          MR. LYTLE: Objection.
2      Q.   That he is not saying that?
3      **A.   I don't think he is suppressing feedback**
4  **at all here. I think he is just measuring the**
5  **blocks in a model that describe the feedback path.**
6  **Maybe I am mis -- I haven't read this article in**
7  **years.**
8      Q.   In the introduction, the article, the
9  whole point of the article is how to deal with
10 acoustic feedback. He starts with the PA systems
11 and saying they have not been applied to hearing
12 aids and they probably wouldn't work, right? Isn't
13 that his whole point?
14         MR. LYTLE: Objection.
15     **A.   I don't know what his whole point is**
16 **without reading the whole article, but my**
17 **understanding as I look at the figures and just**
18 **page through here is he is modeling the feedback**
19 **path.**
20     Q.   So if Dr. Egolf testified under oath
21 that he was discussing a feedback suppression
22 method in eyeglass hearing aids and that he

246

1  concluded, as did Mr. Weaver, that that kind of
2  system would not work in an in the ear, behind the
3  ear hearing aid, would you believe him?
4          MR. LYTLE: Objection.
5      **A.   Not necessarily. I'm not sure I would**
6  **believe that.**
7      Q.   Okay, but you have no engineering
8  background --
9      **A.   I --**
10     Q.   -- right?
11     **A.   I have been working on feedback**
12 **cancellation for many, many years, and I know that**
13 **with a robust enough filter structure if you put**
14 **the microphone here, here or here it would still**
15 **work.**
16     Q.   But you are relying on other engineers
17 who are on your team to come to those conclusions,
18 not yourself, right? You're not an engineer,
19 right?
20     **A.   Those are my conclusions. I can**
21 **understand the measurements and the work that is**
22 **done.**

247

1      Q.   Okay.
2          Have you ever read Dr. Egolf's
3  deposition testimony about the eyeglass hearing
4  aids?
5      **A.   No, I haven't.**
6      Q.   And why the feedback suppression method
7  on those eyeglass hearing aids would not work on an
8  in the ear, behind the ear hearing aid?
9          MR. LYTLE: Objection.
10     **A.   No, I have not read his deposition.**
11     Q.   Do you know what the VA project
12 entailed?
13     **A.   I'm not sure I understand what you mean.**
14     Q.   Do you know if the VA project entailed
15 eyeglass hearing aids?
16     **A.   No, I don't.**
17     Q.   So you never looked at the VA progress
18 reports to determine that that project dealt with
19 eyeglass hearing aids?
20         MR. LYTLE: Objection.
21     Q.   Is that correct?
22         MR. LYTLE: Same objection.

248

1      **A.   I never looked at the report. However,**
2  **I have seen the Weaver and Egolf Acoustical Society**
3  **presentation and their slides which shows a picture**
4  **of an eyeglass hearing aid.**
5      Q.   So do you conclude from that that the
6  Egolf Weaver project dealt with eyeglass hearing
7  aids and not in the ear and behind the ear hearing
8  aids?
9      **A.   No, I can't draw that conclusion.**
10     Q.   Have you ever seen their work applied to
11 in the ear or behind the ear hearing aids?
12     **A.   No, I have not.**
13     Q.   You next discuss on Page 61 the Weaver
14 thesis. I think this is his master's thesis,
15 right?
16     **A.   Yes.**
17     Q.   An Adaptive Open-Loop Estimator for the
18 Reduction of Acoustic Feedback. Master's thesis of
19 Wyoming 1984, right?
20     **A.   Correct.**
21     Q.   And you say again, "I am informed that
22 this Weaver master's thesis in 1984 qualifies as

249

1   prior art to the ETG patents," right?
2       **A.   That's correct.**
3       Q.   And who informed you of that?
4       **A.   The Widex attorneys did.**
5       Q.   And do you know of your own personal
6   knowledge whether this master's thesis was
7   published and available to the public?
8       **A.   I do not know.**
9           **(Soli Deposition Exhibit Number 28 was**
10  **marked for identification.)**
11  BY MR. STEINBERG:
12      Q.   I'm going to hand you a composite
13  exhibit, Exhibit 28, which are the affidavits of
14  Martha Hanscom, Janet Woods and Margret
15  M-a-r-g-r-e-t Paul. Have you seen these before?
16      **A.   No, I have not.**
17      Q.   These are affidavits of the librarians
18  at the University of Wyoming library?
19          MR. LYTLE:  Objection.
20      **A.   I'm sorry?**
21      Q.   They confirmed that this master's thesis
22  was not publicly available prior to the filing of

250

1   this patent. Would you agree with them? Would you
2   believe them?
3           MR. LYTLE:  Objection.
4       **A.   I see it was put into the database in**
5   **March of '87.**
6       Q.   Do you have any information to
7   contradict these librarians?
8       **A.   No, I don't.**
9           **(Soli Deposition Exhibit Number 29 was**
10  **marked for identification.)**
11  BY MR. STEINBERG:
12      Q.   I am going to hand you what has been
13  marked Exhibit, I believe it is 29, right?
14      **A.   Yes.**
15      Q.   Okay. Exhibit 29 is a catalog printout
16  of the Kim Weaver thesis that we have just
17  discussed. Do you see that, under 502 at the
18  bottom it says Master's Thesis, University of
19  Wyoming 1984?
20      **A.   Where does it say that? I'm sorry.**
21      Q.   There is some numbers at the bottom.
22      **A.   Oh, I see it, yes.**

