IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 05-422 (GMS) |
| SONIC INNOVATIONS, INC., et al, | ) ) ) | |
| Defendants. | ) ) | |
| | ) | |

**PLAINTIFF ENERGY TRANSPORTATION GROUP INC.'S MEMORANDUM IN
SUPPORT OF ITS MOTION FOR ENHANCED DAMAGES AND ATTORNEY'S FEES**

Edmond D. Johnson (# 2257)
Matthew A. Kaplan (# 4956)
PEPPER HAMILTON
Hercules Plaza Suite 5100
1313 Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6500

*Attorneys for Energy Transportation Group, Inc.*

OF COUNSEL:

Marty Steinberg
HUNTON & WILLIAMS LLP
1111 Brickell Avenue , Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500

Brian M. Buroker
HUNTON & WILLIAMS LLP
1900 K Street, N.W., Suite 1200
Washington, DC 20006-1109
Telephone: (202) 955-1500

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone: (804) 788-8788

Dated: March 27, 2008

<u>**TABLE OF CONTENTS**</u>

I. INTRODUCTION ................................................................................................ 1

II. NATURE AND STAGE OF THE PROCEEDINGS ...................................... 1

III. SUMMARY OF THE ARGUMENT ............................................................. 2

IV. STATEMENT OF FACTS ............................................................................. 3

V. ARGUMENT ..................................................................................................... 6

   A. The Applicable Legal Standards .................................................................. 6

      1. Enhanced Damages .................................................................................. 6

      2. Attorney's Fees ........................................................................................ 8

         a. Attorney's Fees Under 35 U.S.C. § 285 ....................................... 8

         b. Attorney's Fees Under 28 U.S.C. § 1927 and the Court's Inherent Power ............ 9

   B. The *Read* Factors Support Treble The Damages Against Widex ................ 10

      1. Widex's Wanton, Willful Infringement Warrants the Full Enhancement ............... 10

         a. Widex Knew Dr. Levitt and His Patents ..................................... 11

         b. Widex Failed to Investigate ........................................................ 13

   C. Defendants' Litigation Behavior Warrants Full Enhancement ................... 14

      1. The EKMS Smokescreen ....................................................................... 16

      2. Defendants' Counsel Disobeyed The Court's Instruction ....................... 19

      3. Defendants Covered Up Blatant Infringement ....................................... 24

      4. Defendants Paid Fact Witnesses and Hired Industry-Friendly Experts ......... 27

      5. Defendants' Pre-Trial Litigation Tactics Support Enhancement ............ 31

   D. The Other *Read* Factors Also Favor Full Enhancement Of Damages ......... 32

      1. Widex's Large Size and Financial Resources ........................................ 33

      2. This Case Was Not A Close Case .......................................................... 33

      3. Widex's Years of Willful Infringement and Intent to Continue Infringing ........... 33

**4. Defendants' Motivation for Harm** ........................................................................... **34**

**5. Widex Copied the Patents-in-Suit** ........................................................................ **35**

**E. The Totality Of The Circumstances And The Policy Behind Enhanced Damages Supports Treble Damages** ........................................................................ **35**

**F. This Case Is Exceptional And The Court Should Award ETG Its Attorney's Fees** .... **36**

**G. This Case Is Exceptional Because The Jury Found Willful Infringement** ................. **36**

**H. Defense Counsel's Conduct Warrants Finding This Case Exceptional** ..................... **37**

**I. Other *Read* Factors Support An Award Of Attorney's Fees** ......................................... **39**

**J. An Award of Attorney's Fees from Widex is Appropriate** ......................................... **39**

**K. An Award of Attorney's Fees from Demant is Appropriate** ...................................... **40**

**VI. CONCLUSION** ........................................................................................................ **40**

## TABLE OF AUTHORITIES

### Cases

Advanced Med. Optics, Inc. v. Alcon Labs., Inc.,
 2005 WL 3454283 (D. Del. Dec. 16, 2005)...................................................................... 8, 11

Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.,
 53 F.2d 1557 (Fed. Cir. 1988).......................................................................................... 6, 7

C.R. Bard, Inc. v. U.S. Surgical Corp.,
 258 F. Supp. 2d 355 (D. Del. 2003) .............................................................................. 37, 38

Central Soya Co., Inc. v. Hormel & Co.,
 723 F.2d 1573 (Fed. Cir. 1983)............................................................................................ 9

Chambers v. NASCO, Inc.,
 501 U.S. 32 (1991) ....................................................................................................... 9, 10

Crucible Inc. v. Stora Kopparbergs Bergslags AB,
 701 F. Supp. 1157 (W.D. Pa. 1988) ................................................................................... 38

Cybor Corp. v. FAS Techs.,
 138 F.3d 1448 (Fed. Cir. 1998)........................................................................................... 8

Domestic Fabrics Corp. v. Sears, Roebuck & Co.,
 326 F. Supp. 2d 694 (E.D.N.C. 2004) ................................................................................ 37

Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.,
 279 F.3d 1022 (Fed. Cir. 2002).......................................................................................... 11

Golight, Inc. v. Wal-mart Stores, Inc.
 355 F.3d 1327 (Fed. Cir. 2004).......................................................................................... 37

Grefco Inc. v. Kewanee Indus.,
 499 F. Supp. 844 (D. Del. 1980) .......................................................................................... 8

In re Complaint of PMD Enter. Inc.,
 215 F. Supp. 2d 519 (D.N.J. 2002)................................................................................ 28, 29

In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions,
 278 F.3d 175 (3d Cir. 2002)........................................................................................... 9, 10

Jurgens v. CBK, Ltd.,
 80 F.3d 1566 (Fed. Cir. 1996).................................................................................6, 7, 8, 11, 14

Kloster Speedsteel AB v. Crucible Inc.,
    793 F.2d 1565 (Fed. Cir. 1986) ............................................................ 38

Knorr-Bremse Systeme Fuer Nutzdahrzeuge GmbH v. Dana Corp.,
    383 F.3d 1337 (Fed. Cir. 2004) (en banc) ............................................ 6

Lam, Inc. v. Johns-Manville Corp.,
    718 F.2d 1056 (Fed. Cir. 1983) ............................................................ 8

Lucent Technologies, Inc. v. Newbridge Corp.,
    168 F. Supp. 2d 269 (D. Del. 2001) ..................................................... 9

Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersystems GmbH,
    No. 98-cv-01072 (D. Colo. Feb. 12, 2008) ..................................... 14, 19, 27, 38

Modine Mfg. Co. v. Allen Group, Inc.,
    917 F.2d 538 (Fed. Cir. 1990) .......................................................... 2, 8

Multi-Tech, Inc. v. Components, Inc.,
    708 F. Supp. 615 (D. Del. 1989) .......................................................... 9

nCube Corp. v. SeaChange Int'l, Inc.,
    313 F. Supp. 2d 361 (D. Del. 2004) ........................... 3, 14, 33, 35, 37, 39

Novozymes A/S v. Genecor Int'l, Inc.,
    474 F. Supp. 2d 592 (D. Del. 2007) ............................................ 2, 6, 11

Promega Corp. v. LifeCodes Corp.,
    53 USPQ2d 1463 (D. Utah 1999) ....................................................... 33

Qualcomm, Inc. v. Broadcom Corp.,
    2008 U.S. Dist LEXIS 911 (S.D. Cal. Jan. 7, 2008) ........................... 28

Read Corp. v. Portec, Inc.,
    90 F.2d 816 (Fed. Cir. 1992) ............................... 7, 32, 33, 34, 36, 39

Rite-Hite Corp. v. Kelley Co.,
    819 F.2d 1120 (Fed Cir. 1987) ............................................................ 7

Roadway Express, Inc. v. Piper,
    447 U.S. 752 (1980) .......................................................................... 10

S.C. Johnson & Son, Inc. v. Carter-Wallace,Inc.,
    781 F.2d 198 (Fed. Cir. 1986) .......................................................... 37

Scott Paper Co. v. Moore Bus. Forms, Inc.,
    594 F. Supp. 1051 (D. Del. 1984) ..................................................... 38

Scripps Clinic & Research Found. v. Baxter Travenol Labs.,
   729 F. Supp 1473 (D. Del. 1990) .......................................... 39

Sensonics, Inc. v. Aerosonic Corp.,
   81 F.3d 1566 (Fed. Cir. 1996) .............................................. 37

SRI Int'l, Inc. v. Advanced Tech.,
   127 F.3d 1462 (Fed. Cir. 1997) .............................................. 6

SRI Int'l v. Matsushita Elec. Corp.,
   775 F.2d 1107 (Fed. Cir. 1985) ............................................ 16

Tate Access Floors, Inc. v. Maxcess Techs., Inc.,
   222 F.3d 958 (Fed. Cir. 2000) ............................................... 8

Underwater Devices, Inc. v. Morrison-Knudsen Co.,
   717 F.2d 1380 (Fed. Cir. 1993) ............................................ 11

Williams v. Giant Eagle Markets, Inc.,
   883 F.2d 1184 (3d Cir. 1989) ................................................ 9

Zenith Labs., Inc. v. Bristol-Myers Squibb Co.,
   19 F.3d 1418 (Fed. Cir. 1994) .............................................. 16

**Statutes**

28 U.S.C. § 1927 ...................................................... 1, 2, 9, 39, 40

35 U.S.C. § 284 ............................................................ 1, 2, 11

35 U.S.C. § 285 .............................................................. 1, 2, 9

Fed. R. Civ. P. 54(d)(2)(B) ................................................... 39

Fed. R. Civ. P. 54(d)(2)(C) ................................................... 39

**Other Authorities**

10 Wright, Miller & Kane, Federal Practice (3d ed. 2001) ........................ 39

## I.  INTRODUCTION

In view of the jury's willfulness finding, the Court should treble the damage award against Widex.  The Court should also find that this case is exceptional and award ETG its attorney's fees from either or both Defendants.  While enhancement and an award of attorney's fees are discretionary, compelling facts and circumstances warrant enhancement and an attorney's fees award.  Plaintiff Energy Transportation Group, Inc. ("ETG") therefore respectfully submits this memorandum in support of its motion against defendants Widex A/S and Widex Hearing Aid Co., Inc. (collectively "Widex") for enhanced damages pursuant to 35 U.S.C. § 284 and attorney's fees and associated expenses pursuant to 35 U.S.C. § 285, 28 U.S.C. § 1927, other applicable statutes, and rules that provide for attorney's fees, and/or the power of this Court under prevailing case law and common law doctrine, and against defendants William Demant Holding A/S, Oticon A/S, Oticon Inc., Bernafon AG, Bernafon, LLC, and WDH, Inc. (collectively, "Demant") for attorney's fees and associated expenses pursuant to 35 U.S.C. § 285, 28 U.S.C. § 1927, other applicable statutes and rules that provide for attorney's fees, and/or the power of this Court under prevailing case law and common law doctrine.[1]

## II.  NATURE AND STAGE OF THE PROCEEDINGS

ETG filed suit against several defendants, including Widex and Demant, on June 23, 2005, alleging infringement of U.S. Patent Nos. 4,731,850 (the "'850 Patent") and 4,879,749 (the "'749 Patent) (collectively, the "Patents-In-Suit") by Defendants' manufacture, use, sale, offer for sale, and importation of hearing aid products and components (*i.e.*, chips) for use in hearing aids and related products.  All defendants except Widex and Demant settled before the 9-day jury trial held from January 22 until February 1, 2008.  The jury returned a verdict on February 4,

---

[1] The term "Defendants" includes both Widex and Demant.

finding that (1) Widex willfully infringed the asserted claims of the Patents-In-Suit; (2) Demant infringed the asserted claims of the Patents-In-Suit; and (3) Defendants failed to prove that the Patents-In-Suit were invalid. *See* D.I. 521. The jury awarded monetary damages of $15 Million against Widex and $16 Million against Demant. *See id.* This Court entered judgment in favor of ETG on February 8, 2008. *See* D.I. 522. ETG now moves to amend the judgment pursuant to Federal Rules of Civil Procedure 54 and 59, 35 U.S.C. §§ 284 and 285, and 28 U.S.C. § 1927.

