Appx. A

43
3

Chen - direct

1    hearing devices.

2              So we helped him and helped support some of his

3    work in that area.  We had no clear commercial objective.

4    But we wanted to help out.

5    Q.    As a result of becoming interested again in the

6    patents, what did you do?

7    A.    I engaged a consulting firm to go out and look at

8    licensing commercial and commercialization opportunities
for

9    the technology, for the patents.

10   Q.    What was the name of that firm?

11   A.    EKMS.

12   Q.    Can you tell the jury what EKMS is or was?

13   A.    I was introduced to EKMS by some other advisors of

14   ours.  They said that EKMS was skilled at helping people
who

15   had patents and other technology find ways to commercialize

16   it, to get license revenues, royalties, because we weren't

17   specialists in this.  And this is something that they did
as

18   a line of work.

19             So we thought that was a good thing to do, to

20   have them go out and see if the hearing aid industry would

21   be interested in licensing our patents, particularly given

22   the improved technical capabilities of chips and batteries.

23   Q.    Did you retain EKMS to value the patents?

24   A.    No.

25   Q.    Turn your book to DX-1630, please.

Chen - direct

1    don't recall the exact details of who.

2    Q.    What is your understanding of the results of EKMS's

3    efforts?

4    A.    My general understanding is that they were not able to

5    interest any hearing aid manufacturer in licensing

6    discussions.

7    Q.    Let's turn in your notebook to DX-1610.

8    A.    Okay.

9    Q.    This is entitled ETG Summary Report.  Do you see that?

10   A.    Yes.

11   Q.    Do you recognize this document?

12   A.    Again, may I just briefly flip through it ?

13          Yes, I recognize this.

14   Q.    I will ask you a few questions about the document. If

15   you will look with me on the first page at the second

16   paragraph on the first page, it states there that EKMS

17   contacted a company called Sound ID.  Do you see that?

18   A.    Yes.

19   Q.    And it states there, I think we are highlighting it on

20   the screen that, quote, "During this conversation, Sound ID

21   revealed that they did not feel that the main patent was

22   relevant to their practice," it goes down in the next

23   paragraph, "because their hearing aids use a process called

24   continuous adaptation."

25          Do you see that?

Chen - cross

1  would be also a kind of mixed result.  Same as when I have
a

2  discussion with somebody, it's fair to say we talked about

3  something together.  It doesn't mean that we agreed.

4  Q.   When you testified, why did you talk about this

5  document?  It was after the July document that you did talk

6  about.

7  A.   First of all, I wasn't asked to talk about this

8  document in the earlier question.  You are asking me about

9  it now so I'm answering.

10  Q.   So you were only asked to talk about the July
document

11  and then the EKMS report.  That is all you were asked to

12  talk about.

13  A.   That is my recollection of what I was asked a few

14  minutes ago.

15  Q.   Let's look at DX-1610.  Let's start off with the
first

16  paragraph of this.

17          And what it says is:  EKMS began working to

18  license the patents in the Audimax portfolio in late

19  May/early June of 2002.  At that time, the decision was
made

20  to focus in on the '850, which appeared to be the strongest

21  of the set of Audimax patents.  The following companies
were

22  chosen as targets:

23          And then it lists five companies.  The second

24  one is Widex, and the third one is Oticon.  Do you see
that?

25  A.   Correct.

46
4

Chen - cross

1    Q.    Who chose these targets?

2    A.    I have no idea but I certainly didn't.  It was

3    probably EKMS but I don't know exactly how this set of

4    targets was derived.

5    Q.    Next paragraph.

6          It talks about after talking with Harley Levitt

7    and Richard Dugot in mid May, we chose to contact several

8    ReSound scientists whose had started a second company,

9    called SoundID.  Do you see that?

10   A.    Yes, I do.

11   Q.    And do you know who SoundID is?

12   A.    Generally speaking.

13   Q.    Okay.  They're a company that EKMS went to talk to in

14   trying to license these patents; correct?

15   A.    Correct.

16   Q.    And when did you know about that?

17   A.    I recall vaguely that I knew that they, that SoundID

18   had been contacted back in the time range of when EKMS was

19   working for us and certainly my memory has been refreshed

20   since then.

21   Q.    Do you remember that SoundID had told EKMS that they

22   didn't think they infringed because they do a continuously

23   adaptive feedback cancellation technique?

24   A.    Well, that certainly is what I now understand based

25   upon all the documents I have had to review.

Chen - cross

1   A.   Yes.

2   Q.   It says, "Eric Dowling, the EKMS expert, took a look

3   at the patent while EKMS arranged a second call with Harry

4   Levitt for early August."

5        Do you see that?

6   A.   Yes.

7   Q.   Were you aware at the time that EKMS was talking to

8   Dr. Levitt about his patent?

9   A.   I was aware generally that they would be in contact

10  with him.

11  Q.   And were you aware that Dr. Dowling was talking to

12  Harry Levitt?

13  A.   Not specifically, but I was sure that EKMS was

14  contacting those people associated with us who were relevant

15  to what they had been asked to do.

16  Q.   It goes -- I am sorry.  Did you have more for that

17  answer?

18  A.   No.

19  Q.   It goes on to say, "Over the course of two calls, we

20  worked through the language of the patent and found that the

21  body of the patent included language adverse to an

22  interpretation of the claims involving a continuously

23  adaptive approach."

24        Do you see that?

25  A.   Yes.

46
8

Chen - cross

1    Q.    Were you made aware that EKMS had come to the

2    conclusion that there was an interpretation based on the

3    language in the patent adverse to an interpretation that
the

4    claims covered continuously adaptive approach?

5    A.    I am generally aware that certain people said that

6    this concept of continuously adaptive might be in their
view

7    a problem for us.  But I don't remember who it was.  I know

8    the Sound ID people apparently had said that.

9    Q.    Were you aware at the time that EKMS had come to that

10   conclusion?

11   A.    I was not aware that they had any strong conclusion

12   about this feature.

13   Q.    Now, let me see if I understand you, Mr. Chen.  You

14   are reading this paragraph up on the screen to mean that

15   this is not the position of EKMS, it's just the position of

16   Sound ID?  Did I understand you correctly?

17   A.    I can't say that this is EKMS's final conclusion,

18   because later on in the report they, EKMS said that the

19   report says that they hadn't completed their study of this

20   issue.

21   Q.    But this paragraph that we have up on the screen,

22   based on what you have read in this report, you don't think

23   that this is EKMS's opinion?  You think it's Sound ID's

24   opinion?

25   A.    I can't say.  I can't say one way or the other.

Brown - cross

1              Okay.  This is one of your slides, Mr. Brown.

2    It is for Claim 1 and Claim 2 of the '749 patent?

3    A.    That's correct.

4    Q.    And then we have, it's a chart.  We have the claim

5    language on the left-hand side and then on the right-hand

6    side we have the corresponding structure; correct?

7    A.    Correct.

8    Q.    And that structure is the structure that you have

9    to find either exactly or equivalently in the defendants'

10   products to find infringement; correct?

11   A.    That's correct.

12   Q.    Okay.  Now, there is a lot of structure there.  I

13   want to point to one in particular.  It's part of the

14   means for receiving.  And, in particular, it says it's an

15   analog-to-digital converter 40.  Do you see that?

16   A.    Yes.

17   Q.    Now, does the LMS filter have an analog-to-digital

18   converter?

19   A.    The data is already in the format.  The

20   analog-to-digital filter was done when it came into the

21   microphones so you definitely won't find that specific

22   element in there.

23   Q.    So the LMS filter does not have an analog-to-digital

24   converter; correct?

25   A.    No, it compares the correlation into digital
signals.

Brown – cross

1    Q.    And you wouldn't need anything equivalent to an

2    A-to-D converter because it's already digital; isn't that

3    correct?

4    A.    That's correct.

5    Q.    Okay.  Can we put up figure 2 of the '850 patent,

6    please?

7              Okay.  I know you are familiar with this figure,

8    Mr. Brown.  I think you may have testified that you had done

9    work for amplifiers for hearing aids; is that correct?

10   During your career.

11   A.    Probably around 20 of them.

12   Q.    I'm pointing right now at element 68.  Do you see

13   that?

14   A.    Yes.  68 is basically a single, as it's shown in this

15   drawing, it would be a linear amplifier.

16   Q.    And that is the amplifier for amplifying this speaker

17   right there, 69; correct?

18   A.    Not entirely.  The programmable limiter is also an

19   amplifier.  And the filter down at the bottom, 63, also had

20   some effect on both the signal, amplitude and frequency of

21   the signal.  So they all perform part of the amplifying

22   function.

23   Q.    Okay.  Thank you.  Now, do you see that little dot

24   where I'm pointing which is between this amplifier 68 and

25   this speaker 69?

Westermann - direct

1    Q.    Now, you are familiar with the '850 and '749 patents

2    at issue here.  Correct?

3    A.    Today I am, yes.

4    Q.    Now, in the 20 years since they have been filed, has

5    Widex ever filed an opposition in any patent office in the

6    world to those patents?

7    A.    To the Levitt patent?

8    Q.    Correct.

9    A.    No, we have never.

10   Q.    Now, we have talked about this industry association

11   called HIMPP.  It's an acronym, right, H-I-M-P-P?

12   A.    That's correct.

13   Q.    What does that stands for, if you can tell us?

14   A.    The hearing Instrument Manufacturers Patent

15   Partnership.

16   Q.    Patent partnership?

17   A.    Yes.

18   Q.    And HIMPP was started by certain hearing aid

19   manufacturers to acquire a group of patents.  Correct?

20   A.    That's correct.

21   Q.    And Widex is a member of HIMPP.  Correct?

22   A.    That's correct.  Widex is a partner in HIMPP.

23   Q.    Is the Demant entity a partner in HIMPP?

24   A.    Yes.

25   Q.    Now, did HIMPP assist the hearing aid industry,

Westermann - direct

1      including Widex and Demant, in obtaining CDs from a company

2      called MicroPatent that contains patents of interest to the

3      hearing aid companies?

4      A.      Yes.

5      Q.      And all the members of HIMPP, including Widex and

6      Demant, have access to that CD with those patents.
Correct?

7      A.      Yes.  I mean, that information is public.  So

8      everybody can get that.  You just have an easy way,

9      organized way of getting them.

10     Q.      You, in fact, are the managing director of HIMPP.
Is

11     that correct?

12     A.      That's correct.

13     Q.      And other personnel in your patent department also

14     have access to that database of patents.  Correct?

15     A.      That's correct.

16     Q.      And you personally have access to that database of

17     patents.  Correct?

18     A.      I do.

19     Q.      And all of the HIMPP members, including Demant, has

20     access to that database.  Right?

21     A.      Not correct, because they have their own database.

22     Q.      But that is essentially a copy of the database that

23     contains these patents.  Right?

24     A.      Essentially, yes.

25     Q.      And both the '850 and the '749 patents were in that

Westermann - direct

1    database that was distributed by HIMPP to the HIMPP
members.

2    Correct?

3    A.    That's correct.

4    Q.    And that occurred in about 2001.  Is that correct?

5    A.    That's correct.  I think 2001 or 2002.

6    Q.    Now, I am going to ask you about other knowledge
that

7    Widex had about the '850 and '749 patents other than the

8    database from HIMPP.  Okay?

9    A.    Okay.

10   Q.    I would like to refer in the book in front of you to

11   Exhibit PX-366.

12   A.    Okay.

13   Q.    And PX-366 purports to be an assignment of a patent.

14   Correct?

15   A.    Yes.

16   Q.    Do you recognize this document?

17   A.    I saw it during my HIMPP interview in Denmark.

18   Q.    Now, if you look about four or five pages back,
there

19   is actually an assignment agreement.  Do you see that?

20   A.    Yes.

21   Q.    It's dated June 1996.  Right?  You can see that in

22   the first full paragraph at the very end?

23   A.    Okay.  It's signed during August but --

24   Q.    So it's June 1996, signed in August 1996.  Correct?

25   A.    Yes.

Westermann - direct

1    Q.    Who signed that?

2    A.    The first signature is the CEO of the ReSound

3    Corporation, Peter Lebenthal (phonetic).  And the other

4    signature is me.

5    Q.    Okay.  And was this an assignment of certain patents

6    to HIMPP?

7    A.    Yes, it was.

8    Q.    Okay.  So that means that HIMPP, on behalf of the

9    hearing aid manufacturers, were assigned these specific

10    patents.  Correct?

11    A.    That's correct.

12    Q.    So let's turn next to 367, and 367 is a letter to
the

13    Patent Office by a law firm called Seniger, Powers, Levitt
&

14    Rodel, signed by Robert Evans.

15              Do you recognize that?

16    A.    Yes.

17    Q.    And that's a law firm that worked for HIMPP.

18    Correct?

19    A.    Correct.

20    Q.    And their assignment in this regard was to
effectuate

21    this assignment of these patents.  Right?

22    A.    That's correct.

23    Q.    Now, if you look at the second page, which is a

24    document which deals with the patent that was assigned to

25    HIMPP, it lists a number of U.S. patents that were

Westermann - direct

1    referenced in that patent.  Correct?

2    A.      Yes, it appears so.

3    Q.      And is Dr. Levitt's '850 patent referenced there?

4    A.      It is referenced as the second last document.

5    Q.      And the date of this assignment was 1996.  Correct?

6    A.      What again?

7    Q.      The date of the assignment we referred to before was

8    1996?

9    A.      That's correct, yes.

10   Q.      So Dr. Levitt's patent was in the files of HIMPP at

11   least as of 1996.  Correct?

12   A.      This document was in the files of HIMPP as of late

13   '96, yes.

