IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ENERGY TRANSPORTATION GROUP, INC.,   )
  )
     Plaintiff,   )
  )
    v.   )     C.A. No. 05-422 (GMS)
  )
SONIC INNOVATIONS, INC., et al,   )
  )
     Defendants.   )

**OPENING BRIEF IN SUPPORT OF DEFENDANTS' RENEWED
MOTION FOR JUDGMENT AS A MATTER OF LAW
WITH RESPECT TO DAMAGES OR, IN THE ALTERNATIVE,
FOR A REMITTITUR OR NEW TRIAL ON DAMAGES**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200
mgraham@mnat.com
jparrett@mnat.com

OF COUNSEL:

John M. Romary

C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, DC  20001-4413
202.408.4000

*Attorneys for William Demant Holding A/S,
WDH Inc., Oticon A/S, Oticon, Inc.,
Bernafon AG, and Bernafon LLC*

OF COUNSEL:

SUGHRUE MION, PLLC
David J. Cushing
William H. Mandir
Carl J. Pellegrini
Brian K. Shelton
2100 Pennsylvania Ave., N.W.
Suite 800
Washington, DC  20037
202.293.7060

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200
dreid@mnat.com
jcincilla@mnat.com

*Attorneys for Widex A/S and
Widex Hearing Aid Co. Inc.*

Dated:  March 27, 2008

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................. 1

II.     NATURE AND STAGE OF PROCEEDINGS ..................................................... 1

III.    SUMMARY OF ARGUMENT ............................................................................ 1

IV.     FACTUAL BACKGROUND ............................................................................... 2

V.      ARGUMENT ....................................................................................................... 4

        A.      Legal Standards........................................................................................ 4

                1.      Judgment as a Matter of Law.................................................... 4

                2.      New Trial and Remittitur .......................................................... 5

        B.      ETG's Reasonable Royalty Analysis and the Jury's Damages Verdict Are
                Based on Speculation and Not Supported by Substantial Evidence ....... 5

                1.      Mr. Musika's Profit Analysis Is Legally Flawed and Unreliable .............. 6

                2.      Mr. Musika's Conclusions are Untethered to Any Meaningful
                        *Georgia-Pacific* Factor 13 Analysis or Assessment of the Portion
                        of the Profit to be Credited to the Claimed Invention............................... 12

                3.      Mr. Musika Improperly Disregarded the Legion of Licenses in the
                        Hearing Aid Field .................................................................................... 14

        C.      The Evidence Overwhelmingly Supports Damages of No More Than $2
                Million for Demant and $1.5 Million for Widex ................................. 16

VI.     CONCLUSION.................................................................................................. 20

# TABLE OF AUTHORITIES

## CASES

*Aro Manufacturing Co. v. Convertible Top Co.*,
377 U.S. 476 (1964)......................................................................................................... 7

*Boston Scientific Corp. v. Schneider (Europe) AG*,
983 F. Supp. 245 (D. Mass. 1997) .................................................................................. 15

*Boucher v. Suzuki Motor Corp.*,
73 F.3d 18 (2d Cir. 1996) ................................................................................................. 9

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)......................................................................................................... 6

*Dimnick v. Schiedt*,
293 U.S. 474 (1935)......................................................................................................... 5

*Dowagiac Manufacturing Co. v. Minnesota Moline Plow Co.*,
235 U.S. 641 (1915)......................................................................................................... 9

*DSU Medical Corp. v. JMS Co.*,
471 F.3d 1293 (Fed. Cir. 2006) (en banc) ....................................................................... 5

*Duplan Corp. v. Deering Milliken, Inc.*,
444 F. Supp. 648 (D.S.C. 1977), *aff'd in part and rev'd in part*,
594 F.2d 979 (4th Cir. 1979), *cert. denied*, 444 U.S. 1015 (1980)............................... 15

*Ellipse Corp. v. Ford Motor Co.*,
461 F. Supp. 1354 (N.D. Ill. 1978), *cert. denied*, 446 U.S. 939 (1980) ....................... 17

*Fromson v. Western Litho Plate & Supply*,
853 F.2d 1568 (Fed. Cir. 1988) ....................................................................................... 9

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970), *modified & aff'd*,
446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870 (1971)............................... 1, 12, 17

*Joy Technologies, Inc. v. Flakt, Inc.*,
954 F. Supp. 796 (D. Del. 1996)..................................................................................... 10

*Kaiser Industries Corp. v. Jones & Laughlin Steel Corp.*,
181 U.S.P.Q. (BNA) 193 (W.D. Pa. 1974), *rev'd on other grounds*,
515 F.2d 964 (3d Cir.), *cert. denied*, 423 U.S. 876 (1975)........................................... 16

*Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*,
761 F.2d 649 (Fed. Cir. 1985) .......................................................................................... 7

*Kumho Tire Co. v. Carmichael,*
526 U.S. 137 (1999) ............................................................................................ 6

*Lifescan Inc. v. Home Diagnostics, Inc.,* 103 F. Supp. 2d 345 (D. Del. 2000) ............................ 5

*MicroStrategy Inc. v. Business Objects, S.A.,*
429 F.3d 1344 (Fed. Cir. 2005) ........................................................................... 6

*Monolithic Power Systems, Inc. v. O2 Micro International Ltd.,*
2007 WL 470259 (N.D. Cal. 2007) .................................................................... 10

*Montgomery Ward & Co. v. Duncan,*
311 U.S. 243 (1940) ............................................................................................ 5

*Pannu v. Iolab Corp.,*
155 F.3d 1344 (Fed. Cir. 1998) ........................................................................... 4

*Perkin-Elmer Corp. v. Computervision Corp.,*
732 F.2d 888 (Fed. Cir. 1984) ............................................................................. 4

*Randolph , Inc. v. Specialties Development Corp.,*
213 F.2d 873 (3d Cir. 1954), *cert. denied,* 348 U.S. 861 (1954) .......................... 17

*Spence v. Board of Education for Christina School District,*
806 F.2d 1198 (3d Cir. 1986) .............................................................................. 5

*Suffolk Co. v. Hayden,*
70 U.S. 315 (1865) .............................................................................................. 9

