IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-422 (GMS) |
| | ) | |
| SONIC INNOVATIONS, INC., et al, | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX OF EXHIBITS & TRIAL TRANSCRIPT EXCERPTS TO OPENING BRIEF IN SUPPORT OF DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW WITH RESPECT TO DAMAGES OR, IN THE ALTERNATIVE, FOR A REMITTITUR OR NEW TRIAL ON DAMAGES**

                                              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                              Mary B. Graham (#2256)
                                              James W. Parrett, Jr. (#4292)
                                              1201 North Market Street
                                              P.O. Box 1347
                                              Wilmington, DE  19899
                                              302.658.9200
                                              jparrett@mnat.com
                                              *Attorneys for William Demant Holding A/S,*
                                              *WDH Inc., Oticon A/S, Oticon, Inc.,*
                                              *Bernafon AG, and Bernafon LLC*

OF COUNSEL:

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
901 New York Ave., N.W.                   Donald E. Reid (#1058)
Washington, DC  20001-4413            Jason A. Cincilla (#4232)
202.408.4000                                       1201 North Market Street
                                              P.O. Box 1347
                                              Wilmington, DE  19899
                                              302.658.9200
                                              dreid@mnat.com
                                              *Attorneys for Widex A/S and*
                                              *Widex Hearing Aid Co. Inc.*

OF COUNSEL:

SUGHRUE MION, PLLC
David J. Cushing
William H. Mandir
Carl J. Pellegrini
Brian K. Shelton
2100 Pennsylvania Ave., N.W.
Suite 800
Washington, DC  20037
202.293.7060

Dated: March 27, 2008

2170957

## TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| JX151 | Bernafon-Maico, USA 1999 Business Plan |
| JX159 | Oticon Inc. Business Plan 1999 |
| JX180 | General Information about K/S HIMPP |
| PX648 para. 209 | German Federal Cartel Office Decision |
| PX648 para. 124-125 | German Federal Cartel Office Decision |
| Appx. A | Trial Transcript (excerpts) |
| Appx. B | "Royalty Rates for Comparable Licenses" |
| Appx. C | "Comparable Licenses- Hearing Aid Technology" |
| Appx. D | "Summary- Demant" |
| Appx. E | "Summary- Widex" |
| Appx. F | "Reasonable Royalty Damages" |
| Appx. G | "Real World" v. Musika's Rate" |

2170957

# JX151

# Bernafon-Maico, USA

# 1999 Business Plan

EXHIBIT
JX 151

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEM016383

| | | | | | | |
|---|---|---|---|---|---|---|
| Prog, total market | 61094 | 84641 | 92232 | 92798 | 100766 | 116436 |
| Conv, total market | 356253 | 362520 | 395412 | 360337 | 349254 | 357036 |
| Total market | 417347 | 447161 | 487644 | 453135 | 450020 | 473472 |
| %share prog | 14.6 | 18.9 | 18.9 | 20.5 | 22.4 | 24.6 |
| %chgn total | | 7.1 | 9.1 | -7.1 | -0.7 | 5.2 |
| %chng prog | | 38.5 | 9.0 | 0.6 | 8.6 | 15.6 |
| %chng conv | | 1.8 | 9.1 | -8.9 | -3.1 | 2.2 |
| B-M Q. Prog Sales | 1263 | 1570 | 1917 | 1983 | 2456 | 2476 |
| B-M % Share | 2.07 | 1.85 | 2.08 | 2.14 | 2.44 | 2.13 |

Bernafon-Maico's programmable market share market has only shown a small increase, with a high water point of 2.44% in first quarter of 1998.

The market continues to be dominated mainly by Widex, Siemens, Oticon and ReSound. With Siemens introduction into the digital market and the anticipated introduction from ReSound, the competition remains high.

On the lower end of the market there are a number of 'garage' companies that are pushing the EQ-II circuit in the programmable version based on price. This will most likely result in higher competition for the Dualine WDRC instruments.

