APPX. A

570

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              -   -   -

 4

 5    ENERGY TRANSPORTATION,          :  Civil Action
      INC.,                           :
 6                                    :
                 Plaintiff,           :
 7                                    :
            v.                        :
 8                                    :
      WILLIAM DEMANT HOLDINGS A/S,    :
 9    et al.,                         :
                                      :
10               Defendants.          :   No. 05-422 (GMS)

11                              -   -   -

12                    Wilmington, Delaware
                    Thursday, January 24, 2008
13                         9:07 a.m.
                      Fourth Day of Trial
14                              -   -   -

15    BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

16


17


18    APPEARANCES:

19            EDMOND D. JOHNSON, ESQ.
              Pepper Hamilton LLP
20                 -and-
              MARTY STEINBERG, ESQ.,
21            BRIAN M. BUROKER, ESQ., and
              MAYA M. ECKSTEIN, ESQ.
22            Hunton & Williams
              (Washington, D.C.)
23
                              Counsel for Plaintiff
24

25
```

1

Westermann - direct

1    Q.    Okay.  And if you look down the references cited in

2    that patent, you see the Dr. Levitt patent, the '850?

3    A.    Yes, I do.

4    Q.    And this was a patent that was filed in April of

5    1993; correct?

6    A.    It seems to be a division of what was filed in '93,

7    yes.

8    Q.    And when was the transaction when HIMPP purchased

9    these patents?

10   A.    It was in the summer of '96.

11   Q.    1996?

12   A.    Yes.

13   Q.    Now, HIMPP purchased these patents for approximately

14   how much money?

15   A.    These CID patents or the entire portfolio.

16   Q.    The entire portfolio.

17   A.    I believe it was $40 and-a-half million U.S. dollars.

18   Q.    Was anything done to review the references listed in

19   the patents as prior art like Dr. Levitt's '850 patent at

20   the time of this expenditure of $14.5 million?

21   A.    No, because these CID patents actually just came as a

22   kind of extra.  We were not looking for those, specifically.

23   Q.    Now, is one of the benefits of Widex being a member

24   of HIMPP that you would pay less royalties to license

25   patented technology as a member of HIMPP?

Westermann - cross

 1     So NEC offered them to -- actually, first to our daughter

 2     company, Widex Japan, who forwarded the information to Widex

 3     Denmark.  And it was decided in HIMPP, I brought it up in

 4     HIMPP, and HIMPP decided we would like to, that HIMPP would

 5     like to take over these patents, for the same reasons that

 6     we had with the Decibel patent.

 7     Q.     Does HIMPP license the patents that they have

 8     obtained?

 9     A.     Yes.

10     Q.     And what are the terms for license of HIMPP patents?

11     A.     There are two possibilities.  Today, I think there

12     are nine partners in HIMPP who have each paid $1.8 million

13     to become a partner, and thereby be licensed.

14            If you are a smaller company, it's possible to

15     have a very simple flat three-percent royalty rate.  Then

16     you can use all the patents.

17     Q.     And what does -- how did HIMPP arrive at this

18     $1.8 million?

19     A.     Well, that was the cost that the initial six

20     companies had to pay.

21     Q.     What does this $1.8 million get for the company that

22     is a member of HIMPP?

23     A.     It gets a license to use all the patents

24     indefinitely.

25     Q.     And you mentioned the other option was a

Westermann - cross

1    three-percent royalty rate?

2    A.    Yes.

3    Q.    Do you have to for that second option pay any

4    lump-sum amount?

5    A.    No.

6    Q.    Why did HIMPP offer this option of either paying 1.8

7    or the three percent?

8    A.    HIMPP wanted to remove -- we saw the 3M patents as a

9    barrier for the technological development of hearing aids.

10   So we were happy to get rid of that.  And we thought we

11   would have to make them available also for anybody else

12   interested in the field.

13   Q.    Has HIMPP ever refused to let a company join HIMPP?

14   A.    No.  Never.

15   Q.    Has any company decided to become licensees of HIMPP?

16   A.    Yes, we have a handful.

17   Q.    Has HIMPP ever refused to license anybody?

18   A.    No.

19   Q.    Can any one member of HIMPP prevent a new member from

20   joining HIMPP?

21   A.    No.  That would require a majority of HIMPP to do

22   that.  But HIMPP would never do that.

23   Q.    Have there ever been any disputes between Widex and

24   members of HIMPP?

25   A.    You mean ongoing patent disputes?

Westermann - cross

1    of the ETG patents?

2    A.    No.

3    Q.    Had anyone at Widex prior to this lawsuit seen the

4    patents, the ETG patents before?

5    A.    Well, we found out it was in our files.

6    Q.    How did you discover that?

7    A.    We searched through our electronic files and through

8    our paper files.

9    Q.    And what did you discover during this search?

10   A.    Well, there was a paper copy, as I remember, of the

11   '749.

12   Q.    '749 is one of the patents, yes.

13   A.    Yes.  And I believe there was a copy of the European

14   equivalent.  And we also discovered that in this very large

15   database we have, that both patents were there

16   electronically.

17   Q.    You said very large database.  How large is very

18   large?

19   A.    Oh, today there is more than 17,000 patents in that

20   database.

21   Q.    Okay.  And when did the, I think you said '749

22   patent, when did that make its way into the database?  What

23   year?

24   A.    Well, the database, it came in in 2000, was it '1 or

25   '2?  I don't remember.

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3

 4                            -  -  -

 5   ENERGY TRANSPORTATION,        :  Civil Action
     INC.,                        :
 6                                :
                  Plaintiff,      :
 7                                :
          v.                      :
 8                                :
     WILLIAM DEMANT HOLDINGS A/S, :
 9   et al.,                      :
                                  :
10                Defendants.     :  No. 05-422 (GMS)

11                            -  -  -

12                      Wilmington, Delaware
                      Friday, January 25, 2008
13                          9:00 a.m.
                      Fifth Day of Trial
14                            -  -  -

15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16

17

18   APPEARANCES:

19           EDMOND D. JOHNSON, ESQ.
             Pepper Hamilton LLP
20                   -and-
             MARTY STEINBERG, ESQ.,
21           BRIAN M. BUROKER, ESQ., and
             MAYA M. ECKSTEIN, ESQ.
22           Hunton & Williams
             (Washington, D.C.)
23
                               Counsel for Plaintiff
24

25
```

1

Musika - direct

1    have a lot of costs.  Once they develop their code and once

2    they are able to get everybody to put it in their computers

3    and buy it, every time we buy a computer and turn it on,

4    that price that we are paying, a portion of it goes to

5    Microsoft as a royalty.

6    Q.    And what is a royalty rate?

7    A.    A royalty rate is just a portion, a percent of the

8    revenue that was generated or the profits that were

9    generated.  You could express it either as revenue, as

10    percentage of the revenue or percentage of the profits.

