Donohue - direct

1    Cushman?

2    A.        February of 1989.

3    Q.        And did you continue to work in the patent field

4    following that?

5    A.        Yes.  After that, one of my clients, Samsung

6    Electronics, which is a major manufacturer of television

7    sets, cell phones, LCDs, semiconductor products and that

8    sort of thing, they asked me if I would come to Korea to

9    help set up a legal department there.  They had none at the

10   time.

11            And they also had very difficult patent

12   problems.  So they wanted me to set up a patent strategy.

13   So as a result, I moved my family from Washington, D.C. to

14   Seoul, Korea, for two and a half years.

15   Q.        How long did you work for Samsung in total?

16   A.        I worked for Samsung for 15 years.  I retired at

17   the end of 2003.

18   Q.        What positions or titles did you hold at

19   Samsung?

20   A.        I started out as director of intellectual

21   property affairs for them.  But then I became executive vice

22   president of the corporation as a whole.

23   Q.        Can you tell the jury a little bit about your

24   accomplishments while working at Samsung?

25   A.        Yes, when I started Samsung, they had one U.S.

Donohue - direct

1    patent to their name.  And I immediately set up a program

2    for acquiring patents from their internal inventions.  By

3    the year 2000, we were No. 4 in the world in number of U.S.

4    patents granted to it.  So we became a major patent

5    organization.

6            In addition, we had very difficult problems with

7    asserted patents in our semiconductor business.  There were

8    7 or 8 competitors, plus many other corporations who were

9    asserting patents against Samsung, plus individuals.

10           At the time Samsung was very concerned about the

11   problem of royalty stacking.  If there were licenses granted

12   to all these companies, they were concerned that they might

13   be put out of business.

14           So I set about setting up a strategy for getting

15   reasonable royalty rates from each of these parties who were

16   asserting patents against Samsung.

17   Q.      Were you personally involved in licensing

18   negotiations?

19   A.      Yes.  I was a -- I set the strategy and actually

20   was the lead negotiator.  I attended meetings and did the

21   negotiations.  I called upon my financial people, my

22   accountants, to help me frame out what would be a reasonable

23   reasonable royalty range.  I counted upon my staff members

24   to analyze the patents and tell me which patents we needed

25   to take a license under.

Donohue - direct

1    Q.        Through your employment at Samsung and your

2    previous work at the Cushman Darby firm, how many licenses

3    have you been involved with?

4    A.        Well over a hundred that I directly was involved

5    with in negotiating, and many more that I oversaw from more

6    of a distance.

7    Q.        In your capacity at Samsung, what companies did

8    you negotiate licenses with?

9    A.        Basically, your global 500 companies.  Examples

10   are Lucent, Motorola, Intel, IBM, AT&T before Lucent,

11   various European and Japanese corporations.

12   Q.        I believe you testified earlier that you worked

13   at Samsung until 2003.  Is that right?

14   A.        That's correct.

15   Q.        And what did you do after leaving Samsung?

16   A.        Well, I still have a consultant business in

17   which I give advice on strategy and on licensing of patents.

18   Q.        Prior to this case, have you testified in any

19   judicial proceeding or served as an expert witness on the

20   topic of damages?

21   A.        Yes, I have.  I have testified as a fact witness

22   for Samsung in two arbitrations and in one litigation, much

23   like this litigation here, on the issue of royalty rates and

24   damages.  I have also testified on behalf of Microsoft on

25   the issue of damages as an expert witness.  This is out in

Donohue - direct

1  Georgia-Pacific.  Then these factors are rooted in the real
2  world.  That is what the case law requires, that you take it
3  into real world consideration.  In the hundred-or-so
4  licenses I negotiated, the very most important factor is the
5  first factor which is how much money did the owner of the
6  patent derive from royalties from the patent.

7          The second most important factor is the second
8  one there which is what are the comparable rates paid for
9  patents in the industry?  Of course, I've looked at all the
10  other factors and considered them in my analysis.

11  Q.        Okay.  So to clarify, you considered all 15
12  factors?

13  A.        I have.  Yes, I have.

14  Q.        What did you determine in Georgia-Pacific Factor
15  1?

16  A.        Well, first of all, I determined that there is
17  no established royalty rate for the patents.  And the reason
18  for this is that the patents have never been licensed
19  before.  In the case of Audimax and ETG, there were attempts
20  to license the patents but these failed.

21          Secondly, at the beginning of the negotiation,
22  you also consider what is the commercial embodiment?  Is it
23  something that is attractive that I would want to use in my
24  own business?  And in this case here, there was never a
25  commercial embodiment of the patented invention.

Donohue - direct

1    I also considered the EKMS attempts to license

2    the patents.  As you might have heard in your earlier

3    testimony here, ETG retained EKMS which is a licensing and

4    consulting firm specializing in the licensing of technology.

5    EKMS was highly incentivized to license patents because it's

6    part of its consideration for doing this work.  It got a

7    percent of the revenue it gained from licensing the patents.

8    And in this case, EKMS failed to license the patents.

9    Q.        What other evidence did you consider?

10   A.        Well, as you can see, that following the EKMS

11   attempt but failure to license the patent, there was the

12   Chen purchase of his brother's interest in ETG.  That

13   purchase was for 50 percent interest in ETG for $1 million.

