IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-422 (GMS) |
| | ) | |
| SONIC INNOVATIONS, INC., et al, | ) | |
| | ) | |
| Defendants. | ) | |

**OPENING BRIEF IN SUPPORT OF
THE DEFENDANTS' RENEWED MOTION FOR JUDGMENT
AS A MATTER OF LAW AND REQUEST FOR
<u>NEW TRIAL ON THE ISSUES OF INFRINGEMENT AND VALIDITY</u>**

-1MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
OF COUNSEL:                              1201 North Market Street
                                        P.O. Box 1347
John M. Romary                          Wilmington, DE 19899
C. Gregory Gramenopoulos                302.658.9200
FINNEGAN, HENDERSON, FARABOW,           mgraham@mnat.com
  GARRETT & DUNNER, LLP                 jparrett@mnat.com
901 New York Ave., N.W.
Washington, DC 20001-4413               *Attorneys for William Demant Holding A/S,*
202.408.4000                            *WDH, Inc., Oticon A/S, Oticon, Inc.,*
                                        *Bernafon AG, and Bernafon, LLC*

OF COUNSEL:                             MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                                        Donald E. Reid (#1058)
David J. Cushing                        Jason A. Cincilla (#4232)
William H. Mandir                       1201 North Market Street
Carl J. Pellegrini                      P.O. Box 1347
SUGHRUE MION, PLLC                      Wilmington, DE 19899
2100 Pennsylvania Ave., N.W.            302.658.9200
Suite 800                               dreid@mnat.com
Washington, DC 20037
202.293.7060                            *Attorneys for Widex A/S and Widex Hearing*
                                        *Aid Co., Inc.*

Dated: March 27, 2008

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

I. INTRODUCTION ............................................................................... 1

II. SUMMARY OF THE GROUNDS FOR REVERSING THE JURY'S
VERDICT .......................................................................................... 1

III. BACKGROUND ................................................................................ 3

    A. Summary of the '850 Patent ..................................................... 3

        1. Acoustic Feedback Is Cancelled by Equal and Opposite
Electrical Feedback ...................................................... 3

        2. The Filter Coefficients in the '850 Patent Are Calculated
Using a Test Signal that Drives the Receiver ................ 4

        3. The Feedback Filter of the '850 Patent Is Programmed to
Produce the Same Response as the Tested Acoustic
Feedback Path ............................................................. 4

        4. The Feedback Filter of the '850 Patent Does Not
Automatically Adapt to Changes in the Acoustic Feedback
Path ............................................................................. 5

    B. Summary of the Accused Products ............................................ 5

        1. Acoustic Feedback Is "Cancelled" in the Accused Products
by Electrical Feedback .................................................. 5

        2. Filter Coefficients in the Accused Products Are Calculated
Using an LMS Algorithm ............................................. 6

        3. The Feedback Filter of the Accused Products Cannot be
"Provided" with the Coefficients of the Levitt Patents, It Is
Non-Programmable ...................................................... 6

        4. The Feedback Filter of the Accused Products Is Not
Programmed to Produce a Response, But Rather Adapts to
Variations in the Acoustic Feedback Path .................... 6

    C. Summary of the Prior Art ......................................................... 7

        1. U.S. Patent No. 4,783,818 issued to Graupe et al. ("Graupe
'818") .......................................................................... 7

a.      Acoustic Feedback Is "Cancelled" in Graupe '818 by Electrical Feedback ..................................................7

b.      The Filter Coefficients in Graupe '818 Are Calculated Using a Test Signal that Drives the Receiver .........................................................................7

2.      The Best LMS Feedback Canceller (the "Best Invention").......................8

D.      The Jury's Verdict....................................................................................8

IV.     ARGUMENT ...........................................................................................9

A.      Standard for Granting JMOL ....................................................................9

B.      Standard for Granting a New Trial ...........................................................9

C.      The Accused Products Do Not Use a "Programmable" Delay Line Filter that Is "Programmed" as Required by Claim 19 of the '850 Patent  10

D.      No Reasonable Jury Could Find a "Programmed" Filter in the Accused Products and Yet Find an Absence of Clear and Convincing Evidence that Graupe '818 Anticipates Claim 19 ...........................12

1.      ETG Admits, Given ETG's Interpretation of "Programmable" that All Elements of Claim 19 of the '850 Patent Are Disclosed in Graupe '818.........................................12

2.      No Reasonable Jury Could Find that Graupe '818 Does Not Effect Substantial Reduction of Acoustic Feedback.................................13

a.      There Was No Meaningful Showing of What Is and What Is Not "Substantial Reduction of Acoustic Feedback" ....................................................................13

b.      There Was No Meaningful Showing that the Coefficients of the '850 Patent and Graupe '818 Were Derived Differently ..............................................15

E.      No Reasonable Jury Could Find a "Programmed" Filter in the Accused Products and Yet Find an Absence of Clear and Convincing Evidence that the Best Invention Anticipates Claim 19...................17

1.      The Best Invention Is Prior Art................................................17

2.      Acoustic Feedback Is Cancelled in the Best Invention by Electrical Feedback ..................................................................18

3.    The Best LMS Feedback Canceller Invention Anticipates Claim 19 as ETG Interprets the Court's Construction of the Claim ............................................................................................18

F.    No Reasonable Jury Could Find Written Description Support for Any Claims in the '850 Patent that Are Construed so Broadly as to Encompass the LMS Filter of the Accused Products ...............................................21

G.    The Accused Products Do Not Use a "Programmed" Filter or a "Programmable Filter" as Required by Claims 13, 14, and 16 of the '850 Patent ...............................................................................................27

H.    The Best LMS Feedback Canceller Invention Anticipates All the Asserted Claims ...............................................................................................28

I.    Prosecution History Estoppel Precludes the Application of the Doctrine of Equivalents ("DOE") to Claim 19 of the '850 Patent and to Claims 1 and 2 of the '749 Patent ...............................................................28

1.    Claim 19 of the '850 Patent Cannot Be Expanded by the DOE ...............................................................................................29

2.    Claims 1 and 2 of the '749 Patent Cannot Be Expanded by the DOE ...............................................................................................30

J.    The Asserted Claims Cannot Be Expanded Under the DOE to Cover the Accused Products ...............................................................................31

1.    No Particularized Testimony and Linking Argument ...............................31

2.    Vitiation of Claimed Elements ...............................................................35

3.    No Valid Hypothetical Claim ...............................................................36

K.    ETG Has Not Established that Any of the Means-Plus-Function Claim Elements Required in the '749 Patent Claims Are Present ........................38

V.    CONCLUSION ...............................................................................................40

TABLE OF AUTHORITIES

Page(s)

CASES

*Amgen Inc. v. Hoechst Marion Roussel, Inc.*,
  314 F.3d 1313 (Fed. Cir. 2003) ...................................................................21

*Biagro W. Sales, Inc. v. Grow More, Inc.*,
  423 F.3d 1296 (Fed. Cir. 2005) .............................................................. 28-29

*Comark Comm'ns, Inc. v. Harris Corp.*,
  156 F.3d 1182 (Fed. Cir. 1998) ...................................................................32

*CytoLogix Corp. v. Ventana Med. Sys., Inc.*,
  424 F.3d 1168 (Fed. Cir. 2005) ...................................................................40

*Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.*,
  347 F.3d 1314 (Fed. Cir. 2003) ...................................................................29

*DSU Med. Corp. v. JMS Co., Ltd.*,
  471 F.3d 1293 (Fed. Cir. 2006) ...................................................................27

*Enzo Biochem, Inc. v. Gen-Probe Inc.*,
  285 F.3d 1013 (Fed. Cir. 2002), *vacated on other grounds*, 414 F.3d 1376 (Fed. Cir.
  2002) ...............................................................................................................24

*Exxon Chem. Patents, Inc. v. Lubrizol Corp.*,
  64 F.3d 1553 (Fed. Cir. 1995) ...................................................................10

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  344 F.3d 1359 (Fed. Cir. 2003) (en banc) ..................................................29

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
  535 U.S. 722 (2002) .............................................................................. 28-30

*Flex-Rest, LLC v. Steelcase, Inc.*,
  455 F.3d 1351 (Fed. Cir. 2006) ...................................................................17

*Freedman Seating Co. v. Am. Seating Co.*,
  420 F.3d 1350 (Fed. Cir. 2005) ...................................................................36

*Globetrotter Software, Inc. v. Elan Computer Group, Inc.*,
  362 F.3d 1367 (Fed. Cir. 2004) ...................................................................19

*Hewlett-Packard Co. v. Mustek Sys., Inc.*,
  340 F.3d 1314 (Fed. Cir. 2003) ...................................................................32

v.

*Impax Labs, Inc. v. Aventis Pharms., Inc.*,
    468 F.3d 1366 (Fed. Cir. 2006)........................................................................13, 15

*Integra Lifesciences I, Ltd. v. Merck KgaA*,
    496 F.3d 1334 (Fed. Cir. 2007)........................................................................38

*Kemco Sales, Inc. v. Control Papers Co.*,
    208 F.3d 1352 (Fed. Cir. 2000)........................................................................39

*KSR Int'l Co. v. Teleflex Inc.*,
    127 S. Ct. 1727 (2007) ............................................................................ 17, 20-21

*Lifescan Inc. v. Home Diagnostics, Inc.*,
    103 F. Supp. 2d 345 (D. Del. 2000)..................................................................10

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
    424 F.3d 1336 (Fed. Cir. 2005)................................................................ 22-23, 26

*Martin v. Mayer*,
    823 F.2d 500 (Fed. Cir. 1987)..........................................................................24

*Miken Composites v. Wilson Sporting Goods Co.*,
    515 F.3d 1331 (Fed. Cir. 2008).........................................................................32

*Montgomery Ward & Co. v. Duncan*,
    311 U.S. 243 (1940)..........................................................................................9

*Mycogen Plant Sci., Inc. v. Monsanto Co.*,
    252 F.3d 1306 (Fed. Cir. 2001).........................................................................29

*NTP, Inc. v. Research in Motion, Ltd.*,
    418 F.3d 1282 (Fed. Cir. 2005).........................................................................27

*Pannu v. Iolab Corp.*,
    155 F.3d 1344 (Fed. Cir. 1998)..........................................................................9

*Planet Bingo, LLC v. GameTech Int'l, Inc.*,
    472 F.3d 1338 (Fed. Cir. 2006).........................................................................12

*Reiffin v. Microsoft Corp.*,
    214 F.3d 1342 (Fed. Cir. 2000).........................................................................26

*Streamfeeder, LLC v. Sure-Feed Sys., Inc.*,
    175 F.3d 974 (Fed. Cir. 1999)...........................................................................37

*Stumbo v. Eastman Outdoors, Inc.*,
    508 F.3d 1358 (Fed. Cir. 2007).........................................................................35

*Summit Tech., Inc. v. Nidek Co.*,
  363 F.3d 1219 (Fed. Cir. 2004)..................................................................11

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
  90 F.3d 1558 (Fed. Cir. 1996)........................................................ 31-32, 34

*Tronzo v. Biomet, Inc.*,
  156 F.3d 1154 (Fed. Cir. 1998)............................................................24, 36

