Appx. A

92

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3
                               -   -   -
 4

 5    ENERGY TRANSPORTATION,          :  Civil Action
      INC.,                           :
 6                                    :
                    Plaintiff,        :
 7                                    :
           v.                         :
 8                                    :
      WILLIAM DEMANT HOLDINGS A/S,    :
 9    et al.,                         :
                                      :
10                  Defendants.       :   No. 05-422 (GMS)

11                             -   -   -

12                        Wilmington, Delaware
                        Tuesday, January 22, 2008
13                           8:30 a.m.
                          Second Day of Trial
14
                               -   -   -
15
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16

17

18    APPEARANCES:

19                    EDMOND D. JOHNSON, ESQ.
                      Pepper Hamilton LLP
20                         -and-
                      MARTY STEINBERG, ESQ.,
21                    BRIAN M. BUROKER, ESQ., and
                      MAYA M. ECKSTEIN, ESQ.
22                    Hunton & Williams
                      (Washington, D.C.)
23
                                         Counsel for Plaintiff
24

25
      APPEARANCES CONTINUED:
```

1

1    increases that awful sound.  And you can only imagine how
2    bad that feels in the ear, when it is confined in the ear of
3    a person.

4            The feedback problem, the evidence will show, is
5    one of the most significant issues that discouraged
6    hearing-impaired people from actually wearing hearing aids.
7    And we are showing you a letter from 1982 from a hearing aid
8    manufacturer to the Veterans Administration.  And that
9    hearing aid manufacturer says, Acoustical feedback is
10   currently regarded generally as one of the two major
11   problems which are detracting from the effectiveness of
12   hearing aid fittings.  Up to now, the industry has not been
13   able to work together to solve this problem.

14           That letter, we will show, was only a few short
15   years before Dr. Levitt, who you will see and hear in this
16   case, had this amazing idea to cancel feedback.

17           Now, the evidence will show that this invention
18   starts, as usual, with one single person, with a vision to
19   create something special and patented.  And that person is
20   Dr. Harry Levitt.

21           That is an awful picture.  He does look better
22   than that.  Nevertheless, that is Dr. Levitt's photo.

23           The evidence will show that he was one of the
24   preeminent scientists in the industry, with an idea of how
25   to obtain a better quality of sound for hearing-aid wearers.

1           We're not attacking.  You won't see evidence
2      attacking Dr. Levitt.  What you will see is evidence
3      attacking his patents, not him.  We're not attacking him as
4      a person.  We're saying the invention is not worthy of a
5      patent, and we don't practice it.

6           I -- I would be surprised if some day we don't
7      hire him again as an expert for other reasons and in other
8      things, so please understand that's not what our evidence is
9      going to show.

10          Let me tell you something else that may surprise
11     you.  I think the idea of having -- I shouldn't do it that
12     way.  I will say the evidence will show that the idea of
13     having equal and opposite signal to cancel feedback is a
14     great idea.  Did you hear me?  It's a great idea.  And we
15     use it.  And if some of our witnesses are going to get
16     up here and somehow be -- be seen to say that we don't,
17     they're -- it's just not right.

18          The evidence will show that we have acoustic
19     feedback cancellation, that we have a signal in the feedback
20     path that mimics the feedback signal and cancels it by
21     subtracting.

22          So why are we here today if we're going to admit
23     that we're doing that?  The reason we're here today is
24     because Dr. Levitt, bless him, was not first with that idea.
25     It's like a race.  That's what a patent is like.  It's like

1    his pocket and use any telephone he had access to.

2         The whole idea and the reason for winning that award

3    was the demonstration for how miniaturization could solve a

4    very practical problem.

5    Q.    Now, Doctor, I think you also heard in opening that

6    the defendants' lawyers claimed that your patents were not,

7    quote, unquote, "adaptive." They were fixed.

8         I would like to direct your attention again to

9    Exhibit 4, the '850 patent.

10   A.    Yes?

11   Q.    Okay. And if we look at the first page in the

12   abstract section, in the very middle --

13   A.    Okay.

14   Q.    -- there's some language that says, which supplies

15   co-efficients to a programmable filter and amplitude limiter

16   in the hearing aid so as to cause the hearing aid to adjust

17   automatically to the optimum set of parameter values for

18   speech level, room reverberation and type of background

19   noise then obtaining.

20        Can you tell the jury what that language has to

21   do with your patent being adaptive?

22   A.    Okay. The filter consists of the components, digital

23   components. In order for it to operate, it needs

24   co-efficients. And what we did was send co-efficients and

25   we kept updating the co-efficients, that is we were updating

174

Levitt - direct

 1    or adapting the -- we were changing the co-efficients to

 2    adapt to the acoustic environment.  So it was an adaptive

 3    hearing aid.

 4    Q.    Now, if you will please turn to Column 1, lines 9

 5    through 14.

 6    A.    Yes.

 7    Q.    Okay.  And I'm going to read it to you.  It says, More

 8    specifically, it relates to hearing aids of this character

 9    that are capable of automatically adjusting to optimum

10    parameter values as operating conditions such as speech

11    level, room reverberation and background noise change, and

12    also for reducing acoustic feedback.

13          Could you tell the jury, please, what that has

14    to do with the adaptive nature of your technology relating

15    to feedback?

16    A.    Well, the whole idea would be that as a person wore

17    this hearing aid, and if the environment changed, that could

18    cause any problems, including a change in acoustic feedback,

19    that the host controller that is wearable this would tend to

20    be wearable eventually, would, in fact, change the hearing

21    aid, change the filter co-efficients such that it would

22    adjust to the new acoustic environment.  And that's an

23    adaptive process.

24    Q.    And then if you turn to Column 2 lines, I believe it's

25    22 through 27, which reads, Still another object of the

Levitt - direct

1    invention is to provide new and improved hearing aid

2    apparatus that is capable of effective noise and

3    reverberation suppression and acoustic feedback reduction

4    while maintaining optimum hearing characteristics as the

5    speech and noise levels vary.

6                What does that have to do with being adaptive?

7    A.    Well, if you are wearing a hearing aid and things

8    change, you might hold a telephone against your ear, or any

9    of those things where the acoustic environment changes,

10   the -- the feedback might occur or there might be a

11   different kind of noise and you'd want to change the hearing

12   aid's characteristic such that you had the optimum

13   characteristics for the listener without feedback, and that

14   required adaptive changes to that filter.

15   Q.    Then if you turn to Column 11, Lines 31 through 38,

16   and I will read it for you, it says, Automatic adjustment of

17   the frequency response of the hearing aid as a function of

18   speech level may also be effected by placing the

19   programmable filter in a feedback loop in a series with a

20   programmable compression amplifier.  Since the degree of

21   feedback depends on signal level, the overall frequency

22   response also depends on signal level.

23                What does that have to do with being adaptive?

24   A.    Well, you would want to make sure that you adapt the

25   system such that you have optimum gain characteristics or

268

Levitt - direct

1    frequency shaping for the listener.

2    Q.    Finally, if you turn to Column 11, Lines 51 through 57

3    on that same page, and I will read it to you, it says,

4    Moreover, by virtue of the novel means employed for

5    effecting automatic adjustment of the programmable filter to

6    optimum parameter values as the speech level, room

7    reverberation and type of background noise change and for

8    reducing acoustic feedback, a superior hearing aid system of

9    optimum characteristics can be prescribed for

10   hearing-deficient patients.

11         What does that have to do with being adaptive?

12   A.    Okay.   When you have the hearing aid that is

13   adjusting itself automatically, the method of adjustment is

14   adaptive.   It might get worse, and come back to the optimum

15   condition.   Automatic adjustment requires some adaptive

16   mechanism or algorithm in the system.

17   Q.    I think you also heard in opening argument with the

18   lawyers say, well, their technology is different because

19   it's adaptive on the fly.   Can you compare that to your

20   patented technology?

21         MR. ROMARY:   Expert testimony.

22         THE COURT:   Counsel, I am going to sustain that

23   objection.

24         Do you want to be heard on that?

25         MR. STEINBERG:   I believe he said it in opening.

Levitt - direct

1    Q.    In the patent that you invented, was the host

2    controller manual or automatic?

3    A.    It could be either.  Initially, we started with manual

4    adjustment.  And then we programmed it to be automatic.  The

5    intent was to have finally an automatic system.

6    Q.    You have described prototypes which you called

7    breadboards and we have seen pictures of those.  How did

8    you -- how would you get those into a human ear?

9    A.    Well, that involves a manufacturing process.  I mean,

10   what we did at that time was we had the shell of a hearing

11   aid.  And we put a transducer into it, a loud speaker into

12   it, a microphone, and wires going to the breadboard.

13   Acoustically, to the person wearing it, it was like a

14   regular hearing aid.  But the breadboard was separate.

15             The idea at that point was to get a manufacturer

16   to manufacture the actual electronics such that it would be

17   either pocket-worn or fit behind the ear.  And that's where

18   we couldn't find a manufacturer to go with us.

19   Q.    Now, if you turn over to Column 14 in the patent, the

20   '850 patent, Exhibit 4.

21   A.    No. 4.

22   Q.    Yes.  Exhibit 4, the '850 patent, and Column 14.

23   A.    Yes.

24   Q.    There is two claims there, 13 and 14.  Both of them

25   use the word determining.  Do you see that?

Levitt - direct

1              THE COURT:  Doctor, let me interrupt for just a

2     second.

3              THE WITNESS:  Sure.

4              THE COURT:  Your lawyer will get a chance to ask

5     you additional questions.

6              THE WITNESS:  Yes.

7              THE COURT:  So he can give you that opportunity

8     to explain.  He gets to control the questioning.

9              THE WITNESS:  Okay.

10             THE COURT:  Okay?

11             MR. ROMARY:  If I'm able.

12             THE COURT:  I really control the questioning.

13             THE WITNESS:  You're in charge.

14             THE COURT:  But it is what we call

15     cross-examination, so he gets to ask the questions.

16             THE WITNESS:  Okay.

17             THE COURT:  Okay.

18             THE WITNESS:  The LMS filter does not measure

19     amplitude in phase to get the answer, but when it does get

20     an answer, it can be transformed into amplitude and phase

21     information.

22     BY MR. ROMARY:

23     Q.   Just so I understand and just so the jury understands,

24     you don't need to have phase and amplitude information to

25     have an LMS filter work.  Yes or no?

Levitt - direct

1    A.    Again, it's one of these yes/no questions where

2    whichever way I answer is going to give you misleading

3    information.

4    Q.    Can you answer yes or no?

5    A.    I just told you, if I answer yes or no, it's not going

6    to be an accurate answer.

7              THE COURT:  I think the answer is he cannot

8    answer yes or no.  Okay.

9    BY MR. ROMARY:

10   Q.    Now I'm really now confused because I thought just a

11   moment ago you did say an LMS filter does not need phase or

12   amplitude information in order to operate.

13   A.    No.

14   Q.    Yes or no?

15   A.    I did not say that.

16             THE COURT:  He didn't say that.  He qualified

17   his answer.

18             MR. ROMARY:  Okay.

19             THE COURT:  Okay.

20   BY MR. ROMARY:

21   Q.    Can you take -- according to your understanding, if I

22   gave you phase and amplitude information, I said, make this

23   LMS filter operate in view of this phase and amplitude

24   information, can you make it operate?  Yes or no?

25   A.    Please don't ask me yes-or-no-questions because

