Morley - direct

```
 1              So it's a fast-acting sort of governor on that
 2     circuit.
 3     Q.    Is the DCO necessary in the Widex products to cancel
 4     feedback?
 5     A.    Yes.  It's part of that patent that describes their
 6     technique.  They have this fast-acting system that can lower
 7     the gains quickly in case feedback starts to happen.  Then
 8     they also have a little more slowly adapting circuit, which
 9     is what they call their feedback path simulator or the LMS
10     algorithm that is doing the subtracting the feedback
11     estimate out.
12     Q.    What happens if you don't use the DCO?
13     A.    Without the DCO, the patent clearly says that you
14     would have to change how fast the feedback path simulator
15     adjusts itself.  So that it would have to adjust even
16     quicker, so that it could try to remove things faster.  And
17     in so doing, though, it would create annoying sounds.  So
18     they had to put the DCO in in order to work in tandem with
19     this slower-acting feedback patent simulator.
20     Q.    Is the DCO used in both the accused products?
21     A.    Yes, there is DCO in both of them.
22     Q.    We are now going to turn to the claims of the ETG
23     patents.  Are you familiar with Claims 13, 14, 16 and 19 of
24     the '850 patent?
25     A.    Yes, I am.
```

Morley - direct

1    A.    Yes.

2    Q.    And what did Mr. Neilsen say about these two blocks in

3    connection with memory?

4    A.    He said that the memory, the only memory, the memory

5    that the coefficients are stored in is located in the WLMS

6    block and not in the WFIR block.

7    Q.    The memory located in WLMS block, are you able to go

8    in and change that, those memory locations, values?

9    A.    That memory is being updated, as we heard over and

10   over, updated 32,000 times a second by the LMS algorithm

11   that's hardwired into that block.  That block has full

12   control over the memory.  You can't go in there and change

13   it.

14   Q.    By the way, you see these gray blocks that we see in

15   this figure?

16   A.    Yes, I see a lot of them.

17   Q.    Do you recall a question posed by ETG's counsel to

18   Mr. Neilsen about these gray blocks?

19   A.    Yes, I do.

20   Q.    Do you recall him asking whether they were memory

21   locations or RAM?

22   A.    Yes, I remember him asking Mr. Neilsen whether the

23   ones that have just been highlighted and expanded, whether

24   those in particular were random access memory blocks.

25   Q.    Do those gray areas represent RAM or any other type of

     1    memory location?

     2    A.    No, I agree with Mr. Neilsen.  His answer I believe

     3    was they're just labels on some wires.

     4    Q.    Now, you mentioned you reviewed some code in

     5    connection to determine whether or not the WFIR block

     6    contained any memory?

     7    A.    Yes.

     8    Q.    Did you review VHDL code?

     9    A.    Yes.

    10    Q.    Can you read VHDL code?

    11    A.    Yes.

    12    Q.    Can you put up PX-857, please?

    13          Okay.  At the top, it says WFIR.

    14                MR. STEINBERG:  May we approach for a moment.

    15                THE COURT:  Yes.

    16                (The following took place at sidebar.)

    17                MR. STEINBERG:  Your Honor, there was nothing in

    18    the expert's report about code analyzing this issue at all.

    19                MR. BUROKER:  He said he reviewed the code.  He

    20    agreed with Dr. Gloster's analysis but there is no detail in

    21    his report where he steps through the code at all.

    22                MR. MANDIR:  His expert report identifies that

    23    he reviewed all the code for the Widex products.  He heard

    24    Dr. Gloster yesterday going through code.  In fact, one of

    25    Dr. Morley's reports --

Morley - direct

1   filter therein programmed to equalize and reduce the effect

2   of said acoustic feedback both in amplitude and phase on a

3   signal in said transmission channel."

4   Q.    Do either the Senso Diva or the Inteo products perform

5   the inserting step in Claim 13?

6   A.    Not at all.  The filters that are used to cancel

7   feedback in both of those hearing aids are put onto the chip

8   when it's made in a factory in Taiwan.  And that filter is

9   in that chip from when it gets put on at the chip

10  manufacturing plant until the hearing aid is put in the --

11  for the rest of its life, the existence of that hearing aid,

12  that filter is in there.  It never leaves.

13  Q.    So if you take Claim 13 as a whole, is it your opinion

14  that the Widex Inteo and Senso Diva includes all of the

15  features in that claim?

16  A.    It's my opinion that it includes very few if any of

17  the features in that claim, the Senso Diva and Inteo.

18  Q.    Can we now go to Claim 14, which is another one of the

19  claims asserted by ETG.  Correct?

20  A.    Yes.  This is similar to Claim 13, but it doesn't

21  require specifically for the programmable filter that's

22  programmed to be in a feedback path.  It could be anywhere,

23  presumably.

24  Q.    So are all of the reasons that you just gave why the

25  Senso Diva and Inteo are not infringing Claim 13 applicable

Morley - direct

1    to Claim 14?

2    A.    That's right.  It doesn't -- still, there is a

3    determining and inserting step here, and neither of those

4    products perform either of those steps.

5    Q.    Let's go to Claim 16, which is the claim we saw that

6    was dependent on 14.  Claim 14, why don't you go ahead and

7    read it into the record, Dr. Morley?

8    A.    "A method of reducing feedback in a hearing aid as

9    described in Claim 14 in which said programmable filter is

10   inserted in an electrical feedback loop for said

11   transmission channel."

12   Q.    Does either the Inteo or Senso Diva have that

13   programmable filter?

14   A.    No.

15   Q.    I want to go and talk about your doctrine of

16   equivalents analysis.  I think you mentioned that you

17   considered prior art in connection with that.  Is that

18   correct?

19   A.    I did.

20   Q.    And one of the references I think you mentioned was a

21   patent to a Dr. Graupe.  Is that right?

22   A.    Correct.

23   Q.    Can we have DX-982, please.  Is this the Graupe patent

24   you were referring to?

25   A.    Yes, it is.

1    Q.    This patent was filed October 17, 1985. Do you know

2    if that was before or after Dr. Levitt's -- ETG's patents?

3    A.    This was well before those were filed.

4    Q.    Let's go down, I think we can stay with the figure

5    that's on the cover page of this, unless you want to see

6    anymore. Can you describe what we see here? Would you like

7    a different figure, Dr. Morley?

8    A.    This will do fine. What this is is a block diagram of

9    Dr. Graupe's invention for canceling feedback. And it has

10   some various blocks here. If we work our way through from

11   left to right, over here we see this microphone, here is the

12   sounds coming into the microphone. There is the information

13   signal, that is the signal you want to hear, and then there

14   is also this other arrow coming in, that's stuff you don't

15   want to hear, that's feedback.

16           The microphone output is having its output is

17   being reduced by a feedback signal here that's electrical.

18   Q.    I am sorry. What do you mean by reduced?

19   A.    There is a subtraction of electrical feedback estimate

20   here. So we are trying to cancel the feedback at the same

21   point that we have seen in the ETG patents, after the

22   microphone. It goes through an amplifier, which would be

23   the hearing compensation portion of the hearing aid, where

24   you adjust it to each patient.

25           And then we see it come to the SPK, that is the

1    speaker, and then out of the speaker, he has a

2    representation of the acoustic feedback coming back.  And he

3    puts a block there to indicate that it's got a

4    characteristic called a transfer characteristic back to the

5    microphone input.

6    Q.    Let me ask you this, Dr. Morley:  That ling, H(S),

7    20A, is that a real circuit diagram?  What is that

8    representing?

9    A.    That is whatever happens to be there at the time that

10   the -- that's representing the acoustic feedback path, which

11   is not a physical per se item.  It is just the arrow or

12   whatever the path is.

13              Then he has here, tapped off here, just like we

14   have seen in the ETG patents, we have coming off a feedback

15   signal that comes through what he calls a correction

16   circuit.  But if we look at another diagram we will see it's

17   a tap delay line filter with coefficients stored in it.  So

18   he has got a tap delay line filter that's programmable in a

19   feedback path that's being used to cancel feedback.

20   Q.    Let's look at a figure so that we can see exactly the

21   type of circuit is 21A.  I think it's Figure 2 -- Figure 4.

22   What Figure do you want, Dr. Morley?

23   A.    I don't have the patent in front of me or I could tell

24   you.  That is not it.  I don't want these.

25   Q.    Next one.  It should be in your book, by the way.

Morley - direct

1    Next one?

2    A.    There you go, Figure 5.

3    Q.    Okay.  I see up on top of Figure 5 it says correction

4    circuit.  Was that the same correction circuit block we saw

5    in the cover page of the Graupe patent?

6    A.    Yes, and I know that because not only does it have the

7    same name, but over here it's got the No. 21 and on the

8    front page was No. 21.

9    Q.    Is this a delay line filter, what we see here in

10   Figure 5 of Graupe?

11   A.    This is a tapped delay line filter.  We have over here

12   on the right-hand side are the delay blocks.  And we have

13   these M blocks which multiply.  So what we have are

14   multiplication and then addition up in this block here.

15            Here we have our coefficients.

16   Q.    Can we go to the cover page of Graupe, please.  So

17   what does this correction circuit do?

18   A.    This correction circuit gives an estimate of the

19   acoustic feedback in an electrical form so it can be

20   subtracted out from the microphone input.

21   Q.    Does this correction circuit, does it have

22   coefficients?

23   A.    It has -- there are coefficients that are decided and

24   given to it from a circuit called an identifier circuit.

25   Q.    And so does that mean that the coefficients in this

1    correction circuit change?

2    A.    Yes.  They get updated from time to time.

3    Q.    And this is a feedback cancellation filter?

4    A.    It is.

5    Q.    So how is that compared to what we have been

6    describing with respect to the discussion this morning of

7    the ETG patents?

8    A.    The ETG patents don't change the coefficients out in

9    normal use, whereas this invention does periodically measure

10   the acoustic feedback path, calculate new coefficients, and

11   then use those in the correction circuit for adjusting the

12   feedback, or canceling it.

13   Q.    Can we have Morley Demonstrative No. 16, please.

14          Okay.  Can you explain what we see here, Dr.

15   Morley?

16   Q.    Okay.  Up at the top is my simplified block diagram

17   for the ETG patented hearing aid, with its acoustic feedback

18   fixed filter in the feedback path.  And down below we see

19   the block diagram of the Graupe '818 patent, and I have had

20   the colors match up, so the acoustic feedback path here is

21   in purple on both of them, the microphone is blue, the

22   feedback canceling filter is in blue up at the top, the

23   hearing compensation filter here in the middle is in red.

24          The amplifier is in here, and that's why they

25   are both red.  And then we got a speaker that's orange.  So

Morley - direct

1    there is a one-to-one correspondence between those blocks.

2    Q.    What is the purpose of this demonstrative with respect

3    to your doctrine of equivalents analysis?

4    A.    Well, if we are to believe that the '850 patent covers

5    an adaptive feedback canceling algorithm, like is in the

6    Widex products, then it's going to also cover this invention

7    right here from Mr. Graupe, which came out before it, and so

8    that would invalidate it as being obvious.

9    Q.    It's Dr. Graupe, but that's okay.

10    A.    Excuse me, Dr. Graupe.

11    Q.    Can we now go to DX-1111.  Do you recognize this

12    document, Dr. Morley?

13    A.    Yes, I do.

14    Q.    What is it?

15    A.    I believe it's the cover sheet of Leland Best's

16    Master's thesis.

17    Q.    Have you reviewed this document?

18    A.    I did.

19    Q.    Are you familiar with it?

20    A.    Yes.

21    Q.    Did you attend a deposition of Dr. Best that we saw

22    today?

23    A.    I had the pleasure of meeting him and attending that

24    deposition.

25    Q.    Okay.  Can we look at Figure 13, please.

1          Can you explain to the jury what Figure 13

2     shows?

3     A.      This is the adaptive feedback cancellation invention

4     of Dr. Best.

5     Q.      Can you explain -- okay.  Let me walk you through it.

6              What is the W we see towards the bottom?

7     A.      Down there the W block, which is by now very

8     familiar, the LMS algorithm.  That is the adaptive feedback

9     canceling filter that's in the feedback path.

10    Q.      How does this Figure 13 diagram, how does it work?

11    A.      Well, we have pressure coming into the microphone over

12    here.

13    Q.      Pressure, what is that?

14    A.      Sorry, sound pressure, sounds in the environment,

15    coming in, getting added to something else coming up here.

16    What that is is the acoustic feedback.  So this adder, the

17    sum there, that Greek sigma means add.  That is really an

18    addition that gets done out -- well, at the microphone.

19    This sort of is representing the microphone here, because

20    that's where the two sounds come together, and the output of

21    the microphone is the sum of those two.

22    Q.      Let me ask you, the H that you have been referring to,

23    is that the acoustic feedback?

24    A.      That is the mathematical model for the acoustic

25    feedback path.

Morley - direct

1    Q.    And then the output of this sigma, this first sigma,

2    what does that represent?

3    A.    At that point there, that is the output of the

4    microphone.

5    Q.    Does that include whatever you speak into the

6    microphone?

7    A.    Yes.

8    Q.    Does it include any acoustic feedback that is in that

9    microphone?

10   A.    That's right.  It is the sum of those two signals,

11   what you want to hear and what's getting fed back.

12   Q.    Then we have another sigma, but it looks like it has a

13   plus and a minus.  What is that all about?

