**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 05-422 (GMS) |
| | ) | |
| v. | ) | |
| | ) | |
| SONIC INNOVATIONS, INC., et al, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PLAINTIFF ETG'S MEMORANDUM IN SUPPORT OF ITS
MOTION FOR JUDGMENT AS A MATTER OF LAW**

Edmond D. Johnson (# 2257)
Matthew A. Kaplan (# 4956)
PEPPER HAMILTON LLP
Hercules Plaza Suite 5100
1313 Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6500

OF COUNSEL:

*Attorneys for Energy Transportation Group, Inc.*

Marty Steinberg
HUNTON & WILLIAMS LLP
1111 Brickell Avenue
Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500

Brian M. Buroker
HUNTON & WILLIAMS LLP
1900 K Street, N.W., Suite 1200
Washington, DC 20006-1109
Telephone: (202) 955-1500

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone: (804) 788-8788

Dated: March 27, 2008

## TABLE OF CONTENTS

I.    Nature and Stage of Proceedings ........................................................................1

II.    Summary of Argument .....................................................................................2

III.    Concise Statement of Facts ..............................................................................5

IV.    Argument .......................................................................................................10

  A.    Judgment as a Matter of Law Standard...........................................................10

  B.    Defendants Have Not Offered Sufficient Evidence to Support a Jury Finding of Invalidity Based Upon Nine Items That Are Not Prior Art................................................10

     1.    The Weaver Thesis Was Not Cataloged, Indexed and Shelved Before Filing of the Patents-in-Suit................................................................................11

     2.    The JASA Presentation Fails to Qualify as Prior Art ...........................13

     3.    The VA Presentation Was Not Publicly Accessible ..............................14

     4.    The Jackson Hole Presentation Was Not Corroborated.........................15

     5.    The Weaver Thesis Presentation Was Not Corroborated or Made Publicly Available ................................................................................16

     6.    The Weaver Work is Not a Prior Invention ..........................................17

       a.    The AFC-1 and AFC-2 Circuits Were Suppressed and Concealed ...........18

       b.    The AFC-1 and AFC-2 Circuits Were Abandoned for Later Circuits.......19

       c.    The AFC-1 and AFC-2 Circuits Were Not Sufficiently Tested ...............20

     7.    The Best Work is Not a Prior Invention ...............................................20

     8.    The JASA Abstract Is Not an Enabling Disclosure ...............................21

     9.    The 1984 VA R&D Progress Report Is Not an Enabling Disclosure ...................23

  C.    No Reasonable Jury Could Have Decided That Claims 13, 14, and 16 Were Not Literally Infringed................................................................................23

     1.    Defendants' Arguments Misled The Jury .............................................24

       a.    The Determining Step Does Not Require a Physical Measurement ..........24

       b.    The Inserting Step Does Not Require that the Circuit be Broken and a Filter Physically Placed in the Hearing Aid................................................26

c.      Defendants Presented Misleading Non-infringement Arguments to the Jury and Even Attempted to Disavow Their Own Technical and Marketing Documents Despite FDA and FTC Regulations......................................29

2.      Defendants' Only Proof of Non-infringement Was Comparing a Manipulated Patent Figure to the Accused Products - Not the Properly Construed Claims.......33

3.      ETG Presented Strong Evidence That Would Allow a Reasonable Jury To Reach But One Conclusion Regarding Literal Infringement...........................................35

a.      ETG Presented Uncontroverted Evidence that the "Determining" Step Was Literally Infringed..........................................................................35

b.      ETG Presented Uncontroverted Evidence that the "Inserting" Step Was Literally Infringed...................................................................................38

V.      Conclusion .......................................................................................................39

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Advanced Display System, Inc. v. Kent State Univ.*,
  212 F.3d 1272 (Fed. Cir. 2000)....................................................................22

*In re Cronyn*,
  890 F.2d 1158 (Fed. Cir. 1989).....................................................................12

*Dawn Equipment Co. v. Kentucky Farms, Inc.*,
  140 F.3d 1009 (Fed. Cir. 1998).....................................................................10

*In re Donohue*,
  766 F.2d 531 (Fed. Cir. 1985).......................................................................22

*Dow Chemical Co. v. Astro-Valcour Inc.*,
  267 F.3d 1334 (Fed. Cir. 2001)..............................................................17, 20

*In re Hall*,
  781 F.2d 897 (Fed. Cir. 1986).......................................................................12

*Johnson & Johnson v. Carolina Lee Knitting Co.*,
  258 F.2d 593 (4th Cir. 1958) ........................................................................31

*Kimberly-Clark Corp. v. Johnson & Johnson*,
  745 F.2d 1437 (Fed. Cir. 1984).....................................................................20

*In re Klopfenstein*,
  380 F.3d 1345 (Fed. Cir. 2004).....................................................................13

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
  520 F. Supp. 2d 537 (D. Del. 2007)..............................................................10

*Massachusetts Institute of Tech. v. AB Fortia*,
  774 F.2d 1104 (Fed. Cir. 1985).....................................................................13

*Norian Corp. v. Stryker Corp.*,
  363 F.3d 1321 (Fed. Cir. 2004)..............................................................13, 17

*Reading & Bates Const. Co. v. Baker Energy Res. Corp.*,
  748 F.2d 645 (Fed. Cir. 1984)................................................................22, 24

*Robotic Vision Sys., Inc. v. View Eng'g, Inc.*,
  189 F.3d 1370 (Fed. Cir. 1999).....................................................................10

*Russell v. J.P. Seeburg Co.*,
    123 F.2d 509 (7th Cir. 1941) ...................................................................31, 32

*SRI International v. Matsushita Electric Corp.*,
    775 F.2d 1107 (Fed. Cir. 1985).................................................................32, 35

*Walter v. Holiday Inns, Inc.*,
    985 F.2d 1232 (3d Cir. 1993)........................................................................10

*In re Wyer*,
    655 F.2d 221 (C.C.P.A. 1981) ................................................................11, 12

## FEDERAL STATUTES

35 U.S.C. § 102...........................................................................1, 8, 11, 14, 17, 20

Fed. R. Civ. P. 50.......................................................................................10, 11

I.      **Nature and Stage of Proceedings**

In support of its motion (D.I. 530 & D.I. 517), Energy Transportation Group, Inc.

("ETG") asserts that the Court should enter judgment as a matter of law for ETG on the

following issues: 1) Defendants' anticipation and obviousness defenses that rely on any one of

nine items that fail to qualify as "prior art;" and 2) literal infringement for all Accused Products

(*see infra*) of Widex, Oticon, and Bernafon under Claims 13, 14 and 16 of the '850 Patent.

This Court conducted a trial by jury from January 18, 2008 through February 4, 2008.

Prior to trial, on December 12, 2007, ETG submitted a Motion in Limine that sought to exclude

two masters level theses from Leland Best and Kim Weaver (respectively referred to as the Best

Thesis and Weaver Thesis) as "printed publications" under 35 U.S.C. § 102.  D.I. 466.  On

January 18, this Court ruled that the Best Thesis did not qualify as a printed publication, but

deferred ruling on the Weaver Thesis.  At the close of the Defendants' case on February 1, 2008,

ETG moved for judgment as a matter of law pursuant to Rule 50 seeking a ruling that the

asserted claims of the Patents-in-suit (United States Patent Nos. 4,731,850 (the '850 Patent and

4,879,749 (the '749 Patent)) were infringed and valid.  D.I. 517.  This Court deferred ruling on

ETG's motion until after trial.

On February 4, 2008, after nine days of trial testimony, the jury returned a verdict in this

patent infringement action determining:

- Defendants' Accused Products (*see infra*) literally infringed Claim 19 of the '850 Patent.

- Defendants' Accused Products infringed Claims 13, 14, 16 and 19 of the '850 Patent
  pursuant to the doctrine of equivalents.

- Defendants' Accused Products infringed Claims 1 and 2 of the '749 Patent pursuant to
  the doctrine of equivalents.

- The asserted claims of the '850 Patent (Claims 13, 14, 16, and 19) were all valid over the alleged prior art asserted by the Defendants and likewise the clams satisfied the requirements of Section 112 of the Patent Act.

- The asserted claims of the '749 Patent (Claims 1 and 2) were valid over the alleged prior art asserted by the Defendants and, likewise, the claims satisfied the requirements of Section 112 of the Patent Act.

- The Demant Defendants were liable for damages in the amount of $16 Million.

- The Widex Defendants were liable for damages in the amount of $15 Million.

- The Widex Defendants' infringement for both Patents-in-suit was willful.

D.I. 521 (Jury Verdict, Feb. 4, 2008). On February 22, 2008, ETG filed a renewed Motion for Judgment as a Matter of Law preserving its prior Rule 50 motion. D.I. 530. ETG also filed a Motion for Enhanced Damages and Attorneys Fees (D.I. 531) and a Motion for Prejudgment and Post-Judgment Interest (D.I. 532), both of which are outstanding before this Court. The parties and this Court agreed to a briefing schedule wherein Opening Briefs are due on March 27, 2008, Answering Briefs are due on May 9, 2008, and Reply Briefs are due on May 29, 2008. D.I. 525.

## II.    Summary of Argument

1.      Judgment as a matter of law is warranted with respect to nine oblique references and presentations that do not qualify as "prior art." Much of the purported prior art relied upon by the Defendants during this action is simply not valid prior art pursuant to the Patent Act and clear case law guidance. In a desperate attempt to cobble together an invalidity case, the Defendants sought to rely on references that were never made public, never published, and were so vague as to present no indication as to how they could serve to invalidate Dr. Levitt's pioneering claimed inventions. While these references fail to teach the claimed inventions of the

Patents-in-suit, ETG requests a ruling by this Court that certain of the Defendants' prior art references do not even qualify as prior art.  As the jury properly determined, the asserted claims of the ETG Patents-in-suit are valid in light of the piecemeal alleged prior art the Defendants presented at trial.

