Exhibit 13

Page 92

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3                         -   -   -
 4
 5   ENERGY TRANSPORTATION,          :   Civil Action
     INC.,                           :
 6                                   :
               Plaintiff,            :
 7                                   :
          v.                         :
 8                                   :
     WILLIAM DEMANT HOLDINGS A/S,    :
 9   et al.,                         :
                                     :
10             Defendants.           :   No. 05-422 (GMS)
11                         -   -   -
12                  Wilmington, Delaware
                Tuesday, January 22, 2008
13                      8:30 a.m.
                   Second Day of Trial
14                         -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18   APPEARANCES:
19             EDMOND D. JOHNSON, ESQ.
               Pepper Hamilton LLP
20                     -and-
               MARTY STEINBERG, ESQ.,
21             BRIAN M. BUROKER, ESQ., and
               MAYA M. ECKSTEIN, ESQ.
22             Hunton & Williams
               (Washington, D.C.)
23
                                  Counsel for Plaintiff
24
25
     APPEARANCES CONTINUED:
```

```
 1
                  MARY B. GRAHAM, ESQ.
 2                Morris, Nichols, Arsht & Tunnell
                           -and-
 3                JOHN M. ROMARY, ESQ.,
                  GREGORY C. GRAMENOPOULOS, ESQ.,
 4                VINCENT KOVALICK, ESQ.,
                  KAY HILL, ESQ.,
 5                GERSON S. PANITCH, ESQ., and
                  ARTHUR A. SMITH, ESQ.
 6                Finnegan, Henderson, Ford, Farabow & Dunner
                  (Washington, D.C.)
 7
                                      Counsel for
 8                                    Demant Defendants
 9                DONALD E. REID, ESQ.
                  Morris, Nichols, Arsht & Tunnell
10                         -and-
                  WILLIAM H. MANDIR, ESQ.,
11                JOHN SCHERLING, ESQ.,
                  CARL J. PELLEGRINI, ESQ.,
12                BRIAN SHELTON, ESQ., and
                  MATTHEW KAPLAN, ESQ.
13                Sughrue Mion
                  (Washington, D.C.)
14
                                      Counsel for Widex
15                                    Defendants
16                      -  -  -
17
18
19
20
21
22
23
24
25
```

1   written by them, authored by them, put out to the public by

2   them, to promote their products, to sell them to hearing-

3   impaired people.

4           Now, remember, as we just discussed, the

5   technology in the bottom left-hand corner, you will see from

6   the front page of the '850 patent, there's an abstract.  It

7   tells you generally how the system works.  And it

8   essentially says what we just said:  Acoustical feedback is

9   reduced by an electrical feedback path in the hearing aid

10  which is matched in both amplitude and phase to the acoustic

11  feedback path and the two feedback signals being subtracted

12  so as to cancel each other.

13          That's essentially what we just showed you.

14          Now we're showing you one of the defendant's,

15  Widex's description, of their Diva hearing aid.  And you can

16  see it on the screen.  And it says, When the FPS, and that's

17  the feedback path simulator, determines the characteristics

18  of the feedback signal, it will subtract an imitated

19  feedback signal from the incoming signal, thus eliminating

20  the annoying feedback.

21          Yes.  Now, as you can see from that brochure,

22  that language is a description of the '850 patent.

23          Now comes the interesting part.  Apparently,

24  after Widex was sued, and recognizing that that language is

25  an admission that they infringe these patents, you will hear

1   Mr. Nielsen, who's a representative of the Widex company,

2   suddenly testify, no, Widex's own description, their

3   published description of their own product that they sent

4   out was inaccurate.  That's what you are going to hear him

5   say.

6            Now, likewise, the evidence will show that

7   another defendant, one of the Demant companies, Oticon, that

8   brochure which describes one of their hearing aid products,

9   called a Syncro, and you see that on the screen.

10           First, the brochure gives you a written

11  description of the Syncro.  It says dynamic feedback

12  cancellation automatically removes feedback from the

13  sound path through phase cancellation without a reduction in

14  gain.

15           Remember what we talked about with phase.  And

16  just to show you they're using the exact same system, they

17  go on to give you a description on the very next page of

18  exactly what they are doing.  And if you look at the first

19  box, they're a spike with the feedback coming out of the

20  signal.  If you look at the second box, where it says phase

21  cancellation, what is that below the spike?  It's an equal

22  but opposite signal.

23           And then what happens in the third box?  They

24  cancel feedback.

25           So that creation, that depiction, is the

Page 150

1    creation of Dr. Levitt, where you create an equal but

2    opposite signal, and you cancel.

3              And, again, strangely enough, what will you

4    hear?  From an entirely different officer, from an entirely

5    different company, you're going to hear Mr. Christensen from

6    Oticon, when he's faced with this exact language, he's going

7    to say no, it really doesn't do what he we say it does in

8    our own documentation.

9              And then you're going to see the third

10   defendant, which is Bernafon, another Demant company.  And

11   they similarly, for their product, the Symbio XT, they

12   describe their adaptive feedback cancellation, and they say,

13   quote, "Symbio XT advance canceller solves the problem by

14   working on line to detect the presence of feedback and

15   subtract it from the incoming signal."

16             Just like the other two executives, you're going

17   to see Mr. Schaub of Bernafon come up and testify and say,

18   gee, you know, our brochure is wrong.  It really doesn't do

19   that.

20

21

22

23

24

25

1

2

3

4           Take 5.

5

6

7

8           Take 5.

9

10

11          So what you are going to see and hear from three

12  different companies, all taking the same tack now that they

13  have been sued and now claiming that their own data, their

14  own promotional brochures, their own technical data that is

15  used to sell their hearing aids, is inaccurate.  And the

16  evidence will show that there could be only one reason why

17  they take that position, because the descriptions of their

18  documents are admissions that they infringe this technology.

19          Now, the evidence will also show that these

20  defendants were well-aware of Dr. Levitt's patent.  It

21  wasn't something they didn't know about.  As you will

22  remember, there was a letter retaining Dr. Levitt as their

23  expert.  Now, he was retained as their expert because they

24  were relying on his expertise and ingenuity partially

25  because he invented these patents.

