Chen - cross

Page 458

1    reporting on late next week.  In the meantime, we will have

2    a much clearer picture of those digital hearing aid features

3    required to constitute obvious infringement and have begun

4    looking at ReSound, Oticon, Widex, Siemens and others to see

5    whether these features do, indeed, exist in any of their

6    hearing aid products.

7              Have you seen this document before today,

8    Mr. Chen?

9    A.    I may have.  I don't recall.

10   Q.    The attorneys didn't give you this document to look at

11   before you testified?

12   A.    They gave me a lot of documents to look at, sir.

13   Q.    But you can't remember them giving you this document?

14   A.    I don't remember, one way or the other.  But if you

15   are showing it to me, that's fine.

16   Q.    And this e-mail is after the July document that you

17   testified about, isn't it?

18   A.    Correct.

19   Q.    Okay.  Can we go up?

20             Okay.  So now we have this e-mail on September

21   12th that we just read to Mr. Pitonyak.  Mr. Pitonyak writes

22   back two hours later and says, John, to Mr. Boddie, John

23   Boddie, we would like to get a written report on the

24   accomplishments to date, the direction we are moving and

25   your conclusions to date.  We have not had much feedback

Chen - cross

Page 459

1    beyond your e-mail below.

2              And the e-mail below is the one we just read.

3              Have you seen that E mile from Mr. Pitonyak?

4    A.    I may have, but ...

5    Q.    Okay.  Next page, please.  Page up.

6              Okay.  Then, bottom one, please.

7              Mr. Boddie writes back the next day, Friday the

8    13th, and says:  Mr. Pitonyak, I'll send a report on Monday.

9              Okay.  Next e-mail.

10             Mr. Pitonyak, who seems to answer his e-mail

11   very regularly a couple hours later says:  Thanks, Mike.

12             And do you see the cc. there?

13   A.    Yes.

14   Q.    Who is that cc.?

15   A.    Me.

16   Q.    Okay.  Do you remember getting this?

17   A.    I don't remember it but it was addressed to me.

18   Q.    And this was the e-mail that occurred just prior to

19   the EKMS report; correct?

20   A.    What was the date of the EKMS report?

21   Q.    I believe it's September 16, 2002.

22   A.    Okay.

23   Q.    The Monday after that.

24             MS. ECKSTEIN:  Objection, Your Honor.  There is

25   nothing on the report, itself suggesting the date.

Chen - cross

Page 460

1          THE COURT:  Did you say "I believe?"

2          MR. MANDIR:  This says it's coming on the 16th.

3          THE COURT:  Who cares what you believe, counsel.

4          MR. MANDIR:  Okay.

5          THE COURT:  Sustained.

6    BY MR. MANDIR:

7    Q.    But this e-mail indicates a report is coming on

8    Monday; right?

9    A.    Apparently.

10   Q.    And this EKMS report, do you understand this to come

11   after this?

12   A.    I don't know when -- are you referring to the exhibit

13   you asked me to look at?

14   Q.    DX-1610.

15   A.    The one that --

16   Q.    That's the ETC summary report.

17   A.    I don't know when that was sent or received and I

18   don't know whether it was the final report.

19   Q.    But you know it was, it was in the September time

20   frame, don't you, from just looking at the document?

21   A.    All I could tell from re-reading the document was that

22   it was probably written some time after early August but --

23   or late August, but that is all I could tell.

24   Q.    Okay.  And this e-mail of September 13th is referring

25   to a report from EKMS to be sent; correct?

Chen - cross

Page 461

1    A.    They're referring to some report.  What kind of

2    report, I have no idea.

3    Q.    Okay.  So now you testified about a document July

4    24th, 2002 that indicated that Mr., Dr. Dowling had some

5    conclusions about the '850 patent; correct?  About whether

6    it was continuously adaptive or not.  That is what you

7    testified about.

8    A.    Yes, I just said that.

9    Q.    And then you didn't testify about this document that

10   we see where EKMS says that we've looked a lot closer at

11   this patent and we've gotten Harry Levitt involved and we

12   have some mixed results to tell you about; correct?

13   A.    Could you repeat the question again?

14   Q.    Sure.  You didn't talk about this e-mail of September

15   12th which indicates that Dr. Dowling took a much closer

16   look at the patents and that he got Dr. Levitt involved and

17   had some mixed results to tell you about.  You didn't look

18   at this document, did you?

19   A.    I'm sorry.  You asked me two questions.  One, I didn't

20   mention this and then you said I didn't look at it, so ...

21   Q.    You testified, Mr. Chen, that you thought that the

22   earlier July e-mail clarified what was really meant in this

23   ETG, this EKMS report; right?

24   A.    I think, if I recall what I said a few minutes ago, I

25   said that, to me, it was, the July 24th clearly expressed

Chen - cross

Page 462

1    what the expert, Mr. Dowling thought, and it would help me

2    interpret or understand more the wider implications of what

3    EKMS was saying in the document that was entitled the

4    summary report.

5    Q.    Do you think this document September 12th, do you

6    think this e-mail from Mr. Boddie, do you think that would

7    help clarify the EKMS report?

8    A.    The problem is that this just said the exercise had

9    some mixed results, so I don't know what the mixed results

10   are.  And I don't know mixed results in whose eyes because

11   it talks about three people talking, and so I don't know

12   whose opinion is being reflected and about what.  So, to me,

13   it's just sort of a mystery.

14   Q.    Well, it says that Eric Dowling, Harry Levitt and I --

15   being Mr. Boddie -- spent the last three weeks taking a much

16   closer look at the Audimax patent, particularly the '850,

17   doesn't it?

18   A.    Correct.

19   Q.    And it also says that this exercise has had some mixed

20   results which we will be reporting on late next week.

