Brown - direct

1    voice, if you put your fingers in your ear and talk, you

2    hear your voice louder than you do normally because the

3    sound actually goes out of your ears coming from the back of

4    your throat.  This is called the occlusion effect.

5            So you put a vent in to get rid of those two

6    problems, and that makes feedback worse.  So using the

7    anti-feedback allows you to use a bigger vent and not have

8    as much feedback problem.

9    Q.    Now, let's take a look at PX-376.  Are you familiar

10   with this document?

11   A.    Yes, I am.

12   Q.    This is one of the ones we looked at earlier, isn't

13   it?

14   A.    Right.

15   Q.    Let's take a look on Page 8 of that document.  What

16   does this section say about the Diva feedback path

17   simulator?

18   A.    It says the feedback path simulator FPS estimates the

19   characteristics of the feedback signal in order to generate

20   a cancellation signal.

21   Q.    And I think there is another section lower down in

22   that same text on Page 8.  What does this say?

23   A.    A cancellation signal C is generated which is sent to

24   the summer, plus sign in parentheses, to cancel the feedback

25   signal at the microphone.

Brown - direct

1  Q.    Later in the same paragraph I want to direct your

2  attention to the sentence that starts Furthermore.  What

3  does that sentence say?

4  A.    Furthermore, since it is an inverse replica of the

5  feedback signal, more than one feedback frequency can be

6  canceled.

7  Q.    What does that mean?

8  A.    Well, it means, historically, once it just had a notch

9  filter.  In something like that, you could only do one

10  feedback.  Not only did they distort the signal, but they

11  weren't too effective, because if you kill one feedback

12  there will be another one, just a little less volume,

13  amplitude someplace else.  This way the filter can actually

14  cancel all of the feedback elements across the frequency

15  band.

16         Basically, these are just describing what we saw

17  in the technical documents.

18  Q.    So you believe it to be an accurate --

19  A.    Yes.

20  Q.    Can we look at PX-20, please, which is WID16223.  What

21  is this document?

22  A.    This is a Diva document.  Diva is one of their product

23  lines.

24  Q.    It's not highlighted now.  If you could look at the

25  top above the text, what does that say?  The very first

Brown - direct

1   line, what does the second line there say?

2   A.    For Widex internal use, confidential.

3   Q.    What do you take from that?

4   A.    I take it that this is describing what they believe to

5   be the proprietary part of their documentation.  They didn't

6   want this being distributed to the public, so this would not

7   be a public marketing document.

8   Q.    And what does this document say about the Diva

9   feedback canceling system?

10  A.    Well, this document is a list of questions and

11  answers.  This particular page has a question saying, what

12  is Diva feedback canceling?  And below it answers the

13  question, saying when the FPS has determined the

14  characteristics of the feedback signal it will subtract an

15  imitated feedback signal from the incoming signal, thus

16  eliminating the annoying feedback.

17  Q.    Did you rely on this sentence in performing your

18  analysis?

19  A.    Well, this sentence, along with all the others,

20  perform a very strong preponderance of evidence in

21  understanding not only is it in the HDL code, it is in the

22  engineering documents, it's in the marketing documents.

23  Q.    Let's look at the second patent, the '749 patent.  If

24  we could take a look at that.  That's JX-2.  Are you

25  familiar with this patent, too?

Brown - direct

Page 559

1   A.    Yes, that is a cover page for it.

2   Q.    Is this patent related to the '850 patent that we have

3   been discussing this afternoon?

4   A.    Yes.  This patent is derived from the '850.  And it

5   covers the host controller.

6   Q.    What is the filing date on this patent?  I think we

7   have it highlighted.

8   A.    It was filed February 12, 1988.  But since it's a

9   division of the first patent, it actually goes back to the

10  June 26th date.

11  Q.    What did you say the title of this document was?

12  A.    It's host controller for programmable digital hearing

13  aid system.

14  Q.    I think we have a demonstrative that shows Claims 1

15  and 2 of the '749 patent?

16  A.    Yes.

17  Q.    What is this claim directed to?

18  A.    Well, it's directed to a host controller for producing

19  data from a computer for programming hearing aid to cancel

20  acoustic feedback.  It comprises these three names.

21  Q.    And is there a definition for the term host controller

22  that you used in your analysis?

23  A.    A process for controlling the functions of the filter.

24  Q.    Under your understanding of that definition, is there

25  any limitation on the size or location of the host

Brown - direct

Page 560

1    controller you needed to look for?

2    A.     No, there is no limitations on the size or location.

3    It's not specified where it is.  The specific example shows

4    it is two physical boards.

5    Q.     In addition to the first part here, the host

6    controller, what else is required to find whether there is

7    infringement of Claim 1 of the '749 patent?

8    A.     Well, you must look at the three other elements here.

9    First is a means for receiving signals from the hearing aid

10   and measuring phase and amplitude.

11           The second is means for receiving signals from

12   the hearing aid indicative of the summation of the acoustic

13   feedback and acoustic feedback cancellation signals.

14           And third is a means controlled by the computer

15   for adjusting the phase and amplitude necessary to eliminate

16   the acoustic feedback and produce a null simulation --

17   summation.

18   Q.     These claims use the term "means for," and then

19   something that follows.  What is your understanding of how

20   you apply that language?

21   A.     Well, when a patent applicant wants to be a little

22   more general and try to say I have a means for doing this,

23   that's sorts of a generic term.  So it's a

24   means-plus-function term.  And you look at what the means

25   are and what the function they try to achieve is.

