Westermann - direct

1    Q.      And it's to Dr. Levitt; correct?

2    A.      Correct.

3    Q.      And it has a number of enclosures; correct?

4    A.      It has, yes.

5    Q.      And it is cc'd to you?

6    A.      The letter is, yes.

7    Q.      Right.  And one of the enclosures is Dr. Levitt's

8    resume; correct?

9    A.      That is correct.

10   Q.      Now, another enclosure is a declaration.  Do you know

11   what a declaration is?

12   A.      I believe so.

13   Q.      Okay.  Is it a statement under oath that you asked

14   Dr. Levitt to sign and supply to the patent department?

15   A.      I believe it must be under oath, yes.

16   Q.      And if you look at the very first line in the

17   declaration, what does it say?  The very first line.

18   A.      The very first -- you mean, I, Harry Levitt?

19   Q.      Right after that.

20   A.      My curriculum vitae is attached to this declaration.

21   Q.      Now, if you look at page three of his resume,

22   Dr. Levitt's resume, at the bottom, do you see the two

23   patents at issue in this case?

24   A.      Yes, they are listed there.  Yes.

25   Q.      Now, you wanted to insure that Dr. Levitt had

Westermann - direct

Page 750

1    excellent credentials that were at least as good or better

2    than the opposing expert in this particular matter, didn't

3    you?

4    A.    No, we already had that.

5    Q.    Now, if you look at the Exhibit 562, the first

6    letter?

7    A.    Yes.

8    Q.    In paragraph three of that letter, it says the

9    patentee -- that is the other party, right?  The patentee

10   filed a response, copy enclosed in which they submitted a

11   declaration of a Nobel prize recipient opining that the

12   invention claimed in the Anderson '806 patent would not have

13   been obvious in light of the prior art.

14        Do you see that?

15   A.    What page is that?

16   Q.    That's the second page of the first letter in the

17   first full paragraph, midway down.

18   A.    The patentee -- I'm not quite.

19   Q.    It's highlighted on the -- in the --

20   A.    In which?  Can you show me?

21   Q.    It's highlighted on the screen, if you can see that.

22   A.    Is it the upper one or lower one?

23   Q.    The upper one, sir.

24   A.    I have that here.

25   Q.    Okay.  So your's was saying the other side has a

Westermann - direct

Page 751

1    Nobel prize winner who is testifying about this patent;

2    right?

3    A.    Yes.

4    Q.    And you wanted someone whose credentials were better

5    than that; right?

6    A.    Well, we wanted one who had relevance to the case.

7    The Nobel prize taker was a Nobel prize taker in memory

8    technology which is not hearing aids.

9    Q.    So if you look at the second paragraph, the very last

10   sentence says:  We would like to submit for their

11   consideration a declaration by someone with much better

12   credentials on the issue.  Right?

13   A.    Yes.

14   Q.    And did you agree with that?

15   A.    Certainly.

16   Q.    Now, these letters also say that you hired Dr. Levitt

17   for yet another engagement on another issue as a patent

18   expert; is that correct?

19   A.    I believe so.  I don't remember the actual -- I don't

20   think that case ever got to be finalized, but I know we did,

21   we tried to use him on some.

22   Q.    Okay.  And, in fact, in the second letter, that's

23   attached to your Exhibit 598, there is a memorandum

24   agreement whereby he is retained, he is actually hired;

25   correct?

Westermann - direct

Page 752

1    A.      I believe so.  Yes.

2    Q.      Now, I think I asked you before whether or not you

3    had ever testified as an expert on what's called the Mangold

4    patent.  I think you said you did not.  Is that correct?

5    A.      Well, not like I am testifying today.  I was asked to

6    give a presentation about the current state of hearing aid

7    products.

8    Q.      Well, if you would turn to Page 9 of your first

9    volume of testimony?

10              MR. MANDIR:  I am sorry, counsel.  What page?

11              MR. STEINBERG:  Page 9.

12   BY MR. STEINBERG:

13   Q.      Starting at Line 4, were you asked these questions

14   and did you give these answers:

15              "Question:  Other than the testimony in that

16   matter, have you ever given testimony before any other

17   government agencies or any other proceeding?

18              "Answer:  Once in Stockholm.

19              "Question:  What was that about?

20              "Answer:  That was about a 3M patent that was

21   originally filed in Sweden where we had opposed, Widex had

22   opposed.

23              "Question:  And was your testimony in connection

24   with the opposition to that patent?

25              "Answer:  I was asked to present at stages of

Westermann - direct

Page 782

1           MR. MANDIR:  Objection, mischaracterizes.  To

2    modify the infringement?

3           THE COURT:  Could you rephrase?

4           MR. STEINBERG:  Sure.

5    BY MR. STEINBERG:

6    Q.    What have you done to terminate the infringing

7    products that are on the market?

8           MR. MANDIR:  Same objection.

9           MR. STEINBERG:  To eliminate the infringing

10   products from the market.

11          THE COURT:  I don't think they accept the

12   characterization.

13          MR. MANDIR:  Exactly, Your Honor.  We don't

14   accept it's infringing.

15          THE COURT:  It's alleged.

16          MR. STEINBERG:  It's alleged, correct.

17          THE COURT:  You can rephrase.

18   BY MR. STEINBERG:

19   Q.    What have you done with respect to the products on

20   the market about the alleged infringement?

21   A.    We haven't developed anything after, I mean after the

22   patents actually ran out.

23   Q.    You continued to sell those products; correct?

24   A.    Yes, we continued to sell the products we had.

25          MR. STEINBERG:  May I have a moment, Your Honor?

Westermann - cross

Page 794

1    Q.     You mentioned the 3M patent that HIMPP has obtained.

2           Besides 3M, has HIMPP obtained any other patents

3    over the years?

