Schaub - cross

1    would that mean?  It would say that the instrument also

2    notices how it howls.

3              We easily hear this if it occurs.  It would just

4    say, if it detects, it knows that it's howling.  But this

5    alone would not be sufficient.  There must be this feedback

6    suppression to make only part -- to suppress the acoustic

7    feedback signal so that it does not howl.  So it actually

8    continuously does more.

9              Again, here, from the perspective of the hearing

10   aid user, like the audiologist, when there is a problem

11   there is a processing scheme that helps, and it prevents

12   howling.

13   Q.    So you agree that this description is something that

14   audiologist and hearing aid users would understand?

15   A.    I didn't get it.

16   Q.    Do you agree that this description that we are seeing

17   on the screen for the adaptive feedback cancellation is

18   something that audiologists and hearing aid users would

19   understand?

20   A.    I think so.  And I know that the marketing material

21   specialists, they are in contact with audiologists and

22   end-users to check.  Their objective is to translate the

23   technical information so that the ideas arrive and the

24   audiologists understand.  That is the objective.

25   Q.    Well, isn't the term suppression just as easy to

Schaub - cross

1    understand as the term cancellation?

2    A.    I was actually thinking about this myself after we

3    had the discussion last summer.  And the risk, when I talked

4    to hearing aid users, audiologists, that just say it

5    suppresses feedback, if the hearing aid users know, if they

6    associate with feedback the howling, and I say, ah, don't

7    worry, this instrument, it suppresses feedback, you might

8    walk away from me thinking, oh, no, this is not a good

9    instrument.  It will just make this whistling a little bit

10   softer.  But that is not what happens.

11             The whistling, the howling, is gone.

12             So, you see, suppress, in the public discourse,

13   could be misleading.

14   Q.    So there is a marketing advantage in using the term

15   cancellation.  Is that what you are saying?

16   A.    Sorry?  Once again, please?

17   Q.    You see there being a marketing advantage to using

18   the word cancellation over the word suppression.  Correct?

19             MR. GRAMENOPOULOS:  Objection.

20             THE COURT:  Basis?

21             MR. GRAMENOPOULOS:  Can go we go the sidebar?

22             (The following took place at sidebar.)

23             THE COURT:  Yes.

24             MR. GRAMENOPOULOS:  I am a little concerned this

25   is getting into expert witness territory.  This witness is

Schaub - cross

1              (Last question read.)

2              THE WITNESS:  What does this mean, correct?  Do

3    you mean if I agree?

4              THE COURT:  Yes.

5              THE WITNESS:  Let me quickly see.

6              This question confuses me.  What is the --

7              THE COURT:  Perhaps he can rephrase.

8              THE WITNESS:  Yes.  Okay.

9    BY MR. BUROKER:

10   Q.    We talked about how you thought that suppression was

11   not a good a term to be used in the document.  Is that

12   correct?

13   A.    I said that if I just say suppression, people might

14   think that howling is still there, which I think is not good

15   to use this word, for this reason.

16   Q.    So the term canceller is used to convey that the

17   feedback is no longer there.  Correct?

18   A.    No.  You are mixing up things now.

19             So when an audiologist says to his client, look,

20   lady, look, sir, this instrument cancels feedback, so the

21   audiologist thinks and the hearing aid user, I assume,

22   understands this instrument in this situation will not howl,

23   so in this context, this is the right way to say these

24   things.

25             If you let me go there and the audiologist would

Schaub - cross

1    say, here, I have an expert, he made this process so he can

2    explain this, and if I then would say don't worry, it

3    suppresses, it suppresses the feedback signal, the client

4    might really think that it's still howling because we use

5    these words differently if we are talking in general, the

6    audiologist, or if I analyze a DSP processing scheme.

7              And I have to use my terms in my work and also

8    in the designs that I make.

9    Q.    I want to show you another document, which is PX-561,

10   which is toward the end of that book.  This is an article

11   written by an audiologist consultant for Bernafon AG.  Is

12   that correct?

13   A.    The document says Ken Bozeman, audiological

14   consultant.

15   Q.    And if you can look at the Page 14, which is also

16   labeled ETG23464 so the last three digits are 464.

