Morley - direct

Page 1357

1    A.    Yes.  That's something that you walk into a noisy area

2    or -- it happens all the time.

3    Q.    Can you give an example of when that might happen?

4    A.    Well, in every-day life, you go into a cafeteria,

5    there is noise, go out in traffic.  You might be driving

6    down the street and you are listening -- you notice this.

7           You are listening to your radio, and it's a nice

8    day, so you got the car window down.  And there is noise out

9    there from the freeway.  So we turn up the volume on our

10   radio so it will come up over the noise level.  Then if you

11   pull off the freeway and come to a stop sign, I have

12   noticed, it's like, whoa, I got to turn the volume down now,

13   because I have turned it up to overcome some noise that's

14   not there anymore, so I need to adjust it back down.

15   Q.    Do the ETG patents describe this idea of varying the

16   gain in accordance with noise?

17   A.    Yes, it does.

18   Q.    For what filter?

19   A.    For the hearing compensation filter.

20   Q.    Okay.  I want to now turn to the '850 patent, Figure

21   2, please.

22          Is this a feature of varying the amplification

23   depending on how much noise, is that shown in this figure at

24   all?

25   A.    Well, in this filter -- sorry, in this figure, there

Morley - direct

Page 1358

1    is a lot of stuff.  It took me a while to figure out what's

2    all there.  But basically, there is the hearing compensation

3    filter, for now it is just sort of up in the upper half.

4            Then down here in this lower right corner, there

5    is a bunch of stuff.  All that circuitry there is the

6    circuitry that picks what is going to be on the menu.  The

7    menu of pockets is stored in this RAM here, No. 77.  That is

8    where it is stored, all those different sets that the

9    circuitry down here figures out which set it wants to pick.

10   Q.    So the circuitry you have just referred to, I see

11   something, a box 96, I guess, speech detector, is that part

12   of this circuitry that we have been referring to?

13   A.    Yes.  That's part of the feature of being able to

14   change the settings based on whether speech or noise is

15   present in these different frequency ranges.

16   Q.    So what happens if it detects speech?

17   A.    Well, if you think speech is present, you wouldn't

18   want to reduce the gain.  If you think speech is, say,

19   bigger than noise in that band, then it would be a good idea

20   to keep the gain up, because there is speech, and you want

21   to hear that.  But if it detects instead that there is more

22   noise than there is speech, at those frequencies, then it

23   will lower the amplification there so you get less noise

24   coming through and hopefully you will be able to hear

25   better.

Morley - direct

Page 1360

1    credit for, you might call that adaptive, it can

2    automatically adjust.  It doesn't generate new coefficients

3    to be put in.  All it does is pick from the sets of

4    coefficients that were put in back at the audiologist's

5    office.  So it's got a limited menu.  It is not like a chef

6    who can whip up anything you want on the spot.  You can only

7    pick the meals that are on the menu.

8    Q.    This automatic controlling feature, does that have

9    anything to do with canceling feedback?

10   A.    Not at all.

11   Q.    Can we go to Demonstrative 2 back for a second,

12   please.

13          So this automatic controlling feature that we

14   have been discussing, is it relevant to either of those

15   filters we see here?

16   A.    Yes.  It's picking the sets of coefficients that get

17   used in this hearing compensation filter, but not anything

18   to do with that feedback canceller.

19   Q.    Okay.  Let's quickly go through some of the areas that

20   you highlighted in the patent.  I would like to just comment

21   on them.

22          Can we go to the abstract.

23          I think the first place that you had identified

24   was the abstract.  Do you see that?

25   A.    Yes.

Morley - direct

Page 1361

1    Q.    Does the abstract talk about changing coefficients

2    with respect to canceling feedback?

3    A.    Yes.  A number of lines, about halfway down there is

4    the word adjust automatically, two words, and it talks about

5    cause the hearing aid to adjust automatically to the optimum

6    set of parameter values.  So that means picking one of those

7    sets that have been put in there for the speech level, room

8    reverberation, and type of background noise then obtaining.

9           That is discussing what that circuit in Figure 2

10   could do, is determine the speech level and background

11   noise.

12   Q.    Does that have anything to do with acoustic feedback?

13   A.    Not at all.

14   Q.    Can we go to Column 1, Lines 8 through 13, please.

15          Can you read that, Dr. Morley?

16   A.    Yes.  It says that, this relates to hearing aids of

17   this character that are capable of automatically adjusting

18   to optimum parameter values, once again, picking a set as

19   operating conditions such as speech level, room

20   reverberation and background noise change.

21          So it says it is going to automatically adjust

22   when those things change.  And so change is very important

23   in that part of the sentence.

24          It goes on to say, and also for reducing

25   acoustic feedback.

Morley - direct

Page 1362

1    But it doesn't say when anything changes.  It

2 just says to reduce it.

3 Q.    And is your interpretation that -- would you say

4 acoustic feedback is not related to change consistent with

5 how the patent describes the acoustic feedback filter?

6 A.    Absolutely.

7 Q.    I am not going to go through all of them.  Let me just

8 go through a few more.

9    Column 11, Lines 32 to 33, please.  Can you look

10 at this and give your opinion as to whether or not this has

11 anything to do with acoustic feedback?

12 A.    It says automatic adjustment of the frequency

13 response of the hearing aid as a function of speech level.

14 So that's saying when speech level changes, the automatic

15 adjustment is adjusted.  So it doesn't have anything to do

16 with acoustic feedback.

17 Q.    Column 11, Lines 52 to 55, please.

18 A.    Once again, it talks about automatic adjustment of the

19 programmable filter -- that is our filter in the forward

20 path -- to optimum parameter values as the speech level,

21 room reverberation and type of background noise change.

22    So it's going to adjust due to that change.  So

23 there is a cause and effect.  But then it says, and for

24 reducing acoustic feedback.  And it doesn't say in response

25 anything changes or not.

