Anderson - direct

1    Q.      And what happens to the next 16,000ths of a second?

2    A.      You have a partial update of the next four.  You are

3    building your columns one little bit at a time.  It's going

4    to take it actually maybe seconds to get a full set of

5    coefficients in there.

6    Q.      And all this time, is the delay line in the process

7    and inserted in the process?

8    A.      Yes.  So the delay line is actually an integral part

9    of the algorithm.  It may not be apparent from all the

10   diagrams but the mathematics make it clear that those delay

11   line values are used in both the update step and in the

12   filtering step.  And so it's obviously inserted at that

13   point.  And I might add that the claim requires something

14   that is effective to reduce feedback and all zeros or a

15   couple partially updated coefficients are in no way

16   effective to reduce feedback.

17   Q.      Can we go back please to Anderson 5, the claim chart?

18           So with respect to Claim 14, should we yellow

19   the whole thing or not, on inserting?  This whole step.

20   A.      Well, that whole step is not met in the accused

21   products, if that is what you mean by highlighting it.

22   Q.      And that would be either literally or under the

23   doctrine of equivalents?

24   A.      Absolutely.

25   Q.      So that takes care of Claim 14.  What is your opinion

Anderson - direct

Page 1593

1  with respect to Claim 16?

2  A.      Claim 16 requires all the restrictions of Claim 14.

3  And since in my opinion the limitations of Claim 14 aren't

4  met, Claim 16 is also not met and that would be the first

5  line there.  We could remove those checks.

6  Q.      These here?

7  A.      Yes.  And we've already discussed that LMS filters

8  are not programmable, and for that reason, in fact they

9  aren't equivalent to programmable filters -- I might add

10  that in, among engineers, among those that are in this

11  field, the term "programmable" is usually not used except to

12  distinguish a filter from an adaptive filter.

13  Q.      Okay.  What do we do with these checks?

14  A.      Well, the accused devices don't have a programmable

15  filter in the feedback loop so I would remove both those

16  checks.

17  Q.      Do you have an opinion as to how your analysis of

18  literally and under the doctrine of equivalents for Claim 14

19  compares to your analysis for Claim 13?

20  A.      Claim 13 requires the same determination step and so

21  the identical analysis applies.

22  Q.      And -- I'm sorry.

23  A.      It also requires an insertion of a programmed filter.

24  And the same analysis there applies.

25  Q.      So you agree then with Mr. Brown that the analysis

Soli - direct

Page 1644

1    A.    The House Ear Institute is a private, nonprofit

2    research institute, whose mission is directed to education

3    and research that improves the need -- to meet the needs of

4    people with hearing impairment and deafness.  I don't want

5    to be immodest, but I think that institute is viewed as

6    perhaps the leading research institute in that field

7    throughout the world.

8    Q.    Now, why is it called House Ear Institute?

9    A.    Well, it has nothing to do with houses.  The founder

10   of the institute was a man named Dr. Howard House.  He was a

11   surgeon who HEI some of the earlier ear surgeries before the

12   cochlear implant.  He founded it back in the 1940s.

13   Q.    What is your title -- does the House Ear Institute go

14   by HEI?

15   A.    Yes, you can call it HEI.

16   Q.    What is your title at HEI?

17   A.    I actually have two titles.  I am the head of what is

18   now called the Department of Human Communications Sciences

19   and Devices.  That's quite a mouthful.  And I am also vice

20   president for the institute with responsibility for the

21   intellectual property of our institute.

22   Q.    Do you direct or train any engineers on your staff?

23   A.    Yes.  I direct the activities, over the years I have

24   directed the activities of software engineers, electrical

25   engineers.  I have had graduate student engineers working in

Soli - cross

Page 1695

1    electrical engineers; correct?

2    A.      Correct.

3    Q.      And you rely on them, do you not?

4    A.      I'm not sure what you mean by "rely."

5    Q.      Well, for engineering work.

6    A.      They work for me.  I instruct them what to do.  They

7    rely on me to tell them what the design requirements are and

8    what the structures are and they then use off-the-shelf

9    circuits to make single processing programs that implement

10   those structures that I have instructed them to do.  So we

11   rely on each other.

12   Q.      Now, the House Ear Institute has had contracts with a

13   number of companies in the hearing aid manufacturing

14   industry; correct?

15   A.      Possibly a few, yes.

16   Q.      Okay.  And those have been for hundreds of thousands

17   of dollars; correct?

18   A.      There is one that I know of that was for several

19   hundred thousand dollars.  That is the only one I recall of

20   that amount.

21   Q.      And the hearing aid manufacturers are listed on your

22   website as contributors; correct?

23   A.      I have no idea.

24   Q.      Have you ever looked at your website?

25   A.      Of course I have, but I don't look at that part of

Soli - cross

Page 1696

1    it.

2    Q.    Now --

3    A.    I'm sorry.  I would like to correct something.  It's

4    not correct to say the hearing aids.  Some may be but I

5    don't think all of them are listed there.

6    Q.    Do the members that are listed there belong to an

7    organization called HIMPP?

8    A.    I don't know.

9    Q.    Now, in your report, you said that one profile of an

10   expert in this case to perform the duties you are

11   performing, and you say, quote, in my opinion a person of

12   ordinary skill in the art of ETG patents would have been an

13   individual with at least training at the master's degree

14   level with a specialty in acoustic related engineering;

15   right?  That is one definition you gave?

16   A.    That is correct.

17   Q.    That is not you; right?

18   A.    No, I'm an expert.  I'm not a person of ordinary

19   skill in the art.  I've been qualified as an expert.  I

20   trained those people in my laboratory and I have trained

21   them in the laboratory at 3M.

22   Q.    You just said you are not a person of ordinary skill

23   in the art; is that correct?

24   A.    That's correct.  I am qualified as an expert.

25   Q.    Okay.  But in your report, you put language in your

Page 1784

1   overbroad.

2           THE COURT:  Mr. Reid.

3           MR. REID:  Your Honor, again, this statement was

4   made in the opening.  There was no objection to it.  We

5   believe that it is proper recitation of what we think the

6   evidence will show.  We believe they can argue to the jury

7   that we are wrong, that we have stated -- they can point to

8   this and say there is nothing in this report that

9   specifically says Dr. Dowling has this opinion.  We can say

10  the opposite.  We think it does say that.

11          It is a matter of the interpretation of that

12  report.

13          THE COURT:  Ms. Eckstein's point is that you are

14  now -- the jury hasn't heard this -- but that the Court and

15  the parties now have seen a sworn declaration which

16  expressly refutes that contention, your contention that the

17  report does support that view.  Go ahead.

