Exhibit 24

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Senior District Judge Richard P. Matsch

Civil Action No.  98-cv-01072-RPM

MEDTRONIC NAVIGATION, INC.,
MEDTRONIC SOFAMOR DANEK , INC.,
SOFAMOR DANEK HOLDINGS, INC.,
ST. LOUIS UNIVERSITY, and
TRUSTEES OF DARTMOUTH COLLEGE,

     Plaintiffs,

v.

BRAINLAB MEDIZINISCHE COMPUTERSYSTEMS GMBH,
BRAINLAB AG,
BRAINLAB USA, INC., and
BRAINLAB, INC.,

     Defendants.

_____

ORDER FOR AWARD OF ATTORNEY FEES AND COSTS TO BRAINLAB
DEFENDANTS

_____

   The defendants (collectively BrainLAB) seek to recover all of their attorney fees

and costs incurred in the defense of this suit for patent infringement, contending that it

was filed and prosecuted not to protect the technology protected by the patent claims

but to drive a competitor out of a market for an emerging technology for application in

the navigation of surgical instruments in procedures requiring exquisite precision, as in

the removal of a brain tumor.  Medtronic Navigation, Inc. (Medtronic) and its

predecessor Surgical Navigation Technologies, Inc. (SNT) marketed variations of a

device called "StealthStation" in competition with BrainLAB's "VectorVision" devices.

The accused devices can be described as passive optical systems in contrast to an active acoustic system. That contrasting technology was at the core of this case.

BrainLAB contends that it is entitled to fees and costs because this is an exceptional case justifying relief under 35 U.S.C. § 285; that plaintiffs' lead counsel should be held responsible under 28 U.S.C. § 1927 and that the Court should grant the motion in the exercise of its inherent authority to protect the integrity of the processes of adjudication. Upon reflection, this Court finds and concludes that the rulings on the claims construction issues adjudicated the fairly debatable issues in this case and that the manner in which plaintiffs' counsel continued the prosecution of the claims through trial was in disregard of their obligations as officers of the court. The fairness of the adversary system of adjudication depends upon the assumption that trial lawyers will temper zealous advocacy of their client's cause with an objective assessment of its merit and be candid in presenting it to the court and to opposing counsel. When that assumption has been contradicted by a trial record of conduct reflecting a winning is all that is important approach to the trial process, the court has a duty to redress this resulting harm to the opposing party.

BrainLAB has made a plausible argument that this entire civil action was frivolous. The chronology of the suit must be viewed against the backdrop of developments in the field of image-guided surgical navigation technology.

In approximately 1991, SNT began development of an image-guided surgical navigation product. SNT worked with Dr. Richard Bucholz of St. Louis University. SNT also collaborated with Dr. Peter Heilbrun of the University of Utah. In 1994, SNT

-2-

obtained rights to the application for patent that issued as U.S. Patent No. B1 5,383,454 to Bucholz (the '454 Patent or the Bucholz Patent). The claims of that patent relate to a system that depends on the activation of sound emitters on a surgical instrument and the patient which are tracked by an array of microphones establishing coordinates that give their positions through triangulation. SNT did not commercialize the active acoustic technology described in the Bucholz patent. It developed a product employing active optical technology, a system using light emitting from diodes on a surgical instrument and the patient, detected by an array of cameras to establish the positions of the instrument and the patient through triangulation. In January 1996, SNT received FDA approval and began marketing its product as StealthStation.

In May 1997, BrainLAB received FDA approval to market an image-guided surgical navigation product using passive optical technology, a system employing reflective markers on a surgical instrument and the patient and an array of cameras to establish their positions using triangulation. In late April 1998, BrainLAB's counsel wrote a letter to SNT, informing SNT that BrainLAB expected to receive a patent for passive optical navigation technology, in essence cautioning Medtronic not to incorporate that technology into its products. Twelve days later, on May 12, 1998, SNT and its parent, Sofamor Danek Group, brought this suit, complaining that the BrainLAB products using passive optical technology infringed the Bucholz '454 Patent.[1]

_____

[1] The plaintiffs also sought a declaration of non-infringement of a patent owned by BrainLAB (the '861 Patent), and BrainLAB counterclaimed for infringement of that patent. After the court issued its order construing the '861 Patent, all issues relating to the '861 patent were dismissed.

Significantly, the prosecution history of the Bucholz Patent included statements by the applicant explaining that the claimed invention was distinguished by having emitters on the surgical probe as well an emitter attached to the patient's head. The prosecution history also included a narrowing amendment.

In January 1999, Medtronic acquired SNT through its acquisition of Sofamor Danek Group. Later that month, Medtronic acquired rights to three patents to Heilbrun, U.S. Patent Nos. 5,389,101; U.S. Patent No. 5,836,954, and U.S. Patent No. 5,603,318 (the Heilbrun Patents) from the University of Utah. The Heilbrun Patents describe camera-based apparatus and methods for locating a surgical instrument and patient in a medical workspace. In November 1999, Medtronic acquired a license for U.S. Patent No. 4,722,056 to Roberts (the Roberts Patent) by assignment from Elekta Company. The Roberts Patent relates to a computer-based surgical navigation system that allows a surgeon to look through the eye piece of a microscope at a target area, and see, for example, the outline of a prior image of a body part superimposed on a live image of the patient's body part.

Medtronic amended the complaint, adding claims of infringement and adding and substituting plaintiffs to encompass those having ownership interests in the relevant patent rights. By the fourth amended complaint, filed April 25, 2000, the plaintiffs included claims of infringement of the Bucholz '454 Patent, another Bucholz patent (the '183 Patent), the three Heilbrun Patents, and the Roberts patent. Sofamor Danek Holdings, a subsidiary of Sofamor Danek Group, was added as a plaintiff, along with St. Louis University (the owner and assignor of the Bucholz Patents) and the

Trustees of Dartmouth College (the owner and original assignor of the Roberts Patent). The caption was subsequently changed to reflect that Sofamor Danek, Inc. had become Medtronic Sofamor Danek and that SNT had become Medtronic Navigation, Inc. Throughout the trial, Medtronic's lawyers portrayed SNT as the plaintiff.

Notably, Medtronic added claims of infringement of two of the Heilbrun patents on February 1, 1999, within days of acquiring those patents from the University of Utah. At trial, Dr. Kurt Smith, one of the founders of SNT, testified that the timing was merely a coincidence. He also testified that the Heilbrun patents had been added to the complaint as an "afterthought." Before Medtronic acquired the Heilbrun and Roberts Patents and added them to this suit, no one had ever asserted that either the VectorVision products or the StealthStation embodied any claims of those patents. Even considering Dr. Smith's entire testimony about Medtronic's reasons for acquiring the Heilbrun and Roberts Patents, the reasonable inference to be drawn is that Medtronic added these claims to bolster its position that it owned the patent rights to passive optical technology. Medtronic and its counsel undoubtedly anticipated that the scope of the Bucholz '454 Patent would be hotly contested. Adding other patents to the suit increased its complexity and increased the pressure on BrainLAB.

Medtronic then approached BrainLAB about a potential settlement. BrainLAB's President, Stefan Vilsmeier, testified that those discussions centered on Medtronic's efforts to acquire BrainLAB. There was a hiatus in court proceedings during the later half of 2001, when Medtronic and BrainLAB jointly requested several postponements of a scheduling conference, due to the ongoing settlement negotiations.

BrainLAB rejected Medtronic's buy-out overtures. In January 2002, when the settlement negotiations broke down, Medtronic changed lead counsel, and lawyers from the McDermott, Will & Emery (MWE) law firm entered their appearances. Fact and damage discovery were then reopened.

The parties briefed issues of claims construction, and a *Markman* hearing was held. Medtronic advocated broad constructions of the patents-in-suit. With respect to claim 14 of the Bucholz patent, Medtronic argued that the "reference means" should be construed as an "array of sensors," an argument that would have allowed Medtronic to proceed on a theory of literal infringement and avoid having to show that active acoustic (or active optical) and passive optical technologies are equivalent. On September 29, 2004, the Court issued its order construing the disputed claim language. That order limited the Bucholz and Roberts patents to acoustic reference systems and ruled that the Heilbrun Patent claims required a "static" workplace coordinate framework. At a scheduling conference held on February 4, 2005, Medtronic's counsel stated that it would proceed with claims of infringement under the doctrine of equivalents.

The defendants moved for summary judgment of dismissal, arguing that under the Court's construction of the asserted claims, the BrainLAB devices could not be found to infringe and that the doctrine of prosecution history estoppel precluded the application of the doctrine of equivalents as to the Bucholz Patent claims.

What was apparent to defendants' counsel and should have been equally obvious to Medtronic's principal lawyers was not perceived by the Court. The Court

-6-

elected to proceed to trial, accepting the plaintiffs' assertion that there were material

factual questions to be resolved at trial, particularly with respect to issues of

equivalents.  At that stage in the proceedings, the Court, unlike Medtronic and its

counsel, had not had an opportunity to view the accused devices.  The Court's decision

to proceed to trial was based on its view that the legal questions in the case could be

better evaluated in the context of a full evidentiary record, rather than on information

communicated through legal briefs and declarations of expert witnesses.  Accordingly,

the court determined it was prudent to proceed to trial, giving Medtronic a full

opportunity to present its case.

At trial, Medtronic alleged infringement of claim 14 of the Bucholz '454 Patent,

claim 1 of the Roberts Patent, claim 1 of the Heilbrun '101 Patent, and claim 1 of the

Heilbrun '318 Patent.  The Bucholz Patent, however, was the centerpiece of

Medtronic's case.  Of the asserted patents, the Bucholz Patent was the only one that

SNT had owned during the first several years that it sold the StealthStation and the

only one it owned when it filed suit.  The Bucholz '454 patent provided the primary

basis for Medtronic's claim that it had suffered lost profits of over $100 million.[2]

BrainLAB moved for judgment as a matter of law at the close of the evidence,

but the Court submitted the case to the jury, recognizing that a defendants' verdict

would end the litigation if the claims construction rulings were affirmed on appeal but

_____

[2]Medtronic had paid $1.25 million for rights to all three Heilbrun Patents.
Because of the ownership structure of the Heilbrun Patents, Medtronic was limited to
seeking reasonable royalty damages with respect to its claims of infringement of those
patents. The Roberts Patent was relevant only to the microscope feature of the
accused products.

that another trial would be required if those rulings were reversed and the Court had granted the motion. The Court did not submit the issues of prosecution history estoppel to the jury, ruling that those were questions to be determined by the Court.

The jury found for the plaintiffs but the verdict was set aside by this Court's order granting the Rule 50(b) motion. Mem. Op. and Order, Feb. 24, 2006 [doc. 545]. The premises of that order were for the most part the same as those presented in the defendants' motions for summary judgment. In retrospect, those motions should have been granted, saving BrainLAB the cost of a 13-day jury trial. In setting aside the jury's verdict, this Court found that misleading trial tactics by the MWE lawyers, Mr. McMahon and Ms. Elson, had influenced the jury verdict, and their tactics were an abuse of advocacy.

After the entry of judgment in favor of BrainLAB, Medtronic appealed the judgment, and BrainLAB moved to recover its costs and attorney fees. BrainLAB's motions for costs and fees were stayed, pending the outcome of Medtronic's appeal.

The judgment in favor of BrainLAB was affirmed by the Federal Circuit Court of Appeals in March 2007, in an unpublished opinion. The Federal Circuit adopted this Court's reasoning with respect to claim construction and its reasons for rejecting the plaintiffs' evidence and theories of infringement as to all of the asserted patent claims, including the conclusion that the Bucholz Patent's prosecution history precluded Medtronic's claim of infringement of that patent under the doctrine of equivalents.

On May 3, 2007, BrainLAB followed this Court's direction at a status conference following appeal to identify the entities against which fees and costs are sought, to

-8-

provide specific evidentiary support for these claims and to make more explicit the legal theories relied on. BrainLAB did that in its filing of May 3, 2007. Recognizing that the responses of Medtronic and MWE would require separate representation by new counsel, the Court extended the time for those filings to July 23, 2007, and the reply to August 27, 2007.

Upon review of all of the papers filed, the Court finds and concludes that Medtronic and MWE have joint and several liability for the attorney fees and expenses BrainLAB incurred in defending this action in this court after BrainLAB's summary judgment motions showed that the claims construction rulings had eviscerated the plaintiffs' case. Fees are awarded against the Medtronic plaintiffs (Medtronic Navigation, Inc., Medtronic Sofamor Danek, Inc., and Sofamor Danek Holdings, Inc.) pursuant to 35 U.S.C. § 285 and the court's inherent authority, and against MWE pursuant to 28 U.S.C. § 1927 and the court's inherent authority.[3]

The evidence is not sufficient to support a finding that Medtronic's contentions up to the time of the Court's ruling on the claims construction issues were frivolous, without merit or vexatiously presented. After receiving the Court's claims construction ruling, however, Medtronic and the MWE lawyers had a duty to reexamine this litigation and make an objective assessment of the validity of Medtronic's claims that BrainLAB's products infringed the patent claims as construed. They were obliged to accept those

_____

[3]BrainLAB's supplemental memorandum in support of its motion for attorney fees and costs [Doc. 569] states that it seeks fees against only the Medtronic plaintiffs, not St. Louis University or The Trustees of Dartmouth College, and as to the counsel who represented the plaintiff group, BrainLAB seeks fees against MWE only.

rulings as the law of the case and proceed with an appeal by requesting certification of

an interlocutory appeal or conceding the summary judgment motions.  Rather than

accept that the claims construction rulings stripped the merits from this case, counsel

chose to pursue a strategy of distorting those rulings, misdirecting the jury to a different

reading of the claim language, and blatantly presenting the jury with a product to

product comparison contrary to established law and the Court's cautionary instructions.

Additionally, they deceived the jury into accepting the statements in BrainLAB's FDA

application as an admission of patent infringement.  Capping all of this was a closing

argument that misdirected the jury's attention from the focus of the case, carefully

crafted to avoid the Court's instructions.  That argument distorted both the evidence

and the law, misleading the jury into a plaintiffs' verdict.

