Exhibit 34

GERMAN FEDERAL CARTEL OFFICE
3rd Decision Division



FOR PUBLICATION

Case No.: B 3 – 33101 - Fa – 578/06

**Merger Control Proceedings**
**Order pursuant to Section 40 paragraph 2 GWB**

<u>**Decision**</u>

In the administrative proceedings

1. of Phonak Holding AG, Stäfa, Switzerland;

Party 1.,

-     Authorized Counsel:
  Attorneys Gleiss Lutz; Maybachstraße 6; 70469 Stuttgart,

2. of GN ReSound A/S, Ballerup, Denmark,

3. of GN ReSound GmbH Hörtechnologie, Münster, and

4. of GN US Holdings Inc., MN, USA

Parties 2.-4.,

-     Authorized Counsel:
  Attorneys Hengeler Mueller, Bockenheimer Landstraße 24,
  60323 Frankfurt am Main,

5. of GN Store Nord A/S, Ballerup, Denmark

Party 5.,

-     Authorized Counsel:
  Attorneys Hengeler Mueller, Bockenheimer Landstraße 24,
  60323 Frankfurt am Main

6. of Siemens AG, Munich;

Summoned Party,

on account of a review of a proposed concentration pursuant to Section 36 paragraph 1 of
the Law Against Restraints on Competition (GWB), the 3rd Decision Division of the German
Federal Cartel Office decided on April 11, 2007:



EXHIBIT
PX 648

1.    The proposal of Party 1., registered by attorney's letter of December 13, 2006, to acquire the shares in and control over the Parties 2.- 4., is prohibited.

2.    The fee for this decision, crediting the fee of EUR [...] to be determined separately for the registration of the concentration, is set at

EUR [...]

[...]

and is imposed on Party 1.

### A.    Reasons

### I.    Proposed Concentration and Process

(1)    By attorney's letter of November 8, 2006, received here on November 10, 2006, Phonak Holding AG, Stäfa, Switzerland (hereinafter Phonak) registered the proposal to acquire the companies GN ReSound A/S, Ballerup, Denmark, GN ReSound GmbH Hörtechnologie, Münster, and GN US Holdings Inc., MN, USA, from GN Store Nord A/S, Ballerup, Denmark. The companies to be acquired (hereinafter GN ReSound) currently constitute the hearing aids business area of GN Nord A/S. They are active in the development, production, and distribution of hearing aids, of hearing-aid accessories, and of audiological diagnostic devices. After the registration was withdrawn in the meantime, Phonak registered the proposal again on December 13, 2006. The Decision Division had announced before that it intended to further determine the market structures and competitive processes on the markets affected by the proposal and, if applicable, initiate the main review process pursuant to Section 40 paragraph 1 GWB.

(2)    Based on the results of the investigation carried out after the renewed registration, the Decision Division notified Phonak's authorized counsel and recipient of service, by letter of January 12, 2007 served on January 13, 2007, of the commencement of the main review process (Section 40 paragraph 1 GWB). As of that time, the latter was also the party authorized to accept service for the seller and the companies to be acquired.

(3)    A meeting between the Decision Division and representatives of Phonak was held in the Federal Cartel Office on December 18, 2006. During the meeting, primarily questions of factual and regional market differentiation and the potential market effects of the proposal were discussed.

MOJ00000243

(4)     In addition to written requests for information, the Decision Division also held discussions with other manufacturers of hearing aids regarding the market structures and the competitive situation for hearing aids. In this context, an on-site questioning of and visit to the development department was carried out on February 22, 2007, at Siemens Audiologische Technik GmbH (hereinafter SAT) during the course of the investigations. On March 6, 2007, the Decision Division held a discussion with the hearing aid manufacturer Oticon in the Federal Cartel Office.

(5)     By letter of March 2, 2007, the seller, GN Store Nord A/S, Ballerup, Denmark, appointed an attorney as its authorized counsel and recipient of service. The latter is also authorized to accept service on behalf of the companies to be acquired (e-mail of March 21, 2007).

(6)     By letter of March 9, 2007, Siemens AG, Munich, requested to be summoned to the proceedings pursuant to Section 54 paragraph 2 No. 3 GWB. This request was granted by decision of March 22, 2007.

(7)     On March 19, 2007, the Decision Division held a discussion with representatives of Phonak, GN Store Nord A/S, and the target companies. During this discussion, the competitive concerns were explained in detail to the companies involved.

(8)     By deficiency notification letter of March 22, 2007, the Decision Division notified the participants regarding the reasons for the intended prohibition of the concentration. The participant Phonak inspected the files and through its authorized counsel made written comment regarding the concentration, its competitive effects, and the intended prohibition. It is Phonak's belief that the concentration could in no way lead to the creation or strengthening of a market-dominating position. The authorized counsel of GN Store Nord A/S also espoused this opinion in writing, but did not comment substantively on the findings of fact made and considerations offered by the Decision Division in the deficiency notification. Referring to the alleged determination of the Decision Division to prohibit, GN Store Nord A/S waived any comment on the deficiency notification in the context of fair hearing and announced it would contest the anticipated prohibition order before the Upper State Court (OLG) Düsseldorf.

(9)     The Decision Division informed the Swiss and the Danish competition authorities about the deficiency notification letter. The State Cartel Office of the State of Nordrhein-Westfalen was granted the opportunity to comment; it did not express an opinion.

(10)    In order to avert the impending prohibition of the concentration and a lawsuit consequent thereupon, Phonak, a party to the concentration, by letter of March 20, 2007 has submitted proposals for conditions. In its opinion, based on principles of

proportionality under constitutional and international law, the German Federal Cartel Office is obligated to accept these commitments and to clear the proposal subject to corresponding conditions. GN Store Nord A/S has endorsed these proposals by letter of March 21, 2007, at the same time denying the causality of the proposed concentration for a change of the competitive situation in Germany. The proposed commitments were discussed with the parties to the concentration in a meeting on March 30, 2007. The Decision Division signaled to the parties to the concentration during this discussion that it does not consider the proposals adequate to dispose of the competitive concerns against the concentration. Thereupon, the participants to the concentration declared material parts of the proposed commitments to be business secrets and refused to have a market test conducted.

II.    **Companies Involved**

(11)    Phonak acts as a holding company having no business activity of its own. Under the brands Phonak and Unitron Hearing, its subsidiaries develop, manufacture, and distribute hearing aids as well as accessories for hearing aids (mainly wireless signal transmitters, so-called "FM-devices"). In Germany, Phonak is active via Phonak GmbH, Fellbach-Oeffingen, and Unitron Hearing GmbH, Fellbach-Oeffingen. Both companies are distribution companies for hearing aids and accessories and carry out hearing aid adjustments and repairs.

