success. The competitive conditions for analog and digital hearing aids are not be viewed in isolation from each other for that very reason. Both types of hearing aid belong to one substantively relevant market.

### 3.2.2   No Separate Markets for BTE and ITE Hearing Aids

(84)   BTE and ITE devices represent merely different designs for hearing aids. The components employed are very similar, the spectrum of programmability of their adjustment algorithms, their areas of use and their performance being more or less equivalent. Overall, the technical differences between hearing aids worn behind the ear (BTE) and those worn in the ear (ITE) are not weighty enough to assume separate substantively relevant markets. All well-known manufacturers of hearing aids offer both BTE and ITE-hearing aids. Together they have an extensive and complete portfolio. This product portfolio is also purchased by hearing aid acousticians as a complete product assortment.

(85)   ITE hearing aids in Germany have a much smaller market share than BTE digital hearing aids. In the analog section of the market, they are virtually not offered any more, while their share of the digital market amounts only to about 10%.

(86)   All hearing aid manufacturers surveyed support this market division and count BTE and ITE hearing aids as part of one standardized substantively relevant market.

### 3.2.3   No Separate Markets for the Individual Price Segments

(87)   Every manufacturer, for each of the price segments mentioned in Section 3.1.9, offers one or two families of products, with different types of hearing aids for each (e.g., BTE, ITE, Power Version etc.) an. The price segments underlying the ZVEI reporting system, however, are purely list price segments. According to ZVEI analyses, the manufacturer's sale prices actually achieved lie in part one or two price segments below the corresponding list price segment. To that extent ZVEI's price segmentation is in the first instance an attempt to provide businesses participating in the reporting system as detailed an overview as possible of the manufacturer's sale prices and sales obtained on the market. The associated gains in transparency for manufacturers, however, taken as such do not indicate any product market demarcation oriented towards these price segments.

(88)   Independent of their respective price segment, the hearing aids serve the same area of application. The well-known manufacturers of hearing aids unanimously stated that product innovations, *i.e.*, new features or functions, are always first introduced in the High-End area. These new functions can potentially also be used in hearing aids of the lower price segments, since the hearing aids of a manufacturer are as a rule

MOJ00000266

installed on one or two chip platforms on which all the adjustment algorithms –
whether new or already introduced onto the market – can be programmed. Phonak,
for example, uses for all hearing aids the so-called Palio Platform. This platform can
hold all programs developed by Phonak.[25] Likewise, GN ReSound has a standard
chip platform for all families of products. SAT and Oticon use several platforms, but
are also able to activate features for types of hearing aids in different price segments.

(89)    The product differentiation between the price segments is essentially obtained by the
activation or, as the case may be, non-activation of the relevant installed functions.
Thus, SAT has thus far offered the "Sound Smoothing" function only in the High-End
segment (Centra product family). Sound Smoothing would, for example, also be
available on the Artis, a hearing aid in the 401-600 EUR list price segment (same chip
platform), but in Germany has currently not yet been activated. In Australia, by
contrast, Sound Smoothing is already being offered by SAT in the mid-range price
segments. Phonak as well offers Sound Smoothing only in the upper price segments
(*e.g.*, SaviaArt SoundRelax).

(90)    Additional product differences within the manufacturers' product portfolios lie mainly
in the size of the devices and in the power consumption.

(91)    Consequently, it can be established that hearing aids, based on the virtually co-
extensive product qualities belong to one substantively relevant market regardless of
the price segment to which they belong. The "optimization" of the hearing aid
normally carried out in the upper price segment first – *e.g,* as regards speech
recognition and noise suppression – does not run counter to this, especially because
the underlying manufacturing and developmental know-how is available to all
suppliers of hearing aids of which the Decision Division is aware. The product
differentiations mentioned are not as important in their totality as to justify a
substantive market demarcation geared towards individual types of hearing aids or
price classes. The Decision Division is thus proceeding on the assumption of one
standardized substantive market for hearing aids.

**3.3    Separate Market for Sale of Hearing Aids to Hearing Aids Acousticians**

(92)    For cases of reduced hearing, a patient is typically examined and treated by an Ear-
Nose-Throat physician. As need be (speech comprehension of less than 80%), the
latter may prescribe a hearing aid and refer the patient to a hearing aid acoustician. In
the "prescription," there is normally no specific hearing aid, but the hearing loss is
described with the measurement data obtained and, as appropriate, a device type is
recommended.

---

[25] Thus, *e.g.*, Phonak Letter of December 27,2006, p.5, pg. 262 d.A

(93)   The structure of the hearing aids acoustician retail trade in Germany is characterized by somewhat less than 15-20 active supra-regional chain operators with more than 10 chain stores, a half dozen large purchasing cooperatives and about 1500 companies with one to three branches. The 15 largest chain store operators and purchasing cooperatives account for a procurement volume, measured by amount, of less than 50 % of all hearing aids procured in Germany through the hearing aid acoustician retail trade. Even the procurement volume of the largest chain operators, Kind and Geers, lies in each case well below 10%.

(94)   Alongside the normal distribution channel through hearing aid acousticians, in Germany for some years now the so-called "abbreviated treatment channel" *[verkürzte Versorgungsweg]* has become established. Here, hearing aids are sold by representatives of the manufacturers themselves, with the assistance of Ear-Nose-Throat physicians. In the first model of this abbreviated treatment channel, there is an on-line connection between the physician's practice and the manufacturer. The physician generates measurements that are converted at the manufacturing site. The hearing aid is then delivered to the client when ready. In the other model, the adjustments are made by the manufacturer directly at the doctor's office. If a patient selects the abbreviated treatment channel, the hearing aid acoustician retail trade is circumvented as a retail stage in the distribution of hearing aids.

(95)   In Germany, only the companies Sonic and auric are active in the abbreviated treatment channel. The latter accounts for less than 10% of total sales of hearing aids. All other competitors (basically Siemens, Phonak, Oticon, GN ReSound, Widex) sell their products exclusively through the hearing aid acoustician retail trade. They are not suppliers in the abbreviated treatment channel. Hearing aids obtained by the abbreviated treatment channel – so stated by Sonic – due to the cost savings for a portion of the services of the hearing aid acoustician, are sold to the end customer at below the end customer price in the hearing aid specialist retail trade.

(96)   To that extent, Siemens' objection, that the distribution-based split-up of the hearing aid market into separate partial markets for delivery to (a) the hearing aid acoustician retail trade and (b) the abbreviated treatment channel is incorrect based on its own deliveries to suppliers in the abbreviated treatment channel, contradicts its own data. In its written answer, Siemens reported that, except for the mentioned manufacturers Sonic and auric, it was unaware of any company active in the abbreviated treatment channel.[28]

(97)   Various hearing aid acousticians and the Federal Guild of Hearing Aid Acousticians *[Bundesinnung der Hörgeräte-Akustiker]* (biha) have brought complaints against doctors who participate in the abbreviated treatment channel, accusing them of

---

[28] Siemens, Letter of January 8, 2007, p. 19, pg. 260 LO Wettbewerber I

MOJ00000268

unprofessional and thus anti-competitive behavior. To the knowledge of the Decision Division, the complaints were dismissed.[27] Hearing aids acousticians also argue against the abbreviated treatment channel that only they have the training for the selection and optimum adjustment of a hearing aid.

