- The 3M patents serve the purpose, in particular, of digital adjustment of a hearing aid to the individual hearing loss of a user, signal processing in the hearing aid and the development of programming plug-ins on the hearing aid.[57] According to information from Phonak, these are basic patents for being able to develop digital hearing aids at all; the corresponding patents run until 2008/2012.
- Decibel Instruments conveyed to HIMPP fundamental patents for computer-based programming of hearing aids and for the development of the adjustment software, as well as for the set-up and design of an ITE device; the corresponding patents run until 2011/2018.
- NEC conveyed to HIMPP fundamental patents for development of signal processing / and the so-called DSP architecture; the patents run until 2015/2016.

(170)  By the collectivizing of the foundational patents, according to the statements of the participating manufacturers, it was intended to avoid patent disputes during the introduction of digitalization. Today, all well-known manufacturers are partners in HIMPP. For an entry contribution of 1.8 million EUR, patents may be used without licensing fees. According to the reports of the manufacturers surveyed, HIMPP is open to all suppliers desiring to enter. Whoever is not a partner (e.g., auric) receives a licensing agreement. The licensing fee is then calculated on the basis of the digitally programmable hearing aids sold per year.[58]

(171)  According to statements by the participants in the concentration, no competitor thus shows any key technical advances *vis-à-vis* competing companies with respect to the basic technologies.[59] At the same time, the participants in the concentration espouse the view that the HIMPP patents are admittedly basic patents that are required for the development of digital hearing aids, but that the competition over innovations is being carried out in other areas (new programming algorithms, enhancement of BTE devices, etc.).[60]

(172)  According to information from Phonak, the partners in HIMPP do not intend to acquire additional patents. However, [...], a manufacturer of chips for hearing aids, will join HIMPP in 2008. According to statements by Oticon, the problem exists that [...] is currently infringing the HIMPP patent portfolio, in that the company is installing the adjustment algorithm of a third party hearing aid manufacturer on a chip. To avoid

---

[57] For the particulars: Phonak Letter of December 27, 2006, p. 3, pg. 355 d.A.

[58] This means that the partners in HIMPP at a minimum are aware of the overall number of digital hearing aids sold by these licensees.

[59] Phonak Letter of November 28, 2006, p. 9, pg. 271 d.A. B3-554/06.

[60] Phonak Letter of December 27, 2007, p. 3 *et seq.*, pg. 355 *et seq.* d.A

MOJ00000291

looming patent disputes, [...] shall now become a partner in HIMPP and thereby become a user of the patent portfolio. It emerges from the minutes of HIMPP Board Meetings sent that HIMPP is also negotiating with other chip manufacturers like [...] regarding a corresponding interest in HIMPP or a licensing of HIMPP patents.[61]

(173) Along with the patent portfolio, HIMPP maintains a joint patent database of the partners regarding all patent specifications relevant to hearing aids. This database makes it possible for the partners in HIMPP to look at competitors' patent specifications at the phase of the examination of patentability, and to look into whether the competitor or the company itself are running the risk of infringing an already existing patent or parallel patent examination proceedings are looming. As a rule, the companies then agree on a license.

(174) The partners in HIMPP meet semi-annually during the professional convention of the European Union of Hearing Aid Acousticians (EUHA) and the American association AAA.

(175) HIMPP is registered with the European Commission on Form A/B and on June 18, 1997 was granted a Comfort Letter. Contrary to Phonak's factual submission,[62] the Commission has not formally exempted HIMPP.

(176) A further example of the cooperation to be observed in the hearing aid industry are the joint ventures **HIMSA I and HIMSA II.**

(177) When hearing aids are adjusted to the client, the hearing aid acoustician has the task of putting together the measurement data with the programmable parameters. For this purpose, the acoustician first creates an audiogram with six measurement values (measurement system). The corresponding characteristic data is the basis for adjusting the hearing aid. Based on that data, the hearing aid acoustician makes a preliminary selection of suitable hearing aids so as to adjust or program them, as the case may be. The client may then try out and compare these hearing aids ("comparative adjustment"). Finally, the client decides upon a hearing aid.

(178) In 1993, Oticon, Phonak, Widex, and GN ReSound founded the Hearing Instruments Manufacturers Software Association, Denmark (HIMSA I). HIMSA I has in the meantime created a software solution with NOAH that is used as an interface between the audiometric measurement systems and the adjustment software of the relevant manufacturer. Client data and audiometric information are entered centrally into the NOAH hearing aids software (measurement system - measurement system module - NOAH). After that, the data is automatically entered into the relevant

---

[61] Phonak Letter of December 27, 2006, Appendix I 1.(a), pg. 363 d.A.
[62] Comments on Deficiency Notification Letter, S. 11

MOJ00000292

adjustment software. The advantage of this is that the hearing aid acoustician no longer must enter the client data into each individual adjustment program but, using the interface between NOAH and manufacturer's NOAH adjustment software, may always access the client data regardless of which adjustment program he is working just then. NOAH can be combined with every manufacturer's adjustment program (via a hearing aid adjustment module); the prerequisite for this is that the adjustment software be certified by HIMSA. Also through HIMSA, eTONA, a program to support electronic ordering, and NOAHlink, a hardware accessory to link the computer and the hearing aid, are distributed to hearing aid acousticians. In 2002, it was decided to expand the number of partners with SAT and Starkey. For that reason, a new partnership, HIMSA II, was founded.

(179)  HIMSA I and HIMSA II were registered with the KOM. HIMSA I was granted a Comfort Letter, while the registration of the By-Laws and Partnership Agreements of HIMSA II became ineffective when the 1/2003 Order went into effect.

## 6.1.2.2 Licensing of Hearing Aid Technology

(180)  Especially the leading hearing aid manufacturers, SAT, Phonak and Oticon, are "intertwined" by a series of reciprocal licensing and cross-licensing agreements. This is also true, although to a far lesser extent, for the next following competitors GN ReSound, Widex and Starkey. Reciprocal licenses continue to recur because the manufacturers' focus of development is very similar and for that reason the threat of patent disputes exists over and over again. Companies frequently work on product enhancements for which competitors have already filed patents. The HIMPP-maintained patent database of all patent specifications relevant to hearing aids simplifies identification of corresponding parallel developments. As a rule, the companies then agree on a reciprocal license with no fees.[63] Chiefly licensed are features/function in the process of signal transmission and programming, but so too are hardware components such as the tubes used for Open Feed-in and end pieces or die casting processes for manufacturing hearing aids.[64] In what follows, the collectivization of application-related technology between the oligopolists SAT, Phonak and Oticon shall be discussed using the example of the "Patent Cross License and Option Agreements" entered into between these companies.

