(250) **In summary,** the Decision Division is of the opinion that the findings regarding competition on price and terms do not make it possible to recognize any clear indications of significant competition in the oligopoly. A fundamental ground for this overall assessment is that, with the start of digitalization, the hearing aid manufacturers not only divided up the market into different price segments but, despite the considerable technical distortions caused by digitalization, were also able to stabilize these price segments over time. The list price structure, like the list prices, has basically remained constant. Furthermore, the price level too – as measured by average manufacturer's selling prices – was also basically able to be kept constant or even, in the segment with the strongest sales, even raised. Against the background of sharply increased volumes and the circumstance of considerable economies of scale in this sector[94] this appears extraordinarily astounding. Insofar as price competition can be established, this came primarily from competitor GN ReSound, and specifically to compensate for losses of market share. By contrast, the price behavior of the oligopolists – even as measured here by their average manufacturer's selling prices – after small fluctuations clearly grew closer. It was impossible to ascertain the asserted competition over terms, and in any case it had no discernible significant effect on the evolution of average manufacturer's selling prices. To that extent, the asserted competition over terms is not a sufficient indication of functioning competition within the oligopoly[95]. Furthermore, neither the claimed price competition nor the claimed competition over terms had any discernible effect on the changes in market shares. The market share gains of Phonak that can be established did not in any case come at the expense of the other oligopolists to any relevant extent, and even the gains in market share from the outsiders are not the consequence of price campaigns, but are basically the result of Phonak's more successful product introduction strategy combined with a parallel serious error in product policy on the part of its competitor GN ReSound.

### 6.1.3.3 Coordination and Sanctions Mechanisms in the Oligopoly

(251) The conclusions about the efficacy of the coordination and defense mechanisms in the oligopoly directly follow from the above-mentioned structural conditions and their effects on internal competition. Based on the multiple already existing coordination mechanisms in the technical development area as well as in the area of prices, breaches of the concerted oligopolistic behavior can be sanctioned over the short term and in a graduated manner. In the technical area of development, oligopolists who do not hold to the unwritten consensus can be excluded from exchange and from licensing agreements and their new developments can be systematically attacked with the argument of patent infringements. In the price area, relevant warnings can be

---

[94] *E.g.*, Exhibit 8 E to Oticon Letter of January 05, 2007, Danske Equities Company Report on William Demant, October 10, 2006, p. 4, pg. 1023 (*verso*) d.A..
[95] Rs. T-464/04 "Independent Music Publishers and Labels Association (Impala)/Kommission";

MOJ00000317

ReSound and Widex, the competitors next following the companies SAT, Phonak and Oticon, from being ascribed to the oligopoly.

(255) Based on its business resources, GN ReSound from the outside is still the company that stands the closest to the oligopoly. With regard to total hearing aid sales, operating costs, R&D expenditures and gross margin achieved, the company has a business profile comparable to the oligopolists. It is true that, in the past, GN ReSound has shown considerable operating weaknesses and weaknesses in brand strategy, but its technological potential and the quality of its patent portfolio should be seen as totally capable of competition. In the past, the company has repeated been a top market leader in technology, for example with Open Feed-In through the ReSound Air product family or the introduction of a battery charging system, even though the innovations were shortly reproduced by SAT, Phonak and/or Oticon after a short time (on GN ReSound's competitive position, see also *infra*, margin number 287 *et seq.*).

(256) In the "List Price over 900 EUR" segment, Widex has since 2003 sold the Senso Diva family of products, and since 2006 Inteo as well. There were more than three years between the respective product introductions. [...] In addition, the gaps in market share separating it from oligopolists SAT, Phonak and Oticon are very large. The market share gap separating it from Oticon and Phonak comes to [15-20%], and from SAT [25-30%]. Overall, Widex's competitive potential in any event does not appear sufficient to be able to attack the market position of the oligopolists effectively. The same is true for the company Starkey, represented by only a very small market share in Germany.

(257) Acting as a restriction on the competitive impulses of the current outsiders to the oligopoly, it should be noted that they are just as much participants in the various forms of cooperation on the relevant market (*e.g.*, HIMPP, HIMSA, ZVEI reporting system) as are the oligopolists. According to the information up till this point, however, GN ReSound does not participate in an exchange of patents to the same extent as the companies SAT, Phonak and Oticon. For their current product offerings, the latter have exchanged a series of application-specific patents through reciprocal licenses.

(258) The Decision Division thus leaves open the question of whether the outsiders to the oligopoly, prior to the concentration, are in a position to bring significant competition into the oligopoly. There is – at least with GN ReSound – at least the business potential for such competition.

**6.1.5 Barriers to Market Entry / Potential Competition**

meted out to oligopoly members in accordance with the severity of the breach. Price-related attacks may be confined to individual large customers, may relate to less significant price segments or, on the other hand, may target economically significant and high-income customer segments (*e.g.*, the "List Price over 750 EUR" segment).

(252) The Decision Division has analyzed the available data from the ZVEI reporting system set up by the hearing aid manufacturers. In accordance with that data, Phonak's objection, that the ZVEI reporting system did not lead to detailed market transparency and is not suitable for triggering and ensuring coordination and sanctions mechanisms in the oligopoly[96], is not comprehensible. On the basis of the analyses carried out, the Decision Division can show, *inter alia*, that the high market transparency, the segmentation of the market into six price segments and the ZVEI reporting system have, since 2002, greatly increased transparency with regard to market share structure and the setting of prices and in the meantime have led to a widespread adjustment of the manufacturers' own manufacturer's selling prices in the individual price segments. The described segmentation of the market and the corresponding transparency regarding a multitude of list and manufacturer's selling prices places the manufacturers in a position to recognize a possible competitive advance immediately. They then also know in which price segment the advance took place. Due to the stability of supply and demand conditions, the participating companies in practice exclude the chance of changes to market share or manufacturer's sales prices not involving a conscious deviation from the coordinated price ("cheat"), but rather [can determine] that they involve a regular normal "market noise" created by fluctuations in the order situation.

