

(319) From the graph it can be seen that all leading hearing aid manufacturers, with gross margins of 60-70% of sales, are among the most profitable industries. SAT is not shown there since it publishes no data hereon. By its own statements, SAT's gross margins lie between the comparative values for GN ReSound and Widex.

(320) As the following graph shows, the profitability of a company appears to correlate to its market share.

**Graph 10: EBITA Compared to Market Share**



(321) According to this, SAT, as the market leader, should also have the highest profitability.

(322) The Decision Division asked for the EBITDA of all leading suppliers, and determined that for all leading suppliers it lies between 25% and 35% of sales. Such an EBITDA is extraordinarily high. Thus, for example, the median value of EBITDA - return on sales for the European chemicals industry in the year 2003 was approximately 15%[111], the top value for German clinic operators was 18.3%[112], the EBITDA return for DaimlerChrysler for 2006 was approximately 11%, that of Bertelsmann was approximately 9%, that of Nestle in 2000 was approximately 15% and that of BMW in 2005 was 14.6%.

(323) The amount of profits earned in the hearing aid industry provides grounds for serious doubt whether, on the market for hearing aids, structural competitive conditions exist that lead to significant price competition and thus guarantee a relevant limitation on profits through competition. This doubt is obviously also shared by analysts.

(324) Thus, Carnegie Securities Research, in its market study "Time to concentrate," expressly alludes to the risk that a potential for price increases always exists, but that end users must be able to pay the price:

> **"Same potential to increase prices as always**
> While manufactures asking for higher prices is one prerequisite for price increases, another is that end-users must be willing and able to pay the higher Price asked. If the prices in the market are already so high that the end-user cannot afford to pay any more, the manufactures can introduce as many new features as they want without being able to lift the price level."[113]

(325) It is obviously assumed that a pronounced policy of profit maximization is being implemented by all manufacturers, the limit of which is the monopoly price, *i.e.*, where the risk exists that buyers, due to the high price, will entirely forego buying and thus even for a monopolist a price increase no longer makes economic sense.

(326) Phonak's objection, that the exits from the market over the past years make it clear that the market is not profitable *per se*[114], is off base here. The Decision Division did not contest that an essential criterion for market success as a hearing aid manufacturer lies is the realization of economies of scale. The market exits of the last years thus related exclusively to smaller suppliers who, due to a lack of "economies of scale" had no access to new generations of chips and competitive production

---

[111] German Central Bank estimates, pg. 1069 d.A.
[112] Gazette of Commerce, January 4, 2005, pg. 1071 d.A.
[113] Carnegie Securities Research, page 35, pg. 1017d.A.

costs. But this changes nothing about the fact that – even against the background of the market structures and in view of the market processes depicted – on hearing aid markets there exist structural competitive conditions that are unable to ensure significant price competition and hence a relevant limitation of profits through competition. Based on the results of its determinations, the Decision Division is not of the opinion that the technological developments and increases in efficiency on the Germany hearing aid market will maintain effective competition and that consumers will appropriately share in these efficiency gains.

(327) Overall, a further growth in profits is expected in the hearing aid industry ("We see scope for a further 5%-point increase in the overall EBIT margin for the industry")[115]. The Decision Division does not fail to perceive here that the expected increases in profits depend not only on autonomous price increases of the manufacturers or even on price agreements. On the contrary, a significant portion of the profit increases rests upon a continual growth in volume, with the consequence that based on the economies of scale lower unit costs will accrue and profits will thereby be able to rise[116]. These economic circumstances are the steady spurs to private businesses. The competitive problem consists in the fact that already in the past, competition took place with the product portfolio, but not to the same extent with the price. But this competition, limited to that extent, cannot fulfill its (chief) function of limiting prices in the interests of consumers. On the contrary, it has to be established that the attempt of GN ReSound to compete over prices was ultimately unsuccessful. To that extent, Phonak has also already announced that the company will give this policy up.

