Exhibit A

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
                          -   -   -
 4
 5   ENERGY TRANSPORTATION,          :   Civil Action
     INC.,                           :
 6                                   :
                Plaintiff,           :
 7                                   :
          v.                         :
 8                                   :
     WILLIAM DEMANT HOLDINGS A/S,    :
 9   et al.,                         :
                                     :
10              Defendants.          :   No. 05-422 (GMS)
11                        -   -   -
12              Wilmington, Delaware
              Tuesday, January 22, 2008
13                  8:30 a.m.
              Second Day of Trial
14
                          -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18   APPEARANCES:
19              EDMOND D. JOHNSON, ESQ.
              Pepper Hamilton LLP
20                   -and-
              MARTY STEINBERG, ESQ.,
21            BRIAN M. BUROKER, ESQ., and
              MAYA M. ECKSTEIN, ESQ.
22            Hunton & Williams
              (Washington, D.C.)
23
                              Counsel for Plaintiff
24
25
     APPEARANCES CONTINUED:
```

```
 1                  MARY B. GRAHAM, ESQ.
                    Morris, Nichols, Arsht & Tunnell
 2                        -and-
                    JOHN M. ROMARY, ESQ.,
 3                  GREGORY C. GRAMENOPOULOS, ESQ.,
                    VINCENT KOVALICK, ESQ.,
 4                  KAY HILL, ESQ.,
                    GERSON S. PANITCH, ESQ., and
 5                  ARTHUR A. SMITH, ESQ.
                    Finnegan, Henderson, Ford, Farabow & Dunner
 6                  (Washington, D.C.)

 7                                      Counsel for
                                        Demant Defendants
 8
 9                  DONALD E. REID, ESQ.
                    Morris, Nichols, Arsht & Tunnell
10                        -and-
                    WILLIAM H. MANDIR, ESQ.,
11                  JOHN SCHERLING, ESQ.,
                    CARL J. PELLEGRINI, ESQ.,
12                  BRIAN SHELTON, ESQ., and
                    MATTHEW KAPLAN, ESQ.
13                  Sughrue Mion
                    (Washington, D.C.)

