1   Q.    How about any subsequent projects, like the Jump 3,

2   were the Levitt patents uncovered by Oticon when it did its

3   searches?

4   A.    No.

5   Q.    Did you or others at Oticon use the Levitt patents as

6   a basis for developing the features in Jump, Jump 2B or Jump

7   3?

8   A.    No.  Let me make clear, we did not know of these

9   patents when we did those developments.  And the technology

10  we developed is different from what is in those patents.

11            So the answer is no.

12  Q.    Do you know Dr. Levitt?

13  A.    I know the name.  I have heard the name.  I don't know

14  him.

15  Q.    Has Dr. Levitt ever approached you and indicated that

16  Oticon is infringing his two patents?

17  A.    No.  Not that I know of.

18  Q.    Have you ever heard of Audimax prior to this lawsuit?

19  A.    Yes, I think so.

20  Q.    Let's turn to one last area of questioning.

21            Mr. Christensen, are you aware that some of the

22  marketing materials for Oticon describe the anti-feedback

23  system as a cancellation system?

24  A.    Yes, I am aware of that.

25  Q.    Do you agree with that description?

Christensen - direct

Page 1020

1    A.    No, I do not agree with that description, because it's

2    a feedback reduction system and not a feedback cancellation

3    system.

4    Q.    Can you maybe describe that in more simple terms for

5    the jury so that they can understand your technical

6    understanding of that?

7    A.    Yes.  In technical terms, I would say if you cancel

8    something, you remove it completely.  If you reduce

9    something, you don't take it away completely, but you take

10   it away probably sufficiently, but not completely.  And the

11   feedback reduction system that we have been developing at

12   Oticon is simply not able to cancel feedback.  But it's able

13   to reduce the feedback somewhat that it's not annoying or

14   being heard.

15              MR. GRAMENOPOULOS:  No further questions.

16              THE COURT:  Counsel, you may cross-examine.

17              MR. STEINBERG:  Your Honor, may I approach the

18   witness?

19              THE COURT:  Yes.

20                      CROSS-EXAMINATION

21   BY MR. STEINBERG:

22   Q.    Now, Mr. Christensen, you clearly understood every

23   question that your counsel asked you?

24   A.    Yes, I think so.

25   Q.    You speak and understand English?

Christensen - cross

1    the feedback, not to cancel, because I think we measured --

2    it can reduce by an amount of 10 to 12 decibels.  It is a

3    technical measurement, how much it can reduce.  And it's the

4    order of magnitude.  And ten decibels equals like three

5    times.

6    Q.    Did you finish your answer?

7    A.    Not really.  If it did cancel, it would cancel by an

8    infinite amount, not only three times.  So that's why I

9    distinguish between reduce and cancel.

10   Q.    So can you answer my question?  You disagree with the

11   technical language in this Oticon document.  Is that

12   correct?

13   A.    On this point, yes.

14   Q.    And it goes on to say in the very next paragraph, The

15   feedback via the two feedback paths will cancel each other

16   when there is a perfect match between the two feedback

17   paths.  Right?

18   A.    That's what it says.

19   Q.    In fact, you testified previously that you were

20   puzzled by the use of the word cancel.  Isn't that correct?

21   A.    Previously?

22   Q.    Yes.  When you testified in your deposition?

23   A.    At deposition we also discussed the use of the word

24   cancel, that's true.

25   Q.    And you said you were puzzled by the use of the word

Christensen - cross

1    cancel in your own company's documents.  Right?

2    A.    I probably have said that, yes, if you say so, because

3    it's not correct.

4    Q.    Okay, let's look at PX-30.  PX-30 is a brochure for a

5    product called the Adapto.  Did your company make a product

6    called the Adapto?

7    A.    Oticon makes a product called the Adapto.

8    Q.    Okay.  And let's turn to page 448.

9    A.    Yes.

10   Q.    On 448, it clearly says Adapto dynamic feedback

11   cancellation; correct?

12   A.    It says so, yes.

13   Q.    And your position is you strongly disagree, it doesn't

14   have feedback cancellation; right?

15   A.    I must repeat myself.  It talks about --

16   Q.    Can you answer my question first?

17              MR. GRAMENOPOULOS:  Let him answer the question.

18              THE COURT:  You can answer the question.  Go

19   ahead.

20              THE WITNESS:  I must repeat myself, it says in

21   this marketing material, cancellation.  I still have the

22   same opinion that we are talking about the feedback

23   reduction, not cancellation.

24   BY MR. STEINBERG:

25   Q.    Okay.  And then it goes on to say:  Adaptive feedback

1    can rephrase it and break it down into its components.

2    Parse it.

3    BY MR. STEINBERG:

4    Q.    If you do agree that your products use phase

5    cancellation and measure the input and output and compare

6    them and cancel -- you understand that part; right?  If you

7    agree that that is what your documents say and that is what

8    your products do, you would be agreeing that you're

9    determining the phase and the amplitude, creating an equal

10   but opposite signal and cancelling; right?

11   A.    I'm sorry.  It was still a long one, but if I agree to

12   that, I think, as I understand your question, you're right.

13   The problem is I strongly disagree because the technology is

14   not built that way.

15   Q.    Now, let's go to PX-31.  PX-31 is --

16   A.    31?

17   Q.    PX-31.  PX-31 is a document by your company for

18   another hearing aid called the Gaia; right?  If I'm

19   pronouncing that right.

20   A.    Gaia is right, yes.  It's from Oticon, not my company.

21   Q.    Oticon.

22   A.    Yes, thank you.

23   Q.    Okay.  Now, if you turn to page 417.

24   A.    Yes.

25   Q.    Okay.  Now, on 417, of course, it identifies a system

Christensen - cross

1    A.    Yes.

2    Q.    Okay.  And under a title called Effective Feedback

3    Management Without Loss of Audibility -- do you see that?

4    A.    Yes.

5    Q.    It says, phase cancellation is the only true way to

6    eliminate feedback without affecting audibility.  When

7    feedback is detected, DFC uses digital phase cancellation to

8    effectively remove the unwanted whistling sound.  Right?

9    A.    It's in the document, yes.

10   Q.    So if that would be correct, that would be determining

11   the amplitude and phase, reversing the signal and

12   cancelling; right?

13   A.    Well, if that was correct.

14   Q.    In fact, above that, there is a handy little picture

15   of how that works.  I don't know if we can put that up on

16   the screen.

17         Do you see that picture?  The principle of phase

18   cancellation is to introduce a mirrored signal to cancel out

19   the feedback.

20             And what is that spike going up?  That is

21   feedback, isn't it?

22   A.    I don't know.  I didn't do it.

23   Q.    You don't know?

24   A.    I think it's supposed to illustrate something you want

25   to cancel.

Christensen - cross

1    BY MR. STEINBERG:

2    Q.    Now, are you testifying here before the jury that all

3    of the technical material and information and brochures that

4    was provided to audiologists and hearing impaired people was

5    incorrect?

6    A.    What I'm saying is --

7    Q.    Can you answer my question first?  Then you can

8    explain.

9            THE COURT:  No, I'm going to let him answer the

10   question in a manner that he chooses.  And if you want to

11   ask a follow-up, you can do that?

12   A.    Thank you.

13           What I'm saying is from a technical standpoint,

14   the descriptions in the marketing material aren't accurate.

15   If you see it from the users perspective, what the hearing

16   aid does, how it's perceived by the user, well, it describes

17   what the user will perceive.  The feedback is reduced or

18   cancelled and feedback is gone but from a very technical

19   standpoint, it's not correct.  That is a point that I think

20   is important to understand about marketing material.

21   BY MR. STEINBERG:

22   Q.    Well, the first material we looked at was not

23   marketing material, it was a technical document, internal

24   document of your company, wasn't it?

25   A.    It was a technical document that was intended for use

Christensen - cross

1    internally in the company but it was not the detailed

2    description of the algorithm.

3    Q.    So just to answer my question, are you testifying here

4    today that internal technical material and material that was

5    given to hearing impaired people was inaccurate about how

6    your feedback mechanism works?

7    A.    It's inaccurate in the details of how it works.

8    Q.    Are you aware that the Food and Drug Administration of

9    the United States regulates hearing aids?

10   A.    Yes, I know about the Food and Drug Administration to

11   some extent.

12   Q.    Are you aware that the FDA, the Food and Drug

13   Administration requires totally accurate statements in the

14   marketing materials of hearing aids?

15   A.    I don't know about the details of the FDA

16   requirements, no.

17   Q.    Have you reported the inaccuracies in these marketing

18   materials to the FDA?

19   A.    Me, personally?

20   Q.    Yes.

21   A.    No, I have not.

22   Q.    In the patent that we looked at before, your patent,

23   the '871 patent, it says feedback cancellation.  Are you

24   aware that you have to make an application under oath before

25   the Patent Office and state with accuracy what your patented

Christensen - redirect

Page 1051

1  technology does?

2  A.    I'm not aware of the sort of details of patent law.

3  I'm not a patent attorney.

4  Q.    Has anyone gone to the Patent Office and told the

5  Patent Office, no, our technology really doesn't cancel

6  feedback?

7  A.    I don't know.

8            MR. STEINBERG:  No further questions.

9            THE COURT:  All right.  Mr. Gramenopoulos,

10  redirect.

11                  REDIRECT EXAMINATION

12  BY MR. GRAMENOPOULOS:

13  Q.    I think I'm just going to ask one question, and I'm

14  going to ask you about the marketing materials or the

15  patents and concepts.  I'm going to ask you about the

16  products, the products accused in this case.  Based on your

17  knowledge of the LMS adaptive filter, will you please

18  explain for the jury why it is not possible to do phase

19  cancellation or measure amplitude phase?

20            THE COURT:  Or determine amplitude?  Apples to

21  apples, if you might.

22            MR. GRAMENOPOULOS:  I'm sorry?

23            THE COURT:  Well, if you want to keep it apples

24  to an apples, I think you --

25            MR. GRAMENOPOULOS:  Let's first start with phase

1    cancellation.

2              THE COURT:  Well, just determine.  I'm just

3    focusing on the word determine.

4    BY MR. GRAMENOPOULOS:

5    Q.    Okay.  Determine amplitude and phase.  Let's start

6    there.

7    A.    Okay.  The adaptive LMS algorithm has no means to

8    determine amplitude or phase.  It is what we call a

9    statistical-based system.  It's looking at the whole

10   frequency range, that is, all of the frequencies.  And if

11   you have to, if you shoot, measure or determine phase, then

12   you are talking about a single frequency signal, single

13   tone.  You cannot do that with a broadband tone.  So that is

14   a clear distinction between the broadband and the single

15   tone approach.

16   Q.    Is that the reason why you believe that marketing

17   materials are inaccurate?

18   A.    Well, that is why we cannot talk about phase

19   cancellation, because then you are talking about a single

20   frequency cancellation.

