Weaver - cross

Page 1277

1    approach was taken by a circuit called AFC 2, Weaver, 1984,

2    to suppress feedback in behind-the-ear hearing aids."

3            Do you read this as saying your approach

4    involved placing your circuit in a feed forward direction?

5    A.    It's like I said a minute ago, if you looked at the

6    block diagram, it may be stated that way.

7    Q.    Do you think that's how Dr. Egolf understood it and

8    that's why he explained it this way to the VA?

9    A.    I don't know -- that is not a fair question to ask,

10   what he is thinking.

11   Q.    Now, the VA paid for all of the work that you did on

12   the AFC and the AFC 1.  Is that correct?

13   A.    Yes.

14   Q.    And you believed that all of the entitle intellectual

15   property rights belong to the VA.  Is that right?

16   A.    At the time, yes.

17   Q.    And were you aware that Dr. Egolf filled a patent

18   disclosure form to the VA?

19   A.    Yes.

20   Q.    But, to your knowledge, neither you or the Veterans

21   Administration patented the designs for AFC or AFC 1.

22   Correct?

23   A.    That's correct.

24   Q.    And if it was an advancement for feedback canceling,

25   wouldn't the VA have wanted to patent the technology and use

Weaver - cross

Page 1278

1    it in hearing aids?

2    A.    I don't know.  I mean, the VA is a public

3    organization.  First of all, in the eighties I don't think

4    people -- we weren't that patent-conscious.  And I wasn't

5    aware that the VA was in the business of patenting things

6    and trying to make money on it.

7                So, no.

8    Q.    And do you know Dr. Leland Best?

9    A.    He was a grad student who was coming along after me.

10   Q.    But were you ever aware of the thesis and the work

11   that he was doing?

12   A.    On the periphery.

13   Q.    But you didn't know about the substance of it?

14   A.    Not enough to testify.

15               MR. BUROKER:  No further questions.

16               THE COURT:  Redirect.

17               MR. KOVALICK:  Just a couple, Your Honor.

18                      REDIRECT EXAMINATION

19   BY MR. KOVALICK:

20   Q.    Let's stick with DX-978 if we could, please, that same

21   Figure 5.  Do you still have it in front of you?

22   A.    1065, yes.

23   Q.    DX-978.  Figure 5.

24   A.    Yes.

25   Q.    What is the name of that figure?

Best - dep.

1    problem was to get rid of the one, still leaving the other

2    behind.

3             "Question:  And I believe you just said you

4    didn't ever read the thesis of Mr. Weaver; is that correct?

5             "Answer:  That's correct.

6             "Question:  Did you attend any presentation by

7    Mr. Weaver about his thesis?

8             "Answer:  No.

9             "Question:  Do you have any documents that

10   you're aware of that would indicate what dates you actually

11   began that work?

12            "Answer:  No.

13            "Question:  At the time you began the work, did

14   you have a solution in mind, or just that you were going to

15   begin working on the problem?

16            "Answer:  At the time I began the work, I

17   actually just wanted to apply adaptive filtering to hearing

18   aids.

19            "Question:  So in the fall of 1984, at the time

20   you began, you had not discovered the LMS algorithm; is that

21   correct?

22            "Answer:  That's correct.

23            "Question:  Do you have any documents that would

24   indicate when you discovered the LMS algorithm?

25            "Answer:  No.

Best - dep.

1           "Question:  You talked earlier about there being

2     two different prototypes that were built; is that correct?

3           "Answer:  Yes.

4           "Question:  And prototype 1 and prototype 2, for

5     lack of a better name, are what we called them; is that

6     correct?

7           "Answer:  Yes.

8           "Question:  Do you have any documents that

9     describe prototype 1?

10          "Answer:  No.

11          "Question:  Do you know what happened to the

12    first prototype?

13          "Answer:  No.

14          "Question:  Did you destroy it?

15          "Answer:  I didn't personally destroy it.  It's

16    conceivable that they threw the machine out when it became

17    obsolete, but I don't know, really.

18          "Question:  I'll ask it again.  Do you have any

19    documents that would demonstrate that the first prototype

20    was built before May of 1985?

21          "Answer:  No.

22          "Question:  Was the first prototype ever tested

23    on an actual hearing impaired person?

24          "Answer:  No.

25          "Question:  Are there any photographs of the

Best - dep.

1  second prototype that you're aware of?

2          "Answer:  I don't know.

3          "Question:  Other than your thesis, are there

4  documents that would demonstrate that the second prototype

5  was built at any point prior to May of 1985?

6          "Answer:  I guess the right answer is I don't

7  know, but possibly Mike Wreschner's thesis.

8          "Question:  You're not aware of any documents,

9  though; is that correct?

10          "Answer:  That's correct.

11          "Question:  To your knowledge, was the second

12  prototype ever tested on a hearing impaired person?

13          "Answer:  No.

14          "Question:  You discussed a demonstration of the

15  second prototype for a number of people; is that correct?

16          "Answer:  Yes.

17          "Question:  Do you have any documents that

18  evidenced that that demonstration ever took place?

19          "Answer:  No.

20          "Question:  So there's no documents that would

21  demonstrate who actually was present at the demonstration;

22  is that right?

23          "Answer:  Not that I'm aware of.

24          "Question:  Are you aware of anybody else

25  physically viewing your first prototype?

Best - dep.

Page 1328

1          "Question:  And this document is also not dated;

2     is that correct?

3          "Answer:  That's correct.

4          "Question:  And there's no evidence that anybody

5     else ever signed this or witnessed this material; correct?

6          "Answer:  Correct.

7          "Question:  Do you know what happened to the

8     second prototype that was built?

9          "Answer:  No.

10         "Question:  Where was the last place that you

11    saw it?

12         "Answer:  It was in that same lab, yes, that's

13    correct.

14         "Question:  When you were doing your consulting

15    work between 1985 and 1986, do you recall seeing the second

16    prototype in the lab?

17         "Answer:  I'm not sure.

18         "Question:  It was obviously still in the lab

19    when you gave your master's defense; is that correct?

20         "Answer:  Yes.

21         "Question:  And after that, you don't know what

22    happened to it?

23         "Answer:  Right.

24         "Question:  Your master's defense, you

25    indicated, I believe, lasted about an hour; is that correct?

Morley - direct

Page 1350

1   A.   Yes, there are some other filters.   There is, as we've

2   heard about, there is an feedback cancellation filter.

3   Q.   Is this hearing compensation filter different than the

4   feedback cancellation filter?

5   A.   Yes, it is.

6   Q.   Let me show you Demonstrative No. 2.

7        And can you explain this demonstrative to the

8   jury, please?

9   A.   This is a simplified block diagram of what the ETG

10  patents show when both filters are involved.   The hearing

11  compensation filter in what we call the forward path and the

12  feedback --

13  Q.   I'm sorry.   When you say the forward path, what are

14  you referring to?

15  A.   The forward path meaning the direction that the sound

16  goes from the microphone to the ear.   That would be the

17  forward path.

18  Q.   Do you have a pointer up there?

19  A.   I don't think so.

20        MR. MANDIR:   Your Honor, if I may?

21        THE COURT:   Sure.

22        (Pointer passed up.)

23  BY MR. MANDIR:

24  Q.   Okay.   I'm sorry, Dr. Morley.   I think you were

25  referring to the forward path.   Could you just explain that?

Morley - direct

Page 1351

1    A.    Okay.  The forward path would be from the microphone

2    through the filter.

3          (Video screen goes blank.)

4          MR. MANDIR:  You zapped it.

5              (Picture returns.)

6    BY MR. MANDIR:

7    Q.    Okay.  I'm sorry.  Go ahead.

8    A.    Okay.  From the microphone through the hearing

9    compensation filter and the amplifier to the speaker, that

10   is the forward path.  And it taps down here to get the

11   signal, electrical signal, goes through the canceling

12   filter, and comes back here to be subtracted out.  So that

13   is what we call a feedback path.

14   Q.    And what is the purpose of this feedback canceling

15   filter?

16   A.    It's to try to take out the signal electrically that

17   is equal to the audio signal or the acoustic signal that

18   comes back around to the microphone.

19   Q.    What are those numbers that you show here, a bunch of

20   1s and 0s?

21   A.    Yes.  Digital systems have 1s or 0s.  Binary numbers

22   are the ones we use.

23   Q.    What are they used for?

24   A.    That would be the coefficient.  That is just to

25   represent that that feedback canceling filter has some

Morley - direct

Page 1352

1    coefficients programmed into it.

2    Q.    And what is the purpose of those coefficients being

3    programmed into the filter?

4    A.    Those coefficients were determined by a computer in

5    conjunction with a host controller to try to mimic the

6    acoustic feedback path with the filter.

7    Q.    Does the hearing compensation filter, is that involved

8    in the feedback cancellation?

9    A.    No it's not.

10    Q.    Okay.  The next question for you, Dr. Morley, is how

11    does a person get fitted with a hearing aid according to the

12    ETG patents?

13    A.    I think we have a picture at least here, yes.

14    Q.    Demonstrative 3.  Thank you.

15    A.    Yes.  So at the audiologist or dispenser's office, the

16    person that is going to be fitted would sit, it says, in a

17    quiet room with the hearing aid in place.  It would be

18    connected through an electrical cable over to a host

19    controller that is connected to a computer, and that is how

20    it would be set up for them to get fitted.

21    Q.    So what kind of test are you referring to?

22    A.    This first test that would be conducted according to

23    the ETG patents would be a test to determine what the

24    hearing loss is of the patient by putting some tones from

25    the host controller into the hearing aid, having the patient

Morley - direct

Page 1353

1    say whether they can hear them or not.  We've all been

2    through hearing tests presumably so that is the typical

3    hearing test that you would go through.

4    Q.    And does it get some data from this test?

5    A.    Yes.  From that test, it finds out at what particular

6    tones and frequencies the person can or cannot hear and how

7    much hearing loss they have at each one of those

8    frequencies.

9    Q.    And is this procedure used for each of those filters

10   that we saw before?

11   A.    Well, the first procedure is just to establish what

12   the hearing compensation filter needs to be set at to help

13   this particular patient hear better.  So that is the first

14   step in the fitting procedure.

15   Q.    Okay.  And the next step?

16   A.    Well, after that, what happens then is once the test

17   has been completed, the computer here calculates some

18   coefficients, different sets of coefficients we say, and

19   puts it into a little memory chip.  And then the patents say

20   that that memory chip then is transferred, is put into the

21   hearing aid so that the hearing aid is now programmed, that

22   forward path compensation filter is now set up, customized

23   for that particular patient.

24   Q.    You said it had sets of coefficients.  What are you

25   referring to?

Morley - direct

1    A.    Well, that hearing compensation filter, as we'll see,

2    has some ability, it's sort of like a menu.  There is a

3    bunch of different settings that get programmed into it

4    because this patient, under different situations, if there

5    is a lot of noise in the room, you might want to set those

6    settings up a little differently than if it's in a quiet

7    room.  And the hearing aid has the possibility, the

8    capability to pick from this menu of settings.  So they

9    program in a number of different settings for each patient

10   and then the hearing aid, during normal operation, is able

11   to pick from that menu which set the hearing aid then thinks

12   might be the best one for the patient.

13   Q.    Okay.  Is there a test done for the feedback canceling

14   filter?

