IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ENERGY TRANSPORTATION GROUP, INC.,

        Plaintiff,

        v.

SONIC INNOVATIONS, INC., et al,

        Defendants.

) ) ) ) ) ) ) ) ) ) )

C.A. No. 05-422 (GMS)

## PLAINTIFF ENERGY TRANSPORTATION GROUP INC.'S OPPOSITION TO THE WIDEX DEFENDANTS' MOTION FOR JUDGMENT AS A MATTER OF LAW AND REQUEST FOR NEW TRIAL ON THE ISSUE OF WILLFUL INFRINGEMENT

Edmond D. Johnson (#2257)
Matthew A. Kaplan (#4956)
PEPPER HAMILTON
Hercules Plaza Suite 5100
1313 Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6500

OF COUNSEL:

*Attorneys for Energy Transportation Group, Inc.*

Marty Steinberg
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500

Brian M. Buroker
HUNTON & WILLIAMS LLP
1900 K Street, N.W., Suite 1200
Washington, DC 20006-1109
Telephone: (202) 955-1500

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone: (804) 788-8788

May 9, 2008

## TABLE OF CONTENTS

I. INTRODUCTION ................................................................................................................. 1

II. NATURE AND STAGE OF THE PROCEEDINGS .......................................................... 1

III. SUMMARY OF THE ARGUMENT ................................................................................ 2

IV. STATEMENT OF FACTS ............................................................................................... 2

V. ARGUMENT ..................................................................................................................... 2

    A. The Applicable Legal Standards .................................................................................. 2

        1. Judgment as a matter of law ..................................................................................... 2

        2. New trial ................................................................................................................... 3

        3. Willful patent infringement ...................................................................................... 3

    B. Substantial Evidence Supports The Jury's Willful Infringement Verdict ............................. 4

        1. Substantial evidence established an objectively high likelihood of infringement ............. 4

            a. The hearing aid industry is crowded with presumptively valid patents ......................... 7

            b. Widex failed to search its patent databases .................................................. 9

            c. The Patents-In-Suit were well publicized .................................................... 10

            d. Dr. Levitt is a prominent scientist within the hearing aid industry ............................ 12

            e. Widex intended to infringe the Patents-In-Suit ............................................ 13

            f. Widex ignored the Patents-In-Suit in its files .............................................. 15

            g. Widex ignored its own technical and marketing materials ............................. 15

            h. Widex acted despite an objectively high risk of infringement ......................... 16

        2. ETG presented substantial evidence that Widex knew or should have known that launching the Diva and Inteo hearing aids would result in infringement of a valid patent .. 17

    C. Widex's Sole Theory To Defeat Liability For Willful Infringement Is Baseless ................ 20

        1. The jury's verdict establishes that Widex's purported litigation defenses were not substantial ............................................................................................................... 20

        2. Widex's non-infringement defenses were not substantial ................................. 21

i

a. A failed cover-up of documents that admit infringement is not a substantial defense . 23

b. A defense without documentary evidence is not a substantial defense ....................... 23

3. Widex continues to reargue claim construction ................................................................ 24

4. Widex continues to misrepresent the EKMS documents .................................................. 25

D. Widex Is Not Entitled To A New Trial ............................................................................... 26

VI. CONCLUSION ........................................................................................................................ 27

# TABLE OF AUTHORITIES

**Cases**

*Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*,
    485 F. Supp. 2d 519 (D. Del. 2007) ........................................................................ 3

*Black & Decker, Inc. v. Robert Bosch Tool Corp.*,
    2008 U.S. App. LEXIS 207 (Fed. Cir. Jan 7, 2008) ........................................ 20, 22

*CGB Occup. Therapy, Inc. v. RHA Health Servs. Inc.*,
    357 F.3d 375 (3d Cir. 2004) ................................................................................... 2

*Depomed, Inc. v. Ivax Corp.*
    532 F. Supp. 2d 1170 (N.D. Cal. 2007) .......................................... 6, 10, 20, 22

*Donald M. Durkin Contracting, Inc. v. City of Newark*,
    2007 WL 2710451 (D. Del. Sept. 17, 2007) ...................................................... 3, 27

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ............................................................................................... 3

*Genentech, Inc., v. Novo Nordisk A/S*,
    108 F.3d 1361 (Fed. Cir. 1997) ............................................................................ 23

*Greenleaf v. Garlock, Inc.*,
    174 F.3d 352 (3d Cir. 1999) ................................................................................... 3

*In re Buchner*,
    929 F.2d 660 (Fed. Cir. 1991) ............................................................................. 23

*In re Seagate Tech., LLC*,
    497 F.3d 1360 (Fed. Cir. 2007) ..................................................... 3, 4, 5, 8, 17

*Lightning Lube, Inc. v. Witco Corp.*,
    4 F.3d 1153 (3d Cir. 1993) ................................................................................ 2, 3

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) ......................................................................... 24, 25

*Moyer v. United Dominion Indus., Inc.*,
    473 F.3d 532 (3d Cir. 2007) ................................................................................... 2

*Perkin-Elmer Corp. v. Computervision Corp.*,
    732 F.2d 888 (Fed. Cir. 1984) ............................................................................... 2

*Read v. Portec*,
    970 F.2d 816 (Fed. Cir. 1992) ..................................................................... 4, 5, 22

*Stryker Corp. v. Davol Inc.*,
    234 F.3d 1252 (Fed. Cir. 2000) ............................................................. 3

*Williamson v. Consol. Rail Corp.*,
    926 F.2d 1344 (3d Cir. 1991) ............................................................. 3

**Statutes**

35 U.S.C. § 282 ............................................................................................. 5, 8

# I. INTRODUCTION

ETG presented the jury with substantial, uncontroverted evidence of Widex's[1] willful infringement. Based on that substantial evidence, the jury found Widex's infringement willful. The Court should deny Widex's motion for judgment as a matter of law (JMOL) to preserve the jury's willful infringement verdict. The Court also should deny Widex's request for a new trial on the issue of willful infringement because the jury's verdict was not against to the weight of the evidence.

# II. NATURE AND STAGE OF THE PROCEEDINGS

ETG filed suit against several defendants, including Widex, on June 23, 2005, alleging infringement of U.S. Patent Nos. 4,731,850 (the "'850 Patent") and 4,879,749 (the "'749 Patent") (collectively, the "Patents-In-Suit") by the defendants' manufacture, use, sale, offer for sale, and importation of hearing aid products and components (*i.e.*, chips) for use in hearing aids and related products. All defendants except Widex and Demant[2] settled before the 9-day jury trial held from January 22, 2008 until February 1, 2008. The jury returned a verdict on February 4, 2008 finding, *inter alia*, that Widex willfully infringed the asserted claims of the Patents-In-Suit and Widex and Demant failed to prove that the Patents-In-Suit were invalid. *See* D.I. 521. The jury awarded monetary damages of $15 million against Widex, *see id.*, and entered judgment in ETG's favor on February 8, 2008. *See* D.I. 522. On February 21, 2008, Widex moved the Court for JMOL and requested a new trial on the issue of willful infringement. *See* D.I. 529. ETG opposes Widex's motion for the reasons stated herein.

