# Exhibit A

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
                          -   -   -
 4
 5   ENERGY TRANSPORTATION,        :  Civil Action
     INC.,                         :
 6                                 :
              Plaintiff,           :
 7                                 :
         v.                        :
 8                                 :
     WILLIAM DEMANT HOLDINGS A/S,  :
 9   et al.,                       :
                                   :
10            Defendants.          :   No. 05-422 (GMS)
11                        -   -   -
12                 Wilmington, Delaware
                Tuesday, January 22, 2008
13                     8:30 a.m.
                   Second Day of Trial
14
                          -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18   APPEARANCES:
19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                      -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                                Counsel for Plaintiff
24
25
     APPEARANCES CONTINUED:
```

Levitt - direct

Page 218

```
 1              MR. STEINBERG:  May please the Court.
 2              THE COURT:  Please proceed, counsel.
 3                      DIRECT EXAMINATION
 4    BY MR. STEINBERG:
 5    Q.    Dr. Levitt, have you ever testified in a trial before?
 6    A.    No.
 7    Q.    Are you nervous?
 8    A.    Yes.
 9    Q.    How old are you today?
10    A.    I will be 71 in May.
11    Q.    Now, both sides seem to agree that you are a
12    preeminent scientist, but I'm going to go through your
13    background, if you don't mind.
14          Where did you grow up?
15    A.    South Africa.
16    Q.    Where did you go to college?
17    A.    I did my undergraduate degree in South Africa and my
18    doctoral degree in London, England.
19    Q.    Where did you go to school in London?
20    A.    I went to the Imperial College of Science &
21    Technology.
22    Q.    And what is the Imperial Science & Technology?
23    A.    It's the pretty issue equivalent of MIT.
24    Q.    And, Doctor, if you need to refer to your resume, it's
25    at DX-988.  It's quite long.
```

Levitt - direct

1              Do you recognize -- I'm sorry.

2    A.    Please let me get there.

3    Q.    DX-988.

4    A.    Yes, I have it.

5    Q.    And can you identify that document?

6    A.    Yes.  It's my resume.

7    Q.    You may have to pull the microphone a little closer to

8    your --

9              THE COURT:  Well, unfortunately, it doesn't

10   pull.  Do your best, Doctor.

11             THE WITNESS:  Okay.  Yes.  This is my resume, I

12   recognize it.

13

14

15

16

17

18

19

20

21

22              Take 11 take 11 (.

23

24

25

Levitt - direct

Page 220

1

2    BY MR. STEINBERG:

3    Q.    Now, what doctoral degree did you obtain?

4    A.    Ph.D. in electrical --

5              THE COURT:  You can move that other stuff over

6    here.

7    BY MR. STEINBERG:

8    Q.    What degree did you obtain?

9    A.    Ph.D. in electrical engineering.

10   Q.    Just for our benefit, what is the study of electrical

11   engineering?

12   A.    It is the study, the utilization of electrical

13   signals.

14   Q.    Did you do any graduate research while you were at the

15   college?

16   A.    Well, I was a research assistant, which is a common

17   practice.  That is, you get some financial support to do

18   your doctoral studies.

19   Q.    What kind of research did you do?

20   A.    Work on digital signal processing, and modeling of the

21   ear, acoustics of the ear.

22   Q.    What is digital signal processing?

23   A.    I am sorry.  The digital signal processing began when

24   I went to Bell Telephone.  I did work on modeling of the ear

25   using electrical engineering concepts.

Levitt - direct

1    Q.    After your graduate degree, what kind of work did you

2    do?

3    A.    I was hired by Bell Telephone Laboratories.  That was

4    the name in those days.  There I did work on digital signal

5    processing, synthesis of speech by computer, simulation of

6    speech by computer, adaptive techniques.  Some work in

7    statistics.  And also working on devices to help the

8    handicapped.

9    Q.    And what was Bell Labs?

10   A.    Bell Labs was the premier research institution in the

11   country in the area of electrical technology and signal

12   processing.

13   Q.    After your research at Bell Labs, what did you do?

14   A.    I accepted a professorship at the City University of

15   New York.

16   Q.    What is the City University of New York?

17   A.    Well, it is a major city university, has 20-plus

18   campuses, and it provides education to the residents of New

19   York City.

20   Q.    Were you accepted into the Graduate Center at the City

21   University of New York?

22   A.    Yes.  The Graduate Center was sort of the special

23   center that did the doctoral level work as opposed to the

24   undergraduate work.

25   Q.    What field of education was your associate

Levitt - direct

1   professorship in?

2   A.     The program in which I was hired is known as the

3   Doctoral Program in Speech and Hearing Sciences, but it

4   covered linguistics as well.

5            The boundaries became somewhat blurred at that

6   level.  I did work in linguistics as well as engineering.

7   Q.     Did you become a full professor at the City

8   University?

9   A.     Yes.

10  Q.     About when was that?

11  A.     I believe '73.

12  Q.     In what field?

13  A.     Well, in speech and hearing science program, the

14  professorship.  I could do anything I wanted in any

15  discipline.

16  Q.     What did you do as a professor?

17  A.     Well, when I first came I worked on the speech of deaf

18  children and methods of improving speech of deaf children,

19  on the language acquisition of deaf children and improving

20  the rate of learning, of acquiring language, especially

21  syntax.

22            I developed displays for visual representation

23  of speech for deaf children.  Moved into developing hearing

24  aids or evaluating hearing aids, applying statistical

25  procedures for improving the efficiency of fitting hearing

Levitt - direct

Page 223

1    aids.  Applying digital signal processing, developed the

2    digital hearing aids, developed a digital hearing aid.

3    Applied digital signal techniques to video, processing of

4    video signals to help people improve their lip-reading

5    ability.

6    Q.    You have used this term a couple times, digital signal

7    processing.  What does that mean?

8    A.    It's when you use a comparator that is -- when you use

9    a technique where signals are digitized into streams of

10   numbers and that you manipulate these numbers in a

11   mathematical way to represent physical systems in many

12   cases.

13   Q.    Did you eventually become tenured at the City

14   University of New York?

15   A.    Oh, yes.

16   Q.    And what does becoming tenured mean?

17   A.    It means I can work at the university indefinitely.

18   Q.    Did you perform research after you became tenured?

19   A.    Well, I performed research from the day I started

20   until the day I retired.

21   Q.    And did the research continue in the topics you just

22   mentioned?

23   A.    Yes, it still continues.

24   Q.    When did you first become interested in children and

25   adults who had hearing impairments?

Levitt - direct

Page 224

1  A.    When I was at Bell Labs they had a very special

2  committee on, a rather ostentatious name, called the Ideas

3  Committee for Handicapped People.  And the idea was for

4  people like myself who did basic research to come up with

5  ideas that could be implemented in some way for people that

6  had sensory impairments, blindness, and particularly hearing

7  loss was of interest.

8          And I was on that committee for several years.

9  Q.    Now, were you bestowed the honor of Distinguished

10 Professor at the Graduate School at the City University of

11 New York?

12 A.    Yes, I was.

13 Q.    And what does that designation mean?

14 A.    Well, it's an honor that a professor has made

15 significant contributions to the field and to the

