Chen - cross

1   Q.    Were you made aware that EKMS had come to the

2   conclusion that there was an interpretation based on the

3   language in the patent adverse to an interpretation that the

4   claims covered continuously adaptive approach?

5   A.    I am generally aware that certain people said that

6   this concept of continuously adaptive might be in their view

7   a problem for us.  But I don't remember who it was.  I know

8   the Sound ID people apparently had said that.

9   Q.    Were you aware at the time that EKMS had come to that

10  conclusion?

11  A.    I was not aware that they had any strong conclusion

12  about this feature.

13  Q.    Now, let me see if I understand you, Mr. Chen.  You

14  are reading this paragraph up on the screen to mean that

15  this is not the position of EKMS, it's just the position of

16  Sound ID?  Did I understand you correctly?

17  A.    I can't say that this is EKMS's final conclusion,

18  because later on in the report they, EKMS said that the

19  report says that they hadn't completed their study of this

20  issue.

21  Q.    But this paragraph that we have up on the screen,

22  based on what you have read in this report, you don't think

23  that this is EKMS's opinion?  You think it's Sound ID's

24  opinion?

25  A.    I can't say.  I can't say one way or the other.

Chen - cross

Page 469

1    Q.    And you can't say because you were looking at this

2    earlier e-mail, July 24th e-mail, between Dr. Dowling and

3    John Boddie?  Is that why you can't say?

4    A.    The reason I can't say is because it's not clear who

5    the two calls are with and whose opinion is being expressed.

6    Q.    You are not aware that -- you don't think this says

7    that Harry Levitt and Eric Dowling were talking to each

8    other?  Isn't that what it says here, Mr. Chen?

9    A.    It says that we -- I don't know who the "we" is.  We

10   could be EKMS and Harry Levitt and Dr. Dowling.  It could be

11   EKMS.

12         Again, it's not absolutely clear to me who is

13   taking the position or finding that there may be some

14   question about this.

15   Q.    Can't you look at the sentence right before the we?

16   It's pretty clear, isn't it, "Dr. Eric Dowling, the EKMS

17   expert, took a look while EKMS arranged a second call with

18   Harry Levitt for early August"?

19         MS. ECKSTEIN:  Your Honor, at this point, it's

20   asked and answered.

21         THE COURT:  I am going to sustain the objection.

22   You are becoming argumentative.

23         MR. MANDIR:  Okay, Your Honor.  I will move on.

24   BY MR. MANDIR:

25   Q.    At the bottom of this page, Mr. Chen, it starts with,

Chen - cross

1    "While neither of these points," and above it it makes two

2    points about prior art and also about prosecution.  And what

3    it says, if you read starting on that last line of that

4    page, it says "While neither of these points prevent an

5    interpretation of the patent that might require compulsory

6    licensing, it seems that such an interpretation is

7    nonobvious enough to pose a serious hindrance to any

8    litigation-free licensing effort."

9              Do you see that?

10   A.    Yes.

11   Q.    Were you aware that EKMS came to the conclusion that

12   the only way that a company would license is if they got

13   sued?

14   A.    In general, that's the conclusion I drew as a

15   businessman, based upon all the advice I received, including

16   whatever input we had from EKMS.

17   Q.    Now, you mentioned that you are not sure that this

18   report is the final report.  Is that right?

19   A.    Correct.

20   Q.    Are you aware of another report?

21   A.    I am not aware of any other report.

22   Q.    What happened to EKMS after this report?  Did you fire

23   them?

24   A.    We did not continue with them.

25   Q.    You fired them?

Chen - cross

Page 471

1    A.    I don't remember if there was a specific letter giving

2    written notice of termination of our agreement with them.

3    Q.    What was the reaction when you got this report from

4    EKMS?  Were you happy with their analysis?

5    A.    I, frankly, as I said, don't recall whether -- too

6    much about my reaction at the moment that I may have seen

7    this report.  But I do clearly know and remember what I did

8    in general.

9    Q.    You don't recall challenging this report with EKMS.

10   Is that right?

11   A.    I don't remember myself challenging this report with

12   EKMS.

13   Q.    Okay.  The second page, the first full paragraph, it

14   says that the '749 patent -- that is the other patent

15   involved in this lawsuit.  Right?  Are you aware of that?

16   A.    Yes.

17   Q.    It says, "Seems to suffer from the same problem,

18   specifying in the description of the preferred embodiment

19   that test sounds shall be provided as necessary rather than

20   all of the time as would occur with a continuously adaptive

21   system."

22              Do you see that?

23   A.    Yes.

24   Q.    Were you aware that EKMS also came to the conclusion

25   that the '749 patent had problems covering continuously

Chen - cross

Page 472

1    adaptive hearing aids?

2    A.    The technical details of any difficulty that they

3    might have had in regard to our features and how they would

4    apply to the products, I am not aware of the technical

5    details.  All I know is as a business matter, there was no

6    clear conclusion that I could draw from this.

7    Q.    Let's go to the third page, please.

8          Were you aware that as part of EKMS's analysis,

9    they looked at the product literature of both Widex and

10   Oticon.

11   A.    Now that I have seen this document and refreshed my

12   memory, yes, it appears they did that.

13   Q.    Let's go back for a moment to DX-1642.

14   A.    Just give me a second.

15   Q.    Sure.

16   A.    Okay.

17   Q.    This was the e-mail that you testified about in your

18   direct examination.  Correct?

19   A.    Yes, I was asked to testify about this.

20   Q.    And this is a document that is between Mr. Boodie of

21   EKMS and Eric Dowling.  Is that your understanding?

22   A.    That's my understanding.

23   Q.    And this document, this e-mail, there is no indication

24   that it was ever given to Audimax.  Isn't that correct?

25   A.    Well, from the way it's addressed, no.  But, of

Chen - cross

Page 473

1    course, I have no idea whether other means of communication

2    occurred.

3    Q.    So for all you know, this was an internal e-mail

4    within EKMS trying to figure out this patent.  Correct?

5    A.    I can't draw any conclusions.

6    Q.    And that's because you have no way to know whether

7    this -- in fact, there is nothing here to suggest or

8    indicate that this e-mail or the substance of it was ever

9    transmitted to Audimax.  Correct?

10   A.    I can't say.

11   Q.    Let's go down on this document, please.

12         Now, Doctor Dowling in this e-mail points to a

13   lot of places in the patent, correct, and says nobody but a

14   red-faced liar would ever say that the patent is not

15   adaptive?  Is that your understanding?

16   A.    That's what it says.

17   Q.    Now, all the citations in this e-mail that Dr. Dowling

18   has identified, do you know if any of them have to do with

19   cancellation of acoustic feedback?

20   A.    I couldn't possibly say.  I am not a technical person.

21   Q.    Do you know --

22         THE COURT:  Counsel, let him finish his answer.

23         MR. MANDIR:  I am sorry, Your Honor.

24         THE WITNESS:  I can't comment on technical

25   things.  I am not an electrical engineer.

Chen - cross

1    BY MR. MANDIR:

2    Q.    So you don't know if Dr. Dowling in this e-mail of

3    July 24th, whether or not he is on the right track here by

4    pointing to things in the patent that matter?

5    A.    I am not qualified to judge about his professional

6    opinion.

7    Q.    Don't you think that would be something of

8    importance, if you are going to interpret that ETG report

9    that says we don't think that there is coverage of the

10   adaptive approach?  Don't you think it would be important to

11   know whether this has anything to do with the final

12   conclusion?

13          MS. ECKSTEIN:  Objection, Your Honor.  It is

14   misstating the document.

15          THE COURT:  It's cross-examination.  Go ahead.

16          Could you repeat the question?

17   BY MR. MANDIR:

18   Q.    This document, this e-mail, don't you think it is

19   important to be able to understand that paragraph in the

20   final report about who is saying what to know whether this

21   e-mail is based on an -- based on correct citations to the

22   patent with respect to acoustic feedback?

23   A.    Sorry.  That was a long sentence with a lot of parts.

24   Say it again in a more structured way, please?

25   Q.    This document, this e-mail, you don't know whether it

1  has to do, the portions cited in there about the patent, you

2  don't know if it has to do with acoustic feedback or not?

3  A.    No.  I am not competent to say.

4  Q.    You don't know if Dr. Dowling, after writing this

5  e-mail, somebody pointed out to him, you know, all these

6  things that you cited, they don't have to do with acoustic

7  feedback in the patent?  You don't know that?

8  A.    No.

9  Q.    You don't know if Dr. Levitt pointed that out to Dr.

10  Dowling?

11  A.    Correct, I don't know that.

12  Q.    But we do know that Dr. Dowling met with Harry Levitt

13  from the final report.  We know that.  Right?

14  A.    Well, apparently they had some contact, whether it was

15  in person or by phone.

16  Q.    Now, at the time you sold Audimax -- I am sorry, that

17  you bought your brother's share in Audimax, that was 2003.

18  Is that right?

19  A.    I bought -- my brother and I divided up all the ETG

20  assets, and among them Audimax was included in the

21  transaction.

22  Q.    And what time, what date was that?

23  A.    Roughly around 2003.  I don't remember the exact

24  dates.

25  Q.    And you paid your brother one million dollars to get

Chen - cross

Page 476

1    his interest of Audimax and the two patents that are

2    involved in this lawsuit.  Correct?

