IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ENERGY TRANSPORTATION GROUP, INC., )
)
)
Plaintiff, )
)
v. )
)
SONIC INNOVATIONS, INC., et al, )
)
)
Defendants. )
)

C.A. No. 05-422 (GMS)

**PLAINTIFF ENERGY TRANSPORTATION GROUP INC.'S OPPOSITION TO DEFENDANTS' RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW WITH RESPECT TO DAMAGES OR, IN THE ALTERNATIVE, FOR A REMITITTUR OR NEW TRIAL ON DAMAGES**

OF COUNSEL:

Marty Steinberg
HUNTON & WILLIAMS LLP
1111 Brickell Avenue , Suite 2500
Miami, Florida  33131
Telephone:  (305) 810-2500

Brian M. Buroker
HUNTON & WILLIAMS LLP
1900 K Street, N.W., Suite 1200
Washington, DC 20006-1109
Telephone:  (202) 955-1500

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone:  (804) 788-8788

May 9, 2008

Edmond D. Johnson (#2257)
Matthew A. Kaplan (#4956)
PEPPER HAMILTON LLP
Hercules Plaza Suite 5100
1313 Market Street
Wilmington, DE 19899-1709
Telephone:  (302) 777-6500

*Attorneys for Energy Transportation Group, Inc.*

## Table of Contents

I. Introduction ........................................................................................ 1

II. Nature and Stage of the Proceedings .......................................... 1

III. Summary of the Argument ........................................................... 2

IV. Statement of Facts ........................................................................ 4

V. Argument ........................................................................................ 7

    A. Applicable Legal Standards ................................................ 7

        1. *Judgment As a Matter of Law* ............................... 7

        2. *New trial* ............................................................... 8

        3. *Remitittur* ............................................................. 9

        4. *Standard for Damages in a Patent Case* ............. 9

    B. Defendants' Motion Is an Untimely *Daubert* Challenge ..... 12

    C. Substantial Evidence Supports the Jury's Damages Verdict ..... 15

    D. Defendants' Attacks on Mr. Musika's Testimony Are Baseless ..... 17

        1. *Mr. Musika Considered Licenses in the Hearing Aid Field and Properly Found Them to be of Little or No Relevance* ..... 17

        2. *Mr. Musika's Use of Profit Margin To Calculate a Reasonable Royalty is Proper and Supported by the Facts and Law* ..... 22

        3. *Mr. Musika Properly Analyzed Georgia-Pacific Factor 13* ..... 28

    E. Defendants Rely on Unreliable or Irrelevant Evidence in Support of Their Damages Calculation ..... 32

VI. Conclusion ........................................................................ 36

## <u>Table of Authorities</u>

### CASES

*Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 485 F. Supp. 2d 519 (D. Del. 2007) ........................................................................................................................... 8

*Alfred v. Caterpillar, Inc.*, 262 F. 3d 1083 (10th Cir. 2001).......................................... 14

*Bio-Rad Laboratories, Inc. v. Nicolet Instr. Corp.*, 739 F. 2d 604 (Fed. Cir. 1984) .................. 22

*Brunswick Corp. v. United States*, 36 Fed. Cl. 204 (1996)....................................... 10, 29

*CGB Occup. Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F. 3d 375 (3d Cir. 2004)................... 7

*Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993)................................... 12

*Donald M. Durkin Contracting, Inc. v. City of Newark*, 2007 WL 2710451 (D. Del. Sept. 17, 2007) .................................................................................................................... 8, 16

*Dragan v. L.D. Caulk Co.*, 1989 WL 133536 (D. Del. April 21, 1989) (unpublished)............... 10

*Eiland v. Westinghouse Elec. Corp.*, 58 F. 3d 176 (5th Cir. 1995)................................... 9

*FMS, Inc. v. Volvo Const. Equipment North America, Inc.*, No. 00 C 8143, 2007 WL 844899 (N.D. Ill. Mar. 20, 2007).................................................................................... 13

*Frazier v. Honeywell Intern., Inc.*, 518 F. Supp. 2d 831 (E.D. Tex. 2007) ........................... 13

*Fromson v. Western Litho Plate and Supply Co.*, 853 F. 2d 1568 (Fed. Cir. 1988)... 10, 11, 23, 24

*Galloway v. U.S.*, 319 U.S. 372 (1943)................................................................ 7

*Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D. N.Y. 1970).. 10, 29

*Honeywell International, Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459 (D. Del. 2005) ..................................................................................................... 9, 10, 12, 23, 24

*Hurley v. Atl. City Police Dep't*, 933 F. Supp. 396 (D. N.J. 1996), aff'd 174 F. 3d 95 (3d Cir. 1999) .................................................................................................................. 8

*Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F. 3d 860 (Fed. Cir. 2003)......................... 10

*IPPV Enterprises, LLC v. Echostar Communications, Corp.*, 191 F. Supp. 2d 530 (D. Del. 2002) .................................................................................................................... 9

*Joy Technologies, Inc. v. Flakt, Inc.*, 954 F. Supp. 796 (D. Del. 1996)............................. 24

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F. 3d 1337 (Fed. Cir. 2004) ................................................................................................................. 11

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) .............................................. 12

*Lam, Inc. v. Johns-Manville Corp.*, 718 F. 2d 1056 (Fed. Cir. 1983)............................... 27

*Lightning Lube, Inc. v. Witco Corp.*, 4 F. 3d 1153 (3d Cir. 1993)................................ 7, 8

*Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery*, 202 F. Supp. 2d 371 (D. N.J. 2002)..... 13

*Macsenti v. Becker*, 237 F. 3d 1223 (10th Cir. 2001)............................................... 13

*Marbled Murrelet v. Babbitt*, 83 F. 3d 1060 (9th Cir. 1996)...................................... 13

*McKnight By and Through Ludwig v. Johnson Controls, Inc.*, 36 F. 3d 1396 (8th Cir. 1994) .... 13

*Monolithic Power Sys., Inc. v. 02 Micro Int'l Ltd.*, 476 F. Supp. 2d 1143 (N.D. Cal. 2007)....... 27

*Moyer v. United Dominion Indus., Inc.*, 473 F. 3d 532 (3d Cir. 2007)................................ 7

*Naeem v. McKesson Drug Co.*, 444 F. 3d 593 (7th Cir. 2006)..................................... 13

*Newell Company v. Kenney Mfg. Co.*, 864 F. 2d 757 (Fed. Cir. 1988) ............................. 8

*Oiness v. Walgreen Co.*, 88 F. 3d 1025 (Fed. Cir. 1996)......................................... 27

*Perkin-Elmer Corp. v. Computervision Corp.*, 732 F. 2d 888 (Fed. Cir. 1984) ....................... 7

ii

*Praxair, Inc. v. ATMI, Inc.*, 445 F. Supp. 2d 460 (D. Del. 2006) .................................................. 8

*Questar Pipeline Co. v. Grynberg*, 201 F. 3d 1277 (10th Cir. 2000) ............................................ 13

*Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 788 F. 2d 1554 (Fed. Cir. 1986) ...................... 10

*Riles v. Shell Exploration and Prod. Co.*, 298 F. 3d 1302 (Fed. Cir. 2002) ................................ 10

*Stryker Corp. v. Davol Inc.*, 234 F. 3d 1252 (Fed. Cir. 2000) ........................................................ 7

*Telecomm Technical Services, Inc. v. Siemens Rolm Communications, Inc.*, 1999 U.S. Dist.
    LEXIS 21415 (N.D. Ga. Aug. 24, 1999) ............................................................................... 26

*Williamson v. Consol. Rail Corp.*, 926 F. 2d 1344 (3d Cir. 1991) ............................................ 8, 36

*Wright v. City of Philadelphia*, No. 01-6160, 2007 WL 951421 (E.D. Pa. Mar. 27, 2007) ......... 13

STATUTES

35 U.S.C. § 284 ............................................................................................................................. 12

35 U.S.C. § 284 (2001) ................................................................................................................... 9

OTHER AUTHORITIES

11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure,
    §2807 (2d ed. 1995) .................................................................................................................. 9

Fed. R. Civ. P. 50 ...................................................................................................................... 7, 16

Patent Damages Law & Practice §1:12 ........................................................................................... 9

U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Enforcement and Intellectual Property
    Rights: Promoting Innovation and Competition (2007), Chapter 3, § B ................................ 19

## I.    Introduction

The Court should deny Defendants' motion for judgment as a matter of law, remitittur, or a new trial on damages, in its entirety. Defendants' motion is an untimely *Daubert* motion that this Court should not consider for the first time after the close of evidence. Moreover, even if the Court opts to consider the motion, it lacks merit. Defendants' motion largely argues that substantial evidence supported ***their*** experts' view of the facts and methodology, and ignores the fact that the jury decided that their experts' view of the facts and methodology was incredible, wrong, unpersuasive, or all of the above. Substantial evidence supported the jury's verdict.

Nor was this a runaway jury. The jury found for ETG on many, but not all, liability issues, and awarded ETG a lower reasonable royalty rate than it requested. The jurors' attentiveness and devotion to their task throughout a long and complex trial, and their verdict, should be sustained. Defendants' arguments lack merit and should be rejected.

