# EXHIBIT 1

Page 351

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
                           -   -   -
 4
 5   ENERGY TRANSPORTATION,              :   Civil Action
     INC.,                              :
 6                                      :
              Plaintiff,                :
 7                                      :
          v.                            :
 8                                      :
     WILLIAM DEMANT HOLDINGS A/S,       :
 9   et al.,                            :
                                        :
10            Defendants.               :   No. 05-422 (GMS)
11                         -   -   -
12                   Wilmington, Delaware
                  Wednesday, January 23, 2008
13                      8:30 a.m.
                   Third Day of Trial
14
                           -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18   APPEARANCES:
19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                      -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                              Counsel for Plaintiff
24
25
```

Levitt - redirect

1    Q.    Now, let's look at the patent language itself.  If you

2    don't mind looking at Column 1, Lines 7 through 13.  That

3    says, more specifically, It relates to hearing aids of this

4    character that are capable of automatically adjusting to

5    optimum parameter values as operating conditions such as

6    speech level, room reverberation and background noise

7    change, and also for reducing acoustic feedback.

8    A.    That is correct.

9    Q.    Is that a reference to an adaptive feedback reduction?

10   A.    That is a reference to the use of adaptive techniques

11   for all of those applications, noise reduction, feedback

12   reduction, adjusting for sudden increases in sound.  Those

13   are all adaptive techniques.

14   Q.    Now let's go to Column 2, Lines 23 through 28, which

15   says, Still another objective of the invention is to provide

16   new and improved hearing aid apparatus that is capable of

17   effective noise and reverberation suppression and acoustic

18   feedback reduction while maintaining optimum hearing

19   characteristics as the speech and noise levels vary.

20           Is that a reference to the adaptive nature of

21   the patent.

22   A.    Very definitely.  It is one of the great strengths of

23   this particular hearing aid, in that you find the optimum

24   hearing aid for a given person, and prior to this point if

25   they went out wearing it, the acoustic feedback, not

1    necessarily feedback that would cause whistling, but that

2    acoustic feedback would reduce the characteristics of that

3    hearing aid to less than an optimum setting.  And this

4    method of canceling would ensure that the hearing aid had

5    its optimum settings when the person was wearing it.

6    Q.    Finally, on Column 11, Lines 51 through 57, where it

7    states, Moreover, by virtue of the novel means employed for

8    effecting automatic adjustment of the programmable filter to

9    optimum parameter values as the speech level, room

10   reverberation and type of background noise change and for

11   reducing acoustic feedback, a superior hearing aid system of

12   optimum characteristics can be prescribed for

13   hearing-deficient patients.  Paragraph?

14   A.    That is correct.  And it requires adaptive adjustment.

15   Q.    Mr. Romary asked you if anyone had criticized --

16   strike that.

17            Mr. Romary had reminded you that I asked you a

18   question as to whether or not anyone had criticized your

19   patents in 1997 when you were hired as an expert for these

20   defendants.  Do you remember that?

21   A.    Yes.  And nobody criticized me.

22   Q.    He then asked you in 1997, did you tell these

23   defendants that their products were infringing your patents?

24   Do you recall that?

25   A.    No.

T. Westermann - designations

1              "Answer:  Yes.

2              "Question:  Is it important to you to market the

3     feedback control?

4              "Answer:  Sure.  Investigations have been made

5     many times in the markets to find out what the hard of

6     hearing is worried about and feedback is one of the things

7     coming up on top.  So every manufacturer would do whatever

8     they can to, to avoid feedback.

9              "Question:  But in your marketing materials such

10    as -- well, let's first limit it to the data sheet.  Would

11    you consider a data sheet a marketing-- a piece of marketing

12    material?

