Musika - direct

Page 872

1    Q.    Now, did you make any determination from materials you

2    looked at as to whether there was any intertwined

3    relationships of these members of HIMPP?

4    A.    Yes, the HIMPP relationship itself.  Whether we call

5    it -- I know Mr. Sorenson yesterday disagreed, he didn't

6    want to call it a patent pool.  I would call it a patent

7    pool, but I don't think the name of it -- it's really the

8    economic or the substance of the transaction.  It's, whether

9    we call it a patent pool or not, yes, it does represent

10   intertwined relationships.

11              THE COURT:  Westermann or Sorenson?

12   A.        Sorenson.  No, Westermann.

13              MR. STEINBERG:  Westermann.  Everyone has done

14   that so far.

15              THE COURT:  I didn't want the jury to be

16   confused.  We're talking about Mr. Westermann?

17   A.        Yes.

18              MR. STEINBERG:  Thank you, Your Honor.

19   BY MR. STEINBERG:

20   Q.    Now, if you wouldn't mind turning to JX-180 which is

21   in the jurors notebook.  It's entitled General Information

22   About K/S HIMPP, H-I-M-P-P?

23   A.        Yes.

24   Q.    Okay.  Now, if you look down under the license and

25   patent portfolio section of that document, does that give

Musika - direct

Page 873

1   you some information about the license rates of HIMPP

2   members?

3   A.    Yes.  And Mr. Westermann did testify yesterday that

4   for parties who wished to take a license outside the

5   membership of HIMPP, they pay a three-percent running

6   royalty.  I know it says flat but that means a flat three

7   percent regardless of what the price is so they pay, just as

8   my royalty is, it's three percent on the sales price of all

9   the products that they sell.

10  Q.    And does HIMPP itself say whether that license rate is

11  comparable or lower than a typical royalty?

12  A.    It says exactly that:  That the three percent that

13  HIMPP charges is either comparable or lower.  And they say

14  that -- again, I'm not trying to say that the HIMPP patent

15  pool or the HIMPP partnership is illegal or it's necessarily

16  a bad thing.  The German regulators find it a bad thing --

17  but they want to keep that rate low and they would argue

18  that keeping it low, lower than what someone outside the

19  HIMPP partnership would be because they're saying if we keep

20  that rate low, then that should translate to lower prices so

21  that the consumer should ultimately benefit.  And that is

22  true.  If that were true, if the agreement between the

23  parties to pay a three percent was less than what they would

24  have to pay if each of them was suing each other, then that

25  should translate through and that should cause the prices to

Musika - direct

1    be less to the end consumer.

2                And that was the German Federal Cartel Office

3    looked at.  They said, well there is nothing wrong

4    necessarily on the face of this partnership to hold down the

5    royalty rates, but let's see if that translates to lower

6    prices and lower profits.  Did you pass that on to the end

7    consumer.

8    Q.    And did they?

9    A.    No.  Well, no, according to the German Federal Cartel

10   Office.  And, no, according to the data that I have looked

11   at.

12   Q.    Now, you mentioned this German Cartel Office.  If you

13   will turn to Exhibit PX-648, which should be in the jurors

14   notebook.

15               Is that the report you are referring to?

16   A.    Yes.

17   Q.    Now, why does the analysis of the hearing aid industry

18   affect your opinion about damages in this case?

19   A.    Well, you have put on a summary slide there that I've

20   put together that identifies another source, too.  I looked

21   at this report and I also looked at a study that was done, a

22   joint study that was done by the Copenhagen Business School

23   and actually a University of California professor did a

24   joint study of the industry.  This was dating back in the

25   early nineties.  And this summarizes the comments or the

Musika - direct

Page 875

1    conclusions or the observations that both organizations made

2    about the industry and why I concluded, to answer your

3    question, why I concluded the transactions or license

4    agreements between HIMPP members or industry members aren't

5    market rates.  They're not arm's length.

6    Q.    And would you mind reading into the record those few

7    conclusions?

8    A.    Yes, I think we're going to get into them.  But the

9    HIMPP patent license rates were low, as HIMPP said

10   themselves.

11           They are friendly competitors, as the article

12   and the German Cartel Office said.

13           The competition isn't what it -- it's not highly

14   competitive.

15           There is control.  There is joint control over

16   the hearing aid petitions.

17           Prices were very, very high; which translated

18   into very high revenues; which translated into very high

19   margins.  And we're going to see, it wasn't passed on to the

20   consumer.

21           And there was not a lot of new market entrants,

22   which would suggest to me that the market is open to

23   outsiders.

24   Q.    Okay.  Now, it's a very long report, as we see.  Did

25   you ask us to select some specific portions to the report so

Musika - direct

Page 876

1    we can see what you used to substantiate your conclusions?

2    A.    Yes.

3    Q.    Okay.  Let's share the next slide, please.

4          Okay.  Can you tell us what we're looking at

5    here?

