# EXHIBIT 5

GERMAN FEDERAL CARTEL OFFICE
3rd Decision Division

Case No.: B 3 – 33101 - Fa – 578/06

Bilag 2
DELACOUR
FOR PUBLICATION

Merger Control Proceedings
Order pursuant to Section 40 paragraph 2 GWB

### Decision

In the administrative proceedings

1. of Phonak Holding AG, Stäfa, Switzerland;

                                                                Party 1.,

    Authorized Counsel:
    Attorneys Gleiss Lutz; Maybachstraße 6; 70469 Stuttgart,

2. of GN ReSound A/S, Ballerup, Denmark,

3. of GN ReSound GmbH Hörtechnologie, Münster, and

4. of GN US Holdings Inc., MN, USA

                                                                Parties 2.-4.,

    Authorized Counsel:
    Attorneys Hengeler Mueller, Bockenheimer Landstraße 24,
    60323 Frankfurt am Main,

5. of GN Store Nord A/S, Ballerup, Denmark

                                                                Party 5.,

    Authorized Counsel:
    Attorneys Hengeler Mueller, Bockenheimer Landstraße 24,
    60323 Frankfurt am Main

6. of Siemens AG, Munich;

                                                               Summoned Party,

on account of a review of a proposed concentration pursuant to Section 36 paragraph 1 of the Law Against Restraints on Competition (GWB), the 3rd Decision Division of the German Federal Cartel Office decided on April 11, 2007:


EXHIBIT PX 648

MOJ00000242

acoustician retail trade. This market is geographically confined to Germany.

## 6. Effects of the Concentration

(125) The concentration allows one to expect the creation of an oligopolistic and market-dominating position for hearing aid manufacturers SAT, Oticon and Phonak on the German market for production and distribution of hearing aids to the hearing aid acoustician retail trade (Section 36 paragraph 1, Section 19 paragraph 3 clause 2 GWB).

### 6.1. Market Structure and Competitive Conditions Prior to the Concentration

(126) The relevant market reveals a series of particular competitive characteristics favoring concerted oligopolistic behavior. These include, in particular, the following circumstances:

> The **degree of concentration** on the market for hearing aids is very high. The three leading suppliers SAT, Phonak and Oticon have a combined marked share of over 80% in Germany. Thus, even the so-called "narrow" **presumption of oligopoly** in Section 19 paragraph 3 clause 1 No. 1 GWB is exceeded by more than 30% in the instant case. The high combined market share is accompanied by very large market share advantages over the next following competitors; the market share gap separating them from the next competitors GN ReSound (No. 4) and Widex (No. 5) in each case amounts to far more than 70%.
>
> The manufacturers are intertwined with one another by **contractual business relationships (ensured in part by company law)** (mainly joint ventures and licensing agreements). These business relationships and cooperation directly relate to the market for hearing aids and have led to the construction of general industry standards and the collectivizing of patent rights. Going along with that, then, is a technological and product-brand-related "marching in lockstep" among the oligopolists.
>
> Hearing aid manufacturers have created an extensive system of market information. On the basis of the monthly sales and volume reports to ZVEI and the monthly evaluations by ZVEI, the participating companies receive a very detailed overview, *inter alia*, of sales volumes, manufacturer's sales prices obtained and sales revenues in the individual price segments for digital hearing aids. This ensures that competitors can recognize, in real time, changes to their market shares and competitive advances by competitors and that competition will be impaired. In addition, the result of the ZVEI reporting system is a highly asymmetrical market transparency in favor of hearing aid manufacturers and at the expense of hearing aid acousticians and the end

MOJ00000275

customers of hearing aids.

Since digital hearing aids became established, the market has lost innovative pace and has in the meantime transitioned into a **phase of maturation**, with genuine product innovations no longer to be expected. This does not mean that the market for hearing aids does not continue to be open to innovations in the sense of product enhancements. But these innovations are achieved by the improvement and optimization of existing technology. In this, manufacturers of hearing aids are very close to each other in their developmental expertise. The Decision Division does not fail to note that technological and esthetic improvements of digital hearing aids are being brought to market time and again. These improvements can be carried out promptly, however, by each of the oligopolists such that the competition over the introduction of new families of products does not alter the power relationship in the oligopoly on a lasting basis and to an extent relevant for the issue.

