# EXHIBIT 7

## License Agreement
## Thin Tube Technology

between

**GN ReSound A/S**
Maarkaervej 2A
DK-2630 Taastrup

- subsequently referred to as "Licensor" -

and

**Willam Demant Holding A/S**
Strandvejen 58
DK – 2900 Hellerup

- subsequently referred to as "Licensee" –

- Licensor and Licensee subsequently jointly referred to as the "Parties" -

### Preamble

(1)    **Whereas,** the Licensor has developed a technology where the use of Thin Tubes in combination with partially open ear mold provides a new generation of BTE products with greatly improved comfort and cosmetic appear (the "Thin Tube Technology").

(2)    **Whereas,** the Licensor is the owner of several Patents and Design Rights concerning Thin Tube Technology listed in Annex A.

(3)    **Whereas,** the Licensee is a worldwide distributor of hearing systems and is interested to obtain a license with respect to Licensor's Thin Tube Technology.



EXHIBIT

JX 14



:ONFIDENTIAL - ATTORNEYS' EYES ONLY                                    DEM012901

(4)     Whereas, Licensor has offered in addition to this License Agreement to produce
        Standard Thin Tubes with identical characteristics and quality on a large scale basis and
        to sell them to Licensee and other licensees under a supply contract to be entered into
        separately. The licensees can therefore choose whether to produce the Thin Tubes
        themselves under the license or whether to purchase the Thin Tubes from Licensor

 

(4) Whereas the Parties on 19 January 2005 have signed a Term Sheet related to this
    Thin Tube Technology

Now, therefore, the Parties agree as follows:

## Article 1
### Definitions

1.1     "Affiliates" or "Affiliated with" shall mean with respect to any person, any other person
        that, directly or indirectly, controls, is controlled by or is under common control with,
        that person, provided however, that in each case any such other person shall be
        considered to be an Affiliate only during the time during which such control exists. For
        purposes of this definition, "control" (including, with correlative meaning, the terms
        "controlled by" and "under common control with"), as used with respect to any person,
        shall mean the possession, directly or indirectly, of the power to direct and/or cause the
        direction of the management and policies of such person, whether through the ownership
        of voting securities, by contract or otherwise. For purposes of this definition, "person"
        means an individual or any legally recognized entity, including any corporation,
        partnership, limited partnership, limited liability company, association or trust.

1.2.    "Customised Products" shall mean any hearing aids which can be connected to the ear
        of the user by means of a Thin Tube, which is not a Standard Thin Tube, because a
        different connector is used to connect to the hearing aid.

1.3     "Dedicated Products" shall mean any hearing aids that can only be connected to the ear
        of a user by means of a Thin Tubes being either Standard Thin Tubes or Customised Thin
        Tubes.

WDH GN Thin Tube License 26-05-05

ONFIDENTIAL - ATTORNEYS' EYES ONLY

1.4    "**Dedicated Thin Tubes**" shall mean Thin Tubes which are sold by Licensee with the purpose or possibility of being used for the Dedicated Products.

1.5    "**Dependent Right**" shall mean any invention or development of know-how with respect to the Thin Tube Technology made after the Effective Date which cannot be used without a license to the Patents because it makes use of any invention protected under the Patents.

1.6    "**Design Rights**" shall mean all Design Rights and design right applications of Licensor as listed in Annex A.

1.7    "**Effective Date**" shall mean the date of signature of this license agreement.

1.8    "**Licensed Products**" shall mean "Dedicated Products", and "Optional Thin Tubes".

1.9    "**Optional Products**" shall mean any hearing aid that can be connected to the ear of the user by means of a Thin Tube like a Dedicated Product, but which can alternatively also be connected to the ear of the user by other means not using the Patents and/or Design Rights, in particular the common hook/1,93 mm ID tube/ear mold and further can be fitted to the users needs using Licesees fitting software dedicated for the Optional product using an Optional Thin Tube.

1.10    "**Optional Thin Tubes**" shall mean any Thin Tubes as described in the Patents and/or Design Rights which are sold by Licensee to customers of Licensee with the purpose or possibility of being used for Optional Products.

1.11    "**Patents**" shall mean all patents and patent applications of Licensor as listed in Annex A.

1.12    "**Sold**" shall mean the act of selling, leasing or otherwise placing, transferring, distributing, providing, furnishing for use or disposing of the Licensed Product by Licensee to someone not Affiliated with Licensee within the Territory. The number of products Sold shall mean the total number Sold subtracted by the number of same products returned for credit in any given period.

1.13    "**Standard Thin Tubes**" shall mean the Thin Tubes marketed for the ReSoundAIR product or any subsequent set of tubes that are appointed Standard thin Tubes because they are used by both licensor and licensees.

1.14    "**Term of the License Agreement**" shall mean the term from the Effective Date until expiration of the last of the Patents or Design Rights listed in Annex A.

WDH GN Thin Tube License 26-05-05

DEM012903

1.15   **"Territory"** shall mean the European Union, the United States of America, Japan and Australia irrespective of the fact that not all Patents and/or Design Rights in Annex A are issued or applied for in all the countries mentioned.

1.16   **"Thin Tubes"** shall mean any pre-formed tube less than 3 mm in outer diameter as described in the Patents and/or Design Rights.

1.17   **"Thin Tube Technology"** shall mean hearing aids that can be connected to the ear of the user by means of a Thin Tube.

## Article 2
### License grant

2.1   Licensor hereby grants to Licensee, under the terms and conditions of this Agreement, a royalty bearing, non-exclusive, non-transferable license to make, have made, import, use, offer to sell and to sell the Licensed Products in the Territory.

2.2   Licensee is not entitled to assign the license or to grant sublicenses without the prior written consent of Licensor, except to its Affiliates.

## Article 3
### Cross license

3.1   The parties agree to grant each other a royalty free, non-exclusive, non-transferable cross-license to all Dependent Rights. However, this cross-license shall not take effect before expiration of one year after the first sale of any product in which the Dependent Right is used.

3.2   The parties agree to negotiate in good face about cross-licensing of any invention or development of know-how outside a Dependent Right.

WDH GN Thin Tube License 26-05-05

5

## Article 4
### License fees

4.1    Licensee shall pay to Licensor the following license fees:

    4.1.1    A one-time-payment of € 105.000 within 30 days after the Effective Date.

    4.1.2    A one-time-payment of € 20.000 within 30 days after the Effective Date, if Licensee wishes to sell Optional Thin Tubes for Optional Products.

    4.1.3    A running license fee of € 2,50 for each Dedicated Product sold.

    4.1.4    A running license fee of € 0,20 for each Optional Thin Tube sold. However, the one-time-payment by Licensee relating to Optional Thin Tubes according to Article 4.1.2 shall cover all running license fees with respect to Optional Thin Tubes for 18 months starting from the first quarter after the months where the first Optional Thin Tubes are sold by Licensee.

