# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) ) ) | |
| Plaintiff, | ) ) | C.A. No. 05-422 (GMS) |
| v. | ) ) | |
| SONIC INNOVATIONS, INC., et al, | ) ) | |
| Defendants. | ) ) | |

**PLAINTIFF ETG'S OPPOSITION TO DEFENDANTS' BRIEF IN SUPPORT OF THEIR RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND REQUEST FOR NEW TRIAL ON THE ISSUES OF INFRINGEMENT AND VALIDITY**

Edmond D. Johnson (#2257)
Matthew A. Kaplan (#4956)
PEPPER HAMILTON LLP
Hercules Plaza Suite 5100
1313 Market Street
Wilmington, DE 19899-1709
Telephone: (302) 777-6500

*Attorneys for Energy Transportation Group, Inc.*

OF COUNSEL:

Marty Steinberg
HUNTON & WILLIAMS LLP
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Telephone: (305) 810-2500

Brian M. Buroker
HUNTON & WILLIAMS LLP
1900 K Street, N.W., Suite 1200
Washington, DC 20006-1109
Telephone: (202) 955-1500

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone: (804) 788-8788

May 9, 2008

# **TABLE OF CONTENTS**

I.      INTRODUCTION .................................................................................................1

II.     STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS...................3

III.    SUMMARY OF ARGUMENT .............................................................................3

IV.     CONCISE STATEMENT OF FACTS ....................................................................5

V.      ARGUMENT....................................................................................................7

  A.    APPLICABLE LEGAL STANDARDS ...................................................................7

    1.    Judgment As A Matter of Law................................................................7

    2.    New Trial ..............................................................................................8

  B.    OVERWHELMING SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S
      VERDICT OF INFRINGEMENT ........................................................................8

    1.    ETG Presented Overwhelming Evidence of Infringement of Claims 13, 14, 16
        and 19 of the '850 Patent ...................................................................10

        a.    The Jury Correctly Determined That the Infringing Devices Are
            "Programmed" ........................................................................14

        b.    Defendants' Challenge of the Jury's Finding of Infringement Under
            DOE Is Completely Baseless ....................................................18

           i.    ETG Presented Ample Particularized Testimony On An
              Element by Element Basis ............................................18

           ii.   None of the Elements are Vitiated by the Jury's DOE Verdict.........19

           iii.  No Prior Art Prevents Infringement Under DOE................................20

    2.    Substantial Evidence Supports the Jury's Verdict of Infringement Under
        DOE of Claims 1 and 2 of the '749 Patent ...........................................21

    3.    ETG Presented Substantial Evidence of Defendants' Inducement of
        Infringement.........................................................................................22

    4.    Defendants Failed to Prove that Prosecution History Estoppel Applies to
        Claim 19 of the '850 Patent or Claims 1 and 2 of the '749 Patent .......24

        a.    Claim 19 of the '850 Patent Was Never Amended....................24

        b.    Claims 1 and 2 of the '749 Patent Were Not Amended
            For Purposes of Patentability ...................................................25

C.    DEFENDANTS FAILED TO MEET THEIR BURDEN OF PROVING INVALIDITY 26

1.    Defendants Failed to Prove Invalidity by Clear and Convincing Evidence ..........27

2.    The Best Work Does Not Invalidate the Patents-in-Suit ......................................28

a.    The Best Work is Not a Prior Invention ...................................................28

b.    The Filter of the Best Circuit is Not in a Feedback Path ..........................28

c.    Claims 1 and 2 of the '749 Patent ............................................................30

3.    Graupe '818 Does Not Invalidate Claim 19 of the '850 Patent............................30

4.    Defendants Presented No Evidence To Support Their New
Obviousness Defense ...........................................................................................33

5.    Defendants Failed to Meet Their Burden of Proving Lack of
Written Description...............................................................................................35

VI.    CONCLUSION...................................................................................................................38

# TABLE OF AUTHORITIES

*Abbott Laboratories v. Syntron Bioresearch, Inc.*,
    334 F.3d 1343 (Fed. Cir. 2003)......................................................................35

*Advanced Cardiovascular System, Inc. v. Medtronic Vascular, Inc.*,
    485 F. Supp. 2d 519 (D. Del. 2007)...............................................................8

*Becton Dickinson and Co. v. Tyco Health-Care Group LP*,
    2006 U.S. Dist. LEXIS 14999 (D. Del. Mar. 31, 2006) ...............................38

*Biotec Biologische Naturverpakungen GmbH v. Biocorp., Inc.*,
    249 F.3d 1341 (Fed. Cir. 2001).....................................................................23

*Chiuminatta Concrete Concepts, Inc. v. Cardinal Industrial, Inc.*,
    145 F.3d 1303 (Fed. Cir. 1998).....................................................................23

*Compare Deering Precision Instrs., L.L.C. v. Vector Distribution System, Inc.*,
    347 F.3d 1314 (Fed. Cir. 2003).....................................................................25

*Conoco, Inc. v. Energy & Environmental International, L.C.*,
    460 F.3d 1349 (Fed. Cir. 2006).....................................................................24

*Conroy v. Reebok International*,
    14 F.3d 1570 (Fed. Cir. 1994).......................................................................20

*Crystal Semiconductor v. Tritech Microelectronics*,
    246 F.3d 1336 (Fed. Cir. 2001).....................................................................24

*Dolly, Inc. v. Spalding & Evenflo Companies, Inc.*,
    16 F.3d 394 (Fed. Cir. 1994).........................................................................21

*Elkay Manufacturing Co. v. Ebco Manufacturing Co.*,
    192 F.3d 973 (Fed. Cir. 1999).......................................................................16

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*,
    535 U.S. 722 (2002).......................................................................................25

*Finnigan Corp. v. International Trade Commission*,
    180 F.3d 1354 (Fed. Cir. 1999).....................................................................27

*Galloway v. U.S.*,
    319 U.S. 372 (1943).........................................................................................7

*Golden Blount, Inc. v. Robert H. Peterson Co.*,
  438 F.3d 1354 (Fed. Cir. 2006)......................................................................22

*Graver Tank & Manufacturing Co. v. Linde Air Products Co.*,
  339 U.S. 605 (1950)........................................................................................18

*Hilton Davis Chemical Co. v. Warner-Jenkinson Co., Inc.*,
  62 F.3d 1512 (Fed. Cir. 1995).........................................................................19

*Insituform Technologies, Inc. v. CAT Contracting, Inc.*,
  385 F.3d 1360 (Fed. Cir. 2004).......................................................................26

*Lightning Lube, Inc. v. Witco Corp.*,
  4 F.3d 1153 (3d Cir. 1993)................................................................................8

*LizardTech, Inc. v. Earth Resource Mapping, Inc.*,
  424 F.3d 1336 (Fed. Cir. 2005).......................................................................35

*Moyer v. United Dominion Industrial, Inc.*,
  473 F.3d 532 (3d Cir. 2007)..............................................................................7

*Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*,
  806 F.2d 1565 (Fed. Cir. 1986).......................................................................26

*Perkin-Elmer Corp. v. Computervision Corp.*,
  732 F.2d 888 (Fed. Cir. 1984)...........................................................7, 18, 20, 26

*SRI International v. Matsushita Electric Corp*,
  775 F.2d 1107 (Fed. Cir. 1985).......................................................................17

*Stryker Corp. v. Davol Inc.*,
  234 F.3d 1252 (Fed. Cir. 2000)......................................................................7, 8

*Summit Technology, Inc. v. Nidek Co.*,
  363 F.3d 1219 (Fed. Cir. 2004).......................................................................16

*Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*,
  872 F.2d 978 (Fed. Cir. 1989).........................................................................21

*Symbol Technology, Inc. v. Opticon, Inc.*,
  935 F.2d 1569 (Fed. Cir. 1991).......................................................................14

*Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*,
  279 F.3d 1357 (Fed. Cir. 2002).......................................................................28

*Teleflex Inc. v. Ficosa N.A. Corp.*,
  299 F.3d 1313 (Fed. Cir. 2002)................................................................8, 16

*Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*,
  520 U.S. 17 (1997)..............................................................................21

*Williamson v. Consolidated Rail Corp.*,
  926 F.2d 1344 (3d Cir. 1991)...................................................................8

## FEDERAL STATUTES

35 U.S.C. § 102...................................................................................6, 28

35 U.S.C. § 112...................................................................................35

Fed. R. Civ. P. 50................................................................................7

# I.    INTRODUCTION

The Court should deny Defendants' Renewed Motion for Judgment as a Matter of Law and Request for New Trial on the Issues of Infringement and Validity (D.I. 543) ("Defendants' Motion") in its entirety.  Plaintiff Energy Transportation Group ("ETG") presented substantial evidence of Defendants' infringement.  Defendants, on the other hand, utterly failed to meet their burden of proving invalidity by clear and convincing evidence.  The evidence supports the jury's verdict of infringement and validity.

Evidence of Defendants' infringement was overwhelming.  In fact, even before any evidence was presented, defense counsel admitted at opening that Dr. Harry Levitt's novel technique of creating an equal and opposite signal to cancel feedback is "a great idea" and Defendants "use it."  Tr. 165:10-15.[1]  Defense counsel even warned the jury that if any of their witness said that Defendants do not use Dr. Levitt's technology, they are "just not right."  Tr. 165:15-17.

