Brown - redirect

1    analog, and the speaker, and it compares that to the input

2    after the filter's feedback has been subtracted, and looks

3    for coherence.

4                    If it finds that there is any of that

5    feedback element still in the subtracted answer, then it

6    modifies the coefficients to attempt to correct for that.

7    It makes, calculates a new guess and applies that to the

8    filter.

9                    Then after this is cycled all the way through

10   the filter, come back around and new data comes back, it can

11   check to see whether it did a good job.

12                   As we pointed out, there is a lot more cycles in

13   between in the middle.  So this is a continuous process.

14   Q.      And do you agree or disagree that that measures phase

15   and amplitude?

16   A.      Definitely.  It doesn't read out phase and amplitude.

17   It measures it, it determines the effect on it.  It programs

18   the filter to respond to that effect, and the coefficients

19   of the filter define phase and amplitude.  They are the

20   measurement of it.

21   Q.      What was required to determine infringement of Claims

22   13, 14 and 16?

23   A.      That it determines the effect on the signal, the

24   effect of acoustic feedback on the signal in the patent.

25   Q.      And what again is your opinion as to whether the LMS

Brown - redirect

Page 651

1    does that?

2    A.      It does that.

3    Q.      And there was some discussion about how often it does

4    that?  What was it, 32,000 times a second?

5    A.      Yes.  A lot faster than we can think.

6    Q.      Does the fact that it does that 32,000 times a second

7    change your analysis as to whether these accused products

8    infringe?

9    A.      No, it doesn't.

10   Q.      And how many times, then, does it make a

11   determination when it performs the 32,000 times a second?

12   A.      Well, it makes 32,000 determinations.  But as I said,

13   it takes several seconds to actually integrate to the

14   answer, so that it doesn't distort speech.

15   Q.      Does it also then insert coefficients each time that

16   it determines them?

17   A.      Each time.

18   Q.      Does that change your analysis that it inserts

19   coefficients 32,000 times a second?

20   A.      No.  I still agree, it inserts coefficients 32,000

21   times a second.

22   Q.      What is your understanding as to whether or not the

23   claim requires -- strike that.

24           Does the fact that it performs these steps

25   multiple times change your analysis as to whether it

Brown - redirect

Page 652

1    infringes those claims?

2    A.    Once, twice, or 32,000 times a second, the same

3    analysis.

4    Q.    I believe you indicated that the LMS algorithm was an

5    improvement.  How is it an improvement on the Dr. Levitt

6    filter?

7    A.    Well, Dr. Levitt had a little man over here on the

8    side tweaking the knobs on the phase and amplitude meters to

9    null it out.  The LMS algorithm implemented in silicon does

10   that on the chip, and tweaks the knobs and controls the

11   filter to do it.  So it's an improvement.  You don't have to

12   do it manually.

13   Q.    Does that change your analysis that they infringe?

14   A.    No.  I think an improvement -- in fact, you can get a

15   patent on your improvement.  But that doesn't change

16   infringement.

17   Q.    Under the doctrine of equivalents analysis that you

18   provided for the '749 claims -- can we pull up the slide

19   that shows the corresponding structure.  In your analysis,

20   do you understand whether you need to find an equivalent to

21   each and every one of those specific structures listed in

22   the right-hand column?

23   A.    It's my understanding of the doctrine of equivalents

24   I have to find an equivalent function, not the specific

25   one-to-one relationship.

Brown - redirect

1    Q.    So if you don't find a specific latch or a specific

2    A-to-D converter, that doesn't change the analysis?

3    A.    No.  That's why I couldn't find literal, because

4    there was no specific one-to-one.

5    Q.    Do you remember the questions about Radio Shack,

6    trying to find the LMS filter?

7    A.    I have gone to Radio Shack to find parts once in a

8    while.  But not advanced ones.

9    Q.    Now, was an LMS filter readily available in 1986?

10   A.    Not as a discrete component, no.  That was my joke.

11   Q.    There was some discussion about whether or not the

12   accused products use a test signal.  Do you recall that?

13   A.    Yes.

14   Q.    Any of the claims that we have talked about require a

15   test signal?

16   A.    No.

17   Q.    There was discussion about whether or not the

18   microphone could be disconnected or connected.  Are there

19   any claims that you are aware of that require the claim to

20   be connected or disconnected?

21   A.    No.

22   Q.    There was a discussion about whether or not the LMS

23   filter generates its coefficient.  Do you recall that?

24   A.    Yes.

25   Q.    Do you believe it is proper to view the LMS and the

Brown - redirect

Page 654

1    FIR structures that we talked about in your direct

2    examination as a single filter?

3    A.    Well, no, not in an effort to get around the

4    infringement.  When we build chips, we, today, build small

5    structures, integrate them into what we call cells, we put

6    cells together to make macro cells, and we put them together

7    to build systems.

8            We give the macro cell a name.  That doesn't

9    mean it doesn't contain subcells.  And even from the

10   defendants' own engineering literature we see the subcells

11   are a filter with an LMS controlling it.

12           So it's not appropriate to roll it up into a

13   higher level and say it does it internally.

14           MR. BUROKER:  Your Honor, may I have a moment?

15           THE COURT:  Yes.

16   BY MR. BUROKER:

17   Q.    Assume the LMS was available as a discrete chip in

18   1986 and you bought it back to Dr. Levitt's offices there at

19   Audimax.  Could he use it in the same way he used the

20   technology to determine amplitude and phase?

21   A.    Well, yes.  I think Dr. Levitt would certainly have

22   been capable of doing that with his experience in filters at

23   that point in time.

24           MR. BUROKER:  Thank you, Mr. Brown.

25           THE COURT:  Mr. Brown, you are excused.  Thank

Gloster - direct

Page 660

1    entities.

2    Q.      Have you published any papers relating to your use of

3    hardware description planning for modeling digital systems?

4    A.      Yes.  In fact, I published a paper in 2006 that was

5    in a conference in Hawaii.  It was called Optimizing The 2D

6    Discrete Cosine Transform for Execution on an FPGA System,

7    on a reconfigurable system.  In that paper we actually

8    modeled a system.  I think in 2002 I wrote a paper called A

9    Reconfigurable Instruction Set Architecture Assembler, we

10   actually wrote VHDL.  That was for a NASA conference.

11   Previously, we wrote with one of my Ph.D. students that is

12   now a Ph.D. a paper, VHDL Modeling Of A Discrete Cosine

13   Transform.  That was actually at a VHDL user forum.  So that

14   conference was particularly for VHDL.

15   Q.      Do you consider yourself to have special knowledge of

16   hardware description language?

17   A.      Yes.

18   Q.      And use of hardware description language for

19   designing digital systems?

20   A.      Yes.  If somebody can take a look at the VHDL code

21   that is written for a particular circuit to model it, if

22   somebody else understands the compiler that is used to

23   translate that model into the actual circuit, then they can

24   tell from the code what will end up in the final circuit.

25              MR. BUROKER:  Your Honor, we would like to offer

Gloster - direct

1    Dr. Gloster as an expert on digital systems and hardware

2    description language.

3                    THE COURT:  Any objection?

4                    MR. SHELTON:  No objection, Your Honor.

5                    THE COURT:  Doctor, you may proceed as an

6    expert.

7    BY MR. BUROKER:

8    Q.    Doctor, were you engaged by one of the parties in the

9    case?

10   A.    Yes.

11   Q.    Who was that?

12   A.    ETG, the Energy Transportation Group.

13   Q.    What was the general topic you were engaged to do?

14   A.    Well, I was engaged to take a look at the technical

15   documents that were presented to me and to sort of see if

16   they matched the code, which is actually what's in the chip.

17   The particular feature that I was tasked to look at was

18   feedback cancellation.

19   Q.    What kinds of technical documents did you compare to

20   the code?

21   A.    Basically, I received several technical documents

22   from Mr. Kip Brown.  And also I received code that was

23   deposited at a neutral site.  So I had to go to the neutral

24   site to review the code.  So I would go and take a look at

25   the code, pull out the portions that matched the particular

Gloster - direct

Page 662

1    block diagrams and the technical documents, and then

2    determine whether what was in the code was actually what was

3    represented in the technical documents.

4    Q.    How much code did you have to review in that process?

5    A.    I had to go through tens of thousands of lines of

6    code before I could find the particular portions of the code

7    that were related to feedback cancellation.  Then after I

8    looked at those particular portions, I had to identify which

9    figures in the technical documents were related to the code

10   and to determine whether they matched.

11   Q.    Prior to your work on this case, had you done any

12   analysis of digital systems relating to hearing aid

13   products?

14   A.    No, I had not worked on hearing aids specifically.

15   However, I have worked with naval research.  And we actually

16   did image processing.  In image processing you translate the

17   images into digital samples, then you filter the digital

18   samples.

19         So once you are looking at digital samples, be

20   it from a video image or from an audio signal, the

21   processing of the samples is the same.

22   Q.    For the Demant defendants and the Widex defendants,

23   when you reviewed the technical materials and the hardware

24   description language code, what was the general conclusion

25   you came to?

Gloster - direct

Page 663

1    A.    It was my opinion that the technical documents

2    matched the code.  They were accurate descriptions of what

3    was actually found in the code.

4              I think there had been some question previously

5    as to whether or not the documents matched the code.  That

6    was my job.  I found that for this particular block diagram

7    this matched the code.

8              Typically, engineers create block diagrams

9    before they actually write the code.  So it would be natural

10   to find a set of block diagrams that matched the code.

11   Q.    For the Widex defendants, which products did you look

12   at?

13   A.    It was Diva and Inteo.

14   Q.    Did they use the same integrated circuit or chip?

15   A.    Actually, not exactly.  What happened was the Diva

16   was derived from the Diva 1 platform.  And the Inteo was

17   derived from the Diva 2 platform.  I also called it the

18   Rollo.

19              So I looked at the Diva 1 and the Diva 2

20   platforms.  In the Diva 2, I think there was two instances

21   of the feedback path simulator, FPS.  In Diva 1 there was

22   only one.

23   Q.    It is your understanding that the feedback path

24   simulator between the two different chip platforms was

25   similar?

Gloster - direct

Page 664

```
 1   A.      Yes.

 2   Q.      For that feedback patent simulator for the Widex

 3   products, what was the analysis that you did?

 4   A.      Basically, I was asked to identify which block

 5   diagrams in the technical documents matched actually the

 6   code, and to look at the code, go through the code and

 7   determine whether they were accurate or not.

 8   Q.      Could you take a look in your book at JX-305?

 9   A.      Yes, I have it.

10   Q.      Are you familiar with this document?

11   A.      Yes.

12   Q.      What is this document?

13   A.      This is the Diva 2 feedback canceling document from

14   Widex.

15   Q.      Is this one of the ones you looked at?

16   A.      Yes.

17   Q.      Is there a particular figure that you looked at in

18   this document?

19   A.      Yes.  I think it was Figure 2.1.

20   Q.      We have a demonstrative that will highlight that.  I

21   think it's Gloster 2.  Why did you look at this figure in

22   particular?

23   A.      Because this was the figure in the technical specs

24   that related to feedback canceling.  You can see at the top

25   of the figure it says feedback canceling.  And Mr. Brown
```

Gloster - direct

Page 665

1    gave me this particular figure to take a look at.

2    Q.    Can you describe what are all these different squares

3    or rectangles and the lines, what is this trying to show to

4    an engineer?

5    A.    Each of the boxes represented in this figure

6    represents a particular module.  In this particular figure,

7    I immediately zoomed in to try to find the portions of the

8    VHDL code that correspond to this figure.  Then I found a

9    particular section called canceling.  It was canceling .VHD.

10   That was the particular file that had to do with feedback

11   canceling.

12   Q.    Were there any particular blocks or lines in this

13   figure that you focused in on?

14   A.    Yes.  There were two blocks that I focused in on.

15   And the two different blocks that I focused in on was the

16   WLMS block and the WFIR block.

17              I noticed in the code that they were two

18   separate blocks and that the WLMS block provided inputs or

19   coefficients to the WFIR block.

20   Q.    Let's take a look at the code and show where you

21   found that -- first of all, you said inputs.  What do you

22   mean by an input to a block?

23   A.    Well, an input is the information that is provided to

24   a particular block.  In the case of digital systems, inputs

25   are always binary digits, ones or zeros, and they could be

Gloster - direct

Page 666

1    multiple bits.

2    Q.      What about outputs?  What are outputs?

3    A.      Outputs is the information that comes out of a block

4    that is provided to the next block.  Same thing as

5    information, could be binary digits, bits, one or more bits.

6    Q.      Can you tell from looking at the inputs and outputs

7    of these blocks in the code what if any relationship there

8    is between the parts?

9    A.      Yes, if you look at the code, you can tell how the

10   blocks are connected, whether this block is connected to

11   that other block.  You can also tell the function of each

12   block by opening the inside of that block.  So you can go

13   inside the block, and you can go inside that block further.

14   Q.      Let's take a look at PX-857.  Are you familiar with

15   that exhibit?

