IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-422 (GMS) |
| | ) | |
| SONIC INNOVATIONS, INC., et al, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S AMENDED
MOTION FOR ENHANCED DAMAGES AND ATTORNEY'S FEES**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200
dreid@mnat.com

OF COUNSEL:

SUGHRUE MION, PLLC
David J. Cushing
William H. Mandir
Carl J. Pellegrini
Brian K. Shelton
2100 Pennsylvania Ave., N.W.
Suite 800
Washington, DC 20037
202.293.7060

*Attorneys for Widex A/S and
Widex Hearing Aid Co. Inc.*

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200
mgraham@mnat.com
jparrett@mnat.com

OF COUNSEL:

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, DC 20001-4413
202.408.4000

*Attorneys for William Demant Holding A/S,
WDH Inc., Oticon A/S, Oticon, Inc.,
Bernafon AG, and Bernafon LLC*

May 9, 2008

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................... iii

INTRODUCTION ................................................................................................................... 1

SUMMARY OF THE ARGUMENT ....................................................................................... 1

LEGAL STANDARDS ........................................................................................................... 1

    A.    Enhanced Damages ................................................................................................ 1

    B.    Standard for Awarding Attorney's Fees ................................................................ 2

        1.    The Standard Under § 285 ............................................................................ 2

        2.    The Standard Under § 1927 and the Court's Inherent Power ..................... 3

ARGUMENT ........................................................................................................................... 4

I.    THIS COURT SHOULD DENY ETG'S REQUEST FOR ENHANCED
    DAMAGES FROM WIDEX ......................................................................................... 4

    A.    ETG's Evidence of Widex's Willfulness Was Legally Insufficient
        and the Totality of the Circumstances Does Not Support
        Enhancement ......................................................................................................... 5

        1.    The Evidence Does Not Support the Willfulness Verdict ........................... 5

        2.    Substantial Litigation Defenses Undermined Any
            Objectively Defined Risk of Infringement .................................................. 5

        3.    The Evidence of Knowledge of the Patents Was
            Speculative and Remote ............................................................................... 7

        4.    Given the Minimal Knowledge of the Patents and Lack of
            Any Objective Indication of Risk of Infringement, There
            Was No Obligation to Investigate ............................................................... 9

    B.    The Case Was Close Both on Infringement and Validity, and
        Defendants' Substantial Defenses Were Litigated in Good Faith ........................ 10

    C.    ETG's Allegations of Bad Faith and Litigation Misconduct Are
        Illusory ................................................................................................................ 17

1.      EKMS Undermines Willful Infringement and Supports Non-Infringement and Invalidity ................................................17

2.      ETG's Allegation of Intentional Misconduct Is a Blatant Attempt to Distort the Record to Compensate for the Weakness of Its Argument for Enhancement of Damages from Widex and Attorney's Fees from Both Defendants ........................18

3.      Defendants' Arguments at Trial Were Consistent with the Court's Claim Construction Order ............................................22

4.      There Was No "Cover-Up" of Infringement ..............................................25

5.      There Is No Support for ETG's Contention that Defendants' Witnesses Are Relevant to the Enhancement Inquiry ................................................27

6.      The Complaints of Pre-litigation Misconduct Are Without Merit................................................28

7.      There Was No Evidence that Widex Copied the Levitt Patents................................................29

D.      The Remaining *Read* Factors Also Counsel Against Enhancement ....................31

     1.      Widex's Size and Resources Are Irrelevant ..............................................31

     2.      The Duration of Alleged Infringement and Post-Filing Conduct Are Irrelevant ................................................32

     3.      There Was No Evidence of Any Motivation for Harm..............................34

E.      The Totality of the Circumstances Weighs Against Enhancement ....................35

II.      ETG'S REQUEST FOR ATTORNEY'S FEES FROM EITHER DEFENDANT SHOULD BE DENIED ................................................35

A.      ETG's Own Conduct Illustrates the Inappropriateness of This Case for a Fees Award Under 35 U.S.C. § 285 ............................................36

B.      There Is No Basis for an Award of Attorney's Fees from Either Defendant Under § 1927 or the Court's Inherent Power ........................39

CONCLUSION................................................40

TABLE OF AUTHORITIES

Page(s)

CASES

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*,
    228 F.3d 1338 (Fed. Cir. 2000)......................................................................................8

*Baker Indus., Inc. v. Cerberus Ltd.*,
    764 F.2d 204 (3d Cir. 1985)........................................................................................4

*Black & Decker, Inc. v. Robert Bosch Tool Corp.*,
    Nos. 2007-1243 and 2007-1244, 2008 U.S. App. LEXIS 207 (Fed. Cir. Jan. 4, 2008) ...........6

*by Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995) (en banc)................................................................1, 14

*Cybor Corp. v. FAS Techs., Inc.*,
    138 F.3d 1448 (Fed. Cir. 1998).......................................................................2-3, 11, 35

*FieldTurf Int'l, Inc. v. Sprinturf, Inc.*,
    433 F.3d 1366 (Fed. Cir. 2006)....................................................................................3

*GNB Battery Techs., Inc. v. Exide Corp.*,
    886 F. Supp. 420 (D. Del. 1995).................................................................................11

*Golight, Inc. v. Wal-Mart Stores, Inc.*,
    216 F. Supp. 2d 1175 (D. Colo. 2002).........................................................................32

*Honeywell Int'l v. Hamilton Sunstrand Corp.*,
    166 F. Supp. 2d 1008 (D. Del. 2001)......................................................................11, 32

*IMX, Inc. v. LendingTree, LLC*,
    469 F. Supp. 2d 203 (D. Del. 2007).............................................................................11

*In re Prudential Ins. Co. Am. Sales Practice Litig. Agent Actions*,
    278 F.3d 175 (3d Cir. 2002).....................................................................................3-4

*In re Seagate Tech., LLC*,
    497 F.3d 1360 (Fed. Cir. 2007)...........................................................................Passim

*Juicy Whip, Inc. v. Orange Bang, Inc.*,
    382 F.3d 1367 (Fed. Cir. 2004)....................................................................................1

*Kimberly-Clark Corp. v. Johnson & Johnson*,
    745 F.2d 1437 (Fed. Cir. 1984)....................................................................................3

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
    372 F. Supp. 2d 833 (E.D. Va. 2005) ..................................................................3

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
    383 F.3d 1337 (Fed. Cir. 2004).........................................................................33

*Laitram Corp. v. NEC Corp.*,
    115 F.3d 947 (Fed. Cir. 1997)...........................................................................11

*LaSalle Nat'l Bank v. First Conn. Holding Group, LLC*,
    287 F.3d 279 (3d Cir. 2002)...................................................................... 3-4, 40

*Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersystems GmbH*,
    No. 98-cv-01072 (D. Colo. Feb. 12, 2008) ......................................................39

*MercExchange, L.L.C. v. eBay, Inc.*,
    275 F. Supp. 2d 695 (E.D. Va. 2003), *aff'd in relevant part*, 401 F.3d 1323 (Fed. Cir.
    2005), *vacated on other grounds*, 126 S. Ct. 1837 (2006).......................................32

*Modine Mfg. Co. v. Allen Group, Inc.*,
    917 F.2d 538 (Fed Cir. 1990).............................................................................11

*Motorola, Inc., v. Interdigital Tech. Corp.*,
    121 F.3d 1461 (Fed. Cir. 1997)..........................................................................36

*Nat'l Presto Indus. v. W. Bend Co.*,
    76 F.3d 1185 (Fed. Cir. 1996).......................................................................2, 36

*Odetics, Inc. v. Storage Tech. Corp.*,
    185 F.3d 1259 (Fed. Cir. 1999).................................................................2, 11, 32

*Oscar Mayer Foods Corp. v. Conagra, Inc*,
    869 F. Supp. 656 (W.D. Wis. 1994) ..................................................................32

*Power Mosfet Techs., L.L.C. v. Siemens AG*,
    378 F.3d 1396 (Fed. Cir. 2004)..........................................................................37

*Read Corp. v. Portec, Inc.*,
    970 F.2d 816 (Fed. Cir. 1992)...................................................................... Passim

*Riles v. Shell Exploration & Prod. Co.*,
    298 F.3d 1302 (Fed. Cir. 2002)..........................................................................11

*Sensonics, Inc. v. Aerosonic, Corp.*,
    81 F.3d 1566 (Fed. Cir. 1996)............................................................................36

*State Indus. v. A.O. Smith Corp.*,
    751 F.2d 1226 (Fed. Cir. 1985)................................................................35

*Stryker Corp. v. Intermedics Orthopedics, Inc.*,
    96 F.3d 1409 (Fed. Cir. 1996)................................................................31

*Toy v. Plumbers & Pipefitters Local Union No. 74 Pension Plan*,
    497 F. Supp. 2d 591 (D. Del. 2007)........................................................4


STATUTES

28 U.S.C. § 1927 ........................................................................ 3-4, 39

35 U.S.C. § 112 .................................................................................7

35 U.S.C. § 284 .................................................................................1

35 U.S.C. § 285 .............................................................................2, 36


RULES

Federal Rule of Evidence 702............................................................27

## INTRODUCTION

Defendants Oticon A/S, Oticon, Inc., Bernafon AG, Bernafon, LLC, WDH, Inc.,

and William Demant Holding A/S ("Demant") and defendants  Widex A/S, and Widex Hearing

Aid Co., Inc. ("Widex") (collectively the "Defendants") oppose Plaintiff Energy Transportation

Group, Inc.'s ("ETG") Amended Motion for Enhanced Damages and Attorney's Fees (D.I. 538).

For the reasons set out below, Defendants request that the Court deny this motion.

## SUMMARY OF THE ARGUMENT

ETG blows minor mistakes out of proportion and focuses on what are essentially

irrelevant issues.  The record shows, however, that (1) the totality of the circumstances weighs

heavily against enhancing ETG's damages award from Widex and that (2) Defendants'

professional and good faith presentation of strong, if not overwhelming, non-infringement and

invalidity defenses coupled with ETG's own bad faith litigation conduct weighs against any

award of attorney's fees from either Defendant.

