IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-422 (GMS) |
| | ) | |
| SONIC INNOVATIONS, INC., et al, | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX OF TRIAL TRANSCRIPT EXCERPTS TO DEFENDANTS' ANSWERING
BRIEF IN OPPOSITION TO PLAINTIFF'S AMENDED MOTION
<u>FOR ENHANCED DAMAGES AND ATTORNEY'S FEES</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200
jparrett@mnat.com
*Attorneys for William Demant Holding A/S,
WDH Inc., Oticon A/S, Oticon, Inc.,
Bernafon AG, and Bernafon LLC*

OF COUNSEL:

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, DC 20001-4413
202.408.4000

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200
dreid@mnat.com
*Attorneys for Widex A/S and
Widex Hearing Aid Co. Inc.*

OF COUNSEL:

SUGHRUE MION, PLLC
David J. Cushing
William H. Mandir
Carl J. Pellegrini
Brian K. Shelton
2100 Pennsylvania Ave., N.W.
Suite 800
Washington, DC  20037
202.293.7060

Dated: May 9, 2008

2322572

## TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| Attachment A | Trial Transcript (excerpts) |
| Attachment B | Discovery Conference Transcript, November 1, 2007 (excerpt) |
| Attachment C | Pretrial Conference Transcript, January 3, 2008 (excerpt) |

# ATTACHMENT A

1             IN THE UNITED STATES DISTRICT COURT

2             IN AND FOR THE DISTRICT OF DELAWARE

3
                          -   -   -
4

5   ENERGY TRANSPORTATION,              :   Civil Action
    INC.,                               :
6                                       :
                   Plaintiff,           :
7                                       :
          v.                            :
8                                       :
    WILLIAM DEMANT HOLDINGS A/S,        :
9   et al.,                             :
                                        :
10             Defendants.              :   No. 05-422 (GMS)

11                        -   -   -

12                   Wilmington, Delaware
                   Tuesday, January 22, 2008
13                      8:30 a.m.
                   Second Day of Trial
14
                          -   -   -
15
    BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16

17

18  APPEARANCES:

19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                      -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                                  Counsel for Plaintiff
24

25

1    APPEARANCES CONTINUED:

2              MARY B. GRAHAM, ESQ.
               Morris, Nichols, Arsht & Tunnell
3                      -and-
               JOHN M. ROMARY, ESQ.,
4              GREGORY C. GRAMENOPOULOS, ESQ.,
               VINCENT KOVALICK, ESQ.,
5              KAY HILL, ESQ.,
               GERSON S. PANITCH, ESQ., and
6              ARTHUR A. SMITH, ESQ.
               Finnegan, Henderson, Ford, Farabow & Dunner
7              (Washington, D.C.)

8                                   Counsel for
                                    Demant Defendants
9
               DONALD E. REID, ESQ.
10             Morris, Nichols, Arsht & Tunnell
                       -and-
11             WILLIAM H. MANDIR, ESQ.,
               JOHN SCHERLING, ESQ.,
12             CARL J. PELLEGRINI, ESQ.,
               BRIAN SHELTON, ESQ., and
13             MATTHEW KAPLAN, ESQ.
               Sughrue Mion
14             (Washington, D.C.)

15                                  Counsel for Widex
                                    Defendants
16
                         -  -  -
17

18

19

20

21

22

23

24

25

1    increases that awful sound.  And you can only imagine how

2    bad that feels in the ear, when it is confined in the ear of

3    a person.

4         The feedback problem, the evidence will show, is

5    one of the most significant issues that discouraged

6    hearing-impaired people from actually wearing hearing aids.

7    And we are showing you a letter from 1982 from a hearing aid

8    manufacturer to the Veterans Administration.  And that

9    hearing aid manufacturer says, Acoustical feedback is

10   currently regarded generally as one of the two major

11   problems which are detracting from the effectiveness of

12   hearing aid fittings.  Up to now, the industry has not been

13   able to work together to solve this problem.

14        That letter, we will show, was only a few short

15   years before Dr. Levitt, who you will see and hear in this

16   case, had this amazing idea to cancel feedback.

17        Now, the evidence will show that this invention

18   starts, as usual, with one single person, with a vision to

19   create something special and patented.  And that person is

20   Dr. Harry Levitt.

21        That is an awful picture.  He does look better

22   than that.  Nevertheless, that is Dr. Levitt's photo.

23        The evidence will show that he was one of the

24   preeminent scientists in the industry, with an idea of how

25   to obtain a better quality of sound for hearing-aid wearers.

1           Now, it's going to be critically important

2    for you to remember how the industry and how these

3    defendants felt about Dr. Levitt for over 30 years until

4    this lawsuit was brought, where Dr. Levitt's patents were

5    infringed.

6           The evidence will show that suddenly, when money

7    was on the table and money was at stake, these defendants

8    changed their tune and are now claiming Dr. Levitt is

9    not the inventor.  What he invented was obvious.  There

10   are other people that had this idea.  To challenge these

11   20-year old patents in order to protect what the evidence

12   will show were extraordinarily high profits, hundreds of

13   millions of dollars, that these defendants made using Dr.

14   Levitt's invention.

15          Now, let's talk about the patents that you've

16   heard about in a little bit more specificity.

17          Now, the audience -- the evidence will show that

18   Audimax and ETG and Dr. Levitt wanted to address this

19   particular feedback problem.

20          Dr. Levitt came up with a brilliant idea.  He

21   was going to use computer techniques that had never benefit

22   used before to program filters in a digital hearing aid

23   to eliminate feedback to achieve a better quality of

24   sound.  And the evidence will show, this is the beginning

25   pages of each of the two patents, the '850 and the '749

1    patents.

2            The evidence will show that these patents were

3    pioneering patents, nothing like this had ever been done

4    before.  Obviously, this is highly technical and we're going

5    to have Dr. Levitt sit here and explain to you how the

6    patent work and we're going to have experts come in and

7    explain to you in detail how the patents work.

8            I'm going to try and do it briefly, but it

9    will be at a much lower level than our experts and Dr.

10   Levitt.

11           Now, let's discuss how these patents came into

12   being.  Audimax was the ETG predecessor we had talked about,

13   and in 1984, Dr. C.Y. Chen, who was then the owner of

14   Audimax, hired Dr. Levitt, the word leader in audiology at

15   that time, to try and solve major problems with hearing

16   aids.  This was the mid-1980s.

17           Dr. Levitt was then teamed with a respected

18   engineer, Richard Dugat and a circuit designer, Mr. Copper,

19   and that effort resulted in these two patents.

20           The evidence will show that Dr. Levitt was the

21   first to invent the feedback cancellation method and these

22   two patents.  And what he did, and we'll explain more about

23   it in a moment, was he invented on a computer a way to

24   determine the characteristics of feedback, what feedback

25   was, and then he created essentially an equal but opposite

1    signal to feedback and canceled it.  Essentially, he

2    measured the feedback, determined what it was, created a

3    signal that was equal and opposite to it.  The two

4    subtracted each other out and they came to zero, and that

5    canceled feedback.

6              Now, what does that mean?  As we discussed

7    briefly before, feedback is the noise that leaks from the

8    speaker back into the microphone.

9              Can we have that next -- as you see, there's a

10   microphone going through an amplifier.  The amplifier

11   increases the loudness of noise.  Goes into a speaker.

12             If the speaker is too close to the microphone,

13   the red lines, that's feedback, leaks out of the speaker

14   into the microphone, and it creates a vicious cycle.  Goes

15   round and round and round, increasing all the time and that

16   whistling and screeching noise you hear gets louder and

17   louder and louder.

18             Dr. Levitt thought up a unique approach to

19   dealing with feedback, and that approach is the predominant

20   method being used today in modern hearing aids.  And to

21   explain that, we'll have to tell you a little bit about

22   sound waves.

23             A sound wave is composed of amplitude, that

24   means how high it is or how strong it is, and phase, which

25   is where it's placed and how often it starts and goes.

1          Now, Dr. Levitt came up with a brilliant idea.

2    If you determined the amplitude and phase of the feedback

3    signal and then you created a signal that was equal in

4    amplitude but opposite in phase, it would cancel, the two

5    would subtract and eliminate feedback.

6          Now, the way I like to think about this, and

7    this is a depiction of it, you can see that when the sound

8    goes from the microphone to the amplifier, the blue line is

9    sound.  And when it comes back out of the speaker, it starts

10   to get into feedback.  At the very bottom, there's a filter,

11   where it measures essentially or determines the

12   characteristics, amplitude and phase.  And as you can see,

13   one is up and one is down, and those two cancel each other

14   out and essentially stop feedback.

