1    APPEARANCES CONTINUED:

2              MARY B. GRAHAM, ESQ.
              Morris, Nichols, Arsht & Tunnell
3                   -and-
              JOHN M. ROMARY, ESQ.,
4             GREGORY C. GRAMENOPOULOS, ESQ.,
              VINCENT KOVALICK, ESQ.,
5             KAY HILL, ESQ.,
              GERSON S. PANITCH, ESQ., and
6             ARTHUR A. SMITH, ESQ.
              Finnegan, Henderson, Ford, Farabow & Dunner
7             (Washington, D.C.)

8                                      Counsel for
                                       Demant Defendants
9

              DONALD E. REID, ESQ.
10            Morris, Nichols, Arsht & Tunnell
                   -and-
11            WILLIAM H. MANDIR, ESQ.,
              JOHN SCHERLING, ESQ.,
12            CARL J. PELLEGRINI, ESQ.,
              BRIAN SHELTON, ESQ.,
13            MATTHEW KAPLAN, ESQ., and
              J. WARREN LYTLE, JR., ESQ.
14            Sughrue Mion
              (Washington, D.C.)
15

                                       Counsel for Widex
16                                     Defendants

17                       -   -   -

18

19

20

21

22

23

24

25

1    Do you know what Moore's Law is?

2    A.    Yes, I am familiar with that.

3    Q.    What is Moore's Law?

4    A.    Moore's Law is a prediction from Gordon Moore, who was

5    the founder of Intel.  And he predicted all the way back in

6    the sixties that the semiconductor technology would evolve

7    at such a pace that for every 18 months we would double the

8    power of computers and memories and so on.

9    Q.    That means chips get smaller and smaller and hold more

10   information.  Correct?

11   A.    I would say it's either -- either they get smaller or

12   they keep the size and have more information.

13   Q.    Or both?

14   A.    Right.

15   Q.    The advances in chip technology allowed for

16   miniaturization over the years.  Correct?

17   A.    Yes, that's correct.

18   Q.    And integrated circuits mean that you put various

19   electronic gizmos into one circuit, one electrical circuit.

20   Right?  You integrate them?

21   A.    Yes.  That's what I tried to explain before, I am

22   sorry, I was not clear.  But the idea is to integrate a lot

23   of electronics into this, three-by-four millimeters or

24   something like that.

25   Q.    And through the years, parties have been able to

Christensen - cross

1   integrate more and more things into an integrated circuit.

2   Right?

3   A.    Yes.    That's the beauty of technology.

4   Q.    Now, when you were talking before about patents and

5   the algorithm and so forth, you mentioned a filter.  Right?

6   You mentioned a feedback filter?

7   A.    I mentioned an adaptive, commercial filter.  Is that

8   the one you are referring to?

9   Q.    Yes.

10  A.    Yes.

11  Q.    In the filter technology that you are familiar with,

12  does your company use what is called an FIR filter, an

13  acronym for a finite impulse response filter?

14  A.    We use that technology on our platform, yes, we do.

15  Q.    And that type of filter is a delay line filter.

16  Right?

17  A.    It's also referred to as a delay line filter.  I think

18  it has a lot of different names, really.

19  Q.    And the filter, the feedback filter, needs

20  coefficients to operate correctly.  Right?

21  A.    Any filter would need coefficients to operate.

22  Q.    And the filter receives the coefficients from the LMS

23  algorithm.  Right?

24  A.    Well, that's not the way I see it.  The adaptive LMS

25  filter is really one unit.  I mean, it has to have all the

1    internally in the company but it was not the detailed

2    description of the algorithm.

3    Q.    So just to answer my question, are you testifying here

4    today that internal technical material and material that was

5    given to hearing impaired people was inaccurate about how

6    your feedback mechanism works?

7    A.    It's inaccurate in the details of how it works.

8    Q.    Are you aware that the Food and Drug Administration of

9    the United States regulates hearing aids?

10   A.    Yes, I know about the Food and Drug Administration to

11   some extent.

12   Q.    Are you aware that the FDA, the Food and Drug

13   Administration requires totally accurate statements in the

14   marketing materials of hearing aids?

15   A.    I don't know about the details of the FDA

16   requirements, no.

17   Q.    Have you reported the inaccuracies in these marketing

18   materials to the FDA?

19   A.    Me, personally?

20   Q.    Yes.

21   A.    No, I have not.

22   Q.    In the patent that we looked at before, your patent,

23   the '871 patent, it says feedback cancellation.  Are you

24   aware that you have to make an application under oath before

25   the Patent Office and state with accuracy what your patented

1              IN THE UNITED STATES DISTRICT COURT

2              IN AND FOR THE DISTRICT OF DELAWARE

3

                            -  -  -

4

5    ENERGY TRANSPORTATION,          :   Civil Action
     INC.,                           :
6                                    :
               Plaintiff,            :
7                                    :
          v.                         :
8                                    :
     WILLIAM DEMANT HOLDINGS A/S,    :
9    et al.,                         :
                                     :
10             Defendants.           :   No. 05-422 (GMS)

11                          -  -  -

12                   Wilmington, Delaware
                   Monday, January 28, 2008
13                        9:37 a.m.
                    Sixth Day of Trial
14
                            -  -  -
15
     BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge, and
16                                       a Jury

17

18   APPEARANCES:

19             EDMOND D. JOHNSON, ESQ.
               Pepper Hamilton LLP
20                    -and-
               MARTY STEINBERG, ESQ.,
21             BRIAN M. BUROKER, ESQ., and
               MAYA M. ECKSTEIN, ESQ.
22             Hunton & Williams
               (Washington, D.C.)
23
                              Counsel for Plaintiff
24

25

```
 1    APPEARANCES CONTINUED:

 2                    MARY B. GRAHAM, ESQ.
                      Morris, Nichols, Arsht & Tunnell
 3                         -and-
                      JOHN M. ROMARY, ESQ.,
 4                    GREGORY C. GRAMENOPOULOS, ESQ.,
                      VINCENT KOVALICK, ESQ.,
 5                    KAY HILL, ESQ.,
                      GERSON S. PANITCH, ESQ., and
 6                    ARTHUR A. SMITH, ESQ.
                      Finnegan, Henderson, Ford, Farabow & Dunner
 7                    (Washington, D.C.)

 8                                        Counsel for
                                          Demant Defendants
 9
                      DONALD E. REID, ESQ.
10                    Morris, Nichols, Arsht & Tunnell
                          -and-
11                    WILLIAM H. MANDIR, ESQ.,
                      JOHN SCHERLING, ESQ.,
12                    CARL J. PELLEGRINI, ESQ.,
                      BRIAN SHELTON, ESQ.,
13                    MATTHEW KAPLAN, ESQ., and
                      J. WARREN LYTLE, JR., ESQ.
14                    Sughrue Mion
                      (Washington, D.C.)
15
                                          Counsel for Widex
16                                        Defendants

17                            -   -   -

18

19

20

21

22

23

24

25
```

1   the use of adaptive filters?

2   A.    Yes.   The feedback cancelling system also gives an

3   opportunity to help on the so-called occlusion problem.

4   Occlusion is when you put fingers in your ear and start

5   listening to your own voice.   Then you will find the sounds

6   are very hollow.   In order to compensate for that problem,

7   the traditional way is to make an intended leakage from the

8   outside and through a little ventilation channel through the

9   eardrum, but when do you that, typically you would get some

10  feedback problems, but by using the cancelling technique you

11  can avoid that and still make it more comfortable of the

12  wearer of the hearing aids.

13  Q.    When did Widex first start using adaptive LMS filters

14  in their hearing aids?

15  A.    From Senso Diva.

16  Q.    In what year was that?

17  A.    2001, I believe.

18  Q.    Why didn't Widex use LMS adaptive filters in earlier

19  Widex products?

20  A.    Because the first hearing aids that we made were with

21  digital technology was in '95-96.   And at that time, we only

22  knew about one technique that would make this work, and this

23  was by intentionally injecting noise into the feedback path

24  generated by the hearing aid, but this would give some

25  problems for the user.

Nielsen - direct

1    Q.      And what kind of problems would that give to the

2    user?

3    A.      The problem is that the noise would be audible for

4    most hard of hearing.  Even though they were hard of

5    hearing, the noise would be at a level way too high so you

6    it would not be comfortable and acceptable to wear this type

7    of hearing aid.

8    Q.      Were there any commercial products that did use this

9    method in that time frame?

10   A.      Yes, I know at least one which were so-called DFS

11   system and it worked only for very hard of hearing people

12   with very significant hearing loss, almost deaf people.

13   Q.      Did Widex try to solve the problem of using injected

14   noise in their hearing aids?

15   A.      Yes, we found a way to solve the problem without

16   using the noise injection.

17   Q.      And how was that problem solved?

18   A.      We found a way to use adaptive feedback cancelling

19   would the noise.

20   Q.      Did Widex get any patents related to this new design?

21   A.      Yes, we got one.

22   Q.      Can you look at Exhibit DX-1599, please?

23   A.      (Witness complies.)

24   Q.      And what is this document?

25   A.      That is the patent that we got relating to the

Nielsen - direct

1    feedback cancelling without the noise.

2    Q.    And who is the inventor?

3    A.    Thomas Kaulberg.

4    Q.    Did Thomas Kaulberg work on any of accused products?

5    A.    Yes, he was a designer of the feedback cancelling

6    system in Senso Diva.

7    Q.    What type of adaptive filter is used in the Senso

8    Diva?

9    A.    Say that again, please.

10    Q.    I'm sorry.  What type of adaptive filter is used in

11    the Senso Diva?

12    A.    It's an adaptive filter for the sine, sine LMS

13    algorithm.

14    Q.    And what type of filter is used in the Inteo hearing

15    aid?

16    A.    That is normalized LMS algorithm.  Basically working

17    the same way, slight differences.

18    Q.    Can you please go to JX-301?  And figure 1.

19           What is figure 1?

20    A.    That is an overview of the major blocks in the Senso

21    Diva that is relevant for describing the Senso Diva feedback

22    cancelling system.

23    Q.    Using figure 1, can you explain to the jury how the

24    adaptive LMS filter cancels feedback in the Senso Diva?

25    A.    Yes, I will try.  If we start in the rightmost side

1    IN THE UNITED STATES DISTRICT COURT

2    IN AND FOR THE DISTRICT OF DELAWARE

3
                        -  -  -
4

5    ENERGY TRANSPORTATION,              :  Civil Action
     INC.,                              :
6                                       :
               Plaintiff,               :
7                                       :
          v.                            :
8                                       :
     WILLIAM DEMANT HOLDINGS A/S,       :
9    et al.,                            :
                                        :
10             Defendants.              :   No. 05-422 (GMS)

11                        -  -  -

12                   Wilmington, Delaware
                 Tuesday, January 29, 2008
13                      8:50 a.m.
                  Seventh Day of Trial
14
                        -  -  -
15
     BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge,
16                                      and a Jury

17


18
     APPEARANCES:
19
                    EDMOND D. JOHNSON, ESQ.
20                  Pepper Hamilton LLP
                         -and-
21                  MARTY STEINBERG, ESQ.,
                    BRIAN M. BUROKER, ESQ., and
22                  MAYA M. ECKSTEIN, ESQ.
                    Hunton & Williams
23                  (Washington, D.C.)

24                                     Counsel for Plaintiff

25

```
 1   APPEARANCES CONTINUED:

 2                MARY B. GRAHAM, ESQ.
                 Morris, Nichols, Arsht & Tunnell
 3                    -and-
                 JOHN M. ROMARY, ESQ.,
 4               GREGORY C. GRAMENOPOULOS, ESQ.,
                 VINCENT KOVALICK, ESQ.,
 5               KAY HILL, ESQ.,
                 GERSON S. PANITCH, ESQ., and
 6               ARTHUR A. SMITH, ESQ.
                 Finnegan, Henderson, Ford, Farabow & Dunner
 7                (Washington, D.C.)

 8                                    Counsel for
                                      Demant Defendants
 9
                 DONALD E. REID, ESQ.
10               Morris, Nichols, Arsht & Tunnell
                      -and-
11               WILLIAM H. MANDIR, ESQ.,
                 JOHN SCHERLING, ESQ.,
12               CARL J. PELLEGRINI, ESQ.,
                 BRIAN SHELTON, ESQ.,
13               MATTHEW KAPLAN, ESQ., and
                 J. WARREN LYTLE, JR., ESQ.
14               Sughrue Mion
                 (Washington, D.C.)
15
                                      Counsel for Widex
16                                    Defendants

17                        -   -   -

18

19

20

21

22

23

24

25
```

Morley - direct

1   Q.    What time did this, what time frame did this project
2   end with CID?
3   A.    I think we were funded roughly from '82 or so up
4   through about '91.
5   Q.    Okay.  And since 1991, have you been involved in any
6   hearing aid projects?
7   A.    Yes.  And I'd like to say by 1991, my students and I
8   had actually designed a three chip set and had a hearing aid
9   that was wearable that fit in your pocket and it did
10  adaptive filtering and was quite a nice prototype hearing
11  aid.
12           Then after that, the other hearing aid research
13  I did, to answer your question, is that I worked in the
14  summer of 1993, I spent in Stockholm, Sweden, and I worked
15  in a company there that made integrated circuits or computer
16  chips, as they've been called here, and I did a feasibility
17  study for using their particular chip fabrication plant for
18  making a digital hearing aid.  And then a few months later,
19  I was still on a sabbatical from the university.  I had the
20  opportunity to go work in Australia in Sydney, the suburbs
21  of Sydney at a national acoustics laboratory where I worked
22  on advanced signal processing algorithms for hearing aids.
23  Q.    Are those digital hearing aids?
24  A.    Yes.
25  Q.    Okay.  Anything else?

