IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-422 (GMS) |
| | ) | |
| SONIC INNOVATIONS, INC., et al, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' ANSWERING BRIEF IN OPPOSITION TO PLAINTIFF'S
SECOND AMENDED MOTION FOR JUDGMENT AS A MATTER OF LAW**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200
dreid@mnat.com

OF COUNSEL:

SUGHRUE MION, PLLC
David J. Cushing
William H. Mandir
Carl J. Pellegrini
Brian K. Shelton
2100 Pennsylvania Ave., N.W.
Suite 800
Washington, DC 20037
202.293.7060

*Attorneys for Widex A/S and
Widex Hearing Aid Co. Inc.*

May 9, 2008

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200
mgraham@mnat.com
jparrett@mnat.com

OF COUNSEL:

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, DC 20001-4413
202.408.4000

*Attorneys for William Demant Holding A/S,
WDH Inc., Oticon A/S, Oticon, Inc.,
Bernafon AG, and Bernafon LLC*

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........................................................................................... iii

INTRODUCTION ..............................................................................................................1

SUMMARY OF THE REASONS FOR DENYING ETG'S JMOL ..............................1

ARGUMENT ......................................................................................................................3

I.      STANDARD FOR GRANTING JMOL.................................................................3

II.     THE VALIDITY PORTION OF ETG'S SECOND AMENDED
MOTION IS IMPROPER .......................................................................................4

III.    DEFENDANTS HAVE OFFERED SUFFICIENT EVIDENCE
TO SUPPORT A JURY FINDING THAT THE BEST
INVENTION AND THE WEAVER INVENTION QUALIFY AS
PRIOR ART............................................................................................................6

        A.     Law of Prior Inventorship.........................................................................6

        B.     The Best Invention Qualifies as a Prior Invention that Was
Not Abandoned, Suppressed, or Concealed..............................................7

        C.     The Weaver Invention Qualifies as Prior Art ...........................................11

                1.     The Weaver Thesis ......................................................................12

                2.     The Weaver Thesis Presentation..................................................13

                3.     The Weaver AFC-1 and AFC-2 Circuits ....................................14

                4.     The VA Presentation....................................................................14

                5.     The ASA Presentation..................................................................15

                6.     The JASA Abstract ......................................................................15

                7.     The Jackson Hole Presentation ...................................................16

                8.     1984 VA R&D Progress Report ...................................................17

        D.     ETG's Motion Seeking JMOL That The Weaver Work Is
Not "Prior Art" Should Be Denied ...........................................................17

IV.  DEFENDANTS PRESENTED SUBSTANTIAL EVIDENCE THAT CLAIMS 13, 14, AND 16 OF THE '850 PATENT WERE NOT LITERALLY INFRINGED...........................................................................19

    A.  ETG's Testimony Regarding the "Determining" Step of Claims 13, 14, and 16 of the '850 Patent Was Vigorously Contested..............................................................................................20

    B.  ETG's Testimony Regarding the "Inserting Step" Was Vigorously Contested.................................................................22

    C.  Defendants Presented Substantial Evidence That Accused Products Do Not Have A "Filter Therein Programmed" (Claim 13) Or A "Programmable Filter Programmed" (Claim 14) To Equalize And Reduce The Effect Of Said Acoustic Feedback Both In Amplitude And Phase on a Signal In The Transmission Channel...........................................25

    D.  Defendants Provided a Substantial and Proper Non-Infringement Analysis...........................................................................27

V.  DEFENDANTS DID NOT MISLEAD THE JURY ...........................................28

    A.  Defendants' Reference to "Measuring" Was Proper.................................28

    B.  Defendants Did Not Present "Misleading" Non-infringement Arguments ........................................................................32

    C.  Defendants Did Not Admit that Their Technical Documents Proved Literal Infringement of Claims 13, 14, and 16.......................................................................................33

CONCLUSION.........................................................................................................35

TABLE OF AUTHORITIES

Page(s)

CASES

Amgen, Inc. v. Hoechst Marion Roussel, Inc.,
    314 F.3d 1313 (Fed. Cir. 2003)................................................................................15

Apotex USA, Inc. v. Merck & Co.,
    254 F.3d 1031 (Fed. Cir. 2001)..................................................................................6

Bailey v. Dart Container Corp. of Mich.,
    292 F.3d 1360 (Fed. Cir. 2002)..................................................................................4

Beckman Instruments, Inc. v. LKB Produkter AB,
    892 F.2d 1547 (Fed. Cir. 1989)................................................................................16

Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.,
    320 F.3d 1339 (Fed. Cir. 2003)..................................................................................4

Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,
    489 U.S. 141 (1989)................................................................................................18

Checkpoint Sys., Inc. v. U.S. Int'l Trade Comm'n,
    54 F.3d 756 (Fed. Cir. 1995)............................................................................ 6-7, 10

Corona Cord Tire Co. v. Dovan Chem. Corp.,
    276 U.S. 358 (1928)..................................................................................................7

Dow Chem. Co. v. Astro-Valcour, Inc.,
    267 F.3d 1334 (Fed. Cir. 2001)..................................................................................7

E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.,
    849 F.2d 1430 (Fed. Cir. 1988)................................................................................18

Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.,
    315 F. Supp. 2d 589 (D. Del. 2004)............................................................................7

Jordan v. Duff & Phelps, Inc.,
    815 F.2d 429 (7th Cir. 1987) .....................................................................................4

Palmer v. Dudzik,
    481 F.2d 1377 (C.C.P.A. 1973) ...............................................................................10

Pannu v. Iolab Corp.,
    155 F.3d 1344 (Fed. Cir. 1998)..................................................................................3

*Perkin-Elmer Corp. v. Computervision Corp.*,
    732 F.2d 888 (Fed. Cir. 1984)...............................................................................3

*Symbol Techs., Inc. v. Opticon, Inc.*,
    935 F.2d 1569 (Fed. Cir. 1991).............................................................................15

*Whirlpool Corp. v. LG Elec., Inc.*,
    No. 1:04-CV-100, 2006 WL 2035215 (W.D. Mich. July 18, 2006).......................33

## STATUTES

35 U.S.C. § 102(a) ...................................................................................... 13-15

35 U.S.C. § 102(g) ...................................................................................... *passim*

Federal Rule of Civil Procedure 50 .................................................................3, 5

## INTRODUCTION

Defendants Oticon A/S, Oticon, Inc., Bernafon AG, Bernafon, LLC, WDH, Inc., William Demant Holding A/S, Widex A/S, and Widex Hearing Aid Co., Inc. (collectively, the "Defendants") oppose Plaintiff Energy Transportation Group, Inc.'s ("ETG") Second Amended Motion for Judgment as a Matter of Law ("ETG's Second Amended Motion"). For the reasons described in this opposition brief, Defendants request that the Court deny ETG's Second Amended Motion.

## SUMMARY OF THE REASONS FOR DENYING ETG'S JMOL

The first portion of ETG's Second Amended Motion seeks "judgment" that certain material Defendants proffered at trial is not in fact "prior art." But ETG prevailed at trial on the issue of validity. Accordingly, ETG has no basis to raise any issue of validity as a matter of right. Moreover, ETG's Second Amended Motion in this regard is moot except to the extent that it addresses material that is also addressed in Defendants' Renewed Motion for Judgment as a Matter of Law and Request for New Trial on the Issues of Infringement and Validity ("Defendants' Infringement and Validity JMOL Motion"). (D.I. 527, Opening Brief at D.I. 545.) However, as to that material, Defendants, not ETG, had the right to challenge the jury's verdict on validity and have done so, relying on United States Patent No. 4,783,818 issued to Graupe (the "Graupe '818 Patent"), the Best Invention, and the JASA Abstract. Since the remaining material referenced in ETG's Second Amended Motion is not addressed in Defendants' Infringement and Validity JMOL Motion as "prior art," the issue as to whether or not this material is in fact prior art is now moot.[1]

---

[1]    Defendants do reserve the right to present this additional material to the jury should a new trial be granted on the issue of validity to show the level of skill in the art.

By the present motion, ETG seeks to preempt Defendants' right to the briefing rules associated with their right to challenge validity by preemptively first challenging the status of the Best Invention and the JASA Abstract as "prior art."  That challenge, however, should be restricted to the reply ETG is permitted to Defendants' Infringement and Validity JMOL Motion and the limitations associated with that reply.  To allow ETG to proceed with the current preemptive motion turns the sequence of a JMOL validity challenge on its head and gives ETG inappropriate and unjustified briefing advantages, including not only additional pages beyond the limitations imposed by the Local Rules but also a "last say" on the issue of validity that by rule should be reserved for Defendants, the moving party on the issue of validity.  Accordingly, as it pertains to the issue of validity, ETG's Second Amended Motion should be ignored.

