1    A.       No.   That's the beauty of the patent.   There were a

 2    number of algorithms people were playing with, and it does

 3    not specify which algorithm.

 4    Q.       Did the defendants invent the LMS algorithm?

 5    A.       No.

 6    Q.       Was it around at the time of Dr. Levitt's patent?

 7    A.       Mathematically speaking, it was around, yes.

 8    Q.       In your view, an LMS algorithm could be used to

 9    provide coefficients to a filter?

10    A.       Yes.

11    Q.       And, in fact, that's what the defendants' products

12    do.   Is that right?

13    A.       That's what I have seen, in each of their examples

14    they show it as a discrete block with a path showing the

15    filter coefficients being loaded into the filter.

16    Q.       You were shown a fairly complex number, a series of

17    mathematical equations.   Do you recall that?

18    A.       Yes.

19    Q.       Could you explain how the LMS algorithm calculates

20    coefficients?

21    A.       Well, when I see equations like that, I either go

22    back to the textbook or refer it to one of my engineers.   I

23    used to teach this at Berkeley.   But to make it simple,

24    basically, it looks at the output of this signal, the

25    amplifier, and just before it goes, is converted back to

Brown - redirect

1    analog, and the speaker, and it compares that to the input

2    after the filter's feedback has been subtracted, and looks

3    for coherence.

4                    If it finds that there is any of that

5    feedback element still in the subtracted answer, then it

6    modifies the coefficients to attempt to correct for that.

7    It makes, calculates a new guess and applies that to the

8    filter.

9                    Then after this is cycled all the way through

10   the filter, come back around and new data comes back, it can

11   check to see whether it did a good job.

12                   As we pointed out, there is a lot more cycles in

13   between in the middle.  So this is a continuous process.

14   Q.    And do you agree or disagree that that measures phase

15   and amplitude?

16   A.    Definitely.  It doesn't read out phase and amplitude.

17   It measures it, it determines the effect on it.  It programs

18   the filter to respond to that effect, and the coefficients

19   of the filter define phase and amplitude.  They are the

20   measurement of it.

21   Q.    What was required to determine infringement of Claims

22   13, 14 and 16?

23   A.    That it determines the effect on the signal, the

24   effect of acoustic feedback on the signal in the patent.

25   Q.    And what again is your opinion as to whether the LMS

1    just talking about?

2              THE WITNESS:  You see the P0 through P47?  Right

3    there.

4    BY MR. BUROKER:

5    Q.    That signifies the memory.  Is that correct?

6    A.    Yes, that's correct.

7    Q.    What does the presence of that memory tell you, if

8    anything, about this design?

9    A.    The presence of memory in digital systems clearly

10   defines that they are programmable.  A computer has memory,

11   so we can program it.

12             So if memory is present, then it must be

13   programmable, because it can change, the values can change.

14   Q.    In this case what is the memory used for?  What does

15   it change?

16   A.    It changes the coefficient.  So the WLMS block

17   computes the coefficients, it changes them, stores them in

18   the memory.

19             So they can be subsequently changed and applied

20   to the filter.

21   Q.    So before we move on to Oticon, for purposes of the

22   Widex document you reviewed, what is your conclusion as to

23   whether or not this diagram is accurate?

24   A.    It's my conclusion, it's my opinion that the

25   technical documents directly match, accurately match what's

Gloster - direct

```
 1    in the code, and that this update module -- not the update
 2    module, the WLMS module produces the coefficients.  They are
 3    stored in a RAM and they are provided as input to the WFIR
 4    block, which is the 48-tap final impulse response filter.
 5    Q.    Thank you.  Did you perform a similar analysis with
 6    regard to the Oticon products involved in this case?
 7    A.    Yes.
 8    Q.    And describe, again, what did you do for the Oticon
 9    products?
10    A.    I went through a similar procedure.  I tried to
11    identify the technical documents that sort of matched the
12    code.  And I was given the technical documents by Mr. Brown.
13    And it was my understanding they came from the defendants.
14              Then I looked at the code and tried to identify
15    which portions of the code dealt with feedback cancellation.
16    Then when I found those, I tried to match that code to the
17    actual technical specs.
18              Now, in this case, it was Verilog code, not
19    VHDL.
20    Q.    Do you understand how many platforms there are in the
21    Oticon product?
22    A.    Yes.  It's my understanding that there were many
23    products, but I only looked at two platforms, and that was
24    Jump 2 and Jump 3.  It was my understanding that Jump 2 and
25    Jump 3 were in many of the other products.
```

1  coefficients.  The coefficients were applied as input to the

2  FBC_FIR block.

3  Q.    Okay.  And what is the -- there is a little box there

4  that maybe it's got a 26 -- excuse me.  It has a 26 on it.

5  What is that little block there?

6  A.    The 26 block is what they call the coefficient

7  buffer, feedback cancellation coefficient buffer.  That is

8  where the coefficients are actually stored.  In this filter,

9  I believe it was a 24 tap FIR filter so it would be 24

10  coefficients that were stored.

11  Q.    And were you able to then compare this to the code in

12  the Oticon products?

13  A.    Yes.  I compared this block diagram to the code and

14  it's my opinion that the actual technical document, this

15  particular figure matched the code with respect to these

16  products.

17  Q.    And based on your review of the code, is their update

18  module a separate module from the FIR filter?

19  A.    The update module was definitely a separate module

20  from the FBC_FIR module, and the update module computed

21  coefficients which were stored in a memory and provided as

22  input to an FIR filter, which is FBC_FIR.  If you look in

23  the figure, the diagonal line going up from the coefficient

24  buffer to the FBC_FIR block is where the coefficients

25  actually were transferred from the coefficient buffer into

1    higher power than hearing aids today.

2    Q.    They would require a lot of power; correct?

3    A.    Definitely, yes.

4    Q.    Now, you said that your company focused on hearing

5    aids for children at least in part; correct?

6    A.    Correct.

7    Q.    You're aware, aren't you, that Dr. Levitt's feedback

8    system, one of the reasons it was invented is because it did

9    not require a response from a child; right?  You could just

10   measure the null effect.  You are aware of that; right?

11   A.    Only as -- only for the feedback cancellation.  It

12   doesn't require information of the hearing loss.

13   Q.    That's what I meant for the feedback cancellation.

14   You are aware of that; right?

15   A.    Yes.

16   Q.    Now, you told your counsel that you sold 10 million

17   hearing aids and you were going to sell 15 million hearing

18   aids.  What were the profits on those 10 million hearing

19   aids?

20   A.    I mean that is over 50 years.  I couldn't tell you.

21   Q.    Now, counsel directed you to DX-1599.  I believe that

22   is in your book.  And that's a patent that Widex was

23   assigned by an inventor.  It's entitled "hearing aid,"

24   right?

25   A.    That is correct.  Yes.

1               IN THE UNITED STATES DISTRICT COURT

2               IN AND FOR THE DISTRICT OF DELAWARE

3

                        -  -  -

4

5    ENERGY TRANSPORTATION,          :   Civil Action
     INC.,                           :
6                                    :
                    Plaintiff,       :
7                                    :
            v.                       :
8                                    :
     WILLIAM DEMANT HOLDINGS A/S,    :
9    et al.,                         :
                                     :
10               Defendants.         :   No. 05-422 (GMS)

11                      -  -  -

12                   Wilmington, Delaware
                   Friday, January 25, 2008
13                        9:00 a.m.
                     Fifth Day of Trial
14
                        -  -  -
15
     BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge
16

17

18   APPEARANCES:

19               EDMOND D. JOHNSON, ESQ.
                 Pepper Hamilton LLP
20                      -and-
                 MARTY STEINBERG, ESQ.,
21               BRIAN M. BUROKER, ESQ., and
                 MAYA M. ECKSTEIN, ESQ.
22               Hunton & Williams
                 (Washington, D.C.)
23
                                    Counsel for Plaintiff
24

25

```
1    APPEARANCES CONTINUED:

2                    MARY B. GRAHAM, ESQ.
                     Morris, Nichols, Arsht & Tunnell
3                         -and-
                     JOHN M. ROMARY, ESQ.,
4                    GREGORY C. GRAMENOPOULOS, ESQ.,
                     VINCENT KOVALICK, ESQ.,
5                    KAY HILL, ESQ.,
                     GERSON S. PANITCH, ESQ., and
6                    ARTHUR A. SMITH, ESQ.
                     Finnegan, Henderson, Ford, Farabow & Dunner
7                      (Washington, D.C.)

8                                         Counsel for
                                          Demant Defendants
9
                     DONALD E. REID, ESQ.
10                   Morris, Nichols, Arsht & Tunnell
                          -and-
11                   WILLIAM H. MANDIR, ESQ.,
                     JOHN SCHERLING, ESQ.,
12                   CARL J. PELLEGRINI, ESQ.,
                     BRIAN SHELTON, ESQ.,
13                   MATTHEW KAPLAN, ESQ., and
                     J. WARREN LYTLE, JR., ESQ.
14                   Sughrue Mion
                       (Washington, D.C.)
15
                                          Counsel for Widex
16                                        Defendants

17                          -   -   -

18

19

20

21

22

23

24

25
```

Christensen - cross

1  you?

2  A.    I learned about the algorithm but not necessarily the

3  first day it was invented.

4  Q.    Now, where I think your counsel referred you to a

5  patent, I believe you have it in front of you in your

6  counsel's -- yes.  JX-6, I believe it is.

7  A.    Is that the other book?

8  Q.    Yes, that's the other book.  I am sorry.  I believe

9  you said this was one of the patents that you received for

10  feedback in the United States.  Is that correct?

11  A.    Yes, this is one of the patents that Oticon received.

12  Q.    And you just told the jury a few moments ago that the

13  feedback cancellation mechanisms in the products by Oticon

14  and Demant are not feedback cancellation systems, didn't

15  you?  Explain that.

16  A.    I said that what we had in the products, we have in

17  feedback reduction system based on the LMS algorithm.

