1   A.      Well, that hearing compensation filter, as we'll see,

2   has some ability, it's sort of like a menu.  There is a

3   bunch of different settings that get programmed into it

4   because this patient, under different situations, if there

5   is a lot of noise in the room, you might want to set those

6   settings up a little differently than if it's in a quiet

7   room.  And the hearing aid has the possibility, the

8   capability to pick from this menu of settings.  So they

9   program in a number of different settings for each patient

10  and then the hearing aid, during normal operation, is able

11  to pick from that menu which set the hearing aid then thinks

12  might be the best one for the patient.

13  Q.      Okay.  Is there a test done for the feedback canceling

14  filter?

15  A.      Yes.  After those sets of coefficients have been

16  loaded into that memory chip and it's been put into the

17  hearing aid to program the hearing compensation filter with

18  all its different sets of possible settings, then there is a

19  test that is done where some tones are once again presented

20  from this host controller, under control of a computer

21  program, that send these tones in to check to see how much

22  feedback there is at these different frequencies.  So it's

23  just measuring how much gets back to the microphone.  Once

24  it knows that at these different test frequencies, the

25  computer knows how to calculate some coefficients, one set

1    of coefficients which the ETG patents say it uses then to

2    program a filter to be put into the feedback path to cancel

3    feedback.

4    Q.    Okay.  I want to now concentrate on the first filter,

5    this hearing compensation filter.  And I think we have a

6    demonstration, a demonstrative on that.  This would be 4.

7              Okay.  Can you explain what we see here in this

8    demonstrative, please?

9    A.    Okay.  The idea here is that what we're showing is how

10   we might set up a hearing aid that has three adjustments or

11   three sound ranges, three different frequency ranges.  And

12   here we have the low range or the bass, middle range and

13   treble or high frequencies.  And what I'm showing here then

14   in the vertical axis is that at the low range we're asking

15   for more amplitude than we are in the middle or the high.

16   So this would be a good setting for someone who was hard of

17   hearing at low frequencies because the hearing aid provides

18   more amplitude there than it does at the other frequencies.

19   Q.    So does that mean that the middle and high, this

20   person can hear better?  That's why the setting is not as

21   high?

22   A.    That is right.

23   Q.    Okay.  Can we take a look at slide 5?

24             Okay.  This looks a little different.  Can you

25   explain this?

Morley - direct

1    A.    Yes, this would just be another one that shows that

2    this person has a hearing loss at the high frequencies

3    relative to what they can hear at the middle or low

4    frequencies.  So we asked the hearing aid to provide more

5    amplitude here at the high end than at the middle or the

6    low.

7    Q.    Again, is this for setting the hearing compensation

8    filter?

9    A.    This is the kind of response that would be programmed

10   into the hearing compensation filter for a particular

11   patient.

12   Q.    Is this relevant to the feedback cancellation filter?

13   A.    Not at all.

14   Q.    Okay.  I think we have another one.  I think it's an

15   animation, actually.  No. 6.

16   A.    Here we can see that if noise is present, then we can

17   see maybe that we want to adapt or change somehow, pick a

18   different setting based on what noise is present.

19              So this is meant, in a simplified way, to show

20   the idea of changing the response of the hearing aid.  If we

21   detect that noise is present, we would go to that menu and

22   pick a different setting that is more appropriate for that

23   amount of noise that's present.

24   Q.    Is that something that in normal day-to-day activity

25   might actually occur?

Morley - direct

1    A.    Yes.    That's something that you walk into a noisy area

2    or -- it happens all the time.

3    Q.    Can you give an example of when that might happen?

4    A.    Well, in every-day life, you go into a cafeteria,

5    there is noise, go out in traffic.    You might be driving

6    down the street and you are listening -- you notice this.

7          You are listening to your radio, and it's a nice

8    day, so you got the car window down.    And there is noise out

9    there from the freeway.    So we turn up the volume on our

10   radio so it will come up over the noise level.    Then if you

11   pull off the freeway and come to a stop sign, I have

12   noticed, it's like, whoa, I got to turn the volume down now,

13   because I have turned it up to overcome some noise that's

14   not there anymore, so I need to adjust it back down.

15   Q.    Do the ETG patents describe this idea of varying the

16   gain in accordance with noise?

17   A.    Yes, it does.

18   Q.    For what filter?

19   A.    For the hearing compensation filter.

20   Q.    Okay.    I want to now turn to the '850 patent, Figure

21   2, please.

22          Is this a feature of varying the amplification

23   depending on how much noise, is that shown in this figure at

24   all?

25   A.    Well, in this filter -- sorry, in this figure, there

Morley - direct

1    A.    They can't be changed unless you hook up that cable

2    again and go back at the audiologist's office.

3    Q.    Can we go to Demonstrative No. 10, please.  Can you

4    explain this for the jury, please?

5    A.    Well, this just shows at the audiologist's office what

6    all the electrical connections are, and it's got all the

7    busy stuff in there that shows all the circuitry.  But not

8    all that is being used at the time of testing at the

9    audiologist's office.  So I have a simpler one, I think.

10   Q.    I see Figure 1 of the patent, you have it labeled host

11   controller.  Does the patent say that Figure 1 is the host

12   controller?

13   A.    That's what it describes it as everywhere.

14   Q.    And in Figure 2, I see you have labeled that as

15   hearing aid.  Does the patent, the ETG patents describe

16   Figure 2 as a hearing aid?

17   A.    That's what Figure 2 is referred to everywhere.

18   Q.    Where is -- so I see host controller and I see on the

19   bottom right hand, in the green, that's the host controller.

20   Is the computer, which is the thing the host controller is

21   sitting on, is that shown in Figure 1 or Figure 2?

22   A.    Well, what they show is this little box over here, 24,

23   is a dotted line, and it's around some connectors.  And in

24   the patent it actually calls that the computer.  But one of

25   ordinary skill in the art would realize that they left out

Morley - direct

1    the computer, that that really means plug this host

2    controller into a computer with those connections over

3    there.

4    Q.    So the number 24, what does the patent call that?

5    A.    The patents both call it a computer.

6    Q.    Okay.  I think the next demonstrative, 11, is an

7    animation.  Can you explain what it is and how it works?

8    A.    Okay.  I promise this is as technical as I'll get

9    here, I think.

10          This is going to show the testing for the

11    feedback.  So what we have down at the bottom, we have the

12    signal generator and the host controller that is going to

13    generate the test tones and send them in through this path

14    up here through the limiter and the amplifier into the

15    speaker or the receiver and then we're going to get some

16    acoustic feedback coming over here to the microphone.  It's

17    going to come through to this sigma, this Greek number,

18    which means just to add, it's an adder there that adds the

19    signals that come to it.  There are two signals coming in.

20          So that signal comes back.  The acoustic

21    feedback comes back around through the microphone and in.

22    And then the other signal that is going to come in, we'll

23    see.  So there we are sending the tone out to the speaker.

24          And then now the next thing, we'll get the

25    acoustic feedback and we also get an electric feedback going

Morley - direct

1  through this circuit up here and they come back to this

2  summer.

3            Now, the electric feedback, that signal went

4  through this measurement box, this phase, and it's really an

5  adjustable delay and adjustable volume control.  So the

6  computer, it says in the patent, adjusts that so that when

7  that signal, the electrical feedback signal is equal and

8  opposite to this acoustic signal coming back, that the

9  summer here, okay, that comes out, goes into the null

10  detector and says, oh, I've canceled it.

11            So when that is true, when it detects a null,

12  that means that it has figured out what the phase and

13  amplitude is.  It's created a signal of equal amplitude and

14  opposite phase and it's cancelled it so it now knows what to

15  program into the feedback canceling filter.

16  Q.    Okay.  I noticed on the right-hand side of this, you

17  have figure 2 and a box.  Does that mean all of the circuits

18  that you show within that box are in figure 2 of the patent?

19  A.    That is correct.

20  Q.    And figure 2, what is that called in the patent?

21  A.    That is the hearing aid.

22  Q.    Okay.  On the left-hand side, I see three boxes:  One

23  called measure phase and magnitude, then there is another

24  box entitled null detector, and then a third box labeled

25  signal generator.  Why are they on the left-hand side?

Morley - direct

1   A.      Well, all of those components, those boxes, those

2   functions are inside figure 1 in the patent and figure 1, as

3   we know, is the host controller, not the hearing aid.

4   Q.      Okay.   Now I see that you have made some connections

5   between figures 1 and 2.   For example, up at the output of

6   the measure phase and magnitude, I see a number 144 and a

7   $V_{FBK}$.   Do you see that?   It's over a little bit to the left,

8   down.

9   A.      Oh, I see.   Yes.   Yes.

10  Q.      That is connected to it looks like terminal it looks

11  like 143?

12  A.      143, $V_{FBK}$.

13  Q.      Why do they have the same name?

14  A.      It's telling you those are supposed to be connected

15  together there.

16  Q.      Now, what does the patent say 144 and 143 are?

17  A.      It calls those either connectors or terminals,

18  indicating that they are something that you can unplug.   It

19  is meant to be unplugged.   It doesn't call them wires or

20  conductors, for example, which would indicate an electrical

21  connection that is not meant to be taken apart.

22  Q.      In other places, for the lines that are hardwired,

23  does the patent call it conductors?

24  A.      It sure does.

25  Q.      Okay.   Dr. Morley, the coefficients that are figured

1    out and placed into the feedback canceling filter, can they

2    be updated during normal day-to-day operations?

3    A.    No, they cannot.

4    Q.    Can they be updated in any way?

5    A.    They could be updated if you went back to the

6    audiologist office and went through this test again and

7    let the computer calculate some new ones and reprogram the

8    filter and then reinsert it.

9    Q.    And what kind of day-to-day activities may cause --

10   let me strike that.  What is your opinion as to the

11   viability of a solution that we see in the ETG patents where

12   the coefficients in the canceling filter do not change

13   during normal operation?

14   A.    The coefficients, since they don't change in normal

15   operation, once the patient leaves with the hearing aid,

16   it's not a very useful hearing aid, as we've heard over and

17   over again.  The acoustics change.  You pick up a phone to

18   put it to your ear, you put on a hat, like a baseball hat,

19   maybe --

20   Q.    Maybe.

21   A.    -- or other hat.  And, you know, things change.  The

22   acoustics are always changing and so a fixed solution like

23   this is not a useful one.

24   Q.    What are some day-to-day activities that may cause the

25   feedback to change, the feedback condition, during normal

Morley - direct

1    operation, walking around?

