IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) | |
| | ) | **REDACTED PUBLIC** |
| Plaintiff, | ) | **VERSION** |
| | ) | |
| v. | ) | C.A. No. 05-422 (GMS) |
| | ) | |
| SONIC INNOVATIONS, INC., et al, | ) | |
| | ) | |
| Defendants. | ) | |

**APPENDIX OF EXHIBITS & TRIAL TRANSCRIPT EXCERPTS TO DEFENDANTS'
ANSWERING BRIEF IN OPPOSITION TO PLANTIFF'S MOTION
FOR PREJUDGMENT AND POST-JUDGMENT INTEREST**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200
jparrett@mnat.com
*Attorneys for William Demant Holding A/S,
WDH Inc., Oticon A/S, Oticon, Inc.,
Bernafon AG, and Bernafon LLC*

OF COUNSEL:

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
 GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, DC  20001-4413
202.408.4000

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200
dreid@mnat.com
*Attorneys for Widex A/S and
Widex Hearing Aid Co. Inc.*

OF COUNSEL:

SUGHRUE MION, PLLC
David J. Cushing
William H. Mandir
Carl J. Pellegrini
Brian K. Shelton
2100 Pennsylvania Ave., N.W.
Suite 800
Washington, DC  20037
202.293.7060

Dated: May 9, 2008
 Redacted Filing Date: May 13, 2008
2322594

## TABLE OF EXHIBITS

| EXHIBIT | DESCRIPTION |
|---|---|
| JX-36 | Oticon Inc. Unit and Sales Development 1999-2006 |
| JX-40 | Bernafon LLC Unit and Sales Development 1999-2006 |
| JX-199 | WidexASSales1.xls, Quantity and Amount by Model, by Week |
| JX-216 | Sales Information |
| Attachment A | Trial Transcript (excerpts) |
| Attachment B | *"Prejudgment Interest Rates in Patent Cases Don't Compound and Error"* Roy J. Epstein |

2322594

JX-36

REDACTED
IN ITS
ENTIRETY

JX-40

REDACTED
IN ITS
ENTIRETY

JX-199

REDACTED
IN ITS
ENTIRETY

**JX-216**

REDACTED
IN ITS
ENTIRETY

# ATTACHMENT A

Chen - direct

1    Q.    Is this one of the items that you were referring to?

2    A.    Yes.

3    Q.    Let's look at the second paragraph.  It states there,

4    "The ETG filter can be adaptive."

5            Do you see that?

6    A.    Yes.

7    Q.    And in the fifth paragraph, it gives Mr. Dowling's,

8    quote-unquote, "bottom line," doesn't it?

9    A.    I see the paragraph you mean, you are indicating at

10   the bottom, starting with "The bottom line."

11   Q.    It states there, "The bottom line is nobody but a

12   red-faced liar could read these cites and say the '850 does

13   not contemplate adaptive filtering.  On the contrary, it is

14   spelled out in certain claims and objects of the invention

15   and is disclosed in the spec in several places."

16           Do you see that?

17   A.    Yes.

18   Q.    Now, EKMS worked with Audimax in 2001-2002, I think

19   you said?

20   A.    Yes.  In that time range, yes.

21   Q.    Having been involved in this litigation, are you now

22   aware when the defendants first started selling their

23   accused products?

24   A.    I am aware generally of when the defendants started

25   selling products that we think might be infringing.

1    Q.    Was it in the same time frame?

2    A.    Yeah.

3    Q.    Did EKMS ever advise Audimax that modern-day hearing

4    aids did not infringe the '850 or '749 patents?

5    A.    Not to my knowledge.

6    Q.    Did EKMS ever advise Audimax that these defendants'

7    hearing aids did not infringe the '850 or '749 patents?

8    A.    Not to my knowledge.

9    Q.    What did you do after EKMS completed its work?

10   A.    I felt that our patents had value, and I went to

11   engage a law firm, your law firm, to help me get the benefit

12   of our rights and what we invented.

13   Q.    You took EKMS's advice about litigation?

14   A.    I made a decision that it was clear that there was

15   some value to our patents, and I engaged a law firm to help

16   me have my rights addressed, our rights addressed.

17   Q.    After your father passed away, who owned the Chen

18   family assets and companies?

19   A.    My brother, my mother, myself, and our employee

20   pension fund.

21   Q.    Did there come a time when you and your brother

22   decided to split up the family assets and company?

23   A.    Yes.

24   Q.    What assets did you decide to split up?

25   A.    Everything that was owned by ETG.

Musika - direct

1    video at the beginning, the Patent Office talked about how

2    there were 300,000, I think, patents filed, and

3    applications, and out of that only 150,000 were issued, even

4    out of those 150,000 issued, there is just a very small

5    portion of those that ever generate any income.  And they

6    are worthless.  Those patents don't have any value.

7              What we are getting to is the profits.  We are

8    looking for the profits.

9    Q.    And did you come to a royalty rate figure in this

10   case?

11   A.    I did.

12   Q.    What was that?

13   A.    8.4 percent of the revenue of the defendants.

14   Q.    Now, what records did you look at to arrive at your

15   damage calculations in this particular case?

16   A.    As I indicated, I have looked at their financial

17   records.  First, I needed to try to identify, indeed, how

18   much sales amount there was with respect to these accused

19   items.  So I was told by counsel and by both sides, I don't

20   think there is any dispute about what are the accused items.

21   So my next challenge was to try to identify, well, how much

22   were they sold for ultimately.  And then after that I tried

23   to get to the profits.

24   Q.    Let's start with the Demant defendants, Oticon.  Can

25   you tell us how you arrived at the sales and revenues for

Musika - direct

1    the accused products from Oticon?  And there is a slide on

2    the board.

