IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ENERGY TRANSPORTATION GROUP, INC.,  )
)
        Plaintiff,  )
)
        v.  )      C.A. No. 05-422 (GMS)
)
SONIC INNOVATIONS, INC., et al,  )
)
        Defendants.  )

**REPLY BRIEF IN SUPPORT OF THE WIDEX DEFENDANTS'
MOTION FOR JUDGMENT AS A MATTER OF LAW AND
<u>REQUEST FOR NEW TRIAL ON THE ISSUE OF WILLFUL INFRINGEMENT</u>**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
*Attorneys for Defendants*
*Widex A/S and Widex Hearing Aid Co. Inc.*

OF COUNSEL:

SUGHRUE MION, PLLC
David J. Cushing
William H. Mandir
Carl J. Pellegrini
Brian K. Shelton
2100 Pennsylvania Ave., N.W.
Suite 800
Washington, DC 20037
(202) 293-7060

May 29, 2008

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.    ETG FAILED TO POINT TO SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S FINDING OF WILLFULNESS................................................................................1

    A.    There Was No Objective Risk of Infringement ...................................... 2

        1.    ETG Presented No Evidence of Any "Standards of Commerce" At Trial ..2

        2.    Widex Was Not Required to Perform Any Due Diligence When There Was No Evidence That the Levitt Patents Were Relevant ..........................4

        3.    The Manner In Which the Levitt Patents Were "Well Publicized" Contradicts The Existence Of An Objectively Defined Risk That Widex Infringed.................................................................................................6

        4.    The Prominence of Dr. Levitt Is Not Relevant To The Willfulness Inquiry7

        5.    There Was No Evidence of Intent to Infringe...............................................9

        6.    The Existence of the Levitt Patents In Widex's Database Does Not Give Rise To An Objective Risk of Infringement................................................10

        7.    The Technical Detail in a Product Description is Irrelevant.....................10

        8.    ETG Did Not Present Evidence Of An Objective Risk Of Infringement ..11

    B.    ETG's Evidence Under Seagate's Subjective Prong Was Insufficient................. 11

    C.    The Substantial Nature of Widex's Defenses Preclude a Finding of Willfulness 13

        1.    That The Jury Finds A Patent Valid and Infringed Does Not Render Defenses Insubstantial ...............................................................................14

            a)    ETG's "Cover Up" Theory Has No Merit ......................................14

            b)    Widex's Defenses Were Substantiated By Documentary Evidence15

        2.    Evidence Showing Lack Of Written Description Is Not Rearguing Claim Construction............................................................................................15

        3.    The Fact that the EKMS Report Was Communicated to ETG Itself Undermines the Willful Infringement Verdict...........................................16

III.    CONCLUSION.................................................................................................17

## TABLE OF AUTHORITIES

**Cases**

*Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338 (Fed. Cir. 2000) ........................ 11

*Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 2008 U.S. App. LEXIS 207 (Fed. Cir. 2008) 14

*Cohesive Techs., Inc. v. Waters Corp., Inc.*, 526 F. Supp. 2d 84 (D.Mass. 2007) ................. 12, 13

*Franklin Elec. Co. v Dover Corp.*, 2007 U.S. Dist. LEXIS 84588 (W.D. Wis. 2007) ................. 14

*In re Seagate Tech., LLC*, 497 F.3d 1360  (Fed. Cir. 2007) .................................................... 2, 3, 5

*Knorr Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1345 (Fed. Cir. 2004) ...................................................................................................................................... 5

*Markman v. Westview Instruments, Inc.*, 52 F.3d 967  (Fed. Cir. 1995) ...................................... 10

*Norian Corp. v. Stryker Corp.*, 363 F.3d 1321  (Fed. Cir. 2004) .................................................... 9

*ResQNet.com, Inc., v. Lansa, Inc.*, 2008 U.S. Dist. LEXIS 7908 (S.D.N.Y. 2008) ..................... 14

## INTRODUCTION

Defendants Widex A/S and Widex Hearing Aid Company, Inc. (collectively, "Widex") submit this Brief in reply to ETG's Opposition to Widex's Motion for Judgment as a Matter of Law and Request for New Trial on the Issue of Willful Infringement (D.I.573) and in further support of its Motion for Judgment as a Matter of Law (JMOL) finding no willful infringement, or, in the alternative, for a new trial (D.I. 529).

