# EXHIBIT A

Brown - cross

1    reducing acoustic feedback?

2    A.    That's not the way I read it.

3    Q.    I understand that.  But you will agree that it could

4    be read that way, don't you?

5    A.    I have no argument.

6    Q.    And you will agree that there is no disclosure in
the

7    patent, in the hearing aid itself determining when acoustic

8    feedback path has changed?

9    A.    I agree that there is no disclosure.  But as Dr.

10   Levitt said, the null method allows you to do it, and one
of

11   ordinary skill in the art would know that without it having

12   to be written into there.

13   Q.    You have to give me some signal so I know you are

14   done.  I don't want to disrupt you.  Are you done?

15   A.    (Witness nods head affirmatively.)

16   Q.    But the embodiment that the inventor gave to the

17   public doesn't have this automatic adjustment of acoustic

18   feedback.  In fact, you said yourself it is a fixed filter,

19   didn't you, for acoustic feedback?

20   A.    No, I didn't say it was a fixed filter.  As I
pointed

21   out, one of ordinary skill in the art would know that you

22   could connect the lines that go to the E PROM and program
it

23   on the fly if you wanted to.  It showed because in his

24   breadboard he physically took the E PROM from his computer

25   board, which we saw was a very large piece of equipment,
and

Chen - cross

1    Q.    Who chose these targets?

2    A.    I have no idea but I certainly didn't.  It was

3    probably EKMS but I don't know exactly how this set of

4    targets was derived.

5    Q.    Next paragraph.

6          It talks about after talking with Harley Levitt

7    and Richard Dugot in mid May, we chose to contact several

8    ReSound scientists whose had started a second company,

9    called SoundID.  Do you see that?

10   A.    Yes, I do.

11   Q.    And do you know who SoundID is?

12   A.    Generally speaking.

13   Q.    Okay.  They're a company that EKMS went to talk to in

14   trying to license these patents; correct?

15   A.    Correct.

16   Q.    And when did you know about that?

17   A.    I recall vaguely that I knew that they, that SoundID

18   had been contacted back in the time range of when EKMS was

19   working for us and certainly my memory has been refreshed

20   since then.

21   Q.    Do you remember that SoundID had told EKMS that they

22   didn't think they infringed because they do a continuously

23   adaptive feedback cancellation technique?

24   A.    Well, that certainly is what I now understand based

25   upon all the documents I have had to review.

46
5

Chen - cross

1    Q.    Did you understand that at the time?

2    A.    I don't -- probably, I understood at the time but I

3    can't recall exactly.

4    Q.    Were you being kept apprised of what EKMS was doing

5    and the successes or failures that they were having

6    licensing your patents?

7    A.    I asked Mr. Mike Pitonyak to handle the detailed

8    day-to-day interaction with EKMS because I had a lot of

9    other things that I was paying attention to also at the

10   time.

11   Q.    You certainly looked at this EKMS report that we have

12   up on the screen at some point, didn't you?

13   A.    Yes, probably.

14   Q.    And was it before you filed the lawsuit?

15   A.    I can't recall.

16   Q.    You're not sure if you saw this report before you

17   filed the lawsuit?

18   A.    I don't recall.

19   Q.    So you paid $50,000 for this report; right?  Correct?

20   A.    Correct.

21   Q.    And this was a company that you had hired; correct?

22   A.    Correct.

23   Q.    And this was concerning these Audimax patents, the

24   only two patents, the only two real assets Audimax had;

25   right?

115

Chen - cross

1   A.   Yes.

2   Q.   It says, "Eric Dowling, the EKMS expert, took a look

3   at the patent while EKMS arranged a second call with Harry

4   Levitt for early August."

5        Do you see that?

6   A.   Yes.

7   Q.   Were you aware at the time that EKMS was talking to

8   Dr. Levitt about his patent?

9   A.   I was aware generally that they would be in contact

10  with him.

11  Q.   And were you aware that Dr. Dowling was talking to

12  Harry Levitt?

13  A.   Not specifically, but I was sure that EKMS was

14  contacting those people associated with us who were relevant

15  to what they had been asked to do.

16  Q.   It goes -- I am sorry.  Did you have more for that

17  answer?

18  A.   No.

19  Q.   It goes on to say, "Over the course of two calls, we

20  worked through the language of the patent and found that the

21  body of the patent included language adverse to an

22  interpretation of the claims involving a continuously

23  adaptive approach."

24        Do you see that?

25  A.   Yes.

Chen - cross

1    Q.    Were you made aware that EKMS had come to the

2    conclusion that there was an interpretation based on the

3    language in the patent adverse to an interpretation that
the

4    claims covered continuously adaptive approach?

5    A.    I am generally aware that certain people said that

6    this concept of continuously adaptive might be in their
view

7    a problem for us.  But I don't remember who it was.  I know

8    the Sound ID people apparently had said that.

9    Q.    Were you aware at the time that EKMS had come to that

10   conclusion?

11   A.    I was not aware that they had any strong conclusion

12   about this feature.

13   Q.    Now, let me see if I understand you, Mr. Chen.  You

14   are reading this paragraph up on the screen to mean that

15   this is not the position of EKMS, it's just the position of

16   Sound ID?  Did I understand you correctly?

17   A.    I can't say that this is EKMS's final conclusion,

18   because later on in the report they, EKMS said that the

19   report says that they hadn't completed their study of this

20   issue.

21   Q.    But this paragraph that we have up on the screen,

22   based on what you have read in this report, you don't think

23   that this is EKMS's opinion?  You think it's Sound ID's

24   opinion?

25   A.    I can't say.  I can't say one way or the other.

Hauge - direct

1    responsibility I have as well is that I have to insure that

2    the inventions made at the company, the Demant Group

3    companies are foreign-less patent applications.

4    Q.    As an aside, are you aware of where the products that

5    are accused of infringement are made?

6    A.    Yes, the Demant Group with Oticon make the accused

7    products in Denmark and they ship them to the rest of the

8    world from Denmark.

9    Q.    Have all the of the accused products always been made

10   in Denmark?

11   A.    Yes.

12   Q.    Were you personally responsible for doing any

13   searches to determine whether any of the accused products

14   infringed anybody else's patents?

15   A.    Yes.  I have been responsible for doing clearance

16   searches on Syncro 2 and Delta product families.

17   Q.    And what specifically did you do as part of those

18   searchs?

19   A.    Well, first, I met with, my supervisor at the time

20   was Michael Christensen and he gave me a topic

21   specification.  That is a document describing all of the new

22   features of these products which have to be examined.  And

23   he taught me the procedures of how to perform the clearance

24   searches and the policies of Bernafon and Oticon.

25   Q.    And after you met with Michael Christensen, did you

Hauge - direct

1    do anything else?

2    A.    Yes, I studied the target specification obviously and

3    I met with the project management to discuss whether I had a

4    correct understanding of what was in the features of those

5    target specifications.  And when we had come to a certain

6    agreement on the terms, I went back to my computer

7    essentially and I made database searches in our database

8    which is a database including 17,000 patents relating to

9    hearing aid technology.

10   Q.    Did you search anywhere else other than your 17,000

11   patent database?

12   A.    Yes.  I also searched on a database which is

13   maintained by the European Patent Office and that includes

14   patents and patent applications on any technology in the

15   world.

16   Q.    And as a result of your searching, did you identify

17   any patents that might pose a risk?

18   A.    Yes.  In relation to these two products, Syncro 2 and

19   Delta, I identified 24 patents and patent applications which

20   may pose as an infringement risk for those products.

21   Q.    Included within those 24 patents, were the Levitt

22   patents there?

23   A.    No.

24   Q.    What did you do after you found those 24 patents?

25   A.    I went to the project management and we went through

Hauge - cross

1    looking for the exhibit book.  There are only two exhibits.

2            THE COURT:  No problem.

3            (Binders passed up.)

4                CROSS-EXAMINATION

5    BY MS. ECKSTEIN:

6    Q.    Good afternoon, Mr. Hauge.

7    A.    Good afternoon.

8    Q.    I apologize if I mispronounce your name.

9    A.    That's okay.

10   Q.    Just a few questions.  You mentioned some searches

11   that were done before the introduction of the accused

12   products?

13   A.    Yes.

14   Q.    And you mentioned using search terms?

15   A.    Key words.  I did mention it but, yes, I did use key

16   words in order to determine or find relevant patents.

17   Q.    And did you search using the terms "feedback" or

18   "feedback cancellation?"

19   A.    I believe so.

20   Q.    I'm sorry?

21   A.    I believe so.

22   Q.    And yet you didn't find the Levitt patents?

23   A.    No.

24   Q.    Let me hand you, if you could look, there is JX-7.

25   Can you put JX-7 on the screen?  Go to the next page,

Levitt - direct

1    A.    Yes.

2    Q.    And what is that association?

3    A.    It's a professional association concerned with the

4    fields of speech, language, and hearing, and particularly

5    the clinical aspects of those fields.

6    Q.    What do you mean by clinical?  What does that mean?

7    A.    Well, they have a whole section of audiology.  They

8    have a whole section of speech pathology.  They certify

9    clinics.  They provide training in those areas to students.

10   Q.    In 1988 were you awarded the Javitz Neuroscience

11   Investigator Award for the National Institute of Health?

12   A.    Yes.

13   Q.    What is the National Institute of Health?

14   A.    That is the nation's foremost institute concerned
with

15   research in health matters.

16   Q.    Who is the Javitz Award named after?

17   A.    The late Senator Javitz of New York.

18   Q.    What did you do to receive that award?

19   A.    That award was given out occasionally for a research

20   proposal of exceptional merit.  And what it entailed is an

21   extra two years of funding without requesting it.

22   Q.    What was the subject matter of your award?

23   A.    That is on the application of digital signal

24   processing to video signals to help improve deaf people's

25   ability to lip-read.

22
9

Levitt - direct

1   Q.    In 1989 were you named a Fellow of the New York

2   Academy of Medicine?

3   A.    Yes.

4   Q.    What is the New York Academy of Medicine?

5   A.    Well, it's the academy in the New York metropolitan

6   area concerned with the medical profession.

7   Q.    But you are not a medical doctor, are you?

8   A.    No.

9   Q.    In 1999 were you awarded the New York City Mayor's

10  Award?

11  A.    Yes.

12  Q.    What is the New York City Mayor's Award?

13  A.    It is an award that the Mayor makes once a year for

14  significant contributions to science and technology.

15  Q.    If you can turn to PX-357, I am going to ask you if

16  that's a description of the New York Mayor's Award that you

17  received.  That's PX-357.

18  A.    I am getting it.

19  Q.    Take your time.

20  A.    I have it.

21  Q.    Do you recognize that description of your award?

22  A.    Yes, I do.

23  Q.    Does it accurately describe the award you received?

24  A.    Yes.

25  Q.    Can you read into the record what it says?

230

Levitt - direct

1   A.    The whole paragraph?

2   Q.    As much as you can.

3             THE COURT:  Counsel, let me see counsel for a

4   moment.

5             (The following took place at sidebar.)

6             THE COURT:  Counsel, we have far too limited

7   time.  You could really spend the rest of the morning or

8   afternoon before the lunch break just going through his

9   qualifications.  There is no dispute that this is a

10  preeminent scientist.  Do you think?

11            MR. STEINBERG:  I don't think so.  But I don't

12  think the jury has heard the extent of it.  And they are

13  going to say that there were other inventors that had these

14  ideas, they had these brilliant ideas and he didn't.

15            THE COURT:  That's fine.  Are they going to

16  present anybody who is close to being as renowned as this

17  man?

18            MR. ROMARY:  No.  We have accepted that he is

19  renowned.  It's just irrelevant to the issue of whether he

20  is the inventor of this patent.

21            MR. STEINBERG:  The problem is, Judge, when
    they

22  present their case, none of their witnesses, none of these

23  so-called people who wrote these articles, have anywhere

24  near the credentials.  And if the jury doesn't hear it, how

25  are they going to know that?

Levitt - direct

1          MR. ROMARY:  It is not relevant.

2          THE COURT:  Whether it is relevant or not --

3          MR. STEINBERG:  It is relevant, of course.

4          THE COURT:  In terms of assessing -- they have

5    the benefit of the resume in their books.  And they can read

6    it.  I am not going to try to hamstring you and tell you how

7    to practice law.  We are going on a bit.

8          MR. STEINBERG:  I am going to summarize the next

9    sessions about his articles.  I am just going to say did you

10   write 150 -- I am going to summarize that.

11         THE COURT:  It goes on and on.

12         MR. STEINBERG:  I would like to get his major

13   awards.

14         THE COURT:  I will let you reference the awards.

15   But I am not going to let you have him read the Mayor's

16   citations or any other citation into the record.  You can

17   reference the awards.

18         (End of sidebar conference.)

19         THE COURT:  You may proceed.

20   BY MR. STEINBERG:

21   Q.    Dr. Levitt, in 2001, at the Special Session of the

22   Annual Session of the Acoustical Society of America, were

23   you honored?

24   A.    Yes, I was.

25   Q.    Did that award have anything to do with the technology

23
2

Levitt - direct

1    at issue in this case?

2    A.    Well, it wasn't exactly an award.  It was a special

3    session of the Acoustical Society of America to honor my

4    contributions to the field.  And there were several papers.

5    And one of the papers discussed my contributions to the

6    cancellation of acoustic feedback.

7    Q.    In 2006, were you awarded the James Jurger (phonetic)

8    Career Award for Research in Audiology?

9    A.    Yes.

10    Q.    What is the James Jurger Career Award for Research in

11    Audiology?

12    A.    It is for contributions to the field of audiology and

13    education of audiologists.

14    Q.    In 2007, did you receive a commendation from the

15    Institute of the Electrical and Electronic Engineers?

16    A.    Yes.

17    Q.    And what was that commendation for?

18    A.    I had helped write an American National Standard on

19    the measurement and control of interference in hearing aids

20    from digital wireless telephones, such as cell phones.  And

21    that standard was -- became a national standard and was

22    necessary for the manufacture of digital cell phones.

23    Q.    Has that standard now been written into the law?

24    A.    Yes, the FTC adopted that standard as a requirement

25    for the manufacturers of cell phones to meet the

Levitt - direct

1    requirements of the standard such that there was -- people

2    with hearing aids would not be exposed to that much

3    interference from the cell phone.

4    Q.    Now, reading your resume, you graduated from school

5    with your doctoral degree in 1964?

6    A.    Yes.

7    Q.    Are you retired now?

8    A.    Yes.

9    Q.    When did you retire?

10   A.    In 2000.

11   Q.    And after you retired, have you kept active in the

12   field?

13   A.    Yes, I have.

14   Q.    What have you done?

15   A.    I've consulted for companies and I also do research.

16   Q.    Now, did you likewise serve as a chairman to many

17   committees for scientific institutes and associations?

18   A.    Yes, I have.

19   Q.    Okay.  To try and speed things along, I'm just going

20   to read the names of those associations and ask you if those

21   are the associations you belong to.  Okay?

22              The American National Standards Institute?

23   A.    Yes.

24   Q.    The writing groups of the American National Standards

25   Institute?

Westermann - direct

1    the European patent from the American patent that you are

2    aware of?

3    A.      I don't remember but there was only one.

4    Q.      There was only one; correct?

5    A.      Yes.

6    Q.      Okay.  And, in fact, you can see that by the

7    inventors being Dr. Levitt, Mr. Dugot and Mr. Kopper;

8    correct?

9    A.      Yes.

10   Q.      And you can also see it has a priority date on the

11   left-hand side, June 26th, 1986, the same date of

12   Dr. Levitt's patent in the United States; correct?

13   A.      That is correct.

14   Q.      So this essentially means this is the European
patent

15   based on the United States patent of Dr. Levitt; right?

16   A.      Yes, I would think so.  Yes.

17   Q.      Now, lets refer you to Exhibit 775.  775 is the

18   European patent application for the identical patent, the

19   '850 patent; correct?

20   A.      It has the same priority, yes.

21   Q.      In fact, the writing, the handwriting at the very
top

22   is your secretary's writing, isn't it?

23   A.      I think only the one to the very left.

24   Q.      Okay.  Right to the right, at the very top, there is

25   a sign and then there is a U.S. patent number.  Do you see

Westermann - direct

1   that?

2   A.      Yes.

3   Q.      And the sign means equal to that; right?

4   A.      Or approximately.

5   Q.      Equivalent; correct?

6   A.      Right.

7   Q.      Okay.  And this also came from Widex's files;

8   correct?

9   A.      It must have, yes.

10  Q.      I'm going to show you Exhibit 774.

11          All right.  We have 774 on the screen, since I

12  can't find it, the '749 patent.  Do you have it?

13  A.      I have it.

14  Q.      Now, that '749 patent also would have been in your

15  files about the same time, August of 1993; correct?

16  A.      I wouldn't know.  I don't think so.

17  Q.      Well, whose writing is that on the '749 patent?

18  A.      I think at this corner it's still my secretary, but

19  the rest is probably at later time, and he was not there in

20  '93.

21  Q.      He had already gone?

22  A.      He hadn't started.

23  Q.      When did he leave?

24  A.      The end of 1999.

25  Q.      Do you have your deposition transcript in front of

Westermann - direct

1    Nobel prize winner who is testifying about this patent;

2    right?

3    A.    Yes.

4    Q.    And you wanted someone whose credentials were better

5    than that; right?

6    A.    Well, we wanted one who had relevance to the case.

7    The Nobel prize taker was a Nobel prize taker in memory

8    technology which is not hearing aids.

9    Q.    So if you look at the second paragraph, the very last

10    sentence says:  We would like to submit for their

11    consideration a declaration by someone with much better

12    credentials on the issue.  Right?

