IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ENERGY TRANSPORTATION GROUP, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-422 (GMS) |
| | ) | |
| SONIC INNOVATIONS, INC., et al, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW WITH RESPECT TO DAMAGES OR, IN THE ALTERNATIVE, FOR A REMITTITUR OR NEW TRIAL ON DAMAGES**

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)

OF COUNSEL:

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, DC 20001-4413
202.408.4000

1201 North Market Street
P.O. Box 1347
Wilmington, DE 19899
302.658.9200
mgraham@mnat.com
jparrett@mnat.com
*Attorneys for William Demant Holding A/S,*
  *WDH Inc., Oticon A/S, Oticon, Inc.,*
  *Bernafon AG, and Bernafon LLC*


MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 North Market Street

OF COUNSEL:

David J. Cushing
William H. Mandir
Carl J. Pellegrini
Brian K. Shelton
SUGHRUE MION, PLLC
2100 Pennsylvania Ave., N.W.
Suite 800
Washington, DC 20037
202.293.7060

P.O. Box 1347
Wilmington, DE 19899
302.658.9200
dreid@mnat.com
jcincilla@mnat.com
*Attorneys for Widex A/S and*
  *Widex Hearing Aid Co. Inc.*

Dated: May 29, 2008

# TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................1

II.    DEFENDANTS' JMOL IS NOT A *DAUBERT* CHALLENGE .........................................2

III.   THE COURT SHOULD GRANT DEFENDANTS' JMOL WITH RESPECT TO
       DAMAGES.......................................................................................................4

       A.     Contrary to ETG's Contentions, There is No Substantial Evidence to
              Support the Juror's Excessive Damages Award ........................................5

       B.     There Was No Evidence Presented by ETG to Establish The Portion of
              Defendants' Profits That Could Be Attributed to the "Use" of the Asserted
              Patents.....................................................................................................10

       C.     The Multitude of Comparable Hearing Aid Licenses and Other Relevant
              Evidence Under *Georgia-Pacific* Substantially Support a Reasonable
              Royalty of No More Than 0.5 % ...........................................................16

IV.    IN THE ALTERNATIVE THE COURT SHOULD ORDER A REMITTITUR
       OR NEW TRIAL ON DAMAGES..................................................................19

V.     CONCLUSION.............................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*Dowagiac Mfg. Co. v. Minn. Moline Plow Co.*,
    235 U.S. 641 (1915)...................................................................................................... 10

*FMS, Inc. v. Volvo Constr. Equip. N. Am. Inc.*,
    00 C 8143, 2007 WL 844899, at *8 (N.D. Ill. Mar. 20, 2007) ................................... 3

*Fromson v. Western Litho Plate and Supply Co.*,
    853 F.2d 1568 (Fed. Cir. 1988) ......................................................................... 8, 16

*Georgia-Pacific v. Plywood Corp. 318 F. Supp. 1116 (S.D.N.Y. 1970), modified & aff'd, 446
    F.2d 295 (2d Cir.), cert denied, 404 U.S. 870 (1971)*....................................... passim

*Integra Lifesciences I, Ltd. v. Merck KGaA*,
    331 F.3d 860 (Fed. Cir. 2003) ................................................................................. 4

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001) ............................................................................... 8

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
    383 F.3d 1337 (Fed. Cir. 2004) ............................................................................... 8

*Lam, Inc. v. Johns-Manville Corp.*,
    718 F.2d 1056 (Fed. Cir. 1983) ............................................................................... 9

*Lightning Lube, Inc. v. Witco Corp.*,
    802 F. Supp. 1180 (D.N.J. 1992), *aff'd*, 4 F.3d 1153 (3rd Cir. 1993) ...................... 19

*Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*,
    895 F.2d 1403 (Fed.Cir.1990) ............................................................................... 16

*Monolithic Power Systems, Inc. v. O2 Micro International Ltd.*,
    2007 WL 470259 (N.D. Cal. 2007) ........................................................................ 10

*Oiness v. Walgreen Co.*,
    88 F.3d 1025 (Fed. Cir. 1996) ................................................................................. 9

*Pannu v. Iolab Corp.*,
    155 F.3d 1344 (Fed. Cir. 1998) ............................................................................... 2

*Perkin-Elmer Corp. v. Computervision Corp.*,
    732 F.2d 888 (Fed. Cir. 1984) ............................................................................ 3, 4

*Price v. Delaware Dep't of Correction*,
    40 F. Supp. 2d 544 (D. Del. 1999)......................................................................... 19

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*,
 289 U.S. 689 (1933).................................................................................................. 8, 16

*Telecomm Technology Services, Inc. v. Siemens Rolm Communications, Inc.*,
 1999 U.S. Dist. LEXIS 21415 (N.D. Ga. 1999) ........................................................ 9

*Trell v. Marlee Electronics Corp.*,
 912 F.2d 1443 (Fed. Cir. 1990) ................................................................................. 4

*TWM Manufacturing Co. v. Dura Corp.*,
 789 F.2d 895 (Fed. Cir. 1986) ................................................................................... 8

*Unisplay, S.A. v. American Elec. Sign Co.*,
 69 F.3d 512 (Fed. Cir. 1995) ..................................................................................... 8

**Statutes**

35 U.S.C. § 284.................................................................................................................. 10

**Treatises**

Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*,
 85 Tex. L. Rev. 1991 (2007).................................................................................... 11

## I.    INTRODUCTION

Plaintiff ETG's Opposition Brief (D.I. 575) challenges Defendants'[1] Renewed Motion for

Judgment as a Matter of Law ("JMOL") With Respect to Damages or, In the Alternative, for a

Remitittur or a New Trial on Damages ("Defendants' Renewed Motion," D.I. 528) on the basis

of (i) Defendants' Renewed Motion being an "untimely *Daubert* motion" and (ii) the juror's

damages verdict being supported by substantial evidence.[2]  ETG is wrong on both counts.

