EXHIBIT A

GERMAN FEDERAL CARTEL OFFICE
3rd Decision Division

Case No.: B 3 – 33101 - Fa – 578/06



Bilag
2

**DELACOUR**

FOR PUBLICATION

**Merger Control Proceedings**
**Order pursuant to Section 40 paragraph 2 GWB**

### Decision

In the administrative proceedings

1. of Phonak Holding AG, Stäfa, Switzerland;

Party 1.,

- Authorized Counsel:
  Attorneys Gleiss Lutz; Maybachstraße 6; 70469 Stuttgart,

2. of GN ReSound A/S, Ballerup, Denmark,

3. of GN ReSound GmbH Hörtechnologie, Münster, and

4. of GN US Holdings Inc., MN, USA

Parties 2.-4.,

- Authorized Counsel:
  Attorneys Hengeler Mueller, Bockenheimer Landstraße 24,
  60323 Frankfurt am Main,

5. of GN Store Nord A/S, Ballerup, Denmark

Party 5.,

- Authorized Counsel:
  Attorneys Hengeler Mueller, Bockenheimer Landstraße 24,
  60323 Frankfurt am Main

6. of Siemens AG, Munich;

Summoned Party,

on account of a review of a proposed concentration pursuant to Section 36 paragraph 1 of the Law Against Restraints on Competition (GWB), the 3rd Decision Division of the German Federal Cartel Office decided on April 11, 2007:



EXHIBIT

PX 648

digitalization, however, they will not revolutionize the market for hearing aids, but will lead to further improvement and optimization of the existing digital technology (e.g., improved algorithms for signal amplification and processing). Here, hearing aid manufacturers are very close to one another in their developmental expertise; genuine leaps forward in technology are the exception.[9]

(63)    According to the findings, the status of technological development and the concrete possibilities for such development currently lie, in particular, in the areas of:

- High, occlusion-free sound quality (open feed-in)
- Sound Smoothing (suppression of impulse noise).[10]
- Longer battery life,
- DataLearning and Datalogging[11],
- Automatic microphone equalization (e2e)[12]
- Enhancement of directional microphones[13] and
- Wireless transmission process for data and auto-signals, both between two hearing aids (see supra) and between external electronic components and the hearing aid (Bluetooth technology[14], FM systems[15] etc.).

(64)    In part, hearing aid manufacturers are already re-issuing already existing products under new product names without any innovative, potentially patented functionalities being added. With its Perseo product, Phonak has mentioned an example of such a product strategy.[16] Mr. Valentin Chapero Rueda, the CEO of Phonak, in the October 2, 2006 Phonak Analyst Meeting on the occasion of presenting the planned takeover of GN ReSound - referring to the takeover of GN ReSound's product portfolio - employed the concept of a "pseudo-multiplicity of products ":

---

[9] To the same effect also: Siemens, Discussion on 2.22.2007, Discussion Notes, pg. 3 *et seq.*, pg. 795 *et seq.* d.A.

[10] Unpleasant disturbance noises (*e.g.*, paper rustling, dishes clattering, doors slamming) are suppressed and the desired signals are thereby made significantly more audible. The hearing comfort of the hearing aid is increased.

[11] DataLearning: The calibrated algorithms are able to recognize the hearing-impaired person's sound environment and orient the device's programming thereto (self-learning algorithms). Data Logging: Here, the device while being worn stores the particular characteristics of the hearing-impaired person's sound environment. The hearing aid acoustician can take note of this in another adjustment of the device; Siemens, Discussion on 2.22..2007, Discussion Notes p. 3., pg. 795 d.A.

[12] Here, both hearing aids automatically adjust themselves to each other in their sensitivity if environmental noises change. The hearing-impaired person then has the same auditory quality and amplification performance in both ears, SAT Discussion on 2.22.2007, Discussion Notes p. 3; pg. 795 d.A.

[13]Directional microphones pick up signals from the line of sight as well as from the side and rear side of the head, thereby strengthening the capturing of the signal by the microphones (better filtering out of desired signals, key word: "Digital Surround Zoom"); SAT Discussion on 2.22.2007, Discussion Notes p. 3, pg. 795 d.A.; Phonak, Letter of 2.14.2007, Appendix 10, pg. 663 d.A..

[14] Hands-free equipment for telephones, cell phones, wireless communication with audio systems, etc.

[15] See margin note 69.

[16] Phonak, Letter of 2.14. 2007, p. 9, pg. 631 d.A.

MOJ00000260

"The beauty of our approach is that we will create or we will maintain this pseudo-complexity from a product point of view while having a very, very orderly, structured and efficient platform approach underneath. So cash is king, but sometimes also perception is king. So what we are doing is basically cater to the perception of our customers while using the same core technologies".[17]

(65)   In the view of the participants in the combination, what is today determining the market success of hearing aids - besides the aforesaid technological innovations -are purely subjective, for the most part non-patented "feel-good" factors.

"What is decisive, rather, is the interplay of a multitude of "feel-good factors" - often purely subjective too - which for the most part show no connection to patented inventions."[18]

(66)   Under this heading come the miniaturization of cases ("small, ultra-narrow and as light as a feather"), an elegant and modern design, attractive high-tech colors and a heightened aesthetic quality of the hearing aid.[19] What this indicates is that the hearing aid market, in particular over the last few years, has entered into a phase of technical and visual optimization, and bursts of innovation, such as are to be observed in young markets in the development and experimentation phase, are no longer to be expected.

### 3.1.7   Accessories and Other Audiological Devices

(67)   **Accessories** for hearing aids essentially include products for cleaning and care, batteries, remote controls, battery chargers and connection cables. Remote controls allow hearing aid wearers to adjust the device's functioning to the hearing situation at any time.

(68)   As a rule, remote controls are offered by manufacturers as accessories for their own hearing aids and are directly tied to the sales of their own hearing aids. Other accessories are offered by other manufacturers too, outside the hearing aid market. The supplier structure is broader here than in the area of hearing aids. In the area of accessory parts, the concentration does not lead to any merger law concerns based on the very small sales compared to the hearing aid market and its relatively small relevance to the hearing aid market. The market structure would not fundamentally change if sales with remote controls were added to the hearing aid market. The area

---

[17] Exhibit 6 to Oticon Letter of January 5, 2007 in Oticon appendix folder.

[18] Phonak Letter of February 14, 2007, p. 8; pg. 630 d.A.

adjustment software. The advantage of this is that the hearing aid acoustician no longer must enter the client data into each individual adjustment program but, using the interface between NOAH and manufacturer's NOAH adjustment software, may always access the client data regardless of which adjustment program he is working just then. NOAH can be combined with every manufacturer's adjustment program (via a hearing aid adjustment module); the prerequisite for this is that the adjustment software be certified by HIMSA. Also through HIMSA, eTONA, a program to support electronic ordering, and NOAHlink, a hardware accessory to link the computer and the hearing aid, are distributed to hearing aid acousticians. In 2002, it was decided to expand the number of partners with SAT and Starkey. For that reason, a new partnership, HIMSA II, was founded.

(179)   HIMSA I and HIMSA II were registered with the KOM. HIMSA I was granted a Comfort Letter, while the registration of the By-Laws and Partnership Agreements of HIMSA II became ineffective when the 1/2003 Order went into effect.