251

1       Q.   And at 100 it describes the author, Kim
2   Weaver?
3       **A.   I see that.**
4       Q.   Do you know how to read a catalog
5   printout as to when a publication was cataloged in
6   the library available for public use?
7       **A.   No, I don't.**
8       Q.   Okay. If you look at Line 008?
9       **A.   I see that.**
10      Q.   Those -- do you understand that to state
11  that this was first cataloged in March of 1987?
12      **A.   I can't say. I am not familiar with**
13  **these codes.**
14      Q.   Has anyone provided you with Dr. Egolf's
15  testimony as to whether and when this master's
16  thesis was made available to the public?
17      **A.   No.**
18      Q.   If he testified it wasn't available to
19  the public prior to the date of the filing of the
20  patent, would you believe him?
21      **A.   Yes, I would.**
22      Q.   Now, the master's thesis that you were

252

1   looking at, was that dealing with a sound system or
2   a public address system?
3       **A.   My understanding --**
4           MR. LYTLE:  Objection.
5       **A.   Excuse me.**
6       Q.   You can answer.
7           MR. LYTLE:  Which thesis are you talking
8   about?
9           MR. STEINBERG:  There is only one we are
10  talking about, that's Mr. Weaver's.
11      **A.   Assuming we are talking about the Weaver**
12  **thesis, my understanding is that the first**
13  **prototype he built was comprised of a microphone,**
14  **an amplifier, and a small loudspeaker that were on**
15  **a breadboard of some kind.**
16      Q.   Not a hearing aid?
17      **A.   No.**
18      Q.   When you say no, you mean correct --
19      **A.   No, it was not a hearing aid at the**
20  **beginning.**
21      Q.   Okay.
22          Then on Page 64 you say with respect to

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

64 (Pages 253 to 256)

253

1  automatic feedback cancellation circuit AFC-1
2  described in the Weaver thesis, do you see that?
3     **A.   I see that.**
4     Q.   And you say, "I have been informed that
5  the AFC-1 circuit as described in the Weaver thesis
6  is prior art to the '850 patent," right?
7     **A.   I see that.**
8     Q.   Who informed you of that?
9     **A.   The Widex attorneys did.**
10    Q.   And then you go on to say that Weaver
11  developed the AFC-2 and AFC-3, and you understand
12  that those are also prior art.
13    **A.   That's correct.**
14    Q.   And how do you understand that? Did
15  counsel tell you that also?
16    **A.   Yes, they did.**
17    Q.   Okay.
18       You also state that you reviewed Widex's
19  second supplemental response. Are you relying on
20  that in some way in your opinion?
21    **A.   No. I don't believe so.**
22       MR. LYTLE: Objection. Which response

254

1  are you talking about?
2       MR. STEINBERG: Second supplemental
3  response.
4     **A.   Do you have a copy of that?**
5       MR. LYTLE: Which page are you on?
6       THE WITNESS: 64, down at the bottom.
7       MR. LYTLE: Interrogatory responses?
8       MR. STEINBERG: Yes.
9       MR. LYTLE: Okay.
10  BY MR. STEINBERG:
11    Q.   Would you like to see it?
12    **A.   Yes.**
13    **Q.**
14       MR. STEINBERG: Let's mark it. This one
15  seems thicker. I don't know why.
16       THE WITNESS: I will take the thin one.
17       MR. STEINBERG: You want the thin one?
18  I don't know why. Maybe they are double paged or
19  something. I don't know. Let's see, are these the
20  same thing? Oh, they are all supplemental
21  responses. I see.
22       Maybe we can just mark this as a

255

1  composite exhibit for simplicity's sake. Can you
2  throw me one of those clips, doctor?
3       Thank you.
4       (Soli Deposition Exhibit Number 30 was
5  marked for identification.)
6  BY MR. STEINBERG:
7     Q.   Let me hand you Exhibit 30, which is a
8  composite exhibit of supplemental responses by
9  Widex, and since you mention in your report I just
10  want to know if you are relying on them in any
11  fashion for anything in your report.
12    **A.   No, I'm not.**
13    Q.   Okay. That's all I need to know.
14    **A.   Okay.**
15       MR. LYTLE: Are you finished with your
16  answer?
17    **A.   No, I'm not relying on them.**
18    Q.   Okay.
19    **A.   Do you want this back or should I --**
20    Q.   You can just keep it in the pile.
21       Now, in your report under -- you make no
22  mention of any AFC version past 1, 2 or 3.

256

1     **A.   That's right.**
2     Q.   You make no mention of, for instance,
3  AFC-6 as prior art, right?
4     **A.   That's correct.**
5     Q.   Have you reviewed Dr. Egolf's article or
6  testimony concerning -- or Dr. Weaver's -- excuse
7  me, Mr. Weaver's testimony concerning the AFC-1, 2
8  or 3?
9       MR. LYTLE: Objection to form.
10    **A.   My understanding is the Weaver thesis**
11  **was designated AFC-1, and the implementation of**
12  **that that was made to use with a hearing aid, which**
13  **I assume is the eyeglass hearing aid that was**
14  **demonstrated to the VA and was used in his**
15  **Acoustical Society presentation, that was AFC-2. I**
16  **think I saw that in a section of Weaver's**
17  **deposition.**
18    Q.   Were you aware that Mr. Weaver testified
19  that the AFC-1 circuit was abandoned?
20       MR. LYTLE: Objection.
21    **A.   I saw, I read that someplace, yes.**
22    Q.   And were you aware that they merely