## III.  SUMMARY OF THE ARGUMENT

1.      Section 284 of the Patent Act allows the Court to enhance damages up to treble the amount awarded by the jury. Typically, enhancement is provided when infringement is willful. *Novozymes A/S v. Genecor Int'l, Inc.*, 474 F. Supp. 2d 592, 610 (D. Del. 2007). The jury concluded that Widex's infringement was willful. *See* D.I. 521. The facts the jury considered, as well as other compelling facts and circumstances, support enhancement. ETG therefore urges the Court to find that enhancement is appropriate and enter a judgment of treble the jury's award of $15 Million against Widex. Failure to do so will render the jury's verdict a nullity. The jury in this case was attentive, thoughtful, and meticulous. Their verdict details the incredibly careful and analytical process in which they engaged. Their verdict separated the actions of Widex from Demant as to the issue of willfulness. To give life to the jury's verdict, the Court should award treble damages against Widex.

2.      Under 35 U.S.C. Section 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990). A court can also consider other factors in determining whether a case is exceptional, such as the defendant's conduct during the entire litigation, a defendant's continuing infringement, and whether the outcome of the case was decided in the plaintiff's favor. *See nCube Corp. v. SeaChange Int'l, Inc.*, 313 F. Supp. 2d 361, 387 & 391 (D. Del.

2004).  In view of the jury's willfulness finding and other compelling facts and circumstances, including Defendants' litigation misconduct, ETG respectfully urges the Court to find that this case is exceptional and enter a judgment awarding ETG its attorney's fees from Widex.   Based on this same litigation misconduct and other compelling facts and circumstances, ETG also urges the Court to find that this case is exceptional and enter a judgment awarding ETG its attorney's fees from Demant.

3.    In addition, under 28 U.S.C. § 1927 and/or the inherent power of the Court, ETG urges a finding against Widex and/or Demant for ETG's attorney's fees directly resulting from litigation misconduct occurring throughout the case proceedings.

## IV.  STATEMENT OF FACTS

The concepts developed by Dr. Levitt and a team of engineers at ETG's predecessor, Audimax, became the subject of a patent application entitled "Programmable Digital Hearing Aid System," filed on June 26, 1986.  *See* JX 4 (attached as Exhibit 1 to Vivarelli Declaration)[1]. This application matured into the '850 Patent on March 15, 1988.  *Id.*  Other claims directed toward a "Host Controller For Programmable Digital Hearing Aid System" were separated into a divisional patent application that issued as the '749 Patent on November 7, 1989.  *See* JX 2 (Viv. Ex. 2).

The asserted claims of the Patents-In-Suit[2] are directed to various aspects of a programmable digital hearing aid.  *See* JX 4 (Viv. Ex. 1) at ETG00001719-1720; JX 2 (Viv. Ex. 2) at ETG00002295.  Broadly speaking, these claims cover the innovative concept of determining the effect of amplitude and phase of acoustic feedback and inserting a

---

[1] All cites to exhibits in the Vivarelli Declaration will be referred to herein as "Viv. Ex. ___".

[2] At trial, ETG asserted claims 13, 14, 16, and 19 of the '850 Patent and claims 1-6 of the '749 Patent.

programmable delay line filter to create an equal but opposite signal to cancel the acoustic feedback.  *See id.*

At *Markman*, Defendants unsuccessfully argued that the claims should be limited to fixed filters.  *See, e.g.*, D.I. 294 at 24:11-16, 33:3-24, and 35:8-12.  As acknowledged in the Court's Claim Construction Order (D.I. 351), the patent claims do not address and have no limitation based on whether the filter is fixed or adaptive.  *See* D.I. 351.  Notably, the Court appropriately construed a "programmable delay line filter" to mean "a filter that operates on time-delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighted samples."  *Id.* at 1.  The Court further determined that "the value of at least one weighting coefficient can be programmed."  *Id.*  Finally, the Court determined that "programmed" means "provided with one or more values so as to produce a response."  *Id.* at 2.  These interpretations do not limit the claims to a fixed filter.

Defendants also unsuccessfully argued that the "determining" step of claims 13, 14, and 16 of the '850 patent was limited only to a "measurement of phase and amplitude."  *Id.* at 5.  The Court also expressly rejected Defendants' proposed construction for "host controller," which would have limited the host controller to a big box, separate from the hearing aid.  *Id.* at 7, n.21.

Moreover, Defendants were in an untenable position because their own marketing and technical materials admitted infringement.[3]  During discovery, Defendants took the position that that their technical and marketing materials were inaccurate to avoid the admissions contained therein that demonstrated that their products adopted the patented technology invented by Dr. Levitt.  They insisted that their more detailed computer code told a different story - believing that

---

[3] *See, e.g.*, PX 820 (Viv. Ex. 3), PX 33 (Viv. Ex. 4), PX 394 (Viv. Ex. 5), PX 30 (Viv. Ex. 6), PX 391 (Viv. Ex. 7), PX 551 (Viv. Ex. 8), PX 393 (Viv. Ex. 9), JX 138 (Viv. Ex. 10), JX 26 (Viv. Ex. 11), JX 305 (Viv. Ex. 12)**;** *see also* Tr. at 1042:12-15 (Christensen), 1044:23-1045:6 (Christensen).  All excerpts from the trial transcript are attached as Viv. Ex. 13

ETG had neither the resources nor the expertise to decipher their computer code.[4]  This latest defense to the admissions in their own materials forced ETG to retain Dr. Clay Gloster, a computer code expert, to demonstrate that Defendants' own materials were accurate and not misleading based upon the detailed code.

At trial, Defendants' witnesses shifted their position, recognizing that their position that their own materials were false was contrary to their obligation to the hearing impaired, the FDA, the FTC, and the Patent Office.  They then backtracked from their deposition testimony and characterized the technical materials as being written for a less-technical audience and the marketing materials as being written for a non-technical audience.[5]  But, of course, the words that they wrote demonstrated that their own materials were not intended for laymen and were "worded differently" to make them understandable.[6]  Moreover, their internal technical materials contained the exact same or similar wording.  Finally, Defendants' materials contained graphic pictures and descriptions that unquestionably demonstrate they were using Dr. Levitt's patented technology. *See, e.g.*, PX 33 (Viv. Ex. 4).  And, as Dr. Clay Gloster showed, Defendants' code matched their technical and marketing materials.  *See, e.g.*,  Tr. at 662:22-663:3.

The end result was a jury verdict, finding that (1) Widex willfully infringed the asserted

---

[4] *See, e.g.*, Nielsen Dep. Tr. at 85:4-11, 142:5-17, 148:5-8, 157:6-17, 185:5-12, 211:21-212:8, 212:20-213:8, 235:19-236:10, 237:5-18 (Viv. Ex. 14); Christensen Dep. Tr. at 25:3-6, 30:21-25, 31:16-32:2, 47:14-21, 52:12-20, 56:3-9, 62:4-7, 63:9-15, 74:7-75:4, 75:15-24, 81:7-23, 90:7-10, 90:21-91:10, 96:23-97:8, 98:25-99:15, 103:24-104:10, 104:17-23, 116:15-23, 140:17-141:2, 150:11-152:7, 157:7-158:7 (Viv. Ex. 15); Schaub Dep. Tr. at 20:17-21, 26:16-27:9, 43:4-12, 44:19-45:5, 45:15-19, 48:8-11, 59:17-25, 68:23-70:7, 73:5-20, 76:17-23, 78:6-80:9 (Viv. Ex. 16).

[5] *See, e.g.*, Tr. at 1124:2-1129:23, 1134:25-1135:17, 1136:6-1137:1 (Nielsen); Tr. at 1019:20-1020:14, 1037:13-1038:23, 1049:2-20, 1049:22-1050:7 (Christensen); Tr. at 1075:21-1077:17, 1078:12-1079:12, 1085:12-1086:3, 1089:1-1091:13, 1093:10-1094:8, 1096:25-1098:6 (Schaub).

[6] ETG contends that the following description was not intended for a layman.  *See, e.g.*, PX 501 at ED00002451_019 (Viv. Ex. 17) ("The Dynamic Integrator, which in turn instructs the MD Active feedback cancellation unit to generate a signal with the opposite phase as the feedback signal and route it to the  input stage for its cancellation.")

claims of the Patents-In-Suit; (2) Demant infringed the asserted claims of the Patents-In-Suit; and (3) Defendants failed invalidate the Patents-In-Suit. The jury awarded monetary damages of $15 Million against Widex and $16 Million against Demant. *See* D.I. 521.

## V. ARGUMENT

### A. The Applicable Legal Standards

#### 1. Enhanced Damages

Section 284 of the Patent Act allows the Court to enhance damages up to treble the amount awarded by the jury. Typically, enhancement is provided when infringement is willful. *See, e.g., Novozymes*, 474 F. Supp. 2d at 610. A finding of willful infringement "is a statement that patent infringement, like other civil wrongs, is disfavored, and intentional disregard of legal rights warrants deterrence." *Knorr-Bremse Systeme Fuer Nutzdahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1342 (Fed. Cir. 2004) (*en banc*). "In exceptional cases of patent infringement, a court 'may increase the damages up to three times.'" *Novozymes*, 474 F. Supp. 2d at 610 (quoting 35 U.S.C. § 284). This statutory provision for enhanced damages "recognizes the tortious nature of patent infringement and the public interest in a stable patent right." *SRI Int'l, Inc. v. Advanced Tech.*, 127 F.3d 1462, 1464 (Fed. Cir. 1997) (affirming trial court's decision to treble damages award). Moreover, an increased damage award is intended to deter willful patent infringement by punishing the willful infringer. *See Knorr-Bremse*, 383 F.3d at 1348; *see also, Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.*, 853 F.2d 1557, 1566 (Fed. Cir. 1988).

The Federal Circuit mandates a two-step inquiry to determine whether enhanced damages are appropriate. First, the Court must consider whether the "infringer is guilty of conduct upon which increased damages may be based," like willful infringement. Second, if the Court finds such an act, then it must examine the "totality of the circumstances" to determine if enhancement is appropriate. *See Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570-71 (Fed. Cir. 1996) (*citing Read*

*Corp. v. Portec, Inc.*, 90 F.2d 816, 826-27 (Fed. Cir. 1992)).

In this case, the inquiry's first step is satisfied by the jury's verdict that Widex willfully infringed the Patents-In-Suit. *Jurgens*, 80 F.3d at 1571. In addition, the Court may examine the totality of the circumstances to determine whether and what amount of enhancement is appropriate. *See id.* at 1572-73 (holding that the District Court abused its discretion by not awarding damages when at least two *Read* factors supported doing so).

In *Read*, the Federal Circuit laid out nine factors to be considered during the second step of the inquiry. These nine *Read* factors, which guide the Court in assessing the appropriateness of an enhanced damages award, include: (1) "whether the infringer deliberately copied the ideas or design of another," (2) "whether the infringer, when he knew of the other's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) "the infringer's behavior as a party to the litigation;" (4) "defendant's size and financial condition;" (5) the "closeness of the case;" (6) the "duration of defendant's misconduct;" (7) "remedial action by the defendant;" (8) "defendant's motivation for harm;" and (9) "[w]hether defendant attempted to conceal its misconduct." *Read*, 970 F.2d at 827.

The "paramount factor" in deciding whether to grant an enhancement and the size thereof is the egregiousness of the defendant's conduct based on all facts and circumstances. *Rite-Hite Corp. v. Kelley Co.*, 819 F.2d 1120, 1125-26 (Fed Cir. 1987); *see also Read*, 970 F.2d at 826. In determining whether and to what degree to enhance damages under § 284, the Court should consider the damages necessary both to punish the willful infringer and deter infringement. *Avia Group*, 853 F.2d at 1566.