14   Q.      Which referenced Dr. Levitt's patent.  Correct?

15   A.      That's correct.

16   Q.      Now, you know that the reason that Dr. Levitt's

17   patent is in that list of patents is because it was relevant

18   prior art to that technology.  Correct?

19   A.      It could be.

20   Q.      Well, didn't you testify that you knew that, in your

21   deposition we took, that you knew that that was the reason

22   it was listed, because it was relevant prior art?

23   A.      I mean, somebody believed it to be prior art.

24   Q.      Now, in fact, this statement, which is otherwise

25   known as an IDS statement, sent to the Patent Office, that

Westermann - direct

1    was the purpose of it, was it not, to identify prior art?

2    A.    I only learned that at the Danish hearing.

3    Q.    You learned that at the Danish hearing?

4    A.    Yes.

5    Q.    So let's turn now to PX-649.

6    A.    649?

7    Q.    Yes.

8    A.    Okay.

9    Q.    That's a document entitled Articles of Association
of

10    KS HIMPP.  Right?

11    A.    That's correct.

12    Q.    And that's the organization we have been talking

13    about of the hearing aid manufacturers?

14    A.    That's correct.

15    Q.    Now, if you turn to the next page, it says it's a

16    limited partnership.  Correct?

17    A.    That's correct.

18    Q.    And then it lists the few partners in Section 3.1.

19    Correct?

20    A.    That's correct.

21    Q.    And it lists Widex.  Right?

22    A.    That's correct.

23    Q.    And Oticon.  Correct?

24    A.    That's correct.

25    Q.    Now, the original goal of HIMPP was to eliminate the

Westermann - direct

1    threat of patents being enforced against the hearing aid

2    companies by 3M.  Right?

3    A.    That's correct.

4    Q.    And one of the members of HIMPP actually bought 3M's

5    patents and contributed them to this organization called

6    HIMPP; right?

7    A.    Contributed.

8    Q.    Yes.

9    A.    Sold it to him.

10   Q.    Sold it to him.  Okay.  And the members of HIMPP were

11   all competitors of the company that bought those patents;

12   correct?

13   A.    They were, yes.

14   Q.    Now, I'm going to direct your attention to Exhibit

15   773.  PX-773.

16         Do you have that in front of you?

17   A.    Yes.

18   Q.    And you have seen that before, right?

19   A.    Yes, I saw it also during the deposition.

20   Q.    And that's the registration for the patent?

21   A.    Registration, you could say that.

22   Q.    And this document came from Widex's records; correct?

23   A.    I believe so, yes.

24   Q.    And if you look at the top right-hand side, on the

25   top right-hand corner, the date there, now in Europe, they

Westermann - direct

1      reverse the month and year, right?  They reverse the day and

2      the month.  Excuse me.

3      A.      I believe it's opposite.

4      Q.      Compared to the way we write the day and the month in

5      the United States; right?

6      A.      It is correct that it is opposite.

7      Q.      So that would read, if I'm reading it correctly,

8      August 5th, 1993; am I reading that correctly?

9      A.      I think so, yes.

10     Q.      So this was in Widex's files from August 1993?

11     A.      Yes, it would have been.

12     Q.      And this is a description of Dr. Levitt's patent;

13     correct?

14     A.      No.

15     Q.      No?

16     A.      This is just registration of the number and its

17     filing date.

18     Q.      But it is the patent we're talking about in this

19     case; correct?

20     A.      Not actually.  This is the European equivalent.

21     Q.      It's the European equivalent of Dr. Levitt's patent

22     meaning it's the identical patent filed in Europe; correct?

23     A.      Not necessarily, because due to the filing history,

24     it may have changed, doing the prosecution in Europe.

25     Q.      Well, is there anything substantively different about

Westermann - direct

1    the European patent from the American patent that you are

2    aware of?

3    A.    I don't remember but there was only one.

4    Q.    There was only one; correct?

5    A.    Yes.

6    Q.    Okay.  And, in fact, you can see that by the

7    inventors being Dr. Levitt, Mr. Dugot and Mr. Kopper;

8    correct?

9    A.    Yes.

10    Q.    And you can also see it has a priority date on the

11    left-hand side, June 26th, 1986, the same date of

12    Dr. Levitt's patent in the United States; correct?

13    A.    That is correct.

14    Q.    So this essentially means this is the European
patent

15    based on the United States patent of Dr. Levitt; right?

16    A.    Yes, I would think so.  Yes.

17    Q.    Now, lets refer you to Exhibit 775.  775 is the

18    European patent application for the identical patent, the

19    '850 patent; correct?

20    A.    It has the same priority, yes.

21    Q.    In fact, the writing, the handwriting at the very
top

22    is your secretary's writing, isn't it?

23    A.    I think only the one to the very left.

24    Q.    Okay.  Right to the right, at the very top, there is

25    a sign and then there is a U.S. patent number.  Do you see

Westermann - direct

1    that?

2    A.    Yes.

3    Q.    And the sign means equal to that; right?

4    A.    Or approximately.

5    Q.    Equivalent; correct?

6    A.    Right.

7    Q.    Okay.  And this also came from Widex's files;

8    correct?

9    A.    It must have, yes.

10   Q.    I'm going to show you Exhibit 774.

11         All right.  We have 774 on the screen, since I

12   can't find it, the '749 patent.  Do you have it?

13   A.    I have it.

14   Q.    Now, that '749 patent also would have been in your

15   files about the same time, August of 1993; correct?

16   A.    I wouldn't know.  I don't think so.

17   Q.    Well, whose writing is that on the '749 patent?

18   A.    I think at this corner it's still my secretary, but

19   the rest is probably at later time, and he was not there in

20   '93.

21   Q.    He had already gone?

22   A.    He hadn't started.

23   Q.    When did he leave?

24   A.    The end of 1999.

25   Q.    Do you have your deposition transcript in front of

Westermann - direct

1    you, sir?

2    A.    No.

3              MR. STEINBERG:  May I approach, Your Honor?

4              THE COURT:  Yes, you may.

5    Q.    I'll hand you your deposition transcript in this

6    case.  (Documents passed forward.)

7              Now, having looked at the '850 patent and now

8    the '749 patent, would that suggest to you that the '749

9    patent was also in your file as of August 5th, 1993?

10   A.    Having again looked?

11   Q.    We just looked at the '850.

12   A.    Yes.

13   Q.    And now we're looking at the '749.

14   A.    Yes.

15   Q.    Both from Widex files.  Would that suggest to you

16   that the '749 was also in Widex's files as of August 5th,

17   1993?

18   A.    I can't say for certain.  Could be.

19   Q.    Let's turn to page 168 of your deposition.  This

20   would be volume two.  And if you look at page 168, starting

21   at line 21, were you asked this question and did you give

22   this answer.

23   A.    At what line?

24   Q.    At line 21.  Were you asked this question and did
you

25   give this answer:

Westermann - direct

```
 1              "Question:  Would that suggest that the '749

 2    patent was also in your file as of August 5th, 1993?

 3              "Answer:  Yes."

 4              Did you give that answer?

 5    A.    I must have.  And it could have been there.

 6    Q.    Now, let's go back to HIMPP for just a second, this

 7    organization.  HIMPP doesn't have any office, does it,

 8    separate office?

 9    A.    No.

10    Q.    HIMPP works out of Widex; correct?

11    A.    Widex is a secretary of HIMPP, yes.

12    Q.    HIMPP doesn't have employees or resources, it uses

13    Widex employees and resources; correct?

14    A.    Correct.

15    Q.    And you in fact manage HIMPP's bank account;
correct?

16    A.    Yes.

17    Q.    Now, I'm going to hand you some exhibits which are

18    copies of different patents in the HIMPP portfolio and I'm

19    going to ask you to identify them for a moment.  So if you

20    would turn to DX-1181.

21              Do you recognize DX-1181?

22    A.    Yes.

23    Q.    Okay.  What is DX-1181?

24    A.    It's a short list of the national patents of one of

25    the HIMPP patent families.
```

Westermann - direct

1    to this lawsuit; correct?

2    A.     Yes.

3    Q.     In fact, you have held the opinion that Dr. Levitt
is

4    an authority in the field of hearing aids and audiology for

5    decades; correct?

6    A.     I certainly believe so, yes.

7    Q.     And you had seen Dr. Levitt's resume many, many
years

8    ago because you and HIMPP hired Dr. Levitt as an expert;

9    right?

10   A.     I received it, I didn't read it.

11   Q.     You never read his resume even though you got it?

12   A.     Yes, it's 11 pages long.

13   Q.     Now, is it a fact that Dr. Levitt was hired on
behalf

14   of the organization you are the director of, HIMPP?

15   A.     That's correct.

16   Q.     And that was in 1996-1997; correct?

17   A.     I believe so, yes.

18   Q.     Now, the law firm that hired Dr. Levitt, is that the

19   same law firm defending you in this lawsuit?

20   A.     That is correct.

21   Q.     Now, when Dr. Levitt was hired, his resume was

22   attached to the materials that were provided to both you
and

23   your law firm; correct?

24   A.     I think that is correct.

25   Q.     And all of the HIMPP members, including Widex and

Westermann - direct

```
 1    Demant, would have known that Dr. Levitt had been retained
 2    as an expert on behalf of HIMPP; correct?
 3    A.    Yes, because there was a common decision to use him.
 4    Q.    It was a group decision by all the members?
 5    A.    Yes, and that is why I didn't need to read the
 6    resume.  We wanted him.
 7    Q.    You didn't read his resume because you knew he was a
 8    preeminent expert in the field, right?
 9    A.    Yes.
10    Q.    Now, if you wouldn't mind turning to 562, PX-562.
11    A.    (Witness complies.)
12    Q.    And that purports to be a letter to Dr. Levitt dated
13    December 26, 1996 from the Sughrue law firm, Mr. Cushing
14    retaining Dr. Levitt?
15    A.    That is correct.
16    Q.    And who is Mr. Cushing?
17    A.    Mr. Cushing is our U.S. patent lawyer.
18    Q.    And he in the same law firm that is representing you
19    here today?
20    A.    Yes.
21    Q.    In fact, if you look at the second page, the letter
22    shows it was sent to you also; correct?
23    A.    That is correct.  The letter was?
24    Q.    Yes.  The letter was sent to you?
25    A.    Yes.
```

Westermann - direct

1    Q.    Did you receive the letter?

2    A.    I am sure I did.

3    Q.    Did you read it?

4    A.    I am sure I did.

5    Q.    And did you agree with the decision to hire Dr.

6    Levitt as an expert?

7    A.    I mean we had already agreed to that in HIMPP.

8    Q.    And you were hiring Dr. Levitt as an expert in a

9    patent proceeding; correct?

10   A.    That is correct.  A reexamination request.

11   Q.    Now, the reason you sought Dr. Levitt out was
because

12   his expertise in digital hearing aids; correct?

13   A.    No, in hearing aids.

14   Q.    In hearing aids?

15   A.    It was not a digital -- this patent was not about

16   digital hearing aids, it was about analog hearing aids.

17   Q.    And you were aware that Dr. Levitt supplied his

18   resume giving you all of his credentials; right?

19   A.    I was expecting him to be in there, yes.

20   Q.    Now, let's look at the next exhibit, 598, which is a

21   composite exhibit of a second letter to Dr. Levitt.

22              Do you have that?

23   A.    Yes.

24   Q.    It's by the same law firm; right?

25   A.    Yes.

Westermann - direct

1    Q.    And it's to Dr. Levitt; correct?

2    A.    Correct.

3    Q.    And it has a number of enclosures; correct?

4    A.    It has, yes.

5    Q.    And it is cc'd to you?

6    A.    The letter is, yes.

7    Q.    Right.  And one of the enclosures is Dr. Levitt's

8    resume; correct?

9    A.    That is correct.

10   Q.    Now, another enclosure is a declaration.  Do you
know

11   what a declaration is?

12   A.    I believe so.

13   Q.    Okay.  Is it a statement under oath that you asked

14   Dr. Levitt to sign and supply to the patent department?

15   A.    I believe it must be under oath, yes.

16   Q.    And if you look at the very first line in the

17   declaration, what does it say?  The very first line.

18   A.    The very first -- you mean, I, Harry Levitt?

19   Q.    Right after that.

20   A.    My curriculum vitae is attached to this declaration.

21   Q.    Now, if you look at page three of his resume,

22   Dr. Levitt's resume, at the bottom, do you see the two

23   patents at issue in this case?

24   A.    Yes, they are listed there.  Yes.

25   Q.    Now, you wanted to insure that Dr. Levitt had

Westermann - cross

1    in-the-ear hearing aid, this size.  The first digital.

2              And, two years later, in 1997, I think, we

3    launched the first so-called completely-in-the-canal digital

4    hearing aid that is so small, in-the-ear hearing aid, that

5    it disappears in the ear canal.

6              I have a couple more that I could mention. That

7    we, at the beginning of this decade, in 2003, we launched

8    something we called Camisha.  That is a computer aided

9    manufacturing of all the shells that has to fit into the ear

10   canal.  It's done by computer.  Very efficient.

11   Q.    Okay.  Thank you.  You mentioned the AUD lab and a

12   number of technical people in that AUD lab that was working

13   for Widex.  As a result, has Widex obtained any patents?

14   A.    Yes, we have been very active with filing our own

15   patents and have done so for many years.

16   Q.    Are any of those patents used in Widex technology,

17   Widex hearing aids?

18   A.    Practically, all of them.  Some of them are so old

19   that they may not be involved, but practically all of them.

20   We file patents in order to use them in our product.

21   Q.    And do any of those patents that you have obtained

22   relate to feedback cancellation?