*Tektronix, Inc. v. United States,*
552 F.2d 343 (Ct. Cl. 1977) ................................................................................ 7

*Telecomm Technology Services, Inc. v. Siemens Rolm Communications, Inc.,*
1999 U.S. Dist. LEXIS 21415 (N.D. Ga. 1999) ............................................. 10, 11

*TWM Manufacturing Co. v. Dura Corp.,*
789 F.2d 895 (Fed. Cir. 1986) ............................................................................. 7

*U.S. Philips Corp. v. International Trade Commission,*
424 F.3d 1179 (Fed. Cir. 2005) ......................................................................... 15

*Unisplay, S.A. v. American Electronic Sign Co.,*
69 F.3d 512 (Fed. Cir. 1995) ............................................................................... 5

*W.R. Grace & Co. v. Intercat Inc.,*
60 F. Supp. 2d 316 (D. Del. 1999) ...................................................................... 7

**STATUTES**

35 U.S.C. § 284 .................................................................................................................... 9

**RULES**

Fed. R. Civ. P. 50 ............................................................................................................... 5

Fed. R. Civ. P. 50(a) .......................................................................................................... 1

Fed. R. Civ. P. 59(a) .......................................................................................................... 1

**ARTICLES**

Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*,
     85 Tex. L. Rev. 1991 (2007) ................................................................. 13, 17, 19

## I.    INTRODUCTION

Defendants Oticon A/S, Oticon, Inc., Bernafon AG, Bernafon, LLC, WDH, Inc., William Demant Holding A/S ("Demant"), Widex A/S, and Widex Hearing Aid Co., Inc. ("Widex") (collectively the "Defendants") have timely renewed their motion for judgment in their favor and against Plaintiff Energy Transportation Group, Inc. ("ETG") as a matter of law with respect to damages pursuant to Fed. R. Civ. P. 50(a).  In the alternative, the Defendants have moved for a remittitur or new trial on damages pursuant to Fed. R. Civ. P. 59(a).

## II.    NATURE AND STAGE OF PROCEEDINGS

ETG filed this lawsuit against Widex and Demant on June 23, 2005, asserting Defendants' infringement of U.S. Patent Nos. 4,731,850 ("the '850 patent") and 4,879,749 ("the '749 patent").  This Court held a jury trial on all issues from January 22, 2008, through February 1, 2008.  At the close of evidence, Widex and Demant brought a motion for judgment as a matter of law ("JMOL") pursuant to Fed. R. Civ. P. 50(a).  The Court reserved judgment on the motion. (Trial Tr. 2021:1-8 (Appendix A includes all pages of the trial transcript referenced herein).)  On February 4, 2008, the jury found the patents-in-suit infringed and awarded ETG damages of $16 million against Demant and $15 million against Widex.  (D.I. 521.)

## III.    SUMMARY OF ARGUMENT

A reasonable royalty may be determined by considering a number of real-world factors and hypothesizing a negotiation between a willing licensee and a willing licensor at the time the alleged infringement began.  *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), *modified & aff'd*, 446 F.2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870 (1971).  Here, rather than acknowledging the legion of comparable licenses in the hearing aid field or performing a proper *Georgia-Pacific* analysis, ETG's damages expert, Mr. Terry Musika, confused the jury by asserting "collusion" in the hearing aid industry based on a report

by the German Federal Cartel Office and presenting an arbitrary profits analysis that inappropriately and prejudicially lumped together the financial data for all of the original defendants in this case. Without the support of substantial evidence, Mr. Musika asserted at trial that no comparable licenses existed and that the Defendants enjoyed a supposed 9.2% profit premium for the accused products and that a running royalty rate of 8.4% was appropriate.

Contrary to ETG's contention, a reasonable royalty rate can and should be determined from examination of the comparable licenses in the hearing aid industry, and resort to an arbitrary profits analysis is neither necessary nor appropriate. In fact, as testified by Defendants' expert, Mr. Charles Donohoe, a review of the comparable licenses in the hearing aid field would have led negotiators in a hypothetical negotiation to reach no more than a 0.5% royalty for the asserted ETG patents. Moreover, the trial testimony of Dr. John Putnam objectively demonstrates the flaws in Mr. Musika's analysis and that a reasonable royalty for the patents-in-suit should be well under 1% of sales.

The damages awarded by the jury in this case, however—$16 million against Demant and $15 million against Widex—translate into royalty rates well beyond 0.5%. In light of the evidence presented at trial, no jury reasonably could find that the damages awarded against Demant and Widex are justified, and the Court should grant JMOL that the appropriate damages are not greater than $2.0 million for Demant and not greater than $1.5 million for Widex or, in the alternative, order a remittitur or new trial on damages.

IV.    **FACTUAL BACKGROUND**

It is undisputed that ETG and its predecessor, Audimax, never licensed the patents-in-suit nor implemented a commercial hearing aid product based on the technology claimed in the patents. (Donohoe, Tr. 1814:14-25 (direct).) ETG in fact hired EKMS, a firm specializing in licensing technology, as a last ditch effort to exploit the patents before their

expiration. However, despite its contingent interest in the exploitation efforts, EKMS also failed
to license the ETG patents. (Donohoe, Tr. 1815:1-8 (direct).)

It also is undisputed that a multitude of factors go into making a successful
hearing aid. Competition in the industry is fierce. (Jacobsen, Tr. 1001:10-20 (direct).)
Accordingly, the many technologies that are in a product, the marketing of the hearing aid, the
distribution and sales channels, the reliability of the hearing aid, the reputation of the
manufacturer, the styling and cosmetic features, and the fit of the hearing aid all contribute to the
ability of Defendants to differentiate and sell their products. (*See* Musika, Tr. 929:25-930:25
(cross), Donohoe, Tr. 1819:11-18 (direct).)