A number of companies are aggressively pushing to buy up dispensing offices. The main players are Sonus, Helix and Hearing Science. It is essential that we monitor this situation and make sure we do not miss business opportunities with these companies. We currently have contracts with Helix and Hearing Science. It is our objective to get a contract with Sonus, since they are currently the biggest player.

We are now in a position where we actively can promote the Maico Network. All three product lines are in place under the Maico label along with end user material and packaging. The Maico Network currently has 23 active customers. Some replacements have occurred during the year. Year-to-date, the Maico Network accounts for 16% of the programmable sales.

The Maico Network concept holds a lot of promise. The basic idea is to create increased loyalty by providing exclusivity and end user marketing support that leads to increased earnings for the individual member. Parallels to the concept are increasingly dominating the market by organizations like Sonus, Hearing Science and AHAA to mention a few.

**CONFIDENTIAL - ATTORNEYS' EYES ONLY**                                           DEM016386

# JX159

# Business Plan 1999 - Oticon Inc.

## Introduction

1999 is going to be a challenging year for Oticon inc.

The severely increased competition in the high end/digital segment combined with the relative weakening of our digital product portfolio makes it difficult to continue dramatic increases in profits.

The loss of competitive power in the high end segment is a result of two factors. The lack of depth in the present DigiFocus line (lack of CIC, true canal size, power and directional BTE's) and the significant delay in the introduction of a second generation digital line. The challenge for Oticon Inc. is to find other ways to increase revenues and profits.

The top priority in 1999 is to protect the position of the DigiFocus line to maintain Oticon as a first division player in the digital market segment. In addition Oticon Inc. will seek to establish DigiLife as the first affordable digital product in the midprice segment and further make an entry into the programmable CIC segment with PrimoFocus CIC.

On the customer side Oticon Inc. will utilize the broader product line to make headway into medium to large sized accounts where we today are weak.

This leads to the following projections for the financial key figures:

**TABLE 1**
**Financial Key figures ($mill.)**

|  | 1997 Actual | 1998 Forecast | 1999 Budget |
|---|---|---|---|
| Total Unit sales | 73,900 | 72,800 | 81,300 |
| Revenues | 41.1 | 43.3 | 51.9 |
| Gross Margin | 20.4 | 21.6 | 23.5 |
| Expenses | 17.3 | 17.8 | 19.4 |
| Profits bt | 3.1 | 3.8 | 4.2 |

The sales goals are based on a successful repositioning of DigiLife and on full availability of DigiFocus DuoMic in December 1998, DigiFocus II in June 1999 and Adapto in October 1999.

Please note that the budgeted profit is influenced negatively by an extraordinary 3% transfer price increase equivalent to $800.000.

EXHIBIT JX 159

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEM013381

Competition

The competitive situation is well described in the budget input and shall thus not be repeated here except for a few more market specific observations.

We have now seen the impact of Widex and Siemens who are limiting our expansion in the digital segment, but still allows us to hold on to a substantial and very profitable share of that market.

A real threat is however the upcoming entry of ReSound that might prove to be very dangerous because of the significant overlap between ours and their customer base. The first information's on their digital products indicate very strong performance including flexible frequency shaping, directionality (BTE & ITE), noise reduction and feedback management - all included at prices similar to our current pricing. Most likely ReSound will not offer a digital CIC from the onset.

Another potential danger that is not mentioned in the budget input is "Sonic Innovations" - the start up company out of Salt Lake City, Utah. The team (including a number of ReSound people) and capital behind this company is strong enough to make them a real competitor in the digital field. One significant risk yet to be seen is rumors about very low pricing on fairly advanced technology - which most likely will hit the market in the fall of 1998.