11    Q.    Have you determined a royalty rate in this case?

12    A.    I have.

13    Q.    How do you arrive at this damage figure, the

14    reasonable royalty rate?  What do you do?

15    A.    It is a process that involves, in this case, I used a

16    process which has been used many times before in cases like

17    this called a Georgia-Pacific analysis.  In a

18    Georgia-Pacific analysis, it relates to a prior case.

19    Georgia-Pacific was one of the named parties.  And that

20    particular case sets forth 15 factors.

21          But the principal part of the ultimate

22    determination of the reasonable royalty, even with the

23    Georgia-Pacific factors, is, once again, going to the

24    profits, finding out if there is profits.

25          If there is not profits, when we saw the patent

Musika - direct

1    video at the beginning, the Patent Office talked about how

2    there were 300,000, I think, patents filed, and

3    applications, and out of that only 150,000 were issued, even

4    out of those 150,000 issued, there is just a very small

5    portion of those that ever generate any income.  And they

6    are worthless.  Those patents don't have any value.

7              What we are getting to is the profits.  We are

8    looking for the profits.

9    Q.    And did you come to a royalty rate figure in this

10   case?

11   A.    I did.

12   Q.    What was that?

13   A.    8.4 percent of the revenue of the defendants.

14   Q.    Now, what records did you look at to arrive at your

15   damage calculations in this particular case?

16   A.    As I indicated, I have looked at their financial

17   records.  First, I needed to try to identify, indeed, how

18   much sales amount there was with respect to these accused

19   items.  So I was told by counsel and by both sides, I don't

20   think there is any dispute about what are the accused items.

21   So my next challenge was to try to identify, well, how much

22   were they sold for ultimately.  And then after that I tried

23   to get to the profits.

24   Q.    Let's start with the Demant defendants, Oticon.  Can

25   you tell us how you arrived at the sales and revenues for

Musika - direct

1  How much can I get? And we say, well, we need to figure out

2  how much profit your patents ultimately going to generate

3  and that will take a lot of work.

4      But just give me some rule of thumb, just tell me.

5  And oftentimes people will throw out, well, you will get 25

6  as a rule of thumb, 25-to-33 percent of the licensee's

7  profits. It's just a benchmark.

8      And so I started by looking at the infringer -- not

9  the infringer, the accused parties' profits and I said,

10  well, as a starting point, I know that ETG wants, of course,

11  everything. They want all the profits but I'm saying it's

12  reasonable to start with 25-to-33 percent.

13  Q.   What level of profits were you looking at for the

14  defendants?

15  A.   It's important in getting to the profits again to get

16  down to an operating profit margin.

17  Q.   What is an operating profit margin?

18  A.   Within this profit-and-loss statement here, I

19  summarized a great deal. I just said revenue minus

20  expenses, but if any of us are having trouble sleeping we'd

21  open up one of these complicated financial statements from a

22  public company and we would see lots of, not so much revenue

23  but we would see lots of expenses. There is cost of goods

24  sold, there is selling general administrative expenses,

25  there is interest, so there is lots of expenses.

862
Musika - direct

1          What we need to do and what the law has actually
2     said is that if you are going to develop, if you are going
3     to take a portion of that party's profits, I'm not trying to
4     determine an amount that punishes them.  This is not about
5     punishing them.  It's again a reasonable royalty.  So the
6     first thing I want to do is make sure I leave them with
7     enough money to cover all of their operating expenses.  So I
8     don't take gross profit because that is higher up in the
9     profit-and-loss statement.  That is just deducting the
10    direct costs of goods sold.  I subtract out all the selling
11    expenses, all the marketing expenses, all the overhead
12    expenses, all the general administrative expenses, so I get
13    down to that bottom operating profit.  And the only thing
14    that is really left out from that are interest and taxes.
15    Q.    Did you identify the operating profit for the accused
16    products in this case?
17    A.    I did.
18    Q.    What was that operating profit margin?
19    A.    I calculated the operating profit margin for the
20    accused products at 25.6 percent.
21    Q.    Okay.  I'm sure we've all heard the word "profit
22    margin" in general.  Are there different margins in your
23    world, the accounting world?
24    A.    Yes.  Again, we're talking about from this point
25    forward, I'm talking about an operating profit margin, not

44

Musika - direct

1    and calculated here the -- what is shown on here is a gross

2    profit margin for the industry as not the industry as a

3    whole but all the products that rely on the patent, or are

4    claimed to rely on the patent. So I developed a gross

5    profit margin for all of the products. And that's, I can't

6    use the pointer but that is the second number down which is

7    65.2.

8              I then took all of the business in general at

9    this level, back at this level but all, not just Widex, not

10   just Demant but all the other industry participants, too,

11   and I calculated what their gross profit margin was for all

12   products at that top level. And that was 56 percent. And

13   when I subtracted the two, I could see that the products

14   that rely on these or claim to rely on these profits

15   generated a premium, a gross profit margin of 9.2 percent

16   greater than all of the other products produced by all the

17   other companies. So that was my starting point was to

18   identify the 9.2 percent.

19   Q.   Okay. Then did you use that to help calculate the

20   operating margin of the relevant products?