14   So you might assume then that ETG was worth $2 million.  ETG

15   owned 80 percent of Audimax, so extrapolating that would

16   mean that the value of the patents in Audimax, which is all

17   that Audimax owned, would be about $2 and-a-half million.

18   So that would be the price that would be paid for the

19   patents themselves.

20        Now, I don't consider this to be an example of

21   what a reasonable rate would be for the patents here in suit

22   because the patents are being bought, not licensed, but it's

23   sort of a benchmark or it's a reality check on what level of

24   value there would be for the patents that are here in suit.

25   Q.        What was your ultimate conclusion under GP-1?

Donohue - direct

1    A.          Under GP-1, I felt there would be a downward

2    impact on the rate.

3    Q.          Okay.  Let's turn to Georgia-Pacific Factor 2.

4    What conclusions did you reach under GP-2?

5    A.          Well, here, the hearing aid technology is very

6    complex, much like the Samsung semiconductor technology.

7    There are many patentable features.  I think Mr. Jacobsen

8    testified there are 17,000 patents in the hearing aid

9    industry.  Because of the many complex features of the

10   hearing aid and because of the many patents in the field,

11   there was potential at the time of this negotiation that

12   there would be many licenses to be had.

13          So that would mean that the negotiators would

14   understand that the royalty rates had to be reasonable.

15   They couldn't be real high.

16   Q.          Who did Widex and Demant negotiate licenses

17   with?

18   A.          Well, here is a list of companies.  They license

19   companies in the industry such as Siemens, GN ReSound,

20   Gennum and Phonak.  But they also license outside, people

21   outside the industry such as Etymotic Research and clinical

22   hearing consultants.  They license components manufacturers

23   and individuals and, of course, they license HIMPP.

24   Q.          Do you recall how many total agreements?

25   A.          It's around 29 agreements, of which some were

Donohue - direct

1    cross license agreements.  There were around 16 agreements

2    that were royalty bearing agreements.

3    Q.        Have you seen any evidence that would suggest

4    that these are not true and fair commercial transactions?

5    A.        None whatsoever, no.

6    Q.        Can you explain to the jury a little bit more

7    about the HIMPP license that is outlined there?

8    A.        The HIMPP patents were, the base patents were

9    purchased from 3M Company by ReSound.  3M Company is not in

10   the industry and it had no reason to sell the patents at a

11   low rate.  ReSound, in turn, sold the patents to HIMPP for

12   $14 and-a-half million.  Again, that was a market rate.

13            If you put this in perspective, at that time,

14   there were 20 patent families and so the price per patent

15   family would have been 20 divided into $14.7 million which

16   would be $725,000 per patent family.  A patent family

17   includes the U.S. patent plus it's foreign counterpart

18   patents.

19            HIMPP, in turn, licensed the patents to the

20   industry.  They licensed it in a lump sum form by selling

21   partnerships to companies who wanted to buy in as a

22   partnership.  And that was for $1.8 million.  And again,

23   that was for 20 patent families so the price per patent

24   family was quite a bit lower than $1.8 million.  And these

25   HIMPP patents are basic foundation patents in the industry,

Donohue - direct

1   so they're very important patents.

2              They also offered a license in the alternative

3   at three percent.  And again, if you look at HIMPP as having

4   20 patent families within it, and you divide 20 patent

5   families into three percent, you come up with an average of

6   .15 percent royalty rate per patent family.

7              Subsequently, HIMPP purchased patents from

8   Decibel or from NEC which I understand are very important

9   patents which enhances the value of the portfolio that is

10  licensed either through the lump sum form of $1.8 million or

11  through a running royalty rate.

12  Q.         Among all the licenses you considered, what

13  conclusions did you draw about the royalty rate?

14  A.         Well, all the licenses I considered, there is

15  the average royalty rate among the licenses in the industry

16  paid for by Demant and by Widex was about a half a percent.

17             The maximum royalty paid was 1.4 percent.  That

18  was to Etymotic that had three patent families in it.  So on

19  a per patent family basis, it would be somewhat in the

20  neighborhood of .5 percent, slightly less than .5 percent.

21             For the HIMPP patents, which again are

22  foundation patents in the industry, the rate was 3 percent

23  but bear in mind there are 20 patent families there so on a

24  patent family basis, it was .15 percent.

25  Q.         How many patents in the HIMPP portfolio today?

Donohue - direct

1    A.          There are 250 patents in that patent portfolio.

2    Q.          What conclusions did you draw under GP-2?

3    A.          So under GP-2, I concluded that this is strong

4    evidence of what a reasonable royalty should be at least the

5    range of what a reasonable royalty should be.

6    Q.          Could you give us some conclusions you drew

7    under the other Georgia-Pacific factors?

8    A.          Sure.  I looked at, for example, the

9    profitability and commercial success of the product under

10   Georgia-Pacific Factor No. 8.

11          Here, the hearing aid business is very complex

12   and there are many factors that go into making the

13   profitability of the product.  For example, styling, fit,

14   marketing, reputation.  Just as when you wear an Acoste

15   shirt, you pay extra money for that, so it's reputation for

16   the company.  After service, a lot of these factors go into

17   play in addition to the fact there are all these other

18   patents that apply to the hearing aids.