*TurboCare Div. of Demag Delaval Turbomach. Corp. v. Gen. Elec. Co.*,
  264 F.3d 1111 (Fed. Cir. 2001)..................................................................22

*Vas-Cath Inc. v. Mahurkar*,
  935 F.2d 1555 (Fed. Cir. 1991)..................................................................22

*Waner v. Ford Motor Co.*,
  331 F.3d 851 (Fed. Cir. 2003)....................................................................35

*Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*,
  520 U.S. 17 (1997).....................................................................................28

*Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*,
  904 F.2d 677 (Fed. Cir. 1990), *overruled in part on other grounds*, *Cardinal Chem.*
  *Co. v. Morton Int'l, Inc.*, 508 U.S. 83 (1993) .........................................36

*Zygo Corp. v. Wyko Corp.*,
  79 F.3d 1563 (Fed. Cir. 1996)....................................................................34

**FEDERAL: STATUTES, RULES**

35 U.S.C. § 102..............................................................................................7

35 U.S.C. § 102(g).........................................................................................17

35 U.S.C. § 103........................................................................................17, 20

35 U.S.C. § 112, ¶ 1....................................................................................2, 21

35 U.S.C. § 271............................................................................................27

Fed. R. Civ. P. 50...........................................................................................9

Fed. R. Civ. P. 50(a).......................................................................................1

I.    **INTRODUCTION**

Defendants Oticon A/S, Oticon, Inc., Bernafon AG, Bernafon, LLC, WDH, Inc., William

Demant Holding A/S, Widex A/S, and Widex Hearing Aid Co., Inc. (collectively the

"Defendants") have timely renewed their Motion for judgment in their favor and against Plaintiff

Energy Transportation Group, Inc. ("ETG") as a matter of law pursuant to Fed. R. Civ. P. 50(a)

on the issues of infringement and validity of U.S. Patent Nos. 4,731,850 ("the '850 Patent") and

4,879,749 ("the '749 Patent") (collectively "the Levitt Patents") (D.I. 516).  In the alternative,

the Defendants have moved for a new trial.

II.    **SUMMARY OF THE GROUNDS FOR REVERSING THE JURY'S VERDICT**

The Accused Products[1] and the hearing aid of the Levitt Patents both use a filter in an

electrical feedback path that mimics the acoustic feedback path to reduce the effect of acoustic

feedback.  But the similarity ends there as the structure and operation of the Accused Products

are undisputedly different from that disclosed in the Levitt Patents.  The Levitt Patents program a

hearing aid for a particular response based on fitting measurements.  The Accused Products

cannot be programmed to any particular response, but rather adapt to changing acoustic feedback

conditions using a Least Means Square (LMS) filter.  Unduly influenced by the similar result,

and without giving proper weight to the differences as the claims require, the jury found literal

infringement of claim 19 of the '850 Patent and found infringement under the doctrine of

equivalents of claims 13, 14, 16, and 19 of the '850 Patent, and claims 1 and 2 of the '749

Patent.[2]  In addition, ETG's evidence of infringement under the doctrine of equivalents and its

---

[1]    The Accused Products, unless indicated otherwise, may all be considered identical for purposes of the infringement issues raised at trial.

[2]    Trial exhibits cited in this Brief, including the '850 Patent (JX 4) and '749 Patent (JX 2), or the relevant portions thereof, are attached.  Portions of the trial transcript referenced in this Brief are attached as Appendix A.

analysis of means-plus-function elements were deficient as a matter of law.

Moreover, a key piece of prior art, U.S. Patent No. 4,783,818 issued to Graupe et al. ("Graupe '818"), also has a filter in an electrical feedback path that mimics the acoustic feedback path and thereby reduces the effect of acoustic feedback. In addition, another piece of prior art, the work of Dr. Leland Best, also has a filter, an LMS adaptive filter, that reduces the effect of acoustic feedback. Graupe '818 and Best were either ignored or totally misunderstood by the jury in its finding that the claims at issue were infringed and yet not proven to be invalid. ETG cannot have it both ways. The asserted claims cannot simultaneously be broad enough to cover the Accused Products merely because the Accused Products reduce the effect of acoustic feedback by using a filter to mimic the acoustic feedback path, and yet not be rendered invalid in view of Graupe '818 and Best, which both also use a filter to do the same thing.

Additionally, the asserted claims cannot be broad enough to cover the Accused Products yet, at the same time, satisfy the written description requirement under 35 U.S.C. § 112, ¶ 1. The jury heard the key inventor, Dr. Levitt, repeatedly testify that he "intended" to use an adaptive filter to cancel feedback and Mr. Brown testified that one skilled in the art could have made the necessary filter alterations. The written description inquiry, however, is limited to the four corners of the '850 Patent, which describes only a filter programmed to cancel feedback for a fixed acoustic feedback path, with no means to detect changes in that path and, therefore, no means to adaptively change the filter. No reasonable jury could have found that the '850 Patent provides an adequate written description of using an adaptive filter to cancel acoustic feedback.

The '850 Patent specification and the prior art mandate that the Court's claim construction of "a programmable filter" that is "programmed" be interpreted to produce "a" response, in the sense of one "programmed" response, not a series of ever-changing, un-

programmed, filter conditions.  Besides steering clear of any written description insufficiencies and the prior art, this interpretation provides a meaningful distinction as to what is "a programmable filter" and what is not.  Certainly, the Court's constructions cannot be understood to mean, as Mr. Brown testified at trial, that the terms "programmable filter" and "programmed" can be read out of the claim because they include "just about all digital filters."

## III.    BACKGROUND

### A.    Summary of the '850 Patent[3]

#### 1.    Acoustic Feedback Is Cancelled by Equal and Opposite Electrical Feedback

The '850 Patent relates to a programmable digital hearing aid system.  A key feature of this system is the ability of the hearing aid to be programmed during a fitting procedure to reduce the effect of acoustic feedback[4] as it exists at the time of that fitting procedure.  (JX 4 at 3:3-11, 4:12-30, 9:12-46.)  The '850 Patent contemplates the creation of an electrical feedback path inside the hearing aid that has the identical amplitude and phase characteristics to the acoustical feedback and, accordingly, has the same effect on an electrical signal passing through it as the acoustic feedback path has on the acoustic feedback signal passing through the acoustic feedback path.  Thus, when combined, the acoustic and electrical feedback signals cancel one another, thereby reducing the effect of acoustic feedback.  (JX 4 at 9:12-46.)

---

[3]    The '850 and '749 Patents are identical in disclosure.  Accordingly, reference will only be made to the '850 Patent disclosure.

[4]    Acoustic feedback occurs when a portion of the sound emanating from the receiver of the hearing aid is returned to the hearing aid microphone over an acoustic feedback path external to the hearing aid, resulting in a whistling or ringing condition.  (JX 4 at 1:36-43, 9:12-29.)

**2.     The Filter Coefficients in the '850 Patent Are Calculated Using a Test Signal that Drives the Receiver**

In the '850 Patent, a test case of acoustic feedback is created by using a tone generator 21 to drive the hearing aid speaker ("receiver") 69. (JX 4 at Fig. 2, 4:12-30, 9:12-29.) At the input to receiver 69, this signal is labeled $V_\emptyset$out, which corresponds to the sound emanating from receiver 69. The resultant acoustic signal created by $V_\emptyset$out passes out of receiver 69, travels over the acoustic feedback path, and reappears at the output of microphone 57 with an unknown phase shift and amplitude change caused by the acoustic feedback path. (JX 4 at Fig. 2; Morley, Tr. 1371:10-1372:15 (direct).) Thus, at this point, the effect of feedback path on sound traveling back to the microphone from the receiver is unknown.

To determine this effect, the electrical signal driving the receiver, signal $V_\emptyset$out, is also supplied to a host controller wherein the phase and amplitude of $V_\emptyset$out is altered. (JX 4 at 9:30-40.) Summing amplifier 60 subtracts the $V_\emptyset$out signal altered by the host controller from the sound appearing at microphone 57 that the $V_\emptyset$out signal produced, altered by the acoustic feedback path. (JX 4 at Figs. 1-2, 9:30-40.) Thus, the amount of phase shift and amplitude change imparted on $V_\emptyset$out by the host controller to produce a null at summing amplifier 60 is a determination of the effect on phase and amplitude that the acoustic feedback path had on the $V_\emptyset$out-generated sound passing through it. (Levitt, Tr. 308:22-309:22 (cross).)

**3.     The Feedback Filter of the '850 Patent Is Programmed to Produce the Same Response as the Tested Acoustic Feedback Path**

Based on the phase shift and amplitude variation, which must be imposed on $V_\emptyset$out to produce the null at summing amplifier 60, a set of filter coefficients is calculated that provides these same variations of phase and amplitude to a signal applied to that filter. With filter 64 of the '850 Patent so programmed and connected to receive the signal driving receiver 69, filter 64 will have the same effect on a signal driving the receiver as the acoustic feedback path has on the

resultant signal produced by that receiver.  (JX 4 at 9:30-46; Levitt, Tr. 309:4-24 (cross).)  Thus,

when the filter output is subtracted from the microphone output, the effect of acoustic feedback

can be reduced, *provided* the phase shifts and amplitude variations caused by the acoustic

feedback path do not change.

> ### 4. The Feedback Filter of the '850 Patent Does Not Automatically Adapt to Changes in the Acoustic Feedback Path

Significantly, there is nothing in the '850 Patent describing that the coefficients should,

or even can be, altered as the acoustic feedback path changes.  (Levitt, Tr. 323:18-323:23 (cross)

("It wasn't designed to cancel acoustic feedback adaptively when the feedback is changing.");

Brown, Tr. 593:6-12 (cross).)[5]

## B. Summary of the Accused Products

> ### 1. Acoustic Feedback Is "Cancelled" in the Accused Products by Electrical Feedback

Defendants acknowledged in their opening statement that the Accused Products had an

electrical feedback path that used a delay line to cancel an acoustic feedback signal.  (Tr. 165:10-

15.)  However, as noted above and discussed in detail below, this admission, and the evidence

that supported this admission, is insufficient as a matter of law to support a finding of

infringement of any valid claim.  Yet, as also noted above and explained below, this is the ***only***

---

[5]    There is disclosure of how speech level and noise change are detected, and how different sets of stored coefficients are "automatically" selected based on these changes. Also, there is admittedly disclosure of how different sets of stored coefficients are "automatically" selected based on these changes.  (JX 4 at 2:30-3:2, 3:12-20, 5:60-6:46.6:44-54, 7:60-8:23, 11:32-36.) Thus, while the inventors contemplated the use of an automatic system, it was limited to speech and noise changes.  There is no disclosure indicating the inventors contemplated using such an automatic system for purposes of reducing acoustic feedback.  Rather, the disclosure indicates that the feedback reduction system is based on a single measurement of acoustic feedback made at the time of the fitting procedure.  Since it is based on a single measurement there is simply no reason to make it automatic.

evidence of similarity between the Levitt Patents and the Accused Products.