```
 1    they're implying a certain -- you get an inaccurate answer
 2    if I just say yes or no.
 3    Q.    You can say you can't answer.  I just want to know.
 4    Yes or no, or you can't answer?
 5    A.    I can't answer that question because it doesn't fit
 6    the nature of LMS.
 7    Q.    That's fine.  Other experts may disagree, but that's
 8    fine.
 9                   THE COURT:  Counsel --
10                   MR. STEINBERG:  Objection.
11                   THE COURT:  Sustained.
12                   MR. ROMARY:  Thank you.
13    BY MR. ROMARY:
14    Q.    Okay.  Let's go back to your patent, please.  By the
15    way, you did not disclose an LMS filter in your patent;
16    correct?  Yes or no?
17    A.    No, I did not display an -- a filter of that type, but
18    I did describe a system that gave the equivalent answer.
19    Q.    Okay.  So an LMS filter is not in there.  Correct?
20    Yes?
21    A.    It's an immediate -- there's a method that's in there
22    that gives you the same answer essentially --
23    Q.    I'm not asking you that, sir.  I know every filter
24    that works gives you the same result.  I'm asking you
25    whether an LMS filter is in there?  Yes or no?
```

Levitt - cross

1    Q.    And some of that acoustic feedback is going to come

2    right to this summary, isn't it?

3    A.    Right.

4    Q.    You are going to take another sample of that test

5    signal and run it through this amplifier and this phase

6    adjuster, aren't you?

7    A.    Yes.   That is a technique we use to accomplish the

8    null method of adaptive adjustment.

9    Q.    Exactly.   What you do is you adjust these two so you

10   get exactly the same signal as you are getting from the test

11   signal when acoustic feedback is occurring.   Correct?

12   A.    Yes.

13   Q.    When these two things are adjusted so that you get a

14   null, you know that for that particular condition, you have

15   the right phase and amplitude represented by this phase

16   shifter and by this amplifier.   Correct?

17   A.    Yes.

18   Q.    And then you take that information and you convert it

19   by a computer into coefficients that will give you the same

20   phase and amplitude when you load those coefficients into

21   this filter.   Correct?

22   A.    Yes.   But that filter has to be in the feedback path.

23   Q.    Yes.

24   A.    Yes.

25   Q.    What you are doing is you are saying, okay, I know

1    all.

2    A.    I am sorry.  Every time you are asking the question I

3    think you are asking the question about the hearing aid in

4    general.

5    Q.    No, sir, I am sorry.  That's not what I am doing.  I

6    am asking about these two figures and what's in the patent.

7    That's all.

8    A.    Thank you.

9    Q.    In these two figures, and what's in the patent, when

10   you do the measuring process, you open up and disconnect the

11   microphone.  Correct?

12   A.    Again, you are using the word measuring process.  And

13   measuring is only one possible way of doing it.

14   Q.    You do open up the microphone, don't you?

15   A.    In the example I gave, you disconnect the microphone.

16   Q.    So it's no longer operating as a traditional standard

17   hearing aid.  Isn't that correct?

18   A.    As pointed out, there are standard hearing aids which

19   have electrical inputs.  It is not operating as a hearing

20   aid with what they call an audio input as opposed to on

21   electrical input.

22   Q.    I think we all understand what's happening.  The test

23   signal comes in here, right, and some of it is going to come

24   out of the speaker and it's going to form acoustic feedback?

25   A.    For that particular example, yes.

Levitt - cross

1    beat your wife?  Whatever you say implies something that's

2    not positive.

3              I wish you would not ask me yes-no questions

4    because I cannot say, well, yes, maybe, no.  I would rather

5    give you a full explanation of what's going on.

6    Q.    You have every right to do that at cross-examination

7    and you have the right to say you can't answer yes or no.  I

8    am not trying to put words in your mouth.  I am just trying

9    to make a record as to, yes, you can answer, no, you can't,

10   or I can't answer the question.  Those are legitimate

11   answers.  Just want one of the three.

12   A.    Thank you.

13   Q.    My question is, we have got a spot down here where the

14   hearing aid tells you whether the loudness of the signal is

15   changing.  Is that correct?

16   A.    Yes.

17   Q.    And we have got something here that tells you whether

18   the noise characteristics are changing.  Correct?

19   A.    Yes.

20   Q.    Do we have anything that tells you when the acoustic

21   feedback characteristics are changing?

22   A.    Not in that configuration.

23   Q.    Now if we go back to the host control.

24              If you cannot detect when the acoustic feedback

25   conditions are changing, you just have one set of

Levitt - cross

```
 1    coefficients for the acoustic feedback conditions that exist
 2    at the time these measurements are made.  Isn't that
 3    correct?
 4    A.    You are implying that under conditions that I cannot
 5    detect if acoustic feedback is changing?
 6    Q.    Yes.
 7    A.    I can when the filters are in the appropriate
 8    positions.  There are lots of switches to move the filters
 9    around, depending on what you want to implement.
10    Q.    There is no position you can put this filter in to
11    have anything in this hearing aid detect when the acoustic
12    feedback path changes, is there?
13    A.    Yes, because the null detector would show a deviance.
14    Q.    You have to be connected to the host controller for
15    that, don't you?
16    A.    The host controller would be an integral part of the
17    whole unit.
18    Q.    I am talking about the whole hearing aid, sir.
19    A.    If you are talking just about the hearing aid in an
20    application for which it wasn't designed, yes.
21    Q.    This wasn't designed to be a hearing aid?
22    A.    It wasn't designed to cancel acoustic feedback
23    adaptively when the feedback is changing.
24    Q.    That's the answer to my question --
25          MR. STEINBERG:  May he finish his answer,
```

Levitt - cross

1     Q.    His paper was in 1991, do you recall that?

2     A.    Yes.

3     Q.    And that would have been after your patent was filed?

4     A.    I can't remember -- the paper was published after my

5     patent was filed, yes.

6     Q.    Your patent was filed in June of 1986?

7     A.    Yes.

8     Q.    And are you quite certain that Dr. Kates worked for

9     you after that period of time?

10    A.    I told you, I cannot remember the day he was first

11    hired.

12    Q.    Now, he worked with LMS filters.  Right?

13    A.    He worked with an LMS filter, yes.

14    Q.    And you knew about LMS filters before your patent was

15    filed.  You said that?

16    A.    I am familiar with LMS filters, yes.

17    Q.    Are LMS filters small?  Can they be run by batteries?

18    A.    That depends on the technology that you have.

19    Q.    The work you were doing before the patent was filed

20    with LMS filters, that had nothing to do with Audimax.

21    Right?

22    A.    Yes.  I worked with an LMS filter at the university.

23    That particular LMS filter was relatively large and needed

24    an electrical power input.

25    Q.    Do you know --

351

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3
                              -  -  -
 4

 5    ENERGY TRANSPORTATION,              :  Civil Action
      INC.,                              :
 6                                       :
                     Plaintiff,          :
 7                                       :
            v.                           :
 8                                       :
      WILLIAM DEMANT HOLDINGS A/S,       :
 9    et al.,                            :
                                         :
10            Defendants.                :   No. 05-422 (GMS)

11                              -  -  -

12                        Wilmington, Delaware
                        Wednesday, January 23, 2008
13                           8:30 a.m.
                          Third Day of Trial
14
                              -  -  -
15
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16

17

18    APPEARANCES:

19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                     -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                                        Counsel for Plaintiff
24

25
```

1    example, the phase is not what is shown here, is it?

2    A.    That's the period.

3    Q.    But if you were measuring this from some absolute

4    place, like if this were the corner of your property and you

5    were saying, okay, this first one here is four feet away,

6    that would be a measurement of phase then, wouldn't it?

7    A.    Yes.   You would specify it as a function of a period.

8    That second mermaid would be one period away from the

9    beginning.   And that would be zero phase, actually.

10   Q.    Now, your host controller that is shown in your

11   patent, Figure 1, that would measure this amplitude in the

12   amplifier that I kept circling in the host controller.

13   Correct?

14   A.    One of its functions would be to measure that

15   amplitude.

16   Q.    And the phase shifter I kept referring to, one of its

17   functions would be to measure from some reference point the

18   phase of that signal.   Correct?

19   A.    Actually, I was slightly in error.   One of its

20   functions would be to determine the amplitude and to

21   determine the phase.

22   Q.    Now, in real life, when you walk around with a hearing

23   aid, if you use this analogy, those mermaids are going to

24   get bigger and smaller as the acoustic feedback path

25   changes.   Correct?

1    A.    Yes, that is correct.

2    Q.    And in my opening I kind of danced around a little bit

3    and said, okay, they are going to dance around, their phase

4    is going to shift also in the real world.  Is that correct?

5    A.    Yes.

6    Q.    So in the real world, if we were going to use your

7    host controller, it would have to be carried around with you

8    and somehow keep track of all that?

9    A.    Yes.  But that was envisioned for the somewhat distant

10   future.

11   Q.    In the host controller that you showed in your patent,

12   that wasn't shown, was it?

13   A.    I don't believe the patent specified whether the host

14   controller was going to be wearable or not wearable.

15   Q.    Just so everyone is clear about this, can we put -- I

16   don't have the number.  I thought I had written it down

17   here.  I apologize.  I think it's 131, JX-131.  Just so

18   everyone understands, that is your host controller as of

19   1986.  Correct?

20   A.    That was the host controller we used at the time we

21   developed the apparatus.

22   Q.    And that would have been before the patent was filed.

23   Right?

24   A.    Yes.

25

12

1          Take 3 is another file

2     Q.    Now, could we go back to the mermaids again for a

3     moment?

4               You can leave this up.  It doesn't matter.

5               Dr. Levitt, would you agree that in the real

6     world, it's an improvement to be able to follow the mermaids

7     as they're moving and to adjust adaptively as they're

8     moving?  That it's an improvement?

9     A.    That would be an improved version.

10    Q.    In fact, for a hearing impaired person that has a lot

11    of trouble hearing, it would be an enormous improvement,

12    wouldn't it?

13    A.    I couldn't tell you how big of an improvement to  have

14    it change all the time rapidly but it would be an

15    improvement.