14   A.    That sigma is where we are subtracting out this Z --

15   there is a little tick mark next to it.  We call that, in

16   electrical engineering, math, whatever, Z prime.  That

17   little tick mark makes it a prime.  The signal that is

18   labeled Z prime here is getting subtracted out from the

19   output of the microphone.

20   Q.    Why would you subtract out something from the

21   microphone?

22   A.    Because you are trying to subtract out the part of the

23   signal that is acoustic feedback.

24   Q.    And I see before that Z prime this block W.  What is

25   that doing?

Morley - direct

1    A.    Well, the W block has a dashed line with an arrow
2    through it.  It is connected up to the top here, to this LMS
3    algorithm block, and actually the block is labeled LMS noise
4    canceller.  So that is the block that is calculating his
5    coefficients, if you will, for the feedback canceling filter
6    down here.

7              And so the dashed line coming down there with
8    the arrow is indicating that the coefficients in that
9    particular filter down there are being changed and
10   controlled by the LMS algorithm up above.

11   Q.    The LMS algorithm that we see there, how does that
12   relate to the LMS algorithms that are used by defendants
13   today?

14   A.    Well, mathematically, there are some differences.  The
15   main thing on this one here is that you see over to the left
16   there is a white noise generator.  So he had actually a
17   white noise generator, which, when the Judge goes to the
18   sidebar to talk to the lawyers over here and straighten
19   things out with them, you hear this noise come on here,
20   there is this "sh-sh-sh-sh," that is a white noise
21   generator.  So that is the kind of signal that comes out of
22   here.

23              It's used to help the LMS algorithm in this
24   thesis to adapt its coefficients.  And it also gets added to
25   the signal that goes out into the ear.  But he was careful

Morley - direct

1    in his thesis to recognize, of course, that that could

2    possibly be a problem.  And he keeps that volume of that

3    noise low, so it can do its job while not interfering with

4    the quality of the sound that the hearer is listening to.

5    Q.    Do modern day LMS algorithms use that white noise?

6    A.    No.  I think in the late nineties, the algorithms came

7    around to where they no longer needed a white noise

8    generator like that.  But it is my understanding that there

9    was at least one hearing aid out on the market that did use

10   this technique which included a white noise generator.

11   Q.    What was the name of that company?

12   A.    As I sit here now I forgot the name.  I knew it the

13   other day.

14   Q.    So let's go to Morley Demonstrative No. 15, please.

15   Here we -- why don't you explain what it is.

16   A.    What we have here is just the basic hearing aid,

17   without any feedback cancellation, just to try to not

18   overcomplicate and see everything at once.

19          Here is the forward path, as I have been talking

20   about it today, from the microphone through to the speaker.

21   And down below -- that's the ETG '850 patent on the top.

22   Down below is Leland Best's, Dr. Best's thesis drawing.  And

23   once again, forward path in through the microphone in blue,

24   then on through the forward path, and we can see in both of

25   them, we have an acoustic feedback path in purple.

1      And this little W shouldn't be in here yet.  We

2   are going to pop that in up above in a minute.

3   Q.    Okay.  So now what do we see?

4   A.    So now we have the feedback canceling filter in both

5   of the hearing aids and we see Dr. Best's is this LMS

6   algorithm along with the feedback canceling filter, W.

7   Q.    Okay.  So what is the purpose behind this

8   demonstrative, Dr. Morley?

9   A.    This is to show that if we were to expand or take the

10   interpretation of Mr. Brown and his doctrine of equivalents,

11   even in his literal analysis of the claims, then it would,

12   the claim in the ETG patent would describe this circuit, the

13   invention of Dr. Best and that would make that claim invalid

14   because Best came before the ETG patent.

15   Q.    So for purposes of just the doctrine of equivalents,

16   what does that mean?

17   A.    That it would be an improper application of the

18   doctrine of equivalents.  You have stretched the scope of

19   the claim too far because you have brought in some prior

20   art.

21   Q.    Okay.  Can we go back to Claim 19, please?

22           Okay.  I think we talked about literal

23   infringement already.  And your opinions that it's not

24   literally infringed.  We've talked about doctrine of

25   equivalents with respect to both Dr. Graupe's patent and

```
 1    BY MR. STEINBERG:
 2    Q.    Are boxes or blocks, do they represent different
 3    components within that sketch?
 4    A.    In the DSPRAP, detailed overview of the feedback
 5    canceling system, my understanding is that the WFIR is
 6    indeed a block, the things that are in yellow here that I
 7    consider to be blocks are the WLMS block and the WFIR block.
 8    There is nothing else in yellow that I think an electrical
 9    engineer would call a block, sir.
10    Q.    So at least according to you, the WLMS block and the
11    WFIR, the filter block, are separate components.  Correct?
12    A.    At this level of representation, those are separate
13    elements.
14    Q.    Now, did you hear Dr. Gloster tell the jury that he
15    located these two separate blocks in the feedback portion of
16    both the code and the diagram?
17    A.    Yes.
18    Q.    And the WLMS refers to the place where the WLMS
19    algorithm resides.  Correct?
20    A.    That's where the components are that actually execute
21    that algorithm.
22    Q.    And the WFIR refers to a filter.  Correct?
23    A.    The WFIR is a filter, yes.
24    Q.    Now, you don't dispute that the place where the WLMS
25    algorithm resides is a different place than the filter.
```

Morley - cross

1    programmable, and I say, well, let's look at the WFIR

2    filter, it must have memory and it -- you must be able to

3    change the values in the memory in order for it to be

4    programmable according to that view.

5    Q.    I think you misspoke.  You said if it could change the

6    values that could not be programmable.  You meant it could

7    be.  Right?

8    A.    Yes.  I didn't mean to say it's not programmable if

9    you can change the values.  I meant to say to be

10   programmable it has to have memory and you have to be able

11   to change those values that are stored in the memory.

12   Q.    And you agree that, at least in your interpretation,

13   the WLMS block has memory?

14   A.    I agree that the WLMS block has memory.

15   Q.    And you agree that the filter receives different

16   coefficients, in fact, you testified, 32,000 times a second

17   or something like that; right?

18   A.    32,000 times a second, the WLMS algorithm changes the

19   values in the memory in a WLMS block and the WFIR has access

20   to look at those coefficients so it can do its calculation.

21   Q.    Right.  And coefficients means values; right?

22   A.    That's true.

23   Q.    Now, it's your position that the feedback path

24   simulator in the Widex products is an adaptive filter that

25   generates its filter coefficients internally but not

1522

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3
                           -   -   -
 4

 5      ENERGY TRANSPORTATION,           :  Civil Action
        INC.,                            :
 6                                       :
                    Plaintiff,           :
 7                                       :
             v.                          :
 8                                       :
        WILLIAM DEMANT HOLDINGS A/S,     :
 9      et al.,                          :
                                         :
10                  Defendants.          :  No. 05-422 (GMS)

11                         -   -   -

12                    Wilmington, Delaware
                   Wednesday, January 30, 2008
13                        8:30 a.m.
                     Eighth Day of Trial
14
                           -   -   -
15
        BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
16                                        and a Jury

17

18
        APPEARANCES:
19
                     EDMOND D. JOHNSON, ESQ.
20                   Pepper Hamilton LLP
                          -and-
21                   MARTY STEINBERG, ESQ.,
                     BRIAN M. BUROKER, ESQ., and
22                   MAYA M. ECKSTEIN, ESQ.
                     Hunton & Williams
23                   (Washington, D.C.)