2.      ETG is entitled to judgment as a matter of law that Claims 13, 14 and 16 are literally infringed by each of the Accused Products in suit.  The theories of non-infringement offered by the Defendants were legally and factually untenable in light of this Court's Claim Construction Order.  In an effort to defeat infringement, the Defendants improperly reargued their claim construction case to the jury resulting in confusion as to proper claim scope and meaning.  Specifically, in Claims 13, 14, and 16, the Defendants consistently read out the proper language "determining **the effect on the amplitude and phase** of a signal" and instead attempted to confuse the jury by continuously substituting their own narrow interpretation that required a "measurement of phase and amplitude."  Such an interpretation was rejected by this Court during Markman proceedings, yet the Defendants ignored this Court's Order and insisted on presenting its "measurement" defense to the jury at least 63 times.  *See* D.I. 351 (Markman Order, Aug. 17, 2007); *see also,* n.10, *supra.*  Also, instead of comparing the claim language ("determining the effect on" and also "inserting . . . a programmable filter") to the Accused Products, the Defendants created further jury confusion by only comparing the Accused Products to a manipulated figure found in the '850 Patent -- never to the properly construed claims as required.  The Defendants further sought to avoid literal infringement of these same claims by contending that "inserting between the input and output of said transmission channel a programmable filter"  had to mean that a filter was **physically** inserted and hardwired at the factory in order to infringe.  The Defendants also argued that the Patents-in-suit required two

separate devices and the size of the devices made them incapable of being utilized, while admitting that significant miniaturization took place since the mid-1980's when the invention was created. All of these arguments were contrary to this Court's Claim Construction Order. *See* D.I. 351.

3.    Even more disturbing and confusing for the jury is the fact that the Defendants presented a blatantly misleading non-infringement case by arguing that the patents did not cover both fixed and adaptive technology - again, contrary to this Court's Claim Construction Order. Finally, Defendants attempted to mislead the jury into believing that Dr. Eric Dowling (ETG's purported expert prior to filing suit) did not believe that Claims 13, 14 and 16 would be literally infringed by an adaptive filter.[1]  As this Court now realizes, this argument was false, yet the Defendants persisted in misleading the jury even through closing arguments.  *See* Tr. 2185:13-2189-14; 2191:8-13; 2199:19-21; 2204:5-23.[2]

4.    ETG presented overwhelming evidence at trial to prove literal infringement of Claims 13, 14 and 16. First, Dr. Levitt's background information of the Patents-in-suit gave proper context to the pioneering feedback cancellation techniques. Next, Dr. Clay Gloster's unchallenged testimony concerning how the code and programming control the Accused Products proved that the limitations of Claims 13, 14 and 16 were met. Finally, Mr. Brown's expert analysis that thoroughly explained the operations of the Accused Products as compared to the properly construed claims conclusively established literal infringement. But for the Defendants ignoring this Court's claim construction and presenting false and misleading

---

[1]  A complete discussion of this issue is found in Plaintiff ETG's Memorandum in Support of its Motion for Enhanced Damages and Attorneys Fees, incorporated by reference herein.

[2]  Relevant portions of the trial transcripts are included as Exhibit A to the Declaration of Robert L. Kinder. All citations to exhibits (Ex. ___) refer to the exhibits attached with the Declaration of Robert Kinder, incorporated by reference herein.

arguments, a reasonable jury would have concluded that Claims 13, 14 and 16 were literally infringed as well as infringed pursuant to the doctrine of equivalents.

## III.    Concise Statement of Facts

The following summary of facts provides support for ETG's pending motions:

1.    Defendants presented into evidence a written work entitled "An Adaptive Open-Loop Estimator For The Reduction of Acoustic Feedback, Master's Thesis of Kim Weaver" (DX 956) ("The Weaver Thesis") (Ex. B).

2.    Defendants' paid fact witnesses gave testimony regarding an alleged presentation of the Weaver Thesis ("Weaver Thesis Presentation") that was limited to three professors in a closed panel presentation.  Tr. 1158:17-21; 1254:24-1255:12; 1267:7-25; 1763:25-1764:13.

3.    No printed publications or written works related to the Weaver Thesis were disseminated before, during or after the Weaver Thesis Presentation.  Tr. 1158:17-21; 1267:7-25.

4.    The Weaver Thesis (DX 956) was not cataloged, indexed and shelved until on or after March 3, 1987.  Tr. 1748:23-1749:16; 1753:5-12.  Further, the Weaver Thesis was not publicly accessible prior to this time.  Tr. 1748:23-1749:16; 1753:5-12.

5.    Defendants paid fact witnesses gave testimony regarding work done at the University of Wyoming by Mr. Kim Weaver and the development of an AFC-1 and AFC-2 circuit ("the Weaver Work").

6.    The AFC-1 Circuit was abandoned and the parts were recycled for use.  Tr. 1270:20-1271:2.

7.    The AFC-2 Circuit was abandoned and the parts were recycled for use.  Tr. 1271:3-5; 121:19-22.

8.      The Defendants did not produce any prototypes or physical evidence of the existence of prototypes for the Weaver Work at trial.

9.      Defendants' paid fact witnesses gave testimony regarding an abstract published in the Journal of Acoustical Society of America (JASA), vol. 77, Spring 1985 ("JASA Abstract"). DX 1010 (Ex. C).  The JASA Abstract is a single paragraph with no diagrams or illustrations.

10.     Defendants' paid fact witnesses gave testimony regarding an alleged presentation known as the Journal of Acoustical Society of America (JASA) Presentation (DX-962) (Ex. D) (hereafter "JASA Presentation").  Tr. 1190:19-22; 1269:23-1270:5; 1270:3-5.

11.     The JASA Presentation (DX 962) was a fifteen minute "lecture only" presentation, including time for question and answers.  Tr. 1190:19-22; 1269:23-1270:5; 1270:3-5.  *See also* DX 963 (Ex. E).  No printed publications or written works were disseminated before, during or after the JASA Presentation.  *Id.*

12.     Defendants failed to provide any proof that the speaker slides (DX 962-63) were slides that were actually presented at the JASA Presentation.  Tr. 1190:19-22; 1269:23-1270:5; 1270:3-5.

13.     Defendants' paid fact witnesses gave testimony regarding an alleged presentation or demonstration to the Veterans Administration ("VA") on December 7, 1984 ("VA Presentation") in Augusta, Georgia, at the VA Medical Center.

14.     The VA Presentation was not advertised to the public and it was only attended by a few medical professionals with an affiliation to the VA.  Tr. 1258:19-1259:18; 1269:12-16; 1269:17-19; 1765:17-1768:7.

15.     No printed publications or written work related to the Weaver Work was disseminated at the December 7, 1984 VA Presentation. Tr. 1765:17-1768:7; 1269:12-16; 1269:17-19; 1258:19-1259:18.

16.     Defendants have not produced any slides or written materials that may have been used at the December 7, 1984 VA Presentation. Tr. 1765:17-1768:7.

17.     Dr. Vernon Larson's office at the VA Medical Center in 1984-1985 was on a floor of the facility that was not accessible to the public because animal tests were performed on this floor. Tr. 1759:2-1762:5. The VA Quarterly Progress Reports sent to Dr. Larson by Dr. Egolf were kept in this office. Tr. 1759:2-1762:5.

18.     Dr. Egolf only sent the AFC-6 circuit to the VA - to Dr. Larson - at the end of the project. Tr. 1206:9-18. The AFC-1 and AFC-2 circuits were never sent to the VA, or publicly displayed, because both circuits were recycled. Tr. 1270:20-1271:2; 1271:3-5; 121:19-22.

19.     Even the AFC-6 circuit, the last circuit in a progression, had problems with functioning and operation. Tr. 1214:4-6.

20.     The Defendants failed to present any testimony or evidence of a commercial embodiment based upon any of the AFC Circuits.

21.     Defendants' paid fact witnesses gave testimony regarding a Veterans Administration Rehabilitation R&D Progress Reports 1984 ("1984 R&D Progress Report"). DX 1357 (relevant portions attached at Ex. F). The 1984 R&D Progress Report devotes two sentences to the AFC system with no reference to a specific AFC circuit.

22.     Defendants' paid fact witnesses gave testimony regarding an alleged presentation at a Jackson Hole, Wyoming conference ("Jackson Hole Presentation").

23.    The Jackson Hole Presentation allegedly occurred on September 4, 1985.  DX 971 (Ex. G).  No printed publications or written works were disseminated before, during or after the presentation.  Tr. 1167:13-16; 1169:13-14.

24.    The Defendants have presented no written, documentary, or physical proof of any device that was allegedly demonstrated at the Jackson Hole Presentation.

25.    On August 31, 1987, Dr. David Egolf sent correspondence to Dr. Vernon Larson (JX 43A) that stated: "I am writing to report that I believe there is one patentable item which was conceived and developed partially as a result of that contract.  That item, the acoustic feedback control circuit, is briefly described in the enclosed patent disclosure form…."  Further, the "Title of the Invention" is listed as: "Automatic Feedback Control Circuit."  JX 43A (Ex. H); *see also*, Tr. 1225:5-1228:22.

26.    The date range on this correspondence from Dr. Egolf to Dr. Larson identified that the patentable work was developed between May 1984 to April 1986.  JX 43A.

27.    According to Defendants' own witnesses, *e.g.*, David Egolf, the AFC-1 and AFC-2 circuits were purportedly developed during the May 1984 to April 1986 timeframe.  Tr. 1227:21-1228:7.

28.    Mr. Weaver testified that the AFC-1 circuit was described in the Weaver Thesis, dated July 1984.  Tr. 1252:14-1253:1.

29.    Mr. Weaver testified that the AFC-2 circuit was constructed between July 1984 and December 1984.  Tr. 1258:13-14.

30.    The VA work undertaken by Dr. Egolf and Dr. Larson did not result in the filing of any patent applications.  Tr. 1227:13-14.