1          We're not attacking.  You won't see evidence

2    attacking Dr. Levitt.  What you will see is evidence

3    attacking his patents, not him.  We're not attacking him as

4    a person.  We're saying the invention is not worthy of a

5    patent, and we don't practice it.

6          I -- I would be surprised if some day we don't

7    hire him again as an expert for other reasons and in other

8    things, so please understand that's not what our evidence is

9    going to show.

10          Let me tell you something else that may surprise

11    you.  I think the idea of having -- I shouldn't do it that

12    way.  I will say the evidence will show that the idea of

13    having equal and opposite signal to cancel feedback is a

14    great idea.  Did you hear me?  It's a great idea.  And we

15    use it.  And if some of our witnesses are going to get

16    up here and somehow be -- be seen to say that we don't,

17    they're -- it's just not right.

18          The evidence will show that we have acoustic

19    feedback cancellation, that we have a signal in the feedback

20    path that mimics the feedback signal and cancels it by

21    subtracting.

22          So why are we here today if we're going to admit

23    that we're doing that?  The reason we're here today is

24    because Dr. Levitt, bless him, was not first with that idea.

25    It's like a race.  That's what a patent is like.  It's like

1    argument.

2                Now, let's go to the patents just for a moment.

3    As I said, there is two patents.  And there is two figures.

4    Figure 1 in both patents, Figure 2 in both patents.  Figure

5    1 in both patents has to do with the host controller.

6    Figure 2 in both patents is the hearing aid.  Now, when I

7    first saw this my eyes glazed over.  I can imagine that is

8    what is going to happen to you.

9                What we are going to do is you are going to hear

10   testimony from both sides, Mr. Steinberg's witnesses and our

11   witnesses will come forward and try to explain to you what's

12   going on in this mass of electronics.

13               If I could go to the next picture, please.

14               I am just going to highlight the ideas that I

15   would like you to understand the evidence will show.  The

16   basic idea is that this is down here -- I don't know how I

17   am going to do this without wiggling.  This is where the

18   sound comes in.  This is the speaker.  The sound goes "jeep"

19   (indicating) all the way through here, this amplifier, this

20   red thing is the amplifier and, bam, comes out here.  That

21   is the microphone, there is the speaker.  So the sound comes

22   out here.  It goes in here, "jeep," comes out here.  The

23   whole hearing aid is run by a battery.  It means you can

24   disconnect it from the host controller and go anyplace you

25   want.

1           Some of this sound will come back here.  That is

2      the feedback.  So what do you do?  You hook up a host

3      controller, and you measure that feedback.  You heard Mr.

4      Steinberg said you have to measure phase.  There is the

5      thing that measures the phase.  There is the thing that

6      measures the amplitude.

7           You got a computer down here that takes those

8      measurements and turns them into the numbers that the filter

9      needs.  And you got a thing here, it's called an E PROM.

10     What really it is, it is a memory stick.  If you have a

11     computer today, you have a memory stick, this is an old

12     memory stick.  The memory stick gets stuck in the host

13     controller.  It gets programmed with these coefficients, so

14     you know where to put the fence up.  It gets pulled out of

15     the host controller and gets put into the hearing aid.  And

16     after that happens, you can't change them again or else you

17     go back and then the wearer goes away.

18          That is the evidence of how his system works.

19          Now, Mr. Steinberg was attributing us to wanting

20     this miniaturization theory.  It is really his theory.  What

21     he is trying to say and what you will hear their experts say

22     is we have taken all of this and crunched it down into the

23     size of this (indicating).

24          What you will find, the truth is we don't have

25     anything that measures phase no matter how small it is.  We

1    don't have anything that measures amplitude no matters how

2    small it is.  And we don't have anything that programs a

3    delay line.  We do have a delay line, but it is connected

4    into the process of creating the coefficients by an LMS

5    algorithm.  So ours is non-programmable.  If somebody walked

6    into a doctor's office with this thing (indicating), and

7    said, okay, I want you to provide coefficients to me, I want

8    these coefficients, he will say I can't do it.  I can't get

9    in there.  There is no way to get in there.

10         And ETG's expert will admit and tell you there

11   is no way to get those coefficients in.  Yet he will still

12   call it programmable because he will say, if you push it

13   apart and rip it apart, you can still push them in there

14   somehow.  But you can't.  You can't do it.

15         Next slide.

16         So there is good news and bad news.  The good

17   news is that Dr. Levitt solved an old problem.  The old

18   problem in '85 was, these things took a lot of power.  You

19   had to build a hearing aid with that little battery that

20   would run everything.  And he found a solution to that.  He

21   said, well, what we will do is do some of the stuff with it

22   plugged into the wall and we will do the rest of it with it

23   run by the battery.  That is a good idea.  And if we did

24   that, we probably wouldn't be here today, because we

25   probably -- something would happen.  We would solve the

1   problem of Dr. Levitt.

2          We don't do that.  Why?  The bad news.  As soon

3   as you unplug that hearing aid and you walk around, and the

4   mermaids start jumping around, you are going to get feedback

5   again.  We don't do it and nobody does it.

6          And the words you look for is programmable or

7   programmed.

8          Now, I was trying to figure out, how am I going

9   to explain to people that, having spent as much time as I

10  have studying this, how am I going to explain to them the

11  difference?

12         No analogy is perfect.  It is the one we came up

13  with.  A programmable filter is a little like if you get in

14  your car, you all drive, you have a radio in your car.  You

15  get in your car, there is a radio but it is not your radio.

16  Somebody else put the radio in there.  And it's got one knob

17  on it.  That knob allows you to adjust the channel.  That is

18  programmable.  You can program it and go to whatever channel

19  you want to go to.

20         You go to sleep.  The next day you wake up and

21  somebody else has been tinkering with your car.  Now you

22  don't have that radio anymore.  You have a radio with no

23  knob.  What's this?  The radio with no knob.  What am I

24  going to do with it?  You drive around and find out it