21         So isn't it your understanding that based on

22   those three people and looking at it, there is some

23   conclusion that has come about?

24   A.    It's not clear to me whether they were agreeing with

25   each other or whether they had different opinions which

1    would be also a kind of mixed result.  Same as when I have a

2    discussion with somebody, it's fair to say we talked about

3    something together.  It doesn't mean that we agreed.

4    Q.    When you testified, why did you talk about this

5    document?  It was after the July document that you did talk

6    about.

7    A.    First of all, I wasn't asked to talk about this

8    document in the earlier question.  You are asking me about

9    it now so I'm answering.

10   Q.    So you were only asked to talk about the July document

11   and then the EKMS report.  That is all you were asked to

12   talk about.

13   A.    That is my recollection of what I was asked a few

14   minutes ago.

15   Q.    Let's look at DX-1610.  Let's start off with the first

16   paragraph of this.

17            And what it says is:  EKMS began working to

18   license the patents in the Audimax portfolio in late

19   May/early June of 2002.  At that time, the decision was made

20   to focus in on the '850, which appeared to be the strongest

21   of the set of Audimax patents.  The following companies were

22   chosen as targets:

23            And then it lists five companies.  The second

24   one is Widex, and the third one is Oticon.  Do you see that?

25   A.    Correct.

1  Q.    Who chose these targets?

2  A.    I have no idea but I certainly didn't.  It was

3  probably EKMS but I don't know exactly how this set of

4  targets was derived.

5  Q.    Next paragraph.

6        It talks about after talking with Harley Levitt

7  and Richard Dugot in mid May, we chose to contact several

8  ReSound scientists whose had started a second company,

9  called SoundID.  Do you see that?

10  A.    Yes, I do.

11  Q.    And do you know who SoundID is?

12  A.    Generally speaking.

13  Q.    Okay.  They're a company that EKMS went to talk to in

14  trying to license these patents; correct?

15  A.    Correct.

16  Q.    And when did you know about that?

17  A.    I recall vaguely that I knew that they, that SoundID

18  had been contacted back in the time range of when EKMS was

19  working for us and certainly my memory has been refreshed

20  since then.

21  Q.    Do you remember that SoundID had told EKMS that they

22  didn't think they infringed because they do a continuously

23  adaptive feedback cancellation technique?

24  A.    Well, that certainly is what I now understand based

25  upon all the documents I have had to review.

Page 465

1    Q.    Did you understand that at the time?

2    A.    I don't -- probably, I understood at the time but I

3    can't recall exactly.

4    Q.    Were you being kept apprised of what EKMS was doing

5    and the successes or failures that they were having

6    licensing your patents?

7    A.    I asked Mr. Mike Pitonyak to handle the detailed

8    day-to-day interaction with EKMS because I had a lot of

9    other things that I was paying attention to also at the

10   time.

11   Q.    You certainly looked at this EKMS report that we have

12   up on the screen at some point, didn't you?

13   A.    Yes, probably.

14   Q.    And was it before you filed the lawsuit?

15   A.    I can't recall.

16   Q.    You're not sure if you saw this report before you

17   filed the lawsuit?

18   A.    I don't recall.

19   Q.    So you paid $50,000 for this report; right?  Correct?

20   A.    Correct.

21   Q.    And this was a company that you had hired; correct?

22   A.    Correct.

23   Q.    And this was concerning these Audimax patents, the

24   only two patents, the only two real assets Audimax had;

25   right?

Chen - cross

Page 466

1   A.     Right.

2   Q.     But you don't remember reading this report prior to

3   filing a lawsuit against the two defendants that are

4   actually named in this report?

5   A.     I don't recall whether I read this immediately prior

6   to doing that, but I do remember that I made the conscious

7   decision that we had some rights which probably we should

8   try to enforce.

9             THE COURT:  Counsel, I think I'm going to let

10  the jury take a stretch break at this point.

11            MR. MANDIR:  Your Honor.

12            THE COURT:  Let's take a short stretch break.

13            (Brief recess taken.)

14            THE COURT:  Ms. Walker, please bring in the

15  jury.

16            (Jury enters courtroom at 12:21 p.m.)

17            THE COURT:  Please, take your seats, ladies and

18  gentlemen.  We will continue with the cross-examination.

19            MR. MANDIR:  Thank you, Your Honor.

20  BY MR. MANDIR:

21  Q.     Mr. Chen, do you have open DX-1610, the document we

22  were just talking about?

23  A.     Let me just open it up.

24  Q.     I want to refer you to the last paragraph, which

25  starts with, "Eric Dowling."  Do you see that?

Chen - cross

Page 467

1    A.    Yes.

2    Q.    It says, "Eric Dowling, the EKMS expert, took a look

3    at the patent while EKMS arranged a second call with Harry

4    Levitt for early August."

5              Do you see that?

6    A.    Yes.

7    Q.    Were you aware at the time that EKMS was talking to

8    Dr. Levitt about his patent?

9    A.    I was aware generally that they would be in contact

10   with him.

11   Q.    And were you aware that Dr. Dowling was talking to

12   Harry Levitt?

13   A.    Not specifically, but I was sure that EKMS was

14   contacting those people associated with us who were relevant

15   to what they had been asked to do.

16   Q.    It goes -- I am sorry.  Did you have more for that

17   answer?

18   A.    No.

19   Q.    It goes on to say, "Over the course of two calls, we

20   worked through the language of the patent and found that the

21   body of the patent included language adverse to an

22   interpretation of the claims involving a continuously

23   adaptive approach."

24             Do you see that?

25   A.    Yes.

Page 468

1   Q.    Were you made aware that EKMS had come to the

2   conclusion that there was an interpretation based on the

3   language in the patent adverse to an interpretation that the

4   claims covered continuously adaptive approach?