Brown - direct

Page 561

1                   So the Court has defined the function, and then

2       has identified within the specification, specifically in the

3       examples, schematics, in Figures 1 and 2, what elements of

4       the circuits correspond to these means.

5       Q.    So we have a demonstrative that shows the

6       corresponding elements here.  It's Brown 13.  Could you

7       explain what this large chart shows?

8       A.    On the left we see the claims that we saw just before.

9       And on the right we see the physical components in the

10      example schematic on the diagrams that have been identified

11      as performing those means within the specification.

12      Q.    In each of the boxes on the right, it uses the phrase

13      at the end "and all equivalents thereof."  What does that

14      mean to you?

15      A.    It means you don't have to have those specific

16      elements, that you have to have something that does the same

17      function and in essentially the same manner.

18                  Again, it comes to this idea of being able to

19      integrate things together and do them in smaller and smaller

20      packages.  Instead of having a PC board with parts plugged

21      into them as it was in Dr. Levitt's report that he proved

22      the theory with, today we have fully integrated packages.

23      And we may sometimes have exactly the same components, or we

24      may have different components that actually perform the same

25      function.

Brown - direct

1              In this case we have actually gone to digital.

2    So where he may have had analog comparators, we would have

3    digital functions that do it, and so on and so forth.  The

4    question really is, do the means perform the same function?

5    Q.    For example, the first box there, means for receiving

6    signals, on the right-hand side there is a number of items

7    out of the patent specification.  Were you able to find

8    those items in the accused products of the defendants?

9    A.    Well, not at the literal level, because I couldn't

10   actually go down to the device level and seek them out.

11             I did have Dr. Gloster look at the circuitry, at

12   the block level and functional level, see if it matched.

13   But I wasn't able to go to the literal level and find those

14   specific components.

15   Q.    So did you perform an analysis under literal

16   infringement?

17   A.    No.  I performed an analysis under the doctrine of

18   equivalents.

19   Q.    And did you find infringement under the doctrine of

20   equivalents of Claims 1 and 2 of the '749 patent for the

21   accused products we have been discussing?

22   A.    Yes.

23   Q.    Let's look at, go back to the claim if you would,

24   which is Brown 12.  What is the host controller in the

25   accused products?

Brown - direct

1    A.     Well, in the accused products, the host controller has

2    been integrated into the chip.

3           The functions of producing the data and

4    programming the filter in the hearing aid is actually

5    performed by the element's routine and its associated

6    components.

7    Q.     So for the Oticon product there was an update block.

8    Correct?

9    A.     Yes.

10   Q.     And what was the LMS block for the Widex product?

11   A.     I believe it was the WLMS.

12   Q.     Let's look back at the claim again, Brown Slide 12.

13   What is the structure that you looked at for the means for

14   receiving signals from the hearing aid?

15   A.     That's within the uptake block and inside the LMS

16   structure again.  This has all been condensed into the LMS

17   structure which receives data from, in fact -- if we go back

18   to the demonstrative they had I can show you where.  It

19   receives data from the input on the right and from the

20   output there, from the input it receives the data, which is

21   after the summation of the filter in the microphone.  And it

22   receives the output data.  And it uses those two pieces of

23   information to calculate the next coefficients for the FIR

24   filter.

25   Q.     This is an Oticon, so is the analysis for the Bernafon

Brown - direct

Page 564

1    and Widex products similar?

2    A.    It would be the same.

3    Q.    And in your view, do these elements in the accused

4    products measure phase and amplitude?

5    A.    No, they don't actually measure phase and amplitude.

6    Again, as I said before, what they measure is the effect on

7    producing an output of the filter that is equal and opposite

8    in phase and amplitude.  Again, mathematically speaking, the

9    coefficients of the filter do have that information in it.

10   Both phase and magnitude are defined by the coefficients of

11   the filter, but it's not measured, it's not read out.

12   Q.    So did you find that the accused products provided an

13   equivalent to what is reported here?

14   A.    That's right.  That is why I only did an analysis

15   under the doctrine of equivalents.

16   Q.    The next element says, means for receiving signals

17   from the hearing aid indicative of the summation of acoustic

18   feedback and acoustic feedback signals.  Did you find some

19   structure in the accused products that perform this

20   function?

21   A.    That's the structure, the dotted line on the right

22   side there.

23   Q.    And did you find whether or not, did you determine

24   whether or not the structure you found was equivalent to the

25   structure in the corresponding structure you showed in the

Brown - direct

1   earlier slide?

2   A.    Yes, it has the same function and has the same way and

3   result in calculation of the coefficients.

4   Q.    And the third element, Claim 1, means controlled by

5   the computer for adjusting the phase and amplitude necessary

6   to eliminate acoustic feedback and produce a null summation.

7   Did you find the structure that performed that function?

8   A.    Yes.  In the particular demonstrative, we were just

9   saying it's the path from the update module into the FIR

10  filter through the buffer where the data is, where the

11  coefficients are provided to the filter.

12  Q.    And is that a substantial equivalent to the structure

13  in the corresponding structure you listed earlier?

14  A.    Yes, it is.

15  Q.    Claim 2 then adds the further recitation of a means

16  controlled by the computer for transmitting phase shift and

17  amplitude data to program the hearing aid to eliminate

18  acoustic feedback.  Did you find a structure that performed

19  that function?