4    A.     Yes.  Twice.  First HIMPP took over a patent

5    portfolio from a former U.S. hearing aid company called

6    Decibel.  Later they took over some from the Japanese NEC,

7    very large company in Japan.

8    Q.     You mentioned Decibel.  Is that right?

9    A.     That's correct.

10   Q.     Why were the Decibel patents obtained?

11   A.     Well, Decibel had gone out of business.  And the

12   patents were available.  And the partners of HIMPP believed

13   it more safe to have HIMPP buy them than to risk them

14   falling in the wrong hands.

15   Q.     What do you mean falling in the wrong hands?

16   A.     Like falling in the hands of somebody that just wants

17   to block the market or block the hearing aid technology or

18   to litigate.

19   Q.     You mentioned the NEC patents?

20   A.     Yes.

21   Q.     Why were the NEC patents obtained?

22   A.     Well, NEC is a very big company, but they are not

23   producing hearing aids.  I understand they had sponsored

24   some university work, and those patents were a result of

25   this university work.  And NEC didn't see any use for them.

Westermann - cross

1              And I can hardly see what the rest are.

2    Q.    Okay.

3    A.    There is some brigade in the third line, I think.

4    Q.    Is any of the writing directed to feedback

5    cancellation?

6    A.    I can't say -- the fourth one seems to be phase

7    shift.  But I don't see any feedback cancellation.

8    Q.    Are you aware if any Widex engineers or scientists

9    who were involved in the design of either the Senso Diva or

10   the Inteo, do you know if any of them were aware of Dr.

11   Levitt's patents at the time they did their research and

12   design?

13   A.    No, certainly not.

14   Q.    Was Widex ever approached by a company called EKMS?

15   A.    No, not that I know of.

16              MR. MANDIR:  Excuse me, Your Honor.

17              (Pause.)

18   BY MR. MANDIR:

19   Q.    Mr. Westermann, can you turn to PX-598, please?  I

20   think it's in Mr. Steinberg's book.

21   A.    (Witness complies.)  Yes.

22   Q.    Can you turn to page 12 of the requests for

23   reexamination that Mr. Steinberg was asking you about a few

24   moments about?

25   A.    Page 12.

Westermann - redirect

Page 811

1    A.    Yes.

2    Q.    But this controller, in today's technology, is small

3    enough to fit in the hearing aid; right?

4    A.    This particular controller is.  (Nodding yes.)

5    Q.    Now, I believe counsel asked you if you ever were

6    sued for patent infringement.  One of the purposes of HIMPP

7    was so that the hearing aids manufacturers wouldn't sue each

8    other for patent infringement; correct?

9    A.    No.

10   Q.    Oh.  Have you sued another hearing aid manufacturer

11   for patent infringement?

12   A.    We haven't, but others have.

13   Q.    One of the purposes of HIMPP was to amicably resolve

14   these patent disputes among the members of HIMPP; correct?

15   A.    No, not when HIMPP was created.  It was to try to

16   remove or help remove technical barriers in the development.

17   Q.    Do you remember voluntary procedures being enacted by

18   HIMPP?

19   A.    Yes.

20   Q.    And the voluntary procedures said that one of the

21   purposes was that its members would not sue each other in

22   an attempt to amicably resolve these issues; correct?

23   A.    That is something we discussed and made later.  This

24   is a few years older than the information in HIMPP.

25   Q.    Now, when you answered your counsel's questions about

Westermann - redirect

Page 812

1    the purposes of HIMPP, one of the purposes you said was the

2    risk of patents falling into the wrong hands; right?

3    A.    Correct.

4    Q.    And that would be the hands of people outside the

5    major hearing aid manufacturers; right?

6    A.    That is what it would normally be, yes.

7    Q.    Now, you testified that at the time this suit was

8    filed, you were totally unaware of Dr. Levitt's patents; is

9    that correct?

10   A.    That's correct.

11   Q.    But you and HIMPP hired Dr. Levitt and on his resume

12   where you hired him, it listed prominently his patents?

13   A.    That's right.

14         MR. MANDIR:    Objection to the characterization.

15         THE COURT:    Sustained.    You can rephrase.

16         MR. STEINBERG:    Sure.

17   BY MR. STEINBERG:

18   Q.    You hired Dr. Levitt and on his resume it listed his

19   patents; correct?

20   A.    Yes, with a lot of other references.

21   Q.    And, in fact, in your files, as early as 1993, Dr.

22   Levitt's patents appeared in the files of HIMPP and Widex;

23   correct?

24   A.    HIMPP didn't exist at that time.

25   Q.    I'm sorry.  Widex.  Excuse me.

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                IN AND FOR THE DISTRICT OF DELAWARE
 3
                              -   -   -
 4
 5     ENERGY TRANSPORTATION,            :   Civil Action
       INC.,                            :
 6                                      :
                  Plaintiff,            :
 7                                      :
          v.                            :
 8                                      :
       WILLIAM DEMANT HOLDINGS A/S,     :
 9     et al.,                          :
                                        :
10                Defendants.           :   No. 05-422 (GMS)
11                            -   -   -
12                     Wilmington, Delaware
                     Friday, January 25, 2008
13                          9:00 a.m.
                      Fifth Day of Trial
14
                              -   -   -
15
       BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18     APPEARANCES:
19               EDMOND D. JOHNSON, ESQ.
                 Pepper Hamilton LLP
20                   -and-
                 MARTY STEINBERG, ESQ.,
21               BRIAN M. BUROKER, ESQ., and
                 MAYA M. ECKSTEIN, ESQ.
22               Hunton & Williams
                 (Washington, D.C.)
23
                                    Counsel for Plaintiff
24
25
```

Page 820