17   A.    Yes, 64.

18   Q.    And there is a section that says Bernafon's Symbio

19   Feedback Control.  It's in the middle column?

20   A.    Yes.

21   Q.    In that section, it's down a little bit, there is a

22   paragraph that starts, In the active mode.  Do you see that?

23   A.    Yes.

24   Q.    I want to read the description in this document and

25   ask you whether or not you agree that it's accurate.

Schaub - cross

1    persistent problem experienced by hearing aid users is

2    acoustic feedback.  Feedback can be described as a

3    whistling, screeching, ringing, humming, and buzzing, but

4    just what is feedback?"

5              Okay.  Just this first, this very first

6    paragraph sets out the scope.  He actually identifies the

7    feedback in his discourse with whistling, with howling, with

8    this ill-functioning of the instrument that you can hear.

9              This is what I was -- that is exactly what I was

10   explaining already several times.

11   Q.    With that assumption, then, is the statement on Page

12   14 that I just read an accurate description of the Alaska

13   product?

14   A.    Then, if we now go to that description that you have

15   on the screen there, we must say that Ken Bozeman in his

16   thinking, he goes on and he assumes that the perfect

17   cancellation would be needed to eliminate the howling.  This

18   is how I interpret what I read here.  But this is actually

19   not true.

20             As I explained before, I think several

21   times already, it's still the 25 percent that we just have

22   to live with that the filter cannot do better, we have to

23   live with, it's there.  It's part of it.  He doesn't know

24   about these details, obviously.

25   Q.    So I don't understand what the -- is this accurate or

Schaub - cross

Page 1097

1   not accurate?  I am not sure.

2   A.     Well, again, when you talk to -- when we talk between

3   us as just normal human beings, then we understand

4   everything, and I can also show how it relates to the

5   technical language.  This is what you showed here.  This,

6   very difficult language, is reinserting out of phase, this

7   is nothing more than the subtraction.  So this is a very

8   complex -- in a way, very many words for saying in the

9   feedback system, there is a subtraction of the filter

10  aspect, these values are subtracted from the microphone

11  signal.  It is nothing more than this.

12  Q.     Does that describe the Alaska feedback system, to

13  calculate a signal and reinsert it?

14  A.     No.  Stop, stop, stop.  I just said, this is the way

15  in the marketing material, because also, if you go through

16  this document, Ken Bozeman takes the effort to explain other

17  more simple systems and other also more advanced systems

18  that work differently.  And he tries to go all along the

19  line and to keep the audience following.

20         So he also takes some notions from one

21  application to the other.

22         What I want to state here clearly is what

23  happens in the product.  In the accused product, what the

24  processor does, that is what we see from the Verilog code,

25  and that invention that is behind it, we can see it from the

Schaub - cross

Page 1098

1    Bernafon patent, that shows what is really there.  This is a

2    translation from the technical description to the

3    description so that as many people can understand what the

4    instrument can do or can do good for them without needing to

5    have all these people first to go to a technical school.

6    That's the point.

7    Q.    So you want to turn to the Bernafon patent, let's

8    look at JX-28.  Did you just indicate that this patent shows

9    what your product does?

10   A.    I am sorry.  I am not yet there.  JX-21?

11   Q.    28.

12   A.    Yes, I meant 28, sorry.  I have it in front of me,

13   yes.

14   Q.    Does this describe the Bernafon feedback suppression

15   system?

16   A.    Well, this is the U.S. patent assigned to Bernafon.

17   It describes the invention.  At the Alaska processor, it is

18   one implementation.

19   Q.    Let's look at Figure 1.

20   A.    Figure 1.

21   Q.    Does this show a box with the label 10 and a U with

22   the label 11?  Do you see where I am pointing it to?

23   A.    Yes, I would like you to zoom out.

24   Q.    To zoom out or in?

25   A.    Out.  Yes.  Sorry.  I think you did already.  I'm

Nielsen - direct

1    A.       Yes, they did.

2    Q.       During that deposition were you shown and asked

3    questions about some marketing materials?

4    A.       Yes, a lot of them.

5    Q.       Could you refer to PX-497, please.

6    A.       Yes.

7    Q.       Was that one of the marketing documents that you were

8    shown at your deposition?