Morley - direct

1    Q.    Again, is there anything that is described in the

2    patent in terms of how you actually implement the feedback

3    cancellation filter that discusses changing the coefficients

4    in normal operation?

5    A.    No.   It's programmed once at the audiologist's office.

6    That feedback cancellation filter is inserted into the

7    circuit, and the patient walks away with the hearing aid,

8    and you can't change it anymore.

9    Q.    Can we also go to Column 12, Claim 5.

10         Okay.   This Claim 5, what is that referring to?

11    A.    Claim 5 talks about, impart, imparting or impart

12    different response characteristics to the hearing aid,

13    responsive to the level of speech signals in the

14    transmission channel in excess of the level of noise.

15         So this is describing that circuit that I showed

16    in Figure 2 in the lower right-hand corner that's picking

17    from that menu again.   This is talking about changing the

18    settings of the hearing compensation filter when noise and

19    speech levels change.   It doesn't have anything to do

20    whatsoever with feedback, acoustic feedback canceling.

21    Q.    And is ETG asserting Claim 5 in this case?

22    A.    No.

23    Q.    Now, do you understand that ETG is asserting Claims

24    13, 14, 16 and 19?

25    A.    Yes, I do.

Morley - direct

1    Q.    And do any of those claims have anything to do with

2    changing coefficients?

3    A.    No, none of those.

4    Q.    Let's now go back to that second filter now, the

5    feedback cancellation filter.

6              Can we have Demonstrative No. 8, please.

7              What does this show, Dr. Morley?

8    A.    Okay.  Once again, this is a picture of the whole

9    patent, so we can see things in perspective.  And what I

10   have shown here are the places in the drawings or the

11   teachings of the patent where it specifically talks about

12   feedback compensation, or feedback canceling.

13             Up in the drawings, what I have shown are the

14   parts of the circuitry that, if they weren't there, you

15   couldn't do feedback cancellation.  So they are exclusively

16   used for the feedback canceling feature of the testing over

17   here in the host controller and the actual implementation of

18   the -- during the test of the feedback canceling.

19             What isn't shown in here is that the filter, the

20   feedback canceling filter is supposed to be connected from

21   up here down to a terminal down here.  But they don't show

22   that, don't even show the feedback canceling filter in this

23   drawing.

24   Q.    Okay.  Can we put back up Demonstrative No. 2, please.

25   Again, referring to this top filter, the feedback canceling

Morley - direct

Page 1365

1    filter, is that the filter you were just referring to that

2    they didn't show in Figure 2?

3    A.    Yes.

4    Q.    Now, does ETG propose a solution to this feedback

5    problem we have been hearing?

6    A.    Yes, they do.

7    Q.    What is their solution?

8    A.    The ETG patent solution is to measure the acoustic

9    feedback path, using the computer and the host controller,

10   and then, after they know what it is, let the computer

11   calculate some coefficients, take those coefficients and

12   program them into a feedback canceling filter, and then

13   insert that feedback canceling filter into the hearing aid

14   to cancel feedback, and then disconnect the host controller

15   from the hearing aid so the patient can wear it away.

16   Q.    So after you measure the feedback, you mentioned that

17   the filter wasn't shown in Figure 2, the feedback

18   cancellation filter?

19   A.    That's right.

20   Q.    How does it get in there?

21   A.    Well, the patent says that once it's programmed to

22   cancel feedback, it is inserted between, I believe it was

23   terminals 142 and 143 or 140 and 143 or something.  142 and

24   143.

25   Q.    Okay.  Can I have Demonstrative No. 18, please.

Morley - direct

1    analysis the first time I was told what it was by lawyers.

2    If it has the same function, and achieves that function in

3    the same way, and it achieves the same result, then it's

4    equivalent under the doctrine of equivalents.

5    Q.    Okay.  So we saw in all these claims a programmable

6    filter or a programmed filter; is that correct?

7    A.    That's correct.

8    Q.    Do they both function to cancel feedback?

9    A.    They have the common feature that both the ETG patents

10   and the accused devices both function -- I think I heard

11   that in the opening -- they both cancel acoustic feedback.

12   Q.    And you agree with that?

13   A.    And I agree with that.

14   Q.    Now, do they do it, do they cancel, perform this

15   function of canceling feedback in the same way?

16   A.    They don't do it in any way near the same way.  And

17   just to say it one more time, the way that the ETG patents

18   does this is with a fixed filter that got set at the

19   audiologist's office and never changes; and the way that the

20   hearing aids from Widex, the Inteo and the Senso Diva, do

21   this is they have an adaptive LMS algorithm that constantly

22   adapts to the changing acoustics, the acoustic feedback

23   path.

24   Q.    Do they get the same results?

25   A.    No, they get completely different results.

Morley - direct

Page 1428

1    Q.    Can you explain that?

2    A.    The patented hearing aid in the '850 patent is it's

3    result is that you have dancing mermaids.  It can't get rid

4    of the acoustic feedback when the feedback path changes

5    because it was programmed to take care of only one

6    particular situation.  And if something happens, which it

7    does all the time, then it's not going to cancel feedback

8    anymore.

9              Meanwhile, the patented hearing aids, which are

10   actually built and sold, they cancel feedback and they do it

11   everyday, every minute of the day.  No matter what happens

12   in the acoustic environment, they work.

13   Q.    Okay.  Now, I think we're done for now with the '850

14   patent.  Why don't we go to the '749 patent.

15             Okay.  Are you aware, Dr. Morley --

16             THE COURT:  Counsel, we're at our afternoon

17   break hour.  So we'll break at this point.

18             (Brief recess taken.)

19              All right, Ms. Walker.  Please bring in the

20   jury.

21             (Jury returned.)