18          MR. REID:  Your Honor, unfortunately, this is a

19  problem that was created by the plaintiffs, by their late

20  production of this document, by their entire conduct

21  relating to these documents.

22          THE COURT:  Let me interrupt for a second.  Is

23  it fair to ask, for the Court to let that stand in light of

24  the information, albeit belatedly received and perhaps

25  received as a result of their own -- I am not saying that

Page 1790

1    preliminary instructions coupled with my final instructions

2    will take care of this, and that is where we're going to

3    leave it.  I'm not going to agree, Mr. Johnson, to the

4    proposed curative instruction, Mr. Steinberg.

5           MR. STEINBERG:  Your Honor, what would they be

6    permitted to say about this in closing?

7           THE COURT:  Well, let's discuss that.

8           MR. MANDIR:  Well, I think Mr. Johnson's

9    comment was right on.  I mean we haven't had a chance to

10   cross-examine or do whatever, but given the declaration, and

11   I don't know any other reason to doubt it, I can't say

12   something that I now know, as an officer of the court.

13          THE COURT:  Right.

14          MR. MANDIR:  So I can characterize it another

15   way:  that EKMS sent this report and they got this and this

16   is what it said certainly, and I won't mention -- and Eric

17   Dowling was certainly somehow involved in the project but I

18   don't have to attribute specifically to him.

19          MR. STEINBERG:  Your Honor, I don't think --

20          THE COURT:  You don't think Eric Dowling should

21   be mentioned.

22          MR. STEINBERG:  This is an ethical issue.

23          MR. MANDIR:  Then you have to white him out.

24          THE COURT:  Well, let's white him out.  It does

25   present a mixed question of ethics.  And we have ethical

Page 1791

1   attorneys here and so I'm not concerned that anybody is

2   going to act unethically, but we can white that out.

3           MR. STEINBERG:  I don't think they should be

4   allowed to refer to Dr. Dowling.

5           THE COURT:  Well, that is what we're saying.

6   That is what they're agreeing to.

7           MR. STEINBERG:  And white it out of the exhibit.

8           THE COURT:  Is that what you --

9           MR. MANDIR:  No, no, Your Honor.  I was being --

10          THE COURT:  Well, I don't think there should be

11  a reference to Dowling.

12          MR. MANDIR:  Okay.  I don't have to reference

13  him, but the document just says he was involved.

14          THE COURT:  Could I see the document again?

15          MR. MANDIR:  Yes.

16          MR. STEINBERG:  Yes.  And, Your Honor, if you

17  will notice that particular paragraph, right before the

18  language that they want to highlight, there is a reference

19  to phone calls with Dr. Dowling.

20          (Document passed forward.)

21          THE COURT:  Mr. Steinberg, I've been handed I

22  think by Mr Reid, I'm looking at --

23          MR. MANDIR:  DX-1610, Your Honor.

24          THE COURT:  -- DX-1610.  In the first page, it's

25  the ETG summary report, 105.  And you complain I think about

1    the last paragraph, the first sentence; is that correct?

2              MR. STEINBERG:  I believe so, Your Honor.

3              THE COURT:  The only thing I see there is Eric

4    Dowling, EKMS expert, took a look at the patent.

5              MR. STEINBERG:  Correct.

6              THE COURT:  That's it.

7              MR. STEINBERG:  Yes, but then they're going to

8    imply that he came to the conclusion listed below where it

9    says an adverse -- where am I reading?  Over the course of

10   the two calls -- one of which you could imply would be with

11   Dr. Dowling -- we worked through the language of the patent

12   and found that the body of the patent included language

13   adverse to interpretation of the claims.

14             THE COURT:  Well, counsel just conceded he can't

15   make that argument.  Ethically, he just conceded that.

16             MR. MANDIR:  Yes, Your Honor.  I won't make that

17   argument.

18             THE COURT:  So they're not going to be able to.

19   He is not desirous of making that argument.  He is not going

20   to be permitted to make that argument.  He just conceded

21   that.  So what are you arguing about?

22             MR. STEINBERG:  But he is going to argue this is

23   the EKMS report to us.

24             MR. MANDIR:  Of course it is.

25             MR. STEINBERG:  Our response, which is also in

Page 1793

1    the record, Your Honor, is another e-mail from Eric Dowling

2    that says anyone who says it's not adaptive is a red-faced

3    liar.

4              MR. MANDIR:  You can make that argument,

5    Mr. Steinberg.

6              THE COURT:  I'm not really seeing the problem.

7    Your last reference lost me.

8              MR. STEINBERG:  Judge, the reason we have

9    this -- and you can see the declaration of Dr. Dowling --

10   the only opinion Dr. Dowling actually gave is an e-mail from

11   him.  And the e-mail from him says, the bottom line is

12   nobody but a red-faced liar could read these cites and say

13   the '850 does not contemplate adaptive filtering.  That is

14   DX-1642.

15             THE COURT:  Yes, I'm trying to find it.  I have

16   1642.  Oh, yes.  Have you seen it?

17             MR. MANDIR:  Yes, Your Honor.  Well, I know the

18   document.

19             THE COURT:  Okay.

20             MR. MANDIR:  But if you remember Mr. Chen's

21   cross-examination, they put that in through Mr. Chen, 1642

22   and the red faced liar, and they gave the 1610.  And

23   Mr. Chen said, oh, if you look at the two together, what

24   this means is somehow that, you know, adverse something --

25   it doesn't mean what it looks like it means.  What they

1  didn't put in and what Mr. Steinberg doesn't tell you is the

2  document that I gave to Ms. Chen that had an e-mail from Mr.

3  Boddie, the author of that ETG report that said we -- to ETG

4  saying, hey, we took another look at this patent.  We, being

5  Mr. Dowling, Dr. Dowling, Harry Levitt and I, we all looked

6  at it and we looked at it much closer than we did before.

7  That was in September.  That e-mail that he just referred to

8  was in July.

9          In September, they are now looking at it much

10  closer and we're going to give you a report in a couple of

11  days and it's going to have some mixed results, okay?  So to

12  say that is the only opinion of Dr. Dowling, we have an

13  e-mail that references Dr. Dowling saying we all looked at

14  it again much closer and we have some mixed results and that

15  is the results they got.

16          MR. STEINBERG:  And so lies the problem because

17  we have the declaration of Dr. Dowling that says I agree

18  with the statement in DX-1642 that the bottom line is

19  "nobody but a red-faced liar could read those cites and say

20  the '850 does not contemplate adaptive filtering.  I have

21  never changed my view in this regard."  And they're going to

22  imply he did.