Litigation misconduct is a basis for transferring the burden of attorney fees and

expenses under both of the statutes relied on by BrainLAB and the Court's inherent

authority to supervise the conduct of litigation.  In essence, the response from the

plaintiff and MWE, through new counsel, is that the Court had the obligation to stop any

trial conduct that stepped over the line of zealous advocacy.  In short, they argue that

they should not be held responsible for what they were able to get away with during the

trial presentation.  The adamant denial that there was any abuse of advocacy in this

case is in disregard of what this Court has already concluded and displays the same

arrogance that has colored this case almost from its inception.  Throughout these

proceedings Medtronic and the MWE lawyers have demonstrated that when they are

faced with adverse court rulings, they proceed undeterred, with only superficial

observance of the court's determinations. Such conduct supports the conclusion that after the *Markman* rulings, Medtronic's primary objective in pursuing this litigation was to put economic pressure on its competitor in the market.

*This case is exceptional under 35 U.S.C. § 285*

"The court in exceptional cases may award reasonable attorney fees to the prevailing party." 35 U.S.C. § 285. "A case may be deemed exceptional when there has been some material inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Fed.R.Civ.P. 11, or like infractions." *Brooks Furniture Mfg. v. Dutailier Int'l, Inc.*, 393 F.3d 1378, 1381 (Fed. Cir. 2005) (citations omitted). "There is a presumption that the assertion of infringement of a duly granted patent is made in good faith. . . . Thus, the underlying improper conduct and the characterization of the case as exceptional must be established by clear and convincing evidence." *Id.* at 1382 (citations omitted). Those standards are met in this case.

The Court has already concluded that Medtronic engaged in litigation misconduct during the trial. That same misconduct also supports the conclusion that Medtronic continued this suit vexatiously after the claims were construed. Vexatious conduct includes conduct that "obfuscates the legal issues and complicates the defendants' and the court's task of sorting them out." *Shackelford v. Courtesy Ford, Inc.*, 96 F.Supp.2d 1140, 1144 (D. Colo. 2000) (citing *Braley v. Campbell*, 832 F.2d 1504, 1509 (10th Cir. 1987)).

-11-

Medtronic and MWE point to the testimony of Medtronic's experts as evidence that its claims were not objectively baseless or brought in subjective bad faith. That argument is unavailing. The opinions of Medtronic's experts were crafted to fit the infringement theories put forward by Medtronic's counsel, and those theories were legally and factually untenable in light of the court's claim construction. Medtronic pursued a strategy of giving superficial recognition to the court's claim construction rulings, while pressing its own interpretations of the claims.

Medtronic's first witness, Dr. Smith, repeatedly described the Bucholz invention as having "an array of sensors" for detecting radiated energy – the claim construction that Medtronic had argued and lost. Medtronic then continued that same theme throughout the presentation of its expert testimony and closing arguments. Dr. Grimson, who testified as an expert on behalf of Medtronic with respect to infringement of the Bucholz and Roberts patents, described the reference means (the array of microphones) of the Bucholz patent as "sensors" for detecting radiation, and then used those terms when opining that the accused products infringed. With respect to the Heilbrun Patent claims, Medtronic contended that BrainLAB's dynamic referencing system was simply a faster version of the static system described in the Heilbrun Patents, but it supported that contention with the testimony of Dr. Taylor, whose infringement analysis failed to take into account the actual operation of the BrainLAB products. As the Court pointed out in its previous order, Medtronic's representations in its summary judgment responses with respect to the Heilbrun Patents were different from the positions it advocated at trial. Mem. and Op. on Post-

-12-

Trial Mots. at 35 & 41.  In short, after the Court issued its claim construction order and even through trial, Medtronic struggled to articulate a viable theory of infringement as to the Heilbrun patents.  It never was able to do so.

Despite its acknowledgment that product-to-product comparison would be improper for the purpose of showing infringement, Medtronic repeatedly compared the StealthStation and VectorVision products, portraying BrainLAB as a follower who had wrongfully capitalized on the success of the StealthStation.  Importantly, Medtronic did not contend that the StealthStation embodied all of the elements of the asserted patent claims.  To the contrary, in response to questions raised by the Court before trial, Medtronic argued that such a showing was unnecessary for the purpose of proving lost profits.  *See* Pls.' Mem. Addressing Damages, Sept. 2, 2005 [Doc. 421].

The most egregious example of Medtronic's improper product-to-product comparisons was its presentation of testimony and closing argument regarding a letter BrainLAB submitted to the FDA.  In seeking FDA approval, BrainLAB had referred to the StealthStation as a predicate device and stated that the VectorVision was substantially equivalent.  In his rebuttal testimony, Dr. Smith repeated the wording of BrainLAB's FDA submission, emphasizing the phrase "substantially equivalent."  Tr. at 2714:5 –13; 2723:3 –10.  During rebuttal closing argument Mr. McMahon then told the jury that "[BrainLAB] went to the FDA, and they told the FDA that our products are – the substantial equivalence here is between this product – that is, the VectorVision – is similar in design, composition, and function to the StealthStation.  *Bears directly on what we are doing here today*."  Tr. at 2976, emphasis added.  When BrainLAB's

-13-

counsel objected, the court responded that "the jury will know and be told again that the comparison is to be made to the claims and the defendant's products. This is not a comparison between the StealthStation's products and BrainLAB's products." Mr. McMahon responded, "Right, Your Honor, *this is an admission*." *Id.* at 2977. That is, while appearing to agree with the Court's statement about the proper comparison, Mr. McMahon continued comparing the products, telling the jury that the term "substantially equivalent" in BrainLAB's FDA submission was an *admission* that BrainLAB infringed under the doctrine of equivalents.

Medtronic and MWE argue that their trial conduct was not abusive advocacy because the Court did not do enough to restrain it. That argument ignores the Court's admonitions on the issue of product-to-product comparisons (Tr. at 1578-79), as well as Medtronic's own representations to the Court. During argument about whether Medtronic should be allowed to demonstrate its StealthStation to the jury, Medtronic's counsel acknowledged that product-to-product comparisons would be improper for the purpose of showing infringement. Tr. at 917:10-12. When cross-examining Mr. Vilsmeier, Mr. McMahon (in response to objections) represented that BrainLAB's FDA letter was not going to be used for the purpose of making product-to-product comparisons. Tr. at 1925:19 – 1926:18. On this issue, the parameters had been established. Counsel were obligated to observe the court's admonitions and to comply with their own representations to the Court.

Medtronic cannot credibly claim that the product comparisons were a justified response to BrainLAB's assertion that it was the first to commercialize passive optical

technology.  Throughout the trial, Medtronic's counsel and witnesses described the StealthStation as the product that revolutionized the field of image-guided surgery and portrayed BrainLAB as a follower.  In presenting its defenses, BrainLAB was entitled to explain the development of the relevant art and the place of its products in that chronology.  BrainLAB's presentation did not "open the door" for Medtronic to tell the jury that BrainLAB had admitted infringement in its FDA submission.  Medtronic's counsel were experienced patent litigators who understood the differences between the doctrine of equivalents and the FDA process.  They knew that BrainLAB's statements in its FDA submission were not an admission that the BrainLAB products infringed the asserted patents.  Indeed, Medtronic as a defendant has argued that admission of similar statements it made in an FDA application would be misleading and unfairly prejudicial.  *See Cardiovention, Inc. v. Medtronic, Inc.*, 483 F.Supp.2d 830, 840-41 (D. Minn. 2007).

Medtronic and MWE cannot argue that product comparisons were appropriate to show that the VectorVision and StealthStation products were substitutes for the purpose of determining lost profits.  BrainLAB did not dispute that the StealthStation and VectorVision products competed directly with each other.  The only conclusion to be drawn is that Medtronic crafted and executed an intentionally misleading trial strategy.

As set forth above, the Bucholz Patent was the centerpiece of Medtronic's case, and in particular its damages case.  At trial, Medtronic and BrainLAB presented evidence regarding the prosecution history of the Bucholz Patent.  During the jury

-15-

instruction conference, the Court informed counsel that the issues of prosecution history estoppel would be determined by the Court. During closing argument, Mr. McMahon told the jury that the absence of jury instructions about the prosecution history of the Bucholz Patent showed that BrainLAB had not been forthright in its presentation. Tr. at 2991-92. Mr. McMahon's commentary on the lack of jury instructions was another example of the excessive partisanship that colored this trial.

The Bucholz prosecution history ultimately proved fatal to Medtronic's claim based on that patent. MWE's attempt to blame to BrainLAB for delay in raising the issue of prosecution history estoppel is unfounded. Prosecution history is relevant to claim construction – and in fact was argued by both Medtronic and BrainLAB during the *Markman* hearing, but prosecution history *estoppel* is a different question. That issue came to the forefront after the Court issued its order on claim construction, rejecting Medtronic's interpretation of the Bucholz Patent claims. From that point, the Bucholz prosecution history impacted the range of what could be considered an equivalent. Rather than alter course after the Court issued its claim construction order, Medtronic and MWE proceeded to trial, continuing to advocate Medtronic's interpretation of the Bucholz Patent and telling the jury that "this whole notion that whatever happened in the patent office on this patent, that somehow it was a limitation, is just nonsense." Tr. at 2991:19-21. By pointing the jury to language in the patents that supported Medtronic's reading of the claims, Mr. McMahon was directing the jury to override the court's claim construction. Tr. at 2983-84. He then repeatedly told the jury during

-16-

closing argument that "tracking is tracking," a statement that misguided the jury about the requirements of infringement analysis.

The procedural history of this case, particularly the numerous amendments to the complaint, indicates that Medtronic fully understood that it could not rely on the Bucholz '454 Patent to support its position that Medtronic owned the patent rights to passive optical technology, unless the Bucholz Patent claims were construed so as to bring that technology within the literal claim scope. During closing argument, Mr. McMahon told the jury that Medtronic had built its case "brick-by-brick." But Medtronic's case was built on the Bucholz Patent, and that foundation crumbled after the Court's claim construction order.

Medtronic argues that fees should not be awarded against it where its claims survived summary judgment and were presented to the jury which returned a verdict in its favor. Medtronic's argument overstates the significance of what it refers to as the "objective signposts." The Court's denial of BrainLAB's motions did not relieve Medtronic of its duty to evaluate its claims, and the Court's rulings certainly were not a license for Medtronic to engage in abusive conduct at trial. As the Court has already concluded, the jury verdict was influenced by the litigation misconduct that gives rise to the present motion.

The conduct of Medtronic and its counsel constituted much more than a few instances of overstepping during a hard-fought battle. This case involved complicated technology. Patent law is complex and not intuitive to the average juror. Parties and counsel have an obligation to refrain from seeking to take advantage of those

-17-

complexities by employing misleading strategies. Medtronic's infringement claims had

the appearance of substance because BrainLAB's VectorVision products, like

Medtronic's StealthStation, employed concepts and some features that were also

present in the inventions of the asserted patents. Conceptual similarity, however, is not

enough to show infringement, and a patent holder cannot pick and choose among

features found in various patents in its portfolio and then combine them to show

infringement. Medtronic's burden was to prove that each element and limitation of each

of the asserted patent claims was found in each the accused products. Instead,

Medtronic guided the jury to a comparison of the accused products and the

StealthStation, and then offered them a short-cut with the "tracking is tracking" sound

bite. Medtronic's untenable positions and misleading tactics complicated the Court's

task of analyzing the legal issues.

BrainLAB has suffered an injustice, and the court has the authority under 35

U.S.C. § 285 to remedy that wrong. BrainLAB is entitled to recover the attorneys' fees

it incurred in connection with the district court proceedings after it moved for summary

judgment.

*An assessment of fees against MWE is warranted under 28 U.S.C. § 1927:*

> Any attorney or other person admitted to conduct cases in any court of the
> United States or any Territory thereof who so multiplies the proceedings
> in any case unreasonably and vexatiously may be required by the court to
> satisfy personally the excess costs, expenses, and attorneys' fees
> reasonably incurred because of such conduct.

Under this statute, "excess costs, expenses, or attorney's fees are imposable against

an attorney personally for conduct that, viewed objectively, manifests either intentional

-18-

or reckless disregard of the attorney's duties to the court." *Braley v. Campbell*, 832

F.2d at 1512. Subjective bad faith is not a prerequisite to an award under the statute.

*Id.* "A lawyer's reckless indifference to the law may impose substantial costs on the

adverse party. Section1927 permits a court to insist that the attorney bear the costs of

his own lack of care." *Id.* at 1511 (quoting *In re TCI Ltd.*, 769 F.2d 441, 445 (7th Cir.

1985). Costs and fees may be awarded under § 1927 "when an attorney is cavalier or

bent on misleading the court; intentionally acts without a plausible basis; [or] when the

entire course of the proceedings was unwarranted." *Dominion Video Satellite, Inc. v.*

*Echostar Satellite L.L.C.*, 430 F.3d 1269, 1278 (10th Cir. 2005) (quoting *Miera v.*

*Dairyland Ins. Co.*, 143 F.3d 1337, 1342 (10th Cir.1998)).

      An award under § 1927 requires findings that the attorney's conduct was

improper and caused an unreasonable multiplying of the proceedings. *See Braley*, 832

F.2d at 1513 ("the court must identify the extent of the multiplicity resulting from the

attorney's behavior and the costs arising therefrom"); *see also Sangui Biotech Int'l, Inc.*

*v. Kappes*, 179 F.Supp. 2d 1240, 1243 (D. Colo. 2002). Both requirements are met

here.

      After the Court issued its claim construction rulings, Medtronic's counsel

proceeded cavalierly, with reckless indifference to the merits of Medtronic's

infringement claims. The continued prosecution of a claim after its lack of merit has

become apparent warrants sanctions under § 1927. *Shackelford*, 96 F.Supp. 2d at

1145. At trial, MWE's conduct was in disregard for the duty of candor, reflecting an

attitude of "what can I get away with?" Throughout the trial, the MWE lawyers artfully

avoided the limitations of the patent claims and created an illusion of infringement. They did so with full awareness that their case was without merit.

There is a split of authority on the question of whether section 1927 authorizes fee awards against law firms. *See Claiborne v. Wisdom*, 414 F.3d 715, 722-24 (7th Cir. 2005) (discussing circuit split and concluding that "§ 1927 does not provide a legal basis for an order of fees against an entity like a law firm that is not itself 'admitted to practice'"). The United States Court of Appeals for the Tenth Circuit has not addressed this issue. In this case, an award against the firm is appropriate. As the lead lawyers, Mr. McMahon and Ms. Elson were the most visible, but numerous MWE lawyers and support staff participated in the litigation and in the trial. Liability should be borne by the firm. If section 1927 does not support an award of fees against MWE as an entity, then such an award is appropriate under the court's inherent authority.