(12)    In the financial year 2005/2006, Phonak's consolidated sales revenues amounted to EUR 559.2 million, of which EUR [200-250] million in the Member States of the European Union and approximately EUR [30-80] million in Germany. Sales revenues for hearing aids in Germany amounted to EUR [30-80] million, while sales of FM-devices amounted to approximately EUR [>0-10] million. The remaining sales were generated with accessories for hearing aids (cleaning and care products, batteries, remote controls, etc.), spare parts, and other services.

(13)    **GN ReSound** manufactures and distributes hearing aids and audiological diagnostic devices. The company has acquired a number of competitors over the last few years. These include Danavox, ReSound, Beltone, Viennatone, Philips, and Interton. GN ReSound today offers hearing aids in Germany under the brands GN ReSound, Beltone, and Interton. The subsidiary GN Otometrics is active in the area of audiological diagnostic devices. 3M sold its hearing aid business in 1996 to GN ReSound. GN ReSound integrated the hearing aid business, then known under the name Sonar, and sold the patent portfolio to the company Hearing Instrument Manufacturers Patent Partnership, Vaerlose, Denmark (hereinafter HIMPP). Both GN ReSound and Phonak and all other well-known manufacturers of hearing aids are shareholders of HIMPP and make use of intellectual property rights held by HIMPP (on the significance of HIMPP, see margin number 168 *et seq.*, margin number 202 *et*

*seq.*, below).

(14)   With GN ReSound, Phonak would acquire the following companies in Germany:
   • GN Hearing GmbH, Münster (distribution of hearing aids in Germany),
   • GN Otometrics GmbH & Co. KG (distribution von audiological diagnostic devices in Germany) and its general partner GN Otometrics Verwaltungs-GmbH, Münster,
   • GN Otometrics Holding GmbH, Münster (holding company),
   • Auditdata GmbH, Münster (currently inactive),
   • GN ReSound GmbH Hörtechnologie, Münster (holding company),
   • Interton Electronic hearing aids GmbH, Bergisch Gladbach (production and distribution of hearing aids),
   • Eraton Hörgeräte GmbH, Bergisch Gladbach (currently inactive).

(15)   During the 2005 financial year, GN ReSound generated total sales von EUR 450.4 million, of which EUR [150-200] million in Member States of the European Union and EUR [>0-50] million in Germany. Sales revenues for hearing aids in Germany amounted to EUR [>0-50] million, while sales of audiological diagnostic devices amounted to EUR [>0-10 million]. The remaining sales were generated by accessories for hearing aids (cleaning and care products, batteries, remote controls, etc.), spare parts, and other services.

(16)   The summoned **Siemens AG** is the parent company of a corporate group globally active, inter alia, in electronics and electrical engineering. In the area of hearing aids, Siemens is active via its subsidiary Siemens Audiologische Technik GmbH, Erlangen, and offers hearing aids under the brands Siemens, Audio Service, and Hansaton. In addition, it offers audiological measuring devices. Global total sales of Siemens AG in financial year 2005/2006 amounted to approximately EUR 87 billion.

## III.   Formal Review

(17)   The proposed concentration fulfills the factual prerequisites for a concentration under Section 37 paragraph 1 No. 3 lit. a) GWB (share acquisition) as well as of Section 37 paragraph 1 No. 2 GWB (acquisition of control).

(18)   The proposal has no EU-wide significance within the meaning of the European Regulation on Control of Concentrations, since the threshold values in Article 1, par. 2 and 3 of the Control of Concentrations Regulation will not be reached for the participating companies.

(19)   The effects of the intended concentration come within the scope of the GWB (Section 130 paragraph 2 GWB). Both participants in the concentration obtain sales revenues in Germany and have sites here.

(20)    The GWB's provisions regarding the control of concentrations are applicable pursuant to Section 35 paragraph 1 GWB. The proposal is subject to registration and control, since the sales thresholds of Section 35 paragraph 1 No. 1 and No. 2 GWB are being exceeded and the factual prerequisites for an exemption under Section 35 paragraph 2 GWB are not present.

## IV.    Substantive Prerequisites for Prohibition

(21)    Under Section 36 paragraph 1 GWB, a concentration expected to create or strengthen a position of market dominance is to be prohibited by the German Federal Cartel Office unless the participating companies show that improvements to competitive conditions also come about as a result of the concentration and that these improvements outweigh the disadvantages of the market domination.

(22)    The proposed concentration meets the prerequisites for prohibition of GWB Section 36 paragraph 1, clause 1, since it is expected to cause a market-dominating oligopoly on the market for production and distribution of hearing aids through the hearing aids/acoustician retail market. Indications of predominant improvements are being made in competitive conditions that outweigh the disadvantages of market dominance have neither thus far been proposed, nor are they otherwise obvious.

## 1.    Prohibition Order Not Barred by Law of Higher Rank

(23)    The participants in the concentration believe that the German Federal Cartel Office, for reasons of international law, has no authority in this case to make the prohibition. In their view, the principle of effects would contain not just a legitimation for the use of German law but a limitation as well. It would stay within the non-interference prohibition, hierarchically superior under German Federal Constitution Article 25, only if the application of domestic law and measures stemming therefrom were limited to such effects in Germany. Were the proposed concentration not divisible into a domestic and a foreign portion, authority for the prohibition, they argue, would be lacking for the case as a whole.[1]

(24)    The participants in the concentration have additionally submitted that the target company has merely achieved under [>0-10%] of its worldwide sales in Germany. In all other jurisdictions, the proposal is either not required to be registered or – insofar as the relevant concentration control regime provides for clearance as a prerequisite to implementation – has already been cleared. In the instant case, they argue, the focus of the concentration clearly does not lie in Germany. Hence, no authority to prohibit the entire concentration exists.

---

[1] Most recently: Comment on Deficiency Notification Letter, p. 26 *et seq.*

(25)    In the view of the Decision Division, the factual prerequisites of Section 36 paragraph 1 GWB are present. The domestic effect of the proposal (Section 130 paragraph 2 GWB) indisputably exists, even if the proposed concentration is brought about abroad. As a mandatory decision, the legal consequence ordered by statute, prohibition of the concentration, is not placed within the discretion of the Decision Division. There is also no room for any consideration whereby the possible national interest in prohibition was to be given a lower value than the non-intervention prohibition of international law.