(98)    The manufacturers listed in the hearing aid retail trade have informed the Decision Division that they do not participate in the abbreviated treatment channel and also have no plans to do so. It was stated by Sonic and various hearing aid acousticians that hearing aid manufacturers who make use of the abbreviated treatment channel are denied access to hearing aid acousticians. In its survey of hearing aid acousticians, the Decision Division was unable to ascertain any case in which a hearing aid acoustician, in the years 2004 - 2006, had listed a supplier which was in competition with it via the abbreviated treatment mode.

(99)    The suppliers which are listed in the hearing aid acoustician retail trade support the latter in their rejection of the abbreviated treatment channel. By its own account, Auric is not supplied with third-party hearing aids for the "abbreviated treatment" distribution channel.[28] Suppliers Sonic and auric are also not members of the ZVEI or of ZVEI's Electromedical Technology trade association. Auric and Sonic hold responsible for this, *inter alia*, the other hearing aid manufacturers' lack of willingness to cooperate. As stated by Sonic, under ZVEI's By-Laws only those manufacturers may belong to it who distribute their products along the classic distribution channel through hearing aid acousticians with local specialized stores.[29]

(100)   The manufacturers Sonic and auric are not in a competitive relationship to the suppliers of the hearing aid acoustician retail trade. They are not viewed by hearing aid acousticians as alternative suppliers.

(101)   Thus, there are two virtually completely separate distribution channels serving manufacturers. The manufacturers Sonic and auric distribute their hearing aids exclusively through the abbreviated treatment channel, *i.e.*, Ear-Nose-Throat physician; the other suppliers, who are also members of ZVEI, distribute their hearing aids exclusively through the hearing aids acoustician retail trade. Hence, a division of the objectively relevant market into two purchaser groups is proper, based on the actual behavior of sellers as well as buyers.[30] The Decision Division will take note of possible competition by Sonic and auric in the context of its overall merger-law

[27] BGH, Decision of November 15,2001, Case File: I ZR 275/99; BGH, Decision of June 29,2000, Case File: I ZR 59/98.
[28] auric Letter of January 1, 2007, p. 8, pg. 98 LO Wettbewerber I.
[29] Sonic Letter of January 5, 2007, p. 14, pg. 354 LO Wettbewerber I.
[30] The case was differently postured in the "vacuum cleaner bag" case, where the manufacturers of vacuum cleaner sold their products on one standardized market, to which both the device manufacturers as well as the retail trade belong, as market counter-parties; BGH October 5,2004, WuW/E DE-R 1355, 1356 *et seq.*

consideration.

## 4.    Geographic Market Demarcation

(102)  The geographically relevant market, within the meaning of the GWB's control of concentrations, is to be demarcated by economic criteria. It encompasses the area in which the relevant products are regularly offered and sold and which is distinguished from neighboring regions by discernibly different competitive conditions.

(103)  In the instant case, the Decision Division is operating on the assumption that the market for the manufacture and distribution of hearing aids to the hearing aid acoustician retail trade is, from an economic perspective, to be regionally demarcated on a national basis.

(104)  The participants in the combination regard the question of whether the market for hearing aids is to be defined Germany-wide or Europe-wide as not relevant to the decision. However, a series of reasons would argue in favor of a Europe-wide market demarcation. The fact that the German system of social insurance is different from that in other countries would not argue for a German market, since relatively few hearing aids are paid for entirely or predominantly by the GKV. Adjustment by a hearing aid acoustician is only necessary for ITE hearing aids (manual preparation of the otoplastic). Overall, hearing aid manufacturers supply national markets through a few central manufacturing sites. With the customers, finally, what is involved are highly professional hearing aid acousticians, who as a rule are best familiar with the technology employed.[31]

(105)  With medical technology products, the German Federal Cartel Office, in its regular decisional practice and in harmony with the Commission[32], proceeds on the assumption of national markets. The Commission and the German Federal Cartel Office essentially base themselves here on the following aspects:

- The reimbursability of medical-technology products varies from Member State to Member State. There are different upper limits on price and different systems of reimbursement.
- Procurement procedures are considerably different.
- Domestic customers almost never buy abroad. Here, they particularly pose risks with respect to inventory management and product liability.
- As a rule, a local distribution agency and intensive on-site support are a prerequisite for market entry and successful market cultivation. On-site service

---

[31] Phonak, Letter of December 27, 2006, p. 12 *et seq.*, pg. 329 *et seq.* d.A.
[32] Cf. COMP/M. 3146 Smith & Nephew/Centerpulse, most recently COMP/M.3687 Johnson&Johnson/Guidant

encompasses the spectrum from product and handling training up to inventory management.

(106)  In the instant case as well, a regional demarcation of the market does not lead to another result.

## 4.1    Significance of National Distribution Systems

(107)  It is true that the leading suppliers in Germany, SAT, Phonak, Oticon, GN ReSound and Widex operate throughout the world. In addition, the product-quality-related requirements for approval of medical products or medical devices are being extensively harmonized in the European Economic Area by the transposition of the EC Medical Products Directive (EU Directive 93/42/EEC). Pursuant to Annex X, hearing aids belong to Class IIa of the Directive and must thus pass through specific quality assurance procedures harmonized in the EU.

(108)  Nevertheless, all hearing aid manufacturers possess a national distribution system in those countries of central market-strategic importance to them. All hearing aid manufacturers active in Germany have their own tightly meshed distribution system available here. Manufacturers without a domestic distribution and service system were not listed with the hearing aid acousticians surveyed.

## 4.2    Significance of On-Site Service

(109)  On-site service by the manufacturer or supplier of hearing aids, as the case may be, was without exception of outstanding significance, or even indispensable, for the hearing aid acousticians surveyed, e.g., for consultation, for training on the adjustment software and adjustment of the hearing aid to the ear, as well as for prompt solution of technical problems in connection with use. With each new product family introduced onto the market, the manufacturers hold road shows at their most important customers. The frequency of client visits for customer service and training in the hearing aid market is extremely high based on the short product life cycles - particularly in the upper price segments. An overwhelming majority of manufacturers surveyed reported that it regarded extensive and intensive on-site service as a considerable factor in the differentiation of competitors.[33] All hearing-aid acousticians surveyed affirmed, clearly and without reservation, the need for concomitant intensive on-site service by suppliers. It should be noted here that the Decision Division without exception surveyed large customers with high purchasing volumes and a multitude of branches. For the remaining operations with one, two or three branches, the need for intensive on-site service by the listed hearing aid manufacturers is a fortiori a given.