(181)  In 2006, Phonak entered into two "Patent Cross License and Option Agreements" (a) with Oticon and (b) with SAT. In them, the parties to the agreement reciprocally grant each other the right to request from the other party to the agreement licenses at no

---

[63] SAT Discussion on February 22,.2007, Note p. 4, pg. 796 d.A
[64] See specifically Phonak Letter of December 12, 2006, Appendices II 5.1 and II.5.2; II.6.1 and II.6.2, pg. 147 *et seq.* d.A.; Siemens Letter of January 05, .2007, Appendix 1, pg. 263 d.A. LO Wettbewerber I; Oticon, Letter of January 05, 2007, Appendix 2A, pg. 161 *et seq.* d.A. LO Wettbewerber I, Appendix volume.

MOJ00000293

charge for up to [...] patent families (Phonak-Oticon agreement) [...] patent families (Phonak-SAT agreement). Under the framework of these agreements, an intensive exchange of patents between Phonak and its competitors SAT and Oticon took place through the end of 2006.

(182)  The Cross-Licensing Agreement between Phonak and Oticon relates to key patents that [...] relate to the focal points of development described in Section 3.1.6. They have in part already been employed in hearing aids of the contracting parties introduced onto the market. Since Phonak as a party to the agreement designates the precise contents of the patent exchange as a trade secret, the Decision Division shall dispense here with a precise description.[65]

(183)  The patent exchange with SAT relates to [...] patent families. This Agreement as well relates to key patents that [...] relate to the focal points of development described in Section 3.1.6. They have in part already been employed in hearing aids of the contracting parties introduced onto the market. Since Phonak as a party to the agreement designates the precise contents of the patent exchange as a trade secret, the Decision Division shall dispense here with a precise description.[66]

(184)  Thus, the patents relate not only to marginal areas of technological development, but essentially to current product developments with a considerable market significance (on this point, see margin number 206 *et seq.*).

### 6.1.2.3 Outlays for Research and Development

(185)  Along with the aforementioned technological optimizations of hearing aids, today it is chiefly purely subjective "feel good" factors that determine the market success of hearing aids. Under this heading come the miniaturization of cases ("small, ultra-narrow and as light as a feather"), an elegant and modern design, attractive high-tech colors and a heightened aesthetic quality of the hearing aid.[67] What this indicates is that the hearing aid market, in particular over the last few years, has entered into a phase of technical and visual optimization, and bursts of innovation, such as are to be observed in young markets in the development and experimentation phase, are no longer to be expected. This is also supported by the R+D costs, inquired about by the Decision Division, of the five leading hearing aid manufacturers for the years 2003 through 2006, including expenditures for licensing fees paid to companies outside the corporate group. The corresponding outlays amounted to between approximately 35 and 55 million EUR per year. Thus, R&D outlays in 2006 were a [5-10]% share of the

---

[65] For particulars regarding the contents, see Oticon Letter of February 21, 2007, p. 6 *et seq.* LO Wettbewerber II.
[66] For particulars regarding the contents, see Siemens Letter of February 20, 2007, Appendix 2, LO Wettbewerber II.
[67] Phonak Letter of February 14, 2007, p. 8; pg. 630 d.A.

MOJ00000294

respective sales of the companies questioned. Thus, measured against customary R&D expenses in the optical, medical and mechatronics industries, they are about average.

#### 6.1.2.4 Market Transparency

(186)   The market transparency in Germany on the domestic market for hearing aids is so strongly pronounced that concerted oligopolistic behavior is thereby favored even prior to the concentration.

(187)   In the view of the Decision Division, what matters for an assumption of market transparency - favoring concerted oligopolistic behavior - is not that complete product, price and condition transparency exist. This is never the case on commercial markets, since manufacturers regularly offer a product portfolio to the trade and, depending on the customer's size, a policy of price deductions with special conditions or price campaigns is customary. Were one to affirm the presence of concerted oligopolistic behavior only if oligopolists had an overview over the entire price and rebate policy of their competitors, it would scarcely be possible to carry out proof of oligopolistic market dominance in the control of mergers. The mandatory overriding rule would largely just be idling in place.

(188)   In order to favor concerted oligopolistic behavior, it is sufficient if the market transparency reaches a level that, on the one hand, allows oligopolists to be aware of competitors' product and price strategies and identify competitive advances of other competitors. On the other hand, the degree of market transparency must put the oligopolists in a position to be able to react in the short term to competitive advances of other oligopolists, so as to adjust their own product offering or their own terms accordingly.[68] On such a scenario, the competitive advance of one oligopolist would not lead to a lasting growth in market share, since the comparative advantage of this advance over competitors could be neutralized by their reaction without a significant time lag.[69]

(189)   The Decision Division is of the opinion that the market transparency on the domestic market for the production and distribution of hearing aids to hearing aid acousticians has now reached such an extent as to adequately ensure concerted oligopolistic behavior in the sense of the principles mentioned in margin number 162 f. The following findings are dispositive for this purpose:

#### (1)   Transparency regarding Time of New Product Introductions

---

[68] Rs. T-464/04 "Independent Music Publishers and Labels Association (Impala)/Kommission"; Court of First Instance, Decision of July 13, 2006, margin number 440.
[69] See also Wagner-von Papp, "Wie "Identifizierend" dürfen Marktinformationsverfahren sein?" ["How

MOJ00000295

(190) New product introductions are announced exclusively on two dates a year in connection with two trade shows. The first trade show is an event of the American Academy of Audiology (AAA) and takes place early in the year in the U.S.A.; the other is an event of the European Union of Hearing Aid Acousticians (EUHA) and takes place every fall in Germany. The Decision Division is unaware of any case from the last few years in which a new production introduction was not brought to market within a narrow band of time around one of these conventions. Consequently, competitive advantages, in the sense of the introduction of new hearing aid functions, thus take place only in a temporal context foreseeable to all manufacturers.

**(2)     Stability of Supply and Demand Conditions**

(191) The **supplier structure** on the relevant market has bee extremely stable and fixed for years. After a long phase of consolidation, on the domestic market there are today only five suppliers with market shares over 5% active. The remaining suppliers play no appreciable role. None of the competitors surveyed was able to name any market entries over the last ten years on the German hearing aid market for production and distribution to the hearing aid acoustician retail trade. On the contrary, as a result of insolvencies (*e.g.*, Linke, Intrasone) or takeovers (*e.g.*, Viennatone, Sonar, Philips, Bosch), brands have disappeared from the market. Sonic alone entered the German market, in the year 2000, but has been unable to establish itself with hearing aid acoustician and today serves only those using the abbreviated treatment channel.