(253) The very expectation that the coordination for a specific time period could fail, should a deviation be discovered, can already be an effective deterrent mechanism. Moreover, even the identification of a specific deviator is possible and likely in the interplay of (a) the segmentation of the market and a market information system, (b) a very narrow structure of suppliers, with only three manufacturers with above a 10% market share and (c) a high market transparency.

**6.1.4 Current Outside Competition**

(254) Even before the concentration, the oligopoly consisting of SAT, Phonak and Oticon can only be attacked by outside competition to a limited degree. Overall, the alternatives available to market counterparties are considerably limited by the interplay of the very clear market leadership of the three leading suppliers and the very large gaps in market share separating them from the next following competitors. At the same time, these significant, market-structural differences exclude GN

---

European Court of Justice, first instance, Decision of July 13, 2006, margin number 409, 446.
[96] So claimed, however in Comments to Deficiency Notification Letter, p. 12 *et seq.*

(259) An examination of barriers to market entry and potential competition is given great weight in the assessment under merger law. Just as market share provides indications of the relationship of the participants in the concentration to their current competitors, the barriers to market entry provide information regarding the significance of potential competition on the market affected. In the instant case, the market for the production and distribution of hearing aids for the hearing aids acousticians' retail trade characterized by a series of market-structural and strategic barriers to market entry, which in their totality confront the entry of potential competitors. Here it should be noted that, due to the considerable investments in research and development and the economies of scale required for market entry, a market entry cannot be limited to Germany, even though Germany is the market in Europe with the strongest sales and the second largest market in the world.

### 6.1.5.1 Structural Barriers to Market Entry / Market Phase

(260) The requirement of close geographic contact between hearing aid manufacturers and hearing aid acousticians represents a *structural* barrier to market entry. For geographic proximity and on-site service is a basic prerequisite for the listing of a hearing aid manufacturer (see also *supra*, margin number 109).

(261) What is determining the market success of hearing aids today - alongside the above-mentioned technological optimizations - are purely subjective "feel-good" factors. Consequently, the market positions of the companies already active on the market are established and, in the opinion of the Decision Division, scarcely subject to challenge. What this leads to is that potential competitors, who would have to take upon themselves the cost-intensive and tedious processes of development for a market entry, are deterred. The high costs for development of a digital hearing aid of one's own, combined with the economies of scale needed for successful market cultivation, make market entry difficult and, in the past, have even led to smaller competitors such as Acousticon losing all significance on the market for production and distribution of hearing aids. Against the background of a market for hearing aids in Germany that is largely "allocated out," the market position particularly of the oligopoly consisting of SAT, Phonak and Oticon structurally ensured.

### 6.1.5.2 Strategic Barriers to Market Entry

(262) The barriers to market entry described are strengthened by the *strategic* behavior in particular of the oligopolists. Both as regards basic patents (HIMPP) and patents needed for product enhancements, they have a network of patents that favors a sealing off of the hearing aid market against potential competitors. Any third party development directed towards the hearing aid market would thus constantly contain within itself the danger of patent infringement. Comparable strategic barriers to

market entry also exist if a potential hearing aid manufacturer wanted to introduce its product portfolio to German hearing aid acousticians. If it does not have a distribution license from NOAH and HIMSA-certified adjustment software, in practice it has no prospect of being listed with a hearing aid acoustician. He would have to distribute the adjustment software as a "stand-alone version" to hearing aid acousticians, for the latter to then enter the measurement data manually. In the opinion of the Decision Division, this would be an insurmountable barrier to market entry onto the German market. To that extent, there is in practice no prospect of an entrance onto the German market for the production and distribution of hearing aids to the hearing aid acoustician retail trade contrary to the interests of the established manufacturers.

### 6.1.5.3 Significance of Suppliers Sonic and auric

(263) It is not to be expected that Sonic and auric, which currently serve exclusively the abbreviated treatment channel, could become important current competitors in the hearing aid acoustician retail trade distribution channel. Hearing aid manufacturers which use the abbreviated treatment channel are currently refused access to hearing aid acousticians. In its survey of hearing aid acousticians, the Decision Division was unable to find any case in which a hearing aid acoustician has listed a supplier competing with it through the abbreviated treatment channel.

(264) The Decision Division regards a corresponding listing to any appreciable extent as unlikely in the future as well. The pricing of suppliers in the abbreviated treatment channel is cheaper than in the hearing aid acoustician retail trade. This mainly has to do with the fact that the services billed for by the hearing aid acoustician are either not incurred in the abbreviated treatment channel or are more favorably priced. The abbreviated treatment channel to that extent also leads to more price transparency for the end customer. On the other hand, due to the lack of price transparency for end customers, the hearing aid acoustician retail trade can not only shift the high manufacturer's selling prices onto the end customer, but can also price its own services so high that an individual hearing aid is in part a multiple of times more expensive than the manufacturer's selling price. To that extent, the hearing aid acoustician retail trade has no interest in opening its own sales channel to suppliers to the abbreviated treatment channel. For this would lead to increased pressure on their own end prices.