> "He (Phonak's CEO) also emphasized that some of the growth will be driven by higher average selling prices in the ReSound arm. He stated that GN ReSound's ASPs are significantly below Phonak's on all product categories, but that they will be closing some of the gap going forward. This will be naturally also supportive for the overall growth in the 'new Phonak'".[117]

(328) To that extent it is also explainable why analysts after the concentration do not expect that competitors will be negatively affected by the concentration. On the contrary, the further limited competition will also be to their benefit. In addition, they can even expect that possible disintegration effects from "negative distribution synergies"[118] will take the form of additional sales for competitors.

---

[114] Comments on Deficiency Notification, p. 22.
[115] Danske Equities company report for William Demant of October 10, 2006, Appendix 8E to Oticon Letter of January 5, 2007, p.1, pg. 1022 d.A.
[116] Danske Equities company report, ibid., p.1, 4, 16, 46, 48, 57, pg. 1022 et seq. d.A.
[117] Danske Equities company report, ibid., p. 9, pg. 1026 d.A.
[118] Danske Equities company report, ibid., p. 8, pg. 1025 (verso) d.A.

(329) Consequently, the synergies from the concentration, from the collectivizing of research and development, the achievement of higher economies of scale and the integration of a competitor heretofore active on prices, will not lead to Phonak's being strengthened in the oligopoly leading to "more competition." In the opinion of the Decision Division, the concentration will lead to a strengthening of the already considerable concerted oligopolistic behavior. After the concentration, the positive market results in the past for individual companies will further improve. This will, in the opinion of the Decision Division, come at the expense of functioning competition over innovations and price, and hence at the expense of consumers.

### 7. Proposal for Conditions

(330) An exemption of the concentration with ancillary conditions, on the basis of Phonak's proposal of March 20, 2007,[119] is not possible, in the Decision Division's opinion (Section 40 paragraph 3 GWB).

(331) Insofar as the companies are offering terms or conditions, these taken together are such as to cause the prerequisites for prohibition to disappear. A "balancing" based on supposed constitutional and international law principles of proportionality is out of the question.

(332) Phonak has proposed that Phonak and GN ReSound, after the concentration, forego participation in the **ZVEI reporting system**. This undertaking is to be evaluated as positive for competition, but is already required under anti-trust law. The Decision Division is assuming that the ZVEI reporting system violates Section 1 GWB and Article 81 of the EC Treaty. Under cases decided by the Düsseldorf Upper State Court of July 26 and September 30, 2002 in the "Statistisches Informationssystem Transportbeton" ["Transportation Concrete Statistical Information System"] matter, a reporting system is not permitted under anti-trust law if fewer than five companies with market shares worthy of mention are participating. Only by a satisfactory number of companies participating in the reporting procedure can it be guaranteed that the average data shown in the report back (total volumes delivered, average prices) cannot be decoded and traced back to individual companies or business transactions. Due to the high degree of market transparency brought about in the instant case not just by the ZVEI reporting system but also by other structural conditions, the present reporting system should even now already be impermissible under anti-trust law. For even non-identifying market information procedures may violate Section 1 GWB or Article 81 of the EC Treaty, insofar as they enable a participant to recognize a forward advance of price competition, not only if they also permit the author thereof to be discovered.

---

[119] Phonak Letter of March 20, 2007, pg. 1083 *et seq.* d.A.; presentation on designing sales conditions by GN ReSound, pg. 1086a-1086e d.A.

MOJ00000340

(333) Beyond that, Phonak has offered to cancel the cross-licensing agreement with Oticon and in the future to enter into no comparable agreements with either Siemens or with Oticon. Furthermore, Phonak is to strive to cancel the exchange of licenses which has already taken place in the context of cross-licensing agreements.