14                                      Counsel for Widex
15                                      Defendants

16                            -   -   -
17
18
19
20
21
22
23
24
25
```

1   numbers -- patent have very long numbers.  I'm going to

2   refer to these two patents by their last three digits.

3   The patent numbers are the '850 and the '749 patents.  But

4   you see the whole number there in your preliminary

5   instruction.

6           Because these numbers -- I'm not going to go

7   through that next sentence either.

8           ETG contends that the Widex defendants and/or

9   the Demant defendants made, used, sold, offered for sale

10  and/or imported hearing aids -- hearing aid devices that

11  infringed these patents, that they imported components that

12  had an infringing purpose, and that they encouraged others

13  to engage in activities that infringe their patents.

14          ETG also alleges that the Widex and/or Demant

15  defendants' infringement was willful.  Now, ETG seeks

16  damages for the defendants' alleged infringement.

17          ETG does not contend that all of the claims of

18  each patent are infringed by the defendants.  Instead, ETG

19  asserts that only certain claims are infringed.  As you

20  know, these may be called the asserted claims.  ETG also

21  contends that some, but not all, of the defendants' products

22  infringe.  I and the attorneys and witnesses may refer

23  to these product from time to time as the accused product

24  or an accused product.  An accused product simply refers

25  to a product that ETG claims, asserts, infringes its

1    They're not just in one position.  The feedback path doesn't

2    just stay constant.

3            When you go into the doctor's office to get your

4    hearing aid and have it first fixed up for you, sure, it's

5    got a certain feedback path and you can measure the phase

6    and amplitude when you are sitting in the doctor's office,

7    but as soon as you go out of the doctor's office, it

8    changes.

9            And so these things are happening all over the

10   place.  They are changing.  And what we have is a -- is a

11   different kind of filter.  It's actually not brand-new.

12   It's an old filter, back in the 1960's.  It's called an LMS

13   adaptive filter.

14           And what's the primary difference between that

15   and a programmable filter that Dr. Levitt used?

16           The evidence will show that the primary

17   difference is that the adaptive filter is not programmable.

18   It runs on its own.  It figures out everything on its own

19   and it does it without measuring phase and amplitude.  It

20   uses a very complicated mathematical form called and LMS

21   algorithym.  It's all together.  It's not that it's small.

22   If you had one the side of this room, it still couldn't have

23   coefficient put in it.

24           So when you take Dr. Levitt's host controller

25   and you measure where the mermaids are and you convert his

Page 176

1    The sound gets amplified, it comes out, it is

2    supposed to go to the ear.  Some of it comes back around.

3    The solution to the problem is -- Slide 24.

4    The solution to the problem is that you put an

5    electrical feedback path inside the hearing aid.  And you

6    set that patent up so that it cancels the acoustic feedback

7    path.  But there are a number of ways to do that.  One way

8    is you measure the path first, you measure it, you get the

9    phase and amplitude information.  That is your first step.

10    Then you convert that information into coefficients that go

11    into this filter.  And that's what Dr. Levitt did.

12    The other way is you use a complex filter called

13    an LMS algorithm filter, an LMS adaptive filter.  It doesn't

14    measure the acoustic feedback.  It doesn't measure the

15    amplitude and phase.  It does it differently, and it uses

16    the filter itself inside the hearing aid to create the

17    solution.

18    I would like to give you a little overview about

19    the company, too, just say a little bit more.

20    We invent things internally.  We have over, you

21    will hear that we have over 450 inside scientists and

22    researchers.  You will hear the millions of dollars that we

23    spend on our own research.  But you will hear that we also,

24    this is kind of unique about the Demant Group, we are

25    actually owned by a charitable foundation, 60 percent.  And

1          Some of this sound will come back here.  That is

2   the feedback.  So what do you do?  You hook up a host

3   controller, and you measure that feedback.  You heard Mr.

4   Steinberg said you have to measure phase.  There is the

5   thing that measures the phase.  There is the thing that

6   measures the amplitude.

7          You got a computer down here that takes those

8   measurements and turns them into the numbers that the filter

9   needs.  And you got a thing here, it's called an E PROM.

10  What really it is, it is a memory stick.  If you have a

11  computer today, you have a memory stick, this is an old

12  memory stick.  The memory stick gets stuck in the host

13  controller.  It gets programmed with these coefficients, so

14  you know where to put the fence up.  It gets pulled out of

15  the host controller and gets put into the hearing aid.  And

16  after that happens, you can't change them again or else you

17  go back and then the wearer goes away.

18         That is the evidence of how his system works.

19         Now, Mr. Steinberg was attributing us to wanting

20  this miniaturization theory.  It is really his theory.  What

21  he is trying to say and what you will hear their experts say

22  is we have taken all of this and crunched it down into the

23  size of this (indicating).

24         What you will find, the truth is we don't have

25  anything that measures phase no matter how small it is.  We

1    the same phase and amplitude.  It has to in order to cancel

2    it, but it wasn't measured it ahead of time to get it.  It

3    keeps looking and hunting around, seeing, am I close, am I

4    close, is it going to work?

5              When it works, he's got the right coefficient,

6    but it never measures the phase and amplitude ahead of time

7    and puts it into the filter and says, I hope it works.

8    That's what's in the patent.  The patent says measure it

9    ahead of time, put it in and hope it works.  The way this

10   works is, I'm changing all the time.  I'm looking all the

11   time.  I am making sure it works and I'm never measuring

12   phase and amplitude.

13             Now, this is well before, again, Dr. Levitt's

14   date of invention.

15             Can we go back to the time line?

16             And what did Mr. Best do?  Dr. Best.  Dr. Best

17   went into a -- in front of his professors, gave his thesis,

18   gave a public presentation on his thesis, deposited his

19   thesis in the -- in his library and it was -- that was

20   a lack of dedication.  So he was dedicating it to the

21   public.

22

23

24

25

1   side-by-side view.  What this shows on the left-hand side is

2   Dr. Levitt's patent, his programming approach.  And on the

3   right-hand side is how modern-day hearing aids, the hearing

4   aids that the two defendants in this case actually make and

5   use and people wear.

6          Now, on the left side, the programming approach,

7   as Mr. Romary had mentioned, the coefficients necessary to

8   cancel feedback are programmed by this audiologist.  On the

9   audiologist's table, we see, there is a host controller and

10  there is a computer, all external to the hearing aid.

11         What happens is, the patient comes into the

12  audiologist's office.  They do some testing.  And they

13  figure out, okay, what's the best way to cancel this

14  feedback?  They send these coefficients to the hearing aid.

15  And that's it.  They can't change.

16         And at that point in time when they are in this

17  audiologist's office, they are trying to do the best they

18  can to measure the feedback and figure out how you should

19  cancel it.  And they create these coefficients or settings,

20  really, that will cancel the feedback.

21         That might work if the patient doesn't leave.

22  That is the problem.  Once he goes out in the real world,

23  and wants to do day-to-day activities, like chewing, or

24  yawning, or getting on the phone or anything that is

25  different than the feedback condition that exists at that

Page 239

1   Q.    That purports to be the so-called '749 patent?

2   A.    Yes.

3   Q.    Do you recognize that patent?

4   A.    Yes.

5   Q.    Are you one of the inventors of that patent?

6   A.    Yes.

7   Q.    Did the United States Government Patent Office examine

8   that patent?

9   A.    Yes.

10   Q.    Did the United States government officially grant your

11   application for that patent?

12   A.    Yes.

13   Q.    Are the '850 patent and the '749 patents related to

14   each other in some way?

15   A.    Yes.

16   Q.    Can you explain to the jury how they're related?

17   A.    Well, the first patent described a digital hearing aid

18   and the second patent described an apparatus for controlling

19   the digital hearing aid.

20   Q.    Now, can you tell the jury what you hope to accomplish

21   with these two patents, the '850 and the '749 patents?

22   A.    Well, at that time, hearing aids were not providing

23   very good amplification for people with hearing impairment

24   and I realized that the technology that was becoming

25   available at that time, that is digital technology, could

Levitt - direct

Page 240

1    end up with hearing aids that provide substantial better

2    sound quality and improve the -- generally improve --

3    provide a substantial -- substantial improvements in the

4    quality of hearing aids.

5    Q.    Was there one particular problem or issue that you

6    thought was significant?

7    A.    Well, acoustic feedback was a problem.

8    Q.    All right.  What is acoustic feedback?

9    A.    In hearing aids, especially one that's worn on the

10   ear, the loudspeaker of the hearing aid is very close to the

11   microphone of the hearing aid, and so what almost invariably

12   happens is that some of the loudspeaker leaks back to the

13   microphone, so that signal that leaks back is amplified by

14   the hearing aid, and that causes even more leakage and you

15   have like an avalanche effect, where the hearing aid keeps

16   amplifying the signals again and again and again.  You get

17   an unstable situation and it's very unpleasant because it

18   gives a very loud whistle.

19   Q.    Dr. Levitt, I don't know if you can look at the screen

20   up here.  We're going to play a demonstrative.

21          If you wouldn't mind explaining what's happening

22   on the demonstrative, I think you have a screen in front of

23   you.

24   A.    Yes.  I will describe it.  The sound to somebody

25   speaking to somebody with a hearing aid, the sound would

Levitt - direct

Page 241

1    reach the microphone.  That sound would be picked up by the

2    amplifier and be converted to an electrical signal, which

3    the amplifier would amplify, make it more intense, and that

4    more intense electrical signal would go to a loudspeaker,

5    which would convert it back to an audio signal, which the

6    person would hear.

7              Now, normally, that's a good arrangement.  One

8    makes the sounds louder, easier for a hard of hearing person

9    to hear the speech.  However, some of the sound that's

10   generated by that loudspeaker, shown by those red waves,

11   leak back to the microphone and the microphone now amplifies

12   not only the sound coming in, but also the leaked signal,