21             MR. GRAMENOPOULOS:  No further questions.

22             THE COURT:  Thank you, sir.  You are excused.

23   You can make your plane.

24             THE WITNESS:  Thank you very much.

25             THE COURT:  Ladies and gentlemen, we have at

1    last come to the end of our week.  I want to remind you that

2    you must keep an open mind.  Do not discuss the matters that

3    have been touched on in this courtroom in any way with

4    anyone.  I want you to do no research, listen to reports, if

5    there are any, or watch any TV or read about this case.  I

6    want you to travel safely.  Be back on Monday at 9:30.  We

7    will start then.  Okay?  Thank you very much.

8                    (Jury left courtroom.)

9                    THE COURT:  Counsel, I just stayed to check to

10   see if you had the next iteration of the jury instructions

11   for me.

12                   MR. ROMARY:  Could I make one correction about

13   this?  In Instruction 8, when I was doing this, the middle

14   of last night I managed to leave off Claim 19 of the '850

15   patent.

16                   THE COURT:  Okay.  That is not going to be

17   controversial.

18                   MS. ECKSTEIN:  Your Honor, what we're handing up

19   to you is, most of which is agreed to, you will see there

20   are a few issues we still don't agree on.  One of the

21   instructions that looks agreed, because it was up until this

22   morning, is the one on the Government sales defense.

23   Considering the testimony received today, ETG no longer

24   agrees that should even be a part of the case.

25                   THE COURT:  Okay.

Page 1056

```
 1                    IN THE UNITED STATES DISTRICT COURT
 2                    IN AND FOR THE DISTRICT OF DELAWARE
 3
                                - - -
 4
 5     ENERGY TRANSPORTATION,          :   Civil Action
       INC.,                          :
 6                                    :
                 Plaintiff,           :
 7                                    :
            v.                        :
 8                                    :
       WILLIAM DEMANT HOLDINGS A/S,    :
 9     et al.,                        :
                                      :
10               Defendants.          :   No. 05-422 (GMS)
11                                - - -
12                         Wilmington, Delaware
                         Monday, January 28, 2008
13                             9:37 a.m.
                         Sixth Day of Trial
14
                                - - -
15
       BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge, and
16                                      a Jury
17
18     APPEARANCES:
19                    EDMOND D. JOHNSON, ESQ.
                      Pepper Hamilton LLP
20                         -and-
                      MARTY STEINBERG, ESQ.,
21                    BRIAN M. BUROKER, ESQ., and
                      MAYA M. ECKSTEIN, ESQ.
22                    Hunton & Williams
                      (Washington, D.C.)
23
                                      Counsel for Plaintiff
24
25
```

```
 1    APPEARANCES CONTINUED:
 2                MARY B. GRAHAM, ESQ.
                  Morris, Nichols, Arsht & Tunnell
 3                    -and-
                  JOHN M. ROMARY, ESQ.,
 4                GREGORY C. GRAMENOPOULOS, ESQ.,
                  VINCENT KOVALICK, ESQ.,
 5                KAY HILL, ESQ.,
                  GERSON S. PANITCH, ESQ., and
 6                ARTHUR A. SMITH, ESQ.
                  Finnegan, Henderson, Ford, Farabow & Dunner
 7                (Washington, D.C.)
 8                                        Counsel for
                                          Demant Defendants
 9
                  DONALD E. REID, ESQ.
10                Morris, Nichols, Arsht & Tunnell
                       -and-
11                WILLIAM H. MANDIR, ESQ.,
                  JOHN SCHERLING, ESQ.,
12                CARL J. PELLEGRINI, ESQ.,
                  BRIAN SHELTON, ESQ.,
13                MATTHEW KAPLAN, ESQ., and
                  J. WARREN LYTLE, JR., ESQ.
14                Sughrue Mion
                  (Washington, D.C.)
15
                                          Counsel for Widex
16                                        Defendants
17                         -   -   -
18
19
20
21
22
23
24
25
```

Schaub - direct

1    Q.      Please turn to the page referenced by the control

2    number DEM000148, you will see that at the bottom of the

3    page.

4    A.      Yes, I am ready.

5    Q.      On the left-hand side, there is this phrase

6    ChannelFree signal processing.  What is ChannelFree signal

7    processing?

8    A.      Yes.  The ChannelFree signal processing, this is a

9    marketing term for this patented processing scheme for the

10   loudness control.

11   Q.      Do you think that term is specific for its intended

12   audience?

13   A.      Yes.  And, of course, there is more explanation on

14   what it means in more places.  Yes.

15   Q.      If you look on the right-hand side of the page?

16   A.      Yes, it's not on the screen, but here.

17   Q.      There is a heading Adaptive Feedback Canceller.  Can

18   you read the statement that appears underneath that heading?

19   A.      Yes.  It says, "SwissEar uses a fast-acting adaptive

20   feedback canceller to ensure feedback-free fittings."

21   Q.      Do you agree with this statement?

22   A.      Well, let's look at the intended audience.  This

23   information is for audiologists and for hearing aid users.

24   So this is a public discourse.  And what the general public

25   understands with the term feedback is howling, when the

Schaub - direct

Page 1076

1   hearing instrument whistles.  This is what the general

2   public understands feedback is.

3            Now, the feedback suppression system prevents

4   howling in many situations.  So an instrument without the

5   feedback suppression system would howl in many situations

6   where the instrument with the feedback suppression system

7   does not howl.

8            So it is actually eliminating or canceling the

9   howling.  And now this is conveying the right thing.  So

10  audiologists understand this.

11           Now I have to say, from my perspective as a

12  signal processing engineer, I use, or I suggest, I prefer a

13  more precise term, rather than cancellation, I call this

14  suppression.

15  Q.    And why is suppression more precise?

16  A.    Yes.  To understand this, I must explain from the DSP

17  engineer's viewpoint feedback, then we think of the feedback

18  signal, the feedback signal, the signal that goes out of the

19  receiver, out of the ear canal and goes back into the

20  microphone.

21           Without the feedback suppression system,

22  100 percent of the these signal samples travel through the

23  instrument.  Now, with a feedback suppression system, it

24  achieves in the average that only 25 to 35 percent of these

25  signal values still go through.

Schaub - direct

1           This is a good achievement.  And it helps so

2    that the instrument does not howl in may situations where

3    otherwise it would howl.

4           Here is the point, as I see it.  When there are

5    still 25 to 35 percent of the signal values still going

6    through, then for me, looking more precisely, it is not

7    canceling.  It is just suppressing, squeezing.

8    Q.    Do you think the term adaptive feedback canceller as

9    it appears in this marketing material, do you believe that's

10   misleading?

11   A.     No.  For its intended audience, this is the right way

12   to convey it.

13          Actually, in the old days, when I was using my

14   own technical wording, addressing audiologists, I just

15   created question marks on their forehead.

16          This is the right way to say it, as it is in the

17   documents for this audience.

18          MR. GRAMENOPOULOS:  No further questions.

19          THE COURT:  Counsel.  You may cross-examine.

20                    CROSS-EXAMINATION

21   BY MR. BUROKER:

22   Q.    Good morning, Mr. Schaub.  My name is Brian Buroker

23   for ETG.  I believe you testified --

24   A.     Good morning, Mr. Buroker.

25   Q.    Good morning.

Schaub - cross

Page 1078

1    A.      I recognize you from last time.

2    Q.      From the summer.  Right.

3            You testified regarding the Jump 3 platform.

4    You weren't involved in working on the code for the Jump 3

5    platform, were you?

6    A.      No.

7    Q.      And is it your testimony now that all of the Alaska

8    products include a feedback canceller?

9    A.      No.  I explained, it has this feedback suppression

10   system, the technical, using the technical terms as I use

11   them.

12   Q.      But the marketing materials refer to those as a

13   feedback canceller.  Correct?

14   A.      Yes.  The marketing material, as we just saw, it says

15   feedback canceller.  Now, I explained why.

16   Q.      So is the marketing material that refers to the

17   element as a feedback cancelling -- excuse me.  Is the

18   marketing material that refers to the product as a feedback

19   canceller accurate or inaccurate?

20   A.      Could you please say again?  I didn't get exactly.

21   You stopped.  Please say it again.

22   Q.      Sure.  We saw one marketing document that referred to

23   the feature as the adaptive feedback canceller.  Is that

24   accurate?

25   A.      Well, I explained about the audience.  Addressing

Schaub - cross

Page 1079

1    audiologists and hearing aid users, this wording is correct

2    and is good.  And I explained my DSP engineer's perspective,

3    where I just suggest to use a more precise term that also is

4    the term in our patent.

5    Q.    If that same term appeared in technical materials,

6    prepared by Bernafon, would it be accurate in the technical

7    materials?

8    A.    Here, also, we have -- I still have to distinguish a

9    little bit.

10          We have engineers of different types.  What I

11   say is, what I just said is, a DSP engineer, the right term

12   the DSP engineer uses or prefers to use is suppression.

13   Q.    So let's take a look at JX-26, which is in, I think

14   it's in your binder.

15   A.    In this binder?

16   Q.    I believe it is.  Actually, no, it is not.

17          May I approach?

18          THE COURT:  Yes, you may.

19   BY MR. BUROKER:

20   Q.    Are you familiar with this document, JX-26?

21   A.    The first one, yes.  Yes.  How was the question,

22   please?

23   Q.    I just asked if you were familiar with this document.

24   A.    Yes, I recognize this document.

25   Q.    If we could turn over to the second page of the

Schaub - cross

1    A.    Yes.

2    Q.    In the label, it says that it's the feedback

3    canceller block in more detail.  Do you see the heading?

4    A.    Yes.  I see the first sentence after the title, yes.

5    Q.    This diagram shows separate blocks for the filter and

6    the filter tuning mechanism.  Correct?

7    A.    This diagram shows the Box 2 filter and the Box 3

8    filter tuning.

9    Q.    And it shows the filter tuning box providing

10   coefficients to the filter.  Correct?

11   A.    No.  Where do you see this?

12   Q.    Why is there an arrow pointing from the filter tuning

13   box to the filter?

14   A.    Well, this is a diagram, still a simplified diagram,

15   showing here two things.  Then in the text it says the

16   feedback conditions are constantly changing.  To counter

17   this, the filter applied in the FBC is not static but adapts

18   on the fly.

19          So the filter actually is the whole thing, the

20   adaptive LMS filter is the two, and you cannot separate

21   them.  To actually see what goes on in the processor, we

22   have to look at the very low curve that we just had over

23   there.  And I explained that there is a module of this

24   echo.v, and that it contains all the LMS adaptive filter,

25   and that it performs these operations, and that it updates

Schaub - cross

Page 1086

1    its own coefficients.

2            So what is in the product is an LMS adaptive

3    filter, adapting its own coefficients or rates.

4    Q.    But this diagram shows the filter in Box 2 with a

5    separate box for the mechanism that provides the

6    coefficients.  Correct?

7    A.    This diagram shows a Box 2 and a Box 3.  And all you

8    say is your interpretation.  And it is not what -- to see

9    what happens, we have to look at the Verilog code, then you

10   know what is in the product.

11   Q.    If you could take, draw your attention to another

12   exhibit, JX-27, which is the very large document in your

13   book there.  Are you familiar with this document?