15   A.    Yes.  After those sets of coefficients have been

16   loaded into that memory chip and it's been put into the

17   hearing aid to program the hearing compensation filter with

18   all its different sets of possible settings, then there is a

19   test that is done where some tones are once again presented

20   from this host controller, under control of a computer

21   program, that send these tones in to check to see how much

22   feedback there is at these different frequencies.  So it's

23   just measuring how much gets back to the microphone.  Once

24   it knows that at these different test frequencies, the

25   computer knows how to calculate some coefficients, one set

Morley - direct

Page 1355

1    of coefficients which the ETG patents say it uses then to

2    program a filter to be put into the feedback path to cancel

3    feedback.

4    Q.    Okay.  I want to now concentrate on the first filter,

5    this hearing compensation filter.  And I think we have a

6    demonstration, a demonstrative on that.  This would be 4.

7         Okay.  Can you explain what we see here in this

8    demonstrative, please?

9    A.    Okay.  The idea here is that what we're showing is how

10   we might set up a hearing aid that has three adjustments or

11   three sound ranges, three different frequency ranges.  And

12   here we have the low range or the bass, middle range and

13   treble or high frequencies.  And what I'm showing here then

14   in the vertical axis is that at the low range we're asking

15   for more amplitude than we are in the middle or the high.

16   So this would be a good setting for someone who was hard of

17   hearing at low frequencies because the hearing aid provides

18   more amplitude there than it does at the other frequencies.

19   Q.    So does that mean that the middle and high, this

20   person can hear better?  That's why the setting is not as

21   high?

22   A.    That is right.

23   Q.    Okay.  Can we take a look at slide 5?

24         Okay.  This looks a little different.  Can you

25   explain this?

Morley - direct

1    A.    Yes, this would just be another one that shows that

2    this person has a hearing loss at the high frequencies

3    relative to what they can hear at the middle or low

4    frequencies.  So we asked the hearing aid to provide more

5    amplitude here at the high end than at the middle or the

6    low.

7    Q.    Again, is this for setting the hearing compensation

8    filter?

9    A.    This is the kind of response that would be programmed

10   into the hearing compensation filter for a particular

11   patient.

12   Q.    Is this relevant to the feedback cancellation filter?

13   A.    Not at all.

14   Q.    Okay.  I think we have another one.  I think it's an

15   animation, actually.  No. 6.

16   A.    Here we can see that if noise is present, then we can

17   see maybe that we want to adapt or change somehow, pick a

18   different setting based on what noise is present.

19          So this is meant, in a simplified way, to show

20   the idea of changing the response of the hearing aid.  If we

21   detect that noise is present, we would go to that menu and

22   pick a different setting that is more appropriate for that

23   amount of noise that's present.

24   Q.    Is that something that in normal day-to-day activity

25   might actually occur?

Morley - direct

1   A.     Yes.  That's something that you walk into a noisy area

2   or -- it happens all the time.

3   Q.     Can you give an example of when that might happen?

4   A.     Well, in every-day life, you go into a cafeteria,

5   there is noise, go out in traffic.  You might be driving

6   down the street and you are listening -- you notice this.

7            You are listening to your radio, and it's a nice

8   day, so you got the car window down.  And there is noise out

9   there from the freeway.  So we turn up the volume on our

10  radio so it will come up over the noise level.  Then if you

11  pull off the freeway and come to a stop sign, I have

12  noticed, it's like, whoa, I got to turn the volume down now,

13  because I have turned it up to overcome some noise that's

14  not there anymore, so I need to adjust it back down.

15  Q.     Do the ETG patents describe this idea of varying the

16  gain in accordance with noise?

17  A.     Yes, it does.

18  Q.     For what filter?

19  A.     For the hearing compensation filter.

20  Q.     Okay.  I want to now turn to the '850 patent, Figure

21  2, please.

22            Is this a feature of varying the amplification

23  depending on how much noise, is that shown in this figure at

24  all?

25  A.     Well, in this filter -- sorry, in this figure, there

Morley - direct

Page 1365

1    filter, is that the filter you were just referring to that

2    they didn't show in Figure 2?

3    A.    Yes.

4    Q.    Now, does ETG propose a solution to this feedback

5    problem we have been hearing?

6    A.    Yes, they do.

7    Q.    What is their solution?

8    A.    The ETG patent solution is to measure the acoustic

9    feedback path, using the computer and the host controller,

10   and then, after they know what it is, let the computer

11   calculate some coefficients, take those coefficients and

12   program them into a feedback canceling filter, and then

13   insert that feedback canceling filter into the hearing aid

14   to cancel feedback, and then disconnect the host controller

15   from the hearing aid so the patient can wear it away.

16   Q.    So after you measure the feedback, you mentioned that

17   the filter wasn't shown in Figure 2, the feedback

18   cancellation filter?

19   A.    That's right.

20   Q.    How does it get in there?

21   A.    Well, the patent says that once it's programmed to

22   cancel feedback, it is inserted between, I believe it was

23   terminals 142 and 143 or 140 and 143 or something.  142 and

24   143.

25   Q.    Okay.  Can I have Demonstrative No. 18, please.

Morley - direct

1          Can you explain this to the jury, please, Dr.

2    Morley?

3    A.    This is where the patent, the ETG patents, describe

4    that the feedback canceling filter should be inserted into

5    the circuit after it's programmed.

6    Q.    Okay.  Let's now go to another demonstrative,

7    Demonstrative No. 9.

8          Okay.  This, I think, is an animation.  Can you

9    explain this to the jury, please?

10   A.        Yes.  What we see down here across the bottom is our

11   friend the conventional hearing aid with a hearing

12   compensation filter and the amplifier, speaker and

13   microphone.

14         And what I am going show now is after that has

15   been set up to act like a hearing aid, the hearing

16   compensation filter would have been programmed already, and

17   I am going to show the steps of what happens, what the ETG

18   patents say you should do to practice this invention.

19         So first, you have to disconnect the speaker

20   from the amplifier there, because we are going to put in

21   some test tones.  And we don't want the microphone signal to

22   get amplified and come through because we want to measure

23   the feedback path.

24         So we want to put in a tone, it's teaching you

25   to put in a tone and disconnect that path.

Morley - direct

Page 1367

1  Q.    Okay.

2  A.    So here is the feedback measuring circuit.  And it's

3  connected now to the speaker.  And it's ready to put a tone.

4  And it's also hooked up to the microphone output so it can

5  see how much of that comes back as acoustic feedback.  So it

6  is in a position now to test this system.  It can put in a

7  known input and it can see how much comes back.

8  Q.    Question for you:  I see that the host controller has

9  arrived.  Can you explain that?

10 A.    Yes.  As it describes in several places in the patent,

11 for the purposes of this measurement you have to hook up a

12 host controller to the hearing aid so that you can make this

13 test.

14 Q.    And that host controller, was that one of those boxes

15 we saw on the table in that scene of the audiologist's

16 office?

17 A.    That is one of those boxes we saw back in the

18 audiologist's office on the table that had the cable running

19 from it to the hearing aid.

20 Q.    Please proceed.

21 A.    Okay.  If we can go -- here domes our tone, and it

22 comes out the speaker.  It is going to head on back.  You

23 will notice it diminishes a little, and it takes a while go

24 to get there.  So that's amplitude and phase.  Delay and

25 amplitude.

1    Q.    Why did it diminish a little bit?

2    A.    Well, the leak on a hearing aid isn't going to let all

3    the sound get back to the microphone.  So it is not as loud,

4    the feedback there isn't as loud as it was there

5    (indicating).

6                Under this condition, because we don't have the

7    forward path, so we can't cause the squeal to happen.

8    Q.    By the way, why is it that you disconnected that point

9    between the amplifier and speaker to do this feedback

10   measurement?

11   A.    It is absolutely essential.  You don't want to have

12   the microphone input coming through the amplifier and going

13   out the speaker, too, because you can't measure, you don't

14   have a controlled situation.  And you would also -- you

15   could actually create the feedback squeal and it would mess

16   up all of your measurements.

17   Q.    What do you mean it's not a controlled situation?

18   A.    Well, to do a measurement, you want to put an input in

19   and measure what the output is due to that input.  So you

20   want to have a controlled situation.

21   Q.    Well, why is -- this input, is it an input that you

22   know about?

23   A.    Yes, it is the one that the host controller has

24   created.  It is a pure tone or a sine wave, we call it, in

25   engineering.  It is just a tone.

Morley - direct

Page 1369

1    Q.    Please proceed.

2    A.    Okay.  So now --

3    Q.    I am sorry.  I see now that this feedback measuring

4    circuit has those ones and zeros again.  What is that?

5    A.    Once it's done, the testing of putting the tones in

6    and seeing how much comes back and how long it took each

7    frequency to get back and what its amplitude is, it then has

8    the data it needs to run a program to calculate these

9    coefficients that it can stuff into a feedback canceling

10   filter to program it.  And then it does that, the host

11   controller stuffs the coefficients in there or programs it,

12   and then it's done with its job, and the feedback canceling

13   filter has been programmed.

14        And now we are ready to insert it, as the

15   patents say, into the feedback path, so we put that, move it

16   from the host controller into the hearing aid, and it goes

17   in.

18        Now we have reconnected the amplifier to the

19   speaker, and we have a feedback path, as we say, that is

20   electrical and it's gone through the feedback canceling

21   filter, comes back, and it subtracts from the microphone

22   input.  So the hearing aid is ready to go.

23   Q.    Those ones and zeros that we see in the feedback

24   canceling filter, do they ever change now that it is in the

25   hearing aid?

Morley - direct

Page 1370

1    A.    They can't be changed unless you hook up that cable

2    again and go back at the audiologist's office.

3    Q.    Can we go to Demonstrative No. 10, please.  Can you

4    explain this for the jury, please?

5    A.    Well, this just shows at the audiologist's office what

6    all the electrical connections are, and it's got all the

7    busy stuff in there that shows all the circuitry.  But not

8    all that is being used at the time of testing at the

9    audiologist's office.  So I have a simpler one, I think.

10   Q.    I see Figure 1 of the patent, you have it labeled host

11   controller.  Does the patent say that Figure 1 is the host

12   controller?

13   A.    That's what it describes it as everywhere.

14   Q.    And in Figure 2, I see you have labeled that as

15   hearing aid.  Does the patent, the ETG patents describe

16   Figure 2 as a hearing aid?

17   A.    That's what Figure 2 is referred to everywhere.

18   Q.    Where is -- so I see host controller and I see on the

19   bottom right hand, in the green, that's the host controller.

20   Is the computer, which is the thing the host controller is

21   sitting on, is that shown in Figure 1 or Figure 2?

22   A.    Well, what they show is this little box over here, 24,

23   is a dotted line, and it's around some connectors.  And in

24   the patent it actually calls that the computer.  But one of

25   ordinary skill in the art would realize that they left out

Morley - direct

Page 1371

1   the computer, that that really means plug this host

2   controller into a computer with those connections over

3   there.

4   Q.    So the number 24, what does the patent call that?

5   A.    The patents both call it a computer.

6   Q.    Okay.  I think the next demonstrative, 11, is an

7   animation.  Can you explain what it is and how it works?

8   A.    Okay.  I promise this is as technical as I'll get

9   here, I think.