---

[1] The term "Widex" includes both defendants Widex A/S and Widex Hearing Aid Co., Inc.

[2] The term "Demant" includes defendants William Demant Holding A/S, Oticon A/S, Oticon Inc., Bernafon AG, Bernafon, LLC, and WDH, Inc.

## III. SUMMARY OF THE ARGUMENT

1.     The Court should deny Widex's motion because the jury's willfulness verdict is supported by substantial evidence.  In particular, the evidence demonstrated that Widex marketed and sold infringing hearing aids despite an objectively high likelihood that its actions would result in the infringement of a valid patent.  Moreover, substantial evidence establishes that Widex was aware of this objectively high likelihood when it marketed and sold the infringing hearing aids.  The Court should also deny Widex's request for a new trial on the issue of willful infringement because the jury's verdict was not against the clear weight of the evidence.

## IV. STATEMENT OF FACTS

ETG incorporates by reference the Statement of Facts appearing in Section IV of Plaintiff ETG's Opposition to Defendants' Brief In Support of Their Renewed Motion for Judgment as a Matter of Law and Request for a New Trial on the Issues of Infringement and Validity, which is being filed concurrently herewith.

## V. ARGUMENT

### A. The Applicable Legal Standards

#### 1. Judgment as a matter of law

Entry of judgment as a matter of law is a "sparingly" invoked remedy.  *Moyer v. United Dominion Indus., Inc.,* 473 F.3d 532, 545 n.8 (3d Cir. 2007) (*quoting CGB Occup. Therapy, Inc. v. RHA Health Servs. Inc.,* 357 F.3d 375, 383 (3d Cir. 2004)).  JMOL is appropriate only if there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmovant.  Fed. R. Civ. P. 50.  A district court may overturn a jury's verdict *only if*, upon the record before the jury, reasonable jurors could not have reached that verdict.  *See Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984); *see also Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1166 (3d Cir. 1993).  On a motion for JMOL, the Court must view all

evidence in the light most favorable to the non-moving party. *Galloway v. U.S.*, 319 U.S. 372 (1943). Further, district courts must grant the nonmovant the benefit of all inferences that may reasonably be drawn from the evidence. *Stryker Corp. v. Davol Inc.*, 234 F.3d 1252, 1258 (Fed. Cir. 2000). In performing this narrow inquiry, courts must refrain from weighing the evidence, determining the credibility of witnesses, or substituting their our own version of the facts for that of the jury. *Lightning Lube,* 4 F.3d at 1166.

### 2. New trial

In ruling on a motion for a new trial, the Court "must proceed cautiously and not substitute its own judgment of the facts and assessment of the witnesses' credibility for the jury's independent evaluation." *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 485 F. Supp. 2d 519, 523 (D. Del. 2007). "Indeed, 'new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience.'" *Donald M. Durkin Contracting, Inc. v. City of Newark*, 2007 WL 2710451 at *2 (D. Del. Sept. 17, 2007) (*quoting Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1344 (3d Cir. 1991); *see also Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 366 (3d Cir. 1999).

### 3. Willful patent infringement

The Federal Circuit set forth a new test for willfulness in *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). In establishing the test, the Federal Circuit recognized that "the term [reckless] is not self-defining." *Id.* (*quoting Farmer v. Brennan*, 511 U.S. 825, 836 (1994). Drawing support from the Supreme Court's statement in *Safeco Ins. Co. of Am. v. Burr* that "[i]t is [a] high risk of harm, objectively assessed that is the essence of recklessness at common law," 127 S. Ct. at 2215, the Federal Circuit held that, "to establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted

3

despite an objectively high likelihood that its actions constituted infringement of a valid patent."
*Id*. According to the Federal Circuit, "[t]he state of mind of the accused infringer is not relevant
to this objective inquiry." *Id*. If this threshold objective standard is satisfied, "the patentee must
also demonstrate that this objectively defined risk (determined by the record developed in the
infringement proceeding) was either known or so obvious that it should have been known to the
accused infringer." *Id*.

### B. Substantial Evidence Supports The Jury's Willful Infringement Verdict

The jury's willfulness verdict is supported by substantial evidence, and is the only
conclusion the jury could have reached from the clear and convincing evidence. Considering the
"totality of the circumstances," *see generally Read v. Portec,* 970 F.2d 816, 826-28 (Fed. Cir.
1992), Widex's decision to launch the Diva and Inteo hearing aids without analyzing relevant
patents or performing any due diligence intentionally disregards the reasonable respect for
intellectual property rights and was objectively reckless. Moreover, the overwhelming evidence
established that Widex knew about Dr. Levitt and his patents (*see* D.I. 539, Section V.B.1.a) and,
thus, was fully aware of the objectively defined risk of infringing his patents. And because
Widex was patent savvy, Widex should have known that it was objectively reckless to launch the
Diva and Inteo hearing aids. Thus, the jury's willfulness verdict against Widex is supported by
substantial evidence.

#### 1. Substantial evidence established an objectively high likelihood of infringement

The evidence presented to the jury at trial was clear – Widex launched its Diva and Inteo
hearing aids despite an objectively high likelihood that doing so would infringe a valid patent. In
*Seagate*, the Federal Circuit expressly declined to provide guidance about the application of this
new standard, but acknowledged Judge Newmann's statement in her concurring opinion that "the

standards of commerce would be among the factors a court might consider." 497 F.3d at 1371

n.5.  Judge Newmann opined:

> Although new uncertainties are introduced by the court's evocation of "objective standards" for such inherently subjective criteria as "recklessness" and "reasonableness," I trust that judicial wisdom will come to show the way, in the common-law tradition. The standards of behavior by which a possible infringer evaluates adverse patents should be the standards of fair commerce, ***including reasonableness of the actions taken in the particular circumstances***. It cannot be the court's intention to tolerate the intentional disregard or destruction of the value of the property of another, simply because that property is a patent; yet the standard of "recklessness" appears to ratify intentional disregard, and to reject objective standards requiring a reasonable respect for property rights.

*Id.* at 1385 (Newmann, J., concurring) (emphasis added).  Thus, among other things, the Court

may consider "the standards of behavior by which a possible infringer evaluates adverse patents"

and "the standards of fair commerce, including reasonableness of the [infringer's] actions taken

in the particular circumstances." *Id.*  Indeed, no court would tolerate unreasonable actions that

result in the "intentional disregard or destruction of the value" of patent rights. *Id.*

While *Seagate* presented a new standard for establishing willfulness, it did not alter the

requirement the Court consider the "totality of the circumstances." *See generally Read*, 970 F.2d

at 826-28.  When examining the totality of the circumstances for establishing willful

infringement, ETG contends the following factors establish an objectively high likelihood that

Widex's actions constituted infringement of a valid patent.