16 university.

17 Q.    What was the basis for your particular honor?

18 A.    Well, I had done some important work in helping deaf

19 children and, of course, the digital hearing aid.

20 Q.    Now, other than being a tenured professor at the City

21 University of New York, have you had other employment as a

22 consultant or an expert or other employment in the hearing

23 industry, also?

24 A.    I have served as a consultant.  My full-time

25 employment was the university.  But I have served as a

Levitt - direct

Page 225

1    consultant to companies, government organizations.  The

2    university allows me to spend a certain percentage of my

3    time under this type of consulting, provided it is relevant

4    to my university work.

5    Q.    Have you consulted for hearing aid manufacturers from

6    time to time?

7    A.    Yes, I have.

8    Q.    Have you consulted for the Lexington School for the

9    Deaf?

10   A.    Yes, I have.

11   Q.    What is the Lexington School for the Deaf?

12   A.    Well, it is now known as the Lexington Center.  But it

13   started out as a school for the deaf.  It now is concerned

14   with training and finding employment and generally helping

15   improve the quality of life for deaf children and young

16   people.

17   Q.    Did you donate your time to the Lexington School for

18   the Deaf?

19   A.    Yes, I did.

20   Q.    Were you a consultant to AT&T/Bell Labs?

21   A.    Yes, I was.

22   Q.    Were you a consultant to BBN?

23   A.    Yes, I was.

24   Q.    What is BBN?

25   A.    It is a company called Baltz, Branic & Newman

Levitt - direct

Page 226

1    (phonetic), and it is concerned with applications of

2    acoustics.

3    Q.    Were you also retained and hired as an expert witness

4    in patent cases by hearing aid manufacturers?

5    A.    Yes, I have.

6    Q.    Have you been a consultant or expert for the Federal

7    Trade Commission?

8    A.    Yes.

9    Q.    Have you been a consultant and expert for New York

10    State?

11    A.    For the New York State Trade Commission, yes.

12    Q.    Have you been a consultant and expert for the FCC, the

13    Federal Communication Commission?

14    A.    Yes.

15    Q.    And for the FDA?

16    A.    Yes.

17    Q.    Now, Dr. Levitt, I would like to ask you about certain

18    of the honors you have received in your career.  I am not

19    going to ask you about all of them.  I don't think time

20    permits.  I would like to focus on a few of them.

21         In 1972 you were named Fellow of the Acoustical

22    Society of America.  Is that correct?

23    A.    Yes.

24    Q.    And what is the Acoustical Society of America?

25    A.    That's a professional organization dedicated to the

Levitt - direct

Page 227

1    advancement of the field of acoustics.

2    Q.    And what does being a Fellow mean?

3    A.    Well, for somebody that has made significant

4    contributions to the field.

5    Q.    In 1975, were you awarded the Fletcher Award in

6    Technical Application by the New York League for the Hard of

7    Hearing?

8    A.    Yes, the New York League awarded me that Fletcher

9    Award for contributions to the development, application of

10   technology to help hearing-impaired people.

11   Q.    In 1981 were you named the National winner of the John

12   Hopkins University First National Search for application of

13   Personal Computing to Aid the Handicapped?

14   A.    Yes.

15   Q.    What is the Johns Hopkins University?

16   A.    It is one of the nation's foremost universities.

17   Q.    What did you do to become the winner of that First

18   National Search?

19   A.    I served, I developed what was called a pocket wand

20   telecommunicator, which essentially, in those days, a deaf

21   person communicated over the telephone, they used a tele-

22   typewriter, which was a huge piece of equipment.  And I

23   showed you could actually do it with a pocket wand unit.

24   Q.    In 1982 were you made a Fellow with the American

25   Speech, Language and Hearing Association?

Levitt - direct

1   A.    Yes.

2   Q.    And what is that association?

3   A.    It's a professional association concerned with the

4   fields of speech, language, and hearing, and particularly

5   the clinical aspects of those fields.

6   Q.    What do you mean by clinical?  What does that mean?

7   A.    Well, they have a whole section of audiology.  They

8   have a whole section of speech pathology.  They certify

9   clinics.  They provide training in those areas to students.

10  Q.    In 1988 were you awarded the Javitz Neuroscience

11  Investigator Award for the National Institute of Health?

12  A.    Yes.

13  Q.    What is the National Institute of Health?

14  A.    That is the nation's foremost institute concerned with

15  research in health matters.

16  Q.    Who is the Javitz Award named after?

17  A.    The late Senator Javitz of New York.

18  Q.    What did you do to receive that award?

19  A.    That award was given out occasionally for a research

20  proposal of exceptional merit.  And what it entailed is an

21  extra two years of funding without requesting it.

22  Q.    What was the subject matter of your award?

23  A.    That is on the application of digital signal

24  processing to video signals to help improve deaf people's

25  ability to lip-read.

Levitt - direct

Page 229

1    Q.    In 1989 were you named a Fellow of the New York

2    Academy of Medicine?

3    A.    Yes.

4    Q.    What is the New York Academy of Medicine?

5    A.    Well, it's the academy in the New York metropolitan

6    area concerned with the medical profession.

7    Q.    But you are not a medical doctor, are you?

8    A.    No.

9    Q.    In 1999 were you awarded the New York City Mayor's

10   Award?

11   A.    Yes.

12   Q.    What is the New York City Mayor's Award?

13   A.    It is an award that the Mayor makes once a year for

14   significant contributions to science and technology.

15   Q.    If you can turn to PX-357, I am going to ask you if

16   that's a description of the New York Mayor's Award that you

17   received.  That's PX-357.

18   A.    I am getting it.

19   Q.    Take your time.

20   A.    I have it.

21   Q.    Do you recognize that description of your award?

22   A.    Yes, I do.

23   Q.    Does it accurately describe the award you received?

24   A.    Yes.

25   Q.    Can you read into the record what it says?

Levitt - direct

1           MR. ROMARY:  It is not relevant.

2           THE COURT:  Whether it is relevant or not --

3           MR. STEINBERG:  It is relevant, of course.

4           THE COURT:  In terms of assessing -- they have

5    the benefit of the resume in their books.  And they can read

6    it.  I am not going to try to hamstring you and tell you how

7    to practice law.  We are going on a bit.

8           MR. STEINBERG:  I am going to summarize the next

9    sessions about his articles.  I am just going to say did you

10   write 150 -- I am going to summarize that.

11          THE COURT:  It goes on and on.

12          MR. STEINBERG:  I would like to get his major

13   awards.

14          THE COURT:  I will let you reference the awards.

15   But I am not going to let you have him read the Mayor's

16   citations or any other citation into the record.  You can

17   reference the awards.

18           (End of sidebar conference.)

19          THE COURT:  You may proceed.

20   BY MR. STEINBERG:

21   Q.    Dr. Levitt, in 2001, at the Special Session of the

22   Annual Session of the Acoustical Society of America, were

23   you honored?

24   A.    Yes, I was.

25   Q.    Did that award have anything to do with the technology

Levitt - direct

Page 232

1   at issue in this case?

2   A.     Well, it wasn't exactly an award.  It was a special

3   session of the Acoustical Society of America to honor my

4   contributions to the field.  And there were several papers.

5   And one of the papers discussed my contributions to the

6   cancellation of acoustic feedback.

7   Q.     In 2006, were you awarded the James Jurger (phonetic)

8   Career Award for Research in Audiology?

9   A.     Yes.