3    A.    Absolutely not.  I paid my brother one million and

4    other consideration as part of the global dividing up of

5    assets and obligations that existed in ETG.

6    Q.    And in 2003 when you gave your brother one million

7    dollars and other consideration, that gave you all of his

8    rights in the Audimax patents.  Correct?

9    A.    It gave me all the rights and liabilities of dealing

10   with Audimax, yes, as part of the overall transaction

11   involving lots of things.

12   Q.    That transaction gave you his rights in the Audimax

13   patents.  Correct?

14   A.    Which transaction?

15   Q.    The transaction that we are speaking about.

16   A.    The transaction, globally speaking, of us separating

17   up our stuff, yes, Audimax was part of that.

18   Q.    And that was in 2003?

19   A.    Approximately, yes.

20   Q.    And at that point, in 2003, you had approached Sound

21   ID to see if they were willing to license the patents.

22   Correct?

23   A.    Well, apparently, that was done before 2003, yes.

24   Q.    And Sound ID said we don't need it because we don't

25   infringe that technology.  Correct?

Chen - cross

Page 477

1    A.    Apparently, yes.

2    Q.    And at that point, we see this EKMS report before that

3    transaction saying that they don't think your Audimax

4    patents cover continuously adaptive approach.  Correct?

5    A.    Sir, before that transaction, you mean --

6    Q.    This 2003 transaction we have been talking about.

7    A.    I explained that stuff with my brother.

8    Q.    Correct.  By the time this transaction occurred, you

9    had this EKMS report.

10   A.    Correct.  We must have had some kind of report.

11   Whether it was this one or a more final report, you know, I

12   don't remember.

13   Q.    Okay.  So did you license, did you have any licenses

14   on the Audimax patents at the time of this transaction with

15   your brother?

16   A.    No.

17   Q.    Okay.  So it had never been licensed prior to that

18   time?

19   A.    No.

20   Q.    And so when you did this transaction with your

21   brother, you considered what had been done before with

22   respect to this Audimax patent; correct?

23   A.    When you say "considered," what do you mean?

24   Q.    Well, you considered that the Audimax patent had never

25   been a product that you made with respect to the Audimax

1    patent; right?  You considered that in this transaction

2    where your brother's Audimax shares were given to you,

3    didn't you?

4    A.    Wait a second.  Sorry.

5    Q.    Let me rephrase, please.

6    A.    Okay.  Thanks.

7    Q.    At the time you had this transaction with your brother

8    in 2003, at that point you came to some agreement as to how

9    certain assets would be split and the Audimax patents, his

10   interest in Audimax patents came to you; correct?

11   A.    Correct.

12   Q.    At that time, in 2003, when you -- you considered the

13   Audimax patents values, didn't you?  I mean when you made

14   the transaction, you must have considered what it was worth.

15   A.    No, not really.

16   Q.    You didn't really consider whether the transaction was

17   based on a fair consideration?

18   A.    We had no idea at that time of what the patents were

19   worth because we knew that to make them worth something, we

20   either have to develop products or we'd have to license the

21   technology or sue people to pay us for infringing the

22   patents.

23   Q.    Okay.  So you had no idea what it was worth but you

24   did know in 2003, when this transaction occurred, that you

25   couldn't license it to anybody; correct?

Chen - cross

Page 479

1    A.    I wouldn't use the word "couldn't."  There was no

2    interest in whatever companies had been approached to

3    license it, but "could" is different from "would" so I don't

4    know.

5    Q.    Okay.  And you had a company that you had retained say

6    that they didn't think that these two patents covered

7    modern-day technology at the time you made this transaction

8    with your brother; correct?

9    A.    I don't think that is what they said and that is not

10   certainly how I acted.  The stuff that you have asked me to

11   look at in which I have looked at as part of pretrial

12   preparation indicates that they said that the people they

13   approached to try to license our technology just refused to

14   license our technology and said it's not relevant.  That was

15   the position of those companies, so EKMS was not able to get

16   any commercial response from the people they approached.

17   Q.    But --

18   A.    It didn't mean that EKMS didn't think whatever they

19   thought about whether people should be licensing it from us.

20   Q.    Well, we know that EKMS didn't think it covered

21   modern-day technology; correct?

22   A.    We know that EKMS said there were questions that need

23   to be looked at in regard to that.  They didn't come to that

24   conclusion and obviously I took the step of suing now

25   because I didn't accept that.  I thought that we had some

Chen - cross

Page 480

1    rights.

2    Q.    Okay.  You said you took the step of suing.  And I

3    believe in your direct examination, you talked about who

4    would split up any damage award that you would get based on

5    this lawsuit; correct?

6    A.    Correct.

7    Q.    How would that be split up?

8    A.    According to the rights ownership that I think we

9    referred to earlier, Harry Levitt two percent, Richard Dugot

10   six or seven percent, my late father's estate, therefore, my

11   mother, six -- five or six or seven percent, the estate of

12   the late Henry Durocher, who was an executive that worked

13   there getting a couple percent, BioMed getting a couple

14   percent and ETG getting 80 percent.

15   Q.    And all these individuals who get this percentage

16   award, if it was recovered, they are all sharing in the

17   costs of this lawsuit; is that right?

18   A.    They have shared the costs to a certain extent.

19   Q.    Not equally based on what their ownership interest is?

20   A.    Well, the costs of litigating unfortunately are very

21   high so I knew to carry forth litigation I couldn't rely on

22   them to carry forward the litigation entirely by themselves,

23   so I undertook to shoulder most of the burden.

24   Q.    Okay.  So you are going to pay for the lawsuit and

25   what did you get in return?

Chen - cross

1    A.    Well, I wanted to be able to consolidate the patents,

2    Audimax into ETG to streamline the corporate organization

3    and to reduce the costs of maintaining and trying to manage

4    the patents, so they agreed to that.  So in return, I agreed

5    to try to commercialize or get benefit for Harry and Richard

6    and everything else as well as myself.

7    Q.    And any recovery in the lawsuit would first go to

8    repay these expenses for litigation; correct?

9    A.    Yes.

10   Q.    And these were all paid by you, these costs for the

11   litigation?

12   A.    Yes.

13   Q.    And the other people involved, they won't have to pay

14   for any of costs?

15   A.    They paid for some portion of it.

16              MR. MANDIR:  Okay.  Your Honor, if I may just

17   have a moment?

18              THE COURT:  Yes.

19              (Pause.)

20              MR. MANDIR:  Okay.  I just have a few more

21   questions.

22   BY MR. MANDIR:

23   Q.    Back to DX-1610.  If you could look in your binder,

24   Mr. Chen?

25   A.    (Witness complies.)

Chen - cross

1    Q.    Okay.  The last paragraph of that, it's page two.

2    A.    Okay.

3    Q.    It starts off with "taking a second tack."  Do you see

4    that?

5    A.    Correct.

6    Q.    What it says there is:

7          Taking a second tack, EKMS has begun examining

8    the product literature of the major hearing aid companies

9    listed above, trying to identify those products that are not

10   continuously adaptive.

11         Do you see that?

12   A.    Yes.

13   Q.    Were you aware that EKMS was trying to look for

14   companies that perhaps didn't do the continuously adaptive

15   approach as a way generating revenue for Audimax?

16   A.    In the detail you mentioned, no.

17   Q.    And EKMS had an incentive to license these target

18   companies; correct?

19   A.    Correct.

20   Q.    They got a percentage cut of whatever that, whatever

21   revenue would flow from that; correct?

22   A.    Correct.

23   Q.    And that is in addition to the $50,000 that you paid

24   them?

25   A.    Correct.

Brown - direct

1    the speaker.

2    Q.    So what did Dr. Levitt and the other inventors invent

3    in the '850 patent?

4    A.    Well, their invention was to find a way of reducing or

5    eliminating or at least cancelling a large portion of the

6    acoustic feedback by taking some of the output, putting it

7    through a filter and feeding it back to the input where it's

8    matched in both phase and amplitude to the acoustic sound

9    that travels around the outside through the air or through

10   the body.

11   Q.    Is there a place in the patent where you look to see

12   what the specific inventions that are recited are?

13   A.    Yes, you look at the claims.  The claims define the

14   dimensions or the properties of their claims.  As I said, in

15   the video you saw early on, it's like a piece of property.

16   The deed says what the limits are and what your rights are

17   and the same is true with the claims in a patent.  The

18   claims define what is yours and what other people can't

19   trespass on.

20   Q.    If one party has a patent is it possible for other

21   parties to get patents on improvements?

22   A.    Yes, that is quite commonly done.  There is the

23   original patent, and then people will improve on that, and

24   they'll get a patent on the specific improvement.  For

25   example, if I had a patent on a tire and somebody comes out

Brown - direct

1    A.    Yes.   The intent here is to determine the effect of

2    the feedback, and you must determine it both in amplitude, I

3    guess in the determine step -- yes, you determine both the

4    amplitude and phase of the feedback signal.

5    Q.    And then what about the inserting step?  What could

6    you explain the analysis that you used for that element?

7    A.    The inserting step, you take that signal that you

8    determined and you insert in a filter in the feedback

9    channel so you can equalize out the effect of that feedback

10   in both phase and amplitude.

11   Q.    To find that a product infringes this claim, do you

12   need to find all of these highlighted elements in that

13   accused product?