## II.    Nature and Stage of the Proceedings

ETG filed suit against several defendants, including Demant[1] and Widex,[2] on June 23, 2005, alleging infringement of U.S. Patent Nos. 4,731,850 (the "'850 Patent") and 4,879,749 (the "'749 Patent") (collectively, the "Patents-In-Suit") by defendants' manufacture, use, sale, offer for sale, and importation of hearing aid products and components (*i.e.*, chips) for use in hearing aids and related products. All defendants except Widex and Demant settled before the 9-day jury trial held January 22-February 1, 2008. The jury returned a verdict on February 4, finding, *inter*

---

1 The term "Demant" includes defendants William Demant Holding A/S, Oticon A/S, Oticon Inc., Bernafon AG, Bernafon, LLC, and WDH, Inc.

[2] The term "Widex" includes defendants Widex Hearing Aid Company and Widex A/S.

*alia*, that Demant and Widex infringed the asserted claims of the Patents-In-Suit, and awarding

damages of $16 million against Demant and $15 million against Widex. *See* D.I. 521. The

Court entered judgment in ETG's favor on February 8, 2008. *See* D.I. 522. Defendants moved

the Court for JMOL With Respect to Damages or, In the Alternative, for a Remitittur or New

Trial on Damages on February 21, 2008, *see* D.I. 528, and filed a brief in support on March 27,

2008 ("Defendants' Brief"). *See* D.I. 543. ETG now opposes Defendants' motion for the

reasons stated herein.

### III.    Summary of the Argument

1. Defendants' Motion is an untimely *Daubert* challenge. Defendants never objected to the

   methodology used by Mr. Musika to reach a reasonable royalty rate, either before trial or

   during trial. Instead, Defendants waited until after the close of evidence to lob their *Daubert*

   challenge. Defendants' motion is untimely and should not even be considered, considering

   the clear prejudice to the Court, which was deprived of the opportunity to engage in a

   meaningful *Daubert* analysis, and ETG, which was deprived of the opportunity to proffer

   supplemental proof in support of Mr. Musika's calculations and methodology.

2. Substantial evidence supports the jury's damages verdict. The jury received evidence that

   Defendants' so-called "comparable" licenses were not arm's-length negotiations, that their

   own industry association (HIMPP) charges a royalty rate that they recognize is low, that the

   hearing aid industry is not competitive, that Defendants charge incredibly high prices and

   earn "extraordinarily high" profits from sales of infringing products, and that feedback

   cancellation is important to the quality and high sales of hearing aids. Moreover, Defendants'

   damages expert agreed that royalties attained through litigation should be higher than those

   attained through negotiations. Considering the evidence, the jury reasonably awarded ETG

damages that are based on an effective royalty rate of 3.91-99 percent for Demant and 4.97 percent for Widex.

3. Mr. Musika considered licenses in the hearing aid field, and properly found them to be of little or no relevance to his analysis. Defendants urge that those licenses should have been considered "comparables" and result in a reasonable royalty rate of approximately 0.5 percent. But the jury received evidence that the German Federal Cartel Office found the industry non-competitive and with high risk of collusion. And Defendants' own witnesses and exhibits established that the industry organized a structure intended to keep hearing-aid related patents from "falling into the wrong hands" and to charge royalty rates lower than the market could bear. Moreover, even if relevant, precedent holds that industry royalty rates do not establish a ceiling above which royalty rates may not be assessed.

4. Mr. Musika properly calculated Defendants' profit margin from the sale of infringing products. Precedent explicitly allowed Mr. Musika to consider Defendants' actual profits in his analysis, especially considering that Defendants produced no reliable evidence of their expected profits, and that Defendants failed to keep records depicting profit margins on a product-by-product basis.

5. Mr. Musika properly analyzed *Georgia-Pacific* factor 13. While Defendants claim that Mr. Musika failed to consider the concept of "patent stacking" in his analysis, they fail to acknowledge that they failed to perform a patent stacking analysis with respect to the infringing products, let alone offer any evidence of patent stacking with respect to those products. Additionally, substantial evidence supported Mr. Musika's conclusion that the Levitt Patents were pioneering in nature.

6.  Defendants simply prefer their view of the facts and their experts' opinions to Mr. Musika's. Defendants forget, though, that the question is not whether substantial evidence supports their preferred royalty rate, but whether substantial evidence supports the jury's decision to award ETG $31 million in damages. Moreover, the jury was free to disregard or give less weight to any witness and/or testimony it did not consider credible. Substantial evidence supported the jury's verdict.

## IV.   Statement of Facts

In nine days of trial, the jury received a considerable amount of evidence that ultimately supported its damages verdict. Among other things, the jury heard evidence that Demant earned more than $417 million in profits from the infringing products during the damages period. *See* Trial Tr. 852:10-18; 853:9-14; 854:13-17;[3] JX36 (attached as Exhibit 2); JX40 (attached as Exhibit 3). Similarly, Widex earned more than $306 million in profits from the accused products during the damages period. *See* Trial Tr. 854:22-855:3; 855:9-22; JX216 (attached as Exhibit 4). These profits resulted in a 9.2 percent profit premium for the infringing products over non-infringing products. *See* Trial Tr. 864:8-18. As noted by the German Federal Cartel Office:

> The hearing aid industry is an extraordinarily profitable economic area. This is true not only in comparison to other industries, but also when compared to the highly profitable medical technology.

PX 648, ¶ 318.[4] *See also* 877:13-16; PX648 ("The key numbers of the oligopoly members are not only very similar but in comparison to other sectors bear witness to an extraordinarily high profitability of the companies."). Indeed, the members of HIMPP, which include Defendants,

---

[3] Excerpts from the trial transcript are collectively found in Exhibit 1.

[4] Excerpts from the German Federal Cartel Report are attached collectively in Exhibit 5.

have an "extraordinarily high" EBITA, especially when compared to other industries. The members of HIMPP enjoy an EBITA of 35 percent, while Daimler Chrysler's EBITA is 11 percent, BMW's is 14 percent, Nestlé's is 15 percent, the European chemical industry's is 15 percent, and German clinic operators' is 18.3 percent. Trial Tr. 876: 22-877:6; PX 648. These high profits are earned not only in Germany, but throughout the world: "Hence the earnings indicator as well is very comparable and confirms the high profit margins achieved by the members of the oligopoly throughout the world with their products." PX 648, ¶ 137. *See also id.*, ¶ 137 ("The key numbers of the oligopoly members are thus not only very similar, but in comparison to other sectors bear witness to an extraordinarily high profitability of the companies."). Such high profitability apparently is not enough for Defendants, though, as, according to Tom Westermann, the Vice President of Sales and Marketing of Defendant Widex Hearing Aid Company, Widex sets prices according to "what the market can bear", but "[t]hat's not always enough." Trial Tr. 399:19-400:12.

Defendants sought to elicit evidence about various license agreements entered into by Defendants and other members of the hearing aid industry. While Defendants touted these as comparable licenses, the jury heard evidence that the agreements were not entered into as arm's-length transactions. For example, the German Federal Cartel Office noted that hearing aid manufacturers, including Oticon and Widex, "are intertwined by a series of reciprocal licensing and cross-licensing agreements." PX 648 at ¶ 180. It further explained that

> [r]eciprocal licenses continue to recur because the manufacturers' focus of development is very similar and for that reason the threat of patent disputes exists over and over again. Companies frequently work on product enhancements for which competitors have already filed patents. The HIMPP-maintained patent database of all patent specifications relevant to hearing aids simplifies

5

> identification of corresponding parallel developments.  As a rule,
> the companies then agree on a reciprocal license with no fees.

*Id.* at ¶ 180.  This exchange of patents, including the HIMPP-owned patents, "simply does not have the aim of guaranteeing the creative freedom of product development, but the aim of shaping the product on the same technological basis and preventing medium-term advances in development by competitors."  Id. at ¶ 210 (internal footnote omitted).  Considering these arrangements, the German authorities "regard[ed] the risk of collusion through such agreements as comparatively high in narrow oligopolies and high barriers to market entry."  *Id.* (footnote omitted).

Moreover, Defendants pointed to HIMPP's three percent royalty rate as proof of a comparable royalty.  But HIMPP itself acknowledged that its royalty rate is often "lower than a typical license rate."  JX180 (attached as Exhibit 6).  And Soren Westermann, Widex' Director of Research Information Technology and Intellectual Property and the Managing Director of HIMPP, testified that the leading hearing aid manufacturers created HIMPP specifically to preclude high license rates by preventing hearing aid-related patents from "falling into the wrong hands":

> Q:    Now, when you answered your counsel's questions about the purposes of HIMPP, one of the purposes you said was the risk of patents *falling into the wrong hands*; right?
>
> A:    Correct.
>
> Q:    And that would be the *hands of people outside the major hearing aid manufacturers*; right?
>
> A:    That is what it would normally be, yes.