13             "Answer:  Towards the professionals, yes.

14             "Question:  Okay.  You're right.  I -- do you

15    know what the margin is on the revenues derived from sales

16    of hearing aids over the cost of manufacturing the hearing

17    aids?

18             "Answer:  Yes, it's approximately 50 percent.

19             "Question:  Do you have target -- do you try to

20    set prices so that --

21             "Answer:  No.

22             "Question:  -- you will achieve the 50 percent?

23             "Answer:  No.

24             "Question:  Do you set any targets?

25             "Answer:  As much as possible.  As much as

T. Westermann - designations

1    possible.

2              "Question:  Okay.

3              "Answer:  Market from market varies.  I've tried

4    many years to have average sales prices all over the world,

5    same, but forget it.  So it is from market to market.

6              "Question:  Okay.  How do you set the prices?

7              "Answer:  We set what the market can bear, and

8    that means we are looking at competition, who are out there

9    and what type of hearing aid is this and which category,

10   price category does it fall in, and how much can we charge,

11   and then we charge as much as we can.  That's not always

12   enough.

13             "Question:  When you're setting the price of a

14   hearing aid, do you look at what the cost is to manufacture

15   that particular hearing aid?

16             "Answer:  No.

17             "Question:  So the cost is basically irrelevant

18   in your analysis.  It's all market-driven?

19             "Answer:  Yes.

20             "Question:  Okay.  Widex USA company may have

21   sold the product for a different price.  Is that right?  In

22   other words, if they -- if you're -- taking a hypothetical,

23   if in week 20 the USA company sold all 1,000 of the Bravo

24   CIC units --

25             "Answer:  Mm-hmm.

T. Westermann - designations

Page 407

1              "Question:  A few minutes ago we were talking

2      about the difference between feedback cancellation and

3      feedback management and the different platforms or processes

4      that the products use.  Do the products that have the

5      feedback cancellation as opposed to the feedback management

6      actually sell better than the feedback management products?

7              "Answer:  Different -- very different from

8      market to market.

9              "Question:  How about in the U.S.?

10             "Answer:  Some, yes.

11             "Question:  Yes, the cancellation sells better

12     than the --

13             "Answer:  I shouldn't say cancellation sells

14     better.  The products that have cancellation are selling

15     better.  Maybe not -- maybe not due to the cancellation, but

16     it's among a lot of other things.

17             "Question:  You said earlier you don't do any

18     studies to determine that kind of thing.  But do you have a

19     sense as to whether the feedback cancellation is part of the

20     driving factor for the better sales?

21             "Answer:  I have to believe that it is -- that

22     it has some value to the hard of hearing, since that is what

23     they are asking for and we are giving them a better, better

24     product to help them with the problems they have, so

25     therefore I have a feeling that they would probably prefer

Meltsner - dep.

1          "Answer:  Yes.

2          "Question:  You get from time to time data

3   sheets or specification sheets from Denmark.  Is that right?

4          "Answer:  Yes.

5          "Question:  Did I ask you, do you consider data

6   sheets to be marketing materials?

7          "Answer:  I would.

8          "Question:  Mr. Meltsner, are there any

9   particular features of the hearing aids that you have found

10  market better than others, that really get a response?

11         "Answer:  Yes.

12         "Question:  What feature?

13         "Answer:  The noise reduction, feedback

14  management.

15         "Question:  Any others that are particularly --

16  do you know if having a canceling system makes the hearing

17  aid more expensive?

18         "Answer:  Yes, I think it does.

19         "Question:  Does it make it more profitable?

20         "Answer:  Not necessarily.

21         "Question:  Have you ever done any analysis to

22  determine whether certain features increase sales of a

23  product or not?

24         "Answer:  No.

25         "Question:  I'm showing you a rather substantial

Chen - direct

Page 439