6    A.    These are just a short series of comments out of the

7    report they looked at to cause me to conclude that according

8    to the German regulator, these are not arm's-length

9    transactions.  And this says:  The hearing aid industry is

10   an extraordinarily profitable economic area.  This is true

11   not only in comparison to other industries, but also when

12   compared to the highly profitable medical technology.

13   Q.    Did the German authorities also discuss what is called

14   EBITDA?

15   A.    Yes, they did.

16   Q.    First of all, what is EBITDA?

17   A.    EBITDA is a standard measure or abbreviation of

18   profitability.  It's earnings.  Each one of those letters

19   just stand for one of the expenses that we deduct.  So it's

20   earnings before interest, taxes, depreciation, and

21   amortization.

22         So this is a fairly high level profit, not down at the

23   profit that I looked and used.  But be that as it may, it's

24   comparing a number of other companies to the HIMPP member

25   profits and what this slide shows is that the HIMPP members

Musika - direct

1   have an EBITDA profit margin of 35 percent.

2          Compare that to, for example, names you will

3   recognize:  DaimlerChrysler, 11 percent; BMW, 14 percent;

4   Nestle chocolate, 15 percent; All European Chemical

5   Industry, 15 percent; and of the German clinic operators,

6   18.3 percent.

7               This wasn't selective data.  I used all the data

8   that the German Federal Office Cartel Office provided and

9   we can see that as an industry, the hearing aid industry

10  profits are, as they say, extraordinary.

11  Q.    Okay.  And so what did the German report find about

12  the margins in this industry?

13  A.    They said a number of things.  The key numbers of the

14  oligopoly members are not only very similar but in

15  comparison to other sectors bear witness to an

16  extraordinarily high profitability of the companies.

17              Hence, this earning indicator as well is very

18  comparable and confirms the high profit margins achieved by

19  the members of the oligopoly throughout the world with their

20  products.

21              Keep in mind again that what the German

22  regulators are trying to do is to try to see whether or not

23  the -- it's not just the mere existence of the patent pool.

24  There is nothing wrong on its face of the patent pool if

25  indeed choosing this low royalty rate, that that would

Musika - direct

Page 878

1    translate through to low prices to the consumer and low

2    profits.  So what the regulators are looking at did this low

3    royalty rate of three percent actually benefit ultimately

4    the consumer?  And what they're saying in these comments is

5    we don't see that, we see just the opposite.

6            Third comment:  Astounding price discipline is

7    ascertainable over the course of time, which particularly in

8    the high price the segments has even permitted price

9    increases.

10            So prices remain high and even in some of those

11    lofty higher price models, they continued high.

12            Competition hasn't driven down the prices.

13            And, finally, the lack of competition at the

14    level of the hearing aid acoustician can also be shown by

15    their exceedingly high margins on the manufacturer's selling

16    price.

17            So what they're saying, we're not even talking

18    about that.  That is out the door.  So even after the

19    manufacturer makes a profit, even after the distributor

20    makes a profit, what they're talking about, because the

21    distributors are actually selling it to the doctors or to

22    the acoustical professionals, and they make a profit on top

23    of it.  They're not being sued here but there is another

24    profit down the road before somebody puts a hearing aid in

25    their ear.

Musika - direct

Page 879

1    Q.    And did the German authorities discuss the competition

2    or lack thereof in this industry?

3    A.    Yes, they did.  The first comment again is this

4    comment of the intertwined relationship.

5          Second comment, it talks about how no market entrants

6    have entered into this.  So a barrier in a sense to other

7    new companies coming in.

8                And then, the final comment:  In summary, the

9    Decision Division is of the opinion that the findings

10   regarding competition on price and terms do not make it

11   possible to recognize any clear indications of significant

12   competition in the oligopoly.

13               Hence, in the background of sharply increased

14   volumes and the circumstance of considerable economies of

15   scale in this sector, this appears extraordinarily

16   astounding.

17               These are comments saying if we thought this low

18   three percent royalty was going to benefit, we should see it

19   in new market entrants.  We should see it in prices coming

20   down.  We should see it in low margins, low prices.  We

21   don't see any of that.

22   Q.    Okay.  Did the German authorities discuss the effects

23   of this behavior in the hearing aid industry itself?

24   A.    Yes.

25   Q.    It says -- and this is, it basically summarizes and

Musika - direct

1    says that we don't really see any innovation.  In spite

2    of these high prices, in spite of some of the technology

3    that is out in the marketplace, the first comment in part,

4    hearing aid manufacturers are already reissuing already

5    existing products under new product names without any

6    innovative, potentially patented functionalities being

7    added.

8              And this comment was a comment made by one of

9    the HIMPP members, which is a very telling comment.

10   Q.    But not either of these defendants here?

11   A.    It was not the defendants, no.  This was another one

12   of the HIMPP members.