**Supply and demand conditions** on the relevant market are stable. Suppliers on the market have, without exception, been established and active on the relevant market for more than 10 years. According to information from the hearing aid manufacturers surveyed, virtually no market entries have taken place over the years past. Rather, due to company takeovers, the market has undergone a considerable consolidation to, now, the five suppliers in Germany worthy of note.

The demand is not dependent on business cycle, even though the market potential for hearing aids has been exhausted only in small part. Due to the high stigmatization of the wearing of hearing aids, those suffering from hearing loss that actually get a hearing aid are as a rule categorically referred to such a device. Correspondingly, there are hardly product-related alternatives or the possibility of a considerable time delay in procuring a hearing aid.

(127) The greatest possible adjustment of suppliers to these competitive conditions favors a concerted oligopolistic behavior, which argues for a market-dominating oligopoly among SAT, Phonak and Oticon even before the combination, even though a number of current market conditions also provide indications for competition in the oligopoly. Finally, it may be debatable whether significant competition no longer exists in the oligopoly already prior to the combination. In any event, the concentration between Phonak and GN ReSound would further reduce those competitive impulses still present in the market. (On this point, see *infra*, margin number 287 *et seq.*). The concentration is in any event creating market conditions on the basis of which, in the future, no significant competition between hearing aid manufacturers SAT, Phonak and Oticon is any more to be expected. This lack of internal competition corresponds to a pre-eminent market position of the oligopoly *vis-à-vis* the remaining suppliers of

MOJ00000276

not indicate that no coordinated behavior is present.[45]

(137) Asymmetries resulting from market shares are also not suitable for reflecting the business power relations between the oligopolists SAT, Phonak and Oticon in the market for hearing aids. For the business data obtained in the instant case show that the power relations between the oligopolists SAT, Phonak and Oticon in the hearing aid market is extremely balanced.

- **Total sales volumes** in the worldwide hearing aid business are comparable. For SAT, Phonak and Oticon, they are each between 550 and 650 million EUR. The integration of SAT into the Siemens corporate group to that extent does not impair the symmetrical set-up in the relevant market.
- The three leading manufacturers constitute an oligopoly not just in Germany **but in Europe and throughout the world as well**. In Europe, the combined market shares are at over 70%. The market shares of the oligopolists in each case lie in a range between approximately 20 and 30%. Worldwide, the combined market share is over 65%. The market shares of the oligopolists are close to one another, with a tight spread of about 5%.
- **Production costs** for all hearing aids sold (machinery, salaries, overhead, etc.) for all three oligopolists are between 25-35% of sales. Each of them has inexpensive production sites in China and/or Poland.
- **R&D expenditures**, including expenditures for licensing fees, are for each of them between 5% and 10% of sales. They are thus around the average R&D costs for companies operating in medical technology.[46]
- **Sales costs** for all three oligopolists are at around 20-30% of sales.
- All members of the oligopoly have at least two hearing aid brands, such that they are in a position to implement a **multi-brand strategy** in the market.
- So-called "**gross margin**" is a figure representing the percentage share of sales that is left over after production costs are deducted. It is a key number for assessing the profitability of a business. According to an October 10, 2006 Company Report by Dansk Equities for Wiliam Demant[47], gross margins for Oticon and Phonak are 69% and 67%, respective. According to the information available, the gross margin for SAT, which is not published, is [...] and thus just under the figures for Phonak and Oticon. Thus, Phonak, Oticon and Siemens are to be assigned to the top bracket of companies in medical technology. The key numbers of the oligopoly members are thus not only very similar, but in comparison to other sectors bear witness to an extraordinarily high profitability of the companies.

---

[45] On this point, see also Monopoly Commission, HG 2004/2005 "Mehr Wettbewerb auch im Dienstleistungssektor!" ["More Competition in the Service Sector Too!"], Baden-Baden 2006, margin number 505 *et seq.*

[46] See SPECTARIS 2006 Sector report, p. 5 and p. 30; www.spectaris.de.

[47] October 10, 2006 Danske Equities company report for William Demant, Appendix 8E to William Demant/Oticon Letter of January 5, 2007.