4.2    All amounts due under 4.1 are exclusive of taxes and duties.

4.3    The license fees are due for 7 years starting from the first quarter after the month in which the first Licensed Product is sold by Licensee.

4.4    The total amount of running license fees according to Article 4.1.3 and 4.1.4 (excluding the one-time payments to Article 4.1.1 and 4.1.2) in each business year during the Term of the License Agreement is limited to € 250.000.

4.5    The license fees are to be paid on a half year basis based on the business year of the Licensee. They are to be paid not later than 60 days after the expiry of such half year. The license fees shall be paid to an account, as informed by Licensor, of an independent license administrator appointed by Licensor. The aggregate amount of all license payments will be paid to Licensor by the license administrator according to the terms agreed by the Licensor and the administrator.

4.6    Licensee shall under no circumstances pay higher license fees to Licensor than third parties being licensed to use similar Thin Tube Technology on the materially same terms.



WDH GN Thin Tube License 26-05-05

ONFIDENTIAL - ATTORNEYS' EYES ONLY

## Article 5
### Training and Consultancy

The one-time-payment according to Article 4.1.1 also covers up to 200 hours of engineering consultancy from Licensor staff in Denmark (or elsewhere if costs are reimbursed by Licensee) in relation to the usability by Licensee of the Thin Tube Technology. As part of the training and consultancy, Licensor offers to assist with having necessary tooling made by experienced tooling providers to Licensee without Licensor being entitled to any mark-up of costs deriving from such tooling costs.

## Article 6
### Statement and Records

6.1    Licensee shall keep proper accounts of Licensed Products Sold and, on thirty (30) days notice, shall be available for inspection and audit by License Administrator, acting in confidence, during normal business hours; *provided, however*, that Licensor shall not cause such an inspection and audit to occur more than once in any given twelve (12) month period, and *provided, further*, that all such inspections and audits shall be conducted in such a manner as to not unreasonably interfere with the conduct of the Licensee's regular business activities.    License Administrator is to hold in strict confidence any information obtained from Licensee or of which he becomes aware during such inspection and audit and to use such information solely for the purposes of this Agreement. License Administrator shall disclose no information to Licensor other than the amount of any shortfall or overpayment by Licensee. Licensor bears all costs related to such audit, except as outlined in clause 6.2.

6.2    Should an audit pursuant to Article 6.1 reveal a substantial payment shortfall by Licensee, the amount of the shortfall shall be paid promptly by Licensee after the discovery thereof, together with interest thereon calculated at the rate of one percent (1%) per month from the date such license fee should have been paid and the Licensee shall exceptionally undertake to reimburse Licensor against any costs incurred in relation to such audit. Should an audit pursuant to Article 6.1 reveal an substantial overpayment, the amount of the overpayment shall be paid by Licensor to Licensee promptly after the discovery thereof, together with interest thereon calculated at the rate of one percent (1%) per month from the date such overpayment was made.



WDH GN Thin Tube License 26-05-05

CONFIDENTIAL - ATTORNEYS' EYES ONLY

6.3     Licensee shall provide the License Administrator with a written statement of the number of sold units certified by the auditor of Licensee, not later than sixty (60) days following the end of each half year, based on the business year of the Licensee. The License Administrator shall not disclose this written statement to Licensor. The license administrator may only advise Licensor whether the amount due in license fees according to the written statement differs from the amount actually paid by Licensee and, if so, by how much.

6.4     Licensee is obliged to declare to Licensor any type of Dedicated Product and any type of product not defined in this agreement that may be used in conjunction with the Thin Tube Technology at least five (5) days after commencing sale of such product.

## Article 7
### Duration

7.1     This agreement shall continue until the last expiration of any of the patents listed in Annex A.

7.2     In case of any material default on either side of the agreement in performing its obligations under the agreement, the other party can set the defaulting party a deadline of thirty (30) days to rectify the problem. In case that the defaulting party does not rectify the problem and no other resolution can be reached, the other party can terminate the agreement with a notice period of further sixty (60) days.

## Article 8
### Enforcement of the Patents and Design Rights

8.1     Licensor shall use reasonable efforts to prosecute pending applications to obtain applicable patent protection for and shall maintain the Patents and Design Rights.. Licensor shall decide in its discretion if the Patents and Design Rights will be enforced against third parties..

8.2     In any infringement suit brought or declaratory judgment action defended to protect any of the Patents and/or Design Rights pursuant to this Agreement, Licensor shall have the right, but not the obligation, to prosecute or defend such action in its sole discretion. Licensee shall reasonably cooperate in any such litigation at Licensor's expense and agrees to join such litigation if requested to do so, at no expense to Licensee. The total



WDH GN Thin Tube License 26-05-05

DEM012907

8

cost of any such infringement action commenced or defended solely by the Licensor shall be borne by the Licensor.

8.3   In the event that Licensor does not intend to prosecute or defend an action or enforce a Patent or Design Right, Licensor and Licensee may discuss whether Licensee may do so on behalf of Licensor, if Licensee agrees to pay all expenses and damages associated therewith. In such a case, Licensor agrees to join such action if required to maintain standing. However, it shall be Licensor's sole discretion whether to allow Licensee to prosecute or defend an action or to enforce a Patent or Design Right instead of Licensor.

8.4   Licensor and Licensee agree to notify each other promptly of each infringement or possible infringement of the Patents and/or Design Rights, as well as any facts which may affect the validity, scope, or enforceability of the Patents and/or Design Rights of which either party becomes aware, and Licensee shall provide reasonable assistance to Licensor, at Licensor's request and expense, in connection with any suit or action brought by Licensor to enforce the Patents and/or Design Rights in the Territory.

8.5   Third Parties' Intellectual Property Rights. Licensor will make every effort to ensure that the Thin Tubes do not infringe any third party's intellectual property rights. Nevertheless, if any third party claims infringement of its intellectual property rights by the Thin Tubes, Licensor will, at its option and expense, either (i) procure for Phonak the right to continue using such Thin Tubes or the allegedly infringing portions of the Thin Tubes, or (ii) replace or modify the Thin Tubes or the allegedly infringing portions of the Thin Tubes, so that it becomes non-infringing.

8.6   In case the Thin Tubes infringe on third party's intellectual property rights, and Licensor is not able to rectify the default as per Article 8.5, Licensor shall pay any financial claims made on Licensee by third party up to an amount equal to the total license and royalty fees paid to Licensor by Licensee under this Agreement.