Oddly enough, that is exactly what happened.  Defendants' historic documents, prepared well before ETG filed this lawsuit, included scores of technical and marketing documents that describe how they use Dr. Levitt's technology.  Defendants even prepared graphic and other descriptions that were eerily similar to Dr. Levitt's patents.  *See, e.g.*, PX 33 (D.I. 560, Ex. BB), PX 393 (D.I. 561, Ex. DD), PX 820 (D.I. 564, Ex. LL).  Defendants' contemporaneously prepared documents made the same admissions that their hearing aid devices create an equal and opposite signal to cancel feedback.  After being sued for patent infringement, however, Defendants unsuccessfully tried to disavow their technical and public documents.  Defense

---

[1] All cites to the Declaration of Robert Kinder in Support of Plaintiff ETG's Opposition to Defendants' Brief in Support of Their Renewed Motion for Judgment as a Matter of Law and Request for New Trial on the Issues of Infringement and Invalidity will be referred to herein as "Kinder Opp. Dec. Ex. __".  For the Court's convenience, all excerpts from the trial transcript are attached as Kinder Opp. Dec. Ex. NN.

witnesses testified at trial that these documents - given to audiologists, hearing aid dispensers and ultimately their customers - were inaccurate.  Tr. 1042:12-15; 1044:23-1045:6; 1136:13-14. In fact, Defendants admitted to the very motive that led to their disavowal of their own confidential and public materials.  If they admitted their own pre-suit materials were accurate that admitted infringement.  Tr. 1044:23-1045:6; 1048:5-9.

Substantial evidence at trial demonstrated that Defendants' documents do in fact accurately describe the feedback system in Defendants' infringing hearing aids.  Dr. Clay Gloster testified that Defendants' source code -- which defines how the feedback features are implemented in Defendant's infringing hearing aids -- is consistent with Defendants' technical and public documents.  Defendants do not challenge Dr. Gloster's testimony.  ETG's other technical expert witness, Mr. Clyde Brown, detailed to the jury how each and every element of the claims were shown in Defendants' feedback cancellation systems, thereby unequivocally proving infringement.  Substantial evidence proves that Defendants' documents that mimic Dr. Levitt's technology are indeed accurate.

In response, Defendants chose a confusing strategy of first denying their own representations about their feedback technology in their marketing and technical documents, then attempting to distance themselves from their own witnesses' deposition testimony that had attempted to disavow their own documents.  Clearly, the jury could have concluded that this was nothing more than a failed cover-up attempt by parties who infringed the patents.  There is only one reason why Defendants would run from their own documents and earlier admissions - they infringe Dr. Levitt's patents and want to avoid liability.

Additionally, Defendants' Motion should be denied because it ignores this Court's Claim Construction Order, contradicts settled Federal Circuit precedent and precedent from this Court,

ignores testimony and evidence that the jury could properly have considered and accepted in rendering its verdict, raises new arguments that were not presented at trial, and improperly asks the Court to make evidentiary inferences in Defendants' favor.

## II.    STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS

Two and a half years after ETG filed this case, a jury considering the 9-day trial held January 22-February 1, 2008 found Defendants Widex[2] and Demant[3] liable for infringing all asserted claims of both United States Patent Nos. 4,731,850 (the '850 Patent) and 4,879,749 (the '749 Patent) (collectively, "the Patents-in-Suit"), and found Widex liable for willful infringement.  *See* D.I. 521.  The jury also rejected all of Defendants' invalidity arguments.  *See id*.  The Court entered judgment in ETG's favor on February 8, 2008.  *See* D.I. 522.  Defendants moved the Court for JMOL on certain issues related to infringement and invalidity on February 21, 2008, *see* D.I. 527, and filed a brief in support on March 27, 2008 ("Br.").  *See* D.I. 548.

## III.    SUMMARY OF ARGUMENT

1.    Defendants' own technical specifications, public documents, graphic depictions and software code, the testimony of ETG's and Defendants' experts, and testimony from the inventor himself provide substantial evidence to support the jury's infringement verdict.  All the accused Demant and Widex hearing aid devices ("Infringing Devices") perform feedback reduction through filters that are repeatedly programmed with different sets of coefficients to effect substantial reduction of acoustic feedback.  Defendants' documents and graphic depictions admit infringement by mirroring the technology in Dr. Levitt's patents.

---

[2] The term "Widex" includes Defendants Widex Hearing Aid Company and Widex A/S.

[3] The term "Demant" includes Defendants William Demant Holding A/S, Oticon A/S, Oticon Inc., Bernafon AG, Bernafon, LLC and WDH, Inc.

2.      Prosecution history estoppel does not apply to any of the claim elements at issue. Defendants can point to nothing in the prosecution file history that supports any narrowing amendment made for the purposes of patentability.  Therefore, ETG is entitled to the full range of equivalents.

3.      The evidence supports the jury's finding of infringement under the Doctrine of Equivalents ("DOE").  ETG's expert performed an element by element analysis, identified corresponding structure for each element and demonstrated that any differences are insubstantial.

4.      Dr. Levitt's patents provide an adequate written description of the claims at issue, including examples of fixed and automatically adjustment to cancel or reduce acoustic feedback. *See, e.g.*, JX 4 at 1:5-13; 11:32-37; 11:51-57 (D.I. 557, Ex. L).  Defendants spent much of the trial confusing the jury with their hyper-technical "fixed vs. adaptive" argument and relying on their own interpretation of an alleged "third" expert's (Eric Dowling, Ph.D.) opinion, which has been shown to be incorrect.  *See* Dowling Declaration (D.I. 553, Ex. 29).  This "defense" ignores the Claim Construction Order.

5.      Defendants presented only a cursory invalidity case based on an alleged prototype described in college thesis referred to as the Master's Thesis - Digital Suppression of Acoustic Feedback in Hearing Aids by Leland Best ("the Best Work") and U.S. Patent No. 4,783,818 to Graupe ("Graupe '818") -- the two pieces of prior art upon which they now focus.[4]  Federal Circuit precedent requires that a proper invalidity analysis include a thorough examination of each claim and each element of that claim -- something their (unqualified) invalidity expert failed to do.  Realizing the insufficiency of the evidence they presented at trial, Defendants now

---

[4] Curiously, Defendants' brief fails to mention any of the items that purportedly encompassed the "Weaver Work."  Any argument concerning the "Weaver Work" is therefore waived.  The lack of record evidence compels judgment as a matter of law in favor of ETG for the items related to the "Weaver Work" as set forth in ETG's Motion for Judgment as a Matter of Law filed on March 27, 2008, incorporated by reference herein.  D.I. 549.

advance a new invalidity position: obviousness based on the combination of the Best Work and

Graupe '818. Defendants presented no evidence of this purported combination at trial and

cannot advance it here. Defendants failed to meet their burden of clear and convincing evidence.

6.      Finally, after having the jury spend two full weeks assessing witnesses'

credibility, resolving conflicts in testimony, and evaluating the weight of the evidence,

Defendants now ask this Court to grant a new trial and undo the jury's verdict without

demonstrating any error whatsoever. The Court should decline that invitation.

## IV.    CONCISE STATEMENT OF FACTS

On February 4, 2008, the jury returned a verdict finding that (1) Widex willfully

infringed the asserted claims of the Patents-In-Suit; (2) Demant infringed the asserted claims of

the Patents-In-Suit; and (3) Defendants failed to prove that the Patents-In-Suit were invalid. *See*

D.I. 521.

Widex's infringing hearing aid products are the Diva and Inteo ("Widex Infringing

Devices"); Demant's infringing hearing aid products are:

- Oticon: Adapto, Gaia, Atlas Plus, Syncro, Syncro 2, Delta 8000, Delta 6000,

  Safran, Tego, Tego Pro, Sumo DM ("Oticon Infringing Devices"); and

- Bernafon: Symbio, Symbio XT, SwissEar, Neo, ICOS, WIN ("Bernafon

  Infringing Devices") (collectively "the Infringing Devices").

For the Infringing Devices, the coefficients generated by a component that uses an LMS

Algorithm are provided to a filter located in a feedback path of the circuit. *See, e.g.*, Tr. 660:25-

677:15; 500:22-563:14; 617:24-619:11; 644:17-654:23.

The filter of the Infringing Devices uses a memory, which allows the filter to be

programmed with new coefficients. *See, e.g.*, Tr. 671:5-13; 671:14-20; 677:1-7; 683:22-25;

684:4-13; 684:17-19; 684:24-25.  For the Infringing Devices, the filter located in a feedback path of the circuit generates a counter signal to subtract out the acoustic feedback.  *See, e.g.*, Tr. 660:25-677:15; 500:22-563:14; 617:24-619:11; 644:17-654:23.

This Court previously ruled that a written document entitled "Master's Thesis - Digital Suppression of Acoustic Feedback in Hearing Aids by Leland Best" ("Best Thesis") was not a printed publication pursuant to 35 U.S.C. § 102.  D.I. 504.

Defendants did not produce at trial any prototypes or physical evidence of the existence of prototypes based upon the Best Thesis ("the Best Work").  Nor did Defendants produce at trial any product or prototypes or physical evidence of the existence of any product or prototype based upon U.S. Patent No. 4,783,818 to Graupe ("Graupe '818").  DX 982 (Kinder Opp. Dec. Ex. OO).

At trial, Defendants failed to argue that the Best Work combined with Graupe '818 rendered any claims obvious.  *See, e.g.*, Tr. 1727:6-19.  Defendants also did not include such a theory in Defendants' Motion.  D.I. 527.

At trial, the jury heard a considerable amount of evidence that Widex willfully infringed the Patents-In-Suit.  The jury heard that (1) the patent landscape in the hearing aid industry is crowded with patents (*see, e.g.*, Tr. 769:1-2, 798:17-799:5 (S. Westermann)); (2) since 1993, Widex maintained multiple searchable databases of relevant hearing aid patents (*see, e.g.*, Tr. 716:25-717:9, 799:23-800:2, 801:9-17, 801:21-802:3 (S. Westermann)); (3) the Patents-In-Suit were well publicized (*see* PX 598 (D.I. 553, Ex. 18) at LEV00000133; *see also* Tr. 236:1-14, 276:16-277:2, 382:1-384:5 (Levitt), 748:20-749:50, 749:7-9 (S. Westermann), 1904:4-1905:10, 1911:7-25 (Kates), 1434:4-1436:19 (Morley)); (4) Dr. Levitt was a prominent scientist (*see* PX 562 (D.I. 553, Ex. 19), Tr. 747:7-9, 750:5-751:15 (S. Westermann); *see also* Tr. 277:15-278:8

(Levitt)); (5) that Widex intended to infringe the Patents-In-Suit (*see, e.g.*, JX 4 (D.I. 546, Ex. 1), JX 2 (D.I. 546, Ex. 2), PX 820 (D.I. 546, Ex. 3), PX 551 (D.I. 551, Ex. 10) JX 305 (D.I. 552, Ex. 12); (6) Widex ignored references to the Patents-In-Suit in its files *See* Tr. 733:1-735:2, 773:1-7 (S. Westermann); and (7) Widex ignored its own technical and marketing documents *See* JX 305 (D.I. 532, Exhibit 12); PX 501 (D.I. 552, Ex. 17); Tr. 733:1-735:2, 773:1-7 (S. Westermann).