16   A.      Yes.

17   Q.      What is that exhibit?

18   A.      This is the actual VHDL code that dealt with

19   canceling, feedback canceling.

20   Q.      And is there any section in this section of code that

21   deals with canceling that tells you that there is a WFIR

22   filter?

23   A.      Yes.  I think it's on the subsequent page.  This is

24   the actual declaration of the entity for the entire

25   canceling block.  And inside it you should see the WFIR.

Gloster - direct

1          So at the bottom here of G-4, if you notice

2    highlighted in red, you will notice that that is the actual

3    WFIR block.  It's instantiated or called.  So it's called

4    within the canceling block.  And you can see the inputs and

5    outputs of that module denoted by port map.

6          The green highlighted sections are the actual

7    coefficients that are the inputs to the WFIR block.

8    Q.    And is there a section of this top level code that

9    shows you that there is a WLMS block?

10   A.    Yes.  I think on the previous page that we just saw,

11   the page before this none.

12   Q.    G-2.

13   A.    G-2 starts with the WLMS block right there.  You can

14   see the actual instantiation of the WLMS block.  And it goes

15   onto the next page, if you will.

16          Those are all the inputs and outputs of that

17   particular block, Just highlighted in green the

18   coefficients, which are the outputs of that particular

19   block.

20   Q.    And again, we use the term FIR.  What is an FIR?

21   A.    FIR is a finite impulse response filter.  It is

22   actually a delay line filter that's used to model the

23   acoustic feedback, which is fed back into the system and

24   subtracted from the microphone input to cancel out feedback.

25   Q.    And is there anywhere in the code that confirms what

Gloster - direct

1    we saw in the diagram that showed the two being connected?

2    A.      Yes.  I think if you go back to the graphic that we

3    saw where there was a WFIR, if you look above it, there is

4    actually a block where it says WLMS, WFIR, connect, and it

5    clearly shows these two modules, the output of the WLMS

6    block provides inputs to the WFIR block, because they are

7    directly connected together, and here is the code that shows

8    it.

9    Q.      What does this mean to you?  What is the significance

10   of this?

11   A.      It means that the WLMS block calculates the

12   coefficients.  Those are computed.  Those are outputs.

13   Those are provided as inputs to the WFIR filter.

14   Q.      Is the LMS a separate component from the filter?

15   A.      Yes.  You can definitely see in the code that there

16   is two separate blocks, one is for the WLMS.  One is

17   specifically for the WFIR.  And the two blocks in the actual

18   code are connected together code together.  I just clearly

19   pointed that out in the code.

20   Q.      Is there a specific section in the code that also

21   provides the detail for the FIR filter and the WLMS?

22   A.      Yes.  There is a different section of the code where

23   each of those blocks is defined and what's inside those

24   blocks is further defined.

25   Q.      Let's take a look at -- so we are looking at here one

Gloster - direct

Page 669

1    section of the code, the top part says WLMS canceling.  What

2    is this section?

3    A.      This section of the code is where the design engineer

4    has developed a VHDL model of the WLMS block.  You can see

5    the entity WLMS.  First, you have to list all of the inputs

6    and outputs of the module.  So this is where that module is

7    defined.

8            If you go to the next page, it goes on to tell

9    all of the inputs and outputs.  And you can see clearly the

10   designer has made a comment, coefficients output, those are

11   the coefficients that are the output of the WLMS block.

12   Q.      And is there anywhere in the code that indicates

13   where those coefficients go to?

14   A.      Yes.

15   Q.      And where is that?

16   A.      You can also see a WFIR block that has been defined,

17   if you bring up the other graph.

18   Q.      That's the first page here, is entitled WFIR,

19   canceling.  That is the page we are talking about?

20   A.      That's correct.  Here the WFIR block is further

21   described.

22           You can see the entity WFIR is defined.  There

23   is the inputs and outputs.  If you will notice, at the green

24   section, the inputs to that block are the coefficients.

25   Once again.

Gloster - direct

1    Q.      Let's go back and look at Gloster 2, then, which is

2    the diagram.   Were you able to confirm that there are

3    separate boxes for the WLMS and the WFIR in the code?

4    A.      Yes.   I looked at the code, and you could see from

5    the code that there definitely was separate blocks.   The

6    WLMS block provided inputs to the WFIR block.   The WLMS

7    block determined what the coefficients were.   They were

8    passed to the WFIR block.

9    Q.      Did you see anything in the code that confirmed what

10   is shown in the diagram as the arrows pointing from the WLMS

11   to the WFIR?

12   A.      Yes.   As I brought to your attention, there was a

13   connect block that is equivalent to the arrow shown from the

14   WLMS block to the WFIR block, the connection between the two

15   modules.

16   Q.      Please finish.

17   A.      If you also notice, there is a RAM there, P0 to P47.

18   That indicates that there were 47 taps to the FIR filter --

19   48 is, zero to 47, 48 coefficients that were provided as

20   inputs.

21              So the WLMS block computed them and those

22   were placed in a RAM and then applied to the FIR filter.

23              THE COURT:   Do you have a laser pointer or

24   anything?

25              MR. BUROKER:   Can you highlight the block he was

Gloster - direct

Page 671

1    just talking about?

2              THE WITNESS:  You see the P0 through P47?  Right

3    there.

4    BY MR. BUROKER:

5    Q.      That signifies the memory.  Is that correct?

6    A.      Yes, that's correct.

7    Q.      What does the presence of that memory tell you, if

8    anything, about this design?

9    A.      The presence of memory in digital systems clearly

10   defines that they are programmable.  A computer has memory,

11   so we can program it.

12              So if memory is present, then it must be

13   programmable, because it can change, the values can change.

14   Q.      In this case what is the memory used for?  What does

15   it change?

16   A.      It changes the coefficient.  So the WLMS block

17   computes the coefficients, it changes them, stores them in

18   the memory.

19              So they can be subsequently changed and applied

20   to the filter.

21   Q.      So before we move on to Oticon, for purposes of the

22   Widex document you reviewed, what is your conclusion as to

23   whether or not this diagram is accurate?

24   A.      It's my conclusion, it's my opinion that the

25   technical documents directly match, accurately match what's

Page 672

1    in the code, and that this update module -- not the update

2    module, the WLMS module produces the coefficients.  They are

3    stored in a RAM and they are provided as input to the WFIR

4    block, which is the 48-tap final impulse response filter.

5    Q.    Thank you.  Did you perform a similar analysis with

6    regard to the Oticon products involved in this case?

7    A.    Yes.

8    Q.    And describe, again, what did you do for the Oticon

9    products?

10   A.    I went through a similar procedure.  I tried to

11   identify the technical documents that sort of matched the

12   code.  And I was given the technical documents by Mr. Brown.

13   And it was my understanding they came from the defendants.

14          Then I looked at the code and tried to identify

15   which portions of the code dealt with feedback cancellation.

16   Then when I found those, I tried to match that code to the

17   actual technical specs.

18          Now, in this case, it was Verilog code, not

19   VHDL.

20   Q.    Do you understand how many platforms there are in the

21   Oticon product?

22   A.    Yes.  It's my understanding that there were many

23   products, but I only looked at two platforms, and that was

24   Jump 2 and Jump 3.  It was my understanding that Jump 2 and

25   Jump 3 were in many of the other products.

Gloster - direct

Page 673

1    Q.    What was the name of the feature that you looked at

2    for the Jump 2 and Jump 3 products?

3    A.    For Jump 2 and Jump 3 I focused on feedback

4    cancellation.

5    Q.    Do you recall the name of their feedback cancellation

6    module?

7    A.    Yes.  It was AFB, I think it was anti-feedback, is

8    the acronym.

9    Q.    I am going to show you what has been marked as

10   JX-138.  It's in your book.  I think it's in the jurors'

11   notebooks.  What is this document?

12   A.    It says The AFB Algorithm.  It is the defendants'

13   documentation discussing how they deal with feedback.

14   Q.    And similar to what you did with Widex, is there a

15   particular figure you focused on?

16   A.    Yes.  I think that was Figure 13.

17   Q.    Okay.  Let's take a look.  Is this demonstrative

18   drawn from Figure 13 of the JX-138?

19   A.    Yes.

20   Q.    Again, what is this series of boxes and lines

21   showing?

22   A.    This particular block diagram is what, is supposed to

23   be the insides or the internal components of the AFB block.

24   Inside of it, I focused on two blocks which was the update

25   block and FBC_FIR block.  The update block computed the

Gloster - direct

1    coefficients.   The coefficients were applied as input to the

2    FBC_FIR block.

3    Q.      Okay.  And what is the -- there is a little box there

4    that maybe it's got a 26 -- excuse me.  It has a 26 on it.

5    What is that little block there?

6    A.      The 26 block is what they call the coefficient

7    buffer, feedback cancellation coefficient buffer.  That is

8    where the coefficients are actually stored.  In this filter,

9    I believe it was a 24 tap FIR filter so it would be 24

10   coefficients that were stored.

11   Q.      And were you able to then compare this to the code in

12   the Oticon products?

13   A.      Yes.  I compared this block diagram to the code and

14   it's my opinion that the actual technical document, this

15   particular figure matched the code with respect to these

16   products.

17   Q.      And based on your review of the code, is their update

18   module a separate module from the FIR filter?

19   A.      The update module was definitely a separate module

20   from the FBC_FIR module, and the update module computed

21   coefficients which were stored in a memory and provided as

22   input to an FIR filter, which is FBC_FIR.  If you look in

23   the figure, the diagonal line going up from the coefficient

24   buffer to the FBC_FIR block is where the coefficients

25   actually were transferred from the coefficient buffer into

Gloster - direct

Page 675

1    the FIR filter.

2    Q.    Okay.  Does the FIR filter calculate its own

3    coefficients?

4    A.    No, the update block calculates the coefficients

5    which are provided as input to the FIR filter.

6    Q.    Okay.  Let's take a look briefly, if you would, at

7    the code you that looked at, JX-298.  And what is this that

8    we just called up, G10A?  What is that?

9    A.    This is the actual code for the AFB block.  If you

10   notice at the block, it says AFB_RTL.V.  it's written in

11   Verilog.  Inside of that block, if you move down, you will

12   see the blocks, one of the blocks.

13         The highlighted block there at the bottom is

14   FBC_FILT, that is the actual instantiation of the filter

15   that is where the filter is called an AFB module.  And if

16   you notice, there is a line that is highlighted.  That is

17   where the coefficients are provided as input to the filter.

18   Q.    Okay.  I think -- what do you mean by instantiated,

19   in English?

20   A.    Instantiated is a hardware description language term

21   meaning calling that particular block so that blocks occurs

22   inside the AFB module.

23   Q.    So from that, you can tell whether it's actually

24   inside the chip?

25   A.    That is correct.

Gloster - direct

1   Q.      Is there anything that helps you to determine whether

2   or not there is an update module on the jump 2 and jump 3

3   feedback cancellation circuit?

4   A.      Yes.  If you look at the AFB code with Verilog, you

5   will find an updated module that is instantiated.  Here you

6   will see the update module is instantiated.  You can see

7   also the green lines that the coefficients are produced and

8   those coefficients are provided as input to the FBC_FIR

9   block.

10  Q.      What can you tell, if anything, the coefficients

11  definition in the FIR filter and this coefficient definition

12  here in the update module?

13  A.      If you look closely at the code, you can determine

14  that the outputs of the update module are provided at input

15  to the FBC_filter, FIR filter.

16  Q.      If we can go back we can look at Gloster 1, real

17  briefly.

18          And is that the same as what is shown here in

19  Figure 13 out of the exhibit?

20  A.      Yes.  The output of the update module is provided as

21  input to the buffer and then those coefficients are provided

22  as input to the finite input response, the FBC_FIR block.

23  Q.      And what, if anything, is there to -- strike that.

24  Is there any significance to the existence of a buffer in

25  this design?

Gloster - cross

1    A.    Yes.  Once again, it's a memory element.  A buffer is

2    a memory element.  It's used to store the coefficients and

3    the existence of a memory, to me, says that it's

4    programmable.  So, therefore, this is a programmable delay

5    line filter.  The coefficients are calculated.  They're

6    provided as input to the filter, the two separate blocks.  I

7    think that's what it says.

8                    MR. BUROKER:  Can you give me one second?

9                    Thank you, Dr. Gloster.

10                   THE COURT:  All right, gentlemen.

11                   Counsel, you may cross-examine.

12                   MR. SHELTON:  Good afternoon, Your Honor.  Brian

13   Shelton for Widex defendants.

14                   THE COURT:  Good afternoon, counsel.

15                        CROSS-EXAMINATION

16   BY MR. SHELTON:

17   Q.    Good afternoon, Dr. Gloster.

18   A.    Good afternoon.

19   Q.    Prior to this litigation, you had not served as an

20   expert witness; correct?

21   A.    That's correct.

22   Q.    And this case is the first time you have offered an

23   opinion in a patent infringement lawsuit; correct?