## LEGAL STANDARDS

### A.    Enhanced Damages

Under 35 U.S.C. § 284, a trial court may increase damages up to three times the

amount found or awarded.  However, a finding of willful infringement "merely ***authorizes***, but

does not ***mandate***, an award of increased damages," let alone treble damages.  *Juicy Whip, Inc. v.*

*Orange Bang, Inc.*, 382 F.3d 1367, 1373 (Fed. Cir. 2004) (quoting *Modine Mfg. Co. v. Allen*

*Group, Inc.*, 917 F.2d 538, 543 (Fed Cir. 1990)).  "The paramount determination in deciding to

grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based

on all the facts and circumstances."  *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir.

1992), *abrogated in part on other grounds by Markman v. Westview Instruments, Inc.*, 52 F.3d

967 (Fed. Cir. 1995) (en banc).  Thus, the decision whether to enhance is "firmly within the scope of the district court's reasoned discretion, informed by the totality of the circumstances." *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1274 (Fed. Cir. 1999).

In determining whether enhancement of damages is warranted, the following factors are considered in analyzing the totality of the circumstances: (1) whether the infringer deliberately copied the ideas or design of another; (2) whether the infringer, when he knew of the other's patent, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringer's behavior as a party to the litigation; (4) the defendant's size and financial condition; (5) the closeness of the case; (6) the duration of the defendant's misconduct; (7) remedial action by the defendant; (8) the defendant's motivation for harm; and (9) whether the defendant attempted to conceal its misconduct.  *Read Corp.*, 970 F.2d at 827.

### B.    Standard for Awarding Attorney's Fees

#### 1.    The Standard Under § 285

35 U.S.C. § 285 provides that the "court in exceptional cases may award reasonable attorney fees to the prevailing party."  Determining whether a case is exceptional and eligible for an award of attorney's fees is a two-step process.  First, the district court must determine whether a case is exceptional.  After determining that a case is exceptional, the district court must determine whether attorney's fees are appropriate.  *See Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1460 (Fed. Cir. 1998) (citations omitted).

Attorney's fees should be awarded only in "exceptional" cases that exemplify bad faith, recklessness, or vexatious litigation tactics.  Even in "extraordinary" cases, the Federal Circuit has noted that "the award of attorney fees is not automatic."  *Nat'l Presto Indus. v. W.*

*Bend Co.*, 76 F.3d 1185, 1197 (Fed. Cir. 1996).  Moreover, so long as a party litigates an

uncertain case "in good faith" and raises defenses that are "not frivolous or asserted for an

improper purpose," a court is well within its discretion to deny a prevailing party's motion for

attorney's fees.  *Cybor Corp.*, 138 F.3d at 1460-61.

   Further, attorney's fees are "not to be awarded in normal cases involving no

unconscionable conduct on the part of the losing party."  *Kimberly-Clark Corp. v. Johnson &*

*Johnson*, 745 F.2d 1437, 1458 (Fed. Cir. 1984).  Attorney's fees are only to be awarded when it

is necessary to prevent a "gross injustice" to the prevailing party.  *See FieldTurf Int'l, Inc. v.*

*Sprinturf, Inc.*, 433 F.3d 1366 (Fed. Cir. 2006).  This is so because "Congress in choosing to

limit district court authority to award attorney's fees to 'exceptional' cases has made clear that

this should occur only in rare or extraordinary cases."  *Knorr-Bremse Systeme Fuer*

*Nutzfahrzeuge GmbH v. Dana Corp.*, 372 F. Supp. 2d 833, 851 (E.D. Va. 2005).  "Exceptional"

cases are "those rare or extraordinary cases blighted and marked by a party's bad faith or

inequitable conduct."  *Id*.

   **2.**  **The Standard Under § 1927 and the Court's Inherent Power**

   28 U.S.C. § 1927 is reserved for behavior of an egregious nature that is violative

of recognized standards in the conduct of litigation.  *See In re Prudential Ins. Co. Am. Sales*

*Practice Litig. Agent Actions*, 278 F.3d 175, 188 (3d Cir. 2002).  Section 1927 applies to

situations where an attorney has (1) multiplied proceedings (2) unreasonably and vexatiously,

(3) thereby increasing the cost of the proceedings (4) with bad faith or with intentional

misconduct.  *See LaSalle Nat'l Bank v. First Conn. Holding Group, LLC*, 287 F.3d 279, 288 (3d

Cir. 2002).

   Before awarding fees under § 1927, a Court must find that counsel's conduct

- 3 -

resulted in bad faith, rather than misunderstanding, bad judgment, or well-intentioned zeal. *Id.* at

289. This bad-faith standard under § 1927 requires that an attorney's "conduct must be of an

egregious nature, stamped by bad faith that is violative of recognized standards in the conduct of

litigation." *See Baker Indus., Inc. v. Cerberus Ltd.*, 764 F.2d 204, 208 (3d Cir. 1985) (quoting

*Colucci v. N.Y. Times Co.*, 533 F. Supp. 1011, 1014 (S.D.N.Y. 1982)); *see also Toy v. Plumbers*

*& Pipefitters Local Union No. 74 Pension Plan*, 497 F. Supp. 2d 591, 597 (D. Del. 2007)

(denying attorney's fees where litigation decisions by counsel were not found to be in bad faith,

their decisions were not entirely meritless, and their conduct did not rise to the level that would

support an award under § 1927.). Generally, a court's inherent power to impose attorney's fees

"should be reserved for those cases in which the conduct of a party or an attorney is egregious

and no other basis for sanctions exists." *Prudential Ins. Co.*, 278 F.3d at 189 (quoting *Martin v.*

*Brown*, 63 F.3d 1252, 1265 (3d Cir. 1995)).

## <u>ARGUMENT</u>

### I.   THIS COURT SHOULD DENY ETG'S REQUEST FOR ENHANCED DAMAGES FROM WIDEX

ETG's evidence of willfulness was legally insufficient, the case was close,

Defendants litigated in good faith, and Widex did not cover up infringement or copy the patents.

For these and other reasons, ETG's motion for enhanced damages from Widex should be

denied.[1]

---

[1]   The jury found that Demant did not willfully infringe the Levitt patents (D.I. 521 at 7) and ETG did not move for enhanced damages against Demant (D.I. 538 at 1).

### A.    ETG's Evidence of Widex's Willfulness Was Legally Insufficient and the Totality of the Circumstances Does Not Support Enhancement

#### 1.    The Evidence Does Not Support the Willfulness Verdict

The record and strength of Widex's defenses overwhelmingly point to the conclusion that Widex's belief that the Levitt Patents are invalid and/or not infringed is legitimate, well justified, and correct.  The lack of clear and convincing evidence of willful infringement is explained in detail in the Opening Brief in Support of the Widex Defendants' Motion for Judgment as a Matter of Law and Request for New Trial on the Issue of Willful Infringement ("Widex's Opening Willful Infringement Brief").  (D.I. 541.)  This insufficiency of the evidence on willfulness compels denial of ETG's request for enhanced damages, as set forth below.

#### 2.    Substantial Litigation Defenses Undermined Any Objectively Defined Risk of Infringement

Strikingly, ETG makes no attempt to reconcile the jury's finding of willfulness with the heightened standard for finding willful infringement mandated by *Seagate*, which decreed that willful infringement requires "at least a showing of objective recklessness."  *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).  Nor does ETG bother to mention that the Federal Circuit, in *Seagate*, expressly "abandon[ed] the affirmative duty of due care" and the "affirmative obligation to obtain opinion of counsel."  *Id*.

Even more telling is ETG's failure to point to any evidence to satisfy *Seagate*'s threshold objective inquiry.  Under the objective prong of *Seagate*, the "patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent."  *Id*.  The accused infringer's state of mind is not relevant to this inquiry.  *Id*.  If the threshold objective prong is met, the patentee must

satisfy *Seagate*'s subjective prong, which requires the patentee to show that the "objectively-defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer." *Id*.

As set forth in Widex's Opening Willful Infringement Brief, ETG failed to present legally sufficient evidence to satisfy the enhanced criteria for willfulness under *Seagate*. Thus, as the finding of willfulness was not supported by legally sufficient evidence and must fail, so too must fail ETG's argument that willful infringement supports enhancement of damages. However, even assuming ETG could satisfy the heightened standard under *Seagate*, which it cannot, the evidence on the issue of willfulness is insufficient to support finding this case exceptional.

First, there was no objectively defined risk of Widex's infringement. As discussed below, Defendants presented substantial litigation defenses as to both infringement and validity that are contrary to an objective risk of infringement. *See Black & Decker, Inc. v. Robert Bosch Tool Corp.*, Nos. 2007-1243 and 2007-1244, 2008 U.S. App. LEXIS 207, at *18 (Fed. Cir. Jan. 4, 2008) (under *Seagate*, "both legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent").

In addition, the lack of an objectively high likelihood of infringement was confirmed by EKMS coming to the same conclusion as Widex that the Levitt Patents did not cover a "continuously adaptive" approach to feedback cancellation, which was also apparently shared by SoundID, a hearing aid manufacturer EKMS approached on behalf of ETG as part of the failed campaign to license the Levitt Patents or otherwise exploit these "assets." (Chen, Tr.

433:8-434:23, 435:3-7 (direct); DX 1610 at 1-2.)[2]  Further, articles by peers of Dr. Levitt, Mr.

Kates and Dr. Bustamante, support Widex's conclusion that the '850 Patent inventors did not

contemplate adjusting to changes in the acoustic feedback path and, therefore, a claim

interpretation covering an adaptive filter would violate the written description requirement under

35 U.S.C. § 112, ¶ 1:

> The fixed filter, however, cannot adjust to changes in the acoustic
> environment.  (DX 1240 at 9 (emphasis added), attached to D.I.
> 547.)
>
> [The '850 Patent] employed a fixed filter, derived from one
> measurement of the feedback path transfer function, as the transfer
> function estimate, rendering this approach vulnerable to changes in
> the acoustic environment.

(DX 1239 at 1 (emphasis added); attached to D.I. 547.)

This evidence alone, demonstrating independent and unpartisan review of the

Levitt Patents occurring well before this lawsuit, demonstrates there was no objectively defined

risk of Widex infringing a valid patent.

### 3.     The Evidence of Knowledge of the Patents Was Speculative and Remote

Without addressing the objective prong of the *Seagate* criteria, ETG focuses on

subjective evidence, which has no bearing on the willfulness analysis under *Seagate* if the

threshold objective prong is not met.  Even so, the purported "knowledge" of the Levitt Patents

by Widex is unreliable and speculative, demonstrating the tenuous nature of the willfulness

finding and counseling against any enhancement of damages.