15         Now, I tried to think about this a lot, how I

16   would explain this, and so I thought about if you have a

17   neighbor that you just can't stand, and your neighbor builds

18   a spite fence, and in that spite fence, they put around

19   their house purple mermaids as columns so every time you

20   step out of your door in the morning and every time you come

21   home at night, all you see are those awful purple mermaids,

22   and you decide, okay, I'm going to eliminate that from my

23   sight.  I can't stand that.  It's killing me.

24         So you hire a contractor, and you say, look,

25   your job is to eliminate those purple mermaids from my

1  sight.   I want beautiful -- all I want to see are beautiful

2  Greek columns.

3  And so what does your contractor do?  He

4  measures the amplitude and he determines the phase, where

5  they start and how often they are placed, and then he tries

6  to build a wall that replicates where the purple mermaids

7  are.   But you can see on the screen, if he's not exactly

8  perfect in both amplitude and phase, all you've got are

9  the purple mermaids and your columns.  But if he does

10  mimic both, the amplitude and the phase, automatically,

11  you're going to cancel the purple mermaids.  And that's

12  essentially what Dr. Levitt invented on a computer in a

13  digital filter.

14  Now, of course, he was much more scientific

15  than I was in doing what he did.  He determined the

16  amplitude and phase of a feedback signal and then matched it

17  and essentially subtracted the two.  And you can see the

18  feedback going in.   That's the measurement or determination

19  of what the feedback is, the amplitude and phase.   Then

20  he creates an equal but opposite, and that goes back up

21  between the microphone and the amplifier.  It cancels

22  the feedback.  And you've eliminated that annoying feedback.

23  The evidence will show that nothing like that

24  had ever been done before.  And we will prove that virtually

25  all of the defendants' accused products rely on this core

1    Mr. Nielsen, who's a representative of the Widex company,

2    suddenly testify, no, Widex's own description, their

3    published description of their own product that they sent

4    out was inaccurate.  That's what you are going to hear him

5    say.

6              Now, likewise, the evidence will show that

7    another defendant, one of the Demant companies, Oticon, that

8    brochure which describes one of their hearing aid products,

9    called a Syncro, and you see that on the screen.

10             First, the brochure gives you a written

11   description of the Syncro.  It says dynamic feedback

12   cancellation automatically removes feedback from the

13   sound path through phase cancellation without a reduction in

14   gain.

15             Remember what we talked about with phase.  And

16   just to show you they're using the exact same system, they

17   go on to give you a description on the very next page of

18   exactly what they are doing.  And if you look at the first

19   box, they're a spike with the feedback coming out of the

20   signal.  If you look at the second box, where it says phase

21   cancellation, what is that below the spike?  It's an equal

22   but opposite signal.

23             And then what happens in the third box?  They

24   cancel feedback.

25             So that creation, that depiction, is the

1    creation of Dr. Levitt, where you create an equal but

2    opposite signal, and you cancel.

3                And, again, strangely enough, what will you

4    hear?  From an entirely different officer, from an entirely

5    different company, you're going to hear Mr. Christensen from

6    Oticon, when he's faced with this exact language, he's going

7    to say no, it really doesn't do what he we say it does in

8    our own documentation.

9                And then you're going to see the third

10   defendant, which is Bernafon, another Demant company.  And

11   they similarly, for their product, the Symbio XT, they

12   describe their adaptive feedback cancellation, and they say,

13   quote, "Symbio XT advance canceller solves the problem by

14   working on line to detect the presence of feedback and

15   subtract it from the incoming signal."

16               Just like the other two executives, you're going

17   to see Mr. Schaub of Bernafon come up and testify and say,

18   gee, you know, our brochure is wrong.  It really doesn't do

19   that.

20

21

22

23

24

25

1    retention of Dr. Levitt by these defendants, when they

2    offered to hire him and did hire him as an expert, the

3    evidence will show they hired him as an expert to testify on

4    almost exactly the same defenses they are claiming here

5    today, invalidity and prior art.

6         Now, suddenly, 20 years later, after seeing and

7    hearing all that for over 20 years and hiring him

8    themselves, the evidence will show they have suddenly

9    changed their opinion and they want you to believe he is not

10   the inventor, there are other people that wrote articles or

11   had patents.

12        Now, the evidence will show that in all those

13   20 years of the publications of these patents and speeches

14   and articles and seminars, not one time, not once until this

15   lawsuit was filed, did anyone ever suggest to Dr. Levitt or

16   anyone else that he wasn't the inventor of this technology,

17   someone else invented it before him, there was prior art, or

18   any other thing that would have invalidated his claims.

19        In fact, the evidence will show just the

20   opposite.  Witnesses of the defendant, like Dr. Egolf here,

21   will testify that Harry Levitt was preeminent in this field,

22   and he is a respected scientist in this field, his ideas

23   were great, significant.

24        Now, the next thing you are going to hear is

25   what we call the miniaturization theory.

1          The defendants are going to say that because in

2    the 1980s batteries were of a certain size and chips were of

3    a certain size, so the technology that is invented was a

4    little bit large in the 1980s, and now, with the smaller

5    chips and smaller batteries, they can all put that right in

6    the ear, so therefore you should ignore this technology that

7    was invented by Dr. Levitt.

8          But the evidence will show that the core

9    technology, no matter what the size of the chip, no matter

10   what the size of the battery -- which, by the way, the size

11   of the chips and the size of the batteries have nothing to

12   do with these defendants, as we all know.  That is the

13   Intels of the world that have lowered the size of the chips.

14         But they have nothing at all to do with the core

15   technology, the core technology you have seen that cancels

16   feedback.

17         Those of you who are old enough to remember what

18   the technology was in the 1980s, this is a typical 1980s

19   computer.  You had that large CPU unit or processor you

20   either had to fit on the floor or your desk.  You had your

21   keyboard.  You had a monitor that had tubes in it, if you

22   can ever remember tubes, not a flat screen monitor.  And it

23   was a huge thing.

24         And now that screen, that CPU and that keyboard,

25   are in the size of a credit card, a BlackBerry.  And that's

1    because computer chips and batteries have diminished in size

2    over the years at an incredible rate.  But that still has

3    nothing to do with the core technology which we are talking

4    about here.

5              The same thing happened with telephones.  If you

6    remember the so-called portable telephones that you used to

7    carry around were like a football.  Now you have the Razor

8    from Motorola that is a fraction of the size.  That has

9    nothing to do with the core technology.  It has to do with

10   the chips and the battery size.

11             The evidence will show that the entire hearing

12   aid industry was unable to solve this power consumption or

13   miniaturization in the mid-1980's.  And it wasn't solved

14   until almost 2000, which is when these infringing products

15   first started hitting the market.  Perhaps one of the most

16   famous patents of all time, granted to Alexander Graham

17   Bell, in 1876, he invented the telephone, as we all know,

18   strangely enough, attempts to commercialize the telephone

19   also failed because of the awkwardness and people didn't

20   want to use it as such.

21             But you will see that these patents have

22   absolutely no limitation, based on the size of the hearing

23   aid, the size of the battery, the size of the chips or the

24   location of the host controller.  As the Judge told you

25   earlier, he is going to give you instructions as to how the

1    claims are interpreted by the Court, who has already

2    reviewed the claims in this case.

3         Now, the defendants will also tell you that

4    their feedback systems are adaptive.  And they will suggest

5    to you that the technology invented by Dr. Levitt was fixed,

6    that's a word they are going to use, and couldn't adapt to

7    the environment to cancel out feedback.  But they won't be

8    able to point to one word in these patents that say they are

9    fixed.  In fact, the patents say quite to the contrary.

10   There are a number of places in the patents that say, adjust

11   automatically to the optimum set of parameter values.

12   Automatically adjusting.  Automatic adjustment.  Acoustic

13   feedback reduction while maintaining optimum hearing

14   characteristics.

15        Now, interestingly enough, while the defendants

16   are attacking Dr. Levitt's patents as not being adaptive,

17   the evidence will show and you will hear their own expert,

18   Dr. Soli, admit that the patents are, in fact, adaptive.  So

19   the evidence will show merely that the defendants are

20   arguing we think we slightly improved these patents.  We

21   have a new smaller hearing aid that fits in the ear.  But

22   the evidence will show that the core technology is the same.