Morley - direct

1    A.    More recently, about six years ago, I did some

2    consulting for a former Ph.D. student who started a company

3    to make a little battery operated hand-held unit that they

4    could use to test the hearing automatically of babies,

5    without the babies having to say whether they can hear or

6    not, like you would test an adult.  You can decide whether

7    the baby has a hearing loss or not.

8    Q.    Okay.  Any other work in the hearing aid field since

9    1991?

10   A.    I was approached by a gentleman from the U.S.

11   Government Access Board about four years ago.  He was

12   concerned with making playgrounds safe for kids with hearing

13   aids or another type of hearing instrument known as a

14   cochlear implant.  It turns out when kids go down plastic

15   slides, they generate a lot of static electricity.  Some of

16   us know, when we've had our kids come down, they come off

17   the end, they zap us when we touch them.  And it turns out

18   that that particular electricity can cause the hearing aids

19   to temporarily malfunction or lose their programming.  Then

20   the kids have to go back to the audiologist office in these

21   cases.  In the cochlear implants, in particular, they have

22   to get an appointment, go back and get the thing set up

23   again.  So it's a nuisance to them, and I've been working on

24   a project with a company in St. Louis that makes a polymer

25   that is an antistatic coating, and we've been testing that

Morley - direct

1    on plastic slides to see if we can make them safe for kids

2    with these instruments.

3    Q.    Okay.  Thank you, Dr. Morley.

4              MR. MANDIR:  Your Honor, I'd like to offer

5    Dr. Morley at this time as an expert in digital hearing aid

6    design and operation.

7              MR. STEINBERG:  No objection.

8              THE COURT:  There is no objection.  The Court

9    accepts Dr. Morley.

10             MR. MANDIR:  Thank you, Your Honor.

11   BY MR. MANDIR:

12   Q.    Dr. Morley, when did you first start working on this

13   case; do you recall?

14   A.    I think it was late 2005.

15   Q.    Do you have an opinion as to the level of ordinary

16   skill at the time of the ETG patents?

17   A.    Yes.  And I'll try to say it from memory what I wrote

18   in the report about it, but it would be somebody, say, an

19   engineer with a master's degree that had it in some sort of

20   an engineering field that was acoustics related or there are

21   other people such as somebody that would have a sensory

22   psychology background that knows about the hearing system so

23   somebody that comes at it from the hearing sciences side.

24   In either case, they should have maybe two to three years of

25   experience in the development of hearing aids.

Morley - direct

1    Q.    Can we see the next demonstrative, No. 7, please.

2              Do you know what this demonstrative is, Dr.

3    Morley?

4    A.    This is a demonstrative I put together, partially

5    because I have been sitting here in the courtroom and we

6    have been zooming in on all these different places, but we

7    have never seen the patent in its entirety, to get an idea

8    of the perspective.

9              So what this shows is the whole patent.  I have

10   gone in and highlighted in green here different areas, and

11   up here we will see this area that I just discussed, which

12   is the circuitry that is responsible for picking which

13   setting the hearing aid should be set for for that hearing

14   compensation filter in the forward path.

15             The text that I have highlighted are the areas

16   that refer to the operation of that picking of these

17   settings in some automatic fashion.

18   Q.    Okay.  Let's go back to Figure 2 of the '850 patent,

19   please.

20             I think you were referring to the circuitry kind

21   of towards the bottom right hand of Figure 2.  Is that

22   circuitry an adaptive feature?

23   A.    Well, the patent actually never says the word

24   adaptive.  But it does say automatically adjusting.  And I

25   think one of ordinary skill in the art, you would give them

Morley - direct

1   credit for, you might call that adaptive, it can

2   automatically adjust.  It doesn't generate new coefficients

3   to be put in.  All it does is pick from the sets of

4   coefficients that were put in back at the audiologist's

5   office.  So it's got a limited menu.  It is not like a chef

6   who can whip up anything you want on the spot.  You can only

7   pick the meals that are on the menu.

8   Q.    This automatic controlling feature, does that have

9   anything to do with canceling feedback?

10  A.    Not at all.

11  Q.    Can we go to Demonstrative 2 back for a second,

12  please.

13          So this automatic controlling feature that we

14  have been discussing, is it relevant to either of those

15  filters we see here?

16  A.    Yes.  It's picking the sets of coefficients that get

17  used in this hearing compensation filter, but not anything

18  to do with that feedback canceller.

19  Q.    Okay.  Let's quickly go through some of the areas that

20  you highlighted in the patent.  I would like to just comment

21  on them.

22          Can we go to the abstract.

23          I think the first place that you had identified

24  was the abstract.  Do you see that?

25  A.    Yes.

Morley - direct

1    Q.    Does the abstract talk about changing coefficients

2    with respect to canceling feedback?

3    A.    Yes.  A number of lines, about halfway down there is

4    the word adjust automatically, two words, and it talks about

5    cause the hearing aid to adjust automatically to the optimum

6    set of parameter values.  So that means picking one of those

7    sets that have been put in there for the speech level, room

8    reverberation, and type of background noise then obtaining.

9            That is discussing what that circuit in Figure 2

10   could do, is determine the speech level and background

11   noise.

12   Q.    Does that have anything to do with acoustic feedback?

13   A.    Not at all.

14   Q.    Can we go to Column 1, Lines 8 through 13, please.

15           Can you read that, Dr. Morley?

16   A.    Yes.  It says that, this relates to hearing aids of

17   this character that are capable of automatically adjusting

18   to optimum parameter values, once again, picking a set as

19   operating conditions such as speech level, room

20   reverberation and background noise change.

21           So it says it is going to automatically adjust

22   when those things change.  And so change is very important

23   in that part of the sentence.

24           It goes on to say, and also for reducing

25   acoustic feedback.

Morley - direct

1        But it doesn't say when anything changes.  It

2   just says to reduce it.

3   Q.    And is your interpretation that -- would you say

4   acoustic feedback is not related to change consistent with

5   how the patent describes the acoustic feedback filter?

6   A.    Absolutely.

7   Q.    I am not going to go through all of them.  Let me just

8   go through a few more.

9        Column 11, Lines 32 to 33, please.  Can you look

10  at this and give your opinion as to whether or not this has

11  anything to do with acoustic feedback?

12  A.    It says automatic adjustment of the frequency

13  response of the hearing aid as a function of speech level.

14  So that's saying when speech level changes, the automatic

15  adjustment is adjusted.  So it doesn't have anything to do

16  with acoustic feedback.

17  Q.    Column 11, Lines 52 to 55, please.

18  A.    Once again, it talks about automatic adjustment of the

19  programmable filter -- that is our filter in the forward

20  path -- to optimum parameter values as the speech level,

21  room reverberation and type of background noise change.

22       So it's going to adjust due to that change.  So

23  there is a cause and effect.  But then it says, and for

24  reducing acoustic feedback.  And it doesn't say in response

25  anything changes or not.

Morley - direct

1    Q.    Again, is there anything that is described in the

2    patent in terms of how you actually implement the feedback

3    cancellation filter that discusses changing the coefficients

4    in normal operation?

5    A.    No.    It's programmed once at the audiologist's office.

6    That feedback cancellation filter is inserted into the

7    circuit, and the patient walks away with the hearing aid,

8    and you can't change it anymore.

9    Q.    Can we also go to Column 12, Claim 5.

10            Okay.    This Claim 5, what is that referring to?

11   A.    Claim 5 talks about, impart, imparting or impart

12   different response characteristics to the hearing aid,

13   responsive to the level of speech signals in the

14   transmission channel in excess of the level of noise.

15            So this is describing that circuit that I showed

16   in Figure 2 in the lower right-hand corner that's picking

17   from that menu again.    This is talking about changing the

18   settings of the hearing compensation filter when noise and

19   speech levels change.    It doesn't have anything to do

20   whatsoever with feedback, acoustic feedback canceling.

21   Q.    And is ETG asserting Claim 5 in this case?

22   A.    No.

23   Q.    Now, do you understand that ETG is asserting Claims

24   13, 14, 16 and 19?

25   A.    Yes, I do.

Morley - direct

1    Q.    And do any of those claims have anything to do with

2    changing coefficients?

3    A.    No, none of those.

4    Q.    Let's now go back to that second filter now, the

5    feedback cancellation filter.

6              Can we have Demonstrative No. 8, please.

7              What does this show, Dr. Morley?

8    A.    Okay.  Once again, this is a picture of the whole

9    patent, so we can see things in perspective.  And what I

10   have shown here are the places in the drawings or the

11   teachings of the patent where it specifically talks about

12   feedback compensation, or feedback canceling.

13             Up in the drawings, what I have shown are the

14   parts of the circuitry that, if they weren't there, you

15   couldn't do feedback cancellation.  So they are exclusively

16   used for the feedback canceling feature of the testing over

17   here in the host controller and the actual implementation of

18   the -- during the test of the feedback canceling.

19             What isn't shown in here is that the filter, the

20   feedback canceling filter is supposed to be connected from

21   up here down to a terminal down here.  But they don't show

22   that, don't even show the feedback canceling filter in this

23   drawing.

24   Q.    Okay.  Can we put back up Demonstrative No. 2, please.

25   Again, referring to this top filter, the feedback canceling

Morley - direct

1    Q.    Can we look at Demonstrative No. 14 for a moment.

2              So this is the claim construction order that you

3    mentioned.  I see Items 1, 2, and 3 and 4 -- I don't see 3.

4    1, 2, 4 and 5.  Did you consider these definitions when you

5    did your infringement analysis?

6    A.    Yes, I did.

7    Q.    In your opinion, does the Senso Diva and the Inteo

8    hearing aids include a programmable delay line filter

9    located in a feedback path that is programmed?

10   A.    No.

11   Q.    And why is that?

12   A.    Well, if we look at the term programmed, it says, in

13   Item 4, The term programmed is construed to mean, quote,

14   "provided with one or more values so as to produce a

15   response," end quote.

16             In the Senso Diva and the Inteo products, the

17   filter that is in the feedback path is not provided with any

18   coefficients.  It generates its own.  It's got its chef

19   there whipping up the meals, whatever it needs.

20   Q.    Can we go to DX-1660.

21             It's Figure 2, which I believe is WID003941.

22             Were you here during the testimony of Mr. Brown?

23   A.    I was.

24   Q.    Did Mr. Brown refer to this figure?

25   A.    Yes, he did.

Morley - direct

1    Next one?

2    A.    There you go, Figure 5.

3    Q.    Okay.  I see up on top of Figure 5 it says correction

4    circuit.  Was that the same correction circuit block we saw

5    in the cover page of the Graupe patent?

6    A.    Yes, and I know that because not only does it have the

7    same name, but over here it's got the No. 21 and on the

8    front page was No. 21.

9    Q.    Is this a delay line filter, what we see here in

10   Figure 5 of Graupe?

11   A.    This is a tapped delay line filter.  We have over here

12   on the right-hand side are the delay blocks.  And we have

13   these M blocks which multiply.  So what we have are

14   multiplication and then addition up in this block here.

15              Here we have our coefficients.

16   Q.    Can we go to the cover page of Graupe, please.  So

17   what does this correction circuit do?

18   A.    This correction circuit gives an estimate of the

19   acoustic feedback in an electrical form so it can be

20   subtracted out from the microphone input.

21   Q.    Does this correction circuit, does it have

22   coefficients?

23   A.    It has -- there are coefficients that are decided and

24   given to it from a circuit called an identifier circuit.

25   Q.    And so does that mean that the coefficients in this

1    correction circuit change?

2    A.    Yes.   They get updated from time to time.

3    Q.    And this is a feedback cancellation filter?

4    A.    It is.

5    Q.    So how is that compared to what we have been

6    describing with respect to the discussion this morning of

7    the ETG patents?