On the merits, the validity portion of ETG's Second Amended Motion should be denied in its entirety.  The Best Invention (prior invention), the Weaver Invention (prior invention), and the JASA Abstract and VA Report (printed publications) are all valid "prior art" materials, and there is a reasonable basis for the jury to have reached this conclusion.

The second portion of ETG's Second Amended Motion seeks judgment that claims 13, 14, and 16 of the '850 Patent were literally infringed.  On this issue of literal infringement, however, there is also a reasonable basis for the jury to have concluded as it did that there was no literal infringement of these claims.  First, although the Court found that these claims did not require physical measurement of the effect that the feedback path has on the phase and amplitude of a signal, the Court did not, as ETG in effect asserts, remove any requirement for a "determining" step.  That would be improper as a matter of basic claim construction law. The fact that the Accused Products do not "measure" the effect of phase and amplitude is a critical step in concluding there was no literal infringement of these claims since "measurement"

is one form of "determining."  ETG was left to proving some other form of "determining" was

present in the Accused Products, but all ETG could show was the end result; namely, a reduction

in the effect of acoustic feedback by using a filter that mimics the effect of the acoustic feedback

path.  This is not a showing of the "determining" step.  Accordingly, since there was no

measuring of the effect of phase and amplitude, and since all ETG could show was the end

result, there was no evidence from which any jury could possibly have found any infringement of

claims 13, 14, and 16, much less inevitably have found literal infringement, as must be the case

for ETG to prevail on its Second Amended Motion.  Moreover, the jury could have reasonably

concluded that the Accused Products do not include, at least not literally, the "inserting" step

required by claims 13, 14 and 16.  Although ETG's characterizes its evidence as to this step as

"uncontroverted", the trial record reveals that both of Defendants' technical experts testified that

none of the Accused Products performs the claimed inserting step.

## ARGUMENT

### I.     STANDARD FOR GRANTING JMOL

Under Rule 50 of the Federal Rules of Civil Procedure, a court may grant a

motion for judgment as a matter of law ("JMOL") where there is no legally sufficient basis for a

jury to find for the non-moving party.  *See* Fed. R. Civ. P. 50.  Thus, in order to prevail on a

motion for JMOL following a jury trial, a moving party "must show that the jury's findings,

presumed or express, are not supported by substantial evidence or, if they were, that the legal

conclusion(s) implied [by] the jury's verdict cannot in law be supported by those findings."

*Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (alteration in original) (quoting

*Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984))

("'Substantial' evidence is such relevant evidence from the record taken as a whole as might be accepted by a reasonable mind as adequate to support the finding under review.").

## II. THE VALIDITY PORTION OF ETG'S SECOND AMENDED MOTION IS IMPROPER

The validity issues ETG raises in its Second Amended Motion concerning material not addressed by Defendants' Infringement and Validity JMOL Motion are moot because ETG could not appeal a denial of the validity aspects of its Second Amended Motion. The validity issues ETG raises as to the Best Invention and the JASA Abstract are appropriate for an opposition to Defendants' Infringement and Validity JMOL Opening Brief (D.I. 545), not for a preemptive JMOL motion.

The Federal Circuit has held that a winning party may not assert a cross-appeal unless the relief sought by the cross-appeal would expand the relief given in the original judgment. *Bailey v. Dart Container Corp. of Mich.*, 292 F.3d 1360, 1362 (Fed. Cir. 2002) ("It is only necessary and appropriate to file a cross-appeal when a party seeks to enlarge its own rights under the judgment or to lessen the rights of its adversary under the judgment."); *see also Boehringer Ingelheim Vetmedica, Inc. v. Schering-Plough Corp.*, 320 F.3d 1339, 1348 n.1 (Fed. Cir. 2003) ("Cross-appeals for the sole purpose of making an argument in support of the judgment are worse than unnecessary. They disrupt the briefing schedule, increasing from three to four the number of briefs, and they make the case less readily understandable to the judges. The arguments will be distributed over more papers, which also tend to be longer. Unless a party requests the alteration of the judgment in its favor, it should not file a notice of appeal." (quoting *Jordan v. Duff & Phelps, Inc.*, 815 F.2d 429, 439 (7th Cir. 1987)).

Hence, the Federal Circuit does not hesitate to dismiss cross-appeals and conditional cross-appeals that, even if successful, would not expand the relief the cross-appellant

previously obtained.  Instead, the cross-appellant is left with asserting the arguments it wants to

make in the cross-appeal as additional grounds to support the original judgment in its opposition

brief.  Here, ETG obtained a verdict that the claims were not proven to be invalid.  Hence, ETG

could not appeal a denial of the validity aspects of its Second Amended Motion seeking

"judgment" that certain materials are not prior art, since that "judgment" would not expand the

relief ETG obtained when the jury found that the Levitt Patents were not proven invalid.  ETG

can, however, respond to arguments Defendants made in their Infringement and Validity JMOL

Motion by asserting that the materials therein relied upon by Defendants do not constitute prior

art.

       Accordingly, Defendants urge that this Court apply the same rationale of judicial

economy that the CAFC applies to cross-appeals.  ETG's Second Amended Motion will not

enlarge ETG's relief under the verdict and, as a consequence, ETG's Second Amended Motion

as it pertains to validity issues should be stricken.

       Rule 50(a)(1) also supports this result since it holds that on a JMOL motion, the

court may "(A) resolve the issue against the party; and (B) grant a motion for judgment as a

matter of law against the party on a claim or defense that, under the controlling law, can be

maintained or defeated <u>only with</u> a favorable finding on that issue."  Fed. R. Civ. P. 50 (emphasis

added).  The "only with" prong is not met by ETG's Second Amended Motion.

       ETG's Second Amended Motion, as it pertains to validity, also provides an

inappropriate and unjustified briefing advantage.  The Motion permits ETG additional pages

beyond the limitations imposed by the Local Rules.  Perhaps more importantly, ETG gets the

"last say" on the issue of validity that by rule should be reserved for Defendants as the moving

party on the issue of validity. Accordingly, the Court should prevent this improper advantage and ignore ETG's Second Amended Motion as it pertains to validity.

In any event, and to avoid any inference that Defendants agree with ETG's assertions, Defendants will now substantively address the validity issues raised by ETG's Second Amended Motion.

## III.  DEFENDANTS HAVE OFFERED SUFFICIENT EVIDENCE TO SUPPORT A JURY FINDING THAT THE BEST INVENTION AND THE WEAVER INVENTION QUALIFY AS PRIOR ART

Defendants introduced sufficient evidence at trial to support a finding by the jury that the "inventions" of Leland Best and Kim Weaver qualify as prior art under 35 U.S.C. § 102(g)—i.e., a prior invention by another.

### A.    Law of Prior Inventorship

ETG in its Second Amended Motion asserts that substantial evidence of Dr. Best's and Mr. Weaver's prior inventions was not introduced at trial. This is not accurate. Defendants introduced substantial evidence at trial that the claims in the Levitt Patents are invalid as being anticipated by the prior invention of both Dr. Leland Best and Mr. Kim Weaver.

As the jury was instructed, in a patent infringement lawsuit, a patent may be invalidated under 35 U.S.C. § 102(g) due to another's prior invention. *Checkpoint Sys., Inc. v. U.S. Int'l Trade Comm'n*, 54 F.3d 756, 761 (Fed. Cir. 1995). Prior inventorship under § 102(g) requires that "once a challenger of a patent has proven by clear and convincing evidence that 'the invention was made in this country by another inventor,' 35 U.S.C. § 102(g), the burden of production shifts to the patentee to produce evidence sufficient to create a genuine issue of material fact as to whether the prior inventor has suppressed or concealed the invention." *Apotex USA, Inc. v. Merck & Co.*, 254 F.3d 1031, 1037 (Fed. Cir. 2001). A first inventor may avoid a

determination of abandonment by showing that (s)he described the invention in a publicly

disseminated document. *Checkpoint Sys.*, 54 F.3d at 762 ("[T]o negate a finding of suppression

or concealment, the public must have gained knowledge of the invention which will insure its

preservation in the public domain." (citing *Palmer v. Dudzik*, 481 F.2d 1377, 1387 (C.C.P.A.

1973))).  This publication need not qualify as a "printed publication" and may in fact occur after

the date of invention of, and even after the filing for, the patent-at-issue.  *See Corona Cord Tire*

*Co. v. Dovan Chem. Corp.*, 276 U.S. 358, 384-85 (1928) (invention made in 1916-17 was not

abandoned, where prior inventor made a public oral presentation of invention to scientific group

in September 1919 and published paper in April 1920; therefore, that prior invention defeated

second invention that was reduced to practice in February 1919); *Dow Chem. Co. v. Astro-*

*Valcour, Inc.*, 267 F.3d 1334, 1336-37, 1342-43 (Fed. Cir. 2001) (thirty-month period from the

time prior inventor reduced invention to practice until he publicized the invention by bringing it

to market did not show abandonment, even though second inventor reduced his invention to

practice and filed a patent application in the interim).