18  Q.    But you told them specifically, I want to explain to

19  you, it is really not cancellation, it is reduction.  Right?

20  A.    That's correct.

21  Q.    What's your patent called?

22  A.    This patent is called Feedback Cancellation Using

23  Bandwidth Detection.

24  Q.    And throughout this patent, on all the pages of the

25  patent, doesn't it say feedback cancellation?

 1    A.    Well, I cannot speak for all the pages of the patent,

 2    but I can see it on the title, at least.

 3    Q.    And even in the abstract, right at the beginning, a

 4    method for canceling feedback.  Right?

 5    A.    I can see that, yes.

 6    Q.    Because you know as an engineer, there is a difference

 7    between reduction and cancellation.  Right?

 8    A.    In my interpretation, there is a clear distinction

 9    between cancellation and reduction.

10    Q.    And to cancel, you have to determine the phase and

11    amplitude of the feedback signal and create an equal but

12    opposite signal to cancel, don't you?

13    A.    Not necessarily, I think.

14    Q.    Is that one way you do it?

15    A.    Excuse me?

16    Q.    Is that one way to do it?

17    A.    It could be a way to do it.  There might be other

18    ways.

19    Q.    Now, let's take a look at the second page of that

20    patent that you were just talking about.  And you were

21    telling us something about, well, there is this LMS filter

22    and it's all in one thing and you can't program it and so

23    forth.  Correct?

24              MR. GRAMENOPOULOS:  Objection.  That

25    mischaracterizes his testimony.  I don't think there was any

Christensen - cross

1    Q.    All right.  Let's turn to the very next page, which is

2    200, and if you see under the relative power consumption it

3    says, the delayed output signal of the hearing aid is

4    filtered through a 24-tap FIR filter with coefficients

5    generated by the LMS.  Do you see that?

6    A.    Yes, I see that.

7    Q.    Is that how it operates, sir?

8    A.    That's how it's described here at least, yes.

9    Q.    This is Oticon's document.  Correct?

10   A.    Yes.  This is a document that should explain the

11   functionality of the system, not necessarily the details of

12   implementation.

13   Q.    Okay.  Now, let's turn to 210 in this same document.

14   Under Section 4.3, it says the AFB -- what does AFB stand

15   for?

16   A.    Anti-feedback.

17   Q.    The anti-feedback system is designed to predict and

18   cancel as much as possible of the microphone signal from the

19   information and HF component of the output signal.  Correct?

20   A.    That's what it says here.

21   Q.    But you are saying that's not correct?

22   A.    I am saying it's reducing.

23   Q.    You disagree with the language in this technical

24   document from Oticon.  Is that correct?

25   A.    My view, as I said, this algorithm is able to reduce

Christensen - cross

1    the feedback, not to cancel, because I think we measured --

2    it can reduce by an amount of 10 to 12 decibels.  It is a

3    technical measurement, how much it can reduce.  And it's the

4    order of magnitude.  And ten decibels equals like three

5    times.

6    Q.    Did you finish your answer?

7    A.    Not really.  If it did cancel, it would cancel by an

8    infinite amount, not only three times.  So that's why I

9    distinguish between reduce and cancel.

10   Q.    So can you answer my question?  You disagree with the

11   technical language in this Oticon document.  Is that

12   correct?

13   A.    On this point, yes.

14   Q.    And it goes on to say in the very next paragraph, The

15   feedback via the two feedback paths will cancel each other

16   when there is a perfect match between the two feedback

17   paths.  Right?

18   A.    That's what it says.

19   Q.    In fact, you testified previously that you were

20   puzzled by the use of the word cancel.  Isn't that correct?

21   A.    Previously?

22   Q.    Yes.  When you testified in your deposition?

23   A.    At deposition we also discussed the use of the word

24   cancel, that's true.

25   Q.    And you said you were puzzled by the use of the word

Christensen - cross

1   cancel in your own company's documents.  Right?

2   A.    I probably have said that, yes, if you say so, because

3   it's not correct.

4   Q.    Okay, let's look at PX-30.  PX-30 is a brochure for a

5   product called the Adapto.  Did your company make a product

6   called the Adapto?

7   A.    Oticon makes a product called the Adapto.

8   Q.    Okay.  And let's turn to page 448.

9   A.    Yes.

10  Q.    On 448, it clearly says Adapto dynamic feedback

11  cancellation; correct?

12  A.    It says so, yes.

13  Q.    And your position is you strongly disagree, it doesn't

14  have feedback cancellation; right?

15  A.    I must repeat myself.  It talks about --

16  Q.    Can you answer my question first?

17          MR. GRAMENOPOULOS:  Let him answer the question.

18          THE COURT:  You can answer the question.  Go

19  ahead.

20          THE WITNESS:  I must repeat myself, it says in

21  this marketing material, cancellation.  I still have the

22  same opinion that we are talking about the feedback

23  reduction, not cancellation.

24  BY MR. STEINBERG:

25  Q.    Okay.  And then it goes on to say:  Adaptive feedback

1    cancellation is an active system.  It constantly monitors

2    the state of the instrument and cancels the feedback path.

3    And then it goes on to say:  By comparing the signal

4    entering the hearing microphone and the amplified signal,

5    the DFC eliminates feedback by precise phase cancellation.

6    Right?

7            Now, you don't agree that it monitors feedback,

8    do you.

9    A.    There is a lot in there that I don't agree to.

10   Q.    Can you answer my question?  You don't even agree that

11   it monitors feedback, do you?

12   A.    Monitors feedback?  Well, in one way you could say it

13   monitors feedback.

14   Q.    You don't agree that it measures by phase

15   cancellation, it cancels feedback, do you?

16   A.    I don't agree to that, that's correct.

17   Q.    Now, if you did agree to that, that your Adapto system

18   and your technical documents determine the feedback signal

19   and then used phase cancellation, as your documents say, you

20   would be agreeing that your technical devices determine the

21   phase and the amplitude and create an equal and opposite

22   signal and cancel; wouldn't you?

23   A.    That was a long line of argument.  You might be right

24   on that.

25            THE COURT:  The question was argumentive.  You

1   can rephrase it and break it down into its components.

2   Parse it.

3   BY MR. STEINBERG:

4   Q.    If you do agree that your products use phase

5   cancellation and measure the input and output and compare

6   them and cancel -- you understand that part; right?  If you

7   agree that that is what your documents say and that is what

8   your products do, you would be agreeing that you're

9   determining the phase and the amplitude, creating an equal

10  but opposite signal and cancelling; right?

11  A.    I'm sorry.  It was still a long one, but if I agree to

12  that, I think, as I understand your question, you're right.

13  The problem is I strongly disagree because the technology is

14  not built that way.

15  Q.    Now, let's go to PX-31.  PX-31 is --

16  A.    31?

17  Q.    PX-31.  PX-31 is a document by your company for

18  another hearing aid called the Gaia; right?  If I'm

19  pronouncing that right.

20  A.    Gaia is right, yes.  It's from Oticon, not my company.

21  Q.    Oticon.

22  A.    Yes, thank you.

23  Q.    Okay.  Now, if you turn to page 417.

24  A.    Yes.

25  Q.    Okay.  Now, on 417, of course, it identifies a system

Christensen - cross

1    as dynamic feedback cancellation; right?

2    A.    Correct.

3    Q.    And then it says that DFC, the dynamic feedback

4    cancellation, constantly monitors the input of the

5    instrument for the presence of acoustic feedback.    When

6    feedback is detected, the DFC reacts immediately by phasing

7    out the feedback signal.    Correct?

8    A.    That's what it says, at least.

9    Q.    And you totally disagree with that statement?

10    A.    I disagree that it is phasing out the feedback signal,

11    but I do agree that it monitors the input of the instrument.

12    Q.    Now, again, if you agreed that it determined this

13    signal and phased it out, you would be agreeing that it

14    determined the amplitude and phase, created an equal but

15    opposite signal and cancelled; right?

16    A.    Let me think that through.    I'm not sure I agree to

17    that.    I think it was a little extension of your

18    argumentation here.

19    Q.    Is there any other way it could do it with phasing it

20    out, sir?

21    A.    I would have to figure that out.    There might be.

22    Q.    But you don't know, sitting here today?

23    A.    Not as I'm sitting here, concentrated on all this

24    stuff, no.

25    Q.    Now, if you turn to 1434 under that same document,

1    there is a frequently asked questions section; right?

2    A.    Yes.

3    Q.    Who creates the questions and who creates the answers?

4    A.    All the marketing people do.

5    Q.    And one of the questions is, how does the dynamic

6    feedback cancellation system work; right?

7    A.    Correct.

8    Q.    And part way down in that answer is when feedback is

9    detected, the DFC system eliminates it immediately, using

10   phase cancellation; right?

11   A.    It's in the document, yes.

12   Q.    Again, if you admitted that that is what your product

13   did, you would be admitting that it reverses the phase and

14   cancels; right?

15   A.    But I don't admit it.

16   Q.    I understand that.

17   A.    Okay.

18   Q.    But if you did, that is what it would mean; correct?

19   A.    That would be the obvious meaning of this.

20   Q.    Okay.

21   A.    If it was the case.

22   Q.    All right.  Let's turn to PX-231.  PX-231 is the Atlas

23   product, right?

24   A.    Yes, Atlas Plus it says.

25   Q.    Okay.  Let's turn to 772.

Christensen - cross

1   A.    Yes.

2   Q.    Okay.  And under a title called Effective Feedback

3   Management Without Loss of Audibility -- do you see that?

4   A.    Yes.

5   Q.    It says, phase cancellation is the only true way to

6   eliminate feedback without affecting audibility.  When

7   feedback is detected, DFC uses digital phase cancellation to

8   effectively remove the unwanted whistling sound.  Right?

9   A.    It's in the document, yes.

10  Q.    So if that would be correct, that would be determining

11  the amplitude and phase, reversing the signal and

12  cancelling; right?