2    A.    Well, I think I just answered that.  I thought.  Maybe

3    I didn't.  What can change acoustically walking around?

4    Q.    Yes.

5    A.    Putting on a hat, hugging someone, putting a phone to

6    your ear, walking past a wall, turning your head.

7    Q.    Okay.  And how would the ETG patent solution, how

8    would they react to that?

9    A.    They would act as if nothing had happened.  It

10   doesn't -- it can't detect that anything has changed in

11   terms of the feedback path because it's not testing that.

12   Q.    Can we put up Demonstrative No. 12, please?

13            Okay.  Have you ever seen this demonstrative

14   before?

15   A.    How could I forget?

16   Q.    Okay.  And this is, we saw some pink mermaids, I

17   believe; is that right?

18   A.    Yes.  I think the premise was that these were, your

19   neighbor put these up and you want to cancel them out.

20   Q.    In this demonstrative, and we understand it's just a

21   demonstrative, do you recall if the feedback condition

22   changed?

23   A.    Well, this is a fixed solution.  The mermaids are

24   supposed to be representing this unwanted feedback signal

25   and it doesn't change because they stay behind those

Morley - direct

1    It says for the purpose of this measurement, the

2    feedback loop is broken between 140 and 122.  And then it's

3    hooked up to the host controller.  So what this is telling

4    us is we disrupt normal operation to make this measurement

5    and we hook the host controller up temporarily to make the

6    measurement.

7    Q.    What does this tell you about whether or not the host

8    controller is connected to the hearing aid at all times?

9    A.    It tells me that it is not normally connected, only

10   for the purposes of this measurement do we break this and

11   hook up the host controller.  It would be absurd to have

12   this feedback path broken all the time and have the host

13   controller hooked up all the time because it wouldn't

14   operate as a hearing aid.

15   Q.    Okay.  One more, column 11, lines 39 to 42.

16           Can you go ahead and do the same for this

17   passage, please?

18   A.    Okay.  As one of ordinary skill in the art, when I

19   read this passage, I said okay, these guys are inventors.

20   They're looking into the future and they're going to say

21   what they envision, what could happen with their hearing

22   aid.  And they say that these components shown in figs. 2, 4

23   and 5 may be incorporated in the hearing aid or part may be

24   contained in a pocket-size case.  So they're talking about

25   how you might package this up with electronics.

1   Q.    Can we look at Demonstrative No. 14 for a moment.

2               So this is the claim construction order that you

3   mentioned.  I see Items 1, 2, and 3 and 4 -- I don't see 3.

4   1, 2, 4 and 5.  Did you consider these definitions when you

5   did your infringement analysis?

6   A.    Yes, I did.

7   Q.    In your opinion, does the Senso Diva and the Inteo

8   hearing aids include a programmable delay line filter

9   located in a feedback path that is programmed?

10  A.    No.

11  Q.    And why is that?

12  A.    Well, if we look at the term programmed, it says, in

13  Item 4, The term programmed is construed to mean, quote,

14  "provided with one or more values so as to produce a

15  response," end quote.

16              In the Senso Diva and the Inteo products, the

17  filter that is in the feedback path is not provided with any

18  coefficients.  It generates its own.  It's got its chef

19  there whipping up the meals, whatever it needs.

20  Q.    Can we go to DX-1660.

21              It's Figure 2, which I believe is WID003941.

22              Were you here during the testimony of Mr. Brown?

23  A.    I was.

24  Q.    Did Mr. Brown refer to this figure?

25  A.    Yes, he did.

1    "Question:  Now, I believe you testified earlier

2    about the WLMS block.  Do you recall that?

3        "Answer:  Yes.

4        "Question:  And I believe you testified that in

5    your view, that block had a programmable aspect to it; is

6    that correct?

7        "Answer:  I said that block produced

8    coefficients.  The coefficients were stored in a RAM.  And

9    the existence in a RAM means the coefficients can be

10   changed.  Hence, it's programmable."

11   Q.    What is your understanding of whether or not the WLMS

12   block has RAM?

13   A.    My understanding is that it does.

14   Q.    And is that consistent with your understanding of

15   Dr. Gloster's testimony?

16   A.    I think that is what he is saying right here.

17   Q.    Were you here when Mr. Brown testified?

18   A.    Yes.

19   Q.    Did Mr. Brown identify whether or not -- where memory

20   was with respect to either the WFIR or the WLMS block?

21   A.    I don't think he had an opinion as to where RAM was.

22   Q.    So based on the Court's claim construction, your own

23   analysis, the testimony of Mr. Nielsen, and the testimony of

24   both Dr. Gloster and Mr. Brown, what is your opinion as to

25   whether or not the WFIR block in the Senso Diva and the

1    Inteo products is a programmable or a programmed filter?

2    A.    It is definitely not a programmable or a programmed

3    filter.

4    Q.    And why is that?

5    A.    Because it definitely does not have any memory or any

6    memory that can be changed.

7    Q.    Can we go to Claim 19, please, of the '850.

8              In Claim 19, do you see the requirement of a

9    programmable delay line filter?

10   A.    Yes, I do.

11   Q.    Do you see the requirement of a programmed filter?

12   A.    Yes, I see the filter being programmed in the second

13   last line.

14   Q.    Do either the Inteo or the Senso Diva products have a

15   programmable delay line filter or programmed filter

16   according to Mr. Brown's analysis?

17   A.    Neither of those have a programmable delay line filter

18   or a programmed filter interposed in a feedback path between

19   the input and the output of the transmission channel.

20   Q.    The feedback path is another requirement of the claim.

21   Is that correct?

22   A.    That's right.

23   Q.    Let's go to Claim 13, if we would.  First of all, let

24   me ask you, do you see any requirement in Claim 13 of a

25   programmed filter?

1    A.    Yes, I do.

2    Q.    And can we highlight that, please?

3    A.    At about Line 13, it talks about a filter therein

4    programmed.

5    Q.    Does Claim 13, programmed filter, is that found in

6    either the Inteo or the Senso Diva products?

7    A.    No.

8    Q.    For the same reasons that you said for Claim 19?

9    A.    Right.  It's required also in this claim to be an

10   electrical feedback path.

11   Q.    Can we go to Claim 14.  Do you see anything in Claim

12   14 that requires a programmable filter?

13   A.    Once again, about three lines or four lines from the

14   bottom there.

15   Q.    Do you see anything with respect to a filter that

16   that's been programmed?

17   A.    Yes.  Right following that.

18   Q.    Do either the Inteo or Senso Diva have a programmable

19   filter that's programmed according to Mr. Brown's analysis

20   of Claim 14?

21   A.    I don't believe so.

22   Q.    Now, Claim 16, that's the other claim that is

23   required, that's been asserted.  Does Claim 16 have anything

24   referring to a programmable filter?

25   A.    Yes.

Morley - direct

1    Q.    And does Claim 14 -- Claim 16 is dependent on Claim

2    14.    Correct?

3    A.    Yes.

4    Q.    What is your understanding of the fact that it is

5    dependent on Claim 14?

6    A.    That means it has to have all the elements of Claim

7    14.    And in addition, it has to have any limitations that

8    are included in Claim 16.

9    Q.    So we have talked about 14 already.    It also -- we see

10   in 16 the said programmable filter.    Does the Inteo or Senso

11   Diva have a programmable filter according to Claim 16?

12   A.    No.

13   Q.    Let's go back to Claim 13.

14           So we looked at only the programmable or

15   programmed filter in Claim 13.    What I would like to do is

16   go through this claim and ask you if any of the other

17   features may be in either the Inteo or the Senso Diva.    Is

18   that okay, Dr. Morley?

19   A.    Fine.

20   Q.    Why don't you go ahead and just take a look at that

21   first what we call preamble of Claim 13.    Can you read that

22   out loud?

23   A.    "A method of reducing acoustic feedback in a sound

24   system comprising a microphone, a transducer, and a signal

25   transmission channel interposed between said microphone and

Morley - direct

1    transducer."

2    Q.    Do the Inteo and Senso Diva have those features in the

3    preamble?

4    A.    Yes.

5    Q.    By the way, what's your understanding of what it

6    requires to infringe a claim?  Do you have to have all of

7    the features in it or can you just have some of the

8    features?

9    A.    You have to have each and every element in the claim.

10    Q.    Okay.  Let's start now the next -- the first step is

11    the determining step.  Can you read that, please?

12    A.    Yes.  The first step here is determining the effect on

13    the amplitude and phase of a signal in said transmission

14    channel as a function of frequency of acoustic feedback

15    between said transducer and microphone.

16    Q.    Okay.  Does the Inteo or Senso Diva perform that

17    determining step?

18    A.    No, neither of them perform that step.

19    Q.    Why not?

20    A.    Because the Inteo and the Senso Diva just generate

21    inside the WLMS block coefficients to try to cancel the

22    feedback in an adaptive way.  They don't in any way, if we

23    go into the patent and look at the equations, there is

24    nothing in the equations that determines the calculation of

25    the coefficients in that adaptive filter.  Nothing in those

Morley - direct

1    equations has anything about phase and amplitude.

2    Q.    You mentioned equations.  Can we put up DX-1599,

3    please, Column 9 and 10.

4         The equations that you were just referring to,

5    is that described in the Widex patent?

6    A.    This is the right page.

7    Q.    What do these equations tell you about amplitude and

8    phase?

9    A.    Nothing.  These are the equations that are actually

10    calculated inside that filter 32,000 times a second to

11    update the coefficients inside the LMS filter.

12    Q.    And do these equations indicate that phase or

13    amplitude is used in figuring out those coefficients?

14    A.    There is no mention at all of phase.  You can see that

15    the value of the data coming through gets mentioned.  So

16    that's the feedback signal from the speaker.

17    Q.    Could we go back to Claim 13, please.  So is it your

18    opinion that the Inteo or Senso Diva performs this

19    determining step?

20    A.    Neither of those accused products performs the

21    required determining step in the claim.

22    Q.    And then the next step, could you read that?  It's

23    starting with "inserting"?

24    A.    "Inserting between the input and output of said

25    transmission channel an electrical feedback path having a

1    filter therein programmed to equalize and reduce the effect

2    of said acoustic feedback both in amplitude and phase on a

3    signal in said transmission channel."

4    Q.    Do either the Senso Diva or the Inteo products perform

5    the inserting step in Claim 13?