3    A.    Yes.  What that shows is, you will remember from the

4    organization chart over to the right of the Demant

5    defendants where the accused products are.  Remember when I

6    said it was six years, 2001 through 2006.  So the total,

7    under each column, is just each year's sales.  So, for

8    example, in 2001, only the Adapto was sold in 2001.  You can

9    see there, that is about $8.4 million.

10            So I go through each year.  And this comes

11   directly from the Demant sales records.  And these are the

12   sales records of the distributor.  So when its revenue out

13   the door, I am really just talking about that final sales

14   amount that I showed in my example here, is $1,111.  It is

15   just the final sales out the door, not the sales between the

16   parties, but how much did they finally sell it to the person

17   out the door.

18            That came to a total of $383,433,083.

19   Q.    I am going to direct your attention to JX-36, which

20   hopefully is in the jurors' notebooks.  It is at Tab 7 of

21   the juror notebook, or should be.

22   A.    Yes, I have that.

23   Q.    Can you tell us what that is?

24   A.    These are the actual records, sales records that were

25   produced by the defendant, Demant defendants, that show the

1    sales of their product.  So it was from these actual books

2    and records of Demant that I pulled out the accused sales

3    and put them into the period that I have listed there.

4    Q.    Did you do the same exercise for the Demant defendant

5    Bernafon?

6    A.    I did, yes.

7    Q.    Can you explain to the jury what they are seeing

8    there?

9    A.    This is the Bernafon sales.  We see the same period.

10   The reason we don't see 2001 here is because Bernafon did

11   not have any sale of its accused items in 2001.  So the

12   first time there was a sale of an accused item for Bernafon

13   was 2002.  And I added across.  And you get to the

14   $33,653,667 for total sales of accused items by Bernafon.

15   Q.    If you will turn to JX-40, which should be in the

16   jurors' notebooks, can you tell us what that is?

17   A.    Yes.  These are the sales records from the

18   distributor, Bernafon LLC, which lists the actual sales

19   again out the door, the last sale there out the door to

20   audiologists or doctors.

21   Q.    Did you summarize the revenues from both Oticon and

22   Bernafon, the Demant defendants?

23   A.    Yes.

24   Q.    Can you tell the jury what they are seeing now?

25   A.    Yes.  I want to explain why there are two numbers

1    there, November 2006 and June 2006.

2              Let's just talk about November 2006 first.

3              The reason -- let me explain.  The reason there

4    are two different numbers there that are slightly different,

5    the 417 million versus the 357, it relates to -- there is a

6    different expiration date on the patents.  So if you go out

7    to the final expiration date of both patents, that would be

8    November 2006.  If you go to the earlier expiration date,

9    that would be June 2006.

10             So you have got less sales because you cut it

11   off sooner.

12             That is the reason for those two differences.

13             But if I add Bernafon and Oticon together, and I

14   take the November date as the cutoff date, those two sales

15   come to $417,086,750, and I multiply that times 8.4 percent,

16   to produce a damage related to the Demant defendants of

17   $35,035,287.

18   Q.    Now, let's go through the same exercise for the Widex

19   defendants.

20   A.    Okay.

21   Q.    What are we seeing now on the screen?

22   A.    The same thing.  Now we have the sales history from

23   the period 2001 through 2006.  There we can see again that I

24   have got two different cutoff dates, depending on which

25   expiration date the Court chooses.  But taking it through

1    the final date, the July date -- I am sorry, the November

2    date, total sales of the two accused products for Widex are

3    $306,127,967.

4           Again, this isn't my number.  These are numbers

5    that all come directly from the books and records, the

6    accounting records of the defendants' companies.

7    Q.    Are those only for the six years in question?

8    A.    Yes, they are.

9    Q.    If you look at Exhibit JX-216, which again should be

10   in the jurors' notebook, tell us what that is?

11   A.    Yes.  These records are the original books and records

12   that came directly from the Widex defendants.  So it was

13   from these records that I extracted the sales of the accused

14   products and put into this demonstrative.

15   Q.    And did you do, likewise, a summary for the Widex

16   defendants?

17   A.    Yes, exactly.

18   Q.    The damages?

19   A.    You can see, we have two different dates.  But taking

20   the later date, and adding those sales together, the total

21   sales were $306,127,967.  That is not a number that is

22   disputed by Widex.  This comes from their records.

23          The 8.4 percent is my opinion, which I think is

24   the appropriate reasonable royalty.  When I multiply the 8.4

25   percent times the total 306 million, that produces a damage

Musika - direct

1    of $25,714,749.

2    Q.    Did you do a summary including the damages of both

3    groups of defendants, Demant and Widex?

4    A.    Yes.

5    Q.    And can you tell the jury what we are seeing here?

6    A.    Yes.    This is just adding up the pieces that we have

7    already identified.    So we have got the total sales of Widex

8    shown on there, total sales of Oticon and Bernafon, add them

9    across, multiply them times 8.4 percent.    And the total

10   damages from all of the defendants then equals $60,750,036,

11   which is 8.4 percent of the total sales, this is total sales

12   reported.    You remember yesterday, Mr. Westermann was not

13   sure, couldn't remember how much was sold or what the

14   profits were.

15          Well, this comes from the books, their books and

16   records.    And it is that number under A plus B, their

17   representation is $723,214,717, just for the six-year

18   period.    That's just the six years.

19   Q.    Mr. Musika, you testified before that one of the ways

20   in which you analyzed damages in this case was you

21   referenced a case called Georgia-Pacific.    Can you explain

22   to the jury how you analyzed damages under Georgia-Pacific?

23   A.    Yes.    As I mentioned, Georgia-Pacific has 15 factors,

24   which I used to get to the 8.4 percent.    What we are going

25   to talk about now is where did this 8.4 percent come from.