For reasons discussed in Widex's Opening Brief (D.I.541) and those discussed below, no reasonable jury, considering the record in its entirety, could find that Widex willfully infringed the Levitt Patents.

## ETG FAILED TO POINT TO SUFFICIENT EVIDENCE TO SUPPORT THE JURY'S FINDING OF WILLFULNESS

In order for the jury's finding of willful infringement to be upheld, ETG was required to point to clear and convincing evidence of objective recklessness. ETG utterly failed to point to any evidence sufficient to support the jury verdict. Rather, the evidence offered in support of the jury's verdict revealed nothing more than bare knowledge by Widex of the Levitt patents:

- o The Levitt Patents were simply listed on a copy of Dr. Levitt's eleven page resume which Widex received years before the Widex Products were developed and in connection with a matter unrelated to Widex's products.

- o The Levitt Patents were present in Widex's patent database among thousands of other hearing aid patents.

- o The '850 patent was cited in a patent that the HIMPP organization, to which Widex belonged, acquired in 1996, well before the accused products were developed

- o Some writing on a copy of the '749 patent by a patent engineer which related to a feature of the patent which had no connection to any of the claims asserted at trial.

1

(See Widex's Opening Brief, D.I. 541 at 14-16).

Such limited evidence could not give rise to an objectively defined risk that Widex was highly likely to infringe, as it did not even have a relation to the accused products. Further, the bare knowledge evidence was not tied to any evidence that anyone at Widex ever considered the Levitt Patents in connection with the Widex products. That bare evidence, thus falls far short of the type of evidence needed to meet the heightened objective recklessness standard imposed by *Seagate*. The simple fact is that ETG did not have any evidence that anyone at Widex ever had reason to consider the Levitt patents in any meaningful fashion with respect to the Accused Products. Further, ETG could not point to evidence that Widex ever understood that it knew or should have known that it infringed, or that Widex acted recklessly despite this knowledge.[1]

Based on such evidence, no reasonable juror could have found that ETG satisfied both prongs under the *Seagate* inquiry--clear and convincing evidence that the Widex acted despite an objectively high likelihood that its actions constituted infringement of a valid patent; and such an objectively-defined risk was either known or was so obvious that should have been known to the Widex. See *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).

## A. There Was No Objective Risk of Infringement

### 1. ETG Presented No Evidence of Any "Standards of Commerce" At Trial

Although ETG acknowledges the new standard for willfulness imposed by *Seagate*, it attempts to portray Widex's actions as violating the "standards of commerce" discussed in Judge Newman's concurring opinion. In so doing, ETG, in effect, seeks to rewrite the new *Seagate*

---

[1] Notably, there was no evidence that Dr. Levitt or anyone affiliated with ETG ever approached Widex with any suggestion that Widex might be infringing before the filing of this lawsuit.

standard imposed by the Federal Circuit in the guise of alleged violations of "standards of
commerce". ETG's transparent attempt to compensate for the legal insufficiency of the evidence
it presented at trial should be rejected.

In *Seagate*, the majority expressly declined to develop the application of the new standard,
but indicated that the "standards of commerce", as described in Judge Newman's concurrence,
was a factor that Courts might consider. *See Seagate*, 497 F.3d at 1371 n. 5. However, the full
context of Judge Newman's concurring remarks expressed a concern over the "intentional
disregard" of patent rights. *See Seagate*, 497 F.3d at 1385. Judge Newman urged that "the
standards of behavior by which a possible infringer evaluates adverse patents should be the
standards of fair commerce, including reasonableness of the actions taken in the particular
circumstances." *Id.*

ETG's attempt, for the first time in its Opposition Brief, to portray Widex's actions as
somehow violative of "standards of commerce" rings hollow because it presented no evidence at
trial, expert testimony, or otherwise, to establish any acceptable "standards of commerce" in the
circumstances of this case. For instance, there was no evidence that, under the circumstances, it
would be a standard of commerce to have reviewed the Levitt Patents and then done something
as a result. Moreover, ETG offered no jury instruction as to standards of commerce, thereby
waiving the issue.