13    A.    Yes.

14    Q.    And did you agree with that?

15    A.    Certainly.

16    Q.    Now, these letters also say that you hired Dr. Levitt

17    for yet another engagement on another issue as a patent

18    expert; is that correct?

19    A.    I believe so.  I don't remember the actual -- I don't

20    think that case ever got to be finalized, but I know we did,

21    we tried to use him on some.

22    Q.    Okay.  And, in fact, in the second letter, that's

23    attached to your Exhibit 598, there is a memorandum

24    agreement whereby he is retained, he is actually hired;

25    correct?

Westermann - cross

1    of the ETG patents?

2    A.    No.

3    Q.    Had anyone at Widex prior to this lawsuit seen the

4    patents, the ETG patents before?

5    A.    Well, we found out it was in our files.

6    Q.    How did you discover that?

7    A.    We searched through our electronic files and through

8    our paper files.

9    Q.    And what did you discover during this search?

10   A.    Well, there was a paper copy, as I remember, of the

11   '749.

12   Q.    '749 is one of the patents, yes.

13   A.    Yes.    And I believe there was a copy of the European

14   equivalent.    And we also discovered that in this very large

15   database we have, that both patents were there

16   electronically.

17   Q.    You said very large database.    How large is very

18   large?

19   A.    Oh, today there is more than 17,000 patents in that

20   database.

21   Q.    Okay.    And when did the, I think you said '749

22   patent, when did that make its way into the database?    What

23   year?

24   A.    Well, the database, it came in in 2000, was it '1 or

25   '2?    I don't remember.

Westermann - cross

1    Q.    And at that time how many patents were in the

2    database?

3    A.    Well, we got a huge amount, we started up a search of

4    patents, a very wide search.  And we got, within half a year

5    we got between six and seven thousand patents, I think.

6    Q.    Let me show you PX-773.  I think that is actually in

7    the notebook that Mr. Steinberg gave you.  PX-773.

8    A.    Yes.

9    Q.    And I believe Mr. Steinberg asked you some questions

10   about this.  Can you identify what PX-773 is?

11   A.    It is a printout from a very primitive database we

12   had, we just initiated in the early nineties.

13   Q.    I think Mr. Steinberg pointed you up to the top

14   right-hand corner of this document.  It indicates 05/08-93.

15   What does that refer to?

16   A.    That is the date of the printout, actually.

17   Q.    The date is August 5th, '93?

18   A.    That is August 5th, '93, yes.

19   Q.    And at that time, does that mean that at that date

20   this patent was logged into the database?

21   A.    It could have been logged in earlier.  It was just

22   printed on that date.

23   Q.    At this time, this '93 time frame, how many patents

24   were in the database?

25   A.    I don't know.  I can see -- yes, I can.  It says in

Westermann - cross

```
1    the top, there is some Danish, Antal Poster, just to the

2    right of the middle of the top 1,439 documents registered.

3    Q.    And is this entry showing that the U.S. patent was
in

4    the database?

5    A.    No.  It only shows that a U.S. patent was the

6    priority document.

7          This is about the European EPO250679 patent.

8    Q.    Can you now look at PX-775, which again, it should
be

9    in that same notebook, Mr. Westermann?

10   A.    Yes.

11   Q.    Can you tell me what PX-775 is?

12   A.    That is the European patent we just mentioned.  It's

13   actually only an application.

14   Q.    How many -- do you know how many counterparts there

15   are to the two patents in this lawsuit in Europe?

16   A.    Only this one, as far as I know.

17   Q.    Now, in the 1993 time frame, did the Senso Diva

18   exist?

19   A.    '93?

20   Q.    Yes.

21   A.    No.  That was long before.

22   Q.    What year did the Senso Diva come out?

23   A.    In 2000 and someplace, 2001.

24   Q.    Was Senso Diva the first hearing aid that Widex made

25   with feedback cancellation?
```

Westermann - cross

1    A.    Yes.

2    Q.    And then the Inteo, when did that come out?

3    A.    2006?  It was 2006, I think.

4    Q.    And the Inteo also has the feedback cancellation

5    feature?

6    A.    Yes.

7    Q.    How is the database, how is it updated?

8    A.    Which one?

9    Q.    Well, the database that we saw the entry, that was
in

10   the '93.  Was it different times when the database changed,

11   in terms of how it was kept?

12   A.    Well, the database we had at that time was just a

13   catalog, and it was maintained by my secretary, who would

14   simply enter the patent numbers that -- we had hard covers

15   of all these patents.  And she would enter the patent

16   numbers and the inventor, so that we could find it in case

17   we wanted to find that patent.

18   Q.    Okay.  You said that was in what year?

19   A.    It was around '93.  I think it may have started in

20   '92.  Around that time.

21   Q.    Since that time, has the database been automated?

22   A.    Oh, we got a completely new one from this, HIMPP

23   decided, the HIMPP group decided to create a search, with

24   the help of an American company called MicroPatents.  And

25   they started supplying patents to the HIMPP partners.  And

Westermann - cross

1    each HIMPP partner gets every second week a couple of CDs

2    with the latest patents and applications that have been

3    published.

4    Q.    Has Widex gone through and analyzed all the patents

5    in your database?

6    A.    Oh, no.

7    Q.    Why not?

8    A.    That's 17,000.

9    Q.    Can we have up PX-774?  Again, it should be in that

10   same notebook, Mr. Westermann.

11   A.    Yes.

12   Q.    Do you know what PX-774 is?

13   A.    That is the '749 patent.

14   Q.    In the bottom left-hand corner, you see some
writing.

15   A.    Yes.

16   Q.    Mr. Steinberg asked you about that.  What is your

17   understanding of who wrote that?

18   A.    I am pretty sure that this is the handwriting of a

19   patent engineer we had in the late nineties.

20   Q.    Do you know what the handwriting says?

21   A.    As far as I can see, he lists a couple of features

22   that are on certain pages of the patent.

23   Q.    What are the features?

24   A.    Well, the first is an FM link.  And then he says

25   multi-microphone.

Westermann - cross

```
 1            And I can hardly see what the rest are.
 2    Q.    Okay.
 3    A.    There is some brigade in the third line, I think.
 4    Q.    Is any of the writing directed to feedback
 5    cancellation?
 6    A.    I can't say -- the fourth one seems to be phase
 7    shift.  But I don't see any feedback cancellation.
 8    Q.    Are you aware if any Widex engineers or scientists
 9    who were involved in the design of either the Senso Diva or
10    the Inteo, do you know if any of them were aware of Dr.
11    Levitt's patents at the time they did their research and
12    design?
13    A.    No, certainly not.
14    Q.    Was Widex ever approached by a company called EKMS?
15    A.    No, not that I know of.
16            MR. MANDIR:  Excuse me, Your Honor.
17            (Pause.)
18    BY MR. MANDIR:
19    Q.    Mr. Westermann, can you turn to PX-598, please?  I
20    think it's in Mr. Steinberg's book.
21    A.    (Witness complies.)  Yes.
22    Q.    Can you turn to page 12 of the requests for
23    reexamination that Mr. Steinberg was asking you about a few
24    moments about?
25    A.    Page 12.
```

# EXHIBIT B

LEXSEE

BLACK & DECKER, INC. and BLACK & DECKER (U.S.), INC., Plaintiffs-Cross Appellants, v. ROBERT BOSCH TOOL CORPORATION, Defendant-Appellant.

2007-1243, 2007-1244

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

260 Fed. Appx. 284; 2008 U.S. App. LEXIS 207

January 7, 2008, Decided

**NOTICE:** THIS DECISION WAS ISSUED AS UNPUBLISHED OR NONPRECEDENTIAL AND MAY NOT BE CITED AS PRECEDENT. PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**PRIOR HISTORY:** [**1]
Appeal from the United States District Court for the Northern District of Illinois in case no. 04-CV-7955. Judge Amy J. St. Eve.
Black & Decker, Inc.  v. Robert Bosch Tool Corp., 476 F. Supp. 2d 887, 2007 U.S. Dist. LEXIS 11662 (N.D. Ill., 2007)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant corporation sought review of a final judgment entered by the United States District Court for the Northern District of Illinois in favor of plaintiff corporations in a patent infringement suit for alleged infringement of two patents. Plaintiffs cross-appealed one aspect of the judgment that excluded one of defendant's products from the group of enjoined products.

**OVERVIEW:** The patents at issue related to a combination of radio and battery charger using a variety of battery voltages. On appeal, defendant contested the trial court's claim construction, the jury's infringement verdict, and other determinations. The jury had found that defendant infringed five claims of one patent and one claim of the second patent. The court held that the trial

court's construction of "power conversion circuit" was erroneous and without sufficient consideration of factors beyond those three words and the dependent claims. The trial court should have looked at surrounding claim language as a consideration for claim construction. The court concluded that the claim construction should have included a review of the specification and prosecution history, and the term "power conversion circuit" should have included a DC/DC converter and circuitry that would increase and reduce voltages. The court rejected the trial court's reliance on the claim differentiation doctrine. Because the district court incorrectly construed the term "power conversion circuit," the court vacated the infringement verdict and the finding of willfulness.

**OUTCOME:** The court affirmed the jury's verdict on obviousness and the trial court's denial of defendant's inequitable conduct claim. The court vacated the infringement verdict and remanded the matter to the district court for further proceedings.

**CORE TERMS:** battery, voltage, radio, power supply, conversion, converter, specification, patent, infringement, injunction, embodiment, volts, invention, obviousness, removable, jury instructions, inequitable conduct, proper construction, charger, output, pack, jury's verdict, output voltage, enclosure, magnitude, disposed, powered, invalid, adjust, new trial

**LexisNexis(R) Headnotes**

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*

[HN1]The surrounding claim language provides an important consideration for construing a particular term within a claim.

*Patent Law > Infringement Actions > Claim Interpretation > General Overview*

[HN2]Beyond the language of the claims, the specification also provides meaningful guidance when construing claim terms. The claim, however, should contain a linguistic "hook," or some point to tie it to a concept from the specification.

*Civil Procedure > Trials > Jury Trials > Jury Instructions > Objections to Instructions*
*Civil Procedure > Appeals > Reviewability > Preservation for Review*

[HN3]Precedent in the Seventh Circuit holds that, in order to preserve an issue for appeal, a party does not have to object to jury instructions that later become erroneous under a change in the law.

*Patent Law > Nonobviousness > Elements & Tests > Teaching Away From Invention*

[HN4]The United States Court of Appeals for the Federal Circuit has already said that the teaching, suggestion, motivation test remains good law for obviousness, only a rigid application of that test is problematic.

*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Infringing Acts > Intent & Knowledge*

[HN5]A patentee must prove an infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. Under this objective standard, both legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent.

**COUNSEL:** Dean D. Niro, Niro, Scavone, Haller & Niro, of Chicago, Illinois, argued for the plaintiff-cross appellant. With him on the brief were Raymond P. Niro, Paul C. Gibbons, and David J. Mahalek. Of counsel was Christopher J. Lee.

Jon R. Trembath, Merchant & Gould P.C., of Minneapolis, Minnesota, argued for defendant-appellant. With him on the brief was Erik G.Swenson, Also on the brief were

Kirstin L. Stoll-DeBell and Elizabeth J. Reagan of Denver, Colorado.

**JUDGES:** Before RADER, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and PROST, Circuit Judge.

**OPINION BY:** PROST

**OPINION**

[*285] PROST, *Circuit Judge.*

Robert Bosch Tool Corp. ("Bosch") appeals from a final judgment of the United States District Court for the Northern District of Illinois, relating to a patent infringement suit by Black & Decker, Inc. and Black & Decker (U.S.), Inc. (collectively "B&D") asserting U.S. Patent Nos. 6,308,059 ("the '059 patent") and 6,788,925 ("the '925 patent"). *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, 476 F. Supp. 2d 887 (N.D. Ill. 2007) ("*B&D JMOL*"). Specifically, Bosch contests the district court's claim [**2] construction, the jury's infringement verdict, the jury instructions on obviousness, the district court's denial of inequitable conduct, the district court's denial of judgment as a matter of law ("JMOL") relating to willful infringement, and the district court's award of enhanced damages to B&D. B&D cross-appeals one aspect of the district court's injunction, which specifically excluded from the enjoined products one of Bosch's radios not considered at trial. *Black & Decker, Inc. v. Robert Bosch Tool Corp.*, No. 04-CV-7955 (N.D. Ill. Dec. 7, 2006) ("*Injunction Order*"). In light of problems with the district court's claim construction, we amend that construction, *vacate* the infringement verdict, and *remand* for further proceedings. We *affirm*, however, the jury's verdict on obviousness and the district court's denial of Bosch's inequitable conduct claim.

[*286] BACKGROUND

The '059 and '925 patents relate to a combination of a radio and a battery charger. The radio contains a power supply that, when plugged into an alternating current ("AC") outlet, supplies direct current ("DC") to power the radio and charge the battery. When disconnected from the AC outlet, the radio may operate on DC power supplied [**3] by the battery. Such radios find particular utility on construction job-sites, which create high demand to recharge cordless power tools. In light of the variety of battery voltages used in cordless tools, the patents contemplate operation using a variety of battery voltages. The patents claim the invention with some variation; as an example for the purposes of our analysis, claim 1 of the '059 patent recites (emphases added):

A combination battery charger and portable radio comprising: an enclosure;

a radio disposed in said enclosure and including a radio receiver for receiving radio signals and generating audio output signals responsive thereto;

an AC powered DC power supply disposed in said enclosure for powering said radio and generating a first DC output voltage having a magnitude sufficient to power said radio;

a removable DC power supply disposed in said enclosure for powering said radio, said removable DC power supply being selected to generate a second DC output voltage having a magnitude in a range that includes voltages both lower and higher than the magnitude of said first DC output voltage from said AC powered DC power supply; and

a *power conversion circuit* disposed between [**4] said AC powered DC power supply and said removable DC power supply, and between said radio and said removable DC power supply, *to enable* said removable DC power supply to power said radio and be charged by said AC powered DC power supply, *regardless* of the magnitude of the second DC output voltage from said removable DC power supply.

After a trial, the jury found that Bosch had infringed claims 1, 2, 6, 7, and 10 of the '059 patent and claim 1 of the '925 patent, and that those same claims were not invalid, but that claims 2 and 10 of the '925 patent were invalid as anticipated and obvious. *Injunction Order*; *B&D JMOL*. Based on the jury's finding that Bosch willfully infringed the patents, the district court enhanced damages by fifty percent. *Black & Decker*, No. 04-CV-7955, 2006 U.S. Dist. LEXIS 84969 (N.D. Ill. Nov. 20, 2006). The district court denied Bosch's inequitable conduct claim after a bench trial. *Black & Decker*, No. 04-CV-7955, 2006 U.S. Dist. LEXIS 78062 (N.D. Ill. Oct. 24, 2006) ("*Inequitable Conduct*").

The district court issued an injunction directed at the Bosch radios considered at trial, but specifically exempted a newer model radio that the court had excluded from trial by granting a motion in limine. *Injunction Order*. Considering [**5] post-trial motions, the district court denied Bosch's motions for JMOL and for a new trial that it did not infringe B&D's patents, willfully or otherwise. *Black & Decker*, No. 04-CV-7955, 2006 U.S. Dist. LEXIS 92882 (N.D. Ill. Dec. 22, 2006; 2007 U.S.

Dist. LEXIS 2714, Jan. 12, 2007). Finally, the district court granted B&D's motion for JMOL that claims 2 and 10 of the '925 patent were not invalid as anticipated or obvious in light of the asserted prior art. *B&D JMOL*. This appeal and cross-appeal followed. We have jurisdiction pursuant to 28 U.S.C. 1295(a).

[*287] DISCUSSION

I

On appeal, Bosch challenges the district court's construction of "power conversion circuit," which the district court construed as a "circuit that changes electrical energy." Bosch contends that the proper construction should require a plurality of DC to DC ("DC/DC") converters, which can convert an input DC voltage to a different output DC voltage, either higher or lower. It also asserts error in the court's refusal to construe "regardless" as used in the claims.

B&D claims that, by failing to object to the claim construction jury instructions and failing to argue claim construction in its motion for JMOL, Bosch has waived the ability to challenge those constructions. It also [**6] disputes the correct construction for "power conversion circuit," asserting that the district court correctly construed the broad claim language by refusing to limit it to the preferred embodiment as captured by the dependent claims.

As an initial matter, we agree with Bosch that the Seventh Circuit futility exception controls the wavier issue here. Because Bosch proposed and argued for its construction at the *Markman* hearing, "[o]bjection under Rule 51 was not required to preserve the right to appeal the *Markman* ruling." *Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.*, 381 F.3d 1371, 1381 (Fed. Cir. 2004) (considering the applicable rule under Seventh Circuit precedent).

The district court based its construction of "power conversion circuit" in large part on the principle of claim differentiation, because dependent claims require a power conversion circuit ("PCC") that produces a voltage different from the power supply or battery. *Black & Decker*, 389 F. Supp. 2d 1010, 1015-16 (N.D. Ill. 2005). That doctrine, however, cannot serve as a basis to give a patent scope beyond the invention it discloses. *See Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1368 (Fed. Cir. 2000). [**7] Any presumption arising here from the dependent claims fails to override the proper construction of "power conversion circuit" provided by the claims, the specification, and the prosecution history. Accordingly, as discussed below, the district court erred by construing "power conversion circuit" without sufficient consideration of factors beyond those three words and the dependent claims.

A

[HN1]The surrounding claim language provides an important consideration for construing a particular term within a claim. *Phillips v. AWH Corp., 415 F.3d 1303, 1314 (Fed. Cir. 2005)*. To provide for functionality with a variety of battery voltages, the patents claim a "power conversion circuit . . . to enable [the battery] to power [the] radio and be charged by [the power supply], regardless of the [battery voltage]." *E.g.*, '059 patent, col.5 ll.38-45. Claim 1 of the '925 patent requires only that the PCC enables the battery to power the radio regardless of battery voltage. '925 patent, col.5 ll.46-50. In either case, the surrounding claim language requires that the PCC operates to enable certain functionality in the combination radio.