Defendants' Renewed Motion does not seek to exclude the testimony of ETG's damages

expert, Terry Musika.  Rather, the Defendants seek to set aside the jury's damages verdict as

being unsupported by the weight of the evidence.  As established in the Defendants' Opening

Brief (D.I. 543), there is no substantial evidence to support ETG's damages calculations or the

damages ultimately awarded by the jury.  Mr. Musika's testimony, which confused and

prejudiced the jury with misleading and irrelevant excerpts from a report of the German Federal

Cartel Office (PX 648 (the "German Cartel report"), excerpts attached hereto as Exhibit A) and

which raised assertions about "collusion" in the hearing aid market, does not constitute

substantial evidence.  Mr. Musika also adopted a profits-based approach that was untethered to

any meaningful *Georgia-Pacific* analysis and contrary to any lawfully cognizable, reasonable

royalty determination.

---

[1]  The term "Defendants" encompasses defendants Oticon A/S, Oticon Inc., Bernafon AG, Bernafon LLC, WDH, Inc. and William Demant Holding A/S (collectively "Demant"), and defendants Widex A/S and Widex Hearing Aid Company (collectively "Widex").

[2] As a preliminary matter, Defendants note that a number of exhibits attached to the Declaration of Maya M. Eckstein (D.I. 576) in support of ETG's Opposition are license agreements or excerpts of deposition transcripts that were not presented to the jury and, as reflected on the face of the documents themselves, are confidential.  These exhibits – Exhibits 7, 8, 9, 11, 12 and 13 – therefore should <u>not</u> have been filed as part of the public record and should have been filed under seal.  Defendants have raised with ETG the sealing of exhibits in this case and will be filing a motion with the Court to address this issue.

The weight of the evidence undeniably shows that the jury's damages verdict is excessive and not reflective of a reasonable royalty. ETG's and Audimax's failure to license the patents, the multitude of comparable hearing aid licenses, and other relevant evidence rejected by Mr. Musika would have lead negotiators under a *Georgia-Pacific* analysis to a maximum of 0.5% as a reasonable royalty. However, without the support of substantial evidence, the jury unjustifiably assessed damages against the Defendants at a rate that is approximately up to 10 times greater than what is reasonable and supportable under the law.[3]

This Court should reject ETG's opposition and grant Defendants' Renewed Motion, not on the basis of *Daubert*, but in view of the lack of any substantial evidence to support the jury's excessive damages award. In the alternative, this Court should order a remittitur or a new trial on damages in view of the clear weight of the evidence.

## II.     DEFENDANTS' JMOL IS NOT A *DAUBERT* CHALLENGE

ETG incorrectly characterizes Defendants' Renewed Motion as being an untimely *Daubert* challenge. However, in its Opposition Brief, ETG readily acknowledges that the relevant issue is whether the substantial evidence supports the jury's decision to award ETG $31 million in damages. (ETG Opp'n Br., D.I. 575 at 4.) Contrary to ETG's characterization, Defendants' Renewed Motion does not seek to exclude Mr. Musika's trial testimony or damages calculations on the basis of the *Daubert* standard. Instead, Defendants ask the Court to rule, as a matter of law, that the jury's findings are not supported by substantial evidence. The pivotal question as to whether there is "substantial evidence" addresses the legal requirement that the relevant evidence, when taken as a whole, might be accepted by a reasonable mind as adequate to support the damages award. *See Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998);

---

[3] *See* Defendants' Opening Br., D.I. 543 at 16-21 & n.8.

*Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984). In this case, that legal requirement has not been met.

To support its position, ETG contends that courts routinely reject *Daubert* challenges if they are not timely asserted before or during trial because of the "clear prejudice" to the non-moving party. In light of the facts of this case, however, ETG's arguments are not credible.

First, the cases cited in ETG's Opposition Brief (D.I. 575 at 13) are not applicable to Defendants' Renewed Motion. In all of those cases, the moving party specifically sought application of the *Daubert* test to challenge or exclude an expert's testimony. For example, in the *FMS* case, the moving party sought a new trial on damages because the expert's testimony on lost profits purportedly did not satisfy the *Daubert* standard. *FMS, Inc. v. Volvo Constr. Equip. N. Am. Inc.*, 00 C 8143, 2007 WL 844899, at *8 (N.D. Ill. Mar. 20, 2007).[4] According to the moving party, the court should have stricken the expert's testimony on its own initiative by exercising its "*Daubert* gatekeeper function." *Id*. at *9. Here, however, the Defendants' have not moved to strike Mr. Musika's testimony nor does Defendants' Renewed Motion seek application of the *Daubert* standard. Instead, as acknowledged by ETG, the central issue to be addressed by the Court is whether substantial evidence supports the juror's excessive damages award.

Second, there is certainly no prejudice to ETG. Prior to trial, ETG had a full opportunity to study the reports of Defendants' damages experts, Mr. Charles Donohoe and Dr. Jon Putnam.

---

[4] In *FMS*, the moving party submitted additional arguments for supporting its motion on damages. *FMS, Inc. v. Volvo Constr. Equip. N. Am. Inc.*, 00 C 8143, 2007 WL 844899, at *9-12 (N.D. Ill. Mar. 20, 2007). One of those positions was that the jury's verdict was unsupported by the evidence. *Id*. at *10-11. Despite rejecting the *Daubert* challenge as being untimely, the court considered the moving party's other grounds for its motion and, in particular, separately assessed whether jury's verdict concerning lost profits was reasonable in view of the weight of the evidence. *Id*. at *11-12.

Those reports set forth all of the shortcomings and errors surrounding Mr. Musika's damages calculations. With the aid of Mr. Musika, ETG analyzed those reports and, with the assistance of its trial counsel, ETG deposed Defendants' experts. In short, ETG was fully aware before trial of the issues concerning Mr. Musika's calculations, but decided not to proffer any supplemental proof to substantiate Mr. Musika's opinions or to otherwise correct his methodology.