## 6.1.2.2 Licensing of Hearing Aid Technology

(180)   Especially the leading hearing aid manufacturers, SAT, Phonak and Oticon, are "intertwined" by a series of reciprocal licensing and cross-licensing agreements. This is also true, although to a far lesser extent, for the next following competitors GN ReSound, Widex and Starkey. Reciprocal licenses continue to recur because the manufacturers' focus of development is very similar and for that reason the threat of patent disputes exists over and over again. Companies frequently work on product enhancements for which competitors have already filed patents. The HIMPP-maintained patent database of all patent specifications relevant to hearing aids simplifies identification of corresponding parallel developments. As a rule, the companies then agree on a reciprocal license with no fees.[63] Chiefly licensed are features/function in the process of signal transmission and programming, but so too are hardware components such as the tubes used for Open Feed-in and end pieces or die casting processes for manufacturing hearing aids.[64] In what follows, the collectivization of application-related technology between the oligopolists SAT, Phonak and Oticon shall be discussed using the example of the "Patent Cross License and Option Agreements" entered into between these companies.

(181)   In 2006, Phonak entered into two "Patent Cross License and Option Agreements" (a) with Oticon and (b) with SAT. In them, the parties to the agreement reciprocally grant each other the right to request from the other party to the agreement licenses at no

---

[63] SAT Discussion on February 22,.2007, Note p. 4, pg. 796 d.A
[64] See specifically Phonak Letter of December 12, 2006, Appendices II 5.1 and II.5.2; II.6.1 and II.6.2, pg. 147 *et seq.* d.A.; Siemens Letter of January 05, .2007, Appendix 1, pg. 263 d.A. LO Wettbewerber I; Oticon, Letter of January 05, 2007, Appendix 2A, pg. 161 *et seq.* d.A. LO Wettbewerber I, Appendix volume.

MOJ00000293

EXHIBIT B

Chen - direct

1    Q.    Is this one of the items that you were referring to?

2    A.    Yes.

3    Q.    Let's look at the second paragraph.  It states there,

4    "The ETG filter can be adaptive."

5          Do you see that?

6    A.    Yes.

7    Q.    And in the fifth paragraph, it gives Mr. Dowling's,

8    quote-unquote, "bottom line," doesn't it?

9    A.    I see the paragraph you mean, you are indicating at

10    the bottom, starting with "The bottom line."

11    Q.    It states there, "The bottom line is nobody but a

12    red-faced liar could read these cites and say the '850 does

13    not contemplate adaptive filtering.  On the contrary, it is

14    spelled out in certain claims and objects of the invention

15    and is disclosed in the spec in several places."

16          Do you see that?

17    A.    Yes.

18    Q.    Now, EKMS worked with Audimax in 2001-2002, I think

19    you said?

20    A.    Yes.  In that time range, yes.

21    Q.    Having been involved in this litigation, are you now

22    aware when the defendants first started selling their

23    accused products?

24    A.    I am aware generally of when the defendants started

25    selling products that we think might be infringing.

1    Q.    Was it in the same time frame?

2    A.    Yeah.

3    Q.    Did EKMS ever advise Audimax that modern-day hearing

4    aids did not infringe the '850 or '749 patents?

5    A.    Not to my knowledge.

6    Q.    Did EKMS ever advise Audimax that these defendants'

7    hearing aids did not infringe the '850 or '749 patents?

8    A.    Not to my knowledge.

9    Q.    What did you do after EKMS completed its work?

10   A.    I felt that our patents had value, and I went to

11   engage a law firm, your law firm, to help me get the benefit

12   of our rights and what we invented.

13   Q.    You took EKMS's advice about litigation?

14   A.    I made a decision that it was clear that there was

15   some value to our patents, and I engaged a law firm to help

16   me have my rights addressed, our rights addressed.

17   Q.    After your father passed away, who owned the Chen

18   family assets and companies?

19   A.    My brother, my mother, myself, and our employee

20   pension fund.

21   Q.    Did there come a time when you and your brother

22   decided to split up the family assets and company?

23   A.    Yes.

24   Q.    What assets did you decide to split up?

25   A.    Everything that was owned by ETG.

 1    in-the-ear hearing aid, this size.  The first digital.

 2              And, two years later, in 1997, I think, we

 3    launched the first so-called completely-in-the-canal digital

 4    hearing aid that is so small, in-the-ear hearing aid, that

 5    it disappears in the ear canal.

 6              I have a couple more that I could mention.  That

 7    we, at the beginning of this decade, in 2003, we launched

 8    something we called Camisha.  That is a computer aided

 9    manufacturing of all the shells that has to fit into the ear

10    canal.  It's done by computer.  Very efficient.

11    Q.    Okay.  Thank you.  You mentioned the AUD lab and a

12    number of technical people in that AUD lab that was working

13    for Widex.  As a result, has Widex obtained any patents?

14    A.    Yes, we have been very active with filing our own

15    patents and have done so for many years.

16    Q.    Are any of those patents used in Widex technology,

17    Widex hearing aids?

18    A.    Practically, all of them.  Some of them are so old

19    that they may not be involved, but practically all of them.

20    We file patents in order to use them in our product.

21    Q.    And do any of those patents that you have obtained

22    relate to feedback cancellation?

23    A.    Yes, a few, yes.

24    Q.    Can you refer to Exhibit DX-1599?  It should be in

25    the second book that you received, Mr. Westermann.

Westermann - cross

1    A.    What was the number again?

2    Q.    DX-1599.

3    A.    I got it.

4    Q.    Can you tell me what this exhibit shows?

5    A.    Yes.  This is Widex's first patent on feedback

6    cancellation.

7    Q.    Is the technology in this patent in your products

8    today?

9    A.    The technology that we use today is described in this

10   patent, yes.

11   Q.    Can you give an estimate on the amount of money that

12   Widex spends on research and development on an annual basis?

13   A.    We don't have -- it would be in the order of 20, at

14   least $20 million annually.

15   Q.    Mr. Westermann, when did you first find out about

16   this lawsuit?

17   A.    That was back in, as far as I remember, 2005.  I was

18   called by someone from Oticon, who asked me if I had heard

19   about this lawsuit that was filed in the United States

20   against, it named us and several others.

21   Q.    Prior to finding out about this lawsuit, in 2005, had

22   anyone from ETG ever approached you or Widex alleging patent

23   infringement?

24   A.    Definitely did not.

25   Q.    Prior to this lawsuit, did anyone from Audimax

1    reasonable royalty.

2    Q.    We are using this word royalty.  What does the word

3    royalty mean?

4    A.    I watched the film when court opened.  And it was

5    quite good.  It used the analogy, the comparison to land.

6    It said, well, if you own land and somebody else wanted to

7    use the land, they wanted to use the land to farm on it, if

8    they wanted to use the land to build a road through it or

9    whatever, if you owned the land and somebody else wanted to

10   use it, you would charge them some kind of rent or some kind

11   of fee.  That is what a royalty is.  A royalty is just a fee

12   or it's rent or it's a portion of their revenue and profits,

13   to use your, or ETG's, asset.

14   Q.    Can you give us an example we would all understand

15   about when you would pay a royalty on a patent, for

16   instance, in today's world?

17   A.    Well, Microsoft would be a good example.  Microsoft,

18   every time any of us open up our computer we will see -- we

19   are probably numb to it at this point -- but the screen

20   opens and you always see a little license down there.  That

21   means that Microsoft has built into their price a charge for

22   their intellectual property, which is the source code for

23   the Microsoft Windows operating system.

24        So Microsoft or software companies have a great

25   business.  They don't have a lot of hard assets.  They don't

1    video at the beginning, the Patent Office talked about how

2    there were 300,000, I think, patents filed, and

3    applications, and out of that only 150,000 were issued, even

4    out of those 150,000 issued, there is just a very small

5    portion of those that ever generate any income.  And they

6    are worthless.  Those patents don't have any value.

7              What we are getting to is the profits.  We are

8    looking for the profits.

9    Q.    And did you come to a royalty rate figure in this

10   case?