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

65 (Pages 257 to 260)

257

1  recycled these circuits on a breadboard and didn't
2  save them?
3    A. I read that as well, yes.
4    Q. Okay, and were you aware that the AFC-1
5  circuit was never developed into any commercial
6  embodiment?
7    A. Right. The AFC-1 in my understanding
8  was a prototype. That's usually the fate of a
9  prototype.
10   Q. It was succeeded by the AFC-2 and then
11 on to the 3 and so forth?
12   A. I suspect so. AFC-2 is the only one I
13 have further knowledge of.
14   Q. Have you ever seen the AFC-1 or 2?
15   A. No, I have not.
16   Q. Other than the description in the Egolf
17 Weaver work, have you ever read anything about the
18 AFC-1 or 2?
19   A. No, I have not.
20   Q. On Page 65 you next refer to an abstract
21 from the 109th meeting of the Acoustical Society.
22 That's Weaver's abstract, right?

258

1    A. Weaver and Egolf I think were both
2  authors on it.
3    Q. And again you say, "I am informed that
4  the Weaver abstract is prior art with respect to
5  the ETG patents," correct?
6    A. That's correct.
7    Q. And who informed you of that?
8    A. The same counsel.
9      (Soli Deposition Exhibit Number 31 was
10 marked for identification.)
11 BY MR. STEINBERG:
12   Q. I'm going to hand you Exhibit 31 which
13 purports to be the Journal of the Acoustical
14 Society of America. On 109th meeting program table
15 of contents, and then there is some pages
16 thereafter that describe some I guess you would
17 call them abstracts, right?
18   A. Yes.
19   Q. Okay. And which abstract in this group
20 are you claiming is the abstract you are relying on
21 as prior art?
22   A. I think it is designated as VV5 down at

259

1  the bottom on the lower right.
2    Q. Okay. Does it say it measures magnitude
3  and phase but creates an equal but opposite signal?
4    A. It doesn't use those words, but I
5  understand it to mean that.
6    Q. Okay, and it is only one paragraph,
7  right?
8    A. That's correct.
9    Q. Were you at this presentation?
10   A. I was at the meeting. In fact, I had
11 two abstracts of my own somewhere in there. They
12 are not included here, but I don't recall attending
13 it. I wish I had.
14   Q. Okay. So you didn't attend this?
15   A. No. I was working in another area at
16 that time.
17   Q. And you agree that the format for these
18 meetings were 15-minute presentations?
19   A. Usually. It varies. Sometimes it is
20 more. Sometimes it is less. These were, it looks
21 like they were 15 apiece.
22   Q. Now, you say the abstract "describes a

260

1  method for estimating the in situ magnitude and
2  phase response of the acoustic feedback path in a
3  prototype hearing aid worn on a human subject."
4    Where does it say that in this abstract?
5    A. Well, he talks about the system
6  estimator which closely matches the open loop
7  transfer function of an in situ hearing aid, and he
8  describes how that estimator is produced by
9  correlating the estimator signal with the hearing
10 aid signal, which as I think I said earlier is a
11 well-known method for determining the transfer
12 function which can be expressed as the magnitude
13 and phase of the feedback path.
14   Q. But the words you have used to describe
15 this abstract, and I quote, "The Weaver abstract
16 describes a method for estimating the in situ
17 magnitude and phase response of acoustic feedback
18 path in a prototype hearing aid worn on a human
19 subject," those don't appear in the abstract at
20 all, do they?
21   A. Well, the exact words do not but the
22 meaning that is expressed by the abstract I think

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

66 (Pages 261 to 264)

261

1 is expressed by my comments as well.
2     Q.   Well, the words magnitude and phase
3 don't appear at all, do they?
4     A.   As I've said before, someone normally
5 skilled in the art who realizes that this estimator
6 is a transfer function, that magnitude and phase is
7 specified by that transfer function.
8     Q.   But the words magnitude and phase as you
9 put in your report don't appear in that abstract at
10 all, do they?
11     A.   I don't see them there.
12     Q.   Does the word human subject appear?
13     A.   In situ hearing aid means a hearing aid
14 worn on a human subject.  That's what it means.
15     Q.   So in situ couldn't mean anything on a
16 mannequin?
17     A.   In situ means on a human, in my
18 understanding of those words.
19     Q.   Where did you get the verbiage to
20 describe the abstract?
21     A.   I wrote it.
22     Q.   Does it describe any type of filter?

263

1 130.
2         "Question:  Could someone who is
3 familiar with hearing aids from this description
4 alone build this device?
5         "Answer:  I have no idea."
6     A.   Well, I don't -- it's in -- it's a vague
7 answer to me.  I don't understand what it means.
8 It might mean yes.  It might mean no.
9     Q.   Are you saying you could build this
10 device from this description?
11     A.   I think I could with my group in my
12 laboratory at that time, yes.
13     Q.   Now, you say on August 12th, 1985, on
14 Page 65 that Mr. Weaver presented his work on the
15 canceling acoustic feedback at a meeting of the
16 Acoustical Society in Austin.
17     A.   I think that's April 12th.
18     Q.   April 12th.  I'm sorry if I didn't say
19 that.  Is that correct?
20     A.   Yes.  That's my understanding.
21     Q.   Okay.  How did you get that
22 understanding?