2. **Attorney's Fees**

a. <u>Attorney's Fees Under 35 U.S.C. § 285</u>

Under 35 U.S.C. Section 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party." The decision to award attorney fees is committed to the discretion of the trial judge. *Modine Mfg. Co. v. Allen Group, Inc.*, 917 F.2d 538, 543 (Fed. Cir. 1990). "The determination of whether a case is exceptional and, thus, eligible for an award of attorney fees under § 285 is a two-step process. First, the district court must determine whether a case is exceptional. After determining that a case is exceptional, the district court must determine whether attorney fees are appropriate. . . ." *Cybor Corp. v. FAS Techs.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998) (*en banc*). "An express finding of willfulness is a sufficient basis for classifying a case as 'exceptional.'" *Modine*, 917 F.2d at 543. "As a general rule, attorney's fees under section 285 may be justified by any valid basis for awarding increased damages under section 284." *Jurgens v. CBK, Ltd*, 80 F.3d 1566, 1573 n.4 (Fed. Cir. 1996).

"An award of attorney's fees and costs is typical in cases of willful infringement." *Advanced Med. Optics, Inc. v. Alcon Labs., Inc.*, 2005 WL 3454283 at *9 (D. Del. Dec. 16, 2005). As with enhanced damages, "when a trial court denies attorney fees in spite of a finding of willful infringement, the court must explain why the case is not 'exceptional' within the meaning of the statute." *Modine*, 917 F.2d at 543. *See also Tate Access Floors, Inc. v. Maxcess Techs., Inc.*, 222 F.3d 958, 972 (Fed. Cir. 2000) ("The district court abused its discretion in refusing to increase damages or award attorney fees because it failed to articulate any reasons for refusing to make such awards.").

Section 285 also "permits the prevailing party to recover disbursements that were necessary for the case." *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1069 (Fed. Cir. 1983); *see, e.g., Grefco Inc. v. Kewanee Indus.*, 499 F. Supp. 844, 870 (D. Del. 1980); *Multi-*

*Tech, Inc. v. Components, Inc.*, 708 F. Supp. 615, 623 (D. Del. 1989) (awarding attorney's fees and requiring supplemental documentation).  Attorney's fees may include "those sums that the prevailing party incurs in the preparation for and performance of legal services related to the suit." *Central Soya Co., Inc. v. Hormel & Co.*, 723 F.2d 1573, 1578 (Fed. Cir. 1983).  Additionally, nontaxable expenses may also be awarded in exceptional cases.  *See Lucent Tech., Inc. v. Newbridge Corp.*, 168 F. Supp. 2d 269, 275-76 (D. Del. 2001).

### b. <u>Attorney's Fees Under 28 U.S.C. § 1927 and the Court's Inherent Power</u>

In addition to the availability of attorney's fees under 35 U.S.C. Section 285, the Court may choose to impose personal liability on attorneys under 28 U.S.C. Section 1927 for excess costs, expenses, and attorney's fees where the offending attorneys have "unreasonably and vexatiously" multiplied the proceedings in a case.  In order to impose personal liability upon the offending attorneys, the Court must find that "an attorney has "(1) multiplied proceedings; (2) in an unreasonable and vexatious manner; (3) thereby increasing the cost of the proceedings; and (4) doing so in bad faith or by intentional misconduct." *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 188 (3d Cir. 2002) (citing Williams v. Giant Eagle Markets, Inc., 883 F.2d 1184, 1191 (3d Cir. 1989)).  Unreasonable and vexatious conduct must amount to willful bad faith.  *Id.*

Moreover, as an alternative, well established precedent allows a court to control litigation under its inherent power.  *See, e.g., Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991) ("It has long been understand that 'certain implied powers must necessarily result to our Courts of justice from the nature of their institution,' powers 'which cannot be dispensed with in a Court, because they are necessary to the exercise of all others.'") (internal citations omitted).  Included in inherent powers is the power to discipline parties and/or attorneys who appear before the Court. *See In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*, 278 F.3d 175, 188-89 (3d

Cir. 2002) (*quoting Chambers*, 501 U.S. at 43). "The imposition of sanctions in this instance transcends a court's equitable power concerning relations between the parties and reaches a court's inherent power to police itself. . . ." *Chambers*, 501 U.S. at 45-46. To impose an award of attorney's fees under the court's inherent powers, the court must find that the counsel's conduct constituted or was tantamount to bad faith. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766-67 (1980).

## B. The *Read* Factors Support Treble The Damages Against Widex

Widex's damages should be trebled. Widex and its counsel collaborated with Demant to create improper "defenses" to their obvious willful infringement. They committed substantial discovery abuses causing vexatious and costly litigation. Prior to and during trial they purposefully set out on a course to contradict this Court's claims construction order by claiming that the Levitt patent was not adaptive, required two separate devices, and was too large to be commercially successful - all directly contrary to this Court's *Markman* Order. *See infra*, Section V.C.1. Before and during trial, Defendants relied heavily on an unsigned, undated EKMS Summary Report, without interviewing or deposing anyone at EKMS, in an attempt to reargue claim construction and mislead the jury. *See infra*, Section V.C.1. They also coordinated a cover-up of admitted infringement, paid fact witnesses and hired industry-friendly experts to bolster their positions at trial. *See infra*, Sections V.C.1-3. Such unreasonable, bad-faith litigation conduct warrants enhancement. Moreover, during trial, Defendants' counsel intentionally disobeyed this Court's instructions and misled the jury. *See infra*, Section V.C.2. When this conduct is viewed in conjunction with other factors to be considered for enhancement, it becomes apparent that this Court should treble Widex's damages.

### 1. Widex's Wanton, Willful Infringement Warrants the Full Enhancement

Widex's actions present the prototypical case for enhanced damages. Where an infringer

"continues his infringing activity, and fails to investigate and determine, in good faith, that he possesses reasonable defenses to an accusation of patent infringement, the infringement is in bad faith." *Jurgens*, 80 F.3d at 1571. "'[B]ad faith' properly refers to an infringer's failure to meet his affirmative duty to use due care in avoiding infringement of another's patent rights." *Id.* (quoting *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1389-90 (Fed. Cir. 1993)). A case is exceptional and warrants enhanced damages under 35 U.S.C. § 284 upon a finding of willful infringement. *See Novozymes*, 474 F. Supp. 2d at 601 (citing *Epcon Gas Sys., Inc. v. Bauer Compressors, Inc.*, 279 F.3d 1022, 1034 (Fed. Cir. 2002)). This Court has enhanced damages where lack of an appropriate investigation supported the jury's willfulness finding. *Advanced Med. Optics, Inc. v. Alcon Labs., Inc.*, 2005 WL 3454283 at *9 (D. Del. Dec. 16, 2005).

In this case, Widex knowingly infringed the Patents-In-Suit without ever conducting an appropriate investigation. *See infra,* Sections V.B.1.a-b. Widex's only defense to willfulness was that it was not aware of the Patents-In-Suit before the filing of the lawsuit. *See, e.g.,* Tr. at 803:8-13. The facts clearly showed otherwise. Widex was aware of the Patents-In-Suit and failed to conduct any investigation into its possible infringement. *See infra*, Section V.B.1.a-b. Simply put, Widex failed to make a good-faith effort to avoid infringement. *Id.*

### a.     <u>Widex Knew Dr. Levitt and His Patents</u>

The evidence is overwhelming that Widex knew of Dr. Levitt and was aware of the Patents-In-Suit. Widex, as a partner in the Hearing Instrument Manufacturers Patent Partnership ("HIMPP"), hired Dr. Levitt in December 1996 as an expert in a patent matter on HIMPP's behalf, *see* PX 598 (Viv. Ex. 18), and did so because his credentials were better than that of a Nobel Prize recipient. *See* PX 562 at ETG00024486 (Viv. Ex. 19); *see also* Tr. 274:19-275:3, 276:3281:5, 745:18-752:1 In July 1997, Widex's lawyers prepared a declaration for Dr. Levitt

on behalf of Widex and HIMPP that attached his Curriculum Vitae, which prominently listed the Patents-In-Suit.  *See* PX 598 (Viv. Ex. 18) at LEV00000133; *see also* Tr. at 276:16-277:2, 749:7-9   HIMPP's counsel in that matter – who represents Widex in this case – sent a copy of the declaration and Curriculum Vitae to Soren Westermann, Widex's Director of Research, Information Technology, and Intellectual Property, and the managing director of HIMPP.  *See* PX 598 (Viv. Ex. 18); *see also* Tr. at 714:5-7, 717:10-12.  Strangely enough, the Declaration of Dr. Levitt, in addition to attaching his resume, was created by Widex's lawyers to obtain the opinion of Dr. Levitt on the exact same issues (obviousness, prior art, invalidity) and the exact same authors (Graupe and Egolf) that Widex raised ten years later against Dr. Levitt.

At trial, Soren Westermann admitted receiving copies of PX 562 and PX 598 in December 1996 and July 1997, respectively.  Tr. at 747:10-748:4; 746:7-10.  He also admitted that "[he] knew [Dr. Levitt] was a preeminent expert in the field."  Tr. at 747:7-9.

Widex and Soren Westermann were put on notice of Dr. Levitt's the Patents-In-Suit.  In fact, in addition to hiring Dr. Levitt as their expert in a patent infringement case, documents obtained by Widex identifying the Patents-In-Suit were found in Widex's files as early as 1993.  *See* PX 773 (Viv. Ex. 20); PX 774 (Viv. Ex. 21); PX 775 (Viv. Ex. 22); *see also* Tr. at 723:10-11, 724:17-725:8, 725:10-727:5.  Thus, ample evidence existed to refute Widex's bad faith denial of knowledge of Dr. Levitt's patents.

Soren Westermann further admitted that, by August 5, 1993, Widex had in its database an entry of the patent registration for the European equivalent of the '850 Patent, which lists the '850 Patent as the priority application.  *See* PX 773 (Viv. Ex. 20); Tr. at 723:10-11.  Soren Westermann also admitted that Widex's files contained a copy of the European equivalent of the '850 Patent that included handwritten notes by Soren Westermann's secretary equating it to the

'850 Patent. *See* PX 775 (Viv. Ex. 22); Tr. at 724:17-725:8. Obviously, this means that Widex considered the validity and application of Dr. Levitt's patent at least as early as the 1990's. Finally, Soren Westermann admitted that Widex's files contained a copy of the '749 Patent containing handwritten notes made by his secretary as early as August 5, 1993. *See* PX 774 (Viv. Ex. 21); Tr. at 725:10-727:5.

Widex also runs HIMPP, which was well aware of the Patents-In-Suit. *See* Tr. at 717:10-12. In 1996, HIMPP purchased patents from the "CID family," including at least one that cited the '850 Patent. *See* DX 1195 (Viv. Ex. 23); Tr. at 728:21-729:10. And, in 2001, as a member of HIMPP, Widex obtained a CD that identified the Patents-In-Suit as patents of interest to hearing aid companies. Tr. at 728:21-729:10, 716:21-718:5.

Despite this overwhelming evidence, Widex took the position at trial that it was not aware of the existence of the Patents-In-Suit before the filing of this lawsuit. *See, e.g.*, Tr. at 803:8-13 To reach its decision, the jury clearly believed Widex was not telling the truth. Even though Soren Westermann oversees Widex's patent department, which monitors patents in the hearing aid field, he persisted in claiming complete ignorance. *See* Tr. at 714:19-22. The jury did not buy this farce, especially considering that (1) Widex monitors patents in the hearing aid field; (2) Widex hired Dr. Levitt as its expert relying on his resume which contained the patents; and (3) Widex's files contained the Patents-In-Suit as early as August 5, 1993, it is evident that Widex was aware of the Patents-In-Suit before the filing of this lawsuit.