23   A.    Yes, a few, yes.

24   Q.    Can you refer to Exhibit DX-1599?  It should be in

25   the second book that you received, Mr. Westermann.

Westermann - cross

1    A.    What was the number again?

2    Q.    DX-1599.

3    A.    I got it.

4    Q.    Can you tell me what this exhibit shows?

5    A.    Yes.  This is Widex's first patent on feedback

6    cancellation.

7    Q.    Is the technology in this patent in your products

8    today?

9    A.    The technology that we use today is described in this

10    patent, yes.

11    Q.    Can you give an estimate on the amount of money that

12    Widex spends on research and development on an annual basis?

13    A.    We don't have -- it would be in the order of 20, at

14    least $20 million annually.

15    Q.    Mr. Westermann, when did you first find out about

16    this lawsuit?

17    A.    That was back in, as far as I remember, 2005.  I was

18    called by someone from Oticon, who asked me if I had heard

19    about this lawsuit that was filed in the United States

20    against, it named us and several others.

21    Q.    Prior to finding out about this lawsuit, in 2005, had

22    anyone from ETG ever approached you or Widex alleging patent

23    infringement?

24    A.    Definitely did not.

25    Q.    Prior to this lawsuit, did anyone from Audimax

Westermann - cross

1    contact you or Widex alleging patent infringement of Dr.

2    Levitt's patents?

3    A.    No.

4    Q.    Prior to this lawsuit, did Dr. Levitt contact you or

5    anyone at Widex and say that you were infringing his

6    patents?

7    A.    No, he didn't.

8    Q.    Has Widex ever been sued for patent infringement

9    before?

10   A.    Not really, no.

11   Q.    Prior to being sued in this case, had you ever heard

12   of a company ETG?

13   A.    Never.

14   Q.    Prior to this lawsuit, had you ever heard of a

15   company Audimax?

16   A.    No.

17   Q.    Okay.  There was some discussion about HIMPP.  I

18   think you may have said it.  What is HIMPP, H-I-M-P-P?

19   A.    It's the Hearing Instrument Manufacturers Patent

20   Partnership.

21   Q.    How do you know about HIMPP?

22   A.    Well, I happen to be the manager of HIMPP.

23   Q.    And how long have you been the manager?

24   A.    From its beginning back in 1996.

25   Q.    And who formed HIMPP?

Westermann - cross

1          And I can hardly see what the rest are.

2     Q.    Okay.

3     A.    There is some brigade in the third line, I think.

4     Q.    Is any of the writing directed to feedback

5     cancellation?

6     A.    I can't say -- the fourth one seems to be phase

7     shift.  But I don't see any feedback cancellation.

8     Q.    Are you aware if any Widex engineers or scientists

9     who were involved in the design of either the Senso Diva or

10    the Inteo, do you know if any of them were aware of Dr.

11    Levitt's patents at the time they did their research and

12    design?

13    A.    No, certainly not.

14    Q.    Was Widex ever approached by a company called EKMS?

15    A.    No, not that I know of.

16          MR. MANDIR:  Excuse me, Your Honor.

17          (Pause.)

18    BY MR. MANDIR:

19    Q.    Mr. Westermann, can you turn to PX-598, please?  I

20    think it's in Mr. Steinberg's book.

21    A.    (Witness complies.)  Yes.

22    Q.    Can you turn to page 12 of the requests for

23    reexamination that Mr. Steinberg was asking you about a few

24    moments about?

25    A.    Page 12.

Westermann - redirect

1    higher power than hearing aids today.

2    Q.    They would require a lot of power; correct?

3    A.    Definitely, yes.

4    Q.    Now, you said that your company focused on hearing

5    aids for children at least in part; correct?

6    A.    Correct.

7    Q.    You're aware, aren't you, that Dr. Levitt's feedback

8    system, one of the reasons it was invented is because it
did

9    not require a response from a child; right?  You could just

10   measure the null effect.  You are aware of that; right?

11   A.    Only as -- only for the feedback cancellation.  It

12   doesn't require information of the hearing loss.

13   Q.    That's what I meant for the feedback cancellation.

14   You are aware of that; right?

15   A.    Yes.

16   Q.    Now, you told your counsel that you sold 10 million

17   hearing aids and you were going to sell 15 million hearing

18   aids.  What were the profits on those 10 million hearing

19   aids?

20   A.    I mean that is over 50 years.  I couldn't tell you.

21   Q.    Now, counsel directed you to DX-1599.  I believe
that

22   is in your book.  And that's a patent that Widex was

23   assigned by an inventor.  It's entitled "hearing aid,"

24   right?

25   A.    That is correct.  Yes.

Westermann - redirect

1    Q.    And that is in the year 2000; correct?

2    A.    It's in the year 2000, yes.

3    Q.    And at least one part of this patent deals with

4    acoustic feedback; correct?

5    A.    Yes.

6    Q.    But Dr. Levitt's patents aren't cited as prior art,

7    are they?

8    A.    No, they're not.

9    Q.    Now, you realize that one of the issues in this case

10   is a question about Dr. Levitt had a host controller and a

11   hearing aid and it's a question about whether those two

12   things could be put all in one package and so forth.  Do
you

13   understand that?

14   A.    I understand that.

15   Q.    If you look in the abstract of this patent, right on

16   the first page, doesn't it say that this present invention

17   relates to a hearing aid with an adaptive filter for

18   suppression of acoustic feedback in the hearing aid?  And

19   then it says, the hearing aid further comprises a
controller

20   that is adapted to compensate for acoustic feedback by

21   determination of a first parameter of an acoustic loop and

22   so on.  Correct?

23   A.    Yes.

24   Q.    And, in fact, in the picture depicted below that, it

25   has a controller; right?

241

Egolf - direct

1   hearing aid of the future will have this freedom."

2           Do you recall that?

3   A.    Yes, I do.

4   Q.    Why were you suggesting that digital hearing aids of

5   the future would have such -- would be free from feedback?

6   A.    Because we were already working on that concept.

7   Another student was doing work.

8   Q.    Where?

9   A.    At the University of Wyoming.

10  Q.    Who was that student?

11  A.    His name was Kim Weaver.  In parallel with the work

12  that Perry Wechsler was doing.  It was financed by another

13  organization, the Veterans Administration had financed that

14  project.

15  Q.    We will get to that in just one second.

16           If we can have DX-954A, please.  Do you

17  recognize this document, sir?

18  A.    Yes, I do.

19  Q.    What is it?

20  A.    It is the proposal that I coauthored with Vern Larson

21  to the Veterans Administration for a research project to

22  produce a feedback-free hearing aid.

23  Q.    Who is Dr. Vern Larson?

24  A.    Dr. Vern Larson at that time was the director of

25  audiology and speech pathology at the VA Medical Center in

Egolf - direct

1    Augusta, Georgia.

2    Q.    Who were you making this proposal at that time?

3    A.    We had some ideas about eliminating acoustic feedback

4    in hearing aids.  And we needed financing to be able to

5    support those ideas.  We had to pay graduate students to do

6    the work.

7    Q.    Can you tell the jury the date of this proposal for

8    this feedback cancellation?

9    A.    I believe it's October 10, 1982.

10   Q.    And I believe the title, just for the record, is

11   Acoustic Feedback Suppression in Hearing Aids.  Is that

12   accurate?

13   A.    Yes, sir.

14   Q.    Did you get the money?

15   A.    Yes, we did.

16   Q.    From the Veterans Administration?

17   A.    From the Veterans Administration, yes.

18   Q.    So did you start research into feedback cancellation?

19   A.    Immediately.

20         MR. KOVALICK:  Can I please have DX-955.

21   BY MR. KOVALICK:

22   Q.    Do you recognize this document, sir?

23   A.    Yes, I do.

24   Q.    What is it?

25   A.    It is my quarterly progress report to the Veterans

Egolf - direct

1   Administration.  I mailed this to Dr. Vern Larson in

2   Augusta, Georgia.

3   Q.    What was a quarterly progress report?

4   A.    Well, in exchange for our receiving money to support

5   the research, we were required to send quarterly progress

6   reports to the Veterans Administration.

7   Q.    Telling them what?

8   A.    Outlining our progress to that point in time.

9   Q.    I see.  What is the date of this document?

10   A.    July 20, 1984.

11   Q.    Did you write this?

12   A.    Yes, I did.

13   Q.    Just briefly, on the second page, Section III refers

14   to at the bottom, Section IIIA, Active Feedback Cancellation

15   (AFC) Method.  Can you see that?

16   A.    Yes, sir.

17   Q.    Can you explain to the jury what that is?

18   A.    This was a method for canceling acoustic feedback.

19   This work was really the work that Kim Weaver produced as a

20   graduate student working on the project.  We were -- the

21   hearing aid that he developed was adaptive.  It was able to

22   adapt to different acoustical environments and cancel

23   acoustic feedback.

24   Q.    Was the feedback cancellation technique adaptive?

25   A.    It was adaptive, yes, sir.

Egolf - direct

1    Q.    Now, as of -- when did Mr. Weaver, just briefly,

2    start working on that circuit, do you recall?

3    A.    I don't recall the exact date.  But certainly it was

4    after October 10, 1985 when the project was funded.

5    Q.    We can go through that with him.

6              By this date, July 20th, 1984, did he have

7    a working circuit for canceling feedback?

8    A.    Yes, he did.

9    Q.    How do you know that?

10    A.    I witnessed the circuit.

11    Q.    We will talk about that --

12    A.    I witnessed the experiments.

13    Q.    I would like to direct your attention a few pages in

14    to Appendix A, please.  Can you tell the jury what Appendix

15    A to DX-955 is?

16    A.    Yes, sir.  Appendix A is a rough draft copy of Kim

17    Weaver's thesis.

18    Q.    What is a thesis?

19    A.    It is a Master's thesis in this case.  Kim was

20    working on a Master's degree in electrical engineering, and

21    produced this thesis.  This is a write-up of the research

22    that he did, covering his efforts to develop a hearing aid

23    with active feedback cancellation.

24              And all Master's degree students, if they are

25    successful and receive their Master's degrees, are required,

Egolf - direct

1    they were required at that time at the University of Wyoming

2    to submit a thesis, which is a write-up of what they had

3    done.

4    Q.    We will go through that in just a little more detail.

5    Just a couple pages out of the draft.

6          MR. KOVALICK:  Can I please have Figure 3.1.

7    It's on my Page EGOLF00070.

8    BY MR. KOVALICK:

9    Q.    Can you please tell the jury what that is?

10   A.    This is a block diagram of the hearing aid with the

11   active feedback cancellation circuitry.  Again, it's a block

12   diagram so it does not show discrete components.

13   Q.    And you sent this thesis to Vern Larson at the VA,

14   correct, as part of his quarterly report?

15   A.    Yes, sir.

16   Q.    Can you turn to appendix B that is attached to this

17   document?  That is my EGOLF109.

18   A.    (Witness complies.)

19   Q.    Can you tell the jury what appendix B is that you

20   attached to this quarterly report?

21   A.    Appendix B is a write-up of the work of Dr. Lynn

22   Kirlin, who was also part of our research group at the

23   university of Wyoming.  Dr. Kirlin worked closely with Kim

24   Weaver and myself, and he had developed some theories of his

25   own, independent of what we were going, and I asked him to

Egolf - direct

1   write them up and include them in the report to the Veterans

2   Administration.  He had some different ideas about feedback

3   cancellation, different from Kim Weaver's.

4   Q.    Did you guys discuss feedback cancellation and these

5   different techniques at Wyoming?

6   A.    Almost daily.  Dr. Kirlin, at that point in time,

7   happened to be my office mate.  We shared one room with two

8   desks.

9   Q.    Could I have the second page please, the abstract?

10  Thank you.

11         I'll direct your attention to the second

12  paragraph of the abstract.  Can you tell the jury what that

13  is describing?

14  A.    It describes a technique known as least mean square,

15  or it's now known as Widrow's least mean square algorithm,

16  and it's a method that was fairly new at the time.  And

17  Dr. Kirlin was proposing to use this as a scheme for

18  cancelling acoustic feedback.

19  Q.    Is the least mean square algorithm also known as the

20  LMS algorithm?

21  A.    Yes, sir.

22  Q.    Was it then?

23  A.    Yes, sir.

24  Q.    Could I have figure 4, please?  I'm on Egolf127.

25         What is figure 4 of this document, sir?

Egolf - direct

1    A.    Figure 4 is again a block diagram.  It's a block

2    diagram of Kim Weaver's system.

3    Q.    Why is a block diagram of Kim Weaver's system in this

4    report by Dr. Kirlin?

5    A.    Dr. Kirlin and I and Kim Weaver worked closely

6    together, and so he included a block diagram of Kim Weaver's

7    system and he was showing how Kim Weaver's system could

8    utilize the LMS algorithm.

9    Q.    If I could please have page 23 of the document.  It's

10   the second to the last page.

11          The document refers to some conclusions that

12   Dr. Kirlin was reporting to the Veterans Administration.

13   Could you tell the jury about some of these conclusions?

14   A.    His conclusions from the work and the research he

15   did to develop this document were that the elements and

16   algorithms certainly could be used in combination with Kim

17   Weaver's circuit.  He actually was investigating a number

18   of different techniques for cancelling acoustic feedback.

19   And that was our proposal to the Veterans Administration,

20   to look at a number of different techniques.

21   Q.    And the date of this document is June 30th, 1984,

22   just for the record?