There are more than 17,000 patents pertaining to the hearing aid industry. (*See*
Westermann, Tr. 798:19-20 (cross).) Thus, in products like hearing aids that have many
complex features and many intellectual property inputs, patent royalty stacking is a real concern.
(*See* Jacobsen, Tr. 970:9-971:7 (direct), 1808:10-13, Donohoe, Tr. 1816:3-15 (direct), 1827:8-12,
1844:23-1845:6 (cross).) If too many royalties at high rates are imposed on a company's
products, the company simply may be unable to do business. (*See id.*)

Accordingly, royalties for licenses in the hearing aid industry cannot be too high,
and the evidence is undisputed that the average royalty rate for the hearing aid industry licenses
paid for by Demant and Widex is about 0.5%, with the maximum rate being 1.4% for a license
with three patent families. (Donohoe, Tr. 1818:12-20 (direct); *see* Appendix B [Donohoe slide
"Royalty Rates for Comparable Licenses"].)

Defendants also are members of the Hearing Instrument Manufacturers Patent
Partnership ("HIMPP"). HIMPP was established in 1996 to acquire a portfolio of basic
foundational hearing aid related patents, to avoid infringement issues, and to make those patents

3

available to all interested parties in the hearing aid industry on a non-discriminatory basis. (JX 180;[1] Jacobsen, Tr. 963:10-22, 964:7-12 (direct), Donohoe, Tr. 1817:19-24 (direct).) The patents initially were sold by 3M, which is not in the hearing aid industry, to ReSound. (Donohoe, Tr. 1817:6-12 (direct).) ReSound then sold the patents to HIMPP for $14.5 million. (*Id.*; Westermann, Tr. 729:13-22 (direct).) Taking into account the over 200 patents in approximately 20 patent families in the HIMPP portfolio (JX 180), that sales price equates to $725,000 per patent family. (Donohoe, Tr. 1817:13-18 (direct).) Any hearing aid manufacturer can become a partner in HIMPP for $1.8 million or, in the alternative, can obtain a license to the HIMPP patents for a 3% royalty. (JX 180; Westermann, Tr. 795:7-796:22 (cross), Jacobsen, Tr. 966:14-967:7 (direct).) That 3% royalty for access to the entire HIMPP portfolio of approximately 20 patent families yields a rate of 0.15% per patent family. (Donohoe, Tr. 1818:2-6 (direct).)

## V.     ARGUMENT

### A.     Legal Standards

#### 1.     Judgment as a Matter of Law

Under Rule 50 of the Federal Rules of Civil Procedure, a court should grant a motion for judgment as a matter of law ("JMOL") where "there is no legally sufficient basis for a jury to find for [the non-moving] party." *See* Fed. R. Civ. P. 50. Thus, in order to prevail on a renewed motion for JMOL following a jury trial, the Defendants "must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (alteration in original) (quoting *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984))

---

[1]    Trial exhibits cited in this Brief, or the relevant portions thereof, are attached.

("'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review.").

### 2.      New Trial and Remittitur

A new trial may be granted at the discretion of the district court when the verdict is against the clear weight of the evidence. *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251 (1940) ("The motion for a new trial may invoke the discretion of the court in so far as it is bottomed on the claim that the verdict is against the weight of the evidence . . . ."). For example, a jury's award of damages cannot be sustained when "the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1309 (Fed. Cir. 2006) (en banc). The standard for grant of a new trial is less rigorous than the standard for grant of judgment as a matter of law because the court need not view the evidence in the light most favorable to the verdict winner. *Lifescan Inc. v. Home Diagnostics, Inc.,* 103 F. Supp. 2d 345, 350 (D. Del. 2000).

The use of remittitur is well established as a device employed when a court finds that a damage award is clearly unsupported and/or excessive. *Spence v. Bd. of Educ. of Christina Sch. Dist.*, 806 F.2d 1198, 1201 (3d Cir. 1986). Its use is within the trial judge's discretion. *Id.* A court may reduce a damages award to the "highest amount of damages that the jury could properly have awarded based on the relevant evidence." *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 519 (Fed. Cir. 1995); *Dimmick v. Schiedt*, 293 U.S. 474, 486 (1935).

### B.      ETG's Reasonable Royalty Analysis and the Jury's Damages Verdict Are Based on Speculation and Not Supported by Substantial Evidence

As testified to by the Defendant's expert, Mr. Charles Donohoe, *Georgia-Pacific* sets forth a number of factors that, when present, should be taken into consideration in a reasonable royalty analysis. ETG's damages expert, Mr. Musika, also professed that he

performed a *Georgia-Pacific* analysis.  (Musika, Tr. 850:3-20 (direct).)  However, Mr. Musika improperly gave weight to factors that are unsupported by the evidence and ignored other factors that are present in the record, all the while engaging in impermissible speculation and guesswork concerning the profits associated with the accused products or the portion of those profits to be credited to the claimed invention.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-92 (1993), the trial court acts as a "gatekeeper" to exclude expert testimony that is irrelevant or does not result from the application of reliable methodologies or theories to the facts of the case.  *See also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999) (holding that principles of *Daubert* apply not only to scientific testimony, but to all expert testimony).  Consequently, the Federal Circuit routinely upholds the decision of district courts to exclude consideration of speculative expert testimony.  *See*, *e.g.*, *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1353, 1355-56 (Fed. Cir. 2005).

### 1.    Mr. Musika's Profit Analysis Is Legally Flawed and Unreliable

In an effort to seek a large damages award, Mr. Musika advanced a speculative "profit premium" to raise the damages floor over a reasonable royalty.  Although purporting to use his profit analysis to opine on a reasonable royalty, Mr. Musika in effect advocated an accounting of Defendants' profits.  (*See* Musika, Tr. 851:7-8 (direct) ("What we are getting to is the profits.  We are looking for the profits.").)  By law, however, ETG is not entitled to any form of damages other than a reasonable royalty.  ETG cannot seek lost profits because it never made or had the capacity to make a hearing aid according to the patents-in-suit.  ETG also is not

permitted to an accounting of the Defendants' profits, because damages based on an accounting of profits was excluded by the 1946 Patent Act.[2]

To determine a reasonable royalty, ETG's expert purported to follow the analytical approach upheld by the Federal Circuit in *TWM Manufacturing Co. v. Dura Corp.*, 789 F.2d 895, 899-900 (Fed. Cir. 1986).  That approach involves the subtraction of "the infringer's usual or acceptable net profit from its anticipated net profit realized from sales of infringing devices."  *Id.* at 899; *see also Tektronix, Inc. v. United States*, 552 F.2d 343, 349 (Ct. Cl. 1977).  In practice, however, Mr. Musika followed another approach altogether, one that has never been adopted or approved by any court.