Distribution

The last 2 years have shown a dramatic change in the distribution system in the US, largely due to the emergence of multiple-outlet Audiology companies. There are 6 main companies in this arena, accounting for approximately 300 dispensing outlets. Since their business concepts are still maturing, they are at different stages of centralization and control over the daily operations of their outlets. The following model can be used to view the volume vs. control matrix:

Table 5
**Distribution matrix**

| Control | | | | |
|---|---|---|---|---|
| High | Present digital customers<br><br>B2        B1 | e.g. Jones, Dallas | Newport | |
| Medium | | American Hearing Center<br>Hearing Sciences | HearX<br>Helix<br>Sonus | |
| Low | | | American AAA<br>Epic | |
| | (25-150) | (150-300) | (300 +) | Units per month |

Until now, one strategy for the multiple-outlet audiology companies is to position themselves to attract regional and national managed-care contracts. However, it is not expected that they can survive financially selling only to managed care patients. They are now striving to combine a

5

CONFIDENTIAL - ATTORNEYS' EYES ONLY                                            DEM013385

# JX180

### General information about K/S HIMPP

K/S HIMPP (kommanditselskabet Hearing Instrument Manufacturers Patent Partnership), a Danish limited partnership, was established on August 28, 1996 by GN Danavox A/S, Oticon A/S, Phonak AG, ReSound Corporation, Starkey Laboratories Inc., and Widex ApS. In January 1997 Siemens Audiologische Technik GmbH joined the partnership later to be followed by Unitron Hearing, Sonic Innovations, Rion Co., Türk+Türk GmbH and Gennum Corporation.

The purpose of the partnership was to acquire a large portfolio of hearing aid related patents and make the patented technology available to all interested parties in the hearing aid industry.

The patent portfolio consists of more than 20 patent families comprising well over 200 national patents when all applications issue. The patents are primarily directed towards programmable hearing aids, digital hearing aids, computer programming of hearing aids, and advanced fitting strategies.

Access to the patented technology can be obtained either through membership in the partnership or through entering into a license agreement with K/S HIMPP.

#### Membership of K/S HIMPP

Any hearing aid manufacturer can become a partner in K/S HIMPP upon payment of US$ 1.8 million. A partner is entitled to a non-exclusive worldwide license under all existing HIMPP patents and applications, participation in the HIMPP business of managing its patent portfolio and acquisition of new patents, and a sharing in the revenues from licensing the HIMPP patents.

#### License under the HIMPP patent portfolio

Those hearing aid manufacturers not wishing to become partners may obtain a license under the HIMPP patents on terms set forth in the enclosed standard Patent License Agreement. The royalty is a flat 3% of the price of hearing aids covered by one or more HIMPP patents, a rate which is comparable to or lower than a typical royalty for a single patent family in the hearing aid field.

It is expected that all hearing aid manufacturers will become partners or licensees. There is no need for component suppliers to be licensed although their customers will require licenses to manufacture hearing aids using components which utilize the patented technology. Similarly, retailers will not require licenses as long as their suppliers are licensed.

Please contact K/S HIMPP for additional information on becoming a partner or licensee.

2005/HIMPP\infomanu



EXHIBIT
JX 180

EXHIBIT
Widep 44
6-26-07

WID000060
WID000060

PX648
para. 124-125



Bilag 2
DELACOUR
FOR PUBLICATION

GERMAN FEDERAL CARTEL OFFICE
3rd Decision Division

Case No.: B 3 – 33101 - Fa – 578/06

**Merger Control Proceedings**
**Order pursuant to Section 40 paragraph 2 GWB**

**Decision**

In the administrative proceedings

1. of Phonak Holding AG, Stäfa, Switzerland;

    Party 1.,

    - Authorized Counsel:
      Attorneys Gleiss Lutz; Maybachstraße 6; 70469 Stuttgart,

2. of GN ReSound A/S, Ballerup, Denmark,

3. of GN ReSound GmbH Hörtechnologie, Münster, and

4. of GN US Holdings Inc., MN, USA

    Parties 2.-4.,

    - Authorized Counsel:
      Attorneys Hengeler Mueller, Bockenheimer Landstraße 24,
      60323 Frankfurt am Main,