21   A.   Yes. I then took that 9.2 percent and I moved -- you

22   can see it right there, that second box down -- and I said,

23   well, let's go back to those companies, and these companies

24   at this level as well as all the other companies that are

25   claimed to rely on the patent. And I added up what their

Musika - direct

1    total operating is.  So I know that their operating margin

2    is 16.4 percent for all products.  Because I knew at the

3    gross profit level, there was a premium of 9.2, I added that

4    9.2 to the operating margin of 16.4 to produce an operating

5    margin for the relevant products of 25.6.

6    Q.    Okay.  Now, are you suggesting that ETG should get

7    that entire operating profit margin?

8    A.    No.  Again, that would not be reasonable.  Just accept

9    or assume for a moment that my calculation is right that the

10   25 percent is what the defendants in total earn as a profit

11   margin for the sale of this.  If we took that as being the

12   total amount that had to be paid over, then there wouldn't

13   be any incentive for them actually to make it.  They would

14   get nothing in return.  And again, this is not -- I'm not

15   here to punish them or determine what is punishing, it's to

16   determine what portion is reasonable to pay to them for the

17   use of it.

18   Q.    Okay.  Then did you determine a reference rate for the

19   defendants here?

20   A.    Yes, I did.

21   Q.    Okay.  Did you prepare a slide for that?

22   A.    Well, this slide shows then the result of both the

23   plaintiff and defendant.  And this is sort of the opening of

24   the hypothetical negotiation.  And the top part is the

25   licensor.

Musika - direct

1    Q.    Is that ETG in this case?

2    A.    It is ETG.  Yes, sir.

3              So we can see that this line is the royalty

4    percent.  So it goes from zero, when we're not going to give

5    them any portion of the revenue, all the way up to that

6    little insignia, which is infinity.  And, of course, as I

7    say again, if you ask ETG how much should I get, well,

8    they'll say I want it all.  Of course, they want it all.  If

9    you ask the defendant what do you want, well, I don't want

10   to pay anything, it's zero.  But I'm trying to look at the

11   financial results to determine what is reasonable.

12             From the licensor's standpoint, remember, I

13   determined the operating profit was 25.6.  You remember that

14   I said as a benchmark that 25-to-33 percent is just a

15   starting point, it's a benchmark.  If you take 25 percent

16   times 25.6, that will give you 6.4 percent.

17             So when we get those phone calls every month and

18   the inventors from Johns Hopkins is saying how much, just

19   give me some idea, I just want a start, just give me some

20   idea, I would say if you have a profit margin, you can take

21   25 percent as a starting point.  It could be less, it could

22   be more but that is a starting point.  So I say well, the

23   licensor, it would be reasonable as a starting point to

24   expect 6.4 percent which is 25 percent of the operating

25   margin of 25.6 earned on the accused products.

Musika - direct

1          On the licensee side, what is reasonable, they
2     would say zero.  They have said zero.  That is why they're
3     sitting here.  But what I have looked at there, I said,
4     well, what is reasonable is that premium, that 9.2 percent,
5     because that leaves them with the same profit margin that
6     they earned on all the rest of their products.  So I start
7     there saying it's 9.2 percent as a reasonable starting
8     point.  Of course, it could be, according to them, anywhere
9     down to zero.
10    Q.    And from that, did you determine a negotiating range
11    for this hypothetical negotiation?
12    A.    Yes.  Again, there are circumstances where the final
13    result could come outside of that range, like trying to
14    build towards what is reasonable.  The parties, although
15    neither of them can agree, I would start by saying it's
16    somewhere between this 6.4 and 9.2 range is a reasonable
17    range.
18    Q.    And using the Georgia-Pacific factors did you come up
19    with a royalty rate within this range?
20    A.    I did.
21    Q.    And what was that?
22    A.    That was the 8.4 percent.
23    Q.    So let's briefly go over the Georgia-Pacific factors.
24    There is a chart on the board.  What is that?
25    A.    Those are the 15 factors.  I took my range and I said,

Musika - direct

1    well, let's turn to the Georgia-Pacific analysis now and see

2    if the Georgia-Pacific analysis tells me something about

3    where the rate ought to be in that range or outside that

4    range.  It could be outside the range.

5    Q.    Okay.  And the first one is, is there an established

6    royalty rate for these patents?

7    A.    That is a good factor because that is a factor which

8    would cause the final conclusion to be outside the range.

9    If these patents had been licensed to the entire industry

10   from the beginning of time at a certain rate, that would be

11   considered an established license.  But these patents

12   haven't been licensed to anyone and so there is no

13   established rate and so that factor doesn't have any

14   probative information for us.

15   Q.    And is that why you included it as neutral under the

16   effect?

17   A.    Yes.

18   Q.    And the next factor looks at rates paid by licensees

19   for comparable patents.  What did you find in that regard?

20   A.    This factor tries to look for, to see whether the

21   licensees have engaged in licensing activity for patents

22   that are similar to these patents, and if so, what the rate

23   was that was paid on those.  And I looked and I did not find

24   any licenses that I believe were comparable.  You can find

25   licenses that were less than one percent, you could find

Musika - direct

1    we can see what you used to substantiate your conclusions?

2    A.    Yes.

3    Q.    Okay.  Let's share the next slide, please.

4          Okay.  Can you tell us what we're looking at

5    here?

6    A.    These are just a short series of comments out of the

7    report they looked at to cause me to conclude that according

8    to the German regulator, these are not arm's-length

9    transactions.  And this says:  The hearing aid industry is

10   an extraordinarily profitable economic area.  This is true

11   not only in comparison to other industries, but also when

12   compared to the highly profitable medical technology.

13   Q.    Did the German authorities also discuss what is called

14   EBITDA?

15   A.    Yes, they did.

16   Q.    First of all, what is EBITDA?

17   A.    EBITDA is a standard measure or abbreviation of

18   profitability.  It's earnings.  Each one of those letters

19   just stand for one of the expenses that we deduct.  So it's

20   earnings before interest, taxes, depreciation, and

21   amortization.

22         So this is a fairly high level profit, not down at the

23   profit that I looked and used.  But be that as it may, it's

24   comparing a number of other companies to the HIMPP member

25   profits and what this slide shows is that the HIMPP members

Musika - direct

1    have an EBITDA profit margin of 35 percent.