19          So to determine the profitability and commercial

20   success of the product, you have to look at all these

21   factors for the patents in suit.  Now, the patents in suit

22   are important.  There is no question about that.  Assume you

23   find infringement and validity but there are many other

24   factors.  So on here, in general, it would increase the rate

25   somewhat because the patent invention is used in the

Donohue - direct

1    commercial products.

2    Q.          Did you consider commercial value or

3    profitability under any of the other Georgia-Pacific

4    factors?

5    A.          Yes, under Georgia-Pacific 13.  Here, again,

6    under Georgia-Pacific 13, you have to figure out what

7    portion of the overall profit is attributable to the

8    patented invention.  And again, as I said, what contributes

9    to profitability is not just the patents in suit but other

10   patents as well as styling and appearance, the reputation of

11   the manufacturer, the marketing that goes on and so forth.

12   So it's, I think it is impossible to attribute a profit, a

13   portion of the profit made to the hearing aids being sold.

14   Q.          Okay.  Let's turn to your opinions concerning

15   Mr. Musika's conclusions.  What opinions did you form about

16   his analysis of damages in this case?

17   A.          Well, if you look just, for example,

18   Mr. Jacobsen testified that the profits of Demant are

19   somewhere between 18 and 20 percent.  The Musika proposal

20   seeks 8.4 percent of that, almost half of that profit

21   margin.  This, in the face of all the other patents out

22   there and potential patent licenses.  So I think if you look

23   at that compared to the average royalty rate being paid in

24   the industry, which is .5 percent, it's way out of whack.

25   It doesn't make sense.

Donohue - direct

1    BY MR. GRAMENOPOULOS:

2    Q.        Let's move on to your damages calculation.

3    A.        Sure.

4    Q.        In your opinion, what is a reasonable royalty in

5    this case?

6    A.        A reasonable royalty can be in the form of a

7    lump sum or a running royalty.  If it is a lump sum, it's 1

8    million.  I base that upon the HIMPP agreement as one

9    example, where there is $1.8 million, but split over 20

10   patent families, which would abbreviate it much less than a

11   million dollars.  I erred on the side of ETG and raised it

12   up to a million dollars.

13              I also looked at other licenses in the industry

14   where there is lump-sum rates, and they range between

15   350,000 to $500,000.  So again, erring on the side of ETG,

16   being conservative, I set it at $1 million.

17   Q.        Can you tell the jury about your conclusions on

18   the royalty amount?

19   A.        On the royalty amount, if we do a reasonable

20   royalty analysis, we first have to multiply the sales that

21   are, we call it the royalty base, the sales that are covered

22   by the Levitt patents.  You multiply that by the royalty

23   rate that I propose.  And that equals the damages.

24   Q.        Okay.  What was the first fundamental

25   calculation you made?

21

Donohue - direct

1    A.      So for Widex, Dr. Putnam will show that the

2    sales covered were 301.9 million dollars.  If you will

3    multiply that by the royalty range I propose, which is

4    .25 percent, up to .5 percent, you would get a damage range

5    of $750,000, up to a maximum of 1.11 million dollars.

6        If you look at the Demant side of it, Demant had

7    higher sales.  As Dr. Putnam will explain, the sales covered

8    by the patents would be 408 million -- 408.9 million

9    dollars.  Again, if you multiply that by the royalty rate,

10    you come up with a royalty of $1.02 million up to 2.4

11    million dollars as the maximum.

12    Q.      Did you reach any other computations to come up

13    with a reasonable royalty?

14    A.      I did.  In the case where you find that the '749

15    patent is not valid or not infringed, so only the '850

16    patent is involved, it had a shorter patent life for the

17    products covered.  So there would be fewer sales involved.

18        So here I took sales figures of 277.7 million

19    and multiplied it by the royalty rates that I propose, and

20    came up with a damage range of $690,000 up to 1.39 million

21    dollars.

22    Q.      Did you reach any other calculations?

23    A.      And with respect to Demant -- can we go back to

24    the previous slide?  With respect to Demant, the damages

25    are -- I am sorry, the sales are 355.6 million dollars.  And

Donohue - direct

1     multiplying that times the reasonable royalty comes up with

2     a damage for Demant of $890,000, up to a maximum of 1.78

3     million dollars.

4     Q.          Let's go to the next slide.  What calculation

5     did you reach here?

6     A.          I am sorry.  It may be that you will find that

7     damages can only be computed from the time the patent

8     infringement lawsuit was filed in 2005, June of 2005.  In

9     that case the sales subject to damages are even lower.  So

10    in this case, for Widex, the damages would be based upon

11    128.3 million dollars base of sales times the royalty rate,

12    which would equal $320,000 up to $640,000.  And for Demant,

13    it would be $62.6 million of sales, multiplied by the

14    royalty rate, which would give 160,000 dollars up to 310,000

15    dollars.

16    Q.          Did you reach any conclusions concerning

17    Demant's claim for sales to the U.S. Government?

18    A.          Yes, I did.  I understand that there is some

19    evidence that Demant made $8.3 million in sales to the

20    Veterans Administration.  If that is so, then that should be

21    subtracted out of the top-level figure, which is the

22    previous slide here someplace.  Here.  You should subtract

23    that out.

24    Q.          In Scenario 1?

25    A.          Scenario 1, yes.  Out of Scenario 1 for Demant,

Donohoe - cross

1   Q.        The whole month?

2   A.        Sure.  The whole month, yes.

3   Q.        And you have been attending the trial regularly?

4   A.        I have been attending the trial regularly, yes.

5   Q.        Now, when you testified you were at Samsung, the
6   vast majority of cases were against Samsung as a defendant
7   in patent infringement cases.  Correct?