###### 2.    Filter Coefficients in the Accused Products Are Calculated Using an LMS Algorithm

The LMS filter of the Accused Products includes a delay line and an LMS algorithm generator.  (*See* Anderson, Tr. 1611:23-1612:2, 1622:24-1623:1 (cross), Morley, Tr. 1449:2-23 (cross).)  The LMS algorithm generator looks at an "error" signal indicating the difference between the signal driving the receiver and the signal after the delay line output has been subtracted from the microphone output.  (*See* Brown, Tr. 516:11-18 (direct).)  The LMS algorithm provides coefficients to the delay line and continuously adjusts those coefficients, trying to keep this "error" signal as small as possible.  (Brown, Tr. 649:19-650:13 (redirect).)

###### 3.    The Feedback Filter of the Accused Products Cannot be "Provided" with the Coefficients of the Levitt Patents, It Is Non-Programmable

Once imported into the United States, the LMS algorithm cannot be altered, and the related LMS delay line is slaved to that LMS algorithm.  (Anderson, Tr. 1615:7-15 (cross).)  In fact, ETG's expert, Mr. Brown, agreed that the Accused Products cannot be "provided" the very coefficients calculated by the only embodiment of the "invention" set out in the '850 Patent. (Brown, Tr. 613:15-614:17 (cross).)

###### 4.    The Feedback Filter of the Accused Products Is Not Programmed to Produce a Response, But Rather Adapts to Variations in the Acoustic Feedback Path

The Accused Products are adaptive to changes in the acoustic feedback path.  (Brown, Tr. 529:14-21 (direct), 613:3-5 (cross).)  The LMS algorithm continuously monitors changes in the "error" signal, which indicate changes in the acoustic feedback path, to produce continuously changing coefficients as the acoustic feedback path changes.  (Nielsen, Tr. 1119:11-17 (direct).)

C.     **Summary of the Prior Art**

1.     **U.S. Patent No. 4,783,818 issued to Graupe et al. ("Graupe '818")**

Graupe '818 was filed on October 17, 1985, several weeks before the November 12, 1985

date of invention for the '850 Patent.[6] (*See* DX 982; JX 4; Soli, Tr. 1656:20-1657:10 (direct).)

Thus, Graupe '818 is "prior art" to the '850 Patent.  *See* 35 U.S.C. § 102.

a.     **Acoustic Feedback Is "Cancelled" in Graupe '818 by Electrical Feedback**

Graupe '818, like the '850 Patent, also has an electrical feedback path inside the hearing

aid (correction circuit 21A) that mimics the acoustic feedback path and, accordingly, has the

same effect on an electrical signal driving the receiver/speaker as the acoustic feedback path has

on the acoustic feedback signal generated as a result of that signal.  (*See* Soli, Tr. 1659:18-

1662:1 (direct); Morley, Tr. 1416:16-1418:20 (direct).)  Thus, when combined, the acoustic and

electrical feedback signals cancel one another, thereby reducing the effect of acoustic feedback.

(DX 982 at Abstract, Fig. 2.)  This is precisely the same concept expressed in the '850 Patent.

b.     **The Filter Coefficients in Graupe '818 Are Calculated Using a Test Signal that Drives the Receiver**

In Graupe '818, as in the '850 Patent, a test signal y(t) is used to see what happens when

a signal from the transmission channel goes through the acoustic feedback path.  (*See* Matzen,

Tr. 1923:19-1924:4 (direct).)  This test signal y(t) causes speaker 18 to generate corresponding

sound, just as $V_{\emptyset}$out causes the '850 Patent's receiver 69 to generate corresponding sound.  (*See*

*id.*, Soli, Tr. 1672:8-1673:2 (direct).)  This y(t)-generated sound passes out of speaker 18, travels

over the acoustic feedback path, and reappears at the output of the microphone 12 with an

---

[6]     (*See* D.I. 461; Pretrial Hr'g Tr. 83:5-6, 85:9-16 (Jan. 3, 2008) (relevant portion attached as Appendix B.)

unknown phase shift and amplitude change caused by the acoustic feedback path.  (Soli, Tr. 1672:9-1673:2 (direct), Matzen, Tr. 1923:19-1924:4 (direct).)  Thus, at this point, the effect of feedback path on the signal y(t), which came from the output of the transmission channel, is unknown.  (DX 982 at Fig. 3, 6:65-7:6.)

The test signal y(t) is also sent to an identifier circuit 34 (DX 982 at Fig. 3, 7:6-9), just as $V_\emptyset$out of the '850 Patent is also sent to the '850 Patent's host controller.  Identifier circuit 34 of Graupe '818 produces parameters that identify the acoustic feedback path.  (DX 982 at 7:9-16; *see also* Soli, Tr. 1661:9-1662:19 (direct).)  These parameters are then provided to a delay line 21 to generate a feedback cancellation signal.  (DX 982 at Fig. 3, 7:22-38.)

### 2.      The Best LMS Feedback Canceller (the "Best Invention")

Dr. Leland Best developed the idea of using an LMS feedback canceller to reduce the effect of acoustic feedback in a hearing aid (the "Best Invention") before the earliest date of invention of the ETG patents.  (Best, Tr. 1295:5-1296:1, 1301:10-25, 1303:8-1305:4.)  Dr. Best described his idea in his Master's thesis, "Digital Suppression of Acoustic Feedback in Hearing Aids" (DX 1111), which he completed in May 1985.  (Best, Tr. 1292:24-1293:18.)  Dr. Best also built and tested a prototype LMS feedback canceller that he described in his thesis.  (DX 1111 at 21-31, "Chapter IV Prototype Feedback Canceller"; Best, Tr. 1303:5-1304:16.)  Dr. Best demonstrated his invention to his professors and fellow students, and to visitors to the University, including Jim Nunley of a commercial hearing aid company called Audiotone.  (Egolf, Tr. 1174:22-1176:10 (direct), Best, Tr. 1304:17-1306:15.)

### D.      The Jury's Verdict

The jury found that Defendants failed to meet their burden to show that any asserted claim was invalid and that ETG had met its burden of proving infringement of claim 19 of the '850 Patent, both literally and under the doctrine of equivalents, and of proving infringement

under the doctrine of equivalents for claims 13, 14, and 16 of the '850 Patent, and for claims 1

and 2 of the '749 Patent.  (*See* Jury Verdict, D.I. 521.)

The jury found that ETG did not meet its burden of showing literal infringement of

claims 13, 14, and 16 of the '850 Patent.  (*See id*.)  ETG did not even attempt to show literal

infringement of claims 1 and 2 of the '749 Patent, admitting that the Accused Products did not

"measure" the phase and amplitude shift caused by the acoustic feedback path, as is required by

these claims.  (*See* Brown, Tr. 516:19-517:1, 562:5-18 (direct).)

## IV.    ARGUMENT

### A.    Standard for Granting JMOL

Under Rule 50 of the Federal Rules of Civil Procedure, a court may grant a motion for

judgment as a matter of law ("JMOL") where there is no legally sufficient basis for a jury to find

for the non-moving party.  *See* Fed. R. Civ. P. 50.  Thus, in order to prevail on a renewed motion

for JMOL following a jury trial, the Defendants "must show that the jury's findings, presumed or

express, are not supported by substantial evidence or, if they were, that the legal conclusion(s)

implied [by] the jury's verdict cannot in law be supported by those findings."  *Pannu v. Iolab*

*Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (alteration in original) (quoting *Perkin-Elmer Corp.*

*v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984)) ("'Substantial' evidence is such

relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as

adequate to support the finding under review.").

### B.    Standard for Granting a New Trial

A new trial may be granted at the discretion of the district court when the verdict is

against the clear weight of the evidence.  *Montgomery Ward & Co. v. Duncan*, 311 U.S. 243, 251

(1940) ("The motion for a new trial may invoke the discretion of the court in so far as it is

bottomed on the claim that the verdict is against the weight of the evidence . . . .").  The standard

for grant of a new trial is less rigorous than the standard for grant of JMOL because the court

need not view the evidence in the light most favorable to the verdict winner.  *See Lifescan Inc. v.*

*Home Diagnostics, Inc.*, 103 F. Supp. 2d 345, 350 (D. Del. 2000).

>        C.        **The Accused Products Do Not Use a "Programmable" Delay Line Filter that
>                  Is "Programmed" as Required by Claim 19 of the '850 Patent**

The Court construed the term "programmable delay line filter" of claim 19 to mean "a

filter that operates on time-delayed samples of an input by multiplying each sample by a

corresponding weighting coefficient and summing the weighted samples."  (D.I. 495 § A, ¶ 1.)

Further, "the value of at least one weighting coefficient" must be able to be "programmed."  (*Id.*)

The Court also construed "programmed" to mean "provided with one or more values so as to

produce a response."  (*Id.* at ¶ 4.)

A proper interpretation of the Court's construction of "programmable delay line filter,"

however, must fairly differentiate between one that is "programmable" and one that is "non-

programmable."  To hold otherwise would make the word "programmable" mere surplusage.  It

is a fundamental canon of claim construction that every word in a claim is to be given meaning

and effect.  *Exxon Chem. Patents*, *Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1557 (Fed. Cir. 1995) (A

court "must give meaning to all the words in [the] claims.").

ETG's infringement expert, Mr. Brown, given the Court's claim construction, testified

that "just about any digital filter" will do.  (Tr. 533:15-21 (direct).)  In effect, he read the word

"programmable" out of the claims:

>        Q.        We talked about adaptive filters for Claims 14, 16 and 13.  Does it matter in your
>                  analysis whether or not the defendants utilize an adaptive filter for purposes of
>                  Claim 19.
>        A.        No, it does not.
>        Q.        And why is that?
>        Q.        **Claim 19** does not state it has to be static or adaptive or anything.  **It just says
>                  the filter** has to be there and it has to perform a function of feedback removal.

(Brown, Tr. 544:4-12 (direct) (emphases added).)

This is wrong as a matter of law. The term "a response" used in the Court's construction needs to be viewed in the context of the '850 Patent, which describes storing fixed coefficients in RAM 77 of the programmable filter 64 to produce a given filter response needed to cancel feedback observed during fitting. (JX 4 at Fig. 2, 5:9-20; 31-59.) The claimed "programmable" filter would then be construed as one capable of exhibiting "a" response, in the sense of one "programmed" response, not a series of ever changing, un-programmed, filter conditions. (Anderson, Tr. 1575:7-19, 1586:16-1588:22 (direct).) If a filter was continuously varying, and was not subject to being set to a given "response," it would not be "programmable" since it could not be "provided with one or more values so as to produce **a** response."[7] (D.I. 495 (emphasis added).)

There is no dispute that the Accused Products use an LMS filter that has a delay line component and an LMS algorithm component. Sixteen thousand times a second, coefficients are updated and 16,000 times a second, a new sample is introduced to the delay line.[8] (Schaub, Tr. 1067:7-15 (direct).) Accordingly, each sample is exposed to changing coefficients as it passes through the delay line. ETG asserts that since the delay line receives a set of coefficients every sixteen thousandth of a second, it is "provided with one or more values so as to produce a response" and, accordingly, is both "programmable" and "programmed" as required by claim 19.

In the case of the accused LMS filter, however, even if the delay line of such a filter were

---

[7]     *See, e.g.*, *Summit Tech., Inc. v. Nidek Co.*, 363 F.3d 1219, 1228-30 (Fed. Cir. 2004) (affirming JMOL of no literal infringement, after jury found literal infringement, because substantial evidence did not support jury's verdict of infringement where claim required "*a* light spot" and the accused product formed multiple spots).