16    Q.    Now, in my opening, I took my hearing aid out and I

17    made it whistle and then I said, okay, now it doesn't

18    whistle.  Is there anything in your patent that detects the

19    onset of that whistling that tells the host controller, hey,

20    it's whistling?

21    A.    No, but that was established technology at the time.

22    Q.    But I just want to make it clear that that is not

23    disclosed in your host controller or in your hearing aid of

24    your patent, is it?

25    A.    Well, actually when the host controller is working,

1    feedback between the receiver and the microphone?

2    A.    Yes, I did.

3    Q.    Where is that shown again?

4    A.    The blue element at the bottom does the determining.

5    This is the WLMS -- it is the update module, which contains

6    the LMS routine.  The coefficients are loaded into the

7    buffer, which is the small box directly above it.  And the

8    buffer then passes them up into the filter, where the

9    coefficients are provided to the filter from the update

10   module.

11   Q.    What is your understanding of what an LMS algorithm

12   is?

13   A.    This the least mean squared algorithm is the routine,

14   in this case it is a hardware one, but it is a routine to

15   look at the coherence between the output and the input and

16   determine when there is a signal present and iterate to a

17   final solution, which closely approximates the elimination

18   feedback by reducing the error term to a null.

19   Q.    Does the LMS algorithm specifically measure phase and

20   amplitude?

21   A.    No, it doesn't.  It determines the effect on phase and

22   amplitude.  And that's what the claim requires.  It is true

23   that, mathematically speaking, the coefficients define the

24   amplitude and phase.  But it's not necessary for them to be

25   defined or read out according to the claim.  The effect is

1    all that's asked for.

2    Q.    Did you analyze the Oticon products that are based on

3    the anti-feedback algorithm to determine whether they met

4    the limitation of Claims 14 and 16 of inserting between the

5    input and output of the transmission channel a programmable

6    filter programmed to equalize and reduce the effect of

7    acoustic feedback both in amplitude and phase on a signal in

8    the transmission channel?

9    A.    Yes.    The prior art filter, which is the orange box at

10   the top, with the arrow through it, is a programmable

11   filter, and it is inserted in that phase.    When the

12   coefficients are put into the filter, the filter then has a

13   filter function and it's electrically inserted into the

14   path, and provides a signal out of it, which is the -- the

15   result is the opposite of the acoustic feedback in both

16   phase and amplitude.

17   Q.    I am not sure if you mentioned this before.    There is

18   a little box above the update box.    What does that box show?

19   A.    That is a buffer, and that box stores the data while

20   the update module is doing its computation.    In fact, it

21   actually shows arrows in both directions because it receives

22   the coefficient from the update module and then when the

23   update module is doing its next calculation, it actually

24   returns the previous calculation's coefficients so the

25   update module can use that for its next calculation.

Brown - direct

1   calculate the coefficients and then you insert them.  It can
2   be done iteratively as it's done in the LMS routine, but if
3   you compare that to the original patent, it is very much
4   like Dr. Levitt's person and his "no" routine going back and
5   tweaking the knob until he found a no.  In this case, the
6   LMS routine does it on a chip and tweaks the knob until it
7   finds a no.
8   Q.   Can a product determine the effect on phase and
9   amplitude without making a specific measurement?
10  A.   As I said before, the effect does not require absolute
11  measurement of the phase and amplitude.  It requires
12  producing coefficients resulting in that inverse signal
13  which is the effect.
14  Q.   I think you were here for the opening statement.  Did
15  you understand that the defendants are saying that their
16  products are adaptive?
17  A.   Yes.
18  Q.   And that they use adaptive filters?
19  A.   Yes.
20  Q.   Do you agree with that?
21  A.   Yes.
22  Q.   Does that change your analysis?
23  A.   No.
24  Q.   Why is that?
25  A.   Because the adaptive filter, as I said a minute ago,

1    when we talk about a FIR filter, this is a simple version of
2    what it would look like.  And what we have is data coming in
3    input and each time delay, each clock cycle, it is shifted
4    to the right so we have time delayed samples.  Those are
5    the -- the delays are shown by T minus one and T minus two.
6        Just below that we see the two multiplying or
7    multipliers in the filter.  And what they do is they
8    multiply the data sample by the coefficients C1 and C2, to
9    produce an output that is so much of each one of those time
10   samples.  Those results are then summed together at the
11   bottom, in summers, to produce the weighted -- we call those
12   multiplied answers weighted samples.
13        And the value of at least one of those
14   coefficients can be programmed.
15   Q.   So what are the kinds of filters that satisfy this
16   understanding of a programmable delay line filter?
17   A.   Well, just about any digital filter will satisfy a
18   delay line filter because it operates on time-delayed
19   samples, and it multiplies these samples by coefficients,
20   and sums them together in one way or another.  But the
21   simplest example is like this FIR filter.
22   Q.   What kind of filters did you find in the accused
23   Oticon,  Bernafon and Widex products?
24   A.   In all of them we found some variant of an FIR filter.
25   Q.   So they have programmable delay line filters?

Brown - direct

1    A.    Absolutely.

2    Q.    And how are the programmable delay line filters in

3    their products programmed?

4    A.    Well, the ones with respect to this feedback canceling

5    are programmed by the LMS routines, which calculate the

6    coefficients for them.  When they start up, some of them

7    actually have best guesses that are loaded in for the first

8    times, other products start up at zero.  But the bottom line

9    is each time a new set of coefficients is loaded, a new

10   filter equation is inserted in the feedback loop.  And from

11   an electrical standpoint, that is like putting a new filter

12   in.

13   Q.    Did you do a comparison between Claim 19, which was up

14   there, to the Demant products?

15   A.    Yes, I did.

16   Q.    Is there a demonstrative to help show how you compared

17   Claim 19 to their products?

18   A.    I believe so.

19   Q.    Brown B-1.  Is this the same figure earlier that we

20   were looking at, Claim 16?

21   A.    Yes, it is.

22   Q.    Could you indicate where here you have got a

23   microphone?

24   A.    Again, we have a microphone on the right side, the

25   little dotted box in the middle is an acoustic feedback

Brown - direct

1    Q.    Let's look at a Demonstrative W-1, please.  Go ahead,
2    Mr. Brown.  Where in this diagram do you find the Claim 19
3    elements?
4    A.    As before, we find the microphone on the left, the
5    receiver on the right, the transmission channel in the
6    middle, and the feedback path simulator at the bottom.  And
7    the feedback path is from the output to the input.
8    Q.    From this diagram can you tell whether or not the
9    feedback path simulator is a programmable delay line filter?
10   A.    Not at this level.
11   Q.    Could you look at another diagram to look at that?
12   A.    Yes, I did.
13   Q.    I show you W-2.  It's the same diagram we saw earlier?
14   A.    This is the same as before.
15   Q.    And where in here if anywhere is there a programmable
16   delay line filter?
17   A.    A programmable delay line filter has been highlighted
18   in orange and is called WFIR.
19   Q.    Is this filter programmable?
20   A.    Yes, it is.
21   Q.    And how is that?
22   A.    Well, we see the filter coefficient develop on the
23   WLMS routine, as we said before, and those filter
24   coefficients are passed through to the first filter.  In
25   other words, it provided the first filter from a coefficient

542

Brown - direct

1    generator.

2    Q.    And is the filter, which is the orange box, and the

3    WLMS block, are those separate components?

4    A.    Yes, they're separate components, as is shown on this

5    block diagram at a more detailed level.  As you can see,

6    they're separate components.

7    Q.    In your opinion, is it proper to consider the LMS

8    block to be part of the filter?

9    A.    Well, the filter is the first filter and the LMS block

10   calculates a routine.  Then if you go to the next layer up,

11   we can say all of it is a function of an LMS filter, but in

12   point of fact that's a macro block name which contains

13   within it these smaller macro blocks of a first filter which

14   the patent requires and the calculation block.

15   Q.    In your analysis of Claim 19, does it matter whether

16   or not you can provide coefficients to the filter from an

17   external device?

18   A.    No, the patent doesn't anywhere say in the claims that

19   it has to be externally programmed.

20   Q.    And is the WFIR block, that is a delay line filter?

21   A.    Yes, it is.

22   Q.    This filter here says WFIR.  What is a WFIR filter?

23   A.    Again, that is the warped function, and it's an added

24   enhancement to allowing a shorter delay line to have the

25   same accuracy of a larger number of taps.

```
 1      for Widex that have additional elements, did that make a
 2      difference in the analysis of Claim 19?
 3      A.    No, it does not.
 4      Q.    We talked about adaptive filters for Claims 14, 16 and
 5      13.   Does it matter in your analysis whether or not the
 6      defendants utilize an adaptive filter for purposes of Claim
 7      19?
 8      A.    No, it does not.
 9      Q.    And why is that?
10      A.    Claim 19 does not state it has to be static or
11      adaptive or anything.  It just says the filter has to be
12      there and it has to perform a function of feedback removal.
13      Q.    Okay.  Let's pull up the checklist.  Number one,
14      please.
15            So did you find the Widex products are hearing
16      aids?
17      A.    Yes, they're hearing aids.
18      Q.    They have microphone, receiver and transmission
19      channel?
20      A.    Yes, yes, yes.
21      Q.    And do they have a programmable delay line filter?
22      A.    They do.
23      Q.    And is it in a feedback path?
24      A.    It is.
25      Q.    And that programmable delay line filter was their WFIR
```

Brown - direct

1    19 under the doctrine of equivalents?

2    A.    Yes.  If they don't infringe literally, they certainly

3    infringe under the doctrine of equivalents because they do

4    substantially the same thing in substantially the same way

5    to effect substantially the same result.

6    Q.    Let's look at Brown 3 for Claim 16 of the patent, the

7    Demonstrative Brown 3.

8    A.    Yes.

9    Q.    Did you make an analysis as to whether or not the

10   accused products meet the determining step under the

11   doctrine of equivalents?

12   A.    Well, yes.  The determining step has a function,

13   way -- well, one of the ways of an equivalent is function,

14   way, result.  So you look at the determining step and you

15   say what is the function?  The function is to determine the

16   effective amplitude and phase of the signal transmission.

17   Now, the way is by the LMS filter calculating the

18   coefficients.  And the result is that you end up with the

19   resulting output of that filter being the effect of the

20   acoustic feedback in the external channel.

21   Q.    Is what you have just described substantially the same

22   as what is described in the patent in your view?

23   A.    That is correct.

24   Q.    Now, did you analyze whether or not the accused

25   products perform the inserting step under the doctrine of

1    equivalents?

2    A.    Again, the inserting step says that you insert between

3    the input and output of the transmission channel a

4    programmable filter programmed to equalize and reduce the

5    effect of said acoustic feedback.  So the function is to

6    insert a filter which equalizes the effect.  The way is

7    again through the elements filter calculating coefficients,

8    loading them into the FIR filter.  And the result is to

9    equalize and reduce the effect of the acoustic feedback in

10   both phase and amplitude.