24                                      Counsel for Plaintiff

25
```

1

Morley - cross

| 1 | A. | No, he did not.  He donated it to the public. |

 1    A.    No, he did not.  He donated it to the public.

 2    Q.    These defendants never -- he donated what to the

 3    public?

 4    A.    He put it in the library and didn't try to protect

 5    his intellectual property.  He made it publicly available

 6    without seeking any protection of intellectual property for

 7    himself.

 8    Q.    Are the defendants using Mr. Best's technology?  Is

 9    that what they are doing?

10    A.    They are using something very similar.  They don't

11    have to inject a test tone like he did, that pseudo-random

12    noise that he had to inject.  Other than that, it is a

13    similar system, very similar.

14    Q.    How much money did they pay Mr. Best?

15    A.    I have no knowledge if they paid him anything.

16    Q.    That didn't pay him one dime, did they?

17    A.    I have no knowledge whether they have paid him or

18    not.

19    Q.    Now, you talked about automatic and adaptive.  I want

20    to refer you to a couple sections in JX-4, the '850 patent.

21          I believe you testified earlier that where the

22    patent uses the language automatically justifying, one of

23    ordinary skill in the art would say that is adaptive.

24    Right?

25    A.    I said that I think I would, to give them the

1575
Anderson - direct

1    Q.    Okay.  One moment, please.  Can we put up Anderson
2    No. 4, please?
3    A.    It says my monitor is going to sleep.  I hope that is
4    the only thing in here.
5    Q.    We have our numbers messed up here a little bit.  I'm
6    sorry.
7    A.    "Programmed" was construed by the court -- and this
8    is a reasonable description.  "Programmed" means "provided
9    with one or more values."  And I understood and I think
10   Mr. Brown and his testimony also agreed that these values
11   would be the filter coefficients or the weighting values of
12   the filter.  So "programmed" means "provided with one or
13   more values so as to produce a response."
14            In my opinion, this makes sense.  When you are
15   talking about a programmed system, you have an idea of the
16   response you want.  You give the appropriate coefficients,
17   and then that filter, well, acts in the desired manner.
18   That would be on a signal, but what it does to that signal
19   would be the response.
20   Q.    And this word "programmed," that is a word you find
21   in the claims?
22   A.    Yes.
23   Q.    Okay.  Could we go back to Anderson No. 1, please,
24   the first one?
25            Okay.  So I believe you were at the point where

1    the claims, nor does it make any attempt to infringe on

2    any of the claims.  And I don't regard that as literal

3    infringement and I don't regard no attempt to program it to

4    be equivalent to having it programmed to reduce feedback.

5    Q.    But you say there is a circuit in there that is

6    disabled; is that correct?

7    A.    That is correct.

8    Q.    Is that circuit the same as what is in the other 16?

9    A.    It's the same as what is in the Jump 3 devices.  It's

10   identical.

11   Q.    So with respect to the disabled circuit, can it be

12   treated the same as the other 16?

13   A.    Yes.

14   Q.    Have you prepared a demonstrative to explain to the

15   jury your understanding of the Demant devices?

16   A.    I have.

17   Q.    I believe that is Anderson No. 2.

18          Is this the correct demonstrative?

19   A.    This is it.

20   Q.    We're on a roll.  We've got our numbers straight.

21   Would you explain this demonstrative please for the jury?

22   A.    So this type of diagram should be looking familiar by

23   this time.

24          These are, this is a high level summary of what

25   is going on in the accused products.  We have a microphone

Anderson - direct

1    and transmission path and this is called the receiver.  It's

2    what produces the sound, like a telephone receiver.  There

3    is an LMS adaptive filter that takes signals from the output

4    and subtracts some filtered version of that from the input.

5         Now, you will notice that this is different from

6    the claim or, I'm sorry, the patent specifications in

7    several significant ways.

8         First, this is always connected.  This path here

9    is not disconnected.  And there is no test signal inserted.

10         Second, there is no determination of phase and

11   amplitude.  Where the patent describes determination of

12   phase and amplitude and insertion of programmable filter,

13   instead, the accused products don't make that determination.

14   And there is no way to provide it with any coefficients that

15   you might have come up with.

16         You see the X there?  That is where it used to

17   be on the previous chart.  There is no way to provide this

18   hearing aid with coefficients.  There is no way to program

19   the feedback in the hearing aid.  There is, the LMS filter

20   itself is not programmed for a response.  Rather, it's left

21   to run free.  It generates its own coefficients

22   continuously.

23   Q.    Now, could we for a moment, can we put up the two

24   side by side?  Is that possible?  No. 1 and No. 2.  Thank

25   you.

Anderson - direct

1       There, are the accused Demant products a

2   miniaturization of the Levitt system?

3   A.      That is one of the first things I looked for because

4   ETG has suggested that that is the case.  And in my opinion,

5   it's not for several reasons.  One, there is no test signal

6   used.   Two, there is no determination of the amplitude and

7   phase of the feedback as required by the host controller,

8   patent and the hearing aid patent.  And, three, as I

9   mentioned before, this feedback filter isn't a programmed

10  filter.  It's not giving values that will have a response

11  where it changes so quickly.  No signal ever passes through

12  that filter with a single response.  Rather, it's changed

13  every cycle.

14  Q.      Okay.  Now, doctor, let's look at the actual language

15  of the claims, if we may.  Could we go to Demonstrative 5,

16  which I believe is the checklist used by ETG.

17          Okay.  Do you recognize this?

18  A.      Yes.  This is the chart Mr. Brown used in his

19  analysis of the Bernafon and Oticon products relevant to

20  Claims 14 and 16.  It looks like 16 is cut off a bit, but,

21  yes.

22  Q.      What do you understand the issue of infringement is?

23  Do you have to have all the checks or is it okay to just

24  have a lot of them?

25  A.      Right.  For infringement, it's important, every

1   and get the same result as the other.

2   Q.    Can we go back to the claim chart?  Anderson 5.

3         So that is the basis for removing the checks

4   over here for the first determining step; is that correct?

5   A.    Yes, that is.

6   Q.    And that is under both literal infringement and

7   doctrine of equivalents; is that correct?

8   A.    That is correct.

9   Q.    Now, is there anything else in this claim, any other

10  conclusion you have reached as to whether it's appropriate

11  to have a check or not have a check?

12  A.    In my opinion, that is sufficient for it to not

13  infringe but if you look down to the next step, I think that

14  is not performed either.

15  Q.    What should we do with the checks there?

16  A.    As I have just mentioned, a programmable filter and

17  an adaptive filter are different things but the programmable

18  filter, you provide it with coefficients.  It gives you the

19  response.  With an adaptive filter, you cannot provide it

20  with coefficients.  It generates its own coefficients.  And

21  I understand that ETG is asserting that while it has

22  coefficients, it must have been programmed.

23         I disagree with that for many reasons:  One, if

24  all a filter must have to be programmed is coefficients,

25  that means all filters are programmable and the point of

65

1    differentiating a programmable filter would be a moot point
2    and it would read that part out of the claim.
3            Another reason I disagree is that with the LMS
4    adaptive filters, you cannot determine what the response
5    will be.  You can't provide it with values so it will
6    achieve a response.  It's going to do what it wants to do.
7    Q.    So, doctor, are you just looking at this language
8    right here?  Can we just get that highlighted?
9            Is that the language you are referring to?
10   A.    Yes.  The programmable filter programmed.  Okay?  So
11   an LMS adaptive filter is not a programmable filter.  It
12   cannot be provided with values.  And, in fact, it's not
13   programmable and in my opinion something that is not
14   programmable or non-programmable is not equivalent to
15   something that is programmable.  The function is different.
16   One allows you to produce a certain response and result is
17   different -- I'm sorry -- substantially different.  You can
18   specify the response you want with the programmable filter.
19   You cannot with an adaptive filter.
20           THE COURT:  Doctor, just a moment ago you said
21   "programmable" would be read out of the claim.  Do you
22   recall that?
23           THE WITNESS:  Yes.
24           THE COURT:  Would you explain what you mean by
25   that so the jury understands?

1588

Anderson - direct

| 1 | THE WITNESS:  Yes. |
| 2 | So each and every -- and, judge, I hope I get |
| 3 | the legal terms right.  You will help me if I'm not. |
| 4 | THE COURT:  I will, if necessary. |
| 5 | THE WITNESS:  Okay.  Thank you. |
| 6 | So if you said that if a filter had |
| 7 | coefficients, then it must be programmable, that would |
| 8 | mean that any filter which must have coefficients is a |
| 9 | programmable filter. |
| 10 | If that is the case, then they use the |
| 11 | distinction they want a programmable filter and then they're |
| 12 | later going back and saying, well, we mean any filter.  In |
| 13 | other words, we didn't really mean programmable, we mean any |
| 14 | filter.  That means any filter.  And so what they have |
| 15 | effectively done in that interpretation is say that word in |
| 16 | the term is irrelevant.  But as I understand, that is |
| 17 | inappropriate. |
| 18 | If you put a word, a limitation in the claim, |
| 19 | you can't just remove it later and say it's unimportant, the |
| 20 | claim doesn't really require that term. |
| 21 | Is that correct? |
| 22 | THE COURT:  Thank you, doctor. |
| 23 | BY MR. ROMARY: |
| 24 | Q.    Now, doctor, what should we do with these checks over |
| 25 | here in view of your opinion? |

Anderson - direct

1    numbers refer to numbered items in the figures of the

2    patent.

3    Q.    Did you prepare an additional demonstrative, Anderson

4    9, to try to help the jury understand this?

5    A.    Yes, I did.

6    Q.    Would you explain this demonstrative for the jury,

7    please?

8    A.    Sure.  This takes the claim construction of the Court

9    and it just highlights the identified elements.

10   Q.    Now, in order to find infringement, you have to find

11   what, according to your assessment?

12   A.    Well, you either need to find those pieces or those

13   parts of the structure in the accused device or the

14   equivalents of these structures.

15   Q.    And what was your conclusion?

16   A.    Well, first, those particular things do not exist --

17   is this the -- no.

18            This is it.  This is the right one.

19            These particular structures are not present in

20   the device.  So, of course, the next step is to look for

21   something equivalent to those.

22            Now, over on the right-hand side, we see two

23   switches and two connectors.  This one is labeled V-test-in,

24   this one is labeled NUL, these two, these four parts of this

25   structure are the parts that are used in the accused device

1   to provide a test signal into the hearing aid and return a

2   signal indicative of the feedback after it's been canceled.

3           Now, this structure is not present in the

4   accused devices and nothing equivalent to it is there

5   because the same function isn't performed.  There is no need

6   to provide a test signal, no need to break the transmission

7   path or suspend the operation of the hearing aid.

8           So I couldn't find, nor did I expect to find,

9   something that would allow you to break the transmission

10  path, suspend the operation of the hearing aid and insert a

11  test signal.  It simply wasn't there.  Nor was anything

12  equivalent to it there in any of the accused devices.

13          Next you see a block -- rather, a group over

14  here showing a digital phase shifter, programmable gain

15  amplifier, and latches.  These elements were not present in

16  the accused devices.  This is part of the host controller

17  and is identified as separate from the hearing aid.

18          And there is nothing like that in the accused

19  devices, nor is there anything that performs the same

20  function, where you can specify a phase shift and have that

21  occur.

22  Q.      So what is your conclusion with respect to the

23  corresponding structure requirement for this element?

24  A.      I did not find that in any of the accused devices.  I

25  did not find anything equivalent to this structure, that

Anderson - cross

1    that code because it is all intermingled together.

2           In the Jump products, the code is a little

3    better organized.  There is a single module for the adaptive

4    filter.  And that filter provides no way to access the

5    coefficients.  Within that filter, different sections of the

6    code describe different parts of that filter.

7    Q.    Sir, that section is not called a filter.  It's

8    called a feedback canceling block, the AFB block.  Correct?

9    A.    Correct.

10   Q.    It doesn't say that the entirety is the filter, does

11   it?

12   A.    That is what is in the feedback path that operates on

13   the signal.

14   Q.    Well, let's take a look at the demonstrative that is

15   based on Figure 13 out of PX-138 that we have seen.

16          You agree that this accurately depicts the

17   components of the Jump 2 and Jump 3 anti-feedback system?

18   A.    It doesn't show all connections.  But it's a fairly

19   accurate view.

20   Q.    And you recognize that there is a box in sort of the

21   middle of the page that says FBC_FIR.  Correct?

22   A.    Yes, I see that.

23   Q.    And this document, PX-138, and I think it was in your

24   book that your counsel provided to you, describes that as a

25   24-tabbed filter.  Correct?

Anderson - cross

1   A.      That is a delay line.  It has a multiplier.  It
2   doesn't have the coefficients.
3   Q.      But Oticon's own technical document describes that
4   element as a filter.  Correct?
5   A.      Can you point that out to me?  I think I recall that
6   that uses the word filter there.  As I understood, that
7   meant that that is where the actual filter output is
8   produced.
9   Q.      So do you agree or disagree that that block is a
10  filter?
11  A.      I agree it's part of a filter.
12  Q.      The document doesn't say this is part of a filter.
13  This says this is a filter.  Correct?
14  A.      I am describing what I found in the products.
15  Q.      Based on what?  The technical documents that you
16  relied on?
17  A.      Recall, I said I started with the technical
18  documents, and then I went and looked at the code to verify
19  how things actually worked.  This document itself shows that
20  the coefficient buffer is elsewhere.
21  Q.      Okay.  And Dr. Gloster explained how the code and
22  this diagram are accurate, didn't he?
23  A.      I heard him, yes.
24  Q.      And during your deposition, when you were asked if
25  you disagreed with any of the positions he took in his

1   Q.    And so the buffer provides the coefficients to the

2   FIR block?

3   A.    That's one way of putting it.

4   Q.    And that's the way Mr. Brown analyzed these documents

5   and the Oticon products.  Correct?

6   A.    Yes, I believe so.

7   Q.    So if we assume that he is correct, and that the

8   filter is actually the FIR block, then you would agree that

9   that filter is programmed.  Correct?

10  A.    No, I would not.

11  Q.    And why not?

12  A.    Because you cannot specify a response.  You can't

13  provide it with coefficients to achieve a response, within

14  the context of the LMS adaptive filter.  Those coefficients

15  are inaccessible, and they change continually.

16  Q.    Well, the output of that filter, the FIR filter, is a

17  response.  Correct?

18  A.    It does produce an output, yes.  But the response of

19  the filter is changing continually.  You are not programming

20  it to any response.  I view it a lot like the radio example.

21  You might have had a radio, but if you were to take that

22  radio, remove the knobs, and put in something that gave it a

23  mind of its own that would change itself, it is no longer a

24  programmable radio.

25        The coefficients in this filter have been locked

1    off.  And they change continually.  They do not have a

2    response in the sense of a program filter having a response.

3    Q.    Again, that is all based on your viewing that the

4    filter is all three components and not just the FIR block.

5    Correct?

6    A.    That is a common understanding.  Among those of skill

7    in the art, an LMS adaptive filter and a programmed filter

8    are two very different things.

9    Q.    Well, isn't an LMS filter just a self-programming

10   filter?

11   A.    We use the word self-adjusting.  But if you want to

12   call it self-programming...

13   Q.    So it's programmable, it programs itself?

14   A.    It's not provided with coefficients.

15   Q.    If you view it as a whole, and you say your

16   hypothesis or your analysis does.  But if you view the

17   filter as just the actually FIR block in this diagram, which

18   this document says, then it is provided with coefficients.

19   Correct?

20   A.    I disagree with that interpretation.  But if that's

21   the view you take -- and I understand that is the view ETG

22   is taking.

23   Q.    And each time that filter gets new coefficients,

24   there is a new response that it provides.  Now, it may do

25   that continuously and very fast, but there is a new response

1    each time.  Correct?

2    A.    Well, the filter does something different every time,

3    if that's what you mean by response.  Typically, when you

4    are talking about filters, you talk about filter responses,

5    there are several ways to define it.  You can talk about

6    frequency response, which isn't defined in this case.  You

7    can talk about impulse response, which doesn't apply in an

8    adaptive filter case.  You can talk about what it does to

9    the signal as it goes through the filter.  But if the signal

10   can never go through the filter before that is changed,

11   there is no way to measure the response of the filter.

12              I think the key is a response.  You are not

13   giving it a response.  It is doing its own thing.  It's

14   changing continually.

15   Q.    Each time new coefficients are provided, there is an

16   output of that filter.  You agree with that.  Correct?

17   A.    Yes.

18   Q.    And isn't that a response?

19              THE COURT:  Let me see counsel for a moment.

20              (The following took place at sidebar.)

21              THE COURT:  I don't want to unduly constrain

22   your cross.  I think you are at an impasse.  There is a

23   fundamental disagreement between the experts in this case,

24   and it is going to be up to the jury to decide, resolve that

25   disagreement.

Anderson - cross

1    Correct?

2    A.    No.

3    Q.    It doesn't say measure?

4    A.    It doesn't.

5    Q.    It doesn't indicate that you have to read out the

6    results of your determination, does it?

7    A.    No, it doesn't.

8    Q.    In fact, in every-day language people might say I

9    determined how much money I am going to spend, but that

10   doesn't mean that I have shown everyone my calculations.

11   Right?

12   A.    Well, determine has two common meanings.  One would

13   be to define or establish, and the other would be to measure

14   or ascertain.  If it means to define, then it doesn't make

15   sense.  You have just -- you are saying that the filter has

16   to define what the feedback is doing?  The feedback is

17   feeding back regardless of whether or not there is a filter.

18            The only other obvious interpretation would be

19   some sort of ascertaining.

20            So let's go to the ascertaining.