-8-

31.     In a Journal of Acoustical Society of America ("JASA") article, Dr. Egolf declared that his work with the Veterans Administration was "unpublished." Tr. 1195:29-1199:18. DX 975 (Ex. I) ("The Hearing Aid Feedback Path Mathematical Simulations and Experimental Verification" by David P. Egoff, Henry C. Howell, Kim A. Weaver, and D. Steven Barker, at p.1586). Dr. Egolf described his work with the VA as "unpublished" in every publication he authored. Tr. 1192:19-1193:10; 1195:15-1199:18; 1208:10-20; 1240:4-1241:15.

32.     This Court has previously ruled that a written document entitled: "Master's Thesis - Digital Suppression of Acoustic Feedback in Hearing Aids by Leland Best" ("Best Thesis") was not a printed publication pursuant to 35 U.S.C. § 102. D.I. 504.

33.     The Defendants did not produce at trial any prototypes or physical evidence of the existence of prototypes based upon the Best Thesis ("the Best Work").

34.     The accused hearing aid products of the Widex Group are the Diva and Inteo, ("Widex Accused Products") the accused hearing aid products of the Demant Group are: Oticon: Adapto, Gaia, Atlas Plus, Syncro, Syncro 2, Delta 8000, Delta 6000, Safran, Tego, Tego Pro, Sumo DM and Bernafon: Symbio, Symbio XT, SwissEar, Neo, ICOS, Win ("Demant Accused Products") (collectively "the Accused Products").

35.     For the Accused Products, the coefficients determined by the LMS technique are transferred into a filter located in a feedback path of the circuit. Tr. 660:25-677:15; 500:22-563:14; 617:24-619:11; 644:17-654:23.

36.     For the Accused Products, the filter located in a feedback path of the circuit is used to subtract out the acoustic feedback. Tr. 660:25-677:15; 500:22-563:14; 617:24-619:11; 644:17-654:23.

## IV.    Argument

Pursuant to Fed. R. Civ. P. 50, ETG moves this Court for entry of judgment as a matter of law on the issues set forth below.

### A.    Judgment as a Matter of Law Standard

Pursuant to Fed. R. Civ. P. 50, a court may render judgment as a matter of law (JMOL) after the moving party is fully heard on an issue at trial, if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." *Martek Biosciences Corp. v. Nutrinova, Inc*., 520 F. Supp. 2d 537, 544 (D. Del. 2007) (quoting *Walter v. Holiday Inns, Inc*., 985 F.2d 1232, 1238 (3d Cir. 1993)).  To prevail on a renewed motion for JMOL following a jury trial, a party must show that the jury's findings, presumed or express, are not supported by substantial evidence or, if they were, that the legal conclusions implied by the jury's verdict cannot in law be supported by those findings.  *Id.*  The proper analysis "is whether a reasonable jury, given the facts before it, could have arrived at the conclusion it did."  *Dawn Equip. Co. v. Kentucky Farms, Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998).

### B.    Defendants Have Not Offered Sufficient Evidence to Support a Jury Finding of Invalidity Based Upon Nine Items That Are Not Prior Art

Defendants alleged that Claims 13, 14, 16 and 19 of the '850 Patent and Claims 1 and 2 of the '749 Patent are both anticipated and obvious.  The burden of establishing invalidity of a patent, or any claim thereof, rests on the party asserting such invalidity and that party must present clear and convincing evidence establishing facts that lead to the legal conclusions of invalidity.  *See, e.g.*, *Robotic Vision Sys., Inc. v. View Eng'g, Inc*., 189 F.3d 1370, 1377 (Fed. Cir. 1999).  For their anticipation and obviousness defenses, Defendants paraded before this Court a laundry list of materials, including nine items they allege to be prior art.  None of those nine items qualify as prior art.  At trial, the evidence overwhelmingly established that these nine

-10-

references did not qualify as prior art under any section of 35 U.S.C. § 102. No reasonable juror could have concluded otherwise under the law. Accordingly, pursuant to Fed. R. Civ. P. 50, ETG is entitled to a judgment as a matter of law that the asserted claims are not invalid as anticipated or obvious based on any of the nine references because such references fail to qualify as prior art.

Specifically, none of the following qualifies as prior art:

(1)    The Weaver Thesis;

(2)    The JASA Presentation;

(3)    The VA Presentation;

(4)    The Jackson Hole Presentation;

(5)    The Weaver Thesis Presentation;

(6)    The Weaver Work - AFC-1 and AFC-2 circuits;

(7)    The Best Work;

(8)    The JASA Abstract;

(9)    The 1984 VA R&D Progress Report ;

Defendants - through their paid fact witnesses and expert witness, Dr. Soli - presented testimony concerning these alleged references, none of which qualify as valid prior art and each should have been excluded from the trial. The testimony relating to these non-qualifying references did nothing more than confuse the jury and unnecessarily prolong the trial.

### 1.    The Weaver Thesis Was Not Cataloged, Indexed and Shelved Before Filing of the Patents-in-Suit

Whether a given reference is a "printed publication" depends on whether it was "publicly accessible" during the prior period. *See* D.I. 504 (Order, Jan. 18, 2008 citing *In re Wyer*, 655 F.2d 221, 226 (C.C.P.A. 1981)). A given reference is "publicly accessible" upon "a satisfactory

showing that such document has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation." *Id.*

In the context of a thesis, the Federal Circuit has principally looked at three factors: (1) distribution or dissemination, *see* D.I. 504 (Order, Jan. 18, 2008 (citing *In re Hall*, 781 F.2d 897, 898-99 (Fed. Cir. 1986))); (2) records accessible to the public, *see id.* (citing *In re Wyer*, 655 F.2d at 226); and (3) indexing and cataloguing in a meaningful way, *see id.* (citing *In re Cronyn*, 890 F.2d 1158, 1161 (Fed. Cir. 1989)). Per this Court's Order, the Best Thesis was excluded as a printed publication. *See* D.I. 504 (Order, Jan. 18, 2008). The analysis for the Weaver Thesis (DX 956) is indistinguishable from the analysis in D.I. 504 for the Best Thesis (DX 1111) (Ex. J). Here, as with Dr. Best, Mr. Weaver presented his thesis in 1984 to three professors in a closed panel presentation. *See, e.g.,* Tr. 1254:24-1255:12. As with Dr. Best, Mr. Weaver did not distribute copies of his thesis before, during, or after his presentation.[3] In a similar manner to the Best Thesis, the Weaver Thesis was not displayed for others, including those skilled in the art, to read and copy. The cataloguing procedure of the Weaver Thesis is nearly identical to that of the Best Thesis.[4] *See* D.I. 504, at 4. All of the evidence presented establishes irrefutably that the Weaver Thesis was not catalogued until March 3, 1987, long after

---

[3] Mr. Weaver allegedly presented his thesis to students at an informal Friday meeting. However, no copies of the Weaver Thesis were distributed and the Weaver Thesis was not displayed. Besides his thesis defense and the informal Friday meeting, Mr. Weaver testified that he did not present his thesis in any other forum. *See, e.g.,* Tr. 1267:23-25.

[4] The Weaver Thesis was sent to the University of Wyoming library ("Library") and placed in a box for indexing and cataloging. Tr. 1748:23-1749:16. Janet Ruth Woods, a librarian at the Library, testified that the boxes of theses received by the Library during the 1984-1987 time period were not searchable by subject matter prior to being inputted into the OCLC (Online Computer Library Catalog) database. Tr. 1753:5-12. The Weaver Thesis was not publicly available, searchable, or on display until long after the filing date of the '850 Patent.

the filing date of the Patents-in-suit. *See* JX 51 (printout from University of Wyoming Library OCLC) (Ex. K). Given the foregoing, the Weaver Thesis was not publicly accessible during the relevant time period and JMOL should be entered on Defendants' invalidity defenses that rely on the Weaver Thesis.

### 2.     The JASA Presentation Fails to Qualify as Prior Art

A paper that is orally presented in a forum open to all interested persons constitutes a "printed publication" if written copies are disseminated without restriction. *Massachusetts Institute of Tech. v. AB Fortia,* 774 F.2d 1104, 1109 (Fed. Cir. 1985). The transient display of slides during the presentation does not meet this requirement. *See In re Klopfenstein*, 380 F.3d 1345, 1349 n.4 (Fed. Cir. 2004); *Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1330 (Fed. Cir. 2004).

The JASA Presentation (DX 963) slides indicate that the manner of presentation was "Lecture only," with no handouts. Ex. E. The presentation ran for a mere fifteen minutes, and a portion of that time was devoted to a question-and-answer session. *See, e.g.,* Tr. 1190:19-22. Mr. Weaver testified that copies of the slides were not provided to any attendees. *See, e.g.,* Tr. 1269:23-1270:5. Defendants submitted no evidence that copies of the presentation or any written material were made available or ever distributed without restriction. *See, e.g.,* Tr. 1270:3-5. Therefore, because the JASA Presentation involved a mere transient display of slides with no corresponding distribution of any documents, it cannot qualify as a printed publication. *See Norian Corp.*, 363 F.3d at 1330.

The JASA Presentation slides (DX 963) lack sufficient corroboration to qualify as prior art under any section of 35 U.S.C. § 102 for multiple reasons. First, the Defendants have failed to provide any evidence that the slides were the actual slides presented. DX 963 (Ex. E). Such corroborating evidence would be essential for the material to qualify as prior art. Next, the

-13-

Defendants have not established the scope of the materials presented at the JASA conference,

nor have the Defendants established whether any details were even given concerning how the

alleged circuit would function. Moreover, the slides lack sufficient detail to have put the public

in possession of the scope and contents of the claims of the Patents-in-suit. *See* DX 963 (Ex. E).

The vague illustrations and minimal description provided in the slides support Dr. Egolf's

August 1987 letter indicating that no pertinent information of the Weaver Work was ever

disclosed. The Defendants never presented evidence at trial that these slides (DX 963) were

actually used at the event or shown to the public. Again, judgment as a matter of law on any

invalidity defense based on the JASA Presentation should be entered.