25  goes to the best station.  I drive to Newark, it's a

1    side-by-side view.  What this shows on the left-hand side is

2    Dr. Levitt's patent, his programming approach.  And on the

3    right-hand side is how modern-day hearing aids, the hearing

4    aids that the two defendants in this case actually make and

5    use and people wear.

6            Now, on the left side, the programming approach,

7    as Mr. Romary had mentioned, the coefficients necessary to

8    cancel feedback are programmed by this audiologist.  On the

9    audiologist's table, we see, there is a host controller and

10   there is a computer, all external to the hearing aid.

11           What happens is, the patient comes into the

12   audiologist's office.  They do some testing.  And they

13   figure out, okay, what's the best way to cancel this

14   feedback?  They send these coefficients to the hearing aid.

15   And that's it.  They can't change.

16           And at that point in time when they are in this

17   audiologist's office, they are trying to do the best they

18   can to measure the feedback and figure out how you should

19   cancel it.  And they create these coefficients or settings,

20   really, that will cancel the feedback.

21           That might work if the patient doesn't leave.

22   That is the problem.  Once he goes out in the real world,

23   and wants to do day-to-day activities, like chewing, or

24   yawning, or getting on the phone or anything that is

25   different than the feedback condition that exists at that

1    audiologist's office, because his hearing aid is programmed

2    with coefficients that can't change, if you have a different

3    feedback condition, it is just not going to work very well.

4              Right-hand side.

5              Again, that's the Widex and the Demant

6    modern-day hearing aids.  And the modern-day hearing aids

7    are adaptive.  They are adaptive hearing aids, meaning that

8    they actually figure out, as you move around, as you have

9    the hearing aid, what is the feedback condition existing

10   right at this point in time?  Figure it out, and cancel it,

11   on the fly, without going back to the audiologist's office.

12   Does it all by itself.  It generates its own coefficients.

13   The coefficients aren't generated in this host controller

14   and this computer that is sitting on the audiologist's

15   table.

16             So we never looked at Dr. Levitt's patent in the

17   sense of ever comparing his patent to modern-day hearing aid

18   companies because this would have been the comparison.

19   There is no comparison.

20             So these patents came out of the blue, and

21   certainly no one had told us that we infringe prior to this

22   lawsuit.

23             Now, I would like to just talk a little bit

24   about some of the witnesses that you are going to hear from.

25   One person you are going to hear from is Mr. Soren

1    those passages that were cited here to you this morning were

2    directed to the hearing impairment correction circuit, not

3    the feedback correction circuit.

4              So every one of those is directed to something

5    that is simply not the subject matter of this lawsuit.  The

6    subject matter of this lawsuit is feedback cancellation

7    filters, not the hearing impairment, but yet what you will

8    hear, what Dr. Morley will tell you, is that all those sites

9    have to do with the hearing impairment filter.

10             Now, there's another area that I'd like to talk

11    to you about.  It has to do with a document that ETG

12    received back in 2002.  I mentioned that Dr. Morley, Ph.D.

13    in electrical engineering, will give testimony to you

14    explaining why the Widex LMS adaptive filters do not

15    infringe.

16             Demant's expert is a guy by the name of Dr.

17    Anderson.  He will also say that the LMS filter that Demant

18    uses does not infringe the patents.

19             So we have two experiments coming to the same

20    conclusion, each of them from the defendants.

21             There's another technical expert who also

22    has a Ph.D. in electrical engineering and who is also

23    of the opinion that the two patents in this lawsuit do not

24    cover continuously adaptive filters, such as defendants'

25    products.

1          Now, this third expert is not someone whose

2    going to testify on behalf of Widex.  It's not someone whose

3    going to testify on behalf of Demant.  This third expert was

4    an expert that was retained by ETG, the plaintiff in this

5    case.

6          This third exert was retained by ETG about three

7    years before this lawsuit in 2002.  It started in 2005.

8    Three years before, and they were -- ETG asked them to

9    evaluate the patent.  This expert was a person by the name

10   of Dr. Dowling, Dr. Eric Dowling, and he was acting for a

11   company called EKMS.  EKMS was a company that specializes in

12   licensing and evaluating patents.

13          In 2002, ETG has these two Audimax patents

14   that they owned.  They went to EKMS and asked them to take a

15   look at them, evaluate them, and see if they would cover

16   modern hearing aid technology.  And specifically, whether

17   they would cover the continuously adaptive LMS filter that

18   all of the defendants use.

19          Now, this person, Dr. Dowling, he -- he was a --

20   an electrical engineer and Ph.D.  He was also a specialist

21   in digital signal processing, which is exactly the

22   technology that is done in modern day hearing aids.  And he

23   was the person that EKMS was going to use to do this

24   evaluation.

25          Now, I should say that this was not something

1    that ETG or Audimax went into very lightly.  They paid EKMS

2    $50,000 to do the evaluation.  They also gave EKMS an

3    incentive.  The incentive was that they got a percentage cut

4    of any money that they could get, either through licensing

5    or if they sold the patent.

6              So there was an incentive for EKMS to come up

7    with a conclusion that, hey, if we can, you know -- if these

8    patents cover the technology, we could go out and we would

9    get a percentage of any money that came in.

10             Dr. Dowling studied the patents, spoke -- who

11   did he speak with?  Dr. Levitt about his patents extensively

12   as part of his evaluation of the patents.  And he concluded

13   that the modern continuously adaptive filters specifically

14   used by Widex and specifically used by Demant do not

15   infringe Dr. Levitt's patents.

16             Let's take a look at that report.

17             This is Page 1 of the report.  The report is

18   titled up in the right-hand corner, ETG Summary Report.  And

19   this, by the way, is in your notebook, the whole report,

20   under DX-1610.

21             This is Page 1, and I'm going to just read a

22   portion of Page 1.  Eric Dowling, that's the Ph.D., the EKMS

23   expert -- I'm sorry.  It's not in your notebook.  Took a

24   look at the patent while EKMS arranged a second call with

25   Harry Levitt for early August.

1                This report was prepared in September -- on