5   A.    I am generally aware that certain people said that

6   this concept of continuously adaptive might be in their view

7   a problem for us.  But I don't remember who it was.  I know

8   the Sound ID people apparently had said that.

9   Q.    Were you aware at the time that EKMS had come to that

10  conclusion?

11  A.    I was not aware that they had any strong conclusion

12  about this feature.

13  Q.    Now, let me see if I understand you, Mr. Chen.  You

14  are reading this paragraph up on the screen to mean that

15  this is not the position of EKMS, it's just the position of

16  Sound ID?  Did I understand you correctly?

17  A.    I can't say that this is EKMS's final conclusion,

18  because later on in the report they, EKMS said that the

19  report says that they hadn't completed their study of this

20  issue.

21  Q.    But this paragraph that we have up on the screen,

22  based on what you have read in this report, you don't think

23  that this is EKMS's opinion?  You think it's Sound ID's

24  opinion?

25  A.    I can't say.  I can't say one way or the other.

Page 469

1  Q.    And you can't say because you were looking at this

2  earlier e-mail, July 24th e-mail, between Dr. Dowling and

3  John Boddie?  Is that why you can't say?

4  A.    The reason I can't say is because it's not clear who

5  the two calls are with and whose opinion is being expressed.

6  Q.    You are not aware that -- you don't think this says

7  that Harry Levitt and Eric Dowling were talking to each

8  other?  Isn't that what it says here, Mr. Chen?

9  A.    It says that we -- I don't know who the "we" is.  We

10  could be EKMS and Harry Levitt and Dr. Dowling.  It could be

11  EKMS.

12         Again, it's not absolutely clear to me who is

13  taking the position or finding that there may be some

14  question about this.

15  Q.    Can't you look at the sentence right before the we?

16  It's pretty clear, isn't it, "Dr. Eric Dowling, the EKMS

17  expert, took a look while EKMS arranged a second call with

18  Harry Levitt for early August"?

19         MS. ECKSTEIN:  Your Honor, at this point, it's

20  asked and answered.

21         THE COURT:  I am going to sustain the objection.

22  You are becoming argumentative.

23         MR. MANDIR:  Okay, Your Honor.  I will move on.

24  BY MR. MANDIR:

25  Q.    At the bottom of this page, Mr. Chen, it starts with,

Chen - cross

1   "While neither of these points," and above it it makes two

2   points about prior art and also about prosecution.  And what

3   it says, if you read starting on that last line of that

4   page, it says "While neither of these points prevent an

5   interpretation of the patent that might require compulsory

6   licensing, it seems that such an interpretation is

7   nonobvious enough to pose a serious hindrance to any

8   litigation-free licensing effort."

9           Do you see that?

10  A.   Yes.

11  Q.   Were you aware that EKMS came to the conclusion that

12  the only way that a company would license is if they got

13  sued?

14  A.   In general, that's the conclusion I drew as a

15  businessman, based upon all the advice I received, including

16  whatever input we had from EKMS.

17  Q.   Now, you mentioned that you are not sure that this

18  report is the final report.  Is that right?

19  A.   Correct.

20  Q.   Are you aware of another report?

21  A.   I am not aware of any other report.

22  Q.   What happened to EKMS after this report?  Did you fire

23  them?

24  A.   We did not continue with them.

25  Q.   You fired them?

Chen - cross

Page 471

1    A.    I don't remember if there was a specific letter giving

2    written notice of termination of our agreement with them.

3    Q.    What was the reaction when you got this report from

4    EKMS?  Were you happy with their analysis?

5    A.    I, frankly, as I said, don't recall whether -- too

6    much about my reaction at the moment that I may have seen

7    this report.  But I do clearly know and remember what I did

8    in general.

9    Q.    You don't recall challenging this report with EKMS.

10   Is that right?

11   A.    I don't remember myself challenging this report with

12   EKMS.

13   Q.    Okay.  The second page, the first full paragraph, it

14   says that the '749 patent -- that is the other patent

15   involved in this lawsuit.  Right?  Are you aware of that?

16   A.    Yes.

17   Q.    It says, "Seems to suffer from the same problem,

18   specifying in the description of the preferred embodiment

19   that test sounds shall be provided as necessary rather than

20   all of the time as would occur with a continuously adaptive

21   system."

22              Do you see that?

23   A.    Yes.

24   Q.    Were you aware that EKMS also came to the conclusion

25   that the '749 patent had problems covering continuously

Chen - cross

Page 472

1  adaptive hearing aids?

2  A.    The technical details of any difficulty that they

3  might have had in regard to our features and how they would

4  apply to the products, I am not aware of the technical

5  details.  All I know is as a business matter, there was no

6  clear conclusion that I could draw from this.

7  Q.    Let's go to the third page, please.

8        Were you aware that as part of EKMS's analysis,

9  they looked at the product literature of both Widex and

10  Oticon.

11 A.    Now that I have seen this document and refreshed my

12 memory, yes, it appears they did that.

13 Q.    Let's go back for a moment to DX-1642.

14 A.    Just give me a second.

15 Q.    Sure.

16 A.    Okay.

17 Q.    This was the e-mail that you testified about in your

18 direct examination.  Correct?

19 A.    Yes, I was asked to testify about this.

20 Q.    And this is a document that is between Mr. Boodie of

21 EKMS and Eric Dowling.  Is that your understanding?

22 A.    That's my understanding.

23 Q.    And this document, this e-mail, there is no indication

24 that it was ever given to Audimax.  Isn't that correct?

25 A.    Well, from the way it's addressed, no.  But, of

Chen - cross

Page 473

1    course, I have no idea whether other means of communication

2    occurred.

3    Q.    So for all you know, this was an internal e-mail

4    within EKMS trying to figure out this patent.  Correct?