20  A.    Well, it's actually within the chip and so therefore

21  phase shift and amplitude data are the coefficients to the

22  filter.  Coefficients to the filter define that, and so we,

23  when we take the LMS routine as the host controller, it's

24  transmitting that data to the filter within the hearing aid.

25  It's all within the hearing aid but it's still transmitting

Brown - direct

Page 566

1    the data.

2    Q.    So is it your testimony that LMS algorithms in these

3    products are involved in each of these steps or each of

4    these elements we walked through?

5    A.    That's correct, just as a host controller was involved

6    in each of these on the outside where a person twiddled the

7    knobs to get the "no," here the host controller does that

8    twiddling through the iterative process and transmits the

9    data to the filter to achieve function which was to

10   eliminate acoustic feedback.

11   Q.    Let's look at checklist three then.

12            Your analysis for all three, all of the products

13   for each of the three defendants is substantially the same?

14   A.    My analysis is substantially the same and under the

15   doctrine of equivalents.

16   Q.    Okay.  And did you find a host controller for

17   producing data from a computer for a programmable hearing

18   aid to cancel acoustic feedback in all three?

19   A.    Yes.

20   Q.    Did you find a means for receiving signals?

21   A.    Yes.

22   Q.    And a means for receiving signals from the hearing aid

23   indicative of the summation of acoustic feedback and

24   acoustic feedback cancellation signals?

25   A.    That's correct.

Brown - direct

Page 567

1   Q.    And a means controlled by the computer for adjusting

2   the phase and amplitude necessary to eliminate acoustic

3   feedback and produce a null summation?

4   A.    That's correct.

5   Q.    And a means controlled by the computer for

6   transmitting phase shift and amplitude data to program the

7   hearing aid to eliminate acoustic feedback?

8   A.    Correct.

9   Q.    Are the advances in miniaturization a result of the

10  work of these defendants?

11  A.    No.  The hearing industry was a difficult industry for

12  us to work in because the volumes of wafers that we bought

13  for the hearing aid customers was so small that we didn't

14  even qualify as a real customer to the foundries.  The

15  advances of technology have, as I think we heard before,

16  have come about due to the driving force of the digital

17  technologies, the computer companies and the high speed

18  DSP that is being developed and we've been able to take

19  advantage of that to build hearing aid products.

20  Q.    We've looked at a few documents from these various

21  defendants.  Did you look at any other documents in

22  performing your analysis?

23  A.    I think the first time I received seven boxes of

24  documents.  I think we condensed this pile.  When you

25  brought it up, it shocked me, but this pile out of those

1    seven boxes.  And I'm sure I looked at a lot more but I

2    think this contains most of the ones I relied upon.

3    Q.    Did you also review deposition testimony of the

4    technical witnesses for the defendants?

5    A.    Yes, I did.

6    Q.    Is there anything else that you relied on in

7    performing your analysis?

8    A.    Well, I relied on, discussed the engineering

9    documents, the marketing documents, technical witness

10   testimony and other depositions and, of course,

11   Dr. Gloster's analysis of the code.  In other words, the

12   language defines the structure of these chips.

13              MR. BUROKER:  Can I have a moment?

14              THE COURT:  Sure.

15              (Pause.)

16              MR. BUROKER:  Your Honor, I don't have any more

17   questions.

18              THE COURT:  All right.  Counsel, I think rather

19   than start the cross-examination today, we'll recess a

20   little early today.

21              Ladies and gentlemen, I'm going to let you go 14

22   minutes early.  So again, keep my earlier instructions in

23   mind.  Travel safely.  We'll see you tomorrow at 9:00.

24              Do counsel need me for anything?

25              MS. GRAHAM:  I don't think so, Your Honor.

Brown - direct

Page 569

```
 1                THE COURT:  Okay.  Great.

 2                (Jury trial adjourns at 4:15 p.m.)

 3                      -  -  -

 4   Reporters:  Kevin Maurer and Brian Gaffigan

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                IN AND FOR THE DISTRICT OF DELAWARE
 3
                            -   -   -
 4
 5   ENERGY TRANSPORTATION,          :   Civil Action
     INC.,                           :
 6                                   :
               Plaintiff,            :
 7                                   :
          v.                         :
 8                                   :
     WILLIAM DEMANT HOLDINGS A/S,    :
 9   et al.,                         :
                                     :
10             Defendants.           :   No. 05-422 (GMS)
11                          -   -   -
12                   Wilmington, Delaware
                  Thursday, January 24, 2008
13                        9:07 a.m.
                     Fourth Day of Trial
14
                            -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18   APPEARANCES:
19             EDMOND D. JOHNSON, ESQ.
               Pepper Hamilton LLP
20                  -and-
               MARTY STEINBERG, ESQ.,
21             BRIAN M. BUROKER, ESQ., and
               MAYA M. ECKSTEIN, ESQ.
22             Hunton & Williams
               (Washington, D.C.)
23
                                  Counsel for Plaintiff
24
25
```