```
 1   APPEARANCES CONTINUED:
 2             MARY B. GRAHAM, ESQ.
             Morris, Nichols, Arsht & Tunnell
 3                 -and-
             JOHN M. ROMARY, ESQ.,
 4           GREGORY C. GRAMENOPOULOS, ESQ.,
             VINCENT KOVALICK, ESQ.,
 5           KAY HILL, ESQ.,
             GERSON S. PANITCH, ESQ., and
 6           ARTHUR A. SMITH, ESQ.
             Finnegan, Henderson, Ford, Farabow & Dunner
 7           (Washington, D.C.)
 8                              Counsel for
                               Demant Defendants
 9
             DONALD E. REID, ESQ.
10           Morris, Nichols, Arsht & Tunnell
                   -and-
11           WILLIAM H. MANDIR, ESQ.,
             JOHN SCHERLING, ESQ.,
12           CARL J. PELLEGRINI, ESQ.,
             BRIAN SHELTON, ESQ.,
13           MATTHEW KAPLAN, ESQ., and
             J. WARREN LYTLE, JR., ESQ.
14           Sughrue Mion
             (Washington, D.C.)
15
                               Counsel for Widex
16                             Defendants
17                    -  -  -
18
19
20
21
22
23
24
25
```

Musika - direct

Page 853

1    sales of their product.  So it was from these actual books

2    and records of Demant that I pulled out the accused sales

3    and put them into the period that I have listed there.

4    Q.     Did you do the same exercise for the Demant defendant

5    Bernafon?

6    A.     I did, yes.

7    Q.     Can you explain to the jury what they are seeing

8    there?

9    A.     This is the Bernafon sales.  We see the same period.

10   The reason we don't see 2001 here is because Bernafon did

11   not have any sale of its accused items in 2001.  So the

12   first time there was a sale of an accused item for Bernafon

13   was 2002.  And I added across.  And you get to the

14   $33,653,667 for total sales of accused items by Bernafon.

15   Q.     If you will turn to JX-40, which should be in the

16   jurors' notebooks, can you tell us what that is?

17   A.     Yes.  These are the sales records from the

18   distributor, Bernafon LLC, which lists the actual sales

19   again out the door, the last sale there out the door to

20   audiologists or doctors.

21   Q.     Did you summarize the revenues from both Oticon and

22   Bernafon, the Demant defendants?

23   A.     Yes.

24   Q.     Can you tell the jury what they are seeing now?

25   A.     Yes.  I want to explain why there are two numbers

Musika - direct

Page 854

1    there, November 2006 and June 2006.

2           Let's just talk about November 2006 first.

3           The reason -- let me explain.  The reason there

4    are two different numbers there that are slightly different,

5    the 417 million versus the 357, it relates to -- there is a

6    different expiration date on the patents.  So if you go out

7    to the final expiration date of both patents, that would be

8    November 2006.  If you go to the earlier expiration date,

9    that would be June 2006.

10          So you have got less sales because you cut it

11   off sooner.

12          That is the reason for those two differences.

13          But if I add Bernafon and Oticon together, and I

14   take the November date as the cutoff date, those two sales

15   come to $417,086,750, and I multiply that times 8.4 percent,

16   to produce a damage related to the Demant defendants of

17   $35,035,287.

18   Q.    Now, let's go through the same exercise for the Widex

19   defendants.

20   A.    Okay.

21   Q.    What are we seeing now on the screen?

22   A.    The same thing.  Now we have the sales history from

23   the period 2001 through 2006.  There we can see again that I

24   have got two different cutoff dates, depending on which

25   expiration date the Court chooses.  But taking it through

Musika - direct

Page 855

1    the final date, the July date -- I am sorry, the November

2    date, total sales of the two accused products for Widex are

3    $306,127,967.

4              Again, this isn't my number.  These are numbers

5    that all come directly from the books and records, the

6    accounting records of the defendants' companies.

7    Q.    Are those only for the six years in question?

8    A.    Yes, they are.

9    Q.    If you look at Exhibit JX-216, which again should be

10   in the jurors' notebook, tell us what that is?

11   A.    Yes.  These records are the original books and records

12   that came directly from the Widex defendants.  So it was

13   from these records that I extracted the sales of the accused

14   products and put into this demonstrative.

15   Q.    And did you do, likewise, a summary for the Widex

16   defendants?

17   A.    Yes, exactly.

18   Q.    The damages?

19   A.    You can see, we have two different dates.  But taking

20   the later date, and adding those sales together, the total

21   sales were $306,127,967.  That is not a number that is

22   disputed by Widex.  This comes from their records.

23             The 8.4 percent is my opinion, which I think is

24   the appropriate reasonable royalty.  When I multiply the 8.4

25   percent times the total 306 million, that produces a damage

Jacobsen - direct

Page 972

1   A.     Yes.  I was in many directions very surprised.  First

2   of all, the first we see to a patent is they sue us.  They

3   don't call us and tell us, hey, do we want to negotiate a

4   license?

5           Secondly, when we saw the patents, there is only

6   a little more than a year before the patent expire.  Why

7   wait until the patent expires?

8           So, yes, we were very surprised.

9   Q.     At any time before this lawsuit was filed, did you

10  ever hear that Dr. Levitt mentioned to anyone that his

11  patents might be infringed or that he even had patents?

12  A.     No.

13  Q.     At any time before this lawsuit was filed, did you

14  ever hear that ETG claimed that it had patents that were

15  infringed by your company?

16  A.     I have never heard about ETG before the suit.

17  Q.     At any time before this lawsuit was filed, did you

18  ever hear that Audimax suggested that there might be an

19  infringement problem with any patents?

20  A.     No, they did not.

21  Q.     At any time before this lawsuit was filed, did a

22  company called EKMS ever approach you and suggest that there

23  was an infringement issue?

24  A.     No, they did not.

25          MR. PANITCH:  I have no further questions.

Jacobsen - cross

Page 992

1    Demant Group is relying on an opinion from patent counsel

2    stating that they did not infringe the Levitt patents.

3    Isn't that right?  You are not aware of it?

4    A.    I don't know whether we are or not.

5    Q.    The Demant Group, it never did anything to design

6    around the Levitt patents, did it?

7    A.    As we were not aware about these patents before we