9    A.       Yes, it was.

10   Q.       What is PX-497?

11   A.       That's a big marketing schematic that has been sent

12   out to our customers or the audiologists in order to explain

13   the operation of the Senso Diva.

14   Q.       Is that one of the detailed technical specifications

15   that you referred to earlier that is used to generate the

16   circuits that are in the actual product?

17   A.       No, definitely not.

18   Q.       Does this document accurately reflect all the

19   circuits and functions that are in the accused product?

20   A.       It depends what you mean by accurate.

21   Q.       Well, are all of the blocks and connections shown in

22   the diagram exactly the same as they are in the actual

23   product?

24   A.       No, definitely not.

25   Q.       Would you say that this document, PX-497, provides a

Page 1125

1    good representation of the functions and signal flow in the

2    Senso Diva?

3    A.    Yes.  I think it's doing a good job to explain the

4    operation of the hearing aid.  That's what it was designed

5    to do.

6    Q.    Would you use this document to determine exactly how

7    the circuits are connected in the actual product?

8    A.    No.

9              MR. BUROKER:  Objection.  Leading.

10             THE COURT:  Rephrase.

11             MR. PELLEGRINI:  I will move on.

12   BY MR. PELLEGRINI:

13   Q.    Could you refer to PX-501?

14   A.    Yes.

15   Q.    Was this one of the documents that you were shown at

16   your deposition?

17   A.    Yes, it is.

18   Q.    What is this document?

19   A.    That's also a marketing document, in this case it's

20   produced by our colleagues in the United States, in New

21   York.  It is a series of small articles that have been

22   written, with the intent to explain the different features

23   of the hearing aid.

24   Q.    Is this one of the detailed technical specifications

25   that you referred to earlier that are is to generate the

Nielsen - direct

Page 1126

1   circuits that are in the actual product?

2   A.      No, it is not.

3   Q.      Can you go to Page 6 in the right-hand column under

4   Multi-Directional Active Feedback Cancellation.  If you look

5   at the first sentence its says, "The Inteo active feedback

6   cancellation algorithm takes input from the spatial feedback

7   tracer, which estimates feedback paths from the extreme

8   polar patterns of the dual microphones, to create a signal

9   of the opposite phase for its cancellation."

10          Do you see that?

11  A.      Yes.

12  Q.      Is that sentence technically accurate?

13  A.      No, it's not, because it says "its cancellation," but

14  it's not very clear to me what the "its" is referring to.

15  It's not the way I would have described it.

16  Q.      Can you refer to PX-820.  Was this a document that

17  you were shown at your deposition?

18  A.      Yes, it is.

19  Q.      And what is this document?

20  A.      This is an internal Widex document with a lot of

21  questions and answers, and it has been written with the

22  intent to train our salespeople and marketing people, so

23  that they understand the way we would like to explain to our

24  customers the different features of the hearing aid.

25  Q.      Could you turn to Page 18, please?  Do you know if

Nielsen - direct

Page 1127

1   this document is provided to people outside of Widex?

2   A.      Hopefully not, because it is stamped with an internal

3   use only, confidential.

4   Q.      If we go to the question and answer under Item No. 9,

5   the second paragraph in the answer, it says, "When the FPS

6   has determined the characteristics of the feedback signal it

7   will subtract an imitated feedback signal from the incoming

8   signal, thus eliminating the annoying feedback."

9                   First of all, what is the FPS?

10  A.      That must be the feedback path simulator, which is

11  the adaptive feedback canceling system.

12  Q.      Is the sentence that I have just read that is

13  highlighted in yellow on the board, is that technically

14  accurate?

15  A.      No, it's not really technically correct, because it's

16  talking about determination of feedback signal.  That's not

17  really what we do.  It would be more correct to write

18  determination of the feedback path.

19  Q.      Can you please refer to PX-506.

20  A.      Yes.

21  Q.      What is this document?

22  A.      It seems like some kind of a training material that

23  has been either from ScreenTone or maybe it could also be

24  from a PowerPoint presentation.

25  Q.      Is this one of the detailed specifications that you

Nielsen - direct

Page 1128

1   referred to earlier that is used to generate the circuits

2   that are in the actual product?