22             THE COURT:  All right.  Please take your seats,

23   ladies and gentlemen.  We'll continue with the examination

24   of Dr. Morley.

25             MR. MANDIR:  Thank you, Your Honor.

Morley - direct

Page 1444

1    Line 22?

2    A.    Yes, it is.

3    Q.    The same that we saw on the cover page, the

4    handwritten portion.  Is that correct?

5    A.    That's correct.

6    Q.    Now, this phase shift we are talking about, does it

7    have anything to do at all with feedback cancellation?

8    A.    None whatsoever.

9              MR. MANDIR:  Thank you, Dr. Morley.

10             No further questions, Your Honor.

11             THE COURT:  Counsel, you may cross-examine.

12             MR. STEINBERG:  Thank you, Your Honor.

13                      CROSS-EXAMINATION

14   BY MR. STEINBERG:

15   Q.    Good afternoon, Dr. Morley.

16   A.    Good afternoon.

17   Q.    Not like fantasy camp.  Right?

18   A.    Not even close.  More like nightmare camp.

19   Q.    But when you go to fantasy camp, you aren't paid to go

20   to fantasy camp, are you?

21   A.    No, I am not.

22   Q.    But you are paid to be here, aren't you?

23   A.    That's correct.

24   Q.    And how much are you being paid to be here?

25   A.    I get paid $315 per hour.

Morley - cross

Page 1445

1    Q.    And how much have you been paid to date?

2    A.    I think about $150,000 to date.

3    Q.    And what does that not include?

4    A.    That does not include some preparation that I did in I

5    think December, and none of the month of January.

6    Q.    And how many hours do you think you have billed in

7    December and January?

8    A.    I don't know.  I haven't had time to worry about that

9    yet.

10   Q.    How does $150,000 compare to your ordinary salary?

11   A.    It's just about the same as my annual salary.

12   Q.    And you have had the advantage of sitting here

13   throughout the trial listening to people testify.  Right?

14   A.    I have listened to them.  I don't know if that's

15   considered an advantage.

16   Q.    Now, you have disagreed with every expert that ETG has

17   put on except Dr. Gloster.  Right?

18   A.    Well, in my report I actually had some points where I

19   disagreed with Dr. Gloster as well.

20   Q.    Well, you told the jury here today that you agreed

21   with him.  Isn't that what you said?

22   A.    On the point that we were discussing at the time, yes,

23   sir.

24   Q.    So you disagree with him about something dealing with

25   his testimony in this case?

Page 1493

1          THE COURT:  Let me ask you this, counsel.  Who

2    was it that didn't get an opinion of counsel?

3          MR. ROMARY:  We are both in the same spot.  We

4    both are relying on litigation counsel.

5          THE COURT:  No, no, no.  Who didn't get an

6    opinion of counsel?  One of you did and one didn't.

7          MR. ROMARY:  Right here.  We have not identified

8    the advice of litigation counsel as being an opinion of

9    counsel.

10         THE COURT:  There is an opinion of counsel

11   floating around here somewhere.  Who got an opinion of

12   counsel?

13         MR. MANDIR:  Well, what happened, Your Honor,

14   was we were asked about that question at a deposition.  Did

15   you get an opinion of counsel?  And the answer was yes, we

16   had talked to this person.  And they said yes, that we did

17   get an opinion.  It was an oral opinion.

18         THE COURT:  And you have elected not to rely

19   upon that.

20         MR. MANDIR:  And we objected.

21         THE COURT:  And you represent?

22         MR. MANDIR:  Widex.

23         THE COURT:  So Widex has an opinion which they

24   have elected not to rely on.

25         MS. ECKSTEIN:  Can we clarify whether it's a

Page 1494

1    patent counsel opinion or litigation counsel opinion?

2              MR. JOHNSON:  And if it's prelitigation.  I

3    don't think it's prelitigation.

4              MR. MANDIR:  It's certainly not prelitigation

5    because we had no idea.  We didn't know about these patents

6    that were asserted until we got sued.  So it's certainly

7    post-litigation.  There is no question about that.

8              THE COURT:  So neither party got an opinion of

9    counsel.

10             MR. ROMARY:  Before.

11             MR. MANDIR:  Before, absolutely not.

12             MR. ROMARY:  No.

13             THE COURT:  What is your view of that,

14   Mr. Steinberg?

15             MR. STEINBERG:  Well, Your Honor, there is

16   apparently no written opinion of counsel either and no

17   separate patent attorney who has opined.  I mean we're

18   talking about litigators, trial lawyers saying no, I don't

19   think he did it.

20             THE COURT:  Yes.

21             MR. STEINBERG:  I don't think that qualifies.

22             THE COURT:  I don't know.  I don't either.  So

23   your position would be that this should be a factor listed

24   among the factors that the jury should consider.

25             MR. STEINBERG:  And we shouldn't distinguish

1  between either party.

2            MR. MANDIR:  Your Honor, I don't understand that

3  because we didn't get an opinion because we never were

4  accused of infringing.  The only time we could have possibly

5  gotten an opinion was after the lawsuit.  So I don't think

6  it's fair to say, oh, well, you didn't get one before but

7  yet we didn't know.

8            THE COURT:  Well, out in the commercial world,

9  when you seek to commercialize or patent a product, doesn't

10 a prudent company, a prudent entity seek to determine

11 whether there are patents that might be infringed.

12           MR. MANDIR:  Your Honor, there are six or seven

13 million patents.  There is no proof that these defendants --

14           (Court and law clerk confer.)

15           THE COURT:  Yes, you can keep going.

16           MR. MANDIR:  Okay.  I'm sorry.

17           (Pause.)

18           THE COURT:  Go ahead, counsel.

19           MR. MANDIR:  Your Honor, there is no evidence

20 that anyone at either of the defendants saw either of these

21 patents and said you know what?  These might apply to the

22 Inteo or the Diva.

23           THE COURT:  So the contention is neither party

24 had knowledge of the patents in suit?