23          MR. MANDIR:  Well, first of all, what he just

24  said, if it's adaptive filtering, we would agree with him

25  because as we've heard, the patents talk about adaptive

1    filtering in a context different than acoustic feedback.  So

2    if you look at that July 24th e-mail, which we went through

3    with Dr. Morley and I think others, you know, we say

4    everyone that he says there is adaptive filtering but not

5    acoustic feedback.  So what we surmise is when they had

6    this later really looking into it, he realized oh, well, all

7    these different citations I gave you about adaptive, they

8    are adaptive but not for acoustic feedback, and then they

9    realized that and they gave the report and the report

10   specifically talks about no adaptive feature for acoustic

11   feedback.

12          MR. STEINBERG:  Your Honor, the declaration

13   doesn't talk about the other functions of this hearing aid

14   like noise and so forth.

15          THE COURT:  Well, you just uncovered that in a

16   declaration.  What is it that you would want to argue to the

17   jury?

18          MR. MANDIR:  Your Honor, I want to be able to

19   read the document to them, point to paragraphs.  I won't say

20   anything that attributes it to Dr. Dowling.  They can read

21   it themselves.  I'll just read it.  And they can decide.  I

22   won't say one word about it.

23          THE COURT:  I think that is the way to handle

24   this.  Let the decider of fact decide the facts.  Why are

25   you trying to run away from this?  I think I know why you

Page 1796

1   are trying to run away from this, but ...

2           MR. STEINBERG:  Your Honor, they're going to

3   imply that Dr. Dowling did change his mind.

4           MR. MANDIR:  No.

5           THE COURT:  No, no.

6           MR. MANDIR:  I can't show what I'm going to say.

7           THE COURT:  Yes, I'm not going to make you do

8   that.  But, no, I think we've now had a good discussion and

9   counsel understand the parameters of the conversation that I

10  will permit on this subject with the jury.  I don't think

11  we're going to have a problem.  If we have a problem,

12  Mr. Steinberg, in real-time, you pop up and let's go to

13  sidebar.

14          MR. STEINBERG:  Fine, Your Honor.

15          THE COURT:  All right?

16          So we've covered jury instructions.

17          Verdict form.  Verdict form.  Counsel, a

18  couple of things.  I haven't really examined this carefully

19  but I think that we need to break out DOE and equivalent

20  infringement and literal infringement for this jury for

21  looking-down-the-road purposes with regard to my POE

22  decision, the history estoppel, prosecution history

23  estoppel.  And I think you should break this out by accused

24  product.  At some point, there may be an injunction that

25  may be at issue.

Page 1802

```
1              IN THE UNITED STATES DISTRICT COURT
2              IN AND FOR THE DISTRICT OF DELAWARE
3
                        -   -   -
4
5   ENERGY TRANSPORTATION,           :   Civil Action
    INC.,                            :
6                                    :
            Plaintiff,               :
7                                    :
        v.                           :
8                                    :
    WILLIAM DEMANT HOLDINGS A/S,     :
9   et al.,                          :
                                     :
10          Defendants.              :   No. 05-422 (GMS)
11                      -   -   -
12              Wilmington, Delaware
            Friday, January 31, 2008
13                 9:30 a.m.
            Ninth Day of Trial
14
                        -   -   -
15
    BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18  APPEARANCES:
19          EDMOND D. JOHNSON, ESQ.
            Pepper Hamilton LLP
20                  -and-
            MARTY STEINBERG, ESQ.,
21          BRIAN M. BUROKER, ESQ., and
            MAYA M. ECKSTEIN, ESQ.
22          Hunton & Williams
            (Washington, D.C.)
23
                            Counsel for Plaintiff
24
25
```

Page 1803

```
 1   APPEARANCES CONTINUED:
 2              MARY B. GRAHAM, ESQ.
               Morris, Nichols, Arsht & Tunnell
 3                   -and-
               JOHN M. ROMARY, ESQ.,
 4             GREGORY C. GRAMENOPOULOS, ESQ.,
               VINCENT KOVALICK, ESQ.,
 5             KAY HILL, ESQ.,
               GERSON S. PANITCH, ESQ., and
 6             ARTHUR A. SMITH, ESQ.
               Finnegan, Henderson, Ford, Farabow & Dunner
 7             (Washington, D.C.)
 8                                  Counsel for
                                    Demant Defendants
 9
               DONALD E. REID, ESQ.
10             Morris, Nichols, Arsht & Tunnell
                    -and-
11             WILLIAM H. MANDIR, ESQ.,
               JOHN SCHERLING, ESQ.,
12             CARL J. PELLEGRINI, ESQ.,
               BRIAN SHELTON, ESQ.,
13             MATTHEW KAPLAN, ESQ., and
               J. WARREN LYTLE, JR., ESQ.
14             Sughrue Mion
               (Washington, D.C.)
15                                  Counsel for Widex
16                                  Defendants
17                   -  -  -
18
19
20
21
22
23
24
25
```

Donohue - direct

Page 1811

1    factors, and focused on the comparable licenses in the

2    hearing aid industry.  And I concluded that you can

3    determine royalties in two fashions, one by virtue of a lump

4    sum as shown on the slide.  That would be a million dollars.

5    And the other would be a running royalty rate, which would

6    be .5 percent.

7    Q.          Why is your opinion different from that

8    presented by ETG's expert, Mr. Musika?

9    A.          Well, Mr. Musika and I both agree that the

10   Georgia-Pacific factors should apply.  However, we differ in

11   that I looked at comparable licenses in the industry to see

12   what rates were paid in those license agreements.

13              Mr. Musika looked at a profit analysis, which I

14   don't believe is supported by the evidence in this case.

15   Q.          Before reviewing the bases of your opinions, can

16   you tell the jury what materials you considered to form your

17   opinions in this case?

18   A.          Well, this is, as you now know, a very

19   complicated patent litigation.  So there are a voluminous

20   number of documents that I looked at.  Among those are the

21   ETG patents and the asserted claims, the patents of the

22   defendants Widex and Demant in this case here.  I looked at

23   the HIMPP documents.  I looked at documents produced during

24   discovery, including the EKMS documents that you have heard

25   about earlier.  And ETG business documents.

Donohue - direct

Page 1814

1    Georgia-Pacific.  Then these factors are rooted in the real

2    world.  That is what the case law requires, that you take it

3    into real world consideration.  In the hundred-or-so

4    licenses I negotiated, the very most important factor is the

5    first factor which is how much money did the owner of the

6    patent derive from royalties from the patent.

7              The second most important factor is the second

8    one there which is what are the comparable rates paid for

9    patents in the industry?  Of course, I've looked at all the

10   other factors and considered them in my analysis.

11   Q.        Okay.  So to clarify, you considered all 15

12   factors?

13   A.        I have.  Yes, I have.

14   Q.        What did you determine in Georgia-Pacific Factor

15   1?