*An fee award is appropriate under the Court's inherent authority*

Federal courts have inherent authority to "assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO*, 501 U.S. 32, 50 (1991) (quoting *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 258-59 (1975)). This authority includes the authority to assess fees against counsel who engage in abusive litigation conduct. To impose an award of attorney's fees against counsel under the court's inherent powers, the court must find that the counsel's conduct constituted or was tantamount to bad faith. *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766-67 (1980).

-20-

The facts discussed above support an award of fees under the court's inherent authority.  Medtronic's and MWE's pursuit of meritless litigation to eliminate competition in the medical products market requires remediation.

Based on the foregoing, it is

ORDERED that the order staying any proceeding on defendants' bill of costs [doc. 559] is vacated.  The defendants' motion for costs [doc. 552] will be determined initially by the Clerk of the Court; it is

FURTHER ORDERED that the defendants' motion for attorney fees [doc. 553] is granted in part.  On or before March 12, 2008, the defendants shall file a detailed description of the services rendered by their attorneys in connection with the district court proceedings in this suit from February 24, 2005, through the date of this order, with accompanying affidavits and summaries of the relevant qualifications and experience as required by Local Rule 54.3.  Objections to the requested fees may be filed on or before April 11, 2008.

Dated:  February 12, 2008

BY THE COURT:

s/Richard P. Matsch

_____
Richard P. Matsch, Senior District Judge

Exhibit 25

## John Boddie

From:    &lt;DSPEric@aol.com&gt;
To:      "John Boddie" &lt;john_boddie@hotmail.com&gt;
Sent:   Wednesday, July 24, 2002 7:53 AM
Subject: ETG Adaptive question - US4731850

John,

I meant to get this done yesterday, but things did not go my way on that. I will be out today and part of tomorrow trying to fetch my car from the shipping port. The analysis needed to write the letter follows. Remember, the definition of an adaptive filter is a filter that adjusts its parameters (filter coeficients) in order to respond to enviornmental changes, usually to reduce a metric function of error.

The ETG filter can be adaptive. Below are some cites from the patent with some short analysis.

Note I did not include the col. # and line # cites. If you decide to write a letter and use these cites, add the col. #, line # references to these. I do it by word searching on the USPTO text document by cutting and pasting a portion of the cite, and using that to help find it in the paper version.

You can cut and paste certain passages in the letter and give the col., line # cites, or just give the col., line # cites.

The bottom line is nbonbody but a red faced liar could read these cites and say the '850 does not contemplate adaptive filtering. On the contrary, it is spelled out in certain claims and objects of the invention and is disclosed in the spec in several places.

Eric

........

1) The claim below uses the controllable meansd to adaptively control the filter characteristic:

"5. A hearing aid comprising at least one input microphone, an output receiver, and a transmission channel interposed between said microphone and receiver, means controllable to impart different response characteristics to said hearing aid, and controlling means responsive to the level of speech signals in said transmission channel in excess of the level of noise signals in said channel for automatically controlling said controllable means to impart a selected one of said different response characteristics to said hearing aid."

See also claims 6-8 that also do a form of adaptive filtering.

UTEK
0030

Defendants Trial
Exhibit
DX-1642
Civil Action no. 05-422

CONFIDENTIAL

2) The object below clearly in dicates adaptive filtering:

"Still another object of the invention is to provide new and improved hearing aid apparatus that is capable of effective noise and reverberation suppression and acoustic feedback reduction while maintaining optimum hearing characteristics as the speech and noise levels vary." ——————————  *Def of adaptive*

3) Note below that the filter parameters are adjusted to optimize for rum etc.... this is an adaptive filter:

"Desirably, several sets of optimum hearing aid parameter values, specified in terms of both the amplitude and phase characteristics, are determined for the patient as a function of speech level, type of background noise, and room reverberation, both spectral and temporal characteristics of the noise being taken into account. The selected optimum parameter values are preferably programmed into an electronically erasable, programmable read only memory (EEPROM) which supplies coefficients to programmable filter and amplitude limiting means in the hearing aid so as to cause the hearing aid to adjust automatically to the optimum set of parameter values for the speech level, room reverberation, and type of background noise then obtaining."

*this is preferred*

4) The cite below also does adaptive filtering:

"Automatic adjustment of the hearing aid to take into account environmental conditions such as changes in the speech level and type of background noise obtaining at any time is effected by environmental control means comprising a speech detector 96, four band pass filters 97, 98, 99 and 100, and a level detector including four differently prebiased comparators 101, 102, 103 and 104."

5) The cite below also indicates adaptive filtering:

"Each of the sixty-four possible combinations of the 6 bit binary words identifies a different frequency response for the programmable filter, and a corresponding set of coefficients stored in the RAM 77 is selected, thereby automatically adjusting the hearing aid to the optimum set of parameter values as the speech level and type of background noise change."

UTEK
0031

6) Another cite showing adaptive behavior:

"The outputs of these comparators in combination with the outputs of the level decoder, 117, generate a 6-bit word that selects the appropriate set of filter coefficients in the RAM 77."

7) This cite toward the back summarizes:

"The invention thus provides a novel and highly effective hearing aid system for use by hearing impaired patients. By utilizing a digital or analog delay line as a programmable filter

CONFIDENTIAL

in a hearing aid, it is possible to establish optimal hearing aid parameters for the patient. Moreover, by virtue of the novel means employed for effecting automatic adjustment of the programmable filter to optimum parameter values as the speech level, room reverberation and type of background noise change and for reducing acoustic feedback, a superior hearing aid system of optimum characteristics can be prescribed for hearing deficient patients."

UTEK
0032

CONFIDENTIAL

Exhibit 26

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ENERGY TRANSPORTATION GROUP, INC.,      )
                                        )
            Plaintiff,                  )
                                        )
        v.                              )        C.A. No. 05-422 (GMS)
                                        )
SONIC INNOVATIONS, INC., et al.,        )
                                        )
            Defendants.                 )
                                        )

## SUPPLEMENTAL EXPERT REPORT OF ROBERT E. MORLEY, JR., D. Sc.
## ON BEHALF OF DEFENDANTS

CONTAINS CONFIDENTIAL AND CONFIDENTIAL ATTORNEYS
EYES ONLY INFORMATION, SUBJECT TO PROTECTIVE ORDER

TABLE OF CONTENTS

I.    INTRODUCTION ................................................................................................. 0
II.   SUMMARY OF ISSUES COVERED ............................................................... 0
III.  1984 VA REPORT ............................................................................................ 1
IV.   GRAUPE NOTEBOOK PAGE ....................................................................... 2
V.    LEVEL OF ORDINARY SKILL ..................................................................... 3
VI.   ERRATA............................................................................................................ 3
VII.  CONCLUSION.................................................................................................. 4

**CONTAINS CONFIDENTIAL AND CONFIDENTIAL ATTORNEYS
EYES ONLY INFORMATION, SUBJECT TO PROTECTIVE ORDER**

## I.     INTRODUCTION

1.     In my report of September 17, 2007, I reserved the right to respond to any opinions put forth by ETG's experts and to supplement my report accordingly.  I have read the report of Mr. Clyde M. Brown, Jr., who ETG has put forward as an expert, concerning the alleged validity of U.S. Patent No. 4,731,850 ("the '850 patent") and U.S. Patent No. 4,879,749 ("the '749 patent) (collectively, "the ETG patents").

2.     This report supplements my report of September 17, 2007 (my "invalidity report") and sets forth a summary of opinions I expect to testify on with respect to the issues of validity. In addition, I expect to testify regarding the testimony and opinions of other experts in this case, including Mr. Brown.

3.     I incorporate by reference into this report all sections of my report of September 17, 2007.

## II.     SUMMARY OF ISSUES COVERED

4.     In my September 17, 2007 report in paragraph 3, I said that I had been asked to opine on the "enablement" of the "1984 VA Report" and a "1984 Graupe notebook entry." However, I inadvertently omitted them from that report.

5.     This supplemental report sets forth those opinions I expect to testify on with respect to these issues.

6.     This supplemental report also addresses the different level of skill proffered by Messrs. Brown and Matzen.

7.     I will also consider any reports and/or testimony of ETG's experts or any subsequent documents or testimony, including that presented at trial, hereinafter brought to my attention.

### III.     1984 VA REPORT

8.     In my opinion, the 1984 VA Report (Levitt Deposition Exhibit 135, pages 163-64) presents an enabling system for canceling acoustic feedback.

9.     The 1984 VA Report asks "Could a microprocessor-based, adaptive system be utilized in a feedback suppression scheme designed specifically for hearing aids?" Its answer to this was a description of an active feedback cancellation system (AFC) in which "low level pseudo-random noise (PRN) is injected into the circuit just ahead of the amplifier. That portion of the original PRN that returns to the microphone via the feedback path is monitored at the microphone output. A microprocessor then utilizes these two signals – the original PRN and that returning via the vent – to compute the open loop transfer function GH of the hearing aid."

10.     In my opinion, one skilled in the art would have understood how to use these measurements to determine the correlation between these two signals and from that determine the effect on the amplitude and phase of a signal in the transmission channel as a function of frequency of acoustic feedback between the receiver and the microphone, including the amplifier.

11.     The 1984 VA Report goes on to teach that in the AFC system "the microprocessor uses computed values of GH to create an estimator. The estimator causes the input informational signal (e.g., that containing information such as speech and not PRN) to react destructively with signals returning via the vent outlet, thereby canceling the effect of the feedback path."

12.     In my opinion, this teaches one of ordinary skill how to create an effective electrical feedback cancellation signal using an estimator in the electrical feedback path. In my opinion, one of ordinary skill would have understood that a programmable tapped delay line filter would be an obvious choice of an estimator, particularly in view of the Nunley article

D-1

(Levitt Exhibit 108), which describes a programmable tapped delay line filter and suggests that the use of such filter may be utilized in a digital hearing aid that is "free from feedback."

13.    I note there is remarkable similarity between the 1984 VA Report as noted and the "second method" reported by Dr. Levitt in his December 12, 1985 "Possible Claims" document. (Levitt Exhibit 124; ETG 00002485-90).

14.    In view of the foregoing, the 1984 VA Report is an enabling disclosure of an acoustic feedback cancellation system of the type described by at least claims 13, 14 and 19 of the '850 patent.

## IV.    GRAUPE NOTEBOOK PAGE

15.    In my opinion, the Graupe notebook page (Notebook page 64, PHO_173666) presents an enabling system for canceling acoustic feedback.

16.    Page 64 of Dr. Graupe's notebook shows two systems for canceling acoustic feedback. The first system employs an adaptive feedback cancellation filter (E(s)) in an electrical feedback path. The algorithm for updating the adaptive feedback cancellation filter parameters is shown as well. Dr. Graupe emphatically notes that "Realization is simple!!" with respect to this system. I agree. In my opinion, the first system of the page 64 disclosure would have enabled one of ordinary skill to create an effective system for canceling acoustic feedback in a hearing aid using an adaptive filter in an electrical feedback path.

17.    Dr. Graupe notes that the above system "requires quiet environments" and teaches a second system that is effective at canceling acoustic feedback in a hearing aid that does not require a quiet environment. The second system injects a pseudo noise signal into the hearing aid output in order to first identify the characteristics of the acoustic feedback path and then uses the identified characteristics to program a programmable filter $G_2$ in an electrical feedback path

D-2

to cancel the acoustic feedback. In my opinion, the second system of the Graupe notebook also would have enabled one of ordinary skill to create an effective acoustic feedback cancellation system.

## V.    LEVEL OF ORDINARY SKILL

18.    I have reviewed the level of skill proffered by Messrs. Brown and Matzen. Although I disagree and believe the level they have identified is somewhat below the level of "ordinary skill" in 1984-86 timeframe, the level proffered by Messrs. Brown and Matzen is sufficiently high that, if adopted, it would not change my opinions rendered in this supplemental report or in my original report of September 17, 2007.

## VI.    ERRATA

19.    In reviewing my report I noticed that a clarification should be made to my report, which is as follows:

20.    In paragraph 96 of my initial report, I stated that "The earliest document I have seen indicating that Dr. Levitt and/or anyone associated with ETG or Audimax knew about the Zeta Noise Blocker, other than the "11/12/84" sketch is a February 28, 1985 document (LEV00000013-14)." However, I have since reviewed a letter from Pat Reese of Nicolet to Dr. Levitt dated October 18, 1984 (LEV 00085257-76), which shows that Dr. Levitt was aware of the Zeta Noise Block as of the date he received this letter. This does not change any opinion that I have rendered.

D-3

## VII.    CONCLUSION

21.    I reserve the right to respond to any opinions put forth by ETG's experts and to supplement this report accordingly. In addition, I reserve the right to supplement this report based on any additional information brought forth during further proceedings in this case.

22.    I understand my deposition is scheduled for November 12, 2007. I will be prepared to answer all questions concerning my opinions at that time.

Dated: November 11, 2007

Robert E. Morley, Jr. D.Sc.

D-4

Exhibit 27

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

ENERGY TRANSPORTATION GROUP,  )
INC.                          )
                              )
        Plaintiff,            )
                              )        Civil Action No.
        v.                    )        05-CV-422-GMS
                              )
SONIC INNOVATIONS, INC., et al. )
                              )
        Defendants.           )
                              )

SUPPLEMENTAL EXPERT WITNESS REPORT OF
CHARLES DONOHOE ON BEHALF
OF DEFENDANTS WIDEX A/S, WIDEX HEARING AID CO. INC.,
OTICON A/S, OTICON INC., BERNAFON AG, BERNAFON, LLC, WDH, INC.,
AND WILLIAM DEMANT HOLDING A/S

I.    INTRODUCTION

1. I have been retained by Widex A/S and Widex Hearing Aid Co. Inc. (hereafter

collectively termed "Widex"), and Oticon A/S, Oticon Inc., Bernafon AG, Bernafon,

LLC, WDH, Inc., and William Demant Holding A/S (hereafter collectively termed "the

Demant Group") to provide this expert report in connection with the *Energy*

*Transportation Group, Inc. v. Sonic Innovations, Inc., et al.* lawsuit involving U.S. Patent

Nos. 4,879,749 ("the '749 patent") and 4,731,850 ("the '850 patent") (collectively, "the

patents-in-suit"). On October 19, 2007, I provided an Expert Witness Report relating to

damages.