(26)    Prohibition of the concentration violates neither general rules of international law (German Federal Constitution Article 25), nor does it disproportionately trench upon constitutionally guaranteed legal positions occupied by the participants in the concentration.

(27)    Among the fundamental principles of international law is the prohibition of abusive practices or intervention as well as the principle of effects. Whether, under constitutional rules, a limitation of the prohibition to an identifiable domestic portion would be in order for divisible concentrations need not be addressed here, since the concentration is not geographically divisible in this way. But if the concentration is not divisible, the doubtless prevailing opinion assumes that there is general authority to prohibit the concentration as a whole so as to effectuate the goals of Section 36 paragraph 1 GWB.[2]

(28)    Domestically, Phonak and GN ReSound maintain primarily distribution facilities for foreign product development and production sites. A limitation of the prohibition order to the domestic effects would be ineffective here based on indeterminacy. Thus, Phonak's hearing aid business area is chiefly, and that of GN ReSound, the company to be acquired, exclusively active in Germany in distribution. Only GN ReSound's subsidiary Interton has domestic production facilities as well. In addition, a sensible split of GN ReSound's competitive potential by separating out a fundamentally non-productive hearing aid business of GN ReSound appears impossible for the following reasons:

•    GN ReSound's business potential in Germany is not fundamentally determined by the Interton subsidiary. Interton hearing aids account for only 20-25% of GN ReSound's domestic sales of hearing aids.

---

[2] *Stadler* in Langen/Bunte, Section 130 margin number 192; *Rehbinder* in Immenga/Mestmäcker, Section 130 paragraph 2 margin number 193 *et seq.* with ref. to BKartA *[German Federal Cartel Office]* 4.15. 1992, WuW/E 2521, 2524 – Gearwheel factor Friedrichshafen/Allison; BKartA 7.23. 1992, AG 1992, 363, 367 – Gilette/Wilkinson; Meesen, ZHR 143 (1979), 281; same author, Kollisionsrecht *[Conflict of Laws]*, p. 17 *et seq.*; Beck p. 116; Harms in GK Einl. Zus-Kontrolle *[Intro. to Control of Combinations]* margin number 154, Schnyder p. 380 *et seq.*

- A split-off of GN ReSound's domestic distribution activities would also not lead to a separation of the competitive potential lying behind GN ReSound because the core business potential lies not in distribution but in product development and production, in its available patent and product portfolio and in the strategic brand positioning of the parent corporate group.

(29)    Already to that extent, the effects on the territory of the Federal Republic of Germany are an objectively required point of involvement within the meaning of international law. Here, the concentration leads to considerable additions of market share in the product market affected and to the rise of a market-dominating oligopoly.

(30)    The participants in the concentration achieved joint domestic sales revenues of [70-100 million EUR]. Measured against sales revenues in the EU, these amount to approximately 20 %. In addition, Germany – as measured by sales revenues – is the second largest hearing aid market in the world. Consequently, the economic focus of the concentration – with respect to Europe – unequivocally lies in Germany. Just for that reason it is not obvious that the domestic interest in the concentration outweighs the interest of, *e.g.*, the countries in which the participants in the concentration have their headquarters (Switzerland, Denmark). The balancing of interests yields a significant interest of Germany. as the second largest hearing aid market in the world, in fending off dangers to its domestic competitive structure, an interest to which no other weighty national interests stand opposed.

(31)    Nor may the applicability of domestic merger controls be made dependent on the vagaries of choice of domicile or the scope of the business activities of these companies. In a globalized world, companies that must report concentrations due to their exceeding GWB § 35's threshold values will as a rule have both sites and also significant sales in many countries of Europe and the world. Were applicability of the GWB to be prevented by the fact that Phonak has its headquarters in Switzerland or that the participating companies market their hearing aids worldwide, companies would always be able to use international law as an instrument to block the use of national competition rules. The result would then be that no domestic possibilities would any longer exist for implementation of competition law. But since, except for EU law, there is no supra-national law of competition, companies like Phonak and GN ReSound would be largely exempted from the effective application of competition law.

(32)    The prohibition of the concentration does not trench upon constitutionally guaranteed legal positions occupied by the participants in the concentration (German Federal Constitution Article 2 paragraph 1, Article 12 paragraph 1, Article 1 paragraph 1).

- Under Article 19 paragraph 3 of the Federal Constitution, those rights granted to natural persons are available to legal persons as well, insofar as by their

nature they are applicable to the latter. Hence, legal persons too may possess the fundamental right to general freedom of action (Constitution, Article 2, paragraph 1), professional freedom (Constitution, Article 12, paragraph 1) and the fundamental right of property (Constitution, Article 14, paragraph 1). But by virtue of an express constitutional rule, the expansion of fundamental rights extends only to domestic legal persons (BVerfGE *[Decision of the Federal Constitutional Court]* 21, 207, 208). This is inapplicable in the person of the two participants in the concentration, the headquarters of which are respectively located in Switzerland or Denmark. The fundamental right to professional freedom, pursuant to Constitution Article 12, paragraph 1, is in any event only available to Germans.

- The decision to prohibit the concentration would also not violate the fundamental rights of the participants therein even if one were to assume in their favor that the relevant freedom rights of Article 2 paragraph 1, 12 paragraph 1 and 14 paragraph 1 of the Constitution were available to them. Section 36 GWB, when applied to the concentration in a manner corresponding to the principle of proportionality, limits the fundamental property right of Constitution Article 14 paragraph 1 as a content and boundary-line provision and simultaneously limits, in a constitutional manner, the fundamental right to professional freedom and the catch-all fundamental right of general freedom of action stemming from Article 2 paragraph 1 of the Constitution.

(33) Consequently, prohibition of the combination is not unreasonable overall and is in accord with the principle of the rule of law (Constitution, Article 20, paragraph 3). The prohibition is appropriate, necessary and commensurate as an exceptional legal measure for protecting against the concretely impending threat of the creation of a position of market dominance. No milder measure for warding off the threat is apparent. In particular, an economically sensible splitting off of a German portion of the combination is not possible, since in Germany it is almost exclusively distribution facilities which are to be found.

## 2. Determinations

(34) The evaluation of the proposed concentration under competition law is essentially based on data from the participating companies as well as on the results of the surveying (in part several times) of well-known manufacturers of hearing aids with their headquarters or with agencies in Germany. These companies are: SAT, Germany; William Demant, with its subsidiaries Oticon and Bernafon (hereinafter Oticon), Denmark; Widex, Denmark; Starkey, USA; Sonic, USA; Acousiticon, Germany; auric, Germany, Audifon, Germany, and bruckhoff, Germany.