---

[33] E.g., Siemens Letter of January 8, 2007, p. 8, pg. 249 d.A., see also Written Answers of Widex, Starkey, Oticon, bruckhoff, auric, Sonic in LO Wettbewerber I

### 4.3    Actual Purchasing Behavior of Buyers

(110)    In its investigations, the Decision Division received no references to significant purchases from abroad. Direct purchases from abroad by buyers of hearing aids, despite significant price differences, for example in the High-End segment[34], apparently take place only in exceptional cases or only to a very limited extent. This is also confirmed by important manufacturers such as Oticon[35] The results of the survey of domestic buyers indicate overall that they as a rule do not even consider meeting their hearing aid requirements through a supplier with an office abroad and without its own domestic distribution system. Consistent therewith, neither did any of the hearing aid acousticians mention a company without a domestic distribution and service system as a current supplier.

### 4.4    A Comparison of European Prescription and Reimbursement Systems

(111)    The competitive conditions within the European Union reveal quite considerable differences with respect to national prescription and reimbursement systems. The following regimes are basically to be noted:

**France, Switzerland and Germany**

(112)    The systems of reimbursement show considerable parallels (for the German system, see above, margin number 72 *et seq.*). In France as well, the patient receives a prescription, as needed, from an Ear-Nose-Throat physician, with which he goes to the hearing aid acoustician and is treated. The statutory health insurance system in France, however, reimburses only a fixed amount of approximately 200 EUR per ear (there are exceptions for children, youth and the indigent). The fixed amount in Germany is more than twice as high.[36] In Switzerland, the treatment and reimbursement systems resemble those in Germany.[37]

**Spain, Italy**

(113)    It is true that hearing aids are basically distributed by hearing aid acousticians[38]; but there is no reimbursement of costs by health insurance funds (exceptions for children and the indigent).

---

[34] On this point, *see infra*, margin number 119 *et seq.*
[35] Letter of January 5, 2007, p. 13, pg. 173 LO Wettbewerber I; see also Sonic Letter of January 5, 2007, page 6, pg. 346 LO Wettbewerber I.
[36] See, *e.g.*, Siemens Letter of January 8, 2007, p. 10, pg. 251 LO Wettbewerber I; Oticon Letter of January 5, 2007, p. 14, pg. 174 LO Wettbewerber I.
[37] See, *e.g.*, Phonak Letter of December 27,2007, p. 16, pg. 333 d.A.
[38] Amplifon and Gaes are the leading acoustician companies on the market, with a market share of well over 50%.

**Great Britain, Scandinavia**

(114)  In Great Britain, treatment for hearing aids is divided into two parts (the systems in the Scandinavian countries are comparable):

*National Health Service (NHS)*

(115)  The patient is referred by his general practitioner to a clinic with an audiological division. There, any hearing loss is diagnosed and a suitable hearing aid (mostly BTE) adjusted. The patient receives the hearing aid at no cost, but has no ability to choose with respect to the quality of the device. The hearing aids dispensed through the NHS are centrally procured within the context of solicitations for bids. Only about 15% of hearing aids are purchased "off-contract" by the clinics themselves from hearing aid manufacturers. As a rule, the treatment, up to adjustment of the hearing aid, lasts around 18 months.[39]

*Private purchase of hearing aids*

(116)  For ITE hearing aids and for higher-priced products that are not dispensed by the National Health Service, the treatment structure resembles that in Germany. But a reimbursement is not made. According to data from Phonak, in Great Britain each year approximately 200,000 of the total of 600,000 hearing aids adjusted are distributed through this private market.[40]

*Public Private Partnerships*

(117)  Due to the long waiting time between diagnosis and ultimate treatment, the National Health Service is more and more transitioning over to involving hearing aid acousticians in the adjustment of fully reimbursed hearing aids. The hearing aid acoustician orders the corresponding hearing aids out of the NHS allocation.

(118)  The differences described lead to the conclusion that the sales terms, distribution systems and price-fixing leeway for a series of price segments in the countries or regions mentioned are extremely different. In and of itself, this indicates that the market for the production and distribution of hearing aids to hearing aid acousticians by the present process is geographically limited to Germany.

**4.5    A Comparison of European Manufacturer's Sales Prices**

(119)  The participants in the concentration have indicated to the Decision Division, *inter*

---

[39] Siemens Letter of January 8, 2007, p. 11.; Oticon Letter of January 5,2007, p. 14
[40] Discussion with Phonak on February 18,2007; for the description of the system, see also Siemens, Letter of January 8,2007, p. 11 *et seq.*, Sonic, Letter of January 5, 2007, p. 7.

*alia*, the average manufacturer's sales prices obtained in 2006 for the families of products marketed by Phonak and GN ReSound in the upper price segment "List Price > 900 EUR."[41] In these segments, the technical and visual optimization of the device plays a greater role as a sales argument than the amount of the price reimbursed by the health insurance funds. Accordingly, when comparing manufacturer's selling prices, the differences in reimbursement systems lead to fewer distortions [than] in the lower price segments. Finally, this segment is viewed by many of the market participants as the price segment for hearing aids decisive for competition.

(120)   The Savia product family is distributed by Phonak in Sweden, France and Spain at a considerably lower manufacturer's sales price than in Germany. According to Phonak's data, the manufacturer's sales price of Savia in Germany in 2006 was [...] EUR (preliminary projection of January 16, 2007).[42] Phonak's manufacturer's sales price for Savia in Sweden, France and Spain was [...] of the manufacturer's sales price in Germany.

(121)   The manufacturer's sale prices obtained by GN ReSound in Sweden, France, Great Britain, Austria and Spain for the High-End Metrix family of products, at [...], is below the average manufacturer's sales price in Germany calculated by ZVEI for 2006 for the Segment "List Price over 900 EUR" segment. In Germany, GN ReSound took Metrix off the market again in 2006.[43]

(122)   These price differences also support the view of the Decision Division that, in the instant case, an independent German market for hearing aids is geographically relevant.

(123)   Based on the sharply different reimbursement systems in the largest Member States of the European Union, an international price comparison for basic hearing aids or low-priced hearing aids appears to be not meaningful.

**5.    Results of Objective and Geographical Market Demarcation**

(124)   In the opinion of the Decision Division, the proposed concentration accordingly relates to the market for production and distribution of hearing aids to the hearing aid

---

[41] Appendix VI 3.1 and Appendix VI 3.2.
[42] Phonak Letter of February 16, 2007, Phonak Appendix 2. The projected manufacturer's sales price stated, however, appears to the Decision Division to be not quite plausible, since the average manufacturer's sales price calculated by the ZVEI for 2006, at 838 EUR for the "List Price over 900 EUR" segment, is more than [...] over this price and Phonak, according to the ZVEI reports, is unequivocally the market leader in this segment. Accordingly, the manufacturer's sales price for Savia would have to be above the amount estimated by Phonak.
[43] GN ReSound Letter of February 16,2007, GN ReSound Appendix 2; here only the manufacturer's sale price for Metrix Mini can be found.

acoustician retail trade. This market is geographically confined to Germany.