(192) **Demand** is not dependent on the business cycle, even though the market potential for hearing aids has been exhausted only in small part. It is true that, in Germany, approximately 70-80% of those with significant hearing loss have been treated, but only 30 to 50% of those with medium to severe hearing loss have. Those with a slight hearing loss purchase a hearing aid only rarely, *i.e.*, in 10% of the cases. According to SAT's estimates, out of approximately 15 million persons with hearing loss, about 4 million wear a hearing aid. Thus far, persons with diminished hearing capacity can decide only with great difficulty, if at all, on the purchase of a hearing aid. The wearing of a hearing aid continues to be bound up with a heavy stigma (hearing aids are viewed as a sign of diminished vitality and capacity), with the hearing impaired fearing professional or social isolation.[70] The hearing-impaired who in fact do buy a hearing aid are as a rule categorically referred to such a device. Correspondingly, there exist scarcely any alternatives for other devices or the possibility of a considerable time delay in getting one. Correspondingly, the supplier relationships of hearing aid manufacturers to hearing aid acousticians over the long term have stable,

---

'identifying' may market information procedures be?"] , WuW 7 and 8/2005, p. 732, 735.
[70] See, *e.g.*, the corresponding study by Keppler Konsumforschung GmbH, in Appendix 11 to Phonak Letter of January 30, 2007, pg. 672 *et seq.* d.A.

MOJ00000296

slightly increasing delivery amounts.

(193)  The common defensive attitude towards suppliers using the abbreviated treatment channel (see *supra,* margin number 94 *et seq.*) clearly shows the fixed manufacturer - retailer relationships, which are defended also against other potential buyers of hearing aids. The manufacturers do not accept suppliers using the abbreviated treatment channel into their association, the ZVEI, and refuse to supply Ear-Nose-Throat physicians using the abbreviated treatment channel. Hearing aid acousticians are not interested in listing hearing aid manufacturers who also offer their products using the abbreviated treatment channel.

(194)  The survey of the 17 largest chain operators and purchasing cooperatives produced no indications of significant customer migrations among the oligopolists. It is correct that hearing aid manufacturer Phonak lost its position as primary supplier to a large chain store operator in the year 2006.[71] The share of total sales, by value, represented by this chain store operator's procurement volume, however, is only [5-10%]. To that extent, this example, on its own, is not a suitable proof of significant competition in the oligopoly. Moreover, Phonak continues to be listed with this chain store operator and is still supplying [10-20%] of the hearing aids procured by this operator. No other noteworthy examples of a change of supplier among the oligopolists are known to the Decision Division.

(3)    **Price Transparency through Countrywide Listing and Steady Customer Contacts**

(195)  The 17 largest chain store operators and purchasing cooperatives surveyed by the Decision Division account for a procurement volume, by value, of just about 50% of all hearing aids obtained in Germany through the hearing aid acoustician retail trade. The oligopolists are listed as primary suppliers with 15 of the 17 companies surveyed. With every introduction onto the market of a new family of products, the manufacturers hold so-called road shows at all important suppliers. The frequency of client visits for customer service and training in the hearing aid market is extremely high based on the short product life cycles - particularly in the upper price segments - and on the annual price negotiations. The list prices, which show a high stability over time, are known to the market. They are the starting point for the annual negotiation with buyers regarding terms. Special conditions, such as rebates in kind or discounts, that could lead to inaccuracies in price transparency do not play a decisive role in the setting of prices, according to the findings of the Decision Division (see *infra* margin number 244 *et seq.*). To that extent, there is considerable price transparency just because of the steady customer contacts. The retailers themselves bring about an indirect exchange of information regarding individual terms, since these retailers

---

[71] Phonak Letter of February 14, 2007, p. 3, pg. 625 d.A.

normally negotiate in reference to the terms offered or guaranteed by the other hearing aid manufacturers.

## (4) ZVEI Reporting System

(196)   This price transparency is strengthened by the ZVEI reporting system. With that system, hearing aid manufacturers have created an extensive **system of market information**. The ZVEI reporting system, with its current highly detailed data reporting and processing, was set up in 2002, *i.e.*, in a time in which the establishment of digitalization was still in full swing and the setting of prices could still have been designated as a process of discovery.

(197)   Since 2002, the ZVEI reporting system has greatly increased transparency as regards market share structure and the setting of prices. After an adjustment phase of 4 years now, the oligopolists' average manufacturer's sales prices have strongly converged with one another (on this point, see margin number 231 *et seq.*).

(198)   All manufacturers who distribute hearing aids in Germany to the hearing aid acoustician retail trade participate in the ZVEI reporting system. Manufacturers who distribute hearing aids using the abbreviated treatment channel are not admitted. Based on the strong consolidation over the past few years, the data exchange today largely is concentrated on the companies SAT, Phonak, Oticon, GN ReSound and Widex. Based on the monthly reports, the ZVEI makes available to participating companies the following analyses (aggregated across all participating companies, analyses for individual months, quarters and entire years):
   - Total number of items and sales data for analog, digitally programmable and digital hearing aids;
   - Total number of items and sales data for BTE and ITE hearing aids;
   - Total number of items for individual ITE devices (*e.g.*, fully modular, semi-modular, delivered with wrapper, CIC-hearing aids);
   - Total number of items for single-channel/multi-channel hearing aids;
   - Total number of items and sales data, separately, for the six digital hearing aid price segments and
   - Average manufacturer's sales prices, separately, for the six digital hearing aid price segments.

In this process, the average manufacturer's sales prices are determined in accordance with the following criteria:
   (a)   The ZVEI determines the average manufacturer's sales price for each list price segment, regardless of where the manufacturer's sales price lies within the relevant list price segment or in a list price segment below it.
   (b)   The ZVEI determines the average manufacturer's sales price for each list

price segment. Insofar as the amount of the manufacturer's sales price lies outside the list price segment (*e.g.*, a product from the "List Price > 900 EUR" segment in the manufacturer's sales price lies within the "List Price 751-900 EUR" segment), the relevant volumes with this manufacturer's sales price are referred to the "751-900 EUR" segment.

(199)  The companies participating in the ZVEI reporting system can thereby make a precise determination each month of, *inter alia*, their own market share in all price segments and for different types of hearing aid. Beyond that, they receive ongoing information regarding changes in manufacturer's sales prices in these segments. It should be noted here that the manufacturers participating in the ZVEI reporting system themselves jointly created the segmentation into six list price segments. This segmentation of the market and the corresponding transparency regarding a multitude of list and manufacturer's sales prices puts the manufacturers in a position to recognize a possible competitive advance immediately. They then also know in which price segment the advance took place. Due to the stable supply and demand conditions, the participating companies can now in practice exclude the chance of changes to market share or manufacturer's sales prices not involving a conscious deviation from the coordinated price ("cheat"), but rather [can determine] that they involve a regular normal "market noise" created by fluctuations in the order situation.[72]

**(5) Asymmetry of Market Transparency to the Detriment of Buyers**

(200)  While hearing aid manufacturers, due to their great transparency, have competitive products and product portfolios, list prices or average manufacturer's sales prices available, the setting of prices, in particular, is confusing to the purchasing hearing aid acousticians – at best with the exception of a few large chain store operators.