### 6.1.5.4 No Market Entries in the Past

(265) Over the last ten years, there have been no attempts at market entry on the German hearing aid market for production and distribution to the hearing aid acoustician retail trade. Only Sonic, in the year 2000, entered the German market, but was unable to establish itself with hearing aid acousticians and today serves only the abbreviated

treatment channel. In addition, brands have disappeared from the market through insolvencies (e.g., Linke, Intrasone) or takeovers (e.g., Viennatone, Sonar, Philips, Bosch). After a long phase of consolidation phase, there are only five suppliers with market shares of more than 5% active in Germany today.

### 6.1.6 No Counterbalancing Power of Buyers

(266) According to the findings of the Decision Division, it is not to be expected that the behavioral leeway of the oligopoly will be effectively constrained by counterbalancing market power on the buy side. A precondition for counterbalancing market power is, first, the existence of strong market buyers and, on the other, that the latter, as called for, divide up their orders among competitors in accordance with considerations of market strategy, so as not to become dependent on one or more (dominant) suppliers.[97]

(267) These structural conditions are not present, prior to the concentration, in the market for production and distribution of hearing aids to the hearing aid acoustician retail trade. The degree of concentration on the supply side far exceeds that on the demand side. The structure of the hearing aid acoustician retail trade in Germany is characterized by barely 15-20 supra-regional chain store operators with more than 10 branches, a half dozen large purchasing cooperatives and about 1500 businesses with from one to three branches. The 15 largest chain store operators and purchasing cooperatives account for a procurement volume, by value, of less than 50% of all hearing aids in Germany procured through the hearing aid acoustician retail trade. Even the procurement volume of the largest chain store operators, Kind and Geers, in each case lies far below 10%. In the opinion of the Decision Division, they have no significant counterbalancing power on the demand side of the market for hearing aids.

(268) The findings have yielded a series of indications allowing the conclusion to be drawn of significant difficulties when suppliers are changed. Thus, the hearing aid acousticians surveyed, almost without exception, asserted that there were significant conversion costs, particularly in the area of product and software training. Hence, according to the findings of the Decision Division, there has in the past only been a delisting of one of the oligopolists SAT, Phonak or Oticon in the most isolated of cases.

(269) The market surveys did not provide any indications of a conscious division of orders to different manufacturers for reasons of market strategy, in the interests of avoiding dependencies. The oligopolists are listed with nearly all the hearing aid acousticians

---

[97] Cf., BGH WuW/E 1749, 1752 – Klöckner-Becorit.

in Germany. This will also not change in the future, especially because the structure of the demand side is far more split up than the supply side, on which the degree of concentration would increase still more after the concentration.

(270) In Phonak's opinion, the hearing aid acousticians in Germany occupy a "gatekeeper" position. Since the consumers themselves can scarcely make an objective evaluation of the advantages and disadvantages of the hearing aids of different manufacturers, as a rule they rely entirely on the advice of the hearing aid acoustician. It is thus, it claims, the opinion transmitted to the consumer by the acoustician that very fundamentally decides upon the success of a brand. Even if the oligopoly were to raise prices in lockstep, acousticians could, without more, make the hearing aids of Widex or Starkey appetizing to their customers and thereby cause the oligopolistic discipline feared by the Decision Division to idle in place. The reaction of hearing aid acousticians to the takeover of Hansaton Austria by Phonak is an example, it states, of how quickly and effectively the hearing aid acousticians can turn away from a supplier. It is also striking, according to Phonak, that the market counterparties do not share the concerns of the German Federal Cartel Office.[98]

(271) In an assessment of counterbalancing market power, the question arises of whether the function of effective competition – *e.g.*, the function of an effective competition over innovations and prices – can find an equivalent replacement, in an individual case, in demand-side power and strategic purchasing behavior. In the opinion of the Decision Division, this is to be rejected in the instant case. The hearing aid acoustician retail trade has neither the demand-side power nor the will to initiate such a competition over prices and/or innovations among the oligopolists. The present case is characterized far more by the fact that hearing aid manufacturers and hearing aid acousticians in Germany for the most part have a common set of interests, which lies not in competitive pressures directed against one another, but in the effort to obtain from the end customer the highest possible profit margin, both for the manufacturer and for the hearing aid acoustician. A correspondingly aligned set of interests is possible if the end customer – as in the relevant market here – has no product and price transparency.

(272) The "gatekeeper" position claimed by Phonak for hearing aid acousticians, in and of itself, provides no additional information gained regarding the question of whether counterbalancing demand-side power exists. It is ultimately a matter of describing the "manufacturer - retailer - end user" distribution structure. The question ultimately posed by Phonak, whether the hearing aid acoustician retail trade – due also to the lack of product and price transparency to the end customer – is able, and wishes, to carry out market-strategy-based purchasing behavior, with the corresponding market

---

[98] Phonak Comments on Deficiency Notification Letter, p. 4 *et seq.*

effects, against a narrow oligopoly on the supplier side, is to be answered in the negative. This is supported by the following considerations:

- The demand side is strongly fragmented and thus, solely by virtue thereof, not in a position to implement purchasing behavior based on market strategy, with the corresponding market effects. Apart from the few large chain store operators and purchasing cooperatives, the procurement volumes of the small-scale operations characteristic of the demand are too small to be able to undertake a promising attempt at market-strategy-based purchasing behavior.

- Since no later than the digitalization of hearing aids, the hearing aid acoustician retail trade has no longer possessed the cost and developmental expertise to initiate competition among the leading suppliers. In the adjustment of hearing aids, they essentially rely on the product quality of the manufacturer and functioning adjustment software.