(334) In principle, the foregoing of cross-licensing agreements can contribute to placing limits on the competition-dampening exchange of technology among market participants. For the instant case, however, the following is to be noted: Regardless of the question of whether the still existing patent licensing agreement between Phonak and Oticon is cancelled, in the future there will, with respect to application-specific technologies, either be an exchange of technology or a waiver of challenges to patent infringements. The leading hearing aid manufacturers including Phonak have themselves proposed that reciprocal licenses be and must be on the agenda, since the manufacturers' focal points of development are very similar and thus the danger of patent disputes exists again and again. Companies frequently work on product enhancements on which competitors have already filed patents. To that extent, the Decision Division is not of the opinion that the participating companies can solve the market-structural problem of the large-scale exchange of technology and the technological "lock-step cadence" among the oligopolists just by the offer of a condition to end particular licenses and omit them in the future. Beyond that, it should be noted that the patent exchange provided for in the cross-licensing agreements concluded with Oticon and Siemens has already taken place. Against the background that the intellectual property rights exchanges were also employed for product families already introduced onto the market (*e.g.*, the Savia product family), it is unclear here what actual market effects would be had from a cancellation and the "striving" for a (partial) rollback of the patent exchange. Phonak has also not made any submission on this point.

(335) The proposal that Phonak and GN ReSound should end their **position as partners in HIMPP** would admittedly improve the structural conditions on the hearing aid market. But this would only be true insofar as the Decision Division has assumed a strengthening effect in that by the concentration the oligopoly would receive a majority of votes on the on the Administrative Committee, which is responsible for the management of the joint venture. The inclusion of GN ReSound, which has thus far had 4 out of 12 votes, would thus make possible an implementation of the combined interests of the oligopolists in HIMPP. It is only this effect which the condition would remove.

(336) But even after withdrawal from the HIMPP partnership, Phonak and GN ReSound, due to HIMPP's "gatekeeper" function, would rely on licensing of the patent portfolio. Otherwise, when developing new hearing aids, they would continuously be

committing patent infringements. Substantively, then, the relinquishment of the position as partners in HIMPP, in the current view of the Decision Division, would have no significant effects on competitive conditions.

(337) Against the background of the limited market effects of the proposals discussed above, the question of whether the structural **sales proposals** would be able to eliminate the conditions for prohibition becomes highly significant. Phonak has offered [...] Interton Electronic hearing aids GmbH, Münster, [...]

(338) The offered sale [...] not suited to dispel the competitive concerns of the Decision Division. [...]:

(339) Even if the participating companies fulfilled the offered sales conditions, [...] would not be suited to dispelling the merger-law concerns. [...]:

(a) Interton

(340) Interton's competitive potential is small. Interton hearing aids account for only about 20-25% of the domestic hearing aid sales of GN ReSound. In addition, the company sells 80-85% of its hearing aids in the "List Price 201-600 EUR" segment. In the "List Price > 750 EUR" segment that is decisive for competition over innovations, the company is practically not active. The Decision Division also has no information available regarding whether Interton still has its own R&D division or now already has access to the developmental know-how, production capacity and components of GN ReSound. The Decision Division also does not believe that, against this background, a buyer will be found for Interton. For in view of the sharp consolidation on the market, the high significance of a competitive brand and patent portfolio and the achievement of economies of scale, the competitive potential of Interton as a stand-alone-company is to be rated low. In this context, the Decision Division also makes reference to the fact that the business strategy decision of GN ReSound to take Interton over in 2005 was viewed on the market as questionable at least.

[...]

(341)

(342)

(343)

(344) Overall, then, the proposed conditions submitted are substantively unsuited to

eliminate the competitive concerns of the Decision Division. A transitioning of the current market position of GN ReSound to a third company is not to be expected, against the background that it essentially involves a [...].

**8.   Causality**

(345) In the proceedings, the authorized counsel of GN Store Nord A/S expressed the opinion that the Decision Division in its decision must take into account not only the development which would result after the implementation of the concentration – possibly with the fulfillment of the conditions being taken into account. Developments after a definitive prohibition would also have to be taken into account, he claimed, for only by comparing both developments could the concentration's causal contribution to a change in the competitive situation be assessed. GN Store Nord would have to so refashion the sales process that the concentration resulting therefrom no longer met the prerequisites adopted by the German Federal Cartel Office for prohibition on the German market. For this purpose, he argued, it is necessary that [...][120]

(346) This view, in the opinion of the Decision Division, is incorrect for the following reasons.