13   which is now amplified by the amplifier, converted back

14   to sound by the loudspeaker, and now a more intense version

15   of that leaked signal leaks back to the microphone, and now

16   you have a circle where the more intense version of the

17   leaked signal is amplified even more.

18             It gets back to the speaker, and that is even

19   greater leakage.  And that even greater leakage is

20   amplified, and you get into a cycle of events where, within

21   a short while, the sound coming out of the loudspeaker is

22   extremely intense and oscillates at certain frequencies, and

23   the -- it's manifested as a very loud whistle or -- or

24   screech from the hearing aid.

25   Q.    Dr. Levitt, how does this feedback affect the

Levitt - direct

1    willingness of a hearing-impaired person to wear a hearing

2    aid?

3    A.    It had a substantial effect.  It may have been one of

4    the major causes for people not wishing to use hearing aids.

5    It had two effects, which were very damaging, or very --

6    which detracted from the use of the hearing aid.  The one,

7    of course, was the unpleasant shriek, whistle, which is very

8    loud and the person would have to remove the hearing aid or

9    turn the volume down.  But another problem, more subtle, was

10   in order to deal with acoustic feedback, the manufacturers

11   of hearing aids and the audiologists would fit the hearing

12   aid into the ear canal with a very tight fitting ear mold.

13   It would reduce the leakage, but it was also uncomfortable

14   to wear and a lot of people would not wear hearing aids

15   simply because the ear molds are uncomfortable.  It was with

16   a double whammy.  It was very bad news.

17   Q.    If you could turn back to JX-4, that's the '850

18   patent.

19   A.    JX-4?

20   Q.    Right.

21   A.    Okay.  Yes.

22   Q.    And I want to direct your attention to Column 1, and

23   just so you're or oriented, after you get past the sketches,

24   there's some descriptive language.

25   A.    Column 1.

Q. And if you look at the very top, there's a Column 1 and a Column 2. So that's how you sort of found out where you are in a patent.

A. Yes.

Q. If you look at Column 1, lines 33 through 50, did you describe in your patent the methods that had previously been used to try and address feedback?

A. Yes. That paragraph summarizes the methods that were used at that time to combat acoustic feedback.

Q. And why didn't those methods work?

A. Well, they weren't very effective. There was also some leakage equipment. They try and make the -- they tried to improve the tightness of the fit of the ear mold. It was uncomfortable. They tried reducing the gain of the hearing aid in the regions, the frequency regions where feedback was occurring which detracted from the effectiveness of the hearing aid.

Q. Now, obviously, a hearing-impaired person needs amplitude, needs louder sounds to hear?

A. Yes.

Q. What happens to this feedback when you turn up the amplitude or the sound so a hearing-impaired person can hear?

A. Yes. When you turn up the gain of the hearing aid, the gain is the amplification of the hearing aid. If you

Levitt - direct

Page 244

1    turn it up gain, you will get to a point where the leakage

2    that is occurring is sufficient to cause this and you have

3    this high pitch whistle occurring.

4    Q.    Now I'd like to ask you some questions about your

5    relationship with Audimax and how this project that ended in

6    the patent started.

7         Did you ever meet a person named Dr. C.Y. Chen?

8    A.    Yes.

9    Q.    Who was Dr. C.Y. Chen?

10   A.    Dr. C.Y. Chen was the owner of Audimax.

11   Q.    Okay.  Did he also own other companies?

12   A.    Yes.  His major business was energy transportation,

13   but he was a very interesting man, and he had a great

14   technology in applying health problems, and he had several

15   projects developing devices or products for health-related

16   problems.

17   Q.    And do you recall what brought you to his attention,

18   how you met him?

19   A.    One of his colleagues apparently approached Dr. Chen,

20   who wanted -- who introduced me to Dr. Chen, and Dr. Chen

21   wanted me to develop a digital hearing aid.

22   Q.    And when did you first meet Dr. Chen?

23   A.    February of 1984.

24   Q.    At some point in time, did you meet Dr. Chen's son?

25   A.    Yes.

Levitt - direct

1    Q.    And can you basically describe the separate jobs or

2    duties that you, Mr. Dugat and Mr. Copper had on this

3    project?

4    A.    Yes.  My job was, of course, to develop the

5    ideas and how to implement them and Mr. Dugat could design

6    the -- the system itself, and Mr. Copper would put it

7    together.

8    Q.    Did you eventually sign an agreement to work for

9    Audimax?

10    A.    Yes, I did.

11    Q.    Did you begin working prior to signing that agreement?

12    A.    Yes.

13    Q.    Now, to understand how these patents work, we're going

14    to have to understand something called co-efficients.  And

15    if you wouldn't mind trying to tell the jury in language

16    that we can all understand, what is a coefficient?

17    A.    Okay.  A key element in digital signal processing is

18    where you have digital units and the characteristics of

19    those digital units are specified by co-efficients.

20    Q.    Okay.  And what is an algorithm?

21    A.    All algorithm is a sequence of steps to solve a

22    problem.

23    Q.    And how do algorithms relate to co-efficients?

24    A.    Well, if you want your digital device to do something,

25    you have to decide on the characteristics of    the digital

Levitt - direct

Page 247

1    device, which then you decide on the co-efficients that will

2    determine those characteristics, and then you have to go

3    through an algorithm to derive those co-efficients.

4    Q.    And did you personally prepare the algorithms and

5    co-efficients for feedback cancellation --

6    A.    Yes.

7    Q.    -- for these patents?

8    A.    Yes.

9    Q.    How did you do that?

10    A.    Well, I had to work out what was required.  We had

11    to determine the requirements of a filter that we were using

12    to cancel the feedback.  Then once we determined the

13    requirements for that filter, I wrote algorithms that would

14    calculate the co-efficients for the filter.

15    Q.    And after you prepared the algorithms and the

16    coefficient, what happened?

17    A.    They were loaded and we tried out the system and we

18    canceled feedback.

19    Q.    Now, in the mid-1980s, was power consumption and

20    battery size a problem?

21    A.    Yes.  This was a very big concern.

22    Q.    Was it a more significant concern with digital

23    products?

24    A.    In terms of a hearing aid at that point in time, the

25    reason why it took so long for digital technology to be

Levitt - direct

1    that is the '850 patent, entitled Programmable Digital

2    Hearing Aid System.

3    A.    Which one, JX-4?

4    Q.    Yes.  The '850.

5    A.    Yes.

6    Q.    Were the features that are indicated in that patent

7    conceived and reduced to practice before the filing date?

8    A.    Oh, yes, definitely.

9    Q.    Did the technology in that patent actually work?

10   A.    Yes.

11   Q.    Did you personally observe it working?

12   A.    Yes.

13              MR. ROMARY:  Objection, Your Honor.  Leading.

14              THE COURT:  Sustained.  It's leading.

15   BY MR. STEINBERG:

16   Q.    Did you observe it working?

17   A.    Yes.

18   Q.    Now, what did the technology in that patent achieve?

19   A.    Well, we achieved, with a special feedback

20   cancellation, we achieved the ability to cancel acoustic

21   feedback in the hearing aid.

22   Q.    How did that affect the gain?

23   A.    When we canceled using the technique I developed, the

24   amplification of the hearing aid remained unchanged.  So you

25   could shape the hearing aid, get the frequency response you

1  needed for a given person, and then you could cancel the

2  feedback without any change to the gain or output of that

3  hearing aid.

4            This was a feature that was not possible with

5  hearing aids before that date.  Before that date, if there

6  was acoustic feedback, you had to lower the gain in some

7  way.

8  Q.    Did you achieve an advance in gain?

9  A.    Yes.  One of the limitations of hearing aids that were

10  in those days was because there was the possibility or the

11  probability of getting acoustic feedback with the frequency

12  response that the person needed, you didn't provide the gain

13  that that person needed, because if you did, the hearing aid

14  would go into oscillation.

15            So what happened was people were being fitted

16  with hearing aids that didn't have the best frequency

17  response that the person wearing it needed.  Every person

18  needs a different frequency response.

19  Q.    Do you remember what advance in gain you achieved?

20  A.    We got as much as a ten-decibel improvement in gain

21  before we had any feedback problems.

22  Q.    Can you tell us in an explanation in real life what

23  that means?

24  A.    I am sorry for using a technical term.  Ten-decibel

25  improvement in gain means that we increased the power of the

Levitt - direct

Page 258

1    A.    Yes, it was.

2    Q.    Now, in the patent, does it describe only one way to

3    achieve your objective?

4    A.    No.  We envisioned possible ways of doing it.  So the

5    patent was written in a very flexible way to cover

6    possibilities that I thought could take place, including

7    methods that we had actually tried.

8    Q.    Now, if you wouldn't mind turning to JX-49.  JX-49

9    purports to be your consulting agreement with Audimax.  Do

10   you recognize that document?

11   A.    Yes.  This is my consulting agreement.

12   Q.    Now, did your agreement require you to assign your

13   rights in the patent to Audimax?

14   A.    Yes.  I assigned all of my rights to the patent to

15   Audimax.

16   Q.    Were those rights then assigned through a series of

17   assignments to ETG?

18   A.    That's correct.  I assigned my rights to Audimax and

19   Audimax assigned it to ETG.

20          MR. STEINBERG:  Your Honor, I believe we have an

21   agreement of the parties that the assignments will be

22   admitted into evidence.

23          THE COURT:  They are not already in?

24          MR. ROMARY:  No objection.

25          THE COURT:  They are admitted.

Levitt - direct

1    his pocket and use any telephone he had access to.

2        The whole idea and the reason for winning that award

3    was the demonstration for how miniaturization could solve a

4    very practical problem.

5    Q.    Now, Doctor, I think you also heard in opening that

6    the defendants' lawyers claimed that your patents were not,

7    quote, unquote, "adaptive."  They were fixed.

8        I would like to direct your attention again to

9    Exhibit 4, the '850 patent.

10   A.    Yes?

11   Q.    Okay.  And if we look at the first page in the

12   abstract section, in the very middle --

13   A.    Okay.

14   Q.    -- there's some language that says, which supplies

15   co-efficients to a programmable filter and amplitude limiter

16   in the hearing aid so as to cause the hearing aid to adjust

17   automatically to the optimum set of parameter values for

18   speech level, room reverberation and type of background

19   noise then obtaining.

20        Can you tell the jury what that language has to

21   do with your patent being adaptive?

22   A.    Okay.  The filter consists of the components, digital

23   components.  In order for it to operate, it needs

24   co-efficients.  And what we did was send co-efficients and