14   A.    Yes.  This is a document we also looked at last

15   summer.

16   Q.    And is this a technical document used as part of the

17   design process for the Alaska processor?

18   A.    This document has the perspective of the later stage

19   IC design that Erich Zwyseig was doing.

20   Q.    And your name is listed as one of the authors of the

21   document on the first page?

22   A.    My name is listed there, yes.

23   Q.    If you could take a look at the page that ends with

24   the Bates number 5745, please.

25   A.    Yes, 45.

Schaub - cross

1    Q.      It says, "Larger venting has always been synonymous

2    with acoustic feedback, but SymbioXT's advanced adaptive

3    feedback canceller solves the problem by working online to

4    detect the presence of feedback and subtract it from the

5    incoming signal."

6              Is that an accurate description of the Alaska

7    product?

8    A.     Well, again here, this is marketing material, and we

9    have also to allow for the audience, what the intended

10   audience is, to convey the ideas for the audience.

11             Let me check.

12             So for audiologists, hearing aid users.

13             Hearing aid users and audiologists will

14   understand from this paragraph that the instrument with this

15   feedback system allows larger venting, which is true.  And

16   they also understand that a howling signal that would be

17   present otherwise will in most conditions be eliminated.

18             So it's good for this audience, that's correct.

19   It's the way to convey these ideas.

20   Q.     From a technical standpoint, does the SymbioXT

21   product detect the presence of feedback?

22   A.     I think we discussed this before, last summer, and I

23   said that, again, here from the DSP engineer's perspective,

24   detecting is not really the right term.

25             I mean, if I may explain this, detect, what

Schaub - cross

Page 1090

1    would that mean?  It would say that the instrument also

2    notices how it howls.

3             We easily hear this if it occurs.  It would just

4    say, if it detects, it knows that it's howling.  But this

5    alone would not be sufficient.  There must be this feedback

6    suppression to make only part -- to suppress the acoustic

7    feedback signal so that it does not howl.  So it actually

8    continuously does more.

9             Again, here, from the perspective of the hearing

10   aid user, like the audiologist, when there is a problem

11   there is a processing scheme that helps, and it prevents

12   howling.

13   Q.    So you agree that this description is something that

14   audiologist and hearing aid users would understand?

15   A.    I didn't get it.

16   Q.    Do you agree that this description that we are seeing

17   on the screen for the adaptive feedback cancellation is

18   something that audiologists and hearing aid users would

19   understand?

20   A.    I think so.  And I know that the marketing material

21   specialists, they are in contact with audiologists and

22   end-users to check.  Their objective is to translate the

23   technical information so that the ideas arrive and the

24   audiologists understand.  That is the objective.

25   Q.    Well, isn't the term suppression just as easy to

Schaub - cross

Page 1091

1    understand as the term cancellation?

2    A.    I was actually thinking about this myself after we

3    had the discussion last summer.  And the risk, when I talked

4    to hearing aid users, audiologists, that just say it

5    suppresses feedback, if the hearing aid users know, if they

6    associate with feedback the howling, and I say, ah, don't

7    worry, this instrument, it suppresses feedback, you might

8    walk away from me thinking, oh, no, this is not a good

9    instrument.  It will just make this whistling a little bit

10    softer.  But that is not what happens.

11              The whistling, the howling, is gone.

12              So, you see, suppress, in the public discourse,

13    could be misleading.

14    Q.    So there is a marketing advantage in using the term

15    cancellation.  Is that what you are saying?

16    A.    Sorry?  Once again, please?

17    Q.    You see there being a marketing advantage to using

18    the word cancellation over the word suppression.  Correct?

19              MR. GRAMENOPOULOS:  Objection.

20              THE COURT:  Basis?

21              MR. GRAMENOPOULOS:  Can go we go the sidebar?

22              (The following took place at sidebar.)

23              THE COURT:  Yes.

24              MR. GRAMENOPOULOS:  I am a little concerned this

25    is getting into expert witness territory.  This witness is

Schaub - cross

Page 1093

1                    (Last question read.)

2                    THE WITNESS:  What does this mean, correct?  Do

3    you mean if I agree?

4                    THE COURT:  Yes.

5                    THE WITNESS:  Let me quickly see.

6                    This question confuses me.  What is the --

7                    THE COURT:  Perhaps he can rephrase.

8                    THE WITNESS:  Yes.  Okay.

9    BY MR. BUROKER:

10   Q.    We talked about how you thought that suppression was

11   not a good term to be used in the document.  Is that

12   correct?

13   A.    I said that if I just say suppression, people might

14   think that howling is still there, which I think is not good

15   to use this word, for this reason.

16   Q.    So the term canceller is used to convey that the

17   feedback is no longer there.  Correct?

18   A.    No.  You are mixing up things now.

19                    So when an audiologist says to his client, look,

20   lady, look, sir, this instrument cancels feedback, so the

21   audiologist thinks and the hearing aid user, I assume,

22   understands this instrument in this situation will not howl,

23   so in this context, this is the right way to say these

24   things.

25                    If you let me go there and the audiologist would

Schaub - cross

1    say, here, I have an expert, he made this process so he can

2    explain this, and if I then would say don't worry, it

3    suppresses, it suppresses the feedback signal, the client

4    might really think that it's still howling because we use

5    these words differently if we are talking in general, the

6    audiologist, or if I analyze a DSP processing scheme.

7              And I have to use my terms in my work and also

8    in the designs that I make.

9    Q.    I want to show you another document, which is PX-561,

10   which is toward the end of that book.  This is an article

11   written by an audiologist consultant for Bernafon AG.  Is

12   that correct?

13   A.    The document says Ken Bozeman, audiological

14   consultant.

15   Q.    And if you can look at the Page 14, which is also

16   labeled ETG23464 so the last three digits are 464.

17   A.    Yes, 64.

18   Q.    And there is a section that says Bernafon's Symbio

19   Feedback Control.  It's in the middle column?

20   A.    Yes.

21   Q.    In that section, it's down a little bit, there is a

22   paragraph that starts, In the active mode.  Do you see that?

23   A.    Yes.

24   Q.    I want to read the description in this document and

25   ask you whether or not you agree that it's accurate.

Schaub - cross

Page 1096

1    persistent problem experienced by hearing aid users is

2    acoustic feedback.  Feedback can be described as a

3    whistling, screeching, ringing, humming, and buzzing, but

4    just what is feedback?"

5            Okay.  Just this first, this very first

6    paragraph sets out the scope.  He actually identifies the

7    feedback in his discourse with whistling, with howling, with

8    this ill-functioning of the instrument that you can hear.

9            This is what I was -- that is exactly what I was

10   explaining already several times.

11   Q.    With that assumption, then, is the statement on Page

12   14 that I just read an accurate description of the Alaska

13   product?

14   A.    Then, if we now go to that description that you have

15   on the screen there, we must say that Ken Bozeman in his

16   thinking, he goes on and he assumes that the perfect

17   cancellation would be needed to eliminate the howling.  This

18   is how I interpret what I read here.  But this is actually

19   not true.

20           As I explained before, I think several

21   times already, it's still the 25 percent that we just have

22   to live with that the filter cannot do better, we have to

23   live with, it's there.  It's part of it.  He doesn't know

24   about these details, obviously.

25   Q.    So I don't understand what the -- is this accurate or

Schaub - cross

Page 1097

1    not accurate?  I am not sure.

2    A.    Well, again, when you talk to -- when we talk between

3    us as just normal human beings, then we understand

4    everything, and I can also show how it relates to the

5    technical language.  This is what you showed here.  This,

6    very difficult language, is reinserting out of phase, this

7    is nothing more than the subtraction.  So this is a very

8    complex -- in a way, very many words for saying in the

9    feedback system, there is a subtraction of the filter

10   aspect, these values are subtracted from the microphone

11   signal.  It is nothing more than this.

12   Q.    Does that describe the Alaska feedback system, to

13   calculate a signal and reinsert it?

14   A.    No.  Stop, stop, stop.  I just said, this is the way

15   in the marketing material, because also, if you go through

16   this document, Ken Bozeman takes the effort to explain other

17   more simple systems and other also more advanced systems

18   that work differently.  And he tries to go all along the

19   line and to keep the audience following.

20         So he also takes some notions from one

21   application to the other.

22         What I want to state here clearly is what

23   happens in the product.  In the accused product, what the

24   processor does, that is what we see from the Verilog code,

25   and that invention that is behind it, we can see it from the

Schaub - cross

Page 1098

1    Bernafon patent, that shows what is really there.  This is a

2    translation from the technical description to the

3    description so that as many people can understand what the

4    instrument can do or can do good for them without needing to

5    have all these people first to go to a technical school.

6    That's the point.

7    Q.    So you want to turn to the Bernafon patent, let's

8    look at JX-28.  Did you just indicate that this patent shows

9    what your product does?

10   A.    I am sorry.  I am not yet there.  JX-21?

11   Q.    28.

12   A.    Yes, I meant 28, sorry.  I have it in front of me,

13   yes.

14   Q.    Does this describe the Bernafon feedback suppression

15   system?

16   A.    Well, this is the U.S. patent assigned to Bernafon.

17   It describes the invention.  At the Alaska processor, it is

18   one implementation.

19   Q.    Let's look at Figure 1.

20   A.    Figure 1.

21   Q.    Does this show a box with the label 10 and a U with

22   the label 11?  Do you see where I am pointing it to?

23   A.    Yes, I would like you to zoom out.

24   Q.    To zoom out or in?

25   A.    Out.  Yes.  Sorry.  I think you did already.  I'm

Page 1125

```
 1    good representation of the functions and signal flow in the

 2    Senso Diva?

 3    A.    Yes.  I think it's doing a good job to explain the

 4    operation of the hearing aid.  That's what it was designed

 5    to do.

 6    Q.    Would you use this document to determine exactly how

 7    the circuits are connected in the actual product?

 8    A.    No.

 9              MR. BUROKER:  Objection.  Leading.

10              THE COURT:  Rephrase.

11              MR. PELLEGRINI:  I will move on.

12    BY MR. PELLEGRINI:

13    Q.    Could you refer to PX-501?

14    A.    Yes.

15    Q.    Was this one of the documents that you were shown at

16    your deposition?

17    A.    Yes, it is.

18    Q.    What is this document?

19    A.    That's also a marketing document, in this case it's

20    produced by our colleagues in the United States, in New

21    York.  It is a series of small articles that have been

22    written, with the intent to explain the different features

23    of the hearing aid.

24    Q.    Is this one of the detailed technical specifications

25    that you referred to earlier that are is to generate the
```

Page 1126

1    circuits that are in the actual product?

2    A.    No, it is not.

3    Q.    Can you go to Page 6 in the right-hand column under

4    Multi-Directional Active Feedback Cancellation.  If you look

5    at the first sentence its says, "The Inteo active feedback

6    cancellation algorithm takes input from the spatial feedback

7    tracer, which estimates feedback paths from the extreme

8    polar patterns of the dual microphones, to create a signal

9    of the opposite phase for its cancellation."