10           This is going to show the testing for the

11   feedback.  So what we have down at the bottom, we have the

12   signal generator and the host controller that is going to

13   generate the test tones and send them in through this path

14   up here through the limiter and the amplifier into the

15   speaker or the receiver and then we're going to get some

16   acoustic feedback coming over here to the microphone.  It's

17   going to come through to this sigma, this Greek number,

18   which means just to add, it's an adder there that adds the

19   signals that come to it.  There are two signals coming in.

20           So that signal comes back.  The acoustic

21   feedback comes back around through the microphone and in.

22   And then the other signal that is going to come in, we'll

23   see.  So there we are sending the tone out to the speaker.

24           And then now the next thing, we'll get the

25   acoustic feedback and we also get an electric feedback going

Morley - direct

Page 1372

1  through this circuit up here and they come back to this

2  summer.

3          Now, the electric feedback, that signal went

4  through this measurement box, this phase, and it's really an

5  adjustable delay and adjustable volume control.  So the

6  computer, it says in the patent, adjusts that so that when

7  that signal, the electrical feedback signal is equal and

8  opposite to this acoustic signal coming back, that the

9  summer here, okay, that comes out, goes into the null

10  detector and says, oh, I've canceled it.

11          So when that is true, when it detects a null,

12  that means that it has figured out what the phase and

13  amplitude is.  It's created a signal of equal amplitude and

14  opposite phase and it's cancelled it so it now knows what to

15  program into the feedback canceling filter.

16  Q.    Okay.  I noticed on the right-hand side of this, you

17  have figure 2 and a box.  Does that mean all of the circuits

18  that you show within that box are in figure 2 of the patent?

19  A.    That is correct.

20  Q.    And figure 2, what is that called in the patent?

21  A.    That is the hearing aid.

22  Q.    Okay.  On the left-hand side, I see three boxes:  One

23  called measure phase and magnitude, then there is another

24  box entitled null detector, and then a third box labeled

25  signal generator.  Why are they on the left-hand side?

Morley - direct

1    A.    Well, all of those components, those boxes, those

2    functions are inside figure 1 in the patent and figure 1, as

3    we know, is the host controller, not the hearing aid.

4    Q.    Okay.  Now I see that you have made some connections

5    between figures 1 and 2.  For example, up at the output of

6    the measure phase and magnitude, I see a number 144 and a

7    VFBK.  Do you see that?  It's over a little bit to the left,

8    down.

9    A.    Oh, I see.  Yes.  Yes.

10   Q.    That is connected to it looks like terminal it looks

11   like 143?

12   A.    143, VFBK.

13   Q.    Why do they have the same name?

14   A.    It's telling you those are supposed to be connected

15   together there.

16   Q.    Now, what does the patent say 144 and 143 are?

17   A.    It calls those either connectors or terminals,

18   indicating that they are something that you can unplug.  It

19   is meant to be unplugged.  It doesn't call them wires or

20   conductors, for example, which would indicate an electrical

21   connection that is not meant to be taken apart.

22   Q.    In other places, for the lines that are hardwired,

23   does the patent call it conductors?

24   A.    It sure does.

25   Q.    Okay.  Dr. Morley, the coefficients that are figured

Morley - direct

1    out and placed into the feedback canceling filter, can they

2    be updated during normal day-to-day operations?

3    A.    No, they cannot.

4    Q.    Can they be updated in any way?

5    A.    They could be updated if you went back to the

6    audiologist office and went through this test again and

7    let the computer calculate some new ones and reprogram the

8    filter and then reinsert it.

9    Q.    And what kind of day-to-day activities may cause --

10   let me strike that.  What is your opinion as to the

11   viability of a solution that we see in the ETG patents where

12   the coefficients in the canceling filter do not change

13   during normal operation?

14   A.    The coefficients, since they don't change in normal

15   operation, once the patient leaves with the hearing aid,

16   it's not a very useful hearing aid, as we've heard over and

17   over again.  The acoustics change.  You pick up a phone to

18   put it to your ear, you put on a hat, like a baseball hat,

19   maybe --

20   Q.    Maybe.

21   A.    -- or other hat.  And, you know, things change.  The

22   acoustics are always changing and so a fixed solution like

23   this is not a useful one.

24   Q.    What are some day-to-day activities that may cause the

25   feedback to change, the feedback condition, during normal

Morley - direct

1    operation, walking around?

2    A.    Well, I think I just answered that.  I thought.  Maybe

3    I didn't.  What can change acoustically walking around?

4    Q.    Yes.

5    A.    Putting on a hat, hugging someone, putting a phone to

6    your ear, walking past a wall, turning your head.

7    Q.    Okay.  And how would the ETG patent solution, how

8    would they react to that?

9    A.    They would act as if nothing had happened.  It

10   doesn't -- it can't detect that anything has changed in

11   terms of the feedback path because it's not testing that.

12   Q.    Can we put up Demonstrative No. 12, please?

13           Okay.  Have you ever seen this demonstrative

14   before?

15   A.    How could I forget?

16   Q.    Okay.  And this is, we saw some pink mermaids, I

17   believe; is that right?

18   A.    Yes.  I think the premise was that these were, your

19   neighbor put these up and you want to cancel them out.

20   Q.    In this demonstrative, and we understand it's just a

21   demonstrative, do you recall if the feedback condition

22   changed?

23   A.    Well, this is a fixed solution.  The mermaids are

24   supposed to be representing this unwanted feedback signal

25   and it doesn't change because they stay behind those

1    pillars.

2    Q.    Now, did you prepare a demonstrative based on this

3    demonstrative that showed what would happen if feedback

4    conditions did change?

5    A.    Yes, I did.

6    Q.    And could we have Demonstrative 13, please?

7              So what are we seeing here?

8    A.    This is the real world.  Feedback changes.  The

9    amplitude changes so they're getting bigger or smaller and

10   they're moving around in phase, frequency.  Things change in

11   the real world so these mermaids don't stay behind the fixed

12   solution to the problem.

13   Q.    Okay.  Let me just ask you a few questions.  I see

14   that these dancing mermaids are getting bigger and smaller.

15   What is that representing?

16   A.    That would be the amplitude of the feedback, acoustic

17   feedback signal that you are trying to cancel.

18   Q.    So the amplitude would be changing?

19   A.    Sure.  When I put my hand up to my ear, I could

20   imagine that there is going to be more feedback than when

21   the leak is just going out into the air.

22   Q.    Okay.  And I see that the distance between mermaids

23   also changes?

24   A.    Right.

25   Q.    What is that representing?

Morley - direct

1          It says for the purpose of this measurement, the

2     feedback loop is broken between 140 and 122.  And then it's

3     hooked up to the host controller.  So what this is telling

4     us is we disrupt normal operation to make this measurement

5     and we hook the host controller up temporarily to make the

6     measurement.

7     Q.    What does this tell you about whether or not the host

8     controller is connected to the hearing aid at all times?

9     A.    It tells me that it is not normally connected, only

10    for the purposes of this measurement do we break this and

11    hook up the host controller.  It would be absurd to have

12    this feedback path broken all the time and have the host

13    controller hooked up all the time because it wouldn't

14    operate as a hearing aid.

15    Q.    Okay.  One more, column 11, lines 39 to 42.

16          Can you go ahead and do the same for this

17    passage, please?

18    A.    Okay.  As one of ordinary skill in the art, when I

19    read this passage, I said okay, these guys are inventors.

20    They're looking into the future and they're going to say

21    what they envision, what could happen with their hearing

22    aid.  And they say that these components shown in figs. 2, 4

23    and 5 may be incorporated in the hearing aid or part may be

24    contained in a pocket-size case.  So they're talking about

25    how you might package this up with electronics.

Morley - direct

1    filter therein programmed to equalize and reduce the effect

2    of said acoustic feedback both in amplitude and phase on a

3    signal in said transmission channel."

4    Q.    Do either the Senso Diva or the Inteo products perform

5    the inserting step in Claim 13?

6    A.    Not at all.  The filters that are used to cancel

7    feedback in both of those hearing aids are put onto the chip

8    when it's made in a factory in Taiwan.  And that filter is

9    in that chip from when it gets put on at the chip

10   manufacturing plant until the hearing aid is put in the --

11   for the rest of its life, the existence of that hearing aid,

12   that filter is in there.  It never leaves.

13   Q.    So if you take Claim 13 as a whole, is it your opinion

14   that the Widex Inteo and Senso Diva includes all of the

15   features in that claim?

16   A.    It's my opinion that it includes very few if any of

17   the features in that claim, the Senso Diva and Inteo.

18   Q.    Can we now go to Claim 14, which is another one of the

19   claims asserted by ETG.  Correct?

20   A.    Yes.  This is similar to Claim 13, but it doesn't

21   require specifically for the programmable filter that's

22   programmed to be in a feedback path.  It could be anywhere,

23   presumably.

24   Q.    So are all of the reasons that you just gave why the

25   Senso Diva and Inteo are not infringing Claim 13 applicable

Morley - direct

1    correction circuit change?

2    A.    Yes.  They get updated from time to time.

3    Q.    And this is a feedback cancellation filter?

4    A.    It is.

5    Q.    So how is that compared to what we have been

6    describing with respect to the discussion this morning of

7    the ETG patents?

8    A.    The ETG patents don't change the coefficients out in

9    normal use, whereas this invention does periodically measure

10   the acoustic feedback path, calculate new coefficients, and

11   then use those in the correction circuit for adjusting the

12   feedback, or canceling it.

13   Q.    Can we have Morley Demonstrative No. 16, please.

14           Okay.  Can you explain what we see here, Dr.

15   Morley?

16   Q.    Okay.  Up at the top is my simplified block diagram

17   for the ETG patented hearing aid, with its acoustic feedback

18   fixed filter in the feedback path.  And down below we see

19   the block diagram of the Graupe '818 patent, and I have had

20   the colors match up, so the acoustic feedback path here is

21   in purple on both of them, the microphone is blue, the

22   feedback canceling filter is in blue up at the top, the

23   hearing compensation filter here in the middle is in red.

24           The amplifier is in here, and that's why they

25   are both red.  And then we got a speaker that's orange.  So

Morley - direct

1          I think in the second column here, she talks

2    about a number of researchers in, let's see, two through

3    four.

4    Q.    Yes.  And if you go back to the references on the last

5    page?

6    A.    Yes.  Reference two, is that the '850 patent of ETG?

7    Q.    Yes.  It's referring to the '850 patent, correct?

8    That's the second.

9    A.    Right.  Now I see it.  Right after that, if we can go

10   back to the second column of the first page?  In the top

11   paragraph, about five or six lines in.

12          It says, a number of researchers -- and then in

13   brackets, two through four, so that is an indication of the

14   references at the back of the document -- have achieved some

15   success with this general approach.  One, reference two that

16   we know now is the '850 patent, employed a fixed filter,

17   derived from one measurement of the feedback path transfer

18   function, as the transfer function estimate, rendering this

19   approach vulnerable to changes in the acoustic environment.

20   Q.    Is that consistent or inconsistent with your

21   understanding of the '850 patent?

22   A.    It's dead on.

23   Q.    Okay.  Let's look at Exhibit 1240, please.

24          This is a document entitled, The Problem of

25   Feedback in Hearing Aids by a Mr. James M. Kates.  Are you

Morley - cross

Page 1460

1    A.    As that term is understood in the industry, yes.

2    Q.    In other words, you didn't use another term to

3    describe it, you didn't use the word suppression, you used

4    feedback cancellation in your report and in your testimony

5    before the jury; right?