- **Launching new products within crowded patent landscape.**  In an industry where the

   patent landscape is crowded with presumptively valid patents (*see* 35 U.S.C. § 282), it is

   objectively reckless and unreasonable for industry members to launch new products

   without any analysis or prior due diligence. *See Seagate*, 497 F. 3d at 1371, n.5.

   Allowing major industry players, like Widex, to do so would result in the "intentional

disregard or destruction in the value of property of another." *Id.* at 1385 (Newmann, J., concurring).

- **Maintaining searchable databases of relevant patents and failing to search them before launching products with a new key feature.**  It is objectively reckless for an accused infringer, like Widex, to (1) maintain multiple searchable databases, including an industry-wide database and (2) then fail to search the databases using keywords or other search terms that are relevant to a new product launch.

- **Ignoring the well-publicized nature of the patents.**  A court may consider whether relevant patents are well-publicized before the launch of a product. *See Depomed, Inc. v. Ivax Corp.* 532 F. Supp. 2d 1170, 1185-86 (N.D. Cal. 2007).  If the patents are well publicized, the objective risk of infringing a valid patent is higher. *See id.*  It is therefore unreasonable and objectively reckless for a company that is preparing to launch a new product to ignore well-publicized patents that discuss the same key features touted in the new products.

- **Ignoring the prominence of the inventor.**  Similar to the well-publicized nature of the patents, if the inventor is prominent within the industry, has received awards for his patented technology, and has been hired by the infringers as a patent expert, the objective risk of infringing a valid patent is higher.  It is unreasonable and objectively reckless for a company that is preparing to launch a new products to ignore the patented technology of a prominent inventor within the industry.

- **Intending to infringe.**  It is objectively reckless to intend to infringe a presumptively valid patent.  Intending to infringe a valid patent epitomizes willful conduct, and allowing

Widex, to do so would clearly result in the "intentional disregard or destruction in the value of property of another." *Id.* at 1385 (Newmann, J., concurring).

- **Ignoring references to the patents in its own records.** It is unreasonable and objectively reckless to ignore the actual patents and references to them in the infringer's files.

- **Ignoring the infringer's own technical and marketing materials.** Where the infringer's own marketing materials clearly describe highly technical products in a manner in which one would expect to involve patents, it is unreasonable and objectively reckless to fail to perform a patent search.

Because the jury heard (1) that Widex launched new products in an industry crowded with presumptively valid patents; (2) Widex maintained a keyword searchable database but failed to search the database using keywords that related to key features included in their new products; (3) Widex ignored the well-publicized nature of the Patents-In-Suit; (4) Widex ignored the patented technology of Dr. Levitt, who was a prominent inventor in the hearing aid industry; (5) Widex intended to infringe the Patents-In-Suit; (6) Widex ignored copies of and references to the Patents-In-Suit in its own records; and (7) Widex ignored its own technical and marketing materials, substantial evidence supports the jury's verdict that Widex acted despite an objectively high likelihood that launching the Diva and Inteo hearing aids would result in infringement of a valid patent.

### a. The hearing aid industry is crowded with presumptively valid patents

Substantial evidence that the hearing aid industry is crowded with presumptively valid patents supports the jury's willfulness verdict. The substantial evidence presented at trial clearly demonstrates that the patent landscape for the hearing aid industry increased ten-fold since 1993

(*see, e.g.*, Tr. at 798:17-800:2 (S. Westermann)).[3]  In 1993, before HIMPP's formation, Widex

maintained a separate database of relevant patents that included over 1,400 patents.  *See, e.g.*, Tr.

at 799:23-800:2 (S. Westermann).  By 2001, the HIMPP database of hearing-aid related patents

included between 6,000-7,000 patents.  *See, e.g.*, Tr. at 798:24-799:5 (S. Westermann).  Today,

"there is more than 17,000 patents in that database."  Tr. at 798:17-20. (S. Westermann).  In fact,

Soren Westermann, Widex's Director of Research, Information Technology, and Intellectual

Property and the Managing Director of HIMPP,  testified that HIMPP maintains a patent

database with "tons" of documents.  Tr. at 769:1-2.[4]  The U.S. patents in these databases are

presumed valid.  *See* 35 U.S.C. § 282.  Also, Widex's expert at trial referred to over 200 patents

in the hearing aid industry that they alleged were relevant to determine damages.  *See, e.g.*, Tr. at

1881:18-23 (Putnam).

In the hearing aid industry, where the patent landscape is very crowded with "tons" of

patents, it is objectively reckless, unreasonable, and not "fair" for significant industry members,

like Widex, to launch new products without performing *any* analysis or due diligence.  Doing so

is tantamount to tolerating an entire industry that disrespects patent rights.  Substantial evidence

and Widex's admissions that the patent landscape for hearing aids is crowded with "tons" of

patents and documents establishes an objectively high likelihood that Widex would infringe a

valid patent when launching a new product and, therefore, supports the jury's verdict.

---

[3] For the Court's convenience, all excerpts from the trial transcript are attached as Viv. Opp. Dec. Ex. A.

[4] At trial, Widex suggested that, because there were over 17,000 patents relating to hearing aids, Widex should be excused from analyzing the patents in the database.  *See* Tr. at 802:4-8.  In fact, the opposite is true.  Because the patent landscape is crowded with patents, Widex should not be permitted to ignore relevant patents when launching new products.  *See Seagate*, 497 F.3d at 1385 (Newmann, J., concurring).

### b. **Widex failed to search its patent databases**

Substantial evidence that Widex maintained searchable databases of relevant patents, but failed to search those databases supports the jury's willfulness verdict. The jury heard that, as early as 1993, Widex began maintaining a database of over 1,400 relevant patents. *See, e.g.*, Tr. at 799:23-800:2 (S. Westermann). This database was searchable by patent number and inventor name "…in case [Widex] wanted to find that patent." *See* Tr. at 801:9-17 (S. Westermann). Soren Westermann admitted that, by August 5, 1993, this database contained an entry of the patent registration for the European equivalent of the '850 Patent, which lists the '850 Patent as the priority application. *See* PX 773 (D.I. 553, Exhibit 20); Tr. at 723:10-11. This entry lists "Levitt, H" as an opfinder (the Danish word for inventor). *See id.* An inventor name search of this database for Dr. Levitt would have returned this registration. But Widex admitted to not performing ***any*** search of its databases. *See* Tr. at 773:1-7 (S. Westermann).

The jury also heard that HIMPP, which is operated by Widex's own Soren Westerman, assists Widex and other hearing aid industry members, including Demant, in maintaining an automated database of patents that are of interest to the hearing aid industry. *See* Tr. at 716:25-717:9, 717:13-18, 769:1-2, 801:21-802:3 (S. Westermann). The HIMPP database essentially provides an easy, organized way of accessing those patents. *Id.* Christian Hauge, Oticon's Head of Intellectual Property, testified that the HIMPP database is keyword searchable. *See* Tr. at 1743:2-9; *see also* Tr. at 1745:10-16. As discussed above, by the time Widex launched the Diva hearing aids, the HIMPP database of hearing aid related patents included between 6,000-7,000 patents that were searchable. *See, e.g.*, Tr. at 798:24-799:5 (S. Westermann). For good measure, HIMPP sent around a CD of patents to its members, including Widex, in 2001 that identified the Patents-In-Suit as patents of interest to hearing aid companies. Tr. at 716:21-718:5, 728:21-729:10 (S. Westermann).