10  Q.     What is the James Jurger Career Award for Research in

11  Audiology?

12  A.     It is for contributions to the field of audiology and

13  education of audiologists.

14  Q.     In 2007, did you receive a commendation from the

15  Institute of the Electrical and Electronic Engineers?

16  A.     Yes.

17  Q.     And what was that commendation for?

18  A.     I had helped write an American National Standard on

19  the measurement and control of interference in hearing aids

20  from digital wireless telephones, such as cell phones.  And

21  that standard was -- became a national standard and was

22  necessary for the manufacture of digital cell phones.

23  Q.     Has that standard now been written into the law?

24  A.     Yes, the FTC adopted that standard as a requirement

25  for the manufacturers of cell phones to meet the

Levitt - direct

1    requirements of the standard such that there was -- people

2    with hearing aids would not be exposed to that much

3    interference from the cell phone.

4    Q.    Now, reading your resume, you graduated from school

5    with your doctoral degree in 1964?

6    A.    Yes.

7    Q.    Are you retired now?

8    A.    Yes.

9    Q.    When did you retire?

10   A.    In 2000.

11   Q.    And after you retired, have you kept active in the

12   field?

13   A.    Yes, I have.

14   Q.    What have you done?

15   A.    I've consulted for companies and I also do research.

16   Q.    Now, did you likewise serve as a chairman to many

17   committees for scientific institutes and associations?

18   A.    Yes, I have.

19   Q.    Okay.  To try and speed things along, I'm just going

20   to read the names of those associations and ask you if those

21   are the associations you belong to.  Okay?

22            The American National Standards Institute?

23   A.    Yes.

24   Q.    The writing groups of the American National Standards

25   Institute?

1    A.    That's the whole idea of it.

2    Q.    From 1961 to present, approximately how many

3    scientific papers have you published?

4    A.    Over 150.  I'm not sure.

5    Q.    And out of those 150 or more scientific papers,

6    how many have dealt with technology for the hearing

7    impaired?

8    A.    I would say the majority.

9    Q.    And have many of those articles dealt with the issue

10   of feedback and feedback cancellation?

11   A.    Several have, yes.

12   Q.    And do some of those articles mention the patents in

13   this case?

14   A.    Yes.

15   Q.    Dr. Levitt, have you also written books or chapters in

16   books that dealt with the hearing impaired and digital

17   signal processing?

18   A.    Yes.

19   Q.    Approximately how many books and chapters of books

20   have you written on those topics?

21   A.    I would say at least 30.

22   Q.    Have you also been asked to be the editor of the

23   special editions of scientific journals?

24   A.    Yes.

25   Q.    Have your scientific works been accepted to be

Levitt - direct

Page 237

1    reprinted in special collections?

2    A.    Yes.

3    Q.    About how many times?

4    A.    About a dozen or more.  I'm not sure.

5    Q.    Have you also given speeches and seminars and

6    scientific talks on hearing impaired and digital signal

7    processing and feedback and so forth?

8    A.    Yes.

9    Q.    Approximately how many times have you given such

10   talks?

11   A.    Well, for my entire professional career once I started

12   at the University --

13   Q.    Yes?

14   A.    -- I would give a talk, professional meetings, once

15   or twice a month for 20, 30 years, so work that out.

16   Q.    I'm not good with math.

17   A.    It's 30 times 25.  Several hundred.

18   Q.    Okay.  Have you been selected by the United States

19   government to receive research grants with respect to aiding

20   the hearing impaired?

21   A.    Yes.

22   Q.    By what government agencies?

23   A.    The National Institutes of Health, the Office of

24   Education, the National Institute of Disability &

25   Rehabilitation Research.

Levitt - direct

1              (The following took place at sidebar.)

2              MR. ROMARY:  Your Honor, I think what he is

3      coming to is he is going to try to explain through expert

4      testimony what is going on.  If he wants to say what is in

5      the patent, I don't care.

6              MR. STEINBERG:  This is how the patent works.

7      It's what it does.  It determines the amplitude and phase.

8              MR. ROMARY:  I will withdraw for a while.  I

9      don't want it to be expert.  If it's factual, it is okay.

10             MR. STEINBERG:  It is also exactly what he

11     invented.  He invented a system that determines the

12     amplitude and phase.  He created a filter.  And he has got

13     to explain it to them.

14             MR. ROMARY:  I will withdraw it for a while.

15             (End of sidebar conference.)

16             THE COURT:  The objection has been withdrawn.

17             THE WITNESS:  Please repeat the question?

18     BY MR. STEINBERG:

19     Q.   We are going to show a demonstrative and ask you to

20     explain it with respect to amplitude and phase and how it

21     canceled the signal?

22     A.    That is not the one that shows amplitude and phase.

23     That shows the nature of acoustic feedback.

24     Q.    Here we go.  In terms of explaining your patent,

25     explain to the jury what they are seeing and how this works

Levitt - direct

Page 273

1    and how it relates to your patent?

2    A.    Okay.    If you look at the diagram, and you look at the

3    section going, the wire going from the amplifier to the loud

4    speaker, that has two waveforms there.    The black waveform

5    is the signal that's coming in, the one that you want to

6    hear, and the red waveform is the feedback signal that has

7    leaped from the loud speaker back to the microphone, back to

8    the amplifier, and amplified one more time.

9            The concern, of course, is you want to cancel

10    that red waveform, the acoustic signal.    To do that, you

11    have to know not only how intense it is, not only the

12    amplitude, but the exact location, when you get peaks and

13    valleys.    The whole idea of the filter to cancel, it creates

14    an electrical signal that not only has the same amplitude,

15    but it has peaks and valleys at exactly the same instance in

16    time as the signal you want to cancel.

17            When you subtract the two, they cancel each

18    other out.

19            I would like to add that the possibility of

20    doing this with a hearing aid only became possible with

21    digital electronics, because prior to that, with the

22    old-fashioned analog electronics, it was very difficult to

23    manipulate the phase of a signal in a hearing aid.    You

24    could change the amplitude or the gain, but it was very hard

25    or impossible to change the phase the way you wanted it to

Levitt - direct

Page 274

1    be changed.

2              With a digital system, it was very easy to

3    change both amplitude and phase at the same time and

4    independently of each other.  And that was the trick that

5    enabled us to cancel feedback.

6    Q.    Doctor, I had a little difficult time understanding

7    when I first heard it.  What does the word subtract mean

8    when you look at this diagram?

9    A.    You take two signals, I mean, it's addition.  If you

10   have a signal that has a value of five, and it's exactly the

11   same instance of time, another signal has a value of five,

12   and you are subtracting, you are ending up with a signal of

13   zero, that is no signal.

14   Q.    Doctor, would you please turn to PX-562.

15   A.    Yes, I have it.

16   Q.    PX-562 purports to be a December 26th, 1996 letter

17   from the Sughrue law firm hiring you as an expert.  Did you

18   receive that letter?

19   A.    Yes, I did.

20   Q.    Who is cc'd on that letter?

21   A.    Mr. Soren Westermann.

22   Q.    Who is Soren Westermann?

23   A.    He is the head, CEO, I believe, of Widex and also

24   managing, senior person HIMPP organization.

25   Q.    You mentioned HIMPP.  What is HIMPP?