14   A.    You have to find each one of them.

15   Q.    And that's for Claim 14.  What about Claim 16?  What

16   additional is required for that claim?

17   A.    Claim 16 requires that the programmable filter of

18   Claim 14 be placed in an electrical feedback element loop.

19   Q.    And what does that mean?

20   A.    Well, it means that it must be an electrical circuit.

21   And in the Court's construction, it means it's in a feedback

22   loop from the output to the input.

23   Q.    Did you prepare a demonstrative to illustrate, take

24   the words for the claim to a diagram to help us understand

25   this claim?

Brown - direct

1    A.    Yes.

2    Q.    Okay.  Let's take a look at that demonstrative.

3          Okay.  Sir, what is this diagram showing?

4    A.    It shows the elements of that claim and in the lower

5    left-hand corner, you see the key words from those steps in

6    the two claims.  On the left we have a microphone, on the

7    right we have speaker.  In between the two, we have a

8    transmission channel.  We have a determining phase at the

9    bottom which determines the effect of the acoustic feedback

10   which you see across the top.

11         And then we insert it into the filter.  We

12   insert it by placing the coefficients C0, C1 and so forth

13   into the filter and the filter is in a feedback loop which

14   goes from the output of the transmission channel back to the

15   input of the transmission channel.

16   Q.    So explain again, what does a filter do?

17   A.    The filter takes the coefficients from the determining

18   circuit phase and takes the output of the signal, passing

19   through the filter, produces the signal inverse signal we

20   see in orange right next to the plus sign, the little circle

21   with the plus is an adder where the signal from the

22   microphone which contains both the signal we want to have

23   plus this feedback we do not want, and that adder adds the

24   inverse signal from the filter in both phase and amplitude

25   to cancel it out so none of that gets into the transmission

Brown - direct

1   channel.

2   Q.    And this diagram shows two circles with a C in it.

3   Those are the coefficients?

4   A.    Those are the coefficients.  Those represent the

5   coefficients being loaded into the filter.

6   Q.    And this diagram just shows two but how many

7   coefficients can there be?

8   A.    Typically, there is someplace between 16 and 32.

9   Q.    And I think I asked you earlier about what a feedback

10  path is.  Could you explain again where the feedback path is

11  in this diagram?

12  A.    Feedback path goes from the output, which is in this

13  picture right before the speaker, back to the input and it's

14  summed together with that little circle with the plus in it.

15  Q.    Claim 16 in the inserting step uses the term

16  "programmable filter."  What is the definition of a

17  programmable filter that you applied in your analysis?

18  A.    Programmable filter is a filter where you can insert,

19  apply coefficients to give it, coefficients of one or more

20  of the elements of the filter.

21  Q.    Do you have an example of how you might give

22  coefficients to a filter that makes it easier to understand?

23  A.    Yes, I did an example for you.  Yes.

24          This is an equalizer.  I guess those are, some

25  might recognize it from the stereo systems.  I don't know if

Brown - direct

1    Q.    Did you also confirm -- strike that.  How do you know

2    to rely on this document?

3    A.    Well, first off, this specific document, it's part of

4    their technical documents.  I believe their technical

5    representative indicated it is correct.  And, again,

6    Dr. Gloster looked through the pages to compare it to the

7    diagrams in this document.

8    Q.    Is there a particular figure that you focused on in

9    this document?

10   A.    Yes, there was.

11   Q.    I think we have a demonstrative that is based on this.

12   It's slide Brown W3.

13        Do you know, what does this slide show?

14   A.    This is a little more top level than the last one but

15   it shows again the same function.  We have a microphone and

16   receiver, a transmission channel, a feedback path with the

17   feedback simulator in it.  In this case, the feedback

18   simulator actually contains filters and the circuitry.

19   Q.    Is there another document in the Widex materials that

20   provide the specifics of what is in that feedback path

21   simulator?

22   A.    Yes, there was.

23   Q.    Let's take a look at JX-305.  And I think that is also

24   in the juror notebooks.

25   A.    This is an engineering document defining how the

Brown - direct

Page 526

1    feedback cancelling is done for this product.

2    Q.    This is a Widex document?

3    A.    Yes.

4    Q.    Is there a figure within this document that you

5    specifically?

6    A.    Yes, this describes the filter and the WLMS routine.

7    Q.    Let's take a look at the demonstrative that has this

8    figure in it.  Okay.  Can you explain what part of this

9    document, if any, is relevant to your analysis.

10   A.    Well, the one that just clicked blue is the WLMS and

11   the one directly above it is the WFIR.  And we see against

12   here, the WLMS calculates the coefficients, passes them up

13   through this bus which is depicted by two parallel lines

14   with an arrow at the top saying this is the direction it is

15   going in, and the coefficients are loaded into the FIR

16   filter from the module.  So the module determines the

17   effect, calculates coefficients, provides coefficients to

18   the filter and by doing so, inserts a filter in the feedback

19   loop.

20   Q.    This block at the bottom says WLMS.  Again, what is

21   the difference between a WLMS and an LMS?

22   A.    Well, W stands for warped.  It's an improvement on a

23   standard LMS, but it's still an LM and it works together

24   with the WFIR, which again is an FIR filter with some

25   improvements on it but it's still a line filter.

Brown - direct

Page 527

1    Q.    Does the fact that the Widex product includes a WLMS

2    change the analysis that you gave?

3    A.    No, it doesn't.  It's still provides a basic function

4    with some improvements.

5    Q.    Okay.  Now, which part of the diagram, if any, perform

6    the determining step in Claims 14, 16?

7    A.    The determining step would be performed by the WLMS

8    portion taking inputs from the output and the input with the

9    first approximation subtracted -- or from the previous

10   approximation subtracted from it.

11   Q.    And then the inserting step of Claims 14 and 16, where

12   is that done in this diagram?

13   A.    That's the two vertical arrows that are colored orange

14   which takes the coefficients from the calculation in the

15   determining step and inserted them into the filter.

16   Q.    And what do the arrows mean going from the WLMS box to

17   the WFIR box?

18   A.    Well, the fact there are two arrows separating this

19   means there is a data bus and the arrow indicates the

20   direction the data is going in.

21   Q.    And what is the data going up that bus?

22   A.    Coefficients.

23   Q.    So the coefficients are travelling from the LMS into

24   the FIR?

25   A.    That's correct.

Brown - direct

Page 528

1    Q.    Did you determine whether or not the WLMS provided the

2    coefficient to the WFIR?

3    A.    By passing the coefficients to the next stage up, they

4    insert them or provide them, however you want to word that.

5    Q.    And this figure having even more boxes than the one we

6    saw before, does that change your analysis?

7    A.    No, it doesn't change the analysis.

8    Q.    None of those have anything to do with whether or not

9    they do the inserting or determining step?

10   A.    They don't negate the fact that it does the

11   determining and inserting.  That's correct.  It still meets

12   that criteria.

13   Q.    And, again, like with the Oticon products, does your

14   analysis for Claims 14 and 16 similar to the analysis you

15   did for Claim 13 of the '850 patent?

16   A.    That's correct.

17   Q.    You mentioned I think that there is two steps,

18   determining and inserting.  Are the steps here in the claim

19   performed in that order in the Oticon, Bernafon, Widex

20   products we just looked at?

21   A.    Yes, they are.  The determining is done by the LMS

22   routine and calculates coefficients, then inserts the

23   coefficients into the filter and thereby sets a new filter,

24   electrical filter response.  And in electrical terms, we

25   considered that inserting filter.  And so first you have to

```
 1                  IN THE UNITED STATES DISTRICT COURT
 2                  IN AND FOR THE DISTRICT OF DELAWARE
 3
                              -   -   -
 4
 5    ENERGY TRANSPORTATION,            :   Civil Action
      INC.,                            :
 6                                     :
                   Plaintiff,          :
 7                                     :
           v.                          :
 8                                     :
      WILLIAM DEMANT HOLDINGS A/S,      :
 9    et al.,                          :
                                       :
10                 Defendants.         :   No. 05-422 (GMS)
11                            -   -   -
12                     Wilmington, Delaware
                    Thursday, January 24, 2008
13                         9:07 a.m.
                      Fourth Day of Trial
14
                              -   -   -
15
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18    APPEARANCES:
19                   EDMOND D. JOHNSON, ESQ.
                     Pepper Hamilton LLP
20                        -and-
                     MARTY STEINBERG, ESQ.,
21                   BRIAN M. BUROKER, ESQ., and
                     MAYA M. ECKSTEIN, ESQ.
22                   Hunton & Williams
                     (Washington, D.C.)
23
                                  Counsel for Plaintiff
24
25
```

Westermann - direct

Page 714

1    A.       That's correct.

2    Q.       And you have never worked anywhere but in your family

3    business.  Correct?

4    A.       That's correct.

5    Q.       Now, at Widex, what is your title?

6    A.       I am director of research of information technology

7    and of intellectual property.

8    Q.       And for our benefit, what is intellectual property?

9    A.       It's mainly patents.

10   Q.       Like the patents that are at issue in this case.

11   Right?

12   A.       Yes.

13   Q.       And are you, in fact, also in charge of the patent

14   department at Widex?

15   A.       Yes, I am.

16   Q.       What is the patent department?

17   A.       That's a department with six engineers and a

18   secretary.