Trial Tr. 812:1-6.  His statement is corroborated by the report of the German Federal Cartel Office, which found that HIMPP's members have created "an insurmountable barrier to market

entry into the German market," PX 648, ¶ 262, that "virtually no market entries have taken place over the years past," *id.* at ¶ 126, and that the "risk of collusion through such agreements" is "comparatively high in narrow oligopolies and high barriers to market entry." *Id.* at ¶ 210. Indeed, the lack of competition in the hearing aid industry is so stark that the German authorities found that "the findings regarding competition on price and terms do not make it possible to recognize any clear indications of significant competition in the oligopoly." *Id.* at ¶ 250.

## V.    **Argument**

### A.    **Applicable Legal Standards**

#### 1.    *Judgment As a Matter of Law*

Entry of judgment as a matter of law ("JMOL")  is a "sparingly" invoked remedy. *Moyer v. United Dominion Indus., Inc.,* 473 F. 3d 532, 545 n. 8 (3d Cir. 2007) (*quoting CGB Occup. Therapy, Inc. v. RHA Health Servs. Inc.,* 357 F. 3d 375, 383 (3d Cir. 2004).  JMOL is appropriate only if there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmovant. Fed. R. Civ. P. 50.  A district court may overturn a jury's verdict *only if*, upon the record before the jury, reasonable jurors could not have reached that verdict. *See Perkin-Elmer Corp. v. Computervision Corp.*, 732 F. 2d 888, 893 (Fed. Cir. 1984); *see also Lightning Lube, Inc. v. Witco Corp.,* 4 F. 3d 1153, 1166 (3d Cir. 1993) ("[JMOL] should be granted only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference, there is insufficient evidence from which a jury reasonably could find liability.").  On a motion for JMOL, the Court must view all evidence in the light most favorable to the party opposing the motion. *Galloway v. U.S.*, 319 U.S. 372 (1943).  Further, district courts must grant the nonmovant the benefit of all inferences that may reasonably be drawn from the evidence. *Stryker Corp. v. Davol Inc.*, 234 F. 3d 1252, 1258 (Fed. Cir. 2000).  In

performing this narrow inquiry, courts must refrain from weighing the evidence, determining the credibility of witnesses, or substituting their own version of the facts for that of the jury. *Lightning Lube,* 4 F. 3d at 1166.

### 2. *New trial*

On a motion for new trial, the Court "must proceed cautiously and not substitute its own judgment of the facts and assessment of the witnesses' credibility for the jury's independent evaluation." *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 485 F. Supp. 2d 519, 523 (D. Del. 2007). *See also Praxair, Inc. v. ATMI, Inc.*, 445 F. Supp. 2d 460, 465 (D. Del. 2006). Rather, "[w]here a motion for a new trial is based primarily on the weight of the evidence, the discretion of the trial court is limited." *Donald M. Durkin Contracting, Inc. v. City of Newark*, 2007 WL 2710451 at *2 (D. Del. Sept. 17, 2007) (citations omitted). "Indeed, 'new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience.'" *Id.* (quoting *Williamson v. Consol. Rail Corp.*, 926 F. 2d 1344, 1344 (3d Cir. 1991). "Although a court is permitted to consider the credibility of trial witnesses and to weigh evidence, it must 'exercise restraint to avoid usurping the jury's primary function.'" *Id.* (*quoting Hurley v. Atl. City Police Dep't*, 933 F. Supp. 396, 403 (D. N.J. 1996), aff'd 174 F. 3d 95 (3d Cir. 1999). *See also Newell Company v. Kenney Mfg. Co.*, 864 F. 2d 757, 765 (Fed. Cir. 1988) ("[j]udges must accept the factual findings, presumed from a favorable jury verdict, which are supported under the substantial evidence/reasonable juror standard.").

### 3.     *Remitittur*

In the exceptional circumstance in which a court determines that a damages award should

be overturned as unreasonably excessiveness, the court may in its discretion grant a remitittur.

*See IPPV Enterprises, LLC v. Echostar Communications, Corp.*, 191 F. Supp. 2d 530, 572 (D.

Del. 2002) (citing *Eiland v. Westinghouse Elec. Corp.*, 58 F. 3d 176, 182 (5th Cir. 1995)).  To

reach such an unusual result, however, the Court must find that  "in light of the evidence, the

verdict is so unreasonably high that it would be unconscionable to permit it to stand." *Id.* (citing

11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure,

§2807, at 52 (2d ed. 1995).

### 4.     *Standard for Damages in a Patent Case*

Upon a finding of infringement, the plaintiff in a patent case is entitled to "damages

adequate to compensate for the infringement, but in no event less than a reasonable royalty for

the use made of the invention by the infringer." 35 U.S.C. § 284 (2001).   There is no single

prescribed method for determining a reasonable royalty rate.  *See Honeywell International, Inc. v.

Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459, 465-66 (D. Del. 2005) (section 284 "does not

mandate how the district court must compute [the reasonable royalty], only that the figure

compensate for the infringement").  *See also* Patent Damages Law & Practice §1:12

("Importantly, no single accepted method exists for how a court must determine 'reasonable

royalty' damages").  Thus, the district court has the discretion to determine the proper

methodology for assessing and computing damages under § 284.  *Id.* (citing *TWM Mfg.*, 789 F.

2d at 898).

The district court's discretion is limited by only three factors: (1) the damages must be no

less than a "reasonable royalty for the use made of the invention by the infringer"; (2) the

damages must adequately "compensate for the infringement"; and (3) the reasonable royalty must be based on "sound economic and factual predicates." *Id.* at 466 (quoting § 284; *Riles v. Shell Exploration and Prod. Co.*, 298 F. 3d 1302, 1311 (Fed. Cir. 2002)). While the so-called *Georgia-Pacific*[5] factors may serve as a guide in the reasonable royalty rate inquiry, "the court is neither constrained by them nor required to consider each one where they are inapposite or inconclusive." *Brunswick Corp. v. United States*, 36 Fed. Cl. 204, 211-12 (1996). What constitutes a reasonable royalty depends on the evidence presented and the particular facts of each case. *See Dragan v. L.D. Caulk Co.*, 1989 WL 133536, * 9 (D. Del. April 21, 1989) (unpublished) (citing *Radio Steel & Mfg. Co. v. MTD Products, Inc.*, 788 F. 2d 1554, 1557 (Fed. Cir. 1986)).[6]

The calculation of a reasonable royalty rate envisions a hypothetical negotiation between the patent holder and infringer at some point before infringement began. *Honeywell*, 378 F. Supp. 2d at 464 (citing *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F. 3d 860, 869 (Fed. Cir. 2003). However, while the date of the hypothetical negotiation is critical to the analysis, it does not "rigidly foreclose the factfinder from considering subsequent events." *Id.* Such rigidity would ignore a limitation "inherent to the hypothetical negotiation method." *Id.*

Specifically, a potential licensee in a normal negotiation can either (a) opt not to use the invention, (b) pay an agreed royalty, or (c) infringe the patent and risk litigation. *Id.* (citing *Fromson v. Western Litho Plate and Supply Co.*, 853 F. 2d 1568, 1576 (Fed. Cir. 1988),

---

[5] *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D. N.Y. 1970), *modified*, 446 F.2d 295 (2d. Cir. 1971).

*overruled on other grounds, Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.,*

383 F. 3d 1337 (Fed. Cir. 2004). That is not the case, though, with a hypothetical negotiation,

because the factfinder "presumes that the licensee has made the second choice, when it fact it

made the third." *Id.* (quoting *id.*). Thus, the factfinder "may be tempted 'to pretend that the

infringement never happened.'" *Id.* (quoting *TWM Mfg. Co. v. Dura Corp.*, 789 F. 2d 895, 900

(Fed. Cir. 1986)). Accordingly, the hypothetical negotiation analysis must be applied "flexibly"

and "as a device in the aid of justice." *Id.*

> The [hypothetical negotiation] methodology encompasses fantasy
> and flexibility; fantasy because it requires a court to imagine what
> warring parties would have agreed to as willing negotiators;
> flexibility because it speaks of negotiations as of the time
> infringement began, yet permits and often requires a court to look
> to events and facts that occurred thereafter and that could not have
> been known to or predicted by the hypothesized negotiations.

*Fromson*, 853 F. 2d at 1575. As a result, it is entirely appropriate to consider information that

post-dates the hypothetical negotiation.

    This flexible approach, often referred to as the "book of wisdom" approach, helps to

prevent prospective infringers from perceiving "'that blatant, blind appropriation of

inventions. . . is the profitable, can't-lose course.'" *Id.* at 465 (quoting *Fromson*, 853 F. 2d at

1575). Otherwise, "prospective infringers might rationally conclude that, at worst, upon a

finding of infringement, a license can be compelled, probably at the same royalty that would have

been paid if the patentee's rights had been respected at the outset." *Id.* (internal quotation marks

---

[6] Thus, Defendants' assertion that *Georgia-Pacific* sets forth a number of factors "that, when present, ***should be taking into consideration*** in a reasonable royalty analysis" is plainly wrong. Defendants' Brief at 5 (emphasis added). The Court has the discretion to determine the proper methodology for assessing and computing damages. *Honeywell*, 378 F. Supp. 2d at 465-66. Moreover, Mr. Musika did, in fact, consider all 15 *Georgia-Pacific* factors. *See Trial Tr.* 867:24-886:22.

omitted). The "book of wisdom" concept "protects the *quid pro quo* arrangement underlying patent law by ensuring that the patentee will be adequately compensated for infringement." *Id.* (quoting *id.* at 1575). As a result, infringers can be compelled to pay **more** in royalties than what they would have paid had they willingly negotiated with the licensor immediately before infringement began.