```
 1   A.    Yes.

 2   Q.    Let's look at the second paragraph.  It states there,

 3   "The ETG filter can be adaptive."

 4              Do you see that?

 5   A.    Yes.

 6   Q.    And in the fifth paragraph, it gives Mr. Dowling's,

 7   quote-unquote, "bottom line," doesn't it?

 8   A.    I see the paragraph you mean, you are indicating at

 9   the bottom, starting with "The bottom line."

10   Q.    It states there, "The bottom line is nobody but a

11   red-faced liar could read these cites and say the '850 does

12   not contemplate adaptive filtering.  On the contrary, it is

13   spelled out in certain claims and objects of the invention

14   and is disclosed in the spec in several places."

15              Do you see that?

16   A.    Yes.

17   Q.    Now, EKMS worked with Audimax in 2001-2002, I think

18   you said?

19   A.    Yes.  In that time range, yes.

20   Q.    Having been involved in this litigation, are you now

21   aware when the defendants first started selling their

22   accused products?

23   A.    I am aware generally of when the defendants started

24   selling products that we think might be infringing.

25   Q.    Was it in the same time frame?
```

Chen - direct

1    A.    Yeah.

2    Q.    Did EKMS ever advise Audimax that modern-day hearing

3    aids did not infringe the '850 or '749 patents?

4    A.    Not to my knowledge.

5    Q.    Did EKMS ever advise Audimax that these defendants'

6    hearing aids did not infringe the '850 or '749 patents?

7    A.    Not to my knowledge.

8    Q.    What did you do after EKMS completed its work?

9    A.    I felt that our patents had value, and I went to

10   engage a law firm, your law firm, to help me get the benefit

11   of our rights and what we invented.

12   Q.    You took EKMS's advice about litigation?

13   A.    I made a decision that it was clear that there was

14   some value to our patents, and I engaged a law firm to help

15   me have my rights addressed, our rights addressed.

16   Q.    After your father passed away, who owned the Chen

17   family assets and companies?

18   A.    My brother, my mother, myself, and our employee

19   pension fund.

20   Q.    Did there come a time when you and your brother

21   decided to split up the family assets and company?

22   A.    Yes.

23   Q.    What assets did you decide to split up?

24   A.    Everything that was owned by ETG.

25   Q.    Can you give us an example of some of the companies?

Chen - direct

1    A.    Well, we had some share ownership in some ships.  We

2    had some share ownership in some small but growing energy

3    companies.  We had some -- we had the Audimax patents.  We

4    had a -- we had just started a company to help deal with

5    increased security for shipping.

6              We had -- let's see what else.

7    Q.    There were a number of companies?

8    A.    Yes, there were a number of companies and projects

9    involved.  There were assets, there were contracts, and

10   there were also obligations, investment obligations and so

11   forth.

12   Q.    What was the concept of how the assets would be

13   divided between you and your brother?

14   A.    Well, obviously, we would have to be mutually

15   satisfied with whatever was arrived at.  And he didn't want

16   to bear a lot of investment risk in growing businesses.  So

17   we tried to find a way to divide up things such that he

18   wouldn't have to do things which required further

19   investment.  And he wanted to have more, safer and current

20   income.

21   Q.    You mentioned a number of companies and contracts and

22   so on.  Did you view this splitting up of the assets as a

23   series of transactions or as a single global transaction?

24   A.    We did things in several steps.  But it was an overall

25   transaction, a global division of things.

Chen - direct

Page 442

1    Q.    Were the transactions interrelated?

2    A.    Yes.

3    Q.    What assets did your brother receive in the

4    transaction?

5    A.    He received the entirety of the marine, the ship

6    security company that we had established, which had joint

7    venture partners.  And he received ten percent of the

8    financial benefit we would get from some ship investments.

9    But I was required to make a hundred percent of the

10   investment, but he got 10 percent of the financial benefit

11   without having to put up any investment.

12             He got a million dollars in cash.  He was freed

13   of the obligation to continue funding the development of

14   some of our other companies.  And I took on that whole

15   responsibility.

16   Q.    You mentioned that he received a million dollars in

17   cash.

18   A.    Correct.

19   Q.    Was that million dollars in cash attributable to any

20   specific asset in the transactions?

21   A.    No.

22   Q.    Did you attribute that one million dollars to the

23   patents in this case?

24   A.    No.

25   Q.    Were the patents valued at the time of this

Chen - direct

1    transaction with your brother?

2    A.    No.

3    Q.    And what happened to the company that owned the

4    patents?

5    A.    In order to reduce the cost of maintaining the

6    corporate affairs, we were simplifying the number of

7    companies we owned.  So we decided to liquidate Audimax and

8    have the ownership of the patents held directly by ETG.

9    Q.    So who or what entity owns the patents now?

10   A.    ETG.

11   Q.    Does anyone or any other company have an interest in

12   the patents?

13   A.    Yes.

14   Q.    Who is that?

15   A.    The inventors, Richard Dugot and Harry Levitt, own a

16   percentage of the financial benefit of the patents.  The

17   estate of one of the managers who was involved at that time,

18   Henry Durancher (phonetic), his estate owns some shares.  My

19   mother owns some shares that came to her through the estate

20   of my father.  And also Biomed.

21   Q.    What is Biomed?

22   A.    Biomed is the large orthopedic company that bought

23   Biolectron from us.  There were some shares of Audimax held

24   by Biolectron.

25   Q.    Who owns ETG today?

Brown - direct

1    Dr. Levitt said, will disturb the hearing aid's operation

2    but the large amount produces a squealing sound that nobody

3    likes.

4    Q.    Is it important to reduce acoustic feedback in a

5    hearing aid then?

6    A.    Yes, both from comfort and actually for people to

7    continue to use the hearing aid.  I think I saw a number

8    saying 25 percent of the complaints about hearing aids had

9    to do with this feedback, and they didn't like that.

10   Secondly, if there is some level of feedback it disturbs the

11   signal processing of the hearing aid, thereby reducing the

12   hearing aid's ability to compensate for the wearer's

13   impairment.

14   Q.    How did older hearing aids deal with acoustic

15   feedback, if at al?

16   A.    Well, the standard solution for it was just turn the

17   gain down.  And then there were various and sundry options

18   after that where they turned gain down in individual

19   channels, when they put notch filter and did a bunch of

20   other things, but all of these solutions had serious

21   drawbacks:  They didn't sound good, they cut holes out of

22   what you were hearing, or they just plain didn't have enough

23   amplification for your hearing impairment.

24   Q.    And is gain volume, essentially?

25   A.    Yes, gain is the amount of volume that comes out of

Page 570

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
                         -    -    -
 4
 5   ENERGY TRANSPORTATION,            :   Civil Action
     INC.,                            :
 6                                     :
              Plaintiff,               :
 7                                     :
         v.                            :
 8                                     :
     WILLIAM DEMANT HOLDINGS A/S,      :
 9   et al.,                           :
                                       :
10            Defendants.              :   No. 05-422 (GMS)
11                        -    -    -
12                  Wilmington, Delaware
                 Thursday, January 24, 2008
13                     9:07 a.m.
                  Fourth Day of Trial
14
                         -    -    -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18   APPEARANCES:
19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                   -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                              Counsel for Plaintiff
24
25
```