13             The beauty of our approach is that we will

14   create or we will maintain this pseudo complexity from a

15   product point of view while having a very, very orderly,

16   structured and efficient platform approach underneath.  So

17   cash is king, but sometimes also perception is king.  So

18   what we are doing is basically cater to the perception of

19   our customers while using the same core technologies.

20             So they rename it, they bring out new products

21   but they're indicating we're really not changing it.  And

22   that is a way of perpetuating and keeping prices high.  Once

23   again, we don't see evidence that this low royalty rate that

24   the parties that were in this club, in this membership, in

25   this partnership has actually passed through to the end

Musika - direct

Page 881

1    consumer.

2    Q.    And did the Germans report any risk associated with

3    these practices in the hearing aid industry?

4    A.    Yes.  And I know the other side keeps suggesting I

5    said that they're colluding or engaging in price fixing.  I

6    have never said that the other side is engaging in price

7    fixing.  I'm reciting again the German Cartel Office that

8    says on the backdrop of what we have seen in terms of the

9    extraordinary high profits, the high margins, the lack of

10   market entrants, the lack of innovation, that there is a

11   risk of collusion that could occur between these

12   individuals.  And I think Mr. Westermann's comment yesterday

13   was a telling comment as well to say we were fearful at

14   times that patents would fall into the wrong hands, which

15   again suggests that there is a club here, there is a

16   partnership and we don't want anyone who is not a

17   manufacturer to have these patents.  Those would be the

18   wrong hands.

19   Q.    Now, did the German reports finally conclude the

20   effect of these practices on the consumer?

21   A.    Yes.  It says the present case is characterized by

22   more, characterized far more by the fact that hearing aid

23   manufacturers and hearing aid acousticians in Germany for

24   the most part have a common sense of interest, which lies

25   not in competitive features directed against one another,

Musika - direct

Page 882

1    but in the end to obtain from the end customer the highest

2    possible profit margin, both for the manufacturer and for

3    the hearing aid acoustician.

4    Q.    Now, did the German report look only at the German

5    market?

6    A.    No.  They were looking at these companies because

7    these companies, as we know, the HIMPP members are

8    throughout Europe and throughout the world.  They are

9    concerned ultimately with the sales in Germany.  But when

10   they looked at the company, they looked at their worldwide

11   operations.

12   Q.    And what did this analysis of the article from the

13   Copenhagen Business School, the testimony you reviewed, the

14   German report, how did that come to play on your opinion as

15   to whether or not you could rely on the actual license rates

16   between these HIMPP members?

17   A.    First, I did not conclude that they colluded in price

18   fixing.  I did not conclude they engaged in antitrust

19   behavior.  I concluded that a federal regulator concluded

20   that the three percent rate that they charge each other that

21   hadn't fallen into the wrong hands is not a market rate.  It

22   doesn't translate into what would happen with someone who,

23   according to Mr. Westermann, was in the wrong hands and

24   negotiated a market rate.  It's just not reliable.

25   Q.    Now, in addition to your reasonable royalty rate

Musika - direct

Page 883

1    analysis that you have shown us, did you also look for

2    comparable licenses?

3    A.     I did.

4    Q.     What did you do to do that?

5    A.     I searched the public domain for licenses in related

6    industries and the hearing aid industry and the medical

7    devices industry and several industries.

8    Q.     And what was your conclusion about whether you found a

9    comparable license?

10    A.     I couldn't.  There was just not enough information.

11    In one respect, there was too much information.  There are

12    hundreds and hundred and hundreds of patents and, as I said,

13    the ranges would go from a fraction of a percent up to 15

14    percent, none of which could I establish was, as the

15    defendants' expert ranked this, in the top five percent and

16    none that were necessarily at the same time period.  So I

17    didn't find any that were comparable.

18    Q.     Okay.  Let's go back to the Georgia-Pacific analysis

19    that we were going through and just quickly go through the

20    remainder of the factors in that analysis.

21              Can we get it up here on the screen?

22              I think we're at three, whether it's an

23    exclusive or nonexclusive license, and just briefly explain

24    what that is and what you found.

25    A.     Yes, the rest of these are relatively simple.

Musika - direct

1                The license, excuse me, would be nonexclusive.

2    The licensor for ETG is not negotiating for a high exclusive

3    license.  It's just again what is reasonable is what would

4    be available to everyone.

5    Q.    Now, the fourth factor is whether the licensor had a

6    licensing possibility?

7    A.    Yes.  And here, it's ETG wants to license it which

8    causes the rate to be a little lower.  If they had to get

9    their own products, they would be seeking their profits, but

10   they need to license it so that creates a lower -- a

11   willingness to lower the rate.

12   Q.    The fifth factor is whether there was a commercial

13   relationship between the licensor and the licensee.

14   A.    Again, they're not competitors so that again causes it

15   to go down.

16   Q.    The sixth is whether the patent would lead to

17   derivative sales?