- Besides that, a company's economic power is measured by so-called **EBITDA**. EBITDA is an economic indicator that depicts the profit and cash flow produced by a business. Thus, EBITDA does not look, for example, at a company's "leeway for accounting creativity," insofar as interest, taxes, write-offs on fixed assets and write-offs on intangible assets are affected. To analysts, EBITDA is one of the key indicators of a company's business success.

- SAT's, Oticon's and Phonak's EBITDA in 2006 was between 25% and 35% of sales. In the process, Phonak's EBITDA grew sharply between 2003 and 2006 and caught up with the EBITDA values for Oticon and SAT. Hence, this earnings indicator as well is very comparable and confirms the high profit margins achieved by the members of the oligopoly throughout the world with their products.

(138) Consequently, then, despite the non-symmetrical breakdown of market shares, the business resources of the three oligopolists in the hearing aid business are very similar. This is true not just for sales revenues, but also for the cost structures and core indicators of the economic success of SAT, Phonak and Oticon.

(139) In its comments on the deficiency notification letter, Siemens spoke in opposition to these principles and factual determinations. In its view, the way the three leading manufacturers are organized, with respect to financial power, inclusion in a corporate group, decision-making structures, market set-up / marketing presentation and R&D costs, are so different that there can be no talk of any "symmetry" of these suppliers as found by the Decision Division.[48]

(140) The Decision Division is of the opinion that the group structure of the Siemens corporate group, taken on its own, is no indication that, in markets structured as an oligopoly, the company cannot have participated in coordinated behavior with companies that are set up differently with respect to their financial power and their other business resources. This would in any event be present if the company belonging to a corporate group, based on its particular resources in the relevant market, initiates competitive behavior that prevents concerted oligopolistic behavior. That is not the case here. SAT, a subsidiary of Siemens, with respect to operating data in the hearing aid business, is set up in a similar fashion to Phonak and Oticon – this was shown by the Decision Division based on the indicators presented above. In the area of component supplies (chips), in the past there were only intra-company supplier relations with Infineon. Today, however, Infineon no longer belongs to the Siemens Group. For the rest, SAT is also not dependent on the resources of the

---

[48] Siemens, Comments on Deficiency Notification, p. 4 *et seq.*

adjustment software. The advantage of this is that the hearing aid acoustician no longer must enter the client data into each individual adjustment program but, using the interface between NOAH and manufacturer's NOAH adjustment software, may always access the client data regardless of which adjustment program he is working just then. NOAH can be combined with every manufacturer's adjustment program (via a hearing aid adjustment module); the prerequisite for this is that the adjustment software be certified by HIMSA. Also through HIMSA, eTONA, a program to support electronic ordering, and NOAHlink, a hardware accessory to link the computer and the hearing aid, are distributed to hearing aid acousticians. In 2002, it was decided to expand the number of partners with SAT and Starkey. For that reason, a new partnership, HIMSA II, was founded.

(179) HIMSA I and HIMSA II were registered with the KOM. HIMSA I was granted a Comfort Letter, while the registration of the By-Laws and Partnership Agreements of HIMSA II became ineffective when the 1/2003 Order went into effect.

### 6.1.2.2 Licensing of Hearing Aid Technology

(180) Especially the leading hearing aid manufacturers, SAT, Phonak and Oticon, are "intertwined" by a series of reciprocal licensing and cross-licensing agreements. This is also true, although to a far lesser extent, for the next following competitors GN ReSound, Widex and Starkey. Reciprocal licenses continue to recur because the manufacturers' focus of development is very similar and for that reason the threat of patent disputes exists over and over again. Companies frequently work on product enhancements for which competitors have already filed patents. The HIMPP-maintained patent database of all patent specifications relevant to hearing aids simplifies identification of corresponding parallel developments. As a rule, the companies then agree on a reciprocal license with no fees.[63] Chiefly licensed are features/function in the process of signal transmission and programming, but so too are hardware components such as the tubes used for Open Feed-in and end pieces or die casting processes for manufacturing hearing aids.[64] In what follows, the collectivization of application-related technology between the oligopolists SAT, Phonak and Oticon shall be discussed using the example of the "Patent Cross License and Option Agreements" entered into between these companies.