8.7   If a pending Patent or Design Right is rejected in either the US or Europe, or a granted Patent or Design Right lapses or is successfully challenged by a third party in either the US or Europe, then the Parties agree to renegotiate the license fees in section 4.1.3 and 4.1.4 accordingly. Renegotiation should commence latest 30 days after the change in Patents or Design Rights status, and should be concluded no later than 60 days after commencing renegotiations. If renegotiations are not commenced, or no agreement can be reached within the specified timeframe, the dispute shall be resolved per Section 13. Any change in license fee shall be effective as of the date of change in Patents or Design Rights status.



WDH GN Thin Tube License 26-05-05

## Article 9
### Confidentiality

9.1     The Parties agree that the content of this agreement and all information exchanged between the Parties related to the Thin Tube Open Technology shall be kept confidential.

9.2     The afore-mentioned confidentiality obligation does not apply if and to the extent that disclosure is required by law or in connection with an assignment, license or sublicense of the Patents or Design Rights to which a party of this Agreement is entitled under the terms and conditions of this Agreement. In this case, the disclosing Party shall pass on the confidentiality obligations under this Article 9 of this Agreement to the receiving party.

## Article 10
### No-challenge

If Licensee or one of its Affiliates challenges one of the Patents or Design Rights, Licensor shall be entitled to terminate the agreement with immediate effect.

## Article 11
### No Warranties

11.1    Licensor warrants that it is the sole owner of the Patents and the Design Rights and it is entitled to grant the licenses granted under this Agreement.

11.2    Except as set out in Section 11.1 above, Licensor does not assume any warranty with respect to the Patents or Design Rights, especially with respect to their patentability and validity or their commercial exploitability, notwithstanding the provisions of clauses 8.1, 8.5 and 8.6.

## Article 12
### Purchase and Supply of Thin Tube related products

WDH GN Thin Tube License 26-05-05

ONFIDENTIAL - ATTORNEYS' EYES ONLY

12.1    The parties agree to discuss in good faith whether Licensee wishes to pursue an opportunity to purchase on fair market terms Standard or Dedicated Thin Tubes for Dedicated Products and/or Optional Thin Tubes for Optional Products (tubes and domes) from Licensor or any manufacturer appointed by Licensor.

12.2    A separate supply agreement will cover all aspects of supply terms, face out of products and pricing. This supply agreement is to be negotiated separately between the parties.

12.3    However, it shall be stated for the avoidance of doubt that Licensee is free to manufacture and sell Licensed Products itself under this license agreement, if Licensee wishes to do so.

### Article 13
### Choice of Law and Forum

13.1    This Agreement shall be governed by and construed in accordance with Danish Law.

13.2    All disputes arising out of or in connection with the present Agreement, including any question regarding its existence, validity or termination, shall be finally settled under the Rules of Arbitration of the International Chamber of Commerce, Paris by one or more arbitrators in accordance with the said Rules.

13.3    The seat of arbitration shall be Copenhagen, Denmark. The language to be used in the arbitration proceeding shall be Danish.

### Article 14
### Miscellaneous

14.1    Alterations, amendments and terminations of this Agreement require reference to this Agreement and written form. This shall also apply for this clause. This Agreement embodies the entire Agreement of the parties with respect to the Patents and Design Rights and any prior representation or agreement (whether express or implied and whether orally or in writing), including the term sheet between the Parties dated 19 January 2005 shall have no effect.


WDH GN Thin Tube License 26-05-05

ONFIDENTIAL - ATTORNEYS' EYES ONLY

11

14.2   The provisions of this Agreement shall be deemed independent and severable. If any
provision of this Agreement is held invalid or unenforceable, the parties agree to replace
this provision by a valid and enforceable provision as close as possible to the intended
commercial effect. The same shall apply in case of an omission.

14.3   This Agreement, including the license grant in Article 2 and the other rights, duties and
obligations of Licensee under this Agreement, is personal to and not assignable, or
transferable by Licensee, whether by merger, operation of law or in any other manner,
without the prior written consent of Licensor.

For and on behalf of                                    For and on behalf of
**GN ReSound A/S**                                      **William   Demant   Holding   A/S**

Taastrup, 31-05-2005                                    Hellerup, 2 / JUNE 2005

Nikolai Bisgaard, SVP IP & IR                           Niels Jacobsen, CEO & President

(Signature)                                             (Signature)

WDH GN Thin Tube License 26-05-05

ONFIDENTIAL - ATTORNEYS' EYES ONLY

12

## Annex A

**Patents**

| Title: | **Behind the Ear Hearing Aid System** |
| Priority: | 18-07-1997 from US Provisional Patent Application No. 60/053031 |

| Country | Status | Application | Filing | Patent | Grant |
|---------|--------|-------------|--------|--------|-------|
| AU | Granted | 98/84097 | 17-07-1998 | 738314 | 03-01-2002 |
| EP (CH/LI,DE, DK,FR,GB) | Pending | 98934610.1 | 17-07-1998 | | |
| JP | Pending | 503686 | 17-07-1998 | | |
| US | Pending | 09/341994 | 17-07-1998 | | |

| Title: | **Open Ear Canal Hearing Aid System** |
| Priority: | 10-01-1997 from US Patent Application No. 08/781714 |

| Country | Status | Application | Filing | Patent | Grant |
|---------|--------|-------------|--------|--------|-------|
| EP (AT,CH/LI, DE,DK,ES,FR, IT,NL,SE,UK) | Pending | 98902495.5 | 09-01-1998 | | |
| JP | Pending | 531203 | 09-01-1998 | | |
| US | Granted | 08/781714 | 10-01-1997 | 6275596 | 14-08-2001 |

| Title: | **A Retaining Member for an Earpiece** |
| Priorities: | 15-02-2003 from Danish Patent Application No. 2003 00229 |
| | 17-02-2003 from Danish Patent Application No. 2003 00239 |

| Country | Status | Application | Filing | Patent | Grant |
|---------|--------|-------------|--------|--------|-------|
| EP (Full designation) | Pending | 04075444.2 | 15-02-2004 | | |

WDH GN Thin Tube License 26-05-05

DEM012912

| US | Granted | 10/778646 | 13-02-2004 |
|----|---------|-----------|-----------|

---

## Design Rights

**Title:**     **Hearing Aid with Earpiece**
Priority:     01-04-2003 from European Community Design Application No. 000007893

| Country | Status | Application | Filing | Design | Registration |
|---------|--------|-------------|--------|--------|--------------|
| CN | Pending | 03367897.9 | 29-09-2003 | | |
| EU | Registered | 000007893 | 01-04-2003 | 000007893 | 01-04-2003 |
| JP | Pending | 2003-28932 | 01-10-2003 | | |
| US | Pending | 29/191014 | 30-09-2003 | | |



WDH GN Thin Tube License 26-05-05

CONFIDENTIAL - ATTORNEYS' EYES ONLY

Switzerland

Non-Exclusive

## LICENSE AGREEMENT

Phonak AG

Laubisrütistrasse 28
8712 Stäfa
Switzerland

between

Phone +41 1 928 01 0 .
Fax +41 1 928 03 90

**Phonak AG**
Laubisrütistrasse 28
CH-8712 Stäfa                    ("**Licensor**")

and

**William Demant Holding A/S**
Strandvejen 58
DK-2900 Hellerup                ("**Licensee**")

Regarding hearing aids with at least two microphones

### Preamble

a)      Licensor has developed a patent protected hearing aid instrument
        which is, according to the European Patent description in EP certificate
        no. 0 499 699 B1, known under the designation "Hearing aid with at
        least two microphones" and which can be operated by remote control
        ("Hearing Aid").