Despite this evidence, Widex admitted that it ***never*** searched ***any*** database for relevant patents.  *See* Tr. 773:1-7 (S. Westermann).  Widex also admitted to ***never*** investigating its possible infringement or the validity of the Patents-In-Suit.  *See* Tr. 733:1-735:2 (S. Westermann).

## V.    ARGUMENT

### A.    APPLICABLE LEGAL STANDARDS

#### 1.    Judgment As A Matter of Law

Entry of judgment as a matter of law ("JMOL")  is a "sparingly" invoked remedy.  *Moyer v. United Dominion Indus., Inc.,* 473 F.3d 532, 545 n.8 (3d Cir. 2007).  JMOL is appropriate only if there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmovant.  Fed. R. Civ. P. 50.  A district court may overturn a jury's verdict ***only if***, upon the record before the jury, reasonable jurors could not have reached that verdict.  *See Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).  On a motion for JMOL, the Court must view all evidence in the light most favorable to the party opposing the motion. *Galloway v. U.S.*, 319 U.S. 372 (1943).  Further, district courts must grant the nonmovant the benefit of all inferences that may reasonably be drawn from the evidence.  *Stryker Corp. v. Davol Inc.*, 234 F.3d 1252, 1258 (Fed. Cir. 2000).  In performing this narrow inquiry, courts must refrain from weighing the evidence, determining the credibility of witnesses, or substituting

their own version of the facts for that of the jury.  *Lightning Lube, Inc. v. Witco Corp.,* 4 F.3d 1153, 1166 (3d Cir. 1993).

   **2.**  **New Trial**

   The Court "must proceed cautiously and not substitute its own judgment of the facts and assessment of the witnesses' credibility for the jury's independent evaluation."  *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 485 F. Supp. 2d 519, 523 (D. Del. 2007). "Indeed, 'new trials because the verdict is against the weight of the evidence are proper only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks [the] conscience.'" *Id.* (quoting *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1344 (3d Cir. 1991)).

   **B.**  **OVERWHELMING SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S VERDICT OF INFRINGEMENT**

   The jury's infringement verdict is supported by overwhelming evidence.  *See Teleflex Inc. v. Ficosa N.A. Corp.,* 299 F.3d 1313, 1329 (Fed. Cir. 2002); *Stryker Corp.*, 234 F.3d at 1259.  Defense counsel admitted at opening that Dr. Levitt's novel technique of creating an equal and opposite signal to cancel feedback is a "great idea" and "we use it."  Tr. 165:10-15. Defendants prepared scores of technical and marketing documents and graphic depictions that all describe how they use Dr. Levitt's technology.  Defendants made similar admissions that their hearing aid products create an equal and opposite signal to cancel feedback.  As shown below in an Oticon document, (1) feedback is detected, (2) a replica signal matched in both phase and amplitude is created; (3) the replica signal is used to cancel out the feedback.  *See, e.g.,* PX 33 (D.I. 560, Ex. BB).





A marketing document from Bernafon below describes Dr. Levitts' technology of detecting feedback and subtracting the feedback with a counter signal. *See, e.g.*, PX 393 (D.I. 561, Ex. DD).

**Adaptive Feedback Cancellation (AFC)**
Larger venting has always been synonymous with acoustic feedback, but Symbio XT's advanced Adaptive Feedback Canceller solves the problem by working on-line to detect the presence of feedback and subtract it from the incoming signal.

Finally, Widex prepared and distributed documents that admit their use of Dr. Levitt's technology. *See, e.g.,* PX 820 (D.I. 564, Ex. LL).



When the FPS has determined the characteristics of the feedback signal it will subtract an imitated feedback signal from the incoming signal, thus eliminating the annoying feedback. Due to the

Demant's Thomas Christensen testified that, if he admitted that their own statements were accurate, Defendants would be infringing Dr. Levitts' technology. *See, e.g.,* Tr. 1044:23-1045:6; 1048:5-9 (Q: "If that document is accurate, it means that it determines the phase and amplitude, it means that it determines the phase and amplitude of the feedback signal, creates an equal and opposite signal and cancels, right? A: I think that is the conclusion, yes.").

The substantial evidence at trial demonstrated that these documents do in fact accurately describe Defendants' Infringing Devices.  Dr. Clay Gloster testified that the source code for Defendants' devices -- which defines how the feedback features are implemented in Defendants' infringing hearing aids -- is consistent with Defendants' technical and public documents.  *See, e.g.*, Tr. 660:25-677:15.  Dr. Gloster's testimony remains unchallenged.  Relying on Dr. Gloster's code analysis, ETG's other technical expert witness, Mr. Brown, demonstrated to the jury how each and every element of the claims were found in Defendants' feedback system.

To avoid the jury's verdict, Defendants ignore the overwhelming evidence of infringement and rather advance arguments that ignore the language of the claims of the Patents-in-Suit and the Court's Claim Construction Order.  Moreover, Defendants fail to acknowledge that the evidence must be viewed in the light most favorable to ETG when deciding JMOL.  When the correct standard is applied, the record evidence is not only substantial, but is overwhelmingly in ETG's favor.

### 1. ETG Presented Overwhelming Evidence of Infringement of Claims 13, 14, 16 and 19 of the '850 Patent

To establish proof of infringement, ETG's expert, Mr. Brown, *inter alia*, compared the claim language of Claim 16 (combined with Claim 14), reproduced below, to technical diagrams that accurately depict the components of the Infringing Devices.  *See, e.g.*, Tr. 514:2-520:19.  The diagram below (Figure 13) is taken from a technical document prepared by Demant before this litigation when Defendants had no incentive to create evidence.  JX 138 at DEM005199 (D.I. 557, Ex. Q).  As shown here, each highlighted claim limitation of Claim 16 corresponds to structure highlighted in a matching color in Demant's technical diagram.

**14.** A method of reducing acoustic feedback in a hearing aid comprising a microphone, a receiver fitted in an ear of a wearer of the aid, and a signal transmission channel interposed between said microphone and transducer, comprising the steps of determining the effect on the amplitude and phase of a signal in said transmission channel as a function of frequency of acoustic feedback between said receiver and microphone, and inserting between the input and output of said transmission channel a programmable filter programmed to equalize and reduce the effect of said acoustic feedback both in amplitude and phase on a signal in said transmission channel.

**16.** A method of reducing feedback in a hearing aid as described in claim 14 in which said programmable filter is inserted in an electrical feedback loop for said transmission channel.

Kinder Opp. Dec. Ex. PP



Figure 13. Block diagram of the implementation of the AFB algorithm.

Kinder Opp. Dec. Ex. QQ

-11-

As admitted by Demant, Oticon Infringing Devices all have a microphone (shown in green), a receiver (shown in brown) and a signal transmission channel between the two (shown in red). Oticon Infringing Devices perform the step of determining (shown in blue). The Update block (shown in blue) represents the LMS algorithm, which compares signals at an input and an output (shown by the dashed blue lines) and determines the effect on the amplitude and phase of a signal in the transmission channel. *See, e.g.*, Tr. 516:11-517:1. The Update block generates coefficients that represent the amplitude and phase of the feedback signal, temporarily stores the coefficients in a buffer (memory) and then provides the coefficients to the FIR filter (shown in orange). JX 138 at DEM005200 (D.I. 557, Ex. Q) ("coefficients [are] generated by the LMS"). Each time a set of coefficients is provided to the FIR filter, the FIR filter is activated, thereby inserting a new filter programmed to generate an equal and opposite signal to counter acoustic feedback. *See, e.g.*, Tr. 517:2-16. In describing their feedback system, Defendants admit "[t]he output of the internal feedback path is subtracted from the microphone signal to remove the part of the microphone signal that comes via the external feedback." JX 138 at DEM0005186 (D.I. 557, Ex. Q); Tr. 518:22-519:8. Defendants' technical diagrams accurately describe Dr. Levitt's feedback cancellation technique set forth in Claims 13, 14 and 16.

Mr. Brown applied a similar analysis to Claim 13. *See, e.g.*, Tr. 520:13-522:2. His analysis applied equally to Bernafon and Oticon's feedback systems. *See, e.g.*, Tr. 522:3-523:19. Mr. Brown also performed a similar analysis for Claims 13, 14, and 16 for Widex, as shown below with respect to Claim 19. *See, e.g.*, Tr. 523:20-531:18.

For Claim 19, Mr. Brown compared the claim language, reproduced below, to technical diagrams that accurately depict the components of the Infringing Devices. The diagrams below are taken from technical documents prepared by Widex before this litigation. *See, e.g.*, PX 791

(D.I. 563, Ex. JJ), JX 305 (D.I. 557, Ex. P).  Mr. Brown performed a similar analysis for Claim

19 for Demant, as shown above with respect to Claim 16.  *See, e.g.*, Tr. 534:13-540:4.  As shown

here, each highlighted claim element of Claim 19 corresponds to structure highlighted in a

matching color in Defendants' technical diagrams.

### 19. A hearing aid comprising

    at least one input microphone,

    an output receiver,

    a signal transmission channel interposed between said microphone
and said receiver,

    and a programmable delay line filter interposed in a feedback path
between the input and output of said transmission channel,

    said programmable filter being programmed to effect substantial
reduction of acoustic feedback from said receiver to said microphone.