24   A.    That is correct.

25   Q.    Now, Dr. Gloster, you are not offering an opinion as

Gloster - cross

1    A.    Yes.

2    Q.    And there was a slide that he had up and I'd like to

3    bring it up.  It's Brown 13, if I could.  And I believe

4    there was some testimony regarding the difference

5    means-plus-function elements and then there was -- and the

6    column on the right side here we have the corresponding

7    structure.  Do you recall that, sir?

8    A.    Yes.

9    Q.    At any course during your involvement with this case,

10   were you ever asked to look at the Widex products to

11   determine if the corresponding structure elements we see on

12   the right hand of this chart were present?

13            MR. BUROKER:  Objection, Your Honor.  Beyond the

14   scope.  He already didn't look at the patents.

15            MR. SHELTON:  I'll withdraw that.

16   BY MR. SHELTON:

17   Q.    Now, I believe you testified earlier about the WLMS

18   block.  Do you recall that?

19   A.    Yes.

20   Q.    And I believe you testified that in your view, that

21   block had a programmable aspect to it; is that correct?

22   A.    I said that block produced coefficients.  The

23   coefficients were stored in a RAM.  And the existence in a

24   RAM means the coefficients can be changed.  Hence, it's

25   programmable.

Gloster - cross

Page 684

1   Q.    So if I understand your view of programmable, in

2   order for a device to be programmable, you have to have a

3   memory; is that correct?

4   A.    In order for a device to be programmable, you would

5   actually have to be able to change the values; okay?

6   Programmable is the opposite of fixed.  Fixed means you

7   cannot change it.  In even in a Court's construction,

8   programmable means that you can change the coefficients one

9   or more times.  In the era of digital systems design, you

10  have to store a value to be able to change it.  So when we

11  design a digital system we put a memory, a coefficient

12  buffer or a RAM in its place.  That means programmable.  If

13  a computer had no memory, it would not be programmable.

14  Q.    If I understand you, sir, in order for something to

15  be programmable in your view, you would have to have a

16  memory?  Yes or no.

17  A.    In the digital area, the existence of a

18  programmable -- of a memory infers directly that it's

19  programmable.  That is what I said.

20  Q.    So is that yes?

21  A.    Could you repeat the question?

22  Q.    Yes.  In your view, in order for something to be

23  programmable, you have to have a memory?  Yes or no.

24  A.    No.  In my view in order for it to be programmable,

25  you have to be able to change the values.  In the digital

Westermann - direct

Page 716

1    Q.      Now, you are familiar with the '850 and '749 patents

2    at issue here.  Correct?

3    A.      Today I am, yes.

4    Q.      Now, in the 20 years since they have been filed, has

5    Widex ever filed an opposition in any patent office in the

6    world to those patents?

7    A.      To the Levitt patent?

8    Q.      Correct.

9    A.      No, we have never.

10   Q.      Now, we have talked about this industry association

11   called HIMPP.  It's an acronym, right, H-I-M-P-P?

12   A.      That's correct.

13   Q.      What does that stands for, if you can tell us?

14   A.      The hearing Instrument Manufacturers Patent

15   Partnership.

16   Q.      Patent partnership?

17   A.      Yes.

18   Q.      And HIMPP was started by certain hearing aid

19   manufacturers to acquire a group of patents.  Correct?

20   A.      That's correct.

21   Q.      And Widex is a member of HIMPP.  Correct?

22   A.      That's correct.  Widex is a partner in HIMPP.

23   Q.      Is the Demant entity a partner in HIMPP?

24   A.      Yes.

25   Q.      Now, did HIMPP assist the hearing aid industry,

Westermann - direct

Page 717

1    including Widex and Demant, in obtaining CDs from a company

2    called MicroPatent that contains patents of interest to the

3    hearing aid companies?

4    A.    Yes.

5    Q.    And all the members of HIMPP, including Widex and

6    Demant, have access to that CD with those patents.  Correct?

7    A.    Yes.  I mean, that information is public.  So

8    everybody can get that.  You just have an easy way,

9    organized way of getting them.

10   Q.    You, in fact, are the managing director of HIMPP.  Is

11   that correct?

12   A.    That's correct.

13   Q.    And other personnel in your patent department also

14   have access to that database of patents.  Correct?

15   A.    That's correct.

16   Q.    And you personally have access to that database of

17   patents.  Correct?

18   A.    I do.

19   Q.    And all of the HIMPP members, including Demant, has

20   access to that database.  Right?

21   A.    Not correct, because they have their own database.

22   Q.    But that is essentially a copy of the database that

23   contains these patents.  Right?

24   A.    Essentially, yes.

25   Q.    And both the '850 and the '749 patents were in that

Westermann - direct

Page 718

1    database that was distributed by HIMPP to the HIMPP members.

2    Correct?

3    A.     That's correct.

4    Q.     And that occurred in about 2001.  Is that correct?

5    A.     That's correct.  I think 2001 or 2002.

6    Q.     Now, I am going to ask you about other knowledge that

7    Widex had about the '850 and '749 patents other than the

8    database from HIMPP.  Okay?

9    A.     Okay.

10   Q.     I would like to refer in the book in front of you to

11   Exhibit PX-366.

12   A.     Okay.

13   Q.     And PX-366 purports to be an assignment of a patent.

14   Correct?

15   A.     Yes.

16   Q.     Do you recognize this document?

17   A.     I saw it during my HIMPP interview in Denmark.

18   Q.     Now, if you look about four or five pages back, there

19   is actually an assignment agreement.  Do you see that?

20   A.     Yes.

21   Q.     It's dated June 1996.  Right?  You can see that in

22   the first full paragraph at the very end?

23   A.     Okay.  It's signed during August but --

24   Q.     So it's June 1996, signed in August 1996.  Correct?

25   A.     Yes.

Westermann - direct

Page 728

1    Q.     Okay.  And is this so-called Mangold patent?

2    A.     It's the so-called Mangold patent.

3    Q.     Yes.  Do you see the inventor named Mangold?

4    A.     But there are similar Mangold patents.

5    Q.     Is this one of the Mangold patents?

6    A.     Yes.

7    Q.     Now, if you look at the references, No. 14?

8    A.     Excuse me.  What references?

9           MR. STEINBERG:  May I have a moment, Your Honor?

10          THE COURT:  Yes.

11          (Pause.)

12   BY MR. STEINBERG:

13   Q.     Let's move on to DX-1195.  Now, the patent you are

14   looking at, is that one of the patents that was purchased by

15   HIMPP in the original transaction?

16   A.     This is not the patent.  This is a list of patents.

17   Q.     A list of patents?

18   A.     Yes.  And this is the list the patent family called

19   CID 3, that HIMPP was a part of the patent portfolio that

20   HIMPP purchased.

21   Q.     Let's go to DX-1196.  And what is DX-1196?

22   A.     It appears to be one of the U.S. patents from the CID

23   3 family.

24   Q.     One of the patents purchased by HIMPP?

25   A.     Yes, correct.

Westermann - direct

Page 729

1    Q.    Okay.  And if you look down the references cited in

2    that patent, you see the Dr. Levitt patent, the '850?

3    A.    Yes, I do.

4    Q.    And this was a patent that was filed in April of

5    1993; correct?

6    A.    It seems to be a division of what was filed in '93,

7    yes.

8    Q.    And when was the transaction when HIMPP purchased

9    these patents?

10   A.    It was in the summer of '96.

11   Q.    1996?

12   A.    Yes.

13   Q.    Now, HIMPP purchased these patents for approximately

14   how much money?

15   A.    These CID patents or the entire portfolio.

16   Q.    The entire portfolio.

17   A.    I believe it was $40 and-a-half million U.S. dollars.

18   Q.    Was anything done to review the references listed in

19   the patents as prior art like Dr. Levitt's '850 patent at

20   the time of this expenditure of $14.5 million?

21   A.    No, because these CID patents actually just came as a

22   kind of extra.  We were not looking for those, specifically.

23   Q.    Now, is one of the benefits of Widex being a member

24   of HIMPP that you would pay less royalties to license

25   patented technology as a member of HIMPP?

Westermann - direct

Page 733

1    Q.      But prior to launching the Senso Diva with feedback

2    cancellation, your patent department didn't do anything to

3    search for patents that related to feedback cancellation,

4    did it?

5    A.      I am not sure.  They probably didn't.

6    Q.      I am sorry?

7    A.      I don't think they did specifically that, no.

8    Q.      Well, when you were deposed did you tell us that they

9    didn't do anything?

10   A.      I mean, we do an ongoing survey.  And that is it.

11   Q.      Can you turn to Page 118 and 119 in your deposition,

12   Volume II.

13           If you look down, starting with Line 22 on Page

14   118 going over to the next page, were you asked these

15   questions and did you give these answers:

16           Okay.  Prior to launching the Senso Diva

17   product, do you know whether your patent department did a

18   search relating to feedback and feedback cancellation?

19           Answer:  The patent department was not so big at

20   that time and I don't think they made -- made a specific

21   search for feedback cancellation.

22   A.      Exactly.

23   Q.      But today you would do that.  Right?

24   A.      Yes.

25   Q.      Now, in fact, despite having a policy of reviewing

Westermann - direct

Page 734

1    patents to determine infringement, Widex didn't perform any

2    due diligence to determine whether its Senso product would

3    be infringing any other patent whatsoever prior to launching

4    that product, did they?

5    A.    May I have that again?

6    Q.    Sure.  Despite Widex having a policy of reviewing

7    patents to determine infringement, Widex didn't perform any

8    due diligence whatsoever to determine whether the Senso

9    product was infringing other patents?

10   A.    The Senso Diva product?  There are many Senso

11   products.  You mean the Senso Diva product?

12   Q.    Correct.

13   A.    Well, we didn't really have this official policy back

14   at that time.

15   Q.    Did you do any due diligence whatsoever to determine

16   whether the Senso Diva infringed any other patent?

17   A.    Apart from the ongoing surveillance, I don't think

18   so.

19   Q.    Well, you are saying you did something.  What did you

20   do?

21   A.    I mean, we had a constant, we were constantly

22   monitoring the incoming patents.  And if something resembled

23   anything we were planning to do, we would act.

24   Q.    But you don't recall performing any specific due

25   diligence to determine whether this product was infringing

Page 735

1    any other patent.  Correct?

2    A.    Not a specific duty, no.

3    Q.    Now, you have been here from the open argument.

4    Correct?

5    A.    Yes.

6    Q.    And you have heard the testimony, you have heard the

7    lawyers talk and so forth.  Correct?

8    A.    Yes.

9    Q.    Now, you have heard other members of your company say

10   that Widex prepares various types of information for the

11   public and for others about their product, describing their

12   products.  Correct?

13   A.    Sure.

14   Q.    Is that true?

15   A.    Sure.

16   Q.    And you have also, you agree with me that prior to

17   that material going out to the public, that material is

18   reviewed for correctness by your technical people.  Correct?

19   A.    I think so.

20   Q.    To make sure it's accurate.  Correct?

21   A.    Yes.

22   Q.    In fact, your technical people will actually write up

23   the information about the product so that the marketing

24   department can then put out a brochure describing your

25   product.  Correct?

Westermann - direct

Page 747

1    Demant, would have known that Dr. Levitt had been retained

2    as an expert on behalf of HIMPP; correct?

3    A.    Yes, because there was a common decision to use him.

4    Q.    It was a group decision by all the members?

5    A.    Yes, and that is why I didn't need to read the

6    resume.  We wanted him.

7    Q.    You didn't read his resume because you knew he was a

8    preeminent expert in the field, right?

9    A.    Yes.

10   Q.    Now, if you wouldn't mind turning to 562, PX-562.

11   A.    (Witness complies.)

12   Q.    And that purports to be a letter to Dr. Levitt dated

13   December 26, 1996 from the Sughrue law firm, Mr. Cushing

14   retaining Dr. Levitt?

15   A.    That is correct.

16   Q.    And who is Mr. Cushing?

17   A.    Mr. Cushing is our U.S. patent lawyer.

18   Q.    And he in the same law firm that is representing you

19   here today?

20   A.    Yes.

21   Q.    In fact, if you look at the second page, the letter

22   shows it was sent to you also; correct?

23   A.    That is correct.  The letter was?

24   Q.    Yes.  The letter was sent to you?

25   A.    Yes.

Westermann - direct

Page 748

1    Q.    Did you receive the letter?

2    A.    I am sure I did.

3    Q.    Did you read it?

4    A.    I am sure I did.

5    Q.    And did you agree with the decision to hire Dr.

6    Levitt as an expert?

7    A.    I mean we had already agreed to that in HIMPP.

8    Q.    And you were hiring Dr. Levitt as an expert in a

9    patent proceeding; correct?

10   A.    That is correct.  A reexamination request.

11   Q.    Now, the reason you sought Dr. Levitt out was because

12   his expertise in digital hearing aids; correct?

13   A.    No, in hearing aids.

14   Q.    In hearing aids?

15   A.    It was not a digital -- this patent was not about

16   digital hearing aids, it was about analog hearing aids.

17   Q.    And you were aware that Dr. Levitt supplied his

18   resume giving you all of his credentials; right?