---

[2]     Trial exhibits and trial transcript excerpts cited herein, unless otherwise indicated, are attached to the accompanying Appendix Of Exhibits And Trial Transcript Excerpts To Defendants' Answering Brief In Opposition To Plaintiff's Amended Motion For Enhanced Damages and Attorneys' Fees.

ETG could not point to any meaningful knowledge of the Levitt Patents on the part of Widex and was forced to rely on innuendo to support its willful infringement charge. For instance, ETG made much of the fact that Soren Westermann, Widex's Director of Research, Information Technology and Intellectual Property, knew of Dr. Levitt prior to this lawsuit and had received a copy of his resume in connection with HIMPP's decision to engage Dr. Levitt in connection with a reexamination proceeding. However, the fact that Dr. Levitt's patents were mentioned in two lines on an eleven-page resume is hardly evidence of any meaningful notice of the patents being communicated to Widex, and is insufficient to establish knowledge in the context of willful infringement.[3]  *See Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1351-52 (Fed. Cir. 2000).

ETG also pointed to Widex having a copy of the Levitt Patents in its patent files. (ETG Br. at 12-13.) However, ETG did not—because it could not—point to any evidence of anyone at Widex ever considering the Levitt Patents in connection with any of the Widex Accused Products. Further, despite the fact ETG and Dr. Levitt did analyze the Widex Accused Products relative to the Levitt Patents years before, no one, including ETG and Dr. Levitt himself, ever felt compelled to bring any allegation of possible infringement of these patents to Widex, formally or informally, prior to Widex being sued in this Court.

Faced with this dearth of evidence of any meaningful knowledge of the Levitt Patents, ETG points to handwriting and markings appearing on the front pages of a copy of the '749 Patent and a copy of the European equivalent to the '850 Patent. Taking a colossal leap in logic, ETG concludes that "[o]bviously, this means that Widex considered the validity and

---

[3]   Since Mr. Westermann was already familiar with Dr. Levitt, he had no reason to scrutinize Dr. Levitt's voluminous resume.  (Westermann, Tr. 746:3-12, 747:4-9 (direct).)

application of Dr. Levitt's patents at least as early as the 1990's." (ETG Br. at 12-13). But, the Widex Accused Products were developed years later. (Nielsen, Tr. 1115:13-17 (direct).) Even more important, none of this writing on the patents had any relevance to the issues in this case. (Morley, Tr. 1443:8-1444:8 (direct); Westermann, Tr. 724:17-725:6 (direct), 802:9-803:7 (cross).) As such, ETG never established any connection with this writing and anyone at Widex considering any infringement issues with respect to the Levitt Patents. Even if Widex had considered the Levitt Patents in some meaningful fashion before this lawsuit, and there is absolutely no evidence of this, one could not reasonably say that Widex's conclusions would have been any different from Dr. Bustamante and Mr. Kates, or that of SoundID, as reflected by the failed EKMS commercialization efforts.[4]

> ### 4.      Given the Minimal Knowledge of the Patents and Lack of Any Objective Indication of Risk of Infringement, There Was No Obligation to Investigate

As indicated above, ETG never contacted Widex about the Levitt Patents prior to filing the lawsuit. Nevertheless, ETG asserts that "Widex admitted that it **never** investigated its possible infringement or the invalidity of the Patents-In-Suit." (ETG Br. at 13.) ETG neglects to mention that post-*Seagate*, there is neither an affirmative duty to obtain an opinion of counsel nor an affirmative duty of due care. *See Seagate*, 497 F.3d at 1371. For reasons discussed above, there was no objectively defined risk that Widex was highly likely to infringe a valid interpretation of the Levitt Patents. Widex did not investigate the Levitt Patents because it had

---

[4]     The EKMS report and the articles by Dr. Bustamante and Mr. Kates also evidence that it would not have been obvious to Widex or anyone else that the Levitt Patents could be construed to cover an adaptive filter. EKMS and Dr. Bustamante and Mr. Kate came to this conclusion after studying the Levitt Patents, and EKMS also studied the Widex Accused Products. On the other hand, Widex never even considered the Levitt Patents in the context of the Widex Accused Products.

no reason to do so, and ETG failed to present any objective evidence that would suggest otherwise.

       The lack of legally sufficient evidence to support the jury's finding of willfulness eviscerates ETG's request for enhancement of damages from Widex and demonstrates the self-serving nature underlying the distorted portrayal of the trial record employed in its motion. Analysis of the remaining *Read* factors compels the same conclusion.

### B. The Case Was Close Both on Infringement and Validity, and Defendants' Substantial Defenses Were Litigated in Good Faith[5]

       In addressing the "closeness" factor of *Read*, ETG refers to an alleged infringement "cover-up" and suggests that the jury saw past this so-called cover-up to find "every asserted claim valid and infringed."   (ETG Br. at 33.)  Thus, by ETG's simplistic reasoning, the case must not have been close.  The record reveals otherwise.

       First, ETG's "infringement cover-up" theory is nothing more than a *post-hoc* fiction contrived in a transparent effort to lend credibility to a request for enhancement suffering from deficient evidence.  Further, in stating that the jury "found every asserted claim valid and infringed," ETG fails to mention that the jury found literal infringement of ***only one claim***, and that the jury expressly rejected ETG's arguments that claims 13, 14, and 16 of the '850 Patent were infringed literally.  ETG did not even attempt to show literal infringement of claims 1 and 2 of the '749 Patent.  Finally, although ETG asked the jury for $25.7M from Widex in damages,

---

[5]   Demant joins Widex in asserting that the issues of validity and infringement were hotly contested and so "close" that, as a matter of law, judgment should be granted in favor of Defendants.  (*See* Opening Brief in Support of the Defendants' Renewed Motion for Judgment as a Matter of Law and Request for New Trial on the Issues on Infringement and Validity ("Defendants' Infringement and Validity JMOL Opening Brief") (D.I. 545).)

the jury rejected this request and awarded a little more than half of what ETG requested.[6]  All of

these facts unmistakably demonstrate the closeness of the issues in this case.

   Further, ETG conveniently avoids any discussion of the relative significance that

the closeness of a case plays in the *Read* analysis.  In fact, the closeness of a case has been a

consistent basis upon which courts decline to enhance damages.[7]  If an accused infringer litigates

non-frivolous defenses in "good faith" and the issue of infringement presents a "close case," a

court need not find the case to be exceptional, even if the jury finds willful infringement.  *See*

*Honeywell Int'l v. Hamilton Sunstrand Corp.*, 166 F. Supp. 2d 1008, 1040-41 (D. Del. 2001)

*vacated-in-part on other grounds*, 370 F.3d 1131 (Fed. Cir. 2004); *IMX, Inc. v. LendingTree,*

*LLC*, 469 F. Supp. 2d 203, 223 (D. Del. 2007) (holding that case of willful infringement was not

exceptional when "defendant's infringement of the '947 patent was a 'close' question, and

---

[6] The jury awarded $15M against Widex.  The jury likewise awarded ETG substantially less
($16M) than the $36M it requested from Demant.  (D.I. 521 at 8.)

[7] *See Cybor Corp.*, 138 F.3d at 1461 (affirming denial of enhanced damages because,
"although Cybor was found to infringe all twenty of the claims, this result does not mean that
the case was not close"); *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1314 (Fed.
Cir. 2002) (affirming denial of enhanced damages where, "[d]espite record evidence that
Shell copied the '918 patent, the district court found that the issues of infringement, damages,
and willfulness were close questions," and district court "noted that the case was hard-fought,
and that the jury could have found for Shell on the infringement and willfulness issues");
*Laitram Corp. v. NEC Corp.*, 115 F.3d 947, 955 (Fed. Cir. 1997) (affirming district court's
decision not to enhance damages because "[t]he district court held that, despite the jury
finding of willfulness, which it assumed to be proper, enhanced damages were inappropriate
because of the closeness of both the infringement and willfulness issues"); *Odetics, Inc. v.
Storage Tech. Corp.*, 14 F. Supp. 2d 800, 805 n.9 (E.D. Va. 1998), *aff'd*, 185 F.3d 1259 (Fed.
Cir. 1999) ("It is worth noting that, even if [the defendant] were found not to have
'mount[ed] a good faith and substantial challenge to the existence of infringement,' this
Court would still decline to award any enhanced damages, taking into consideration the nine
factors enumerated in *Read*, especially the closeness of the case.") (alteration in original)
(citation omitted); *Modine Mfg. Co. v. Allen Group, Inc.*, 14 U.S.P.Q.2d 1210, 1217 (N.D.
Cal. 1989), *aff'd* 917 F.2d 538 (Fed. Cir. 1990) ("Because the issue of patentability was close
and litigated in good faith, this Court exercises its complete discretion and DENIES
plaintiff's motion for increased damages, despite the finding of willful infringement.")
(citation omitted); *GNB Battery Techs., Inc. v. Exide Corp.*, 886 F. Supp. 420, 441 (D. Del.
1995) (denying motion for enhanced damages where validity issues were close).

defendant's trial tactics did not rise to the level of bad faith or vexatious litigation").

Here, Defendants presented significant and substantial defenses to both validity and infringement, which were pursued vigorously at trial and litigated in good faith. These defenses and the evidence in support thereof set forth numerous reasons as to why the jury's verdict was in error. A summary of the defenses and grounds for overturning the jury's findings follows:[8]

- The Accused Products do not use a "programmable" delay line filter that is programmed, as required by claim 19 of the '850 Patent. ETG's testimony on the alleged infringement of claim 19 relied upon reading the term "programmable" out of the "programmable delay line filter" limitation. Indeed, ETG's expert on infringement, Mr. Brown, testified that "just about any digital filter" will do. (Tr. 533:16-22 (direct).) However, there was no substantial evidence in the record that showed the LMS adaptive filters of the type utilized in Defendants' products could be a "programmable" delay line filter since one could not force the delay line to produce "a" response. Although ETG's transparent attempt to read "programmable" out of the "programmable delay line filter" limitation may have misled the jury, it is an improper basis to support a finding of infringement.