23        Now, let me talk about damages as the last topic

24   I want to address.

25        The evidence will show and our expert will

 1              We're not attacking.  You won't see evidence

 2      attacking Dr. Levitt.  What you will see is evidence

 3      attacking his patents, not him.  We're not attacking him as

 4      a person.  We're saying the invention is not worthy of a

 5      patent, and we don't practice it.

 6              I -- I would be surprised if some day we don't

 7      hire him again as an expert for other reasons and in other

 8      things, so please understand that's not what our evidence is

 9      going to show.

10              Let me tell you something else that may surprise

11      you.  I think the idea of having -- I shouldn't do it that

12      way.  I will say the evidence will show that the idea of

13      having equal and opposite signal to cancel feedback is a

14      great idea.  Did you hear me?  It's a great idea.  And we

15      use it.  And if some of our witnesses are going to get

16      up here and somehow be -- be seen to say that we don't,

17      they're -- it's just not right.

18              The evidence will show that we have acoustic

19      feedback cancellation, that we have a signal in the feedback

20      path that mimics the feedback signal and cancels it by

21      subtracting.

22              So why are we here today if we're going to admit

23      that we're doing that?  The reason we're here today is

24      because Dr. Levitt, bless him, was not first with that idea.

25      It's like a race.  That's what a patent is like.  It's like

1    a race to see who is the first to invent, and Dr. Levitt

2    wasn't the first to invent.  We will show you four other

3    people that had the idea before him.  One even had a patent

4    on it.

5            Now, we're not accusing Dr. Levitt of stealing

6    that idea from them.  That's not what this is all about.

7    It's about whether there are other people that were first

8    to invent that would make his patent invalid if his patent

9    just covered this very broad idea of equal and opposite

10   signal.

11           But we're going to show you that that is not

12   what his patent covers.  Remember the fence?  I thought that

13   was great.  I wish I had seen it before.  The mermaids?  The

14   way Dr. -- I don't have a picture of it because it's theirs,

15   but the way this works is, Dr. Levitt measured where the

16   mermaids were.  That's the feedback.  He saw how far they

17   were away and how tall they were, and that's his measuring.

18   He does that in something called a host controller.  And the

19   second of his patents is the '749 patent.  That's the host

20   controller patent.

21           By the way, just so you understand, both patents

22   are identical.

23           He only filed one patent.  He filed it in 1986

24   and both of them are identical.  But when he got done

25   getting his hearing aid patent, the Patent Office split it

1       Some of this sound will come back here.  That is

2   the feedback.  So what do you do?  You hook up a host

3   controller, and you measure that feedback.  You heard Mr.

4   Steinberg said you have to measure phase.  There is the

5   thing that measures the phase.  There is the thing that

6   measures the amplitude.

7       You got a computer down here that takes those

8   measurements and turns them into the numbers that the filter

9   needs.  And you got a thing here, it's called an E PROM.

10  What really it is, it is a memory stick.  If you have a

11  computer today, you have a memory stick, this is an old

12  memory stick.  The memory stick gets stuck in the host

13  controller.  It gets programmed with these coefficients, so

14  you know where to put the fence up.  It gets pulled out of

15  the host controller and gets put into the hearing aid.  And

16  after that happens, you can't change them again or else you

17  go back and then the wearer goes away.

18      That is the evidence of how his system works.

19      Now, Mr. Steinberg was attributing us to wanting

20  this miniaturization theory.  It is really his theory.  What

21  he is trying to say and what you will hear their experts say

22  is we have taken all of this and crunched it down into the

23  size of this (indicating).

24      What you will find, the truth is we don't have

25  anything that measures phase no matter how small it is.  We

1   don't have anything that measures amplitude no matters how

2   small it is.  And we don't have anything that programs a

3   delay line.  We do have a delay line, but it is connected

4   into the process of creating the coefficients by an LMS

5   algorithm.  So ours is non-programmable.  If somebody walked

6   into a doctor's office with this thing (indicating), and

7   said, okay, I want you to provide coefficients to me, I want

8   these coefficients, he will say I can't do it.  I can't get

9   in there.  There is no way to get in there.

10          And ETG's expert will admit and tell you there

11  is no way to get those coefficients in.  Yet he will still

12  call it programmable because he will say, if you push it

13  apart and rip it apart, you can still push them in there

14  somehow.  But you can't.  You can't do it.

15          Next slide.

16          So there is good news and bad news.  The good

17  news is that Dr. Levitt solved an old problem.  The old

18  problem in '85 was, these things took a lot of power.  You

19  had to build a hearing aid with that little battery that

20  would run everything.  And he found a solution to that.  He

21  said, well, what we will do is do some of the stuff with it

22  plugged into the wall and we will do the rest of it with it

23  run by the battery.  That is a good idea.  And if we did

24  that, we probably wouldn't be here today, because we

25  probably -- something would happen.  We would solve the

Levitt - direct

1    incorporated into commercial hearing aids was the very high

2    power consumption at that time of digital components

3    relative to what was referred to as old-fashioned analogue

4    components.

5    Q.    And what did the size of batteries have to do with the

6    physical description or size of a hearing aid at that time,

7    in the mid-80s?

8    A.    Well, the problem for a wearable unit at that time was

9    that it had to be small.  Hearing aid has to be cosmetically

10   acceptable.  You can't have a big piece of machinery hanging

11   on to your -- wearing it on your belt or something like

12   that.  It has -- if you are going to have a practical

13   hearing aid, it has to fit either on the ear, in the ear.

14   Some devices have pocket-worn units.  It has to be small.

15   But in order for it to be small, the power consumption has

16   to be low because otherwise you're going to need a very

17   large battery.  And the chips have to be small.  Otherwise,

18   you won't fit it into a small unit.

19   Q.    I was going to ask you that next.  Did you have the

20   same experience with the size of computer chips in the

21   mid-1980s?

22   A.    Yes.  Computer chips were too large in those days for

23   something to wear on the ear.

24   Q.    When you prepared your patents, did you anticipate the

25   miniaturization that would take place both with respect to

Levitt - direct

1    batteries and chips?

2    A.    Absolutely.  There's a very famous law known as

3    Murray's law that says for a given task, the size of the

4    chips will go down by a factor of two every two years, or

5    specified another way is that the power, the computing power

6    of the chip, will double every two years.

7    Q.    And who or what entities were responsible for the

8    smaller sizes of chips in batteries?

9    A.    Well, industry had a tremendous amount for

10   miniaturization of the digital products, and the computer

11   industry in particular, and they were the driving force.

12   They developed -- companies like Intel developed chips that

13   were smaller and smaller and more and more powerful.

14   Q.    Doctor, if you wouldn't mind turning to JX-68.

15   A.    Yes.

16   Q.    Okay.  That should be -- JX-68 --

17   A.    Oh, 68?

18   Q.    68.

19   A.    I'm sorry.  I was looking at 86.

20              68.  Yes.  Okay.

21   Q.    That should be a memo dated December 12th --

22   A.    Yes.

23   Q.    -- 1985, entitled, Possible Claims.

24              Do you see that?

25   A.    Yes.

Levitt - direct

1    received any royalties.

2    Q.    Now, Dr. Levitt, do you have a financial interest in

3    this lawsuit?

4    A.    Yes.    There's apparently what was in that royalty

5    agreement has been transferred to ETG and I am eligible, I

6    believe, for two percent of whatever comes out of this.

7    Q.    What --

8    A.    Can I just comment on that?

9    Q.    Sure.    Finish your answer.

10   A.    I know a financial interest is important, but if I

11   might just make a comment from an episode in the book, the

12   novel by Dickens and David Copperfield.    His mentor points

13   out to him, if you have a sixpence more than you need, that

14   is happiness.    If you have a sixpence less than what you

15   need, that is great unhappiness.

16        I'm comfortable where I'm living now and my retirement

17   annuity is sufficient for me to live comfortably.    Extra

18   money isn't that important to me.    I won't object to getting

19   it.    What is really important to me is this idea that

20   somehow the ideas that I had way back when are invalid today

21   and the contribution I made isn't -- the contribution that I

22   believe that I've made to help people, that is what upsets

23   me.

24   Q.    Doctor, in the mid-1980s were you able to

25   commercialize these patents?

1          MR. ROMARY:  Yes.

2          THE COURT:  Articulate your objection.

3          MR. ROMARY:  It should be question and answer.

4          THE COURT:  Let's avoid a narrative.  If we can,

5    ask a question.