8    A.    The ETG patents don't change the coefficients out in

9    normal use, whereas this invention does periodically measure

10   the acoustic feedback path, calculate new coefficients, and

11   then use those in the correction circuit for adjusting the

12   feedback, or canceling it.

13   Q.    Can we have Morley Demonstrative No. 16, please.

14          Okay.  Can you explain what we see here, Dr.

15   Morley?

16   Q.    Okay.  Up at the top is my simplified block diagram

17   for the ETG patented hearing aid, with its acoustic feedback

18   fixed filter in the feedback path.  And down below we see

19   the block diagram of the Graupe '818 patent, and I have had

20   the colors match up, so the acoustic feedback path here is

21   in purple on both of them, the microphone is blue, the

22   feedback canceling filter is in blue up at the top, the

23   hearing compensation filter here in the middle is in red.

24          The amplifier is in here, and that's why they

25   are both red.  And then we got a speaker that's orange.  So

Morley - direct

1    Senso Diva and the Inteo product?

2    A.    My understanding is I needed to find the equivalent

3    structure over there, and I looked for the equivalent

4    structure of each element there and did not find it.

5    Q.    Do you remember Mr. Brown's testimony concerning the

6    A-to-D converter, which is in the second block down on the

7    right-hand side, under corresponding structure?

8    A.    Yes, I see it.  Analog-to-digital converter 40.

9    Q.    Is there an A-to-D or analog-to-digital converter in

10   either the Inteo or the Senso Diva products?

11   A.    There is, but it's not in the WLMS block.  And that's

12   the block he identified.

13   Q.    In your opinion, is Claim 1 infringed under the

14   doctrine of equivalents by the Inteo or Senso Diva products?

15   A.    Not at all.

16   Q.    And for Claim 2, is Claim 2 infringed under the

17   doctrine of equivalents by either the Inteo or Senso Diva

18   products?

19   A.    No.

20   Q.    Okay.  Now we're going to talk about one of the

21   defenses that I think you said you testified on certain

22   validity issues with respect to both defendants.  Do you

23   have an opinion as to whether or not there is a proper

24   written description in the ETG patents about the invention?

25   A.    Well, I think if we take ETG's position on

1   infringement that the claims 13, 14, 16 and 19 all cover

2   adaptive LMS filter-based feedback cancellers like the Widex

3   Inteo and the Widex Senso Diva, then the patent should tell

4   someone of ordinary skill in the art, it should have a

5   written description so when I read that patent and I get

6   back to the claim and it says, hey, there is a claim and

7   they're saying this claim covers an adaptive LMS filter for

8   canceling feedback, then I should, when I see that, go, oh,

9   now I know where to go in that patent and find the

10  description that says to me that when the inventor sent that

11  application to the Patent Office he understood that his

12  patent could do that, that it had that feature, that

13  capability.  And I have to be able to find that written

14  description that shows me he knew that it could do that.

15  Q.    Is there anything in the '850 or '749 patents that

16  indicate that the inventors of those patents had in their

17  possession the possibility that the programmable delay line

18  filter could be an adaptive filter?

19  A.    I don't believe there is any evidence that shows they

20  had that in their possession at the time that they filed

21  this patent, these patents.

22  Q.    And what is the basis for that?

23  A.    Well, we went through, today, when we looked at the

24  different parts of the patent, in the few places where it

25  does describe anything that could be stretched to be

Morley - direct

1    considered to be adaptive, it has nothing to do with

2    feedback cancellation.  There is no description in the

3    patent about how to do adaptive feedback cancellation.

4    Q.    Okay.  Let me show you Exhibit 1239.

5          Are you familiar with this exhibit?

6    A.    Yes, I am.

7    Q.    What is this exhibit?

8    A.    It's an article written by, among others, Diane

9    Bustamante.  She is the first author cited.  And it says

10   it's the measurement and adaptive suppression of acoustic

11   feedback in hearing aids.  So it's sort of a summary

12   article.

13   Q.    In this article, does Ms. Bustamante say anything

14   about the '850 patent?

15   A.    I believe so?

16   Q.    And what does she say?

17   A.    I'm looking for the exact place, but I'm not sure it's

18   on this.

19   Q.    I think it's in your notebook under 1239.

20   A.    1239.  Thank you.

21   Q.    Yes.

22   A.    I haven't looked at this in awhile so it's going to

23   take awhile to find it.

24   Q.    I'll try to help you out.

25   A.    Sorry.

Morley - direct

1        It's no indication that there is some fatal flaw

2    or anything in it.

3        Every thesis, just about, has a section in there

4    that says, this is what I have done, this is the

5    performance, if I wanted to go further, in performance, this

6    is what I would suggest somebody do to improve this thing

7    even more.

8    Q.    Can we turn now to PX-774.  Dr. Morley, were you in

9    the courtroom when ETG's counsel asked Mr. Westermann about

10   this document?

11   A.    I was.

12   Q.    Do you see at the second-to-last line of that it says

13   phase shift Column 11 Line 22.  Do you see that?

14   A.    I see it.

15   Q.    Can we go to Column 11, Line 22 of the '749 patent.

16        Can you go ahead and read that, starting with by

17   using an array?

18   A.    "Using an array of two or more microphones on the

19   body (e.g., along the frame of a pair of spectacles), the

20   weighting coefficients can be chosen in the manner described

21   above such that the weighted summed output of the

22   microphones, with an appropriate phase shift, is equivalent

23   to the output of a frequency selective directional

24   microphone."

25   Q.    This word phase shift, that is found in Column 11,

Morley - direct

1    Line 22?

2    A.    Yes, it is.

3    Q.    The same that we saw on the cover page, the

4    handwritten portion.  Is that correct?

5    A.    That's correct.

6    Q.    Now, this phase shift we are talking about, does it

7    have anything to do at all with feedback cancellation?

8    A.    None whatsoever.

9            MR. MANDIR:  Thank you, Dr. Morley.

10           No further questions, Your Honor.

11           THE COURT:  Counsel, you may cross-examine.

12           MR. STEINBERG:  Thank you, Your Honor.

13                   CROSS-EXAMINATION

14   BY MR. STEINBERG:

15   Q.    Good afternoon, Dr. Morley.

16   A.    Good afternoon.

17   Q.    Not like fantasy camp.  Right?

18   A.    Not even close.  More like nightmare camp.

19   Q.    But when you go to fantasy camp, you aren't paid to go

20   to fantasy camp, are you?

21   A.    No, I am not.

22   Q.    But you are paid to be here, aren't you?

23   A.    That's correct.

24   Q.    And how much are you being paid to be here?

25   A.    I get paid $315 per hour.

1          IN THE UNITED STATES DISTRICT COURT

2          IN AND FOR THE DISTRICT OF DELAWARE

3

4                    -   -   -

5    ENERGY TRANSPORTATION,              :   Civil Action
     INC.,                              :
6                                        :
                 Plaintiff,             :
7                                        :
           v.                           :
8                                        :
     WILLIAM DEMANT HOLDINGS A/S,        :
9    et al.,                             :
                                         :
10               Defendants.             :   No. 05-422 (GMS)

11                    -   -   -

12                 Wilmington, Delaware
             Wednesday, January 30, 2008
13                 8:30 a.m.
             Eighth Day of Trial
14
                      -   -   -
15

16   BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge,
                                and a Jury
17

18
     APPEARANCES:
19
                   EDMOND D. JOHNSON, ESQ.
20                 Pepper Hamilton LLP
                         -and-
21                 MARTY STEINBERG, ESQ.,
                   BRIAN M. BUROKER, ESQ., and
22                 MAYA M. ECKSTEIN, ESQ.
                   Hunton & Williams
23                 (Washington, D.C.)

24                              Counsel for Plaintiff

25

```
 1    APPEARANCES CONTINUED:

 2                 MARY B. GRAHAM, ESQ.
                   Morris, Nichols, Arsht & Tunnell
 3                      -and-
                   JOHN M. ROMARY, ESQ.,
 4                 GREGORY C. GRAMENOPOULOS, ESQ.,
                   VINCENT KOVALICK, ESQ.,
 5                 KAY HILL, ESQ.,
                   GERSON S. PANITCH, ESQ., and
 6                 ARTHUR A. SMITH, ESQ.
                   Finnegan, Henderson, Ford, Farabow & Dunner
 7                 (Washington, D.C.)

 8                                      Counsel for
                                        Demant Defendants
 9
                   DONALD E. REID, ESQ.
10                 Morris, Nichols, Arsht & Tunnell
                        -and-
11                 WILLIAM H. MANDIR, ESQ.,
                   JOHN SCHERLING, ESQ.,
12                 CARL J. PELLEGRINI, ESQ.,
                   BRIAN SHELTON, ESQ.,
13                 MATTHEW KAPLAN, ESQ., and
                   J. WARREN LYTLE, JR., ESQ.
14                 Sughrue Mion
                   (Washington, D.C.)
15
                                        Counsel for Widex
16                                      Defendants

17                        -   -   -

18

19

20

21

22

23

24

25
```

Anderson - direct

1    and transmission path and this is called the receiver.  It's

2    what produces the sound, like a telephone receiver.  There

3    is an LMS adaptive filter that takes signals from the output

4    and subtracts some filtered version of that from the input.

5            Now, you will notice that this is different from

6    the claim or, I'm sorry, the patent specifications in

7    several significant ways.

8            First, this is always connected.  This path here

9    is not disconnected.  And there is no test signal inserted.

10           Second, there is no determination of phase and

11   amplitude.  Where the patent describes determination of

12   phase and amplitude and insertion of programmable filter,

13   instead, the accused products don't make that determination.

14   And there is no way to provide it with any coefficients that

15   you might have come up with.

16           You see the X there?  That is where it used to

17   be on the previous chart.  There is no way to provide this

18   hearing aid with coefficients.  There is no way to program

19   the feedback in the hearing aid.  There is, the LMS filter

20   itself is not programmed for a response.  Rather, it's left

21   to run free.  It generates its own coefficients

22   continuously.

23   Q.    Now, could we for a moment, can we put up the two

24   side by side?  Is that possible?  No. 1 and No. 2.  Thank

25   you.

Anderson - direct

1    There, are the accused Demant products a

2    miniaturization of the Levitt system?

3    A.    That is one of the first things I looked for because

4    ETG has suggested that that is the case.  And in my opinion,

5    it's not for several reasons.  One, there is no test signal

6    used.  Two, there is no determination of the amplitude and

7    phase of the feedback as required by the host controller,

8    patent and the hearing aid patent.  And, three, as I

9    mentioned before, this feedback filter isn't a programmed

10   filter.  It's not giving values that will have a response

11   where it changes so quickly.  No signal ever passes through

12   that filter with a single response.  Rather, it's changed

13   every cycle.

14   Q.    Okay.  Now, doctor, let's look at the actual language

15   of the claims, if we may.  Could we go to Demonstrative 5,

16   which I believe is the checklist used by ETG.

17        Okay.  Do you recognize this?

18   A.    Yes.  This is the chart Mr. Brown used in his

19   analysis of the Bernafon and Oticon products relevant to

20   Claims 14 and 16.  It looks like 16 is cut off a bit, but,

21   yes.

22   Q.    What do you understand the issue of infringement is?

23   Do you have to have all the checks or is it okay to just

24   have a lot of them?

25   A.    Right.  For infringement, it's important, every

Anderson - cross

1    hearing aid, couldn't it work that way?

2    A.      Yes, I suppose it could.

3    Q.      And you had some discussion about the size of the

4    power source on the host controller?

5    A.      Yes.

6    Q.      And your specialty is in miniaturizing things with

7    small power; is that correct?

8    A.      Correct.

9    Q.      So with today's technology, would it then be easy to

10   take all the functionality of Dr. Levitt's host controller,

11   put that on the same chip as the hearing aid and have a

12   single power source?

13   A.      For the most part, I believe so.

14   Q.      You talked about the Oticon and Bernafon marketing

15   documents briefly?

16   A.      I mentioned that I looked at them, as Mr. Brown had

17   referenced them in his report.

18   Q.      Have you seen any of them that were inaccurate or

19   misleading?

20   A.      I saw that none of them described any of the

21   inventions at a sufficiently technical level to ascertain

22   whether or not the accused products infringe.

23   Q.      My question was whether or not you saw any of them

24   that were inaccurate or misleading?

25   A.      I didn't see anything misleading.

Anderson - cross

1    Q.    But to do that analysis, what did you compare between

2    the structure identified by the Court in the accused

3    product?  What was your comparison?

4    A.    Sir, I've answered this question before.  I'll answer

5    it again.  I looked, as ETG, Mr. Brown suggested, in the

6    LMS filter, in the update algorithm.  In fact, I looked

7    everywhere around.  I looked for pieces of it.  It's hard to

8    enumerate everything I looked at, but I looked at everything

9    that is in the hearing aid that could remotely qualify as

10   performing that, being that structure.  I could not find it.