> "[A] determination of abandonment, suppression, or concealment has
'consistently been based on equitable principles and public policy as applied to the facts of each
case.'"  *Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 608 (D. Del.
2004) (quoting *Checkpoint Sys.*, 54 F.3d at 761).  Thus, with any reasonable basis to find lack of
intent to abandon, suppress or conceal, ETG's Second Amended Motion should be denied.

### B.    The Best Invention Qualifies as a Prior Invention that Was Not Abandoned, Suppressed, or Concealed

Not only did Defendants offer evidence that Dr. Leland Best's work at the

University of Wyoming in 1985 qualifies as a prior invention, which is sufficient to defeat

ETG's Second Amended Motion, but no reasonable jury could have found that Best's work did

not qualify as a prior invention under 35 U.S.C. § 102(g).  (*See* Defendants' Infringement and

Validity JMOL Opening Brief; D.I. 545 at 17.)  ETG attacks Dr. Best's prior invention on three

grounds:  (1) Dr. Best's prototype circuit was allegedly suppressed, (2) the circuit allegedly was

abandoned, and (3) the prototype circuit allegedly was insufficiently tested.  However, none of

these grounds is legally sufficient, even if true, to rebut the clear and convincing evidence

presented at trial that Dr. Best's LMS feedback cancellation invention qualifies as a prior

invention under 35 U.S.C. § 102(g).

        Defendants presented an abundance of evidence that Dr. Best invented his

prototype LMS feedback canceller circuit prior to the November 12, 1985 date of invention of

the Levitt Patents.  It is undisputed that Dr. Best wrote a thesis entitled "Digital Suppression of

Acoustic Feedback in Hearing Aids" as part of his master's degree work at the University of

Wyoming prior to that date.  (DX 1111 (attached to D.I. 547); Best, Tr. 1292:19-1293:7.)[2]  His

thesis includes an entire chapter about the prototype circuit that cancels acoustic feedback in a

hearing aid.  (DX 1111 at 21 (Best-00365) ("Chapter IV Prototype Feedback Canceller.  This

chapter contains a description of the hardware and software of a prototype feedback

canceller.").)

        It is undisputed that, prior to November 12, 1985, Dr. Best tested his idea for

canceling feedback by building a prototype and then testing it.  (Best, Tr. 1295:14-1296:16,

Matzen, Tr. 1932:25-1933:17 (direct).)  Dr. Best devotes an entire chapter in his thesis to the

---

[2]    Trial exhibits and trial transcript excerpts cited herein, unless otherwise indicated, are attached to the accompanying Appendix Of Exhibits And Trial Transcript Excerpts To Defendants' Answering Brief In Opposition To Plaintiff's Second Amended Motion For Judgment As A Matter Of Law.  Excerpts of trial transcripts are included in the Appendix as Attachment A.

testing that he performed on his prototype circuit. (DX 1111 at Best-00376 ("Chapter V –

Experimental Results") (D.I. 547).) Dr. Egolf testified that he witnessed the testing and

demonstration of the circuit prior to November 12, 1985. (Egolf, Tr. 1173:20-1174:19 (direct).)

And ETG's validity expert, Mr. Matzen, admits that Dr. Best did extensive testing of his LMS

feedback canceller. (Matzen, Tr. 1932:25-1933:17 (direct).) There is not one scintilla of

evidence that this testing did not occur.

       The Best thesis contains test results that show that Dr. Best's idea for a feedback

canceller not only worked, but worked well. (DX 1111 at 43 (Best-00387) ("The experimental

results presented here show, beyond a doubt, that the LMS adaptive feedback canceller is in fact

capable of providing additional stable gain with an ordinary hearing aid, the maximum stable

gain achieved with this system being 13.3 dB.") (D.I. 547); Egolf, Tr. 1175:10-1176:2 (direct).)

It worked so well it produced an additional 13 dB of gain that the hearing aid otherwise could not

have produced. (Best, Tr. 1296:2-9.) It is uncontroverted that the Best LMS feedback canceller

produced this additional 13 dB of gain. Even ETG's expert, Mr. Matzen, agreed that Dr. Best's

feedback canceller effectively cancels feedback:

> Q:    I'm just asking about feedback. Does the Best circuit cancel feedback?
> A:    I would assume it does, yes.
> Q:    In fact, it cancels it pretty well, doesn't it?
> A:    Yes, it does.

(Matzen, Tr. 1965:9-13 (cross).)

       Dr. Best did not abandon, suppress, or conceal his idea for an LMS feedback

canceller. On the contrary, he dedicated his idea to the public. ETG argues that Dr. Best is not a

prior inventor because he allegedly abandoned his prototype circuit. But the issue is not whether

he abandoned any particular <u>circuit</u> but whether he abandoned his <u>invention</u>. No reasonable jury

could conclude that Dr. Best abandoned his <u>invention</u> in view of the substantial and

uncontroverted evidence that he described his invention in detail in his thesis, presented it to

others, and gave his thesis to the University of Wyoming Library to publish.

       The fact that the library took too long to index the thesis to allow the thesis to

qualify as a printed publication cannot, and does not, negate the fact that Dr. Best did not

abandon his invention.  To the contrary, he dedicated his invention to the public by his

submission of his thesis to the University of Wyoming library without any conditions of

confidentiality and with full knowledge and intent that the thesis would be made public.  (Best,

Tr. 1307:21-1308:3, 1308:23-1309:3.)  These are not the actions of someone who intends to

abandon, suppress, or conceal his invention—just the opposite.  These are the actions of

someone who intends to dedicate his invention to the public so all can understand and enjoy its

benefits.  *See Checkpoint Sys.*, 54 F.3d at 762; *Palmer*, 481 F.2d at 1387.

       ETG ignores the relevant facts and instead attempts to mislead the Court by citing

irrelevant and misleading facts.  For example, ETG states that Defendants failed to present any

documentation to support the existence of the prototype.  (ETG Br. at 21.)  This is just contrary

to the undisputed facts.  The thesis describes the prototype in great detail.  (DX 1111 at 21 (D.I.

547); Matzen, Tr. 1932:13-15 (direct).)  Even the citation ETG offers in apparent support of its

proposition that no documents were presented at trial that support the existence of the prototype,

acknowledges that the thesis describes the prototype.  (Best, Tr. 1326:3-5 ("Question: <u>Other than

your thesis</u>, are there documents that would demonstrate that the second prototype was built at

any point prior to May of 1985?" (emphasis added)).)  The thesis is documentary evidence of

that prototype as the thesis describes the prototype and its operation and testing in detail.  (DX

1111; Best, Tr. 1317:1-6.)

ETG in its brief relies on Dr. Best not developing his concept into a commercial product to rebut the evidence of prior inventorship.  (ETG Br. at 21.)  But Dr. Best's purpose for writing his thesis and making a prototype was not for commercial gain; it was to obtain his master's degree and make his work available to others through the University library.  ETG cites no authority for the need for a master's candidate, whose goal is not to develop commercial products, to develop an invention into a commercial product to avoid abandoning his invention. Dr. Best fulfilled his requirements for the master's degree and submitted his thesis to the University library to be published.  (Best, Tr. 1307:21-1308:3, 1308:23-1309:3.)  ETG's contention that he abandoned his invention because he did not seek to commercialize it is unfounded in view of the fact that Dr. Best's purpose for inventing the LMS feedback canceller was to satisfy the requirements for his master's degree.  DX 1111 (D.I. 547).

In yet another misdirection, ETG argues that the Best thesis does not support a reduction to practice because it was not tested on a hearing impaired individual.  In an attempt to confuse the relevant issues, ETG tries to impose an unnecessary requirement on the Best Invention.  The alleged invention was the suppression of acoustic feedback in a hearing aid.  The evidence is unequivocal that the prototype LMS feedback canceller described in the Best thesis significantly reduced feedback in a hearing aid as gain was increased.  (Best, Tr. 1295:9-13, 1296:2-16, 1304:7-16.)  As noted above, even ETG's expert admits that Dr. Best's LMS feedback canceller effectively cancels feedback.  (Matzen, Tr. 1965:9-13 (cross).)

## C.     The Weaver Invention Qualifies as Prior Art

The following materials evidence the work of Kim Weaver.  This work led to, and these materials describe, the Weaver Invention, which is prior invention "prior art" under 35 U.S.C. § 102(g):

- 11 -

(a)     The Weaver Thesis
(b)     The Weaver Thesis Presentation
(c)     The Weaver AFC-1 and AFC-2 Circuits
(d)     The Veterans Administration (VA) Presentation
(e)     The ASA Presentation
(f)     The JASA Abstract (which also qualifies as prior art as a "printed publication")
(g)     The Jackson Hole Presentation
(h)     The 1984 VA R&D Progress Report (which also qualifies as prior art as a "printed publication")

From this material, Defendants' Infringement and Validity JMOL Motion relies only on the JASA Abstract as "prior art." Accordingly, ETG's positions concerning the JASA Abstract should be presented in its opposition to Defendants' JMOL, not as part of a separate motion for JMOL. The issue of whether the other pieces of Weaver's work constitute prior art is moot. Nevertheless, Defendants present the following points to avoid any suggestion that Defendants admit the Weaver Invention is not in fact and as a matter of law "prior art."