13  A.    Well, if that was correct.

14  Q.    In fact, above that, there is a handy little picture

15  of how that works.  I don't know if we can put that up on

16  the screen.

17        Do you see that picture?  The principle of phase

18  cancellation is to introduce a mirrored signal to cancel out

19  the feedback.

20             And what is that spike going up?  That is

21  feedback, isn't it?

22  A.    I don't know.  I didn't do it.

23  Q.    You don't know?

24  A.    I think it's supposed to illustrate something you want

25  to cancel.

1    Q.    And what is the spike going down?

2    A.    It's something that is there in order to cancel.

3    Q.    It's the reverse; correct?

4    A.    Yes, you can put it that way.

5    Q.    Let's go to PX-33.  This is a document for the Syncro

6    hearing aid; correct?

7    A.    That's correct.

8    Q.    All right.  Then let's turn to page 2124.  And, of

9    course, on 2124, it says it's a dynamic feedback

10   cancellation system; right?

11   A.    Correct.

12   Q.    And let me read to you what it says.  It says:

13   Dynamic feedback cancellation is a two-stage feedback

14   cancellation system designed to eliminate feedback before it

15   develops into uncomfortable whistling.  Unlike traditional

16   feedback management, which reduces gain to eliminate

17   feedback, the DFC in Syncro uses phase cancellation.  Phase

18   cancellation is the only way to eliminate feedback while

19   maintaining audibility of the signal.  As soon as feedback

20   is detected, the feedback detection initiates the DFC system

21   to remove the unwanted whistling sounds through digital

22   phase cancellation.

23        And then over the top of the picture, it says digital

24   phase cancellation ensures no reduction or distortion of the

25   signal and no loss of audibility.

Christensen - cross

1     Right?

2     A.    Yes, that is what the document says.

3     Q.    And again if you admitted that is accurate, that would

4     be determining the amplitude and phase, reversing it and

5     cancelling it, wouldn't it?

6     A.    If I admitted it was accurate, but it's not accurate.

7     It's a marketing paper you are showing here.

8     Q.    Now, let's look at the handy little chart to the right

9     with the three little boxes; okay?

10    A.    Okay.

11    Q.    Underneath it, it says:  Example of how phase

12    cancellation can remove the feedback while leaving the

13    important signal untouched.  Do you see that?

14    A.    I see that.

15    Q.    In the first box, that spike up is feedback, right?

16    A.    I think it's intended to show some feedback.

17    Q.    And in the second box, the phase cancellation is a

18    spike down, equal but opposite in amplitude and phase;

19    right?

20    A.    I think that is what it intends to show.

21    Q.    And the third box shows feedback removed; correct?

22    A.    Yes.

23    Q.    Okay.  But you have testified that is not what is

24    happening, right?

25    A.    That is correct.

1    Q.    Okay.

2              THE COURT:  Mr. Steinberg, how much more do you

3    have of this witness?

4              MR. STEINBERG:  About 15 minutes, Your Honor.

5              THE COURT:  Well, we're not going to finish him

6    today.  I thought we might.

7              MR. STEINBERG:  I'm sorry, Your Honor.

8              MR. GRAMENOPOULOS:  Your Honor, the witness has

9    an appointment back in Europe and he has a flight scheduled

10   for Saturday so if we're only 15 minutes away from

11   completing his testimony?

12             THE COURT:  Ladies and gentlemen, I'm going to

13   ask you to indulge us here today.  This gentleman has to get

14   back to somewhere in Europe and I won't hold him over, with

15   your permission, in order to do that.  I'm going to let Mr.

16   Steinberg finish and Mr. Gramenopoulos will have some

17   redirect.  So we'll get out of here as soon as we can.  All

18   right?

19             MR. STEINBERG:  Thank you, Your Honor.

20             MR. GRAMENOPOULOS:  Thank you, Your Honor.

21   BY MR. STEINBERG:

22   Q.    I'm going to refer you to PX-404.  PX-404.

23   A.    Yes, sir.

24             THE COURT:  But I am going to let you come in a

25   little later on Monday.

```
 1              MR. STEINBERG:  Does that include us, judge?
 2              THE COURT:  No.  No.  You have nothing on Tim
 3    Russert when it comes to quotes, but go ahead.
 4              (Laughter.)
 5    BY MR. STEINBERG:
 6    Q.    We're now looking at the Sumo DM brochure; correct?
 7    A.    That's correct.
 8    Q.    And that is another product of Oticon; correct?
 9    A.    Excuse me?
10    Q.    And that is another Oticon product; correct?
11    A.    That is correct.
12    Q.    If you look at page 869.  And on 869, once again it
13    says, Sumo DM's dynamic feedback cancellation system will
14    eliminate both ongoing static feedback due to the gain
15    setting and ear mold fit and will also respond to sudden
16    changes in the acoustical environment, such as chewing and
17    hugging, that would ordinarily result in feedback.  When
18    such feedback occurs, within a few tenths of a second, the
19    DFC system generates a counter signal at the same frequency
20    of the one which is causing the feedback but which is out of
21    phase with this signal.  This effectively removes the
22    annoying whistling without any decrease in gain.  Is that
23    correct?
24    A.    That is what the marketing material says, yes.
25    Q.    And again that, if that is true, that would be a
```

Christensen - cross

1    system that determines the phase and amplitude, creates an

2    equal and opposite signal and cancels; right?

3    A.    Well, at least it says something about phasing out the

4    signal.  IC see that.

5    Q.    Is that correct?  Was my question to you correct?  If

6    that document is accurate, it means that it determines the

7    phase and amplitude of the feedback signal, creates an equal

8    and opposite signal and cancels; right?

9    A.    I think that is the conclusion, yes.

10                THE COURT:  Let me see counsel a second.

11                (The following took place at sidebar.)

12                THE COURT:  I should have said Tim Russert has

13   nothing on you.

14                Don't you think you have driven this point home?

15                MR. STEINBERG:  Yes, I am through.

16                MR. BUROKER:  It's the last one.

17                MR. STEINBERG:  It's the last one.

18                THE COURT:  Oh, it's the last one.

19                MR. GRAMENOPOULOS:  I have one question.

20                THE COURT:  Okay.

21                MR. STEINBERG:  No, I have a few more questions

22   but not about brochures.

23                THE COURT:  You're not doing this anymore.

24                MR. STEINBERG:  Sure.

25                (End of sidebar conference.)

Christensen - cross

1    BY MR. STEINBERG:

2    Q.    Now, are you testifying here before the jury that all

3    of the technical material and information and brochures that

4    was provided to audiologists and hearing impaired people was

5    incorrect?

6    A.    What I'm saying is --

7    Q.    Can you answer my question first?  Then you can

8    explain.

9              THE COURT:  No, I'm going to let him answer the

10   question in a manner that he chooses.  And if you want to

11   ask a follow-up, you can do that?

12   A.    Thank you.

13             What I'm saying is from a technical standpoint,

14   the descriptions in the marketing material aren't accurate.

15   If you see it from the users perspective, what the hearing

16   aid does, how it's perceived by the user, well, it describes

17   what the user will perceive.  The feedback is reduced or

18   cancelled and feedback is gone but from a very technical

19   standpoint, it's not correct.  That is a point that I think

20   is important to understand about marketing material.

21   BY MR. STEINBERG:

22   Q.    Well, the first material we looked at was not

23   marketing material, it was a technical document, internal

24   document of your company, wasn't it?

25   A.    It was a technical document that was intended for use

1    internally in the company but it was not the detailed

2    description of the algorithm.

3    Q.    So just to answer my question, are you testifying here

4    today that internal technical material and material that was

5    given to hearing impaired people was inaccurate about how

6    your feedback mechanism works?

7    A.    It's inaccurate in the details of how it works.

8    Q.    Are you aware that the Food and Drug Administration of

9    the United States regulates hearing aids?

10   A.    Yes, I know about the Food and Drug Administration to

11   some extent.

12   Q.    Are you aware that the FDA, the Food and Drug

13   Administration requires totally accurate statements in the

14   marketing materials of hearing aids?

15   A.    I don't know about the details of the FDA

16   requirements, no.

17   Q.    Have you reported the inaccuracies in these marketing

18   materials to the FDA?

19   A.    Me, personally?

20   Q.    Yes.

21   A.    No, I have not.

22   Q.    In the patent that we looked at before, your patent,

23   the '871 patent, it says feedback cancellation.  Are you

24   aware that you have to make an application under oath before

25   the Patent Office and state with accuracy what your patented

Christensen - redirect

 1  technology does?

 2  A.    I'm not aware of the sort of details of patent law.

 3  I'm not a patent attorney.

 4  Q.    Has anyone gone to the Patent Office and told the

 5  Patent Office, no, our technology really doesn't cancel

 6  feedback?

 7  A.    I don't know.

 8              MR. STEINBERG:    No further questions.

 9              THE COURT:    All right.    Mr. Gramenopoulos,

10  redirect.

11                    REDIRECT EXAMINATION

12  BY MR. GRAMENOPOULOS:

13  Q.    I think I'm just going to ask one question, and I'm

14  going to ask you about the marketing materials or the

15  patents and concepts.    I'm going to ask you about the

16  products, the products accused in this case.    Based on your

17  knowledge of the LMS adaptive filter, will you please

18  explain for the jury why it is not possible to do phase

19  cancellation or measure amplitude phase?

20              THE COURT:    Or determine amplitude?    Apples to

21  apples, if you might.

22              MR. GRAMENOPOULOS:    I'm sorry?

23              THE COURT:    Well, if you want to keep it apples

24  to an apples, I think you --

25              MR. GRAMENOPOULOS:    Let's first start with phase

1    cancellation.

2              THE COURT:  Well, just determine.  I'm just

3    focusing on the word determine.

4    BY MR. GRAMENOPOULOS:

5    Q.    Okay.  Determine amplitude and phase.  Let's start

6    there.