6    A.    Not at all.  The filters that are used to cancel

7    feedback in both of those hearing aids are put onto the chip

8    when it's made in a factory in Taiwan.  And that filter is

9    in that chip from when it gets put on at the chip

10   manufacturing plant until the hearing aid is put in the --

11   for the rest of its life, the existence of that hearing aid,

12   that filter is in there.  It never leaves.

13   Q.    So if you take Claim 13 as a whole, is it your opinion

14   that the Widex Inteo and Senso Diva includes all of the

15   features in that claim?

16   A.    It's my opinion that it includes very few if any of

17   the features in that claim, the Senso Diva and Inteo.

18   Q.    Can we now go to Claim 14, which is another one of the

19   claims asserted by ETG.  Correct?

20   A.    Yes.  This is similar to Claim 13, but it doesn't

21   require specifically for the programmable filter that's

22   programmed to be in a feedback path.  It could be anywhere,

23   presumably.

24   Q.    So are all of the reasons that you just gave why the

25   Senso Diva and Inteo are not infringing Claim 13 applicable

Morley - direct

1   to Claim 14?

2   A.    That's right.  It doesn't -- still, there is a

3   determining and inserting step here, and neither of those

4   products perform either of those steps.

5   Q.    Let's go to Claim 16, which is the claim we saw that

6   was dependent on 14.  Claim 14, why don't you go ahead and

7   read it into the record, Dr. Morley?

8   A.    "A method of reducing feedback in a hearing aid as

9   described in Claim 14 in which said programmable filter is

10  inserted in an electrical feedback loop for said

11  transmission channel."

12  Q.    Does either the Inteo or Senso Diva have that

13  programmable filter?

14  A.    No.

15  Q.    I want to go and talk about your doctrine of

16  equivalents analysis.  I think you mentioned that you

17  considered prior art in connection with that.  Is that

18  correct?

19  A.    I did.

20  Q.    And one of the references I think you mentioned was a

21  patent to a Dr. Graupe.  Is that right?

22  A.    Correct.

23  Q.    Can we have DX-982, please.  Is this the Graupe patent

24  you were referring to?

25  A.    Yes, it is.

1    correction circuit change?

2    A.    Yes.    They get updated from time to time.

3    Q.    And this is a feedback cancellation filter?

4    A.    It is.

5    Q.    So how is that compared to what we have been

6    describing with respect to the discussion this morning of

7    the ETG patents?

8    A.    The ETG patents don't change the coefficients out in

9    normal use, whereas this invention does periodically measure

10   the acoustic feedback path, calculate new coefficients, and

11   then use those in the correction circuit for adjusting the

12   feedback, or canceling it.

13   Q.    Can we have Morley Demonstrative No. 16, please.

14              Okay.    Can you explain what we see here, Dr.

15   Morley?

16   Q.    Okay.    Up at the top is my simplified block diagram

17   for the ETG patented hearing aid, with its acoustic feedback

18   fixed filter in the feedback path.    And down below we see

19   the block diagram of the Graupe '818 patent, and I have had

20   the colors match up, so the acoustic feedback path here is

21   in purple on both of them, the microphone is blue, the

22   feedback canceling filter is in blue up at the top, the

23   hearing compensation filter here in the middle is in red.

24              The amplifier is in here, and that's why they

25   are both red.    And then we got a speaker that's orange.    So

1              I think in the second column here, she talks

2   about a number of researchers in, let's see, two through

3   four.

4   Q.   Yes.   And if you go back to the references on the last

5   page?

6   A.   Yes.   Reference two, is that the '850 patent of ETG?

7   Q.   Yes.   It's referring to the '850 patent, correct?

8   That's the second.

9   A.   Right.   Now I see it.   Right after that, if we can go

10  back to the second column of the first page?   In the top

11  paragraph, about five or six lines in.

12             It says, a number of researchers -- and then in

13  brackets, two through four, so that is an indication of the

14  references at the back of the document -- have achieved some

15  success with this general approach.   One, reference two that

16  we know now is the '850 patent, employed a fixed filter,

17  derived from one measurement of the feedback path transfer

18  function, as the transfer function estimate, rendering this

19  approach vulnerable to changes in the acoustic environment.

20  Q.   Is that consistent or inconsistent with your

21  understanding of the '850 patent?

22  A.   It's dead on.

23  Q.   Okay.   Let's look at Exhibit 1240, please.

24             This is a document entitled, The Problem of

25  Feedback in Hearing Aids by a Mr. James M. Kates.   Are you

Morley - cross

1   A.    As that term is understood in the industry, yes.

2   Q.    In other words, you didn't use another term to

3   describe it, you didn't use the word suppression, you used

4   feedback cancellation in your report and in your testimony

5   before the jury; right?

6   A.    That's correct.

7   Q.    Now, I think one of your statements here today was

8   that the LMS algorithm, if I can ever pronounce that word

9   correctly, does not measure feedback.  I think you testified

10  to that earlier; is that correct?

11  A.    I'm not sure I would have said that.  I think I would

12  have said that it doesn't measure the effect on the phase

13  and amplitude in a signal in the transmission channel as the

14  claim requires.

15  Q.    Okay.  Going back to the same order that you have

16  apparently read, that order doesn't require a measurement,

17  does it?

18  A.    Well, it says to determine.

19  Q.    And to determine doesn't mean measure.  It's broader

20  than the word measure, isn't it?

21  A.    It can be.

22  Q.    Now, you say that one of the things that is different

23  about the Widex products from Dr. Levitt's patent is that

24  they use an LMS algorithm; correct?  That is one of the

25  things?

1    MR. ROMARY:  Your Honor, the entire second

2    patent, the '749 patent is addressed to the host controller.

3    When it was originally filed, it had no reference to

4    measuring phase or amplitude.  That was not a term -- that

5    was not a limitation.

6        If Your Honor will recall, there was a big

7    argument with regard to the first patent, the early patent,

8    as to whether the word determining or determine meant

9    measure.

10       And the plaintiffs took the position that, no,

11   no, no.  Measuring is a very specific thing.  It requires an

12   extra step.  It's different.  It's not the same as

13   determining.

14       But what happened was, when the claim was

15   rejected, all the claims were rejected in the second case,

16   the patentee came back and introduced this phrase, measuring

17   phase --

18       THE COURT:  I am going to interrupt you, as is

19   my privilege, I think, as a Judge, and as you are accustomed

20   to, quite clearly.  I think that this matter can be briefed

21   post-verdict, and that I can resolve it in a more sober

22   fashion, absent the press of events to resolve it.  I just

23   don't think it requires attention at this point.

24       If you believe in your position, raise it

25   pose-verdict.  You may not need to raise it.

1522

1                 IN THE UNITED STATES DISTRICT COURT

2                 IN AND FOR THE DISTRICT OF DELAWARE

3
                          -   -   -
4

5    ENERGY TRANSPORTATION,          :   Civil Action
     INC.,                           :
6                                    :
                  Plaintiff,         :
7                                    :
           v.                        :
8                                    :
     WILLIAM DEMANT HOLDINGS A/S,    :
9    et al.,                         :
                                     :
10                Defendants.        :   No. 05-422 (GMS)

11                        -   -   -

12                   Wilmington, Delaware
                  Wednesday, January 30, 2008
13                      8:30 a.m.
                   Eighth Day of Trial
14
                          -   -   -
15
     BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge,
16                                      and a Jury

17

18
     APPEARANCES:
19
                   EDMOND D. JOHNSON, ESQ.
20                 Pepper Hamilton LLP
                         -and-
21                 MARTY STEINBERG, ESQ.,
                   BRIAN M. BUROKER, ESQ., and
22                 MAYA M. ECKSTEIN, ESQ.
                   Hunton & Williams
23                 (Washington, D.C.)

24                                  Counsel for Plaintiff

25

```
 1    APPEARANCES CONTINUED:

 2                    MARY B. GRAHAM, ESQ.
                      Morris, Nichols, Arsht & Tunnell
 3                         -and-
                      JOHN M. ROMARY, ESQ.,
 4                    GREGORY C. GRAMENOPOULOS, ESQ.,
                      VINCENT KOVALICK, ESQ.,
 5                    KAY HILL, ESQ.,
                      GERSON S. PANITCH, ESQ., and
 6                    ARTHUR A. SMITH, ESQ.
                      Finnegan, Henderson, Ford, Farabow & Dunner
 7                    (Washington, D.C.)

 8                                        Counsel for
                                          Demant Defendants
 9
                      DONALD E. REID, ESQ.
10                    Morris, Nichols, Arsht & Tunnell
                           -and-
11                    WILLIAM H. MANDIR, ESQ.,
                      JOHN SCHERLING, ESQ.,
12                    CARL J. PELLEGRINI, ESQ.,
                      BRIAN SHELTON, ESQ.,
13                    MATTHEW KAPLAN, ESQ., and
                      J. WARREN LYTLE, JR., ESQ.
14                    Sughrue Mion
                      (Washington, D.C.)
15
                                          Counsel for Widex
16                                        Defendants

17                            -   -   -

18

19

20

21

22

23

24

25
```

1    A.      For the '850 patent, I considered Claim 13, Claim 14,

2    Claim 16 and Claim 19.  And for the '749 patent, I

3    considered Claims 1 and 2.

4    Q.      Doctor, how did you determine what these claims are

5    all about?

6    A.      Well, first the Court construes the meaning of

7    certain terms in the claims, as you have seen.  Then I read

8    the claims.  And for the rest of the terms, I applied their

9    plain and ordinary meaning as it would mean to one of skill

10   in the art in light of the patent specification.

11   Q.      Now, what is your understanding of one of ordinary

12   skill in the art?

13   A.      My understanding is essentially the same as

14   Dr. Morley's.

15   Q.      Did you hear Mr. Brown's definition when he

16   testified?

17   A.      Yes, I did.

18   Q.      Do you disagree with him?

19   A.      No, that is fine, too.  And it doesn't make any

20   difference.  It turns out there are many ways people can the

21   approach the problem of hearing aid work.  It's a

22   multi-disciplinary field.  So Mr. Brown's is a fine

23   definition as well.

24   Q.      Let's look for a moment at the Levitt patents.  And I

25   don't want to bore the jury and go over everything again but

1   just get a highlight of what your understanding of what the

2   Levitt patents are doing.  You prepared a demonstrative for

3   that; is that right?

4   A.    Yes, I did.

5   Q.    Is this what you prepared?

6   A.    The Demant products or the Levitt?

7   Q.    It would be Anderson 1.

8   A.    There we do.  That's it.

9   Q.    Okay.  Would you describe please for the jury what

10  you did here?