1    and calculated here the -- what is shown on here is a gross

2    profit margin for the industry as not the industry as a

3    whole but all the products that rely on the patent, or are

4    claimed to rely on the patent.  So I developed a gross

5    profit margin for all of the products.  And that's, I can't

6    use the pointer but that is the second number down which is

7    65.2.

8            I then took all of the business in general at

9    this level, back at this level but all, not just Widex, not

10   just Demant but all the other industry participants, too,

11   and I calculated what their gross profit margin was for all

12   products at that top level.  And that was 56 percent.  And

13   when I subtracted the two, I could see that the products

14   that rely on these or claim to rely on these profits

15   generated a premium, a gross profit margin of 9.2 percent

16   greater than all of the other products produced by all the

17   other companies.  So that was my starting point was to

18   identify the 9.2 percent.

19   Q.   Okay.  Then did you use that to help calculate the

20   operating margin of the relevant products?

21   A.   Yes.  I then took that 9.2 percent and I moved -- you

22   can see it right there, that second box down -- and I said,

23   well, let's go back to those companies, and these companies

24   at this level as well as all the other companies that are

25   claimed to rely on the patent.  And I added up what their

1  total operating is.  So I know that their operating margin

2  is 16.4 percent for all products.  Because I knew at the

3  gross profit level, there was a premium of 9.2, I added that

4  9.2 to the operating margin of 16.4 to produce an operating

5  margin for the relevant products of 25.6.

6  Q.    Okay.  Now, are you suggesting that ETG should get

7  that entire operating profit margin?

8  A.    No.  Again, that would not be reasonable.  Just accept

9  or assume for a moment that my calculation is right that the

10  25 percent is what the defendants in total earn as a profit

11  margin for the sale of this.  If we took that as being the

12  total amount that had to be paid over, then there wouldn't

13  be any incentive for them actually to make it.  They would

14  get nothing in return.  And again, this is not -- I'm not

15  here to punish them or determine what is punishing, it's to

16  determine what portion is reasonable to pay to them for the

17  use of it.

18  Q.    Okay.  Then did you determine a reference rate for the

19  defendants here?

20  A.    Yes, I did.

21  Q.    Okay.  Did you prepare a slide for that?

22  A.    Well, this slide shows then the result of both the

23  plaintiff and defendant.  And this is sort of the opening of

24  the hypothetical negotiation.  And the top part is the

25  licensor.

Musika - direct

1    we can see what you used to substantiate your conclusions?

2    A.    Yes.

3    Q.    Okay.  Let's share the next slide, please.

4          Okay.  Can you tell us what we're looking at

5    here?

6    A.    These are just a short series of comments out of the

7    report they looked at to cause me to conclude that according

8    to the German regulator, these are not arm's-length

9    transactions.  And this says:  The hearing aid industry is

10   an extraordinarily profitable economic area.  This is true

11   not only in comparison to other industries, but also when

12   compared to the highly profitable medical technology.

13   Q.    Did the German authorities also discuss what is called

14   EBITDA?

15   A.    Yes, they did.

16   Q.    First of all, what is EBITDA?

17   A.    EBITDA is a standard measure or abbreviation of

18   profitability.  It's earnings.  Each one of those letters

19   just stand for one of the expenses that we deduct.  So it's

20   earnings before interest, taxes, depreciation, and

21   amortization.

22         So this is a fairly high level profit, not down at the

23   profit that I looked and used.  But be that as it may, it's

24   comparing a number of other companies to the HIMPP member

25   profits and what this slide shows is that the HIMPP members

1    have an EBITDA profit margin of 35 percent.

2         Compare that to, for example, names you will

3    recognize:  DaimlerChrysler, 11 percent; BMW, 14 percent;

4    Nestle chocolate, 15 percent; All European Chemical

5    Industry, 15 percent; and of the German clinic operators,

6    18.3 percent.

7              This wasn't selective data.  I used all the data

8    that the German Federal Office Cartel Office provided and

9    we can see that as an industry, the hearing aid industry

10   profits are, as they say, extraordinary.

11   Q.    Okay.  And so what did the German report find about

12   the margins in this industry?

13   A.    They said a number of things.  The key numbers of the

14   oligopoly members are not only very similar but in

15   comparison to other sectors bear witness to an

16   extraordinarily high profitability of the companies.

17              Hence, this earning indicator as well is very

18   comparable and confirms the high profit margins achieved by

19   the members of the oligopoly throughout the world with their

20   products.

21              Keep in mind again that what the German

22   regulators are trying to do is to try to see whether or not

23   the -- it's not just the mere existence of the patent pool.

24   There is nothing wrong on its face of the patent pool if

25   indeed choosing this low royalty rate, that that would

Donohoe - cross

1    A.          Well, I looked at, No. 1, the number of patents

2    in the industry.  The licenses that were already in place.

3    I looked at the potential for downstream licenses because of

4    the number of patents.  The number of complex features that

5    are patentable in a hearing aid.  And I draw the real world

6    conclusion that there is a danger of patent stacking here.

7    Q.          But you didn't do any specific work to determine

8    whether these defendants had licenses that they were paying

9    royalties on that would interfere with their paying for

10   another license, did you?

11   A.          At that time, no.  No, not at that time.  I

12   didn't quantize that and didn't feel I had to quantize that

13   because I was concerned about what the future looked like.

14   Q.          Now, in your report you concluded that the

15   defendants would only be interested in paying a lump sum

16   royalty; correct?

17   A.          Not only, because I gave both the running

18   royalty and the lump sum alternatives.  I said in my report,

19   though, that a lump sum is generally favored by licensees in

20   these situations.

21   Q.          But you know now that HIMPP, the organization

22   these defendants belong to, recommends a percentage running

23   royalty; correct?