ETG's premise that consideration of the "standards of commerce" supports the jury's
willfulness verdict in this case is further flawed because there was no evidence presented at trial
that Widex intentionally disregarded the Levitt patents. Indeed, ETG largely relies on novel
theories of culpability, without support, in a transparent effort to bolster the speculation and
innuendo upon which its willfulness case was premised. For instance, ETG points to launching

3

new products within a crowded patent landscape, maintaining databases of patents and failing

to search them before launching products with key new features, ignoring the well-publicized

nature of the Levitt patents, ignoring the prominence of the inventor, ignoring references to

patents in its own records, and ignoring one's technical and marketing materials.

However, the evidence of record, as discussed below, does not support ETG's

contentions that Widex intentionally ignored the Levitt Patents and that Widex intended to

infringe them. Thus, even if this Court considers the standards of commerce as part of the

objective recklessness inquiry, ETG still falls far short of *Seagate*'s heightened standard.

### 2. <u>Widex Was Not Required to Perform Any Due Diligence When There Was No Evidence That the Levitt Patents Were Relevant</u>

ETG's attempt to portray the lack of a search of Widex's patent database as evidence of

objective recklessness has no merit. ETG does not point to any authority, even under the prior

"affirmative duty of due care" standard that *Seagate* abolished, to support the contention that

failing to perform a due diligence analysis prior to launching a product is evidence of willfulness.

Indeed, the Federal Circuit recognized the practical burdens imposed by a requirement of a

detailed analysis of any potentially relevant patents prior to setting forth the heightened objective

recklessness criteria. *See Knorr Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383

F.3d 1337, 1345 (Fed. Cir. 2004) , *see also Seagate*, 497 F.3d at 1385 (Newman, J., concurring)

("Thus, to the extent that Underwater Devices has been applied as a per se rule that every

possibly related patent must be exhaustively studied by expensive legal talent, lest infringement

presumptively incur treble damages, I agree that the standard should be modified.").

4

The evidence showed that Widex maintained a limited patent database having some 1,400 patents in 1993. (Westermann, Tr. 799:13-800:2) (cross).)[2] This early patent database allowed for patents to be retrieved only by the patent number or the inventor name. (Westermann, Tr. 801:9-20 (cross).)  Subsequently, in approximately 2001 Widex, as well as other HIMPP members, began to receive CDs of the "latest" patents and published applications retrieved by MicroPatent that allowed for keyword searching of the contents of this HIMPP database to be performed.  (*See* Westermann, Tr. 801:21-802:3 (cross); *see also* Hauge, Tr. 1743:2-9 (direct).)  In the 2001 timeframe, this database consisted of 6,000-7,000 patents provided by MicroPatent and at the time of trial exceeded more than 17,000.  (Westerman, Tr. 798:17-20 (cross).)

However, ETG did not present any evidence that would have given rise to an obligation for Widex to search for the Levitt Patents and it cites no authority that suggests otherwise. First, whether Widex had the capability to perform keyword searching of its patent database is irrelevant.  Even the general public has access to any number of searchable databases, such as the U.S Patent database maintained by the U.S.P.T.O that is readily accessible via the Internet. ETG's argument would effectively mean that any company in the world with access to patents in some database would be required to constantly perform keyword searches and analysis of thousands of patents simply to avoid the possibility of being held a willful infringer because a patent was listed on a resume or was, in some other trivial fashion, "known" to it.  Such an obligation, would, in effect, resuscitate the now defunct affirmative duty of due care standard.

Further, ETG attempts to bolster the willfulness verdict against Widex by claiming that the jury necessarily carefully considered the evidence because it did not find the Demant

---

[2] Cited transcript references are attached as Exhibit A.

defendants liable for willful infringement. (ETG Br. at 21.) As the sole support offered for the distinction between the two Defendant groups, ETG points to the testimony of the product clearance search performed by Oticon A/S.[3] By ETG's reasoning, Demant was not willful because it performed due diligence, but Widex was willful because it performed none. However, ETG conveniently neglects to mention that while Oticon's clearance search for products employing adaptive feedback cancellation technology substantially identical to that of the Widex products uncovered 24 patents as potential infringement concerns, the Levitt patents were not found at all. (Hauge, Tr. 1742:12-1743:23 (direct), Tr. 1745:10-23 (cross).)