To understand this requirement, we must consider three possibilities: [**8] (1) the battery provides approximately the same voltage as the power supply, (2) the battery provides a higher voltage than the power supply, and (3) the battery provides a lower voltage than the power supply. The claims contemplate all of these three conditions. *E.g.*, '059 patent, col.5 ll.32-37. Under all conditions, we assume that the [*288] power supply can power the radio directly. With a battery of the same voltage as the power supply, either the battery or the power supply may power the radio; similarly, the power supply can charge the battery directly. With a battery of a higher voltage than the power supply, the PCC must increase the voltage from the power supply in order to charge the battery, and reduce the voltage from the battery in order to power the radio from the battery. Conversely, for a battery of a lower voltage than the power supply, the PCC must increase the voltage from the battery in order to power the radio, and reduce the voltage from the power supply in order to charge the battery appropriately.

Combining all of these possibilities, as the claims require, a PCC that enables the desired functionality must contain circuitry to both increase and reduce voltages. Accordingly, [**9] a proper construction for "power conversion circuit" must include the requirement that the circuit can both increase and reduce voltages.

B

[HN2]Beyond the language of the claims, the specification also provides meaningful guidance when construing claim terms. *Phillips, 415 F.3d at 1317*. The claim, however, should contain a linguistic "hook," or some point to tie it to a concept from the specification. *NTP, Inc. v. Research In Motion, Ltd., 418 F.3d 1282, 1310 (Fed. Cir. 2005)* (quoting *Renishaw PLC v. Marposs Societa' per Azioni, 158 F.3d 1243, 1248 (Fed. Cir. 1998)*). Here, the claim does exactly that by using the term "conversion."

While the specification of the patents here does not use the exact phrase "power conversion circuit," it does touch on conversion a limited number of times. First, the Summary of the Invention states:

> An optional variable voltage feature permits use of battery packs lower or higher than 12 volts to be used by the radio. The variable voltage feature includes a socket having a plurality of contacts mating with an adapter, matching predetermined requirements of a DC source battery pack, and a double pole single throw on/off switch controlling a *DC/DC* [**10] *power source converter* for supplying power to said radio.

'059 patent, col.2 ll.57-64 (emphasis added). Then, describing the preferred embodiment, it states:

> In an alternate embodiment, additional circuitry is provided to permit the use of battery packs lower or higher than 12 volts to be used in radio 1. In this embodiment, socket 45 is replaced with socket 70 which now has six contacts mating with adapter 61, which match the requirements of a particular battery pack 60. The on/off switch is now upgraded to a double pole single throw variety for controlling *output DC/DC converter 68* for battery operation of radio 1. This extra pair of contacts eliminate the "standby" losses of converter 68 when radio 1 is turned off.
>
> *Charging DC/DC converter 69* is selected via relay 70 when the charger is turned on. Although electromagnetic relay 70 is shown, a solid state relay can be used instead. If battery pack 60 has a voltage rating higher than 12 volts (e.g. 18 volts), the *output converter 68* is a step down type reducing the battery voltage to a nominal 12 volts while charge converter 69 is a step up converting a nominal 12 volts from the charger to a nominal 18 volts at the battery. If the battery [**11] voltage were lower than 12 volts (e.g. 9.6 volts), the output converter 68 is a step up type while the charging converter 69 is a step down type. Diodes 56 and 67 are used for power [*289] steering while diodes 66 and 65 are used for *DC/DC converter* isolation.

*Id.* at col.4 l.55 to col.5 l.10 (emphases added). The specification does not elsewhere use a form of "convert" in the context of permitting various voltage batteries. Both portions of the specification cited above describe a circuit that adjusts voltage using a DC/DC converter. In the first example, from the Summary of the Invention, the patent describes a circuit that adjusts the power of the battery to allow it to power the radio. In the second example, from the Detailed Description, the patent describes a circuit that both raises and lowers voltage, to allow the battery to power the radio and to allow the power supply to charge the battery.

B&D argues that only the preferred embodiment contains a DC/DC converter and that we should not limit construction of the "power conversion circuit" to such a device. But we can find nothing in the patent that discloses a PCC other than the one shown in the preferred embodiment. Indeed, at oral [**12] argument, counsel for B&D admitted that Figure 6 of the patents, illustrating a more general embodiment, does not contain a power conversion circuit. Oral Arg. at 20:58-21:02, available at: http://www.cafc.uscourts.gov/oralarguments/mp3/2007-1243.mp3 ("[I]t's not present in [figure] six. There's no conversion circuit in six."). The specification consistently describes a circuit that has the ability to change voltages using a DC/DC converter. For that reason, we conclude that the specification requires that a "power conversion circuit" includes a DC/DC converter.

While the specification requires a "power conversion circuit" to include a DC/DC converter, it does not limit the PCC to only such a device. Both instances in the specification discussing conversion also describe a circuit containing other electrical components such as switches. Additionally, the specification does not consistently require multiple DC/DC converters in the PCC, as the appellant urges. The first use of "converter," in the Summary of the Invention, describes only a single converter. We therefore reject Bosch's suggestion that the proper construction requires two DC/DC converters.

C

The prosecution history further [**13] confirms the correct construction of "power conversion circuit." Remarking on an amendment submitted to the examiner after an interview, the applicant described the invention as including a "power conversion circuit that adjusts the voltage that is either supplied by the [power supply] to the [battery], or supplied by the [battery] to the radio. In the preferred embodiment, the power conversion circuit is implemented by a pair of DC/DC converters . . . ." '059 patent prosecution, Amendment of Apr. 26, 2001, at 7. This statement confirms that (1) the PCC must adjust

voltage up and down and (2) the PCC in the preferred embodiment uses two DC/DC converters. As we have discussed, the surrounding claim language also requires the PCC both increase and reduce voltage. And the fact that the preferred embodiment uses two DC/DC converters comports with the specification's requirement that the PCC includes a DC/DC converter. In sum, the prosecution history confirms the proper construction of "power conversion circuit" provided by the claim language and the specification.

D

As mentioned, above, the district court's reliance on claim differentiation cannot survive the definition for "power conversion [**14] circuit" provided by the claim, the [*290] specification, and the prosecution history. Further, our construction--requiring circuitry to increase and reduce voltages and requiring a DC/DC converter--does not make redundant the requirement in dependent claim 2 of the '059 patent that the PCC generates a third voltage sufficient to power the radio. A PCC meeting the limitations of claim 1 may generate a voltage equal to that of the power supply, and thus would not satisfy the "third voltage" requirement of claim 2.

Therefore, because the dependent claims do add additional limitations, and because even if they did not, the presumption of scope applied to the independent claims under the doctrine of claim differentiation here does not overcome the definition from the intrinsic record, we reject the district court's reliance on that doctrine. Giving appropriate consideration to the surrounding claim language, the specification, and the prosecution history, we construe "power conversion circuit" as a circuit that can increase and reduce DC voltages and includes a DC/DC converter.

E

Bosch also argues that the district court erred by refusing to construe the "regardless" claim term. Besides proposing [**15] a boundless construction, Bosch also argues that the term should require operation on any battery voltage available at the time of the invention. We reject Bosch's arguments, and instead agree with B&D and the district court that the plain meaning of "regardless" suffices here. As B&D points out, the claims describe a "range" of battery voltages, which provides a limiting context to the "regardless" term.

II

Because the district court incorrectly construed "power conversion circuit," we vacate the infringement verdict and the willfulness finding and remand for further proceedings to resolve the factual question of infringement. We reject Bosch's argument that we should hold as a matter of law that its combination radios cannot

infringe claim 1 of the '925 patent based on the "charger" limitation.

### III

Bosch also argues on appeal that the jury instructions regarding the standard for obviousness require a new trial or even reversal of the jury's verdict finding the claims nonobvious. In Bosch's view, the Supreme Court's rejection of the teaching, suggestion, motivation test in *KSR International Co. v. Teleflex, Inc.*, 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007), requires us to grant Bosch a new trial on obviousness. [**16] Although Bosch did not object at trial, [HN3]Seventh Circuit precedent holds that, in order to preserve an issue for appeal, a party does not have to object to jury instructions that later become erroneous under a change in the law. *Phillips v. Cameron Tool Corp.*, 950 F.2d 488, 491 (7th Cir. 1991).

We agree with Bosch that the jury instructions stated a standard inconsistent with *KSR*--that Bosch had to show a rigid and inflexible "motivation or suggestion." [HN4]This court has already said that the teaching, suggestion, motivation test remains good law for obviousness, only a rigid application of that test is problematic. The problem for Bosch on appeal, however, is that it fails to identify evidence in the record that could support a jury's verdict of obviousness even under the correct standard.

Additionally, because our altered claim construction narrows the district court's construction, it therefore does nothing to bolster Bosch's invalidity arguments. Accordingly, [*291] we affirm the jury's verdict of non-obviousness.

### IV

Bosch further disputes the district court's denial of Bosch's claim of inequitable conduct. The district court found a lack of intent to deceive on the part of the prosecuting attorney. [**17] *Inequitable Conduct, 2006 U.S. Dist. LEXIS 78062, at *4-21.* While Bosch argues that related co-pending applications not disclosed during prosecution of the '059 and '925 patents would have provided information material to patentability, we do not find an abuse of discretion in the trial court's decision. Due to their filing date, the references could not have served as prior art to the application here. Further, no evidence demonstrates the examiner would have declared an interference. Indeed, according to Bosch's expert, the priority dates of the two applications differed too much for the examiner to have declared an interference. Finally, even if Bosch could establish materiality, nothing indicates the district court would have or should have changed its conclusion on intent.

### V

In light of our disposition of the claim construction issue on appeal, and consequent vacating of the infringement verdict, the issue of willful infringement becomes moot. Should the trial court need to revisit the issue on remand, however, we note that, as Bosch argues on appeal, our recent en banc decision in *In re Seagate* may well affect the court's willfulness analysis. 497 F.3d 1360 (Fed. Cir. 2007).

While B&D correctly states [**18] that *Seagate* did not affect Bosch's argument that it did not have knowledge of the patents in suit, that would not necessarily resolve the issue. The district court, in deciding the enhanced damages issue, recognized that "Bosch had legitimate defenses to Black & Decker's infringement claims." Further, the jury found two claims invalid as obvious, showing that the appellant also made a credible invalidity argument.

As we stated in *Seagate*,[HN5] the patentee must prove the "infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." *Id.* at 1371. Under this objective standard, both legitimate defenses to infringement claims and credible invalidity arguments demonstrate the lack of an objectively high likelihood that a party took actions constituting infringement of a valid patent.

### VI

In light of our conclusion with respect to claim construction, the cross-appeal regarding the scope of the permanent injunction becomes moot. Should the issue arise again on remand, however, we note that B&D has raised serious questions about the district court's exclusion of certain products from the scope of the injunction.

At trial, the district court excluded [**19] evidence of Bosch's PB10-DC "Advanced" combination radio from trial. Then, when issuing the permanent injunction, the court explicitly excluded from that injunction the Advanced product. *Injunction Order.* The exclusion of evidence from trial may have appropriately penalized B&D for failing to update its interrogatory answers when it learned of the Advanced product; the exclusion prevented B&D from automatically applying an infringement verdict to that product. The injunction, however, took the much more significant step of requiring B&D to assert claims against the Advanced product in a new suit without regard to its similarity to the products explicitly included in the injunction. The district court provided no rationale to explain [*292] why B&D should not have the opportunity to demonstrate that the Advanced product constitutes nothing more than a colorable variation from the enjoined products. *Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1317-18 (Fed. Cir. 2004).

### CONCLUSION

260 Fed. Appx. 284, *; 2008 U.S. App. LEXIS 207, **

For the foregoing reasons, we affirm-in-part, vacate-in-part, and remand to the district court for further proceedings.

# EXHIBIT C

LEXSEE

**FRANKLIN ELECTRIC CO., INC., Plaintiff, v. DOVER CORPORATION, d/b/a OPW FUELING COMPONENTS, Defendant.**

05-C-598-S

**UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF WISCONSIN**

**2007 U.S. Dist. LEXIS 84588**

**November 15, 2007, Entered**

**PRIOR HISTORY:** Franklin Elec. Co. v. Dover Corp., 2006 U.S. Dist. LEXIS 47722 (W.D. Wis., July 11, 2006)

**CORE TERMS:** sump, containment, frame, top, spill, infringement, downward, patent, collector, shield, summary judgment, boot, prior art, assembly, bottom, shroud, matter of law, infiltration, positioning, invention, skill, hole, lost profits, non-infringement, specification, obviousness, embodiment, patented, upward, container

**COUNSEL:** [*1] For FRANKLIN ELECTRIC CO., INC., Plaintiff: CHRISTOPHER DARROW, YOUNG & BASILE PC, TROY, MI; Thomas Ross, Marshall Gerstein & Borun LLP, Chicago, IL; Timothy Edwards, Axley Brynelson Llp, Madison, WI.

For INC. OPW, DOVER CORPORATION, Defendants: James R. Troupis, Michael Best & Friedrich LLP, Madison, WI.

**JUDGES:** JOHN C. SHABAZ, District Judge.

**OPINION BY:** JOHN C. SHABAZ

**OPINION**

MEMORANDUM AND ORDER

Plaintiff Franklin Electric Co., Inc. commenced this patent infringement action alleging that defendant Dover Corporation manufactures and sells underground fuel storage tank ("UST") components which infringe its United States Patents Nos. 5,085,257 ('257 patent) and

6,840,549 B1 ('549 patent). On May 4, 2006, the Court entered summary judgment of non-infringement as to both patents. Plaintiff appealed from the judgment of non-infringement of the '257 patent and on March 1, 2007 the Federal Circuit Court of Appeals reversed that portion of the judgment and remanded for further proceedings The matter is presently before the Court on defendant's second motion for summary judgment of non-infringement and invalidity of the '257 patent. Defendant also moves for alternative determinations that even if the '257 is found valid [*2] and infringed, the facts are insufficient as a matter of law to establish willful infringement or damages for lost profits. The following is a summary of relevant undisputed facts.

FACTS

The '257 patent relates to UST components installed above underground tanks to facilitate filling the tanks while protecting against spills and water infiltration. The '257 patent claims a containment assembly which attaches to the top of a containment sump surrounding the riser pipes and protects against spills during the filling process and water infiltration into the system. Defendant manufactures and sells UST components which perform functions similar to those of the patented devices. Following is a more detailed discussion of the patents in suit and the accused devices.

The '257 patent claims a sump cover containment assembly which protects surrounding soil from contamination during the filling and evacuating of underground petroleum storage tanks and prevents water from enter-

ing to avoid contamination of the tank contents. Claim 1 is the only independent claim:

> 1. A sump cover containment assembly for use with a containment sump which has a top end with a hole therein, comprising:
>
> a substantially [*3] hollow frame having an open top end and an open bottom end sized, shaped and oriented so that said bottom end fits around said top end of said containment sump;
>
> a sump cover positionable over said top end of said frame, having at least one downward extension and at least one access hole extending through said at least one downward extension, said at least one access hole being of proper size, shape and orientation to facilitate positioning of a spill collector therein;
>
> a lid for covering each of said at least one access holes in said sump cover;
>
> first sealing means for sealing said lid to said sump cover;
>
> second sealing means for sealing said sump cover to said frame to minimize intrusion of surface water into said substantially hollow frame; and
>
> a sump shield substantially covering said top end of said containment sump, having a downward lip which extends downward about said containment sump between said frame and said containment sump, and an upward extension having a hole therein sized, shaped and oriented to mate with said at least one downward extension of said sump cover and to facilitate positioning of said spill collector therein.

Figure 7 of the '257 patent depicts a preferred embodiment [*4] of the invention.

[SEE FIG. 7] IN ORIGINAL]

The patent application which ultimately led to the issuance of the '257 patent was initially rejected in its entirety by the examiner as obvious. To overcome the rejection certain amendments were made to claim 1 including the addition of the phrase "to facilitate positioning of a spill collector therein" in two places. The remarks accompanying the amendment included the following:

> Claim 1 has been amended to include further clarifying and limiting language which clearly distinguishes claim 1 as amended from the prior art of record. More specifically, claim 1 now includes clarification of the sump cover as accepting a spill collector in one of its downward extensions, as well as clarification of the sump shield as substantially covering the top end of the containment sump while accepting a spill collector in one of its upward extensions.... Thus, the containment assembly of amended claim 1 is capable of much more than is the prior art of record. It acts as a housing for containing and supporting a spill collector, as well as acting as a secondary containment system which facilitates access for maintaining a spill collector utilized therewith. [*5] Thus, the spill collector no longer needs to be concreted into the ground as was previously required.

In its March 1, 2007 order, at page 15, the Federal Circuit announced the following interpretation of the claim 1 requirement that the extensions "facilitate position" of the spill collector:

> Therefore, we hold that the extensions need not assist with, or even be capable of assisting with, the act of positioning the spill collector. Instead, we agree with Franklin that the upward and downward extensions need only "allow" the spill collector to be positioned in the hole.