Ultimately, ETG had the burden at trial to present legally sufficient evidence that a reasonable jury could rely upon to award damages for the asserted infringement of the patents-in-suit. *Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1447 (Fed. Cir. 1990) ("Trell had the burden of persuading the court with legally sufficient evidence regarding the amount that should be awarded as a reasonable royalty."). The jury's damages award can only be upheld if supported by substantial evidence. *Integra Lifesciences I, Ltd. v. Merck KGaA*, 331 F.3d 860, 869, 872 (Fed. Cir. 2003) (reversing denial of JMOL to overturn $15 million award of reasonable royalty damages because record evidence did not support award), *vacated and remanded on other grounds*, 545 U.S. 193 (2004); *see also Perkin-Elmer Corp.*, 732 F.2d at 893. ETG failed to meet this burden through the evidence it marshaled at trial. The unsubstantiated damages theory presented by its expert, Mr. Musika, does not remedy this failure of proof. Moreover, unduly influenced by speculative guesswork of Mr. Musika, the jury arrived at an inflated damages award that is not only greater than a reasonable royalty, but also is unsupported by legally cognizable, substantial evidence.

## III.  THE COURT SHOULD GRANT DEFENDANTS' JMOL WITH RESPECT TO DAMAGES

As established in Defendants' Opening Brief (D.I. 543), there is no substantial evidence to support the jury's excessive damages award of $16 million against Demant and $15 million against Widex. Those awards translate to a royalty rate of approximately 3.9% based on

4

Demant's sales and 4.9% based on Widex's sales. (*See* Putnam, Tr. 1858:7-1860:3 (direct) (Exhibit B includes all pages of the trial transcript referenced herein).) Those rates are up to 10 times higher than the average royalty rates paid by Demant and Widex for licenses to comparable hearing aid technology. (*See* Donohoe, Tr. 1818:12-20 (direct).) On a per patent basis, the jury's verdict is also unjustifiably higher than the HIMPP rate of 3.0% for 20 patent families, which translates to 0.15% per patent family. (Donohoe, Tr. 1818:2-6 (direct).)

The law requires that the jury's verdict be supported by substantial evidence. Contrary to ETG's assertions and the conclusions reached by its expert, such evidence does not exist.[5] Moreover, the only competent and reliable evidence in this case shows that a running royalty of no more than 0.5% would fairly compensate ETG for the asserted infringement of the patents-in-suit.[6]

## A.    Contrary to ETG's Contentions, There is No Substantial Evidence to Support the Juror's Excessive Damages Award

As ETG recognizes, judgment as a matter of law is appropriate when the verdict is not supported by substantial evidence or, in other words, "when reasonable jurors could not have reached the verdict." (ETG Opp'n Br., D.I. 575 at 7.) *See Perkin-Elmer Corp.*, 732 F.2d at 893 ("'Substantial' evidence is such relevant evidence from the record taken as a whole as might be

---

[5] On page 28 of its Opposition Brief (D.I. 575), ETG contends that the jury's verdict is supported by substantial evidence because the jury verdict is "about half of what Musika's testimony would have supported under a substantial evidence analysis." The mere fact that the jury did not award the overly excessive amounts recommended by Mr. Musika, however, does not mean that the jury's verdict is supported by substantial evidence. As established in Defendants' Opening Brief (D.I. 543), neither Mr. Musika's opinions nor the jury verdict are supported by substantial evidence.

[6] A royalty of 0.5% translates to a maximum $2.04 million damages award against Demant and a maximum $1.51 million damages award against Widex. (Donohoe, Tr. 1823:1-11 (direct).) Both of these amounts assume a verdict which entitles ETG to pre-suit damages. (*See* Defendants' Opening Br., D.I. 543 at n.7.)

accepted by a reasonable mind as adequate to support the finding under review.").  Yet, ETG contends that the jury's verdict is supported by substantial evidence in view of the conclusions about "collusion" reached by the German Federal Cartel Office and the Defendants' purported "extraordinary high" profit margins.  (ETG Opp'n Br., D.I. 575 at 16.)  Whether or not these assertions about "collusion" and high profit margins are true, the evidence is still insufficient for a jury to reasonably award $31 million in favor of ETG, and judgment as a matter of law should be entered in favor of Defendants.

First, the German Cartel report (PX 648) is not substantial evidence that any potential lack of competition or "risk of collusion" in the hearing aid industry has **in fact** resulted in artificially lower rates for comparable licenses.  During trial, ETG artfully skirted the Court's directives on the Defendants' motions in limine and used the report to present inflammatory and confusing material to the jury through Mr. Musika's testimony.[7]  A "reasonable mind," however, would not accept the German Cartel report as having any bearing on patent infringement and reasonable royalty damages issues arising in the United States.

As indicated in Defendants' Opening Brief, the German Cartel report makes no findings whatsoever as to whether the **royalty rates paid** for licenses in the hearing aid field are somehow unreasonable or artificially depressed.  (D.I. 543 at 14-15.)  Indeed, the German Cartel report does not identify any of the royalty bearing licenses entered into by Demant or Widex, or even examine whether the average 0.5% royalty rate for those licenses is somehow unreasonable or

---

[7]  For example, Mr. Musika testified: "And, excuse me, I'm not here to say that the participants engaged in any unlawful behavior.  I'm not here to say that they engaged in any antitrust behavior."  (Musika, Tr. 871:14-16 (direct).)  Likewise, Mr. Musika's testimony regarding the German Cartel report's characterization of Defendants' profitability in relation to other industries (Musika, Tr. 876:9-877:20 (direct)), as emphasized by ETG in its closing argument (Steinberg, Tr. 2209:10-22 (closing)), was irrelevant and presented for only one reason – to inflame the jury into rendering an excessive damages award.

artificially low.[8]  ETG's reference to ¶180 of the German Cartel report, concerning "reciprocal license[s] with no fees," is also irrelevant.  ***Royalty free*** cross licenses, which in themselves are often deemed pro-competitive in the United States,[9] are distinct from the ***royalty bearing*** licenses that are highly relevant under *Georgia-Pacific* factor 2.  Finally, despite ETG's attempts to raise confusion about the scope of the German Cartel report, the German authorities were focused on market concentration in the ***German*** market.  The German Cartel report makes no findings whatsoever on competition in the United States, let alone whether there was risk of "collusion" under United States law.  In short, no reasonable jury would discount the Defendants' licenses or consider them not to be the basis of arm's-length transaction simply on the basis of the German Cartel report.