11   A.    I did.

12   Q.    What was that?

13   A.    8.4 percent of the revenue of the defendants.

14   Q.    Now, what records did you look at to arrive at your

15   damage calculations in this particular case?

16   A.    As I indicated, I have looked at their financial

17   records.  First, I needed to try to identify, indeed, how

18   much sales amount there was with respect to these accused

19   items.  So I was told by counsel and by both sides, I don't

20   think there is any dispute about what are the accused items.

21   So my next challenge was to try to identify, well, how much

22   were they sold for ultimately.  And then after that I tried

23   to get to the profits.

24   Q.    Let's start with the Demant defendants, Oticon.  Can

25   you tell us how you arrived at the sales and revenues for

1          What we need to do and what the law has actually

2    said is that if you are going to develop, if you are going

3    to take a portion of that party's profits, I'm not trying to

4    determine an amount that punishes them.  This is not about

5    punishing them.  It's again a reasonable royalty.  So the

6    first thing I want to do is make sure I leave them with

7    enough money to cover all of their operating expenses.  So I

8    don't take gross profit because that is higher up in the

9    profit-and-loss statement.  That is just deducting the

10   direct costs of goods sold.  I subtract out all the selling

11   expenses, all the marketing expenses, all the overhead

12   expenses, all the general administrative expenses, so I get

13   down to that bottom operating profit.  And the only thing

14   that is really left out from that are interest and taxes.

15   Q.    Did you identify the operating profit for the accused

16   products in this case?

17   A.    I did.

18   Q.    What was that operating profit margin?

19   A.    I calculated the operating profit margin for the

20   accused products at 25.6 percent.

21   Q.    Okay.  I'm sure we've all heard the word "profit

22   margin" in general.  Are there different margins in your

23   world, the accounting world?

24   A.    Yes.  Again, we're talking about from this point

25   forward, I'm talking about an operating profit margin, not

Musika - direct

1    A.    One of the primary sources of information that I used

2    was the report by the German Federal Cartel Office when it

3    studied the hearing aid industry to make a decision as to

4    whether to approve a merger of two of those top nine

5    participants who represent 80 percent of the market.

6    Q.    And in your analysis of looking at this industry, did

7    you come across an organization known as HIMPP, H-I-M-P-P?

8    A.    Yes, I did.

9    Q.    And what is that and what did you determine about that

10   organization as it affects damages?

11   A.    That organization was identified by the German

12   regulators in reviewing the industry as an organization or

13   as an example of the kind of relationships that exist

14   between the participants.  And, excuse me, I'm not here to

15   say that the participants engaged in any unlawful behavior.

16   I'm not here to say they engaged in any antitrust behavior.

17   I'm simply reporting what the German regulator found with

18   respect to the non-arm's-length basis of the agreements.

19          Those agreements can be perfectly lawful.  I

20   don't even have the ability to tell you whether they're

21   lawful or not, but I do have the financial training to

22   know whether they are arm's length or not.  And what the

23   German regulator found was those transactions for a number

24   of reasons, which I think we're going to discuss, are not

25   reflective of a market transaction.

1    we can see what you used to substantiate your conclusions?

2    A.    Yes.

3    Q.    Okay.  Let's share the next slide, please.

4              Okay.  Can you tell us what we're looking at

5    here?

6    A.    These are just a short series of comments out of the

7    report they looked at to cause me to conclude that according

8    to the German regulator, these are not arm's-length

9    transactions.  And this says:  The hearing aid industry is

10   an extraordinarily profitable economic area.  This is true

11   not only in comparison to other industries, but also when

12   compared to the highly profitable medical technology.

13   Q.    Did the German authorities also discuss what is called

14   EBITDA?

15   A.    Yes, they did.

16   Q.    First of all, what is EBITDA?

17   A.    EBITDA is a standard measure or abbreviation of

18   profitability.  It's earnings.  Each one of those letters

19   just stand for one of the expenses that we deduct.  So it's

20   earnings before interest, taxes, depreciation, and

21   amortization.

22              So this is a fairly high level profit, not down at the

23   profit that I looked and used.  But be that as it may, it's

24   comparing a number of other companies to the HIMPP member

25   profits and what this slide shows is that the HIMPP members

Musika - direct

1    have an EBITDA profit margin of 35 percent.

2         Compare that to, for example, names you will

3    recognize:  DaimlerChrysler, 11 percent; BMW, 14 percent;

4    Nestle chocolate, 15 percent; All European Chemical

5    Industry, 15 percent; and of the German clinic operators,

6    18.3 percent.

7              This wasn't selective data.  I used all the data

8    that the German Federal Office Cartel Office provided and

9    we can see that as an industry, the hearing aid industry

10   profits are, as they say, extraordinary.

11   Q.    Okay.  And so what did the German report find about

12   the margins in this industry?

13   A.    They said a number of things.  The key numbers of the

14   oligopoly members are not only very similar but in

15   comparison to other sectors bear witness to an

16   extraordinarily high profitability of the companies.

17             Hence, this earning indicator as well is very

18   comparable and confirms the high profit margins achieved by

19   the members of the oligopoly throughout the world with their

20   products.

21             Keep in mind again that what the German

22   regulators are trying to do is to try to see whether or not

23   the -- it's not just the mere existence of the patent pool.

24   There is nothing wrong on its face of the patent pool if

25   indeed choosing this low royalty rate, that that would

Musika - direct

1    from the appendix of Mr. Donohoe's report, it gives all the

2    industry participants, and it gives their EBIT, earnings

3    before interest and taxes, which is operating profit.

4              And I averaged all those.  I am sure --

5              MR. SCHERLING:  Your Honor, I object as beyond

6    the scope of the report.

7              THE COURT:  Of the report?

8              MR. STEINBERG:  It is an attachment to the

9    report.

10             THE COURT:  Let's discuss this.

11             (The following took place at sidebar.)

12             THE COURT:  Mr. Steinberg, you say it is

13   discussed in an attachment?

14             MR. STEINBERG:  It is an attachment to their

15   experts' reports.  Their analysts reports have.

16             MR. SCHERLING:  I agree with that.  But he did

17   not do this analysis as part of his opinion.  The documents

18   are there, but he did not do this analysis.

19             MR. STEINBERG:  Judge, we didn't get the reports

20   until after his report was filed.

21             He was asked questions about this in his

22   deposition.  He didn't see their expert reports or their

23   attachments until after he filed his report, and there was

24   no opportunity for rebuttal reports.

25             MR. SCHERLING:  He was asked questions about

Musika - direct

1    this in his deposition.  But he did not provide this

2    analysis that he is doing now where he is taking figures

3    from those reports and making calculations.

4            THE COURT:  I think Mr. Steinberg's point is

5    that he was not given an opportunity because of the

6    exchange.

7            MR. SCHERLING:  Mr. Musika prepared a report,

8    did not have this analysis.  Mr. Donohoe prepared a report,

9    it attached these documents he is relying on.  Mr. Musika

10   then was deposed.  I asked him questions about expected

11   profits.  That's why this is an overall fair area of

12   inquiry.  But in responding to those questions, he did not

13   answer with these types of calculations that he is now

14   seeking to talk about.

15           THE COURT:  Is this the first time you have

16   heard from him or had the opportunity to hear from him -- I

17   guess that's two questions.

18           MR. SCHERLING:  About these calculations.  But

19   he has now gone into those reports and taken figures out of

20   those reports from Mr. Donohoe and done math on them.  And

21   he is now relaying those to the jury.

22           THE COURT:  Regardless of the fact that he

23   didn't provide an analysis, as you say, regarding the

24   specific calculations, did you discuss with him at

25   deposition the general precepts that are being elicited from

1    him, the general analysis?

2              MR. SCHERLING:  He referred to the reports, I

3    remember him referring to reports.  I don't recall him

4    referring to precisely this information in the reports.