262

1     A.   I'm sorry?
2     Q.   Does the abstract describe any type of
3 filter?
4     A.   Well, again I think someone normally
5 skilled at that time would understand that the
6 estimator as it was described in how it would be
7 derived comprises a filter.
8     Q.   Does it describe a filter on its face?
9     A.   It doesn't use the word filter.
10     Q.   Okay.
11         Now, are you saying that someone who was
12 knowledgeable in this area could use this brief
13 description to build this device?
14     A.   I think they could build a prototype
15 system without too much difficulty based on this
16 information.
17     Q.   But you agree that Dr. Egolf was one of
18 the authors?
19     A.   I believe so, yes.  He was the second a
20 author.
21     Q.   Did anyone ever tell you that he was
22 asked this question and gave this answer at Page

264

1     A.   Well, I saw his name in the program.  I
2 received a copy of the overhead materials that he
3 used to make the presentation, and I saw someplace
4 or somebody reported to me from his deposition that
5 he made that presentation.
6     Q.   You said you saw the overhead materials?
7     A.   Yes.
8     Q.   Where are they?
9     A.   I don't have them with me, but I used
10 two of them in my report here.
11     Q.   Did you?
12     A.   Yes, sir.
13     Q.   Where are they?
14     A.   They are on Page 67 and Page 68.
15     Q.   Those little graphs?
16     A.   Yes.
17     Q.   They refer to an eyeglass hearing aid,
18 correct?
19     A.   It appears that way, yes.
20     Q.   When you say appears that way, the
21 picture on Page 67 actually shows that, doesn't it?
22     A.   Yes, it does.  It shows -- well, it is

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

67 (Pages 265 to 268)

265

1    hard to say, to be honest with you. It looks like
2    a hearing aid in the ear but it may not function as
3    a hearing aid. It may be just set up so he can
4    take these measurements. I can't tell from looking
5    at the picture.
6        Q.   Well, it doesn't appear to be a hearing
7    aid in the ear. It appears to be some sort of
8    hearing device on a stem with a tube into the ear,
9    right?
10       A.   Yes.
11       Q.   So that would be an eyeglass hearing
12   aid, right?
13       A.   It looks like it, yes.
14       Q.   Okay.
15           Now, these abstracts and presentations
16   dealt with the AFC-1 or 2?
17       A.   My understanding is that AFC-1 was built
18   on the breadboard on the bench with a loudspeaker
19   and the microphone. AFC-2 used the same circuit
20   but it was built smaller so that it could be at
21   least packaged or carried around more easily and be
22   connected to a hearing aid. So this appears to be

266

1    representative of AFC-2 as I understand it.
2        Q.   Okay. You next discuss on Page 68 the
3    Veterans Administration Rehabilitation R&D Progress
4    Report on Page 64. Is that same one we already
5    discussed?
6        A.   Yes, it is. I think we already talked
7    about this.
8        Q.   And that also applies to eyeglass
9    hearing aids, right?
10       A.   I suspect so, but I don't remember
11   whether those words were used in there.
12       Q.   Take a look.
13       A.   I don't see them say that, but based on
14   everything else we have been looking at from about
15   that same time I suspect it is exactly what we are
16   looking at in this picture on Page 67 is the device
17   that they were using. Having built them myself,
18   you don't want to build any more than you have to
19   so there might just be one of them.
20       Q.   Now, have you had access to Dr. Egolf's
21   testimony about the AFC-1 and AFC-2 whether they
22   were adequate to address feedback cancellation?

267

1        A.   I haven't seen his testimony but I have
2    seen the report from the Acoustical Society and the
3    summary of the VA progress report.
4        Q.   Were you aware that Dr. Egolf testified
5    that the methodology in the 1 and 2 were inadequate
6    and that's why they had to move on to other series
7    of the AFC circuits?
8            MR. LYTLE:   Objection.
9        Q.   You can answer.
10       A.   I'm not aware that they were inadequate,
11   but I do notice that I believe that Mr. Weaver
12   reported 14.7 DB of additional gain in his AFC-2 at
13   the Acoustic Society meeting which I think is an
14   excellent result.
15       Q.   Were you aware that Dr. Egolf said that
16   the AFC-2 proved to be very sensitive to even
17   slight changes in the environment immediately
18   surrounding it?
19       A.   No, I wasn't aware of that.
20       Q.   Were you aware that he testified that
21   there were significant problems with the AFC-2
22   circuit?

268

1        A.   No, I wasn't aware of that.
2        Q.   Okay. Were you aware that he testified
3    that he would have never moved on from the AFC-2 if
4    it was adequate?
5            MR. LYTLE:   Objection.
6        A.   I haven't seen that testimony either.
7        Q.   Now, with respect to the AFC circuits,
8    those weren't even digital processing, were they?
9        A.   No, that's not -- I don't agree with
10   that.
11       Q.   You don't agree with that?
12       A.   No. Both AFC-1 and AFC-2 used an Intel
13   2920 which is a digital controller to function as a
14   programmable delay line filter that implements the
15   delay element in the feedback path.
16       Q.   Were you aware that Dr. Egolf was asked
17   these questions about the AFC, all of the AFC
18   systems from 1 through 6, and he said, "a more
19   adaptable approach would be to produce the same
20   system with the digital computer"?
21       A.   I wasn't aware of that. I would agree
22   with that, however.