### b. <u>Widex Failed to Investigate</u>

Despite having direct knowledge of Dr. Levitt and the Patents-In-Suit, Widex admitted that it ***never*** investigated its possible infringement or the invalidity of the Patents-In-Suit. *See* Tr. at 733:1-735:2. Widex also admitted that it continued to sell the infringing products after it was sued without any work-around of its products. *See* Tr. at 782:19-24. Moreover, Widex

failed to introduce any attorneys' opinions as to its claim of non-infringement, and during oral argument we learned that they did not even receive an opinion except from their trial counsel. *See* Tr. at 1493:13-1495:7. The jury's willfulness verdict thus reflects its belief that Widex lacked any good-faith belief in the invalidity or non-infringement of the Patents-In-Suit. As this Court recognizes, in finding willful infringement, the jury necessarily rejects the argument that a defendant acts in good faith. *See nCube v. SeaChange Int'l, Inc.*, 313 F. Supp. 2d 361,383 (D. Del. 2004) (in finding willful infringement, the "jury necessarily rejected the argument that [defendant], in good faith, relied on opinion of counsel"). Widex willfully ignored the Patents-In-Suit when launching the infringing hearing aids. Indeed, Widex admitted that it continued to sell the infringing products after it was sued.

## C. Defendants' Litigation Behavior Warrants Full Enhancement

"Increased damages may also be awarded because of the bad faith of the other side." *Jurgens*, 80 F.3d at 1570. "Bad faith is used, for example, in referring to misconduct in the prosecution of or litigation over a patent." *Id.* "Such conduct includes . . . attorney or client misconduct during litigation. . . ." *Id.*

Recently, a district court found litigation misconduct where a litigant "pursued a strategy of giving superficial recognition to the court's claim construction rulings, while pressing its own interpretations of the claims" at trial. *Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersystems GmbH*, No. 98-cv-01072 at 12 (D. Colo. Feb. 12, 2008) (order for award of attorney fees and costs) (Viv. Ex. 24). The court also found that "[t]he opinions of Medtronic's experts were crafted to fit the infringement theories put forward by Medtronic's counsel, and those theories were legally and factually untenable in light of the court's claim construction." *Id.* at 12. The court's discussion regarding Medtronic's litigation misconduct bears recitation, as the facts and circumstances are strikingly similar to this case. The court stated:

- 14 -

> After receiving the Court's claims construction ruling, however, Medtronic and [its] lawyers had a duty to reexamine this litigation and make an objective assessment of the validity of Medtronic's claims that BrainLAB's products infringed the patent claims as construed. They were obligated to accept those rulings as the law of the case and proceed with an appeal by requesting certification of an interlocutory appeal or conceding the summary judgment motions. Rather than accept that the claims construction rulings stripped the merits from this case, counsel chose to pursue a strategy of distorting those rulings, misdirecting the jury to a different reading of the claim language, and blatantly presenting the jury with a product to product comparison contrary to established law and the Court's cautionary instructions. Additionally, they deceived the jury into accepting the statements in BrainLAB's FDA application as an admission of patent infringement. Capping all of this was a closing argument that misdirected the jury's attention from the focus of the case, carefully crafted to avoid the Court's instructions. That argument distorted both the evidence and the law, misleading the jury into a plaintiff's verdict.

*Id.* at 9-10.

The trial of this case was no different. Defendants presented theories of non-infringement that were legally and factually untenable in light of this Court's Claim Construction Order. Despite the Court's Claim Construction Order to the contrary, Defendants argued in opening and closing arguments, created pleadings and expert reports, put on witnesses, and introduced evidence to support their contentions that: (1) the Levitt patents were not adaptive, (2) the determining step required absolute measurement,[7] (3) the Levitt patents were two devices rather than one, and (4) the Levitt devices were too large to be commercially successful (despite admitting to the miniaturization that occurred between 1986 and the time the infringing products came onto the market). *See, e.g.*, Tr. at  179:14-180:18, 181:16-182:5, 203:6-204:19, 1031:25-1032:3, 1427:5-1428:12, 1582:25-1583:11, 1585:16-1586:1, 1592:25-1593:12. They also purposefully confused the jury with arguments and testimony concerning the demonstrative figures in the patent rather than deal with the language of the claims themselves. *See, e.g.*, Tr. at 1357:20-1365:19; *see also Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423

---

[7] At one point, the Court even corrected defense counsel's attempt to confuse "determining" with "measuring," reminding the Defendants to keep it "apples-to-apples." *See* Tr. at 1051:13-1052:6.

(Fed. Cir. 1994) (holding that the district court erred by permitting the defendant to make a comparison of the accused compound with a sample the defendant considered to be the patented compound instead of the claim); *see also SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).

Also, as the Court is well aware, counsel for Defendants began a purposeful strategy of misleading the jury as to the meaning of the EKMS[8] documents in opening statements and during questioning of witnesses. This mischaracterization built to a deplorable crescendo in the closing argument, when defense counsel knowingly disobeyed the Court's instructions. *See* Tr. at 2188:10-22, 2204:9-18. The bad faith misconduct of Defendants' counsel during closing argument is exactly the type of misconduct that warrants enhancement. Defendants' other litigation tactics during trial and discovery reflect a coordinated cover-up to disavow incriminating documents in an attempt to avoid infringement. In sum, Defendants' behavior throughout litigation supports treble damages.

### 1. The EKMS Smokescreen

At *Markman*, Defendants unsuccessfully argued that the claims should be limited to fixed filters. *See, e.g.*, D.I. 294 at 24:11-16, 33:3-24, and 35:8-12. As acknowledged in the Court's Claim Construction Order (D.I. 351), the claims do not address and have no limitation based on whether the filter coefficients are fixed or adaptive. *See* D.I. 351. In other words, the claims, as construed, cover both fixed and adaptive filters. Defendants were in an unfortunate position because their own marketing and technical materials, which described their "adaptive" filters in

---

[8] EKMS was an entity hired by ETG to determine if it could license the patented technology to the hearing aid industry. Unfortunately, these efforts began well after the Defendants began to infringe the patents. Therefore, no hearing aid company would be receptive to essentially admitting infringement, by admitting that they belatedly needed to license the patents. EKMS retained Dr. Eric Dowling to examine the patents to determine if the technology reflected in the patents was "adaptive" and contained in modern day hearing aids. Dr. Dowling opined that Dr. Levitt's patents were "adaptive." *See* DX 1642 (Viv. Ex. 25)

detail, admitted infringement.[9]  Also, in light of the Court construction of the "determining" step, Defendants could no longer argue an absolute measurement of phase and amplitude was required.

Instead of reexamining their position and making an objective assessment of the validity of ETG's infringement claims in light of this Court's claim construction order, Defendants chose to proceed to trial, continuously rearguing claim construction, and covering-up their infringement.  In preparation for trial, Defendants' non-infringement expert, Dr. Morley, supplemented his expert report to say that the EKMS documents "support his conclusions of non-infringement" because they "indicate that hearing aids that employ an adaptive filter for cancelling acoustic feedback do not infringe any of the '850 patent claims."  *See* Supplemental Expert Report of Robert E. Morley, Jr., D. Sc. on Behalf of Defendants (Viv. Ex. 26).  Similarly, Defendants' damages expert, Dr. Donohoe, also supplemented his expert report to say that "EKMS expert, Eric Dowling, in consultation with Dr. Levitt "'worked through the language of the ['850] patent and found that the body of the patent included language adverse to an interpretation of the claims involving a continuously adaptive approach.'"[10]  These supplementations indicate that Defendants were preparing to ignore this Court's lawful Order and reargue claim construction at trial.

Defendants' relied heavily on an EKMS Summary Report to reargue claim construction.[11]  *See* DX 1610 (Viv. Ex. 28).  Defendants repeatedly manipulated and used the

---

[9] *See, e.g.*, PX 820 (Viv. Ex. 3), PX 33 (Viv. Ex. 4), PX 394 (Viv. Ex. 5), PX 30 (Viv. Ex. 6), PX 391 (Viv. Ex. 7), PX 551 (Viv. Ex. 8), PX 393 (Viv. Ex. 9), JX 138 (Viv. Ex. 10), JX 26 (Viv. Ex. 11), JX 305 (Viv. Ex. 12); *see also* Tr. at 1042:12-15 (Christensen), 1044:23-1045:6 (Christensen).

[10] *See* Supplemental Expert Witness Report of Charles Donohoe on Behalf of Widex A/S, Widex Hearing Aid Co., Inc., Oticon A/S, Oticon, Inc., Bernafon AG, Bernafon LLC, WDH, Inc., and William Demant Holdings A/S (Viv. Ex. 27).

[11] The EKMS Summary Report (DX 1610) is extrinsic evidence to a claim construction analysis. Moreover, it was prepared over three years before the filing of this lawsuit.

EKMS Summary Report to suggest (1) that the Court's claim interpretation was wrong and (2) that ETG got an opinion from a "third" expert (Dr. Dowling) that confirmed Defendants' position that the asserted claims did not cover adaptive filters.[12]  The truth about Dr. Dowling's opinion is, in fact, quite the opposite.  *See* Dowling Declaration (Viv. Ex. 29)

These repeated references to EKMS were nothing more than a smokescreen intended to misdirect the jury to a different reading of the claim language and mislead the jury as to Dr. Dowling's actual opinion.  In fact, Defendants attempted to use the undated, unsigned EKMS Summary Report, in the absence of any testimony of EKMS or Dr. Dowling, for the proposition that the expert retained by ETG (Dr. Dowling) once had determined that ETG's patents were adaptive, but had changed his mind, found them not to be adaptive, and found the modern day hearing aids did not infringe the patents.  Defendants even argued during opening arguments that the EKMS Summary Report and other related documents proved non-infringement, stating, "So here we have three years before ETG files this lawsuit going to EKMS, a specialist in evaluating patents.  They hire a Ph.D. in exactly the technology necessary and he concludes that Widex and Oticon's continuously adaptive filters are not covered."  Tr. at 213:8-12.  The arguments enabled Defendants to focus the trial away from the merits of ETG's infringement claims.

Defendants also improperly elicited testimony from their experts as to the fixed nature of Dr. Levitt's patents, the determining step requiring an absolute measurement, their claims that the patents required two devices instead of one, and that the devices were too big to be operable. Instead of focusing the jury on a proper infringement analysis using the Court's claim

---

[12] Defendants mentioned the EKMS Summary Report on no less than *seven* occasions at trial.  First, Widex discussed EKMS at length during its opening argument.  *See* Tr. at 210:21-215:25.  Second, Defendants focused most of Mr. Chen's cross examination on EMKS issues.  *See* Tr. at 449:15-482:25.  Third, Widex questioned Soren Westermann about EKMS during his direct examination.  *See* Tr. at 803:13-14.  Fourth, Demant similarly questioned Niels Jacobsen about EKMS during his direct examination.  *See* Tr. at 972:21-24.  Fifth, Charles Donohoe discussed EMKS several times during his direct examination.  *See* Tr. at 1811:15-25, 1814:14-1816:2.  Sixth, Demant mentioned EKMS during its closing argument.  *See* Tr. at 2146:19-22.  Seventh, and most notably, Widex centered its closing argument around EKMS.  *See* Tr. at 2178:25-2185:15, 2188:24-2192:3, 2196:6-2200:5.

construction, Defendants instead argued to the jury (1) that they did not infringe because their hearing aids contained "adaptive" filters, *see e.g.*, Tr. at 1427:5-1428:12, 1582:25-1583:11, 1585:16-1586:1, 1592:25-1593:12, (2) that the EKMS Summary Report confirmed this position. *see, e.g.*, Tr. at 213:8-12, and (3) that the "determining" step required measuring. S*ee, e.g.*, Tr. at 1051:13-1052:20.  Unfortunately for Defendants, the claim construction order stripped these arguments away from them.  But much like the plaintiffs in *Medtronic*, Defendants "pursued a strategy of giving superficial recognition to the court's claim construction rulings, while pressing its own interpretations of the claims" at trial using this EKMS smokescreen.  *Medtronic Navigation, Inc*, No. 98-cv-01072 at 12.  Not only did they breach the claim construction order by arguing that Dr. Levitt's patents were not "adaptive," but they also argued that the patents required two devices instead of one and that the devices were too big to be operative - all in contradiction of this Court's claim construction order.