23   A.    Yes, sir.

24   Q.    I noticed the last page refers to some references.

25   Do you know if Dr. Kirlin was researching for references

Egolf - direct

```
1    related to this LMS technique he was considering?

2    A.     Yes, he was.

3    Q.     Okay.  Did he ever report to you if he found anything

4    by Dr. Levitt on the subject?

5    A.     Say that again, please.

6    Q.     Did he ever report to you that he found any articles

7    or publications by Dr. Levitt on the subject?

8    A.     On the subject of?

9    Q.     Cancelling feedback, by any technique.

10   A.     I don't recall that he said anything about it.  I do

11   know Dr. Kirlin is a very bright, thorough person.

12   Q.     There is nothing in the references listed here from

13   Dr. Levitt, though; correct?

14   A.     Yes, sir.

15          THE COURT:  Are you going on to another

16   document, counsel?

17          MR. KOVALICK:  Yes, sir.

18          THE COURT:  Why don't we take our lunch break,

19   ladies and gentlemen.

20          (Lunch recess - 1:00 p.m. until 2:00 p.m.)

21          THE COURT:  All right, Ms. Walker.

22          (Jury returned.)

23          THE COURT:  Please take your seats, ladies and

24   gentlemen.  Counsel, you may continue.

25          MR. KOVALICK:  Thank you, Your Honor.
```

Egolf - direct

1          May I please have on the display, DX-956.

2     BY MR. KOVALICK:

3     Q.     Can you tell the jury what this document is?

4     A.     Yes.  That is Kim Weaver's master thesis.  That's

5     essentially the same document minus a few typos from the one

6     that was presented in the July 20th progress report.

7     Q.     So this one is dated December of 1984.  Do you see

8     that?

9     A.     Yes, sir.

10    Q.     Why is there two versions of this with the different

11    dates?

12    A.     The students at the University of Wyoming are

13    required to date their theses one of two days, either

14    December or May, and that is because graduation times,

15    regardless of when the student finishes, graduation times

16    are only in December and May.  Mr. Weaver finished in the

17    summer of 1984.  He was required by the university to date

18    his thesis December of 1984.  That was his graduation date.

19    Q.     Okay.  So this version describes the same feedback

20    cancellation circuits as the previous version in July?

21    A.     Yes, sir.

22    Q.     Let's talk just a little bit about the thesis

23    procedure, please.  Can you tell the jury the process at

24    that time for a grad student to deliver their thesis to you

25    to earn their degree?

Egolf - direct

1    A.      When a student finishes his work, of course, he

2    writes up this thesis that you see on the cover page here.

3    He then, in order to graduate, is required to defend the

4    thesis in front of a minimum of three faculty members, and

5    these are called his committee.  In this particular case,

6    Mr. Weaver defended his thesis in front of three faculty

7    members:  I was his advisor or major professor and two other

8    faculty members.  He made an oral presentation with overhead

9    transparencies and at end of that presentation then, the

10   committee decides whether or not the student is worthy of

11   receiving a master's degree.

12   Q.      Did you give a degree?

13   A.      Yes, sir.

14   Q.      Okay.  Now, other than the presentation to the three

15   professor panel that you referred to, did Mr. Weaver make

16   any other presentations in conjunction with his thesis?

17   A.      Yes, sir.  In my department at that time -- this is

18   in the 1980s -- we had a Friday afternoon colloquium, it

19   began at three o'clock in the afternoon, and students who

20   were either about to graduate or had just graduated were

21   required to make a presentation to the department.  And this

22   included both faculty and graduate students.  It was a more

23   informal affair, and afterward, we all went to the beer

24   garden at 4:00 o'clock.

25   Q.      Okay.  Let's talk about what happened before the beer

Egolf - direct

1    garden then.  About how many people were there when

2    Mr. Weaver delivered his presentation?

3    A.    I would say about 20 people.  Usually the audience

4    was 20 to 30 people.  That included the faculty and graduate

5    students.

6    Q.    Now, was there is an open door or closed door

7    presentation?

8    A.    It's an open door presentation.  It's advertised

9    across campus a couple weeks in advance so there are posters

10   all over campus.  Of course, this is before the Internet so

11   posters were put up on bulletin boards around campus.  Of

12   course, there was a poster every Friday all year long and

13   Kim's was one of those.

14   Q.    Do you recall attending that open presentation?

15   A.    Yes, I did.

16   Q.    What did Mr. Weaver explain there, just briefly?

17   A.    He explained basically the high points of the

18   research that he did that are included in the written

19   portion of his thesis.  He did it with overhead

20   transparencies just like he did in the presentation to the

21   professors.

22   Q.    Do you recall what happened with the copy of

23   Mr. Weaver's thesis after he delivered it?

24   A.    Yes, I do.

25   Q.    What happened?

Egolf - direct

1    A.    It's required.  The university requirement is that

2    the student must submit at least one copy, and it's a bound

3    copy so it's bound like a textbook, to the graduate school.

4    And then the graduate school disseminates it from there.

5    Q.    Now, do you know for a fact that is what happened

6    Mr. Weaver's thesis or is that just the general policy?

7    A.    That is the general policy, and I assume they

8    followed the general policy.  The general policy was that

9    one copy was put on the shelf in the science library at the

10   University of Wyoming, another copy came back to the

11   department from which the student graduated and appeared on

12   the shelf within the department office.  I do know that

13   Mr. Weaver's thesis did come back to the department because

14   I did see it on the shelf at the time.

15   Q.    Came back to which department?

16   A.    To our department, electrical engineering.

17   Q.    And what did you do with it?

18   A.    I didn't do anything with it.  I just noticed it on

19   the shelf.

20   Q.    Shelf of what?

21   A.    This was in our department.  It's -- at that time, it

22   was small room behind the department head's desk.  And there

23   were some big bookshelves and we probably had 100 thesis on

24   the bookshelves.

25   Q.    That is a library?

Egolf - direct

1    A.    It was a mini-library in the department.

2    Q.    I see.  Now, what about any larger libraries?  Was

3    the thesis delivered to the universities as a general rule

4    as opposed to specifically this one?

5    A.    As a general rule, they appeared at the university

6    library.  I didn't make it a point to look up Mr. Weaver's

7    thesis but I did go there to look up other theses because I

8    needed to do research on other topics.

9    Q.    Was there any policy of trying to keep the theses a

10   secret at the university?

11   A.    I wouldn't think so because the universities are in

12   the business of disseminating information, not hiding it.

13   Q.    Okay.  Was the Wyoming University, was that open to

14   the general public back in '84 and '85?

15   A.    I assume it was.  I have been in the library since

16   then.  I do not work for the University of Wyoming, and I

17   have been there more than once since then and there are not

18   people stopping me at the door.

19   Q.    Was it open to the student body public?

20   A.    Yes, it was.

21   Q.    Did you tell people outside of the university about

22   Mr. Weaver's feedback cancellation circuit?

23   A.    Yes, I did.

24   Q.    Do you recall the when the first time you did that

25   was?

Egolf - direct

1    A.    On a number of occasions.  Of course, the first time

2    was in the quarterly progress reports to the Veterans

3    Administration.  Following those quarterly progress reports,

4    we made a presentation to the Veterans Administration, to

5    personnel at Veterans Administration at the VA Center in

6    Augusta, Georgia.

7    Q.    And when was that, please?

8    A.    That was in December of 1984.

9    Q.    Can you briefly describe that presentation you made?

10   A.    Sure.

11   Q.    Who was there, first of all?

12   A.    The people who were there were first myself and Kim

13   Weaver who was the student.  Dr. Larson, who is in charge of

14   the project at the VA Medical Center in Augusta, Georgia.  I

15   do recall that also Professor Bill Cooper from the

16   University of South Carolina was there.  And I believe there

17   were 10 to 12 medical school students.  It was Dr. Larson's

18   class at the Medical School of Georgia that attended the

19   talk.

20   Q.    Who gave the actual presentation, you or Mr. Weaver?

21   A.    Kim Weaver gave the presentation.

22   Q.    And generally what did he present?

23   A.    It was an oral presentation.  It was comprised of

24   overhead transparencies.  They were the old antique slides

25   that nobody ever uses any more.

Egolf - direct

1    Q.    Sure.  Did you demonstrate the hearing aid at that

2    time, the circuits?

3    A.    Yes, we did following the presentation.  We went to

4    Dr. Larson's office and we demonstrated -- I shouldn't say

5    we demonstrated.  Kim Weaver demonstrated his hearing aid.

6    It was a wearable hearing aid at the time.

7    Q.    Can you just describe it briefly, your demonstration?

8    A.    Sure.  It was a small package about the size of a

9    hand calculator.  Maybe a little bit thicker.  It might have

10   been too big to put in your shirt pocket but you certainly

11   could have worn it on your belt.  There was an umbilical

12   cord that came up to the hearing aid and the hearing aid was

13   a behind-the-ear hearing aid with an ear mold that fit in

14   the ear.

15   Q.    And did anyone try it on?

16   A.    Several people tried it on.

17   Q.    Who, please?

18   A.    As I recall, at that demonstration, Dr. Larson tried

19   it on.

20   Q.    Did the feedback cancellation circuit work?

21   A.    Yes, it did.

22   Q.    How do you know?

23   A.    I had listened to it previously and I saw

24   Dr. Larson's reaction during that demonstration.

25   Q.    How did he react?

Egolf - direct

1   A.      As far as I know, positively, because he continued to

2   send money for continued research at the University of

3   Wyoming and the dollars were coming from the Veterans

4   Administration under his supervision.

5   Q.      Did you ask Dr. Larson to not tell anyone about the

6   circuits?

7   A.      Certainly not.  Why would I do that?

8   Q.      I have to ask the questions, sir.

9           Can I have DX-962, please?

10          Can you tell the jury what this is?

11  A.      This is the front cover of the program for a meeting

12  of the Acoustical Society of America, Austin, Texas in April

13  of 1985.

14  Q.      And what is the Acoustical Society of America, very

15  briefly?

16  A.      It's a collection of, this is a professional society.

17  It's a collection of people who have interest in sound

18  acoustics.  The members are all across the board.  There are

19  deaf educators.  There are audiologists.  There are ENTs,

20  ear nose and throats, MDs, there are engineers,

21  acousticians, people who work in the hearing aid industry,

22  people who fit hearing aids, psychologists whose have an

23  interest, all the way down to sound engineers and musicians

24  in the recording business.  In fact, not too many years ago,

25  the then conductor of the Boston Pops Orchestra was a member

Egolf - direct

```
 1    of the Acoustical Society of America.
 2    Q.      What was the purpose of this document?
 3    A.      This was an announcement for their 109th meeting in
 4    Austin, Texas; and it gave a listing of the presentations to
 5    be made during that meeting.
 6    Q.      And did you make a presentation at that meeting?
 7    A.      Yes, I did.  I was involved with actually three
 8    presentations but certainly I think the one of interest here
 9    is Mr. Leber's.
10    Q.      Okay.  When were the presentations made, please?
11    A.      The presentations were made, of course, during a
12    period of several days, every 15 minutes.  There were
13    numbers of sessions so if you had an interest in attending
14    one session, many of these sessions were simultaneously in
15    different meeting rooms at the University of Texas in
16    Austin.
17    Q.      What did you and Mr. Weaver present?
18    A.      Mr. Weaver did the presentation.  I attended and it
19    was a result of -- this was a description of the work that
20    Mr. Weaver had done not only on his master's thesis but on
21    the work that he had followed up with after his master's
22    thesis.  He actually finished the writing of his master's
23    thesis in July of 1984 and he stayed at the university
24    because we continued to hire him to work on advances on his
25    work that he had done for the master's degree.  So this was
```

Egolf - direct

1    actually the second generation of hearing aid that he was

2    talking about at this presentation.

3    Q.    Did that generation have the same or a different

4    feedback cancellation circuit from the first one?

5    A.    Yes, the same feedback cancellation circuit.

6    Q.    Did he describe it at that presentation?

7    A.    Yes, he did.

8    Q.    And you attended?

9    A.    Yes, I attended.

10   Q.    About how many people were in the room?

11   A.    I'm guessing now but I would say probably 30 to 50.

12   I think Mr. Weaver has a better answer than do I.

13   Q.    Was this a --

14   A.    That was a normal attendance at this meetings.  I

15   gave the presentation immediately prior to this, and I

16   remember that many people in that presentation.

17   Q.    Was your presentation on feedback cancellation?

18   A.    It was not.  No.  It was on a different aspect of

19   hearing aid research.

20   Q.    I'll leave that to another day.  Was this a public

21   presentation or secret?

22   A.    It was public.

23   Q.    Were there any restrictions on disclosure that you

24   made?  Did you say don't tell anyone about my circuit?

25   A.    No, I did not.

Egolf - direct

1    Q.    Why did you go to this presentation?  Why did you go

2    to this symposium and make a presentation?

3    A.    Well, as you know, university professors are, like

4    myself, involved in publish or perish.  There is a reason

5    for that.  That is because, universities are in business of

6    disseminating, not hiding information.  One requirement of

7    getting paid and getting promotions is that we have to

8    publish the results of our work.  And I got credit for that

9    publication towards my promotion.

10                    That's why I was doing it.

11    Q.    This is a little hard to read.  But can you please

12    tell the jury what this document is?

13    A.    This is also a program advertisement for a conference

14    held in Jackson, Wyoming, in August and September of 1985.

15    It was a conference organized by Dr. Michael Marion.  He was

16    a former colleague of mine at the University of Wyoming.

17    Q.    Did you attend this conference?

18    A.    Yes, I did.

19    Q.    Did you present at the conference?

20    A.    I was a presenter at the conference, yes, sir.

21    Q.    And the date of the conference was what?

22    A.    Late August-early September, as you can see from the

23    front cover of the program.