Mr. Musika calculated an operating profit margin of 25.6% based on financial information from Widex, Demant, and four other hearing aid manufacturers.  (*See* Musika, Tr. 862:19-20 (direct).)  He based this calculation on a supposed gross profit margin for the accused products of 65.2%, less a gross profit margin for "all the other industry participants," to get a "premium" of 9.2% for the accused products.  (*See* Musika, Tr. 864:8-18 (direct).)  He then added this 9.2% premium to the operating margin (16.4%) for "all the other companies that are claimed to rely on the patent" to produce an alleged operating margin of 25.6% for the accused products.[3]  (Musika, Tr. 864:21-865:5 (direct).)

---

[2]     The 1946 Patent Statute was amended to "precisely eliminate the recovery of profits as such and allow the recovery of damages only."  *Aro Mfg. Co. v. Convertible Top Co.*, 377 U.S. 476, 505 (1964).  It was also to "eliminate the necessity of the traditional accounting to determine the infringer's profits in all damages determinations."  *Kori Corp. v. Wilco Marsh Buggies & Draglines, Inc.*, 761 F.2d 649, 654 (Fed. Cir. 1985).  *Cf. W.R. Grace & Co. v. Intercat Inc.*, 60 F. Supp. 2d 316, 321 (D. Del. 1999) ("In calculating damages, the focus is on the financial harm to the patent owner caused by the infringement.  No consideration is given to whether the defendant gained or lost by the infringing act.").

Mr. Musika's claimed approach in arriving at his alleged operating margin was to gather as much information as possible to be accurate. (Musika, Tr. 922:10-923:1 (cross).) However, his calculations omit financial information pertaining to Siemens, a major company in the hearing aid industry with significant market share. (Musika, Tr. 923:2-4 (cross).) Moreover, Mr. Musika also failed to cite any evidence to refute the charge that his calculations purporting to concern "all the other industry participants" failed to include at least 20% of all known hearing aid manufacturers. (*See* Musika, Tr. 926:11-927:8 (cross).) Such omissions by themselves render Mr. Musika's calculations inherently speculative and unreliable.

Further, without the benefit of a reasoned analysis or assessment of the value of the claimed invention to the accused products, Mr. Musika asserted that a range of 25% to 33% of these supposed operating profits for the accused products forms a starting point for a royalty rate for the *Georgia-Pacific* hypothetical negotiation. (*See* Musika Tr. 861:8-12 (direct), 866:12-867:17.) This assertion, coupled with Mr. Musika's 9.2% "premium," created an unsupported "negotiating range" of 6.4% to 9.2%, within which Mr. Musika engaged in an illusory manipulation of the *Georgia-Pacific* factors and concluded that a running royalty rate of 8.4% was appropriate. (*See* Musika, Tr. 866:12-868:4 (direct).)

Mr. Musika's analysis is fundamentally flawed and, accordingly, unreliable. He calculated a purported "industry profit margin" based on (1) the profit margins of assorted hearing aid companies (including parties no longer in this lawsuit), and (2) the profit margins on all of these companies' products (both accused as well as non-accused hearing aid products, as well as on non-hearing products). This calculation was based on profit margins obtained during the period of infringement, not anticipated profit margins at the time when infringement first began. As a result, Mr. Musika failed to compare any single Defendant's expected profits on a

given accused hearing aid product with that particular Defendant's profits on non-accused hearing aid products. In addition, since his computation involved not only non-accused hearing aid products but also non-hearing aid products *and* the accused products, a comparison with the profit margins on the accused products becomes utterly meaningless. In other words, rather than determining what the "premium" of a given Defendant's accused apples' profit rate happens to be over the profit rate on its non-accused oranges, ETG seeks to compare the Defendants' collective accused apples' profit rate to a bowl containing a mixture of all of the Defendants' apples, oranges, and irrelevant radishes, with no attempt to make adjustments for the presence of either apples or radishes in the bowl.

The novel approach advocated by Mr. Musika in this case was not employed by either the *TWM* or *Tektronix* courts, nor has it ever been sanctioned by any other court in the land. Although no single accepted method exists for determining a reasonable royalty, ETG cannot simply adopt whatever approach it likes. Mr. Musika's analysis is inherently flawed and speculative, failing to provide a *reliable* indication of what portion of the profit for any given Defendant (or even for all Defendants collectively) is attributed "for the *use made* of the *invention* by the *infringer*," as required by 35 U.S.C. § 284 (emphases added).[4] *See Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to essentially be an apples and oranges comparison). This Court upheld a

---

[4]    The extent of use of an invention must be considered when determining a reasonable royalty. *Dowagiac Mfg. Co. v. Minn. Moline Plow Co.*, 235 U.S. 641, 648 (1915); *Suffolk Co. v. Hayden*, 70 U.S. 315, 320 (1865); *Fromson v. W. Litho Plate & Supply*, 853 F.2d 1568, 1579 (Fed. Cir. 1988). As discussed below, Mr. Musika similarly failed to make any meaningful analysis of the appropriate share of the profits under *Georgia-Pacific* factor 13. (*See* Musika, Tr. 886:14-22 (direct), 934:13-935:4 (cross).)

9

similar attack on an expert's gross margin calculations in a lost profits analysis in *Joy Technologies, Inc. v. Flakt, Inc.*, 954 F. Supp. 796, 806 (D. Del. 1996) (damages expert's use of non-escalated and escalated numbers in the same gross margin calculation found to be akin to comparing apples to oranges).  Nor is it an excuse that Mr. Musika lacked the proper data to break down his analysis by Defendant and by accused product.  *See Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 2007 WL 470259, at *9-10 (N.D. Cal. 2007).