5. of GN Store Nord A/S, Ballerup, Denmark

    Party 5.,

    - Authorized Counsel:
      Attorneys Hengeler Mueller, Bockenheimer Landstraße 24,
      60323 Frankfurt am Main

6. of Siemens AG, Munich;

    Summoned Party,

on account of a review of a proposed concentration pursuant to Section 36 paragraph 1 of the Law Against Restraints on Competition (GWB), the 3rd Decision Division of the German Federal Cartel Office decided on April 11, 2007:

EXHIBIT PX 648

MOJ00000242

*alia*, the average manufacturer's sales prices obtained in 2006 for the families of products marketed by Phonak and GN ReSound in the upper price segment "List Price > 900 EUR."[41] In these segments, the technical and visual optimization of the device plays a greater role as a sales argument than the amount of the price reimbursed by the health insurance funds. Accordingly, when comparing manufacturer's selling prices, the differences in reimbursement systems lead to fewer distortions [than] in the lower price segments. Finally, this segment is viewed by many of the market participants as the price segment for hearing aids decisive for competition.

(120) The Savia product family is distributed by Phonak in Sweden, France and Spain at a considerably lower manufacturer's sales price than in Germany. According to Phonak's data, the manufacturer's sales price of Savia in Germany in 2006 was [...] EUR (preliminary projection of January 16, 2007).[42] Phonak's manufacturer's sales price for Savia in Sweden, France and Spain was [...] of the manufacturer's sales price in Germany.

(121) The manufacturer's sale prices obtained by GN ReSound in Sweden, France, Great Britain, Austria and Spain for the High-End Metrix family of products, at [...], is below the average manufacturer's sales price in Germany calculated by ZVEI for 2006 for the Segment "List Price over 900 EUR" segment. In Germany, GN ReSound took Metrix off the market again in 2006.[43]

(122) These price differences also support the view of the Decision Division that, in the instant case, an independent German market for hearing aids is geographically relevant.

(123) Based on the sharply different reimbursement systems in the largest Member States of the European Union, an international price comparison for basic hearing aids or low-priced hearing aids appears to be not meaningful.

5.  **Results of Objective and Geographical Market Demarcation**

(124) In the opinion of the Decision Division, the proposed concentration accordingly relates to the market for production and distribution of hearing aids to the hearing aid

---

[41] Appendix VI 3.1 and Appendix VI 3.2.
[42] Phonak Letter of February 16, 2007, Phonak Appendix 2. The projected manufacturer's sales price stated, however, appears to the Decision Division to be not quite plausible, since the average manufacturer's sales price calculated by the ZVEI for 2006, at 838 EUR for the "List Price over 900 EUR" segment, is more than [...] over this price and Phonak, according to the ZVEI reports, is unequivocally the market leader in this segment. Accordingly, the manufacturer's sales price for Savia would have to be above the amount estimated by Phonak.
[43] GN ReSound Letter of February 16, 2007, GN ReSound Appendix 2; here only the manufacturer's sale price for Metrix Mini can be found.

acoustician retail trade. This market is geographically confined to Germany.

## 6. Effects of the Concentration

(125) The concentration allows one to expect the creation of an oligopolistic and market-dominating position for hearing aid manufacturers SAT, Oticon and Phonak on the German market for production and distribution of hearing aids to the hearing aid acoustician retail trade (Section 36 paragraph 1, Section 19 paragraph 3 clause 2 GWB).