2         Compare that to, for example, names you will

3    recognize: DaimlerChrysler, 11 percent; BMW, 14 percent;

4    Nestle chocolate, 15 percent; All European Chemical

5    Industry, 15 percent; and of the German clinic operators,

6    18.3 percent.

7              This wasn't selective data.  I used all the data

8    that the German Federal Office Cartel Office provided and

9    we can see that as an industry, the hearing aid industry

10   profits are, as they say, extraordinary.

11   Q.    Okay.  And so what did the German report find about

12   the margins in this industry?

13   A.    They said a number of things.  The key numbers of the

14   oligopoly members are not only very similar but in

15   comparison to other sectors bear witness to an

16   extraordinarily high profitability of the companies.

17              Hence, this earning indicator as well is very

18   comparable and confirms the high profit margins achieved by

19   the members of the oligopoly throughout the world with their

20   products.

21              Keep in mind again that what the German

22   regulators are trying to do is to try to see whether or not

23   the -- it's not just the mere existence of the patent pool.

24   There is nothing wrong on its face of the patent pool if

25   indeed choosing this low royalty rate, that that would

Musika - direct

1    translate through to low prices to the consumer and low

2    profits.  So what the regulators are looking at did this low

3    royalty rate of three percent actually benefit ultimately

4    the consumer?  And what they're saying in these comments is

5    we don't see that, we see just the opposite.

6            Third comment:  Astounding price discipline is

7    ascertainable over the course of time, which particularly in

8    the high price the segments has even permitted price

9    increases.

10            So prices remain high and even in some of those

11    lofty higher price models, they continued high.

12            Competition hasn't driven down the prices.

13            And, finally, the lack of competition at the

14    level of the hearing aid acoustician can also be shown by

15    their exceedingly high margins on the manufacturer's selling

16    price.

17            So what they're saying, we're not even talking

18    about that.  That is out the door.  So even after the

19    manufacturer makes a profit, even after the distributor

20    makes a profit, what they're talking about, because the

21    distributors are actually selling it to the doctors or to

22    the acoustical professionals, and they make a profit on top

23    of it.  They're not being sued here but there is another

24    profit down the road before somebody puts a hearing aid in

25    their ear.

Musika - direct

1    Q.    And did the German authorities discuss the competition

2    or lack thereof in this industry?

3    A.    Yes, they did.  The first comment again is this

4    comment of the intertwined relationship.

5        Second comment, it talks about how no market entrants

6    have entered into this.  So a barrier in a sense to other

7    new companies coming in.

8        And then, the final comment:  In summary, the

9    Decision Division is of the opinion that the findings

10    regarding competition on price and terms do not make it

11    possible to recognize any clear indications of significant

12    competition in the oligopoly.

13        Hence, in the background of sharply increased

14    volumes and the circumstance of considerable economies of

15    scale in this sector, this appears extraordinarily

16    astounding.

17        These are comments saying if we thought this low

18    three percent royalty was going to benefit, we should see it

19    in new market entrants.  We should see it in prices coming

20    down.  We should see it in low margins, low prices.  We

21    don't see any of that.

22    Q.    Okay.  Did the German authorities discuss the effects

23    of this behavior in the hearing aid industry itself?

24    A.    Yes.

25    Q.    It says -- and this is, it basically summarizes and

Musika - direct

1    consumer.

2    Q.    And did the Germans report any risk associated with

3    these practices in the hearing aid industry?

4    A.    Yes.  And I know the other side keeps suggesting I

5    said that they're colluding or engaging in price fixing.  I

6    have never said that the other side is engaging in price

7    fixing.  I'm reciting again the German Cartel Office that

8    says on the backdrop of what we have seen in terms of the

9    extraordinary high profits, the high margins, the lack of

10   market entrants, the lack of innovation, that there is a

11   risk of collusion that could occur between these

12   individuals.  And I think Mr. Westermann's comment yesterday

13   was a telling comment as well to say we were fearful at

14   times that patents would fall into the wrong hands, which

15   again suggests that there is a club here, there is a

16   partnership and we don't want anyone who is not a

17   manufacturer to have these patents.  Those would be the

18   wrong hands.

19   Q.    Now, did the German reports finally conclude the

20   effect of these practices on the consumer?

21   A.    Yes.  It says the present case is characterized by

22   more, characterized far more by the fact that hearing aid

23   manufacturers and hearing aid acousticians in Germany for

24   the most part have a common sense of interest, which lies

25   not in competitive features directed against one another,

Musika - direct

1    but in the end to obtain from the end customer the highest

2    possible profit margin, both for the manufacturer and for

3    the hearing aid acoustician.

4    Q.    Now, did the German report look only at the German

5    market?

6    A.    No.    They were looking at these companies because

7    these companies, as we know, the HIMPP members are

8    throughout Europe and throughout the world.    They are

9    concerned ultimately with the sales in Germany.    But when

10    they looked at the company, they looked at their worldwide

11    operations.

12    Q.    And what did this analysis of the article from the

13    Copenhagen Business School, the testimony you reviewed, the

14    German report, how did that come to play on your opinion as

15    to whether or not you could rely on the actual license rates

16    between these HIMPP members?

17    A.    First, I did not conclude that they colluded in price

18    fixing.    I did not conclude they engaged in antitrust

19    behavior.    I concluded that a federal regulator concluded

20    that the three percent rate that they charge each other that

21    hadn't fallen into the wrong hands is not a market rate.    It

22    doesn't translate into what would happen with someone who,

23    according to Mr. Westermann, was in the wrong hands and

24    negotiated a market rate.    It's just not reliable.

25    Q.    Now, in addition to your reasonable royalty rate

Musika - direct

1    Q.    We're at No. 10.

2    A.    Well, I would say that that, too, is higher because --

3    I'm sorry -- neutral.  Because the -- is this licensor?  I'm

4    sorry.  The licensor doesn't use it, doesn't sell it so it

5    hasn't been of any direct benefit to the licensor.  However,

6    it has been a huge benefit to the end-user.  So this is

7    going to cancel out to being neutral.