8   A.        That's true.  There was a real problem at
9   Samsung with patent stacking.  So many companies were
10  asserting patents against Samsung.  So our chief objective
11  at the time was to try to negotiate a reasonable royalty so
12  that the company could survive with a profitable base.  Yes.

13  Q.        So Samsung was a defendant like these defendants
14  here.  Right?

15  A.        Yes.  Now, later on at Samsung, as our patent
16  portfolio developed, we also became a plaintiff.

17  Q.        Now, I believe you said that after 2003, when
18  you opened your own business, you opined on reasonable
19  royalty rate in a couple cases?

20  A.        I did, yes.

21  Q.        One of those items you mentioned was for
22  Samsung.  Correct?

23  A.        Yes.

24  Q.        But I believe you told the jury you testified as
25  a fact witness.  Right?

26

Donohoe - cross

1      are many other things that go into making.

2                      MR. STEINBERG:  Your Honor, may we instruct the

3      witness?

4                      THE COURT:  No, I'm not.

5                      You may continue.

6                      MR. STEINBERG:  Thank you.

7                      You can continue, sir.

8                      THE WITNESS:  I'm finished.

9      BY MR. STEINBERG:

10     Q.            Now, you testified earlier about some issue

11     called patent stacking or royalty stacking?

12     A.            I did, yes.

13     Q.            And your concern was that these companies would

14     be paying other license rates that may interfere with them

15     paying a license rate to ETG?

16     A.            That would have been the mindset of the

17     negotiators at the beginning of the negotiation.  They would

18     have looked at, there is a lot of patents in the industry,

19     there is a lot of potential for licenses coming forward.  So

20     they would be concerned about if they took a lot of licenses

21     as they might have to, there would be a patent stacking

22     problem.

23     Q.            But, again, you have done absolutely nothing

24     whatsoever to determine whether there is in fact a patent

25     stacking issue with these two defendants; correct?

Donohoe - cross

1    A.        Well, I looked at, No. 1, the number of patents

2    in the industry.  The licenses that were already in place.

3    I looked at the potential for downstream licenses because of

4    the number of patents.  The number of complex features that

5    are patentable in a hearing aid.  And I draw the real world

6    conclusion that there is a danger of patent stacking here.

7    Q.        But you didn't do any specific work to determine

8    whether these defendants had licenses that they were paying

9    royalties on that would interfere with their paying for

10   another license, did you?

11   A.        At that time, no.  No, not at that time.  I

12   didn't quantize that and didn't feel I had to quantize that

13   because I was concerned about what the future looked like.

14   Q.        Now, in your report you concluded that the

15   defendants would only be interested in paying a lump sum

16   royalty; correct?

17   A.        Not only, because I gave both the running

18   royalty and the lump sum alternatives.  I said in my report,

19   though, that a lump sum is generally favored by licensees in

20   these situations.

21   Q.        But you know now that HIMPP, the organization

22   these defendants belong to, recommends a percentage running

23   royalty; correct?

24   A.        They recommend both.  A lump sum -- you can pay

25   a lump sum, actually become a partner by paying a lump sum,

Putnam - direct

1    Q.         Are the sales figures that -- excuse me.  Are

2    these sales figures that you relied on the same ones that

3    Mr. Musika relied on?

4    A.         Yes.

5    Q.         Did Mr. Musika make any mistakes in his

6    calculations?

7    A.         Yes.  You probably recall that Mr. Musika said

8    that he had included sales beyond the expiration of the

9    patent that ought not to have been included, and so they

10   ought to be removed because they are not part of the damages

11   calculation.

12   Q.         And just to confirm, because I believe I may

13   have misspoken last week with Mr. Musika, do you agree that

14   the '850 patent expired on June 26, 2006?

15   A.         That is my understanding, yes.

16   Q.         And the '749 on November 7, '2006?

17   A.         That's right.

18   Q.         And so what are you doing in this document,

19   slide, now with respect to that?

20   A.         Well, this slide relates to Demant sales.  Mr.

21   Musika said they were $417.8 million dollars.  But he

22   included sales through the end of November.  That's

23   incorrect, because the patents expired on November 7th.

24              So the sales that Demant made between

25   November 7th and the end of November amount to $8.19 million

Putnam - direct

1      dollars, I have taken those out.  That reduces the royalty

2      base to 408.9 million dollars.

3      Q.          Now, I see you have a second correction there,

4      less U.S. Government sales.  What's that?

5      A.          Yes.  Well, Demant is also -- Mr. Donohoe talked

6      about this -- negotiated a contract with the U.S. Government

7      to sell hearing aids to the Veterans Administration.  And I

8      have looked at those sales and examined them, both the

9      spread sheets that summarize the sales as well as the

10     detailed sales records, invoices.  And they total

11     8.3 million dollars.

12               So if they are not -- Demant says that they

13     should not be included because under certain circumstances

14     sales the U.S. Government are not subject to damages.

15               Subtracting those out, that gives a corrected

16     total of four London 400.6 million dollars.

17     Q.          Did you also make corrections in the

18     calculations for Widex?