[8]     The Widex devices change coefficients 32,000 times a second. (Morley, Tr. 1400:7-1401:3, 1457:15-20 (cross).)

considered to be a "filter" as required by claim 19, there is no substantial evidence in the record

showing that it would be a "programmable" delay line filter since, no matter how hard one tried,

one could not avoid the LMS algorithm and force the delay line to produce "a" response.  That

simply is not the way the Accused Products are constructed.  (Anderson, Tr. 1579:16-22,

1587:3-6 (direct), 1615:7-1616:2, 1616:23-1617:14, 1636:19-1637:7 (cross).)  Even ETG's

expert, Mr. Brown, agreed.  (Tr. 614:8-17 (cross).)[9]

For at least this reason, there is insufficient evidence for the jury to have found

infringement of claim 19, either literally or under the doctrine of equivalents.[10]  At the very least,

the finding that claim 19 is infringed, either literally or under the doctrine of equivalents, is so

against the weight of the evidence as to justify a new trial on this point.

> **D.** **No Reasonable Jury Could Find a "Programmed" Filter in the Accused Products and Yet Find an Absence of Clear and Convincing Evidence that Graupe '818 Anticipates Claim 19**

> **1.** **ETG Admits, Given ETG's Interpretation of "Programmable" that All Elements of Claim 19 of the '850 Patent Are Disclosed in Graupe '818**

Graupe '818 discloses a communication system in general, and a hearing aid in

particular, that has an acoustic feedback path between the speaker and the microphone.  (DX 982

at Abstract, 1-8.)  The Graupe '818 invention:

---

[9]     Moreover, Dr. Gloster, ETG's technical expert, confirmed the need for a "programmable" device to have a memory, thus allowing it to allow creation of "a" response.  (Gloster, Tr. 684:1-685:11 (cross).)  ETG, however, has no evidence that what it identifies as the "programmable filter" in the Accused Products has a memory.

[10]    Obviously, a "non-programmable" filter cannot be the equivalent of a "programmable" filter.  *See, e.g., Planet Bingo, LLC v. GameTech Int'l, Inc.*, 472 F.3d 1338, 1344-45 (Fed. Cir. 2006) (holding claimed method reciting "establishing a *predetermined* combination" as not being equivalent to one determined *after* the game had begun (emphasis added)).  Moreover, as explained below, the prior art and prosecution history estoppel preclude expansion of claim 19 to cover the Accused Products under the doctrine of equivalents.

> provides an identification circuit for dynamically identifying those parameters associated only with acoustic feedback, and a correction circuit whose transfer function is established in accordance with the parameters identified by the identification circuit.  The transfer function of the correction circuit is such that the effect of acoustic feedback is cancelled .
> . . .

(DX 982 at Abstract, 8-15.)

The Defendants offered testimony on Graupe '818 from Dr. Soli that, using ETG's interpretation of the Court's claim constructions, all the elements of claim 19 are found in Graupe '818.  ( Soli, Tr. 1658:9-12, 1658:18-1662:23 (direct).)  ETG's expert, Mr. Matzen, agreed, stating that "[n]othing is missing from Claim 19."  (Tr. 1988:1-13 (cross).)

## 2. No Reasonable Jury Could Find that Graupe '818 Does Not Effect Substantial Reduction of Acoustic Feedback

### a. There Was No Meaningful Showing of What Is and What Is Not "Substantial Reduction of Acoustic Feedback"

Mr. Matzen did testify that, in his opinion, Graupe '818, even though it had all the elements of claim 19, nevertheless did not "effect substantial reduction of acoustic feedback." (Tr. 1927:8-21 (direct), 1977:21-25 (cross), 2004:2-12 (redirect).)  This bald assertion was made, however, without any scientific or factual support and without any basis in logic or technical reality.  Accordingly, Mr. Matzen's testimony cannot be a basis upon which a reasonable jury could conclude Graupe '818 was not shown to anticipate claim 19.

A prior art patent is presumed to have an enabling disclosure and the burden is on the patentee to prove otherwise.  *Impax Labs, Inc. v. Aventis Pharms., Inc.*, 468 F.3d 1366, 1382 (Fed. Cir. 2006).  Here, Graupe '818 repeatedly states that it is effective in obviating the problem of acoustic feedback (DX 982 at Abstract, 15 (acoustic feedback is "cancelled"), 2:55-60 ("the effect of acoustic feedback to be significantly reduced or eliminated"), 7:36-38 ("prevents the communication system from producing screeching noise associated with acoustic feedback"),

1:64-68 ("automatically and adaptively overcoming the problem of screeching noise caused by acoustic feedback"), 2:12-18 ("cancels the effect of the acoustic feedback").  (*See also* DX 982 at Title, claims 1, 5, 15, 29, 33, 43, 46, 47, 56, 1:15-18, 4:1-5, 2:33-36, 3:40-47, 5:9-14, 5:63-6:3).)

The burden was on ETG to prove otherwise.  Mr. Matzen admits that Graupe '818 produces "some reduction" (Tr. 2004:11-12 (redirect)), but not "substantial" reduction (Tr. 2004:12 (redirect)).  He made no attempt to define where "some" ends and "substantial" begins.[11, 12]

Specifically, although agreeing that Graupe '818 reduces acoustic feedback (Matzen, Tr. 1928:15-16 (direct), 1974:16-19 (cross), 2004:9-12 (redirect)), it was Mr. Matzen's opinion that "the reduction of feedback would not be as good as it would if they [any errors in the transmission channel] were considered."  (Tr. 2004:6-12 (redirect).)  Mr. Matzen never explained how much reduction in feedback is necessary before that reduction would be considered "substantial."  Mr. Matzen certainly could not rely on the '850 Patent for any guidance on how much feedback reduction is "substantial."  The '850 Patent's only reference to any amount of

---

[11]    At trial, Demant's witnesses testified that only seventy-five percent of the feedback signals are cancelled.  (*See, e.g.*, Schaub, Tr. 1084:1-21, 1096:11-24 (cross).)  There is no evidence of record to support infringement with only seventy-five percent cancellation and yet avoid invalidity because a prior art reference, Graupe '818, according to ETG, reduces but does not completely cancel acoustic feedback.  ETG cannot have it both ways.

[12]    The feedback canceling system of the Widex products requires: (1) a fast-acting dynamic cancellation optimizer (the DCO), and (2) a slow-acting feedback path simulator FPS (which includes an LMS filter "WFIR" and an LMS algorithm "WLMS").  (Morley, Tr. 1387:15-1388:21, Brown, Tr. 541:8-542:14.)  ETG did not, however, provide any testimony as to the amount of relative feedback reduction provided by either the "DCO" or the LMS filter.  The jury had no way to determine whether Mr. Brown's testimony that Widex's LMS filter provides "substantial" reduction in acoustic feedback is any more or less feedback reduction than what Mr. Matzen testified occurs in Graupe '818.

acoustic feedback is when it describes, in the Background Section, that a "highly unpleasant whistling sound" occurs as a result of acoustic feedback if the gain in the hearing aid is sufficiently high. (JX 4 at 1:38-41.) But Graupe '818 teaches at least enough feedback reduction to prevent this unpleasant sound. The Patent Office, when examining Graupe '818, understood that Graupe '818 provides an enabling disclosure that teaches how to cancel the effects of acoustic feedback in a hearing aid to prevent the hearing aid from producing the screeching noise associated with acoustic feedback.[13] (*See, e.g.*, DX-982 at 1:15-18 and 64-68, 3:40-47 and 7:36-38.)

Mr. Matzen never disputed that the filter in Graupe '818 reduces enough feedback to prevent this screeching noise. In view of the only teaching in the '850 Patent about necessary feedback reduction, the <u>undisputed</u> fact that the Graupe '818 filter prevents the hearing aid from producing the screeching or whistling noise necessarily means the filter provides a "substantial" reduction of acoustic feedback, as that term is used in the '850 Patent claims.[14] ETG cannot point to any substantial evidence indicating otherwise.

### b. There Was No Meaningful Showing that the Coefficients of the '850 Patent and Graupe '818 Were Derived Differently

Moreover, ETG argued that the reason there is no "substantial reduction of acoustic feedback" in Graupe '818 is because Graupe '818 "calculates the wrong coefficients." (Matzen, Tr. 1922:25-1923:14, 1926:10-19, 1928:3-16 (direct).) But this cannot be, and is fatally against the weight of the evidence of record. In both Graupe '818 and the '850 Patent, the testing of a

---

[13]   A prior art patent is presumed to have an enabling disclosure and the burden is on the patentee to prove otherwise. *Impax Labs*, 468 F.3d at 1382.

[14]   In their claim construction briefing, Defendants urged that "substantial" was indefinite. (Defendants' Opening Claim Construction Brief, D.I. 252 at 25-26.)

signal—V$_\emptyset$out in the '850 Patent and y(t) in Graupe '818—drives the respective speakers

(Matzen, Tr. 2001:14-20 (cross)):



In the '850 Patent, V$_{\text{TEST IN}}$ passes through a portion of the transmission channel and

reaches the speaker as V$_\emptyset$out.  The only signal, however, sent back to the host controller is

V$_\emptyset$out, which is the signal used to drive the speaker, exactly the same signal as y(t) in Graupe

'818, which drives the Graupe '818 speaker.  (Matzen, Tr. 2000:4-9 (cross); Soli, Tr. 1672:8-

1673:2 (direct).)  To suggest that y(t) must have arisen from a signal that passed through some

other portion of the transmission channel is not supported by any substantial evidence of record

or by any modicum of logic or scientific honesty.[15]

Since the '850 Patent coefficients and the Graupe '818 coefficients are both calculated

using the signal that drives the respective speakers, and since the '850 Patent coefficients result

in "substantial" reduction, whatever that means, then so too do the Graupe '818 coefficients, and

---

[15]     The values of V$_{\text{TEST IN}}$ and V$_\emptyset$out are not disclosed anywhere in the '850 Patent and thus can be any value, just as y(t) in Graupe '818 can be any value.  The point is what happens to the sound from the speaker created by V$_\emptyset$out or y(t) as that sound passes though the feedback path, not how V$_\emptyset$out or y(t) was created.

17.

there is no substantial evidence to the contrary.[16]

In view of the above, Defendants submit that the jury's finding that claim 19 of the '850 Patent is not invalid for anticipation is not supported by substantial evidence. At the very least, the finding that Graupe '818 does not anticipate claim 19 is so against the weight of the evidence as to justify a new trial on this point. Moreover, as a matter of law, the Court should rule that claim 19 is invalid under 35 U.S.C. § 103 as being obvious in view of the prior art. [17]

### E.     No Reasonable Jury Could Find a "Programmed" Filter in the Accused Products and Yet Find an Absence of Clear and Convincing Evidence that the Best Invention Anticipates Claim 19

#### 1.     The Best Invention Is Prior Art

Dr. Best gave his thesis to the University of Wyoming library in May 1985 for publication; it was placed on the University library's shelves, available to all who wanted to read it, entered into the library catalog system for anyone to access, and is still there today. (Woods, Tr. 1751:20-1752:9.) Accordingly, while the Court has held that the Best Master's Thesis is not a printed publication (D.I. 504), the Best Invention as described in that thesis is prior art under 35 U.S.C. § 102(g), having been reduced to practice before the Levitt November 12, 1985 date of invention, and having not been abandoned, suppressed, or concealed as evidenced by the timely submission to the University library without restriction. *Flex-Rest, LLC v. Steelcase, Inc.*, 455

---

[16]     The April 1985 JASA Abstract (DX 962) confirms that, before the Levitt date of invention, it was known that substantial reduction of acoustic feedback could be achieved using an electrical feedback signal:

The acoustic feedback which causes a hearing aid to become unstable at high gains is effectively reduced by the addition of negative electrical feedback. (DX 962 at OTI007443.)