11   Q.    Did you analyze the difference between the specific

12   example in the patent and the methods used by the defendants

13   for determining and inserting?

14   A.    Well, the specific example in the patent is just that,

15   it's an example of what's the claim, of one way to do the

16   claims.  The claims define the rights of the patentee.  The

17   example is one embodiment that can teach how to do that.

18   And it's not proper to read the limitations of the

19   specification, in other words, the embodiment into the

20   claims.  You can understand the claims in light of the

21   specification in total but you don't know it by the figures

22   in the specification.

23   Q.    So did you find that the function/way/result that you

24   described for the accused products is substantially the same

25   as the function/way/result for the inserting step?

1    A.    Yes, I did.

2    Q.    Okay.  Now, Claims 14 and 16 mention the receiver

3    fitted in the ear and you talked about behind the ear

4    hearing aids?

5    A.    Yes.

6    Q.    Did you analyze behind-the-ear hearing aids under the

7    doctrine of equivalents?

8    A.    Yes, I did.

9    Q.    And what was the analysis that you provided?

10   A.    As I said before, in the behind-the-ear hearing aids,

11   the aid is physically on the top of the ear, and some of

12   them heard the term "on the ear" but we called it BTEs when

13   I was in the industry, and there is a tube that comes down

14   from the speaker and into the ear, into a mold in the ear

15   that holds it in your ear.  That tube actually has acoustic

16   responses to them that add to the response of the speaker,

17   itself.  So if it's not literally in the ear, it certainly

18   is, under DOE, doctrine of equivalents, in the ear.  It's

19   function is to put the sound to your eardrum, the way is on

20   the speaker taking an electrical signal and converting it to

21   an acoustic signal, and the result is you hear the output of

22   the hearing aid.

23   Q.    Now, looking at Claim 19 -- if we could have the slide

24   for Claim 19 -- did you perform an analysis of Claim 19

25   under the doctrine of equivalents?

1    A.    Yes.

2    Q.    And which element did you focus on?

3    A.    Well, obviously, they have a microphone, receiver and

4    a transmission channel.  Those are pretty straightforward.

5          The next element is a programmable delay line

6    filter, and it must be interposed in a feedback channel.

7    And we saw that physically from the documentation and from

8    Dr. Gloster's looking at the code.

9          And so when we're doing an analysis under the

10   doctrine of equivalents, we see that the function is, place

11   the feedback filter in the path -- place a filter in the

12   feedback path.  The way is to use an FIR filter where it is

13   physically in the feedback path, and by inserting

14   coefficients into that filter, you insert that filter into

15   the feedback path.  And the result is the filter is there to

16   cancel the acoustic signal.

17         And, programmable filter, the last element is

18   said programmable filter being programmed to effect

19   substantial reduction.  As I said before, the filter is

20   physically in that loop.  It's given a coefficient from the

21   LMS routine, and having done so, its effect is and the

22   result is that it cancels or significantly reduces the

23   feedback, which is the important element in the original

24   patent and in these products and their marketing literature.

25   Q.    So did you determine whether or not the

1    function/way/result that you just described for the accused
2    products is similar to the function/way/result of the
3    programmable delay line filter?
4    A.    Yes.
5    Q.    What is your analysis?
6    A.    That it meets under DOE.
7    Q.    Sir, I'm going to direct your attention to PX-33,
8    which I think is in the juror's notebook, too.  Are you
9    familiar with this document?
10   A.    Yes, that is the cover page describing the Syncro.
11   Q.    And who is this document for, do you know?
12   A.    Oticon.
13   Q.    What kind of document is it?
14   A.    I'd have to see the next page to make sure because
15   that page doesn't tell a whole bunch.
16   Q.    Okay.  Could we look at the next page?
17   A.    Yes.  This is a marketing document.  And it's
18   actually -- when I say a marketing document, it's a document
19   created by the manufacturer and provided to the distributor
20   to give to both audiologists and the public.  It's to teach
21   the audiologist how it works so they can instruct their
22   patients on how they work and they can use the same
23   marketing information and sales tools with their customers.
24   So these documents have to be relatively close to what the
25   product really does because there is a significant amount of

1           In this case we have actually gone to digital.

2    So where he may have had analog comparators, we would have

3    digital functions that do it, and so on and so forth.  The

4    question really is, do the means perform the same function?

5    Q.    For example, the first box there, means for receiving

6    signals, on the right-hand side there is a number of items

7    out of the patent specification.  Were you able to find

8    those items in the accused products of the defendants?

9    A.    Well, not at the literal level, because I couldn't

10   actually go down to the device level and seek them out.

11          I did have Dr. Gloster look at the circuitry, at

12   the block level and functional level, see if it matched.

13   But I wasn't able to go to the literal level and find those

14   specific components.

15   Q.    So did you perform an analysis under literal

16   infringement?

17   A.    No.  I performed an analysis under the doctrine of

18   equivalents.

19   Q.    And did you find infringement under the doctrine of

20   equivalents of Claims 1 and 2 of the '749 patent for the

21   accused products we have been discussing?

22   A.    Yes.

23   Q.    Let's look at, go back to the claim if you would,

24   which is Brown 12.  What is the host controller in the

25   accused products?

1    A.    Well, in the accused products, the host controller has
2    been integrated into the chip.
3            The functions of producing the data and
4    programming the filter in the hearing aid is actually
5    performed by the element's routine and its associated
6    components.
7    Q.    So for the Oticon product there was an update block.
8    Correct?
9    A.    Yes.
10   Q.    And what was the LMS block for the Widex product?
11   A.    I believe it was the WLMS.
12   Q.    Let's look back at the claim again, Brown Slide 12.
13   What is the structure that you looked at for the means for
14   receiving signals from the hearing aid?
15   A.    That's within the uptake block and inside the LMS
16   structure again.  This has all been condensed into the LMS
17   structure which receives data from, in fact -- if we go back
18   to the demonstrative they had I can show you where.  It
19   receives data from the input on the right and from the
20   output there, from the input it receives the data, which is
21   after the summation of the filter in the microphone.  And it
22   receives the output data.  And it uses those two pieces of
23   information to calculate the next coefficients for the FIR
24   filter.
25   Q.    This is an Oticon, so is the analysis for the Bernafon

1    and Widex products similar?

2    A.    It would be the same.

3    Q.    And in your view, do these elements in the accused

4    products measure phase and amplitude?

5    A.    No, they don't actually measure phase and amplitude.

6    Again, as I said before, what they measure is the effect on

7    producing an output of the filter that is equal and opposite

8    in phase and amplitude. Again, mathematically speaking, the

9    coefficients of the filter do have that information in it.

10   Both phase and magnitude are defined by the coefficients of

11   the filter, but it's not measured, it's not read out.

12   Q.    So did you find that the accused products provided an

13   equivalent to what is reported here?

14   A.    That's right.  That is why I only did an analysis

15   under the doctrine of equivalents.

16   Q.    The next element says, means for receiving signals

17   from the hearing aid indicative of the summation of acoustic

18   feedback and acoustic feedback signals.  Did you find some

19   structure in the accused products that perform this

20   function?

21   A.    That's the structure, the dotted line on the right

22   side there.

23   Q.    And did you find whether or not, did you determine

24   whether or not the structure you found was equivalent to the

25   structure in the corresponding structure you showed in the

570

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3
                              -  -  -
 4

 5    ENERGY TRANSPORTATION,          :   Civil Action
      INC.,                           :
 6                                    :
                   Plaintiff,         :
 7                                    :
            v.                        :
 8                                    :
      WILLIAM DEMANT HOLDINGS A/S,    :
 9    et al.,                         :
                                      :
10             Defendants.            :   No. 05-422 (GMS)

11                            -  -  -

12                     Wilmington, Delaware
                    Thursday, January 24, 2008
13                         9:07 a.m.
                      Fourth Day of Trial
14
                              -  -  -
15
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16

17

18    APPEARANCES:

19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                   -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                              Counsel for Plaintiff
24

25
```

1

574

Brown - cross

1    Q.    And there is no question in your mind, is there, that

2    one of ordinary skill in the art would have understood that

3    one piece of this invention was a hearing aid that you were

4    supposed to walk away from a fitting process and walk around

5    the room and be able to use?

6    A.    There is no question about the fact that the

7    long-term intent was to use this in a hearing aid, correct.

8    Q.    And one of the problems Dr. Levitt was facing in this

9    time was power consumption.  Correct?

10   A.    At this point in time, the problems in executing it

11   were power consumption and physical size of the circuitry to

12   achieve it.  So those things weren't available at that point

13   in time.

14   Q.    So you heard Dr. Levitt testify that this was the

15   host controller in 1986 (indicating).  Correct?

16   A.    That was their prototype they built to demonstrate

17   it.

18   Q.    Now, one of ordinary skill in the art at that time

19   wouldn't have known how to make this small enough to put in

20   the ear, would they?

21   A.    One of ordinary skill in the art at that time would

22   have known that this was a prototype and it would have to be

23   integrated in some way, shape or manner.

24   Q.    One of ordinary skill in the art in 1986 would not

25   know how to make this small enough to go in the ear, would

Brown - cross

1    they?

2    A.    Not with 1986 electronic products.  But that doesn't

3    mean they couldn't envision doing that.

4    Q.    I am not asking what they could envision.  I am

5    asking what was taught in the patent and available to one of

6    ordinary skill in the art in 1986.  They couldn't put this

7    in the ear back then, could they?

8    A.    They couldn't put that piece of equipment in your

9    ear, no.

10   Q.    And they couldn't have made it small enough to go in

11   the ear, could they, in 1986?

12   A.    Certainly not that piece of equipment, you are right.

13   Q.    So, in 1986, when this invention was made, it was

14   contemplated that there would be a fitting process with this

15   thing plugged into the wall and there would be a hearing aid

16   run by batteries that would be hooked up to this during the

17   fitting process but unhooked and you would walk away with

18   it.  Isn't that what was contemplated in 1986?

19   A.    That was one of the embodiments that was contemplated

20   and discussed in the specification.  That wasn't a

21   restriction of it, though.

22   Q.    It wasn't a restriction of what?

23   A.    The specification doesn't restrict the claims.

24   Q.    We are not talking about the claims.  Let me make it

25   clear.  I am just talking about the teaching, what he

576

Brown - cross

1    offered to the public in that time.

2    A.    What he showed in his example, embodiment, that's

3    correct.

4    Q.    Now, Dr. Levitt, I thought he said that the hearing

5    aid wouldn't work if you walked away from the host

6    controller.  Did you understand him to say that?

7    A.    I understand him to say that the diagrams in the

8    specification would not work if you disconnected it from the

9    host controller as it was shown in the embodiment that he

10   used as an example.

11   Q.    What he was talking about, I believe -- can we go to

12   Figure 2 of the patent, please.  I believe that is in your

13   book as JX-4.

14          We will put it up here for you.

15          I think what he is talking about here, isn't it,

16   that these two terminals are open in the picture.  Correct?

17   A.    Yes.  Those two terminals are connected on the host

18   controller side of the page through a series of switches.

19   Q.    You would agree with me that one of ordinary skill in

20   the art, knowing that this was supposed to be a hearing aid

21   you can walk around with, would understand that you close

22   those when you disconnect them from the host controller.

23   Right?

24   A.    That's correct.  But one of ordinary skill in the art

25   would also know that you could have the two connected

7

1    skill in the art would know that automatically means going

2    back and testing it again.

3    Q.    Let's hold that for a moment, because I am going to

4    cover that.  All I am trying to do is go through what he

5    taught the public when this patent was issued.  He taught

6    the public, you measure the phase and amplitude, you put

7    those measurements in the computer.  From those you

8    calculate coefficients through a mathematical algorithm that

9    he doesn't disclose, but presumably people know how to do

10   that.

11          And you have coefficients.

12   A.    Yes.

13   Q.    You put the coefficients into the hearing aid.

14   Correct?

15   A.    That's correct.

16   Q.    Now, you may make some other measurements, you may do

17   some other things for other purposes, but that's what he

18   teaches for acoustic feedback control, doesn't he?

19   A.    That's the way he did his breadboard and that's what

20   he taught.  One of ordinary skill in the art would know you

21   could connect those coefficients directly to the E PROM.

22   You don't have to take it or move it as he did in a

23   breadboard.

24   Q.    I am not asking what one of ordinary skill in the art

25   would do beyond what's shown.  I am asking what's shown to

Brown - cross