21            Is it ascertaining the amplitude and phase as a

22   function of frequency?  No, it's not.  It's not doing

23   anything substantially similar.

24   Q.    You agree the LMS algorithm creates coefficients.

25   Correct?

Anderson - cross

1    A.    Absolutely.

2    Q.    And you agree that from those coefficients one can

3    derive the phase and amplitude response.  Correct?

4    A.    If you have coefficients, and if it's in the context

5    of a fixed filter, and so let's even suggest that maybe we

6    have let the filter adapt and then we have stopped it and

7    said, okay, this is my time and variant filter, you could

8    perform a transform.  And there you could determine the

9    phase and amplitude as a function of frequency.  But that

10   step is not performed, that analysis doesn't apply, and you

11   would have determined the phase and amplitude and function

12   of frequency of the transfer function of the filter.  You

13   would not have determined the effect on the transmission

14   path, the phase and amplitude in the transmission path of

15   the acoustic feedback.  You are not determining even the

16   right thing.

17   Q.    Well, the inputs to the LMS are the output of the

18   transmission channel and the input of the transmission

19   channel.  Correct?

20   A.    I am sorry, all the outputs and inputs, I was

21   thinking of something else.  Go ahead and ask that again.

22   Q.    The inputs, what the LMS algorithm uses to make its

23   calculations, are the output of the transmission path and

24   the input of the transmission path?

25   A.    Okay.

Anderson - cross

1    Q.    But to do that analysis, what did you compare between
2    the structure identified by the Court in the accused
3    product?  What was your comparison?
4    A.    Sir, I've answered this question before.  I'll answer
5    it again.  I looked, as ETG, Mr. Brown suggested, in the
6    LMS filter, in the update algorithm.  In fact, I looked
7    everywhere around.  I looked for pieces of it.  It's hard to
8    enumerate everything I looked at, but I looked at everything
9    that is in the hearing aid that could remotely qualify as
10   performing that, being that structure.  I could not find it.
11   Q.    And going back to the memory.  You agree there is a
12   memory in this, the Oticon's accused device; right?
13   A.    Yes.
14   Q.    And the presence of a memory to you does not indicate
15   that that filter is programmable; correct?
16   A.    That is correct.
17   Q.    And that is a disagreement you have with Dr. Gloster
18   on his testimony; is that correct?
19   A.    Dr. Gloster said the presence of a memory indicates
20   the filter is programmable.  And I take issue with that on
21   two points:
22         The first point is that if that is all that is
23   required for a programmable filter, then any filter is
24   programmable.
25         The second would be that that memory is not

Anderson - cross

1    accessible.  I checked very carefully.  And so if, for

2    example, that memory were accessible, if you could provide

3    it with values, if you could give it a response, yes, that

4    would describe a programmable filter but we don't have that.

5    We can't get at it, and even if you could, it would change

6    immediately.  So the memory in this case is doing something

7    different than making that filter a programmable filter.

8    Q.    Well, you say you can't get at it but the LMS puts

9    coefficients in that buffer; correct?

10   A.    Yes.

11   Q.    So the LMS can get at it?

12   A.    The LMS is part of the filter itself.

13   Q.    I understand your position.

14              MR. BUROKER:  No further questions.

15              THE COURT:  Redirect.

16              MR. ROMARY:  No questions, Your Honor.

17              THE COURT:  Thank you, doctor.  You are excused.

18              THE WITNESS:  Thank you.

19              MR. LYTLE:  Good morning, Your Honor.

20              THE COURT:  Good morning, counsel.

21              MR. LYTLE:  My name is Jay Lytle, counsel for

22   defendant Widex.

23              THE COURT:  All right.

24              MR. LYTLE:  And defendants call at this time

25   Dr. Sigfrid Soli.

1    same.

2    Q.    Is this the Figure you are referring to?

3    A.    Yes, it is.  And I think everybody has seen this

4    before.  I just want to draw your attention to the presence

5    of this electrical feedback path with a, what he called an

6    estimator in it that created the signal that canceled the

7    effects of the acoustic feedback.

8              This, to my knowledge, is the first evidence of

9    the use of an electrical feedback path to cancel feedback in

10   a hearing aid.

11   Q.    Was this idea -- did you find that this idea was

12   present in all of the Weaver work that you just went

13   through?

14   A.    Yes, it was.

15   Q.    Okay, Doctor.  Do I understand it right that the work

16   related to what Mr. Weaver did as shown on the top of this

17   chart?

18   A.    That is true.

19   Q.    What is shown on the bottom of the chart?

20   A.    There are two important events shown here on the

21   bottom.  One is in May 1985, when Dr. Leland Best completed

22   his Master's thesis, describing the use of an LMS adaptive

23   filter to cancel feedback in a hearing aid.  And this thesis

24   was defended and demonstrated to Dr. Egolf.

25              Then on October 17, 1985, that's the date that

1    Dr. Graupe filed his patent that describes a method for
2    adaptively filtering the signal in a hearing aid to cancel
3    acoustic feedback as well.
4    Q.    Is that the Graupe '818 patent that we have heard
5    about?
6    A.    Yes, it is.
7    Q.    What does the red line indicate?
8    A.    The red line is positioned at the place approximately
9    November 12th of 1985.  And that is the date of Dr. Levitt's
10   invention.
11   Q.    So all the work that you are showing on the left-hand
12   side of that red line, that was done before Dr. Levitt's
13   date of invention?
14   A.    Yes, it was.
15   Q.    Now, Dr. Soli, what I would like you now to do with
16   the jury is to show us where in the actual claims of the
17   '850 and '749 patents, in your opinion, the prior art shows
18   all the features of the claims.
19        So if we could start with the Graupe '818
20   patent, DX-982.  This is in the jury binder, I believe,
21   DX-982.
22        Dr. Soli, did you review the Graupe '818 patent?
23   A.    Yes, I did.
24   Q.    Did you form an opinion about whether it includes --
25   let's step back for a second.

1658

Soli - direct

1    Among the claims that are asserted in the '850

2    patent, did you find one in particular that you would like

3    to start with, discuss?

4    A.    I think it's easiest if we start with Claim 19.

5    Q.    With Claim 19, then, did you review that with respect

6    to the Graupe '818 patent and form an opinion?

7    A.    Yes, I did.

8    Q.    What is your opinion?

9    A.    My opinion is that all of the elements of Claim 19 in

10    the '850 patent are anticipated by Graupe '818 if we

11    interpret the claims of the '850 patent as they have been

12    interpreted in the infringement case.

13    Q.    Let's just start walking through the claim.

14    Can we go to the next slide, please.

15    Where in Graupe did you find the beginning of

16    the claim, a hearing aid with all the elements that are

17    listed?

18    A.    The first element is a hearing aid with a

19    microphone, output receiver and signal transmission channel.

20    In the patent it describes the technical field

21    of the patent is related to hearing aids.  And Figure 2

22    shows a block diagram of a communications system that could

23    be a hearing aid, according to what Graupe has said,

24    comprising a microphone, an amplifier in the transmission

25    channel, and a speaker.

Soli - direct

1   Q.    Okay.  Turning to the next element, next slide, a

2   programmable delay line filter, did you find that in Graupe

3   '818?

4   A.    Yes.  I relied on the claim construction for a

5   programmable delay line filter.  And I found such a filter

6   in Figure 5.

7             Graupe calls it a correction circuit.  But it

8   acts as a programmable delay line filter.  Here are the

9   delayed input samples.  Here are the coefficients.  Here are

10  the multiplies.  Here is the summation.  And here is the

11  output.

12            That comprises the elements of a programmable

13  delay line filter.

14  Q.    Now, is the filter in Graupe an adaptive type filter?

15  A.    The Graupe system is an adaptive system, as he claims

16  in the title of his invention and throughout.  Within that

17  system is found this filter.

18  Q.    Okay.  Go to the next slide.  The next element is

19  this programmable filter is interposed in a feedback path.

20  Did you find that in Graupe '818?

21  A.    Yes.

22  Q.    Where is that?

23  A.    Figure 3, which is kind of a complicated Figure,

24  shows a number of things.  It shows the hearing aid here

25  that we saw before, although the amplifier is divided into

Soli - direct

1   two parts.  It also shows some other circuitry up here and

2   here that we will talk about momentarily.

3            Then it shows a path that begins here, right

4   before the speaker, goes up here, up here, through this

5   filter 21 we just looked at, and over here and back down,

6   and is subtracted from the signal right after the

7   microphone.

8            So this programmable delay line filter 21, the

9   correction circuit, is interposed in the feedback path

10   between the input and the output of the transmission

11   channel.

12   Q.    If we go to the next element, does the Graupe '818

13   describe programming the filter?

14   A.    Yes.  This block over here on the right-hand side is

15   called an identification circuit.  And what it does -- and I

16   will tell more about it later -- is goes through some

17   functions that obtain a set of coefficients that it then

18   provides via this line to the correction circuit 21.

19            So this process of doing so, then, it programs

20   that filter.

21            Then the other requirement is that it

22   substantially reduce acoustic feedback.

23            If we look in the specification, Column 8, Lines

24   50 to 55 down at the bottom there, it talks about this

25   process of programming the filter.  And then it says, as a

1   result the acoustic feedback link does not affect the

2   communications circuit during its operational mode.  This is

3   the acoustic feedback link, that is to say the feedback

4   path.

5   Q.    You mentioned the identification circuit providing

6   the coefficients.  Is that part of the entire Graupe system?

7   A.    Yes.  We are looking at the whole system right now as

8   Graupe described it.

9   Q.    Okay.  And how -- you mentioned that this is an

10  adaptive system also.  Does Graupe describe how it adapts or

11  how often it adapts?

12  A.    Well, like other adaptive systems, once you turn it

13  on it starts adapting.  And the first thing that happens

14  when you turn it on is this element here which is called a

15  logic circuit opens up these switches so it interrupts the

16  forward path of the hearing aid and this identification

17  system then shoots a noise through here that comes all the

18  way around, goes back up here, comes back and uses that

19  noise then to create a set of coefficients that are

20  programmed into this filter here and then those switches are

21  closed and the hearing aid begins operating.

22          This process is repeated automatically from time

23  to time under a variety of different conditions.  So it

24  begins by adaptively obtaining the first set of coefficients

25  for the filter and then adaptively modifying those from time

1    to time.

2    Q.    Does he give any examples of how often he changes the

3    coefficient?

4    A.    Well, he said when there is a change in the level of

5    the signal in the transmission channel, he might trigger the

6    adaptive process or he might do it every so often, maybe

7    every minute or so.

8    Q.    Every minute?

9    A.    Yes.

10   Q.    Now, if he does it every minute, does that tell you

11   whether or not there is any memory that must be in the

12   system?

13   A.    Well, if it happens every minute, that means that

14   this guy here is going to create some coefficients based

15   on the response of this path, every minute put them over

16   here, and then this filter is going to have to use those

17   coefficients to cancel feedback until it gets a new set.  So

18   those coefficients have to be held in a memory of some kind

19   during that time.

20   Q.    So, Dr. Soli, to sum it up, have you found all the

21   elements of Claim 19 in the Graupe '818 patent if you apply

22   Claim 19 as ETG has applied it to the defendant's products?

23   A.    Yes, I have.

24   Q.    And if we go to the next chart.

25         And now we've seen a bunch of checkmark charts.

1  Q.    That's the LMS adaptive algorithm?

2  A.    Yes.  When we see it later, we're not going to see

3  all these details, we're just going to see this single block

4  labeled this way.

5  Q.    Can we go to the next slide.

6         And is that interposed in a feedback path?

7  A.    Yes, it is.  I think you have seen this figure before

8  but let me refresh your memory.

9         This is the forward path through the microphone

10 through the hearing aid.  This path here which goes from

11 this point back toward the input of the hearing aid contains

12 the programmable filter or adaptive filter W whose output is

13 subtracted here.

14        The coefficients for this filter are generated

15 by the LMS algorithm which is shown up here and the filter

16 is sitting in the feedback path, as we see.

17 Q.    And if we can go to the next slide.

18        Where, if at all, does Best show that the filter

19 is programmed?

20 A.    The programming process, again according to ETG's

21 interpretation of that process, is occurring continuously.

22 The algorithm is supplying coefficients to this filter on

23 every sample so that would be defined according to ETG's

24 programming.  So that is the programming process.

25        Now, regarding the substantial reduction of

143

1672
Soli - direct

1    Claim 14 talks about a method of reducing
2    acoustic feedback in a hearing aid, with the various parts
3    of the hearing aid.  Did you find that in the Graupe patent?
4    A.    Just like we saw before with the earlier claim,
5    figure 2 shows us a microphone, an amplifier and a speaker
6    which comprised the signal transmission channel for the
7    hearing aid.
8    Q.    Okay.  If we can go to the next element.
9    Determining the effect on the amplitude and
10   phase.  Did you find that the Graupe '818 patent describes
11   that?
12   A.    Yes.  Now, again, we need to view this in light of
13   ETG's interpretation of the claims for infringement
14   purposes.  As I understand those, ETG is asserting that an
15   adaptive filter whose coefficients are obtained in such a
16   way that they can be used to cancel acoustic feedback, that
17   they also embody or relate to the magnitude and phase
18   characteristics of the signal.  So if we view a filter whose
19   coefficients had those characteristics as determining the
20   effect of amplitude and phase, then what we see with Graupe
21   '818 is this identification circuit does exactly that.  A
22   signal, a noise, white noise is sent through the speaker
23   around through the acoustic link to the feedback path, back
24   through the microphone and returns to this identifier, and
25   what happens inside the identifier is that the coefficients

151

Soli - direct

1    for a filter that characterize the acoustic feedback path

2    are identified or determined.

3    Q.    Okay.  We can go to the next element, the inserting

4    element.  Inserting between the input and output of the

5    transmission channel, a programmable filter.  Did you find

6    that?

7    A.    Yes.  You can see it in figure 3 but it's easier to

8    see it in figure 2 because the extra stuff is not in there

9    now.  Here, we have this correction circuit inserted between

10   the input and the output as the transmission channel, right

11   here.

12   Q.    Okay.  And did you find that it's the programmable

13   filter is programmed?

14   A.    Yes, it is.

15   Q.    How is that shown?

16   A.    That is shown here as we have discussed before.  This

17   programming process takes place when the identifier, after

18   it's identified, the transfer function of the filter

19   coefficients provide those filter coefficients over to the

20   correction circuit over here.

21   Q.    And would this circuit produce the -- reduce the

22   effect of acoustic feedback both in amplitude and phase?

23   A.    Yes, it would.

24   Q.    Okay.  And now what does Claim 16 add?

25   A.    Well, Claim 16 is a dependent claim that says that

Hauge - direct

1    responsibility I have as well is that I have to insure that

2    the inventions made at the company, the Demant Group

3    companies are foreign-less patent applications.

4    Q.    As an aside, are you aware of where the products that

5    are accused of infringement are made?

6    A.    Yes, the Demant Group with Oticon make the accused

7    products in Denmark and they ship them to the rest of the

8    world from Denmark.

9    Q.    Have all the of the accused products always been made

10   in Denmark?

11   A.    Yes.

12   Q.    Were you personally responsible for doing any

13   searches to determine whether any of the accused products

14   infringed anybody else's patents?

15   A.    Yes.  I have been responsible for doing clearance

16   searches on Syncro 2 and Delta product families.

17   Q.    And what specifically did you do as part of those

18   searchs?

19   A.    Well, first, I met with, my supervisor at the time

20   was Michael Christensen and he gave me a topic

21   specification.  That is a document describing all of the new

22   features of these products which have to be examined.  And

23   he taught me the procedures of how to perform the clearance

24   searches and the policies of Bernafon and Oticon.

25   Q.    And after you met with Michael Christensen, did you

Woods - dep.

1          "Answer:   They would have had to have the
2    author's name.
3          "Question:  So there was no prohibition against
4    getting access to the thesis at that time, you just had to
5    know how to do it; is that correct?
6          "Answer:   Right.
7          "Question:  You indicated that an individual
8    could -- once the information was put into the OCLC, an
9    individual could go to the librarian, or a librarian, and
10   search for a thesis based on the information in the OCLC.
11   Could an individual do that over the phone?  Did they come
12   here to the library?  How -- where did the individual have
13   to be?
14         "Answer:   They probably would have had to have
15   come in.
16         "Question:  When you say probably, are you aware
17   of anybody ever requesting the information over the phone
18   like that?
19         "Answer:  No.
20         "Question:  Does the library have a copy of the
21   thesis of Leland C. Best, titled Digital Suppression of
22   Acoustic Feedback in Hearing Aids?
23         "Answer:   It was in the stacks a week ago.
24         "Question:  Do you know when it was first put in
25   the stacks?

1           "Answer:  No.

2           "Question:  Based on your experience, could you

3   give me an estimate of when it might have been put in the

4   stacks based on what you see here in the OC -- in Exhibit

5   17?  If you could answer, please?

6           "Answer:  Probably in October of 1986.

7           "Question:  What is the earliest that it could

8   have been put in the stacks?

9           "Answer:  Late September.

10          "Question:  When Mr. Best's thesis arrived,

11  would a member of the general public have been able to

12  access the thesis before it was put into the OCLC?

13          "Answer:  Only if they requested the thesis by

14  the author's name.

15          "Question:  If the member of the general public

16  knew the subject matter that he or she was interested in,

17  could that person have requested that the library search

18  through theses for something on that subject matter?

19          "Answer:  They could have, but we wouldn't have

20  done it.

21          "Question:  Why not?

22          "Answer:  Because we had no indication on any of

23  the information we had what the subject of the theses were.

24  All we had was the name.

25          "Question:  Do you know if the copy -- if the

1802