### 3. The VA Presentation Was Not Publicly Accessible

Defendants provided testimony at trial about an alleged presentation made to Dr. Larson

at the VA Medical Center on December 7, 1984, without any reliance on supporting

documentation. Again, without supporting evidence of the scope and contents of this

presentation, evidence of this alleged presentation amounts to nothing more than unsupported

and uncorroborated testimony, which this Court has consistently rejected in this action. Even

more troubling, the Defendants rely only on paid fact witness testimony. Dr. Larson testified

that no one outside the VA knew about the alleged presentation and that there had been no

publication regarding the same. *See, e.g.*, Tr. 1767:8-1768:7. Mr. Weaver testified that he did

not have a copy of the alleged presentation slides used at the VA Presentation. *See, e.g.*, Tr.

1269:12-16. In addition, Mr. Weaver testified that no handouts or any copies of the alleged

presentation were distributed. *See, e.g.*, Tr. 1269:17-19. The testimony presented at trial

indicates that only medical students or residents associated with the VA hospitals were *perhaps*

in attendance. *See, e.g.*, Tr. 1258:19-1259:18. Further, there is no evidence that anyone

interested in the subject matter would have been able to attend this presentation or access any

-14-

related information. Tr. 1258:19-1259:18; 1269:12-16; 1269:17-19; 1765:17-1768:7. The alleged presentation was simply not a public presentation, and no evidence exists to support the uncorroborated testimony of the Defendants' paid fact witnesses.

Defendants also presented vague testimony concerning a purported demonstration in Dr. Larson's office in the VA facility in Augusta, Georgia. Defendants could only present unsupported testimony regarding this alleged demonstration at the VA Medical Center. According to Mr. Weaver, the alleged demonstration occurred in Dr. Larson's office where only Mr. Weaver, Dr. Egolf, Dr. Larson and another unidentified colleague were present. *See, e.g.,* Tr. 1259:19-24. Ironically, Dr. Larson testified that the floor on which his office was located **was closed to the public** because of animal testing. *See* Tr. 1759:2-1762:5 (It was not open to the public "because the wing that I had my labs in also had labs for investigators doing animal research. And they wouldn't allow the public in that wing because of that factor now, I had to get special permission to bring even patients up to that floor."). This fact alone, that the event occurred behind closed doors on a protected floor sealed off from the public, removes the alleged events from the public domain. Even still, Defendants have provided no supporting documentation to corroborate any alleged demonstration in Dr. Larson's inaccessible office. There is no indication that either the presentation or the demonstration at the VA Medical Center were open to the public - to the contrary, the evidence proves that no one outside the VA attended. Tr. 1767:8-23. Accordingly, the presentation and demonstration both fail to qualify as valid prior art and fail to meet the requirement of publicly available. *See* D.I. 504 (Order, Jan. 18, 2008 (citing *In re Wyer*)).

### 4.    The Jackson Hole Presentation Was Not Corroborated

The alleged Jackson Hole Presentation purportedly held on September 4, 1985 (DX 971) is not supported by the record. Dr. Egolf alleged that he demonstrated a portable hearing aid that

included Mr. Weaver's circuit, without an accompanying slide presentation.  *See, e.g.,* Tr. 1167:13-16.  In fact, Dr. Egolf's presentation was described in the brochure as "Lecture Series."  *See* DX 971 at OTI009464 (Ex. G).  Defendants again rely purely on a paid fact witness with no supporting documentation of what was demonstrated.  Such testimony should be viewed with distrust, given that Dr. Egolf had already been paid $53,000 for his "fact" testimony and was expecting much more.  Tr. 1181:18-1182:7.  He was even being represented by Defendants' lawyers.  Tr. 1180:17-23.  Further, there is no indication that this conference was widely attended or even advertised to the hearing aid industry.  Therefore, the alleged demonstration at Jackson Hole does not meet the requirements of "publicly accessible" because no supporting materials were disseminated or made available to the public.  *See* D.I. 504 (Order, Jan. 18, 2008, citing *In re Wyer*); *see also*, Tr. 1169:13-14.

### 5.    The Weaver Thesis Presentation Was Not Corroborated or Made Publicly Available

Mr. Weaver's Thesis Presentation is not prior art.  As described by Dr. Egolf, the Thesis Presentation was an informal presentation that was required by graduate students.  *See, e.g.,* Tr. 1157:17-24.  During the Thesis Presentation, Mr. Weaver allegedly explained the high points of the research to his peers.[5]  *See, e.g.,* Tr. 1158:17-21.  Mr. Weaver testified that he does not have any evidence supporting the Thesis Presentation beyond his own paid testimony.  *See, e.g.,* Tr. 1267:7-17.  Moreover, no handouts were given to the audience and no one was given a copy of the Weaver Thesis.  *See, e.g.,* Tr. 1267:18-22.  In fact, other than the Thesis Defense and the Thesis Presentation, Mr. Weaver testified that he did not present his Thesis to anyone.  *See, e.g.,* Tr. 1267:23-25.

---

[5]  Dr. Best, who was at the University at the same time period working in the same department, testified that he did not attend Mr. Weaver's Thesis Presentation.  *See, e.g.*, Tr. 1324:6-8.

None of the alleged presentations relied upon by the Defendants qualify under any section of 35 U.S.C. § 102.  Defendants rely only on paid fact witness testimony with no supporting documentation of actual availability of any presentation material.  *See Norian Corp.*, 363 F.3d at 1330.

### 6.    The Weaver Work is Not a Prior Invention

The Weaver Work does not amount to a prior invention or prior public knowledge because it was not sufficiently tested, it was abandoned, suppressed and concealed, and it is insufficiently corroborated.  Abandonment, suppression or concealment may be inferred based upon the prior inventor's unreasonable delay in making the invention publicly known.  *Dow Chem. Co. v. Astro-Valcour Inc.*, 267 F.3d 1334, 1342 (Fed. Cir. 2001).

During the project with the VA, Dr. Egolf and his team worked on several active feedback cancellation (AFC) circuits, in each instance an earlier AFC circuit was abandoned for a later improved AFC circuit.  In total, Dr. Egolf and his team worked on the AFC-1, AFC-2, AFC-3, AFC-4, AFC-5 and AFC-6 circuits in succession.[6]  Shortly after the AFC-1 was developed, this circuit was abandoned for a later AFC-2 circuit.  Recognizing problems with the AFC-2 circuit, Dr. Egolf and his team worked on another improved circuit - the AFC-3 circuit, which was not relied upon by the Defendants for purposes of alleged prior art.[7]

The AFC-1 and AFC-2 circuits do not qualify as prior invention because: (1) these circuits were never publicly disclosed; (2) each circuit was abandoned for a later improved circuit; and (3) these circuits were not sufficiently tested to support any determination that they worked for their intended purpose.

---

[6]  Only the AFC-6 circuit was submitted to the VA at the completion of the project.  Tr. 1235:9-11.  And this occurred after the '850 Patent was filed.

[7]  At Trial, Defendants did not rely on the AFC-3 circuit under any invalidity theory.  Tr. 1732:2-4.

### a. The AFC-1 and AFC-2 Circuits Were Suppressed and Concealed

In an August 31, 1987 letter (JX 43A), Dr. Egolf advised Dr. Larson of a patentable item conceived and developed partially as a result of the VA contract.  The confidential invention disclosure form identifies that the patentable invention encompasses the work done on the AFC-1 and AFC-2 circuits.  *See* JX 43A (Ex. H).  Specifically, Dr. Egolf indicated that there was no public disclosure of any pertinent information for any AFC circuit as of August 31, 1987.  *See, e.g.,* Tr. 1228:17-22.  The confidential invention disclosure form states that there had been no disclosure of the circuits for the entire period of the project covering all AFC circuits.  *See* JX 43A (Ex. H).  Because this form was not filled out until August 1987, the details of all of the circuits were confidential until at least that time.  Based on this document prepared by Dr. Egolf, none of the pertinent details of the AFC circuits or the Weaver Work were made public because Dr. Egolf and his team considered the subject matter still patentable.

Eventually, the determination was made not to pursue a patent on this technology.  *See, e.g.,* Tr. 1227:13-14; 1277:20-23.  Even still, the parties' own admissions demonstrate that the subject matter remained out of the public domain through August 1987.  Further, Dr. Egolf and Mr. Weaver never developed any corresponding commercial product for the public.  Given the delay in indexing, cataloging and shelving the Weaver Thesis, in conjunction with a lack of any meaningful attempt to otherwise publish the pertinent details, the Weaver Work was concealed and suppressed and thus fails as valid prior art.

Defendants contend that confidentiality only applied to the AFC-3 circuit.  *See, e.g.,* Tr. 1235:5-8.  This is incorrect.  Based on the date range of **May 1984 to April 1986** identified by Dr. Egolf in the August 1987 form, the affirmative statement that no public disclosure has

-18-

occurred also applies to the AFC-1[8] and AFC-2[9] circuits.  The best evidence of whether or not the pertinent details of the underlying technology found in the AFC-1 and AFC-2 circuits were ever made public should be the written record (JX 43A) maintained by Drs. Egolf and Larson.

Moreover, Dr. Egolf himself cited to the work with the VA as "unpublished" in his publications.  PX 975 (Ex. I).  *See, e.g.,* Tr. 1196:10-15; 1198:15-1199:15.  Dr. Egolf testified that he applied the definition of "unpublished" as provided by the Journal of Acoustical Society of America (JASA).  The JASA style manual cautions its authors to "avoid references to unpublished material that is difficult or impossible to obtain."  *See, e.g.,* Tr. 1198:24-1199:1. Under this definition, Dr. Egolf admittedly did not consider his work with the VA as being readily available to the public.

### b.  The AFC-1 and AFC-2 Circuits Were Abandoned for Later Circuits

The AFC-1 circuit was never reduced to practice because Mr. Weaver abandoned this circuit.  After the AFC-1 circuit was built and work had begun on the AFC-2 circuit, Mr. Weaver testified that the AFC-1 was eventually recycled, thus further removing it as potential anticipatory prior art.  *See, e.g.,* Tr. 1270:20-1271:2 ("whenever the value of AFC 1, the technology was fully implemented, tested up into AFC 2, eventually I am sure the parts were recycled.")