2    September 16, 2002.

3                Over the course of two calls, we worked through

4    the language of the patent -- they are referring to the '850

5    patent -- and found that the body of the patent included

6    language adverse to an interpretation of the claims

7    involving a continuously adaptive approach.

8                So here we have three years before ETG files

9    this lawsuit going to EKMS, a specialist in evaluating

10   patents.  They hire a Ph.D. in exactly the technology

11   necessary and he concludes that Widex and Oticon's

12   continuously adaptive filters are not covered.

13               Go to Page 2.

14               We talked about the '850 patent.  On Page 2,

15   there's a discussion, well, the '850 doesn't cover what

16   these continuously adaptive filters.  How about the '749

17   patent?  What we see is EKMS concludes the '749 patent also

18   is a problem.  It doesn't cover it.  It talks about the main

19   child of the '850.

20               As Mr. Romary said, these patents are

21   related.  There's the '749 patent.  And what EKMS says is,

22   '749 seems to suffer from the same problem, specifying in

23   the description of the preferred embodiment, that test

24   sounds shall be provided as necessary rather than all of the

25   time as would occur with a continuously adaptive system.

1            Go to the next page.

2            This is Page 3.  And there are two discussions

3    here about two filters.  Widex filters, the exact one

4    that is being asserted is infringed and Oticon's filter.

5    Again, exactly the same one that is being accused of

6    infringement.

7            They look at this and they say, Widex -- Widex

8    is doing the continuously adaptive immediate.  They're not

9    covered.

10           Next page.

11           Oticon, similarly, they're also doing the

12   continuously adaptive, and both of these filters and what

13   they're talking about is the continuously adaptive approach

14   for purposes of canceling feedback.  And this is a report

15   that was paid for by ETG that concluded exactly what the two

16   experts and the defendants are going to say, that Dr.

17   Levitt's programmable filter, it's programmed, is very

18   different from what modern day hearing aid companies use,

19   which is a continuously adaptive approach.

20           Now, Mr. Romary already talked about some of the

21   prior systems.  He talked about Dr. Graupe.  He talked about

22   Dr. Egolf and Mr. Weaver and Dr. Best as being all before

23   Dr. Levitt's patent.  So I won't go into that.  I just want

24   to show you a graphic that I think kind of shows the

25   position of the defendants.

Page 215

1           The adaptive approach, which was done by Dr.
2   Graupe, Egolf, Mr. Weaver and Dr. Best, that is the approach
3   that the defendants ultimately adopted, because that is the
4   way it works.

5           Dr. Levitt was off in a different direction.  He
6   wasn't going to do adaptive.  He was going to do this
7   programmed, and for a lot of reasons they talked about,
8   there were power consumption and a number -- for whatever
9   reason, that was his approach.

10          Dr. Graupe and Dr. Egolf, Mr. Weaver and Dr.
11  Best, they knew what had to be done.  You had to do an
12  adaptive approach for it to work, and that's what they did,
13  and that is the genesis of modern day hearing aid
14  technology.

15          Now, Dr. Levitt was aware of this difference
16  between his programmed filter and the industries is
17  continuously adaptive filter.  That is why, that is why he
18  never approached anyone else suggesting that they were using
19  his technology.

20          When ETG sought out EKMS, and specifically EKMS
21  hired Dr. Dowling to do the analysis, they came to exactly
22  the same conclusion you're going to hear from defendants'
23  experts, Dr. Morley and Oticon's Dr. Anderson:  That ETG's
24  20-year old patents do not cover defendants' modern day
25  technology.

Levitt - direct

Page 274

1    be changed.

2           With a digital system, it was very easy to

3    change both amplitude and phase at the same time and

4    independently of each other.  And that was the trick that

5    enabled us to cancel feedback.

6    Q.    Doctor, I had a little difficult time understanding

7    when I first heard it.  What does the word subtract mean

8    when you look at this diagram?

9    A.    You take two signals, I mean, it's addition.  If you

10   have a signal that has a value of five, and it's exactly the

11   same instance of time, another signal has a value of five,

12   and you are subtracting, you are ending up with a signal of

13   zero, that is no signal.

14   Q.    Doctor, would you please turn to PX-562.

15   A.    Yes, I have it.

16   Q.    PX-562 purports to be a December 26th, 1996 letter

17   from the Sughrue law firm hiring you as an expert.  Did you

18   receive that letter?

19   A.    Yes, I did.

20   Q.    Who is cc'd on that letter?

21   A.    Mr. Soren Westermann.

22   Q.    Who is Soren Westermann?

23   A.    He is the head, CEO, I believe, of Widex and also

24   managing, senior person HIMPP organization.

25   Q.    You mentioned HIMPP.  What is HIMPP?

Levitt - direct

Page 275

1    A.    HIMPP is an industry-based organization designed

2    primarily to protect the interests of the companies that

3    constitute HIMPP.

4                   MR. ROMARY:  Objection.  Hearsay.  I would like

5    the answer struck.  He doesn't have personal knowledge of

6    that.

7                   THE COURT:  Do you really want to advance that

8    objection?  I will sustain it.

9                   You may ask some foundational questions, Mr.

10   Steinberg, if you wish.

11   BY MR. STEINBERG:

12   Q.    How long have you been in the hearing aid industry?

13   A.    Well, I have been doing research in hearing aids since

14   1969, '70.

15   Q.    How long have you consulted for hearing aid

16   manufacturers?

17   A.    About 30 years, '70 to 2008, actually.

18   Q.    Have you been on their technology panels and so forth?

19   A.    Yes.

20   Q.    Are you familiar with an organization known as HIMPP?

21   A.    I am.

22   Q.    Do you know whether or not hearing aid manufacturers

23   belong to HIMPP?

24   A.    The big hearing aid manufacturers belong to HIMPP.

25                  THE COURT:  The Court is satisfied.

Levitt - direct

Page 276

1              MR. STEINBERG:  Thank you, Your Honor.

2    BY MR. STEINBERG:

3    Q.    The Sughrue law firm that hired you, who were they

4    hiring you on behalf of?

5    A.    They were hiring me on behalf of HIMPP.

6    Q.    Do Widex and Demant belong to HIMPP?

7    A.    Yes, they do.

8    Q.    How did this assignment come up?

9    A.    Well, they approached me because there was a patent

10   they wanted me to evaluate for them.

11   Q.    When they approached you, did they ask you for your

12   resume?

13   A.    Yes, they did.

14   Q.    Did you provide your resume?

15   A.    Yes, I did.

16   Q.    And if you turn to a composite exhibit, which is

17   PX-598, that's a composite exhibit which is another letter