5    A.    I can't draw any conclusions.

6    Q.    And that's because you have no way to know whether

7    this -- in fact, there is nothing here to suggest or

8    indicate that this e-mail or the substance of it was ever

9    transmitted to Audimax.  Correct?

10   A.    I can't say.

11   Q.    Let's go down on this document, please.

12         Now, Doctor Dowling in this e-mail points to a

13   lot of places in the patent, correct, and says nobody but a

14   red-faced liar would ever say that the patent is not

15   adaptive?  Is that your understanding?

16   A.    That's what it says.

17   Q.    Now, all the citations in this e-mail that Dr. Dowling

18   has identified, do you know if any of them have to do with

19   cancellation of acoustic feedback?

20   A.    I couldn't possibly say.  I am not a technical person.

21   Q.    Do you know --

22         THE COURT:  Counsel, let him finish his answer.

23         MR. MANDIR:  I am sorry, Your Honor.

24         THE WITNESS:  I can't comment on technical

25   things.  I am not an electrical engineer.

Chen - cross

Page 474

1  BY MR. MANDIR:

2  Q.    So you don't know if Dr. Dowling in this e-mail of

3  July 24th, whether or not he is on the right track here by

4  pointing to things in the patent that matter?

5  A.    I am not qualified to judge about his professional

6  opinion.

7  Q.    Don't you think that would be something of

8  importance, if you are going to interpret that ETG report

9  that says we don't think that there is coverage of the

10 adaptive approach?  Don't you think it would be important to

11 know whether this has anything to do with the final

12 conclusion?

13          MS. ECKSTEIN:  Objection, Your Honor.  It is

14 misstating the document.

15          THE COURT:  It's cross-examination.  Go ahead.

16          Could you repeat the question?

17 BY MR. MANDIR:

18 Q.    This document, this e-mail, don't you think it is

19 important to be able to understand that paragraph in the

20 final report about who is saying what to know whether this

21 e-mail is based on an -- based on correct citations to the

22 patent with respect to acoustic feedback?

23 A.    Sorry.  That was a long sentence with a lot of parts.

24 Say it again in a more structured way, please?

25 Q.    This document, this e-mail, you don't know whether it

Chen - cross

Page 475

1  has to do, the portions cited in there about the patent, you

2  don't know if it has to do with acoustic feedback or not?

3  A.    No.  I am not competent to say.

4  Q.    You don't know if Dr. Dowling, after writing this

5  e-mail, somebody pointed out to him, you know, all these

6  things that you cited, they don't have to do with acoustic

7  feedback in the patent?  You don't know that?

8  A.    No.

9  Q.    You don't know if Dr. Levitt pointed that out to Dr.

10  Dowling?

11  A.    Correct, I don't know that.

12  Q.    But we do know that Dr. Dowling met with Harry Levitt

13  from the final report.  We know that.  Right?

14  A.    Well, apparently they had some contact, whether it was

15  in person or by phone.

16  Q.    Now, at the time you sold Audimax -- I am sorry, that

17  you bought your brother's share in Audimax, that was 2003.

18  Is that right?

19  A.    I bought -- my brother and I divided up all the ETG

20  assets, and among them Audimax was included in the

21  transaction.

22  Q.    And what time, what date was that?

23  A.    Roughly around 2003.  I don't remember the exact

24  dates.

25  Q.    And you paid your brother one million dollars to get

Chen - cross

Page 476

1    his interest of Audimax and the two patents that are

2    involved in this lawsuit.  Correct?

3    A.    Absolutely not.  I paid my brother one million and

4    other consideration as part of the global dividing up of

5    assets and obligations that existed in ETG.

6    Q.    And in 2003 when you gave your brother one million

7    dollars and other consideration, that gave you all of his

8    rights in the Audimax patents.  Correct?

9    A.    It gave me all the rights and liabilities of dealing

10   with Audimax, yes, as part of the overall transaction

11   involving lots of things.

12   Q.    That transaction gave you his rights in the Audimax

13   patents.  Correct?

14   A.    Which transaction?

15   Q.    The transaction that we are speaking about.

16   A.    The transaction, globally speaking, of us separating

17   up our stuff, yes, Audimax was part of that.

18   Q.    And that was in 2003?

19   A.    Approximately, yes.

20   Q.    And at that point, in 2003, you had approached Sound

21   ID to see if they were willing to license the patents.

22   Correct?

23   A.    Well, apparently, that was done before 2003, yes.

24   Q.    And Sound ID said we don't need it because we don't

25   infringe that technology.  Correct?

Chen - cross

Page 477

1    A.    Apparently, yes.

2    Q.    And at that point, we see this EKMS report before that

3    transaction saying that they don't think your Audimax

4    patents cover continuously adaptive approach.  Correct?

5    A.    Sir, before that transaction, you mean --

6    Q.    This 2003 transaction we have been talking about.

7    A.    I explained that stuff with my brother.

8    Q.    Correct.  By the time this transaction occurred, you

9    had this EKMS report.

10   A.    Correct.  We must have had some kind of report.

11   Whether it was this one or a more final report, you know, I

12   don't remember.

13   Q.    Okay.  So did you license, did you have any licenses

14   on the Audimax patents at the time of this transaction with

15   your brother?

16   A.    No.

17   Q.    Okay.  So it had never been licensed prior to that

18   time?

19   A.    No.

20   Q.    And so when you did this transaction with your

21   brother, you considered what had been done before with

22   respect to this Audimax patent; correct?

23   A.    When you say "considered," what do you mean?

24   Q.    Well, you considered that the Audimax patent had never

25   been a product that you made with respect to the Audimax

Chen - cross

Page 478

1    patent; right?  You considered that in this transaction

2    where your brother's Audimax shares were given to you,

3    didn't you?