Page 571

```
 1    APPEARANCES CONTINUED:
 2                MARY B. GRAHAM, ESQ.
                  Morris, Nichols, Arsht & Tunnell
 3                     -and-
                  JOHN M. ROMARY, ESQ.,
 4                GREGORY C. GRAMENOPOULOS, ESQ.,
                  VINCENT KOVALICK, ESQ.,
 5                KAY HILL, ESQ.,
                  GERSON S. PANITCH, ESQ., and
 6                ARTHUR A. SMITH, ESQ.
                  Finnegan, Henderson, Ford, Farabow & Dunner
 7                (Washington, D.C.)
 8                                    Counsel for
                                      Demant Defendants
 9
                  DONALD E. REID, ESQ.
10                Morris, Nichols, Arsht & Tunnell
                       -and-
11                WILLIAM H. MANDIR, ESQ.,
                  JOHN SCHERLING, ESQ.,
12                CARL J. PELLEGRINI, ESQ.,
                  BRIAN SHELTON, ESQ.,
13                MATTHEW KAPLAN, ESQ., and
                  J. WARREN LYTLE, JR., ESQ.
14                Sughrue Mion
                  (Washington, D.C.)
15
                                      Counsel for Widex
16                                    Defendants
17                        -  -  -
18
19
20
21
22
23
24
25
```

Gloster - direct

Page 662

1    block diagrams and the technical documents, and then

2    determine whether what was in the code was actually what was

3    represented in the technical documents.

4    Q.    How much code did you have to review in that process?

5    A.    I had to go through tens of thousands of lines of

6    code before I could find the particular portions of the code

7    that were related to feedback cancellation.  Then after I

8    looked at those particular portions, I had to identify which

9    figures in the technical documents were related to the code

10   and to determine whether they matched.

11   Q.    Prior to your work on this case, had you done any

12   analysis of digital systems relating to hearing aid

13   products?

14   A.    No, I had not worked on hearing aids specifically.

15   However, I have worked with naval research.  And we actually

16   did image processing.  In image processing you translate the

17   images into digital samples, then you filter the digital

18   samples.

19          So once you are looking at digital samples, be

20   it from a video image or from an audio signal, the

21   processing of the samples is the same.

22   Q.    For the Demant defendants and the Widex defendants,

23   when you reviewed the technical materials and the hardware

24   description language code, what was the general conclusion

25   you came to?

Gloster - direct

1    A.      It was my opinion that the technical documents

2    matched the code.  They were accurate descriptions of what

3    was actually found in the code.

4            I think there had been some question previously

5    as to whether or not the documents matched the code.  That

6    was my job.  I found that for this particular block diagram

7    this matched the code.

8            Typically, engineers create block diagrams

9    before they actually write the code.  So it would be natural

10   to find a set of block diagrams that matched the code.

11   Q.      For the Widex defendants, which products did you look

12   at?

13   A.      It was Diva and Inteo.

14   Q.      Did they use the same integrated circuit or chip?

15   A.      Actually, not exactly.  What happened was the Diva

16   was derived from the Diva 1 platform.  And the Inteo was

17   derived from the Diva 2 platform.  I also called it the

18   Rollo.

19           So I looked at the Diva 1 and the Diva 2

20   platforms.  In the Diva 2, I think there was two instances

21   of the feedback path simulator, FPS.  In Diva 1 there was

22   only one.

23   Q.      It is your understanding that the feedback path

24   simulator between the two different chip platforms was

25   similar?

Page 712

1    get the last turn.

2                (Jury enters courtroom at 1:37 p.m.)

3                THE COURT:  Do you want me to explain that to

4    the jurors?

5                MR. MANDIR:  Please.

6                THE COURT:  I will attempt to.

7                Ladies and gentlemen, please take your seats.

8    Your next witness.

9                MR. STEINBERG:  Soren Westermann, Your Honor.

10               THE COURT:  If I understand correctly, ladies

11   and gentlemen, this gentleman is actually going to appear in

12   both cases.  I am going to flex the Rules of Evidence a

13   little bit, to enable there to be some leading by Mr.

14   Steinberg, leading questions, even though he is calling Mr.

15   Westermann in his case.  And we are going to cover some of

16   the issues that the defense wants covered with this witness

17   while he is on the stand now.

18               ... SOREN WESTERMANN, having been duly

19          sworn as a witness, was examined and testified as

20          follows ...

21               THE COURT:  You may proceed, Mr. Steinberg.

22               Good afternoon.

23                          DIRECT EXAMINATION

24   BY MR. STEINBERG:

25   Q.    Mr. Westermann, do you speak and understand English?

Westermann - direct

Page 714

1    A.      That's correct.

2    Q.      And you have never worked anywhere but in your family

3    business.  Correct?

4    A.      That's correct.

5    Q.      Now, at Widex, what is your title?

6    A.      I am director of research of information technology

7    and of intellectual property.

8    Q.      And for our benefit, what is intellectual property?

9    A.      It's mainly patents.

10   Q.      Like the patents that are at issue in this case.

11   Right?

12   A.      Yes.

13   Q.      And are you, in fact, also in charge of the patent

14   department at Widex?

15   A.      Yes, I am.

16   Q.      What is the patent department?

17   A.      That's a department with six engineers and a

18   secretary.

19   Q.      And among other things that the patent department at

20   Widex does, one of the things that the patent department at

21   Widex does is it monitors patents in the hearing aid field.

22   Correct?

23   A.      That's correct.

24   Q.      And if Widex believes that a patent is invalid, they

25   would file an opposition with the Patent Office.  Correct?

Westermann - direct

Page 716

1   Q.      Now, you are familiar with the '850 and '749 patents

2   at issue here.  Correct?

3   A.      Today I am, yes.

4   Q.      Now, in the 20 years since they have been filed, has

5   Widex ever filed an opposition in any patent office in the

6   world to those patents?