8    were sued, we haven't designed -- we just didn't, or I

9    didn't know about them at least before that.

10   Q.    You are aware the Levitt patents had not expired when

11   this suit was filed, aren't you?

12   A.    It was just before, what I understand was that it was

13   just before the expiration of the patents, yes.

14   Q.    So the Demant Group did not do anything to design

15   around the patents.  Correct?  It's a yes or no question.

16   A.    But I don't know what year you are asking about.  Is

17   that before or after?

18   Q.    Any time.

19   A.    As I said, we didn't know the patents when the accused

20   product was developed.  So the answer is no.  I am not sure.

21   You will have to repeat the question again then.

22   Q.    Did the Demant Group at any time do anything to design

23   around the Levitt patents?

24   A.    We never believed we infringed the patent.

25   Q.    So the answer is no?

Jacobsen - cross

Page 993

1   A.      Probably is, yes.

2               MS. ECKSTEIN:  If I can have just a moment, Your

3   Honor.

4               (Pause.)

5   BY MS. ECKSTEIN:

6   Q.      I asked you about any time.  What about since the

7   filing of this lawsuit in June 2005, between that and the

8   expiration of the patents a year later, did the Demant Group

9   do anything to design around?

10  A.      I was told we were not infringing the patents.  So we

11  didn't change anything.

12              MS. ECKSTEIN:  Thank you.

13              THE COURT:  We will redirect after our break.

14              (Jury leaves courtroom at 3:02 p.m.)

15              (Recess taken.)

16              (Jury enters courtroom at 3:19 p.m.)

17              THE COURT:  All right.  Members of the jury,

18  please take your seats.  We will have redirect examination.

19  REDIRECT EXAMINATION

20  BY MR. PANITCH:

21  Q.      Mr. Jacobsen, when you were referring to what you did

22  after the lawsuit was filed, you said something like you

23  were relying on the very clever people.  Who are the people

24  that you were talking about?

25  A.      That's the people I have employed in our patent

Christensen - direct

Page 1019

1  Q.    How about any subsequent projects, like the Jump 3,

2  were the Levitt patents uncovered by Oticon when it did its

3  searches?

4  A.    No.

5  Q.    Did you or others at Oticon use the Levitt patents as

6  a basis for developing the features in Jump, Jump 2B or Jump

7  3?

8  A.    No.  Let me make clear, we did not know of these

9  patents when we did those developments.  And the technology

10 we developed is different from what is in those patents.

11         So the answer is no.

12 Q.    Do you know Dr. Levitt?

13 A.    I know the name.  I have heard the name.  I don't know

14 him.

15 Q.    Has Dr. Levitt ever approached you and indicated that

16 Oticon is infringing his two patents?

17 A.    No.  Not that I know of.

18 Q.    Have you ever heard of Audimax prior to this lawsuit?

19 A.    Yes, I think so.

20 Q.    Let's turn to one last area of questioning.

21         Mr. Christensen, are you aware that some of the

22 marketing materials for Oticon describe the anti-feedback

23 system as a cancellation system?

24 A.    Yes, I am aware of that.

25 Q.    Do you agree with that description?

Christensen - direct

Page 1020

1   A.    No, I do not agree with that description, because it's

2   a feedback reduction system and not a feedback cancellation

3   system.

4   Q.    Can you maybe describe that in more simple terms for

5   the jury so that they can understand your technical

6   understanding of that?

7   A.    Yes.  In technical terms, I would say if you cancel

8   something, you remove it completely.  If you reduce

9   something, you don't take it away completely, but you take

10  it away probably sufficiently, but not completely.  And the

11  feedback reduction system that we have been developing at

12  Oticon is simply not able to cancel feedback.  But it's able

13  to reduce the feedback somewhat that it's not annoying or

14  being heard.

15              MR. GRAMENOPOULOS:  No further questions.

16              THE COURT:  Counsel, you may cross-examine.

17              MR. STEINBERG:  Your Honor, may I approach the

18  witness?

19              THE COURT:  Yes.

20                      CROSS-EXAMINATION

21  BY MR. STEINBERG:

22  Q.    Now, Mr. Christensen, you clearly understood every

23  question that your counsel asked you?

24  A.    Yes, I think so.

25  Q.    You speak and understand English?

Christensen - cross

Page 1031

1    Do you know what Moore's Law is?

2    A.     Yes, I am familiar with that.

3    Q.     What is Moore's Law?

4    A.     Moore's Law is a prediction from Gordon Moore, who was

5    the founder of Intel.  And he predicted all the way back in

6    the sixties that the semiconductor technology would evolve

7    at such a pace that for every 18 months we would double the

8    power of computers and memories and so on.

9    Q.     That means chips get smaller and smaller and hold more

10   information.  Correct?

11   A.     I would say it's either -- either they get smaller or

12   they keep the size and have more information.

13   Q.     Or both?

14   A.     Right.

15   Q.     The advances in chip technology allowed for

16   miniaturization over the years.  Correct?

17   A.     Yes, that's correct.

18   Q.     And integrated circuits mean that you put various

19   electronic gizmos into one circuit, one electrical circuit.

20   Right?  You integrate them?

21   A.     Yes.  That's what I tried to explain before, I am

22   sorry, I was not clear.  But the idea is to integrate a lot

23   of electronics into this, three-by-four millimeters or

24   something like that.

25   Q.     And through the years, parties have been able to

Christensen - cross

Page 1032

1    integrate more and more things into an integrated circuit.

2    Right?

3    A.    Yes.  That's the beauty of technology.

4    Q.    Now, when you were talking before about patents and

5    the algorithm and so forth, you mentioned a filter.  Right?

6    You mentioned a feedback filter?

7    A.    I mentioned an adaptive, commercial filter.  Is that

8    the one you are referring to?

9    Q.    Yes.

10   A.    Yes.

11   Q.    In the filter technology that you are familiar with,

12   does your company use what is called an FIR filter, an

13   acronym for a finite impulse response filter?

14   A.    We use that technology on our platform, yes, we do.

15   Q.    And that type of filter is a delay line filter.

16   Right?

17   A.    It's also referred to as a delay line filter.  I think

18   it has a lot of different names, really.

19   Q.    And the filter, the feedback filter, needs

20   coefficients to operate correctly.  Right?