3   A.    No.

4   Q.    If you go to Page 2 of this exhibit, at the bottom,

5   it reads, "Based on the models of the feedback path and the

6   information about the current polar characteristic in each

7   of the 15 frequency channels, the multi-directional active

8   feedback canceling makes a replica of the feedback signal

9   and subtracts it from the signal pathway.  This processing

10  is continuous and is updated instantly."

11              Is this statement technically accurate?

12  A.    Not the way I read it, because it seems to indicate

13  that we are also doing canceling in each of the 15 bands.

14  So that's really irrelevant because that's not what we are

15  doing.  We are doing cancellation in a broadband frequency

16  range.

17  Q.    If you wanted to know the accurate details of how the

18  Senso Diva or Inteo work, what type of documents would you

19  use at Widex to do that?

20  A.    I will typically use the DSP reports we just went

21  through before.

22  Q.    Would you use marketing documents for that purpose?

23  A.    Definitely not.

24              MR. PELLEGRINI:  No more questions.

25              THE COURT:  Cross-examine, counsel.

1                          CROSS-EXAMINATION

2    BY MR. BUROKER:

3    Q.      Good afternoon, Mr. Nielsen.  I have a few questions

4    for you.  You described the process by which products are

5    produced at Widex.  And I have a few questions about that.

6    During the development of the Diva process, the Diva

7    product, did you develop any prototypes?

8    A.      Personally, no.  I was not involved in the

9    development of the circuits in the Diva.

10   Q.      Do you know if any prototypes were developed as part

11   of that process?

12   A.      They must have done some, yes.

13   Q.      Are the prototypes the same size as the ultimate

14   hearing aid that was developed for the Diva product?

15   A.      Typically, no.

16   Q.      Are they larger?

17   A.      They are larger.

18   Q.      And then the next step after the prototype is to

19   develop the integrated circuit design.  Is that correct?

20   A.      Yes.

21   Q.      And then integrate those into a much smaller product

22   for the consumer?

23   A.      Yes.

24   Q.      You mentioned a box that you helped develop for the

25   Diva product.  Is that a box that is used during the fitting

Nielsen - cross

Page 1134

1    Q.      So you haven't confirmed in the VHDL code whether or

2    not this diagram is accurate.  Is that correct?

3    A.      No, I have not.

4    Q.      Are you aware that an expert hired by ETG reviewed

5    the VHDL code and compared it with this document?

6    A.      No.

7    Q.      I believe you testified that the WLMS algorithms

8    calculate coefficients and then store them in the WLMS box.

9    Is that what you testified?

10   A.      Maybe I said that.  I don't know.  It estimates the

11   feedback path and sets the coefficients, yes.

12   Q.      If those --

13   A.      Installs it in the memory within the WLMS.

14   Q.      If the codes show that the memory was not actually

15   part of the WLMS block, you wouldn't be able to dispute the

16   code.  Correct?

17   A.      No.  I don't know VSDL codings, I am sorry.

18   Q.      You were shown a number of marketing documents.  And

19   you gave some testimony about that just a few moments ago.

20   A.      Right.

21   Q.      And one of those was an internal document, PX-820?

22   A.      Excuse me?

23   Q.      PX-820.

24   A.      820.  I got it.  The Q's and the A's.

25   Q.      Did you prepare the description of the Diva feedback

Nielsen - cross

Page 1135

1    canceller in this document?

2    A.    No.  I don't do marketing materials.

3    Q.    Do you have any idea how it was prepared?

4    A.    Not really.

5    Q.    Did you prepare any of the materials or descriptions

6    in the other marketing documents you were shown?

7    A.    No, not to my knowledge.  I might have been consulted

8    about something, but I don't recall.

9    Q.    Do you know how they were prepared?

10   A.    No, not exactly.  I mean, they probably have been,

11   the marketing people have probably had meetings with the

12   technical people, and in some cases the technical people

13   make more informal documents that can be used to make it

14   easier for the marketing people to really see what's going

15   on, because from these documents, it would be very hard for

16   marketing people to understand what is really going on,

17   because it is highly technical details.

18   Q.    But you don't know how that was done.  That is your

19   assumption or speculation as to how it was done.  Correct?

20   A.    That is the general way we would do it.  But I cannot

21   speak for exactly one document, if this is what you are

22   asking me.