25           MR. MANDIR:  Absolutely not.  I mean they showed

1          THE COURT:  At least for, in addition to that,

2    the reason that is suggested by your opponent in paragraph

3    number three.  So what we will do is, on our own, we will

4    conduct some research, but you are free to, if you want to,

5    submit something -- just citations, please.  I don't need a

6    writing -- that we'll look at, if we haven't already, if I

7    haven't already resolved the issue overnight.

8          Are there any other?  I think those are the only

9    instructions in contention.

10          MR. BUROKER:  Your Honor, just at some point at

11    the close of evidence, we'll need to, there is a listing of

12    prior art in 5.1.  I think we'll need to work out that final

13    list at some point after they've presented all their

14    evidence and they haven't done that yet.

15          THE COURT:  I'll leave that to counsel.

16    Hopefully, you will be able to work that out.

17          Now, so that, at least for the moment, puts to

18    bed what we can do on the jury instructions.

19          And, of course, who knows, there may be

20    additional evidence that might be adduced that may cause a

21    need to readdress some other aspect as to the final

22    instructions.  You should be aware of that as well.

23          The January 29 letter from ETG concerning their

24    desire, -- and that was addressed earlier by Ms. Eckstein --

25    concerning their desire to put on a rebuttal case,

1    concerning Dr. Dowling.  Who is going to handle this?  Ms.

2    Eckstein?

3              MS. ECKSTEIN:  Sure.

4              THE COURT:  Don't read to me, Ms. Eckstein.

5    Make an argument.

6              MS. ECKSTEIN:  Absolutely not.  And I'm not

7    going to repeat what is already in the record.

8              THE COURT:  No, you don't need to do that

9    either.

10             MS. ECKSTEIN:  The main point is that we had no

11   reason to believe that they were going to do, the defendants

12   were going to do anything with the summary report from EKMS

13   other than rely on it as a business record and state this is

14   information that ETG had received from EKMS.  But they have

15   gone beyond that now.  They have done more than that.  They

16   have told the jury repeatedly that there is a third expert

17   in this case, Dr. Dowling, who EKMS hired.  He wasn't an

18   EKMS employee but EKMS hired him separately and he was ETG's

19   expert and this is what he believed, these were his words

20   and his statement and he changed his opinion.  They have put

21   forward his point, his position and made it a focal point of

22   their case.

23             Because of that, we believe that we will be

24   prejudiced if we do not have an opportunity to bring him

25   here and tell the jury what in fact was the situation.

1          THE COURT:  A couple of questions.  Just a

2    practical, logical consideration:  When can you get him?  He

3    is coming from Costa Rica?

4          MS. ECKSTEIN:  He is.  He is willing to come.

5          THE COURT:  You are going to drag him away from

6    Costa Rica.  The other poor man couldn't attend his

7    Cardinals camp.

8          MS. ECKSTEIN:  I understand we incorrectly

9    understood that he would be able to testify Friday morning.

10         I think his testimony will last a total of

11   30 minutes, direct and cross-examination.  It's very

12   limited.  We don't intend to offer him as an expert.  Just

13   on the factual issues.

14         He was able to make it so that he could be here

15   to testify Friday morning.  We can talk to him and see if he

16   can do it Thursday afternoon.  I need to arrange that.

17         THE COURT:  As to Page 3 of your letter, you

18   have highlighted a question, and I don't see the answer to

19   the question.  The question that you have highlighted is,

20   Can't you look -- this is examination of Dr. Dowling -- of

21   Mr. Chen, rather, concerning Dr. Dowling -- the question

22   that was put was:  Can't you look at the sentence right

23   before the we?

24         It's pretty clear, isn't it, Dr. Dowling, the

25   EKMS expert took a look while EKMS arranged a second call

1    with Harry Levitt for early August?  What is the answer to

2    that question?

3             MS. ECKSTEIN:  I apologize that wasn't included.

4    My recollection is Mr. Chen then testified that it is not

5    clear to him.  Mr. Chen's testimony was that he did not know

6    whose statements the EKMS summary report represented.

7    Further, the EKMS summary report is not authored by anybody.

8    There is no name on it.

9             THE COURT:  I do have a fairly decent

10   independent recollection for some reason of Mr. Chen's

11   testimony.  Okay.  I understand your position.

12            MS. GRAHAM:  Yes, Your Honor.  If I can address

13   this.  We oppose this witness, his coming.  He is not proper

14   rebuttal.  There is no surprise here.  In fact, we think he

15   is not properly coming to the trial at all, whether it would

16   have been for their direct case or for rebuttal.

17            If the Court will recall, the EKMS report was

18   produced to us after the Court ordered its production.  They

19   had withheld it as privileged and work product.  The Court

20   ordered it produced.  We got that on November 6th, which was

21   sometime after fact discovery had closed.

22            We then saw the report.  We saw the important

23   language in it, which the Court may remember was put up on

24   the screen in the trial, in which the EKMS folks -- and they

25   were hired, by the way, there is an agency agreement.  They

Page 1507

1    were asked to act, this report was within the scope of what

2    they were hired to do.

3            They said, We found that the patent includes

4    language adverse to an interpretation that the claims

5    involve a continuously adaptive approach.  And the next

6    sentence makes clear with respect to acoustic feedback.

7            So we then identified that we were relying on

8    the report and -- on two expert supplemental reports.  The

9    experts were deposed.

10           So they knew we were relying on this report.

11   And right then, if they had something that they wanted to

12   put in evidence to bring to trial that would counter that

13   conclusion that I read to Your Honor, in the report, they

14   were on notice.  They should have at that point identified.

15   They should have said, gee, you know?  This report looks

16   like Mr. Dowling reached this conclusion.  But gee, maybe he

17   didn't.  And we don't think he really did, and somehow that

18   is relevant and we will use that somehow.