16   A.        Well, first of all, I determined that there is

17   no established royalty rate for the patents.  And the reason

18   for this is that the patents have never been licensed

19   before.  In the case of Audimax and ETG, there were attempts

20   to license the patents but these failed.

21             Secondly, at the beginning of the negotiation,

22   you also consider what is the commercial embodiment?  Is it

23   something that is attractive that I would want to use in my

24   own business?  And in this case here, there was never a

25   commercial embodiment of the patented invention.

Donohue - direct

Page 1815

1          I also considered the EKMS attempts to license

2    the patents.  As you might have heard in your earlier

3    testimony here, ETG retained EKMS which is a licensing and

4    consulting firm specializing in the licensing of technology.

5    EKMS was highly incentivized to license patents because it's

6    part of its consideration for doing this work.  It got a

7    percent of the revenue it gained from licensing the patents.

8    And in this case, EKMS failed to license the patents.

9    Q.          What other evidence did you consider?

10   A.          Well, as you can see, that following the EKMS

11   attempt but failure to license the patent, there was the

12   Chen purchase of his brother's interest in ETG.  That

13   purchase was for 50 percent interest in ETG for $1 million.

14   So you might assume then that ETG was worth $2 million.  ETG

15   owned 80 percent of Audimax, so extrapolating that would

16   mean that the value of the patents in Audimax, which is all

17   that Audimax owned, would be about $2 and-a-half million.

18   So that would be the price that would be paid for the

19   patents themselves.

20          Now, I don't consider this to be an example of

21   what a reasonable rate would be for the patents here in suit

22   because the patents are being bought, not licensed, but it's

23   sort of a benchmark or it's a reality check on what level of

24   value there would be for the patents that are here in suit.

25   Q.          What was your ultimate conclusion under GP-1?

Donohue - direct

Page 1816

1    A.          Under GP-1, I felt there would be a downward

2    impact on the rate.

3    Q.          Okay.  Let's turn to Georgia-Pacific Factor 2.

4    What conclusions did you reach under GP-2?

5    A.          Well, here, the hearing aid technology is very

6    complex, much like the Samsung semiconductor technology.

7    There are many patentable features.  I think Mr. Jacobsen

8    testified there are 17,000 patents in the hearing aid

9    industry.  Because of the many complex features of the

10   hearing aid and because of the many patents in the field,

11   there was potential at the time of this negotiation that

12   there would be many licenses to be had.

13              So that would mean that the negotiators would

14   understand that the royalty rates had to be reasonable.

15   They couldn't be real high.

16   Q.          Who did Widex and Demant negotiate licenses

17   with?

18   A.          Well, here is a list of companies.  They license

19   companies in the industry such as Siemens, GN ReSound,

20   Gennum and Phonak.  But they also license outside, people

21   outside the industry such as Etymotic Research and clinical

22   hearing consultants.  They license components manufacturers

23   and individuals and, of course, they license HIMPP.

24   Q.          Do you recall how many total agreements?

25   A.          It's around 29 agreements, of which some were

Page 2029

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
                          -  -  -
 4
 5   ENERGY TRANSPORTATION,           :   Civil Action
     INC.,                           :
 6                                   :
                Plaintiff,           :
 7                                   :
          v.                         :
 8                                   :
     WILLIAM DEMANT HOLDINGS A/S,     :
 9   et al.,                         :
                                     :
10              Defendants.          :   No. 05-422 (GMS)
11                        -  -  -
12                   Wilmington, Delaware
                  Friday, February 1, 2008
13                       8:30 a.m.
                    Tenth day of Trial
14
                          -  -  -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
16                                  and a Jury
17
18
     APPEARANCES:
19
                 EDMOND D. JOHNSON, ESQ., and
20               MATTHEW KAPLAN, ESQ.
                 Pepper Hamilton LLP
21                    -and-
                 MARTY STEINBERG, ESQ.,
22               BRIAN M. BUROKER, ESQ., and
                 MAYA M. ECKSTEIN, ESQ.
23               Hunton & Williams
                 (Washington, D.C.)
24
                                Counsel for Plaintiff
25
```