1

CONTAINS CONFIDENTIAL AND CONFIDENTIAL ATTORNEY'S
EYES ONLY INFORMATION, SUBJECT TO PROTECTIVE ORDER

2. In my report of October 19, 2007 I reserved the right to supplement my report if new information became available. I understand that, after I prepared my October 19, 2007 report, Plaintiff Energy Transportation Group, Inc. ("ETG") produced additional documents (UTEK 0001-66, 89, 91-108, 115-27; MP 00000028-41, 43-47, 50-54, 93, 95-105, 109-120; P-00194-98; P-00252-56; P-00443-47; P-02593-94; P-02599-610). Based on those documents, this report supplements my October 19, 2007 report. If asked, I will testify regarding the matters set forth in this supplemental report.

3. If additional information may become available, I reserve the right to modify the opinions in my October 19, 2007 report and this supplemental report based upon such new information. In presenting the matters set forth in this report at trial, I may use some or all of the documents listed in ¶ 2 above, or excerpts and/or enlargements of them. I may also use visual aids and demonstrative exhibits to help me explain my opinions, the bases therefor, and testimony.

4. I incorporate by reference into this report all sections of my report of October 19, 2007.

## II.    BACKGROUND

5. I have reviewed the aforementioned documents produced after my October 19, 2007 Report. In my opinion, these documents would have been highly relevant to the hypothetical negotiation between the Plaintiff and Defendants. These documents explain a lack of interest in acquiring a license under the patents-in-suit and the apparent acquiescence by Plaintiff's predecessor, Audimax to license the patents-in-suit. The events described in the documents were in reasonable proximity to the hypothetical negotiations. Accordingly, under *Georgia-Pacific*, the parties to the hypothetical

negotiations would have been presumed to have had knowledge of the events, and at the very least, the events described in the documents would serve as a reality check on the results of the negotiation.

6. In 2002, Audimax, the predecessor in ownership of the '850 and '749 patents-in-suit, retained EKMS, Inc. (hereafter "EKMS") to seek revenue by licensing these and other patents to targeted companies in the hearing aid industry. EKMS was an intellectual property consulting firm that specialized in converting patents into revenue. (*See* UTEK 0001.) As I understand it from the aforementioned documents, EKMS agreed to be paid on a contingent fee basis for revenue gained from licensing the patents. If EKMS was successful in licensing the Audimax patents, it would benefit as it would receive a substantial portion of the royalty income gained from the licenses. If it was unable to license the patents, there would be no benefit and likely a loss.

7. From late May and early June to at least September 2002, EKMS evaluated the prospects of licensing the Audimax patents with particular focus on the '850 patent. (*See* MP00000095-99, P-02593-94 and P-02599-610.) Among the five targeted companies were Widex and Oticon, which is part of the Demant Group. Both Widex and Oticon are defendants to this action. After speaking with Dr. Harry Levitt, among others, EKMS contacted SoundID, a hearing aid company founded by "several ex-ReSound scientists." (*See* MP00000095-99.) SoundID, which was not identified as a "target" company, concluded that the '850 patent did not cover an adaptive system to reduce feedback. EKMS' expert, Eric Dowling, in consultation with Dr. Levitt "worked through the language of the ['850] patent and found that the body of the patent included language adverse to an interpretation of the claims involving a continuously adaptive approach."

3

(*Id.*) While they concluded that the claims could be interpreted more broadly, they also concluded that such an interpretation would be so non-obvious as to hinder licensing of the patent for continuously adaptive feedback systems. (*See* MP00000095-96.)

8. EKMS and Dr. Levitt also concluded that the '749 patent had a similar limitation. (*See* MP00000096.) They further concluded that other patents in the Audimax portfolio were more limited in scope than the '850 and '749 patents. (*Id.*) Because of this, EKMS began to look for commercially available hearing aids that did not have a continuously adaptive feedback system. However, they felt that, as of 2002, most companies would be using a continuously adaptive feedback system. (*Id.*)

9. My understanding from the documents listed in ¶ 2 above is that EKMS determined that licensing the patents-in-suit to the targeted companies was not feasible due to, among other things, the narrow scope of the patents in relation to the technology being practiced at the time.

IV.    **ANALYSIS AND OPINION**

10. Although EKMS had a clear financial interest in gaining revenue from the licensing of the Audimax patents, the recently produced documents indicate that EKMS apparently abandoned the licensing effort based on its conclusion that the patented technology simply was not sufficiently broad. This is further evidence of the failure to license the patents-in-suit and provides additional support for a downward impact on the royalty to be negotiated in a hypothetical negotiation under *Georgia-Pacific* factors 1 and 4, as discussed in my October 19, 2007 report.

4

11. The EKMS documents also provide further evidence of the lack of commercial success and popularity of the patented inventions under *Georgia-Pacific* factor 8, the lack of advantages of the patented inventions over other non-infringing products under *Georgia-Pacific* factor 9 and the lack of benefits to those who use the invention under *Georgia-Pacific* factor 10. These considerations provide additional downward impact on the royalty to be negotiated in the hypothetical negotiation.

12. With respect to *Georgia-Pacific* factor 13, the Musika Report contends that the patents-in-suit are "pioneering patents." The Musika Report thus concludes that a high royalty rate would have been negotiated in the hypothetical negotiation predicated on the pioneering status of the patents-in-suit. (*See, e.g.,* Musika Report ¶¶ 111-12.) However, EKMS, a firm specializing in converting patents into revenue, working with experts and the inventor, Dr. Harry Levitt, and receiving input from scientists from SoundID, essentially drew the opposite conclusion. Not only were the Audimax patents not pioneering, the technology covered by the patents was not even being used in the hearing aid industry. EKMS had a clear financial interest in gaining revenue from the licensing of the Audimax patents, but apparently aborted the licensing effort after concluding that the patented technology was simply not broad enough.

13. The foregoing is strong evidence that the patents are not pioneering. Moreover, the conclusions drawn in 2002 by EKMS, working with Dr. Harry Levitt, that the Audimax patents were not broad and pioneering, were in reasonably close proximity to the hypothetical negotiations in 2000 for Widex and 2001 for the Demant Group. It is reasonable to conclude that had an actual negotiation taken place in the 2000 and 2001 time frame with Widex and the Demant group, the negotiators would have come to the same

conclusion, *i.e.*, that the patents-in-suit were not in fact broad, pioneering patents. Accordingly, while the hypothetical negotiation assumes the patents to be infringed, the hypothetical negotiators would not have conferred broad pioneering status to the patents.

14. Accordingly, not only is the Musika Report flawed for the reasons stated in my October 19, 2007 report, but for the additional reason that the EKMS documents further undermine the royalty proposed in the Musika Report, which is based on the patents-in-suit being broad pioneer patents as asserted by Mr. Musika with respect to *Georgia-Pacific* factor 13.

15. As noted in my October 19, 2007 report with respect to *Georgia-Pacific* factor 13, many factors contribute to the ultimate sale and pricing of the accused hearing aids. The documents relating to EKMS listed in ¶ 2 above are significant evidence that the patents-in-suit are not pioneer patents and that they have at best a marginal role in the realizable profits for the accused products, a factor having a downward effect on the royalty rate and thus further supporting the opinions set forth in my October 19, 2007 report.

Dated: December 15, 2007

Charles R. Donohoe

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that true and correct copies of the SUPPLMENTAL EXPERT WITNESS REPORT OF CHARLES DONOHOE ON BEHALF OF DEFENDANTS WIDEX A/S, WIDEX HEARING AID CO., INC., OTICON A/S, OTICON INC., BERNAFON AG, BERNAFON, LLC, WDH, INC. AND WILLIAM DEMANT HOLDING A/S were caused to be served via e-mail upon the following parties on December 16, 2007:

REPRESENTING ENERGY
TRANSPORTATION GROUP, INC.

Edmond D. Johnson
PEPPER HAMILTON LLP
**johnsone@pepperlaw.com**

Brian M. Buroker
HUNTON & WILLIAMS LLP
**bburoker@hunton.com**
**etg@hunton.com**

REPRESENTING STARKEY
LABORATORIES, INC.

Mary Matterer
MORRIS, JAMES LLP
**mmatterer@morrisjames.com**

Amy A. Quinlan
MORRIS, JAMES LLP
**aquinlan@morrisjames.com**

Steven L. Reitenour
BOWMAN AND BROOKE LLP
**steve.reitenour@msp.bowmanandbrooke.com**

Richard G. Morgan
BOWMAN AND BROOKE LLP
**richard.morgan@bowmanandbrooke.com**

REPRESENTING WIDEX A/S
AND WIDEX HEARING AID CO. INC.

Donald E. Reid
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
**dreid@mnat.com**

William H. Mandir
SUGHRUE MION PLC
**wmandir@sughrue.com**

David J. Cushing
SUGHRUE MION PLC
**dcushing@sughrue.com**

Carl J. Pellegrini
SUGHRUE MION PLC
**cpellegrini@sughrue.com**

_____

Arthur A. Smith
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Avenue, N.W.
Washington, D.C. 20001-4413
Phone:  (202) 408-4000
Fax:  (202) 408-4400

1502465v1

Exhibit 28

## ETG Summary Report

EKMS began working to license the patents in the AudioMax portfolio in late May/ Early June of 2002. At that time, the decision was made to focus on patent US4,731,850, which appeared to be the strongest of the set of AudioMax patents. The following companies were chosen as targets:

1. ReSound (now part of GN Great Nordic)
2. Widex
3. Oticon
4. Siemens
5. Phonak

After talking with Harry Levitt and Richard Dugot in Mid-May we chose to contact several ex-ReSound scientists who had started a second company called SoundID. We delivered the patents to the SoundID scientists and held our first phone conversation on 9 July. During this conversation, SoundID revealed that they did not feel that the main Patent, US4731850, was relevant to their practice. Their reading of this patent focused on Claim 13 and they sought to define the term "Determining" in claim 13. Their interpretation (from the body of the patent) reveals that the term "determining" involved a process where:

1. Normal hearing aid function would be suspended
2. A test cycle using a signal (probe) would run
3. The cycle would allow the hearing aid to optimally reduce feedback
4. Normal function would resume

They noted that this model is not used in their hearing aids, all of which have a probe running continually in the background (a process called continuous adaptation)

SoundID noted that neither they nor ReSound used such a process and since such a process was material to the art disclosed in the patent and since such a process was implied in the claims, they felt that they were not offering services covered under the patent. They also raised the issue of prior art without providing any details.

Eric Dowling, the EKMS expert, took a look at the patent while EKMS arranged a second call with Harry Leavitt for early August . Over the course of two calls, we worked though the language of the patent and found that the body of the patent included language adverse to an interpretation of the claims involving a continuously adaptive approach. A key issue involved a breaking of a feedback loop and applying a test signal. This impacts Claim 13. At this point, EKMS ordered a copy of the file wrapper and engaged in a prior art search. While EKMS uncovered no invalidating prior art, it was noted that (1) there was relevant art in the field more than one year prior to the filing of the patent and (2) the claims in the patent had been narrowed during prosecution due to prior art concerns. While neither of these points prevent an interpretation of the patent that might require

Defendants Trial
Exhibit

DX-1610

Civil Action no. 05-422

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    MP00000031

compulsory licensing, it seems that such an interpretation is non-obvious enough to pose a serious hindrance to any litigation-free licensing effort.

The main child patent of 4731850 [US4879749: Host controller for programmable digital hearing aid system] seems to suffer from the same problem, specifying in the description of the preferred embodiment, that test sounds shall be provided as necessary rather than all of the time as would occur with a continuously adaptive system.

With respect to US4879749:

> Claim 1 has some potential because it involves a continuously adaptive system. However, claim 1 involves a limiter, and this is harder to find in the product literature. Reverse engineering may be needed to find the limiter function in a target product. Also, the file wrapper indicates US Patent 548082 discloses a very similar system. This would indicate that Claim 1 would most likely receive a narrow interpretation and may need to be close to the exact embodiment disclosed in the patent. Hence to pursue Claim 1, we would probably need reverse engineering and then we would have to determine if the accused device uses the method of the ETG patent and not US Patent 548082. The risk here is that effort may be spent and the result may indicate the accused device is protected by the 548082 reference.

> Claim 5 is similar in ways to Claim 1, but includes means-for language. Hence Claim 5 includes implicit limitations tied to the specific embodiments disclosed in the specification. Hence Claim 5 would most likely be difficult to read on a target product.

> Claim 18 was also evaluated in more detail because it involves a continuously adaptive system. This claim involves an amplifier that is disclosed as a compression amplifier in the specification. So far none of the research has identified products that use a compression amplifier to impart a continuously-time-variable frequency response.

EKMS has not finished examining all of the patents in the set for weakness on the continuously/ intermittently adaptive front. It is worth noting , however, that an initial survey of the patents found the other patents in the set to be more limited in scope for unrelated reasons.

Taking a second tack, EKMS has begun examining the product literature of the major hearing aid companies listed above, trying to identify those products that are not continuously adaptive. The feeling at present, is that most companies have chosen to strive for products that are continuously adaptive even though this approach can have problems, including a constant, buzzing noise in the background. The feeling at SoundID was that the art disclosed in the AudioMax patent might be tried if and only if continuously adaptive products failed to succeed in the market—an event unlikely in the next three years.

NFIDENTIAL - ATTORNEYS' EYES ONLY

MP00000032

From the product literature:

WIDEX— it seems that Widex is working on continuously adaptive methods:

From literature:
*Cancels Annoying Feedback (whistling)*
With previous technology, in order to control feedback (whistling), amplification had to be reduced. This minimized the effectiveness of the hearing aid. Senso Diva's unique Feedback Cancellation System is always on to monitor changes in the environment that may cause feedback. For example, when speaking on the phone, chewing, or in quiet surroundings, the likelihood of feedback increases. The Diva cancels the potentially annoying feedback without reducing amplification. This unique ability to reduce feedback before it is audible provides a more comfortable listening experience.
For more technical information visit our special Senso Diva web-site
*Back to features*

http://www.widex.co.za/sensdiva.htm#feedback

## OTICON

## Fully Automatic
## Feedback Manager
In small, non-linear high-performance
hearing aids such as DigiFocus II, utilizing
the maximum gain without feedback
is a very important fitting parameter.
DigiFocus II offers a fully automatic
4-band feedback system that eliminates
feedback automatically without affecting
speech intelligibility and sound quality.

http://www.oticon.es/Product/DFocus/_gfx/pdf/pbr_uk.pdf

TEXAS INSTRUMENTS: Seems to be aimed at continuously adaptive methods
DSP and Hearing Aids

Although DSP technology can greatly enhance the effectiveness of digital hearing aids, high power consumption has prohibited their use in most devices. The C55x DSP core will likely eliminate the power consumption drawback for the first time. More than 300 million people worldwide are affected by hearing loss, but only five-percent benefit by wearing a hearing instrument. Hearing instruments are not widely used because current technology does not effectively address the intricacies of hearing and cannot be fully customized to the needs of the user. However, using DSP techniques made possible by the C55x DSP core, a new generation of hearing aids will offer programmability to accommodate each individual's hearing needs, and the ability to adapt to the dynamics of audio reproduction.