(35)    In addition, the 17 largest hearing aid acousticians or purchasing cooperatives of hearing aids acousticians were also surveyed about their procurement behavior and the competitive conditions in the demand for hearing aids.

(36)    In addition, the Decision Division questioned the Electrotechnical and Electronics Industry Central Association *[Zentralverband Elektrotechnik- und Elektrotechnikindustrie e. V]* (ZVEI) regarding the reporting system installed in ZVEI's "Electromedical Technology" trade association for sales, manufacturers' selling prices and other internal company data of hearing aid manufacturers.

### 3.    Substantive Market Demarcation

(37)    Under the "relevant market" principle *[Bedarfsmarktprinzip]*, products belong to one and the same substantive (supply) market if, in the view of an average knowledgeable buyer, they are interchangeable without more as regards their qualities, prices and anticipated purposes of use, because they are suitable for satisfying the same requirement. Goods or services functionally interchangeable in this manner are market equivalents and together constitute a substantively relevant market.[3]

(38)    In market demarcation, the Decision Division also looks at the perspective of the full product range or, as the case may be, the flexibility in adjustment of production. In doing so, the substantively relevant market is demarcated by product groups covering a standardized requirement and for the development and production of which comparable development and production know-how and similar production facilities may be applied (BGH WuW/E DE-R 1501, 1502 – motor vehicle clutches).

(39)    The result of the determinations is that the proposal relates to the domestic product market for production and distribution of hearing aids for the hearing aid - acoustician retail market.

### 3.1    General Product and Market Information

### 3.1.1    Loss of Hearing and Hearing Aids

(40)    The **human ear** is a complicated system, consisting of (a) the outer ear (auricle, outer auditory canal), (b) the middle ear (eardrum, ossicles – malleus, incus, stapes –) and (c) inner ear (cochlea, semi-circular canals of the organ of equilibrium, auditory and equilibrium nerve). The acoustic signals that come to the ear from the outside are air

---

[3] For case law, *see* BGH [German Federal Supreme Court], WuW/E DE-R 1087, 1091 - fire brigade equipment; OLG Düsseldorf, WuW/E DE-R 1148, 1152 – trans-o-flex; both with additional references.

vibrations. These vibrations, in the form of sound waves, hit the eardrum through the auricle and the auditory canal. There, the vibrations are strengthened and carried further over the ossicles. They finally reach the inner ear. Here, there are up to 20,000 highly sensitive sensory cells (so-called "hair cells") The hair cells are stimulated differently depending on the intensity and wavelength of the vibrations. The vibrations are converted into bioelectric impulses and relayed over the auditory nerve to the hearing center in the brain. Through decoding, conversion and interpretation, the acoustic signals are finally heard and understood as, *e.g.*, speech, music or street noise.

(41)   **Hearing loss** has a series of causes. Thus, in old age, the functioning of the hair cells may deteriorate (*age related hearing loss*). As a rule, higher pitches are more seriously affected hereby than lower ones. Background noises and especially loud tones are often disturbing for those affected by this condition.

(42)   The transfer of sound across the eardrum and the auditory ossicles may also be disturbed (*sound conduction hearing loss*). Causes are, for example, adhesions, eardrum injuries or inflammatory processes. Those affected by this condition hear all signals more softly than those with normal hearing.

(43)   Hearing loss may arise from exposure to noise in everyday life and on the job (loud work environment, concerts, earphones, etc.). Young people as well are increasingly affected by this. Through steady damage to the auditory cochlea, at first it is primarily the higher frequencies that are more poorly perceived, and later the middle tones as well.

(44)   Additional hearing impairments are sudden acute hearing loss and tinnitus, *inter alia*.[4]

(45)   **Hearing aids** are electronic devices which improve the hearing function for the hard of hearing by strengthening the incoming acoustic signals. Here, the interactions between hearing aid technology and auditory impression - e.g. the filtering out of "necessary" signals, improvement of speech comprehensibility and auditory comfort in difficult hearing situation - is a sphere in which *audiology* carries out its work.

(46)   Hearing aids basically consist of the following components:

- One or more microphones that capture the incoming acoustic signals and convert them into electrical signals,
- an analog or digital amplifier that strengthens and processes these signals,

---

[4] Further information can be found on the home pages of numerous hearing aid manufacturers and hearing aid acousticians, e.g., www.gerland-bielefeld.de.

- a loudspeaker (= earpiece) that converts the electrical signals back into sound and emits them into the ear, and
- batteries that supply power to the system

### 3.1.2 Analog and Digital Hearing Aids

(47)  As a technical matter, the product market for hearing aids can be subdivided into (a) digital, (b) digitally programmable analog and (c) analogue hearing aids.

(a)  **Analog hearing aids** have analog signal processing and a mechanical calibration of the hearing aid by controls attached to the hearing aid, mostly through so-called "trimmers" (e.g., calibration of volume). Analog microprocessors as a rule do not allow for any complex signal processing, but are basically limited to purely acoustical strengthening of the environment.

(b)  With **digitally programmable analog hearing aids**, signal processing is analog, while the calibration of the device takes place through a PC programming interface. The advantage *vis-à-vis* (non-digitally-programmable) analog hearing aids lies in the fact that the calibration of the hearing aid is not limited to controls externally attached to the device. Thus, for example, volume adjustments may be made at different frequencies. But since an analog technology is involved, no language recognition and background noise suppression can take place.

(c)  **Digital hearing aids** have digital signal processing, and may be digitally calibrated by PC. Along with automatic volume controls and hearing aid program selection, this technology permits background noise and speech recognition. Digital hearing systems can ascertain and suppress background noises, so as not to strengthen them along with speech or music. It is thus possible to precisely adjust the hearing aid to the client's individual hearing loss and life circumstances.

(48)  The core of a digital hearing aid is made up of integrated circuits (chips). They control the signal processing. These chips are tiny and process several million transactions per second. On the chips are installed so-called adjustment algorithms which define the digital signal conduction and establish the performance spectrum of the hearing aid in question. Well-known manufacturers use either so-called DSP-Chips or ASIC-Chips. These are mainly distinguished with regard to the programmability technology of the adjustment algorithms (*e.g.*, new functions and programs), but according to the findings of the Decision Division are equivalent as regards their range of application and performance.