**6.    Effects of the Concentration**

(125)    The concentration allows one to expect the creation of an oligopolistic and market-dominating position for hearing aid manufacturers SAT, Oticon and Phonak on the German market for production and distribution of hearing aids to the hearing aid acoustician retail trade (Section 36 paragraph 1, Section 19 paragraph 3 clause 2 GWB).

**6.1.    Market Structure and Competitive Conditions Prior to the Concentration**

(126)    The relevant market reveals a series of particular competitive characteristics favoring concerted oligopolistic behavior. These include, in particular, the following circumstances:

- The **degree of concentration** on the market for hearing aids is very high. The three leading suppliers SAT, Phonak and Oticon have a combined marked share of over 80% in Germany. Thus, even the so-called "narrow" **presumption of oligopoly** in Section 19 paragraph 3 clause 1 No. 1 GWB is exceeded by more than 30% in the instant case. The high combined market share is accompanied by very large market share advantages over the next following competitors; the market share gap separating them from the next competitors GN ReSound (No. 4) and Widex (No. 5) in each case amounts to far more than 70%.

- The manufacturers are intertwined with one another by **contractual business relationships (ensured in part by company law)** (mainly joint ventures and licensing agreements). These business relationships and cooperation directly relate to the market for hearing aids and have led to the construction of general industry standards and the collectivizing of patent rights. Going along with that, then, is a technological and product-brand-related "marching in lockstep" among the oligopolists.

- Hearing aid manufacturers have created an extensive system of market information. On the basis of the monthly sales and volume reports to ZVEI and the monthly evaluations by ZVEI, the participating companies receive a very detailed overview, *inter alia*, of sales volumes, manufacturer's sales prices obtained and sales revenues in the individual price segments for digital hearing aids. This ensures that competitors can recognize, in real time, changes to their market shares and competitive advances by competitors and that competition will be impaired. In addition, the result of the ZVEI reporting system is a highly asymmetrical market transparency in favor of hearing aid manufacturers and at the expense of hearing aid acousticians and the end

customers of hearing aids.

- Since digital hearing aids became established, the market has lost innovative pace and has in the meantime transitioned into a **phase of maturation**, with genuine product innovations no longer to be expected. This does not mean that the market for hearing aids does not continue to be open to innovations in the sense of product enhancements. But these innovations are achieved by the improvement and optimization of existing technology. In this, manufacturers of hearing aids are very close to each other in their developmental expertise. The Decision Division does not fail to note that technological and esthetic improvements of digital hearing aids are being brought to market time and again. These improvements can be carried out promptly, however, by each of the oligopolists such that the competition over the introduction of new families of products does not alter the power relationship in the oligopoly on a lasting basis and to an extent relevant for the issue.

- **Supply and demand conditions** on the relevant market are stable.

- Suppliers on the market have, without exception, been established and active on the relevant market for more than 10 years. According to information from the hearing aid manufacturers surveyed, virtually no market entries have taken place over the years past. Rather, due to company takeovers, the market has undergone a considerable consolidation to, now, the five suppliers in Germany worthy of note.

- The demand is not dependent on business cycle, even though the market potential for hearing aids has been exhausted only in small part. Due to the high stigmatization of the wearing of hearing aids, those suffering from hearing loss that actually get a hearing aid are as a rule categorically referred to such a device. Correspondingly, there are hardly product-related alternatives or the possibility of a considerable time delay in procuring a hearing aid.

(127)  The greatest possible adjustment of suppliers to these competitive conditions favors a concerted oligopolistic behavior, which argues for a market-dominating oligopoly among SAT, Phonak and Oticon even before the combination, even though a number of current market conditions also provide indications for competition in the oligopoly. Finally, it may be debatable whether significant competition no longer exists in the oligopoly already prior to the combination. In any event, the concentration between Phonak and GN ReSound would further reduce those competitive impulses still present in the market. (On this point, see *infra*, margin number 287 *et seq.*). The concentration is in any event creating market conditions on the basis of which, in the future, no significant competition between hearing aid manufacturers SAT, Phonak and Oticon is any more to be expected. This lack of internal competition corresponds to a pre-eminent market position of the oligopoly *vis-à-vis* the remaining suppliers of

MOJ00000276

hearing aids active on the market.

### 6.1.1 Market Shares

(128) According to the results of the market survey, on the relevant German market for supplying hearing aids to the hearing aid acoustician retail trade (hereinafter hearing aid market) there are a maximum of nine companies, or, as the case may be, company groups active to an extent worthy of note. The total market volume for the production and distribution of hearing aids to the hearing aid acoustician retail trade amounted to around 205 million EUR in Germany in 2006.

(129) The key suppliers on the hearing aid market offer the following primary brands and secondary brands in Germany:

| | |
|---|---|
| **Siemens (SAT)** | Siemens, Audio Service, Hansaton[44]; |
| **Phonak** | Phonak, Unitron; |
| **GN ReSound** | GN ReSound, Beltone, Interton; |
| **William Demant/Oticon** | Oticon, Bernafon; |
| **Starkey** | Starkey; |
| **Widex** | Widex. |

### 6.1.1.1 Current Breakdown of Market Shares

(130) According to the findings by the Decision Division, the following market structures exist on the German market for the year 2006:

**Table 7: 2006 Market Shares**

| | 2006 |
|---|---|
| | % |
| 1 SAT | 32.5-37.5 |
| 2 Phonak | 20-25 |
| 3 Oticon | 20-25 |
| Total 1-3 | 81.1 |
| 4 GNReSound | 5-10 |
| 5 Widex | 5-10 |
| 6 bruckhoff | <2.5 |
| 7 Starkey | <2.5 |
| 8 Audifon | <1 |
| 9 Acousticon | <1 |
| Total | 100% |

---

[44] Siemens holds an interest of just under 50% an Hansaton Akustik GmbH, but has veto rights with

(131) Accordingly, the three manufacturers SAT, Phonak and Oticon, prior to the concentration, are achieving a combined market share of over 80%. Even the so-called "narrow" presumption of oligopoly in Section 19 paragraph 3 clause 2 No. 1 GWB is thereby exceeded in the instant case by more than 30%.

(132) This high combined market share is accompanied by very large market advantages over the next following competitors; the market share gap between the oligopoly and competitors GN ReSound (No. 4) and Widex (No. 5) amounts in each case to more than 70 percentage points.

(133) Coming after GN ReSound and Widex are suppliers with an only insignificant market position in Germany. The market shares of the German supplier bruckhoff and the American company Starkey in each case lie below 2.5%. In the opinion of the Decision Division, *Bruckhoff* in hearing aids has at best only a very limited competitive potential of its own, since the company offers modified devices of hearing aid manufacturers Oticon, Phonak, SAT and Sonic under its own brand name. *Starkey* is an American hearing aid manufacturer, the focus of whose business activity lies outside Europe. Audifon, a subsidiary of the hearing aid acoustician Kind, plays no role as a supplier of hearing aids, since it is basically active only within its corporate group. *Acousticon* has now largely withdrawn from the hearing aid business and basically distributes audiological diagnostic and measurement devices. It can therefore be excluded that these competitors are in a position to effectively circumscribe the behavioral leeway of the market-leading hearing aid manufacturers.