(201)  By very reason of the described cooperation and the sales and price reporting system, an asymmetrical market transparency arose in the past to the benefit of hearing aid manufacturers and to the detriment of hearing aid acousticians, and truly to the detriment of end customers for hearing aids. The manufacturers' default product range, from basic devices to high end hearing aids, is accompanied by a price range in which a high-end device costs up to 10 times more than a basic device. In view of the fact that the digitalization of hearing aids has now concluded and product differentiation basically takes the form of technical improvements or optimizations or an altered product design, this argues against a functioning price competition in the market. Even less than hearing aid acousticians are end customers in a position to carry out a price and product comparison. Hearing aids – differently from many consumer goods – cannot simply be compared on price. The final

---

[72] See also Wagner-von Papp, "Wie "Identifizierend" dürfen Marktinformationsverfahren sein?" ["How 'identifying' may market information procedures be?"] , WuW 7 and 8/2005, p. 732, 735.

MOJ00000299

customer price is made up of the manufacturer's sales price and the price for
servicing by the hearing aid manufacturer. The setting of prices is completely non-
transparent to the customer. To that extent, the hearing aid acousticians profit as well
from this asymmetrical market transparency.

### 6.1.3 Effects of the Structural Conditions on Internal Competition in the Oligopoly

### 6.1.3.1 Competition for Innovations and Competition for New Product Introductions

(202)    With the collectivization of the foundational patents through **HIMPP**, hearing aid
manufacturers placed the digitalization of hearing aids on a common basis very early.
On the one hand, this has led to the establishment of an industry standard, and on
the other has placed competition over digitalization into an exceedingly cooperative
environment right from the outset.[73]

(203)    It is true that one may agree with the participating companies that the HIMPP patent
portfolio involves basis patents and not patents for new functions and algorithms.[74]
However, the view of Phonak[75] and Siemens[76], that HIMPP only has a standardizing
function favoring competition, does not, in the opinion of the Decision Division, go far
enough. The relevance of HIMPP for their activity as hearing aid manufacturers is
fundamental. Without a position as a partner in HIMPP or a licensing agreement with
HIMPP, the production of a digital hearing aid is impossible. This key function is seen
by the partners in HIMPP as an important mutual connector. HIMPP was the starting
point for development of a digital market for hearing aids, which decisively rested on
a common cooperation of the traditional hearing aid manufacturers. By contrast to the
development of digital cameras, companies coming from digital technology have not
gained a foothold in the hearing aid market itself. Through the acquisition and
collectivization of the HIMPP patent pool, the traditional hearing aid manufacturers
early on also assured themselves of access to digitalization. This is also defended
against third party manufacturers – currently against chip manufacturers. The
expansion of the circle of HIMPP partners to include companies outside the sector is
dependent on the agreement of the current partners. Thus, there exists a right of
preemption for a partner's interests in HIMPP insofar as it is acquired by a company
that thus far does not belong to the circle of HIMPP partners.[77] The oligopoly
members SAT, Phonak and Oticon are already among the authoritative partners in

---

[73] 73 Oticon's then president and CEO, Lars Kolind, referred to HIMPP and HIMSA as concrete
projects to create a cooperative environment in Europe, *e.g.*, Lecture to the IFHOA (International
Federation of Hard Hearing People) on June 6, 1997, www.ifhoa.org/papers/kolind.htm, pg. 403 *et
seq.* d.A.
[74] Most recently: Comments on Deficiency Notification Letter, p. 11.
[75] Comments on Deficiency Notification Letter, p. 11.
[76] Comments on Deficiency Notification Letter, p. 7 *et seq.*
[77] See Shareholders Agreement in Appendix II.1.2.1. to Phonak Letter of December 13, 2006, pg. 33
d.A.

MOJ00000300

HIMPP. After the concentration, their position as partners will be decisively enhanced, since they will then dispose of a majority of the votes on the Administrative Committee, which is responsible for the management of the joint venture [...]. The inclusion of GN ReSound, which has thus far had [...] votes, will thus make possible an implementation of the combined interests of the oligopolists in HIMPP. Consequently, in the opinion of the Decision Division, this leads to a safeguarding of the oligopoly.

(204)    The patent portfolio will also not lose its competitive significance to the hearing aid market in the forecasting time period, since for the most part it runs until 2012/2018.

(205)    In the view of the Decision Division, the cooperation of the leading hearing aid manufacturers in Germany within the framework of **HIMSA I and HIMSA II** has no significant competition-dampening effects in the relations of the joint venture partners to one another. The NOAH software solution, however, in the Decision Division's view, leads to a further binding of the purchasing hearing aid acousticians to the hearing aid manufacturers established on the market. Thus, NOAH supports the already tight retailer-manufacturer relationship.

(206)    The **exchange of patents among the oligopolists** does not only relate to marginal areas of technological development, but essentially to current product developments with a decisive market significance.

(207)    This can be understood, in the Decision Division's opinion, by the example of the Cross-Licensing Agreements described in margin number 180 *et seq.*. In the information they provided to the Decision Division, the companies participating in these agreements and other market participants basically identified the development areas of "occlusion-free sound quality" "Sound Smoothing", "automatic microphone equalization ", "enhancement of directional microphones ", "Data Learning" and "wireless transmission process " as focal points for current and medium-term product development. The patents exchanged among the three leading suppliers cover these focal points of development virtually without exception. Phonak is advertising its newest high-end product microSavia for, *inter alia*, the high occlusion-free sound quality, the good comprehensibility of one's own voice (Real Ear Sound), the innovative directional microphone technology (digital surroundZoom) and the excellent speech comprehension (noise and wind suppression). The newest technology in the area of noise suppression "Sound Smoothing" was introduced by SAT through Centra SoundSmoothing in April 2006; in November 2006, Phonak followed suit with SaviaArt SoundRelax and Unitron Element AntiShock. The aforesaid technological innovations are, without exception, also the subject of a no-cost exchange of technology between Phonak and its competitors SAT and Oticon. Due to the high significance of this exchange of technology among the leading

MOJ00000301

hearing aid manufacturers for new product introductions, the Decision Division – unlike Phonak - views it as significant if Phonak, for example for the Savia product family, shares a considerable portion of the patents employed here [...] with third party manufacturers, in particular the other oligopolists.[78]

(208)   Due to the depicted cooperation of the leading hearing aid manufacturers in the area of basic patents for digitalization (HIMPP), the cross-linking of software components like measurement technology and adjustment software via NOAH (HIMSA I, HIMSA II) and the mutual, largely cost-free licensing of essential product developments, the leading manufacturers are very close to each other in their developmental expertise. Simultaneously, through HIMPP's monitoring of the patents relevant to the hearing aid industry, information regarding current technological developments is collectivized and a uniform information base ensured. Competitive advances of individual manufacturers – insofar as they occur at all – are generally picked up within a few months by the competition. Such a process contributes materially to the mutual confidence in the concerted oligopolistic behavior and is all but structurally ensured through the aforesaid collectivization. For based on the common basic technologies and the comparable developments among the oligopolists resulting therefrom, everyone must take into account that he might infringe a patent of another competitor in a special area. The non-trivial numbers of patent complaints filed illustrates this problem. Being aware of this situation and with a view toward not consistently blocking one another, it seems nothing less than compelling from a business perspective to exchange patents with one another again and again.[79] This structurally ensures the concerted oligopolistic behavior in technological competition and the prevention of lasting technological advances. Genuine technical advances are the exception. In the hearing aid market, there are no real surprise moments.