- Hearing aid acousticians are themselves not exposed to any price competition. The end customer only obtains transparency regarding the end price after the selection and adjustment of the hearing aid. As a rule, after the conclusion of the comparative adjustment he may no longer make a change of hearing aid acoustician shop. Already to that extent, there is scant need for price pressure on manufacturers from hearing aid acousticians. It is also no argument against this to say that the average volume rebate is about 30% of the manufacturer's list price. Based on the high profits of hearing aid acousticians and the constancy of the manufacturer's selling prices of all manufacturers, it can be assumed that the amount of the list price provides no robust data concerning the final pricing. This is also made clear by the extensive agreement among list prices when the manufacturers are compared.

- The lack of competition at the level of the hearing aid acoustician can also be shown by their exceedingly high margins on the manufacturer's selling price. The Decision Division has before it, for examination under anti-trust law, a small-to-mid-sized company recommendation regarding the calculation and pricing of hearing aids. This is based on an old such recommendation and, depending on the amount of the manufacturer's selling price to the hearing aid acoustician, provides for margins on the order of magnitude of from 190 to 500% (!). The margins are basically composed of the manual service (hearing aid adjustment) as estimated by the acoustician and the costs of consultation.

- The NOAH software solution, in the opinion of the Decision Division, leads to a further binding of the purchasing hearing aid acoustician retail trade to the

       hearing aid manufacturers established on the market (see *supra*, margin number 176 *et seq.*).

(273) Phonak is also unable to prove that the takeover of Hansaton Austria in 2001 was the cause of the market share decline of that time. First, in the proceedings Phonak has always explained the declines of market share of that time above all by a product portfolio not satisfactorily attuned to digitalization.[99] Then, Phonak has merely submitted two letters from hearing aid acousticians which (a) contain no proof of a corresponding delisting of Phonak products and (b) contain no data on the shares represented (at that time) by these retailers in Phonak's total sales in Germany. In the current survey of retailers by the Decision Division, in any event, the named acousticians were not among the 17 largest buyers in Germany.

### 6.1.7 Comprehensive Overview of Competitive Conditions Prior to the Concentration

(274) In the instant case, the Decision Division must examine a concentration on a market which, with regard to product differentiation and technological progress, in and of itself offers no environment suited *per se* to concerted oligopolistic behavior. Thus, the digitalization of hearing aids has led to an upheaval of the hearing aid market, the products are not homogeneous but rather are fit into a portfolio and the pricing is correspondingly different.

(275) Even so, the Decision Division, as a result of its market determinations, has found an oligopolistic market structure characterized by much less internal competition than would be expected in view of the market characteristics mentioned.

(276) The Decision Division has found structural conditions that supported concerted oligopolistic behavior and make significant competition more difficult. This ranges from the stability of supply and demand conditions to transparency with regard to product developments and time of product introductions down to the ZVEI reporting system and a strongly asymmetrical product and price transparency to the detriment of buyers.

(277) Hearing aid manufacturers – and this is especially true of the three large suppliers SAT, Phonak and Oticon – by the collectivizing of foundational patents and application-specific intellectual property rights have made the market, since the start of digitalization, into a cooperative environment that favors concerted oligopolistic behavior in the introduction of product innovations. Furthermore, hearing aid manufacturers in Germany have jointly defined the product portfolio and the price segments in the market for hearing aids. Corresponding to these price classed defined in connection with the ZVEI reporting system, all manufacturers have

---

[99] Phonak Letter of February 14, 2007, p. 13, pg. 635 d.A.

MOJ00000325

successively "filled out" their product portfolio and structured their product offerings accordingly. The result of the reporting system grounded on this segmentation is an agreement of list prices and a convergence of manufacturer's selling prices.

(278) The Decision Division does not fail to recognize that Phonak, by a brand policy highly effective on the market in the 2003 to 2006 time period, gained for itself a stronger weight within the oligopoly. This strengthening, however, was essentially at the expense of those outside the oligopoly. Phonak did not attack the market positions of the other oligopolists to a relevant extent. It is also true that SAT has slight losses of market share to note, but these shifts in the mid-single-digit area are not enough by themselves to substantiate significant competition in the oligopoly. This is especially true against the background that, due to the structural distortions from the digitalization of the market, a clear change in the market would have been expected, to the detriment of individual monopoly members as well.

(279) The competition to be observed in the past over new product introductions, combined with comparatively short product life cycles, is also, in the opinion of the Decision Division, likewise not a strong indication of existing internal competition.

(280) The hearing aid manufacturers are very close to one another in their developmental expertise, are basically working on the same focal points of development, and in each case possess a product portfolio with no gaps. Thus, competitive advances of individual manufacturers can be picked up by the competition very quickly, in part within a few months. The Decision Division is unable to discern any shifts in market structure due to new product introductions that led to a genuine shift in the power relationships within the oligopoly – for example, in the sense of a change in market leadership.

(281) Against the backdrop that, in the future – unlike in the past – no rapid technological developments are to be expected, but rather enhancements to individual areas, the competitive weight of technological developments will further decline in favor of the improvement of so-called feel-good factors and a boost in marketing efforts.