(347) First, the sale of GN ReSound only runs into merger-law concerns if GN ReSound were sold to one of the oligopolists active in Germany: SAT, Oticon or Phonak. Provided that [...], the sales process could also be reshaped in such a way that GN ReSound is sold to a third party hearing aid manufacturer or to a company not on the market. No merger law concerns in Germany would stand opposed to that.

(348) Secondly [...]

(349) Thirdly [...]

**9. Overview**

(350) In light of all of the foregoing, it is to be expected that through the concentration, a market-dominating position of the companies SAT, Phonak and Oticon will arise.

(351) The market for production and distribution of hearing aids to the hearing aid acoustician retail trade is, already prior to the concentration, characterized by structural conditions that argue for concerted oligopolistic behavior. On the one hand, these characteristics are based on the particular distribution structure – high customer retention, stable supply and demand conditions. On the other hand, what is involved are competitive conditions that the oligopoly members SAT, Phonak and

---

[120] Letter of March 21, 2007, pg. 1091 d.A.

Oticon have themselves put in place. These include the collectivization of technology through joint ventures and reciprocal, no-fee licenses, as well as the joint elaboration and implementation of price segments. On the basis of these structural conditions – which they themselves partly put in place – it is comparatively easy for the oligopolists to reach agreement on the conditions for an oligopolistic coordination. They are also in a position to follow and monitor the specifics of coordination. In the event of a breach of this coordination, finally, they are able to employ credible deterrent mechanisms. Consequently, competition over innovation and prices is already sharply limited even prior to the concentration, and the Decision Division leaves open whether to assume a market-dominating oligopoly, consisting of SAT, Phonak and Oticon even before the concentration. It is in any case of the opinion that the competitive conditions on the in any event already highly concentrated market will be further worsened by the den concentration. The takeover of Phonak's [sic] development potential and the removal of the one competitor on the market active on prices, combined with a leading role for the oligopoly in foundational technologies guaranteed by company law, would eliminate a large portion of the competitive potential still remaining on the market. The already great transparency regarding pricing and new product introduction would be further increased. The oligopoly would be able to ward off current and potential competition more effectively than before the concentration and thereby create and ensure a common market-dominating position.

(352) After the concentration, the positive market results in the past for individual companies will further improve. This will, in the opinion of the Decision Division, come at the expense of functioning competition over innovations and price, and hence at the expense of consumers.

(353) An exemption of the concentration with ancillary conditions, on the basis of the foregoing proposed conditions is not possible. The proposed conditions submitted are substantively unsuited to eliminate the competitive concerns of the Decision Division. A transitioning of the current market position of GN ReSound to a third company is not to be expected, against the background that it essentially involves a [...].

(354) Prohibition of the concentration violates neither international nor constitutional law. This is especially true against the background that an economically sensible splitting off of a German portion of the announced combination is not possible, since the GN ReSound business area to be acquired essentially operates almost exclusively distribution facilities in Germany. The doubts expressed by the seller about whether the concentration would be causally related to the change in the competitive situation cannot be supported either.

      B.    Fees
          [...]

MOJ00000344

   C. Instructions for Appeal
    [...]

Heistermann    Dr. Pape    Krueger

MOJ00000345



**TRANSPERFECT TRANSLATIONS**

THE LEADER IN INTERNATIONAL COMMUNICATIONS

ATLANTA

BOSTON

BRUSSELS

CHICAGO

DALLAS

DENVER

FRANKFURT

GENEVA

HONG KONG

HOUSTON

LONDON

LOS ANGELES

MIAMI

MINNEAPOLIS

NEW YORK

PARIS

PHILADELPHIA

RESEARCH TRIANGLE PARK

SAN DIEGO

SAN FRANCISCO

SEATTLE

WASHINGTON, D.C.

Rob Wouk

I, Rob Wouk, professional translator, competent to translate from German into English, hereby certify that this translation is, to the best of my professional knowledge and belief, a faithful rendering of the "SourceBR0012995_Beschluss im Verwaltungsverfahren_GERMAN" German document.

Signed: *[signature]*

Date: 06 Decembre 2007