25   we kept updating the co-efficients, that is we were updating

Levitt - direct

1    or adapting the -- we were changing the co-efficients to

2    adapt to the acoustic environment.  So it was an adaptive

3    hearing aid.

4    Q.    Now, if you will please turn to Column 1, lines 9

5    through 14.

6    A.    Yes.

7    Q.    Okay.  And I'm going to read it to you.  It says, More

8    specifically, it relates to hearing aids of this character

9    that are capable of automatically adjusting to optimum

10   parameter values as operating conditions such as speech

11   level, room reverberation and background noise change, and

12   also for reducing acoustic feedback.

13          Could you tell the jury, please, what that has

14   to do with the adaptive nature of your technology relating

15   to feedback?

16   A.    Well, the whole idea would be that as a person wore

17   this hearing aid, and if the environment changed, that could

18   cause any problems, including a change in acoustic feedback,

19   that the host controller that is wearable this would tend to

20   be wearable eventually, would, in fact, change the hearing

21   aid, change the filter co-efficients such that it would

22   adjust to the new acoustic environment.  And that's an

23   adaptive process.

24   Q.    And then if you turn to Column 2 lines, I believe it's

25   22 through 27, which reads, Still another object of the

Levitt - direct

Page 267

1    invention is to provide new and improved hearing aid

2    apparatus that is capable of effective noise and

3    reverberation suppression and acoustic feedback reduction

4    while maintaining optimum hearing characteristics as the

5    speech and noise levels vary.

6              What does that have to do with being adaptive?

7    A.    Well, if you are wearing a hearing aid and things

8    change, you might hold a telephone against your ear, or any

9    of those things where the acoustic environment changes,

10   the -- the feedback might occur or there might be a

11   different kind of noise and you'd want to change the hearing

12   aid's characteristic such that you had the optimum

13   characteristics for the listener without feedback, and that

14   required adaptive changes to that filter.

15   Q.    Then if you turn to Column 11, Lines 31 through 38,

16   and I will read it for you, it says, Automatic adjustment of

17   the frequency response of the hearing aid as a function of

18   speech level may also be effected by placing the

19   programmable filter in a feedback loop in a series with a

20   programmable compression amplifier.  Since the degree of

21   feedback depends on signal level, the overall frequency

22   response also depends on signal level.

23             What does that have to do with being adaptive?

24   A.    Well, you would want to make sure that you adapt the

25   system such that you have optimum gain characteristics or

Levitt - direct

Page 268

1    frequency shaping for the listener.

2    Q.    Finally, if you turn to Column 11, Lines 51 through 57

3    on that same page, and I will read it to you, it says,

4    Moreover, by virtue of the novel means employed for

5    effecting automatic adjustment of the programmable filter to

6    optimum parameter values as the speech level, room

7    reverberation and type of background noise change and for

8    reducing acoustic feedback, a superior hearing aid system of

9    optimum characteristics can be prescribed for

10   hearing-deficient patients.

11            What does that have to do with being adaptive?

12   A.    Okay.  When you have the hearing aid that is

13   adjusting itself automatically, the method of adjustment is

14   adaptive.  It might get worse, and come back to the optimum

15   condition.  Automatic adjustment requires some adaptive

16   mechanism or algorithm in the system.

17   Q.    I think you also heard in opening argument with the

18   lawyers say, well, their technology is different because

19   it's adaptive on the fly.  Can you compare that to your

20   patented technology?

21            MR. ROMARY:  Expert testimony.

22            THE COURT:  Counsel, I am going to sustain that

23   objection.

24            Do you want to be heard on that?

25            MR. STEINBERG:  I believe he said it in opening.

Levitt - direct

1              THE COURT:  Let's see.

2              (The following took place at sidebar.)

3              THE COURT:  Mr. Steinberg, the objection, as I

4    understand it, is that you are soliciting an expert opinion

5    from a witness who has not been identified and called for

6    that purpose.

7              MR. ROMARY:  Yes, sir.

8              MR. STEINBERG:  Of course, we would say he is an

9    expert and they have hired him as an expert.

10             THE COURT:  You would have to comply with Rule

11   26, at least.  No question, he is an expert.  But there is

12   no expert report, I don't think, is there?

13             MR. STEINBERG:  No.

14             THE COURT:  I will sustain the objection.

15             (End of sidebar conference.)

16             THE COURT:  You may proceed, counsel.  The

17   objection is sustained.

18   BY MR. STEINBERG:

19   Q.   Now, Dr. Levitt, when technology creating computer

20   chips and batteries were small enough, what would happen to

21   the distinction between the host controller and the hearing

22   aid?

23             MR. ROMARY:  Your Honor, same objection.

24             THE COURT:  Same ruling.

25   BY MR. STEINBERG:

Levitt - direct

Page 270

1    Q.    In the patent that you invented, was the host

2    controller manual or automatic?

3    A.    It could be either.  Initially, we started with manual

4    adjustment.  And then we programmed it to be automatic.  The

5    intent was to have finally an automatic system.

6    Q.    You have described prototypes which you called

7    breadboards and we have seen pictures of those.  How did

8    you -- how would you get those into a human ear?

9    A.    Well, that involves a manufacturing process.  I mean,

10   what we did at that time was we had the shell of a hearing

11   aid.  And we put a transducer into it, a loud speaker into

12   it, a microphone, and wires going to the breadboard.

13   Acoustically, to the person wearing it, it was like a

14   regular hearing aid.  But the breadboard was separate.

15            The idea at that point was to get a manufacturer

16   to manufacture the actual electronics such that it would be

17   either pocket-worn or fit behind the ear.  And that's where

18   we couldn't find a manufacturer to go with us.

19   Q.    Now, if you turn over to Column 14 in the patent, the

20   '850 patent, Exhibit 4.

21   A.    No. 4.

22   Q.    Yes.  Exhibit 4, the '850 patent, and Column 14.

23   A.    Yes.

24   Q.    There is two claims there, 13 and 14.  Both of them

25   use the word determining.  Do you see that?

Levitt - direct

1    A.    Yes.

2    Q.    What does determining mean?

3         MR. ROMARY:  Objection.  Your Honor, that is

4    claim construction.

5         THE COURT:  Sustained.

6    BY MR. STEINBERG:

7    Q.    Did the determining step in your patent require any

8    specific kind of determining?

9    A.    No.  The whole idea of determining what we needed

10   allowed us to solve the problem in different ways.  We could

11   have measured the phase and amplitude that would have

12   canceled acoustic feedback.  We could have used an empirical

13   procedure, like the null method, for determining what was

14   needed to cancel the acoustic feedback.  We could have used

15   a theoretical prediction of determining the filter that

16   would cancel the feedback.

17        There are many ways of determining the necessary

18   amplitude and phase.  And we gave one specific example in

19   the patent which we thought was an easy one to understand,

20   relatively speaking.

21   Q.    Let's show the graphic again about amplitude and phase

22   and ask you to explain it to the jury?

23        MR. ROMARY:  Expert testimony.

24        THE COURT:  Do you want to discuss it?

25        MR. STEINBERG:  Yes, I would.

Levitt - direct

1        (The following took place at sidebar.)

2        MR. ROMARY:  Your Honor, I think what he is

3    coming to is he is going to try to explain through expert

4    testimony what is going on.  If he wants to say what is in

5    the patent, I don't care.

6        MR. STEINBERG:  This is how the patent works.

7    It's what it does.  It determines the amplitude and phase.

8        MR. ROMARY:  I will withdraw for a while.  I

9    don't want it to be expert.  If it's factual, it is okay.

10       MR. STEINBERG:  It is also exactly what he

11   invented.  He invented a system that determines the

12   amplitude and phase.  He created a filter.  And he has got

13   to explain it to them.

14       MR. ROMARY:  I will withdraw it for a while.

15       (End of sidebar conference.)

16       THE COURT:  The objection has been withdrawn.

17       THE WITNESS:  Please repeat the question?

18   BY MR. STEINBERG:

19   Q.   We are going to show a demonstrative and ask you to

20   explain it with respect to amplitude and phase and how it

21   canceled the signal?

22   A.    That is not the one that shows amplitude and phase.

23   That shows the nature of acoustic feedback.

24   Q.   Here we go.  In terms of explaining your patent,

25   explain to the jury what they are seeing and how this works

Page 273

1    and how it relates to your patent?

2    A.    Okay.  If you look at the diagram, and you look at the

3    section going, the wire going from the amplifier to the loud

4    speaker, that has two waveforms there.  The black waveform

5    is the signal that's coming in, the one that you want to

6    hear, and the red waveform is the feedback signal that has

7    leaped from the loud speaker back to the microphone, back to

8    the amplifier, and amplified one more time.

9              The concern, of course, is you want to cancel

10   that red waveform, the acoustic signal.  To do that, you

11   have to know not only how intense it is, not only the

12   amplitude, but the exact location, when you get peaks and

13   valleys.  The whole idea of the filter to cancel, it creates

14   an electrical signal that not only has the same amplitude,

15   but it has peaks and valleys at exactly the same instance in

16   time as the signal you want to cancel.

17             When you subtract the two, they cancel each

18   other out.

19             I would like to add that the possibility of

20   doing this with a hearing aid only became possible with

21   digital electronics, because prior to that, with the

22   old-fashioned analog electronics, it was very difficult to

23   manipulate the phase of a signal in a hearing aid.  You

24   could change the amplitude or the gain, but it was very hard

25   or impossible to change the phase the way you wanted it to

Levitt - direct

Page 274

1  be changed.

2          With a digital system, it was very easy to

3  change both amplitude and phase at the same time and

4  independently of each other.  And that was the trick that

5  enabled us to cancel feedback.

6  Q.    Doctor, I had a little difficult time understanding

7  when I first heard it.  What does the word subtract mean

8  when you look at this diagram?

9  A.    You take two signals, I mean, it's addition.  If you

10 have a signal that has a value of five, and it's exactly the

11 same instance of time, another signal has a value of five,

12 and you are subtracting, you are ending up with a signal of

13 zero, that is no signal.

14 Q.    Doctor, would you please turn to PX-562.

15 A.    Yes, I have it.

16 Q.    PX-562 purports to be a December 26th, 1996 letter

17 from the Sughrue law firm hiring you as an expert.  Did you