10            Do you see that?

11   A.    Yes.

12   Q.    Is that sentence technically accurate?

13   A.    No, it's not, because it says "its cancellation," but

14   it's not very clear to me what the "its" is referring to.

15   It's not the way I would have described it.

16   Q.    Can you refer to PX-820.  Was this a document that

17   you were shown at your deposition?

18   A.    Yes, it is.

19   Q.    And what is this document?

20   A.    This is an internal Widex document with a lot of

21   questions and answers, and it has been written with the

22   intent to train our salespeople and marketing people, so

23   that they understand the way we would like to explain to our

24   customers the different features of the hearing aid.

25   Q.    Could you turn to Page 18, please?  Do you know if

Nielsen - direct

Page 1127

1    this document is provided to people outside of Widex?

2    A.    Hopefully not, because it is stamped with an internal

3    use only, confidential.

4    Q.    If we go to the question and answer under Item No. 9,

5    the second paragraph in the answer, it says, "When the FPS

6    has determined the characteristics of the feedback signal it

7    will subtract an imitated feedback signal from the incoming

8    signal, thus eliminating the annoying feedback."

9              First of all, what is the FPS?

10   A.    That must be the feedback path simulator, which is

11   the adaptive feedback canceling system.

12   Q.    Is the sentence that I have just read that is

13   highlighted in yellow on the board, is that technically

14   accurate?

15   A.    No, it's not really technically correct, because it's

16   talking about determination of feedback signal.  That's not

17   really what we do.  It would be more correct to write

18   determination of the feedback path.

19   Q.    Can you please refer to PX-506.

20   A.    Yes.

21   Q.    What is this document?

22   A.    It seems like some kind of a training material that

23   has been either from ScreenTone or maybe it could also be

24   from a PowerPoint presentation.

25   Q.    Is this one of the detailed specifications that you

Nielsen - direct

1    referred to earlier that is used to generate the circuits

2    that are in the actual product?

3    A.    No.

4    Q.    If you go to Page 2 of this exhibit, at the bottom,

5    it reads, "Based on the models of the feedback path and the

6    information about the current polar characteristic in each

7    of the 15 frequency channels, the multi-directional active

8    feedback canceling makes a replica of the feedback signal

9    and subtracts it from the signal pathway.  This processing

10   is continuous and is updated instantly."

11            Is this statement technically accurate?

12   A.    Not the way I read it, because it seems to indicate

13   that we are also doing canceling in each of the 15 bands.

14   So that's really irrelevant because that's not what we are

15   doing.  We are doing cancellation in a broadband frequency

16   range.

17   Q.    If you wanted to know the accurate details of how the

18   Senso Diva or Inteo work, what type of documents would you

19   use at Widex to do that?

20   A.    I will typically use the DSP reports we just went

21   through before.

22   Q.    Would you use marketing documents for that purpose?

23   A.    Definitely not.

24            MR. PELLEGRINI:  No more questions.

25            THE COURT:  Cross-examine, counsel.

Nielsen - cross

1                      CROSS-EXAMINATION

2    BY MR. BUROKER:

3    Q.      Good afternoon, Mr. Nielsen.  I have a few questions

4    for you.  You described the process by which products are

5    produced at Widex.  And I have a few questions about that.

6    During the development of the Diva process, the Diva

7    product, did you develop any prototypes?

8    A.      Personally, no.  I was not involved in the

9    development of the circuits in the Diva.

10   Q.      Do you know if any prototypes were developed as part

11   of that process?

12   A.      They must have done some, yes.

13   Q.      Are the prototypes the same size as the ultimate

14   hearing aid that was developed for the Diva product?

15   A.      Typically, no.

16   Q.      Are they larger?

17   A.      They are larger.

18   Q.      And then the next step after the prototype is to

19   develop the integrated circuit design.  Is that correct?

20   A.      Yes.

21   Q.      And then integrate those into a much smaller product

22   for the consumer?

23   A.      Yes.

24   Q.      You mentioned a box that you helped develop for the

25   Diva product.  Is that a box that is used during the fitting

1   Q.      So you haven't confirmed in the VHDL code whether or

2   not this diagram is accurate.  Is that correct?

3   A.      No, I have not.

4   Q.      Are you aware that an expert hired by ETG reviewed

5   the VHDL code and compared it with this document?

6   A.      No.

7   Q.      I believe you testified that the WLMS algorithms

8   calculate coefficients and then store them in the WLMS box.

9   Is that what you testified?

10  A.      Maybe I said that.  I don't know.  It estimates the

11  feedback path and sets the coefficients, yes.

12  Q.      If those --

13  A.      Installs it in the memory within the WLMS.

14  Q.      If the codes show that the memory was not actually

15  part of the WLMS block, you wouldn't be able to dispute the

16  code.  Correct?

17  A.      No.  I don't know VSDL codings, I am sorry.

18  Q.      You were shown a number of marketing documents.  And

19  you gave some testimony about that just a few moments ago.

20  A.      Right.

21  Q.      And one of those was an internal document, PX-820?

22  A.      Excuse me?

23  Q.      PX-820.

24  A.      820.  I got it.  The Q's and the A's.

25  Q.      Did you prepare the description of the Diva feedback

1    canceller in this document?

2    A.    No.  I don't do marketing materials.

3    Q.    Do you have any idea how it was prepared?

4    A.    Not really.

5    Q.    Did you prepare any of the materials or descriptions

6    in the other marketing documents you were shown?

7    A.    No, not to my knowledge.  I might have been consulted

8    about something, but I don't recall.

9    Q.    Do you know how they were prepared?

10   A.    No, not exactly.  I mean, they probably have been,

11   the marketing people have probably had meetings with the

12   technical people, and in some cases the technical people

13   make more informal documents that can be used to make it

14   easier for the marketing people to really see what's going

15   on, because from these documents, it would be very hard for

16   marketing people to understand what is really going on,

17   because it is highly technical details.

18   Q.    But you don't know how that was done.  That is your

19   assumption or speculation as to how it was done.  Correct?

20   A.    That is the general way we would do it.  But I cannot

21   speak for exactly one document, if this is what you are

22   asking me.

23   Q.    If you could look at -- while we are on this

24   document, let's take a look at Page 18 of the document,

25   which also has its Bates label WID, and the last three

Nielsen - cross

1    numbers are 240.

2    A.      Page 18?

3    Q.      Yes.  The one that has the label Diva Feedback

4    Canceling?

5    A.      Yes.

6    Q.      And you testified that the sentence that starts the

7    second paragraph, "When the FPS has determined the

8    characteristics of the feedback signal it will subtract an

9    imitated feedback signal from the incoming signal, thus

10   eliminating the annoying feedback."

11             You had testified that that sentence was

12   not technically accurate.  Is that right?

13   A.      Yes.  It's not technically accurate because the

14   signal is not determined.  We try to estimate the path.  The

15   signal would be unpredictable because it fluctuates much

16   faster than the path.

17   Q.      Do you have any idea why an internal document for use

18   in training at the advertising and marketing department

19   would be technically inaccurate?

20   A.      I have no idea why it's inaccurate.  Actually, I

21   think it describes well the overall operation from a normal

22   perspective.  But it's not technically correct.

23   Q.      And you think ordinary people would understand the

24   system as described here?

25   A.      At least I think this is what they hoped for when

1    they wrote it.

2    Q.    Just give me just a minute.

3          (Pause.)

4          And the marketing documents that we looked at

5    that you said had some technical inaccuracies, that you

6    looked at with Mr. Pellegrini...

7    A.     The block diagram.

8    Q.    The marketing documents you reviewed with Mr.

9    Pellegrini?

10   A.    In general?

11   Q.    Yes.  You indicated that they had some technical

12   inaccuracies.  Correct?

13   A.    From an engineering point of view, yes.

14   Q.    And all of those documents that you reviewed were

15   prepared by either Widex A/S or Widex Hearing Aid Company in

16   the United States.  Is that correct?

17   A.    Could you repeat that?

18   Q.    Those marketing documents that you reviewed were ones

19   that had been prepared by either Widex A/S or Widex Hearing

20   Aid Company here in the United States?

21   A.    Yes.  The ones I recall, yes.  There was one, the

22   training documents, I am not really sure who made those.  It

23   might be one of those two possibly.

24         MR. BUROKER:  Thank you.

25         MR. PELLEGRINI:  No redirect.

Egolf - direct

Page 1157

1    A.    When a student finishes his work, of course, he

2    writes up this thesis that you see on the cover page here.

3    He then, in order to graduate, is required to defend the

4    thesis in front of a minimum of three faculty members, and

5    these are called his committee.  In this particular case,

6    Mr. Weaver defended his thesis in front of three faculty

7    members:  I was his advisor or major professor and two other

8    faculty members.  He made an oral presentation with overhead

9    transparencies and at end of that presentation then, the

10   committee decides whether or not the student is worthy of

11   receiving a master's degree.

12   Q.    Did you give a degree?

13   A.    Yes, sir.

14   Q.    Okay.  Now, other than the presentation to the three

15   professor panel that you referred to, did Mr. Weaver make

16   any other presentations in conjunction with his thesis?

17   A.    Yes, sir.  In my department at that time -- this is

18   in the 1980s -- we had a Friday afternoon colloquium, it

19   began at three o'clock in the afternoon, and students who

20   were either about to graduate or had just graduated were

21   required to make a presentation to the department.  And this

22   included both faculty and graduate students.  It was a more

23   informal affair, and afterward, we all went to the beer

24   garden at 4:00 o'clock.

25   Q.    Okay.  Let's talk about what happened before the beer

Egolf - direct

Page 1158

1   garden then.  About how many people were there when

2   Mr. Weaver delivered his presentation?

3   A.    I would say about 20 people.  Usually the audience

4   was 20 to 30 people.  That included the faculty and graduate

5   students.

6   Q.    Now, was there is an open door or closed door

7   presentation?

8   A.    It's an open door presentation.  It's advertised

9   across campus a couple weeks in advance so there are posters

10  all over campus.  Of course, this is before the Internet so

11  posters were put up on bulletin boards around campus.  Of

12  course, there was a poster every Friday all year long and

13  Kim's was one of those.

14  Q.    Do you recall attending that open presentation?

15  A.    Yes, I did.

16  Q.    What did Mr. Weaver explain there, just briefly?

17  A.    He explained basically the high points of the

18  research that he did that are included in the written

19  portion of his thesis.  He did it with overhead

20  transparencies just like he did in the presentation to the

21  professors.

22  Q.    Do you recall what happened with the copy of

23  Mr. Weaver's thesis after he delivered it?

24  A.    Yes, I do.

25  Q.    What happened?

Egolf - direct

Page 1167

1    Q.    Why did you go and present at this conference?

2    A.    I was asked by Dr. Marion to do so.  He knew the work

3    that Kim and I were doing on feedback in hearing aids.

4    Q.    Did Mr. Weaver go with you to this one?

5    A.    No, he did not.  Kim had left the university in March

6    of 1985.  All good students eventually want to go get jobs.