6    A.    That's correct.

7    Q.    Now, I think one of your statements here today was

8    that the LMS algorithm, if I can ever pronounce that word

9    correctly, does not measure feedback.  I think you testified

10   to that earlier; is that correct?

11   A.    I'm not sure I would have said that.  I think I would

12   have said that it doesn't measure the effect on the phase

13   and amplitude in a signal in the transmission channel as the

14   claim requires.

15   Q.    Okay.  Going back to the same order that you have

16   apparently read, that order doesn't require a measurement,

17   does it?

18   A.    Well, it says to determine.

19   Q.    And to determine doesn't mean measure.  It's broader

20   than the word measure, isn't it?

21   A.    It can be.

22   Q.    Now, you say that one of the things that is different

23   about the Widex products from Dr. Levitt's patent is that

24   they use an LMS algorithm; correct?  That is one of the

25   things?

1          MR. ROMARY:  Your Honor, the entire second

2    patent, the '749 patent is addressed to the host controller.

3    When it was originally filed, it had no reference to

4    measuring phase or amplitude.  That was not a term -- that

5    was not a limitation.

6          If Your Honor will recall, there was a big

7    argument with regard to the first patent, the early patent,

8    as to whether the word determining or determine meant

9    measure.

10         And the plaintiffs took the position that, no,

11   no, no.  Measuring is a very specific thing.  It requires an

12   extra step.  It's different.  It's not the same as

13   determining.

14         But what happened was, when the claim was

15   rejected, all the claims were rejected in the second case,

16   the patentee came back and introduced this phrase, measuring

17   phase --

18         THE COURT:  I am going to interrupt you, as is

19   my privilege, I think, as a Judge, and as you are accustomed

20   to, quite clearly.  I think that this matter can be briefed

21   post-verdict, and that I can resolve it in a more sober

22   fashion, absent the press of events to resolve it.  I just

23   don't think it requires attention at this point.

24         If you believe in your position, raise it

25   pose-verdict.  You may not need to raise it.

Page 1522

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3                         -  -  -

4

5    ENERGY TRANSPORTATION,          :   Civil Action
     INC.,                           :
6                                    :
               Plaintiff,            :
7                                    :
          v.                         :
8                                    :
     WILLIAM DEMANT HOLDINGS A/S,    :
9    et al.,                         :
                                     :
10             Defendants.           :   No. 05-422 (GMS)
                          -  -  -
11
12                  Wilmington, Delaware
                Wednesday, January 30, 2008
13                     8:30 a.m.
                  Eighth Day of Trial
14
                          -  -  -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
16                              and a Jury
17
18
     APPEARANCES:
19
                    EDMOND D. JOHNSON, ESQ.
20                  Pepper Hamilton LLP
                        -and-
21                  MARTY STEINBERG, ESQ.,
                    BRIAN M. BUROKER, ESQ., and
22                  MAYA M. ECKSTEIN, ESQ.
                    Hunton & Williams
23                  (Washington, D.C.)
24                              Counsel for Plaintiff
25

Page 1523

```
 1    APPEARANCES CONTINUED:
 2                    MARY B. GRAHAM, ESQ.
                      Morris, Nichols, Arsht & Tunnell
 3                       -and-
                      JOHN M. ROMARY, ESQ.,
 4                    GREGORY C. GRAMENOPOULOS, ESQ.,
                      VINCENT KOVALICK, ESQ.,
 5                    KAY HILL, ESQ.,
                      GERSON S. PANITCH, ESQ., and
 6                    ARTHUR A. SMITH, ESQ.
                      Finnegan, Henderson, Ford, Farabow & Dunner
 7                    (Washington, D.C.)
 8                                        Counsel for
                                          Demant Defendants
 9
                      DONALD E. REID, ESQ.
10                    Morris, Nichols, Arsht & Tunnell
                         -and-
11                    WILLIAM H. MANDIR, ESQ.,
                      JOHN SCHERLING, ESQ.,
12                    CARL J. PELLEGRINI, ESQ.,
                      BRIAN SHELTON, ESQ.,
13                    MATTHEW KAPLAN, ESQ., and
                      J. WARREN LYTLE, JR., ESQ.
14                    Sughrue Mion
                      (Washington, D.C.)
15
                                          Counsel for Widex
16                                        Defendants
17                         -   -   -
18
19
20
21
22
23
24
25
```

Morley - cross

Page 1549

1    Q.    Let's make it a little more simple.  In any of the

2    claims that you have read, does it say that you either have

3    to disconnect the host controller or you have to connect the

4    host controller?

5    A.    No.

6    Q.    In fact, there are pins on Figure 1 and Figure 2, the

7    host controller, and the programmable hearing aid, that

8    connect.  Right?

9    A.    There are something like a dozen or so connectors

10   there, yes.

11   Q.    You showed us one of your demonstratives, a person

12   sitting in an audiologist's office being fitted and there

13   was a computer and it was hooked up and there was a hearing

14   aid on the ear.  Right?

15   A.    Yes, and there was a host controller as well.

16   Q.    And you know that for modern hearing aids, a patient

17   goes in and is fitted and hooked up to a computer and the

18   hearing aid is programmed.  Right?

19   A.    Yes, I know that.

20   Q.    You heard Mr. Nielsen of Widex testify to that.

21   Correct?

22   A.    I heard him say that that is how they fit the hearing

23   aid.

24   Q.    Now, you testified on direct that ETG's solution was

25   to measure feedback?

Anderson - direct

1    A.    For the '850 patent, I considered Claim 13, Claim 14,

2    Claim 16 and Claim 19.  And for the '749 patent, I

3    considered Claims 1 and 2.

4    Q.    Doctor, how did you determine what these claims are

5    all about?

6    A.    Well, first the Court construes the meaning of

7    certain terms in the claims, as you have seen.  Then I read

8    the claims.  And for the rest of the terms, I applied their

9    plain and ordinary meaning as it would mean to one of skill

10    in the art in light of the patent specification.

11    Q.    Now, what is your understanding of one of ordinary

12    skill in the art?

13    A.    My understanding is essentially the same as

14    Dr. Morley's.

15    Q.    Did you hear Mr. Brown's definition when he

16    testified?

17    A.    Yes, I did.

18    Q.    Do you disagree with him?

19    A.    No, that is fine, too.  And it doesn't make any

20    difference.  It turns out there are many ways people can the

21    approach the problem of hearing aid work.  It's a

22    multi-disciplinary field.  So Mr. Brown's is a fine

23    definition as well.

24    Q.    Let's look for a moment at the Levitt patents.  And I

25    don't want to bore the jury and go over everything again but

Anderson - direct

Page 1572

1    just get a highlight of what your understanding of what the

2    Levitt patents are doing.  You prepared a demonstrative for

3    that; is that right?

4    A.    Yes, I did.

5    Q.    Is this what you prepared?

6    A.    The Demant products or the Levitt?

7    Q.    It would be Anderson 1.

8    A.    There we do.  That's it.

9    Q.    Okay.  Would you describe please for the jury what

10   you did here?

11   A.    Sure.  This is a --

12   Q.    Do you have a pointer, sir?

13   A.    I have a pointer.

14   Q.    Thank you.

15   A.    This is a summary of what is in the patent

16   specification, what is described in the patent.  And I'll

17   discuss how that relates to the claims in just a moment.  As

18   you have heard, there are two patents.  One of them covers

19   the hearing aid and one of them covers the host controller.

20         Now, you heard Dr. Levitt talk about his goal in

21   producing a digital hearing aid that could be customized to

22   an individual and address many of the problems in hearing.

23   And he was presented with problems.  The technology at the

24   time didn't really allow him to realize this full dream and

25   so he worked out a very, I thought very clever way of

Anderson - direct

1    putting the bare essentials of a programmable hearing aid

2    into the hearing aid.  It could be programmed.  It could

3    have characteristics that he wanted it to have.  And then

4    all the extra required things, the signal generators, the

5    determination of amplitude and phase switching programs and

6    such, that could be placed in a host controller.  This

7    enables someone to go in and get fitted and leave with a

8    hearing aid that could be operated off the hearing aid

9    battery and have, like I say, a functional digital hearing

10   aid and leave all the rest of the circuitry behind at the

11   audiologist office.

12            Now, in order to accomplish this, this host

13   controller was designed to be able to program the hearing

14   aid, provide it with coefficients.  Now, in the case of

15   acoustic feedback reduction, the actual signal path was cut.

16   In other words, the normal operation of the hearing aid was

17   suspended.  A test signal was inserted and would go out

18   through the receiver and a little bit would leap back

19   independent and the idea was to measure that or, rather,

20   determine the amplitude and phase.  So the host controller

21   would supply the test signal and then receive the return

22   signal and use that to determine the amplitude and phase of

23   this feedback effect.  Using that, coefficients were then

24   calculated and inserted or provided to the filter so it

25   would achieve the desired response and reduce feedback.

Anderson - direct

1    Q.    What is this number down here, this 1.5 V and the 110

2    V?  What does that represent?

3    A.    Over on the right, the 1.5 is the hearing aid battery

4    voltage that was specified in the specification.  Over on

5    the left, we don't know exactly if it was 110 volts but that

6    was just to indicate this was operating off a different

7    supply.  The supply, the 1.5 volt supply wasn't connected to

8    the host controller.

9    Q.    Dr. Anderson, how do you know that?

10   A.    Well, in the specification, it shows that the hearing

11   aid battery supplies the hearing aid.  It doesn't show that

12   it supplies the host controller.  And I have many reasons

13   technically for believing that that is the case.

14   Q.    Can you provide a summary of those technical reasons

15   for the jury?

16   A.    Well, one of them is the basic idea of the patent is

17   that they would be separated.  Another reason is that during

18   that time I was working with EEPROM technology as it's

19   described, and it didn't require 1.5 volts, it required 14

20   to 20 volts, and that was part of the host controller.

21   Q.    Now, you have down here a label, programmed for a

22   response.  You have that in quotes.  Why did you do that?

23   A.    Why don't we move on to the -- I've got a

24   demonstrative that talks about the Court's claim

25   construction.

Anderson - direct

1    Q.      Okay.  One moment, please.  Can we put up Anderson

2    No. 4, please?

3    A.      It says my monitor is going to sleep.  I hope that is

4    the only thing in here.

5    Q.      We have our numbers messed up here a little bit.  I'm

6    sorry.

7    A.      "Programmed" was construed by the court -- and this

8    is a reasonable description.  "Programmed" means "provided

9    with one or more values."  And I understood and I think

10   Mr. Brown and his testimony also agreed that these values

11   would be the filter coefficients or the weighting values of

12   the filter.  So "programmed" means "provided with one or

13   more values so as to produce a response."

14              In my opinion, this makes sense.  When you are

15   talking about a programmed system, you have an idea of the

16   response you want.  You give the appropriate coefficients,

17   and then that filter, well, acts in the desired manner.

18   That would be on a signal, but what it does to that signal

19   would be the response.

20   Q.      And this word "programmed," that is a word you find

21   in the claims?

22   A.      Yes.

23   Q.      Okay.  Could we go back to Anderson No. 1, please,

24   the first one?

25              Okay.  So I believe you were at the point where

Anderson - direct

Page 1576

1    you have the programmable filter programmed for a response;

2    is that correct?

3    A.    Yes.

4    Q.    Then what happens?

5    A.    Once that is done, the patent specification describes

6    these two lines as being reconnected.  Normal operation of

7    the hearing aid is resumed and the hearing aid can then

8    operate independently of the host controller.