9

Despite maintaining this automated database that provides easy, organized access to patents of interest to the hearing aid industry, Widex admitted to *never* searching the HIMPP database for relevant patents either. *See* Tr. at 773:1-7 (S. Westermann). This failure to search Widex's databases is objectively reckless. Widex has admitted that the Patents-In-Suit appear in two databases that it maintains. *See* PX 773 (D.I. 553, Exhibit 20); Tr. at 723:10-11; Tr. at 728:21-729:10, 716:21-718:5. The keywords "cancel," "acoustic," and "feedback" appear at least in the abstract of the '850 Patent. *See* JX 4 (D.I. 546, Exhibit 1). Similarly, the keywords "feedback" and "cancellation" appear at least in the abstract of the '749 Patent. *See* JX 2 (D.I. 546, Exhibit 2). A simple keyword search of the HIMPP database using the previously-mentioned terms would return both Patents-In-Suit. But Widex admitted to not performing *any* search of its databases. *See* Tr. at 773:1-7 (S. Westermann). Widex's failure to search these databases that certainly would have uncovered the Patents-In-Suit is objectively reckless and supports the jury's willfulness verdict.

### c. <u>The Patents-In-Suit were well publicized</u>

Substantial evidence that the Patents-In-Suit were well publicized also supports the jury's willfulness verdict. *See Depomed,* 532 F. Supp. 2d at 1186. It is objectively reckless and unreasonable for Widex to ignore well-publicized patents that discuss the same key features touted in Widex's infringing products. The evidence showed that is exactly what Widex did.

The jury heard substantial evidence that the Patents-In-Suit were well publicized. First, Dr. Levitt, a named inventor of the Patents-In-Suit, prominently listed the Patents-In-Suit on his Curriculum Vitae. *See* PX 598 (D.I. 553, Exhibit 18) at LEV00000133; *see also* Tr. at 276:16-277:2 (Levitt), 749:7-9 (S. Westermann). Copies of Dr. Levitt's Curriculum Vitae were widely distributed. *See id*. In fact, in July 1997, Widex's lawyers prepared a declaration for Dr. Levitt on behalf of Widex and HIMPP and attached his Curriculum Vitae to that declaration. *Id.* This

declaration with the attached Curriculum Vitae was submitted to the U.S. Patent and Trademark Office in a reexamination proceeding. *See* Tr. at 748:20-749:50 (S. Westermann).

Second, many of Dr. Levitt's publications reference the Patents-In-Suit. *See, e.g.*, Tr. 236:1-14; 237:5-8 (Levitt). The jury heard Dr. Levitt explain that a number of his 150-plus published articles mention the Patents-In-Suit. *See.* Tr. 236:1-14. Dr. Levitt also testified that he gave numerous speeches, seminars, and scientific talks on issues relating to the Patents-In-Suit. *See* Tr. at 237:5-8. Members of the hearing aid industry attended many of these speeches and seminars. *See* Tr. at 299:1-3 (Levitt).

Third, the jury heard that other members of the hearing aid industry published articles that discussed the Patents-In-Suit. In 1991, James Kates wrote an article that discusses the '850 Patent in a publication subscribed to by industry members. *See* DX 1240 (attached as Exhibit B to the Declaration of Daniel G. Vivarelli, Jr. In Support of Energy Transportation Group's Opposition to the Widex Defendants' Motion for Judgment as a Matter of Law and Request for New Trial on the Issue of Willful Infringement)[5]; *see also* Tr. at 382:1-384:5 (Levitt); Tr. at 1435:23-1436:15 (Morley). Mr. Kates again discussed the '850 Patent in a special session of the annual session of the Acoustical Society of America being held specifically to honor Dr. Levitt's lifelong achievement in hearing aids and feedback cancellation. *See, e.g.*, Tr. at 231:21-232:6 (Levitt); Tr. at 347:11-20 (Levitt); 1904:4-1905:10 (Kates); 1911:7-25 (Kates); *see also* DX 1770 (Viv. Opp. Dec. Ex. C). Diane Bustamate and others also published an article that discusses the '850 Patent. *See* DX 1239 (Viv. Opp. Dec. Ex. D); *see also* Tr. at 1434:4-1436:19 (Morley).

---

[5] All cites to the Declaration of Daniel G. Vivarelli, Jr. In Support of Energy Transportation Group's Opposition to the Widex Defendants' Motion for Judgment as a Matter of Law and Request for New Trial on the Issue of Willful Infringement will be referred to herein as "Viv. Opp. Dec. Ex. ___".

Finally, additional examples of the well-publicized nature of the Patents-In-Suit can be found in Plaintiff Energy Transportation Group's Memorandum In Support of Its Motion for Enhanced Damages and Attorney's Fees (D.I. 539), Section V.B.1.a. Despite the fact that the Patents-In-Suit were well-publicized, Widex admitted that it *never* investigated its possible infringement or the validity of the Patents-In-Suit. *See* Tr. at 733:1-735:2. It also introduced no evidence in the record at trial that it had ever obtained an opinion of counsel regarding the Patents-in-Suit. It is objectively reckless and unreasonable to admittedly ignore the well-publicized Patents-In-Suit. The substantial evidence that the Patents-In-Suit were well publicized to the hearing aid industry and Widex therefore supports an objectively high likelihood that Widex infringed a valid patent.

### d. <u>Dr. Levitt is a prominent scientist within the hearing aid industry</u>

Substantial evidence that Dr. Levitt was a prominent scientist within the hearing aid industry also supports the jury's willfulness verdict. Similar to ignoring well-publicized patents, it is objectively reckless and unreasonable for Widex to ignore the patents of a prominent scientist within the hearing aid industry.

The jury heard substantial evidence regarding Dr. Levitt's prominence within the hearing aid industry. Dr. Levitt testified at length about his career (*see* Tr. at 218:16-226:16), the many honors and awards he received throughout his career, including being named a Fellow in the Acoustical Society of America (*see* Tr. at 226:21-227:4), receiving the Fletcher Award in Technical Application (*see* Tr. at 227:5-10), being named the National winner of the Johns Hopkins University First National Search for Application of Personal Computing to Aid the Handicapped (*see* Tr. at 227:11-23), being named a Fellow with the American Speech, Language and Hearing Association (*see* Tr. at 227:24-228:9), receiving the Javitz Neuroscience Investigator Award for the National Institute of Health (*see* Tr. at 228:10-25), being named a

Fellow of the American Academy of Medicine (*see* Tr. at 229:1-6), receiving the New York City Mayor's Award (*see* Tr. at 228:9-24; *see also* PX 357 (Viv. Opp. Dec. Ex. E), being honored at the Special Session of the Annual Session of the Acoustical Society of America (*see* Tr. at 231:21-232:6), and receiving the James Jerger Career Award for Research in Audiology (*see* Tr. at 232:1-233:3).