```
 1              MR. STEINBERG:  Thank you, Your Honor.
 2    BY MR. STEINBERG:
 3    Q.    The Sughrue law firm that hired you, who were they
 4    hiring you on behalf of?
 5    A.    They were hiring me on behalf of HIMPP.
 6    Q.    Do Widex and Demant belong to HIMPP?
 7    A.    Yes, they do.
 8    Q.    How did this assignment come up?
 9    A.    Well, they approached me because there was a patent
10    they wanted me to evaluate for them.
11    Q.    When they approached you, did they ask you for your
12    resume?
13    A.    Yes, they did.
14    Q.    Did you provide your resume?
15    A.    Yes, I did.
16    Q.    And if you turn to a composite exhibit, which is
17    PX-598, that's a composite exhibit which is another letter
18    to you from the same law firm, and it attaches some
19    documents; correct?
20    A.    Yes.
21    Q.    And is your resume attached?
22    A.    Yes.
23    Q.    And did you provide these lawyers for the HIMPP
24    organization and these defendants with your resume?
25    A.    Yes, I did.
```

Levitt - direct

Page 277

1   Q.    Does your resume list your patents?

2   A.    Yes.

3   Q.    Okay.  And I direct your attention to Page 3 of your

4   resume.  Are those the two patents at issue in this case?

5   At the very bottom?

6   A.    Yes, those are my patents.

7   Q.    Were you asked to discuss your experience and

8   background to enable you to undertake this assignment with

9   the lawyers for HIMPP and Widex and Demant?

10  A.    Yes.

11  Q.    Now, if you turn back to 562, the first letter, where

12  they hired you, that's the 1996 letter, and if you look at

13  Page 2, in the third paragraph --

14  A.    596?

15  Q.    No.  562, the previous letter to you, dated December

16  '96.

17  A.    Yes.

18  Q.    And you look on the second page --

19  A.    Yes?

20  Q.    -- the first full paragraph, it says, in pertinent

21  part, The patentee filed a response, copy enclosed, in which

22  they submitted a declaration by a Nobel prize recipient

23  opining that the invention claimed in the Anderson '806

24  patent would not have been obvious in light of the prior

25  art.

Levitt - direct

Page 278

1          Do you see that sentence?

2    A.    I see it.

3    Q.    Did anyone discuss with you your qualifications and

4    expertise compared to this Nobel prize winners?

5    A.    Well, I was actually very complimented that they

6    considered me as somebody who, as they said here, had much

7    better credentials than a Nobel prize winner on this

8    particular issue.

9    Q.    Now, towards the end of the letter, they mention

10   sending you a declaration for your signature.

11          Did that occur?

12   A.    Yes.

13   Q.    Okay.  Now, if you turn back over to 598, the

14   composite exhibit, attached there is one of the documents,

15   your declaration.

16   A.    Yes.

17   Q.    And is one of the documents also a consulting

18   arrangement whereby these defendants and HIMPP hired you?

19   A.    Yes.

20   Q.    Now, is the second letter also c.c.'d to Mr. Sorenson?

21   Mr. Westerman.  Excuse me.

22   A.    Yes.

23   Q.    Now, does the second letter, dated July of 1997 -- it

24   mentions yet another project they wanted to retain you on as

25   an expert.  Did that occur?

Levitt - direct

Page 299

1    Q.    When you spoke at seminars, did members of the hearing

2    aid industry attend your seminars?

3    A.    Yes.

4    Q.    Did any of them tell you at that time when they

5    attended your seminars that you weren't the inventor?

6    A.    No.

7    Q.    Did they tell you there was prior art or it was

8    invalid?

9    A.    No.

10   Q.    Did any one of the gentlemen whose articles or patents

11   have been mentioned ever tell any of the associations who

12   gave you awards that you didn't deserve those awards?

13   A.    No.

14   Q.    When is the first time that anyone has challenged your

15   patents?

16   A.    When this patent case came to be.

17   Q.    Now, Doctor, are you surprised that your patents are

18   being challenged?

19   A.    I am amazed.  I mean, I worked with these companies 20

20   to 30 years, advised them on developing new products, new

21   ideas for hearing aids.  Now they turn around and say my

22   ideas aren't original.

23   Q.    Dr. Levitt, why are you testifying in this case?

24   A.    I have been asked to testify.

25   Q.    Other than being asked to.

Levitt - cross

Page 347