19   Q.       And among other things that the patent department at

20   Widex does, one of the things that the patent department at

21   Widex does is it monitors patents in the hearing aid field.

22   Correct?

23   A.       That's correct.

24   Q.       And if Widex believes that a patent is invalid, they

25   would file an opposition with the Patent Office.  Correct?

Westermann - direct

Page 716

1    Q.      Now, you are familiar with the '850 and '749 patents

2    at issue here.  Correct?

3    A.      Today I am, yes.

4    Q.      Now, in the 20 years since they have been filed, has

5    Widex ever filed an opposition in any patent office in the

6    world to those patents?

7    A.      To the Levitt patent?

8    Q.      Correct.

9    A.      No, we have never.

10   Q.      Now, we have talked about this industry association

11   called HIMPP.  It's an acronym, right, H-I-M-P-P?

12   A.      That's correct.

13   Q.      What does that stands for, if you can tell us?

14   A.      The hearing Instrument Manufacturers Patent

15   Partnership.

16   Q.      Patent partnership?

17   A.      Yes.

18   Q.      And HIMPP was started by certain hearing aid

19   manufacturers to acquire a group of patents.  Correct?

20   A.      That's correct.

21   Q.      And Widex is a member of HIMPP.  Correct?

22   A.      That's correct.  Widex is a partner in HIMPP.

23   Q.      Is the Demant entity a partner in HIMPP?

24   A.      Yes.

25   Q.      Now, did HIMPP assist the hearing aid industry,

1    including Widex and Demant, in obtaining CDs from a company

2    called MicroPatent that contains patents of interest to the

3    hearing aid companies?

4    A.    Yes.

5    Q.    And all the members of HIMPP, including Widex and

6    Demant, have access to that CD with those patents.  Correct?

7    A.    Yes.  I mean, that information is public.  So

8    everybody can get that.  You just have an easy way,

9    organized way of getting them.

10    Q.    You, in fact, are the managing director of HIMPP.  Is

11    that correct?

12    A.    That's correct.

13    Q.    And other personnel in your patent department also

14    have access to that database of patents.  Correct?

15    A.    That's correct.

16    Q.    And you personally have access to that database of

17    patents.  Correct?

18    A.    I do.

19    Q.    And all of the HIMPP members, including Demant, has

20    access to that database.  Right?

21    A.    Not correct, because they have their own database.

22    Q.    But that is essentially a copy of the database that

23    contains these patents.  Right?

24    A.    Essentially, yes.

25    Q.    And both the '850 and the '749 patents were in that

Westermann - direct

Page 718

1    database that was distributed by HIMPP to the HIMPP members.

2    Correct?

3    A.      That's correct.

4    Q.      And that occurred in about 2001.  Is that correct?

5    A.      That's correct.  I think 2001 or 2002.

6    Q.      Now, I am going to ask you about other knowledge that

7    Widex had about the '850 and '749 patents other than the

8    database from HIMPP.  Okay?

9    A.      Okay.

10   Q.      I would like to refer in the book in front of you to

11   Exhibit PX-366.

12   A.      Okay.

13   Q.      And PX-366 purports to be an assignment of a patent.

14   Correct?

15   A.      Yes.

16   Q.      Do you recognize this document?

17   A.      I saw it during my HIMPP interview in Denmark.

18   Q.      Now, if you look about four or five pages back, there

19   is actually an assignment agreement.  Do you see that?

20   A.      Yes.

21   Q.      It's dated June 1996.  Right?  You can see that in

22   the first full paragraph at the very end?

23   A.      Okay.  It's signed during August but --

24   Q.      So it's June 1996, signed in August 1996.  Correct?

25   A.      Yes.

Westermann - direct

Page 721

1    was the purpose of it, was it not, to identify prior art?

2    A.    I only learned that at the Danish hearing.

3    Q.    You learned that at the Danish hearing?

4    A.    Yes.

5    Q.    So let's turn now to PX-649.

6    A.    649?

7    Q.    Yes.

8    A.    Okay.

9    Q.    That's a document entitled Articles of Association of

10   KS HIMPP.  Right?

11   A.    That's correct.

12   Q.    And that's the organization we have been talking

13   about of the hearing aid manufacturers?

14   A.    That's correct.

15   Q.    Now, if you turn to the next page, it says it's a

16   limited partnership.  Correct?

17   A.    That's correct.

18   Q.    And then it lists the few partners in Section 3.1.

19   Correct?

20   A.    That's correct.

21   Q.    And it lists Widex.  Right?

22   A.    That's correct.

23   Q.    And Oticon.  Correct?

24   A.    That's correct.

25   Q.    Now, the original goal of HIMPP was to eliminate the

Westermann - direct

Page 722

1    threat of patents being enforced against the hearing aid

2    companies by 3M.   Right?

3    A.      That's correct.

4    Q.      And one of the members of HIMPP actually bought 3M's

5    patents and contributed them to this organization called

6    HIMPP; right?

7    A.      Contributed.

8    Q.      Yes.

9    A.      Sold it to him.

10   Q.      Sold it to him.   Okay.   And the members of HIMPP were

11   all competitors of the company that bought those patents;

12   correct?

13   A.      They were, yes.

14   Q.      Now, I'm going to direct your attention to Exhibit

15   773.   PX-773.

16              Do you have that in front of you?

17   A.      Yes.

18   Q.      And you have seen that before, right?

19   A.      Yes, I saw it also during the deposition.

20   Q.      And that's the registration for the patent?

21   A.      Registration, you could say that.

22   Q.      And this document came from Widex's records; correct?

23   A.      I believe so, yes.

24   Q.      And if you look at the top right-hand side, on the

25   top right-hand corner, the date there, now in Europe, they

Page 723

1    reverse the month and year, right?  They reverse the day and

2    the month.  Excuse me.

3    A.     I believe it's opposite.

4    Q.     Compared to the way we write the day and the month in

5    the United States; right?

6    A.     It is correct that it is opposite.

7    Q.     So that would read, if I'm reading it correctly,

8    August 5th, 1993; am I reading that correctly?

9    A.     I think so, yes.

10   Q.     So this was in Widex's files from August 1993?

11   A.     Yes, it would have been.

12   Q.     And this is a description of Dr. Levitt's patent;

13   correct?

14   A.     No.

15   Q.     No?

16   A.     This is just registration of the number and its

17   filing date.

18   Q.     But it is the patent we're talking about in this

19   case; correct?

20   A.     Not actually.  This is the European equivalent.

21   Q.     It's the European equivalent of Dr. Levitt's patent

22   meaning it's the identical patent filed in Europe; correct?

23   A.     Not necessarily, because due to the filing history,

24   it may have changed, doing the prosecution in Europe.

25   Q.     Well, is there anything substantively different about

Westermann - direct

Page 727

1               "Question:  Would that suggest that the '749

2    patent was also in your file as of August 5th, 1993?

3            "Answer:  Yes."

4            Did you give that answer?

5    A.    I must have.  And it could have been there.

6    Q.    Now, let's go back to HIMPP for just a second, this

7    organization.  HIMPP doesn't have any office, does it,

8    separate office?

9    A.    No.

10    Q.    HIMPP works out of Widex; correct?

11    A.    Widex is a secretary of HIMPP, yes.

12    Q.    HIMPP doesn't have employees or resources, it uses

13    Widex employees and resources; correct?

14    A.    Correct.

15    Q.    And you in fact manage HIMPP's bank account; correct?

16    A.    Yes.

17    Q.    Now, I'm going to hand you some exhibits which are

18    copies of different patents in the HIMPP portfolio and I'm

19    going to ask you to identify them for a moment.  So if you

20    would turn to DX-1181.

21            Do you recognize DX-1181?

22    A.    Yes.

23    Q.    Okay.  What is DX-1181?

24    A.    It's a short list of the national patents of one of

25    the HIMPP patent families.

Westermann - direct

Page 728

1   Q.    Okay.  And is this so-called Mangold patent?

2   A.    It's the so-called Mangold patent.

3   Q.    Yes.  Do you see the inventor named Mangold?

4   A.    But there are similar Mangold patents.

5   Q.    Is this one of the Mangold patents?

6   A.    Yes.

7   Q.    Now, if you look at the references, No. 14?

8   A.    Excuse me.  What references?

9            MR. STEINBERG:  May I have a moment, Your Honor?

10           THE COURT:  Yes.

11           (Pause.)

12  BY MR. STEINBERG:

13  Q.    Let's move on to DX-1195.  Now, the patent you are

14  looking at, is that one of the patents that was purchased by

15  HIMPP in the original transaction?

16  A.    This is not the patent.  This is a list of patents.

17  Q.    A list of patents?

18  A.    Yes.  And this is the list the patent family called

19  CID 3, that HIMPP was a part of the patent portfolio that

20  HIMPP purchased.

21  Q.    Let's go to DX-1196.  And what is DX-1196?

22  A.    It appears to be one of the U.S. patents from the CID

23  3 family.

24  Q.    One of the patents purchased by HIMPP?

25  A.    Yes, correct.

Westermann - direct

Page 729

1    Q.      Okay.  And if you look down the references cited in

2    that patent, you see the Dr. Levitt patent, the '850?

3    A.      Yes, I do.

4    Q.      And this was a patent that was filed in April of

5    1993; correct?