Indeed, the plain language of § 284 supports a flexible, "book of wisdom" approach by ensuring the recovery of damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for **the use made** of the invention by the infringer." 35 U.S.C. § 284 (emphasis added). The "use made" of an invention cannot be known until after infringement began, *see Honeywell*, 378 F. Supp. 2d at 465, and is most readily evidenced by an infringer's actual profits.

### B.    Defendants' Motion Is an Untimely *Daubert* Challenge

Defendants' Motion is little more than an attempt to untimely and improperly exclude Mr. Musika's testimony under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993) and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999). Defendants argue that Mr. Musika's methodology and calculations are speculative and unreliable and, thus, his testimony should be excluded. Defendants' Brief at 6-11. However, Defendants (a) failed to file a motion *in limine* to strike Mr. Musika's testimony, (b) failed to request a *Daubert* hearing to attack Mr. Musika's methodology and calculations, and (c) failed to contemporaneously object during trial to **any** of Mr. Musika's testimony on *Daubert* grounds. Accordingly, Defendants waived their right to

challenge Mr. Musika's methodology and calculations under *Daubert*, and the jury's damages award should not be disturbed.[7]

Considering the clear prejudice arising from an untimely *Daubert* challenge to an expert's testimony -- made for the first time after trial -- it is not surprising that courts routinely reject such challenges, holding that they are waived if not asserted before or during trial. *See Naeem v. McKesson Drug Co.*, 444 F. 3d 593, 609-11 (7th Cir. 2006); *Macsenti v. Becker*, 237 F. 3d 1223, 1231-34 (10th Cir. 2001); *Questar Pipeline Co. v. Grynberg*, 201 F. 3d 1277, 1289-90 (10th Cir. 2000); *Marbled Murrelet v. Babbitt*, 83 F. 3d 1060, 1066-67 (9th Cir. 1996); *McKnight By and Through Ludwig v. Johnson Controls, Inc.*, 36 F. 3d 1396, 1406-07 (8th Cir. 1994); *Frazier v. Honeywell Intern., Inc.*, 518 F. Supp. 2d 831, 839 (E.D. Tex. 2007); *Wright v. City of Philadelphia*, No. 01-6160, 2007 WL 951421, at * 3 (E.D. Pa. Mar. 27, 2007); *FMS, Inc. v. Volvo Const. Equipment North America, Inc.*, No. 00 C 8143, 2007 WL 844899, * 8-9 (N.D. Ill. Mar. 20, 2007); *Lithuanian Commerce Corp., Ltd. v. Sara Lee Hosiery*, 202 F. Supp. 2d 371, 375-77 (D. N.J. 2002).

*FMS* is instructive. There, the defendant filed a post-trial motion for judgment as a matter of law, or in the alternative, a new trial or remitittur, arguing in part that the plaintiff's expert witness' testimony should have been excluded under *Daubert*. *FMS, Inc.*, No. 00 C 8143, 2007 WL 844899 at * 4, 8. The *FMS* court rejected the defendant's challenge, considering that it waited until the close of evidence to object to the expert's testimony despite (a) having had the

---

[7] On the other hand, ETG filed *Daubert* motion challenging Defendants' experts more than a month before trial. Even then, the Court expressed concern about the timing of those motions, stating that they should have been filed earlier as motions *in limine*. January 3, 2008 Pretrial Conference, 85:17-86:21 (attached as Exhibit 15). Thus, Defendants have had notice at least since then that they needed to expeditiously file any purported challenge to Mr. Musika's methodology.

expert's reports since May 2004 and February 2005 and (b) having had it own expert to criticize the foundations of the challenged expert's testimony. *Id.* at *8. The court explained that

> [r]aising *Daubert* objections to expert testimony after the close of all the evidence harms the truth-seeking function of the court in two ways: first, it smacks of sandbagging, and second, it both deprives the [c]ourt of any opportunity to conduct a meaningful analysis and the opposing party the opportunity to bolster its proof.

*Id.* (citing *Alfred v. Caterpillar, Inc.*, 262 F. 3d 1083, 1087 (10th Cir. 2001) ("Daubert generally contemplates gatekeeping function, not a 'gotcha' junction.")). The court also rejected the defendant's argument that the district court should have *sua sponte* stricken the expert's testimony:

> To shirk its responsibility under the Federal Rule of Evidence during trial and then to attempt to place the blame on this [c]ourt in a post-trial motion is not an acceptable litigation strategy. By the time both sides had rested their cases, it was entirely too late for this [c]ourt to conduct a proper *Daubert* analysis.

*Id.* at * 9.

Here, Defendants had ample opportunity to raise *Daubert* objections against Mr. Musika, both during the pretrial period and trial. Defendants received Mr. Musika's expert report on September 17, 2007 -- almost four months before trial -- and deposed him at length three times. Despite these facts, Defendants failed to move to exclude his testimony before trial. Nor did Defendants preserve a *Daubert* challenge to Mr. Musika's testimony in the Final Pretrial Order.[8] And Defendants utterly failed to assert ***a single objection*** under *Daubert* to Mr. Musika's trial testimony. Indeed, they affirmatively stated that they had no objection to his admission as an expert:

---

[8] ETG, on the other hand, preserved its objections to the qualifications of Defendants' purported experts, Messrs. Morely, Soli, Donohoe, and Putnam, pursuant to *Daubert*. *See* Final Pretrial Order [D.I. 458], Section E.3.

MR. STEINBERG: Your Honor, at this point we tender Mr. Musika as an expert on patent damages.

MR. SCHERLING: No objection, Your Honor.

THE COURT: He will be received as such.

Trial Tr. 838:22-25. Instead, Defendants chose to cross-examine him about his methodology and conclusions, as well as present two damages experts of their own to refute his methodology and conclusions.

In light of Defendants' strategic decision not to raise a *Daubert* challenge to Mr. Musika's testimony before or during trial, Defendants waived any such objection. As stated by the *FMS* court, "[t]he rule cannot be otherwise," because allowing Defendants to assert *Daubert* objections for the first time after trial precludes the Court from engaging in a meaningful *Daubert* analysis and deprived ETG of the opportunity to proffer supplemental proof in support Mr. Musika's calculations and methodology. The Court should reject Defendants' untimely objections and allow the jury's damages award to stand.

### C.    Substantial Evidence Supports the Jury's Damages Verdict

The jury awarded ETG $15 million from Widex and $16 million from Demant, which, based on their sales, equate to effective royalty rates of 4.97 percent for Widex and 3.91-99 percent for Demant.[9] These awards (and royalty rates) are considerably lower than the approximately $25 million (Widex) and $35 million (Demant) advocated by ETG's damages expert. Indeed, the effective royalty rates based on the jury's verdict are approximately half-way between ETG's proposal (8.4 percent) and Defendants' proposal (its questionable 0.5 percent position).

Substantial evidence supported the jury's verdict on damages. For example, the jury heard evidence that Defendants have "extraordinarily high" profit margins and an EBITA far exceeding other major industries. Indeed, Demant earned more than $417 million in profits from the infringing products alone during the damages period, while Widex earned more than $306 million from its infringing products during the damages period. The jury also heard testimony that Defendants earned profits 9.2 percent higher on the infringing products than they earned on other products.

The jury also heard evidence establishing that the hearing aid industry lacks competition and, as a rule, the major hearing aid manufacturers (including Defendants) typically cross-license each other, often without charge or fees. The jury also received evidence that the Defendants created HIMPP specifically to prevent patents from "falling into the wrong hands" and that its three percent royalty rate is often lower than the market rate. Indeed, the jury heard evidence from the report of the German Federal Cartel Office that the hearing aid industry so lacked in competition, that the "risk of collusion" is "comparatively high."

Considering the plethora of evidence, it cannot be said that "no legally sufficient evidentiary basis" existed for the jury to reasonably award damages of $15 million and $16 million. *See* Fed. R. Civ. P. 50. Nor can it be said that the jury's verdict "resulted in a miscarriage of justice" or that the verdict "cries out to be overturned or shocks the conscience." *See Donald M. Durkin Contracting, Inc.*, 2007 WL 2710451 at *2. Substantial evidence supported the jury's verdict.

---

[9] If the jury gave Demant credit for certain government sales, the royalty rate is 3.91 percent. If it refused to do so, the royalty rate is 3.99 percent.

D.     **Defendants' Attacks on Mr. Musika's Testimony Are Baseless**

1.     *Mr. Musika Considered Licenses in the Hearing Aid Field and Properly Found Them to be of Little or No Relevance*

Defendants' motion largely focuses on Mr. Musika's purported failure to consider various licenses in the hearing aid field in his consideration of a reasonable royalty rate. In fact, Mr. Musika did consider those licenses, concluding that they were not the result of arm's-length negotiations and, thus, gave them little or no weight in his analysis.