Westermann - redirect

Page 811

1    A.      Yes.

2    Q.      But this controller, in today's technology, is small

3    enough to fit in the hearing aid; right?

4    A.      This particular controller is.    (Nodding yes.)

5    Q.      Now, I believe counsel asked you if you ever were

6    sued for patent infringement.    One of the purposes of HIMPP

7    was so that the hearing aids manufacturers wouldn't sue each

8    other for patent infringement; correct?

9    A.      No.

10   Q.      Oh.   Have you sued another hearing aid manufacturer

11   for patent infringement?

12   A.      We haven't, but others have.

13   Q.      One of the purposes of HIMPP was to amicably resolve

14   these patent disputes among the members of HIMPP; correct?

15   A.      No, not when HIMPP was created.   It was to try to

16   remove or help remove technical barriers in the development.

17   Q.      Do you remember voluntary procedures being enacted by

18   HIMPP?

19   A.      Yes.

20   Q.      And the voluntary procedures said that one of the

21   purposes was that its members would not sue each other in

22   an attempt to amicably resolve these issues; correct?

23   A.      That is something we discussed and made later.   This

24   is a few years older than the information in HIMPP.

25   Q.      Now, when you answered your counsel's questions about

Westermann - redirect

Page 812

1    the purposes of HIMPP, one of the purposes you said was the

2    risk of patents falling into the wrong hands; right?

3    A.       Correct.

4    Q.       And that would be the hands of people outside the

5    major hearing aid manufacturers; right?

6    A.       That is what it would normally be, yes.

7    Q.       Now, you testified that at the time this suit was

8    filed, you were totally unaware of Dr. Levitt's patents; is

9    that correct?

10   A.       That's correct.

11   Q.       But you and HIMPP hired Dr. Levitt and on his resume

12   where you hired him, it listed prominently his patents?

13   A.       That's right.

14           MR. MANDIR:  Objection to the characterization.

15           THE COURT:  Sustained.  You can rephrase.

16           MR. STEINBERG:  Sure.

17   BY MR. STEINBERG:

18   Q.       You hired Dr. Levitt and on his resume it listed his

19   patents; correct?