18   A.    Yes.  A derivative sale or convoyed sale are, as a

19   result of selling the hearing aids, do defendants make other

20   money, again not even included in the manufacturing, not

21   even included in the distribution?  And the answer is yes.

22   We all know that when we buy electrical equipment or there

23   happens to be a CD player or whatever, people will ask us do

24   we want to sign up for the service contract?  Do we want to

25   sign up for the extended warranty?  And, likewise, those

Musika - direct

Page 885

1    types of revenue are available to the defendants as well.

2    So as a result of putting the hearing aid into the

3    consumer's ear, they stand -- "they" being of the

4    defendants -- stand to gain additional revenue down the road

5    for maintenance, warranty service and so on.

6    Q.    And seven is the duration of the patent?

7    A.    Yes.  There was enough years, six years left here that

8    that was a meaningful time period in which to say that the

9    defendants -- and they have it.  The question was asked

10   again of Mr. Westermann, have we done anything during the

11   time since you have known about this to design around or

12   develop a new product?  And the answer is no.  So this would

13   cause upward progression.

14   Q.    And then the profitability of the commercial success

15   of the products that included this patented technology.

16   A.    We covered that extensively, very high profits under

17   any measure.

18   Q.    The advantages of incorporating the technology to

19   patent?

20   A.    And that was covered by the technical experts with

21   respect to its use and I relied on the technical experts for

22   that in terms of its pioneering nature, yes.

23   Q.    The commercial embodiment of the patented technology

24   as owned by the inventor?

25   A.    We lost our picture.

Musika - direct

1    Q.    We're at No. 10.

2    A.    Well, I would say that that, too, is higher because --

3    I'm sorry -- neutral.  Because the -- is this licensor?  I'm

4    sorry.  The licensor doesn't use it, doesn't sell it so it

5    hasn't been of any direct benefit to the licensor.  However,

6    it has been a huge benefit to the end-user.  So this is

7    going to cancel out to being neutral.

8    Q.    That would answer No. 11; right?  The value to the

9    infringer?

10    A.    Yes, that is what is higher.

11    Q.    No. 12 looks at the portion of the profit or selling

12    price that is customary in the industry.

13    A.    None that I identified.  Neutral.

14    Q.    No. 13 is the profit credited to this invention.  And

15    it has been sold?

16    A.    And that is what we looked at, and I discussed the

17    profits margins there, yes, in terms of higher profit margin

18    and that being higher pressure.

19    Q.    And, of course, the opinion of an expert.  You have

20    been held to be an expert in this field; correct?

21    A.    And I have relied on the expert opinions of Dr. Brown

22    and Dr. Gloster.

23    Q.    Okay.  Now, did you review Dr. Donohoe's expert

24    report?

25    A.    Yes.  Well, it's not Dr. Donohoe.

1              So back into their analysis, Dr. Putnam says

2      that Mr. Musika used the wrong profit rates, he should use

3      expected profit rates, not the actual profit rates.  And he

4      uses a more complicated term, he will talk about, ex-ante.

5      But what it really means is at the time or near the time of

6      infringement, what did the two defendants expect their

7      profit margins to be.

8              And he gives us two profit margins.  This is on

9      Page 32 of his expert report, he gives us the expected

10     profit margin first for the Demant defendants, and he

11     identifies that at 17.8 percent.  Then on Page 32 he gives

12     us the expected profit rate for the Widex defendants.  And

13     he identifies that as 19.4, profit rate.

14             Those are the expected profit rates.

15             What I did was, since I want to get to an

16     overall profit rate, you just averaged those two.  You

17     averaged the 17.8 and the 19.4 and you will get an average

18     profit margin of 18.6.

19             So I have an average profit, expected profit

20     margin, according to Dr. Putnam, of 18.6.

21             I then went to Mr. Donohoe's report, and he has

22     accumulated analysts' reports from outside analysts that

23     study the hearing aid industry.  And I went to his analysts'

24     report for 1999.  And this is for -- I think the name of the

25     analyst group is NyKredit.  Page 2 of the NyKredit report

Musika - direct

Page 896

1   from the appendix of Mr. Donohoe's report, it gives all the

2   industry participants, and it gives their EBIT, earnings

3   before interest and taxes, which is operating profit.

4                   And I averaged all those.  I am sure --

5                   MR. SCHERLING:  Your Honor, I object as beyond

6   the scope of the report.

7                   THE COURT:  Of the report?

8                   MR. STEINBERG:  It is an attachment to the

9   report.

10                  THE COURT:  Let's discuss this.

11                  (The following took place at sidebar.)

12                  THE COURT:  Mr. Steinberg, you say it is

13  discussed in an attachment?

14                  MR. STEINBERG:  It is an attachment to their

15  experts' reports.  Their analysts reports have.

16                  MR. SCHERLING:  I agree with that.  But he did

17  not do this analysis as part of his opinion.  The documents

18  are there, but he did not do this analysis.

19                  MR. STEINBERG:  Judge, we didn't get the reports

20  until after his report was filed.