(181) In 2006, Phonak entered into two "Patent Cross License and Option Agreements" (a) with Oticon and (b) with SAT. In them, the parties to the agreement reciprocally grant each other the right to request from the other party to the agreement licenses at no

---

[63] SAT Discussion on February 22, 2007, Note p. 4, pg. 796 d.A
[64] See specifically Phonak Letter of December 12, 2006, Appendices II 5.1 and II.5.2; II.6.1 and II.6.2, pg. 147 et seq. d.A.; Siemens Letter of January 05, 2007, Appendix 1, pg. 263 d.A. LO Wettbewerber I; Oticon, Letter of January 05, 2007, Appendix 2A, pg. 161 et seq. d.A. LO Wettbewerber I, Appendix volume.

allowable market share threshold of 20% for the Group Exemption Directive to be applicable (Article 3 paragraph 1).[81]

(210) In addition, the exchange of patents in the market for hearing aids – and this applies to HIMPP just as much as to the licensing agreements between the manufacturers – simply does not have the aim of guaranteeing the creative freedom of product development[82], but the aim of shaping the product on the same technological basis and preventing medium-term advances in development by competitors. The Commission regards the risk of collusion through such agreements as comparatively high in narrow oligopolies and high barriers to market entry.[83] To that extent, even the gains in efficiency brought about by the licensing, which Siemens, referring to the TT Group Exemption Directive, submits are positive factors for far-ranging licensing[84], cannot outweigh the competition-dampening effects. This is all the more true as possible gains in efficiency through the reciprocal cost-free licensing did not in the past lead to corresponding price advantages for the consumers.

(211) The participating companies have submitted that, in particular, the success or failure of newly introduced models has a clear effect on the market share of the relevant competitor and that the manufacturers were therefore in a constant **innovation competition over the introduction of new models**. This is supported, they argue, by the very short product cycles, in particular in the upper price segment. The market, the claim, is determined by short product life cycles and ongoing competition over product enhancements. This opinion is also shared by key competitors SAT and Oticon. Both Phonak and Siemens, in their Comments on the Deficiency Notification Letter of the Decision Division, repeated their opinion that the German hearing aid market is characterized by intensive competition for innovation. Siemens argued that only by considerable investment efforts and new products were market shares won back in competition that otherwise would have been lost. Dynamic competition, it states, is characterized precisely by the fact that competitive advances with gains in market share were countered by other competitors by means of their own increased competitive advances.[85] Even in Phonak's view, it corresponds to nothing less than the ideal image of competition that innovative advances of one competitor are countered by product improvements of other competitors. Here, it states, the speed of innovation in the hearing aid industry is especially high.[86]

---

[81] More stringent requirements for reciprocal agreements between competitors, see Guidelines for Application of Article 81 of the EC Treaty to technology transfer agreements (2004/C 101/02), margin number 78.
[82] TT Group Exemption Directive Guidelines, margin number 111.
[83] TT Group Exemption Directive Guidelines, margin number 136, 138 et seq., 143
[84] Comments on Deficiency Notification Letter, p. 8 et seq.
[85] Siemens Comments on Deficiency Notification Letter, p. 10.
[86] Phonak, Comments on Deficiency Notification Letter, S. 15.

(250) **In summary**, the Decision Division is of the opinion that the findings regarding competition on price and terms do not make it possible to recognize any clear indications of significant competition in the oligopoly. A fundamental ground for this overall assessment is that, with the start of digitalization, the hearing aid manufacturers not only divided up the market into different price segments but, despite the considerable technical distortions caused by digitalization, were also able to stabilize these price segments over time. The list price structure, like the list prices, has basically remained constant. Furthermore, the price level too – as measured by average manufacturer's selling prices – was also basically able to be kept constant or even, in the segment with the strongest sales, even raised. Against the background of sharply increased volumes and the circumstance of considerable economies of scale in this sector[94] this appears extraordinarily astounding. Insofar as price competition can be established, this came primarily from competitor GN ReSound, and specifically to compensate for losses of market share. By contrast, the price behavior of the oligopolists – even as measured here by their average manufacturer's selling prices – after small fluctuations clearly grew closer. It was impossible to ascertain the asserted competition over terms, and in any case it had no discernible significant effect on the evolution of average manufacturer's selling prices. To that extent, the asserted competition over terms is not a sufficient indication of functioning competition within the oligopoly[95]. Furthermore, neither the claimed price competition nor the claimed competition over terms had any discernible effect on the changes in market shares. The market share gains of Phonak that can be established did not in any case come at the expense of the other oligopolists to any relevant extent, and even the gains in market share from the outsiders are not the consequence of price campaigns, but are basically the result of Phonak's more successful product introduction strategy combined with a parallel serious error in product policy on the part of its competitor GN ReSound.