EXHIBIT

JX 17

EXHIBIT

Demant 34
7-31-07

b)  Licensee desires to obtain the right to make use of the patents related to the Hearing Aid and to manufacture and sell the Hearing Aid, and Licensor – owning the right to license patent rights and technical information pertinent to the Hearing Aid – is desirous of granting to Licensee on a non-exclusive basis a license for the use of the patent related to the Hearing Aid and for the manufacturing and sale of the Hearing Aid in the territory as defined below.

Now, therefore, the Parties agree as follows:

1.    Definitions

For the purposes of this Agreement the following terms have – in addition to the term Hearing Aid as defined in the preamble – the stated meanings (the singular includes a reference to the plural and vice versa):

1.1.    "**Party(ies)**" means Licensor and/or Licensee.

1.2.    "**Remote Control**" means the remote control of the Hearing Aid controlling the multi-microphone function in the Hearing Aid.

1.3.    "**Territory**" means the entire world.

1.4.   "Licensed Patent" means the patent rights corresponding to the technology protected by and according to Swiss patent certificate no. 681411 A5 and European patent no. 0 499 699 B1.

1.5.   "Technical Information" means business secrets, know-how, information and expertise, including technical knowledge, designs, drawings, data, and any other similar information, possessed by or available to, or controlled or controllable by, Licensor that relates to the manufacture, assembly, use, sale or service of the Product and does not belong to a third party.

1.6.   "Subsidiary" means a company in which Licensee or Licensor own more than 50% (fifty per cent) of the voting stock or over which Licensee or Licensor have otherwise a controlling influence by virtue of their holding of shares.

2.   Existing Contractual Relationship

Between the Parties certain mutual understandings and/or contractual relationships exist already with regard to the exploitation of the Hearing Aid which shall be converted hitherto by means of clarification and shall be regarded as superseded by this Agreement.

3.   License

Subject to the definitions hereabove and terms and conditions hereinafter, Licensor hereby grants to Licensee a non-exclusive right to make use of and exploit the Licensed Patent and Technical Information for the manufacture, use, sale, lease, repair and service of products

covered by the Licensed Patent in the Territory during the lifetime of
this Agreement.

4.    Transfer of the License and Sublicenses

    4.1.    Neither Licensee's rights nor its obligations of this Agreement
are transferable without the prior written consent of Licensor.

    4.2.    Licensee shall not grant sub-licenses without Licensor's prior
written consent which consent shall not be unreasonably
withheld.

    Licensee has, however, the right to grant without further consent
sub-licenses to all its present and future Subsidiaries. Licensor
shall be informed by Licensee in writing of such sub-licenses to
a Subsidiary.

    4.3.    In any event Licensee shall ensure proper performance of this
Agreement by each of its Subsidiaries or sub-licensee, if any,
and Licensee expressly warrants that any of its Subsidiaries or
sub-licensees, if any, will fulfil the terms and conditions of this
Agreement insofar as Licensor's interests and position are
concerned.

5.    Down-Payment and Royalties

    5.1.    Licensee shall pay to Licensor a non-refundable net lump sum
as down-payment in the amount of USD 75'000 (seventy-five
thousand US dollars) to be paid by bankers draft at the date
when Licensee decides to make use of the Licensed Patent

DEM013826

which decision must be taken by Licensee not later than December 31, 2000. Licensee shall notify Licensor once it has decided to make use of the Licensed Patent.

5.2.  Further, once Licensee has decided to make use of the Licensed Patent and to market, manufacture and sell the Remote Control, then Licensee shall pay to Licensor on an ongoing basis a royalty of USD 3 (three US dollars) per Remote Control produced by Licensee (or Subsidiaries or sub-licensees, if any) within the Territory.

5.3.  Within 30 days following the close of each calendar quarter Licensee shall provide Licensor with a quarterly statement in writing duly certified by an authorised officer of Licensee setting forth with respect to Licensee (and sub-licensees, if any) for that quarter concerned the quantities of Remote Controls manufactured and/or sold and the royalty due to the Licensor.

5.4.  All costs, such as stamp duties, taxes and other similar levies originating from or in connection with the conclusion of this Agreement shall be borne by Licensee. However, in the event that the government of a country imposes any income taxes on payments hereunder by Licensee to Licensor and requires Licensee to withhold such tax from such payments, Licensee may deduct such tax from such payments. In such event, Licensee shall promptly furnish Licensor with tax receipts issued by appropriate tax authorities so as to enable Licensor to support a claim for credit against income taxes which may be payable by Licensor in Switzerland.

6.    **Payment Terms**

As from Licensee's decision to make use of the Licensed Patent and to produce the Remote Control royalties shall be paid to Licensor by Licensee quarterly within 30 days following the close of each calendar quarter for all Remote Controls produced and/or invoiced (whether by Licensee or its Subsidiaries or sub-licensees, if any) during such quarter.

7.    **Currency and Interest**

7.1.    Subject to the written consent of Licensor all payments shall be made in US dollar.

7.2.    If Licensee is in default as to any payments, it shall pay to Licensor penalty interests at a rate of 12 % p.a. The non-payment of royalties within the 30 days period as agreed to in sec. 6 shall be deemed default without further notice.

8.    **Maintenance of Patents**

8.1.    Licensor shall maintain the patents and patent applications on which the Licensed Patent is based.

8.2.    Licensee will discuss the necessity and co-ordinate with Licensor any new patent applications and registrations of the Licensed Patent in new countries by and at the discretion of Licensor and at the direction of Licensor's patent attorney.



9.    **Right to Inspection**

9.1.    In order that the statements and reports provided for in sec. 5.3 of this Agreement may be verified, Licensee shall keep and maintain for a period of at least 3 (three) years, full, complete and accurate books and records recording the quantities of Remote Controls manufactured and/or sold by Licensee (or its Subsidiaries or sub-licensees, if any).