Kinder Opp. Dec. Ex. RR



Kinder Opp. Dec. Ex. SS                    Kinder Opp. Dec. Ex. TT

    Widex hearing aids all have a microphone (shown in green), a receiver (shown in brown)

and a signal transmission channel between the two (shown in red).  Widex's WFIR filter is

within the Feedback Path Simulator (shown in orange) interposed in a feedback path (shown in

yellow).  The details of Widex's Feedback Path Simulator is shown in another diagram (above

right).  Widex Infringing Devices all include a WFIR filter (shown in orange) which is a

variation of a FIR filter - both of which qualify as a delay line filter.  *See, e.g.,* Tr. 526:20-25; 541:17-542:1; 542:20-543:4.  The WLMS block (shown in blue) represents the WLMS algorithm which is a variation of the LMS algorithm.  *See, e.g.* Tr. 526:20-25.  The WLMS algorithm generates coefficients that are temporarily stored in memory and then provided to the WFIR filter.  *See, e.g.,* 541:19-542:1.  By providing coefficients to the WFIR filter, the WFIR filter is programmed to effect substantial reduction of acoustic feedback.  Widex describes their feedback cancellation system as follows: "When the FPS has determined the characteristics of the feedback signal it will subtract an imitated feedback signal from the incoming signal, thus eliminating the annoying feedback."  PX 820 at WID163240 (D.I. 564, Ex. LL).  Widex's technical description of their feedback system matches Dr. Levitt's invention of Claim 19.

> ### a.    The Jury Correctly Determined That the Infringing Devices Are "Programmed"

The jury heard substantial evidence that Defendants' Infringing Devices are "programmed" within the meaning of the Court's construction of that term.  Tr. 512:16-20 ("Programmable filter is a filter where you can insert, apply coefficients …"); 513:15-20 ("you program [the filter] so that you can give it the value necessary to compensate for the acoustic feedback"); 518:10-11 ("The fact that it shows a diagonal arrow through the FIR block means that it can be programmed.").  *See also* Tr. 534:2-12; 539:3-8; 541:19-542:1; 545:6-8.

Moreover, Mr. Brown explained how Defendants' own documents - technical specifications and materials intended for the public - support his opinions.  *See, e.g.*, JX 138 (D.I. 557, Ex. Q), PX 791 (D.I. 563, Ex. JJ), JX 305 (D.I. 557, Ex. P), PX 33 (D.I. 560, Ex. BB) (Tr. 550:7-552:15), PX 30 (D.I. 559, Ex. Z) (Tr. 552:16-553:24), PX 231 (D.I. 561, Ex. CC) (Tr. 553:25-555:12), PX 393 (D.I. 561, Ex. DD) (Tr. 555:13-556:8), PX 376 (D.I. 562, Ex. EE) (Tr. 556:9-557:19) and PX 820 (D.I. 564, Ex. LL) (Tr. 557:20-558:22).  *Symbol Tech., Inc. v.*

*Opticon, Inc.*, 935 F.2d 1569, 1574-76 (Fed. Cir. 1991) (holding that "testimony on the ultimate

issue of infringement is permissible in patent cases" and that expert's discussion of "summary

evidence" satisfied patent owner's burden of proving infringement).

Even more compelling was Dr. Gloster's analysis of Defendants' source code, which

confirmed that the Infringing Devices' filters are programmed with coefficients generated by the

LMS algorithm. Dr. Gloster testified that a filter is programmable if the values of the

coefficients can change. *See* Tr. 671:5-13 ("A: The presence of memory in digital systems

clearly defines that they are programmable. A computer has memory, so we can program it. So

if memory is present, then it must be programmable, because it can change, the values can

change."). The existence of a memory in all the Infringing Devices supports Dr. Gloster's

testimony that the filters are indeed programmable. *See, e.g.,* Tr. 671:14-20; 677:1-7; 683:22-25

(cross); 684:4-13 (cross); 684:17-19 (cross); 684: 24-25 (cross). *See also* PX 857 (Widex Code)

(Kinder Opp. Dec. Ex. UU) (Demonstrative of Widex Code) and JX 298 (Demant code) (Kinder

Opp. Dec. Ex. VV) (Demonstrative of Demant code). Moreover, Defendants' non-infringement

expert, Dr. Morley, testified that he could not disagree with Dr. Gloster's testimony. *See, e.g.,*

Tr. 1445:24-1446:1 ("Q: So you disagree with him about something dealing with his testimony

in this case? A. No, I don't.").

Defendants argue that the term "programmed" produces a single and only one response

that cannot be changed.[5] Br. at 11. However, Defendants made this same argument during the

claim construction process, and this Court rejected it.[6] Moreover, Defendants' restrictive

---

[5] The term "programmed" is construed to mean "provided with one or more values so as to produce a
response." Order Construing the Terms of U.S. Patent Nos. 4,731,850 and 4,879,749 ("Claim Construction Order")
at ¶ 4. D.I. 351.

[6] In their claim construction briefs, Defendants argued that claims 13-16 and 19 should be limited to a filter
whose coefficients are fixed. However, this Court rejected this overly narrow interpretation. D.I. 351.

interpretation would render "programmable" meaningless, as "programmable" implies that the filter can be programmed again and again.

Moreover, Defendants now resort to arguing for a construction of this Court's claim construction itself.  Specifically, they attempt to limit the phrase "a response," which is not in the claim itself.[7]  Even if the phrase "a response" were part of the claim language (and it is not), it would be interpreted as "one or more responses" because, when the open-ended transition word "comprising" is used in a claim, such as the claims of the '850 Patent, the article "a" or "an" means "one" or "more than one."  *See, e.g., Elkay Mfg. Co. v. Ebco Mfg. Co.,* 192 F.3d 973, 977 (Fed. Cir. 1999).

Defendants' other arguments for re-construing "programmed" also lack merit.  For example, Defendants focus on only their own interpretation of the "'850 Patent specification and prior art mandate," Br. at 2, and further allege that certain excerpts from the specification describe "fixed coefficients."  *See* Br. at 11.  The Patents-in-Suit do not use the word "fixed" to describe its feedback mechanism, instead it describes it as "automatic."  JX 4 at 1:5-13; 11:32-37; 11:51-57 (D.I. 557, Ex. L).  Defendants expert, Dr. Morley, testified that one skilled in the art would have known that any filter in any patent could have been an adaptive filter or a fixed filter.  Tr. 1551:11-16.  Again, Defendants' argument blatantly disregards this Court's claim construction, which does not limit the term "programmed" to a fixed or single response.  Regardless, Defendants' reliance on isolated excerpts of the '850 Patent specification is improper.  *Teleflex,* 299 F.3d at 1326 ("That claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims") (citations omitted).  The Federal Circuit reiterated that the focus must be on the claims and not

---

[7] Defendants' reliance on *Summit Tech* is improper because the term "a response" is not in the claim language.  *Summit Tech., Inc. v. Nidek Co.*, 363 F.3d 1219 (Fed. Cir. 2004).

any particular embodiment described in the specification. *SRI Int'l v. Matsushita Elec. Corp*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (*en banc*).

Defendants also accuse ETG's expert, Mr. Brown, of reading the terms "programmable" and "programmed" out of the claims. But Defendants misquote Mr. Brown's testimony. When he referred to "just about all digital filters," he was referring to the term "delay line filter," which is a term that is not in dispute and Defendants admit that their products use a delay line filter. *See, e.g.*, Tr. 533:17-21; 1032:12-21; 1398:3-10. Contrary to Defendants' misplaced arguments, Mr. Brown provided more than sufficient testimony and documentary support that the Infringing Devices are indeed "programmed" within the Court's definition. *See, e.g.,* Tr. 534:2-12 (Mr. Brown testified that the FIR filters are programmed by the LMS algorithms). In addition, Dr. Levitt testified that the LMS algorithm is one of many algorithms that conceivably can be used to determine the phase and amplitude of the feedback signal and generate coefficients to the filter to create and equal but opposite signal to cancel the feedback. *See, e.g.*, Tr. 375:19-25. That the LMS algorithm determines the feedback signal by a trial and error method of attempting to approximate the signal is of no consequence.

Applying the proper claim construction, the jury properly rejected the argument that "a response" refers to only one "programmed" response and not "a series of ever changing, un-programmed, filter conditions." Br. at 11. In the "series" of responses found in Defendants' infringing products, each response is "a response." If anything, Defendants' hearing aids meet the "programmed" claim recitation many times over. *See, e.g.,* Tr. 626:5-15 (Mr. Brown testified that the hearing aids are programmed many times a second).

> **b.    Defendants' Challenge of the Jury's Finding of Infringement Under DOE Is Completely Baseless**

ETG presented overwhelming and convincing evidence of Defendants' infringement both literally as well as under the DOE. *See* ETG's Memorandum in Support of JMOL motion (Jury should have found literal infringement for all the asserted claims) filed March 27, 2008. D.I. 549. Defendants again fail to present any argument that ETG's verdict is not supported by substantial evidence. *Perkin-Elmer Corp.*, 732 F.2d at 893. Instead, Defendants challenge the jury's verdict of infringement by ignoring the Court's Claim Construction. This is not a proper basis for JMOL.

> **i    ETG Presented Ample Particularized Testimony On An Element by Element Basis**

The record supports the jury's finding of infringement under DOE. Mr. Brown specifically addressed equivalents on an element by element basis. Tr. 548:23-550:6 (DOE analysis for Claim 19); Tr. 546:2-548:22 (DOE analysis for Claims 13, 14 and 16). He also explained that any differences between the asserted claims and the Infringing Devices are insubstantial. "Equivalency may be found if the differences between that which is claimed and its embodiment in the accused composition are insubstantial." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950). To determine whether a difference is substantial, the Court should consider "whether the element in the accused composition performs substantially the same function in substantially the same way to obtain substantially the same result as the claimed element." 339 U.S. at 608. Specifically, Mr. Brown applied the function, way, result test on an element by element basis for the asserted claims. *See, e.g.,* Tr. 546:9-23 (analysis for determining step in Claims 13, 14 and 16); 546:24-548:1 (analysis for inserting step in Claims 13, 14 and 16; 549:5-550:6 (programmable filter in Claim 19). "In applying the doctrine of equivalents, it is often enough to assess whether the claimed and accused products or processes

included substantially the same function, way and result." *Hilton Davis Chemical Co. v. Warner-Jenkinson Co., Inc.*, 62 F.3d 1512, 1518 (Fed. Cir. 1995).