19   A.    I was expecting him to be in there, yes.

20   Q.    Now, let's look at the next exhibit, 598, which is a

21   composite exhibit of a second letter to Dr. Levitt.

22          Do you have that?

23   A.    Yes.

24   Q.    It's by the same law firm; right?

25   A.    Yes.

Westermann - direct

Page 749

1   Q.      And it's to Dr. Levitt; correct?

2   A.      Correct.

3   Q.      And it has a number of enclosures; correct?

4   A.      It has, yes.

5   Q.      And it is cc'd to you?

6   A.      The letter is, yes.

7   Q.      Right.  And one of the enclosures is Dr. Levitt's

8   resume; correct?

9   A.      That is correct.

10  Q.      Now, another enclosure is a declaration.  Do you know

11  what a declaration is?

12  A.      I believe so.

13  Q.      Okay.  Is it a statement under oath that you asked

14  Dr. Levitt to sign and supply to the patent department?

15  A.      I believe it must be under oath, yes.

16  Q.      And if you look at the very first line in the

17  declaration, what does it say?  The very first line.

18  A.      The very first -- you mean, I, Harry Levitt?

19  Q.      Right after that.

20  A.      My curriculum vitae is attached to this declaration.

21  Q.      Now, if you look at page three of his resume,

22  Dr. Levitt's resume, at the bottom, do you see the two

23  patents at issue in this case?

24  A.      Yes, they are listed there.  Yes.

25  Q.      Now, you wanted to insure that Dr. Levitt had

Westermann - direct

Page 750

1    excellent credentials that were at least as good or better

2    than the opposing expert in this particular matter, didn't

3    you?

4    A.      No, we already had that.

5    Q.      Now, if you look at the Exhibit 562, the first

6    letter?

7    A.      Yes.

8    Q.      In paragraph three of that letter, it says the

9    patentee -- that is the other party, right?  The patentee

10   filed a response, copy enclosed in which they submitted a

11   declaration of a Nobel prize recipient opining that the

12   invention claimed in the Anderson '806 patent would not have

13   been obvious in light of the prior art.

14             Do you see that?

15   A.      What page is that?

16   Q.      That's the second page of the first letter in the

17   first full paragraph, midway down.

18   A.      The patentee -- I'm not quite.

19   Q.      It's highlighted on the -- in the --

20   A.      In which?  Can you show me?

21   Q.      It's highlighted on the screen, if you can see that.

22   A.      Is it the upper one or lower one?

23   Q.      The upper one, sir.

24   A.      I have that here.

25   Q.      Okay.  So your's was saying the other side has a

Page 751

1    Nobel prize winner who is testifying about this patent;

2    right?

3    A.    Yes.

4    Q.    And you wanted someone whose credentials were better

5    than that; right?

6    A.    Well, we wanted one who had relevance to the case.

7    The Nobel prize taker was a Nobel prize taker in memory

8    technology which is not hearing aids.

9    Q.    So if you look at the second paragraph, the very last

10   sentence says:  We would like to submit for their

11   consideration a declaration by someone with much better

12   credentials on the issue.  Right?

13   A.    Yes.

14   Q.    And did you agree with that?

15   A.    Certainly.

16   Q.    Now, these letters also say that you hired Dr. Levitt

17   for yet another engagement on another issue as a patent

18   expert; is that correct?

19   A.    I believe so.  I don't remember the actual -- I don't

20   think that case ever got to be finalized, but I know we did,

21   we tried to use him on some.

22   Q.    Okay.  And, in fact, in the second letter, that's

23   attached to your Exhibit 598, there is a memorandum

24   agreement whereby he is retained, he is actually hired;

25   correct?

Westermann - direct

Page 769

1    Q.    And they were in the patent base bought by him?

2    A.    That is correct, which is a ton of documents.

3    Q.    Now, Dr. Levitt's patents were filed in 1986.  Up

4    until this lawsuit was filed against Widex and Demant, up

5    until that time, have you heard anybody -- not just Widex

6    and Demant but anybody, any scientist, Dr. Graupe,

7    Mr. Egolf -- heard anyone ever say in that entire time that

8    Dr. Levitt's patents were invalid?

9    A.    No, I haven't.

10   Q.    Now, I believe in the opening statement, some prior

11   art was referred to.  There was a patent by Dr. Graupe.

12   Right?

13   A.    Correct.

14   Q.    And there were some articles by Mr. Best and Dr.

15   Egolf and Mr. Weaver.  Right?

16   A.    That's right.

17   Q.    Did Widex ever license Dr. Graupe's patent?

18   A.    No.

19   Q.    Did Widex ever pay Mr. Best or Dr. Egolf or Mr.

20   Weaver for their technology?

21   A.    No, we didn't.

22   Q.    Now, your company is not relying on any opinion of

23   patent counsel --

24              MR. MANDIR:  Objection, Your Honor.

25              (The following took place at sidebar.)

Westermann - direct

Page 773

1    infringement?

2              MR. STEINBERG:  That's correct.

3              THE COURT:  That is their position.

4              MR. MANDIR:  I understand.  That is --

5              THE COURT:  I wanted to make sure I understood

6    what their position was.

7              MR. MANDIR:  I understood that to be their

8    position.  You absolutely cannot do that.

9              THE COURT:  I am not going to rule on this

10   objection at the moment.  I want to go back and review my

11   decision in Telcordia, so that I am confident of the ground

12   that I stand on when I rule.

13             But I want you to argue for the record your

14   interpretation of what you think I ruled and why you believe

15   that ruling precludes this line of inquiry.

16             MR. PELLIGRINI:  It is my understanding of the

17   Telcordia case, there were two different situations.  The

18   first situation was one of the parties, Lucent, who did not

19   get an opinion of counsel, and the other party, Cisco, did

20   get an opinion and they said we are not waiving privilege.

21   We are not going to rely on the advice of counsel defense.

22             So you said, for Lucent, it was proper to ask

23   whether or not you got an opinion.  For Cisco, since they

24   did get an opinion and were not waiving it, it was improper

25   to ask them whether or not they were relying on advice of

Westermann - cross

Page 798

1    of the ETG patents?

2    A.    No.

3    Q.    Had anyone at Widex prior to this lawsuit seen the

4    patents, the ETG patents before?

5    A.    Well, we found out it was in our files.

6    Q.    How did you discover that?

7    A.    We searched through our electronic files and through

8    our paper files.

9    Q.    And what did you discover during this search?

10   A.    Well, there was a paper copy, as I remember, of the

11   '749.

12   Q.    '749 is one of the patents, yes.

13   A.    Yes.  And I believe there was a copy of the European

14   equivalent.  And we also discovered that in this very large

15   database we have, that both patents were there

16   electronically.

17   Q.    You said very large database.  How large is very

18   large?

19   A.    Oh, today there is more than 17,000 patents in that

20   database.

21   Q.    Okay.  And when did the, I think you said '749

22   patent, when did that make its way into the database?  What

23   year?

24   A.    Well, the database, it came in in 2000, was it '1 or

25   '2?  I don't remember.

Westermann - cross

Page 799

1    Q.      And at that time how many patents were in the

2    database?

3    A.      Well, we got a huge amount, we started up a search of

4    patents, a very wide search.  And we got, within half a year

5    we got between six and seven thousand patents, I think.

6    Q.      Let me show you PX-773.  I think that is actually in

7    the notebook that Mr. Steinberg gave you.  PX-773.

8    A.      Yes.

9    Q.      And I believe Mr. Steinberg asked you some questions

10   about this.  Can you identify what PX-773 is?

11   A.      It is a printout from a very primitive database we

12   had, we just initiated in the early nineties.

13   Q.      I think Mr. Steinberg pointed you up to the top

14   right-hand corner of this document.  It indicates 05/08-93.

15   What does that refer to?

16   A.      That is the date of the printout, actually.

17   Q.      The date is August 5th, '93?

18   A.      That is August 5th, '93, yes.

19   Q.      And at that time, does that mean that at that date

20   this patent was logged into the database?

21   A.      It could have been logged in earlier.  It was just

22   printed on that date.

23   Q.      At this time, this '93 time frame, how many patents

24   were in the database?

25   A.      I don't know.  I can see -- yes, I can.  It says in

Westermann - cross

Page 800

1    the top, there is some Danish, Antal Poster, just to the

2    right of the middle of the top 1,439 documents registered.

3    Q.    And is this entry showing that the U.S. patent was in

4    the database?

5    A.    No.  It only shows that a U.S. patent was the

6    priority document.

7              This is about the European EPO250679 patent.

8    Q.    Can you now look at PX-775, which again, it should be

9    in that same notebook, Mr. Westermann?

10   A.    Yes.

11   Q.    Can you tell me what PX-775 is?

12   A.    That is the European patent we just mentioned.  It's

13   actually only an application.

14   Q.    How many -- do you know how many counterparts there

15   are to the two patents in this lawsuit in Europe?

16   A.    Only this one, as far as I know.

17   Q.    Now, in the 1993 time frame, did the Senso Diva

18   exist?

19   A.    '93?

20   Q.    Yes.

21   A.    No.  That was long before.

22   Q.    What year did the Senso Diva come out?

23   A.    In 2000 and someplace, 2001.

24   Q.    Was Senso Diva the first hearing aid that Widex made

25   with feedback cancellation?

Westermann - cross

Page 801

1    A.      Yes.

2    Q.      And then the Inteo, when did that come out?

3    A.      2006?  It was 2006, I think.

4    Q.      And the Inteo also has the feedback cancellation

5    feature?

6    A.      Yes.

7    Q.      How is the database, how is it updated?

8    A.      Which one?

9    Q.      Well, the database that we saw the entry, that was in

10   the '93.  Was it different times when the database changed,

11   in terms of how it was kept?

12   A.      Well, the database we had at that time was just a

13   catalog, and it was maintained by my secretary, who would

14   simply enter the patent numbers that -- we had hard covers

15   of all these patents.  And she would enter the patent

16   numbers and the inventor, so that we could find it in case

17   we wanted to find that patent.

18   Q.      Okay.  You said that was in what year?

19   A.      It was around '93.  I think it may have started in

20   '92.  Around that time.

21   Q.      Since that time, has the database been automated?

22   A.      Oh, we got a completely new one from this, HIMPP

23   decided, the HIMPP group decided to create a search, with

24   the help of an American company called MicroPatents.  And

25   they started supplying patents to the HIMPP partners.  And

Westermann - cross

Page 802

1    each HIMPP partner gets every second week a couple of CDs

2    with the latest patents and applications that have been

3    published.

4    Q.    Has Widex gone through and analyzed all the patents

5    in your database?

6    A.    Oh, no.

7    Q.    Why not?

8    A.    That's 17,000.

9    Q.    Can we have up PX-774?  Again, it should be in that

10   same notebook, Mr. Westermann.

11   A.    Yes.

12   Q.    Do you know what PX-774 is?

13   A.    That is the '749 patent.

14   Q.    In the bottom left-hand corner, you see some writing.

15   A.    Yes.

16   Q.    Mr. Steinberg asked you about that.  What is your

17   understanding of who wrote that?

18   A.    I am pretty sure that this is the handwriting of a

19   patent engineer we had in the late nineties.

20   Q.    Do you know what the handwriting says?

21   A.    As far as I can see, he lists a couple of features

22   that are on certain pages of the patent.

23   Q.    What are the features?

24   A.    Well, the first is an FM link.  And then he says

25   multi-microphone.