- One could not find a "programmed" filter in the Accused Products and at the same time find an absence of clear and convincing evidence that the Graupe '818 reference anticipates claim 19. Here, ETG's own expert, Mr. Matzen, admitted that given ETG's interpretation of "programmable" in claim 19, all elements of claim 19 are disclosed in Graupe '818. Mr. Matzen would nevertheless contend the Graupe '818 did not "effect

---

[8]    These grounds are set forth in detail in Defendants' Infringement and Validity JMOL Opening Brief. (D.I. 545.)

substantial reduction of acoustic feedback," even though he agreed it would reduce at least some acoustic feedback. (Matzen, Tr. 1927:19-21, 1928:3-21 (direct), 2004:2-12 (redirect).) Mr. Matzen's "distinction," plainly contrived in an attempt to save claim 19 from invalidity, is illogical and unsound, as the disclosure of Graupe '818 makes numerous references to cancelling, reducing, and eliminating the effect of acoustic feedback. Indeed, the superfluous nature of Mr. Matzen's distinction is even more evident given his admission that Graupe '818 provides "some reduction" of acoustic feedback, just not "substantial" reduction.[9] Mr. Matzen was unable, however, to define where "some" ends and "substantial" begins.

- ETG's attempt to bolster the "substantial" distinction, that "Graupe '818 calculates the wrong coefficients," was likewise illogical and scientifically unsound. In fact, the coefficients of the '850 Patent and Graupe '818 are calculated using the same signal that drives the respective speakers, meaning that if the '850 Patent provides "substantial reduction," then Graupe '818 must as well. Similarly, ETG refused to allow its infringement expert, Mr. Brown, to even consider Graupe '818.[10] Therefore, one was left to wonder whether Mr. Brown's finding that the Accused Products substantially reduced acoustic feedback was any more or less of a reduction found in Graupe '818.

---

[9]  Mr. Matzen's testimony is especially unsound given the substantial testimony at trial that an adaptive system, such as in Graupe '818, reduced feedback better than a fixed system, such as in the Levitt Patents. (Morley, Tr. 1418:16-1419:12 (direct); Kates, Tr. 1909:20-1910:4; Levitt, 361:10-363:15 (cross).)

[10]  Mr. Brown never considered Graupe '818, notwithstanding that Defendants' infringement experts opined that Graupe '818 prevented infringement under the doctrine of equivalents. (Brown, Tr. 628:13-629:21 (cross).)

- The LMS feedback canceller of Dr. Leland Best constituted a prior invention to the Levitt Patents. Mr. Matzen contended that Dr. Best's feedback canceller did not anticipate claim 19 because the filter was not in a feedback path. The basis for Mr. Matzen's distinction concerning Best is equally as dubious. First, Mr. Matzen's argument would require further limitation to the Court's definition of "feedback path," which the Court construed as "a path in which a signal travels from the output to the input." (D.I. 495 § A, ¶ 2.) Mr. Matzen contended that to satisfy the Court's definition, the feedback path must begin at the speaker and end at the microphone. (Matzen, Tr. 1968:9-1969:9 (cross).) Mr. Matzen's position at trial was not only contrary to ETG's position at the *Markman* hearing, but flies in the face of the plain language of the claim itself that allows the transmission channel to be "interposed" in any portion of the forward path between the microphone and receiver, with the filter connected between the input and output of that portion. Further, Mr. Matzen's distinction also has the effect of excluding the preferred embodiment of the '850 Patent itself. The reason ETG was forced to concoct yet another distinction is clear, because the Best feedback canceller discloses his filter located in the "feedback path."

- The lack of written description precluded the claims of the '850 Patent from being construed so broadly as to encompass the LMS filters employed by the Accused Products, in which the filter coefficients are adaptively changed for the purpose of reducing acoustic feedback. ETG's infringement expert, Mr. Brown, admitted that the Levitt Patents failed to disclose any mechanism to detect when acoustic feedback is changed. (Brown, Tr. 2014:13-17 (cross).) Thus, if one cannot detect when the acoustic feedback path changes, one cannot change the filter coefficients to adapt to that change.

- 14 -

Mr. Brown's admission compels the finding that there is no written description in the '850 Patent to support claims that cover a device that detects changes in the acoustic feedback path and produces new filter coefficients to adapt to that change.

- The Best Invention anticipated all the asserted claims. If the Accused Products were found to infringe on the theory that the cancellation of feedback inherently includes, or is equivalent to, the determination of amplitude and phase effects required by claims 13, 14, and 16, or the "programmable filter" required by claim 19, or the corresponding structure and recited functions of claims 1 and 2 of the '749 Patent, these same claims are invalid in view of the Best Invention.

- ETG surrendered claim scope during prosecution and was precluded from using the doctrine of equivalents to recapture surrendered claim scope. Thus, prosecution history estoppel precluded a finding of infringement of claim 19 of the '850 Patent and claims 1 and 2 of the '749 Patent. For claim 19 of the '850 Patent, it was added as a new claim (application claim 25) after the original claims were rejected and the applicant expressly relied on the feature of the "programmable delay line filter" in the feedback path as an allegedly novel feature in view of the cited art. ETG failed to rebut the presumptive surrender and was precluded from any equivalents to the programmable delay line filter. As to the '749 Patent, because the applicant narrowed the scope of what would issue as claims 1-6 to add the limitations regarding measuring phase and amplitude to overcome a prior art rejection, a presumption of total surrender of equivalents applies, which ETG could not rebut and did not even attempt to do so at trial. Notably, ETG failed to establish that the use of LMS adaptive filters was a foreseeable alternative to "measuring

phase and amplitude," nor did ETG offer any other reason to rebut the presumption of surrender.

- Beyond the prosecution history estoppel argument, the jury's finding of infringement of all of the asserted claims under the doctrine of equivalents cannot be sustained as a matter of law for additional reasons. First, ETG failed to meet its burden of proving equivalence using particularized testimony and linking argument. Second, ETG's doctrine of equivalents evidence eviscerates the "determining" step of claims 13, 14, and 16, the "programmable" and "programmed" requirement of claim 19 of the '850 Patent, and the corresponding structure of claims 1 and 2 of the '749 Patent. Third, any hypothetical claim that covers the Accused Products and is supported by the '850 Patent disclosure would be invalid in view of Graupe '818 and the Best Invention.

- ETG failed to show that any of the means-plus-function claim elements required in the '749 Patent claims were present. Rather, ETG only provided evidence of the same result—the reduction of the effect of acoustic feedback—and improperly ignored the "way" that result was obtained. Conversely, Defendants' expert testimony established that the way and even the result are not substantially the same.

- Thus, ETG's contention that "[t]he case for infringement and validity was not close," is self-serving rhetoric, given these substantial defenses that Defendants presented at trial. Indeed, this case was not close but rather overwhelmingly called for judgment as a matter of law in favor of Defendants.

### C.    ETG's Allegations of Bad Faith and Litigation Misconduct Are Illusory[11]

#### 1.    EKMS Undermines Willful Infringement and Supports Non-Infringement and Invalidity

ETG's urging that the EKMS documents were utilized as a "smokescreen" to confuse the jury is completely lacking in merit.  (*See* ETG Br. at 16-19.)  ETG improperly withheld production of these documents from Defendants based on an untenable claim of work product that was itself a smokescreen employed by ETG to conceal evidence.  However, the Court saw through this ruse and ETG was forced to produce the damning evidence of failed commercialization efforts and unfavorable analysis of the Levitt Patents.  (Nov. 1, 2007 Tel. Conf. Tr. 18:8-19:14 (relevant portions in Appendix, Attachment B).)  ETG's present attempt to exploit the very evidence that it wrongly withheld should be rejected.

In addition, contrary to ETG's self-serving argument, Defendants did not rely on the EKMS documents to "reargue claim construction."  (ETG Br. at 17.)  Defendants' use of the EKMS documents at trial was not improper, as the EKMS documents were relevant to: (1) willfulness, (2) what the Levitt Patents teach to one skilled in the art for purposes of establishing written description, and (3) the value of the patents. Further, there was nothing improper about Dr. Morley and Mr. Donohoe supplementing their expert reports to address the EKMS documents, which served to put ETG on notice that such testimony would be forthcoming at trial.

---

[11]    Demant joins in this section to the extent ETG incorporated its analysis of "bad faith" into its attorney's fees analysis.

    **2.**      **ETG's Allegation of Intentional Misconduct Is a Blatant Attempt to Distort the Record to Compensate for the Weakness of Its Argument for Enhancement of Damages from Widex and Attorney's Fees from Both Defendants**

Regarding Widex counsel's closing argument, ETG blows an innocent mistake regarding the EKMS documents out of proportion.[12]  In a desperate effort to compensate for the clear weaknesses of its request for enhancement and attorney's fees, ETG presents a salacious tale of Widex's defense counsel intentionally disobeying the Court to further confuse the jury with the "EKMS smokescreen," replete with declarations from ETG counsel referring to alleged discussions occurring off the record between counsel for Widex, Mr. Mandir, and counsel for Demant, Mr. Romary.  However, the record reveals that the alleged bad-faith misconduct was in reality a misunderstanding by Widex counsel, occurring in the midst of a closing argument with millions of dollars on the line, as to the precise manner of the clarification the Court required during a sidebar.  ETG's shameful attempt to pervert this misunderstanding into intentional bad-faith misconduct should be rejected.

Contrary to ETG's urging, there was nothing unreasonable or improper about the discussion of the EKMS documents in Defendants' opening statement or during the cross-examination of Kimball Chen.[13]  The documents plainly suggest that Dr. Dowling, the technical

---

[12]  Importantly, any purported defiance of the Court's instruction in connection with the EKMS documents had nothing to do with Demant counsel.  But, in any event, Demant counsel disagrees with ETG that Widex's counsel intentionally disobeyed the Court's instructions.  Demant counsel also believes that Widex counsel would never have intentionally taken action that would risk prompting the Court to grant entry of the Dowling Declaration, an accumulation of untested statements that Defendants never had the chance to challenge from a source Defendants never had the opportunity to cross-examine.

[13]  As ETG notes, Defendants did not interview or depose anyone at EKMS or Dr. Dowling.  The EKMS documents, which were not even produced until well after fact discovery closed, spoke for themselves.  The notion that Defendants were somehow obligated to interview or depose someone at EKMS has no merit.

expert retained by EKMS, had reviewed the Levitt Patents with the assistance of Dr. Levitt and

agreed that the patents contained language adverse to covering continuously adaptive products:

> Eric Dowling, the EKMS expert, took a look at the patent while
> EKMS arranged a second call with Harry Leavitt for early August.
> Over the course of two calls, we worked through the language of
> the patent and found the body of the patent included language
> adverse to an interpretation of the claims involving a continuously
> adaptive approach.