6          Doctor, just hold on.  Sometimes the rules get a

7    little in the way.

8          THE WITNESS:  That's fine.  That's fine.

9    BY MR. STEINBERG:

10   Q.    Can you explain the difference between the host

11   controller and the programmable digital hearing aid?

12   A.    Okay.  The hearing aid component processed the audio

13   signals that were coming in and shaped them and amplified

14   them for the hearing impaired person.  Now, to do that, it

15   had to know how to shape and control the signals.  That

16   information was provided by the host controller.  They did

17   not have to be separate.  You could have separated them if

18   you wanted to, but you did not have to, and in the

19   particular diagram that's in the patent, if you do separate

20   them, the hearing aid would stop functioning.

21   Q.    Doctor, did you request that we prepare some

22   demonstratives on the issue of miniaturization from the

23   1980's?

24   A.    Yes.

25   Q.    Okay.  So I'd like to now show those on the screen, if

Levitt - direct

1    you don't mind.

2                Tell the jury what you are seeing.

3                THE COURT:  Counsel, let me see counsel for a

4    minute.

5                (Side bar conference held off the record.)

6                THE COURT:  Counsel, do you have an objection to

7    the use of what you describe as a demonstrative?

8                MR. ROMARY:  Yes, your Honor.

9                THE COURT:  I am going to overrule the

10   objection.

11   BY MR. STEINBERG:

12   Q.    Dr. Levitt, if you would take a look at the

13   demonstrative with the size of the computer in the 1980's

14   and then relate it to your host controller and digital

15   hearing aid, please, for the jury?

16   A.    Okay.  Well, what you see in this first diagram or

17   slide is the computers that you had available in the year

18   1982.  And notice how big everything was and the fact that

19   they were separate components, physically separate

20   components.

21         There was a -- the scope or the display was a huge

22   cathode ray tube.  The computer itself was a heavy, heavy

23   box with a good deal of electronics in it and weighed a ton,

24   and then to use it, one had a keyboard to type on.  Three

25   separate physical components, yet they don't have to be

Levitt - direct

1    his pocket and use any telephone he had access to.

2           The whole idea and the reason for winning that award

3    was the demonstration for how miniaturization could solve a

4    very practical problem.

5    Q.    Now, Doctor, I think you also heard in opening that

6    the defendants' lawyers claimed that your patents were not,

7    quote, unquote, "adaptive."  They were fixed.

8           I would like to direct your attention again to

9    Exhibit 4, the '850 patent.

10   A.    Yes?

11   Q.    Okay.  And if we look at the first page in the

12   abstract section, in the very middle --

13   A.    Okay.

14   Q.    -- there's some language that says, which supplies

15   co-efficients to a programmable filter and amplitude limiter

16   in the hearing aid so as to cause the hearing aid to adjust

17   automatically to the optimum set of parameter values for

18   speech level, room reverberation and type of background

19   noise then obtaining.

20           Can you tell the jury what that language has to

21   do with your patent being adaptive?

22   A.    Okay.  The filter consists of the components, digital

23   components.  In order for it to operate, it needs

24   co-efficients.  And what we did was send co-efficients and

25   we kept updating the co-efficients, that is we were updating

```
 1                  IN THE UNITED STATES DISTRICT COURT

 2                  IN AND FOR THE DISTRICT OF DELAWARE

 3
                              -   -   -
 4

 5     ENERGY TRANSPORTATION,          :   Civil Action
       INC.,                           :
 6                                     :
                    Plaintiff,         :
 7                                     :
             v.                        :
 8                                     :
       WILLIAM DEMANT HOLDINGS A/S,    :
 9     et al.,                         :
                                       :
10                  Defendants.        :   No. 05-422 (GMS)

11                            -   -   -

12                      Wilmington, Delaware
                      Wednesday, January 23, 2008
13                           8:30 a.m.
                        Third Day of Trial
14
                              -   -   -
15
       BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge
16

17

18     APPEARANCES:

19                    EDMOND D. JOHNSON, ESQ.
                      Pepper Hamilton LLP
20                           -and-
                      MARTY STEINBERG, ESQ.,
21                    BRIAN M. BUROKER, ESQ., and
                      MAYA M. ECKSTEIN, ESQ.
22                    Hunton & Williams
                      (Washington, D.C.)
23
                                     Counsel for Plaintiff
24

25
```

```
 1    APPEARANCES CONTINUED:

 2               MARY B. GRAHAM, ESQ.
               Morris, Nichols, Arsht & Tunnell
 3                    -and-
               JOHN M. ROMARY, ESQ.,
 4             GREGORY C. GRAMENOPOULOS, ESQ.,
               VINCENT KOVALICK, ESQ.,
 5             KAY HILL, ESQ.,
               GERSON S. PANITCH, ESQ., and
 6             ARTHUR A. SMITH, ESQ.
               Finnegan, Henderson, Ford, Farabow & Dunner
 7             (Washington, D.C.)

 8                              Counsel for
                               Demant Defendants
 9
               DONALD E. REID, ESQ.
10             Morris, Nichols, Arsht & Tunnell
                    -and-
11             WILLIAM H. MANDIR, ESQ.,
               JOHN SCHERLING, ESQ.,
12             CARL J. PELLEGRINI, ESQ.,
               BRIAN SHELTON, ESQ.,
13             MATTHEW KAPLAN, ESQ., and
               J. WARREN LYTLE, JR., ESQ.
14             Sughrue Mion
               (Washington, D.C.)
15
                              Counsel for Widex
16                             Defendants

17                    -  -  -

18

19

20

21

22

23

24

25
```

1    example, the phase is not what is shown here, is it?

2    A.    That's the period.

3    Q.    But if you were measuring this from some absolute

4    place, like if this were the corner of your property and you

5    were saying, okay, this first one here is four feet away,

6    that would be a measurement of phase then, wouldn't it?

7    A.    Yes.    You would specify it as a function of a period.

8    That second mermaid would be one period away from the

9    beginning.    And that would be zero phase, actually.

10    Q.    Now, your host controller that is shown in your

11    patent, Figure 1, that would measure this amplitude in the

12    amplifier that I kept circling in the host controller.

13    Correct?

14    A.    One of its functions would be to measure that

15    amplitude.

16    Q.    And the phase shifter I kept referring to, one of its

17    functions would be to measure from some reference point the

18    phase of that signal.    Correct?

19    A.    Actually, I was slightly in error.    One of its

20    functions would be to determine the amplitude and to

21    determine the phase.

22    Q.    Now, in real life, when you walk around with a hearing

23    aid, if you use this analogy, those mermaids are going to

24    get bigger and smaller as the acoustic feedback path

25    changes.    Correct?

1    A.    Yes, that is correct.

2    Q.    And in my opening I kind of danced around a little bit

3    and said, okay, they are going to dance around, their phase

4    is going to shift also in the real world.  Is that correct?

5    A.    Yes.

6    Q.    So in the real world, if we were going to use your

7    host controller, it would have to be carried around with you

8    and somehow keep track of all that?

9    A.    Yes.  But that was envisioned for the somewhat distant

10   future.

11   Q.    In the host controller that you showed in your patent,

12   that wasn't shown, was it?

13   A.    I don't believe the patent specified whether the host

14   controller was going to be wearable or not wearable.

15   Q.    Just so everyone is clear about this, can we put -- I

16   don't have the number.  I thought I had written it down

17   here.  I apologize.  I think it's 131, JX-131.  Just so

18   everyone understands, that is your host controller as of

19   1986.  Correct?

20   A.    That was the host controller we used at the time we

21   developed the apparatus.

22   Q.    And that would have been before the patent was filed.

23   Right?

24   A.    Yes.

25

1        Take 3 is another file

2    Q.    Now, could we go back to the mermaids again for a

3    moment?

4            You can leave this up.  It doesn't matter.

5            Dr. Levitt, would you agree that in the real

6    world, it's an improvement to be able to follow the mermaids

7    as they're moving and to adjust adaptively as they're

8    moving?  That it's an improvement?

9    A.    That would be an improved version.

10   Q.    In fact, for a hearing impaired person that has a lot

11   of trouble hearing, it would be an enormous improvement,

12   wouldn't it?

13   A.    I couldn't tell you how big of an improvement to  have

14   it change all the time rapidly but it would be an

15   improvement.

16   Q.    Now, in my opening, I took my hearing aid out and I

17   made it whistle and then I said, okay, now it doesn't

18   whistle.  Is there anything in your patent that detects the

19   onset of that whistling that tells the host controller, hey,

20   it's whistling?