11   Q.    And going back to the memory.  You agree there is a

12   memory in this, the Oticon's accused device; right?

13   A.    Yes.

14   Q.    And the presence of a memory to you does not indicate

15   that that filter is programmable; correct?

16   A.    That is correct.

17   Q.    And that is a disagreement you have with Dr. Gloster

18   on his testimony; is that correct?

19   A.    Dr. Gloster said the presence of a memory indicates

20   the filter is programmable.  And I take issue with that on

21   two points:

22         The first point is that if that is all that is

23   required for a programmable filter, then any filter is

24   programmable.

25         The second would be that that memory is not

Anderson - cross

1   accessible.  I checked very carefully.  And so if, for

2   example, that memory were accessible, if you could provide

3   it with values, if you could give it a response, yes, that

4   would describe a programmable filter but we don't have that.

5   We can't get at it, and even if you could, it would change

6   immediately.  So the memory in this case is doing something

7   different than making that filter a programmable filter.

8   Q.    Well, you say you can't get at it but the LMS puts

9   coefficients in that buffer; correct?

10  A.    Yes.

11  Q.    So the LMS can get at it?

12  A.    The LMS is part of the filter itself.

13  Q.    I understand your position.

14           MR. BUROKER:  No further questions.

15           THE COURT:  Redirect.

16           MR. ROMARY:  No questions, Your Honor.

17           THE COURT:  Thank you, doctor.  You are excused.

18           THE WITNESS:  Thank you.

19           MR. LYTLE:  Good morning, Your Honor.

20           THE COURT:  Good morning, counsel.

21           MR. LYTLE:  My name is Jay Lytle, counsel for

22  defendant Widex.

23           THE COURT:  All right.

24           MR. LYTLE:  And defendants call at this time

25  Dr. Sigfrid Soli.

Soli - direct

A.      The House Ear Institute is a private, nonprofit
research institute, whose mission is directed to education
and research that improves the need -- to meet the needs of
people with hearing impairment and deafness.  I don't want
to be immodest, but I think that institute is viewed as
perhaps the leading research institute in that field
throughout the world.

Q.      Now, why is it called House Ear Institute?

A.      Well, it has nothing to do with houses.  The founder
of the institute was a man named Dr. Howard House.  He was a
surgeon who HEI some of the earlier ear surgeries before the
cochlear implant.  He founded it back in the 1940s.

Q.      What is your title -- does the House Ear Institute go
by HEI?

A.      Yes, you can call it HEI.

Q.      What is your title at HEI?

A.      I actually have two titles.  I am the head of what is
now called the Department of Human Communications Sciences
and Devices.  That's quite a mouthful.  And I am also vice
president for the institute with responsibility for the
intellectual property of our institute.

Q.      Do you direct or train any engineers on your staff?

A.      Yes.  I direct the activities, over the years I have
directed the activities of software engineers, electrical
engineers.  I have had graduate student engineers working in

Soli - direct

1    with a method of measuring the transfer function of the

2    feedback path.

3            MR. LYTLE:  Your Honor, at this time the

4    defendants would like to offer Dr. Soli as an expert in the

5    field of hearing aids and feedback cancellation in hearing

6    aids.

7            MR. STEINBERG:  We have the same objection we

8    offered previous to the trial, Your Honor.

9            THE COURT:  Remind me of it.  I don't remember

10   what it was.

11           (The following took place at sidebar.)

12           THE COURT:  What was the objection, Mr.

13   Steinberg?

14           MR. STEINBERG:  We filed a motion to strike him

15   as an expert because he is essentially a psychologist.  All

16   the people that he used as an engineer to do --

17           THE COURT:  You will cross him on that.  Thank

18   you.  Overruled.

19           (End of sidebar conference.)

20           THE COURT:  Same ruling.  The objection is

21   overruled.  The Court will receive the Doctor as an expert.

22   BY MR. LYTLE:

23   Q.    Dr. Soli, you said you were asked to give an opinion

24   about whether or not the claims in the '850 and '749 patents

25   that ETG asserts the defendants infringe are valid by

Soli - direct

1    with a method of measuring the transfer function of the

2    feedback path.

3             MR. LYTLE:  Your Honor, at this time the

4    defendants would like to offer Dr. Soli as an expert in the

5    field of hearing aids and feedback cancellation in hearing

6    aids.

7             MR. STEINBERG:  We have the same objection we

8    offered previous to the trial, Your Honor.

9             THE COURT:  Remind me of it.  I don't remember

10   what it was.

11            (The following took place at sidebar.)

12            THE COURT:  What was the objection, Mr.

13   Steinberg?

14            MR. STEINBERG:  We filed a motion to strike him

15   as an expert because he is essentially a psychologist.  All

16   the people that he used as an engineer to do --

17            THE COURT:  You will cross him on that.  Thank

18   you.  Overruled.

19            (End of sidebar conference.)

20            THE COURT:  Same ruling.  The objection is

21   overruled.  The Court will receive the Doctor as an expert.

22   BY MR. LYTLE:

23   Q.    Dr. Soli, you said you were asked to give an opinion

24   about whether or not the claims in the '850 and '749 patents

25   that ETG asserts the defendants infringe are valid by

1    filtering in a context different than acoustic feedback.  So

2    if you look at that July 24th e-mail, which we went through

3    with Dr. Morley and I think others, you know, we say

4    everyone that he says there is adaptive filtering but not

5    acoustic feedback.  So what we surmise is when they had

6    this later really looking into it, he realized oh, well, all

7    these different citations I gave you about adaptive, they

8    are adaptive but not for acoustic feedback, and then they

9    realized that and they gave the report and the report

10   specifically talks about no adaptive feature for acoustic

11   feedback.

12             MR. STEINBERG:  Your Honor, the declaration

13   doesn't talk about the other functions of this hearing aid

14   like noise and so forth.

15             THE COURT:  Well, you just uncovered that in a

16   declaration.  What is it that you would want to argue to the

17   jury?

18             MR. MANDIR:  Your Honor, I want to be able to

19   read the document to them, point to paragraphs.  I won't say

20   anything that attributes it to Dr. Dowling.  They can read

21   it themselves.  I'll just read it.  And they can decide.  I

22   won't say one word about it.

23             THE COURT:  I think that is the way to handle

24   this.  Let the decider of fact decide the facts.  Why are

25   you trying to run away from this?  I think I know why you

1    are trying to run away from this, but ...

2            MR. STEINBERG:  Your Honor, they're going to

3    imply that Dr. Dowling did change his mind.

4            MR. MANDIR:  No.

5            THE COURT:  No, no.

6            MR. MANDIR:  I can't show what I'm going to say.

7            THE COURT:  Yes, I'm not going to make you do

8    that.  But, no, I think we've now had a good discussion and

9    counsel understand the parameters of the conversation that I

10   will permit on this subject with the jury.  I don't think

11   we're going to have a problem.  If we have a problem,

12   Mr. Steinberg, in real-time, you pop up and let's go to

13   sidebar.

14           MR. STEINBERG:  Fine, Your Honor.

15           THE COURT:  All right?

16           So we've covered jury instructions.

17           Verdict form.  Verdict form.  Counsel, a

18   couple of things.  I haven't really examined this carefully

19   but I think that we need to break out DOE and equivalent

20   infringement and literal infringement for this jury for

21   looking-down-the-road purposes with regard to my POE

22   decision, the history estoppel, prosecution history

23   estoppel.  And I think you should break this out by accused

24   product.  At some point, there may be an injunction that

25   may be at issue.

1    IN THE UNITED STATES DISTRICT COURT

2    IN AND FOR THE DISTRICT OF DELAWARE

3
                    -   -   -
4

5    ENERGY TRANSPORTATION,          :   Civil Action
     INC.,                           :
6                                    :
                 Plaintiff,          :
7                                    :
          v.                         :
8                                    :
     WILLIAM DEMANT HOLDINGS A/S,    :
9    et al.,                         :
                                     :
10               Defendants.         :   No. 05-422 (GMS)

11                    -   -   -

12                  Wilmington, Delaware
                 Friday, January 31, 2008
13                     9:30 a.m.
                  Ninth Day of Trial
14
                    -   -   -
15

     BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge
16

17

18   APPEARANCES:

19             EDMOND D. JOHNSON, ESQ.
               Pepper Hamilton LLP
20                  -and-
               MARTY STEINBERG, ESQ.,
21             BRIAN M. BUROKER, ESQ., and
               MAYA M. ECKSTEIN, ESQ.
22             Hunton & Williams
               (Washington, D.C.)
23
                              Counsel for Plaintiff
24

25

1803

```
 1    APPEARANCES CONTINUED:

 2                  MARY B. GRAHAM, ESQ.
                    Morris, Nichols, Arsht & Tunnell
 3                       -and-
                    JOHN M. ROMARY, ESQ.,
 4                  GREGORY C. GRAMENOPOULOS, ESQ.,
                    VINCENT KOVALICK, ESQ.,
 5                  KAY HILL, ESQ.,
                    GERSON S. PANITCH, ESQ., and
 6                  ARTHUR A. SMITH, ESQ.
                    Finnegan, Henderson, Ford, Farabow & Dunner
 7                   (Washington, D.C.)

 8                                      Counsel for
                                        Demant Defendants
 9
                    DONALD E. REID, ESQ.
10                  Morris, Nichols, Arsht & Tunnell
                         -and-
11                  WILLIAM H. MANDIR, ESQ.,
                    JOHN SCHERLING, ESQ.,
12                  CARL J. PELLEGRINI, ESQ.,
                    BRIAN SHELTON, ESQ.,
13                  MATTHEW KAPLAN, ESQ., and
                    J. WARREN LYTLE, JR., ESQ.
14                  Sughrue Mion
                    (Washington, D.C.)
15
                                        Counsel for Widex
16                                      Defendants

17                          -   -   -

18

19

20

21

22

23

24

25
```

Kates - dep.

1    "Question:  So that basically eliminated the

2    entire group other than you and --

3    "Answer:  And Tom Worrall.

4    "Question:  -- the other individual?  When you

5    gave this talk, was Dr. Levitt there?

6    "Answer:  The session was in his honor, and he

7    was there.

8    "Question:  Okay.  Had you spoken to him much

9    since you left CUNY?

10    "Answer:  I don't specifically remember any

11    discussions other than saying hello and chatting at

12    conferences where we would find ourselves both in residence.

13    "Question:  Did you write the abstract that's on

14    Page 2 of Exhibit 19?

15    "Answer:  Yes, I did.

16    "Question:  Is what you wrote in the abstract

17    true?

18    "Answer:  Let me re-read the abstract, please.

19    "Yes, I believe this to still be true.

20    "Question:  Okay.  Was -- do you consider Dr.

21    Levitt's work in the feedback cancellation area to have been

22    important to the work that you did?

23    "Answer:  No, I do not.

24    "Question:  Why not?

25    "Answer:  As I've mentioned before, Harry

Kates - dep.

1   designed a fixed filter.  I did not, and still do not, feel

2   that that is an adequate solution to the problem of feedback

3   in hearing aids.  Work that dealt with adaptive filters I

4   felt then, and still feel, is much more appropriate.

5               "Question:  Did his work inspire you to create

6   or to work on the adaptive filters as opposed to the fixed

7   filter system that he had come up with?

8               "Answer:  You're asking me -- well, let -- give

9   me a second here.

10              "I do not remember the genesis of my work on

11  feedback cancellation in Harry's group.  Where that germ

12  came from, whether mine or Harry's, I don't remember.

13              "Question:  Could it have been your reading of

14  the '850 patent?

15              "Answer:  It was more likely my reading of Dave

16  Egolf's publications combined with the work that I had done

17  when I was at Signatron in adaptive noise cancellation.

18              "Question:  In a non-hearing aid context?

19              "Answer:  In a non-hearing aid context, correct.

20              "Question:  But you didn't start working on

21  feedback cancellation -- cancellation systems until you got

22  to CUNY.  Is that correct?

23              "Answer:  I had been modeling feedback behavior

24  prior to that.

25              "Question:  Right.

Matzen - direct

1   Q.          During the identification mode, is there even a

2   transmission channel?

3   A.          No, there is not.

4   Q.          So let's go back to Matzen 8 again.  The third

5   bullet says function as a noise generator.  That is what we

6   talked about earlier.

7   A.          Yes, uh-huh.

8   Q.          It says the Graupe '''818 does not show

9   determining  the effect on amplitude and phase on a signal

10  in the transmission channel.  Could you explain your reason

11  for that?

12  A.          Certainly.  During the identification mode,

13  there is no transmission channel so there is no way to

14  determine anything about the transmission channel.