**1.     The Weaver Thesis**

Like Dr. Best, Mr. Kim Weaver was another graduate student at the University of Wyoming in 1984-85 who also had the idea of canceling feedback in a hearing aid. Mr. Weaver explained his idea in his thesis entitled "An Adaptive Open-Loop Estimator for the Reduction of Acoustic Feedback" dated December 1984 (the "Weaver Thesis"). (DX 956; Weaver, Tr. 1254:7-17 (direct).) His thesis included a description of his idea, complete with schematic diagrams, of using an open-loop estimator to estimate the open-loop path of a hearing aid, plus the feedback, and then subtracting out that estimate from the incoming signal. (Weaver, Tr. 1256:17-1257:20 (direct).) This eliminates the feedback and allows the amplification of the hearing aid to be substantially increased. (Weaver, Tr. 1257:14-20 (direct).) Mr. Weaver's idea is summarized in Figure 3.1 in the Weaver Thesis and it is this idea that is present throughout all

of Mr. Weaver's work.  (DX 956 at 14 (EGOLF 01978); Weaver, Tr. 1256:17-22 (direct); Soli, 1655:20-1656:14 (direct).)

The Weaver Thesis describes a prototype circuit, AFC-1, that includes the open-loop estimator in a feedback path that reduces feedback.  (Weaver, Tr. 1258:6-7 (direct).)  Mr. Weaver built and tested a series of prototype circuits starting with AFC-1 and then moved to AFC-2 as part of a progression of refinements.  (Weaver, Tr. 1258:2-14 (direct).)  But each of these circuits embodied Mr. Weaver's idea of estimating the open-loop feedback and then subtracting that estimate from the incoming signal to cancel the feedback.  (Weaver, Tr. 1256:17-1258:11 (direct); Soli, Tr. 1655:20-1656:14 (direct).)

ETG argues that the Weaver Thesis is not a printed publication because it was not cataloged before the November 12, 1985 date of invention of the Levitt Patents.  (ETG Br. at 11-13.)  That is not the issue.  As noted above, whether a particular publication is a "printed publication" under 35 U.S.C. § 102(a) has no bearing on whether the invention described in that publication (the "Weaver Invention") is in fact prior invention "prior art" under 35 U.S.C. § 102(g).

## 2.     The Weaver Thesis Presentation

After Mr. Weaver defended his thesis, he gave a presentation to the University community about his invention that was advertised in advance and open to the public.  (Weaver, Tr. 1255:13-1256:16 (direct).)  Mr. Weaver testified that he spent about forty to fifty minutes discussing "all the meat, the circuits, everything I could to fill 50 minutes of presentation of my thesis.  Present it all."  (Tr. 1256:4-5 (direct).)  The presentation was given to a room full of twenty or thirty people, consisting of graduate students, professors, and other guests.  (Weaver, Tr. 1256:6-10 (direct).)  And there were no conditions whatsoever that the information be kept

- 13 -

confidential. (Weaver, Tr. 1256:12-16 (direct).) Accordingly, there is substantial evidence that information contained in Mr. Weaver's thesis presentation (the "Weaver Invention") is prior art at least under 35 U.S.C. § 102(a) as being known by others in the United States before the earliest date of invention of the Levitt Patents. Moreover, this public presentation refutes any assertion that the Weaver Invention was abandoned, suppressed, or concealed from the relevant public.

### 3.    The Weaver AFC-1 and AFC-2 Circuits

There was substantial evidence at trial that the AFC-1 and AFC-2 circuits were described in the Weaver Thesis and presented and demonstrated to the relevant public as discussed above, prior to the earliest date of invention of the Levitt Patents. (DX 956; Egolf, Tr. 1213:14-18 (cross); Weaver Tr. 1258:5-6, 1258:15-1259:6, 1259:19-1260:4 (direct), DX 962 (attached to D.I. 547), Weaver Tr. 1260:16-1261:19 (direct).)

### 4.    The VA Presentation

As discussed above, Mr. Weaver presented his invention to twenty to thirty medical students and professors at the VA hospital in Augusta, Georgia in 1984. (Weaver, Tr. 1258:15-1259:24 (direct).) There is substantial evidence that the presentation occurred. Both Mr. Weaver and Dr. Larson, chief of Audiology and Speech Pathology Services at the VA, testified that the presentation took place, neither of whom has an interest in the outcome of this litigation. (Weaver, Tr. 1258:15-1259:24 (direct); Larson, Tr. 1755:17-1756:5, 1764:19-1765:24.) Accordingly, the VA presentation qualifies as prior art at least under 35 U.S.C. § 102(a) as the invention being known in the United States.

### 5.    The ASA Presentation

Substantial evidence was also presented at trial that Mr. Weaver described his invention in a presentation during a conference of the American Acoustical Society (ASA) in Austin, Texas in April 1985.  Mr. Weaver testified that he presented slides showing his invention as well as test results that show that acoustic feedback was canceled.  (Tr. 1260:16-1265:2 (direct); DX 963.)  ETG claims that there is no corroborating evidence of the presentation.  (ETG Br. at 16.)  However, the slides shown at the presentation are in evidence and corroborate Mr. Weaver's testimony.  (DX 963.)

### 6.    The JASA Abstract

An abstract of Mr. Weaver's presentation to the ASA was published in the Journal of the ASA ("JASA") prior to the April 1985 ASA conference.  (DX 962 (D.I. 547); Soli, Tr. 1654:7-15 (direct).)  The JASA Abstract qualifies as a printed publication under 35 U.S.C. § 102(a) because it was published before the November 12, 1985 Levitt date of invention, and under § 102(b) because it was published more than one year before the filing date of the Levitt Patents.  ETG challenges the JASA Abstract as not being enabled.  (ETG Br. at 21-23.) Enablement, however, is not a test for whether something is prior art under sections 102 or 103. It is a requirement to show anticipation by a printed publication under §§ 102(a) and (b), but is not a test for the prior art *status*.  Accordingly, a prior art reference may be used for all that teaches or discloses under section 103, even if that does not amount to an enabling disclosure of what is disclosed.  *Amgen, Inc. v. Hoechst Marion Roussel, Inc.*, 314 F.3d 1313, 1357 (Fed. Cir. 2003) ("Under § 103, . . . a reference need not be enabled; it qualifies as a prior art, regardless, for whatever is disclosed therein."); *Symbol Techs.*, *Inc. v. Opticon*, *Inc.*, 935 F.2d 1569, 1578 (Fed. Cir. 1991) ("While a reference must enable someone to practice the invention in order to

anticipate under § 102(b), a non-enabling reference may qualify as prior art for the purpose of

determining obviousness under § 103."); *Beckman Instruments*, *Inc. v. LKB Produkter AB*, 892

F.2d 1547, 1551 (Fed. Cir. 1989) ("Even if a reference discloses an inoperative device, it is prior

art for all that it teaches.").

Moreover, substantial evidence was offered at trial by Dr. Soli that the JASA

Abstract contains enough information to make and use the Weaver invention. (Soli, Tr. 1654:7-

15 (direct).) ETG asserts that Mr. Weaver, Dr. Egolf, and Dr. Larson all testified to the contrary,

that a person of ordinary skill would not have been able to build the Weaver Invention from the

JASA Abstract. This does not negate the fact that the jury may have disregarded this testimony

and instead accepted that of Dr. Soli. More importantly, even if true, that does not negate the

fact that the JASA Abstract was published early enough to be "prior art" and is therefore

available to render obvious the Levitt claimed invention to the extent of its teachings. According

to ETG, the Levitt invention is simply the use of an electrical feedback signal to cancel acoustic

feedback. But that is exactly what the JASA Abstract teaches well before the Levitt date of

invention:

> "The acoustic feedback which causes a hearing aid to become unstable at high gains is
> effectively reduced by the addition of negative electrical feedback."

(DX 962 at EGOLF 02174 (D.I. 547).)

Taken in combination with the Graupe '818 Patent, one of ordinary skill would be

enabled to build the claimed Levitt invention. (*See* Defendant's Infringement and Validity

JMOL Opening Brief; D.I. 545 at 16-17, n.17.)