7    A.    Okay.  The adaptive LMS algorithm has no means to

8    determine amplitude or phase.  It is what we call a

9    statistical-based system.  It's looking at the whole

10   frequency range, that is, all of the frequencies.  And if

11   you have to, if you shoot, measure or determine phase, then

12   you are talking about a single frequency signal, single

13   tone.  You cannot do that with a broadband tone.  So that is

14   a clear distinction between the broadband and the single

15   tone approach.

16   Q.    Is that the reason why you believe that marketing

17   materials are inaccurate?

18   A.    Well, that is why we cannot talk about phase

19   cancellation, because then you are talking about a single

20   frequency cancellation.

21              MR. GRAMENOPOULOS:  No further questions.

22              THE COURT:  Thank you, sir.  You are excused.

23   You can make your plane.

24              THE WITNESS:  Thank you very much.

25              THE COURT:  Ladies and gentlemen, we have at

1056

```
 1              IN THE UNITED STATES DISTRICT COURT

 2              IN AND FOR THE DISTRICT OF DELAWARE

 3
                        -   -   -
 4

 5    ENERGY TRANSPORTATION,          :   Civil Action
      INC.,                           :
 6                                    :
                  Plaintiff,          :
 7                                    :
            v.                        :
 8                                    :
      WILLIAM DEMANT HOLDINGS A/S,    :
 9    et al.,                         :
                                      :
10              Defendants.           :   No. 05-422 (GMS)

11                      -   -   -

12                  Wilmington, Delaware
                  Monday, January 28, 2008
13                      9:37 a.m.
                  Sixth Day of Trial
14
                        -   -   -
15
      BEFORE:  HONORABLE GREGORY M. SLEET, Chief Judge, and
16                                        a Jury

17

18    APPEARANCES:

19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                   -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                              Counsel for Plaintiff
24

25
```

```
 1   APPEARANCES CONTINUED:

 2                    MARY B. GRAHAM, ESQ.
                      Morris, Nichols, Arsht & Tunnell
 3                         -and-
                      JOHN M. ROMARY, ESQ.,
 4                    GREGORY C. GRAMENOPOULOS, ESQ.,
                      VINCENT KOVALICK, ESQ.,
 5                    KAY HILL, ESQ.,
                      GERSON S. PANITCH, ESQ., and
 6                    ARTHUR A. SMITH, ESQ.
                      Finnegan, Henderson, Ford, Farabow & Dunner
 7                    (Washington, D.C.)

 8                                      Counsel for
                                        Demant Defendants
 9
                      DONALD E. REID, ESQ.
10                    Morris, Nichols, Arsht & Tunnell
                           -and-
11                    WILLIAM H. MANDIR, ESQ.,
                      JOHN SCHERLING, ESQ.,
12                    CARL J. PELLEGRINI, ESQ.,
                      BRIAN SHELTON, ESQ.,
13                    MATTHEW KAPLAN, ESQ., and
                      J. WARREN LYTLE, JR., ESQ.
14                    Sughrue Mion
                      (Washington, D.C.)
15
                                      Counsel for Widex
16                                     Defendants

17                         -   -   -

18

19

20

21

22

23

24

25
```

Egolf - direct

1    Q.    Why did you go to this presentation?  Why did you go
2    to this symposium and make a presentation?
3    A.    Well, as you know, university professors are, like
4    myself, involved in publish or perish.  There is a reason
5    for that.  That is because, universities are in business of
6    disseminating, not hiding information.  One requirement of
7    getting paid and getting promotions is that we have to
8    publish the results of our work.  And I got credit for that
9    publication towards my promotion.
10                    That's why I was doing it.
11   Q.    This is a little hard to read.  But can you please
12   tell the jury what this document is?
13   A.    This is also a program advertisement for a conference
14   held in Jackson, Wyoming, in August and September of 1985.
15   It was a conference organized by Dr. Michael Marion.  He was
16   a former colleague of mine at the University of Wyoming.
17   Q.    Did you attend this conference?
18   A.    Yes, I did.
19   Q.    Did you present at the conference?
20   A.    I was a presenter at the conference, yes, sir.
21   Q.    And the date of the conference was what?
22   A.    Late August-early September, as you can see from the
23   front cover of the program.
24   Q.    Of 1985?
25   A.    Yes, sir.

 1   Q.    Why did you go and present at this conference?

 2   A.    I was asked by Dr. Marion to do so.  He knew the work

 3   that Kim and I were doing on feedback in hearing aids.

 4   Q.    Did Mr. Weaver go with you to this one?

 5   A.    No, he did not.  Kim had left the university in March

 6   of 1985.  All good students eventually want to go get jobs.

 7   So Kim had taken a job by that time.

 8              MR. KOVALICK:  May I please have Page OTI009452.

 9   BY MR. KOVALICK:

10   Q.    Are you the David Egolf that is referring to?

11   A.    Yes, I am.

12   Q.    What is that referring to on that page, sir?

13   A.    This was a demonstration of several of the projects

14   that we had ongoing at the present time at the University of

15   Wyoming.  I might add, these were demonstrations.  These

16   were not slide presentations.

17   Q.    Did you demonstrate Mr. Weaver's feedback suppression

18   circuit?

19   A.    I demonstrated the portable hearing aid that included

20   the feedback suppression circuit that Mr. Weaver developed.

21   Q.    Why don't you tell the jury about that demonstration,

22   please?

23   A.    Well, of course, it's hard to hear what's going on in

24   a hearing aid.  And so what we did was we instrumented our

25   small hearing aids so that the people listening could hear

1    through a loud speaker.  We attached the hearing aid to what

2    is known as an artificial ear.  And in the artificial ear is

3    a tiny microphone.  The microphone would then broadcast what

4    was being heard inside this artificial ear canal.

5            So we had a method for switching Mr. Weaver's

6    circuit in and out of the hearing aid.  And we would turn it

7    off, turn the volume up, so that the hearing aid began to

8    squeal.  And I understand that there was a demonstration

9    here of the squeal of a hearing aid that is undergoing

10   unstable oscillation earlier.

11           And then we would switch Mr. Weaver's circuit

12   in, and the squeal would go away.  We would turn the volume

13   up even louder before it began to squeal again.

14           So it was a demonstration of the ability to

15   raise the volume of the hearing aid beyond that which was

16   possible before, when you included Mr. Weaver's circuit in

17   the hearing aid.

18   Q.    How many people attended that presentation?

19   A.    I think there were about 60 people.  There was quite

20   a group in Jackson.  It was quite a popular conference.

21   This was one that was repeated a number of years.

22           It began in 1981, and it became quite popular.

23   Of course, Jackson, Wyoming, is a nice destination for a

24   conference like that.

25   Q.    How many people actually attended your presentation?

                              Egolf - direct

1    A.      I think about 60.  I didn't count the numbers.  I

2    would say the entire room was full.

3    Q.      What types of people?  What were their jobs?  Who

4    attended this?

5    A.      It was a little different than the Acoustical Society

6    of America.  These were people who were really more

7    interested in hearing aids.  These were hearing aid fitters,

8    audiologists, engineers like myself who worked on hearing

9    aid research.  There were hearing aid manufacturers.

10             That was generally the audience.

11   Q.      Now, were these secret proceedings or were these open

12   to the public?

13   A.      These were open to the public as long as you paid

14   your fees.

15   Q.      Did you ask anyone to keep your presentation secret?

16   A.      I did not, no.

17   Q.      May I please have DX-1540?

18             MR. KOVALICK:  (Addressing the jury)  You have

19   an abbreviated version of this for obvious reasons in your

20   notebook that is DX-1357.

21   BY MR. KOVALICK:

22   Q.      The second page is probably easier to read.

23             Can you tell the jury your understanding of what

24   this document is?

25   A.      This is a document that I believe was written in

1    Q.    Can you tell the jury what this is?

2    A.    Yes, sir.  This is another Master's thesis, a thesis

3    produced by Leland Best.  At that time I had 11 graduate

4    students working for me.  Lee was not working directly for

5    me.  He was working for John Steadman, who was another

6    professor in my department.

7    Q.    Just a couple of questions, because we will hear a

8    deposition from him.

9              What is the date of this document?

10   A.    May 1985.

11   Q.    Did you participate in the presentation of this

12   thesis?

13   A.    I participated in the defense of the thesis.  I was

14   present when Lee Best defended his thesis in front of his

15   graduate committee.  I was on his graduate committee.  I was

16   not his major professor.  I was not his supervisor.

17   Q.    Did you attend when he presented his thesis?

18   A.    Yes, I did.  I was also present when he demonstrated

19   in the laboratories, when he demonstrated the hearing aid.

20   Q.    Can you tell us about that demonstration?

21   A.    Yes.  The hearing aid, in many of these situations,

22   it was somewhat difficult to mount the hearing aid or fit

23   the hearing aid onto different people.  So we had a

24   mannequin.  And the mannequin had the same external ear.

25                   Of course, when you move from person to

1    person, the shape of your external ear changes.  So we had a

2    mannequin in the laboratories.  The mannequin I had

3    described as before had an artificial ear.  That is an

4    artificial outer ear.  And the hearing aid was mounted, and

5    this was a body-worn hearing aid.  It had a battery pack, an

6    umbilical cord up to the device that fit behind the ear.

7         And the hearing aid was tested on the mannequin.

8    We used something called a spectrum analyzer to display the

9    results.

10   Q.    With reference to the date of May 1985 on this

11   document, when was that presentation of the hearing aid that

12   you just referred to?

13   A.    It was in the spring of 1985, prior to the graduation

14   date.  As I had stated before, this is a fixed graduation

15   date, one of two allowed at the University of Wyoming.  They

16   only have two ceremonies during the year, May and December.

17        But his presentation, his demonstration, was

18   prior to May 1985.  I don't recall the exact date.  I am

19   pretty certain it was in April of 1985.