11  A.    Sure.  This is a --

12  Q.    Do you have a pointer, sir?

13  A.    I have a pointer.

14  Q.    Thank you.

15  A.    This is a summary of what is in the patent

16  specification, what is described in the patent.  And I'll

17  discuss how that relates to the claims in just a moment.  As

18  you have heard, there are two patents.  One of them covers

19  the hearing aid and one of them covers the host controller.

20          Now, you heard Dr. Levitt talk about his goal in

21  producing a digital hearing aid that could be customized to

22  an individual and address many of the problems in hearing.

23  And he was presented with problems.  The technology at the

24  time didn't really allow him to realize this full dream and

25  so he worked out a very, I thought very clever way of

Anderson - direct

1    putting the bare essentials of a programmable hearing aid

2    into the hearing aid.  It could be programmed.  It could

3    have characteristics that he wanted it to have.  And then

4    all the extra required things, the signal generators, the

5    determination of amplitude and phase switching programs and

6    such, that could be placed in a host controller.  This

7    enables someone to go in and get fitted and leave with a

8    hearing aid that could be operated off the hearing aid

9    battery and have, like I say, a functional digital hearing

10    aid and leave all the rest of the circuitry behind at the

11    audiologist office.

12            Now, in order to accomplish this, this host

13    controller was designed to be able to program the hearing

14    aid, provide it with coefficients.  Now, in the case of

15    acoustic feedback reduction, the actual signal path was cut.

16    In other words, the normal operation of the hearing aid was

17    suspended.  A test signal was inserted and would go out

18    through the receiver and a little bit would leap back

19    independent and the idea was to measure that or, rather,

20    determine the amplitude and phase.  So the host controller

21    would supply the test signal and then receive the return

22    signal and use that to determine the amplitude and phase of

23    this feedback effect.  Using that, coefficients were then

24    calculated and inserted or provided to the filter so it

25    would achieve the desired response and reduce feedback.

1   Q.    What is this number down here, this 1.5 V and the 110

2   V?  What does that represent?

3   A.    Over on the right, the 1.5 is the hearing aid battery

4   voltage that was specified in the specification.  Over on

5   the left, we don't know exactly if it was 110 volts but that

6   was just to indicate this was operating off a different

7   supply.  The supply, the 1.5 volt supply wasn't connected to

8   the host controller.

9   Q.    Dr. Anderson, how do you know that?

10  A.    Well, in the specification, it shows that the hearing

11  aid battery supplies the hearing aid.  It doesn't show that

12  it supplies the host controller.  And I have many reasons

13  technically for believing that that is the case.

14  Q.    Can you provide a summary of those technical reasons

15  for the jury?

16  A.    Well, one of them is the basic idea of the patent is

17  that they would be separated.  Another reason is that during

18  that time I was working with EEPROM technology as it's

19  described, and it didn't require 1.5 volts, it required 14

20  to 20 volts, and that was part of the host controller.

21  Q.    Now, you have down here a label, programmed for a

22  response.  You have that in quotes.  Why did you do that?

23  A.    Why don't we move on to the -- I've got a

24  demonstrative that talks about the Court's claim

25  construction.

1    Q.    Okay.  One moment, please.  Can we put up Anderson

2    No. 4, please?

3    A.    It says my monitor is going to sleep.  I hope that is

4    the only thing in here.

5    Q.    We have our numbers messed up here a little bit.  I'm

6    sorry.

7    A.    "Programmed" was construed by the court -- and this

8    is a reasonable description.  "Programmed" means "provided

9    with one or more values."  And I understood and I think

10   Mr. Brown and his testimony also agreed that these values

11   would be the filter coefficients or the weighting values of

12   the filter.  So "programmed" means "provided with one or

13   more values so as to produce a response."

14           In my opinion, this makes sense.  When you are

15   talking about a programmed system, you have an idea of the

16   response you want.  You give the appropriate coefficients,

17   and then that filter, well, acts in the desired manner.

18   That would be on a signal, but what it does to that signal

19   would be the response.

20   Q.    And this word "programmed," that is a word you find

21   in the claims?

22   A.    Yes.

23   Q.    Okay.  Could we go back to Anderson No. 1, please,

24   the first one?

25           Okay.  So I believe you were at the point where

1    you have the programmable filter programmed for a response;

2    is that correct?

3    A.    Yes.

4    Q.    Then what happens?

5    A.    Once that is done, the patent specification describes

6    these two lines as being reconnected.  Normal operation of

7    the hearing aid is resumed and the hearing aid can then

8    operate independently of the host controller.

9    Q.    Doctor, I believe you said that the patent itself

10   describes those as being reconnected.  Is that what you

11   meant to say or is it one of ordinary skill in the art would

12   understand that would be connected?

13   A.    In the specification, it talks, it enumerates that

14   the signal flows from the microphone through this filter.

15   In the actual diagram, I think you heard Dr. Levitt say that

16   the diagram doesn't show that but one of ordinary skill in

17   the art especially with that specification would know that

18   you need to connect those for the signal to flow as

19   described in the patent.

20   Q.    So in the ordinary operation of the device, would the

21   host controller be carried around with the user or what

22   would happen?

23   A.    That certainly seems contrary to what was envisioned

24   in the patent, which was a clever way of building a small

25   programmable hearing aid that could then be programmed by an

 1  audiologist to have certain responses.

 2  Q.    I'd now like to direct the jury's attention, allow

 3  the jury to hear your opinion with regard to the accused

 4  products.    First of all, let's start out with how many

 5  accused products did you consider of the Demant Group?

 6  A.    Quite a few.    There are 17 products that I considered

 7  and researched.

 8  Q.    Now, I'm not going to ask you to see if you

 9  memorized them all.    I'm just going to ask if they can

10  all be considered the same, with the same infringement

11  assessment or do they have to be separated out?

12  A.    For the most part, they're the same with respect to

13  the fact that there is an adaptive filter in the feedback

14  path.    One of the products, though, I think should be

15  considered differently and that is the Bernafon Win product.

16  I'm not sure why it was on the accused list because it has

17  no adaptive feedback suppression of any kind.    It's actually

18  based on a chip that has that, but the chip, that part of

19  the chip is disabled at the factory and so it's necessarily

20  not programmed to reduce feedback.

21  Q.    So do I understand then that -- excuse me.    Are you

22  saying that 16 products can be treated the same?

23  A.    Yes.

24  Q.    The 17th one shouldn't be because?

25  A.    The 17th one, because it doesn't infringe on any of

1            There, are the accused Demant products a

2    miniaturization of the Levitt system?

3    A.    That is one of the first things I looked for because

4    ETG has suggested that that is the case.  And in my opinion,

5    it's not for several reasons.  One, there is no test signal

6    used.  Two, there is no determination of the amplitude and

7    phase of the feedback as required by the host controller,

8    patent and the hearing aid patent.  And, three, as I

9    mentioned before, this feedback filter isn't a programmed

10    filter.  It's not giving values that will have a response

11    where it changes so quickly.  No signal ever passes through

12    that filter with a single response.  Rather, it's changed

13    every cycle.

14    Q.    Okay.  Now, doctor, let's look at the actual language

15    of the claims, if we may.  Could we go to Demonstrative 5,

16    which I believe is the checklist used by ETG.

17            Okay.  Do you recognize this?

18    A.    Yes.  This is the chart Mr. Brown used in his

19    analysis of the Bernafon and Oticon products relevant to

20    Claims 14 and 16.  It looks like 16 is cut off a bit, but,

21    yes.

22    Q.    What do you understand the issue of infringement is?

23    Do you have to have all the checks or is it okay to just

24    have a lot of them?

25    A.    Right.  For infringement, it's important, every

1    single element to the claim must match the accused products.

2    Q.    So if one check is missing, what would your opinion

3    be?

4    A.    Then my opinion would be that the products do not

5    infringe that claim.

6    Q.    And have you considered infringement both literally

7    and under the doctrine of equivalents?

8    A.    Yes, I have.

9    Q.    Okay.  Would you please tell the jury why you reached

10    your opinion that there is no infringement of Claim 14

11    either literally or under the doctrine of equivalents?

12    A.    Yes.  Before I do, I should mention that I would have

13    probably included one more item on this chart, and that is

14    the claim language strongly suggests and the Court has

15    construed that the two steps of Claim 14 and also Claim 13

16    must be performed in order.  This is what is called a method

17    claim, it describes doing something.  And these steps must

18    be performed in the order in which they are in the patent.

19    I'll talk about that when I talk about the second step.

20    Q.    May I just ask you, could you tell the jury where you

21    would put that additional row in?

22    A.    I would put it, as the next requirement here for this

23    inserting step, that it must occur after the determining

24    step.

25    Q.    Thank you.  Please continue.

1  A.    Sure.  The first few describe a hearing aid.  That is

2  not under dispute.

3            This next step requires determining -- and this

4  is a mouthful and I apologize -- determining the effect on

5  the amplitude and phase of a signal in said transmission

6  channel as a function of frequency of acoustic feedback

7  between said receiver and microphone.

8            And I would say that neither of those two steps

9  are performed in any of the accused -- I'm sorry -- this

10  step is not performed in any of the accused products.

11            THE COURT:  You might want to wait.  Instruct

12  your IT person to wait until the witness is testifying.

13            MR. ROMARY:  Yes, I was asking him to highlight

14  it and I think we miscommunicated, Your Honor.

15            THE COURT:  Okay.

16            MR. ROMARY:  All I need is for you to highlight

17  this.

18            (Demonstrative highlighted.)

19            THE COURT:  Okay.

20  BY MR. ROMARY:

21  Q.    In your opinion, should the check next to the

22  highlighted section be on or off?

23  A.    In my opinion, they should be off.  So now you can

24  take them away.

25  Q.    Now, what is the basis for your opinion that this

1    step is not literally performed or not performed by

2    equivalence?

3    A.    The adaptive filters -- I guess I should start by

4    saying -- let's see.  How do I bring this up?  I understand

5    adaptive filters.  I have written papers and designed

6    adaptive filters.  I understand the math behind them.  I

7    understand the principles behind them.  And I can tell you

8    or show you, whichever you would like to see, that there is

9    no determination of amplitude or phase effect in adaptive

10   filters, that they do not need that information, they cannot

11   make use of that information and it is simply not performed.