24   A.          They recommend both.  A lump sum -- you can pay

25   a lump sum, actually become a partner by paying a lump sum,

Donohoe - cross

1   and you can pay a running royalty.  The option is up to

2   whoever wants to take a license.

3   Q.          Can you turn in your book to PX-640?

4   A.          I'm sorry.  I didn't hear you, Mr. Steinberg.

5   Q.          Sure.  PX-640.

6   A.          Okay.  I have that.

7   Q.          And that's a pleading on behalf of HIMPP;

8   correct?

9   A.          That is correct.  That is the pleading on behalf

10  of HIMPP.

11  Q.          Have you ever seen this before?

12  A.          I have.

13  Q.          And are you aware that this came to the

14  conclusion that they would rather -- they would recommend

15  the payment of a percentage royalty rate?

16  A.          Where do you have -- where are you referring to?

17  Q.          Sure.  Let me find that.  Oh, I'm sorry.  It's

18  on the board.

19              It says:  Therefore, from both an administrative

20  point of view but also from what would be the most

21  reasonable for all manufacturers, it was decided that it was

22  best to have a percentage royalty.

23              Do you see that?

24  A.          Oh, I'm sorry.  I wasn't looking at the slide

25  here.  You are reading from paragraph F; is that correct?

Donohoe - cross

1    Q.          Yes.  Correct.  Paragraph F is entitled Royalty

2    Rate.

3    A.          I'm sorry.  It seems like it's different.  Oh, I

4    see.  You are quoting a portion out of the general section

5    F.  Okay.

6    Q.          Yes.  It's the last sentence in the second

7    paragraph.  Do you see that?

8    A.          Okay.

9    Q.          And what that means, a percentage royalty rate

10   is a running royalty rate; right?

11   A.          Yes.  This is one of two forms of paying for a

12   license under the HIMPP patents.  You can pay it by a

13   running royalty rate or you can pay it by paying a flat $1.8

14   million.  And so if I can explain, for some companies, the

15   sales volume won't be that high so it's not worth paying the

16   $1.8 million for a license so they would rather pay on a

17   running royalty basis.  It would be more convenient for them

18   to do that because the amount they would pay would end up

19   less so that is what paragraph F is talking about.  Yes.

20   Q.          Okay.  Now, you made a mention of one particular

21   transaction between the Chen family brothers.

22   A.          I did.

23   Q.          Right?  Okay.  And you equated that to some

24   value that you are telling the jury about; right?

25   A.          Yes.

1    improvements is not a defense to infringing Dr. Levitt's

2    patent.  In fact, they said, well, our improvement is we

3    do this LMS algorithm 32,000 times a second.  All you are

4    required to do is to do it once.  Just once.  So are they

5    infringing 32,000 times a second?  Maybe that is the answer.

6             Another factor you can take into consideration

7    is praise for the invention.  And certainly you have heard

8    nothing but praise for the invention by awards given to

9    Dr. Levitt for this very invention.

10            Now, they say their damages should be less.  And

11   Dr. Putnam gave you this complicated formula.  You remember

12   when he came up with a minus 12 percent?  I think you will

13   all remember that.  Now, it's almost impossible to come up

14   with a minus 12 percent.  You are talking about companies

15   who have profit margins higher than Mercedes Benz for crying

16   out loud and they have 50 percent profit margins.  And he

17   somehow translates that into minus 12 percent.  I wish he

18   was doing my taxes.

19            But you can't deny the profit margins of these

20   companies.  And the German regulators obtained their

21   reports, interviewed their employees and reported their

22   results, and you will see it in front of you.

23            And, by the way, what is he saying?  Is he

24   saying if Widex is better run than Oticon, then Oticon

25   should pay less for the exact same technology?  That doesn't

ATTACHMENT B

Originally published in IPL Newsletter 24(2), Winter 2006.
Pagination matches original.

# Prejudgment Interest Rates in Patent Cases Don't Compound an Error

## BY ROY J. EPSTEIN

### I.    Introduction

The patent damages trial is over with the exception of one last detail. Pursuant to 35 U.S.C. § 284, the court intends to award prejudgment interest. The judge has asked the parties to brief the issue, because both the interest rate and the question of whether to compound it are within the court's discretion. This contrasts with Lanham Act violations, for example, where the interest rate is specified in 26 U.S.C § 6621. The ability to engage the court with solid economic analysis on these points can be worth a significant amount of money. How should you proceed? What arguments do you have?

The recent district court decision in *Union Carbide v. Shell Oil* shows the potential stakes.[1] This case involved alleged infringement of a patented process for the production of ethylene oxide, which has considerable value as an input for manufacturing various synthetics such as polyester fiber, resin and film. On top of a substantial jury award, the district court entered judgment in favor of Union Carbide for prejudgment interest in the amount of $42.4 million. This was the cumulative effect of using the prime rate of interest over a damages period from 1993 to 2004.

Should Union Carbide have been disappointed? The court awarded only simple interest, which reduced the amount of interest by millions of dollars over the 11-year damages period. Was Shell fortunate that the court used the prime rate? After all, it is generally accepted that prime is "the rate at which US banks will lend to their prime corporate customers"[2] and that it is "the lowest rate of interest on bank loans at a given time and place."[3] The short answer to these questions is that the bottom-line amount of prejudgment interest was probably excessive by several million dollars.[4] But to understand why requires economic analysis.

The district court in *United Carbide* is highly experienced in patent matters, and its treatment of interest is reconcilable with established precedents. The Federal Circuit has affirmed both simple interest[5] and use of the prime rate[6] at various times. So there is almost certainly no error under an abuse-of-discretion standard. The broader issue is that courts, as well as many litigators, appear not to be aware of recent developments that bear on improved determination of prejudgment interest.