Thus, the purported "distinction" proffered by ETG as supporting the willfulness finding against Widex yields a plainly illogical result—one defendant is not held to have willfully infringed because it conducted a due diligence analysis in which the Levitt Patents were not found, while the other defendant is determined a willful infringer because the due diligence ETG portrays as requisite to avoid being "objectively reckless" was not performed. So, even if Widex had performed a clearance analysis as ETG contends it should have, there is no evidence that the Levitt patents would have been found and deemed relevant to the Accused Products.[4] Rather, the only evidence indicates that the Levitt patents would not have been found or deemed relevant.

### 3.    The Manner In Which the Levitt Patents Were "Well Publicized" Contradicts The Existence Of An Objectively Defined Risk That Widex Infringed

Although ETG seeks to portray the Levitt patents as being "well-publicized," ETG neglects to mention the unfavorable publicity relating to those patents. The articles by Dr.

---

[3] Oticon A/S was a member of the Demant Defendant group.

[4] The lack of an objective risk of infringement is confirmed by the independent evaluations of Kates, Bustamante, and SoundID, and the EKMS Summary Report, as discussed below in Section II.A.3.

Levitt's peers, Mr. Kates and Dr. Bustamante, support Widex's conclusion that the Levitt Patents did not contemplate adjusting to changes in the acoustic feedback path and a claim interpretation covering an adaptive filter would violate the written description requirement under 35 U.S.C. § 112, ¶ 1:

> The fixed filter, however, cannot adjust to changes in the acoustic environment.
> (DX 1240 at 9, attached to D.I. 547.)

> [The '850 Patent] employed a fixed filter, derived from one measurement of the feedback path transfer function, rendering this approach vulnerable to changes in the acoustic environment.
> (DX 1239 at 1, attached to D.I. 547.)

The views of Mr. Kates and Dr. Bustamante were also consistent with that of SoundID, whom EKMS approached on behalf of ETG as part of the failed efforts to license the Levitt Patents. (Chen, Tr. 464:22-465:4,) The EKMS Summary Report further reflected the concern that there was  language in the disclosure of the Levitt Patents which was "adverse to an interpretation covering a continuously adaptive approach." (Chen, Tr 467:20-468:9 (cross); DX-1610).)

Contrary to ETG's urging, the alleged well-publicized nature of the Levitt Patents does not support the willfulness verdict.  Rather, it indicates that one skilled in the art would have considered the Levitt Patents irrelevant to an adaptive system for canceling feedback.

### 4. The Prominence of Dr. Levitt Is Not Relevant To The Willfulness Inquiry

ETG cites no support for the novel proposition that the prominence of an inventor is relevant to the willfulness inquiry.  The awards that Dr. Levitt has garnered over the course of

his career have no bearing on this issue, and ETG does not, because it cannot, establish any connection between these awards and an objective risk of Widex infringing the Levitt Patents.[5]

Instead, ETG points to the patents being listed "prominently" on Dr. Levitt's Curriculum Vitae which was received by Soren Westermann. (ETG. Br. at 13.) Despite ETG's self-serving portrayal, the patents-in-suit were listed on the resume by nothing more than the patent number, title, and date. (PX 598). That is, they were on an eleven page resume. Further, although Mr. Westermann received this resume, he testified he had no reason to review it precisely because Dr. Levitt was a well-known expert in the general field and HIMPP had already made the decision to hire him.[6] (Westermann, Tr. 745:18-747:9 (direct).) More significantly, however, there was no evidence that Dr. Levitt ever discussed his patents with Mr. Westermann, anyone else at Widex or any other Defendant before this suit was filed, much less raised any challenge of potential infringement.

Faced with such deficiencies, ETG is forced to rely on supposition surrounding Dr. Levitt's prominence in the field and an obscure disclosure of the patents among eleven pages of a voluminous resume to support its charge of willful infringement. Such evidence falls far short of an objective risk of infringement mandated by *Seagate* and illustrates ETG's overreaching and the lack of sufficient evidence for the willful infringement verdict.[7]

---

[5] In any event, Dr. Levitt cannot be fairly characterized as having "received awards for his patented technology," (ETG Br. at 6). Dr. Levitt's testimony concerning his awards did not even mention the patents in suit (See Tr. 228:10-233:3.)

[6] ETG again mischaracterizes the reference to Dr. Levitt as someone with "better credentials than a Nobel Prize recipient." (*See* ETG Br. at 13.) The point was that the Nobel Prize recipient in question did not have experience in hearing aids. (Westermann, Tr. 751:4-8 (direct).)