*Defendant's Containment Assembly*

Defendant manufactures and sells a containment system which attaches to the top of a sump above a UST. The system includes a composite or metal tray which is attached to an adapter on the riser. A metal ring attaches a bellows-like spill container made of molded plastic to the tray. The spill container extends upward and connects to a second metal ring which is attached to the sump cover. A second, optional, soft pliable bellows-like boot called the water shroud boot can be placed over the spill container. It is attached at the top to the same metal ring used to attach the spill container [*6] and at the bottom to a cover that is placed over the sump. Both the spill

container and the water shroud boot are flexible bellows so that they can move both vertically and laterally without breaking their respective seals. The diagram below depicts the defendant's accused containment assembly:

[SEE [OPW MULTI-PORT (MPWS)] IN ORIGINAL]

### Relevant Prior Art

U.S. Patent No. 5,058,633 to Sharp ("Sharp") and U.S. Patent No. 4,615,362 to Hartman ("Hartman") are prior art to the '257 patent. Sharp claims a UST assembly which includes a secondary containment chamber. Sharp's figure 11 depicts a preferred embodiment:

[SEE [FIG. 11] IN ORIGINAL]

As evident from an examination of the preferred embodiment, Sharp does not disclose a cover over its containment sump.

Hartman describes an environmentally safe protection device to contain fuel fill hose spillage. Hartman's figure 2. depicts a preferred, embodiment of the invention:

[SEE [FIG. 2] IN ORIGINAL]

Hartman describes the use of a screen (labeled "150" in figure 2) which filters debris from spilled fuel before it enters a containment sump.

Plaintiff manufactures and sells UST watertight sump containment assemblies. The assemblies do not incorporate all [*7] elements of the '257 patent, however they are protected by other patents owned by plaintiff. In 2003, defendant began selling the OPW multiport system with water shroud boot. Prior to developing the OPW multiport, defendant tried unsuccessfully to license the '257 technology. Both plaintiff's and defendant's products are used with containment sumps. Plaintiff's products are substantially more expensive than defendant's competitive products. In 2006 defendant began selling a non-infringing alternative product.

Other available systems for filling tanks do not employ sumps but directly bury pipe components. Other systems with a sump include components for enhanced vapor recovery but to not prevent water from entering the sump. During the relevant period Fibrelite Composites, Ltd. sold a UST fiberglass secondary containment system including a sump. Fibrelite's products included a seal between the manhole cover frame and the top of the sump to prevent water infiltration.

The prevention of water infiltration into the containment sump was a desirable characteristic of the products and was required by California regulation AB2481 for all new sump containment systems on new construc-

tion after [*8] July 1, 2003. Customers were seeking water tight UST systems in 2003.

### MEMORANDUM

Defendant's present motion for summary judgment seeks a determination of non-infringement based on four separate elements of claim one of the '257 patent. Defendant also seeks a determination that all claims of the '257 patent are invalid as obvious in light of the Sharp and Hartman patents. Additionally, defendant seeks summary judgment that plaintiff's claims for lost profits and willful infringement fail as a matter of law.

Summary judgment is appropriate when, after both parties have the opportunity to submit evidence in support of their respective positions and the Court has reviewed such evidence in the light most favorable to the nonmovant, there remains no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c), Fed. R. Civ. P. A fact is material only if it might affect the outcome of the suit under the governing law. Disputes over unnecessary or irrelevant facts will not preclude summary judgment. A factual issue is genuine only if the evidence is such that a reasonable factfinder, applying the appropriate evidentiary standard of proof, could return [*9] a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Under Rule 56(e) it is the obligation of the nonmoving party to set forth specific facts showing that there is a genuine issue for trial.

### Infringement

Patent infringement analysis consists of two steps. First, the patent claims must be interpreted or construed to determine their meaning and scope. Second, the properly construed claims are compared to the process or product accused of infringing. Markman v. Westview Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995). The first step of this analysis, claim construction, is a matter of law exclusively for the court. Id. at 970-71. To establish infringement plaintiff must prove that each claim element is present in the accused product, either literally or by equivalence. Dawn Equipment Co. v. Kentucky Farms Inc., 140 F.3d 1009, 1015 (Fed. Cir. 1998). Conversely, defendant can prevail by demonstrating that at least one element of the asserted claim is absent in their product or process.

The well established process for claim construction begins with examination of the claims language. The language is given its ordinary meaning as it would be understood [*10] by one of ordinary skill in the relevant art, given its context and the other patent claims. Rexnord Corp. v. Laitram Corp., 274 F.3d 1336, 1342 (Fed. Cir. 2001). This initial construction is then consid-

ered in light of the specification to determine whether the inventor expressed a different meaning for the language, whether the preferred embodiment is consistent with the initial interpretation and whether the inventor specifically disclaimed certain subject matter. *Id.* at 1342-43. The specification takes on a more important role if the claims language is particularly ambiguous, *id.,* or if the inventor invoked the means plus function language of 35 U.S.C. § 112, P 6 thereby incorporating the specification's embodiment into the claims by reference. Finally, the interpretation is examined for consistency with the patent's prosecution history and any disclaimers made therein. *Id.* at 1343.

Assuming one or more elements is literally absent from the accused device, it must be determined whether the device infringes under the doctrine of equivalents. The Supreme Court offered the following guidance for assessing whether an element is present by equivalents:

> Does the accused product or process [*11] contain elements identical or equivalent to each claimed element of the patented invention? ... A focus on individual elements and a special vigilance against allowing the concept of equivalence to eliminate completely any such elements should reduce considerably the imprecision of whatever language is used. An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element plays a role substantially different from the claimed element.

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chemical Co.,* 520 U.S. 17, 40, 117 S. Ct. 1040, 137 L. Ed. 2d 146 (1997).

Defendant contends that as a matter of law the frame of its device does not include a bottom end which "fits around" the top end of the containment sump or a sump shield having a downward lip "between" the frame and the containment sump. Both contentions are based on the factual premise that in its accused device the lower portion of the frame does not extend down to vertically overlap the top portion of the sump. Resolution of the argument therefore requires both construction of the terms "fits around" [*12] and "between" and a factual determination concerning the spatial relationships of the components in defendant's device.

The phrase "fits around" in the context of the patent claim ordinarily means to encircle or surround. To encircle or surround requires that the encircling item is in the same plane as the item encircled. This definition is reinforced by the preceding language requiring that the bottom end of the frame be "sized, shaped and oriented" to fit around the top of the sump. The use of the word "oriented" in modification surely implies that the bottom of the frame must be situated relative to the top of the sump to encircle it. This definition is further confirmed by the col. 5, lines 30-34 of the specification which discusses positioning of the components:

> Such positioning allows frame 18 to overlap extension 17 of the containment sump 11 and facilitates proper positioning of sump shield 16 to effectively eliminate water intrusion into containment sump 11.

Additionally, the specification discloses an optional seal 110 between the frame and the downward lip of the sump shield (see col. 5, lines 1-3), a seal which is only possible if the frame surrounds and encircles the top [*13] of the sump.

A similarly compelling analysis leaves no doubt that the downward lip of the sump shield lies "between" the frame and the containment sump only if the top portion of the sump and the bottom portion of the frame overlap. In this context the common meaning of between is in the space separating two things. Thus, for the downward lip of the sump shield to lie "between" the bottom portion of the frame and the top portion of the sump, the two must overlap. The specification confirms this in for the same reason it confirms common definition of "fits around."

The second step in the analysis is to determine whether the frame of defendant's accused device overlaps the top of the sump. In the previously stipulated depiction of the device it appears that there is overlap so that the frame is oriented to fit around the top of the sump and the downward lip of the sump shield is between the two. In support of this motion, however, defendant has submitted by affidavit a revised drawing, purporting to more precisely represent the relationship of the components of its device which indicates a space of 3.688 inches between the top of the sump and the bottom of the frame. Notwithstanding the [*14] newly presented diagram the Court cannot accept the fact of a space as undisputed. First, it contradicts previously stipulated evidence. Second, the representation that the distance between the components can be measured to within a one thousandth of an inch is entirely contrary to the undisputed fact that the flexible nature of both the spill container and the water shroud boot permit significant verti-

cal and horizontal variance in the orientation of the man-hole components of the system relative to the riser pipes and the sump. An issue of fact exists concerning the orientation of these components as they are used and therefore an issue of fact remains on the issue literal infringement.

Furthermore, even if it could be determined that there was no literal infringement because the bottom of the frame is inches above the top of the sump, the issue of infringement by equivalents remains. The relevant element in the patent claims, a cylindrical frame which extends downward overlapping the top of the sump, is replaced in the accused device by a cylindrical frame which extends downward and stops inches short of overlapping the sump top. The issue is whether the shortened frame matches the [*15] function, way, and result of the overlapping frame, or plays a role substantially different from the claimed element. That issue presents a question of fact not subject to resolution on summary judgment.

In another non-infringement argument, defendant asserts that the sump cover of its device lacks a "downward extension" that "mates" with an "upward extension" of the sump shield. There is no dispute that the sump shield of defendant's device includes an upward extension that mates with the bottom of the water shroud boot. The issue is whether the water shroud boot is properly characterized as a "downward extension" of the sump cover. More specifically, the issue of construction is whether the "downward extension" must be an integral part of the cover. The term "extension" does not suggest that a component be an integral part of that which it extends. In fact, the term is not only consistent with but even implies the attachment of an additional component. To overcome this common meaning of the term defendant argues that the claim requires a cover "having" an extension and that the verb "have" implies that the cover and the extension are integral. The argument is unpersuasive. Devices [*16] (e.g., vacuum cleaners) are often described as "having" extensions, even though the extensions are not unitary parts of the device. Without improperly importing the preferred embodiment into the claim, there is no basis to conclude that the downward extension must be a unitary part of the cover.

In its final non-infringement position, defendant argues that the "size, shape and orientation" of its water shroud boot does not "allow positioning" of the spill container. This argument is nearly the same as the argument accepted by this Court in granting defendant summary judgment on its first motion. Unfortunately for defendant, the Federal Circuit disagreed. In light of the claim construction presently governing the case, the argument has no merit. Defendant argues that the water shroud boot does not allow positioning because it is installed over the spill collector and is in such close proximity that

the spill collector cannot be manipulated once the boot is in place. The reasoning of the Court of Appeals forecloses this argument:

> It does not matter *when* a space is created to house the spill collector; a structure can still infringe claim 1 if the space only exists after the full device [*17] is constructed.
>
> . . .
>
> [W]e agree with Franklin that the upward and downward extensions need only "allow" the spill collector to be positioned in the hole.

March 1, 2007 decision at 14-15. There is no question that the size shape and orientation of the water shroud boot allows the spill collector to be positioned in the hole it creates. The order of assembly and the ability or inability to manipulate the components after assembly is irrelevant. Under the Federal Circuit analysis, the element is literally present in the accused device.

*Obviousness*

A claim is obvious under 35 U.S.C. § 103 when "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time of the invention to a person having ordinary skill in the art." The ultimate issue of obviousness has been termed an issue of law. However, its determination is dependent on a series of factual issues as set forth in *Graham v. John Deere Co., 383 U.S. 1, 86 S. Ct. 684, 15 L. Ed. 545 (1966)*. Those inquiries are as follows: (1) determining the scope and content of prior art; (2) comparing the differences between the prior art and the claims at issue; (3) determining the [*18] level of ordinary skill in the art; and (4) considering objective evidence of obviousness or nonobviousness. *Id.* at 15-16.

The principal issue presented by this motion is whether it would have been obvious to one of ordinary skill in the art to combine the components of Sharp with the screen covering of Hartman to produce the sump shield in the '257 patent. Longstanding patent law requires that when a defendant argues that a combination of prior art references renders the patented invention obvious, the defendant has the burden to establish some motivation in the prior art for one of ordinary skill in the art to make the combination. *In re Rouffet, 149 F.3d 1350, 1357 (Fed. Cir. 1998)*. Defendant argues that recent analysis of *KSR Intern. Co. v. Teleflex, Inc., 127 S. Ct. 1727, 167 L. Ed. 2d 705 (2007)* alters this standard in

a way that compels a finding of obviousness as a matter of law.

> KSR affirmed the idea that

>> it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine elements in the way the claimed new invention does. This is so because inventions in most, is not all, instances rely upon building blocks long since uncovered, and claimed [*19] discoveries almost of necessity will be combinations of what, in some sense, is already known.

Id. at 1741. However, it rejected a rigid and formalistic approach to proving a teaching, suggestion or motivation to perform the combination in favor of broader, more common sense approach to the issue. Id. at 1740-42. Under the correct analysis, any need or problem, known in the field of endeavor at the time of the invention and addressed by the patent can provide a reason for combining the elements in the claimed manner. Id. at 1742.

Applying this standard for obviousness, fact issues preclude a determination of obviousness or nonobviousness on summary judgment. Sharp does not disclose a sump shield. Hartman discloses a filter or screen over the top of the sump to filter out solid debris from entering the sump which could be described as a sump shield. However, there would be no reason to incorporate the sieve-like cover of Hartman over the Sharp sump because the configuration of Sharp, which seals out debris from entry either from the top or sides would not permit debris to reach such a screen. Although the problem of water infiltration into the sump was known in the field of endeavor [*20] at the time of the invention, the Hartman screen would be of no use to solve that problem. Accordingly, whether one of ordinary skill in the art was motivated by the desire to filter debris or to seal out moisture, it seems doubtful that combining Hartman and Sharp would have provided an obvious solution.

Neither does the testimony of the '257 inventor Smith prove obviousness sufficiently to warrant summary judgment. Smith testified that preventing water from entering the sump was a problem well known in the field and that he solved the problem with a sump shield that was like a lid which was put on the sump which was like a jar. It is true that putting a lid on a jar is an old concept, but it is not necessarily true that the concept was obvious to apply to a containment sump. At most, the testimony implies that the solution was obvious to Smith, but the fact that the solution became obvious to the inventor does not establish that it would have been obvious to the hypothetical person of ordinary skill in the art. KSR, 127 S. Ct. at 1742 (The question is not whether the combination was obvious to the patentee.)

Because the facts do not establish that incorporation of a sump shield element [*21] into the prior art was obvious as a matter of law, it follows that none of the dependent claims were obvious as a matter of law. The Court does not address whether adding other elements to the prior art would have been obvious.

### Willfulness

To establish willful infringement plaintiff must demonstrate "objective recklessness" by clear and convincing evidence. In re Seagate Technology, LLC, 497 F.3d 1360, 1371 (Fed. Cir. 2007). "Objective recklessness" means that "the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." Id. Additionally, plaintiff must show that this objectively defined risk was known or should have been known by the infringer. Id. The accused infringer's actual state of mind is irrelevant for purposes of the analysis. Id. While a pre-infringement opinion of counsel is relevant to defeat a claim of willfulness, an accused infringer has no affirmative obligation to obtain one. Id. Seagate expressly deferred further development on how to apply the standard to future cases. Id.

Defendant points primarily to this Court's first summary judgment decision as conclusively establishing that there was not an objectively [*22] high likelihood of infringement. Plaintiff points to defendant's failure to seek advice of counsel prior to selling the accused devices, defendant's efforts to obtain a license from plaintiff's predecessor, customer demand for a waterproof system and letters from the patentee accusing defendant of infringement. Plaintiff argues that this evidence establishes willfulness.

All of the evidence advanced by plaintiff goes to the second component of the Seagate test -- what defendant knew or should have known with respect to the likelihood of infringement. That plaintiff accused defendant of infringement or defendant sought a license has no bearing on whether there was an objectively high likelihood that its product infringed. It goes to the defendant's knowledge and state of mind, which Seagate holds irrelevant to the objective inquiry. The infringement analysis in the first summary judgment decision goes to the objective inquiry of the likelihood of infringement. Regardless of the contrary decision of the Appeals Court, the analysis establishes defendants' conduct in selling its product was not reckless in the sense that there was an "objectively high likelihood" that its actions were infringement. [*23] Given the significant support in the

language of the patent, the specification and prosecution history for defendant's non-infringement position, plaintiff cannot meet its burden to prove objective recklessness by clear and convincing evidence.

*Lost Profits*

To recover lost profits a patent owner must prove that but for the infringement, it would have made some or all of the infringer's sales. *Bic Leisure Products, Inc. v. Windsurfing Intern., Inc.,* 1 F.3d 1214, 1218 (Fed. Cir. 1993). One way to prove that infringement caused lost sales is to establish the four *Panduit* factors: (1) a demand for the patented product, (2) the absence of acceptable non-infringing substitutes, (3) plaintiff's capacity to exploit the demand, (4) the profits lost due to the infringement. *Id.* (citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir. 1978)). The patentee's burden is to show a reasonable probability that it would have made the sales. *Rite-Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1545. Once it does so the burden shifts to the infringer to prove that it is unreasonable to infer that the patentee would have made some or all of the sales.

Initially, defendant argues [*24] that plaintiff's concession that its products do not employ all elements of the '257 patent precludes recovery of lost profit damages. This argument was thoroughly considered and rejected by *Rite-Hite,* 56 F.3d at 1546-48. Assuming plaintiff can demonstrate that it would have sold its competing products but for defendant's infringement, the fact that it is not practicing the '257 teachings is not a policy bar to recovery. Furthermore, it has no effect on the application of the second *Panduit* factor.

Viewing the evidence in a light most favorable to plaintiff, a fact issue remains concerning the availability of lost profit damages. There is ample evidence to support a finding of demand for a product, like the patented device, which protects from water infiltration. Inventor Smith testified of the long felt need for a system that protected against water infiltration. The demand for such systems is further confirmed by California's regulatory requirement (AB 2481) that new installations protect against water infiltration. Finally, evidence of demand is found in defendant's efforts to license the patented technology and to promptly develop a product to meet customer demand for water exclusion.

There [*25] is substantial dispute concerning the availability of acceptable non-infringing substitutes. Depending on the particular application, direct bury products and products which have EVR technology but are not water tight, are substitutes for the watertight products of the parties. However, in light of the higher cost of plaintiff's product and the additional cost of defendant's separately sold water shroud boot, it can be presumed that defendant's purchasers were purchasing only in the water tight, sump containment systems market to which plaintiff's lost profit claims are directed. This is at least one reasonable inference.