Second, Defendants' purported high profit margins have no bearing on a reasonable royalty determination unless there is substantial evidence on the portion of any profits for the Accused Products that can be attributed to the use of the claimed invention.  It is undisputed that ETG is <u>not</u> entitled, by law, to lost profits or any damages award based on an accounting of Defendants' profits.[10]  Even beyond Mr. Musika's carefully disguised, yet improper, focus on the

---

[8]  Incredibly, ETG implies that certain license agreements (JX 14, 17, 167- collectively Exhibit 7 to the Eckstein Declaration (D.I. 576)) were considered by the German authorities. (D.I. 575 at 18.)  Yet, there is <u>no</u> evidence that these license agreements were analyzed as part of the German Cartel report.  Moreover, these exhibits were <u>not</u> introduced by ETG during trial, there was no trial testimony ***at all*** on these licenses, and they were not even given to the jury (D.I. 526).  ETG cannot rely on evidence not before the jury to support its contentions concerning the German Cartel report or, more specifically, as support for the jury's verdict.  If the jury never saw this evidence, it could not have relied on it. That principle applies not only to the foregoing license agreements, but also to the deposition transcript excerpts (Exhibits 8, 9, 11, 12 and 13 to the Eckstein Declaration) ETG submitted in support of its opposition.

[9]  Defendants' Opening Br., D.I. 543 at 15-16.

[10]  *See* Defendants' Opening Br., D.I. 543 at 6-7 & n.2.

Defendants' profits (*see* Musika, Tr. 851:7-8 (direct) ("What we are getting to is the profits. We are looking for the profits.")), Mr. Musika's calculations regarding the Defendants' profits for the Accused Products fails to provide lawfully cognizable, substantial evidence supporting the excessive damages award in this case.

Initially, ETG's argument that the law and facts require use of actual profits here (ETG Opp'n Br., D.I. 575 at 23-25) is wrong.   The Federal Circuit has made clear that the hypothetical negotiation rule only "recognizes sales ***expectations*** at the time when infringement begins as a basis for a royalty base as opposed to an ***after-the-fact counting of actual sales***." *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001) (emphasis added); *see also Unisplay, S.A. v. American Elec. Sign Co.*, 69 F.2d 512, 518 (Fed. Cir. 1995) ("A reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment.").   Consistent with this requirement, the analysis upheld in *TWM* subtracted overhead expenses from "***projected***" gross profit "to get an ***anticipated*** net profit." *TWM Manfg. Co. v. Dura Corp.*, 789 F.2d 895, 899 (Fed. Cir. 1986) (emphasis added).   Thus, Mr. Musika's calculations utilizing actual rather than anticipated profits is not a lawfully cognizable basis for supporting the jury verdict.[11]

Apparently recognizing this error in his use of actual rather than expected profits, over the Defendants' objections (Musika, Tr. 896:10-900:5) Mr. Musika made a mid-course shift at

---

[11] Mr. Musika's use of actual profits as the basis for determining a reasonable royalty is contrary to the rule that events and facts that occur after the date of the hypothetical negotiation (the so-called "book of wisdom") may be used flexibly "to correct uncertain prophecy," but not so one-sided as to charge the infringer with elements of value non-existent at the time of his infringement. *Fromson v. Western Litho Plate and Supply Co.*, 853 F.2d 1568, 1575 (Fed. Cir. 1988) (*quoting Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698-99 (1933)), *overruled on other grounds by Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337 (Fed. Cir. 2004).

trial.  Using expected profits from certain analyst reports produced by the Defendants, but never

before addressed by Mr. Musika, Mr. Musika opined at trial that a royalty rate of 6.4% was

reasonable.  (Muskia, Tr. 900:-9-901:15 (direct); *see* ETG Opp'n Br., D.I. 575 at 25-26.)

However, for the reasons discussed below in Section B, Mr. Muskia wholly failed to present any

accompanying evidence to establish, as required by 35 U.S.C. § 284 and *Georgia-Pacific* factor

13, that any portion of the Defendants' profits could be attributed to the "use" of the patents-in-

suit.  Thus, even Mr. Musika's mid-trial  attempt to correct his error fails to provide substantial

evidence to support the jury's damages verdict.

ETG's attempt to overcome the unreliability of Mr. Musika's profit calculations also

fails.  No amount of rationalizations on ETG's part (*see*, *e.g.*, ETG Opp'n Br., D.I. 575 at n.15)

can change the fact that Mr. Musika left out at least 20% of the industry in making his

calculations.  (*See* Musika, Tr. 926:11-927:8 (cross).)  And ETG acknowledges, as it must, that

the court in *Telecomm Technology Services, Inc. v. Siemens Rolm Communications, Inc.*, 1999

U.S. Dist. LEXIS 21415 (N.D. Ga. 1999) did preclude Mr. Musika from presenting testimony

based on averaging data from other parties (ETG Opp'n Br., D.I. 575 at n.16) – precisely what he

also did here in making his calculations regarding the operating profit margins.  (*See* Musika, Tr.

862:19-20 (direct).)