5              THE COURT:  How are you handicapped?  How would

6    you be, if at all, handicapped in your examination of him if

7    I were to permit him to do that?

8              MR. SCHERLING:  I want to have an opportunity to

9    review those calculations, discuss them with our experts.

10             MR. STEINBERG:  I am sure we could take a break

11   if he needs that.

12             THE COURT:  We don't want to do this on the fly.

13   That is why the rules are set up the way they are now.

14             If your contention is that you are somehow

15   hamstrung by the process that was imposed upon the parties,

16   both parties, by the Court, or that there was something --

17   are you saying that your opponent didn't do?

18             MR. STEINBERG:  Yes, Your Honor.

19             THE COURT:  Go ahead.

20             MR. STEINBERG:  They were the ones that attached

21   these analysts' reports to their expert reports.  Mr. Musika

22   was asked questions during his deposition about those

23   analysts' reports.  If they didn't ask him that exact

24   question that elicited this answer, that is their problem.

25   He reviewed them, they analyzed them.  They had days with

1   this fellow.  They could ask him any question they wanted

2   to.

3                   THE COURT:  These respect attachments that

4   defense provided --

5                   MR. STEINBERG:  To their reports.

6                   THE COURT:  Are your experts in a position to

7   talk about these attachments?  I would imagine they would

8   be.

9                   MR. SCHERLING:  If he is allowed to testify

10  about this, we will have a couple days --

11                  THE COURT:  To get them ready.  Go ahead and

12  make your point.

13                  MR. SCHERLING:  My last point, I did ask Mr.

14  Musika what opinions he had about Mr. Donohoe's and Mr.

15  Putnam's testimony and their opinion, because they were

16  deposed in the interim before his last day of deposition,

17  and he did not raise this specifically as a criticism, these

18  calculations, they were not raised as a criticism.

19                  THE COURT:  I will let you cross-examine him

20  about that.

21                  It seems to me that, the attachments having been

22  submitted by your side, you should be well able to counter

23  them at least probably in cross, I should suspect, but also

24  through the presentation of your case-in-chief.

25                  MR. SCHERLING:  If we include the four experts,

Musika - direct

1    that's correct.  We can do that.  He had an opportunity to

2    bring that up in his deposition and he didn't.  And I asked

3    him specifically about this.

4              THE COURT:  Well, you can ask him about that,

5    too.  I am going to overrule the objection.

6              (End of sidebar conference.)

7              THE COURT:  The objection is overruled.

8    BY MR. STEINBERG:

9    Q.    Mr. Musika, let's go back and refresh where we are.

10   You were talking about some analysts' reports that were

11   attached to the defendants' expert reports and you used them

12   as a check and balance on your reasonable royalty rate?

13   A.    Yes, if I could very quickly summarize.  So I took Dr.

14   Putnam's expected profit rates, because he says it should be

15   expected, not the actual.  That came to 18.6 percent.  And

16   the method I am using is, like the Georgia-Pacific analysis,

17   there is another analysis in what's called the TWM case

18   called the analytical approach.  This is the analytical

19   approach.

20              This isn't something that I am making up again.

21   This comes directly another case.  So what you do is you

22   take the expected profit rate, is what they did in the TWM

23   case, 18.6, and you deduct from it the industry average.

24              I went to Dr. Donohoe's report to get the

25   industry average, because in 1998, the analysts' report

Musika - direct

1    reviews all of the participants.  And I averaged those and

2    came up with an average profit margin of 12.2.  It is on

3    Page 2 of the NyKredit report.

4         For, I believe it was 1998 was the last year it

5    had prior to the 1999 negotiations, there was one market

6    participant whose reporting period didn't have a number for

7    '98, so I used the '97 number.  If they want to check my

8    math to see where I came up with the 12.2 percent.  What I

9    do is I deduct the 12.2 percent, because that is the

10   average, and we once again want to make it reasonable.  We

11   want to leave the defendants with the same profit that the

12   rest of the industry earns.

13        They expected to make 18.6.  The rest of the

14   industry was making 12.2.  Subtract that.  And that produces

15   a royalty of 6.4 percent.

16        Well, it's not 8.4, my opinion.  But it's much,

17   much closer, in terms of the reasonableness, than

18   $2 million.

19        So you could take 6.4 percent times the 723

20   million, and produce approximately a 42 or $43 million

21   damage.  Or you could take my number, which is the 8.4

22   percent, times the 723 million, and produce a $60 million

23   damage.  Or you have their conclusion of two million, even

24   though, as I say, taking their amount and running them

25   through the analytical approach, it comes up to a damage

1    amount of 43 million based on a rate of 6.4 percent.

2    Q.    Let's just recap.  Let's show the next slide, the

3    reasonable royalty rate you arrived at.

4              This slide shows the negotiating range.  How did

5    you arrive at the 8.4?

6    A.    That is the upper bound.  I ultimately decided based

7    on the Georgia-Pacific factor it shouldn't go all the way to

8    the 9.2 percent, but I did leave it at 33 percent.  So it

9    was within the range and based on the outcome of the

10   Georgia-Pacific factors.

11   Q.    Let's apply that 8.4 percent to the Demant defendants.

12   What did you conclude?

13   A.    Again, 8.4 percent times the 417 million produced a

14   $35 million damage number.

15   Q.    Let's apply it to the Widex defendants.  And what did

16   you conclude?

17   A.    8.4 percent times the 306 million produced a damage of

18   25 million.

19   Q.    And did you have a final total conclusion for both

20   defendants?

21   A.    Yes.  There again is the 8.4 percent multiplied times,

22   the key number is in the A plus B column, it is hard to

23   read, but if we go all way down to the bottom of that, that

24   is $723,214,747.

25              That's not a disputed number.  That is the total

Musika - cross

1    A.    Correct.

2    Q.    Did Dr. Levitt ever approach Widex or Demant regarding

3    licensing the patents in this case?

4    A.    I don't know.

5    Q.    And Audimax didn't approach the defendants; correct?

6    A.    I don't know.

7    Q.    And ETG did not approach of the defendants about

8    licensing?

9    A.    I don't know.

10   Q.    You have only been involved as part of a team

11   negotiating a license on three occasions; correct?

12   A.    Me, personally?  My company has been involved many

13   more times but me personally three times, yes.

14   Q.    Am I correct that your report does not identify any

15   common management or ownership among Widex, Demant, ReSound,

16   Siemens, Phonak, Starkey.  Do you identify any common

17   ownership amongst any of the defendants or other major

18   players in the hearing aid industry in your report?

19   A.    That was not a --

20   Q.    Okay.  Let me ask the question again.

21   A.    -- precise question.

22   Q.    Does your report identify any common ownership or

23   management amongst any companies in the hearing aid

24   industry?

25   A.    Sure.

1    to.  You are raising the possibility of a breach not

2    intended.

3                    MR. STEINBERG:  Correct.

4                    THE COURT:  I'll listen carefully.

5                    MR. STEINBERG:  Thank you.

6                    (End of sidebar conference.)

7                    THE COURT:  You may proceed, counsel.

8                    MR. SCHERING:  Excuse me.  If you could briefly

9    display Musika slide 3.

10   BY MR. SCHERING:

11   Q.    Mr. Musika, this slide indicates that nine of the ten

12   largest companies have 80 percent of the market.  That means

13   in this case, in making your calculations in which you

14   determine the defendants profits here, you ignored at least

15   20 percent of the hearing aid industry in making those

16   calculations.