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

68 (Pages 269 to 272)

269

1     Q.   So the question was, "So this wasn't
2   produced with a digital computer, correct?
3          "Answer:  It was not produced with a
4   digital computer, no.
5          "Question:  So your system did not use
6   digital processors, correct?
7          "Answer:  The system did not use DSP
8   because of the power they consumed, that's
9   correct."
10         Were you aware of that?
11     A.   No, but I think the answer -- if I could
12   comment on it.  I think the answer he gave is
13   different than what I was saying.  A DSP is,
14   amongst the people like myself, means a digital
15   signal processor that can perform essentially all
16   of the functions of a hearing aid, and such a DSP
17   was not available at that time.  But there were
18   digital elements like the Intel 2920 that could
19   perform certain functions that were smaller and
20   that were digital.
21     Q.   Were you aware that he identified the
22   circuitry that allegedly did the feedback

270

1   suppression as an analog circuit in his testimony?
2   And it is identified in the description, in the
3   technical description as an analog circuit?
4          MR. LYTLE:  Objection.
5     A.   I'm not aware of that.
6     Q.   If it was an analog circuit and
7   Dr. Egolf agreed that it was an analog product,
8   that would be substantially different than the '850
9   and the '749, wouldn't it?
10         MR. LYTLE:  Objection.
11     A.   I don't know how to comment on that.  As
12   I recall, the '850 patent describes both an analog
13   and a digital implementation of the hearing aid
14   structure.
15     Q.   Well, you describe in your own report
16   the '850 as a digital feedback cancellation system,
17   right?
18         MR. LYTLE:  Objection.
19     Q.   Is that correct?
20         MR. LYTLE:  Objection.
21     A.   The system that I describe in
22   considering '850 was the digital implementation,

271

1   although I believe I made reference a couple of
2   times to the analog as well.
3     Q.   So the fact, the fact that all these AFC
4   circuits of Weaver and Egolf were analog and not
5   digital, that doesn't affect your opinion
6   whatsoever; is that correct?
7          MR. LYTLE:  Objection.
8     A.   Well, I would not characterize them
9   entirely as analog because they have in my view a
10   programmable digital tap delay line filter that is
11   used as part of the circuit, so it's not entirely
12   analog.  So that's my opinion in that regard.
13     Q.   If that opinion is incorrect, then would
14   that change your opinion about whether these
15   publications are prior art?
16     A.   No.  It would not.
17     Q.   Then on Page 69 you start talking about
18   the Leland Best master's thesis in 1985, correct?
19     A.   That's correct.
20     Q.   And you again say, "I am informed that
21   the hearing aid described in Leland Best master's
22   thesis at the University of Wyoming in 1985

272

1   qualifies as prior art with respect to the 1985 ETG
2   patents," correct?
3     A.   That's correct.
4     Q.   All right.  Who informed you of that?
5     A.   Widex counsel.
6     Q.   And if you look back at the librarians'
7   affidavits in front of you, Composite Exhibit 28, I
8   believe --
9     A.   Yes.
10     Q.   -- do those affidavits also deal with
11   when the Leland Best master's thesis was first
12   available to the public?
13     A.   Yes, it looks like that.
14     Q.   And it wasn't before the patent was
15   filed or granted, was it?
16     A.   I see that Best's thesis was entered
17   into the database on August 20th of 1986.  I don't
18   remember what the filing dates were for the
19   patents, however.
20     Q.   Well, I believe on the face of it it is
21   June 26, 1986.
22     A.   Okay.  Well that would be after June 26

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

69 (Pages 273 to 276)

273

1  of 1986.
2      MR. STEINBERG: Let's mark this as the
3  next.
4      (Soli Deposition Exhibit Number 32 was
5  marked for identification.)
6  BY MR. STEINBERG:
7      Q.   I'm handing you Exhibit 32, which is
8  again a catalog description of the Best thesis. Do
9  you see his name, Leland Best, at 100?
10     A.   Yes, I do.
11     Q.   And you see at 502 it says Thesis MS
12  University of Wyoming, 1985?
13     A.   Yes. I do.
14     Q.   And the subject matter is Feedback down
15  at 650?
16     A.   Yes.
17     Q.   Okay. Then if you look at 008, it
18  describes the date that you just stated, 8-20-86.
19     A.   Okay. I can't read that code.
20     MR. LYTLE: Objection.
21     A.   But I think the affidavit says the same
22  thing.

274

1      Q.   Okay. Do you know whether there was a
2  prototype made using the Best article?
3      A.   The Best thesis?
4      Q.   The Best thesis, excuse me.
5      A.   Yes, I believe he did make a prototype.
6      Q.   Have you ever seen it?
7      A.   No, I have not.
8      Q.   Do you know whether there was any patent
9  applied for and granted using the Best thesis?
10     A.   I do not know.
11     Q.   Okay. What information do you have that
12  Dr. Levitt saw this master's thesis?
13     A.   I don't have any information of that.
14     Q.   Okay.
15          You next discuss on Page 72 the
16  Graupe --
17     MR. STEINBERG: We have been going for a
18  while. Do you guys want to take a break?
19     THE WITNESS: That would be a good idea.
20     MR. STEINBERG: Okay.
21     THE VIDEO OPERATOR: Going off the
22  record. The time now is 3:13 p.m.