### 2. Defendants' Counsel Disobeyed The Court's Instruction

Having devised their trial strategy around contradicting this Court's Claim Construction Order and having fixed the jury's attention on this EKMS smokescreen, Defendants, despite warnings from the Court to the contrary, forged ahead to misrepresent the EKMS documents to the jury in their closing arguments.[13]  Defendants knew, however, that doing so would be risky.

During opening argument, Widex counsel discussed EKMS at length and stated:

There's another technical expert who also has a Ph.D. in electrical engineering and who is also of the opinion that the two patents in this lawsuit do not cover continuously adaptive filters, such as defendants' products.

Now, this third expert is not someone whose going to testify on behalf of Widex. It's not someone whose going to testify on behalf of Demant.  This third expert was an expert that was retained by ETG, the plaintiff in this case.

---

[13] *See* Viv. Ex. 30, which is a timeline of events surrounding the EKMS documents.

This third expert was retained by ETG about three years before this lawsuit in
2002. It started in 2005. Three years before, and they were -- ETG asked them to
evaluate the patent. This expert was a person by the name of Dr. Dowling, Dr.
Eric Dowling, and he was acting for a company called EKMS. EKMS was a
company that specializes in licensing and evaluating patents.

Tr. at 210:21:211:12. Defense counsel also stated, "So here we have three years before ETG

files this lawsuit going to EKMS, a specialist in evaluating patents. They hire a Ph.D. in exactly

the technology necessary and he concludes that Widex and Oticon's continuously adaptive filters

are not covered." Tr. at 213:8-12. Defendants made these statements despite never having

interviewed or deposed anyone from EKMS, much less Dr. Dowling.[14]

Defendants continued to focus on Dr. Dowling and the EKMS Summary Report during

Kimball Chen's cross examination. *See* Tr. at 449:15-482:25. Defendants repeatedly implied

that Dr. Dowling came to a conclusion that that the body of the patent included language adverse

to an interpretation of the claims involving a continuously adaptive approach. *Id*; *see also* DX

1610 (Viv. Ex. 28), DX 1623 (Viv. Ex. 31), and DX 1642 (Viv. Ex. 25).

Dr. Dowling's previous written statement (after thoroughly analyzing the patents)

directly contradicted this implication. He emphatically stated:

The bottom line is nobody but a red-faced liar could read these cites and say the
'850 Patent does not contemplate adaptive filtering. On the contrary, it is spelled
out in certain claims and objects of the invention and is disclosed in the spec in
several places.

DX 1642. During trial, ETG located Dr. Dowling in Costa Rica to determine whether he had, as

Defendants suggested, ever changed his opinion as to the adaptive nature of Dr. Levitt's patents.

Dr. Dowling confirmed in a declaration that he "the only opinion [he] gave at the time of [his]

technical evaluation of the Levitt Patents was that the Levitt Patents cover 'an adjustable filter

---

[14] After opening arguments, Plaintiffs were able to locate Dr. Dowling in Costa Rica and obtain a
declaration from him. *See* Viv. Ex. 29. He was equally available to the Defendants who purposefully sought to
mischaracterize the evidence rather than speak with Dr. Dowling.

[that] is adaptively adjusted so as to estimate the acoustic environment and cause the feedback signal to be cancelled." Dowling Declaration at ¶ 22 (Viv. Ex. 29). Regarding the so-called "red-faced liar" email, *see* DX 1642 (Viv. Ex. 25), Dr. Dowling declared that he "never changed his view" that "nobody but a red-faced liar could read these cites and say the '850 Patent does not contemplate adaptive filtering." *See* Dowling Declaration at ¶¶ 14-15 (Viv. Ex. 29). This and other statements by Dr. Dowling confirmed that Defendants' statements to the jury were false and improper. *See* Dowling Declaration (Viv. Ex. 29) at ¶¶ 4-22.

In light of Defendants' improper arguments and questioning of witnesses, having obtained Dr. Dowling's declaration to the contrary, ETG sought to call Dr. Dowling as a rebuttal witness. *See* Tr. at 1245:3-1246:10, 1503:23-1520:23. Defendants argued vehemently against bringing Dr. Dowling to trial as a rebuttal witness and the Court denied ETG's request, *see* Tr. 1520:1-9, but recognized the import of Dr. Dowling's Declaration (submitted to the Court in support of ETG calling Dr. Dowling as a rebuttal witness) during prolonged discussions with the Court just two days before closing arguments. *See* Tr. at 1784:3-17. During those arguments to the Court, ETG's counsel sought clarification as to what defense counsel would be permitted to say regarding Dr. Dowling's "opinion" during closing argument in light of Dr. Dowling's Declaration that was contrary to Defendants' statements to the jury. *See* Tr. at 1790:5-1796:13. ETG's counsel raised the concern that defense counsel would "imply that Dr. Dowling changed his mind," in direct contradiction with Dr. Dowling's Declaration. Tr. at 1796:2-3. Mr. Mandir responded, "No," suggesting that defense counsel would not make this implication. Tr. at 1796:4. The Court agreed that such a suggestion was improper. Tr. at 1796:5.

During closing argument Defendant's counsel did exactly what he said he would not do and what the Court forbid him to do. First, he misled the jury by stating that Dr. Dowling's prior

opinion on the adaptive nature of Dr. Levitt's patents were limited to the noise filtering function

and did not apply to cancelling feedback. Tr. 2181:9-2182:12   The very document he referred to

as well as Dr. Dowling's declaration clearly refuted that misrepresentation. Defense counsel then

began to state and imply that Dr. Dowling changed his opinion and found Dr. Levitt's patents not

to be adaptive. Tr. 2183:20-24, 2185:13-15.  Plaintiff's lawyer objected. Based on counsel's

conduct during closing argument, which had violated the Courts' admonition, at a sidebar during

closing argument, the Court instructed defense counsel to advise the jury that Dr. Eric Dowling

never changed his mind regarding the adaptive nature of the Patents-In-Suit.  *See* Tr. at 2185:16-

2188:22.  Specifically, the Court instructed Defense counsel to tell the jury that "[defendants] are

not saying that Eric Dowling changed his mind."  Tr. at 2188:10-15.  Despite this explicit

instruction, Defendants' counsel failed to do so and instead advised the jury:

> Okay.  So we were reading Eric Dowling, the EKMS expert, took a look at the
> patent while EKMS arranged a second call with Harry Levitt for early August.
> Over the course of two calls, we worked through the language of the patent and
> found that the body of the patent included language adverse to an interpretation of
> the claims involving a continuously adaptive approach.
>
> Now, I don't know exactly how that came about.  I don't know how it came about.
> All I know is this EKMS document says it and this was given to Audimax.
> They're saying that they looked at it and EKMS is coming to the conclusion that
> they interpret the claims -- EKMS interprets these claims to be something adverse
> to interpretation that would involve a continuously adaptive approach.

Tr. at 2189:1-14.  That Mr. Mandir had violated the Court's direct instruction was evident even

to his co-counsel, Mr. Romary, who passed up a note to Mr. Mandir during the his closing

reminding him to follow the Court's instruction.  *See* Steinberg Declaration at ¶ 3 (Viv. Ex. 32);

*see also* Buroker Declaration at ¶ 3 (Viv. Ex. 33).

Indeed, Defense counsel confirmed as much during the ensuing sidebar.  The Court

admonished Mr. Mandir that "[he] didn't say anything about it."  Mr. Mandir admitted his

failure, responding, "I know, you are right."  Tr. at 2204.[15]

In addition to ignoring the Court's instruction, defense counsel also made misleading statements to the jury during closing arguments.  Defense counsel argued that the so-called red-faced liar email, *see* DX 1642 (Viv. Ex. 25), does not say "adaptive filtering for feedback cancellation," and only refers to claims that do not "have anything to do with feedback cancellation."  Tr. 2181:12-2182:12.  Defense counsel then only referenced Dr. Dowling's first of many citations that supported Dr. Dowling's position that the '850 Patent dictated adaptive filtering.  *Id.*  Conveniently, defense counsel ignored the next citation on the next page, in which Dr. Dowling cites to the following passage, which he says "clearly [] dictates adaptive filtering:"

> Still another object of the invention is to provide new and improved hearing aid apparatus that is capable of effective noise and reverberation suppression and acoustic feedback reduction while maintaining optimum hearing characteristics as the speech and noise levels vary.

DX 1642 at UTEK0031.  By ignoring this passage, defense counsel mislead the jury to believe that Dr. Dowling's opinion was not related to feedback cancellation.  This belief directly contradicts Dr. Dowling's declaration.  *See* Dowling Declaration (Viv. Ex. 29) at ¶ 17.

Defense counsel's admitted misconduct and other misleading statements were particularly egregious and should not be countenanced.  Rather, it is precisely the type of bad faith litigation misconduct that warrants treble damages. Moreover, this ground for treble damages and attorneys fees does not rely in any manner on the claim construction order - but is a separate and distinct act of misrepresentation and failure to abide by the Court's orders.

---

[15] Following closing arguments and the jury's departure from the courtroom, Mr. Romary and Mr. Mandir engaged in a heated argument during which Mr. Romary criticized Mr. Mandir for ignoring the Court's instruction. *See* Steinberg Declarations (Viv. Ex. 32) at ¶ 4.  Mr. Romary noted that he even gave Mr. Mandir a note to tell the jury what the Judge told him and Mr. Mandir ignored it.  Steinberg Declaration (Viv. Ex. 32) at ¶ 4.  Mr. Mandir then apologized to Mr. Romary.  *Id.*  Mr. Romary repeated his statement that he had warned Mr. Mandir, during closing argument, but Mr. Mandir had ignored him, during the post verdict session with the court.  *See* Steinberg and Buroker Declarations (Viv. Exs. 32 and 33) at ¶¶ 5 and 4, respectively.

### 3. Defendants Covered Up Blatant Infringement

Defendants' technical and marketing documents admitted infringement. In view of this admitted infringement, Defendants attempted to mislead and distract the jury at trial. First, Defendants attempted to distract the jury by rearguing claim construction. *See supra*, Section V.C.1. The second attempt was by covering up the admitted infringement, offering shifting non-infringement positions throughout discovery and trial. Defendants believed that if they were successful at either of these attempts, they could avoid the consequences of their infringement.

The cover-up began during discovery, when Defendants took the position that their technical and marketing materials were inaccurate and that ETG could only rely on Defendants' code to provide accurate product descriptions.[16] As a direct result of Defendants' pre-trial position, ETG was required to hire Dr. Clay S. Gloster to review Defendants' code to determine whether it matched the technical and marketing materials.[17] To make matters difficult on ETG, Defendants insisted on only providing the code through an escrow agent, apparently believing that ETG lacked the resources to review the code and make this determination. Defendants were wrong. Dr. Gloster confirmed that the code and written materials matched, and submitted an expert report in this regard. Once Dr. Gloster confirmed that the code matched their technical and marketing materials, ETG knew what Defendants knew all along – all of Defendants' documents, including the technical materials, marketing materials, and code, admitted infringement. With no way out, Defendants set up a smokescreen and continued the cover-up.

At trial, to cover up their infringement, Defendants presented ETG with a moving target.