24    Q.    Of 1985?

25    A.    Yes, sir.

Egolf - direct

1    Q.    Why did you go and present at this conference?

2    A.    I was asked by Dr. Marion to do so.  He knew the work

3    that Kim and I were doing on feedback in hearing aids.

4    Q.    Did Mr. Weaver go with you to this one?

5    A.    No, he did not.  Kim had left the university in March

6    of 1985.  All good students eventually want to go get jobs.

7    So Kim had taken a job by that time.

8              MR. KOVALICK:  May I please have Page OTI009452.

9    BY MR. KOVALICK:

10   Q.    Are you the David Egolf that is referring to?

11   A.    Yes, I am.

12   Q.    What is that referring to on that page, sir?

13   A.    This was a demonstration of several of the projects

14   that we had ongoing at the present time at the University of

15   Wyoming.  I might add, these were demonstrations.  These

16   were not slide presentations.

17   Q.    Did you demonstrate Mr. Weaver's feedback suppression

18   circuit?

19   A.    I demonstrated the portable hearing aid that included

20   the feedback suppression circuit that Mr. Weaver developed.

21   Q.    Why don't you tell the jury about that demonstration,

22   please?

23   A.    Well, of course, it's hard to hear what's going on in

24   a hearing aid.  And so what we did was we instrumented our

25   small hearing aids so that the people listening could hear

Egolf - direct

1    through a loud speaker.  We attached the hearing aid to what

2    is known as an artificial ear.  And in the artificial ear is

3    a tiny microphone.  The microphone would then broadcast what

4    was being heard inside this artificial ear canal.

5            So we had a method for switching Mr. Weaver's

6    circuit in and out of the hearing aid.  And we would turn it

7    off, turn the volume up, so that the hearing aid began to

8    squeal.  And I understand that there was a demonstration

9    here of the squeal of a hearing aid that is undergoing

10   unstable oscillation earlier.

11           And then we would switch Mr. Weaver's circuit

12   in, and the squeal would go away.  We would turn the volume

13   up even louder before it began to squeal again.

14           So it was a demonstration of the ability to

15   raise the volume of the hearing aid beyond that which was

16   possible before, when you included Mr. Weaver's circuit in

17   the hearing aid.

18   Q.    How many people attended that presentation?

19   A.    I think there were about 60 people.  There was quite

20   a group in Jackson.  It was quite a popular conference.

21   This was one that was repeated a number of years.

22           It began in 1981, and it became quite popular.

23   Of course, Jackson, Wyoming, is a nice destination for a

24   conference like that.

25   Q.    How many people actually attended your presentation?

Egolf - direct

```
1    A.     I think about 60.  I didn't count the numbers.  I

2    would say the entire room was full.

3    Q.     What types of people?  What were their jobs?  Who

4    attended this?

5    A.     It was a little different than the Acoustical Society

6    of America.  These were people who were really more

7    interested in hearing aids.  These were hearing aid fitters,

8    audiologists, engineers like myself who worked on hearing

9    aid research.  There were hearing aid manufacturers.

10                     That was generally the audience.

11   Q.     Now, were these secret proceedings or were these open

12   to the public?

13   A.     These were open to the public as long as you paid

14   your fees.

15   Q.     Did you ask anyone to keep your presentation secret?

16   A.     I did not, no.

17   Q.     May I please have DX-1540?

18                     MR. KOVALICK:  (Addressing the jury)  You have

19   an abbreviated version of this for obvious reasons in your

20   notebook that is DX-1357.

21   BY MR. KOVALICK:

22   Q.     The second page is probably easier to read.

23                     Can you tell the jury your understanding of what

24   this document is?

25   A.     This is a document that I believe was written in
```

114

Egolf - direct

1    1985.  But it's a compendium of all the research the

2    Veterans Administration was financing during 1984.  And it

3    included progress reports.  There are numbers of

4    universities involved here.  There are people who are

5    developing artificial limbs, hearing aids, special types of

6    eyeglasses.  All kinds of very interesting projects.

7    Q.    Does this report include any descriptions about your

8    Weaver feedback suppression circuits?

9    A.    Yes, it does.

10   Q.    Can you point that out for the jury?

11   A.    It's on Page 163.  I don't know if you have the whole

12   document.  It's over 200 pages.

13   Q.    They have the relevant pages.  They do have that.

14   A.    Okay.  You have got it right there.

15   Q.    It refers to acoustic feedback suppression in hearing

16   aids?

17   A.    Yes, sir, it does.

18   Q.    What is that, please?

19   A.    Well, this, of course, was the title of our research,

20   this was the title of the proposal that was funded by the

21   Veterans Administration.  And this is a description of what

22   we did during 1985.

23         Now, I had a number of students working on this

24   project.  So I had to report on everything that everybody

25   was doing.

Egolf - direct

```
 1          So Mr. Weaver's work only occupies about a
 2   paragraph and a half.
 3   Q.    Can you point out where Mr. Weaver's work is
 4   described?
 5   A.    It's on the second page.  I think that's 164.  It's
 6   the third, fourth and fifth paragraphs down.
 7   Q.    Starts with, In the other system?
 8   A.    It begins with, Investigators also have designed.
 9          THE COURT:  Counsel, can I see you at sidebar,
10   please?
11          (The following took place at sidebar.)
12          THE COURT:  This testimony seems to go to the
13   issue of printed publications.
14          MR. KOVALICK:  Yes.
15          MR. MANDIR:  It's both.
16          MR. ROMARY:  It's both.  It's public knowledge.
17          THE COURT:  I don't want to spend time on the
18   printed publication issue if it is not in dispute.  It is
19   curious to me you don't cite a ruling, which is law of the
20   case, that I made with regard to the disputed --
21          MR. ROMARY:  That is a different issue.
22          THE COURT:  Don't interrupt me, counsel, please.
23          That may be a different issue.  We will come to
24   that.  I am stating a curiosity, if you don't mind.
25          MR. KOVALICK:  May I explain?
```

Egolf - direct

1           THE COURT:  Yes.

2           MR. KOVALICK:  We are showing a general

3   disclosure to the public, which can become prior art and

4   prior invention as well, as well as prior knowledge and use

5   under 102(a).

6           We are just trying to show the public

7   dissemination.  They were not trying to keep this stuff

8   secret.  This is the last one in that regard.

9           THE COURT:  That's fair.  Okay.

10          (End of sidebar conference.)

11          MR. KOVALICK:  With your permission, sir?

12          THE COURT:  Yes.  Mr. Weaver's work is

13  described?

14  A.      Yes.  That describes not only Mr. Weaver's work but

15  some other work that we were doing.

16  Q.      So is that the full extent, just that paragraph?  Or

17  is there anything else in there?

18  A.      Beginning with "Investigators," down through the last

19  paragraph, where it says "preliminary results," to the

20  final -- to the termination of that entry.

21  Q.      One last document, please.

22          Can I please have DX-979.

23          MR. KOVALICK:  Folks, I believe you have another

24  version in your binder that is DX-1111.

25  BY MR. KOVALICK:

Egolf - direct

1    Q.    Can you tell the jury what this is?

2    A.    Yes, sir.  This is another Master's thesis, a thesis

3    produced by Leland Best.  At that time I had 11 graduate

4    students working for me.  Lee was not working directly for

5    me.  He was working for John Steadman, who was another

6    professor in my department.

7    Q.    Just a couple of questions, because we will hear a

8    deposition from him.

9              What is the date of this document?

10   A.    May 1985.

11   Q.    Did you participate in the presentation of this

12   thesis?

13   A.    I participated in the defense of the thesis.  I was

14   present when Lee Best defended his thesis in front of his

15   graduate committee.  I was on his graduate committee.  I was

16   not his major professor.  I was not his supervisor.

17   Q.    Did you attend when he presented his thesis?

18   A.    Yes, I did.  I was also present when he demonstrated

19   in the laboratories, when he demonstrated the hearing aid.

20   Q.    Can you tell us about that demonstration?

21   A.    Yes.  The hearing aid, in many of these situations,

22   it was somewhat difficult to mount the hearing aid or fit

23   the hearing aid onto different people.  So we had a

24   mannequin.  And the mannequin had the same external ear.

25              Of course, when you move from person to

Egolf - direct

1    person, the shape of your external ear changes.  So we had a

2    mannequin in the laboratories.  The mannequin I had

3    described as before had an artificial ear.  That is an

4    artificial outer ear.  And the hearing aid was mounted, and

5    this was a body-worn hearing aid.  It had a battery pack, an

6    umbilical cord up to the device that fit behind the ear.

7          And the hearing aid was tested on the mannequin.

8    We used something called a spectrum analyzer to display the

9    results.

10    Q.    With reference to the date of May 1985 on this

11    document, when was that presentation of the hearing aid that

12    you just referred to?

13    A.    It was in the spring of 1985, prior to the graduation

14    date.  As I had stated before, this is a fixed graduation

15    date, one of two allowed at the University of Wyoming.  They

16    only have two ceremonies during the year, May and December.

17          But his presentation, his demonstration, was

18    prior to May 1985.  I don't recall the exact date.  I am

19    pretty certain it was in April of 1985.

20    Q.    Now, this document refers to the digital suppression

21    of acoustic feedback.

22          Did Mr. Best's hearing aid have feedback

23    suppression?

24    A.    Yes, it did.

25    Q.    Did it work the same way as Mr. Weaver's?

Egolf - direct

1    A.    No, it was different.

2    Q.    What did he use?

3    A.    He used, and I described this before, he described

4    something called the LMS algorithm.  And this was the method

5    suggested Dr. Kirlin.  It was earlier in my testimony.

6          Dr. Kirlin was on his committee.  And Lee took

7    Dr. Kirlin's advice and ran witness.  He said that's what I

8    want to do to investigate a technique for eliminating

9    feedback.

10   Q.    Did you see any of the results of the tests of this

11   particular hearing aid?

12   A.    Yes, I did.

13   Q.    How were the results?

14   A.    They were incredible.

15   Q.    Can you give us numbers?

16   A.    This allowed -- well, the results are described as

17   providing 12 db of -- 12 to 13 db of additional stable gain.

18   Additional stable gain is the additional volume that you can

19   crank the hearing aid up.

20         I don't know if this has been stated before.

21   But the Veterans Administration, one of the largest dollar

22   volume outputs from the VA is hearing aids, because war

23   veterans like myself return typically with hearing damage.

24   And so many people who have severe hearing loss just do not

25   derive a benefit from a hearing aid because you can't crank

Egolf - direct

1   the volume high up enough before the doggone thing begins to

2   screech.  So this provided that additional volume.

3   Q.     Did you witness any other people observe the

4   operation of Mr. Best's feedback suppression circuit?

5   A.     Yes, I did.

6   Q.     How many people would you saw?

7   A.     There were at least three in the room other than

8   myself.

9   Q.     Did you require those people to keep it a secret?

10  A.     No, I didn't.  I had no control over it.

11  Q.     Who was controlling Mr. Best in his thesis?

12  A.     Control is a strong word.  Too strong a word.

13  Q.     Who was he reporting to?

14  A.     He was reporting to Dr. John Steadman.  John is now

15  the dean of engineering at the University of South Alabama,

16  in Mobile.

17  Q.     Just very quickly, can you tell the jury what Figure

18  11 represents?

19  A.     I have to preface this with I am not an expert on Lee

20  Best's thesis.  But I will do the best job I can.

21         Figure 11 is, if you will see the lower part of

22  the figure, that represents --

23         MR. STEINBERG:  Your Honor, we object.  This is

24  expert testimony.  He is testifying about someone else's

25  project.  He was not supervising this.

1177

Egolf - direct

1    THE COURT:  What is your reaction?

2    MR. KOVALICK:  Although he prefaced it with not

3    an expert, he was still factually there and it was delivered

4    to him and he understood it at the time.

5    THE COURT:  I will let him continue.  Go ahead.

6    Overruled.

7    THE WITNESS:  The lower part of the diagram you

8    see the blocks with, I can point them out, U, H, W and G.

9    P-T is the sound pressure at the ear drum.  P-S is the sound

10   pressure coming into the ear.

11   This is basically the block diagram of a hearing

12   aid.  This part up here is the microcentra or

13   microprocessor.  That's the digital portion that includes

14   the LMS algorithm.

15   Q.    The LMS algorithm, is that doing feedback

16   cancellation?

17   A.    Yes, it is.  That is the software algorithm that

18   accomplishes feedback suppression.

19   Q.    And can I please have page WID1888995.

20         It looks like that runs through 1889004.

21         Can you just tell the jury what it is these last

22   few pages of the document are, sir?

23   A.    This is the computer code that is entered into the

24   digital processor in the hearing aid that accomplishes

25   feedback suppression via the LMS algorithm.  This is a copy

Egolf - direct

1    of the code.

2    Q.    Do you know who wrote this code?

3    A.    Lee Best wrote the code.

4    Q.    Do you know what happened to a copy of this thesis at

5    the university?

6    A.    I assume it went the same route.  It had to be

7    submitted to the graduate school.  And their general policy

8    was one copy back to the department and one copy to the

9    science library.

10            MR. STEINBERG:  This is all speculation.

11            THE COURT:  Sustained.  The jury will disregard

12   the witness' assumptions.  He can testify from personal

13   knowledge.

14   BY MR. KOVALICK:

15   Q.    You don't know for sure what happened to the

16   document, sir?

17   A.    No.

18            MR. KOVALICK:  I have no further questions.

19            THE COURT:  Cross.

20            MR. STEINBERG:  Your Honor, we have some

21   documents.