This is not the first time that Mr. Musika has presented unreliable damages testimony.  In *Telecomm Technology Services, Inc. v. Siemens Rolm Communications, Inc.*, 1999 U.S. Dist. LEXIS 21415 (N.D. Ga. 1999), Mr. Musika also sought to opine as to damages resulting from infringement.  In calculating damages attributable to most of the counterdefendants in the case, Mr. Musika examined each of their records to make his calculations for each counterdefendant.  *Id.* at *6.  With respect to counterdefendant RealCom, however, Mr. Musika considered the produced information insufficient, so instead he used the average of the percentages of infringing systems and the average sales prices for the other counterdefendants in making his computations for RealCom.  *Id.* at *6-8.  Although the counterplaintiff, Siemens Rolm, argued that Mr. Musika's extrapolation method was the best possible approach given the scarcity of the data produced, the court noted that those cases allowing extrapolation in calculating infringement damages relied on known *intracompany* figures, *not figures from other defendants*.  *Id.* at *9-10.  The court therefore rejected Mr. Musika's averaging approach as unreliable:

> [E]ven accepting *arguendo* that Musika's method is the best possible one under the circumstances, it still must pass the threshold of reliability.  Thus, while Kumho Tire and Daubert recognize that an expert must be afforded a degree of flexibility in approaching his or her task, the need for flexibility does not

> negate the ever present requirement of reliability, which
> Musika's method simply does not satisfy.

*Id.* (footnote omitted).

In rejecting Mr. Musika's opinion as unreliable, the *Telecomm* court noted that his method was "inherently unreliable because it assumed without evidence that RealCom's business mix is indistinguishable from the other counterdefendant[s]," and that evidence actually existed that RealCom's business mix in fact was different from the other counterdefendants.[5]

Mr. Musika made virtually the identical mistakes in this case by using the financial information for other hearing aid manufacturers not on trial and by commingling data for both accused and non-accused products. His profit calculations and opinions based thereon are supported neither in the method nor in the requirements of the law for determining damages for patent infringement. In short, the record contains no reliable evidence that there is a 9.2% profit premium associated with the accused products. The unreliability of Mr. Musika's methodology was highlighted by the testimony of Dr. Putnam that, if the premium calculated using Mr. Musika's methodology were based on the financial information of Demant and Widex alone, the "premium" is a ***negative* 12%**. (Putnam, Tr. 1876:5-1877:13 (direct).) Therefore, as with the *Telecomm* case, this Court should find that Mr. Musika's analysis is unreliable and that ETG's royalty rate is not supported by legally sufficient evidence.

---

[5]     *Id.* at *8. Mr. Musika's method effectively sums together the Defendants and treats them as a single entity. But this method is unreliable because it does not account consistently for the differing mixes of products and profits produced by each company. As recognized by the *Telecomm* court, this differing business mix is further evidence of the unreliability of Mr. Musika's approach. *Id.*

**2.      Mr. Musika's Conclusions are Untethered to Any Meaningful**
***Georgia-Pacific* Factor 13 Analysis or Assessment of the**
**Portion of the Profit to be Credited to the Claimed Invention**

*Georgia-Pacific* factor 13 requires consideration of:

> [t]he portion of the realizable profit that should be credited to the invention as
> distinguished from non-patented elements, the manufacturing process, business
> risks, or significant features or improvements added by the infringer.

*Georgia-Pacific*, 318 F. Supp. at 1120.  In other words, "the royalty rate must be based not just

on the value of the invention in the abstract, but what it contributes in the context of the other

elements of the accused product."  Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty*

*Stacking*, 85 Tex. L. Rev. 1991, 2040 (2007).

One of the primary issues that *Georgia-Pacific* factor 13 addresses is the problem

of patent royalty stacking, which was addressed by Mr. Donohoe (Donohoe, Tr. 1807:23-

1808:16 (direct), 1827:5-12, 1844:23-1845:6 (cross)) but ignored by Mr. Musika.  *See* Lemley &

Shapiro, 85 Tex. L. Rev. at 2020 & n.75 ("[P]atents covering one small component of the larger

invention are supposed to get lower royalty rates . . . than patents covering the whole product,"

and *Georgia-Pacific* factor 13 is one of the factors to assess the "relative value of the patented

component to the infringing product.").

At trial, Mr. Musika admitted on cross-examination that a whole host of factors—

including the many technologies that are in a product, marketing, distribution and sales channels,

product reliability—contribute to the ability of Defendants to sell their hearing aids.  (Musika,

Tr. 929:25-930:25 (cross).)  Although Mr. Musika claimed that he already had taken those items

into account (*see id.*), he nevertheless failed to make any meaningful or reliable analysis under

*Georgia-Pacific* factor 13 or otherwise to determine the portion of the profits to be credited to

the claimed invention.

12

At trial, the extent of Mr. Musika's analysis under *Georgia-Pacific* factor 13 consisted entirely of looking at "the profits margins there, yes, in terms of higher profit margin and that being higher pressure."  (Musika, Tr. 886:14-18 (direct).)  Whatever that means, it sheds little light on the incremental value of the use of the patents-in-suit in light of the multitude of other elements that comprise, and contribute to sales of, the accused products.  Although Mr. Musika also inexplicably relied on the supposed "pioneering" nature of the invention for support under *Georgia-Pacific* factor 13, he is not a technical expert and could identify no trial testimony supporting his claim.  (Musika, Tr. 928:25-929:17 (cross).)  In fact, the testimony of John Kates was that Dr. Levitt's work in feedback cancellation was *not* pioneering.  (Kates, Tr. 1912:7-9 (dep.).)

Mr. Musika's failure to perform a proper *Georgia-Pacific* factor 13 analysis was confirmed at trial through the following cross-examination of his prior deposition testimony:

> Q.    Mr. Musika, I will ask the question again.  Isn't it true that you did not do any analysis to try to separate out the value of the use of the invention of the patents in suit?
>
> A.    That is not true, that I did not do any analysis to try and separate out whatever the rest of your question is.
>
> Q.    Would you play 81, please.
>
> "So just to clarify for the record, which part did you do?
>
> "Answer:  I did an analytical review method.  **I didn't go and try to separate out and suggest that the value that's represented by the analytical method is necessarily reflective of just the incremental value of the use of the technology.**"
>
> That was your answer, correct?
>
> A.    That was my answer as it relates to the analytical method.