### 6.1. Market Structure and Competitive Conditions Prior to the Concentration

(126) The relevant market reveals a series of particular competitive characteristics favoring concerted oligopolistic behavior. These include, in particular, the following circumstances:

- The **degree of concentration** on the market for hearing aids is very high. The three leading suppliers SAT, Phonak and Oticon have a combined marked share of over 80% in Germany. Thus, even the so-called "narrow" **presumption of oligopoly** in Section 19 paragraph 3 clause 1 No. 1 GWB is exceeded by more than 30% in the instant case. The high combined market share is accompanied by very large market share advantages over the next following competitors; the market share gap separating them from the next competitors GN ReSound (No. 4) and Widex (No. 5) in each case amounts to far more than 70%.
- The manufacturers are intertwined with one another by **contractual business relationships (ensured in part by company law)** (mainly joint ventures and licensing agreements). These business relationships and cooperation directly relate to the market for hearing aids and have led to the construction of general industry standards and the collectivizing of patent rights. Going along with that, then, is a technological and product-brand-related "marching in lockstep" among the oligopolists.
- Hearing aid manufacturers have created an extensive system of market information. On the basis of the monthly sales and volume reports to ZVEI and the monthly evaluations by ZVEI, the participating companies receive a very detailed overview, *inter alia*, of sales volumes, manufacturer's sales prices obtained and sales revenues in the individual price segments for digital hearing aids. This ensures that competitors can recognize, in real time, changes to their market shares and competitive advances by competitors and that competition will be impaired. In addition, the result of the ZVEI reporting system is a highly asymmetrical market transparency in favor of hearing aid manufacturers and at the expense of hearing aid acousticians and the end

PX648
para. 209



Bilag 2
DELACOUR
FOR PUBLICATION

GERMAN FEDERAL CARTEL OFFICE
3rd Decision Division

Case No.: B 3 – 33101 - Fa – 578/06

**Merger Control Proceedings**
**Order pursuant to Section 40 paragraph 2 GWB**

**Decision**

In the administrative proceedings

1. of Phonak Holding AG, Stäfa, Switzerland;

  Party 1.,

  - Authorized Counsel:
    Attorneys Gleiss Lutz; Maybachstraße 6; 70469 Stuttgart,

2. of GN ReSound A/S, Ballerup, Denmark,

3. of GN ReSound GmbH Hörtechnologie, Münster, and

4. of GN US Holdings Inc., MN, USA

  Parties 2.-4.,

  - Authorized Counsel:
    Attorneys Hengeler Mueller, Bockenheimer Landstraße 24,
    60323 Frankfurt am Main,

5. of GN Store Nord A/S, Ballerup, Denmark

  Party 5.,

  - Authorized Counsel:
    Attorneys Hengeler Mueller, Bockenheimer Landstraße 24,
    60323 Frankfurt am Main

6. of Siemens AG, Munich;

  Summoned Party,

on account of a review of a proposed concentration pursuant to Section 36 paragraph 1 of the Law Against Restraints on Competition (GWB), the 3rd Decision Division of the German Federal Cartel Office decided on April 11, 2007:



EXHIBIT
PX 648

MOJ00000242

hearing aid manufacturers for new product introductions, the Decision Division – unlike Phonak - views it as significant if Phonak, for example for the Savia product family, shares a considerable portion of the patents employed here [...] with third party manufacturers, in particular the other oligopolists.[78]

(208) Due to the depicted cooperation of the leading hearing aid manufacturers in the area of basic patents for digitalization (HIMPP), the cross-linking of software components like measurement technology and adjustment software via NOAH (HIMSA I, HIMSA II) and the mutual, largely cost-free licensing of essential product developments, the leading manufacturers are very close to each other in their developmental expertise. Simultaneously, through HIMPP's monitoring of the patents relevant to the hearing aid industry, information regarding current technological developments is collectivized and a uniform information base ensured. Competitive advances of individual manufacturers – insofar as they occur at all – are generally picked up within a few months by the competition. Such a process contributes materially to the mutual confidence in the concerted oligopolistic behavior and is all but structurally ensured through the aforesaid collectivization. For based on the common basic technologies and the comparable developments among the oligopolists resulting therefrom, everyone must take into account that he might infringe a patent of another competitor in a special area. The non-trivial numbers of patent complaints filed illustrates this problem. Being aware of this situation and with a view toward not consistently blocking one another, it seems nothing less than compelling from a business perspective to exchange patents with one another again and again.[79] This structurally ensures the concerted oligopolistic behavior in technological competition and the prevention of lasting technological advances. Genuine technical advances are the exception. In the hearing aid market, there are no real surprise moments.