8    Q.    That would answer No. 11; right?  The value to the

9    infringer?

10   A.    Yes, that is what is higher.

11   Q.    No. 12 looks at the portion of the profit or selling

12   price that is customary in the industry.

13   A.    None that I identified.  Neutral.

14   Q.    No. 13 is the profit credited to this invention.  And

15   it has been sold?

16   A.    And that is what we looked at, and I discussed the

17   profits margins there, yes, in terms of higher profit margin

18   and that being higher pressure.

19   Q.    And, of course, the opinion of an expert.  You have

20   been held to be an expert in this field; correct?

21   A.    And I have relied on the expert opinions of Dr. Brown

22   and Dr. Gloster.

23   Q.    Okay.  Now, did you review Dr. Donohoe's expert

24   report?

25   A.    Yes.  Well, it's not Dr. Donohoe.

Musika - cross

1    Q.    It is not to determine reasonable damages based on
2    profits?  You are to determine a reasonable royalty, not a
3    reasonable damages based on profit?
4    A.    Well, my opinion is that that's the same thing.
5    Q.    Now, a couple of the Georgia-Pacific factors do refer
6    to the profitability of the accused products.  You have
7    Factor 8 that refers to established profitability and Factor
8    13, portion of realizable profit.  Correct?
9    A.    Yes.
10   Q.    And I want to focus our discussion a little bit on the
11   profits right now.
12              You testified that you like to start the
13   hypothetical negotiation with a starting point.  Correct?
14   A.    With some reference points, yes.
15   Q.    And you used here the defendants' profits and what is
16   known to some as the 25-percent of profits rule to set the
17   expectations of the parties?
18   A.    Yes.
19   Q.    And for the defendants you used a split of profits
20   approach with the profit premium you calculated?
21   A.    Yes.
22   Q.    And for the plaintiff's starting point you used the
23   25-percent rule.  Correct?  25 percent of profits?
24   A.    I think that was the question you asked two questions
25   ago.  As their starting reference point, yes.  The 25.

Musika - cross

```
 1    A.    Correct.

 2    Q.    Did Dr. Levitt ever approach Widex or Demant regarding

 3    licensing the patents in this case?

 4    A.    I don't know.

 5    Q.    And Audimax didn't approach the defendants; correct?

 6    A.    I don't know.

 7    Q.    And ETG did not approach of the defendants about

 8    licensing?

 9    A.    I don't know.

10    Q.    You have only been involved as part of a team

11    negotiating a license on three occasions; correct?

12    A.    Me, personally?  My company has been involved many

13    more times but me personally three times, yes.

14    Q.    Am I correct that your report does not identify any

15    common management or ownership among Widex, Demant, ReSound,

16    Siemens, Phonak, Starkey.  Do you identify any common

17    ownership amongst any of the defendants or other major

18    players in the hearing aid industry in your report?

19    A.    That was not a --

20    Q.    Okay.  Let me ask the question again.

21    A.    -- precise question.

22    Q.    Does your report identify any common ownership or

23    management amongst any companies in the hearing aid

24    industry?

25    A.    Sure.
```

Musika - cross

1  Q.    It does?

2  A.    Yes.

3  Q.    And now, I'm not talking about say within the Demant

4  entities or anything like that.

5  A.    Okay.

6  Q.    So treat Demant as a single entity, Widex as a single

7  entity.  Do you divide common ownership amongst any of those

8  major hearing aids companies in your report?

9  A.    I shouldn't -- I think what you are getting at -- and

10  I shouldn't -- perhaps I should seek to make you ask the

11  question a little bit more clear.  But there are many

12  industry participants.  As we see in that one slide that pie

13  chart, that eight or nine out of the ten control 80 percent

14  of the market.  So we can talk about those then, those

15  larger companies.  Is that what you are getting to?

16  Q.    Sure.  I did not see it in your report that you said,

17  for example, that Widex and Demant share any common

18  ownership.  Would you agree with that?

19  A.    I don't know.  I don't have the shareholder -- nobody

20  has ever produced a shareholder or equity listing of all

21  these eight or nine major companies so I contend that nobody

22  knows who owns or whether there is common ownership.  I

23  didn't identify any but that doesn't mean it doesn't exist.

24  Q.    Okay.  So you didn't identify any common ownership of

25  the major hearing aid companies?

Musika - cross

1    A.    I did not.

2    Q.    Thank you.  I want to look at some of your, discuss

3    with you some of the opinions about the profits in this

4    case.

5              And if we could put up the Georgia-Pacific

6    factors again.

7              We were talking earlier that factor 8 and

8    factor 13, for example, address profits.  Number 8 refers

9    to the established profitability and commercial success of

10   the infringing product, and 13 refers to the portion of

11   realizable profit to be credited to the patented technology.

12             So these factors were to gauge the value of the

13   patented technology to the product; correct?

14   A.    Can I have that, please, one more time?

15   Q.    These factors are helping us look to the product and

16   see how much of the technology of that product is really

17   going into the success of the product?

18   A.    Let's take them one at a time.

19             Factor No. 8 is talking about the -- let's

20   just take it literally -- established profitability and

21   commercial success of the infringing product.  That is what

22   it says and that is what I looked for.  I looked for the

23   infringing product -- or the accused product, it's not

24   infringing yet.  When I look at the accused product and I

25   look at its profitability, that's what No. 8 says and that

Musika - cross

1    Your Honor.

2    BY MR. SCHERING:

3    Q.    Am I correct that when you testified this morning

4    about the profit information that you were using, the

5    financial information that you were using to make your

6    calculations to determine the operating profit you used,

7    that when you then applied the 25 percent rule you used

8    information for all the companies?

9    A.    I don't know what you mean by all the companies.

10   Q.    Okay.  What companies information did you use in

11   making and establishing what you found to be the operating

12   profit that you relied on in this case?

13   A.    All of the companies that I understand sold products

14   which relied on the patents.

15   Q.    You actually used, in addition to the defendants, you

16   used the financial information of four other companies;

17   correct?