19     A.          Yes, I did.

20     Q.          Can you explain that, please?

21     A.          Well, again it's the same for Widex.  As Mr.

22     Donohoe said, the number is a little bit smaller, 306.1

23     million.  Again, taking out the sales that were made after

24     November 7, 2006, that's 4.25 million, that leaves a

25     corrected royalty base of 301.9 million dollars.

Putnam - direct

1    Q.        For Widex is there any correction for sales to

2    the U.S. Government?

3    A.        No, there isn't.

4    Q.        Dr. Putnam, we talked about the sales figures as

5    you corrected Mr. Musika's calculations.  Were Mr. Musika's

6    profit calculations in error in any respect?

7    A.        Yes, they were.  He also made several mistakes

8    in calculating profits.

9              I think it easiest to describe them if I do it

10   on a demonstrative.

11             MR. SCHERLING:  Your Honor, may Dr. Putnam step

12   down from the podium to do a demonstrative?

13             THE COURT:  Do you want to position the

14   demonstrative to make it easy for him?

15             MR. SCHERLING:  Yes, thank you.

16             THE COURT:  Ladies and gentlemen, can you see

17   that?  I see the writing is a little small.

18             (Witness steps down from stand.)

19   BY MR. SCHERLING:

20   Q.        Dr. Putnam, what is on that board that you have

21   got there by the jury?

22   A.        Well, you recall, this is a copy of the slide

23   that Mr. Musika put up in his testimony, in which he

24   described something called the premium -- what he called the

25   premium profit margin.  The way he computes a premium profit

Putnam - direct

1    calculations.

2                    MR. SCHERLING:  Dr. Putnam, what we'll do, to

3    simplify this, is if we can display on the Elmo.

4    BY MR. SCHERLING:

5    Q.            This is a document you prepared; correct?

6    A.            That's right.

7    Q.            Okay.  And it has a figure here of a negative 12

8    percent.  First of all, before you explain how you got

9    there, what does that negative 12 percent represent?

10   A.            Well, let me back up where we were before the

11   break.  Mr. Musika is computing what we call a profit

12   premium.  He says that the accused product are more

13   profitable than the other products that aren't accused in

14   this case.  The question is, is that statement true?  Are

15   the accused products more profitable than the other products

16   not accused in this case?  The answer to that question is

17   no.  Using Mr. Musika's method and applying it to the

18   defendants in this courtroom, Demant and Widex, the same

19   data shows the accused products are actually less profitable

20   than the  other products in this case.

21                  The amount by which they're less profitable is

22   minus 12 percent.  There is not a 9.2 percent premium, there

23   is actually a minus 12 percent discount relative to the

24   other products.  The reason why that is important is because

25   Mr. Musika's method does not show that the Levitt patents

Putnam - direct

1    caused Demant and Widex to earn more profits than they

2    earned on their other products.

3    Q.        So with Exhibit 9A here, the report that you

4    prepared, the bottom line is if you use just Widex and

5    Demant and apply Mr. Musika's method for the premium, you

6    actually get a negative premium; is that true?

7    A.        Yes, that is right.  Exhibit 9A is simply shows

8    the intermediate calculations that I would have shown on

9    Mr. Musika's exhibit with the baseline sales of the other

10   company's products and so forth, combine them together just

11   the way he did.  Getting to the bottom line, it's not 9.2

12   percent, it's minus 12 percent.  The results are completely

13   reversed.

14   Q.        So, does that mean in this case that we should

15   just apply or subtract 12 percent from Mr. Musika's profit

16   calculations instead of a 9 percent premium?

17   A.        No, there is one other conceptual error.  This

18   whole discussion that we're involved in is talking about the

19   actual profits earned by Demant and Widex over the period

20   2001 to 2006.  But Mr. Musika in his testimony and in the

21   case that he cites, TWM Manufacturing, says that what we

22   ought to be looking at is expected profits.  That is

23   consistent with the Federal Circuit case law which says

24   you should look at expected profits, not actual profits.  So

25   what I did was to look at the expected profits of the

Putnam - direct

1    company, what they thought they were going to make going

2    forward, not what we know they made looking backwards.

3    Q.        What does this slide show?

4    A.        Well, I use Mr. Musika's original assumption

5    which is the parties would have been negotiating in 1999,

6    and I went and looked at the profits that were forecast for

7    Demant and for Widex at that point.  And I took the average

8    of the forecast.  And you can see on the board the two

9    numbers that are circled for Demant.  The forecasted profit

10   rate is just under 18 percent, about 17.8, and for Widex,

11   it's just over 19 percent, about 19.4.

12   Q.        Now, does this next slide further explain what

13   you are talking about, with expected profits?

14   A.        Yes.  For me, I sort of like to look at things

15   visually so the simplest thing to do is to think of the

16   sales of the company as being a pie and, first and most

17   importantly, break down sales.  When you break down a

18   company's sales, you break them into its costs and into its

19   profits.  So the costs represent 82 percent of the pie, most

20   of it, and then the profits are that purple slice that is up

21   in the upper right-hand corner.  They represent about 18 or

22   19 percent of the company's sales.

23   Q.        So in using this, the expected profits, how do

24   you relate that to the ETG patents?