[17]     The trivial difference between claim 19 and Graupe '818 asserted by ETG is immaterial or, at the minimum, a predictable variation. As such, there is no substantial evidence to support a finding that claim 19 is not invalid for being obvious in view of Graupe '818. *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1740 (2007) ("If a person of ordinary skill can implement a predictable variation, §103 likely bars its patentability.").

F.3d 1351, 1358-59 (Fed. Cir. 2006) ("Because Flex-Rest did not offer any evidence indicating a

designed intent to withhold the KBS device from the public, we conclude there is not sufficient

evidence to support a jury instruction regarding intentional suppression or concealment.").

> **2.     Acoustic Feedback Is Cancelled in the Best Invention by Electrical Feedback**

Like the Accused Products, the Best Invention used an LMS filter to cancel the effects of

acoustic feedback in a hearing aid.  (Best, Tr. 1310:14-20.)  The Best LMS filter includes an

LMS algorithm and a delay line.  Coefficients calculated by the LMS algorithm were used in the

delay line to produce an electrical cancellation signal that is subtracted from the incoming signal.

(DX 1111 at Figs. 11, 13; Best, Tr. 1318:21-1319:6.)

> **3.     The Best LMS Feedback Canceller Invention Anticipates Claim 19 as ETG Interprets the Court's Construction of the Claim**

Mr. Matzen readily admitted that Dr. Best's LMS feedback canceller cancels substantial

acoustic feedback.  (Tr. 1965:9-13 (cross).)  But, according to ETG, the Best LMS filter was not

in a feedback path, as required by claim 19.  (Matzen, Tr. 1973:1-14 (cross).)  Once again,

however, ETG used an improper claim interpretation to make this flawed argument.

Claim 19 requires "a *signal transmission channel* interposed between said microphone

and said receiver."  The claim also requires "a programmable delay line filter interposed in a

feedback path between the input and output of said *transmission channel*."  The Court construed

the term "feedback path" as "a path in which a signal travels from the output to the input."  (D.I.

495 § A, ¶ 2.)

ETG's expert, Mr. Matzen, testified that to satisfy the Court's construction of a feedback

path, the feedback path must begin at the speaker and must end at the microphone.  (Tr. 1936:18-

1937:15 (direct).)[18]  But that is not what the claim says.  The plain language of the claim allows

the *transmission channel* to be "interposed" in any portion of the forward path that is between

the microphone and the receiver, and the filter must be connected between the output and the

input of that portion.

Construing the claim to require a connection beginning at the speaker and ending at the

microphone is not only inconsistent with the language, but also with the preferred embodiment

shown in Fig. 2 of the '850 Patent.  As shown in Fig. 2, the electrical feedback path ends at the

summer 60, which is not at the output of the microphone 57, but rather is at a later point in the

transmission channel after both a programmable automatic gain control amplifier 58 and a switch

59.  Thus, the claim interpretation relied on by ETG to distinguish over Best, i.e., begin at the

speaker 69 and end at the microphone 57, excludes the preferred embodiment described in the

'850 Patent.  But, a claim construction that would exclude the preferred embodiment is "rarely, if

ever, correct."  *Globetrotter Software, Inc. v. Elan Computer Group, Inc.*, 362 F.3d 1367, 1381

(Fed. Cir. 2004) (citing *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir.

1996)).  Therefore, the Court should find as a matter of law that ETG's interpretation of the

Court's construction of claim 19 is incorrect.

A proper interpretation of the Court's construction of claim 19, as noted above, simply

requires the LMS filter be placed between the output and the input of any portion of the forward

path (i.e., the "transmission channel").  The Best Invention meets this requirement as shown in

Fig. 13 of the Best Thesis and as shown below in simplified form (Soli, Tr. 1664:5-16 (direct);

---

[18]        This is in direct conflict with the position ETG took at the *Markman* Hearing, where they
stated: "So we think, here, the patentee chose to define the two end points of the path by
the input and the output, **not by the receiver or the microphone**, even though the
microphone and receiver are also in the claim."  (D.I. 294 at 52 (relevant portion attached
as Appendix C) (emphasis added).)

DX 1111 at 29):



Thus, there is no substantial evidence that ETG can point to that supports the jury's finding that Best does not anticipate claim 19, at least according to how ETG has applied that claim.  Moreover, Mr. Matzen admitted that the Best feedback canceller is connected serially with the hearing aid amplifier.  Graupe '818 teaches that, "[w]hile correction circuit 21A is shown connected in feedback relationship to the amplifier component, it is also possible for the correction circuit to be connected serially . . . ."  (DX 982 at 5:16-19.)  Thus, it would have been obvious to place the Best LMS filter in the same position as the Graupe '818 correction circuit, which would satisfy even ETG's overly narrow reading of "feedback path."[19]   At the very least, the finding that Best does not anticipate or render obvious claim 19 is so against the weight of the evidence as to justify a new trial on this point.[20]

---

[19]     *See KSR Int'l*, 127 S. Ct. at 1734 ("Section 103 forbids issuance of a patent when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'") (citing 35 U.S.C. § 103).

[20]     As with Graupe '818, the differences asserted by ETG with respect to the Best Invention are so immaterial that there is no substantial evidence to support a finding that claim 19 is

(Continued . . .)

**F.     No Reasonable Jury Could Find Written Description Support for Any Claims in the '850 Patent that Are Construed so Broadly as to Encompass the LMS Filter of the Accused Products**

It is axiomatic that claims must be construed the same way for purposes of validity as for infringement. *Amgen Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1330 (Fed. Cir. 2003). If the asserted claims of the '850 and '749 Patents, including claim 19, are broadly construed to cover the accused LMS adaptive filters, then Defendants are entitled to judgment that no reasonable jury could have found that such claims satisfied the written description requirement set forth at 35 U.S.C. § 112, ¶ 1.[21]

Here, the '850 Patent discloses a hearing aid with only a single set of coefficients programmed for acoustic feedback reduction when the hearing aid is first fitted and that thereafter remain fixed as the acoustic feedback path changes. The key point here, obviously missed by the jury, is that both Dr. Levitt and Mr. Brown, ETG's expert on written description, admitted that the '850 Patent does not disclose any way to detect when the acoustic feedback path changes, even when the hearing aid is attached to the host controller:

> Q.     Do we have anything that tells you when the acoustic feedback characteristics are changing?
> A.     Not in that configuration.

(Levitt, Tr. 322:13-22 (cross).)

> Q.     There is nothing in this hearing aid that detects acoustic feedback change, is there?
> A.     No, there is no detection of acoustic feedback in the specification -- in the

---

(. . . continued)

not invalid for being obvious in view of the teachings of the Best Invention. *See KSR Int'l Co.*, 127 S. Ct. at 1740.

[21]     All of the asserted claims of the Levitt Patents are subject to this defense. These claims have all been asserted to cover the Accused Products based on the use in those devices of an LMS filter that adapts to changes in the acoustic feedback path rather than being programmed to produce a response for the conditions that exist during fitting.

example in the specification.  You are correct.

(Brown, Tr. 2014:13-17 (cross).)

If one cannot detect when the acoustic feedback path changes, obviously one cannot change the filter coefficients to adapt to that change.

This admission, as a matter of law, compels a finding that there is no written description in the '850 Patent sufficient to support claims that cover a device that does in fact detect changes in the acoustic feedback path and does in fact produce new filter coefficients to adapt to that change.  *See, e.g.*, *Vas-Cath Inc. v. Mahurkar*, 935 F.2d 1555, 1563-64 (Fed. Cir. 1991) ("[T]he applicant must also convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention."); *TurboCare Div. of Demag Delaval Turbomach. Corp. v. Gen. Elec. Co.*, 264 F.3d 1111, 1119 (Fed. Cir. 2001) (Even if the claimed location was obvious from the description, it was not inherent and, therefore, did not meet the written-description requirement; thus, "[n]o reasonable juror could find that [the applicant]'s original disclosure was sufficiently detailed to enable one of skill in the art to recognize that [the inventor] invented what is claimed.").

In *LizardTech, Inc. v. Earth Resource Mapping, Inc.*, 424 F.3d 1336, 1344-45 (Fed. Cir. 2005), the Federal Circuit affirmed a summary judgment that certain claims directed to an image compression algorithm were invalid for lack of an adequate written description and an enabling disclosure, where the specification described only one mode of performing a required compression but the asserted claims generally claimed all modes that could compress the image. The court noted that:

> [t]he trouble with allowing claim 21 to cover all ways of performing DWT-based
> compression processes that lead to a seamless DWT is that there is no support for
> such a broad claim in the specification.  The specification provides only a single
> way of creating a seamless DWT, which is by maintaining updated sums of DWT

> coefficients.  There is no evidence that the specification contemplates a more
> generic way of creating a seamless array of DWT coefficients.

*Id.* at 1344.

Here, the '850 Patent likewise describes only one way of reducing the effect of acoustic

feedback, namely, by measuring the phase and amplitude, calculating a set of coefficients based

on that measurement, and programming a filter in the hearing aid using these coefficients.[22]   As

ETG's expert, Mr. Brown, testified:

Q.     Let's hold that for a moment, because I am going to cover that.  All I am trying to do is go
through what he taught the public when this patent was issued.  He taught the public, you
measure the phase and amplitude, you put those measurements in the computer.  From those you
calculate coefficients through a mathematical algorithm that he doesn't disclose, but presumably
people know how to do that.  And you have coefficients.

> A.     Yes.
> Q.     You put the coefficients into the hearing aid.  Correct?
> A.     That's correct.
> Q.     Now, you may make some other measurements, you may do some other
> things for other purposes, but that's what he teaches for acoustic feedback control,
> doesn't he?
> A.     That's the way he did his breadboard and that's what he taught.  One of
> ordinary skill in the art would know you could connect those coefficients directly
> to the E PROM.  You don't have to take it or move it as he did in a breadboard.
> Q.     I am not asking what one of ordinary skill in the art would do beyond
> what's shown.  I am asking what's shown to one of ordinary skill in the art, what's
> shown there, that's all.  So I have accurately stated, haven't I, what is shown?
> A.     **You have accurately stated what is shown in the example, in the**
> **specification.**

---

[22]     Two independent articles, one by Kates (DX 1240) and one by Bustamante (DX 1239),
confirm that the inventors of the '850 Patent did not contemplate adjusting to changes in
the acoustic feedback path:

> **The fixed filter, however, cannot adjust to changes in the acoustic**
> **environment.**   (DX 1240 at 9 (emphasis added).)