```
 1    one of ordinary skill in the art, what's shown there, that's
 2    all.  So I have accurately stated, haven't I, what is shown?
 3    A.    You have accurately stated what is shown in the
 4    example, in the specification.
 5    Q.    Thank you.
 6          Now, let's talk about this automatic thing.  We
 7    have heard this red-faced liar thing, and I want to get this
 8    straightened out.  Let's go through that.
 9          There is something down here in the hearing aid
10    that detects, when you are walking around, you are
11    disconnected from the host controller, you are not connected
12    to this anymore, you are walking around the street, and it
13    does detect when the noise gets louder, doesn't it?
14    A.    That's correct.
15    Q.    It does automatically change different sets of
16    coefficients depending upon that loudness of noise, doesn't
17    it?
18    A.    Yes, it does pertain to the noise reduction claims,
19    which aren't being asserted at this time.
20    Q.    That's where I was going to go, sir.  That is exactly
21    my point.  It also has in here some you were saying noise
22    reduction.  There is actually a noise reduction circuit in
23    there, isn't there, in addition to a loudness circuit?
24    A.    Yes.
25    Q.    It not only changes the volume so you don't get
```

1   reducing acoustic feedback?

2   A.    That's not the way I read it.

3   Q.    I understand that.  But you will agree that it could

4   be read that way, don't you?

5   A.    I have no argument.

6   Q.    And you will agree that there is no disclosure in the

7   patent, in the hearing aid itself determining when acoustic

8   feedback path has changed?

9   A.    I agree that there is no disclosure.  But as Dr.

10  Levitt said, the null method allows you to do it, and one of

11  ordinary skill in the art would know that without it having

12  to be written into there.

13  Q.    You have to give me some signal so I know you are

14  done.  I don't want to disrupt you.  Are you done?

15  A.    (Witness nods head affirmatively.)

16  Q.    But the embodiment that the inventor gave to the

17  public doesn't have this automatic adjustment of acoustic

18  feedback.  In fact, you said yourself it is a fixed filter,

19  didn't you, for acoustic feedback?

20  A.    No, I didn't say it was a fixed filter.  As I pointed

21  out, one of ordinary skill in the art would know that you

22  could connect the lines that go to the E PROM and program it

23  on the fly if you wanted to.  It showed because in his

24  breadboard he physically took the E PROM from his computer

25  board, which we saw was a very large piece of equipment, and

24

1    zero and there is no effect of the filter on the electrical

2    path.

3    Q.    So in the case of the accused device, there is a

4    continuously adaptive approach; correct?

5    A.    That is correct.

6    Q.    It's not a fixed approach; correct?

7    A.    That is correct.

8    Q.    And if a fixed approach means a response, then the

9    continuous adaptive approach is not a response, is it?

10   A.    It's a response each time it's recalculated.

11   Q.    So it's 32,000 responses a second?

12   A.    32,000 very slightly different responses a second.

13   Q.    So there it's 32,000 new insertions of a filter?

14   A.    That's correct.

15   Q.    Now, if I went back and took Dr. Levitt's host

16   controller and I calculated the coefficients that he

17   determined and I tried to put those coefficients into one of

18   the accused devices as it's imported into the United States

19   as a hearing aid, so now I have one of the accused hearing

20   aids in this hand and I have Dr. Levitt's host controller

21   with the coefficients that he has calculated for a response

22   in this hand, I can't put those in there, can I?

23   A.    In the first place, the two machines are different

24   so they wouldn't even be compatible, any more than your

25   product would be compatible with your competitor's product.

1      Secondly, you have integrated it into the chip and have not

2      provided connections to the external world because that is

3      not necessary with the algorithm built into the chip.    That

4      is why we put things into the chip, so we don't have to make

5      the external connections.

6      Q.    So we have glued over our socket; correct?

7      A.    No, you connected your socket internally.

8      Q.    And there is no way to put these coefficients into

9      our device once it gets in the United States, are there, the

10     Levitt connections?

11     A.    It's neither necessary or logical.

12     Q.    And there is no way to do it, correct, yes.

13     A.    Again I say you wouldn't do it for his coefficients

14     or external ones into your package because they are done

15     internally.

16     Q.    There is no way to do it, is there?

17     A.    No.

18     Q.    Thank you.    Now, you said that your Claims 13 and

19     14 -- excuse me -- 14 and 16 analysis were very similar to

20     your Claim 13 analysis; correct?

21     A.    Yes.

22     Q.    And so that was for purposes of infringement, right?

23     A.    Yes.

24     Q.    And the same discussion we just had about Claims

25     13 and 14 -- and 16, that applies to Claim 13.    Did I say

618
Brown - cross

1    know the phase.

2    Q.    Do you need to know the amplitude?

3    A.    Again, you need information from that.  You do not

4    need to measure the amplitude.

5    Q.    So you do not need, in an LMS filter, to have that

6    phase shifter and amplifier information to run the LMS

7    filter, do you?

8    A.    The filter provides that information when you provide

9    it with the coefficients and you look for the error term

10   that is the null reading in the host controller of Dr.

11   Levitt's example.

12   Q.    Yes or no, do you need to know the phase and

13   amplitude output of that phase shifter or that amplifier to

14   run an LMS filter?

15   A.    You do need to measure the phase and amplitude, you

16   measure the result.

17   Q.    In fact, isn't one of the advantages of an LMS filter

18   that you don't have to know the result before you start?

19   You don't have to know what phase and amplitude you need

20   when you start using it?  That's one of the advantages,

21   isn't it?

22   A.    That's right.  It's an approved way to do the null

23   routine.

24   Q.    Yes, and you don't need to know the phase and

25   amplitude in order to run the LMS algorithm?

1    A.    Well, phase and amplitude are defined by the

2    coefficient when you have reached the answer.

3    Q.    Right.  It gives you the answer, but you don't need

4    to know ahead of time what the answer is with an LMS filter,

5    do you?

6    A.    No, you start out even at zero and approximate to the

7    answer.

8    Q.    And that is pretty different than having to know the

9    answer before you start and then putting the coefficients

10   in, isn't it?

11   A.    It's an improvement.

12         MR. ROMARY:  Just give me a moment.  I'm

13   checking that we have covered everything.

14   BY MR. ROMARY:

15   Q.    The accused devices, they don't use a test signal in

16   the same way that Dr. Levitt does, do they?

17   A.    I don't believe these two defendants' accused devices

18   use a test signal.

19   Q.    The accused devices don't have to disconnect or open

20   the loop for the microphone when they're correcting for

21   acoustic feedback, do they?

22   A.    Dr. Levitt didn't correct for acoustic feedback

23   with a microphone open.  He used a microphone open when he

24   was applying the filter coefficients for the patient

25   prescription and the accused devices take the audiogram

1    And the whole idea of a digital hearing aid is we time
2    quantize.  We take samples and we operate on samples as
3    numerical numbers.  It's all math until it comes out the
4    other end.  It gets integrated into the radio signal again.
5    Q.    And that one sample is what my question.  That one
6    sample by itself is not doing a whole lot, is it?  It's an
7    iterative process that continues to do it in order to get
8    rid of this feedback?
9    A.    It's an iterative process.  As I said, depending upon
10   the manufacturer, it would take between two and ten seconds
11   to come to a complete null and then it just tries to follow
12   the environment.
13   Q.    Thank you.  You mentioned I believe, Mr. Brown, that
14   in your analysis for the '850 patent, which included Claims
15   13, 14, 16 and 19, you did an analysis both for literal
16   infringement and for the doctrine of equivalents; is that
17   correct?
18   A.    That's correct.
19   Q.    As part of your analysis for the doctrine of
20   equivalents, you didn't consider any prior art, did you?
21   A.    I did not go back and investigate prior art, that's
22   correct.
23   Q.    So you didn't consider prior art when you were
24   looking at the doctrine of equivalents and whether what the
25   claims meant was equivalent to what the defendants have;

637
Brown - cross

1          Okay.  This is one of your slides, Mr. Brown.

2    It is for Claim 1 and Claim 2 of the '749 patent?

3    A.     That's correct.

4    Q.     And then we have, it's a chart.  We have the claim

5    language on the left-hand side and then on the right-hand

6    side we have the corresponding structure; correct?

7    A.     Correct.

8    Q.     And that structure is the structure that you have

9    to find either exactly or equivalently in the defendants'

10   products to find infringement; correct?

11   A.     That's correct.

12   Q.     Okay.  Now, there is a lot of structure there.  I

13   want to point to one in particular.  It's part of the

14   means for receiving.  And, in particular, it says it's an

15   analog-to-digital converter 40.  Do you see that?

16   A.     Yes.

17   Q.     Now, does the LMS filter have an analog-to-digital

18   converter?

19   A.     The data is already in the format.  The

20   analog-to-digital filter was done when it came into the

21   microphones so you definitely won't find that specific

22   element in there.

23   Q.     So the LMS filter does not have an analog-to-digital

24   converter; correct?

25   A.     No, it compares the correlation into digital signals.

1    Q.    And you wouldn't need anything equivalent to an

2    A-to-D converter because it's already digital; isn't that

3    correct?

4    A.    That's correct.

5    Q.    Okay.  Can we put up figure 2 of the '850 patent,

6    please?

7          Okay.  I know you are familiar with this figure,

8    Mr. Brown.  I think you may have testified that you had done

9    work for amplifiers for hearing aids; is that correct?

10   During your career.

11   A.    Probably around 20 of them.

12   Q.    I'm pointing right now at element 68.  Do you see

13   that?

14   A.    Yes.  68 is basically a single, as it's shown in this

15   drawing, it would be a linear amplifier.

16   Q.    And that is the amplifier for amplifying this speaker

17   right there, 69; correct?

18   A.    Not entirely.  The programmable limiter is also an

19   amplifier.  And the filter down at the bottom, 63, also had

20   some effect on both the signal, amplitude and frequency of

21   the signal.  So they all perform part of the amplifying

22   function.

23   Q.    Okay.  Thank you.  Now, do you see that little dot

24   where I'm pointing which is between this amplifier 68 and

25   this speaker 69?

69

Brown - redirect

1    A.    No.    That's the beauty of the patent.    There were a
2    number of algorithms people were playing with, and it does
3    not specify which algorithm.

4    Q.    Did the defendants invent the LMS algorithm?

5    A.    No.

6    Q.    Was it around at the time of Dr. Levitt's patent?

7    A.    Mathematically speaking, it was around, yes.

8    Q.    In your view, an LMS algorithm could be used to
9    provide coefficients to a filter?

10   A.    Yes.

11   Q.    And, in fact, that's what the defendants' products
12   do.    Is that right?

13   A.    That's what I have seen, in each of their examples
14   they show it as a discrete block with a path showing the
15   filter coefficients being loaded into the filter.

16   Q.    You were shown a fairly complex number, a series of
17   mathematical equations.    Do you recall that?

18   A.    Yes.

19   Q.    Could you explain how the LMS algorithm calculates
20   coefficients?

21   A.    Well, when I see equations like that, I either go
22   back to the textbook or refer it to one of my engineers.    I
23   used to teach this at Berkeley.    But to make it simple,
24   basically, it looks at the output of this signal, the
25   amplifier, and just before it goes, is converted back to

Brown - redirect

1    analog, and the speaker, and it compares that to the input

2    after the filter's feedback has been subtracted, and looks

3    for coherence.

4            If it finds that there is any of that

5    feedback element still in the subtracted answer, then it

6    modifies the coefficients to attempt to correct for that.

7    It makes, calculates a new guess and applies that to the

8    filter.

9            Then after this is cycled all the way through

10   the filter, come back around and new data comes back, it can

11   check to see whether it did a good job.

12           As we pointed out, there is a lot more cycles in

13   between in the middle.  So this is a continuous process.

14   Q.    And do you agree or disagree that that measures phase

15   and amplitude?

16   A.    Definitely.  It doesn't read out phase and amplitude.

17   It measures it, it determines the effect on it.  It programs

18   the filter to respond to that effect, and the coefficients

19   of the filter define phase and amplitude.  They are the

20   measurement of it.

21   Q.    What was required to determine infringement of Claims

22   13, 14 and 16?

23   A.    That it determines the effect on the signal, the

24   effect of acoustic feedback on the signal in the patent.

25   Q.    And what again is your opinion as to whether the LMS

81

Gloster - cross