```
 1                IN THE UNITED STATES DISTRICT COURT

 2               IN AND FOR THE DISTRICT OF DELAWARE

 3                           -  -  -

 4

 5    ENERGY TRANSPORTATION,          :   Civil Action
      INC.,                          :
 6                                   :
                   Plaintiff,        :
 7                                   :
           v.                        :
 8                                   :
      WILLIAM DEMANT HOLDINGS A/S,   :
 9    et al.,                        :
                                     :
10              Defendants.          :   No. 05-422 (GMS)

11                           -  -  -

12                    Wilmington, Delaware
                    Friday, January 31, 2008
13                        9:30 a.m.
                      Ninth Day of Trial
14                           -  -  -

15
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16

17

18    APPEARANCES:

19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                     -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                               Counsel for Plaintiff
24

25
```

1

1     the Best thesis and then some work by Mr. Weaver?

2     A.          Yes.

3     Q.          And involving an article by Nunley and South;

4     correct?

5     A.          Yes.

6     Q.          And did you also have opinions that you rendered

7     in this case relating to those pieces of work?

8     A.          Yes, I did.

9     Q.          Let's talk first about the Graupe '''818 patent.

10    Let's display DX-982.

11               Are you familiar with this patent?

12    A.          Yes, I am.

13    Q.          And is this the same patent that Dr. Soli

14    testified about earlier?

15    A.          Yes, it is.

16    Q.          Did you form an opinion as to whether the Graupe

17    '''818 patent anticipates any of the pending claims of the

18    '850 or '749 patent?

19    A.          Yes, I did.

20    Q.          What is the summary of your opinions?

21    A.          It does not.

22    Q.          Do you have a demonstrative that we created to

23    help summarize the reasons?

24    A.          Yes.

25    Q.          Could you explain to the jury the primary

1    reasons why Graupe '''818 does not anticipate?

2    A.        Sure.   The Graupe '''818 patent excludes the

3    amplifier and transmission channel during the identified

4    mode.   During that identification mode, it calculates the

5    wrong coefficients and also during that mode it functions as

6    a noise generator.

7    Q.        And then what does the second half of the slide

8    show?

9    A.        The second half of the slide shows that the

10   Graupe '''818 does not show determining the effect on

11   amplitude and phase of a signal in the transmission channel

12   which is a requirement for Claims 13, 14 and 16.   And it

13   does not show a filter programmed to effect substantial

14   reduction of acoustic feedback which is Claim 19.

15   Q.        Let's talk about the first bullet point.   You

16   say that the '''818 does not, excludes the amplifier.   Could

17   you explain what you mean by that?

18   A.        Certainly.

19   Q.        We'll display Matzen 7 here.

20   A.        Okay.   In the top half of this drawing, there is

21   a block diagram of the Graupe patent that shows the

22   microphone, the receiver, the ID, which stands for the

23   identification circuit, and the C, which stands for the

24   correction circuit, and here lightly is amplification.

25             In the identification mode, the identification

1    circuit opens these two switches which removes the forward

2    transmission path and the amplifier from the circuit.  So it

3    senses being a hearing aid and it injects a signal into the

4    receiver which the person wearing a hearing aid can hear.

5    Q.        So during the identification mode, can the

6    patient or the wearer of the hearing aid hear sound from the

7    outside that is coming into the microphone?

8    A.        No, he cannot.  The connection between the

9    microphone, the amplifier and receiver has been disconnected

10   by these two switches and it operates only as a noise

11   generator.

12   Q.        So what would the patient hear while the circuit

13   was in the identification mode?

14   A.        The patient would hear a noise similar to what

15   you hear when at the sidebar and the judge puts on that

16   white noise generator.

17   Q.        How often or when does it switch into this

18   identification mode?

19   A.        It switches in the identification mode a number

20   of times.  It, of course, goes into that mode when the power

21   of course comes on so that it can initially set up.  It goes

22   into the identification mode.  If the circuit itself senses

23   things such as instability, squeal, it will go into the

24   identification mode.  If the gain is changed in the

25   amplifier by perhaps the wearer turning the volume control

123

Matzen – direct

1    Q.        So as configured, the circuit wouldn't work with

2    the compression amplifier?

3    A.        That's right.

4    Q.        Is there any specific circuitry described in the

5    Graupe '''818 patent for the correction circuit or the

6    amplification block?

7    A.        No, there is really no definitions of any

8    circuitry or hardware.  It's pretty much all block diagrams

9    of mathematical functions.  It's a mathematics based paper.

10   Q.        Now, going back to Matzen 8, the overview slide,

11   the second point here, it says it calculates the wrong

12   coefficients.  What do you mean by that?

13   A.        What I mean by that is that when it goes into

14   the identification mode and disconnects the amplifier, it

15   identifies the transfer function of the acoustic feedback.

16   But it does not do that basing those calculations on the

17   effect through transmission channel.  So it is actually

18   calculating the improper coefficients for proper reduction

19   of acoustic feedback.

20   Q.        And, again, what would be the transmission

21   channel shown here?

22   A.        Transmission channel would be the lightened

23   amplifier that connects the microphone to the receiver

24   speaker.  That's the transmission channel through the

25   system.

Matzen - direct

1    Q.          During the identification mode, is there even a
2    transmission channel?
3    A.          No, there is not.
4    Q.          So let's go back to Matzen 8 again.  The third
5    bullet says function as a noise generator.  That is what we
6    talked about earlier.
7    A.          Yes, uh-huh.
8    Q.          It says the Graupe '''818 does not show
9    determining  the effect on amplitude and phase on a signal
10   in the transmission channel.  Could you explain your reason
11   for that?
12   A.          Certainly.  During the identification mode,
13   there is no transmission channel so there is no way to
14   determine anything about the transmission channel.
15   Q.          So in your opinion then, can Graupe '''818
16   satisfy this claim limitation from Claims 13, 14 and 16?
17   A.          No.  Because there is so much error, because of
18   that, the system, not knowing what is happening through the
19   transmission channel when it's in the correction mode, it
20   would not be able to really effect substantial reduction of
21   acoustic feedback.
22   Q.          Does the Graupe '''818 patent discuss phase and
23   amplitude?
24   A.          No, it does not.
25   Q.          Does it discuss determining the effect on phase

Matzen - direct

1    and amplitude of a signal in the transmission channel?

2    A.          No, it does not.

3    Q.          The next bullet on your slide does not show

4    filter programmed to effect substantial reduction of

5    acoustic feedback (Claim 19).  Could you explain what this

6    means?

7    A.          I just did, I thought.

8    Q.          Okay.  And remind me.

9    A.          The filter, which is the corrections circuit, is

10   programmed by coefficients that are transferred from

11   the identity circuit but because those coefficients are

12   determined with the amplifier and out and the whole

13   transmission channel not there, the coefficients do not

14   include the effect of the signal through the transmission

15   channel so the reduction that it does accord is not

16   substantial.

17   Q.          Does the Graupe '''818 patent have any

18   indication of the amount of feedback that it claims to

19   reduce?

20   A.          There is no information in the patent

21   whatsoever.

22   Q.          Is there any way to determine how that circuit,

23   how much feedback that circuit might produce?

24   A.          No, there is no circuit details or hardware

25   details.  In fact, I believe in Dr. Graupe's deposition he

1    signal from the hearing aid microphone while the canceller

2    output drives the hearing aid amplifier at the same point

3    where the microphone is normally connected.  The physical

4    connection from the aid to the canceller is made -- let's

5    see -- by a small shielded cable.  One end plugs into the

6    controller, the other end is attached to the circuit within

7    the aid.  Thus, all physical characteristics of the hearing

8    aid are preserved even though the canceller is an external

9    device.

10    Q.        So let's go back and look in Matzen 2.  And why

11    is that circuit the Best circuit -- is the Best circuit in a

12    feedback path, as defined by the Court?

13    A.        No, it is not.

14    Q.        What is the definition that you used?

15    A.        The definition I use is that feedback path means

16    a path in which a signal travels from the output to the

17    input.

18    Q.        Let's go back to Matzen 2.  Where is the output

19    in the Best circuit?

20    A.        The Best circuit's output is right here, and the

21    input to the Best circuit is right here.  That is in the

22    forward channel, forward path of the transmission channel of

23    the hearing aid.  This being the output of the transmission

24    channel.

25    Q.        So let's go back at Matzen 5.1 or 5-1.  If the

Matzen - direct

1   Best work doesn't have a filter in the feedback path, what

2   is your opinion as to whether it can anticipate Claims 13,

3   16 or 19?

4   A.          It cannot.  It cannot match those claims.

5   Q.          The next bullet point says, Does not show

6   determining the effect on amplitude and phase of a signal in

7   the transmission channel, Claims 13, 14 and 16.  Can you

8   explain what this means?

9   A.          Yes.  The Best circuit can only determine what

10  happens at the input to the transmission channel.  It cannot

11  determine what happens in the transmission channel.  It

12  cannot determine the effect on amplitude and phase signal in

13  the transmission channel because it does not look at the

14  whole transmission channel.  There is no connection to the

15  output.

16  Q.          And if it doesn't determine the effect of

17  amplitude and phase of a signal in the transmission channel,

18  is it your opinion -- what is your opinion as to whether it

19  can anticipate Claims 13, 14 or 16?

20  A.          It cannot.

21  Q.          And did Dr. Soli apply the Best circuit to the

22  '749 patent?

23  A.          Yes, I believe he did.

24  Q.          In his testimony?

25  A.          I don't remember.

1965

Matzen - cross

1    the feedback is summed as a negative to cancel feedback,

2    have you?

3    A.          There is no feedback in the circuit by the

4    Court's direction.

5    Q.          Are you saying there is no feedback in the Best

6    circuit?

7    A.          I'm saying this hearing aid does not have

8    feedback in the transmission channel.

9    Q.          I'm just asking about feedback.  Does the Best

10   circuit cancel feedback?

11   A.          I would assume it does, yes.

12   Q.          In fact, it cancels it pretty well, doesn't it?

13   A.          Yes, it does.

14   Q.          Now, could we show the Best thesis?  DX-1111,

15   page 34.

16          Now, you didn't show this figure again, have you?

17   A.          I don't believe we did.

18   Q.          But that is the Best feedback, LMS feedback

19   canceler?

20   A.          Yes, that is a symbolic diagram of the whole

21   canceler.

22   Q.          Okay.  And you drew it as just a simple box

23   before, right?

24   A.          That's right.

25   Q.          And what does that box represent in relation to

1973

Matzen - cross

1    Q.        Could we put Claim 19 up from the '850 patent.

2              And this is Claim 19 in the '850 patent?

3    A.        Yes.

4    Q.        And this doesn't have anything about determining

5    phase and amplitude; right?

6    A.        Right, it does not.

7    Q.        Okay.  So is there any other reason other than

8    your position that the filter is not in a feedback path?

9    A.        You are talking just about Claim 19?

10   Q.        Just Claim 19.

11   A.        I misunderstood the last question.

12   Q.        Yes.

13   A.        Yes.  No, that's it.  There is no filter in the

14   feedback path.

15   Q.        So would you agree with me, then, if the jury

16   finds that the Best thesis does show a feedback path as the

17   Court has construed it, then it would have all the elements

18   of Claim 19?

19   A.        Yes.

20   Q.        Now, you talked about the Graupe patent.

21   A.        Yes.

22   Q.        You mentioned that there was no testing on a

23   real person.  Do you recall that?

24   A.        I think I said in the Graupe discussion that

25   there is no indication that that circuit was ever built.  So

Matzen - cross

1    it could not have been tested on anybody.

2    Q.        Do you know if Dr. Levitt's invention in the

3    '850 was ever built?

4    A.        I have no opinion on that.

5    Q.        Do you know or you don't know?

6    A.        I have no idea.

7    Q.        You don't know.

8              So you don't know if it was ever tested on a

9    person?

10   A.        No.

11   Q.        You don't know if it would work?

12   A.        I have no idea.

13   Q.        Now, if we can go to the Graupe '818 patent.

14   You have read the Graupe '818 patent?

15   A.        Yes, I have.

16   Q.        And you would agree with me, wouldn't you, that

17   the Graupe '818 patent describes a method for adaptively

18   filtering acoustic feedback?

19   A.        Yes.

20   Q.        And I think you have also stated that the Graupe

21   '818 would not be a practical hearing aid because it would

22   have to interrupt its operation of the hearing aid during

23   the identification mode?

24   A.        That's right.

25   Q.        Now, do you have an understanding how the '850

Matzen - cross

 1                    MR. BUROKER:  Objection.  Same objection.
 2                    MR. LYTLE:  Your Honor, the witness is taking
 3          the position that Graupe '818 doesn't teach all the elements
 4          of the claim, and separates the amplifier during the
 5          identification mode.  And we are trying to show that the
 6          '850 patent operates in the same way.
 7                    THE COURT:  The basis of your objection is?
 8                    MR. BUROKER:  He didn't talk about the patent
 9          specification.  And that's what he is talking about now.  He
10          talked about the claims.
11                    MR. LYTLE:  But to construe the -- to understand
12          the claims, they need to be read in light of the spec.
13                    MR. BUROKER:  You have already interpreted the
14          claims, Your Honor.  That is the point.
15                    MR. LYTLE:  You have interpreted certain phrases
16          in the claim.
17                    THE COURT:  And not the entire claim.
18                    MR. LYTLE:  Correct.
19                    THE COURT:  I will let him answer this.
20          BY MR. LYTLE:
21          Q.        Mr. Matzen, you just said that the Graupe '818
22          patent didn't satisfy the claims because it opens up those
23          switches and there is no amplifier in the middle when it
24          does its identification?
25          A.        That's right.

Matzen - cross