After the AFC-2 circuit was built, Mr. Weaver and Dr. Egolf moved on to the AFC-3 circuit.  *See, e.g.,* Tr. 1271:3-5; 1212:19-22 ("Q: And the AFC 2 was never worked on again and you went on to the next model, AFC 3, right?  A: I didn't work on it.").  Such abandonment

---

[8]  Mr. Weaver testified that AFC-1 was described in his Thesis, dated July 1984 and December 1984.  Tr. 1252:14-1253:1.

[9]  Mr. Weaver testified that AFC-2 was constructed between July 1984 and December 1984.  Tr. 1258:13-14.

#9479730 v1

defeats prior invention pursuant to 35 U.S.C. § 102(g).  *See Dow Chem. Co.*, 267 F.3d at 1342

("The failure to file a patent application, to describe the invention in a published document, or to

use the invention publicly, within a reasonable time after first making the invention may

constitute abandonment, suppressions or concealment.") (citations omitted).  As each later circuit

was an improvement from an earlier circuit, and given the fact that the Defendants admitted that

work ceased on the earlier circuits after a later circuit was built, each earlier circuit was

abandoned for the later improved circuit.  Because the AFC-2 circuit was abandoned for another

circuit soon after being built, it cannot be valid prior art.

### c.   The AFC-1 and AFC-2 Circuits Were Not Sufficiently Tested

In order for a prior invention to qualify as prior art under § 102(g), it must have been

reduced to practice.  The prior invention must also have been sufficiently tested to demonstrate

that it works for its intended purpose.  *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d

1437 (Fed. Cir. 1984).  Mr. Weaver testified that the AFC-1 circuit was limited to a public

address (PA) system and not a hearing aid.  *See, e.g.,* Tr. 1266:10-25.  Thus, the AFC-1 circuit

was never even tested as a hearing aid.  As for the AFC-2, Defendants have provided no

evidence that the circuit was ever tested on a hearing impaired individual.  Accordingly, there is

no definitive way to ascertain whether the circuit worked for its intended purpose - effective

acoustic feedback suppression in a hearing aid.  Mr. Weaver's testing was therefore insufficient

to support any reduction to practice to a hearing aid.  Accordingly, the lack of reduction to

practice presents yet another independent reason for excluding the AFC-1 and AFC-2 circuits as

prior art under § 102(g).

### 7.    The Best Work is Not a Prior Invention

At trial, Defendants improperly relied on the Best Work to support their invalidity

argument.  The Best Work, which allegedly includes a prototype hearing aid referred to as

Prototype 2, does not qualify as a prior invention because: (1) the circuit was suppressed; (2) the circuit was subsequently abandoned; and (3) the circuit was not sufficiently tested. In addition, the Defendants failed to present any documentation to support the existence of the prototype or any demonstration thereof. *See, e.g.,* Tr. 1325:25-1326:23. At trial, Defendants' paid fact witness, Dr. Egolf, recalled none of the details of the Prototype 2. In addition, Dr. Best and Mr. Weaver were at the same University working in the same department around the same time frame. However, at the time, neither one knew any details of the other's work. *See, e.g.,* Tr. 1278:8-14;1324:3-8.

Defendants have failed to provide any evidence that Dr. Best's prototype was developed into a commercial embodiment; nor was the concept supported by the Best Thesis ever incorporated into a commercial product. Given the delay it took for the work of Mr. Best to be indexed and cataloged, and with no meaningful attempt whatsoever to publish the Best Thesis, the work was concealed and suppressed and thus fails as valid prior art.

In addition, the Best Thesis fails to support any reduction to practice because it was never tested on a hearing impaired individual. *See, e.g.,* Tr. 1326:11-13 ("Q: To your knowledge, was the second prototype ever tested on a hearing impaired person? A: No."). Accordingly, there was no definitive way to ascertain whether the purported hearing aid actually worked for its intended purpose. Whether the device constructed by Dr. Best would even qualify as a hearing aid if it did not function to aid the hearing of the wearer is highly questionable. Even if the circuit was reduced to practice, the Prototype 2 was later abandoned. *See, e.g.,* Tr. 1328:7-9 ("Q: Do you know what happened to the second prototype that was built? A: No.").

### 8.    The JASA Abstract Is Not an Enabling Disclosure

A reference must be enabling and must describe the claimed invention sufficiently to have placed it in the possession of a person of ordinary skill in the field of the invention. *See*

-21-

*Reading & Bates Constr. Co. v Baker Energy Res. Corp.*, 748 F.2d 645, 651 (Fed. Cir. 1984) (a one-page brochure boasting of the ability and results of a process did not constitute an enabling disclosure of that process). In other words, the disclosure within the "four corners" of the alleged prior art document must be sufficiently detailed to enable a person of ordinary skill in the relevant field to make and use the claimed invention. *Advanced Display Sys., Inc. v. Kent State Univ.*, 212 F.3d 1272, 1282 (Fed. Cir. 2000). A printed publication does not suffice as prior art if it is not enabling. *In re Donohue*, 766 F.2d 531, 533 (Fed. Cir. 1985).

The JASA Abstract is a single paragraph summary, with no diagrams or illustrations. *See* DX 1010 (Ex. C). This brief summary makes no reference to the Weaver Thesis. Dr. Egolf describes the abstract as a very brief description with no more than a couple lines. *See, e.g.,* Tr. 1190:23-1191:2. Mr. Weaver acknowledges that the abstract does not provide sufficient technical details. *See, e.g.,* Tr. 1270:15-17 ("Q: You wouldn't have expected somebody to be able to build your circuit from the few lines in the abstract from the JASA Presentation, would you? A: You're right. It's hard for me to say what somebody else can build."). In addition, Dr. Larson, another of Defendants' paid fact witnesses who worked at the VA Medical Center at the time, indicated that the abstract did not provide sufficient detail. *See, e.g.,* Tr. 1768:22-24 ("There's not enough information given for me to say the means by which cancellation is effective in the abstract.") Dr. Egolf further supports the position that the description is insufficient. *See, e.g.,* Tr. 1191:6-10 ("Q: And you have testified that despite the fact that you're an electrical engineer, you have no idea whether someone familiar with hearing aids could build a device from these few words, right? A: Yes, sir.").

The lack of technical details provided by the JASA Abstract is in concurrence with Dr. Egolf's August 1987 letter (JX 43A) indicating that no pertinent information of the Weaver

-22-

Work was ever disclosed to the public. Dr. Egolf stated in 1987 that he was entitled to a patent for an "Automatic Feedback Control Circuit," and such a concession demonstrates that the details of the "Automatic Feedback Control Circuit" were confidential. JX 43A (Ex. H). Essentially, the pertinent details of the work done by Dr. Egolf's team was never made available to the public. Vaguely mentioning an idea in an abstract, with no accompanying details or pertinent information, simply does not qualify as prior art pursuant to the Patent Act.

### 9.   The 1984 VA R&D Progress Report Is Not an Enabling Disclosure

The 1984 VA R&D Progress Report is not an enabling disclosure. The abstract/excerpt from the 1984 R&D Progress Report relied upon by the Defendants provides even less detail than the JASA Abstract and is deficient for at least the same reasons. *See* DX 1357. The R&D Progress Report has no diagrams, sketches or any detailed illustrations to support any technical details. *See, e.g.,* Tr. 1219:24-1220:1. The 1984 R&D Progress Report devotes a mere two sentences to the AFC system with no reference to a specific AFC circuit. Because of the lack of technical details concerning any AFC circuit, the 1984 R&D Progress Report fails to enable one skilled in the art to make and use the system and should have been excluded as valid prior art. *See Reading & Bates Constr. Co.*, 748 F.2d at 651. In fact, the 1984 R&D Progress Report simply does not describe Dr. Levitt's technology. One of ordinary skill in the art would be completely unable to make and use the patented technology of Dr. Levitt by referring to this summary abstract found in the 1984 VA R&D Progress Report.

### C.   No Reasonable Jury Could Have Decided That Claims 13, 14, and 16 Were Not Literally Infringed

ETG is entitled to judgment as a matter of law that Claims 13, 14 and 16 ("the Method Claims") are literally infringed by the Accused Products. But for the Defendants purposefully ignoring this Court's Claim Construction Order (D.I. 351) in the presentation of their case and

further confusing the jury by injecting claim limitations that this Court had specifically rejected, the jury would have reached the inevitable and correct conclusion that the Accused Products literally infringe the Method Claims. The Method Claims recite two distinct clauses: the "determining" clause and the "inserting" clause. *See* '850 Patent, Claims 13, 14 and 16 (JX 4) (Ex. L). Each of these limitations is met literally by the Defendants' feedback cancellation products.

### 1. Defendants' Arguments Misled The Jury

#### a. The Determining Step Does Not Require a Physical Measurement

The plain meaning of the language comprising the "determining" step should control any infringement analysis. The analysis must begin with the language: "determining **the effect on the amplitude and phase** of a signal…" '850 Patent, Claims 13 and 14 (emphasis added). Of particular importance is the fact that the language does not state "measure phase and amplitude," or even state "determine phase and amplitude." Instead, the carefully crafted claim language dictates that "**the effect on** the amplitude and phase of a signal" must be determined. Nowhere does the claim language call for, or require, an absolute value or measurement.