18   to you from the same law firm, and it attaches some

19   documents; correct?

20   A.    Yes.

21   Q.    And is your resume attached?

22   A.    Yes.

23   Q.    And did you provide these lawyers for the HIMPP

24   organization and these defendants with your resume?

25   A.    Yes, I did.

Levitt - direct

Page 277

1    Q.    Does your resume list your patents?

2    A.    Yes.

3    Q.    Okay.  And I direct your attention to Page 3 of your

4    resume.  Are those the two patents at issue in this case?

5    At the very bottom?

6    A.    Yes, those are my patents.

7    Q.    Were you asked to discuss your experience and

8    background to enable you to undertake this assignment with

9    the lawyers for HIMPP and Widex and Demant?

10   A.    Yes.

11   Q.    Now, if you turn back to 562, the first letter, where

12   they hired you, that's the 1996 letter, and if you look at

13   Page 2, in the third paragraph --

14   A.    596?

15   Q.    No.  562, the previous letter to you, dated December

16   '96.

17   A.    Yes.

18   Q.    And you look on the second page --

19   A.    Yes?

20   Q.    -- the first full paragraph, it says, in pertinent

21   part, The patentee filed a response, copy enclosed, in which

22   they submitted a declaration by a Nobel prize recipient

23   opining that the invention claimed in the Anderson '806

24   patent would not have been obvious in light of the prior

25   art.

Levitt - direct

Page 278

1          Do you see that sentence?

2    A.    I see it.

3    Q.    Did anyone discuss with you your qualifications and

4    expertise compared to this Nobel prize winners?

5    A.    Well, I was actually very complimented that they

6    considered me as somebody who, as they said here, had much

7    better credentials than a Nobel prize winner on this

8    particular issue.

9    Q.    Now, towards the end of the letter, they mention

10   sending you a declaration for your signature.

11         Did that occur?

12   A.    Yes.

13   Q.    Okay.  Now, if you turn back over to 598, the

14   composite exhibit, attached there is one of the documents,

15   your declaration.

16   A.    Yes.

17   Q.    And is one of the documents also a consulting

18   arrangement whereby these defendants and HIMPP hired you?

19   A.    Yes.

20   Q.    Now, is the second letter also c.c.'d to Mr. Sorenson?

21   Mr. Westerman.  Excuse me.

22   A.    Yes.

23   Q.    Now, does the second letter, dated July of 1997 -- it

24   mentions yet another project they wanted to retain you on as

25   an expert.  Did that occur?

Levitt - direct

Page 279

1    A.    Yes, it did.

2    Q.    Do you remember what that project was?

3    A.    It had to do with a multi-channel hearing aid, a

4    patent on a multi-channel hearing aid.

5    Q.    Now, let's look at your declaration, which is one of

6    the items attached to the second letter, Exhibit PX-598, and

7    it's entitled, Declaration of Harry Levitt in Support of

8    Request for Re-Examination of U.S. patent, and I will just

9    use the last three numbers, '806.

10             Do you see that?

11   A.    Yes.

12   Q.    Do you recognize that document?

13   A.    Yes, I do.

14   Q.    Okay.  Who provided that document to you?

15   A.    The lawyers at HIMPP.

16   Q.    Okay.  And did you execute that document for the

17   Patent Office?

18   A.    I reviewed it I edited it and I signed it.

19   Q.    Now, at the time you signed this document, 1997, how

20   long had your patents been in existence?

21   A.    About nine years, at least.

22   Q.    At the time you signed this document in 1997, had any

23   of the infringing patents -- excuse me -- infringing devices

24   been sold on the market?

25   A.    No.  They -- they weren't manufacturing them at the

Page 280

1   time.

2   Q.    In terms of issues that you were asked to address in

3   your declaration, can you just give us a sort of brief

4   example of the kinds of issues you were asked to address?

5   A.    Well, whether the prior art had -- if there was

6   sufficient prior -- prior art prior to this patent, and how

7   it had been implemented and that type of thing.

8   Q.    And are there portions of this declaration that deal

9   with your work on the adaptive nature of filters?  For

10  instance, if you look at Page 12, Paragraph 32D and E.

11  A.    Oh, yes.  Yes.  Of course.

12  Q.    Now, when the lawyers for Widex, Demant and HIMPP

13  asked you to sign this declaration and serve as their

14  expert, did any of them ever suggest to you that you were

15  not the inventor of feedback cancellation covered in the

16  patents on your resume?

17  A.    No.

18  Q.    Did they ever suggest to you that there was prior art

19  that invalidated your patents in any way?

20  A.    No.

21  Q.    Did they ever suggest to you that there were any

22  publications written that made your patents obvious?

23  A.    No.

24  Q.    Did they ever suggest to you that the feedback

25  cancellation mechanism in your patents wasn't adaptive?

Levitt - direct

Page 281

1    A.    No.

2    Q.    Did they ever suggest to you that there was anything

3    at all whatsoever wrong with your patents when they hired

4    you?

5    A.    No.

6    Q.    Now, you told us that you had two assignments.  One

7    was this assignment and another was an assignment regarding

8    a patent, I think you said a multi-memory hearing aid.

9          Have you served as an expert in other patent

10   cases for hearing aid manufacturers?

11   A.    Yes.  Yes, I have.

12   Q.    Have you ever served on hearing aid manufacturers'

13   scientific boards?

14   A.    Yes.

15   Q.    Have you served as an expert on hearing aids and their

16   features for the United States Government?

17   A.    Yes, I have.

18         MR. STEINBERG:  May I just have a moment, your

19   Honor?

20         THE COURT:  Yes.

21         (Pause.)

22         MR. STEINBERG:  Your Honor, may we approach for

23   just a moment?

24         (Side bar conference held out of the hearing of

25   the jury as follows.)

Page 351

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
                          -   -   -
 4
 5   ENERGY TRANSPORTATION,          :   Civil Action
     INC.,                          :
 6                                  :
              Plaintiff,            :
 7                                  :
         v.                         :
 8                                  :
     WILLIAM DEMANT HOLDINGS A/S,    :
 9   et al.,                        :
                                    :
10            Defendants.           :   No. 05-422 (GMS)
11                        -   -   -
12              Wilmington, Delaware
              Wednesday, January 23, 2008
13                  8:30 a.m.
              Third Day of Trial
14
                          -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18   APPEARANCES:
19              EDMOND D. JOHNSON, ESQ.
              Pepper Hamilton LLP
20                  -and-
              MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
              MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
              (Washington, D.C.)
23
                              Counsel for Plaintiff
24
25
```