4    A.    Wait a second.  Sorry.

5    Q.    Let me rephrase, please.

6    A.    Okay.  Thanks.

7    Q.    At the time you had this transaction with your brother

8    in 2003, at that point you came to some agreement as to how

9    certain assets would be split and the Audimax patents, his

10   interest in Audimax patents came to you; correct?

11   A.    Correct.

12   Q.    At that time, in 2003, when you -- you considered the

13   Audimax patents values, didn't you?  I mean when you made

14   the transaction, you must have considered what it was worth.

15   A.    No, not really.

16   Q.    You didn't really consider whether the transaction was

17   based on a fair consideration?

18   A.    We had no idea at that time of what the patents were

19   worth because we knew that to make them worth something, we

20   either have to develop products or we'd have to license the

21   technology or sue people to pay us for infringing the

22   patents.

23   Q.    Okay.  So you had no idea what it was worth but you

24   did know in 2003, when this transaction occurred, that you

25   couldn't license it to anybody; correct?

Chen - cross

Page 479

1   A.    I wouldn't use the word "couldn't."  There was no

2   interest in whatever companies had been approached to

3   license it, but "could" is different from "would" so I don't

4   know.

5   Q.    Okay.  And you had a company that you had retained say

6   that they didn't think that these two patents covered

7   modern-day technology at the time you made this transaction

8   with your brother; correct?

9   A.    I don't think that is what they said and that is not

10  certainly how I acted.  The stuff that you have asked me to

11  look at in which I have looked at as part of pretrial

12  preparation indicates that they said that the people they

13  approached to try to license our technology just refused to

14  license our technology and said it's not relevant.  That was

15  the position of those companies, so EKMS was not able to get

16  any commercial response from the people they approached.

17  Q.    But --

18  A.    It didn't mean that EKMS didn't think whatever they

19  thought about whether people should be licensing it from us.

20  Q.    Well, we know that EKMS didn't think it covered

21  modern-day technology; correct?

22  A.    We know that EKMS said there were questions that need

23  to be looked at in regard to that.  They didn't come to that

24  conclusion and obviously I took the step of suing now

25  because I didn't accept that.  I thought that we had some

Chen - cross

Page 480

1    rights.

2    Q.    Okay.   You said you took the step of suing.   And I

3    believe in your direct examination, you talked about who

4    would split up any damage award that you would get based on

5    this lawsuit; correct?

6    A.    Correct.

7    Q.    How would that be split up?

8    A.    According to the rights ownership that I think we

9    referred to earlier, Harry Levitt two percent, Richard Dugot

10   six or seven percent, my late father's estate, therefore, my

11   mother, six -- five or six or seven percent, the estate of

12   the late Henry Durocher, who was an executive that worked

13   there getting a couple percent, BioMed getting a couple

14   percent and ETG getting 80 percent.

15   Q.    And all these individuals who get this percentage

16   award, if it was recovered, they are all sharing in the

17   costs of this lawsuit; is that right?

18   A.    They have shared the costs to a certain extent.

19   Q.    Not equally based on what their ownership interest is?

20   A.    Well, the costs of litigating unfortunately are very

21   high so I knew to carry forth litigation I couldn't rely on

22   them to carry forward the litigation entirely by themselves,

23   so I undertook to shoulder most of the burden.

24   Q.    Okay.   So you are going to pay for the lawsuit and

25   what did you get in return?

Chen - cross

Page 481

1    A.    Well, I wanted to be able to consolidate the patents,

2    Audimax into ETG to streamline the corporate organization

3    and to reduce the costs of maintaining and trying to manage

4    the patents, so they agreed to that.  So in return, I agreed

5    to try to commercialize or get benefit for Harry and Richard

6    and everything else as well as myself.

7    Q.    And any recovery in the lawsuit would first go to

8    repay these expenses for litigation; correct?

9    A.    Yes.

10   Q.    And these were all paid by you, these costs for the

11   litigation?

12   A.    Yes.

13   Q.    And the other people involved, they won't have to pay

14   for any of costs?

15   A.    They paid for some portion of it.

16            MR. MANDIR:  Okay.  Your Honor, if I may just

17   have a moment?

18            THE COURT:  Yes.

19            (Pause.)

20            MR. MANDIR:  Okay.  I just have a few more

21   questions.

22   BY MR. MANDIR:

23   Q.    Back to DX-1610.  If you could look in your binder,

24   Mr. Chen?

25   A.    (Witness complies.)

Page 482

1    Q.    Okay.  The last paragraph of that, it's page two.

2    A.    Okay.

3    Q.    It starts off with "taking a second tack."  Do you see

4    that?

5    A.    Correct.

6    Q.    What it says there is:

7              Taking a second tack, EKMS has begun examining

8    the product literature of the major hearing aid companies

9    listed above, trying to identify those products that are not

10   continuously adaptive.

11             Do you see that?

12   A.    Yes.

13   Q.    Were you aware that EKMS was trying to look for

14   companies that perhaps didn't do the continuously adaptive

15   approach as a way generating revenue for Audimax?

16   A.    In the detail you mentioned, no.

17   Q.    And EKMS had an incentive to license these target

18   companies; correct?

19   A.    Correct.

20   Q.    They got a percentage cut of whatever that, whatever

21   revenue would flow from that; correct?

22   A.    Correct.

23   Q.    And that is in addition to the $50,000 that you paid

24   them?

25   A.    Correct.

Brown - direct

1              THE COURT:  The Court will receive Mr. Brown as

2      an expert.

3              MR. BUROKER:  Thank you, Your Honor.

4      BY MR. BUROKER:

5      Q.    Mr. Brown, have you been hired to analyze the two

6      patents at issue in this case?