7   A.      To the Levitt patent?

8   Q.      Correct.

9   A.      No, we have never.

10  Q.      Now, we have talked about this industry association

11  called HIMPP.  It's an acronym, right, H-I-M-P-P?

12  A.      That's correct.

13  Q.      What does that stands for, if you can tell us?

14  A.      The hearing Instrument Manufacturers Patent

15  Partnership.

16  Q.      Patent partnership?

17  A.      Yes.

18  Q.      And HIMPP was started by certain hearing aid

19  manufacturers to acquire a group of patents.  Correct?

20  A.      That's correct.

21  Q.      And Widex is a member of HIMPP.  Correct?

22  A.      That's correct.  Widex is a partner in HIMPP.

23  Q.      Is the Demant entity a partner in HIMPP?

24  A.      Yes.

25  Q.      Now, did HIMPP assist the hearing aid industry,

Westermann - direct

Page 717

1    including Widex and Demant, in obtaining CDs from a company

2    called MicroPatent that contains patents of interest to the

3    hearing aid companies?

4    A.    Yes.

5    Q.    And all the members of HIMPP, including Widex and

6    Demant, have access to that CD with those patents.  Correct?

7    A.    Yes.  I mean, that information is public.  So

8    everybody can get that.  You just have an easy way,

9    organized way of getting them.

10   Q.    You, in fact, are the managing director of HIMPP.  Is

11   that correct?

12   A.    That's correct.

13   Q.    And other personnel in your patent department also

14   have access to that database of patents.  Correct?

15   A.    That's correct.

16   Q.    And you personally have access to that database of

17   patents.  Correct?

18   A.    I do.

19   Q.    And all of the HIMPP members, including Demant, has

20   access to that database.  Right?

21   A.    Not correct, because they have their own database.

22   Q.    But that is essentially a copy of the database that

23   contains these patents.  Right?

24   A.    Essentially, yes.

25   Q.    And both the '850 and the '749 patents were in that

Westermann - direct

Page 718

1  database that was distributed by HIMPP to the HIMPP members.

2  Correct?

3  A.     That's correct.

4  Q.     And that occurred in about 2001.  Is that correct?

5  A.     That's correct.  I think 2001 or 2002.

6  Q.     Now, I am going to ask you about other knowledge that

7  Widex had about the '850 and '749 patents other than the

8  database from HIMPP.  Okay?

9  A.     Okay.

10 Q.     I would like to refer in the book in front of you to

11 Exhibit PX-366.

12 A.     Okay.

13 Q.     And PX-366 purports to be an assignment of a patent.

14 Correct?

15 A.     Yes.

16 Q.     Do you recognize this document?

17 A.     I saw it during my HIMPP interview in Denmark.

18 Q.     Now, if you look about four or five pages back, there

19 is actually an assignment agreement.  Do you see that?

20 A.     Yes.

21 Q.     It's dated June 1996.  Right?  You can see that in

22 the first full paragraph at the very end?

23 A.     Okay.  It's signed during August but --

24 Q.     So it's June 1996, signed in August 1996.  Correct?

25 A.     Yes.

Page 721

1    was the purpose of it, was it not, to identify prior art?

2    A.      I only learned that at the Danish hearing.

3    Q.      You learned that at the Danish hearing?

4    A.      Yes.

5    Q.      So let's turn now to PX-649.

6    A.      649?

7    Q.      Yes.

8    A.      Okay.

9    Q.      That's a document entitled Articles of Association of

10   KS HIMPP.  Right?

11   A.      That's correct.

12   Q.      And that's the organization we have been talking

13   about of the hearing aid manufacturers?

14   A.      That's correct.

15   Q.      Now, if you turn to the next page, it says it's a

16   limited partnership.  Correct?

17   A.      That's correct.

18   Q.      And then it lists the few partners in Section 3.1.

19   Correct?

20   A.      That's correct.

21   Q.      And it lists Widex.  Right?

22   A.      That's correct.

23   Q.      And Oticon.  Correct?

24   A.      That's correct.

25   Q.      Now, the original goal of HIMPP was to eliminate the

Westermann - direct

Page 722

1    threat of patents being enforced against the hearing aid

2    companies by 3M.   Right?

3    A.      That's correct.

4    Q.      And one of the members of HIMPP actually bought 3M's

5    patents and contributed them to this organization called

6    HIMPP; right?

7    A.      Contributed.

8    Q.      Yes.

9    A.      Sold it to him.

10   Q.      Sold it to him.   Okay.   And the members of HIMPP were

11   all competitors of the company that bought those patents;

12   correct?

13   A.      They were, yes.

14   Q.      Now, I'm going to direct your attention to Exhibit

15   773.   PX-773.

16           Do you have that in front of you?

17   A.      Yes.

18   Q.      And you have seen that before, right?

19   A.      Yes, I saw it also during the deposition.

20   Q.      And that's the registration for the patent?

21   A.      Registration, you could say that.

22   Q.      And this document came from Widex's records; correct?

23   A.      I believe so, yes.

24   Q.      And if you look at the top right-hand side, on the

25   top right-hand corner, the date there, now in Europe, they

Westermann - direct

Page 723

1    reverse the month and year, right?  They reverse the day and

2    the month.  Excuse me.

3    A.    I believe it's opposite.

4    Q.    Compared to the way we write the day and the month in

5    the United States; right?