21   A.    Any filter would need coefficients to operate.

22   Q.    And the filter receives the coefficients from the LMS

23   algorithm.  Right?

24   A.    Well, that's not the way I see it.  The adaptive LMS

25   filter is really one unit.  I mean, it has to have all the

Christensen - cross

Page 1037

1   the feedback, not to cancel, because I think we measured --

2   it can reduce by an amount of 10 to 12 decibels.  It is a

3   technical measurement, how much it can reduce.  And it's the

4   order of magnitude.  And ten decibels equals like three

5   times.

6   Q.    Did you finish your answer?

7   A.    Not really.  If it did cancel, it would cancel by an

8   infinite amount, not only three times.  So that's why I

9   distinguish between reduce and cancel.

10  Q.    So can you answer my question?  You disagree with the

11  technical language in this Oticon document.  Is that

12  correct?

13  A.    On this point, yes.

14  Q.    And it goes on to say in the very next paragraph, The

15  feedback via the two feedback paths will cancel each other

16  when there is a perfect match between the two feedback

17  paths.  Right?

18  A.    That's what it says.

19  Q.    In fact, you testified previously that you were

20  puzzled by the use of the word cancel.  Isn't that correct?

21  A.    Previously?

22  Q.    Yes.  When you testified in your deposition?

23  A.    At deposition we also discussed the use of the word

24  cancel, that's true.

25  Q.    And you said you were puzzled by the use of the word

Christensen - cross

Page 1038

1   cancel in your own company's documents.  Right?

2   A.    I probably have said that, yes, if you say so, because

3   it's not correct.

4   Q.    Okay, let's look at PX-30.  PX-30 is a brochure for a

5   product called the Adapto.  Did your company make a product

6   called the Adapto?

7   A.    Oticon makes a product called the Adapto.

8   Q.    Okay.  And let's turn to page 448.

9   A.    Yes.

10  Q.    On 448, it clearly says Adapto dynamic feedback

11  cancellation; correct?

12  A.    It says so, yes.

13  Q.    And your position is you strongly disagree, it doesn't

14  have feedback cancellation; right?

15  A.    I must repeat myself.  It talks about --

16  Q.    Can you answer my question first?

17              MR. GRAMENOPOULOS:  Let him answer the question.

18              THE COURT:  You can answer the question.  Go

19  ahead.

20              THE WITNESS:  I must repeat myself, it says in

21  this marketing material, cancellation.  I still have the

22  same opinion that we are talking about the feedback

23  reduction, not cancellation.

24  BY MR. STEINBERG:

25  Q.    Okay.  And then it goes on to say:  Adaptive feedback

Page 1042

1    there is a frequently asked questions section; right?

2    A.    Yes.

3    Q.    Who creates the questions and who creates the answers?

4    A.    All the marketing people do.

5    Q.    And one of the questions is, how does the dynamic

6    feedback cancellation system work; right?

7    A.    Correct.

8    Q.    And part way down in that answer is when feedback is

9    detected, the DFC system eliminates it immediately, using

10   phase cancellation; right?

11   A.    It's in the document, yes.

12   Q.    Again, if you admitted that that is what your product

13   did, you would be admitting that it reverses the phase and

14   cancels; right?

15   A.    But I don't admit it.

16   Q.    I understand that.

17   A.    Okay.

18   Q.    But if you did, that is what it would mean; correct?

19   A.    That would be the obvious meaning of this.

20   Q.    Okay.

21   A.    If it was the case.

22   Q.    All right.  Let's turn to PX-231.  PX-231 is the Atlas

23   product, right?

24   A.    Yes, Atlas Plus it says.

25   Q.    Okay.  Let's turn to 772.

Christensen - cross

Page 1044

1   Q.   And what is the spike going down?

2   A.   It's something that is there in order to cancel.

3   Q.   It's the reverse; correct?

4   A.   Yes, you can put it that way.

5   Q.   Let's go to PX-33.  This is a document for the Syncro

6   hearing aid; correct?

7   A.   That's correct.

8   Q.   All right.  Then let's turn to page 2124.  And, of

9   course, on 2124, it says it's a dynamic feedback

10  cancellation system; right?

11  A.   Correct.

12  Q.   And let me read to you what it says.  It says:

13  Dynamic feedback cancellation is a two-stage feedback

14  cancellation system designed to eliminate feedback before it

15  develops into uncomfortable whistling.  Unlike traditional

16  feedback management, which reduces gain to eliminate

17  feedback, the DFC in Syncro uses phase cancellation.  Phase

18  cancellation is the only way to eliminate feedback while

19  maintaining audibility of the signal.  As soon as feedback

20  is detected, the feedback detection initiates the DFC system

21  to remove the unwanted whistling sounds through digital

22  phase cancellation.

23       And then over the top of the picture, it says digital

24  phase cancellation ensures no reduction or distortion of the

25  signal and no loss of audibility.

1          Right?

2    A.    Yes, that is what the document says.

3    Q.    And again if you admitted that is accurate, that would

4    be determining the amplitude and phase, reversing it and

5    cancelling it, wouldn't it?

6    A.    If I admitted it was accurate, but it's not accurate.

7    It's a marketing paper you are showing here.

8    Q.    Now, let's look at the handy little chart to the right

9    with the three little boxes; okay?

10   A.    Okay.

11   Q.    Underneath it, it says:  Example of how phase

12   cancellation can remove the feedback while leaving the

13   important signal untouched.  Do you see that?

14   A.    I see that.

15   Q.    In the first box, that spike up is feedback, right?

16   A.    I think it's intended to show some feedback.

17   Q.    And in the second box, the phase cancellation is a

18   spike down, equal but opposite in amplitude and phase;

19   right?

20   A.    I think that is what it intends to show.

21   Q.    And the third box shows feedback removed; correct?

22   A.    Yes.

23   Q.    Okay.  But you have testified that is not what is

24   happening, right?

25   A.    That is correct.

Christensen - cross

Page 1049

1    BY MR. STEINBERG:

2    Q.    Now, are you testifying here before the jury that all

3    of the technical material and information and brochures that

4    was provided to audiologists and hearing impaired people was

5    incorrect?

6    A.    What I'm saying is --

7    Q.    Can you answer my question first?  Then you can

8    explain.

9              THE COURT:  No, I'm going to let him answer the

10   question in a manner that he chooses.  And if you want to

11   ask a follow-up, you can do that?