23   Q.    If you could look at -- while we are on this

24   document, let's take a look at Page 18 of the document,

25   which also has its Bates label WID, and the last three

Nielsen - cross

Page 1136

1    numbers are 240.

2    A.      Page 18?

3    Q.      Yes.  The one that has the label Diva Feedback

4    Canceling?

5    A.      Yes.

6    Q.      And you testified that the sentence that starts the

7    second paragraph, "When the FPS has determined the

8    characteristics of the feedback signal it will subtract an

9    imitated feedback signal from the incoming signal, thus

10   eliminating the annoying feedback."

11              You had testified that that sentence was

12   not technically accurate.  Is that right?

13   A.      Yes.  It's not technically accurate because the

14   signal is not determined.  We try to estimate the path.  The

15   signal would be unpredictable because it fluctuates much

16   faster than the path.

17   Q.      Do you have any idea why an internal document for use

18   in training at the advertising and marketing department

19   would be technically inaccurate?

20   A.      I have no idea why it's inaccurate.  Actually, I

21   think it describes well the overall operation from a normal

22   perspective.  But it's not technically correct.

23   Q.      And you think ordinary people would understand the

24   system as described here?

25   A.      At least I think this is what they hoped for when

Nielsen - cross

Page 1137

1    they wrote it.

2    Q.    Just give me just a minute.

3          (Pause.)

4          And the marketing documents that we looked at

5    that you said had some technical inaccuracies, that you

6    looked at with Mr. Pellegrini...

7    A.    The block diagram.

8    Q.    The marketing documents you reviewed with Mr.

9    Pellegrini?

10   A.    In general?

11   Q.    Yes.  You indicated that they had some technical

12   inaccuracies.  Correct?

13   A.    From an engineering point of view, yes.

14   Q.    And all of those documents that you reviewed were

15   prepared by either Widex A/S or Widex Hearing Aid Company in

16   the United States.  Is that correct?

17   A.    Could you repeat that?

18   Q.    Those marketing documents that you reviewed were ones

19   that had been prepared by either Widex A/S or Widex Hearing

20   Aid Company here in the United States?

21   A.    Yes.  The ones I recall, yes.  There was one, the

22   training documents, I am not really sure who made those.  It

23   might be one of those two possibly.

24          MR. BUROKER:  Thank you.

25          MR. PELLEGRINI:  No redirect.

Egolf - direct

1          THE COURT:  Thank you, sir.  You are excused.

2          (Witness excused.)

3          THE COURT:  Next witness.

4          MR. ROMARY:  One moment, Your Honor.

5          ... DAVID P. EGOLF, having been duly

6      sworn as a witness, was examined and testified as

7      follows ...

8          THE COURT:  You may proceed, counsel.

9          MR. KOVALICK:  Thank you, Your Honor.

10                    DIRECT EXAMINATION

11   BY MR. KOVALICK:

12   Q.    Dr. Egolf, where are you from, sir?

13   A.    I live in Troy, Idaho.

14   Q.    How old are you?

15   A.    I am 64 years old.

16   Q.    Where do you work, sir?

17   A.    I work at the University of Idaho.  I am a professor

18   of electrical engineering at the University of Idaho in

19   Moskow, Idaho.

20   Q.    What types of classes do you teach, please?

21   A.    I teach courses in circuits, electro-acoustics,

22   digital filtering, automatic controls.  And several others.

23   Q.    How long have you been at the University of Idaho?

24   A.    I have been there for nearly 14 years.

25   Q.    Let's go back briefly to the beginning of your

Egolf - cross

Page 1179

1   A.      Yes.  How are you, Mr. Steinberg?

2   Q.      How are you?

3   A.      Good.

4   Q.      Good.

5            Now, you testified to the jury about your work

6   which was funded by the VA.  Correct?

7   A.      Yes, sir.

8   Q.      About this feedback mechanism.  Are you testifying

9   that you had a complete invention before Dr. Levitt's

10  patents were filed?

11  A.      Please describe what you mean by complete invention.

12  Q.      Anything you consider to be a complete invention.

13  A.      We did not have an invention.  We made no attempt to

14  patent anything.  That was not our goal.

15  Q.      Now, Dr. Egolf, you shared with us your history with

16  the University of Wyoming and your background and so forth.