19           But they did not come forward with it.  They did

20   not identify Dr. Dowling in interrogatory answers.  In fact,

21   they supplemented it two days after they produced the EKMS

22   report, in which we asked them, and this was Interrogatory

23   4, we asked them to identify all analyses relating to

24   infringement, validity, scope of the patent, all those

25   things.

1          They maintained and reiterated, and stated as a

2   fifth, I think it was, supplemental response, that they were

3   maintaining privilege as to any other analyses.

4          So we had no idea that they would rely on Dr.

5   Dowling.

6          So then, no surprise, we got to trial.  The

7   opening relied on the EKMS report.  And they knew we were

8   going to.  So with Mr. Chen, the Court may recall, they

9   actually introduced the EKMS report.  They were the first

10  ones to put it into evidence.  They also introduced

11  Exhibit 1642, which is the red-faced liar e-mail.

12         We weren't relying on that.

13         We then crossed on it.  Then there was redirect.

14  And ETG then pulled out Exhibit 1640, which we hadn't relied

15  on.  And the Court allowed testimony.  We actually had

16  objected to it.

17         But those e-mails were being used by them to

18  support an inference that the report was not correct.  We

19  are not changing, by the way.  They have letters suggesting

20  we suggest there was a change.  We don't suggest there was a

21  change in what Dr. Dowling or ETG or anybody on behalf of

22  EKMS might have been saying.

23         They were the ones who wanted to introduce these

24  e-mails.

25         So now what they are trying to do is bootstrap.

Page 1509

1   Apparently, they feel that these e-mails were not sufficient

2   evidence to counteract what the report said.  So now they

3   want to bring in Dr. Dowling to testify about the e-mails to

4   say he actually did an analysis that is counter to the

5   analysis in the report.

6              And that's not proper rebuttal.  They knew to

7   bring in this material in their direct case if they wanted

8   to bring it in at all.

9              Moreover, it is not proper in the trial at all,

10  because as I mentioned, we were not on notice that Dr.

11  Dowling had done some analysis which allegedly was contrary

12  to what was in the EKMS report.  Now they want to bring him

13  in.  That's clearly what the declaration says.

14             In addition, as far as testifying about the

15  e-mails -- which we think is really a side show, because the

16  issue is what is in the report.  That's what we are relying

17  on.  I don't care how many EKMS experts did -- they could

18  have had ten of them that did some other analysis, because

19  what they reported to ETG, and which ETG received, was the

20  analysis reported in Exhibit 1610, purportedly on behalf of

21  an expert.  And that is what ETG knew.

22             Moreover, we have a further problem with their

23  bringing this witness to testify as purportedly the author

24  of the two e-mails.  And he admits he wasn't the author of

25  the report.  So he has nothing to give us about the report.

Page 1510

1              But they now say that he was the author of these

2    two e-mails.

3              But when we got their privilege log, which are

4    led -- with the Court's order to the production of 1640 and

5    1642, the red-faced liar e-mail, Eric Dowling isn't listed

6    as the author.  Eric, E, I suppose it's Eric, E Cahn

7    (phonetic) is listed as the author.  And Dowling's name

8    nowhere appears on this.

9              With respect to 1640, there is no author,

10   recipient or copy listed, and certainly not Dr. Dowling.

11             So if Dr. Dowling had relevant testimony to

12   offer about these exhibits, he should have been identified

13   long before.

14             We would submit it's not proper to interject

15   this now.  It would be prejudicial to us.  We certainly

16   haven't had discovery of him.  And it is a side show in the

17   trial which will distract from the point, which is what is

18   in the actual report given to ETG.

19             THE COURT:  Okay.  Thank you, Ms. Graham.

20             A response.

21             MS. ECKSTEIN:  First about the point --

22             THE COURT:  You may want to come to the podium.

23             MS. ECKSTEIN:  Thank you, Your Honor.

24             With respect to the supplemental reports.  The

25   two supplemental reports that we received, one was from Dr.

Page 1511

1    Morley and one from our damages expert, Dr. Donohoe.

2    Neither of them stated, neither of them suggested that they

3    were going to take the position that the EKMS summary report

4    represented Dr. Dowling's beliefs.  There was nothing in

5    those supplemental reports that made that suggestion at all.

6    We scoured those before we sent this letter to you or

7    brought this up today because we wanted to make sure there

8    was no reason that we should have had notice before this to

9    know that they were going to make those assertions.

10            I think Ms. Graham is has actually articulated

11   the reasons we need this rebuttal.  In opening statements,

12   Mr. Mandir, he put the report on the screen.  And he said,

13   these are Dr. Dowling's opinions.  This is what Dr. Dowling

14   told ETG.  He authored this report.  He may not have said he

15   authored this report.  But he did say this is what Dr.

16   Dowling told ETG.  And that's why they have made this an

17   issue.

18            They have made this a central point of their

19   case, the fact that this third expert, Dr. Dowling, told

20   ETG, purportedly, that the patents did not cover an adaptive

21   approach with respect to feedback cancellation.  It's been

22   repeated to the jury several times.  The jury is going to

23   remember that.

24            Our concern is if we can't bring Dr. Dowling in

25   to tell the jury I didn't author this report, I authored

Page 1512

1    the, quote-unquote, red-faced liar e-mail, I never changed

2    my position -- they are the ones who brought forward, I

3    believe even in opening, the fact -- the assertion that he

4    changed his mind.  They presented a timeline.  First he

5    wrote the, quote-unquote, red-faced liar e-mail, I think it

6    was a July 2002 e-mail, and then he spoke with Harry Levitt

7    and then he spoke with Sound ID (phonetic), and then he

8    produced this December 2002 summary report, and there he had

9    changed his mind.  That was his assertion, not ours.