```
 1    APPEARANCES CONTINUED:
 2                MARY B. GRAHAM, ESQ.
                  Morris, Nichols, Arsht & Tunnell
 3                    -and-
                  JOHN M. ROMARY, ESQ.,
 4                GREGORY C. GRAMENOPOULOS, ESQ.,
                  VINCENT KOVALICK, ESQ.,
 5                KAY HILL, ESQ.,
                  GERSON S. PANITCH, ESQ., and
 6                ARTHUR A. SMITH, ESQ.
                  Finnegan, Henderson, Ford, Farabow & Dunner
 7                (Washington, D.C.)
 8                                        Counsel for
                                          Demant Defendants
 9
                  DONALD E. REID, ESQ.
10                Morris, Nichols, Arsht & Tunnell
                      -and-
11                WILLIAM H. MANDIR, ESQ.,
                  JOHN SCHERLING, ESQ.,
12                CARL J. PELLEGRINI, ESQ.,
                  BRIAN SHELTON, ESQ., and
13                J. WARREN LYTLE, JR., ESQ.
                  Sughrue Mion
14                (Washington, D.C.)
15                                        Counsel for Widex
                                          Defendants
16                            -   -   -
17
18
19
20
21
22
23
24
25
```

Page 2132

1    cancels it by subtraction.  I stand by that.  That is what I

2    said then.  That is what I'm saying now.  If that were the

3    end of the case, we could just all go home.  That is not

4    what Dr. Levitt's patent covers.  If it did, it would be

5    invalid.

6             We spent hours of precious time over the last

7    nine days arguing over terminology in marketing documents.

8    I said, and I'll say it again, feedback cancellation,

9    feedback reduction, feedback suppression.  It doesn't matter

10   what you call it.  That is not what determines infringement.

11   It just doesn't matter.  You could call it Swiss cheese, as

12   Dr. Anderson said on the stand.  It doesn't matter what you

13   call it, it matters what you do.  It matters what is in

14   there.

15            We even had a phrase "phase cancellation" which

16   Dr. Anderson explained to you was the subtraction, that's

17   all.  There has been no admission by Thomas Christensen of

18   any infringement.  There has been no admission of any kind

19   of misstatement that violates federal trade, a federal Food

20   and Drug Administration order.  That is not what this case

21   is about.  There certainly has been no admission that there

22   is any determination of phase and amplitude ahead of time

23   and then insertion of a filter.  There has been no

24   admission.  There has been no admission of programmability

25   or use of a programmable filter.  None whatsoever.

Page 2146

1    There is no determination of phase and amplitude ahead of

2    time.  Their argument is once you put the filter in and it

3    works, there must have been a determination.

4            Well, that would make every single phase, every

5    single acoustic cancellation device infringing and would

6    also make every device that occurred beforehand including

7    Dr. Graupe's anticipatory.  That can't be it.  You can't

8    have it both ways.  It can't be.

9            And you heard our experts explain what an LMS

10   filter is all about.  You heard the very fact that if you

11   took the coefficients from the patent itself, from

12   Dr. Levitt's patent and you tried to shove it into our

13   filter, forget about the technology problems.  But you tried

14   to use them conceptually.  You can't do it.  Because they're

15   fundamentally different ideas.  One is a fixed filter with a

16   response.  The other is an LMS filter that is continuously

17   adapting.  Continuously adapting.  It's fundamentally

18   different.

19           You saw they hired EKMS to give them some sort

20   of input into it.  What did that report say?  Fundamentally

21   different.  We agree with them.  We agree with the report

22   that they got.

23           No.  Please go back.

24           So why would anybody attack patents that they're

25   not using?  More power to Dr. Levitt.

Page 2178

1    instruction that you have.  It's 4.9.

2            Now, what did Mr. Brown do in his?  He says that

3    the '850, Claims 13, 14, 16, 19, he says literal

4    infringement.  We saw that with his memory.  He also says

5    there is infringement under the doctrine of equivalents.  He

6    also says under the '749, Claims 1 and 2, he says no literal

7    infringement, just doctrine of equivalents.  You just saw

8    the instruction.  It says you've got to consider the prior

9    art, okay?  I don't know if you recall, but I examined

10   Mr. Brown, and here is what he said:

11           "Question:  So you didn't consider prior art

12   when you were looking at the doctrine of equivalents and

13   whether what the claims meant was equivalent to what the

14   defendants have; correct?

15           "Answer:  That's correct."

16           That's what Mr. Brown said.  In fact, he went

17   on, if you recall, to say I didn't think it was even

18   appropriate to consider prior art.

19           What we have here, ladies and gentlemen, is an

20   admission that they cannot possibly meet their burden under

21   the doctrine of equivalents.  Mr. Brown didn't even do the

22   proper analysis.  No literal infringement for '850, no

23   doctrine of equivalents for either of these patents.  There

24   is no infringement.

25           Okay.  Next point, EKMS.  And EKMS is relevant

Page 2179

1    to a couple of issues in this case, so I want to go through

2    it.  I'm going to go through as quickly as I can and then,,

3    with this background, as we go through some of the other

4    issues, you will see how relevant it is.  And the first few,

5    I'm going to run through it and I'm going to give you the DX

6    number, the exhibit number, if you are interested in looking

7    at it.

8           October 5th, that's the first e-mail I have up

9    here.  It is an e-mail from EKMS.  And EKMS you have heard

10   testimony was a company that Audimax, Mr. Chen in

11   particular, hired back in 2001 to evaluate these patents,

12   the patents that are in this lawsuit.  And this is an e-mail

13   from EKMS to Mr. Chen, October 5th.  It's Exhibit 1637.  And

14   all it says there is basically, you know, this is what we

15   do, and Mr. Chen had been referred to EKMS, and it was kind

16   of an opening type of letter.  It was actually an e-mail.

17          November 1st, a letter from Mr. Pitonyak, who I

18   think is either the vice president or president of Audimax,

19   to EKMS saying, go ahead, do the evaluation.

20          November 8th, a week later, very timely, there

21   is a -- by the way, that November 1st letter, if you are

22   interested, is 1608.  November 8th letter is from -- there

23   is no person's name on it.  But there is an indication on

24   that that it's from, there is initials, and you may recall

25   that Ms. Eckstein talked to you, used it in connection with

Page 2180

1    Mr. Chen's deposition.  And that's Eric Dowling.  You may

2    remember Dr. Dowling, his initials are at the top of that,

3    and it's kinds of an initial look at that.  And, in fact,

4    both the patents here, the '749 and '850, doesn't compare

5    any products at the time, but this memo indicates that

6    perhaps, you know, there is some possibilities here.  And it

7    says both with respect to the '850 and the '749, we got to

8    look at this a little bit more.

9            Then we get a letter, e-mail on July 2nd.  It's

10   Exhibit 1627.

11           Can we pop that up, please.

12           So the date is July 2nd.  It's from Adam Erlich.

13   And you can see from his e-mail address, he is an EKMS

14   person.  It is to Michael Pitonyak, who is with Audimax.  As

15   you may have heard, he is also with a company called

16   KeyTimer.  Copied Kimball Chen, Harry Levitt, Dr. Levitt,

17   Richard Dugot, another one of the inventors, John Boddie,

18   who we are going to see a little later in the e-mail, also

19   from EKMS, Mr. Boddie.  And what it says here, Michael, I

20   wanted to update you on our progress with the feedback

21   family, and he mentions the '850 and others.  We had a very

22   helpful conversation with Richard and Harry -- I presume

23   it's Dr. Levitt -- and a paren, (thank you again for your