Existing hearing aids sample incoming speech, separate it according to its frequency and map it to a frequency-response profile of the wearer. DSP-based hearing aids will continue this mapping, but complement it with techniques such as noise cancellation, feedback cancellation, pitch shifting, speech enhancement and beam forming (to focus on the sound source). In addition, adaptive filtering, achievable only with a programmable device like a DSP, will allow frequency response curves to be continuously modified in response to various sound environments. For people who wear two hearing aids with different processing for each ear, the C55x DSP core will allow the devices (which are dependent on the level of processing) to be matched so sound arrives at both ears at the same time.
http://www.ti.com/sc/docs/news/2000/99085d.htm

NFIDENTIAL - ATTORNEYS' EYES ONLY

MP00000033

## RESOUND

Most hearing instruments attempt to deal with the problem of feedback. Some change programming parameters in certain frequency regions to reduce the likelihood of feedback. Others reduce amplification in the affected frequency bands until feedback disappears.

Only GN ReSound's Digital Feedback Suppression (DFS) doesn't reduce gain. And only GN ReSound uses an entirely digital approach to effectively beat feedback without compromising the wearer's ability to hear.

The DFS system instantly crushes feedback by simply detecting feedback and creating an inverted signal to cancel out the offending tone before it becomes audible. This inverted signal is opposite in phase, but with the same amplitude.

Digital Feedback Suppression constantly monitors sound returning to the microphone and compares it with an "image" in the static filter bank. If the signal is not identical then an inverted signal is added to cancel out the annoying feedback signal.
And it does it without reducing the wearer's hearing - or their ability to talk on the phone, wear a hat or give a hug. Canta 7 incorporates the very latest in DFS technology to make life a little easier for both you and your patients.

When feedback is detected, some instruments change programming parameters in certain frequency regions.

Others reduce amplification in the affected frequency bands until feedback disappears.

Only GN ReSound's Digital Feedback Suppression (DFS) doesn't reduce gain, effectively beating feedback without compromising the wearer's ability to hear.
Canta7 uses the most advanced, custom-designed chip ever designed for a hearing instrument. The software-based chip, which has the most computational power on the market, is a true microprocessor that makes it possible for the first-generation of Canta7 to already outperform all existing hearing
http://www.gnresound.com/canta/nocompromise.html

## SIEMENS

Offers several digital hearing aids:

| Fully Digital Hearing Aids | | |
|---|---|---|
| | | |
| | Because no two hearing losses are exactly alike<br><br>A multi-channel equalizer in SIGNIA Select shapes sound to meet your individual hearing requirements precisely. The SIGNIA Select chip operates continuously to make soft sounds audible and to keep loud sounds at a comfortable volume. | http://www.audioconsult.com/siemens.html |
| | | |
| | | |
| | | |

NFIDENTIAL - ATTORNEYS' EYES ONLY

MP00000034

| Digitally Programmable Hearing Aids | | |
|---|---|---|
| | | |
| | | |

## Suppression of feedback

A further major advantage of the digital technology in modern hearing systems is the effective suppression of acoustic feedback. It used to be possible to reduce the feedback whistle only by strengthening or lengthening the otoplastic, making the ventilation hole smaller, reducing the level reproduction or lowering the volume. However, this was always to the detriment of the wear comfort and reproduction quality of the instrument. A digital hearing aid has much more effective ways available. Together with the useful signal, it also transmits a special inaudible test signal through the otoplastic and into the ear canal, and compares the test signal, which may be returned because of leaks and therefore tend to cause feedback, with the original signal sent. If it discovers feedback, it removes it immediately by means of a counter-phase correction signal, and so fast that the patient will not notice any feedback or the fact that it has been corrected.

The Siemens patents: *EP1017253A2: Blind source separation for hearing aids,   US6404895 06/11/2002 Method for feedback recognition in a hearing aid and a hearing aid operating according to the method and US6044163 03/28/2000 Hearing aid having a digitally constructed calculating unit employing a neural structure* deal with continuously adaptive feedback control.

## Phonak

### Effective dual feedback control
*Offers optimum all-round audibility.*
This innovative system is an option to support the fitter and the user, should feedback occur. The dual feedback control allows stable amplification with minimum gain loss. Two feedback control mechanisms are available. The fixed notch filter eliminates sources of constant feedback. A high-resolution notch is tuned to suppress a source of feedback with virtually no impact on gain. For further protection, an adaptive notch is available to eliminate feedback associated with occasional increased gain, for example from a jaw movement or the positioning a hat. It is deactivated once the feedback stops but stays on stand-by should feedback re-occur.
http://www.phonak.com/index.cfm?dom=1&rub=2&lng=1

## STARKEY:

Starkey AXENT Hearing Aid
February, 2002. Starkey Laboratories, America's largest hearing aid manufacturer, has just introduced the new line of Genesis digital signal processing hearing aids, The Axent is the leader of this new line. The Axent has an active feedback cancellation system that monitors its output, listening for feedback, and adjusts the feedback filter to subtract the feedback signal from the input.

http://www.hearingcenter.com/info_files/Axent.html

NFIDENTIAL - ATTORNEYS' EYES ONLY                    MP00000035

Exhibit 29

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ENERGY TRANSPORTATION GROUP, INC., )
                                     )
        Plaintiff,                    )
                                       )
        v.                               )        C.A. No. 05-422 (GMS)
                                       )
SONIC INNOVATIONS, INC., et al,         )
                                       )
        Defendants.               )

## **DECLARATION OF ERIC M. DOWLING, Ph.D.**

1.     This declaration is submitted pursuant to 28 U.S.C. § 1746.

2.     I am a citizen of the United States of America.

3.     In 1989, I obtained a Ph.D. in Electrical Engineering from the University of Florida.

4.     In or about late 2001, I was hired by EKMS to perform a technical evaluation of U.S. Patent Nos. 4,731,850 ("the '850 Patent") and 4,879,749 ("the '749 Patent") (collectively, "the Levitt Patents").

5.     During the period from late 2001 to about September 2002, I performed the requested technical evaluation of the Levitt Patents on behalf of EKMS.

6.     I have reviewed the ETG Summary Report marked as Civil Action No. 05-422 Defendants Trial Exhibit DX-1610 (attached as Appendix A).

7.     I did not author DX-1610.

8.     I do not agree with the statement in DX-1610 that "the patent included language adverse to an interpretation of the claims involving a continuously adaptive approach."

9.    Moreover, during my technical evaluation, I never concluded or made a statement to the effect that "the patent included language adverse to an interpretation of the claims involving a continuously adaptive approach."

10.   I have reviewed an email that I wrote to John Boddie on July 24, 2002, which is marked as Civil Action No. 05-422 Defendants Trial Exhibit No. DX-1642 (attached as Appendix B).

11.   I authored DX-1642.

12.   As is evident from DX-1642, as part of my technical evaluation of the Levitt Patents, I analyzed the adaptive nature of the Levitt Patents with regard to feedback cancellation.

13.   I agree with the statement in DX-1642 that "[t]he ETG filter can be adaptive."

14.   I also agree with the statement in DX-1642 that "[t]he bottom line is [no]body but a red faced liar could read these cites and say the '850 does not contemplate adaptive filtering."

15.   I never changed my view in this regard.

16.   As stated in DX-1642, my view that the ETG filter can be adaptive for feedback cancellation was based in part upon the statement in the '850 Patent that "by virtue of the novel means employed for effecting automatic adjustment of the programmable filter to optimum parameter values as the speech level, room reverberation and type of background and for reducing acoustic feedback, a superior hearing aid system of optimum characteristics can be prescribed for hearing deficient patients."

17.   Also, as stated in DX-1642, my view that the ETG filter can be adaptive for feedback cancellation was further supported by the statement in the '850 Patent that "[s]till another object of the invention is to provide new and improved hearing aid apparatus that is capable of effective noise and reverberation suppression and acoustic feedback reduction while maintaining optimum hearing characteristics as the speech and noise levels vary."

18.  I have reviewed a document entitled "AudioMax Patents - EKMS Patent Area Coverage Report" which is marked as Civil Action No. 05-422 Defendants Trial Exhibit No. DX-1640 (attached as Appendix C).'

19.  My initials "EMD" and the date, November 8, 2001, appear on the title of DX-1640.

20.  I authored DX-1640.

21.  As stated in DX-1640, I agree that claim element 13b ("inserting between the input and output of said transmission channel en electric feedback path having a filter therein programmed to equalize and reduce the effect of said acoustic feedback both in amplitude and phase on a signal in said transmission channel") covers "an adjustable filter [that] is adaptively adjusted so as to estimate the acoustic environment and cause the feedback signal to be cancelled."

22.  As the records reflect, the only opinion I gave at the time of my technical evaluation of the Levitt Patents was that the Levitt Patents cover "an adjustable filter [that] is adaptively adjusted so as to estimate the acoustic environment and cause the feedback signal to be cancelled."

I declare, under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct.

Executed this 27ᵗʰ day of January, 2008.

Eric M. Dowling, Ph.D.

Exhibit 30

## EKMS TIMELINE

**January 5, 2007**

- ETG identifies EKMS.

**July 31, 2007**

- Defendants question Kimball Chen about EKMS at his deposition.

**November 5, 2007**

- Court orders ETG to produce EKMS documents to Defendants.

**November 6, 2007**

- ETG produces EKMS documents to Defendants.

**November 20, 2007**

- Dr. Morley supplements his non-infringement report as follows:

Finally, I have reviewed the EKMS documents, which I understand recently became available. These documents support my conclusions of non-infringement by the Widex hearing aids. The EKMS documents indicate that hearing aids that employ an adaptive filter for canceling acoustic feedback do not infringe any of the '850 patent claims. In addition, the documents note the same non-infringement reasons I pointed out with respect to claims 1, 5, and 18 of the '850 patent. Also, the EKMS documents point to the same non-infringement reasons I specified for the '749 patent claims.

**December 15, 2007**

- Dr. Donohoe includes the following paragraphs regarding EKMS in his supplemental expert report on damages:

7. From late May and early June to at least September 2002, EKMS evaluated the prospects of licensing the Audimax patents with particular focus on the '850 patent. (*See* MP00000095-99, P-02593 and P-02599-610.) Among the five targeted companies were Widex and Oticon, which is part of the Demant Group. Both Widex and Demant are defendants to this action. After speaking with Dr. Harry Levitt, among others, EKMS contacted SoundID, a hearing aid company founded by "several ex-ReSound scientists." (*See* MP0000095-99.) SoundID, which was not identified as a "target" company, concluded that the '850 patent did not cover an adaptive system to reduce feedback. EKMS expert, Eric Dowling, in consultation with Dr. Levitt "worked through the language of the ['850] patent and found that the body of the patent included language adverse to an interpretation of the claims involving a continuously adaptive approach." (*Id.*) While they concluded tha the claims could be interpreted more

- 1 -

broadly, they also concluded that such an interpretation would be so non-obvious as to hinder licensing of the patent for continuously adaptive feedback systems.  (*See* MP00000095-96.)

8. EKMS and Dr. Levitt also concluded that the '749 patent had a similar limitation. (*See* MP00000096.)  They further concluded that other patents in the Audimax portfolio were more limited in scope than the '850 and '749 patents.  (*Id.*)  Because of this, EKMS began to look for commercially available hearing aids that did not have a continuously adaptive feedback system.  However, they felt that, as of 2002, most companies would be using a continuously adaptive feedback system.  (*Id.*)

9. My understanding from the documents listed in ¶ 2 above is that EKMS determined that licensing the patents-in-suit to the targeted companies was not feasible due to, among other things, the narrow scope of the patents in relation to the technology being practiced at the time.

13. The foregoing is strong evidence that the patents are not pioneering.  Moreover, the conclusions drawn in 2002 by EKMS, working with Dr. Harry Levitt, that the Audimax patents were not broad and pioneering, were in reasonably close proximity to the hypothetical negotiations in 2002 for Widex and 2001 for the Demant Group.  It is reasonable to conclude that had an actual negotiation taken place in the 2000 and 2001 time frame with Widex and Demant group, the negotiations would have come to the same conclusion, *i.e.*, that the patents-in-suit were not in fact broad, pioneering patents.  Accordingly, while the hypothetical negotiation assumes the patents to be infringed, the hypothetical negotiators would not have conferred broad pioneering status to the patents.

## January 22, 2008 (Trial - Day 2)

- Defense Counsel makes the following statement during opening arguments:

Tr. at 210:21-211:12:

There's another technical expert who also has a Ph.D. in electrical engineering and who is also of the opinion that the patents in this lawsuit do not cover continuously adaptive filters, such as defendants' products.  Now, this third expert is not someone whose [sic] going to testify on behalf of Widex.  It's not someone whose [sic] is going to testify on behalf of Demant.  This third expert was an expert that was retained by ETG, the plaintiff in this case.  This third exert was retained by ETG about three years before this lawsuit in 2002.  It started in 2005.  Three years before, and they were -- ETG asked them to evaluate the patent.  This expert was a person by the name of Dr. Dowling, Dr. Eric Dowling, and he was acting for a company called EKMS.  EKMS was a company that specializes in licensing and evaluating patents.

Tr. at 212:10-15:

Dr. Dowling studied the patents, spoke -- who did he speak with?  Dr. Levitt about his patents extensively as part of his evaluation of the patents.  And he concluded that the modern continuously adaptive filters specifically used by Widex and specifically used by Demant do not infringe Dr. Levitt's patents.

Tr. at 213:8-12:

So here we have three years before ETG files this lawsuit going to EKMS, a specialist in evaluating patents. They hire a Ph.D. in exactly the technology necessary and he concludes that Widex and Oticon's continuously adaptive filters are not covered.

**January 23, 2008 (Trial - Day 3)**

- Defense Counsel cross examines Kimball Chen as follows:

Tr. at 467:19-25

Q.    It goes on to say, "Over the course of two calls, we worked through the language of the patent and found that the body of the patent included language adverse to an interpretation of the claims involving a continuously approach." Do you see that?