(49)   For precise and prompt adjustment of hearing aids to the amplification needs of those with hearing loss, hearing aid acousticians employ so-called **adjustment software**. This is made available to them, at no cost, by the hearing aid manufacturer in question.

(50)   In Germany in 2006, digital hearing aids dominated the market, with a more than 90% share of market volume. The specific breakdown by volume and amount among digital, digitally programmable analog and analog hearing aids can be seen in the following Table[5]:

**Table 1: Market Weight of Digital and Analog Hearing Aids**

|  | Volume | | Amount | |
|---|---|---|---|---|
|  | No. of items | % | in TEUR | % |
| Total hearing aids | 650,484 | 100.0% | 193,521 | 100.0% |
| of which: | | | | |
| Total digital hearing aids | 589,528 | 90.6% | 187,530 | 96.9% |
| Total analog hearing aids | 60,413 | 9.3% | 5,991 | 3.1% |
| of which: | | | | |
| Digitally programmable | 35,613 | 5.5% | | |
| Analog | 24,800 | 3.8% | | |

### 3.1.3   In-the-Ear Devices ("ITE") and Behind-the-Ear Devices("BTE")

(51)   With **ITE ("in-the-ear") hearing aids**, the electronics (either completely digital, digitally programmable analog or analog) are built into the ear adjuster piece sitting in the ear. The ear adjustment piece is also called an otoplastic. It is made individually by the manufacturer depending on the wearer's size. For this purpose, the hearing aid acoustician prepares a cast of the auricle and attaches this to an order for an ITE device. Three types can be distinguished:

- Concha devices fill up the entire auricle and are also suited to even greater hearing strength.
- Auditory canal devices sit in the forward portion of the auditory canal and are suitable for medium hearing losses.
- CIC devices are worn deep in the auditory canal and are miniature devices which can be drawn out of the auditory canal, as need be, by means of a small thread. They can be used with slight to medium hearing losses and not overly narrow auditory canals.

---

[5] The data is based on the ZVEI's sector statistics (see also margin number 75 *et seq.*).

(52)  With **BTE ("behind-the-ear") hearing aids,** the hearing aid is integrated into a case that is worn behind the ear. The ear adjuster piece in the ear makes sure that the hearing aid has the proper settings. Since the electronics are in the hearing aid worn behind the ear, the ear adjuster piece is fundamentally smaller than is the otoplastic with ITE-hearing aids. A thin plastic tube conducts the sound from the hearing aid into the ear adjuster piece.

(53)  Based on their open manner of construction, hearing comfort with BTE devices is fundamentally higher than with ITE devices (see also below, *Excursus on: "open feed-in"*). In addition, BTE-hearing aids are becoming increasingly smaller and are "disappearing" behind the ear, such that the ITE devices' advantages in this regard are increasingly being eliminated by product developments with BTE hearing aids.

(54)  In Germany, the market volume share of the BTE-hearing aids is over 90%. The specific breakdown by volume and amount between BTE and ITE devices can be seen in the following Table 6[6]:

**Table 2: Market Share of BTE and ITE Devices**

|  | Volume | | Amount | |
|---|---|---|---|---|
|  | No. of Items | % | in TEUR | % |
| Total hearing aids, | 650,484 | 100.0% | 193,521 | 100.0% |
| of which: | | | | |
| **Digital hearing aids** | 589,546 | 90.6% | 187,530 | 96.9% |
| of which: | | | | |
| BTE devices | 522,560 | 80.3% | 161,282 | 83.3% |
| ITE devices | 66,986 | 10.3% | 26,248 | 13.6% |
| of which | | | | |
| **Analog hearing aids** | 60,413 | 9.3% | 5,991 | 3.1% |
| of which | | | | |
| BTE devices | 56,924 | 8.8% | | |
| ITE devices | 3,489 | 0.5% | | |

**Excursus: Open Feed-In**

(55)  Traditional BTE hearing aids contain a hearing aid adapter piece which more or less completely closes off the ear and causes an unnatural perception of one's own voice as well as of swallowing and chewing noises (so-called "occlusion"). In addition, a closed hearing aid takes away from those with slight hearing losses any possibility of using their own remaining hearing ability. The disadvantages described naturally also

---

[6] The data is based on ZVEI's sector statistics.

MOJ00000255

apply for ITE hearing aids. In 2003, GN ReSound introduced onto the market the first successful so-called "open feed-in" device (the AIR product line). Open feed-in offers an ear adapter piece that is fundamentally smaller and more permeable than the traditional ear adapter pieces of BTE hearing aids. This soft, small plastic shield is connected to the hearing aid by a thin sound tube. Open feed-in guarantees that the ear gets better air and that no heat accumulation or, in some cases, dampness can build up. Furthermore, open system wearers do not perceive their own voices and swallowing and chewing noises as unnatural. To prevent the acoustic feedback effects (so-called "acoustic feedback whistling")[7] which appear to an increased extent with open feed-in, correspondingly effective software systems are employed. Open feed-in is particularly suitable for clients with slight to medium hearing loss in the high tone area. It is particularly the higher tones, which in typical age-related hearing loss are lost, that are amplified. Since the ear is not completely covered, signal amplification in the low tone area, *i.e.*, for the lower frequencies, is (partially) lost. But due to the openness of the system, the client can directly perceive the lower frequencies in the environment. Open feed-in BTE devices – since they are used for slight to medium hearing loss – have relatively small cases (the lower the amplification needed, that much smaller the possible components). Open feed-in BTE hearing aids are among the most important developments of the last few years and are among the best-selling hearing aids on the market.

### 3.1.4    Partially Implanted Hearing Systems

(56)    Alongside BTE and ITE hearing aids, there are also **partially implanted hearing systems**. These are attached with a special fastener on the skullcap behind the ear (*e.g.*, if the auditory canal is missing or has been chronically inflamed). The transfer of sound does not take place here by amplification of air vibrations, but through the bone directly to the inner ear. The corresponding products are not interchangeable with hearing aids. Bone-anchored hearing systems are also not offered by hearing aid manufacturers. The key supplier of bone-anchored hearing systems in the Cochlear company in Switzerland. Phonak and Cochlear have formed a joint venture to combine know-how in the air of audiology and in the area of hearing implants. Since the proposal does not affect the area of partially implanted hearing systems, further discussions on this area in what follows are rendered unnecessary.