(134) Overall, the alternatives of the market counterparties are already considerably limited in view of the interplay of the very clear market leadership of the three leading manufacturers and the very large market share gaps between them and the next following competitors.

### .6.1.1.2    Symmetry of the Oligopoly

(135) The **breakdown of market shares** in the oligopoly is initially non-symmetrical. SATs market share is 10-15% over the market shares of the next following competitors Phonak and Oticon.

(136) On its own, this does not argue against a market-dominating oligopoly. Oligopolies are also possible among companies with very different market shares. An oligopolist is fundamentally defined by its behavior and not by criteria such as market shares or ownership structure. Symmetries in the criteria mentioned are neither necessary nor sufficient for actually coordinated behavior to be present. Likewise, asymmetries do

---

respect to strategic business decisions and thus exercises a co-controlling influence on Hansaton.

not indicate that no coordinated behavior is present.[45]

(137) Asymmetries resulting from market shares are also not suitable for reflecting the business power relations between the oligopolists SAT, Phonak and Oticon in the market for hearing aids. For the business data obtained in the instant case show that the power relations between the oligopolists SAT, Phonak and Oticon in the hearing aid market is extremely balanced.

- **Total sales volumes** in the worldwide hearing aid business are comparable. For SAT, Phonak and Oticon, they are each between 550 and 650 million EUR. The integration of SAT into the Siemens corporate group to that extent does not impair the symmetrical set-up in the relevant market.
- The three leading manufacturers constitute an oligopoly not just in Germany **but in Europe and throughout the world as well**. In Europe, the combined market shares are at over 70%. The market shares of the oligopolists in each case lie in a range between approximately 20 and 30%. Worldwide, the combined market share is over 65%. The market shares of the oligopolists are close to one another, with a tight spread of about 5%.
- **Production costs** for all hearing aids sold (machinery, salaries, overhead, etc.) for all three oligopolists are between 25-35% of sales. Each of them has inexpensive production sites in China and/or Poland.
- **R&D expenditures**, including expenditures for licensing fees, are for each of them between 5% and 10% of sales. They are thus around the average R&D costs for companies operating in medical technology.[46]
- **Sales costs** for all three oligopolists are at around 20-30% of sales.
- All members of the oligopoly have at least two hearing aid brands, such that they are in a position to implement a **multi-brand strategy** in the market.
- So-called **"gross margin"** is a figure representing the percentage share of sales that is left over after production costs are deducted. It is a key number for assessing the profitability of a business. According to an October 10, 2006 Company Report by Dansk Equities for Wiliam Demant[47], gross margins for Oticon and Phonak are 69% and 67%, respective. According to the information available, the gross margin for SAT, which is not published, is [...] and thus just under the figures for Phonak and Oticon. Thus, Phonak, Oticon and Siemens are to be assigned to the top bracket of companies in medical technology. The key numbers of the oligopoly members are thus not only very similar, but in comparison to other sectors bear witness to an extraordinarily high profitability of the companies.

---

[45] On this point, see also Monopoly Commission, HG 2004/2005 "Mehr Wettbewerb auch im Dienstleistungssektor!" ["More Competition in the Service Sector Too!"], Baden-Baden 2006, margin number 505 *et seq.*
[46] See SPECTARIS 2006 Sector report, p. 5 and p. 30; www.spectaris.de.
[47] October 10, 2006 Danske Equities company report for William Demant, Appendix 8E to William Demant/Oticon Letter of January 5, 2007.

MOJ00000279

- Besides that, a company's economic power is measured by so-called **EBITDA**. EBITDA is an economic indicator that depicts the profit and cash flow produced by a business. Thus, EBITDA does not look, for example, at a company's "leeway for accounting creativity," insofar as interest, taxes, write-offs on fixed assets and write-offs on intangible assets are affected. To analysts, EBITDA is one of the key indicators of a company's business success.

- SAT's, Oticon's and Phonak's EBITDA in 2006 was between 25% and 35% of sales. In the process, Phonak's EBITDA grew sharply between 2003 and 2006 and caught up with the EBITDA values for Oticon and SAT. Hence, this earnings indicator as well is very comparable and confirms the high profit margins achieved by the members of the oligopoly throughout the world with their products.

(138) Consequently, then, despite the non-symmetrical breakdown of market shares, the business resources of the three oligopolists in the hearing aid business are very similar. This is true not just for sales revenues, but also for the cost structures and core indicators of the economic success of SAT, Phonak and Oticon.

(139) In its comments on the deficiency notification letter, Siemens spoke in opposition to these principles and factual determinations. In its view, the way the three leading manufacturers are organized, with respect to financial power, inclusion in a corporate group, decision-making structures, market set-up / marketing presentation and R&D costs, are so different that there can be no talk of any "symmetry" of these suppliers as found by the Decision Division.[48]

(140) The Decision Division is of the opinion that the group structure of the Siemens corporate group, taken on its own, is no indication that, in markets structured as an oligopoly, the company cannot have participated in coordinated behavior with companies that are set up differently with respect to their financial power and their other business resources. This would in any event be present if the company belonging to a corporate group, based on its particular resources in the relevant market, initiates competitive behavior that prevents concerted oligopolistic behavior. That is not the case here. SAT, a subsidiary of Siemens, with respect to operating data in the hearing aid business, is set up in a similar fashion to Phonak and Oticon -- this was shown by the Decision Division based on the indicators presented above. In the area of component supplies (chips), in the past there were only intra-company supplier relations with Infineon. Today, however, Infineon no longer belongs to the Siemens Group. For the rest, SAT is also not dependent on the resources of the

---

[48] Siemens, Comments on Deficiency Notification, p. 4 *et seq.*

MOJ00000280

Siemens Group. For example, investments in research and development make up less than 10% of hearing aid sales. In addition, SAT participated just as actively as Phonak and Oticon in the oligopolist cooperation on the hearing aid market. To that extent, the differentiation of suppliers into mid-sized companies or international corporate groups is, in the instant case, irrelevant to the question of whether a company can in principle have participated in concerted oligopolistic behavior.[49]

### 6.1.1.3 Changes in Market Share

**(1)     Overall Market Survey**

(141)   Since 2003, the oligopoly's market share has grown quite considerably, from just over 70% in 2003 to over 80% in 2006. The market shares of the next following competitors GN ReSound and Widex each fell by almost half between 2003 and 2006.