(209)   Contrary to the opinion of Siemens, a transfer of technology among competitors does not point to concerted oligopolistic behavior only if it were ineligible for an exemption under the Commission's Group Exemption Directive for Technology Transfer Agreements (TT-GVO).[80] The collectivizing of application-specific technology in this case, one of the things molding market behavior, also allows an inference to be drawn of a dampening of competition in the relations of the oligopolists to one another if contained none of the core limitations listed in the Group Exemption Directive and thus Article 81 of the EC Treaty were not directly applicable. The Decision Division in these proceedings has not examined technology transfer among the oligopolists for its conformity to Article 81 of the EC Treaty. However, licensing agreements involve a reciprocal exchange of patents among competitors which very clearly exceed the

---

[78] Phonak Letter of February 14, 2007, p. 6, pg. 628 d.A.
[79] This impression become further solidified for the Decision Division even after discussions with SAT and Oticon, see Discussion with SAT on February 22, 2007, Note p. 4, pg. 796 d.A., Discussion with Oticon on March 6, 2007, Note p. 4, pg. 1075 d.A.
[80] Comments on Deficiency Notification Letter, p. 8 *et seq.*

allowable market share threshold of 20% for the Group Exemption Directive to be applicable (Article 3 paragraph 1).[81]

(210)    In addition, the exchange of patents in the market for hearing aids - and this applies to HIMPP just as much as to the licensing agreements between the manufacturers – simply does not have the aim of guaranteeing the creative freedom of product development[82], but the aim of shaping the product on the same technological basis and preventing medium-term advances in development by competitors. The Commission regards the risk of collusion through such agreements as comparatively high in narrow oligopolies and high barriers to market entry.[83] To that extent, even the gains in efficiency brought about by the licensing, which Siemens, referring to the TT Group Exemption Directive, submits are positive factors for far-ranging licensing[84], cannot outweigh the competition-dampening effects. This is all the more true as possible gains in efficiency through the reciprocal cost-free licensing did not in the past lead to corresponding price advantages for the consumers.

(211)    The participating companies have submitted that, in particular, the success or failure of newly introduced models has a clear effect on the market share of the relevant competitor and that the manufacturers were therefore in a constant **innovation competition over the introduction of new models.** This is supported, they argue, by the very short product cycles, in particular in the upper price segment. The market, the claim, is determined by short product life cycles and ongoing competition over product enhancements. This opinion is also shared by key competitors SAT and Oticon. Both Phonak and Siemens, in their Comments on the Deficiency Notification Letter of the Decision Division, repeated their opinion that the German hearing aid market is characterized by intensive competition for innovation. Siemens argued that only by considerable investment efforts and new products were market shares won back in competition that otherwise would have been lost. Dynamic competition, it states, is characterized precisely by the fact that competitive advances with gains in market share were countered by other competitors by means of their own increased competitive advances.[85] Even in Phonak's view, it corresponds to nothing less than the ideal image of competition that innovative advances of one competitor are countered by product improvements of other competitors. Here, it states, the speed of innovation in the hearing aid industry is especially high.[86]

---

[81] More stringent requirements for reciprocal agreements between competitors, see Guidelines for Application of Article 81 of the EC Treaty to technology transfer agreements (2004/C 101/02), margin number 78.
[82] TT Group Exemption Directive Guidelines, margin number 111.
[83] TT Group Exemption Directive Guidelines, margin number 136, 138 et seq., 143
[84] Comments on Deficiency Notification Letter, p. 8 et seq.
[85] Siemens Comments on Deficiency Notification Letter, p. 10.
[86] Phonak, Comments on Deficiency Notification Letter,,S. 15.

(212)  To be of consequence to the merger-law evaluation, competitive advances must be somewhat stable. This is not the case, for example, if (a) competitive advances can be obtained over the short term, *i.e.*, within months, due to a technological lock-step movement initiated by the market participants themselves and (b) no genuine advances in development exist that could be implemented in competition and lead to a not merely short-term rise in sales and volume. Oticon turned over to the Decision Division a (reliable) chart showing that [...].[87] As an enduring successful product introduction over the last three years, the Decision Division is aware only of the Savia product family. It is just this competitive advance by Phonak that causes the Decision Division not to assume a market-dominating oligopoly with no internal competition even prior to the concentration. Here, however, it should be noted that even this competitive advance has not attacked the market position of Siemens and Oticon in any manner relevant to the decision.

(213)  The Decision Division, furthermore, is not of the opinion that the mere fact that all hearing aid manufacturers make new product introductions in combination with relatively short product life cycles allows in the instant case for an inference to be drawn of significant competition in the oligopoly.

(214)  The hearing aid manufacturers are very close to one another in their developmental expertise, are basically working on the same focal points of development, and in each case possess a product portfolio with no gaps. Thus, competitive advances of individual manufacturers can be picked up by the competition very quickly, in part within a few months. The fact that hearing aid manufacturers introduce new or, as the case may be, improved products only in connection with trade shows occurring semi-annual comes from a voluntary self-imposed commitment. At least as functions, for example in the high-end area, are concerned that are already marketable and are being introduced by competitors in other price segments by way of "downgrading," a reaction to a corresponding competitive advance would even be possible immediately, within a few days.

(215)  The introduction of Tego, Cielo and eXtra in 2005 is an example of the possible reactions of the oligopolists to a corresponding competitive advance. With the introduction of Tego, Oticon was the first manufacturer to introduce a hearing aid with high-end qualities into a price segment far below that. Due to their comparable technical expertise and their comprehensive product portfolio, SAT (Cielo) and Phonak (eXtra) followed suit within approximately 6 months and caught up with Oticon's competitive advance. Oticon brought Tego to market in April 2005. Phonak and SAT followed with eXtra and Cielo, respectively, in November 2005. Both the list prices as well as the manufacturer's selling prices were not more than 10% apart.

---

[87] See pg. 1077 d.A.

However, considerably more of the competing products Cielo and eXtra were able to be sold in 2006 than of Tego. To that extent, Oticon, by the introduction of Tego, was unable to add lasting market shares against the other oligopolists.