(282) The competition over price and terms is, in the Decision Division's opinion, already likewise no longer of significance. Thus, *inter alia*, a considerable disciplining of price competition has emerged from the highly differentiated ways of analyzing the ZVEI reports. Despite the structural changes in the hearing aid market, combined with the in part significant volume increases in the individual segments, an astounding price discipline is ascertainable over the course of time, which particularly in the high-priced segments has even permitted price increases. Basically, only for competitor GN ReSound is somewhat quite significant deviation in pricing behavior from the other competitors to be noted.

(283) In addition, according to Phonak, a competition over terms not taken into account in the ZVEI data must have had significant effects on the evolution of average manufacturer's selling prices. But the Decision Division was unable to observe corresponding price changes, which would then also have proceeded differently with individual oligopolists.

(284) Naturally, the Decision Division is unable to show that the individual prices of the hearing aid manufactures for comparable products are the same throughout. Such would also not be required to prove concerted oligopolistic behavior. But it is able to show that the price strategy – namely that related to price segments and product groups – shows quite considerable parallels and coordination that cannot fail to be looked at in the examination of an oligopolistic market.

(285) In its Comments on the Deficiency Notification, Phonak has objected to the Decision Division that, in the past, the [German Federal Cartel] Office has viewed the presumption of oligopoly as having been rebutted in similarly situated cases.[100] The decision cited by Phonak to that effect, in the *Invoptic/Essilor* case, B4-62/03, shows a number of fundamental differences from the fact situation to be examined here, however. To that extent, it is unsuited to comparison:

- In the *Invoptic/Essilor* case, in a number of sub-markets examined, the participating companies were, at most, to be assigned to an oligopoly when the "broad" presumption of oligopoly of Section 19 paragraph 3 clause 2 No. 2 GWB was examined. According to the market structure, however, they belong rather to the oligopoly outsiders.

- In the markets under examination, the Decision Division established considerable increases in the market shares of the oligopoly outsiders, in part with falling market volumes. That is not the case here.

- In the *Invoptic/Essilor* case, by contrast to the case to be decided here, the Decision Division had no indications of cooperation through joint ventures, patent pools and reciprocal licenses of application-specific technologies. To that extent, there were no indications of a dampening of competition over innovations.

- Market transparency for eyeglasses, according to what was known at the time by the Decision Division, was also not promoted by a market information system.

---

[100] Phonak, Comments on Deficiency Notification, p. 6 *et seq.*

MOJ00000327

- In the *Invoptic/Essilor* case, the Decision Division clearly ascertained quite considerable customer migrations and shifts in demand by opticians. Such is not the case here. Here in the past, even with the largest buyers surveyed, there was a de-listing of one of the oligopolists SAT, Phonak or Oticon only in the most isolated cases.

- With eyeglasses – in contrast to hearing aids – there obviously often are market entries by new suppliers due to lower barriers to market entry.

(286) Consequently, the Decision Division has considerable doubts whether an assumption of significant competition in the oligopoly can be made in the present case. The arguments for significant internal competition put forward by the participants in the concentration are, upon more careful analysis, not of such weight as to permit clear recognition of significant competition in the oligopoly, together with the corresponding changes in power relations. In any event, the competition on the domestic hearing aid market – in particular among the companies SAT, Phonak and Oticon - has greatly weakened. The concentration will eliminate a large portion of the remaining competitive impulses, further facilitate coordination in the oligopoly and thus lead to the rise of a market-dominating oligopoly.

## 6.2   Rise of a Market-Dominating Oligopoly through the Concentration

(287) The Decision Division is of the opinion that the concentration will further significantly weaken the currently still remaining competitive impulses among oligopolists SAT, Phonak and Oticon, such that, after the concentration, no significant competition is any longer to be expected among them. Based on the market shares accruing to the oligopoly and the neutralization of the business resources of GN ReSound heretofore placed in competition and its competitive actions to be expected in the future, the creation of a position of market dominance is thus to be expected from the concentration. It should be noted here that the Decision Division, with respect the situation already prior to the concentration, already has considerable doubts about whether significant competition in the oligopoly can be assumed. The arguments for significant internal competition put forward by the participants in the concentration are, upon more careful analysis, not of such weight as to permit clear recognition of significant competition in the oligopoly, together with the corresponding changes in power relations.

### 6.2.1   Higher Degree of Concentration

(288) The supplies Siemens, Phonak and Oticon after the concentration will arrive at a combined **market share** of just under 90 %. Currently, their share is over 80%. The

degree of concentration is thus rising considerably, especially since Widex, as the only remaining competitor with market shares worthy of mention is achieving a domestic market share of less than 10%. Through the concentration, the symmetry in the oligopoly relative to market share will also grow. After the concentration, Phonak would like just behind SAT and ahead of Oticon.

(289) **In Europe and throughout the world**, GN ReSound has a **market share** amounting from 12.5% to 17.5%. The decline in market share turned out to be smaller here than in Germany. Thus, GN ReSound, both in Europe as well as worldwide, is No. 4 on the market with a large gap in market share separating it from Widex. The three oligopolists are thereby raising not just their combined market share in Germany, but also in Europe and throughout the world. In Europe, the combined market shares after the concentration are well over 80%. Worldwide, the combined market share is just about 80%.