18 receive that letter?

19 A.    Yes, I did.

20 Q.    Who is cc'd on that letter?

21 A.    Mr. Soren Westermann.

22 Q.    Who is Soren Westermann?

23 A.    He is the head, CEO, I believe, of Widex and also

24 managing, senior person HIMPP organization.

25 Q.    You mentioned HIMPP.  What is HIMPP?

Levitt - direct

1    Q.    Do you have to measure phase and amplitude in order to

2    make an LMS filter work?

3    A.    The LMS filters works --

4    Q.    Yes or no, please?

5    A.    Do I have to measure?

6    Q.    Do you have to measure phase and amplitude to make an

7    LMS filter work?  Yes or no?

8    A.    It's not an appropriate question for that kind of

9    signal processing.

10          MR. STEINBERG:  Your Honor, the witness can

11    explain his answer.

12          MR. ROMARY:  Yes, but the witness has to give me

13    a yes or no before he explains, sir.

14          THE COURT:  I'm going to ask you that you reput

15    the question.  Rephrase the question, please.

16          MR. ROMARY:  Yes, sir.

17    BY MR. ROMARY:

18    Q.    According to your understanding of an LMS filter, do

19    you need to have -- do you need to know the phase and

20    amplitude that you want to make an LMS filter operate?  Yes

21    or no?

22    A.    The answer to your question is no, but I'd like to

23    explain what this is all about.

24          In an LMS filter, you have a digital filter with

25    co-efficients --

Page 291

1          THE COURT:  Doctor, let me interrupt for just a
2    second.
3          THE WITNESS:  Sure.
4          THE COURT:  Your lawyer will get a chance to ask
5    you additional questions.
6          THE WITNESS:  Yes.
7          THE COURT:  So he can give you that opportunity
8    to explain.  He gets to control the questioning.
9          THE WITNESS:  Okay.
10          THE COURT:  Okay?
11          MR. ROMARY:  If I'm able.
12          THE COURT:  I really control the questioning.
13          THE WITNESS:  You're in charge.
14          THE COURT:  But it is what we call
15    cross-examination, so he gets to ask the questions.
16          THE WITNESS:  Okay.
17          THE COURT:  Okay.
18          THE WITNESS:  The LMS filter does not measure
19    amplitude in phase to get the answer, but when it does get
20    an answer, it can be transformed into amplitude and phase
21    information.
22    BY MR. ROMARY:
23    Q.   Just so I understand and just so the jury understands,
24    you don't need to have phase and amplitude information to
25    have an LMS filter work.  Yes or no?

1    A.    Again, it's one of these yes/no questions where

2    whichever way I answer is going to give you misleading

3    information.

4    Q.    Can you answer yes or no?

5    A.    I just told you, if I answer yes or no, it's not going

6    to be an accurate answer.

7              THE COURT:  I think the answer is he cannot

8    answer yes or no.  Okay.

9    BY MR. ROMARY:

10    Q.    Now I'm really now confused because I thought just a

11    moment ago you did say an LMS filter does not need phase or

12    amplitude information in order to operate.

13    A.    No.

14    Q.    Yes or no?

15    A.    I did not say that.

16              THE COURT:  He didn't say that.  He qualified

17    his answer.

18              MR. ROMARY:  Okay.

19              THE COURT:  Okay.

20    BY MR. ROMARY:

21    Q.    Can you take -- according to your understanding, if I

22    gave you phase and amplitude information, I said, make this

23    LMS filter operate in view of this phase and amplitude

24    information, can you make it operate?  Yes or no?

25    A.    Please don't ask me yes-or-no-questions because

Levitt - direct

Page 293

1    they're implying a certain -- you get an inaccurate answer

2    if I just say yes or no.

3    Q.    You can say you can't answer.  I just want to know.

4    Yes or no, or you can't answer?

5    A.    I can't answer that question because it doesn't fit

6    the nature of LMS.

7    Q.    That's fine.  Other experts may disagree, but that's

8    fine.

9                 THE COURT:  Counsel --

10               MR. STEINBERG:  Objection.

11               THE COURT:  Sustained.

12               MR. ROMARY:  Thank you.

13   BY MR. ROMARY:

14   Q.    Okay.  Let's go back to your patent, please.  By the

15   way, you did not disclose an LMS filter in your patent;

16   correct?  Yes or no?

17   A.    No, I did not display an -- a filter of that type, but

18   I did describe a system that gave the equivalent answer.

19   Q.    Okay.  So an LMS filter is not in there.  Correct?

20   Yes?

21   A.    It's an immediate -- there's a method that's in there

22   that gives you the same answer essentially --

23   Q.    I'm not asking you that, sir.  I know every filter

24   that works gives you the same result.  I'm asking you

25   whether an LMS filter is in there?  Yes or no?

Levitt - direct

1    A.    No, but the patent claims that you can determine

2    what you need to find, and if it so happens that an LMS

3    filter is the way to determine the amplitude and phase, then

4    so be it.

5              MR. ROMARY:  Can I get an instruction for yes or

6    no?

7              THE COURT:  Move on.  Move on.

8    BY MR. ROMARY:

9    Q.    Okay.  Let's go back to your patent, please.

10   A.    Yes.

11   Q.    Now, you saw this diagram in my opening; correct?

12   A.    Yes.

13   Q.    Okay.  And this is your host controller; correct?

14   A.    Yes.

15   Q.    And this is --

16             MR. ROMARY:  Can we have the next one, the color

17   part?

18   BY MR. ROMARY:

19   Q.    Okay.  I'm not asking about your claims.  I'm not

20   asking about what you think the patent could cover.  I'm

21   just asking about what is disclosed in these two figures and

22   the associated written description.

23             Do you understand?

24   A.    I understand.

25   Q.    Okay.  In the -- in order to make this particular

Levitt - direct

1    a hearing aid?  Yes?  That's correct, isn't it?

2    A.    Again, if it's designed to be plugged into the wall,

3    yes.  If it's designed to be run off a battery, no.

4    Q.    Okay.  If you had a lot of power consumption problems

5    over here (indicating), there's nothing inconsistent with

6    your invention that we couldn't plug this into the wall,

7    break this off and have this guy walk away; correct?

8    A.    Yes, you can plug it into the wall if you so wish, but

9    you don't have to.  It's not a requirement.

10   Q.    That's all my question is.  You can't.

11   A.    Yes.

12   Q.    Now, in order to measure the acoustic feedback using

13   this system -- and you do, in fact, measure it using this

14   system, don't you?  Yes or no?

15   A.    Yes.

16   Q.    Okay.  In order to do that --

17   A.    Excuse me.  In this particular example, we measure it,

18   but actually we implemented a null technique in that

19   particular -- I said it wasn't a measurement.  It was a null

20   procedure, which is adaptive.

21   Q.    Okay.  It's -- we're going to get to that.  Let me go

22   through this slowly so the jury has a chance to follow.

23   Okay?

24   A.    Yes.

25   Q.    The way this works is that you inject a test signal in

Levitt - direct

Page 298

1    here; right?

2    A.    Yes.

3    Q.    It would want to measure your acoustic feedback?

4    A.    Right.

5    Q.    Inject --

6    A.    Correct.

7    Q.    This is open, right, so the microphone is not working?

8    A.    When -- not necessarily.  The only time when you

9    absolutely have to disconnect the microphone is when you

10   adjust the hearing aid to give the best possible

11   amplification for your -- your patient without any

12   possibility of acoustic feedback.  Once you've got that, you

13   know the requirements of your hearing aid for that person.

14   After that, you worry about how to deal with acoustic

15   feedback, and at that point, you connect the microphone.

16   And that's the only time you need to disconnect the

17   microphone, the only time you have to disconnect the

18   microphone.

19

20

21

22   Q.    When they were peer-reviewed, did any of the peers

23   tell you that you were not the inventor, it wasn't adaptive,

24   it was obvious?

25   A.    No.

Levitt - cross

Page 305

1    controller.  Was that correct?

2    A.    Yes.

3    Q.    And Figure 2 was your hearing aid.  Is that correct?

4    A.    Yes.

5    Q.    This is Figure 1.  Correct?  Can you see that, sir?

6    A.    I can see it.

7    Q.    This is Figure 1?

8    A.    Yes.

9    Q.    And this is Figure 2?

10   A.    Yes.

11   Q.    Do you remember the little mermaids?

12   A.    Yes.

13   Q.    Was it accurate that you do have to measure the phase

14   and amplitude to start your process?

15   A.    No.  You have to determine the amplitude and phase.

16   You are not committed to measuring it.  You could do it by a

17   null method.  You could do it by measurement.  And you could

18   do it by theory.  Determining is much more general than

19   measuring.

20   Q.    How did you do it in your patent?  You did it by

21   measuring, didn't you?

22   A.    No.  We determined it in the patent.  It says quite

23   distinctly that we determine it.

24   Q.    Isn't it true that in your patent what you did is you

25   connected the host controller to the hearing aid?  Correct?

Levitt - cross

Page 324

1   please, Your Honor?

2            THE COURT:  Had you finished your response, sir?

3            THE WITNESS:  I don't know, to be honest with

4   you.

5            THE COURT:  Next question.

6   BY MR. ROMARY:

7   Q.    Now, the work you actually did at Audimax, you got

8   paid for that.  Right?

9   A.    Yes, I was paid very nicely.

10  Q.    $150,000 for two summers and one day a week.  Right?

11  A.    Yes.  It's embarrassing, but that's what they paid me.

12  Q.    Now, if your expert, Dr. Brown, says that this filter

13  over here in the embodiment disclosed in the patent is a

14  fixed filter, would you be able to argue with him on that or

15  would you agree with him?  This is your expert.

16  A.    Again, it's one of those questions that is so

17  heavily -- there is so much detail in your question that I

18  cannot give you a simple answer.

19  Q.    Okay, that's fair.

20            I think you gave three ways that you could

21  possibly -- excuse me.  I do not mean to put words in your

22  mouth.  The best I have from my notes that I took quickly is

23  you could measure the acoustic feedback, you could have an

24  empirical null system and you could theoretically predict

25  acoustic feedback.  Is that pretty accurate?

Levitt - cross

Page 337

1    you measure how bad the person's hearing is?

2    A.    Right.

3    Q.    The next one is you try to figure out how to solve

4    that problem?

5    A.    Right.

6    Q.    Only after you do that do you then measure the

7    acoustic feedback in the hearing aid.    Correct?

8    A.    Yes.

9    Q.    That's what your patent says to do?

10   A.    Right.

11   Q.    The next thing is, you reprogram.  This means, I think

12   you told us on deposition, that you take whatever

13   programming you had to make the hearing aid right, so it

14   could hear well, now you add to it the characteristics of

15   acoustic feedback, to minimize the acoustic feedback.  Is

16   that correct?

17   A.    It depends on whether you now put a programmable

18   filter in the feedback path.  There are different ways of

19   doing this.

20   Q.    You are absolutely right.  Let's assume what you are

21   doing is you have got two filters, one is in the feedback

22   path and one is in the forward path?

23   A.    Right.

24   Q.    Under that circumstance you would just be programming

25   the feedback path filter.  Correct?