7    So Kim had taken a job by that time.

8              MR. KOVALICK:  May I please have Page OTI009452.

9    BY MR. KOVALICK:

10   Q.    Are you the David Egolf that is referring to?

11   A.    Yes, I am.

12   Q.    What is that referring to on that page, sir?

13   A.    This was a demonstration of several of the projects

14   that we had ongoing at the present time at the University of

15   Wyoming.  I might add, these were demonstrations.  These

16   were not slide presentations.

17   Q.    Did you demonstrate Mr. Weaver's feedback suppression

18   circuit?

19   A.    I demonstrated the portable hearing aid that included

20   the feedback suppression circuit that Mr. Weaver developed.

21   Q.    Why don't you tell the jury about that demonstration,

22   please?

23   A.    Well, of course, it's hard to hear what's going on in

24   a hearing aid.  And so what we did was we instrumented our

25   small hearing aids so that the people listening could hear

Egolf - direct

1    A.      I think about 60.  I didn't count the numbers.  I

2    would say the entire room was full.

3    Q.      What types of people?  What were their jobs?  Who

4    attended this?

5    A.      It was a little different than the Acoustical Society

6    of America.  These were people who were really more

7    interested in hearing aids.  These were hearing aid fitters,

8    audiologists, engineers like myself who worked on hearing

9    aid research.  There were hearing aid manufacturers.

10                   That was generally the audience.

11   Q.      Now, were these secret proceedings or were these open

12   to the public?

13   A.      These were open to the public as long as you paid

14   your fees.

15   Q.      Did you ask anyone to keep your presentation secret?

16   A.      I did not, no.

17   Q.      May I please have DX-1540?

18                   MR. KOVALICK:  (Addressing the jury)  You have

19   an abbreviated version of this for obvious reasons in your

20   notebook that is DX-1357.

21   BY MR. KOVALICK:

22   Q.      The second page is probably easier to read.

23                   Can you tell the jury your understanding of what

24   this document is?

25   A.      This is a document that I believe was written in

Egolf - cross

Page 1180

1          MR. STEINBERG:  May I approach, Your Honor?

2          THE COURT:  You may.

3    BY MR. STEINBERG:

4    Q.     I am going to hand you a copy of your deposition

5    transcript, Dr. Egolf.

6    A.     Okay.

7    Q.     I will direct you to Page 17, Lines 22 through 25.

8    Let me ask you if you were asked this question and you gave

9    this answer.

10          "Are you represented here today?

11          "Answer:  Yes, I am represented here today.

12          "Question:  And who's representing you?

13          "Answer:  Finnegan Henderson."

14          That is the same law firm representing this

15   defendant.  Correct?

16   A.     Yes, sir.

17   Q.     So you were represented by the same law firm

18   representing the defendant.  Correct?

19   A.     I was working for them, yes.

20   Q.     Well, you are still working for them, aren't you?

21   A.     I am being paid, yes.

22   Q.     Now, they hired you in this case by paying you as a

23   consultant and a witness.  Correct?

24   A.     As an expert witness, yes.

25   Q.     But you are not testifying here as an expert witness,

Egolf - cross

1   are you?

2   A.    No.   I am testifying as a fact witness.

3   Q.    But you have been working for them for two years and

4   they have been paying you for two years.   Right?

5   A.    Only one year.

6   Q.    One year?

7   A.    Yes, sir.

8   Q.    I thought you said you were working since

9   February 2006 for the defendants?

10  A.    That's the time I signed the contract with them, yes.

11  I didn't do any work.

12  Q.    When we took your deposition in Moskow, Idaho -- am I

13  pronouncing that right?

14  A.    "Mos-co."   "Mos-cow" is in Russia.

15  Q.    I will try to get it right.   That was in November of

16  2007?

17  A.    Yes, sir.

18  Q.    At that date you had already been paid $53,000.

19  Right?

20  A.    Yes, sir.

21  Q.    How much have you been paid to date?

22  A.    $53,000.

23  Q.    Are you going to render another bill?

24  A.    I am going to render a bill for the time spent away

25  from my consulting business, yes.

Egolf - cross

Page 1182

```
 1   Q.      You are going to render a bill for all the

 2   preparation that you prepared for your testimony today.

 3   Right?

 4   A.      Yes, sir.

 5   Q.      And you are going to render a bill for your testimony

 6   here today.  Right?  The time you are spending?

 7   A.      Yes, sir.

 8   Q.      And how much will that be?

 9   A.      I haven't run an accounting on it.

10   Q.      And when you testified at your deposition, you were

11   even being paid during the time you were testifying.

12   Correct?

13   A.      That's incorrect.

14   Q.      That's not correct?

15   A.      That's not correct.

16   Q.      Were you paid for your appearance at your deposition?

17   A.      That was not correct.  That was not.

18   Q.      Were you asked this question and did you give this

19   answer at Page 21, Line 6 through 8:

20              "Question:  Are you being paid for your

21   appearance here today?

22              "Answer:  Yes, I'm being paid for my appearance

23   here today."

24              That was incorrect?

25   A.      That was incorrect.
```

Egolf - cross

1    Simulation As a Means For Understanding Acoustic Feedback in

2    Hearing Aids; right?

3    A.    Yes, sir.

4    Q.    You gave that presentation?

5    A.    Yes, sir, I did.

6    Q.    A presentation lasted about 15 minutes?

7    A.    That's correct.

8    Q.    And on the face of that, it said it's reported only

9    for eyeglass-type hearing aids; right?

10   A.    Yes, sir.

11   Q.    Now, this presentation doesn't have anything at all

12   to do with in-the-ear, behind-the-ear hearing aids; right?

13   A.    It does not.

14   Q.    Now, let's go to the next presentation in 962A which

15   is entitled:  Electronic Cancellation of Acoustic Feedback

16   to Increase Hearing Aid Stability, by Mr. Weaver and

17   yourself.

18   A.    Yes, sir.

19   Q.    Do you see that?  And, likewise, that was another 15

20   minute presentation?

21   A.    10 minutes of presentation, five minutes of

22   questions.

23   Q.    And there is a very brief description of that

24   presentation; correct?

25   A.    That's correct.

Egolf - cross

1    Q.    No more than a couple lines, right?

2    A.    Yes, sir.

3    Q.    And there is absolutely nothing else, nothing else in

4    this document that describes that presentation; right?

5    A.    In that document, that's correct.

6    Q.    And you have testified that despite the fact that

7    your an electrical engineer, you have no idea whether

8    someone familiar with hearing aids could build a device from

9    these few words; right?

10   A.    Yes, sir.

11   Q.    And what is described in that device is one of the

12   AFC circuits you were talking about, I think AFC2?

13   A.    Yes, sir.

14   Q.    And that was involved in the VA project; right?

15   A.    That was one of the evolutionary hearing aids of the

16   VA project.

17   Q.    Now, if you turn to DX-974.

18   A.    (Witness complies.)

19   Q.    Now, this is an article entitled:  The Hearing Aid

20   Feedback Path.  And you and Mr. Weaver are a few of the

21   authors; correct?

22   A.    Yes, sir.

23   Q.    And this also was done under the VA project; right?

24   A.    Yes, sir.

25   Q.    And, again, this paper is about a mathematical

Egolf - cross

Page 1192

1    procedure for simulating functions of feedback on an

2    eyeglass-type hearing aid; right?

3    A.     Yes, sir.

4    Q.     Now, this article comes to the conclusion that there

5    was knowledge, both theoretical and experimental, that had

6    not yet been developed at that time; right?

7    A.     That's what it says.

8    Q.     And it also says, without that information, there is

9    little hope of developing even a theoretical model of this

10   device; right?

11   A.     That is correct.

12   Q.     So without that information, you couldn't even

13   develop a theoretical mathematical model, right?

14   A.     I think your use of the word "even" is incorrect.

15   Q.     Okay.  Strike the "even."  You couldn't do it at that

16   time; correct?

17   A.     You could not develop a mathematical model without

18   that information.

19   Q.     Now, if you turn to the very last page, there is a

20   string of cites; correct?

21   A.     Those are references.

22   Q.     Okay.  And I think it's the last reference down at

23   the bottom, Dr. Larson.  Does that refer to some of the work

24   during this project?

25   A.     Yes, sir.

Egolf - cross

Page 1193

1   Q.      And it says, VD Larson, Acoustic Feedback Suppression

2   in Hearing Aids, unpublished proposal to the Veterans

3   Administration.   Correct?

4   A.      That's correct.   That is the proposal.

5   Q.      That means it was unpublished?

6   A.      The proposal, yes.

7   Q.      But you agree with me?

8   A.      It was a proposal we wrote and sent to the Veterans

9   Administration to acquire the research dollars required to

10  fund the project.   Yes, sir.

11  Q.      Now, I want you to next turn to DX-975.

12  A.      (Witness complies.)

13  Q.      Do you have that in front of you have?

14  A.      Yes, sir.

15  Q.      That is an article entitled, Hearing Aid Feedback

16  Path:  Mathematical Simulations and Experimental

17  Verification.   Correct?

18  A.      Yes, sir.

19  Q.      And this also involved computer simulations of

20  eyeglass-hearing aids simulations and so forth; correct?

21  A.      Completely, yes.

22  Q.      And this was done in the VA Project; right?

23  A.      Yes, sir.

24  Q.      And then when you did all this work, you wrote a

25  conclusion; correct?   And the conclusion is on page 1586?

Egolf - cross

1    Q.      Right.

2    A.      I emphasize the word "theory."

3    Q.      And it also means that you, the author, came to the

4    conclusion that your theory would yield very poor results

5    with the human ear; correct?

6    A.      That was the theory I was programming, yes, on the

7    computer.

8    Q.      And that is because behind-the-ear and in-the-ear

9    hearing aids are very different than eyeglass hearing aids,

10   right?

11   A.      For this application, that's correct.

12   Q.      Because it doesn't take into effect the human ear or

13   the shape of the head; correct?

14   A.      That is correct.

15   Q.      Now, 975, the document we've been referring to,

16   doesn't deal with behind-the-ear or in-the-ear hearing aids;

17   right?

18   A.      That is correct.

19   Q.      Now, if you look again at the references on the last

20   page of this article?

21   A.      Which article?  Excuse me.

22   Q.      This is 975.

23   A.      Okay.  Thank you.

24   Q.      And on the first page, there are references to

25   various Egolf articles; right?

Page 1196

1    A.    Yes, sir.

2    Q.    Okay.  Now if you look at the next to the last one,

3    it says Egolf, 1984, acoustic feedback suppression in

4    hearing aids:  Parts I, II and III, unpublished?

5    A.    That's what it says, yes, sir.

6    Q.    And what that means by Reports I, II and III is you

7    provided a number of different reports to the VA on this

8    project; right?

9    A.    That is correct.

10    Q.    And you listed them all as unpublished; correct?

11    A.    According to the style manual of the Journal of the

12    Acoustical Society of America, in which I was publishing

13    this article, it was required to list them as unpublished.