9    Q.    Doctor, I believe you said that the patent itself

10   describes those as being reconnected.  Is that what you

11   meant to say or is it one of ordinary skill in the art would

12   understand that would be connected?

13   A.    In the specification, it talks, it enumerates that

14   the signal flows from the microphone through this filter.

15   In the actual diagram, I think you heard Dr. Levitt say that

16   the diagram doesn't show that but one of ordinary skill in

17   the art especially with that specification would know that

18   you need to connect those for the signal to flow as

19   described in the patent.

20   Q.    So in the ordinary operation of the device, would the

21   host controller be carried around with the user or what

22   would happen?

23   A.    That certainly seems contrary to what was envisioned

24   in the patent, which was a clever way of building a small

25   programmable hearing aid that could then be programmed by an

Anderson - direct

Page 1577

1    audiologist to have certain responses.

2    Q.    I'd now like to direct the jury's attention, allow

3    the jury to hear your opinion with regard to the accused

4    products.  First of all, let's start out with how many

5    accused products did you consider of the Demant Group?

6    A.    Quite a few.  There are 17 products that I considered

7    and researched.

8    Q.    Now, I'm not going to ask you to see if you

9    memorized them all.  I'm just going to ask if they can

10   all be considered the same, with the same infringement

11   assessment or do they have to be separated out?

12   A.    For the most part, they're the same with respect to

13   the fact that there is an adaptive filter in the feedback

14   path.  One of the products, though, I think should be

15   considered differently and that is the Bernafon Win product.

16   I'm not sure why it was on the accused list because it has

17   no adaptive feedback suppression of any kind.  It's actually

18   based on a chip that has that, but the chip, that part of

19   the chip is disabled at the factory and so it's necessarily

20   not programmed to reduce feedback.

21   Q.    So do I understand then that -- excuse me.  Are you

22   saying that 16 products can be treated the same?

23   A.    Yes.

24   Q.    The 17th one shouldn't be because?

25   A.    The 17th one, because it doesn't infringe on any of

Anderson - direct

Page 1601

1    measure it.  It doesn't determine it.  Certainly, it's not

2    equivalent to measuring amplitude and phase.

3    Q.      Let's go to the second means-plus-function element in

4    this claim, if we could.  That would be your Demonstrative

5    10.

6            Could you briefly describe for the jury what you

7    were trying to depict in this demonstrative?

8    A.      Certainly.  You can see, by the way, spelled out

9    below on the left the Court's construction, the

10   corresponding structure, it is highlighted on the right.

11   This is for the second means-plus-function limitation of the

12   claim.

13           As you can see, we have the same two switches

14   and connectors.  I couldn't find them the first time I

15   looked and I couldn't find them the second time I looked,

16   either literally or by equivalence.  I also didn't find the

17   other elements in the claim, as shown over here on the left.

18   Q.      So what was your opinion with respect to the second

19   means-plus-function element of these claims?

20   A.      In my opinion, this is not met, that structure nor

21   any equivalent structure is present.

22   Q.      Do we have a demonstrative for the third

23   means-plus-function element?  That would be No. 11.

24           This is the third one you prepared, sir?

25   A.      Yes, this is it.

Anderson - cross

Page 1617

1   each time.  Correct?

2   A.    Well, the filter does something different every time,

3   if that's what you mean by response.  Typically, when you

4   are talking about filters, you talk about filter responses,

5   there are several ways to define it.  You can talk about

6   frequency response, which isn't defined in this case.  You

7   can talk about impulse response, which doesn't apply in an

8   adaptive filter case.  You can talk about what it does to

9   the signal as it goes through the filter.  But if the signal

10  can never go through the filter before that is changed,

11  there is no way to measure the response of the filter.

12          I think the key is a response.  You are not

13  giving it a response.  It is doing its own thing.  It's

14  changing continually.

15  Q.    Each time new coefficients are provided, there is an

16  output of that filter.  You agree with that.  Correct?

17  A.    Yes.

18  Q.    And isn't that a response?

19          THE COURT:  Let me see counsel for a moment.

20          (The following took place at sidebar.)

21          THE COURT:  I don't want to unduly constrain

22  your cross.  I think you are at an impasse.  There is a

23  fundamental disagreement between the experts in this case,

24  and it is going to be up to the jury to decide, resolve that

25  disagreement.

Anderson - cross

Page 1622

1    Correct?

2    A.    No.

3    Q.    It doesn't say measure?

4    A.    It doesn't.

5    Q.    It doesn't indicate that you have to read out the

6    results of your determination, does it?

7    A.    No, it doesn't.

8    Q.    In fact, in every-day language people might say I

9    determined how much money I am going to spend, but that

10   doesn't mean that I have shown everyone my calculations.

11   Right?

12   A.    Well, determine has two common meanings.  One would

13   be to define or establish, and the other would be to measure

14   or ascertain.  If it means to define, then it doesn't make

15   sense.  You have just -- you are saying that the filter has

16   to define what the feedback is doing?  The feedback is

17   feeding back regardless of whether or not there is a filter.

18           The only other obvious interpretation would be

19   some sort of ascertaining.

20           So let's go to the ascertaining.

21           Is it ascertaining the amplitude and phase as a

22   function of frequency?  No, it's not.  It's not doing

23   anything substantially similar.

24   Q.    You agree the LMS algorithm creates coefficients.

25   Correct?

Anderson - cross

Page 1625

1    why did the marketing documents suggest that it does?

2    A.    I really can't say.

3    Q.    Now, your basis for saying that the accused products

4    don't insert, that is based on your understanding that there

5    is some act of physically inserting a filter; is that

6    correct?

7    A.    The words are "inserting a programmable filter

8    programmed."  That is what I went on.

9    Q.    And you said the only time that could possibly happen

10   is at the factory?

11   A.    The obvious interpretation of that, especially in

12   light of what is going on in the claims, is that you have

13   inserted a filter and that filter is inserted, is

14   programmed.  That is what is required by the claims.  Now,

15   the filter is physically inserted at the factory.  It would

16   be, I understand Mr. Brown is stating that once you put

17   coefficients into an already inserted filter, we could say

18   that is equivalent to inserting a filter.  If that is the

19   case, then when the coefficients are first inserted into the

20   filter, those coefficients do not meet the requirement or

21   limitation of the claims that they be programmed to effect a

22   substantial reduction of feedback.

23   Q.    But that process is iterative so it happens over and

24   over again; correct?

25   A.    I disagree with that.

Anderson - cross

Page 1631

1   Q.     Is that what it literally describes or your

2   interpretation of the patent?

3   A.     In the claims, you go through this little fixed

4   filter, right.  But it inserts a test signal that eventually

5   go out through the receiver.  That is what is described in

6   the specification of the patent.

7   Q.     I think you said in the claims.  Did you mean to

8   say in the claims?  You said in the claims, it describes

9   disconnected?

10  A.     I thought I corrected myself.

11  Q.     You are talking about the specification?

12  A.     The specification, yes.

13  Q.     And where in the specification is that?

14  A.     Well, Dr. Morley talked about this at length.  I

15  suppose we can hit it again.  And I don't have my marked up

16  copy here so it's going to take me a moment.  But I think we

17  can turn to column 9, 30.

18  Q.     That is JX-4.

19  A.     This is the '850 patent, column 9, line 30.

20         For the purpose of this measurement, the

21  feedback loop is broken between 140 and 122.  So you would

22  have to refer back to the diagram there.  But I will say

23  that that is after the microphone and in a path that then

24  leads towards the receiver.

25  Q.     And then -- are you finished?  I'm sorry.

Soli - cross

Page 1732

1    A.    That is my understanding.

2    Q.    Now, you only referenced in your report AFC Circuits

3    1 and 2 as prior art.  Correct?

4    A.    That's correct.

5    Q.    And you, yourself, have written articles where you

6    found that the modeling of eyeglass hearing aids doesn't

7    translate to in-the-ear or behind-the-ear hearing aids.

8    Correct?

9    A.    I don't recall that I have written an article to that

10   effect.  I know what you are thinking of.  But I don't think

11   that's what the article is about.

12   Q.    DX-1767.  That's an article by you and others

13   entitled Robust Microphone Array Processors Incorporating

14   The Head Shadow Effects?

15   A.    Correct.

16   Q.    And that was an article about how it is difficult to

17   compensate for the ear and the head shadow in formulating a

18   hearing aid.  Right?

19   A.    Could I read the abstract?  It might help me a bit.

20   Q.    It is right in front of you, if you want to turn to

21   it.

22   A.    Thank you.

23   Q.    It's DX-1767.

24   A.    This is an article that reports the work of a

25   graduate student named Michael Hoffman.  And the purpose of

Woods - dep.

1    Mr. Romary?

2              MR. ROMARY:  I think it's about ten minutes.  Do

3    you have the exact number?

4              MR. MANDIR:  Eight minutes.

5              MR. ROMARY:  Eight-to-ten minutes.

6              (Video played.)

7              "Question:  Can you state your full name,

8    please?

9              "Answer:  Janet Ruth Woods.

10             "Question:  Are you currently employed by the

11   University of Wyoming?

12             "Answer:  Yes.

13             "Question:  What's your position?

14             "Answer:  I'm the Supervisor of Library Services

15   in the Technical Services Department.

16             "Question:  And is that position -- well, strike

17   that.  How long have you held that position?

18             "Answer:  About 24 years.

19             "Question:  Can you walk me through the process

20   of receiving a thesis from a student or from wherever you

21   receive it until that thesis is stored on the shelves?

22             "Answer:  Okay.

23             "Question:  Who submits a thesis to the library

24   to be shelved?

25             "Answer:  The graduate school.

Woods - dep.

Page 1749

1              "Question:  And how does the graduate school

2       submit that thesis?

3              "Answer:  Prior to January they would call us,

4       me, and tell us that a -- a box of theses was ready to be

5       sent to the library and we would go and pick them up.

6              "Question:  Did you say when the graduate school

7       calls that you would send someone to pick them up or --

8              "Answer:  Right.

9              "Question:  Okay.  When that person arrived,

10      would the boxes of theses, who would they be delivered to?

11             "Answer:  The catalogers.

12             "Question:  And what do the catalogers do?  What

13      is their function?

14             "Answer:  They are responsible for putting the

15      records into the library system so that the materials are

16      accessible.

17             "Question:  Do they perform that function only

18      for theses or for other --

19             "Answer:  A variety of materials.

20             "Question:  Can you give me an example of other

21      materials they would perform that function for?

22             "Answer:  Foreign language monographs,

23      monographs that are written that are not generally available

24      like personal memoirs, pamphlets.  There's a word and I

25      can't remember it.

Woods - dep.

Page 1753

1    department has a copy of the thesis of Kim A. Weaver?

2              "Answer:  The department or the library?

3              "Question:  I'm sorry.  The library?

4              "Answer:  Yes.  Again, a week ago we did.

5              "Question:  And if a member of the general

6    public wanted to see a copy of Mr. Weaver's thesis before it

7    was entered into OCLC, would that -- he or she have been

8    able to get a copy of the thesis?

9              "Answer:  If they had the author's name.

10             "Question:  If they only knew the subject matter

11   of the thesis, would they have been able to get a copy?

12             "Answer:  No.

13             "Question:  Ms. Woods, good morning.

14             "Answer:  Good morning.