Widex even admitted that Dr. Levitt was a prominent scientist within the hearing aid industry, referring to him as someone with better credentials than a Nobel Prize recipient. *See* PX 562 (D.I. 553, Exhibit 19), Tr. at 750:5-751:15 (S. Westermann); *see also* Tr. at 277:15-278:8 (Levitt). In fact, Soren Westermann admitted that "[he] knew [Dr. Levitt] was a preeminent expert in the field." Tr. at 747:7-9. Soren Westermann also admitted receiving a copy of Dr. Levitt's Curriculum Vitae that prominently listed the Patents-In-Suit. Tr. at 747:10-748:4; 746:7-10.

Yet, despite acknowledging Dr. Levitt's prominence and despite being aware of Dr. Levitt's patents (*see infra*, Section V.B.II), Widex admitted to ***never*** investigating its possible infringement or the validity of Dr. Levitt's patents - the Patents-In-Suit. *See* Tr. at 733:1-735:2 (S. Westermann). It is objectively reckless and unreasonable for Widex to admittedly ignore Dr. Levitt's patents.

### e. Widex intended to infringe the Patents-In-Suit

Substantial evidence that Widex intended to infringe the Patents-In-Suit supports the jury's willfulness verdict. Because ETG presented evidence that (1) Widex knew about the Patents-In-Suit (*see* D.I. 539, Section V.B.1.a; *see also infra*, Section V.B.2); (2) the Patents-In-Suit discuss feedback cancellation; and (3) Widex's product descriptions are strikingly similar to the language in the Patents-In-Suit, the jury heard substantial evidence to conclude that Widex

intended to infringe the Patents-In-Suit. That Widex attempted to cover-up their admitted infringement further evidenced Widex's intent to infringe.

The Patents-In-Suit describe feedback cancellation. *See* JX 4 (D.I. 546, Exhibit 1); JX 2 (D.I. 546, Exhibit 2). Dr. Levitt testified at length about how the Patents-In-Suit cover feedback cancellation. *See, e.g.*, Tr. at 272:19-274:13. ETG's expert, Dr. Clyde "Kip" Brown, also testified as to how the Patents-In-Suit cover the specific implementation of feedback cancellation made by Widex. *See, e.g.*, Tr. at 507:2-10, 510:23-512:1.

The jury could easily compare the language in Widex's product descriptions to the language in the Patents-In-Suit and conclude that they are strikingly similar. *See, e.g.*, PX 820 (D.I. 546, Exhibit 3), PX 551 (D.I. 551, Exhibit 10) JX 305 (D.I. 552, Exhibit 12). The abstract of the '850 Patent states "Acoustical feedback is reduced by an electrical feedback path in the hearing aid which is matched in both amplitude and phase to the acoustic feedback path, the two feedback signals being subtracted so as to cancel each other." *See* JX 4 (D.I. 546, Exhibit 1). One of Widex's product descriptions states "When the FPS has determined the characteristics of the feedback signal, it will subtract an imitated feedback signal from the incoming signal, thus eliminating the annoying feedback." PX 820 (D.I. 546, Exhibit 3). Another product description that includes a graphic that visually depicts the language in the '850 Patent. PX 551 (D.I. 551, Exhibit 10) at ED0033028_0031. Also, as Kip Brown testified, the graphic appearing in JX 305 visually depicts the language of the '850 Patent. *See, e.g.*, Tr. at 525:23-528:16; *see also* JX 305 (D.I. 552, Exhibit 12) at WID2340008. In view of this evidence, the jury could have reasonably concluded that Widex's product descriptions were strikingly similar to the language of the '850 patent because they infringed the Patents-In-Suit.

Because Widex was aware of the Patents-In-Suit, the jury also reasonably concluded that these strikingly-similar product descriptions evidence Widex's intent to infringe the Patents-In-Suit. That Widex attempted to cover up its admitted infringement by denying the statements in their own internal and external materials (*see* D.I. 539, Section V.C.3; *see also infra*, Section V.C.2.a) further evidences Widex's intent to infringe the Patents-In-Suit. This evidence of Widex's intent to infringe epitomizes Widex's willful conduct.

### f. <u>Widex ignored the Patents-In-Suit in its files</u>

Substantial evidence that Widex ignored the Patents-In-Suit and references to the Patents-In-Suit in its files supports the jury's willfulness verdict. It is unreasonable and objectively reckless for an infringer to ignore numerous copies and references to patents in its files.

The jury heard substantial evidence that is exactly what Widex did. Widex's files were littered with marked-up copies of and references to the Patents-In-Suit, *see* D.I. 539, Section V.B.1.a, and Widex admits this fact. *See* Widex's JMOL Brief (D.I. 541) at 13-14. But Widex admitted to not performing *any* search of its files. *See* Tr. at 773:1-7 (S. Westermann). Widex also admitted that it *never* investigated its possible infringement or the validity of the Patents-In-Suit. *See* Tr. at 733:1-735:2 (S. Westermann). It is unreasonable and objectively reckless for Widex ignore patents that appeared throughout its files.

### g. <u>Widex ignored its own technical and marketing materials</u>

Substantial evidence that Widex ignored its own technical and marketing materials also supports the jury's willfulness verdict. Where the infringer's own marketing materials clearly describe highly technical products in a manner in which one would expect to involve patents, it is unreasonable and objectively reckless to fail to perform a patent search.

The jury heard substantial evidence about the contents of Widex's marketing and technical materials. For example, JX 305 (D.I. 552, Exhibit 12) includes highly technical

descriptions and graphical representations of the infringing hearing aids. *See, e.g.*, JX 305 (D.I. 552, Exhibit 12). In addition to providing detailed technical graphics on WID234011, it states, for example, "not-so-coarse $2^x 2$ is changed, MSB(s) is added and the result provides the (algebraic) sign s coarse (i.e. if s=1, y should be negative (inversion of y). The block is limited so the max output is $2^{-3}$." Also, PX 501 states, "The Dynamic Integrator, which in turn instructs the MD Active feedback cancellation unit to generate a signal with the opposite phase as the feedback signal and route it to the input stage for its cancellation." PX 501 at ED00002451_019 (D.I. 552, Exhibit 17). The highly technical nature of the product descriptions published by Widex indicate that development of these products was likely to involve patents. It is therefore unreasonable and objectively reckless for Widex to fail to perform a patent search regarding these products.

### h. Widex acted despite an objectively high risk of infringement

Widex launched its first product incorporating feedback cancellation – the Diva – in 2000 (*see, e.g.*, Tr. at 732:12-17 (S. Westermann)) and the Inteo in 2006. *See, e.g.*, Tr. at 801:2-6 (S. Westermann). As demonstrated above, the record provides substantial evidence to support the jury's finding that Widex launched these products despite an objectively high likelihood that doing so would infringe a valid patent. *See supra*, Sections V.B.1a-V.B.1g. Substantial evidence regarding any one of the above factors alone would be sufficient to establish an objectively high likelihood of infringing a valid patent. Here, with strong evidence on each of these factors, the jury could have only reached one conclusion - that Widex launched its Diva and Inteo products despite an objectively high likelihood that doing so would infringe a valid patent.