```
1    filter?

2    A.    Never bothered me.

3    Q.    It didn't bother you?

4    A.    No.

5    Q.    But you never challenged that, did you?

6    A.    That was brought to my attention until recently, as a

7    matter of fact.

8    Q.    Other than recently, at the time you didn't challenge

9    him, did you?

10   A.    No.

11   Q.    As a matter of fact, you got this award in, what was

12   it, 2001?

13   A.    I think so.

14   Q.    And that was the Acoustic Society of America.  You

15   said it wasn't an award.  It was -- would you explain it for

16   the jury, what it was?

17   A.    It was a Special Session of the Acoustical Society of

18   America to honor my contributions and different people gave

19   talks in different areas of research that I had made

20   contributions.  Kates gave a talk on feedback cancellation.

21   Q.    And his talk was about his acoustic -- about his

22   acoustic system with the LMS filter.  Correct?

23   A.    He described his system.

24   Q.    As being -- as using an be LMS filter.  Correct?

25   A.    Yes.
```

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                IN AND FOR THE DISTRICT OF DELAWARE
 3
                         -   -   -
 4
 5    ENERGY TRANSPORTATION,            :   Civil Action
      INC.,                            :
 6                                      :
                  Plaintiff,           :
 7                                      :
          v.                           :
 8                                      :
      WILLIAM DEMANT HOLDINGS A/S,      :
 9    et al.,                          :
                                        :
10                Defendants.           :   No. 05-422 (GMS)
11                       -   -   -
12                   Wilmington, Delaware
                  Wednesday, January 23, 2008
13                      8:30 a.m.
                     Third Day of Trial
14
                         -   -   -
15
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18    APPEARANCES:
19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                      -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                               Counsel for Plaintiff
24
25
```

Levitt - redirect

Page 382

1    Q.    Now, this article was written in 1991.  I believe you

2    said that Mr. Kates was one of those that honored you in a

3    special session of the Acoustical Society of America in

4    2001, ten years later.  Is that correct?

5    A.    That is correct.

6    Q.    So let's go to that exhibit, which is DX-1770.

7    A.    In which book?

8    Q.    That's in the other book.

9    A.    Okay.  Yes.

10   Q.    Do you have it in front of you?  That is the special

11   session?

12   A.    Right.

13   Q.    The honor that Mr. Kates was giving you at that

14   special session?

15   A.    Yes.

16   Q.    So the second page of that document describes that he

17   was honoring you for your feedback cancellation system,

18   among other things.  Right?

19   A.    That is correct.

20   Q.    Now, after that, we have his specific papers for his

21   presentation.  Correct?  It says feedback cancellation in

22   hearing aids.  James Kates.  Right?

23   A.    Yes.

24   Q.    After that, is that your patent, the '850 patent?

25   A.    Yes.

Levitt - redirect

Page 383

1   Q.    Then after that, is that some of the claims of your

2   patent?

3   A.    Yes.

4   Q.    Then we go to the very next page, which is labeled

5   Page 4 at the very top, it says Feedback Path Model?

6   A.    Yes.

7   Q.    Is that your patent?

8   A.    No.  That's his work.

9   Q.    That's Mr. Kates's work?

10  A.    Right.

11  Q.    Now, if you could just leaf through Mr. Kates's

12  presentation and see if he wants once in his presentation

13  ever says your filters are fixed?

14  A.    No.

15  Q.    But if you look back on Page 1 where Mr. Kates

16  describes his method, that's the title, Feedback Path Model

17  on Page 4 of his presentation?

18  A.    Yes.

19  Q.    Let's go to Page 4 if we can.

20  A.    I have got Page 4.

21  Q.    I want to play it on the screen so we can all see it.

22        There we are.

23        That is describing Mr. Kates's methodology.

24  Correct?

25  A.    Yes.

1    Q.    Now, in his methodology does he use a fixed filter?

2    A.    He does describe a fixed filter in the second last

3    line.

4    Q.    And that's in his model, not yours.  Correct?

5    A.    That is correct.

6    Q.    Now, after Mr. Kates left you at City University of

7    New York, who did he work for after that?

8    A.    ReSound.

9    Q.    And ReSound is what?

10   A.    Is one of the hearing aid companies that's -- I forget

11   who owns it today, but it is part of the group.

12   Q.    Does your patent have any limit on the number of sets

13   of coefficients you can put into the memory of the filter?

14   A.    There is no limit specified.

15            MR. STEINBERG:  May I have one moment, Your

16   Honor?

17            THE COURT:  Yes.

18            (Pause.)

19            MR. STEINBERG:  Thank you, Your Honor.

20            THE COURT:  You are welcome.

21            Dr. Levitt, thank you.  You are excused.

22            THE WITNESS:  I am excused?

23            THE COURT:  Yes.

24            THE WITNESS:  I appreciate that very much.

25            (Witness excused.)

Chen - cross

Page 449

1    80 percent of Audimax at that time.  Is that right?

2    A.    Yes.

3    Q.    And today you own a hundred percent of ETG?

4    A.    Yes.

5    Q.    I think I heard you say, Mr. Chen, that you personally

6    are not somebody who has a technical background.  Is that

7    correct?

8    A.    Correct.

9    Q.    And you are not someone qualified to talk about the

10   patents that are involved in this lawsuit, are you?

11   A.    In the technical matters relating to these patents,

12   no.

13   Q.    That is what I meant, I am sorry.

14   A.    No.

15   Q.    You mentioned, I believe, that in the 2001-2002 time

16   frame, you became interested in, you and your brother became

17   interested in possibly licensing or maybe selling your

18   patents.  Is that correct?

19   A.    Yes.

20   Q.    And you retained a company by the name of EKMS.

21   Correct?

22   A.    Correct.

23   Q.    And were you the person who retained EKMS?

24   A.    I contacted them and initiated discussions, and then

25   handed off the -- I don't remember whether I did the

Chen - cross

Page 450

1    negotiation of the final -- of whatever was finally agreed

2    or whether one of our other colleagues did that.  But I

3    initiated the engagement of EKMS, the discussions.

4    Q.    Now, you looked at a -- I think Ms. Eckstein gave you

5    a document, let me go get it.  It should be in your

6    notebook, Mr. Chen.  This is a Document DX-1642.  Do you

7    have that?

8    A.    1642, yes.

9    Q.    Let's put that up.

10            And this is a document you testified about.  Let

11   me ask you this:  When was the first time you saw this

12   document?

13   A.    The first time I saw this document was recently.

14   Q.    You had not seen it before?

15   A.    I don't recall seeing it before.  It may have crossed

16   my desk.  But I don't recall seeing it before.