6    A.      It seems to be a division of what was filed in '93,

7    yes.

8    Q.      And when was the transaction when HIMPP purchased

9    these patents?

10   A.      It was in the summer of '96.

11   Q.      1996?

12   A.      Yes.

13   Q.      Now, HIMPP purchased these patents for approximately

14   how much money?

15   A.      These CID patents or the entire portfolio.

16   Q.      The entire portfolio.

17   A.      I believe it was $40 and-a-half million U.S. dollars.

18   Q.      Was anything done to review the references listed in

19   the patents as prior art like Dr. Levitt's '850 patent at

20   the time of this expenditure of $14.5 million?

21   A.      No, because these CID patents actually just came as a

22   kind of extra.  We were not looking for those, specifically.

23   Q.      Now, is one of the benefits of Widex being a member

24   of HIMPP that you would pay less royalties to license

25   patented technology as a member of HIMPP?

Westermann - direct

Page 732

1    that.

2    Q.      Now, if you look down, where it says licenses under

3    HIMPP patent portfolio, you see the second sentence says,

4    the royalty is a flat three percent of the price of hearing

5    aids covered by one or more HIMPP patents, a rate which is

6    comparable to or lower than a typical royalty for a single

7    patent family in the hearing aid field.

8              Do you see that?

9    A.      That's correct.

10   Q.      Is that an accurate statement?

11   A.      I believe so.

12   Q.      Now, your company manufactured a product called the

13   Senso Diva starting in about the year 2000.  Right?

14   A.      I believe so.

15   Q.      Was that the first product that Widex produced that

16   incorporated a feedback canceller?

17   A.      I believe so.

18   Q.      Now, you are aware that ETG claims that that product,

19   among others, infringes its patents.  Correct?

20   A.      I am aware of that.

21   Q.      Now, you had this patent department.  And one of its

22   jobs was to monitor patents and determine whether they were

23   infringing.  Correct?

24   A.      Yes.  The patent department was much smaller at that

25   time.

Westermann - direct

Page 733

1    Q.    But prior to launching the Senso Diva with feedback

2    cancellation, your patent department didn't do anything to

3    search for patents that related to feedback cancellation,

4    did it?

5    A.    I am not sure.  They probably didn't.

6    Q.    I am sorry?

7    A.    I don't think they did specifically that, no.

8    Q.    Well, when you were deposed did you tell us that they

9    didn't do anything?

10   A.    I mean, we do an ongoing survey.  And that is it.

11   Q.    Can you turn to Page 118 and 119 in your deposition,

12   Volume II.

13         If you look down, starting with Line 22 on Page

14   118 going over to the next page, were you asked these

15   questions and did you give these answers:

16         Okay.  Prior to launching the Senso Diva

17   product, do you know whether your patent department did a

18   search relating to feedback and feedback cancellation?

19         Answer:  The patent department was not so big at

20   that time and I don't think they made -- made a specific

21   search for feedback cancellation.

22   A.    Exactly.

23   Q.    But today you would do that.  Right?

24   A.    Yes.

25   Q.    Now, in fact, despite having a policy of reviewing

Westermann - direct

Page 734

1    patents to determine infringement, Widex didn't perform any

2    due diligence to determine whether its Senso product would

3    be infringing any other patent whatsoever prior to launching

4    that product, did they?

5    A.    May I have that again?

6    Q.    Sure.  Despite Widex having a policy of reviewing

7    patents to determine infringement, Widex didn't perform any

8    due diligence whatsoever to determine whether the Senso

9    product was infringing other patents?

10   A.    The Senso Diva product?  There are many Senso

11   products.  You mean the Senso Diva product?

12   Q.    Correct.

13   A.    Well, we didn't really have this official policy back

14   at that time.

15   Q.    Did you do any due diligence whatsoever to determine

16   whether the Senso Diva infringed any other patent?

17   A.    Apart from the ongoing surveillance, I don't think

18   so.

19   Q.    Well, you are saying you did something.  What did you

20   do?

21   A.    I mean, we had a constant, we were constantly

22   monitoring the incoming patents.  And if something resembled

23   anything we were planning to do, we would act.

24   Q.    But you don't recall performing any specific due

25   diligence to determine whether this product was infringing

Westermann - direct

Page 735

1   any other patent.  Correct?

2   A.      Not a specific duty, no.

3   Q.      Now, you have been here from the open argument.

4   Correct?

5   A.      Yes.

6   Q.      And you have heard the testimony, you have heard the

7   lawyers talk and so forth.  Correct?

8   A.      Yes.

9   Q.      Now, you have heard other members of your company say

10  that Widex prepares various types of information for the

11  public and for others about their product, describing their

12  products.  Correct?

13  A.      Sure.

14  Q.      Is that true?

15  A.      Sure.

16  Q.      And you have also, you agree with me that prior to

17  that material going out to the public, that material is

18  reviewed for correctness by your technical people.  Correct?

19  A.      I think so.

20  Q.      To make sure it's accurate.  Correct?

21  A.      Yes.

22  Q.      In fact, your technical people will actually write up

23  the information about the product so that the marketing

24  department can then put out a brochure describing your

25  product.  Correct?

Westermann - direct

Page 746

1    to this lawsuit; correct?

2    A.      Yes.

3    Q.      In fact, you have held the opinion that Dr. Levitt is

4    an authority in the field of hearing aids and audiology for

5    decades; correct?

6    A.      I certainly believe so, yes.

7    Q.      And you had seen Dr. Levitt's resume many, many years

8    ago because you and HIMPP hired Dr. Levitt as an expert;

9    right?

10   A.      I received it, I didn't read it.

11   Q.      You never read his resume even though you got it?

12   A.      Yes, it's 11 pages long.

13   Q.      Now, is it a fact that Dr. Levitt was hired on behalf

14   of the organization you are the director of, HIMPP?

15   A.      That's correct.

16   Q.      And that was in 1996-1997; correct?

17   A.      I believe so, yes.

18   Q.      Now, the law firm that hired Dr. Levitt, is that the

19   same law firm defending you in this lawsuit?

20   A.      That is correct.

21   Q.      Now, when Dr. Levitt was hired, his resume was

22   attached to the materials that were provided to both you and

23   your law firm; correct?

24   A.      I think that is correct.

25   Q.      And all of the HIMPP members, including Widex and

Westermann - direct

Page 747

1    Demant, would have known that Dr. Levitt had been retained

2    as an expert on behalf of HIMPP; correct?

3    A.     Yes, because there was a common decision to use him.

4    Q.     It was a group decision by all the members?

5    A.     Yes, and that is why I didn't need to read the

6    resume.  We wanted him.

7    Q.     You didn't read his resume because you knew he was a

8    preeminent expert in the field, right?

9    A.     Yes.

10   Q.     Now, if you wouldn't mind turning to 562, PX-562.

11   A.     (Witness complies.)

12   Q.     And that purports to be a letter to Dr. Levitt dated

13   December 26, 1996 from the Sughrue law firm, Mr. Cushing

14   retaining Dr. Levitt?

15   A.     That is correct.

16   Q.     And who is Mr. Cushing?

17   A.     Mr. Cushing is our U.S. patent lawyer.

18   Q.     And he in the same law firm that is representing you

19   here today?

20   A.     Yes.

21   Q.     In fact, if you look at the second page, the letter

22   shows it was sent to you also; correct?

23   A.     That is correct.  The letter was?

24   Q.     Yes.  The letter was sent to you?

25   A.     Yes.

Westermann - direct

1    Q.    Did you receive the letter?

2    A.    I am sure I did.

3    Q.    Did you read it?

4    A.    I am sure I did.

5    Q.    And did you agree with the decision to hire Dr.

6    Levitt as an expert?

7    A.    I mean we had already agreed to that in HIMPP.

8    Q.    And you were hiring Dr. Levitt as an expert in a

9    patent proceeding; correct?

10   A.    That is correct.  A reexamination request.

11   Q.    Now, the reason you sought Dr. Levitt out was because

12   his expertise in digital hearing aids; correct?

13   A.    No, in hearing aids.

14   Q.    In hearing aids?

15   A.    It was not a digital -- this patent was not about

16   digital hearing aids, it was about analog hearing aids.

17   Q.    And you were aware that Dr. Levitt supplied his

18   resume giving you all of his credentials; right?

19   A.    I was expecting him to be in there, yes.

20   Q.    Now, let's look at the next exhibit, 598, which is a

21   composite exhibit of a second letter to Dr. Levitt.

22         Do you have that?

23   A.    Yes.

24   Q.    It's by the same law firm; right?

25   A.    Yes.

Westermann - direct

Page 749

1    Q.    And it's to Dr. Levitt; correct?

2    A.    Correct.

3    Q.    And it has a number of enclosures; correct?

4    A.    It has, yes.

5    Q.    And it is cc'd to you?

6    A.    The letter is, yes.

7    Q.    Right.  And one of the enclosures is Dr. Levitt's

8    resume; correct?

9    A.    That is correct.

10   Q.    Now, another enclosure is a declaration.  Do you know

11   what a declaration is?

12   A.    I believe so.

13   Q.    Okay.  Is it a statement under oath that you asked

14   Dr. Levitt to sign and supply to the patent department?

15   A.    I believe it must be under oath, yes.

16   Q.    And if you look at the very first line in the

17   declaration, what does it say?  The very first line.