Mr. Musika's decision to afford those licenses little or no weight is supported by substantial evidence. For example, the German Federal Cartel Office concluded that hearing aid manufacturers, including Oticon and Widex, "are intertwined by a series of reciprocal licensing and cross-licensing agreements" with no fees. PX 648 at ¶ 180. The German Federal Cartel Office further explained that

> [r]eciprocal licenses continue to recur because the manufacturers' focus of development is very similar and for that reason the threat of patent disputes exists over and over again. Companies frequently work on product enhancements for which competitors have already filed patents. The HIMPP-maintained patent database of all patent specifications relevant to hearing aids simplifies identification of corresponding parallel developments. *As a rule, the companies then agree on a reciprocal license with no fees.*

*Id.* at ¶ 180 (emphasis added). The German authorities further found that "the exchange of patents in the market for hearing aids -- and this applies to HIMPP just as much as to the licensing agreements between the manufacturers -- *simply does not have the aim of guaranteeing the creative freedom of product development, but the aim of shaping the product on the same technological basis and preventing medium-term advances in development by competitors*." *Id.* at ¶ 210 (emphasis added) (internal footnote omitted). As a result, the German

17

authorities "regard[ed] the risk of collusion through such agreements as comparatively high in narrow oligopolies and high barriers to market entry." *Id.* (footnote omitted).[10]

Defendants advance several arguments for the proposition that the findings of the German Federal Cartel Office should carry no weight. First, they complain that its findings cannot apply here because the German authorities focused on market concentration in the German, not U.S., market. While the German authorities' investigation was, in fact, focused on the German market, they nonetheless also considered the worldwide market for hearing aids. For example, the German Federal Cartel Office's report noted that "[t]otal sales volumes in the worldwide hearing aid business are comparable" and that "[t]he three leading manufacturers [including Oticon] constitute an oligopoly not just in Germany but in Europe and throughout the world as well." PX 648, ¶ 137. The report further noted that the oligopoly's market share "worldwide . . . is over 65%." *Id.*

Moreover, Defendants' point is irrelevant to the German Federal Cartel Office's review of licenses among hearing aid manufacturers, as those license agreements (including licenses to the HIMPP-owned patents) are not geographically limited in scope. *See, e.g.*, JX 14, 17, 167 (collectively attached as Exhibit 7). The German Federal Cartel Office's conclusions about license agreements in the hearing aid industry spanned borders.

Second, Defendants argue that, despite the findings of the German Federal Cartel Office, "arrangements such as patent pools and cross-licensing actually ***can*** promote competition and innovation" and that courts "have recognized that avoiding litigation through pooling

---

[10] Accordingly, Defendants' claim that the German Federal Cartel Office "made no findings whatsoever as to whether the royalty rates for licenses in the hearing aid field were unreasonable or artificially depressed" lacks merit. *See* Defendants' Brief at 14.

arrangements and cross-licensing *may* benefit competition." Defendants' Brief at 15 (emphasis

added). However, it is well settled that, while patents pools *can* promote competition, they also

*can hinder* competition. *See, e.g.*, U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust

Enforcement and Intellectual Property Rights: Promoting Innovation and Competition (2007),

Chapter 3, § B ("The panelists addressed other areas that might raise competitive concern,

including whether patents included in the pool were essential and valid, whether patent pool

members retained the ability to license their patents outside of the pool, whether grantback

requirements reduce incentives to innovate, . . ."); C ("Licensors could be discouraged from

making investments in innovation if 'a pooling arrangement . . . requires members to grant

licenses to each other at minimal cost . . . because members of the pool have to share their

successful research and development and each of the members can free ride on the

accomplishments of other pool members'"). Moreover, Defendants' experts conducted *no*

*analysis* to determine whether the HIMPP patent pool hindered or benefited competition. *See,*

*e.g.*, Putnam Deposition 108:11-22 (attached as Exhibit 8). Thus, Defendants' argument is

irrelevant.

Third, Defendants argue that Mr. Musika's failure to identify common ownership of the

major hearing aid companies somehow dooms his analysis. Defendants' Brief at 16. But

Defendants' argument is nonsensical because, by definition, an oligopoly is comprised of

separate companies, not companies owned by a single entity. *See, e.g.*, American Heritage

Dictionary of the English Language, Fourth Edition, Houghton Mifflin Company, 2004,

http://dictionary.reference.com/browse/oligopoly (accessed: May 5, 2008) (defining oligopoly as

"[a] market condition in which *sellers* are so few that the actions of any one of them will

materially affect price and have a measurable impact on competitors" (emphasis added)).

Moreover, there is no requirement that an expert or fact finder find common ownership before deciding that purportedly comparable license agreements receive less weight than other evidence. Moreover, Defendants ignore that they, along with other members of the hearing aid industry, commonly owned HIMPP. As the German Federal Cartel Office found, HIMPP is used to stabilize and reduce competition among its members, to the detriment of non-members. And, various other facts support the reasonable conclusion that the licenses Defendants advocated as comparables were not, in fact, reliable evidence. Those facts are found in the report of the German Federal Cartel Office (*see* supra), but also from Defendants' own witnesses and documents.

For example, Soren Westermann, Widex' Director of Research Information Technology and Intellectual Property and the Managing Director of HIMPP, testified that HIMPP was created specifically to prevent high license rates by having hearing aid-related patents "fall into the wrong hands":

> Q:    Now, when you answered your counsel's questions about the purposes of HIMPP, one of the purposes you said was the risk of patents *falling into the wrong hands*; right?
>
> A:    Correct.
>
> Q:    And that would be the *hands of people outside the major hearing aid manufacturers*; right?
>
> A:    That is what it would normally be, yes.

Trial Tr. 811:25-812:6. Additionally, according to HIMPP's own documents, its three percent royalty rate is often lower "than a typical royalty" in the hearing aid field. JX180 (Exhibit 6).

Finally, Defendants assert that Mr. Musika "confused the jury by asserting 'collusion' in the hearing aid industry based on" the report of the German Federal Cartel Office. Defendants'

Brief at 1-2.  In fact, Mr. Musika took pains to explain to the jury that he *was not* charging the

hearing aid industry with collusion:

> Q.    And what is that [HIMPP] and what did you determine about
> that organization as it affects damages?
>
> A.    That organization [HIMPP] was identified by the German
> regulators in reviewing the industry as an organization or as an
> example of the kind of relationships that exist between the
> participants.   And, excuse me, I'm not here to say that the
> participants engaged in any unlawful behavior. I'm not here to say
> they engaged in any antitrust behavior. I'm simply reporting what
> the German regulator found with respect to the non-arm's-length
> basis of the agreements.
>
> Those agreements can be perfectly lawful.  I don't even have the
> ability to tell you whether they're lawful or not, but I do have the
> financial training to know whether they are arm's length or not.
> And what the German regulator found was those transactions for a
> number of reasons, which I think we're going to discuss, are not
> reflective of a market transaction.

Trial Tr. 871:9-25.  Rather, Mr. Musika merely repeated the findings of the German authorities

and opined that, as a result, licenses in the hearing aid industry cannot be considered arm's-

length transactions. *Id.*

Moreover, while Defendants fault the German Federal Cartel Office for referring to the

hearing aid industry as possibly collusive, they proffered no evidence to the contrary.  Their

experts admitted they did not conduct an economic market analysis (like the German Federal

Cartel Office did), and that they did not even read the German Federal Cartel Office's report

before their depositions.  Donohoe Dep. at 77:16-22 (attached as Exhibit 9); Putnam Dep. at

121:3-7 (Exhibit 8).

Defendants' emphasis on licenses in the hearing aid industry also is misplaced because

royalties on other patents in the industry generally carry little weight in determining a reasonable

royalty on the patents-in-suit. *See, e.g.*, *Bio-Rad Laboratories, Inc. v. Nicolet Instr. Corp.*, 739 F.

2d 604, 617 (Fed. Cir. 1984). In *Bio-Rad*, the Federal Circuit affirmed an approximately 33

percent reasonable royalty despite evidence that "the industry royalty rate runs from three to ten

percent of sales." *Id.* As the *Bio-Rad* Court explained, industry royalty rates "do not necessarily

establish a ceiling for the royalty that may be assessed after an infringement trial." *Id.* That is

the case even more so here, where one of Defendants' damages experts, Dr. Putnam, ranked the

patents-in-suit among the top five percent of patents in the hearing aid industry.[11]  Trial Tr.

1896:13-17. The licenses Defendants rely on as comparables, though, did not involve patents

ranked as high as the Levitt Patents. Trial Tr. 1840:15-19. Accordingly, such licenses should

carry little, if any, weight in the reasonable royalty analysis.