20   A.       Yes, with a lot of other references.

21   Q.       And, in fact, in your files, as early as 1993, Dr.

22   Levitt's patents appeared in the files of HIMPP and Widex;

23   correct?

24   A.       HIMPP didn't exist at that time.

25   Q.       I'm sorry.  Widex.  Excuse me.

```
 1                 IN THE UNITED STATES DISTRICT COURT
 2                 IN AND FOR THE DISTRICT OF DELAWARE
 3
                              -    -    -
 4
 5    ENERGY TRANSPORTATION,              :   Civil Action
      INC.,                              :
 6                                        :
                 Plaintiff,               :
 7                                        :
           v.                             :
 8                                        :
      WILLIAM DEMANT HOLDINGS A/S,        :
 9    et al.,                             :
                                          :
10               Defendants.              :   No. 05-422 (GMS)
11                            -    -    -
12                      Wilmington, Delaware
                     Friday, January 25, 2008
13                         9:00 a.m.
                       Fifth Day of Trial
14
                              -    -    -
15
      BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18    APPEARANCES:
19                 EDMOND D. JOHNSON, ESQ.
                   Pepper Hamilton LLP
20                      -and-
                   MARTY STEINBERG, ESQ.,
21                 BRIAN M. BUROKER, ESQ., and
                   MAYA M. ECKSTEIN, ESQ.
22                 Hunton & Williams
                   (Washington, D.C.)
23
                                        Counsel for Plaintiff
24
25
```

Musika - direct

Page 835

1    specialist to come in and manage the company for the benefit

2    of the Court and the creditors.

3            I have served numerous times as a Chapter 11

4    trustee.

5            I have served as a Chapter 7 trustee to

6    liquidate companies.  I have served as a Court-appointed

7    receiver in state court, which is the same role as the

8    Chapter 11 trustee, it is just in state court.

9            I have served as a special examiner as appointed

10   by the U.S. Federal Bankruptcy Court to go in and examine

11   specific records, to tell the Court what has happened with

12   respect to financial transactions.

13           I have served as special master in somewhat the

14   same capacity.

15           Those are some of the roles that I have served.

16   Q.    In those roles, do you ever manage intellectual

17   property?

18   A.    Yes.  Any time one of those companies that I am

19   responsible for in a trustee capacity has intellectual

20   property, then it is my duty, just like the hard assets, to

21   make an appraisal of what the value is and make sure that

22   that value is maximized, so that the creditors or the

23   stockholders receive their fair value for that asset.

24   Q.    And in those roles when you are serving as a

25   Court-appointed trustee, receiver, or so forth, do you value

Musika - direct

1    A.    Yes, I have.

2    Q.    Approximately how many times?

3    A.    For the last 35 years, I have probably testified in

4    all forms of courts maybe a hundred times, something

5    approaching a hundred times.

6    Q.    Have you testified in federal court like we are

7    sitting in today?

8    A.    Yes.

9    Q.    Have you ever provided expert testimony regarding the

10   reasonable royalty rate in the licensing of intellectual

11   property?

12   A.    Yes, many times.

13   Q.    Do you belong to any professional organizations?

14   A.    Yes.  I belong to the Licensing Executive Society.  I

15   belong to the American Institute of Certified Public

16   Accountants.  And I belong to the American Society of CPAs.

17   Q.    What is the Licensing Executive Society?

18   A.    As I indicated, it is a group, international group, it

19   is a very well-known group internationally that has got a

20   membership which is made up of technical people, science,

21   lawyers and financial people.

22          MR. STEINBERG:  Your Honor, at this point we

23   tender Mr. Musika as an expert on patent damages.