21                  He was asked questions about this in his

22  deposition.  He didn't see their expert reports or their

23  attachments until after he filed his report, and there was

24  no opportunity for rebuttal reports.

25                  MR. SCHERLING:  He was asked questions about

Musika - direct

1    that's correct.  We can do that.  He had an opportunity to

2    bring that up in his deposition and he didn't.  And I asked

3    him specifically about this.

4              THE COURT:  Well, you can ask him about that,

5    too.  I am going to overrule the objection.

6              (End of sidebar conference.)

7              THE COURT:  The objection is overruled.

8    BY MR. STEINBERG:

9    Q.    Mr. Musika, let's go back and refresh where we are.

10   You were talking about some analysts' reports that were

11   attached to the defendants' expert reports and you used them

12   as a check and balance on your reasonable royalty rate?

13   A.    Yes, if I could very quickly summarize.  So I took Dr.

14   Putnam's expected profit rates, because he says it should be

15   expected, not the actual.  That came to 18.6 percent.  And

16   the method I am using is, like the Georgia-Pacific analysis,

17   there is another analysis in what's called the TWM case

18   called the analytical approach.  This is the analytical

19   approach.

20             This isn't something that I am making up again.

21   This comes directly another case.  So what you do is you

22   take the expected profit rate, is what they did in the TWM

23   case, 18.6, and you deduct from it the industry average.

24             I went to Dr. Donohoe's report to get the

25   industry average, because in 1998, the analysts' report

Musika - direct

Page 901

1   reviews all of the participants.  And I averaged those and

2   came up with an average profit margin of 12.2.  It is on

3   Page 2 of the NyKredit report.

4            For, I believe it was 1998 was the last year it

5   had prior to the 1999 negotiations, there was one market

6   participant whose reporting period didn't have a number for

7   '98, so I used the '97 number.  If they want to check my

8   math to see where I came up with the 12.2 percent.  What I

9   do is I deduct the 12.2 percent, because that is the

10  average, and we once again want to make it reasonable.  We

11  want to leave the defendants with the same profit that the

12  rest of the industry earns.

13           They expected to make 18.6.  The rest of the

14  industry was making 12.2.  Subtract that.  And that produces

15  a royalty of 6.4 percent.

16           Well, it's not 8.4, my opinion.  But it's much,

17  much closer, in terms of the reasonableness, than

18  $2 million.

19           So you could take 6.4 percent times the 723

20  million, and produce approximately a 42 or $43 million

21  damage.  Or you could take my number, which is the 8.4

22  percent, times the 723 million, and produce a $60 million

23  damage.  Or you have their conclusion of two million, even

24  though, as I say, taking their amount and running them

25  through the analytical approach, it comes up to a damage

Musika - cross

Page 930

1    ability of the of defendants to sell their products in the

2    hearing aids market?

3    A.    Yes, I would agree to that.

4    Q.    It could be the many technologies that are in the

5    product; correct?

6    A.    Sure.

7    Q.    It could be marketing?

8    A.    Absolutely.

9    Q.    It could be distribution and sales channels?

10   A.    Yes.

11   Q.    It could be product reliability?

12   A.    Yes.

13   Q.    There is a whole host of factors that contribute to

14   the ability of the hearing aids companies that sell their

15   products in the market?

16   A.    Absolutely.  And all of which go into again those

17   expenses that make up -- I abbreviated them here but if

18   they're marketing, they go into the expenses here for

19   marketing expenses.  If they're selling and distribution,

20   they go into the expense line item here.  And I've backed

21   them out of the profit.  They have already been compensated

22   for all of those considerations.  I'm making sure that I'm

23   only taking that net profit.  So they've already covered all

24   of those expenses you are mentioning.  I'm not taking any of

25   that way from it.  It's already been covered.

Jacobsen - direct

1    time?

2    A.    They were owned by 3M, a very big American company.

3    Actually, those who do the yellow Post-It.  It's one of the

4    companies in U.S. that really holds a lot of patents.  And

5    we got the opportunity to buy more than 200 patents for $12

6    and-a-half million.

7    Q.    And were those significant, insignificant patents?

8    How would you characterize them?

9    A.    I think they were crucial for the development of

10   hearing aids.  They were absolutely crucial to develop

11   programmable and digital hearing aids going forward.  Not

12   only one of them but a number of them.

13   Q.    So you purchased about 200 crucial hearing aids

14   patents for a total sum of about $12 and-a-half million?

15   A.    That's true.

16   Q.    Now, what happened to those patents?  Where did they

17   go?

18   A.    They went into the partnership, to the HIMPP

19   partnership.

20             THE COURT:  Can I see counsel a second?

21             (The following took place at sidebar.)

22             THE COURT:  Do us a favor.  Don't restate the

23   testimony, don't restate his answers.  His answers will

24   stand on their own.