### 6.1.3.3 Coordination and Sanctions Mechanisms in the Oligopoly

(251) The conclusions about the efficacy of the coordination and defense mechanisms in the oligopoly directly follow from the above-mentioned structural conditions and their effects on internal competition. Based on the multiple already existing coordination mechanisms in the technical development area as well as in the area of prices, breaches of the concerted oligopolistic behavior can be sanctioned over the short term and in a graduated manner. In the technical area of development, oligopolists who do not hold to the unwritten consensus can be excluded from exchange and from licensing agreements and their new developments can be systematically attacked with the argument of patent infringements. In the price area, relevant warnings can be

---

[94] *E.g.*, Exhibit 8 E to Oticon Letter of January 05, 2007, Danske Equities Company Report on William Demant, October 10, 2006, p. 4, pg. 1023 (*verso*) d.A..
[95] Rs. T-464/04 "Independent Music Publishers and Labels Association (Impala)/Kommission";

MOJ00000317

(259) An examination of barriers to market entry and potential competition is given great weight in the assessment under merger law. Just as market share provides indications of the relationship of the participants in the concentration to their current competitors, the barriers to market entry provide information regarding the significance of potential competition on the market affected. In the instant case, the market for the production and distribution of hearing aids for the hearing aids acousticians' retail trade characterized by a series of market-structural and strategic barriers to market entry, which in their totality confront the entry of potential competitors. Here it should be noted that, due to the considerable investments in research and development and the economies of scale required for market entry, a market entry cannot be limited to Germany, even though Germany is the market in Europe with the strongest sales and the second largest market in the world.

### 6.1.5.1 Structural Barriers to Market Entry / Market Phase

(260) The requirement of close geographic contact between hearing aid manufacturers and hearing aid acousticians represents a *structural* barrier to market entry. For geographic proximity and on-site service is a basic prerequisite for the listing of a hearing aid manufacturer (see also *supra*, margin number 109).

(261) What is determining the market success of hearing aids today - alongside the above-mentioned technological optimizations - are purely subjective "feel-good" factors. Consequently, the market positions of the companies already active on the market are established and, in the opinion of the Decision Division, scarcely subject to challenge. What this leads to is that potential competitors, who would have to take upon themselves the cost-intensive and tedious processes of development for a market entry, are deterred. The high costs for development of a digital hearing aid of one's own, combined with the economies of scale needed for successful market cultivation, make market entry difficult and, in the past, have even led to smaller competitors such as Acousticon losing all significance on the market for production and distribution of hearing aids. Against the background of a market for hearing aids in Germany that is largely "allocated out," the market position particularly of the oligopoly consisting of SAT, Phonak and Oticon structurally ensured.

### 6.1.5.2 Strategic Barriers to Market Entry

(262) The barriers to market entry described are strengthened by the *strategic* behavior in particular of the oligopolists. Both as regards basic patents (HIMPP) and patents needed for product enhancements, they have a network of patents that favors a sealing off of the hearing aid market against potential competitors. Any third party development directed towards the hearing aid market would thus constantly contain within itself the danger of patent infringement. Comparable strategic barriers to

market entry also exist if a potential hearing aid manufacturer wanted to introduce its product portfolio to German hearing aid acousticians. If it does not have a distribution license from NOAH and HIMSA-certified adjustment software, in practice it has no prospect of being listed with a hearing aid acoustician. He would have to distribute the adjustment software as a "stand-alone version" to hearing aid acousticians, for the latter to then enter the measurement data manually. In the opinion of the Decision Division, this would be an insurmountable barrier to market entry onto the German market. To that extent, there is in practice no prospect of an entrance onto the German market for the production and distribution of hearing aids to the hearing aid acoustician retail trade contrary to the interests of the established manufacturers.