9.2.    Licensor is authorised to have these records inspected by an auditor selected by Licensor. The costs of any such inspection will be borne by Licensor unless significant irregularities chargeable to Licensee are revealed.

10.    **Infringement of Licensed Patent**

10.1.    Law suits against third parties for infringing the Licensed Patent in the Territory shall – unless directed otherwise by Licensor – be brought at the discretion, on the initiative and in the name of Licensee. Both Parties shall advise each other of any known or suspected infringement of the Licensed Patent by third parties. However, Licensor is, at its own discretion, entitled to sue third parties by its own or to join Licensee in a litigation versus third parties for infringing the Licensed Patent, but must notify Licensee about its intention and decision of an own or joint law suit within reasonable time as from the day Licensor became aware of the actual or potential infringement.

Costs incurred in connection with legal proceedings pursuant to this section 10.1. shall be borne by the Party at whose discretion the law suit was initiated and brought.

10.2. Any suits initiated and brought by third parties against the Remote Controls manufactured and/or sold by Licensee or against the Licensed Patent shall – unless directed otherwise by Licensor – be defended by Licensee.

Costs incurred in connection with legal proceedings pursuant to this section 10.2. shall be borne by Licensor if suits are initiated and brought against the Licensed Patent. If suits are initiated and brought against the Remote Controls manufactured and/or sold by Licensee costs incurred shall be borne by Licensee.

10.3. If a legislation of a country within the Territory does not permit Licensee to litigate on its initiative and in its own name, it is agreed that Licensor will act in such litigation as party..

10.4. In any event of litigation involving Licensee versus third parties Licensor shall – if so required by and at the expense of Licensee – assist Licensee with technical expertise in the protection against any infringement or in the defence against suits initiated by third parties. Further, no Party shall settle any suit, action or claim or make any concession or admission which may be prejudicial to the interest of the other Party without the prior written approval of the other Party .

Costs incurred in connection with legal proceedings pursuant to this section 10.1. shall be borne by the Party at whose discretion the law suit was initiated and brought.

10.2. Any suits initiated and brought by third parties against the Remote Controls manufactured and/or sold by Licensee or against the Licensed Patent shall – unless directed otherwise by Licensor – be defended by Licensee.

Costs incurred in connection with legal proceedings pursuant to this section 10.2. shall be borne by Licensor if suits are initiated and brought against the Licensed Patent. If suits are initiated and brought against the Remote Controls manufactured and/or sold by Licensee costs incurred shall be borne by Licensee.

10.3. If a legislation of a country within the Territory does not permit Licensee to litigate on its initiative and in its own name, it is agreed that Licensor will act in such litigation as party..

10.4. In any event of litigation involving Licensee versus third parties Licensor shall – if so required by and at the expense of Licensee – assist Licensee with technical expertise in the protection against any infringement or in the defence against suits initiated by third parties. Further, no Party shall settle any suit, action or claim or make any concession or admission which may be prejudicial to the interest of the other Party without the prior written approval of the other Party .

However, if Licensee decides not to make use of the Licensed Patent or if Licensee does not notify Licensor prior to December 31, 2000 stating that Licensee will make use of the Licensed Patent combined with the down-payment due under sec. 5.1, then this Agreement shall be deemed as automatically expired.

13.3. Termination

This Agreement can only be terminated

13.3.1. by written agreement of the Parties;

13.3.2. by either Party by appropriate written notice if the other Party commits, directly or indirectly, a substantial breach of any of its obligations under this Agreement and does not remedy such breach within sixty (60) days of receipt of written notice given by the Party requiring such remedy and warning prospective termination. If Licensee delays in making a payment of royalty or disbursement with more than sixty (60) days after having received a written reminder from the Licensor, it shall be considered a substantial breach of this Agreement.

14.    Miscellaneous

14.1. Either Party must not assign, sub-license (except to companies belonging to the Licensee's group or circumstances as agreed in sec. 4.2 above) or otherwise transfer this Agreement or any

However, if Licensee decides not to make use of the Licensed Patent or if Licensee does not notify Licensor prior to December 31, 2000 stating that Licensee will make use of the Licensed Patent combined with the down-payment due under sec. 5.1, then this Agreement shall be deemed as automatically expired.

13.3. Termination

This Agreement can only be terminated

13.3.1.  by written agreement of the Parties;

13.3.2.  by either Party by appropriate written notice if the other Party commits, directly or indirectly, a substantial breach of any of its obligations under this Agreement and does not remedy such breach within sixty (60) days of receipt of written notice given by the Party requiring such remedy and warning prospective termination. If Licensee delays in making a payment of royalty or disbursement with more than sixty (60) days after having received a written reminder from the Licensor, it shall be considered a substantial breach of this Agreement.

14.   Miscellaneous

14.1. Either Party must not assign, sub-license (except to companies belonging to the Licensee's group or circumstances as agreed in sec. 4.2 above) or otherwise transfer this Agreement or any

rights or obligations hereon without the prior written consent of the other Party.

14.2. This Agreement may not be modified or amended except in writing signed by both Parties.

14.3. Licensee shall not set off any amounts due under this Agreement against any claim it may maintain against Licensor.

14.4. The waiver by either Party of a breach or default in any of the provisions of this Agreement shall not be construed as a waiver by such Party of any succeeding breach of the same or other provisions nor shall any delay or omission on the part of either Party to exercise or avail itself of any right, power or privilege that it has or may have hereunder operate as a waiver of any right, power or privilege by such Party.

14.5. The provisions of this Agreement are severable, and any invalidity or unenforceability of any provision shall not affect the remainder of this Agreement. If any provision of this Agreement is declared invalid or unenforceable by a court of competent jurisdiction, such clause or provision shall be deemed to have been replaced by the valid clause or provision which most nearly achieves the intended economic purpose and effect of the invalid clause or provision, having due regard for the spirit of this Agreement.

15. **Notices**

Any and all notices and communications under this Agreement shall be made in the case of Licensee to:

William Demant Holding A/S
Attn. Niels Jacobsen
Strandvejen 58
DK-2900 Hellerup
Telefax: +45-39-27 79 00

15.1. in the case of Licensor to:

Phonak AG
Attn. Sören Larsen
Laubisrütistrasse 28
CH-8712 Stäfa
Telefax: +41-1-928 07 07

with copy to:

Froriep Renggli
Attn. Dr. Alessandro L. Celli
Bellerivestrasse 201
CH-8034 Zurich
Switzerland

Telefax : +41-1-383 60 50

unless previously changed by the addressee Party by appropriate written notice.