ETG presented far more than mere generalized testimony as to the overall similarity, as Defendants assert. Defendants cannot argue that the analysis was not performed but argue for an unreasonably high degree of detail that is not required. Defendants continue to ignore the proper JMOL standard, the substantial evidence that supports the jury's verdict.

### ii    None of the Elements are Vitiated by the Jury's DOE Verdict

ETG presented substantial testimony that both steps of Claims 13, 14 and 16 are satisfied by the Defendants' LMS routine combined with the FIR filter. As Mr. Brown explained, the determining step is performed when the LMS algorithm generates the coefficients. *See, e.g.,* Tr. 515:22-516:18; 527:5-10. The inserting step is performed when the coefficients generated by the LMS algorithm are activated thereby inserting a new filter in the circuit. *See, e.g.,* Tr. 517:2-16; 527:11-15; Kinder Opp. Dec. Exs. QQ & WW.

Defendants incorrectly allege that ETG only focused on the second step of "inserting" and therefore, the first step of "determining" would be read out of the claim. *See* Br. at 36. In making this allegation, Defendants ignore the overwhelming evidence presented at trial.

As for Claim 19, Defendants argue that the term "programmed' is vitiated by the range of equivalents given to this term. The only evidence Defendants rely upon is their own misinterpretation of Mr. Brown's testimony regarding "just about any filter." When read in context, Mr. Brown testified that "just about any digital filter will satisfy a delay line filter." Tr. 533:17-21. Defendants do not dispute the term "delay line filter" and admit their filters are delay line filters. *See, e.g.,* Tr. 1032:12-21; 1398:3-10. Moreover, there is absolutely no support for Defendants' allegation that Mr. Brown ignored the term "programmable." In fact, Mr. Brown

and Dr. Gloster both fully address the term "programmable" as construed by the Court.  *See, e.g.,* Tr. 512:16-20; 513:15-20; 518:10-11; 534:2-12; 539:3-8; 541:19-542:1; 545:6-8; 671:5-13; 671:14-20; 677:1-7; 683:22-25; 684:4-13; 684:17-19; 684:24-25.

### iii    No Prior Art Prevents Infringement Under DOE

Defendants merely conclude that if "filter therein programmed" (Claim 13), "programmable filter programmed" (Claims 14, 16) or "programmable delay line filter" that is "programmed" (Claim 19) are "expanded" to cover adaptive filters, the claims would read on the Best Work and Graupe '818.  *See* Brief at 37.  However, that argument wrongly assumes that the Best Work and Graupe '818 are valid prior art and that both invalidate these claims.

Defendants further conclude that the jury's finding of infringement under DOE should be overturned merely because Mr. Brown did not consider the prior art.  Defendants misunderstand the law.  While prior art may be relevant to the ultimate equivalence determination, there is no requirement that the same expert that renders an opinion on whether the claims are met literally or equivalently be the same expert that analyzes the prior art.  In this case, Mr. Brown relied on the analysis of another expert, Mr. Norman Matzen, that the claims were valid.[8]  Moreover, the jury made the factual determination, based on substantial evidence, that none of the claims ensnared the prior art, including the Best Work and Graupe '818.  *See infra*, Section V.C.

---

[8] It is the Defendants that have the burden - not the plaintiff's expert - to establish that prior art precludes the scope of equivalents.  *See Perkin-Elmer Corp.*, 732 F.2d at 900.  A Defendant must "apply standards of patentability consistent with [Federal Circuit] jurisprudence regarding anticipation and obviousness." *Conroy v. Reebok Int'l*, 14 F.3d 1570, 1577 (Fed. Cir. 1994).  Here, Defendants completely failed to prove that any valid prior art exists that would preclude the Doctrine of Equivalents in this case, especially considering the Best Work is not even valid prior art, and Graupe '818 is not currently asserted against the Claims 13, 14, and 16 of the '850 Patent or Claims 1 and 2 of the '749 Patent.

## 2. Substantial Evidence Supports the Jury's Verdict of Infringement Under DOE of Claims 1 and 2 of the '749 Patent

The jury heard substantial evidence at trial that the Infringing Devices meet each and every element of Claims 1 and 2 of the '749 Patent equivalently. *See Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997). Mr. Brown performed a thorough element by element analysis for both Claims 1 and 2 of the '749 Patent. Mr. Brown referred to a demonstrative (Brown 13) prepared at his direction that specified the structure as defined by the Court's Claim Construction Order. *See* Kinder Opp. Dec. Ex. XX. Tr. 561:5-14. Mr. Brown explained this demonstrative throughout his DOE analysis and correctly identified corresponding structure in the Infringing Devices on an element-by-element basis. *See, e.g.*, Tr. 563:12-24 (first means element in Claim 1); 564:18-565:3 (second means element in Claim 1); 565:7-14 (third means element in Claim 1); 565:18-566:1 (means element in Claim 2); 566:11-567:8.

Mr. Brown explained that, through the advances in miniaturization, the equivalents of all the structure for each element of Claims 1 and 2 of the '749 Patent have been condensed into the LMS algorithm and other associated structure. Tr. 563:15-24; 567:14-19. Defendants' expert Morley agreed with the miniaturization analysis. Tr. 1546:8-20; 1547:10-14. The mere fact that the size of the devices prior to miniaturization required some components to be separate does not inhibit a claim in a patent that envisions the components to be miniaturized. Moreover, there is no requirement for an absolute one to one correspondence. *See Sun Studs, Inc. v. ATA Equipment Leasing, Inc.*, 872 F.2d 978, 989 (Fed. Cir. 1989) ("An apparatus claim describing a combination of components does not require that the function of each be performed by a separate structure in the apparatus. The claimed and accused devices must be viewed and evaluated as a whole."); *Dolly, Inc. v. Spalding & Evenflo Companies, Inc.*, 16 F.3d 394, 398 (Fed. Cir. 1994) ("Equivalency can also exist when separate claim limitations are combined into a single

component of the accused device."). Thus, ETG properly identified corresponding equivalent structure for each element of the asserted claims of the '749 Patent and satisfied its burden for proving infringement.

As the evidence shows, Defendants' allegation that ETG made no reference at all to the specific corresponding structure is without merit.

### 3.    ETG Presented Substantial Evidence of Defendants' Inducement of Infringement

ETG presented overwhelming evidence that Defendants knew about the Patents-in-Suit and intended, encouraged, instructed, and substantially benefited from their customers' infringement of the claims of the Patents-In-Suit.

Evidence of the direct infringement by a third-party or the inducer's intent need not be supported by direct evidence. Rather, circumstantial evidence will suffice, and indeed, is often the best evidence. *Golden Blount, Inc. v. Robert H. Peterson Co.*, 438 F.3d 1354, 1362-63 (Fed. Cir. 2006). The jury correctly found that Defendants had knowledge of the patents long before they made their first Infringing Product. *See* Plaintiff ETG's Memorandum in Support of Its Motion for Enhanced Damages and Attorney's Fees (D.I. 539) (discussion of Widex's knowledge of Dr. Levitt and the Patents-in-Suit), incorporated by reference. In addition, Demant owned issued patents that cite the '850 Patent. *See, e.g.*, JX 9 (Kinder Opp. Dec. Ex. YY), JX 315 (Kinder Opp. Dec. Ex. ZZ). Finally, Defendants are members of HIMPP, which was well aware of the Patents-in-Suit, especially after hiring Dr. Levitt as their own patent expert. *See, e.g.*, Tr. 717:10-12; 963:6-9; 982:12-14. As early as April 5, 1993, Dr. Levitt's patents were identified in a searchable database maintained by Widex. *See, e.g.*, Tr. 723:10-11; 724:17-725:8; 725:10-727:5. In 1996, HIMPP purchased patents from the "CID family," including at least one that cited the '850 Patent. *See* DX 1195 (D.I. 553, Ex. 23); Tr. 728:21-729:10. And, in 2001, as

a member of HIMPP, Defendants obtained a CD that identified the Patents-in-Suit as patents of

interest to hearing aid companies.  *See, e.g.,* Tr. 728:21-729:10, 716:21-718:5.  Indeed, the

evidence of Defendants' knowledge of the Patents-in-Suit was substantial and even more so for

Widex, given that the jury found that Widex had willfully infringed the patents.

  Scores of Defendants' documents demonstrated that they designed their hearing aids to

create an equal and opposite signal to cancel feedback when used by customers.  Likewise, the

jury heard un-rebutted evidence that Defendants then promoted, encouraged, and instructed their

customers, hearing aid professionals and audiologists, in the use of those infringing hearing

aids.[9]  Defendants sold and offered for sale the hearing aid products to audiologists and hearing

aid dispensers for the ultimate sale and use by hearing aid wearers.  *See, e.g.*, Tr. 988:12-17.

Through Defendants' own words and graphical depictions in promotional and technical

literature, ETG showed that Defendants provided user guides, manuals, handbooks, brochures,

presentations and customer support, all so that customers could use the infringing hearing aid

devices in an infringing manner  - to create an equal and opposite signal to cancel feedback - as

Defendants intended they be used.  *See, e.g.,* Tr. 550:17-551:2; JX 26 (D.I. 558, Ex. T); JX 29

(D.I. 558, Ex. U); JX 32 (D.I. 558, Ex. V); JX 264 (D.I. 559, Ex. W); JX 266 (D.I. 559, Ex. X);

PX 497 (D.I. 559, Ex. Y); PX 30 (D.I. 559, Ex. Z); PX 31 (D.I. 560, Ex. AA); PX 33 (D.I. 560,

Ex. BB); PX 231 (D.I. 561, Ex. CC); PX 393 (D.I. 561, Ex. DD), PX 376 (D.I. 562, Ex. EE); PX

377 (D.I. 562, Ex. FF); PX 378 (D.I. 562, Ex. GG); PX 409 (D.I. 562, Ex. HH); PX 501 (D.I.