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
                         -   -   -
 4
 5    ENERGY TRANSPORTATION,           :   Civil Action
      INC.,                            :
 6                                     :
                 Plaintiff,            :
 7                                     :
          v.                           :
 8                                     :
      WILLIAM DEMANT HOLDINGS A/S,     :
 9    et al.,                          :
                                       :
10               Defendants.           :   No. 05-422 (GMS)
11                         -   -   -
12               Wilmington, Delaware
             Friday, January 25, 2008
13                 9:00 a.m.
             Fifth Day of Trial
14
                         -   -   -
15
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18    APPEARANCES:
19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                    -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                                   Counsel for Plaintiff
24
25
```

Jacobsen - direct

Page 963

1    that was called a filter bank but is a very important part

2    of the technology for our products during the '90s.  And for

3    one of the patents, we pay half a dollar per unit and for

4    the other patents, we pay four dollars per unit.  Per unit

5    means for the sale of one hearing aid.

6    Q.    Now, we've heard a little bit about an organization

7    called HIMPP.  Are you involved at all in HIMPP?

8    A.    Yes, I'm the chairman of HIMPP and has been the

9    chairman since it was established in 1996.

10   Q.    Can you explain for the jury why HIMPP was formed and

11   what its purpose is?

12   A.    HIMPP was formed when we saw that there was a large

13   group of patents that was, it was important for the future

14   development of hearing aid.  And HIMPP was formed when we

15   got the opportunity to buy those patents and not only for

16   ourself, to secure that we didn't infringe those patents,

17   but also for others in the industry that didn't want to

18   infringe those patents.  We had the possibility to buy the

19   patents and form this partnership around them.  At the same

20   time, also to make sure that we could have a future

21   development of hearing aids in the industry, we made them

22   available on equal terms for all players in the industry.

23   Q.    Now, before HIMPP was formed, when you were looking at

24   the patents that you are talking about that initially went

25   into this HIMPP partnership, who owned those patents at the

Jacobsen - cross

Page 982

1    meetings, don't you, including other attempts to license the

2    HIMPP patents?

3    A.    No.  Actually, the meetings I participate in is the

4    overall part of it and the management part is taken care of

5    mainly by Widex.

6    Q.    So at the meetings you attend, those discussions

7    aren't had; is that right?

8    A.    If there is a proposal from the management that HIMPP

9    are going to acquire a patent that was very early in its

10   lifetime, yes, that will be discussed in the meetings I'm

11   in.

12   Q.    And HIMPP also monitors patents and applications in

13   the hearing aids field, doesn't it?

14   A.    Yes, the management of HIMPP is doing that.  Yes.

15   Q.    And hired a company called MicroPatent to do so?

16   A.    I don't know.

17   Q.    You are not familiar with a company called

18   MicroPatent?

19   A.    No.

20   Q.    You are aware, though, that HIMPP has hired a company

21   to monitor patents and applications; right?

22   A.    No.  I'm aware that they are monitoring but how they

23   do it, I basically don't know.

24   Q.    Are you aware that MicroPatent biweekly, every two

25   weeks delivers CDs to HIMPP's members containing patents and

Jacobsen - cross

Page 988

1    is that right?

2    A.     Yes, just in the U.S.

3    Q.     In the U.S.

4    A.     Yes.

5    Q.     And they use your technical and marketing materials to

6    educate the hearing aid dispensers, don't they?

7    A.     I don't know whether they use the materials to

8    educate.  They have special educational materials.  They

9    have their laptops and they do training sessions and

10   educational sessions.  I think we would say that the

11   marketing material is what we sent to our dispensers.

12   Q.     So you do provide the marketing materials to your

13   dispensers?

14   A.     Yes.

15   Q.     And you expect them to rely on it?

16   A.     It's a sales material that you provide to convince

17   them that our products are the ones they should use.

18   Q.     And you expect them to be accurate; is that right?

19   A.     They will probably never be accurate as something

20   else.  It is an explanation where you try to explain in

21   broad terms what we are providing you.  It's not a technical

22   report that you will send in to a Government agency for

23   approval.

24   Q.     Are you saying that you provide inaccurate materials

25   to your dispensers?

Christensen - cross

Page 1032

1    integrate more and more things into an integrated circuit.

2    Right?

3    A.    Yes.  That's the beauty of technology.

4    Q.    Now, when you were talking before about patents and

5    the algorithm and so forth, you mentioned a filter.  Right?

6    You mentioned a feedback filter?

7    A.    I mentioned an adaptive, commercial filter.  Is that

8    the one you are referring to?

9    Q.    Yes.

10   A.    Yes.

11   Q.    In the filter technology that you are familiar with,

12   does your company use what is called an FIR filter, an

13   acronym for a finite impulse response filter?

14   A.    We use that technology on our platform, yes, we do.

15   Q.    And that type of filter is a delay line filter.

16   Right?

17   A.    It's also referred to as a delay line filter.  I think

18   it has a lot of different names, really.

19   Q.    And the filter, the feedback filter, needs

20   coefficients to operate correctly.  Right?

21   A.    Any filter would need coefficients to operate.

22   Q.    And the filter receives the coefficients from the LMS

23   algorithm.  Right?

24   A.    Well, that's not the way I see it.  The adaptive LMS

25   filter is really one unit.  I mean, it has to have all the

Christensen - cross

Page 1042

1    there is a frequently asked questions section; right?

2    A.    Yes.

3    Q.    Who creates the questions and who creates the answers?

4    A.    All the marketing people do.

5    Q.    And one of the questions is, how does the dynamic

6    feedback cancellation system work; right?

7    A.    Correct.

8    Q.    And part way down in that answer is when feedback is

9    detected, the DFC system eliminates it immediately, using

10   phase cancellation; right?

11   A.    It's in the document, yes.

12   Q.    Again, if you admitted that that is what your product

13   did, you would be admitting that it reverses the phase and

14   cancels; right?

15   A.    But I don't admit it.

16   Q.    I understand that.

17   A.    Okay.

18   Q.    But if you did, that is what it would mean; correct?

19   A.    That would be the obvious meaning of this.

20   Q.    Okay.

21   A.    If it was the case.

22   Q.    All right.  Let's turn to PX-231.  PX-231 is the Atlas

23   product, right?

24   A.    Yes, Atlas Plus it says.

25   Q.    Okay.  Let's turn to 772.

Christensen - cross

Page 1044

1    Q.    And what is the spike going down?

2    A.    It's something that is there in order to cancel.

3    Q.    It's the reverse; correct?

4    A.    Yes, you can put it that way.

5    Q.    Let's go to PX-33.  This is a document for the Syncro

6    hearing aid; correct?

7    A.    That's correct.

8    Q.    All right.  Then let's turn to page 2124.  And, of

9    course, on 2124, it says it's a dynamic feedback

10   cancellation system; right?

11   A.    Correct.

12   Q.    And let me read to you what it says.  It says:

13   Dynamic feedback cancellation is a two-stage feedback

14   cancellation system designed to eliminate feedback before it

15   develops into uncomfortable whistling.  Unlike traditional

16   feedback management, which reduces gain to eliminate

17   feedback, the DFC in Syncro uses phase cancellation.  Phase

18   cancellation is the only way to eliminate feedback while

19   maintaining audibility of the signal.  As soon as feedback

20   is detected, the feedback detection initiates the DFC system

21   to remove the unwanted whistling sounds through digital

22   phase cancellation.

23        And then over the top of the picture, it says digital

24   phase cancellation ensures no reduction or distortion of the

25   signal and no loss of audibility.

Christensen - cross

1              Right?

2    A.    Yes, that is what the document says.

3    Q.    And again if you admitted that is accurate, that would

4    be determining the amplitude and phase, reversing it and

5    cancelling it, wouldn't it?

6    A.    If I admitted it was accurate, but it's not accurate.

7    It's a marketing paper you are showing here.

8    Q.    Now, let's look at the handy little chart to the right

9    with the three little boxes; okay?

10   A.    Okay.

11   Q.    Underneath it, it says:  Example of how phase

12   cancellation can remove the feedback while leaving the

13   important signal untouched.  Do you see that?

14   A.    I see that.

15   Q.    In the first box, that spike up is feedback, right?

16   A.    I think it's intended to show some feedback.

17   Q.    And in the second box, the phase cancellation is a

18   spike down, equal but opposite in amplitude and phase;

19   right?

20   A.    I think that is what it intends to show.

21   Q.    And the third box shows feedback removed; correct?

22   A.    Yes.

23   Q.    Okay.  But you have testified that is not what is

24   happening, right?

25   A.    That is correct.

Christensen - cross

Page 1048

1    system that determines the phase and amplitude, creates an

2    equal and opposite signal and cancels; right?

3    A.    Well, at least it says something about phasing out the

4    signal.  IC see that.

5    Q.    Is that correct?  Was my question to you correct?  If

6    that document is accurate, it means that it determines the

7    phase and amplitude of the feedback signal, creates an equal

8    and opposite signal and cancels; right?

9    A.    I think that is the conclusion, yes.

10             THE COURT:  Let me see counsel a second.

11             (The following took place at sidebar.)

12             THE COURT:  I should have said Tim Russert has

13    nothing on you.

14             Don't you think you have driven this point home?

15             MR. STEINBERG:  Yes, I am through.

16             MR. BUROKER:  It's the last one.

17             MR. STEINBERG:  It's the last one.

18             THE COURT:  Oh, it's the last one.

19             MR. GRAMENOPOULOS:  I have one question.

20             THE COURT:  Okay.

21             MR. STEINBERG:  No, I have a few more questions

22    but not about brochures.

23             THE COURT:  You're not doing this anymore.

24             MR. STEINBERG:  Sure.

25             (End of sidebar conference.)

Page 1056

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                IN AND FOR THE DISTRICT OF DELAWARE
 3
                         -   -   -
 4
 5    ENERGY TRANSPORTATION,          :   Civil Action
      INC.,                           :
 6                                    :
               Plaintiff,             :
 7                                    :
          v.                          :
 8                                    :
      WILLIAM DEMANT HOLDINGS A/S,    :
 9    et al.,                         :
                                      :
10             Defendants.            :   No. 05-422 (GMS)
11                       -   -   -
12                  Wilmington, Delaware
                 Monday, January 28, 2008
13                      9:37 a.m.
                 Sixth Day of Trial
14
                         -   -   -
15
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge, and
16                                   a Jury
17
18    APPEARANCES:
19               EDMOND D. JOHNSON, ESQ.
                 Pepper Hamilton LLP
20                    -and-
                 MARTY STEINBERG, ESQ.,
21               BRIAN M. BUROKER, ESQ., and
                 MAYA M. ECKSTEIN, ESQ.
22               Hunton & Williams
                 (Washington, D.C.)
23
                              Counsel for Plaintiff
24
25
```

Schaub - cross

Page 1083

1    a feedback canceller.  Is that right?"

2              And the answer was:  "The processor has an

3    adaptive feedback suppression system."

4              Is that what you were asked and is that what you

5    answered?

6    A.    This is what we were saying, yes.

7    Q.    Is the reason you won't agree to call it --

8              THE COURT:  Counsel, let me see you.

9              (The following took place at sidebar.)

10             THE COURT:  Mr. Gramenopoulos doesn't seem to

11   want to object.  I do.  We are wasting time.  He has already

12   answered this line of questioning.  And you haven't

13   impeached him.  There is nothing inconsistent with what you

14   have just shown this jury.  Let's move on.

15             (End of sidebar conference.)

16   BY MR. BUROKER:

17   Q.    Is the reason that you don't want to call this

18   feature in the Alaska product a feedback canceller because

19   that would indicate that your claims detect the presence of

20   feedback create an equal but opposite signal and insert that

21   signal in the feedback path to cancel feedback?

22   A.    Sorry.  I couldn't follow.

23             THE COURT:  I am sure he lost the jury if he

24   lost you.  Could you break that down, counsel.

25   BY MR. BUROKER:

Nielsen - cross

Page 1136

1    numbers are 240.

2    A.      Page 18?

3    Q.      Yes.   The one that has the label Diva Feedback

4    Canceling?

5    A.      Yes.

6    Q.      And you testified that the sentence that starts the

7    second paragraph, "When the FPS has determined the

8    characteristics of the feedback signal it will subtract an

9    imitated feedback signal from the incoming signal, thus

10   eliminating the annoying feedback."

11              You had testified that that sentence was

12   not technically accurate.  Is that right?

13   A.      Yes.   It's not technically accurate because the

14   signal is not determined.   We try to estimate the path.  The

15   signal would be unpredictable because it fluctuates much

16   faster than the path.

17   Q.      Do you have any idea why an internal document for use

18   in training at the advertising and marketing department

19   would be technically inaccurate?

20   A.      I have no idea why it's inaccurate.   Actually, I

21   think it describes well the overall operation from a normal

22   perspective.  But it's not technically correct.

23   Q.      And you think ordinary people would understand the

24   system as described here?

25   A.      At least I think this is what they hoped for when

Page 1243

```
 1                IN THE UNITED STATES DISTRICT COURT
 2                IN AND FOR THE DISTRICT OF DELAWARE
 3
                              -   -   -
 4
 5     ENERGY TRANSPORTATION,         :  Civil Action
       INC.,                          :
 6                                    :
                   Plaintiff,         :
 7                                    :
            v.                        :
 8                                    :
       WILLIAM DEMANT HOLDINGS A/S,   :
 9     et al.,                        :
                                      :
10                 Defendants.        :  No. 05-422 (GMS)
11                            -   -   -
12                    Wilmington, Delaware
                    Tuesday, January 29, 2008
13                        8:50 a.m.
                    Seventh Day of Trial
14
                              -   -   -
15
       BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
16                                     and a Jury
17
18
       APPEARANCES:
19
                    EDMOND D. JOHNSON, ESQ.
20                  Pepper Hamilton LLP
                         -and-
21                  MARTY STEINBERG, ESQ.,
                    BRIAN M. BUROKER, ESQ., and
22                  MAYA M. ECKSTEIN, ESQ.
                    Hunton & Williams
23                  (Washington, D.C.)
24                                   Counsel for Plaintiff
25
```

Best - dep.

Page 1325

1          "Question:  You talked earlier about there being

2     two different prototypes that were built; is that correct?

3          "Answer:  Yes.

4          "Question:  And prototype 1 and prototype 2, for

5     lack of a better name, are what we called them; is that

6     correct?

7          "Answer:  Yes.

8          "Question:  Do you have any documents that

9     describe prototype 1?

10         "Answer:  No.

11         "Question:  Do you know what happened to the

12    first prototype?

13         "Answer:  No.

14         "Question:  Did you destroy it?

15         "Answer:  I didn't personally destroy it.  It's

16    conceivable that they threw the machine out when it became

17    obsolete, but I don't know, really.