(DX 1610 at 1 (MP00000031).)

Only after ETG approached the Court during trial presenting a declaration from

Dr. Dowling was there any reason for Defendants to believe that Dr. Dowling did not share the

view that the Levitt Patents could not cover continuously adaptive products.  ETG sought to call

Dr. Dowling as a rebuttal witness, which the Court rejected.  However, Defendants believed that

reference to what the documents themselves stated was appropriate during closing argument, to

which the Court agreed.  As Mr. Mandir explained to the Court:

> Your Honor, I want to be able to read the document to them, point
> to paragraphs.  I won't say anything that attributes it to Dr.
> Dowling.  They can read it themselves.  I'll just read it.  And they
> can decide.  I won't say one word about it.  (Tr. 1795:18-22.)

The Court further instructed that there would be no implication that Dr. Dowling

had ever changed his mind from the position expressed in his earlier "red-faced liar" email, to

which defense counsel agreed.  (Tr. 1796:2-13.)

During the closing argument, counsel for ETG objected when Widex

counsel, Mr. Mandir, began to read from the paragraph of the EKMS Summary Report

concerning Dr. Dowling and the "second phone call" with Dr. Levitt, claiming in the sidebar

conference that the sentence of the Summary Report that followed ("…we worked through the

language of the patent and found the body of the patent included language adverse to an

interpretation of the claims involving a continuously adaptive approach") would imply that Dr.

Dowling had changed his opinion.  (Tr. 2185:20-22; *see* DX 1610 at 1.)  To address any concern

that reading from this portion of the document would imply that Dr. Dowling had changed his

mind, Demant counsel, Mr. Romary, suggested: "[c]an we say something like we are not saying

that Eric Dowling changed his mind," to which the Court agreed.  (Tr. 2188:13-15.)

      Mr. Mandir's statement immediately following the sidebar conference was

believed by Mr. Mandir to comply with the Court's instruction:

> Okay.  So we were reading Eric Dowling, the EKMS expert, took a
> look at the patent while EKMS arranged a second call with Harry
> Levitt for early August.  Over the course of two calls, we worked
> through the language of the patent and found that the body of the
> patent included language adverse to an interpretation of the claims
> involving a continuously adaptive approach.
>
> Now, I don't know exactly how that came about.  I don't know
> how it came about.  All I know is this EKMS document says it and
> this was given to Audimax.  They're saying that they looked at it
> and EKMS is coming to the conclusion that they interpret the
> claims – EKMS interprets these claims to be something adverse to
> interpretation that would involve a continuously adaptive
> approach.

(Tr. 2189:1-14 (emphasis added).)

      Thus, Mr. Mandir expressly qualified the statement read from the EKMS Report

to emphasize that the conclusion was that of EKMS and reasonably believed the qualification to

comply with the Court's instruction.  (Mandir Dec. at ¶¶ 3-6.)

      At the conclusion of Defendants' closing, counsel for ETG again objected and the

Court agreed that the jury should have been told that there was no evidence that Dr. Dowling

ever changed his mind.  (Tr. 2204:9-16.)  The Court then instructed that the Declaration of Dr.

Dowling would be received in evidence to clarify this point.  (Tr. 2204:19-22.)

      The remarks made in Widex's closing argument do not suggest that counsel was

intent on disobeying the Court's instruction.  Rather, the record indicates counsel's effort to avoid any implication that the conclusions of EKMS were those of anyone else and a misunderstanding as to precisely what counsel should have stated.  Further, in view of the circumstances, the Court took the action it felt appropriate to clarify this point by allowing the Dowling Declaration into evidence.

Despite the evidence of counsel's efforts to abide by the Court's instructions, ETG proceeds in a misguided effort to impute intentional misconduct to this misunderstanding by pointing to a note passed from Mr. Romary to Mr. Mandir during the closing argument, an alleged "heated argument" that occurred between Mr. Romary and Mr. Mandir, and Mr. Romary's statement during an off-the-record, post-verdict session with the Court.  None of these contentions have merit.

First, as to the note passed to Mr. Mandir from Mr. Romary during closing, Mr. Mandir did not notice the note placed on the lectern in the midst of his closing argument. (Mandir Dec. at ¶ 5; Pellegrini Dec. at ¶ 5; Romary Dec. at ¶ 5; Gramenopoulos Dec. at ¶ 5.) Nor does counsel for ETG suggest that Mr. Mandir ever appreciated that a note had been passed to him and that he acknowledged its contents during his closing.  The "heated argument" between Mr. Romary and Mr. Mandir is likewise mischaracterized.  Understandably, defense counsel were upset that the declaration of Dr. Dowling that they opposed was later allowed to come into evidence.  The fact that a "heated" discussion may have occurred is not evidence of intentional misconduct.

Finally, although the Court specifically told all counsel that the discussions occurring in the post-verdict session were "off the record," ETG's counsel has disobeyed the Court's instruction and referred to statements made by counsel at that session.  Defense counsel

have no other choice but to correct the record in view of ETG's allegation that Mr. Romary,

during the post-verdict session, "repeated his statement that he had warned Mr. Mandir, during

closing argument, but Mr. Mandir ignored him, . . . ." (ETG Br. at 23 n.15.) ETG neglects to

mention that Mr. Romary's statement was directed to the passing of the note, which Mr. Mandir

was not aware of at the time of the closing statement. (Mandir Dec. at ¶ 5; Pellegrini Dec. at

¶ 5; Romary Dec. at ¶ 5; Gramenopoulos Dec. at ¶ 5.) Moreover, ETG further neglects to

mention that Mr. Mandir explained to the Court that he had not intended to disobey the Court's

ruling, that he did not see Mr. Romary's note, and that he believed his statement concerning the

EKMS Summary Report was consistent with the Court's instruction. In response, the Court

indicated that it did not believe the failure to comply with the instruction was intentional or that

counsel had engaged in any misconduct. Rather, the Court stated that it thought Widex counsel

had simply misunderstood the Court's instruction and did not believe that his action had been

intentional. (Mandir Dec. at ¶ 7; Pellegrini Dec. at ¶ 7; Romary Dec. at ¶ 7; Gramenopoulos Dec.

at ¶ 7.)

       ETG's account of the closing argument, imaginative as it may be, does not

comport with reality, and its request for this Court to impute intentional bad-faith misconduct

should be rejected.

    **3.**    **Defendants' Arguments at Trial Were Consistent with the Court's Claim Construction Order**

       ETG's assertion that Defendants participated in litigation misconduct by

intentionally and repeatedly contradicting the Court's Claim Construction Order at trial is

egregiously wrong. (ETG Br. at 15.) Notably, ETG does not suggest that it actually objected at

the time to the allegedly offending conduct.

       First, ETG argues that "the patent claims do not address and have no limitation

- 22 -

based on whether the filter is fixed or adaptive." (ETG Br. at 4.) Although ETG was able to convince the jury that the Levitt Patents cover adaptive filters, Defendants and their experts believe that the Court's Claim Construction Order does not dictate this interpretation. For example, as ETG noted, the Court construed a "programmable delay line filter" to mean "a filter that operates on time-delayed samples of an input by multiplying each sample by a corresponding weighting coefficient and summing the weighted samples." (D.I. 495 at § A, ¶ 1.) The Court further determined that "the value of at least one weighting coefficient can be programmed," and that "programmed" means "provided with one or more values so as to produce a response." (*Id*. at § A, ¶ 4.) Defendants had the right to argue that the production of "*a* response" as used in the Court's Claim Construction Order indicated that adaptive filters were outside the scope of the claims. (Morley, Tr. 1393:1-19 (direct).)[14]    In addition, there is a question of what constitutes a "filter." If a "filter" were deemed to include both the accused delay line and the accused LMS algorithm, then there is no way to "provide" values to that "filter," as Defendants argued at trial.

Next, contrary to ETG's assertion, Defendants had every right to establish that the Accused Products do not "measure" amplitude and phase. First, claim 1 of the '749 Patent expressly requires "measuring phase and amplitude," so of course Defendants had the right to show that the Accused Products do not so "measure." And, although the Court has found that actually "measuring" of phase and amplitude is not required for claim 13, 14, and 16 of the '850 Patent, the Court did not eliminate the "determining" step, as ETG would do. The fact that the

---

[14]    Dr. Anderson, Demant's expert, concurred. (Anderson, Tr. 1579:18-22 (direct) ("There is no way to program the feedback in the hearing aid. There is, the LMS filter itself is not programmed for a response. Rather, it's left to run free. It generates its own coefficients continuously.").)

Accused Products do not "measure" the effect of phase and amplitude creates a serious burden on ETG to show what is done to satisfy the "determining" step—other than produce a final result that reduces acoustic feedback. As noted in Defendants' Brief in Opposition to Plaintiff's Second Amended Motion for Judgment as a Matter of Law filed concurrently herewith, there is no such proof. All that ETG could point to were the resultant coefficients in the Accused Products. (Brown, Tr. 515:23-517:2 (direct).) At no point did ETG even attempt to show how determining these coefficients had anything to do with "determining the effect on the amplitude and phase . . . as a function of frequency," as is required by claims 13, 14, and 16 of the '850 Patent. Hence, Defendants cannot possibly be said to be undertaking the "determining step" of the '850 Patent claims, either literally or under the doctrine of equivalents. Defendants also had every right to argue that the '749 Patent claims require a number of different elements.[15] Nothing in the Court's Claim Construction Order prohibits such a reading of the claim. (D.I. 495 at § B, ¶¶ 1-5.)

Lastly, ETG alleges that Defendants argued that the Levitt devices were too large to be commercially successful, "despite admitting to the miniaturization that occurred between 1986 and the time the infringing products came onto the market." (ETG Br. at 15.) This

---

[15]    Claim 1 of the '749 Patent recites:

> *A host controller* for producing data *from a computer for a programmable hearing aid* to cancel acoustic feedback comprising *means for receiving signals from the hearing aid* and measuring phase and amplitude, *means for receiving signals from the hearing aid* indicative of the summation of acoustic feedback and acoustic feedback cancellation signals, and *means controlled by the computer* to eliminate acoustic feedback and produce a null summation.