21   A.    No, but that was established technology at the time.

22   Q.    But I just want to make it clear that that is not

23   disclosed in your host controller or in your hearing aid of

24   your patent, is it?

25   A.    Well, actually when the host controller is working,

Chen - direct

1    hearing aids using the -- using, I'm not an engineer but,

2    techniques of manipulating sound to make it more

3    intelligible, easier to understand, and eliminating certain

4    major problems that existing technology couldn't solve.

5    Q.    Did you, yourself meet Dr. Levitt in that '83-84 time

6    frame?

7    A.    Yes.

8    Q.    And did you attend any meetings with Dr. Levitt

9    concerning the project that he was working on?

10   A.    Yes.

11   Q.    Was Dr. Levitt's projects supposed to address any

12   particular problem related to hearing aids?

13   A.    Yes, but the major problem that he felt he could solve

14   was feedback cancellation.

15   Q.    And do you know whether he intended to address that

16   problem through digital hearing aids or analog devices or

17   something else?

18   A.    Well, it was always very clear that he wanted to go do

19   this with digital signal processing.

20   Q.    Before hiring Dr. Levitt, do you know whether Audimax

21   did anything to determine his background and expertise?

22   A.    Yes.

23   Q.    And what was that?

24   A.    We always liked to be associated with the people who

25   are the leaders in their field.  And so we would have done

1    possibly create beneficial advances in the other aspects of

2    hearing devices.

3              So we helped him and helped support some of his

4    work in that area.  We had no clear commercial objective.

5    But we wanted to help out.

6    Q.    As a result of becoming interested again in the

7    patents, what did you do?

8    A.    I engaged a consulting firm to go out and look at

9    licensing commercial and commercialization opportunities for

10   the technology, for the patents.

11   Q.    What was the name of that firm?

12   A.    EKMS.

13   Q.    Can you tell the jury what EKMS is or was?

14   A.    I was introduced to EKMS by some other advisors of

15   ours.  They said that EKMS was skilled at helping people who

16   had patents and other technology find ways to commercialize

17   it, to get license revenues, royalties, because we weren't

18   specialists in this.  And this is something that they did as

19   a line of work.

20             So we thought that was a good thing to do, to

21   have them go out and see if the hearing aid industry would

22   be interested in licensing our patents, particularly given

23   the improved technical capabilities of chips and batteries.

24   Q.    Did you retain EKMS to value the patents?

25   A.    No.

Chen - direct

```
1    Q.    Turn your book to DX-1630, please.

2    A.    Right.

3    Q.    This appears to be a draft agreement between ETG and

4    EKMS.  Is that right?

5    A.    Again, may I just flip through each page?

6              (Pause.)

7              Correct.

8    Q.    This does appear to be a draft.  Is that right?

9    A.    Yes.

10   Q.    Was an agreement ever finalized?

11   A.    I don't remember.  But I am sure that some mutually

12   agreeable arrangement was reached.  Otherwise, they wouldn't

13   have gone out and done the work they did.

14   Q.    Did you pay EKMS for its work?

15   A.    I would assume so.  I had asked someone else who

16   worked with our family to handle the day-to-day relationship

17   with EKMS.

18   Q.     Do you recall how much EKMS was paid for its work?

19   A.    I think they were paid a retainer of something like

20   $50,000 up front.

21   Q.    Were you personally involved in engaging EKMS?

22   A.    Yes.

23   Q.    Do you know what work, generally speaking, EKMS did

24   for Audimax?

25   A.    Well, in general, I was informed that they made some
```

 1   contact with the hearing aid manufacturing market.  But I

 2   don't recall the exact details of who.

 3   Q.    What is your understanding of the results of EKMS's

 4   efforts?

 5   A.    My general understanding is that they were not able to

 6   interest any hearing aid manufacturer in licensing

 7   discussions.

 8   Q.    Let's turn in your notebook to DX-1610.

 9   A.    Okay.

10   Q.    This is entitled ETG Summary Report.  Do you see that?

11   A.    Yes.

12   Q.    Do you recognize this document?

13   A.    Again, may I just briefly flip through it ?

14              Yes, I recognize this.

15   Q.    I will ask you a few questions about the document.  If

16   you will look with me on the first page at the second

17   paragraph on the first page, it states there that EKMS

18   contacted a company called Sound ID.  Do you see that?

19   A.    Yes.

20   Q.    And it states there, I think we are highlighting it on

21   the screen that, quote, "During this conversation, Sound ID

22   revealed that they did not feel that the main patent was

23   relevant to their practice," it goes down in the next

24   paragraph, "because their hearing aids use a process called

25   continuous adaptation."

Chen - direct

1    Q.    Were the patents valued at the time of this

2    transaction with your brother?

3    A.    No.

4    Q.    And what happened to the company that owned the

5    patents?

6    A.    In order to reduce the cost of maintaining the

7    corporate affairs, we were simplifying the number of

8    companies we owned.  So we decided to liquidate Audimax and

9    have the ownership of the patents held directly by ETG.

10   Q.    So who or what entity owns the patents now?

11   A.    ETG.

12   Q.    Does anyone or any other company have an interest in

13   the patents?

14   A.    Yes.

15   Q.    Who is that?

16   A.    The inventors, Richard Dugot and Harry Levitt, own a

17   percentage of the financial benefit of the patents.  The

18   estate of one of the managers who was involved at that time,

19   Henry Durancher (phonetic), his estate owns some shares.  My

20   mother owns some shares that came to her through the estate

21   of my father.  And also Biomed.

22   Q.    What is Biomed?

23   A.    Biomed is the large orthopedic company that bought

24   Biolectron from us.  There were some shares of Audimax held

25   by Biolectron.

Chen - cross

1    because I didn't accept that.  I thought that we had some

2    rights.

3    Q.    Okay.  You said you took the step of suing.  And I

4    believe in your direct examination, you talked about who

5    would split up any damage award that you would get based on

6    this lawsuit; correct?

7    A.    Correct.

8    Q.    How would that be split up?

9    A.    According to the rights ownership that I think we

10   referred to earlier, Harry Levitt two percent, Richard Dugot

11   six or seven percent, my late father's estate, therefore, my

12   mother, six -- five or six or seven percent, the estate of

13   the late Henry Durocher, who was an executive that worked

14   there getting a couple percent, BioMed getting a couple

15   percent and ETG getting 80 percent.

16   Q.    And all these individuals who get this percentage

17   award, if it was recovered, they are all sharing in the

18   costs of this lawsuit; is that right?

19   A.    They have shared the costs to a certain extent.

20   Q.    Not equally based on what their ownership interest is?

21   A.    Well, the costs of litigating unfortunately are very

22   high so I knew to carry forth litigation I couldn't rely on

23   them to carry forward the litigation entirely by themselves,

24   so I undertook to shoulder most of the burden.

25   Q.    Okay.  So you are going to pay for the lawsuit and

Brown - direct

1    A.    Yes, gain is the amount of volume that comes out of

2    the speaker.

3    Q.    So what did Dr. Levitt and the other inventors invent

4    in the '850 patent?

5    A.    Well, their invention was to find a way of reducing or

6    eliminating or at least cancelling a large portion of the

7    acoustic feedback by taking some of the output, putting it

8    through a filter and feeding it back to the input where it's

9    matched in both phase and amplitude to the acoustic sound

10   that travels around the outside through the air or through

11   the body.

12   Q.    Is there a place in the patent where you look to see

13   what the specific inventions that are recited are?

14   A.    Yes, you look at the claims.  The claims define the

15   dimensions or the properties of their claims.  As I said, in

16   the video you saw early on, it's like a piece of property.

17   The deed says what the limits are and what your rights are

18   and the same is true with the claims in a patent.  The

19   claims define what is yours and what other people can't

20   trespass on.

21   Q.    If one party has a patent is it possible for other

22   parties to get patents on improvements?

23   A.    Yes, that is quite commonly done.  There is the

24   original patent, and then people will improve on that, and

25   they'll get a patent on the specific improvement.  For

Brown - direct

1    have a transmission channel between the microphone and the

2    receiver or speaker.  And then at the bottom of this I have

3    the update module, which is the area where the coefficients

4    are calculated for the filter.  And those coefficients are

5    loaded up into the filter, which is shown here in it looks

6    to me like almost orange.  And the filter is in a feedback

7    channel between the output and the input.

8    Q.    How did you know to rely on this particular diagram

9    out of the Oticon documents?