15  Q.          So in your opinion then, can Graupe '''818

16  satisfy this claim limitation from Claims 13, 14 and 16?

17  A.          No.  Because there is so much error, because of

18  that, the system, not knowing what is happening through the

19  transmission channel when it's in the correction mode, it

20  would not be able to really effect substantial reduction of

21  acoustic feedback.

22  Q.          Does the Graupe '''818 patent discuss phase and

23  amplitude?

24  A.          No, it does not.

25  Q.          Does it discuss determining the effect on phase

Matzen - direct

1    and amplitude of a signal in the transmission channel?

2    A.            No, it does not.

3    Q.            The next bullet on your slide does not show

4    filter programmed to effect substantial reduction of

5    acoustic feedback (Claim 19).  Could you explain what this

6    means?

7    A.            I just did, I thought.

8    Q.            Okay.  And remind me.

9    A.            The filter, which is the corrections circuit, is

10   programmed by coefficients that are transferred from

11   the identity circuit but because those coefficients are

12   determined with the amplifier and out and the whole

13   transmission channel not there, the coefficients do not

14   include the effect of the signal through the transmission

15   channel so the reduction that it does accord is not

16   substantial.

17   Q.            Does the Graupe '''818 patent have any

18   indication of the amount of feedback that it claims to

19   reduce?

20   A.            There is no information in the patent

21   whatsoever.

22   Q.            Is there any way to determine how that circuit,

23   how much feedback that circuit might produce?

24   A.            No, there is no circuit details or hardware

25   details.  In fact, I believe in Dr. Graupe's deposition he

Matzen - cross

1    Q.          It is.

2    A.          Yes.

3    Q.          And the lines that connect box H, is that a

4    feedback path?

5    A.          No, it is not.

6    Q.          Why not?

7    A.          Because it doesn't originate at the output of

8    the transmission channel.

9    Q.          What is your understanding of what box H is

10   representing?

11   A.          Box H represents the total acoustic feedback.

12   Q.          That is the acoustic feedback; right?

13   A.          Like I say, it's a symbolic thing that includes

14   a lot of things.

15   Q.          But that shows the actual sound coming back

16   around?

17   A.          It's the symbolic realization of it, yes.

18   Q.          So by your definition, that wouldn't be a

19   feedback path, would it?

20   A.          The Court's definition states for there to be

21   feedback in this document, it must go from the output to the

22   input.  And the output of the hearing aid is that point

23   where the speaker is driven.  And that is what is box G.

24   Q.          So is it's your understanding that, based on

25   your understanding of the Court's definition of the feedback

Matzen - cross

1    path, box H would not be a feedback path?

2    A.        Box H is a symbolic realization of the feedback.

3    It contains a number of items.

4    Q.        But my question was based on your understanding

5    of the Court's definition of a feedback path, you're saying

6    that H is not in a feedback path?

7    A.        That's right, according to this drawing.  Again,

8    this is symbolic.  This is not the way the circuit is

9    actually built within hardware.

10   Q.        Now, you're familiar with Leland Best's thesis?

11   A.        Yes, I am.

12   Q.        And you're aware that at the end of his thesis,

13   he put the software code that he wrote?

14   A.        Yes, he did.

15   Q.        And that is the software code that implements

16   the LMS feedback canceler?

17   A.        Yes.

18   Q.        Okay.  Did you review that code?

19   A.        I did not.

20   Q.        Why didn't you?

21   A.        I don't understand the code language.

22   Q.        You can't read the code?

23   A.        I cannot.

24   Q.        Are you familiar with Dr. Gloster in this case,

25   one of ETG's experts?

Matzen - redirect

1    A.          My analysis.

2    Q.          Does the Graupe '818 have a programmable filter

3    that affects substantial reduction of acoustic feedback?

4    A.          In my opinion, not really.

5    Q.          Why not?

6    A.          Because due to the fact that the forward channel

7    is not considered when the coefficients are determined, the

8    coefficients do not include any errors in the transmission

9    channel.  And being that there is no errors corrected for

10   the reduction of the feedback would not be as good as it

11   would if they were considered.  So it isn't substantial.  It

12   does do some reduction, but it is not substantial reduction.

13   Q.          So what is your opinion as to whether Graupe

14   '818 anticipates Claim 19?

15   A.          In my opinion, it does not.

16   Q.          In the Weaver circuit, the Weaver thesis

17   circuit, the GH-hat, that was the echo estimator?

18   A.          Yes.

19   Q.          Was that in the feedback path?

20   A.          No, it was not.

21   Q.          Why not?

22   A.          Again, it's because it was inside of the total

23   circuitry of the Weaver estimator, and that resided in a

24   location between the microphone and the amplifier and was

25   not connected to the output of the transmission channel,

1    acoustic feedback, the coefficients are fixed?  Yes or no.

2                    MS. ECKSTEIN:  Objection, Your Honor.  That has

3    been asked and answered.

4                    THE COURT:  Overruled.  Go ahead.

5                    THE WITNESS:  Okay.

6    BY MR. ROMARY:

7    Q.          Can I have a yes or no?

8    A.          If they relate -- yes or no?

9    Q.          Yes or no.

10   A.          No, nothing specifically for feedback alone, but

11   feedback correlates to the real environment, so you can't

12   say totally no.

13   Q.          There is nothing in this hearing aid that

14   detects acoustic feedback change, is there?

15   A.          No, there is no detection of acoustic feedback

16   in the specification -- in the example in the specification.

17   You are correct.

18   Q.          Thank you.

19                    MR. ROMARY:  Can I move a little bit so I don't

20   jab somebody with this?

21                    THE COURT:  Yes, you can.

22   BY MR. ROMARY:

23   Q.          Now, I drew this little diagram down here;

24   correct?

25   A.          Yes, you did.

```
 1                IN THE UNITED STATES DISTRICT COURT

 2               IN AND FOR THE DISTRICT OF DELAWARE

 3                          -   -   -

 4

 5    ENERGY TRANSPORTATION,          :   Civil Action
      INC.,                           :
 6                                    :
                   Plaintiff,         :
 7                                    :
           v.                         :
 8                                    :
      WILLIAM DEMANT HOLDINGS A/S,    :
 9    et al.,                         :
                                      :
10                 Defendants.        :   No. 05-422 (GMS)

11                          -   -   -

12                     Wilmington, Delaware
                      Friday, February 1, 2008
13                          8:30 a.m.
                        Tenth day of Trial
14
                            -   -   -
15

      BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge,
16                                      and a Jury

17


18

      APPEARANCES:
19
                      EDMOND D. JOHNSON, ESQ., and
20                    MATTHEW KAPLAN, ESQ.
                      Pepper Hamilton LLP
21                         -and-
                      MARTY STEINBERG, ESQ.,
22                    BRIAN M. BUROKER, ESQ., and
                      MAYA M. ECKSTEIN, ESQ.
23                    Hunton & Williams
                      (Washington, D.C.)
24
                                   Counsel for Plaintiff
25
```

2030

```
 1    APPEARANCES CONTINUED:

 2              MARY B. GRAHAM, ESQ.
              Morris, Nichols, Arsht & Tunnell
 3                  -and-
              JOHN M. ROMARY, ESQ.,
 4            GREGORY C. GRAMENOPOULOS, ESQ.,
              VINCENT KOVALICK, ESQ.,
 5            KAY HILL, ESQ.,
              GERSON S. PANITCH, ESQ., and
 6            ARTHUR A. SMITH, ESQ.
              Finnegan, Henderson, Ford, Farabow & Dunner
 7            (Washington, D.C.)

 8                                    Counsel for
                                     Demant Defendants
 9
              DONALD E. REID, ESQ.
10            Morris, Nichols, Arsht & Tunnell
                  -and-
11            WILLIAM H. MANDIR, ESQ.,
              JOHN SCHERLING, ESQ.,
12            CARL J. PELLEGRINI, ESQ.,
              BRIAN SHELTON, ESQ., and
13            J. WARREN LYTLE, JR., ESQ.
              Sughrue Mion
14            (Washington, D.C.)

15                                    Counsel for Widex
                                     Defendants
16
                           -   -   -
17

18

19

20

21

22

23

24

25
```

1              No more books.  No more weightlifting back to

2       the jury room.  We are actually in the home stretch.

3              Let me say something that is obvious.  And, of

4       course, everyone always overlooks the obvious.

5              Dr. Levitt and ETG have patents.  The United

6       States Patent Office looked at this technology.  The experts

7       at the Patent Office granted those patents.  And they are

8       officially secured by Dr. Levitt and ETG.

9              You know, it's almost hard to remember the start

10      of this trial now.  But at the beginning I know you remember

11      the trial lawyers told you things that they believed the

12      evidence would show.  I know, from our standpoint, we told

13      you that Dr. Levitt invented technology that determined the

14      phase and amplitude of feedback signals, created an equal

15      but opposite signal, which we are showing to you, subtracted

16      those two mirror-image signals and canceled feedback.

17             Counsel for the defendants then told you, as to

18      that very technology, we use it.  I don't know if you

19      remember when defendants' counsel told you, and we have the

20      statements.

21             "Let me tell you something else that may

22      surprise you.  I will say the evidence will show that the

23      idea of having an equal and opposite signal to cancel

24      feedback is a great idea.  Did you hear me?  It's a great

25      idea.  And we use it."

1           After telling you that, the defendants then

2    spent most of this trial trying to convince you they don't

3    use it.  But after admitting that they do use it, they then

4    put on employee after employee after employee to try and

5    tell you the statements we wrote in our own documents are

6    false, they really don't mean what they say.

7           But, of course, the evidence was overwhelming.

8    They do use Dr. Levitt's technology.  And you will see that,

9    when the defendants' counsel then went on to say something

10   very interesting.  If some of our witnesses are going to get

11   up here and somehow be seen to say that we don't -- meaning

12   we don't use it -- they're just not right, it's just not

13   right.

14          Why in the world would they say if our witnesses

15   say we didn't use it they are wrong?

16          Well, we quickly saw why they said that.  These

17   friendly competitors tried to cover up their patent

18   infringement and failed miserably.

19          One thing my dad always told me is, when you

20   have something complicated and you want to think through how

21   to make a decision, life usually goes logically, if you use

22   your common sense, you will come to the right conclusion.

23   No matter what the complexities are, no matter how many

24   scientists testify, just use your logic.

25          For instance, if you had a dispute with your

1    in reading computer code.  Do you remember Dr. Clay Gloster?

2    You heard Dr. Clay Gloster trace through what would be to

3    anyone else undecipherable computer code and demonstrate to

4    you conclusively that the code written by their engineers,

5    the defendants' engineers is identical to their written

6    description of their products and how their technology

7    worked.  And his analysis is unrefuted because there can't

8    be any dispute.  Dr. Gloster told you these defendants

9    describe exactly what their products do.  And folks, as

10   Mr. Christensen admitted, if their documents are correct and

11   accurate, they infringe Dr. Levitt's patents.

12            Now, even their own experts reluctantly admitted

13   that the technical documents were accurate and Dr. Gloster

14   was right.  Although they were very polished, they were very

15   well rehearsed.  On cross-examination, they admit exactly

16   what Dr. Gloster testified to because they knew they

17   couldn't refute the root of their own client's technology,

18   the computer code that was prepared by these defendants'

19   engineers.

20            You know, you have CSI Miami and CSI New York

21   and CSI Las Vegas and now we have CSI Delaware where we had

22   to have our expert come in and look at the root of their

23   code to tell us the technical documents really mean what

24   they say.  So it comes fully back to the statement in

25   opening.  If some of our witnesses are going to come up here

1    and say they don't do it, it's just not right.

2         Well, why would they say that?  Well, outside of

3    the hearing aid industry, outside of this partnership, they

4    have HIMPP, outside of their cozy relationship, their rules,

5    their rules imposed by regulators.  We've already seen what

6    the German authorities have found.  Then there are the nasty

7    little details like the Food and Drug Administration that

8    requires you to actually be honest when you tell people

9    about hearing aids.  And then there are the patents that

10   they got for their improvements in Dr. Levitt's technology

11   which all swear to the United States Patent Department that

12   they have feedback canceling mechanism.  So a trial here in

13   a courtroom before you, they can't continue to take the

14   position that their own documents are false.  It's too

15   dangerous.  So they have admitted what we suspected all

16   along.  They infringed Dr. Levitt' patents and then they

17   engaged in a coordinated coverup, and that coordinated

18   coverup failed because it was exposed to light here in this

19   courtroom and it's in your hands to rectify that willful

20   conduct.

21        Now, let's talk about the defenses that have

22   been offered to you.

23        First they say that Dr. Levitt's invention

24   wasn't adaptive, it's fixed.  Now, even if that's true and

25   they improved on what Dr. Levitt did, that doesn't matter.