### 7. The Jackson Hole Presentation

ETG asserts that the Jackson Hole presentation in September 1985 is not prior art

because Dr. Egolf's testimony is not corroborated. (ETG Br. at 15-16.) However, ETG fails to

inform the Court that a brochure from the presentation is in evidence that indicates that Dr. Egolf gave a presentation at the meeting of a "Practical Demonstration of Hearing Aid Innovations," including "Feedback Suppression Circuits."  (DX 971 at OTI 009452; Egolf, Tr. 1166:13-1169:16 (direct).)

ETG also criticizes Dr. Egolf's testimony as unreliable because he was paid by the Defendants.  However, Dr. Egolf testified that he has no interest in the outcome of the lawsuit and no reason was given to doubt that testimony.  (Egolf, Tr. 1236:22-24 (redirect).)

### 8.    1984 VA R&D Progress Report

The 1984 VA R&D Progress Report (the "VA Report") describes Mr. Weaver's idea for canceling feedback.  (DX 1357 at 163-64 (DEM523864-65).)  Even if the VA Report does not describe all the details of the feedback cancellation circuit, it describes the idea of estimating feedback and acting destructively to reduce the feedback.  The VA Report was published prior to the earliest date of invention of the Levitt Patents and is thus "prior art" for all it teaches.

### D.    ETG's Motion Seeking JMOL That The Weaver Work Is Not "Prior Art" Should Be Denied

ETG contends in its brief that the Weaver Invention was abandoned, suppressed, or concealed because of Mr. Weaver's alleged unreasonable delay in making the invention publicly known.  (ETG Br. at 17.)  This position is untenable and ignores the evidence.  Mr. Weaver promptly submitted his thesis to the University in December 1984 so that it could be cataloged and placed on the library shelves for all to read.  (Weaver, Tr. 1268:1-17 (cross).) There was no delay on Mr. Weaver's part in making his thesis available to the public.  And in fact, the Weaver Thesis was cataloged and placed on the library shelves, and is there today. (Woods, Tr. 1752:25-1753:4.)

ETG also takes the position that because the parts on the AFC circuits were recycled, this somehow equates to Mr. Weaver abandoning his invention.  Not so.  Even if the parts from the prototypes were recycled, the Weaver Invention is described in the Weaver Thesis, which sits today on the shelves of the University of Wyoming library for anyone to read. Not only does the thesis describe Mr. Weaver's idea about how to cancel feedback, but it also includes the schematic diagrams so that the prototypes can be built.  (DX 955 at EGOLF 0049, EGOLF 0116, EGOLF 0118; Weaver, Tr. 1253:18-1254:18, 1256:20-1258:11 (direct).)  ETG has proffered no case law to support it assertion that simply recycling parts of a prototype equates to abandoning an invention.

ETG criticizes Dr. Egolf for submitting an invention disclosure form to Dr. Larson at the VA but not filing a patent application for Mr. Weaver's invention.  However, there is no requirement that an inventor file a patent application on an invention.  *See Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 149 (1989) ("Once an inventor has decided to lift the veil of secrecy from his work, he must choose the protection of a federal patent *or the dedication of his idea to the public at large*." (emphasis added)); *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1437 (Fed. Cir. 1988) (explaining that a patent application need not be filed on an invention for it to be considered § 102(g) prior art as long as the invention is found not to have been abandoned, suppressed, or concealed).  ETG also asserts that the parties somehow admitted that there was no public disclosure of Mr. Weaver's invention as of August 1987 because Dr. Egolf checked off a box on an invention disclosure form indicating there had been no public disclosure of "the" invention.  (ETG Br. at 18.)  However, Dr. Egolf testified that the "invention" that was the subject of this form was a feature of AFC-3,

which was not the AFC-1 and AFC-2 basic feedback cancellation feature for which Defendants

were presenting the Weaver-related evidence.  (Egolf, Tr. 1235:5-14 (redirect).)

       The fact that Mr. Weaver's Invention was widely disclosed to others in the form

of the Weaver Thesis and related presentation, the JASA Abstract and VA Report, the VA

presentation, as well as both the Jackson Hole and Austin, Texas presentations, has not been

challenged by any contrary evidence of record.  Thus, the evidence shows that Mr. Weaver did

not abandon, suppress, or conceal his invention.  Not only is there substantial evidence of record

to this effect, which is all that is required to defeat ETG's Second Amended Motion on this

point, but the evidence is so overwhelming that no reasonable jury could have found otherwise.

## IV.    DEFENDANTS PRESENTED SUBSTANTIAL EVIDENCE THAT CLAIMS 13, 14, AND 16 OF THE '850 PATENT WERE NOT LITERALLY INFRINGED

       In ETG's Second Amended Motion, an assertion is made that no reasonable jury

could have found that claims 13, 14, and 16 of the '850 Patent were not literally infringed.  Not

so.  As is set out in detail below, Defendants presented substantial evidence for a jury to have

found that claims 13, 14, and 16 of the '850 Patent were not infringed, either literally or under

the doctrine of equivalents.[3]  Examples include testimony by Widex's expert on infringement,

Dr. Morley, and Demant's expert on infringement, Dr. Anderson.[4]  (*See, e.g.*, Morley, Tr.

1409:23-1415:14 (direct); Anderson, Tr. 1580:14-1582:10, 1582:21-1594:5 (direct).)

---

[3]    Defendants' Infringement and Validity JMOL Motion addresses the issue of infringement of these claims under the doctrine of equivalents.

[4]    *See also* Dr. Morley's testimony at 393:12-19 and 1408:22-1409:6 concerning claim 19, where he explained that the Accused Products do not have a programmable filter.

A.     **ETG's Testimony Regarding the "Determining" Step of Claims 13, 14, and 16 of the '850 Patent Was Vigorously Contested**

ETG alleges that "ETG Presented Uncontroverted Evidence that the 'Determining' Step Was Literally Infringed." (ETG Br. at 35.) ETG is wrong. Defendants presented substantial evidence to the contrary.

For example, Dr. Morley, Widex's expert, testified that the mathematical equations defining the operation of Widex's LMS filter have nothing to do with either phase or amplitude. (Tr. 1412:10-1413:21 (direct).) Likewise, Dr. Anderson, Demant's expert, testified there was no determination of amplitude or phase. (Tr. 1582:1-10, 1582:25-1583:11, 1584:4-1585:3 (direct).)

Thus, the jury could have (and should have) reasonably relied on the testimony of Dr. Morley and Dr. Andersen concerning the mathematical equations defining the operation of an LMS filter to conclude that Defendants' Accused Products, all of which include an LMS filter, do not determine the effect of phase and amplitude as a function of frequency as is required by claims 13, 14, and 16, or as a function of anything.

ETG also argues that their expert, Dr. Gloster, "conclusively" established that each Accused Product "uses an LMS technique that determines coefficients based upon inputs having digitized phase and amplitude characteristics." (ETG Br. at 36.) ETG is wrong, as the testimony ETG cites as supporting this argument says nothing about "phase" or "amplitude."

Apparently what ETG is asserting is that because coefficients are "determined" that result in a feedback signal that reduces the effect of acoustic feedback, necessarily the "determining" step of claims 13, 14, and 16 must have been performed  But once again ETG is wrong.  These claims do not merely require finding the correct coefficients; rather they require a separate and distinct step of "determining the effect on the amplitude and phase of a signal in

said transmission path as a function of frequency of acoustic feedback." (*See* Defendants'

Infringement and Validity JMOL Opening Brief; D.I. 545 at 35-36.)

There is no dispute that the Accused Products use an LMS algorithm. But no

expert for ETG—not Dr. Gloster nor Mr. Brown or Mr. Matzen—at any point in the trial was

able to point to any aspect of an LMS algorithm that undertook any literal determination of the

effect of phase or amplitude as a function of frequency, or even an equivalent thereof. Therein

lies the fallacy of ETG's position. While the Court has found that actually "measuring" of phase

and amplitude is not required, the Court did not eliminate the "determining" step, as ETG would

do. The fact that the Accused Products do not "measure" the effect of phase and amplitude

creates a serious burden on ETG to show what is done to satisfy the "determining" step—other

than produce a final result that reduces acoustic feedback. There is no such proof and, as shown

above, to the contrary, there is substantial evidence that an LMS algorithm makes no

determination of the effect of phase, makes no determination of the effect of amplitude, makes

no determination whatsoever as a function of frequency and, hence, cannot possibly be said to be

undertaking the "determining step" of the Levitt claims, either literally or under the doctrine of

equivalents.

Mr. Brown admitted that LMS filters do not need to determine phase and

amplitude to operate, yet he still found the determining step satisfied because the right result was

reached:

> Q.    Yes, and you don't need to know the phase and amplitude in order to run
>        the LMS algorithm?
> A.    Well, phase and amplitude are defined by the coefficient when you have
>        reached the answer.
> Q.    Right. It gives you the answer, but you don't need to know ahead of time
>        what the answer is with an LMS filter, do you?
> A.    No, you start out even at zero and approximate to the answer.