20   Q.    Now, this document refers to the digital suppression

21   of acoustic feedback.

22        Did Mr. Best's hearing aid have feedback

23   suppression?

24   A.    Yes, it did.

25   Q.    Did it work the same way as Mr. Weaver's?

Egolf - direct

1   A.     No, it was different.

2   Q.     What did he use?

3   A.      He used, and I described this before, he described

4   something called the LMS algorithm.  And this was the method

5   suggested Dr. Kirlin.  It was earlier in my testimony.

6            Dr. Kirlin was on his committee.  And Lee took

7   Dr. Kirlin's advice and ran witness.  He said that's what I

8   want to do to investigate a technique for eliminating

9   feedback.

10  Q.     Did you see any of the results of the tests of this

11  particular hearing aid?

12  A.     Yes, I did.

13  Q.     How were the results?

14  A.     They were incredible.

15  Q.     Can you give us numbers?

16  A.     This allowed -- well, the results are described as

17  providing 12 db of -- 12 to 13 db of additional stable gain.

18  Additional stable gain is the additional volume that you can

19  crank the hearing aid up.

20            I don't know if this has been stated before.

21  But the Veterans Administration, one of the largest dollar

22  volume outputs from the VA is hearing aids, because war

23  veterans like myself return typically with hearing damage.

24  And so many people who have severe hearing loss just do not

25  derive a benefit from a hearing aid because you can't crank

Egolf - direct

1    the volume high up enough before the doggone thing begins to

2    screech.  So this provided that additional volume.

3    Q.    Did you witness any other people observe the

4    operation of Mr. Best's feedback suppression circuit?

5    A.    Yes, I did.

6    Q.    How many people would you saw?

7    A.    There were at least three in the room other than

8    myself.

9    Q.    Did you require those people to keep it a secret?

10   A.    No, I didn't.  I had no control over it.

11   Q.    Who was controlling Mr. Best in his thesis?

12   A.    Control is a strong word.  Too strong a word.

13   Q.    Who was he reporting to?

14   A.    He was reporting to Dr. John Steadman.  John is now

15   the dean of engineering at the University of South Alabama,

16   in Mobile.

17   Q.    Just very quickly, can you tell the jury what Figure

18   11 represents?

19   A.    I have to preface this with I am not an expert on Lee

20   Best's thesis.  But I will do the best job I can.

21         Figure 11 is, if you will see the lower part of

22   the figure, that represents --

23         MR. STEINBERG:  Your Honor, we object.  This is

24   expert testimony.  He is testifying about someone else's

25   project.  He was not supervising this.

 1   was never used again and you went over to AFC 3.  Correct?

 2   A.    I think "never used again" was is a misstatement.  It

 3   was a natural progression, and then we moved on to the next

 4   circuit.  As I recall, the AFC 2 circuit was in the lab for

 5   a while, as we moved on to AFC 3.  We didn't destroy

 6   anything before we created something new.

 7   Q.    But didn't you say that from those results you had to

 8   take a different approach after the AFC 2?

 9   A.    We took different approaches with each step, yes.

10   Whenever we found a circuit or an improvement to a circuit

11   that seemed to work better, we would incorporate that.  It

12   was a natural progression.  So with each circuit, we hoped

13   we improved the situation.

14   Q.    Now, the AFC 2, though, was the subject matter of Mr.

15   Weaver's thesis.  Correct?

16   A.    Yes, it was -- that's incorrect.  AFC 1 was the

17   subject matter of his thesis.  AFC 2 Mr. Weaver produced

18   during his employment after writing his thesis.

19   Q.    So the AFC 1, that had problems.  Right?

20   A.    Again, we moved in a natural progression from one

21   circuit to the next to the next.  Each one was an

22   improvement over the last one.  It is whether the cup is

23   half empty or half full.  I saw it as half full.  You stated

24   it as half empty.

25               Excuse me.

 1     circuit board.  We did that, but we didn't actually arrive

 2     at a printed circuit board until we got to AFC 6.  And each

 3     one of these steps was a very expensive procedure.  We spent

 4     a lot of time and money doing this.

 5     Q.     Now, the patent issue that he talked about, were you

 6     requested some -- which versions of the AFCs were you

 7     requesting confidentiality for?

 8     A.     I believe it was AFC 3.

 9     Q.     What about at the end, what AFC was that?

10     A.     That was AFC 6.  That was the one that was actually

11     sent to the Veterans Administration.

12     Q.     Did you request such confidentiality for either AFC 1

13     or 2?

14     A.     No.

15     Q.     Who did fund Mr. Best's LMS thesis work if it wasn't

16     the VA?  Who did fund that?

17     A.     Audiotone Corporation funded the beginning of it.  I

18     think their money ran out midway through the project, and I

19     believe my department picked up Lee's salary for the rest of

20     the time.

21     Q.     Did you show that circuit to the Audiotone people?

22     A.     You know, I don't recall.

23     Q.     You specifically don't remember?

24     A.     I don't remember.

25     Q.     You mentioned you spent about $53,000 on the

Egolf - redirect

1   consulting with --

2   A.      I billed $53,000.  I believe something like $47,000

3   was for my time and the rest was expenses, yes, sir.

4   Q.      So about how many hours did you work over that time?

5   A.      Almost 200 hours.

6   Q.      Doing what?

7   A.      I produced probably 40 pounds of paper, documents,

8   from the 1980s.  These were stored in boxes in the basement,

9   beneath my office, at the university.  These were archived

10  boxes with my name on them.  I spent a long time going

11  through these boxes.  Many of these documents here, many of

12  them, are the ones I found in the basement.  I billed for my

13  time searching for these.  In fact, I went through three

14  searches because I am not a very good housekeeper.  So there

15  is a lot of piles in my office, and I apologize for that.

16              But I went through three searches.  Then, these

17  are highly technical documents.  I was hired by Finnegan to

18  consult, and the consulting amounted to explaining this

19  stuff to everybody.

20  Q.      What is your hourly rate?

21  A.      My hourly rate is $250 an hour.

22  Q.      Do you have any financial interest in the outcome of

23  this case?

24  A.      I have none.

25  Q.      Now, you referred to, in answer to one of the cross

```
 1                IN THE UNITED STATES DISTRICT COURT

 2               IN AND FOR THE DISTRICT OF DELAWARE

 3
                          -  -  -
 4

 5     ENERGY TRANSPORTATION,           :   Civil Action
       INC.,                           :
 6                                      :
                    Plaintiff,          :
 7                                      :
            v.                          :
 8                                      :
       WILLIAM DEMANT HOLDINGS A/S,     :
 9     et al.,                          :
                                        :
10                  Defendants.         :   No. 05-422 (GMS)

11                         -  -  -

12                      Wilmington, Delaware
                       Tuesday, January 29, 2008
13                          8:50 a.m.
                        Seventh Day of Trial
14
                          -  -  -
15
       BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge,
16                                     and a Jury

17


18
       APPEARANCES:
19
                      EDMOND D. JOHNSON, ESQ.
20                    Pepper Hamilton LLP
                             -and-
21                    MARTY STEINBERG, ESQ.,
                      BRIAN M. BUROKER, ESQ., and
22                    MAYA M. ECKSTEIN, ESQ.
                      Hunton & Williams
23                    (Washington, D.C.)

24                                    Counsel for Plaintiff

25
```

1244

```
 1    APPEARANCES CONTINUED:

 2              MARY B. GRAHAM, ESQ.
              Morris, Nichols, Arsht & Tunnell
 3                   -and-
              JOHN M. ROMARY, ESQ.,
 4            GREGORY C. GRAMENOPOULOS, ESQ.,
              VINCENT KOVALICK, ESQ.,
 5            KAY HILL, ESQ.,
              GERSON S. PANITCH, ESQ., and
 6            ARTHUR A. SMITH, ESQ.
              Finnegan, Henderson, Ford, Farabow & Dunner
 7            (Washington, D.C.)

 8                                  Counsel for
                                    Demant Defendants
 9
              DONALD E. REID, ESQ.
10            Morris, Nichols, Arsht & Tunnell
                   -and-
11            WILLIAM H. MANDIR, ESQ.,
              JOHN SCHERLING, ESQ.,
12            CARL J. PELLEGRINI, ESQ.,
              BRIAN SHELTON, ESQ.,
13            MATTHEW KAPLAN, ESQ., and
              J. WARREN LYTLE, JR., ESQ.
14            Sughrue Mion
              (Washington, D.C.)
15
                                    Counsel for Widex
16                                  Defendants

17                      -   -   -

18

19

20

21

22

23

24

25
```

1    graduation was.

2    Q.    We will talk about that in just a little bit.  I just

3    want to look at a couple of things in here, have you explain

4    them to the jury, please.

5              MR. KOVALICK:  Can we have Appendix F of the

6    document, EGOLF00116.

7    BY MR. KOVALICK:

8    Q.    Can you tell the jury what that is?

9    A.    Yes.  This is a circuit which was used to generate

10   pseudo-noise and inject it through the hearing aid or the PA

11   system to measure, to quantify the open-loop characteristics

12   in the system.  It would measure basically the propagation

13   of the delay, the phase through the hearing aid.

14   Q.    Was that part of the canceling feedback, this circuit?

15   A.    Yes.  First of all, you measure the system, and then

16   you insert an estimator using the measurements of this

17   measurement system to cancel the feedback.

18             MR. KOVALICK:  Can I please have EGOLF00118.

19   BY MR. KOVALICK:

20   Q.    Can you tell the jury what this circuit is?

21   A.    This is actually the estimator.  So the result of the

22   previous circuit was fit into this circuit to actually

23   eliminate the feedback.

24   Q.    And why did you send these circuit diagrams and this

25   draft thesis to Vern Larson?

Weaver - direct

1    A.    Because Vern Larson and the Veterans Administration

2    was funding research on my thesis.  It was -- we were doing

3    it for the good of the hearing aid users, trying to improve,

4    trying to improve the maximum gain they could get.