12   Q.    Could we go back to Anderson 2 just for a moment?

13         Doctor, using Anderson 2, could you explain to

14   the jury what the LMS filter is doing, how it works?

15   A.    Sure.  The LMS filter -- and it helps me to describe

16   it as a living thing and actually in this case I think it

17   applies because like a living thing, the LMS filter does its

18   own -- it's self determining in that effect.  It watches the

19   signal that is about to go out and to be heard by the

20   hearing impaired listener.  It also watches what is coming

21   back into the microphone.  Now, it takes a little time for

22   this signal to come back around.  And if that signal comes

23   back around, it looks for some correlation there.  It

24   subtracts that portion of the output which reappears at the

25   input.  So that the hearing impaired listener will only have

1    to listen to something one time, not multiple times.  This

2    is done by a correlation.  It has no bearing or relevance on

3    amplitude and phase.

4    Q.    Now, I'd like to direct your attention to the exhibit

5    in your book, JX-138A.

6    A.    Okay.

7    Q.    What is this, sir?

8    A.    This is a description of the anti-feedback algorithm.

9    That is the LMS algorithm used in the Jump 3 and Jump 2

10   devices.  It's also very similar to that used in the Alaska

11   products by Bernafon.

12   Q.    And can we turn please to DEM005187?

13   A.    Okay.

14   Q.    What is going on here, doctor?

15   A.    There are several equations on this page I think a

16   little further down.  These are the first equations in the

17   adaptive, LMS adaptive filter.  If you go on to the next

18   page, they actually continue now for several pages.

19   Q.    Where do they end?

20   A.    They end on 5190.

21   Q.    And they end with what?

22   A.    The last equation on 5190 is the equation governing

23   how fast the filter moves.  The one just prior to that

24   determines how the weights are adjusted.

25   Q.    Is there any place in these equations, doctor, where

1   the effect of amplitude and phase on a signal of a

2   transmission path is determined?

3   A.    No, there is not.

4   Q.    Is there any place in these equations where the

5   equivalent of the effect of amplitude and the phase of a

6   signal in the transmission channel is determined?

7   A.    No, they perform -- the result is far different.

8   When you are talking about determining the amplitude and

9   phase effect in the context of this patent, that is used to

10  generate coefficients having a desired response.  Here,

11  there is no amplitude or phase measure determined in any

12  way.  The result is far different.  You don't know the

13  response that you want.  Instead, you just gradually tweak

14  or update these things, the filter coefficients until they

15  are effective at the goal of reducing feedback.

16  Q.    So you don't have to know where you want to go with

17  an LMS filter; is that correct?

18  A.    Yes, I would say the primary difference between an

19  adaptive filter and a programmable filter is that if you

20  know what you want the filter to do in terms of its

21  response, you use a programmable filter.  If you don't know

22  what you want the filter to do or that what it's going to do

23  is going to be changing in some unknown way, you use an

24  adaptive filter.  One is programmable, one is

25  non-programmable.  Neither one can perform the same function

1    and get the same result as the other.

2    Q.    Can we go back to the claim chart?  Anderson 5.

3              So that is the basis for removing the checks

4    over here for the first determining step; is that correct?

5    A.    Yes, that is.

6    Q.    And that is under both literal infringement and

7    doctrine of equivalents; is that correct?

8    A.    That is correct.

9    Q.    Now, is there anything else in this claim, any other

10   conclusion you have reached as to whether it's appropriate

11   to have a check or not have a check?

12   A.    In my opinion, that is sufficient for it to not

13   infringe but if you look down to the next step, I think that

14   is not performed either.

15   Q.    What should we do with the checks there?

16   A.    As I have just mentioned, a programmable filter and

17   an adaptive filter are different things but the programmable

18   filter, you provide it with coefficients.  It gives you the

19   response.  With an adaptive filter, you cannot provide it

20   with coefficients.  It generates its own coefficients.  And

21   I understand that ETG is asserting that while it has

22   coefficients, it must have been programmed.

23              I disagree with that for many reasons:  One, if

24   all a filter must have to be programmed is coefficients,

25   that means all filters are programmable and the point of

1587

Anderson - direct

 1    differentiating a programmable filter would be a moot point

 2    and it would read that part out of the claim.

 3            Another reason I disagree is that with the LMS

 4    adaptive filters, you cannot determine what the response

 5    will be.  You can't provide it with values so it will

 6    achieve a response.  It's going to do what it wants to do.

 7    Q.    So, doctor, are you just looking at this language

 8    right here?  Can we just get that highlighted?

 9            Is that the language you are referring to?

10    A.    Yes.  The programmable filter programmed.  Okay?  So

11    an LMS adaptive filter is not a programmable filter.  It

12    cannot be provided with values.  And, in fact, it's not

13    programmable and in my opinion something that is not

14    programmable or non-programmable is not equivalent to

15    something that is programmable.  The function is different.

16    One allows you to produce a certain response and result is

17    different -- I'm sorry -- substantially different.  You can

18    specify the response you want with the programmable filter.

19    You cannot with an adaptive filter.

20            THE COURT:  Doctor, just a moment ago you said

21    "programmable" would be read out of the claim.  Do you

22    recall that?

23            THE WITNESS:  Yes.

24            THE COURT:  Would you explain what you mean by

25    that so the jury understands?

1    THE WITNESS:  Yes.

2        So each and every -- and, judge, I hope I get

3    the legal terms right.  You will help me if I'm not.

4        THE COURT:  I will, if necessary.

5        THE WITNESS:  Okay.  Thank you.

6        So if you said that if a filter had

7    coefficients, then it must be programmable, that would

8    mean that any filter which must have coefficients is a

9    programmable filter.

10       If that is the case, then they use the

11   distinction they want a programmable filter and then they're

12   later going back and saying, well, we mean any filter.  In

13   other words, we didn't really mean programmable, we mean any

14   filter.  That means any filter.  And so what they have

15   effectively done in that interpretation is say that word in

16   the term is irrelevant.  But as I understand, that is

17   inappropriate.

18       If you put a word, a limitation in the claim,

19   you can't just remove it later and say it's unimportant, the

20   claim doesn't really require that term.

21       Is that correct?

22       THE COURT:  Thank you, doctor.

23   BY MR. ROMARY:

24   Q.   Now, doctor, what should we do with these checks over

25   here in view of your opinion?

Anderson - direct

1  A.      Well, I have a few more nails to put in this point,

2  if that is okay.

3  Q.      Please.

4  A.      Right now, I can say you can take those two checks

5  off.

6          Another point is this step must be performed

7  after the determining step.  For Claim 14, it requires

8  inserting a programmable filter programmed.

9          Claim 13 requires inserting a feedback path

10 having a filter therein programmed.

11          So in both cases, it's talking about inserting a

12 filter and it's also talking about the program, that it's a

13 programmed filter.

14          Now, you heard Dr. Morley talk about how the

15 patent specification says you insert a filter after you have

16 determined these coefficients.  And that is consistent with

17 this claim.  But in the accused products, the filter is

18 inserted at the time of manufacture, long before there are

19 any coefficients anywhere.  And so the insertion step

20 occurs out of order then.  It occurs first, and it's not

21 programmed.

22 Q.      Did you prepare a graphic for that to explain that

23 process, your point?  Is that this one, No. 12?

24 A.      Yes, please.  I don't remember the number of it.

25 Q.      No. 12, please.

1    Can you explain your point using this

2    demonstrative, doctor?

3    A.    Sure.  And I know you have seen a lot of these

4    things.  I wanted to put them all up on the same slide and I

5    appreciate your patience here.

6    On the left, we have what I call the technical

7    description.  This can either be words or it can be a block

8    diagram, and this is how an engineer first expresses the

9    concept that he is trying to accomplish.  When he has got

10   that worked out, he writes Verilog code or she writes

11   Verilog code and this code is a description, it's a

12   description that the computer understands of the circuits

13   and it's used by chip manufacturers to actually produce the

14   circuits.

15   The final step is an actual chip.  This chip now

16   has circuits on there that perform the functions and have

17   the structure specified in the code but it's made of

18   transistors primarily and capacitors.

19   Q.    Doctor, did you actually take a picture of an accused

20   device or are you just using a demonstrative?

21   A.    I'm sorry.  We just pulled that chip off the

22   Internet.  But it's about the same size and complexity of

23   one of the accused devices.

24   Q.    Now, what did you understand Mr. Brown to say with

25   regard to this step of inserting a filter?  When did he say

1    that it occurred?

2    A.    Mr. Brown suggested that the filter was inserted

3    every time new coefficients were provided.  In my view, that

4    is inappropriate.  The filter is inserted at the time of

5    manufacture.  When you provide it with coefficients, you are

6    just updating the filter or changing the filter.  You are

7    not removing it and reinserting it.

8    Q.    According to Mr. Brown's interpretation, how many

9    times would this filter be inserted?

10   A.    In the accused devices, this filter is updated,

11   depending upon the specific device, between about 16,000 and

12   20,000 times a second.

13   Q.    A second?

14   A.    Yes.

15   Q.    What are the initial coefficients that are used in

16   the accused LMS adaptive filter?

17   A.    All of the initial coefficients -- I'm sorry.  All of

18   the initial coefficients and all the accused devices are

19   zero, so when you turn the device on, the adaptive filter

20   has coefficients in there that are all zeros.

21   Q.    And what happens the next step, the next 16,000th of

22   a seconds?  What happens?

23   A.    This a partial update of a few of the coefficients.

24   Q.    Do you know how many?

25   A.    I think it's four, for the Jump platform.

1    Q.    And what happens to the next 16,000ths of a second?

2    A.    You have a partial update of the next four.  You are

3    building your columns one little bit at a time.  It's going

4    to take it actually maybe seconds to get a full set of

5    coefficients in there.

6    Q.    And all this time, is the delay line in the process

7    and inserted in the process?

8    A.    Yes.  So the delay line is actually an integral part

9    of the algorithm.  It may not be apparent from all the

10   diagrams but the mathematics make it clear that those delay

11   line values are used in both the update step and in the

12   filtering step.  And so it's obviously inserted at that

13   point.  And I might add that the claim requires something

14   that is effective to reduce feedback and all zeros or a

15   couple partially updated coefficients are in no way

16   effective to reduce feedback.

17   Q.    Can we go back please to Anderson 5, the claim chart?

18             So with respect to Claim 14, should we yellow

19   the whole thing or not, on inserting?  This whole step.

20   A.    Well, that whole step is not met in the accused

21   products, if that is what you mean by highlighting it.