In particular, use of the prime rate for prejudgment interest is rapidly becoming anachronistic for several reasons. Economic analysis has advanced, better data have become readily available, and financial markets

---

*Dr. Epstein is adjunct professor of finance at Boston College and has extensive experience as an economic expert witness. He has published additional articles on analysis of reasonable royalties, lost profits, and price erosion in patent cases. He may be reached at rje@royepstein.com. The author thanks Michael Klyce, Alan Marcus, and especially Fred Knapp for helpful comments.*

© 2006 American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or downloaded or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

have changed dramatically. Courts should be receptive to new methods, particularly ones that offer greater reliability and are easy to implement. These methods should lead to improved outcomes in terms of making the plaintiff whole without overcompensation. One can even predict that courts will change in this direction, and it will be incumbent upon litigators to keep up with them.

## II.    The Conceptual Framework

The cases consistently teach that prejudgment interest is an element of compensation to make the plaintiff whole. The loss of use of the money due as damages in effect is another component of injury.[7] Under exceptional circumstances, a court may decline to award interest, particularly if the plaintiff is found to have caused undue delay in bringing suit or prosecuting its case. Nonetheless, prejudgment interest is typically necessary to achieve the make-whole standard (i.e., to place the patent holder in as good a financial position as would have occurred in the absence of infringement).[8] In addition, prejudgment interest promotes prompt case resolution by eliminating a financial benefit to defendants from the inherent delays of litigation.

These are sound general principles. The problem is that there is an enormous range of possible interest rates, from the risk-free Treasury rate on the low end of the spectrum to the "lost" rate of return on highly profitable investments a plaintiff may claim it would have undertaken had it not been damaged. A coherent analysis has to justify a particular rate. The main economic paradigms are discussed next.

### A.    The Defendant Borrowing Model

A standard conceptual framework in economics for determining the appropriate rate of prejudgment interest is the defendant borrowing model, sometimes known as the "coerced loan" theory. It works as follows. Suppose there is a finding that the defendant caused $1 million in damages to the plaintiff at some earlier date. In this case the plaintiff should have had an additional $1 million in assets during the time since the injury. The fact that the defendant has the use of the $1 million after the date of the injury is tantamount to a loan (albeit an involuntary one) by the plaintiff. As explained by Judge Richard A. Posner some years ago, "the defendant who has violated the plaintiff's rights is in effect a debtor of the plaintiff."[9] Viewed as a loan, the competitive level of prejudgment interest is the market rate that the defendant would pay to borrow such an amount.[10] This market rate reflects expected inflation and includes an appropriate premium for the risk of default by the defendant on its obligation.[11]

The logic of the borrowing model has additional implications. Because the amount of the judgment is typically not secured by collateral and the damages could be payable at any time (depending on how quickly the legal proceedings move forward), the model implicitly contemplates the defendant's rate for short-term, unsecured debt. Put differently, it involves a hypothetical short-term loan that is continually rolled over (with accumulated interest) until the judgment is paid. The interest rate on the loan should reset on each roll over to track current market conditions, including possible changes in the creditworthiness of the defendant.

The borrowing model places bounds on the prejudgment interest rate. The rate is above the rate on T-bills, as no private entity can borrow at that rate. The rate is below the defendant's cost of capital, as the hypothetical loan does not give the plaintiff an equity interest in the defendant that would require earning the cost of capital.[12] These bounds in general still span a wide range, so further analysis is required. A solution is offered in Section III below.

### B.    The Lost Return Approach

An alternative to the defendant borrowing model is the plaintiff "lost return" approach. One formulation of the lost return approach runs as follows:[13]

> An individual who is not in possession of money that is rightfully his must forgo potential investment gains…For corporations and businesses, the opportunity cost can be calculated within a range where the minimum award would be the firm's cost of capital and maximum awards would be based on its historical rate of return, if higher.

This is clearly to the advantage of plaintiffs because it is possible to claim lost returns that are far higher than the rate the defendant would pay on a loan. Although superficially plausible, there are several decisive economic problems with using this approach as a general method for determining prejudgment interest.

First, investments entail risk. The universe of "potential investment gains" includes losses as well as gains, yet this doctrine only considers positive outcomes with the cost of capital as a floor. But a firm is not guaranteed to earn its cost of capital on a given project.

Second, awarding the plaintiff's cost of capital or higher creates an undesirable incentive for the plaintiff to protract the litigation unnecessarily. It makes delay an attractive investment in its own right. This threatens to frustrate efficient settlement and waste the resources of the judicial system.

Third, the lost return approach often implicitly relies on an assumption of imperfect capital markets, which is seldom justifiable in a damages analysis. If the plaintiff had a good investment opportunity, it should have been possible to obtain financing to undertake it so that the return need not have been lost. This fundamentally invalidates the premise of the lost return approach, which assumes the damages necessarily result in abandoning a project or undertaking it on a smaller scale.[14]

A variant of this lost return approach posits that the plaintiff would have used the amount of the damages to pay down other debt (i.e., that the plaintiff incurred unnecessary interest payments). This approach in effect substitutes the plaintiff's rate on this debt for the defendant's

© 2006 American Bar Association.    Reproduced with permission.    All rights reserved.    Page 9

short-term borrowing rate. The principle criticism of this approach is that plaintiffs often have many different types of debt outstanding that may be quite difficult to analyze–for example, short- and long-term, fixed and floating rate, debt in different currencies, debt with embedded options, and prepayment penalties. Reliably establishing what the plaintiff would have paid down but-for the infringement could require judicial, attorney, and expert resources that would impose undue costs and delays on the case at hand. By comparison, the defendant borrowing model produces an economically rational result and, as will be demonstrated, is far easier to implement.