[7] Even prior to *Seagate*, willful infringement could not be proven merely by evidence that the defendant infringed and had knowledge of the patent. *See Norian Corp. v. Stryker Corp.*, 363 F.3d 1321, 1332 (Fed. Cir. 2004).

### 5.    There Was No Evidence of Intent to Infringe

ETG's argument that Widex intended to infringe the Levitt Patents based on purported similarities in the specification of the Levitt Patents and Widex's product descriptions is without legal authority and should be rejected. As evidence that Widex "intended" to infringe the Levitt Patents, ETG contends that the "jury could easily compare the language Widex's product descriptions to the language in the Patents-In-Suit and conclude they are strikingly similar." (ETG. Br. at 14.) ETG proceeds to claim that such "strikingly-similar product descriptions" as "evidence [of] Widex's intent to infringe the Patent-In-Suit." (ETG Br. at 15.) Widex strongly disputes this contention. The substantial evidence at trial showed that the specification of the Levitt Patents and the Widex products differed significantly, as discussed at length in Defendants' JMOL on infringement and validity (D.I. 545). Indeed, as ETG's expert on infringement, Mr. Brown, conceded, the Levitt Patents had no disclosure as to how the hearing aid itself could determine when the acoustic feedback path had changed.[8] (Brown, Tr. 593:6-12 (cross).)

In any event, infringement is determined by a comparison of the claims of the patent, as construed by the Court, to the accused devices. *See Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 976 (Fed. Cir. 1995). The notion that similarity between the specification of a patent and an accused product's description is relevant to willfulness is yet another instance of ETG's overreaching. Further, ETG's misleading portrayal of Defendants' marketing materials is addressed at length in Defendants' Infringement and Validity JMOL Opening Brief. (D.I. 545.) ETG's continued reliance on the contrived infringement "cover-up" theory and so-called

---

[8] The purported similarity between the disclosure of the Levitt Patents and the Widex product descriptions is further contradicted by the evidence of Widex's own patented feedback cancellation technique, in which the Levitt Patents were not even cited by the Examiner. See Section II.A.8, below.

9

similarities between the specification and Widex's product documentation shows the lack of any legitimate evidence to support the willfulness verdict.

### 6.    The Existence of the Levitt Patents In Widex's Database Does Not Give Rise To An Objective Risk of Infringement

ETG's overreaching is further exposed by its claim in its brief that "Widex's files were littered with marked-up copies of and references to the Patents-In-Suit...and Widex admits this fact." (ETG Br. at 15)  First, Widex never admitted that its files were "littered" with copies of the Levitt Patents.  Moroever, the fact that Widex had copies of the Levitt Patents among a patent database with thousands of hearing aid patents does not establish an objective risk of infringement, and the fact that ETG is forced to point to such as evidence of willfulness is telling. *See Ajinomoto Co. v. Archer-Daniels-Midland Co.*, 228 F.3d 1338, 1351-52 (Fed. Cir. 2000) (accused infringer's knowledge of patent, without more, is insufficient to support conclusion of willfulness.)

More importantly, the markings on the Levitt Patents in Widex's database had no relevance to the issues in this case.  The only evidence at trial about these markings showed that they related to a feature in the claims which was not asserted by ETG. (Morley, Tr. 1443:8-1444:8 (direct); Westermann, Tr. 724:17-725:6 (direct), 802:9-803:7 (cross).)  ETG never established any connection between this writing and anyone at Widex ever considering any infringement issues with respect to the Levitt Patents.  (See Defendants' Brief in Opposition to ETG's Motion for Enhanced Damages, D.I. 579at 9.)

### 7.    The Technical Detail in a Product Description is Irrelevant

ETG argues that where an "infringer's own marketing materials clearly describe highly technical products in a manner in which one would expect to involve patents, it is unreasonable

and objectively reckless to fail to perform a patent search." (ETG Br. at 15.)  As with ETG's other attempts to rewrite the law of willfulness, this argument is without merit and should be dismissed.  As discussed above in Section II.A.2, the fact that a patent search was not performed simply does not give rise to an objectively defined risk of infringement.[2]

###             8.    ETG Did Not Present Evidence Of An Objective Risk Of Infringement

As discussed above, the evidence pointed to by ETG as supporting an objective risk of Widex infringing the Levitt Patents is flawed, unsupported, and legally unsound.  Indeed, the substantial weight of evidence presented at trial contradicted the existence of an objectively defined risk.  ETG did not meet its burden under the objective prong of *Seagate* and Widex's Motion for JMOL should be granted for this reason alone.