In that market, only the Fibrelite sump product appears to be a potentially acceptable non-infringing substitute. The Fibrelite product apparently differs from the parties' products in that it does not use a sump shield to preclude the entry of water by condensation or by surface runoff through the manhole cover, but precludes infiltration of outside water through the ground by sealing the frame to the top of the sump. Whether and to what extent purchases would see these products as acceptable substitutes remains an issue of fact. Furthermore, even to the extent the [*26] Fibrelite product competes in the same market, it continues to appear likely that a percentage of the infringing sales would have been made by plaintiff, but for defendant's infringing sales.

On the issue of the third *Panduit* factor, the evidence tends to show that plaintiff had the capacity to manufacture and sell many, if not all of the additional units. Plaintiff was manufacturing only in a single shift and could have immediately doubled capacity simply by operating a second shift. A factual issue remains concerning whether the ability to expand capacity was less than the total available additional sales.

The issues and arguments raised may be persuasive in reducing the total sales which plaintiff would have made but for infringement. They do not, however, establish as a matter of law that plaintiff will be unable to prove that it would have captured some portion of defendant's infringing sales had defendant not been competing in the market with an infringing product.

ORDER

IT IS ORDERED that defendant's motion for summary judgment is GRANTED on the issue of willfulness and is in all other respects DENIED.

Entered this 15th day of November, 2007.

BY THE COURT:

JOHN C. SHABAZ

District Judge

# EXHIBIT D

LEXSEE

RESQNET.COM, INC., Plaintiff, - against - LANSA, INC., Defendant.

01 Civ. 3578 (RWS)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

533 F. Supp. 2d 397; 2008 U.S. Dist. LEXIS 7908

February 1, 2008, Decided
February 1, 2008, Filed

**PRIOR HISTORY:** ResQNet.com, Inc. v. Lansa, Inc.,
2006 U.S. Dist. LEXIS 85613 (S.D.N.Y., Nov. 22, 2006)

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Plaintiff patentee brought
an action against defendant competitor, alleging that the
competitor's product infringed patents claiming processes
which downloaded a screen of information from a re-
mote mainframe computer onto a local personal com-
puter, but the competitor asserted that the patents were
invalid. The court conducted a bench trial.

**OVERVIEW:** One patent described a user interface for
a remote terminal, and a second patent described a con-
figurable terminal capable of communicating with re-
mote computers. The court held that the competitor did
not infringe the first patent since the accused product
lacked a means of identifying a particular user or an abil-
ity to map key function to specific screens, but the ac-
cused product infringed the second patent. The iterative
process of the accused product of examining a
downloaded green screen for each screen ID of the prod-
uct, one-by-one, to determine whether an override should
be implemented constituted an algorithm described by
the patent. Further, prior sales of a product of the com-
petitor did not invalidate the infringed patent since the
version sold lacked communications software and an
ability to function with a host and server, and there was
no evidence of publication of a third party's instruction
manual to establish obviousness based on prior art. Also,
there was no showing of lack of operability or enable-

ment since the patent was not required to identify a
unique screen if an outside screen was altered, or to ex-
plain generation of a default graphical user interface.

**OUTCOME:** Judgment was entered in favor of the
competitor with regard to the first patent, but judgment
was entered in favor of the patentee with regard to the
second patent, and the patentee was awarded damages
based on a reasonable royalty.

**CORE TERMS:** screen, patent, software, terminal, user,
infringement, invention, developer, royalty, license,
server, fiscal years, host, identifying information, main-
frame, override, downloaded, prior art, displayed, plural-
ity, remote, infringer, default, logged, dumb, algorithm,
infringe, patented, estimate, maintenance fee

**LexisNexis(R) Headnotes**

*Patent Law > Infringement Actions > Burdens of Proof*
[HN1]To succeed on an infringement claim, a patentee
must demonstrate that an accused product contains each
and every limitation of a properly construed claim. Each
element of a claim is material and essential, and the ab-
sence of any one must result in a finding of no infringe-
ment. It is the patentee's burden to prove infringement,
whether literal or by the doctrine of equivalents, by a
preponderance of the evidence.

533 F. Supp. 2d 397, *; 2008 U.S. Dist. LEXIS 7908, **

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN2]See 35 U.S.C.S. § 271(a).

*Patent Law > Infringement Actions > Burdens of Proof*
*Patent Law > Infringement Actions > Claim Interpretation > Means Plus Function*
[HN3]Where a patent contains elements in a mean-plus-function format, to show infringement, it is the patentee's burden to prove that it is more likely than not that an accused device: (1) contains a structure that performs the identical function to the function recited in the means-plus-function limitation; and (2) that the structure of the accused device that performs that function is either identical or equivalent to the corresponding structure disclosed in the patent specification.

*Patent Law > Infringement Actions > Burdens of Proof*
[HN4]To prove direct infringement, a patentee must establish by a preponderance of the evidence that every limitation set forth in the asserted claim is found in the accused product, either literally or by a substantial equivalent.

*Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement*
[HN5]To establish indirect infringement of a patent, a plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements.

*Patent Law > Infringement Actions > Infringing Acts > Contributory, Indirect & Induced Infringement*
[HN6]Indirect infringement can be proved through circumstantial evidence.

*Patent Law > Statutory Bars > On Sale Bar > Elements*
*Patent Law > Statutory Bars > Public Use Bar > Elements*
[HN7]A persons is not entitled to a patent if the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States. 35 U.S.C.S. § 102(b).

*Evidence > Procedural Considerations > Burdens of Proof > Allocation*

*Patent Law > Statutory Bars > On Sale Bar > Elements*
[HN8]A patent claim is invalid if an embodiment of the claimed invention was both: (1) subject to commercial offer for sale in the United States; and (2) ready for patenting more than one year before the patent application date. A party asserting the bar bears the burden of demonstrating its application by clear and convincing evidence. An invention was on sale if the claimed invention was embodied in the thing sold or commercially offered for sale. It is not required that a sale was actually made; the essential question is whether or not there was an attempt to obtain commercial benefit. The claimed invention is ready for patenting when there is reason to believe it would work for its intended purpose.

*Patent Law > Nonobviousness > Elements & Tests > Ordinary Skill Standard*
*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
[HN9]A patent is invalid for obviousness under 35 U.S.C.S. § 103 where the claimed subject matter would have been obvious to one of ordinary skill in the art at the time the invention was made. To find obviousness, a person of ordinary skill in the art may combine two or more items of prior art. A court determines the following factual matters, each of which must be established by clear and convincing evidence to establish obviousness: (a) the scope and content of the prior art relied upon; (b) the difference or differences, if any, between a claim and the prior art; (c) the level of ordinary skill in the art at the time the invention was made; and (d) objective factors indicating non-obviousness.

*Patent Law > Statutory Bars > Public Use Bar > Elements*
[HN10]A patent is rendered invalid where the claimed invention was described in a printed publication before the critical date. 35 U.S.C.S. § 102(b).

*Patent Law > Statutory Bars > Public Use Bar > Elements*
[HN11]To qualify as a printed publication under 35 U.S.C.S. § 102(b), a prior art reference must have placed a claimed invention in the possession of the public more than one year before the date of the patent application.The party seeking to introduce the reference should produce sufficient proof of its dissemination or that it has otherwise been available and accessible to persons concerned with the art to which the document relates and thus most likely to avail themselves of its contents.

*Patent Law > Nonobviousness > Elements & Tests > Prior Art*
*Patent Law > U.S. Patent & Trademark Office Proceedings > Filing Requirements > General Overview*
[HN12]Mere submission of an Information Disclosure Statement (IDS) to the U.S. Patent and Trademark Office does not constitute a patent applicant's admission that any reference in the IDS is material prior art.

*Patent Law > Utility Requirement > General Overview*
[HN13]A patent that claims an impossible invention fails to meet the utility requirement of 35 U.S.C.S. §§ 101, 112 and is invalid for lack of operability. To violate 35 U.S.C.S. § 101 the claimed device must be totally incapable of achieving a useful result.

*Patent Law > Claims & Specifications > Enablement Requirement > Standards & Tests*
[HN14]To be enabling under 35 U.S.C.S. § 112, a patent must contain a description that enables one skilled in the art to make and use a claimed invention.

*Patent Law > Remedies > Damages > General Overview*
[HN15]See 35 U.S.C.S. § 284.

*Patent Law > Remedies > Damages > General Overview*
[HN16]Deciding how much to award as damages for patent infringement is not an exact science, and the methodology of assessing and computing damages is committed to the sound discretion of a district court.

*Patent Law > Remedies > Damages > Reasonable Royalties*
[HN17]In the absence of an established royalty rate, a court considering damages for patent infringement determines a reasonable rate based upon the result of a hypothetical negotiation between the parties at the time the infringement began. The key element in setting a reasonable royalty after determination of validity and infringement is the necessity for return to the date when the infringement began.

*Patent Law > Remedies > Damages > Reasonable Royalties*
[HN18]To guide a royalty determination in considering damages for patent infringement, courts typically look to 15 factors, the first five of which are the following: (1)

the royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty; (2) the rates paid by the licensee for the use of other patents comparable to the patent in suit; (3) the nature and scope of the license, as exclusive or non-exclusive, or as restricted or nonrestricted in terms of territory or with respect to whom the manufactured product may be sold; (4) the licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly; and (5) the commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business, or whether they are inventor and promoter.

*Patent Law > Remedies > Damages > Reasonable Royalties*
[HN19]To guide a royalty determination in considering damages for patent infringement, courts typically look to 15 factors, factors (6) through (10) of which are the following: (6) the effect of selling the patented specialty in promoting sales of other products of the licensee, the existing value of the invention to the licensor as a generator of sales of his non-patented items, and the extent of such derivative or convoyed sales; (7) the duration of the patent and the term of the license; (8) the established profitability of the product made under the patent, its commercial success, and its current popularity; (9) the utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results; and (10) the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention.

*Patent Law > Remedies > Damages > Reasonable Royalties*
[HN20]To guide a royalty determination in considering damages for patent infringement, courts typically look to 15 factors, factors (11) through (15) of which are the following: (11) the extent to which the infringer has made use of the invention, and any evidence probative of the value of that use; (12) the portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions; (13) the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer; (14) the opinion testimony of qualified experts; and (15) the amount that a licensor (such as the patentee) and a licen-

see (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee--who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention--would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Patent Law > Infringement Actions > Infringing Acts > General Overview*
[HN21]It is a general rule under United States patent law that no infringement occurs when a patented product is made and sold in another country.

*Patent Law > Remedies > Collateral Assessments > Increased Damages*
[HN22]Under 35 U.S.C.S. § 284, a court finding patent infringement may award enhanced damages up to three times the amount of actual damages. In the absence of statutory standards, such damages are appropriate upon a showing of willful infringement. Proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness. A patentee bears the burden of demonstrating by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent. The infringer's state of mind is not relevant to this initial objective inquiry. If the objective component is satisfied, the analysis shifts to the subjective knowledge of the infringer: the patentee must then demonstrate that this objectively defined risk (determined by the record developed in the infringement proceeding) was either known or so obvious that it should have been known to the accused infringer.

*Civil Procedure > Remedies > Injunctions > Permanent Injunctions*
*Patent Law > Remedies > Equitable Relief > Injunctions*
[HN23]A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. The decision whether to grant or deny injunctive relief rests

within the equitable discretion of the district courts, which must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards.

*Civil Procedure > Sanctions > General Overview*
[HN24]A court has significant discretion in determining what sanction should be imposed for a violation of Fed. R. Civ. P. 11. Factors to be considered in determining an appropriate sanction include: (1) the good faith or bad faith of the offender; (2) the degree of willfulness, vindictiveness, negligence, or frivolousness involved in the offense; (3) the knowledge, experience and expertise of the offender; (4) any prior history of sanctionable conduct on the part of the offender; (5) the reasonableness and necessity of the out-of-pocket expenses incurred by the offended person as a result of the misconduct; (6) the nature and extent of the prejudice, apart from out-of-pocket expenses, suffered by the offended person as a result of the misconduct; (7) the relative culpability of client and counsel, and the impact on their privileged relationship of an inquiry into that area; (8) the risk of chilling the specific type of litigation involved; and (9) the impact of the sanction on the offender, including the offender's ability to pay a monetary sanction.

*Civil Procedure > Sanctions > General Overview*
[HN25]Factors to be considered in determining an appropriate sanction for a violation of Fed. R. Civ. P. 11 include: (10) the impact of the sanction on the offended party, including the offended person's need for compensation; (11) the relative magnitude of sanction necessary to achieve the goal or goals of the sanction; (12) burdens on the court system attributable to the misconduct, including consumption of judicial time and incurrence of juror fees and other court costs; (13) the degree to which the offended person attempted to mitigate any prejudice suffered by him or her; (14) the degree to which the offended person's own behavior caused the expenses for which recovery is sought; (15) the extent to which the offender persisted in advancing a position while on notice that the position was not well grounded in fact or warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law; and (16) the time of, and circumstances surrounding, any voluntary withdrawal of a pleading, motion, or other paper.

COUNSEL: [**1] For Plaintiff: Jeffrey I. Kaplan, Esq., KAPLAN GILMAN GIBSON & DERNIER LLP, Woodbridge, NJ.

For Defendant: James H. Hulme, Esq., Janine A. Carlan, Esq., ARENT FOX LLP, Washington, D.C.; Steven Kimelman, Esq., David N. Wynn, Esq., ARENT FOX LLP, New York, NY.

JUDGES: ROBERT W. SWEET, U.S.D.J.

OPINION BY: ROBERT W. SWEET

OPINION

[*403] Sweet, D.J.,

Upon all the proceedings had heretofore and upon the following findings of fact and conclusions of law, judgment will be entered in favor of defendant Lansa, Inc. ("Lansa" or the "Defendant") as to U.S. Patent No. 5,831,608 (the "'608 Patent") and in favor of plaintiff ResQNet.com, Inc. ("ResQNet" or the "Plaintiff") as to U.S. Patent No. 6,295,075 (the "'075 Patent").

**Prior Proceedings**

By a complaint filed on April 27, 2001 and an amended complaint filed on December 4, 2001, ResQNet alleged that Lansa's product "NewLook" infringed one or more claims of five U.S. patents, the '608 Patent, the '075 Patent, and U.S. Patent Nos. 5,530,961 (the "'961 Patent"), 5,792,659 (the "'659. Patent"), and 5,812,127 (the "'127 Patent"). ResQNet subsequently withdrew its allegations of infringement concerning the '659 Patent and the '127 Patent.

After holding a hearing pursuant to Markman v. Westview Instruments, Inc., 517 U.S. 370, 116 S. Ct. 1384, 134 L. Ed. 2d 577 (1996), [**2] the Court interpreted the language of the '608 Patent, the '075 Patent. and the '961 Patent in an Opinion dated September 5, 2002. See ResQNet.com, Inc. v. Lansa, Inc., No. 01 Civ. 3578 (RWS), 2002 U.S. Dist. LEXIS 16667 (S.D.N.Y. Sept. 5, 2002) ("ResQNet I").

Based upon the Court's claims contruction in ResQNet I, the parties stipulated to final judgment in Lansa's favor with respect to all three patents then in the suit. ResQNet's claims were dismissed with prejudice, with ResQNet's consent, by final judgment entered by this Court on November 4, 2002.

On appeal, the Federal Circuit affirmed in part and reversed in part the claim [*404] construction ruling in ResQNet I, and remanded for further proceedings. See ResQNet.com, Inc. v. Lansa, Inc., 346 F.3d 1374 (Fed. Cir. 2003) ("ResQNet II"). Based upon the stipulated final judgment entered in November 2002, and the Federal Circuit's affirmance of this Court's claim construction ruling on the '961 patent, only the '075 and '608 patents remained on remand in October 2003.

By an Opinion dated January 13, 2005, the Court denied the parties' motions for partial summary judgment, Plaintiff's motion to strike Defendant's invalidity defense as to the [**3] '075 Patent, and Plaintiff's motion for sanctions, granted Plaintiff's motion for leave to file a sur-reply and Defendant's motion for leave to amend its answer and counterclaims, and granted in part Defendant's motion for sanctions. See ResQNet.com, Inc. v. Lansa, Inc., 382 F. Supp. 2d 424 (S.D.N.Y. 2005) ("ResQNet III").

The parties then moved for partial summary judgment on the issue of ResQNet's alleged inequitable conduct in the prosecution of the '075 Patent. By an Opinion dated November 22, 2006, the Court granted summary judgment in favor of ResQNet on this issue. See ResQNet.com, Inc. v. Lansa, Inc., No. 01 Civ. 3578 (RWS), 2006 U.S. Dist. LEXIS 85613 (S.D.N.Y. Nov. 22, 2006) ("ResQNet IV").

A bench trial was held from May 21, 2007 to May 24, 2007 and post-trial memoranda were submitted up to and including August 29, 2007.

Lansa filed a motion to strike Plaintiff's exhibit 5A on October 26, 2007, which the Court denied on December 3, 2007.

The only remaining patent claims at issue are claim 1 of the '608 Patent, and claim 1 of the '075 Patent. (Joint Pretrial Submission "Stipulations of Law and Fact Agreed to by All Parties" P 2).

**Findings of Fact**

*A. Background*

In ResQNet·II, the [**4] Federal Circuit summarized the subject matter of the patent claims at issue in this action:

> The three patents-in-suit claim, in relevant part, "screen recognition" and terminal emulation - processes that download a screen of information from a remote mainframe computer onto a local personal computer (PC). Mainframe computers permit multiple users to simultaneously access one central computer. Before the widespread use of PCs, each user would connect to the mainframe using a so-called "dumb terminal." A dumb terminal typically included a monitor for displaying text and a keyboard for data entry. A dumb terminal, as its name implies, did not process or reformat the data received from the mainframe. Rather, the dumb terminal simply displayed the information

from the mainframe. Symmetrically, the dumb terminal sent all data entry back to the mainframe for processing. Because a dumb terminal's monitor generally was a monochromatic green, the display was called a "green screen."