ETG cites *Oiness v. Walgreen Co.*, 88 F.3d 1025 (Fed. Cir. 1996) and *Lam, Inc. v. Johns-

Manville Corp.*, 718 F.2d 1056 (Fed. Cir. 1983) in an attempt to justify Mr. Musika's use of data

from other hearing aid companies.  (ETG Opp'n Br., D.I. 575 at 27).  *Lam*, however, concerned a

situation in which the defendant kept inaccurate records regarding the number of infringing sales

(718 F.2d at 1065), which is not the case here.  *Oiness* likewise concerned a lack of records

regarding the number of infringing sales, not product line profitability.  The *Oiness* court

nonetheless found remittitur to be appropriate.  88 F.3d at 1030-31 ("In this case, Oiness purported to meet its burden of proof with mere speculation and guess work.  Any insufficiency in Walgreen's records cannot supplant Oiness's burden to prove lost profits by a preponderance of evidence.").  Here, although they do not keep records of profits per product, Demant and Widex produced all available financial data.  Although, like Dr. Putnam, Mr. Musika could have analyzed that information as it pertains to Demant and Widex, he found it more advantageous to ETG to use the other companies' data to unreliably inflate his profit calculations.  ETG's claim that Mr. Musika lacked the proper data to break down his analysis by Defendant and by Accused Product simply is not an excuse to use financial information of other hearing aid companies.  *See Monolithic Power Sys., Inc. v. O2 Micro Int'l Ltd.*, 476 F. Supp. 1143, 1154-56 (N.D. Cal. 2007).

The final stake in the heart of Mr. Musika's profit calculations is the ***undisputed*** testimony of Dr. Putnam that, using the very method that Mr. Musika applied to the six companies initially sued by ETG, the profit "premium" for the accused products of Demant and Widex is ***negative*** 12%, not the positive 9.2% Mr. Musika found when mixing the data for all of the defendants originally in the lawsuit.  (Putnam, Tr. 1876:5-1877:13 (direct).)  Such wild variance in damages outcomes (based on who ETG decided to sue or to settle with) undermines any measure of confidence that would permit reasonable minds to rely on Mr. Musika's calculations at all.  Reasonable jurors could only disregard that testimony, leaving the verdict in this case unsupported by any evidence, let alone substantial evidence.

### B.     There Was No Evidence Presented by ETG to Establish The Portion of Defendants' Profits That Could Be Attributed to the "Use" of the Asserted Patents

Even if there is some validity to Mr. Musika's profits analysis, the extent of use of an invention must be considered when determining a reasonable royalty.  *See* 35 U.S.C. § 284 (requiring "a reasonable royalty for the ***use*** made of the invention by the infringer") (emphasis

supplied); *Dowagiac Mfg. Co. v. Minn. Moline Plow Co.*, 235 U.S. 641, 648 (1915).  Mr.

Musika's damages calculations, however, did not provide substantial evidence to support any

reasonable determination of the portion of Defendants' profits to be attributed to the use of the

ETG patents in the Accused Products, a key factor in the reasonable royalty analysis recognized

by *Georgia-Pacific* factor 13.[12]

In its effort to sidestep this critical omission, ETG takes issue with the proposition that

*Georgia-Pacific* factor 13 addresses the problem of patent stacking in products, such as hearing

aids, with many intellectual property inputs.[13]  (ETG Opp'n Br., D.I. 575 at 29.)  However,

*Georgia-Pacific* factor 13 goes directly to determining the value of a patent comprising "one

small component of the larger invention."  Mark A. Lemley & Carl Shapiro, *Patent Holdup and

Royalty Stacking*, 85 Tex. L. Rev. 1991, 2040, 2020 & n.75 (2007) ("*Georgia-Pacific* factor 13 is

one of the factors in determining the "relative value of the patented component to the infringing

product.").  Thus, while ETG is correct that *Georgia-Pacific* factor 13 does not explicitly use the

words "patent stacking" (*see* ETG Opp'n Br., D.I. 575 at 29), the issue clearly is implicit in the

*Georgia-Pacific* factor 13 directive to consider "[t]he portion of the realizable profit that should

---

[12] *Georgia-Pacific* factor 13 specifically concerns:

> [t]he portion of the realizable profit that should be credited to the invention as
> distinguished from non-patented elements, the manufacturing process, business
> risks, or significant features or improvements added by the infringer.

*Georgia-Pacific v. Plywood Corp.* 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified & aff'd*,
446 F.2d 295 (2d Cir.), *cert denied*, 404 U.S. 870 (1971).

[13]  ETG's Opposition Brief, while maintaining that the patents-in-suit are "pioneering" (D.I. 575
at 32), provides no evidence that the patents **themselves** are "pioneering," as opposed to the
recognized need in the art to control acoustic feedback.  Further, ETG does not advance any
evidence that establishes that Mr. Musika used the supposed "pioneering" nature of the patents
as part of a *Georgia-Pacific* factor 13 to determine the portion of profit that should be credited to
that patents as opposed to all of the other inputs related to the Accused Products.

be credited to the invention as distinguished from non-patented elements, the manufacturing

process, business risks, or significant features or improvements added by the infringer."

*Georgia-Pacific*, 318 F. Supp. at 1120.

ETG further argues that Defendants did not identify other specific patents whose

technology actually is used in the accused products.  (ETG Opp'n Br., D.I. 575 at 29-31.)  The

testimony of Niels Jacobson, Chairman of Bernafon and President and CEO of Oticon as well as

William Demant Holding, however, was unambiguous in describing that the technology of many

patents are required to produce hearing aids, leading to the problem of royalty stacking in

licensing:

> Q.     I apologize.  There was a question I wanted to ask you in the last line
> of questioning that I failed to.  So I am just going to come back to it.
> You were talking about the percentages, fractions of a percent per
> patent in your industry that are common.  Why is that?  Is there a
> reason why the rates are at that rate?
>
> A.     Yes.  I think it's -- it is clear that there is no single patent for hearing
> aid.  It's all patents that are covering a fraction of something.  It could
> be, as I told you before, the patent on how to make the ear mold.  It
> can be a patent on anti-feedback.  It could be a patent on all other
> elements.  It can be a tube patent.  It can be a filter bank.
>
> All the patents we acquired from 3M, they were important all to
> develop hearing aids.[14]
>
> So if you have to stack, you can say, use this patent and this patent and
> this patent.  If you pay a high rate on each of the patents, then you will
> say, no, no, I will not develop this hearing aid, because, you know,
> when we come to the market, then the patent owners will take all what
> we need to pay our employees.