17   A.    Well, as I think my testimony was this morning, the

18   basis of this slide was the Copenhagen University of

19   California report which was issued some time in 1998 and so

20   that this graph depicts, as I indicated, the state of the

21   market in 1998, calculations that I made with respect to my

22   profit margin that covered the period 2001 through 2006.  So

23   I think before either you or I could conclude that I

24   included or excluded companies, we would need to look at

25   what this graph would look like during the 2001 to 2006 time

Musika - cross

1    period.  And I haven't done that so I can't agree or

2    disagree with you.

3    Q.    You have no reason to think that it's different?

4    A.    I have no reason to think that.

5    Q.    You don't know.

6    A.    I have no reason to say it one way or the other,

7    that's right.  But I know that this doesn't get us to the

8    answer that you are looking for.

9    Q.    In this case, you did not do any analysis specifically

10    to compare the defendants' accused versus non-accused

11    digital hearing aids, correct?

12    A.    I tried.

13    Q.    You tried to do a comparison of the accused version

14    non-accused digital hearing aids?

15    A.    Yes.

16    Q.    What did you do?  Okay.

17    A.    I didn't say anything yet.

18    Q.    I'm sorry.

19          MR. STEINBERG:  Your Honor, may the witness

20    answer the question?

21          THE COURT:  You may.

22          MR. SCHERING:  Go ahead.

23          THE COURT:  He has given you permission.  You

24    can go ahead, Mr. Musika.

25    A.    As I indicated, there are levels of production of

1          THE COURT:  You need to look at the deposition,

2      Mr. Steinberg, to see if you agree there is an impeachable

3      statement being made.

4          MR. STEINBERG:  I really don't think it's

5      impeachable, to be honest with you.  I don't think it

6      impeaches anything he said.

7          THE COURT:  I'll let him ask the question.

8          (End of sidebar conference.)

9          THE COURT:  Counsel, you may proceed.

10         MR. SCHERING:  Thank you, Your Honor.

11         THE COURT:  Counsel, you may proceed.

12     BY MR. SCHERLING:

13     Q.    Mr. Musika, I will ask the question again.  Isn't it

14     true that you did not do any analysis to try to separate out

15     the value of the use of the invention of the patents in

16     suit?

17     A.     That is not true, that I did not do any analysis to

18     try and separate out whatever the rest of your question is.

19     Q.     Would you play 81, please.

20              "So just to clarify for the record, which part

21     did you do?

22              "Answer:  I did an analytical review method.  I

23     didn't go and try to separate out and suggest that the value

24     that's represented by the analytical method is necessarily

25     reflective of just the incremental value of the use of the

Musika - cross

1    technology."

2              That was your answer.  Correct?

3    A.      That was my answer as it relates to the analytical

4    method.

5    Q.    Now, Mr. Musika, if we could just -- display Slide 16,

6    please, Musika Slide 16.

7              It's true, isn't it, that you used the

8    25-percent rule to establish that 6.4 percent mark there

9    that is the low end of the negotiating range?

10   A.    Yes.

11   Q.    And you agree that the 25-percent rules is not

12   supposed to be a standalone basis for determining a

13   reasonable royalty?

14   A.    Well, I don't know if it is not supposed to, according

15   to --

16   Q.    According to you.

17   A.    I don't use it as a standalone basis, that's correct.

18   Q.    Okay.  So the 25-percent rule is not supposed to be

19   used as a standalone basis for establishing a reasonable

20   royalty?

21   A.    It's not --

22   Q.    According to you.

23   A.    Now, I didn't say it is not supposed to be used.  I

24   think there is a difference.  It is not a subtle difference.

25   What I think the question is implying -- you will correct

Jacobsen - direct

1    A.    We have two main facilities, one for Oticon and one

2    for Bernafon in Switzerland.    And then we have a specific

3    research center that is not doing product development, but

4    really are looking into the future:    What is it we can do to

5    help the hearing-impaired people in the long run?

6            Maybe it's not possible to do today, but to

7    think about how do we actually in the future compensate for

8    a hearing loss.    That's what they are doing.

9    Q.    How much money each year does the Demant Group invest

10   in research and development?

11   A.    We are each year growing the amount of money we are

12   spending.    The figures you see here is in Danish kroner.

13   And there is about five Danish kroner to one dollar.    This

14   means that in 2006, we have spent 90 million U.S. dollars in

15   research and development.    And in 2007, just ended, we have

16   spent more than a hundred million U.S. dollars in research

17   and development, really to make the products that is for the

18   help of the hearing-impaired people.

19   Q.    What was that figure in 2001 in U.S. dollars?

20   A.    It was about 40 to 50 million dollars in 2001.    So

21   it's growing every year.    And what it is saying up there is

22   that we are growing our cost spent for research and

23   development by 13 percent every year since 2001.

24   Q.    Why are you doing that?

25   A.    We are doing that because it is important for our

Jacobsen - direct

1    that was called a filter bank but is a very important part

2    of the technology for our products during the '90s.  And for

3    one of the patents, we pay half a dollar per unit and for

4    the other patents, we pay four dollars per unit.  Per unit

5    means for the sale of one hearing aid.

6    Q.    Now, we've heard a little bit about an organization

7    called HIMPP.  Are you involved at all in HIMPP?

8    A.    Yes, I'm the chairman of HIMPP and has been the

9    chairman since it was established in 1996.

10   Q.    Can you explain for the jury why HIMPP was formed and

11   what its purpose is?

12   A.    HIMPP was formed when we saw that there was a large

13   group of patents that was, it was important for the future

14   development of hearing aid.  And HIMPP was formed when we

15   got the opportunity to buy those patents and not only for

16   ourself, to secure that we didn't infringe those patents,

17   but also for others in the industry that didn't want to

18   infringe those patents.  We had the possibility to buy the

19   patents and form this partnership around them.  At the same

20   time, also to make sure that we could have a future

21   development of hearing aids in the industry, we made them

22   available on equal terms for all players in the industry.

23   Q.    Now, before HIMPP was formed, when you were looking at

24   the patents that you are talking about that initially went

25   into this HIMPP partnership, who owned those patents at the

1  time?

2  A.    They were owned by 3M, a very big American company.

3  Actually, those who do the yellow Post-It.  It's one of the

4  companies in U.S. that really holds a lot of patents.  And

5  we got the opportunity to buy more than 200 patents for $12

6  and-a-half million.

7  Q.    And were those significant, insignificant patents?

8  How would you characterize them?

9  A.    I think they were crucial for the development of

10  hearing aids.  They were absolutely crucial to develop

11  programmable and digital hearing aids going forward.  Not

12  only one of them but a number of them.

13  Q.    So you purchased about 200 crucial hearing aids

14  patents for a total sum of about $12 and-a-half million?

15  A.    That's true.

16  Q.    Now, what happened to those patents?  Where did they

17  go?

18  A.    They went into the partnership, to the HIMPP

19  partnership.

20          THE COURT:  Can I see counsel a second?

21          (The following took place at sidebar.)

22          THE COURT:  Do us a favor.  Don't restate the

23  testimony, don't restate his answers.  His answers will

24  stand on their own.

25          MR. PANITCH:  Okay.

Jacobsen - direct

1   two businesses.

2   Q.    Do you have an understanding of whether or not that

3   report was relating to the rest of the world or only to

4   Germany?

5   A.    No.   The report was done by Germans about the German

6   market and the situation in the German market.   It's obvious

7   that the German office cannot have any opinion on anything

8   outside the German market.

9   Q.    I apologize.   There was a question I wanted to ask you

10  in the last line of questioning that I failed to.   So I am

11  just going to come back to it.   You were talking about the

12  percentages, fractions of a percent per patent in your

13  industry that are common.   Why is that?   Is there a reason

14  why the rates are at that rate?