275

1      (Recess taken -- 3:13 p.m.)
2      (After recess -- 3:22 p.m.)
3      THE VIDEO OPERATOR: Stand by. Here we
4  go.
5          We are now back on the record. The time
6  is 3:22 p.m.
7  BY MR. STEINBERG:
8      Q.   Dr. Soli, on Page 72 you then go to the
9  Graupe '818 patent, right?
10     A.   Correct.
11     Q.   And you say again, "I am informed that
12  the '818 patent qualifies as prior art with respect
13  to the ETG patents," right?
14     A.   That is correct.
15     Q.   And who informed you?
16     A.   The Widex counsel.
17     Q.   Now --
18     (Soli Deposition Exhibit Number 33 was
19  marked for identification.)
20  BY MR. STEINBERG:
21     Q.   Handing you Exhibit 33, which is the
22  Graupe '818 patent --

276

1      A.   Yes.
2      Q.   -- have you seen that before?
3      A.   Yes, I have.
4      Q.   Okay. Now, does the Graupe '818 patent
5  describe a system that operates in two different
6  modes, an identification mode and a correction
7  mode?
8      A.   Yes, I believe that is the case.
9      Q.   The '850 and the '749 patents do not
10  operate in that manner, do they?
11     A.   It's not possible to tell from the
12  specification, as I understand it. For the
13  magnitude and phase as a function of frequency to
14  be measured it would be necessary, as I understand
15  it, to interrupt the function of the hearing aid to
16  take those measurements, so that would be
17  equivalent in some ways to an identification mode.
18     Q.   Does the '850 or '749 patent say
19  anywhere at all that they interrupt the
20  transmission of sound?
21     A.   I don't recall a statement to that
22  effect.

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

70 (Pages 277 to 280)

277

1    Q.    Have you seen any document in this whole
2    case, any memo, any technical document, any
3    description that says that the '850 or '749 patent
4    interrupts the transmission of sound in any way?
5    **A.    No, I have not.**
6    Q.    Okay.  Now, the Graupe patent injects a
7    noise every 30 or 60 seconds, right?
8    **A.    I don't know how often it does but it**
9    **must inject a noise to perform its identification**
10    **function.**
11    Q.    And when it is in the identification
12    mode it cannot operate as a hearing aid, right?
13    **A.    That's correct.**
14    Q.    And you describe that in your own
15    article, Exhibit 8 we showed you previously,
16    correct?
17    **A.    Exhibit 8 -- oh, yes, the Ear and**
18    **Hearing publication?**
19    Q.    Yes.
20    **A.    Yes, that's correct.  It didn't describe**
21    **the Graupe circuit but I think --**
22    Q.    Well, I believe you said it did describe

278

1    the Graupe circuit.
2           MR. LYTLE:  Objection.
3    **A.    Let's take a look.  I'm pretty sure**
4    **that's not the case.**
5    Q.    If you look at Page 2 of Exhibit 8 --
6    **A.    I'm thinking of the wrong thing.  I**
7    **thought you were talking about this article.**
8    **Sorry.**
9    Q.    Exhibit 8 is this article?
10    **A.    Yes, Chi.  He probably did.**
11    Q.    Well, it is not just Chi.  You are on
12    it?
13    **A.    Next-to-the-last.**
14    Q.    Next-to-last?
15    **A.    Next-to-last.**
16    Q.    Well, there is only four.
17    **A.    Next-to-the-last is the worst position.**
18         **Okay.  It appears -- where, did you say?**
19    Q.    Page 2, the second full paragraph talks
20    about probe noises inserting and then you mention
21    the Graupe patent.
22    **A.    I see that, yes.**

279

1    Q.    Do you see that?
2    **A.    That's correct.**
3    Q.    Okay.
4    **A.    Excuse me.**
5    Q.    If the identification mode in the Graupe
6    patent as you describe excludes the amplifier,
7    isn't it true that you are not determining the
8    amplitude and phase of a signal in the transmission
9    channel?
10    **A.    Could you refer me to where that is**
11    **stated?**
12    Q.    Oh, I believe it is in the patent
13    itself.  Can you read the -- are you proficient in
14    reading these diagrams?
15    **A.    Perhaps.  We will see.**
16    Q.    All right.
17    **A.    I'm looking at Figure 3 which I think is**
18    **the most informative.**
19    Q.    Okay.
20    **A.    So maybe you can answer -- pose your**
21    **question again?**
22    Q.    The identification circuit --

280

1    **A.    Yes.**
2    Q.    -- excludes the amplifier, right?
3    **A.    It does.**
4    Q.    So if it excludes the amplifier, you are
5    not determining the effect of amplitude and phase
6    of a signal that is in the transmission channel,
7    right?
8    **A.    The question really doesn't make a lot**
9    **of sense to me because the purpose of the**
10    **identification circuit, as I understand it, is to**
11    **determine the amplitude and phase of a signal that**
12    **travels through the speaker, the acoustic link, and**
13    **back to the microphone because that's the same**
14    **portion of the path that the canceller or the**
15    **correction circuit applies to.  As long as those**
16    **are matched, the identification part and the**
17    **correction part, the desired function can be**
18    **achieved.**
19         **That's the same way the '850 does it,**
20    **too, as I understand it.**
21    Q.    You will agree with me that the
22    identification mode in the '818 patent excludes the

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

71 (Pages 281 to 284)