---

[16] *See, e.g.*, Nielsen Dep. Tr. (Viv. Ex. 14) at 85:4-11, 142:5-17, 148:5-8, 157:6-17, 185:5-12, 211:21-212:8, 212:20-213:8, 235:19-236:10, 237:5-18; Christensen Dep. Tr. (Viv. Ex. 15) at 25:3-6, 30:21-25, 31:16-32:2, 47:14-21, 52:12-20, 56:3-9, 62:4-7, 63:9-15, 74:7-75:4, 75:15-24, 81:7-23, 90:7-10, 90:21-91:10, 96:23-97:8, 98:25-99:15, 103:24-104:10, 104:17-23, 116:15-23, 140:17-141:2, 150:11-152:7, 157:7-158:7; Schaub Dep. Tr. (Viv. Ex. 16) at 20:17-21, 26:16-27:9, 43:4-12, 44:19-45:5, 45:15-19, 48:8-11, 59:17-25, 68:23-70:7, 73:5-20, 76:17-23, 78:6-80:9.

[17] Notably, the Defendants did not offer a rebuttal expert on this issue. In fact, the Defendants never disputed Dr. Gloster's analysis or conclusion.

First, Defendants' counsel completely disavowed their own witnesses' prior testimony, advising the jury that "We use it" (referring to the technology disclosed in Dr. Levitt's patents). Tr. at 165:12-15. Having heard Plaintiff's opening argument concerning the false testimony to cover up these blatant admissions of infringement, *see* 148:14-151:18, Defense counsel, in opening, also told the jury: "[a]nd if some of our witnesses are going to get up here and somehow be -- be seen to say that we don't [use an equal and opposite signal to cancel feedback], they're -- it's just not right." *See* Tr. at 165:10-17. Then, inexplicably, Defendants put on witnesses who continued to insist that their own written materials were not technically accurate. This time around, the witnesses changed their deposition testimony and they characterized their technical materials as having been written for a less-technical audience and the marketing materials as having been written for a non-technical audience.[18] However, Defendants' ruse was exposed during trial. First, the written materials were replete with scientific jargon and obviously not technically incorrect due to being tailored for a less informed audience. *See, e.g.*, PX 501 (Viv. Ex. 17), PX 30 (Viv. Ex. 6), PX 391 (Viv. Ex. 7), PX 551 (Viv. Ex. 8). Second, Defendants' materials contained graphics and charts representing their written descriptions, leaving no room for doubt. *See, e.g.*, PX 33 (Viv. Ex. 4). Third, the written and graphic depictions were contained in internal, technical materials and external marketing materials - which refuted the baseless argument that the materials were intended for a less scientific audience. *See, e.g.,* JX 138 (Viv. Ex. 10), JX 26 (Viv. Ex. 11), JX 305 (Viv. Ex. 12). Finally, Dr. Gloster testified that Defendants' written materials mirrored the computer code.

Moreover, it became painfully obvious why the Defendants were compelled to deny their

---

[18] *See, e.g.*, Tr. at 1124:2-1129:23, 1134:25-1135:17, 1136:6-1137:1 (Nielsen); Tr. at 1019:20-1020:14, 1037:13-1038:23, 1049:2-20, 1049:22-1050:7 (Christensen); Tr. at 1075:21-1077:17, 1078:12-1079:12, 1085:12-1086:3, 1089:1-1091:13, 1093:10-1094:8, 1096:25-1098:6 (Schaub).

own admissions, since their witnesses admitted that if they agreed that the written materials were accurate they would be admitting infringement. *See* Tr. at 1042:12-15 (Christensen), 1044:23-1045:6 (Christensen).  Therefore, after telling the jury that "We use it" and that any witness who denies it would not be right, the Defendants chose a strategy to place before the jury witnesses to testify to the exact opposite, hoping to mislead the jury into ignoring their admissions, while at the same time not having the jury believe that they lied in their own written materials.  To walk this fine line, Defendants mischaracterized their own documents and presented false testimony. And then, during closing, defense counsel stated:

> We spent hours of precious time over the last nine days arguing over terminology in marketing documents.  I said, and I'll say it again, feedback cancellation, feedback reduction, feedback suppression.  It doesn't matter what you call it. That is not what determines infringement.  It just doesn't matter.  You could call it Swiss cheese, as Dr. Anderson said on the stand.  It doesn't matter what you call it, it matters what you do.  It matters what is in there.

Tr. at 2132:6-14.

Despite their repeated attempts to cover up their infringement, Defendants never actually disputed Dr. Gloster's analysis "what's in there" in his determination of the code or his confirmation that Defendants' hearing aids performed as described in the technical and marketing materials.  *See, e.g.*, Tr. at 662:22-663:3 (Gloster).  And, as Dr. Brown opined, the technical and marketing materials admitted infringement.  *See* Tr. at 501:5-569:12.

The only plausible explanation for Defendants' shifting positions is that they engaged in a coordinated effort to avoid the consequences of infringement.  This cover-up was not surprising considering that the hearing aid manufacturers are intertwined with one another in a powerful oligopoly, in an effort to: (1) protect and maintain the oligopoly, (2) keep others out, (3) control the market by controlling technology, (4) rely on "cookie cutter" technology to save money and (5) protect their obscenely high margins and profits.  *See* PX 648 (German Federal

Cartel Office Report) at (Viv. Ex. 34). As noted in the German Federal Cartel Office Report, "According to information from the hearing aid manufacturers surveyed, virtually no market entries have taken place over the years past." *Id.* Moreover, "the Decision Division is of the opinion that the findings regarding competition on price and terms do not make it possible to recognize any clear indications of significant competition in the oligopoly." *Id.* at ¶ 250. "The present case is characterized far more by the fact that hearing aid manufacturers and hearing aid acousticians in Germany for the most part have a common set of interests, which lies not in competitive pressures directed against one another, but in the effort to obtain from the end customer the highest possible profit margin, both for the manufacturer and for the hearing aid acoustician." *Id.* at ¶ 271. It is also not surprising that the cover-up failed and ultimately proved infringement. As Mr. Christensen acknowledged, if he admitted the documents were accurate, he would be admitting infringement of the asserted claims. *See* Tr. at 1044:23-1045:6. The fact that Defendants coordinated this cover-up in an attempt to avoid the consequences of admitted infringement evidences bad faith litigation conduct that warrants enhancement.

### 4. Defendants Paid Fact Witnesses and Hired Industry-Friendly Experts

Like the plaintiffs in *Medtronic*, to effectively distract the jury and carry out the cover-up, Defendants needed witnesses and experts to fit the theories put forward by defense counsel. So Defendants paid exorbitant sums to purported independent fact witnesses to testify that obscure and irrelevant projects they were involved in were prior art. *See* Plaintiff ETG's Memorandum in Support of its Motion for Judgment as a Matter of Law, filed concurrently herewith. They also hired industry-friendly, highly paid experts to dispute the Court's claim construction order.

Delaware Rule of Professional Conduct 3.4(b) provides, in pertinent part, that "[a] lawyer shall not…offer inducement to a witness that is prohibited by law." Del. Lawyers' R. Prof'l Conduct R. 3.4(b) 2003. In applying a similar rule, a district court in the Third Circuit found it a

violation of Rule 3.4(b) to compensate a fact witness outside of reasonable compensation for time and expenses. *See, e.g., In re Complaint of PMD Enter. Inc.*, 215 F. Supp. 2d 519, 529-30 (D.N.J. 2002). One can assume, therefore, that if a lawyer compensates a fact witness unreasonably, the lawyer is acting in bad faith.[19]

In this case, Demant retained Dr. Egolf as a purported consultant. *See* Egolf Dep. Tr. (Viv. Ex. 35) at 18. When asked about his relationship with Demant, Dr. Egolf testified that his so-called "consulting" work consisted of nothing more than reviewing his own records to find documents pertaining to this case and showing up at a deposition to testify for Defendants. *See* Egolf Dep. Tr. (Viv. Ex. 35) at 19. By the time of his October 9, 2007 deposition, Defendants had already paid Dr. Egolf *approximately $53,000* with much more to come. *Id.* at 21.

Not surprising, at trial, Dr. Egolf attempted to cover-up the fact that he was a handsomely paid fact witness. *See* Tr. at 1179:15-1181:2. First, after denying that he was represented by defense counsel, Dr. Egolf testified that he was hired as an "expert witness." Tr. at 1180:22-24. Then, he acknowledged that he was only testifying as a fact witness. Tr. at 1180:25-1181:2. Finally, when pressed, Dr. Egolf admitted to being paid well over ***$53,000*** for his testimony. Tr. at 1182:21-1184:25. But this attempted cover-up also failed, as it became clear to the jury that Dr. Egolf was a paid fact witness. Dr. Egolf himself even admitted that he was "not an independent witness." Tr. at 1179:15-1181:2. In addition, Dr. Egolf was repeatedly impeached with his own testimony. For example, when asked whether he was represented by one of the law firms representing the defendants, Dr. Egolf answered, "I don't know what you mean by

---

[19] Although the Court did not disqualify these paid fact witnesses prior to hearing their testimony, on cross-examination, these paid fact witnesses admitted to receiving exorbitant amounts to review their own files and testify to facts, while being represented by Defendant's counsel, stretching the truth to try to characterize their obscure, failed projects as prior art, can now be considered by the Court, as part and parcel of the litigation conduct of the Defendants *Cf. Qualcomm, Inc. v. Broadcom Corp.*, 2008 U.S. Dist LEXIS 911, *13-*16 (S.D. Cal. Jan. 7, 2008).

represented." Tr. at 1179:23-25.  Dr. Egolf was then impeached with his deposition testimony

where he previously admitted that Finnegan Henderson (Demant's trial counsel) was

representing him.  Tr. at 1180:4-21.  Dr. Egolf was a classic example of a purely "fact" witness,

who, having been corrupted by huge payments, went out of his way to characterize his testimony

to benefit his "sponsor."  *See In re Complaint of PMD Enter. Inc.*, 215 F. Supp. 2d at 529-30.

But Defendants did not stop at paying Dr. Egolf.  Rather, they paid several other fact

witnesses, including Mr. Kim Weaver.  Defendants paid Mr. Weaver to assist them by

"recall[ing] the work that was done on [Mr. Weaver's] thesis and to give some general

information, [and] help [Demant's counsel] understand a little better the hearing aid systems…."

Weaver Dep. Tr. (Viv. Ex. 36) at 82;  *see also* Tr. at 1265:19-22.  Prior to trial, Defendants paid

Mr. Weaver approximately $8,000 for his work as a purported independent fact witness. [20]  Tr. at

1265:19-22.  The fact that Defendants paid large sums of money to purported independent fact

witnesses evidences a bad faith attempt to secure favorable testimony from purely fact witnesses

that warrants enhancement.

Defendants' reliance on industry-friendly experts also warrants enhancement.  Much like

overpaying fact witnesses, choosing industry-friendly experts suggests a bad-faith effort to

ensure favorable testimony.

Defendants' invalidity expert, Dr. Sigfrid Soli, is a Vice-President of Intellectual Property

with the House Ear Institute, an industry-friendly organization.  Tr. at 1644:16-21.  The House

Ear Institute has had high-dollar contracts with a number of companies in the hearing aid

industry.  Tr. at 1695:12-20.  For example, the House Ear Institute had a $300,000 research and

---

[20] Conveniently, Dr. Egolf and Mr. Weaver could not recall how much additional time they would be billing Defendants for through trial.  Both gentlemen spent significant time after their depositions and also spent many days in Wilmington preparing to testify.

co-development contract with Starkey (a HIMPP member that had settled prior to trial).  Soli

Dep. Tr. at 26:16-27:12 (Viv. Ex. 37).  Moreover, hearing aid manufacturers contribute to the

House Ear Institute.  Tr. at 1695:21-1696:5.  In light of this support, Dr. Soli had many reasons

to remain friendly with members of the hearing aid industry.  To ensure that Dr. Soli fit the

theories put forward by defense counsel, Widex also paid Dr. Soli a significant amount for his

testimony.[21]  Soli Dep. Tr. (Viv. Ex. 37) at 37:22-38:13.  In fact, Widex paid Dr. Soli

approximately $55,000 before his deposition, continued paying him for his services through trial.