22            THE COURT:  Okay.

23                    CROSS-EXAMINATION

24   BY MR. STEINBERG:

25   Q.    Dr. Egolf, we met before?

Weaver - direct

1    because of my personal interests.

2    Q.    What school did you go to?

3    A.    I went to the University of Wyoming, in the

4    Engineering Department.

5    Q.    What degree did you earn there?

6    A.    I earned a Bachelor of science in electrical

7    engineering, with a bioengineering option.  And I earned a

8    Master's of science in electrical engineering.

9    Q.    And when did you study for your Master's degree?

10   A.    I studied for it in -- I got my degree in '84.  So a

11   couple years before that.

12   Q.    1984?

13   A.    Yes.

14   Q.    And what were you working on to get that degree?

15   A.    Normal course work, and then my thesis work was to

16   develop circuits and techniques for suppressing acoustic

17   feedback in hearing aids.  More of a general technique,

18   actually, for my thesis, for suppressing acoustic feedback.

19   Q.    Did you actually generate some working circuits for

20   suppressing acoustic feedback?

21   A.    Yes, we did.

22   Q.    Can you tell the jury a little bit about that?

23   A.    Whenever we worked -- whenever I worked on the thesis,

24   first of all, we did a study of the overall problem.  We

25   modeled the head and the sound propagation around the

Weaver - direct

1    hearing aid to determine what the problems were.

2         Then we built a mockup.  The same problem you

3    have with acoustic feedback in hearing aids also occurs in

4    public address systems.  So because it's easier to work on

5    public address systems because it is a little bigger, we,

6    first of all, developed a technique that we used on a public

7    address system.

8         So we put together a microphone, speaker.  It

9    was easy to vary the system.  It was easy to try the

10   techniques.  We did various measurements, and tried

11   different schemes to suppress it in there, and eventually

12   came up with the technique I used in the thesis, which was

13   to measure the open-loop path of the system, and then create

14   an estimator that created that, so we could create an equal

15   but opposite version which could be subtracted, which would

16   take away the feedback.

17   Q.   We will talk briefly about some of those concepts

18   then.

19        MR. KOVALICK:  Can I please have DX-955

20   displayed.

21   BY MR. KOVALICK:

22   Q.   Do you know what this document is, sir?

23   A.   One second.

24        You can go either from the hard copy or right

25   off the display.

Weaver - direct

1    A.      Yes.  This is a quarterly progress report which was

2    submitted to the Veterans Administration in July of '84.

3    Q.    If you turn to Appendix A, which is about half a dozen

4    pages in, do you recognize this document?

5    A.    Yes, I do.

6    Q.    Can you tell the jury what this is?

7    A.    This is the -- basically my thesis, which was written

8    and completed by July '84.  So the work had been completed

9    by then, and it is, the title of this is An Adaptive

10   Open-Loop Estimator For The Reduction Of Acoustic Feedback.

11   Q.    Did you have working circuits as of this July 1984

12   date?

13   A.    Yes, we did.

14   Q.    You had a working hearing aid?

15   A.    It was in a PA, it was a public address system at the

16   time of the thesis.

17   Q.    Just describe that generally.  How big was it.

18   Desktop model?

19   A.    It was a desktop model.  It was a good quality

20   speaker, and then the sound went through an audio amplifier

21   and through some car speakers.

22   Q.    And that was as of July 1984?

23   A.    That was as of July 1984.  The thesis was completed

24   in, it was all written up by July '84, and then the next

25   graduation interval was December.  That's when the actual

Weaver – direct

1    graduation was.

2    Q.    We will talk about that in just a little bit.  I just

3    want to look at a couple of things in here, have you explain

4    them to the jury, please.

5                MR. KOVALICK:  Can we have Appendix F of the

6    document, EGOLF00116.

7    BY MR. KOVALICK:

8    Q.    Can you tell the jury what that is?

9    A.    Yes.  This is a circuit which was used to generate

10   pseudo-noise and inject it through the hearing aid or the PA

11   system to measure, to quantify the open-loop characteristics

12   in the system.  It would measure basically the propagation

13   of the delay, the phase through the hearing aid.

14   Q.    Was that part of the canceling feedback, this circuit?

15   A.    Yes.  First of all, you measure the system, and then

16   you insert an estimator using the measurements of this

17   measurement system to cancel the feedback.

18                MR. KOVALICK:  Can I please have EGOLF00118.

19   BY MR. KOVALICK:

20   Q.    Can you tell the jury what this circuit is?

21   A.    This is actually the estimator.  So the result of the

22   previous circuit was fit into this circuit to actually

23   eliminate the feedback.

24   Q.    And why did you send these circuit diagrams and this

25   draft thesis to Vern Larson?

Weaver - direct

1    A.    Because Vern Larson and the Veterans Administration

2    was funding research on my thesis.  It was -- we were doing

3    it for the good of the hearing aid users, trying to improve,

4    trying to improve the maximum gain they could get.

5              MR. KOVALICK:  Could I have DX-956, please.

6    BY MR. KOVALICK:

7    Q.    Can you tell the jury what this document is?

8    A.    This is the thesis which was submitted.  It's the same

9    document with a different date on it.

10   Q.    Why is the date different?

11   A.    Because that's when the actual graduation was.  But if

12   you look through the two documents, they are the same.

13   Q.    Okay.  So this version, DX-956, is dated

14   December 1988?

15   A.    '84.

16   Q.    I am sorry, December 1984.

17   A.    Right.

18   Q.    Thank you.

19              When did you actually deliver your thesis to

20   your panel of advisors at Wyoming?

21   A.    It was in early December of '84.

22   Q.    Can you tell us about that?  What did you do and who

23   was there?

24   A.    Yes.  What happened, the normal procedure at the

25   university is, you write the thesis with, you know, counsel

Weaver - direct

1    from your advisor, who was Dr. Egolf.  And then once it's

2    all written and your research is done, you submit some

3    period in advance to each of the members of the committee.

4    And the committee is three to five professors, who kind of

5    know what you are doing and who judge you.

6            So you submit it, you submit the thesis to the

7    panel.  And then they have a closed-door defense, where you

8    go into the conference room, and they basically have their

9    way with asking questions on anything in the thesis and

10   anything in your past education.

11           So it's a little final grill session to teach

12   you some humiliation, I think, at the end of grad school.

13   Q.    After that process, did you have to present your

14   thesis to anyone else?

15   A.    Yes.

16   Q.    Tell us about that, please?

17   A.    The normal procedure is after you have defended

18   successfully your thesis in the closed-panel presentation,

19   you give a public presentation.  And every Friday afternoon,

20   there was a seminar series, which was open to the campus and

21   open to the public.  And the topics which were presented at

22   this seminar series were published in advance.

23   Q.    Now, you said that was a normal procedure.  Do you

24   recall specifically presenting your thesis at one of those?

25   A.    Yes, absolutely.

Weaver - direct

1    Q.    Can you tell us about that a little bit?

2    A.    It was a, I believe it's about a 40 to 50-minute

3    presentation.  And in that presentation, it basically showed

4    all the meat, the circuits, everything I could to fill

5    50 minutes of presentation of my thesis.  Present it all.

6    Q.    How many people were there?

7    A.    Twenty or 30.  A room full.

8    Q.    What types of people in general?

9    A.    They were grad students, professors of the department,

10   other guests, and oftentimes we had professors from other

11   departments who had interest in the particular topics.

12   Q.    Was there any requirement to keep that presentation

13   confidential or secret?

14   A.    Absolutely not.  Especially in the eighties, the

15   university atmosphere was to share information.  People like

16   to show what you are doing because it was interesting.

17            MR. KOVALICK:  Can I please have Figure 3.1,

18   which I have on Page 14 of the document, EGOLF1978.

19   BY MR. KOVALICK:

20   Q.    Can you tell the jury what Figure 3.1 is?

21   A.    Yes.  This is a block diagram of the PA system that is

22   used in the thesis with the open-loop estimator added.

23   Q.    And what is the open-loop estimator?

24   A.    The open-loop estimator is this bottom block, which is

25   GH-hat.  And what it does is, if you look -- if you look at

Weaver - direct

1    the upper path, that is M-A-S-H, that upper loop, what

2    happens is, the sound which comes into the PA system or

3    hearing aid goes into the microphone, M, and then it's fed

4    through the amplifier and the speaker.

5    Q.    Up here?

6    A.    Yes.  And then some of the sound leaks out through the

7    vent tube in the hearing aid.  Some of it, you know, goes

8    through the plastic.  Some of the sound comes back.  And you

9    can never really stop that.

10          So that sound comes back through the feedback

11   path H.  If that sound comes back in phase with an amplitude

12   greater than one, the system goes unstable.  It's a basic

13   engineering premise that has been shown many times.

14          So what the circuits do is they estimate what

15   the open-loop path of the PA system or hearing aid plus the

16   feedback is.  Then it synthesizes that, and then it

17   subtracts that signal out.

18          So you have basically eliminated the feedback,

19   and it allows you to increase your amplification

20   substantially.

21   Q.    And with this version of DX-956, the December '84

22   version of your thesis, are the schematics the same as in

23   July?

24   A.    Yes.

25   Q.    They are?  Had the circuits changed at all between

Weaver - direct

1  July and December of '84?

2  A.    What had happened between July in '84, we called these

3  circuits, we named them in kind of a progression.  You

4  define one circuit and you get as much life as possible and

5  then it would evolve to the next stage.  So in the thesis,

6  it was, I think we called it AFC 1.  And between the thesis

7  circuit of AFC 1, we moved to AFC 2, and AFC 2 had a few

8  enhancements.  It had been shrunk down.  It was on a

9  soldered board.  It was battery operated.  It fit into a

10  little plastic case and it was retrofitted into an actual

11  hearing aid.

12  Q.    And what time was AFC 2 constructed?

13  A.    AFC 2 was constructed between July of '84 and December

14  of '84.  There is a reason for that.

15  Q.    Okay.  Do you recall demonstrated that hearing aid of

16  AFC 2 on anyone?

17  A.    Yes.

18  Q.    Can you tell us about that?

19  A.    Yes.  In July and December of '84, we went down,

20  Dr. Egolf and myself went down to Augusta, Georgia to the

21  Veterans Administration to demonstrate the work we had been

22  doing to show them preliminary results.  So during that

23  time, first of all, the VA -- a little background -- the VA

24  is associated with I believe University of Georgia Medical

25  School.  It's in the same campus.  So whenever we went down

Weaver – direct

1   there, first of all, they made a classroom available to us

2   and we went in and we made a public presentation where we

3   basically presented a lot of the same stuff that was

4   presented in the thesis defense, the circuits, technique, et

5   cetera, plus additional new findings of how much stable gain

6   we had gotten with the AFC 2 on people.

7   Q.   You demonstrated at that presentation?  You actually

8   demonstrated?

9   A.   At the presentation, demonstrating a hearing aid is

10   not very effective so we did it with data, slides, the

11   schematics.

12   Q.   How many people attended that presentation?

13   A.   20 or 30.

14   Q.   And you said there were medical students.  Is that

15   what you said?

16   A.   There were medical students and other professors,

17   people who were teaching the medical students.  Of course,

18   Dr. Larson.

19   Q.   Did you demonstrate that AFC 2 version of that hearing

20   aid to anyone down there in Augusta?

21   A.   Yes.  After the seminar, we had a demonstration of it

22   to Dr. Larson and so we went into his office and there was

23   myself, Dr. Egolf and another colleague of Dr. Larson's was

24   there.  And we tried it on and we demonstrated it to them.

25   Q.   Did it work?

Weaver - direct

1  A.   Yes.  Yes, it did.  It was still a little bit new,

2  which is good.  It was impressive that you could hear

3  substantially more gain with it, and he was optimistic.  We

4  were a new project and it had good results already.

5  Q.   Gain is a word we heard.  Can you just tell the jury

6  in terms of decibels or whatever number you want?  Like what

7  type of gain improvement were you getting?

8  A.   Well, I believe it says in here 15 additional dB, 15

9  dB of additional stable gain, which is a substantial

10  increase in how much gain the hearing aid can provide.

11  Q.   Does the dB of gain change depending on who is wearing

12  the aid?

13  A.   It can, yes.

14  Q.   Okay.

15  A.   All right.  Yes.

16  Q.   That's fine.  Can I please have DX-962?

17          Do you know what this document is?

18  A.   Yes.  This is, it looks like the abstract for a

19  meeting that was held of the Journal of the Acoustical

20  Society of America for a conference that they held in

21  Austin, Texas in April of '85.

22  Q.   Did you attend this meeting?

23  A.   Yes, I presented at this meeting.

24  Q.   You did.  What did you present?

25  A.   I presented the same work, the acoustic feedback

Weaver - direct

1    technique presentation.

2    Q.    Did you demo the hearing aid?

3    A.    No, it was just not appropriate in a seminar-type

4    environment to demo the hearing aid.

5    Q.    How many people did you present to?  Do you recall?

6    A.    Once again, 20 or 30.  The conference is broken up

7    into many sessions and people tend to go in and out of

8    sessions so it's a moderate sized room.  20 to 30 is my

9    guess.

10   Q.    Was it an open or closed demonstration --

11   presentation?  I'm sorry.

12   A.    It's an open presentation.  Any member of the society

13   can be there.  They just pay their dues and go to the

14   conference.  They can attend.

15   Q.    Did you ask for any restrictions on confidentiality

16   with regard to the --

17   A.    No.

18   Q.    -- presentation?

19   A.    There were no restrictions on confidentiality.

20   Q.    I noticed a summary on the second page that is being

21   displayed now.  Do you know who authored this?