(Tr. 934:13-935:4 (emphasis added).)

13

By his own admission, Mr. Musika did not make any meaningful analysis of the incremental value of the use of the claimed invention with respect to the accused products, a fundamental inquiry required by *Georgia-Pacific* factor 13. As a result, Mr. Musika's trial testimony regarding *Georgia-Pacific* factor 13 was meaningless and unreliable to support a reasonable royalty based on profits. Moreover, to the extent Mr. Musika tried to salvage that testimony by pointing to his "analytical method," that attempt also fails for the reasons discussed above.

### 3. Mr. Musika Improperly Disregarded the Legion of Licenses in the Hearing Aid Field

Rather than relying on comparable licenses under *Georgia-Pacific* factor 2, Mr. Musika improperly discounted all of the license agreements in the hearing aid field on the basis of the German Federal Cartel Office's decision. (*See* Musika, Tr. 882:12-24 (direct) ("I concluded that a federal regulator concluded that the three percent rate that they charge each other that hadn't fallen into the wrong hands is not a market rate.").)

The German Federal Cartel Office, however, was focused on market concentration of certain hearing aid manufacturers (the "oligopolists") in the ***German*** market. (*See* PX 648 at ¶¶ 124-125 (excerpt attached).) The German Federal Cartel Office also specifically stated that it was ***not examining "technology transfer among the oligopolists for its conformity to Article 81 of the EC Treaty."*** (PX 648 at ¶ 209 (emphasis added) (excerpt attached).) It likewise made no findings whatsoever as to whether the royalty rates for licenses in the hearing aid field were unreasonable or artificially depressed, let alone whether Defendants' or HIMPP's actions had any negative effect whatsoever on competition in the United States.

In fact, none of the excerpts from the German Federal Cartel Office's decision that Mr. Musika paraded in front of the jury, however, actually discuss any actual finding by the

German regulators that the licensing rates in the hearing aid industry are not true and fair rates. High profits, price discipline, and lack of competition among hearing aid acousticians (*see* Musika, Tr. 876:4-878:16 (direct)), purported findings of intertwined relationships, barriers to entry, and lack of competition in the industry (*see* Musika, Tr. 879:1-21 (direct)), and the purported "risk of collusion" (*see* Musika, Tr. 881:2-18 (direct)) all may inflame a jury against Defendants, but they do not support Mr. Musika's conclusion that "a federal regulator concluded that the three percent rate that they charge each other that hadn't fallen into the wrong hands is not a market rate."  (Musika, Tr. 882:19-21 (direct).)

        The section of the German Federal Cartel Office's decision regarding "intertwined relationships" that Mr. Musika displayed to the jury, quoted from and relied on in his disregard of the industry licenses, states that "[t]he manufacturers are intertwined with one another by contractual business relationships (ensured in part by company law) (mainly joint ventures and licensing agreements)."  Regardless of the conclusion that Mr. Musika drew from this statement by the German authorities, arrangements such as patent pools and cross-licensing actually can promote competition and innovation.  *See, e.g.*, *U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1192 (Fed. Cir. 2005) (citing U.S. Department of Justice and Federal Trade Commission antitrust guidelines stating that "[b]y promoting the dissemination of technology, cross-licensing and pooling arrangements are often procompetitive").  Other courts also specifically have recognized that avoiding litigation through pooling arrangements and cross-licensing may benefit competition.  *See, e.g., Boston Scientific Corp. v. Schneider (Europe) AG*, 983 F. Supp. 245, 269 (D. Mass. 1997); *Duplan Corp. v. Deering Milliken, Inc.*, 444 F. Supp. 648 (D.S.C. 1977), *aff'd in part and rev'd in part*, 594 F.2d 979 (4th Cir. 1979), *cert. denied*, 444 U.S. 1015 (1980); *Kaiser Indus. Corp. v. Jones & Laughlin Steel Corp.*, 181

U.S.P.Q. (BNA) 193, 223-24 (W.D. Pa. 1974), *rev'd on other grounds*, 515 F.2d 964 (3d Cir.), *cert. denied*, 423 U.S. 876 (1975).  *See also* Lemley & Shapiro, 85 Tex. L. Rev. at 1994 (cross-licenses and patent pools are pro-competitive).[6]

Finally, regardless of Mr. Musika's unsupported conclusion regarding the licenses in the hearing aid industry, Mr. Musika admitted that he did not identify any common ownership of the major hearing aid companies.  (Musika, Tr. 917:24-918:1 (cross).)  This absence of common ownership comports with Mr. Donohoe's testimony that he saw no evidence that would suggest that the licenses in the hearing aid industry are not "true and fair commercial transactions."  (Donohoe, Tr. 1817:3-5 (direct).)

Under the circumstances, Mr. Musika had no legitimate basis for excluding the legion of comparable licenses from his reasonable royalty analysis.  This error, coupled with his improper and unreliable profit analysis and wholesale failure to make any *Georgia-Pacific* factor 13 assessment of the value of the patented features in the sale of the accused products, leaves his testimony with little to no evidentiary significance, and is an insufficient basis for the jury's damages verdict.

### C. The Evidence Overwhelmingly Supports Damages of No More Than $2 Million for Demant and $1.5 Million for Widex

Reliance on other licenses in the industry is appropriate under *Georgia-Pacific* factor 2:  "The rates paid by the licensee for the use of other patents comparable to the patent in

___

[6]     The supposed lack of competition in the hearing aid industry is also unsupported by the evidence.  For example, the internal business plans of Oticon and Bernafon demonstrate that the industry in fact is competitive.  (JX 151 at DEM016386 (excerpt attached) ("With Siemens['s] introduction into the digital market and the anticipated introduction from ReSound, the competition remains high."), JX 159 at DEM013385 (excerpt attached) ("A real threat is however the upcoming entry of ReSound that might prove to be very dangerous because of the significant overlap between ours and their customer base.").)

suit." *Georgia-Pacific*, 318 F. Supp. at 1120. *See, e.g., Ellipse Corp. v. Ford Motor Co.*, 461 F.