(209) Contrary to the opinion of Siemens, a transfer of technology among competitors does not point to concerted oligopolistic behavior only if it were ineligible for an exemption under the Commission's Group Exemption Directive for Technology Transfer Agreements (TT-GVO).[80] The collectivizing of application-specific technology in this case, one of the things molding market behavior, also allows an inference to be drawn of a dampening of competition in the relations of the oligopolists to one another if contained none of the core limitations listed in the Group Exemption Directive and thus Article 81 of the EC Treaty were not directly applicable. The Decision Division in these proceedings has not examined technology transfer among the oligopolists for its conformity to Article 81 of the EC Treaty. However, licensing agreements involve a reciprocal exchange of patents among competitors which very clearly exceed the

---

[78] Phonak Letter of February 14, 2007, p. 6, pg. 628 d.A.
[79] This impression become further solidified for the Decision Division even after discussions with SAT and Oticon, see Discussion with SAT on February 22, 2007, Note p. 4, pg. 796 d.A., Discussion with Oticon on March 6, 2007, Note p. 4, pg. 1075 d.A.
[80] Comments on Deficiency Notification Letter, p. 8 et seq.

MOJ00000302

allowable market share threshold of 20% for the Group Exemption Directive to be applicable (Article 3 paragraph 1).[81]

(210) In addition, the exchange of patents in the market for hearing aids - and this applies to HIMPP just as much as to the licensing agreements between the manufacturers – simply does not have the aim of guaranteeing the creative freedom of product development[82], but the aim of shaping the product on the same technological basis and preventing medium-term advances in development by competitors. The Commission regards the risk of collusion through such agreements as comparatively high in narrow oligopolies and high barriers to market entry.[83] To that extent, even the gains in efficiency brought about by the licensing, which Siemens, referring to the TT Group Exemption Directive, submits are positive factors for far-ranging licensing[84], cannot outweigh the competition-dampening effects. This is all the more true as possible gains in efficiency through the reciprocal cost-free licensing did not in the past lead to corresponding price advantages for the consumers.

(211) The participating companies have submitted that, in particular, the success or failure of newly introduced models has a clear effect on the market share of the relevant competitor and that the manufacturers were therefore in a constant **innovation competition over the introduction of new models.** This is supported, they argue, by the very short product cycles, in particular in the upper price segment. The market, the claim, is determined by short product life cycles and ongoing competition over product enhancements. This opinion is also shared by key competitors SAT and Oticon. Both Phonak and Siemens, in their Comments on the Deficiency Notification Letter of the Decision Division, repeated their opinion that the German hearing aid market is characterized by intensive competition for innovation. Siemens argued that only by considerable investment efforts and new products were market shares won back in competition that otherwise would have been lost. Dynamic competition, it states, is characterized precisely by the fact that competitive advances with gains in market share were countered by other competitors by means of their own increased competitive advances.[85] Even in Phonak's view, it corresponds to nothing less than the ideal image of competition that innovative advances of one competitor are countered by product improvements of other competitors. Here, it states, the speed of innovation in the hearing aid industry is especially high.[86]

---

[81] More stringent requirements for reciprocal agreements between competitors, see Guidelines for Application of Article 81 of the EC Treaty to technology transfer agreements (2004/C 101/02), margin number 78.
[82] TT Group Exemption Directive Guidelines, margin number 111.
[83] TT Group Exemption Directive Guidelines, margin number 136, 138 et seq., 143
[84] Comments on Deficiency Notification Letter, p. 8 et seq.
[85] Siemens Comments on Deficiency Notification Letter, p. 10.
[86] Phonak, Comments on Deficiency Notification Letter,,S. 15.

# APPX. A