18   A.    Yes.

19   Q.    Okay.  And so you used Demant and Widex, four other

20   hearing aid companies' financial information in making your

21   calculations; correct?

22   A.    Correct.

23   Q.    Okay.  Now, you were trying to be as accurate as

24   possible in gathering this financial information to then

25   make your calculations for operating profits?

Musika - cross

```
1    A.     Correct.

2    Q.     Okay.  And you had six companies.  You did not include

3    in your calculations at least one major company, Siemens;

4    correct?

5    A.     Correct.

6    Q.     And I believe one of the pie charts --

7             MR. STEINBERG:  Your Honor, may we approach for

8    a moment.

9             THE COURT:  Yes.

10            (The following took place at sidebar.)

11            THE COURT:  Yes, Mr. Steinberg.

12            MR. STEINBERG:  Your Honor, we're becoming

13   dangerously close to this witness telling him why he

14   analyzed the former defendants of this case.  Siemens was

15   not one of them.  Because his analysis was done for the

16   settlements in this case and we have all agreed that we're

17   not going to go into the settlements of the defendants of

18   what happened to them, and now he is asking that, well, why

19   didn't it include Siemens, so he is going to -- at some

20   point in time, he is going to say they settled out and we

21   all agreed that the jury is not going to hear that.

22            MR. SCHERING:  Your Honor, the point here is

23   that Mr. Musika had just used the information for the

24   defense originally in a case, but he suggested this.  That

25   his testimony this morning was that he used a broad range of
```

Musika - cross

1    to.  You are raising the possibility of a breach not

2    intended.

3                MR. STEINBERG:  Correct.

4                THE COURT:  I'll listen carefully.

5                MR. STEINBERG:  Thank you.

6                (End of sidebar conference.)

7                THE COURT:  You may proceed, counsel.

8                MR. SCHERING:  Excuse me.  If you could briefly

9    display Musika slide 3.

10   BY MR. SCHERING:

11   Q.    Mr. Musika, this slide indicates that nine of the ten

12   largest companies have 80 percent of the market.  That means

13   in this case, in making your calculations in which you

14   determine the defendants profits here, you ignored at least

15   20 percent of the hearing aid industry in making those

16   calculations.

17   A.    Well, as I think my testimony was this morning, the

18   basis of this slide was the Copenhagen University of

19   California report which was issued some time in 1998 and so

20   that this graph depicts, as I indicated, the state of the

21   market in 1998, calculations that I made with respect to my

22   profit margin that covered the period 2001 through 2006.  So

23   I think before either you or I could conclude that I

24   included or excluded companies, we would need to look at

25   what this graph would look like during the 2001 to 2006 time

Musika - cross

```
 1      period.  And I haven't done that so I can't agree or
 2      disagree with you.
 3      Q.    You have no reason to think that it's different?
 4      A.    I have no reason to think that.
 5      Q.    You don't know.
 6      A.    I have no reason to say it one way or the other,
 7      that's right.  But I know that this doesn't get us to the
 8      answer that you are looking for.
 9      Q.    In this case, you did not do any analysis specifically
10      to compare the defendants' accused versus non-accused
11      digital hearing aids, correct?
12      A.    I tried.
13      Q.    You tried to do a comparison of the accused version
14      non-accused digital hearing aids?
15      A.    Yes.
16      Q.    What did you do?  Okay.
17      A.    I didn't say anything yet.
18      Q.    I'm sorry.
19                  MR. STEINBERG:  Your Honor, may the witness
20      answer the question?
21                  THE COURT:  You may.
22                  MR. SCHERING:  Go ahead.
23                  THE COURT:  He has given you permission.  You
24      can go ahead, Mr. Musika.
25      A.    As I indicated, there are levels of production of
```

Musika - cross

1   manufacturing here and then levels of distribution, each

2   with their own individual profit margins.  And to get to the

3   final total accused profit margin, you need to add them

4   together and eliminate the inner company sales.  I did that

5   here in this drawing because it's what needs to be done.

6        But as I indicated, I did not get the financial

7   statements that relate to the products for the

8   manufacturing.  The only profits and sales numbers that I

9   got for the products were here at the distribution.  I got

10  total financial statements here but I couldn't tease out, I

11  couldn't identify the products in here.  So I don't know

12  what percentage of profit the companies actually made on the

13  accused products in the manufacturing and sale of it.  I

14  didn't get those numbers.  I asked for the numbers.  I said

15  we need to get them.  They said, well, this is all they

16  produced is the financial statements as a whole.  So I was

17  stymied and that's why I had to turn to the methodology I

18  used.

19  BY MR. SCHERING:

20  Q.    So is your testimony that you do not have the

21  information to compare accused versus non-accused digital

22  hearing aids profitability?

23  A.    Not all the way through the organizations.  That is

24  correct.

25  Q.    As part of your opinion for Georgia-Pacific 13 -- if

Musika - cross

1    we could put that up for a moment?  The portion of

2    realizable profits to be credited to the patented

3    technology.  You said part of that is based on your

4    understanding of the patents as pioneering?

5    A.    Yes.

6    Q.    And you said that is because Mr. Brown testified that

7    the patents were pioneering?

8    A.    Well, that is what he represented to me.  That is my

9    understanding of his expert report and the opinions that he

10   holds.  I wasn't here for his testimony.  I don't know what

11   he testified to here in trial.

12   Q.    So you don't know if he testified in court that the

13   patents were pioneering?

14   A.    I don't.  That's true.

15   Q.    And you are not a technical expert.  You don't have

16   scientific training; correct?

17   A.    No, I do not.

18   Q.    Would you agree that -- and again, we're looking here

19   at trying to ascertain the portion of realizable profit that

20   you credited to the patented technology.  Would you agree

21   that many factors contributed to the ability of the

22   defendants to sell product, to sell their hearing aids?

23   A.    The question was just a little unclear.  Can you try

24   it one more time?

25   Q.    Would you agree that many factors contribute to the

Musika - cross

1    ability of the of defendants to sell their products in the

2    hearing aids market?

3    A.    Yes, I would agree to that.

4    Q.    It could be the many technologies that are in the

5    product; correct?