25   A.        Well, the exercise we're engaged in is to figure

Putnam - direct

1    out what portion of the profits, what part of the 18 percent

2    is actually attributable to the ETG patents as opposed to

3    all the other things that go into making a hearing aid and

4    go into making it profitable.  So this is what is called a

5    Georgia-Pacific Factor 13 analysis.

6            The portion of the profit that should be

7    credited to the invention as opposed to all the other

8    factors that go into making the product profitable.  And I

9    actually listed them here on the slide.  Quoting from the

10   case law, it says, the portion of profit should be credited

11   to the invention, as distinguished from non-patented

12   elements, the manufacturing process, business risks, or

13   significant features and improvements added by the

14   infringer.  In other words, other things that Demant and

15   Widex put into a hearing aid that cause it to make money but

16   that aren't attributable to the ETG patents.

17   Q.          Is this analysis of profits the only thing to

18   consider under the Georgia-Pacific case?

19   A.          No, this is Georgia-Pacific Factor 13 and we

20   heard both Mr. Musika and Mr. Donohoe discuss the other 14

21   factors.  I'm just discussing Factor 13.

22   Q.          Can you go to the next slide, please?

23          So does this slide describe what you are trying

24   to do under Georgia-Pacific Factor 13?

25   A.          Yes.  Now we're talking the pie chart and we're

Putnam - direct

1    breaking it down to get at the heart that the law tells us

2    we have to look at.  So we have various categories of things

3    that contribute to profits:  patented improvements, other

4    intellectual property like trade secrets and trademarks,

5    the copyright on the software.  We have the improved

6    manufacturing process that caused the companies to make more

7    money through automation.  Business risks which means the

8    returns to shareholders, people that actually gave these

9    companies money to invest in.  They need a return on this

10    investment.  And other features and improvements that might

11    not be patented but still contribute value.  Mr. Donohoe

12    mentioned styling and things you can't patent but still

13    cause the firm to make money.

14    Q.        Can you just use the 25 percent rule to find

15    that ETG's percentage of those profits?

16    A.        No, the 25 percent rule is very unreliable,

17    particularly in circumstances like this where you have lots

18    of other patented improvements that go into producing

19    profits.  You can't give one invention 25 percent or, as

20    Mr. Musika says, 33 percent of the profits because that

21    would be unfair to give and unreliable to give that large a

22    fraction of the profits to one invention when there are so

23    many inventions that go into a hearing aid.

24    Q.        So what should we do to try to find out what the

25    proper portion or share of profits is for ETG?

Putnam - direct

1    A.        Well, the method I use is something called

2    count, rank and divide.  It's a three-step process that I

3    used to put a boundary on ETG's claims for their share of

4    the profits.

5    Q.        Before we go on each step, can you explain

6    briefly what that means?

7    A.        So you can think of it as having, it's really no

8    more complicated than what you do when you have folks over

9    for dinner.  You count the number of people that you expect

10   to come to dinner, you rank them according to the size

11   portion they're going to get.  So big people get a big

12   dinner plate, babies get a small dinner plate, and then you

13   divide all your food on your stove according to the ranking

14   of each person.  So your big uncle gets a larger portion and

15   your toddler gets a smaller portion and you do that

16   according to a formula based on what you think they're going

17   to eat.

18   Q.        So in the first step, counting, what did you

19   count in this case?

20   A.        In this case, I counted all the patents that are

21   either owned or licensed by each of the parties, by Demant

22   and by Widex and found that they were approximately 100 in

23   each case.

24   Q.        Does the product actually have to have the

25   patents in it, the technology of the patents?

Putnam - direct

1    A.        No.  And this is important to understand.  A

2    patent gives you the right to prevent other people from

3    using your invention, okay?  You don't have to actually use

4    that invention yourself as long as you can prevent somebody

5    else from using the invention to compete with you.  So if I

6    have a patent and I can prevent my competitor from using

7    that invention, then I can make more money than my

8    competitor because they can't use it.  That patent is

9    valuable to me even if I, myself am also not using that

10   invention.

11   Q.        So after you count the patents, what is the

12   second step?

13   A.        Well, then you need to rank them.  This is, like

14   I said, at the dinner party, you might rank them by a

15   person's size.  Well, patents aren't ranked by size, they're

16   ranked by value, and I ranked the patents in this case using

17   subsequent citations in later patents using a method that

18   actually I illustrated it here with a book called Patents,

19   Citations and Innovations, a Window on the Knowledge

20   Economy.  It's written by a couple professors, Adam Jaffe

21   and Manuel Trajtenberg.  Economists have found if you use

22   the number of citations, that that is correlated with the

23   relative value of the patents.  The more citations a patent

24   receives, the more value it has on average.

25   Q.        And that article you mentioned, you mentioned

Putnam - direct

1    the original work by Mr. Trajtenberg?

2    A.          Yes.  Actually, Mr. Trajtenberg wrote the first

3    article in economic literature using patent citations to

4    measure innovations, and this is a book that summarizes his

5    work and the work of others over the last 15 or 20 years.

6    Q.          And the original article he mentioned, is that

7    DX-1634?

8    A.          Yes, in the witness book.  That's right.

9    Q.          Can you briefly tell the jury what patent

10   citations there are?