>  [The '850 Patent] employed a fixed filter, derived from one measurement of the
> feedback path transfer function, as the transfer function estimate, rendering this
> approach vulnerable to changes in the acoustic environment.  (DX 1239 at 1
> (emphasis added).)

(Brown, Tr. 586:3-587:4 (cross) (emphasis added).)

ETG speculated that the hearing aid may remain attached to the host controller and, in that condition, argued one skilled in the art could construct an adaptive feedback reduction system. (Brown, Tr. 2007:1-2011:10 (direct).)  The issue, however, is not what hypothetical uses could have been made of the Levitt system but whether the patent specification evidenced that the inventors themselves were actually in possession of an adaptive feedback reduction system. *See Martin v. Mayer*, 823 F.2d 500, 504-05 (Fed. Cir. 1987) (complying with the written description requirement "is 'not a question of whether one skilled in the art *might* be able to construct the patentee's device from the teachings of the disclosure . . . .  Rather, it is a question of whether the application necessarily discloses that particular device.'"); *Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1158 (Fed. Cir. 1998) (a disclosure that "merely renders the later-claimed invention obvious is not sufficient to meet the written description requirement").

Even with the hearing aid connected to the host controller, as noted above, there is ___**no**___ support of record for ___**detecting**___, much less adapting, to varying acoustic feedback path conditions.  The '850 Patent is completely silent as to when and how adjustments are to be made other than during the fitting process.  (Brown, Tr. 574:24-576:10, 2014:13-17 (cross).)  The only disclosure in the '850 Patent for adjusting the acoustic feedback coefficients is during the initial fitting process.  (JX 4 at 6:54-7:3, 9:12-55.)

Moreover, while Dr. Levitt testified that he intended to have the coefficients recalculated when the acoustic feedback path changed (Tr. 270:1-8 (direct)), this testimony is also insufficient as a matter of law—even if true—to support the written description requirement.  The written description requirement is satisfied by what the inventor actually disclosed in the four corners of the patent, not "by what could have been disclosed, but was not." *Enzo Biochem, Inc. v. Gen-*

*Probe Inc.*, 285 F.3d 1013, 1022 (Fed. Cir. 2002), *vacated on other grounds*, 414 F.3d 1376

(Fed. Cir. 2002).

In spite of the fact that no ETG witness could point to any written description that the

host controller was to be used to adaptively correct for changes in the acoustic feedback, ETG

nevertheless pressed on by pointing to vague general references of "automatic" adjustment in

general summary sections of the '850 Patent.  For example, ETG's expert, Mr. Brown, pointed to

the very first paragraph of the '850 Patent, which recites:

> This invention relates to hearing aids, and more particularly to hearing aids that
> are programmable so as to have suitable characteristics to compensate for the
> hearing deficiencies of a patient.  More specifically, it ***relates*** to hearing aids of
> this character that are capable of **automatically adjusting** to optimum parameter
> values as operating conditions such as **speech level, room reverberation and
> background noise change**, and also for reducing acoustic feedback.

(JX 4 at 1:5-13 (emphases added); *see also* JX 4 at 2:22-27, 11:32-38, 11:51-57; Levitt, Tr.
265:5-268:16 (direct).)

This is another telling example of how ETG confused the jury.  In the '850 Patent, there

is disclosure of how speech level and noise change are detected.  (*See, e.g.*, JX 4 at 2:30-3:2,

3:12-20, 5:60-6:46.)  Also, there is admittedly disclosure of how different sets of stored

coefficients are "automatically" selected based on these changes.  (JX 4 at 6:44-54, 7:60-8:23,

11:32-36.)  But ETG has applied the claims of both patents against the Accused Products that

automatically adapt to changes in the acoustic feedback path rather than being "programmed" to

a single feedback path condition.  As noted above, there is admittedly no disclosure of even how

to detect such a change.  Thus, even if the jury were to have found, improperly, that the

references to "automatic" in these quotes were intended to also refer to acoustic feedback

adjustment, which clearly they are not,[23] for the claims to justify this scope of coverage, the patent must show that the inventors had full possession of the idea of adapting to changing acoustic feedback and knew how to do it. *Reiffin v. Microsoft Corp.*, 214 F.3d 1342, 1345 (Fed. Cir. 2000) (One of the primary purposes of the written description requirement is "to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification."). The "written description" clause of § 112 requires the specification to satisfy two requirements: (1) it must describe the manner and process of making and using the invention so as to enable a person of skill in the art to make and use the full scope of the invention without undue experimentation; and (2) it must describe the invention sufficiently to convey to a person of skill in the art that the patentee had possession of the claimed invention at the time of the application, i.e., that the patentee invented what is claimed. *LizardTech*, 424 F.3d at 1344-45.

Accordingly, there is no substantial evidence that the '850 Patent specification discloses automatically adjusting for changes in the acoustic feedback. Thus, if the claims cover the adaptive Accused Products, then the claims must be held invalid, as the inventors have not described the invention as broadly as they have claimed. At the very least, the jury's finding that the claims cover an adaptive filter, and yet the written description requirement has not been violated, is so adverse to the weight of the evidence that a new trial on this point is justified.

---

[23]     The jury may have found that the host controller does "automatically" calculate the acoustic feedback coefficients during fitting in the sense that the process is computer controlled, but there is not a scintilla of support for any notion that the host controller or related computer was intended to adapt to changing acoustic feedback conditions.

G.    **The Accused Products Do Not Use a "Programmed" Filter or a "Programmable Filter" as Required by Claims 13, 14, and 16 of the '850 Patent**

Claim 13 requires a "filter therein programmed," and claim 14 requires "a programmable filter programmed" to equalize and reduce the effect of said acoustic feedback both in amplitude and phase on a signal in the transmission channel.

For the same reasons set out above for claim 19, Defendants submit that there is insufficient evidence for the jury to have found any infringement of claims 13 or 14, or claim 16, which depends from claim 14.  At the very least, the finding that claims 13 or 14, or claim 16 are infringed under the doctrine of equivalents by reason of the Accused Products having the equivalent of a "programmed" filter or a "programmable filter," is so against the weight of the evidence as to justify a new trial on this point.

Moreover, claims 13, 14 and 16 are method claims.  To directly infringe these claims, each step must be performed "within the United States."  35 U.S.C. § 271(a).  *See NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1318 (Fed. Cir. 2005).  The Accused Products are made outside of the United States (*see, e.g.*, Morley, Tr. 1414:4-12 (direct), Hauge, Tr. 1742:4-11 (direct)) and ETG has not satisfied its burden to establish that any of the Defendants perform the steps of these claims in the United States or that Defendants had the requisite knowledge or intent to show pre-suit indirect infringement.  *See* 35 U.S.C. § 271(b), (c); *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1303, 1305-06 (Fed. Cir. 2006).  Thus, as a matter of law, the Court should also rule that the Defendants do not (at least prior to the suit) indirectly infringe claims 13, 14, and 16.

**H.     The Best LMS Feedback Canceller Invention Anticipates All the Asserted Claims**

There is no meaningful difference of record between the Accused Products and the Best Invention.  (Morley, Tr. 1542:8-13 (cross).)  While it is true that the LMS filter of the Best Invention is connected before and not after the main amplifier in the forward path, as discussed above, this difference has no effect on a claim 19 analysis given a proper interpretation of the Court's construction of "feedback path."  The same is true of claim 13.  Claim 14 of the '850 Patent and claims 1 and 2 of the '749 Patent do not use the term "feedback path."  Claim 16 uses the term "feedback loop" and, hence, are not even subject to the faulty "feedback path" argument ETG made in attempting to distinguish the claims of the Levitt Patents from the Best Invention.

If the Accused Products are found to infringe on the theory that the cancellation of feedback inherently includes, or is equivalent to, the determination of amplitude and phase effects required by claims 13, 14, and 16, or the "programmable filter" required by claim 19, or the corresponding structure and recited functions of claims 1 and 2 of the '749 Patent, these same claims must also read on and, thus, are invalid in view of the Best Invention.

**I.     Prosecution History Estoppel Precludes the Application of the Doctrine of Equivalents ("DOE") to Claim 19 of the '850 Patent and to Claims 1 and 2 of the '749 Patent**

ETG cannot use the doctrine of equivalents to recapture claim scope that it surrendered during prosecution.  *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 733-34 (2002).  The question of whether a prosecution history estoppel arises from a claim amendment and, if so, the extent of the estoppel, presents a question of law that is to be determined exclusively by the Court.  *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 39 n.8 (1997); *see also Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1301-02 (Fed. Cir. 2005).  Where a patent's prosecution history shows that an applicant narrowed the

scope of the claims to secure the patent, those acts presumptively create an estoppel that bars ***all***

equivalents for the added limitations. *Festo*, 535 U.S. at 740; *Biagro*, 423 F.3d at 1305.  Like

claim amendments, the addition of a new independent claim can create an estoppel. *See, e.g.*,

*Deering Precision Instruments, L.L.C. v. Vector Distribution Sys., Inc.*, 347 F.3d 1314, 1325-26

(Fed. Cir. 2003); *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 252 F.3d 1306, 1319-20 (Fed. Cir.

2001).

A patentee can rebut the *Festo* presumption of total surrender only if it can show (1) the

equivalent was unforeseeable at the time of the application; (2) the rationale underlying the

amendment bears no more than a tangential relation to the equivalent in question; or (3) other

reasons suggesting that the patentee could not reasonably be expected to have described the

insubstantial substitute in question. *Festo*, 535 U.S. at 740-41.  Whether the patentee has

rebutted the presumption presents a question of law that the Court, not the jury, must determine.

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 344 F.3d 1359, 1367-68 (Fed. Cir. 2003)

(en banc).  Most importantly, the patentee bears the burden of proof on whether it has rebutted

the presumption. *Biagro*, 423 F.3d at 1305.

### 1.    Claim 19 of the '850 Patent Cannot Be Expanded by the DOE

Claim 19 (application claim 25) was not an original claim of the '850 Patent.  (JX 5 (only

relevant portions attached), original application at 25-31, June 27, 1987 Amend. at 5.)  Rather, it

was added after the original claims of the application had been rejected over prior art such as

Engebretson.  (*See id.* at 5-6.)  The applicants expressly relied on the programmable delay line

filter in the feedback path limitation in application claim 25 as the novel feature that was "not

taught by Engebretson et al. or any of the other cited references."  (*Id*. at 9.)  ETG has failed to

produce any evidence to meet its burden to overcome the presumptive surrender.  Nor could it.

ETG cannot satisfy criterion (1) because prior art LMS adaptive filters were known and used at

the time of the application, and were known and, therefore, foreseeable (Levitt, Tr. 358:14-16

(cross).)  Moreover, because an alleged equivalent LMS adaptive filter is directly relevant to the

claimed "programmable filter" in the feedback path—the announced novel feature of new claim

19—and that feature existed in the prior art, ETG cannot satisfy criterion (2) or (3) of *Festo*.

Therefore, all equivalents to the "programmable delay line filter" are barred as a matter

of law.  As a result, the jury should not have been asked to render a finding regarding

infringement of claim 19 of the '850 Patent under the doctrine of equivalents, and JMOL should

be granted accordingly.