```
 1    Q.     So if I understand your view of programmable, in
 2    order for a device to be programmable, you have to have a
 3    memory; is that correct?
 4    A.     In order for a device to be programmable, you would
 5    actually have to be able to change the values; okay?
 6    Programmable is the opposite of fixed.  Fixed means you
 7    cannot change it.  In even in a Court's construction,
 8    programmable means that you can change the coefficients one
 9    or more times.  In the era of digital systems design, you
10    have to store a value to be able to change it.  So when we
11    design a digital system we put a memory, a coefficient
12    buffer or a RAM in its place.  That means programmable.  If
13    a computer had no memory, it would not be programmable.
14    Q.     If I understand you, sir, in order for something to
15    be programmable in your view, you would have to have a
16    memory?  Yes or no.
17    A.     In the digital area, the existence of a
18    programmable -- of a memory infers directly that it's
19    programmable.  That is what I said.
20    Q.     So is that yes?
21    A.     Could you repeat the question?
22    Q.     Yes.  In your view, in order for something to be
23    programmable, you have to have a memory?  Yes or no.
24    A.     No.  In my view in order for it to be programmable,
25    you have to be able to change the values.  In the digital
```

115

Worning – dep.

1    systems area, if a memory is -- if a memory exists, then it

2    must be programmable.

3    Q.    And the converse of that, if there is no memory

4    device would not be programmable; correct?

5    A.    In the digital area, you shouldn't -- the inexistence

6    of memory should mean that you probably cannot program it.

7    However, from where I stand, fixed means that you hardwired

8    the batteries, so to put the one to one and the zero to

9    zero, so you cannot change the values.  Programmable to me

10   means that you cannot change the values.  So a fixed system

11   would mean that you can't change the values.

12   Q.    Okay.

13             MR. SHELTON:  May I have one moment, Your Honor?

14             THE COURT:  Yes.

15             MR. SHELTON:  Your Honor, I have nothing further

16   but I understand that counsel for Demant may have a few

17   questions of their own.

18             THE COURT:  That's fine.

19             MS. HILL:  Actually I have no additional

20   questions, Your Honor.

21             MR. BUROKER:  No redirect.

22             THE COURT:  All right.  Doctor, thank you.

23   Appreciate it.

24             (Witness leaves witness stand.)

25             MR. BUROKER:  At this time, we would play a

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3                         -  -  -  -

 4

 5   ENERGY TRANSPORTATION,          :  Civil Action
     INC.,                           :
 6                                   :
                  Plaintiff,         :
 7                                   :
            v.                       :
 8                                   :
     WILLIAM DEMANT HOLDINGS A/S,    :
 9   et al.,                         :
                                     :
10               Defendants.         :  No. 05-422 (GMS)

11                         -  -  -

12                    Wilmington, Delaware
                   Friday, January 25, 2008
13                       9:00 a.m.
                     Fifth Day of Trial
14                         -  -  -

15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16

17

18   APPEARANCES:

19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                   -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                                   Counsel for Plaintiff
24

25
```

1

1056

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3                    _  _  _

4

5    ENERGY TRANSPORTATION,        :  Civil Action
     INC.,                         :
6                                  :
                 Plaintiff,        :
7                                  :
          v.                       :
8                                  :
     WILLIAM DEMANT HOLDINGS A/S,  :
9    et al.,                       :
                                   :
10              Defendants.        :  No. 05-422 (GMS)

11                    _  _  _

12              Wilmington, Delaware
               Monday, January 28, 2008
13                  9:37 a.m.
               Sixth Day of Trial
14
                      _  _  _
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge, and
16                                      a Jury

17

18   APPEARANCES:

19              EDMOND D. JOHNSON, ESQ.
               Pepper Hamilton LLP
20                  -and-
               MARTY STEINBERG, ESQ.,
21             BRIAN M. BUROKER, ESQ., and
               MAYA M. ECKSTEIN, ESQ.
22             Hunton & Williams
               (Washington, D.C.)
23
                              Counsel for Plaintiff
24

25

                            1

1   outline how to use it, the main thing to develop.  So what
2   we have done at Bernafon as our own contribution, our own
3   development, is, it needs additional signal conditioning to
4   make this adaptive LMS filter work reliably in the real
5   world.  This has to do with the nature of the acoustic
6   signals.  And this is what hadn't been solved.
7   Q.    Can you provide for the jury a brief description of
8   how the adaptive filter works in the Alaska processor?
9   A.    Yes.  An adaptive filter, this adaptive LMS filter is
10  actually a complicated thing.  But looking at what it does,
11  it does filtering, and in addition, it does updating its own
12  rates or its own coefficients.  So this is the essence of
13  the adaptive filter, that it updates its own filter rates.
14  And these two things go interleavingly, filtering, updating,
15  filtering, updating, 16,000 times a second.
16  Q.    Once you had these solutions for the Alaska
17  processor, what work occurred next?
18  A.    Well, when we had this algorithmic solutions, then
19  the next step is to make an integrated circuit.  And this
20  starts with a top-level description.  And I personally,
21  myself, I wrote the Verilog code that sets out, that defines
22  the Alaska processor that is in the accused product.  So
23  this was the next stage.
24  Q.    Can you describe for the jury what the Verilog code
25  is?

1   Q.      The term feedback canceller, is the reason why you
2   don't want to call the product a feedback canceller because
3   that would mean that your products determine that there is
4   feedback --

5                   THE COURT:   Can we stop there?

6                   MR. BUROKER:   Sure.

7                   THE WITNESS:   I can tell you why I prefer the
8   name suppression.  I already did, actually.  I just repeat
9   myself, sorry.  I explained that without the feedback
10  suppression system, the acoustic signal that goes out of the
11  ear canal and goes back into the microphone, without the
12  feedback suppression system, 100 percent of this sample goes
13  through the hearing aid.

14                  So that may be a problem.  And with the feedback
15  suppression system, in the average, still 25 percent of all
16  the signal values are still there.

17                  So this is why I just insist that from my
18  perspective, this is suppression.  It's reducing, it's
19  suppression.  It's not canceling.

20                  Sorry, this is how I understand the English
21  language.

22  BY MR. BUROKER:

23  Q.      In the same document you are referring to, if you
24  could look at the page that's Bates labeled DEM6037.

25                  There is a diagram there.

 1    persistent problem experienced by hearing aid users is

 2    acoustic feedback.  Feedback can be described as a

 3    whistling, screeching, ringing, humming, and buzzing, but

 4    just what is feedback?"

 5            Okay.  Just this first, this very first

 6    paragraph sets out the scope.  He actually identifies the

 7    feedback in his discourse with whistling, with howling, with

 8    this ill-functioning of the instrument that you can hear.

 9            This is what I was -- that is exactly what I was

10    explaining already several times.

11    Q.    With that assumption, then, is the statement on Page

12    14 that I just read an accurate description of the Alaska

13    product?

14    A.    Then, if we now go to that description that you have

15    on the screen there, we must say that Ken Bozeman in his

16    thinking, he goes on and he assumes that the perfect

17    cancellation would be needed to eliminate the howling.  This

18    is how I interpret what I read here.  But this is actually

19    not true.

20            As I explained before, I think several

21    times already, it's still the 25 percent that we just have

22    to live with that the filter cannot do better, we have to

23    live with, it's there.  It's part of it.  He doesn't know

24    about these details, obviously.

25    Q.    So I don't understand what the -- is this accurate or

1    continuously monitoring the arrow signal in order to keep

2    it on a minimum value because this would mean that we are

3    most efficiently suppressing the feedback.  Is that okay?