```
 1    Q.           Now, let's go back to Graupe '''818.  Figure 3,
 2    please.
 3                 And now for, I think we established that Claim
 4    19 had all the elements met.  That this was -- well, perhaps
 5    we should go through that.  What, in your opinion, is
 6    missing from the Graupe '''818 with respect to Claim 19?
 7    A.           Can I see Claim 19?
 8    Q.           Yes.  Can we put Claim 19 up, please.
 9                 What is missing from Claim 19?
10    A.           Nothing is missing from Claim 19.
11    Q.           Nothing.  So Graupe '''818 has everything that
12    is shown here in Claim 19?
13    A.           Yes.
14    Q.           Can we go to Claim 14, please?
15                 And what, if anything, is missing from Claim 14
16    in the Graupe '''818 patent?
17    A.           Determining the effect on the amplitude and
18    phase of a signal in said transmission channel as a function
19    of frequency of acoustic feedback between said receiver and
20    microphone.
21    Q.           Again, if the jury disagrees with you on that,
22    is there anything else in this claim that, in your opinion,
23    the Graupe '818 patent doesn't have?
24    A.           No.
25    Q.           And the same with Claim 13?
```

2000

Matzen - cross

```
1    Q.        I'll go slower.

2    A.        (Reviews document.)  Okay.  Now, you were

3    saying?

4    Q.        I am saying the signal is being picked off at

5    65, it is going into the host controller.  It is being

6    varied through the phase shifter and the amplifier, and it

7    is one of the inputs to the summation, which is the null

8    system?

9    A.        That's right.

10   Q.        And the other input -- trying to get this

11   right -- the other input comes off the microphone.  Right?

12   A.        Yes.

13   Q.        And what you do, what you are saying, this thing

14   gets adjusted and from this adjustment you figure out the

15   coefficients.  This thing gets adjusted from this

16   adjustment, you figure out the coefficients.  Correct?

17   A.        There is a signal missing down here.

18   Q.        I have got to do that.  You are saying that

19   signal comes in here.  Right?

20   A.        Yes.

21   Q.        But it gets picked off here, doesn't it?

22   A.        Yes.

23   Q.        So electronically, it doesn't make any

24   difference whether it comes in here or here, does it, it

25   makes absolutely no difference?  One is just bigger than the
```

1    A.        My analysis.

2    Q.        Does the Graupe '818 have a programmable filter

3    that affects substantial reduction of acoustic feedback?

4    A.        In my opinion, not really.

5    Q.        Why not?

6    A.        Because due to the fact that the forward channel

7    is not considered when the coefficients are determined, the

8    coefficients do not include any errors in the transmission

9    channel.  And being that there is no errors corrected for

10   the reduction of the feedback would not be as good as it

11   would if they were considered.  So it isn't substantial.  It

12   does do some reduction, but it is not substantial reduction.

13   Q.        So what is your opinion as to whether Graupe

14   '818 anticipates Claim 19?

15   A.        In my opinion, it does not.

16   Q.        In the Weaver circuit, the Weaver thesis

17   circuit, the GH-hat, that was the echo estimator?

18   A.        Yes.

19   Q.        Was that in the feedback path?

20   A.        No, it was not.

21   Q.        Why not?

22   A.        Again, it's because it was inside of the total

23   circuitry of the Weaver estimator, and that resided in a

24   location between the microphone and the amplifier and was

25   not connected to the output of the transmission channel,

Brown - direct

1    Q.        You can continue.

2    A.        Thank you.  It comes up through this complicated

3    set of switches.  These two switches here and this one down

4    here are designed to allow this filter to be put either in

5    the forward or feedback path.

6              This is the actual schematic of the breadboard

7    that doctor Levitt.  So he was trying to get it in both

8    directions.  Some of the claims at issue here are in

9    forward.  It comes through these switches, down the volume

10   control, through this programmable limiter, which is the

11   programmable portion, the limiting portion of the feedback

12   path, through an amplifier to the speaker.

13             From the speaker it goes in two paths.  One goes

14   up and back to the host controller that you heard Mr. Romary

15   talk about.

16             The other one goes down here through this switch

17   and into this feedback filter.

18             This filter 64, right here, is the feedback

19   filter in this application, shown in Figure Two.  It comes

20   out of this filter, comes down and into the summing

21   amplifier here, which then goes back over to the host

22   controller.

23   Q.        What about the microphone?  Is the microphone

24   disconnected?

25   A.        No.  The microphone right here is disconnected

1      during the portion of the fitting where the audiogram is
2      done.

3             This is where the patient's hearing test is
4      done, in this case in situ, in the ear. And they use the
5      same tone control to do the tone test that you normally
6      would just put a headset over to do.

7             So they disconnect the microphone during that
8      because they don't want you to be disturbed by the
9      surrounding noises.

10            During the feedback calculation, the microphone
11     here must be connected because if it wasn't connected you
12     would have no measurement of acoustic feedback. So it has
13     to be connected.

14     Q.     Now, Dr. Morley also testified that under normal
15     operation, the hearing aid disclosed in the Levitt patents
16     had to be disconnected from the host controller. Do you
17     recall that testimony?

18     A.     Yes, he did.

19     Q.     Do you agree with him?

20     A.     No, I don't.

21     Q.     Could you tell us why?

22     A.     In the first place, there is no place in the
23     patent which says you have to disconnect it to carry it
24     around. In the schematic shown, these two connections go
25     over the host controller, where the connections are made to

Brown - direct

1    put the microphone and the summing amplitude in the

2    feed-forward path or not.  And there is nothing in the

3    patent that says you couldn't leave a connector and carry it

4    around.

5            Obviously, you are not going to carry that

6    elephant hearing aid.  I think that's what one of the

7    previous guys told about his breadboard.  But certainly the

8    inventor intends to build a package that you could wear in a

9    pocket and connect with a cable up.

10            In fact, they later on tried to do this in their

11    company.

12    Q.        Would a person of ordinary skill in the art in

13    1986 understand that the hearing aid or host controller

14    could be connected during normal operation?

15    A.            Yes.  In fact, many of my customers were doing

16    this, building their breadboard first, or protoboard,

17    building it in a little box, letting people walk around with

18    it.  This was the normal procedure that we did.

19    Q.        Now, Dr. Morley also testified that the feedback

20    filter had to be placed between terminals 142 and 143 over

21    on the left side.  Do you agree with him?

22    A.        Between here and down here?

23    Q.        Yes.

24    A.        Yes, he testified that.  But I don't.g107.

25            Agree with him.  In fact, if you would look at the way

Brown - direct

1    this Figure 2 is drawn, this filter 64 is actually connected

2    in that configuration so that you wouldn't need an external

3    filter.

4    Q.         And is there also support in the specification

5    for your opinion?

6    A.         Yes, there is.

7    Q.         Let's turn to Column 9, please.  Start with Line

8    40 and go down to about 56.  If you could turn your

9    attention to Line 41 there, and explain to us what we see

10   here?

11   A.         Well, this is referring to the period in time in

12   which the host controller, just above this, has disconnected

13   those pins and made sure they were connected to the host

14   controller.  And it says that you use the settings in the

15   phase shifter and all that to calculate the null.  This is

16   the null process that I was talking about where you cancel

17   the signal in the microphone with the feedback signal

18   through the host controller.

19              Then you can put a feedback path there, or:  If

20   desired, the additional programming filter in the feedback

21   path of the hearing aid can be eliminated by calculating the

22   effective gain of both the forward and feedback paths and

23   modifying the programmable filter 64 so as to include this

24   additional gain.  This implementation necessarily requires

25   an adjustment to both the amplitude and phase characteristic

```
 1      of the filter 64.  Alternatively, filter 64 can be placed in
 2      the feedback path with appropriate changes in coefficients.
 3                  This is the way it is actually drawn in the
 4      schematic.
 5      Q.          Okay.  And finally in the '850 patent, must the
 6      hearing aid be returned to the audiologist office to adapt
 7      for the purposes of feedback cancellation?
 8      A.          Well, if the host controller remains connected
 9      to it, the answer would be no, and nowhere in the patent
10      does it say it has to be returned for that.
11                  MS. ECKSTEIN:  Thank you.
12                          CROSS-EXAMINATION
13      BY MR. ROMARY:
14      Q.          Hello again, Mr. Brown.  This might be the last
15      time.
16      A.          I hope so.
17      Q.          Okay.
18                  THE COURT:  So does the jury.
19                  THE WITNESS:  I would agree.
20      BY MR. ROMARY:
21      Q.          Mr. Brown, when the host controller and the
22      hearing aid are separated, you cannot, you can no longer
23      change the coefficients for purposes of acoustic feedback
24      cancellation, can you?
25      A.          If they were separated, you could no longer
```

2014
Brown - cross

1    acoustic feedback, the coefficients are fixed?  Yes or no.

2            MS. ECKSTEIN:  Objection, Your Honor.  That has

3    been asked and answered.

4            THE COURT:  Overruled.  Go ahead.

5            THE WITNESS:  Okay.

6    BY MR. ROMARY:

7    Q.        Can I have a yes or no?

8    A.        If they relate -- yes or no?

9    Q.        Yes or no.

10   A.        No, nothing specifically for feedback alone, but

11   feedback correlates to the real environment, so you can't

12   say totally no.

13   Q.        There is nothing in this hearing aid that

14   detects acoustic feedback change, is there?

15   A.        No, there is no detection of acoustic feedback

16   in the specification -- in the example in the specification.

17   You are correct.

18   Q.        Thank you.

19            MR. ROMARY:  Can I move a little bit so I don't

20   jab somebody with this?

21            THE COURT:  Yes, you can.

22   BY MR. ROMARY:

23   Q.        Now, I drew this little diagram down here;

24   correct?

25   A.        Yes, you did.

Appx. B

1

```
09:17:08   1              IN THE UNITED STATES DISTRICT COURT

           2              IN AND FOR THE DISTRICT OF DELAWARE

           3                         - - -

           4

           5   ENERGY TRANSPORTATION,        :   Civil Action
               INC.,                         :
           6                                 :
                         Plaintiff,          :
           7                                 :
                    v.                       :
           8                                 :
               SONIC INNOVATIONS, INC.,      :
           9   PHONAK HOLDING AG,            :
               PHONAK INC.,                  :
          10   UNITRON HEARING, INC.,        :
               WILLIAM DEMANT HOLDING A/S,   :
          11   OTICON A/S,                   :
               OTICON INC.,                  :
          12   WIDEX A/S,                    :
               WIDEX HEARING AID CO. INC.,   :
          13   GN RESOUND A/S,               :
               GN RESOUND CORPORATION,       :
          14   STARKEY LABORATORIES, INC.,   :
               GENNUM CORPORATION,           :
          15   RESISTANCE TECHNOLOGY INC.,   :
               BERNAFON AG,                  :
          16   WDH, INC., and                :
               BERNAFON, LLC,                :
          17                                 :
                         Defendants.         :   No. 05-422 (GMS)
          18                         - - -

          19                  Wilmington, Delaware
          20              Thursday, January 3, 2008
                                  9:30 a.m.
          21               Pretrial Conference

          22                         - - -

          23   BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

          24

          25
```

2

```
 1   APPEARANCES:

 2       EDMOND D. JOHNSON, ESQ.
         Pepper Hamilton LLP
 3           -and-
         MARTY STEINBERG, ESQ.,
 4       BRIAN M. BUROKER, ESQ.,
         MAYA M. ECKSTEIN, ESQ., and
 5       DANIEL VIVARELLI, ESQ.
         Hunton & Williams
 6       (Washington, D.C.)