The Defendants ignored this Court's Order and instead argued to the jury the same flawed positions that were previously dismissed. *Compare* D.I. 247 (Joint Claim Construction Statement, May 9, 2007), *with* D.I. 351 (Markman Order, Aug. 17, 2007). Realizing that the Court's Claim Construction Order left them with no viable non-infringement theories, the Defendants wrote this Court's construction out of the analysis by arguing at every turn to the jury that their previously rejected interpretations should govern. For example, during Markman proceedings, the Defendants argued to this Court that the "determining" phrase: "means **measuring** and the phrase 'as a function of frequency' means at a known frequency." D.I. 247, at Claim 13. The Court correctly rejected the notion that the '850 Patent was limited to this

-24-

overly narrow requirement of "measuring" and "at a known frequency." Instead, based upon the

specification of the '850 Patent, the Markman Order dictated that the "determining" clause did

not need to be construed and it should be afforded its plain and ordinary meaning. D.I. 351. In

spite of the Markman Order that rejected a narrow measuring limitation, the Defendants injected

an artificial "measuring" requirement into the determining clause that resulted in confusion for

the jury at trial. For instance, the Demant Group argued:

> The solution to the problem is that you put an electrical feedback path inside the hearing aid. And you set that patent up so that it cancels the acoustic feedback path. But there are a number of ways to do that. One way is you **measure** the path first, you **measure** it, you get the phase and amplitude information. That is your first step. Then you convert that information into coefficients that go into this filter. **And that's what Dr. Levitt did**.
>
> The **other way** is you use a complex filter called an LMS algorithm filter, an LMS adaptive filter. **It doesn't measure the acoustic feedback**. It doesn't **measure** the amplitude and phase. It does it differently, and it uses the filter itself inside the hearing aid to create the solution.

Tr. 176:4-17 (emphases added). Demant also argued to the jury:

> The patent says **measure** it ahead of time, put it in and hope it works. The way this works is, I'm changing all the time. I'm looking all the time. I am making sure it works and **I'm never measuring phase and amplitude**.

Tr. 194:8-12 (emphases added). Similarly, the Widex Defendants sought to narrow the claim

scope by insisting that the claim language of the Method Claims required measuring feedback:

> And at that point in time when they are in this audiologist's office, they are trying to do the best they can to **measure the feedback** and figure out how you should cancel it. And they create these coefficients or settings, really, that will cancel the feedback.

Tr. 203:16-20 (emphasis added). Widex's expert even put forth a demonstrative exhibit that

required a "Feedback Measuring Circuit" for the "determining" step. Ex. M. These arguments

are contrary to this Court's Markman Order and the Defendants utter failure to compare the

Accused Products to the properly construed claims entitles ETG to judgment as a matter of law.

#9479730 v1

By day five of the trial, this Court had even deciphered Defendants' improper tactics of reading out the proper claim scope for their failed claim construction ("measuring") arguments:

> Q.   I think I'm just going to ask one question, and I'm going to ask you about the marketing materials or the patents and concepts.  I'm going to ask you about the products, the products accused in this case.  Based on your knowledge of the LMS adaptive filter, will you please explain for the jury why it is not possible to do phase cancellation **or measure amplitude phase**?
>
> THE COURT:  Or determine amplitude?  Apples to apples, if you might.
>
> MR. GRAMENOPOULOS:  I'm sorry?
>
> THE COURT:  Well, if you want to keep it apples to an apples, I think you --
>
> MR. GRAMENOPOULOS:  Let's first start with phase cancellation.
>
> THE COURT:  Well, just determine.  I'm just focusing on the word determine.

Tr. 1051:11-1052:3 (emphasis added).  Although this Court caught the Defendants in the act on this one occasion, the dozens of other instances[10] that the Defendants substituted "measuring" for the proper claim interpretation "determining the effect on the amplitude and phase…" without a doubt caused jury confusion as to the proper scope of the claim language.

### b.   The Inserting Step Does Not Require that the Circuit be Broken and a Filter Physically Placed in the Hearing Aid

The Defendants similarly confused the jury by arguing that the inserting step of the Method Claims required that the feedback circuit be physically broken and then a filter hardwired in place with the capability embedded to cancel feedback.  As Defendants' expert opined:

> Q.   Do either the Senso Diva or the Inteo products perform the inserting step in Claim 13?

---

[10]  Defendants refer to "measure" or "measurements" of phase and amplitude no less than 63 times.  *See, e.g.*, Tr. 168:5, 25; 176:8, 14; 180:3, 4; 194:8; 203:18; 290:1, 5, 6; 297:12, 13; 298:3; 305:13; 324:23; 337:6; 361:11, 17; 580:20-581:1; 586:6; 809:10; 1051:19 (admonished by the Court); 1052:11; 1365:8, 16: 1366:22; 1367:11; 1368:10, 13, 19; 1369:3; 1372:4, 23; 1376:6; 1379:1, 4, 6, 10: 1419:9; 1435:17; 1460:12; 1472:4, 9; 1549:25-27; 1601:1, 2; 1617:11; 1622:12-23; 1631:20; 1976:25; 1979:7; 1981:2; 1983:2, 3; 2008:12; 2017:4; 2018:3; 2195:3, 11.  Notably, at least 39 references to "measuring" phase and amplitude came **after** this Court admonished Defendants' counsel for not using the word "determining the effect on the amplitude and phase."  Tr. 1051:11-1053:2.

> A.    Not at all.  The filters that are used to cancel feedback in both of those hearing aids **are put onto the chip when it's made in a factory in Taiwan**.  And that filter is in that chip from when it gets put on at the chip manufacturing plant until the hearing aid is put in the -- for the rest of its life, the existence of that hearing aid, that filter is in there.  It never leaves.

Tr. 1414:4-12 (direct examination of Dr. Robert Morley) (emphasis added).  Dr. Morley even relied upon a demonstrative exhibit showing a circuit physically broken with a filter outside the circuit ready to be hardwired into the hearing aid.  Ex. M.  Similarly, on cross examination:

> Q.    Now, your basis for saying that the accused products don't insert, that is based on your understanding that there is some act of physically inserting a filter; is that correct?
>
> A.    The words are "inserting a programmable filter programmed."  That is what I went on.
>
> Q.    And you said the only time that could possibly happen is at the factory?
>
> A.    The obvious interpretation of that, especially in light of what is going on in the claims, is that you have inserted a filter and that filter is inserted, is programmed.  That is what is required by the claims.  Now, **the filter is physically inserted at the factory**. . . .

Tr. 1625:3-22 (cross examination of Dr. Robert Morley) (emphasis added).  The Defendants' "physically inserted at the factory" defense was nothing more than a ruse to confuse the jury and obscure the proper claim scope as interpreted by this Court.  The Defendants' position that the inventors envisioned any embodiment where a circuit would have to be broken and a new filter physically inserted before the invention would work is illogical, and disingenuous at best.  Such a theory finds no support in the specification.  As explained by ETG's expert upon cross-examination:

> In electrical engineering, that is how we insert a filter is by taking and giving it a filter value.  We don't break the filter out of the circuit, calculate it, plug it back in.  This is integrated into a single chip.  There is no way to do that.  And it would be envisioned by Dr. Levitt when he initially designed this.  He wouldn't expect somebody to break open the hearing aid, programmable hearing aid and put it back in.

Tr. 611:23-612: 5 (cross examination of Mr. Clyde Brown).  Even in light of evidence that physical insertion of a filter made no rational sense, the Defendants nonetheless presented their

case to the jury in such a manner as to claim they did not infringe literally because their filters were permanently installed at the factory and always operational. According to the Defendants' unsupported theory, the only way the inserting step could be literally infringed was if a hearing aid were cracked open and an engineer physically inserted a preprogrammed filter in the feedback path. Certainly, human interaction was not contemplated by the '850 Patent as part of the digital filtering process.

Defendants' "physical insertion" theory inevitably led to jury confusion and apprehension to find literal infringement. As evinced by Defendants' demonstratives, the Defense team not only sought to rewrite the claim language to fit their needs, but they also redrew the patent figures in order to confuse the jury regarding how the inserting step must be met. As depicted in Exhibit N, the Defendants created a completely new arrangement contending that the claimed feedback cancellation filter must be outside the circuit depicted in the true patent figure, so that it could be more readily disconnected. In reality, Figure 2 of the '850 Patent already has a filter depicted in a feedback path at (64). *See also*, Figure 2 (switches (82) and (83) capable of putting the filter (64) in feedback or feedforward path); Col. 9, ll. 47-51 ("If desired, the **additional** programmable filter in the feedback path…."). The Defendants' exhibit led to clear confusion among the jury about whether or not a single filter had to be physically inserted before the inserting limitation was literally met. Based upon the specification, and the knowledge possessed by one of ordinary skill in the art at the time of filing, the inserting step clearly does not require a hard-wired physical filter insertion every time new coefficients are programmed into the filter.

The jury's failure to find literal infringement of the Method Claims was an inevitable result of the Defendants' improper and misleading arguments that run counter to this Court's

Markman Order and to common sense.  Because the jury consistently heard the Defendants and

their hired experts argue that the determining step required an absolute physical measurement of

phase and amplitude, they were erroneously led to believe that the adaptive algorithm techniques

used in the Accused Products did not determine phase and amplitude characteristics as required

by the claims.  Such is not the case.  Under this Court's Markman Order, the techniques used by

the Defendants do indeed <u>determine</u> the effect on phase and amplitude of a signal as a function

of the acoustic feedback in order to mirror the feedback signal to cancel it out.  Had the jury not

been misled to believe that the inserting step required a filter to be physically hardwired into a

new circuit, they would have also found this limitation of the Method Claims literally met.

> ### c.  Defendants Presented Misleading Non-infringement Arguments to the Jury and Even Attempted to Disavow Their Own Technical and Marketing Documents Despite FDA and FTC Regulations

Faced with overwhelming evidence of clear infringement, the Defendants in this action

were forced to put on a charade for the jury regarding infringement of Claims 13, 14 and 16.

First and foremost, the Court's Claim Construction Order clearly states that the Patents-in-suit

cover both fixed and adaptive technology.  *See* D.I. 351 (rejecting Defendants' arguments for a

fixed filter).  Second, Plaintiff's expert showed conclusively that even if the patents did not cover

"adaptive" technology, one of ordinary skill in the art in the mid-1980's would have understood

that the patented technology could use adaptive means.  Nevertheless, Defendants attempted to

confuse and mislead the jury by arguing that the patented technology must be "adaptive" for

infringement to occur and that the Patents-in-suit were not adaptive.  *See, e.g.*, Tr. 1374:9-

1375:11 (direct examination of Dr. Robert Morley) ("And, you know, things change.  The

acoustics are always changing and so **a fixed solution** like this [Patents-in-suit] is not a useful

one.").  All of this was, of course, contrary to this Court's Claims Construction Order.