Page 352

```
 1   APPEARANCES CONTINUED:
 2              MARY B. GRAHAM, ESQ.
                Morris, Nichols, Arsht & Tunnell
 3                   -and-
                JOHN M. ROMARY, ESQ.,
 4              GREGORY C. GRAMENOPOULOS, ESQ.,
                VINCENT KOVALICK, ESQ.,
 5              KAY HILL, ESQ.,
                GERSON S. PANITCH, ESQ., and
 6              ARTHUR A. SMITH, ESQ.
                Finnegan, Henderson, Ford, Farabow & Dunner
 7              (Washington, D.C.)
 8                                      Counsel for
                                        Demant Defendants
 9
                DONALD E. REID, ESQ.
10              Morris, Nichols, Arsht & Tunnell
                     -and-
11              WILLIAM H. MANDIR, ESQ.,
                JOHN SCHERLING, ESQ.,
12              CARL J. PELLEGRINI, ESQ.,
                BRIAN SHELTON, ESQ.,
13              MATTHEW KAPLAN, ESQ., and
                J. WARREN LYTLE, JR., ESQ.
14              Sughrue Mion
                (Washington, D.C.)
15
                                        Counsel for Widex
16                                      Defendants
17                   -  -  -
18
19
20
21
22
23
24
25
```