7      A.    Yes, I was hired to look at the patents and determine

8      if I found infringement there.

9      Q.    So did you look at the products for both the Demant

10     group and the Widex group?

11     A.    Yes, I did.

12     Q.    Prior to this case did you have any experience in

13     analyzing hearing aid technology?

14     A.    Well, when we were building chips for the hearing aid

15     industry and building our own standard products, we

16     definitely looked into all of the things that we found

17     available at the time, because we were trying to build the

18     most cost-effective hearing aid chips.

19              At that point in time, one area we found very

20     important was feedback theory, feedback, acoustic feedback

21     reduction.  And I spent a lot of time looking into that.

22              At that point in time we didn't find any

23     solutions that were in vogue that were operational.  That

24     was in the pre-2000 time frame, and these chips we are

25     talking about weren't open on the market yet.

Brown - direct

Page 502

1    Q.    Are you familiar with the concept in the patent area

2    called a person of ordinary skill in the art?

3    A.    Yes, I am.

4    Q.    Did you try to ascertain from these patents what the

5    person of ordinary skill in the art was?

6    A.    Yes.  I was asked to do that.  The ordinary skill in

7    the art is a hypothetical concept of someone who at the time

8    of the patent would have been able to understand and use the

9    patent to either develop the patent or to develop products

10   using the patent.

11             So you would look to someone who would have the

12   background and experience to understand the meaning and the

13   use of the patent.

14   Q.    So for these patents, what was the person of ordinary

15   skill in the art that you found?

16   A.    My understanding would say that you would require at

17   least a Bachelor's degree in electrical engineering or an

18   equivalent thereto, and at least two years of experience in

19   circuits relating to hearing products, an understanding, in

20   other words, of the cycle acoustics that the chip is trying

21   to solve, but the -- excuse me -- the patent, but the patent

22   really addresses an electrical problem and feedback theory.

23   Q.    Are you familiar with experience that this

24   hypothetical person of ordinary skill in the art would know?

25   A.    Yes.  Not only was I active in the field, I was quite

Brown - direct

Page 503

1    familiar with my customers' engineers.  And I hired several

2    engineers to design similar chips, similar products at that

3    point in time.

4    Q.    Did you use this person of ordinary skill in the art

5    in connection with your analysis in this case?

6    A.    Yes, I did.

7    Q.    Are you aware of the position that some of the

8    defendants' experts took on what the person of ordinary

9    skill in the art is?

10   A.    Yes, I am.

11   Q.    Do you agree or disagree with their view?

12   A.    Well, I disagree with their view.

13   Q.    And why is that?

14   A.    Well, primarily because they do not appear to require

15   any understanding in electronics and filter theory,

16   substituted information on hearing and psychoacoustics, and

17   I don't believe that would qualify them to actually build a

18   product.

19   Q.    And why is that important, the background you

20   described?  Why is that important?

21   A.    It's to build a product.

22   Q.    Right.

23   A.    To understand filter theory, to understand circuit

24   theory, and how to assemble such a device.

25   Q.    Okay.  I'd like to show you what has been marked as

Brown - direct

Page 504

1    JX-4, which is the '850 patent.

2                    If you could get that up, please.

3                    Are you familiar with this document?

4    A.    That's the cover page for the '850 patent.

5    Q.    Can you tell when this patent was filed?

6    A.    June 26, 1986.

7    Q.    And what is the title of the '850 patent?

8    A.    Programmable digital hearing aid system.

9    Q.    So does this patent have something to do with hearing

10   aids?

11   A.    Yes.

12   Q.    Why don't you describe what the basic components of

13   the hearing aid are?  And I think you have a demonstrative

14   to use.

15   A.    Yes, I have a demonstrative for that.

16   Q.    Okay.  Sir, what are the basic components of the

17   hearing aid?

18   A.    The basic components of the hearing aid, on the left

19   we have a microphone.  And in between, on the right, we have

20   a speaker.  The hearing aid is called a receiver.  In

21   between the microphone and speaker, we have transmission

22   channel.  And the transmission channel is where the

23   amplification takes place and where the filtering to

24   compensate for a particular hearing aid wearer's loss.  In

25   other words, a hearing impaired person has a hearing loss.

Brown - direct

Page 505

1    We want to compensate for that and improve his ability to

2    hear.

3    Q.    Okay.  You may have covered this but again what does

4    the microphone do in this diagram?

5    A.    The microphone converts the acoustic sound, in other

6    words, the sound, the physical sound into an electrical

7    signal which is then sent into the amplifier or into the

8    transmission channel.  The electrical signal is then

9    processed by the electronics and then that electrical

10   amplified signal is then sent to the speaker which, like the

11   speaker in a home, produces physical acoustic sound,

12   hopefully close to your eardrum.

13   Q.    Does the '850 patent deal with acoustic feedback for

14   hearing aids?

15   A.    Yes, it does.

16   Q.    What is acoustic feedback?

17   A.    Well, with acoustic feedback, there was a

18   demonstrative there, but some of the sound coming out of the

19   speaker gets back into the microphone.  We see that in a PA

20   system.  As we see up here, the person talking comes in the

21   microphone, goes up to the amplifier.  It's amplified, the

22   volume comes back out and a little bit of that sound goes

23   back out of the amplifier again.  And each time it goes

24   around that circle, it builds up and increases until you get

25   a large amount of feedback.  Now, even a small amount, as

Brown - direct

Page 506

1  Dr. Levitt said, will disturb the hearing aid's operation

2  but the large amount produces a squealing sound that nobody

3  likes.

4  Q.    Is it important to reduce acoustic feedback in a

5  hearing aid then?

6  A.    Yes, both from comfort and actually for people to

7  continue to use the hearing aid.  I think I saw a number

8  saying 25 percent of the complaints about hearing aids had

9  to do with this feedback, and they didn't like that.