6    A.    It is correct that it is opposite.

7    Q.    So that would read, if I'm reading it correctly,

8    August 5th, 1993; am I reading that correctly?

9    A.    I think so, yes.

10   Q.    So this was in Widex's files from August 1993?

11   A.    Yes, it would have been.

12   Q.    And this is a description of Dr. Levitt's patent;

13   correct?

14   A.    No.

15   Q.    No?

16   A.    This is just registration of the number and its

17   filing date.

18   Q.    But it is the patent we're talking about in this

19   case; correct?

20   A.    Not actually.  This is the European equivalent.

21   Q.    It's the European equivalent of Dr. Levitt's patent

22   meaning it's the identical patent filed in Europe; correct?

23   A.    Not necessarily, because due to the filing history,

24   it may have changed, doing the prosecution in Europe.

25   Q.    Well, is there anything substantively different about

Page 724

1    the European patent from the American patent that you are

2    aware of?

3    A.      I don't remember but there was only one.

4    Q.      There was only one; correct?

5    A.      Yes.

6    Q.      Okay.  And, in fact, you can see that by the

7    inventors being Dr. Levitt, Mr. Dugot and Mr. Kopper;

8    correct?

9    A.      Yes.

10   Q.      And you can also see it has a priority date on the

11   left-hand side, June 26th, 1986, the same date of

12   Dr. Levitt's patent in the United States; correct?

13   A.      That is correct.

14   Q.      So this essentially means this is the European patent

15   based on the United States patent of Dr. Levitt; right?

16   A.      Yes, I would think so.  Yes.

17   Q.      Now, lets refer you to Exhibit 775.  775 is the

18   European patent application for the identical patent, the

19   '850 patent; correct?

20   A.      It has the same priority, yes.

21   Q.      In fact, the writing, the handwriting at the very top

22   is your secretary's writing, isn't it?

23   A.      I think only the one to the very left.

24   Q.      Okay.  Right to the right, at the very top, there is

25   a sign and then there is a U.S. patent number.  Do you see

1    that?

2    A.      Yes.

3    Q.      And the sign means equal to that; right?

4    A.      Or approximately.

5    Q.      Equivalent; correct?

6    A.      Right.

7    Q.      Okay.  And this also came from Widex's files;

8    correct?

9    A.      It must have, yes.

10   Q.      I'm going to show you Exhibit 774.

11           All right.  We have 774 on the screen, since I

12   can't find it, the '749 patent.  Do you have it?

13   A.      I have it.

14   Q.      Now, that '749 patent also would have been in your

15   files about the same time, August of 1993; correct?

16   A.      I wouldn't know.  I don't think so.

17   Q.      Well, whose writing is that on the '749 patent?

18   A.      I think at this corner it's still my secretary, but

19   the rest is probably at later time, and he was not there in

20   '93.

21   Q.      He had already gone?

22   A.      He hadn't started.

23   Q.      When did he leave?

24   A.      The end of 1999.

25   Q.      Do you have your deposition transcript in front of

Westermann - direct

1  you, sir?

2  A.      No.

3          MR. STEINBERG:  May I approach, Your Honor?

4          THE COURT:  Yes, you may.

5  Q.      I'll hand you your deposition transcript in this

6  case.  (Documents passed forward.)

7          Now, having looked at the '850 patent and now

8  the '749 patent, would that suggest to you that the '749

9  patent was also in your file as of August 5th, 1993?

10  A.      Having again looked?

11  Q.      We just looked at the '850.

12  A.      Yes.

13  Q.      And now we're looking at the '749.

14  A.      Yes.

15  Q.      Both from Widex files.  Would that suggest to you

16  that the '749 was also in Widex's files as of August 5th,

17  1993?

18  A.      I can't say for certain.  Could be.

19  Q.      Let's turn to page 168 of your deposition.  This

20  would be volume two.  And if you look at page 168, starting

21  at line 21, were you asked this question and did you give

22  this answer.

23  A.      At what line?

24  Q.      At line 21.  Were you asked this question and did you

25  give this answer:

Page 727

1          "Question:  Would that suggest that the '749

2    patent was also in your file as of August 5th, 1993?

3          "Answer:  Yes."

4          Did you give that answer?

5    A.    I must have.  And it could have been there.

6    Q.    Now, let's go back to HIMPP for just a second, this

7    organization.  HIMPP doesn't have any office, does it,

8    separate office?

9    A.    No.

10   Q.    HIMPP works out of Widex; correct?

11   A.    Widex is a secretary of HIMPP, yes.

12   Q.    HIMPP doesn't have employees or resources, it uses

13   Widex employees and resources; correct?

14   A.    Correct.

15   Q.    And you in fact manage HIMPP's bank account; correct?

16   A.    Yes.

17   Q.    Now, I'm going to hand you some exhibits which are

18   copies of different patents in the HIMPP portfolio and I'm

19   going to ask you to identify them for a moment.  So if you

20   would turn to DX-1181.

21          Do you recognize DX-1181?

22   A.    Yes.

23   Q.    Okay.  What is DX-1181?

24   A.    It's a short list of the national patents of one of

25   the HIMPP patent families.

Westermann - direct

Page 728

1    Q.    Okay.  And is this so-called Mangold patent?

2    A.    It's the so-called Mangold patent.

3    Q.    Yes.  Do you see the inventor named Mangold?

4    A.    But there are similar Mangold patents.

5    Q.    Is this one of the Mangold patents?

6    A.    Yes.

7    Q.    Now, if you look at the references, No. 14?

8    A.    Excuse me.  What references?

9          MR. STEINBERG:  May I have a moment, Your Honor?

10          THE COURT:  Yes.

11          (Pause.)