12   A.        Thank you.

13             What I'm saying is from a technical standpoint,

14   the descriptions in the marketing material aren't accurate.

15   If you see it from the users perspective, what the hearing

16   aid does, how it's perceived by the user, well, it describes

17   what the user will perceive.  The feedback is reduced or

18   cancelled and feedback is gone but from a very technical

19   standpoint, it's not correct.  That is a point that I think

20   is important to understand about marketing material.

21   BY MR. STEINBERG:

22   Q.    Well, the first material we looked at was not

23   marketing material, it was a technical document, internal

24   document of your company, wasn't it?

25   A.    It was a technical document that was intended for use

Christensen - cross

Page 1050

1    internally in the company but it was not the detailed

2    description of the algorithm.

3    Q.    So just to answer my question, are you testifying here

4    today that internal technical material and material that was

5    given to hearing impaired people was inaccurate about how

6    your feedback mechanism works?

7    A.    It's inaccurate in the details of how it works.

8    Q.    Are you aware that the Food and Drug Administration of

9    the United States regulates hearing aids?

10   A.    Yes, I know about the Food and Drug Administration to

11   some extent.

12   Q.    Are you aware that the FDA, the Food and Drug

13   Administration requires totally accurate statements in the

14   marketing materials of hearing aids?

15   A.    I don't know about the details of the FDA

16   requirements, no.

17   Q.    Have you reported the inaccuracies in these marketing

18   materials to the FDA?

19   A.    Me, personally?

20   Q.    Yes.

21   A.    No, I have not.

22   Q.    In the patent that we looked at before, your patent,

23   the '871 patent, it says feedback cancellation.  Are you

24   aware that you have to make an application under oath before

25   the Patent Office and state with accuracy what your patented

Christensen - redirect

Page 1051

1    technology does?

2    A.    I'm not aware of the sort of details of patent law.

3    I'm not a patent attorney.

4    Q.    Has anyone gone to the Patent Office and told the

5    Patent Office, no, our technology really doesn't cancel

6    feedback?

7    A.    I don't know.

8                    MR. STEINBERG:  No further questions.

9                    THE COURT:  All right.  Mr. Gramenopoulos,

10   redirect.

11                       REDIRECT EXAMINATION

12   BY MR. GRAMENOPOULOS:

13   Q.    I think I'm just going to ask one question, and I'm

14   going to ask you about the marketing materials or the

15   patents and concepts.  I'm going to ask you about the

16   products, the products accused in this case.  Based on your

17   knowledge of the LMS adaptive filter, will you please

18   explain for the jury why it is not possible to do phase

19   cancellation or measure amplitude phase?

20                    THE COURT:  Or determine amplitude?  Apples to

21   apples, if you might.

22                    MR. GRAMENOPOULOS:  I'm sorry?

23                    THE COURT:  Well, if you want to keep it apples

24   to an apples, I think you --

25                    MR. GRAMENOPOULOS:  Let's first start with phase

Christensen - redirect

Page 1052

1    cancellation.

2              THE COURT:  Well, just determine.  I'm just

3    focusing on the word determine.

4    BY MR. GRAMENOPOULOS:

5    Q.    Okay.  Determine amplitude and phase.  Let's start

6    there.

7    A.    Okay.  The adaptive LMS algorithm has no means to

8    determine amplitude or phase.  It is what we call a

9    statistical-based system.  It's looking at the whole

10   frequency range, that is, all of the frequencies.  And if

11   you have to, if you shoot, measure or determine phase, then

12   you are talking about a single frequency signal, single

13   tone.  You cannot do that with a broadband tone.  So that is

14   a clear distinction between the broadband and the single

15   tone approach.

16   Q.    Is that the reason why you believe that marketing

17   materials are inaccurate?

18   A.    Well, that is why we cannot talk about phase

19   cancellation, because then you are talking about a single

20   frequency cancellation.

21              MR. GRAMENOPOULOS:  No further questions.

22              THE COURT:  Thank you, sir.  You are excused.

23   You can make your plane.

24              THE WITNESS:  Thank you very much.

25              THE COURT:  Ladies and gentlemen, we have at

Page 1056

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
                            -   -   -
 4
 5   ENERGY TRANSPORTATION,         :   Civil Action
     INC.,                         :
 6                                 :
             Plaintiff,            :
 7                                 :
         v.                        :
 8                                 :
     WILLIAM DEMANT HOLDINGS A/S,  :
 9   et al.,                       :
                                   :
10            Defendants.          :   No. 05-422 (GMS)
11                          -   -   -
12                 Wilmington, Delaware
                 Monday, January 28, 2008
13                      9:37 a.m.
                   Sixth Day of Trial
14
                            -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge, and
16                                       a Jury
17
18   APPEARANCES:
19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                   -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                               Counsel for Plaintiff
24
25
```

```
 1   APPEARANCES CONTINUED:
 2              MARY B. GRAHAM, ESQ.
                Morris, Nichols, Arsht & Tunnell
 3                   -and-
                JOHN M. ROMARY, ESQ.,
 4              GREGORY C. GRAMENOPOULOS, ESQ.,
                VINCENT KOVALICK, ESQ.,
 5              KAY HILL, ESQ.,
                GERSON S. PANITCH, ESQ., and
 6              ARTHUR A. SMITH, ESQ.
                Finnegan, Henderson, Ford, Farabow & Dunner
 7              (Washington, D.C.)
 8                             Counsel for
                               Demant Defendants
 9
                DONALD E. REID, ESQ.
10              Morris, Nichols, Arsht & Tunnell
                     -and-
11              WILLIAM H. MANDIR, ESQ.,
                JOHN SCHERLING, ESQ.,
12              CARL J. PELLEGRINI, ESQ.,
                BRIAN SHELTON, ESQ.,
13              MATTHEW KAPLAN, ESQ., and
                J. WARREN LYTLE, JR., ESQ.
14              Sughrue Mion
                (Washington, D.C.)
15                             Counsel for Widex
16                             Defendants
17                   -   -   -
18
19
20
21
22
23
24
25
```