17  You are not an independent witness here today, are you?

18  A.      I am not an independent witness.  What do you mean by

19  an independent witness?

20  Q.      In fact, you are represented personally by one of the

21  law firms that is representing the defendants, aren't you?

22  A.      I am here as a fact witness.

23  Q.      Can you answer my question, sir?  Are you represented

24  by the attorneys representing the defendants?

25  A.      I don't know what you mean by represented.

Egolf - cross

1              MR. STEINBERG:  May I approach, Your Honor?

2              THE COURT:  You may.

3    BY MR. STEINBERG:

4    Q.     I am going to hand you a copy of your deposition

5    transcript, Dr. Egolf.

6    A.     Okay.

7    Q.     I will direct you to Page 17, Lines 22 through 25.

8    Let me ask you if you were asked this question and you gave

9    this answer.

10             "Are you represented here today?

11             "Answer:  Yes, I am represented here today.

12             "Question:  And who's representing you?

13             "Answer:  Finnegan Henderson."

14             That is the same law firm representing this

15   defendant.  Correct?

16   A.      Yes, sir.

17   Q.     So you were represented by the same law firm

18   representing the defendant.  Correct?

19   A.     I was working for them, yes.

20   Q.     Well, you are still working for them, aren't you?

21   A.     I am being paid, yes.

22   Q.     Now, they hired you in this case by paying you as a

23   consultant and a witness.  Correct?

24   A.     As an expert witness, yes.

25   Q.     But you are not testifying here as an expert witness,

Egolf - cross

Page 1181

1  are you?

2  A.     No.  I am testifying as a fact witness.

3  Q.     But you have been working for them for two years and

4  they have been paying you for two years.  Right?

5  A.     Only one year.

6  Q.     One year?

7  A.     Yes, sir.

8  Q.     I thought you said you were working since

9  February 2006 for the defendants?

10 A.     That's the time I signed the contract with them, yes.

11 I didn't do any work.

12 Q.     When we took your deposition in Moskow, Idaho -- am I

13 pronouncing that right?

14 A.     "Mos-co."  "Mos-cow" is in Russia.

15 Q.     I will try to get it right.  That was in November of

16 2007?

17 A.     Yes, sir.

18 Q.     At that date you had already been paid $53,000.

19 Right?

20 A.     Yes, sir.

21 Q.     How much have you been paid to date?

22 A.     $53,000.

23 Q.     Are you going to render another bill?

24 A.     I am going to render a bill for the time spent away

25 from my consulting business, yes.

Egolf - cross

Page 1182

1    Q.    You are going to render a bill for all the

2    preparation that you prepared for your testimony today.

3    Right?

4    A.    Yes, sir.

5    Q.    And you are going to render a bill for your testimony

6    here today.  Right?  The time you are spending?

7    A.    Yes, sir.

8    Q.    And how much will that be?

9    A.    I haven't run an accounting on it.

10   Q.    And when you testified at your deposition, you were

11   even being paid during the time you were testifying.

12   Correct?

13   A.    That's incorrect.

14   Q.    That's not correct?

15   A.    That's not correct.

16   Q.    Were you paid for your appearance at your deposition?

17   A.    That was not correct.  That was not.

18   Q.    Were you asked this question and did you give this

19   answer at Page 21, Line 6 through 8:

20           "Question:  Are you being paid for your

21   appearance here today?

22           "Answer:  Yes, I'm being paid for my appearance

23   here today."

24           That was incorrect?

25   A.    That was incorrect.

Egolf - cross

Page 1183

1   Q.      That was incorrect?

2   A.      That was incorrect.

3   Q.      You testified under oath at your deposition that you

4   were being paid for that time?

5   A.      That was incorrect.

6   Q.      You were never paid for that time.  Is that what you

7   are testifying?

8   A.      I was not paid for that time.  I did not bill for

9   that time.  I did not bill and was not paid for that time.

10  Q.      You only decided not to bill for that time after you

11  were asked that question.  Right?

12  A.      I beg your pardon?

13  Q.      You hadn't billed for that time up to that time.  Is

14  that correct?

15  A.      I did not bill for that time.

16  Q.      But you only decided not to bill for that time after

17  you were asked this question and answered in this way.