10            THE COURT:  And he was not on your original

11   witness list why?

12            MS. ECKSTEIN:  For a number of reasons.

13   Probably foremost is we didn't need him to prove any

14   elements in our case.  There was no reason for us to put him

15   on a witness list.  There was simply no reason to put him on

16   a witness list.

17            THE COURT:  Is it possible you didn't put him on

18   a witness list because you didn't count on my ruling the

19   document in and discoverable?

20            MS. ECKSTEIN:  Actually, that ruling came a

21   month before we needed to file the witness list.  So we were

22   aware of it at that point.

23            We frankly were surprised that he was not on the

24   defendants' witness list.  The defendants have put words in

25   his mouth.  The defendants have told the jury what he

Page 1513

1    believed, what he said, what he purportedly opined.  If they

2    wanted the jury to hear what he purportedly believed and

3    opined, they should have put him on their witness list and

4    brought him here.

5              THE COURT:  Ms. Graham, one of the concerns I

6    have is, accepting everything you said, this is, after all,

7    this is an enterprise at bottom that is interested in

8    seeking the truth of the matter, to the best of our ability,

9    without unfairly and unduly prejudicing one side or the

10   other insofar as the process of getting to that truth is

11   concerned.

12             They didn't raise the report of Dr. Dowling in

13   their opening and emphasize it.  You did, your side did.

14   Are you saying they should have reasonably anticipated that

15   you would use this report in the way that you did, and

16   effectively present another expert or another witness, at

17   least, who was not going to be able to be examined, direct

18   or cross, whose views would not be able to be tested, so

19   that this jury could make a determination about what it

20   believed or not?  Go ahead.

21             MS. GRAHAM:  Well, Your Honor, what we were

22   doing was making argument about the evidence.  And we didn't

23   use anything other than this very document.  That is all

24   that we are arguing about.  So the document itself says that

25   Eric Dowling, the EKMS expert, took a look at the patent

Page 1514

1   while EKMS arranged a second call with Harry Levitt for

2   early August.

3            So when Mr. Mandir in his opening talked about

4   it, he was referring to that statement.  So he is saying the

5   EKMS expert -- I can hand Your Honor this page, if that

6   would be helpful.  It's towards the bottom of the last

7   paragraph.

8            THE COURT:  This is --

9            MS. GRAHAM:  This is DX-1610.  It is the report

10  itself.  This is what Mr. Mandir was arguing about and

11  referring to.

12           THE COURT:  Is that the bracketed sentence?

13           MS. GRAHAM:  Yes, down at the bottom, it's the

14  first three sentences that are at issue.  And that is what

15  Mr. Mandir was speaking from.

16           THE COURT:  Third down, took the EKMS expert --

17  that sentence.

18           MS. GRAHAM:  Took a look at the patent, yes.

19  While EKMS arranged a second call with Harry Levitt for

20  early August.  Then the next sentence refers to these calls

21  and what happened as a result of it.  And it says over the

22  course of two calls we worked through the language of the

23  patent and found that the body of the patent included

24  language adverse to an interpretation of the claims

25  involving a continuously adaptive approach, a key issue

Page 1515

1   involved the breaking of a feedback loop and applying a test

2   signal.

3            All Mr. Mandir was arguing from this document,

4   that they knew absolutely -- they can't suggest that they

5   didn't understand, when we gave them the expert reports.  In

6   fact, probably when they saw this, they knew this was the

7   important part.

8            Our whole case, an important element, as the

9   Court has heard over and over, has been whether or not the

10  patent is continuously adaptive with respect to acoustic

11  feedback.

12           This statement addressed it.  All Mr. Mandir did

13  was to argue from this statement.  Again, whether or not

14  Eric Dowling really had some other view someplace off the

15  screen doesn't matter, because this was what was told to

16  ETG.

17           So when they went to do licensing, they

18  understood that this was, we would argue -- they can argue a

19  different interpretation.  They are free to argue to the

20  jury, oh, no, you can't really read this document this way.

21  But we would argue that as a result of this, Mr. Chen, and

22  the others attesting, knew -- understood that an expert had

23  looked at the patent with Dr. Levitt, and looked at the

24  claims, and considered that it would not cover the

25  continuously adaptive approach.

Page 1516

1          And, Your Honor, that is all that we are relying

2    on this for.

3          I mean, we could all bring in lots of people,

4    other experts, essentially.  They are trying to bring in

5    this guy to say he has some other opinion.  But it doesn't

6    matter if he has another opinion.

7          THE COURT:  They are not asserting -- I

8    understand the argument, so much that he has another --

9    well, it's mixed, actually, that he, in the affidavit, in

10   the declaration, he writes, I do not agree with the

11   statement in DX-1610 that the patent included language

12   adverse to an interpretation of the claims involving a

13   continuously adaptive approach -- 1610 being the EKMS

14   report.

15         He also says, Moreover, during my technical

16   evaluation I never concluded or made a statement to the

17   effect that the patent included language adverse to an

18   interpretation of the claims involving a continually

19   adaptive approach.  I agree, in Paragraph 13, with the

20   statement in DX-1642 that the ETG filter can be adaptive.

21         Counsel for the defendants, at least in part,

22   it's set forth here in the ETG letter, stated to the jury in

23   opening that there is another technical expert who also has

24   a Ph.D. in electrical engineering, and who is also of the

25   opinion that the patents in this lawsuit do not cover

Page 1517

1    continuously adaptive filters, such as the defendants'

2    products.  That is directly contrary, that assertion, to

3    what we see in the declaration.

4              Counsel, sit down.  She is doing a fine job.

5              Response, please.

6              MS. GRAHAM:  Your Honor, the primary point is

7    that what was communicated to ETG is what matters.  And it

8    was the communication of that opinion to ETG that is at the

9    heart of the damages issue, and which we were relying on

10   this for.