24   help).  We have approached Brent Edwards at Sound ID, and he

25   is pulling together a conference call with his boss Charles

Page 2181

1    Pavlovich, in order to determine whether Sound ID would be

2    interested in licensing or, alternatively, how we might best

3    approach ReSound.  We are also looking at approaches into

4    Oticon and Widex.

5              The two defendants.

6              So here they are looking to see, maybe we can do

7    something with these patents, we are going to try to talk to

8    Sound ID at this time.

9              Next e-mail is one of July 24th.  This is the

10   red-faced liar e-mail.

11             Can we pull this up.

12             This is an e-mail from Dr. Dowling.  It's 1642.

13   And I think you have seen this before.  Towards the bottom,

14   it says, the bottom line is, Nobody but a red-faced liar

15   could read these cites and say the '850 does not contemplate

16   adaptive filtering.

17             Now, it is significant, it doesn't say adaptive

18   filtering for feedback cancellation.  It just says adaptive

19   filtering.  And as Dr. Morley testified, it does talk about

20   adaptive filtering, not in connection with feedback

21   cancellation, but the patent does.

22             Now, what is the first claim that Dr. Dowling is

23   referring to?  Claim 5.  I specifically asked Dr. Morley

24   about Claim 5, and asked him, did Claim 5, does that have

25   anything to do with feedback cancellation?  He says,

Page 2182

1    absolutely not.  And I also asked him -- and you know, ETG

2    has not even asserted Claim 5 in this case.  Yet that is the

3    first claim, that is the first citation that Dr. Dowling

4    gives you.

5              Then it goes on, and there is some more

6    citations to the patent.  And you have heard all of that.

7    Dr. Morley went through every one of them, and has concluded

8    that the patent does not talk about adaptive filtering for

9    purposes of canceling feedback.

10             As we see what Dr. Dowling says, he said, it's

11   not clear, what he is saying there, but he is talking about

12   adaptive filtering.

13             Okay.  July 25th, 1625, very next day.  The

14   bottom one.

15             It's from Ed Kahn, you can see again from his

16   e-mail address that that is someone from EKMS, going to

17   Kimball Chen, Mr. Chen, the ETG CEO:

18             Dear Kimball.

19             What is interesting is this long paragraph, it

20   says, This note was on the border of what we consider

21   appropriate to copy you as well as Mike P.  It simply

22   reflects that Sound ID will provide us a safe practice of

23   handling the usual objections.  Safer that is, than doing

24   the same with no infringers in his division.

25             What he is saying is we are going to go after

Page 2183

1   Sound ID, see what they say.  If they have objections, we,

2   of course, can respond to them.

3           Okay.  July 25th.  Again, one day after the

4   red-faced liar e-mail.  And this gives kind of a report of

5   what Sound ID said back to them, after they approached them.

6   Again, Mr. Pitonyak of Audimax, John Boddie of EKMS, says

7   Adam Erlich and I spoke with the folks of Sound ID and they

8   raised some objections regarding the nature of the filtering

9   in the digital hearing aid patent, the '850.  They suggested

10  that the filtering process should be interpreted as static

11  rather than adaptive.

12          Then it goes on to talk about how they might

13  deal with Sound ID.  Towards the end of that paragraph, it

14  starts at, "At present."

15          Can you highlight that, please.

16          At present we are drafting a careful response to

17  the objections raised at Sound ID and hope to send this

18  response by August 9th, right after Harry -- Dr. Levitt --

19  who knows the folks at Sound ID, returns from England.

20          As we see here, they also mention Eric, Dr.

21  Dowling, and he is of the opinion that, you know, this Sound

22  ID, who says it's static, they are wrong.  Dr. Levitt is

23  coming back.  Sometime after August 9th we are going to talk

24  to him, and we will see what happens.

25          Okay.  September 12th, 1623.

Page 2184

1          So I presume Dr. Levitt got back around

2    August 9th.

3          Next page.

4          So this is September 12th, about four weeks

5    after, about a week after Dr. Levitt was supposed to get

6    back.  Mr. Pitonyak, the Audimax guy, Eric Dowling:  Our

7    expert, Harry Levitt and I -- this is from Boddie of EKMS --

8    have spent the last three weeks taking a much closer look at

9    the Audimax patents with a focus on the '850 patent.  This

10   exercise has had some mixed results which we will be

11   reporting on later next week.  In the meantime, we have a

12   much clearer picture of those digital hearing aid features

13   required to constitute obvious infringement and have started

14   to begin looking at some different other companies.

15          Then September 16th, or, at least according to

16   e-mail correspondence, suggests -- this is 1610.  This is

17   the report that they get.  And this report is, again, from

18   EKMS to Audimax.  They are talking about everything that has

19   happened to date and what their conclusions are to date.  It

20   talks about in the beginning that EKMS started working to

21   try to license this on behalf of Audimax as of early June of

22   2002.  The following companies were chosen as targets.  2

23   and 3, Widex and Oticon, were both targets of EKMS.

24          The next paragraph talks about Harry, Dr.

25   Levitt, and Richard Dugot, the other inventor, contacting

Page 2185

1    these people at Sound ID, and trying to get them, see what

2    their read is on this patent.  And they come back.  And what

3    they say here is -- why don't we just go back down a little

4    bit more, that first one -- they said, they noted that this

5    model is not used in their hearing aids, all of which have a

6    probe running continually in the background, a process

7    called continuous adaptation.

8           The next one says, Sound ID noted that neither

9    they nor ReSound used such a process and since such a

10   process was material to the art disclosed in the patent and

11   since this process was applied in the claims, they felt they

12   were not offering services covered under the patent.

13          Next paragraph, this is the conclusion.  Eric

14   Dowling, the EKMS expert, took a look at the patent while

15   EKMS arranged a second call with Harry Levitt --

16          MR. STEINBERG:  Your Honor, I hate to interrupt.

17   But I think we need to approach the Bench for this.

18               (The following took place at sidebar.)

19          THE COURT:  Yes, Mr. Steinberg.

20          MR. STEINBERG:  Again, he is implying that Eric

21   Dowling changed his opinion, and the next sentence says it's

22   adverse to what the declaration that we have says.

23          MR. MANDIR:  He can read the document, can't he?

24          MR. STEINBERG:  What he is doing is exactly what

25   the declaration says.

Page 2186

1           MR. MANDIR:  That is not true.

2           MR. STEINBERG:  Dr. Dowling didn't do that.  He

3    has gone through this series of things saying Dr. Dowling

4    came to his opinion.  Then there was a further review.

5    There was a change of mind.  Here is the result.  The first

6    sentence says Dr. Dowling and Dr. Levitt were consulting.

7    The second sentence says there was a change in result.

8    There was no --

9           THE COURT:  I am not going to let you imply that

10   which we have agreed you should not.

11          MR. MANDIR:  I agree, Your Honor.  I thought I

12   have been very careful -- I can read the document, can't I?

13          THE COURT:  Perhaps.  But I think you need to be

14   mindful of our discussion yesterday and Mr. Steinberg's

15   legitimate concerns in this regard and should be your

16   legitimate concerns as an officer of this Court.

17          I am not going to highlight it.  I am not going

18   to say anything else about it.  I think you would be

19   mistaken to ask me.  It would be your right.  But I don't

20   think I am going to accede to it.

21          MR. STEINBERG:  It will require me to respond to

22   say Dr. Dowling never changed his mind.  There is no