A.    Yes.

Tr. at 469:6:22

Q.    You are not aware that -- you don't think this says Harry Levitt and Eric Dowling were talking to each other? Isn't that what it says here, Mr. Chen?

A.    It says that we -- I don't know who the "we" is. We could be EKMS and Harry Levitt and Dr. Dowling. It could be EKMS. Again, it's not absolutely clear to me who's taking the position or finding that there may be some question about this.

Q.    Can't you look at the sentence right before the we? It's pretty clear, isn't it, "Dr. Eric Dowling, the EKMS'expert " took a look while EKMS arranged a second call with Harry Levitt for early August"?

MS. ECKSTEIN:    Your Honor, at this point, it's asked and answered.

THE COURT:    I am going to sustain the objection. You are becoming argumentative.

**January 25, 2008 (Trial - Day 5)**

- ETG's counsel confers with Dr. Eric Dowling.

**January 27, 2008**

- ETG received signed declaration from Dr. Dowling.
- Dr. Dowling agrees to testify without remuneration.

**January 28, 2008 (Trial - Day 6)**

- ETG notifies Defendants of its intention to call Dr. Dowling as a rebuttal witness.

**January 29, 2008 (Trial - Day 7)**

- Counsel had the following discussion with the Court:

  Tr. at 1502:23-1521:23:

THE COURT: The January 29 letter from ETG concerning their desire, -- and that was addressed earlier by Ms. Eckstein -- concerning their desire to put on a rebuttal case, concerning Dr. Dowling. Who is going to handle this? Ms.Eckstein?

MS. ECKSTEIN: Sure.

THE COURT: Don't read to me, Ms. Eckstein. Make an argument.

MS. ECKSTEIN: Absolutely not. And I'm not going to repeat what is already in the record.

THE COURT: No, you don't need to do that either.

MS. ECKSTEIN: The main point is that we had no reason to believe that they were going to do, the defendants were going to do anything with the summary report from EKMS other than rely on it as a business record and state this is information that ETG had received from EKMS. But they have gone beyond that now. They have done more than that. They have told the jury repeatedly that there is a third expert in this case, Dr. Dowling, who EKMS hired. He wasn't an EKMS employee but EKMS hired him separately and he was ETG's expert and this is what he believed, these were his words and his statement and he changed his opinion. They have put forward his point, his position and made it a focal point of their case. Because of that, we believe that we will be prejudiced if we do not have an opportunity to bring him here and tell the jury what in fact was the situation.

THE COURT: A couple of questions. Just a practical, logical consideration: When can you get him? He is coming from Costa Rica?

MS. ECKSTEIN: He is. He is willing to come.

THE COURT: You are going to drag him away from Costa Rica. The other poor man couldn't attend his Cardinals camp.

MS. ECKSTEIN: I understand we incorrectly understood that he would be able to testify Friday morning. I think his testimony will last a total of 30 minutes, direct and cross-examination. It's very limited. We don't intend to offer him as an expert. Just on the factual issues. He was able to make it so that he could be here to testify Friday morning. We can talk to him and see if he can do it Thursday afternoon. I need to arrange that.

THE COURT: As to Page 3 of your letter, you have highlighted a question, and I don't see the answer to the question. The question that you have highlighted is, Can't you look -- this is examination of Dr. Dowling -- of Mr. Chen, rather, concerning Dr. Dowling -- the question that was put was: Can't you look at the sentence right before the we?

It's pretty clear, isn't it, Dr. Dowling, the EKMS expert took a look while EKMS arranged a second call with Harry Levitt for early August? What is the answer to that question?

MS. ECKSTEIN: I apologize that wasn't included. My recollection is Mr. Chen then testified that it is not clear to him. Mr. Chen's testimony was that he did not know whose statements the EKMS summary report represented. Further, the EKMS summary report is not authored by anybody. There is no name on it.

THE COURT: I do have a fairly decent independent recollection for some reason of Mr. Chen's testimony. Okay. I understand your position.

MS. GRAHAM: Yes, Your Honor. If I can address this. We oppose this witness, his coming. He is not proper rebuttal. There is no surprise here. In fact, we think he is not properly coming to the trial at all, whether it would have been for their direct case or for rebuttal.

If the Court will recall, the EKMS report was produced to us after the Court ordered its production. They had withheld it as privileged and work product. The Court ordered it produced. We got that on November 6th, which was sometime after fact discovery had closed.

We then saw the report. We saw the important language in it, which the Court may remember was put up on the screen in the trial, in which the EKMS folks -- and they were hired, by the way, there is an agency agreement. They were asked to act, this report was within the scope of what they were hired to do.

They said, We found that the patent includes language adverse to an interpretation that the claims involve a continuously adaptive approach. And the next sentence makes clear with respect to acoustic feedback.

So we then identified that we were relying on the report and -- on two expert supplemental reports. The experts were deposed.

So they knew we were relying on this report. And right then, if they had something that they wanted to put in evidence to bring to trial that would counter that conclusion that I read to Your Honor, in the report, they were on notice. They should have at that point identified. They should have said, gee, you know? This report looks like Mr. Dowling reached this conclusion. But gee, maybe he didn't. And we don't think he really did, and somehow that is relevant and we will use that somehow.

But they did not come forward with it. They did not identify Dr. Dowling in interrogatory answers. In fact, they supplemented it two days after they produced the EKMS report, in which we asked them, and this was Interrogatory 4, we asked them to identify all analyses relating to infringement, validity, scope of the patent, all those things.

They maintained and reiterated, and stated as a fifth, I think it was, supplemental response, that they were maintaining privilege as to any other analyses.

So we had no idea that they would rely on Dr. Dowling.

So then, no surprise, we got to trial. The opening relied on the EKMS report. And they knew we were going to. So with Mr. Chen, the Court may recall, they actually introduced the EKMS report. They were the first ones to put it into evidence. They also introduced Exhibit 1642, which is the red-faced liar e-mail.

We weren't relying on that.

We then crossed on it. Then there was redirect. And ETG then pulled out Exhibit 1640, which we hadn't relied on. And the Court allowed testimony. We actually had objected to it.

But those e-mails were being used by them to support an inference that the report was not correct. We are not changing, by the way. They have letters suggesting we suggest there was a change. We don't suggest there was a change in what Dr. Dowling or ETG or anybody on behalf of EKMS might have been saying.

They were the ones who wanted to introduce these e-mails.

So now what they are trying to do is bootstrap. Apparently, they feel that these e-mails were not sufficient evidence to counteract what the report said. So now they want to bring in Dr. Dowling to testify about the e-mails to say he actually did an analysis that is counter to the analysis in the report.

And that's not proper rebuttal. They knew to bring in this material in their direct case if they wanted to bring it in at all.

Moreover, it is not proper in the trial at all, because as I mentioned, we were not on notice that Dr. Dowling had done some analysis which allegedly was contrary to what was in the EKMS report. Now they want to bring him in. That's clearly what the declaration says.

In addition, as far as testifying about the e-mails -- which we think is really a side show, because the issue is what is in the report. That's what we are relying on. I don't care how many EKMS experts did -- they could have had ten of them that did some other analysis, because what they reported to ETG, and which ETG received, was the analysis reported in Exhibit 1610, purportedly on behalf of an expert. And that is what ETG knew.

Moreover, we have a further problem with their bringing this witness to testify as purportedly the author of the two e-mails. And he admits he wasn't the author of the report. So he has nothing to give us about the report.

But they now say that he was the author of these two e-mails.

But when we got their privilege log, which are led -- with the Court's order to the production of 1640 and 1642, the red-faced liar e-mail, Eric Dowling isn't listed as the author. Eric, E, I suppose it's Eric, E Cahn (phonetic) is listed as the author. And Dowling's name nowhere appears on this.

With respect to 1640, there is no author, recipient or copy listed, and certainly not Dr. Dowling.

So if Dr. Dowling had relevant testimony to offer about these exhibits, he should have been identified long before.

We would submit it's not proper to interject this now. It would be prejudicial to us. We certainly haven't had discovery of him. And it is a side show in the trial which will distract from the point, which is what is in the actual report given to ETG.

THE COURT: Okay. Thank you, Ms. Graham. A response.

MS. ECKSTEIN: First about the point --

THE COURT: You may want to come to the podium.

MS. ECKSTEIN: Thank you, Your Honor.

With respect to the supplemental reports. The two supplemental reports that we received, one was from Dr. Morley and one from our damages expert, Dr. Donohoe. Neither of them stated, neither of them suggested that they were going to take the position that the EKMS summary report represented Dr. Dowling's beliefs. There was nothing in those supplemental reports that made that suggestion at all. We scoured those before we sent this letter to you or

brought this up today because we wanted to make sure there was no reason that we should have had notice before this to know that they were going to make those assertions.

I think Ms. Graham is has actually articulated the reasons we need this rebuttal. In opening statements, Mr. Mandir, he put the report on the screen. And he said, these are Dr. Dowling's opinions. This is what Dr. Dowling told ETG. He authored this report. He may not have said he authored this report. But he did say this is what Dr. Dowling told ETG. And that's why they have made this an issue.

They have made this a central point of their case, the fact that this third expert, Dr. Dowling, told ETG, purportedly, that the patents did not cover an adaptive approach with respect to feedback cancellation. It's been repeated to the jury several times. The jury is going to remember that.

Our concern is if we can't bring Dr. Dowling in to tell the jury I didn't author this report, I authored the, quote-unquote, red-faced liar e-mail, I never changed my position -- they are the ones who brought forward, I believe even in opening, the fact -- the assertion that he changed his mind. They presented a timeline. First he wrote the, quote-unquote, red-faced liar e-mail, I think it was a July 2002 e-mail, and then he spoke with Harry Levitt and then he spoke with Sound ID (phonetic), and then he produced this December 2002 summary report, and there he had changed his mind. That was his assertion, not ours.

THE COURT: And he was not on your original witness list why?

MS. ECKSTEIN: For a number of reasons. Probably foremost is we didn't need him to prove any elements in our case. There was no reason for us to put him on a witness list. There was simply no reason to put him on a witness list.

THE COURT: Is it possible you didn't put him on a witness list because you didn't count on my ruling the document in and discoverable?

MS. ECKSTEIN: Actually, that ruling came a month before we needed to file the witness list. So we were aware of it at that point.

We frankly were surprised that he was not on the defendants' witness list. The defendants have put words in his mouth. The defendants have told the jury what he believed, what he said, what he purportedly opined. If they wanted the jury to hear what he purportedly believed and opined, they should have put him on their witness list and brought him here.

THE COURT: Ms. Graham, one of the concerns I have is, accepting everything you said, this is, after all, this is an enterprise at bottom that is interested in seeking the truth of the matter, to the best of our ability, without unfairly and unduly prejudicing one side or the other insofar as the process of getting to that truth is concerned.

They didn't raise the report of Dr. Dowling in their opening and emphasize it. You did, your side did. Are you saying they should have reasonably anticipated that you would use this report in the way that you did, and effectively present another expert or another witness, at least, who was not going to be able to be examined, direct or cross, whose views would not be able to be tested, so that this jury could make a determination about what it believed or not? Go ahead.

MS. GRAHAM: Well, Your Honor, what we were doing was making argument about the evidence. And we didn't use anything other than this very document. That is all that we are arguing about. So the document itself says that Eric Dowling, the EKMS expert, took a look at the patent while EKMS arranged a second call with Harry Levitt for early August.

So when Mr. Mandir in his opening talked about it, he was referring to that statement. So he is saying the EKMS expert -- I can hand Your Honor this page, if that would be helpful. It's towards the bottom of the last paragraph.

THE COURT: This is --

MS. GRAHAM: This is DX-1610. It is the report itself. This is what Mr. Mandir was arguing about and referring to.

THE COURT: Is that the bracketed sentence?

MS. GRAHAM: Yes, down at the bottom, it's the first three sentences that are at issue. And that is what Mr. Mandir was speaking from.

THE COURT: Third down, took the EKMS expert -- that sentence.

MS. GRAHAM: Took a look at the patent, yes. While EKMS arranged a second call with Harry Levitt for early August. Then the next sentence refers to these calls and what happened as a result of it. And it says over the course of two calls we worked through the language of the patent and found that the body of the patent included language adverse to an interpretation of the claims involving a continuously adaptive approach, a key issue involved the breaking of a feedback loop and applying a test signal.

All Mr. Mandir was arguing from this document, that they knew absolutely -- they can't suggest that they didn't understand, when we gave them the expert reports. In fact, probably when they saw this, they knew this was the important part.

Our whole case, an important element, as the Court has heard over and over, has been whether or not the patent is continuously adaptive with respect to acoustic feedback.

This statement addressed it. All Mr. Mandir did was to argue from this statement. Again, whether or not Eric Dowling really had some other view someplace off the screen doesn't matter, because this was what was told to ETG.

So when they went to do licensing, they understood that this was, we would argue -- they can argue a different interpretation. They are free to argue to the jury, oh, no, you can't really read this document this way. But we would argue that as a result of this, Mr. Chen, and the others attesting, knew -- understood that an expert had looked at the patent with Dr. Levitt, and looked at the claims, and considered that it would not cover the continuously adaptive approach.

And, Your Honor, that is all that we are relying on for this.

I mean, we could all bring in lots of people, other experts, essentially. They are trying to bring in this guy to say he has some other opinion. But it doesn't matter if he has another opinion.

THE COURT: They are not asserting -- I understand the argument, so much that he has another -- well, it's mixed, actually, that he, in the affidavit, in the declaration, he writes, I do not agree with the statement in DX-1610 that the patent included language adverse to an interpretation of the claims involving a continuously adaptive approach -- 1610 being the EKMS report.

He also says, Moreover, during my technical evaluation I never concluded or made a statement to the effect that the patent included language adverse to an interpretation of the claims involving a continually adaptive approach. I agree, in Paragraph 13, with the statement in DX-1642 that the ETG filter can be adaptive.

Counsel for the defendants, at least in part, it's set forth here in the ETG letter, stated to the jury in opening that there is another technical expert who also has a Ph.D. in electrical engineering, and who is also of the opinion that the patents in this lawsuit do not cover

continuously adaptive filters, such as the defendants' products. That is directly contrary, that assertion, to what we see in the declaration.

Counsel, sit down. She is doing a fine job.

Response, please.

MS. GRAHAM: Your Honor, the primary point is that what was communicated to ETG is what matters. And it was the communication of that opinion to ETG that is at the heart of the damages issue, and which we were relying on this for.