### 3.1.5    Digitalization of Hearing Aids

(57)    The market for hearing aids was revolutionized by digitalization. The correction of

---

[7] With sound conduction from the hearing aid to the ear, particularly with open feed-in hearing aids it happens that the amplified sound escapes from the ear via the open ear adapter piece, is picked up once again by the microphone of the BTE hearing aid, is again amplified and conducted into the ear, picked up again and so on. The end effect is a more or less shrill whistling, which leads to a significant impairment of hearing comfort.

hearing impairments through the wearing of hearing aids has been decisively improved by digital signal transmission and processing. This radical wave of innovations has now largely been concluded. Digital hearing systems have gone on to become the industry standard.

(58)    The development and extent of the almost entirely concluded substitution of digital for analog hearing aids is clearly expressed in the following Tables of absolute and relative volume changes and the graphical representation thereof.

**Table 3: Changes in Volume of Digital and Analog Hearing Aids**

| Hearing Aids | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| | No. of Items | No. of Items | No. of Items | No. of Items | No. of Items |
| Digital | 258,578 | 384,736 | 430,301 | 509,400 | 589,528 |
| Analog - digitally program. | 136,456 | 141,960 | 96,564 | 65,837 | 35,613 |
| Analog | 162,304 | 154,117 | 89,902 | 43,823 | 24,800 |
| Total | 561,573 | 684,204 | 617,822 | 619,773 | 650,484 |
| Total Change | 100 | 122 | 110 | 110 | 116 |

**Graph 1: Evolution of Substitution of Digital for Analog Hearing Aids**



TOTAL

**Table 4:**
**Percentage Changes in Digital and Analog Hearing Aids by Volume**

| Hearing Aids | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| | % | % | % | % | % |

| | | | | | |
|---|---|---|---|---|---|
| Digital | 46% | 56% | 70% | 82% | 91% |
| Analog - digital-progr. | 24% | 21% | 16% | 11% | 5% |
| Analog | 29% | 23% | 15% | 7% | 4% |
| Total | 100% | 100% | 100% | 100% | 100% |

(59)    The substitution of digital hearing aids for analog hearing aids did not take place rapidly, but rather over an 8-10 year time period. By volume and amount, market volume between 2002 and 2006 also did not shoot up, but rather rose steadily by a total of 16% and 14%, respectively. The background to this may have been that the statutory health insurance funds only allow provide an allowance for a new hearing aid every five years, and thus the process of substitution takes place fairly continuously over a longer time period.

(60)    The moderate rise in market volume was accompanied by a strong substitution of digital for analog and digitally programmable analog hearing aids. While the process of substitution in 2002 was already far along in the upper price segments, especially in the "List Price[8] > 900 EUR" segment, hearing aid manufacturers first established digital hearing aids in the lower price segments, in particular in the segment "List Price below 200 EUR," only starting in 2002/2003 and to an increased extent only starting in 2004. This is shown by the following Tables:

**Table 5: Changes in Volume of Digital Hearing Aids by Price Segment**

| Digital Hearing Aids by List Price Groupings | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|
| | No. of Items | No. of Items | No. of Items | No. of Items | No. of Items |
| up to 200 EUR | 8,125 | 14,489 | 64,548 | 124,771 | 178,996 |
| 200 – 400 EUR | 100,300 | 200,122 | 207,607 | 192,842 | 198,773 |
| 400 – 600 EUR | 36,590 | 40,262 | 28,805 | 51,515 | 78,326 |
| 600 – 750 EUR | 20,021 | 29,249 | 27,163 | 14,439 | 12,926 |
| 750 – 900 EUR | 21,578 | 21,387 | 23,236 | 31,317 | 32,313 |
| Over 900 EUR | 71,964 | 79,228 | 78,942 | 94,516 | 88,195 |
| TOTAL | 258,578 | 384,736 | 430,301 | 509,400 | 589,528 |

**Table 6: Relative Growth of Digital Hearing Aids**

| Digital Hearing Aids by | 2002 | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|---|

---

[8] In what follows, List Price is the price in the Hearing Aid Manufacturer - Hearing Aid Acoustic Retail relationship, before deduction of sales reductions (*e.g.*, volume rebates, discounts, bonuses).

| List Price Grouping | % | % | % | % | % |
|---|---|---|---|---|---|
| up to 200 EUR | 100% | 178% | 794% | 1536% | 2203% |
| 200 – 400 EUR | 100% | 200% | 207% | 192% | 198% |
| 400 – 600 EUR | 100% | 110% | 79% | 141% | 214% |
| 600 – 750 EUR | 100% | 146% | 136% | 72% | 65% |
| 750 – 900 EUR | 100% | 99% | 108% | 145% | 150% |
| over 900 EUR | 100% | 110% | 110% | 131% | 123% |
| TOTAL | 100% | 149% | 166% | 197% | 228% |

(61)    The process of substitution probably finally came to an end only in 2006, since, based
on the growth in the lowest price segment (up to 200 EUR), it was once again
possible to achieve a total growth in volume of approximately 50% for digital hearing
aids.

Graph 2:    **Changes in Volume for Digital Hearing Aids**



### 3.1.6    Focal Points of Hearing Aid Development

(62)    The market for hearing aids has now transitioned into a maturation phase; genuinely
*new* product developments are no longer to be expected. This distinguishes the
hearing aid market of today from markets in the expansion phase, which barely begin
to evolve and reveal such a fast tempo of innovation that market shares and market
leadership is still unstable or cannot be determined at all. This does not mean that the
hearing aid market does not still continue to be open to innovations in the sense of
product enhancements. There are multiple possibilities for development. Unlike

digitalization, however, they will not revolutionize the market for hearing aids, but will lead to further improvement and optimization of the existing digital technology (*e.g.*, improved algorithms for signal amplification and processing). Here, hearing aid manufacturers are very close to one another in their developmental expertise; genuine leaps forward in technology are the exception.[9]

(63)    According to the findings, the status of technological development and the concrete possibilities for such development currently lie, in particular, in the areas of:

- High, occlusion-free sound quality (open feed-in)
- Sound Smoothing (suppression of impulse noise).[10]
- Longer battery life,
- DataLearning and Datalogging[11],
- Automatic microphone equalization (e2e)[12]
- Enhancement of directional microphones[13] and
- Wireless transmission process for data and auto-signals, both between two hearing aids (see supra) and between external electronic components and the hearing aid (Bluetooth technology[14], FM systems[15] etc.).