**Table 8: Changes in Market Share 2003-2006**

| Germany | 2003 | 2004 | 2005 | 2006 |
|---|---|---|---|---|
| Market Volumes (EUR million) | 209 | 197 | 201 | 205 |
| Market Shares | % | % | % | % |
| 1 Siemens | 35-40 | 35-40 | 32.5-37.5 | 32.5-37.5 |
| 2 Phonak | 12.5-17.5 | 12.5-17.5 | 20-25 | 20-25 |
| 3 Oticon | 15-20 | 20-25 | 20-25 | 20-25 |
| Total 1-3 | **70.7%** | **72.7%** | **78.5%** | **81.1%** |
| 4 GNReSound | 10-15 | 10-15 | 7.5-12.5 | 5-10 |
| 5 Widex | 7.5-12.5 | 7.5-12.5 | 5-10 | 5-10 |
| 6 bruckhoff | <2.5 | <2.5 | <2.5 | <2.5 |
| 7 Starkey | <2.5 | <2.5 | <2.5 | <2.5 |
| 8 audifon | <1 | <2.5 | <1 | <1 |
| 9 Acousiticon | <1 | <1 | <1 | <1 |
| Total | 100.0% | 100.0% | 100.0% | 100.0% |

---

[49] See also Monopoly Commission, *loc. cit.*, margin number 515.

**Graph 3: Changes in Market Share 2003-2006**



(142)  While, in the oligopoly, the market share of SAT went down by only a few percentage points, Phonak was able to significantly increase its market shares between 2003 and 2006 (+ approximately [...]), just as Oticon was able to raise its market share in the 2003 to 2006 time period (+ approximately [...]). Their market shares are now each at more than 20%. It is true that Phonak's and Oticon's gains in market share in the years 2003 to 2006 were at the expense of SAT as well, but very much overwhelmingly at the expense of competitors GN ReSound and Widex. In addition, the market share of SAT between 2005 and 2006 once again remained nearly constant. To that extent, the growth in market share of Phonak and Oticon is in itself not a sufficient indication of significant competition in the oligopoly. It must here also be noted that, structurally, the market has been decisively changed by digitalization and, with significant competition, these structural changes would have instead led one to expect far more conspicuous shifts among the oligopoly's members.

(2)    **Changes in Market Share in the ZVEI Price Segments**

(143)  The participants in the concentration submit that Phonak's rise in market share is to

MOJ00000282

be attributed in particular to the success on the market of the Savia family of products, which the company brought to market at the beginning of 2005 and led to significant rises in market share right in that year of its introduction.

(144)   In its Letter of January 30, 2007, Phonak submits that the increases in market share of Phonak are not, or are not exclusively, to be traced to corresponding drops in market share of GN ReSound. This would become particularly clear were one to analyze the changes in market share in ZVEI's price segments for digital hearing aids.

(145)   The Decision Division has all the sales volumes and sales revenues reported to ZVEI for 2006. These data were turned over to the Decision Division by ZVEI. The ZVEI did not transmit the reports for the prior year, stating that the latter had already been destroyed. The Decision Division thereupon directly requested that the hearing aid manufacturers who participated in the ZVEI system send it the data for the years 2001-2006 that were reported back by ZVEI. Here, however, the Decision Division confined itself to the three oligopoly members and the two larger outsiders GN ReSound and Widex, because these companies account for approximately 95% of the market volume and only these companies are relevant for an assessment of internal and external competition. Except for the companies Phonak and GN ReSound, which stated that they only had incomplete documentation available for their secondary brands Unitron and Beltone, respectively, all of the aforesaid companies submitted the documents.

(146)   The 5.7% difference in total sales made on the hearing aid market in Germany, not taken into consideration by the Decision Division, mainly relates to (1) the data for Unitron and Beltone not submitted by the participants in the concentration and (2) the sales of Starkey, bruckhoff and Audifon, totaling under 3 %, not taken into account. After Siemens, at the request of the Decision Division, also remitted Hansaton's reports to the ZVEI, the sales reports of Siemens to the ZVEI correspond most closely to the company's sales data for the hearing aid market requested by the Decision Division. Phonak's argument, that the ZVEI figures are incomplete because numerous sales were not reported, can thus not be accepted by the Decision Division. In addition to the inaccuracies mentioned, it is only the Siemens sales made by it to the hearing aid acoustician Kind and sold by Kind to end customers under its own brand name that are not encompassed in the ZVEI reporting system. This, however, does not lead to any (appreciable) imprecision in the ZVEI figures, either as regards the completeness of the data or as regards the robustness of the conclusions regarding average manufacturer's sales prices (on this point, see margin number 233 *et seq.*). On the one hand, the share accounted for by Siemens deliveries to Kind is well under 2% of total sales of hearing aids, and is included in the 5.7% difference mentioned. On the other hand, the hearing aids delivered to Kind are not subject to

the setting of prices customary on the market. Here it is not the list price that is the starting point of the negotiation, but rather a net price that takes account of the particular features of acquisition of Private Label products. For example, the manufacture's sale price with Private Label products is calculated without any warranty, without taking sales promotion activity into account, and without use of the manufacturer's own repair and service facilities, and is thus not typical for the setting of prices on the market. The inaccuracies described do not impair the usability of the ZVEI analyses also because the corresponding sales remain left out of account in all years. Finally, the ZVEI data do not materially diverge from the sales data of the companies which were reported to the German Federal Cartel Office for the year 2006. The Decision Division thus regards the ZVEI data - with the aforesaid limitations – as in principle adequate to serve as a basis for analyzing competitive conditions.

(147)    On this matter, the Decision Division regards an analysis of market share changes based on the individual price segments prepared for the ZVEI reporting system as not being entirely correct, because the segments cannot be clearly differentiated from one another either from a technical perspective or the perspective of product brands and thus do not make separate marketing strategies possible for the companies.

(148)    Oticon described the customer segmentation in Germany as follows to the Decision Division, identifying **three significant customer groups:**[50]

- The first group of customers is of low income, and is only able to obtain a basic device at the fixed amount eligible for reimbursement from the GKV. These are the devices that are purchased in the "List Price up to 200 EUR" segment.
- Above the "List Price up to 200 EUR" segment, a price segment has established itself in Germany that, as compared with the basic hearing aid, offers considerably more functions and hearing comfort; as a rule, however, the additional amount payable by the client can still be paid even on average income.
- High-income customers who wish to use the latest technology have the option of buying a high-end device in the "List Price > 900 EUR" price segment. For product innovations, *i.e.*, new features and/or functions are always introduced first in this segment.

(149)    In principle, the Decision Division shares the opinion of Oticon with regard to a threefold division of the market. With regard to their specific lines of demarcation and their competitive significance, however, the following additional comments are of importance:

---

[50] Oticon Discussion on March 6, 2007, Note p. 4 *et seq.*, pg. 1075 *et seq.* d.A.

(150)   The **"List Price up to 200 EUR"** segment, relative to volume in the year 2006, has a 30% share, and a 10% share of the digital market measured by sales[51]. A robust dynamic analysis of market shares based on this price segment, however, would fail for two reasons. In the first place, this segment has developed only over the last few years. Between 2003 and 2006, the market volume there has tripled, and just in the last year it rose by nearly 50%. This makes a competitive analysis significantly more difficult. Secondly, it is only since 2004 that SAT and Oticon have offered a product in this segment. In the List Price up to 200 EUR segment, Widex has had no significant market share down till today. Finally, the competitive setting of prices is distorted in this segment since it is basically determined by the GKV fixed amount. Consequently, the particular structures in this segment thus do not make a proper analysis of competitive conditions possible based on the changes in market share in the period from 2003 to 2006.