(216)   Consequently, the Decision Division regards it as completely conceivable that Oticon, by the introduction of Tego, sought a competitive advance over Phonak and SAT. This competitive advance, however, was not successful due to the considerable market and price transparency for the other oligopolists. To that extent, the production introduction of Tego, in the opinion of the Decision Division, is less an example of functioning competition in the oligopoly than it is, rather, an indication of parallel behavior in the oligopoly ensured by the high degree of market transparency.

(217)   Even the chronological sequence of new product introductions in the highest price segment "List Price > 900 EUR" in the years 2003 to 2006 does not allow any adequate inference of competition in the oligopoly to be drawn.

(218)   We can, on the one hand, read from the data for the past three years that, with the key suppliers SAT, Phonak, Oticon and GN ReSound, new product introductions in the upper price segment over 900 EUR followed a relatively steady rhythm of 18-24 months for each.

(219)   Phonak introduced "Perseo" in the 1st quarter of 2003, and GN ReSound "ReSound Air" in the 2nd quarter of 2003. Widex too, with Senso Diva, introduced a hearing aid in the list price segment > 900 EUR in the year 2003.

(220)   Oticon followed with Synchro in the 2nd quarter of 2004, and SAT in the 4th quarter of 2004 with Acuris.

(221)   As expected, after 24 months Phonak, in February 2005, introduced with Savia its next generation of products in the price segment over 900 EUR. It is true that GN ReSound introduced the product Metrix onto the market at virtually the same time, but without notable success. In 2005, only small quantities were sold, and GN ReSound has now taken the product off the market. Widex in 2005 brought no new product family onto the market in this price segment. Accordingly, large portions of the sales potential of the then "outdated" "ReSound Air" and "Senso Diva" product families went over to competitor Phonak, which at this time had the most successful new hearing aid in this segment of the market. Also, Phonak, with micro Savia, pushed forward a small BTE device, which looks very similar to the ReSound Air case design and that extent must have generated a corresponding "recognition effect" among prior customers for GN ReSound.

(222)   Almost exactly 24 months after the introduction of Synchro, Oticon in the 2nd quarter

of **2006** introduced its new product family Delta 8000, while SAT, 18 months after the introduction of Acuris, in May 2006 introduced Centra onto the market.

(223)   In the view of the Decision Division, this "staggered product introduction policy" among the hearing aid manufacturers is, on the one hand, an explanation for why, when individual years are looked at in passing, changes to individual oligopolists' market shares can come about. On the other, herein lie the beginnings of an explanation for the fact that the market shares of SAT and Oticon in the upper price segment over the past few years were not subject to any significant lasting changes and the market shares of Phonak rose, in particular at the expense of GN ReSound and Widex. With its new product introduction, Phonak was precisely targeting the phase in which sales of the then "outdated" ReSound Air hearing aids and Senso Diva hearing aids were sinking and neither GN ReSound nor Widex were able to offset their sales declines by any successful successor models in the "List Price > 900 EUR" segment. Competitors SAT and Oticon had already secured their sales volumes at this time through corresponding successor models of their own (Delta 8000, Acuris). Sales volumes also approximately corresponded to the sales volumes for the predecessor models. To that extent, the shifts in market share in the year 2005 also had their basis in this special situation. The fact that SAT and Oticon were unable to draw any benefit for themselves from the obviously failed product policy of outsiders to the oligopoly is an indication that the situation in the oligopoly in the year 2005 was not entirely lacking in competition. Whether from this one may draw an inference of significant competition in the oligopoly, however, is doubtful. The increases in market share from the introduction of the new product Savia were essentially at the expense of GN ReSound and Widex, competitors with weak market shares. Other than that, the new product introductions generally draw to themselves the sales volumes of their respective predecessor models, without making a lasting attack on the competitive position of the competing oligopolists.

(224)   In its Comments on the Deficiency Notification, Siemens mentioned its new product developments in the area of directional microphone technology (2002) and e2e technology (2004), for which to date no comparable products of competitors are available.[88] According to the information possessed by the Decision Division, the e2e technology ("automatic microphone equalization") was licensed by SAT in January of 2004, thus already before the corresponding introduction of its own product, to competitors [...] against a very small one-time fee.[89] In its Synchro product family, Oticon offers e2e technology. Phonak, too, is represented in directional microphone technology with its Savia family of products. Phonak has licensed patents relating hereto to SAT.

---

[88] Comments on Deficiency Notification Letter, S. 12.
[89] Siemens Letter of February 20, 2007, Appendix 2.

(225)  **In summary**, the following can be established: Insofar as the Decision Division can recognize competition over innovations and new product introductions, this in and of itself does not, without more, argue for significant competition inside the oligopoly in the instant case. A reason for this, on the one hand, is that it would not make business sense for the oligopolists - and especially with regard to the highest possible profit maximization - to prevent technological development by tacitly agreeing to forego such competition and, as called for, evaluate the corresponding technological developments of a competitor as a breach of concerted oligopolistic behavior. On the hearing aid market relevant here, concerted oligopolistic behavior with respect to technological competition can only mean that the oligopolists are fashioning this competition to be as transparent as possible and are seeing to it that the advance of one oligopolist in the introduction of technical optimization does not become a lasting advance structurally ensured by the market. The high market, product and price transparency supports this behavior.

(226)  This concerted behavior is facilitated by the fact that new technical developments are only introduced onto the market at the two hearing aid trade shows early in the year and in the fall, such that competitors, based on their own technical know-how, can react to them over the relatively short term. Against the backdrop that, in the future – unlike in the past – no rapid technological developments are to be expected, but rather enhancements to individual areas, the competitive weight of technological developments will further decline in favor of the improvement of so-called feel-good factors and a boost in marketing efforts.

## 6.1.3.2 Price Competition

(227)  In Phonak's view, it is the hearing aid manufacturers' capacity for innovation that is the most important parameter of competition. On the other hand, it maintains, price plays no essential role as a competitive parameter. It merely reflects the high level of quality. GN ReSound's price level, moreover, is comparable to that of competitors.[90]

(228)  The Decision Division, even in this competitive parameter regarded by Phonak as obviously only of secondary rank, sees considerable indications, even prior to the concentration, of concerted oligopolistic behavior by hearing aid manufacturers. Phonak's statement regarding the setting of the price for GN ReSound is furthermore incorrect. With respect to manufacturer's selling prices, GN ReSound in the past came forward as a supplier who was aggressive on prices as compared to the oligopoly.

**(1)    List Prices**

---

[90] Phonak Letter of November 28, 2006, p. 7f, pg. 269 d.A. B3-554/06

(229)   In 2002, within the framework of their ZVEI reporting system, hearing aid manufacturers divided up the digital hearing aid market, originally of three list price segments (in 2001), into six list price segments. These six list price segments created by manufacturers won acceptance on the market. Furthermore, it seems that not just the structure of the list prices was agreed upon between the manufacturers. Even the amount of the list prices of the various manufacturers themselves largely coincide in the individual segments.