**Table 13: 2006 Market Shares after Concentration**

|            | 2006      |
|------------|-----------|
|            | %         |
| 1 Siemens  | 32.5-37.5 |
| 2 Phonak   | 27.5-32.5 |
| 3 Oticon   | 20-25     |
| Total 1-3  | ca. 90    |
| 5 Widex    | 5-10      |
| 6 bruckhoff| <2.5      |
| 7 Starkey  | <2.5      |
| 8 Audifon  | <1        |
| 9 Acousticon | <1      |
| Total      | 100%      |

**6.2.2 With Respect to Market Resources, GN ReSound is the Next Competitor After the Oligopolists.**

(290) On the question of the rise of a market-dominating oligopoly, the total business potential of GN ReSound is to be weighed and evaluated, [in order to determine] to what extent the inclusion of these resources in the oligopoly will take further competitive pressure off the oligopolists and increase the solidarity of their reactions. The business resources of GN ReSound as the No. 4 in the worldwide hearing aid business are far stronger than the evolution of market shares would make one suspect.

**6.2.2.1 Company Data**

(291) GN ReSound's **total foreign sales revenues** in the worldwide hearing aid business are not significantly below those of SAT, Phonak and Oticon; and are thus more than twice as high as the total sales of Widex in the hearing aid business.

(292) Just as with the other oligopolists, **R&D expenditures**, including expenditures for licensing fees, are between 5% and 10% of sales, and are thus around the average R&D costs for companies operating in medical technology.

(293) GN ReSound has **a production facility** in Xiamen, China, and – just like the other oligopolists – can achieve correspondingly favorable production costs.

(294) The same is true of **operating costs**; the corresponding costs of GN ReSound are somewhat higher than those of Phonak, but in the range between 20-30% of sales, as with the other oligopolists too.

(295) Just like the oligopolists, GN ReSound, with its secondary brands **Beltone and Interton**, possesses several hearing aid brands and, like these, is in a position to implement a multi-brand strategy. Widex by contrast has only one brand.

(296) GN ReSound's **gross margin** is at 65% and thus in the range of the published gross margins of Phonak and Oticon.[101] Thus, despite GN ReSound's declines in market share, its gross margins are virtually identical.

(297) Only in **EBITDA** does GN ReSound fall behind the oligopolists according to the information available. This earnings-related indicator shows the losses of market share for GN ReSound over the last few years.

(298) To that extent, based on its core business data, GN ReSound is positioned similarly to the oligopolists. It is to that extent the strongest power on the market, next to the oligopoly, with respect to total sales, market share, production capacity, available markets and profitability.

### 6.2.2.2 Integration of GN ReSound's Development Potential

(299) Phonak has sent the Decision Division documents that were prepared in creation with the planned takeover of GN ReSound.[102] According to them, GN ReSound has already begun to draw the business ramifications of the **distribution and brand-strategy weaknesses** of the past. The situation appears entirely comparable to

---

[101] Danske Equities October 10, 2006 company report for William Demant, Appendix 8E to Oticon Letter of January 5, 2007, p. 49, pg. 1046 d.A.

[102] Appendix 5(1) through 5(5) to Phonak Letter of March 1, 2007, pg. 887 *et seq.* d.A.

Phonak's situation in 2002. Both in the available Due Diligence documents as well as on the market itself, the current business weaknesses of GN ReSound are seen to be less in technological potential but rather more in the marketing of its product portfolio and the management of its distribution system. An exception is the adjustment software which, apparently even with the abortive product introduction of the new high-end hearing aid Metrix, was jointly responsible for the failure.

(300) By contrast to that, in Phonak's opinion GN ReSound possesses a good patent portfolio. This one the one hand relates to products already introduced onto the market. The Decision Division is aware, for example, that in the past there was a difference of opinions between Phonak and GN ReSound regarding the patentability of the case design of ReSound Air.[103] Phonak had envisaged a nearly identical design for microSavia and had to change it prior to market introduction so as not to get drawn into a patent dispute with GN ReSound. In its Comments, Phonak misperceives the competitive significance of this patent dispute for the Decision Division. In no way is it to be seen as an example of competition-restricting behavior, but rather an indication that GN ReSound has heretofore employed its intellectual property rights, whether technology patents or utility models, in competition against the other hearing aid manufacturers too.[104] GN ReSound is less strongly integrated into an exchange of patents and licenses than the three oligopolists SAT, Phonak and Oticon among one another. Based on the information available, GN ReSound is basically a licensor or, as the case may be, an OEM supplier with regard to components for Open Feed-In hearing aids (thin tubes, end pieces, so-called "Tulip Domes").[105] The Decision Division thus expects that the state of technological development among the oligopolists will further converge and the market transparency for the oligopoly will be further strengthened by the concentration. Because GN ReSound is currently working on product developments that are by its own account of great interest to potential acquirer Phonak.

(301) According to the documents available, in 2007 [...] GN ReSound will bring [...] to market.

(302) According to the documents prepared in connection with the acquisition of GN ReSound, the authors have even presented the so-called "product road map" for GN ReSound. [...]

### 6.2.3 Integration of a Competitor Active on Prices / Effects on Price Competition and

---

[103] Appendix 7 to Phonak Letter of January 30, 2007, pg. 353 d.A., Appendix in the appendix folder for this letter.

[104] The assessment by Phonak possibly rests upon a misinterpretation of the Deficiency Notification Letter; Comments on Deficiency Notification, p. 19.

[105] See Appendix III.1.3.2 to Phonak Letter of December 27,2006, pg. 353 d.A., Appendix in appendix

**Price Transparency within the Oligopoly**

(303) Over the past years, GN ReSound has attempted to counteract the melting away of its market shares through a "selling by price" strategy. In 2006, GN ReSound was clearly below the average manufacturer's selling prices of all competitors in all price segments contained in the ZVEI reporting system. Even though this low-price strategy did not lead to a corresponding stabilization of market shares, GN ReSound's policy on terms offered to the hearing aid acoustician retail trade over the last two years apparently differed significantly from the terms policy of the other hearing aid manufacturers active on the market. Through the concentration, the one competitor still active on prices would now be taken over by one of the oligopolists, even though GN ReSound, due to mistakes in its brand and distribution policy and the strong market position of the oligopoly even prior to the concentration, was unable to convert this price competition into corresponding increases of market share.