```
1                    IN THE UNITED STATES DISTRICT COURT
2                    IN AND FOR THE DISTRICT OF DELAWARE
3
                                  -   -   -
4
5    ENERGY TRANSPORTATION,              :   Civil Action
     INC.,                              :
6                                        :
               Plaintiff,                :
7                                        :
          v.                             :
8                                        :
     WILLIAM DEMANT HOLDINGS A/S,        :
9    et al.,                             :
                                         :
10             Defendants.     :   No. 05-422 (GMS)
11                                -   -   -
12                      Wilmington, Delaware
                      Wednesday, January 23, 2008
13                          8:30 a.m.
                        Third Day of Trial
14
                                  -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18   APPEARANCES:
19             EDMOND D. JOHNSON, ESQ.
               Pepper Hamilton LLP
20                  -and-
               MARTY STEINBERG, ESQ.,
21             BRIAN M. BUROKER, ESQ., and
               MAYA M. ECKSTEIN, ESQ.
22             Hunton & Williams
               (Washington, D.C.)
23
                                  Counsel for Plaintiff
24
25
```

```
 1    APPEARANCES CONTINUED:
 2               MARY B. GRAHAM, ESQ.
               Morris, Nichols, Arsht & Tunnell
 3                   -and-
               JOHN M. ROMARY, ESQ.,
 4             GREGORY C. GRAMENOPOULOS, ESQ.,
               VINCENT KOVALICK, ESQ.,
 5             KAY HILL, ESQ.,
               GERSON S. PANITCH, ESQ., and
 6             ARTHUR A. SMITH, ESQ.
               Finnegan, Henderson, Ford, Farabow & Dunner
 7             (Washington, D.C.)
 8                            Counsel for
                              Demant Defendants
 9
               DONALD E. REID, ESQ.
10             Morris, Nichols, Arsht & Tunnell
                       -and-
11             WILLIAM H. MANDIR, ESQ.,
               JOHN SCHERLING, ESQ.,
12             CARL J. PELLEGRINI, ESQ.,
               BRIAN SHELTON, ESQ.,
13             MATTHEW KAPLAN, ESQ., and
               J. WARREN LYTLE, JR., ESQ.
14             Sughrue Mion
               (Washington, D.C.)
15
                              Counsel for Widex
16                            Defendants
17                   -   -   -
18
19
20
21
22
23
24
25
```

Levitt - cross

1    example, the phase is not what is shown here, is it?

2    A.    That's the period.

3    Q.    But if you were measuring this from some absolute

4    place, like if this were the corner of your property and you

5    were saying, okay, this first one here is four feet away,

6    that would be a measurement of phase then, wouldn't it?

7    A.    Yes.  You would specify it as a function of a period.

8    That second mermaid would be one period away from the

9    beginning.  And that would be zero phase, actually.

10   Q.    Now, your host controller that is shown in your

11   patent, Figure 1, that would measure this amplitude in the

12   amplifier that I kept circling in the host controller.

13   Correct?

14   A.    One of its functions would be to measure that

15   amplitude.

16   Q.    And the phase shifter I kept referring to, one of its

17   functions would be to measure from some reference point the

18   phase of that signal.  Correct?

19   A.    Actually, I was slightly in error.  One of its

20   functions would be to determine the amplitude and to

21   determine the phase.

22   Q.    Now, in real life, when you walk around with a hearing

23   aid, if you use this analogy, those mermaids are going to

24   get bigger and smaller as the acoustic feedback path

25   changes.  Correct?

Levitt - redirect

Page 375

1    and phase of a signal in the transmission path?

2            MR. ROMARY:  Objection.

3            THE COURT:  Aren't you getting into the field of

4    expertise that you are going to have other people discuss?

5            I am going to sustain the objection.

6    BY MR. STEINBERG:

7    Q.    Do you know how an LMS filter works?

8    A.    Yes, I do.

9    Q.    How does an LMS filter work?

10   A.    Basically, it is a programmable digital filter with a

11   set of coefficients, and you have an algorithm to determine

12   the coefficients, so as to minimize acoustic feedback by

13   canceling the waveforms, which is equivalent to determining

14   the amplitude and phase of the feedback and canceling.

15   Q.    Mr. Romary asked you whether the actual words LMS

16   algorithm were contained in your patent and you said they

17   weren't.  Correct?

18   A.    Why should I specify one specific method?

19   Q.    You, yourself, used an algorithm to effectuate the

20   patent.  Correct?

21   A.    I set an example, yes.

22   Q.    Is the actual name of the algorithm in your patent?

23   A.    No.

24   Q.    Are there other algorithms that could be used?

25   A.    Yes.

Levitt - redirect

1    Q.    Now, I believe Mr. Romary asked you a number of times

2    about what I would call the fitting process.  And I will

3    direct your attention to those pages.  Yes.  Column 6.  He

4    was directing your attention to these five steps, as you

5    might recall, and had you go through those steps?

6    A.    Yes, he went through them with me.

7    Q.    Is there something where you wear a hearing aid where

8    a hearing-impaired person has to first go in and get what's

9    called fitted?

10   A.    Yes.  When a person first comes in for a hearing aid,

11   you have to evaluate the residual hearing that that person

12   has.  And that, of course, is very much an individual, each

13   person has a different kind of residual hearing.  Some

14   people have more, some people have less.  So you have to

15   find that out first.  That is the very first set of

16   measurements.

17   Q.    In your experience, serving for hearing aid

18   manufacturers for the last 30 years, is the fitting

19   procedure commonly used for modern high-end hearing aids?

20   A.    It's an essential component.

21   Q.    And during the fitting procedure, is the patient and

22   the hearing aid essentially hooked up to a computer?

23   A.    Yes.

24   Q.    Now, when Mr. Romary took you through those five

25   steps, the last step is called comparison testing of

Levitt - redirect

Page 377

1    possible alternative settings of the hearing aid to

2    determine the optimal hearing aid settings for the subject.

3            Now, can the paired comparisons be used for

4    other things, such as feedback cancellation?

5    A.    The paired comparison technique is an adaptive

6    procedure that I developed to hone in on the optimum

7    settings, including a situation where there might be some

8    feedback.  Bear in mind, feedback doesn't always have to

9    have whistling.  This would be to optimize a hearing aid so

10   as to minimize feedback that might reduce the quality of

11   sound in the hearing even without whistling.

12   Q.    Now, Mr. Romary asked you if the host controller was

13   used in the fitting process.  And you said it was.  Correct?

14   A.    I beg your pardon?

15   Q.    Mr. Romary asked you if the host controller was used

16   in the fitting process.

17   A.    Yes.

18   Q.    Is it also used for any other purpose?

19   A.    Well, it's used for evaluating the hearing loss.  It's

20   used for canceling feedback.  It has a number of

21   applications and uses.

22   Q.    Now, Mr. Romary directed you to one description in the

23   schematics of your patent that described an adaptive filter

24   for noise.  Do you remember that?

25   A.    Yes.

Levitt - redirect

Page 378

1    Q.    Now, let's look at the patent language itself.  If you

2    don't mind looking at Column 1, Lines 7 through 13.  That

3    says, more specifically, It relates to hearing aids of this

4    character that are capable of automatically adjusting to

5    optimum parameter values as operating conditions such as

6    speech level, room reverberation and background noise

7    change, and also for reducing acoustic feedback.

8    A.    That is correct.

9    Q.    Is that a reference to an adaptive feedback reduction?

10   A.    That is a reference to the use of adaptive techniques

11   for all of those applications, noise reduction, feedback

12   reduction, adjusting for sudden increases in sound.  Those

13   are all adaptive techniques.

14   Q.    Now let's go to Column 2, Lines 23 through 28, which

15   says, Still another objective of the invention is to provide

16   new and improved hearing aid apparatus that is capable of

17   effective noise and reverberation suppression and acoustic

18   feedback reduction while maintaining optimum hearing

19   characteristics as the speech and noise levels vary.

20              Is that a reference to the adaptive nature of

21   the patent.

22   A.    Very definitely.  It is one of the great strengths of

23   this particular hearing aid, in that you find the optimum

24   hearing aid for a given person, and prior to this point if

25   they went out wearing it, the acoustic feedback, not

Levitt - redirect

Page 380

1    Q.    In 1997, were these defendants' products on the

2    market?

3    A.    No.

4    Q.    Now, Mr. Romary has suggested to you a number of times

5    that in 1986 when you filed your patent you may have known a

6    best method but you didn't disclose it.   In 1986 did you

7    know a best method?

8    A.    No.  We did not know what was, quote, the best method.

9    And I think I pointed out, in fact, in one of my papers,

10   which is very widely cited, referenced by the researchers,

11   discusses this issue of what is meant by optimum, or best.

12   And I pointed out, in technical terms, rather than that

13   analogy I gave you about motor cars, you cannot just have a

14   best method unless you specify the conditions under which

15   the best method is supposed to operate.   And that involved

16   the availability of the technology, the application of the

17   technology.

18             And so we were very careful to include a very

19   flexible description of the invention so as to make sure

20   that we encompassed the best method, whichever one it was.

21   Q.    Now, Mr. Romary directed you to an article written by

22   Mr. Kates.

23   A.    Yes.

24   Q.    I wonder if you can find that.  It is probably in the

25   exhibits in the other book.  It is DX-1029.

1    A.    That is in this book?

2    Q.    I believe it would be in the other book, correct.

3    A.    Yes, I have it.

4    Q.    If you notice, down at the bottom right there are what

5    we call Bates stamp numbers, starting GNR.  Do you see that?

6    A.    Yes.

7    Q.    If you look for the last three digits, 305.

8    A.    Yes.

9    Q.    This is the language that Mr. Romary was referring to,

10   and the language says, quote, The system proposed by Kates,

11   1990, is an adaptive version of a feedback cancellation

12   system proposed by Levitt, et al., 1988, that used a

13   time-invariant cancellation filter set when fitting the

14   hearing aid.

15          Is he referring to one specific filter in your

16   device?

17   A.    Yes.  I believe there -- I don't know what was on his

18   mind when he wrote that.  But I believe that he was

19   referring to a specific version of the invention, not to its

20   other possible applications.

21   Q.    And there were other -- were there other adaptive

22   applications of your device?

23   A.    Yes.  As we pointed out just a short while ago,

24   adaptive, automatic adjustment appears time and again in the

25   patent.

Levitt - redirect

1    Q.    Now, this article was written in 1991.  I believe you

2    said that Mr. Kates was one of those that honored you in a

3    special session of the Acoustical Society of America in

4    2001, ten years later.  Is that correct?

5    A.    That is correct.

6    Q.    So let's go to that exhibit, which is DX-1770.

7    A.    In which book?

8    Q.    That's in the other book.

9    A.    Okay.  Yes.

10   Q.    Do you have it in front of you?  That is the special

11   session?

12   A.    Right.

13   Q.    The honor that Mr. Kates was giving you at that

14   special session?

15   A.    Yes.

16   Q.    So the second page of that document describes that he

17   was honoring you for your feedback cancellation system,

18   among other things.  Right?

19   A.    That is correct.

20   Q.    Now, after that, we have his specific papers for his

21   presentation.  Correct?  It says feedback cancellation in

22   hearing aids.  James Kates.  Right?

23   A.    Yes.

24   Q.    After that, is that your patent, the '850 patent?

25   A.    Yes.

Levitt - redirect

1    Q.    Then after that, is that some of the claims of your

2    patent?

3    A.    Yes.

4    Q.    Then we go to the very next page, which is labeled

5    Page 4 at the very top, it says Feedback Path Model?

6    A.    Yes.

7    Q.    Is that your patent?

8    A.    No.  That's his work.

9    Q.    That's Mr. Kates's work?

10   A.    Right.

11   Q.    Now, if you could just leaf through Mr. Kates's

12   presentation and see if he wants once in his presentation

13   ever says your filters are fixed?

14   A.    No.

15   Q.    But if you look back on Page 1 where Mr. Kates

16   describes his method, that's the title, Feedback Path Model

17   on Page 4 of his presentation?

18   A.    Yes.

19   Q.    Let's go to Page 4 if we can.

20   A.    I have got Page 4.

21   Q.    I want to play it on the screen so we can all see it.

22         There we are.

23         That is describing Mr. Kates's methodology.

24   Correct?

25   A.    Yes.

Levitt - redirect

1    Q.    Now, in his methodology does he use a fixed filter?

2    A.    He does describe a fixed filter in the second last

3    line.

4    Q.    And that's in his model, not yours.  Correct?

5    A.    That is correct.

6    Q.    Now, after Mr. Kates left you at City University of

7    New York, who did he work for after that?

8    A.    ReSound.

9    Q.    And ReSound is what?

10   A.    Is one of the hearing aid companies that's -- I forget

11   who owns it today, but it is part of the group.

12   Q.    Does your patent have any limit on the number of sets

13   of coefficients you can put into the memory of the filter?

14   A.    There is no limit specified.

15             MR. STEINBERG:  May I have one moment, Your

16   Honor?

17             THE COURT:  Yes.

18             (Pause.)

19             MR. STEINBERG:  Thank you, Your Honor.

20             THE COURT:  You are welcome.

21             Dr. Levitt, thank you.  You are excused.

22             THE WITNESS:  I am excused?

23             THE COURT:  Yes.

24             THE WITNESS:  I appreciate that very much.

25             (Witness excused.)

Brown - direct

1    Q.    Some of the hearing aids you worked on, were they

2    analog or digital?

3    A.    The early ones were analog and the HSLC was a mixed

4    signal, it was half analog and half digital.  We worked on

5    two DSP chips.  One was a, what I call a state machine.  It

6    was fixed hardware, like the defendants' machine.  And one

7    that we did of our own, which was a software-driven DSP

8    machine.

9    Q.    Again, what does DSP stand for?

10   A.    Digital signal processing.  This is what is presently

11   being called all digital.  The front end is really still all

12   analog.  It has an A-to-D and D-to-A, which means

13   analog-to-digital and digital to analog -- those are the

14   kind of chips I used to build in discrete parts.  But the

15   middle of it is all signal processing that is done on the

16   DSP chips almost with a microcontroller, a microcomputer.

17   Q.    Are your the inventor on any patents?

18   A.    Yes, I am the assigned inventors on ten patents.

19   Q.    Do any of those patents relate to hearing aid

20   technology?

21   A.    Four of them.

22          MR. BUROKER:  Your Honor, I would like to offer

23   Mr. Brown as an expert.

24          THE COURT:  Any objection?

25          MR. ROMARY:  No objection, sir.

Brown - direct

1           THE COURT:  The Court will receive Mr. Brown as

2    an expert.

3           MR. BUROKER:  Thank you, Your Honor.

4    BY MR. BUROKER:

5    Q.    Mr. Brown, have you been hired to analyze the two

6    patents at issue in this case?

7    A.    Yes, I was hired to look at the patents and determine

8    if I found infringement there.

9    Q.    So did you look at the products for both the Demant

10   group and the Widex group?

11   A.    Yes, I did.

12   Q.    Prior to this case did you have any experience in

13   analyzing hearing aid technology?

14   A.    Well, when we were building chips for the hearing aid

15   industry and building our own standard products, we