14    And their definition of published or unpublished was in a

15    journal such as this one.

16    Q.    And --

17    A.    I couldn't have listed them otherwise.

18    Q.    I'm going to hand you, for the record, Exhibit PX-466

19    and PX-445 -- excuse me.  446 and 445.

20    A.    They're not in here?

21    Q.    No, they're not.

22    A.    Okay.  Here is PX-446.

23            (Documents passed forward.)

24    Q.    Now, you testified in your deposition to the same

25    thing.  That, gosh, the only reason I didn't list these as

Egolf - cross

1    published or the reason I listed them as unpublished is I

2    was required to by the Journal of Acoustical Society of

3    America; right?

4    A.    That's correct.

5    Q.    Okay.  Well, you've got the information for

6    contributors to the Journal of Acoustical Society of America

7    right in front of you.  Do you see that?  446?

8    A.    Yes, I do.

9    Q.    And where does it say you can't list them?

10   A.    You will have to give me a minute.

11   Q.    Okay.

12   A.    Okay?  Because I have already looked this up.  May I

13   break for a minute?

14   Q.    I don't believe so.

15   A.    If you want me to answer that question, I need time.

16            THE COURT:  Yes, go ahead and look.

17            THE WITNESS:  Okay.  Thank you.

18            If you look on page nine of the AIP style manual

19   --  the AIP is American Institute of Physics.  In the

20   Journal of Acoustical Society of America, all authors are

21   required to conform to the AIP style manual.

22            On page nine, table two, on the right-hand

23   column, there are references listed as 11, 12, 13 and 14.

24   And that is on the right-hand column.  The left-hand column,

25   it says references to unpublished work.

Egolf - cross

1   Q.      Is that what you are referring to?

2   A.      Yes, sir.

3   Q.      Where does it say in there that it's limited to

4   unpublished articles in that journal alone?

5   A.      Excuse me.

6   Q.      Isn't that your testimony that that is the reason you

7   listed them as unpublished, because it was only unpublished

8   in the Acoustical Society of America?

9   A.      I said in the Acoustical Society of America, I had to

10  adhere to the style manual of that journal.  This is the

11  style manual of that journal.

12              THE COURT:  He said a journal of that type,

13  referring to that journal.

14  BY MR. STEINBERG:

15  Q.      But you agree with me those reports were in fact

16  unpublished; correct?

17  A.      It depends on your definition of unpublished.  I'm

18  going by this definition.  I was required to adhere to this

19  definition in order to publish in the Journal of the

20  Acoustical Society of America.

21  Q.      Okay.  And if you look at the definition down in sub

22  eight on the same page, there is a definition; correct?

23  A.      Let me read it.

24  Q.      And I'll read it into the record.  It says:  Avoid

25  references to unpublished material that is difficult or

1    impossible to obtain.  If you must refer to unpublished

2    material of your own, consider preparing it for deposit to

3    the AIP's physics auxiliary publication service.

4             Right?

5    A.    That's what it says, yes.

6    Q.    And so under that definition, your works were

7    unpublished; correct?

8    A.    May I read the rest of this?

9    Q.    Sure.

10   A.    You have to again give me time to read it.

11   Q.    Absolutely.

12   A.    Yes, that's what it says.

13   Q.    And under that definition, your works were

14   unpublished; correct?

15   A.    According to this definition, that's correct.

16   Q.    And you have never submitted your works for deposit

17   in the AIP's Physics Auxiliary Publication Service, did you?

18   A.    I did not.

19   Q.    Now, let's talk about 963.  Do you have that in front

20   of you, sir?

21   A.    963A?

22   Q.    963A, that's correct.

23   A.    Okay.

24   Q.    And that is an article entitled, Electronic

25   Cancellation of Acoustic Feedback to Increase Hearing Aid

Egolf - cross

Page 1206

1   construct 12 prototypes and deliver them to the VA, but in

2   fact none of them were delivered to the VA.  Right?

3   A.     That's incorrect.  We delivered two prototypes to the

4   VA.  And we requested that they would reduce the number

5   because they were expensive to produce, and they agreed with

6   us.

7   Q.     May we refer to Page 187, Lines 9 and 10.

8   A.     What are we looking at?

9   Q.     This is your deposition testimony:

10              "Question:  Were there any of these prototypes

11   prepared of the AFC 1, 2, or 3?

12              "Answer:  None that were sent to the VA."

13   A.     That's correct, none of the AFC 1, 2 or 3s were

14   sent to the VA.  AFC 6, two copies of the prototypes were

15   sent to the VA.  I retained one.

16   Q.     Do you know if there is any contention in this case

17   about AFC 6?

18   A.     I have no idea.

19   Q.     Let's move to 977, DX-977.  Is this another of the

20   reports that you, Mr. Larson and others worked on?

21   A.     This is the final report to the VA.  This is Volume I

22   of the final report.

23   Q.     Right.  There were two volumes of the final report.

24   One delivered in February of '86 and one delivered in 1987,

25   I think August of '87 or thereabouts.

Egolf - cross

1    future articles."

2                    Is that correct?

3    A.    That's correct.  And here I am referring to the

4    mathematical models, not to Kim Weaver's circuit.

5    Q.    And this is as of February 1986.  Right?

6    A.    That is the date of this final report.  Yes.

7                    I would like to add that the final report

8    was a summary of all of the quarterly progress reports that

9    were submitted earlier.

10   Q.    And then, if you turn to 849 there is some references

11   there.  Correct?

12   A.    Yes, that's the list of references.

13   Q.    And the sixth reference is a reference you sent to

14   the VA in your own report.  Correct?

15   A.    That's correct.

16   Q.    And you describe your own reports as unpublished yet

17   again.  Right?

18   A.    I used the Definition of Style Manual of the Journal

19   of The Acoustical Society of America in everything I did

20   because that's the only journal I publish in.

21   Q.    If you turn to 0852, it should be a page or two

22   later?

23   A.    Yes, sir.

24   Q.    That is yet another chapter or another research

25   project under the VA as part of your reports.  Right?

Egolf - cross

Page 1212

1   was primarily a description of the extension, clear out to

2   AFC 6 that Tom McConnell produced.

3                    In fact, at the end of this project, at the

4   end of Tom McConnell's work -- Tom McConnell was the person

5   who produced AFC 6 -- we built his circuit.  We made three

6   replicas of it, delivered two to the Veterans

7   Administration.

8   Q.    Do you know if this trial here is about AFC 6 at all?

9   A.    I told you before, I don't know.

10  Q.    Now, you concluded that the AFC 2 circuit had

11  problems.  Correct?

12  A.    I think if you emphasize the word problems, that

13  would be a misstatement.  It was a natural progression from

14  AFC 1 to 2 to 3 to 4 to 5 to 6.  Each stage had some

15  problems that we overcame with the next stage, yes, that's

16  correct.

17  Q.    So it is correct it had problems.  Is that correct?

18  A.    Yes.

19  Q.    And AFC 2 was never worked on again and you went on

20  went on to the next model, AFC 3.  Right?

21  A.    I didn't work on it.  Kim Weaver worked on it.  You

22  should ask Kim Weaver that.  I didn't work on that.

23  Q.    You were in charge of this project, weren't you?

24  A.    Yes, I was.

25  Q.    And you know FLA the AFC 2 at a certain point in time

Egolf - cross

Page 1214

1    Q.      You wouldn't have moved on to another circuit if it

2    was working adequately, would you?

3    A.      We saw better ways to do things.  That's half full.

4    Q.      Even with the AFC 6 circuit, you found problems.

5    Correct?

6    A.      There were some problems, yes.  Nothing is perfect.

7    Q.      And you testified that even with the AFC 6 circuit,

8    the last one in the progression, which you described as an

9    analog circuit, you said that was only a start in the right

10   direction, didn't you?

11   A.      I don't recall that.  You should point me to that.

12   Q.      Well --

13   A.      I have answered a lot of questions several times.

14   Q.      Let's go to Page 235.

15   A.      Of my deposition?

16   Q.      Lines 19 to 24.

17   A.      Okay.

18   Q.      Were you asked these questions?

19   A.      I agree with my previous statement.

20   Q.      "What's called the AFC 6.  Right?

21           "Answer:  That's correct.

22           "Question:  Okay.  And then you go on to state,

23   there were numerous problems with both the development and

24   setup of that system.  Correct?

25           "Answer:  Yes, that's what it says."

Egolf - cross

Page 1219

1    A.    Yes, sir.

2    Q.    And those pages are about two-thirds of the way

3    through DX-1357A, pages 163 and 164, I believe.

4    A.    Yes, sir.

5    Q.    So there is only like a page and-a-half inside this

6    huge report; right?  Is that correct?

7    A.    Yes.

8    Q.    And I believe you were telling the jury that this

9    report has all kinds of interesting reports and a thesis and

10   scientific information and so forth?

11   A.    These were, as far as I can tell.  Because I only

12   submitted this to Vernon Larson.  I never saw this document.

13   I hadn't seen it until this year.  Reported in here are the

14   results for 1984 of all of the research projects that the

15   Veterans Administration was supporting under this particular

16   division, rehabilitation R&D.

17   Q.    Right.  But you never even saw this document until we

18   presented it to you at your deposition; right?

19   A.    That is exactly correct.

20   Q.    Okay.  And in all of your publications that you have

21   written through the years, you have never even referred to

22   this, have you?

23   A.    No, I didn't know it existed.

24   Q.    Okay.  Now, in those one and-a-half pages, it has no

25   diagram, no sketch; correct?

Egolf - cross

Page 1220

1    A.    That's correct.

2    Q.    It doesn't mention phase or amplitude or anything

3    like that; correct?

4    A.    I would have to read it in detail, which I have not

5    done in several days.

6    Q.    Okay.  Well, if you could skim it real quickly, we

7    would appreciate it.

8    A.    Sure.  So your question is what again, please?

9    Q.    It doesn't mention determining phase and amplitude

10   creating an equal and opposite signal and cancelling;

11   correct?

12   A.    Okay.  Please bear with me while I read it.

13          That's correct.  It does not include words

14   "phase" and "amplitude."

15   Q.    And it's about the same VA project we've been talking

16   about, correct?

17   A.    It's about the same VA project, yes, sir.

18   Q.    Now, I believe if I remember your testimony

19   correctly, you testified earlier that you never asked

20   Mr. Larson to keep your research private or confidential.

21   Do you remember that?

22   A.    I would have to -- I think you corrected me on that

23   during the deposition.

24   Q.    Well, I'm not talking about the deposition.  I'm

25   talking about today.

Egolf - cross

Page 1225

1                    Yes, that is correct.

2    Q.      And then you tell him, in the second paragraph,

3    Vern -- that is Mr. Larson, right?

4    A.      Yes.

5    Q.      (Continuing):  -- there are other reasons for keeping

6    this material confidential for, at least, a short period of

7    time.  First, I have not yet had time to send this material

8    off for publication and I would hate to be scooped by

9    someone at another university who sent for copies of these

10   reports.  Second, you and I seem to have the "edge" in the

11   grantsmanship game with the VA.  If this material is

12   distributed to other researchers who we must compete with

13   for grants, we may lose that edge.