15             "Question:  My name is John Rabena and I

16   represent one of the defendants in this case.  Generally

17   for, for example, for December graduates, when would you

18   expect to receive the theses?

19             "Answer:  Usually in March.

20             "Question:  Okay.  And I think you said

21   before -- or earlier this morning that a member of the

22   public could request the theses if they knew the author's

23   name; is that right?

24             "Answer:  Yes.

25             "Question:  And that the library would give them

Larson - dep.

Page 1759

1    regard, no.

2              "Question:  With respect to this particular

3    project, the Dr. Egolf grant proposal and the grant that was

4    actually awarded, what years did this particular project,

5    what years was the project active?

6              "Answer:  I believe that funding was received in

7    January of 1983 or during that quarter, the first quarter of

8    1983.  And the project ran, gee, up through 1985, 1986.

9    Although the bulk of the work took place around 1985, I

10   believe, and certainly by 1986.

11             "Question:  Do you recall what the latest date

12   that work may have been done on the project was?

13             "Answer:  I only recall the date that I received

14   what Dr. Egolf believed was his final report to the Veterans

15   Administration, and that was in, I believe, June of 1987.

16             "Question:  So to the best of your knowledge, no

17   one outside of the VA came in to look at a copy of those

18   copies?

19             "Answer:  In the contracting office?

20             "Question:  Yes.

21             "Answer:  I have no idea.

22             "Question:  Okay.

23             "Answer:  No idea.

24             "Question:  What about the copies of the

25   quarterly progress reports that were forwarded to you?

Larson - dep.

Page 1760

1          "Answer:  Uh-huh.

2          "Question:  How would you maintain those?

3          "Answer:  In a filing area in the research

4   laboratories.

5          "Question:  In the research laboratory on the

6   third floor?

7          "Answer:  Yeah, I suspect on the third floor,

8   research laboratory.

9          "Question:  Now, you mentioned the first floor

10  was generally open to the public.  What about the third

11  floor?

12         "Answer:  No, it was not, not generally, because

13  the wing that I had my labs in also had labs for

14  investigators doing animal research.  And they wouldn't

15  allow the public in that wing because of that factor now, I

16  had to get special permission to bring even patients up to

17  that floor.

18         "Question:  Dr. Larson, I handed you an exhibit

19  marked as Larson Exhibit 5?

20         "Answer:  Uh-huh.

21         "Question:  Are you familiar with this

22  particular document?

23         "Answer:  I'd have to say that I was at one

24  time.  I'm certainly not at this moment.

25         "Question:  I realize the date on it is

Larson - dep.

1    July 20th, 1984, so it's quite some time ago?

2             "Answer:  Uh-huh.

3             "Question:  Can you generally describe what this

4    document was?

5             "Answer:  It's a report from Dr. Egolf

6    describing his progress to date on the work funded by the VA

7    in accordance with the research grant awarded to the

8    investigator.

9             "Question:  And this is one of the quarterly

10   progress reports that we were just discussing?

11            "Answer:  That's what it appears to be.

12            "Question:  The date says July 20th, 1984.  But

13   do you recall when you first may have received this report?

14            "Answer:  No.  I have no recollection.

15            "Question:  If you can recall, I know this was

16   some time ago, but were you as of July 20th, 1984 receiving

17   this report, were you fairly satisfied with the work that

18   had been done to date since the project began in early 1983?

19            "Answer:  I don't remember ever being

20   dissatisfied with the work accomplished.

21            "Question:  Now, with this specific report

22   marked Larson Exhibit 5, what did you physically do with

23   this report when you received it?

24            "Answer:  Read the report and asked questions

25   for my own understanding and ultimately gauge the audiologic

Larson - dep.

Page 1762

1    testing was going to be soon forthcoming and then it would

2    be filed.

3              "Question:  Did you send this particular exhibit

4    to anyone else?

5              "Answer:  Not to my knowledge, no.

6              "Question:  Do you know if the VA ever compiled

7    any type of abstracts from progress reports into any type of

8    compilation?

9              "Answer:  I'm aware of the VA's efforts in that

10   regard.

11             "Question:  What -- could you describe those?

12             "Answer:  The one that I'm aware of is a

13   publication by the VA Rehabilitation Research and

14   Development Service in a publication entitled VARRD Progress

15   Reports.  And this essentially was a journal, I believe, a

16   professional journal.  And one number annually, only issued

17   annually, would include short abstracts of research

18   accomplished, particularly under VARRD grants.

19             "Question:  You mentioned it was a type of

20   journal.  Who would have access to this report?

21             "Answer:  My recollection is that it was widely

22   disseminated to medical center libraries, university

23   libraries, public libraries, to all audiologists in the

24   Veterans Administration system, and to anybody else that

25   indicated to the VARRD that they wanted to be on the mailing

Page 1763

1    list.

2              "Question:  And I believe you mentioned it would

3    contain short abstracts of work being done?

4              "Answer:  Correct.

5              "Question:  Do you know if such an annual VARRD

6    progress report was created for the year 1984?

7              "Answer:  I believe it was, yes.

8              "Question:  And when would that have been

9    distributed to some of the places that you had just

10   mentioned?

11             "Answer:  I don't have any recollection of that.

12             "Question:  Are you aware of any specific public

13   library that would have a copy of the 1984 progress report?

14             "Answer:  Not specifically.

15             "Question:  Are you aware of any specific public

16   library that would have a copy of any VARRD annual progress

17   report?

18             "Answer:  No, I'm really not, no.

19             "Question:  Generally speaking, what is this?

20   This paragraph refers to a product called -- or not a

21   product.  Strike that.  This introduction refers to the AFC

22   system.  What was the AFC system?

23             "Answer:  It's beyond, you know, the range of my

24   expertise to describe the AFC system, it would be.

25             "Question:  I'm sorry, let me clarify the

Larson - dep.

1    question.  Did you attend any presentation or defense where

2    Mr. Weaver was presenting or defending the thesis?

3                "Answer:  No, I did not attend the defense of

4    the thesis of any kind.

5                "Question:  Okay.  Did you obtain any knowledge

6    about the thesis defense by Kim Weaver?

7                "Answer:  I did not.

8                "Question:  Okay.

9                "Answer:  You know, we're several thousand

10   miles away and it would be an unreasonable expectation that

11   I would attend the University of Wyoming thesis defense.

12               "Question:  It would have been a nice time of

13   year, though.

14               "Answer:  I have been there.

15               "Question:  In the middle, about three

16   paragraphs down, it says that the AFC 2 system is to be

17   demonstrated to personnel at the VA Medical Center in

18   Augusta, Georgia on December 7th, 1984.

19               "Did a demonstration, in fact, occur at the VA

20   Medical Center in Augusta, Georgia on December 7th, 1984?

21               "Answer:  I recall a demonstration in early

22   December of '84, yes.

23               "Question:  Can you describe how the

24   presentation took place?

25               "Answer:  One presentation that was made was in

Larson - dep.

Page 1765

1    a conference room that was in the confines of the Audiology

2    and Speech Pathology Clinical Service.  And as I recall, Mr.

3    Weaver would describe the device and demonstrate the device.

4              "Question:  When you say the device, can you

5    clarify?

6              "Answer:  Yeah.  The feedback prototype they

7    brought with them, on their list.

8              "Question:  And what -- the feedback prototype,

9    if you recall, can you generally describe what physical form

10   it was in?

11             "Answer:  I believe it was -- it was a box and

12   along with a BTE hearing aid, as far as I recall.

13             "Question:  A big box?

14             "Answer:  This size perhaps (indicating), maybe

15   five, six, yeah, five by six by five, something like that,

16   six by six.

17             "Question:  Who attended the demonstration?

18             "Answer:  I did.  I have no specific

19   recollection of other individuals, but in all likelihood any

20   audiology interns or staff would have been invited to

21   attend.  Inasmuch as we were affiliated with the Medical

22   College of Georgia, Medical College of Georgia faculty and

23   residents and any medical students on rotational service

24   would have been and were likely to have attended.

25             "Question:  And I'm not for sure if you answered

Larson - dep.

Page 1766

1    this, but do you recall any of the ten people specifically,

2    besides Dr. Egolf, Kim Weaver and yourself?

3              "Answer:  The only one I can recall specifically

4    would be Dr. Dean Elliot, who was section head of the

5    Otolaryngology Department at the VA.  Dr. Elliot is now

6    deceased.  Other than that it would be, you know, just a

7    guess as to likelihood.

8              "Question:  Okay.  How did people become aware

9    that this presentation was going to occur?

10             "Answer:  Probably orally for those internally

11   within our departments, audiology department at the VA and

12   the audiology research component at the VA.  But most likely

13   I would have sent a memorandum to the department chair at

14   the Medical College of Georgia, saying that we're hosting

15   Mr. Weaver and Dr. Egolf in this presentation.

16             "Question:  Were there any printed fliers

17   advertising the presentation?

18             "Answer:  I don't recall for this presentation.

19   I know other presentations we did.  I don't recall

20   specifically this presentation.

21             "Question:  Was there anything that went out to

22   the public that would identify this presentation?

23             "Answer:  I -- I don't think so.  I don't know.

24             "Question:  But there were no notices sent to

25   professional societies?

Larson - dep.

1              "Answer:  Not to my knowledge.

2              "Question:  And the media wasn't informed?

3              "Answer:  Not to my knowledge.

4              "Question:  And as far as you know, you didn't

5      pay for any advertisements in newspapers or any other

6      publications?

7              "Answer:  No.

8              "Question:  To the best of your knowledge, no

9      one outside the VA or the VA facilities associated with the

10     VA knew of this demonstration?

11             "Answer:  I don't have a recollection of that,

12     again, other than affiliated faculty and interns and

13     students who may have been present.

14             "Question:  Okay.  Did you or anyone else write

15     about this demonstration after it occurred?

16             "Answer:  Not to my recollection, no.

17             "Question:  Were there any type of meeting notes

18     or minutes describing what took place at the demonstration?

19             "Answer:  Not that I recall.

20             "Question:  Were you asked by Dr. Egolf or

21     anyone else to make this presentation open to the general

22     public?

23             "Answer:  I don't recall.

24             "Question:  So to the best of your knowledge and

25     based upon this request, did you ever send these particular

Larson - dep.

Page 1768

1  progress reports out to anyone?

2          "Answer:  I'm positive that I did not

3  disseminate, you know, these reports.

4          "Question:  So to the best of your knowledge,

5  there had been no publication regarding this material up to

6  this point?

7          "Answer:  To the best of my knowledge, uh-huh.

8          "Question:  Dr. Larson, I've just handed you a

9  document labeled Larson Exhibit 15, bearing Bates numbers

10 WID189088 through 189101.  Look at the front page, do you

11 recall what this document is?

12         "Answer:  No, I can't tell looking at the front

13 page.  It's certainly a paper prepared by Weaver, Egolf, and

14 McConnell related to acoustic feedback cancellation.

15         "Question:  Were you at this alleged

16 presentation?

17         "Answer:  I was not.

18         "Question:  Okay.  By reading this abstract, can

19 you tell what they were talking about as far as the project

20 here?

21         "Answer:  They appear to be describing a scheme

22 for the cancellation of acoustic feedback.  There's not

23 enough information given for me to say the means by which

24 cancellation is effected in the abstract.