**2. ETG presented substantial evidence that Widex knew or should have known that launching the Diva and Inteo hearing aids would result in infringement of a valid patent**

Widex knew or should have known that the Diva and Inteo products would infringe a valid patent. Under *Seagate*, if the threshold objective standard is satisfied, "the patentee must also demonstrate that this objectively defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Seagate*, 497 F.3d at 1371. The evidence was overwhelming that Widex knew or should have known of Dr. Levitt and the Patents-In-Suit. *See* D.I. 539, Section V.B.1.a. Moreover, because Widex is patent savvy with regard to hearing aid patents, Widex knew or should have known of the objectively high likelihood that its actions would constitute infringement of a valid patent.

The jury also heard that Dr. Levitt is one of the most well-known and well-regarded members of the hearing aid industry. *See* D.I. 539, Section V.B.1.a; *see also supra*, Section V.B.1.d. Widex was intimately familiar with Dr. Levitt at least in part because Widex hired Dr. Levitt on behalf of HIMPP on more than one occasion. *Id.* Dr. Levitt both published and spoke to members of the hearing aid industry about the Patents-In-Suit. *See* Tr. at 299:1-3 (Levitt). Also, as Widex admits, the Patents-In-Suit were littered throughout Widex's patent files. *See* Widex's JMOL Brief (D.I. 541) at 13-14; *see also* D.I. 539, Section V.B.1.a. Therefore, Widex knew of the Patents-In-Suit and was likewise aware that launching the Diva and Inteo products without performing any analysis or due diligence on them would substantially increase the risk that they would infringe a valid patent.

Substantial evidence also showed that Widex was patent savvy with regard to hearing aid patents. Widex is the controlling member of a patent partnership, HIMPP (*see* Tr. at 727:6-16, Tr. at 716:10-17), and Soren Westermann is the managing director of HIMPP (*see* Tr. at 717:10-

12). The main purpose for establishing HIMPP was to eliminate the threat of patents being enforced against the hearing aid industry (*see* Tr. at 721:25-722:3). One of HIMPP's major functions is to maintain a database containing "tons" of patents that are relevant to the hearing aid industry on behalf of the HIMPP members (*see* Tr. at 716:25-717:6).

As the controlling member of a patent partnership, whose stated purpose is to eliminate the threat of patents being enforced against the hearing aid industry, Widex certainly should have known that, of the "tons" of presumptively valid patents contained in its database, some of those patents might pose a threat to its newly-developed products. Likewise, Widex should have known that launching the Diva and Inteo products without performing any infringement analysis or due diligence would likely result in the infringement of a valid patent. *See* Tr. at 733:1-735:2 (S. Westermann).

Widex and HIMPP were aware of approximately 6,000-7,000 patents related to hearing aids in 2000. *See, e.g.*, Tr. at 798:24-799:5 (S. Westermann). Additionally, at the time Widex launched its infringing hearing aids, Widex "constantly monitor[ed] incoming patents." Tr. at 734:6-735:1 (S. Westermann). Yet, Widex admittedly failed to conduct any due diligence before launching the Diva products. *See* Tr. at 734:6-735:2 (S. Westermann). In fact, Soren Westermann admitted that Widex launched the Diva products without performing "any specific due diligence to determine whether [Diva] was infringing any other patent." *Id*. Moreover, Widex presented no evidence that it received and relied on an opinion of counsel regarding the non-infringement or invalidity of the Patents-In-Suit.

By 2006, the number of patents in the hearing aid industry of which Widex/HIMPP was aware had more than doubled since the Diva's 2000 launch, reaching 17,000. *See* Tr. at 798:17-20. (S. Westermann). Notably, by the 2006 launch of the Inteo product, Widex was certainly

aware of this lawsuit, which was filed June 2005. By that time, Widex had a policy of reviewing patents in advance of launching new products to assess infringement issues. *See* Tr. at 733:16-24 (S. Westermann). Yet, substantial evidence showed that, despite this policy, with knowledge of this lawsuit, and without an opinion of counsel, Widex launched its Inteo products anyway. *See, e.g.*, Tr. at 801:2-6 (S. Westermann).

Widex's argument that it cannot be found liable for willful infringement because none of the Widex engineers or scientists involved in the design of the infringing hearing aids had any awareness of the ETG patents at the time Widex developed those products is a red herring. There is no requirement that engineers or scientists of the company know about the patent, particularly when the manager of the engineers and scientists and the IP department head had actual knowledge of the objectively high risk. *See supra*, Section V.B.1. Soren Westermann is Widex's Director of Research, Information Technology, and Intellectual Property, *see* Tr. at 714:5-7, 717:10-12, and clearly was aware of the Patents-In-Suit. *See* D.I. 539, Section V.B.I.a. As the director of both research and intellectual property, Soren Westermann was at least one person within Widex who knew about the Patents-In-Suit (as Director of Intellectual Property) and was in the position to convey this knowledge to the scientist and engineers involved in the design of the accused products (as Director of Research).[6] At trial, despite overwhelming evidence that Soren Westermann had personal knowledge of the Patents-In-Suit (*see* D.I. 539, Section V.B.1.a), Soren Westermann contended that he did not have personal knowledge of the Patents-In-Suit. *See* Tr. at 768:18-25; Tr. at 803:8-13. The jury considered Soren Westermann's contention and concluded otherwise. *See* D.I. 521.

---

[6] To say that the Widex engineers or scientists involved in the design of the Diva or Senso Diva were not aware of the ETG patents implies that Soren Westermann purposefully withheld the Patents-In-Suit from those scientists and engineers.

As demonstrated above, substantial evidence established an objectively high risk that the Diva and Inteo products would infringe a valid patent. *See supra*, V.B.1.a-V.B.1.d. That Widex was patent savvy and admitted to having various policies for constantly monitoring incoming patents and reviewing patents to determine infringement, but instead chose to launch these products without performing "any specific due diligence" establishes that Widex acted despite this objectively high risk. The jury's willfulness verdict is supported by substantial evidence.

### C. Widex's Sole Theory To Defeat Liability For Willful Infringement Is Baseless

Widex's JMOL presents only one defense to the finding of willful infringement – that it presented purportedly substantial litigation defenses. *See* D.I. 541 at III.A-III.B. It would be improper to consider litigation defenses as a sole defense to willful infringement in light of evidence of so many other factors. *See infra*, Section V.C.2. By relying solely on purported litigation defenses at trial, Widex conveniently ignores the fact that (a) the jury rejected its defenses, *see supra*, Section V.B; D.I. 539, Section V.C.3, and (b) substantial evidence relating to other factors establish that Widex acted despite an objectively high likelihood of infringement.