17   Q.    So this was something that the lawyers gave you to

18   look at.  Is that right?

19   A.    That's correct.

20   Q.    And this is a document -- do you know who it's from?

21   A.    Well, by reading it, it looks like it's from somebody

22   named -- whose Internet address is DSPEric.

23   Q.    Do you know who that is?

24   A.    I think it's the expert, technical expert that EKMS

25   was working with at the time.

Chen - cross

Page 451

1   Q.    Were you -- Dr. Dowling, is that who you are thinking

2   about?

3   A.    That was the name of the expert, as far as I am aware.

4   Q.    How did you know that Dr. Dowling was the expert?

5   A.    I was informed, and it's also in other documents that

6   have been referred to earlier.

7   Q.    Informed by whom?

8   A.    My lawyers and -- I may have been informed, but have

9   forgotten, from any of the documents that were shown to me

10  at that time when EKMS was hired, because I remember that

11  they were engaging a technical expert and had mentioned the

12  names to our people.

13  Q.    Okay.  Now, this document, this e-mail is directed to

14  Mr. John Boddie.  You know who that is, don't you?

15  A.    I don't remember.

16  Q.    You don't understand Boddie works for EKMS?

17  A.    Yes.

18  Q.    You do understand that?

19  A.    Yes.

20  Q.    Now, I think I testified that this was an e-mail  that

21  in your opinion gave a different interpretation to   the

22  document we saw later, DX-1610.  Is that a fair

23  characterization of your testimony?

24  A.    I guess I would have to disagree with you.  When you

25  say this is a document which gives a different

Chen - cross

Page 452

1    interpretation, to me, it's a document which would aide in

2    understanding the entirety of the other document.

3    Q.    Oh, okay.  I'm sorry.  So, this document gives clarity

4    to DX-16 -- the document that we saw called the ETG summary

5    report.  Is that right, Mr. Chen?

6    A.    I would say this document helps one try to understand

7    the other document, and it makes very clear the position of

8    the technical expert.

9    Q.    Oh, okay.  Now, you saw this document, DX-1642.  You

10   saw DX-1610, the ETG report; correct?

11   A.    Do you mind if I just flip back?  Which one is it?

12   Q.    1610.

13   A.    Okay.  Yes.

14   Q.    You saw that document; right?

15   A.    Yes, correct.

16   Q.    And who gave you that document, DX-1610?

17   A.    You have just given it to me now.

18   Q.    No, I mean when you testified.  When did you see it

19   first?

20   A.    I don't know.  Certainly, my knowledge of it was

21   refreshed when I was preparing for this trial.  I don't

22   recall whether I saw this or a draft of this or if this is a

23   draft or whatever in some time six years ago or five years

24   ago, whenever.

25   Q.    So this summary report, the ETG summary report that

Chen - cross

Page 453

1    EKMS prepared, you are not sure whether you saw it before

2    this lawsuit?

3    A.    I don't remember.

4    Q.    Did you know the substance of this report before you

5    filed this lawsuit?

6    A.    I knew that, I knew that EKMS had contacted people and

7    that nobody wanted to license and then I decided to go and

8    do something, which is to litigate.

9    Q.    Did you know the substance of this report prior to

10   this lawsuit?

11   A.    I may have known the substance of this but I don't

12   remember, but -- fine, if I answered your question.  Sorry.

13   Q.    You remember that deposition I spoke about that was on

14   July 31, 2007?

15   A.    Correct.

16   Q.    Now, I asked you at that time if you were aware of the

17   substance of this ETG -- this EKMS report.  Do you remember

18   that?

19   A.    I remember vaguely that we may have had some

20   discussion along those lines.

21   Q.    Now, you were under oath back in your deposition just

22   like you are under oath today; correct?

23   A.    Yes.

24   Q.    You understand that?

25   A.    Correct.

Chen - cross

Page 454

1   Q.     Now, didn't you tell me that?

2                THE COURT:  Did you have a copy of the

3   deposition?

4                MR. MANDIR:  Yes, Your Honor.

5                Would you like a copy of the deposition?

6                THE COURT:  I would like you to give it to him.

7                MR. MANDIR:  Okay.

8                THE COURT:  Counsel, are you aware, do you have

9   a copy of the deposition?

10               MS. ECKSTEIN:  I do have a copy.

11               THE COURT:  Could you make a specific reference

12  to page and line?

13               MR. MANDIR:  I'm going to, Your Honor.  Thank

14  you.

15  BY MR. MANDIR:

16  Q.     At that deposition, I asked you, didn't I, whether or

17  not you were aware of the substance of it?

18  A.     Could you refresh any memory?

19  Q.     Yes, I will do that.

20               MS. ECKSTEIN:  Your Honor, could we have page

21  and line number?

22               THE COURT:  Could we have a reference to the

23  page and line?  And are you intending to provide the witness

24  with a copy?

25               MR. MANDIR:  Yes, Your Honor.

Chen - cross

Page 455

```
 1                THE COURT:  Well, let's do that first before you
 2      ask the question.
 3                MR. MANDIR:  Well, what I can do, Your Honor, is
 4      actually just play that, the tape.
 5                THE COURT:  Okay.
 6                THE WITNESS:  Excuse me.  Do you mind if I take
 7      a cough drop?
 8                MR. MANDIR:  Of course.
 9                Just one moment, Your Honor.
10                (Pause.)
11                MR. MANDIR:  Can you put up 126, two through
12      five, please?
13      BY MR. MANDIR:
14      Q.           "Question:  But you were made aware of the
15      substance of the EKMS report; correct?
16                "Answer:  I generally would have been aware of
17      the substance of the report.
18                Do you remember making that testimony, Mr. Chen?
19      A.    If that is what your record is, then I must have said
20      that, yes.
21                Thank you.
22      Q.    Okay.  Let's go back to this document, DX-1642,
23      please.
24      A.    Okay.
25      Q.    Okay.  Now, my understanding is you believe that 1642,
```

Chen - cross

Page 456

1    which was provided by your attorneys, gives clarity to

2    DX-1610 which is the EKMS report; correct?

3    A.    I think that it expresses the opinion of a technical

4    expert.  I would have to look very closely to see whether I

5    could answer your question exactly.

6    Q.    Okay.  But as far as you know, it gives clarity.  The

7    documents that you have received; is that correct?

8    A.    It helps me, if you ask me now how to interpret the

9    two, taking the two documents together, I would have an

10   interpretation, yes.

11   Q.    Did you look at any other documents concerning the

12   possible interpretation of DX-1610, the EKMS report besides

13   this DX-1642, the e-mail from Dr. Dowling?