18   A.    The very first -- you mean, I, Harry Levitt?

19   Q.    Right after that.

20   A.    My curriculum vitae is attached to this declaration.

21   Q.    Now, if you look at page three of his resume,

22   Dr. Levitt's resume, at the bottom, do you see the two

23   patents at issue in this case?

24   A.    Yes, they are listed there.  Yes.

25   Q.    Now, you wanted to insure that Dr. Levitt had

Page 750

1    excellent credentials that were at least as good or better

2    than the opposing expert in this particular matter, didn't

3    you?

4    A.    No, we already had that.

5    Q.    Now, if you look at the Exhibit 562, the first

6    letter?

7    A.    Yes.

8    Q.    In paragraph three of that letter, it says the

9    patentee -- that is the other party, right?  The patentee

10   filed a response, copy enclosed in which they submitted a

11   declaration of a Nobel prize recipient opining that the

12   invention claimed in the Anderson '806 patent would not have

13   been obvious in light of the prior art.

14            Do you see that?

15   A.    What page is that?

16   Q.    That's the second page of the first letter in the

17   first full paragraph, midway down.

18   A.    The patentee -- I'm not quite.

19   Q.    It's highlighted on the -- in the --

20   A.    In which?  Can you show me?

21   Q.    It's highlighted on the screen, if you can see that.

22   A.    Is it the upper one or lower one?

23   Q.    The upper one, sir.

24   A.    I have that here.

25   Q.    Okay.  So your's was saying the other side has a

Westermann - direct

Page 751

1   Nobel prize winner who is testifying about this patent;

2   right?

3   A.    Yes.

4   Q.    And you wanted someone whose credentials were better

5   than that; right?

6   A.    Well, we wanted one who had relevance to the case.

7   The Nobel prize taker was a Nobel prize taker in memory

8   technology which is not hearing aids.

9   Q.    So if you look at the second paragraph, the very last

10  sentence says:  We would like to submit for their

11  consideration a declaration by someone with much better

12  credentials on the issue.  Right?

13  A.    Yes.

14  Q.    And did you agree with that?

15  A.    Certainly.

16  Q.    Now, these letters also say that you hired Dr. Levitt

17  for yet another engagement on another issue as a patent

18  expert; is that correct?

19  A.    I believe so.  I don't remember the actual -- I don't

20  think that case ever got to be finalized, but I know we did,

21  we tried to use him on some.

22  Q.    Okay.  And, in fact, in the second letter, that's

23  attached to your Exhibit 598, there is a memorandum

24  agreement whereby he is retained, he is actually hired;

25  correct?

Westermann - direct

Page 768

1    Q.    I'm sorry?

2    A.    I would certainly think so, yes.

3    Q.    Now, if there was any question at that time about

4    whether or not Dr. Levitt was the inventor of the patents or

5    whether his patents were invalid for any reason, you would

6    have never used Dr. Levitt as an expert, would you?

7    A.    If we had been in a suit, you mean?

8    Q.    For this declaration.  If his patents were invalid

9    and there was prior art and he wasn't really the inventor,

10   would have you used him to file a sworn declaration in front

11   of the Patent Office?

12   A.    I don't see why that would influence it.

13   Q.    Let's put it this way.  At the time that you asked

14   Dr. Levitt to file this declaration in front of the Patent

15   Office, Widex never claimed that Dr. Levitt's patents were

16   invalid in any way, shape or form, did they?

17   A.    No.

18   Q.    And during the entire time you used Dr. Levitt as an

19   expert or consultant all over the last 20 years, you never

20   claimed his patents were invalid, have you?

21   A.    No, we are not really aware of them.

22   Q.    I thought you said earlier today they were in your

23   records?

24   A.    Yes, but I don't know if they're in the development

25   engineers' records.

Westermann - direct

1    Q.    And they were in the patent base bought by him?

2    A.    That is correct, which is a ton of documents.

3    Q.    Now, Dr. Levitt's patents were filed in 1986.  Up

4    until this lawsuit was filed against Widex and Demant, up

5    until that time, have you heard anybody -- not just Widex

6    and Demant but anybody, any scientist, Dr. Graupe,

7    Mr. Egolf -- heard anyone ever say in that entire time that

8    Dr. Levitt's patents were invalid?

9    A.    No, I haven't.

10   Q.    Now, I believe in the opening statement, some prior

11   art was referred to.  There was a patent by Dr. Graupe.

12   Right?

13   A.    Correct.

14   Q.    And there were some articles by Mr. Best and Dr.

15   Egolf and Mr. Weaver.  Right?

16   A.    That's right.

17   Q.    Did Widex ever license Dr. Graupe's patent?

18   A.    No.

19   Q.    Did Widex ever pay Mr. Best or Dr. Egolf or Mr.

20   Weaver for their technology?

21   A.    No, we didn't.

22   Q.    Now, your company is not relying on any opinion of

23   patent counsel --

24              MR. MANDIR:  Objection, Your Honor.

25              (The following took place at sidebar.)

Westermann - direct

Page 773

1    infringement?

2              MR. STEINBERG:  That's correct.

3              THE COURT:  That is their position.

4              MR. MANDIR:  I understand.  That is --

5              THE COURT:  I wanted to make sure I understood

6    what their position was.

7              MR. MANDIR:  I understood that to be their

8    position.  You absolutely cannot do that.

9              THE COURT:  I am not going to rule on this

10   objection at the moment.  I want to go back and review my

11   decision in Telcordia, so that I am confident of the ground

12   that I stand on when I rule.

13             But I want you to argue for the record your

14   interpretation of what you think I ruled and why you believe

15   that ruling precludes this line of inquiry.

16             MR. PELLIGRINI:  It is my understanding of the

17   Telcordia case, there were two different situations.  The

18   first situation was one of the parties, Lucent, who did not

19   get an opinion of counsel, and the other party, Cisco, did

20   get an opinion and they said we are not waiving privilege.

21   We are not going to rely on the advice of counsel defense.

22             So you said, for Lucent, it was proper to ask

23   whether or not you got an opinion.  For Cisco, since they

24   did get an opinion and were not waiving it, it was improper

25   to ask them whether or not they were relying on advice of

1    of the ETG patents?

2    A.    No.

3    Q.    Had anyone at Widex prior to this lawsuit seen the

4    patents, the ETG patents before?

5    A.    Well, we found out it was in our files.

6    Q.    How did you discover that?

7    A.    We searched through our electronic files and through

8    our paper files.

9    Q.    And what did you discover during this search?

10   A.    Well, there was a paper copy, as I remember, of the

11   '749.

12   Q.    '749 is one of the patents, yes.

13   A.    Yes.  And I believe there was a copy of the European

14   equivalent.  And we also discovered that in this very large

15   database we have, that both patents were there

16   electronically.

17   Q.    You said very large database.  How large is very

18   large?

19   A.    Oh, today there is more than 17,000 patents in that

20   database.

21   Q.    Okay.  And when did the, I think you said '749

22   patent, when did that make its way into the database?  What

23   year?

24   A.    Well, the database, it came in in 2000, was it '1 or

25   '2?  I don't remember.

Westermann - cross

Page 799

1    Q.    And at that time how many patents were in the

2    database?

3    A.    Well, we got a huge amount, we started up a search of

4    patents, a very wide search.  And we got, within half a year

5    we got between six and seven thousand patents, I think.

6    Q.    Let me show you PX-773.  I think that is actually in

7    the notebook that Mr. Steinberg gave you.  PX-773.

8    A.    Yes.

9    Q.    And I believe Mr. Steinberg asked you some questions

10   about this.  Can you identify what PX-773 is?

11   A.    It is a printout from a very primitive database we

12   had, we just initiated in the early nineties.

13   Q.    I think Mr. Steinberg pointed you up to the top

14   right-hand corner of this document.  It indicates 05/08-93.

15   What does that refer to?

16   A.    That is the date of the printout, actually.

17   Q.    The date is August 5th, '93?

18   A.    That is August 5th, '93, yes.

19   Q.    And at that time, does that mean that at that date

20   this patent was logged into the database?

21   A.    It could have been logged in earlier.  It was just

22   printed on that date.

23   Q.    At this time, this '93 time frame, how many patents

24   were in the database?

25   A.    I don't know.  I can see -- yes, I can.  It says in

Westermann - cross

Page 800

1    the top, there is some Danish, Antal Poster, just to the

2    right of the middle of the top 1,439 documents registered.

3    Q.    And is this entry showing that the U.S. patent was in

4    the database?

5    A.    No.  It only shows that a U.S. patent was the

6    priority document.

7            This is about the European EPO250679 patent.

8    Q.    Can you now look at PX-775, which again, it should be

9    in that same notebook, Mr. Westermann?

10   A.    Yes.

11   Q.    Can you tell me what PX-775 is?

12   A.    That is the European patent we just mentioned.  It's

13   actually only an application.

14   Q.    How many -- do you know how many counterparts there

15   are to the two patents in this lawsuit in Europe?

16   A.    Only this one, as far as I know.

17   Q.    Now, in the 1993 time frame, did the Senso Diva

18   exist?