      2.      ***Mr. Musika's Use of Profit Margin To Calculate a Reasonable Royalty is Proper and Supported by the Facts and Law***

Defendants fault Mr. Musika for advancing a so-called "speculative 'profit premium' to

raise the damages floor above a reasonable royalty" and claim that he "in effect advocated an

accounting of Defendants' profits." Defendants' Brief at 6. Defendants clearly seek to confuse

the record. To be perfectly clear, Mr. Musika engaged in an analysis to determine an appropriate

reasonable royalty; he used profits as a mechanism to determine what Defendants may have been

willing to pay in a hypothetical negotiation.[12] He did not perform, or purport to perform, a lost

profits analysis or a disgorgement analysis, as Defendants suggest. *See, e.g.*, Trial Tr. 848:16-19

---

[11] Dr. Putnam ranked the Levitt Patents in comparison to all patents held and owned by Demant and Widex, including the HIMPP-owned patents. *See, e.g.*, Trial Tr. 1837:2-10. Ironically, Defendants criticize Mr. Musika for including industry-wide information in his analysis, yet Dr. Putnam relied upon licenses involving HIMPP -- an industry-wide organization -- and other members of the hearing aid industry.

[12] Mr. Musika's approach is perfectly proper. *See, e.g.*, *Honeywell International, Inc.*, 378 F. Supp. 2d at 465-66. (D. Del. 2005). Indeed, *Georgia-Pacific* expressly contemplates a review of an infringer's profits. 318 F. Supp. at 1120 (factor 11 requires a review of "[t]he extent to which the infringer has made use of the invention; and any evidence probative of the value of that use").

("Well, ETG, as you heard, doesn't sell hearing aids. So I can't do any lost profits. They didn't lose profits from the sale of the hearing aids because they don't sell hearing aids").

Defendants' argument focuses on Mr. Musika's use of Defendants' actual, as opposed to expected, profits and his use of financial information from other members of the hearing aid industry. Defendants' arguments lack merit. Among other things, Defendants fail to recognize that (1) actual profits may, in fact, be considered in a reasonable royalty analysis, (2) Defendants failed to produce *any* reliable evidence of their expected profits, and (3) Defendants' failure to produce documents reflecting their profit margins on a product-by-product basis necessitated Mr. Musika's analysis.

First, substantial precedent supports Mr. Musika's consideration of Defendants' actual profits as opposed to expected profits. As this Court explained in *Honeywell*, the hypothetical negotiation analysis is inherently limited because it suggests Defendants were willing licensees and never infringed the patents-in-suit. *See Honeywell*, 378 F. Supp. 2d at 464. *See also Fromson*, 853 F. 2d at 1786. As the jury's verdict now confirms, that simply was not the case -- Defendants were *not* willing licensees and *did*, in fact, infringe.

Defendants focus only on the "fantasy" element of the hypothetical negotiation analysis, i.e., the assumption that they were willing licensees and never infringed. *See Fromson,* 853 F. 2d at 1575. Defendants ignore the requirement that the analysis be applied with "flexibility" and "permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiations." *Id.* Defendants' focus is precisely what the "book of wisdom" was intended to prevent -- having Defendants' blatant and blind appropriation of the Levitt Patents be a "profitable, can't-lose course."

*Honeywell*, 378 F. Supp. 2d at 465[13] (quoting *Fromson*, 853 F. 2d at 1575).  Accordingly, Mr. Musika properly considered Defendants' actual profits.

Second, other than Defendants' actual profits, Defendants produced ***no*** reliable information with which to evaluate, at the time of the hypothetical negotiation, what Defendants anticipated their profits to be for the products in question.  Indeed, their Brief points to ***none***.  At trial, Defendants' expert pointed to various analyst reports that purportedly showed Defendants' low profit expectations at the time of the hypothetical negotiation.  But Defendants' own expert established the unreliability of these reports.  Notably, Dr. Putnam testified that the reports provided overall company profit information, *i.e.* information not specific to any product:

> Q. And yet the only evidence that you have shown us of the defendants' expectations are, I think you referenced then some analyst reports; is that right?
>
> A. Yes, that is right.  That is what the industry reports say the defendants were expected to make in 1999.
>
> Q. Those analyst reports don't focus on the accused products, do they?
>
> A. They're company wide.  No, that's true. Exactly.  I mean that is what Mr. Musika did and that is the highest or the lowest level of expectations we can derive in this case.
>
> Q. The analyst reports, they provide the companies overall profit expectations for all products; right?
>
> A. Yes, that is right.  That is the baseline.
>
> Q. So you don't know what these defendants' profit expectations for the accused products were, do you?

---

[13] Defendants rely on *Joy Technologies, Inc. v. Flakt, Inc.*, 954 F. Supp. 796 (D. Del. 1996).  However, the cited portion of *Joy Technologies* applies to a lost profits analysis, not a reasonable royalty analysis.  *See Joy Technologies*, 954 F. Supp. at 806.  The Court in *Joy Technologies* also considered a reasonable royalty analysis and, notably, applied a 25 percent royalty rate despite evidence of a 1-3 percent rate used in a similar agreement between the same parties in Europe.  *Id.* at 808.

A. The analyst reports don't say that, no. And I don't think it's reported anywhere in the case. I don't think they calculated their expectations.

Trial Tr. at 1889:3-21. Indeed, the reports not only fail to provide expectations specific to the accused products, but are not even specific to the United States; instead, they provide worldwide profit information. *See. e.g.*, DX 1227; 1230 (collectively attached as Exhibit 10). Nor do the analyst reports focus on the years of infringement for the products in this lawsuit. *Id.*

And even if the analyst reports could be considered reliable, they supported Mr. Musika's analysis. As a check on his own analysis, Mr. Musika averaged the expected profit margins reached by Defendants' expert, Dr. Putnam -- 17.8 percent for Demant and 19.4 percent for Widex -- averaging them to 18.6 percent.[14] Trial Tr. 895:1-896:3. He then averaged the expected profit margin found in the analyst reports that Defendants proffered as proof of Defendants' expectations, resulting in an average profit margin of 12.2 percent. Trial Tr. 900:13-901:18. Because Defendants' average expected profit margin was 18.6 percent, compared to the industry's 12.2 percent, Mr. Musika opined that a royalty of 6.4 percent also would have been reasonable. *Id.* Thus, even using Defendants' analyst reports and Defendants' expected profit

---

[14] Defendants contend that their expert, Dr. Putnam, performed an analysis that resulted in a -12% profit margin. Defendants fail to recognize, though, that the jury simply may have found his testimony incredible, wrong, unpersuasive, or all of the above. In light of the report of the German Federal Cartel Office and testimony about Defendants' excessive profits, the jury's conclusion is not surprising.

margins, Mr. Musika' reasonable royalty rate is far higher than the .5 percent advanced by Defendants.[15]

Third, Defendants claim that Mr. Musika's derivation of an industry profit margin by, *inter alia*, utilizing the profit margins on "all of these companies' products (both accused as well as non-accused hearing aid products, as well as on non-hearing products)" is unreliable. Defendants' Brief at 8-9. They are wrong.[16] However, Mr. Musika's analysis is a direct result of Defendants' failure to produce the very type of information they now assert Mr. Musika should have used in his analysis. Specifically, Defendants failed to produce -- and apparently failed to even keep -- any records reflecting profit margin by product. Tom Westermann, Widex A/S' Vice President, testified that Widex A/S does not possess records evidencing the profit margin of

---

[15] Defendants criticize Mr. Musika's application of *TWM Manufacturing Co. v. Dura Corp.*, 789 F. 2d 895 (Fed. Cir. 1986) because he purportedly failed to consider the gross profit margins of 20% of known hearing aid manufacturers, including Siemens. Defendants' Brief at 7-8. Defendants describe Siemens as "a major company in the hearing aid industry with significant market share." *Id.* at 8. But Defendants failed to produce *any* evidence at trial that Siemens is, in fact, a "major company in the hearing aid industry" or that it has "significant market share". Additionally, Mr. Musika did not exclude 20% of hearing aid manufacturers from his analysis. Rather, he also applied *TWM*'s analytical approach to the analyst reports Defendants proffered, which analyzed the industry as a whole. More importantly, as the Court knows, Mr. Musika considered all available information from all members of the industry who were parties to this case. That other industry members settled just before trial does not invalidate the validity and accuracy of financial records they produced in discovery in this very case.

[16] Defendants contend that *Telecomm Technical Services, Inc. v. Siemens Rolm Communications, Inc.*, 1999 U.S. Dist. LEXIS 21415 (N.D. Ga. Aug. 24, 1999) -- a case in which the court rejected a small portion of Mr. Musika's opinion -- is "identical" to this case. *Telecomm* is very different. Notably, the *Telecomm* court addressed a pre-trial Daubert motion relating to one piece of a multi-faceted opinion Mr. Musika expected to offer. Additionally, Mr. Musika considered the production of information by the RealCom counterdefendant as grossly insufficient and, thus, did not use RealCom's data but instead averaged data from other counterdefendants to arrive at a damages figure for RealCom. *Telecomm*, 1999 U.S. Dist. LEXIS at * 7. The court precluded Mr. Musika from opining on that small piece of the case because it believed Mr. Musika should have considered what little information RealCom produced. Nonetheless, the court fully accepted his opinion on other matters for which it had been proffered. Id. at *14, 19 and 20.