24          MR. SCHERLING:  No objection, Your Honor.

25          THE COURT:  He will be received as such.

Musika - direct

```
 1              I know in my work that you can buy hearing aids
 2   that are a lot cheaper than that.  So there really is quite
 3   a range of value.  Anything down to even less than a
 4   thousand dollars, I have seen some.
 5              So it is a range.
 6   Q.    Now, let's talk about your damages analysis.  Assuming
 7   that the '850 and '749 patents were infringed, what is the
 8   standard for the damages that can be received?
 9   A.    There is two standards, very generally speaking.  ETG,
10   or the plaintiff, is claiming that they own patents that the
11   defendants, the two defendants used.  One form of damage
12   could be or is that ETG claims that they would have made the
13   sales that the two defendants made.
14              So they are basically saying, I lost sales.  I
15   would have sold those hearing aids.
16              Well, ETG, as you heard, doesn't sell hearing
17   aids.  So I can't do any lost profits.  They didn't lose
18   profits from the sale of the hearing aids because they don't
19   sell hearing aids.
20              The other form of damage, then, as we have
21   heard, is a reasonable royalty, which is to say that, as a
22   company that owns the patents, and if you find that they are
23   valid and infringed, then it's called a reasonable royalty.
24   Under no event, the law says, should the plaintiff be paid,
25   or have damages anything less than, it is a floor, than a
```

Page 852

1    the accused products from Oticon?  And there is a slide on

2    the board.

3    A.    Yes.  What that shows is, you will remember from the

4    organization chart over to the right of the Demant

5    defendants where the accused products are.  Remember when I

6    said it was six years, 2001 through 2006.  So the total,

7    under each column, is just each year's sales.  So, for

8    example, in 2001, only the Adapto was sold in 2001.  You can

9    see there, that is about $8.4 million.

10            So I go through each year.  And this comes

11   directly from the Demant sales records.  And these are the

12   sales records of the distributor.  So when its revenue out

13   the door, I am really just talking about that final sales

14   amount that I showed in my example here, is $1,111.  It is

15   just the final sales out the door, not the sales between the

16   parties, but how much did they finally sell it to the person

17   out the door.

18            That came to a total of $383,433,083.

19   Q.    I am going to direct your attention to JX-36, which

20   hopefully is in the jurors' notebooks.  It is at Tab 7 of

21   the juror notebook, or should be.

22   A.    Yes, I have that.

23   Q.    Can you tell us what that is?

24   A.    These are the actual records, sales records that were

25   produced by the defendant, Demant defendants, that show the

Musika - direct

Page 853

1    sales of their product.  So it was from these actual books

2    and records of Demant that I pulled out the accused sales

3    and put them into the period that I have listed there.

4    Q.    Did you do the same exercise for the Demant defendant

5    Bernafon?

6    A.    I did, yes.

7    Q.    Can you explain to the jury what they are seeing

8    there?

9    A.    This is the Bernafon sales.  We see the same period.

10   The reason we don't see 2001 here is because Bernafon did

11   not have any sale of its accused items in 2001.  So the

12   first time there was a sale of an accused item for Bernafon

13   was 2002.  And I added across.  And you get to the

14   $33,653,667 for total sales of accused items by Bernafon.

15   Q.    If you will turn to JX-40, which should be in the

16   jurors' notebooks, can you tell us what that is?

17   A.    Yes.  These are the sales records from the

18   distributor, Bernafon LLC, which lists the actual sales

19   again out the door, the last sale there out the door to

20   audiologists or doctors.

21   Q.    Did you summarize the revenues from both Oticon and

22   Bernafon, the Demant defendants?

23   A.    Yes.

24   Q.    Can you tell the jury what they are seeing now?

25   A.    Yes.  I want to explain why there are two numbers

Musika - direct

Page 854

1    there, November 2006 and June 2006.

2              Let's just talk about November 2006 first.

3              The reason -- let me explain.  The reason there

4    are two different numbers there that are slightly different,

5    the 417 million versus the 357, it relates to -- there is a

6    different expiration date on the patents.  So if you go out

7    to the final expiration date of both patents, that would be

8    November 2006.  If you go to the earlier expiration date,

9    that would be June 2006.

10             So you have got less sales because you cut it

11   off sooner.

12             That is the reason for those two differences.

13             But if I add Bernafon and Oticon together, and I

14   take the November date as the cutoff date, those two sales

15   come to $417,086,750, and I multiply that times 8.4 percent,

16   to produce a damage related to the Demant defendants of

17   $35,035,287.

18   Q.    Now, let's go through the same exercise for the Widex

19   defendants.