25             MR. PANITCH:  Okay.

Brown - direct

Page 506

1   Dr. Levitt said, will disturb the hearing aid's operation

2   but the large amount produces a squealing sound that nobody

3   likes.

4   Q.    Is it important to reduce acoustic feedback in a

5   hearing aid then?

6   A.    Yes, both from comfort and actually for people to

7   continue to use the hearing aid.  I think I saw a number

8   saying 25 percent of the complaints about hearing aids had

9   to do with this feedback, and they didn't like that.

10  Secondly, if there is some level of feedback it disturbs the

11  signal processing of the hearing aid, thereby reducing the

12  hearing aid's ability to compensate for the wearer's

13  impairment.

14  Q.    How did older hearing aids deal with acoustic

15  feedback, if at al?

16  A.    Well, the standard solution for it was just turn the

17  gain down.  And then there were various and sundry options

18  after that where they turned gain down in individual

19  channels, when they put notch filter and did a bunch of

20  other things, but all of these solutions had serious

21  drawbacks:  They didn't sound good, they cut holes out of

22  what you were hearing, or they just plain didn't have enough

23  amplification for your hearing impairment.

24  Q.    And is gain volume, essentially?

25  A.    Yes, gain is the amount of volume that comes out of

1    two businesses.

2    Q.    Do you have an understanding of whether or not that

3    report was relating to the rest of the world or only to

4    Germany?

5    A.    No.    The report was done by Germans about the German

6    market and the situation in the German market.    It's obvious

7    that the German office cannot have any opinion on anything

8    outside the German market.

9    Q.    I apologize.    There was a question I wanted to ask you

10   in the last line of questioning that I failed to.    So I am

11   just going to come back to it.    You were talking about the

12   percentages, fractions of a percent per patent in your

13   industry that are common.    Why is that?    Is there a reason

14   why the rates are at that rate?

15   A.    Yes.    I think it's -- it is clear that there is no

16   single patent that is the patent for hearing aid.    It's all

17   patents that are covering a fraction of something.    It could

18   be, as I told you before, the patent on how to make the ear

19   mold.    It can be a patent on anti-feedback.    It could be a

20   patent on all other elements.    It can be a tube patent.    It

21   can be a filter bank.

22            All the patents we acquired from 3M, they were

23   important all to develop hearing aids.

24            So if you have to stack, you can say, use this

25   patent and this patent and this patent.    If you pay a high

Jacobsen - direct

1    rate on each of the patents, then you will say, no, no, I

2    will not develop this hearing aid, because, you know, when

3    we come to the market, then the patent owners will take all

4    what we need to pay our employees.

5            So it doesn't make sense to pay these very high

6    fees on a single patent because you need a number of patents

7    often when you develop a hearing aid.

8    Q.    Mr. Musika testified earlier about -- I don't remember

9    the exact number, it was in the 30 million range for the two

10   Levitt patents as being something that would be reasonable

11   to negotiate in this field.  How does that number comport

12   with your understanding of what is reasonable?

13   A.    I think it's quite obvious that when we had paid

14   $1.8 million to have access to 250 patents that are coming

15   mostly from 3M, you know, it doesn't make any sense.  This

16   is an opportunity.

17   Q.    Let's talk about now the Levitt patents that are the

18   subject of this suit.  At any time before this lawsuit was

19   filed, either in your role as chairman of HIMPP or in your

20   role in the Demant Group companies, do you ever recall

21   hearing about the Levitt patents?

22   A.    I didn't hear anything about the Levitt patents before

23   this suit, before we were sued on these patents.

24   Q.    Do you recall your reaction when you had learned that

25   you were sued?