### 6.1.5.3 Significance of Suppliers Sonic and auric

(263) It is not to be expected that Sonic and auric, which currently serve exclusively the abbreviated treatment channel, could become important current competitors in the hearing aid acoustician retail trade distribution channel. Hearing aid manufacturers which use the abbreviated treatment channel are currently refused access to hearing aid acousticians. In its survey of hearing aid acousticians, the Decision Division was unable to find any case in which a hearing aid acoustician has listed a supplier competing with it through the abbreviated treatment channel.

(264) The Decision Division regards a corresponding listing to any appreciable extent as unlikely in the future as well. The pricing of suppliers in the abbreviated treatment channel is cheaper than in the hearing aid acoustician retail trade. This mainly has to do with the fact that the services billed for by the hearing aid acoustician are either not incurred in the abbreviated treatment channel or are more favorably priced. The abbreviated treatment channel to that extent also leads to more price transparency for the end customer. On the other hand, due to the lack of price transparency for end customers, the hearing aid acoustician retail trade can not only shift the high manufacturer's selling prices onto the end customer, but can also price its own services so high that an individual hearing aid is in part a multiple of times more expensive than the manufacturer's selling price. To that extent, the hearing aid acoustician retail trade has no interest in opening its own sales channel to suppliers to the abbreviated treatment channel. For this would lead to increased pressure on their own end prices.

### 6.1.5.4 No Market Entries in the Past

(265) Over the last ten years, there have been no attempts at market entry on the German hearing aid market for production and distribution to the hearing aid acoustician retail trade. Only Sonic, in the year 2000, entered the German market, but was unable to establish itself with hearing aid acousticians and today serves only the abbreviated

MOJ00000321

time frame foreseeable for all manufacturers. Competitive behavior is thus already quite transparent for the oligopolists. The concentration will make the market more transparent and clearer with respect to competition over new product introductions.

(316) The Decision Division has already explicitly set out that the tight customer connections and the ongoing customer care, combined with the ZVEI reporting system, has sharply increased transparency as regards the market share structure and pricing. It was through this that the market upheavals in the wake of digitalization did not lead to a loss of transparency. Today, the ZVEI reporting system is a further strong instrument for creating market share and price transparency, for recognizing breaches and, as needed, to instituted countermeasures. Together with the extensive transparency regarding technologies and the oligopolists' "technological lock-step cadence," competitive advances, either through the introduction of new products and/or reductions in the manufacturer's selling price, even for individual price segments on the market, can be immediately recognized and picked up.

### 6.2.6 No Disintegration of the Oligopoly's Market Share After the Concentration

(317) The Decision Division is not of the opinion that the market share of the oligopoly will significantly disintegrate after the concentration. Phonak itself does not assume that the concentration will have disintegration effects and provides as a rationale that in the past neither the takeover of Unitron (by Phonak), nor the takeover of Werner (by Oticon) nor Rexton (by Siemens) led to corresponding disintegrations of market shares.[110] Even if Phonak after the takeover could not make complete use of GN ReSound's market position for itself, the corresponding disintegrations would be picked up by the other oligopolists. A shifting of GN ReSound's market position to other competitors is not to be expected just by reason of the concentration, which benefits not only Phonak but the other oligopolists, too.

### 6.2.7 Market Results

(318) The hearing aid industry is an extraordinarily profitable economic area. This is true not only in comparison to other industries, but also when compared to the highly profitable medical technology. The following graph show a comparison of the gross margins of companies in the area of medical technology.

**Graph 9: Gross Margins in Top Group - Medical Technology**

---

[110] Phonak Analyst Meeting of October 2, 2006, Exhibit 6 to Oticon Letter of January 5, 2007.



Source: Danske Equities and Company data

(319) From the graph it can be seen that all leading hearing aid manufacturers, with gross margins of 60-70% of sales, are among the most profitable industries. SAT is not shown there since it publishes no data hereon. By its own statements, SAT's gross margins lie between the comparative values for GN ReSound and Widex.

(320) As the following graph shows, the profitability of a company appears to correlate to its market share.

Graph 10: EBITA Compared to Market Share



* Please note that differences in group structure reduce the margin in William Demant (higher proportion of low-margin retail business) where the opposite is true for Widex where the reliance on more indirect sales channels in key markets gives the company a higher fundamental level of profitability.

Source: Carnegie Research

MOJ00000337