16.    **Applicable Law and Arbitration**

16.1.  This Agreement shall be governed by and construed in accordance with the laws of Switzerland.

16.2.  All disputes arising out of or in connection with this Agreement, including disputes on its conclusion, binding effect, amendments and termination, shall be resolved to the exclusion of the ordinary courts by a three-person arbitral tribunal in accordance with the International Arbitration Rules of the Zurich Chamber of Commerce. Each Party nominates an arbitrator. The arbitration shall be held in Zurich and be conducted in English.

The Parties hereto have executed this Agreement in two counterparts.

Date:  April 26, 1999

Licensor:                              Licensee:

Phonak AG, Stäfa                       William Demant Holding A/S, Hellerup

Peter Pfluger       Søren Larsen       Niels Jacobsen

DEM013825

CONFIDENTIAL
SUBJECT TO FED R. EVID 408

## LICENSE AGREEMENT

This License Agreement ("Agreement") is made this 1st day of July, 2006 ("Effective Date") by and between Etymotic Research Inc., an Illinois Corporation having a principal place of business at 61 Martin Lane, Elk Grove Village, Illinois 60007 ("ETYMOTIC"), and Oticon A/S (CVR. No. 42 33 42 19), a Danish corporation having a principal place of business at Kongebakken 9, 2765 Smorum, Denmark, on behalf of itself and its Affiliates (collectively, "LICENSEE").

WHEREAS, LICENSEE desires to make, have made, use, offer to sell, sell, repair and import Licensed Products,

WHEREAS, ETYMOTIC is willing to grant LICENSEE a license under the Licensed Patents to make, have made, use, offer to sell, sell, repair and import Licensed Products,

NOW THEREFORE, in consideration of the premises, ETYMOTIC and LICENSEE hereby agrees as follows:

1.    DEFINITIONS

1.1    "Licensed Product(s)" shall mean Directional Products and Low Battery Products, but shall specifically exclude (1) any products that include the directional microphone product commonly referred to as the C-MIC™ and generally disclosed in U.S. provisional application Serial No. 60/237,988 filed October 5, 2000 (now U.S. Patent No. 6,798,890), and (2) Array

Page 1 of 17



EXHIBIT
JX 167

CONFIDENTIAL
SUBJECT TO FEB. R. EVID. 408

Products.

     1.2    "Directional Product(s)" shall mean any hearing aid sold by LICENSEE that, but for the license granted under this Agreement, would infringe one or more claims in any of the Etymotic Directional Patents. LICENSEE represents and warrants that the complete list of all current products sold by LICENSEE that are subject to a running royalty under paragraph 3.1.2 is included in Exhibit B. The list may be altered from time to time when products are introduced or terminated.

     1.3    "Low Battery Product(s)" shall mean any hearing aid sold by LICENSEE that, but for the license granted under this Agreement, would infringe one or more claims in the Etymotic Low Battery Patent.

     1.4    "Array Product(s)" shall mean: (1) any faceplate assembly or finished hearing aid that includes three or more microphones, and which optionally includes at least one hearing aid circuit, a plastic support, a battery door, and battery contacts, and (2) any microphone assembly for incorporation into a faceplate assembly or finished hearing aid, which faceplate assembly or finished hearing aid includes three or more microphones and optionally includes at least one hearing aid circuit, a plastic support, a battery door, and battery contacts; that, but for the license granted under this Agreement, would infringe one or more claims in any of the Licensed Patents.

     1.5    "Directional Microphone" shall mean a microphone that has a single microphone

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEM012872

CONFIDENTIAL
SUBJECT TO FED. R. EVID. 408

cartridge enclosing a diaphragm, a first and a second spaced apart sound passage for communicating sound from an external sound field to each side of the diaphragm within the microphone cartridge.

    1.6    "Dual Omnidirectional Product(s)" shall mean hearing aids sold by LICENSEE that incorporate a configuration in which a two omnidirectional microphone configuration is used to achieve directivity in place of a single cartridge microphone.

    1.7    "Etymotic Directional Patents" shall mean U.S. Patent No. 6,285,771 and U.S. Patent No. 6,101,258, including any parent, other ancestors, continuations, continuations-in-part, divisionals, reexaminations, and reissues, and any past, present, or future foreign counterparts of said patents, parents, or ancestors.

    1.8    "Etymotic Low Battery Patent" shall mean U.S. Patent No. 6,704,424, including any parent, other ancestors, continuations, continuations-in-part, divisionals, reexaminations, and reissues, and any past, present, or future foreign counterparts of said patents, parents, or ancestors.

    1.9    "Licensed Patents" shall mean U.S. Patent Nos. 6,285,771, 6,101,258, and 6,704,424 and related patents according to 1.7 and 1.8.

Page 3 of 17

CONFIDENTIAL
SUBJECT TO FED. R. EVID. 408

1.10    "Affiliates" shall mean all direct and indirect corporate parents of LICENSEE and all present and future subsidiaries of all such direct and indirect corporate parents.

1.11    "Licensed Supplier" shall mean a third party licensee having a written license agreement with ETYMOTIC under one or more of the Licensed Patents to make, use, offer to sell and sell Licensed Products.

1.12    "Net Sales" shall mean the number (expressed in units) of Directional Products including a Directional Microphone made, used, or sold by LICENSEE and its Affiliates in any accounting period, in the United States, and in any foreign country where ETYMOTIC has at least one issued claim of the Etymotic Directional Patents which has not been held invalid or unenforceable and is infringed by a Directional Product, less the number (expressed in units) of Directional Products that are returned for full credit to LICENSEE and/or Affiliates after royalty has been paid on such units.

2.    GRANT

2.1    Subject to receipt by ETYMOTIC of the initial license fee in paragraph 3.1.1 below and any running royalties due under Paragraph 3.1.2 below, ETYMOTIC hereby grants to LICENSEE, and to the Affiliates defined in Paragraph 1.10 above, a personal, non-transferable, non-exclusive right under the Licensed Patents to make, have made, use, offer to sell, sell, repair and import Licensed Products.

Page 4 of 17

CONFIDENTIAL
SUBJECT TO FED. R. EV. ID. 408

2.2     Subject to receipt by ETYMOTIC of payment of the initial license fee in Paragraph 3.1.1 below, ETYMOTIC hereby releases and forever discharges LICENSEE from any and all claims, causes of action, claims or demands whatsoever for infringement by Directional Products of the Etymotic Directional Patents and by Low Battery Products of the Etymotic Low Battery Patent which ETYMOTIC has or may have had prior to the Effective Date.

2.3     No right to sublicense is granted by this Agreement. No license for products other than Licensed Products, or under ETYMOTIC patents other than the Licensed Patents, shall be implied by this license.