---

[9] The Federal Circuit has held that providing instructional materials, implementation, or encouragement to use a device in an infringing manner constitutes induced infringement.  *See, e.g.*, *Biotec Biologische Naturverpakungen GmbH v. Biocorp., Inc.*, 249 F.3d 1341, 1351 (Fed. Cir. 2001) (finding inducement where the infringer provided customers with instructions for infringing use); *Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc.*, 145 F.3d 1303, 1311-12 (Fed. Cir. 1998) (affirming summary judgment of inducement where "advertisements" for accused product encouraged an infringing use).

563, Ex. II); PX 791 (D.I. 562, Ex. JJ); PX 810 (D.I. 563, Ex. KK); PX 820 (D.I. 564, Ex. LL);

DX 1417 (D.I. 564, Ex. MM).

All the accused hearing aids include the infringing feedback reduction features, as

delivered by Defendants to hearing aid professionals and their customers.  These features are not

optional, but are integral to the hearing aid.  In fact, there is no evidence that the accused hearing

aids could operate without the feedback reduction features.[10]  While the hearing aid is in

operation, the LMS algorithm calculates new coefficients that program the FIR filter.  As Mr.

Brown explained, the process repeats itself many times.  *See, e.g., Id.* Tr. 528:21-529:7; 566:2-

10; 606:15-25 (cross); 609:11-18 (cross) and 628:9-12 (cross).

When, as here, a defendant sells an accused product, and the customer uses that product

as intended, it practices the method.  *Crystal Semiconductor v. Tritech Microelectronics*, 246

F.3d 1336, 1351 (Fed. Cir. 2001) (selling device to customer that used it to practice method

claim constitutes inducement).  ETG's evidence was more than sufficient to meet the burden of

proving that Defendants induced their customers to infringe method Claims 13, 14, and 16 of the

'850 Patent from the inception of infringing sales.

### 4.    Defendants Failed to Prove that Prosecution History Estoppel Applies to Claim 19 of the '850 Patent or Claims 1 and 2 of the '749 Patent

#### a.    Claim 19 of the '850 Patent Was Never Amended

Prosecution history estoppel cannot apply to Claim 19 because Claim 19 was never

amended or otherwise narrowed during prosecution.  *See, e.g.*, *Conoco, Inc. v. Energy & Envtl.*

*Int'l, L.C.*, 460 F.3d 1349, 1363 (Fed. Cir. 2006) ("prosecution history estoppel limits the broad

---

[10] Defendants never suggested or presented any evidence that any of their customer could use the accused hearing aids in a manner that avoided the feedback functionality.  Defendants cannot claim ignorance of the fact that their customers employed the accused systems in exactly the manner in which they were designed and intended to be used.  Defendants had every opportunity to produce evidence that their customers did not in fact use the accused hearing aid devices in an infringing manner, but they did not do so.

application of the doctrine of equivalents by having an equivalents argument for subject matter relinquished when a ***patent claim is narrowed*** during prosecution") (emphasis added).  The Patent Office never issued a single rejection against any of the Feedback Claims[11] that recited a programmable delay line filter to cancel or substantially reduce acoustic feedback.  *See* JX 5 (Kinder Opp. Dec. Ex. AAA) (office action dated Mar. 31, 1987, pp. 1-3); ("Notice of Allowability" dated Sept. 15, 1987, allowing issued Claim 19 without comment or rejection).

Also, Claim 19 was not added in response to a rejection of a similar, broader claim. *Compare Deering Precision Instrs., L.L.C. v. Vector Distribution Sys., Inc.*, 347 F.3d 1314, 1325-26 (Fed. Cir. 2003) (cited in Br. at 29)  (requiring a finding that the claim at issue "was narrowed by the deletion of a broad original claim in favor of a claim that contained the [distinguishing claim limitation]."  The only evidence of record on this subject - the file history itself - shows that Claim 19 was added and that it is substantively different from the few claims that had been rejected.  JX 5 (office action response dated June 29, 1987, pp. 1-9) (Kinder Opp. Dec. Ex. AAA).

### b.  Claims 1 and 2 of the '749 Patent Were Not Amended For Purposes of Patentability

ETG established that the Infringing Devices determine the effect on the amplitude and phase.  The jury correctly found that "measuring" phase and amplitude is merely one way of "determining" and the jury could have found the Infringing Products were therefore equivalent.

Prosecution history estoppel does not apply to the equivalent in question because the "measuring phase and amplitude" recitation was not amended or narrowed to overcome the prior art.  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 740 (2002)

---

[11]  The Feedback Claims of the '850 Patent include claims 13, 14, 16 and 19.

(Estoppel does not apply, though, if a patentee demonstrates that "the rationale underlying the narrowing amendment [bore] no more than a tangential relation to the equivalent in question."). There is no prior art in the record that would have precluded a claim to determining phase and amplitude but permitted the claims reciting measuring instead. Put another way, the phrase "measuring phase and amplitude" was not added to get around any prior art at the time.

Even if a presumption of prosecution history applies, ETG overcomes it because the limitation in question was not added to overcome any prior art. Here, Patentee added new claims to highlight the ability to sum the acoustic feedback signal with an adjusted phase shift and amplitude signal to produce an acoustic feedback cancellation signal. *See* JX 3 (office action response dated March 17, 1989, pp. 3-4 (Kinder Opp. Dec. Ex BBB). Nothing in the prosecution history suggests any relationship between the new claim limitations and any prior rejection of broader claim language. Whether the phase and amplitude are measured or determined is tangential to the summing of the signals to produce an acoustic feedback cancellation signal. *See Insituform Tech., Inc. v. CAT Contracting, Inc.*, 385 F.3d 1360, 1370 (Fed. Cir. 2004). Therefore, ETG is not precluded from arguing equivalents for the "measuring phase and amplitude" recitation. Defendants have not proved otherwise.

## C.    DEFENDANTS FAILED TO MEET THEIR BURDEN OF PROVING INVALIDITY

On a renewed motion for JMOL on invalidity, Defendants carry a particularly heavy burden because "a patentee need submit ***no*** evidence in support of a conclusion of validity by a … jury." *Orthokinetics, Inc. v. Safety Travel Chairs, Inc.*, 806 F.2d 1565, 1570 (Fed. Cir. 1986) (emphasis in original). Defendants bear the heavy burden of submitting substantial evidence sufficient to overcome the strong presumption of validity. *Perkin-Elmer Corp.,* 732 F.2d at 893.

Defendants had a full opportunity and failed to convince the jury that ETG's patents were invalid. Defendants spent hours of testimony of their paid experts and paid fact witnesses[12] on the so-called "Weaver Work" that is no longer part of Defendants' invalidity contentions. Defendants primarily now complain that the jury either ignored or totally misunderstood the Best Work and Graupe '818, refusing to accept the possibility that those works simply are not prior art (Best Work), not enabled (both) and insufficient technically (both). Br. at 2. And, the jury decided that Defendants did not proffer the requisite clear and convincing evidence necessary to overcome the strong presumption of validity statutorily accorded to the Patents-in-Suit. Shockingly, they now attempt to raise a wholly new argument (a proposed combination of the Best Work and Graupe '818), never presented at trial to the jury.

### 1.    Defendants Failed to Prove Invalidity by Clear and Convincing Evidence

Defendants argue that the asserted claims cannot be simultaneously broad enough to cover the Infringing Devices and yet not be rendered invalid in view of the Best Work and Graupe '818. Br. at 2. As the jury found, Defendants practice the innovative feedback reduction techniques of the Patents-in-Suit - not the prior art. As defense counsel admitted during opening arguments, "we use it." Tr. 165:10-17.

Regardless, anticipation cannot be proved by merely establishing that one practices the prior art. *See Tate Access Floors, Inc. v. Interface Architectural Resources, Inc.*, 279 F.3d 1357, 1365-69 (Fed. Cir. 2002) (defense of non-infringement cannot be proved by comparing an accused product to the prior art.). Anticipation requires a showing that each element of the claim

---

[12] Uncorroborated oral testimony by interested parties "is insufficient as a matter of law to establish invalidity of [a] patent." *Finnigan Corp. v. Int'l Trade Comm'n*, 180 F.3d 1354, 1370 (Fed. Cir. 1999).

at issue, properly construed, is found in a single prior art reference.  "[I]t is the presence of the

prior art and its relationship to the claim language that matters for invalidity."  *Id*. at 1367.

The jury correctly found that Defendants' Infringing Devices fall squarely within the

scope of the claims of the Patents-in-Suit and that the Patents-in-Suit do not encroach on the Best

Work or Graupe '818.

### 2.    The Best Work Does Not Invalidate the Patents-in-Suit

The substantial evidence presented at trial demonstrated that Dr. Best's system did not

support a filter in a feedback path of the transmission channel.  The structure of the system was

fundamentally different than the system described by the Patents-in-Suit.

### a.    The Best Work is Not a Prior Invention

As detailed in Plaintiff ETG's Memorandum in Support of JMOL motion filed March 27,

2008 (D.I. 549), incorporated by reference, Defendants improperly relied on the Best Work to

support their invalidity argument.  When viewing the evidence in a light most favorable to ETG,

the jury could have found that the Best Work was not even valid prior art, given that the Best

Thesis does not even qualify as a printed publication.  D.I. 504.  The record evidence also shows

that the alleged prototype fails as prior invention under 35 U.S.C. § 102(g) because (1) the circuit

was suppressed; (2) the circuit was subsequently abandoned; and (3) the circuit was not tested on

a hearing impaired person so it was not sufficiently tested.  *See, e.g.,* Tr. 1325:25-1326:23.  In

addition, Defendants failed to present any documentation to support the existence of the

prototype or any demonstration thereof.  *Id*.  These facts support a finding that the Best Work is

not prior art under any section of 35 U.S.C. § 102.