18         "Question:  I'll ask it again.  Do you have any

19    documents that would demonstrate that the first prototype

20    was built before May of 1985?

21         "Answer:  No.

22         "Question:  Was the first prototype ever tested

23    on an actual hearing impaired person?

24         "Answer:  No.

25         "Question:  Are there any photographs of the

Best - dep.

Page 1326

1    second prototype that you're aware of?

2              "Answer:  I don't know.

3              "Question:  Other than your thesis, are there

4    documents that would demonstrate that the second prototype

5    was built at any point prior to May of 1985?

6              "Answer:  I guess the right answer is I don't

7    know, but possibly Mike Wreschner's thesis.

8              "Question:  You're not aware of any documents,

9    though; is that correct?

10             "Answer:  That's correct.

11             "Question:  To your knowledge, was the second

12   prototype ever tested on a hearing impaired person?

13             "Answer:  No.

14             "Question:  You discussed a demonstration of the

15   second prototype for a number of people; is that correct?

16             "Answer:  Yes.

17             "Question:  Do you have any documents that

18   evidenced that that demonstration ever took place?

19             "Answer:  No.

20             "Question:  So there's no documents that would

21   demonstrate who actually was present at the demonstration;

22   is that right?

23             "Answer:  Not that I'm aware of.

24             "Question:  Are you aware of anybody else

25   physically viewing your first prototype?

Morley - direct

Page 1398

1    Q.    Do you agree with that?

2    A.    I agree with that.

3    Q.    Based on Dr. Gloster's testimony and your own

4    opinions, can you explain to the jury whether or not the

5    Widex Senso Diva and the Inteo products include a

6    programmable delay line filter, according to what Mr. Brown

7    has said?

8    A.    According to what Dr. Gloster said, they do not have a

9    programmable delay line filter because they are not

10   programmable because they don't have memory.

11   Q.    Okay.  So let's go back again.  Mr. Brown said that

12   the WFIR block is the programmable delay line filter;

13   correct?

14   A.    That is what he identified in his literal infringement

15   analysis, I believe as the programmable delay line filter in

16   Claim 19.

17   Q.    Okay.  Does WFIR have any memory?

18   A.    None.

19   Q.    So based on that, what would Dr. Gloster say about

20   that WFIR block?

21         MR. STEINBERG:  Objection, speculating as to

22   what Dr. Gloster would say.

23         THE COURT:  Well, you can rephrase.

24   BY MR. MANDIR:

25   Q.    Based on your understanding of Dr. Gloster's

Morley - direct

Page 1434

1    considered to be adaptive, it has nothing to do with

2    feedback cancellation.  There is no description in the

3    patent about how to do adaptive feedback cancellation.

4    Q.    Okay.  Let me show you Exhibit 1239.

5          Are you familiar with this exhibit?

6    A.    Yes, I am.

7    Q.    What is this exhibit?

8    A.    It's an article written by, among others, Diane

9    Bustamante.  She is the first author cited.  And it says

10   it's the measurement and adaptive suppression of acoustic

11   feedback in hearing aids.  So it's sort of a summary

12   article.

13   Q.    In this article, does Ms. Bustamante say anything

14   about the '850 patent?

15   A.    I believe so?

16   Q.    And what does she say?

17   A.    I'm looking for the exact place, but I'm not sure it's

18   on this.

19   Q.    I think it's in your notebook under 1239.

20   A.    1239.  Thank you.

21   Q.    Yes.

22   A.    I haven't looked at this in awhile so it's going to

23   take awhile to find it.

24   Q.    I'll try to help you out.

25   A.    Sorry.

Morley - direct

1          I think in the second column here, she talks

2     about a number of researchers in, let's see, two through

3     four.

4     Q.    Yes.  And if you go back to the references on the last

5     page?

6     A.    Yes.  Reference two, is that the '850 patent of ETG?

7     Q.    Yes.  It's referring to the '850 patent, correct?

8     That's the second.

9     A.    Right.  Now I see it.  Right after that, if we can go

10    back to the second column of the first page?  In the top

11    paragraph, about five or six lines in.

12          It says, a number of researchers -- and then in

13    brackets, two through four, so that is an indication of the

14    references at the back of the document -- have achieved some

15    success with this general approach.  One, reference two that

16    we know now is the '850 patent, employed a fixed filter,

17    derived from one measurement of the feedback path transfer

18    function, as the transfer function estimate, rendering this

19    approach vulnerable to changes in the acoustic environment.

20    Q.    Is that consistent or inconsistent with your

21    understanding of the '850 patent?

22    A.    It's dead on.

23    Q.    Okay.  Let's look at Exhibit 1240, please.

24          This is a document entitled, The Problem of

25    Feedback in Hearing Aids by a Mr. James M. Kates.  Are you

Morley - direct

Page 1436

1    familiar with this document?

2    A.    Probably not as much as you would like me to be if

3    it's going to be just like the last one.

4    Q.    No, no, I can help you out this time.

5    A.    I've seen it.  I've read it.

6    Q.    If you could turn to, it's page 231.

7    A.    Yes.

8    Q.    It's at the top of page 231.

9    A.    I see it.

10   Q.    A reference to, it starts out, "the system proposed by

11   Kates."  Why don't you read that in, would you please?

12   A.    Yes.  The system proposed by Kates (1990A) is an

13   adaptive version of a feedback cancellation system proposed

14   by Levitt, et al. (1988.) that used a time invariant

15   cancellation filter set when fitting the hearing aid.

16   Q.    What is your understanding of time invariant

17   cancellation filter?

18   A.    That is just kind of a fancy way of saying it doesn't

19   change over time so it's fixed.

20   Q.    Can you read the next sentence?

21   A.    The fixed filter, however, cannot adjust to changes in

22   the acoustic environment.  Such changes occur when a

23   telephone receiver is moved close to the aided ear, when a

24   hand is brought up to the hearing aid to adjust the volume

25   control, or when the position of the instrument shifts in

Morley - cross

Page 1445

1    Q.    And how much have you been paid to date?

2    A.    I think about $150,000 to date.

3    Q.    And what does that not include?

4    A.    That does not include some preparation that I did in I

5    think December, and none of the month of January.

6    Q.    And how many hours do you think you have billed in

7    December and January?

8    A.    I don't know.  I haven't had time to worry about that

9    yet.

10   Q.    How does $150,000 compare to your ordinary salary?

11   A.    It's just about the same as my annual salary.

12   Q.    And you have had the advantage of sitting here

13   throughout the trial listening to people testify.  Right?

14   A.    I have listened to them.  I don't know if that's

15   considered an advantage.

16   Q.    Now, you have disagreed with every expert that ETG has

17   put on except Dr. Gloster.  Right?

18   A.    Well, in my report I actually had some points where I

19   disagreed with Dr. Gloster as well.

20   Q.    Well, you told the jury here today that you agreed

21   with him.  Isn't that what you said?

22   A.    On the point that we were discussing at the time, yes,

23   sir.

24   Q.    So you disagree with him about something dealing with

25   his testimony in this case?

Morley - cross

Page 1446

1    A.    No, I don't.

2    Q.    And you were here when Dr. Gloster, who is an expert

3    on visual systems and hardware description language,

4    testified about his reference to the actual computer code,

5    comparing it to the diagrams prepared by the engineers at

6    Widex.  Correct?

7    A.    Yes.

8    Q.    And you don't dispute any of his testimony with regard

9    to that.  Correct?

10   A.    As best as I can recall.  I would have to read it all,

11   if you want to have me categorically agree with everything.

12   He was on the stand for a while.

13   Q.    Let's refer to JX-305, which is that figure of the

14   Widex feedback cancellation system we have been talking

15   about.  Do you have it in front of you?

16   A.    I do.

17   Q.    We have it up on the board.

18   A.    Okay.

19   Q.    Now, that's a figure that both you and Dr. Gloster

20   testified about in court.  Right?

21   A.    That's correct.

22   Q.    And it's called the detailed overview of the feedback

23   canceling system.  Correct?

24   A.    Yes.

25   Q.    And Dr. Glover testified that this technical document

Morley - cross

1  A.    In order to be adaptive and change to the changing

2  acoustic feedback path, yes.

3  Q.    Now, you know that Dr. Levitt also used an algorithm;

4  correct?

5  A.    He didn't use an algorithm to change any filter

6  coefficients in his feedback cancellation filter when it was

7  in the hearing aid.

8  Q.    Can you answer my question?  Do you know if Dr. Levitt

9  used algorithms?

10  A.    For what purpose?

11  Q.    To provide values.

12  A.    Yes, he used algorithms to provide values.

13  Q.    And you know that the LMS algorithm was around in the

14  1960s and '70s; correct?

15  A.    I certainly know of a paper I referenced by Bernard

16  Widrow of '75 and I was aware of it.

17  Q.    Now, you claim that Widex uses a method of feedback

18  cancellation described in the '486 patent; right?  That that

19  is where you get the description from?

20  A.    I believe that is it.  I mean we're going a long way

21  here without me seeing any documents.  I'm shooting from the

22  hip.