(JX 2 at 12:12-21, D.I. 547 (emphases added).)

assertion is misleading.  There is no question that the Levitt devices were not commercially successful.  And, it was ETG that suggested to the jury that all Defendants did was merely miniaturize the technology in the Levitt Patents.  (*See, e.g.*, Tr. 155:24-158:2 (opening); Levitt, Tr. 248:24-249:13, 262:21-263:4, 263:12-265:4 (direct); Brown, Tr. 567:10-20 (direct); Christensen, Tr. 1031:15-1032:3 (cross); Anderson, Tr. 1633:6-13 (cross).)  Defendants correctly pointed out that this was not true.  (*See, e.g.*, Tr. 180:19-181:9 (opening); Brown, Tr. 577:11-580:16 (cross); Anderson, Tr. 1580:1-13 (direct).)[16]

### 4.    There Was No "Cover-Up" of Infringement

ETG's claim that Defendants' technical materials, marketing documents, and code "admitted infringement," and that Defendants were forced to engage in a "cover-up" finds no basis in the evidence of record.  ETG's theory is essentially based on the overreaching premise that the Defendants infringe the Levitt Patents simply because the Accused Products use an equal and opposite signal to cancel acoustic feedback.  This tactic of painting Defendants as liars and criminals may have been sufficient to confuse the jury,[17] but it is inadequate to support a finding of infringement for reasons set forth in detail in Defendants' Infringement and Validity

---

[16]  Dr. Anderson explained the differences in detail:

Q:  There, are the accused Demant products a miniaturization of the Levitt system?

A:  That is one of the first things I looked for because ETG has suggested that that is the case.  And in my opinion, it's not for several reasons.  One, there is no test signal used.  Two, there is no determination of the amplitude and phase of the feedback as required by the host controller, patent and the hearing aid patent.  And, three, as I mentioned before, this feedback filter isn't a programmed filter.  It's not giving values that will have a response where it changes so quickly.  No signal ever passes through that filter with a single response.  Rather, it's changed every cycle.

(Anderson, Tr. 1580:1-13 (direct).)

[17]  ETG's lead counsel even went as far as to say that the case should be entitled "CSI Delaware."  (Tr. 2100:21 (closing).)

JMOL Opening Brief.  (D.I. 545.)

As Defendants demonstrated, the Levitt Patents do not cover the overly broad concept of a signal in the feedback path that mimics feedback and cancels it by subtraction. Defendants further demonstrated that, in the manner in which the Accused Products actually work, they do not infringe any of the asserted claims.  And despite ETG's repeated misleading use of Defendants' marketing materials as purported "admissions" of infringement, ETG could not point to any admission of a determination of phase and amplitude followed by inserting a filter, any admission of programmability or use of a programmable filter, or any other admission of infringement of the properly construed claims.

ETG's overreaching is readily apparent in its arguing that the Defendants disavowed their own witnesses' prior testimony.  As evidence of this, ETG points to remarks made in the opening statement: "'We use it' (referring to the technology disclosed in Dr. Levitt's patents)."  (ETG Br. at 25.)  In fact, the "it" referred to the idea of having an equal and opposite signal to cancel feedback.[18]  As was later explained, Dr. Levitt was not the first with that idea. (Trial Tr. 165:10-166:4.)  Indeed, the claims of the Levitt Patents do not simply require the use of an equal and opposite signal to cancel feedback to be infringed.  If it were otherwise, the claims would be invalid, as Defendants' evidence at trial showed and is established in Defendants' Infringement and Validity JMOL Opening Brief.  (D.I. 545.)

There is absolutely no credible evidence of any "infringement cover-up" in this case.  Rather, as the evidence showed, Defendants relied on substantial non-infringement and invalidity defenses that were pursued in good faith.

---

[18]   *See infra* note 26.

### 5.    There Is No Support for ETG's Contention that Defendants' Witnesses Are Relevant to the Enhancement Inquiry

ETG's allegations that Defendants improperly relied upon paid fact witnesses and "industry-friendly" experts indicates the lack of evidence to support ETG's request for enhanced damages and attorney's fees.  This Court has already received full briefing and argument on the issue in connection with Plaintiff's Fourth Motion in Limine (D.I. 464), which this Court denied. (Pretrial Hr'g Tr. 6:2-13:12 (Jan. 2, 2008) (Appendix, Attachment C.)  Regarding any "industry-friendly" experts, Federal Rule of Evidence 702 permits the use of experts.[19]  Moreover, these experts, Dr. Morley and Dr. Soli, were deemed qualified and received by the Court.  (Soli, Tr. 1650:3-6, 20-21 (direct); Morley, Tr. 1348:4-9 (direct).)

ETG's attempt at reviving its argument that the payment to certain witness Defendants was improper should fare no better than ETG's original effort.  The amounts paid to Dr. Egolf and Mr. Weaver were reasonable, given that they were making the same fees in their ordinary consulting work, which were commensurate with standard rates.  Moreover, there was no evidence that any fees paid to Dr. Egolf or Mr. Weaver were in any way contingent on the outcome of the case.[20]  ETG cites to no authority that reasonable payment to a consultant, which is not contingent on the outcome of the case, is evidence of bad faith or even relevant to the enhancement inquiry.[21]  It is improper for ETG to raise this issue of witness fees after the Court

---

[19]    Defendants note that ETG has not challenged that the testimony of these experts was based upon sufficient facts or data, was the product of reliable principles and methods, or that the principles and methods were applied reliably to the facts of the case.  *See* Fed. R. Evid. 702.

[20]    Conversely, the evidence showed that Dr. Levitt, testifying as a fact witness for ETG, would receive two percent of any net recovery, and eighty percent of any recovery would go to ETG, with Mr. Chen as the sole owner.  (Levitt, Tr. 260:2-6 (direct); Chen, Tr. 443:10-11, 444:1-2 (direct); 480:3-15 (cross).)

had already ruled.  In any event, this rehashing of a failed argument should again be rejected.

ETG likewise fails to offer any support for the novel proposition that "[m]uch like overpaying fact witnesses, choosing industry-friendly experts suggests a bad-faith effort to ensure favorable testimony."  (ETG Br. at 29.)  The fact that Dr. Soli holds the position of Vice-President of Intellectual Property with House Ear Institute, a private, non-profit research institute involved in the education and research to meet the needs of the hearing impaired (Trial Tr. 1644:1-7 (Soli direct)), does not impart any bad faith in the Defendants engaging him as an expert, regardless of whether the institute has been involved in contracts with hearing aid manufacturers.  Nor does Dr. Morley's previous involvement with the Central Institute of the Deaf and the fact that he is listed as an inventor on the "CID family" of patents lead to the conclusion that "Defendants knew that he would provide them with the testimony they needed." (ETG Br. at 30.)[22]  ETG's theory of industry-friendly experts conspiring with Defendants to present favorable testimony has no basis in fact and should be given no weight in the enhancement analysis.

### 6.    The Complaints of Pre-litigation Misconduct Are Without Merit

There is no basis to ETG's claim that Defendants employed litigation tactics purportedly intended to "drive up the cost of litigation in an effort to wear down ETG."  (ETG

---

[21]   The case of *In re Complaint of PMD Enterprises*, which ETG relies on, is inapposite to the facts of the present case.  In the *PMD* case, the plaintiff's attorney was sanctioned under New Jersey's professional conduct rules for offering to pay an adverse fact witness, whom the plaintiff's attorney knew to be a member of the defendant's litigation control group, an hourly fee to assist the plaintiff in preparing its case.  *See* 215 F. Supp. 2d 519, 529-30 (D.N.J. 2002).

[22]   As ETG well knows, Dr. Morley's involvement with CID research concluded in 1991 and his involvement with hearing aid research since that time was minimal. (Morley, Tr. 1346:1-1348:2 (direct).)

Br. at 31.)[23]  For instance, although ETG contends that Defendants were playing "document production games" (*id.*), all parties, including ETG, produced large amounts of documents on a rolling basis, and there was nothing extraordinary concerning the Defendants' production of documents, given the complex nature of this patent litigation and the large amount of documents that were involved.   (D.I. 457, Ex. 23.)

As to the so-called "HIMPP documents," ETG has no support for the assertion that Widex and Demant had any plan to "hide" them.  As the Court is aware, HIMPP was not a party to the case, and there was never any suggestion that these documents, which were produced by Sonic, were ever in the Defendants' possession.  (Pretrial Hr'g Tr. 133:9-13 (*see* Appendix, Attachment C).)

Finally, ETG complains of the late assertion of Affirmative Defenses by Defendants when ETG itself was unquestionably at least partly to blame.  Much of the evidence of the various grounds in the inequitable conduct charge could not have been known by Defendants until very late in fact discovery, when responsive documents showing material prior art, clearly responsive to earlier discovery requests, were uncovered by the Defendants during an inspection of Dr. Levitt's home.  (D.I. 456)

### 7.    There Was No Evidence that Widex Copied the Levitt Patents

ETG claims that there is "an abundance of evidence that Widex copied the Patents-In-Suit," yet it cannot point to any evidence that suggests anyone at Widex having any "knowledge" of the Levitt Patents or even considered the Levitt Patents in connection with any

---

[23]  Ironically, ETG waited until the eve of trial to drop numerous asserted claims and Accused Products.  ETG's "tactic" unquestionably drove up the cost of litigation for Defendants, who were forced to expend substantial sums in defending against claims that ETG either knew or reasonably should have known much sooner that it would not pursue at trial.

hearing aid product Widex developed.  Rather, ETG points to Widex being "aware" of Dr.

Levitt's patents because Widex hired Dr. Levitt.  However, the evidence showed that Widex did

not hire Dr. Levitt; rather, HIMPP hired him.  ETG also fails to mention that although Soren

Westermann was involved in the decision to hire Dr. Levitt on behalf of HIMPP and received a

copy of Dr. Levitt's resume listing his patents, Mr. Westermann's uncontroverted testimony was

that he did not review the resume because he had known Dr. Levitt previously and did not notice

the Levitt Patents listed on the eleven-page document because he had no reason to review it.

(Westermann, Tr. 746:3-12, 747:4-9 (direct).)