10   A.    Well, first off, it's their engineering documents that

11   defines how they are doing things.  Secondly, Dr. Gloster,

12   who you will hear from later, assured me he looked at the

13   documents and told me that they were essentially correct, at

14   least as far as infringement is concerned.

15   Q.    Who is Dr. Gloster again?

16   A.    He is a professor from, I have forgotten the

17   university in Washington there.  But he is an expert in HDL

18   and DHDL languages.  These are languages that we use to

19   define, hardware description language, HDL, and that's how

20   these chips are designed.  You design them in a language

21   which will then tell the synthesizer how to actually execute

22   the chip.

23   Q.    Going back to Claim 16, did you find that the Oticon

24   products that employ the anti-feedback algorithm determine

25   the effect on the amplitude and phase of the signal in the

Brown - direct

1    A.    Yes.    This is actually a very simple FIR filter.    So

2    when we talk about a FIR filter, this is a simple version of

3    what it would look like.    And what we have is data coming in

4    input and each time delay, each clock cycle, it is shifted

5    to the right so we have time delayed samples.    Those are

6    the -- the delays are shown by T minus one and T minus two.

7         Just below that we see the two multiplying or

8    multipliers in the filter.    And what they do is they

9    multiply the data sample by the coefficients C1 and C2, to

10   produce an output that is so much of each one of those time

11   samples.    Those results are then summed together at the

12   bottom, in summers, to produce the weighted -- we call those

13   multiplied answers weighted samples.

14         And the value of at least one of those

15   coefficients can be programmed.

16   Q.    So what are the kinds of filters that satisfy this

17   understanding of a programmable delay line filter?

18   A.    Well, just about any digital filter will satisfy a

19   delay line filter because it operates on time-delayed

20   samples, and it multiplies these samples by coefficients,

21   and sums them together in one way or another.    But the

22   simplest example is like this FIR filter.

23   Q.    What kind of filters did you find in the accused

24   Oticon,  Bernafon and Widex products?

25   A.    In all of them we found some variant of an FIR filter.

Brown - direct

1    A.    That's correct.

2    Q.    And a means controlled by the computer for adjusting

3    the phase and amplitude necessary to eliminate acoustic

4    feedback and produce a null summation?

5    A.    That's correct.

6    Q.    And a means controlled by the computer for

7    transmitting phase shift and amplitude data to program the

8    hearing aid to eliminate acoustic feedback?

9    A.    Correct.

10   Q.    Are the advances in miniaturization a result of the

11   work of these defendants?

12   A.    No.    The hearing industry was a difficult industry for

13   us to work in because the volumes of wafers that we bought

14   for the hearing aid customers was so small that we didn't

15   even qualify as a real customer to the foundries.    The

16   advances of technology have, as I think we heard before,

17   have come about due to the driving force of the digital

18   technologies, the computer companies and the high speed

19   DSP that is being developed and we've been able to take

20   advantage of that to build hearing aid products.

21   Q.    We've looked at a few documents from these various

22   defendants.    Did you look at any other documents in

23   performing your analysis?

24   A.    I think the first time I received seven boxes of

25   documents.    I think we condensed this pile.    When you

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3
                              -   -   -
 4

 5    ENERGY TRANSPORTATION,          :   Civil Action
      INC.,                           :
 6                                    :
                    Plaintiff,        :
 7                                    :
            v.                        :
 8                                    :
      WILLIAM DEMANT HOLDINGS A/S,    :
 9    et al.,                         :
                                      :
10                  Defendants.       :   No. 05-422 (GMS)

11                            -   -   -

12                      Wilmington, Delaware
                      Thursday, January 24, 2008
13                         9:07 a.m.
                        Fourth Day of Trial
14
                              -   -   -
15
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16

17

18    APPEARANCES:

19                    EDMOND D. JOHNSON, ESQ.
                      Pepper Hamilton LLP
20                         -and-
                      MARTY STEINBERG, ESQ.,
21                    BRIAN M. BUROKER, ESQ., and
                      MAYA M. ECKSTEIN, ESQ.
22                    Hunton & Williams
                      (Washington, D.C.)
23
                                      Counsel for Plaintiff
24

25
```

```
 1    APPEARANCES CONTINUED:

 2                MARY B. GRAHAM, ESQ.
                  Morris, Nichols, Arsht & Tunnell
 3                     -and-
                  JOHN M. ROMARY, ESQ.,
 4              GREGORY C. GRAMENOPOULOS, ESQ.,
                  VINCENT KOVALICK, ESQ.,
 5                KAY HILL, ESQ.,
                  GERSON S. PANITCH, ESQ., and
 6                ARTHUR A. SMITH, ESQ.
                  Finnegan, Henderson, Ford, Farabow & Dunner
 7                (Washington, D.C.)

 8                                    Counsel for
                                      Demant Defendants
 9
                  DONALD E. REID, ESQ.
10                Morris, Nichols, Arsht & Tunnell
                       -and-
11                WILLIAM H. MANDIR, ESQ.,
                  JOHN SCHERLING, ESQ.,
12                CARL J. PELLEGRINI, ESQ.,
                  BRIAN SHELTON, ESQ.,
13                 MATTHEW KAPLAN, ESQ., and
                  J. WARREN LYTLE, JR., ESQ.
14                 Sughrue Mion
                  (Washington, D.C.)
15
                                     Counsel for Widex
16                                   Defendants

17                        -  -  -

18

19

20

21

22

23

24

25
```

Brown - cross

1    together, and there were ways of doing wearable prototypes,

2    in things that people wore in their pockets that would have

3    the other electronics, not stuck in your ear, as you

4    suggested earlier.

5    Q.      You are taking the position that they could have made

6    this wearable in 1986, the technology was available?

7    A.      Well, they wouldn't put the CRT and the other pieces

8    of external equipment.  But they could do the similar

9    function in a wearable.

10   Q.      Now, can we show Figure 1 and 2 next to each other.

11              Now, there has been some talk about

12   miniaturization.  Correct?

13   A.      Yes.

14   Q.      You say that the defendants, I think, are not

15   responsible for making everything smaller.  That's not my

16   client's -- they didn't do that, did they?

17   A.      No, they didn't do that.  I have been involved in

18   doing that since 1970, and in that time period I was

19   certainly involved in miniaturizing things, combining single

20   functions into multiple functions, small signal integration

21   ICs to large-scale integration ICs.

22   Q.      Mr. Brown, let me make it clear.  I am not

23   challenging your credentials at all.  You are an expert.

24   A.      No.  You asked me if we didn't envision

25   miniaturization.  And I am saying at that point in time we

Brown - cross

1    were doing it.

2    Q.      I did not ask you that, sir.  I asked you whether it

3    existed at that time.  I am not asking what was envisioned.

4    I am asking -- in 1986, things were pretty big, weren't

5    they?

6    A.      Things were pretty big.  And in point of fact, as Dr.

7    Levitt indicated, that was the primary reason they were

8    unable to complete integrating this at that point in time.

9    It took another 15 years for the technology to get to the

10   point where these things could be integrated.

11   Q.      I am just trying to go through some simple things

12   here.  Our client wasn't responsible for allowing things to

13   be small.  You are saying that is not something we invented,

14   making things smaller.  Right?

15   A.      Unfortunately, the hearing aid industry does not buy

16   enough silicon wafers to drive that.

17   Q.      Mr. Brown, I am going to have to ask for a yes or no,

18   and then you can explain it any way you want.

19          Our client did not invent things being small.

20   That's not what we did.  Yes or no.

21   A.      Yes, you are correct.  No, your client did not invent

22   the technology that made them smaller.

23   Q.      Thank you.  And Dr. Levitt didn't invent the

24   technology to make it smaller, did he?

25   A.      Dr. Levitt had nothing to do with it.

Brown - cross

1    Q.      Okay.   That's all I am trying to do, make that point.

2              Now, one of the discussions, one of the issues

3    that has come out in this case is whether or not we have

4    just taken this, using somebody else's miniaturization

5    capacity, and just made it real small and stuck it in the

6    ear.  You understand that is one of the allegations, don't

7    you?

8              Let me put it differently.

9              In your opinion, did the defendants just take

10   this, make it small, and stick it in your ear?

11   A.      No.   There has been significant improvements to

12   certain parts of the structures in there, yes.

13   Q.      So the answer is no.  Correct?  We didn't just take

14   this and make it smaller and put it in our ear?

15   A.      No.   You added some improvements.

16   Q.      It's not just that we added improvements, is it?

17   This has over here a phase shifter.  Right?

18   A.      Yes.

19   Q.      And that's separate from the filter, which is over

20   here.  Correct?

21   A.      In this embodiment, that is separate from the filter,

22   but the filter is a phase shifter.

23   Q.      I understand that.  It does shift phase, everyone

24   understands it shifts phase.  But there is a phase shifter

25   here separate from this filter, isn't there?

Brown - cross

1    A.        In this embodiment, that's correct.

2    Q.        So if you were just to make this smaller, you would

3    still have a phase shifter that was different from the

4    filter, wouldn't you?  Yes or no.

5    A.        If you just made that smaller, yes.

6    Q.        And if you just made this smaller, there would be a

7    variable amplifier over here that would just be real small,

8    wouldn't it?

9    A.        Yes.

10   Q.        And if you just made it smaller, what you would be

11   doing is be adjusting this phase shifter and this amplifier

12   to see whether you get a null when a test signal went in,

13   wouldn't you?

14   A.        That's correct.

15   Q.        But if you did that, you would get certain -- you

16   don't like the word measurements -- but you get certain

17   indications of phase and amplitude here.  Correct?

18   A.        Yes.  You would be generating coefficients in that

19   filter that would produce --

20   Q.        You don't want me to call that measurement of phase

21   and amplitude.  Is that right?  Or will you call it a

22   measurement?

23   A.        It can be done by absolutely measuring them or the

24   null technique by driving them toward zero and measuring

25   what you have to drive it with, same as the coefficients.

Brown - cross