1    these people at Sound ID, and trying to get them, see what

2    their read is on this patent.  And they come back.  And what

3    they say here is -- why don't we just go back down a little

4    bit more, that first one -- they said, they noted that this

5    model is not used in their hearing aids, all of which have a

6    probe running continually in the background, a process

7    called continuous adaptation.

8              The next one says, Sound ID noted that neither

9    they nor ReSound used such a process and since such a

10   process was material to the art disclosed in the patent and

11   since this process was applied in the claims, they felt they

12   were not offering services covered under the patent.

13             Next paragraph, this is the conclusion.  Eric

14   Dowling, the EKMS expert, took a look at the patent while

15   EKMS arranged a second call with Harry Levitt --

16             MR. STEINBERG:  Your Honor, I hate to interrupt.

17   But I think we need to approach the Bench for this.

18             (The following took place at sidebar.)

19             THE COURT:  Yes, Mr. Steinberg.

20             MR. STEINBERG:  Again, he is implying that Eric

21   Dowling changed his opinion, and the next sentence says it's

22   adverse to what the declaration that we have says.

23             MR. MANDIR:  He can read the document, can't he?

24             MR. STEINBERG:  What he is doing is exactly what

25   the declaration says.

1   you have exactly figured out how to do this and stay within

2   the spirit of what I have directed be done.  I am not

3   accusing you of doing anything intentional.  I am just

4   concerned that damage may be done that may be irreversible.

5           MR. MANDIR:  To tell you the truth, I have been

6   very mindful of this.  Look, EKMS came up with that

7   decision, that report.  It doesn't mean Eric Dowling came up

8   with that position.  But there is no doubt EKMS, and I have

9   never said --

10          THE COURT:  Essentially, what I would like to do

11  is have that acknowledged, there needs to be -- and it is a

12  tough line to not cross, I understand.

13          MR. ROMARY:  Can we say something like we are

14  not saying that Eric Dowling changed his mind?

15          THE COURT:  That is fine.

16          MR. MANDIR:  I will say that.

17          THE COURT:  I think that would -- I think that

18  would satisfy my concern.

19          MR. STEINBERG:  But no more tie-in after that.

20          MR. MANDIR:  I am just going to read the

21  document.

22          THE COURT:  If you would say that, that's fine.

23          (End of sidebar conference.)

24          MR. MANDIR:  Okay.  Can we put the document back

25  up, please?

1          Okay.  So we were reading Eric Dowling, the EKMS

2    expert, took a look at the patent while EKMS arranged a

3    second call with Harry Levitt for early August.  Over the

4    course of two calls, we worked through the language of the

5    patent and found that the body of the patent included

6    language adverse to an interpretation of the claims

7    involving a continuously adaptive approach.

8          Now, I don't know exactly how that came about.

9    I don't know how it came about.  All I know is this EKMS

10   document says it and this was given to Audimax.  They're

11   saying that they looked at it and EKMS is coming to the

12   conclusion that they interpret the claims -- EKMS interprets

13   these claims to be something adverse to interpretation that

14   would involve a continuously adaptive approach.

15         Okay.  Can we go to the next page?  Up at the

16   top, "the main child."

17         The main child patent of the '850 patent --

18   which is the '749 as you may have heard it.  I think you

19   have heard it is a continuation application -- seems to

20   suffer from the same problem, specifying in the description

21   of the preferred embodiment that test sounds shall be

22   provided as necessary rather than all of the time as would

23   occur with a continuously adaptive system.  Okay?

24         We've heard a lot of testimony here about what

25   can be hooked up and is it going all the time or do you

1    Mr. Steinberg's arguments, that you understand the

2    difference between his arguments and what he can actually

3    prove with evidence.

4                    Thank you, ladies and gentlemen.

5                    THE COURT:  Counsel.

6                    MR. STEINBERG:  Your Honor, may we approach for

7    one second?

8                    (The following took place at sidebar.)

9                    MR. STEINBERG:  I apologize, Judge.  But Mr.

10   Mandir, under what you told Mr. Mandir to do, was supposed

11   to tell the jury that there was no evidence that Eric

12   Dowling --

13                   THE COURT:  You tell them and you tell them the

14   other side doesn't disagree with you, because he didn't.

15   And I observed it.

16                   You didn't say anything about it.

17                   MR. MANDIR:  I know, you are right.  When I said

18   EKMS --

19                   MR. STEINBERG:  For the record, we would move

20   for the introduction of Eric Dowling's declaration, because

21   we think we have been unfairly prejudiced.

22                   THE COURT:  I will agree.

23                   (End of sidebar conference.)

24                   MR. STEINBERG:  Thank you, Your Honor.

25                   Ladies and gentlemen, I will be brief.  I know

ATTACHMENT B

IN THE UNITED STATES DISTRICT COURT

IN AND FOR THE DISTRICT OF DELAWARE

- - -

ENERGY TRANSPORTATION GROUP    :  Civil Action
INC.,                          :
                Plaintiff,     :
         v.                    :
SONIC INNOVATIONS, INC.,       :
et al.,                        :
                Defendants.    :   No. 05-422 (GMS)

- - -

Wilmington, Delaware
Wednesday, November 1, 2007
3:30 p.m.
Telephone Conference

- - -

BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge

APPEARANCES:

        EDMOND D. JOHNSON, ESQ., and
        MATTHEW A. KAPLAN, ESQ.
        Pepper Hamilton LLP
             -and-
        BRIAN M. BUROKER, ESQ., and
        MAYA M. ECKSTEIN, ESQ.
        Hunton & Williams
        (Washington, D.C.)

                        Counsel for Plaintiff

---

**APPEARANCES CONTINUED:**

MARY B. GRAHAM, ESQ.
Morris, Nichols, Arsht & Tunnell
    -and-
GREGORY C. GRAMENOPOULOS, ESQ.,
JOHN M. ROMARY, ESQ., and
GERSON S. PANITCH, ESQ.
Finnegan Henderson Farabow Garrett & Dunner
(Washington, D.C.)

            Counsel for Demant
            Defendants

THOMAS C. GRIMM, ESQ.
Morris, Nichols, Arsht & Tunnell
    -and-
DAVID H. BLUESTONE, ESQ.
Brinks Hofer Gilson & Leone
(Chicago, Illinois)

            Counsel for Phonak

MARY MATTERER, ESQ.
Morris James Hitchens & Williams

            Counsel for Starkey Labs

        - - -

---

THE COURT: Good afternoon. Counsel, who is on the line for plaintiff ETG today?

MR. JOHNSON: Your Honor, Ted Johnson from Pepper Hamilton for plaintiff. I have with me from my office Matt Kaplan, and I have Maya Eckstein and Brian Buroker from Hunton & Williams.

THE COURT: Good afternoon. And for the defendant?

MS. GRAHAM: Your Honor, this is Mary Graham for the Demant defendants. With me is John Romary, Greg Gramenopoulos and Gerson Panitch from the Finnegan Henderson firm. And there are other defendants on. I will let them introduce themselves.

THE COURT: Okay.

MR. GRIMM: Your Honor, Tom Grimm at Morris Nichols for Phonak. On the line with me is David Bluestone from the Brinks Hofer firm in Chicago.

THE COURT: All right. Good afternoon.

MS. MATTERER: Good afternoon, Your Honor. This is Mary Matterer for Starkey, Your Honor. I believe we have on the line Steven Reitenour from the Bowman & Brooke firm as well.

THE COURT: Okay. Is that correct? Mr. Reitenour?

        I don't think so.

---

MS. MATTERER: Well, I am here.

THE COURT: That is good enough for me.

        All right. Anyone else?

        Counsel, thanks.

        Thanks for convening on relatively short notice.

        I wanted to follow up on the letter submissions. And I guess it was, is it Mr. Romary, are you going to be speaking to your position today?

        I am sorry, go ahead.

MS. GRAHAM: Your Honor, this is Mary Graham. On the two issues that we put in our letters, I will be addressing the Court on those two issues.

THE COURT: Great. Didn't mean to slight you, Ms. Graham.

MS. GRAHAM: Not at all. I am just trying to help sort through the morass of people that you are confronted with.

THE COURT: That's great. Why don't you get started.

MS. GRAHAM: I will do that.

        The first issue is with respect to whether ETG has waived privilege by relying on certain communications, and in particular those communications are communications between Dr. Levitt, one of the inventors, and the counsel who prosecuted the patent application. And they don't

17

1    Ms. Graham, go ahead.

2    MS. GRAHAM: Okay. With respect to who had

3    knowledge of this, Mr. Chen testified that he was certainly

4    involved in the decision to retain EKMS. So regardless of

5    who else was involved, he was certainly involved as the

6    owner of the company. And second of all, ETG has not

7    pointed us to testimony that suggests that this was leading

8    to litigation. It's rather counsel's --

9    THE COURT: I agree with you, Ms. Graham. I

10   haven't seen any.

11   I haven't seen any testimony of the type that

12   you describe.

13   I am having some difficulty -- if what you are

14   going to continue to say -- I know I cut you off -- is even

15   if the contract does say what is implied, you inferred it

16   might, sort of the issue is, well, what litigation? Can you

17   engage a firm in this manner, when there is really not in

18   point of fact any litigation ensuing or in the offing, in

19   the sense, in the Cendant sense or in any Circuit Court's

20   view, under any Circuit Court's test of what, indeed, is the

21   meaning of the words "in anticipation of litigation"?

22   Does the mere execution of a contractual

23   agreement for the purposes I think you are suggesting, Ms.

24   Eckstein, insulate the results of the engagement from

25   discovery?

18

1    MS. GRAHAM: Yes. And, Your Honor, that was the

2    next point that I would have made. And I believe that

3    absolutely is the law. I think, for example, the Spalding

4    case that they cite supports that very clearly.

5    MS. ECKSTEIN: Your Honor, two things. I need

6    to get my hands on the contract, so I won't be able to get

7    it fax'd to you immediately.

8    THE COURT: Here is what we are going to do. I

9    am going to rule against you, Ms. Eckstein. But that is

10   conditioned upon, I am going to leave myself the option of

11   changing my mind overnight. When can you get the agreement

12   to me?

13   MS. ECKSTEIN: In the next half-hour.

14   THE COURT: Okay. I will take a look at it. If

15   you don't hear from me, the order stands.

16   MS. ECKSTEIN: If I could add one other thing.

17   In terms of what specific litigation was being anticipated,

18   the fact that Mr. Pitonyak testified that they were looking

19   at infringing activities I think suggests to me that they

20   were certainly looking at litigation.

21   THE COURT: What specific infringing activities

22   were they looking at?

23   MS. ECKSTEIN: They were looking to see what

24   companies out there may be infringing the patents in suit.

25   THE COURT: Ms. Graham, do you want to react to

19

1    that?

2    MS. GRAHAM: Yes, Your Honor. As I mentioned,

3    he said, everybody said that these folks were looking

4    into licensing opportunities. That's the first thing that

5    you do, is consider who may be infringing. Nobody said we

6    were looking into bringing a lawsuit.

7    THE COURT: Yes.

8    MS. GRAHAM: That is the critical piece that's

9    missing out of his testimony.

10   THE COURT: I think that is exactly right, Ms.

11   Eckstein. That is an important reason that I think you lose

12   this one. And that's the Court's ruling, absent a change of

13   mind based upon the review of the contract. But I wouldn't

14   hold my breath for that.

15   MS. ECKSTEIN: Thank you, Your Honor.

16   THE COURT: Anything else?

17   MS. GRAHAM: Your Honor, we did send over a

18   letter this afternoon. I don't know if the Court had an

19   opportunity to look at it.

20   THE COURT: Doing other things. What was the

21   letter about?

22   MS. GRAHAM: The letter was to really alert the

23   Court that we have another issue, which we don't think

24   should be argued today because ETG is not in a position to

25   argue it with the Court. It is a very serious issue. It is

20

1    a further issue to the question of the 1984 VA report.

2    THE COURT: I have just been handed the letter.

3    Let me take a look at it.

4    A two-paragraph letter?

5    MS. GRAHAM: Yes.

6    THE COURT: Has ETG seen this letter?

7    MS. GRAHAM: Yes.

8    MS. ECKSTIEN: Yes, Your Honor. I read it

9    before it went out and actually made some changes to it. In

10   a sense, it's joint.

11   (Pause.)

12   THE COURT: If necessary, I will allow a further

13   call, but not briefing at this point.

14   MS. GRAHAM: Thank you, Your Honor. We can call

15   chambers and ask for a date.

16   THE COURT: Another date, if necessary. I take

17   it that there is going to be some discussion regarding these

18   further developments.

19   MR. JOHNSON: We only received this the day

20   before yesterday. This is Mr. Johnson, by the way. And we

21   responded briefly last night. But the problem is that the

22   people that really know about this were busy preparing for

23   deposition and are in depositions today. So we just really

24   aren't in a position to respond to it today. And it may be

25   useful to have some real discussion with the other side.