> Q.     And that is pretty different than having to know the answer before you
>        start and then putting the coefficients in, isn't it?
> A.     It's an improvement.

(Tr. 618:24-619:11 (cross).)[5]

An LMS algorithm is used to cancel/reduce acoustic feedback by creating an electrical feedback signal that mimics the phase and amplitude of the feedback signal. But that is not all what claims 13, 14, and 16 require. If it were, then the Graupe '818 Patent, which is uncontroverted prior art and did the same thing before the Levitt Patents, renders these Levitt Patent claims invalid. To be valid over Graupe, these claims must require some actual determination of the effect of phase and amplitude as is explained in the Defendants' Infringement and Validity JMOL Opening Brief. (D.I. 545 at 36-38.)

**B.     ETG's Testimony Regarding the "Inserting Step" Was Vigorously Contested**

ETG next alleges that "ETG Presented Uncontroverted Evidence that the 'Inserting' Step Was Literally Infringed." (ETG Br. at 38.) Far from being "uncontroverted," Defendants in fact vigorously contested the claimed "inserting" step. For example, Dr. Morley, Widex's expert, testified that the filters in the Widex products are put into the chip at the time of manufacturing in Taiwan:

> Q.     And then the next step, could you read that? It's starting with "inserting"?
> A.     "Inserting between the input and output of said transmission channel an
>        electrical feedback path having a filter therein programmed to equalize
>        and reduce the effect of said acoustic feedback both in amplitude and
>        phase on a signal in said transmission channel."
> Q.     **Do either the Senso Diva or the Inteo products perform the inserting
>        step in Claim 13?**

---

[5]  *See also* Brown, Tr. 649:19-650:20 (cross) ("[T]he coefficients of the filter define phase and amplitude. They are the measurement of it.").

A.      **Not at all**.  The filters that are used to cancel feedback in both of those
hearing aids are put onto the chip when it's made in a factory in Taiwan.
And that filter is in that chip from when it gets put on at the chip
manufacturing plant until the hearing aid is put in the -- for the rest of its
life, the existence of that hearing aid, that filter is in there.  It never leaves.

(Morley, Tr. 1413:22-1414:12 (direct) (emphases added); *see also*, Morley, Tr. 1414:24-1415:4

(direct)).

Likewise, as to the Demant products Dr. Anderson testified:

Another point is this step must be performed after the determining
step.  For Claim 14, it requires inserting a programmable filter
programmed.  Claim 13 requires inserting a feedback path having a
filter therein programmed.  So in both cases, it's talking about
inserting a filter and it's also talking about the program, that it's a
programmed filter.  Now, you heard Dr. Morley talk about how the
patent specification says you insert a filter after you have
determined these coefficients.  And that is consistent with this
claim.  **But in the accused products, the filter is inserted at the
time of manufacture, long before there are any coefficients
anywhere.  And so the insertion step occurs out of order then**.
It occurs first, and it's not programmed.

(Anderson, Tr. 1589:6-21 (direct) (emphasis added).)

Based on the testimony of Dr. Morley and Dr. Anderson, the jury could

reasonably have concluded that the Accused Products do not include, at least not literally, the

claimed "inserting" step to equalize and reduce the effects of feedback.

Moreover, the jury could have reasonably rejected ETG's expert, Mr. Brown's

untenable position that the claimed "inserting" step occurs not just at the time of manufacture,

but also every time the filter receives a new coefficient.

Q.      Now, what did you understand Mr. Brown to say with regard to this step
of inserting a filter?  When did he say that it occurred?

A.      **Mr. Brown suggested that the filter was inserted every time new
coefficients were provided.  In my view, that is inappropriate**.  The
filter is inserted at the time of manufacture.  When you provide it with
coefficients, you are just updating the filter or changing the filter.  You are
not removing it and reinserting it.

- 23 -

(Anderson, Tr. 1590:24-1591:7 (direct) (emphasis added).)

ETG alleges that "Defendants' 'physical insertion' theory inevitably led to jury confusion and apprehension to find literal infringement" and that "such a theory finds no support in the specification."  (ETG Br. at 27-28.)  ETG also argues that "Defendants' position that the inventors envisioned any embodiment where a circuit would have to be broken and a new filter physically inserted before the invention would work is illogical, and disingenuous at best." (ETG Br. at 27.)  The testimony by Drs. Morley and Anderson,[6] however, was correct and fully supported by the specification.  For example, the '850 Patent mentions both breaking a circuit and physically inserting a filter:

> For the purpose of this measurement, the **feedback loop is broken** between 140 and 122.  Terminal 140 of the hearing aid is then connected to terminal 34 of the host controller, terminal 142 of the hearing aid is connected to terminal 31 of the host controller, and terminal 143 of the hearing aid is connected to terminal 144 of the host controller.  The programmable phase shifter 30 and programmable amplifier 32 are then adjusted by the computer 24 so as to minimize the sum of the acoustic and electrical feedback signals of the output of summing amplifier 60.
>
> From the settings obtained with the phase shifter 30 and amplifier 32 at cancellation (at the "null"), the host controller calculates a set of coefficients for **a programmable filter to be inserted in the electrical feedback path between terminals 142 and 143** so as to cancel the acoustic feedback.

(JX 4 at 9:30-46 (emphases added) (D.I. 547).)

On the other hand, there is nothing in the patent specification to support Mr. Brown's testimony that somehow a "new" filter is "inserted" just because the filter received new or different coefficients.

---

[6]   The excerpt on page 27 of ETG's brief at Tr. 1625:3-22 is testimony by Dr. Anderson, not Dr. Morley.

    **C.**    **Defendants Presented Substantial Evidence That Accused Products Do Not Have A "Filter Therein Programmed" (Claim 13) Or A "Programmable Filter Programmed" (Claim 14) To Equalize And Reduce The Effect Of Said Acoustic Feedback Both In Amplitude And Phase on a Signal In The Transmission Channel**

        In addition to providing substantial evidence that the Accused Products do not perform the "determining" and "inserting" steps, Defendants presented substantial evidence that the Accused Products do not have a "filter therein programmed" (claim 13) or a "programmable filter programmed" (claim 14) to equalize and reduce the effect of said acoustic feedback both in amplitude and phase on a signal in the transmission channel.  For example, Dr. Morley testified:

> A.    Well, if we look at the term programmed, it says, in Item 4, The term programmed is construed to mean, quote, "provided with one or more values so as to produce a response," end quote.  **In the Senso Diva and the Inteo products, the filter that is in the feedback path is not provided with any coefficients**.  It generates its own.  It's got its chef there whipping up the meals, whatever it needs.

(Morley, Tr. 1393:12-19 (direct) (emphasis added).)

> Q.    So based on the Court's claim construction, your own analysis, the testimony of Mr. Nielsen, and the testimony of both Dr. Gloster and Mr. Brown, what is your opinion as to whether or not the WFIR block in the Senso Diva and the Inteo products is a programmable or a programmed filter?
>
> A.    **It is definitely not a programmable or a programmed filter**.
>
> Q.    And why is that?
>
> A.    Because it definitely does not have any memory or any memory that can be changed.

(Morley, Tr. 1408:22-1409:6 (direct) (emphasis added).)

        Likewise, Dr. Anderson testified:

A.    As I have just mentioned, a programmable filter and an adaptive filter are different things but the programmable filter, you provide it with coefficients. It gives you the response. With an adaptive filter, you cannot provide it with coefficients. It generates its own coefficients. **And I understand that ETG is asserting that while it has coefficients, it must have been programmed. I disagree with that for many reasons:** One, if all a filter must have to be programmed is coefficients, that means all filters are programmable and the point of differentiating a programmable filter would be a moot point and it would read that part out of the claim. Another reason I disagree is that with the LMS adaptive filters, you cannot determine what the response will be. You can't provide it with values so it will achieve a response. It's going to do what it wants to do.

Q.    So, doctor, are you just looking at this language right here? Can we just get that highlighted? Is that the language you are referring to?

A.    Yes. The programmable filter programmed. Okay? **So an LMS adaptive filter is not a programmable filter. It cannot be provided with values.** And, in fact, it's not programmable and in my opinion something that is not programmable or non-programmable is not equivalent to something that is programmable. The function is different. One allows you to produce a certain response and result is different -- I'm sorry -- substantially different. You can specify the response you want with the programmable filter. You cannot with an adaptive filter.

(Anderson, Tr. 1586:16-1587:19 (direct) (emphases added).)