5                   MR. KOVALICK:   Could I have DX-956, please.

6    BY MR. KOVALICK:

7    Q.    Can you tell the jury what this document is?

8    A.    This is the thesis which was submitted.  It's the same

9    document with a different date on it.

10   Q.    Why is the date different?

11   A.    Because that's when the actual graduation was.  But if

12   you look through the two documents, they are the same.

13   Q.    Okay.  So this version, DX-956, is dated

14   December 1988?

15   A.    '84.

16   Q.    I am sorry, December 1984.

17   A.    Right.

18   Q.    Thank you.

19                   When did you actually deliver your thesis to

20   your panel of advisors at Wyoming?

21   A.    It was in early December of '84.

22   Q.    Can you tell us about that?  What did you do and who

23   was there?

24   A.    Yes.  What happened, the normal procedure at the

25   university is, you write the thesis with, you know, counsel

1  from your advisor, who was Dr. Egolf. And then once it's

2  all written and your research is done, you submit some

3  period in advance to each of the members of the committee.

4  And the committee is three to five professors, who kind of

5  know what you are doing and who judge you.

6          So you submit it, you submit the thesis to the

7  panel. And then they have a closed-door defense, where you

8  go into the conference room, and they basically have their

9  way with asking questions on anything in the thesis and

10 anything in your past education.

11         So it's a little final grill session to teach

12 you some humiliation, I think, at the end of grad school.

13 Q.    After that process, did you have to present your

14 thesis to anyone else?

15 A.    Yes.

16 Q.    Tell us about that, please?

17 A.    The normal procedure is after you have defended

18 successfully your thesis in the closed-panel presentation,

19 you give a public presentation. And every Friday afternoon,

20 there was a seminar series, which was open to the campus and

21 open to the public. And the topics which were presented at

22 this seminar series were published in advance.

23 Q.    Now, you said that was a normal procedure. Do you

24 recall specifically presenting your thesis at one of those?

25 A.    Yes, absolutely.

1    Q.    Can you tell us about that a little bit?

2    A.    It was a, I believe it's about a 40 to 50-minute

3    presentation.  And in that presentation, it basically showed

4    all the meat, the circuits, everything I could to fill

5    50 minutes of presentation of my thesis.  Present it all.

6    Q.    How many people were there?

7    A.    Twenty or 30.  A room full.

8    Q.    What types of people in general?

9    A.    They were grad students, professors of the department,

10   other guests, and oftentimes we had professors from other

11   departments who had interest in the particular topics.

12   Q.    Was there any requirement to keep that presentation

13   confidential or secret?

14   A.    Absolutely not.  Especially in the eighties, the

15   university atmosphere was to share information.  People like

16   to show what you are doing because it was interesting.

17              MR. KOVALICK:  Can I please have Figure 3.1,

18   which I have on Page 14 of the document, EGOLF1978.

19   BY MR. KOVALICK:

20   Q.    Can you tell the jury what Figure 3.1 is?

21   A.    Yes.  This is a block diagram of the PA system that is

22   used in the thesis with the open-loop estimator added.

23   Q.    And what is the open-loop estimator?

24   A.    The open-loop estimator is this bottom block, which is

25   GH-hat.  And what it does is, if you look -- if you look at

Weaver - direct

1  the upper path, that is M-A-S-H, that upper loop, what

2  happens is, the sound which comes into the PA system or

3  hearing aid goes into the microphone, M, and then it's fed

4  through the amplifier and the speaker.

5  Q.    Up here?

6  A.    Yes.  And then some of the sound leaks out through the

7  vent tube in the hearing aid.  Some of it, you know, goes

8  through the plastic.  Some of the sound comes back.  And you

9  can never really stop that.

10          So that sound comes back through the feedback

11  path H.  If that sound comes back in phase with an amplitude

12  greater than one, the system goes unstable.  It's a basic

13  engineering premise that has been shown many times.

14          So what the circuits do is they estimate what

15  the open-loop path of the PA system or hearing aid plus the

16  feedback is.  Then it synthesizes that, and then it

17  subtracts that signal out.

18          So you have basically eliminated the feedback,

19  and it allows you to increase your amplification

20  substantially.

21  Q.    And with this version of DX-956, the December '84

22  version of your thesis, are the schematics the same as in

23  July?

24  A.    Yes.

25  Q.    They are?  Had the circuits changed at all between

1    July and December of '84?

2    A.    What had happened between July in '84, we called these

3    circuits, we named them in kind of a progression.  You

4    define one circuit and you get as much life as possible and

5    then it would evolve to the next stage.  So in the thesis,

6    it was, I think we called it AFC 1.  And between the thesis

7    circuit of AFC 1, we moved to AFC 2, and AFC 2 had a few

8    enhancements.  It had been shrunk down.  It was on a

9    soldered board.  It was battery operated.  It fit into a

10   little plastic case and it was retrofitted into an actual

11   hearing aid.

12   Q.    And what time was AFC 2 constructed?

13   A.    AFC 2 was constructed between July of '84 and December

14   of '84.  There is a reason for that.

15   Q.    Okay.  Do you recall demonstrated that hearing aid of

16   AFC 2 on anyone?

17   A.    Yes.

18   Q.    Can you tell us about that?

19   A.    Yes.  In July and December of '84, we went down,

20   Dr. Egolf and myself went down to Augusta, Georgia to the

21   Veterans Administration to demonstrate the work we had been

22   doing to show them preliminary results.  So during that

23   time, first of all, the VA -- a little background -- the VA

24   is associated with I believe University of Georgia Medical

25   School.  It's in the same campus.  So whenever we went down

1    there, first of all, they made a classroom available to us

2    and we went in and we made a public presentation where we

3    basically presented a lot of the same stuff that was

4    presented in the thesis defense, the circuits, technique, et

5    cetera, plus additional new findings of how much stable gain

6    we had gotten with the AFC 2 on people.

7    Q.    You demonstrated at that presentation?  You actually

8    demonstrated?

9    A.    At the presentation, demonstrating a hearing aid is

10   not very effective so we did it with data, slides, the

11   schematics.

12   Q.    How many people attended that presentation?

13   A.    20 or 30.

14   Q.    And you said there were medical students.  Is that

15   what you said?

16   A.    There were medical students and other professors,

17   people who were teaching the medical students.  Of course,

18   Dr. Larson.

19   Q.    Did you demonstrate that AFC 2 version of that hearing

20   aid to anyone down there in Augusta?

21   A.    Yes.  After the seminar, we had a demonstration of it

22   to Dr. Larson and so we went into his office and there was

23   myself, Dr. Egolf and another colleague of Dr. Larson's was

24   there.  And we tried it on and we demonstrated it to them.

25   Q.    Did it work?

1    A.    Yes.  Yes, it did.  It was still a little bit new,

2    which is good.  It was impressive that you could hear

3    substantially more gain with it, and he was optimistic.  We

4    were a new project and it had good results already.

5    Q.    Gain is a word we heard.  Can you just tell the jury

6    in terms of decibels or whatever number you want?  Like what

7    type of gain improvement were you getting?

8    A.    Well, I believe it says in here 15 additional dB, 15

9    dB of additional stable gain, which is a substantial

10   increase in how much gain the hearing aid can provide.

11   Q.    Does the dB of gain change depending on who is wearing

12   the aid?

13   A.    It can, yes.

14   Q.    Okay.

15   A.    All right.  Yes.

16   Q.    That's fine.  Can I please have DX-962?

17              Do you know what this document is?

18   A.    Yes.  This is, it looks like the abstract for a

19   meeting that was held of the Journal of the Acoustical

20   Society of America for a conference that they held in

21   Austin, Texas in April of '85.

22   Q.    Did you attend this meeting?

23   A.    Yes, I presented at this meeting.

24   Q.    You did.  What did you present?

25   A.    I presented the same work, the acoustic feedback

Weaver - direct

1    technique presentation.

2    Q.    Did you demo the hearing aid?

3    A.    No, it was just not appropriate in a seminar-type

4    environment to demo the hearing aid.

5    Q.    How many people did you present to?  Do you recall?

6    A.    Once again, 20 or 30.  The conference is broken up

7    into many sessions and people tend to go in and out of

8    sessions so it's a moderate sized room.  20 to 30 is my

9    guess.

10    Q.    Was it an open or closed demonstration --

11    presentation?  I'm sorry.

12    A.    It's an open presentation.  Any member of the society

13    can be there.  They just pay their dues and go to the

14    conference.  They can attend.

15    Q.    Did you ask for any restrictions on confidentiality

16    with regard to the --

17    A.    No.

18    Q.    -- presentation?

19    A.    There were no restrictions on confidentiality.

20    Q.    I noticed a summary on the second page that is being

21    displayed now.  Do you know who authored this?

22    A.    Probably myself.  It was either me or Dr. Egolf.  I

23    forgot exactly who wrote the abstract.  It was a summary of

24    the work.

25    Q.    Why did you present this abstract?

1    A.     We presented it.  We sent the abstract to the society,

2    and they look at the abstracts and say people are interested

3    this or not.  So with the abstract, you can either accept

4    the presentation or not.  So if they accept the

5    presentation, they published the abstract to try to draw

6    people to the conference.

7    Q.     Okay.  May I please have displayed DX-963?

8           Can you tell the jury what this document is?

9    A.     Yes.  This is the title transparency for the

10   presentation to the Journal of the Acoustical Society of

11   America.

12   Q.     The titled transparency, what are you referring to by

13   that?

14   A.     Whenever you start a presentation, you have a big

15   stack of transparencies.  People walk in the room, you have

16   the first opening transparency, and that is what this was.

17   Q.     I see.  Okay.  So these transparencies were shown

18   during your presentation, is that accurate?

19   A.     Yes.

20   Q.     Okay.  I noticed on page EGOLF02214 there is an image

21   of an ear with a hearing aid.  Do you see that?