22   Q.    And that would be either literally or under the

23   doctrine of equivalents?

24   A.    Absolutely.

25   Q.    So that takes care of Claim 14.  What is your opinion

Anderson - direct

1    with respect to Claim 16?

2    A.     Claim 16 requires all the restrictions of Claim 14.

3    And since in my opinion the limitations of Claim 14 aren't

4    met, Claim 16 is also not met and that would be the first

5    line there.  We could remove those checks.

6    Q.     These here?

7    A.     Yes.  And we've already discussed that LMS filters

8    are not programmable, and for that reason, in fact they

9    aren't equivalent to programmable filters -- I might add

10   that in, among engineers, among those that are in this

11   field, the term "programmable" is usually not used except to

12   distinguish a filter from an adaptive filter.

13   Q.     Okay.  What do we do with these checks?

14   A.     Well, the accused devices don't have a programmable

15   filter in the feedback loop so I would remove both those

16   checks.

17   Q.     Do you have an opinion as to how your analysis of

18   literally and under the doctrine of equivalents for Claim 14

19   compares to your analysis for Claim 13?

20   A.     Claim 13 requires the same determination step and so

21   the identical analysis applies.

22   Q.     And -- I'm sorry.

23   A.     It also requires an insertion of a programmed filter.

24   And the same analysis there applies.

25   Q.     So you agree then with Mr. Brown that the analysis

1594

Anderson - direct

 1    for Claim 14 applies equally to Claim 13?

 2    A.    Yes.

 3    Q.    And the same checkmarks would be removed for Claim

 4    13; is that correct?

 5    A.    Absolutely.

 6    Q.    Let's go on to Claim 19, which is Anderson 6.

 7              Okay.  What do we have here, doctor?

 8    A.    This is a claim chart also used by Mr. Brown with

 9    Mr. Brown's checks in place.

10    Q.    And what is your opinion with respect to the

11    infringement of Claim 19, both literally and under the

12    doctrine of equivalents?

13    A.    In my opinion, none of the accused products infringe

14    Claim 19.

15    Q.    And can you point to claim language that in your

16    opinion is not present either literally or under the

17    doctrine of equivalents?

18    A.    Let's start with the row that says, and a

19    programmable delay line filter interposed in a feedback path

20    between the input and output of said transmission channel.

21              As I just discussed, the accused products don't

22    have a programmable filter, a programmable delay line filter

23    in the feedback path.  They just have the feedback path.

24    Q.    So what would you do with those two checkmarks?

25    A.    They should be removed.

1617

Anderson - cross

1    each time.  Correct?

2    A.    Well, the filter does something different every time,

3    if that's what you mean by response.  Typically, when you

4    are talking about filters, you talk about filter responses,

5    there are several ways to define it.  You can talk about

6    frequency response, which isn't defined in this case.  You

7    can talk about impulse response, which doesn't apply in an

8    adaptive filter case.  You can talk about what it does to

9    the signal as it goes through the filter.  But if the signal

10   can never go through the filter before that is changed,

11   there is no way to measure the response of the filter.

12             I think the key is a response.  You are not

13   giving it a response.  It is doing its own thing.  It's

14   changing continually.

15   Q.    Each time new coefficients are provided, there is an

16   output of that filter.  You agree with that.  Correct?

17   A.    Yes.

18   Q.    And isn't that a response?

19             THE COURT:  Let me see counsel for a moment.

20             (The following took place at sidebar.)

21             THE COURT:  I don't want to unduly constrain

22   your cross.  I think you are at an impasse.  There is a

23   fundamental disagreement between the experts in this case,

24   and it is going to be up to the jury to decide, resolve that

25   disagreement.

Anderson - cross

1    why did the marketing documents suggest that it does?

2    A.    I really can't say.

3    Q.    Now, your basis for saying that the accused products

4    don't insert, that is based on your understanding that there

5    is some act of physically inserting a filter; is that

6    correct?

7    A.    The words are "inserting a programmable filter

8    programmed."  That is what I went on.

9    Q.    And you said the only time that could possibly happen

10   is at the factory?

11   A.    The obvious interpretation of that, especially in

12   light of what is going on in the claims, is that you have

13   inserted a filter and that filter is inserted, is

14   programmed.  That is what is required by the claims.  Now,

15   the filter is physically inserted at the factory.  It would

16   be, I understand Mr. Brown is stating that once you put

17   coefficients into an already inserted filter, we could say

18   that is equivalent to inserting a filter.  If that is the

19   case, then when the coefficients are first inserted into the

20   filter, those coefficients do not meet the requirement or

21   limitation of the claims that they be programmed to effect a

22   substantial reduction of feedback.

23   Q.    But that process is iterative so it happens over and

24   over again; correct?

25   A.    I disagree with that.

Anderson - cross

1    Q.    Is that what it literally describes or your

2    interpretation of the patent?

3    A.    In the claims, you go through this little fixed

4    filter, right.  But it inserts a test signal that eventually

5    go out through the receiver.  That is what is described in

6    the specification of the patent.

7    Q.    I think you said in the claims.  Did you mean to

8    say in the claims?  You said in the claims, it describes

9    disconnected?

10   A.    I thought I corrected myself.

11   Q.    You are talking about the specification?

12   A.    The specification, yes.

13   Q.    And where in the specification is that?

14   A.    Well, Dr. Morley talked about this at length.  I

15   suppose we can hit it again.  And I don't have my marked up

16   copy here so it's going to take me a moment.  But I think we

17   can turn to column 9, 30.

18   Q.    That is JX-4.

19   A.    This is the '850 patent, column 9, line 30.

20             For the purpose of this measurement, the

21   feedback loop is broken between 140 and 122.  So you would

22   have to refer back to the diagram there.  But I will say

23   that that is after the microphone and in a path that then

24   leads towards the receiver.

25   Q.    And then -- are you finished?  I'm sorry.

1   understand there is some question about that.

2           MR. STEINBERG:  Objection to the speculation,

3   Your Honor.

4           THE COURT:  I will sustain the objection.

5           You can disregard that comment, ladies and

6   gentlemen.  You are directed to disregard that comment.

7           THE WITNESS:  April of 1985 was the publication

8   of an abstract in the Journal of the Acoustical Society of

9   America.  Actually, the abstract would have been published a

10  couple months before that and sent to all the members of the

11  Acoustical Society, and to the libraries throughout the

12  world that subscribe to that journal.

13          That abstract describes Weaver's invention very

14  briefly.  But I think it tells you enough about it to know

15  what he is doing.

16  BY MR. LYTLE:

17  Q.   Dr. Soli, excuse me.  You said you are a member of

18  Acoustical Society of America?

19  A.   Yes, I am Fellow of that society.

20  Q.   Were you in 19585?

21  A.   I wasn't a Fellow then, but I was a member then.

22  Q.   So would you have received that publication?

23  A.   Yes, I did.

24  Q.   Are you familiar with that meeting in April of '85?

25  A.   Yes, I am familiar in the first person because I was

Soli - direct

1    there and I gave two presentations.

2    Q.    Okay.  Did you happen to see Mr. Weaver's

3    presentation?

4    A.    No, I wish I had, though.

5    Q.    Could you continue, please?

6    A.    Yes.

7          Okay.  So he made an oral presentation with

8    slides, I think you have seen some of them, to a group of 30

9    or so people.  Then later that year, in September, Dr. Egolf

10   demonstrated publicly at a professional meeting what's

11   called AFC 2.  This was the circuit embodying Weaver's, Mr.

12   Weaver's invention that could be used with a hearing aid.

13   And it was used with a hearing aid at this time.

14          Then finally, in 1984, the 1984 VA report was

15   published in 1985, the September time frame.  And that also

16   provided a published summary of Weaver's invention.

17          So there is a number of events along the way

18   here that all are related to that invention that was first

19   seen in July of 1984.

20   Q.    Now, in your review of these documents, is there any

21   one particular Figure that you found that really shows Mr.

22   Weaver's idea, his invention?

23   A.    Yes.  The Figure I think is labeled 3.1, Figure 3.1.

24   Q.    In his thesis?

25   A.    In the thesis or the draft thesis.  They are the

1    same.

2    Q.    Is this the Figure you are referring to?

3    A.    Yes, it is.  And I think everybody has seen this

4    before.  I just want to draw your attention to the presence

5    of this electrical feedback path with a, what he called an

6    estimator in it that created the signal that canceled the

7    effects of the acoustic feedback.

8              This, to my knowledge, is the first evidence of

9    the use of an electrical feedback path to cancel feedback in

10   a hearing aid.

11   Q.    Was this idea -- did you find that this idea was

12   present in all of the Weaver work that you just went

13   through?

14   A.    Yes, it was.

15   Q.    Okay, Doctor.  Do I understand it right that the work

16   related to what Mr. Weaver did as shown on the top of this

17   chart?

18   A.    That is true.

19   Q.    What is shown on the bottom of the chart?

20   A.    There are two important events shown here on the

21   bottom.  One is in May 1985, when Dr. Leland Best completed

22   his Master's thesis, describing the use of an LMS adaptive

23   filter to cancel feedback in a hearing aid.  And this thesis

24   was defended and demonstrated to Dr. Egolf.

25              Then on October 17, 1985, that's the date that

Woods - dep.

1           "Answer:  No.

2           "Question:  Based on your experience, could you

3    give me an estimate of when it might have been put in the

4    stacks based on what you see here in the OC -- in Exhibit

5    17?  If you could answer, please?

6           "Answer:  Probably in October of 1986.

7           "Question:  What is the earliest that it could

8    have been put in the stacks?

9           "Answer:  Late September.

10          "Question:  When Mr. Best's thesis arrived,

11   would a member of the general public have been able to

12   access the thesis before it was put into the OCLC?

13          "Answer:  Only if they requested the thesis by

14   the author's name.

15          "Question:  If the member of the general public

16   knew the subject matter that he or she was interested in,

17   could that person have requested that the library search

18   through theses for something on that subject matter?

19          "Answer:  They could have, but we wouldn't have

20   done it.

21          "Question:  Why not?

22          "Answer:  Because we had no indication on any of

23   the information we had what the subject of the theses were.

24   All we had was the name.

25          "Question:  Do you know if the copy -- if the

Woods - dep.

1    department has a copy of the thesis of Kim A. Weaver?

2                    "Answer:  The department or the library?

3                    "Question:  I'm sorry.  The library?

4                    "Answer:  Yes.  Again, a week ago we did.