### C.    The Risk-Free Rate

Some courts have been receptive to use of the risk-free rate on Treasury bills as the prejudgment interest rate.[15] This is not reconcilable with the defendant borrowing model because no private entity can borrow at the risk free rate. Plaintiffs would never claim it as a lost return because it is the lowest possible market interest rate.

One academic theory has rationalized the risk-free rate on the grounds that plaintiffs should not be compensated for the risk of defendant default.[16] Of course, this also grants the defendant the equivalent of a below-market loan. In particular, the defendant borrowing model is framed in terms of the market rate facing the defendant, including the prospective risk of default.  The fact that the defendant is still in existence (and able to pay) at the time of judgment does not eliminate the contemporaneous market assessment of default.

Most decisions that use the risk-free rate do not indicate the specifics that led the court to adopt it. Perhaps these are situations where the court felt a jury award was already on the high side or that a large interest award unfairly threatened the financial stability of the defendant. On this basis, the risk-free rate may be used to accommodate exceptional cases that do not fit neatly into an underlying economic theory.

### III.    Appropriate Market-Based Interest Rates

The prime rate has been a common choice for a prejudgment interest rate in the borrowing model since the 1980s. As mentioned above, the Federal Circuit recognized its use in patent cases in *Lam v. Johns-Manville* and Judge Posner later explained it more generally as a "readily ascertainable figure which provides a reasonable although *rough* estimate."[17] Although the prime rate had advantages years ago, it has become anachronistic. More accurate data are now available. Moreover, the new data show that the prime rate is too high by a substantial margin for most large defendants despite the widespread belief that it errs on the low side.

A more suitable alternative to the prime rate is now online at the Federal Reserve website. Since 1997, the Fed has published average actual short-term market interest rates paid on commercial and industrial loans. The data are gathered in a detailed, comprehensive quarterly survey of commercial and industrial loans known as the E.2 Survey of Terms of Business Lending (E.2).[18] The E.2 data make it clear that large customers, defined as those qualified to borrow more than $1 million, typically pay more than 100 basis points *below* prime. The implication is that prejudgment interest in a major damages case should be below prime if the defendant were of only average creditworthiness for taking on the hypothetical debt.

Even beyond that, many defendants will have a demonstrable record of short-term unsecured borrowing that should establish a credible interest rate that does not rely on market averages. For example, many large companies issue commercial paper (CP), which matures in nine-months or less, or maintain unsecured credit facilities that allow them to borrow short-term at favorable rates. Together, these approaches should be workable in many situations.

Finally, it is useful to address the question of compounding. Many cases reveal disputes between the parties over whether interest should be compound or simple.[19] From the point of view of economics, interest should always be compounded because a plaintiff would earn interest on interest when lending money. The only substantive justification for simple interest is greater ease of computation. But this rationale is archaic in an age of spreadsheets. Moreover, nearly all market interest rates involve compounding. Ordinarily, if a court adopts a market rate as the prejudgment rate then consistency requires the court to adopt the associated compounding convention.

If for some reason the court wants to use simple interest then the rate should be increased to adjust for the lack of compounding. For example, suppose the market rate was 10% compounded annually. Total interest would be 33.1% after three years. Simple interest at approximately 11% would achieve the same result.

### A.    Federal Reserve E.2 Survey Rates

E.2 demonstrates that average commercial and industrial loans carry interest rates well below prime. The August 2005 survey is typical in this regard and will serve as an example. The average rate for all loans was 5.22 percent. By comparison, the prevailing prime rate was 6.25 percent. The average loan therefore was 103 basis points below prime.

In fact, rates at prime or above are predominantly for customers who borrow less than $1 million. Large loans (presumably associated with larger customers) paid much less. For example, the average rate for loans under $100,000 was 6.89 percent, which exceeded prime by a substantial margin. However, loans over $10 million averaged only 4.77 percent. That is, the largest customers pay below average rates and receive even larger discounts to prime, presumably because they are less risky, less costly to service, and/or are able to access more competitive non-bank financing.[20] For the data as a whole, it is evident that over 80% of all loans (by dollar value) pay less than prime.

© 2006 American Bar Association.  Reproduced with permission.  All rights reserved.

The E.2 interest rates are suitable for the defendant borrowing model in other respects. They pertain to short-term, variable rate loans. The averages apply to borrowers who are average risks, not minimal risks. Furthermore, the rates for large loans tend to not to have collateral and so appear to be unsecured.

### B.  Rates for Defendants with Poor Creditworthiness

Suppose there is evidence that the defendant is a poor credit risk. For example, the damages could exceed its net worth. A higher interest rate is clearly called for and in this situation even the prime rate may be too low. One way to proceed for defendants with poor creditworthiness using broader market data is to use rates for high yield—that is, "junk"—bonds. Spreads on junk bonds are typically on the order of 400 basis points above the 1-year T-bill. Applying this spread to the average T-bill rate for August 2005, for example, implies a prejudgment interest rate of 7.87 percent, which was much higher than prime rate.

### C.  Alternatives to E.2 for Creditworthy Defendants

If a defendant has a history of short-term unsecured borrowing during the damages period, those rates are reasonable possibilities to consider instead of E.2. The key point is that average CP rates are dramatically lower than the prime rate (average rates on unsecured credit facilities are not published but are probably only marginally higher than CP). When CP or a similar rate is available to the defendant, the result in recent years is on the order of 300 basis points below prime.

Examples of rates on credit facilities can be found in the annual 10-K filings by public companies. For example, in 2001, Nike had a 364-day revolver (due 364 days from the borrowing date) for $750 million. The interest rate on the revolver at that time would have resulted in a rate of 4.25 percent for Nike, compared to a prime rate of 7.24 percent, again a 300 basis point difference. On the other hand, a defendant with a history of borrowing short-term at higher rates should probably be expected to pay at least those rates in prejudgment interest.