### B.    ETG's Evidence Under Seagate's Subjective Prong Was Insufficient

Besides failing to present substantial clear and convincing evidence of some objectively high risk of infringement, ETG did not present substantial clear and convincing evidence that such a risk was known to Widex, or that the risk should have been obvious.  Simply having knowledge of the patents, even if infringement is subsequently found, is not enough to establish that the infringement was willful. *See Cohesive Techs., Inc. v. Waters Corp., Inc.*, 526 F. Supp. 2d 84, 103-104 (D. Mass. 2007)  (*citing Comark*, 156 F.3d at 1190); *Norian Corp.*, 363 F.3d at 1332 ("willful infringement is not established by the simple fact of infringement); *Ajinomoto Co.*,

---

[2] As ETG is well aware, the feedback cancellation technique employed by Widex's products does involve a patent.  As Widex' evidence showed, the technique utilized by both the Senso Diva and Inteo products was developed totally independent of the Levitt Patents and it is covered by Widex's patent. (D.I.579 at 29-31.)   In fact, the Levitt Patents were not considered relevant by the U.S. Patent and Trademark Office during the examination of the Widex patent, further contradicting the notion of there being an objectively high risk of infringement.  .

*Inc.*, 228 F.3d at 1351-52 (accused infringer's knowledge of patent, without more, is insufficient to support conclusion of willfulness).

In its Opposition, ETG addresses the subjective prong of *Seagate* by largely restating the flawed reasoning it relies on under the objective prong. For instance, ETG points to the prominence of Dr. Levitt in the field, Widex being "patent savvy with regard to hearing aid patents," the existence of the Levitt Patents in the Widex patent database, and the lack of "specific due diligence" prior to launching the accused products. (ETG Br. 17-20.) These arguments are insufficient to establish an objective risk of infringement and necessarily fail to give rise to Widex's having the requisite knowledge of such a risk under the subjective prong.

Indeed, the lack of any meaningful knowledge of the Levitt Patents by Widex is evident from ETG presenting evidence of only one person, Soren Westermann, knowing of them. Undaunted by such a deficiency, ETG contends that:

> "Soren Westermann was at least one person within Widex who knew about the Patents-In-Suit (as Director of Intellectual Property) and was in the position to convey this knowledge to the scientist [sic] and engineers involved in the design of the accused products (as Director of Research)."

(ETG Br. at 19.)

ETG then alleges, in a footnote, that Mr. Westermann might have purposefully withheld the Patents-In-Suit from Widex engineers in scientists, which is offered as further speculation in support of ETG flawed argument. The fact that ETG could not come forward with any evidence tying the engineers and designers to knowledge of the Levitt patents is not a red herring, as ETG argues. It is evidence of a significant deficiency in evidence to support the willfulness verdict. This speculation which ETG is forced to rely upon falls far short of the type of clear and convincing evidence which ETG was required to establish on both the objective and subjective

prongs of *Seagate*, and demonstrates the insufficiency of the evidence to support the jury's finding of willfulness.

### C.  The Substantial Nature of Widex's Defense Precludes a  Finding of Willfulness

Contrary to ETG's urging, the "sole defense" presented in Widex's Opening Brief was not simply "substantial litigation defenses." (See ETG Br. at 20.) Rather, the substantial nature of litigation defenses, which were necessarily related to many of the factors already discussed above, demonstrated the lack of any objectively defined risk of infringement. *See Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 2008 U.S. App. LEXIS 207, *18 (Fed. Cir. 2008) (under *Seagate*, "both legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent."); *see also ResQNet.com, Inc., v. Lansa, Inc.*, 2008 U.S. Dist. LEXIS 7908, *50 (S.D.N.Y. 2008) (no willfulness despite patent being found valid and infringed where "arguments in these areas were substantial, reasonable, and far from the sort of easily-dismissed claims that an objectively reckless infringer would be forced to rely upon."); *Cohesive Techs.*, 526 F. Supp. 2d at 103 (finding no willfulness where there was a bona fide dispute over infringement); *Franklin Elec. Co. v Dover Corp.*, 2007 U.S. Dist. LEXIS 84588, *23 (W.D. Wis. 2007) (finding that the burden of showing objective recklessness was not met given "significant support in the language of the patent, the specification, and the prosecution history for defendant's non-infringement position."). Moreover, the lack of an objectively defined risk of infringement, in addition to being demonstrated from the substantial nature of the defenses presented at trial, was confirmed by the EKMS Summary Report and the independent reviews of the Levitt Patents by Mr. Kates and Dr. Bustamante.