Gradually, PCs replaced dumb terminals. Unlike a dumb terminal, a PC does not merely send and receive information. Rather, a PC uses software to facilitate communication to and from the mainframe. With that software, [**5] a PC does not simply mimic a dumb terminal, but processes the information into a graphical user interface (GUI) format, which is much more user-friendly. Although the GUI format displays and receives information to and from the user, the PC still sends and receives information only in the manner understood by the mainframe, i.e., as if a dumb terminal were connected to the mainframe. In relevant part, the asserted patents [*405] specifically facilitate recognition of the information that the mainframe sends to the PC.

Resqnet II, 346 F.3d at 1375-1376.

B. The '608 Patent

The '608 Patent is entitled "User Interface for a Remote Terminal" and was filed on March 30, 1996. (Defendant's Trial Exhibit ("DTX") 7).

The '608 Patent is a continuation-in-part of the '961 Patent. (Joint Pretrial Submission "Stipulations of Law and Fact Agreed to by All Parties" P 5).

Claim 1 of the '608 Patent is a "means plus function claim" with two of its limitations in means-plus-function format:

> Apparatus for implementing a computer terminal to be connected to a remote computer, said apparatus comprising:
>
> means for identifying a particular user logged on to said remote computer through said computer terminal;
>
> means for [**6] identifying, based upon a position, length and type of each of a plurality of fields, a particular screen to be displayed to said user; and

> a plurality of special function keys, each key performing a specified function, the specified function performed for each key being determined by the particular user logged on and the particular screen identified to be displayed.

('608 Patent, col. 4); see also ResQNet III, 382 F. Supp. 2d at 429.

The first element in claim 1 of the '608 Patent, "means for identifying a particular user logged on to said remote computer through said computer terminal," identifies the user who is using the particular screen by identifying the log-in screen as such and then identifying the field where the log-in is entered. (DTX 106; Yampel Dep. 46-47). "The claimed function is identifying a particular user logged on." ('608 Patent, col. 4). This element describes an algorithm and also refers to the services delivered to different users. (DTX 106; Yampel Dep. 48) ("[O]nce we know who the user is we might produce a different customized screen or the same screen.").

The second element in claim 1 of the '608 Patent has a function of "identifying . . . a particular screen [**7] to be displayed to said user" and the corresponding structure is an algorithm for analyzing the downloaded information to generate a screen ID. ResQNet III, 382 F. Supp. 2d at 430; ('608 Patent, col. 4; Joint Pretrial Submission "Stipulations of Law and Fact Agreed to by All Parties" P 6).

A "screen ID," as used in this Court's prior interpretation of the '961 Patent, "refers to a number." ResQNet I, 2002 U.S. Dist. LEXIS 16667, at *28.

The algorithm of claim 1 of the '608 Patent "is dependent on three parameters for identifying a screen: position, length and type." ResQNet I, 2002 U.S. Dist. LEXIS 16667, at *20; (Joint Pretrial Submission "Stipulations of Law and Fact Agreed to by All Parties" P 8).

The third element of claim 1 of the '608 patent describes customization of special function keys based upon the user who is logged on. ('608 Patent, Col. 4; PTX 22, July 20, 2004 Report P 32, Trial Tr. 505). Special function keys are those keys that the legacy applications (i.e., those applications that generate the green screens) employed, having names like system requests, function key 1, attention keys, clear keys. The special function keys are reflected on a keyboard, and can be something [**8] like the PF1 key. (DTX 106; Yampel Dep. 50).

C. The '075 Patent

The '075 Patent is titled "Configurable terminal capable of communicating with [*406] various remote computers" and was filed on July 10, 1997. (DTX 9).

Claim 1 of the '075 Patent is a pure method claim as follows:

> The method of communicating between a host computer and a remote terminal over a data network comprising steps of:
>
>> establishing a first communication session between said terminal and a communications server via a first communications channel;
>>
>> downloading, from said server to said terminal, communications software for communicating between said terminal and said host and a plurality of specific screen identifying information;
>>
>> utilizing said communications software to implement a second communications session between said terminal and said host via a second communications channel independent of said server;
>>
>> receiving a screen from said host to said terminal;
>>
>> if said received screen matches one of the plurality of specific screen identifying information, displaying a customized GUI [Graphical User Interface] screen; and
>>
>> if said received screen does not match one of the plurality of specific screen identifying information, displaying [**9] a default GUI screen.

('075 Patent, cols. 4-5.) See also ResQNet III, 382 F. Supp. 2d at 430-431.

In claim 1 of the '075 Patent, "a plurality of specific screen identifying information" means "at least two pieces of specific screen identifying information." (Joint Pretrial Submission "Stipulations of Law and Fact Agreed to by All Parties" P 10).

Claim 1 of the '075 patent requires an algorithm that recognizes the screen based on the information downloaded from the mainframe. See ResQNet II, 346 F.3d at 1383-84. Those screens of information are then displayed by the terminal as a customized Graphical User Interface ("GUI") 'or a non-customized default GUI, depending upon whether there is a match between the specific screen identifying information previously

downloaded from the server and the screen information received by the terminal from the host. ('075 Patent).

The critical date for purposes of 35 U.S.C. § 102(b) for the '075 Patent is July 10, 1996, one year prior to the filing date of the 1075 Patent. ResQNet III, 382 F. Supp. 2d at 435.

### D. The NewLook Software

The NewLook software was developed by Looksoftware Proprietary Limited ("Looksoftware"), an Australian company. (Trial Tr. 277). [**10] The product was to be used with an "AS/400," a midrange computer used in small to medium businesses to run business-type applications. (Trial Tr. 280).

When NewLook was first developed, the midrange computers in 1995 often ran applications that used a "green Screen" interface. (Trial Tr. 281, 441).

The developers of NewLook started working on the software in early 1995, and worked on the product throughout the year, with full-time work on the program commencing in the latter half of 1995. (Trial Tr. 284).

Looksoftware sought to develop a product that created a GUI using a so-called "dynamic architecture," where the software would automatically convert "green screens" to GUI screens without using a table lookup or otherwise recognizing the actual screen being displayed. (Trial Tr. 279, 283, 286).

Other products for creating GUIs on the market require purchasers to look at a green screen in advance, create an identification for the screen, and have a GUI created externally that represented that [*407] screen. When these other products were running, the software would recognize the green screen, look up in a table the appropriate GUI associated with that screen, and then present the proper GUI. [**11] (Trial Tr. 298).

The standard edition of NewLook is what an end-user of NewLook would use on a personal computer, typically used by an employee of a business running an AS/400 application. (Trial Tr. 286-87; DTX 67 at LAN 159).

The developer or professional edition of NewLook is used by a programmer (developer) at a company. (Trial Tr. 287; DTX 67 at LAN 159). A developer or programmer using the developer edition of NewLook can create overrides to elements if he or she decides that the automatic changes to a certain element are not how the company wants that element to be displayed. (Trial Tr. 300).

The term "Identify" in NewLook refers to identifying specific elements on a screen. (Trial Tr. 302). The

developer (but not the user) can use the Identify tool to apply overrides. (Trial Tr. 302).

In NewLook, a "screen ID" (hereafter termed a "NewLook Screen ID") is a piece of text generated by the developer that tells the program to apply an override. A NewLook Screen ID is picked by the developer. (Trial Tr. 303). A NewLook Screen ID does not necessarily identify a particular screen and can be present on multiple screens or none at all. (Trial Tr. 303-04). A developer can use the Identify [**12] tool to make changes to a single screen. (Trial Tr. 383-91; Plaintiff's Trial Exhibit ("PTX") 5 at LAN 170, LAN 171, 715).

NewLook uses "filters" to make global changes. When a filter is defined, it applies across all screens. (Trial Tr. 310).

NewLook was advertised as early as March 1996. In one of the first promotions, Looksoftware actually included executable software on a disk in the advertisement. (Trial Tr. 452; DTX 35). The first sale of New-Look was on March 8, 1996 to Aspect Computing of Australia. (Trial Tr. 278, 284; DTX 63).

The testimony and documentary evidence admitted at trial demonstrates that the version of NewLook on sale prior to the critical date ("NewLook version 1.0") lacked a built-in terminal emulator, and instead relied on third-party emulator software to function. (DTX 64 at 10; DTX 68 at 4; Trial Tr. 431, 462).

In March 1996, NewLook was operable with the versions of Windows that were available at the time: Windows 3.x, Windows 95, and Windows NT. NewLook worked with networked computers at the time. (Trial Tr. 357-9; DTX 68; DTX 69).

Today, NewLook has other features not related to GUI, such as web services, and remote program calls. (Trial Tr. 288).

**Conclusions [**13] of Law**

*A. NewLook Does Not Infringe the '608 Patent*

[HN1]To succeed on an infringement claim, the patentee must demonstrate that the accused product contains each and every limitation of the properly construed claim. See Lemelson v. United States, 752 F.2d 1538, 1551 (Fed. Cir. 1985). "[E]ach element of a claim is material and essential," and the absence of any one must result in a finding of no infringement. Id. It is the patentee's burden to prove infringement, whether literal or by the doctrine of equivalents, by a preponderance of the evidence. Id. at 1547.

ResQNet has asserted that Lansa directly infringes the '608 Patent under 35 U.S.C. § 271(a). That statutes states: [HN2]"[W]hoever without authority makes, uses,

offers to sell, or sells any patented invention, within the United States or imports [*408] into the United States any patented invention during the term of the patent therefor, infringes the patent." 35 U.S.C. § 271(a).

Claim 1 of the [HN3]'608 Patent contains elements in a mean-plus-function format. ResQNet II, 346 F.3d at 1382. To show infringement, it is ResQNet's burden to prove that it is more likely than not that NewLook (1) contains a structure that performs the identical function to [**14] the function recited in the means-plus-function limitation; and (2) that the structure of NewLook that performs that function is either identical or equivalent to the corresponding structure disclosed in the patent specification. See Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259, 1266-68 (Fed. Cir. 1999).

The first element in claim 1 of the '608 Patent, a "means for identifying a particular user logged on to said remote computer through said computer terminal," requires that the product "identify[] a particular user logged on." ('608 Patent, col. 4).

The second element in claim 1 of the '608 Patent has a function of "identifying . . . a particular screen to be displayed to said user." ('608 Patent, col. 4; Joint Pretrial Submission "Stipulations of Law and Fact Agreed to by All Parties" P 6).

The third element of claim 1 of the '608 Patent describes customization of special function keys based upon the user who is logged on and the particular screen being displayed. ('608 Patent, Col. 4; PTX 22, July 20, 2004 Report P 32; Trial Tr. 505).

With regard to the first element of this claim, Looksoftware Director of Development Brendan Kay ("Kay") testified that NewLook "doesn't keep track [**15] of the user logged on or make any attempt to do so." (Trial Tr. 372-73). Indeed, no evidence was presented that New-Look requires a user login or password.

Plaintiff's expert, Dr. Eric Dowling ("Dr. Dowling") testified that NewLook recognizes users not through an individualized login, but rather via the computer through which the user logs in. (Trial Tr. 161-62; PTX 7, Appendix III at 1-5 (characterizing this recognition mechanism as a "user machine basis as opposed to a user-independent-of-machine-basis.")).

However, this PC-as-user conception is inconsistent with the language of the '608 Patent. The specification states that the invention seeks to allow "each user to customize . . . based upon his own personal preference and the particular terminal used . . ." ('608 Patent, col. 2). Yet if a user is defined solely by the terminal at which he sits, the two categories of customization sought by the patent ("his own personal preference" and "the particular terminal used") would be exactly the same. The first element

Case 1:05-cv-00422-GMS     Document 596-2     Filed 05/29/2008     Page 50 of 60

533 F. Supp. 2d 397, *; 2008 U.S. Dist. LEXIS 7908, **

of claim 1, a "means for identifying a particular user logged on to said remote computer through said computer terminal" (emphasis added), further supports the notion of user [**16] and terminal as two distinct concepts. ('608 Patent, col. 4). Furthermore, the '608 Patent specification notes that part of the purpose of the patent is to satisfy the "wish" or "desire" of "users" to customize his or her user interface, such wishes or desires capable of being held only by persons, not computer terminals. ('608 Patent, col. 1).

In addition, NewLook does not contain the third element of the '608 Patent's Claim 1. Plaintiff has pointed to two Lansa documents and the deposition testimony of Lansa Senior Product Specialist Eamon Musallam ("Musallam") as establishing the proposition that New-Look allows function keys to be mapped by user and the particular screen displayed.

Lansa documents state that "[i]f authorized, business users may tailor to suit individual preferences," (PTX 5 at LAN. 096), [*409] and "[k]eyboard remapping to corporate standards or personal preference readily accommodated," (PTX 5 at 0735). When asked at his deposition whether end users can remap their keyboards, Musallam stated that "I would say that the end user has an option or the developer has an option to allow the end user to do some basic keyboard mapping." (Musallam Dep. 44-45). Musallam also answered [**17] affirmatively when asked, "[i]n the same application but for different screens of information, could a single function key have different functions?" (Musallam Dep. 49).

However, even accepting ResQNet's interpretation of Musallam's testimony, the evidence shows that New-Look lacks the ability to map key function to specific screens. Musallam clarified at trial his deposition testimony, noting that the ability to map function keys by screen would come from the green screen application, not from NewLook. (Trial Tr. 446). To the extent New-Look allows function key remapping, changes apply to all screens globally. (Trial Tr. 368, 444; PTX 21 at LAN 7541).

As discussed more fully in the next section, a developer can use NewLook's Identify tool to identify a particular screen by picking a NewLook Screen ID that appears on only one screen. [1] However, there is no evidence that NewLook gives the developer the ability to remap the function keys for a particular screen chosen with the Identify tool.

---

1   While the very name of the. term "screen ID" may appear to connote identification of individual screens, the record is clear that a NewLook Screen ID is actually a search string, chosen by the developer, [**18] not an output of an algo-

---

rithm designed to identify unique screens. (Trial Tr. 303-04).

## B. NewLook Directly Infringes the '075 Patent

[HN4]To prove direct infringement, ResQNet must establish by a preponderance of the evidence that "every limitation set forth in the asserted claim is found in the accused product, either literally or by a substantial equivalent." Wolverine World Wide, Inc. v. Nike, Inc., 38 F.3d 1192, 1196 (Fed. Cir. 1994).

Under the preferred embodiment of the '075 Patent,

> the P[ersonal] C[omputer] employs an algorithm -- that is not limited to but may be of the type described in the '961 Patent -- to generate a unique screen ID for each screen of information downloaded from the mainframe. The generated screen ID is then compared with a table of screen IDs that has been previously downloaded from a communications server in order to determine the appropriate customized GUI screen. If the table downloaded from the communications server does not contain a match for the generated screen ID, a default GUI screen is displayed.

ResQNet IV, 2006 U.S. Dist. LEXIS 85613, at *6-7 (citing '075 Patent, col. 3-4).

While the preferred embodiment specifies a particular mode of implementing claim [**19] 1 of the '075 Patent, it is the claim itself, as construed by ResQNet I and ResQNet II, that must guide the Court in determining whether NewLook infringes the '075 Patent. See Teleflex, Inc. v. Ficosa N. Am. Corp., 299 F.3d 1313, 1326 (Fed. Cir. 2002) ("That claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims.") (quoting Raytheon Co. v. Roper Corp., 724 F.2d 951, 957 (Fed. Cir. 1983)); see also ResQNet II, 346 F.3d at 1383 ("The particular screen recognition algorithm used is not critical . . . .") (quoting '075 Patent, col. 4).

[*410]   NewLook contains each of the elements of Claim 1. First, the claim charts "[t]he method of communicating between a host computer and a remote terminal over a data network . . . ." ('075 Patent, col. 4). NewLook is designed to run with an AS/400 host computer and end user terminal. (PTX 5 at 192, 496).

The first element of Claim 1 is "establishing a first communication session between said terminal and a communications server via a first communications chan-

nel." ('075 Patent, col. 5). The evidence demonstrates that PCs running NewLook connect to a server. (PTX 5 at 163, [**20] 494, 731).

The second element of Claim 1 is "downloading, from said server to said terminal, communications software for communicating between said terminal and said host and a plurality of specific screen identifying information." ('075 Patent, col. 5). The overrides selected by the developer -- including the NewLook Screen IDs chosen by the developer for use with the Identify tool -- are stored on the server in the "SID file" or "dynamic design repository." (Trial Tr. 301-02). The evidence demonstrates that running NewLook enables PCs to download communications software and the SID file from the server. (PTX 4 at 146-47; PTX 5A LAN 496-97; Trial Tr. 71-72). Further, the NewLook Screen IDs chosen by the developer and contained in the SID file are "sensitive to row/column positions." (PTX 5 at LAN 170). If used to identify unique screens in the manner discussed below, the SID file contains "at least two pieces of specific screen identifying information." (Joint Pretrial Submission "Stipulations of Law and Fact Agreed to by All Parties" P 10) (defining "a plurality of specific screen identifying information").

The third element of Claim 1 is "utilizing said communications software to [**21] implement a second communications session between said terminal and said host via a second communications channel independent of said server." ('075 Patent, col. 5). The evidence demonstrates that NewLook includes a terminal emulator [2] and may be set up using a network installation, where the software initiates a second communications session with the host via a 5250 datastream. (PTX 4 at 146-47; PTX 5A LAN 496-97; PTX 21 at LAN 6131; Trial Tr. 71-72, 128-30).