---

[14]  The 3M patents referred to by Mr. Jacobsen comprise the bulk of the HIMPP portfolio, with
over 200 patents licensed to hearing aid manufacturers to produce products for the hearing
impaired.  (Defendants' Opening Br., D.I. 543 at 3-4.)

> So it doesn't make sense to pay these very high fees on a single patent because you need a number of patents often when you develop a hearing aid.

(Jacobsen, Tr. 970:9-971:71 (direct).)

Likewise, Soren Westermann, the Director of Research of Information Technology and of Intellectual Property for Widex in Denmark, identified at trial, generally and specifically, patented technology currently used in Widex products:

Q.    Okay.  Thank you.  You mentioned the AUD lab and a number of technical people in that AUD lab that was working for Widex.  As a result, has Widex obtained any patents?

A.    Yes, we have been very active with filing our own patents and have done so for many years.

Q.    Are any of those patents used in Widex technology, Widex hearing aids?

A.    Practically all of them.  Some of them are so old that they may not be involved, but practically all of them.  We file patents in order to use them in our product.

Q.    And do any of those patents that you have obtained relate to feedback cancellation?

A.    Yes, a few, yes.

Q.    Can you refer to Exhibit DX-1599?  It should be in the second book that you received, Mr. Westermann.

                                    *  *  *

A.    Yes.  This is Widex's first patent on feedback cancellation.

Q.    Is the technology in this patent in your products today?

A.    The technology that we use today is described in this patent, yes.

(S. Westermann, Tr. 790:11-791:10 (cross).)  Thus, ETG's argument that Defendants presented no evidence that they used other patented technology in their products simply is wrong.[15]

Moreover, in performing the *Georgia-Pacific* factor 13 analysis that Mr. Musika did not perform, Dr. Putnam explained why a reliable *Georgia-Pacific* factor 13 analysis can be made without precise identification of the other specific patented technology in the accused products:

> Q.    So in the first step, counting, what did you count in this case?
>
> A.    In this case, I counted all the patents that are either owned or licensed by each of the parties, by Demant and by Widex and found that they were approximately 100 in each case.
>
> Q.    Does the product actually have to have the patents in it, the technology of the patents?
>
> A.    No.  And this is important to understand.  A patent gives you the right to prevent other people from using your invention, okay?  You don't have to actually use that invention yourself as long as you can prevent somebody else from using the invention to compete with you.  So if I have a patent and I can prevent my competitor from using that invention, then I can make more money than my competitor because they can't use it.  That patent is valuable to me even if I, myself am also not using that invention.

(Putnam, Tr. 1881:8-1882:10 (direct).)[16]

---

[15]  Once again, ETG falls back on the German Cartel report to attempt to fill in the gaps in the evidence, on this occasion citing the claim in the report that manufacturers re-issue new products without any new innovation.  (ETG Opp'n Br., D.I. 575 at 31.)  That paragraph of the report (PX 648, ¶ 64), however, did not address either Demant or Widex, for which ETG cites no evidence of this supposed lack of innovation.  In fact, the evidence at trial was that both companies spend millions of dollars annually on research and development to improve products for the hearing impaired.  (S. Westermann, Tr. 791 (direct), Jacobsen, Tr. 956 (direct).)

[16]  With respect to Dr. Putnam's patent ranking, ETG's citations to the record (ETG Opp'n Br., D.I. 575 at 32) do not support its assertion that the patents-in-suit ranked higher than, for example, the Engebretson patent in the HIMPP portfolio.  To the contrary, the evidence is that Engebretson ranks higher than the patents-in-suit.  (Donohoe, Tr. 1840 (cross).)  In any event, a patent's placement in the patent ranking alone does not yield its proper share of profits.  The profits must be distributed taking into account all of the inputs and their relative importance.

Finally, ETG contends that Mr. Musika took into account ("backed them out of the profit") all of the other factors that increase the profitability of the accused products in making his calculations.  (ETG Opp'n Br., D.I. 575 at 31.)  A number of factors, however, such as product reliability and company reputation, are not "expenses" such that Mr. Musika could have "backed them out of the profit."  And, as discussed in Defendants' Opening Brief (D.I. 543 at 13), Mr. Musika's failure to make any meaningful analysis of the incremental value of the use of the claimed invention was confirmed at trial through the following cross-examination of his prior deposition testimony:

> Q.     Mr. Musika, I will ask the question again.  Isn't it true that you did not do any analysis to try to separate out the value of the use of the invention of the patents in suit?
>
> A.     That is not true, that I did not do any analysis to try and separate out whatever the rest of your question is.
>
> Q.     Would you play 81, please.
>
> "So just to clarify for the record, which part did you do?
>
> "Answer:  I did an analytical review method.  **I didn't go and try to separate out and suggest that the value that's represented by the analytical method is necessarily reflective of just the incremental value of the use of the technology.**"
>
> That was your answer, correct?
>
> A.     That was my answer as it relates to the analytical method.

(Musika, Tr. 934:13-935:4 (cross) (emphasis added).)  ETG does ***not*** even attempt to explain this testimony in its opposition to Defendants' Renewed Motion.

In sum, although Defendants presented cogent and reliable evidence regarding the portion of the profit attributable to the use of the patents-in-suit, ETG did not.  ETG's failure to make

that determination further demonstrates that reasonable minds would not find substantial

evidence supporting the jury verdict in this case.