15  A.    Yes.   I think it's -- it is clear that there is no

16  single patent that is the patent for hearing aid.   It's all

17  patents that are covering a fraction of something.   It could

18  be, as I told you before, the patent on how to make the ear

19  mold.   It can be a patent on anti-feedback.   It could be a

20  patent on all other elements.   It can be a tube patent.   It

21  can be a filter bank.

22            All the patents we acquired from 3M, they were

23  important all to develop hearing aids.

24            So if you have to stack, you can say, use this

25  patent and this patent and this patent.   If you pay a high

Jacobsen - direct

1　rate on each of the patents, then you will say, no, no, I

2　will not develop this hearing aid, because, you know, when

3　we come to the market, then the patent owners will take all

4　what we need to pay our employees.

5　　　　　　So it doesn't make sense to pay these very high

6　fees on a single patent because you need a number of patents

7　often when you develop a hearing aid.

8　Q.　Mr. Musika testified earlier about -- I don't remember

9　the exact number, it was in the 30 million range for the two

10　Levitt patents as being something that would be reasonable

11　to negotiate in this field.　How does that number comport

12　with your understanding of what is reasonable?

13　A.　I think it's quite obvious that when we had paid

14　$1.8 million to have access to 250 patents that are coming

15　mostly from 3M, you know, it doesn't make any sense.　This

16　is an opportunity.

17　Q.　Let's talk about now the Levitt patents that are the

18　subject of this suit.　At any time before this lawsuit was

19　filed, either in your role as chairman of HIMPP or in your

20　role in the Demant Group companies, do you ever recall

21　hearing about the Levitt patents?

22　A.　I didn't hear anything about the Levitt patents before

23　this suit, before we were sued on these patents.

24　Q.　Do you recall your reaction when you had learned that

25　you were sued?

1    California.

2    Q.          Do you belong to any professional organizations?

3    A.          Yes.  I am a member of the Licensing Executive

4    Society, which is an organization of executives who license

5    patents.  I spoke before them on a number of occasions.  In

6    fact, I was a plenary speaker for them before about 3,000

7    members back about a decade ago.

8               MR. GRAMENOPOULOS:  Your Honor, based on Mr.

9    Donohoe's testimony, we request that the Court recognize him

10   as an expert in the field of patent damages.

11              THE COURT:  Any objections?

12              MR. STEINBERG:  Your Honor, we had our previous

13   objection that you ruled on.

14              THE COURT:  Same ruling.  The Court will receive

15   Mr. Donohoe as an expert.

16   BY MR. GRAMENOPOULOS:

17   Q.          Mr. Donohoe, with respect to damages in this

18   case, what opinions have you formed?

19   Q.          Well, everything is based upon the assumption

20   that you find the patent is valid and infringed.  If you

21   find that, then I find my opinion is that there is a

22   reasonable royalty upon which the damages will be based.

23   Q.          Can you tell the jury what specific opinions you

24   reached concerning damages?

25   A.          Well, I looked primarily at the Georgia-Pacific

1      factors, and focused on the comparable licenses in the

2      hearing aid industry.  And I concluded that you can

3      determine royalties in two fashions, one by virtue of a lump

4      sum as shown on the slide.  That would be a million dollars.

5      And the other would be a running royalty rate, which would

6      be .5 percent.

7      Q.          Why is your opinion different from that

8      presented by ETG's expert, Mr. Musika?

9      A.          Well, Mr. Musika and I both agree that the

10     Georgia-Pacific factors should apply.  However, we differ in

11     that I looked at comparable licenses in the industry to see

12     what rates were paid in those license agreements.

13                 Mr. Musika looked at a profit analysis, which I

14     don't believe is supported by the evidence in this case.

15     Q.          Before reviewing the bases of your opinions, can

16     you tell the jury what materials you considered to form your

17     opinions in this case?

18     A.          Well, this is, as you now know, a very

19     complicated patent litigation.  So there are a voluminous

20     number of documents that I looked at.  Among those are the

21     ETG patents and the asserted claims, the patents of the

22     defendants Widex and Demant in this case here.  I looked at

23     the HIMPP documents.  I looked at documents produced during

24     discovery, including the EKMS documents that you have heard

25     about earlier.  And ETG business documents.

Donohue - direct

1    Georgia-Pacific.  Then these factors are rooted in the real

2    world.  That is what the case law requires, that you take it

3    into real world consideration.  In the hundred-or-so

4    licenses I negotiated, the very most important factor is the

5    first factor which is how much money did the owner of the

6    patent derive from royalties from the patent.

7            The second most important factor is the second

8    one there which is what are the comparable rates paid for

9    patents in the industry?  Of course, I've looked at all the

10   other factors and considered them in my analysis.

11   Q.        Okay.  So to clarify, you considered all 15

12   factors?

13   A.        I have.  Yes, I have.

14   Q.        What did you determine in Georgia-Pacific Factor

15   1?

16   A.        Well, first of all, I determined that there is

17   no established royalty rate for the patents.  And the reason

18   for this is that the patents have never been licensed

19   before.  In the case of Audimax and ETG, there were attempts

20   to license the patents but these failed.

21           Secondly, at the beginning of the negotiation,

22   you also consider what is the commercial embodiment?  Is it

23   something that is attractive that I would want to use in my

24   own business?  And in this case here, there was never a

25   commercial embodiment of the patented invention.

1    I also considered the EKMS attempts to license

2    the patents.  As you might have heard in your earlier

3    testimony here, ETG retained EKMS which is a licensing and

4    consulting firm specializing in the licensing of technology.

5    EKMS was highly incentivized to license patents because it's

6    part of its consideration for doing this work.  It got a

7    percent of the revenue it gained from licensing the patents.

8    And in this case, EKMS failed to license the patents.

9    Q.        What other evidence did you consider?

10   A.        Well, as you can see, that following the EKMS

11   attempt but failure to license the patent, there was the

12   Chen purchase of his brother's interest in ETG.  That

13   purchase was for 50 percent interest in ETG for $1 million.

14   So you might assume then that ETG was worth $2 million.  ETG

15   owned 80 percent of Audimax, so extrapolating that would

16   mean that the value of the patents in Audimax, which is all

17   that Audimax owned, would be about $2 and-a-half million.

18   So that would be the price that would be paid for the

19   patents themselves.

20        Now, I don't consider this to be an example of

21   what a reasonable rate would be for the patents here in suit

22   because the patents are being bought, not licensed, but it's

23   sort of a benchmark or it's a reality check on what level of

24   value there would be for the patents that are here in suit.

25   Q.        What was your ultimate conclusion under GP-1?

Donohue - direct

1    A.              Under GP-1, I felt there would be a downward

2    impact on the rate.

3    Q.              Okay.  Let's turn to Georgia-Pacific Factor 2.

4    What conclusions did you reach under GP-2?

5    A.              Well, here, the hearing aid technology is very

6    complex, much like the Samsung semiconductor technology.

7    There are many patentable features.  I think Mr. Jacobsen

8    testified there are 17,000 patents in the hearing aid

9    industry.  Because of the many complex features of the

10   hearing aid and because of the many patents in the field,

11   there was potential at the time of this negotiation that

12   there would be many licenses to be had.

13              So that would mean that the negotiators would

14   understand that the royalty rates had to be reasonable.

15   They couldn't be real high.

16   Q.              Who did Widex and Demant negotiate licenses

17   with?

18   A.              Well, here is a list of companies.  They license

19   companies in the industry such as Siemens, GN ReSound,

20   Gennum and Phonak.  But they also license outside, people

21   outside the industry such as Etymotic Research and clinical

22   hearing consultants.  They license components manufacturers

23   and individuals and, of course, they license HIMPP.

24   Q.              Do you recall how many total agreements?

25   A.              It's around 29 agreements, of which some were

Donohue - direct

1    cross license agreements.    There were around 16 agreements

2    that were royalty bearing agreements.