281

1  amplifier, right?
2     **A.   That's correct.**
3     Q.   Okay.
4        Have you ever seen Dr. -- excuse me,
5  have you ever seen Mr. Kates' patent?
6     **A.   I'm sorry?**
7     Q.   Have you ever seen Mr. Kates' patent,
8  K-a-t-e-s?
9     **A.   I think he has more than one, but I**
10 **don't recall -- I haven't seen it, or if I have it**
11 **has been a long time.**
12       MR. STEINBERG:  Let's mark this as the
13 next exhibit.
14       I tell you what.  We will go on.  Let's
15 not do that.
16    Q.   On Page 83, Paragraph 152, you say, "As
17 described above, it is my understanding that the
18 test of obviousness includes as one of the factors
19 any secondary considerations."  Do you see that?
20    **A.   I see that.**
21    Q.   Where did you obtain your understanding
22 of the test of obviousness?

282

1     **A.   That was given to me by the Widex**
2  **counsel.**
3     Q.   And you say you have considered
4  secondary considerations in your analysis, right?
5     **A.   That's correct.**
6     Q.   But you don't identify what they are.
7     **A.   Well, I think the remainder of that**
8  **paragraph was intended to address some of those.**
9     Q.   What secondary considerations do you
10 identify in that paragraph?
11    **A.   Someone with more legal knowledge than**
12 **me would have to define what those considerations**
13 **are and then I can tell you what I said in relation**
14 **to them.**
15       MR. LYTLE:  Are you referring to
16 Paragraph 152?
17       MR. STEINBERG:  That's the one he is
18 referring to, right.
19    Q.   From your own knowledge, do you know
20 what secondary considerations mean?
21    **A.   It was explained to me.  I have to say I**
22 **don't remember all the details.  I'm not a lawyer.**

283

1     Q.   So sitting here today you couldn't tell
2  us what that means?
3     **A.   I couldn't tell you in a legal -- in**
4  **legal language, no.**
5     Q.   Nor could you tell us what elements of
6  Paragraph 152 or any of these other paragraphs are
7  secondary considerations, correct?
8     **A.   Well, I remember there is, as I'm**
9  **looking over this paragraph now, one aspect relates**
10 **to the existence of a long felt but unsolved need.**
11 **And as I said in there, that the problems in my**
12 **view were already solved by the prior art, so that**
13 **consideration would not apply.**
14    Q.   The long felt but unsolved need would be
15 a method of effectively dealing with feedback,
16 correct?
17    **A.   That's correct.**
18    Q.   And you're saying that the prior art
19 already accomplished that so there was no need for
20 the patents, right?
21    **A.   I'm not saying there was no need for the**
22 **patents.  I'm saying that the prior art**

284

1  accomplished that.
2     Q.   If the prior art accomplished that, why
3  wasn't the prior art incorporated into any
4  manufacturers' hearing aid product?
5        MR. LYTLE:  Objection.  Foundation.
6     **A.   I'm not sure I understand the question.**
7  **Are you talking about now or at that time?**
8     Q.   Well, first of all, at that time it
9  wasn't.  We can agree to that, correct?
10    **A.   I think we can.  And the reason, as I**
11 **tried to say before, was because of practical**
12 **limitations in making small enough circuits for use**
13 **in hearing aids.**
14    Q.   And are you aware of any specific
15 manufacturer's product that incorporated any of
16 these prior art references in their actual product
17 they put out in the market?
18       MR. LYTLE:  Objection.
19    **A.   As I said before, I'm aware firsthand of**
20 **one that uses the elements feedback cancellation**
21 **algorithm of our making that has been licensed**
22 **through Dynamic Hearing to Interton.  There may be**

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

72 (Pages 285 to 288)

285

1  others. I don't know the details of each
2  manufacturers' circuits.
3      Q.   But Interton is not a defendant in this
4  case?
5      A.   I don't know whether they are or not.
6      Q.   Let's assume they aren't. Are there any
7  other products that you can identify?
8      A.   It's very difficult to look at a
9  product, a hearing aid product sort of as a -- it
10  is sort of like a black box, to know what algorithm
11  is being used inside of it. I think that's one of
12  the conclusions of the Freed and Soli publication
13  that we looked at earlier on.
14      Q.   In Paragraph 152 you say that you are
15  unaware that any defendant copied the ETG patents.
16  How do you know that?
17      A.   I was told by the Widex counsel that
18  that was the case.
19      Q.   You didn't reverse engineer any of their
20  products, did you?
21      A.   No. I'm not capable of doing that.
22      Q.   You didn't look at their technical data

286

1  to see how their cancellation systems work, did
2  you?
3      A.   No, I did not.
4      Q.   In Paragraph 153 you say the
5  manufacturers have not adopted the alleged
6  inventions. How do you know that?
7      A.   Again, I'm basing it on my understanding
8  of the structures that are described in '850 and
9  '749, and I think it would be very difficult to
10  adopt those in a way that would actually work in a
11  hearing aid. That's one consideration.
12          The other is I have been told that none
13  of them have.
14      Q.   Who told you?
15      A.   Again, the counsel.
16      Q.   Again, you have not done any engineering
17  work or looked at any technical data or reverse
18  engineered these products to make that
19  determination, right?
20      A.   No.
21          (Soli Deposition Exhibit Number 34 was
22  marked for identification.)