*Id*. at 38:14-39:5 (Viv. Ex. 37).  Because Dr. Soli's organization, the House Ear Institute, is

funded and supported by the hearing aid manufactures, and Dr. Soli was well-compensated

himself, Dr. Soli had an incentive to provide favorable testimony on behalf of the Defendants.

Likewise, Defendants' non-infringement expert, Dr. Morley, also had a substantial

incentive to provide favorable testimony on behalf of the Defendants.  In fact, Dr. Morley, who

smarted about missing a fantasy baseball camp because of testifying, made so much money from

working on this case, he could buy his own fantasy baseball camp.  *See* Tr. at 1444:15-1445:11.

Defendants needed Dr. Morley to accommodate the untenable non-infringement theories put

forward by defense counsel.  Because (1) Dr. Morley was a researcher at the Central Institute for

the Deaf, *see* Tr. at 1342:1-8, and (2) he is listed as inventor on the "CID family" of patents that

HIMPP purchased to establish its organization, Defendants knew that he would provide them

with the testimony they needed.  *See* DX 1195 (Viv. Ex. 23); s*ee* DX 1196 (Viv. Ex. 38); *see*

*also* Tr. at 729:13-17 (S. Westermann).

Again, to ensure that Dr. Morley would fit the theories put forward by defense counsel,

Defendants paid Dr. Morley well over $150,000 for his expert services. Defendants artfully used

---

[21] Ironically, at trial, Soren Westermann suggested that having a degree in psycho-acoustics (Dr. Soli had), did not qualify him to opine on engineering issues related to hearing aids.  *See* Tr. 741:11-14.

Dr. Morley and other witnesses to contradict this Court's Claim Construction Order on the issue of the "adaptive" nature of the devices, the proper scope of the "determining" step, the requirement for two devices, and the size of the devices.

As discussed above, Defendants trial strategy rested heavily on distracting the jury and covering up their infringement. *See supra*, Section V.C. To carry out this plan, Defendants paid exorbitant sums to purported independent fact witnesses and hired industry-friendly experts. Such bad-faith conduct supports treble damages. *Id.*

### 5. Defendants' Pre-Trial Litigation Tactics Support Enhancement

Defendants' litigation tactics reflect a consistent effort to drive up the cost of litigation in an effort to wear down ETG. As this Court is aware, this case initially included several other defendants who settled before trial. Counsel for Widex and Demant took a lead role in the defense during discovery. For example, Widex and Demant counsel were primarily responsible for all inventor depositions and took a lead role in scheduling depositions of prior art witnesses. Widex's counsel appeared to be responsible for invalidity defenses on behalf of all defendants. Not surprising, Defendants also appeared to coordinate the expense-enhancing effort on behalf of all defendants. Without reciting the entire history of this litigation, the following are representative examples of Defendants' expense-enhancing tactics:

- **Document production games:** Defendants produced excessive amounts of documents during the last three months of discovery and after the close of discovery. Notably, during June 2007, defendants including Widex, Demant, Sonic, GN ReSound, and Phonak produced 23,538 documents totaling 613,778 pages. *See* Declaration of Thomas M. McKenney at ¶ 3 (Viv. Ex. 39). During July 2007, defendants including Widex, Demant, GN ReSound, and Phonak produced 5,562 documents totaling 47,121 pages. *Id.* at ¶ 4. During August 2007, Defendants including Widex, Demant, Sonic, GN ReSound, and Phonak produced 44,495 documents totaling 517,351 pages. *Id.* at ¶ 5. After the close of discovery, defendants including Widex, Demant, Sonic, and Phonak continued to produce 1,139 documents totaling 8,032 pages. *Id.* at ¶ 6 In sum, the defendants produced 74,734 documents totaling 1,186,282 pages from June 1, 2007 through after the close of discovery. *Id.* at ¶ 7. Of these documents, Widex produced 10,626 documents totaling 108,651 pages and Demant produced 992 documents totaling 512,347 pages. *Id.*

at ¶ 8.  This late production was made more offensive in light of the fact that discovery was extended on June 13, 2007 from July 31, 2007 to August 31, 2007.  Moreover, these documents were responsive to ETG's only document requests, which were served in December *of 2006*.  Without this extension, the Defendants would have actually produced approximately 1.2 Million documents during the last two months of discovery.  Not surprising, this late production also proved costly for ETG.  With the discovery cut-off impending, ETG was forced to hire several contract attorneys to review the 1.2 million pages of documents that were dumped on ETG at the last minute.  Defendants also made it a practice of producing documents just prior to depositions.  In one example, just days before a scheduled deposition in Denmark, Demant produced over 1,500 pages of relevant documents (in electronic format) to ETG's counsel's office in Washington D.C. when ETG and Demant were preparing for depositions in Denmark.  Widex also engaged in a similar practice, producing 63,000 pages of documents just  days before the 30(b)(6) deposition of Widex Hearing Aid Company.  Defendants, led by Widex and Demant, played these document production games to drive up ETG's cost and divert their attention away from taking depositions and preparing for trial.

- **Failure to produce HIMPP documents:**  As this Court is aware, several other companies were parties to this litigation.  ETG requested documents relating to HIMPP from all defendants, including Widex and Demant.  Certain of these HIMPP documents, including the HIMPP Voluntary Procedures, were produced by defendant Sonic Innovations, Inc ("Sonic"), but were not produced by any other defendants, including Widex and Demant.  Because Widex runs HIMPP, it certainly had access to these HIMPP documents.  But Widex and Demant laid a plan to hide these HIMPP documents from ETG.  The only reason ETG received these documents was because another defendant, who was not "in" on Widex and Demant's plan, produced them.

- **Demant's late assertion of Affirmative Defenses:**  As this Court is aware, Demant first specified its inequitable conduct defenses in its supplemental responses to ETG's interrogatories on August 31, 2007.  ETG was forced to object to the assertion of these defenses as untimely and fully brief the issue.  Although ETG ultimately prevailed, this additional work near the close of the discovery was costly for ETG.

In sum, when given the opportunity, Defendants consciously acted to drive up the cost of litigation and wear down ETG and its counsel.  Such improper pre-trial litigation conduct warrants enhancement.

### D.  The Other *Read* Factors Also Favor Full Enhancement Of Damages

The other *Read* factors strongly favor enhancement of damages to punish Widex's conduct and to deter other infringers from disregarding legitimate patent rights.

### 1.  Widex's Large Size and Financial Resources

Widex's large size and financial resources further support treble damages.  As Soren

Westermann testified, Widex earns revenues of approximately $300 Million per year.  Tr. at

712:17-21.  Moreover, Widex's sales of infringing products alone totaled $306 Million.  Tr. at

855:18-22.  Given Widex's financial resources, treble damages will have minimal impact on

Widex's financial condition as Widex earns revenues of approximately $300 Million per year.

*See Promega Corp. v. LifeCodes Corp.*, 53 USPQ2d 1463, 1477 (D. Utah 1999) (awarding treble

damages based partially on defendant being "financially capable of paying an enhanced damages

award").  The fact that Widex is financially capable of paying enhanced damages should not

come as a surprise given they "charge as much as [they] can," but '[t]hat's not always enough."

Tr. at 400:11-12 (T. Westermann).

### 2.  This Case Was Not A Close Case

The case for infringement and validity was not close.  The appropriate question regarding

enhancing damages under this *Read* factor is whether the case against the infringer was a close

one.  *See nCube*, 313 F. Supp. 2d at 390 (holding case was not a close one, under *Read* factors,

where jury found infringement of every asserted claim).  As noted above, Defendants sought to

cover-up their admitted infringement.  The jury saw past this cover-up and found every asserted

claim valid and infringed.  *See* D.I. 521.

### 3.  Widex's Years of Willful Infringement and Intent to Continue Infringing

Widex willfully infringed the Patents-In-Suit for approximately five years.  Where the

defendant takes no action to address the infringement accusation, and thus continues to infringe

for an extended period and throughout the litigation, enhancement of damages is particularly

called for.  *nCube*, 313 F. Supp. 2d at 390 ("relevant inquiry is whether a defendant failed to

discontinue its infringement 'once notified of [plaintiff's] lawsuit'").  As noted above, Widex

- 33 -

had knowledge of the Patents-In-Suit since 1993. *See supra* Section V.B.1.a. Soren Westermann admitted that Widex continued to sell the infringing products with knowledge of the alleged infringement. *See* Tr. at 782:19-24. Thus, the duration of Widex's infringement (*Read* factor 6) and Widex's refusal to take any remedial measures (*Read* factor 7) weigh heavily in favor of enhancement. Moreover, Widex presented no opinion of counsel to refute infringement or demonstrate due diligence. *See* Tr. at 1493:13-1495:7.

### 4. Defendants' Motivation for Harm

This *Read* factor weighs heavily in favor of trebling damages against Widex. Defendants' motivation to harm ETG is apparent. They needed to send a message to other small companies that the oligopoly controlled patented technology in the industry, and that outsiders who had innovative technology would face an expensive, protracted litigation. Defendants are both members of HIMPP. Tr. at 716:21-24. As Soren Westermann admitted, hearing aid manufacturers, including Widex and Demant, created HIMPP to eliminate a threat of patents being enforced against the hearing aid companies. Tr. at 721:25-722:3. Soren Westermann also stated that one of HIMPP's purposes was to prevent patents from falling into the hands of people outside the major hearing aid manufacturers. Tr. at 811:25-812:6. He testified that "the partners of HIMPP believed it more safe to have HIMPP buy [the Decibel patents] than risk them falling into the wrong hands." Tr. at 794:10-14. When asked what he meant by the "falling into the wrong hands," he finally admitted that he was referring to persons or companies other than the major hearing aid manufacturers. Tr. at 811:25-812:6. In sum, HIMPP was created to support and foster the oligopoly among the leading hearing aid manufacturers.

ETG is not a hearing aid manufacturer or HIMPP member. As members of HIMPP, Defendants attempted to use ETG's case to send a message to other companies like ETG that HIMPP members intend to infringe an "outsider's" patent without regard to the consequences.

Doing so, they also signaled to other companies like ETG that the only recourse against a

HIMPP member would be to engage in a protracted, expensive litigation. Once sued,

Defendants therefore were motivated to prevent ETG from enforcing its patent rights against

HIMPP members to protect the organization whose stated purpose was to prevent patents from

falling into the hands of people outside the oligopoly of major hearing aid manufacturers.

### 5. Widex Copied the Patents-in-Suit

There is an abundance of evidence that Widex copied the Patents-In-Suit. As noted

above, Widex hired Dr. Levitt and was certainly aware of his patents prior to introducing the

infringing hearing aids into the market. *See supra* Section V.B.1.a. As confirmed by the jury,

Widex hearing aids incorporate the claimed features. Moreover, Widex marketed its products as

including these claimed features in its internal scientific data and external marketing materials

which contained significant admissions. Thus, it is evident that Widex copied the feedback

cancellation technology from the Patents-In-Suit and included them in its hearing aids.

### E. The Totality Of The Circumstances And The Policy Behind Enhanced Damages Supports Treble Damages

The jury verdict of willful infringement is itself sufficient reason for the Court to enhance

damages. When the willfulness is combined with the rest of the circumstances (the *Read* factors

supporting enhancement and Defendants' litigation misconduct), a clear-cut need for enhanced

damages becomes apparent. The *nCube* court addressed a similar situation and stated, "Based on

the jury's findings of willful infringement and in light of the aggravating factors weighing in

favor of enhanced damages in this case, this Court concludes that nCUBE is entitled to an award

for enhanced damages." *nCube*, 313 F. Supp. 2d at 390-91. Many of the factors discussed in

*nCube* are also found in the present case: (1) Widex willfully infringed a valid patent for over

five years; (2) Widex did not form a good-faith belief of non-infringement or invalidity; (3)

Defendants engaged in litigation misconduct; (4) Widex will not be materially impacted by an award of enhanced damages; (5) the case was not close; (6) Widex failed to take remedial actions; (7) Defendants were motivated to harm ETG; and (8) Widex copied the Patents-In-Suit.