22   A.    Probably myself.  It was either me or Dr. Egolf.  I

23   forgot exactly who wrote the abstract.  It was a summary of

24   the work.

25   Q.    Why did you present this abstract?

Weaver - direct

1    A.    We presented it.  We sent the abstract to the society,

2    and they look at the abstracts and say people are interested

3    this or not.  So with the abstract, you can either accept

4    the presentation or not.  So if they accept the

5    presentation, they published the abstract to try to draw

6    people to the conference.

7    Q.    Okay.  May I please have displayed DX-963?

8          Can you tell the jury what this document is?

9    A.    Yes.  This is the title transparency for the

10   presentation to the Journal of the Acoustical Society of

11   America.

12   Q.    The titled transparency, what are you referring to by

13   that?

14   A.    Whenever you start a presentation, you have a big

15   stack of transparencies.  People walk in the room, you have

16   the first opening transparency, and that is what this was.

17   Q.    I see.  Okay.  So these transparencies were shown

18   during your presentation, is that accurate?

19   A.    Yes.

20   Q.    Okay.  I noticed on page EGOLF02214 there is an image

21   of an ear with a hearing aid.  Do you see that?

22   A.    Yes.

23   Q.    Was this ACF 2 version of the hearing aid, was that an

24   eyeglass hearing aid?

25   A.    No, it was a behind-the-ear hearing aid.

Weaver - direct

1   Q.     Behind the ear?

2   A.     If you look here, you can see it's drawn in an

3   eyeglass hearing aid but to have these pictures drawn is

4   very expensive and the principle operation is the same on

5   eyeglass hearing aids or behind-the-ear hearing aids but our

6   work was actually done on a behind-the-ear hearing aid.

7   Q.     So why did you include this?  It looks like the end of

8   an eyeglass.  Why did you include this?

9   A.     Well, first of all, we didn't have that many of these

10  pictures.  It takes an artist to draw these and it was

11  expensive and hard to draw so when you have one good picture

12  that shows the technique and what we're doing, one of them,

13  you use it.  It was an economy of time and money.

14  Q.     I see.  Where did you actually tap in with the

15  feedback circuits?  Why did you tap into the hearing aid?

16  A.     We would pick up the signal coming out of the

17  microphone and then, you can see right here, we would tap

18  here.  And we would tap into the input of the amplifier and

19  this would allow us to maintain the normal fidelity of the

20  amplify that comes with the hearing aid.

21  Q.     Can you show EGOLF 02220, please?

22         Does this accurately show where you were tapping into

23  the hearing aid circuits?

24  A.     Yes.

25  Q.     Okay.  Can I have 2223 displayed, please?

Weaver - direct

1      Just very briefly, can you describe without

2   getting real mathematical what you are showing with these

3   charts.

4   A.     Yes.  This is showing GH.  On the upper plot, there is

5   two lines shown.  The dotted line is the frequency response

6   of an actual Audiotone A-38 hearing aid -- and BTE is behind

7   the ear -- with the feedback added in.  So we have a KEMAR

8   mannequin which is very similar to life and had an ear.  So

9   we put the hearing aid on the mannequin, and then you take

10   tests using the system that is shown in the previous `slide,

11   and you use this to quantify kind of what that system looks

12   like, and so these are the measurements taken from there.

13      So that's the dotted line on both of these

14   plots, the magnitude on the top and the phase in the bottom

15   section, and then the solid line shows the estimator.  In

16   other words, we had an estimator that was made with -- we'll

17   talk about the design of the actual estimator probably

18   later, I'm sure.  But this is its frequency response, so you

19   can see we matched very closely on phase and pretty closely

20   on magnitude.

21   Q.     Can you turn the page, please?  For the record,

22   EGOLF02224.

23      Just very briefly, what are you showing in these

24   charts?

25   A.     We show two plots.  This is the hearing aid with and

Weaver - cross

1    without the feedback suppression circuit added.  With the

2    suppression added, we got 14.7 dB additional stable gain.

3                     MR. KOVALICK:  I have no further questions, Your

4    Honor.

5                     THE COURT:  You may cross-examine, counsel.

6                     MR. KOVALICK:  Thank you, sir.

7                     MR. BUROKER:  Your Honor, I have a book that may

8    have a few additional exhibits.  May I?

9                     THE COURT:  Of course you do.  That's quite

10   fine.

11                    (Binders passed out.)

12                    CROSS-EXAMINATION

13   BY MR. BUROKER:

14   Q.    Good morning, Mr. Weaver.

15   A.    Good morning.

16   Q.    You are being paid by the defendants to work with them

17   in connection with this case; correct?

18   A.    I'm being paid my normal consulting rate, yes.

19   Q.    And how much have you been paid to date?

20   A.    To date?

21   Q.    Yes.

22   A.    I believe it's around $8,000.

23   Q.    Now, you have been working in the hearing aid industry

24   for about 20 years; is that correct?

25   A.    That's correct.

Best - dep.

1    in 1981.  Then I went back for a master's again at the
2    University of Wyoming, and again in electrical engineering.
3    I started that in 1983, to follow 1983, and finished it in
4    the spring of 1985.  And then I went back again to the
5    University of Wyoming to do a Ph.D. in computer science,
6    which I started on in 1988 and finished in 1996.
7            "Question:  After you received your Ph.D. in
8    computer science from the University of Wyoming, did you
9    enter the work force?
10           "Answer:  Yes.
11           "Question:  Can you describe for us your
12   professional career after you received your Ph.D.?
13           "Answer:  Sure.  In 1996, I worked for Lockheed
14   Martin Astronautics for a year.  And then I worked for a now
15   nonexistent consulting firm called Carnegie Group that did
16   some consulting for telecommunications companies.  And then
17   in December, I think it was, of 1999, I went to work for
18   Wall Street on Demand, and I worked there until 2005 when I
19   became disabled.
20           "Question:  What I'd like to focus in on now is
21   your time at the University of Wyoming during your master's
22   program.  And I believe you said that you received a
23   master's from the University of Wyoming in electrical
24   engineering?
25           "Answer:  Yes.

1292

Best - dep.

1      "Question:  And I think you said that you

2   started that program some time in 1983, and you completed it

3   in the spring of 1985; is that correct?

4      "Answer:  That's correct.

5      "Question:  And were there any particular

6   professors that sponsored your master's?

7      "Answer:  They would be the three that were on

8   my committee.  They were Dr. Steadman, Dr. Egolf, and

9   Dr. Kirlin.

10     "Question:  You mentioned that Dr. Steadman,

11  Dr. Egolf and Dr. Kirlin were involved in your defense of

12  the thesis.  They were -- you were defending your thesis in

13  front of them?

14     "Answer:  Yes.

15     "Question:  And when was that defense of your

16  thesis?

17     "Answer:  This was in May of 1985.  I don't

18  remember the exact date.

19     "Question:  Let's start over again.  Best

20  Exhibit No. 2 is a document bearing Bates numbers, BEST00340

21  through BEST00415.  And Best Exhibit 2 is entitled, Digital

22  Suppression of Acoustic Feedback in Hearing Aids, by Leland

23  C. Best.

24     Dr. Best, is Exhibit 2 your thesis that you

25  prepared?

Best - dep.

1          "Answer:  Yes.

2          "Question:  And this has a date of May 1985.  Is

3   that consistent with the time that the thesis would have

4   been prepared?

5          "Answer:  Yes.

6          "Question:  Did you author this thesis?

7          "Answer:  Yes.

8          "Question:  Did you receive any assistance apart

9   from the professor's input?

10          "Answer:  No.

11          "Question:  When would you have submitted --

12   well, let me start off.  Did you submit this thesis to the

13   University of Wyoming?

14          "Answer:  Yes.

15          "Question:  When would you have first

16   submitted -- when did you complete the thesis?

17          "Answer:  Again, I don't know an exact date, but

18   it would have been early May of 1985.

19          "Question:  And who did you submit the thesis to

20   once it was completed?

21          "Answer:  I had to give copies to each of my

22   committee members, and then once they approved it and I had

23   passed my defense, it was given to the university to

24   publish.

25          "Question:  Now, the title of this document,

Best - dep.

1    Best Exhibit 2, your thesis, describes -- I'm sorry -- is

2    entitled, Digital Suppression of Acoustic Feedback in

3    Hearing Aids; is that correct?

4    A.    Yes.

5              "Question:  Could you describe what acoustic

6    feedback is?

7              "Answer:  Well, in a hearing aid, there is a

8    little microphone and a little speaker, often called the

9    receiver.  And some of the sound that is put out by the

10   speaker gets back and is picked up by the microphone.  And

11   if the gain on that system is high enough, it then becomes

12   unstable and squeals, makes a loud squealing noise which is

13   extremely uncomfortable if you're wearing the aid.

14             "Question:  Was the problem of the squealing,

15   was that the subject of your thesis?

16             "Answer:  Trying to get rid of that was, yes.

17             "Question:  And just generally, how did you go

18   about solving the problem of getting rid of acoustic

19   feedback.

20             "Answer:  If you can or if I could predict how

21   much of the sound would get back to the microphone, then it

22   would be possible to simply subtract that out from the

23   microphone input and that would break the feedback, feedback

24   loop.

25             "Question:  How did you go about predicting how

Best – dep.

1    much sound was going back to the mic?

2            "Answer:  I used an algorithm called the LMS

3    algorithm to estimate the transfer function of that feedback

4    path.

5            "Question:  Once you used this LMS algorithm to

6    estimate the feedback path, then what did you do?

7            "Answer:  As I said earlier, I simply subtracted

8    out what was coming in from the microphone.

9            "Question:  Once you subtracted out the result

10    of this algorithm, what was the result?

11            "Answer:  The result was that you could turn the

12    gain up on the microphone considerably higher before you had

13    feedback occur.

14            "Question:  Were you able to cancel this

15    feedback?

16            "Answer:  Yes.

17            "Question:  Did you ever work on an actual

18    prototype hearing aid system?

19            "Answer:  Yes.

20            "Question:  That included this LMS algorithm

21    that you spoke about?

22            "Answer:  Yes.

23            "Question:  And did that prototype work?

24            "Answer:  Yes.

25            "Question:  Did you test the prototype?

Best - dep.

1              "Answer:  Yes.

2              "Question:  What was the results of your testing

3       of the prototype?

4              "Answer:  The result, basically, was that I

5       could achieve up to 13 dB additional gain.

6              "Question:  Is 13 dB additional gain, is that

7       significant?

8              "Answer:  Yes, that is significant.  10 dB

9       sounds to a human about twice as loud.

10             "Question:  And by increasing the gain to 13 dB,

11      up to 13 dB, does that help the hearing aid patient?

12             "Answer:  Yes.

13             "Question:  How does it help a patient?

14             "Answer:  Well, a person that has a hearing

15      loss, the louder you can make that sound the easier it is

16      for them to still be able to hear.

17             "Question:  How did you get interested in this

18      problem of acoustic feedback in hearing aids?

19             "Answer:  Well, my original interest was really

20      in just applying adaptive filters, but Dr. Steadman

21      mentioned to me that he and some previous graduate students

22      had worked on this problem and suggested that I might look

23      at it as something for a potential thesis project.

24             "Question:  What time frame was that, do you

25      recall?

Best - dep.

1          "Answer:  He would have first mentioned it in

2     January of '84.

3          "Question:  So Dr. Steadman mentioned this

4     problem, and you said that he had some other students

5     working on this problem?

6          "Answer:  There was one previous student I knew

7     of that worked on it was Kim Weaver.

8          "Question:  Do you know if Kim Weaver prepared a

9     thesis concerning acoustic feedback?

10         "Answer:  Yes.

11         "Question:  Are you familiar with that thesis?

12         "Answer:  No.

13         "Question:  Did you review that thesis in

14     connection with your work?

15         "Answer:  No.

16         "Question:  Okay.  So Dr. Steadman, in January

17     of '84, mentions this problem of acoustic feedback.  Then

18     what happened?

19         "Answer:  Well, he mentioned it as a possible

20     problem, but he also said that really probably any kind of

21     adaptive filtering that could be useful in any way would be

22     a good thing.  So the first thing I did was to just build a

23     simple adaptive high pass filter that simply filtered out

24     lower frequencies as the sound got higher.  And it wasn't

25     until later that I finally decided that feedback

Best - dep.

1    cancellation was truly what I wanted to do for my thesis.

2              "Question:  What point in time did you realize

3    that acoustic feedback was the problem that you wanted to

4    concentrate on for your thesis?

5              "Answer:  That was in the fall of 1984.

6              "Question:  And how did you get interested in

7    acoustic feedback at that time in the fall of '84?

8              "Answer:  Well, I had started doing some

9    re-reading in the library and read a number of papers.  But

10   one in particular by Widrow and a number of other authors

11   showed applications of the LMS algorithm.  And while I was

12   reading that problem, or that paper, it -- I kind of had an

13   "aha" moment that said I think I can apply this to the

14   feedback problem.

15             "Question:  Now, you mentioned an article by

16   Widrow; is that correct?

17             "Answer:  Yes.

18             "Question:  Best Exhibit 3 is an article

19   entitled, Adaptive Noise Cancelling:  Principles and

20   Applications.  The Bates numbers I have here are BEST0556

21   through 580.

22             Dr. Best, is this the Widrow -- and one of the

23   authors, as you can see, is Widrow, the first author.  Is

24   this the Widrow article that you were just referring to?

25             "Answer:  Yes.

Best - dep.

1              "Question:  Now, this Widrow article has a Best

2      Bates number.  My understanding is that that means that this

3      document came out of your files?

4              "Answer:  That's correct.