Supp. 1354, 1373 (N.D. Ill. 1978), *cert. denied*, 446 U.S. 939 (1980) ("[T]he court has taken into

consideration . . . other patent licenses granted to Ford and Ford's negotiations for other power

steering pump licenses."). *Cf. Randolph Labs., Inc. v. Specialties Dev. Corp.*, 213 F.2d 873 (3d

Cir. 1954), *cert. denied*, 348 U.S. 861 (1954) (2% royalty reasonable because prior patent that

dominated the field had an established royalty rate of 3%).

      Here, a reasonable royalty rate can be determined from examination of the

comparable licenses in the hearing aid industry, and resort to Mr. Musika's arbitrary, speculative,

and unreliable profits analysis is neither necessary nor appropriate. In fact, the undisputed record

establishes that comparable licenses in the hearing aid field would lead negotiators under a

*Georgia-Pacific* analysis to approximately $1 million for a lump sum agreement or, alternatively,

a maximum of 0.5% for a running royalty.

      Mr. Donohoe, who has negotiated well over a hundred licenses (Donohoe, Tr.

1809:1-6 (direct)) as opposed to the three negotiations in which Mr. Musika has been involved

(Musika, Tr. 916:10-13 (cross)), testified that patent royalty stacking is a real concern with

products that, like hearing aids, have many complex features and many intellectual property

inputs. (*See* Donohoe, Tr. 1808:10-13, 1816:3-12 (direct), 1827:8-12, 1844:23-1845:6 (cross).)

*See generally* Lemley & Shapiro, 85 Tex. L. Rev. 1991. Thus, the negotiators in the hypothetical

negotiation would understand that the royalty rates could not be too high, but would have to be

reasonable. (*See* Donohoe, Tr. 1816:13-15 (direct).) Turning to comparable licenses under

*Georgia-Pacific* factor 2, Mr. Donohoe identified 29 agreements, 16 of which were royalty-

bearing, with no evidence that the agreements were anything other than "true and fair

commercial transactions." (Donohoe, Tr. 1816:16-1817:5 (direct); *see* Appendix C [Donohoe

17

slide "Comparable Licenses – Hearing Aid Technology"].)  The evidence is undisputed that the

average royalty rate for the hearing aid industry licenses paid for by Demant and Widex was

about 0.5%, with the maximum rate being 1.4% for a license with three patent families.

(Donohoe, Tr. 1818:12-20 (direct); *see* Appendix B.)

The HIMPP rate of 3.0% illustrated in Appendix B, which is an alternative to

buying into the HIMPP partnership for $1.8 million, provides access to 20 patent families and

approximately 250 patents that include basic foundational patents in the hearing aid industry.

(Donohoe, Tr. 1817:19-1818:11 (direct), 1818:21-1819:1.)  As Mr. Donohoe testified, dividing

the HIMPP portfolio by the 20 patent families yields a rate of 0.15% per patent family.

(Donohoe, Tr. 1818:2-6 (direct).)

The royalty rates observed in the hearing aid industry by Mr. Donohoe are

corroborated by additional significant evidence.  As discussed above, many factors go into

making a successful hearing aid.  Mr. Musika agreed with Mr. Donohoe that a multitude of

factors contribute to the profitability of the product.  The many technologies that are in a product,

marketing, distribution and sales channels, product reliability and reputation, styling, and fit all

contribute to the ability of Defendants to sell their hearing aids.  (Musika, Tr. 929:25-930:25

(cross), Donohoe, Tr. 1819:11-18 (direct).)  Recognizing these various factors that make a

product profitable, the *Georgia-Pacific* factor 13 analysis undertaken by Dr. Putnam confirms

the propriety of a royalty rate in the range found by Mr. Donohoe.

Dr. Putnam performed an objective and detailed analysis to determine the portion

of Defendants' expected profits that actually would be attributable to ETG's patents as opposed

to all of the other factors that go into making a profitable hearing aid.  (Putnam, Tr. 1878:23-

1879:16 (direct), 1879:23-1880:13.)  Using a method supported by years of economic research,

Dr. Putnam identified the patents owned and licensed in by Defendants, ranked them based on

the number of their patent citations, and then allocated to each patent its appropriate share of

profits.  (Putnam, Tr. 1880:24-1884:23 (direct).)  For Demant, Dr. Putnam's analysis resulted in

0.52% of sales being ETG's share attributable to the patents-in-suit.  (Putnam, Tr. 1884:24-

1885:20 (direct); Appendix D [Putnam slide "Summary – Demant"].)  For Widex, ETG's share

of sales came to 0.66%.  (Putnam, Tr. 1885:21-1886:3 (direct); Appendix E [Putnam slide

"Summary – Widex"].)

Other significant evidence in the case also supports a royalty rate in the range

exhibited by the rates of comparable licenses in the hearing aid industry.  It is undisputed, for

example, that Audimax and ETG never commercialized or licensed the patents-in-suit.

(Donohoe, Tr. 1814:14-25 (direct).)  In fact, EKMS, a firm specializing in licensing technology,

with a contingency interest in its efforts, did not license the patents.  (Donohoe, Tr. 1815:1-8

(direct).)  This evidence would have a downward impact on the rate under a *Georgia-Pacific*

analysis.  (Donohoe, Tr. 1815:25-1816-2 (direct).)  Furthermore, Mr. Donohoe observed that Mr.

Chen's subsequent purchase of his brother's interest in ETG and, thus, in the patents-in-suit,

suggested that the patents-in-suit were worth no more than approximately $2.5 million.

(Donohoe, Tr. 1815:9-24 (direct).)