6    A.    Sure.

7    Q.    It could be marketing?

8    A.    Absolutely.

9    Q.    It could be distribution and sales channels?

10   A.    Yes.

11   Q.    It could be product reliability?

12   A.    Yes.

13   Q.    There is a whole host of factors that contribute to

14   the ability of the hearing aids companies that sell their

15   products in the market?

16   A.    Absolutely.  And all of which go into again those

17   expenses that make up -- I abbreviated them here but if

18   they're marketing, they go into the expenses here for

19   marketing expenses.  If they're selling and distribution,

20   they go into the expense line item here.  And I've backed

21   them out of the profit.  They have already been compensated

22   for all of those considerations.  I'm making sure that I'm

23   only taking that net profit.  So they've already covered all

24   of those expenses you are mentioning.  I'm not taking any of

25   that way from it.  It's already been covered.

Musika - cross

```
 1              THE COURT:  You need to look at the deposition,

 2     Mr. Steinberg, to see if you agree there is an impeachable

 3     statement being made.

 4              MR. STEINBERG:  I really don't think it's

 5     impeachable, to be honest with you.  I don't think it

 6     impeaches anything he said.

 7              THE COURT:  I'll let him ask the question.

 8              (End of sidebar conference.)

 9              THE COURT:  Counsel, you may proceed.

10              MR. SCHERING:  Thank you, Your Honor.

11              THE COURT:  Counsel, you may proceed.

12     BY MR. SCHERLING:

13     Q.   Mr. Musika, I will ask the question again.  Isn't it

14     true that you did not do any analysis to try to separate out

15     the value of the use of the invention of the patents in

16     suit?

17     A.    That is not true, that I did not do any analysis to

18     try and separate out whatever the rest of your question is.

19     Q.    Would you play 81, please.

20              "So just to clarify for the record, which part

21     did you do?

22              "Answer:  I did an analytical review method.  I

23     didn't go and try to separate out and suggest that the value

24     that's represented by the analytical method is necessarily

25     reflective of just the incremental value of the use of the
```

Musika - cross

1    technology."

2                That was your answer.  Correct?

3    A.      That was my answer as it relates to the analytical

4    method.

5    Q.      Now, Mr. Musika, if we could just -- display Slide 16,

6    please, Musika Slide 16.

7                It's true, isn't it, that you used the

8    25-percent rule to establish that 6.4 percent mark there

9    that is the low end of the negotiating range?

10   A.      Yes.

11   Q.      And you agree that the 25-percent rules is not

12   supposed to be a standalone basis for determining a

13   reasonable royalty?

14   A.      Well, I don't know if it is not supposed to, according

15   to --

16   Q.      According to you.

17   A.      I don't use it as a standalone basis, that's correct.

18   Q.      Okay.  So the 25-percent rule is not supposed to be

19   used as a standalone basis for establishing a reasonable

20   royalty?

21   A.      It's not --

22   Q.      According to you.

23   A.      Now, I didn't say it is not supposed to be used.  I

24   think there is a difference.  It is not a subtle difference.

25   What I think the question is implying -- you will correct

Jacobsen - direct

1    that was called a filter bank but is a very important part

2    of the technology for our products during the '90s.  And for

3    one of the patents, we pay half a dollar per unit and for

4    the other patents, we pay four dollars per unit.  Per unit

5    means for the sale of one hearing aid.

6    Q.    Now, we've heard a little bit about an organization

7    called HIMPP.  Are you involved at all in HIMPP?

8    A.    Yes, I'm the chairman of HIMPP and has been the

9    chairman since it was established in 1996.

10    Q.    Can you explain for the jury why HIMPP was formed and

11    what its purpose is?

12    A.    HIMPP was formed when we saw that there was a large

13    group of patents that was, it was important for the future

14    development of hearing aid.  And HIMPP was formed when we

15    got the opportunity to buy those patents and not only for

16    ourself, to secure that we didn't infringe those patents,

17    but also for others in the industry that didn't want to

18    infringe those patents.  We had the possibility to buy the

19    patents and form this partnership around them.  At the same

20    time, also to make sure that we could have a future

21    development of hearing aids in the industry, we made them

22    available on equal terms for all players in the industry.

23    Q.    Now, before HIMPP was formed, when you were looking at

24    the patents that you are talking about that initially went

25    into this HIMPP partnership, who owned those patents at the

Jacobsen - direct

1    time?

2    A.    They were owned by 3M, a very big American company.

3    Actually, those who do the yellow Post-It.  It's one of the

4    companies in U.S. that really holds a lot of patents.  And

5    we got the opportunity to buy more than 200 patents for $12

6    and-a-half million.

7    Q.    And were those significant, insignificant patents?

8    How would you characterize them?

9    A.    I think they were crucial for the development of

10   hearing aids.  They were absolutely crucial to develop

11   programmable and digital hearing aids going forward.  Not

12   only one of them but a number of them.

13   Q.    So you purchased about 200 crucial hearing aids

14   patents for a total sum of about $12 and-a-half million?

15   A.    That's true.

16   Q.    Now, what happened to those patents?  Where did they

17   go?

18   A.    They went into the partnership, to the HIMPP

19   partnership.

20              THE COURT:  Can I see counsel a second?

21              (The following took place at sidebar.)

22              THE COURT:  Do us a favor.  Don't restate the

23   testimony, don't restate his answers.  His answers will

24   stand on their own.

25              MR. PANITCH:  Okay.

Jacobsen - direct

1   Q.    And what was the reason?  Can we just highlight what

2   the reason was?

3   A.    Yes.  As coming from the lower part of the press

4   release, it's saying:  By acquiring patents and making them

5   available to all interested parties in the hearing aids

6   industry through membership in the partnership or through

7   license, the group believes that the development of

8   programmable and digital hearing aids can evolve optimally

9   and freely to the benefit of the hard-of-hearing population

10  and the hearing healthcare professionals.

11  Q.    And when was these 200 patents that you put into

12  HIMPP, when did that occur?

13  A.    That was in 1996.

14  Q.    How much does it cost for someone to use the HIMPP

15  patents?