11   A.          Yes.  There has been some discussion about --

12   and you have gotten it by now -- when an examiner examines a

13   patent, he looks at the prior art, he or she looks at the

14   prior art and tries to determine whether the patent

15   application should be granted.  The examiner keeps a record

16   of all the prior art that they look at.  It's part of what

17   is called the file wrapper or just the history.  And they

18   note on the patent application the earlier patents that

19   they've examined to see whether this patent application

20   should be granted.  So if you are an earlier patent, you get

21   something called a citation from a later patent.  The more

22   times an examiner refers to that earlier patent, the more

23   likely it is to be a valuable patent.  So each one of those

24   references by a later examiner from a later patent

25   examination to an earlier patent is called patent citation.

Putnam - direct

1    Q.        So you count the patents and then you rank them

2    by the number of citations.  What is the third step then?

3    A.        And then the third step is to divide the patents

4    according to or divide the pie according to that ranking

5    system by providing each patent with its appropriate share.

6    And again, I consulted economic literature.

7        I'm actually the author of one of the articles in this

8    field called How to Count Patents and Value Intellectual

9    Property.  And it concerns the method of dividing the pie

10   properly based on patents according to their ranking.

11   Q.        Is there other economic literature that supports

12   this method?

13   A.        Yes, the particular article I relied on is

14   actually not mine but one by a fellow named Mark Shankerman

15   (phonetic) of the London School of Economics.  He wrote the

16   original article called How to Estimate a Patent Value

17   Distribution.  And then in 1998, he wrote an article that

18   applied that method to different sectors of the economy.

19   And so in particular, he used the electronic sector.  It's

20   estimates from the electronic sector I'm relying on because

21   a hearing aid is an electronic device and that is the

22   closest field in the economic literature to the present

23   case.

24   Q.        So in this case, what happened when you applied

25   your count, rank and divide method to the facts we have

Putnam - direct

1    here?

2    A.        Well, if you put this all together and you go

3    back to our pie chart, we can actually look at the formula

4    here.  You count the number of patents and rank them.  And

5    in particular, you rank the ETG patents because we're

6    concerned about where they fall within ranking, how big a

7    piece of the pie should they get.  Should it be 33 percent,

8    as Mr. Musika says, or should it be something smaller?

9            So in the upper left-hand corner, you can see

10   the formula that I computed for Demant based on its expected

11   profits.

12   Q.        Can you tell us what you got?

13   A.        Yes.  So the expected profits are 17.8 percent,

14   as I said before.  I have assumed conservatively that the

15   patents account for half of that, which would be 8.9

16   percent.  And then ETG's share of the profits, based on its

17   ranking and the division method, is 5.8 percent of the 8.9

18   percent.  So when you multiply 8.9 percent times 5.8

19   percent, you get 0.52 percent of sales which I estimate to

20   be ETG's appropriate share.

21   Q.        And did you do the same calculations for Widex?

22   A.        Yes, exactly the same calculations, the same

23   formula.  The numbers are different because Widex's expected

24   profits are different, the ranking is slightly different,

25   but it comes down in this case to .66 percent or, in other

Putnam - direct

1    words, about two-thirds of a percent so roughly half a

2    percent for Demant and roughly two-thirds of a percent for

3    Widex.

4    Q.         Are the results that you get with the count,

5    rank and divide method that you use, are they sensitive to

6    errors in the counting, ranking or dividing?

7    A.         Well, any time you change the assumptions in a

8    calculation like this, you are going to change the results.

9    Whenever you change one of the numbers, you are going to

10   change the end result.  But if you do things like say

11   suppose I subtract 10 patents or suppose I change the profit

12   rate to 25 percent, which is Mr. Musika said it was.  The

13   end result is numbers change by on the order of tenths of a

14   percent, so you might go from point five percent to point

15   seven percent or from point six percent to point eight

16   percent.  You are still well under a percent and you are

17   getting a very narrow range in absolute terms of the share

18   of sales that should go to ETG.

19   Q.         How are the results that you found in this case

20   for Demant and Widex relative to the Georgia-Pacific 13

21   analysis?

22   A.         Well, again, this is a way of implementing

23   Georgia-Pacific 13.  We're trying to find a portion of the

24   profits that should be credited to the ETG patents as

25   opposed to all the other factors.  And what I have done is

Kates - dep.

1           "Question:  So you don't believe this was
2      something -- or this was not something that would fall in
3      Category 2 of what you described, which was to honor
4      somebody by talking about the pioneering that they did where
5      you've now built upon that work?
6           "Answer:  In this case, no.
7           "Question:  You don't consider Dr. Levitt's work
8      to be pioneering?
9           "Answer:  Not in feedback cancellation.
10          "Question:  Do you consider his work to be
11     pioneering in any other area?
12          "Answer:  Harry was one of the first to
13     recognize that digital hearing aids were the wave of the
14     future.  But surprisingly little of his work in digital
15     hearing aids has actually ended up in his products.
16          "Question:  How do you know that?
17          "Answer:  In terms of GN ReSound products, what
18     I know that is in those products, the signal processing,
19     there is nothing that I am aware of that could be traced to
20     a specific paper by Harry Levitt.
21          "Question:  I thought you said you weren't
22     involved in the specific implementation of systems into
23     products?
24          "Answer:  That is correct.  But I can still be
25     told by one of the engineers that I have been programming a

```
 1            THE COURT:  Do you think you can get your
 2   positions on JMOL on the record in the next 25 minutes?  By
 3   4:30?  Well, let's start.  Let me hear from defendants
 4   first.
 5            In the interest of full disclosure, I am going
 6   to forewarn you that this is a pro forma exercise I think we
 7   must go through but I'm going to reserve on these motions.
 8   Okay?
 9            MS. GRAHAM:  We will be splitting these up, Your
10   Honor.
11            THE COURT:  Yes, I'm really wondering how much I
12   have to be here, quite frankly.
13            MS. GRAHAM:  It's kind of like Congress.
14            THE COURT:  I know.  Go ahead.
15            MS. GRAHAM:  And actually, we're hoping that
16   particularly on one of them that Your Honor will in fact
17   consider it, and that is with respect to willful
18   infringement.
19            THE COURT:  I'll listen.
20            MS. GRAHAM:  And we filed a written JMOL.
21            THE COURT:  Why don't you turn that around?
22            MS. GRAHAM:  That would be good.  If I might
23   just grab one thing, Your Honor?
24            THE COURT:  Sure.
25            MS. GRAHAM:  As Your Honor knows, Seagate has
```