### 2.    Claims 1 and 2 of the '749 Patent Cannot Be Expanded by the DOE

As presented, application claim 24 of the '749 Patent did not recite any requirement that

the claimed "means" measure phase and amplitude.  (JX 3 (only relevant portions attached), Feb.

12, 1988 Prelim. Amend. at 1-2.)  However, in response to a rejection of this claim as being

obvious in view of the prior art, all of the application claims were cancelled and replaced with

application claims 33-38.  (*Id.*, Mar. 17, 1989 Amend. at 1-3.)  New application claim 33

narrowed the "means for receiving signals" element present in original claim 24 by adding the

further requirement that the means for receiving signals from the hearing aid also include a

means for "measuring phase and amplitude."  (*Id.*, Mar. 17, 1989 Amend. at 2.)  Applicants'

remarks accompanying their amendment failed to specifically address this particular claim

limitation in order to limit or clarify its effect.  As a result of the applicants' amendment, the

Patent Examiner allowed new application claims 33-38, which subsequently issued as claims 1-6

of the '749 Patent.  (*Id.*, June 2, 1989 Notice of Allowability.)

Given that the applicants narrowed their claims by adding the limitations regarding

measuring phase and amplitude to overcome a prior art rejection, a presumption of total

surrender of equivalents applies to these limitations.  *Festo*, 535 U.S. at 740.  This presumption

cannot be rebutted in view of the record in this case, and, indeed, ETG made no attempt to do so at trial. In sum, ETG has not established that the use of LMS filters was not a foreseeable alternative to "measuring phase and amplitude," that the amendments were not just tangentially related to the equivalent, or that there is any other reason to rebut the presumption.

### J.    The Asserted Claims Cannot Be Expanded Under the DOE to Cover the Accused Products

The jury found that all the asserted claims were infringed under the doctrine of equivalents,[24] and that Defendants had failed to meet their burden of showing that any of these claims were invalid in view of the prior art.

Even without consideration of prosecution history estoppel, Defendants challenge the jury's verdict of infringement under the doctrine of equivalents on three additional and separate grounds. First, ETG failed to meet its burden of proving equivalence using particularized testimony and linking argument. Second, ETG's doctrine of equivalence evidence eviscerates the claimed "determining" step of claims 13, 14, and 16, the "programmable" and "programmed" requirement of claim 19 of the '850 Patent, and the corresponding structure of claims 1 and 2 of the '749 Patent. Third, any hypothetical claim that covers the Accused Products and is supported by the '850 Patent disclosure would be invalid in view of Graupe '818 and the Best Invention.

### 1.    No Particularized Testimony and Linking Argument

To support a finding of infringement under the doctrine of equivalents, "a patentee must provide particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device or process. *Texas Instruments Inc. v.*

---

[24]    As noted above, ETG has not met its burden to establish that any of the Defendants directly infringe method claims 13, 14, and 16 in the United States. Therefore, the only basis for which the jury could have found the Defendants liable for infringement of these claims is on the basis of contributory infringement or inducement.

*Cypress Semiconductor Corp.*, 90 F.3d 1558, 1567 (Fed. Cir. 1996); *see also Miken Composites*

*v. Wilson Sporting Goods Co.*, 515 F.3d 1331, 1340-41 (Fed. Cir. 2008)[25]  This evidence must be

presented on a limitation-by-limitation basis, and generalized testimony as to the overall

similarity between the claims and the accused infringer's product or process will not suffice.

*Texas Instruments*, 90 F.3d at 1567; *see also Hewlett-Packard Co. v. Mustek Sys., Inc.*, 340 F.3d

1314, 1322-23 (Fed. Cir. 2003) (denying motion for new trial because Hewlett did not make a

sufficient record of infringement).  The purpose of this evidentiary requirement is "to ensure that

a jury is provided with the proper evidentiary foundation from which it may permissibly

conclude that a claim limitation has been met by an equivalent."  *Comark Comm'ns, Inc. v.*

*Harris Corp.*, 156 F.3d 1182, 1188 (Fed. Cir. 1998).

　　　　ETG failed to provide the requisite particularized testimony and linking argument for its

doctrine of equivalence analysis of any of the asserted claims.  For example, with respect to

claims 13, 14, and 16 of the '850 Patent,[26] ETG's sole expert on infringement, Mr. Brown,

offered only a cursory equivalence analysis of the "determining" and "inserting" steps of claims

14 and 16 that did not address the insubstantiality of any differences between the claimed

---

[25]　　　The Federal Circuit articulated the correct test:

　　Wilson [the patentee] has provided "no particularized testimony from an expert or
　　person skilled in the art that [(a)] specifically addressed equivalents on a limitation-
　　by-limitation basis; [(b)] explained the insubstantiality of the differences between the
　　patented method and the accused product; or [(c)] discussed the function, way, result
　　test." *Aqua-Tex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1329 (Fed. Cir.
　　2007) (internal quotation marks omitted).  Thus, Wilson's "lawyer argument and
　　generalized testimony about the accused product . . . fail[s] to demonstrate a genuine
　　issue of material fact that would prevent the grant of summary judgment." *Id.*

*Miken*, 515 F.3d at 1341.

[26]　　　Throughout the trial, no meaningful distinction was made among these three claims, with
claim 14 consistently being used as representative of all three claims.  The same practice
will be used here as well.

invention and the accused hearing aids.  Specifically, addressing the "determining" element, Mr.

Brown's only analysis under the doctrine of equivalents was limited to the following:

> Q.      Did you make an analysis as to whether or not the Accused Products meet the determining step under the doctrine of equivalents?
> A.      Well, yes.  The determining step has a function, way -- well, one of the ways of an equivalent is function, way, result.  So you look at the determining step and you say what is the function?  The function is to determine the effective amplitude and phase of the signal transmission.
>          Now, the way is by the LMS filter calculating the coefficients.  And the result is that you end up with the resulting output of that filter being the effect of the acoustic feedback in the external channel.
> Q.      Is what you have just described substantially the same as what is described in the patent in your view?
> A.      That is correct.

(Brown, 546:9-23 (direct).)

But Mr. Brown admitted that LMS filters do not need to determine phase and amplitude to operate, yet he still found the determining step satisfied because the right result was reached:

> Q.      Yes, and you don't need to know the phase and amplitude in order to run the LMS algorithm?
> A.      Well, phase and amplitude are defined by the coefficient when you have reached the answer.
> Q.      Right.  It gives you the answer, but you don't need to know ahead of time what the answer is with an LMS filter, do you?
> A.      No, you start out even at zero and approximate to the answer.
> Q.      And that is pretty different than having to know the answer before you start and then putting the coefficients in, isn't it?
> A.      It's an improvement.

(Tr. 618:24-619:11 (cross).)[27]

On direct, Mr. Brown also noted that, "mathematically speaking, the coefficients define the amplitude and phase."  (Tr. 516:23-24 (direct).)  In effect, he was saying that because one ends up with the correct coefficients, one necessarily performed the "determining" step.

Dr. Levitt also agreed that "[t]he LMS filter does not measure amplitude in [sic] phase to

---

[27]     *See also* Brown, Tr. 649:19-650:20 (cross) ("[T]he coefficients of the filter define phase and amplitude.  They are the measurement of it.").

get the answer, but when it does get an answer, it can be transformed into amplitude and phase

information." (Tr. 291:18-21 (cross).) Indeed, when asked if it were possible to make an LMS

filter operate in view of known phase and amplitude information, Dr. Levitt conceded that he

could not answer the question because "***it doesn't fit the nature of LMS***." (Levitt, Tr. 292:21-

293:6 (cross) (emphasis added).)

Mr. Brown's analysis of the "inserting" step of claims 13, 14, and 16 is similarly

deficient. ( Brown, Tr. 546:24-547:10, 547:23-548:1 (direct).) As to his testimony with respect

to the "programmable delay line filter" element of claim 19, Mr. Brown's testimony was wholly

conclusory:

> Q: So did you determine whether or not the function/way/result that you just
> described is similar to the function/way/result of the programmable delay line?
> A: Yes.
> **Q: What is your analysis?**
> **A: That it meets under DOE.**

(Tr. 549:25-550:6 (direct) (emphasis added).)

Mr. Brown's conclusory opinions do not constitute the requisite particularized testimony

and linking argument as to the insubstantiality of the differences between the function, way, or

result of the claimed invention and the Accused Products. Much like the experts' analysis in

*Texas Instruments*, Mr. Brown's analysis starts and ends with the fact that the accused LMS filter

ends up with the correct coefficients.[28] There is no evidence at all of record to show that the **way**

the accused hearing aids calculate these coefficients is substantially the same **way** required by

the claims. Again using claim 14 as an example, there is no evidence that the **way** required by

---

[28]      *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1569 (Fed. Cir. 1996) ("[A] finding of
equivalency just because the same result is achieved is 'a flagrant abuse of the term
equivalent.'") (citing *Burr v. Duryee*, 68 U.S. 531, 573 (1863) (argument that every
combination that produces the same effect is necessarily an equivalent "is a flagrant
abuse of the term 'equivalent'")).

the claim 14 determining step, namely, by "determining the effect [that the acoustic feedback path has] on the amplitude and phase of a signal [i.e. $V_{\varnothing}$out] in said transmission channel as a function of frequency of acoustic feedback between said receiver and transducer," is substantially the same **way** the LMS filter in the Accused Products operates.  The Accused Products have LMS filters that do <u>not</u> require breaking the path between the microphone and speaker, that do <u>not</u> use a test signal, and that do <u>not</u> use any phase shifter or amplifier acting upon a test signal whose settings are used to calculate filter coefficients.  (Anderson, Tr. 1578:20-1580:13, 1598:15-1599:21 (direct).)  To the contrary, the LMS filter coefficients are <u>directly</u> calculated by the LMS algorithm—even Mr. Brown admits this is an "improvement" of the fixed filter arrangement of the '850 Patent, with no showing this improvement acts in a **way** equivalent to the "determining" step literally required by the claims.  (Brown, Tr. 618:24-619:11 (cross).)  Dr. Levitt concurred.  (Tr. 363:5-9 (cross).)

In view of the above, the jury's verdict of infringement under the doctrine of equivalents is not supported by legally sufficient evidence, and Defendants' JMOL of noninfringement of the accused claims should be granted.[29]

## 2.    Vitiation of Claimed Elements

Even if ETG had provided particularized testimony and linking argument in support of its analysis under the doctrine of equivalents, Defendants' motion for JMOL of noninfringement under the doctrine of equivalents should be granted because the equivalence evidence ETG has

---

[29]    *See Stumbo v. Eastman Outdoors, Inc.*, 508 F.3d 1358, 1365-66 (Fed. Cir. 2007) (granting summary judgment of no infringement where accused infringer showed its product operated in a different way); *Waner v. Ford Motor Co.*, 331 F.3d 851, 855-56 (Fed. Cir. 2003) (reversing denial of JMOL of noninfringement where claim required the flat panel of a truck-wheel liner to have a flange present in the panel before the panel was installed in the truck and the accused product did not have a flange until after the panel was installed).

proffered would cause the at least one element of each of these claims to be vitiated.