4    Q.    Yes, thank you.  Does the adaptive filter use any

5    coefficients?

6    A.    Yes, it does.

7    Q.    And are those coefficients updated or do they stay

8    the same?

9    A.    No, they are continuously updated by the algorithm

10    about 32,000 times per second.

11    Q.    And does the estimate of the feedback path change

12    every time the coefficients change?

13    A.    Yes, because the coefficients are the ones calculated

14    which represent the estimated feedback paths, and then it's

15    going to be continuously updated all these times per second.

16    And if the environment changes, the coefficients will change

17    as well.

18    Q.    What happens to the coefficients after they are

19    generated by the LMS algorithm?

20    A.    Then they are stored within the algorithm, being

21    accessible.

22    Q.    Can you go to Exhibit DX-1660, figure 1?

23    A.    (Witness reviews.)

24    Q.    What is figure 1?

25    A.    1660?

1    person, the shape of your external ear changes.  So we had a

2    mannequin in the laboratories.  The mannequin I had

3    described as before had an artificial ear.  That is an

4    artificial outer ear.  And the hearing aid was mounted, and

5    this was a body-worn hearing aid.  It had a battery pack, an

6    umbilical cord up to the device that fit behind the ear.

7              And the hearing aid was tested on the mannequin.

8    We used something called a spectrum analyzer to display the

9    results.

10   Q.    With reference to the date of May 1985 on this

11   document, when was that presentation of the hearing aid that

12   you just referred to?

13   A.    It was in the spring of 1985, prior to the graduation

14   date.  As I had stated before, this is a fixed graduation

15   date, one of two allowed at the University of Wyoming.  They

16   only have two ceremonies during the year, May and December.

17             But his presentation, his demonstration, was

18   prior to May 1985.  I don't recall the exact date.  I am

19   pretty certain it was in April of 1985.

20   Q.    Now, this document refers to the digital suppression

21   of acoustic feedback.

22             Did Mr. Best's hearing aid have feedback

23   suppression?

24   A.    Yes, it did.

25   Q.    Did it work the same way as Mr. Weaver's?

Egolf - direct

1    A.    No, it was different.

2    Q.    What did he use?

3    A.    He used, and I described this before, he described

4    something called the LMS algorithm.  And this was the method

5    suggested Dr. Kirlin.  It was earlier in my testimony.

6          Dr. Kirlin was on his committee.  And Lee took

7    Dr. Kirlin's advice and ran witness.  He said that's what I

8    want to do to investigate a technique for eliminating

9    feedback.

10   Q.    Did you see any of the results of the tests of this

11   particular hearing aid?

12   A.    Yes, I did.

13   Q.    How were the results?

14   A.    They were incredible.

15   Q.    Can you give us numbers?

16   A.    This allowed -- well, the results are described as

17   providing 12 db of -- 12 to 13 db of additional stable gain.

18   Additional stable gain is the additional volume that you can

19   crank the hearing aid up.

20         I don't know if this has been stated before.

21   But the Veterans Administration, one of the largest dollar

22   volume outputs from the VA is hearing aids, because war

23   veterans like myself return typically with hearing damage.

24   And so many people who have severe hearing loss just do not

25   derive a benefit from a hearing aid because you can't crank

1176
Egolf - direct

1    the volume high up enough before the doggone thing begins to

2    screech.  So this provided that additional volume.

3    Q.    Did you witness any other people observe the

4    operation of Mr. Best's feedback suppression circuit?

5    A.    Yes, I did.

6    Q.    How many people would you saw?

7    A.    There were at least three in the room other than

8    myself.

9    Q.    Did you require those people to keep it a secret?

10   A.    No, I didn't.  I had no control over it.

11   Q.    Who was controlling Mr. Best in his thesis?

12   A.    Control is a strong word.  Too strong a word.

13   Q.    Who was he reporting to?

14   A.    He was reporting to Dr. John Steadman.  John is now

15   the dean of engineering at the University of South Alabama,

16   in Mobile.

17   Q.    Just very quickly, can you tell the jury what Figure

18   11 represents?

19   A.    I have to preface this with I am not an expert on Lee

20   Best's thesis.  But I will do the best job I can.

21              Figure 11 is, if you will see the lower part of

22   the figure, that represents --

23              MR. STEINBERG:  Your Honor, we object.  This is

24   expert testimony.  He is testifying about someone else's

25   project.  He was not supervising this.

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3
                         -  -  -
 4

 5   ENERGY TRANSPORTATION,          :  Civil Action
     INC.,                           :
 6                                   :
                  Plaintiff,         :
 7                                   :
          v.                         :
 8                                   :
     WILLIAM DEMANT HOLDINGS A/S,    :
 9   et al.,                         :
                                     :
10            Defendants.            :  No. 05-422 (GMS)

11                       -  -  -

12              Wilmington, Delaware
                Tuesday, January 29, 2008
13                   8:50 a.m.
                Seventh Day of Trial
14
                         -  -  -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
16                                and a Jury

17

18
     APPEARANCES:
19
                  EDMOND D. JOHNSON, ESQ.
20                Pepper Hamilton LLP
                       -and-
21                MARTY STEINBERG, ESQ.,
                  BRIAN M. BUROKER, ESQ., and
22                MAYA M. ECKSTEIN, ESQ.
                  Hunton & Williams
23                (Washington, D.C.)