 7               Counsel for Plaintiff

 8       MARY B. GRAHAM, ESQ.
         Morris, Nichols, Arsht & Tunnell
 9           -and-
         GREGORY C. GRAMENOPOULOS, ESQ.,
10       JOHN M. ROMARY, ESQ.,
         KAY HILL, ESQ., and
11       GERSON S. PANITCH, ESQ.
         Finnegan, Henderson, Ford, Farabow & Dunner
12       (Washington, D.C.)

13               Counsel for
                 Demant Defendants
14
         DONALD E. REID, ESQ.
15       Morris, Nichols, Arsht & Tunnell
             -and-
16       WILLIAM H. MANDIR, ESQ.,
         CARL J. PELLEGRINI, ESQ., and
17       BRIAN SHELTON, ESQ.
         Sughrue Mion
18       (Washington, D.C.)

19               Counsel for Widex
                 Defendants
20
                     - - -
21

22

23

24
25
```

1    THE COURT: Good morning. Happy New Year.

2  Please take your seats.

3        Counsel, this is an office conference, so the

4  rules of Court are in suspense. You can sit if you want, or

5  you can stand, take your jackets off if you would like.

6        What I would like to do is start out with a

7  round of reintroductions, beginning with plaintiff.

8        MR. JOHNSON: Your Honor, Edmond Johnson for the

9  plaintiffs ETG. I have with me at counsel table Marty

10  Steinberg, Brian Buroker, Maya Eckstein and Dan Vivarelli.

11  They are all from Hunton & Williams.

12        THE COURT: Good morning.

13        Ms. Graham.

14        MS. GRAHAM: Good morning, Your Honor. I am

15  here for Demant. Sometimes they are called Oticon, so

16  people don't get confused about that.

17        THE COURT: Can we refer to them as Demant

18  today?

19        MS. GRAHAM: That is fine. With me from

20  Finnegan & Henderson are John Romary, Greg Gramenopoulos,

21  Gerson Panitch, and Kay Hill.

22        THE COURT: Good morning.

23        MR. REID: Good morning, Your Honor. Donald

24  Reid on behalf of Widex. From the Sughrue firm we have Bill

25  Mandir, Carl Pellegrini, and Brian Shelton.

4

1        THE COURT: Good morning.

2        Anybody else?

3        Okay.

4        What I would like to do first is address the

5  parties' motions in limine, as soon as I can pull those out.

6  Then we will talk for, depending, a moment or more,

7  depending, about the two motions in limine -- I view them as

8  motions in limine -- the two Daubert motions that the

9  plaintiff has filed. I will do that.

10        I will tell you that there will be a ruling

11  coming very shortly announcing my decision to deny the

12  renewed motion to dismiss.

13        Then we will go through the actual proposed

14  final pretrial order, the various tabs, places that I have

15  tabbed, and I will invite counsel to remind me if I miss

16  something, I will go back and cover whatever issues that

17  might need to be covered.

18        There are a number of miscellaneous issues at

19  the end of the proposed final pretrial order which we will

20  apparently need to address at greater or lesser degree. We

21  will just see how things go.

22        We will probably take a break around 12:30, if

23  we are still at it. I suspect we will.

24        I don't recall that there is a lot of

25  controversy about the preliminary instructions. The only

1    THE COURT: I am listening.

2    MR. STEINBERG: I don't believe they have met

3    any burden to establish that this is unreliable. It's one

4    of the most substantial industry reports you will probably

5    ever read. It's significant. They have studied the

6    industry for 20 years.

7    MR. GRAMENOPOULOS: Your Honor, what he just

8    said proves they won't be prejudiced by this ruling, because

9    there are other documents, trustworthy documents, that they

10    can rely on. The stock analysts' reports, they can ask our

11    witnesses. They can still bring in the same positions that

12    they have.

13    It is a question of this document, by his own

14    admission, it is done by two graduate students. I don't

15    believe those are professionals in the hearing aid field or

16    people that can come forward with precise analysis of

17    economic data and do the job that we see in these other

18    reports.

19    MR. STEINBERG: I don't think they have --

20    THE COURT: Why is the admission of the document

21    so critical, if I am going to admit reliance upon the

22    information by the expert, his reliance upon the information

23    contained in the document?

24    MR. STEINBERG: Well, I believe the jury has a

25    right to see what the expert relied upon.

82

1    THE COURT: You think this jury is going to read

2    what the expert relied on? He is going to testify to what

3    he testifies. He is going to be cross-examined about the

4    basis of his opinion. Counsel will do its level best to

5    damage the direct of the witness by showing, as contended

6    here, that the data analysis is unreliable. You will

7    redirect in an effort to counter that.

8    MR. STEINBERG: The only problem is, if they are

9    going to cross-examine our expert about the unreliability of

10    this report, which examines the hearing aid industry from

11    1953 on, how in the world is the jury going to come to a

12    conclusion if you can't show them the substantial nature of

13    this report?

14    THE COURT: I will let you reference your report

15    in your redirect or in your direct examination. But I will

16    not let you include it in a jury book as an item of

17    evidence. But he can testify that this was information, I

18    am ruling, he reasonably relied upon. But I don't think it

19    meets the precepts of any exception of which I am aware to

20    any rule of evidence, specifically, 803.

21    MR. STEINBERG: Thank you, Your Honor.

22    MR. GRAMENOPOULOS: Thank you, Your Honor.

23    THE COURT: Let's take a break.

24    (Recess taken.)

25    THE COURT: What I was going to say, I was

1    announcing that I was going to continue to reserve on the

2    Best article issue, but that I am going to rule in favor of

3    the defendant on their motion as regards the date of

4    invention. I don't remember which motion that was.

5    MS. GRAHAM: I believe Docket Item 461.

6    THE COURT: I will grant that motion.

7    MR. STEINBERG: Judge, a clarification.

8    THE COURT: If you are going from May on? Go

9    ahead.

10    MR. STEINBERG: Two things. One is, you are not

11    ruling that the witnesses can't testify to the dates when

12    they did certain things. Correct?

13    THE COURT: What is the defendants' view?

14    MR. ROMARY: That any testimony by Dr. Levitt or

15    Mr. Brown that is just based upon oral recollection and is

16    not corroborated should not be permitted, such as, "I wrote

17    this in 1984."

18    THE COURT: Insofar as that testimony would go

19    to establish the date of invention.

20    MR. ROMARY: Yes, sir.

21    THE COURT: That's correct.

22    MR. STEINBERG: Don't you think you would have

23    to hear and see that evidence? You could always instruct

24    the jury that that evidence doesn't apply or we can't argue

25    at the end of the case that there is an earlier date of

84

1    invention. But it certainly seems to me that the evidence

2    itself of when a scientist did X or Y or when he wrote a

3    note should come in. You could preclude us from arguing to

4    the jury or taking the position after that's all in that

5    there is an earlier date of invention.

6    THE COURT: What would be the purpose of the

7    testimony, of the evidence?

8    MR. STEINBERG: To show the evolution of the

9    invention.

10    MR. ROMARY: That is the whole problem.

11    THE COURT: It's left to me to try to give

12    guidance to the jury as to the meaning of evidence and to

13    you as lawyers.

14    I think, to just have that sitting out there,

15    when we know that the evidence of the inventor would need to

16    be corroborated -- and I have already ruled that I haven't

17    seen independent evidence of corroboration -- I am still

18    hard-pressed to understand, to agree that that would be a

19    proper purpose that would not have the impact of potentially

20    confusing the jury.

21    To show the evolution of the invention? I don't

22    think so. Insofar as reference to the '84 note, no. I am

23    not going to permit that.

24    Yes, you are not going to be able to argue, at

25    least back to November of '84, I thought I heard some

85                                                                                        87

1  concession with regard to perhaps corroboration, your
2  ability to corroborate prior -- did I?
3        MR. ROMARY: No. The problem is that the
4  remaining documents, the August document, the meeting with
5  Dr. Graupe, which is a disputed date document, and the three
6  documents that they proffered in the body of their
7  opposition, is evidence the expert has already said is not
8  probative. It shouldn't be permitted.
9        THE COURT: I think you are going to be -- it's
10  going to be November '85, given the current state of the
11  record.
12        MR. STEINBERG: Judge, just to clarify. Are you
13  ruling that we can't introduce anything prior to November of
14  '85 --
15        THE COURT: Not for purposes of establishing an
16  earlier date of invention. No, you can't.
17        Okay. Let's move on to, there are two motions
18  that were filed by the plaintiff that were filed subsequent
19  to the deadline for filing the pretrial order that are
20  styled as motions in limine -- Daubert motions. I don't yet
21  have a response to those motions because there is still
22  time, I think, left. My question to ETG is, why do you
23  think these are timely?
24        MR. STEINBERG: Your Honor, first of all, they
25  are motions to strike experts under Daubert. They are not

1        MS. GRAHAM: Your Honor, if I might address
2  that?
3        I am not sure of when all expert discovery
4  closed. The depositions of these three experts were
5  November 13, 14th and 15th. So they filed -- I thought
6  there were three Daubert motions, two on damages, I believe,
7  Donohue and Putnam, and a third on Soli, who relates to
8  validity, prior art.
9        MR. JOHNSON: Two were filed under seal and one
10  was not, which may be where the confusion is coming from.
11        THE COURT: I have 483, that's Jonathan Putnam,
12  and 489, which is Soli.
13        MR. STEINBERG: There is one more, Your Honor,
14  Donohue.
15        THE COURT: How was that filed? I am
16  referencing, those docket item references are to the
17  opening -- 489 is the motion as to Soli. It's a motion to
18  strike. It's not styled as a Daubert motion. Yes, it is.
19  Daubert Motion to Strike Donohue.
20        Ms. Graham, your point pertained to all three
21  motions?
22        MS. GRAHAM: Yes. I have slightly different
23  comments -- I would group Donohue and Putnam together, and
24  Soli separately on slightly different comments. In terms of
25  timing, the discovery of them was completed with their

86                                                                                        88

1  motions in limine. Second, expert discovery closed on the
2  same day that the briefs on the motion in limine were due.
3  So we didn't even have transcripts -- I don't think it was
4  actually anticipated by --
5        THE COURT: Is that a fact, expert discovery
6  closed on the --
7        MR. STEINBERG: Yes. I don't think it was
8  anticipated either by the Court or the parties.
9        THE COURT: It wasn't.
10        MR. STEINBERG: Under the case law, you are
11  permitted to file a Daubert motion any time before the
12  witness takes the stand.
13        THE COURT: There is case law and then there is
14  practice in an individual District Judge's practice that he
15  or she engages within I think the appropriate exercise of
16  their discretion. It is my practice that Daubert motions
17  are treated as motions in limine that should be filed
18  concurrent with the filing of other motions in limine. I
19  might even give you additional filings -- in other words,
20  the restriction is to five a side -- but to file so-called
21  Daubert motions/motions in limine.
22        But that aside, you point out an issue that I
23  think I didn't contemplate, that is, the expert discovery
24  closed on the same day as the pretrial order was due.
25        MR. STEINBERG: Correct.

1  depositions on the 13th, 14th and 15th of November. And,
2  indeed, Donohue was the subject of the two MIL motions that
3  Your Honor addressed earlier. Clearly, there was time that
4  they had to consider these.
5        Now, even if, gee, there should have been some
6  allowance given in view of the timing, what they should have
7  done is asked the Court promptly thereafter for permission
8  to file Daubert motions. We are now in the position that we
9  received these things Friday evening, before the Christmas
10  break. We have two weeks right now until jury selection.
11  It's a tremendous burden to have to address these kinds of
12  motions.
13        I also want to, however, get a little into it,
14  because he makes the point that you have a right to bring up
15  Daubert motions.
16        But what Your Honor, my understanding of your
17  practice, on many of these issues, whether it is summary
18  judgment or Daubert, sort of takes an initial look, if you
19  are going to hear it, and decides whether it actually rises
20  to the level that it may warrant briefing and Your Honor
21  spending time on it.
22        Now, with respect to --
23        THE COURT: You may know, or may not know, Ms.
24  Graham, I have suspended from where I used to schedule a TC,
25  a teleconference, to discuss, I would have a deadline for

Appx. C

1