The Defendants furthered their strategy by presenting misleading representations to the jury that Dr. Eric Dowling, ETG's purported technical expert before filing suit, actually changed his mind and reached a conclusion that Claim 13 was not infringed by "adaptive" filters.[11]  After refusing to let Dr. Dowling testify, and faced with his Declaration to the contrary, the Defendants still misled the jury by claiming it was Dr. Dowling's opinion that the claims could not be infringed by "adaptive" filters.  *See* Tr. 2185:13-2189-14; 2191:8-13; 2199:19-21; 2204:5-23. Such testimony and mischaracterization of the evidence by the Defendants certainly confused the jury regarding literal infringement of the Method Claims.

Even more troubling is the Defendants' disavowal of their own technical documents throughout these proceedings.[12]  The Defendants admitted that if their technical documents were true, they would in fact literally infringe Claims 13, 14 and 16:

> Q.   If you do agree that your products use phase cancellation and measure the input and output and compare them and cancel -- you understand that part; right?  If you agree that that is what your documents say and that is what your products do, you would be agreeing that you're determining the phase and the amplitude, creating an equal but opposite signal and cancelling; right?
>
> A.   I'm sorry.  It was still a long one, but if I agree to that, I think, as I understand your question, you're right.  The problem is I strongly disagree because the technology is not built that way.

Tr. 1040:4-14 (cross examination testimony of Thomas Christensen).  Similarly, Mr. Christensen admitted that "if that [document] were correct" then the Accused Products would indeed infringe:

> Q.   It says, phase cancellation is the only true way to eliminate feedback without affecting audibility.  When feedback is detected, DFC uses digital phase cancellation to effectively remove the unwanted whistling sound.  Right?
>
> A.   It's in the document, yes.

---

[11]  *See* Footnote 1.

[12]  *See* Footnote 1.

Q.    So if that would be correct, that would be determining the amplitude and phase, reversing the signal and cancelling; right?

A.    Well, if that was correct.

Tr. 1043:5-13 (cross examination testimony of Thomas Christensen).  The Defendants' attempts to walk away from their own technical and marketing material[13] demonstrates their level of desperation to defeat infringement and the weakness of their non-infringement theories.  *See* Plaintiff ETG's Memorandum in Support of its Motion for Enhanced Damages and Attorneys Fees, Section V.C.3, filed concurrently.  The Defendants' non-infringement positions would essentially require that this Court make a finding that the Defendants' technical and marketing materials are false and misleading.

ETG has a right to rely on the Defendants' published materials as strong evidence of infringement.  *Johnson & Johnson v. Carolina Lee Knitting Co.*, 258 F.2d 593, 599 (4th Cir. 1958) ("While advertising claims alone may not be sufficient to make out a case of infringement . . . the Courts have in numerous instances relied on advertisements as **admissions by the defendant** of the infringing nature of the accused product.") (citations omitted) (emphasis added).  In fact, and in light of clear United States Regulations that govern the marketing of

---

[13]  For instance, Demant's counsel flat out asked their infringement expert:  "Is that the reason why you believe that marketing materials are inaccurate?"  Tr. 1052:16-17.

hearing aids,[14] this Court should adopt the presumption that all of the Defendants' materials are accurate and the burden should then shift to the Defendants to prove any inaccuracies. *See Russell v. J.P. Seeburg Co.*, 123 F.2d 509 (7th Cir. 1941) (finding that the plaintiff had the right to assume that defendant's published product catalogue correctly described the apparatus advertised, and if the catalogue descriptions were incorrect, the burden was on the defendant to show the differences between the catalogue description and the actual product). Where Federal Regulations specifically require that all hearing aid advertisements be truthful, the Defendants' assertions that their own technical documents and marketing materials are inaccurate runs contrary to public policy and this Court would be within its purview to shift any burdens to the Defendants to clearly prove any such inaccuracies. *See id*.

Because of the federally mandated requirements for accuracy in "hearing aid brochures" (*see* n.14) and advertising in general, the statements made in Defendants' materials are far more than just puffery or dumbing down, they must be taken as true statements. The Defendants have admitted that their materials, if accurate, prove literal infringement of the Accused Products and this Court should hold the Defendants accountable. *See, e.g.*, Tr. at 1124:2-1129:23, 1134:25-

---

[14] As described in PX 576 ("FTC Facts for Consumers, Sound Advice on Hearing Aids," May 1998):

> What Are The Federal Standards For Hearing Aid Sales?
>
> The Federal Trade Commission (FTC) is responsible for monitoring the business practices of hearing aid dispensers and vendors. The FTC can take action against companies that mislead or deceive consumers. Such companies may use misleading sales and advertising practices . . .
>
> The Food and Drug Administration (FDA) enforces regulations that deal specifically with the manufacture and sale of hearing aids. . . . The FDA regulations also require that an instruction brochure be provided with the hearing aid that illustrates and describes its operation, use, and care….

PX 576 (Ex. O).

> Further, as admitted by the Demant Defendants: "Q: Going back to the question relating to the materials that you provide the dispensers, you said you couldn't answer whether they are accurate or not. Doesn't the Food and Drug Administration, the FDA, require that your materials, your marketing materials, be accurate? A. I think they require that they are not misleading. Tr. 990:8-13 (cross examination of Niels Jacobsen, CEO of William Demant Holding A/S). **Defendants are now explicitly attempting to persuade this Court that their FDA mandated "instruction brochure[s]" are not accurate depictions of the "operation, use, and care" of their products.**

1135:17, 1136:6-1137:1 (Nielsen); Tr. at 1019:20-1020:14, 1037:13-1038:23, 1049:2-20,

1049:22-1050:7 (Christensen); Tr. at 1075:21-1077:17, 1078:12-1079:12, 1085:12-1086:3,

1089:1-1091:13, 1093:10-1094:8, 1096:25-1098:6 (Schaub).

Nevertheless, ETG has presented evidence regarding the literal infringement of Claims

13, 14 and 16 that the Defendants have simply been unable to counter.  *See infra*.  Based upon

this evidence, and in light of the Defendants' attempts to mislead the jury, this Court should find

that a reasonable jury could come to only one conclusion - that each of the Accused Products

literally infringe Claims 13, 14 and 16.

> **2.    Defendants' Only Proof of Non-infringement Was Comparing a
> Manipulated Patent Figure to the Accused Products - Not the
> Properly Construed Claims**

The Defendants confused the jury by offering that the "determining" step could not be

met unless there was a physical measurement of phase and amplitude and that the "inserting"

step could not be satisfied unless a physical filter insertion occurred.  Defendants portrayed these

improper limitations through a manipulated patent figure of one embodiment.  *See* Ex. N,

(showing manipulated Figure 2 of the '850 Patent with a drawn in filter); Tr. 1370:10-1375:11;

1350:6-1357:19; Ex. M (showing a broken circuit with filter detached requiring a physical

hardwiring) (Morley); Tr. 1571:24-1577:1 (Anderson).  Essentially, instead of comparing the

previously construed claim language to the Accused Products, the Defendants compared a single

manipulated patent figure to the Accused Products, which is improper as a matter of law.  *See*

*SRI Int'l v. Matsushita Elec. Corp.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc)

("Infringement, literal or by equivalence, is determined by comparing an accused product not

with a preferred embodiment described in the specification . . . but with the properly and

previously construed claims in suit.").  To compare an accused product to a single figure in any

-33-

patent is simply wrong.  Yet, that is exactly what the Defendants resorted to in order to defeat literal infringement.

Through the presentation of only a single embodiment (*see, e.g.,* Exhibits M and N), the Defendants attempted to limit the scope of the Method Claims to that specific embodiment disclosed in one figure of the specification, all the while ignoring teachings found elsewhere in the specification.  *See, e.g.*, Tr. 1350:6-1357:19; 1370:10-1375:11 (Morley); Tr. 1571:24-1577:1 (Anderson).  For instance, the '850 Patent teaches adaptively finding the optimal feedback parameters through an algorithm by "re-programming the hearing aid to minimize acoustic feedback…."  Col. 6, ll. 67-68.  The only possible meaning of this phrase is that the filter must have been previously programmed with coefficients to cancel acoustic feedback and, through an adaptive process, new coefficients are thereafter used to "re-program" the filter to find an optimal solution to minimize the acoustic feedback.  *See, e.g.,* Tr. 528:17-529:13.

The Defendants failed to present evidence at trial that the Accused Products do not have the capability for "determining **the effect on** the amplitude and phase of a signal in said transmission channel as a function of frequency of acoustic feedback…."  '850 Patent, Claim 13 (emphasis added).  Instead, relying upon a single manipulated patent figure (Exhibit M) , the Defendants' case rested upon the proposition that their LMS technique did not perform an absolute physical "measurement" of phase and amplitude and a physical insertion of a filter was required.  Pursuant to this Court's Markman Order, and as conclusively proven by ETG at trial, the LMS algorithm techniques are encompassed within the claim scope of the "determining" step.  As explained by ETG's expert:

Q.    Does the LMS algorithm specifically measure phase and amplitude?

A.    No, it doesn't.  It determines the effect on phase and amplitude.  And that's what the claim requires.  It is true that, mathematically speaking, the coefficients define the

-34-

amplitude and phase. But it's not necessary for them to be defined or read out according to the claim. The effect is all that's asked for.

Tr. 516:19-517:1 (cross examination of Mr. Clyde Brown). Further, as the Defendants' expert grudgingly admitted at trial:

> Q.   Okay. Going back to the same [claim construction] order that you have apparently read, that order doesn't require a measurement, does it?
>
> A.   Well, it says to determine.
>
> Q.   And to determine doesn't mean measure. It's broader than the word measure, isn't it?
>
> A.   It can be.