T. Westermann - designations

Page 400

1    possible.

2            "Question:  Okay.

3            "Answer:  Market from market varies.  I've tried

4    many years to have average sales prices all over the world,

5    same, but forget it.  So it is from market to market.

6            "Question:  Okay.  How do you set the prices?

7            "Answer:  We set what the market can bear, and

8    that means we are looking at competition, who are out there

9    and what type of hearing aid is this and which category,

10   price category does it fall in, and how much can we charge,

11   and then we charge as much as we can.  That's not always

12   enough.

13           "Question:  When you're setting the price of a

14   hearing aid, do you look at what the cost is to manufacture

15   that particular hearing aid?

16           "Answer:  No.

17           "Question:  So the cost is basically irrelevant

18   in your analysis.  It's all market-driven?

19           "Answer:  Yes.

20           "Question:  Okay.  Widex USA company may have

21   sold the product for a different price.  Is that right?  In

22   other words, if they -- if you're -- taking a hypothetical,

23   if in week 20 the USA company sold all 1,000 of the Bravo

24   CIC units --

25           "Answer:  Mm-hmm.

Chen - cross

Page 449

1   80 percent of Audimax at that time.  Is that right?

2   A.    Yes.

3   Q.    And today you own a hundred percent of ETG?

4   A.    Yes.

5   Q.    I think I heard you say, Mr. Chen, that you personally

6   are not somebody who has a technical background.  Is that

7   correct?

8   A.    Correct.

9   Q.    And you are not someone qualified to talk about the

10  patents that are involved in this lawsuit, are you?

11  A.    In the technical matters relating to these patents,

12  no.

13  Q.    That is what I meant, I am sorry.

14  A.    No.

15  Q.    You mentioned, I believe, that in the 2001-2002 time

16  frame, you became interested in, you and your brother became

17  interested in possibly licensing or maybe selling your

18  patents.  Is that correct?

19  A.    Yes.

20  Q.    And you retained a company by the name of EKMS.

21  Correct?

22  A.    Correct.

23  Q.    And were you the person who retained EKMS?

24  A.    I contacted them and initiated discussions, and then

25  handed off the -- I don't remember whether I did the

Chen - cross

Page 450

1    negotiation of the final -- of whatever was finally agreed

2    or whether one of our other colleagues did that.  But I

3    initiated the engagement of EKMS, the discussions.

4    Q.    Now, you looked at a -- I think Ms. Eckstein gave you

5    a document, let me go get it.  It should be in your

6    notebook, Mr. Chen.  This is a Document DX-1642.  Do you

7    have that?

8    A.    1642, yes.

9    Q.    Let's put that up.

10          And this is a document you testified about.  Let

11   me ask you this:  When was the first time you saw this

12   document?

13   A.    The first time I saw this document was recently.

14   Q.    You had not seen it before?

15   A.    I don't recall seeing it before.  It may have crossed

16   my desk.  But I don't recall seeing it before.

17   Q.    So this was something that the lawyers gave you to

18   look at.  Is that right?

19   A.    That's correct.

20   Q.    And this is a document -- do you know who it's from?

21   A.    Well, by reading it, it looks like it's from somebody

22   named -- whose Internet address is DSPEric.

23   Q.    Do you know who that is?

24   A.    I think it's the expert, technical expert that EKMS

25   was working with at the time.

Chen - cross

Page 451

1    Q.    Were you -- Dr. Dowling, is that who you are thinking

2    about?

3    A.    That was the name of the expert, as far as I am aware.

4    Q.    How did you know that Dr. Dowling was the expert?

5    A.    I was informed, and it's also in other documents that

6    have been referred to earlier.

7    Q.    Informed by whom?

8    A.    My lawyers and -- I may have been informed, but have

9    forgotten, from any of the documents that were shown to me

10   at that time when EKMS was hired, because I remember that

11   they were engaging a technical expert and had mentioned the

12   names to our people.

13   Q.    Okay.  Now, this document, this e-mail is directed to

14   Mr. John Boddie.  You know who that is, don't you?

15   A.    I don't remember.

16   Q.    You don't understand Boddie works for EKMS?

17   A.    Yes.

18   Q.    You do understand that?

19   A.    Yes.

20   Q.    Now, I think I testified that this was an e-mail  that

21   in your opinion gave a different interpretation to   the

22   document we saw later, DX-1610.  Is that a fair

23   characterization of your testimony?

24   A.    I guess I would have to disagree with you.  When you

25   say this is a document which gives a different

Chen - cross

Page 452

1    interpretation, to me, it's a document which would aide in

2    understanding the entirety of the other document.

3    Q.    Oh, okay.  I'm sorry.  So, this document gives clarity

4    to DX-16 -- the document that we saw called the ETG summary

5    report.  Is that right, Mr. Chen?

6    A.    I would say this document helps one try to understand

7    the other document, and it makes very clear the position of

8    the technical expert.

9    Q.    Oh, okay.  Now, you saw this document, DX-1642.  You

10   saw DX-1610, the ETG report; correct?

11   A.    Do you mind if I just flip back?  Which one is it?

12   Q.    1610.

13   A.    Okay.  Yes.

14   Q.    You saw that document; right?

15   A.    Yes, correct.

16   Q.    And who gave you that document, DX-1610?

17   A.    You have just given it to me now.

18   Q.    No, I mean when you testified.  When did you see it

19   first?

20   A.    I don't know.  Certainly, my knowledge of it was

21   refreshed when I was preparing for this trial.  I don't

22   recall whether I saw this or a draft of this or if this is a

23   draft or whatever in some time six years ago or five years

24   ago, whenever.

25   Q.    So this summary report, the ETG summary report that

Chen - cross

1    EKMS prepared, you are not sure whether you saw it before

2    this lawsuit?