10  Secondly, if there is some level of feedback it disturbs the

11  signal processing of the hearing aid, thereby reducing the

12  hearing aid's ability to compensate for the wearer's

13  impairment.

14  Q.    How did older hearing aids deal with acoustic

15  feedback, if at al?

16  A.    Well, the standard solution for it was just turn the

17  gain down.  And then there were various and sundry options

18  after that where they turned gain down in individual

19  channels, when they put notch filter and did a bunch of

20  other things, but all of these solutions had serious

21  drawbacks:  They didn't sound good, they cut holes out of

22  what you were hearing, or they just plain didn't have enough

23  amplification for your hearing impairment.

24  Q.    And is gain volume, essentially?

25  A.    Yes, gain is the amount of volume that comes out of

Brown - direct

Page 507

1    the speaker.

2    Q.    So what did Dr. Levitt and the other inventors invent

3    in the '850 patent?

4    A.    Well, their invention was to find a way of reducing or

5    eliminating or at least cancelling a large portion of the

6    acoustic feedback by taking some of the output, putting it

7    through a filter and feeding it back to the input where it's

8    matched in both phase and amplitude to the acoustic sound

9    that travels around the outside through the air or through

10   the body.

11   Q.    Is there a place in the patent where you look to see

12   what the specific inventions that are recited are?

13   A.    Yes, you look at the claims.  The claims define the

14   dimensions or the properties of their claims.  As I said, in

15   the video you saw early on, it's like a piece of property.

16   The deed says what the limits are and what your rights are

17   and the same is true with the claims in a patent.  The

18   claims define what is yours and what other people can't

19   trespass on.

20   Q.    If one party has a patent is it possible for other

21   parties to get patents on improvements?

22   A.    Yes, that is quite commonly done.  There is the

23   original patent, and then people will improve on that, and

24   they'll get a patent on the specific improvement.  For

25   example, if I had a patent on a tire and somebody comes out

Brown - direct

Page 508

 1    and invents a rubber tire, and a third person comes out and
 2    builds a steel-belted rubber tire, the rubber tire is
 3    entitled to a patent over my plain tire.  It could have been
 4    wood or whatever.  Rubber was an improvement.  The
 5    steel-belted tire was an improvement over the rubber tire
 6    and over my tire, but both of those patents infringe on my
 7    original tire patent.
 8    Q.    Sir, are you aware that the defendants have patents on
 9    some of the technology?
10    A.    Yes.
11    Q.    Does that factor into your analysis as to whether or
12    not they infringe any of the claims of this patent?
13    A.    No, it does not.  Patents on improvements don't deter
14    the infringement on the original patent.
15    Q.    Let's take a look at Claim 16 of the '850 patent.  Do
16    you know the difference between an independent claim and a
17    dependent claim?
18    A.    Yes.  A dependent claim depends upon the independent
19    claim.  So when you look at the claims of the dependent
20    claim, you have to include all of the restrictions and
21    claims on the dependent claim as well.
22    Q.    Is Claim 14 an example an independent claim?
23    A.    Claim 14 is an independent claim, and Claim 16 says as
24    described in Claim 14.  That makes it dependent upon Claim
25    14.

Brown - direct

Page 509

1    Q.    So in order to analyze Claim 16, you have to find all

2    of the elements of Claim 14 and the additional element of

3    16.  Is that the way to look at this?

4    A.    That is correct.

5    Q.    And did you do that in your analysis?

6    A.    Yes, I did.

7    Q.    What is this a method for in this claim?

8    A.    Well, it's a method for reducing acoustic feedback in

9    a hearing aid.

10   Q.    And does this claim have several parts to it?

11   A.    Yes, it does.  The first three parts are the basic

12   portions of a hearing aid that we talked about early on:  a

13   microphone, receiver, and signal transmission path.

14            The next two steps are first determining the

15   effect of the amplitude and phase of the signal in said

16   transmission channel as a function of frequency of acoustic

17   feedback between said receiver and microphone.

18            And, second step, inserting between the input

19   and output of said transmission channel a programmable

20   filter programmed to equalize and reduce the effect of said

21   acoustic feedback both in amplitude and phase on the signal

22   in said transmission channel.

23   Q.    The last two steps had quite a few words.  Can you

24   explain the understanding of the determining step here that

25   you applied in doing your analysis?

1    A.    Yes.   The intent here is to determine the effect of

2    the feedback, and you must determine it both in amplitude, I

3    guess in the determine step -- yes, you determine both the

4    amplitude and phase of the feedback signal.

5    Q.    And then what about the inserting step?  What could

6    you explain the analysis that you used for that element?

7    A.    The inserting step, you take that signal that you

8    determined and you insert in a filter in the feedback

9    channel so you can equalize out the effect of that feedback

10   in both phase and amplitude.

11   Q.    To find that a product infringes this claim, do you

12   need to find all of these highlighted elements in that

13   accused product?

14   A.    You have to find each one of them.

15   Q.    And that's for Claim 14.  What about Claim 16?  What

16   additional is required for that claim?

17   A.    Claim 16 requires that the programmable filter of

18   Claim 14 be placed in an electrical feedback element loop.

19   Q.    And what does that mean?

20   A.    Well, it means that it must be an electrical circuit.

21   And in the Court's construction, it means it's in a feedback

22   loop from the output to the input.

23   Q.    Did you prepare a demonstrative to illustrate, take

24   the words for the claim to a diagram to help us understand

25   this claim?

Brown - direct

Page 511

1   A.    Yes.

2   Q.    Okay.  Let's take a look at that demonstrative.

3         Okay.  Sir, what is this diagram showing?

4   A.    It shows the elements of that claim and in the lower

5   left-hand corner, you see the key words from those steps in

6   the two claims.  On the left we have a microphone, on the

7   right we have speaker.  In between the two, we have a

8   transmission channel.  We have a determining phase at the

9   bottom which determines the effect of the acoustic feedback

10  which you see across the top.