12   BY MR. STEINBERG:

13   Q.    Let's move on to DX-1195.  Now, the patent you are

14   looking at, is that one of the patents that was purchased by

15   HIMPP in the original transaction?

16   A.    This is not the patent.  This is a list of patents.

17   Q.    A list of patents?

18   A.    Yes.  And this is the list the patent family called

19   CID 3, that HIMPP was a part of the patent portfolio that

20   HIMPP purchased.

21   Q.    Let's go to DX-1196.  And what is DX-1196?

22   A.    It appears to be one of the U.S. patents from the CID

23   3 family.

24   Q.    One of the patents purchased by HIMPP?

25   A.    Yes, correct.

Westermann - direct

Page 729

1    Q.    Okay.  And if you look down the references cited in

2    that patent, you see the Dr. Levitt patent, the '850?

3    A.    Yes, I do.

4    Q.    And this was a patent that was filed in April of

5    1993; correct?

6    A.    It seems to be a division of what was filed in '93,

7    yes.

8    Q.    And when was the transaction when HIMPP purchased

9    these patents?

10   A.    It was in the summer of '96.

11   Q.    1996?

12   A.    Yes.

13   Q.    Now, HIMPP purchased these patents for approximately

14   how much money?

15   A.    These CID patents or the entire portfolio.

16   Q.    The entire portfolio.

17   A.    I believe it was $40 and-a-half million U.S. dollars.

18   Q.    Was anything done to review the references listed in

19   the patents as prior art like Dr. Levitt's '850 patent at

20   the time of this expenditure of $14.5 million?

21   A.    No, because these CID patents actually just came as a

22   kind of extra.  We were not looking for those, specifically.

23   Q.    Now, is one of the benefits of Widex being a member

24   of HIMPP that you would pay less royalties to license

25   patented technology as a member of HIMPP?

Westermann - direct

Page 733

1    Q.    But prior to launching the Senso Diva with feedback

2    cancellation, your patent department didn't do anything to

3    search for patents that related to feedback cancellation,

4    did it?

5    A.    I am not sure.  They probably didn't.

6    Q.    I am sorry?

7    A.    I don't think they did specifically that, no.

8    Q.    Well, when you were deposed did you tell us that they

9    didn't do anything?

10   A.    I mean, we do an ongoing survey.  And that is it.

11   Q.    Can you turn to Page 118 and 119 in your deposition,

12   Volume II.

13         If you look down, starting with Line 22 on Page

14   118 going over to the next page, were you asked these

15   questions and did you give these answers:

16         Okay.  Prior to launching the Senso Diva

17   product, do you know whether your patent department did a

18   search relating to feedback and feedback cancellation?

19         Answer:  The patent department was not so big at

20   that time and I don't think they made -- made a specific

21   search for feedback cancellation.

22   A.    Exactly.

23   Q.    But today you would do that.  Right?

24   A.    Yes.

25   Q.    Now, in fact, despite having a policy of reviewing

Westermann - direct

Page 734

1    patents to determine infringement, Widex didn't perform any

2    due diligence to determine whether its Senso product would

3    be infringing any other patent whatsoever prior to launching

4    that product, did they?

5    A.      May I have that again?

6    Q.      Sure.  Despite Widex having a policy of reviewing

7    patents to determine infringement, Widex didn't perform any

8    due diligence whatsoever to determine whether the Senso

9    product was infringing other patents?

10   A.      The Senso Diva product?  There are many Senso

11   products.  You mean the Senso Diva product?

12   Q.      Correct.

13   A.      Well, we didn't really have this official policy back

14   at that time.

15   Q.      Did you do any due diligence whatsoever to determine

16   whether the Senso Diva infringed any other patent?

17   A.      Apart from the ongoing surveillance, I don't think

18   so.

19   Q.      Well, you are saying you did something.  What did you

20   do?

21   A.      I mean, we had a constant, we were constantly

22   monitoring the incoming patents.  And if something resembled

23   anything we were planning to do, we would act.

24   Q.      But you don't recall performing any specific due

25   diligence to determine whether this product was infringing

Westermann - direct

1    any other patent.  Correct?

2    A.      Not a specific duty, no.

3    Q.      Now, you have been here from the open argument.

4    Correct?

5    A.      Yes.

6    Q.      And you have heard the testimony, you have heard the

7    lawyers talk and so forth.  Correct?

8    A.      Yes.

9    Q.      Now, you have heard other members of your company say

10   that Widex prepares various types of information for the

11   public and for others about their product, describing their

12   products.  Correct?

13   A.      Sure.

14   Q.      Is that true?

15   A.      Sure.

16   Q.      And you have also, you agree with me that prior to

17   that material going out to the public, that material is

18   reviewed for correctness by your technical people.  Correct?

19   A.      I think so.

20   Q.      To make sure it's accurate.  Correct?

21   A.      Yes.

22   Q.      In fact, your technical people will actually write up

23   the information about the product so that the marketing

24   department can then put out a brochure describing your

25   product.  Correct?

Westermann - direct

Page 741

1    complexity of chips will double.

2    Q.     The capacity of chips will double?

3    A.     Yes.

4    Q.     So essentially they'll get smaller and smaller with

5    more information on them over the years; correct?