Schaub - direct

Page 1075

1   Q.      Please turn to the page referenced by the control

2   number DEM000148, you will see that at the bottom of the

3   page.

4   A.      Yes, I am ready.

5   Q.      On the left-hand side, there is this phrase

6   ChannelFree signal processing.  What is ChannelFree signal

7   processing?

8   A.      Yes.  The ChannelFree signal processing, this is a

9   marketing term for this patented processing scheme for the

10  loudness control.

11  Q.      Do you think that term is specific for its intended

12  audience?

13  A.        Yes.  And, of course, there is more explanation on

14  what it means in more places.  Yes.

15  Q.      If you look on the right-hand side of the page?

16  A.      Yes, it's not on the screen, but here.

17  Q.      There is a heading Adaptive Feedback Canceller.  Can

18  you read the statement that appears underneath that heading?

19  A.      Yes.  It says, "SwissEar uses a fast-acting adaptive

20  feedback canceller to ensure feedback-free fittings."

21  Q.      Do you agree with this statement?

22  A.      Well, let's look at the intended audience.  This

23  information is for audiologists and for hearing aid users.

24  So this is a public discourse.  And what the general public

25  understands with the term feedback is howling, when the

Schaub - direct

Page 1076

1    hearing instrument whistles.  This is what the general

2    public understands feedback is.

3            Now, the feedback suppression system prevents

4    howling in many situations.  So an instrument without the

5    feedback suppression system would howl in many situations

6    where the instrument with the feedback suppression system

7    does not howl.

8            So it is actually eliminating or canceling the

9    howling.  And now this is conveying the right thing.  So

10   audiologists understand this.

11           Now I have to say, from my perspective as a

12   signal processing engineer, I use, or I suggest, I prefer a

13   more precise term, rather than cancellation, I call this

14   suppression.

15   Q.    And why is suppression more precise?

16   A.    Yes.  To understand this, I must explain from the DSP

17   engineer's viewpoint feedback, then we think of the feedback

18   signal, the feedback signal, the signal that goes out of the

19   receiver, out of the ear canal and goes back into the

20   microphone.

21           Without the feedback suppression system,

22   100 percent of the these signal samples travel through the

23   instrument.  Now, with a feedback suppression system, it

24   achieves in the average that only 25 to 35 percent of these

25   signal values still go through.

Page 1077

1           This is a good achievement.  And it helps so

2     that the instrument does not howl in may situations where

3     otherwise it would howl.

4           Here is the point, as I see it.  When there are

5     still 25 to 35 percent of the signal values still going

6     through, then for me, looking more precisely, it is not

7     canceling.  It is just suppressing, squeezing.

8     Q.    Do you think the term adaptive feedback canceller as

9     it appears in this marketing material, do you believe that's

10    misleading?

11    A.    No.  For its intended audience, this is the right way

12    to convey it.

13          Actually, in the old days, when I was using my

14    own technical wording, addressing audiologists, I just

15    created question marks on their forehead.

16          This is the right way to say it, as it is in the

17    documents for this audience.

18          MR. GRAMENOPOULOS:  No further questions.

19          THE COURT:  Counsel.  You may cross-examine.

20                    CROSS-EXAMINATION

21    BY MR. BUROKER:

22    Q.    Good morning, Mr. Schaub.  My name is Brian Buroker

23    for ETG.  I believe you testified --

24    A.    Good morning, Mr. Buroker.

25    Q.    Good morning.

Schaub - cross

Page 1078

1   A.      I recognize you from last time.

2   Q.      From the summer.  Right.

3           You testified regarding the Jump 3 platform.

4   You weren't involved in working on the code for the Jump 3

5   platform, were you?