18  Correct?

19  A.      That's not correct.

20  Q.      You hadn't billed for your appearance before you

21  appeared, did you?

22  A.      Say that again, please.

23  Q.      You hadn't billed for your appearance before you

24  appeared, did you?

25  A.      I did not, no.

Egolf - cross

1    Q.       Now, Dr. Egolf, you haven't done any research in the

2    hearing aid industry for about 20 years.  Right?

3    A.       Since 1988.

4    Q.       And you were at the University of Wyoming from 1981

5    to 1988?

6    A.       1977 to 1988.

7    Q.       I beg your pardon.  And you know Dr. Levitt.

8    Correct?

9    A.       I know Dr. Levitt.

10   Q.       And you know that he has received many awards in the

11   hearing aid industry.  Correct?

12   A.       Yes, sir.

13   Q.       Have you received any such awards?

14   A.       What do you mean by such awards?

15   Q.       Awards in the hearing aid industry.

16   A.       Well, again, you will have to -- maybe you should run

17   over Dr. Levitt's awards.

18   Q.       Well, let me ask you if you were asked this question

19   and gave this answer at Page 37, Lines 11 through 15:

20              "Do you have any awards associated with the

21   hearing aid industry?

22              "Answer:  None by the industry itself, but one

23   from the Institute of Sound and Vibration Research in

24   Southampton, England, which is on Page 9 at the top of the

25   page."

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
                           -  -  -
 4
 5   ENERGY TRANSPORTATION,        :   Civil Action
     INC.,                         :
 6                                 :
               Plaintiff,          :
 7                                 :
          v.                       :
 8                                 :
     WILLIAM DEMANT HOLDINGS A/S,  :
 9   et al.,                       :
                                   :
10             Defendants.         :   No. 05-422 (GMS)
11                         -  -  -
12              Wilmington, Delaware
              Tuesday, January 29, 2008
13                  8:50 a.m.
              Seventh Day of Trial
14
                           -  -  -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
16                                  and a Jury
17
18
     APPEARANCES:
19
                    EDMOND D. JOHNSON, ESQ.
20                  Pepper Hamilton LLP
                         -and-
21                  MARTY STEINBERG, ESQ.,
                    BRIAN M. BUROKER, ESQ., and
22                  MAYA M. ECKSTEIN, ESQ.
                    Hunton & Williams
23                  (Washington, D.C.)
24                                  Counsel for Plaintiff
25
```

Page 1244