11             So it doesn't matter if he had some opinion that

12   he -- so he can come in and say, well, I agree or I disagree

13   with these e-mails.  But he is not saying anywhere in his

14   declaration that he communicated a view contrary to the

15   report to ETG.

16             THE COURT:  Okay.  Let me get a response to that

17   point.  I think you need to first address that point.

18             MS. ECKSTEIN:  The last point there, yes.  The

19   communication is what matters.  And the problem is that they

20   have asserted that that communication came directly from Dr.

21   Dowling, another expert in the case.

22             THE COURT:  The communication to ETG?

23             MS. ECKSTEIN:  Correct.  That is what they

24   asserted, the communications to ETG, meaning the ETG summary

25   report.  But those are his opinions, his beliefs, his

1    statements.

2                THE COURT:  Where and how is that communicated?

3                MS. ECKSTEIN:  It was communicated at least in

4    Mr. Mandir's opening statement when he said that Dr. Dowling

5    "is also of the opinion."

6                THE COURT:  Let me ask you, is there evidence?

7    Apart in the opening statement, is there evidence in this

8    record -- and anybody can answer this -- that that view was

9    communicated to ETG?

10               MS. ECKSTEIN:  They sought to elicit that

11   evidence through Mr. Chen.

12               THE COURT:  Mr. Chen did not agree.

13               MS. ECKSTEIN:  That's right.

14               MR. REID:  Your Honor, I was going to say, let

15   me just add, I think Your Honor has hit the point on the

16   head.  They're asking to rebut argument.  Rebuttal is

17   rebuttal to evidence.  There is absolutely no evidence that

18   they're asking to rebut.  If they want to argue to this jury

19   that Mr. Mandir was wrong, that his argument was wrong, they

20   can argue that.  That is closing argument.

21               THE COURT:  I think that is where we go with

22   this one.  Mr. Steinberg.

23               MR. STEINBERG:  Your Honor, there is evidence

24   because they asked Mr. Chen whether he got the summary

25   report.  That's the evidence which they've characterized in

Page 1519

1    a certain way in front of this jury, and the manner in which

2    they've characterized the summary report is that it's the

3    opinion of Eric Dowling.

4              THE COURT:  Well, that is just argument.  That

5    is not evidence.  There is a characterization, I agree with

6    you, one which may bear some discussion by me.  I think you

7    need to respond to Mr. Reid's point concerning the dearth of

8    evidence on the subject.

9              MR. STEINBERG:  Yes, Your Honor.  And I don't

10   know whether they're intending to have their experts address

11   this at all but both of their experts have supplemental

12   reports saying they relied on this.

13             THE COURT:  Relied on what?  The EKMS report?

14             MR. STEINBERG:  The EKMS report.

15             MR. MANDIR:  We're not going to have anyone say

16   that Dr. Dowling said this or didn't say this.

17             THE COURT:  That is the critical point.  That is

18   the critical point, Mr. Steinberg, Ms. Eckstein.

19             I don't think there is evidence at this point.

20   And I think it's fundamental law as to what is -- and you

21   cited case law, appropriate case law in your letter -- as to

22   what is proper rebuttal.  And Mr Reid correctly cites, makes

23   the point that it's to evidence, argument.  And that is

24   completely consistent with everything that we tell the jury

25   about what is evidence and what is not evidence.

1              Now, if you would like me, if you feel it

2    appropriate for me to consider an instruction to cure what

3    you feel was a misstatement of the record, what would later

4    become the record at some point, I'll consider that.  I'm

5    not sure I will agree with you, and you can discuss it with

6    the other side, but I will consider that.  But I think the

7    issue has at last come into sharp focus for me and I

8    understand it.  I'm going to deny the request to offer the

9    rebuttal witness, Dr. Eric Dowling.

10             Do you have other rebuttal evidence that you

11   want to present?

12             MR. STEINBERG:  No, we would request --

13             MS. ECKSTEIN:  We do have.

14             MR. STEINBERG:  Yes, we have other rebuttal.  We

15   would request an instruction because we believe the jury

16   deserves the truth and the truth is in the declaration.

17   It's not in this characterization of these documents.

18             THE COURT:  Well, to the extent that jurors have

19   a lot to remember and they may not remember that, whoa, that

20   wasn't in evidence, that was a lawyer's statement, I will

21   consider that.  So you should discuss that with the other

22   side.  Your point is a fair one in this regard.

23             MR. STEINBERG:  Thank you, Your Honor.

24             THE COURT:  Is there anything else on this?

25   Okay.  Counsel, we'll see you in the morning.

Page 1522

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                IN AND FOR THE DISTRICT OF DELAWARE
 3
                             -   -   -
 4
 5    ENERGY TRANSPORTATION,          :   Civil Action
      INC.,                          :
 6                                    :
               Plaintiff,            :
 7                                    :
          v.                          :
 8                                    :
      WILLIAM DEMANT HOLDINGS A/S,    :
 9    et al.,                         :
                                      :
10             Defendants.           :   No. 05-422 (GMS)
11                           -   -   -
12                  Wilmington, Delaware
            Wednesday, January 30, 2008
13                      8:30 a.m.
                 Eighth Day of Trial
14
                             -   -   -
15
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
16                                    and a Jury
17
18
      APPEARANCES:
19
                 EDMOND D. JOHNSON, ESQ.
20               Pepper Hamilton LLP
                        -and-
21               MARTY STEINBERG, ESQ.,
                 BRIAN M. BUROKER, ESQ., and
22               MAYA M. ECKSTEIN, ESQ.
                 Hunton & Williams
23               (Washington, D.C.)
24                              Counsel for Plaintiff
25
```

Page 1523