23   evidence of that.  We should put the declaration into

24   evidence, for crying out loud, at this point.

25          THE COURT:  I don't know if it is as exactly

1    clear in the jury's mind as you think it is.  I would leave

2    it alone, if I were you.  You respond how you want to

3    respond.  But at this point I am going to leave it where it

4    rests.  I think everybody understands what we talked about.

5              MR. MANDIR:  Absolutely.  Just to be clear, I

6    can certainly read the document that is in evidence.

7              MR. STEINBERG:  Your Honor, this timeline that

8    he just went through, the whole intent of it is to start

9    with Dr. Dowling's opinion, which, by the way, is not

10   limited to the sound, his opinion deals with feedback and

11   says its adaptive.  He just didn't read the second page.

12             Nevertheless, he says Dr. Dowling has this

13   opinion.  Then he puts up an e-mail that says they are

14   looking at it further, they are thinking about changing

15   their mind.  Now he is at the report.  And the first

16   sentence says --

17             THE COURT:  I think the point is well-taken.

18   That's not fair.

19             MR. MANDIR:  I mean, I thought --

20             THE COURT:  I will let you respond.  I don't

21   know exactly --

22             MR. STEINBERG:  I don't think they should go any

23   further, Your Honor.

24             THE COURT:  I really don't.  You need to move on

25   to another area.  I am not sure that I am comfortable that

Page 2188

1    you have exactly figured out how to do this and stay within

2    the spirit of what I have directed be done.  I am not

3    accusing you of doing anything intentional.  I am just

4    concerned that damage may be done that may be irreversible.

5            MR. MANDIR:  To tell you the truth, I have been

6    very mindful of this.  Look, EKMS came up with that

7    decision, that report.  It doesn't mean Eric Dowling came up

8    with that position.  But there is no doubt EKMS, and I have

9    never said --

10           THE COURT:  Essentially, what I would like to do

11   is have that acknowledged, there needs to be -- and it is a

12   tough line to not cross, I understand.

13           MR. ROMARY:  Can we say something like we are

14   not saying that Eric Dowling changed his mind?

15           THE COURT:  That is fine.

16           MR. MANDIR:  I will say that.

17           THE COURT:  I think that would -- I think that

18   would satisfy my concern.

19           MR. STEINBERG:  But no more tie-in after that.

20           MR. MANDIR:  I am just going to read the

21   document.

22           THE COURT:  If you would say that, that's fine.

23           (End of sidebar conference.)

24           MR. MANDIR:  Okay.  Can we put the document back

25   up, please?

1          Okay.  So we were reading Eric Dowling, the EKMS

2     expert, took a look at the patent while EKMS arranged a

3     second call with Harry Levitt for early August.  Over the

4     course of two calls, we worked through the language of the

5     patent and found that the body of the patent included

6     language adverse to an interpretation of the claims

7     involving a continuously adaptive approach.

8          Now, I don't know exactly how that came about.

9     I don't know how it came about.  All I know is this EKMS

10    document says it and this was given to Audimax.  They're

11    saying that they looked at it and EKMS is coming to the

12    conclusion that they interpret the claims -- EKMS interprets

13    these claims to be something adverse to interpretation that

14    would involve a continuously adaptive approach.

15         Okay.  Can we go to the next page?  Up at the

16    top, "the main child."

17         The main child patent of the '850 patent --

18    which is the '749 as you may have heard it.  I think you

19    have heard it is a continuation application -- seems to

20    suffer from the same problem, specifying in the description

21    of the preferred embodiment that test sounds shall be

22    provided as necessary rather than all of the time as would

23    occur with a continuously adaptive system.  Okay?

24         We've heard a lot of testimony here about what

25    can be hooked up and is it going all the time or do you

Page 2190

1    disconnect it?  This report is indicating that it is not all

2    the time.  It's not continuously adaptive.

3              Can we go down to the bottom of that page?

4    "Taking a second tack."  Okay.  Last paragraph of this page.

5    And again, this is DX-1610.

6              Taking a second tack, EKMS has begun examining

7    the product literature of the major hearing aid companies

8    listed above, trying to identify those products that are not

9    continuously adaptive.

10             So what is going on is, okay, we're giving up on

11   trying to find companies that are continuously adaptive.

12   Maybe there are companies that are not.  And because as

13   Mr. Chen testified, EKMS was hired, they got a retainer of

14   $50,000 and they also get a cut of any revenue.  So when

15   they go out talking to SoundID, they have a big incentive.

16   They get a cut of whatever revenue comes in on licensing.

17   So they're saying, look, we can't get them on adaptive,

18   continuously adaptive but maybe we can see what else is

19   going on.

20             Next sentence.

21             The feeling at present is that most companies

22   have chosen to strive for products that are continuously

23   adaptive even though this approach can have problems,

24   including a constant buzzing noise in the background.

25             The feeling at SoundID was that the art

Page 2191

1    disclosed in the Audimax patent might be tried if, and only

2    if, continuously adaptive products failed to succeed in the

3    market -- an event unlikely in the next three years.

4              This was in 2002.  Oticon and Widex got sued

5    three years later, in 2005.  We're still doing the

6    continuously adaptive and I guess that was the time limit

7    that they had.

8              Now, I asked Mr. Chen what happened after this?

9    Was there another report?  Was this the final report?  He

10    couldn't say.  He didn't remember.  But the bottom line is

11    that is it, that is all we have from EKMS.  As of 2002, this

12    is all we have, EKMS, Mr. Boddie, telling Audimax these

13    patents don't cover continuously adaptive.

14             Okay.  I want to talk now about written

15    description.  And Mr. Romary mentioned that.  Can we put up

16    the instruction for 8.0?

17             This is another instruction you have, 8.0.  And

18    let me read a portion of it.  I don't need to read it all,

19    but just to summarize, it says, the written description

20    requirement is satisfied if a person of ordinary skill in

21    the art writing the patent application as originally filed

22    would recognize that the patent application described the

23    invention as finally claimed in the patent.

24             Now, what that means is that when they try to --

25    when ETG is going to try to stretch their claims to cover

Page 2192

1    adaptive filtering like the defendants have, you got to

2    have something in the specification as originally filed to

3    support that.

4              Now, next, slide 13, please.

5              Mr. Romary touched on this.  He pointed to the

6    exact paragraph in the '850 patent on the left-hand side.

7    He pointed out that there is discussion of adaptive with

8    respect to speech and noise and reverberation.  He disagreed

9    on reverberation, and the clear demarcation that says "and

10   also for reducing acoustic."  I'm not sure if you remember

11   but Dr. Morley talked about this exact passage as well and

12   he pointed out on the very next column, column 2, these two

13   features of this adaptive filtering and then of just

14   acoustic feedback cancellation were set forth in separate

15   paragraphs, showing that clearly they're two different

16   things.

17             I know you have gone through a lot of this.  I

18   want to go through it quickly.

19             14.  Here is another location that we think

20   makes it very, very clear that there was never any

21   contemplation, at least not described in the patent, of