So it doesn't matter if he had some opinion that he -- so he can come in and say, well, I agree or I disagree with these e-mails. But he is not saying anywhere in his declaration that he communicated a view contrary to the report to ETG.

THE COURT: Okay. Let me get a response to that point. I think you need to first address that point.

MS. ECKSTEIN: The last point there, yes. The communication is what matters. And the problem is that they have asserted that that communication came directly from Dr. Dowling, another expert in the case.

THE COURT: The communication to ETG?

MS. ECKSTEIN: Correct. That is what they asserted, the communications to ETG, meaning the ETG summary report. But those are his opinions, his beliefs, his statements.

THE COURT: Where and how is that communicated?

MS. ECKSTEIN: It was communicated at least in Mr. Mandir's opening statement when he said that Dr. Dowling "is also of the opinion."

THE COURT: Let me ask you, is there evidence? Apart in the opening statement, is there evidence in this record -- and anybody can answer this -- that that view was communicated to ETG?

MS. ECKSTEIN: They sought to elicit that evidence through Mr. Chen.

THE COURT: Mr. Chen did not agree.

MS. ECKSTEIN: That's right.

MR. REID: Your Honor, I was going to say, let me just add, I think Your Honor has hit the point on the head. They're asking to rebut argument. Rebuttal is rebuttal to evidence. There is absolutely no evidence that they're asking to rebut. If they want to argue to this jury that Mr. Mandir was wrong, that his argument was wrong, they can argue that. That is closing argument.

THE COURT: I think that is where we go with this one. Mr. Steinberg.

MR. STEINBERG: Your Honor, there is evidence because they asked Mr. Chen whether he got the summary report. That's the evidence which they've characterized in a certain way in front of this jury, and the manner in which they've characterized the summary report is that it's the opinion of Eric Dowling.

THE COURT: Well, that is just argument. That is not evidence. There is a characterization, I agree with you, one which may bear some discussion by me. I think you need to respond to Mr. Reid's point concerning the dearth of evidence on the subject.

MR. STEINBERG: Yes, Your Honor. And I don't know whether they're intending to have their experts address this at all but both of their experts have supplemental reports saying they relied on this.

THE COURT: Relied on what? The EKMS report?

MR. STEINBERG: The EKMS report.

MR. MANDIR: We're not going to have anyone say that Dr. Dowling said this or didn't say this.

THE COURT:  That is the critical point.  That is the critical point, Mr. Steinberg, Ms. Eckstein.

I don't think there is evidence at this point. And I think it's fundamental law as to what is -- and you cited case law, appropriate case law in your letter -- as to what is proper rebuttal. And Mr Reid correctly cites, makes the point that it's to evidence, argument. And that is completely consistent with everything that we tell the jury about what is evidence and what is not evidence.

Now, if you would like me, if you feel it appropriate for me to consider an instruction to cure what you feel was a misstatement of the record, what would later become the record at some point, I'll consider that. I'm not sure I will agree with you, and you can discuss it with the other side, but I will consider that. But I think the issue has at last come into sharp focus for me and I understand it. I'm going to deny the request to offer the rebuttal witness, Dr. Eric Dowling.

Do you have other rebuttal evidence that you want to present?

MR. STEINBERG:  No, we would request --

MS. ECKSTEIN:  We do have.

MR. STEINBERG:  Yes, we have other rebuttal.  We would request an instruction because we believe the jury deserves the truth and the truth is in the declaration. It's not in this characterization of these documents.

THE COURT:  Well, to the extent that jurors have a lot to remember and they may not remember that, whoa, that wasn't in evidence, that was a lawyer's statement, I will consider that. So you should discuss that with the other side.  Your point is a fair one in this regard.

MR. STEINBERG:  Thank you, Your Honor.

**January 30, 2008 (Trial - day 8)**

- Counsel had the following discussion with the Court:

  Tr. at 1777:19-1796:14

        MR. JOHNSON:  We also would request a curative instruction.  I have a proposed --

THE COURT:  Have you given it to other counsel?

MR. JOHNSON:  I have given it to other counsel, yes.

Is this agreed upon?

MR. MANDIR:  No.

THE COURT:  It seems to me -- I haven't read through the whole thing, I remember this from yesterday.  Isn't there in here another instruction, as I did preliminarily, as I instructed preliminarily, that attorney argument and statements are not evidence?

MR. ROMARY:  Yes, Your Honor.

THE COURT:  That is not sufficient in your view, counsel?

MR. JOHNSON:  No, it isn't.  It isn't because in this case they told the jury that something was a fact, and it turned out not to be a fact because no evidence came in.  And you remember we had the argument yesterday.

THE COURT:  With regard to the rebuttal.

MR. JOHNSON:  Right.  And you had said that you wouldn't let us put the witness on, but you would consider a curative instruction for that.  So this is limited strictly to the statement

that Mr. Dowling had this opinion, which is something which they had said to the jury for which there was no basis in the record.

THE COURT:  Okay.  Does somebody have the exact -- Mr. Reid, you are going to handle this?

MR. REID:  Yes, Your Honor.

THE COURT:  Could somebody remind me of the exact statement that was made by opening counsel.

MR. REID:  We have the transcript, Your Honor.

THE COURT:  Would you read it?

MR. REID:  It goes on for a couple pages.  But I would be happy to.

THE COURT:  The relevant portion.

MR. REID:  Certainly, Your Honor.

This is from the opening statement, Your Honor.  There was a discussion of the various experts, and then there was a note that there is another technical expert who is described.  And then it is specifically noted that this third expert is not someone who is going to testify on behalf of Widex, not someone who is going to testify on behalf of Demant.  This third expert was an expert that was retained by ETG, the plaintiff in this case.

Then there is a discussion about Mr. Dowling and ETG being -- I am sorry, EKMS being retained to look at these patents.  That they did look at them.  And then there was a discussion, Mr. Dowling studied the patents, spoke with Mr. Levitt about his patents exclusively.  Concluded that the modern continuously adaptive filter specifically used by Widex and used by Demant do not infringe Dr. Levitt's patents, and then went specifically to the report and referred to the report and read from it.

In fact, the report, which is DX-1610, the part that was referenced, starts with, "Eric Dowling, the EKMS expert, took a look at the patent while EKMS arranged a second call with Harry Levitt for early August.  Over the course of two calls, we worked through the language of the patent and found that the body of the patent included language adverse to an interpretation of the claims involving a continuously adaptive approach."

It goes on in the second page specifically talking about both Widex and Demant having a continuously adaptive approach.

So Mr. Mandir did nothing more than suggest that here is the evidence you are going to see.  We believe that this evidence shows that Dr. Dowling reached this conclusion.  Now, there is nothing improper about that.  There was no objection at the time to this statement during the opening.

If they want to argue that our interpretation is wrong, they are entitled to do that.

We are entitled to argue that we still think this is right.  We think that's exactly what this document says.

The jury is the one that gets to decide that issue.  Neither counsel does.

THE COURT:  Excuse me just a second.

(Pause.)

MS. ECKSTEIN:  Your Honor, two points.  First of all, Mr. Mandir did more than just read from the EKMS report.  He specifically said this was -- I can read from the transcript.  He specifically said this was Dr. Dowling's opinion.  And we now know from the declaration that that is not the case.  It is not Dr. Dowling's opinion.

He said, "Dr. Dowling concluded that the modern continuously adaptive filter specifically used by Widex and specifically used by Demant do not infringe Dr. Levitt's patents."

And he also said that "There is another technical expert who is a Ph.D. in electrical engineering and who is also of the opinion that the two patents in this lawsuit do not cover continuously adaptive filters such as defendants' products."

And we know from Dr. Dowling's declaration that that is simply not true.

MR. JOHNSON: In the proposed curative instruction, I carefully did not make any mention of the EKMS report or trying to say there was anything wrong with what they said about the EKMS report. It was only about what Mr. Dowling thought was -- what was in Mr. Dowling's mind when it turns out he was not the author of the EKMS report and he does not hold those opinions.

So it was carefully aimed specifically at the problem that was created by the statement that was overbroad.

THE COURT: Mr. Reid.

MR. REID: Your Honor, again, this statement was made in the opening. There was no objection to it. We believe that it is proper recitation of what we think the evidence will show. We believe they can argue to the jury that we are wrong, that we have stated -- they can point to this and say there is nothing in this report that specifically says Dr. Dowling has this opinion. We can say the opposite. We think it does say that.

It is a matter of the interpretation of that report.

THE COURT: Ms. Eckstein's point is that you are now -- the jury hasn't heard this -- but that the Court and the parties now have seen a sworn declaration which expressly refutes that contention, your contention that the report does support that view. Go ahead.

MR. REID: Your Honor, unfortunately, this is a problem that was created by the plaintiffs, by their late production of this document, by their entire conduct relating to these documents.

THE COURT: Let me interrupt for a second. Is it fair to ask, for the Court to let that stand in light of the declaration, albeit belatedly received and perhaps received as a result of their own -- I am not saying that this is correct, by the way, ETG, that this is the assertion that is being made, that it's ETG's own making, this dilemma. I haven't made a finding regarding that one way or the other. But that is the argument, at least in part.

Is it fair for me to let that impression stand and to let you argue to the jury as you indicate that you would like to in light of the declaration?

MR. REID: Yes, Your Honor, I believe it is, given the fact that they created this situation.

THE COURT: How does that serve the bottom-line, truth-seeking enterprise that we are ostensibly engaged upon here, when we know that the Doctor expressly refutes the contention made by opening -- who was the lawyer?

MR. MANDIR: I said it, Your Honor. Well, I think, if it would resolve matters, that we will not say in closing Dr. Dowling, you know, had this opinion. Probably they have forgotten about it anyway. We would like to say that really -- really what is relevant here, whether he agreed or not, is what ETG got from this report for purposes of damages, what would Mr. Chen have paid given this report. That clearly is adverse to them. You know, what would he have then licensed his patents for, given this, that nobody in the industry is practicing your patents, you know, that's the main thing it is relevant for.

We would agree, we don't have to argue that Eric Dowling specifically said it. We can read the document -- the document is what it is -- and not make a point of it. We would agree to that for sure.

MR. JOHNSON: The problem with that is they already made the point they already told the jury this. We don't know what the jury will remember and what the jury won't remember. That was in the opening and it was very powerfully made. It was a major portion of Mr. Mandir's opening statement.

THE COURT: In your view. In your view and in your team's view, perhaps. I'm not sure that I don't agree. The jury has heard a lot, and why that would necessarily just stick in their minds? Go ahead.

MR. JOHNSON: The reason I'd worry about it sticking in their minds is you are talking about there is an old story about the great weight of the evidence, and if you come in with a bigger pile of paper, you have the greater weight of the evidence. They were talking about having three experts to our having one in their opening statement. That could very well stick because experts are treated a different way by juries than simple laymen.

THE COURT: Well, let me ask you this, Mr. Johnson. They just backed off the assertion, their stated intent to affirmatively argue, that which you view as contrary, is supported by the declarations, supported by the fact.

MR. JOHNSON: Yes.

THE COURT: So they just offered not to do that. Why not just let it lie, and permit the Court's reminder -- that will be very powerfully stated, by the way -- that attorney argument is just that, it's attorney argument, it's not evidence, rather than potentially highlighting this, this point. And there is always the possibility, as I think we're dealing with human beings, who may nonetheless, having it now again highlighted, for them confuse it with evidence that we know it is not.

MR. JOHNSON: I think one of the problems with that is that I just heard that they weren't going to make an argument, which I would have thought was improper for a lawyer to make once you knew that what they would be saying was trying to give the jury a falsehood. So that I don't look at that as a concession, I think that is what they had to do as lawyers, and I think they have said something which goes beyond the truth and that we need a curative instruction.

MR. MANDIR: The problem, Your Honor, is that when we got this document and we had -- we had no other information except the document. And if you look at the transcript, all I do is I say exactly what is in the document. That is all I knew at the time. So to do anything now other than just let it lie would really I think be something that would punish us for not having information that we believe ETG should have given up a long time ago.

THE COURT: You have to keep in mind the two things. That argument, that position that they take, that the document wasn't given over in a timely fashion, just keep it in mind, in addition to the fact that you didn't raise an objection to the statement at the time that it was made.

MR. STEINBERG: Well --

THE COURT: Go ahead, Mr. Steinberg.

MR. STEINBERG: To answer the first, obviously we had it on our privilege log, and it was being considered by the Court. And when we got the ruling, we turned it over.

THE COURT: You did.

MR. STEINBERG: Secondly, it was out of his mouth, you know, before we could object.

THE COURT: Then that is the time you ask for it. And perhaps I didn't, -- and I'll do a mea culpa if I didn't -- there is some of you who have been here before and know that it is my practice that you object during speeches in real-time, you don't wait, so that something can be

done about the harm, if there is a harm, at the time that the injury occurs. But go ahead.

MR. STEINBERG: Of course, we didn't know. We had to go and find this fellow in Costa Rica. We didn't know what he was going to say. We don't know him. He is a stranger to us. So we didn't know whether he was going to say, yes, I changed my opinion, I support that completely, or no, I don't know anything about that. We had no idea. They're going to argue this report.

THE COURT: Yes, and so are you.

MR. STEINBERG: His name is prominently on this report. It's on the sentence right on top of the sentence that they told the jury that was Eric Dowling's opinion, that was Eric Dowling's statement. He is the third expert. Not only is he independent but we hired him. That is prettypowerful.

THE COURT: I don't think they're going to make that argument.

MR. MANDIR: Your Honor, a point to be made is that they probably couldn't object because they didn't even know the facts until last Sunday. So the bottom line is I didn't know the facts. I didn't know it was ever going to come in. I had all the facts and all the witnesses for the trial, and here is the document. And I, almost verbatim, said what was in the document. And I think that is fair.

THE COURT: I had hoped that you would be able to agree. I'm going to have to rule. I believe that my preliminary instructions coupled with my final instructions will take care of this, and that is where we're going to leave it. I'm not going to agree, Mr. Johnson, to the proposed curative instruction, Mr. Steinberg.

MR. STEINBERG: Your Honor, what would they be permitted to say about this in closing?

THE COURT: Well, let's discuss that.

MR. MANDIR: Well, I think Mr. Johnson's comment was right on. I mean we haven't had a chance to cross-examine or do whatever, but given the declaration, and I don't know any other reason to doubt it, I can't say something that I now know, as an officer of the court.

THE COURT: Right.