(64)    In part, hearing aid manufacturers are already re-issuing already existing products under new product names without any innovative, potentially patented functionalities being added. With its Perseo product, Phonak has mentioned an example of such a product strategy.[16] Mr. Valentin Chapero Rueda, the CEO of Phonak, in the October 2, 2006 Phonak Analyst Meeting on the occasion of presenting the planned takeover of GN ReSound - referring to the takeover of GN ReSound's product portfolio - employed the concept of a "pseudo-multiplicity of products ":

---

[9] To the same effect also: Siemens, Discussion on 2.22.2007, Discussion Notes, pg. 3 *et seq.*, pg. 795 *et seq.* d.A.

[10] Unpleasant disturbance noises (*e.g.*, paper rustling, dishes clattering, doors slamming) are suppressed and the desired signals are thereby made significantly more audible. The hearing comfort of the hearing aid is increased.

[11] <u>DataLearning</u>: The calibrated algorithms are able to recognize the hearing-impaired person's sound environment and orient the device's programming thereto (self-learning algorithms). <u>Data Logging</u>: Here, the device while being worn stores the particular characteristics of the hearing-impaired person's sound environment. The hearing aid acoustician can take note of this in another adjustment of the device; Siemens, Discussion on 2.22..2007, Discussion Notes p. 3., pg. 795 d.A.

[12] Here, both hearing aids automatically adjust themselves to each other in their sensitivity if environmental noises change. The hearing-impaired person then has the same auditory quality and amplification performance in both ears, SAT Discussion on 2.22.2007, Discussion Notes p. 3; pg. 795 d.A.

[13] Directional microphones pick up signals from the line of sight as well as from the side and rear side of the head, thereby strengthening the capturing of the signal by the microphones (better filtering out of desired signals, key word: "Digital Surround Zoom"); SAT Discussion on 2.22.2007, Discussion Notes p. 3, pg. 795 d.A.; Phonak, Letter of 2.14.2007, Appendix 10, pg. 663 d.A..

[14] Hands-free equipment for telephones, cell phones, wireless communication with audio systems, etc.

[15] See margin note 69.

[16] Phonak, Letter of 2.14. 2007, p. 9, pg. 631 d.A.

> "The beauty of our approach is that we will create or we will maintain this pseudo-complexity from a product point of view while having a very, very orderly, structured and efficient platform approach underneath. So cash is king, but sometimes also perception is king. So what we are doing is basically cater to the perception of our customers while using the same core technologies".[17]

(65)    In the view of the participants in the combination, what is today determining the market success of hearing aids - besides the aforesaid technological innovations -are purely subjective, for the most part non-patented "feel-good" factors.

> "What is decisive, rather, is the interplay of a multitude of "feel-good factors" - often purely subjective too - which for the most part show no connection to patented inventions."[18]

(66)    Under this heading come the miniaturization of cases ("small, ultra-narrow and as light as a feather"), an elegant and modern design, attractive high-tech colors and a heightened aesthetic quality of the hearing aid.[19] What this indicates is that the hearing aid market, in particular over the last few years, has entered into a phase of technical and visual optimization, and bursts of innovation, such as are to be observed in young markets in the development and experimentation phase, are no longer to be expected.

### 3.1.7    Accessories and Other Audiological Devices

(67)    **Accessories** for hearing aids essentially include products for cleaning and care, batteries, remote controls, battery chargers and connection cables. Remote controls allow hearing aid wearers to adjust the device's functioning to the hearing situation at any time.

(68)    As a rule, remote controls are offered by manufacturers as accessories for their own hearing aids and are directly tied to the sales of their own hearing aids. Other accessories are offered by other manufacturers too, outside the hearing aid market. The supplier structure is broader here than in the area of hearing aids. In the area of accessory parts, the concentration does not lead to any merger law concerns based on the very small sales compared to the hearing aid market and its relatively small relevance to the hearing aid market. The market structure would not fundamentally change if sales with remote controls were added to the hearing aid market. The area

---

[17] Exhibit 6 to Oticon Letter of January 5, 2007 in Oticon appendix folder.

[18] Phonak Letter of February 14, 2007, p. 8; pg. 630 d.A.

MOJ00000261

of accessory parts will thus not be further examined in what follows.

(69)    A significant add-on device for hearing aids is the wireless FM System. This is a wireless signal transmitter, by means of which those suffering from hearing loss can be connected via their hearing aid to their teachers, colleagues or employees. It consists of a transmitter, by which the voice of the speaker is picked up and which is wirelessly connected via radio waves to a small radio receiver. The radio receiver itself is attached to the personal hearing aid. This increases the comprehension of the spoken word in noisy environments. It is the understanding of the Decision Division that Phonak is the key supplier of this technology. By means of universal wireless reception modules on the relevant hearing aid, all other hearing aid manufacturers can use Phonak's FM System. Based on the particular technology and the specific area of application of FM Systems, the latter are not to be assigned to the market for hearing aids. GN ReSound is not active here, so that the proposal has no effects on the area of FM devices.

(70)    **Audiological Diagnostic Devices** are used to make a hearing diagnosis and so as to be able to measure and adjust hearing aids. Purchasers are mainly Ear-Nose-Throat physicians, hearing aid acousticians, Ear-Nose-Throat clinics and occupational physicians. With diagnostic devices for medical determination of loss of hearing, one can distinguish subjective tests and procedures (patient's assistance required) and objective tests (without patient's assistance, e.g., with newborns, handicapped persons). The devices are typically called audiometers and tympanometers (for middle ear diagnostics).[20]

(71)    Hearing aids acousticians require **audiological measuring devices** which go beyond audiometric diagnostics and also perform measurement functions. The combination of these measurement procedures is customarily referred to as a "measurement box" or, as the case may be, "In Situ Measurement." It is not coextensive with adjusting a specific hearing aid to the hearing loss of a person hard of hearing, but serves to verify the hearing aid adjustment. Here, using a probe tube, the sound level in the client's auditory canal is measured and compared with prescribed target curves dependent on hearing loss. Key sellers of such systems are Oticon through its subsidiaries Maico and Interacustics (Affinity product), SAT (UNITY II product) and GN ReSound through its subsidiary GN Otometrics (Aurical product). Along with them, there are smaller sellers such as Acousiticon, Auritec or Homoth. In this sector, Oticon is viewed as the market leader for audiological measurement devices. Phonak is not active here.

---

[19] Phonak Letter of February 14, 2007, p. 8; pg. 630 d.A

[20] A detailed product description can be found in Opticon's Answer of January 5, 2007, p. 5 *et seq.*, pg. 165 LO Wettbewerber I.