(151)   The Decision Division is of the opinion that the second **customer segment** encompasses **list prices 201-600 EUR** - hence both the 200-400 EUR and the 400-600 EUR price segment. For both SAT (Product: Cielo) as well as Phonak (Product: eXtra) and Oticon (Product: Tego) offer their respective best-selling product families in the middle price segment, at list prices – depending on what the product comes with - between 295 EUR and 455 EUR. This segment, relative to volume, has a 47% share, and a 36% share of the digital market measured by sales.

(152)   In the Decision Division's view, the high-end customer segment is also not only limited to hearing aids with a list price of over 900 EUR. It is true that this segment has a central significant to competition, since it is in this market segment that the new technological developments are introduced, and the segment, with a 39% share of total hearing aid sales, is far and away the largest individual segment on the German digital market. According to the information available, however, hearing aids assignable to the "List Price over 900 EUR" segment are, to a not inconsiderable extent, also sold at average manufacturer's sale prices corresponding to the "List Price between 751 and 900 EUR" list price segment. To that extent, the Decision Division assumes that the high-end **customer segment** encompasses **list prices over 750 EUR**, hence both the 750 - 900 EUR and above 900 EUR list price segments. This customer segment accounts for 20% of the volume and 50% of the sales of hearing aids.

(153)   The market shares of the key competitors in both customer segments that – under the general market developments mentioned above - are susceptible of a dynamic analysis - the 201-600 EUR and above 750 EUR segments - saw the following changes:

---

[51] Where applicable, the remaining digitally programmable and analog hearing aids would have to be attributed to this portion of the market.

MOJ00000285

**Table 9: Changes in Market Share in the 201-600 EUR Customer Segment**

|           | 2003     | 2004     | 2005     | 2006     |
|-----------|----------|----------|----------|----------|
|           | %        | %        | %        | %        |
| Siemens   | 45-50    | 50-55    | 40-45    | 45-50    |
| Phonak    | 10-15    | 10-15    | 15-20    | 15-20    |
| OTICON    | 10-15    | 10-20    | 20-25    | 20-25    |
| GNReSound | 7.5-12.5 | 7.5-12.5 | 7.5-12.5 | 7.5-12.5 |
| Widex     | 15-20    | 10-15    | 7.5-12.5 | <5%      |

**Table 10: Changes in Market Share in the above 750 EUR Customer Segment**

|           | 2003   | 2004   | 2005   | 2006   |
|-----------|--------|--------|--------|--------|
|           | %      | %      | %      | %      |
| Siemens   | 25-30  | 25-30  | 30-35  | 25-30  |
| Phonak    | 20-25  | 10-15  | 30-35  | 30-35  |
| OTICON    | 20-25  | 30-35  | 15-20  | 20-25  |
| GNReSound | 10-15  | 10-15  | 10-15  | 5-10   |
| Widex     | 15-20  | 15-20  | 5-10   | 5-10   |

(154)  In the "List Price 201-600 EUR" customer segment, Widex between 2003 and 2006 lost a significant portion of its potential sales (approximately 15%). GN ReSound's market share largely remained stable (change less than 1%). SAT was able to recoup its interim market share losses in 2005 up to [> 0-0.5%] points. Phonak added more than 5% in market share and Oticon nearly 10%. Thus the structural changes, in the dynamic overview, came not at the expense of the oligopolists but at the expense of the outsiders.

(155)  In the "List Price over 750 EUR" customer segment, oligopoly members SAT and Oticon between 2003 and 2006 were able to raise their market shares slightly, by ca. 3% and ca. 1%, respectively, whereas Phonak, with an increase of over 10 percentage points, was able to enlarge its market share considerably. Oticon was not finally able to hold on to its interim gains in market share in 2004, but up to 2006 once again fell back to nearly its starting level of 2003. Here too, Phonak's gains in market share came at the expense of the smaller competitors. GN ReSound was most sharply affected by this (approximately 10 percentage points), while Widex lost over 5 percentage points. The policy of staggered product introduction among hearing aid manufacturers is, in the opinion of the Decision Division, an explanation of why the market shares of SAT and Oticon in the upper price segment in the past few years were in any case not subjected to any lasting changes and Phonak's market shares ultimately rose, in particular at the expense of GN ReSound and Widex.

MOJ00000286

(156)  Consequently, Phonak's market share increases came essentially at the expense of competitors GN ReSound and Widex, with weak market shares in Germany. The market share fluctuations for Oticon and SAT, when the years 2003 through 2006 are viewed dynamically, have swung back once again to the 2003 level. Here, the Decision Division does not fail to recognize that the market shares of SAT and Oticon were subjected to short-term fluctuations. These fluctuations, which in the dynamic overview of the time period 2003 to 2006 were largely offset once again, do not – in and of themselves – stand opposed to market domination.

(157)  It is appropriate to analyze changes in market share on the basis of the overall market, since the manufacturers offer a complete product portfolio from high-end devices to basic devices, the marketing and pricing of which is the result of an overall business design (e.g., new introduction of high-end products and simultaneous of the then "outdated" technology). Besides this, buyers as a rule request delivery of a complete product portfolio from hearing aid manufacturers.

(158)  Insofar as one goes on to look separately at the digital customer segments of significance to the hearing aid market in the years 2003-2006, it becomes clear that Phonak was able to raise its market share above all at the expense of the small competitors. The other oligopolists SAT and Oticon were able to assert or in part even increase their market positions.

(159)  The Decision Division has not failed to notice that Phonak, by a brand policy in the period from 2003 to 2006 that was highly effective on the market, was able to obtain greater weight for itself in the oligopoly. In the opinion of Decision Division, however, this strengthening of Phonak in the oligopoly would only be an indication of significant internal competition if Phonak had attacked the market position of the other oligopolists on a lasting basis and to a considerable extent. But this is not the case. Gains or losses of market share by Oticon and SAT in individual price segments were balanced out once again over the course of time. In addition, the structural distortion through the digitalization of the market are to be considered, which rather apparently would have caused a clear change to the market at the expense of individual members of the oligopoly as well.

### 6.1.1.4 Comments of Phonak and Siemens

(160)  The market share of hearing aid manufacturer Siemens is just above the presumption of market dominance of Section 19 paragraph 3 clause 1 GWB. The Decision Division however, does not share the view of Phonak[52] that, in the instant case, it ought to have examined not the question of an oligopolistic domination of the market

---

[52] Phonak, Comments on Deficiency Notification Letter of April 3, 2007, p. 10

but, at most, only the question of individual market domination. Phonak adduces the following reasons for its view:

- Only the market shares of market leader Siemens remained constant over the course of time.
- The next largest companies have up till now had a market share retreat of well over 20%.
- The next largest companies were subjected to such strong fluctuations in market share that their membership in the alleged oligopoly changed over the course of the years.
- The relevant market is indisputably distinguished by innovation and heterogeneous products (on this point, see *infra*, margin number 202 *et seq.*).