(230)   Thus, for example, the list prices of oligopolists SAT, Phonak and Oticon nearly coincide in the highest price segment "List Price > 900 EUR". Apart from very few exceptions, they are around 1170 and 1199 EUR. A particular signal effect is emitted from this segment with regard to prices as well, since technical innovations such as Sound Smoothing, improvement of the sound quality of one's own vice, the technology for reduction of occlusion or automatic microphone equalization are always introduced by all manufacturers in this segment. Insofar as existing high-end hearing aids are brought onto the market with additional technical innovations (e.g., additional noise suppression, Data Learning), the list prices likewise often coincide. Thus, Centra Sound Smoothing (Siemens, introduced April 2006) and Savia Art dSZ (Phonak, introduced November 2006) were brought to market at the same list price of 1395 EUR. The list prices of Cielo, eXtra and Tego, too, in the "200 to 400 EUR" list price segment, are quite close to one another.

**(2)    Average Manufacturer's Selling Price**

(231)   The companies participating in the ZVEI reporting system are in a position to orient their own price policy to the average manufacturer's selling prices. Since they receive analyses not just of annual but also of monthly manufacturer's selling prices in the individual price segments, each manufacturer can plan his adjustment strategy in detail, in real time and virtually for each individual product. In relation to a specific list price segment, the manufacturer also knows which portion of hearing aids belonging to this list price segment are achieving a manufacturer's selling price within this segment and/or to what extent products from higher-priced list price segments are with their manufacturer's selling price in this list price segment. The pricing policy for hearing aids of the hearing aid manufacturers thereby becomes very transparent. Even if the ZVEI data contain no directly identifying information about individual manufacturers, the degree of detail of the information regarding individual price segments, combined with the ZVEI supplemental information, such as the evolution of ITE or BTE devices as well as information directly available from the market regarding the different market positions of competitors in the individual segments, make it possible to derive not just the average price level in the market, but for all intents and purposes information regarding the price behavior of individual competitors too, particularly of those with the strongest market shares.

(232)   A comparison of average manufacturer's selling prices for the individual ZVEI price segments over the course of time, in the opinion of the Decision Division, proves that a considerable disciplining of price competition has proceeded from the list price segments established by hearing aid manufacturers themselves in connection with the ZVEI reporting system. The parallelism in the list price amounts has also led to a corresponding parallelism in the amounts of the average manufacturer's selling prices. Against the backdrop of the structural changes in the hearing aid market, combined with the in part significant volume increases in the individual segments, an astounding price discipline is ascertainable over the course of time, which particularly in the high-priced segments has even permitted price increases. This is shown by the following Table and the corresponding graphical presentation of the situation[91].

**Table 11: Changes to Average Manufacturer's Selling Prices, 2003-2006 (in EUR)**

| ASP | 2003 in EUR | 2004 in EUR | 2005 in EUR | 2006 in EUR |
|---|---|---|---|---|
| LP[92] up to EUR 200 | 118 | 115 | 106 | 108 |
| LP EUR 200 - 400 | 228 | 225 | 211 | 209 |
| LP EUR 400 - 600 | 371 | 378 | 361 | 341 |
| LP EUR 600 - 750 | 518 | 485 | 479 | 462 |
| LP EUR 750 - 900 | 636 | 637 | 640 | 624 |
| LP over EUR 900 | 802 | 819 | 811 | 838 |

**Graph 4: Changes to Average Manufacturer's Selling Prices, 2003-2006 (in EUR)**

---

[91] Determined on the basis of the ZVEI annual reports.
[92] LP = List Price

MOJ00000309



**(3)     Company-Specific Average Manufacturer's Selling Prices**

(233)   The Decision Division has analyzed the reports sent to it by the ZVEI itself and from the companies participating in the ZVEI reporting system for the years 2003 to 2006. In the process, it has determined that, since the establishment of the ZVEI reporting system broken down by price segment in 2002, the average manufacturer's selling prices in the customer segments "List Price 200-600 EUR" and "List Price > 750 EUR" have clearly converged with one another. This is true in particular for the average manufacturer's selling prices of the oligopoly members. By contrast, in particular for competitor GN ReSound, in part quite significant deviations in price behavior from the other competitors are to be noted. The Decision Division points out that the data material to which the following statements relate was calculated on the basis of companies' individual monthly reports and does not include all brands distributed on the market (*e.g.*, Unitron and Beltone are missing). Based on the small market share of these brands not included, however, the analysis is highly robust even so. Specifically, the following may be established:

(234)   Based on the wide price range in the hearing aid manufacturers' overall product range (the price range between basic device and high-end device is a factor of 10) and the different quantities in the individual segments, a price comparison of the average manufacturer's sale prices over the entire hearing aid market is not meaningful. Similarly, a price comparison in the "List Price > 200 EUR" customer segment, where there are no supplemental payments, is not informative (see the rationale for this in margin number 150).

(235)   In Phonak's opinion, an analysis of the ZVEI reports is fundamentally unsuited to a comparison of average prices. Phonak states that the ZVEI reports take no account

of a series of concessions, such as year-end rebates and discounts. To that extent, the ZVEI's average prices would vary considerably from the prices effectively charged. In addition, products to be assigned to particular segments based on list price were in part sold with considerable reductions, such that, for average, prices they would be included in different segments. This, it claims, is true in particular of the "List Price > 900 EUR" segment. Furthermore, the average prices of a hearing aid changed considerably over the course of its product cycle. In part this would lead to significant corrections of list prices. Phonak showed this, *inter alia*, with the Perseo model.[93]

(236)   The Decision Division does not find this line of argument to be basically sound. The analysis by the Decision Division is based on the monthly reports by hearing aid manufacturers to the ZVEI, which are based on the sales invoiced to vendors. To that extent, the subsequent negotiations over the course of the year are included in the reporting data, insofar as they were invoiced promptly. This is true both for bonus devices (fewer sales with higher quantities) and for additional volume discounts. The Decision Division does not place a high value on the remaining uncertainties based on year-end rebates or discounts taken off at the end of the year. This results from an analysis of the terms about which the Decision Division surveyed the 20 largest customers of each of the five largest manufacturers. According to them, on average, volume rebates of an average amount of 30.5% were allowed. The discounts regularly granted to all customers account for 2.6% on average, bonuses and other sales reductions that could be rather important for subsequent negotiations, account on average altogether for only 1.7% and 0.6%, respectively.

(237)   In addition, the conditions which, in Phonak's opinion, were not taken into account in the ZVEI data would have to have led in the following years to sharply changing average manufacturer's selling prices. But the Decision Division was unable to observe corresponding significant price changes, which would then also have proceeded differently with individual oligopolists. To that extent, the conditions possibly not taken into account in the ZVEI system obviously could not have had a significant influence on the changes in manufacturer's selling prices.