(304) After the concentration, the oligopolists SAT, Phonak and Oticon would be able to oversee and ensure the stability of manufacturer's selling prices even better than up to now. The price transparency and significance of the **ZVEI reporting system** would be significantly increased, in particular for two reasons.

(305) First, there would only be four businesses with appreciable domestic market shares still active in the reporting system. Under cases decided by the Düsseldorf Upper State Court of July 26 and September 30, 2002 in the "Statistisches Informationssystem Transportbeton" ["Transportation Concrete Statistical Information System"] matter,[106] a reporting system is not permitted under anti-trust law if fewer than five companies with market shares worthy of mention are participating. Only by a satisfactory number of companies participating in the reporting procedure can it be guaranteed that the average data shown in the report back (total volumes delivered, average prices) cannot be decoded and traced back to individual companies or business transactions. Due to the high degree of market transparency brought about in the instant case not just by the ZVEI reporting system but also by other structural conditions, the present reporting system should even now already be impermissible under anti-trust law. For even non-identifying market information procedures may violate Section 1 GWB or Article 81 of the EC Treaty, insofar as they enable a participant to recognize a forward advance of price competition, not only if they also permit the author thereof to be discovered.[107] It is specifically in oligopolistic markets that the Commission, too, views the potential threat of non-identifying market

---

folder for this letter, also Appendix 5 (3) to Phonak Letter of March 1, 2007; pg. 921 d.A.
[106] Kart 37/01 (V).
[107] See also Wagner-von Papp, Marktinformationsverfahren: Grenzen der Information im Wettbewerb ["Market Information Procedures: Limits on Information in Competition"], Baden-Baden 2004, p. 241 et seq.

information systems as particularly high.[108] The convergence of the oligopolists' manufacturer's selling prices (see *supra*, margin number 231, 233) demonstrates the good functional capacity of the existing system. This functional capacity will be further improved by the concentration.

(306) Secondly, Phonak would take over the one competitor active on prices. After the concentration, there would only remain Widex as a competitor of note with market shares in excess of 5%. In the past, however, Widex has not been in evidence as a competitor with active pricing, but in its manufacturer's selling prices is consistently at the level of the oligopolists or slightly above. The monitoring of the tacitly agreed manufacturer's selling prices, without the potential for disturbance by a competitor active on prices, will be even easier than it has already been.

### 6.2.4 Convergence of the Symmetry between Audiological Diagnostic and Measurement Devices

(307) Audiological diagnostic and measurement devices are used to carry out hearing diagnoses and to be able to measure and adjust hearing aids. The buyers are mainly Ear-Nose-Throat physicians, hearing aid acousticians, Ear-Nose-Throat clinics and occupational physicians (see *supra*, margin number 70 f.).

(308) A hearing aid acoustician needs audiological measurement devices that go beyond audiometric diagnosis and also perform measurement functions. Key suppliers of such systems are Oticon, through its subsidiaries Maico and Interacustics (*e.g.*, product: Affinity), SAT (*e.g.*, product: UNITY II) and GN ReSound, through its subsidiary GN Otometrics (*e.g.*, product: Aurical). Phonak has heretofore not been active in this area and, through the concentration, will be enabled to further increase its customer retention through the combination of strong product brands and an extensive audiological offering. Through the concentration, the oligopolists' resource strengths in the distribution of hearing aids will also to that extent converge further.

### 6.2.5 Further Improvement of Coordination and Defense Mechanisms in the Oligopoly

(309) Based on the structural conditions described, in the opinion of the Decision Division it is right now already relatively easy on the market for production and distribution of hearing aids to the hearing aid acoustician retail trade to come to an agreement regarding the terms of a coordination. The companies can also adequately monitor whether the specifics of the coordination are being followed, and they are always able to activate credible deterrent mechanisms if a deviation should come to light. In

---

[108] "Guidelines on the assessment of horizontal mergers pursuant to the Council Directive regarding the control of business concentrations" of the Commission, Council Directive No. 139/2004 of January 20, 2005, Number 52, Footnote 70.

MOJ00000333

summary form, the Decision Division supports the results of its determinations in this regard based on the following parameters:

(310) With the collectivization of the foundational patents through **HIMPP**, hearing aid manufacturers placed the digitalization of hearing aids on a common basis very early. On the one hand, this has led to the establishment of an industry standard, and on the other has placed competition over digitalization into an exceedingly cooperative environment right from the outset. This key function is seen by the partners in HIMPP as an important mutual connector. Just by their interests in HIMPP and the at least semi-annual meetings, the partners are in a continuous exchange of information regarding the HIMPP patent portfolio and the possible inclusion of additional companies in the partnership. After the concentration, the oligopoly will receive a majority of the votes on the Administrative Committee, which is responsible for the management of the joint venture ([...] votes). The inclusion of GN ReSound, which has thus far had [...] votes, will thus make possible an implementation of the combined interests of the oligopolists in HIMPP.

(311) The same is true for cooperation in **HIMSA**. If heretofore a deadlock existed on decisions of business strategy between SAT, Phonak and Oticon, on the one hand, and GN ReSound, Widex and Starkey on the other, the oligopolists will thus receive a majority of votes after the concentration. Through the concentration, a coordination of the interests of the oligopolists, *e.g.*, with regard to the conditions for making NOAH available to the hearing aid acoustician retail trade will take immediate effect on the market even more effectively than before.