16   definitely looked into all of the things that we found

17   available at the time, because we were trying to build the

18   most cost-effective hearing aid chips.

19           At that point in time, one area we found very

20   important was feedback theory, feedback, acoustic feedback

21   reduction.  And I spent a lot of time looking into that.

22           At that point in time we didn't find any

23   solutions that were in vogue that were operational.  That

24   was in the pre-2000 time frame, and these chips we are

25   talking about weren't open on the market yet.

Brown - direct

1  Q.    Are you familiar with the concept in the patent area

2  called a person of ordinary skill in the art?

3  A.    Yes, I am.

4  Q.    Did you try to ascertain from these patents what the

5  person of ordinary skill in the art was?

6  A.    Yes.  I was asked to do that.  The ordinary skill in

7  the art is a hypothetical concept of someone who at the time

8  of the patent would have been able to understand and use the

9  patent to either develop the patent or to develop products

10 using the patent.

11         So you would look to someone who would have the

12 background and experience to understand the meaning and the

13 use of the patent.

14 Q.    So for these patents, what was the person of ordinary

15 skill in the art that you found?

16 A.    My understanding would say that you would require at

17 least a Bachelor's degree in electrical engineering or an

18 equivalent thereto, and at least two years of experience in

19 circuits relating to hearing products, an understanding, in

20 other words, of the cycle acoustics that the chip is trying

21 to solve, but the -- excuse me -- the patent, but the patent

22 really addresses an electrical problem and feedback theory.

23 Q.    Are you familiar with experience that this

24 hypothetical person of ordinary skill in the art would know?

25 A.    Yes.  Not only was I active in the field, I was quite

Brown - direct

Page 503

1    familiar with my customers' engineers.  And I hired several

2    engineers to design similar chips, similar products at that

3    point in time.

4    Q.    Did you use this person of ordinary skill in the art

5    in connection with your analysis in this case?

6    A.    Yes, I did.

7    Q.    Are you aware of the position that some of the

8    defendants' experts took on what the person of ordinary

9    skill in the art is?

10    A.    Yes, I am.

11    Q.    Do you agree or disagree with their view?

12    A.    Well, I disagree with their view.

13    Q.    And why is that?

14    A.    Well, primarily because they do not appear to require

15    any understanding in electronics and filter theory,

16    substituted information on hearing and psychoacoustics, and

17    I don't believe that would qualify them to actually build a

18    product.

19    Q.    And why is that important, the background you

20    described?  Why is that important?

21    A.    It's to build a product.

22    Q.    Right.

23    A.    To understand filter theory, to understand circuit

24    theory, and how to assemble such a device.

25    Q.    Okay.  I'd like to show you what has been marked as

Brown - direct

Page 504

1    JX-4, which is the '850 patent.

2              If you could get that up, please.

3              Are you familiar with this document?

4    A.    That's the cover page for the '850 patent.

5    Q.    Can you tell when this patent was filed?

6    A.    June 26, 1986.

7    Q.    And what is the title of the '850 patent?

8    A.    Programmable digital hearing aid system.

9    Q.    So does this patent have something to do with hearing

10   aids?

11   A.    Yes.

12   Q.    Why don't you describe what the basic components of

13   the hearing aid are?  And I think you have a demonstrative

14   to use.

15   A.    Yes, I have a demonstrative for that.

16   Q.    Okay.  Sir, what are the basic components of the

17   hearing aid?

18   A.    The basic components of the hearing aid, on the left

19   we have a microphone.  And in between, on the right, we have

20   a speaker.  The hearing aid is called a receiver.  In

21   between the microphone and speaker, we have transmission

22   channel.  And the transmission channel is where the

23   amplification takes place and where the filtering to

24   compensate for a particular hearing aid wearer's loss.  In

25   other words, a hearing impaired person has a hearing loss.

Brown - direct

1   We want to compensate for that and improve his ability to

2   hear.

3   Q.    Okay.  You may have covered this but again what does

4   the microphone do in this diagram?

5   A.    The microphone converts the acoustic sound, in other

6   words, the sound, the physical sound into an electrical

7   signal which is then sent into the amplifier or into the

8   transmission channel.  The electrical signal is then

9   processed by the electronics and then that electrical

10  amplified signal is then sent to the speaker which, like the

11  speaker in a home, produces physical acoustic sound,

12  hopefully close to your eardrum.

13  Q.    Does the '850 patent deal with acoustic feedback for

14  hearing aids?

15  A.    Yes, it does.

16  Q.    What is acoustic feedback?

17  A.    Well, with acoustic feedback, there was a

18  demonstrative there, but some of the sound coming out of the

19  speaker gets back into the microphone.  We see that in a PA

20  system.  As we see up here, the person talking comes in the

21  microphone, goes up to the amplifier.  It's amplified, the

22  volume comes back out and a little bit of that sound goes

23  back out of the amplifier again.  And each time it goes

24  around that circle, it builds up and increases until you get

25  a large amount of feedback.  Now, even a small amount, as

Brown - direct

1    Dr. Levitt said, will disturb the hearing aid's operation

2    but the large amount produces a squealing sound that nobody

3    likes.

4    Q.    Is it important to reduce acoustic feedback in a

5    hearing aid then?

6    A.    Yes, both from comfort and actually for people to

7    continue to use the hearing aid.  I think I saw a number

8    saying 25 percent of the complaints about hearing aids had

9    to do with this feedback, and they didn't like that.

10   Secondly, if there is some level of feedback it disturbs the

11   signal processing of the hearing aid, thereby reducing the

12   hearing aid's ability to compensate for the wearer's

13   impairment.

14   Q.    How did older hearing aids deal with acoustic

15   feedback, if at al?

16   A.    Well, the standard solution for it was just turn the

17   gain down.  And then there were various and sundry options

18   after that where they turned gain down in individual

19   channels, when they put notch filter and did a bunch of

20   other things, but all of these solutions had serious

21   drawbacks:  They didn't sound good, they cut holes out of

22   what you were hearing, or they just plain didn't have enough

23   amplification for your hearing impairment.

24   Q.    And is gain volume, essentially?

25   A.    Yes, gain is the amount of volume that comes out of

Brown - direct

Page 507

1    the speaker.

2    Q.    So what did Dr. Levitt and the other inventors invent

3    in the '850 patent?

4    A.    Well, their invention was to find a way of reducing or

5    eliminating or at least cancelling a large portion of the

6    acoustic feedback by taking some of the output, putting it

7    through a filter and feeding it back to the input where it's

8    matched in both phase and amplitude to the acoustic sound

9    that travels around the outside through the air or through

10   the body.

11   Q.    Is there a place in the patent where you look to see

12   what the specific inventions that are recited are?

13   A.    Yes, you look at the claims.  The claims define the

14   dimensions or the properties of their claims.  As I said, in

15   the video you saw early on, it's like a piece of property.

16   The deed says what the limits are and what your rights are

17   and the same is true with the claims in a patent.  The

18   claims define what is yours and what other people can't

19   trespass on.

20   Q.    If one party has a patent is it possible for other

21   parties to get patents on improvements?

22   A.    Yes, that is quite commonly done.  There is the

23   original patent, and then people will improve on that, and

24   they'll get a patent on the specific improvement.  For

25   example, if I had a patent on a tire and somebody comes out

Brown - direct

1    and invents a rubber tire, and a third person comes out and

2    builds a steel-belted rubber tire, the rubber tire is

3    entitled to a patent over my plain tire.  It could have been

4    wood or whatever.  Rubber was an improvement.  The

5    steel-belted tire was an improvement over the rubber tire

6    and over my tire, but both of those patents infringe on my

7    original tire patent.

8    Q.    Sir, are you aware that the defendants have patents on

9    some of the technology?

10   A.    Yes.

11   Q.    Does that factor into your analysis as to whether or

12   not they infringe any of the claims of this patent?

13   A.    No, it does not.  Patents on improvements don't deter

14   the infringement on the original patent.

15   Q.    Let's take a look at Claim 16 of the '850 patent.  Do

16   you know the difference between an independent claim and a

17   dependent claim?

18   A.    Yes.  A dependent claim depends upon the independent

19   claim.  So when you look at the claims of the dependent

20   claim, you have to include all of the restrictions and

21   claims on the dependent claim as well.

22   Q.    Is Claim 14 an example an independent claim?

23   A.    Claim 14 is an independent claim, and Claim 16 says as

24   described in Claim 14.  That makes it dependent upon Claim

25   14.

Brown - direct

1   Q.    So in order to analyze Claim 16, you have to find all

2   of the elements of Claim 14 and the additional element of

3   16.  Is that the way to look at this?

4   A.    That is correct.

5   Q.    And did you do that in your analysis?

6   A.    Yes, I did.

7   Q.    What is this a method for in this claim?

8   A.    Well, it's a method for reducing acoustic feedback in

9   a hearing aid.

10  Q.    And does this claim have several parts to it?

11  A.    Yes, it does.  The first three parts are the basic

12  portions of a hearing aid that we talked about early on:  a

13  microphone, receiver, and signal transmission path.

14          The next two steps are first determining the

15  effect of the amplitude and phase of the signal in said

16  transmission channel as a function of frequency of acoustic

17  feedback between said receiver and microphone.

18          And, second step, inserting between the input

19  and output of said transmission channel a programmable

20  filter programmed to equalize and reduce the effect of said

21  acoustic feedback both in amplitude and phase on the signal

22  in said transmission channel.

23  Q.    The last two steps had quite a few words.  Can you

24  explain the understanding of the determining step here that

25  you applied in doing your analysis?

Brown - direct

1    A.    Yes.  The intent here is to determine the effect of

2    the feedback, and you must determine it both in amplitude, I

3    guess in the determine step -- yes, you determine both the

4    amplitude and phase of the feedback signal.

5    Q.    And then what about the inserting step?  What could

6    you explain the analysis that you used for that element?

7    A.    The inserting step, you take that signal that you

8    determined and you insert in a filter in the feedback

9    channel so you can equalize out the effect of that feedback

10    in both phase and amplitude.

11    Q.    To find that a product infringes this claim, do you

12    need to find all of these highlighted elements in that

13    accused product?

14    A.    You have to find each one of them.

15    Q.    And that's for Claim 14.  What about Claim 16?  What

16    additional is required for that claim?

17    A.    Claim 16 requires that the programmable filter of

18    Claim 14 be placed in an electrical feedback element loop.

19    Q.    And what does that mean?

20    A.    Well, it means that it must be an electrical circuit.

21    And in the Court's construction, it means it's in a feedback

22    loop from the output to the input.

23    Q.    Did you prepare a demonstrative to illustrate, take

24    the words for the claim to a diagram to help us understand

25    this claim?

Brown - direct

1   A.    Yes.

2   Q.    Okay.  Let's take a look at that demonstrative.

3         Okay.  Sir, what is this diagram showing?

4   A.    It shows the elements of that claim and in the lower

5   left-hand corner, you see the key words from those steps in

6   the two claims.  On the left we have a microphone, on the

7   right we have speaker.  In between the two, we have a

8   transmission channel.  We have a determining phase at the

9   bottom which determines the effect of the acoustic feedback

10  which you see across the top.

11        And then we insert it into the filter.  We

12  insert it by placing the coefficients C0, C1 and so forth

13  into the filter and the filter is in a feedback loop which

14  goes from the output of the transmission channel back to the

15  input of the transmission channel.

16  Q.    So explain again, what does a filter do?

17  A.    The filter takes the coefficients from the determining

18  circuit phase and takes the output of the signal, passing

19  through the filter, produces the signal inverse signal we

20  see in orange right next to the plus sign, the little circle

21  with the plus is an adder where the signal from the

22  microphone which contains both the signal we want to have

23  plus this feedback we do not want, and that adder adds the

24  inverse signal from the filter in both phase and amplitude

25  to cancel it out so none of that gets into the transmission

Brown - direct

1    channel.

2    Q.    And this diagram shows two circles with a C in it.

3    Those are the coefficients?

4    A.    Those are the coefficients.  Those represent the

5    coefficients being loaded into the filter.

6    Q.    And this diagram just shows two but how many

7    coefficients can there be?

8    A.    Typically, there is someplace between 16 and 32.

9    Q.    And I think I asked you earlier about what a feedback

10   path is.  Could you explain again where the feedback path is

11   in this diagram?

12   A.    Feedback path goes from the output, which is in this

13   picture right before the speaker, back to the input and it's

14   summed together with that little circle with the plus in it.

15   Q.    Claim 16 in the inserting step uses the term

16   "programmable filter."  What is the definition of a

17   programmable filter that you applied in your analysis?

18   A.    Programmable filter is a filter where you can insert,

19   apply coefficients to give it, coefficients of one or more

20   of the elements of the filter.

21   Q.    Do you have an example of how you might give

22   coefficients to a filter that makes it easier to understand?

23   A.    Yes, I did an example for you.  Yes.

24            This is an equalizer.  I guess those are, some

25   might recognize it from the stereo systems.  I don't know if

Brown - direct

1    our rock band generation would, but as you noticed, there

2    are knobs at the top and you adjust these knobs up and down

3    to determine the amount of amplitude that comes out of the

4    speaker in each of these individual frequency's spectra.  As

5    you see down below, as he moves the knobs up and down there,

6    that changes the amount of intensity showing like it did on

7    our old equalizers.

8    A.    When you do this, you can compensate for room problems

9    or your own hearing problems by adjusting the base or treble

10   of your music, in this case an eight-channel one, so you can

11   do quite a bit of correction for your room.

12             Each of the twiddlings of the knobs, each of the

13   positions of those knobs are the coefficients to that

14   filter.

15   Q.    Let's go back to Brown 3, which is Claim 16.  What is

16   the purpose of the programming recited in the inserting step

17   here?  Why do you program it?

18   A.    Well, you program it so that you can give it the value

19   necessary to compensate for the acoustic feedback, to

20   compensate, in other words, in both phase and amplitude.

21   Q.    We just discussed Claim 16 of the '850 patent.  Did

22   you do a comparison of Claim 16 to the hearing aids

23   manufactured and sold by the Demant group?

24   A.    Yes, I did.

25   Q.    And the Demant group is Oticon and Bernafon?