14                   Is that correct?

15   A.      That is correct.

16   Q.      So essentially you were asking him, in March of 1985,

17   to keep this information confidential; correct?

18   A.      That is correct.  I believe what was referred to

19   here, and that is why I wanted to know, is the AFC3 circuit.

20   Q.      And he honored your wishes; correct?

21   A.      I have no idea.

22   Q.      Well, you have no information that he distributed

23   your material after you told him to keep it confidential, do

24   you?

25   A.      I have no idea, one way or the other.

Egolf - cross

1    Q.    Now, let's turn to 43A.

2    A.    Yes, sir.

3    Q.    Okay.  43a is another letter from you to Vernon

4    Larson dated August 31st, 1987; correct?

5    A.    Yes, sir.

6    Q.    Okay.  And this is again about the same work you did

7    for the VA project and you're writing to him about something

8    that you believe is patentable; correct?

9    A.    That's correct.

10   Q.    Okay.  And you're asking him for confidentiality;

11   correct?

12   A.    I need to read that.  Let's see.  Would you point to

13   where I'm asking him for confidentiality?

14   Q.    Well, let's go through it.  Now, you attached to

15   this, in the very next page, a confidential disclosure form;

16   is that correct.

17   A.    Yes, sir.

18   Q.    Whose handwriting is on that form?

19   A.    That's my handwriting.

20   Q.    And you completed this entire form; correct?

21   A.    I did.

22   Q.    Now, even though you completed this form, you never

23   applied for a patent, did you?

24   A.    I was required to complete this form by the contract;

25   and I sent this off to Veterans Administration, Dr. Larson,

Egolf - cross

1    at his request.

2    Q.    Right.

3    A.    I had meant to patent this myself.

4    Q.    Okay.  But no patent was ever obtained?

5    A.    I don't know.

6    Q.    Well, you don't think you would know if your work was

7    patented?

8    A.    I don't know what was -- what became of this after I

9    sent it to the VA.

10    Q.    If your work was patented, you would be an inventor,

11    correct, under the patent laws?

12    A.    If my name was on it, that's correct.

13    Q.    Do you have a patent with you as the inventor?

14    A.    No, I do not.

15    Q.    Right up in 1, 2, and 3 it names you and Mr. Weaver

16    and Mr. McConnell.  Right?

17    A.    Yes.

18    Q.    So you know it is the exact work we have been

19    describing.  Correct?

20    A.    That's correct.

21    Q.    Under Title it says, Automatic Feedback Control

22    Circuit.  That is the AFC circuits we have been talking

23    about.  Right?

24    A.    That is one of the AFC circuits, yes.

25    Q.    Then it describes the period of time you were working

Egolf - cross

Page 1228

1    on it, from May of 1984 to April of '86.  Correct?

2    A.     Yes.

3    Q.     And then if you look at 2E, it says, and you are

4    required to answer this correctly, publication of pertinent

5    information constituting public disclosure.  And that's your

6    handwriting.  Right?

7    A.     That's my handwriting, that's correct.

8    Q.     It says none.  Correct?

9    A.     That's correct.

10   Q.     Is that truthful?

11   A.     Okay.

12   Q.     Was that a truthful answer when you gave it?

13   A.     Let me read this.  Because I am a little bit

14   confused.

15          (Pause.)

16          I understand that, yes.

17   Q.     Now, when you reported to the VA under this

18   confidential disclosure form and you answered that question

19   "None," it was your understanding that none of this work had

20   been published.  Correct?

21   A.     It was my understanding at the time.  I had no

22   experience with patents.

23   Q.     Now, you said you have known Dr. Levitt.  Correct?

24   A.     Yes, sir.

25   Q.     And you have attended a number of his conferences, I

Egolf - redirect

1    circuit board.  We did that, but we didn't actually arrive

2    at a printed circuit board until we got to AFC 6.  And each

3    one of these steps was a very expensive procedure.  We spent

4    a lot of time and money doing this.

5    Q.      Now, the patent issue that he talked about, were you

6    requested some -- which versions of the AFCs were you

7    requesting confidentiality for?

8    A.      I believe it was AFC 3.

9    Q.      What about at the end, what AFC was that?

10   A.      That was AFC 6.  That was the one that was actually

11   sent to the Veterans Administration.

12   Q.      Did you request such confidentiality for either AFC 1

13   or 2?

14   A.      No.

15   Q.      Who did fund Mr. Best's LMS thesis work if it wasn't

16   the VA?  Who did fund that?

17   A.      Audiotone Corporation funded the beginning of it.  I

18   think their money ran out midway through the project, and I

19   believe my department picked up Lee's salary for the rest of

20   the time.

21   Q.      Did you show that circuit to the Audiotone people?

22   A.      You know, I don't recall.

23   Q.      You specifically don't remember?

24   A.      I don't remember.

25   Q.      You mentioned you spent about $53,000 on the

Egolf - redirect

Page 1240

1          THE WITNESS:  Please explain what you are asking

2     again.

3     BY MR. KOVALICK:

4     Q.     I am looking for you to apply your definition of

5     unpublished that you just told to the jury.  Just leaf

6     through the front page of those documents and tell them

7     which of those documents that definition applies to?

8          MR. STEINBERG:  Judge, objection.  There is no

9     time frame.  I think he is asking this witness to interpret

10    the AIPs unpublished to other articles.

11         THE COURT:  I don't think that is what is

12    being --

13         MR. KOVALICK:  No.  I am hoping he is not.

14         THE COURT:  I am going to overrule the

15    objection.

16         THE WITNESS:  I might explain, I know the AIP's

17    definition, because I have published about 40 articles in

18    that journal.

19    BY MR. KOVALICK:

20    Q.     Just please complete the exercise.

21    A.     Do you want me to name them?

22    Q.     If the definition applies, let us know.

23    A.     DX-954A, that's the first one.  DX-955, that's the

24    second one.  DX-956 -- excuse me, yes, DX-956, that's the

25    third one.  Skip DX-962 because it is a publication.

Egolf - redirect

1          And 963, skip that.

2          DX-971.

3          THE COURT:  Skip or include?  Is it or is it not

4    a publication under your definition?

5          THE WITNESS:  It is unpublished by the

6    definition of the Journal of the Acoustical Society of

7    America.

8    BY MR. KOVALICK:

9    Q.    As to which exhibit number?

10   A.    Excuse me.  DX-971A.  That would have been listed as

11   unpublished.

12         THE COURT:  Just tell us about the unpublished

13   documents.

14         THE WITNESS:  Yes, sir.  DX-979.

15         That's it.

16   BY MR. KOVALICK:

17   Q.    Why, for example, would DX-971A be unpublished

18   according to that definition?

19               Can we get that up on the board, please?

20   A.    I am sorry.  It takes time.  Because DX-971A was not

21   published in a refereed journal.

22   Q.    I see.  Is that the only reason?

23   A.    That's correct.

24   Q.    Is that the reason it applies to all of the exhibits

25   you just called out?

```
 1                 IN THE UNITED STATES DISTRICT COURT
 2                 IN AND FOR THE DISTRICT OF DELAWARE
 3
                           -   -   -
 4
 5     ENERGY TRANSPORTATION,           :   Civil Action
       INC.,                            :
 6                                      :
                 Plaintiff,             :
 7                                      :
            v.                          :
 8                                      :
       WILLIAM DEMANT HOLDINGS A/S,     :
 9     et al.,                          :
                                        :
10               Defendants.            :   No. 05-422 (GMS)
11                         -   -   -
12                    Wilmington, Delaware
                    Tuesday, January 29, 2008
13                        8:50 a.m.
                    Seventh Day of Trial
14
                           -   -   -
15
       BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
16                                      and a Jury
17
18
       APPEARANCES:
19
                    EDMOND D. JOHNSON, ESQ.
20                  Pepper Hamilton LLP
                          -and-
21                  MARTY STEINBERG, ESQ.,
                    BRIAN M. BUROKER, ESQ., and
22                  MAYA M. ECKSTEIN, ESQ.
                    Hunton & Williams
23                  (Washington, D.C.)
24                                      Counsel for Plaintiff
25
```

```
 1    APPEARANCES CONTINUED:
 2                MARY B. GRAHAM, ESQ.
                  Morris, Nichols, Arsht & Tunnell
 3                     -and-
                  JOHN M. ROMARY, ESQ.,
 4                GREGORY C. GRAMENOPOULOS, ESQ.,
                  VINCENT KOVALICK, ESQ.,
 5                KAY HILL, ESQ.,
                  GERSON S. PANITCH, ESQ., and
 6                ARTHUR A. SMITH, ESQ.
                  Finnegan, Henderson, Ford, Farabow & Dunner
 7                (Washington, D.C.)
 8                                    Counsel for
                                      Demant Defendants
 9
                  DONALD E. REID, ESQ.
10                Morris, Nichols, Arsht & Tunnell
                       -and-
11                WILLIAM H. MANDIR, ESQ.,
                  JOHN SCHERLING, ESQ.,
12                CARL J. PELLEGRINI, ESQ.,
                  BRIAN SHELTON, ESQ.,
13                MATTHEW KAPLAN, ESQ., and
                  J. WARREN LYTLE, JR., ESQ.
14                Sughrue Mion
                  (Washington, D.C.)
15
                                      Counsel for Widex
16                                    Defendants
17                          -  -  -
18
19
20
21
22
23
24
25
```

Weaver - direct

1    A.      Yes.  This is a quarterly progress report which was

2    submitted to the Veterans Administration in July of '84.

3    Q.      If you turn to Appendix A, which is about half a dozen

4    pages in, do you recognize this document?

5    A.      Yes, I do.

6    Q.      Can you tell the jury what this is?

7    A.      This is the -- basically my thesis, which was written

8    and completed by July '84.  So the work had been completed

9    by then, and it is, the title of this is An Adaptive

10   Open-Loop Estimator For The Reduction Of Acoustic Feedback.

11   Q.      Did you have working circuits as of this July 1984

12   date?

13   A.      Yes, we did.

14   Q.      You had a working hearing aid?

15   A.      It was in a PA, it was a public address system at the

16   time of the thesis.

17   Q.      Just describe that generally.  How big was it.

18   Desktop model?

19   A.      It was a desktop model.  It was a good quality

20   speaker, and then the sound went through an audio amplifier

21   and through some car speakers.

22   Q.      And that was as of July 1984?

23   A.      That was as of July 1984.  The thesis was completed

24   in, it was all written up by July '84, and then the next

25   graduation interval was December.  That's when the actual

Weaver - direct

Page 1253

1    graduation was.

2    Q.    We will talk about that in just a little bit.  I just

3    want to look at a couple of things in here, have you explain

4    them to the jury, please.

5            MR. KOVALICK:  Can we have Appendix F of the

6    document, EGOLF00116.