25         "Question:  Dr. Larson, I handed you what's been

Page 1802

1              IN THE UNITED STATES DISTRICT COURT
2              IN AND FOR THE DISTRICT OF DELAWARE
3

                        -   -   -

4
5    ENERGY TRANSPORTATION,           :  Civil Action
     INC.,                            :
6                                     :
                 Plaintiff,           :
7                                     :
          v.                          :
8                                     :
     WILLIAM DEMANT HOLDINGS A/S,     :
9    et al.,                          :
                                      :
10               Defendants.          :  No. 05-422 (GMS)
11                        -   -   -
12                  Wilmington, Delaware
                  Friday, January 31, 2008
13                      9:30 a.m.
                    Ninth Day of Trial
14
                        -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18   APPEARANCES:
19             EDMOND D. JOHNSON, ESQ.
               Pepper Hamilton LLP
20                  -and-
               MARTY STEINBERG, ESQ.,
21             BRIAN M. BUROKER, ESQ., and
               MAYA M. ECKSTEIN, ESQ.
22             Hunton & Williams
               (Washington, D.C.)
23
                              Counsel for Plaintiff
24
25

Page 1803

```
 1    APPEARANCES CONTINUED:
 2                   MARY B. GRAHAM, ESQ.
                     Morris, Nichols, Arsht & Tunnell
 3                        -and-
                     JOHN M. ROMARY, ESQ.,
 4                   GREGORY C. GRAMENOPOULOS, ESQ.,
                     VINCENT KOVALICK, ESQ.,
 5                   KAY HILL, ESQ.,
                     GERSON S. PANITCH, ESQ., and
 6                   ARTHUR A. SMITH, ESQ.
                     Finnegan, Henderson, Ford, Farabow & Dunner
 7                   (Washington, D.C.)
 8                                       Counsel for
                                         Demant Defendants
 9
                     DONALD E. REID, ESQ.
10                   Morris, Nichols, Arsht & Tunnell
                          -and-
11                   WILLIAM H. MANDIR, ESQ.,
                     JOHN SCHERLING, ESQ.,
12                   CARL J. PELLEGRINI, ESQ.,
                     BRIAN SHELTON, ESQ.,
13                   MATTHEW KAPLAN, ESQ., and
                     J. WARREN LYTLE, JR., ESQ.
14                   Sughrue Mion
                     (Washington, D.C.)
15
                                         Counsel for Widex
16                                       Defendants
17                             -  -  -
18
19
20
21
22
23
24
25
```

Matzen - cross

1          You have stated that this doesn't show

2    determining phase and amplitude from one of the claims?

3    A.          That's correct.

4    Q.          Why is that again?

5    A.          Because during the identification mode, this

6    switch here and this switch here is open so that the forward

7    channel, the transmission channel, which includes this

8    amplifier assembly, is disconnected.  So the transmission

9    channel really doesn't exist.

10          So it cannot determine anything that is

11    happening in the transmission channel because it's

12    disconnected.

13    Q.          Is that because a signal wouldn't flow through

14    the amplifier in the middle there?

15    A.          It's because they are not tracking a signal

16    through that channel, yes.

17    Q.          So no signal would be flowing through there?

18    A.          That's right.

19    Q.          Now, you said you were here when Dr. Morley

20    testified.  Right?

21    A.          Yes.

22    Q.          Do you recall seeing this graphic?

23    A.          Yes, I do.

24    Q.          I believe he was describing the feedback

25    measurement operation in the '850 patent?

Matzen - cross

Page 1979

1   Q.          So you are saying the hearing compensation

2   filter is connected all the way from the microphone to the

3   speaker at the same time when the --

4   A.          I didn't say that.  Would you like me to show

5   you on Figure 2?

6   Q.          Just answer my questions, please.

7               During the measurement of phase and amplitude,

8   are you saying that the hearing compensation filter is

9   connected between the microphone and the speaker?

10  A.          No.  I am saying that the hearing compensation

11  filter is connected to the amplifier and the amplifier is

12  connected to the speaker.

13  Q.          Okay.  But there is an electrical path from the

14  microphone to the speaker --

15  A.          No, there is not.

16              THE COURT:  Is there something that illustrates

17  your point?

18              THE WITNESS:  I take that back.  I am sorry.

19              Yes, Figure 2, Your Honor.

20              THE COURT:  Let's go to Figure 2.

21  BY MR. LYTLE:

22  Q.          Is this going to help us understand the

23  operation, Mr. Matzen?

24  A.          In that mode that you were discussing, a tone is

25  inserted into this block, into Figure 2.  And it's inserted

Matzen - cross

1   Q.          And you say that the hearing compensation filter

2   would be in the circuit when measurement of phase and

3   amplitude occurs?

4   A.          Yes.

5   Q.          And that would be in a person's ear when that

6   was happening?

7   A.          Yes, it would be.

8   Q.          Wouldn't they be hearing the tones that get

9   generated?

10  A.          I have no opinion on that.

11  Q.          You don't know?

12  A.          I don't know what level the signal is.  I can't

13  say.

14  Q.          And if we can go back to Graupe '818.

15              Figure 3, please.

16              Weren't you criticizing the '818 because it has

17  the noise source 38 injecting noise that a person would hear

18  in his ear?  Is that right?

19  A.           That's right.

20  Q.          But isn't that something similar to what you

21  just said?  Wouldn't the person with the '850 hear the tones

22  being generated?

23  A.          I understand that the noise coming out of this

24  circuit would be noticeable.  I don't know what it would be

25  like in '850.  That's why I didn't want to comment on '850.

Matzen - cross

1     about the other claims made, Claims 13, 14 and 16 which deal

2     with measuring phase and amplitude?  Is it your opinion that

3     the Best feedback canceler doesn't measure or, I'm sorry,

4     doesn't determine phase and amplitude?

5     A.          In the transmission channel, that's correct.

6     Q.          And that's because of the location of the filter

7     W?

8     A.          That's because of the location of the complete

9     LMS feedback canceler which resides at the input of the

10    transmission channel.

11    Q.          So are you saying that an LMS adaptive filter

12    doesn't determine the phase and amplitude of the signal?

13    A.          Of a signal in the transmission channel, that's

14    correct.

15    Q.          Isn't the -- didn't you just define a few

16    minutes before that the microphone is at U and the speaker

17    is at G, isn't the transmission channel somewhere in between

18    there?

19    A.          The major part of the transmission channel is in

20    G.

21    Q.          Well, but some of the transmission channels

22    between those two?

23    A.          The microphone, that's all.

24    Q.          You're saying all the stuff between U and G is

25    just the microphone?

Brown - direct

1   during the portion of the fitting where the audiogram is

2   done.

3            This is where the patient's hearing test is

4   done, in this case in situ, in the ear.  And they use the

5   same tone control to do the tone test that you normally

6   would just put a headset over to do.

7            So they disconnect the microphone during that

8   because they don't want you to be disturbed by the

9   surrounding noises.

10           During the feedback calculation, the microphone

11  here must be connected because if it wasn't connected you

12  would have no measurement of acoustic feedback.  So it has

13  to be connected.

14  Q.       Now, Dr. Morley also testified that under normal

15  operation, the hearing aid disclosed in the Levitt patents

16  had to be disconnected from the host controller.  Do you

17  recall that testimony?

18  A.       Yes, he did.

19  Q.       Do you agree with him?

20  A.       No, I don't.

21  Q.       Could you tell us why?

22  A.       In the first place, there is no place in the

23  patent which says you have to disconnect it to carry it

24  around.  In the schematic shown, these two connections go

25  over the host controller, where the connections are made to

1    hello, would that hello come out that speaker?

2    A.          It depends upon how you want to set the switches

3    up in the host controller, and the answer is yes.

4    Q.          When you are measuring for acoustic feedback,

5    the answer is yes?

6    A.          Yes, it can.

7    Q.          Let's see where it's going to go.  It comes in

8    here, right?  It goes through this switch, goes through

9    here, comes out here and goes right here; right?

10    A.          To 140, the null.

11    Q.          Let's see where 140 goes.  Can we have the

12    figure 1?

13          I want to make sure I get the right spot.  I've

14    done this so often but I want to make sure.

15    A.          This is the null.

16    Q.          The 140 comes in at 34, doesn't it, right here?

17    A.          Right there.

18    Q.          OKay.  It comes in through here.

19          (Laughter as the two pointers dance on screen.)

20          MR. ROMARY:  Are we both wiggling?

21    Q.          It comes in here.

22          THE WITNESS:  You're cheating and holding your

23    hand. If I did that, it would hit the board.

24    BY MR. ROMARY:

25    Q.          It goes in here and you could, when you are in

Brown - cross

1   the host controller condition, you could put it back up

2   here, couldn't you if you wanted to avoid the acoustic

3   feedback measurement, so you could send it back; right?

4   A.          Well, you could.  And in point of fact, in

5   conversations with Dr. Levitt, this actually was a double

6   pole switch so it was used both ways and one of ordinary

7   skill in the art would know you could listen to it or you

8   could register to here.

9   Q.          I'm talking about fitting.  If you are going to

10  go through the process of acoustic feedback fitting, just

11  that process, that signal has to come in here, doesn't it?

12  It has to come here.

13  A.          It comes in there.  It has to come through and

14  get measured by the A-to-D at this point.

15  Q.          Right.  And now it's not a signal anymore.  It's

16  not going back to the speaker, is it?  What is going back to

17  the speaker is the test signal, isn't it?  What is going

18  back to the speaker is this thing here.

19  A.          Yes, but you could also have the two in

20  parallel, as I said, and that is the way that they did some

21  of their testing.

22  Q.          That is not shown here, is it?

23  A.          To one of ordinary skill in the art it is.

24  Q.          It's not shown here, is it?

25  A.          Well, not to a lawyer.

Page 2029

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                IN AND FOR THE DISTRICT OF DELAWARE
 3
                            -  -  -
 4
 5    ENERGY TRANSPORTATION,          :   Civil Action
      INC.,                          :
 6                                   :
                  Plaintiff,          :
 7                                   :
           v.                        :
 8                                   :
      WILLIAM DEMANT HOLDINGS A/S,    :
 9    et al.,                        :
                                     :
10           Defendants.    :   No. 05-422 (GMS)
11                          -  -  -
12               Wilmington, Delaware
               Friday, February 1, 2008
13                   8:30 a.m.
               Tenth day of Trial
14
                            -  -  -
15
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
16                                    and a Jury
17
18
      APPEARANCES:
19
                  EDMOND D. JOHNSON, ESQ., and
20                MATTHEW KAPLAN, ESQ.
                  Pepper Hamilton LLP
21                     -and-
                  MARTY STEINBERG, ESQ.,
22                BRIAN M. BUROKER, ESQ., and
                  MAYA M. ECKSTEIN, ESQ.
23                Hunton & Williams
                  (Washington, D.C.)
24
                                    Counsel for Plaintiff
25
```

Page 2030