### 1. The jury's verdict establishes that Widex's purported litigation defenses were not substantial

The jury's verdict that Widex infringed the claims of the Patents-In-Suit and that those claims were not invalid establishes that Widex's purported litigation defenses were not substantial. While invalidity defenses may be a basis for rejecting willfulness, that is the case only if the jury invalidates at least one claim of the asserted patent. *See Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 2008 U.S. App. LEXIS 207 at *18 (Fed. Cir. Jan 7, 2008); *see also Depomed*, F. Supp. 2d at 1185-86.

Here, the jury rejected Widex's litigation defenses, finding that Widex willfully infringed all asserted claims and upholding the validity of *all* of those claims. *See* D.I. 521. The jury clearly did not consider Widex's litigation defenses substantial.

Moreover, by finding that only Widex, and not Demant, willfully infringed the Patents-In-Suit, the jury clearly considered Widex's conduct separate and apart from Demant's after hearing a long and involved case. At trial, Demant presented evidence to the jury to at least attempt to support its contention that it acted reasonably. *See* Tr. at 1742:12-1745:21 (Hauge). By admitting that it did nothing, *see* Tr. at 773:1-7, 733:1-735:2 (S. Westermann), Widex failed to present any evidence that it acted reasonably or was not objectively reckless. The jury's clear distinction between Widex and Demant further supports the fact that Widex's defenses, in particular, were not substantial.

Further support that Widex's litigation defenses lacked credibility can be found in Plaintiff ETG's Opposition to Defendants' Brief In Support of Their Renewed Motion for Judgment as a Matter of Law and Request for a New Trial on the Issues of Infringement and Validity, filed concurrently herewith. As made clear there, Widex is not entitled to JMOL on the issues of non-infringement or invalidity. In addition, Widex's litigation defenses were not convincing to a jury and lack merit as a matter of law. Thus, they cannot now be used as a defense to willful infringement.

### 2. Widex's non-infringement defenses were not substantial

To the extent courts may consider litigation defenses under the *Seagate* objective inquiry, they are among several factors to be considered when analyzing the totality of the

circumstances.[7]  *See generally Read*, 970 F.2d at 826-28.  Since its seminal decision in *Seagate*,

the Federal Circuit has provided only non-precedential guidance on the application of the

"objective reasonableness" standard.  *See Black & Decker, Inc. v. Robert Bosch Tool Corp.*,

2008 U.S. App. LEXIS 207 (Fed. Cir. Jan 7, 2008) (unpublished).  In dicta, the Federal Circuit

noted that, under the *Seagate* objective recklessness standard, "both legitimate defenses to

infringement claims and credible invalidity arguments demonstrate the lack of an objectively

high likelihood that a party took actions constituting infringement of a valid patent."  *Id.* at *18.

The Federal Circuit noted, however, that the invalidity arguments in that case were credible

because the jury found two claims invalid.  *Id.*  Applying a similar analysis, a district court

rejected a willfulness defense after it rejected the party's invalidity defense as a matter of law,

holding that a reasonable party would not have believed the patents invalid.  *See Depomed, Inc.*

*v. Ivax Corp.* 532 F. Supp. 2d 1170, 1185-86 (N.D. Cal. 2007) (denying summary judgment of

no willfulness because "there [was] ample evidence upon which a reasonable juror could

[conclude that defendants acted] despite an objectively high likelihood that is [sic] actions

constituted infringement of a valid patent").

> Even if the Court were to consider Widex's litigation defenses as part of the totality of

circumstances, those defenses do not preclude a willfulness finding because Widex's defenses

were not substantial.  Unlike *Black & Decker*, in this case, the jury found all asserted claims

valid and infringed.  Moreover, Widex's non-infringement theories were contrary to the Claim

Construction Order and based on a failed attempt to cover up documents that admitted

infringement.  *See* D.I. 539, Section V.C.1-V.C.3.  Widex also relies solely on expert testimony,

---

[7] Widex would have the Court believe that the assertion of substantial litigation defenses alone precludes willfulness as a matter of law under the "objective recklessness" standard.  *See* D.I. 541 at § III.A-III.B.  This is not the case when the totality of the circumstances demonstrates otherwise, as it does in this case.

and ***not any documentary evidence***, to allegedly show that its non-infringement defenses were substantial. *See* Section III.B.I of Widex's JMOL Brief (D.I. 541).

### a. A failed cover-up of documents that admit infringement is not a substantial defense

Widex's technical and marketing documents admitted infringement. In view of this admitted infringement, Widex attempted to mislead and distract the jury at trial. *See* D.I. 539, Sections V.C.1-V.C.3. First, Widex attempted to distract the jury by rearguing claim construction. *See id.*, Section V.C.1. Then, Widex attempted to repudiate the documents that admitted infringement, offering shifting non-infringement positions throughout discovery and trial in hopes that the jury would ignore or overlook those documents. *See id.*, Section V.C.3. This attempted cover-up clearly demonstrates Widex's willful and intentional infringement. A cover-up defense that relies on re-arguing claim construction and shifting positions throughout discovery and trial is not a substantial defense to non-infringement.

### b. A defense without documentary evidence is not a substantial defense

That Widex does not point to its documents as evidencing non-infringement, *see* Section III.B.I of Widex's JMOL Brief (D.I. 541), also demonstrates that its non-infringement defense was not substantial. Instead of arguing non-infringement based on documentation, source code, marketing materials, or other documentary evidence, Widex relied almost exclusively on the testimony of its expert, Dr. Morley. *See id.* But Dr. Morley's testimony was based largely on speculation, and Dr. Morley's speculation appears to be based largely on an attempt to reargue the Court's Claim Construction Order. Of course, expert opinions must be based on something besides mere conclusory statements. *See In re Buchner*, 929 F.2d 660, 661 (Fed. Cir. 1991). *See also Genentech, Inc. v. Novo Nordisk A/S*, 108 F.3d 1361, 1367 (Fed. Cir. 1997). The conclusory statements of its expert that try to reargue claim construction and provide no

documentary support cannot render Widex's defenses substantial.

### 3. Widex continues to reargue claim construction

In an effort to make Widex's defenses appear substantial, Widex continues to reargue claim construction. As this Court is well aware, claim construction is a matter of law to be decided by the Court; it is not to be reargued by the parties at trial. *See generally Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995).

At *Markman*, Defendants unsuccessfully argued that the claims should be limited to fixed filters. *See, e.g.*, D.I. 294 at 24:11-16, 33:3-24, and 35:8-12. As acknowledged in the Court's Claim Construction Order (D.I. 351), the claims do not address and have no limitation based on whether the filter coefficients are fixed or adaptive. *See* D.I. 351. In other words, the claims, as construed, cover both fixed and adaptive filters. After *Markman*, Defendants were in an unfortunate position because their own marketing and technical materials admitted infringement.[8] Also, the Court's construction of the "determining" step precluded Widex from arguing that the claims required an absolute measurement of phase and amplitude.