14   A.    I'm trying to think what I have seen in the course of

15   the pretrial preparation and so forth, and before.  I may

16   have seen other things.  I can't recall immediately the

17   specific documents.

18   Q.    Let me put up a new document.  It's DX-1623.

19              Can we go to the second page?  And blow up the

20   bottom, please.

21              And I'm going to refer you to the second page of

22   that two paged document, Mr. Chen.

23   A.    So on the back of the copy you have of the first.

24   Q.    It should be exactly as you see on the screen.

25   A.    Okay.

Chen - cross

Page 457

1   Q.    Okay.  Now, you have remember that DX-1642, the e-mail

2   from Dr. Dowling, that was dated in July of 2002; correct?

3   A.    Okay.

4   Q.    Now, we have a document in September of 2002.  That is

5   after July of 2002; correct?

6   A.    Uh-huh.

7   Q.    Okay.  Now this is an e-mail from a John Boddie which

8   we saw was the person in the other e-mail; correct?

9   A.    Uh-huh.

10  Q.    And he addressed this to a Mr. Pitonyak.  Who is

11  Mr. Pitonyak?

12  A.    Mike Pitonyak is a gentleman who has run one of our

13  companies Heat-Timer for many years and he has also at

14  various times helped manage other of our various

15  enterprises.

16  Q.    So Mr. Pitonyak works for you?

17  A.    Today, no.

18  Q.    But back at this time?

19  A.    Yes.

20  Q.    Okay.  Now, let's see what this e-mail says.  It says:

21          Mr. Pitonyak,

22          Eric Dowling (our expert), Harry Levitt and I

23  have spent the last three weeks taking a much closer look at

24  the Audimax patents with a focus on the '850 patent.  This

25  exercise has had some mixed results which we will be

Chen - cross

Page 458

```
 1    reporting on late next week.  In the meantime, we will have

 2    a much clearer picture of those digital hearing aid features

 3    required to constitute obvious infringement and have begun

 4    looking at ReSound, Oticon, Widex, Siemens and others to see

 5    whether these features do, indeed, exist in any of their

 6    hearing aid products.

 7              Have you seen this document before today,

 8    Mr. Chen?

 9    A.    I may have.  I don't recall.

10    Q.    The attorneys didn't give you this document to look at

11    before you testified?

12    A.    They gave me a lot of documents to look at, sir.

13    Q.    But you can't remember them giving you this document?

14    A.    I don't remember, one way or the other.  But if you

15    are showing it to me, that's fine.

16    Q.    And this e-mail is after the July document that you

17    testified about, isn't it?

18    A.    Correct.

19    Q.    Okay.  Can we go up?

20              Okay.  So now we have this e-mail on September

21    12th that we just read to Mr. Pitonyak.  Mr. Pitonyak writes

22    back two hours later and says, John, to Mr. Boddie, John

23    Boddie, we would like to get a written report on the

24    accomplishments to date, the direction we are moving and

25    your conclusions to date.  We have not had much feedback
```

Chen - cross

Page 459

1    beyond your e-mail below.

2              And the e-mail below is the one we just read.

3              Have you seen that E mile from Mr. Pitonyak?

4    A.    I may have, but ...

5    Q.    Okay.  Next page, please.  Page up.

6              Okay.  Then, bottom one, please.

7              Mr. Boddie writes back the next day, Friday the

8    13th, and says:  Mr. Pitonyak, I'll send a report on Monday.

9              Okay.  Next e-mail.

10             Mr. Pitonyak, who seems to answer his e-mail

11   very regularly a couple hours later says:  Thanks, Mike.

12             And do you see the cc. there?

13   A.    Yes.

14   Q.    Who is that cc.?

15   A.    Me.

16   Q.    Okay.  Do you remember getting this?

17   A.    I don't remember it but it was addressed to me.

18   Q.    And this was the e-mail that occurred just prior to

19   the EKMS report; correct?

20   A.    What was the date of the EKMS report?

21   Q.    I believe it's September 16, 2002.

22   A.    Okay.

23   Q.    The Monday after that.

24             MS. ECKSTEIN:  Objection, Your Honor.  There is

25   nothing on the report, itself suggesting the date.

Chen - cross

Page 460

1          THE COURT:  Did you say "I believe?"

2          MR. MANDIR:  This says it's coming on the 16th.

3          THE COURT:  Who cares what you believe, counsel.

4          MR. MANDIR:  Okay.

5          THE COURT:  Sustained.

6   BY MR. MANDIR:

7   Q.    But this e-mail indicates a report is coming on

8   Monday; right?

9   A.    Apparently.

10  Q.    And this EKMS report, do you understand this to come

11  after this?

12  A.    I don't know when -- are you referring to the exhibit

13  you asked me to look at?

14  Q.    DX-1610.

15  A.    The one that --

16  Q.    That's the ETC summary report.

17  A.    I don't know when that was sent or received and I

18  don't know whether it was the final report.

19  Q.    But you know it was, it was in the September time

20  frame, don't you, from just looking at the document?

21  A.    All I could tell from re-reading the document was that

22  it was probably written some time after early August but --

23  or late August, but that is all I could tell.

24  Q.    Okay.  And this e-mail of September 13th is referring

25  to a report from EKMS to be sent; correct?

Chen - cross

Page 461

1    A.    They're referring to some report.  What kind of

2    report, I have no idea.

3    Q.    Okay.  So now you testified about a document July

4    24th, 2002 that indicated that Mr., Dr. Dowling had some

5    conclusions about the '850 patent; correct?  About whether

6    it was continuously adaptive or not.  That is what you

7    testified about.

8    A.    Yes, I just said that.

9    Q.    And then you didn't testify about this document that

10   we see where EKMS says that we've looked a lot closer at

11   this patent and we've gotten Harry Levitt involved and we

12   have some mixed results to tell you about; correct?

13   A.    Could you repeat the question again?

14   Q.    Sure.  You didn't talk about this e-mail of September

15   12th which indicates that Dr. Dowling took a much closer

16   look at the patents and that he got Dr. Levitt involved and

17   had some mixed results to tell you about.  You didn't look

18   at this document, did you?

19   A.    I'm sorry.  You asked me two questions.  One, I didn't

20   mention this and then you said I didn't look at it, so ...

21   Q.    You testified, Mr. Chen, that you thought that the

22   earlier July e-mail clarified what was really meant in this

23   ETG, this EKMS report; right?

24   A.    I think, if I recall what I said a few minutes ago, I

25   said that, to me, it was, the July 24th clearly expressed

Chen - cross

Page 462

1    what the expert, Mr. Dowling thought, and it would help me

2    interpret or understand more the wider implications of what

3    EKMS was saying in the document that was entitled the

4    summary report.