19   A.    '93?

20   Q.    Yes.

21   A.    No.  That was long before.

22   Q.    What year did the Senso Diva come out?

23   A.    In 2000 and someplace, 2001.

24   Q.    Was Senso Diva the first hearing aid that Widex made

25   with feedback cancellation?

Page 801

1    A.      Yes.

2    Q.      And then the Inteo, when did that come out?

3    A.      2006?  It was 2006, I think.

4    Q.      And the Inteo also has the feedback cancellation

5    feature?

6    A.      Yes.

7    Q.      How is the database, how is it updated?

8    A.      Which one?

9    Q.      Well, the database that we saw the entry, that was in

10   the '93.  Was it different times when the database changed,

11   in terms of how it was kept?

12   A.      Well, the database we had at that time was just a

13   catalog, and it was maintained by my secretary, who would

14   simply enter the patent numbers that -- we had hard covers

15   of all these patents.  And she would enter the patent

16   numbers and the inventor, so that we could find it in case

17   we wanted to find that patent.

18   Q.      Okay.  You said that was in what year?

19   A.      It was around '93.  I think it may have started in

20   '92.  Around that time.

21   Q.      Since that time, has the database been automated?

22   A.      Oh, we got a completely new one from this, HIMPP

23   decided, the HIMPP group decided to create a search, with

24   the help of an American company called MicroPatents.  And

25   they started supplying patents to the HIMPP partners.  And

Westermann - cross

Page 802

1   each HIMPP partner gets every second week a couple of CDs

2   with the latest patents and applications that have been

3   published.

4   Q.    Has Widex gone through and analyzed all the patents

5   in your database?

6   A.    Oh, no.

7   Q.    Why not?

8   A.    That's 17,000.

9   Q.    Can we have up PX-774?  Again, it should be in that

10  same notebook, Mr. Westermann.

11  A.     Yes.

12  Q.    Do you know what PX-774 is?

13  A.    That is the '749 patent.

14  Q.    In the bottom left-hand corner, you see some writing.

15  A.    Yes.

16  Q.    Mr. Steinberg asked you about that.  What is your

17  understanding of who wrote that?

18  A.    I am pretty sure that this is the handwriting of a

19  patent engineer we had in the late nineties.

20  Q.    Do you know what the handwriting says?

21  A.    As far as I can see, he lists a couple of features

22  that are on certain pages of the patent.

23  Q.    What are the features?

24  A.    Well, the first is an FM link.  And then he says

25  multi-microphone.

Westermann - cross

1          And I can hardly see what the rest are.

2   Q.     Okay.

3   A.     There is some brigade in the third line, I think.

4   Q.     Is any of the writing directed to feedback

5   cancellation?

6   A.     I can't say -- the fourth one seems to be phase

7   shift.  But I don't see any feedback cancellation.

8   Q.     Are you aware if any Widex engineers or scientists

9   who were involved in the design of either the Senso Diva or

10  the Inteo, do you know if any of them were aware of Dr.

11  Levitt's patents at the time they did their research and

12  design?

13  A.     No, certainly not.

14  Q.     Was Widex ever approached by a company called EKMS?

15  A.     No, not that I know of.

16          MR. MANDIR:  Excuse me, Your Honor.

17          (Pause.)

18  BY MR. MANDIR:

19  Q.     Mr. Westermann, can you turn to PX-598, please?  I

20  think it's in Mr. Steinberg's book.

21  A.     (Witness complies.)  Yes.

22  Q.     Can you turn to page 12 of the requests for

23  reexamination that Mr. Steinberg was asking you about a few

24  moments about?

25  A.     Page 12.

Page 1243

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3

                          -   -   -
 4
 5   ENERGY TRANSPORTATION,          :   Civil Action
     INC.,                           :
 6                                   :
                Plaintiff,           :
 7                                   :
          v.                         :
 8                                   :
     WILLIAM DEMANT HOLDINGS A/S,    :
 9   et al.,                         :
                                     :
10              Defendants.          :   No. 05-422 (GMS)
11                          -   -   -
12                   Wilmington, Delaware
                  Tuesday, January 29, 2008
13                       8:50 a.m.
                  Seventh Day of Trial
14
                          -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
16                                   and a Jury
17
18
     APPEARANCES:
19
                EDMOND D. JOHNSON, ESQ.
20              Pepper Hamilton LLP
                     -and-
21              MARTY STEINBERG, ESQ.,
                BRIAN M. BUROKER, ESQ., and
22              MAYA M. ECKSTEIN, ESQ.
                Hunton & Williams
23              (Washington, D.C.)
24                                   Counsel for Plaintiff
25
```

Morley - direct

1    considered to be adaptive, it has nothing to do with

2    feedback cancellation.  There is no description in the

3    patent about how to do adaptive feedback cancellation.

4    Q.    Okay.  Let me show you Exhibit 1239.

5          Are you familiar with this exhibit?

6    A.    Yes, I am.

7    Q.    What is this exhibit?

8    A.    It's an article written by, among others, Diane

9    Bustamante.  She is the first author cited.  And it says

10   it's the measurement and adaptive suppression of acoustic

11   feedback in hearing aids.  So it's sort of a summary

12   article.

13   Q.    In this article, does Ms. Bustamante say anything

14   about the '850 patent?

15   A.    I believe so?

16   Q.    And what does she say?

17   A.    I'm looking for the exact place, but I'm not sure it's

18   on this.

19   Q.    I think it's in your notebook under 1239.

20   A.    1239.  Thank you.

21   Q.    Yes.

22   A.    I haven't looked at this in awhile so it's going to

23   take awhile to find it.

24   Q.    I'll try to help you out.

25   A.    Sorry.

Morley - direct

Page 1435

1          I think in the second column here, she talks

2    about a number of researchers in, let's see, two through

3    four.

4    Q.    Yes.  And if you go back to the references on the last

5    page?

6    A.    Yes.  Reference two, is that the '850 patent of ETG?

7    Q.    Yes.  It's referring to the '850 patent, correct?

8    That's the second.

9    A.    Right.  Now I see it.  Right after that, if we can go

10   back to the second column of the first page?  In the top

11   paragraph, about five or six lines in.

12          It says, a number of researchers -- and then in

13   brackets, two through four, so that is an indication of the

14   references at the back of the document -- have achieved some

15   success with this general approach.  One, reference two that

16   we know now is the '850 patent, employed a fixed filter,

17   derived from one measurement of the feedback path transfer

18   function, as the transfer function estimate, rendering this

19   approach vulnerable to changes in the acoustic environment.

20   Q.    Is that consistent or inconsistent with your

21   understanding of the '850 patent?

22   A.    It's dead on.

23   Q.    Okay.  Let's look at Exhibit 1240, please.

24          This is a document entitled, The Problem of

25   Feedback in Hearing Aids by a Mr. James M. Kates.  Are you

Morley - direct

Page 1436

1    familiar with this document?

2    A.    Probably not as much as you would like me to be if

3    it's going to be just like the last one.

4    Q.    No, no, I can help you out this time.

5    A.    I've seen it.  I've read it.

6    Q.    If you could turn to, it's page 231.

7    A.    Yes.

8    Q.    It's at the top of page 231.

9    A.    I see it.

10   Q.    A reference to, it starts out, "the system proposed by

11   Kates."  Why don't you read that in, would you please?

12   A.    Yes.  The system proposed by Kates (1990A) is an

13   adaptive version of a feedback cancellation system proposed

14   by Levitt, et al. (1988.) that used a time invariant

15   cancellation filter set when fitting the hearing aid.

16   Q.    What is your understanding of time invariant

17   cancellation filter?

18   A.    That is just kind of a fancy way of saying it doesn't

19   change over time so it's fixed.

20   Q.    Can you read the next sentence?

21   A.    The fixed filter, however, cannot adjust to changes in

22   the acoustic environment.  Such changes occur when a

23   telephone receiver is moved close to the aided ear, when a

24   hand is brought up to the hearing aid to adjust the volume

25   control, or when the position of the instrument shifts in

Page 1522

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                IN AND FOR THE DISTRICT OF DELAWARE
 3
                            -   -   -
 4
 5   ENERGY TRANSPORTATION,          :   Civil Action
     INC.,                          :
 6                                  :
                 Plaintiff,         :
 7                                  :
          v.                        :
 8                                  :
     WILLIAM DEMANT HOLDINGS A/S,    :
 9   et al.,                        :
                                    :
10              Defendants.         :   No. 05-422 (GMS)
11                          -   -   -
12                   Wilmington, Delaware
                  Wednesday, January 30, 2008
13                      8:30 a.m.
                   Eighth Day of Trial
14
                            -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
16                                      and a Jury
17
18
     APPEARANCES:
19
                    EDMOND D. JOHNSON, ESQ.
20                  Pepper Hamilton LLP
                         -and-
21                  MARTY STEINBERG, ESQ.,
                    BRIAN M. BUROKER, ESQ., and
22                  MAYA M. ECKSTEIN, ESQ.
                    Hunton & Williams
23                  (Washington, D.C.)
24                                  Counsel for Plaintiff
25
```

Hauge - direct

Page 1742

1    responsibility I have as well is that I have to insure that

2    the inventions made at the company, the Demant Group

3    companies are foreign-less patent applications.

4    Q.    As an aside, are you aware of where the products that

5    are accused of infringement are made?