Here, on the other hand, Mr. Musika considered all of Demant and Widex's financial information in his analysis. Mr. Musika did not ignore any of the financial data they produced. Further, as explained fully in Section V.B. above, Defendants waived any Daubert challenge against Mr. Musika by failing to timely raise it before or during trial. Finally, it is uncontroverted that Mr. Musika is well qualified to offer an opinion in this suit, considering his many accomplishments, including having testified numerous times and having served in various court-appointed capacities, including as a bankruptcy trustee and special examiner. Trial Tr. 835:3-14.

each of its individual hearing aids products, but instead calculates a general profit margin by taking the total revenues obtained through the sale of its hearing aid products, subtracting costs (production, marketing, and administration), and dividing the result by the total number of hearing aids sold. *See* T. Westermann Deposition, 77:9-23; 83:9-16 (attached as Exhibit 11). Similarly, Widex Hearing Aid Co.'s Glenn Ethe testified that the profitability analysis he provided to Widex A/S did not break down the profitability rate by hearing aid model. *See* Ethe Deposition, 50:20-51:8 (attached as Exhibit 12). Finally, Demant's Eric Spahr similarly testified that the documents it provided ETG did not break down profitability by hearing aid model. *See* Spahr Deposition, 34:2-13 (attached as Exhibit 13).

Defendants cite to *Monolithic Power Sys., Inc. v. 02 Micro Int'l Ltd.*, 476 F. Supp. 2d 1143 (N.D. Cal. 2007) for the proposition that "[n]or is it an excuse that Mr. Musika lacked the proper data to break down his analysis by Defendant and by accused product." Defendants' Brief at 10. However, the Federal Circuit has held that an infringer should not benefit from its incomplete or inaccurate records to argue that damages calculations are speculative or unreliable. *See Lam, Inc. v. Johns-Manville Corp.*, 718 F. 2d 1056, 1065 (Fed. Cir. 1983).[17] *See also Oiness v. Walgreen Co.*, 88 F. 3d 1025, 1030 (Fed. Cir. 1996). As evidenced above, Defendants did not maintain records that calculated profitability on a product-by-product basis.

---

[17] *Monolithic* also is distinguishable. In *Monolithic*, the defendants brought a *Daubert* challenge against plaintiff's expert in a motion for summary judgment on the issue of damages, which is immediately distinguishable from the procedural posture of this case. As explained in Section V.B. above, Defendants waived *Daubert* challenges to Mr. Musika by failing to challenge his methodology before or during trial. Moreover, *Monolithic* is further distinguishable because defendants in that case pointed out several flaws in plaintiff's expert's report, one of which was the failure to compel defendants to produce information that would have assisted him in arriving at a reasonable royalty rate. *Id.* at 1155. Not only is Mr. Musika's industry profit margin the product of sound analysis and supported by the evidence, but ETG could not have compelled Defendants to produce profitability analysis on each hearing aid product because, as shown above, Defendants did not have such data.

Additionally, Defendants' complaint that Mr. Musika's analysis included other companies' financial data rings hollow. As a result of a stipulation entered by the parties, Mr. Musika was precluded from explaining to the jury that his initial analysis also considered other companies originally sued for infringement in this case. The parties agreed, and memorialized in the Final Pretrial Order, their agreement that "all parties will not mention [] settlement offers and agreements or related settlement terms at trial, and will not present at trial any evidence, argument or inference that the previously named defendants have settled or engaged in settlement discussions." *See* D.I. 458, ¶ O(3). As a result, Mr. Musika was precluded from explaining to the jury that his initial analysis considered ***all*** of the companies named as defendants in this case, including those that settled.

Finally, to the extent Defendants argue that the jury was swayed improperly by Mr. Musika's proper analysis comparing profit margins between accused products and other products to arrive at a reasonable royalty, the jury's damages verdict establishes otherwise. Mr. Musika opined that ETG was entitled to an 8.4 percent royalty rate, with damages totaling $60,750,036, collectively, from Demant and Widex. The jury found damages against Demant for $15 million and against Widex for $16 million, resulting in a total damages award of $31 million -- about half of what Musika's testimony would have supported under a substantial evidence analysis. As is apparent, the jury properly considered and weighed the testimony of ETG's and Defendants' witnesses and came to its own conclusion about the appropriate royalty rate. Nothing about its conclusion suggests that it was unreasonable or not supported by substantial evidence.

### 3.    *Mr. Musika Properly Analyzed Georgia-Pacific Factor 13*

Defendants also claim that Mr. Musika failed to apply *Georgia-Pacific* factor 13 in several respects. As discussed above, there is no requirement that experts or fact finders apply

*every* Georgia-Pacific factor. *See, e.g.,* *Brunswick Corp.*, 36 Fed. Cl. at 211-12. Nonetheless, in this case, Mr. Musika considered each factor, including factor 13. Defendants' attacks on the *way* in which Mr. Musika applied this factor lacks merit. Moreover, even if it had any merit, Defendants' argument was waived by their failure to bring a timely *Daubert* challenge and was a factual matter subject to cross-examination. It does not support the dismissal of the jury's ultimate verdict.

Defendants' arguments lack merit. First, they fault Mr. Musika for failing to recognize that "[o]ne of the primary issues that *Georgia-Pacific* factor 13 addresses is the problem of patent royalty stacking[.]" Defendants' Brief at 12. However, factor 13 seeks consideration of "[t]he portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer." *Georgia-Pacific*, 318 F. Supp. at 1120. Nowhere does the factor explicitly mention patent stacking. Moreover, Defendants fail to cite a single case in which a Court either held that factor 13 considers patent stacking or even recognized patent stacking as a negative factor in a damages analysis.

Moreover, even if patent stacking were an appropriate theory for the jury to consider under factor 13 (or any other factor of *Georgia-Pacific*), Defendants failed to produce any evidence supporting its application here. Indeed, Defendants' experts admitted that they conducted *no* analysis to determine which, if any, other patented technology for which Defendants paid royalties was incorporated into the infringing products. For example, Mr. Donohoe testified:

> Q. Now, you testified earlier about some issue called patent stacking or royalty stacking?

29

A.    I did, yes.

Q.    And your concern was that these companies would be paying other license rates that may interfere with them paying a license rate to ETG?

A.    That would have been the mindset of the negotiators at the beginning of the negotiation. They would have looked at, there is a lot of patents in the industry, there is a lot of potential for licenses coming forward. So they would be concerned about if they took a lot of licenses as they might have to, there would be a patent stacking problem.

Q.    But, again, you have done absolutely nothing whatsoever to determine whether there is in fact a patent stacking issue with these two defendants; correct?

A.    Well, I looked at, No. 1, the number of patents in the industry. The licenses that were already in place. I looked at the potential for downstream licenses because of the number of patents. The number of complex features that are patentable in a hearing aid. And I draw the real world conclusion that there is a danger of patent stacking here.

Q.    *But you didn't do any specific work to determine whether these defendants had licenses that they were paying royalties on that would interfere with their paying for another license, did you?*

A.    *At that time, no.* No, not at that time. I didn't quantize that and didn't feel I had to quantize that because I was concerned about what the future looked like.

Trial Tr. at 1844:23-1845:13 (emphasis added). Realizing their lack of proof, Defendants' Brief

points to Neils Jacobsen's testimony as proof of patent stacking with respect to the accused

products. Defendants' Brief at 3. But, at best, Mr. Jacobsen offered unsupported and

inconclusive testimony that Demant's hearing aids in general *could* be covered by various

patents. *See* Trial Tr. at 970:9-971:7. Mr. Jacobsen failed to identify a single patent for which

Demant paid a royalty that covered any specific accused Demant product.[18]  The report of the

German Federal Cartel Office may explains why Defendants failed to produce such evidence:

"[i]n part, hearing aid manufacturers are already re-issuing already existing products under new

product names without any innovative, potentially patented functionalities being added." PX

648, ¶ 64.  With absolutely no evidence that any of the accused products were covered by any

patent other than the ETG patents, the jury certainly had a reasonable basis on which to conclude

that patent stacking was irrelevant to this case.

Second, Defendants complain that Mr. Musika admitted that a "whole host of factors . . .

contribute to the ability of Defendants to sell their hearing aids[,]" but "failed to make any

meaningful or reliable analysis . . . to determine the portion of the profits to be credited to the

claimed invention." Defendants' Brief at 12.  In fact, Mr. Musika testified that he considered

"the host of factors" and took them into account in his calculation:

> Q.   There is a whole host of factors that contribute to the ability of
> the hearing aids companies that sell their products in the market?
>
> A.   Absolutely.  And all of which go into again those expenses
> that make up -- I abbreviated them here but if they're marketing,
> they go into the expenses here for marketing expenses.  If they're
> selling and distribution, they go into the expense line item here.
> And I've backed them out of the profit.  They have already been
> compensated for all of those considerations.  I'm making sure that
> I'm only taking that net profit.  So they've already covered all of
> those expenses you are mentioning.  I'm not taking any of that way
> from it.  It's already been covered.

Trial Tr. 930:13-25.  *See also* 867:24-886:22 (addressing the *Georgia-Pacific* factors).