20   A.    Okay.

21   Q.    What are we seeing now on the screen?

22   A.    The same thing.  Now we have the sales history from

23   the period 2001 through 2006.  There we can see again that I

24   have got two different cutoff dates, depending on which

25   expiration date the Court chooses.  But taking it through

Musika - direct

1   the final date, the July date -- I am sorry, the November

2   date, total sales of the two accused products for Widex are

3   $306,127,967.

4            Again, this isn't my number.  These are numbers

5   that all come directly from the books and records, the

6   accounting records of the defendants' companies.

7   Q.    Are those only for the six years in question?

8   A.    Yes, they are.

9   Q.    If you look at Exhibit JX-216, which again should be

10  in the jurors' notebook, tell us what that is?

11  A.    Yes.  These records are the original books and records

12  that came directly from the Widex defendants.  So it was

13  from these records that I extracted the sales of the accused

14  products and put into this demonstrative.

15  Q.    And did you do, likewise, a summary for the Widex

16  defendants?

17  A.    Yes, exactly.

18  Q.    The damages?

19  A.    You can see, we have two different dates.  But taking

20  the later date, and adding those sales together, the total

21  sales were $306,127,967.  That is not a number that is

22  disputed by Widex.  This comes from their records.

23           The 8.4 percent is my opinion, which I think is

24  the appropriate reasonable royalty.  When I multiply the 8.4

25  percent times the total 306 million, that produces a damage

1    and calculated here the -- what is shown on here is a gross

2    profit margin for the industry as not the industry as a

3    whole but all the products that rely on the patent, or are

4    claimed to rely on the patent.  So I developed a gross

5    profit margin for all of the products.  And that's, I can't

6    use the pointer but that is the second number down which is

7    65.2.

8              I then took all of the business in general at

9    this level, back at this level but all, not just Widex, not

10   just Demant but all the other industry participants, too,

11   and I calculated what their gross profit margin was for all

12   products at that top level.  And that was 56 percent.  And

13   when I subtracted the two, I could see that the products

14   that rely on these or claim to rely on these profits

15   generated a premium, a gross profit margin of 9.2 percent

16   greater than all of the other products produced by all the

17   other companies.  So that was my starting point was to

18   identify the 9.2 percent.

19   Q.    Okay.  Then did you use that to help calculate the

20   operating margin of the relevant products?

21   A.    Yes.  I then took that 9.2 percent and I moved -- you

22   can see it right there, that second box down -- and I said,

23   well, let's go back to those companies, and these companies

24   at this level as well as all the other companies that are

25   claimed to rely on the patent.  And I added up what their

Musika - direct

1              On the licensee side, what is reasonable, they

2      would say zero.  They have said zero.  That is why they're

3      sitting here.  But what I have looked at there, I said,

4      well, what is reasonable is that premium, that 9.2 percent,

5      because that leaves them with the same profit margin that

6      they earned on all the rest of their products.  So I start

7      there saying it's 9.2 percent as a reasonable starting

8      point.  Of course, it could be, according to them, anywhere

9      down to zero.

10     Q.     And from that, did you determine a negotiating range

11     for this hypothetical negotiation?

12     A.     Yes.  Again, there are circumstances where the final

13     result could come outside of that range, like trying to

14     build towards what is reasonable.  The parties, although

15     neither of them can agree, I would start by saying it's

16     somewhere between this 6.4 and 9.2 range is a reasonable

17     range.

18     Q.     And using the Georgia-Pacific factors did you come up

19     with a royalty rate within this range?

20     A.     I did.

21     Q.     And what was that?

22     A.     That was the 8.4 percent.

23     Q.     So let's briefly go over the Georgia-Pacific factors.

24     There is a chart on the board.  What is that?

25     A.     Those are the 15 factors.  I took my range and I said,

Musika - direct

1    well, let's turn to the Georgia-Pacific analysis now and see

2    if the Georgia-Pacific analysis tells me something about

3    where the rate ought to be in that range or outside that

4    range.  It could be outside the range.

5    Q.    Okay.  And the first one is, is there an established

6    royalty rate for these patents?

7    A.    That is a good factor because that is a factor which

8    would cause the final conclusion to be outside the range.