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
                         -   -   -
 4
 5   ENERGY TRANSPORTATION,              :   Civil Action
     INC.,                              :
 6                                      :
                 Plaintiff,             :
 7                                      :
         v.                             :
 8                                      :
     WILLIAM DEMANT HOLDINGS A/S,       :
 9   et al.,                            :
                                        :
10               Defendants.            :   No. 05-422 (GMS)
11                       -   -   -
12                  Wilmington, Delaware
                  Friday, January 31, 2008
13                      9:30 a.m.
                    Ninth Day of Trial
14
                         -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18   APPEARANCES:
19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                      -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                                  Counsel for Plaintiff
24
25
```

Donohoe - cross

Page 1837

1    A.           Yes.

2    Q.           Now, you are also familiar with the fact that

3    Dr. Putnam ranked the two patents in this case very, very

4    important patents; correct?

5    A.           Within the range of patents that he examined.

6    He looked at around 100 patents for Widex and 94 patents for

7    Demant.  These are patents that were either owned by Widex

8    and Demant or licensed in by Widex and Demant.  And among

9    these patents, he ranked them in an order, yes.  And you're

10   correct.

11   Q.           And out of those 200 or so patents that he

12   looked at, he ranked Dr. Levitt' patents in the 95th

13   percentile, top five percent; right?

14   A.           Well, I don't know what percentile but he ranked

15   them high.

16   Q.           Sixth, does that ring a bell?

17   A.           I think it was sixth in the case of one and --

18   something like that, yes.

19   Q.           Now, you attended Mr. Musika's deposition;

20   correct?

21   A.           I did.  Well, parts of it.

22   Q.           And you heard Mr. Musika testify, well, even the

23   defendants agree that these patents are very special, very

24   valuable.  They ranked them in the 95th percentile or the

25   top five percent of the patents they looked at; right?

Donohoe - cross

Page 1840

1    analysis that ranks the Engebretson patent, '082 among with

2    other HIMPP portfolio patents in the top 90th percentile;

3    correct?

4    A.          I see that, yes.

5    Q.          So the '850 patent would be ranked higher than

6    those; correct?

7    A.          Well, the '850 patent is in the top 90

8    percentile.  It says here that the Engebretson patent is in

9    the top 90th percentile.  It doesn't say where it is but my

10   understanding is that it is ranked higher than the Levitt

11   patents, within that top 90 percentile.

12   Q.          And the Levitt patent was ranked in the top five

13   percent; correct?

14   A.          Yes, which is in the top 90 percentile, yes.

15   Q.          Now, in your analysis, in the patents that you

16   looked at, were -- the patent licenses, excuse me, that you

17   looked at, did you do anything whatsoever to only look at

18   the top five percent?

19   A.          No, I looked at all of them.

20   Q.          Now, you didn't perform any financial analysis

21   regarding revenues, net revenues, costs or profits, did you?

22   A.          No, I left that up for Dr. Putnam.

23   Q.          And you didn't look at the same things that

24   Mr. Musika looked at, for instance, the profits related to

25   the specific infringing products; correct?

Donohoe - cross

Page 1844

1    are many other things that go into making.

2              MR. STEINBERG:  Your Honor, may we instruct the

3    witness?

4              THE COURT:  No, I'm not.

5              You may continue.

6              MR. STEINBERG:  Thank you.

7              You can continue, sir.

8              THE WITNESS:  I'm finished.

9    BY MR. STEINBERG:

10   Q.        Now, you testified earlier about some issue

11   called patent stacking or royalty stacking?

12   A.        I did, yes.

13   Q.        And your concern was that these companies would

14   be paying other license rates that may interfere with them

15   paying a license rate to ETG?

16   A.        That would have been the mindset of the

17   negotiators at the beginning of the negotiation.  They would

18   have looked at, there is a lot of patents in the industry,

19   there is a lot of potential for licenses coming forward.  So

20   they would be concerned about if they took a lot of licenses

21   as they might have to, there would be a patent stacking

22   problem.

23   Q.        But, again, you have done absolutely nothing

24   whatsoever to determine whether there is in fact a patent

25   stacking issue with these two defendants; correct?

Donohoe - cross

Page 1845

1    A.            Well, I looked at, No. 1, the number of patents

2    in the industry.  The licenses that were already in place.

3    I looked at the potential for downstream licenses because of

4    the number of patents.  The number of complex features that

5    are patentable in a hearing aid.  And I draw the real world

6    conclusion that there is a danger of patent stacking here.

7    Q.            But you didn't do any specific work to determine

8    whether these defendants had licenses that they were paying

9    royalties on that would interfere with their paying for

10   another license, did you?

11   A.            At that time, no.  No, not at that time.  I

12   didn't quantize that and didn't feel I had to quantize that

13   because I was concerned about what the future looked like.

14   Q.            Now, in your report you concluded that the

15   defendants would only be interested in paying a lump sum

16   royalty; correct?

17   A.            Not only, because I gave both the running

18   royalty and the lump sum alternatives.  I said in my report,

19   though, that a lump sum is generally favored by licensees in

20   these situations.

21   Q.            But you know now that HIMPP, the organization

22   these defendants belong to, recommends a percentage running

23   royalty; correct?

24   A.            They recommend both.  A lump sum -- you can pay

25   a lump sum, actually become a partner by paying a lump sum,

Donohoe - cross

Page 1848

1    Q.          Now, at the time you came to that conclusion,

2    you didn't know anything about the Chen family assets or who

3    owned what in the Chen family; right?

4    A.          No.  What I understood is that earlier in 2001,