3.     ROYALTY

3.1     In consideration of the Grant of Article 2, LICENSEE shall make payments as follows:

3.1.1     In consideration of the general license, release, and covenants given by this Agreement, LICENSEE shall pay to ETYMOTIC an initial license fee in the amount of five-hundred thousand United States dollars ($500,000.00 USD). This initial license fee is payable upon the signing of this Agreement.

3.1.2     In addition to the foregoing initial license fee, LICENSEE shall pay to ETYMOTIC, a running royalty for Net Sales of Licensed Products as follows:

(a)     Subject to the exceptions of paragraphs (b) and (c) below,

Page 5 of 17



CONFIDENTIAL
SUBJECT TO FED. R. EVID. 408

LICENSEE shall pay to ETYMOTIC a running royalty of $5.00 per unit for Net Sales of Directional Products including a Directional Microphone on a quarterly basis, beginning July 1, 2006 and continuing throughout the term of this Agreement.

(b)     In consideration of the amounts due and/or paid under paragraph 3.1.1, LICENSEE shall not owe a running royalty under the Licensed Patents for a Licensed Product that is also a Dual Omnidirectional Product sold by LICENSEE.

(c)     Notwithstanding 3.1.2(a) above, if LICENSEE purchases a Directional Product from a Licensed Supplier that has paid a royalty to ETYMOTIC on that Product, such as a single cartridge directional microphone on which Sonion has paid a royalty to ETYMOTIC, then no further royalty on that Product or on a hearing aid incorporating that Product will be due under this Agreement.

3.2     Any amount due ETYMOTIC in accordance with paragraph 3.1.2 as the result of each Licensed Product being manufactured, used, sold, leased, imported, or otherwise transferred pursuant to this Agreement shall accrue at the time a Licensed Product is invoiced or shipped to a third-party customer or LICENSEE is paid by a third-party customer, whichever event occurs first, provided however, that if a Licensed Product is returned for full credit or an invoice for a Licensed Product is fully adjusted as an accommodation to the customer, the amounts payable to ETYMOTIC must be accordingly reduced immediately.   All net amounts accrued for the benefit of ETYMOTIC shall be deemed held in trust for the benefit of ETYMOTIC until payment of such amount is made pursuant to this Agreement.

Page 6 of 17



CONFIDENTIAL - ATTORNEYS' EYES ONLY

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

3.3     Unless otherwise specified in this Agreement, all payments due ETYMOTIC under this Agreement shall be paid within forty-five (45) days following the end of the fiscal quarter in which such payment accrues or LICENSEE otherwise incurs the obligation to pay such amounts.

3.4     LICENSEE shall pay to ETYMOTIC interest on any amounts not paid when due. Such interest will accrue from the fifteenth (15th) day after the payment was due at a rate two percent (2%) above the daily prime interest rate, as determined by Chase, or its successor entity, on each day the payment is delinquent, and the interest payment will be due and payable on the first (1st) day of each month after interest begins to accrue, until full payment of all amounts due ETYMOTIC is made.

3.5     LICENSEE shall make payment of any amount due ETYMOTIC under this Agreement in United States dollars.

3.6     LICENSEE shall keep, at its own expense, accurate books of account, using accepted accounting procedures, detailing all data necessary to calculate and audit any payments due ETYMOTIC from LICENSEE.

3.7     ETYMOTIC shall have the right, upon reasonable notice and during normal business hours, through an independent certified public accountant as to which LICENSEE does not have a reasonably well-founded objection, to audit the records of LICENSEE in order to verify

Page 7 of 17

DEM012877

CONFIDENTIAL
SUBJECT TO FED. R. EVID. 408

any payment made by LICENSEE pursuant to this Agreement. ETYMOTIC may not audit the records of LICENSEE more than once per fiscal year unless such audit reveals an underpayment by LICENSEE of more than 5%.

3.8     For each quarterly accounting period during the term of this Agreement, whether or not a payment is made for that period, LICENSEE shall submit a written report summarizing the data used to calculate the amounts paid or to determine that no payment is due. Each report shall be of sufficient detail to allow ETYMOTIC to verify all amounts paid and/or any non-payment, and shall specifically include the following:

(a)     a list of each Licensed Product and corresponding quantities, listed separately, for which a royalty obligation has accrued (as defined in paragraph 3.2 above) during such accounting period, such as product name and model numbers, part numbers or other designations used by LICENSEE to identify and correlate sales revenue or other consideration with products sold or otherwise transferred or used, for each unit of product covered by the report;

(b)     a list of each Licensed Product and corresponding quantities, listed separately, for which an allowance for a return or an accommodation constituting a full adjustment of the sales price has been taken during such accounting period, such as product name and model numbers, part numbers or other designations used by LICENSEE to identify and correlate sales revenue or other consideration with

Page 8 of 17



CONFIDENTIAL
SUBJECT TO FED. R. EVID. 408

products sold or otherwise transferred or used, for each unit of returned product covered by the report;

(c)    the amount of the royalties due for each Licensed Product covered by the report; and

(d)    the total royalties due for all Licensed Products covered by the report.

3.9    Each periodic payment and associated written report shall be certified as true, complete, and accurate by a statement signed by one of LICENSEE directors or officers.

3.10    If ETYMOTIC in the future grants to a third party a license to the Licensed Patents on more favorable royalty terms than those granted LICENSEE in this License Agreement, ETYMOTIC shall adjust the royalty terms of this License Agreement to give LICENSEE the benefit of the same more favorable royalty terms granted such third party from the date they are or were granted to such third party.

4.    MARKING

4.1    LICENSEE agrees to mark Licensed Products that are subject to a running royalty under paragraph 3.1.2 that are made, used, offered for sale, sold, or imported in the United States of America with the numbers of those Etymotic Directional Patents that are issued by the United

Page 9 of 17

CONFIDENTIAL
SUBJECT TO FED. R. EVID. 408

States Patent and Trademark Office.

4.2    The parties agree that LICENSEE may satisfy its obligations under section 4.1 above by updating, in accordance with its usual practices, LICENSEE-originated literature or packaging that is distributed together with such hearing aids.  ETYMOTIC understands that LICENSEE does not update such literature except when it must be reprinted to replenish supplies thereof, and LICENSEE will not be liable for distributing non-updated literature with such hearing aids.

5.    ASSIGNMENT

5.1    Except as part of a sale to an independent third party of the business to which this Agreement relates, LICENSEE shall not assign any of its rights under this Agreement to any other entity, whether directly, by operation of law or otherwise, without the prior express written permission of ETYMOTIC, subject to terms and conditions to be negotiated.

5.2    Subject to the foregoing, this Agreement shall be binding on the respective successors and assigns of ETYMOTIC and LICENSEE.