### b.    The Filter of the Best Circuit is Not in a Feedback Path

The jury correctly concluded the Best Work does not invalidate the asserted claims based

on its technical deficiencies and Defendants' utter failure to make a showing of clear and

-28-

convincing evidence.  The evidence demonstrated that even if the Best Thesis supports prior invention, it supports a finding that Dr. Best inserted his circuit in a forward transmission path as shown below between the microphone and amplifier of an already existing hearing aid.  *See, e.g.,* Tr. 1932:3-10; 1934:24-1935:2 ("And he cut the wire right in this area and put his circuit in here. So this circuit is now occupying position in the … forward path of the transmission channel.").



Kinder Opp. Dec. Ex. CCC

Claim 19 requires that the filter be in a feedback path - defined to be a path in which a signal travels from the output to the input.  D.I. 351 at ¶2.  In accordance with the claim language, "from the output to the input" is in relation to the transmission channel, as shown by the highlighted yellow path below.



Kinder Opp. Dec. Ex. CCC

Therefore, the filter within the Best Circuit is not in a path in which a signal travels from the output to the input of the transmission channel.  Contrary to Defendants' accusations, ETG is not requiring a connection beginning at a speaker and ending at the microphone.  Br. at 19. ETG's expert, Mr. Matzen, did not testify to this effect.  Defendants' interpretation that a filter

can be placed at *any* portion of the forward path contradicts the Court's claim construction that defines a feedback path in relation to the output and the input of the transmission path, which necessarily includes the amplification component. One skilled in the art would *not* understand any portion of the forward path between the microphone and the amplifier to qualify as a feedback path of the transmission channel. Defendants' "expert," Dr. Soli's testimony to the contrary could reasonably have been disregarded by the jury because he is not a degreed electrical engineer nor does he have the requisite filter design experience that would qualify him as one. *See, e.g.*, Tr. 1689:8-10; 1691:19-24; 1694:17-21.

Moreover, because the filter of the Best Work is not in a feedback path, the Best system does not determine the effect on the amplitude and phase of a signal in the transmission path or insert a filter programmed by such a determination, as is required by Claims 13, 14 and 16. *See, e.g.,* Tr. 1937:5-20.

### c.    Claims 1 and 2 of the '749 Patent

There is virtually no evidence in the record, let alone clear and convincing evidence, to challenge the presumptively valid Claims 1 and 2 of the '749 Patent. Defendants' designated expert, Dr. Soli, failed to perform any meaningful invalidity analysis for Claims 1 and 2 of the '749 Patent. He merely concluded that "if all the elements of Claims 1 and 2 [of the '749 Patent] are similar to that of the adaptive filter, as asserted by ETG, then we have an adaptive filter that performs that function in Best's Thesis." *See, e.g.,* Tr. 1687:3-9. That one sentence is the extent of his analysis of the '749 Patent claims. Defendants failed to perform an element by element analysis of Claims 1 and 2 of the '749 Patent. This cursory analysis without any discussion of the claim language is insufficient and fails to meet the clear and convincing burden. Thus, the jury's verdict is supported by the lack of Defendants' showing of any evidence.

### 3.      Graupe '818 Does Not Invalidate Claim 19 of the '850 Patent[13]

The jury correctly concluded that Defendants failed to present clear and convincing evidence that Claim 19 of the '850 Patent is anticipated by Graupe '818.  The evidence heard at trial demonstrated that the system described in Graupe '818 was deficient in numerous ways. Graupe '818 does not provide an enabling disclosure as to the elements of claim 19 of the '850 Patent.  It also fails to disclose effecting substantial reduction of acoustic feedback as required by claim 19 of the '850 Patent.

First, the Graupe '818 disclosure fails to disclose detail necessary to build an operational device as required by claim 19 of the '850 Patent.  ETG's expert, Mr. Matzen, indicated that the "diagram" shown in the Graupe '818 did not include any structure and the text offered no evidence as to what structure could be used to make the theoretical diagram operational.  *See, e.g.,* Tr. 1922:18-1926:9.  The jury heard that Defendants' own expert, Dr. Soli, criticized the Graupe '818 in two published articles.  *See* DX 1765 (Kinder Opp. Dec. Ex. DDD) (Tr. 1713:17-1714:2, 1714:19-23; 1715:13-23); DX 1766 (Kinder Opp. Dec. Ex. EEE) (Tr. 1716:4-22).

In addition, Mr. Matzen testified that Graupe's block diagram requires that any sound from the microphone to the speaker must be prevented (e.g., by breaking the flow of sound) while his mathematical algorithm tries to calculate coefficients.  *Id.*  Specifically, the amplifier and transmission channel of Graupe '818 are purposefully removed from the circuit.  *See* DX 982 (Kinder Opp. Dec. Ex. OO) at 2:29-33.  As a result, any mathematical determination actually calculates incorrect coefficients for modeling "acoustic feedback from said receiver to said microphone."  *See, e.g.,* Tr. at 1926:10-19.  Plus, during the identification mode of operation, the theoretical model of Graupe '818 would not act as a hearing aid but would behave as a noise

---

[13] Defendants have waived any invalidity argument based on Graupe '818 with respect to claims 13, 14, and 16 of the '850 Patent and claims 1 and 2 of the '749 Patent.

generator. *See, e.g.,* Tr. 1929:22-24 ("During the identification mode, there is no hearing aid, the amplifier is disconnected so that [it] is meaningless."). These deficiencies mean that Graupe '818 is not an enabling reference as to claim 19 of the '850 Patent and therefore, may not even be considered prior art as to that claim.

Even if Graupe '818 was prior art, it fails to disclose substantial reduction of acoustic feedback from the receiver to the microphone. Defendants presented no evidence that Graupe '818 would achieve any reduction in acoustic feedback, let alone substantial reduction in acoustic feedback. They had the burden of proof under a clear and convincing standard and completely failed to introduce evidence on this limitation of claim 19. Defendants can point to no evidence that Graupe '818 achieved substantial reduction of acoustic feedback. Dr. Soli, Defendants' primary expert, is not even an engineer and thus would be unqualified to determine from a theoretical model in Graupe '818 that a device built according to its design would achieve acoustic feedback reduction and certainly is unqualified to determine how much reduction it might achieve. Indeed, as discussed, Dr. Graupe's approach was purely mathematical and theoretical. *See, e.g.,* Tr. 1926:4-9. Moreover, he did not translate the mathematics described in Graupe '818 into an actual working product. Defendants provided no testimony of any prototype, any testing on a hearing impaired person or any testing of any device whatsoever. *See, e.g.,* Tr. 1928:17-25. None of defendants' handsomely paid experts built a device using Graupe '818 as a model to determine what amount of feedback reduction it might achieve. As a result, the jury heard absolutely ***no evidence*** as the amount, if any, of acoustic feedback reduction could be achieved using Graupe '818's theoretical design. Hence, there is no reliable way to determine whether the theoretical device described in Graupe '818 could in fact effect

substantial reduction of acoustic feedback.  Moreover, even though Defendants took Dr. Graupe's deposition, they did not call him as witness at trial, either live or by deposition.

In contrast to Defendants' failure to present evidence of the amount of feedback reduction Graupe '818 might provide, the jury heard evidence that Graupe '818 does ***not*** effect substantial reduction in acoustic feedback from ETG's expert.  As discussed above, because Graupe '818 does not calculate the coefficients that are needed to effect substantial reduction of acoustic feedback.  *See, e.g.,* Tr. 2004:2-15 (redirect).  The system described in Graupe '818 functions as a noise generator for much of its operation and therefore does not effect substantial reduction of acoustic feedback.  As the transmission path is purposefully excluded during identification mode, the system does not consider the transmission channel and fails to effect substantial reduction of acoustic feedback.  Any slight variation in the acoustic feedback would require the removal of the amplification component from the circuit and render any system of Graupe '818 ineffective.  Therefore, Graupe '818 has severe disadvantages and would militate against any application as a usable practical hearing aid.  Accordingly, these shortcomings prevent realization of substantial reduction of acoustic feedback in Graupe '818.  Thus, unlike Claim 19 of the '850 Patent, the system described by Graupe '818 does not effect substantial reduction of acoustic feedback.  *See, e.g.,* Tr. 1928:9-16.  When viewing the evidence in the light most favorable to ETG, there is substantial evidence to support the jury's finding of validity of claim 19 over Graupe '818.

### 4.     Defendants Presented No Evidence To Support Their New Obviousness Defense

At trial, Defendants offered no opinions whatsoever that Claim 19 or any claim of the Patents-in-Suit is obvious by the combination of the Best Work in view of Graupe '818.  Rather, Dr. Soli's obviousness arguments were limited to combinations only involving the Weaver

Work.  *See, e.g.,* Tr. 1727:6-19 ("Q: Are you testifying on obviousness? … A: I'm testifying in relation to Weaver's invention that there is an obvious combination where the programmable DSP such as that disclosed by Nunley or perhaps by South").  Realizing the technical deficiencies in the Best Work and Graupe '818, Defendants now seek to offer a combination that was never presented during the case or at trial.[14]  Thus, not only did Defendants fail to provide clear and convincing evidence in support of their obviousness defense on the Patents-in-Suit, they provided absolutely no evidence whatsoever.  Defendants certainly had a full opportunity to put forth their invalidity case and even considered other obviousness combinations.  For instance, they offered the combination of Weaver Work and the South Article as well as the Weaver Work and the Nunley Article at trial - neither one was found convincing by the jury.[15]  Certainly, JMOL briefing is not the time to present new arguments because the ones presented at trial failed.  Defendants should not be given this opportunity.