23  Q.    That's DX-1599.

24  A.    That sounds familiar.

25  Q.    You can take a look at it.

Page 1522

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
                          -   -   -
 4
 5   ENERGY TRANSPORTATION,        :   Civil Action
     INC.,                        :
 6                                :
              Plaintiff,          :
 7                                :
         v.                       :
 8                                :
     WILLIAM DEMANT HOLDINGS A/S, :
 9   et al.,                      :
                                  :
10              Defendants.       :   No. 05-422 (GMS)
11                        -   -   -
12                 Wilmington, Delaware
              Wednesday, January 30, 2008
13                     8:30 a.m.
                  Eighth Day of Trial
14
                          -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
16                                  and a Jury
17
18
     APPEARANCES:
19
                  EDMOND D. JOHNSON, ESQ.
20                Pepper Hamilton LLP
                        -and-
21                MARTY STEINBERG, ESQ.,
                  BRIAN M. BUROKER, ESQ., and
22                MAYA M. ECKSTEIN, ESQ.
                  Hunton & Williams
23                (Washington, D.C.)
24                            Counsel for Plaintiff
25
```

Page 1546

1   A.    I am trying to understand it.

2   Q.    As you know, what governs here are the claims.

3   Right?  Not these pictures or diagrams, but the claims.

4   Correct?

5   A.    I believe it's the claims in light of the Court's

6   construction order, the specification, the file history, as

7   what it would mean to one of ordinary skill in the art.

8   Q.    Is there any limitation in the claims under the

9   Court's construction order as to the number of coefficients

10  that could go into a filter?

11  A.    There is no limitation according to any of those

12  things as to how many taps can be in a filter.

13  Q.    And when you say taps, are you referring to

14  coefficients?

15  A.    The taps are what get multiplied, yes.  So no limit

16  on how many coefficients are in the filter.

17  Q.    And there is no limitation on the capacity of the

18  chips, the computer chips that go into these filters, is

19  there, in the claims?

20  A.    There is no mention of that.

21  Q.    So as the years go by, under Moore's Law, and the

22  chips become smaller and smaller and have more and more

23  capacity, you could use any chip you wanted.  Correct?

24  A.    As long as it practiced the teaching of the patent.

25  Are you talking about you could use any chip to implement

Morley - cross

Page 1547

1    this invention?

2    Q.      I think you understand what I am getting at.  That

3    is, as chips became smaller and held more capacity, you

4    could include those modern chips in exchange for the older

5    chips, couldn't you?

6    A.      I don't believe there was any discussion in this

7    patent about chips.  I don't understand where we are going.

8    Q.      You are one of ordinary skill in the art.  Right?

9    A.      I am.

10   Q.      And you told us earlier in your testimony on direct

11   that you had a big prototype, this big box thing, then you

12   made it all smaller, you integrated circuits, you got better

13   chips and so forth.  Right?  Didn't you tell us that?

14   A.      I sure did.

15   Q.      That's what I am referring to.

16   A.      I thought we were talking about this patent.  I don't

17   know where the chips come into the patent.  I don't see

18   chips claimed or anything.

19   Q.      Okay.  Well, just humor me.

20   A.      Okay.

21   Q.      Is there any limitation on the capacity of computer

22   chips in the claims in this patent?

23   A.      No, there is no mention at all of computer chips.

24   Q.      Okay.  Now, with respect to the host controller, is

25   there anything in the claims of the patent that says it has

Morley - cross

Page 1551

1    asking me to speculate what he would have done beyond what

2    he read in the patent.  I don't think the patent would have

3    suggested to him that he should make it adaptive.

4    Q.    No.  You said that you were a person of ordinary

5    skill in the art at the time and Dr. Levitt was a person of

6    ordinary skill in the art at the time.  Right?

7    A.    Yes, we both were.

8    Q.    And you testified that both of you would have known

9    how to make an adaptive filter in the 1980s.  Right?

10   A.    Yes.  We both knew how to make an adaptive filter.

11   Q.    So then someone of ordinary skill in the art would

12   have known, even if that filter was fixed, that you could

13   make it adaptive in a future iteration.  Correct?

14   A.    I guess one of ordinary skill in the art would have

15   known that any filter he sees anywhere in the world in any

16   patent could have been an adaptive filter or a fixed filter.

17   Q.    I take it you liked the mermaids?

18   A.    I guess I would have to say not particularly.

19   Q.    You did pick the only demonstrative that we played

20   that didn't have anything to do with sound going through a

21   sound system.  Right?

22   A.    Well, you will excuse me.  I thought it was an easy

23   target.

24   Q.    We understand.  And you understand what an analogy

25   is.  Right?

Page 1687

1   as those that are seen in '818, then the claim is

2   anticipated by '818.

3   Q.    Okay.  Then, also, if we go to the next slide.  How

4   about when you consider Dr. Best's work?

5   A.    The same would be true there, because, again, if the

6   elements of Claims 1 and 2 are similar to that of the

7   adaptive filter, as asserted by ETG, then we have an

8   adaptive filter that performs that function in Best's

9   thesis.

10  Q.    So to sum up the '749 patent, is it your opinion that

11  Claims 1 and 2 would be invalid if you would assume that all

12  the elements of the claims could be satisfied by an adaptive

13  filter?

14  A.    That is correct.

15            MR. LYTLE:  Can I have just a moment, Your

16  Honor?

17            THE COURT:  Sure.

18            MR. LYTLE:  Thank you, Your Honor.

19            THE COURT:  Thank you, counsel.  Cross-examine,

20  ETG.

21            MR. STEINBERG:  Yes, Your Honor.  We have some

22  books, as usual.

23                    CROSS-EXAMINATION

24  BY MR. STEINBERG:

25  Q.    Good afternoon Dr. Soli.

Soli - cross

1   testified on prior art.  Right?

2   A.     Not before this case.

3   Q.     Or obviousness.  Correct?

4   A.     Correct.

5   Q.     Now, you have no engineering degree.  Correct?

6   A.     I have no engineering degree.  But I trained

7   engineers who work in this field.

8   Q.     You have no engineering degree.  Is that correct?

9   A.     I have no engineering degree.  But I have trained

10  engineers who work in this field.

11  Q.     And in your prior employment, you personally did not

12  perform any engineering services yourself.  Correct?

13  A.     That's not correct.

14  Q.     Did you testify to that effect in your deposition?

15  A.     I don't recall exactly.  I would have to take a look

16  at it.

17         MR. STEINBERG:  May I approach, Your Honor?

18         THE COURT:  Yes.

19  BY MR. STEINBERG:

20  Q.     When you were at 3M, did you perform any engineering

21  work?

22  A.     Yes, I did.

23  Q.     Let's go to Page 20, Lines 4 through 7.  And I am

24  going to ask you if you were asked this question and gave

25  this answer.

Page 1691

1    A.        I think there is more to engineering work than

2    designing electrical circuits.  In fact, there is much more

3    to it when it comes to doing the design and development of

4    devices like hearing aids.

5              Most device development work is done by

6    designing and implementing signal processing algorithms.  We

7    buy circuits to use for that work.  We don't design them.

8    Q.        You did not design any electrical circuits.  Correct?

9    A.        I had no need to design any electrical circuits.

10   Q.        Have you ever designed any filters?

11   A.        Yes, I have.

12   Q.        Have you ever had any filter design training?

13   A.        Well, I can read the manual and hit the enter key on

14   the software.  That's about all it takes.

15   Q.        Have you ever had any filter design training?

16   A.        Only by reading the materials that come with the

17   software that designs the filters.

18   Q.        Would you turn to Page 21, Lines 7 through 9:

19             "Question:  Do you have any filter design

20   training?

21             "Answer:  No.  I haven't been trained in the

22   formulas that are used to designed filters."

23             Is that correct?

24   A.        That's correct.

25   Q.        Now, to make acoustic filters described in the

Soli - cross

Page 1694

1    about, you have been comparing.

2    A.    What I am comparing are the functional descriptions

3    of the algorithms as shown in the block diagrams of the

4    patents and the other prior art documents.  I am not

5    comparing electrical circuits or the components that

6    comprise those circuits.  I am comparing these on a

7    functional level, which is the level that they are described

8    at.

9    Q.    So are you testifying you don't need that skill then?

10   A.    Not to develop and evaluate algorithms.  To make

11   hearing aids, somebody needs that skill.  But that's not

12   what we are talking about.

13   Q.    That was my question.  To build the acoustic filters

14   you have been describing both in the patents and the prior

15   art, would you have to have the ability to design an

16   electrical acoustical circuit?

17   A.    Yes.  The ability to design the actual circuit is

18   required if you want to build a hearing aid.  There is no

19   question about that.

20   Q.    Correct.  And you don't have that expertise, correct?

21   A.    No, I don't.

22   Q.    Now, you're employed by an entity called the House

23   Ear Institute; correct?

24   A.    Yes.

25   Q.    And the House Ear Institute has a number of

1   A.      That's correct.

2   Q.      And here, there is a column that says Algorithm Type?

3   A.      Yes, I see that.

4   Q.      You see Widex, the third company down, and Oticon,

5   the fourth company down?

6   A.      I do.

7   Q.      They are identified in your document as a canceller.

8   Correct?

9   A.      That's correct.

10  Q.      Now, one of the patents that you had claimed affects

11  Dr. Levitt's patent was invented by a Dr. Graupe?

12  A.      Yes, the '818.

13  Q.      You, yourself, have written at least two articles

14  criticizing that patent.  Correct?

15  A.      I wouldn't say it's been criticized.  It's been cited

16  in those articles.

17  Q.      Let's take one of them, DX-1765.  And this is an

18  article entitled Band Limited Feedback Cancellation With A

19  Modified Filter D-X LMS Algorithm For Hearing Aids.

20  Whatever that means, I am not sure.

21          You are listed as one of the authors in

22  this article.  Right?

23  A.      Yes, I am.

24  Q.      In the very first page on the right-hand column, the

25  first full paragraph, it identifies as one of the devices

Soli - cross

1    your discussing the Graupe patent.  Correct?

2    A.    I am looking to see Graupe there.  Thank you.

3    Q.    We know it is the same patent because if you go back

4    to the reference portion --

5    A.    You are right, it is the patent.

6    Q.    It is the same patent.  Correct?

7    A.    Correct.

8    Q.    And then if you go to the very next page, the second

9    full paragraph of your article discusses some of the

10   infirmities of this patent.  Correct?

11   A.    I would have to see it.

12   Q.    Sure.  It's the second paragraph, left-hand column.

13   You are discussing many approaches that have been tried.

14   And you say, For example, probe noises insert broadband

15   noises into hearing aids to provide strong excitation

16   signals for adaptive filtering."

17          Then you cite, among others, to Graupe.  Right?

18   A.     That's correct.

19   Q.    And you say, "The injection of probe noises must be

20   carefully controlled.  Otherwise, the output sound would be

21   contaminated by the added noise."

22                Right?

23   A.    That's correct.

24   Q.    And what that means to a layman is, when you use this

25   Graupe technology, it actually takes the amplifier out of

Soli - cross

Page 1715

1    the sound circuit, and then you test the feedback with this

2    signal, this noise, and you have to do it every so often,

3    like every 30 or 60 seconds.  Right?

4    A.    Yes.  It is the same thing you would have to do in

5    the '850 patent, when you put the tones in.  You have to

6    take the amplifier out of the circuit, bypass it, and

7    provide a signal that comes back through the microphone to

8    be measured and nulled.  So it is the same process.

9    Q.    Well, in the '850 patent you are talking about the

10   single process at the fitting.  Right?

11   A.    Well, if you just do it once, yes, that is all I am

12   talking about.

13   Q.    But in the Graupe patent, you are talking about every

14   single time the sound changes, this happens.  Right?

15   A.    It could, yes.

16   Q.    That's what you found problematic about the Graupe

17   patent, is essentially, during that time, not only couldn't

18   the person hear, because that circuit would be disconnected,

19   but there would be this noise that comes in every 25, 30,

20   60 seconds.  Right?

21   A.    The noise would come in, and it was that noise that

22   was used to adaptively identify the feedback transfer

23   function so you could update the cancellation filter.

24         So again, the same thing would be required if

25   you wanted to adaptively update the '850 patent from time to

Soli - cross

Page 1716

1    time, only it would probably take longer because you would

2    have to use a whole bunch of tones.  You couldn't just use a

3    blast of noise.

4    Q.      You wrote yet another article criticizing the same

5    patent technology, DX-1766, entitled A Novel Approach For

6    Adaptive Feedback Cancellation For Hearing Aids.

7                 Right?

8    A.      That's correct.

9    Q.      And you had the exact same kind of criticism in that

10   article, that you have to take the amplifier out, it

11   interrupts the sound, it injects a noise, and it changes

12   every single time the sound changes.  Right?

13   A.      I am not sure what you mean by every single time the

14   sound changes.

15   Q.      Wouldn't that be the effect?  If you have to

16   essentially determine feedback every time there is a

17   different noise input, that circuit would be removed and

18   switched.  Right?

19   A.      Yes.  The Graupe '818 patent is set up to sense

20   certain rather dramatic change in the acoustic environment.

21   So not all noise changes would trigger it, but certainly

22   some would.

23   Q.      Now, the Graupe patent itself is DX-982, which should

24   be in front of you or we will put it up on the screen,

25   either one.  This is the patent you relied on as prior art

Soli - cross

Page 1717

1    that you just talked about in your two articles.  Correct?

2    A.      Yes, sir.

3    Q.      Now, in this patent, nowhere on the face of this

4    patent does it say anything about determining amplitude and

5    phase, creating an equal but opposite signal, and canceling,

6    does it?

7    A.      It does talk about canceling.  It creates a

8    cancellation signal.

9    Q.      Can you answer my question?

10   A.      Well, your question is a compound question.  I can't

11   answer all parts of it in the same way.

12   Q.      Does this patent talk about amplitude and phase at

13   all?

14   A.      No, it does not.

15   Q.      Now, let's go to the patent that you were comparing,

16   the '850 patent by Dr. Levitt.  That's PX-4.  If we go to,

17   as an example, Claim 14, and if you look under the first

18   step, it says, "Determining the effect on amplitude and

19   phase of a signal in said transmission channel as a function

20   of the frequency of acoustic feedback between said receiver

21   and microphone."

22                    Right?

23   A.      That's what it says.

24   Q.      But the Graupe '818 patent can't do that because it

25   actually takes the amplifier out of the transmission

Soli - cross

Page 1727

1    A.    I made no analysis based on the final reports but I

2    did make an analysis on a body of work that was provided to

3    me that I was asked to evaluate as prior art for invalidity

4    purposes.  My understanding is that is the body of work that

5    we have evidence about regarding Kim Weaver's invention.

6    Q.    Now, another issue you described -- are you

7    testifying on obviousness?

8    A.    In what regard?

9    Q.    That these prior articles and patents and so forth

10   would have made Dr. Levitt's patent obvious.

11   A.    I'm testifying in relation to Weaver's invention that

12   there is an obvious combination where the programmable DSP

13   such as that disclosed by Nunley or perhaps by South.

14   Q.    Well, I guess I'm not sure I quite understand.  Are

15   you testifying to the issue of obviousness with respect to

16   Dr. Levitt's patents?

17   A.    For Weaver's work or for whose work are you asking?

18   Q.    For anyone's work.

19   A.    Yes, for Weaver's work.

20   Q.    Okay.  Now, in fact in your report, you said you were

21   testifying on the issue of obviousness; right?

22   A.    Depending on where you are looking in the report.

23   Q.    Do you have your report in front of you?

24              MR. STEINBERG:  May I approach, Your Honor?

25              THE COURT:  Yes.

Page 1802