        The lack of any connection between the Levitt Patents is further evident from

ETG's claims that "[a]s confirmed by the jury, Widex hearing aids incorporate the claimed

features," and Widex allegedly "market[ing] its products as including these claimed features in

its internal scientific data and external marketing materials which contained significant

admissions."  (ETG Br. at 35.)  However, the evidence established that Widex's development of

its hearing aid products employing feedback cancellation was independent of any connection to

the Levitt Patents.  As Kim Nielsen, Widex's R&D Coordinator, testified, the first feedback

cancellation circuits developed by Widex resulted from efforts to solve a problem of feedback

cancellation systems employed in commercial products that required noise to be injected into the

feedback path, which was impractical due to the injected noise being audible to the user.

(Nielsen, Tr. 1115:18-1116:16 (direct).)  Widex found a solution to this problem that eliminated

the requirement for the injected noise by using adaptive feedback canceling and received a patent

on this design.  (Nielsen, Tr. 1116:17-1117:3 (direct); DX 1599 (attached to D.I. 542).)  Both of

the Widex Accused Products, the Senso Diva and Inteo, employ the technique embodied by

Widex's patent.[24]  (Nielsen, Tr. 1117:4-17 (direct).)  ETG made no effort to challenge Mr. Nielsen's account of the development of Widex's feedback cancellation systems.

Contrary to ETG's rationale, merely knowing of the existence of a patent followed by a jury finding of infringement is not sufficient to establish copying. *See Stryker Corp. v. Intermedics Orthopedics, Inc.*, 96 F.3d 1409, 1414 (Fed. Cir. 1996) (evidence of intentional or deliberate copying required).  Since there was no evidence of copying, and the evidence showed Widex's independent development of the technology Widex was accused of infringing, this factor strongly compels against enhancement.

### D.    The Remaining *Read* Factors Also Counsel Against Enhancement

### 1.    Widex's Size and Resources Are Irrelevant

Tellingly, ETG attempts to justify enhancement of damages because "treble damages will have minimal impact on Widex's financial condition . . . ."  (ETG Br. at 33.)  However, ETG's portrayal of the financial success of Widex is nothing more than a cynical attempt to leverage Widex's success in the hearing aid industry for ETG's own financial gain and compensate for its flimsy evidence cobbled together in an effort to justify enhanced damages.  Whatever Widex's financial condition may be, it is indisputable that Widex's size and resources bear no relation to culpability.  Indeed, because a defendant's ability to pay has nothing to do with culpability, the size and financial condition of a defendant has been characterized as a "'minor' factor[] in the calculus."  *Odetics*, 14 F. Supp. 2d at 804, *aff'd in relevant part*, 185 F.3d 1259 (Fed. Cir. 1999); *see also MercExchange, L.L.C. v. eBay, Inc.*, 275

---

[24]    The Levitt Patents were not even considered relevant by the U.S. Patent and Trademark Office during the examination of Widex's patent on the feedback cancellation technique employed by the Accused Products, as they were not cited against it.  (Westermann, Tr. 790:24-791:10 (cross), 809:21-811:8 (redirect).)

F. Supp. 2d 695, 720 (E.D. Va. 2003), *aff'd in relevant part*, 401 F.3d 1323 (Fed. Cir. 2005), *vacated on other grounds*, 126 S. Ct. 1837 (2006) (noting that the Court would give the size and wealth of eBay only "minor consideration when weighing the totality of [the] circumstances").

Even in cases involving corporations much larger than Widex, courts have routinely declined to enhance damages. *See, e.g., Honeywell Int'l*, 166 F. Supp. 2d at 1041 (denying request for enhanced damages against Honeywell, which was ranked 71st on Fortune 500); *Golight, Inc. v. Wal-Mart Stores, Inc.*, 216 F. Supp. 2d 1175 (D. Colo. 2002) (declining to award enhanced damages against Wal-Mart, which was ranked 1st on Fortune 500); *Oscar Mayer Foods Corp. v. Conagra, Inc*, 869 F. Supp. 656, 667 (W.D. Wis. 1994) (denying request to enhance damages based on strength of ConAgra's invalidity defense, notwithstanding ConAgra's rank at 16 among Fortune 500 companies).

At most, Widex's size and financial condition would be relevant to an amount of enhanced damages, not the threshold question of whether damages should be enhanced. However, ETG's evidence does not even meet the threshold level and its argument concerning the purported size and financial success is irrelevant.

### 2.     The Duration of Alleged Infringement and Post-Filing Conduct Are Irrelevant

ETG's claim that "Widex willfully infringed the Patents-In-Suit for approximately five years" (ETG Br. at 33) rings hollow given the lack of legally sufficient evidence to support the jury's willfulness finding. Moreover, much of ETG's allegations have little or no significance under the heightened *Seagate* criteria, which ETG conveniently neglects to mention in its brief and makes no effort to reconcile in view of *Seagate*.

For instance, ETG claims that Widex presented "no opinion of counsel to refute infringement or demonstrate due diligence." (ETG Br. at 34.) However, there is no obligation to

obtain an opinion of counsel under *Seagate* and no affirmative duty of due care. *Seagate*, 497 F.3d at 1371. Whether Widex relied on an opinion of counsel at trial is also irrelevant. Although Widex did not rely on an opinion of counsel, the failure to obtain legal advice does not give rise to an adverse inference with respect to willfulness. *See Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1345-46 (Fed. Cir. 2004).

As to the duration of the infringement, ETG made no attempt to bring any concern of infringement to the attention of Widex prior to filing suit in 2005, despite having considered Widex a "target" as early as 2001 in connection with the unfavorable EKMS analysis. In the failed EKMS attempt to extract any value from the patents, the hearing aid manufacturer that was approached regarding the Levitt Patents, SoundID, did not consider them relevant to a continuously adaptive approach such as that employed by the Accused Products. ETG's delay in bringing this action and failure to raise any infringement allegation to Widex before filing suit counsels against willfulness and nullifies the duration of alleged infringement as a factor in the enhancement analysis.

Further, *Seagate* mandates that "a willfulness claim asserted in the original complaint must necessarily be grounded exclusively in the accused infringer's pre-filing conduct," and "[a] patentee . . . should not be allowed to accrue enhanced damages based solely on the infringer's post-filing conduct," when it made no effort to move for a preliminary injunction to stop the alleged post-filing willfulness. *Seagate*, 497 F.3d at 1374. ETG did not seek a preliminary injunction against any Defendant in the case, rendering any post-filing conduct irrelevant.[25] Thus, neither the duration of the alleged infringement nor the lack of

---

[25] Even if ETG had sought preliminary injunctive relief, the substantial nature of Defendants' defenses discussed above would have doubtlessly compelled denial. *See Seagate*, 497 F.3d

remedial measures counsels enhancement in this case.

### 3. There Was No Evidence of Any Motivation for Harm

The trial record is devoid of any suggestion that Widex harbored any ill will or animosity towards ETG. Instead, ETG presents a contrived account of the Defendants, being members of the HIMPP organization and needing to "send a message to other small companies that the oligopoly controlled patented technology in the industry, . . . ." (ETG Br. at 34.) In fact, HIMPP was an organization established for the purpose of buying hearing aid patents to prevent barriers to technological innovation that made the patents it acquired available to anyone interested in the field that paid a reasonable membership fee or a 3% royalty. (Westermann, Tr. 795:7-796:13 (cross).) However, ETG never bothered to approach HIMPP or any of the Defendants concerning the Levitt Patents prior to filing this suit. Indeed, prior to the lawsuit, Widex had not even heard of ETG or Audimax, ETG's predecessor. (Westermann, Tr. 792:11-16 (cross).) ETG never approached Widex before filing suit, yet it now seeks to benefit from an alleged improper motive that is nothing more than Widex properly defending itself from a lawsuit reasonably believed to lack merit.

There is no dispute that Widex and ETG are not competitors, and ETG never was able to commercialize a product based on the Levitt Patents. The substantial evidence showing that the Levitt Patents were not even relevant to Defendants' continuously adaptive feedback cancellation technique undermines the notion that Widex would have intentionally set out to

---

at 1374 ("A substantial question about invalidity or infringement is likely sufficient not only to avoid a preliminary injunction, but also a charge of willfulness based on post-filing conduct.").

infringe the Levitt Patents.  The record does not establish any motivation for Widex to harm

ETG, thus counseling against enhancement.

### E. The Totality of the Circumstances Weighs Against Enhancement

"Merely losing on the defenses of invalidity and non-infringement is not enough

to make a case exceptional."  *State Indus. v. A.O. Smith Corp.*, 751 F.2d 1226, 1238 (Fed. Cir.

1985); *see also Cybor Corp.*, 138 F.3d at 1461 (declining to find exceptionality in case of willful

infringement where the accused infringer's defenses had such merit that the outcome of the case

was "far from a foregone conclusion").  As discussed above, the evidence of willfulness

presented at trial was legally insufficient to support the jury's verdict.

Even if the willfulness verdict were upheld, a proper analysis of the *Read* factors

compels the conclusion that all the factors are either neutral or militate against enhancement.  As

discussed above, there was no evidence that Widex deliberately copied the Levitt Patents and no

basis for Widex to investigate any potential infringement.  Widex presented substantial defenses

that were litigated in good faith.  The case was close on infringement and validity, and there was

no evidence that Widex had any motivation to harm ETG.  Finally, given ETG's failure to seek

preliminary injunctive relief, the duration of misconduct and remedial actions factors have no

relevance to this case.

Under the totality of the circumstances, as properly considered, enhanced

damages against Widex is not warranted.  ETG's request should therefore be denied.

## II. ETG'S REQUEST FOR ATTORNEY'S FEES FROM EITHER DEFENDANT SHOULD BE DENIED

ETG proffers three grounds to support its request for attorney's fees, none of

which have any merit.  First, ETG contends that the Court should award fees and costs because

"attorney's fees should normally be awarded when a defendant has willfully infringed a patent."

(ETG Br. at 36.)  The assertion does not apply to Demant, which was not found guilty of willful infringement.  As to Widex, contrary to ETG's urging, attorney's fees are not "normally awarded" simply because there has been a finding of willful infringement.  *See Nat'l Presto*, 76 F.3d at 1197 ("[T]he award of attorney fees is not automatic, even for the extraordinary case.") (citing *S.C. Johnson & Son, Inc. v. Carter-Wallace, Inc.*, 781 F.2d 198, 228 (Fed. Cir. 1986).  Widex has shown numerous reasons as to why ETG failed to present legally sufficient evidence to support the jury's willfulness finding in its separately filed JMOL.  Further, the insufficiency of evidence supporting willfulness and enhancement is demonstrated above.