```
 1    And the whole idea of a digital hearing aid is we time

 2    quantize.  We take samples and we operate on samples as

 3    numerical numbers.  It's all math until it comes out the

 4    other end.  It gets integrated into the radio signal again.

 5    Q.      And that one sample is what my question.  That one

 6    sample by itself is not doing a whole lot, is it?  It's an

 7    iterative process that continues to do it in order to get

 8    rid of this feedback?

 9    A.        It's an iterative process.  As I said, depending upon

10    the manufacturer, it would take between two and ten seconds

11    to come to a complete null and then it just tries to follow

12    the environment.

13    Q.        Thank you.  You mentioned I believe, Mr. Brown, that

14    in your analysis for the '850 patent, which included Claims

15    13, 14, 16 and 19, you did an analysis both for literal

16    infringement and for the doctrine of equivalents; is that

17    correct?

18    A.        That's correct.

19    Q.        As part of your analysis for the doctrine of

20    equivalents, you didn't consider any prior art, did you?

21    A.        I did not go back and investigate prior art, that's

22    correct.

23    Q.        So you didn't consider prior art when you were

24    looking at the doctrine of equivalents and whether what the

25    claims meant was equivalent to what the defendants have;
```

Brown - cross

1    correct?

2    A.      That's correct.

3    Q.      Prior art didn't even enter into your process, your

4    evaluation?

5    A.      There is another expert who did the prior art

6    research.

7    Q.      But for your analysis on infringement under the

8    doctrine of equivalents, you didn't consider prior art?

9    A.      Well, I considered what was being in use at that

10   point in time.  And I certainly know that none of these

11   techniques were being used in hearing aids at that time.

12   Q.      Have you heard of the Graupe '181 patent?

13   A.      I understand there was such a patent and I suspect

14   you will discuss that in the validity section.

15   Q.      Right.  My question is, so you have heard of Graupe

16   '181 patent?

17   A.      I have heard of it but I have not examined it.

18   Q.      So I guess that means you haven't considered Graupe

19   '181 in connection with your doctrine of equivalents of

20   analysis; is that correct?

21   A.      That is correct.

22   Q.      Have you heard of the Dr. Best's thesis and

23   prototype?

24   A.      I have heard of that in conjunction with this case

25   recently.

Westermann - direct

1    the European patent from the American patent that you are

2    aware of?

3    A.    I don't remember but there was only one.

4    Q.    There was only one; correct?

5    A.    Yes.

6    Q.    Okay.  And, in fact, you can see that by the

7    inventors being Dr. Levitt, Mr. Dugot and Mr. Kopper;

8    correct?

9    A.    Yes.

10   Q.    And you can also see it has a priority date on the

11   left-hand side, June 26th, 1986, the same date of

12   Dr. Levitt's patent in the United States; correct?

13   A.    That is correct.

14   Q.    So this essentially means this is the European patent

15   based on the United States patent of Dr. Levitt; right?

16   A.    Yes, I would think so.  Yes.

17   Q.    Now, lets refer you to Exhibit 775.  775 is the

18   European patent application for the identical patent, the

19   '850 patent; correct?

20   A.    It has the same priority, yes.

21   Q.    In fact, the writing, the handwriting at the very top

22   is your secretary's writing, isn't it?

23   A.    I think only the one to the very left.

24   Q.    Okay.  Right to the right, at the very top, there is

25   a sign and then there is a U.S. patent number.  Do you see

Westermann - direct

1    that?

2    A.    Yes.

3    Q.    And the sign means equal to that; right?

4    A.    Or approximately.

5    Q.    Equivalent; correct?

6    A.    Right.

7    Q.    Okay.  And this also came from Widex's files;

8    correct?

9    A.    It must have, yes.

10   Q.    I'm going to show you Exhibit 774.

11             All right.  We have 774 on the screen, since I

12   can't find it, the '749 patent.  Do you have it?

13   A.    I have it.

14   Q.    Now, that '749 patent also would have been in your

15   files about the same time, August of 1993; correct?

16   A.    I wouldn't know.  I don't think so.

17   Q.    Well, whose writing is that on the '749 patent?

18   A.    I think at this corner it's still my secretary, but

19   the rest is probably at later time, and he was not there in

20   '93.

21   Q.    He had already gone?

22   A.    He hadn't started.

23   Q.    When did he leave?

24   A.    The end of 1999.

25   Q.    Do you have your deposition transcript in front of

1    to this lawsuit; correct?

2    A.    Yes.

3    Q.    In fact, you have held the opinion that Dr. Levitt is

4    an authority in the field of hearing aids and audiology for

5    decades; correct?

6    A.    I certainly believe so, yes.

7    Q.    And you had seen Dr. Levitt's resume many, many years

8    ago because you and HIMPP hired Dr. Levitt as an expert;

9    right?

10   A.    I received it, I didn't read it.

11   Q.    You never read his resume even though you got it?

12   A.    Yes, it's 11 pages long.

13   Q.    Now, is it a fact that Dr. Levitt was hired on behalf

14   of the organization you are the director of, HIMPP?

15   A.    That's correct.

16   Q.    And that was in 1996-1997; correct?

17   A.    I believe so, yes.

18   Q.    Now, the law firm that hired Dr. Levitt, is that the

19   same law firm defending you in this lawsuit?

20   A.    That is correct.

21   Q.    Now, when Dr. Levitt was hired, his resume was

22   attached to the materials that were provided to both you and

23   your law firm; correct?

24   A.    I think that is correct.

25   Q.    And all of the HIMPP members, including Widex and

Westermann - direct

1   Demant, would have known that Dr. Levitt had been retained

2   as an expert on behalf of HIMPP; correct?

3   A.      Yes, because there was a common decision to use him.

4   Q.      It was a group decision by all the members?

5   A.      Yes, and that is why I didn't need to read the

6   resume.  We wanted him.

7   Q.      You didn't read his resume because you knew he was a

8   preeminent expert in the field, right?

9   A.      Yes.

10  Q.      Now, if you wouldn't mind turning to 562, PX-562.

11  A.      (Witness complies.)

12  Q.      And that purports to be a letter to Dr. Levitt dated

13  December 26, 1996 from the Sughrue law firm, Mr. Cushing

14  retaining Dr. Levitt?

15  A.      That is correct.

16  Q.      And who is Mr. Cushing?

17  A.      Mr. Cushing is our U.S. patent lawyer.

18  Q.      And he in the same law firm that is representing you

19  here today?

20  A.      Yes.

21  Q.      In fact, if you look at the second page, the letter

22  shows it was sent to you also; correct?

23  A.      That is correct.  The letter was?

24  Q.      Yes.  The letter was sent to you?

25  A.      Yes.

1    in-the-ear hearing aid, this size.  The first digital.

2              And, two years later, in 1997, I think, we

3    launched the first so-called completely-in-the-canal digital

4    hearing aid that is so small, in-the-ear hearing aid, that

5    it disappears in the ear canal.

6              I have a couple more that I could mention.  That

7    we, at the beginning of this decade, in 2003, we launched

8    something we called Camisha.  That is a computer aided

9    manufacturing of all the shells that has to fit into the ear

10   canal.  It's done by computer.  Very efficient.

11   Q.    Okay.  Thank you.  You mentioned the AUD lab and a

12   number of technical people in that AUD lab that was working

13   for Widex.  As a result, has Widex obtained any patents?

14   A.    Yes, we have been very active with filing our own

15   patents and have done so for many years.

16   Q.    Are any of those patents used in Widex technology,

17   Widex hearing aids?

18   A.    Practically, all of them.  Some of them are so old

19   that they may not be involved, but practically all of them.

20   We file patents in order to use them in our product.