ATTACHMENT C

1

09:17:08    1        IN THE UNITED STATES DISTRICT COURT
        2        IN AND FOR THE DISTRICT OF DELAWARE
        3
                        - - -
        4
        5   ENERGY TRANSPORTATION,        :  Civil Action
            INC.,                         :
        6                                 :
                        Plaintiff,        :
        7                                 :
                v.                        :
        8                                 :
            SONIC INNOVATIONS, INC.,      :
        9   PHONAK HOLDING AG,            :
            PHONAK INC.,                  :
       10   UNITRON HEARING, INC.,        :
            WILLIAM DEMANT HOLDING A/S,   :
       11   OTICON A/S,                   :
            OTICON INC.,                  :
       12   WIDEX A/S,                    :
            WIDEX HEARING AID CO. INC.,   :
       13   GN RESOUND A/S,               :
            GN RESOUND CORPORATION,       :
       14   STARKEY LABORATORIES, INC.,   :
            GENNUM CORPORATION,           :
       15   RESISTANCE TECHNOLOGY INC.,   :
            BERNAFON AG,                  :
       16   WDH, INC., and               :
            BERNAFON, LLC,                :
       17                                 :
                        Defendants.       :  No. 05-422 (GMS)
       18
                        - - -
       19
                        Wilmington, Delaware
       20              Thursday, January 3, 2008
                        9:30 a.m.
       21              Pretrial Conference
       22
                        - - -
       23
            BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
       24
       25

---

2

        1  APPEARANCES:

        2      EDMOND D. JOHNSON, ESQ.
               Pepper Hamilton LLP
        3          -and-
               MARTY STEINBERG, ESQ.,
        4      BRIAN M. BUROKER, ESQ.,
               MAYA M. ECKSTEIN, ESQ., and
               DANIEL VIVARELLI, ESQ.
        5      Hunton & Williams
               (Washington, D.C.)
        6
        7              Counsel for Plaintiff

        8      MARY B. GRAHAM, ESQ.
               Morris, Nichols, Arsht & Tunnell
        9          -and-
               GREGORY C. GRAMENOPOULOS, ESQ.,
       10      JOHN M. ROMARY, ESQ.,
               KAY HILL, ESQ., and
       11      GERSON S. PANITCH, ESQ.
               Finnegan, Henderson, Ford, Farabow & Dunner
       12      (Washington, D.C.)

       13              Counsel for
                      Demant Defendants
       14
               DONALD E. REID, ESQ.
       15      Morris, Nichols, Arsht & Tunnell
                   -and-
       16      WILLIAM H. MANDIR, ESQ.,
               CARL J. PELLEGRINI, ESQ., and
       17      BRIAN SHELTON, ESQ.
               Sughrue Mion
       18      (Washington, D.C.)

       19              Counsel for Widex
                      Defendants
       20
                        - - -
       21
       22
       23
       24
       25

---

3

        1        THE COURT:  Good morning.  Happy New Year.
        2   Please take your seats.
        3        Counsel, this is an office conference, so the
        4   rules of Court are in suspense.  You can sit if you want, or
        5   you can stand, take your jackets off if you would like.
        6        What I would like to do is start out with a
        7   round of reintroductions, beginning with plaintiff.
        8        MR. JOHNSON:  Your Honor, Edmond Johnson for the
        9   plaintiffs ETG.  I have with me at counsel table Marty
       10   Steinberg, Brian Buroker, Maya Eckstein and Dan Vivarelli.
       11   They are all from Hunton & Williams.
       12        THE COURT:  Good morning.
       13        Ms. Graham.
       14        MS. GRAHAM:  Good morning, Your Honor.  I am
       15   here for Demant.  Sometimes they are called Oticon, so
       16   people don't get confused about that.
       17        THE COURT:  Can we refer to them as Demant
       18   today?
       19        MS. GRAHAM:  That is fine.  With me from
       20   Finnegan & Henderson are John Romary, Greg Gramenopoulos,
       21   Gerson Panitch, and Kay Hill.
       22        THE COURT:  Good morning.
       23        MR. REID:  Good morning, Your Honor.  Donald
       24   Reid on behalf of Widex.  From the Sughrue firm we have Bill
       25   Mandir, Carl Pellegrini, and Brian Shelton.

---

4

        1        THE COURT:  Good morning.
        2        Anybody else?
        3        Okay.
        4        What I would like to do first is address the
        5   parties' motions in limine, as soon as I can pull those out.
        6   Then we will talk for, depending, a moment or more,
        7   depending, about the two motions in limine -- I view them as
        8   motions in limine -- the two Daubert motions that the
        9   plaintiff has filed.  We will do that.
       10        I will tell you that there will be a ruling
       11   coming very shortly announcing my decision to deny the
       12   renewed motion to dismiss.
       13        Then we will go through the actual proposed
       14   final pretrial order, the various tabs, places that I have
       15   tabbed, and I will invite counsel to remind me if I miss
       16   something, I will go back and cover whatever issues that
       17   might need to be covered.
       18        There are a number of miscellaneous issues at
       19   the end of the proposed final pretrial order which we will
       20   apparently need to address at greater or lesser degree.  We
       21   will just see how things go.
       22        We will probably take a break around 12:30, if
       23   we are still at it.  I suspect we will.
       24        I don't recall that there is a lot of
       25   controversy about the preliminary instructions.  The only

5

1 issue had to do with a matter that I think I have handled.
2 That was the motion to amend. Is that correct?
3           MS. ECKSTEIN: Yes, Your Honor. I believe the
4 parties have agreed on the preliminary instructions. The
5 only issue was whether the Court would also play the video.
6           THE COURT: That was one of the miscellaneous
7 matters. We can get to that.
8           MS. ECKSTEIN: We have actually agreed to play
9 it as long as the patent is also presented to the jury.
10          THE COURT: I think it should be played, and we
11 can dispense with some of the reading. There is no point in
12 duplicating that which is covered in the video.
13          Perhaps you could take another cut at the
14 preliminary instructions.
15          MR. GRAMENOPOULOS: We had suggested that.
16          THE COURT: We will see how our time is running,
17 as to whether we are going to be able to have a really
18 meaningful conversation about the final jury instructions
19 today. We will have time to do that during the course of
20 our time together, I am sure. If there is any burning
21 issue, anything that needs to be addressed for sure that
22 comes up, that is, an issue that is raised by the final jury
23 instructions, counsel, you should let me know.
24          You will forgive me. It seems like Monday to
25 me. The holidays have really wrecked my clock. It's just

6

1 not ticking correctly.
2           THE COURT: Let's start out with the Plaintiff's
3 what I have numbered as No. 1, its first motion in limine.
4 It's filed at Docket Item 464. It is Plaintiff's Fourth
5 Motion in Limine to Exclude the Testimony of Paid Fact
6 Witnesses.
7           MR. STEINBERG: Your Honor, Marty Steinberg from
8 Hunton & Williams.
9           Throughout the testimony of certain of the
10 defendants' witnesses, primarily Dr. Egolf and Mr. Graupe
11 and Mr. Weaver, they testified that they were merely fact
12 witnesses, they weren't expert witnesses. And, in fact, on
13 many, many occasions, when we tried to ask them questions
14 about the basis of their testimony, we were rebuffed by
15 defense counsel, who told us they are here strictly as fact
16 witnesses, they are not offering any opinions, they are not
17 going to testify as an expert, and so forth.
18          Essentially, what they testified to was about
19 prior art that they had written, articles, journal articles,
20 patents, whatever. So essentially what they were testifying
21 to was about their historic work on hearing aid technology,
22 allegedly to be used as prior art in the defense. Their
23 testimony was what they did, when they did it, and what it
24 meant. And yet instead of testifying purely as fact
25 witnesses, each of these witnesses was paid a handsome fee

7

1 for their testimony. They became essentially an advocate
2 for the defendants.
3           You only have to read the depositions of Dr.
4 Egolf and Dr. Graupe to easily determine they are hostile to
5 ETG. They were reluctant to give testimony that affected
6 the invalidity defense.
7           The evil envisioned by the rules is really what
8 occurred in this case. Despite the fact that defense
9 counsel insisted that Dr. Egolf and the others were there as
10 fact witnesses, they chose to pay Dr. Egolf $250 an hour,
11 and up to the time of his deposition, they had already paid
12 him $53,000 as a fact witness, certainly a handsome sum for
13 a professor at the University of Idaho. And he was even
14 paid for his testimony while at deposition. In other words,
15 he was paid to testify while he was testifying.
16          Similarly, at Mr. Weaver's deposition we
17 solicited testimony from him that he was being paid for his
18 testimony and that he had been solicited to do so by Dr.
19 Egolf, another paid witness. He was also paid at the rate
20 of $250 an hour, despite the fact that he had never served
21 as an expert witness, ever. And he was retained to recall
22 the work he had done on his thesis and provide general
23 information to defense counsel and to testify. That's the
24 classic definition of a fact witness.
25          Now, after we have challenged their testimony,

8

1 they belatedly produced affidavits, which have not been
2 subject to cross, I might add, stating that they were
3 retained and they were consultants. In addition to being
4 fact witnesses and so forth, they were really technical
5 consultants. None of that has been subject to cross. They
6 didn't raise it in their testimony when they were asked.
7           Most importantly, Judge, if you look at those
8 affidavits, which we think you should ignore because they
9 aren't subject to cross, none of them produced any retention
10 or consulting agreement, as required by the federal rules.
11 In other words, there is nothing in writing that says that
12 these people have been retained as technical consultants or
13 experts. Of course, if they were retained as technical
14 consultants or experts, we would be allowed to discover the
15 basis for their testimony, which we weren't allowed to.
16          Now, finally, at Dr. Graupe's testimony, they
17 went so far as to ask us, ETG, to pay for his time and pay
18 for his attorney representing Dr. Graupe, despite the fact
19 that he was allegedly later, they say, a consultant to trial
20 counsel. If he was a consultant to trial counsel, I don't
21 know why he would need another counsel. Nevertheless, he
22 was compensated between 300 and $250 an hour, also.
23          Clearly, these witnesses received money for
24 giving fact testimony. The money they got was substantial.
25          I think the important thing here, Judge, is

1  there are two concepts about witnesses in the United States.
2  One is, there is an expert witness. An expert witness is
3  actually allowed to make money, strangely enough, in our
4  system. They can charge a fee, they can make a profit, and
5  they often do. And then there is what is called a fact
6  witness. Fact witnesses can't make money. That is the
7  whole premise of the ethical rules. They can't any money.
8  The only thing you can do is pay their expenses. And if
9  they suffer a financial loss, which they have to
10  substantiate, a financial loss, you can reimburse them for a
11  financial loss.
12          How does that usually occur? I am a fact
13  witness. I work for XYZ factory. I have to take off five
14  days to prepare and attend a trial. My boss says, I am not
15  paying you for those five days. You lost money. I can be
16  reimbursed for that.
17          That is not what happened here. They paid them
18  a fee, an hourly fee, like an expert, to testify as a fact
19  witness.
20          THE COURT: How did this come to light? During
21  your examination?
22          MR. STEINBERG: During our examination of the
23  witnesses. They have not established in the record that
24  they lost money, that their employment didn't pay them the
25  money, that they are being reimbursed for their lost wages.

1  knowledgeable people. They are engineers. Two of them are
2  professors. They were in the field at the time in the
3  mid-eighties. They are knowledgeable about prior art. They
4  were retained by us initially because they were so
5  knowledgeable about the technology and what went on.
6          This is very typical in patent litigation. That
7  is what you look for, especially if something is 20 years
8  old, you need to find somebody who can explain the
9  technology as it existed then. You ask them to search for
10  prior art. You work with them on understanding the patent.
11  There is all this work that goes on. That is typical. And
12  you pay them a consultant fee.
13          The fees in this case were entirely reasonable
14  and typical. Their affidavits make that clear. In fact,
15  they were making that amount in ordinary consulting. And
16  their declarations make that clear.
17          With respect to the amount they were being paid,
18  the rules don't say that you figure out their lost wages and
19  they get lost wages. The opinions say reasonable
20  compensation. And they are very clear that where you have
21  employed people, it is relatively easy. You know, there are
22  standard rates. And that's what these people were
23  paid. Where the analysis gets a little more difficult is
24  when someone is retired. But we don't have that situation
25  here. These people were all gainfully employed.