ETG also provides an excerpt from Dr. Gloster in which he states that the "presence of memory in digital systems clearly defines that they are programmable." ETG Br. at 36-37 (citing Gloster, Tr. 671:9-10 (direct).) Defendants agree that a memory in a device or component must be present to make that device or component programmable if that memory were appropriately accessible. ETG, however, has no evidence that what it identifies as the "programmable filter" in the Accused Products in fact has a memory. Instead, Dr. Gloster testified that the memory in the Accused Products is separate from the FIR filter: "They are stored in a RAM and they are provided as input to the WFIR block, . . . ." (Tr. 672:2-4 (direct).) Similarly, for the Demant products, Dr. Gloster testified that the "update module computed coefficients which were stored in a memory and provided as input to an FIR filter which is

- 26 -

FBC_FIR."[7] (Gloster, Tr. 674:20-22 (direct).)  Thus, according to Dr. Gloster, the FIR filter

itself cannot possibly be "programmable" since it does not contain any memory.  Based on the

testimony of ETG's own technical expert, the FIR filter in the Accused Products cannot possibly

correspond to the claimed "programmable filters" because the FIR filter contains no memory.[8]

The jury could have reasonably relied upon Dr. Gloster's testimony in finding that claims 13, 14

and 16 are not literally infringed.

        Thus, substantial evidence exists for the jury to conclude reasonably that the LMS

adaptive filters of the accused products are not programmable filters.

     **D.**    **Defendants Provided a Substantial and Proper Non-Infringement Analysis**

        ETG alleges that "Defendants' Only Proof of Non-infringement Was Comparing

a Manipulated Patent Figure to the Accused Products - Not the Properly Construed Claims."

(ETG Br. at 33.)  ETG cites to three portions of the transcript for support.  But these transcript

portions do not support ETG's position.  At pages 1350:6-1357:19 and 1370:10-1375:11 of the

trial transcript, Dr. Morley is explaining what is shown in the Levitt Patents.  There is absolutely

no mention of any Accused Products in this testimony.  Likewise, at 1571:24-1577:1 of the

transcript, Dr. Anderson is also talking about what is in the patents and what the claim

construction was.  Again, there is absolutely no mention of any Accused Products in this

testimony.

---

[7]   Mr. Brown testified that the buffer (memory) and filter were separate components.  (*See, e.g.,* Brown, Tr. 515:23-516:11; 518:7-12 (direct) (D.I. 527).)

[8]   Defendants' Infringement and Validity JMOL Motion requests the Court to find no infringement, either literally or under the doctrine of equivalents, for this very reason.

Noticeably missing from ETG's trial citations are those portions which conclusively demonstrate that Defendants' non-infringement analysis properly compared the Accused Products to the claims.  (*See, e.g.*, Morley, Tr. 1412:10-1413:1 (direct); Anderson, Tr. 1582:1-10, 1582:21-1594:4 (direct).)

## V.     DEFENDANTS DID NOT MISLEAD THE JURY

ETG makes bold and bald assertions that Defendants "misled" the jury.  ETG also accuses Defendants of "purposefully ignoring this Court's Claim Construction Order."  (ETG Br. at 23.)  ETG cites to numerous places in the transcript as allegedly supporting those assertions, but as demonstrated below, none of ETG's citations supports its baseless allegations.

### A.     Defendants' Reference to "Measuring" Was Proper

ETG alleges that "in spite of the Markman order," Defendants "injected an artificial 'measuring' requirement into the determining clause that resulted in confusion for the jury at trial."  (ETG Br. at 25.)  ETG cites to four portions of the transcript in the body of its brief and an additional sixty-three portions in footnote 10.  However, a more careful reading of the transcript shows that those portions do not support ETG's allegation, and in many instances, are not even marginally relevant to the allegation.

Defendants referenced "measuring" for a number of reasons.  First, the Levitt Patents themselves disclose "measuring" the effect of the phase and amplitude that the feedback path has on any signal traveling in the transmission channel.  (*See, e.g.*, JX 4 at 6:66, 9:11-19, D.I. 547.)  It borders on the absurd for ETG to assert that Defendants somehow misled the jury when referencing what the Levitt Patents disclose.

Second, although the "determining" step of claims 13, 14, and 16 of the '850 Patent is not limited to "measuring," it does not exclude "measuring" as one form of

"determining." In fact, measuring the phase and amplitude is not only the disclosed preferred embodiment, it is the only disclosed embodiment supporting the "determining" step. Thus, Defendants had every right to point out that the Accused Products do not "measure" the effect of phase or amplitude, thereby challenging ETG to show what acts are performed that amount to the required "determining" step—a challenge ETG has not met.

Third, claim 1 of the '749 Patent expressly requires "measuring phase and amplitude," so, of course, Defendants are justified in pointing out, as they did, that the Accused Products to not measure phase or amplitude and do not perform any equivalent function. (JX 2 at 12:15) (D.I. 547).

Regarding the specific cites in the body of ETG's brief, Defendants reference to "measure/measuring" was both appropriate and technically accurate. In the first cite (176:4-17), Defendants' attorney was describing what Dr. Levitt did and how LMS filters work. In the second cite (194:8-12), Defendants' attorney was explaining what was disclosed in the Levitt Patents and how that was different from what was in the prior art. In the third cite (203:16-20), Defendants' attorney was explaining the hearing aid fitting process at the audiologist's office in the exact same terms that are in the Levitt Patents. Specifically, step (3) of the prescriptive procedure is "measuring acoustic feedback in the hearing aid." (JX 4 at 6:66, D.I. 547.)

ETG uses the fourth cite (1051:11-1052:3) to allegedly expose Defendants' "improper tactics of reading out the proper claim scope for their failed claim construction ('measuring') arguments." (ETG Br. at 26.) First, the question asked by Defendants' attorney in the cite was not directed to any specific claim; rather, it was directed to the operation of one of the Accused Products. Second, there was nothing improper about the question because, as mentioned above, claim 1 of the '749 Patent requires a host controller with means for measuring

phase and amplitude.  It was perfectly reasonable to ask a witness whether an Accused Product

has a feature of one of the asserted claims.

        Noticeably absent from ETG's brief are the cites to the Defendants' specific non-

infringement analysis of claims 13, 14, and 16.  (*See, e.g.*, Morley, Tr. 1409:23-1415:14 (direct);

Anderson, Tr. 1580:14-1582:10, 1582:21-1594:4 (direct).)  This oversight might be because

Defendants provided explicit testimony about whether the Accused Products "**determined**"

phase and amplitude.  For example, Dr. Morley, Widex's expert, provided the following

testimony:

> Q.     Okay.  Let's start now the next -- the first step is the **determining step**.
> Can you read that, please?
> A.     Yes.  The first step here is **determining** the effect on the amplitude and
> phase of a signal in said transmission channel as a function of frequency
> of acoustic feedback between said transducer and microphone.
> Q.     Okay.  Does the Inteo or Senso Diva perform that **determining** step?
> A.     No, neither of them perform that step.
> Q.     Why not?
> A.     Because the Inteo and the Senso Diva just generate inside the WLMS
> block coefficients to try to cancel the feedback in an adaptive way.  They
> don't in any way, if we go into the patent and look at the equations, there
> is nothing in the equations that **determines** the calculation of the
> coefficients in that adaptive filter.  Nothing in those equations has
> anything about phase and amplitude.

(Morley, Tr. 1412:10-1413:1 (direct) (emphases added).)

        Likewise, Dr. Anderson, Demant's expert, testified as follows:

> A.     Sure.  The first few describe a hearing aid.  That is not under dispute.  This
> next step requires **determining** -- and this is a mouthful and I apologize --
> **determining** the effect on the amplitude and phase of a signal in said
> transmission channel as a function of frequency of acoustic feedback
> between said receiver and microphone.  And I would say that neither of
> those two steps are performed in any of the accused -- I'm sorry -- this step
> is not performed in any of the accused products.

(Anderson, Tr. 1582:1-10 (direct) (emphases added).)

> Q.    Now, what is the basis for your opinion that this step is not literally
> performed or not performed by equivalence?
>
> A.    The adaptive filters -- I guess I should start by saying -- let's see.  How do
> I bring this up?  I understand adaptive filters.  I have written papers and
> designed adaptive filters.  I understand the math behind them.  I
> understand the principles behind them.  And I can tell you or show you,
> whichever you would like to see, that there is no **determination** of
> amplitude or phase effect in adaptive filters, that they do not need that
> information, they cannot make use of that information and it is simply not
> performed.

(Anderson, Tr. 1582:25-1583:11 (direct) (emphasis added).)

It appears that ETG simply searched the transcript for the terms
"measure/measuring."  For example, at 1379:1-2, Dr. Morley is quoting directly from the '850
Patent, which states at column 9, line 30:  "For the purpose of this measurement, the feedback
loop is broken between 140 and 122."  Likewise, at 1631:20-21, Dr. Anderson is quoting the
same portion of the '850 Patent.  How can it be "misleading" for Defendants to quote directly
from the patent?