22   A.     Yes.

23   Q.     Was this ACF 2 version of the hearing aid, was that an

24   eyeglass hearing aid?

25   A.     No, it was a behind-the-ear hearing aid.

Weaver - direct

1   Q.    Behind the ear?

2   A.    If you look here, you can see it's drawn in an

3   eyeglass hearing aid but to have these pictures drawn is

4   very expensive and the principle operation is the same on

5   eyeglass hearing aids or behind-the-ear hearing aids but our

6   work was actually done on a behind-the-ear hearing aid.

7   Q.    So why did you include this?  It looks like the end of

8   an eyeglass.  Why did you include this?

9   A.    Well, first of all, we didn't have that many of these

10  pictures.  It takes an artist to draw these and it was

11  expensive and hard to draw so when you have one good picture

12  that shows the technique and what we're doing, one of them,

13  you use it.  It was an economy of time and money.

14  Q.    I see.  Where did you actually tap in with the

15  feedback circuits?  Why did you tap into the hearing aid?

16  A.    We would pick up the signal coming out of the

17  microphone and then, you can see right here, we would tap

18  here.  And we would tap into the input of the amplifier and

19  this would allow us to maintain the normal fidelity of the

20  amplify that comes with the hearing aid.

21  Q.    Can you show EGOLF 02220, please?

22        Does this accurately show where you were tapping into

23  the hearing aid circuits?

24  A.    Yes.

25  Q.    Okay.  Can I have 2223 displayed, please?

Weaver - direct

1    Just very briefly, can you describe without

2    getting real mathematical what you are showing with these

3    charts.

4    A.    Yes.    This is showing GH.    On the upper plot, there is

5    two lines shown.    The dotted line is the frequency response

6    of an actual Audiotone A-38 hearing aid -- and BTE is behind

7    the ear -- with the feedback added in.    So we have a KEMAR

8    mannequin which is very similar to life and had an ear.    So

9    we put the hearing aid on the mannequin, and then you take

10   tests using the system that is shown in the previous `slide,

11   and you use this to quantify kind of what that system looks

12   like, and so these are the measurements taken from there.

13   So that's the dotted line on both of these

14   plots, the magnitude on the top and the phase in the bottom

15   section, and then the solid line shows the estimator.    In

16   other words, we had an estimator that was made with -- we'll

17   talk about the design of the actual estimator probably

18   later, I'm sure.    But this is its frequency response, so you

19   can see we matched very closely on phase and pretty closely

20   on magnitude.

21   Q.    Can you turn the page, please?    For the record,

22   EGOLF02224.

23   Just very briefly, what are you showing in these

24   charts?

25   A.    We show two plots.    This is the hearing aid with and

Weaver - cross

1    without the feedback suppression circuit added.  With the

2    suppression added, we got 14.7 dB additional stable gain.

3                 MR. KOVALICK:   I have no further questions, Your

4    Honor.

5                 THE COURT:   You may cross-examine, counsel.

6                 MR. KOVALICK:   Thank you, sir.

7                 MR. BUROKER:   Your Honor, I have a book that may

8    have a few additional exhibits.  May I?

9                 THE COURT:   Of course you do.  That's quite

10   fine.

11                (Binders passed out.)

12                      CROSS-EXAMINATION

13   BY MR. BUROKER:

14   Q.   Good morning, Mr. Weaver.

15   A.   Good morning.

16   Q.   You are being paid by the defendants to work with them

17   in connection with this case; correct?

18   A.   I'm being paid my normal consulting rate, yes.

19   Q.   And how much have you been paid to date?

20   A.   To date?

21   Q.   Yes.

22   A.   I believe it's around $8,000.

23   Q.   Now, you have been working in the hearing aid industry

24   for about 20 years; is that correct?

25   A.   That's correct.

1   Q.    And to your knowledge, the only person that received a

2   copy of the thesis other than your three advisors is

3   Dr. Vernon Larson at the VA; is that correct?

4   A.    The library.  It's also presented to the library where

5   it's put on display.

6   Q.    Other than the library and Dr. Larson, you are not

7   aware of any other person that received a copy of the

8   thesis?

9   A.    That's correct.

10  Q.    And you have no testimony about when or if your thesis

11  was ever cataloged, indexed and shelved in the university

12  library, in the University of Wyoming library; correct?

13  A.    Yes, I can't absolutely say when they put it on the

14  shelf.  I know it's submitted in December, right at the time

15  that the thesis is done, and I assume they're timely in

16  putting it on the shelves.  I thought I looked at it but I

17  wouldn't swear to it.

18  Q.    Now, the AFC 2 circuit, that was described in one of

19  the quarterly reports submitted to the VA; is that right?

20  A.    That's correct.

21  Q.    And you said you also gave a presentation about that

22  circuit to the Veterans Administration in December; is that

23  right?

24  A.    That's correct.

25  Q.    You don't have any documents or other physical

1292

Best - dep.

1      "Question:  And I think you said that you

2   started that program some time in 1983, and you completed it

3   in the spring of 1985; is that correct?

4      "Answer:  That's correct.

5      "Question:  And were there any particular

6   professors that sponsored your master's?

7      "Answer:  They would be the three that were on

8   my committee.  They were Dr. Steadman, Dr. Egolf, and

9   Dr. Kirlin.

10      "Question:  You mentioned that Dr. Steadman,

11   Dr. Egolf and Dr. Kirlin were involved in your defense of

12   the thesis.  They were -- you were defending your thesis in

13   front of them?

14      "Answer:  Yes.

15      "Question:  And when was that defense of your

16   thesis?

17      "Answer:  This was in May of 1985.  I don't

18   remember the exact date.

19      "Question:  Let's start over again.  Best

20   Exhibit No. 2 is a document bearing Bates numbers, BEST00340

21   through BEST00415.  And Best Exhibit 2 is entitled, Digital

22   Suppression of Acoustic Feedback in Hearing Aids, by Leland

23   C. Best.

24      Dr. Best, is Exhibit 2 your thesis that you

25   prepared?

Best - dep.

1        "Answer:  Yes.

2        "Question:  And this has a date of May 1985.  Is

3    that consistent with the time that the thesis would have

4    been prepared?

5        "Answer:  Yes.

6        "Question:  Did you author this thesis?

7        "Answer:  Yes.

8        "Question:  Did you receive any assistance apart

9    from the professor's input?

10       "Answer:  No.

11       "Question:  When would you have submitted --

12   well, let me start off.  Did you submit this thesis to the

13   University of Wyoming?

14       "Answer:  Yes.

15       "Question:  When would you have first

16   submitted -- when did you complete the thesis?

17       "Answer:  Again, I don't know an exact date, but

18   it would have been early May of 1985.

19       "Question:  And who did you submit the thesis to

20   once it was completed?

21       "Answer:  I had to give copies to each of my

22   committee members, and then once they approved it and I had

23   passed my defense, it was given to the university to

24   publish.

25       "Question:  Now, the title of this document,

Best - dep.

1    much sound was going back to the mic?

2                    "Answer:  I used an algorithm called the LMS

3    algorithm to estimate the transfer function of that feedback

4    path.

5                    "Question:  Once you used this LMS algorithm to

6    estimate the feedback path, then what did you do?

7                    "Answer:  As I said earlier, I simply subtracted

8    out what was coming in from the microphone.

9                    "Question:  Once you subtracted out the result

10   of this algorithm, what was the result?

11                   "Answer:  The result was that you could turn the

12   gain up on the microphone considerably higher before you had

13   feedback occur.

14                   "Question:  Were you able to cancel this

15   feedback?

16                   "Answer:  Yes.

17                   "Question:  Did you ever work on an actual

18   prototype hearing aid system?

19                   "Answer:  Yes.

20                   "Question:  That included this LMS algorithm

21   that you spoke about?

22                   "Answer:  Yes.

23                   "Question:  And did that prototype work?

24                   "Answer:  Yes.

25                   "Question:  Did you test the prototype?

Best - dep.

1     "Answer:  Yes.

2           "Question:  What was the results of your testing

3    of the prototype?

4           "Answer:  The result, basically, was that I

5    could achieve up to 13 dB additional gain.

6           "Question:  Is 13 dB additional gain, is that

7    significant?

8           "Answer:  Yes, that is significant.  10 dB

9    sounds to a human about twice as loud.

10          "Question:  And by increasing the gain to 13 dB,

11   up to 13 dB, does that help the hearing aid patient?

12          "Answer:  Yes.

13          "Question:  How does it help a patient?

14          "Answer:  Well, a person that has a hearing

15   loss, the louder you can make that sound the easier it is

16   for them to still be able to hear.

17          "Question:  How did you get interested in this

18   problem of acoustic feedback in hearing aids?

19          "Answer:  Well, my original interest was really

20   in just applying adaptive filters, but Dr. Steadman

21   mentioned to me that he and some previous graduate students

22   had worked on this problem and suggested that I might look

23   at it as something for a potential thesis project.

24          "Question:  What time frame was that, do you

25   recall?

Best - dep.

1        "Question:  Did you test the second prototype?

2        "Answer:  Yes.

3        "Question:  In your thesis, you refer to, I

4   believe, a prototype.  Does the thesis refer to either one

5   of these prototypes that we've been talking about?

6        "Answer:  It refers to the second one.

7        "Question:  Did the second prototype work?

8        "Answer:  Yes.

9        "Question:  And how did you know it worked?

10       "Answer:  I made a series of measurements of the

11  additional gain that I could get with the cancellation

12  algorithm, and this is -- it showed that we could get up to

13  13 dB initial gain.

14       "Question:  The test results that you're

15  referring to, is that described in your thesis?

16       "Answer:  Yes.

17       "Question:  Did anyone else see the second

18  prototype working?

19       "Answer:  Probably Dr. Steadman, Dr. Egolf,

20  Dr. Kirlin all saw it, and Mike Wreschner.

21       "Question:  Why Dr. Steadman, Dr. Egolf and

22  Dr. -- well, when did -- let me ask it this way.  When did

23  Dr. Steadman, Dr. Egolf or Dr. Kirlin first see a working

24  second prototype?