5                    "Question:  And if a member of the general

6    public wanted to see a copy of Mr. Weaver's thesis before it

7    was entered into OCLC, would that -- he or she have been

8    able to get a copy of the thesis?

9                    "Answer:  If they had the author's name.

10                   "Question:  If they only knew the subject matter

11   of the thesis, would they have been able to get a copy?

12                   "Answer:  No.

13                   "Question:  Ms. Woods, good morning.

14                   "Answer:  Good morning.

15                   "Question:  My name is John Rabena and I

16   represent one of the defendants in this case.  Generally

17   for, for example, for December graduates, when would you

18   expect to receive the theses?

19                   "Answer:  Usually in March.

20                   "Question:  Okay.  And I think you said

21   before -- or earlier this morning that a member of the

22   public could request the theses if they knew the author's

23   name; is that right?

24                   "Answer:  Yes.

25                   "Question:  And that the library would give them

1755
Woods - dep.

1       library let them see that?

2                   "Answer:  We would have found it.

3                   "Question:  And the same goes for Mr. Best?

4                   "Answer:  Yes.

5                   "Question:  If he had presented it outside to

6       the public and somebody from that audience came and said,

7       could I see a copy of Mr. Best's thesis, would the library

8       have given him access to it?

9                   "Answer:  Yes.

10                  "Question:  And that access would be even if it

11      was not catalogued?

12                  "Answer:  Yes."

13                  MR. ROMARY:  Your Honor, we have two other

14      videos.  One is about 30, 35 minutes.  The other is about

15      ten minutes.

16                  THE COURT:  Let's do the 30-minute video.

17                  "Question:  Could you please state your full

18      name for the record.

19                  "Answer:  My name is Vernon Dale Larson.

20                  "Question:  Now, I am not too familiar with the

21      structure of the VA.  Can you give me some detail about what

22      the duties, the scope of the duties were for somebody in

23      your position of chief of Audiology and Speech Pathology

24      Services?

25                  "Answer:  All right.  The primary mission of an

Larson - dep.

1    audiology and speech pathology program in a VA hospital is

2    patient care.  And we had both audiologists and speech

3    language pathologists on staff and had programs for

4    veterans, both outpatient and inpatient, in both hearing and

5    speech and language conditions.

6            "A second mission of the service was the

7    education of students from affiliated universities.  And a

8    third component, which is not universal across VA Medical

9    Centers, is to conduct research in the area of communication

10   disorders.

11           "I don't believe I received a copy of Kim

12   Weaver's thesis.  I don't recall having read the thesis

13   document.

14           "Question:  Okay.  Who is Kim Weaver?

15           "Answer:  As I recall, he was a graduate student

16   at the University of Wyoming, who was assigned certain

17   responsibilities under the project that Dave Egolf was

18   heading up, which in turn was under contract with the VA.

19           "Question:  This particular project that you're

20   referring to?

21           "Answer:  It was a grant from the VA

22   headquarters in Washington, the VA research and development

23   program, to me as principal investigator at the Augusta VA

24   Medical Center.

25           "Question:  Okay.

 1    question.  Did you attend any presentation or defense where
 2    Mr. Weaver was presenting or defending the thesis?
 3              "Answer:  No, I did not attend the defense of
 4    the thesis of any kind.
 5              "Question:  Okay.  Did you obtain any knowledge
 6    about the thesis defense by Kim Weaver?
 7              "Answer:  I did not.
 8              "Question:  Okay.
 9              "Answer:  You know, we're several thousand
10    miles away and it would be an unreasonable expectation that
11    I would attend the University of Wyoming thesis defense.
12              "Question:  It would have been a nice time of
13    year, though.
14              "Answer:  I have been there.
15              "Question:  In the middle, about three
16    paragraphs down, it says that the AFC 2 system is to be
17    demonstrated to personnel at the VA Medical Center in
18    Augusta, Georgia on December 7th, 1984.
19              "Did a demonstration, in fact, occur at the VA
20    Medical Center in Augusta, Georgia on December 7th, 1984?
21              "Answer:  I recall a demonstration in early
22    December of '84, yes.
23              "Question:  Can you describe how the
24    presentation took place?
25              "Answer:  One presentation that was made was in

1765

Larson - dep.

1    a conference room that was in the confines of the Audiology

2    and Speech Pathology Clinical Service.  And as I recall, Mr.

3    Weaver would describe the device and demonstrate the device.

4                "Question:  When you say the device, can you

5    clarify?

6                "Answer:  Yeah.  The feedback prototype they

7    brought with them, on their list.

8                "Question:  And what -- the feedback prototype,

9    if you recall, can you generally describe what physical form

10   it was in?

11               "Answer:  I believe it was -- it was a box and

12   along with a BTE hearing aid, as far as I recall.

13               "Question:  A big box?

14               "Answer:  This size perhaps (indicating), maybe

15   five, six, yeah, five by six by five, something like that,

16   six by six.

17               "Question:  Who attended the demonstration?

18               "Answer:  I did.  I have no specific

19   recollection of other individuals, but in all likelihood any

20   audiology interns or staff would have been invited to

21   attend.  Inasmuch as we were affiliated with the Medical

22   College of Georgia, Medical College of Georgia faculty and

23   residents and any medical students on rotational service

24   would have been and were likely to have attended.

25               "Question:  And I'm not for sure if you answered

1    IN THE UNITED STATES DISTRICT COURT

2    IN AND FOR THE DISTRICT OF DELAWARE

3

                        - - -

4

5    ENERGY TRANSPORTATION,              :   Civil Action
     INC.,                               :
6                                        :
                Plaintiff,               :
7                                        :
          v.                             :
8                                        :
     WILLIAM DEMANT HOLDINGS A/S,        :
9    et al.,                             :
                                         :
10              Defendants.              :   No. 05-422 (GMS)

11                      - - -

12                Wilmington, Delaware
                  Friday, January 31, 2008
13                    9:30 a.m.
                  Ninth Day of Trial
14
                        - - -
15
     BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge
16

17

18   APPEARANCES:

19              EDMOND D. JOHNSON, ESQ.
                Pepper Hamilton LLP
20                   -and-
                MARTY STEINBERG, ESQ.,
21              BRIAN M. BUROKER, ESQ., and
                MAYA M. ECKSTEIN, ESQ.
22              Hunton & Williams
                (Washington, D.C.)
23
                                   Counsel for Plaintiff
24

25

```
 1   APPEARANCES CONTINUED:

 2                   MARY B. GRAHAM, ESQ.
                     Morris, Nichols, Arsht & Tunnell
 3                        -and-
                     JOHN M. ROMARY, ESQ.,
 4                   GREGORY C. GRAMENOPOULOS, ESQ.,
                     VINCENT KOVALICK, ESQ.,
 5                   KAY HILL, ESQ.,
                     GERSON S. PANITCH, ESQ., and
 6                   ARTHUR A. SMITH, ESQ.
                     Finnegan, Henderson, Ford, Farabow & Dunner
 7                   (Washington, D.C.)

 8                                       Counsel for
                                         Demant Defendants
 9
                     DONALD E. REID, ESQ.
10                   Morris, Nichols, Arsht & Tunnell
                          -and-
11                   WILLIAM H. MANDIR, ESQ.,
                     JOHN SCHERLING, ESQ.,
12                   CARL J. PELLEGRINI, ESQ.,
                     BRIAN SHELTON, ESQ.,
13                   MATTHEW KAPLAN, ESQ., and
                     J. WARREN LYTLE, JR., ESQ.
14                   Sughrue Mion
                     (Washington, D.C.)
15
                                         Counsel for Widex
16                                       Defendants

17                           -   -   -

18

19

20

21

22

23

24

25
```

1   Q.          How did Dr. Best connect it, if at all, to a
2   hearing aid?
3   A.          What he did was he took a standard analog
4   hearing aid, and I believe it was an Audiotone 838, and he
5   opened it up, cut the wire from the microphone to the
6   amplifier, and inserted his system by cable into that
7   junction.  So he inserted it -- I think there is a
8   demonstrative that will show that.  He inserted it into the
9   forward transmission channel between the microphone and the
10  amplifier.
11  Q.          Do we have any photos of the prototype?
12  A.          No, we do not.
13  Q.          Are you aware of any document describing the
14  prototype other than Dr. Best's thesis?
15  A.          No.
16  Q.          Do you know where the prototype is now?
17  A.          I do not.
18  Q.          Is there any way to test whether the prototype
19  actually worked?
20  A.          Without knowing anything about it, no, we could
21  not.
22  Q.          To your knowledge, was the Prototype 2 ever
23  tested on a hearing-impaired person?
24  A.          I don't believe it was.
25  Q.          Did he test it at all?

Matzen - direct

1    A.            He tried it out on himself and he did some

2    extensive testing on a KEMAR mannequin.

3    Q.            What is a KEMAR mannequin?

4    A.            A KEMAR mannequin is a from the waste up model

5    of a normal human without arms.  And you can put different

6    hair wigs on it and have different shaped ears.  And it's

7    built by Knoll's Electronics.  That is where the KE came

8    from in the KEMAR.  And it's very commonly used for hearing

9    aid and acoustics research.

10            And he put the -- inside the ear is a thing

11    called the Zwislocki coupler that duplicates the inner ear,

12    the ear canal.  And there is a microphone in there so you

13    can put the hearing aid on this ear on this mannequin, and

14    take data from the microphone as if it was you listening to

15    it with a human working it.  And he used that to do testing

16    to determine the effectiveness of his acoustic feedback

17    reduction system.

18    Q.            Does something that works on a KEMAR necessarily

19    work on a hearing-impaired person?

20    A.            Not necessary.  There is a lot of variables in a

21    human that don't exist on a KEMAR.

22                MR. LYTLE:  Objection, Your Honor.

23                THE COURT:  Basis.

24                MR. LYTLE:  Again, this isn't in his expert

25    report, the comparison between the mannequin and the human.

1   the feedback is summed as a negative to cancel feedback,

2   have you?

3   A.          There is no feedback in the circuit by the

4   Court's direction.

5   Q.          Are you saying there is no feedback in the Best

6   circuit?

7   A.          I'm saying this hearing aid does not have

8   feedback in the transmission channel.

9   Q.          I'm just asking about feedback.  Does the Best

10  circuit cancel feedback?

11  A.          I would assume it does, yes.

12  Q.          In fact, it cancels it pretty well, doesn't it?

13  A.          Yes, it does.

14  Q.          Now, could we show the Best thesis?  DX-1111,

15  page 34.