### IV.  Case Studies

This section briefly illustrates the methods described in this article using a number of patent cases where prejudgment interest was awarded. These vignettes are based only on the limited public information available and should not be viewed as a substitute for a complete analysis. The author defers to the court's judgment in these cases but hopes the principles described will be of value as similar questions arise in the future.

### A.  AccuScan v. Xerox.[21]

The jury found Xerox infringed an AccuScan patent and awarded almost $10 million in damages. Both parties agreed that prejudgment interest was in order. Xerox argued for the risk-free rate on the 1-year T-bill and AccuScan argued for the prime rate. The court elected to use the T-bill rate, which amounted to $4.7 million in prejudgment interest. The court explained that the T-bill rate

is the basis for postjudgment interest in federal cases according to 28 U.S.C. § 1961 and cited precedents where this reasoning was used for prejudgment interest.[22]

The E.2 model yields a middle figure. The exact damages period is not indicated in the opinion but historically E.2 averages about 150 basis points more than the T-bill. This implies total interest approximately $1 million higher than what was actually awarded but is still significantly below what AccuScan requested. There was no information on U.S.-based short-term borrowing in a number of Xerox 10-Ks reviewed so there is no readily available justification for use of CP or a similar rate.

### B.  Gaus v. Conair Corp.[23]

The plaintiff won prejudgment interest on top of a $28.5 million jury verdict for infringement of a patented device used in electric hair dryers. The district court found that the 52-week Treasury bill rate, compounded annually, was adequate. It appears from the decision that the damages period was more than nine years, from October 1993 to January 2003. Over this period the 52-week T-bill averaged 4.83 percent, so the interest award amounted to several million dollars.

The district court justified its decision by referring to Federal Circuit precedent that prejudgment interest at the T-bill rate is not an abuse of discretion when the patent owner failed to show it borrowed money at a higher rate.24 This appears to be consistent with the variant of the lost return model discussed above. However, it is not clear why the defendant should then receive the equivalent of a below-market loan since its borrowings would certainly be at a rate above the T-bill. Moreover, the decision indicates that the plaintiff was a German inventor. If his principal business was located outside the U.S., it could be difficult to establish how his effective short-run borrowing rate compared to the T-bill.

The defendant borrowing model provides a different answer. Assuming that Conair was reasonably creditworthy for a loan as large as the total damages (the court also enhanced the damages award by 30 percent for willfulness), the E.2 rate should apply. Over the same period, the E.2 rate averaged 6.23 percent, which indicates additional interest on the order of $1 million relative to the T-bill. Finally, if Conair would not be found creditworthy, the appropriate rate would likely be prime (which averaged 7.68 percent) or higher.

### C.  Union Carbide v. Shell[25]

As discussed above, the court in this case used the prime rate as the basis for prejudgment interest. But this is an instance where the defendant Shell was a large issuer of commercial paper. In 2003, for example, it averaged approximately $9 billion in outstanding CP at an average interest rate of 3 percent.[26] By comparison, the average prime rate in 2003 was 4.13 percent.

According to the defendant borrowing model, Shell should have been assessed at its applicable CP rate. On this basis, if the 2003 spread between CP and prime persisted over the entire 1993–2004 damages period, Shell

© 2006 American Bar Association.  Reproduced with permission.  All rights reserved.                    Page 11

should have paid a rate more than 100 basis points lower than the prime rate. The fact that the court only awarded simple interest at prime mitigated, but did not eliminate, this difference.

## V.    Conclusion

The determination of prejudgment interest rates can be improved using basic economic principles and readily available data. Existing procedures in patent cases tend to rely on either the prime rate or the risk-free Treasury bill rate. This article has explained why both of these rates are flawed. The prime rate is typically too high and the T-bill rate is too low. An inappropriate rate can be worth a large amount when the damages are large and/or the damages period is long.

A more reliable market-based prejudgment interest should make use of newly available Federal Reserve data on actual rates for commercial and industrial loans. In particular, these data show that the prime rate is too high for an average borrower by over 100 basis points. The analysis also discusses alternatives. When defendants can demonstrate the ability to borrow at more favorable rates, (e.g., in the commercial paper market or by maintaining a credit facility), those rates should be used instead. On the other hand, if the defendant would have significantly below-average creditworthiness for a loan of the size of the damages, higher rates would be appropriate. Finally, there are limited circumstances where the plaintiff's lost investment return may be more suitable for determining the rate that best makes the plaintiff whole.

The case studies discussed above show a variety of procedures in current practice for determining prejudgment interest, some of which are mutually inconsistent or conflict with basic economics. The methods presented in this article will, it is hoped, assist both courts and litigants to reach prejudgment interest awards that are most consistent with the goal of "making the plaintiff whole," and that avoid significant under- or overcompensation.

### Endnotes

1. Union Carbide Chemicals & Plastics Technology Corp. v. Shell Oil Co., 2004 U.S. Dist. LEXIS 10730 (D. Del. June 9, 2004), aff'd in part and rev'd in part on other grounds, 425 F.3d 1366 (Fed. Cir. 2005).

2. http://www.trading-glossary.com/u0098.asp

3. http://www.answers.com/topic/prime-rate

4. Both Union Carbide and Shell appealed but the methodology of prejudgment interest played no further role. In October 2005 the Federal Circuit remanded for a new determination of damages on other grounds. A final resolution of this case is still pending.