1.    **That The Jury Finds A Patent Valid and Infringed Does Not Render Defenses Insubstantial**

ETG is simply wrong in contending that the jury must find at least one claim invalid for defenses to be substantial or for the case to have been close. *See, e.g., Ajinomoto*, 228 F.3d at 1351-52 (upholding finding of no willfulness where all asserted claims found valid and infringed where defendant mounted "a substantial, albeit unsuccessful challenge" on these issues.)

Moreover, ETG neglects to mention that the jury found literal infringement only for one claim and expressly rejected ETG's argument that claims 13, 14 and 16 were infringed literally. Rather, the jury's infringement finding was, with one exception, solely under the Doctrine of Equivalents. The lack of sufficient evidence to support the infringement and validity findings are discussed in detail in Defendant's JMOL. (D.I. 545) Notably, ETG's position on infringement under the Doctrine of Equivalents was flawed for numerous reasons, not the least of which was the failure of ETG's infringement expert Dr. Brown to even consider whether prior art precluded an interpretation broad enough to cover the Defendants' products.

a)    **ETG's "Cover Up" Theory Has No Merit**

ETG persists in its attempts to portray the Defendant's defenses as a "cover up" of alleged admissions of infringement in technical and marketing documents. Rather, as Defendants demonstrated, the ETG patents do not cover the overly broad concept of a signal in the feedback path that mimics feedback and cancels it by subtraction. Defendants further demonstrated that, in the manner in which the Accused Products actually work, they do not infringe any of the asserted claims. And despite ETG's repeated misleading use of Defendants' marketing materials as purported "admissions" of infringement, ETG could not point to;

- any admission of a determination of phase and amplitude followed by inserting a filter;

14

- any admission of programmability or use of a programmable filter;, or

- any other admission of infringement of the properly construed claims.

The claims of the ETG patents do not simply require the use of an equal and opposite signal to cancel feedback to be infringed. If it were otherwise, the claims would be invalid, as Defendants' evidence at trial showed and is established in Defendants' Infringement and Validity JMOL Opening Brief. (D.I. 545.)

There is no credible evidence of any "infringement cover-up" in this case. Rather, as the evidence showed, Defendants relied on substantial non-infringement and invalidity defenses that were pursued in good faith.

### b)    Widex's Defenses Were Substantiated By Documentary Evidence

ETG's attempt to portray Widex's defenses as being based solely on Dr. Morley's testimony likewise has no merit. Widex's substantial defenses on both infringement and validity are set forth in detail in Defendants' JMOL on Infringement and Validity (D.I. 545.) and are further discussed in Widex's Opening Brief in support of its JMOL on willfulness. These legitimate defenses raise substantial questions of invalidity and infringement which directly undermine the willfulness verdict. *See Seagate*, 497 F.3d at 1374 ("A substantial question about invalidity or infringement is likely sufficient not only to avoid a preliminary injunction, but also a charge of willfulness based on pre-filing conduct.")

### 2.    Evidence Showing Lack Of Written Description Is Not Rearguing Claim Construction

ETG's characterization of Widex's defenses as an attempt to reargue claim construction is yet another convenient distortion of the record. Indeed, the fact that the ETG patents do not disclose any mechanism for detecting a change in acoustic feedback and changing feedback

conditions was highly relevant to whether the claims could simultaneously satisfy the written

description requirement of 35 U.S.C. § 112, ¶ 1 and cover a continuously adaptive feedback

cancellation technique, such as that employed in the Widex products.  (D.I 545)  As discussed

therein, the Levitt Patents cannot satisfy the written description requirement and be construed so

broadly as to cover the Widex products.