> 2   "[A] terminal emulator . . . allows a PC, or a computer, to emulate the functions of what used to be called before a hard-wired terminal. There were hard-wired terminals that connected directly into the . . . host computer. And that capability now is emulated on a PC." (Trial Tr. 70).

The fourth element of Claim 1 is "receiving a screen from said host to said terminal." ('075 Patent, col. 5). NewLook is designed to facilitate the receipt of such green screens. (PTX 5 at LAN 18).

The fifth and sixth elements of Claim 1 are

> if said received screen matches one of the plurality of specific screen identifying information, displaying a customized GUI screen; and

> if said received screen does not match one of the plurality of specific screen [**22] identifying information, displaying a default GUI screen.

('075 Patent, col. 5). These elements require an algorithm that recognizes the screen based on the information downloaded from the mainframe. See ResQNet II, 346 F.3d at 1383-84.

As discussed above, NewLook's dynamic architecture automatically generates a GUI, or "best guess" for each incoming screen. (PTX 3 at 60-61). Absent any overrides pre-programmed by the developer, for each green screen downloaded, [*411] NewLook will display only this "default GUI." (PTX 4 at 113-14).

However, a developer can use NewLook's Identify tool to override the default GUI automatically generated by NewLook's dynamic recognition engine. (Trial Tr. 303). To do so, the developer selects a trigger text (a NewLook Screen ID) and a desired action to be taken if the trigger text is found; NewLook searches each green screen as it is downloaded from the mainframe for the NewLook Screen ID and performs the specified. action if the NewLook Screen ID is found. (DTX 64 at 6; Trail Tr. 302-07).

A developer can use the Identify tool to make changes to a single screen by selecting a NewLook Screen ID that is unique to only that screen. (Trial Tr. 383-91; PTX 5 at LAN [**23] 170, LAN 171, 715). Furthermore, the evidence demonstrates that the makers of NewLook encouraged developers to use the Identify tool as a way of uniquely identifying a screen. (PTX 5 at 715).

After a developer has identified a NewLook Screen ID, NewLook employs a process whereby the program will check each green screen downloaded for the presence of each NewLook Screen ID in a step-by-step fashion. As described by Kay,

> [NewLook] goes in for each [override] to see should I make the changes that this override specifies. If it doesn't [find that the override applies to the green screen], it moves on to the next one. If it [finds that the override applies to the green screen], it makes the changes and then moves on to the next one.

> . . . .

> For each override, [NewLook] is going through and seeing whether the information just received from the AS/400

Case 1:05-cv-00422-GMS     Document 596-2     Filed 05/29/2008     Page 52 of 60

533 F. Supp. 2d 397, *; 2008 U.S. Dist. LEXIS 7908, **

computer contains the trigger text, the [NewLook] [S]creen ID, for each override. If it does, [NewLook] applies the changes.

(Trial Tr. 377-78).

This iterative process of examining the downloaded green screen for each NewLook Screen ID, one-by-one, to determine whether an override should be implemented constitutes a "step-by-step problem-solving procedure, [**24] especially an established, recursive computational procedure for solving a problem in a finite number of steps." ResQNet I, 2002 U.S. Dist. LEXIS 16667, at *25 n.3 (defining "algorithm").

The NewLook software and accompanying instructional material provide a method for accomplishing each element of Claim 1 of the '075 Patent. [3] Accordingly, NewLook directly infringes the '075 Patent.

> 3   Though the Identify tool does not assign each green screen a unique number (or a "screen ID," as defined in ResQNet I, 2002 U.S. Dist. LEXIS 16667, at *28, and included in the '961 Patent), ResQNet II made clear that infringement of the '075 Patent does not require use of the method of the '961 Patent:
>
> > Even though the '961, '608, and '075 patents claim similar (but not the same) subject matter, the '075 patent does not share the genealogy of the other two patents. . . . [T]his court detects no reason to construe the '075 claims as identical to similar claim terms in the other two patents.
>
> ResQNet II, 346 F.3d at 1383.

### C. NewLook Indirectly Infringes the '075 Patent

[HN5]To establish indirect infringement, "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he [**25] knew or should have known his actions would induce actual infringements." Manville Sales Corp. v. [*412] Paramount Sys., Inc., 917 F.2d 544, 553 (Fed. Cir. 1990).

No direct evidence of infringement by any third party was presented by ResQNet. However, [HN6]indirect infringement can be proved through circumstantial evidence. See Moleculon Research Corp. v.

CBS, Inc., 793 F.2d 1261, 1272 (Fed. Cir. 1986). In Moleculon, the relevant claim was construed as "a method for restoring a 2 x 2 x 2 composite cube." Id. The Federal Circuit affirmed the district court's conclusion that the plaintiff had proved infringing acts through "circumstantial evidence of extensive puzzle sales, dissemination of an instruction sheet teaching the method of restoring the preselected pattern with each puzzle, and the availability of a solution booklet on how to solve the puzzle." Id.

As in Moleculon, there exists substantial circumstantial evidence that third parties used NewLook in manner that would infringe. NewLook's online help system provided instructions to developers for using the Identify tool to uniquely identify a particular screen. (PTX 5 at 715). The NewLook Getting Started Guide specifically instructed developers [**26] on how to use overrides to generate a customized GUI for individual screens. (PTX 5 at LAN 171). In fact, NewLook generates an error message if a NewLook Screen ID applies to more than one green screen, further evidence that the software is intended to allow developers to identify particular screens. (PTX 5A at 716, 726).

Accordingly, ResQNet has carried its burden of demonstrating infringing acts sufficient to establish indirect infringement of the '075 Patent, and knowledge on the part of Lansa of such acts. See Manville, 917 F.2d at 553; Moleculon, 793 F.2d at 1272; see also Mickowski v. Visi-Trak Corp., 36 F. Supp. 2d 171, 175, 180 (S.D.N.Y. 1999) (finding inducement, despite noninfringing uses, because written documentation distributed with computer product showed how to practice the patented method).

### D. The Sale of NewLook Version 1.0 Prior to the '075 Patent's Critical Date Does Not Invalidate the '075 Patent

[HN7]Persons are not entitled to patents if "the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States . . . [**27] ." 35 U.S.C. § 102(b).

[HN8]A patent claim is invalid if an embodiment of the claimed invention was both (1) subject to commercial offer for sale in the United States; and (2) ready for patenting more than one year before the patent application date. See Pfaff v. Wells Elecs., 525 U.S. 55, 67-68, 119 S. Ct. 304, 142 L. Ed. 2d 261 (1998). The party asserting the bar bears the burden of demonstrating its application by clear and convincing evidence. See Ferag AG v. Quipp Inc., 45 F.3d 1562, 1566 (Fed. Cir. 1995).

An invention was "on sale" if the claimed invention was embodied in the thing sold or commercially offered for sale. See Group One, Ltd. v. Hallmark Cards, Inc., 254 F.3d 1041, 1046-47 (Fed. Cir. 2001). It is not required that a sale was actually made; the essential question is whether or not there was an attempt to obtain commercial benefit. See id. The claimed invention is ready for patenting when there is reason to believe it would work for its intended purpose. See Evans Cooling Sys., Inc. v. General Motors Corp., 125 F.3d 1448, 1450 (Fed. Cir. 1997).

The evidence establishes that NewLook version 1.0 was placed on sale in the United States prior to the '075 Patent critical date of July 10, 1996: Look Software offered [*413] [**28] NewLook version 1.0 for sale to Specialty Software on June 24, 1996. (DTX 64 at 1; Trial Tr. 456).

The only area of disagreement is whether NewLook version 1.0 is an embodiment of the '075 Patent. Lansa has failed to show by clear and convincing evidence that NewLook version 1.0 contained two elements of Claim 1: communications software and an ability to function with a host and server.

The phrase "communications software" was not construed in either ResQNet I or ResQNet II. Plaintiff's expert witness, Dr. Dowling, interpreted "communications software" to mean "communication software that is used for subsequent communication between the terminal and the host." (PTX 7, Appendix IV at 2). Lansa's expert witness, Charles Gibson ("Dr. Gibson"), testified that "communications software" refers to "downloading the program from the server along with some of the files." (Trial Tr. 512).

The evidence that NewLook version 1.0 contained "communications software" or could facilitate communication between the host and server is scant. The NewLook version 1.0 help manual, which was prepared in February or March 1996, states that "[i]f you are on a network, your users just need access to the NewLook [**29] and application directory containing any NL files." (DTX 66 at 3; Trial Tr. 357-59, 462). A marketing solicitation dated June 24, 1996, stated that NewLook "analys[es] the data stream, typically via call to the emulator's HLLAPI application programming interface," demonstrating communication between the program and the client's emulator. (DTX 64 at 9). Kay testified that NewLook version 1.0 had "the communications," but did not specify what that meant. (Trial Tr. 432). Marcus Dee ("Dee"), managing director of Looksoftware, testified that NewLook version 1.0 lacked an emulator but could download third-party emulator software from a server. (Trial Tr. 475-76).

In light of the evidence that NewLook version 1.0 lacked emulation software, Lansa has failed to clearly and convincingly demonstrate that that version had the communications software that is part of Claim 1 of the '075 Patent. Accordingly, the '075 Patent is not invalid due to the on-sale bar. See Pfaff, 525 U.S. at 67-68.

E. The '075 Patent is Not Invalid For Obviousness

[HN9]A patent is invalid for obviousness under 35 U.S.C. § 103 where the claimed subject matter would have been obvious to one of ordinary skill in the art at the time [**30] the invention was made. See KSR Int'l Co. v. Teleflex Inc., __ U.S. __, 127 S. Ct. 1727, 1734, 167 L. Ed. 2d 705 (2007).

To find obviousness, a person of ordinary skill in the art may combine two or more items of prior art. The Court will determine the following factual matters, each of which must be established by clear and convincing evidence to establish obviousness:

> a. The scope and content of the prior art relied upon;

> b. The difference or differences, if any, between claim 1 and the prior art;

> c. The level of ordinary skill in the art at the time the invention of the '075 Patent was made; and

> d. Objective factors indicating non-obviousness.

See id.

[HN10]A patent is rendered invalid where the claimed invention was described in a "printed publication" before the critical date. Astrazeneca AB v. Mylan Labs., Inc. (In re Omeprazole Patent Litig.), 490 F. Supp. 2d 381, 510 (S.D.N.Y. 2007); [*414] 35 U.S.C. § 102(b).

Lansa has claimed that the '075 Patent is invalid as obvious in light of the prior art. Specifically, Lansa witness Gibson testified that the instruction manual for "Flashpoint" software teaches GUI customization based on screen recognition, the heart of claim 1 of the '075 Patent. (Lansa Proposed Findings of Fact and Conclusions of Law, at 61; [**31] Trial Tr. 502-03; DTX 25).

[HN11]To qualify as a "printed publication" under 35 U.S.C. § 102(b), a prior art reference "must have placed the claimed invention 'in the possession of the public' more than one year before the date of the patent

Case 1:05-cv-00422-GMS    Document 596-2    Filed 05/29/2008    Page 54 of 60

533 F. Supp. 2d 397, *; 2008 U.S. Dist. LEXIS 7908, **

application." In re Omeprazole, 490 F. Supp. 2d at 510 (quoting Eli Lilly & Co. v. Zenith Goldline Pharms. Inc., 471 F.3d 1369, 1375 (Fed. Cir. 2006)). The party seeking to introduce the reference "should produce sufficient proof of its dissemination or that it has otherwise been available and accessible to persons concerned with the art to which the document relates and thus most likely to avail themselves of its contents." In re Wyer, 655 F.2d 221, 227 (C.C.P.A. 1981).

Here, the only evidence that the Flashpoint references were in the public possession prior to the critical date were the dates on the documents themselves. DTX 25, entitled "Flashpoint: The first step to cooperative processing" appears to be a user manual and bears the date of October 1991 on its first page, page 1342. DTX 26, [4] entitled "Flashpoint Tutorial," on page ZEP 1090, bears a copyright date of 1993 and an apparent date marking of "JAN93." However, no witness testified, nor was [**32] any evidence presented, that either of these documents was ever published or disseminated to the public. Indeed, DTX 26 expressly notes that the manual is "an unpublished work and is considered a trade secret belonging to the copyright holder." DTX 26 at ZEP 1090.

    4  DTX 26 was not admitted into evidence itself, however it was contained within DTX 11, which was admitted.

In the absence of any evidence that the Flashpoint references were published prior to the critical date, Flashpoint cannot be considered prior art for the purposes of invalidating the '075 Patent. See Norian Corp. v. Stryker Corp., 363 F.3d 1321, 1330 (Fed. Cir. 2004) (affirming, district court finding that publication was not established in the absence of specific evidence of actual availability and despite testimony that "general practice" was to make such documents available); In re Omeprazole, 490 F. Supp. 2d at 519-21 (finding date on document, citation by European Patent Office, and "scant testimony" insufficient evidence of publication on successive documents); AT&T Corp. v. Microsoft Corp., No. 01 Civ. 4872 (WHP), 2004 U.S. Dist. LEXIS 2192, at *21 (S.D.N.Y. Feb. 17, 2004) (finding expert declaration that document [**33] in question was almost certainly disseminated insufficient to demonstrate publication). [5]

    5  Lansa has argued that ResQNet's submission of Flashpoint references in an Information Disclosure Statement ("IDS") during the reexamination of the '961 Patent on May 1, 2002 constituted an admission that Flashpoint was publicly disseminated. However, [HN12]"mere submission of an IDS to the USPTO does not constitute the patent applicant's admission that any reference in the IDS is material prior art." Abbott Labs. v. Baxter Pharm. Prods., 334 F.3d 1274, 1279 (Fed. Cir. 2003); accord 37 C.F.R. § 1.97(h) (2006). Furthermore, ResQNet's submission in 2002 does not speak to Flashpoint's dissemination prior to the '075 Patent's critical date of July 10, 1996.

Disregarding Flashpoint as prior art for purposes of invalidation of the '075 Patent, no evidence was presented that any prior art disclosed the fifth and sixth elements of [*415] Claim 1, i.e., screen identification and display of customized GUI. Accordingly, Lansa has failed to meet its burden of demonstrating obviousness by clear and convincing evidence. See KSR, 127 S. Ct. at 1734.

## F. The '075 Patent is not Invalid for Lack of Operability or Enablement

[HN13]A [**34] patent that claims an impossible invention fails to meet the utility requirement of 35 U.S.C. §§ 101 and 112 and is invalid for lack of operability. See Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1571 (Fed. Cir. 1992). "To violate § 101 the claimed device must be totally incapable of achieving a useful result." Id.

Lansa has claimed that the '075 Patent is inoperable for recognizing particular screens because it calls for matching to a "plurality of specific screen identifying information," rather than all screen identifying information. ('075 Patent, col. 5). Lansa is correct that it is possible that the invention described in the '075 Patent would fail to identify a unique screen in the event that screen identifying information outside the invention's purview were altered. However, an invention need not solve every problem identified in the prior art. See Resonate Inc. v. Alteon Websystems, Inc., 338 F.3d 1360, 1367 (Fed. Cir. 2003) (citing Honeywell, Inc. v. Victor Co. of Japan, 298 F.3d 1317 (Fed. Cir. 2002)). Lansa has not demonstrated that the invention-described in the '075 Patent is "totally incapable" of recognizing unique screens, and thus has failed in [**35] its burden of showing inoperability. Brooktree, 977 F.2d at 1571.

[HN14]"To be enabling under § 112, a patent must contain a description that enables one skilled in the art to make and use the claimed invention." Atlas Powder Co. v. E. I. du Pont de Nemours & Co., 750 F.2d 1569, 1576 (Fed. Cir. 1984). Lansa has argued that the '075 Patent is unenabled because the specification does not explain how to generate a default GUI. The specification states that "if the list of screen IDs previously downloaded . . . does not contain the ID granted, then a default GUI screen is presented. . . . The default screen may be of any type desired by the user." ('075 Patent, col. 4).

Case 1:05-cv-00422-GMS    Document 596-2    Filed 05/29/2008    Page 55 of 60

533 F. Supp. 2d 397, *; 2008 U.S. Dist. LEXIS 7908, **

Lansa's only evidence to support lack of enablement is the testimony and report of Gibson, who went on to opine that the concept of default GUI generation was known in the prior art and "obvious to those skilled in the art." (PTX 22, July 20, 2004 Report PP 56-57). When, as here, the only evidence tends to undermine the claim, the party asserting lack of enablement has failed to provide clear and convincing evidence of facts establishing lack of enablement. See Johns Hopkins Univ. v. Cellpro, Inc., 152 F.3d 1342, 1359 (Fed. Cir. 1998).

**Damages**

*A.* [**36] *ResQNet is Entitled to Compensatory Damages*

[HN15]"Upon finding for the claimant the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. [HN16]Deciding how much to award as damages is not an exact science, and the methodology of assessing and computing damages is committed to the sound discretion of the district court." State Indus., Inc. v. Mor-Flo Indus., Inc. 883 F.2d 1573, 1576-77 (Fed. Cir. 1989).

The parties appear to agree that the appropriate method of calculating damages is to determine the reasonable royalty, since lost profits cannot be proved.