### C.    The Multitude of Comparable Hearing Aid Licenses and Other Relevant Evidence Under *Georgia-Pacific* Substantially Support a Reasonable Royalty of No More Than 0.5 %

At trial, both ETG's and the Defendants' damages experts testified to performing a

*Georgia-Pacific* analysis and hypothesizing a negotiation between a willing licensee and willing

licensor to determine a reasonable royalty.  (Musika, Tr. 849:13-20 (direct), Donohoe, Tr.

1810:23-1811-6 (direct).)  Mr. Musika's analysis, however, focused on specific *Georgia-Pacific*

factors and ignored others where they did not fit his profits-based theory.  Further, contrary to the

law, Mr. Musika used a one-sided "book of wisdom" approach for his analysis, as opposed to a

*reality check* on the hypothesized negotiations.  *See*, *e.g.*, *Lindemann Maschinenfabrik GmbH v.*

*American Hoist & Derrick Co.,* 895 F.2d 1403, 1407-08 (Fed.Cir. 1990) (court rejects expert's

opinion basing royalties on anticipated profits that bore no relation to and greatly exceeded

actual profits).  Thus, the "book of wisdom" uses experience "to correct uncertain prophecy," not

so as to charge the infringer with elements of value non-existent at the time of his infringement

but "to bring out and expose to light the elements of value that were there from the beginning."

*Fromson*, 853 F.2d  at 1575  (*quoting Sinclair Refining*, 289 U.S. at 698-99 (1933)).  As

discussed above, ETG's opposition only compounds these errors as part of its challenge to

Defendants' Renewed Motion and, therefore, should be rejected.

Contrary to ETG's contention, under a proper *Georgia Pacific* analysis, the weight of the

evidence supports a reasonable royalty of no more than 0.5%.  For example, under *Georgia-*

*Pacific* factor 1, it is uncontested that neither ETG nor Audimax were able to commercialize or

license the patents-in-suit and that, shortly before filing the suit, EKMS also failed to license the

patents despite having a contingency interest in its efforts.  (Donohoe, Tr. 1814:14-1815:8

(direct).)  This evidence, coupled with Mr. Chen's subsequent transaction with his brother indicating a valuation of the ETG patents of no more than $2.5 million, would have a downward impact on the rate (Donohoe, Tr. 1815:9-25-1816-2 (direct)) and is strong evidence against the excessive royalty rates advanced by Mr. Musika and that ultimately awarded by the jury.[17]

      In its opposition, ETG contends that EKMS's work is "irrelevant" because it occurred 2-3 years "after the Defendants already began to infringe the patents."(D.I. 575 at p. 34.)  ETG is wrong.  As established at trial, the earliest sales of the Accused Products occurred in 2001, approximately the same time that EKMS began its efforts and therefore is highly relevant evidence. (Chen, Tr. 439:18-440:2 (direct).)  Moreover, even if EKMS' failure to license did not occur until after the date of the earliest sales of the Accused Products, it forms the same "book of wisdom" that ETG freely applies and accuses the Defendants of ignoring.  (D.I. 575 at 23.)  ETG can not have it both ways and selectively consider subsequent events which allegedly support its damages theory while ignoring other later events which undermine its validity.

      Moreover, under *Georgia-Pacific* factor 2, no reasonable jury would ignore the substantial evidence related to the multitude of comparable hearing aid licenses that ETG attempts to paint as "not reliable."  It is undisputed that the average royalty rate for hearing aid industry licenses paid for Demant and Widex was approximately 0.5%. (Donohoe, Tr. 1818:12-

---

[17]  ETG attempts on pages 34-35 of its Opposition Brief (D.I. 575) to cast the Chen transaction as being "irrelevant" misses the mark.  First, there is no evidence to suggest that valuation by the Chen brothers was higher than $2.5 million.  In fact, as reflected by Mr. Donohoe's testimony, Alex Evans, Vice-President of ETG, testified in deposition that the $1 million bought 50% ownership in ETG.  (Donohoe, Tr. 1848:15-25 (cross).)  That purchase price translates into the $2.5 million maximum valuation for the patents.  (Donohoe, Tr. 1815:10-19 (direct).)  Second, Mr. Donohoe did not use the $2.5 million valuation as a one-sided basis for his reasonable royalty analysis.  Consistent with the "book of wisdom" approach, Mr. Donohoe only used it as a *reality check* on the substantial evidence related to a *Georgia-Pacific* analysis and his reasonable royalty determination. (Donohoe, Tr. 1815:20-24 (direct).)

20 (direct).)  In addition, Mr. Donohoe, who has negotiated well over a hundred licenses,

analyzed all of these agreements and testified that there was no evidence that the agreements

were other than "true and fair commercial transactions." (Donohoe, Tr. 1816:16-1817:5 (direct).)

This testimony is overwhelmingly more probative than that offered by Mr. Musika, who has

been involved in three license negotiations during his entire career. (Musika, Tr. 916:10-13

(cross).)

 ETG contends that Mr. Musika's decision to give the licenses "little or no weight" is

supported by substantial evidence. (ETG Opp'n Br., D.I. 575 at 12.)  Specifically, ETG asserts

that it was proper for Mr. Musika to conclude that the hearing aid licenses were not the result of

arm's-length negotiations in view of the German Cartel report (PX 648).  ETG is wrong for the

reasons discussed above in Section A.  No reasonable jury would discount the Defendants'

licenses or consider them not to be the basis of arm's-length transaction simply on the basis of

the German Cartel report.

 In further support of Mr. Musika's damages theory, ETG points to the HIMPP portfolio

rate as evidence of the specific intent by the Defendants and other members of HIMPP to

"prevent high licenses rates." (ETG Opp'n Br., D.I. 575 at 20.)  What ETG fails to acknowledge

is that the HIMPP license is available to all interested parties in the hearing aid industry on a

non-discriminatory basis.  (JX 180; Jacobsen, Tr. 963:10-22, 964:7-12 (direct), Donohoe, Tr.