3    Q.          Have you seen any evidence that would suggest

4    that these are not true and fair commercial transactions?

5    A.          None whatsoever, no.

6    Q.          Can you explain to the jury a little bit more

7    about the HIMPP license that is outlined there?

8    A.          The HIMPP patents were, the base patents were

9    purchased from 3M Company by ReSound.    3M Company is not in

10   the industry and it had no reason to sell the patents at a

11   low rate.    ReSound, in turn, sold the patents to HIMPP for

12   $14 and-a-half million.    Again, that was a market rate.

13          If you put this in perspective, at that time,

14   there were 20 patent families and so the price per patent

15   family would have been 20 divided into $14.7 million which

16   would be $725,000 per patent family.    A patent family

17   includes the U.S. patent plus it's foreign counterpart

18   patents.

19          HIMPP, in turn, licensed the patents to the

20   industry.    They licensed it in a lump sum form by selling

21   partnerships to companies who wanted to buy in as a

22   partnership.    And that was for $1.8 million.    And again,

23   that was for 20 patent families so the price per patent

24   family was quite a bit lower than $1.8 million.    And these

25   HIMPP patents are basic foundation patents in the industry,

Donohue - direct

1    so they're very important patents.

2              They also offered a license in the alternative

3    at three percent.  And again, if you look at HIMPP as having

4    20 patent families within it, and you divide 20 patent

5    families into three percent, you come up with an average of

6    .15 percent royalty rate per patent family.

7              Subsequently, HIMPP purchased patents from

8    Decibel or from NEC which I understand are very important

9    patents which enhances the value of the portfolio that is

10   licensed either through the lump sum form of $1.8 million or

11   through a running royalty rate.

12   Q.        Among all the licenses you considered, what

13   conclusions did you draw about the royalty rate?

14   A.        Well, all the licenses I considered, there is

15   the average royalty rate among the licenses in the industry

16   paid for by Demant and by Widex was about a half a percent.

17             The maximum royalty paid was 1.4 percent.  That

18   was to Etymotic that had three patent families in it.  So on

19   a per patent family basis, it would be somewhat in the

20   neighborhood of .5 percent, slightly less than .5 percent.

21             For the HIMPP patents, which again are

22   foundation patents in the industry, the rate was 3 percent

23   but bear in mind there are 20 patent families there so on a

24   patent family basis, it was .15 percent.

25   Q.        How many patents in the HIMPP portfolio today?

1     A.            So for Widex, Dr. Putnam will show that the

2     sales covered were 301.9 million dollars.  If you will

3     multiply that by the royalty range I propose, which is

4     .25 percent, up to .5 percent, you would get a damage range

5     of $750,000, up to a maximum of 1.11 million dollars.

6             If you look at the Demant side of it, Demant had

7     higher sales.  As Dr. Putnam will explain, the sales covered

8     by the patents would be 408 million -- 408.9 million

9     dollars.  Again, if you multiply that by the royalty rate,

10    you come up with a royalty of $1.02 million up to 2.4

11    million dollars as the maximum.

12    Q.            Did you reach any other computations to come up

13    with a reasonable royalty?

14    A.            I did.  In the case where you find that the '749

15    patent is not valid or not infringed, so only the '850

16    patent is involved, it had a shorter patent life for the

17    products covered.  So there would be fewer sales involved.

18            So here I took sales figures of 277.7 million

19    and multiplied it by the royalty rates that I propose, and

20    came up with a damage range of $690,000 up to 1.39 million

21    dollars.

22    Q.            Did you reach any other calculations?

23    A.            And with respect to Demant -- can we go back to

24    the previous slide?  With respect to Demant, the damages

25    are -- I am sorry, the sales are 355.6 million dollars.  And

1    analysis that ranks the Engebretson patent, '082 among with

2    other HIMPP portfolio patents in the top 90th percentile;

3    correct?

4    A.          I see that, yes.

5    Q.          So the '850 patent would be ranked higher than

6    those; correct?

7    A.          Well, the '850 patent is in the top 90

8    percentile.  It says here that the Engebretson patent is in

9    the top 90th percentile.  It doesn't say where it is but my

10   understanding is that it is ranked higher than the Levitt

11   patents, within that top 90 percentile.

12   Q.          And the Levitt patent was ranked in the top five

13   percent; correct?

14   A.          Yes, which is in the top 90 percentile, yes.

15   Q.          Now, in your analysis, in the patents that you

16   looked at, were -- the patent licenses, excuse me, that you

17   looked at, did you do anything whatsoever to only look at

18   the top five percent?

19   A.          No, I looked at all of them.

20   Q.          Now, you didn't perform any financial analysis

21   regarding revenues, net revenues, costs or profits, did you?

22   A.          No, I left that up for Dr. Putnam.

23   Q.          And you didn't look at the same things that

24   Mr. Musika looked at, for instance, the profits related to

25   the specific infringing products; correct?

Donohoe - cross

1    Q.          Now, at the time you came to that conclusion,

2    you didn't know anything about the Chen family assets or who

3    owned what in the Chen family; right?

4    A.          No.  What I understood is that earlier in 2001,

5    2002, that there was a division of property among the Chen

6    brothers -- actually, Chen family I guess.  And then in

7    early 2004, there was this purchase of 50 percent ownership

8    in ETG by Kimball Chen.

9    Q.          Now, you have never seen any of the documents

10   related to any of those transactions between Chen family

11   members, have you?

12   A.          No, I never have.  No.

13   Q.          And you never asked for them, have you?

14   A.          I never have, no.

15   Q.          And you don't even know what the $1 million

16   relates to in all of those transactions; correct?

17   A.          Well, sure.  What I understand, and I understand

18   from the deposition testimony of Alex Evans that the $1

19   million was buying one-half percent, I'm sorry, 50 percent

20   ownership in ETG.

21   Q.          But you have never saw any document related to

22   any of those transactions, right?

23   A.          But I haven't seen any documents related to

24   that.  I'm just relying upon deposition testimony of a vice

25   president to Mr. Chen and what he said.

Putnam - direct

1    Q.        Are the sales figures that -- excuse me.  Are

2    these sales figures that you relied on the same ones that

3    Mr. Musika relied on?

4    A.        Yes.

5    Q.        Did Mr. Musika make any mistakes in his

6    calculations?

7    A.        Yes.  You probably recall that Mr. Musika said

8    that he had included sales beyond the expiration of the

9    patent that ought not to have been included, and so they

10   ought to be removed because they are not part of the damages

11   calculation.

12   Q.        And just to confirm, because I believe I may

13   have misspoken last week with Mr. Musika, do you agree that

14   the '850 patent expired on June 26, 2006?

15   A.        That is my understanding, yes.

16   Q.        And the '749 on November 7, '2006?

17   A.        That's right.

18   Q.        And so what are you doing in this document,

19   slide, now with respect to that?

20   A.        Well, this slide relates to Demant sales.  Mr.

21   Musika said they were $417.8 million dollars.  But he

22   included sales through the end of November.  That's

23   incorrect, because the patents expired on November 7th.

24             So the sales that Demant made between

25   November 7th and the end of November amount to $8.19 million

1    dollars, I have taken those out.  That reduces the royalty

2    base to 408.9 million dollars.

3    Q.          Now, I see you have a second correction there,

4    less U.S. Government sales.  What's that?

5    A.          Yes.  Well, Demant is also -- Mr. Donohoe talked

6    about this -- negotiated a contract with the U.S. Government

7    to sell hearing aids to the Veterans Administration.  And I

8    have looked at those sales and examined them, both the

9    spread sheets that summarize the sales as well as the

10   detailed sales records, invoices.  And they total

11   8.3 million dollars.