287

1      BY MR. STEINBERG:
2      Q.   Handing you Exhibit 34, which purports
3  to be a feedback phase inverter, do you see that?
4      A.   I see that paragraph on the top, yes.
5      Q.   And you can see the diagram there where
6  they have the feedback signal and then the phase
7  inverted signal?
8      A.   Yes, I see that.
9      Q.   And that's a description that is almost
10  identical to the description that you have
11  represented in your report that describes the '850
12  patent, right?
13      A.   No. I wouldn't say that. That's not a
14  description. It's just a sketch, you know, some
15  artist's concept of feedback and phase inverted
16  signals. I don't know how they achieve it. This
17  is again marketing material, it appears.
18      Q.   Well, it says the feedback signal and
19  the phase inverted signal cancel each other out
20  eliminating feedback without gain loss. Isn't that
21  how you have described the '850 patent in your
22  report?

288

1          MR. LYTLE: Objection.
2      A.   Well, what I have described in my report
3  is a number of structures and, you know, detailed
4  information about how the '850 patent performs. At
5  the end of all that, presumably it does some type
6  of cancellation, but looking at two pictures at the
7  end didn't tell me that they do it the same way,
8  even though they might achieve the same result.
9      Q.   Now, in Paragraph 153 you say that the
10  ETG patents described a fixed filter for the
11  purposes of acoustic feedback. I won't take you
12  back through all those questions that we --
13      A.   Thank you.
14      Q.   -- asked earlier, but the word fixed is
15  never reported in either of those patents, is it?
16      A.   I don't recall, but my interpretation of
17  what was described and my understanding is that the
18  measures are taken and the filter is put in place
19  and used.
20      Q.   Could you answer my question first, and
21  that is is the word fixed used in those patents?
22      A.   I don't recall seeing it.

VIDEOTAPED DEPOSITION OF SIGFRID D. SOLI, Ph.D.
CONDUCTED ON WEDNESDAY, NOVEMBER 14, 2007

73 (Pages 289 to 292)

289

1    Q.   And the coefficients that are in those
2  filters can be changed, can't they?
3      A.   I'm sorry?
4      Q.   The coefficients in the filters can be
5  changed --
6      A.   In which filters?
7      Q.   In the feedback filters.
8      A.   I think there is only one that I know
9  of.
10     Q.   All right.  Well, there is one that can
11  be changed, correct?
12     A.   Conceivably, yes.
13     Q.   Well, if you took the EEPROM out and
14  plugged it back into the host controller you could
15  change the coefficients, couldn't you?
16     A.   Yes, you could.
17     Q.   And you could also program in
18  theoretically an infinite number of coefficients,
19  right, depending on what the chip would hold?
20        MR. LYTLE:   Objection.
21     A.   I have never seen a chip that would hold
22  an infinite number, but a large number, yes.

290

1    Q.   Especially today?
2      A.   Right.
3      Q.   Now, in Paragraph 153 you say that "I
4  understand that each of the defendants in this
5  litigation has taken a position that it does not
6  infringe the ETG patents.  Thus, the defendants'
7  actions appear to contradict ETG's statement."
8        Are you relying on that in any way?
9      A.   No, I am not.
10     Q.   In 154 you say, "the industry has not
11  recognized that the ETG patents are important."
12        What do you base that on?
13     A.   I have been told that the patents are
14  not used by any of the defendants, and in my
15  understanding and reading of the description, as I
16  said earlier, it doesn't describe -- the algorithms
17  and the structures in the patent do not to me
18  describe a commercially viable hearing aid.
19     Q.   When you said that one of your bases is
20  you were told they were not used in the industry,
21  who told that you?
22     A.   Widex counsel.

291

1    Q.   Okay.
2        And then you said something about an
3  inscription of algorithms you don't think could be
4  viable?
5      A.   Well, it is my opinion, as I read the
6  '850 and the '749, that the structures and the
7  algorithms described therein could not be -- could
8  not function as a commercially viable hearing aid.
9      Q.   And what do you base that on?
10     A.   I base that on my understanding and
11  reading the patent and my knowledge and experience.
12     Q.   In Paragraph 155 you say that it's not
13  apparent that the awards and distinctions
14  Dr. Levitt received relate to the patents, correct?
15     A.   That's what I said, yes.
16     Q.   What do you base that on?
17     A.   I base that on my limited knowledge of
18  what some of those awards are about, and I was
19  informed as well by the Widex counsel that those
20  awards were not related to the patents.
21     Q.   When you say your knowledge of the
22  awards, have you ever read the context or the

292

1  content of the awards yourself?
2      A.   No, but I have some knowledge of the
3  sources of those awards, and I know people who have
4  received some of them, and the kinds of things they
5  give awards for.
6      Q.   Have you ever heard Dr. Levitt referred
7  to as the father of the digital hearing aid?
8      A.   No.
9      Q.   Now, in Paragraph 159 you refer to the
10  Best, Weaver and Graupe in combination with Egolf
11  and so forth and so on, right?
12     A.   159?
13     Q.   Yes.  Correct, Paragraph 159.
14     A.   Let me read what I said.
15        Okay, I have read a portion of it there.
16  Could you ask your question again, please?
17     Q.   Yes.  I just wanted to confirm that
18  those were the same articles and patents we have
19  already talked about, right?
20     A.   Yes, they are.
21     Q.   You also say the HearTech article was
22  prior art, but you also say, "it was only recently