Enhanced damages are intended to punish culpable conduct and deter infringement. This case presents a classic situation of a big, highly profitable company that knows of certain patents, but makes a conscious decision to ignore those rights. Sitting on absurd profits and without a good-faith investigation, Defendants hoped that ETG would never enforce its rights, go away, or that Defendants could make litigation too expensive for ETG to pursue. Absent enhanced damages, infringers are encouraged to take their chances in litigation because the damages end up no worse than what the infringer would have paid in a hypothetical negotiation for a license. Deterrence of such gamesmanship is the precise reason that Congress included treble damages in Section 284.

### F.  This Case Is Exceptional And The Court Should Award ETG Its Attorney's Fees

This Court should award ETG attorney's fees for at least three reasons. First, this Court should award fees and costs from Widex because attorney's fees should normally be awarded when a defendant has willfully infringed a patent. Second, this Court should award attorney's fees from Widex and Demant because their collusive litigation misconduct makes this case exceptional. Third, this Court should award attorney's fees from Widex and Demant because the *Read* factors support an award of attorney's fees. In sum, this case is exceptional and because ETG is the prevailing party, the Court should award ETG its attorney's fees and non-taxable expenses from Widex and Demant.

### G.  This Case Is Exceptional Because The Jury Found Willful Infringement

This Court should award attorney's fees from Widex because Widex willfully infringed the Patents-In-Suit. A verdict of willful infringement is a sufficient basis to find that a case is

- 36 -

'exceptional' and award attorney's fees. *See Golight, Inc. v. Wal-mart Stores, Inc.* 355 F.3d 1327, 1339-40 (Fed. Cir. 2004) (standard of conduct necessary to hold a case exceptional need not be "more egregious conduct than willful infringement"). The Federal Circuit has uniformly upheld attorney fee awards "when willful infringement has been proven." *S.C. Johnson & Son, Inc. v. Carter-Wallace,Inc.*, 781 F.2d 198, 200-01 (Fed. Cir. 1986). The expectation that a Court should award attorney's fees in cases of willful infringement is so strong that the Federal Circuit has even stated that "[i]t is necessary for the trial court to explain why this is not an exceptional case in the face of its express finding of willful infringement." *Id.* at 200-201.

The jury, after hearing all of the evidence presented by both parties and hearing testimony from Soren Westermann, determined that ETG had shown by clear and convincing evidence that Widex was aware of ETG's patent rights and continued its infringing activities without having a reasonable good-faith belief that the Patents-In-Suit were invalid or that these patents were not infringed. Thus, on the jury's finding alone, the Court is justified in awarding attorney's fees from Widex. *See Domestic Fabrics Corp. v. Sears, Roebuck & Co.*, 326 F. Supp. 2d 694, 702 (E.D.N.C. 2004).

### H. Defense Counsel's Conduct Warrants Finding This Case Exceptional

The Court is also justified in awarding attorney's fees from the Defendants because of their coordinated litigation misconduct. In determining an award of attorney's fees, the Court need not look to the question of willfulness alone. *See, e.g., Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574-75 (Fed. Cir. 1996). Rather, a court can also consider other factors in determining whether a case is exceptional, such as the defendant's conduct during the entire litigation, a defendant's continuing infringement, and whether the outcome of the case was decided in the plaintiff's favor. *See nCube*, 313 F. Supp. 2d, at 361, 387 & 391; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 258 F. Supp. 2d 355, 359 (D. Del. 2003) (citing *S.C. Johnson*,

781 F.2d at 201)) (holding that "[m]any factors could affect the result[]…such as the closeness of the case, the tactics of counsel, the conduct of the parties, and any other factors that may contribute to a fair allocation of the burden of litigation between winner and loser").

The behavior of the Defendants and their counsel may – and should – properly be considered as yet another factor supporting an award of attorney's fees from both Defendants.[22] *See C.R. Bard*, 258, F. Supp. 2d at 359.  As discussed above, both Defendants acted in bad faith during the course of this litigation by misleading the jury at every turn and covering up their infringement.  *See supra*, Section V.C.  Both Defendants' counsel also disobeyed the Court's instruction during trial.  *See supra*, Section V.C.2.  Like the plaintiffs in *Medtronic*, Defendants "pursued a strategy of giving superficial recognition to the court's claim construction rulings, while pressing its own interpretations of the claims" at trial.  Defendants ignored this Court's Claim Construction Order, established the EKMS smokescreen and carried out the cover-up of admitted infringement in an effort to distract the jury from the merits of the case.  *Id.*  This type of misconduct supports an award of attorney's fees.  *See Kloster Speedsteel AB v. Crucible Inc.*, 793 F.2d 1565, 1580 (Fed. Cir. 1986) ("[B]ad-faith displayed in pretrial and trial stages, by counsel or party, may render the case exceptional under § 285."), *on remand sub nom.*, *Crucible Inc. v. Stora Kopparbergs Bergslags AB*, 701 F. Supp. 1157 (W.D. Pa. 1988) (awarding attorney's fees); *Scott Paper Co. v. Moore Bus. Forms, Inc.*, 594 F. Supp. 1051, 1086 & 1088 (D. Del. 1984) (holding case exceptional not only because of intentional infringement but also based upon defendants conduct during litigation).  Defendants' conduct prejudiced ETG and unnecessarily drove up the cost associated with this litigation.  The Court should therefore award

---

[22] ETG seeks attorney's fees from Widex and/or Demant.  As discussed above, Defendants and defense counsel coordinated their efforts at trial and those coordinated efforts resulted in attorney misconduct.  *See supra*, Section V.C.  Notably, during closing argument, both Widex and Demant made references to EKMS.  *See, e.g.,* Tr. at 2416:19-22; *see also supra*, Section V.C.2.

attorney's fees from the Defendants.

## I. Other *Read* Factors Support An Award Of Attorney's Fees

Many of the *Read* factors discussed above in Section V.D strongly support an award of attorney's fees from the Defendants. In the past, this Court has applied the so-called *Read* factors to determine whether attorney's fees should be awarded under § 285. *See nCube*, 313 F. Supp. 2d at 391-93. The *Read* factors applied above to Widex similarly apply to Demant. Demant is also a large company, having sold over $417 million dollars in infringing hearing aids, *see* Tr. at 853:21-854:17, and approximately 3.726 Billion Danish Kroners (approximately $778 Million) in assets as of its 2007 Annual Report. *See* William Demant Holding A/S 2007 Annual Report at 38 (Viv. Ex. 40). Like Widex, Demant did not take any remedial measures to avoid infringement. Tr. at 992:5-993:1. As a member of HIMPP, Demant was also motivated to harm ETG. *See supra*, Section V.D.4. Thus, the *Read* factors strongly support an award of attorney's fees from the Defendants.

## J. An Award of Attorney's Fees from Widex is Appropriate

In view of the jury's finding of willfulness and Defendants' pattern of bad faith conduct throughout the litigation, ETG urges the Court to declare this case exceptional and award ETG its attorney's fees, expenses, and costs.[23] This bad faith conduct also warrants sanctions under 28 U.S.C. § 1927 or the Court's inherent power to discipline attorneys and control the litigation. Widex had no reasonable non-infringement position, which should have been exceedingly clear

---

[23] *See* Fed. R. Civ. P. 54(d)(2)(B) & (C); Fed. R. Civ. P. 54, 1993 Advisory Committee Note ("The rule does not require that the motion [under Rule 54(d)] be supported at the time of filing with the evidentiary material bearing on fees. This material must of course be submitted in due course, according to such schedule as the court may direct in light of the circumstances of the case"). *Accord* 10 Wright, Miller & Kane, *Federal Practice*, § 54.154 at 54-228 (3d ed. 2001) ("A fee movant need not, and indeed should not, submit copious evidentiary materials designed to prove…the amount of the fee. Those evidentiary materials should be submitted only as directed by the court."); *Scripps Clinic & Research Found. v. Baxter Travenol Labs.*, 729 F. Supp 1473, 1478 (D. Del. 1990) (granting fees and ordering parties to brief exact amount of such award, if they could not agree).

after the Court's Claim Construction Order.  Instead of conceding infringement and proceeding to trial with invalidity theories, Widex took untenable and shifting positions on non-infringement, needlessly forcing ETG to expend resources to show what should have already been painfully clear to both sides – the Defendants' documents admitted infringement.

### K.  An Award of Attorney's Fees from Demant is Appropriate

In view of the Defendants' pattern of bad faith conduct throughout the litigation, both through Demant's counsel, and through their involvement and collusion with Widex and its counsel, ETG urges the Court to award attorney's fees against Demant and its counsel.  Demant cannot now claim to distance itself from Widex.  As Demant's counsel stated during opening argument, "[B]ecause we both have been sued by ETG, we're required to work together and act as a unit.  So we've split up our opening and some of the defenses have been split up…."  Tr. at 164:3-6.  Throughout trial, Demant colluded with Widex to mislead the jury by focusing on similar "theories" of non-infringement and engage in the cover-up.  Accordingly, Demant should also be sanctioned under 28 U.S.C. § 1927 or the Court's inherent power as appropriate.

## VI.  CONCLUSION

ETG has proven, and the jury has concurred, that Widex's infringement was willful.  This willful infringement occurred for over five years.  This Court should therefore exercise its discretion to enhance damages as punishment for willful infringement.

ETG should also be awarded attorney's fees and costs on the basis of Widex's willful infringement.  This Court should also consider that, in the totality of the circumstances, including Widex's willful infringement, the Defendants' litigation conduct and other *Read* factors, an award of attorney's fees from Widex is the just result.  Likewise, this Court should consider that, in the totality of the circumstances, including the Defendants' litigation conduct and other *Read* factors, an award of attorney's fees from Demant is the just result.

Dated: March 27, 2008

    /s/  Matthew A. Kaplan
Edmond D. Johnson (No. 2257)
Matthew A. Kaplan (No. 4956)
PEPPER HAMILTON
Hercules Plaza Suite 5100
1313 Market Street
Wilmington, DE 19899-1709
Telephone:  (302) 777-6500
Facsimile:  (302) 421-8390

*Attorneys for Energy Transportation Group, Inc.*

OF COUNSEL:

Marty Steinberg
HUNTON & WILLIAMS LLP
1111 Brickell Avenue
Suite 2500
Miami, Florida  33131
Telephone:  (305) 810-2500
Facsimile:  (305) 810-2460

Brian M. Buroker
HUNTON & WILLIAMS LLP
1900 K Street, N.W., Suite 1200
Washington, DC 20006-1109
Telephone:  (202) 955-1500
Facsimile:  (202) 778-2201

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone:  (804) 788-8788
Facsimile:  (804) 343-4630

## <u>CERTIFICATE OF SERVICE</u>

I do hereby certify that on the 27th day of March, 2008, I caused a true copy of the foregoing **Plaintiff Energy Transportation Group's Memorandum In Support of Its Motion For Enhanced Damages and Attorney's Fees** to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

Mary B. Graham (#2256)
MORRIS, NICHOLS, ARSHT &TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE  19899

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
901 New York Ave., N.W.
Washington, DC  20001-4413

*Attorneys for William Demant Holding A/S,
WDH Inc., Oticon A/S, Oticon, Inc.,
Bernafon AG, and Bernafon LLC*

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
MORRIS, NICHOLS, ARSHT &TUNNELL LLP
1201 N. Market Street
Wilmington, DE  19899

William H. Mandir
David J. Cushing
Carl J. Pellegrini
SUGHRUE MION PLC
2100 Pennsylvania Ave., N.W.
Washington, DC  20037

*Attorneys for Widex A/S, Widex Hearing
Aid Co., Inc.*

/s/ Matthew A. Kaplan
Matthew A. Kaplan (# 4956)