5              "Question:  Could you turn to the second page of

6      this Widrow article, Best Exhibit 3, and up at the left-hand

7      top column, are you able to see where it starts, 'filters

8      used?'  The article talks about fixed or adaptive filters.

9      Do you see that?

10             "Answer:  Yes.

11             "Question:  Do you know the difference between a

12     fixed filter and an adaptive filter?

13             "Answer:  Yes.

14             "Question:  Could you please tell us the

15     difference?

16             "Answer:  In a fixed filter, well, the filter

17     has a set of coefficients that are associated with it.  And

18     in a fixed filter, those coefficients are chosen ahead of

19     time by some method, and they just stay there.  That's what

20     they are.  In an adaptive filter, they may or may not be

21     initially set to some value.  But then as time progresses,

22     the algorithm changes the weight to make the output in some

23     way more desirable.

24             "Question:  Now, you mentioned that this Widrow

25     article was something that you were looking at in connection

1300

Best - dep.

1   with your thesis?

2           "Answer:  Yeah.

3           "Question:  Or at least your proposed thesis

4   topic.  Did you use either a fixed or an adaptive filter in

5   connection with your thesis?

6           "Answer:  I used an adaptive filter.

7           "Question:  Was that adaptive filter for

8   purposes of getting rid of this acoustic feedback problem?

9           "Answer:  Yes.

10          "Question:  Was there any reason why you did not

11  use a fixed filter to get rid of this problem of acoustic

12  feedback?

13          "Answer:  Yes.  There are a lot of factors that

14  can change the properties of feedback path.  So it seemed

15  totally necessary to have a thing adapt to current

16  circumstances.

17          "Question:  At the time you were preparing your

18  thesis and working on this problem, did you think that a

19  fixed filter could solve this problem of acoustic feedback?

20          "Answer:  No.

21          "Question:  And why couldn't a fixed filter

22  solve the problem?

23          "Answer:  Basically the same reasons I just gave

24  you.  But if you set it out to cancel the feedback in some

25  specific environment, as you soon as you moved or put on a

Best - dep.

1    hat or changed the gain, that would no longer be correct and

2    it wouldn't work anymore.

3                "Question:  Did you set up a prototype?

4                "Answer:  We did.

5                "Question:  Were there more than one prototype?

6                "Answer:  Yes.

7                "Question:  Okay.  How many different prototypes

8    were there?

9                "Answer:  There were two.

10                "Question:  Okay.  The first prototype, when did

11    you work on that?

12                "Answer:  Well, the hardware for the first

13    prototype was running in early '84, but the software to

14    implement the noise cancellation, I would have been working

15    on, started working on again in late '84, and probably got

16    the version in the thesis in early '85.

17                "Question:  Okay.  So did you actually get this

18    first prototype to work?

19                "Answer:  Yes.

20                "Question:  And when did you get it to work, the

21    prototype?

22                "Answer:  Either --

23                "Question:  The first one.

24                "Answer:  Right.  Either very late '85 -- or,

25    sorry -- very late '84 or very early '85.

Best - dep.

1          "Question:  Did you test this prototype, this
2    first prototype?
3          "Answer:  Yes, but not rigorously.
4          "Question:  How did you test it?
5          "Answer:  We would just -- I say 'we' because I
6    was working with another person who was building hardware.
7          "Question:  Who was that?
8          "Answer:  That was Mike Wreschner.
9          "Question:  And who is Mr. Wreschner?
10         "Answer:  He was another graduate student.
11         "Question:  At the University of Wyoming?
12         "Answer:  Yes, correct.  And we just had the
13   microphone down in a little stand, and could just try to see
14   how far we could turn up the gain with the cancellation,
15   either on or off.  But we had no objective measure at that
16   time.
17         "Question:  Did you reach any conclusions based
18   on your testing of this first prototype?
19         "Answer:  Yes.  It seemed to be clearly allowing
20   us to get a higher gain.
21         "Question:  And how did you know you were able
22   to get a higher gain based on this testing of the prototype?
23         "Answer:  Because we could turn up the gain
24   without the cancellation until we got feedback, and we could
25   turn on the cancellation and see that we could turn up the

Best - dep.

1  gain even higher.

2           "Question:  Higher before what?

3           "Answer:  Higher than it was without the

4  cancellation.

5           "Question:  I think you mentioned that you had

6  two prototypes; is that correct?

7           "Answer:  Yes.

8           "Question:  This -- when did you -- did you

9  build the second prototype?

10          "Answer:  I didn't personally build it.  That

11 was Mike Wreschner's project.

12          "Question:  And did Mr. Wreschner build the

13 second prototype?

14          "Answer:  Yes.

15          "Question:  And when did he finish building it?

16          "Answer:  That would have been mid-to-late

17 spring of '85.

18          "Question:  And how did this second prototype

19 differ from the prototype -- the first prototype, if at all?

20          "Answer:  The second prototype was entirely self

21 contained.  There was a small box that would actually fit in

22 a shirt pocket.  It had a battery and a small circuit board

23 with one of these DSP chips and a little bit of extra

24 hardware that still had a wire that ran up to the hearing

25 aid that one could actually wear.

1304

Best - dep.

1          "Question:  Did you test the second prototype?

2          "Answer:  Yes.

3          "Question:  In your thesis, you refer to, I

4    believe, a prototype.  Does the thesis refer to either one

5    of these prototypes that we've been talking about?

6          "Answer:  It refers to the second one.

7          "Question:  Did the second prototype work?

8          "Answer:  Yes.

9          "Question:  And how did you know it worked?

10         "Answer:  I made a series of measurements of the

11   additional gain that I could get with the cancellation

12   algorithm, and this is -- it showed that we could get up to

13   13 dB initial gain.

14         "Question:  The test results that you're

15   referring to, is that described in your thesis?

16         "Answer:  Yes.

17         "Question:  Did anyone else see the second

18   prototype working?

19         "Answer:  Probably Dr. Steadman, Dr. Egolf,

20   Dr. Kirlin all saw it, and Mike Wreschner.

21         "Question:  Why Dr. Steadman, Dr. Egolf and

22   Dr. -- well, when did -- let me ask it this way.  When did

23   Dr. Steadman, Dr. Egolf or Dr. Kirlin first see a working

24   second prototype?

25         "Answer:  That would have been, again, kind of

62

Best - dep.

1    mid spring of '85.

2           "Question:  Did those gentlemen see the second

3    prototype working soon after you got it working?

4           "Answer:  Yes.

5           "Question:  Were you excited to show them that

6    it was working?

7           "Answer:  Of course, yes.

8           "Question:  Other than Dr. Steadman, Dr. Egolf,

9    Dr. Kirlin and Mike Wreschner, during this time frame of

10   mid-to-late spring '85, did anyone else see the prototype

11   working?

12          "Answer:  I believe Jim Nunley of Audiotone.

13          "Question:  On what occasion did Mr. Nunley see

14   your prototype working, this second prototype?

15          "Answer:  He came for a visit that spring to see

16   our progress.

17          "Question:  Okay.  Let's go back to the second

18   prototype.  And you had mentioned a Mr. Jim Nunley.  When

19   did Mr. Nunley see the working second prototype?

20          "Answer:  Again, it was -- it was, well,

21   middle-to-late spring of '85.

22          "Question:  And you mentioned that Jim Nunley

23   was with a company called Audiotone; is that correct?

24          "Answer:  Correct.

25          "Question:  Okay.  I think I was just asking you

Best - dep.

1    about this company Audiotone.  What was Audiotone?

2              "Answer:  They were a hearing aid manufacturer

3    based in Phoenix, Arizona.

4              "Question:  And what connection was between the

5    University of Wyoming and Audiotone that Mr. Nunley came to

6    see your prototype?

7              "Answer:  In some way that I'm not sure of, but

8    partially supported the research.

9              "Question:  Was there any reaction to this

10   second prototype from any other people who saw it?

11             "Answer:  They were all quite impressed.

12             "Question:  What, in particular, impressed them?

13             "Answer:  That I had been able to make some

14   substantial gains on a problem that previous people had

15   worked on and not been nearly as successful at.

16             "Question:  After you were able to get a second

17   prototype up and running and working, what was the next

18   step?

19             "Answer:  To test it.

20             "Question:  And how long was the testing

21   process?

22             "Answer:  It took me about a week, as I

23   remember.

24             "Question:  Okay.  And so then after the testing

25   process, what was the next step?

Best - dep.

1   "Answer:  Well, at the same time, I was writing

2 my thesis, so it would have been to submit the finished

3 thesis, then do a defense.

4   "Question:  The date on this thesis is May 1985.

5 What does that date represent?  Does it represent the date

6 that you did your defense, or what does it represent?

7   "Answer:  It represents the date that I gave it

8 to the university, submitted it to the university.

9   "Question:  Would that have been before or after

10 your defense?

11   "Answer:  After.

12   "Question:  So your defense was some time -- I

13 guess we don't have a specific date.  Do you know what the

14 date of your defense was?

15   "Answer:  No, not the specific date.

16   "Question:  Do you know if it was in May of

17 1985?

18   "Answer:  Yes.

19   "Question:  It was in May of 1985?

20   "Answer:  (Nodding yes.)

21   "Question:  Okay.  And how much time after you

22 had your defense did you submit your thesis to the

23 university?

24   "Answer:  I don't really remember, but I imagine

25 very shortly afterwards.

1308

Best - dep.

1        "Question:  And I guess certainly within May,

2    since it is a May date?

3        "Answer:  Yes, definitely within May.

4        "Question:  Okay.  Who attended the defense?

5        "Answer:  Dr. Steadman, Dr. Egolf and Dr. Kirlin

6    were definitely there.  I believe Mike Wreschner also

7    attended.

8        "Question:  How long did the defense last?  Do

9    you recall?

10       "Answer:  About an hour.

11       "Question:  And can you give me the format of

12   the defense?

13       "Answer:  Do you need a physical setting or --

14       "Question:  No.  What I'm interested in, did you

15   present a presentation?  Did you --

16       "Answer:  Ah, yes.  First I did a presentation

17   to the people that were there, and then afterwards there was

18   a question-and-answer session.

19       "Question:  Was there any restrictions put on

20   you for showing or sharing your work with people outside the

21   university?

22       "Answer:  No.

23       "Question:  When you submitted your thesis to

24   the university, what was your understanding of what would

25   happen to it?

1309

Best - dep.

1            "Answer:  My understanding was that it would be

2     sent off to be bound in a hard cover volume and it would be

3     shelved in the university library.

4            "Question:  During your defense thesis, did you

5     describe how your system worked?

6            "Answer:  Yes.

7            "Question:  Did you describe how it was able to

8     cancel acoustic feedback?

9            "Answer:  Yes.

10           "Question:  Did you discuss your LMS adaptive

11    algorithm?

12           "Answer:  Yes.

13           "Question:  Did you describe your adaptive

14    filter?

15           "Answer:  Yes.

16           "Question:  Okay.  Let's now get into the thesis

17    itself, Exhibit 2.  Okay.  Can we now turn to Chapter I, the

18    introduction.  That starts with Best 00345.  I'd like to

19    have you read this, if you can, Dr. Best, out loud.  Is that

20    okay?

21           "Answer:  Sure.  The whole page?

22           "Question:  Well, why don't we start with the

23    first two paragraphs?  How's that?

24           "Answer:  Okay.  'Chapter I.  Introduction.

25    Anyone who has used a hearing aid will be familiar with the

Best - dep.

1  phenomenon commonly referred to as feedback.  This effect,

2  which is characterized by a high-pitched squeal, can be

3  uncomfortable to both the hearing aid user and to others

4  nearby.  Feedback occurs when the acoustic feedback path

5  from speaker back to the microphone causes the system to

6  become unstable.  Unfortunately, this often occurs at output

7  gain levels which are too low even for people with only mild

8  hearing impairments.

9         "'In principle, if the characteristics of the

10  feedback path were known exactly, then it would be possible

11  to simply subtract out that part of the microphone install

12  that is due to feedback.  In practice, not only are the

13  characteristics of the feedback path not known, but they may

14  change with time.  This paper presents a method for dealing

15  with the unknown and time-varying nature of the feedback

16  path.  The solution presented here uses the discrete time

17  LMS (Least mean square) adaptive linear combiner, configured

18  as a noise canceller, to develop a real-time estimate of the

19  feedback path.  This estimate is then used to cancel the

20  effects of feedback at the microphone.'

21         "Question:  Thank you.  Does that two paragraphs

22  give an overview of your thesis work?

23         "Answer:  Yes, except it doesn't mention the

24  implementation details.

25         "Question:  Is 13 dB the amount of additional

Best - dep.

1    gain that you did obtain, was that a significant amount of

2    gain?

3            "Answer:  Yes, it was.

4            "Question:  Can you describe what is shown in

5    Figure 1?

6            "Answer:  Well, it shows that the linear

7    combiner is composed of some number of signals that are then

8    multiplied by a set of weights, and the result of that is

9    all added together to produce a signal which I call lower

10   y(k), which is then subtracted from another signal to

11   produce an error output.

12           "Question:  Now, if you turn the page, the next

13   page there is a Figure 2, and it's called adaptive linear

14   combiner.  Do you see that?

15           "Answer:  Yes.

16           "Question:  Can you describe what Figure 2 is

17   showing?

18           "Answer:  In Figure 2, the weights here are

19   being adjusted by this adaptive algorithm to try to minimize

20   the size of the error output.

21           "Question:  How does Figure 1 -- I'm sorry, how

22   does Figure 2 relate to Figure 1, if at all?

23           "Answer:  Figure 1 is not adaptive.  The weights

24   are just chosen by some method, and what you get is what you

25   get.