Accordingly, based upon his years of experience in licensing and his analysis of

the pertinent *Georgia-Pacific* factors, Mr. Donohoe found that a reasonable royalty for the

patents-in-suit either would be a lump sum payment of $1 million or a royalty rate of no more

than 0.5%.  (Donohoe, Tr. 1822:4-1823:11 (direct).)  Applying the 0.5% rate to the royalty bases

calculated by Dr. Putnam yields maximum damages of $2.04 million for Demant and $1.51

million for Widex.  (Donohoe, Tr. 1823:1-11 (direct); Appendix F [Donohoe slide "Reasonable

Royalty Damages" (Scenario 1)].)  Alternatively, if only the asserted method claims of the '850 patent are found to be infringed, then the maximum damages available to ETG would be lower since the royalty base is limited to only post-suit sales by Demant and Widex.[7]

## VI.    CONCLUSION

In light of the record in this case, no reasonable jury could find that ETG is entitled to the damages awarded by the jury.  Mr. Musika's analysis is unreliable and based on impermissible speculation and guesswork without due consideration for the evidence in this case. The only reasonable conclusion is to disregard Mr. Musika's testimony as defective and unreliable.  As Mr. Donohoe aptly summed it up, Mr. Musika's opinions simply are "way out of whack" with the average industry royalty rate of 0.5%.[8]

The only competent and reliable evidence in the record establishes that, upon appropriate application of the *Georgia-Pacific* factors, reasonable negotiators would determine, as a maximum, that a running royalty rate of no more than 0.5% would fairly compensate ETG.

---

[7]    During trial, Mr. Donohoe presented other scenarios, including under the assumption that only the asserted method claims 13, 14, and 16 of the '850 patent were infringed. (Donohoe, Tr. 1824:4-15 (direct).)  Because ETG failed to present any evidence that there is direct infringement of the method claims in the United States by the Defendants, the Defendants' liability with respect to those claims is limited to either contributory infringement or inducement.  *See* Defendants' Opening Br. on Infringement and Validity at 27; 31 n.28.  Moreover, because ETG also failed to establish that any of the Defendants had the requisite knowledge or intent for indirect infringement prior to the filing of this lawsuit, any damages related to the method claims should be computed based on a royalty base for sales following the date of this lawsuit.  *See Id.*

[8]    (Donohoe, Tr. 1820:14-25 (direct); *see* Appendix G [Donohoe slide "Real World" v. Musika's Rate].)  Taking the damages the jury found against Demant of $16 million, the effective royalty rate for Demant is 3.91% on a base of $408.9 million without reducing the base for the VA sales, and is 3.99% on a base of $400.6 million reduced for the VA sales.  Taking the $15 million in damages the Jury found against Widex, the effective royalty rate for Widex on its sales base is 4.97%.  (*See* Putnam, Tr. 1858:7-1860:3 (direct) (royalty base determinations).)  Although these effective royalty rates are less than advocated by Mr. Musika, they are still inflated by nearly a factor of 10 in comparison with the average rate of 0.5% in the hearing aid industry.

With respect to Demant, that rate applied to a proper calculation of the royalty base totals approximately $2.0 million, even without taking into account certain defenses asserted by Demant.  With respect to Widex, application of that rate to the royalty base, again without taking into account defenses asserted by Widex, totals $1.5 million.

Accordingly, for the reasons discussed herein, no jury reasonably could find that damages of $16 million and $15 million are justified as to Demant and Widex, respectively, and the Court should grant JMOL that the appropriate maximum damages are $2.0 million for Demant and $1.5 million for Widex.  If the Court finds that only the asserted method claims of the '850 patent are infringed, then the Court should rule as a matter of law that ETG's damages are limited to post-suit sales by Demant and Widex.  In the alternative, in view of the clear weight of the evidence, the Court should order a remittitur of damages in those amounts or a new trial on damages.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ James W. Parrett, Jr. (#4292)*
_____

Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200
mgraham@mnat.com
jparrett@mnat.com

*Attorneys for William Demant Holding A/S,*
*WDH, Inc., Oticon A/S, Oticon, Inc.,*
*Bernafon AG, and Bernafon LLC*

OF COUNSEL:

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, DC  20001-4413
202.408.4000

OF COUNSEL:

SUGHRUE MION, PLLC
David J. Cushing
William H. Mandir
Carl J. Pellegrini
Brian K. Shelton
2100 Pennsylvania Ave., N.W.
Suite 800
Washington, DC  20037
202.293.7060

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Donald E. Reid (#1058)*
_____

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200
dreid@mnat.com
jcincilla@mnat.com

*Attorneys for Widex A/S and*
*Widex Hearing Aid Co., Inc.*

Dated:  March 27, 2008
2170955

1563245v1

22

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 27, 2008, the foregoing was caused to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

In addition, the undersigned hereby certifies that true and correct copies of the foregoing were caused to be served via electronic mail on March 27, 2008 upon the following parties:

| | |
|---|---|
| REPRESENTING ENERGY TRANSPORTATION GROUP, INC. | Edmond D. Johnson<br>PEPPER HAMILTON LLP<br>**johnsone@pepperlaw.com** |
| | Brian M. Buroker<br>HUNTON & WILLIAMS LLP<br>**etg@hunton.com** |
| REPRESENTING WIDEX A/S AND WIDEX HEARING AID CO. INC. | Donald E. Reid<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>**dreid@mnat.com** |
| | William H. Mandir<br>SUGHRUE MION PLLC<br>**wmandir@sughrue.com** |
| | David J. Cushing<br>SUGHRUE MION PLLC<br>**dcushing@sughrue.com** |
| | Carl J. Pellegrini<br>SUGHRUE MION PLLC<br>**cpellegrini@sughrue.com** |
| | Brian K. Shelton<br>SUGHRUE MION PLLC<br>**bshelton@sughrue.com** |

| | |
|---|---|
| REPRESENTING WILLIAM DEMANT HOLDING A/S, WDH, INC., OTICON A/S, OTICON INC., BERNAFON AG, AND BERNAFON, LLC | Mary B. Graham<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>**mgraham@mnat.com;**<br>**mbgeservice@mnat.com** |
| | John M. Romary<br>FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER<br>**john.romary@finnegan.com** |
| | C. Gregory Gramenopoulos<br>FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER<br>**c.gregory.gramenopoulos@finnegan.com** |

The undersigned also hereby certifies that on March 27, 2008, true and correct copies of the foregoing were caused to be served by hand upon the following Delaware counsel:

Edmond D. Johnson
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE  19899-1709

*/s/ James W. Parrett, Jr. (#4292)*
_____
James W. Parrett, Jr. (#4292)

913379