16  A.    You have two opportunities.  You can either pay $1.8

17  million to use or to have royalty, no royalty paid license.

18  And/or you can choose to pay three percent to use all the

19  patents.

20  Q.    And the $1.8 million, is that for one patent or is

21  that for all the patents?

22  A.    No, the $1.8 million is for the use of all 250 patents

23  in HIMPP.

24  Q.    Is the same true for the three percent?

25  A.    And the three percent also is to use all 250 very

Jacobsen - direct

1    important patents.

2    Q.    How did you arrive at the $1.8 million number?

3    A.    The $1.8 million and the three percent -- we, you

4    know, it was based on the valuation that 3M had put to those

5    patents.  3M is a very professional organization in patents

6    and they felt that this was the value and we have to share

7    the cost.  And this was basically how we came up to this.

8    Q.    All right.  If we could, let's take a look at JX-160.

9    A.    Yes.  This is general information sheet about HIMPP.

10   Q.    And what was the purpose of this document?

11   A.    This document is a general information sheet that

12   HIMPP is sending out to potential new licensees to explain

13   to them what HIMPP is.

14   Q.    And where, if at all, is the $1.8 million and the

15   three percent set forth?

16   A.    Just below this membership of K/S HIMPP.  It is

17   mentioned that upon payment of the $1.8 million, you are

18   entitled to a nonexclusive worldwide license for all

19   existing HIMPP patents and patent applications.

20   Q.    Now -- go ahead.

21   A.    Yes.  The three percent is a little lower on the page

22   where it is saying that the royalty is a flat three percent

23   of the price of hearing aids covered by one or more of the

24   HIMPP patents, a rate which is comparable to or lower than a

25   typical royalty for a single patent family in this field.

Jacobsen - direct

1    two businesses.

2    Q.    Do you have an understanding of whether or not that

3    report was relating to the rest of the world or only to

4    Germany?

5    A.    No.   The report was done by Germans about the German

6    market and the situation in the German market.   It's obvious

7    that the German office cannot have any opinion on anything

8    outside the German market.

9    Q.    I apologize.   There was a question I wanted to ask you

10    in the last line of questioning that I failed to.   So I am

11    just going to come back to it.   You were talking about the

12    percentages, fractions of a percent per patent in your

13    industry that are common.   Why is that?   Is there a reason

14    why the rates are at that rate?

15    A.    Yes.   I think it's -- it is clear that there is no

16    single patent that is the patent for hearing aid.   It's all

17    patents that are covering a fraction of something.   It could

18    be, as I told you before, the patent on how to make the ear

19    mold.   It can be a patent on anti-feedback.   It could be a

20    patent on all other elements.   It can be a tube patent.   It

21    can be a filter bank.

22           All the patents we acquired from 3M, they were

23    important all to develop hearing aids.

24           So if you have to stack, you can say, use this

25    patent and this patent and this patent.   If you pay a high

Jacobsen - direct

1    rate on each of the patents, then you will say, no, no, I

2    will not develop this hearing aid, because, you know, when

3    we come to the market, then the patent owners will take all

4    what we need to pay our employees.

5           So it doesn't make sense to pay these very high

6    fees on a single patent because you need a number of patents

7    often when you develop a hearing aid.

8    Q.    Mr. Musika testified earlier about -- I don't remember

9    the exact number, it was in the 30 million range for the two

10   Levitt patents as being something that would be reasonable

11   to negotiate in this field.  How does that number comport

12   with your understanding of what is reasonable?

13   A.    I think it's quite obvious that when we had paid

14   $1.8 million to have access to 250 patents that are coming

15   mostly from 3M, you know, it doesn't make any sense.  This

16   is an opportunity.

17   Q.    Let's talk about now the Levitt patents that are the

18   subject of this suit.  At any time before this lawsuit was

19   filed, either in your role as chairman of HIMPP or in your

20   role in the Demant Group companies, do you ever recall

21   hearing about the Levitt patents?

22   A.    I didn't hear anything about the Levitt patents before

23   this suit, before we were sued on these patents.

24   Q. .  Do you recall your reaction when you had learned that

25   you were sued?

Jacobsen - redirect

1          THE COURT:  It will probably be helpful, after

2     you finish with this witness, when the lawyers get a chance

3     to discuss the issue and see if there is an ameliorative

4     thing you want us to do, want me to do.  Maybe, maybe not.

5     I don't know.

6               (End of sidebar conference.)

7          THE COURT:  All right, counsel.  You may

8     continue.

9     BY MR. PANITCH:

10    Q.    And do you have a sense of the level of

11    competitiveness or lack thereof in the hearing aid industry?

12    A.    I have.  We are out there every day.  It's a very

13    fierce competition.  All the sales people we have on the

14    road in the U.S., they are fighting the other manufacturers'

15    sales people.  Each participates in having their products on

16    the shelf, so getting space on the shelf is important.  And

17    that is, are you the one that deliver the best service?  Are

18    you the one that can help the dispenser the best to have a

19    successful session, fitting with the hearing impaired?  Then

20    you get the sale.  There is competition every day.

21         MR. PANITCH:  No further questions.

22         THE COURT:  All right.  I think we are finished

23    then.

24         Thank you, sir?

25    A.    Thank you.

```
 1                IN THE UNITED STATES DISTRICT COURT

 2               IN AND FOR THE DISTRICT OF DELAWARE

 3                           -  -  -

 4

 5    ENERGY TRANSPORTATION,          :   Civil Action
      INC.,                           :
 6                                    :
                   Plaintiff,         :
 7                                    :
           v.                         :
 8                                    :
      WILLIAM DEMANT HOLDINGS A/S,    :
 9    et al.,                         :
                                      :
10                 Defendants.        :   No. 05-422 (GMS)

11                           -  -  -

12                      Wilmington, Delaware
                     Friday, January 31, 2008
13                         9:30 a.m.
                       Ninth Day of Trial
14                           -  -  -

15    BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge

16

17

18    APPEARANCES:

19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                   -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                               Counsel for Plaintiff
24

25
```

1