# APPX. B



# Royalty Rates for Comparable Licenses

Source: Putnam Exhibit 3

APPX. C

# Comparable Licenses – Hearing Aid Technology



## Parties To Licenses

- **Widex**
- **Demant**
- **Siemens**
- **GN ReSound**
- **Gennum**
- **Phonak**
- **Etymotic Research Inc.**
- **Clinical Hearing Consultants**
- **Knowles**
- **Exaudio**
- **Steen B. Rasmussen**
- **William P. Stearns**
- **HIMPP**
  - **3M, NEC, Decibel**

Source – DX1165, JX11A, JX14, JX15, DX17, JX20, JX21, JX22, DX167, DX169, DX215, DX1164, JX203

APPX. D

# Summary - Demant

1. There are 94 patents, including the ETG patents.

2. The ETG patents' shares sum to about 5.8% of profits.

3. Expected profits are about 17.8% of sales.

   17.8%  Demant expected profit as % of sales
   x 50%  Share of profits assumed due to all patents
   = 8.9%  Share of Demant sales due to all patents
   x 5.8%  ETG share of expected profits due to all patents
   = 0.52%  ETG share of Demant's sales



Profits (17.8%)

ETG patents
0.52%

All other patented
improvements
8.4%

Non-patented
IP

Manufacturing process

Business risks

Other features
and improvements

Production and
marketing costs
82.2%

APPX. E

# Summary - Widex

1. There are 100 patents, including the ETG patents.

2. The ETG patents' shares sum to about 6.8% of profits.

3. Expected profits are about 19.4% of sales.

| | |
|---|---|
| 19.4% | Widex expected profit as % of sales |
| x 50% | Share of profits assumed due to all patents |
| = 9.7% | Share of Widex sales due to all patents |
| x 6.8% | ETG share of expected profits due to all patents |
| = 0.66% | ETG share of Widex's sales |



Profits (19.4%)

All other patented improvements 9.0%

Non-patented IP

Manufacturing process

Business risks

Other features and improvements

ETG patents 0.66%

Production and marketing costs 80.6%

APPX. F

# Reasonable Royalty Damages

## Widex
**Scenario 1:** Maximum Damages – Both Patents Infringed

| $301.9 Million |  | 0.25% – 0.5% |  | $750 K – $1.51 M |
|---|---|---|---|---|

**MAXIMUM: $1.51 Million**

## Demant
**Scenario 1:** Maximum Damages – Both Patents Infringed

| $408.9 Million |  | 0.25% – 0.5% |  | $1.02 – $2.04 M |
|---|---|---|---|---|

**MAXIMUM: $2.04 Million**

APPX. G



## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 27, 2008, the foregoing was caused to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

In addition, the undersigned hereby certifies that true and correct copies of the foregoing were caused to be served via electronic mail on March 27, 2008 upon the following parties:

REPRESENTING ENERGY
TRANSPORTATION GROUP, INC.

Edmond D. Johnson
PEPPER HAMILTON LLP
**johnsone@pepperlaw.com**

Brian M. Buroker
HUNTON & WILLIAMS LLP
**etg@hunton.com**

REPRESENTING WIDEX A/S
AND WIDEX HEARING AID CO. INC.

Donald E. Reid
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
**dreid@mnat.com**

William H. Mandir
SUGHRUE MION PLLC
**wmandir@sughrue.com**

David J. Cushing
SUGHRUE MION PLLC
**dcushing@sughrue.com**

Carl J. Pellegrini
SUGHRUE MION PLLC
**cpellegrini@sughrue.com**

Brian K. Shelton
SUGHRUE MION PLLC
**bshelton@sughrue.com**

| | |
|---|---|
| REPRESENTING WILLIAM DEMANT HOLDING A/S, WDH, INC., OTICON A/S, OTICON INC., BERNAFON AG, AND BERNAFON, LLC | Mary B. Graham<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>**mgraham@mnat.com;**<br>**mbgeservice@mnat.com** |
| | John M. Romary<br>FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER<br>**john.romary@finnegan.com** |
| | C. Gregory Gramenopoulos<br>FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER<br>**c.gregory.gramenopoulos@finnegan.com** |

The undersigned also hereby certifies that on March 27, 2008, true and correct copies of the foregoing were caused to be served by hand upon the following Delaware counsel:

Edmond D. Johnson
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE  19899-1709

*/s/ James W. Parrett, Jr.*
_____
James W. Parrett, Jr. (#4292)