An element of an accused product or process is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation. *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005) (citing *Warner-Jenkinson*, 520 U.S. at 29 ("It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to *effectively eliminate that element in its entirety*.") (emphasis added)); *Tronzo*, 156 F.3d at 1160.

As noted above, Mr. Brown just relies on the result—there were coefficients inserted into the delay line that reduced the effect of acoustic feedback—accordingly, there was the required "determining." If that "inserting" were all that was required to find the "determining" step, the "determining" step would have no effect and would essentially be read out of the claim as a requirement for infringement.

Thus, the evidence ETG put forth at trial to show that method claims 13, 14, and 16 were infringed vitiates the "determining" step required by these claims. Moreover, as noted above, ETG's approach to claim 19, both literally and under the doctrine of equivalents, effectively eliminates the "programmable" and "programmed" requirement from that claim, resulting in "just about any digital filter" being covered. (Brown, Tr. 533:15-534:1 (direct).) And, as pointed out in detail above, the means-plus-function applied to claims 1 and 2 of the '749 Patent by Mr. Brown expanded those claims to again cover "just about any digital filter" being covered, without regard to any similarity of that filter to the corresponding structure of those claims.

### 3.     No Valid Hypothetical Claim

While the doctrine of equivalents permits a patentee to exclude others from practicing equivalents of the claimed invention, the range of equivalents cannot extend so far as to ensnare the prior art. *Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 684-85

(Fed. Cir. 1990), *overruled in part on other grounds*, *Cardinal Chem. Co. v. Morton Int'l, Inc.*,

508 U.S. 83 (1993).  Because no detailed equivalents position was put forth by ETG at trial, it is

difficult to know the scope of the hypothetical claim that was being asserted by ETG.  However,

ETG did argue in effect that any device that reduced the effect of acoustic feedback using a

programmable delay line in a feedback path infringed.  However, any hypothetical claim of this

broadened scope would be invalid in view of Graupe '818 and the Best Invention.  Specifically,

if the "filter therein programmed" (claim 13), "programmable filter programmed" (claims 14,

16), or a "programmable delay line filter" that is "programmed" (claim 19), are expanded to

cover adaptive filters, the claims would read on at least the Best and Graupe prior art.  (Morley,

Tr. 1415:15-1425:20 (direct).)  As discussed above, the very essence of Graupe '818 was to

determine filter coefficients (referred to in Graupe '818 as "parameters") that were used in the

Graupe '818 delay line filter to reduce the effect of acoustic feedback.[30]  (Morley, Tr. 1417:9-19

(direct).)

　　　　Once the Defendants have satisfied their burden of presenting prior art that shows that the

asserted range of equivalents would encompass the prior art, the burden then rests on the

patentee to show that its claim does not cover the prior art.  *See Streamfeeder, LLC v. Sure-Feed*

*Sys., Inc.*, 175 F.3d 974, 984 (Fed. Cir. 1999).  ETG did not satisfy this burden at trial.  Indeed,

ETG's infringement expert, Mr. Brown, testified that he did not consider the claims in the

context of the prior art:

　　　　　　Q:   As part of your analysis for the doctrine of equivalents, you didn't consider
　　　　　　any prior art did you?

---

[30]　　　　Claim 14 also requires a second step of inserting the filter.  (JX 4 at 14:26-30.)  There is,
however, no dispute that this step is performed in Graupe '818.  In Graupe '818, the filter
is switched into the feedback path after the parameters have been determined and inserted
into the delay line filter."  (DX 982 at 7:28-36).

A:   I did not go back and investigate prior art, that's correct.

(Brown, Tr. 628:19-22 (cross).)[31]

As a consequence, the jury's finding of infringement of the asserted claims under the doctrine of equivalents should be overturned as not supported by substantial evidence.  At the very least, the finding that these claims are infringed under the doctrine of equivalents is so against the weight of the evidence as to justify a new trial on this point.

### K.     ETG Has Not Established that Any of the Means-Plus-Function Claim Elements Required in the '749 Patent Claims Are Present

Claim 1 of the '749 Patent contains three "means-plus-function" recitations, the corresponding structures for which were identified by the Court's January 4, 2008 claim construction Order.  (D.I. 495 § B, ¶¶ 2-5.)  Thus, to literally infringe claim 1 or dependent claim 2 of the '749 Patent, ETG needed to show that the Accused Products performed the ***identical*** functions of these recitations using the ***same or equivalent structure***.  ETG did not even attempt to show literal infringement, since one of the claimed functions was "measuring the phase of amplitude" of signals received at the host controller from the hearing aid.  ETG admitted that no such "measuring" occurs in the LMS filters of the Accused Products.  Instead, ETG argued that the Accused Products were equivalent without undergoing any detailed analysis of what was equivalent to the "measuring" function or how the corresponding structure was present identically or by equivalence.  All that was presented was evidence that the Accused Products obtain the same result—reduction of the effect of acoustic feedback.

---

[31]     "The rule that a jury verdict is reviewed for support by 'substantial evidence' does not mean that the reviewing court must ignore the evidence that does not support the verdict. . . .  [T]he court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached.'" *Integra Lifesciences I, Ltd. v. Merck KgaA*, 496 F.3d 1334, 1345 (Fed. Cir. 2007).

In fact, when construing the '749 Patent, the Court found that the corresponding structure that performed the "measuring" function included phase shifter 30 and amplifier 32.  (D.I. 495 § B, ¶ 2.)  As noted above, adjusting the phase and amplitude of V$_\varnothing$out until the output of summing amplifier 60 was nulled, resulted in the required "measuring the phase of amplitude" function of claim 1.  However, ETG's sole witness on this issue, Mr. Brown, made no reference at all to the specific corresponding structure disclosed in the '749 Patent for this, or the other two, means-plus-function elements.  Thus, his infringement analysis was flawed and incomplete, even under the doctrine of equivalents.  To be equivalent, the "accused structure must perform substantially the same function, in substantially the same way, to achieve substantially the same result as the <u>disclosed</u> structure."  *Kemco Sales, Inc. v. Control Papers Co.*, 208 F.3d 1352, 1364 (Fed. Cir. 2000) (emphasis added).  Instead, for the first "means for receiving element," which includes "means for . . . measuring the phase of amplitude" of signals from the hearing aid, Mr. Brown asserted without explanation that the LMS algorithm was the corresponding structure. (Tr. 562:19-564:15 (direct).)  He made no comparison to the phase shifter 30 and amplifier 32 of the '749 Patent, and made no attempt to show how the LMS algorithm, which he asserted achieved the same result, did so in substantially the same ***way*** as using the phase shifter 30 and amplifier 32.

A second "means for receiving" element, according to the Court's claim construction Order, requires the structure of an analog-to-digital converter.  (D.I. 495 § B, ¶ 3.)  Mr. Brown conceded not only does the LMS filter of the Accused Products not have the structure of an analog-to-digital converter, but additionally there would be no reason to have anything equivalent to such an analog-to-digital converter.  (Tr. 637:17-638:4 (cross).)  Since ETG has conceded that an LMS filter does not have the required structure of an analog-to-digital converter

or anything equivalent thereof, the Accused Products cannot possibly infringe claims 1 and 2 under the doctrine of equivalents.

Proof of similarity of function alone is not sufficient to prove infringement of a means-plus-function element under the doctrine of equivalents. *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1178 (Fed. Cir. 2005) ("To establish infringement under § 112, ¶ 6, it is insufficient for the patent holder to present testimony based only on a functional, not a structural, analysis.").

Consequently, ETG's failure to introduce any evidence to establish that the accused LMS filters operate in substantially the same **way** as phase shifter 30 and amplifier 32 and the related corresponding structure is fatal to its case and renders the jury's verdict unsupportable. The same is true of its failure to conduct a structural analysis for the remaining two means-plus-function elements. Accordingly, ETG's claims of infringement of the '749 Patent under the doctrine of equivalents should be denied as a matter of law. At the very least, the evidence that these claims are infringed under the doctrine of equivalents is so against the weight of the evidence as to justify a new trial on this point.

## V.    CONCLUSION

For the reasons given above, the Court should grant the Defendants' Motion, finding that ETG has failed to establish that the Defendants have infringed any asserted claim of the '850 or the '749 Patent, and that the Defendants have established that these claims are invalid if so broadly construed that they were infringed, and no reasonable jury could find otherwise. Alternatively, at the very least, the finding that these claims are infringed, and that if so broadly construed that they were infringed are still not invalid, is so against the weight of the evidence as to justify a new trial on these points.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ James W. Parrett, Jr.*
_____

OF COUNSEL:

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, DC  20001-4413
202.408.4000

Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200
mgraham@mnat.com
jparrett@mnat.com

*Attorneys for William Demant Holding A/S, WDH,*
*Inc., Oticon A/S, Oticon, Inc.,*
*Bernafon AG, and Bernafon, LLC*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Donald E. Reid*
_____

OF COUNSEL:

David J. Cushing
William H. Mandir
Carl J. Pellegrini
SUGHRUE MION, PLLC
2100 Pennsylvania Ave., N.W.
Suite 800
Washington, DC  20037
202.293.7060

Dated:  March 27, 2008

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200
dreid@mnat.com

*Attorneys for Widex A/S and Widex Hearing Aid Co.,*
*Inc.*

2170933

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on March 27, 2008, the foregoing was caused to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

In addition, the undersigned hereby certifies that true and correct copies of the foregoing were caused to be served via electronic mail on March 27, 2008 upon the following parties:

| | |
|---|---|
| REPRESENTING ENERGY TRANSPORTATION GROUP, INC. | Edmond D. Johnson<br>PEPPER HAMILTON LLP<br>**johnsone@pepperlaw.com** |
| | Brian M. Buroker<br>HUNTON & WILLIAMS LLP<br>**etg@hunton.com** |
| REPRESENTING WIDEX A/S AND WIDEX HEARING AID CO. INC. | Donald E. Reid<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>**dreid@mnat.com** |
| | William H. Mandir<br>SUGHRUE MION PLLC<br>**wmandir@sughrue.com** |
| | David J. Cushing<br>SUGHRUE MION PLLC<br>**dcushing@sughrue.com** |
| | Carl J. Pellegrini<br>SUGHRUE MION PLLC<br>**cpellegrini@sughrue.com** |
| | Brian K. Shelton<br>SUGHRUE MION PLLC<br>**bshelton@sughrue.com** |

| | |
|---|---|
| REPRESENTING WILLIAM DEMANT HOLDING A/S, WDH, INC., OTICON A/S, OTICON INC., BERNAFON AG, AND BERNAFON, LLC | Mary B. Graham<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>**mgraham@mnat.com;**<br>**mbgeservice@mnat.com** |
| | John M. Romary<br>FINNEGAN, HENDERSON, FARABOW,<br>GARRETT & DUNNER<br>**john.romary@finnegan.com** |
| | C. Gregory Gramenopoulos<br>FINNEGAN, HENDERSON, FARABOW,<br>GARRETT & DUNNER<br>**c.gregory.gramenopoulos@finnegan.com** |

The undersigned also hereby certifies that on March 27, 2008, true and correct copies of the foregoing were caused to be served by hand upon the following Delaware counsel:

Edmond D. Johnson
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE  19899-1709


*/s/ James W. Parrett, Jr.*

———————————————————————

James W. Parrett, Jr. (#4292)

2