24                               Counsel for Plaintiff

25
```

1

Best - dep.

1    "Question:  And I think you said that you

2    started that program some time in 1983, and you completed it

3    in the spring of 1985; is that correct?

4    "Answer:  That's correct.

5    "Question:  And were there any particular

6    professors that sponsored your master's?

7    "Answer:  They would be the three that were on

8    my committee.  They were Dr. Steadman, Dr. Egolf, and

9    Dr. Kirlin.

10    "Question:  You mentioned that Dr. Steadman,

11    Dr. Egolf and Dr. Kirlin were involved in your defense of

12    the thesis.  They were -- you were defending your thesis in

13    front of them?

14    "Answer:  Yes.

15    "Question:  And when was that defense of your

16    thesis?

17    "Answer:  This was in May of 1985.  I don't

18    remember the exact date.

19    "Question:  Let's start over again.  Best

20    Exhibit No. 2 is a document bearing Bates numbers, BEST00340

21    through BEST00415.  And Best Exhibit 2 is entitled, Digital

22    Suppression of Acoustic Feedback in Hearing Aids, by Leland

23    C. Best.

24    Dr. Best, is Exhibit 2 your thesis that you

25    prepared?

Best - dep.

1         "Answer:  Yes.

2         "Question:  And this has a date of May 1985.   Is

3    that consistent with the time that the thesis would have

4    been prepared?

5         "Answer:  Yes.

6         "Question:  Did you author this thesis?

7         "Answer:  Yes.

8         "Question:  Did you receive any assistance apart

9    from the professor's input?

10        "Answer:  No.

11        "Question:  When would you have submitted --

12    well, let me start off.  Did you submit this thesis to the

13    University of Wyoming?

14        "Answer:  Yes.

15        "Question:  When would you have first

16    submitted -- when did you complete the thesis?

17        "Answer:  Again, I don't know an exact date, but

18    it would have been early May of 1985.

19        "Question:  And who did you submit the thesis to

20    once it was completed?

21        "Answer:  I had to give copies to each of my

22    committee members, and then once they approved it and I had

23    passed my defense, it was given to the university to

24    publish.

25        "Question:  Now, the title of this document,

1295

Best - dep.

1    much sound was going back to the mic?

2                "Answer:  I used an algorithm called the LMS

3    algorithm to estimate the transfer function of that feedback

4    path.

5                "Question:  Once you used this LMS algorithm to

6    estimate the feedback path, then what did you do?

7                "Answer:  As I said earlier, I simply subtracted

8    out what was coming in from the microphone.

9                "Question:  Once you subtracted out the result

10   of this algorithm, what was the result?

11               "Answer:  The result was that you could turn the

12   gain up on the microphone considerably higher before you had

13   feedback occur.

14               "Question:  Were you able to cancel this

15   feedback?

16               "Answer:  Yes.

17               "Question:  Did you ever work on an actual

18   prototype hearing aid system?

19               "Answer:  Yes.

20               "Question:  That included this LMS algorithm

21   that you spoke about?

22               "Answer:  Yes.

23               "Question:  And did that prototype work?

24               "Answer:  Yes.

25               "Question:  Did you test the prototype?

1296
Best - dep.

1            "Answer:  Yes.

2            "Question:  What was the results of your testing

3   of the prototype?

4            "Answer:  The result, basically, was that I

5   could achieve up to 13 dB additional gain.

6            "Question:  Is 13 dB additional gain, is that

7   significant?

8            "Answer:  Yes, that is significant.  10 dB

9   sounds to a human about twice as loud.

10           "Question:  And by increasing the gain to 13 dB,

11  up to 13 dB, does that help the hearing aid patient?

12           "Answer:  Yes.

13           "Question:  How does it help a patient?

14           "Answer:  Well, a person that has a hearing

15  loss, the louder you can make that sound the easier it is

16  for them to still be able to hear.

17           "Question:  How did you get interested in this

18  problem of acoustic feedback in hearing aids?

19           "Answer:  Well, my original interest was really

20  in just applying adaptive filters, but Dr. Steadman

21  mentioned to me that he and some previous graduate students

22  had worked on this problem and suggested that I might look

23  at it as something for a potential thesis project.

24           "Question:  What time frame was that, do you

25  recall?

Best - dep.

1   hat or changed the gain, that would no longer be correct and

2   it wouldn't work anymore.

3              "Question:  Did you set up a prototype?

4              "Answer:  We did.

5              "Question:  Were there more than one prototype?

6              "Answer:  Yes.

7              "Question:  Okay.  How many different prototypes

8   were there?

9              "Answer:  There were two.

10             "Question:  Okay.  The first prototype, when did

11  you work on that?

12             "Answer:  Well, the hardware for the first

13  prototype was running in early '84, but the software to

14  implement the noise cancellation, I would have been working

15  on, started working on again in late '84, and probably got

16  the version in the thesis in early '85.

17             "Question:  Okay.  So did you actually get this

18  first prototype to work?

19             "Answer:  Yes.

20             "Question:  And when did you get it to work, the

21  prototype?

22             "Answer:  Either --

23             "Question:  The first one.

24             "Answer:  Right.  Either very late '85 -- or,

25  sorry -- very late '84 or very early '85.

Best - dep.

1   gain even higher.

2            "Question:  Higher before what?

3            "Answer:  Higher than it was without the

4   cancellation.

5            "Question:  I think you mentioned that you had

6   two prototypes; is that correct?

7            "Answer:  Yes.

8            "Question:  This -- when did you -- did you

9   build the second prototype?

10           "Answer:  I didn't personally build it.  That

11  was Mike Wreschner's project.

12           "Question:  And did Mr. Wreschner build the

13  second prototype?

14           "Answer:  Yes.

15           "Question:  And when did he finish building it?

16           "Answer:  That would have been mid-to-late

17  spring of '85.

18           "Question:  And how did this second prototype

19  differ from the prototype -- the first prototype, if at all?

20           "Answer:  The second prototype was entirely self

21  contained.  There was a small box that would actually fit in

22  a shirt pocket.  It had a battery and a small circuit board

23  with one of these DSP chips and a little bit of extra

24  hardware that still had a wire that ran up to the hearing

25  aid that one could actually wear.

Best - dep.

1       "Question:  Did you test the second prototype?

2              "Answer:  Yes.

3              "Question:  In your thesis, you refer to, I

4    believe, a prototype.  Does the thesis refer to either one

5    of these prototypes that we've been talking about?

6              "Answer:  It refers to the second one.

7              "Question:  Did the second prototype work?

8              "Answer:  Yes.

9              "Question:  And how did you know it worked?

10             "Answer:  I made a series of measurements of the

11   additional gain that I could get with the cancellation

12   algorithm, and this is -- it showed that we could get up to

13   13 dB initial gain.

14             "Question:  The test results that you're

15   referring to, is that described in your thesis?

16             "Answer:  Yes.

17             "Question:  Did anyone else see the second

18   prototype working?

19             "Answer:  Probably Dr. Steadman, Dr. Egolf,

20   Dr. Kirlin all saw it, and Mike Wreschner.

21             "Question:  Why Dr. Steadman, Dr. Egolf and

22   Dr. -- well, when did -- let me ask it this way.  When did

23   Dr. Steadman, Dr. Egolf or Dr. Kirlin first see a working

24   second prototype?

25             "Answer:  That would have been, again, kind of

1305

Best - dep.

1    mid spring of '85.

2              "Question:  Did those gentlemen see the second

3    prototype working soon after you got it working?

4              "Answer:  Yes.

5              "Question:  Were you excited to show them that

6    it was working?

7              "Answer:  Of course, yes.

8              "Question:  Other than Dr. Steadman, Dr. Egolf,

9    Dr. Kirlin and Mike Wreschner, during this time frame of

10   mid-to-late spring '85, did anyone else see the prototype

11   working?

12             "Answer:  I believe Jim Nunley of Audiotone.

13             "Question:  On what occasion did Mr. Nunley see

14   your prototype working, this second prototype?

15             "Answer:  He came for a visit that spring to see

16   our progress.

17             "Question:  Okay.  Let's go back to the second

18   prototype.  And you had mentioned a Mr. Jim Nunley.  When

19   did Mr. Nunley see the working second prototype?

20             "Answer:  Again, it was -- it was, well,

21   middle-to-late spring of '85.

22             "Question:  And you mentioned that Jim Nunley

23   was with a company called Audiotone; is that correct?

24             "Answer:  Correct.

25             "Question:  Okay.  I think I was just asking you

Best - dep.

1   about this company Audiotone.  What was Audiotone?

2           "Answer:  They were a hearing aid manufacturer

3   based in Phoenix, Arizona.

4           "Question:  And what connection was between the

5   University of Wyoming and Audiotone that Mr. Nunley came to

6   see your prototype?

7           "Answer:  In some way that I'm not sure of, but

8   partially supported the research.

9           "Question:  Was there any reaction to this

10  second prototype from any other people who saw it?

11          "Answer:  They were all quite impressed.

12          "Question:  What, in particular, impressed them?

13          "Answer:  That I had been able to make some

14  substantial gains on a problem that previous people had

15  worked on and not been nearly as successful at.

16          "Question:  After you were able to get a second

17  prototype up and running and working, what was the next

18  step?

19          "Answer:  To test it.

20          "Question:  And how long was the testing

21  process?

22          "Answer:  It took me about a week, as I

23  remember.

24          "Question:  Okay.  And so then after the testing

25  process, what was the next step?

1310

Best - dep.

1   phenomenon commonly referred to as feedback.  This effect,

2   which is characterized by a high-pitched squeal, can be

3   uncomfortable to both the hearing aid user and to others

4   nearby.  Feedback occurs when the acoustic feedback path

5   from speaker back to the microphone causes the system to

6   become unstable.  Unfortunately, this often occurs at output

7   gain levels which are too low even for people with only mild

8   hearing impairments.

9            "'In principle, if the characteristics of the

10  feedback path were known exactly, then it would be possible

11  to simply subtract out that part of the microphone install

12  that is due to feedback.  In practice, not only are the

13  characteristics of the feedback path not known, but they may

14  change with time.  This paper presents a method for dealing

15  with the unknown and time-varying nature of the feedback

16  path.  The solution presented here uses the discrete time

17  LMS (Least mean square) adaptive linear combiner, configured

18  as a noise canceller, to develop a real-time estimate of the

19  feedback path.  This estimate is then used to cancel the

20  effects of feedback at the microphone.'

21           "Question:  Thank you.  Does that two paragraphs

22  give an overview of your thesis work?

23           "Answer:  Yes, except it doesn't mention the

24  implementation details.

25           "Question:  Is 13 dB the amount of additional

1318
Best - dep.

1    adapt the LMS.

2              "Question:  There's some dotted lines coming

3    from this LMS noise canceller to a box W with a variable

4    sign on it.  Do you see that?

5              "Answer:  Yes.

6              "Question:  What is that W with this arrow going

7    through it?

8              "Answer:  It's showing that the weights that

9    were adapted by the LMS algorithm are then used also to

10   cancel out the full feedback signal.

11             "Question:  That W, are those weights?

12             "Answer:  They are the weights.

13             "Question:  Weights of a filter?

14             "Answer:  Of a filter, yes.

15             "Question:  And the coefficients of those

16   filters, the W's, they're being adjusted in a way -- how is

17   that being adjusted relative to what the LMS algorithm is

18   doing?

19             "Answer:  They're identical to what the LMS is

20   getting.

21             "Question:  And once you adjust the weights of

22   that filter, according to the LMS algorithm, what use is

23   that filter?

24             "Answer:  It's an estimate of the feedback path.

25             "Question:  And what -- I see it is then input

Best - dep.

1    to a sigma?

2                    "Answer:  Yes.

3                    "Question:  And as a subtraction.  Why is it a

4    subtraction?

5                    "Answer:  That's how I do the cancellation.  I

6    want to subtract out the feedback.

7                    "Question:  Okay.  Is that filter W, is that in

8    a feedback path?

9                    "Answer:  Yes.

10                   "Question:  Did your prototype system work well?

11                   "Answer:  Yes.

12                   "Question:  And you mentioned that you had a 13

13    dB additional gain as a result of your prototype?

14                   "Answer:  Yes.

15                   "Question:  And that was twice -- that's

16    basically twice the amount of loudness, this 13 dB gain?

17                   "Answer:  Right.

18                   "Question:  Okay.  Let's go to Chapter V of your

19    thesis.  This is Page 376, Best Bates No. 376.  Let me go

20    ahead and read this first part.  It says, 'This chapter

21    presents the results of experiments conducted to determine

22    the effectiveness of the prototype feedback canceller.'

23                    "Did you conduct experiments to determine how

24    well the prototype worked?

25                   "Answer:  Yes.

1   the computer, that that really means plug this host

2   controller into a computer with those connections over

3   there.

4   Q.    So the number 24, what does the patent call that?

5   A.    The patents both call it a computer.

6   Q.    Okay.  I think the next demonstrative, 11, is an

7   animation.  Can you explain what it is and how it works?

8   A.    Okay.  I promise this is as technical as I'll get

9   here, I think.

10           This is going to show the testing for the

11  feedback.  So what we have down at the bottom, we have the

12  signal generator and the host controller that is going to

13  generate the test tones and send them in through this path

14  up here through the limiter and the amplifier into the

15  speaker or the receiver and then we're going to get some

16  acoustic feedback coming over here to the microphone.  It's

17  going to come through to this sigma, this Greek number,

18  which means just to add, it's an adder there that adds the

19  signals that come to it.  There are two signals coming in.

20           So that signal comes back.  The acoustic

21  feedback comes back around through the microphone and in.

22  And then the other signal that is going to come in, we'll

23  see.  So there we are sending the tone out to the speaker.

24           And then now the next thing, we'll get the

25  acoustic feedback and we also get an electric feedback going

1372

Morley - direct

1    through this circuit up here and they come back to this
2    summer.

3            Now, the electric feedback, that signal went
4    through this measurement box, this phase, and it's really an
5    adjustable delay and adjustable volume control.  So the
6    computer, it says in the patent, adjusts that so that when
7    that signal, the electrical feedback signal is equal and
8    opposite to this acoustic signal coming back, that the
9    summer here, okay, that comes out, goes into the null
10   detector and says, oh, I've canceled it.

11           So when that is true, when it detects a null,
12   that means that it has figured out what the phase and
13   amplitude is.  It's created a signal of equal amplitude and
14   opposite phase and it's cancelled it so it now knows what to
15   program into the feedback canceling filter.

16   Q.    Okay.  I noticed on the right-hand side of this, you
17   have figure 2 and a box.  Does that mean all of the circuits
18   that you show within that box are in figure 2 of the patent?
19   A.    That is correct.

20   Q.    And figure 2, what is that called in the patent?
21   A.    That is the hearing aid.

22   Q.    Okay.  On the left-hand side, I see three boxes:  One
23   called measure phase and magnitude, then there is another
24   box entitled null detector, and then a third box labeled
25   signal generator.  Why are they on the left-hand side?

130

Morley - direct

1    on behalf of Widex?

2    A.    I was.

3    Q.    Have you spoken to Mr. Nielsen previously about how

4    the Inteo and Senso Diva products work?

5    A.    He was one of the engineers that I met with at Widex

6    when I visited.

7    Q.    Based on the documents we have just seen, JX-301,

8    DX-1660, DX-1128, DX-1661, and based on your discussions

9    with Mr. Nielsen, can you explain how the Senso Diva and

10   Inteo hearing aids cancel acoustic feedback?

11   A.    Well, both of the products use a variant of the LMS or

12   least mean squared algorithm to first subtract -- first

13   generate an estimate of the acoustic feedback signal, and

14   they then subtract that out from the microphone input.

15   Q.    We saw something, I think you called it the dynamic

16   cancellation optimizer.  Do you recall that?

17   A.    Yes.

18   Q.    What role does that have, if any, in canceling

19   acoustic feedback?

20   A.    Its role in acoustic feedback canceling is that it's a

21   fast-acting circuit that sort of detects the onset, if you

22   will, of this squeal.  What it does is it actually puts the

23   brakes on it, it holds the gain down, pulls the gain down or

24   the amplification in the forward path of the hearing aid.

25   It brings it down to keep it from squealing.