```
09:22:19   1              IN THE UNITED STATES DISTRICT COURT

           2              IN AND FOR THE DISTRICT OF DELAWARE

           3                         - - -

           4

           5    ENERGY TRANSPORTATION GROUP    :    Civil Action
                INC.,
           6                                   :
                              Plaintiff,       :
           7                                   :
                         v.                    :
           8                                   :
                SONIC INNOVATIONS, INC.,       :
           9    PHONAK HOLDING AG,             :
                PHONAK INC.,                   :
          10    UNITRON HEARING, INC.,         :
                WILLIAM DEMAND HOLDING A/S,    :
          11    OTICON A/S,                    :
                OTICON INC.,                   :
          12    WIDEX A/S,                     :
                WIDEX HEARING AID CO. INC.,    :
          13    GN RESOUND A/S,                :
                GN RESOUND CORPORATION,        :
          14    STARKEY LABORATORIES, INC.,    :
                GENNUM CORPORATION,            :
          15    RESISTANCE TECHNOLOGY INC.,    :
                BERNAFON AG,                   :
          16    WDH, INC., and                 :
                BERNAFON, LLC,                 :
          17                                   :
                              Defendants.      :    No. 05-422  (GMS)
          18                         - - -

          19                    Wilmington, Delaware
          20                    Friday, July 6, 2007
                                    9:30 a.m.
          21                       Hearing

          22                         - - -

          23    BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

          24

          25
```

2

1    **APPEARANCES:**

2          EDMOND D. JOHNSON, ESQ.
           THOMAS HENRY KOVACH, ESQ.
3          Pepper Hamilton LLP
                 -and-
4          BRIAN M. BUROKER, ESQ.,
           MARTIN STEINBERG, ESQ.,
5          ROBERT L. KINDER, ESQ., and
           YISUNG SONG, ESQ., and
6          JOHN D. BURNS, ESQ.
           Hunton & Williams
7          (Washington, D.C.)

8                Counsel for Plaintiff

9          MARY B. GRAHAM, ESQ.
           Morris, Nichols, Arsht & Tunnell
10               -and-
           JOHN M. ROMARY, ESQ.,
11         C. GREGORY GRAMENOPOULOS, ESQ., and
           KAY HILL, ESQ.
12         Finnegan, Henderson, Farabow, Garrett & Dunner
           (Washington, D.C.)
13
                 Counsel for Defendant
14                    Oticon

15         RICHARD L. HORWITZ, ESQ.
           Potter Anderson & Corroon LLP
16               -and-
           DONALD DEGNAN, ESQ., and
17         BRYAN K. HANKS, ESQ.
           Holland & Hart
18         (Salt Lake City, Utah)

19               Counsel for Defendant Sonic

20         JACK B. BLUMENFELD, ESQ.
           Morris, Nichols, Arsht & Tunnell
21               -and-
           KENNETH B. HERMAN, ESQ.,
22         ERIC R. HUBBARD, ESQ.,
           DAVID CHUN, ESQ., and
23         ANDREW COTTON, ESQ.
           Ropes & Gray
24         (New York, New York)

25               Counsel for Defendant GN Resound

3

1    **APPEARANCES CONTINUED:**

2          THOMAS C. GRIMM, ESQ.
           Morris Nichols Arsht & Tunnell
3                -and-
           JAMES D. SOBIERAJ, ESQ.,
4          DAVID H. BLUESTONE, ESQ., and
           CHARLES M. McMAHON, ESQ.
5          Brinks Hofer Gilson & Leone
           (Chicago, Illinois)

6                Counsel for Defendant Phonak

7
           DONALD E. REID, ESQ.
8          Morris, Nichols, Arsht & Tunnell
                 -and-
9          WILLIAM H. MANDIR, ESQ.,
           CARL J. PELLEGRINI, ESQ.,
10         S. STUART LEE, ESQ., and
           BRIAN SHELTON, ESQ.
11         Sughrue Mion
           (New York, New York)

12               Counsel for Defendant Widex
13
           MARY MATTERER, ESQ.
14         Morris James Hitchens & Williams
                 -and-
15         RICHARD G. MORGAN, ESQ., and
           STEVEN L. REITENOUR, ESQ.
16         Bowman and Brooke
           (New York, New York)
17               -and-
           TIMOTHY E. BIANCHI, ESQ.
18         Schwegman Lundberg Woessner & Kluth
           (Minneapolis, Minnesota)
19
                 Counsel for Defendant
20                    Starkey Labs

21         BARRY M. KLAYMAN, ESQ.
           Wolf Block Schorr and Solis-Cohen
22               -and-
           JEFFREY D. SHEWCHUK, ESQ.
23         Shewchuk IP Services

24               Counsel for Defendant
                    Resistance Technology
25

4

```
09:32:06   1         THE COURT:  Good morning.  Please be seated.

09:32:10   2         MR. HAMILTON:  Good morning, Your Honor.

09:32:13   3         THE COURT:  Counsel.

09:32:13   4         MR. JOHNSON:  Your Honor, could I introduce

09:32:15   5    people at my table?

09:32:16   6         THE COURT:  I am assuming you are with

09:32:18   7    plaintiff.

09:32:19   8         MR. JOHNSON:  Yes.  Edmond Johnson on behalf of

09:32:22   9    Energy Transportation Group, who is the plaintiff.  I have

09:32:25  10    with me at my table Tom Kovach, whom you know.

09:32:29  11         THE COURT:  Plaintiff is over here.

09:32:30  12         MR. JOHNSON:  They asked us if we would trade

09:32:32  13    sides, so we did.

09:32:34  14         And I have Marty Steinberg from the firm of

09:32:36  15    Hunton & Williams.  I have Brian Buroker, also from Hunton &

09:32:40  16    Williams, Rob Kinder, also from Hunton & Williams, Yisung

09:32:46  17    Song, also from Hunton & Williams, and John Burns from

09:32:49  18    Hunton & Williams.

09:32:51  19         I will let the defendants introduce themselves.

09:32:55  20         THE COURT:  Ms. Graham, are you going to handle

09:32:57  21    this?  Mr. Blumenfeld?

09:33:01  22         MS. GRAHAM:  Your Honor, the logistics are

09:33:03  23    always a challenge.

09:33:04  24         I want to explain, the reason we asked to switch

09:33:06  25    in the courtroom is so all the counsel would have a better
```

49

10:36:56 1 dictionaries and couldn't find a one that defined

10:36:59 2 determining as measuring.

10:37:00 3 We think they are different concepts. The

'2 4 patentee chose to use the word determining in the claims,

...:34 5 not measuring. The only basis that the defendants have

10:37:07 6 cited to for rewriting the claim from determining to

10:37:11 7 measuring is that they say that is the only wording that is

10:37:15 8 used in the actual specification. But that is not true,

10:37:23 9 because this determining phrase was in the original

10:37:24 10 application as filed.

10:37:25 11 The original claims said to the public, I want

10:37:28 12 the word determined to be used. And the original claim is

10:37:36 13 part of the original disclosure. For them to say it is not

10:37:38 14 in the specification is completely contrary to Federal

10:37:40 15 Circuit law. The patentee chose the word determining. That

10:37:43 16 is the term that should be used, unless there is some clear

10:37:46 17 indication that it meant measuring.

10:37:50 18 Now, the next phrase is as a function of. You

10:37:53 19 see in -- let's go back to 140. Claim 13 and 14 both have

10:38:04 20 this phrase that to determine the effect on the amplitude

10:38:07 21 and phase of a signal as a function of frequency. As a

10:38:12 22 function of frequency. The defendants have asked the Court

10:38:21 23 to interpret that to mean at a specific frequency. We think

10:38:21 24 that is just completely incorrect even as a matter of

...:24 25 grammar.

50

10:38:25 1 If you pull up Slide 128.

10:38:34 2 This phrase, as a function of, is actually one

10:38:34 3 that you hear in every-day language. People might say, when

10:38:38 4 I get to work is really a function of traffic. Or, you

10:38:43 5 know, how well I do in school is a function of how hard I

10:38:46 6 study, or something like that. That's what as a function of

10:38:50 7 means. It means that as you change the output is going to

10:38:51 8 change.

10:38:51 9 So for them to say it is at a specific frequency

10:38:55 10 would mean that you are only looking at one frequency. And

10:38:57 11 that would be completely contrary to the ordinary use of

10:39:00 12 that term as people use it in English.

10:39:05 13 The specification contemplates that you would

10:39:07 14 vary the frequency of the test signal and see how that

10:39:11 15 impacts on feedback.

10:39:12 16 So we think there is just no reason to limit it

10:39:15 17 to a single frequency.

10:39:16 18 The final issue on these Claims 13 and 14 is

10:39:22 19 what is the definition of the word inserting.

10:39:25 20 Go back to 140, please.

..:21 21 The second element here says that you insert

10:39:37 22 between the input and output of the transmission channel an

10:39:37 23 electrical feedback path having a filter therein, et cetera.

10:39:42 24 The question is, what does inserting mean in

10:39:46 25 this context?

51

10:39:46 1 If we can go to Slide 126.

10:39:51 2 We think that inserting means to make the filter

10:39:56 3 have effect, to make it begin operating in the circuit. The

10:40:01 4 defendants have asked that the word inserting be just read

10:40:06 5 to the jury. And again, that's an issue where we wouldn't

10:40:11 6 necessarily agree if it were clear that inserting did not

10:40:14 7 require some sort of a physical act. Inserting in this

10:40:19 8 context is more of a concept of having it, the filter, begin

10:40:22 9 operating.

10:40:24 10 The specification, for example, doesn't describe

10:40:30 11 even that the filter is physically connected into the

10:40:34 12 circuit. The filter is already in the circuit. The only

10:40:37 13 thing that is provided are new programming coefficients.

10:40:40 14 That makes that filter effective. You haven't inserted a

10:40:46 15 physical component. That is the issue here.

10:40:48 16 We believe as long as that issue is clear for

10:40:52 17 the jury, the phrasing that we have used is fine, making the

10:40:57 18 filter effective.

10:40:59 19 We think that that makes it clear to the jury.

10:41:04 20 Let's go to Slide 104.

10:41:11 21 There is two other issues that relate to these

10:41:13 22 claims, these feedback claims, feedback path and forward

10:41:17 23 path. One is sort of the opposite of the other. And both

10:41:20 24 parties essentially have defined feedback path relative to

10:41:25 25 forward path.

52

10:41:26 1 We are actually pretty close here on our

10:41:29 2 definitions. The difference between the two

10:41:31 3 interpretations, and where we think the Court needs to

10:41:35 4 focus, we recite the two paths in terms of an input and an

10:41:40 5 output of a transmission channel.

10:41:42 6 The defendants define it in terms of the

10:41:46 7 microphone and the receiver. We think that it's more

10:41:50 8 appropriate to define these paths in terms of the

10:41:53 9 transmission channel, because that is how it is done in the

10:41:57 10 claims.

10:41:58 11 For example, Claim 19, that we looked at

10:42:01 12 earlier, which is Slide 105-14, as you see here, in the very

10:42:11 13 definition within the claim itself, it says that there is a

10:42:18 14 hearing aid comprising all these elements, and then that the

10:42:19 15 programmable delay line filter is interposed in a feedback

10:42:23 16 path between the input and output of the transmission

10:42:27 17 channel. So we think, here, the patentee chose to define

10:42:33 18 the two end points of the path by the input and output, not

10:42:37 19 by the receiver or the microphone, even though microphone

10:42:41 20 and receiver are also in this claim. That's why we have

10:42:45 21 chosen our interpretations to be using input and output and

10:42:48 22 not microphones and receiver.

10:42:50 23 That is the real issue with those two.

10:42:54 24 The next term that comes up in the feedback area

10:42:58 25 is the host controller. If you can pull up Slide 107. The

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on March 27, 2008, the foregoing was caused to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

In addition, the undersigned hereby certifies that true and correct copies of the foregoing were caused to be served via electronic mail on March 27, 2008 upon the following parties:

REPRESENTING ENERGY
TRANSPORTATION GROUP, INC.

Edmond D. Johnson
PEPPER HAMILTON LLP
**johnsone@pepperlaw.com**

Brian M. Buroker
HUNTON & WILLIAMS LLP
**etg@hunton.com**

REPRESENTING WIDEX A/S
AND WIDEX HEARING AID CO. INC.

Donald E. Reid
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
**dreid@mnat.com**

William H. Mandir
SUGHRUE MION PLLC
**wmandir@sughrue.com**

David J. Cushing
SUGHRUE MION PLLC
**dcushing@sughrue.com**

Carl J. Pellegrini
SUGHRUE MION PLLC
**cpellegrini@sughrue.com**

Brian K. Shelton
SUGHRUE MION PLLC
**bshelton@sughrue.com**

REPRESENTING WILLIAM DEMANT HOLDING
A/S, WDH, INC., OTICON A/S, OTICON INC.,
BERNAFON AG, AND BERNAFON, LLC

Mary B. Graham
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
**mgraham@mnat.com;**
**mbgeservice@mnat.com**

John M. Romary
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
**john.romary@finnegan.com**

C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
**c.gregory.gramenopoulos@finnegan.com**

The undersigned also hereby certifies that on March 27, 2008, true and correct copies of the foregoing were caused to be served by hand upon the following Delaware counsel:

Edmond D. Johnson
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE  19899-1709

*/s/ James W. Parrett, Jr.*
_____
James W. Parrett, Jr. (#4292)