Tr. 1460:15-21 (cross examination of Dr. Robert Morley). Even with this admission, the Defendants persisted in presenting testimony that the only way the "determining" step could be met was through physical measurement of phase and amplitude. *See* n.10 (arguing over 60 times that the Method Claims required measuring). Likewise, the "physical insertion" theory was the only evidence the Defendants presented regarding the "inserting" step. It is understandable why the jury was confused to a point where they determined the claim was not infringed literally, but instead infringed pursuant to the doctrine of equivalents. Importantly, the Defendants offered no other evidence or proof of non-infringement of the Method Claims.

### 3.   ETG Presented Strong Evidence That Would Allow a Reasonable Jury To Reach But One Conclusion Regarding Literal Infringement

#### a.   ETG Presented Uncontroverted Evidence that the "Determining" Step Was Literally Infringed

As discussed in detail by Dr. Levitt, his team of inventors contemplated several ways of "determining the effect on the amplitude and phase" that would allow them to pinpoint a solution for a counter feedback signal. *See, e.g.*, Levitt testimony at Tr. 239:15-244:3; 246:13-247:18; 255:18-256:21; 258:2-7; 265:5-274:13; 290:6-294:4; 375:7-384:25. The coefficients for the counter feedback signal would thereafter be used as inputs for, or programmed into, a delay line

filter in an electrical feedback path. The act of making this filter effective in the feedback path to cancel out the acoustic feedback would then satisfy the "inserting" step of the Method Claims. *See id*.

At trial, Dr. Clay Gloster presented testimony establishing that the software code used by each of the Accused Products performs certain functions that directly correspond to the technical documents that Defendants had attempted to disavow. *See* Gloster testimony, Tr. 660:25-677:15. In fact, the Defendants' experts could not offer testimony or evidence to rebut *any* of the testimony of Dr. Gloster. During trial, Dr. Gloster conclusively established that each Accused Product: (a) uses an LMS technique that determines coefficients based upon inputs having digitized phase and amplitude characteristics, (b) transfers these determined coefficients that represent the effect of the phase and amplitude to a separate memory, or RAM, and then provides the coefficients to an FIR filter, (c) uses the FIR filter (a programmable delay line filter) in a dedicated electrical feedback path, and finally (d) subtracts out the acoustic feedback through the FIR filter. *Id*; *see also*, JX 305 (Ex. P), PX 857 (Widex code), JX 138 (Ex. Q), JX 298 (Demant code). Again, Dr. Gloster's testimony was not challenged by the Defendants - the Demant Group did not even bother to cross examine Dr. Gloster, while the Widex Group simply questioned his experience with feedback cancellation in hearing aids. *See, e.g.,* Tr. 677:17-685:20. Dr. Gloster clearly established that the executed code computes coefficients that are based upon an LMS technique designed to minimize the effect of the phase and amplitude, and that these coefficients are thereafter provided to (or programmed into) a FIR filter in a feedback path to cancel out acoustic feedback. As Dr. Gloster concluded for the Widex Group:

> Q.    What does the presence of that memory tell you, if anything, about this design?
>
> A.    The presence of memory in digital systems clearly defines that they are programmable. A computer has memory, so we can program it. So if memory is present, then it must be programmable, because it can change, the values can change.

Q.    In this case what is the memory used for?  What does it change?

A.    It changes the coefficient.  So the WLMS block computes the coefficients, it changes them, stores them in the memory.  So they can be subsequently changed and applied to the filter.

Q.    So before we move on to Oticon, for purposes of the Widex document you reviewed, what is your conclusion as to whether or not this diagram is accurate?

A.    It's my conclusion, it's my opinion that the technical documents directly match, accurately match what's in the code, and that this update module -- not the update module, the WLMS module produces the coefficients.  They are stored in a RAM and they are provided as input to the WFIR block, which is the 48-tap final impulse response filter.

Tr. 671:7-672:4.

The trial testimony and exhibits used by ETG's infringement expert, Mr. Clyde Brown, establish that the Accused Products infringe the Method Claims, including the "determining" and "inserting" steps.  *See, e.g.*, Tr. 500:22-563:14; 617:24-619:11; 644:17-654:23; JX 2 (Ex. R), JX 4 (Ex. L), JX 6 (Ex. S), JX 26 (Ex. T), JX 29 (Ex. U), JX 32 (Ex. V), JX 138 (Ex. Q), JX 264 (Ex. W), JX 266 (Ex. X), JX 298, JX 305 (Ex. P), JX 497 (Ex. Y), PX 30 (Ex. Z), PX 31 (Ex. AA), PX 33 (Ex. BB), PX 231 (Ex. CC), PX 393 (Ex. DD), PX 376 (Ex. EE), PX 377 (Ex. FF), PX 378 (Ex. GG), PX 409 (Ex. HH), PX 501 (Ex. II), PX 791 (Ex. JJ), PX 810 (Ex. KK), PX 820 (Ex. )LL, PX 857, and DX 1417 (Ex. MM).  During trial, Mr. Brown presented testimony and exhibits that establish that the LMS routines performed by the Accused Products are within the claim scope of the Method Claims, as properly construed:

Q   You mentioned I think that there is two steps, determining and inserting.  Are the steps here in the claim performed in that order in the Oticon, Bernafon, Widex products we just looked at?

A.    Yes, they are.  The determining is done by the LMS routine and calculates coefficients, **then inserts the coefficients into the filter and thereby sets a new filter, electrical filter response.  And in electrical terms, we considered that inserting filter**.  And so first you have to calculate the  coefficients and then you insert them.  It can be done iteratively as it's done in the LMS routine, but if you compare that to the original patent, it is very much like Dr. Levitt's person and his "no" [sic - null] routine going back and tweaking the knob until he found a no [null].  In this case, the LMS routine does it on a chip and tweaks the knob until it finds a no [null].

-37-

Q.   Can a product determine the effect on phase and amplitude without making a specific measurement?

A.   As I said before, the effect **does not require absolute measurement** of the phase and amplitude.  **It requires producing coefficients resulting in that inverse signal which is the effect**.

Tr. 528:17-529:13 (emphases added).

### b.   ETG Presented Uncontroverted Evidence that the "Inserting" Step Was Literally Infringed

As discussed above, ETG presented overwhelming evidence that the Defendants' Accused Products satisfy both the determining step and the inserting step of the Method Claims. As described by ETG's expert:  "The determining is done by the LMS routine and calculates coefficients, then inserts the coefficients into the filter and thereby sets a new filter, electrical filter response.  And in electrical terms, we considered that inserting filter."  Tr. 528:17-529:13 (direct testimony of Mr. Clyde Brown).  The '850 Patent is void of any discussions requiring a person to physically "insert" and hardwire a filter into an electrical feedback path, an absurd and illogical reading of the claims.  Any such interpretation would have to ignore the teachings of the specification and seek to limit the claim scope beyond anything that one of skill in the art would have contemplated.  To insert a programmable filter into a feedback path in order to substantially reduce acoustic feedback simply means that the filter is programmed with that capability and then made active, or given an electrical filter response.  Tr. 528:17-529:13.  As the "inserting" step is properly construed and understood to those of skill in the art, the Defendants have offered no evidence of non-infringement and a reasonable jury could have only reached the conclusion that the inserting step is met literally by the Accused Products.

A reasonable jury would have found literal infringement of the Method Claims had they considered the scope of the claim language as properly construed by this Court's Markman Order, and not as narrowly defined by the Defendants' arguments.  Regardless of their current

-38-

disavowals, the Defendants' own written materials admit infringement - materials that were verified by ETG's code expert as being true depictions of how the products performed. The only analysis presented by the Defendants at trial was a comparison of manipulated figures of the Patents-in-suit to the Accused Products - not the properly construed claims. The theories of non-infringement offered by the Defendants were legally and factually untenable in light of this Court's claim construction. Finally, ETG's infringement expert presented the only proper infringement analysis at trial by comparing the detailed features of the Accused Products with each and every limitation of the Method Claims, **as properly construed** by this Court. The only reasonable result is that the Accused Products literally infringe each of Claims 13, 14, and 16 of the '850 Patent.

## V.    Conclusion

For the foregoing reasons and based upon the entirety of the evidence admitted at trial, ETG respectfully requests that the Court grant ETG's motion for judgment as a matter of law as to each of the issues presented above.

Dated: March 27, 2008

/s/ Matthew A. Kaplan
Edmond D. Johnson (# 2257)
Matthew A. Kaplan (# 4956)
PEPPER HAMILTON LLP
Hercules Plaza Suite 5100
1313 Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6500

OF COUNSEL:

*Attorneys for Energy Transportation Group, Inc.*

Marty Steinberg
HUNTON & WILLIAMS LLP
1111 Brickell Avenue
Suite 2500
Miami, Florida  33131
Telephone:  (305) 810-2500

#9479730 v1

Brian M. Buroker
HUNTON & WILLIAMS LLP
1900 K Street, N.W., Suite 1200
Washington, DC 20006-1109
Telephone:  (202) 955-1500

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone:  (804) 788-8788

#9479730 v1

## CERTIFICATE OF SERVICE

I do hereby certify that on the 27th day of March, 2008, I caused a true copy of the

foregoing ***Plaintiff ETG's Memorandum in Support of Its Motion for Judgment As a Matter of***

***Law*** to be electronically filed with the Clerk of the Court using CM/ECF which will send

electronic notification of such filing to all registered participants.


Mary B. Graham (#2256)
MORRIS, NICHOLS, ARSHT &TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
901 New York Ave., N.W.
Washington, DC 20001-4413

*Attorneys for William Demant Holding A/S,
WDH Inc., Oticon A/S, Oticon, Inc.,
Bernafon AG, and Bernafon LLC*

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
MORRIS, NICHOLS, ARSHT &TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19899

William H. Mandir
David J. Cushing
Carl J. Pellegrini
SUGHRUE MION PLC
2100 Pennsylvania Ave., N.W.
Washington, DC 20037

*Attorneys for Widex A/S, Widex Hearing
Aid Co., Inc.*


/s/ Matthew A. Kaplan
    Matthew A. Kaplan (# 4956)

#9479730 v1