3    A.    I don't remember.

4    Q.    Did you know the substance of this report before you

5    filed this lawsuit?

6    A.    I knew that, I knew that EKMS had contacted people and

7    that nobody wanted to license and then I decided to go and

8    do something, which is to litigate.

9    Q.    Did you know the substance of this report prior to

10   this lawsuit?

11   A.    I may have known the substance of this but I don't

12   remember, but -- fine, if I answered your question.  Sorry.

13   Q.    You remember that deposition I spoke about that was on

14   July 31, 2007?

15   A.    Correct.

16   Q.    Now, I asked you at that time if you were aware of the

17   substance of this ETG -- this EKMS report.  Do you remember

18   that?

19   A.    I remember vaguely that we may have had some

20   discussion along those lines.

21   Q.    Now, you were under oath back in your deposition just

22   like you are under oath today; correct?

23   A.    Yes.

24   Q.    You understand that?

25   A.    Correct.

Chen - cross

Page 454

1    Q.    Now, didn't you tell me that?

2             THE COURT:  Did you have a copy of the

3    deposition?

4             MR. MANDIR:  Yes, Your Honor.

5             Would you like a copy of the deposition?

6             THE COURT:  I would like you to give it to him.

7             MR. MANDIR:  Okay.

8             THE COURT:  Counsel, are you aware, do you have

9    a copy of the deposition?

10            MS. ECKSTEIN:  I do have a copy.

11            THE COURT:  Could you make a specific reference

12   to page and line?

13            MR. MANDIR:  I'm going to, Your Honor.  Thank

14   you.

15   BY MR. MANDIR:

16   Q.    At that deposition, I asked you, didn't I, whether or

17   not you were aware of the substance of it?

18   A.    Could you refresh any memory?

19   Q.    Yes, I will do that.

20            MS. ECKSTEIN:  Your Honor, could we have page

21   and line number?

22            THE COURT:  Could we have a reference to the

23   page and line?  And are you intending to provide the witness

24   with a copy?

25            MR. MANDIR:  Yes, Your Honor.

Chen - cross

1          THE COURT:  Well, let's do that first before you

2    ask the question.

3          MR. MANDIR:  Well, what I can do, Your Honor, is

4    actually just play that, the tape.

5          THE COURT:  Okay.

6          THE WITNESS:  Excuse me.  Do you mind if I take

7    a cough drop?

8          MR. MANDIR:  Of course.

9          Just one moment, Your Honor.

10         (Pause.)

11         MR. MANDIR:  Can you put up 126, two through

12   five, please?

13   BY MR. MANDIR:

14   Q.          "Question:  But you were made aware of the

15   substance of the EKMS report; correct?

16         "Answer:  I generally would have been aware of

17   the substance of the report.

18         Do you remember making that testimony, Mr. Chen?

19   A.    If that is what your record is, then I must have said

20   that, yes.

21         Thank you.

22   Q.    Okay.  Let's go back to this document, DX-1642,

23   please.

24   A.    Okay.

25   Q.    Okay.  Now, my understanding is you believe that 1642,

Chen - cross

Page 456

1    which was provided by your attorneys, gives clarity to

2    DX-1610 which is the EKMS report; correct?

3    A.    I think that it expresses the opinion of a technical

4    expert.  I would have to look very closely to see whether I

5    could answer your question exactly.

6    Q.    Okay.  But as far as you know, it gives clarity.  The

7    documents that you have received; is that correct?

8    A.    It helps me, if you ask me now how to interpret the

9    two, taking the two documents together, I would have an

10   interpretation, yes.

11   Q.    Did you look at any other documents concerning the

12   possible interpretation of DX-1610, the EKMS report besides

13   this DX-1642, the e-mail from Dr. Dowling?

14   A.    I'm trying to think what I have seen in the course of

15   the pretrial preparation and so forth, and before.  I may

16   have seen other things.  I can't recall immediately the

17   specific documents.

18   Q.    Let me put up a new document.  It's DX-1623.

19          Can we go to the second page?  And blow up the

20   bottom, please.

21          And I'm going to refer you to the second page of

22   that two paged document, Mr. Chen.

23   A.    So on the back of the copy you have of the first.

24   Q.    It should be exactly as you see on the screen.

25   A.    Okay.

Chen - cross

1    Q.    Okay.  Now, you have remember that DX-1642, the e-mail

2    from Dr. Dowling, that was dated in July of 2002; correct?

3    A.    Okay.

4    Q.    Now, we have a document in September of 2002.  That is

5    after July of 2002; correct?

6    A.    Uh-huh.

7    Q.    Okay.  Now this is an e-mail from a John Boddie which

8    we saw was the person in the other e-mail; correct?

9    A.    Uh-huh.

10   Q.    And he addressed this to a Mr. Pitonyak.  Who is

11   Mr. Pitonyak?

12   A.    Mike Pitonyak is a gentleman who has run one of our

13   companies Heat-Timer for many years and he has also at

14   various times helped manage other of our various

15   enterprises.

16   Q.    So Mr. Pitonyak works for you?

17   A.    Today, no.

18   Q.    But back at this time?

19   A.    Yes.

20   Q.    Okay.  Now, let's see what this e-mail says.  It says:

21              Mr. Pitonyak,

22              Eric Dowling (our expert), Harry Levitt and I

23   have spent the last three weeks taking a much closer look at

24   the Audimax patents with a focus on the '850 patent.  This

25   exercise has had some mixed results which we will be