11        And then we insert it into the filter.  We

12  insert it by placing the coefficients C0, C1 and so forth

13  into the filter and the filter is in a feedback loop which

14  goes from the output of the transmission channel back to the

15  input of the transmission channel.

16  Q.    So explain again, what does a filter do?

17  A.    The filter takes the coefficients from the determining

18  circuit phase and takes the output of the signal, passing

19  through the filter, produces the signal inverse signal we

20  see in orange right next to the plus sign, the little circle

21  with the plus is an adder where the signal from the

22  microphone which contains both the signal we want to have

23  plus this feedback we do not want, and that adder adds the

24  inverse signal from the filter in both phase and amplitude

25  to cancel it out so none of that gets into the transmission

Brown - direct

1    channel.

2    Q.    And this diagram shows two circles with a C in it.

3    Those are the coefficients?

4    A.    Those are the coefficients.  Those represent the

5    coefficients being loaded into the filter.

6    Q.    And this diagram just shows two but how many

7    coefficients can there be?

8    A.    Typically, there is someplace between 16 and 32.

9    Q.    And I think I asked you earlier about what a feedback

10   path is.  Could you explain again where the feedback path is

11   in this diagram?

12   A.    Feedback path goes from the output, which is in this

13   picture right before the speaker, back to the input and it's

14   summed together with that little circle with the plus in it.

15   Q.    Claim 16 in the inserting step uses the term

16   "programmable filter."  What is the definition of a

17   programmable filter that you applied in your analysis?

18   A.    Programmable filter is a filter where you can insert,

19   apply coefficients to give it, coefficients of one or more

20   of the elements of the filter.

21   Q.    Do you have an example of how you might give

22   coefficients to a filter that makes it easier to understand?

23   A.    Yes, I did an example for you.  Yes.

24            This is an equalizer.  I guess those are, some

25   might recognize it from the stereo systems.  I don't know if

Brown - direct

Page 513

1   our rock band generation would, but as you noticed, there

2   are knobs at the top and you adjust these knobs up and down

3   to determine the amount of amplitude that comes out of the

4   speaker in each of these individual frequency's spectra.  As

5   you see down below, as he moves the knobs up and down there,

6   that changes the amount of intensity showing like it did on

7   our old equalizers.

8   A.    When you do this, you can compensate for room problems

9   or your own hearing problems by adjusting the base or treble

10  of your music, in this case an eight-channel one, so you can

11  do quite a bit of correction for your room.

12          Each of the twiddlings of the knobs, each of the

13  positions of those knobs are the coefficients to that

14  filter.

15  Q.    Let's go back to Brown 3, which is Claim 16.  What is

16  the purpose of the programming recited in the inserting step

17  here?  Why do you program it?

18  A.    Well, you program it so that you can give it the value

19  necessary to compensate for the acoustic feedback, to

20  compensate, in other words, in both phase and amplitude.

21  Q.    We just discussed Claim 16 of the '850 patent.  Did

22  you do a comparison of Claim 16 to the hearing aids

23  manufactured and sold by the Demant group?

24  A.    Yes, I did.

25  Q.    And the Demant group is Oticon and Bernafon?

Brown - direct

Page 514

1    A.    Correct.

2    Q.    I am going to show you an Oticon document that is

3    marked JX-138.  I believe that's in the juror books.

4    A.    This is one of the technical documents that I looked

5    at.  It's their anti-feedback algorithm.

6    Q.    What do you understand the AFB to stand for?

7    A.    Anti-feedback.

8    Q.    What is the anti-feedback algorithm in the Oticon

9    products?

10   A.    I believe it's shown in the next demonstrative there.

11   Q.    Let's take a look at Brown D-2.  Where did this

12   diagram come from, sir?

13   A.    This came from their documentation, the engineering

14   document.  You saw the cover page of it.

15   Q.    This came out of Oticon's documents?

16   A.    Yes, we had Oticon documents.  It is Figure 13 of

17   Oticon's document on anti-feedback.

18             If you look at this -- the pointer doesn't

19   point, so we will just talk.

20             Unlike normal engineering diagrams, we have the

21   input on the right and the output on the left, we have the

22   microphone on the right at the top here.

23             Do we have color?  There it is.

24             And we have a speaker on the left.  And then we

25   have a transmission channel between the microphone and the

Brown - direct

Page 515

1    receiver or speaker.  And then at the bottom of this we have

2    the update module, which is the area where the coefficients

3    are calculated for the filter.  And those coefficients are

4    loaded up into the filter, which is shown here in it looks

5    to me like almost orange.  And the filter is in a feedback

6    channel between the output and the input.

7    Q.    How did you know to rely on this particular diagram

8    out of the Oticon documents?

9    A.    Well, first off, it's their engineering documents that

10   defines how they are doing things.  Secondly, Dr. Gloster,

11   who you will hear from later, assured me he looked at the

12   documents and told me that they were essentially correct, at

13   least as far as infringement is concerned.

14   Q.    Who is Dr. Gloster again?

15   A.    He is a professor from, I have forgotten the

16   university in Washington there.  But he is an expert in HDL

17   and DHDL languages.  These are languages that we use to

18   define, hardware description language, HDL, and that's how

19   these chips are designed.  You design them in a language

20   which will then tell the synthesizer how to actually execute

21   the chip.

22   Q.    Going back to Claim 16, did you find that the Oticon

23   products that employ the anti-feedback algorithm determine

24   the effect on the amplitude and phase of the signal in the

25   transmission channel as a function of frequency of acoustic