6    A.     Correct.

7    Q.     Now, this product you put out in the year 2000-2001,

8    does that product have what is called an LMS algorithm, do

9    you know?

10   A.     I know now.  I actually didn't know before the trial.

11   Q.     In your engineering career, had you ever run across

12   the LMS algorithm?

13   A.     No.  I have a specialty in psycho-acoustics and that

14   doesn't have much to do with LMS.

15   Q.     Do you know enough to know that the LMS algorithm has

16   been around since the 1960s?

17   A.     I know now.

18   Q.     But you didn't have it in a commercial product until

19   2000; correct?

20   A.     I believe so.

21   Q.     Now, did you participate in a review by the German

22   authorities of a potential merger in Germany of two hearing

23   aid companies?

24   A.     Not personally.

25   Q.     Did you supply information to the German regulators,

Westermann - direct

Page 745

1   A.      Okay.

2   Q.      Have you done a calculation to determine the profits

3   made on those infringing items that we allege are

4   infringing?

5   A.      For Widex Denmark?

6   Q.      For any Widex company at all.

7   A.      No.

8   Q.      Now --

9   A.      I have not.

10  Q.      You have heard of Dr. Harry Levitt before; right?

11  A.      Yes.

12  Q.      Okay.  You have known about Dr. Levitt for many,

13  many, many years; correct?

14  A.      Yes.

15  Q.      And, in fact, you have read a number of his

16  scientific articles; right?

17  A.      I read a handful or so, yes.

18  Q.      And your company has consulted with Dr. Levitt on

19  occasion; correct?

20  A.      Well, on behalf of HIMPP, yes.

21  Q.      And you consider Dr. Levitt to be an eminent

22  authority in the field of audiology and hearing technology;

23  correct?

24  A.      Yes, and particularly in audiology.

25  Q.      And you have heard that opinion for a long time prior

Page 746

1   to this lawsuit; correct?

2   A.      Yes.

3   Q.      In fact, you have held the opinion that Dr. Levitt is

4   an authority in the field of hearing aids and audiology for

5   decades; correct?

6   A.      I certainly believe so, yes.

7   Q.      And you had seen Dr. Levitt's resume many, many years

8   ago because you and HIMPP hired Dr. Levitt as an expert;

9   right?

10  A.      I received it, I didn't read it.

11  Q.      You never read his resume even though you got it?

12  A.      Yes, it's 11 pages long.

13  Q.      Now, is it a fact that Dr. Levitt was hired on behalf

14  of the organization you are the director of, HIMPP?

15  A.      That's correct.

16  Q.      And that was in 1996-1997; correct?

17  A.      I believe so, yes.

18  Q.      Now, the law firm that hired Dr. Levitt, is that the

19  same law firm defending you in this lawsuit?

20  A.      That is correct.

21  Q.      Now, when Dr. Levitt was hired, his resume was

22  attached to the materials that were provided to both you and

23  your law firm; correct?

24  A.      I think that is correct.

25  Q.      And all of the HIMPP members, including Widex and

Westermann - direct

Page 747

1    Demant, would have known that Dr. Levitt had been retained

2    as an expert on behalf of HIMPP; correct?

3    A.      Yes, because there was a common decision to use him.

4    Q.      It was a group decision by all the members?

5    A.      Yes, and that is why I didn't need to read the

6    resume.  We wanted him.

7    Q.      You didn't read his resume because you knew he was a

8    preeminent expert in the field, right?

9    A.      Yes.

10   Q.      Now, if you wouldn't mind turning to 562, PX-562.

11   A.      (Witness complies.)

12   Q.      And that purports to be a letter to Dr. Levitt dated

13   December 26, 1996 from the Sughrue law firm, Mr. Cushing

14   retaining Dr. Levitt?

15   A.      That is correct.

16   Q.      And who is Mr. Cushing?

17   A.      Mr. Cushing is our U.S. patent lawyer.

18   Q.      And he in the same law firm that is representing you

19   here today?

20   A.      Yes.

21   Q.      In fact, if you look at the second page, the letter

22   shows it was sent to you also; correct?

23   A.      That is correct.  The letter was?

24   Q.      Yes.  The letter was sent to you?

25   A.      Yes.

Westermann - direct

Page 748

1    Q.    Did you receive the letter?

2    A.    I am sure I did.

3    Q.    Did you read it?

4    A.    I am sure I did.

5    Q.    And did you agree with the decision to hire Dr.

6    Levitt as an expert?

7    A.    I mean we had already agreed to that in HIMPP.

8    Q.    And you were hiring Dr. Levitt as an expert in a

9    patent proceeding; correct?

10   A.    That is correct.  A reexamination request.

11   Q.    Now, the reason you sought Dr. Levitt out was because

12   his expertise in digital hearing aids; correct?

13   A.    No, in hearing aids.

14   Q.    In hearing aids?

15   A.    It was not a digital -- this patent was not about

16   digital hearing aids, it was about analog hearing aids.

17   Q.    And you were aware that Dr. Levitt supplied his

18   resume giving you all of his credentials; right?

19   A.    I was expecting him to be in there, yes.

20   Q.    Now, let's look at the next exhibit, 598, which is a

21   composite exhibit of a second letter to Dr. Levitt.

22              Do you have that?

23   A.    Yes.

24   Q.    It's by the same law firm; right?

25   A.    Yes.