6   A.      No.

7   Q.      And is it your testimony now that all of the Alaska

8   products include a feedback canceller?

9   A.      No.  I explained, it has this feedback suppression

10  system, the technical, using the technical terms as I use

11  them.

12  Q.      But the marketing materials refer to those as a

13  feedback canceller.  Correct?

14  A.      Yes.  The marketing material, as we just saw, it says

15  feedback canceller.  Now, I explained why.

16  Q.      So is the marketing material that refers to the

17  element as a feedback cancelling -- excuse me.  Is the

18  marketing material that refers to the product as a feedback

19  canceller accurate or inaccurate?

20  A.      Could you please say again?  I didn't get exactly.

21  You stopped.  Please say it again.

22  Q.      Sure.  We saw one marketing document that referred to

23  the feature as the adaptive feedback canceller.  Is that

24  accurate?

25  A.      Well, I explained about the audience.  Addressing

Page 1079

1    audiologists and hearing aid users, this wording is correct

2    and is good.  And I explained my DSP engineer's perspective,

3    where I just suggest to use a more precise term that also is

4    the term in our patent.

5    Q.    If that same term appeared in technical materials,

6    prepared by Bernafon, would it be accurate in the technical

7    materials?

8    A.    Here, also, we have -- I still have to distinguish a

9    little bit.

10         We have engineers of different types.  What I

11   say is, what I just said is, a DSP engineer, the right term

12   the DSP engineer uses or prefers to use is suppression.

13   Q.    So let's take a look at JX-26, which is in, I think

14   it's in your binder.

15   A.    In this binder?

16   Q.    I believe it is.  Actually, no, it is not.

17         May I approach?

18         THE COURT:  Yes, you may.

19   BY MR. BUROKER:

20   Q.    Are you familiar with this document, JX-26?

21   A.    The first one, yes.  Yes.  How was the question,

22   please?

23   Q.    I just asked if you were familiar with this document.

24   A.    Yes, I recognize this document.

25   Q.    If we could turn over to the second page of the

Schaub - cross

Page 1085

1    A.      Yes.

2    Q.      In the label, it says that it's the feedback

3    canceller block in more detail.  Do you see the heading?

4    A.      Yes.  I see the first sentence after the title, yes.

5    Q.      This diagram shows separate blocks for the filter and

6    the filter tuning mechanism.  Correct?

7    A.      This diagram shows the Box 2 filter and the Box 3

8    filter tuning.

9    Q.      And it shows the filter tuning box providing

10   coefficients to the filter.  Correct?

11   A.      No.  Where do you see this?

12   Q.      Why is there an arrow pointing from the filter tuning

13   box to the filter?

14   A.      Well, this is a diagram, still a simplified diagram,

15   showing here two things.  Then in the text it says the

16   feedback conditions are constantly changing.  To counter

17   this, the filter applied in the FBC is not static but adapts

18   on the fly.

19           So the filter actually is the whole thing, the

20   adaptive LMS filter is the two, and you cannot separate

21   them.  To actually see what goes on in the processor, we

22   have to look at the very low curve that we just had over

23   there.  And I explained that there is a module of this

24   echo.v, and that it contains all the LMS adaptive filter,

25   and that it performs these operations, and that it updates

Schaub - cross

Page 1086

1    its own coefficients.

2              So what is in the product is an LMS adaptive

3    filter, adapting its own coefficients or rates.

4    Q.    But this diagram shows the filter in Box 2 with a

5    separate box for the mechanism that provides the

6    coefficients.  Correct?

7    A.    This diagram shows a Box 2 and a Box 3.  And all you

8    say is your interpretation.  And it is not what -- to see

9    what happens, we have to look at the Verilog code, then you

10   know what is in the product.

11   Q.    If you could take, draw your attention to another

12   exhibit, JX-27, which is the very large document in your

13   book there.  Are you familiar with this document?

14   A.    Yes.  This is a document we also looked at last

15   summer.

16   Q.    And is this a technical document used as part of the

17   design process for the Alaska processor?

18   A.    This document has the perspective of the later stage

19   IC design that Erich Zwyseig was doing.

20   Q.    And your name is listed as one of the authors of the

21   document on the first page?

22   A.    My name is listed there, yes.

23   Q.    If you could take a look at the page that ends with

24   the Bates number 5745, please.

25   A.    Yes, 45.

Schaub - cross

Page 1089

1   Q.      It says, "Larger venting has always been synonymous

2   with acoustic feedback, but SymbioXT's advanced adaptive

3   feedback canceller solves the problem by working online to

4   detect the presence of feedback and subtract it from the

5   incoming signal."

6              Is that an accurate description of the Alaska

7   product?

8   A.      Well, again here, this is marketing material, and we

9   have also to allow for the audience, what the intended

10  audience is, to convey the ideas for the audience.

11             Let me check.

12             So for audiologists, hearing aid users.

13             Hearing aid users and audiologists will

14  understand from this paragraph that the instrument with this

15  feedback system allows larger venting, which is true.  And

16  they also understand that a howling signal that would be

17  present otherwise will in most conditions be eliminated.

18             So it's good for this audience, that's correct.

19  It's the way to convey these ideas.

20  Q.      From a technical standpoint, does the SymbioXT

21  product detect the presence of feedback?

22  A.      I think we discussed this before, last summer, and I

23  said that, again, here from the DSP engineer's perspective,

24  detecting is not really the right term.

25             I mean, if I may explain this, detect, what