```
 1   APPEARANCES CONTINUED:
 2               MARY B. GRAHAM, ESQ.
                 Morris, Nichols, Arsht & Tunnell
 3                    -and-
                 JOHN M. ROMARY, ESQ.,
 4               GREGORY C. GRAMENOPOULOS, ESQ.,
                 VINCENT KOVALICK, ESQ.,
 5               KAY HILL, ESQ.,
                 GERSON S. PANITCH, ESQ., and
 6               ARTHUR A. SMITH, ESQ.
                 Finnegan, Henderson, Ford, Farabow & Dunner
 7               (Washington, D.C.)
 8                                      Counsel for
                                        Demant Defendants
 9
                 DONALD E. REID, ESQ.
10               Morris, Nichols, Arsht & Tunnell
                      -and-
11               WILLIAM H. MANDIR, ESQ.,
                 JOHN SCHERLING, ESQ.,
12               CARL J. PELLEGRINI, ESQ.,
                 BRIAN SHELTON, ESQ.,
13               MATTHEW KAPLAN, ESQ., and
                 J. WARREN LYTLE, JR., ESQ.
14               Sughrue Mion
                 (Washington, D.C.)
15
                                        Counsel for Widex
16                                      Defendants
17                        -  -  -
18
19
20
21
22
23
24
25
```

Page 1245

1          THE COURT:  Good morning.  Please be is seated.

2          I understand there are some issues.

3          MS. ECKSTEIN:  Good morning, Your Honor.  This

4     is actual an issue for a rebuttal witness we intend to call

5     on Friday.  We are raising it today because the witness is

6     in Costa Rica and has to make some travel arrangements.

7          The Court and the jury have repeatedly heard

8     from the defendants --

9          THE COURT:  Did you say Friday?

10         MS. ECKSTEIN:  Yes.

11         Like I say, he is going to be flying in from

12    Costa Rica.

13         THE COURT:  Friday maybe problematic.  We will

14    have to see.

15         MS. ECKSTEIN:  The Court and the jury have

16    repeatedly heard the defendants assert that Eric Dowling, a

17    DSP expert hired by EKMS on behalf of ETG, concluded that

18    the Levitt patents did not cover adaptive filtering with

19    respect to feedback cancellation.  Instead of relying on the

20    business records, the summary report from EKMS, for the

21    proposition that ETG was informed of something, the

22    defendants have sought to put the words of the report into

23    Dr.  Dowling's mouth.

24         We never anticipated that they would do this.

25    And we now seek leave to call him as a rebuttal witness, and

1   would be prejudiced without that opportunity.

2              THE COURT:  Is this a matter that must be taken

3   up this morning?

4              MS. ECKSTEIN:  At some point today, Your Honor.

5              THE COURT:  Not this morning, if we have a jury

6   waiting.  Matters that need to be addressed immediately so

7   we can get the jury out I am willing to address.  If we can

8   take this up at another time -- you were reading from

9   something.  Maybe you want to submit what you were reading

10  from.  I can take a look at it.

11             MS. ECKSTEIN:  Thank you.

12             MR. ROMARY:  Just very briefly, I would like to

13  report on the time.  If we assume that the evidence is

14  closed Thursday night, close of business, then there would

15  be approximately nine hours left for the defendants and six

16  hours left for the plaintiff, and we would ask if the Court

17  would permit closings on Friday morning then on that

18  schedule.

19             THE COURT:  You are anticipating closing the

20  case, the evidence on Thursday evening?

21             MR. ROMARY:  Thursday evening closing the

22  evidence and then Friday morning allowing the closing

23  arguments.

24             THE COURT:  I will deliver instructions Friday

25  morning.

Weaver - cross

Page 1265

1  without the feedback suppression circuit added.  With the

2  suppression added, we got 14.7 dB additional stable gain.

3              MR. KOVALICK:  I have no further questions, Your

4  Honor.

5              THE COURT:  You may cross-examine, counsel.

6              MR. KOVALICK:  Thank you, sir.

7              MR. BUROKER:  Your Honor, I have a book that may

8  have a few additional exhibits.  May I?

9              THE COURT:  Of course you do.  That's quite

10  fine.

11              (Binders passed out.)

12                      CROSS-EXAMINATION

13  BY MR. BUROKER:

14  Q.    Good morning, Mr. Weaver.

15  A.    Good morning.

16  Q.    You are being paid by the defendants to work with them

17  in connection with this case; correct?

18  A.    I'm being paid my normal consulting rate, yes.

19  Q.    And how much have you been paid to date?

20  A.    To date?

21  Q.    Yes.

22  A.    I believe it's around $8,000.

23  Q.    Now, you have been working in the hearing aid industry

24  for about 20 years; is that correct?

25  A.    That's correct.

Morley - direct

Page 1342

1   Q.    Did you then start working with Dr. Ingebretsen on a

2   digital implementation?

3   A.    Right after that first meeting, we decided it would be

4   a good idea to put a proposal together to the Veterans

5   Administration.  We have heard already in court that they

6   were interested in funding research in the hearing area.

7   And we knew that.  So that was our, the target of our first

8   proposal, was to send it to the VA.

9   Q.    Did the VA give you funding?

10  A.    They funded us for a number of years.

11  Q.    Okay.  Let me show you -- let me ask you this:  What

12  happened next?  After you met with Dr. Ingebretsen and you

13  started getting funding with the VA, how did it proceed?

14  A.    Well, we actually were funded by the VA NASA and the

15  3M Corporation, eventually.  And given that we had so many

16  sources of funding, it was decided by someone at the

17  Veterans Administration that it would be a good idea to put

18  together what they called a steering committee, which was

19  just a group of representatives from each of those funding

20  agencies, or company in 3M's case, so that they could

21  monitor the progress of where all their money was going,

22  what we were doing.

23  Q.    Can you give just a summary of the progression of work

24  from that point forward?

25  A.    Yes.  The first thing we built was what we called a