```
 1    APPEARANCES CONTINUED:
 2              MARY B. GRAHAM, ESQ.
               Morris, Nichols, Arsht & Tunnell
 3                   -and-
               JOHN M. ROMARY, ESQ.,
 4             GREGORY C. GRAMENOPOULOS, ESQ.,
               VINCENT KOVALICK, ESQ.,
 5             KAY HILL, ESQ.,
               GERSON S. PANITCH, ESQ., and
 6             ARTHUR A. SMITH, ESQ.
               Finnegan, Henderson, Ford, Farabow & Dunner
 7             (Washington, D.C.)
 8                                  Counsel for
                                    Demant Defendants
 9
               DONALD E. REID, ESQ.
10             Morris, Nichols, Arsht & Tunnell
                     -and-
11             WILLIAM H. MANDIR, ESQ.,
               JOHN SCHERLING, ESQ.,
12             CARL J. PELLEGRINI, ESQ.,
               BRIAN SHELTON, ESQ.,
13             MATTHEW KAPLAN, ESQ., and
               J. WARREN LYTLE, JR., ESQ.
14             Sughrue Mion
               (Washington, D.C.)
15
                                    Counsel for Widex
16                                  Defendants
17                   -  -  -
18
19
20
21
22
23
24
25
```

Anderson - direct

Page 1582

1  A.      Sure.   The first few describe a hearing aid.   That is

2  not under dispute.

3            This next step requires determining -- and this

4  is a mouthful and I apologize -- determining the effect on

5  the amplitude and phase of a signal in said transmission

6  channel as a function of frequency of acoustic feedback

7  between said receiver and microphone.

8            And I would say that neither of those two steps

9  are performed in any of the accused -- I'm sorry -- this

10 step is not performed in any of the accused products.

11           THE COURT:  You might want to wait.  Instruct

12 your IT person to wait until the witness is testifying.

13           MR. ROMARY:  Yes, I was asking him to highlight

14 it and I think we miscommunicated, Your Honor.

15           THE COURT:  Okay.

16           MR. ROMARY:  All I need is for you to highlight

17 this.

18           (Demonstrative highlighted.)

19           THE COURT:  Okay.

20 BY MR. ROMARY:

21 Q.     In your opinion, should the check next to the

22 highlighted section be on or off?

23 A.     In my opinion, they should be off.  So now you can

24 take them away.

25 Q.     Now, what is the basis for your opinion that this

Anderson - direct

Page 1583

1    step is not literally performed or not performed by

2    equivalence?

3    A.      The adaptive filters -- I guess I should start by

4    saying -- let's see.  How do I bring this up?  I understand

5    adaptive filters.  I have written papers and designed

6    adaptive filters.  I understand the math behind them.  I

7    understand the principles behind them.  And I can tell you

8    or show you, whichever you would like to see, that there is

9    no determination of amplitude or phase effect in adaptive

10   filters, that they do not need that information, they cannot

11   make use of that information and it is simply not performed.

12   Q.      Could we go back to Anderson 2 just for a moment?

13           Doctor, using Anderson 2, could you explain to

14   the jury what the LMS filter is doing, how it works?

15   A.      Sure.  The LMS filter -- and it helps me to describe

16   it as a living thing and actually in this case I think it

17   applies because like a living thing, the LMS filter does its

18   own -- it's self determining in that effect.  It watches the

19   signal that is about to go out and to be heard by the

20   hearing impaired listener.  It also watches what is coming

21   back into the microphone.  Now, it takes a little time for

22   this signal to come back around.  And if that signal comes

23   back around, it looks for some correlation there.  It

24   subtracts that portion of the output which reappears at the

25   input.  So that the hearing impaired listener will only have

Page 1585

1  the effect of amplitude and phase on a signal of a

2  transmission path is determined?

3  A.      No, there is not.

4  Q.      Is there any place in these equations where the

5  equivalent of the effect of amplitude and the phase of a

6  signal in the transmission channel is determined?

7  A.      No, they perform -- the result is far different.

8  When you are talking about determining the amplitude and

9  phase effect in the context of this patent, that is used to

10 generate coefficients having a desired response.  Here,

11 there is no amplitude or phase measure determined in any

12 way.  The result is far different.  You don't know the

13 response that you want.  Instead, you just gradually tweak

14 or update these things, the filter coefficients until they

15 are effective at the goal of reducing feedback.

16 Q.      So you don't have to know where you want to go with

17 an LMS filter; is that correct?

18 A.      Yes, I would say the primary difference between an

19 adaptive filter and a programmable filter is that if you

20 know what you want the filter to do in terms of its

21 response, you use a programmable filter.  If you don't know

22 what you want the filter to do or that what it's going to do

23 is going to be changing in some unknown way, you use an

24 adaptive filter.  One is programmable, one is

25 non-programmable.  Neither one can perform the same function

Page 1586

1    and get the same result as the other.

2    Q.    Can we go back to the claim chart?  Anderson 5.

3            So that is the basis for removing the checks

4    over here for the first determining step; is that correct?

5    A.    Yes, that is.

6    Q.    And that is under both literal infringement and

7    doctrine of equivalents; is that correct?

8    A.    That is correct.

9    Q.    Now, is there anything else in this claim, any other

10   conclusion you have reached as to whether it's appropriate

11   to have a check or not have a check?

12   A.    In my opinion, that is sufficient for it to not

13   infringe but if you look down to the next step, I think that

14   is not performed either.

15   Q.    What should we do with the checks there?

16   A.    As I have just mentioned, a programmable filter and

17   an adaptive filter are different things but the programmable

18   filter, you provide it with coefficients.  It gives you the

19   response.  With an adaptive filter, you cannot provide it

20   with coefficients.  It generates its own coefficients.  And

21   I understand that ETG is asserting that while it has

22   coefficients, it must have been programmed.

23           I disagree with that for many reasons:  One, if

24   all a filter must have to be programmed is coefficients,

25   that means all filters are programmable and the point of