22   putting this host controller and connecting it all the time.

23   It's not in the specification.  Not in the description of

24   this patent.

25             It says, the components shown in Figures 2, 4

1  Dr. Best, why didn't he challenge?  Why didn't the

2  defendants challenge the patent?  Why didn't Dr. Levitt

3  challenge the characterization by two people in articles

4  about his patent if it wasn't true?  I mean that is what you

5  should ask yourself.

6            The bottom line is EKMS, Bustamante, Kates,

7  SoundID, they all came to the same conclusion.  It's not

8  adaptive.  It's a static filter.  That is why nobody

9  challenged.  That is why all the adaptive people wouldn't

10 challenge the patent.  Why would they?  It's completely

11 different.  It's static.  It's not adaptive.

12           Okay.  I'm going to talk briefly about ETG's

13 damages case because EKMS is relevant to that.  Let's put up

14 slide 20.

15           This is a demonstrative that either Dr. Putnam

16 or Mr. Donohoe put up, and what it shows is that is a

17 comparison between what the defendants say would be the

18 state of the negotiations at the time of this hypothetical

19 negotiation and what ETG has said.  And we believe this is

20 overreaching if you look at a number of different factors.

21           HIMPP, .15 percent for one family.

22           Average royalty being paid to others, .51

23 percent to others.

24           Dr. Putnam did an analysis on Georgia-Pacific

25 13, the case you always have to use on damages, upper limit,

1   .52 to .66.

2          And then Mr. Donohoe comes up with .25 to .50.

3   So we'll use the highest one of his.

4          That is what this correspondence, these analyses

5   show.

6          ETG, on the other hand, is up at 8.4 percent.

7   That is what they say.  I think it comes out to over $60

8   million.  That is what they say.

9          Now, one thing that Mr. Steinberg has not talked

10  about.  I don't know if he will, but he mentioned it.  But

11  it was this German cartel somehow painting HIMPP as not

12  someone who is negotiating.  They're kind of a club and they

13  give very low rates.  Well, that German cartel is completely

14  irrelevant.  As Mr. Westermann said, that was a proceeding

15  in Germany about the German market, ReSound and Phonak

16  merging, which they're not defendants here.  It's completely

17  irrelevant.  Mr. Westermann said we heard about it but we

18  don't pay any attention to it.  But yet, that was something

19  that Mr. Steinberg wanted to use as a basis to say, oh,

20  these rates are way, way low.

21          Now, next page.

22          Okay.  We talked about this hypothetical

23  negotiation so what I tried to do here is set it up, this

24  hypothetical negotiation.  You have Widex and Demant on one

25  side of the table, you got Mr. Chen on the other side of the

Page 2198

1    table.

2                  Okay.  Using this .5 percent, I believe

3    Dr. Putnam or Chuck Donohoe offers a million for each

4    defendant lump sum, $2 million that is on the table.

5                  Okay.  Mr. Chen, this is in the 2001-2002 time

6    frame when the products started to be made.  This is what he

7    says.  He says to himself, okay, Widex and Demant, they

8    offered me $2 million.

9                  I have never licensed these patents.  I have

10   never made any products under these patents.  And he

11   testified to that.

12                 I'm just getting a license.  I can still go out

13   and license my other targets.

14                 They have been sitting on the shelf, these two

15   patents, for over 10 years.

16                 EKMS, who I was going to give a cut of any

17   revenue, says no one is infringing now and I don't think

18   anyone is ever going to infringe it, because they do on the

19   continuously adaptive approach, and my patents expired in

20   2005 or 2006.

21                 So do you think he would have taken that?  Do

22   you think he would have taken that $2 million at that time?

23   Absolutely, he would have taken it.  He would have taken it

24   in a second.  Do you think he would have said given those

25   facts, no, no, I don't want to pay any less than $60

Page 2199

1    million?  That is what they're asking for now.  That is the

2    overreaching that we're seeing here.

3          Okay.  Willful infringement.  Not only are we

4    accused of infringing the patent, we're accused of willfully

5    infringing the patent.  It's a high standard.  The judge

6    gave you instructions about different standards.  To show

7    willful infringement, you have to show clear and convincing

8    evidence.  It's a higher standard than the preponderance of

9    the evidence, which is their burden.  They have to prove

10   clear and convincing evidence.  Again, this is jury

11   instruction 10.8 on willful infringement.

12         Third one of these, of the items says Widex

13   and/or Demant acted even though they knew, or it was so

14   obvious that they should have known, that their actions were

15   highly likely to infringe a valid patent.

16         So they are saying that we knew or should have

17   known that what our products were doing were highly likely

18   to infringe the '850 or the '749 patent.

19         EKMS -- my response to that is, no.  How would

20   we know that?  EKMS said you don't infringe.  And they were

21   getting a cut of anything that they could get out of it.

22         Diane Bustamante said it was a fixed filter.

23   Kates said it was a fixed filter.  Sound ID, who they tried

24   to license, said, no, we don't need it.  We do continuously

25   adaptive approach.

Page 2200

1          Yet Widex and Oticon is supposed to know,

2   clearly and convincingly, they have to prove that we knew or

3   it was so obvious that we were infringing?  Again, they are

4   overreaching.  All you have to do is use common sense here.

5   They are overreaching.

6          Another point on this willful infringement is

7   that you have not heard any evidence -- you have heard some

8   evidence that the patent was cited here or there.  You never

9   heard any evidence, and Mr. Steinberg won't be able to point

10  you to any evidence, that says that either Widex or Oticon

11  ever compared either one of these patents to any one of the

12  accused products.  It was always in a different context.

13  They never will show you that because it never existed.

14  Why?  Because if anyone had looked at that patent, it was a

15  static filter.  It wasn't a continuously adaptive filter.

16          Now, also, you heard from Dr. Morley that the

17  patent, the '850, had a number of different features.  So

18  when they say it was cited here and cited there, they don't

19  know it was cited because of feedback cancellation.  We

20  heard about this adaptive filtering for purposes of speech

21  and noise.  How do they know it wasn't cited for that

22  reason?  They don't have any evidence of that at all.  They

23  just say it's cited.

24          Well, you knew about it and you should have

25  known about it and you should have known you infringe, even

Page 2204

1    Mr. Steinberg's arguments, that you understand the

2    difference between his arguments and what he can actually

3    prove with evidence.

4            Thank you, ladies and gentlemen.

5            THE COURT:  Counsel.

6            MR. STEINBERG:  Your Honor, may we approach for

7    one second?

8            (The following took place at sidebar.)

9            MR. STEINBERG:  I apologize, Judge.  But Mr.

10   Mandir, under what you told Mr. Mandir to do, was supposed

11   to tell the jury that there was no evidence that Eric

12   Dowling --

13           THE COURT:  You tell them and you tell them the

14   other side doesn't disagree with you, because he didn't.

15   And I observed it.

16           You didn't say anything about it.

17           MR. MANDIR:  I know, you are right.  When I said

18   EKMS --

19           MR. STEINBERG:  For the record, we would move

20   for the introduction of Eric Dowling's declaration, because

21   we think we have been unfairly prejudiced.

22           THE COURT:  I will agree.

23           (End of sidebar conference.)

24           MR. STEINBERG:  Thank you, Your Honor.

25           Ladies and gentlemen, I will be brief.  I know