MR. MANDIR: So I can characterize it another way: that EKMS sent this report and they got this and this is what it said certainly, and I won't mention -- and Eric Dowling was certainly somehow involved in the project but I don't have to attribute specifically to him.

MR. STEINBERG: Your Honor, I don't think --

THE COURT: You don't think Eric Dowling should be mentioned.

MR. STEINBERG: This is an ethical issue.

MR. MANDIR: Then you have to white him out.

THE COURT: Well, let's white him out. It does present a mixed question of ethics. And we have ethical attorneys here and so I'm not concerned that anybody is going to act unethically, but we can white that out.

MR. STEINBERG: I don't think they should be allowed to refer to Dr. Dowling.

THE COURT: Well, that is what we're saying. That is what they're agreeing to.

MR. STEINBERG: And white it out of the exhibit.

THE COURT: Is that what you --

MR. MANDIR: No, no, Your Honor. I was being --

THE COURT: Well, I don't think there should be a reference to Dowling.

MR. MANDIR: Okay. I don't have to reference him, but the document just says he was involved.

THE COURT: Could I see the document again?

MR. MANDIR: Yes.

MR. STEINBERG: Yes. And, Your Honor, if you will notice that particular paragraph, right before the language that they want to highlight, there is a reference to phone calls with Dr. Dowling.

(Document passed forward.)

THE COURT: Mr. Steinberg, I've been handed I think by Mr Reid, I'm looking at --

MR. MANDIR: DX-1610, Your Honor.

THE COURT: -- DX-1610. In the first page, it's the ETG summary report, 105. And you complain I think about the last paragraph, the first sentence; is that correct?

MR. STEINBERG: I believe so, Your Honor.

THE COURT: The only thing I see there is Eric Dowling, EKMS expert, took a look at the patent.

MR. STEINBERG: Correct.

THE COURT: That's it.

MR. STEINBERG: Yes, but then they're going to imply that he came to the conclusion listed below where it says an adverse -- where am I reading? Over the course of the two calls -- one of which you could imply would be with Dr. Dowling -- we worked through the language of the patent and found that the body of the patent included language adverse to interpretation of the claims.

THE COURT: Well, counsel just conceded he can't make that argument. Ethically, he just conceded that.

MR. MANDIR: Yes, Your Honor. I won't make that argument.

THE COURT: So they're not going to be able to. He is not desirous of making that argument. He is not going to be permitted to make that argument. He just conceded that. So what are you arguing about?

MR. STEINBERG: But he is going to argue this is the EKMS report to us.

MR. MANDIR: Of course it is.

MR. STEINBERG: Our response, which is also in the record, Your Honor, is another e-mail from Eric Dowling that says anyone who says it's not adaptive is a red-faced liar.

MR. MANDIR: You can make that argument, Mr. Steinberg.

THE COURT: I'm not really seeing the problem. Your last reference lost me.

MR. STEINBERG: Judge, the reason we have this -- and you can see the declaration of Dr. Dowling -- the only opinion Dr. Dowling actually gave is an e-mail from him. And the e-mail from him says, the bottom line is nobody but a red-faced liar could read these cites and say the '850 does not contemplate adaptive filtering. That is DX-1642.

THE COURT: Yes, I'm trying to find it. I have 1642. Oh, yes. Have you seen it?

MR. MANDIR: Yes, Your Honor. Well, I know the document.

THE COURT: Okay.

MR. MANDIR: But if you remember Mr. Chen's cross-examination, they put that in through Mr. Chen, 1642 and the red faced liar, and they gave the 1610. And Mr. Chen said, oh, if you look at the two together, what this means is somehow that, you know, adverse something -- it doesn't mean what it looks like it means. What they didn't put in and what Mr. Steinberg doesn't tell you is the document that I gave to Ms. Chen that had an e-mail from Mr. Boddie, the author of that ETG report that said we -- to ETG saying, hey, we took another look at this patent.

We, being Mr. Dowling, Dr. Dowling, Harry Levitt and I, we all looked at it and we looked at it much closer than we did before. That was in September. That e-mail that he just referred to was in July.

In September, they are now looking at it much closer and we're going to give you a report in a couple of days and it's going to have some mixed results, okay? So to say that is the only opinion of Dr. Dowling, we have an e-mail that references Dr. Dowling saying we all looked at it again much closer and we have some mixed results and that is the results they got.

MR. STEINBERG: And so lies the problem because we have the declaration of Dr. Dowling that says I agree with the statement in DX-1642 that the bottom line is "nobody but a red-faced liar could read those cites and say the '850 does not contemplate adaptive filtering. I have never changed my view in this regard." And they're going to imply he did.

MR. MANDIR: Well, first of all, what he just said, if it's adaptive filtering, we would agree with him because as we've heard, the patents talk about adaptive filtering in a context different than acoustic feedback. So if you look at that July 24th e-mail, which we went through with Dr. Morley and I think others, you know, we say everyone that he says there is adaptive filtering but not acoustic feedback. So what we surmise is when they had this later really looking into it, he realized oh, well, all these different citations I gave you about adaptive, they are adaptive but not for acoustic feedback, and then they realized that and they gave the report and the report specifically talks about no adaptive feature for acoustic feedback.

MR. STEINBERG: Your Honor, the declaration doesn't talk about the other functions of this hearing aid like noise and so forth.

THE COURT: Well, you just uncovered that in a declaration. What is it that you would want to argue to the jury?

MR. MANDIR: Your Honor, I want to be able to read the document to them, point to paragraphs. I won't say anything that attributes it to Dr. Dowling. They can read it themselves. I'll just read it. And they can decide. I won't say one word about it.

THE COURT: I think that is the way to handle this. Let the decider of fact decide the facts. Why are you trying to run away from this? I think I know why you are trying to run away from this, but ...

MR. STEINBERG: Your Honor, they're going to imply that Dr. Dowling did change his mind.

MR. MANDIR: No.

THE COURT: No, no.

MR. MANDIR: I can't show what I'm going to say.

THE COURT: Yes, I'm not going to make you do that. But, no, I think we've now had a good discussion and counsel understand the parameters of the conversation that I will permit on this subject with the jury. I don't think we're going to have a problem. If we have a problem, Mr. Steinberg, in real-time, you pop up and let's go to sidebar.

MR. STEINBERG: Fine, Your Honor.

## February 1, 2008 (Trial - Day 10)

- Defense counsel makes the following statements during closing arguments:

<u>Tr. at 2179:20-2180:8:</u>

November 8th, a week later, very timely, there is a -- by the way, that November 1st letter, if you are interested, is 1608. November 8th letter is from -- there is no person's name on it. But there is an indication on that that it's from, there is initials, and you may recall that Ms. Eckstein talked to you, used it in connection with Mr. Chen's deposition. And that's Eric Dowling. You may remember Dr. Dowling, his initials are at the top of that, and it's kinds of an initial look at that. And, in fact, both the patents here, the '749 and '850, doesn't compare any products at the time, but this memo indicates that perhaps, you know, there is some possibilities here. And it says both with respect to the '850 and the '749, we got to look at this a little bit more.

<u>Tr. at 2181:9-2182:12:</u>

Next e-mail is one of July 24th. This is the red-faced liar e-mail. Can we pull this up.

This is an e-mail from Dr. Dowling. It's 1642. And I think you have seen this before. Towards the bottom, it says, the bottom line is, Nobody but a red-faced liar could read these cites and say the '850 does not contemplate adaptive filtering.

Now, it is significant, it doesn't say adaptive filtering for feedback cancellation. It just says adaptive filtering. And as Dr. Morley testified, it does talk about adaptive filtering, not in connection with feedback cancellation, but the patent does.

Now, what is the first claim that Dr. Dowling is referring to? Claim 5. I specifically asked Dr. Morley about Claim 5, and asked him, did Claim 5, does that have anything to do with feedback cancellation? He says, not. And I also asked him -- and you know, ETG has not even asserted Claim 5 in this case. Yet that is the first claim, that is the first citation that Dr. Dowling gives you.

Then it goes on, and there is some more citations to the patent. And you have heard all of that. Dr. Morley went through every one of them, and has concluded that the patent does not talk about adaptive filtering for purposes of canceling feedback.

As we see what Dr. Dowling says, he said, it's not clear, what he is saying there, but he is talking about adaptive filtering.

<u>Tr. at 2183:20-24:</u>

As we see here, they also mention Eric, Dr. Dowling, and he is of the opinion that, you know, this Sound ID, who says it's static, they are wrong. Dr. Levitt is coming back. Sometime after August 9th we are going to talk to him, and we will see what happens.

Tr. at 2185:13-15:

Next paragraph, this is the conclusion. Eric Dowling, the EKMS expert, took a look at the patent while EKMS arranged a second call with Harry Levitt --

- During Defendants' closing argument, the following discussion occurred at sidebar:

Tr. at 2185:20-2188:23:

MR. STEINBERG: Again, he is implying that Eric Dowling changed his opinion, and the next sentence says it's adverse to what the declaration that we have says.

MR. MANDIR: He can read the document, can't he?

MR. STEINBERG: What he is doing is exactly what the declaration says.

MR. MANDIR: That is not true.

MR. STEINBERG: Dr. Dowling didn't do that. He has gone through this series of things saying Dr. Dowling came to his opinion. Then there was a further review. There was a change of mind. Here is the result. The first sentence says Dr. Dowling and Dr. Levitt were consulting. The second sentence says there was a change in result. There was no --

THE COURT: I am not going to let you imply that which we have agreed you should not.

MR. MANDIR: I agree, Your Honor. I thought I have been very careful -- I can read the document, can't I?

THE COURT: Perhaps. But I think you need to be mindful of our discussion yesterday and Mr. Steinberg's legitimate concerns in this regard and should be your legitimate concerns as an officer of this Court. I am not going to highlight it. I am not going to say anything else about it. I think you would be mistaken to ask me. It would be your right. But I don't think I am going to accede to it.

MR. STEINBERG: It will require me to respond to say Dr. Dowling never changed his mind. There is no evidence of that. We should put the declaration into evidence, for crying out loud, at this point.

THE COURT: I don't know if it is as exactly clear in the jury's mind as you think it is. I would leave it alone, if I were you. You respond how you want to respond. But at this point I am going to leave it where it rests. I think everybody understands what we talked about.

MR. MANDIR: Absolutely. Just to be clear, I can certainly read the document that is in evidence.

MR. STEINBERG: Your Honor, this timeline that he just went through, the whole intent of it is to start with Dr. Dowling's opinion, which, by the way, is not limited to the sound, his opinion deals with feedback and says its adaptive. He just didn't read the second page.

Nevertheless, he says Dr. Dowling has this opinion. Then he puts up an e-mail that says they are looking at it further, they are thinking about changing their mind. Now he is at the report. And the first sentence says --

THE COURT: I think the point is well-taken. That's not fair.

MR. MANDIR: I mean, I thought --

THE COURT: I will let you respond. I don't know exactly --

MR. STEINBERG: I don't think they should go any further, Your Honor.

THE COURT: I really don't. You need to move on to another area. I am not sure that I am comfortable that   you have exactly figured out how to do this and stay within the spirit of what I have directed be done. I am not accusing you of doing anything intentional. I am just concerned that damage may be done that may be irreversible.

MR. MANDIR: To tell you the truth, I have been very mindful of this. Look, EKMS came up with that decision, that report. It doesn't mean Eric Dowling came up with that position. But there is no doubt EKMS, and I have never said --

THE COURT: Essentially, what I would like to do is have that acknowledged, there needs to be -- and it is a tough line to not cross, I understand.

MR. ROMARY: Can we say something like we are not saying that Eric Dowling changed his mind?

THE COURT: That is fine.

MR. MANDIR: I will say that.

THE COURT: I think that would -- I think that would satisfy my concern.

MR. STEINBERG: But no more tie-in after that.

MR. MANDIR: I am just going to read the document.

THE COURT: If you would say that, that's fine.

(End of sidebar conference.)

- Defense counsel makes the following statements during closing arguments:

Tr. at 2189:1-14:

Okay. So we were reading Eric Dowling, the EKMS expert, took a look at the patent while EKMS arranged a second call with Harry Levitt for early August. Over the course of two calls, we worked through the language of the patent and found that the body of the patent included language adverse to an interpretation of the claims involving a continuously adaptive approach.

Now, I don't know exactly how that came about. I don't know how it came about. All I know is this EKMS document says it and this was given to Audimax. They're saying that they looked at it and EKMS is coming to the conclusion that they interpret the claims -- EKMS interprets these claims to be something adverse to interpretation that would involve a continuously adaptive approach.

- Before ETG's rebuttal closing argument, the following discussion occurred at sidebar:

MR. STEINBERG: I apologize, Judge. But Mr. Mandir, under what you told Mr. Mandir to do, was supposed to tell the jury that there was no evidence that Eric Dowling --

THE COURT: You tell them and you tell them the other side doesn't disagree with you, because he didn't. And I observed it.

You didn't say anything about it.

MR. MANDIR: I know, you are right. When I said EKMS --

MR. STEINBERG: For the record, we would move for the introduction of Eric Dowling's declaration, because we think we have been unfairly prejudiced.

THE COURT: I will agree.

(End of sidebar conference.)

- 19 -

- During ETG's rebuttal ETG made the following response:

Tr. at 2205:10-2206:15:

Let's talk about EKMS. Mr. Romary referred to an undated summary report which he had for you by a company called EKMS.

They didn't present any witness from that company to testify. Why? Because Eric Dowling, the expert, who opined, the independent expert, who opined on Dr. Levitt's patent, wrote a specific report -- hopefully we can get it on the screen -- the red-faced liar, and here we will see it, of course, it says, in the second line from the top, The ETG filter can be adaptive, below are cites from the patent, and so forth. We cut and paste.

Then it goes down a little bit lower, and it says, The bottom line is nobody but a red-faced liar could read these cites and say the '850 does not contemplate adaptive filtering. On the contrary, it is spelled out in certain claims and objects of the invention and is disclosed in the spec in several places.

Then counsel showed you just one, just one of the areas where Dr. Dowling opined it was adaptive. And that was on the first page.

If you turn over to the second page, he opines that the feedback cancellation was adaptive. He never changed his mind. And you will be presented with a declaration of Dr. Eric Dowling as evidence that he then held the opinion that the '850 patent was adaptive. He still holds the opinion that the '850 patent is adaptive. And that declaration will be before you in the jury room. And you will get to see directly what Dr. Dowling has to say. You won't have to depend on me or defendants' counsel. He filed a declaration. You will get to read it. And it supports our infringement case 100 percent.