### 3.1.8  Reimbursement System in Germany

(72)  The legal basis for the financing of a hearing aid by the statutory health insurance system (GKV) is Social Law Code *[Sozialgesetzbuch]* (SBG) V, Section 33. According to the documentation for hearing improvement by an Ear-Nose-Throat physician, the **GKV** will reimburse a **fixed amount**, currently about 420 EUR, for binaural (two-sided) treatment with the 2nd device approximately 335 EUR. In addition, a lump-sum amount between 170 and 190 EUR will be given in reimbursement for repairs. Consumable items (care products, batteries etc.) as a rule must be paid for by the patient him- or herself.[21] The fixed amounts are reimbursed regardless of the final price. The final price for a basic device (list price up to 200 EUR), after adjustment by the hearing aid acoustician, is exactly the fixed amount. In the high-end area, depending on what the device comes with, it lies between 2,000 and 4,000 EUR. A prerequisite for reimbursement is that the hearing aids be on the GKV's list of appliances as an appliance eligible for reimbursement. According to the findings of the Decision Division, persons insured by the statutory system have a right to reimbursement of a fixed amount every five years under their insurance.

(73)  There have been fixed amounts since 1989. In the past, the fixed amounts were slightly lowered again and again. Effective January 1, 2005, responsibility for determination of the fixed amounts was transferred from the state associations to the federal central associations. As of that date, the fixed amounts for hearing aids were standardized and set at the above-mentioned amounts throughout Germany. According to the available information, the result of this was that the fixed amounts were lowered by about 80 EUR.

(74)  According to the findings, at least several of the health insurance funds assume for reimbursement that a **"comparative adjustment"** was done when a hearing aid was purchased. This includes, as a rule, the tentative adjustment of technically comparable products of different manufacturers and – if the client does not prefer a higher-priced hearing aid from the outset – the adjustment of a basic device as well, without any additional payment.

### 3.1.9  ZVEI Reporting System and Price Segments

(75)  All hearing aid manufacturers who distribute their hearing aids to hearing aid acousticians belong to the ZVEI – Electrotechnical and Electronics Industry Central Association, Frankfurt am Main (hereinafter "ZVEI"). They report every month, either to ZVEI or to ZVEI's Electromedical Technology trade association, detailed data regarding their sales volumes and sales of hearing aids. Essentially, what is reported are the monthly number of items sold, and sales of

---

[21] An exception is children of school age.

- Analog, digitally programmable analog and digital hearing aids,
- ITE hearing aids (further broken down by CIC devices, devices with or without wrapper, etc.),
- BTE hearing aids,
- digital hearing aids divided by list price segment (see below),
- test devices on the market (number of items only)
- hearing aid returns from retailer to manufacturer (number of items only),
- FM devices (FM transmitters, FM receivers, number of items only),
- Average customer payment target (days).

The ZVEI reporting system has existed in this degree of detail since 2002.

(76) The price segments defined in connection with this reporting system are the basis for the division of hearing aids into product classes in Germany. Starting in 2002, the price segments were re-defined by the manufacturers as follows:

- hearing aids over 900 EUR List price ("High-End Products").
- hearing aids between 751 and 900 EUR list price ("Business Class").
- hearing aids between 601 and 750 EUR list price ("Comfort Class").
- hearing aids between 401 and 600 EUR list price ("Economy Class").
- hearing aids between 201 and 400 EUR list price ("Economy Class").
- hearing aids up to 200 EUR list price (basic devices, no additional payment).

(77) Now, after conclusion of the process of digital substitution, every manufacturer offers, for each of the above-mentioned segments, one or two product families with corresponding list prices. From the manufacturer's sale prices actually achieved, however, what is shown is that the price segments cannot be precisely demarcated from one another. According to analyses by the ZVEI, the average manufacturer's sales prices lie one or even two price segments below the corresponding list price segment. A fundamental reason for this is probably that, when introducing a new product into a price segment, the manufacturers do not reduce the list price of the predecessor model but only reduce its actual manufacturer's sale price.

## 3.2    Standard Substantively Relevant Market for Hearing Aids

(78) It is the view of the participants in the combination that one should operate on the assumption of an overall market for hearing aids.

(79) The changeover from analog to digital technology, according to them, does not necessarily indicate separate markets. The emergence of a new functionality – here, digitalization – could not lead to the assumption of a new market for each. Otherwise, they maintain, for every new function a new market would have to be defined, even

though these products were quite likely to be competing with one another. Finally, they note, all key sellers are represented on the market with analog and digital hearing aids.[22]

(80)    The ITE and BTE difference, they argue, essentially relates only to an external design feature. The underlying technology is not different. The areas of application are fundamentally identical; both designs could be used for all hearing damage. There are only very few indications, they claim, for which a BTE device is preferred based on the medical indication, e.g. if the auditory canal is too small for an ITE device. Otherwise, the choice of a BTE or an ITE device is dependent on the personal preferences of the customer.[23]

(81)    The view of the participants in the combination is to be followed.

### 3.2.1    No Separate Markets for Analog and Digital Hearing Aids

(82)    As regards the underlying technology and the developmental know-how, analog and digital hearing aids are very differently designed (see above, margin number 57 *et seq.*). Key functions offered by a digital hearing aid – *e.g.*, speech recognition and noise recognition and processing – are also not provided by analog hearing aids. A number of hearing aid manufacturers have stated that they do not (or no longer) offer analog hearing aids. Nonetheless, the instant case involves products which are to be ascribed to one standard, substantively relevant market. The following grounds for this are dispositive:

(83)    The cause of the sharply declining market share of analog hearing aids is to be traced back to the digitalization of hearing aids since 1996/97. Competitor SAT compares the displacement of analog hearing aids with that of black-and-white monitors after the introduction of color television.[24] Based on the innovative technology and the individual possibilities for adjustment, audiological development is today continuing to be geared only to digital hearing aids. Analog and digitally programmable analog hearing aids are basically only still sold in countries outside the European Union. In Germany meanwhile, analog and digitally programmable hearing aids have a share of less than 5% of total hearing aid sales. The trend is further downward. Thus today, the overwhelming demand shaping the market is concentrated on digital hearing aids. Since analog devices have no area of application in which digital devices cannot be used, analog hearing aids are losing market importance to the same extent as digital hearing aids are achieving market

---

[22] Phonak Letter of December 27,2006, p. 7, pg. 324 d.A.

[23] Phonak Letter of November 28, 2006, p. 2 *et seq.*, pg. 295 d.A. B3-554/06.; Phonak Letter of December 27, 2006, p. 7, pg. 324 d.A.

[24] SAT Letter of January 8, 2007, p. 4, pg. 245 LO Wettbewerber I