(161)  It is correct to say that the market shares of SAT in the time period 2003 to 2006 remained constant or fell only slightly within a range of under 5 %. It is equally correct that Phonak added market shares and that Oticon too was able to strengthen its market position in Germany slightly, *i.e.*, within a range of under 5 %. The Decision Division has made a detailed investigation of these shifts in market share and has determined that Phonak made corresponding gains in market share in particular at the expense of those competitors coming after the oligopoly: GN ReSound, Widex and Starkey. But changes in market share in the oligopoly do not argue against market dominance if the market share gains of an oligopolist come not at the expense of the other oligopolists, but basically at the expense of the outsiders. In the opinion of the Decision Division, that is the case here.[53]

(162)  According to the findings of the Decision Division, the gaps in market share between Siemens and the next following companies Phonak and Oticon are far from being over 20%, but are merely about 10% and just over 10%, respectively. Accordingly, even before the concentration, this results in a market structure which under the decisional practice of the German Federal Cartel Office argues against the existence of a position of individual market dominance. The narrow presumption of oligopoly of Section 19 paragraph 3 clause 2 No. 1 GWB and the structural conditions on the substantively relevant market listed in what follows thus accurately describe the situation of threat to competition.

(163)  The fact that the breakdown of market shares among the three leading manufacturers is not completely symmetrical does not argue against the presence of the presumption of oligopoly (on this point, see supra, margin number 135 *et seq.*).

(164)  The market share breakdown submitted by Phonak and the market share chart on

---

[53] See, *e.g.*, "Comet/Piepenbrock," German Federal Cartel Office, Decision of May 12, 1999, margin number 21.

MOJ00000288

page 3 of its Comments on the Deficiency Notification Letter are implausible, and contradict the statements heretofore by the participants in the concentration. Phonak should have been able to recognize this right after reading the Deficiency Notification, which contains a very detailed market analysis using approximate values. The market shares specified for Phonak also do not agree with earlier information from the company itself. If Phonak, in its Letter of January 30, 2007, was still indicating for its company a 20-25% market share by value for the digital hearing aids area and a market share of approximately 40% by volume of analog hearing aids, the total market share (digital and analog) according to the data now submitted and the chart should still only be 15-20%. The market shares for GN ReSound are also too low and contradict the previous submission of the participants in the concentration. These gaps in plausibility are all the more astounding as Phonak and GN ReSound are themselves able to determine their own market shares precisely, based on the available ZVEI analyses.

(165)  The Decision Division has demonstrated that the digitalization of hearing aids at the end of the 1990's was initiated by hearing aid manufacturers active on the market, and has had a market penetration of more than 50% only since 2003.[54] The digitalization of the hearing aid market in Germany has in the meantime largely concluded. To that extent, an overview of market structure over the past eight years – as attempted by Phonak with faulty data - is without meaningful significance for the assessment of the instant case. In an oligopolistic market dealing not in producer durables, but rather production and distribution of products taking place in comparatively short product life cycles, a market share overview encompassing three, or at most four, years, is appropriate for making a competitive assessment.

(166)  While the market shares of Phonak in the years 2003 and 2004 were only just above the market shares of GN ReSound, the picture has changed decisively in the last two years. Phonak has established itself on the market essentially at the expense of GN ReSound and Widex and is thus to be included in the presumption of oligopoly of Section 19 paragraph 3 clause 2 GWB. This is demonstrated by the Decision Division's detailed and robust market share determination and does not represent - as Phonak thinks - "... a non-meaningful snapshot"[55]. GN ReSound is not to be included in the oligopoly. The company is admittedly a participant in joint ventures like HIMSA and HIMPP, but departed from the circle of leading hearing aid manufacturers in Germany no later than in 2005, due to weaknesses mainly of distribution and brand strategy. It is true that the company is still intertwined with the leading hearing aid manufacturers through HIMPP and HIMSA, but its competitive behavior decisively diverges from the behavior of the three leading suppliers. GN ReSound is neither

---

[54] See *supra* Table 4. Market penetration by volume 2002: 46%, 2003: 56%, 2004: 70%, 2005: 82%; 2006 91%.
[55] Comments on Deficiency Notification Letter, p. 10.

participating to the same extent as the oligopolists in an exchange of technology with respect to the new products introduced in 2006 and 2007, nor has GN ReSound over the past years participated in the harmonization of manufacturer's sale prices organized through the ZVEI reporting system. The Decision Division is therefore – just like the Monopoly Commission - of the opinion that companies are to be assigned to an oligopoly only if their behavior as well as aligned.[56] In the instant case, this is just not true of GN ReSound.

## 6.1.2. Structural Conditions Favoring Concerted oligopolistic behavior

(167)  In the view of the Decision Division, the relevant market reveals a series of particular structural conditions favoring concerted oligopolistic behavior. These structural conditions go from cross-entwinements and important product-related licenses to a high degree of market transparency both regarding product innovations and times of product introduction as well as regarding the setting of prices and terms. Also included is the fact that hearing aid manufacturers have jointly created a product and price segmentation for the hearing aid market and jointly possess a countrywide listing with nearly all the larger hearing aid acoustician purchasers. On the basis of these structural conditions – which they themselves partly put in place – it is comparatively easy for the oligopolists to reach agreement on the conditions for an oligopolistic coordination. They are also in a position to follow and monitor the specifics of coordination. In the event of a breach of this coordination, finally, they are able to employ credible deterrent mechanisms. The Decision Division ultimately holds it unlikely, particularly after the concentration, that outsiders to the oligopoly could be in a position to threaten the results of this coordination. For purchasing hearing aid acousticians, this is already true today. The key structural conditions can be summarized as follows:

## 6.1.2.1 HIMPP and HIMSA Joint Ventures

(168)  The essential foundational patents for digital hearing aid technology are held by the Danish company Hearing Instrument Manufacturers Patent Partnership, Vaerlose, Denmark, (HIMPP). HIMPP was founded in 1996 by leading hearing aid manufacturers to acquire patents for the development of digital hearing aids from companies that are not suppliers of hearing aids, and to make them available to all manufacturers of (Third Party Patent Portfolio).

(169)  As one of its founding partners, ReSound had sold to HIMPP the patent portfolio purchased from 3M in 1996. In addition, HIMPP chiefly acquired patents from Decibel Instruments (in 2002) and NEC (in 2003). In the Patent Portfolios:

---

[56] Monopoly Commission HG 2004/2005 "Mehr Wettbewerb auch im Dienstleistungssektor!" ["More Competition in the Service Sector Too!"], Baden-Baden 2006, margin number 505 *et seq.*

MOJ00000290