(238)   The Decision Division agrees with Phonak insofar as the manufacturer's selling prices for products in the "List Price > 900 EUR" segment by average price belong, to a considerable extent in the segment below it, "List Price 751-900 EUR." The Decision Division has thus combined both segments into a "List Price > 750 EUR" customer segment and has made its analysis of changes in average price on the basis of this larger segment.

(239)   Finally, a hearing aid which by list price initially belongs in a higher priced segment,

---

[93] Phonak Letter of February 22,2007, p. 1 *et seq.*, pg. 717 *et seq.* d.A.

MOJ00000311

but in subsequent years in a lower priced segment, is also treated that way in the ZVEI reporting system and is assigned to different price segments over the course of time. This also corresponds to the manufacturer's product policy. But the Decision Division is only aware of a few such cases. Ordinarily the "downgrading" of a hearing aid was accompanied by a change in the brand name. The offering of a high-end product family in a more mid-range price segment under the same name was done, to the Decision Division's knowledge, only by GN ReSound. To that extent, the Decision Division is assuming that the average manufacturer's selling prices represent a suitable indicator of price behavior over time, even if the individual products included in the comparison are not fully homogeneous in the technical sense.

<u>Price comparison for the customer segment "List Price 201-600 EUR"</u>

(240)   In the customer segment "List Price 201-600 EUR," the average manufacturer's selling prices remained nearly constant between 2003 and 2006. The price decline is under 2%. The significant price reductions carried out by GN ReSound since 2005 did not lead to a significant decline in the overall prices, since the company, despite its active price policy, lost considerable sales volume. The average prices of SAT, Phonak, Oticon and Widex clearly converged and are now virtually identical. The two following graphical representations make this state of affairs clear.

**Graph 5**:



**Graph 6**:



(241)  The first graph shows the changes in average manufacturer's selling prices in the customer segment "Listen Price 201-600 EUR." The prices of the oligopoly members were compared with the two outsiders Phonak and Widex. It shows, in particular, the clearly divergent price behavior of GN ReSound in the last two years 2005 and 2006. The second graph compares the price behavior of the oligopoly members in this customer segment and their price adjustment over the course of time.

Price comparison for the customer segment "List Price above 750 EUR"

(242)  Even in the customer segment "List Price over 750 EUR," a price behavior of market participants comparable to that in the customer segment "List Price 201-600 EUR" can be noted over the years 2003 to 2006. The overall price level in this segment rose by a good 2% in this segment from 2003 to 2006.

**Graph 7:**



**Graph 8:**



(243)  After spreading out a bit in 2005, the prices of the oligopolists are once again quite close to each other. The prices of GN ReSound are noticeably - if not so clearly as in the segment previously presented – below those of the oligopolists and Widex over the course of time has settled in price-wise below those of the oligopoly.

**(4)    Competition over Terms**

(244)  The companies taking part in the concentration submit that a significant competition over terms was taking take place. The Decision Division followed up on this submission and attempted to ascertain this: To that end, it surveyed the five largest competitors regarding their terms the 20 largest customers of each of them. In this process, however, only GN ReSound and only one oligopoly member also provided data about their secondary brand, so that behavior regarding terms was not encompassed in its entirety. Overall it was possible to establish that all manufacturers granted their large customers considerable rebates on their list prices. On average, they amounted to a total of 35.4% across all manufacturers and customers. But no direct conclusion may be drawn from this regarding the existence of significant competition over terms. The amount initially only says something about the absolute value of the list prices and provides no indication of the differences in the competition over terms among the hearing aid manufacturers or indeed regarding the changes in the terms over time.

(245)  Out of all sales reductions, 30.5% is accounted for by volume reductions, which – as the name signifies – are allowed for above-average volumes purchased. To that extent, the Decision Division, based on its analyses, could not recognize any particular deviations in behavior among the market participants. As a general rule, with all manufacturers high volumes purchased correspond to high volume rebates. Based on a linear regression analysis of volumes purchased relative to the volume rebates allowed, however, it was possible to establish, on the one hand, that the

behavior of oligopoly members Siemens, Phonak and Oticon is very similar with respect to the granting of volume rebates in its structure, and in particular with regard to the combination of volume purchased to rebate allowed. On the other hand, the analysis provided indications that the oligopoly's structure for allowance of rebates with primary brands is significantly different from the structure for allowance of rebates of outsiders GN ReSound and Widex and the rebate structure of secondary brand of an oligopolist with which a comparison was made. This relationship is expressed in the following Table by reproducing the individual values, and in the graphic by showing the connection between volume and the form of the rebate (for reasons of confidentiality, the names of the companies are not provided, the sequence comes from the slope in the regression grades). The lines for the oligopolists are shown in red, the total regression in blue, and the regression degrees of the outsiders are depicted in black:

**Table 12: Linear Regression of Volume and Volume Discounts**

|  | Increase of the Regression degrees | Certainty measures |
|---|---|---|
| Primary Brand Oligopolist 1 | 290.702226 | 0.901364 |
| Primary Brand Oligopolist 2 | 261.933663 | 0.980399 |
| Primary Brand Oligopolist 3 | 261.973224 | 0.791455 |
| **Total** | **234.200389** | **0.782779** |
| Primary Brand Outsider 1 | 114.399303 | 0.782887 |
| Secondary Brand Outsider | 106.318831 | 0.689874 |
| Secondary Brand Oligopolist | 84.6654991 | 0.958695 |
| Primary Brand Outsider 2 | 46.2448241 | 0.643597 |

MOJ00000315



(246)  Based on the incomplete data basis, the Decision Division does not rate the results of this analysis as a completely robust indicator of concerted oligopolistic behavior. As far as trends go, however, the following is to be noted: As previously described, the connection between the volume purchased and the rebate allowed is strongly marked, and in the same way, with the oligopolists' primary brands. What this indicates is that they also in fact geared the volume rebate to the volume purchased and in doing so essentially behaved the same way. The outsiders and secondary brand of one of the oligopolists behaved differently from this. With them, the volume purchased and the rebates allowed are in significantly smaller connection.

(247)  After the volume rebates, discounts have the second heaviest weight. They account for an average sales reduction of 2.6%. The allowance of discounts is made in a very standardized manner on the market. The spread among the individual manufacturers is at most 0.5%.

(248)  The bonuses allowed have no significance of any relevance on the market, accounting for an average share of only 1.7%. Here, however, the behavior of two market participants varies so greatly that one of them gives no additional bonuses to it large customers and another is significantly above average.

(249)  The other sales reductions too, in the findings of the Decision Division, have no competitive significance on the market for hearing aids. In the first place, they account for only 0.6% percentage points and, on the other, they are overwhelmingly given, apart from individual exceptions, only by outsider GN ReSound.