(312) Already today, **the exchange of patents among the oligopolists** also relates to current product developments with decisive market significance. Reciprocal licenses are being granted over and over again, since the manufacturers' focal points of development are very similar and thus the danger of patent disputes exists again and again. This patent exchange has already in the past led to a technological "lock-step cadence" among SAT, Phonak and Oticon. It holds not only a forum for coming to agreement on the terms of a coordination. The across-the-board patenting of features, designs and components can, in the opinion of the Decision Division, also be used as a strategic means to implement tacit or explicit coordination within the oligopoly or *vis-à-vis* outsiders. It is undisputed that even now, threatened patent infringements are on the agenda due to the technological closeness of the oligopolists and are normally averted by no-cost (reciprocal) licenses. The oligopolists thereby ensure transparency regarding technologies and largely coordinated behavior in technological competition. The integration of GN ReSound's patent portfolio will facilitate this coordination and the oversight thereof. So too will patents obtain an even greater significance as disciplinary instruments in competition.

MOJ00000334

(313) The concentration will narrow the supplier structure to ultimately 4 companies with market shares of any note. In Germany after the concentration, the oligopoly will have a 90% market coverage. This alone will further facilitate the monitoring and implementation of a sustainable coordination. The described segmentation of the market and the corresponding transparency regarding a multitude of list and manufacturer's selling prices places the manufacturers even now in a position to recognize a possible competitive advance immediately. Through the ZVEI's analyses, they also know in which price segment the advance took place. After the concentration, even the possible identification of a deviator will be further improved since the companies which are on the market outside the oligopoly have a total market share of less than 10%. To that extent, deviations from the average manufacturer's selling prices in the individual price segments that could be detected on the market would be traceable to the behavior of one of the oligopolists.

(314) **Hearing aid buyers** in Germany, in the opinion of the Decision Division, have no counterbalancing demand-side power to see to sufficient competition in the oligopoly (see *supra*, margin number 266 *et seq.*). After the further narrowing of the supplier structure, this will also not change in the future. Since the oligopolists are listed with nearly all hearing aid acoustician operations in Germany and the frequency of customer visits is extremely high due to the short product life cycles and the annual price negotiations, the sales conditions in Germany support the coordination of competition-limiting behavior. Phonak has repeatedly submitted in these proceeding that the always short-term supply contracts prevent an effective punishment mechanism in the oligopoly.[109] A corresponding rationale, however, is still owing from Phonak. In the hearing aid market there exist markedly long-term manufacturer-customer relations. The annual negotiations between the manufacturers and the retailers are apparently required to place corresponding new product introductions of hearing aids into an updated contractual framework. Neither the average manufacturer's selling prices nor the supply relations change in their substance. It is precisely these long-term, constant and continual relations between important hearing aid manufacturers and hearing aid acousticians with regular orders and a far-reaching constancy of manufacturer's selling prices across all price segments that constitute a suitable environment for the construction and possible implementation of coordination and deterrent mechanisms. It is precisely the constant, continuous contact with their market counterparties that gives the oligopolists the ability to immediately recognize breaches of oligopoly discipline with an effect on the market. The narrowing of the supplier structure through the concentration would facilitate this still further.

(315) Competitive advances in the sense of **new product introductions** only take place during the conferences of the European EUHA and the American AAA, and thus in a

---

[109] Most recently: Comments on Deficiency Notification, p. 21.

time frame foreseeable for all manufacturers. Competitive behavior is thus already quite transparent for the oligopolists. The concentration will make the market more transparent and clearer with respect to competition over new product introductions.

(316) The Decision Division has already explicitly set out that the tight customer connections and the ongoing customer care, combined with the ZVEI reporting system, has sharply increased transparency as regards the market share structure and pricing. It was through this that the market upheavals in the wake of digitalization did not lead to a loss of transparency. Today, the ZVEI reporting system is a further strong instrument for creating market share and price transparency, for recognizing breaches and, as needed, to instituted countermeasures. Together with the extensive transparency regarding technologies and the oligopolists' "technological lock-step cadence," competitive advances, either through the introduction of new products and/or reductions in the manufacturer's selling price, even for individual price segments on the market, can be immediately recognized and picked up.

### 6.2.6 No Disintegration of the Oligopoly's Market Share After the Concentration

(317) The Decision Division is not of the opinion that the market share of the oligopoly will significantly disintegrate after the concentration. Phonak itself does not assume that the concentration will have disintegration effects and provides as a rationale that in the past neither the takeover of Unitron (by Phonak), nor the takeover of Werner (by Oticon) nor Rexton (by Siemens) led to corresponding disintegrations of market shares.[110] Even if Phonak after the takeover could not make complete use of GN ReSound's market position for itself, the corresponding disintegrations would be picked up by the other oligopolists. A shifting of GN ReSound's market position to other competitors is not to be expected just by reason of the concentration, which benefits not only Phonak but the other oligopolists, too.

### 6.2.7 Market Results

(318) The hearing aid industry is an extraordinarily profitable economic area. This is true not only in comparison to other industries, but also when compared to the highly profitable medical technology. The following graph show a comparison of the gross margins of companies in the area of medical technology.

**Graph 9: Gross Margins in Top Group - Medical Technology**

---

[110] Phonak Analyst Meeting of October 2, 2006, Exhibit 6 to Oticon Letter of January 5, 2007.