```
 1   A.     Correct.

 2   Q.     I am going to show you an Oticon document that is

 3   marked JX-138.  I believe that's in the juror books.

 4   A.     This is one of the technical documents that I looked

 5   at.  It's their anti-feedback algorithm.

 6   Q.     What do you understand the AFB to stand for?

 7   A.     Anti-feedback.

 8   Q.     What is the anti-feedback algorithm in the Oticon

 9   products?

10   A.     I believe it's shown in the next demonstrative there.

11   Q.     Let's take a look at Brown D-2.  Where did this

12   diagram come from, sir?

13   A.     This came from their documentation, the engineering

14   document.  You saw the cover page of it.

15   Q.     This came out of Oticon's documents?

16   A.     Yes, we had Oticon documents.  It is Figure 13 of

17   Oticon's document on anti-feedback.

18          If you look at this -- the pointer doesn't

19   point, so we will just talk.

20          Unlike normal engineering diagrams, we have the

21   input on the right and the output on the left, we have the

22   microphone on the right at the top here.

23          Do we have color?  There it is.

24          And we have a speaker on the left.  And then we

25   have a transmission channel between the microphone and the
```

Brown - direct

1    receiver or speaker.  And then at the bottom of this we have

2    the update module, which is the area where the coefficients

3    are calculated for the filter.  And those coefficients are

4    loaded up into the filter, which is shown here in it looks

5    to me like almost orange.  And the filter is in a feedback

6    channel between the output and the input.

7    Q.    How did you know to rely on this particular diagram

8    out of the Oticon documents?

9    A.    Well, first off, it's their engineering documents that

10   defines how they are doing things.  Secondly, Dr. Gloster,

11   who you will hear from later, assured me he looked at the

12   documents and told me that they were essentially correct, at

13   least as far as infringement is concerned.

14   Q.    Who is Dr. Gloster again?

15   A.    He is a professor from, I have forgotten the

16   university in Washington there.  But he is an expert in HDL

17   and DHDL languages.  These are languages that we use to

18   define, hardware description language, HDL, and that's how

19   these chips are designed.  You design them in a language

20   which will then tell the synthesizer how to actually execute

21   the chip.

22   Q.    Going back to Claim 16, did you find that the Oticon

23   products that employ the anti-feedback algorithm determine

24   the effect on the amplitude and phase of the signal in the

25   transmission channel as a function of frequency of acoustic

Brown - direct

1   feedback between the receiver and the microphone?

2   A.    Yes, I did.

3   Q.    Where is that shown again?

4   A.    The blue element at the bottom does the determining.

5   This is the WLMS -- it is the update module, which contains

6   the LMS routine.  The coefficients are loaded into the

7   buffer, which is the small box directly above it.  And the

8   buffer then passes them up into the filter, where the

9   coefficients are provided to the filter from the update

10  module.

11  Q.    What is your understanding of what an LMS algorithm

12  is?

13  A.    This the least mean squared algorithm is the routine,

14  in this case it is a hardware one, but it is a routine to

15  look at the coherence between the output and the input and

16  determine when there is a signal present and iterate to a

17  final solution, which closely approximates the elimination

18  feedback by reducing the error term to a null.

19  Q.    Does the LMS algorithm specifically measure phase and

20  amplitude?

21  A.    No, it doesn't.  It determines the effect on phase and

22  amplitude.  And that's what the claim requires.  It is true

23  that, mathematically speaking, the coefficients define the

24  amplitude and phase.  But it's not necessary for them to be

25  defined or read out according to the claim.  The effect is

1    all that's asked for.

2    Q.    Did you analyze the Oticon products that are based on

3    the anti-feedback algorithm to determine whether they met

4    the limitation of Claims 14 and 16 of inserting between the

5    input and output of the transmission channel a programmable

6    filter programmed to equalize and reduce the effect of

7    acoustic feedback both in amplitude and phase on a signal in

8    the transmission channel?

9    A.    Yes.  The prior art filter, which is the orange box at

10   the top, with the arrow through it, is a programmable

11   filter, and it is inserted in that phase.  When the

12   coefficients are put into the filter, the filter then has a

13   filter function and it's electrically inserted into the

14   path, and provides a signal out of it, which is the -- the

15   result is the opposite of the acoustic feedback in both

16   phase and amplitude.

17   Q.    I am not sure if you mentioned this before.  There is

18   a little box above the update box.  What does that box show?

19   A.    That is a buffer, and that box stores the data while

20   the update module is doing its computation.  In fact, it

21   actually shows arrows in both directions because it receives

22   the coefficient from the update module and then when the

23   update module is doing its next calculation, it actually

24   returns the previous calculation's coefficients so the

25   update module can use that for its next calculation.

Brown - direct

1    Q.    Did you determine whether or not the update module

2    provides coefficients to the filter in this diagram?

3    A.    Yes, I did.

4    Q.    Does it?

5    A.    Yes, it does.

6    Q.    What is the significance of any of the line from the

7    buffer up to the FIR box?

8    A.    Well, the line from the buffer up to the FIR block is

9    actually a bus line, meaning there is a lot of data in it.

10   The fact that it shows a diagonal arrow through the FIR

11   block means that it can be reprogrammed.

12   Q.    I would like to direct your attention, we are still

13   looking at the same document, but a few pages later, that

14   ends in the Bates number DEM5186.

15         Did you rely on the text in this document,

16   JX-138, as well?

17   A.    Yes, I did.

18   Q.    I am going to direct your attention to the first full

19   paragraph there, if we can get that blown up.

20   A.    Unfortunately, you have to blow it up.

21   Q.    Can you read what this says?

22   A.    "The feedback is canceled, or rather reduced, by the

23   use of an internal feedback path.  The internal feedback

24   path should have the same transfer function as the external

25   feedback path from the DA to the AD, via receiver, acoustic

Brown - direct

1    path and microphone.  The output of the internal feedback

2    path is subtracted from the microphone signal to remove the

3    part of the microphone signal that comes via the external

4    feedback.  The feedback cancellation will be successful if

5    the two feedback paths, the internal and the external, have

6    the same characteristics."

7    Q.    And you relied on this statement in your analysis?

8    A.    Yes.  That is basically what it says in the patent.

9    Q.    If we can go back to the slide with the diagram on it.

10   In that slide, it will come up in a minute here, there were

11   a lot of other components that you didn't have highlighted?

12   A.    That's right.

13   Q.    What is the significance if any of the fact that there

14   are additional components in this diagram?

15   A.    The fact that there are additional features in the

16   circuitry doesn't negate infringing on the original patent.

17   Q.    So as long as you find the elements listed in the

18   claim, you don't need to concern yourself if there are any

19   additional ones in the accused product?

20   A.    That's correct.  I mean, if I have a patent on a tire

21   and somebody makes a whitewall, it doesn't make it not a

22   tire.

23   Q.    If we can pull up the Checklist 2.

24              I just wanted to confirm, I think we have

25   discussed, did you find the Oticon products to use the

Brown - direct

Page 520

1    anti-feedback system performed the method of reducing

2    acoustic feedback?

3    A.        Yes.

4    Q.        You found the microphone?

5    A.        Definitely.

6    Q.        A receiver?

7    A.        Yes.

8    Q.        A signal transmission channel?

9    A.        Yes.

10   Q.        You determined that they performed the step of

11   determining the effect on amplitude and phase and the rest

12   of that recitation?

13   A.        Yes, I determined that.

14   Q.        And you found that they performed the inserting step.

15   Correct?

16   A.        Yes.

17   Q.        Did you find they showed the filter in the feedback

18   path?

19   A.        Yes.

20   Q.        Now I want to direct your attention to Claim 13 of the

21   patent.  What is Claim 13?  Is there any relationship

22   between Claim 13 and these two that you have just analyzed?

23   A.        Yes.  Claim 13 is very similar to Claim 14.

24   Q.        Do you recall whether there is any differences in

25   terms of your analysis?

Brown - direct

Page 521

1  A.    Not significantly, no.

2  Q.    So did you find that the Oticon products that used the

3  anti-feedback algorithm also infringed Claim 13?

4  A.    That's correct.

5  Q.    And your analysis is the same as the one you just gave

6  for 14 and 16?

7  A.    The analysis would be the same.

8  Q.    Do you know if the anti-feedback system that you

9  described is present in all of the accused Oticon hearing

10  aids?

11  A.    It's present in all of the accused Oticon hearing

12  aids.

13  Q.    Did you help create a demonstrative to show which

14  products those are?

15  A.    I did, yes.

16  Q.    Let's look at Brown 8.  Could you explain this slide?

17  A.    Well, the Oticon products are primarily the ones shown

18  there in the Jump 2 platform.  The ones below that are in

19  the Jump 3 platform.  These are different integrated

20  circuits that are closely related.  And for the purpose of

21  the patent infringement, they all use the AFB circuitry in a

22  very similar manner.

23         In addition to that, there is some Bernafon

24  projects that are also on the Jump 3 platform.

25  Q.    So the analysis you gave before for the AFB system

Page 522

1    applies to all of these products shown here on this slide?

2    A.    That's correct.

3    Q.    Are you familiar with the Bernafon integrated circuit

4    called the Alaska chip?

5    A.    Yes.    That's one of the chips that they use in some of

6    their products.

7    Q.    Did you do an analysis for the Bernafon Alaska

8    products?

9    A.    Yes, I did.

10    Q.    Are the hearing aids that are based on the Alaska chip

11    implemented in a similar manner to what we just saw for the

12    Oticon hearing aids?

13    A.    Yes, very similar.

14    Q.    Do they have a filter?

15    A.    Yes, they do.

16    Q.    Where is the filter located?

17    A.    In a feedback loop.

18    Q.    Did they utilize an LMS algorithm?

19    A.    They do.

20    Q.    What is the use of the LMS algorithm in the last

21    products?

22    A.    The LMS algorithm is used to generate the coefficients

23    for the filter, load them, or provide them to the filter.

24    Q.    Did you rely on any testimony to confirm that

25    understanding?

Brown - direct

1    A.    Yes, I did, from Oticon's technical representative.

2    Q.    Is your analysis that you just went through for Claims

3    13, 14 and 16 for the Oticon products the same analysis that

4    you did in analyzing the Bernafon Alaska products?

5    A.    Yes, I did.

6    Q.    So Bernafon has two types of products.  Right?  They

7    have products based on the anti-feedback system, and then

8    they have products based on the Alaska system?

9    A.    That's correct.

10   Q.    But your analysis is essentially the same for both?

11   A.    They both use similar filters.  The Alaska chip has

12   some additional filters in it and is slightly different.

13         But they all have some form of FIR or tap delay

14   line filter in them and an LMS type algorithm to drive that

15   house.

16   Q.    So did you find that the Bernafon products performed

17   each of the steps of the claim here, rather than walking

18   through each one?

19   A.    Yes, I did.

20   Q.    Did you also analyze Claim 16 with reference to the

21   two Widex products at issue in this case?

22   A.    Yes, I did.

23   Q.    Is your analysis for the Widex products similar to

24   what we just talked about for the Oticon products?

25   A.    Quite similar.

Brown - direct

1    Q.    Why is that?

2    A.    Again, they use an FIR filter in the feedback loop.

3    And they use an LMS type in the update module, although they

4    have different names for them.  They use a WLMS and a WFIR,

5    which means a warped function.  It is a slightly different

6    version of the filter.  But it still provides the same

7    functions.

8    Q.    And you understand there are two Widex products at

9    issue.  Is that correct?

10   A.    Yes.

11   Q.    And Inteo and Diva was the names?

12   A.    Correct.

13   Q.    With between these two products, were there any

14   substantial differences that affected your analysis?

15   A.    Not that I have found.

16   Q.    I'm going to show you what has been marked as PX-791.

17   And we are going to need to look at the seventh page of that

18   document because of the sequence of the figures.

19              Are you familiar with this document?

20   A.    Yes, I am.

21   Q.    What is this document?

22   A.    This is their document, feedback cancellation, and in

23   a Senso Diva.  It's a Widex document.  And as you can see at

24   the top, it's written by their engineering or research

25   department.

1   Q.    Did you also confirm -- strike that.  How do you know

2   to rely on this document?

3   A.    Well, first off, this specific document, it's part of

4   their technical documents.  I believe their technical

5   representative indicated it is correct.  And, again,

6   Dr. Gloster looked through the pages to compare it to the

7   diagrams in this document.

8   Q.    Is there a particular figure that you focused on in

9   this document?

10  A.    Yes, there was.

11  Q.    I think we have a demonstrative that is based on this.

12  It's slide Brown W3.

13          Do you know, what does this slide show?

14  A.    This is a little more top level than the last one but

15  it shows again the same function.  We have a microphone and

16  receiver, a transmission channel, a feedback path with the

17  feedback simulator in it.  In this case, the feedback

18  simulator actually contains filters and the circuitry.

19  Q.    Is there another document in the Widex materials that

20  provide the specifics of what is in that feedback path

21  simulator?

22  A.    Yes, there was.

23  Q.    Let's take a look at JX-305.  And I think that is also

24  in the juror notebooks.

25  A.    This is an engineering document defining how the

1    feedback cancelling is done for this product.

2    Q.    This is a Widex document?

3    A.    Yes.

4    Q.    Is there a figure within this document that you

5    specifically?

6    A.    Yes, this describes the filter and the WLMS routine.

7    Q.    Let's take a look at the demonstrative that has this

8    figure in it.  Okay.  Can you explain what part of this

9    document, if any, is relevant to your analysis.

10   A.    Well, the one that just clicked blue is the WLMS and

11   the one directly above it is the WFIR.  And we see against

12   here, the WLMS calculates the coefficients, passes them up

13   through this bus which is depicted by two parallel lines

14   with an arrow at the top saying this is the direction it is

15   going in, and the coefficients are loaded into the FIR

16   filter from the module.  So the module determines the

17   effect, calculates coefficients, provides coefficients to

18   the filter and by doing so, inserts a filter in the feedback

19   loop.

20   Q.    This block at the bottom says WLMS.  Again, what is

21   the difference between a WLMS and an LMS?

22   A.    Well, W stands for warped.  It's an improvement on a

23   standard LMS, but it's still an LM and it works together

24   with the WFIR, which again is an FIR filter with some

25   improvements on it but it's still a line filter.

Brown - direct

Page 527

1    Q.    Does the fact that the Widex product includes a WLMS

2    change the analysis that you gave?

3    A.    No, it doesn't.  It's still provides a basic function

4    with some improvements.

5    Q.    Okay.  Now, which part of the diagram, if any, perform

6    the determining step in Claims 14, 16?

7    A.    The determining step would be performed by the WLMS

8    portion taking inputs from the output and the input with the

9    first approximation subtracted -- or from the previous

10   approximation subtracted from it.

11   Q.    And then the inserting step of Claims 14 and 16, where

12   is that done in this diagram?

13   A.    That's the two vertical arrows that are colored orange

14   which takes the coefficients from the calculation in the

15   determining step and inserted them into the filter.

16   Q.    And what do the arrows mean going from the WLMS box to

17   the WFIR box?

18   A.    Well, the fact there are two arrows separating this

19   means there is a data bus and the arrow indicates the

20   direction the data is going in.

21   Q.    And what is the data going up that bus?

22   A.    Coefficients.

23   Q.    So the coefficients are travelling from the LMS into

24   the FIR?

25   A.    That's correct.

Brown - direct

Page 528

1    Q.    Did you determine whether or not the WLMS provided the

2    coefficient to the WFIR?

3    A.    By passing the coefficients to the next stage up, they

4    insert them or provide them, however you want to word that.

5    Q.    And this figure having even more boxes than the one we

6    saw before, does that change your analysis?

7    A.    No, it doesn't change the analysis.

8    Q.    None of those have anything to do with whether or not

9    they do the inserting or determining step?

10   A.    They don't negate the fact that it does the

11   determining and inserting.  That's correct.  It still meets

12   that criteria.

13   Q.    And, again, like with the Oticon products, does your

14   analysis for Claims 14 and 16 similar to the analysis you

15   did for Claim 13 of the '850 patent?

16   A.    That's correct.

17   Q.    You mentioned I think that there is two steps,

18   determining and inserting.  Are the steps here in the claim

19   performed in that order in the Oticon, Bernafon, Widex

20   products we just looked at?

21   A.    Yes, they are.  The determining is done by the LMS

22   routine and calculates coefficients, then inserts the

23   coefficients into the filter and thereby sets a new filter,

24   electrical filter response.  And in electrical terms, we

25   considered that inserting filter.  And so first you have to

Brown - direct

Page 529

1    calculate the coefficients and then you insert them.  It can

2    be done iteratively as it's done in the LMS routine, but if

3    you compare that to the original patent, it is very much

4    like Dr. Levitt's person and his "no" routine going back and

5    tweaking the knob until he found a no.  In this case, the

6    LMS routine does it on a chip and tweaks the knob until it

7    finds a no.

8    Q.    Can a product determine the effect on phase and

9    amplitude without making a specific measurement?

10   A.    As I said before, the effect does not require absolute

11   measurement of the phase and amplitude.  It requires

12   producing coefficients resulting in that inverse signal

13   which is the effect.

14   Q.    I think you were here for the opening statement.  Did

15   you understand that the defendants are saying that their

16   products are adaptive?

17   A.    Yes.

18   Q.    And that they use adaptive filters?

19   A.    Yes.

20   Q.    Do you agree with that?

21   A.    Yes.

22   Q.    Does that change your analysis?

23   A.    No.

24   Q.    Why is that?

25   A.    Because the adaptive filter, as I said a minute ago,