7    BY MR. KOVALICK:

8    Q.    Can you tell the jury what that is?

9    A.    Yes.  This is a circuit which was used to generate

10   pseudo-noise and inject it through the hearing aid or the PA

11   system to measure, to quantify the open-loop characteristics

12   in the system.  It would measure basically the propagation

13   of the delay, the phase through the hearing aid.

14   Q.    Was that part of the canceling feedback, this circuit?

15   A.    Yes.  First of all, you measure the system, and then

16   you insert an estimator using the measurements of this

17   measurement system to cancel the feedback.

18           MR. KOVALICK:  Can I please have EGOLF00118.

19   BY MR. KOVALICK:

20   Q.    Can you tell the jury what this circuit is?

21   A.    This is actually the estimator.  So the result of the

22   previous circuit was fit into this circuit to actually

23   eliminate the feedback.

24   Q.    And why did you send these circuit diagrams and this

25   draft thesis to Vern Larson?

1    A.    Because Vern Larson and the Veterans Administration

2    was funding research on my thesis.  It was -- we were doing

3    it for the good of the hearing aid users, trying to improve,

4    trying to improve the maximum gain they could get.

5              MR. KOVALICK:  Could I have DX-956, please.

6    BY MR. KOVALICK:

7    Q.    Can you tell the jury what this document is?

8    A.    This is the thesis which was submitted.  It's the same

9    document with a different date on it.

10   Q.    Why is the date different?

11   A.    Because that's when the actual graduation was.  But if

12   you look through the two documents, they are the same.

13   Q.    Okay.  So this version, DX-956, is dated

14   December 1988?

15   A.    '84.

16   Q.    I am sorry, December 1984.

17   A.    Right.

18   Q.    Thank you.

19              When did you actually deliver your thesis to

20   your panel of advisors at Wyoming?

21   A.    It was in early December of '84.

22   Q.    Can you tell us about that?  What did you do and who

23   was there?

24   A.    Yes.  What happened, the normal procedure at the

25   university is, you write the thesis with, you know, counsel

Weaver - direct

Page 1255

1    from your advisor, who was Dr. Egolf.  And then once it's

2    all written and your research is done, you submit some

3    period in advance to each of the members of the committee.

4    And the committee is three to five professors, who kind of

5    know what you are doing and who judge you.

6              So you submit it, you submit the thesis to the

7    panel.  And then they have a closed-door defense, where you

8    go into the conference room, and they basically have their

9    way with asking questions on anything in the thesis and

10   anything in your past education.

11             So it's a little final grill session to teach

12   you some humiliation, I think, at the end of grad school.

13   Q.    After that process, did you have to present your

14   thesis to anyone else?

15   A.    Yes.

16   Q.    Tell us about that, please?

17   A.    The normal procedure is after you have defended

18   successfully your thesis in the closed-panel presentation,

19   you give a public presentation.  And every Friday afternoon,

20   there was a seminar series, which was open to the campus and

21   open to the public.  And the topics which were presented at

22   this seminar series were published in advance.

23   Q.    Now, you said that was a normal procedure.  Do you

24   recall specifically presenting your thesis at one of those?

25   A.    Yes, absolutely.

Page 1258

1    July and December of '84?

2    A.    What had happened between July in '84, we called these

3    circuits, we named them in kind of a progression.  You

4    define one circuit and you get as much life as possible and

5    then it would evolve to the next stage.  So in the thesis,

6    it was, I think we called it AFC 1.  And between the thesis

7    circuit of AFC 1, we moved to AFC 2, and AFC 2 had a few

8    enhancements.  It had been shrunk down.  It was on a

9    soldered board.  It was battery operated.  It fit into a

10   little plastic case and it was retrofitted into an actual

11   hearing aid.

12   Q.    And what time was AFC 2 constructed?

13   A.    AFC 2 was constructed between July of '84 and December

14   of '84.  There is a reason for that.

15   Q.    Okay.  Do you recall demonstrated that hearing aid of

16   AFC 2 on anyone?

17   A.    Yes.

18   Q.    Can you tell us about that?

19   A.    Yes.  In July and December of '84, we went down,

20   Dr. Egolf and myself went down to Augusta, Georgia to the

21   Veterans Administration to demonstrate the work we had been

22   doing to show them preliminary results.  So during that

23   time, first of all, the VA -- a little background -- the VA

24   is associated with I believe University of Georgia Medical

25   School.  It's in the same campus.  So whenever we went down

Weaver - direct

Page 1259

1    there, first of all, they made a classroom available to us

2    and we went in and we made a public presentation where we

3    basically presented a lot of the same stuff that was

4    presented in the thesis defense, the circuits, technique, et

5    cetera, plus additional new findings of how much stable gain

6    we had gotten with the AFC 2 on people.

7    Q.    You demonstrated at that presentation?  You actually

8    demonstrated?

9    A.    At the presentation, demonstrating a hearing aid is

10   not very effective so we did it with data, slides, the

11   schematics.

12   Q.    How many people attended that presentation?

13   A.    20 or 30.

14   Q.    And you said there were medical students.  Is that

15   what you said?

16   A.    There were medical students and other professors,

17   people who were teaching the medical students.  Of course,

18   Dr. Larson.

19   Q.    Did you demonstrate that AFC 2 version of that hearing

20   aid to anyone down there in Augusta?

21   A.    Yes.  After the seminar, we had a demonstration of it

22   to Dr. Larson and so we went into his office and there was

23   myself, Dr. Egolf and another colleague of Dr. Larson's was

24   there.  And we tried it on and we demonstrated it to them.

25   Q.    Did it work?

1    Q.    And since this case or before this case started, no

2    one had ever called you to ask you for a copy of your

3    thesis; is that right?

4    A.    No, or that's correct.

5    Q.    Now, just so I'm clear about the different circuits,

6    there is the AFC or AFC 1 circuit?

7    A.    Yes.

8    Q.    And that is separate from the AFC 2 circuit; correct?

9    A.    That's correct.

10    Q.    And the AFC 1 circuit was just used on a PA system; is

11    that right?

12    A.    That's correct.  And it was used to develop

13    techniques.  It was used to develop the circuits and the

14    algorithms.

15    Q.    And that is what is described in your thesis?

16    A.    That is correct.

17    Q.    The AFC 1 circuit?

18    A.    That is correct.

19    Q.    Now, the AFC 2 circuit then was developed afterwards?

20    A.    Yes.

21    Q.    Let's talk about the thesis then of AFC 1 that was

22    only limited to a PA system.  That work you say was

23    submitted to your advisors which are three professors at

24    Wyoming; is that correct?

25    A.    Yes.

Weaver - cross

1   Q.    And you say that you gave a presentation to them about

2   it?

3   A.    Open-door presentation defense.

4   Q.    And you don't have the slides or any physical evidence

5   to show what you demonstrated to your professors; correct?

6   A.    No, I didn't keep that information.  No.

7   Q.    Then you said you also displayed it to some students

8   and other people at the university; is that correct?

9   A.    Right.  During the public presentation, probably the

10  same transparencies.  And actually thinking about it, I

11  believe I turned all my transparencies and hard copy over to

12  David -- Dr. Egolf.

13  Q.    But we don't have those; correct?

14  A.    I think it's been submitted.  You'd have to ask him.

15  Q.    In any event, you haven't shown these slides of the

16  presentation to the jury this morning?

17  A.    No.

18  Q.    And at the presentation with the students, no handouts

19  were given; is that correct?

20  A.    I believe that is correct, yes.

21  Q.    And the students were not given a copy of your thesis?

22  A.    No.

23  Q.    Other than those two events, you never presented  your

24  thesis at any other place; is that correct?

25  A.    The pure thesis, that's correct.

Weaver - cross

Page 1269

1    evidence to show what you showed the VA in December of 1984,

2    do you?

3    A.    We have the quarterly report and typically would

4    develop drawings for the quarterly report and would present

5    those data, drawings and information at the presentations.

6    So realizing this is pre-computer, the drawings were at a

7    premium so when you generated drawings, you just used the

8    same drawings numerous times.  So, if it's in the quarterly

9    report, it's most likely presented.

10   Q.    But you don't know?

11   A.    Oh, I'm quite sure of that.

12   Q.    But you don't have a copy of the presentation slides

13   that you used at your VA presentation in December of 1984?

14   A.    No, that's 25 years ago.

15   Q.    So you don't have it?

16   A.    That's right.

17   Q.    And you didn't give any handouts to the people at the

18   VA in December of '84 either, did you?

19   A.    I don't believe so.

20   Q.    Now, you also talked about presenting this at a JASA

21   presentation in September -- excuse me.  What time in '85?

22   A.    April '85.

23   Q.    And you didn't give any copies of the slides to the

24   attendees in April of '84, did you?

25   A.    No.

Weaver - cross

Page 1270

1   Q.    You didn't give them a copy of your thesis?

2   A.    No.

3   Q.    Didn't give them any written material about the AFC 2

4   circuit other than what is in the abstract?

5   A.    That is right.

6   Q.    And the abstract doesn't have any technical details in

7   it, does it?

8   A.    Some technical details, yes.  It provides an overview

9   of what is done.

10  Q.    Didn't you testify at your deposition that it didn't

11  have any technical details?

12  A.    An overview, it doesn't have any circuit diagrams.  It

13  doesn't describe the circuit down to a fine level.

14  Q.    You wouldn't have expected somebody to be able to

15  build your circuit from the few lines in the abstract from

16  the JASA presentation, would you?

17  A.    You're right.  It's hard for me to say what somebody

18  else can build.  There are some very talented people in the

19  world.  You can't -- it's not a fair question.

20  Q.    After the AFC 1 circuit was built and demonstrated and

21  you had moved to the AFC 2 circuit, the prototype for the

22  AFC 1 circuit was recycled.  Correct?

23  A.    Eventually it was, certainly.  But I am sure for quite

24  a while, I kept AFC 1 and AFC 2 so I could compare them.

25  And basically, whenever the value of AFC 1, the technology

Weaver - cross

Page 1271

1    was fully implemented, tested up into AFC 2, eventually I am

2    sure the parts were recycled.

3    Q.    Then after AFC 2 the group moved onto a circuit called

4    AFC 3.  Correct?

5    A.    Yes.

6    Q.    And you were peripherally at least involved in AFC 3

7    as well.  Right?

8    A.    Yes.  AFC 3 was being done at the time I left the

9    university.

10   Q.    And after AFC 3 was developed, the group didn't work

11   on AFC 2 anymore, did it?

12   A.    I am not sure what the group worked on.  I wasn't

13   there.

14   Q.    To your knowledge, they didn't work on AFC 2 anymore?

15   A.    I don't know if they did or not.  They could have

16   worked on it.  They could not have worked on it.  I don't

17   know.

18   Q.    Now, you called your circuit an echo estimator.  Is

19   that correct?

20   A.    Yes.

21   Q.    And you did that because you thought that you could

22   model feedback as an echo.  Is that right?

23   A.    Feedback -- it is an echo.  It very closely

24   approximates an echo.  Basically, it comes off the eardrum

25   and around the circuit, and a little bit later it comes in,