```
 1    APPEARANCES CONTINUED:
 2                    MARY B. GRAHAM, ESQ.
                      Morris, Nichols, Arsht & Tunnell
 3                         -and-
                      JOHN M. ROMARY, ESQ.,
 4                    GREGORY C. GRAMENOPOULOS, ESQ.,
                      VINCENT KOVALICK, ESQ.,
 5                    KAY HILL, ESQ.,
                      GERSON S. PANITCH, ESQ., and
 6                    ARTHUR A. SMITH, ESQ.
                      Finnegan, Henderson, Ford, Farabow & Dunner
 7                    (Washington, D.C.)
 8                                        Counsel for
                                          Demant Defendants
 9
                      DONALD E. REID, ESQ.
10                    Morris, Nichols, Arsht & Tunnell
                           -and-
11                    WILLIAM H. MANDIR, ESQ.,
                      JOHN SCHERLING, ESQ.,
12                    CARL J. PELLEGRINI, ESQ.,
                      BRIAN SHELTON, ESQ., and
13                    J. WARREN LYTLE, JR., ESQ.
                      Sughrue Mion
14                    (Washington, D.C.)
15                                        Counsel for Widex
                                          Defendants
16                             -   -   -
17
18
19
20
21
22
23
24
25
```

Page 2185

1    these people at Sound ID, and trying to get them, see what

2    their read is on this patent.  And they come back.  And what

3    they say here is -- why don't we just go back down a little

4    bit more, that first one -- they said, they noted that this

5    model is not used in their hearing aids, all of which have a

6    probe running continually in the background, a process

7    called continuous adaptation.

8            The next one says, Sound ID noted that neither

9    they nor ReSound used such a process and since such a

10   process was material to the art disclosed in the patent and

11   since this process was applied in the claims, they felt they

12   were not offering services covered under the patent.

13           Next paragraph, this is the conclusion.  Eric

14   Dowling, the EKMS expert, took a look at the patent while

15   EKMS arranged a second call with Harry Levitt --

16           MR. STEINBERG:  Your Honor, I hate to interrupt.

17   But I think we need to approach the Bench for this.

18           (The following took place at sidebar.)

19           THE COURT:  Yes, Mr. Steinberg.

20           MR. STEINBERG:  Again, he is implying that Eric

21   Dowling changed his opinion, and the next sentence says it's

22   adverse to what the declaration that we have says.

23           MR. MANDIR:  He can read the document, can't he?

24           MR. STEINBERG:  What he is doing is exactly what

25   the declaration says.

Page 2186

1              MR. MANDIR:  That is not true.

2              MR. STEINBERG:  Dr. Dowling didn't do that.  He

3    has gone through this series of things saying Dr. Dowling

4    came to his opinion.  Then there was a further review.

5    There was a change of mind.  Here is the result.  The first

6    sentence says Dr. Dowling and Dr. Levitt were consulting.

7    The second sentence says there was a change in result.

8    There was no --

9              THE COURT:  I am not going to let you imply that

10   which we have agreed you should not.

11             MR. MANDIR:  I agree, Your Honor.  I thought I

12   have been very careful -- I can read the document, can't I?

13             THE COURT:  Perhaps.  But I think you need to be

14   mindful of our discussion yesterday and Mr. Steinberg's

15   legitimate concerns in this regard and should be your

16   legitimate concerns as an officer of this Court.

17             I am not going to highlight it.  I am not going

18   to say anything else about it.  I think you would be

19   mistaken to ask me.  It would be your right.  But I don't

20   think I am going to accede to it.

21             MR. STEINBERG:  It will require me to respond to

22   say Dr. Dowling never changed his mind.  There is no

23   evidence of that.  We should put the declaration into

24   evidence, for crying out loud, at this point.

25             THE COURT:  I don't know if it is as exactly

1    clear in the jury's mind as you think it is.  I would leave

2    it alone, if I were you.  You respond how you want to

3    respond.  But at this point I am going to leave it where it

4    rests.  I think everybody understands what we talked about.

5                MR. MANDIR:  Absolutely.  Just to be clear, I

6    can certainly read the document that is in evidence.

7                MR. STEINBERG:  Your Honor, this timeline that

8    he just went through, the whole intent of it is to start

9    with Dr. Dowling's opinion, which, by the way, is not

10   limited to the sound, his opinion deals with feedback and

11   says its adaptive.  He just didn't read the second page.

12               Nevertheless, he says Dr. Dowling has this

13   opinion.  Then he puts up an e-mail that says they are

14   looking at it further, they are thinking about changing

15   their mind.  Now he is at the report.  And the first

16   sentence says --

17               THE COURT:  I think the point is well-taken.

18   That's not fair.

19               MR. MANDIR:  I mean, I thought --

20               THE COURT:  I will let you respond.  I don't

21   know exactly --

22               MR. STEINBERG:  I don't think they should go any

23   further, Your Honor.

24               THE COURT:  I really don't.  You need to move on

25   to another area.  I am not sure that I am comfortable that

Page 2188

1   you have exactly figured out how to do this and stay within

2   the spirit of what I have directed be done.  I am not

3   accusing you of doing anything intentional.  I am just

4   concerned that damage may be done that may be irreversible.

5           MR. MANDIR:  To tell you the truth, I have been

6   very mindful of this.  Look, EKMS came up with that

7   decision, that report.  It doesn't mean Eric Dowling came up

8   with that position.  But there is no doubt EKMS, and I have

9   never said --

10          THE COURT:  Essentially, what I would like to do

11  is have that acknowledged, there needs to be -- and it is a

12  tough line to not cross, I understand.

13          MR. ROMARY:  Can we say something like we are

14  not saying that Eric Dowling changed his mind?

15          THE COURT:  That is fine.

16          MR. MANDIR:  I will say that.

17          THE COURT:  I think that would -- I think that

18  would satisfy my concern.

19          MR. STEINBERG:  But no more tie-in after that.

20          MR. MANDIR:  I am just going to read the

21  document.

22          THE COURT:  If you would say that, that's fine.

23          (End of sidebar conference.)

24          MR. MANDIR:  Okay.  Can we put the document back

25  up, please?

1          Okay.  So we were reading Eric Dowling, the EKMS

2    expert, took a look at the patent while EKMS arranged a

3    second call with Harry Levitt for early August.  Over the

4    course of two calls, we worked through the language of the

5    patent and found that the body of the patent included

6    language adverse to an interpretation of the claims

7    involving a continuously adaptive approach.

8          Now, I don't know exactly how that came about.

9    I don't know how it came about.  All I know is this EKMS

10   document says it and this was given to Audimax.  They're

11   saying that they looked at it and EKMS is coming to the

12   conclusion that they interpret the claims -- EKMS interprets

13   these claims to be something adverse to interpretation that

14   would involve a continuously adaptive approach.

15         Okay.  Can we go to the next page?  Up at the

16   top, "the main child."

17         The main child patent of the '850 patent --

18   which is the '749 as you may have heard it.  I think you

19   have heard it is a continuation application -- seems to

20   suffer from the same problem, specifying in the description

21   of the preferred embodiment that test sounds shall be

22   provided as necessary rather than all of the time as would

23   occur with a continuously adaptive system.  Okay?

24         We've heard a lot of testimony here about what

25   can be hooked up and is it going all the time or do you

1    disclosed in the Audimax patent might be tried if, and only

2    if, continuously adaptive products failed to succeed in the

3    market -- an event unlikely in the next three years.

4            This was in 2002.  Oticon and Widex got sued

5    three years later, in 2005.  We're still doing the

6    continuously adaptive and I guess that was the time limit

7    that they had.

8            Now, I asked Mr. Chen what happened after this?

9    Was there another report?  Was this the final report?  He

10   couldn't say.  He didn't remember.  But the bottom line is

11   that is it, that is all we have from EKMS.  As of 2002, this

12   is all we have, EKMS, Mr. Boddie, telling Audimax these

13   patents don't cover continuously adaptive.

14           Okay.  I want to talk now about written

15   description.  And Mr. Romary mentioned that.  Can we put up

16   the instruction for 8.0?

17           This is another instruction you have, 8.0.  And

18   let me read a portion of it.  I don't need to read it all,

19   but just to summarize, it says, the written description

20   requirement is satisfied if a person of ordinary skill in

21   the art writing the patent application as originally filed

22   would recognize that the patent application described the

23   invention as finally claimed in the patent.

24           Now, what that means is that when they try to --

25   when ETG is going to try to stretch their claims to cover

1    we see -- have achieved some success with this general

2    approach.  One -- again referencing item 2 -- employed a

3    fixed filter, derived from one measurement of the feedback

4    path transfer function, as the transfer function estimate,

5    rendering this approach vulnerable to changes in the

6    acoustic environment.

7              Well, Diane Bustamante certainly read that

8    patent and came away with the idea that it's a fixed filter.

9    She certainly did not come away saying that this is an

10   adaptive filter and you connect this all along.  One

11   measurement, that is what the patent is talking about.

12             Next one.  It's slide 18.

13             This is Exhibit DX-1240.  It's an article by

14   Mr. Kates, and we saw Mr. Kates' video.  And this is again a

15   reference to Levitt's 1988 patent, the '850 patent.

16             It says, the system proposed by Kates is an

17   adaptive version of a feedback cancellation system proposed

18   by Levitt, et al that used a time invariant cancellation

19   filter set -- set when fitting the hearing aid.  The fixed

20   filter, however, cannot adjust to changes in the acoustic

21   environment.

22             As we know, Mr. Kates was associated with

23   Dr. Levitt.  He wrote this in 1991.  Clearly, he came away

24   saying it's fixed.  You know, we've heard a lot from ETG

25   about, well, Dr. Egolf, why didn't he challenge the patent?

1    million?  That is what they're asking for now.  That is the

2    overreaching that we're seeing here.

3              Okay.  Willful infringement.  Not only are we

4    accused of infringing the patent, we're accused of willfully

5    infringing the patent.  It's a high standard.  The judge

6    gave you instructions about different standards.  To show

7    willful infringement, you have to show clear and convincing

8    evidence.  It's a higher standard than the preponderance of

9    the evidence, which is their burden.  They have to prove

10   clear and convincing evidence.  Again, this is jury

11   instruction 10.8 on willful infringement.

12             Third one of these, of the items says Widex

13   and/or Demant acted even though they knew, or it was so

14   obvious that they should have known, that their actions were

15   highly likely to infringe a valid patent.

16             So they are saying that we knew or should have

17   known that what our products were doing were highly likely

18   to infringe the '850 or the '749 patent.

19             EKMS -- my response to that is, no.  How would

20   we know that?  EKMS said you don't infringe.  And they were

21   getting a cut of anything that they could get out of it.

22             Diane Bustamante said it was a fixed filter.

23   Kates said it was a fixed filter.  Sound ID, who they tried

24   to license, said, no, we don't need it.  We do continuously

25   adaptive approach.

1    Mr. Steinberg's arguments, that you understand the

2    difference between his arguments and what he can actually

3    prove with evidence.

4                    Thank you, ladies and gentlemen.

5                    THE COURT:  Counsel.

6                    MR. STEINBERG:  Your Honor, may we approach for

7    one second?

8                    (The following took place at sidebar.)

9                    MR. STEINBERG:  I apologize, Judge.  But Mr.

10   Mandir, under what you told Mr. Mandir to do, was supposed

11   to tell the jury that there was no evidence that Eric

12   Dowling --

13                    THE COURT:  You tell them and you tell them the

14   other side doesn't disagree with you, because he didn't.

15   And I observed it.

16                    You didn't say anything about it.

17                    MR. MANDIR:  I know, you are right.  When I said

18   EKMS --

19                    MR. STEINBERG:  For the record, we would move

20   for the introduction of Eric Dowling's declaration, because

21   we think we have been unfairly prejudiced.

22                    THE COURT:  I will agree.

23                    (End of sidebar conference.)

24                    MR. STEINBERG:  Thank you, Your Honor.

25                    Ladies and gentlemen, I will be brief.  I know