In Section III.B.1 of Widex's JMOL motion (D.I. 541), Widex continues to improperly argue that Widex's hearing aids "employ a continuously adaptive feedback cancellation technique very different from the fixed feedback cancellation solution disclosed and claimed in the ETG patents." D.I. 541 at 6. Widex's JMOL motion then alleges that the "ETG patents do not disclose any mechanism to adapt the filter coefficients for feedback cancellation" (*id.*) and that "the ETG patents provided no description of detecting a change in acoustic feedback and then changing the feedback coefficients" as evidence of non-infringement. *Id.* at 7. As the Court is well aware, the proper infringement analysis involves comparing the accused devices to the

---

[8] *See, e.g.*, PX 820 (D.I. 546, Exhibit 3), PX 551 (D.I. 551, Exhibit 10) JX 305 (D.I. 552, Exhibit 12).

construed claims. *See Markman*, 52 F.3d at 976 ("The second step [in an infringement analysis] is comparing the properly construed claims to the device accused of infringing."). The disclosure of or description provided in the ETG patents has no bearing on a proper infringement analysis. That Widex continues to reargue claim construction and relies on an improper infringement analysis to assert that it has a strong non-infringement position demonstrates that Widex's non-infringement defenses were not substantial.

### 4. Widex continues to misrepresent the EKMS documents

Widex also continues to misrepresent the EKMS documents in an effort to support its contention that Widex's litigation defenses were substantial. *See* D.I. 541, Section III.C. Widex contends that "it is *uncontroverted* that EKMS, in an October 2002 report, indicated a finding that a 'continuously adaptive' approach to feedback cancellation was not covered by the ETG patents...." D.I. 541 at 11-12 (emphasis added). That allegation is strongly controverted. *See* Declaration of Dr. Eric Dowling (D.I. 553, Exhibit 29). Not only does Dr. Dowling dispute Widex's contention, but it is not at all clear from the EKMS documents that EKMS ever reached that conclusion.

Widex continues this misrepresentation, contending that "[t]he ETG [sic] summary report *plainly reflects* a determination by EKMS and SoundID that 'continuously adaptive' approaches to feedback were outside the scope of the ETG patent claims." *Id*. at 12 (emphasis added). The substantial evidence presented at trial, including Kimball Chen's testimony (*see* Tr. at 449:15-482:25) and Dr. Dowling's Declaration (D.I. 553, Exhibit 29), make it clear that the EKMS Summary Report (*see* DX 1610 (D.I. 553, Exhibit 28)) does *not* plainly reflect a determination by EKMS that "continuously adaptive" approaches to feedback were outside the scope of the ETG patent claims. In fact, on JMOL, the Court takes facts in the light most favorable to ETG. Therefore, for purposes of this motion, Dr. Dowling's testimony that the Patents-In-Suit *cover*

continuously adaptive feedback cancellation shows that Widex's position is objectively unreasonable. Dr. Dowling's Declaration (D.I. 553, Exhibit 29), ¶ 22.

Because Widex devised its trial strategy around contradicting this Court's Claim Construction Order and having focused the jury's attention on the EKMS smokescreen,[9] Widex forged ahead to misrepresent the EKMS documents throughout trial, despite warnings from the Court to the contrary. By stating that the EKMS documents were uncontroverted and plainly reflect certain positions regarding the adaptive nature of the Patents-In-Suit, Widex continues to misrepresent the EKMS documents.

Widex also implies that EKMS approached Widex by contending that EKMS "specifically included Widex's Senso Diva product among the targets it considered." D.I. 541 at 12. There is no evidence that either ETG or EKMS ever contacted Widex. Moreover, there was never an "independent" evaluation by EKMS that was unfavorable to ETG. The evidence presented at trial was a "summary report" (*see* DX 1610) that obviously did not include the opinion of the expert that EKMS hired – Dr. Dowling. Since Dr. Dowling was the only person within EKMS who had the technical skills to evaluate the adaptive nature of the Patents-In-Suit, Widex's contention that the EKMS documents support the substantial nature of its defenses is unfounded. If anything, that Widex must continue to misrepresent the EKMS documents to support its contention that its litigation defenses were substantial demonstrates that Widex's defenses were anything but substantial.

**D. Widex Is Not Entitled To A New Trial**

Widex is not entitled to a new trial on the issue of willfulness because the jury's willfulness verdict is not against the clear weight of the evidence. As the Court notes, "[n]ew

---

[9] *See* D.I. 539, Section V.C.1-V.C.3.

trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience." *Donald M. Durkin Contracting*, 2007 WL 2710451 at *2 (internal citation omitted). In this case, the jury's verdict was supported by substantial evidence. *See supra*, Section V.B. A verdict that is supported by substantial evidence cannot result in a miscarriage of justice, does not cry out to be overturned, and does not shock the conscience. Therefore, Widex is not entitled to a new trial on the issue

## VI. CONCLUSION

The substantial evidence supports the jury's willfulness verdict against Widex. Moreover, Widex's arguments that its purportedly substantial litigation defenses demonstrate a lack of an objectively high likelihood that Widex actions constituted infringement of a valid patent lack merit. The Court should therefore deny Widex's motion for judgment as a matter of law (JMOL) to preserve the jury's willful infringement verdict

Because the jury's willfulness verdict is supported by substantial evidence, it is not against the weight of the evidence. It also does not result in a miscarriage of justice, does not cry out to be overturned, and does not shock the conscience. The Court should therefore also deny Widex's request for a new trial on the issue of willful infringement.

Dated: May 9, 2008

/s/ Matthew A. Kaplan
Edmond D. Johnson (No. 2257)
Matthew A. Kaplan (No. 4956)
PEPPER HAMILTON
Hercules Plaza Suite 5100
1313 Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6500

*Attorneys for Energy Transportation Group, Inc.*

OF COUNSEL:

Marty Steinberg
HUNTON & WILLIAMS LLP
1111 Brickell Avenue
Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460

Brian M. Buroker
HUNTON & WILLIAMS LLP
1900 K Street, N.W., Suite 1200
Washington, DC 20006-1109
Telephone: (202) 955-1500
Facsimile: (202) 778-2201

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone: (804) 788-8788
Facsimile: (804) 343-4630

## CERTIFICATE OF SERVICE

I do hereby certify that on the 9th day of May, 2008, I caused a true copy of the foregoing **Plaintiff Energy Transportation Group, Inc.'s Opposition to Widex Defendants' Motion for Judgment as a Matter of Law and Request for New Trial on the Issue of Willful Infringement** to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

Mary B. Graham (#2256)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
901 New York Ave., N.W.
Washington, DC 20001-4413

*Attorneys for William Demant Holding A/S,
WDH Inc., Oticon A/S, Oticon, Inc.,
Bernafon AG, and Bernafon LLC*

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19899

William H. Mandir
David J. Cushing
Carl J. Pellegrini
SUGHRUE MION PLC
2100 Pennsylvania Ave., N.W.
Washington, DC 20037

*Attorneys for Widex A/S, Widex Hearing
Aid Co., Inc.*

/s/ Matthew A. Kaplan
Matthew A. Kaplan (#4956)