5    Q.    Do you think this document September 12th, do you

6    think this e-mail from Mr. Boddie, do you think that would

7    help clarify the EKMS report?

8    A.    The problem is that this just said the exercise had

9    some mixed results, so I don't know what the mixed results

10   are.  And I don't know mixed results in whose eyes because

11   it talks about three people talking, and so I don't know

12   whose opinion is being reflected and about what.  So, to me,

13   it's just sort of a mystery.

14   Q.    Well, it says that Eric Dowling, Harry Levitt and I --

15   being Mr. Boddie -- spent the last three weeks taking a much

16   closer look at the Audimax patent, particularly the '850,

17   doesn't it?

18   A.    Correct.

19   Q.    And it also says that this exercise has had some mixed

20   results which we will be reporting on late next week.

21        So isn't it your understanding that based on

22   those three people and looking at it, there is some

23   conclusion that has come about?

24   A.    It's not clear to me whether they were agreeing with

25   each other or whether they had different opinions which

Chen - cross

Page 463

1    would be also a kind of mixed result.  Same as when I have a

2    discussion with somebody, it's fair to say we talked about

3    something together.  It doesn't mean that we agreed.

4    Q.    When you testified, why did you talk about this

5    document?  It was after the July document that you did talk

6    about.

7    A.    First of all, I wasn't asked to talk about this

8    document in the earlier question.  You are asking me about

9    it now so I'm answering.

10   Q.    So you were only asked to talk about the July document

11   and then the EKMS report.  That is all you were asked to

12   talk about.

13   A.    That is my recollection of what I was asked a few

14   minutes ago.

15   Q.    Let's look at DX-1610.  Let's start off with the first

16   paragraph of this.

17            And what it says is:  EKMS began working to

18   license the patents in the Audimax portfolio in late

19   May/early June of 2002.  At that time, the decision was made

20   to focus in on the '850, which appeared to be the strongest

21   of the set of Audimax patents.  The following companies were

22   chosen as targets:

23            And then it lists five companies.  The second

24   one is Widex, and the third one is Oticon.  Do you see that?

25   A.    Correct.

Chen - cross

1    Q.    Who chose these targets?

2    A.    I have no idea but I certainly didn't.  It was

3    probably EKMS but I don't know exactly how this set of

4    targets was derived.

5    Q.    Next paragraph.

6          It talks about after talking with Harley Levitt

7    and Richard Dugot in mid May, we chose to contact several

8    ReSound scientists whose had started a second company,

9    called SoundID.  Do you see that?

10   A.    Yes, I do.

11   Q.    And do you know who SoundID is?

12   A.    Generally speaking.

13   Q.    Okay.  They're a company that EKMS went to talk to in

14   trying to license these patents; correct?

15   A.    Correct.

16   Q.    And when did you know about that?

17   A.    I recall vaguely that I knew that they, that SoundID

18   had been contacted back in the time range of when EKMS was

19   working for us and certainly my memory has been refreshed

20   since then.

21   Q.    Do you remember that SoundID had told EKMS that they

22   didn't think they infringed because they do a continuously

23   adaptive feedback cancellation technique?

24   A.    Well, that certainly is what I now understand based

25   upon all the documents I have had to review.

Chen - cross

Page 465

1    Q.    Did you understand that at the time?

2    A.    I don't -- probably, I understood at the time but I

3    can't recall exactly.

4    Q.    Were you being kept apprised of what EKMS was doing

5    and the successes or failures that they were having

6    licensing your patents?

7    A.    I asked Mr. Mike Pitonyak to handle the detailed

8    day-to-day interaction with EKMS because I had a lot of

9    other things that I was paying attention to also at the

10   time.

11   Q.    You certainly looked at this EKMS report that we have

12   up on the screen at some point, didn't you?

13   A.    Yes, probably.

14   Q.    And was it before you filed the lawsuit?

15   A.    I can't recall.

16   Q.    You're not sure if you saw this report before you

17   filed the lawsuit?

18   A.    I don't recall.

19   Q.    So you paid $50,000 for this report; right?  Correct?

20   A.    Correct.

21   Q.    And this was a company that you had hired; correct?

22   A.    Correct.

23   Q.    And this was concerning these Audimax patents, the

24   only two patents, the only two real assets Audimax had;

25   right?

```
 1    A.     Right.

 2    Q.     But you don't remember reading this report prior to

 3    filing a lawsuit against the two defendants that are

 4    actually named in this report?

 5    A.     I don't recall whether I read this immediately prior

 6    to doing that, but I do remember that I made the conscious

 7    decision that we had some rights which probably we should

 8    try to enforce.

 9              THE COURT:  Counsel, I think I'm going to let

10    the jury take a stretch break at this point.

11              MR. MANDIR:  Your Honor.

12              THE COURT:  Let's take a short stretch break.

13              (Brief recess taken.)

14              THE COURT:  Ms. Walker, please bring in the

15    jury.

16              (Jury enters courtroom at 12:21 p.m.)

17              THE COURT:  Please, take your seats, ladies and

18    gentlemen.  We will continue with the cross-examination.

19              MR. MANDIR:  Thank you, Your Honor.

20    BY MR. MANDIR:

21    Q.     Mr. Chen, do you have open DX-1610, the document we

22    were just talking about?

23    A.     Let me just open it up.

24    Q.     I want to refer you to the last paragraph, which

25    starts with, "Eric Dowling."  Do you see that?
```

Chen - cross

Page 467

1    A.    Yes.

2    Q.    It says, "Eric Dowling, the EKMS expert, took a look

3    at the patent while EKMS arranged a second call with Harry

4    Levitt for early August."

5            Do you see that?

6    A.    Yes.

7    Q.    Were you aware at the time that EKMS was talking to

8    Dr. Levitt about his patent?

9    A.    I was aware generally that they would be in contact

10   with him.

11   Q.    And were you aware that Dr. Dowling was talking to

12   Harry Levitt?

13   A.    Not specifically, but I was sure that EKMS was

14   contacting those people associated with us who were relevant

15   to what they had been asked to do.

16   Q.    It goes -- I am sorry.  Did you have more for that

17   answer?

18   A.    No.

19   Q.    It goes on to say, "Over the course of two calls, we

20   worked through the language of the patent and found that the

21   body of the patent included language adverse to an

22   interpretation of the claims involving a continuously

23   adaptive approach."

24           Do you see that?

25   A.    Yes.