6    A.    Yes, the Demant Group with Oticon make the accused

7    products in Denmark and they ship them to the rest of the

8    world from Denmark.

9    Q.    Have all the of the accused products always been made

10    in Denmark?

11    A.    Yes.

12    Q.    Were you personally responsible for doing any

13    searches to determine whether any of the accused products

14    infringed anybody else's patents?

15    A.    Yes.  I have been responsible for doing clearance

16    searches on Syncro 2 and Delta product families.

17    Q.    And what specifically did you do as part of those

18    searchs?

19    A.    Well, first, I met with, my supervisor at the time

20    was Michael Christensen and he gave me a topic

21    specification.  That is a document describing all of the new

22    features of these products which have to be examined.  And

23    he taught me the procedures of how to perform the clearance

24    searches and the policies of Bernafon and Oticon.

25    Q.    And after you met with Michael Christensen, did you

Hauge - direct

1    do anything else?

2    A.      Yes, I studied the target specification obviously and

3    I met with the project management to discuss whether I had a

4    correct understanding of what was in the features of those

5    target specifications.  And when we had come to a certain

6    agreement on the terms, I went back to my computer

7    essentially and I made database searches in our database

8    which is a database including 17,000 patents relating to

9    hearing aid technology.

10   Q.      Did you search anywhere else other than your 17,000

11   patent database?

12   A.      Yes.  I also searched on a database which is

13   maintained by the European Patent Office and that includes

14   patents and patent applications on any technology in the

15   world.

16   Q.      And as a result of your searching, did you identify

17   any patents that might pose a risk?

18   A.      Yes.  In relation to these two products, Syncro 2 and

19   Delta, I identified 24 patents and patent applications which

20   may pose as an infringement risk for those products.

21   Q.      Included within those 24 patents, were the Levitt

22   patents there?

23   A.      No.

24   Q.      What did you do after you found those 24 patents?

25   A.      I went to the project management and we went through

Hauge - direct

Page 1744

1    them and analyzed them.

2    Q.    And how long, by the way, did the search process

3    take?

4    A.    It's an ongoing process but I would say I spent, it

5    lasted for at least six months.

6    Q.    Was it six months of searching?  The searching

7    itself, how long did it take?

8    A.    When I started the search, it was my first assignment

9    at Oticon.  I would say that two-thirds of my time for the

10   first three months really related to clearance searches for

11   these two products.

12   Q.    Was this the first time you had done patent searches?

13   A.    Oh, no.  I have worked in a patent attorney company

14   before as a patent attorney doing clearance search for

15   clients.

16   Q.    The other products that are accused of infringement

17   in this case, were searches done on those as well?

18   A.    Yes.

19   Q.    Were the Levitt patents identified in connection with

20   any of those searches?

21   A.    No.

22            MR. PANITCH:  I have no further questions.

23            THE COURT:  All right.  Counsel, you may

24   cross-examine.

25            MS. ECKSTEIN:  I apologize, Your Honor.  We're

Hauge - cross

1    looking for the exhibit book.  There are only two exhibits.

2              THE COURT:  No problem.

3              (Binders passed up.)

4                        CROSS-EXAMINATION

5    BY MS. ECKSTEIN:

6    Q.     Good afternoon, Mr. Hauge.

7    A.     Good afternoon.

8    Q.     I apologize if I mispronounce your name.

9    A.     That's okay.

10   Q.     Just a few questions.  You mentioned some searches

11   that were done before the introduction of the accused

12   products?

13   A.     Yes.

14   Q.     And you mentioned using search terms?

15   A.     Key words.  I did mention it but, yes, I did use key

16   words in order to determine or find relevant patents.

17   Q.     And did you search using the terms "feedback" or

18   "feedback cancellation?"

19   A.     I believe so.

20   Q.     I'm sorry?

21   A.     I believe so.

22   Q.     And yet you didn't find the Levitt patents?

23   A.     No.

24   Q.     Let me hand you, if you could look, there is JX-7.

25   Can you put JX-7 on the screen?  Go to the next page,

Page 1802

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                IN AND FOR THE DISTRICT OF DELAWARE
 3
                            -   -   -
 4
 5   ENERGY TRANSPORTATION,           :   Civil Action
     INC.,                           :
 6                                    :
             Plaintiff,               :
 7                                    :
         v.                           :
 8                                    :
     WILLIAM DEMANT HOLDINGS A/S,     :
 9   et al.,                          :
                                      :
10          Defendants.               :   No. 05-422 (GMS)
11                          -   -   -
12                   Wilmington, Delaware
                    Friday, January 31, 2008
13                        9:30 a.m.
                     Ninth Day of Trial
14
                            -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18   APPEARANCES:
19             EDMOND D. JOHNSON, ESQ.
               Pepper Hamilton LLP
20                     -and-
               MARTY STEINBERG, ESQ.,
21             BRIAN M. BUROKER, ESQ., and
               MAYA M. ECKSTEIN, ESQ.
22             Hunton & Williams
               (Washington, D.C.)
23
                              Counsel for Plaintiff
24
25
```

Putnam - direct

Page 1881

1    A.            Well, the method I use is something called

2    count, rank and divide.  It's a three-step process that I

3    used to put a boundary on ETG's claims for their share of

4    the profits.

5    Q.            Before we go on each step, can you explain

6    briefly what that means?

7    A.            So you can think of it as having, it's really no

8    more complicated than what you do when you have folks over

9    for dinner.  You count the number of people that you expect

10   to come to dinner, you rank them according to the size

11   portion they're going to get.  So big people get a big

12   dinner plate, babies get a small dinner plate, and then you

13   divide all your food on your stove according to the ranking

14   of each person.  So your big uncle gets a larger portion and

15   your toddler gets a smaller portion and you do that

16   according to a formula based on what you think they're going

17   to eat.

18   Q.            So in the first step, counting, what did you

19   count in this case?

20   A.            In this case, I counted all the patents that are

21   either owned or licensed by each of the parties, by Demant

22   and by Widex and found that they were approximately 100 in

23   each case.

24   Q.            Does the product actually have to have the

25   patents in it, the technology of the patents?

Kates - dep.

1          "Answer:  I do not remember the specific time.

2    But this particular technical conference tends to be held in

3    the spring.

4          "Question:  I've handed you a document marked

5    Kates -- or marked Exhibit 19 to this deposition, Bates

6    labeled GNRD383587 through 383608.  Is that what you have in

7    front of you?

8          "Answer:  Yes, indeed.

9          "Question:  Can you tell me what this document

10   is?

11         "Answer:  These are copies of the slides that I

12   used for a presentation that I gave, as identified on the

13   cover sheet at an Acoustical Society of America meeting in

14   2001.

15         "Question:  Now, in 2001, you weren't working at

16   CUNY anymore.  Is that correct?

17         "Answer:  That is correct.

18         "Question:  There -- was it -- was your company

19   now Cirrus Logic?  Now, as of June 5th, 2001, was the

20   company Cirrus Logic?

21         "Answer:  I believe it was Cirrus Logic.  It was

22   certainly before I left Cirrus Logic to join ReSound

23   directly.

24         "Question:  Yeah.  And my question was more than

25   the difference between AudioLogic and Cirrus Logic.

Kates - dep.

Page 1905

1            "Answer:  This would have been Cirrus Logic.

2            "Question:  What did you do to prepare for this

3    talk?

4            "Answer:  I was invited to give this talk.  And

5    I went through my work on feedback cancellation, because I

6    wanted to present a summary of what I had accomplished.  The

7    session of the meeting was in honor of Harry.  He was

8    retiring from CUNY.  So I also added some material that

9    provided a tie-in of my interests with one of Harry's

10   interests.

11   Q.        By the time that you gave this talk, had you

12   completed most of your work on feedback cancellation system

13   design?

14           "Answer:  Yes.

15           "Question:  Did anybody help you prepare the

16   materials for this talk?

17           "Answer:  No.  It is my work.

18           "Question:  Did you have any other written

19   materials to accompany these?

20           "Answer:  No, I did not.

21           "Question:  Do you remember any of the other

22   speakers?

23           "Answer:  Many of the other speakers were

24   colleagues of Harry from CUNY -- I don't remember who

25   exactly was a speaker -- or research friends of long

Kates - dep.

Page 1911

1              "Answer:  But actually designing a system to

2    cancel feedback, no, I don't believe I did any work prior to

3    CUNY.

4              "Question:  After you started working with Dr.

5    Levitt's group?

6              "Answer:  Correct.

7              "Question:  You started in the substantive

8    materials of your written presentation with a big copy of

9    the front of the '850 patent.  Why is that?

10             "Answer:  The purpose of this session was to

11   honor Harry.  One can do that several different ways.  You

12   can honor someone by recalling shared war stories.  You can

13   honor somebody by pointing out how work that you did was

14   built on pioneering work that that previous person had.  Or

15   you can honor someone by pointing out a shared interest,

16   where somebody may have looked at a problem, not necessarily

17   solved it, but you want to make the connection between your

18   work and the honoree's work in terms of this shared

19   interest.

20             "And this figure -- the title of the patent I

21   brought up to tell the audience that Harry had an interest

22   in feedback cancellation, I had an interest in feedback

23   cancellation, this was a shared interest, and I was honoring

24   Harry by, in my opinion, solving a problem that he had not

25   solved but where he had expressed an interest in it.