---

[18] Additionally, Mr. Jacobsen testified as the president and CEO of Oticon, chairman of Bernafon, and president and CEO of William Demant Holding.  He did not offer any testimony relating to Widex.

Finally, Defendants complain that Mr. Musika relied "on the supposed 'pioneering' nature of the invention for support under factor 13, but was not a technical expert and could not identify any trial testimony supporting his claim." Defendants' Brief at 13. In fact, Defendants' own expert, Dr .Putnam, supported Mr. Musika's claim, opining that the Levitt Patents ranked in the top 95% of all patents licensed or owned by Demant and Widex, including ranking higher than the so-called "foundational" HIMPP patents. Trial Tr. 1896:1-17. *See also* Trial Tr. 964:7-12 (Jacobsen's testimony that HIMPP patents "were crucial for the development of hearing aids"). Additionally, Dr. Levitt testified that a "great strength" of his technology was that it would cancel feedback "to ensure that the hearing aid had its optimum settings when the person was wearing it." Trial Tr. 378:22-379:5. ETG's technical expert, Kip Brown, similarly testified that the technology was "important", "both from comfort and actually for people to continue to use the hearing aid." Trial Tr. 506:4-13. Moreover, a 1982 letter from a vice president at Starkey to Vernon Larson, Chief of Audiology & Speech Pathology Services for the Veterans Administration, described acoustical feedback as "one of the two major problems which are detracting from the effectiveness of hearing aid fittings." DX954A at OTI007757 (attached as Exhibit 14). And, both Defendants described feedback cancellation as a key feature in high-end hearing ends. *See, e.g.*, Trial Tr. 407:1-6; 413:8-14.

Accordingly, Defendants fail to raise a viable argument that Mr. Musika misapplied *Georgia-Pacific* factor 13.

### E.    Defendants Rely on Unreliable or Irrelevant Evidence in Support of Their Damages Calculation

Defendants make several arguments in support of their argument that "the evidence overwhelmingly supports damages of no more than $2 million for Demant and $1.5 million for

Widex." Defendants' Brief at 16.  *See* Defendants' Brief at 16-20.  None of them have merit and are easily disposed.

First, Defendants again steadfastly refuse to apply the proper legal standard.  The question before the Court is not whether the evidence supports a damages award of $1-2 million.  Rather, the question is whether the evidence supports a damages award of $15 million against Demant and $16 million against Widex.  As discussed above, the evidence does support such an award. Moreover, the jury was free to disagree with Dr. Putnam and Mr. Donohoe, and properly did so, given the flaws in their analysis.

Second, Defendants rely almost exclusively on the royalty rates found in license agreements in the hearing aid industry.  Defendants' Brief at 16-17.  But these licenses are not reliable for all the reasons discussed above.

Third, Defendants improperly rely on patent stacking, *id.* at 17-18, but without any facts to establish it or quantify its impact.

Fourth, Defendants point to the "many factors" that purportedly "go into making a successful hearing aid" and mandate a lower royalty rate.  *Id.* at 18.  As explained above, Mr. Musika considered those factors in his analysis.

Fifth, Defendants argue that Dr. Putnam's citation ranking method "determine[d] the portion of Defendants' expected profits that actually would be attributable to ETG's patents as opposed to" other factors that go into making a hearing aid.  *Id.* at 18.  But Dr. Putnam admitted that he did not know whether any of the other patents against which he ranked the Levitt Patents are incorporated into the accused products or whether they had been litigated to be found valid and infringed:

Q. But all of those other patents, all of those that you compared to or ranked Dr. Levitt's patents against, you don't know whether any of them are actually used in the accused products. Right?

A. Yes. If I understand your question, we have been through this. I can't say on a product-by-product and patent-by-patent basis which products practice which other patents.

Q. And you also don't know whether any of them have gone through the process of litigation and been found valid and infringed. Isn't that right?

A. Well, I think that's true. But with respect to Demant and Widex's own patents, they wouldn't be found valid and infringed because they belong to the company that we are talking about. So you wouldn't litigate over your own patents unless you were suing somebody else and asking for a share of their profits.

Q. But you didn't just look at Demant and Widex's own patents, you ranked the Levitt patents against patents that they licensed from HIMPP and others. Correct?

A. That is also true, yes.

Q. You don't know whether any of those patents have been litigated and found to be valid and infringed. Correct?

A. That is also true, yes.

Trial Tr. 1897:25-1898:24.

Sixth, Defendants improperly rely on EKMS' alleged attempt to license the Levitt Patents in 2001-02. Defendants' Brief at 19. That point is irrelevant because it occurred 2-3 years after the hypothetical negotiation in 1999, after Defendants already began to infringe the patents, and after they were unlikely to agree to a license that would have required them to admit infringement. *See, e.g.*, Trial Tr. 439:17-19. EKMS' work can have no bearing on the royalty rate analysis.

Seventh, Defendants point to Mr. Chen's "subsequent purchase of his brother's interest in ETG and, thus, in the patents-in-suit," suggesting that the patents cannot be worth more than $2.5

million. Defendants' Brief at 19. However, the *only* evidence presented about Mr. Chen's purchase of his brother's interest in ETG was Mr. Chen's testimony that the purchase was completely unrelated to the patents-in-suit and, in fact, was part of a complex set of transactions involving various pieces of consideration. *See* Trial Tr. 440:20-443:2. And Mr. Donohoe admitted that he did not review *any* documents related to the transaction. *See* Trial Tr. 1848:9-14. The value of the transaction, as more accurately described in the range of Mr. Chen's business transaction, is irrelevant to the royalty rate analysis.

Finally, Defendants forget that, even if all of the evidence they presented was credible and reliable, the jury was free to disregard it in light of the evidence presented by ETG. The jury may have reasonably decided that, given the lack of reliable, comparable licenses in the hearing aid industry, the lack of competition in the hearing aid industry, the incredibly high prices charged for hearing aids and the "extraordinarily high" profits earned by Defendants from sales of the infringing products, and the importance of feedback cancellation to improved quality and successful sales of hearing aids, an award of $15 million out of more than $400 million in Demant's sales and $16 million out of more than $300 million in Widex's sales were reasonable. Substantial evidence supports the jury's conclusion.

Accordingly, Defendants fail to present any evidence establishing the jury's damages verdict of $31 million is a "miscarriage of justice" or "cries out to be overturned or shocks [the] conscience." *Donald M. Durkin Contracting*, 2007 WL 2710451 at *2 (quoting *Williamson v.*

*Consol. Rail Corp.*, 926 F. 2d 1344, 1344 (3d Cir. 1991)). Rather, the evidence establishes that the jury's verdict was reasonable and supported by substantial evidence.[19]

## VI. Conclusion

For the all reasons stated herein, ETG respectfully asks the Court to deny Defendants' motion.

---

[19] Defendants' contention in footnote 7 that ETG is entitled to damages on claims 13, 14 and 16 of the '850 Patent only from the date of the filing of the lawsuit is flawed. The evidence establishes that Defendants had notice of the patents well before their infringing activity began and induced infringement from that point forward by, *inter alia*, selling infringing products that performed the patented method. *See* ETG's Opposition to Defendants' Brief in Support of Their Renewed Motion for Judgment as a Matter of Law and Request for New Trial on the Issues of Infringement and Validity.

Dated: May 9, 2008

/s/ Matthew A. Kaplan
Edmond D. Johnson (#2257)
Matthew A. Kaplan (#4956)
PEPPER HAMILTON LLP
Hercules Plaza Suite 5100
1313 Market Street
Wilmington, DE 19899-1709

*Attorneys for Energy Transportation Group, Inc.*

OF COUNSEL:

Marty Steinberg
HUNTON & WILLIAMS LLP
1111 Brickell Avenue
Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500
Facsimile: (305) 810-2460

Brian M. Buroker
HUNTON & WILLIAMS LLP
1900 K Street, N.W., Suite 1200
Washington, DC 20006-1109
Telephone: (202) 955-1500
Facsimile: (202) 778-2201

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone: (804) 788-8788
Facsimile: (804) 343-4630

## CERTIFICATE OF SERVICE

I do hereby certify that on the 9th day of May, 2008, I caused a true copy of the foregoing

**Plaintiff Energy Transportation Group, Inc.'s Opposition to Widex Defendants' Motion**

**for Judgment as a Matter of Law and Request for New Trial on the Issue of Willful**

**Infringement** to be electronically filed with the Clerk of the Court using CM/ECF which will

send electronic notification of such filing to all registered participants.


Mary B. Graham (#2256)
MORRIS, NICHOLS, ARSHT &TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
901 New York Ave., N.W.
Washington, DC 20001-4413

*Attorneys for William Demant Holding A/S,
WDH Inc., Oticon A/S, Oticon, Inc.,
Bernafon AG, and Bernafon LLC*

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
MORRIS, NICHOLS, ARSHT &TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19899

William H. Mandir
David J. Cushing
Carl J. Pellegrini
SUGHRUE MION PLC
2100 Pennsylvania Ave., N.W.
Washington, DC 20037

*Attorneys for Widex A/S, Widex Hearing
Aid Co., Inc.*


/s/ Matthew A. Kaplan
Matthew A. Kaplan (# 4956)