9    If these patents had been licensed to the entire industry

10   from the beginning of time at a certain rate, that would be

11   considered an established license.  But these patents

12   haven't been licensed to anyone and so there is no

13   established rate and so that factor doesn't have any

14   probative information for us.

15   Q.    And is that why you included it as neutral under the

16   effect?

17   A.    Yes.

18   Q.    And the next factor looks at rates paid by licensees

19   for comparable patents.  What did you find in that regard?

20   A.    This factor tries to look for, to see whether the

21   licensees have engaged in licensing activity for patents

22   that are similar to these patents, and if so, what the rate

23   was that was paid on those.  And I looked and I did not find

24   any licenses that I believe were comparable.  You can find

25   licenses that were less than one percent, you could find

Musika - direct

1    licenses that were 15 percent, but none which I considered

2    to be comparable for a whole host of reasons.

3    Q.    In terms of these particular patents, did you

4    determine that they were generally worth more or less

5    patents in this field?

6    A.    Well, there are a whole host of reasons why these

7    patents stand out.  Several points would be the testimony

8    that the Court has heard from Dr. Brown concerning their

9    Pioneering nature.

10                Another factor which the Court has heard

11    numerous times are the number of references that are made

12    to the patent.  In fact, there, the defendants has its own

13    experts, financial or damage experts that you will hear from

14    and they choose a method that ranks these patents based on

15    citations.  And their own experts rank three patents in the

16    95th percentile.  Out of 100 patents, they put this patent

17    up there as the '850 patent as in the 95th percentile.  That

18    is a ranking.  There is only five patents they consider out

19    of 100 that they looked at which are more significant using

20    the metric that they used which is number of citations.  And

21    I know you have seen and heard a lot about citations and

22    their experts believe that the number of citations is an

23    important indicator of the value of the patent.  So there is

24    plenty of evidence even from their own financial experts as

25    to the significance of these two patents.

Musika - direct

Page 870

1  Q.    Now, you mentioned that you didn't find comparable

2  licenses.  In this particular industry, would you look at

3  the license fees that the industry members paid as a good

4  way to arrive at a reasonable royalty rate?

5  A.    No, I had problems with the rates that the licensee --

6  I'm sorry -- that the industry participants paid to each

7  other.

8  Q.    And why do you find that you can't rely on the license

9  rates of industry members?

10  A.    Under generally accepted auditing standards as an

11  audit partner and reporting to the SEC and complying with

12  general accepted auditing principles and standards, as

13  accountants within my profession, we are taught to know and

14  understand and recognize what is called a non-arm's length

15  transaction.  It's a term of art.  And basically what it

16  means is it's not a market, it's not a market driven result.

17         Both parties are not necessarily totally

18  independent and entering into it without any reason other

19  than trying to maximize their own position.  And when I

20  studied this industry, I found at least some organizations

21  of good standing and respect which identified that this

22  industry does not, in terms of its licensing, engage in

23  arm's-length licensing transactions.

24  Q.    And what kind of information did you rely on to come

25  to that conclusion?

Musika - direct

1    A.    One of the primary sources of information that I used

2    was the report by the German Federal Cartel Office when it

3    studied the hearing aid industry to make a decision as to

4    whether to approve a merger of two of those top nine

5    participants who represent 80 percent of the market.

6    Q.    And in your analysis of looking at this industry, did

7    you come across an organization known as HIMPP, H-I-M-P-P?

8    A.    Yes, I did.

9    Q.    And what is that and what did you determine about that

10    organization as it affects damages?

11    A.    That organization was identified by the German

12    regulators in reviewing the industry as an organization or

13    as an example of the kind of relationships that exist

14    between the participants.  And, excuse me, I'm not here to

15    say that the participants engaged in any unlawful behavior.

16    I'm not here to say they engaged in any antitrust behavior.

17    I'm simply reporting what the German regulator found with

18    respect to the non-arm's-length basis of the agreements.

19             Those agreements can be perfectly lawful.  I

20    don't even have the ability to tell you whether they're

21    lawful or not, but I do have the financial training to

22    know whether they are arm's length or not.  And what the

23    German regulator found was those transactions for a number

24    of reasons, which I think we're going to discuss, are not

25    reflective of a market transaction.