5    2002, that there was a division of property among the Chen

6    brothers -- actually, Chen family I guess.  And then in

7    early 2004, there was this purchase of 50 percent ownership

8    in ETG by Kimball Chen.

9    Q.          Now, you have never seen any of the documents

10   related to any of those transactions between Chen family

11   members, have you?

12   A.          No, I never have.  No.

13   Q.          And you never asked for them, have you?

14   A.          I never have, no.

15   Q.          And you don't even know what the $1 million

16   relates to in all of those transactions; correct?

17   A.          Well, sure.  What I understand, and I understand

18   from the deposition testimony of Alex Evans that the $1

19   million was buying one-half percent, I'm sorry, 50 percent

20   ownership in ETG.

21   Q.          But you have never saw any document related to

22   any of those transactions, right?

23   A.          But I haven't seen any documents related to

24   that.  I'm just relying upon deposition testimony of a vice

25   president to Mr. Chen and what he said.

Putnam - cross

Page 1889

1   expectations, then you should look at what actually happened

2   as an estimate of what you think the expectations were.

3   Q.          And yet the only evidence that you have shown us

4   of the defendants' expectations are, I think you referenced

5   then some analyst reports; is that right?

6   A.          Yes, that is right.  That is what the industry

7   reports say the defendants were expected to make in 1999.

8   Q.          Those analyst reports don't focus on the accused

9   products, do they?

10  A.          They're company wide.  No, that's true.

11  Exactly.  I mean that is what Mr. Musika did and that is the

12  highest or the lowest level of expectations we can derive in

13  this case.

14  Q.          The analyst reports, they provide the companies

15  overall profit expectations for all products; right?

16  A.          Yes, that is right.  That is the baseline.

17  Q.          So you don't know what these defendants' profit

18  expectations for the accused products were, do you?

19  A.          The analyst reports don't say that, no.  And I

20  don't think it's reported anywhere in the case.  I don't

21  think they calculated their expectations.

22  Q.          Now, if I understand your testimony, or tell me

23  is  it your testimony that if an infringer has other

24  components to its products that contribute to the profit,

25  they cram everything into a product, they get to benefit

Page 1896

1    Q.          So you ranked the Levitt patents against patents

2    that the defendants have licensed from HIMPP, for example?

3    A.          Yes.

4    Q.          And patents that Demant relied on as

5    independently owned?

6    A.          Yes.

7    Q.          And any other patents they may have licensed.

8    Right?

9    A.          Of the ones that I can find, there are actually

10   some that the licenses don't specify the patent, so I have

11   under-counted in some respects.  But of the ones that I

12   could find, yes.

13   Q.          And you ranked the Levitt patents fairly high,

14   right, in the top five percent of all of those patents as

15   compared to the other patents?

16   A.          The '850 patent ranks fifth or sixth in the

17   ranking, and the '749 is 17th or 19th.

18   Q.          And you adjusted downward for age, right?  The

19   older the patent, the more likely it would be cited, so you

20   adjusted downward for their age?

21   A.          I wouldn't call it justifying downward.  I would

22   just say I controlled for age in the analysis of the

23   ranking.  So you wouldn't simply rank a patent more highly

24   simply because it is older.  That would be improper.

25   Q.          So if you hadn't controlled for age, they

Putnam - cross

Page 1897

1    actually would have been ranked higher.  Right?

2    A.          If I had done the analysis incorrectly, I would

3    have gotten a different result.  That's true.

4    Q.          You would have ranked them higher.  Right?

5    That's my only question.

6    A.          As in anything else, if you take the raw data

7    and don't interpret it, you will get a different result.  If

8    you take the raw data, because the Levitt patents are older,

9    they rank higher than some newer patents, which aren't cited

10   as much.  And you should simply put them on a level playing

11   field and compare them by adjusting for age.

12   Q.          Now, using this method, you concluded that the

13   Levitt patents are entitled to less than a total of

14   two-thirds of the accused product's profits.  Is that right?

15   A.          No.  Sales.  Two-thirds of a percent of the

16   accused product's sales.  I said that their share of profits

17   was about six percent.

18   Q.          This is in comparison to all those other

19   patents, right, as well as other factors?

20   A.          Well, the other factors also have to receive

21   their share of profits, that's true.

22   Q.          As well as the other patents.  Right?

23   A.          Yes, the other patents are also other factors

24   that one should take into account.

25   Q.          But all of those other patents, all of those

Page 1898

1    that you compared to or ranked Dr. Levitt's patents against,

2    you don't know whether any of them are actually used in the

3    accused products.  Right?

4    A.          Yes.  If I understand your question, we have

5    been through this.  I can't say on a product-by-product and

6    patent-by-patent basis which products practice which other

7    patents.

8    Q.          And you also don't know whether any of them have

9    gone through the process of litigation and been found valid

10   and infringed.  Isn't that right?

11   A.          Well, I think that's true.  But with respect to

12   Demant and Widex's own patents, they wouldn't be found valid

13   and infringed because they belong to the company that we are

14   talking about.  So you wouldn't litigate over your own

15   patents unless you were suing somebody else and asking for a

16   share of their profits.

17   Q.          But you didn't just look at Demant and Widex's

18   own patents, you ranked the Levitt patents against patents

19   that they licensed from HIMPP and others.  Correct?

20   A.          That is also true, yes.

21   Q.          You don't know whether any of those patents have

22   been litigated and found to be valid and infringed.

23   Correct?

24   A.          That is also true, yes.

25   Q.          It's your opinion, isn't it, that a patent that