6.    TERM AND TERMINATION

6.1    The term of this Agreement shall commence on the Effective Date and shall end on

Page 10 of 17

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEM012880

CONFIDENTIAL
SUBJECT TO FED. R. EVID. 408

the date upon which the last to expire of any of the Licensed Patents expires, whether by statute or otherwise, unless it earlier terminates by operation of law, by a final decision of a court as to which an appeal is not possible or has not been taken, or by acts of the parties in accordance with the terms of this Agreement.

6.2.   In case of a material breach of this Agreement by LICENSEE, or in the event of a challenge by LICENSEE to the validity or enforceability of the Licensed Patents, ETYMOTIC shall have the right, without limitation of any other right it may have on account of such breach or challenge including but not limited to the right to receive the royalties provided in Section 3.1, to terminate this Agreement by giving LICENSEE at least sixty (60) days written notice of its intention specifying the cause for termination; provided, however, that if LICENSEE shall remedy such breach or challenge during such sixty (60) day period, then this Agreement shall not be terminated on the date specified in such notice.

6.3   LICENSEE, after any termination of this Agreement, including the expiration of the last of the Licensed Patents, shall render an accounting for all Licensed Products manufactured, used, sold, leased or otherwise transferred pursuant to this Agreement prior to the termination or expiration date. Such final accounting shall be made within sixty (60) days after the termination or expiration date.

6.4   Termination of this Agreement shall not excuse LICENSEE's obligation to pay ETYMOTIC royalties under Section 3.1 due ETYMOTIC at the time of any termination thereof, or

Page 11 of 17

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEM012881

CONFIDENTIAL
SUBJECT TO FED. R. EVID. 408

royalties under Section 3.1 due ETYMOTIC at a time after the termination date based upon

LICENSEE's manufacture, use, sale, lease, or other transfer pursuant to this Agreement prior to

termination.


6.5    Waiver by either party of any default shall not deprive such party of any right arising

by reason of any subsequent default.


7.    MISCELLANEOUS


7.1    Each party agrees not to publish or otherwise disclose any of the terms, conditions

or scope of this Agreement and any information or communications related to this Agreement

without the prior written permission of the other party, except, however, each party may disclose

such terms, conditions, scope, information or communications as may be required by law or

regulation, including Securities and Exchange Commission laws and regulations and similar laws

and regulations of countries other than the United States of America, or to enforce its rights under

this Agreement. In addition, ETYMOTIC and LICENSEE may each disclose the fact that this

Agreement has been entered into by the parties.


7.2    Neither ETYMOTIC nor LICENSEE shall be liable for any failure to perform or for

delay in performance hereunder which results from act of God, war, riot, fire, explosion,

governmental orders or restrictions, strikes or other labor troubles, or any other cause beyond the

reasonable control of the affected party. The party who is unable to perform or who is delayed in

CONFIDENTIAL - ATTORNEYS' EYES ONLY                    DEM012882

CONFIDENTIAL
SUBJECT TO FED. R. EVID. 408

performance on account of the foregoing shall promptly notify the other party hereto in writing and shall use its best efforts to recommence performance as soon as possible. In case such delay or failure shall continue for a period of more than three (3) months, the party adversely affected thereby may terminate this Agreement with a written notice to the other party hereto, without any liability being attached to either party hereto.

7.3     Any notice required or permitted to be given hereunder shall be in English and shall be sent by (i) prepaid registered mail, (ii) overnight courier with receipt signature requested, or (iii) facsimile to be confirmed by a letter to the following addresses or to any other addresses as one party hereto may advise the other party hereto in such a manner.

> If to ETYMOTIC:
> 61 Martin Lane
> Elk Grove Village, IL 60007
> Attention: Mead C. Killion
>
> If to LICENSEE:
> OTICON A/S
> Kongebakken 9
> 2765 Smorum
> Denmark
> Attention: Mikael T. Christensen

Any notice (i) delivered by prepaid mail shall be deemed to have been delivered seven (7) days after the time at which it was posted, (ii) delivered by overnight courier shall be deemed to have been delivered on the next business day after the date of receipt signature, and (iii) delivered by facsimile shall be deemed to have been delivered on the next business day following the facsimile transmission date. In proving service, it shall be sufficient to prove that the notice was

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEM012883

CONFIDENTIAL
SUBJECT TO FED. R. EVID. 408

properly addressed and delivered, signed for, or posted, as the case may be.

7.4    This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois, U.S.A., without regard to principles of conflicts of law.

7.5    Any amendments or additions to this Agreement shall not be valid unless executed in writing by duly authorized representatives of the parties hereto.

7.6    This Agreement sets forth the entire agreement and understanding between both parties hereto as to the subject matter of this Agreement and merges and supersedes all prior discussions, agreements, and understandings of any and every nature between both parties hereto, and neither party shall be bound by any condition, definition, warranty, or representation other than as expressly provided for in this Agreement.

7.7    This Agreement has been prepared jointly and shall not be construed strictly against either party.

## EXECUTION IN COUNTERPARTS

This Agreement is to be executed with multiple counterparts each of which shall, when completed with all signatures affixed, be deemed an original.

Page 14 of 17

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEM012884

CONFIDENTIAL
SUBJECT TO FED. R. EVID. 408

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed on their behalf as of the date first above written.

ETYMOTIC                                    OTICON A/S

By: _Mead C. Killion_                       By: _N_____

Printed or typed name:                      Printed or typed name:

_Mead C. Killian_                           Niels Jacobsen

Title: _President_                          Title: _CEO_

Date: _August 29, 2006_                     Date: _JULY 31, 2006_

Page 15 of 17

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEM012885

CONFIDENTIAL
SUBJECT TO PROTECTIVE ORDER

## EXHIBIT A

ANSI Standard S3.35-2004



CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEM012886



CONFIDENTIAL
SUBJECT TO FED. R. EVID. 408

## EXHIBIT B

## CURRENT PRODUCTS SOLD BY LICENSEE
### MEETING THE DEFINITION OF "DIRECTIONAL PRODUCT"
### AND SUBJECT TO A RUNNING ROYALTY

| PRODUCT | BRAND |
|---|---|
| – PRODUCT IDENTIFICATION TO BE PROVIDED BY OTICON PURSUANT TO ¶¶ 1.2 and 3.1.2 – | |
| ADAPTO ITE | OTICON |
| GAIA ITE | OTICON |
| ATLAS ITE | OTICON |
| GO ITE | OTICON |
| DIGIFOCUS ITE | OTICON |
| | |
| | |
| | |
| | |
| | |
| | |

Page 17 of 17

CONFIDENTIAL - ATTORNEYS' EYES ONLY

DEM012887