　　　　Even if Defendants are allowed to introduce the combination of the Best Work and Graupe '818, the trial record simply fails to support this new theory.  None of Defendants' witnesses testified that one skilled in the art would have been motivated to place the Best LMS filter in the same position as the Graupe '818 correction circuit, as alleged by Defendants.  Br. at 20.  If this combination were so obvious, Defendants cannot explain why it took them nearly two years to even imagine this new combination or present any evidence of it at trial.  Furthermore, the modification from forward path to feedback path as suggested by Defendants would have required a complete restructuring of the system.  Dr. Best simply cut the wire between at the

---

[14] Dr. Soli's expert report does not opine on the specific combination of the Best Work in view of Graupe '818.  Indeed, ETG's entire expert report was deficient in so many respects that ETG moved this Court to exclude him as an expert.  *See* D.I. 486, 488. As this combination was not presented at trial, it was waived and cannot be introduced for the first time in Defendants' post-trial brief.

[15] Defendants' failure to argue combinations involving the Weaver Work are now waived.

microphone and kept the components of a traditional hearing aid intact.  To modify the Best

circuit from the input of the forward path to a feedback path would require Dr. Best to restructure

the internal components of the hearing aid to include a filter in a feedback path.  This

modification would not have been foreseeable to Dr. Best.  Defendants can point to nothing in

the trial record to support their new obviousness theory.  The combination suggested by

Defendants fails to render Claim 19 obvious and JMOL should be denied.

### 5. Defendants Failed to Meet Their Burden of Proving Lack of Written Description

Defendants completely failed to meet their clear and convincing burden to establish that

the asserted claims lacked an adequate written description requirement.  35 U.S.C. § 112, ¶ 1;

*Abbott Labs. v. Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1356 (Fed. Cir. 2003).  In fact, the

evidence overwhelmingly supports the jury's verdict that Defendants failed to establish a lack of

a written description.  Defendants' blanket contention that, if the claims cover adaptive filters,

then the claims lack written description falls far short of their obligation to point to specific claim

recitations that lack support.  Indeed, in this case, their burden was exceedingly high for claims

13, 14 and 16 because they are all originally-filed claims.  *LizardTech, Inc. v. Earth Res.*

*Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005) (an originally filed claim can provide the

requisite written description to satisfy section 112).  Defendants certainly fall far short of

establishing that the record lacks substantial evidence to support the jury's verdict.[16]

Under the proper analysis, the jury's determination that the patent specification, taken as

a whole, conveys with reasonable clarity to a person of ordinary skill in the art that the inventor

was in possession of the claimed invention at the time Dr. Levitt and his co-inventors filed their

---

[16] Defendants' citation to evidence they believe was favorable misses the mark.  If there is evidence to support the jury's verdict, JMOL should be declined, even if there may be record evidence that supports the losing party's position.

patent application is overwhelmingly supported by the record, including the testimony of Dr.

Levitt, the patents themselves, expert testimony from ETG's expert, Mr. Brown and the

declaration of Dr. Dowling.

Dr. Levitt and Mr. Brown both testified that the '850 Patent explicitly states that the

device may automatically adjust to cancel feedback by reciting sections of the patent that

indicated that feedback mechanism was "automatic" (*i.e.*, adaptive).  *See*, *e.g.*, Tr. 265:5-268:16

("the method of adjustment is adaptive."); 516:11-18.  *See also* JX 4 at 1:5-13 (D.I. 557, Ex. L)

("automatically adjusting to optimum parameter values as operating conditions such as . . . for

reducing acoustic feedback");  *Id.*, 11:32-37 ("Automatic adjustment of the frequency response .

. .  by placing the programmable filter in a feedback loop"); *Id.*, 11:51-57 ("effecting automatic

adjustment of the programmable filter to optimum parameter values as . . . for reducing acoustic

feedback").[17]  They also testified that the determining step can be performed adaptively through

a series of steps - *i.e.*, an algorithm and that his patent disclosed a few such algorithms.  *See*, *e.g.*,

Tr. 265:5-268:16.  *See also* Tr. 1461:3-12 ("Defendant expert admits that Dr. Levitt "used

algorithms to provide values.").  Specifically, the patent describes the nulling technique

algorithm and the paired comparison algorithm,[18] both of which are adaptive techniques.  *See,

e.g.*, Tr. 516:11-18; 376:21-377:11; 529:14-530:1.

As Dr. Levitt explained:

> Q.   Now, when Mr. Romary took you through those five steps, the last step is
> called comparison testing of possible alternative settings of the hearing aid to
> determine the optimal hearing aid settings for the subject.

---

[17] Even Defendants' Expert, Dr. Morley, admits that one of ordinary skill in the art would have known that any filter … in any patent could have been an adaptive filter or fixed filter.  Tr. 1551:11-16.

[18] The step of "paired comparison testing" described within the specification is no different than the least means squares ("LMS") techniques that seek to determine feedback reduction coefficients through the minimization of an error signal.  Just like the LMS methods, the paired comparison testing "determine[s] the optimal hearing aid settings [coefficients]" to further reduce acoustic feedback.  *See* Tr. 529:14-530:1; 268:2-16.

Now, can the paired comparisons be used for other things, such as feedback cancellation?

**A.    *The paired comparison technique is an adaptive procedure that I developed to hone in on the optimum settings, including a situation where there might be some feedback. Bear in mind, feedback doesn't always have to have whistling. This would be to optimize a hearing aid so as to minimize feedback that might reduce the quality of sound in the hearing even without whistling.***

Tr. 376:21-377:11; 529:14-530:1 (emphasis added) ("Because the adaptive filter, as I said a

minute ago, is very much like the nulling technique in the patent.").

Similarly, Mr. Brown testified that the techniques used by the Infringing Devices

incorporate the same general adaptive nulling technique as described in the patents in suit:

Q.    What is your understanding of what an LMS algorithm is?

A.    This the least mean squared algorithm is the routine, in this case it is a hardware one, but it is a routine to look at the coherence between the output and the input and determine when there is a signal present and iterate to a final solution, which closely approximates the elimination feedback by reducing the error term to a null.

Tr. 516:11-18.

Finally, the Declaration of Dr. Dowling (a "third expert" relied on by Defendants),

introduced as evidence in this trial, establishes that the claims at issue are be adaptive: "I

analyzed the adaptive nature of the Levitt Patents with regard to feedback cancellation … the

ETG filter can be adaptive," and "[no]body but a red faced liar could read these cites and say the

'850 does not contemplate adaptive filtering." Dowling Declaration at ¶¶ 12-14 (D.I. 553, Ex.

29) (quotations omitted).

Defendants' lengthy cross examinations of ETG witnesses about the specific examples in

the patent specification only reaffirmed that the '850/'749 Patent specifications support the

claims as written. *See, e.g.*, Tr. 516:11-18; 376:21-377:11; 529:14-530:1. Finally, testimony of

Defendants' experts on this subject was terse, conclusory and lacked sufficient detail to support a contrary verdict.[19]

Defendants' primary attack boils down to an untimely and improper effort to ask for reconsideration of this Court's Markman Order that summarily refused to limit the claims to a fixed filter.  *See Becton Dickinson and Co. v. Tyco Health-Care Group LP*, 2006 U.S. Dist. LEXIS 14999, *21-24 (D. Del. Mar. 31, 2006) (admonishing a defendant that used the "written description" defense simply as "an improper attempt to reargue claim construction").

## VI.    CONCLUSION

For all of the foregoing reasons, the Court should deny Defendants' renewed motion for judgment as a matter of law and request for a new trial in its entirety.

---

[19] The Kates and Bustamante articles are not relevant as a matter of law because they were written after the filing date of each of the Patents-in-Suit and could simply have been found to be incredible.  Moreover, the Kates article only uses the term fixed to describe the fitting process, not the feedback mechanism.

Dated:  May 9, 2008

/s/ Matthew A. Kaplan
Edmond D. Johnson (No. 2257)
Matthew A. Kaplan (No. 4956)
PEPPER HAMILTON LLP
Hercules Plaza Suite 5100
1313 Market Street
Wilmington, DE 19899-1709
Telephone:  (302) 777-6500

*Attorneys for Energy Transportation Group, Inc.*

OF COUNSEL:

Marty Steinberg
HUNTON & WILLIAMS LLP
1111 Brickell Avenue
Suite 2500
Miami, Florida  33131
Telephone:  (305) 810-2500
Facsimile:  (305) 810-2460

Brian M. Buroker
HUNTON & WILLIAMS LLP
1900 K Street, N.W., Suite 1200
Washington, DC 20006-1109
Telephone:  (202) 955-1500
Facsimile:  (202) 778-2201

Maya M. Eckstein
HUNTON & WILLIAMS LLP
Riverfront Plaza, East Tower
951 East Byrd Street
Richmond, VA 23219-4074
Telephone:  (804) 788-8788
Facsimile:  (804) 343-4630

## CERTIFICATE OF SERVICE

I do hereby certify that on the 9th day of May, 2008, I caused a true copy of the foregoing

***PLAINTIFF ETG'S OPPOSITION TO DEFENDANTS' BRIEF IN SUPPORT OF THEIR***

***RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW AND REQUEST FOR***

***NEW TRIAL ON THE ISSUES OF INFRINGEMENT AND VALIDITY*** to be electronically

filed with the Clerk of the Court using CM/ECF which will send electronic notification of such

filing to all registered participants.


Mary B. Graham (#2256)
MORRIS, NICHOLS, ARSHT &TUNNELL LLP
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
901 New York Ave., N.W.
Washington, DC 20001-4413

*Attorneys for William Demant Holding A/S,
WDH Inc., Oticon A/S, Oticon, Inc.,
Bernafon AG, and Bernafon LLC*

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
MORRIS, NICHOLS, ARSHT &TUNNELL LLP
1201 N. Market Street
Wilmington, DE 19899

William H. Mandir
David J. Cushing
Carl J. Pellegrini
SUGHRUE MION PLC
2100 Pennsylvania Ave., N.W.
Washington, DC 20037

*Attorneys for Widex A/S, Widex Hearing
Aid Co., Inc.*


/s/ Matthew A. Kaplan
Matthew A. Kaplan (#4956)