```
 1              IN THE UNITED STATES DISTRICT COURT
 2              IN AND FOR THE DISTRICT OF DELAWARE
 3
                        -   -   -
 4
 5   ENERGY TRANSPORTATION,          :   Civil Action
     INC.,                           :
 6                                   :
             Plaintiff,              :
 7                                   :
        v.                           :
 8                                   :
     WILLIAM DEMANT HOLDINGS A/S,    :
 9   et al.,                         :
                                     :
10           Defendants.             :   No. 05-422 (GMS)
11                      -   -   -
12                 Wilmington, Delaware
                 Friday, January 31, 2008
13                      9:30 a.m.
                  Ninth Day of Trial
14
                        -   -   -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16
17
18   APPEARANCES:
19            EDMOND D. JOHNSON, ESQ.
              Pepper Hamilton LLP
20                   -and-
              MARTY STEINBERG, ESQ.,
21            BRIAN M. BUROKER, ESQ., and
              MAYA M. ECKSTEIN, ESQ.
22            Hunton & Williams
              (Washington, D.C.)
23
                              Counsel for Plaintiff
24
25
```

Kates - dep.

Page 1904

1          "Answer:  I do not remember the specific time.

2    But this particular technical conference tends to be held in

3    the spring.

4          "Question:  I've handed you a document marked

5    Kates -- or marked Exhibit 19 to this deposition, Bates

6    labeled GNRD383587 through 383608.  Is that what you have in

7    front of you?

8          "Answer:  Yes, indeed.

9          "Question:  Can you tell me what this document

10   is?

11         "Answer:  These are copies of the slides that I

12   used for a presentation that I gave, as identified on the

13   cover sheet at an Acoustical Society of America meeting in

14   2001.

15         "Question:  Now, in 2001, you weren't working at

16   CUNY anymore.  Is that correct?

17         "Answer:  That is correct.

18         "Question:  There -- was it -- was your company

19   now Cirrus Logic?  Now, as of June 5th, 2001, was the

20   company Cirrus Logic?

21         "Answer:  I believe it was Cirrus Logic.  It was

22   certainly before I left Cirrus Logic to join ReSound

23   directly.

24         "Question:  Yeah.  And my question was more than

25   the difference between AudioLogic and Cirrus Logic.

Kates - dep.

Page 1905

1            "Answer:  This would have been Cirrus Logic.

2            "Question:  What did you do to prepare for this

3    talk?

4            "Answer:  I was invited to give this talk.  And

5    I went through my work on feedback cancellation, because I

6    wanted to present a summary of what I had accomplished.  The

7    session of the meeting was in honor of Harry.  He was

8    retiring from CUNY.  So I also added some material that

9    provided a tie-in of my interests with one of Harry's

10   interests.

11   Q.        By the time that you gave this talk, had you

12   completed most of your work on feedback cancellation system

13   design?

14           "Answer:  Yes.

15           "Question:  Did anybody help you prepare the

16   materials for this talk?

17           "Answer:  No.  It is my work.

18           "Question:  Did you have any other written

19   materials to accompany these?

20           "Answer:  No, I did not.

21           "Question:  Do you remember any of the other

22   speakers?

23           "Answer:  Many of the other speakers were

24   colleagues of Harry from CUNY -- I don't remember who

25   exactly was a speaker -- or research friends of long

Kates - dep.

Page 1911

1              "Answer:  But actually designing a system to

2    cancel feedback, no, I don't believe I did any work prior to

3    CUNY.

4              "Question:  After you started working with Dr.

5    Levitt's group?

6              "Answer:  Correct.

7              "Question:  You started in the substantive

8    materials of your written presentation with a big copy of

9    the front of the '850 patent.  Why is that?

10             "Answer:  The purpose of this session was to

11   honor Harry.  One can do that several different ways.  You

12   can honor someone by recalling shared war stories.  You can

13   honor somebody by pointing out how work that you did was

14   built on pioneering work that that previous person had.  Or

15   you can honor someone by pointing out a shared interest,

16   where somebody may have looked at a problem, not necessarily

17   solved it, but you want to make the connection between your

18   work and the honoree's work in terms of this shared

19   interest.

20             "And this figure -- the title of the patent I

21   brought up to tell the audience that Harry had an interest

22   in feedback cancellation, I had an interest in feedback

23   cancellation, this was a shared interest, and I was honoring

24   Harry by, in my opinion, solving a problem that he had not

25   solved but where he had expressed an interest in it.

Matzen - direct

Page 1926

1    Q.          So as configured, the circuit wouldn't work with

2    the compression amplifier?

3    A.          That's right.

4    Q.          Is there any specific circuitry described in the

5    Graupe '''818 patent for the correction circuit or the

6    amplification block?

7    A.          No, there is really no definitions of any

8    circuitry or hardware.  It's pretty much all block diagrams

9    of mathematical functions.  It's a mathematics based paper.

10   Q.          Now, going back to Matzen 8, the overview slide,

11   the second point here, it says it calculates the wrong

12   coefficients.  What do you mean by that?

13   A.          What I mean by that is that when it goes into

14   the identification mode and disconnects the amplifier, it

15   identifies the transfer function of the acoustic feedback.

16   But it does not do that basing those calculations on the

17   effect through transmission channel.  So it is actually

18   calculating the improper coefficients for proper reduction

19   of acoustic feedback.

20   Q.          And, again, what would be the transmission

21   channel shown here?

22   A.          Transmission channel would be the lightened

23   amplifier that connects the microphone to the receiver

24   speaker.  That's the transmission channel through the

25   system.

Matzen - direct

Page 1927

1   Q.          During the identification mode, is there even a

2   transmission channel?

3   A.          No, there is not.

4   Q.          So let's go back to Matzen 8 again.  The third

5   bullet says function as a noise generator.  That is what we

6   talked about earlier.

7   A.          Yes, uh-huh.

8   Q.          It says the Graupe '''818 does not show

9   determining  the effect on amplitude and phase on a signal

10  in the transmission channel.  Could you explain your reason

11  for that?

12  A.          Certainly.  During the identification mode,

13  there is no transmission channel so there is no way to

14  determine anything about the transmission channel.

15  Q.          So in your opinion then, can Graupe '''818

16  satisfy this claim limitation from Claims 13, 14 and 16?

17  A.          No.  Because there is so much error, because of

18  that, the system, not knowing what is happening through the

19  transmission channel when it's in the correction mode, it

20  would not be able to really effect substantial reduction of

21  acoustic feedback.

22  Q.          Does the Graupe '''818 patent discuss phase and

23  amplitude?

24  A.          No, it does not.

25  Q.          Does it discuss determining the effect on phase

Matzen - direct

Page 1928

1    and amplitude of a signal in the transmission channel?

2    A.          No, it does not.

3    Q.          The next bullet on your slide does not show

4    filter programmed to effect substantial reduction of

5    acoustic feedback (Claim 19).  Could you explain what this

6    means?

7    A.          I just did, I thought.

8    Q.          Okay.  And remind me.

9    A.          The filter, which is the corrections circuit, is

10   programmed by coefficients that are transferred from

11   the identity circuit but because those coefficients are

12   determined with the amplifier and out and the whole

13   transmission channel not there, the coefficients do not

14   include the effect of the signal through the transmission

15   channel so the reduction that it does accord is not

16   substantial.

17   Q.          Does the Graupe '''818 patent have any

18   indication of the amount of feedback that it claims to

19   reduce?

20   A.          There is no information in the patent

21   whatsoever.

22   Q.          Is there any way to determine how that circuit,

23   how much feedback that circuit might produce?

24   A.          No, there is no circuit details or hardware

25   details.  In fact, I believe in Dr. Graupe's deposition he

Matzen - direct

1    mentioned that there was no breadboard ever built.

2              MR. LYTLE:  Objection, Your Honor.

3              THE COURT:  Basis.

4              MR. LYTLE:  I believe this goes beyond his error

5    discussed in Dr. Graupe deposition.

6              MR. BUROKER:  Withdraw that.

7              THE COURT:  We'll disregard the response.

8    BY MR. BUROKER:

9    Q.         Now, you also understand Dr. Soli opined on the

10   Graupe '''818 patent with reference to the Claims 1 and 2 of

11   the '749 patent?

12   A.         Yes, uh-huh.

13   Q.         Let's take a look at Brown 13.

14              Did you find the Graupe '''818 anticipates

15   either Claim 1 or 2 of the '749 patent?

16   A.         No, I did not.

17   Q.         Could you explain to the jury why you didn't

18   find that?

19   A.         Certainly.  In the first element of Claim 1, it

20   calls for means for receiving signals from the hearing aid

21   and measuring phase and amplitude.

22              During the identification mode, there is no

23   hearing aid, the amplifier is disconnected so that is

24   meaningless.

25              The second one, means for receiving signals from

Matzen - direct

Page 1932

1    Q.          How did Dr. Best connect it, if at all, to a

2    hearing aid?

3    A.          What he did was he took a standard analog

4    hearing aid, and I believe it was an Audiotone 838, and he

5    opened it up, cut the wire from the microphone to the

6    amplifier, and inserted his system by cable into that

7    junction.  So he inserted it -- I think there is a

8    demonstrative that will show that.  He inserted it into the

9    forward transmission channel between the microphone and the

10   amplifier.

11   Q.          Do we have any photos of the prototype?

12   A.          No, we do not.

13   Q.          Are you aware of any document describing the

14   prototype other than Dr. Best's thesis?

15   A.          No.

16   Q.          Do you know where the prototype is now?

17   A.          I do not.

18   Q.          Is there any way to test whether the prototype

19   actually worked?

20   A.          Without knowing anything about it, no, we could

21   not.

22   Q.          To your knowledge, was the Prototype 2 ever

23   tested on a hearing-impaired person?

24   A.          I don't believe it was.

25   Q.          Did he test it at all?

Matzen - direct

1          MR. BUROKER:  I believe it is.

2          THE COURT:  Why don't you two confer.  Show one

3   another where it is.

4          MR. BUROKER:  I can't find it, so I will just

5   move on.

6   BY MR. BUROKER:

7   Q.          Aside from those issues you have just discussed

8   about Dr. Best's work, did you form any opinion as to

9   whether the work anticipates any of the claims of the '850

10  patent?

11  A.          Yes.  I don't believe it does.

12  Q.          And could you explain for the jury the two

13  points you have got here on this slide?

14  A.          Yes.  Claims 13 and 16 and 19 require a filter

15  to be in the feedback path.  And in the Best work, in the

16  prototype, there is no filter in the feedback path.

17          The total noise reduction method is located in

18  the forward channel of the transmission path.

19  Q.          Let's take a look at Matzen Slide 2.  What does

20  this slide show?

21  A.          The top of the slide shows Dr. Best's circuit.

22  And here is the microphone in the hearing aid that he

23  modified.  Here is the amplifier and the receiver, or

24  speaker.  And he cut the wire right in this area and put his

25  circuit in here.  So this circuit is now occupying a

1    position in the forward channel of the transmission channel,

2    forward path of the transmission channel.

3              On the bottom you will see the '850 patent.  You

4    will see that there is a programmable filter in the feedback

5    path connected from the output of the transmission channel

6    to the input of the transmission channel.

7    Q.        What is the basis for your testimony that the

8    Best circuit is connected in this fashion?

9    A.        It's based on information in the Best thesis.

10   Q.        Let's take a look at the Best thesis.  DX-1111.

11   I believe, I direct your attention to -- well, it doesn't

12   have page number, but it's Bates No. BES365.

13   A.        I think it would be Page 21 if it had a number.

14   Q.        Could you explain to the jury why you believe

15   it's connected between the microphone and the speaker?

16   A.        Yes.  This is the only figure that I am aware of

17   within the thesis that actually calls out actual hardware.

18   You can see here, Dr. Best has input here, and then he has a

19   bunch of components that are called out in the thesis, an

20   amplifier, a filter, sampling and hold, A-to-D converter,

21   followed by the TMS 32010, which is a digital signal

22   processor, followed by the circuit that needs to get back in

23   the analog domain to the output.

24              And it says in highlights here, The canceller

25   input, this being the canceller, The canceller input is the

Matzen - direct

Page 1937

1   Best work doesn't have a filter in the feedback path, what

2   is your opinion as to whether it can anticipate Claims 13,

3   16 or 19?

4   A.          It cannot.  It cannot match those claims.

5   Q.          The next bullet point says, Does not show

6   determining the effect on amplitude and phase of a signal in

7   the transmission channel, Claims 13, 14 and 16.  Can you

8   explain what this means?

9   A.          Yes.  The Best circuit can only determine what

10  happens at the input to the transmission channel.  It cannot

11  determine what happens in the transmission channel.  It

12  cannot determine the effect on amplitude and phase signal in

13  the transmission channel because it does not look at the

14  whole transmission channel.  There is no connection to the

15  output.

16  Q.          And if it doesn't determine the effect of

17  amplitude and phase of a signal in the transmission channel,

18  is it your opinion -- what is your opinion as to whether it

19  can anticipate Claims 13, 14 or 16?

20  A.          It cannot.

21  Q.          And did Dr. Soli apply the Best circuit to the

22  '749 patent?

23  A.          Yes, I believe he did.

24  Q.          In his testimony?

25  A.          I don't remember.

Matzen - redirect

Page 2004

1   A.            My analysis.

2   Q.            Does the Graupe '818 have a programmable filter

3   that affects substantial reduction of acoustic feedback?

4   A.            In my opinion, not really.

5   Q.            Why not?

6   A.            Because due to the fact that the forward channel

7   is not considered when the coefficients are determined, the

8   coefficients do not include any errors in the transmission

9   channel.  And being that there is no errors corrected for

10  the reduction of the feedback would not be as good as it

11  would if they were considered.  So it isn't substantial.  It

12  does do some reduction, but it is not substantial reduction.

13  Q.            So what is your opinion as to whether Graupe

14  '818 anticipates Claim 19?

15  A.            In my opinion, it does not.

16  Q.            In the Weaver circuit, the Weaver thesis

17  circuit, the GH-hat, that was the echo estimator?

18  A.            Yes.

19  Q.            Was that in the feedback path?

20  A.            No, it was not.

21  Q.            Why not?

22  A.            Again, it's because it was inside of the total

23  circuitry of the Weaver estimator, and that resided in a

24  location between the microphone and the amplifier and was

25  not connected to the output of the transmission channel,