Second, there is no basis to ETG's claim that Defendants' "collusive litigation misconduct makes this case exceptional."  As noted above and in Defendants' Infringement and Validity JMOL Opening Brief (D.I. 545), Defendants raised substantial non-infringement and invalidity defenses, which were litigated in good faith.  ETG's allegation of misconduct is a product of its efforts to distort the record for its own financial self-interest.

Finally, ETG argues that attorney's fees are appropriate because the *Read* factors support an award of attorney's fees.  ETG is wrong.  As explained above, the totality of the circumstances does not warrant enhancement of damages.  Likewise, the totality of the circumstances strongly counsels against an award of attorney's fees.

## A.  ETG's Own Conduct Illustrates the Inappropriateness of This Case for a Fees Award Under 35 U.S.C. § 285

The Court may consider the litigation actions of ETG in connection with § 285.  *See Sensonics, Inc. v. Aerosonic, Corp.*, 81 F.3d 1566, 1575 (Fed. Cir. 1996); *see also Motorola, Inc., v. Interdigital Tech. Corp.*, 121 F.3d 1461, 1468 (Fed. Cir. 1997) (noting the "considerable leeway" district courts have to deny fees in light of a movant's own litigation misconduct); *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1415 (Fed. Cir. 2004) ("A party

subjected to behavior warranting an award of sanctions or fees might justifiably be denied those

fees in a district court's discretion for the behavior to which it subjected others.").  In particular,

ETG's own conduct justifies denial of a fee award.

ETG has repeatedly taken overreaching or otherwise inaccurate positions in this

litigation.  For example, ETG baldly asserts that "all of Defendants' documents, including the

technical materials, marketing materials, and code, admitted infringement."  (ETG Br. at 24.)

Defendants' documents made no such admission,[26] and Defendant's experts on non-infringement

---

[26]   Notably, in closing, ETG counsel stated:

> I know, from our standpoint, we told you that Dr. Levitt invented
> technology that determined the phase and amplitude of feedback signals,
> created an equal but opposite signal, which we are showing to you,
> subtracted those two mirror-image signals and canceled feedback.
>
> **Counsel for the defendants then told you, as to that very technology,
> we use it.**  I don't know if you remember when defendants' counsel told
> you, and we have the statements.
>
> "Let me tell you something else that may surprise you.  I will say the
> evidence will show that the idea of having an equal and opposite signal to
> cancel feedback is a great idea.  Did you hear me?  It's a great idea.  And
> we use it."
>
> After telling you that, the defendants then spent most of this trial trying to
> convince you they don't use it.  **But after admitting that they do use it**,
> they then put on employee after employee after employee to try and tell
> you the statements we wrote in our own documents are false, they really
> don't mean what they say.
>
> But, of course, the evidence was overwhelming.  They do use Dr. Levitt's
> technology.

(Tr. 2091:12-2092:8 (closing) (emphases added).)

The implication ETG created was that Defendants' admission of performing feedback
    cancellation meant that they necessarily "used" Dr. Levitt's invention.  Notably missing from
    the quote of Defendants' counsel, however, was any admission, for example, that the
    Accused Products were "programmable," "determined" the effect on the phase and amplitude

certainly disagreed.  Demant counsel's statement, "You could call it Swiss cheese . . . it doesn't

matter what you call it, it matters what you do.  It matters what is in there," that ETG cited is one

hundred percent correct and extremely apt in view of ETG's own behavior.  ETG's blanket

assertion parallels another inaccurate argument urged by ETG's counsel at trial: that *any*

feedback cancellation is attributed to an invention by Dr. Levitt.  (*See, e.g.*, Tr. 2091:12-2092:8

(closing).)[27]

Similarly overreaching, ETG argues that Defendants never disputed Dr. Gloster's

analysis of "what's in there."  (ETG Br. at 26.)  ETG fails to mention, however, that Dr.

Anderson testified that he took issue with portions of Dr. Gloster's testimony.  (Anderson, Tr.

1636:11-1637:13 (cross).)  It was ETG, not Defendants, who never analyzed "what's in there,"

parading marketing materials and alleged FDA and FTC requirements in front of the jury in an

effort to mislead and sway their emotions, when patent infringement depends on "what's in

there."  (*See, e.g.*, Christensen, Tr. 1050:8-21 (cross); Tr. 2101:7-20.)  Any duty to the FDA and

FTC held by Defendants has nothing to do with whether their hearing aids infringed the Levitt

Patents.

As another example, in its discussion of enhanced damages, ETG harps on

*Medtronic Navigation, Inc. v. BrainLAB Medizinische Computersystems GmbH*, No. 98-cv-

---

of feedback signals, or had the "means for" elements required by the various claims of the
ETG patents.

[27]  (*See also* Tr. 138:15-16 ("Dr. Levitt . . . had this amazing idea to cancel feedback."), 142:20-
24, 143:20-144:5, 145:6-14, 146:9-13, 149:10-150:2 ("So that creation, that depiction, is the
creation of Dr. Levitt, where you create an equal but opposite signal, and you cancel."),
150:9-15, 156:14-16; Brown, Tr. 507:3-11 (direct); 2091:12-16.)

01072 (D. Colo. Feb. 12, 2008).  In Medtronic, counsel's actions were far more egregious than

any action ETG even alleges against Defendants.  In *Medtronic*, the court admonished Medtronic

for "deceiving the jury into accepting the statements in BrainLAB's FDA application as an

admission of patent infringement."  Id. at 9-10.  This behavior, which the Court found offensive

in Medtronic, actually parallels ETG's reliance upon statements in Defendants' marketing

documents to establish infringement in the current case when "more detailed" information was

available to ETG.

ETG also was overreaching in pushing the concept that adaptive filters

automatically infringe any construed claim.  Moreover, it was ETG who tried to pull the wool

over the jury's eyes by suggesting that the adaptive nature of the noise suppression system

described in the Levitt Patents applied to the feedback reduction claims. (Morley, Tr. 1359:1-

1364:5, 1432:20-1434:3 (direct).)

Another indication of ETG's conduct at trial which the Court should consider is

ETG's counsel's refusal to confirm that ETG would not be asserting the noise reduction claims

at trial or claims 3-6 of the '749 Patent.  As such, Defendants were forced needlessly to prepare

to defend allegations of infringement for these claims up until the eve of trial, thereby diffusing

their ability to focus on the claims ETG actually planned to assert.

Given its conduct, ETG should not be rewarded with its attorney's fees from

either Defendant.

**B.     There Is No Basis for an Award of Attorney's Fees from Either Defendant Under § 1927 or the Court's Inherent Power**

ETG's request for an award of attorney's fees under § 1927 or the Court's

Inherent Power is inappropriate for reasons similar to those discussed above.  ETG can point to

no legitimate evidence of willful bad faith on the part of counsel for either Defendant, which is a

prerequisite for such an award.  *See LaSalle*, 287 F.3d at 289.  Moreover, ETG's claim that "Widex had no reasonable non-infringement position" (ETG Br. at 39), and the suggestion that Widex should have "conced[ed] infringement and proced[ed] to trial with invalidity theories" (ETG Br. at 40), is flatly contradicted by the Defendants, presentation of substantial non-infringement defenses, which were litigated in good faith.  Moreover, this case involved a jury finding of only one claim being literally infringed, with the jury expressly rejecting ETG's claim of literal infringement for claims 13, 14, and 16.  Further, ETG now complains that Defendants should have dropped their substantial non-infringement defenses to presumably lessen the resources ETG was forced to expend, but at no time did ETG ever approach either Defendant before trial claiming that either Defendant could not prevail on a non-infringement defense and should only rely on validity.

ETG's request for attorney's fees has no merit and should be denied.

## **CONCLUSION**

For the reasons given above, the Court should deny ETG's Motion.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Mary B. Graham*

_____
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200
mgraham@mnat.com
jparrett@mnat.com

*Attorneys for William Demant Holding A/S, WDH Inc., Oticon A/S, Oticon, Inc., Bernafon AG, and Bernafon LLC*

OF COUNSEL:

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, DC  20001-4413
202.408.4000

- 40 -

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

*/s/ Donald E. Reid*

_____

SUGHRUE MION, PLLC
David J. Cushing
William H. Mandir
Carl J. Pellegrini
Brian K. Shelton
2100 Pennsylvania Ave., N.W.
Suite 800
Washington, DC  20037
202.293.7060

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200
dreid@mnat.com

*Attorneys for Widex A/S and
Widex Hearing Aid Co. Inc.*

May 9, 2008
2322464
1588596v1

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 9, 2008, the foregoing was caused to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

In addition, the undersigned hereby certifies that true and correct copies of the foregoing were caused to be served via electronic mail on May 9, 2008 upon the following parties:

REPRESENTING ENERGY
TRANSPORTATION GROUP, INC.

Edmond D. Johnson
PEPPER HAMILTON LLP
**johnsone@pepperlaw.com**

Brian M. Buroker
HUNTON & WILLIAMS LLP
**etg@hunton.com**

REPRESENTING WIDEX A/S
AND WIDEX HEARING AID CO. INC.

Donald E. Reid
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
**dreid@mnat.com**

William H. Mandir
SUGHRUE MION PLLC
**wmandir@sughrue.com**

David J. Cushing
SUGHRUE MION PLLC
**dcushing@sughrue.com**

Carl J. Pellegrini
SUGHRUE MION PLLC
**cpellegrini@sughrue.com**

Brian K. Shelton
SUGHRUE MION PLLC
**bshelton@sughrue.com**

| | |
|---|---|
| REPRESENTING WILLIAM DEMANT HOLDING A/S, WDH, INC., OTICON A/S, OTICON INC., BERNAFON AG, AND BERNAFON, LLC | Mary B. Graham<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>**mgraham@mnat.com;**<br>**mbgeservice@mnat.com**<br><br>John M. Romary<br>FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER<br>**john.romary@finnegan.com**<br><br>C. Gregory Gramenopoulos<br>FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER<br>**c.gregory.gramenopoulos@finnegan.com** |

The undersigned also hereby certifies that on May 9, 2008, true and correct copies of the foregoing were caused to be served by hand upon the following Delaware counsel:

Edmond D. Johnson
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE  19899-1709

*/s/ Mary B. Graham*
_____
Mary B. Graham (#2256)