21   Q.    And do any of those patents that you have obtained

22   relate to feedback cancellation?

23   A.    Yes, a few, yes.

24   Q.    Can you refer to Exhibit DX-1599?  It should be in

25   the second book that you received, Mr. Westermann.

Westermann - cross

1    A.    What was the number again?

2    Q.    DX-1599.

3    A.    I got it.

4    Q.    Can you tell me what this exhibit shows?

5    A.    Yes.  This is Widex's first patent on feedback

6    cancellation.

7    Q.    Is the technology in this patent in your products

8    today?

9    A.    The technology that we use today is described in this

10   patent, yes.

11   Q.    Can you give an estimate on the amount of money that

12   Widex spends on research and development on an annual basis?

13   A.    We don't have -- it would be in the order of 20, at

14   least $20 million annually.

15   Q.    Mr. Westermann, when did you first find out about

16   this lawsuit?

17   A.    That was back in, as far as I remember, 2005.  I was

18   called by someone from Oticon, who asked me if I had heard

19   about this lawsuit that was filed in the United States

20   against, it named us and several others.

21   Q.    Prior to finding out about this lawsuit, in 2005, had

22   anyone from ETG ever approached you or Widex alleging patent

23   infringement?

24   A.    Definitely did not.

25   Q.    Prior to this lawsuit, did anyone from Audimax

Westermann - cross

1    contact you or Widex alleging patent infringement of Dr.

2    Levitt's patents?

3    A.    No.

4    Q.    Prior to this lawsuit, did Dr. Levitt contact you or

5    anyone at Widex and say that you were infringing his

6    patents?

7    A.    No, he didn't.

8    Q.    Has Widex ever been sued for patent infringement

9    before?

10   A.    Not really, no.

11   Q.    Prior to being sued in this case, had you ever heard

12   of a company ETG?

13   A.    Never.

14   Q.    Prior to this lawsuit, had you ever heard of a

15   company Audimax?

16   A.    No.

17   Q.    Okay.  There was some discussion about HIMPP.  I

18   think you may have said it.  What is HIMPP, H-I-M-P-P?

19   A.    It's the Hearing Instrument Manufacturers Patent

20   Partnership.

21   Q.    How do you know about HIMPP?

22   A.    Well, I happen to be the manager of HIMPP.

23   Q.    And how long have you been the manager?

24   A.    From its beginning back in 1996.

25   Q.    And who formed HIMPP?

1    So NEC offered them to -- actually, first to our daughter

2    company, Widex Japan, who forwarded the information to Widex

3    Denmark.  And it was decided in HIMPP, I brought it up in

4    HIMPP, and HIMPP decided we would like to, that HIMPP would

5    like to take over these patents, for the same reasons that

6    we had with the Decibel patent.

7    Q.    Does HIMPP license the patents that they have

8    obtained?

9    A.    Yes.

10   Q.    And what are the terms for license of HIMPP patents?

11   A.    There are two possibilities.  Today, I think there

12   are nine partners in HIMPP who have each paid $1.8 million

13   to become a partner, and thereby be licensed.

14         If you are a smaller company, it's possible to

15   have a very simple flat three-percent royalty rate.  Then

16   you can use all the patents.

17   Q.    And what does -- how did HIMPP arrive at this

18   $1.8 million?

19   A.    Well, that was the cost that the initial six

20   companies had to pay.

21   Q.    What does this $1.8 million get for the company that

22   is a member of HIMPP?

23   A.    It gets a license to use all the patents

24   indefinitely.

25   Q.    And you mentioned the other option was a

Westermann - cross

1    three-percent royalty rate?

2    A.    Yes.

3    Q.    Do you have to for that second option pay any

4    lump-sum amount?

5    A.    No.

6    Q.    Why did HIMPP offer this option of either paying 1.8

7    or the three percent?

8    A.    HIMPP wanted to remove -- we saw the 3M patents as a

9    barrier for the technological development of hearing aids.

10   So we were happy to get rid of that.  And we thought we

11   would have to make them available also for anybody else

12   interested in the field.

13   Q.    Has HIMPP ever refused to let a company join HIMPP?

14   A.    No.  Never.

15   Q.    Has any company decided to become licensees of HIMPP?

16   A.    Yes, we have a handful.

17   Q.    Has HIMPP ever refused to license anybody?

18   A.    No.

19   Q.    Can any one member of HIMPP prevent a new member from

20   joining HIMPP?

21   A.    No.  That would require a majority of HIMPP to do

22   that.  But HIMPP would never do that.

23   Q.    Have there ever been any disputes between Widex and

24   members of HIMPP?

25   A.    You mean ongoing patent disputes?

1    each HIMPP partner gets every second week a couple of CDs

2    with the latest patents and applications that have been

3    published.

4    Q.    Has Widex gone through and analyzed all the patents

5    in your database?

6    A.    Oh, no.

7    Q.    Why not?

8    A.    That's 17,000.

9    Q.    Can we have up PX-774?  Again, it should be in that

10   same notebook, Mr. Westermann.

11   A.       Yes.

12   Q.    Do you know what PX-774 is?

13   A.    That is the '749 patent.

14   Q.    In the bottom left-hand corner, you see some writing.

15   A.    Yes.

16   Q.    Mr. Steinberg asked you about that.  What is your

17   understanding of who wrote that?

18   A.    I am pretty sure that this is the handwriting of a

19   patent engineer we had in the late nineties.

20   Q.    Do you know what the handwriting says?

21   A.    As far as I can see, he lists a couple of features

22   that are on certain pages of the patent.

23   Q.    What are the features?

24   A.    Well, the first is an FM link.  And then he says

25   multi-microphone.

Westermann - cross

1              And I can hardly see what the rest are.

2    Q.    Okay.

3    A.    There is some brigade in the third line, I think.

4    Q.    Is any of the writing directed to feedback

5    cancellation?

6    A.    I can't say -- the fourth one seems to be phase

7    shift.  But I don't see any feedback cancellation.

8    Q.    Are you aware if any Widex engineers or scientists

9    who were involved in the design of either the Senso Diva or

10   the Inteo, do you know if any of them were aware of Dr.

11   Levitt's patents at the time they did their research and

12   design?

13   A.    No, certainly not.

14   Q.    Was Widex ever approached by a company called EKMS?

15   A.    No, not that I know of.

16              MR. MANDIR:  Excuse me, Your Honor.

17              (Pause.)

18   BY MR. MANDIR:

19   Q.    Mr. Westermann, can you turn to PX-598, please?  I

20   think it's in Mr. Steinberg's book.

21   A.    (Witness complies.)  Yes.

22   Q.    Can you turn to page 12 of the requests for

23   reexamination that Mr. Steinberg was asking you about a few

24   moments about?

25   A.    Page 12.

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3

                          -   -   -

4

5    ENERGY TRANSPORTATION,              :   Civil Action
     INC.,                              :
6                                        :
                  Plaintiff,            :
7                                        :
            v.                          :
8                                        :
     WILLIAM DEMANT HOLDINGS A/S,        :
9    et al.,                            :
                                         :
10               Defendants.             :   No. 05-422 (GMS)

11                        -   -   -

12                  Wilmington, Delaware
                   Friday, January 25, 2008
13                       9:00 a.m.
                   Fifth Day of Trial
14

                          -   -   -
15

     BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge
16

17

18   APPEARANCES:

19               EDMOND D. JOHNSON, ESQ.
                 Pepper Hamilton LLP
20                      -and-
                 MARTY STEINBERG, ESQ.,
21               BRIAN M. BUROKER, ESQ., and
                 MAYA M. ECKSTEIN, ESQ.
22               Hunton & Williams
                 (Washington, D.C.)
23
                                    Counsel for Plaintiff
24

25