10

1  There is nothing in the record. Not even the affidavits,
2  which you should strike, say that.
3          In fact, they don't even tell you, Judge, what
4  they made in their full-time positions as professors at the
5  University of Idaho and so forth, because in order to
6  qualify to get reimbursed, they would have to present to the
7  Court what their full-time position paid them. That is in
8  the ABA Ethics opinions at 2003-3. Then they have to
9  establish they lost that money and that money was being
10  reimbursed to them. That didn't happen here.
11          THE COURT: Let hear the other side's position.
12          MS. GRAHAM: First, Your Honor, in asking about
13  when this came up, this issue of whether or not we were
14  improperly paying the witnesses didn't arise until they
15  filed their motion in limine. This is important. He is
16  saying we didn't produce affidavits before. Of course, we
17  didn't, because we didn't know it was an issue. If this was
18  really a concern for them in the truth-gathering process of
19  this litigation, they would have mentioned, after the first
20  time that they heard that a witness that we had retained as
21  a consultant that was being paid, they would have complained
22  about that, instead of waiting until right before trial,
23  hoping they could keep out some of the most important fact
24  witnesses that we have.
25          These witnesses are highly technically

12

1          Interestingly, his argument that, well, we see
2  all the evils here present of what happens when you pay
3  people because they become an advocate or they are hostile
4  to the plaintiff, I, first of all, disagree with that.
5  Reading the transcript, I see none of that. Again, in fact,
6  what the rules say is you just can't pay witnesses
7  contingent on the testimony.
8          For example, it was the Golden Blount case, I
9  think, where the Court said it was bad, you can't have this
10  agreement -- you couldn't have an agreement in this
11  circumstance to pay. And the problem was that the payment
12  was contingent upon the testimony being helpful. We
13  certainly have nothing like that here. The witnesses were
14  very clear that they understood and wanted to tell the truth
15  and they would never accept money to alter their testimony.
16          So as long as the payment is not contingent and
17  it's reasonable, both circumstances of which are present
18  here, there is no problem in paying a witness.
19          I would note, this idea that no fact witness
20  should ever get paid in any circumstance in litigation,
21  which is effectively what he is saying, or close to that,
22  anyway, the irony is we have two of the inventors, Dr.
23  Levitt and Mr. Dugot, who are both being paid substantial
24  contingent sums, two percent and seven percent of any
25  damages recovered, and they are seeking 67 million dollars.

1    So we are not suggesting that they should be
2  precluded. But, obviously, there are circumstances in which
3  witnesses have an interest of some kind, monetary interest
4  in litigation. And that doesn't mean that their being paid
5  is improper unless it violates the very specific
6  requirements noted in the opinions.
7    THE COURT: We are not going to spend a lot more
8  time on this.
9    I disagree with you, counsel. You can certainly
10  cross-examine the witnesses to elicit any bias that you
11  think is appropriate to elicit.
12    The motion is denied.
13    Let's go back and forth. Let's go to what I
14  have described as Defendants' No. 1, Defendants' Motion in
15  Limine No. 1. It occurs at Docket Item 459, Motion to
16  Exclude Evidence and Argument Regarding Awards and Honors
17  Received by Dr. Levitt.
18    MS. GRAHAM: Mr. Romary will address that, Your
19  Honor.
20    MR. ROMARY: Your Honor, I want to make it clear
21  that we are not objecting to Dr. Levitt's background being
22  offered into evidence. We are not objecting to that. We
23  are not even objecting to the mention of these awards.
24    The problem that we have -- they are obviously
25  going to emphasize these awards. That is the whole point of

14

1  them, that they have some connection, some nexus --
2    THE COURT: Be a little more specific.
3  Emphasize how? What do you mean?
4    MR. ROMARY: The one word that they gave you, I
5  think Dr. Kates, Mr. Kates' testimony, they are going to say
6  the award was offered and the patent was mentioned in the
7  course of the award. That, frankly, was the first
8  information I had that there was a nexus between an award
9  and the patent. So my argument that there was no nexus kind
10  of went down the drain with that presentation to Your Honor.
11    But the problem that I have is, that
12  presentation is being objected to. We put it on the exhibit
13  list. We put in the deposition that you saw, they are
14  being offered, in order to convince you that there was some
15  nexus on the trial exhibit list and on the designated
16  depositions so the jury can hear what you heard. And what
17  they heard and what was in there was, yes, the patent was
18  mentioned, but the guy who offered the patent said he didn't
19  do anything, and it was just a starting point.
20    Your Honor, in a sense, we are withdrawing the
21  motion in the sense that they obviously put some evidence in
22  that there is some nexus between at least this one award and
23  the activity of the patent. But we think it's totally
24  unfair and inappropriate for us not to have at the same time
25  the opportunity to show the jury what they showed you to

1  convince you the motion should be denied.
2    MS. ECKSTEIN: Your Honor, if I understand what
3  Mr. Romary said, they are withdrawing the motion except to
4  the extent that we would be presenting evidence that the
5  '850 patent was specifically referenced for the award. Is
6  that my understanding?
7    MR. ROMARY: I am sorry, Your Honor. I am
8  having trouble hearing.
9    THE COURT: He couldn't hear you.
10    MS. ECKSTEIN: I am sorry. I just want to make
11  sure I understand the position.
12    The position is that the defendants are
13  withdrawing the motion except to the extent that ETG would
14  be presenting evidence that for the 2001 Lifetime
15  Achievement Award the '850 patent was specifically
16  referenced and made a part of the award presentation. Is
17  that my understanding?
18    MR. ROMARY: No. What we want to do is have the
19  opportunity, because it's relevant evidence, to show that
20  the person who presented the award had a particular state of
21  mind when he presented the award. That's all.
22    THE COURT: Any difficulty with that?
23    MR. ROMARY: There is an objection to the
24  testimony that we designated that you saw.
25    THE COURT: We are talking about?

16

1    MR. ROMARY: Mr. Kates' testimony.
2    THE COURT: Yes. What page?
3    MR. ROMARY: I believe it's Exhibit E, Your
4  Honor.
5    THE COURT: Counsel, we are looking at Exhibit
6  E, the testimony of James Mitchell Kates.
7    MR. ROMARY: Actually, Your Honor, there were a
8  few pages missing. I have a complete copy if you would
9  like.
10    THE COURT: I am just interested in the relevant
11  pages. They haven't been presented?
12    MR. ROMARY: There is a couple pages missing.
13    THE COURT: That you would like me to see?
14    MR. ROMARY: I think it completes it. We are
15  satisfied with the ones they showed you. But it shows a
16  more complete picture.
17    THE COURT: Let's see if counsel talking to one
18  another can work this out. Right now, talk to one another.
19    MS. ECKSTEIN: Which exhibit?
20    MR. ROMARY: The exhibit we are talking about is
21  for the MIL.
22    (Discussion off the record.)
23    MR. ROMARY: Your Honor, I withdraw the motion
24  with the representation of Ms. Eckstein.
25    THE COURT: That is fine.

---

133

1  right to be involved in this discussion because they
2  produced these documents and they claim they were
3  inadvertently produced. For us to get them back, we would
4  need to get them back from Sonic.
5       THE COURT: These documents found their way into
6  your evidentiary presentation?
7       MS. ECKSTEIN: Yes, sir.
8       THE COURT: What is the position of defendants?
9       MR. GRAMENOPOULOS: I will take that.
10      We, the Demant Group defendants and the Widex
11  defendants, we didn't have any knowledge of these documents
12  because the defendants are not sharing documents.
13      I think that was mentioned earlier.
14      Of course, we didn't see this until we got the
15  copy of the trial exhibit list in draft form and we started
16  sharing drafts and our objections. That's when we first
17  gained knowledge of it. When we saw the documents, we had
18  to request them from ETG's counsel, we immediately noticed
19  these were privileged documents. So we notified Sonic, who
20  we don't believe understood that they had produced these.
21  And then the ensuing actions happened.
22      At the moment, I believe Sonic's input on this
23  is important because of the alleged waiver that ETG is
24  putting forth. Only Sonic and ETG can speak about what
25  communications they had.

---

134

1       As for our side of the equation, a lot of these
2  documents relate to the common privilege, common interest
3  issues, some of the documents relate to HIMPP pleadings
4  where an attorney for HIMPP was there advising all of the
5  defendants. We do believe there is a common privilege on
6  certain of these documents.
7       Before today's pretrial conference, we were
8  trying to get the number of documents narrowed down so it
9  would be much easier to deal with these. I believe a lot of
10  them are not even relevant to this case because they deal
11  with financial records of HIMPP, which I don't see have any
12  basis for this case. So I submitted a list to them just
13  based on the titles of the documents. I said, can't we just
14  get these off, because they don't appear to be relevant at
15  all to this case? Some of the other ones are Sonic-only
16  documents in the sense that they are handwritten notes and I
17  have no idea what they are. They are probably hearsay.
18  There is no Sonic witness that is going to be coming to
19  trial. I think those should also be removed.
20      So we are trying to get the list down. If they
21  believe they are going to use any of the documents at trial,
22  we are happy to work on this issue with them and Sonic is
23  willing to do the same as well.
24      MS. ECKSTEIN: We are hampered in addressing it,
25  as I advised them, in response to their request to limit the

---

135

1  number of documents, we are hampered in doing that because
2  we had already returned the documents, and under that
3  possibility we couldn't look at them because they claimed to
4  have inadvertently produced them. So I can't say the number
5  of documents that are at issue.
6       The other issue, the community of interest
7  doesn't apply here.
8       THE COURT: Let's deal with the first hurdle you
9  have just thrown up, you can't address them because you
10  can't see.
11      MS. ECKSTEIN: I don't have them anymore. When
12  we first prepared our exhibit list, we did have them, of
13  course. And we believed at that point that they were
14  relevant to our case and we would be introducing them into
15  evidence.
16      THE COURT: Are you prepared to propose a
17  vehicle that would enable you to make your arguments?
18      MS. ECKSTEIN: We would have to have Sonic
19  involved with that vehicle because we would need to be able
20  to review those documents to determine whether we could
21  limit the list.
22      THE COURT: Do you think some time might be
23  spent in the lead-up to trial with Sonic and the defendants
24  in some kind of meet-and-confer?
25      MS. ECKSTEIN: I am happy to attempt to talk to

---

136

1  Sonic about that, absolutely.
2       THE COURT: Even if we get on the phone at the
3  end of the first day of trial, you are not going to be able
4  to make your arguments.
5       MR. JOHNSON: Your Honor couldn't really make a
6  decision, either, without seeing the documents.
7       MR. STEINBERG: Can I make a suggestion?
8       THE COURT: Yes, sir.
9       MR. STEINBERG: I think you could order Sonic to
10  produce to both parties and the Court under a protective
11  order for the sole purpose of this argument so we know what
12  we are doing.
13      THE COURT: Any objection to that?
14      MR. GRAMENOPOULOS: That's Sonic's call. I
15  can't say --
16      THE COURT: Just in terms of our process. If
17  you prepare a form of order, I will sign it.
18      MR. GRAMENOPOULOS: I think it would be helpful,
19  actually, to produce redacted versions, where the privileged
20  material is, so they can see them. I think on the titles
21  you can see. So redacted versions, and they can see whether
22  the nonprivileged material is relevant to their case.
23      MS. ECKSTEIN: I think we would need to see the
24  privileged material. My recollection is it was some of that
25  material we wanted to see.

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 9, 2008, the foregoing was caused to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

In addition, the undersigned hereby certifies that true and correct copies of the foregoing were caused to be served via electronic mail on May 9, 2008 upon the following parties:

| | |
|---|---|
| REPRESENTING ENERGY TRANSPORTATION GROUP, INC. | Edmond D. Johnson<br>PEPPER HAMILTON LLP<br>**johnsone@pepperlaw.com** |
| | Brian M. Buroker<br>HUNTON & WILLIAMS LLP<br>**etg@hunton.com** |
| REPRESENTING WIDEX A/S AND WIDEX HEARING AID CO. INC. | Donald E. Reid<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>**dreid@mnat.com** |
| | William H. Mandir<br>SUGHRUE MION PLLC<br>**wmandir@sughrue.com** |
| | David J. Cushing<br>SUGHRUE MION PLLC<br>**dcushing@sughrue.com** |
| | Carl J. Pellegrini<br>SUGHRUE MION PLLC<br>**cpellegrini@sughrue.com** |
| | Brian K. Shelton<br>SUGHRUE MION PLLC<br>**bshelton@sughrue.com** |

REPRESENTING WILLIAM DEMANT HOLDING A/S, WDH, INC., OTICON A/S, OTICON INC., BERNAFON AG, AND BERNAFON, LLC

Mary B. Graham
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
**mgraham@mnat.com;**
**mbgeservice@mnat.com**

John M. Romary
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER
**john.romary@finnegan.com**

C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER
**c.gregory.gramenopoulos@finnegan.com**

**BY HAND DELIVERY:**

Edmond D. Johnson
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE  19899-1709

/James W. Parrett
_____
James W. Parrett, Jr. (#4292)

963298