ETG even cited to a question by its own attorney and to testimony by its own
expert, Mr. Brown, for support that Defendants misled the jury.  At 809:7-10, Mr. Steinberg
asked one of Widex's witness:

> Q.    You're aware, aren't you, that Dr. Levitt's feedback system, one of the
> reasons it was invented is because it did not require a response from a
> child; right?  You could just **measure** the null effect.  You are aware of
> that; right?

(Emphasis added.)  And, at 2008:12, Mr. Brown, ETG's expert, was answering a question posed
by ETG's attorney.  How can ETG's questions or ETG's testimony be a cause of Defendants
"misleading" the jury?

The majority of ETG's cites pertain to testimony related to what is disclosed in
the Levitt Patents and how the embodiments work.  Other cites by ETG include descriptions of

what the prior art does (1419:9), a direct quote from the Bustamante article that describes the '850 Patent (1435:17; 2195:3, 11), and discussions about what LMS filters can do (290:1, 5, 6; 1051:19; 1052:11; 1460:12; 1617:11).

Probably the most curious ETG cite is to 1472:4, 9. In this portion of the transcript, Defendants' attorney is arguing the issue of prosecution estoppel for claims 1 and 2 of the '749 Patent. Not only was this done outside the presence of the jury, claims 1 and 2, as mentioned above, contain the language "means for receiving signals from the hearing aid and measuring phase and amplitude."

**B.    Defendants Did Not Present "Misleading" Non-infringement Arguments**

ETG alleges that Defendants "put on a charade for the jury regarding infringement of claims 13, 14 and 16" because Defendants argued that the claims did not cover "adaptive technology." (ETG Br. at 29.) ETG bases this argument on the assertion that the "Court's Claim Construction Order clearly states that the Patents-in-suit cover both fixed and adaptive technology." (*Id*.) Unfortunately for ETG, the Claim Construction Order does not say that. The Order is silent on the issue. (D.I. 495.) And, as is explained at pages 10-12 of Defendants' Infringement and Validity JMOL Opening Brief, the Court's Claim Construction Order is in fact consistent with excluding adaptive LMS filters of the type employed in the Accused Products. First, the Court's construction requires programming for "a" response, which is not possible in the Accused Products. Second, if the "filter" is deemed to include not just the delay line but also the LMS algorithm, which is integral to any part of the operation of the accused delay lines, then there is no way to "provide" any value to that "filter."

In any event, the jury appeared to reject the argument that the claims cannot cover adaptive filters because the jury found literal infringement of claim 19. (D.I. 521 at 2.)

**C.    Defendants Did Not Admit that Their Technical Documents Proved Literal Infringement of Claims 13, 14, and 16**

One of ETG's themes at trial was to paint the Defendants as liars and criminals[9]

because some of the witnesses disagreed with the technical accuracy of some of their marketing

documents.  (*See, e.g.*, Tr. 148:23-149:5, 150:3-151:18 .)  In particular, ETG questioned Thomas

Christensen at length over why he said the Demant products did not "cancel" feedback, even

though the marketing material said the products did.  (Tr. 1023:12-1024:9, 1036:17-1045:25,

1047:5-1048:9, 1049:2-1051:7.)  This was nothing more than a red herring because claims 13,

14, and 16 do not require feedback "cancellation"—they simply require the reduction of the

effect of acoustic feedback.  That was never in dispute.  Accordingly, both words—

"cancellation" and "reduction"—have the same impact as to infringement, and the fact that

technically trained employees prefer the more accurate word, "reduction," should have had no

effect on the issues in dispute.  *See also Whirlpool Corp. v. LG Elec., Inc.*, No. 1:04-CV-100,

2006 WL 2035215, at *8 (W.D. Mich. July 18, 2006) (marketing materials cannot override the

actual operation of Accused Products).  Yet ETG seized on this point to unfairly sway the jury.

Instead, as Defendants' counsel correctly pointed out in closing arguments:

> We spent hours of precious time over the last nine days arguing
> over terminology in marketing documents.  I said, and I'll say it
> again, feedback cancellation, feedback reduction, feedback
> suppression.  It doesn't matter what you call it.  That is not what
> determines infringement.  It just doesn't matter.  You could call it
> Swiss cheese, as Dr. Anderson said on the stand.  It doesn't matter
> what you call it, it matters what you do. It matters what is in there.

(Tr.  2132:6-14 (closing).)

---

[9]    ETG's counsel went as far as to characterize this case as "CSI Delaware."  (Tr. 2100:21.)

ETG, not Defendants, improperly confused the jury on this point.  The LMS

algorithm that is "in there" has nothing to do with any phase, amplitude, or frequency

"determination," as is required by claims 13, 14, and 16 of the '850 Patent.

Moreover, ETG alleges that the "Defendants admitted that if their technical

documents were true, they would in fact literally infringe claims 13, 14 and 16."  (ETG Br. at 30;

*see also id.* at 32.)  Nothing could be further from the truth.  ETG cites to fifteen portions of the

transcript for support.  (*Id.* at 32-33.)  Unfortunately for ETG, yet once again that support is

lacking.  Defendants never admitted that the "technical documents" showed all of the limitations

of the claims.

ETG is essentially arguing that there was literal infringement of these claims

because the Accused Products used an equal and opposite signal to cancel acoustic feedback.[10]

However, claims 13, 14, and 16 require more than just "determining the phase and amplitude,

creating an equal but opposite signal and canceling."  (Tr. 2109:11-13 (closing).)  Again, ETG,

not Defendants, misled the jury by arguing at closing argument that this was all that was

necessary to prove infringement.  Nowhere in the cites do the Defendants admit, for example, the

requirements of the asserted claims: (1) that the Accused Products determine the effect on the

amplitude or phase of a signal . . . as a function of frequency; (2) that there is an insertion of an

electrical feedback path having a filter therein programmed or a programmable filter

programmed; or (3) that a "determining" step (if there were one) occurs prior to the inserting

step.

---

[10]   As noted above, in Defendants' Infringement and Validity JMOL Opening Brief, Defendants
show that if this is all that is required in these claims, the claims would be invalid over
Graupe.  D.I. 545 at 7-8, 12-17 & 36-37.

## <u>CONCLUSION</u>

For the reasons given above, the Court should deny ETG's Second Amended Motion, finding: (1) that ETG has failed to properly raise issues as to the status of the identified material as "prior art;" (2) that in fact there was substantive evidence to support a jury finding, had there been one, that these materials were all in fact "prior art;" and (3) that there was substantial evidence to support the jury's finding that claims 13, 14, and 16 of the '850 Patent were not literally infringed.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Mary B. Graham*

_____

Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200
mgraham@mnat.com
jparrett@mnat.com

*Attorneys for William Demant Holding A/S,*
*WDH Inc., Oticon A/S, Oticon, Inc.,*
*Bernafon AG, and Bernafon LLC*

OF COUNSEL:

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, DC  20001-4413
202.408.4000

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Donald E. Reid*

_____

Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200
dreid@mnat.com

*Attorneys for Widex A/S and*
*Widex Hearing Aid Co. Inc.*

OF COUNSEL:

SUGHRUE MION, PLLC
David J. Cushing
William H. Mandir
Carl J. Pellegrini
Brian K. Shelton
2100 Pennsylvania Ave., N.W.
Suite 800
Washington, DC  20037
202.293.7060

May 9, 2008
2322407
1587501v2

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 9, 2008, the foregoing was caused to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

In addition, the undersigned hereby certifies that true and correct copies of the foregoing were caused to be served via electronic mail on May 9, 2008 upon the following parties:

REPRESENTING ENERGY
TRANSPORTATION GROUP, INC.

Edmond D. Johnson
PEPPER HAMILTON LLP
**johnsone@pepperlaw.com**

Brian M. Buroker
HUNTON & WILLIAMS LLP
**etg@hunton.com**

REPRESENTING WIDEX A/S
AND WIDEX HEARING AID CO. INC.

Donald E. Reid
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
**dreid@mnat.com**

William H. Mandir
SUGHRUE MION PLLC
**wmandir@sughrue.com**

David J. Cushing
SUGHRUE MION PLLC
**dcushing@sughrue.com**

Carl J. Pellegrini
SUGHRUE MION PLLC
**cpellegrini@sughrue.com**

Brian K. Shelton
SUGHRUE MION PLLC
**bshelton@sughrue.com**

REPRESENTING WILLIAM DEMANT HOLDING
A/S, WDH, INC., OTICON A/S, OTICON INC.,
BERNAFON AG, AND BERNAFON, LLC

Mary B. Graham
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
**mgraham@mnat.com;**
**mbgeservice@mnat.com**

John M. Romary
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
**john.romary@finnegan.com**

C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
**c.gregory.gramenopoulos@finnegan.com**

The undersigned also hereby certifies that on May 9, 2008, true and correct copies of

the foregoing were caused to be served by hand upon the following Delaware counsel:

Edmond D. Johnson
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE  19899-1709

*/s/ Mary B. Graham*

_____

Mary B. Graham (#2256)