25       "Answer:  That would have been, again, kind of

Best - dep.

1    "Answer:  Well, at the same time, I was writing

2    my thesis, so it would have been to submit the finished

3    thesis, then do a defense.

4    "Question:  The date on this thesis is May 1985.

5    What does that date represent?  Does it represent the date

6    that you did your defense, or what does it represent?

7    "Answer:  It represents the date that I gave it

8    to the university, submitted it to the university.

9    "Question:  Would that have been before or after

10   your defense?

11   "Answer:  After.

12   "Question:  So your defense was some time -- I

13   guess we don't have a specific date.  Do you know what the

14   date of your defense was?

15   "Answer:  No, not the specific date.

16   "Question:  Do you know if it was in May of

17   1985?

18   "Answer:  Yes.

19   "Question:  It was in May of 1985?

20   "Answer:  (Nodding yes.)

21   "Question:  Okay.  And how much time after you

22   had your defense did you submit your thesis to the

23   university?

24   "Answer:  I don't really remember, but I imagine

25   very shortly afterwards.

Best - dep.

1      "Question:  And I guess certainly within May,

2   since it is a May date?

3          "Answer:  Yes, definitely within May.

4          "Question:  Okay.  Who attended the defense?

5          "Answer:  Dr. Steadman, Dr. Egolf and Dr. Kirlin

6   were definitely there.  I believe Mike Wreschner also

7   attended.

8          "Question:  How long did the defense last?  Do

9   you recall?

10         "Answer:  About an hour.

11         "Question:  And can you give me the format of

12   the defense?

13         "Answer:  Do you need a physical setting or --

14         "Question:  No.  What I'm interested in, did you

15   present a presentation?  Did you --

16         "Answer:  Ah, yes.  First I did a presentation

17   to the people that were there, and then afterwards there was

18   a question-and-answer session.

19         "Question:  Was there any restrictions put on

20   you for showing or sharing your work with people outside the

21   university?

22         "Answer:  No.

23         "Question:  When you submitted your thesis to

24   the university, what was your understanding of what would

25   happen to it?

Best - dep.

1    "Answer:  My understanding was that it would be
2    sent off to be bound in a hard cover volume and it would be
3    shelved in the university library.
4    "Question:  During your defense thesis, did you
5    describe how your system worked?
6    "Answer:  Yes.
7    "Question:  Did you describe how it was able to
8    cancel acoustic feedback?
9    "Answer:  Yes.
10    "Question:  Did you discuss your LMS adaptive
11    algorithm?
12    "Answer:  Yes.
13    "Question:  Did you describe your adaptive
14    filter?
15    "Answer:  Yes.
16    "Question:  Okay.  Let's now get into the thesis
17    itself, Exhibit 2.  Okay.  Can we now turn to Chapter I, the
18    introduction.  That starts with Best 00345.  I'd like to
19    have you read this, if you can, Dr. Best, out loud.  Is that
20    okay?
21    "Answer:  Sure.  The whole page?
22    "Question:  Well, why don't we start with the
23    first two paragraphs?  How's that?
24    "Answer:  Okay.  'Chapter I.  Introduction.
25    Anyone who has used a hearing aid will be familiar with the

Best - dep.

1    Canceller.  Is that Figure 11, is that what you used in your

2    second prototype?

3                "Answer:  Yes.

4                "Question:  And is that an accurate depiction of

5    the LMS feedback canceller that you used in your prototype?

6                "Answer:  Yes.

7                "Question:  Can you explain Figure 11, please?

8                "Answer:  Well, in Figure 10, the LMS algorithm

9    would effectively estimate the transfer function of that

10   feedback path, but it didn't actually do the full

11   cancellation.  It was just trying to get rid of the white

12   noise component that was in that final signal.  And the

13   change here is that I then also used those weights to

14   process the full output that's driving the speaker.  And

15   therefore, I'm canceling out all of the sound that's

16   going -- well, hopefully all of the sound that's arriving by

17   the feedback path at the microphone.

18               "Question:  The LMS noise canceller that's in

19   the dotted box, is that canceling the white noise component?

20               "Answer:  Yes.

21               "Question:  Okay.

22               "Answer:  Well, actually, let me rephrase that.

23               "Question:  Okay.

24               "Answer:  The E(k) will be the signal with a

25   white noise component canceled out, but it's just used to

Best - dep.

1    second prototype that you're aware of?

2                    "Answer:  I don't know.

3                    "Question:  Other than your thesis, are there

4    documents that would demonstrate that the second prototype

5    was built at any point prior to May of 1985?

6                    "Answer:  I guess the right answer is I don't

7    know, but possibly Mike Wreschner's thesis.

8                    "Question:  You're not aware of any documents,

9    though; is that correct?

10                    "Answer:  That's correct.

11                    "Question:  To your knowledge, was the second

12    prototype ever tested on a hearing impaired person?

13                    "Answer:  No.

14                    "Question:  You discussed a demonstration of the

15    second prototype for a number of people; is that correct?

16                    "Answer:  Yes.

17                    "Question:  Do you have any documents that

18    evidenced that that demonstration ever took place?

19                    "Answer:  No.

20                    "Question:  So there's no documents that would

21    demonstrate who actually was present at the demonstration;

22    is that right?

23                    "Answer:  Not that I'm aware of.

24                    "Question:  Are you aware of anybody else

25    physically viewing your first prototype?

Morley - direct

1    A.    Yes, there are some other filters.  There is, as we've

2    heard about, there is an feedback cancellation filter.

3    Q.    Is this hearing compensation filter different than the

4    feedback cancellation filter?

5    A.    Yes, it is.

6    Q.    Let me show you Demonstrative No. 2.

7              And can you explain this demonstrative to the

8    jury, please?

9    A.    This is a simplified block diagram of what the ETG

10   patents show when both filters are involved.  The hearing

11   compensation filter in what we call the forward path and the

12   feedback --

13   Q.    I'm sorry.  When you say the forward path, what are

14   you referring to?

15   A.    The forward path meaning the direction that the sound

16   goes from the microphone to the ear.  That would be the

17   forward path.

18   Q.    Do you have a pointer up there?

19   A.    I don't think so.

20             MR. MANDIR:  Your Honor, if I may?

21             THE COURT:  Sure.

22             (Pointer passed up.)

23   BY MR. MANDIR:

24   Q.    Okay.  I'm sorry, Dr. Morley.  I think you were

25   referring to the forward path.  Could you just explain that?

Morley - direct

1    A.    Okay.  The forward path would be from the microphone

2    through the filter.

3              (Video screen goes blank.)

4              MR. MANDIR:  You zapped it.

5                   (Picture returns.)

6    BY MR. MANDIR:

7    Q.    Okay.  I'm sorry.  Go ahead.

8    A.    Okay.  From the microphone through the hearing

9    compensation filter and the amplifier to the speaker, that

10   is the forward path.  And it taps down here to get the

11   signal, electrical signal, goes through the canceling

12   filter, and comes back here to be subtracted out.  So that

13   is what we call a feedback path.

14   Q.    And what is the purpose of this feedback canceling

15   filter?

16   A.    It's to try to take out the signal electrically that

17   is equal to the audio signal or the acoustic signal that

18   comes back around to the microphone.

19   Q.    What are those numbers that you show here, a bunch of

20   1s and 0s?

21   A.    Yes.  Digital systems have 1s or 0s.  Binary numbers

22   are the ones we use.

23   Q.    What are they used for?

24   A.    That would be the coefficient.  That is just to

25   represent that that feedback canceling filter has some

1352

Morley - direct

1    coefficients programmed into it.

2    Q.    And what is the purpose of those coefficients being

3    programmed into the filter?

4    A.    Those coefficients were determined by a computer in

5    conjunction with a host controller to try to mimic the

6    acoustic feedback path with the filter.

7    Q.    Does the hearing compensation filter, is that involved

8    in the feedback cancellation?

9    A.    No it's not.

10   Q.    Okay.  The next question for you, Dr. Morley, is how

11   does a person get fitted with a hearing aid according to the

12   ETG patents?

13   A.    I think we have a picture at least here, yes.

14   Q.    Demonstrative 3.  Thank you.

15   A.    Yes.  So at the audiologist or dispenser's office, the

16   person that is going to be fitted would sit, it says, in a

17   quiet room with the hearing aid in place.  It would be

18   connected through an electrical cable over to a host

19   controller that is connected to a computer, and that is how

20   it would be set up for them to get fitted.

21   Q.    So what kind of test are you referring to?

22   A.    This first test that would be conducted according to

23   the ETG patents would be a test to determine what the

24   hearing loss is of the patient by putting some tones from

25   the host controller into the hearing aid, having the patient

Morley - direct

1    say whether they can hear them or not.  We've all been

2    through hearing tests presumably so that is the typical

3    hearing test that you would go through.

4    Q.    And does it get some data from this test?

5    A.    Yes.  From that test, it finds out at what particular

6    tones and frequencies the person can or cannot hear and how

7    much hearing loss they have at each one of those

8    frequencies.

9    Q.    And is this procedure used for each of those filters

10   that we saw before?

11   A.    Well, the first procedure is just to establish what

12   the hearing compensation filter needs to be set at to help

13   this particular patient hear better.  So that is the first

14   step in the fitting procedure.

15   Q.    Okay.  And the next step?

16   A.    Well, after that, what happens then is once the test

17   has been completed, the computer here calculates some

18   coefficients, different sets of coefficients we say, and

19   puts it into a little memory chip.  And then the patents say

20   that that memory chip then is transferred, is put into the

21   hearing aid so that the hearing aid is now programmed, that

22   forward path compensation filter is now set up, customized

23   for that particular patient.

24   Q.    You said it had sets of coefficients.  What are you

25   referring to?