16      Now, you didn't show this figure again, have you?

17  A.          I don't believe we did.

18  Q.          But that is the Best feedback, LMS feedback

19  canceler?

20  A.          Yes, that is a symbolic diagram of the whole

21  canceler.

22  Q.          Okay.  And you drew it as just a simple box

23  before, right?

24  A.          That's right.

25  Q.          And what does that box represent in relation to

1   **during the portion of the fitting where the audiogram is**
2   **done.**

3   **This is where the patient's hearing test is**
4   **done, in this case in situ, in the ear.  And they use the**
5   **same tone control to do the tone test that you normally**
6   **would just put a headset over to do.**

7   **So they disconnect the microphone during that**
8   **because they don't want you to be disturbed by the**
9   **surrounding noises.**

10   **During the feedback calculation, the microphone**
11   **here must be connected because if it wasn't connected you**
12   **would have no measurement of acoustic feedback.  So it has**
13   **to be connected.**

14   Q.      **Now, Dr. Morley also testified that under normal**
15   **operation, the hearing aid disclosed in the Levitt patents**
16   **had to be disconnected from the host controller.  Do you**
17   **recall that testimony?**

18   A.      **Yes, he did.**

19   Q.      **Do you agree with him?**

20   A.      **No, I don't.**

21   Q.      **Could you tell us why?**

22   A.      **In the first place, there is no place in the**
23   **patent which says you have to disconnect it to carry it**
24   **around.  In the schematic shown, these two connections go**
25   **over the host controller, where the connections are made to**

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3
                            -  -  -
 4

 5    ENERGY TRANSPORTATION,          :   Civil Action
      INC.,                           :
 6                                     :
                 Plaintiff,            :
 7                                     :
           v.                          :
 8                                     :
      WILLIAM DEMANT HOLDINGS A/S,     :
 9    et al.,                          :
                                       :
10               Defendants.           :   No. 05-422 (GMS)

11                          -  -  -

12                     Wilmington, Delaware
                      Friday, February 1, 2008
13                          8:30 a.m.
                        Tenth day of Trial
14
                            -  -  -
15
      BEFORE:   HONORABLE GREGORY M. SLEET, Chief Judge,
16                                    and a Jury

17

18
      APPEARANCES:
19
                   EDMOND D. JOHNSON, ESQ., and
20                 MATTHEW KAPLAN, ESQ.
                   Pepper Hamilton LLP
21                      -and-
                   MARTY STEINBERG, ESQ.,
22                 BRIAN M. BUROKER, ESQ., and
                   MAYA M. ECKSTEIN, ESQ.
23                 Hunton & Williams
                   (Washington, D.C.)
24
                                    Counsel for Plaintiff
25
```

2030

```
 1    APPEARANCES CONTINUED:

 2              MARY B. GRAHAM, ESQ.
              Morris, Nichols, Arsht & Tunnell
 3                   -and-
              JOHN M. ROMARY, ESQ.,
 4            GREGORY C. GRAMENOPOULOS, ESQ.,
              VINCENT KOVALICK, ESQ.,
 5            KAY HILL, ESQ.,
              GERSON S. PANITCH, ESQ., and
 6            ARTHUR A. SMITH, ESQ.
              Finnegan, Henderson, Ford, Farabow & Dunner
 7              (Washington, D.C.)

 8                                  Counsel for
                                    Demant Defendants
 9
              DONALD E. REID, ESQ.
10            Morris, Nichols, Arsht & Tunnell
                   -and-
11            WILLIAM H. MANDIR, ESQ.,
              JOHN SCHERLING, ESQ.,
12            CARL J. PELLEGRINI, ESQ.,
              BRIAN SHELTON, ESQ., and
13            J. WARREN LYTLE, JR., ESQ.
              Sughrue Mion
14              (Washington, D.C.)

15                                  Counsel for Widex
                                    Defendants
16
                          -   -   -
17

18

19

20

21

22

23

24

25
```

1     in reading computer code.  Do you remember Dr. Clay Gloster?

2     You heard Dr. Clay Gloster trace through what would be to

3     anyone else undecipherable computer code and demonstrate to

4     you conclusively that the code written by their engineers,

5     the defendants' engineers is identical to their written

6     description of their products and how their technology

7     worked.  And his analysis is unrefuted because there can't

8     be any dispute.  Dr. Gloster told you these defendants

9     describe exactly what their products do.  And folks, as

10    Mr. Christensen admitted, if their documents are correct and

11    accurate, they infringe Dr. Levitt's patents.

12              Now, even their own experts reluctantly admitted

13    that the technical documents were accurate and Dr. Gloster

14    was right.  Although they were very polished, they were very

15    well rehearsed.  On cross-examination, they admit exactly

16    what Dr. Gloster testified to because they knew they

17    couldn't refute the root of their own client's technology,

18    the computer code that was prepared by these defendants'

19    engineers.

20              You know, you have CSI Miami and CSI New York

21    and CSI Las Vegas and now we have CSI Delaware where we had

22    to have our expert come in and look at the root of their

23    code to tell us the technical documents really mean what

24    they say.  So it comes fully back to the statement in

25    opening.  If some of our witnesses are going to come up here

1    are contained in a hearing aid shell is meaningless.

2              The way they work is separate and distinct, as

3    Dr. Gloster told you.  And that's Dr. Clay Gloster.  And

4    that's his testimony, telling you exactly how it works, that

5    they are separate and distinct, and the LMS algorithm

6    generates coefficients.  And Dr. Gloster then told you that

7    the coefficients were placed in memory storage.

8              And finally, Dr. Gloster told you that the

9    coefficients were then provided to the filter, the filter

10    right at the top of that chart, and that filter was then

11    programmed to cancel feedback with the effect of determining

12    the feedback signal in terms of amplitude and phase,

13    creating an equal but opposite signal and canceling, just

14    like their documents say.  And whether it happened ten times

15    a second or 10,000 times a second doesn't matter.  That's

16    exactly what it did.  And it's no wonder they tried to deny

17    what their own documents said.

18              But there is no escaping what it does, because

19    Dr. Gloster, the computer code expert, told you exactly what

20    it does.

21              Now, it almost makes you think of, remember the

22    famous coach, Dennis Green, the football coach, when he lost

23    a game and he came out yelling, "They are who we thought

24    they were," a very famous rant.  Their technology is what we

25    thought it was, exactly what it says in their own documents.

1    cancels it by subtraction.  I stand by that.  That is what I
2    said then.  That is what I'm saying now.  If that were the
3    end of the case, we could just all go home.  That is not
4    what Dr. Levitt's patent covers.  If it did, it would be
5    invalid.

6            We spent hours of precious time over the last
7    nine days arguing over terminology in marketing documents.
8    I said, and I'll say it again, feedback cancellation,
9    feedback reduction, feedback suppression.  It doesn't matter
10   what you call it.  That is not what determines infringement.
11   It just doesn't matter.  You could call it Swiss cheese, as
12   Dr. Anderson said on the stand.  It doesn't matter what you
13   call it, it matters what you do.  It matters what is in
14   there.

15           We even had a phrase "phase cancellation" which
16   Dr. Anderson explained to you was the subtraction, that's
17   all.  There has been no admission by Thomas Christensen of
18   any infringement.  There has been no admission of any kind
19   of misstatement that violates federal trade, a federal Food
20   and Drug Administration order.  That is not what this case
21   is about.  There certainly has been no admission that there
22   is any determination of phase and amplitude ahead of time
23   and then insertion of a filter.  There has been no
24   admission.  There has been no admission of programmability
25   or use of a programmable filter.  None whatsoever.

1    we see -- have achieved some success with this general

2    approach.  One -- again referencing item 2 -- employed a

3    fixed filter, derived from one measurement of the feedback

4    path transfer function, as the transfer function estimate,

5    rendering this approach vulnerable to changes in the

6    acoustic environment.

7                Well, Diane Bustamante certainly read that

8    patent and came away with the idea that it's a fixed filter.

9    She certainly did not come away saying that this is an

10   adaptive filter and you connect this all along.  One

11   measurement, that is what the patent is talking about.

12               Next one.  It's slide 18.

13               This is Exhibit DX-1240.  It's an article by

14   Mr. Kates, and we saw Mr. Kates' video.  And this is again a

15   reference to Levitt's 1988 patent, the '850 patent.

16               It says, the system proposed by Kates is an

17   adaptive version of a feedback cancellation system proposed

18   by Levitt, et al that used a time invariant cancellation

19   filter set -- set when fitting the hearing aid.  The fixed

20   filter, however, cannot adjust to changes in the acoustic

21   environment.

22               As we know, Mr. Kates was associated with

23   Dr. Levitt.  He wrote this in 1991.  Clearly, he came away

24   saying it's fixed.  You know, we've heard a lot from ETG

25   about, well, Dr. Egolf, why didn't he challenge the patent?

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 9, 2008, the foregoing was caused to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

In addition, the undersigned hereby certifies that true and correct copies of the foregoing were caused to be served via electronic mail on May 9, 2008 upon the following parties:

REPRESENTING ENERGY TRANSPORTATION GROUP, INC.

Edmond D. Johnson
PEPPER HAMILTON LLP
**johnsone@pepperlaw.com**

Brian M. Buroker
HUNTON & WILLIAMS LLP
**etg@hunton.com**

REPRESENTING WIDEX A/S AND WIDEX HEARING AID CO. INC.

Donald E. Reid
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
**dreid@mnat.com**

William H. Mandir
SUGHRUE MION PLLC
**wmandir@sughrue.com**

David J. Cushing
SUGHRUE MION PLLC
**dcushing@sughrue.com**

Carl J. Pellegrini
SUGHRUE MION PLLC
**cpellegrini@sughrue.com**

Brian K. Shelton
SUGHRUE MION PLLC
**bshelton@sughrue.com**

REPRESENTING WILLIAM DEMANT HOLDING
A/S, WDH, INC., OTICON A/S, OTICON INC.,
BERNAFON AG, AND BERNAFON, LLC

Mary B. Graham
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
**mgraham@mnat.com;**
**mbgeservice@mnat.com**

John M. Romary
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
**john.romary@finnegan.com**

C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
**c.gregory.gramenopoulos@finnegan.com**

**BY HAND DELIVERY:**

Edmond D. Johnson
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE  19899-1709

*/James W. Parrett*

_____

James W. Parrett, Jr. (#4292)

963298