5. Gyromat Corp. v. Champion Spark Plug Co., 735 F.2d 549, 557 (Fed. Cir. 1984).

6. Lam, Inc. v. Johns-Manville Corp., 718 F.2d 1056, 1060 (Fed. Cir. 1983).

7. West Virginia v. United States, 479 U.S. 305, 311 n.2 (1987).

8. General Motors Corp. v. Devex Corp., 461 U.S. 648, 655 (1983).

9. Gorenstein Enterprises, Inc. v. Quality Care-USA, Inc., 874 F.2d 431 (7th Cir. 1989).

10. More precisely, the relevant rate is the borrowing rate for the ultimate payer of the judgment. If the judgment is to be paid by insurance instead of the defendant then the insurance carrier is the party that has benefited from the "loan."

11. For further justification of the defendant loan approach see Michael S. Knoll, A Primer on Prejudgment Interest, 75 Tex. L. Rev. 293 (1996); Michael S. Knoll & Jeffrey Miguel Colon, "The Calculation of Prejudgment Interest" SSRN paper 732765 (May 31, 2005); James M. Patell et al., Accumulating Damages in Litigation: The Roles of Uncertainty and Interest Rates, 11 J. Legal Stud. 341 (1982); Roman L. Weil, Compensation for the Passage of Time, Litigation Services Handbook: The Role of the Accountant as Expert, chap. 37 (2d ed. 1995).

12. If the defendant's capital structure is highly leveraged the borrowing rate could be close to its cost of capital.

13. See John C. Keir & Robin C. Keir, Opportunity Cost: A Measure of Prejudgment Interest, 39 Bus. Law. 129 (1983).

14. The lost return is most defensible when the plaintiff's lost investment is known with great confidence. For example, Harris Trust et al. v. John Hancock Mutual Life Insurance, 122 F. Supp. 2d 444 (S.D.N.Y. 2000), aff'd in part and rev'd in part, 302 F.3d 18 (2d Cir. 2002), involved an alleged deficiency in assets in a retirement trust. The court found that the trust would have reinvested the damages in the same manner as the rest of its portfolio and so would have earned a rate equal to the trust's actual overall rate of return. However, while this is a reasonable solution given the facts, such a situation is likely to be the exception, not the rule, particularly in the context of patent damages.

15. Polaroid v. Kodak, 16 U.S.P.Q.2d 1481, 1540 (D. Mass. 1990).

16. Franklin M. Fisher & R. Craig Romaine, Janis Joplin's Yearbook and the Theory of Damages, 5 J. Acct. Auditing & Fin. 145 (New Series 1990).

17. Lam, 718 F.2d at 1060; Gorenstein, 874 F.2d at 436 (emphasis added).

18. The survey results are available at http://www.federalreserve.gov/releases/e2.

19. See, e.g., Rite-Hite Corp. v. Kelley Co., Inc. 56 F 3d 1538, 1555 (Fed. Cir. 1995).

20. The syndicated loan market has grown rapidly in recent years and facilitated new competition by investment banks, insurance companies, pension funds, and mutual funds to hold portions of large loans. See William F. Bassett and Egon Zakrajšek, Recent Developments in Business Lending by Commercial Banks, Federal Reserve Bulletin (December 2003).

21. AccuScan v. Xerox, 2000 U.S. Dist. LEXIS 2822 (S.D.N.Y. Mar. 15, 2000).

22. See, e.g., Datascope Corp. v. SMEC, Inc., 879 F.2d 820 (Fed. Cir. 1989).

23. Gaus v. Conair Corp., 2003 U.S. Dist. LEXIS 1445 (S.D.N.Y. Feb. 3, 2003), rev'd, 363 F.3d 1284 (Fed. Cir.), cert. denied, 125 S. Ct. 346 (2004).

24. See id. (citing Laitram Corp v. NEC Corp., 115 F.3d 947, 955 (Fed. Cir. 1997)).

25. Union Carbide v. Shell, 2004 U.S. Dist. LEXIS 10730.

26. Royal Dutch Petroleum Co. 2004 Annual Report, available at http://www.shell.com/html/investor-en/reports2004/rd/index html?=ir.

© 2006 American Bar Association.  Reproduced with permission.  All rights reserved.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on May 13, 2008, the foregoing was caused to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

In addition, the undersigned hereby certifies that true and correct copies of the foregoing were caused to be served via electronic mail on May 13, 2008 upon the following parties:

| | |
|---|---|
| REPRESENTING ENERGY<br>TRANSPORTATION GROUP, INC. | Edmond D. Johnson<br>PEPPER HAMILTON LLP<br>**johnsone@pepperlaw.com** |
| | Brian M. Buroker<br>HUNTON & WILLIAMS LLP<br>**etg@hunton.com** |
| REPRESENTING WIDEX A/S<br>AND WIDEX HEARING AID CO. INC. | Donald E. Reid<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>**dreid@mnat.com** |
| | William H. Mandir<br>SUGHRUE MION PLLC<br>**wmandir@sughrue.com** |
| | David J. Cushing<br>SUGHRUE MION PLLC<br>**dcushing@sughrue.com** |
| | Carl J. Pellegrini<br>SUGHRUE MION PLLC<br>**cpellegrini@sughrue.com** |
| | Brian K. Shelton<br>SUGHRUE MION PLLC<br>**bshelton@sughrue.com** |

| | |
|---|---|
| REPRESENTING WILLIAM DEMANT HOLDING A/S, WDH, INC., OTICON A/S, OTICON INC., BERNAFON AG, AND BERNAFON, LLC | Mary B. Graham<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>**mgraham@mnat.com;**<br>**mbgeservice@mnat.com**<br><br>John M. Romary<br>FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER<br>**john.romary@finnegan.com**<br><br>C. Gregory Gramenopoulos<br>FINNEGAN, HENDERSON, FARABOW, GARRETT & DUNNER<br>**c.gregory.gramenopoulos@finnegan.com** |

*/s/ James W. Parrett, Jr.*

_____
James W. Parrett, Jr. (#4292)