### 3.     The Fact that the EKMS Was Communicated to ETG Itself Undermines the Willful Infringement Verdict

In an interesting twist, ETG attempts to further distance itself from the EKMS Summary

Report by contending now, for the first time, that Dr. Dowling was the "*only* person within

EKMS who had the technical skills to evaluate the adaptive nature of the Patents-In-Suit…"

(See ETG Br. at 26.)  However, there is no support for this contention in the record.

Regardless of ETG's efforts to marginalize the finding reflected in the EKMS Summary

Report that the Levitt patents contained "language adverse to an interpretation of the claims

involving a continuously adaptive approach," the point is that the EKMS Report was

communicated to ETG, which undermines any notion of an objective risk of infringement and

compels a finding of no willful infringement.

Further, ETG wrongly contends that Widex implied that EKMS had approached Widex

concerning the Levitt Patents.  (ETG Br. at 26.)  ETG again misunderstands the significance of

the EKMS evidence.  In fact, the point is that, despite considering Widex a "target" and

reviewing Widex's products and the continuously adaptive feedback cancellation technology

they employed, EKMS did *not* approach Widex.  Nor did ETG, Audimax, or Dr. Levitt ever

approach Widex, or any other Defendant prior to the filing of this lawsuit.  In view of the fact

that this evidence was communicated to ETG, any notion of objectively high likelihood of

infringement is negated.  Moreover, ETG's efforts to portray Widex as a willful infringer is

plainly at odds with its decision to make no effort to approach Widex with any allegation of potential infringement even after it received the EKMS analysis in 2002 in which Widex's Senso Diva were specifically identified as a "target,". In fact, ETG delayed even filing this action until some three years later in 2005.

### CONCLUSION

In light of the record in this case, no reasonable jury could find that Widex willfully infringed the ETG patents. ETG's evidence offered in support of the jury's verdict reveals nothing more than bare knowledge of the patents with nothing that suggests Widex ever had reason to consider the patents in any meaningful fashion. Further, ETG could not point to evidence that Widex ever understood that it knew or should have known that it infringed, or that Widex acted recklessly.

For the reasons given above, the Court should grant judgment as a matter of law that there was no willful infringement. Alternatively, it is respectfully requested that the Court order a new trial on the issue of willfulness for the reasons discussed above.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

OF COUNSEL:

SUGHRUE MION, PLLC
David J. Cushing
William H. Mandir
Carl J. Pellegrini
Brian K. Shelton
2100 Pennsylvania Ave., N.W.
Suite 800
Washington, DC 20037
(202) 293-7060

May 29, 2008

/s/ Donald E. Reid
Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
(302) 658-9200
*Attorneys for Defendant*
*Widex A/S and Widex Hearing Aid Co. Inc.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 29, 2008, the foregoing was caused to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

In addition, the undersigned hereby certifies that true and correct copies of the foregoing were caused to be served via electronic mail on May 29, 2008 upon the following parties:

REPRESENTING ENERGY
TRANSPORTATION GROUP, INC.

Edmond D. Johnson
PEPPER HAMILTON LLP
**johnsone@pepperlaw.com**

Brian M. Buroker
HUNTON & WILLIAMS LLP
**etg@hunton.com**

REPRESENTING WIDEX A/S
AND WIDEX HEARING AID CO. INC.

Donald E. Reid
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
**dreid@mnat.com**

William H. Mandir
SUGHRUE MION PLLC
**wmandir@sughrue.com**

David J. Cushing
SUGHRUE MION PLLC
**dcushing@sughrue.com**

Carl J. Pellegrini
SUGHRUE MION PLLC
**cpellegrini@sughrue.com**

Brian K. Shelton
SUGHRUE MION PLLC
**bshelton@sughrue.com**

REPRESENTING WILLIAM DEMANT HOLDING
A/S, WDH, INC., OTICON A/S, OTICON INC.,
BERNAFON AG, AND BERNAFON, LLC

Mary B. Graham
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
**mgraham@mnat.com;**
**mbgeservice@mnat.com**

John M. Romary
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
**john.romary@finnegan.com**

C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
**c.gregory.gramenopoulos@finnegan.com**

The undersigned also hereby certifies that on May 30, 2008, true and correct copies
of the foregoing will be served by hand upon the following Delaware counsel:

Edmond D. Johnson
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE 19899-1709

*/s/ Donald E. Reid*
_____
Donald E. Reid (#1058)

2346357