[*416] [HN17]In the absence of an established royalty rate, courts should determine a reasonable rate based upon the result of a hypothetical negotiation between the two parties at the time the infringement began. See Rite-Hite Corp. v. Kelley Co., 56 F.3d 1538, 1554 (Fed. Cir. 1995). "The key element in setting a reasonable royalty after determination of validity and infringement is the necessity for return to the date when the infringement began." Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152, 1158 (6th Cir. 1978). [**37] [HN18]To guide the royalty determination, courts typically look to the fifteen factors enumerated in Georgia-Pacific Corp. v. United States Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970), modified by 446 F.2d 295 (2d Cir. 1971). These factors are:

> 1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
>
> 2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

> 3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
>
> 4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
>
> 5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promot[e]r.
>
> [HN19]6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value [**38] of the invention to the licensor as a generator of sales of his non- patented items; and the extent of such derivative or convoyed sales.
>
> 7. The duration of the patent and the term of the license.
>
> 8. The established profitability of the product made under the patent; its commercial success; and its current popularity.
>
> 9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.
>
> 10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.
>
> [HN20]11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.
>
> 12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.
>
> 13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented

Case 1:05-cv-00422-GMS    Document 596-2    Filed 05/29/2008    Page 56 of 60

533 F. Supp. 2d 397, *; 2008 U.S. Dist. LEXIS 7908, **

elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion [**39] testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such [*417] as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily. trying to reach an agreement; that is, the amount which a prudent licensee -- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention -- would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

Georgia-Pacific, 318 F. Supp. at 1120.

ResQNet offered the testimony and expert report of Dr. Jesse David ("Dr. David"), a senior consultant at the National Economic Research Associates who holds a Ph.D. in Economics from Stanford University. Lansa did not offer expert testimony on the issue of damages.

In his thorough analysis, Dr. David applied each of the Georgia-Pacific factors and concluded that an appropriate reasonable royalty rate for use of the patents-in-suit was 12.5 percent. (PTX 8, July 14, 2004 Report ("David Report"), at 13). The key factor driving [**40] Dr. David's ultimate conclusion was the first, the royalties ResQNet received for actual licenses of the patents-in-suit. (David Report, at 5-7). Of the remaining fourteen factors, Dr. David found two having an upward influence, one a lower influence, and eleven a neutral effect. (David Report, at 13).

Without offering any expert testimony of its own, Lansa has made two primary arguments in opposition to Dr. David's rate calculation. First, many of the ResQNet licenses Dr. David used to set his baseline did not license the patents-in-suit. Second, Dr. David failed to account for other software that could be bundled with the infringing software.

The determination of the outcome of a hypothetical negotiation is by its very nature an imprecise art. However distinguishable the other ResQNet patents considered by Dr. David may be, the record reveals no other, more analogous patents to use in setting a baseline for the royalty calculation. Dr. David reached the 12.5% figure by taking into account the differences between the actual ResQNet licenses and the hypothetical license between Lansa and ResQNet. Indeed, the only calculable royalty rate below 12.5% was reached by virtue of settlement [**41] with Zephyr and without the assumption, present for the purposes of hypothetical negotiation, that the '075 Patent was valid and enforceable. [6]

  6 The royalty rate agreed upon in the Zephyr settlement is the subject of a protective order.

Lansa has argued that the "IBM bundled software" licensing rate of one to three percent is applicable, but has not cited any part of the record to support its contention that that license is analogous, or even that it was in fact one to three percent. (Lansa Mem. of Proposed Findings of Fact and Conclusions of Law, at 69). Moreover, Dr. David accounted for bundling as best as the record allowed by considering the "straight patent licenses" (where no code was licensed) granted to Seagull and Zephyr. (David Report, at 6-7). That Lansa itself considered both Seagull and ResQNet to be direct competitors to NewLook further supports the notion that such licenses are analogous. (PTX 21 at LAN 7539, LAN 7541; Trial Tr. 63-65).

None of the licenses considered by Dr. David is a perfect approximation of the hypothetical license between ResQNet and Lansa. The licensing agreements ResQNet reached with IBM, Hummingbird, Crystal Point, ICOM, and Ericom between 1998 [**42] and 2002 each involved licensing of [*418] ResQNet's software or code, and each involved rates higher (some substantially so) than 12.5%. (David Report, at 5-6). ResQNet's only two straight patent licenses, one of which was lower than 12.5%, were granted in the shadow of litigation, and without the assured validity of the '075 Patent. (David Report, at 6-7). Dr. David's conclusion that the reasonable rate lies between these two categories' averages (and closer to the lower one) is well-reasoned and supported in the record. In fact, by omitting the upfront payments present in the majority of ResQNet licenses, Dr. David's methodology is actually biased in favor of lowering the estimated reasonable royalty. (Trial Tr. 31).

In the absence of any contrary expert testimony, and because Lansa's criticisms of Dr. David's report are unsupported by the evidence, 12.5% constitutes a reasonable royalty rate.

Aside from the appropriate' royalty rate, the parties disagree on the appropriate revenue amount to which the rate should be applied.

In his initial report, Dr. David calculated Lansa's revenue from NewLook sales for November 1998

Case 1:05-cv-00422-GMS    Document 596-2    Filed 05/29/2008    Page 57 of 60

533 F. Supp. 2d 397, *; 2008 U.S. Dist. LEXIS 7908, **

through July 2004 to be approximately $ 3.3 million, with associated [**43] maintenance fee revenue of $ 497,000 for the same time period. (David Report, at 13). Dr. David obtained these numbers by extrapolating from revenue estimates given in deposition testimony by former Lansa employee John Nannenhorn ("Nannenhorn"). In a supplemental report prepared on January 25, 2007, Dr. David revised his estimates, based on documents received from Lansa, to arrive at software revenue of $ 4.0 million from November 1998. through March 2007, and maintenance revenue for the same period of $ 6.2 million. (PTX 8, January 25, 2007 Report ("Revised David Report"), at 2).

Lansa President John Siniscal ("Siniscal") testified that Dr. David's estimate of total maintenance fee revenue was "grossly overstated," and that the actual figure for that period was "about $ 2.5 million." (Trial Tr. 267). Lansa produced no evidence that Dr. David's calculations of underlying software sales were inaccurate. Instead, Lansa criticized Dr. David's methodology for failing to examine each individual invoice for NewLook sales (subsequently provided en masse to the Court by ResQNet as PTX 24 after trial without interpretation or tabulation) and for including sales to customers outside the United States. (Lansa Mem. of Proposed Findings of Fact and Conclusions of Law, at 68).

With [**44] respect to revenues from the sales of the NewLook software itself (as distinguished from NewLook maintenance fees), in the absence of any testimonial or documentary evidence presented by Lansa disputing Dr. David's estimates, the figures stated in the Revised David Report are adopted. Because NewLook infringed only the '075 Patent, the period to which the royalty will be applied began on September 25, 2001 (the date on which the '075 Patent was granted), rather than November 3, 1998, as assumed by Dr. David. Accordingly, the total revenue for NewLook sales from September 25, 2001 through March 31, 2007 is found to be $ 1,893,870. [7]

> 7 This figure is derived from Exhibit 4 to the Revised David Report and represents the sum of product revenues for fiscal years 2003 through 2007, plus product revenue for fiscal year 2002 multiplied by the fraction (177/365), to account for the fact that Lansa's fiscal year begins in April of the previous calendar year. (Revised David Report, Ex. 4, at n.1).

There remains the question of whether any of these revenues should be excluded because they represent sales outside of the United States. [HN21]"It is the general rule [*419] under United States patent law that no [**45] infringement occurs when a patented product is made and sold in another country." Microsoft Corp. v.

AT&T Corp., ___ U.S. ___, 127 S. Ct. 1746, 1750, 167 L. Ed. 2d 737 (2007). Lansa has argued that foreign sales (in Latin America, the Caribbean, and Canada) account for between ten and thirty percent of total software sales revenue. (Trial Tr. 263). Siniscal testified that its Canadian office typically handled sales within Canada, and that sales in Latin America and the Caribbean were all sold via distributors. (Trial Tr. 273-74). However, the only documentary evidence shows that sales outside of the United States were conducted via the Lansa main office in Chicago, contradicting Siniscal's testimony. (See, e.g., PTX 24, at 100825 (sale to Mexico), 10828 (sale to Curacao), 100874 (sale to Canada)). In Microsoft, the Court found that the plaintiff did not infringe where the items sold were copies, made abroad, of software which originated in the United States. 127 S. Ct. at 1760. Here, there is no evidence of foreign replication of the software. Instead, the software is sold as a CD-ROM to individual customers, and the only credible evidence in the record shows that the sales are consummated in the United [**46] States. (Trial Tr. 262; PTX 24).

Accordingly, these "foreign" sales fall within the purview of American patent law, and ResQNet is entitled to receive a royalty on them.

The final area of dispute with regard to damages pertains to the maintenance fees charged NewLook customers. Lansa charged each customer who purchased NewLook a surcharge equal to fifteen percent of the NewLook software price as a "maintenance fee" for the first year. (Trial Tr. 265). This first year charge was mandatory, and customers had the choice of whether to renew their maintenance agreement with Lansa each subsequent year, at the same annual rate. (Trial Tr. 265). Typically, 80 percent of customers renewed the maintenance agreement each year. (Trial Tr. 265).

While Lansa does not dispute Dr. David's calculations for NewLook maintenance revenue for fiscal years 2005 and 2006, Siniscal testified that the actual figures for fiscal years 2002, 2003, 2004, and 2007 were below Dr. David's estimates. [8] Siniscal testified that maintenance revenue for fiscal year 2002 was $ 355,000, fiscal year 2003 was $ 394,000, fiscal year 2004 was $ 349,000, and fiscal year 2007 was $ 360,000. (Trial Tr. 268). Lansa introduced no documentary [**47] evidence to support this testimony.

> 8 As noted above, only revenues earned after the '075 Patent's operative date of September 25, 2001 are relevant for damages calculations.

Dr. David calculated the maintenance revenue for fiscal years 2002 through 2004 by multiplying estimated NewLook software sales revenue for each year by 1.553, the ratio of maintenance to software revenue for April

2004 through November 2006. (Revised David Report, at 2). While the Court accepts Dr. David's estimates for software sales, Dr. David's methodology for determining early maintenance revenues was fundamentally flawed and biased toward obtaining a higher number.

As Dr. David testified, the NewLook maintenance fee is "cumulative over time": as software is sold each year, the growth rate of maintenance revenue would be expected to outstrip the growth in software sales revenues. (Trial Tr. 45). Accordingly, as NewLook software sales dropped from an estimated $ 725,000 in 2002 to as low as $ 176,392 in 2005, the relative size of maintenance revenue would be expected to grow as a matter of pure mathematics, absent a sea change in maintenance renewals. [*420] Simply applying the ratio of software-to-maintenance revenues [**48] for the low-sales years of 2005 through 2007 to the prior, much more successful years of 2002 through 2004 would likely substantially overstate maintenance revenues.

Though uncorroborated by any documentary evidence in the record, Siniscal's testimony therefore represents the strongest evidence of the maintenance fee revenues for fiscal years 2002 through 2004. [9]

> 9  David's estimate for maintenance revenue for fiscal year 2007 represents an extrapolation from the first eight months of that year. Because this calculation does not suffer from the same flaws as David's 2002 through 2004 estimates, the Court will adopt David's estimate.

Thus, Lansa's maintenance revenue for the period from September 25, 2001 through March 31, 2007 was $ 2,124,029. [10] The total revenue to which the reasonable royalty should be applied is $ 4,017,899, resulting in a damages award of $ 502,237 through March 31, 2007.

> 10  This figure is derived from Exhibit 4 to the Revised David Report for fiscal years 2005 through 2007, and Siniscal's testimony for fiscal years 2002 through 2004. The fiscal year 2002 number was multiplied by the fraction (177/365), to account for the fact that Lansa's fiscal year begins in April [**49] of the previous calendar year. (Revised David Report, Ex. 4; Trial Tr. 268).

### B. Lansa's Infringement of the '075 Patent was not Willful

[HN22]Under 35 U.S.C. § 284, a court finding infringement may award enhanced damages up to three times the amount of actual damages. In the absence of statutory standards, the Federal Circuit has held that such damages are appropriate upon "a showing of willful in-

fringement." In re Seagate Tech., LLC, 497 F.3d 1360, 1368 (Fed. Cir. 2007) (en banc). The Seagate court heightened the threshold showing required for a finding of willfulness by holding that "proof of willful infringement permitting enhanced damages requires at least a showing of objective recklessness." Id. at 1371.

First, the patentee bears the burden of demonstrating by clear and convincing evidence "the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent." Id. The infringer's state of mind is not relevant to this initial objective inquiry. See id. If the objective component has been satisfied, the analysis shifts to the subjective knowledge of the infringer: the patentee must then demonstrate that "this objectively-defined risk (determined [**50] by the record developed in the infringement proceeding) was either, known or so obvious that it should have been known to the accused infringer." Id.

Here, the evidence does not support a finding of objective recklessness on the part of Lansa. While Lansa was ultimately unsuccessful in defending against infringement or proving invalidity with regard to the '075 Patent, its arguments in these areas were substantial, reasonable, and far from the sort of easily-dismissed claims that an objectively reckless infringer would be forced to rely upon. Despite submitting a supplemental brief addressing the Seagate decision, ResQNet has pointed to no evidence of objective recklessness, but instead relied only on subjective evidence. (Pl. Response to Lansa's Submission of Supplemental Authority, at 5). Accordingly, ResQNet has failed to establish willful infringement of the '075 Patent.

### C. ResQNet is Not Entitled to an Injunction

[HN23]A plaintiff seeking a permanent injunction must satisfy a four-factor [*421] test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to [**51] compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction. The decision whether to grant or deny injunctive relief rests within the equitable discretion of the district courts, which must be exercised consistent with traditional principles of equity, in patent disputes no less than in other cases governed by such standards. See eBay Inc. v. MercExchange, L.L.C., 547 U.S. 388, 126 S.Ct. 1837, 1839, 1841, 164 L. Ed. 2d 641 (2006).

ResQNet has made no showing to establish any of the four factors for a permanent injunction. There is no evidence that any injury to ResQNet by sales of New-

533 F. Supp. 2d 397, *; 2008 U.S. Dist. LEXIS 7908, **

Look is irreparable. There is no showing that remedies at law are insufficient or that a remedy in equity is warranted given the balance of hardships. Accordingly, the issuance of an injunction is not appropriate.

### Sanctions

The Court previously awarded Rule 11 sanctions against ResQNet and its counsel, in an amount to be determined after trial. See ResQNet III, 382 F. Supp. 2d at 457. [HN24]A court has significant discretion in determining what sanction should be imposed [**52] for a Rule 11 violation. See Rule 11 Advisory Committee Note.

Factors to be considered in determining an appropriate sanction, cited by both parties, include:

(1) The good faith or bad faith of the offender;

(2) The degree of willfulness, vindictiveness, negligence, or frivolousness involved in the offense;

(3) The knowledge, experience and expertise of the offender;

(4) Any prior history of sanctionable conduct on the part of the offender;

(5) The reasonableness and necessity of the out-of-pocket expenses incurred by the offended person as a result of the misconduct;

(6) The nature and extent of the prejudice, apart from out-of-pocket expenses, suffered by the offended person as a result of the misconduct;

(7) The relative culpability of client and counsel, and the impact on their privileged relationship of an inquiry into that area;

(8) The risk of chilling the specific type of litigation involved;

(9) The impact of the sanction on the offender, including the offender's ability to pay a monetary sanction;

[HN25](10) The impact of the sanction on the offended party, including the offended person's need for compensation;

(11) The relative magnitude of sanction necessary to achieve the goal or goals [**53] of the sanction;

(12) Burdens on the court system attributable to the misconduct, including consumption of judicial time and incurrence of juror fees and other court costs;

(13) The degree to which the offended person attempted to mitigate any prejudice suffered' by him or her;

(14) The degree to which the offended person's own behavior caused the expenses for which recovery is sought;

[*422] (15) The extent to which the offender persisted in advancing a position while on notice that the position was not well grounded in fact or warranted by existing law or a good faith argument for the extension, modification or reversal of existing law; and

(16) The time of, and circumstances surrounding, any voluntary withdrawal of a pleading, motion or other paper.

In re Omega Trust, 120 B.R. 265, 270-271 (S.D.N.Y. 1990).

The conduct for which sanctions were awarded was ResQNet's "filing an amended complaint containing claims with regard to the '127 Patent and the '608 Patent after having expressly determined that the prior belief of infringement of those patents had been incorrect and in the absence of any intervening developments from which a good faith basis to bring the claims might be inferred." ResQNet III, 382 F. Supp. 2d at 457. [**54] On September 25, 2001, ResQNet represented to Lansa that it would remove those patents from this litigation, yet its Amended Complaint, filed on December 4, 2001, asserted infringement of these two patents. See id. at 455. ResQNet informally withdrew the '127 Patent infringement claim prior to June 2002, and formally withdrew all infringement claims when it stipulated to the consent judgment on November 5, 2002. See id.

Thus, for almost a year Lansa was faced with defending against claims that ResQNet had already determined to be meritless.

ResQNet's voluntary withdrawal of the two patents at issue, the lack of prior history of sanctionable conduct, and the risk of chilling candid settlement discussions must be balanced against the threat imposed by the amended complaint, its economic effect, and the costs presumably incurred during this period. Under these circumstances, an award of $ 100,000 is appropriate.

### Conclusion

533 F. Supp. 2d 397, *; 2008 U.S. Dist. LEXIS 7908, **

For the reasons stated above, judgment will be entered in favor of the Plaintiff with regard to the '075 Patent and the Defendant with regard to the '608 Patent.

Damages in the amount of $ 402,237 (net of the $ 100,000 sanction) are awarded to ResQNet. Lansa shall provide [**55] ResQNet with data indicating its New-Look software sales and maintenance fee revenues since March 31, 2007 to which the reasonable royalty rate of 12.5% shall be applied. Submit judgment on notice.

It is so ordered.

**New York, NY**

**February 1, 2008**

/s/ Robert W. Sweet

**ROBERT W. SWEET**

**U.S.D.J.**