1817:13-1818:11 (direct).)  Moreover, there is nothing suspicious about the statement that the

HIMPP 3.0% rate is lower "than a typical royalty" in the hearing aid field (JX 180), when that

rate is analyzed on a per patent family basis.  As testified by Mr. Donohoe, that rate translates to

0.15% per patent family for the 20 patent families in the HIMPP portfolio (Donohoe, Tr. 1818:2-

6 (direct)), which is **lower than** the 0.5% average rate observed in the hearing aid field for royalty bearing licenses.

As addressed above in Sections A and B, there is no substantial evidence to support the jury's damages award and, contrary to ETG's contentions, no such evidence can be gleaned from the damages theory advanced by Mr. Musika. Accordingly, in view of the weight of the evidence, this Court should grant Defendants' Renewed Motion and enter JMOL in accordance with a maximum running royalty of no greater than 0.5 %, or $2.0 million for Demant and $1.5 million for Widex.

## IV.     IN THE ALTERNATIVE THE COURT SHOULD ORDER A REMITTITUR OR NEW TRIAL ON DAMAGES

The court may grant a new trial under Rule 59(a) on a variety of grounds, including: "the verdict is against the clear weight of the evidence; damages are excessive; the trial was unfair; and that substantial errors were made in the admission or rejection of evidence or the giving or refusal of instructions." *Price v. Delaware Dep't of Correction*, 40 F. Supp. 2d 544, 550 (D. Del. 1999); *Lightning Lube, Inc. v. Witco Corp.*, 802 F. Supp. 1180, 1186 (D.N.J. 1992), *aff'd*, 4 F.3d 1153 (3rd Cir. 1993).

Here, even if the Court were to find sufficient evidence to support the verdict under the more strict standard for JMOL, for the reasons discussed above the verdict in this case is against the clear weight of the evidence. A remittitur consistent with the weight of the evidence -- not more than $2.0 million for Demant and not more than $1.5 million for Widex -- is appropriate, with a new trial on damages in the event that ETG does not accept the remittitur. (*See* Defendants' Opening Br., D.I. 543 at 16-21.)

19

## <u>CERTIFICATE OF SERVICE</u>

        The undersigned hereby certifies that on May 29, 2008, the foregoing was caused to be electronically filed with the Clerk of the Court using CM/ECF which will send electronic notification of such filing to all registered participants.

        In addition, the undersigned hereby certifies that true and correct copies of the foregoing were caused to be served via electronic mail on May 29, 2008 upon the following parties:

| | |
|---|---|
| REPRESENTING ENERGY TRANSPORTATION GROUP, INC. | Edmond D. Johnson<br>PEPPER HAMILTON LLP<br>**johnsone@pepperlaw.com** |
| | Brian M. Buroker<br>HUNTON & WILLIAMS LLP<br>**etg@hunton.com** |
| REPRESENTING WIDEX A/S AND WIDEX HEARING AID CO. INC. | Donald E. Reid<br>MORRIS, NICHOLS, ARSHT & TUNNELL LLP<br>**dreid@mnat.com** |
| | William H. Mandir<br>SUGHRUE MION PLLC<br>**wmandir@sughrue.com** |
| | David J. Cushing<br>SUGHRUE MION PLLC<br>**dcushing@sughrue.com** |
| | Carl J. Pellegrini<br>SUGHRUE MION PLLC<br>**cpellegrini@sughrue.com** |
| | Brian K. Shelton<br>SUGHRUE MION PLLC<br>**bshelton@sughrue.com** |

REPRESENTING WILLIAM DEMANT HOLDING
A/S, WDH, INC., OTICON A/S, OTICON INC.,
BERNAFON AG, AND BERNAFON, LLC

Mary B. Graham
MORRIS, NICHOLS, ARSHT & TUNNELL LLP
**mgraham@mnat.com;**
**mbgeservice@mnat.com**

John M. Romary
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
**john.romary@finnegan.com**

C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
GARRETT & DUNNER
**c.gregory.gramenopoulos@finnegan.com**

The undersigned also hereby certifies that on May 29, 2008, true and correct copies

of the foregoing were caused to be served by hand upon the following Delaware counsel:

Edmond D. Johnson
PEPPER HAMILTON LLP
Hercules Plaza, Suite 5100
1313 Market Street
Wilmington, DE  19899-1709

*/s/ James W. Parrett, Jr.*
_____
James W. Parrett, Jr. (#4292)

913379

## V.    CONCLUSION

In view of the foregoing, no reasonable jury could find that ETG is entitled to the

damages awarded by the jury.  The Court should, therefore, grant Defendants' Renewed Motion.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ James W. Parrett, Jr.*

_____
Mary B. Graham (#2256)
James W. Parrett, Jr. (#4292)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200
mgraham@mnat.com
jparrett@mnat.com

*Attorneys for William Demant Holding A/S,*
*WDH, Inc., Oticon A/S, Oticon, Inc.,*
*Bernafon AG, and Bernafon, LLC*

OF COUNSEL:

John M. Romary
C. Gregory Gramenopoulos
FINNEGAN, HENDERSON, FARABOW,
  GARRETT & DUNNER, LLP
901 New York Ave., N.W.
Washington, DC  20001-4413
202.408.4000

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Donald E. Reid*

_____
Donald E. Reid (#1058)
Jason A. Cincilla (#4232)
1201 North Market Street
P.O. Box 1347
Wilmington, DE  19899
302.658.9200
dreid@mnat.com
jcincilla@mnat.com

OF COUNSEL:

David J. Cushing
William H. Mandir
Carl J. Pellegrini
SUGHRUE MION, PLLC
2100 Pennsylvania Ave., N.W.
Suite 800
Washington, DC  20037
202.293.7060

*Attorneys for Widex A/S and Widex Hearing*
*Aid Co., Inc.*

Dated:  May 29, 2008
2346525
1599961v1