12          So if they are not -- Demant says that they

13   should not be included because under certain circumstances

14   sales the U.S. Government are not subject to damages.

15          Subtracting those out, that gives a corrected

16   total of four London 400.6 million dollars.

17   Q.          Did you also make corrections in the

18   calculations for Widex?

19   A.          Yes, I did.

20   Q.          Can you explain that, please?

21   A.          Well, again it's the same for Widex.  As Mr.

22   Donohoe said, the number is a little bit smaller, 306.1

23   million.  Again, taking out the sales that were made after

24   November 7, 2006, that's 4.25 million, that leaves a

25   corrected royalty base of 301.9 million dollars.

Putnam - direct

1    Q.        For Widex is there any correction for sales to

2    the U.S. Government?

3    A.        No, there isn't.

4    Q.        Dr. Putnam, we talked about the sales figures as

5    you corrected Mr. Musika's calculations.  Were Mr. Musika's

6    profit calculations in error in any respect?

7    A.        Yes, they were.  He also made several mistakes

8    in calculating profits.

9              I think it easiest to describe them if I do it

10   on a demonstrative.

11             MR. SCHERLING:  Your Honor, may Dr. Putnam step

12   down from the podium to do a demonstrative?

13             THE COURT:  Do you want to position the

14   demonstrative to make it easy for him?

15             MR. SCHERLING:  Yes, thank you.

16             THE COURT:  Ladies and gentlemen, can you see

17   that?  I see the writing is a little small.

18             (Witness steps down from stand.)

19   BY MR. SCHERLING:

20   Q.        Dr. Putnam, what is on that board that you have

21   got there by the jury?

22   A.        Well, you recall, this is a copy of the slide

23   that Mr. Musika put up in his testimony, in which he

24   described something called the premium -- what he called the

25   premium profit margin.  The way he computes a premium profit

1    calculations.

2              MR. SCHERLING:  Dr. Putnam, what we'll do, to

3    simplify this, is if we can display on the Elmo.

4    BY MR. SCHERLING:

5    Q.          This is a document you prepared; correct?

6    A.          That's right.

7    Q.          Okay.  And it has a figure here of a negative 12

8    percent.  First of all, before you explain how you got

9    there, what does that negative 12 percent represent?

10   A.          Well, let me back up where we were before the

11   break.  Mr. Musika is computing what we call a profit

12   premium.  He says that the accused product are more

13   profitable than the other products that aren't accused in

14   this case.  The question is, is that statement true?  Are

15   the accused products more profitable than the other products

16   not accused in this case?  The answer to that question is

17   no.  Using Mr. Musika's method and applying it to the

18   defendants in this courtroom, Demant and Widex, the same

19   data shows the accused products are actually less profitable

20   than the  other products in this case.

21              The amount by which they're less profitable is

22   minus 12 percent.  There is not a 9.2 percent premium, there

23   is actually a minus 12 percent discount relative to the

24   other products.  The reason why that is important is because

25   Mr. Musika's method does not show that the Levitt patents

Putnam - direct

1    caused Demant and Widex to earn more profits than they

2    earned on their other products.

3    Q.        So with Exhibit 9A here, the report that you

4    prepared, the bottom line is if you use just Widex and

5    Demant and apply Mr. Musika's method for the premium, you

6    actually get a negative premium; is that true?

7    A.        Yes, that is right.  Exhibit 9A is simply shows

8    the intermediate calculations that I would have shown on

9    Mr. Musika's exhibit with the baseline sales of the other

10   company's products and so forth, combine them together just

11   the way he did.  Getting to the bottom line, it's not 9.2

12   percent, it's minus 12 percent.  The results are completely

13   reversed.

14   Q.        So, does that mean in this case that we should

15   just apply or subtract 12 percent from Mr. Musika's profit

16   calculations instead of a 9 percent premium?

17   A.        No, there is one other conceptual error.  This

18   whole discussion that we're involved in is talking about the

19   actual profits earned by Demant and Widex over the period

20   2001 to 2006.  But Mr. Musika in his testimony and in the

21   case that he cites, *TWM Manufacturing*, says that what we

22   ought to be looking at is expected profits.  That is

23   consistent with the Federal Circuit case law which says

24   you should look at expected profits, not actual profits.  So

25   what I did was to look at the expected profits of the

1    A.          Well, the method I use is something called

2    count, rank and divide.  It's a three-step process that I

3    used to put a boundary on ETG's claims for their share of

4    the profits.

5    Q.          Before we go on each step, can you explain

6    briefly what that means?

7    A.          So you can think of it as having, it's really no

8    more complicated than what you do when you have folks over

9    for dinner.  You count the number of people that you expect

10   to come to dinner, you rank them according to the size

11   portion they're going to get.  So big people get a big

12   dinner plate, babies get a small dinner plate, and then you

13   divide all your food on your stove according to the ranking

14   of each person.  So your big uncle gets a larger portion and

15   your toddler gets a smaller portion and you do that

16   according to a formula based on what you think they're going

17   to eat.

18   Q.          So in the first step, counting, what did you

19   count in this case?

20   A.          In this case, I counted all the patents that are

21   either owned or licensed by each of the parties, by Demant

22   and by Widex and found that they were approximately 100 in

23   each case.

24   Q.          Does the product actually have to have the

25   patents in it, the technology of the patents?

Putnam - direct

1    A.            No.  And this is important to understand.  A

2    patent gives you the right to prevent other people from

3    using your invention, okay?  You don't have to actually use

4    that invention yourself as long as you can prevent somebody

5    else from using the invention to compete with you.  So if I

6    have a patent and I can prevent my competitor from using

7    that invention, then I can make more money than my

8    competitor because they can't use it.  That patent is

9    valuable to me even if I, myself am also not using that

10   invention.

11   Q.            So after you count the patents, what is the

12   second step?

13   A.            Well, then you need to rank them.  This is, like

14   I said, at the dinner party, you might rank them by a

15   person's size.  Well, patents aren't ranked by size, they're

16   ranked by value, and I ranked the patents in this case using

17   subsequent citations in later patents using a method that

18   actually I illustrated it here with a book called Patents,

19   Citations and Innovations, a Window on the Knowledge

20   Economy.  It's written by a couple professors, Adam Jaffe

21   and Manuel Trajtenberg.  Economists have found if you use

22   the number of citations, that that is correlated with the

23   relative value of the patents.  The more citations a patent

24   receives, the more value it has on average.

25   Q.            And that article you mentioned, you mentioned

1    improvements is not a defense to infringing Dr. Levitt's

2    patent.  In fact, they said, well, our improvement is we

3    do this LMS algorithm 32,000 times a second.  All you are

4    required to do is to do it once.  Just once.  So are they

5    infringing 32,000 times a second?  Maybe that is the answer.

6            Another factor you can take into consideration

7    is praise for the invention.  And certainly you have heard

8    nothing but praise for the invention by awards given to

9    Dr. Levitt for this very invention.

10           Now, they say their damages should be less.  And

11   Dr. Putnam gave you this complicated formula.  You remember

12   when he came up with a minus 12 percent?  I think you will

13   all remember that.  Now, it's almost impossible to come up

14   with a minus 12 percent.  You are talking about companies

15   who have profit margins higher than Mercedes Benz for crying

16   out loud and they have 50 percent profit margins.  And he

17   somehow translates that into minus 12 percent.  I wish he

18   was doing my taxes.

19           But you can't deny the profit margins of these

20   companies.  And the German regulators obtained their

21   reports, interviewed their employees and reported their

22   results, and you will see it in front of you.

23           And, by the way, what is he saying?  Is he

24   saying if Widex is better run than Oticon, then Oticon

25   should pay less for the exact same technology?  That doesn't